# CLYDE&CO

|  |  |
|---|---|
| Clyde & Co US LLP<br>30 S Wacker Drive<br>Suite 2600<br>Chicago, Il 60606<br>United States<br>Telephone: +1 312 635 6973<br>Facsimile: +1 312 635 6950<br>www.clydeco.com<br>siobhan.murphy@clydeco.us | Clyde & Co US LLP<br>The Chrysler Building<br>405 Lexington Avenue<br>16th Floor<br>New York, New York 10174<br>United States<br>Telephone: +1 212 710 3900<br>Facsimile: +1 212 710 3950<br>www.clydeco.com<br>james.rodgers@clydeco.us<br>Direct Line: +1 212 702 6771 |

July 10, 2025

VIA EMAIL ONLY
James L. Chapman, IV
W. Ryan Snow
Mackenzie R. Pensyl
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, VA 23510
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com

Re: In the Matter of COEYMAN'S MARINE TOWING, LLC D/B/A CARVER MARINE TOWING AS Owner and Operator of M/T Mackenzie Rose Case No. 2:24-cv-00490 (United States District Court, Eastern District of Virginia)

Counsel:

We write in response to your letter dated July 3, 2025, in which you propose the voluntary dismissal of the limitation action based on alleged violations of Fed. R. Civ. P. 30. This letter also addresses the issues that were raised during the parties' "meet and confer" on July 8, 2025. As you know, it is our view that in a good faith "meet and confer" the parties' job is to work toward a resolution of their dispute, on the evidence and the merits. We do not view your ultimatum demanding that we dismiss our client's case as meeting this requirement. It is our hope, however, that we may yet have a meaningful discussion of discovery and of the allegations in your July 3 letter.

Your letter claims that we, as Carver's counsel's, have engaged in 'obstructionist tactics' with some unstated prejudice to your clients. Those claims are unfounded and not supported by the record. We believe your letter mischaracterizes Carver's conduct, the actions of Carver's counsel, and the substance of the testimony provided by Carver's 30(b)(6) witness. The following discussion identifies specific inaccuracies in your characterization of this conduct and testimony.

40716748

Clyde & Co US LLP is a Delaware limited liability partnership with offices in
Atlanta, Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New Jersey, New York, Orange County, Phoenix, San Francisco and Washington D.C.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.



July 10, 2025
Page 2



At the meet and confer, we asked that you identify what you are seeking, other than Carver's agreement to concede the limitation, which was your sole proposal. Evanston's counsel, Mr. Nanavati, requested that we propose how to cure the Belt Line's so-called prejudice. Because you declined to provide any guidance as to what information you are missing or how the Belt Line is prejudiced, we undertook to review Carver's 30(b)(6) testimony and summarize it below.

As discussed, Petitioner has provided extensive discovery, including production of years of data that we objected to as irrelevant, but we have honored the Court's production Order (Doc. 50). Carver has since produced numerous supplemental responses and documents to the Belt Line's First Set of Requests for Production. Carver produced its Second Supplemental Response on May 22, 2025, its Third Supplemental Response on May 23, 2025, its Amended Third Supplemental Response on May 28, 2025, its Fourth Supplemental Response on June 9, 2025, its Fifth Supplemental Response on June 11, 2025, and its Sixth Supplemental Response on July 3, 2025. Carver has likewise produced numerous supplemental responses and documents to the Belt Line's Second Set of Requests for Production. Carver produced its Third Supplemental Response on May 6, 2025, its Fourth Supplemental Response on May 22, 2025, its Fifth Supplemental Response on June 9, 2025, and its Sixth Supplemental Response on July 3, 2025. Carver has produced over 1,000 pages of responsive documents (CARVER 944-1957) and nearly 1,900 pages of non-privileged responsive email and text communications (CARVER ESI 0001-1884). Carver has also gone further by engaging and paying third party vendors to retrieve and produce responsive documents. Carver has since produced 3,000 pages of electronic Helm CONNECT records (CARVER TBS HELM CONNECT 0001-2961) from TBS.

In conjunction with the Responses, Carver engaged in a complete and comprehensive search and review of its files and has produced all responsive, non-privileged documents. These efforts were undertaken in good faith to ensure a complete and transparent production. As previously stated, Carver performed its due diligence and conducted a comprehensive search for all responsive documents to Norfolk's discovery requests. Carver has substantially complied with this Court's Order and has satisfied its obligations under the Federal Rules. All materials within Carver's possession, custody, or control that are responsive to your requests and not otherwise protected by privilege have been produced. The few materials that remain outstanding will be provided upon receipt.

### Carver's 30(b)(6) Testimony

You allege that Nick Laraway was an improper 30(b)(6) corporate representative for Carver because he relied on the testimony of Brian Moore and Lenny Baldassare, as well as the documents produced throughout discovery, for topics on which he did not have direct knowledge. The reality is that Mr. Laraway provided extensive relevant testimony. As we had discussed prior to the deposition, he also relied on other testimony and evidence.

Mr. Laraway testified that he had reviewed the 30(b)(6) deposition notice and understood that he was present to testify on behalf of the company with regard to the noted topics. Dep, 7:1-

Clyde & Co US LLP is a Delaware limited liability partnership with offices in
Atlanta, Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New Jersey, New York, Orange County, Phoenix,
San Francisco and Washington D.C.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.



10, 25; 8:1-2. He reviewed hundreds of documents to prepare to testify. *Id.* 111:17-19. This included reading summaries of depositions that were provided to him by counsel. 68:13-18; 70:1; 71:5-6. Although Mr. Laraway could not identify what employees sent e-mail using the Mackenzie Rose email address. However, you know from questioning three out of the five crew members onboard that they had no access to vessel computer or any company email. There are two remaining crew members. Chris Miller is deceased; and James Morrissey is avoiding deposition.

*Carver's Ownership of the Vessel, Value of the Vessel, & Mortgages of the Vessel (Dep. Topic Nos. 4, 5, 6)*

Mr. Laraway testified directly to Petitioner's understanding of the value of the Mackenzie Rose at the time of the allision. *Id.*, 58:15-23. He confirmed which valuation appraisal was the basis for that testimony. *Id.* 59:5-18. He also testified that the industry experience of Carver's leaders is consistent with the relevant appraisal. *Id.* 60:9-16.

He testified to the purchase of the Mackenzie Rose. *Id.*, 32:16-25, 33:9-34:9. He also testified as to financing for the Tug and to work done on the Tug. *Id.*, 33:1-8; 34:13-37:2. He addressed appraisals conducted over time. 36:18 – 42:25; 50:15 - 51:19.  While he could not recall the amount of insurance Carver carried on the Mackenzie Rose at the time of the allision, *Id.*, at 44:10-19, that information was produced by Carver. *Id.* at 46:10-15 (Statement of counsel); Testimony as to the production, at 47:17 – 49:14. When asked about the insured value, the witness explained that Carver insureds "the vessels for a minimum of the fair market value, and when there's a higher replacement value, we try and insure them for more." *Id.* 48:18-25. During the deposition, Carver, through counsel suggested that he did not have the 2025 appraisal. *Id.* at 53:23-25. Counsel for Petitioner then, directed Counsel for the Belt Line to that document, and provided a printed copy, as well. *Id.*, at 54-57. Mr. Laraway testified regarding that 2025 appraisal. *Id.*, at 57:17-58:7. He also discussed Carver increasing the value of insurance for its vessels, generally, in 2025. *Id.*, at 52:14 – 53:22.

*The corporate structure and ownership of Coeymans Marine Towing, LLC d/b/a Carver Marine Towing, Inc. (Dep. Topic No. 3)*

When asked to testify as to the relationship among the Carver companies, Mr. Laraway explained the corporate structure and business operations. *Id.* pp. 10:4 – 12:21, 13:9 – 14:1; 26:18 – 27:17; 28:13-31:5. He testified as to how he, and Petitioner, first became aware of the "incident involving the Tug Mackenzie Rose alliding with the Norfolk and Portsmouth Belt Line Bridge in June of 2024." *Id.* 14:2 – 21:16. He also identified persons who received related email, and discussed follow up calls after the notice was received. See also *Id.*, 28:13-35. He identified Petitioner's personnel, as well. *See, e.g. Id.* 102: 21-24; 108:7-12.

Clyde & Co US LLP is a Delaware limited liability partnership with offices in
Atlanta, Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New Jersey, New York, Orange County, Phoenix,
San Francisco and Washington D.C.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.

July 10, 2025
Page 4



*All actions taken by Carver as a result of the Incident, all reasons why Carver did not notify the U.S. Coast Guard and the Belt Line Railroad on June 15, 2024; Damage to the Vessel and the Barge. (Dep. Topic Nos. 18, 19, 22, 23, 24)*

Counsel asked whether "you" initiated any steps to preserve and retain various information. *Id.* 21:20-22. Counsel for Petitioner objected to that request "to the extent that it asks for legal advice" but allowed the witness to answer as to his understanding. *Id.*, 21:22-24. His testimony was that he talked to the company's lawyer on June 20, 2024, *Id.,* 31:22-32:1. This was the day he was first aware of the claim by Norfolk that the bridge had been hit. *Id.* Further, he directed Brian Moore "to make sure he obtained everything [requested evidence] and compiled it for our attorney". *Id.*, 22:5-10. While he did not know the specific actions Brian [Moore] took to comply with the request to preserve telephone data, *Id.*, at 23:12-14, he testified that "Mr. Baldassare's phone has been provided and that the tug phone has as well." *Id.*, at 22:17-19; 16:12-14. It is his understanding that each of these actions was responsive to the Belt Line's correspondence of June 20, 2024, though there was some review of the reported incident underway before June 20, 2025. *Id.*, 130:6-22. Counsel asked at some length about the Company's affidavit as to the search for data. *Id.*, pp 165- 167.

As to the company's understanding the circumstances surrounding the allision, Mr. Laraway testified that "originally Morrissey stated that he got in with the fenders, later amended the story multiple times. Finally, … based on my understanding, during conversations with the Coast Guard, he stated that he got in and hit the bridge while he was piloting the vessel."  142:7-16.  He also explained that the Company is, in part, waiting for the Coast Guard investigation to be complete to finalize its opinions, and will take that into account as to what happened. 143:12-17. Neither the vessel nor the barge was damaged, though he would defer to Mr. Moore and Mr. Baldassare testimony in that regard. *Id.*, 143:22 -144:12. He is not aware of any claim by the barge owner on account of the incident. *Id.*, 144:13-14. Further, he testified that Mr. Moore and Mr. Baldassare were responsible for conducting the investigation of the subject incident in conjunction with the Coast Guard. *Id.,* 156:22–157:4.

*All disciplinary or employment action taken against members of the crew of the Vessel, including James Morrissey and Christopher Miller. (Dep. Topic No. 21)*

Mr. Laraway testified as to records as to the suspension and termination of Captain Morrissey but did not know why he was marked not eligible for rehire; he also acknowledged that if the HR information system did not record the date of Captain Morrissey's suspension, he could not provide it. 106:11 – 109:20. The documents produced reflect that Captain Morrissey was suspended as of June 20, 2024. CARVER ESI 001629-001630. This documentation had been produced prior to the 30(b)(6) deposition.

Likewise, Mr. Laraway explained that the reason for Captain Morrissey's discharge was that the company "didn't feel it appropriate to continue to pay him as a suspended mariner while he was working for someone else." 109:13-20. His discharge was effective September 27, 2024.

Clyde & Co US LLP is a Delaware limited liability partnership with offices in
Atlanta, Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New Jersey, New York, Orange County, Phoenix, San Francisco and Washington D.C.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.

July 10, 2025
Page 5



*Id.*, 112:24-114:13. The company had been waiting for the Coast Guard investigation to be complete before evaluating whether any other action as to Mr. Morrissey was appropriate. *Id.*, 116:3 – 117:1. He also denied any employment action taken against Captain Miller as a result of the allision with the Belt Line Bridge. *Id.*, 115:15- 116:2.

*Carver's protocols and procedures for reporting allisions in place at the time of the Incident (Dep Topic No. 13)*

When asked about Petitioner's procedure for reporting allisions, Mr. Laraway properly referred counsel to the safety management system, which had been produced. *Id.* 73: 2-9. Counsel followed up by marking the documents, as produced, as an exhibit, and obtained testimony as to the same. *Id.*, at 73:10-81:1. This included explaining that the information originally reported to Petitioner was that there was a strike between the barge and the fendering, not a strike to the bridge structure. *Id.*, at 80:20-81:1. Mr. Laraway further testified that "incorrect information was provided to Lenny [Baldassare]." *Id.*, 82:2-4. He also testified that correspondence from the Belt Line was the first notice to him that there had been a strike between the barge and the bridge. *Id.* 82:21-23. He confirmed that no one contacted the Belt Line regarding the allision at any time prior to June 20, 2024. *Id.*, 86:8-13.

*Carver's Safety Management System that was in effect at the time of the Incident (Dep. Topic No. 14)*

Mr. Laraway confirmed that the policy regarding Bridge Transits was provided to the Belt Line. *Id.* 91:16-22. As to the meaning of the text of that policy, "Under no circumstances shall the wheelman … make the bridge due to pressure or pride", Mr. Laraway offered to provide his general understanding but deferred to Messrs. Moore and Baldassare as to its lived usage. 91:23-92:13. Despite the offer, counsel did not ask for Mr. Laraway's understanding of the phrase. *Id.* The explanation has been provided. *See* Baldassare, 169:8-19. Mr. Moore likewise deferred to Mr. Baldassare's definition. Moore 138:2-139:15.

With respect to lookouts, Mr. Laraway acknowledged that there is a form on which lookout information is required to be provided. *Id.*, at 88:12-89:10. He could not say why that information was required on the form. *Id.* He testified that there was no lookout posted for the bridge transit. *Id.*, at 96:18-22. Then he addressed the policy manual regarding "Navigation," confirming that the Mackenzie Rose was equipped with an automatic pilot system. *Id.*, at 89:10-90:1. He stated that he was not aware of a written policy prohibiting the use of the automatic pilot system, but that he would defer to the depositions already taken as to practice in that regard. *Id.* 90:2-15. We confirm that there was no written policy prohibiting the use of the automatic pilot system aboard Petitioner's tugs at the time of the allision or thereafter. As to any restricted use of the autopilot, either by regulation or industry standards, that is strictly within the purview of the expert witnesses. You also had CARVER 000817, which discusses the judgment to be exercised in using the automatic pilot system, but you did not ask questions about it.

Clyde & Co US LLP is a Delaware limited liability partnership with offices in
Atlanta, Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New Jersey, New York, Orange County, Phoenix,
San Francisco and Washington D.C.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.

July 10, 2025
Page 6



In regard to the "Safety Briefing" section, Mr. Laraway again confirmed that the policy was provided. Laraway dep., 92:14-16. On the question of whether there was a safety meeting prior to the allision on June 15, 2024, he again deferred to the existing testimony. 92:25-93:6. Mr. Moore testified that there was, in fact, such a meeting. Moore, pp. 323:21-324:2. It appears that Mr. Baldassare was not asked about safety meetings.

Mr. Laraway also testified that Petitioner had a policy prohibiting the use of alcohol by employees during vessel operations. 99:9-20. He also testified that there was a policy regarding post-incident testing for alcohol use or drug use. Laraway, 99:21-100:20;101:20-25. He also confirmed that Petitioner is not aware of any post-incident alcohol or drug testing. 101:7-10; 102: 1-6. He testified he would rely on Brian and Lenny and the documents provided as to whether there are, in fact, alcohol test kits on 'the vessel'. 101:11-19. While he did not know of any drug testing relevant to the subject case, he also testified that Petitioner has had relationships with multiple drug testing vendors. 103:4–105:25. Similarly, Mr. Laraway confirmed that Petitioner had a policy as to "collision/allision." *Id.*, 118:12-121. This confirmed testimony about photographing an incident and the photographs taken by the crew, which have been produced for the Belt Line in this case. *Id.* Mr. Laraway relied on the testimony and documents produced when asked whether there were any other documents taken by the crew but stated that he was unaware of any additional photos. 122:1-4.

*Freight, towage or hire received or owed for the service of the Vessel at the time of the Incident. (Dep. Topic No. 7)*

Mr. Laraway explained that the particular cargo being pushed by the Mackenzie Rose at the time of the allision was from Skanska, "on a one-off basis". *Id.*, 61:25-62:14. Counsel for Petitioner clarified that the exact payment for this transit had not been located. *Id.* p. 63:25-64:25. However, Carver will be amending its responses to the Belt Line's Third Requests for Production to reflect the freight paid.

*The operation, course and speed of the Vessel on the date of the Incident. (Dep. Topic No. 9)*

On the question of the "operation course and speed of the vessel on the date of the incident", Mr. Laraway deferred to the documents and prior testimony. 67:18-23. He also testified that he had not read those witnesses' testimony but had read summaries that were provided by counsel. 68:13-18; 70:1; 71:5-6. Notably, counsel did not ask Mr. Laraway any questions going to the actual testimony of Messrs. Moore and Baldassare, but instead suggested that the deposition summaries reviewed by Mr. Laraway were provided by "Chat GPT". *Id.*, at 70:11-14.

As you know, Petitioner long since produced the engine logs, daily logs, and Rose Point data in our best available format, which is the native file (a .CEVDR format). The same information was sent to the United States Coast Guard, which has not indicated any concerns as to accessibility of the data. You are also in possession of CARVER 000943, which is an .mp4, depicting the movement of the bridge, wind speed, *et cetera*, reflecting the course of the vessel

Clyde & Co US LLP is a Delaware limited liability partnership with offices in
Atlanta, Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New Jersey, New York, Orange County, Phoenix,
San Francisco and Washington D.C.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.

July 10, 2025
Page 7



and covering more than seven minutes leading to the impact. Mr. Moore testified that the data from Rose Point was downloaded and e-mailed to the Coast Guard and was saved. Moore Dep., 119:13-19.

You had the opportunity to mark CARVER 000943 as an Exhibit and to play that .mp4 for Mr. Laraway. You also had the opportunity to confirm Mr. Moore's testimony with Mr. Laraway, which would likely be a duplicative effort, as Mr. Laraway made it clear that the Petitioner relies on that testimony as to what occurred. We did not, in any way, prevent you from asking questions about the data during the 30(b)(6) deposition or depositions of other witnesses.

*The training Carver provided for the crew of the Vessel. (Dep. Topic No. 11)*

Mr. Laraway deferred to the documents and prior testimony the as to training provided by Carver to its employees and to Captain Morrissey regarding bridge transits and the use of autopilot. 93:7-23; 97:18-25. Similarly, as to testing of Captain Morrisey, Mr. Laraway identified information not available or not yet available to Petitioner, but also noted that he would rely on the existing testimony in the case, or testimony yet to become available. 94:4-95:16; 97:18-98:25. In fact, Petitioner produced training materials as to Captain Morrissey. See CARVER 000851-885. We also have provided CARVER TBS HELM CONNECT 002962-0002993, which conveys the same training information as to Captain Morrisey in a different format. Petitioner has also produced training materials as to all training from 2020 to 2025. CARVER TBS HELM CONNECT 001079-001618. While Mr. Laraway testified that he had no personal knowledge of training records for Captain Morrissey, *id.*, 95:17-25, the documents as produced were not marked as exhibits or used at Mr. Laraway's deposition.

*All repairs made to the navigation, steering, or autopilot systems of the Vessel during the five (5) year period before the Incident. (Dep. Topic No. 20)*

On the issue of the autopilot, Mr. Laraway was asked to acknowledge a February 28, 2024, entry indicating that there was an 'equipment issue' consisting of an 'autopilot failure" as well as an April 1, 2024 SAT compass failure that impacted the autopilot. *Id.*, 149. The fact that the autopilot was replaced shortly thereafter, in April, 2024, and was tested and in good condition as of April 11, 2024 has long since been disclosed. CARVER 000249-000250. Regardless, Mr. Laraway testified he would depend on the testimony and documents in the case to address what investigation followed the incidents. Laraway, p. 149-151. Next, Mr. Laraway was asked about two entries dated entry May 21, 2024 indicating that the autopilot induced a hard turn to port. 153:13-25; 157:23-158:3. Mr. Laraway had no knowledge of an investigation regarding that report as to May 21, 2024. *Id.* While Mr. Laraway was asked about this incident, you deposed the engineer on duty at that time, Jason McGrath, who was onboard and had no memory of the incident. However, subsequent to the incident, on May 22, 2024, the steering system, navigation equipment, GPS, AIS, and compass were checked pursuant to SMS 7.3 MASTER'S DAILY VESSEL REPORTING (TUGS) and passed, and were signed off by the Master James D. Morrissey. This document, *inter alia*, has just been retrieved by TBS and will be produced shortly.

Clyde & Co US LLP is a Delaware limited liability partnership with offices in
Atlanta, Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New Jersey, New York, Orange County, Phoenix,
San Francisco and Washington D.C.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.

July 10, 2025
Page 8



      You asked Mr. Laraway whether he has ever seen an incident report dated June 15, 2024. *Id.*, at 135:12- 136:20, but also asked about an entry logged on June 15, 2024, which explicitly described the incident as then reported to Petitioner. *Id.*, 137:20–138:17. That report indicated that the autopilot was not completely turned off and that the incident involved fendering, not the bridge. *Id.* Mr. Laraway could not provide any additional explanation, and stated he would rely on the testimony of witnesses, including Moore, Laraway, and Morrissey as to what they meant. *Id.*, 138:22 -139:22. Mr. Laraway explained that he had no knowledge of how an autopilot system works. *Id.*, 139:4-140:1.

      As outlined above, Mr. Laraway provided substantive answers at the 30(b)(6) deposition Instead of adjourning the deposition due to Mr. Laraway's supposed unpreparedness, you opted to continue it until completion. After Mr. Laraway's deposition, you failed to inform Carver of Norfolk's intention to file a motion to compel for more complete 30(b)(6) answers, nor did you request a meet and confer on this matter. Now, you assert that Norfolk is prejudiced because its experts did not have the chance to review supplemental answers on 30(b)(6) topics. At no point did you communicate to Carver any critical questions where Norfolk required the company's position, rather than merely adopting the testimony of prior witnesses. Had you reached out to Carver, the parties could have met and conferred, allowing Carver to provide a supplemental response.

      Given the above, we do not see any basis for a motion to bar, much less a demand to dismiss Carver's action.

      Very truly yours,

Siobhán M. Murphy

James H. Rodgers

Clyde & Co US LLP is a Delaware limited liability partnership with offices in
Atlanta, Boston, Chicago, Denver, Las Vegas, Los Angeles, Miami, New Jersey, New York, Orange County, Phoenix, San Francisco and Washington D.C.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.