**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S**
**AND EVANSTON INSURANCE COMPANY'S**
**BRIEF IN SUPPORT OF THEIR MOTION FOR RELIEF UNDER RULES 30 AND 37**

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") and Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company ("Evanston"), by counsel, submit this brief in support of their Motion for Relief under Fed. R. Civ. P. 30 and 37 against Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver").

**Introduction and Background**

On June 15, 2024, Carver's tug M/T MACKENZIE ROSE struck and nearly toppled the Belt Line's mainline railroad bridge when the tug pushed a 200-foot loaded barge into the bridge's western span outside the navigable channel.  To date, the allision has caused more than $15 million in damages.  Carver seeks to limit its liability to $2.5 million.

From the outset, Carver has employed a barrage of obstructionist tactics to impair or block the Belt Line's ability to investigate facts that would defeat Carver's attempt to limit its liability. On the very day of the allision, Carver and its crew failed to notify the U.S. Coast Guard as required by law before fleeing the scene, and never notified the Belt Line, making immediate access to information impossible (drug and alcohol testing, inspection of the vessel, etc.).  *See* ECF 42.

That pattern of evasion and obstruction continued into this litigation. As the Court is aware, the Belt Line promptly propounded discovery requests to Carver (ECF 42), which Carver avoided by raising baseless objections, including a bizarre reading of the Rule 26(f) Order and repeated reliance on a rule of admissibility for subsequent remedial measures to prevent discovery. On April 25, 2025, after overruling nearly every objection Carver interposed, this Court required Carver to fully respond to the Belt Line's requests by May 9, 2025. *See* ECF 50.

Two weeks later, when Carver did not have responses, its counsel asked the Belt Line for another two weeks. The Belt Line agreed, and the parties filed a joint motion giving Carver until May 23, 2025 to comply with the Court's Order. *See* ECF 53. Carver has supplemented five times since the Order, yet its compliance remains incomplete. Only recently, its counsel threatened Rule 11 sanctions against the Belt Line for pointing out deficiencies in Carver's tug log production, including missing entries for an entire three-month period after the allision (when repairs to the autopilot and steering systems likely occurred) and gaps in entries for known "near misses" before the allision. *See* June 23, 2025 Email and Deficiency Letter (**Exhibit A**).

Even more recently, on July 3, 2025, Carver finally produced *partial* text messages[1] from after the allision, more than two months after this Court ordered the production and one day after the Belt Line and Evanston served their expert reports. *See* July 3, 2025 Email with Text Production (**Exhibit C**). Among other things, Carver's delayed production deprived the Belt

---

[1] For instance, despite numerous requests, Carver has yet to produce text messages from Carver's General Manager, Brian Moore, who should be well aware of the need for preservation. *See, e.g.*, May 8, 2025, Order, *Harley Marine NY, Inc. v. Brian Moore, et al.* ("The cell phone that potentially contained electronically-stored information was turned into the Verizon store on or about August 2023, at least six months after the January 20, 2023 notice to preserve all potential and actual evidence was sent to defendant [Brian] Moore and at least five months after this action was commenced. Plaintiff has established that defendant Moore had notice that the cell phone and its contents were relevant to the litigation and that he had a duty to preserve it.") (**Exhibit B**).

Line's and Evanston's tug captain expert of the ability to fully explore rudder issues identified in the texts before providing his report. It also deprived their counsel of the ability to fully explore Carver's efforts to "resolve the steering issue," assess "any damage besides actual scrapes," and "just make it go away." *Id*. A group text with photo(s) (referenced in other texts) still has not been produced, but even a sampling of the texts to date shows obvious relevance. For example, several from the cell phone of Leonard Baldassare, Carver's Port Captain in New York, appear to discuss disciplining the tug captain (Chris Miller) for wanting to report the allision before Mr. Baldassare falsely told the crew that the Coast Guard had cleared them to leave:





From: +18455944410 Brian Moore
To: +18382072960 +18382072960 (owner)

Ugh, was it a hard hit or did he lay up alongside it to go through?  Kinda like Newtown creek style.  Slow things down and lay alongside the fenders to safely pass through.

The last thing Baltimore wants is a bridge investigation.  If its a hard hit, then I can guarantee CG and TVIB will be all over their asses

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +18382072960 +18382072960 | | 6/15/2024 5:14:13 PM(UTC-4) | |

Status: Read

6/15/2024 5:10:16 PM(UTC-4)

From: +18382072960 +18382072960 (owner)
To: +18455944410 Brian Moore

I can tell Chris I notified them and they will do an investigation and to keep going just to shut him up

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +18455944410 Brian Moore | 6/15/2024 5:15:22 PM(UTC-4) | | |

Status: Sent

6/15/2024 5:15:22 PM(UTC-4)

From: +18455944410 Brian Moore
To: +18382072960 +18382072960 (owner)

Okay, CG will issue out an 835 for the rudder.  There is zero chance we can replicate the issue on the rudder so it won't be sailing any where for a while.

Did the rudder actually get stuck or just ship handling?

It's also a 250' barge that's hired out from weeks.

See how we can resolve the steering issue or they make it ship handing issue.

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +18382072960 +18382072960 | | 6/15/2024 5:17:58 PM(UTC-4) | |

Status: Read

6/15/2024 5:17:45 PM(UTC-4)



M/T MACKENZIE ROSE Daily Log June 15, 2024:



At the same time, Carver has evaded providing a date for the Belt Line's and Evanston's tug captain expert to inspect the tug, even though its counsel agreed in April to do so when the expert's flight was cancelled for the original inspection, and even though the Belt Line has twice allowed Carver to inspect the bridge.[2]  This obstruction has proven highly successful for Carver so far, despite formal requests under Rule 34 (*see* **Exhibits D** and **E**), since the deadline for expert reports just passed.  Amazingly, after promising in April to allow the expert to inspect the tug, just last week (2½ months later), Carver reneged and refused an inspection.

Yet Carver's pattern of obstruction is not limited to Rule 34 requests.  It extends profoundly to depositions of Carver's witnesses.  As explained below, on April 28, 29, and 30, counsel for the Belt Line deposed three Carver employees (General Manager Brian Moore, Deckhand Jarkeis Morrissey, Deckhand Sharif Porter) and one former employee (former Port Captain Leonard Baldassare).  During these depositions, Carver's New York counsel made roughly **109** improper speaking objections and instructed witnesses not to answer **13** times without a privilege. [3]

Counsel for the Belt Line also took Carver's Rule 30(b)(6) deposition, with Nicholas Laraway as Carver's corporate representative, on June 17, 2025.  *See* Rule 30(b)(6) Deposition Notice (**Exhibit F**).  Carver designated Mr. Laraway on all noticed topics:

```
17        Q.    And that is the notice of the
18   deposition of Coeymans Marine Towing, d/b/a
19   Carver Marine Towing.
20              And attached as Exhibit A,
21   there's some definitions and a couple of
22   dozen topics.
23              See that?
24        A.    I do.
25        Q.    You've had a chance to review
```

---

[2]     For unknown reasons, Carver confirmed the original tug inspection only the day before it was to occur in Charleston, South Carolina.  The Belt Line's and Evanston's tug expert booked the last flight available to Charleston, but that flight was cancelled and he was unable to attend.

[3]     All depositions of Carver witnesses quoted herein were defended by the same *pro hac vice* counsel for Carver from New York.  All meet and confers in this case have involved the same *pro hac vice* counsel.  None have been attended by Carver's EDVA-admitted counsel from Florida.

```
1  it prior to the deposition?
2       A.    I have.
3       Q.    And it's your understanding
4  that you've been designated to testify on
5  those topics?
6       A.    Yes.
```

Laraway Dep. 7:17-25, 8:1-6 (**Exhibit G**).

During this deposition, Carver's counsel made **35** speaking objections, bringing the total to **144**. Worse still, Mr. Laraway was wholly unprepared to discuss the vast majority of the topics. Instead, he defaulted repeatedly to one of two answers: either denying personal knowledge (an improper avoidance method in a corporate deposition) or referring for his answer to all documents produced in the case and the testimony of all other Carver witnesses. An example from the end of the deposition illustrates the obstruction:

```
5  BY MR. NANAVATI:
6       Q.    And if I missed this I
7  apologize and I am confident that Jim [Rodgers]
8  will object.
9            But do you know whether or not
10 there was working radar on Mackenzie Rose
11 on the date of the allision?
12           MR. RODGERS:  Objection.  Asked
13      and answered, but you can answer.
14       A.    I would rely on the testimony
15 of Brian, Lenny, the crew, the documents
16 we've provided.
17           And as we summarized in the
18 end, I have no reason to believe there
19 wasn't, but I don't know firsthand.
20       Q.    Okay.  And when you are saying
21 that you're relying on the testimony of
22 Brian, Lenny, the crew, what other crew are
23 you relying on?
24       A.    For that answer specifically or
25 for all of the times I said that.

1        Q.    Let's start with that answer
2  specifically.
3            MR. RODGERS:  Just for the
4       record, Mark, is, when he states that
5       he is relying on the crew's testimony
6       to date, which you're aware of was
7       testified, but we also have Jason
8       McGrath tomorrow and potentially
9       Morrissey on next week, and Captain
10      Miller unfortunately passed away.
11           That's what he's referring to,
12      but he can still answer the question
13      if --
14           MR. NANAVATI:  Well, I mean,
15      now that you've answered it for him.
```

```
16      Q.    Is Mr. Rodger's answer, your
17 answer?
18          MR. RODGERS:  Is that --
19      A.    Yes.
20          MR. RODGERS:  -- what I said,
21      correct?
22      A.    Correct.
23      Q.    Okay.  And when you're saying
24 documents produced in response to that
25 question, which documents are you referring

 1 to?
 2      A.    I mean, there were thousands of
 3 documents produced throughout the discovery
 4 is my understanding.
 5          I have reviewed many of them.
 6 I can't speak to which ones specifically
 7 would attest to the working condition of
 8 the radar if any.
 9      Q.    So you're suggesting that we go
10 through the documents and pick ones out
11 that's responsive to the question and that
12 will be your answer?
13          MR. RODGERS:  Objection to
14      form.  Of course you just answered
15      your own question, yes.  You should
16      do your homework.
17      Q.    So you can't identify a single
18 document as you sit here today that would
19 answer the question regarding the status of
20 the radar on the date of the allision, can
21 you?
22      A.    Not specifically, no.
```

Laraway Dep. 171:6-173:22 (**Exhibit G**).

Altogether, this conduct has fundamentally stymied the Belt Line's and Evanston's investigation of Carver's privity and knowledge at every turn.  And pertinent to the relief sought now, no phone call to the Court could have cured Mr. Laraway's deficient preparation or total lack of knowledge on key topics.  Nor are new depositions sufficient to remedy the obstruction, as this would only reward Carver by giving its witnesses a second bite at now-known lines of questioning, after expert disclosures, all at minimal cost compared to the $15 million at issue.  As explained below, the only effective remedy is to (1) *dismiss* the limitation Complaint and allow this case to proceed on the claims by the Belt Line and Evanston; and (2) *deem* the obstructed facts admitted, just like a Request for Admission that is improperly obstructed or denied under Rule 36.

## **Legal Authority**

Generally, "[d]istrict courts are allowed broad discretion in resolving discovery disputes." *Humanscale Corp. v. CompX Int'l, Inc.*, 2009 U.S. Dist. LEXIS 120197, at *5-6 (E.D. Va. 2009). The Eastern District of Virginia has held (and the 4th Circuit has affirmed) that more serious sanctions are appropriate, including dismissal of a case, when "a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice and undermines the integrity of the process." *See Projects Mgmt. v. Dyncorp Int'l LLC*, 734 F.3d 366, 373 (4th Cir. 2013). In *Projects Management*, for example, the plaintiff's repeated violations led to multiple sanctions, including compelling depositions, excluding the plaintiff's damages claim, and ultimately dismissing the case with prejudice. *Id*. at 373. As the Court of Appeals explained, "a district court exercising its inherent authority to impose sanctions may do so sua sponte and must consider the whole of the case in choosing the appropriate sanction." *Id*. at 375.

Under federal law, speaking objections during depositions are wholly improper and form the basis for sanctions under Fed. R. Civ. P. 30(d) on their own. The language of the rule states "[t]he court may impose an ***appropriate sanction***—including the reasonable expenses and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Fed. R. Civ. P. 30(d)(2) (emphasis added).

Further, "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Fed. R. Civ. P. 30(c)(2). Rule 30(b)(6) also states, "a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). The Rule requires that the company "must designate one or more officers, directors, or

managing agents, or designate other persons who consent to testify on its behalf," and that, "[t]he persons designated must testify about information known or reasonably available to the organization."  *Id*.  In an instructive opinion, one federal court even summarized the rules of corporate depositions into a "*de facto* Bible" for courts and litigators.  *See QBE Ins. Corp. v. Jorda Enters.*, 277 F.R.D. 676, 687-91 (S.D. Fl. 2012).

In the context of a Rule 30(b)(6) deposition in particular, this Court has held that, "sanctions may be property imposed against a corporation when its 30(b)(6) designee is unknowledgeable of relevant facts and it fails to designate an available, knowledgeable, and readily identifiable witness because such an 'appearance is, for all practical purposes, no appearance at all.'" *Humanscale*, 2009 U.S. Dist. LEXIS 120197, at *5-6 (citation omitted).  Such sanctions may range from re-deposition of the witness to dismissal of the case with prejudice.  *Id.*, at *6; *see also Projects Mgmt.*, 734 F.3d at 37. As the Fourth Circuit has held, "[d]ue to the very nature of the court as an institution, it must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates." *Id*. at 373 (stating that "a court acting under its inherent authority may impose sanctions for any conduct utterly inconsistent with the orderly administration of justice.").

## Argument

### I.    Carver violated Rule 30(c) by improperly instructing witnesses not to answer.

Rule 30(c)(2) expressly limits when a deponent can be instructed not to answer a question. Pursuant to Rule 30(c), an attorney may instruct a witness not to answer a question "only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."  Carver's counsel instructed multiple witnesses not to answer with no basis for doing so, and the obstructed lines of inquiry should be deemed admitted.

*Leonard Baldassare*

In the deposition of Leonard Baldassare, Carver's former Port Captain, Carver's counsel instructed the witness not to answer seven times. *See* Baldassare Dep., 19:19-20:20; 131:5-132:6; 171:17-173:6; 176:2-7; 180:10-181:2; 183:11-17; 183:18-184:5 (**Exhibit H**).[4]  These objections and instructions are contained in the chart below.

| Page: Line | Deposition Transcript | 30(c) Basis |
|---|---|---|
| 19:19-25<br>20:1-20 | 19      Q.    You were served with a subpoena<br>20    before the deposition?<br>21      A.    Yes, sir.<br>22      Q.    And I asked you to bring<br>23    whatever phone you had used or communicated<br>24    with back --<br>25      A.    Yes.<br><br>1        MR. RODGERS:  Jim --<br>2        MR. CHAPMAN:  Let me just<br>3      finish the question.  Let me just<br>4      finish the question.<br>5        MR. RODGERS:  Finish it.<br>6      Q.    The subpoena requested that you<br>7    produce the phone that you had used on June<br>8    15th, 2024, which was the date of the<br>9    allision, right?<br>10       Do you still have that phone<br>11    today?<br>12        MR. RODGERS:  Just don't answer<br>13      it.  We're producing Mr. Baldassare<br>14      as a Carver witness, not pursuant to<br>15      the subpoena.  Any demand you could<br>16      make to Carver, and -- we'll deal<br>17      with it.  So he's not here now by<br>18      virtue of the subpoena, he's here now<br>19      as our witness as I talked to you<br>20      about, or e-mailed you about. | None. |
| 131:5-25,<br>132:1-6 | 5      Q.    But based on that, would you<br>6    have considered that to be a near miss,<br>7    requiring a near miss report in your Helm<br>8    system?<br>9        MR. RODGERS:  Objection to<br>10      form.  If you understand it, you can<br>11      answer. | None. |

---

[4]      The Belt Line was required to subpoena Mr. Baldassare to attend the deposition since he is a former employee.  As Carver's Port Captain, he was the first and only person that communicated with the crew of the tug immediately after the vessel struck the bridge.  It was not until after Mr. Baldasarre received service of the subpoena seeking production of his phone from June 15, 2024 that Carver sought to claim he was a "company witness" who would be made available as noticed on April 29, 2025.  Carver did not produce the text messages from Mr. Baldassare's phone (quoted above) until July 3, 2025, more than two months after Mr. Baldassare was deposed.

| | | |
|---|---|---|
| | 12     A.   I'm not really sure what you're<br>13  asking.  Are you asking if the incident<br>14  that was reported to me on Saturday the<br>15  15th, would be considered a near miss?<br>16     Q.   Sure.<br>17     A.   In my personnel opinion?<br>18     Q.   Yes.<br>19     A.   I'm not an expert in near<br>20  misses, but --<br>21     MR. RODGERS:  Well, don't --<br>22     A.   No, I'm not really --<br>23     MR. RODGERS:  Stop, stop.<br>24    Don't -- you're not here to give your<br>25    opinion, okay.<br><br>1      THE WITNESS:  Okay.<br>2     A.   Then no.<br>3     Q.   It wouldn't be reported as a<br>4  near miss or you just don't have an<br>5  opinion?<br>6     A.   I don't have an opinion on it | |
| **171:17-25,<br>172:1-5<br>172:16-25,<br>173:1-6** | 17     Q.   I'm trying to understand then<br>18  what is the look out in that circumstance<br>19  as expected to look out for?<br>20     MR. RODGERS:  Objection -- same<br>21    objection.  He's not here as an<br>22    expert.  And he wasn't on the<br>23    Mackenzie Rose.  You're asking his<br>24    opinion, so if have you an --<br>25     THE WITNESS:  I can give my<br><br>1    opinion on it.<br>2     MR. RODGERS:  All right.  I<br>3    don't want you to give your opinion.<br>4    THE WITNESS:  Okay.  All right.<br>5    Then I won't answer it.<br><br>…<br><br>16     Q.   So are you going to answer the<br>17  question?<br>18     A.   No.<br>19     Q.   So you're refusing to answer<br>20  the question?<br>21     MR. RODGERS:  No.  He's not<br>22    refusing, he's listening to his<br>23    attorney.<br>24     MR. CHAPMAN:  So you're --<br>25     MR. RODGERS:  What are you<br><br>1    doing, Jim?  He's listening to me.<br>2     MR. CHAPMAN:  You're<br>3    instructing him not to answer then?<br>4     MR. RODGERS:  Yeah.  If it's an<br>5    opinion.  He's not here as an expert<br>6    and he wasn't on the Mackenzie Rose. | None. |
| **176:2-7** | 2     Q.   Do you think it's a good Marine<br>3  practice to have a safety briefing before<br>4  transiting bridges?<br>5     MR. RODGERS:  Objection.  Don't<br>6    answer that.  I'm directing the | None. |

| Page: Line | Deposition Transcript | 30(c) Basis |
|---|---|---|
| | 7    witness not to answer. | |
| 180:10-23 181:1-2 | 10    Q.    Okay.  So that's my question<br>11    is, whether you wrote it or not, is a<br>12    bridge a danger to navigation?<br>13        MR. RODGERS:  Objection.  He's<br>14        not here as an expert.  And you're<br>15        supposed to premise the questions not<br>16        as an expert.  You haven't done that<br>17        all day, okay?  So I'm going to tell<br>18        him not to answer.  I'm going to<br>19        direct him not to answer anything<br>20        that asks for his opinion.<br>21        MR. CHAPMAN:  You're<br>22    instructing the witness not to answer<br>23    the question?<br><br>1        MR. RODGERS:  Yes, I am.  I<br>2    just said that. | None. |
| 183:11-17 | 11    Q.    So a lookout could have been<br>12    posted to arise -- to appraise of the risk<br>13    of an allision with the bridge, correct?<br>14        MR. RODGERS:  Objection.  Don't<br>15        answer that.  Directing the witness<br>16        not to answer that question as it's<br>17        calling for expert testimony. | None. |
| 183:18-24 184:1-5 | 18    Q.    The last part of that section<br>19    on procedure says, "A lookout shall be<br>20    added when entering any port channel, or<br>21    any waterway intersection."  What is meant<br>22    by a port channel -- when entering a port<br>23    channel, or anyway waterway intersection?<br>24    What does that mean?<br>25<br><br>1        MR. RODGERS:  Objection.  It<br>2        calls for expert testimony and<br>3        interpretation of a statute.<br>4        Just -- I'm going to direct the<br>5        witness not to answer. | None. |

None of these instructions has any basis in law or a recognized privilege.  The futility of curing them with a new deposition is shown by Mr. Baldassare's final non-answer, in which he refuses to answer all by himself, without even requiring a cue from Carver's counsel.  And even though he was a "company witness," his counsel did not admonish the conduct.

| Page: Line | Deposition Transcript | 30(c) Basis |
|---|---|---|
| 222:8-25 | 8    Q.    So they called you to tell you<br>9    that they had slid by and hadn't made any<br>10    contact with the bridge out of the blue on<br>11    a Saturday afternoon?<br>12        MR. RODGERS:  Objection to | None. |

13

```
           13          form.
           14              Q.      Okay.  On a Saturday afternoon.
           15     And you wanted to check whether they were
           16     lying to you, so you had them take some
           17     photos and send them to you.  Is that your
           18     testimony?
           19              MR. RODGERS:  Objection to
           20          form.  You can answer if you want to
           21          extrapolate on that.
           22          A.      I'd rather not answer.
           23          Q.      Are you going to refuse to
           24     answer?
           25          A.      Yes.
```

*Brian Moore*

In the deposition of Brian Moore, Carver's General Manager, Carver's counsel instructed

the witness not to answer five times.  *See* Moore Dep., 29:22–30:9; 362:2–14; 164:4–165:3; 339:3–

342:4; 356:2–21 (**Exhibit I**).  These exchanges are included in the chart below.

| Page: Line | Deposition Transcript | 30(c) Basis |
|---|---|---|
| 29:22-25 30:3-9 | 22     Q.    When did Mr. Baldassare leave Carver?<br>23    A.    I don't recall off the top of my head.<br>24  Three months ago.  That is an estimate.<br>25    Q.    Do you know why he left?<br>…<br>3     MR. RODGERS:  Don't answer that.  That<br>4  is -- I'm directing Mr. Moore not to answer.<br>5    And by way of counsel, you can put in a<br>6  demand and we'll take it under advisement.<br>7  Concerned about employment law here and also<br>8  potential agreements that may have been signed,<br>9  for Mr. Baldassare's sake. | None. |
| 36:2-14 | 2     Q.    Was [Captain Miller] ever terminated from<br>3  employment by Carver?<br>4    A.    I don't know.<br>5    Q.    Do you know if he was ever asked to<br>6  resign?<br>7    A.   No.<br>8    MR. RODGERS:  I'm going to, again,<br>9  direct him not to answer on --<br>10    MR. CHAPMAN:  About Miller?<br>11    MR. RODGERS:  Yeah, but Miller wasn't<br>12  terminated.  He just testified that he was on<br>13  leave, and then he passed away, which we just<br>14  found out as well. | None. |
| 164:4-25 165:1-3 | 4     Q.    My question is really simple.<br>5    Is a bridge a danger to navigation?<br>6    MR. RODGERS:  Objection.  He's not here<br>7  as an expert.  He's here in his capacity at<br>8  Carver.<br>9    You're asking him expert testimony, and<br>10  you're being argumentative.<br>11    MR. CHAPMAN:  I'm just trying to get an<br>12  answer, sir. | None. |

|  |  |  |
|---|---|---|
|  | 13        MR. RODGERS:  Well, I already told him<br>14    not to answer, if it's going to be an opinion.<br>15        MR. CHAPMAN:  So is -- are you<br>16    instructing --<br>17        MR. RODGERS:  He's already told you he<br>18    doesn't -- he told you he doesn't have an<br>19    answer, then you're argumentative.  So he's<br>20    answered the question.<br>21        MR. CHAPMAN:  Are you instructing the<br>22    witness not to answer the question?<br>23        MR. RODGERS:  I already did, and he<br>24    already answered the question, so I think it's<br>25    moot.<br><br>1              Moore - April 28, 2025<br>2        MR. CHAPMAN:  Well, I disagree.  He has<br>3    not answered the question. |  |
| **339:3-25**<br>**340:1-25**<br>**341:1-25**<br>**342:1-4** | 3        So were the texts, e-mails, voicemails,<br>4  or other messages on that device preserved before you<br>5  got rid of it?<br>6      A.    It would still be a cloud-based backup<br>7  for the iCloud, which is an iPhone.  So I'm not sure.<br>8  I -- correction.<br>9        MR. RODGERS:  Just --<br>10    A.    Let me --<br>11        MR. RODGERS:  -- hold on, hold on, hold<br>12  on.<br>13        Is there a reason this was sent to<br>14  Mr. Laraway and not Carver's attorneys?<br>15        MR. CHAPMAN:  Yeah.  I wasn't aware that<br>16  they had counsel at the time.<br>17        MR. RODGERS:  Well, I don't -- I don't<br>18  want him to discuss anything that has to do with<br>19  what they did to preserve.  That's not<br>20  appropriate.<br>21        MR. CHAPMAN:  I'm --<br>22        MR. RODGERS:  I understand the letter.<br>23        MR. CHAPMAN:  -- I'm entitled to ask him<br>24  what he did.<br>25        MR. RODGERS:  No.  You're entitled to<br><br>1              Moore - April 28, 2025<br>2    demand this, and we then produce, and -- you<br>3    know, you're not entitled to do this, because it<br>4    actually impedes on what his former lawyer asked<br>5    him to do or we asked him to do.  And that's<br>6    attorney-client privilege, until the court tells<br>7    us otherwise.<br>8        MR. CHAPMAN:  So --<br>9        MR. RODGERS:  We're not here to have a<br>10    hearing on preservation.  It's not fair to the<br>11    witness, and I don't think it's appropriate, to<br>12    be honest.  So I'm not going to have him answer<br>13    whether he or Carver actually complied with your<br>14    letter.  You're not his attorney, and you sent<br>15    it directly to a party, and whether or not you<br>16    knew who the attorney was is beside the point.<br>17    If you find out later that there's been things<br>18    that weren't preserved, then you make your<br>19    motion.<br>20        MR. CHAPMAN:  And I'm testing right now<br>21    what was preserved. | None.<br>Carver's<br>counsel<br>improperly<br>cites<br>attorney-<br>client<br>privilege<br>where none<br>applies.<br>Efforts to<br>preserve<br>records are<br>not<br>privileged. |

| | | |
|---|---|---|
| | 22         MR. RODGERS:  Well, I'm going to tell<br>23    him not to answer to anything that has to do<br>24    with this letter.  You've asked him if he<br>25    preserved things during this deposition, and he<br><br>1<br>2    answered you whether he thought they had it or<br>3    whatever, but not to this letter.  This is<br>4    not -- this is not appropriate. | |
| 356:2-21 | 2       Q.    So my question was would you expect a<br>3    properly trained crew to avoid striking a stationary<br>4    object like a bridge?<br>5  (DIR)<br>6         MR. RODGERS:  Objection.  That's<br>7    harassing Mr. Moore.<br>8       Don't answer that.<br>9      A.    I've --<br>10        MR. RODGERS:  I said don't -<br>11    A.    Yeah, I would -- I --<br>12        MR. RODGERS:  Don't answer that.  That<br>13    means don't answer that.  Nothing.<br>14        MR. CHAPMAN:  So your --<br>15        MR. RODGERS:  Directing Mr. Moore not<br>16    to answer.<br>17        MR. CHAPMAN:  So your instruction is not<br>18    to answer?<br>19        MR. RODGERS:  I'm directing Mr. Moore,<br>20    yes, not to answer whether it's good policy to<br>21    hit a bridge. | None. |

Counsel's only basis for the first instruction on page 29 was that he was "concerned about employment law." This is not a privilege objection, nor does it find any basis in the Rules. Counsel again instructed Mr. Moore not to answer questions regarding Captain Miller's employment, a preservation letter, and training of the crew.[5] At no point did Carver's counsel cite any permissible basis for any of these instructions. He simply prevented the witness from testifying.

*Jarkeis Morrissey*

Jarkeis Morrissey was also instructed not to answer by Carver's counsel as noted in the chart below. *See* Morrissey Depo. 15:21–17:1 (**Exhibit J**).

| Page: Line | Deposition Transcript | 30(c) Basis |
|---|---|---|
| **15:21-25**<br>**16:1-25**<br>**17:1** | 21       Q.    Has the company issued you a<br>22  phone?  Has Carver issued you a phone?<br>23       A.    No, sir. | None. |

---

[5]    Captain Miller is now deceased.  He was the captain of the tug on June 15, 2024, though not the operator, and left Carver afterwards for reasons that were blocked in the deposition.

```
24        Q.    So do you take your personal
25    cell phone when you are on the boat?

1         A.    Yes, sir.
2         Q.    Have you ever used your
3    personal cell phone to communicate about
4    company business with anybody at Carver?
5         A.    No, sir.
6         Q.    What is your cell phone number?
7         A.    89 --
8              MR. RODGERS:  I'm going to tell
9         him not to answer that.
10              MR. CHAPMAN:  And there's a
11         reason for that?
12              MR. RODGERS:  I'm telling him
13         not to answer that.
14              MR. CHAPMAN:  You're
15         instructing the witness not to answer
16         that question?
17              MR. RODGERS:  Didn't I just say
18         that?
19              MR. CHAPMAN:  Yeah, you did,
20         but I'm just --
21              MR. RODGERS:  You can send a
22         demand and we'll take it under
23         advisement.  I don't want him giving
24         his personal phone number in this
25         deposition.  He's here in his

1         capacity as a Carver employee.
```

Again, Carver's counsel provided no permissible basis for instructing the witness not to answer, forcing the Belt Line to explore other discovery to obtain cell phone communications when this Court had, just days earlier, *ordered* Carver to produce all communications after the allision. *See* ECF 50 (requiring response to, *inter alia*, RFP 34).

## II.    Carver failed to produce an adequate Rule 30(b)(6) designee for deposition.

Carver also obstructed the Belt Line's ability to obtain corporate testimony under Rule 30(b)(6).  Under this Court's precedent, "preparation of a Rule 30(b)(6) witness is not limited to matters of which the witness has personal knowledge, but extends to *all information reasonably available to the responding organization*." *Abu-Eid v. Discover Prods.*, 589 F. Supp. 3d 555, 561 (E.D. Va. 2022) (emphasis added).  "Sanctions are available under Rules 30 and 37 when a party frustrates the deposition of an organizational representative." *Runnels v. Norcold, Inc.*, 2017 U.S. Dist. LEXIS 161474, at *2 (E.D. Va. 2017).  This Court has held that a company is required to

"make a good-faith effort to designate people with knowledge of the matter sought by the opposing party and to adequately prepare its representatives so that they may give complete, knowledgeable, and non-evasive answers in deposition." *Humanscale*, 2009 U.S. Dist. LEXIS 120197, at *5. Rule 30(b)(6) "implicitly requires such persons to review all matters known or reasonably available to [the company] in preparation for the Rule 30(b)(6) deposition." *Id.* at *4.

Here, Mr. Laraway's lack of preparation for any topics outside his personal knowledge, coupled with his repeated answers pointing to all documents in the case and all testimony of other witnesses, thoroughly blocked the Belt Line's efforts to obtain information. In fact, this steady stream of improper and evasive answers covered nearly every topic in the Belt Line's Rule 30(b)(6) notice outside the rare financial matter on which Mr. Laraway, as Carver's CFO, had personal knowledge. Examples of testimony related to Carver's Safety Management System,[6] use of lookouts, and autopilot policies illustrate the point:

```
14      Q.    As part of your
15 responsibilities with Carver, have you ever
16 had occasion to access the safety
17 management system for Carver Marine Towing?
18      A.    Access it?  I have never had
19 occasion to access it directly, no.

                   *    *    *

16      Q.    If you turn to the second page
17 of the form.  Page 899.  There is a
18 numbered section 1.13, "Lookout."  You see
19 that?
20      A.    Yes.
21      Q.    Okay.  It says, "It's
22 required."  Do you see the text required
23 over in the right-hand side?
24      A.    That's correct.
25      Q.    Okay.  Do you know the purpose

 1 of requiring lookout information as part of
 2 this form?
```

---

[6]     A Safety Management System, or SMS, is a federally required document that a commercial vessel owner must establish to govern safe operation of its vessels, including, for example, operating procedures, reporting procedures, lines of authority, required logbooks, and "instructions and procedures to ensure safe operation of [its] vessels and protection of the environment in compliance with international and United States law." 46 U.S.C. § 3203(a)(2).

```
 3                MR. RODGERS:  Objection to
 4          form.  He is not here as an expert.
 5          You can answer as to what he knows.
 6          A.    As to my personal knowledge, I
 7     do not know why.
 8          Q.    Okay.  This is a Carver form
 9     though?
10          A.    Correct.

                    *   *   *

24          Q.    Was the Mackenzie Rose equipped
25     with an autopilot?

 1          A.    That is my understanding.
 2          Q.    Okay.  And as part of the
 3     navigation section of the safety management
 4     system, there's no company prohibition on
 5     using the automatic pilot that's placed on
 6     any of the operators of the vessels,
 7     correct?
 8                MR. RODGERS:  Objection.  If
 9          you're asking him as an expert or as
10          mariner, he's already testified he's
11          not.  To the extent of your
12          knowledge, you can answer.
13          A.    Can you repeat the question,
14     please?
15          Q.    Yeah.  Could you read it back,
16     please?
17                (Whereupon, the above record
18          was read back by the court reporter.)
19                MR. RODGERS:  Same objection.
20                Jim, are you asking him what it
21          says or are you asking him what he
22          knows?
23                MR. CHAPMAN:  Well, I'm asking
24          him about the contents of the safety
25          management system and specifically

 1          focused on the company's policy
 2          regarding the use of autopilot.  And
 3          I just want to be sure that we
 4          understand it.
 5          Q.    And my question is, whether
 6     there is any company policy prohibiting the
 7     use of the autopilot?
 8          A.    I would rely on the depositions
 9     of Brian and Lenny to speak to the
10     specifics.  But based upon reading this,
11     there does not appear to be any prohibition
12     in writing in this document.
13          Q.    Are you aware of any
14     prohibition that is somehow not in writing?
15          A.    I'm not aware.
16          Q.    If you could turn to the
17     section titled 7.1, Bridge Transits.  The
18     Bates Number is Carver 000910.
19                This section appears to provide
20     instructions regarding bridge transits by
21     vessels, correct?
22          A.    That appears to be correct.
23          Q.    And right in the middle of the
```

19

```
24    page, it says, kind of in a call out,
25    yellow or orange-ish color.  "Under no

 1    circumstances shall the wheelman
 2    responsible for the transit make the bridge
 3    due to pressure or pride."  What does that
 4    mean?
 5            MR. RODGERS:  Objection to
 6        form.  You can answer if you
 7        understand the question.
 8        A.    I would rely on the depositions
 9    of Brian and Lenny.  As to the specifics of
10    what that means, I would be making an
11    educated guess.
12        Q.    So you don't know?
13        A.    Not specifically.
```

Laraway Dep., 86:14-19, 88:16-92:13 (**Exhibit G**).

Mr. Laraway gave the same answers regarding safety briefings, crew training, and specific

trainings for James Morrissey, the operator at the time of the allision:

```
17        Q.    Was there a safety briefing
18    before the transit of any of the bridges on
19    the Southern branch of the Elizabeth River?
20            MR. RODGERS:  Objection to
21        form.
22            MR. CHAPMAN:  Let me just
23        finish.
24            MR. RODGERS:  Sorry.
25        Q.    Prior to the allision on June

 1    15th, 2024?
 2        A.    I would rely upon the documents
 3    provided and the depositions of Brian, Lenny
 4    and all the crew members to answer that
 5    question.  I'm not directly aware
 6    personally.
 7        Q.    What training does Carver
 8    provide to its employees regarding bridge
 9    transits.
10        A.    I would rely upon the
11    depositions of Brian and Lenny as to those
12    answers and all of the documents provided
13    in discovery.  I do not specifically know.
14        Q.    Are you -- does Carver know of
15    any training that was specifically provided
16    to Captain Morrissey regarding bridge
17    transits?
18        A.    I would answer the question the
19    same way I answered the prior one.
20        Q.    Which is you don't know and
21    you'd rely on what other people had to say
22    about it?
23        A.    Correct.
```

Laraway Dep., 92:17-93:23 (**Exhibit G**).

The obstruction continued for inquiries related to testing of the captain's knowledge and capabilities regarding bridge transits:

```
 4        Q.   What testing, if any, does
 5   Carver provide regarding the captain's
 6   knowledge and the capabilities regarding
 7   bridge transits?
 8            MR. RODGERS:  Objection.  The
 9        captain's not been -- not testified
10        and he is deceased and Mr. Morrissey
11        is scheduled for next week.  So the
12        witness cannot possibly know that.
13            MR. CHAPMAN:  So once again,
14        there you go off doing your best to
15        coach the witness into an answer,
16        Mr. Rodgers.
17            MR. RODGERS:  I'm not coaching.
18            MR. CHAPMAN:  And I just ask
19        that if you have a form objection,
20        just make it and then we'll proceed
21        with the witnesses knowledge.
22            MR. RODGERS:  You were asking
23        him about testimony that hasn't
24        happened and you know better than
25        anybody it hasn't happened.  So it's
 1        an improper question.
 2        Q.   Could you read the question
 3   back?
 4            (Whereupon, the above record
 5   was read back by the court reporter.)
 6            THE WITNESS:  Can I answer?
 7            MR. RODGERS:  If you can
 8        answer.
 9        A.    I would reiterate the same
10   statement as before.  We would have to rely
11   on the testimony of Brian, Lenny, the
12   captain which we can't have, the future
13   testimony of the mate and the documents
14   provided through discovery.  I do not
15   personally have any firsthand knowledge of
16   any training.
```

Laraway Dep., 94:4-95:16 (**Exhibit G**).

The obstruction also continued for trainings on the use of autopilot for operators of Carver's vessels, similar to Mr. Laraway's testimony on autopilot policies:

```
18        Q.    Mr. Laraway, what training was
19   provided to the captains of the tugs
20   regarding the use of the autopilot on any
21   of the tugs that were equipped with it?
22        A.    I would rely on the testimony
23   of Brian and Lenny, any documents in
24   evidence and the future testimony of
```

```
25    Morrissey.⁷  I'm not specifically aware
 1    myself.
 2         Q.    And you haven't done anything
 3    to become aware?
 4         A.    I didn't hear you.
 5         Q.    And you haven't done anything
 6    to become aware?
 7              MR. RODGERS:  Objection.  He
 8         didn't say that.
 9              MR. CHAPMAN:  Well, he said he
10         was not specifically aware himself.
11         That's what I'm trying to understand.
12         Q.    You haven't done anything to
13    specifically become aware?
14              MR. RODGERS:  Objection.  You
15         can answer if you want.  If you
16         understand it.
17         A.    I understand the question.
18    I -- during my preposition, I did not
19    become aware of specific training related
20    to use of the autopilot.
21         Q.    So you would rely on, I think
22    you said Mr. Baldassare or Mr. Moore or
23    documents?
24         A.    Or documents or Morrissey,
25    testimony forthcoming.
```

Laraway Dep., 97:18-95:25 (**Exhibit G**).

These objections and non-answers resulted in a wholly defective Rule 30(b)(6) deposition. And the examples above are only a portion of the evasive and obstructive testimony.  A more complete list, accompanied by proposed facts to be deemed admitted, is attached as **Appendix A** to the accompanying motion.

As in *Humanscale*, Carver's failure to prepare for and respond to the Belt Line's Rule 30(b)(6) notice is not only improper, but amounts to a failure to appear at all.  *See* Fed. R. Civ. P. 37(d)(1); *Humanscale*, 2009 U.S. Dist. LEXIS 120197, at *6.  Accordingly, under Rule 30(d) and (g) and this Court's inherent authority, sanctions may include any or all of the orders listed in Rule 37(b)(2)(A)(i)–(vi), including dismissal of Carver's limitation Complaint and an order that

---

⁷      This reference is to James Morrissey, the operator of the tug on June 15, 2024, not Jarkeis Morrissey, one of the deckhands (and James Morrissey's son), whose deposition had already been taken.  James Morrissey's deposition was scheduled to occur in Florida on June 24, 2025, but despite proper personal service on him, he failed to appear.  A motion for sanctions and to compel his attendance at deposition was filed July 3, 2025.  *See* ECF No. 62.

"designated facts be taken as established for purposes of the action, as the prevailing party claims."

Fed. R. Civ. P. 37(b)(2)(A)(i).

### III.    Carver's counsel violated Fed. R. Civ. P. 30(d) by making approximately 144 improper speaking objections.

Like Carver's instructions not to answer and its failure to provide Rule 30(b)(6) testimony,

Carver's repeated speaking objections throughout the depositions of its past and present employees

were legion and completely impeded the Belt Line's ability to properly depose the witnesses, as

the objections consistently operated to coach the witnesses on their answers.   Rule 30 mandates

that objections in depositions "must be stated concisely in a nonargumentative and nonsuggestive

manner."  Fed. R. Civ. P. 30(c)(2).  When objections impede, delay, or frustrate the deposition,

they are improper.  *Id*.  As the Advisory Committee Notes to Rule 30 state:

> Depositions frequently have been unduly prolonged, if not unfairly frustrated, by lengthy objections and colloquy, *often suggesting how the deponent should respond*.  While objections may, under the revised rule, be made during a deposition, *they ordinarily should be limited to those that under Rule 32(d)(3) might be waived if not made at that time*, *i.e.*, objections on grounds that might be immediately obviated, removed, or cured, *such as to the form of a question or the responsiveness of an answer*.

Fed. R. Civ. P. 30, Advisory Committee Notes to the 1993 Amendment.  The same Advisory

Committee Notes continue that, "The making of an excessive number of unnecessary objections

may itself constitute sanctionable conduct. . ."  *Id*.

In total, Carver's counsel interposed a total of **144** improper speaking objections (**52** during

Brian Moore's deposition, **41** during Leonard Baldassare's deposition, **7** during Sharif Porter's

deposition, **9** during Jarkeis Morrissey's deposition, and **35** during the Rule 30(b)(6) deposition).

Carver's counsel also delivered lengthy objections designed to coach Carver's witnesses.

*See supra*.  A standout example is below, where Carver's counsel interrupted questioning about

document preservation with a lengthy objection obviously aimed at coaching Mr. Moore:

```
 6      Q.      So is that your e-mail at Carver?
 7      A.      Yes.
 8      Q.      So do you recall receiving this letter?
 9      A.      I don't recall it, but I've seen it.
10      Q.      It was asking you to preserve -- asking
11 Mr. Laraway to preserve information that might
12 otherwise be lost, right?
13      A.      Yes, sir.
14      Q.      Okay.  Did you do anything in response
15 to it to preserve any of the requested information?
16      A.      I did not do anything in particular.
17      Q.      Do you know whether Mr. Laraway did?
18      A.      No, I don't know what Mr. Laraway did,
19 either.
20      Q.      And it specifically requests around
21 preserving texts, e-mails, voicemails and messaging
22 service communications.
23              You told us that the phone that you had
24 at the time you since replaced --
25      A.      Yes.
```

```
 1              Moore - April 28, 2025
 2      Q.      -- right?
 3              So were the texts, e-mails, voicemails,
 4 or other messages on that device preserved before you
 5 got rid of it?
 6      A.      It would still be a cloud-based backup
 7 for the iCloud, which is an iPhone.  So I'm not sure.
 8 I -- correction.
 9              MR. RODGERS:  Just --
10      A.      Let me --
11              MR. RODGERS:  -- hold on, hold on, hold
12      on.
13              Is there a reason this was sent to
14      Mr. Laraway and not Carver's attorneys?
15              MR. CHAPMAN:  Yeah.  I wasn't aware that
16      they had counsel at the time.
17              MR. RODGERS:  Well, I don't -- I don't
18      want him to discuss anything that has to do with
19      what they did to preserve.  That's not
20      appropriate.
21              MR. CHAPMAN:  I'm --
22              MR. RODGERS:  I understand the letter.
23              MR. CHAPMAN:  -- I'm entitled to ask him
24      what he did.
25              MR. RODGERS:  No.  You're entitled to
```

```
 1              Moore - April 28, 2025
 2      demand this, and we then produce, and -- you
 3      know, you're not entitled to do this, because it
 4      actually impedes on what his former lawyer asked
 5      him to do or we asked him to do.  And that's
 6      attorney-client privilege, until the court tells
 7      us otherwise.
 8              MR. CHAPMAN:  So --
 9              MR. RODGERS:  We're not here to have a
10      hearing on preservation.  It's not fair to the
11      witness, and I don't think it's appropriate, to
12      be honest.  So I'm not going to have him answer
13      whether he or Carver actually complied with your
14      letter.  You're not his attorney, and you sent
15      it directly to a party, and whether or not you
16      knew who the attorney was is beside the point.
```

```
17          If you find out later that there's been things
18          that weren't preserved, then you make your
19          motion.
20               MR. CHAPMAN:  And I'm testing right now
21          what was preserved.
22               MR. RODGERS:  Well, I'm going to tell
23          him not to answer to anything that has to do
24          with this letter.  You've asked him if he
25          preserved things during this deposition, and he

 1               Moore - April 28, 2025
 2          answered you whether he thought they had it or
 3          whatever, but not to this letter.  This is
 4          not -- this is not appropriate.
 5               MR. CHAPMAN:  Are you done?
 6               MR. RODGERS:  Not really, but you can
 7          go.
```

Moore Dep., 338:6-341:7 (**Exhibit I**).  The end result of this improper multi-page objection was no answer by the witness at all, forcing the deposition in a different direction.

The argumentative and suggestive objections continued in Mr. Baldassare's deposition.  In one example, Carver's counsel spoke to the witness off the record during the deposition, in the middle of a line of questioning:

```
20          Q.   Did Captain James Morrissey
21     leave Carver before you did?
22          A.   I'm not sure.  I don't know.
23     As far as I knew, after this incident
24     happened, he was still an employee of the
25     company.  However, he was not working on

 1     any of the boats.

                    *   *   *

17          Q.   So you didn't make that
18     decision?
19          A.   I did not.  It was made by
20     upper management.
21          Q.   And when you say "upper
22     management," do you mean Mr. Moore?
23          A.   Correct.
24               MR. RODGERS:  I just want to
25          talk to the witness for a minute.

 1          Are you okay with that, Jim.
 2               MR. CHAPMAN:  You know, I'm
 3          really not.
 4
 5               MR. RODGERS:  All right.  I'll
 6          do it in front of you.  Well, I can,
 7          but I don't want to waste a lot of
 8          time.  Off the record.
 9               (Whereupon, a discussion was
10          held off the record.)
11               THE WITNESS:  This incident
```

```
12        happened, and then on June 24th, I
13        was out for eight weeks on paternity
14        leave.  So anything that --
15             MR. RODGERS:  That's it.
16        That's what he need[s].
17             THE WITNESS:  Okay.
18             MR. RODGERS:  He can ask you
19        now what you remember and know.
20             THE WITNESS:  Sure, understood.
```

Baldassare Dep., 29:20-31:20 (**Exhibit H**).

Additional examples are contained in the deposition excerpts for Messrs. Laraway, Moore, Baldassare, Porter, and Jarkeis Morrissey attached hereto.  *See* **Exhibits G**, **H**, **I**, **J**, and **K**.

## IV.    Carver's deposition objections are part of a pattern of discovery obstructions.

To be sure, the Belt Line acknowledges the gravity of the relief it seeks—that is, an order *dismissing* Carver's limitation Complaint and *deeming* the obstructed facts admitted against Carver, along with its late-produced text messages.  If only one instance of obstruction existed, the "appropriate" remedy might be different.  Here, however, there is simply no way to adequately remedy Carver's pattern of evasive and obstructive conduct that began with its hit-and-run escape from the allision itself, continued with its lack of production in this case until ordered by the Court, pervaded every deposition of Carver's witnesses, including its Rule 30(b)(6) designee, and persists to this day in the form of continuing piecemeal document disclosures long past the deadline ordered by the Court (and extended by agreement out of courtesy), highly damning (albeit incomplete) text threads produced only *after* the Belt Line's expert reports, no date for a tug inspection for the Belt Line's and Evanston's tug captain expert, and *still* no texts or voicemails from Mr. Moore's phone or the tug's phone, among other deficiencies.

The Belt Line's concern over these obstructions is not without reason, since one of the main issues in this case is the seaworthiness of the M/T MACKENZIE ROSE at the time of the incident and Carver's privity and knowledge of it.  Despite Carver's incomplete production, its documents provide glimpses into pervasive issues with the autopilot and steering systems on the tug, including

two rudder failures in May 2024—*after* Carver claims it replaced part of its autopilot system—both turning the tug "hard over" the way it turned to port before the allision on June 15, 2024. These are precisely the kinds of issues that the Belt Line is entitled to explore fully, but that Carver has blocked repeatedly (not only in depositions, but most recently in refusing to even produce the tug for expert inspection).

In view of this extensive pattern of obstruction, anything short of dismissal of Carver's limitation Complaint will only reward Carver for its conduct, allowing its witnesses to re-prepare for known lines of questioning and to inform themselves of critical facts and expert theories after the Belt Line already disclosed its reports. Given their previous conduct, Carver's witnesses can be expected to be even more evasive if given the opportunity to answer again. None of this is how cases are supposed to proceed in the Eastern District of Virginia, and all of it has prejudiced the Belt Line by consistently and thoroughly impeding its ability to develop facts to defeat Carver's limitation effort. The full list of those facts, which exemplify the ongoing prejudice, is identified above and in **Appendix A** to the accompanying motion.

## <u>Conclusion</u>

WHEREFORE, the Belt Line and Evanston respectfully request that this Court enter an Order *dismissing* Carver's limitation Complaint with prejudice, *allowing* this action to proceed on the claims filed by the Belt Line and Evanston without a limitation on recovery, *deeming* the facts underlying the obstructed testimony admitted as detailed in **Appendix A** to the accompanying motion, *deeming* Carver's text messages admissible for purposes of summary judgment or trial, and *granting* the Belt Line and Evanston all other just relief, including attorneys' fees.

Dated:  July 16, 2025

NORFOLK AND PORTSMOUTH BELT
LINE RAILROAD COMPANY


By: _____ */s/ James L. Chapman, IV* _____
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl, VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cmw-law.com
*Counsel for Norfolk and Portsmouth Belt
Line Railroad Company*

EVANSTON INSURANCE COMPANY,
a/s/o NORFOLK AND PORTSMOUTH
BELT LINE RAILROAD COMPANY


_____ */s/ Mark C. Nanavati* _____
Mark C. Nanavati, VSB No. 38709
G. Christopher Jones, Jr., VSB No. 82260
SINNOTT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com

Zachary M. Jett, VSB No. 93285
BUTLER WEIHMULLER KATZ CRAIG LLP
11525 N. Community House Road, Ste 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company,
a/s/o Norfolk and Portsmouth Belt Line
Railroad Company*

28

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 16th day of July 2025 a true and correct copy of the foregoing  was served on parties via CM/ECF electronic filing system upon the following:

James H. Rodgers, Esq. *(pro hac vice)*
CLYDE & CO US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 702-6771
(212) 710-3950
*James.Rodgers@clydeco.us*

Harold L. Cohen. Esq.
CLYDE & CO US LLP
1221 Brickell Ave #1600
Miami, Florida 33131
(202) 747-5108
(202) 747-5150
*Harry.Cohen@clydeco.us*

Rachel Werner, Esq. *(pro hac vice)*
CLYDE & CO US LLP
One N. Central Avenue, Ste 1030
Pheonix, Arizona 85004
(480) 746-4580
(480) 746-4569 Direct
(480) 746-4556 Fax
*Rachel.werner@clydeco.us*

Michael Roman, Esq.
Dawn Johnson, Esq.
Siobhan Murphy, Esq.
CLYDE & CO US LLP
30 S. Wacker Drive, Ste 2600
Chicago, IL 60606
Tel No.: (312) 635-6971
Fax No.: (312)635-6950
*Michael.Roman@clydeco.us*
*Dawn.Johnson@clydeco.us*
*Siobhan.murphy@clydeco.us*
*Counsel for Coeymans Marine Towing, LLC,*
*d/b/a Carver Marine Towing*

James Morrissey (via electronic mail)
4723 Baywood Drive
Lynnhaven, FL 32444
*jdmorrissey15@gmail.com*


_____/s/ James L. Chapman, IV_____