```
IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
----------------------------------------X
IN THE MATTER OF COEYMANS MARINE
TOWING, LLC D/B/A CARVER MARINE
TOWING AS OWNER AND OPERATOR OF M/T
MACKENZIE ROSE, (IMO NO. 8968765) HER
CARGO, ENGINES, BOILERS, TACKLE, EQUIPMENT,
APPAREL, AND APPURTENANCES, ETC., IN REM,
("M/T MACKENZIE ROSE"),

                              CIVIL ACTION
                              NO: 2:24-cv-00490-MSD-LRL

PETITIONING FOR EXONERATION FROM OR
LIMITATION OF LIABILITY IN ALLISION WITH
NORFOLK AND PORTSMOUTH BELT LINE RAILROAD
COMPANY MAIN LINE RAILROAD BRIDGE
(THE "BRIDGE") OCCURRING JUNE 15, 2024 IN
AND ABOUT THE ELIZABETH RIVER, VIRGINIA.

----------------------------------------X

                         June 17, 2025
                         10:08 a.m.



         AN IN PERSON VIDEOTAPED DEPOSITION of

Nicholas Laraway, taken by the respective

parties, pursuant to Order, before Larin

Kaywood, a Notary Public for and within the

State of New York.
```



EXHIBIT
G

JOB NO.: 114501

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division
### In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**Exhibit G**

**Deposition of Nicholas Laraway (Rule 30(b)(6) - June 17, 2025**

| Page | Line | Extract |
|---|---|---|
| 21 - 22 | 17 - 22 | 17     Q.   This letter specifically<br>18   requested that a Carver undertake to<br>19   preserve and retain various information.<br>20          Did you initiate any steps to<br>21   do that?<br>22          <u>MR. RODGERS</u>:  Objection to the<br>23      extent that it asks for legal advice<br>24      that he received, but you can answer<br>25      as to your understanding.<br><br>22<br><br>**1     A.   My understanding was that that**<br>**2   was requested of us and that we were to do**<br>**3   that.**<br>4     Q.   My question though was, did you<br>5   do anything to do that?<br>**6     A.   When I spoke with Brian, I**<br>**7   asked him to make sure that he obtained**<br>**8   everything and compiled it for our attorney**<br>**9   because our attorney was taking lead on**<br>**10   correspondence moving forward.**<br>11     Q.   And sitting here today, do you<br>12   know whether anything was ever done to<br>13   secure any of the mobile devices that were<br>14   utilized for communication between the tug<br>15   and either Mr. Baldassare and Mr. Moore on<br>16   June 15th, 2024?<br>17     A.   I believe Mr. Baldassare's<br>18   phone has been provided and that the tug<br>19   phone has as well.<br>20          I am not certain, but I believe<br>21   there were actions taken to follow the<br>22   request in the letter. |
| 22 - 24 | 11 - 17 | 11     Q.   And sitting here today, do you<br>12   know whether anything was ever done to<br>13   secure any of the mobile devices that were<br>14   utilized for communication between the tug<br>15   and either Mr. Baldassare and Mr. Moore on<br>16   June 15th, 2024? |

**17      A.   I believe Mr. Baldassare's**
**18  phone has been provided and that the tug**
**19  phone has as well.**
**20      I am not certain, but I believe**
**21  there were actions taken to follow the**
**22  request in the letter.**
23     Q.   And provided to whom when you
24  say provided?
25          MR. RODGERS:  That's -- you're

23

1      asking him about attorney-client
2      communications dealing with this
3      litigation.
4         MR. CHAPMAN:  No.  I'm just
5      asking about the physical devices.
6      The phone on the tug and
7      Mr. Baldassare's phone or any other
8      phone that was involved in the
9      communications that occurred on June
10      15th, 2024 between the tug and either
11      Mr. Moore or Mr. Baldassare.
**12      A.   I don't know the specific**
**13  actions that were taken by Brian to comply**
**14  with that.**
15     Q.   And this is what I'm asking is,
16  today you still don't know?
17         MR. CHAPMAN:  I'm not
18      asking --
19         MR. RODGERS:  By counsel we are
20      providing the records of
21      Mr. Baldassare's phone, and the tug
22      phone, and I think you know that.
23         That's what we've provided or
24      we had access to, so.
25         MR. CHAPMAN:  Actually I don't

24

1      know that, but I appreciate you

| | | |
|---|---|---|
| | | 2　　telling me that. |
| | | 3　　　MR. RODGERS:  Well, it's in |
| | | 4　　the -- it's in our response. |
| | | 5　　　MR. CHAPMAN:  We don't need to |
| | | 6　　have a debate about it, but |
| | | 7　　Mr. Malik's declaration says |
| | | 8　　otherwise.  And -- |
| | | 9　　　MR. RODGERS:  No.  Because it |
| | | 10　　wasn't -- we didn't -- we had to get |
| | | 11　　a vender to do that. |
| | | 12　　　So I'm just giving you |
| | | 13　　the -- by counsel.  I'm not sure the |
| | | 14　　witness has any knowledge, but you |
| | | 15　　can tell him what you know. |
| | | **16　　A.   I don't have specific** |
| | | **17　knowledge.** |
| 24 - 26 | 18 - 14 | 18　　Q.   About what's happened to the |
| | | 19　　phones?  Just so we're clear on what we're |
| | | 20　　talking about. |
| | | 21　　　MR. RODGERS:  Personal |
| | | 22　　knowledge? |
| | | 23　　　MR. CHAPMAN:  Yes. |
| | | **24　　A.   I don't have personal knowledge** |
| | | **25　of how that information was obtained and** |
| | | 25 |
| | | **1　provided to our insurance counsel.** |
| | | 2　　Q.   Fair enough.  My question |
| | | 3　　though really relates to, you're the |
| | | 4　　corporate representative. |
| | | **5　　A.   Correct.** |
| | | 6　　Q.   And I'm just trying to |
| | | 7　　understand from your perspective, being the |
| | | 8　　corporate representative, what does Carver |
| | | 9　　say or you say on their behalf about the |
| | | 10　　status of those two phones I have been |
| | | 11　　asking about. |
| | | 12　　　They have been recovered?  They |
| | | 13　　have been secured? |
| | | 14　　　MR. RODGERS:  Objection. |

|  |  |  |
|---|---|---|
|  |  | 15      Counsel, he's already answered that. |
|  |  | 16         Don't answer that. |
|  |  | 17         MR. CHAPMAN:  You are not under |
|  |  | 18      oath, Mr. Rodgers. |
|  |  | 19         <u>MR. RODGERS</u>:  Don't -- well, I |
|  |  | 20      don't know -- this is discovery we're |
|  |  | 21      providing you as counsel, so he's |
|  |  | 22      already answered. |
|  |  | 23         Do you want to ask the same |
|  |  | 24      question again? |
|  |  | 25         Go ahead. |
|  |  | 26 |
|  |  | 1      Q.   How about we have the court |
|  |  | 2   reporter read it back? |
|  |  | 3         <u>MR. RODGERS</u>:  And the corporate |
|  |  | 4      position is what counsel has provided |
|  |  | 5      in this discovery.  That's the |
|  |  | 6      corporate position. |
|  |  | 7         If you want to ask him his |
|  |  | 8      personal knowledge, he's here to |
|  |  | 9      answer that. |
|  |  | 10         (Whereupon, the above record |
|  |  | 11      was read back by the court reporter.) |
|  |  | **12      A.   I personally was not involved** |
|  |  | **13   in the process to secure and provide the** |
|  |  | **14   phones to our counsel.** |
| 41 - 42 | 20 - 6 | 20      Q.   Okay.  So that's -- I'm curious |
|  |  | 21   about that because was it your testimony |
|  |  | 22   that that appraisal that you've seen from |
|  |  | 23   2025 was for $4 million or more? |
|  |  | **24      A.   From what I recall, yes.** |
|  |  | 25      Q.   Okay.  But you don't think it |
|  |  | 42 |
|  |  | 1   was from this appraisal from 2021 that's |
|  |  | 2   marked as Exhibit 5? |

| | | |
|---|---|---|
| | | 3    <u>MR. RODGERS</u>:  Objection to<br>4    form.  You can answer if you<br>5    understand the question.<br>**6    A.  Correct.** |
| 48 - 49 | 2 - 25 | 1  Q.   And it says that it's the<br>2  amount insured/agreed, value is $3,070,000,<br>3  correct?<br>4    A.   That is correct.<br>5    Q.  Do you understand why it is<br>6  insured for that amount?<br>7      <u>MR. RODGERS</u>:  In this document?<br>8      MR. CHAPMAN:  No.<br>9      <u>MR. RODGERS</u>:  In this document.<br><br>10    Q.   Not necessarily in this<br>11  document, but I'm just trying to understand<br>12  why the company is insured it in that<br>13  amount.<br>14      <u>MR. RODGERS</u>:  Just for the<br>15    record, it's -- I think it's dated<br>16    11/1/2023.<br>17      You can answer, if you know.<br>**18    A.  The company generally insures**<br>**19  the vessel for – the vessels for a minimum**<br>**20  of the fair market value, and when there's**<br>**21  a higher replacement value, we try and**<br>**22  insure them for more because if in the**<br>**23  event that we needed to utilize the**<br>**24  insurance, we would need to generally**<br>**25  replace it with something.** |
| 53 | 8 - 22 | 8    Q.   Okay.  So you did mention that<br>9  there was a -- you thought a 2025 survey<br>10  that you've seen and it provides a<br>11  valuation that you think exceeds<br>12  $4 million.<br>13      And is it your understanding<br>14  that on that basis, it's been insured for<br>15  whatever that survey reported the fair<br>16  market value to be?<br>17      <u>MR. RODGERS</u>:  Objection to<br>18    form.  You can answer if you |

| | | |
|---|---|---|
| | | 19    understand the question.<br>**20    A.    That would be my understanding**<br>**21  of the process to increase the insurance**<br>**22  value, yes.** |
| 59 - 61 | 23 - 25 | 23    Q.    Okay.  Other than that survey,<br>24  is there anything else on which Carver<br>25  bases its valuation of the Tug Mackenzie<br><br>60<br><br>1   Rose as of the date of the allision in<br>2   2024?<br>3         MR. RODGERS:  Objection to<br>4     form.  You can answer if you<br>5     understand it.<br>**6     A.    Nothing specifically that I can**<br>**7  bring to mind.**<br>8    Q.    Okay.  I mean, okay.<br>**9     A.    Industry experience.**<br>10    Q.    I'm sorry?<br>**11    A.    I said the industry experience**<br>**12  of our leaders.**<br>13    Q.    Which includes yours?<br>**14    A.    Which would include more**<br>**15  specifically Brian Moore as the general**<br>**16  manager and expert in the maritime field.**<br>17    Q.    And has he ever told you that<br>18  he thought that as of the date of the<br>19  casualty, the vessel was worth something<br>20  between – up to two and a half million<br>21  dollars?<br>**22    A.    I don't recall having that**<br>**23  specific conversations with him.**<br>24    Q.    All right.  Great.  Thank you.<br>25  I'll take that back.  Thank you. |
| 66 | 9 - 24 | 9    Q.    Okay.  And do you know what<br>10  happened in this scenario with Skanska?<br>**11    A.    Dylan indicated with – to me**<br>**12  when I spoke to him that there was a rate**<br>**13  sheet provided, a one off, and that we did** |

| | | |
|---|---|---|
| | | 14  **the work, we invoiced him for it and to his**<br>15  **knowledge, we were paid for it.  And I can**<br>16  **obtain that number for you during a break**<br>17  **if you'd like.**<br>18      Q.   Okay.<br>19          MR. RODGERS:  If not, we'll<br>20      leave a -- you could leave a space in<br>21      the record for that amount and we'll<br>22      get it to counsel.<br>23      **A.**  _____<br>24  _____ . |
| 67 - 68 | 24 - 15 | 24      Q.   So you are not in a position to<br>25   testify about that topic based on anything<br><br>68<br><br>1   you've done to prepare for this deposition?<br>2          MR. RODGERS: **He's relying on**<br>3      **the testimony of Mr. Moore and**<br>4      **Mr. Baldassare.**<br>5      Q.   Maybe I'm -- I apologize.<br>6          MR. RODGERS:  **As well as the**<br>7      **documents produced to date.**<br><br>8      Q.   I may have misunderstood your<br>9   answer.  You said that that information<br>10   would be in the hands of or in the minds of<br>11   or knowledge of Mr. Moore and<br>12   Mr. Baldassare?<br>13      **A.   And what they have testified**<br>14   **to, and all of the information we have**<br>15   **provided today.** |
| 68 - 70 | 16 - 1 | 16      Q.   Okay.  And did you read their<br>17   testimony?<br>18      **A.  I did not.**<br>19      Q.   Did you read a summary of their<br>20   testimony?<br>21          MR. RODGERS:  Objection.<br>22      Attorney-client.  Don't answer that.<br>23      Q.   I'm not asking what's in the |

| | | |
|---|---|---|
| | | 24  summary -- |
| | | 25      MR. RODGERS:  Don't answer |
| | | |
| | | 69 |
| | | |
| | | 1      that. |
| | | 2      Q.  I'm only asking whether you |
| | | 3   have read a summary of their testimony. |
| | | 4      MR. RODGERS:  Objection.  Does |
| | | 5      that include what the attorneys have |
| | | 6      provided? |
| | | 7      MR. CHAPMAN:  It might have. |
| | | 8      I'm not asking what the substance |
| | | 9      was. |
| | | 10      MR. RODGERS:  Don't answer any. |
| | | 11      No.  You're answering what we did to |
| | | 12      prep him and that – I mean, you're |
| | | 13      asking what we did to prep him. |
| | | 14      MR. CHAPMAN:  Well, are you |
| | | 15      telling the witness not to answer, |
| | | 16      Mr. Rodgers? |
| | | 17      MR. RODGERS:  I think I |
| | | 18      objected. |
| | | |
| | | 19      Q.  Okay.  I understand your |
| | | 20   objection.  I'm just asking, did you read a |
| | | 21   summary of what either Mr. Baldassare or |
| | | 22   Mr. Moore testified to? |
| | | 23      MR. RODGERS:  You can answer if |
| | | 24      you read a summary.  Not what you |
| | | 25      read. |
| | | |
| | | 70 |
| | | |
| | | **1      A.  I did read summaries.** |
| 70 - 71 | 2 - 6 | 2      Q.  And do you know who prepared |
| | | 3   the summaries? |
| | | 4      MR. RODGERS:  What was the -- I |
| | | 5      didn't hear you. |
| | | 6      Q.  I said do you know who prepared |

7  the summaries?

8      MR. RODGERS:  Don't answer

9  that.  I'm directing the witness not

10 to answer.

11     Q.   Well, I'm just trying to

12 understand.  Was it like ChatGPT that

13 prepared them or was it an actual human

14 being, if you know?

15     MR. RODGERS:  You're asking him

16     if it came from his attorneys or from

17     somebody else?

18     MR. CHAPMAN:  Well, it might

19     have come from his attorneys.

20     MR. RODGERS:  Well, why don't

21     you establish that so you're not

22     asking him privileged information?

23     MR. CHAPMAN:  Well, I started

24     by asking if he knew who had prepared

25     the summaries.

71

1      MR. RODGERS:  You're getting

2      into attorney-client preparation.

3      You can answer if your attorneys

4      provided you, or somebody else.

**5      A.   It was provided by my**

**6  attorneys.**

| 71 - 72 | 14 - 4 | 14     Q.   And do you -- what was the |

14     Q.   And do you -- what was the

15 speed of the vessel when it allided with

16 the Belt Line Bridge on June 15th, 2024?

17     MR. RODGERS:  Objection.  Asked

18     and answered.  You can answer it

19     again.

**20     A.   I would rely on the testimony**

**21 of Brian and Lenny as well as the documents**

**22 we've provided in discovery.**

23     Q.   Okay.  But what was the speed?

24 I can -- I hear you saying you're relying

25 on them.

| | | |
|---|---|---|
| | | 72<br><br>**1    A.   I don't know off the top of my**<br>**2   head.**<br>3    Q.   You don't?<br>**4    A.   I do not.** |
| 72 | 5 - 11 | 5    Q.   What was the heading of the Tug<br>6   Mackenzie Rose at the time that it allided<br>7   with the Norfolk and Portsmouth Belt Line<br>8   Bridge on June 15th, 2024?<br>9       MR. RODGERS:  Objection.  Asked<br>10      and answered.  You can --<br>**11    A.   I would repeat my prior answer.** |
| 72 - 73 | 12 - 1 | 12     Q.   How long ago did you review the<br>13   summaries that you've mentioned of the<br>14   testimony of Mr. Baldassare or Mr. Moore?<br>15       MR. RODGERS:  Objection.  **I'm**<br>**16       directing the witness not to answer**.<br>17       And I know what you are doing, Jim.<br>18       You are trying into get into<br>19       the -- to attorney-client work<br>20       process.<br>21    Q.   I'm --<br>22       MR. RODGERS:  Yeah, you are.<br>23       So don't answer that.  Maybe ask it a<br>24       different way.  I don't think there's<br>25       another way, but ask it and I'll let<br><br>73<br><br>1     him answer. |
| 77 - 78 | 21 - 8 | 21    Q.   All right.  And on the<br>22   following pages it prefers to further<br>23   sections of 46 CFR 4.03, 4.05?<br>**24    A.   That is correct.**<br>25    Q.   Yeah.  Okay.  So Carver's |

| | | |
|---|---|---|
| | | 78 |

1  policy is to follow the code of federal
2  regulations?
3      MR. RODGERS:  Objection to
4    form.
5        You can answer if you
6    understand the question.
7    A.   Our policy is to follow these
8  specific regulations.

| 80 - 82 | 16 - 15 | 16    Q.   And what is Carver's |
|---|---|---|

16    Q.   And what is Carver's
17  understanding of the reasons why it did not
18  notify the Coast Guard immediately after
19  the allision?
**20    A.   My understanding from preparing**
**21  for this deposition is that the original**
**22  report provided to Lenny was that it was**
**23  strike between the barge and fendering and**
**24  not the bridge structure.  It was not until**
**25  days later that the fact that the bridge**


81


**1  was struck came to light.**
2      Q.   And who reported that
3  information to -- you called him Lenny,
4  that's Mr. Baldassare, right?
**5    A.   Leonard.  Yep.**
6      Q.   Who reported that information
7  to Mr. Baldassare?
**8    A.   It was the captain or the mate,**
**9  I don't recall specifically.**
10      Q.   The captain being Christopher
11  Miller?
12    A.   Yes.
13      Q.   Who's now deceased?
14    A.   Yes.
15      Q.   And the mate being James
16  Morrissey?
**17    A.   Correct.**
18      Q.   Who no longer works for the

| | | |
|---|---|---|
| | | 19  company?<br>**20      A.    Correct.**<br>21      Q.    So is it Carver's assessment<br>22  that one or both of them conveyed false<br>23  information to Mr. Baldassare?<br>24          MR. RODGERS:  Objection to the<br>25      term false, but you can answer if you<br><br>82<br><br>1      understand the question.<br>**2      A.    It is my understanding that**<br>**3  incorrect information was provided to**<br>**4  Lenny.**<br>5      Q.    By either Captain Miller or<br>6  Captain Morrissey?<br>**7      A.    Correct.**<br>8      Q.    How did Carver then become<br>9  aware that that information was incorrect?<br>10          MR. RODGERS:  Go ahead if you<br>11      know.<br>**12      A.    I would have to rely on the**<br>**13  testimony of Lenny and Brian as to how they**<br>**14  become aware that the information was**<br>**15  correct.** |
| 84 - 86 | 4 - 7 | 4      Q.    I'm just trying to find out if<br>5  you became aware that Mr. Moore or<br>6  Mr. Baldassare knew that the original<br>7  information that was provided by either<br>8  Captain Morrissey or Captain Miller on the<br>9  date of the allision was incorrect at any<br>10  time before you received my letter on June<br>11  20th of 2024?<br>**12      A.    I am not aware of when they**<br>**13  specifically learned that they had been**<br>**14  provided incorrect information about it**<br>**15  hitting the fendering, not the bridge.**<br>16      Q.    But did you come to learn that<br>17  they knew of it before you did?<br>18          MR. RODGERS:  Objection. |

19    Q.    That they knew of the incorrect
20  information before you did?
21        MR. RODGERS:  Objection to
22  form.  You're making a statement.  You are
23  asking if he knows that they knew
24  beforehand or are you telling him they knew
25  beforehand?  So my objection is to the


85


1  form.
2        MR. CHAPMAN:  If you want to
3  make a form objection, just make a form
4  objection rather than continuing to --
5        MR. RODGERS:  I mean, if you
6    are not going to re-do the question,
7    then I'll just tell him not to answer
8    it.  So I'd ask that you redo the
9    question in a proper form.
10        MR. CHAPMAN:  Okay.
11        MR. RODGERS:  So it's not to
12    confuse the witness.
13        MR. CHAPMAN:  So I'm not going
14    to re-ask the question.  Okay.  If
15    you want me to tell him not to
16    answer, that's your call.
17        MR. RODGERS:  I know you want
18    me to do that, but we'll see what
19    happens.  You want to repeat the
20    question?
21    A.    Can you repeat the question?
22        MR. CHAPMAN:  Sure.  Madam
23    Court Reporter, could you read it
24    back, please?
25        (Whereupon, the above record


86


1    was read back by the court reporter.)
2        MR. RODGERS:  Do you understand
3    the question?

| | | |
|---|---|---|
| | | 4      **A.   I understand the question.  I'm**<br>5   **not sure as to those facts, you would have**<br>6   **to rely on their testimony as to when they**<br>7   **became aware.** |
| 88 - 89 | 21 - 7 | 21      Q.    Okay.  It says, "It's<br>22   required."  Do you see the text required<br>23   over in the right-hand side?<br>**24      A.   That's correct.**<br>25      Q.    Okay.  Do you know the purpose<br><br>89<br><br>1   of requiring lookout information as part of<br>2   this form?<br>3        MR. RODGERS:  Objection to<br>4      form.  He is not here as an expert.<br>5      You can answer as to what he knows.<br>6      **A.   As to my personal knowledge, I**<br>7   **do not know why.** |
| 90 - 91 | 2 - 12 | 2      Q.    Okay.  And as part of the<br>3   navigation section of the safety management<br>4   system, there's no company prohibition on<br>5   using the automatic pilot that's placed on<br>6   any of the operators of the vessels,<br>7   correct?<br>8        MR. RODGERS:  Objection.  If<br>9      you're asking him as an expert or as<br>10       mariner, he's already testified he's<br>11       not.  To the extent of your<br>12       knowledge, you can answer.<br>**13      A.   Can you repeat the question,**<br>**14   please?**<br>15      Q.    Yeah.  Could you read it back,<br>16   please?<br>17        (Whereupon, the above record<br>18        was read back by the court reporter.)<br>19        MR. RODGERS:  Same objection.<br>20        Jim, are you asking him what it<br>21        says or are you asking him what he<br>22        knows? |

| | | |
|---|---|---|
| | | 23  MR. CHAPMAN:  Well, I'm asking<br>24 him about the contents of the safety<br>25 management system and specifically<br><br>91<br><br>1 focused on the company's policy<br>2 regarding the use of autopilot.  And<br>3 I just want to be sure that we<br>4 understand it.<br><br>5 Q. And my question is, whether<br>6 there is any company policy prohibiting the<br>7 use of the autopilot?<br>**8 A. I would rely on the depositions**<br>**9 of Brian and Lenny to speak to the**<br>**10 specifics.  But based upon reading this,**<br>**11 there does not appear to be any prohibition**<br>**12 in writing in this document.** |
| 91 - 92 | 23 - 13 | 23 Q. And right in the middle of the<br>24 page, it says, kind of in a call out,<br>25 yellow or orange-ish color.  "Under no<br><br>92<br><br>1 circumstances shall the wheelman<br>2 responsible for the transit make the bridge<br>3 due to pressure or pride."  What does that<br>4 mean?<br>5 MR. RODGERS:  Objection to<br>6 form.  You can answer if you<br>7 understand the question.<br>**8 A. I would rely on the depositions**<br>**9 of Brian and Lenny.  As to the specifics of**<br>**10 what that means, I would be making an**<br>**11 educated guess.**<br>12 Q. So you don't know?<br>13 A. Not specifically. |

| 92 - 93 | 17 - 6 | 17    Q.    Was there a safety briefing<br>18    before the transit of any of the bridges on<br>19    the Southern branch of the Elizabeth River?<br>20        MR. RODGERS:  Objection to<br>21      form.<br>22        MR. CHAPMAN:  Let me just<br>23      finish.<br>24        MR. RODGERS:  Sorry.<br><br>25    Q.    Prior to the allision on June<br><br><br>93<br><br>1    15th, 2024?<br>**2      A.   I would rely upon the documents**<br>**3    provided and the depositions of Brian Lenny**<br>**4    and all the crew members to answer that**<br>**5    question.  I'm not directly aware**<br>**6    personally.** |
|---|---|---|
| 93 | 7 - 23 | 7    Q.    What training does Carver<br>8    provide to its employees regarding bridge<br>9    transits.<br>**10      A.   I would rely upon the**<br>**11    depositions of Brian and Lenny as to those**<br>**12    answers and all of the documents provided**<br>**13    in discovery.  I do not specifically know.**<br>14    Q.    Are you -- does Carver know of<br>15    any training that was specifically provided<br>16    to Captain Morrissey regarding bridge<br>17    transits?<br>**18      A.   I would answer the question the**<br>**19    same way I answered the prior one.**<br>20    Q.    Which is you don't know and<br>21    you'd rely on what other people had to say<br>22    about it?<br>**23      A.   Correct.** |
| 94 - 95 | 4 - 16 | 4    Q.    What testing, if any, does<br>5    Carver provide regarding the captain's<br>6    knowledge and the capabilities regarding<br>7    bridge transits? |

8        MR. RODGERS:  Objection.  The
9    captain's not been -- not testified
10    and he is deceased and Mr. Morrissey
11    is scheduled for next week.  So the
12    witness cannot possibly know that.
13        MR. CHAPMAN:  So once again,
14    there you go off doing your best to
15    coach the witness into an answer,
16    Mr. Rodgers.
17        MR. RODGERS:  I'm not coaching.
18        MR. CHAPMAN:  And I just ask
19    that if you have a form objection,
20    just make it and then we'll proceed
21    with the witnesses knowledge.
22        MR. RODGERS:  You were asking
23    him about testimony that hasn't
24    happened and you know better than
25    anybody it hasn't happened.  So it's

95

1        an improper question.

2    Q.    Could you read the question
3    back?
4        (Whereupon, the above record
5    was read back by the court reporter.)
6        THE WITNESS:  Can I answer?
7        MR. RODGERS:  If you can
8    answer.
9    **A.    I would reiterate the same**
10    **statement as before.  We would have to rely**
11    **on the testimony of Brian, Lenny, the**
12    **captain which we can't have, the future**
13    **testimony of the mate and the documents**
14    **provided through discovery.  I do not**
15    **personally have any firsthand knowledge of**
16    **any training.**

| 96 | 6 - 17 | 6    Q.    Have you reviewed any such<br>7    training records for Captain James<br>8    Morrissey? |

| | | |
|---|---|---|
| | | 9    **A.   I specifically have not.**<br>10    Q.    Do you know if they exist?<br>11    **A.    Anything that exists has been**<br>12    **provided through the discovery that we have**<br>13    **conducted.  That I'm aware of.**<br>14    Q.    So you don't know whether it<br>15    exists or not but if it does, you believe<br>16    it's been provided in discovery?<br>17    **A.   Correct.** |
| 97 - 98 | 18 - 1 | 18    Q.    Mr. Laraway, what training was<br>19    provided to the captains of the tugs<br>20    regarding the use of the autopilot on any<br>21    of the tugs that were equipped with it?<br>22    **A.   I would rely on the testimony**<br>23    **of Brian and Lenny, any documents in**<br>24    **evidence and the future testimony of**<br>25    **Morrissey.  I'm not specifically aware**<br><br>98<br><br>1    **myself.** |
| 98 - 99 | 2 - 25 | 2    Q.    And you haven't done anything<br>3    to become aware?<br>4    **A.   I didn't hear you.**<br>5    Q.    And you haven't done anything<br>6    to become aware?<br>7    MR. RODGERS:  Objection.  He<br>8    didn't say that.<br>9    MR. CHAPMAN:  Well, he said he<br>10    was not specifically aware himself.<br>11    That's what I'm trying to understand.<br><br>12    Q.    You haven't done anything to<br>13    specifically become aware?<br>14    MR. RODGERS:  Objection.  You<br>15    can answer if you want.  If you<br>16    understand it.<br>17    **A.   I understand the question.**<br>18    **I -- during my preposition, I did not**<br>19    **become aware of specific training related** |

| | | |
|---|---|---|
| | | **20**  to use of the autopilot.<br>21       Q.    So you would rely on, I think<br>22  you said Mr. Baldassare or Mr. Moore or<br>23  documents?<br>**24       A.   Or documents or Morrissey,**<br>**25  testimony forthcoming.** |
| 100 -<br>102 | 21 - 10 | 21       Q.    There wasn't any post-incident<br>22  alcohol testing of any of the members of<br>23  the crew following the allision of the<br>24  Mackenzie Rose with the Belt Line Bridge on<br>25  June 15th, 2024, correct?<br><br>101<br><br>1         MR. RODGERS:  Just alcohol?<br>2       Q.    Well, I'm asking about alcohol<br>3  right now, but yeah, this refers to<br>4  prohibited substances.<br>5         MR. RODGERS:  Objection to<br>6       form.  You can answer it.<br><br>7       Q.    My first question was about<br>8  alcohol.  There wasn't any alcohol testing,<br>9  was there?<br>10       A.    Not that I'm aware.<br>11       Q.    Okay.  In section D, it says,<br>12  "Alcohol test kits are on board the vessel<br>13  to meet the two-hour alcohol testing<br>14  deadline."  Are there in fact alcohol test<br>15  kits on the vessel?<br>**16       A.   I would have to rely upon the**<br>**17  testimony of Brian and Lenny and the**<br>**18  documents provided in evidence.  I'm not**<br>**19  certain.**<br>20       Q.    Okay.  And then there's a<br>21  further drug testing deadline for<br>22  prohibited substances that has to be done<br>23  within 32 hours.<br>24         You see that?<br>**25       A.   I see that.** |

|  |  | 102 |
|---|---|---|
|  |  | 1    Q.   And there wasn't any such drug<br>2  testing of any members of the crew of the<br>3  Mackenzie Rose within that period of time<br>4  following the allision with the Belt Line<br>5  Bridge, correct?<br>**6    A.   Not that I'm aware of.**<br>7       <u>MR. RODGERS</u>:  You said drug<br>8    testing?<br>9       MR. CHAPMAN:  I said drug<br>10     testing, yes. |
| 106 -<br>107 | 19 - 5 | 19    Q.   Okay.  Was Captain Morrissey<br>20  disciplined in any way after the allision<br>21  with the Belt Line Bridge?<br>**22    A.   He was sus -- my understanding**<br>**23  is he was suspended pending the outcome of**<br>**24  multiple investigations**<br>25    Q.   So how soon was he suspended<br><br>107<br><br>1  after the allision?<br>**2    A.   For specifics, we would need to**<br>**3  rely on the documents and evidence on the**<br>**4  testimony of Brian and Lenny.  I would only**<br>**5  be able to speak to what I recall.** |
| 111 | 4 - 19 | 4    Q.   So the last entry on this page<br>5  says, "Notes."  There's nothing in the<br>6  before column but then in the submitted<br>7  column it says, "Ongoing Coast Guard<br>8  investigations.  See documents."<br>**9    A.   That is what it says.**<br>10    Q.   What documents are those?<br>**11    A.   I don't have personal knowledge**<br>**12  as to what they are.  I would rely on the**<br>**13  testimony of Brian and the documents**<br>**14  submitted.** |

| | | |
|---|---|---|
| | | 15      Q.    Did you review the records<br>16  produced to us regarding Mr. Morrissey?<br>**17      A.   I generally reviewed hundreds**<br>**18  of documents.  I don't know specifically if**<br>**19  I reviewed those specific documents.** |
| 121 -<br>122 | 15 - 4 | 15      Q.    The one you saw, you know, in<br>16  the month or so after the allision, did it<br>17  lead you to believe that there had been<br>18  some damage to the bridge itself?<br>**19      A.   Knowing what I saw in the**<br>**20  letter you sent me and the nature of the**<br>**21  bridge and the photo, it lead me to believe**<br>**22  that that was correct.**<br>23      Q.    Okay.  Do you know whether any<br>24  other photographs of the bridge were taken<br>25  by the tug?<br><br>122<br><br>**1      A.   I would rely upon the testimony**<br>**2  of Brian and Lenny and documents produced,**<br>**3  and I'm personally I'm unaware of any**<br>**4  additional.** |
| 121 -<br>122 | 23 - 4 | 23      Q.    Okay.  Do you know whether any<br>24  other photographs of the bridge were taken<br>25  by the tug?<br><br>122<br><br>**1      A.   I would rely upon the testimony**<br>**2  of Brian and Lenny and documents produced,**<br>**3  and I'm personally I'm unaware of any**<br>**4  additional.** |
| 122 -<br>123 | 25 - 7 | 25      Q.    So who is able to use the<br><br>123 |

| | | |
|---|---|---|
| | | 1  tugmackenzierose@carvercompanies.com e-mail<br>2  address to send things or to send e-mails?<br>**3      A.   I would rely on the testimony**<br>**4  of Brian and Lenny.  However, my**<br>**5  understanding is the captain and mate on**<br>**6  watch during any hitch have access to that**<br>**7  e-mail.** |
| 124 | 1 - 12 | 1         Do you know what photographs or<br>2  what's depicted in the photographs that<br>3  would have been numbered IMG1732 through<br>4  1737 are?<br>5      A.   I do not.<br>6      Q.   And do you know if they were<br>7  ever requested internally since there<br>8  appears to be a gap of a few photographs?<br>**9      A.   I would rely on the testimony**<br>**10  of Brian, Lenny and the documents in**<br>**11  evidence, but I'm not personally familiar**<br>**12  with that request, if any.** |
| 125 | 13 - 22 | 13      Q.   Does the Tug Mackenzie Rose<br>14  have any other e-mail address that is<br>15  like – is there is a<br>16  mackenzierose2@carvercompanies, or some<br>17  other kind of e-mail handle that is<br>18  considered a – I'll call it a, you know,<br>19  tug or official e-mail address?<br>**20      A.   I would rely on the testimony**<br>**21  of Brian and Lenny, but I'm not aware of**<br>**22  any other e-mail address personally.** |
| 128 - 129 | 4 - 13 | 4      Q.   The first one is the chief<br>5  engineer, Mr. McGrath who says, "Was in my<br>6  room, felt abrupt stop," right?<br>7  And then the next one is from one of the<br>8  deckhands, Sharif Porter, "I was in bed<br>9  sleeping, I felt the boat sliding.  I<br>10  thought we popped the push gear."<br>11         And then the next one, the<br>12      other deckhand, Jarkeis Morrissey, in<br>13      the third sentence says, "I was in<br>14      the galley cleaning up and put away |

| | | |
|---|---|---|
| | | 15   the food when we hit something."<br>16   Right.<br>17        And then the last one<br>18   Christopher Miller, the captain who<br>19   says, "I, Christopher Miller, was in<br>20   my bed resting when I felt a bump."<br>21        If this information had been<br>22   shared with you when it came in, what<br>23   would it have lead you to do, if<br>24   anything?  Maybe nothing, but if<br>25   anything.<br><br>129<br><br>1        MR. RODGERS:  Objection.  Calls<br>2    for speculation.<br>3        You can answer if you<br>4    understand the question.<br>5      **A.   Understanding the question and**<br>6    **knowing what – if this information was**<br>7    **provided to me along with the information**<br>8    **that I am aware was shared with Lenny at**<br>9    **the time that there was an issue with the**<br>10   **fendering or a tap as it said in this**<br>11   **e-mail, I would make sure that Brian and**<br>12   **Lenny conducted a full investigation to**<br>13   **confirm the facts.** |
| 130 | 6 - 17 | 6        Q.   Was there an investigation<br>7    initiated before your receiving of my<br>8    letter on June 20th?<br>9        MR. RODGERS:  Objection of form<br>10   on the term investigation.<br>11        If you understand the question,<br>12   you can answer.<br>13      **A.   I would rely specifically on**<br>14   **the testimony of Brian and Lenny and all**<br>15   **the documents provided through discovery.**<br>16   **But my understanding is that they were**<br>17   **reviewing what had happened.** |

| 130 -<br>133 | 18 - 4 | 18    Q.    Yeah.  Can you give us any more |
|---|---|---|
|  |  | 19  detail on what you mean by reviewing what |
|  |  | 20  happened? |
|  |  | **21    A.    I cannot because I wasn't aware** |
|  |  | **22  of it at the time.** |
|  |  | 23    Q.    Just to be sure, you haven't |
|  |  | 24  actually read their testimony, you've only |
|  |  | 25  read -- |
|  |  |  |
|  |  | 131 |
|  |  |  |
|  |  | 1        MR. RODGERS:  Objection. |
|  |  | 2    Objection.  You're getting into |
|  |  | 3    preparation. |
|  |  | 4        And by the way, just for the |
|  |  | 5    record, these statements, whatever |
|  |  | 6    they mean, are dated June 15th, and |
|  |  | 7    have a certain time on it.  So |
|  |  | 8    obviously there was some -- there |
|  |  | 9    were -- that the employees were being |
|  |  | 10    asked by somebody to write down a |
|  |  | 11    statement.  So when you say there was |
|  |  | 12    no investigation, I take issue with |
|  |  | 13    that. |
|  |  | 14        MR. CHAPMAN:  Are you done with |
|  |  | 15    your speaking objection? |
|  |  | 16        MR. RODGERS:  Well, I'm, you |
|  |  | 17    know, just straightening up the |
|  |  | 18    record. |
|  |  | **19    A.    Can you repeat the question?** |
|  |  | 20    Q.    I can't even remember the |
|  |  | 21  question. |
|  |  | **22    A.    Me either.** |
|  |  | 23        MR. RODGERS:  Me either. |
|  |  | 24        ***MR. NANAVATI***:  The question |
|  |  | 25    was, did you actually read the |
|  |  |  |
|  |  | 132 |
|  |  |  |
|  |  | 1    transcript or just read a summary? |
|  |  | 2        MR. RODGERS:  Objection.  Don't |

| | | |
|---|---|---|
| | | 3    answer that.<br>4       MR. CHAPMAN:  So you're<br>5    instructing the client --<br>6      *MR. NANAVATI*:  You're saying<br>7    that he can't answer what he did to<br>8    prepare for a deposition --<br>9      MR. RODGERS:  Who's this?<br>10   Who's speaking?<br>11     *MR. NANAVATI*:  Mark Nanavati.<br>12     MR. RODGERS:  Okay.  Well, you<br>13   can't do the tag team thing.  If you<br>14   want to ask questions on Evanston's<br>15   account, then you can do that when<br>16   Mr. Chapman is completed.<br>17     *MR. NANAVATI*:  I'm not asking<br>18   questions.  I'm challenging your<br>19   objections which are without merit.<br>20     MR. RODGERS:  Okay.  Well, good<br>21   for you but that's not going to<br>22   happen because we are not doing tag<br>23   team.<br>24      My objection is<br>25   you -- is -- and I'll repeat it,<br><br>133<br><br>1    you're asking for attorney-client<br>2    privilege information.  He's already<br>3    answered that he read summaries.  Not<br>4    you, Mark.  I'm talking to Jim. |
| 133 | 5 - 18 | 5    Q.   And all I'm trying to do is be<br>6  clear.  The only thing you read was<br>7  summaries.  You didn't actually read the<br>8  testimony of either Baldassare or Moore,<br>9  correct?<br>10     MR. RODGERS:  Objection.  He's<br>11    told you what he did.  He is not<br>12    going to tell you what he didn't do<br>13    and we are not going there.  So I'm<br>14    going to tell him not answer -- and<br>15    excuse me, I'm going to direct the |

| | | |
|---|---|---|
| | | 16    witness not to answer based on<br>17    attorney-client privilege and<br>18    preparation for this deposition. |
| 134 - 135 | 11 - 8 | 10  Q.   I said -- I asked, are there<br>11  any notifications to management when an<br>12  incident report is filled out in the Helm<br>13  CONNECT system?<br>**14    A.   Management meaning CMT**<br>**15  management or company management?**<br>16    Q.   I don't know if there -- I<br>17  don't understand on how you distinguish<br>18  them.  I'm basically asking would like<br>19  Mr. Moore or Mr. Baldassare or somebody<br>20  else in the management of the towing<br>21  business get a notification?<br>**22    A.   I would rely on the testimony**<br>**23  of Mr. Moore and Lenny as to whether or not**<br>**24  they receive notifications regarding**<br>**25  incident reports from Helm.  I do not**<br><br>135<br><br>**1  receive incident reports from Helm.**<br>2    Q.   Yeah, no, I get that.  But I'm<br>3  just asking what your understanding is.<br>4  Are they supposed to get a report, not<br>5  whether they actually did?<br>**6    A.   I'm not certain how the**<br>**7  interworkings of Helm work as it relates to**<br>**8  incident reporting notification.** |
| 136 | 13 - 20 | 13    Q.   Do you know if there is an<br>14  incident report in the Helm CONNECT system<br>15  for the bridge allision?<br>**16    A.   I would rely on Brian and**<br>**17  Lenny's testimony and what we've submitted**<br>**18  through our discovery process.  I'm not**<br>**19  specifically aware if there is one**<br>**20  personally.** |
| 138 - 142 | 7-22 | 4    Q.   All right.  And the description<br>5  says, "Mate James Morrissey reports the |

6   autopilot was not completely turned off as
7   he was able to correct and switch back over
8   to hand steering and began backing on the
9   Weeks 281 barge and maneuvered the barge
10  alongside fendering on the north and PBL RR
11  bridge.  Photo taken, proceeds slowly away
12  from bridge."
13          In the aftermath of the
14  allision, saying that month or so following
15  June 15th, did you learn that the autopilot
16  had been used while they were making this
17  wedge in the vicinity of the bridge?
18          MR. RODGERS:  Objection.
19      **A.   I do not recall when I became**
20  **aware of the use of autopilot as it related**
21  **to this incident.**
22      Q.   Okay.  Do you have an
23  understanding what he -- it is meant by the
24  autopilot was not completely turned off?
25      **A.   I would rely on the testimony**

1   **of Brian and Lenny and Mate Morrissey**
2   **eventually and the documents we've**
3   **provided, I don't.**
4       Q.   To your knowledge, is there
5   some way that an autopilot can be somehow
6   not completely turned off?
7           MR. RODGERS:  Objection.  He's
8       already testified he is not a
9       mariner, and he's also not here as an
10      expert.
11          You can answer if you have an
12      answer.
13      **A.   I'd rely on the testimony of**
14  **Brian, Lenny, and the mate, and the**
15  **documents in evidence.  I have no knowledge**
16  **of how an autopilot system works.**
17      Q.   Do you know whether this
18  document that we are looking at right now,
19  this PDF printout that's attached to the
20  e-mail marked Exhibit 17, is in fact
21  incident report in the Helm CONNECT system
22  for the bridge allision?
23      **A.   I do not know if it is in the**
24  **Helm CONNECT system.  I would rely on the**
25  **testimony of Brian, Lenny, and the**

1   **documents we've produced.**
2       Q.    What is Carver's understanding
3   of the reason the tug and barge allided
4   with the bridge?
5           MR. RODGERS:  Just what is
6   Carver's understanding?
7               MR. CHAPMAN:  Yeah.
8               MR. RODGERS:  At that time or
9   now.
10      Q.    You can give me both?
11              MR. RODGERS:  No.  He can
12  testify as to what his understanding was at
13  the time he learned of it and what his
14  understanding is now, if you understand
15  that.
16              Why don't you ask him
17  separately, Jim, so we keep it simple?
18              MR. CHAPMAN:  So I don't think
19  I have to but I'll humor you, Mr. Rodgers.
20              MR. RODGERS:  Well, just to add
21      another objection.  It was asked and
22      answered about two hours ago, but
23      again, just split up the question.
24      It would be easier for the witness to
25      understand.

1       Q.    So question one, what is
2   Carver's understanding of the reason that
3   tug and barge allided with the bridge?
4       **A.    My understanding?**
5       Q.    No, Carver's.
6               MR. RODGERS:  Objection to the
7       form.  If you don't understand the
8       question, then you don't -- then
9       don't answer it.
10      **A.    Can you rephrase the question?**
11      Q.    I don't think so.  What is it
12  that you don't understand about the
13  question?
14              MR. RODGERS:  Objection.
15              Don't answer that.
16              Jim, what are you doing here?
17              MR. CHAPMAN:  I'm trying to
18  clarify for him.  You're the one that's
19  made the objection.

| | | |
|---|---|---|
| | | 20      MR. RODGERS: No. No. No. He<br>21  and I have both asked you to split it up.<br>22  You're asking Carver. You are not saying<br>23  then or now. So I -- it's -- just rephrase<br>24  it or withdraw the question.<br>25     Q.   So I'm using present tense.<br><br>1  What is Carver's understanding or the<br>2  reason the tug and barge allided with the<br>3  bridge?<br>4      MR. RODGERS: Object -- same<br>5   objection.<br>6       Do you understand the question.<br>**7    A.  I did. The company's**<br>**8  understanding of what happened when the tug**<br>**9  allided with the bridge was that originally**<br>**10  Morrissey stated that he got in with the**<br>**11  fenders, later amended the story multiple**<br>**12  times. Finally, during -- based on my**<br>**13  understanding, during conversations with**<br>**14  the Coast Guard, he stated that he got in**<br>**15  and hit the bridge while he was piloting**<br>**16  the vessel.**<br>17     Q.   And did -- he was using the<br>18  autopilot to pilot the vessel?<br>**19    A.   I would rely on other people's**<br>**20  testimony to that. I'm not specifically**<br>**21  sure.**<br>22 |
| 142 -<br>143 | 17 - 17 | 17     Q.   And did – he was using the<br>18  autopilot to pilot the vessel?<br>**19    A.   I would rely on other people's**<br>**20  testimony to that. I'm not specifically**<br>**21  sure.**<br>22      MR. RODGERS: And objection to<br>23  the extent as the document speaks for<br>24  itself that you've shown the witness, which<br>25  is and in some kind of an incident log that<br><br>143<br><br>1  says, "Mate James Morrissey reports the<br>2  autopilot was not completely turned off.<br>3  He was able to correct and switch back over |

| | | |
|---|---|---|
| | | 4  to hand steering and began backing on the<br>5  Weeks 281 barge," et cetera, et cetera.<br>6        So that's the document in front<br>7  of him and you are asking him to guess at<br>8  something when the document says what it<br>9  says.<br>10    Q.   Is there anything else to add<br>11  to your answer?<br>**12    A.   I mean the Coast Guard**<br>**13  investigation has not been completed.  So**<br>**14  we have an understanding of what we believe**<br>**15  happened, but we do not have the final**<br>**16  incident report or investigative report**<br>**17  from the Coast Guard.** |
| 143 -<br>144 | 18 - 12 | 18    Q.   There wasn't anybody else at<br>19  the Helm at the time of the allision other<br>20  than Captain James Morrissey, correct?<br>**21    A.   That is my understanding.**<br>22    Q.   Was there any damage to the tug<br>23  as a result of alliding with the bridge?<br>**24    A.   I would rely on the testimony**<br>**25  of Brian, Lenny, and the information in**<br><br>144<br><br>**1  evidence.  But I'm aware -- unaware of any**<br>**2  damage to the tug as a result of the**<br>**3  allision to the bridge.**<br>4    Q.   Was there any damage to the<br>5  barge as a result of alliding with the<br>6  bridge?<br>**7    A.   I would repeat that answer as**<br>**8  it relates to the barge.  There was**<br>**9  potentially some superficial damage but no**<br>**10  noticeable damage that we were made aware**<br>**11  of previously or subsequently that I'm**<br>**12  aware of.** |
| 146 | 1 - 11 | 1    Q.   Do you know what JC or PN are?<br>**2    A.   I do not.**<br>3    Q.   And then it says, "Note light |

| | | |
|---|---|---|
| | | 4  tug in invoice."  Do you see that?<br>**5      A.   Yes.**<br>6      Q.   Does this somehow relate to<br>7  getting paid for work that Carver Marine<br>8  Towing is doing with its tugs?<br>**9      A.   I would rely on Brian's**<br>**10  testimony and the evidence that we have**<br>**11  provided.  I'm -- I would be guessing.** |
| 146 -<br>147 | 19 - 6 | 19          Do you know what the log<br>20  standards are?<br>**21      A.   I personally do not.**<br>22      Q.   Do you have any information<br>23  about when they may have been sent<br>24  previously by, I guess, somebody, the crew?<br>**25      A.   I would rely on Brian's**<br><br>147<br><br>**1  testimony and the evidence we provided or**<br>**2  the documents we've provided.**<br>**3          I don't know what they are to**<br>**4  surmise when they may have been previously**<br>**5  provided.**<br>6      Q.   Okay. |
| 150 -<br>151 | 16 - 9 | 16      Q.   So here's my question.  Where<br>17  it says, "Text sent to investigate," what<br>18  was investigated?<br>**19      A.   I mean, I would rely on the**<br>**20  testimony of Brian and Lenny and the other**<br>**21  members of the crew that had any knowledge**<br>**22  in the documents we produced.**<br>**23          I would have to make an**<br>**24  assumption based upon what I'm reading here**<br>**25  to say exactly what's on –**<br><br>151<br><br>1          MR. RODGERS:  Don't assume --<br>**2      A.    -- I'm not going to do that.**<br>3          MR. RODGERS:  Yeah, don't |

| | | |
|---|---|---|
| | | 4     assume or guess.<br>5     Q.   So that I'm -- so basically you<br>6  don't know and you would depend on whatever<br>7  others have said or what documents have<br>8  been produced about it; is that fair?<br>**9     A.   Correct.** |
| 152 - 153 | 3 - 4 | Q.   So the one on May 3rd, okay,<br>3  for the Mackenzie Rose, it says,<br>4  "Navigation equipment."<br>5         Do you see that?<br>**6     A.   Yes.**<br>7         MR. RODGERS:  Again, I'm going<br>8      to object, because this incident is<br>9      in Helm CONNECT and you have other<br>10      documents which are more specific.<br>11          Ask your question.<br>12     Q.    And it appears that the line<br>13  related to that on the following page says,<br>14  "Rudder went hard over," and so it says.<br>15         Do you have any information<br>16  about that?<br>**17     A.   I would have to rely on the**<br>**18  testimony of others, Brian and Lenny and**<br>**19  the crew and the documents produced.**<br>20     Q.    And do you know whether any<br>21  techs, technicians were charged with<br>22  investigating that one?<br>**23     A.   That one specifically, I would**<br>**24  rely on the testimony of Brian and Lenny,**<br>**25  the others and the documents we've**<br><br>153<br><br>**1  produced.**<br>**2         I do not specifically have**<br>**3  knowledge as to what any techs may or may**<br>**4  not have investigated.** |
| 153 - 154 | 8 - 8 | 8     Q.   Under the caption or heading<br>9  called, "Incident reports."  It says that<br>10   there were so many in first quarter, so |

| | | |
|---|---|---|
| | | 11  many in second quarter and then year to<br>12  date.<br>13         And then right after that<br>14  there's a dated entry May 21, 2024.  It<br>15  says, "The Mackenzie Rose filed one for the<br>16  autopilot inducing a hard turn to port."<br>17         Do you see that?<br>**18      A.   I do see that.**<br>19      Q.   That one for some reason's not<br>20  listed on this spreadsheet that we're<br>21  looking at, Page 2.<br>22         But my question is, do you know<br>23  whether there was any investigation<br>24  regarding that report of the autopilot<br>25  inducing a hard turn to port?<br><br>154<br><br>1         MR. RODGERS:  What date was<br>2      that?<br>3         MR. CHAPMAN:  May 21, 2024.<br>**4      A.   I would've to rely on the**<br>**5  testimony of Brian and Lenny and the**<br>**6  documents we've provided.**<br>**7         I don't have any knowledge of**<br>**8  any investigation.** |
| 154 -<br>155 | 17 - 7 | 17      Q.   Okay.  Was there any<br>18  investigation by technicians or otherwise<br>19  of the autopilot in the aftermath of -- or<br>20  the steering system, either one, in the<br>21  aftermath of --<br>22         MR. RODGERS:  Objection to<br>23      form.<br><br>24      Q.    -- the allision with the<br>25  bridge?<br><br>155<br><br>1         MR. RODGERS:  You can answer. |

| | | |
|---|---|---|
| | | 2    A.   I would have to rely on the<br>3  testimony of Brian and Lenny and the<br>4  documents provided.<br>5        I do not -- I'm not<br>6  specifically aware of any autopilot<br>7  investigation. |
| 155 -<br>157 | 8 - 7 | 8    Q.   And did you do anything to<br>9  determine that?  I mean --<br>10       MR. RODGERS:  Objection.<br>11    Q.   -- I hear what you've said you<br>12  would rely on others --<br>13       MR. CHAPMAN:  Let me finish<br>14    my -- -<br>15       MR. RODGERS:  No I --<br>16       MR. CHAPMAN:  No, let me finish<br>17     my question and you can object.<br>18       MR. RODGERS:  Okay, finish the<br>19    question.<br><br>20    Q.   My -- I heard what you said<br>21  that you would rely on the testimony of<br>22  Brian and Lenny and documents that have<br>23  been produced.<br>24         But I'm just asking, did you do<br>25  anything to specifically determine whether<br><br><br>156<br><br>1  there was any effort to investigate the<br>2  autopilot in the aftermath of the allision<br>3  with the bridge?<br>4       MR. RODGERS:  Objection.<br>5     Immediately after the reporting to<br>6     the Coast Guard, the Coast Guard<br>7     conducted an investigation.<br>8       They investigated every aspect<br>9     of this, which you were aware of<br>10      because you were there at the<br>11      hearings or the interviews.  And<br>12      that's who did the investigation.<br>13        You are asking if they did |

| | | |
|---|---|---|
| | | 14    their own investigation when the<br>15    Coast Guard was investigating it?<br>16        MR. CHAPMAN:  That's exactly<br>17    what I'm asking.<br>18        <u>MR. RODGERS</u>:  At the same time?<br>19        MR. CHAPMAN:  That's exactly<br>20    what I'm asking.<br>21        <u>MR. RODGERS</u>:  Okay.<br>**22      A.    And my answer would remain the**<br>**23    same.  Brian and Lenny were conducting the**<br>**24    investigation in conjunction with the Coast**<br>**25    Guard.**<br><br>157<br><br>**1        I would rely on their testimony**<br>**2    as to the process and results of the**<br>**3    investigation and the documents in**<br>**4    evidence.**<br>**5        I am not personally involved**<br>**6    with any investigation regarding the**<br>**7    autopilot.** |
| 158 | 4 - 14 | 4      Q.    And whether there was any<br>5    investigation by technicians or otherwise<br>6    of that, do you have any knowledge?<br>**7      A.  I would rely on the testimony**<br>**8    of Brian and Lenny on that front.**<br>**9        I do not have specific**<br>**10  firsthand knowledge as to if that specific**<br>**11  thing was reviewed --**<br>12    Q.    Okay.<br>**13      A.    – without – off the top of my**<br>**14  head.** |
| 159 | 3 - 17 | 3      Q.    All right.  Have you seen these<br>4    before today?<br>**5      A.  I may have seen them during my**<br>**6    review and preparation for my deposition.**<br>7      Q.    All right.  So on June 12th,<br>8    2024 the vessel was apparently at a<br>9    shipyard in Baltimore standing by for |

| | | |
|---|---|---|
| | | 10  repairs. |
| | | 11        You see that? |
| | | **12      A.   That is what that says, yes.** |
| | | 13      Q.   Do you know the purpose of |
| | | 14  those repairs? |
| | | **15      A.   I would have to rely on the** |
| | | **16  testimony of Brian and Lenny.  I do** |
| | | **17  not -- and the crew.** |
| 161 - 162 | 5 - 17 | 4   Q.   You've been handed Exhibit 20, |
| | | 5   which is a invoice that was produced |
| | | 6   pursuant to a subpoena by the General Ship |
| | | 7   Repair Corporation, dated June 14th, 2024, |
| | | 8   to Tug Mackenzie Rose and Carver Companies. |
| | | 9        Do you see that? |
| | | **10      A.   I do.** |
| | | 11      Q.   And it says on it that there |
| | | 12  two items that are being invoiced.  The |
| | | 13  first is, "To prepare and weld to keeper |
| | | 14  plate onto the port rudder post." |
| | | 15        See that? |
| | | **16      A.   I do.** |
| | | 17      Q.   Do you know what the reason or |
| | | 18  the need for that repair was? |
| | | **19      A.   I would rely on the testimony** |
| | | **20  of Brian, Lenny, the crew, and the** |
| | | **21  documents we have produced.** |
| | | **22        I personally don't even know** |
| | | **23  what a keeper plate is, so I cannot attest** |
| | | **24  to that.** |
| | | 25      Q.   Okay.  And then second -- the |
| | | |
| | | 162 |
| | | |
| | | 1   second item there is, "Provides straps to |
| | | 2   secure STBD," which I presume to be an |
| | | 3   abbreviation for starboard-side fender for |
| | | 4   transit. |
| | | 5        Do you know what the purpose of |
| | | 6   that repair was? |
| | | **7      A.   I would reiterate the same** |
| | | **8  answer.  I would rely on the testimony of** |

| | | |
|---|---|---|
| | | 9  **Brian, Lenny, the crew and the documents**<br>10  **we've provided.**<br>11      **I don't know why they would do**<br>12  **that.**<br>13    Q.   And do you know any reason for<br>14  why these repairs would be done in<br>15  Baltimore?<br>16    **A.  I would rely on the testimony**<br>17  **of Brian and Lenny.  I don't.** |
| 163 -<br>164 | 20 - 1 | 20    Q.   Okay.  So and is AIS or the<br>21  automated tracking system used on all of<br>22  the Carver vessels, to your knowledge?<br>23    **A.  I would have to rely on the**<br>24  **testimony of Brian or Lenny.  I don't know**<br>25  **specifically that it's on all of our**<br><br><br>164<br><br>1  **vessels.** |
| 164 | 7 - 18 | 7    Q.   Did the Mackenzie Rose have a<br>8  working radar system at the time of the<br>9  allision with the bridge?<br>10    **A.  I would have to rely on the**<br>11  **testimony of Brian, Lenny, the other**<br>12  **members of the crew and the documents we've**<br>13  **produced.**<br>14    Q.   So just to be clear, you don't<br>15  know and you presume that they do, right?<br>16      MR. RODGERS:  Objection to<br>17    form.<br>18    **A.  Correct.** |
| 171 | 9 - 19 | 9      But do you know whether or not<br>10  there was working radar on Mackenzie Rose<br>11  on the date of the allision?<br>12      MR. RODGERS:  Objection.  Asked<br>13    and answered, but you can answer.<br>14    **A.  I would rely on the testimony**<br>15  **of Brian, Lenny, the crew, the documents**<br>16  **we've provided.**<br>17      **And as we summarized in the** |

| | | |
|---|---|---|
| | | **18**  end, I have no reason to believe there<br>**19**  wasn't, but I don't know firsthand. |
| 171 -<br>172 | 20 - 22 | 20     Q.    Okay.  And when you are saying<br>21   that you're relying on the testimony of<br>22   Brian, Lenny, the crew, what other crew are<br>23   you relying on?<br>**24       A.    For that answer specifically or**<br>**25   for all of the times I said that.**<br><br>172<br><br>1     Q.    Let's start with that answer<br>2   specifically.<br>3         <u>MR. RODGERS</u>:  Just for the<br>4      record, Mark, is, when he states that<br>5      he is relying on the crew's testimony<br>6      to date, which you're aware of was<br>7      testified, but we also have Jason<br>8      McGrath tomorrow and potentially<br>9      Morrissey on next week, and Captain<br>10       Miller unfortunately passed away.<br>11         That's what he's referring to,<br>12      but he can still answer the question<br>13      if --<br>14       *MR. NANAVATI*:  Well, I mean,<br>15      now that you've answered it for him.<br><br>16     Q.    Is Mr. Rodger's answer, your<br>17   answer?<br>18         <u>MR. RODGERS</u>:  Is that --<br>19   A.    Yes.<br>20         <u>MR. RODGERS</u>:  -- what I said,<br>21      correct?<br>**22       A.    Correct.** |