# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

----------------------------------------X
IN THE MATTER OF COEYMANS MARINE
TOWING, LLC D/B/A CARVER MARINE
TOWING AS OWNER AND OPERATOR OF M/T
MACKENZIE ROSE, (IMO NO. 8968765) HER
CARGO, ENGINES, BOILERS, TACKLE, EQUIPMENT,
APPAREL, AND APPURTENANCES, ETC., IN REM,
("M/T MACKENZIE ROSE"),

                                                     CIVIL ACTION NO:
                                                     2:24-CV-00490

PETITIONING FOR EXONERATION FROM OR
LIMITATION OF LIABILITY IN ALLISION WITH
NORFOLK AND PORTSMOUTH BELT LINE RAILROAD
COMPANY MAIN LINE RAILROAD BRIDGE
(THE "BRIDGE") OCCURRING JUNE 15, 2024 IN
AND ABOUT THE ELIZABETH RIVER, VIRGINIA.

----------------------------------------X


                     April 29, 2025

                     10:18 a.m.

        AN IN PERSON VIDEOTAPED DEPOSITION of

of Leonard Baldassare, a Defendant herein,

taken by the respective parties, pursuant

to Order, before Larin Kaywood, a Notary

Public for and within the State of New

York.


JOB NO.: 112214

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1   A P P E A R A N C E S:
 2
 3        CRENSHAW, WARE & MARTIN, P.L.C.
            Attorneys for Defendant Norfolk
 4          Portsmouth Belt Line Railroad Company
            150 W. Main Street Suite 1500
 5          Norfolk, Virginia 23510
        BY:  JIM CHAPMAN, ESQ.
 6        E-mail:  Jchapman@cwm-law.com
 7      CLYDE & CO US LLP
            Attorneys for Coeymans Marine Towing, LLC
 8          30 S. Wacker Drive, Suite 2600
            Chicago, IL 60606
 9        BY:  JAMES H. RODGERS, ESQ.
            MICHAEL ROMAN, ESQ.
10        E-mail:  Michael.roman@clydeco.us
                 James.rodgers@clydeco.us
11
        SINNOT, NUCKOLS & LOGAN, P.C.
12          Counsel for Evanston Insurance Company,
            S/s/o Norfolk and Portsmouth Belt Line
13          Railroad Company
            13811 Village Mill Drive
14          Midlothian, Virginia 23114
        BY:  MARK C. NANAVATI, ESQ.
15          CHRISTOPHER JONES, ESQ.
          E-mail:  Mnanavati@snllaw.com
16              Cjones@snllaw.com
17      BUTLER WEIHMULLER KATZ CRAIG, LLP
            Counsel for Evanston Insurance Company,
18          S/s/o Norfolk and Portsmouth Belt Line
            Railroad Company
19          11525 N. Community House Road
            Suite 300
20          Charlotte, North Carolina 28277
        BY:  ZACHARY M. JETT, ESQ.
21        E-mail:  Zjett@butler.legal
22
23   ALSO PRESENT:
24   Ingrid Contreras, the videographer
25   Connan Moss.
```

```
 1                 INDEX
 2        EXAMINATION OF LEONARD BALDASSARE
 3
 4   EXAMINATION BY                          PAGE
 5   Mr. Chapman                          6, 218
 6   Mr. Rodgers                             209
 7
 8          - MARKED EXHIBITS -
 9   NUMBER     DESCRIPTION                  PAGE
10   Exhibit 1 - Bridge Photo 6/15/2024 244   82
11   Exhibit 2 - Barge Photos 6/15/2024 245 - 248  84
12   Exhibit 3 - 9.5 Incident Report - 1/22/2024  137
            (SC pier damage)
13
     Exhibit 4 - Labelled Sections of SMS Produced  158
14          by Carver Listed on cover page
15   Exhibit 6 - Daily Logs 6/12/2024 - 6/16/2024  87
            (Helm System)
16
     Exhibit 9 - Capt. Christopher Miller     96
17          Statements 6/15/2024
18
19        - PREVIOUSLY MARKED EXHIBITS -
20   Exhibit 15 - Deckhand Sharif Porter Statements
               6/15/2024
21
     Exhibit 17 - Capt. James Morrissey Statements
22               6/15/2024
23   Exhibit 19 - CG-2692 Report of Marine Casualty
24   Exhibit 21 - Helm Screenshot 6/15/2024
25   Exhibit 23 - Rough Deck Logs 6/12/2024 - 6/16/2024
```

```
 1      - PREVIOUSLY MARKED EXHIBITS (CONT.) -
 2   Exhibit 24 - Ayers Marine Electronics Records
               4/2024 249 -
 3
     Exhibit 25 - GMT/Mackay Marine Invoices 2023 - 2024
 4
     Exhibit 26 - 9.2 Near Miss Report 5/6/2024
 5          (approved) 41 - 42
 6   Exhibit 28 - 9.2 Near Miss Report 3/4/2024
            (approved) 37 - 38
 7
     Exhibit 30 - 9.2 Near Miss Report 4/19/2024
 8          (approved)
 9   Exhibit 32 - Morrissey Training Records 7/2/23 -
               6/16/24
10
     Exhibit 34 - Voyage Plan 6/15/2024 890 - 897
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1        *    *    *    *    *
 2        THE VIDEOGRAPHER:  This is the
 3   beginning of Media Number 1 in the
 4   deposition of Leonard Baldassare, in
 5   the matter of Coeymans Marine, d/b/a
 6   Carver Marine Towing.  Case number
 7   2:24-cv-00490.  Today's date is
 8   Tuesday, April 29th, 2025, and the
 9   time on the monitor is 10:22 a.m.
10        My name is Ingrid Contreras,
11   and I am the videographer.  The court
12   reporter is Larin -- my mistake,
13   Larin Kaywood.  We are here with
14   Rosenberg & Associates, Inc.  All
15   appearances are recorded.
16        The court reporter will now
17   swear in the witness:
18   L E O N A R D   B A L D A S S A R E, the
19   witness herein, having first been duly
20   sworn by the Notary Public, was examined
21   and testified as follows:
22        THE REPORTER:  Please state
23   your name for the record.
24        THE WITNESS:  Leonard
25   Baldassare.
```

**LEONARD BALDASSARE**

April 29, 2025

Page 6

```
1           THE REPORTER:  And your
2   address, please?
3           THE ADDRESS:  88 Shore Road,
4   Lindenhurst, New York 11757.
5   EXAMINATION BY
6   MR. CHAPMAN:
7       Q.   Good morning, Mr. Baldassare.
8       A.   Good morning.
9       Q.   My name is Jim Chapman, I
10  represent Norfolk and Portsmouth Belt Line
11  Railroad Company.  We are taking your
12  deposition today in connection with a
13  lawsuit, a limitation proceeding that was
14  filed by your former employer, Carver, to
15  limit its liability resulting from the
16  damage to the Belt Lines bridge back in
17  June of 2024.
18          Do you understand that?
19      A.   Yes, sir.
20      Q.   Could you tell me your date of
21  birth?
22      A.   4/26/1993.
23      Q.   I want to get a little
24  background, you know, what your work
25  experience has been and that sort of thing.
```

Page 7

```
1           Who'd you work for before you
2   went to work for Carver?
3       A.   Center Line logistics.
4       Q.   And how long were you at Center
5   Line?
6       A.   Four and a half years.
7       Q.   Doing what?
8       A.   Port Captain.
9       Q.   Did you sail at all while you
10  were Port Captain?  Did you have any sail
11  time?
12      A.   While I was at Center Line?
13      Q.   Yeah.
14      A.   No, but I sailed previously.
15      Q.   Okay.  So who'd you work for
16  right before Center Line?
17      A.   Buchanan Marine.
18      Q.   Did you sail for Buchanan?
19      A.   I did, yes.
20      Q.   Were you the master of one of
21  their vessels?
22      A.   No, I was a mate.
23      Q.   How long were you with
24  Buchanan?
25      A.   A year and half.
```

Page 8

```
1       Q.   Where did you sail out of with
2   Buchanan?
3       A.   Port Washington, New York.
4       Q.   And prior to Buchanan, who were
5   you with?
6       A.   Vane Line Bunkering.
7       Q.   How long with Vane Line?
8       A.   Five years.
9       Q.   All sailing?
10      A.   Yes.
11      Q.   Were you the master of any of
12  the towing vessels?
13      A.   No.
14      Q.   Mate?
15      A.   Mate.
16          THE REPORTER:  Just let him
17      finish his questions.
18          MR. CHAPMAN:  Okay, sure.
19          THE REPORTER:  Then give a
20      pause in between.
21          MR. CHAPMAN:  Sorry.
22          THE REPORTER:  Okay.
23      Q.   I should have said this at the
24  outset, but we'll try to exercise, kind of,
25  good radio discipline.  I'll -- let me
```

Page 9

```
1   finish my question before you start your
2   answer, and I'll do my best to not
3   interrupt your answer.
4       A.   Understood.
5       Q.   Okay.  So before Vane Line, who
6   were you with?
7       A.   I was at SUNY Maritime College.
8       Q.   I'm sorry, SUNY Maritime?
9       A.   Yes.
10      Q.   What was your major?
11      A.   Marine operations.
12      Q.   When did you graduate?
13      A.   2015, sorry.
14      Q.   Four years?
15      A.   Two years.
16      Q.   Two years, okay.
17      A.   Yes.
18      Q.   Did you go somewhere else
19  before SUNY?
20      A.   Yes, community college.
21      Q.   Okay.  But you ended up with a
22  four year degree coming out of SUNY?
23      A.   No, I did two --
24      Q.   It's a two-year program?
25      A.   Yes.
```

**LEONARD BALDASSARE**

**April 29, 2025**

Page 10

1    Q.    Okay.  So when were you
2    first -- when did you get your first
3    merchant marine document?
4    **A.    When I graduated from SUNY,**
5    **took my license exam and got my MMC, so I**
6    **think it was February of '14.**
7    Q.    Are you currently licensed?
8    **A.    Yes.**
9    Q.    What do you hold?
10    **A.    1600 Ton Mate New York Coastal.**
11    Q.    Any endorsement?
12    **A.    Yeah.  I have STCW, Radar**
13    **observer, Lifeboatman, Basic Safety, ECDIS.**
14    Q.    I'm not familiar with that one.
15    What'd you say?
16    **A.    ECDIS.**
17    Q.    ECDIS?
18    **A.    Yeah.**
19    Q.    It's an acronym for something?
20    **A.    Yeah, it's -- I don't know the**
21    **full --**
22    Q.    What does it really mean?
23    **A.    It's a form of like navigation.**
24    Q.    It's like a navigation
25    endorsement?

Page 11

1    **A.    Correct, Yes.**
2    Q.    To use some particular type of
3    nav equipment?
4    **A.    An ECDIS machine.**
5    Q.    Okay.  And how do you spell
6    that?
7    **A.    E-C-D-I-S.**
8    Q.    So has it been about four and a
9    half years since you've actively sailed?
10    **A.    Yeah, roughly.**
11    Q.    Do you ever operate any of
12    Center Line's boats?
13    **A.    No.**
14    Q.    Do you ever operate any of
15    Carver's boats?
16    **A.    No.**
17    Q.    So when did you start with
18    Carver?
19    **A.    January of 2024.**
20    Q.    Did you work with Brian Moore
21    when you were at Vane Line?
22    **A.    He -- we worked there at the**
23    **same time.  We never worked together**
24    **though.**
25    Q.    Okay.  Did you work with Brian

Page 12

1    Moore when you were at Center Line?
2    **A.    I did, yes.**
3    Q.    How long was he at Center Line
4    while you were there.  Like how much
5    overlap was there?
6    **A.    He was there the entire time I**
7    **was there, but I believe he started about a**
8    **year before I did.**
9    Q.    And he -- I know -- he told us
10    yesterday he left to go to Carver.
11    **A.    Mm-hmm.**
12    Q.    Did he invite you to come to
13    Carver after him, or how did you end up at
14    Carver?
15    **A.    They were looking for a Port**
16    **Captain, and I had applied for the job.**
17    Q.    He told us a little bit about
18    the way in which you applied for jobs at
19    Carver.
20    Did you go through the online
21    portal --
22    **A.    No.**
23    Q.    -- to get hired?
24    **A.    No.**
25    Q.    Who'd you -- did you contact

Page 13

1    somebody about getting hired there?
2    **A.    I spoke to Tom Marron, the HR**
3    **representative.**
4    Q.    Do you know how he spells his
5    last name?
6    **A.    I do not.**
7    Q.    Did he run HR at the time?
8    **A.    I believe so, yes.**
9    Q.    What position were you hired
10    into at Carver?
11    **A.    Port Captain.**
12    Q.    So pretty much the same thing
13    you were doing, at least position wise at
14    Center Line?
15    **A.    Correct.**
16    Q.    How many vessels did Center
17    Line have that you sort of had Port Captain
18    responsibility?
19    **A.    Between the tugs and the**
20    **barges, 40 roughly.**
21    Q.    How many tugs?
22    **A.    20.  About 20, I think.  I'd**
23    **have to go through all of them, but**
24    **I -- I'd say 20 is a fair number between**
25    **the offshore and inland division.**

**LEONARD BALDASSARE**

April 29, 2025

Page 14

1    Q.    So fewer tugs to my -- the way
2    Mr. Moore described it at Carver than at
3    Center Line?
4        A.    You're saying?
5        Q.    Yeah.  Well, I'll just ask you
6    this, how many tugs at Carver when you
7    become Port Captain?
8        A.    Seven, I believe.
9        Q.    Okay.
10       A.    Yes.  It's a smaller outlet,
11   correct.  Yeah.
12       Q.    Was it a pay raise to go to
13   Carver?
14       A.    It was.
15       Q.    And compensation wise, was it a
16   salaried position or an hourly position --
17       A.    Salaried.
18       Q.    -- going to Carver?
19       A.    Correct.
20       Q.    Had you been salaried at?
21   Buchanan -- excuse me, at Center Line?
22       A.    Yes.
23       Q.    When did you leave Carver?
24       A.    January of 2025.
25       Q.    So about a year altogether at

Page 15

1    Carver?
2        A.    Correct.
3        Q.    Why'd you leave?
4        A.    It was a mutual agreement.
5    They were looking for me to relocate up to
6    their port in Albany, and it just wasn't an
7    option for me at the time.
8        Q.    You live on Long Island?
9        A.    I do.
10       Q.    When you were Port Captain for
11   Carver, did they allow you to like work
12   from home or did you work some place that
13   was close to where you lived?
14       A.    I worked in the office in
15   Staten Island.
16       Q.    What reason did they give for
17   wanting you to move to the Albany office?
18       A.    I think they were just looking
19   for me to be more involved in the main
20   operation up at the port, but like I said,
21   I have a young child so it wasn't an option
22   for me to move.
23       Q.    How old is your child?
24       A.    She's 10 months.
25       Q.    Okay.  So how long -- I should

Page 16

1    ask you, who are you working for now?
2        A.    H&L Contracting.
3        Q.    And what is their business?
4        A.    Marine construction is the
5    division that I work in.  I'm a project
6    manager.  But they do various construction,
7    but I'm in the marine sector of the
8    company.
9        Q.    Are there any tugs that are
10   part of the marine construction --
11       A.    Yes.
12       Q.    -- division?
13       A.    Yes, there are.
14       Q.    Are they -- give me some idea,
15   relative size?
16       A.    So we have one tug boat that's
17   1200 horse power, it has a COI, and then
18   the rest are all under 26 foot non-COI work
19   boats.
20       Q.    How many altogether?
21       A.    I think about 12.
22       Q.    When you were Port Captain for
23   Carver, tell us what your duties were?
24       A.    I was responsible for the
25   day-to-day operations of the tug fleet.  So

Page 17

1    I would make sure the tugs were crewed, I
2    would make sure that safety equipment was
3    up to snuff.  Just basically be the liaison
4    between the boats and upper management.
5        Q.    Did you have any responsibility
6    for hiring crew personnel?
7        A.    I did not, no.  That all went
8    through HR.  I would sometimes sit in on
9    the interviews, but it would go through HR.
10       Q.    Did you have any responsibility
11   for testing people that were hired into
12   crew positions?
13       A.    No, I did not.
14       Q.    Did somebody else?
15       A.    Not to my knowledge, no.
16       Q.    Was there a training manager,
17   or somebody that was responsible for
18   training when you worked for Carver?
19       A.    No, not to my knowledge.
20       Q.    As a Port Captain, who did you
21   report to?
22       A.    Brian Moore.
23       Q.    Was there anybody else that
24   you, I don't know, thought of having to
25   report to in your mind, somebody else

**LEONARD BALDASSARE**

April 29, 2025

Page 18

1    besides him that you also had to report to?
2        A.    No.
3        Q.    Did you ever deal with Nick
4    Laraway?
5        A.    Yeah.  He was the -- he's like
6    Brian's boss, so -- but not directly, no.
7        Q.    So you never had to meet with
8    him?
9        A.    No.  I did, but I was -- like I
10   wouldn't report to Nick.  I would report
11   things to Brian.
12       Q.    Okay.  Just as a for instance,
13   I'm going to get into some questioning
14   about the allision with the bridge, and how
15   that was reported and that sort of thing,
16   but did you ever have a conversation with
17   Nick Laraway about that incident?
18       A.    I did not, no.
19       Q.    From your perspective, was
20   Brian Moore the guy that ran Carver Marine
21   Towing?
22       A.    Yes, he was the general
23   manager.
24       Q.    What was the normal means of
25   communicating with Mr. Moore when you were

Page 19

1    Port Captain?
2        A.    Phone call.
3        Q.    Did you ever e-mail him?
4        A.    I did.
5        Q.    Is there some distinction in
6    your mind as to why you would e-mail him
7    about some things or -- versus having a
8    phone call with him about others?
9        A.    No, just -- no.
10       Q.    Were you issued a phone by the
11   company --
12       A.    Yes.
13       Q.    -- in your role as Port
14   Captain?
15       A.    Yes, I was.
16       Q.    Do you still have that phone
17   today?
18       A.    I do not, no.
19       Q.    You were served with a subpoena
20   before the deposition?
21       A.    Yes, sir.
22       Q.    And I asked you to bring
23   whatever phone you had used or communicated
24   with back --
25       A.    Yes.

Page 20

1        MR. RODGERS:  Jim --
2        MR. CHAPMAN:  Let me just
3    finish the question.  Let me just
4    finish the question.
5        MR. RODGERS:  Finish it.
6        Q.    The subpoena requested that you
7    produce the phone that you had used on June
8    15th, 2024, which was the date of the
9    allision, right?
10       Do you still have that phone
11   today?
12       MR. RODGERS:  Just don't answer
13   it.  We're producing Mr. Baldassare
14   as a Carver witness, not pursuant to
15   the subpoena.  Any demand you could
16   make to Carver, and -- we'll deal
17   with it.  So he's not here now by
18   virtue of the subpoena, he's here now
19   as our witness as I talked to you
20   about, or e-mailed you about.
21       Q.    Yeah.  I'm just asking
22   whether -- you confirmed that you were
23   served with a subpoena, right?
24       MR. RODGERS:  You can --
25       A.    Yes.

Page 21

1        Q.    Okay.  And the subpoena
2    requested you to produce a phone if you
3    still had it in your possession, correct?
4        A.    Yes.
5        Q.    Okay.  Do you still have that
6    phone in your possession?
7        A.    No.
8        Q.    All right.
9        MR. RODGERS:  Yeah, you can go
10   ahead.
11       A.    Okay.  Yeah.  No.  I don't have
12   the phone in my possession.
13       Q.    And that's because it was a
14   company phone and you turned it back into
15   the company when you left?
16       A.    That is correct.
17       Q.    Is that the only phone that you
18   used for communication on company business?
19       A.    Yes, it is.
20       Q.    So it sounds like when you were
21   working for Carver, you'd carry around two
22   phones.  You had a personal phone and the
23   company phone.
24       MR. RODGERS:  Objection to
25   form.

**LEONARD BALDASSARE**

April 29, 2025

1    Q.    Is that right?
2    A.    Correct, yes.
3    Q.    Did you use the company phone
4    to text -- send text messages on company
5    business?
6    A.    Yes.
7    Q.    Were you ever requested to
8    provide any text information or things that
9    were on that phone in connection with the
10    allision?
11    A.    No.
12    Q.    When you were Port Captain for
13    Carver, did you ever have to fire anybody?
14    A.    No, I did not.
15    Q.    Anybody you felt ought to have
16    been fired?
17    A.    No.
18    Q.    In your role as Port Captain,
19    if -- and I realize you didn't fire anybody
20    or think anybody should be fired, but did
21    you have the authority to recommend that
22    somebody be fired?
23    A.    Yes, I did.
24    Q.    Besides Port Captain, did you
25    hold any other position in the Cargo

1    organization?
2    A.    I did not, no.
3    Q.    So you said that when you were
4    hired, there were seven tugs.  Were there
5    more than that when you left working for
6    cargo?
7    A.    No.
8    Q.    Still seven?
9    A.    Yeah, I believe.  Caroline,
10    Pike, Otter, McKenzie Rose, Helen, Erin
11    Elizabeth, Daisy Mae, yeah, seven.
12    Q.    Okay.
13    A.    Yeah.  Sorry, I just --
14    Q.    Those are all inspected
15    vessels?
16    A.    Correct.  Yes, they are.
17    Q.    Any uninspected vessels?
18    A.    No.
19    Q.    How long did it take you to
20    find a position with H&L Contracting?
21    A.    Three weeks.
22    Q.    Do you feel like you left
23    Carver on good terms?
24    A.    To my knowledge, yes.
25    Q.    Have you had any communications

1    with Brian Moore since you've left Carver?
2    A.    No.
3    Q.    So no texting, no conversation?
4    A.    No.
5    Q.    Did Carver or anyone at Carver
6    provide a reference for you when you left
7    the company?
8    A.    For -- to -- for a new job,
9    you're saying?
10    Q.    Yes.
11    A.    Oh, no.
12    Q.    And did you request one?
13    A.    No.
14    Q.    The -- did you have any
15    preexisting connection with anybody at H&L
16    Contracting before you went to go work for
17    them?
18    A.    No.
19    Q.    And was it like it's owned by a
20    cousin or something?
21    A.    No.
22    Q.    Okay.
23    A.    No, no.
24    Q.    There are three people that
25    are -- that were members of the crew of the

1    Mackenzie Rose when the allision occurred
2    that are no longer with the company, no
3    longer with Carver, Captain Miller, Captain
4    Morrissey and Engineer McGrath.  I want to
5    ask you, did Miller leave while you were
6    still employed by Carver?
7    A.    No.  He was still employed when
8    I left.
9    Q.    And was he still captain of the
10    Mackenzie Rose when you left?
11    A.    He was, but the Mackenzie Rose
12    was in the shipyard when I left.
13    Q.    So what was he doing if --
14    A.    He was home.  He wasn't
15    like -- he wasn't working at the time.
16    Q.    So to your knowledge, he was
17    still collecting a paycheck?
18    A.    No, he was not.
19    Q.    Okay.  So he was still on the
20    company rolls, but he wasn't receiving --
21    A.    Correct.  Because he was not
22    working because his boat was in the
23    shipyard.
24    Q.    So his position as captain,
25    that's not a salaried position.  It's if

**LEONARD BALDASSARE**

April 29, 2025

1  you're working position hourly, or?
2  **A.    Correct.  It's a day rate.**
3  Q.    Day rate.
4  **A.    Yes.**
5  Q.    Okay.  Do you recall the last
6  time you actually spoken to him?
7  **A.    No, I do not.**
8  Q.    Do you know how long the
9  Mackenzie Rose had been in the yard?
10      MR. RODGERS:  If you know.
11  **A.    Five months, I believe.  It was**
12  **still in the yard when I left and I'm not**
13  **sure when exactly it came out, but I would**
14  **say five months.  It was her annual dry**
15  **docking, so.**
16  Q.    So an annual what?  For --
17  **A.    COI.**
18  Q.    Okay.  So she went into the
19  yard, you left -- you said you left in
20  January?
21  **A.    Yes, sir.**
22  Q.    And how long had it been in the
23  yard before that?
24  **A.    A week or two maybe, it wasn't**
25  **very long.**

1  Q.    And then you think -- maybe I
2  misunderstood.  I heard you say something
3  about five months, and I'm just trying to
4  understand.  It wasn't in the yard for five
5  months, or was it?
6  **A.    I don't know.  I'm assuming or**
7  **just remembering --**
8      MR. RODGERS:  Don't assume.
9  **THE WITNESS:  Okay.**
10      MR. RODGERS:  And don't guess.
11  **A.    So I don't know.  I don't know**
12  **how long it was in there.  When I left, it**
13  **was still in the shipyard.**
14  Q.    Okay.
15  **A.    I don't know when it came out.**
16  Q.    All right.  And it had gone
17  there -- gone in there a couple of weeks
18  before you left?
19  **A.    Correct.**
20  Q.    All right.  So did you leave
21  like January 1, January 30?  I'm just
22  trying to, kind of, put a timeframe on
23  this.
24  **A.    I think it was the end of**
25  **January.  I don't know the exact date.**

1  Q.    Had that shipyard evolution for
2  the COI been planned --
3  **A.    Yes.**
4  Q.    -- for some period of time?
5  **A.    Yes.**
6  Q.    And is that the port captain's
7  responsibility, or does somebody else
8  handle that?
9  **A.    That would be the engineering**
10  **department.**
11  Q.    So is there a port engineer for
12  the company that handles that sort of
13  thing?
14  **A.    There is, yes.**
15  Q.    And when you were Port Captain,
16  who was the port engineer?
17  **A.    Chris Nunamann.**
18  Q.    Nunamann?
19  **A.    Yes.  Don't ask me how to spell**
20  **it because I have no idea.**
21  Q.    Okay.
22      THE REPORTER:  And it's COI,
23      the acronym, right?
24  **THE WITNESS:  Yes ma'am?**
25  Q.    And just for clarification of

1  record, COI stands for certificate of
2  inspection, right?
3  **A.    Yes, that's correct.**
4  Q.    So let me ask about Captain
5  Morrissey.  Did he leave the company while
6  you were still port engineer -- excuse me,
7  Port Captain?
8      MR. RODGERS:  I think you said
9      Moore.
10      MR. CHAPMAN:  I said Captain
11      Morrissey, I thought --
12      MR. RODGERS:  Miller.
13      MR. CHAPMAN:  Thought so.
14      MR. RODGERS:  Okay.
15      MR. CHAPMAN:  I mean, Captain
16      James Morrissey.
17      MR. RODGERS:  Oh, Morrissey.  I
18      though you said Moore.  Sorry.  My
19      hearing.
20  Q.    Did Captain James Morrissey
21  leave Carver before you did?
22  **A.    I'm not sure.  I don't know.**
23  **As far as I knew, after this incident**
24  **happened, he was still an employee of the**
25  **company.  However, he was not working on**

**LEONARD BALDASSARE**

**April 29, 2025**

Page 30

1  any of the boats.
2      Q.   So the -- once he brought this
3  barge, or the -- once the Mackenzie Rose
4  delivered this barge to the bridge
5  construction location in New Jersey --
6      A.   Mm-hmm.
7      Q.    -- he didn't sail again for
8  Carver?
9      A.   To my knowledge, no.
10      Q.   Would you have like crew
11  assignment responsibility so that you would
12  actually know that?
13      A.   Yes.  But I believe he was
14  removed from the vessel by upper
15  management.  It was kind of above my pay
16  grade.
17      Q.   So you didn't make that
18  decision?
19      A.   I did not.  It was made by
20  upper management.
21      Q.   And when you say "upper
22  management," do you mean Mr. Moore?
23      A.   Correct.
24          MR. RODGERS:  I just want to
25      talk to the witness for a minute.

Page 31

1      Are you okay with that, Jim.
2          MR. CHAPMAN:  You know, I'm
3      really not.
4
5          MR. RODGERS:  All right.  I'll
6      do it in front of you.  Well, I can,
7      but I don't want to waste a lot of
8      time.  Off the record.
9          (Whereupon, a discussion was
10      held off the record.)
11          THE WITNESS:  This incident
12      happened, and then on June 24th, I
13      was out for eight weeks on paternity
14      leave.  So anything that --
15          MR. RODGERS:  That's it.
16      That's what he need.
17          THE WITNESS:  Okay.
18          MR. RODGERS:  He can ask you
19      now what you remember and know.
20          THE WITNESS:  Sure, understood.
21      Q.   I'm sorry, eight weeks of
22  paternity leave?
23      A.   Yes.
24      Q.   While you were on paternity
25  leave, did anybody inform you that Captain

Page 32

1  Morrissey had been removed?
2      A.   No.
3      Q.   Did you have any communication
4  with anybody at the company during those
5  eight weeks that you were enjoying your
6  paternity leave?
7      A.   In regards to this situation or
8  just in general?
9      Q.   Just in general.
10      A.   I did, yes.
11      Q.   Okay.
12      A.   Just congratulations, is --
13      Q.   Well wishes?
14      A.   Correct.
15      Q.   Okay.  Anything
16  business-related?
17      A.   No.
18      Q.   So when you come back -- let's
19  see -- you said June 24th, right?
20      A.   Yes.
21      Q.   You came back late August of
22  2024?
23      A.   Correct.
24      Q.   And Captain Morrissey was not
25  sailing?

Page 33

1      A.   Correct.
2      Q.   Right.  And was that when you
3  learned that he'd been removed from any
4  operational position?
5      A.   Yes.
6      Q.   Was he doing anything else for
7  the company?
8      A.   I do not know.
9      Q.   You didn't see him?
10      A.   I did not see him, no.
11      Q.   You didn't have any
12  communication with him?
13      A.   I did not.
14      Q.   Do you know whether he's still
15  being paid?
16      A.   I do not know.
17      Q.   And at any time before you left
18  Carver in January of 2025, did Captain
19  Morrissey ever come back?
20      A.   No.
21      Q.   Did you ever come to learn that
22  the reason Captain Morrissey was removed
23  was because of the incident involving the
24  allision with the Belt Line Bridge?
25          MR. RODGERS:  Objection to

LEONARD BALDASSARE

April 29, 2025

Page 34

1    form.  You can answer if you know.
2        A.    I don't know.  I'm not sure.  I
3    was just -- I figured that that was the
4    reason why.
5        Q.    You never asked?
6        A.    I never asked.
7        Q.    Would there be any other reason
8    that he would not --
9        A.    No.
10       Q.    -- come back?
11       A.    No.  That's why I just figured
12   that that was the reason why.
13       Q.    Do you have any idea what he's
14   doing today?
15       A.    I do not.
16       Q.    So let me turn to the Engineer
17   Jacob McGrath?
18       A.    Jason.
19       Q.    Jason, excuse me.  Thank you.
20   Jason McGrath.  Was he still employed by
21   the company when you left in January 2025?
22       A.    He was not.
23       Q.    Do you know when he left?
24       A.    I do not.
25       Q.    Did it have anything to do with

Page 35

1    the allision?
2        A.    I do not know.
3        Q.    Do you know whether he quit --
4        A.    I do not know.
5        Q.    -- or he was asked to leave?
6        A.    I think whenever it happened I
7    was not -- I was out, so I don't know.
8        MR. CHAPMAN:  I'm just going to
9    intervene for a second.  Are you able
10   to get all that down?  I know we're
11   kind of talking back and forth.
12       MR. RODGERS:  You got to wait
13   for him to finish his questions.
14       THE WITNESS:  I know.  I'm
15   sorry.  I'll try to slow down.
16       MR. CHAPMAN:  Yeah, you're
17   doing fine.
18       THE REPORTER:  I'm -- yeah.
19   Just give it a pause.
20       THE WITNESS:  Okay.
21       THE REPORTER:  I know you want
22   to answer.
23       THE WITNESS:  Sorry.
24       THE REPORTER:  It's okay.
25       THE WITNESS:  I'm just not used

Page 36

1    to --
2        THE REPORTER:  I know.
3        THE WITNESS:  -- Stopping.
4        THE REPORTER:  It's not usual
5    conversation.
6        MR. RODGERS:  -- from New York.
7        THE WITNESS:  Yes.
8        THE REPORTER:  Literally.
9        Q.    Were you involved in hiring
10   Captain Morrissey?
11       A.    I was not.
12       Q.    Do you know who had that
13   responsibility?
14       A.    I do not know.  He was employed
15   when I was -- he was already there when I
16   came on board.
17       Q.    So you don't know when he was
18   hired before --
19       A.    I do not know.
20       Q.    -- before that?  Okay.
21   Did -- when you were Port Captain, was
22   there any process for evaluating the
23   capabilities of people that were currently
24   employed?  Like you'd go out and watch them
25   at work or review their daily logs or any

Page 37

1    of that sort of thing?
2        A.    Yes.  So the captains were
3    responsible for evaluating their mates and
4    deck hands, the port engineers would be
5    responsibile for evaluating the engineers
6    on the boats, and then myself or Brian
7    would be responsibile for doing annual ride
8    alongs with the captains to just kind of
9    make sure that they were following policies
10   and procedures.
11       Q.    So how many ride alongs did you
12   do in the year that you worked for Carver?
13       A.    I would say at least five.
14       Q.    Was there anybody else that did
15   ride alongs?
16       A.    Brian Moore.
17       Q.    Okay.  And is a ride
18   along -- can you describe that for us?
19   Like, what do you mean by that?
20       A.    Sure.  Yeah.  So I would get on
21   the boat in the morning when I got in, say
22   they had a couple of jobs that they would
23   be doing, delivering barges, whatever it
24   may be.  I would go with them, I'd be in
25   the wheelhouse with the captain and I'd

LEONARD BALDASSARE

April 29, 2025

Page 38

1  kind of just, you know, make sure that he
2  was operating the vessel safely.
3      Q.    And this is specific to the
4  master of the vessel, right?
5      A.    Yes, sir.
6      Q.    Okay.  Did you ever do anything
7  similar with the mates?
8      A.    No.  The mates would be
9  evaluated by the captains, and then if
10 there was any type of issues, then myself
11 or Brian would get involved and do our own
12 ride along and assessment.
13     Q.    Is there any form that would be
14 filled out in connection with those ride
15 along assessments?
16     A.    I believe so, yes.
17     Q.    Where would you enter that
18 data?  Where -- what form is it that you're
19 talking about?
20     A.    It would go into the Helm
21 CONNECT.
22     Q.    So there's some sort of
23 evaluation process?
24     A.    Yes, sir.
25     Q.    Okay.  So do the masters have

Page 39

1  to do that for the mates?
2      A.    They do, yes.
3      Q.    And how frequently do they have
4  to do that?
5      A.    It's annually.
6      Q.    And you said that the port
7  engineer was responsible for evaluating the
8  engineer assigned to each vessel?
9      A.    Correct.
10     Q.    Is that done also in some kind
11 of ride along, or?
12     A.    Yes.
13     Q.    Okay.  So would the ride along
14 ever take this bridge allision incident as
15 an example?  They started in Chesapeake,
16 Virginia with the barge that they had
17 picked up, and it took them basically two
18 days, maybe a little less, to get to the
19 job site where it was being delivered,
20 right?
21     A.    Mm-hmm.
22     Q.    Would you do a ride along on
23 that type of voyage or are you just talking
24 about going out like a small job in the
25 harbor, where you're out for two hours,

Page 40

1  four hours, maybe the whole day?
2      A.    It would mostly be local stuff.
3  I wouldn't normally go for a multiple day
4  voyage.
5      Q.    So the -- you said about five
6  that you could -- you had done in the year
7  that you were there, they were all less
8  than a full day?
9      A.    No, it would be a full day.
10     Q.    Oh, they would be a full day?
11     A.    Yes, yes.
12     Q.    You spend the whole day on the
13 boat?
14     A.    Correct.
15     Q.    Drinking the coffee on the
16 boat?
17     A.    Doing what I got to do.
18     Q.    Okay.  But there would be a
19 form filled out for that -- a check ride or
20 ride along.
21     A.    Yes.
22     Q.    And there should be a similar
23 form filled out by the master for the mate
24 that they work with, right?
25     A.    Yes.

Page 41

1      Q.    And the Mackenzie Rose is
2  actually -- it's kind of crewed by two
3  crews, right, because there is crew
4  changes?
5      A.    Yes, correct.
6      Q.    So there's really two masters
7  in the Mackenzie Rose?
8      A.    Yes.
9      Q.    Okay.  When Captain Miller was
10 the master, who was the other master that
11 worked kind of the other -- is it two week
12 on, two week off?
13     A.    Yes.
14     Q.    Who was the master that worked
15 the other two weeks?
16     A.    Captain Morrissey.
17     Q.    So Morrissey was actually a
18 captain of the vessel?
19     A.    In this instance, he was
20 working over, which a lot of times people
21 do for extra money if we need someone to
22 fill in.  So he was sailing in the capacity
23 of mate when this incident happened.
24     Q.    Oh, so he was one of the two
25 normal masters of the Mackenzie Rose?

**LEONARD BALDASSARE**

April 29, 2025

Page 42

1    A.    Yes, sir.
2    Q.    Okay.  And he
3  just -- he -- Captain Miller was the other
4  master?
5    A.    Yes.
6    Q.    All right.  So ordinarily, they
7  wouldn't be on the same cycle?
8    A.    No.  They would technically
9  work opposite of each other.
10    Q.    Okay.  So did you ever do a
11  check ride with Captain Morrisey?
12    A.    I don't think I did, no.
13    Q.    Okay.  I mean, you were there
14  for a year, so --
15    A.    Yes.
16    Q.    -- somebody would've done one?
17    A.    Somebody would've done one.
18  But when this happened, I had only been
19  there for five months, so -- or six months,
20  whatever it was.
21    Q.    Okay.  And then you said you
22  didn't work after that --
23    A.    Correct.
24    Q.    -- right?  Okay.  But somebody
25  did one or you would expect there to --

Page 43

1    A.    At some point, somebody prior
2  to me being there would I -- would've done
3  one.
4    Q.    Okay.  Do you know what that
5  form's called?
6    A.    I do not recall what -- it's
7  under in the Helm CONNECT.  I'm not sure.
8    MR. RODGERS:  You're referring
9      to the ride along form?
10    MR. CHAPMAN:  Yes.
11    MR. RODGERS:  Okay.
12    Q.    Or the annual review form,
13  whether it's called ride along, I don't
14  know.
15    A.    Yeah.  I'm not sure what it's
16  called in Helm.  I'm sorry.
17    Q.    And would there be a -- there'd
18  be -- is there one specific to the master
19  of the vessel and another one that's
20  specific to the evaluation of the mate on
21  the vessel, and another one that's specific
22  to the evaluation of the engineer on the
23  vessel?
24    A.    Yes.  It's separate forms for
25  each position.

Page 44

1    Q.    Okay.  Are there any other
2  opportunities to evaluate someone's
3  competence during the work that they're
4  doing on a tug besides those annual reviews
5  that you just mentioned?
6    A.    I don't really understand what
7  you're asking, I'm sorry.
8    Q.    Yeah.  I'm trying -- well, you
9  told us Captain Morrissey was one of the
10  two captains on the vessel.
11    A.    Right.
12    Q.    He was operating in the role of
13  being the mate for this particular two-week
14  assignment, right?
15    A.    Right.
16    Q.    I'm just -- and you explained
17  that there's an annual review process and a
18  form to be filled out?
19    A.    Mm-hmm.
20    THE REPORTER:  Yes?
21    A.    Yes.
22    Q.    So what I'm trying to
23  understand, is there any other time or
24  other opportunity other than annually where
25  any of those roles would actually be

Page 45

1  formally evaluated?
2    A.    Not formally, no.
3    Q.    Okay.  Are there any other
4  forms to be filled out in Helm that involve
5  an evaluation of crew personnel?
6    A.    No.
7    Q.    Did you do anything to prepare
8  to testify today?
9    MR. RODGERS:  Other than
10      meeting with me.
11    MR. CHAPMAN:  Well -- okay.  We
12      can start there, but I'm just asking
13      in his mind whether he did anything
14      to prepare.
15    A.    Just meeting with Jim.
16    Q.    Okay.  Mr. Rodgers?
17    A.    Mr. Rogers, sorry.
18    Q.    All right.  And was that today?
19    A.    It was this morning in your
20  office, and then previously last week --
21    Q.    And other times?
22    A.    Yeah, last week on the phone.
23    Q.    Okay, okay.  I'm not going to
24  dive into what you guys talked about, but
25  did you do anything else in your mind to

**LEONARD BALDASSARE**

April 29, 2025

Page 46

1  prepare for this testimony?
2      A.    No.  Say a prayer this morning
3  on the way in.
4      Q.    Did you review any documents at
5  all?
6      A.    No.
7      Q.    So just trying to understand,
8  you seem very alert, but I want to make
9  sure, did you sleep okay last night?
10     A.    Yes.
11     Q.    All right.  Are you taking any
12 medications or substances that would impair
13 your ability to understand my questions or
14 provide truthful answers?
15     A.    No.
16     Q.    Have you ever testified before?
17     A.    I have not, no.
18     Q.    Okay.  So this deposition is
19 the first time you've ever done
20 this -- ever done a deposition?
21     A.    Correct, yes.
22     Q.    All right.  But never testified
23 at trial, a hearing, anything like that?
24     A.    The -- one with the Coast Guard
25 about this -- the MTSB meeting with the

Page 47

1  Coast Guard, which I believe you were on
2  also.
3      Q.    That was a Zoom meeting --
4      A.    Yes.
5      Q.    -- right?
6      A.    Correct.
7      Q.    So -- and I honestly don't know
8  whether the Coast Guard put you under oath.
9      A.    They did.
10     Q.    But you provided some answers
11 to questions.
12     A.    Yes.
13     Q.    Any other occasions than
14 that --
15     A.    No.
16     Q.    -- where you've testified?
17     A.    No.
18     Q.    Do you understand the term
19 "allision?"
20     A.    Yes, sir.
21     Q.    And what it means for a vessel
22 to a elide with a -- to hit a fixed object,
23 right?
24     A.    Yes.
25     Q.    Tell us how you first learned

Page 48

1  about the Mackenzie Rose eliding with the
2  Belt Line Bridge on June 15th, 2024?
3      A.    Captain Miller called me, told
4  me that they were coming through the
5  bridge, that Captain Morrissey got out of
6  shape, and landed on the fendering inside
7  of the bridge and slid through the bridge,
8  and that there was no damage to the bridge
9  or to the vessel or barge.
10     Q.    So when Captain Miller called
11 you, did you pick up right away, or did he
12 leave a message and you called him back?
13     A.    I believe I picked up right
14 away.
15     Q.    And what were you doing at the
16 time that he called?
17     A.    I don't remember.
18     Q.    So Saturday afternoon?
19     A.    Yes.
20     Q.    In the middle of June?
21     A.    Yes.
22     Q.    Do you know where you were?
23     A.    I was home.
24     Q.    How many conversations did you
25 have with Captain Miller?

Page 49

1      A.    That day?
2      Q.    Yes, sir.
3      A.    I don't really recall.
4      Q.    More than one?
5      A.    Yes.
6      Q.    In the first phone conversation
7  that you had with him, did he tell you that
8  they had taken a photograph?
9      A.    No, he did not.
10     Q.    Did you ask him to take a
11 photograph?
12     A.    I did.
13     Q.    In that first conversation?
14     A.    Yes.
15     Q.    All right.  Did you
16 subsequently receive a photograph?
17     A.    I did.
18     Q.    Was it more than one?
19     A.    I believe it was four or five.
20     Q.    And did you receive them all at
21 the same time, or did you receive them in
22 groups or --
23     A.    I think they came in all at
24 once.
25     Q.    All right.

**LEONARD BALDASSARE**

**April 29, 2025**

Page 50

1    A.    Yeah.
2    Q.    And what do you recall the
3    photos being?
4    A.    **There was a few of the bridge,**
5    **there was one of the barge, and then there**
6    **was one of the tug.**
7    Q.    And when you had -- after you
8    first spoke to Captain Miller, took his
9    phone call and he told you this situation,
10   who did you contact?
11   A.    **Brian Moore.**
12   Q.    And did he pick up when you
13   called him?
14   A.    **I think so, yeah.  I believe he**
15   **did.**
16   Q.    What did you tell him?
17   A.    **Told him that Captain Miller**
18   **just called me, that Captain Morrissey was**
19   **coming through the bridge, got out of**
20   **shape, landed on the fendering.  There was**
21   **no damage that anyone could see, and that**
22   **they were going to send me some photos and**
23   **then I would send him the photos once I got**
24   **them.**
25   Q.    So when Captain Miller told you

Page 51

1    that Captain Morrissey had gotten out of
2    shape, is that -- is it -- does "getting
3    out of shape" have some meaning that you
4    can explain for us?
5    A.    **If you are going through this**
6    **opening, and you're lining up to come**
7    **through the center, and you start sliding a**
8    **little bit, that's getting out of shape.**
9    Q.    So the vessel is drifting in
10   some way or --
11   A.    **Well, there's --**
12   Q.    -- steering in a way that you
13   don't intend it to?
14        MR. RODGERS:  Just for the
15        record, he's testifying as a fact
16        witness, not as an expert.
17        MR. CHAPMAN:  Yeah.  I'm just
18        asking him to explain.
19        MR. RODGERS:  Just putting it
20        on the record.
21        MR. CHAPMAN:  He said those
22        were Miller's words, and I'm --
23        MR. RODGERS:  No, he's
24        fine -- I'm fine with him testifying.
25        I just want to put that on the

Page 52

1    record.  Just --
2    A.    **Can you repeat what you just**
3    **asked, I'm sorry?**
4    Q.    Yeah.  I'm just trying to
5    understand.  You took a paper clip -- a
6    couple of clips and used them, I assume as
7    the fenders of a bridge -- the channel
8    opening?
9    A.    **It could be anything, buoys,**
10   **anything.**
11   Q.    But getting out of shape to you
12   or what you understood Captain Miller to
13   say to you involved the vessel moving in
14   some direction that it wasn't intended to
15   move?
16   A.    **Correct.**
17   Q.    Okay.  And what causes a vessel
18   to get out of shape?
19   A.    **Wind, current, tide, there**
20   **could be a few things of that nature.**
21   Q.    In your first conversation with
22   Captain Miller, did you ask to talk to
23   Captain Morrissey?
24   A.    **I did not.**
25   Q.    Did Captain Miller tell you

Page 53

1    where on the vessel he was calling from?
2    A.    **When -- Captain Miller?**
3    Q.    Yeah.
4    A.    **Yeah.  He was calling from the**
5    **wheelhouse, he told me.**
6    Q.    And what I -- I've learned that
7    there's a phone that goes with the tug?
8    A.    **Yes.**
9    Q.    Maybe there's more than one,
10   but there's at least one phone, right?
11   A.    **There's one boat phone for the**
12   **vessel.**
13   Q.    Okay.  Call the boat phone,
14   right?
15   A.    **Yes.**
16   Q.    And when that phone shows up on
17   your phone, it says, "Tug Mackenzie Rose
18   calling -- "
19   A.    **Yes, sir.**
20   Q.    -- right?  So that's why you
21   know to pick it up.
22   A.    **Yes, sir.**
23   Q.    And would you expect the master
24   of the vessel to call you whenever there is
25   an incident that involves the vessel

**LEONARD BALDASSARE**

**April 29, 2025**

Page 54

1    contacting a fixed object?
2         A.    Yes.
3         Q.    So it says, "Tug Mackenzie
4    Rose," and you assume that you're going to
5    end up talking to the master on the vessel.
6    It might be somebody else, but --
7         A.    Yeah.
8         Q.    -- your first inclination is,
9    "It's the captain calling."
10        A.    Correct.
11        Q.    The master calling?
12
13
14             MR. RODGERS:  Objection to
15        form.  You can answer.
16        A.    Yes.
17        Q.    Okay.  Did you have calls from
18   any of the Carver vessels that day?
19        A.    I don't recall.
20        Q.    The phone, was it like an
21   iPhone or was it an Android device?
22        A.    The boat phone?
23        Q.    No.  The phone that you were
24   assigned, I'm sorry.  Good clarification.
25        A.    It was an iPhone.

Page 55

1         Q.    All right.  And the phone on
2    the boat, do you know whether it's also an
3    iPhone?
4         A.    It was also an iPhone.
5             MR. RODGERS:  Just to clarify
6        for me, the boat phone was an iPhone.
7             THE WITNESS:  Yes.
8             MR. RODGERS:  Okay.
9         Q.    Okay.  So the phone itself, at
10   least for some period of time, would've a
11   log of when that call was placed to you and
12   the duration that you spoke to Captain
13   Miller, right?
14        A.    I would think so.  I'm not a
15   phone expert, but yes.
16        Q.    Well, you've got an iPhone
17   today?
18        A.    I do.
19        Q.    Okay.  Your personal phone is
20   an iPhone?
21        A.    It is.
22        Q.    Right.  And that's the way they
23   work?
24        A.    Yes.
25        Q.    Right.  So the next call, which

Page 56

1    I assume was right away was to Brian Moore?
2         A.    Yes, sir.
3         Q.    And you've told us what you
4    told him.
5         A.    Yes.
6         Q.    And you were waiting on photos?
7         A.    Yes.
8         Q.    How soon after you talked to
9    Mr. Moore did those photos arrive?
10        A.    I don't really recall, but
11   within the hour.  It was fairly quick.
12        Q.    They were delivered to you how?
13        A.    Via text message.
14        Q.    From the boat phone?
15        A.    Yes, sir.
16        Q.    So the photos were taken with
17   the boat phone and then simply forwarded to
18   you?
19        A.    Yes.
20        Q.    Okay.  In the time that you
21   continued to work for Carver, did you ever
22   delete those photos from the company phone?
23        A.    I did not, no.
24        Q.    So at least when you left, they
25   should have still been on there?

Page 57

1         A.    Yes.
2         Q.    Was there any message that came
3    with any of the photos that were sent to
4    you from the boat phone?
5         A.    I don't recall.
6         Q.    Did you at any time while you
7    were still employed by Carver, if there was
8    a text message that came with those photos,
9    ever delete them?
10        A.    No.
11        Q.    After you spoke to Mr. Moore,
12   did you call the boat back?
13        A.    I did.
14        Q.    And what did you tell them?
15        A.    I told them that Brian and I
16   were going to review the photos and discuss
17   the course of action.
18        Q.    So did you tell them to
19   standby?
20        A.    Yes.
21        Q.    And when -- you told us you got
22   the photos within the hour?
23        A.    Mm-hmm.
24        Q.    Is it your recollection that
25   you got photos of the bridge and the barge

**LEONARD BALDASSARE**

**April 29, 2025**

Page 58

1   within the hour?
2       A.   Yes.
3       Q.   All right.  And they came as a
4   group or one at a time, do you recall?
5       A.   I don't recall.
6       Q.   But they all came at about the
7   same time?
8       A.   Yes.
9       Q.   That's your memory, okay.  Then
10  once you got the photos, did you send them
11  to Brian?
12      A.   I did, yes.
13      Q.   And does he have a company
14  phone or did he have a company phone?
15      A.   I don't know, honestly.
16      Q.   You had his -- presumably had
17  his cell number in your contact, right?
18      A.   Yeah.  I think it was his work
19  phone, yeah.
20      Q.   Okay.
21      A.   Yeah.
22           MR. RODGERS:  Don't guess.
23           THE WITNESS:  Okay.
24      Q.   But --
25      A.   I don't know.

Page 59

1       Q.   But you do know that you sent
2   them to him?
3       A.   I did, yes.
4       Q.   Okay.  Did you include any text
5   message when you sent them?
6       A.   I don't recall.  I don't
7   recall.
8       Q.   The photos that you sent to him
9   with your company phone, at any time before
10  you left Carver, did you ever delete those
11  text messages?
12      A.   No.
13      Q.   To Mr. Moore?
14      A.   No, I never deleted anything.
15      Q.   Okay.  In the seven months, six
16  months or so that you were still employed
17  by Carver before you left and turned your
18  phone back in, did you -- was that phone
19  ever replaced?
20      A.   No.
21      Q.   So same phone?
22      A.   Yes, sir.
23      Q.   From June 15th to when you gave
24  it back to him in January of 2025?
25      A.   Yes.

Page 60

1       Q.   Now, I assume that you talked
2   to Mr. Moore again after you sent him the
3   photos?
4       A.   Yes.
5       Q.   Tell us about that
6   conversation.
7       A.   We discussed the photos --
8           MR. RODGERS:  Just -- sorry to
9       interrupt, Jim.  Are you talking
10      about on the phone, or just
11      some -- that day on the phone.
12          MR. CHAPMAN:  That day, yeah.
13          MR. RODGERS:  Okay, go ahead.
14      Q.   Focused -- still focused on
15  June 15th.
16      A.   Okay.  Yeah, sure.  Yeah.  We
17  spoke about the photos, we went over what
18  Captain Miller told us happened.  We didn't
19  observe any damage anywhere to our
20  knowledge, and we both agreed that it would
21  be okay for the vessel to proceed and that
22  we would discuss it further on Monday.
23      Q.   So in your conversation with
24  Mr. Moore after sending him the photos, was
25  there any discussion about the need to

Page 61

1   report the incident to the Coast Guard?
2       A.   No.  We both felt at the time
3   that reporting it was not necessary because
4   there was no damage or anything to report.
5       Q.   But you did actively discuss
6   whether it should be reported?
7       A.   Yes.
8       Q.   To the Coast Guard?
9       A.   Yes.
10      Q.   Okay.  What about reporting it
11  to the Bridge, to the Belt Line Bridge, was
12  that discussed?
13      A.   No.
14      Q.   Just the possibility of
15  reporting to the Coast Guard?
16      A.   Yes, sir.
17      Q.   Did either of you -- did you
18  contact the Coast Guard that day?
19      A.   Not that day, no.
20      Q.   So after you talked to
21  Mr. Moore, did you call the boat back?
22      A.   Yes.
23      Q.   And who did you speak with?
24      A.   Captain Miller again.
25      Q.   So then one more phone

**LEONARD BALDASSARE**

April 29, 2025

Page 62

1  conversation, it sounds like the third
2  conversation you would've had with the boat
3  on the afternoon of June 15th, 2024 about
4  the allision?
5      A.    Yes.
6      Q.    All right.  And what did you
7  tell -- or what did you and Captain Miller
8  talk about?
9      A.    I told him that Brian and I had
10  discussed it.  There was no damage to the
11  tug, there was no damage to the barge.
12  They told us from what they could see that
13  there was no damage to the bridge, so we
14  agreed that it would be okay to proceed.
15     Q.    And the photo of the bridge
16  that they sent you did not indicate -- or
17  you didn't think that there was any damage
18  to the Railroad Bridge?
19     A.    Correct.
20     Q.    In any of -- you told us that
21  you didn't talk to Captain Morrissey in the
22  first conversation, but in any of the
23  conversations that you had with the
24  boat -- I'll call it, on June 15th, did you
25  talk to anybody other than Captain Miller?

Page 63

1      A.    No.
2      Q.    Besides Mr. Moore, did you
3  speak -- and the -- and Captain Miller, did
4  you speak with anybody else with Carver
5  about the allision on June 15th, 2024?
6      A.    I did not, no.
7      Q.    So the last phone call or the
8  third phone call you had with Captain
9  Miller, you indicated that it was okay to
10  leave and to come on up with the barge to
11  destination, right?
12     A.    Yes.
13     Q.    Do you know where the tug and
14  barge were located when you gave them that
15  go ahead?
16     A.    I do not recall.
17     Q.    Do you know how long they stood
18  by the bridge before getting underway?
19     A.    I don't know.
20     Q.    To your knowledge, was anyone
21  instructed to notify the Coast Guard about
22  the allision on June 15th, 2024?
23     A.    No.
24
25

Page 64

1      MR. RODGERS:  Is your last
2  question notified the Coast Guard on
3  the -- on June 15th?  Is that what
4  your question was?
5      MR. CHAPMAN:  I think so.  Let
6  me to read it back.
7      MR. RODGERS:  You understood he
8  was talking about the day of the
9  collision.
10     THE WITNESS:  He was asking if
11  we contacted on the day.
12     MR. RODGERS:  On the day of
13  the --
14     THE WITNESS:  Yeah, we -- yeah.
15  Right.  No, we did not, no.
16     MR. RODGERS:  Yeah.
17     Q.    And my question was whether
18  anybody was instructed -- whether you
19  contacted them or not, was anybody, to your
20  knowledge, instructed to contact the Coast
21  Guard about the allision on June 15th,
22  2024?
23     A.    No, not to my knowledge.
24     Q.    So when did anybody on behalf
25  of Carver first notify the Coast Guard of

Page 65

1  the allision?
2      A.    Monday.
3      Q.    Monday, June 17th?
4      A.    Yes, sir.
5      Q.    Okay.  And was that because
6  Carver contacted the Coast Guard, or was it
7  because the Coast Guard contacted Carver?
8      A.    We contacted the Coast Guard.
9      Q.    Okay.
10     A.    Sector Norfolk, I believe it
11  was.
12     Q.    All right.  And who made that
13  contact?
14     A.    I did.
15     Q.    Who'd you talk to?
16     A.    Lieutenant Palumbo.
17     Q.    So you called Sector Norfolk
18  for what reason?
19     A.    To report the allision with the
20  bridge.
21     Q.    And did you, sort of, when you
22  made that call, did you ask to speak to her
23  personally or did you -- how did that go
24  down?
25     A.    She just happened to answer the

LEONARD BALDASSARE

April 29, 2025

Page 66

1    phone for the investigations number.
2        Q.    That's who you called, was
3    investigations?
4        A.    Yes.  That's who you call to
5    report.
6        Q.    To your knowledge, had the
7    Coast Guard contacted or attempted to
8    contact Harbor before you called Coast
9    Guard office in Norfolk to let --
10       A.    To my knowledge, no.
11       Q.    What caused you to contact the
12   Coast Guard on June 17th?
13       A.    Brian Moore reached out to me
14   in the morning and said that we need to
15   call the Coast Guard to report the
16   allision.
17       Q.    And did he tell you how he had
18   come to that conclusion?
19       A.    He did not, no.
20       Q.    He just told you to do it?
21       A.    Yes.
22       Q.    Where were you physically
23   working on Monday, June 17th?
24       A.    In the office in Staten Island.
25       Q.    And did you use your cell phone

Page 67

1    to call?
2        A.    I used my company cell phone to
3    make the phone call.
4        Q.    Okay.  Thank you for that
5    clarification.  What time did you make that
6    call?
7        A.    I don't recall.  Sometime in
8    the morning, maybe around 9:00 or 10:00.
9        Q.    Did Brian Moore call you to
10   tell you to make that phone call?
11       A.    Yes, he did.
12       Q.    Did he send any e-mail or text
13   about making that phone call?
14       A.    No.
15       Q.    Okay.  When he called you, was
16   there any discussion of why he had reached
17   the conclusion or what his reasons for
18   wanting you to call the Coast Guard were?
19       A.    No, there was not.  He just
20   gave me the order to do it.
21       Q.    So how long was that
22   conversation?
23       A.    Few minutes.
24       Q.    And when you talked to
25   Lieutenant Palumbo that day, what did you

Page 68

1    tell her?
2        A.    I told her that on Saturday, we
3    were coming through the bridge, we had
4    touched up on the fendering and that I was
5    going to be reporting it.  She then
6    instructed me to fill out the Coast Guard
7    2692, which I did that day.
8        Q.    On the 17th?
9        A.    Yes, sir.
10       Q.    And did you send a Coast Guard
11   2692 to the Coast Guard on June 17th?
12       A.    I sent it to Brian for review,
13   and I believe he was the one that sent it.
14       Q.    And did he copy you on the
15   submission to the Coast Guard?
16       A.    I believe so.
17       Q.    So to your memory, was it
18   e-mailed to the Coast Guard?
19       A.    Yes.  Usually -- yes.  That's
20   how it's sent to them.  It's e-mailed.
21       Q.    All right.  So there'd be some
22   e-mail reflecting that transmission?
23       A.    Should be, yes.
24       Q.    And you think Mr. Moore did it?
25       A.    Yes.

Page 69

1        Q.    You didn't?
2        A.    I did not, no.
3        Q.    What was your e-mail address
4    when you were employed by Carver?
5            MR. RODGERS:  Your work
6        address, right?
7            MR. CHAPMAN:  Yeah.
8        A.    lbaldassare@carvercompanies.com
9    .
10       Q.    At any time before you left
11   Carver, do you recall deleting any e-mails
12   that pertained to the allision with the
13   Norfolk Portsmouth Belt Line Bridge?
14       A.    No.
15       Q.    You know in Outlook you can set
16   up little folders to put e-mails that you
17   want to keep.  Did you have a folder for
18   the allision or for this incident in your
19   e-mail?
20       A.    I did not, no.
21       Q.    So it would just be in your
22   general inbox or outbox?
23       A.    Yes.
24       Q.    Now, in connection with
25   contacting the Coast Guard, did you also

**LEONARD BALDASSARE**

April 29, 2025

Page 70

1  contact the Belt Line about the allision?
2      A.    No.
3      Q.    Why not?
4      A.    I was not --
5
6
7          MR. RODGERS:  Objection to
8      form.  You can answer if you --
9      A.    I was not obstructed
10  to -- instructed to, sorry.
11      Q.    So did it occur to you that the
12  Belt Line should be contacted or notified?
13      A.    No.
14      Q.    In the initial conversation you
15  had with Mr. Moore, when he told you to
16  contact the Coast Guard and notify them of
17  the allision, did it come up that the Belt
18  Line should be contacted or there's no
19  reason to contact the Belt Line, anything
20  about contacting the Belt Line?
21          MR. RODGERS:  Objection to
22      form.  You can answer if you know.
23      A.    No.  Nothing came up in our
24  conversation about contacting the Belt
25  Line.

Page 71

1      Q.    Yeah.  So just to be clear, you
2  didn't suggest to Mr. Moore, "Hey, boss,
3  should I also contact the railroad in that
4  conversation?"  Right?
5      A.    No.
6      Q.    And likewise, he didn't say,
7  "Hey, I want you to call the Coast Guard
8  and also call the Belt Line?"
9      A.    No, he did not say that.
10      Q.    Okay.  So Mr. Moore told us
11  that you and he then investigated the
12  allision, right?
13      A.    Mm-hmm.
14          MR. RODGERS:  Objection to
15      form.
16      Q.    Does that comport with your
17  recollection?  Do you agree that both of
18  you were involved in investigating the
19  allision?
20      A.    Yes.  I was up until I was out
21  10 days after on paternity leave.
22      Q.    So tell us what you did after
23  June 15th.  It sounds like maybe it was
24  after June 17th, I don't know, but what you
25  did after June 15th to investigate this

Page 72

1  allision with the Belt Line Bridge?
2      A.    When the boat got to the yard
3  after this voyage, I went on the boat and
4  spoke to the crew about what happened, and
5  they all told me the same story that they
6  had told me on the phone.
7      Q.    Which was?
8      A.    That when they were coming
9  through the bridge, Captain Morrissey had
10  got out of shape.  He landed on the
11  fendering inside the bridge and slipped
12  through on the fendering, and that there
13  was no visible damage.
14      Q.    And you say, "All of the crew,"
15  you -- did you talk to all five members of
16  the crew?
17      A.    Yes.
18      Q.    So just kind of run down,
19  Captain Miller, Captain Morrissey?
20      A.    Yes.
21      Q.    Engineer McGrath?
22      A.    Yes.
23      Q.    And both deck hands?
24      A.    Yes.
25      Q.    One's named Morrissey, and the

Page 73

1  other one is named Porter?
2      A.    Yes.
3      Q.    Right?  You spoke to all of
4  them?
5      A.    Yes.
6      Q.    Did they provide you any
7  written statements?
8      A.    They did, yes.
9      Q.    And the written statements that
10  they provided, were -- did you take them up
11  while you were there on the boat?
12      A.    No.  I informed them that we
13  needed to get statements from everybody
14  explaining to their knowledge what happened
15  and that they were need -- they needed to
16  send them to myself and Brian.
17      Q.    Okay.  Had you received any
18  written statements from the boat before you
19  went aboard the vessel and interviewed the
20  crew members?
21      A.    No.
22      Q.    Did they prepare written
23  statements for you while you were on the
24  boat?
25      A.    No.

**LEONARD BALDASSARE**

**April 29, 2025**

Page 74

1    Q.    So when did you receive written
2    statements from any member of the crew?
3          MR. RODGERS:  Objection to
4          form.  You can answer.
5    **A.    I don't recall exactly when**
6    **they sent everything to me, but I had**
7    **requested it, you know, when I was on the**
8    **boat on that day.**
9    Q.    So did you talk to the crew
10   members before you called the Coast Guard
11   on June 17th?
12   **A.    No, it was after.**
13   Q.    And did you talk to the crew
14   members the same day you talked to the
15   Coast Guard?
16   **A.    I believe it was that Monday,**
17   **yes.**
18   Q.    But it would've been after
19   talking to Lieutenant Palumbo --
20   **A.    Yes.**
21   Q.    -- that you interviewed the
22   crew members?
23   **A.    Yes.**
24   Q.    When you went down to the
25   vessel, did you inspect it to see whether

Page 75

1    there was any damage to it?
2    **A.    Yes.  Myself and Engineer**
3    **McGrath walked down the engine room, up**
4    **into the forward hold just to make sure**
5    **that there was no damage, and we did not**
6    **see any damage on the vessel.**
7    Q.    That's the tugboat?
8    **A.    Yes, sir.**
9    Q.    Right.  Did you inspect the
10   barge at all?
11   **A.    I did not inspect the barge,**
12   **no.**
13   Q.    When you boarded the vessel,
14   was the barge still made up to it?
15   **A.    No.**
16   Q.    Had the barge already been
17   delivered to the job site?
18   **A.    Yes.**
19   Q.    So the Tug Mackenzie Rose
20   arrived at the dock where you boarded it in
21   what they call "a light boat condition?"
22   **A.    Yes, sir.**
23   Q.    Didn't have any barge, right?
24   **A.    No barge, just the tug.**
25   Q.    And what dock did you go to to

Page 76

1    board the vessel?
2    **A.    It was our yard in Staten**
3    **Island where our office is.**
4    Q.    And the job site where the
5    barge had been delivered was how far away?
6    **A.    I'm not sure.  It was a few**
7    **miles.  It wasn't like right there.**
8    Q.    It was over New Jersey?
9    **A.    Yes.**
10   Q.    Did you make any effort to
11   inspect the barge?
12   **A.    No.  It was not my privy to do**
13   **the inspection on the barge, that was going**
14   **to be handled by other parties.**
15   Q.    So did the Coast Guard -- well,
16   let me back up.
17         You got written statements from
18   the crew, did they prepare them themselves?
19   **A.    Yes.**
20   Q.    They did?
21   **A.    Yes.**
22   Q.    And when you received the
23   written statements, were they typed up on
24   company letter head or were they
25   handwritten, or what?

Page 77

1    **A.    No, they were handwritten.**
2    Q.    Who gave them to you?
3    **A.    I think Captain Miller gave**
4    **them to me, if I remember correctly.**
5    Q.    Did he give you the original
6    handwritten statements?
7    **A.    I don't recall.  I think he did**
8    **hand them to me, but I don't recall.**
9    Q.    Is it possible that they were
10   scanned and e-mail to you?
11   **A.    Possibly.**
12
13
14         MR. RODGERS:  Don't guess.
15   **A.    Possibly.**
16   Q.    Does the Tug Mackenzie Rose
17   have the capability of scanning a document?
18   **A.    Yes.**
19   Q.    Were the statements that you
20   received from the crew, they would've been,
21   I guess, one written statement for each
22   member of the crew, right?
23   **A.    Yes.**
24   Q.    Did you ever receive any type
25   of typed-up statement from members of the

LEONARD BALDASSARE

April 29, 2025

Page 78

1  crew?

2      A.    No.

3      Q.    Did you ever speak with any

4  member of the crew about the allision with

5  the bridge after that initial meeting that

6  you had to interview them?

7      A.    No.  Like I said, I went out a

8  few days later on paternity leave, so it

9  was just that one instance.

10     Q.    When you went aboard the vessel

11  to interview them, where did the interviews

12  take place?

13     A.    I interviewed Captain Miller

14  and Morrissey in the wheel house, and the

15  rest of the crew in the galley.

16     Q.    And when you interviewed them,

17  were both Miller and Morrissey with you in

18  the wheelhouse when you talked to them?

19     A.    No, I separated them.

20     Q.    All right.  Same question about

21  the other crew members, were they all

22  together in the gallery when you talked to

23  them?

24     A.    I spoke to both deckhands

25  together in the galley, and I spoke to the

Page 79

1  engineer alone in the galley.

2      Q.    Is there anything that would

3  help you nail down the actual date and time

4  if possible when you conducted these

5  interviews aboard the vessel?

6      A.    No.

7      Q.    You just believe that it was

8  sometime later the day that you initially

9  contacted the Coast Guard, correct?

10     A.    Yes.

11     Q.    How soon after those interviews

12  did you receive the written statements that

13  you described?

14     A.    Like I said before, I don't

15  really remember.  I think it might have

16  been the next day, but I'm not 100 percent

17  sure.

18     Q.    At any time before you went out

19  on paternity leave, did you talk to Nick

20  Laraway about the allision?

21     A.    No.

22     Q.    Did you talk to anyone

23  internally at Carver about the allision

24  besides Mr. Moore, or the five members of

25  the crew of the Tug Mackenzie Rose?

Page 80

1      A.    No, I did not.

2      Q.    Was there a written report of

3  your investigation prepared?

4      A.    Did I -- me, personally?

5      Q.    Yes.

6      A.    No.

7      Q.    You mentioned filing out a

8  2692.  Do you consider that a written

9  report?

10          MR. RODGERS:  Objection to

11      form.  You can answer his question if

12      you understand it.

13     A.    Yes.

14     Q.    Okay.  So there's at least a

15  2692 that you filled out as a result of

16  your investigation, right?

17     A.    Yes.

18     Q.    And you -- your memory is that

19  you sent that 2692 to Mr. Moore and then he

20  sent it to the Coast Guard?

21     A.    Yes.

22     Q.    Right.  Not you, correct?

23     A.    No, I did not.  He did.

24     Q.    All right.  Was there any

25  report that was filled out or completed in

Page 81

1  the Helm system about this incident about

2  the allision?

3      A.    I did not personally fill

4  anything out, no.

5      Q.    Would you expect there to be a

6  form that gets filled out about an incident

7  like this in the Helm system?

8      A.    I'm not really sure.

9      Q.    Have you seen reports from the

10  Helm system about the incidents involving

11  vessels?

12     A.    Not in my time at Carver, no.

13     Q.    You have access to the Helm

14  system?

15     A.    Yes.

16     Q.    So you've got login credentials

17  as Mr. Baldassare -- Leonard Baldassare,

18  correct?

19     A.    Yes.

20     Q.    Is there anything you can't

21  view in the Helm system?

22          MR. RODGERS:  Meaning

23      Mr. Baldassare?

24          MR. CHAPMAN:  Yeah.

25     A.    I'm sure there are.  There's

LEONARD BALDASSARE

April 29, 2025

1   different like categories based on
2   department.  So like I don't know if I was
3   able to access like all the engineering
4   stuff because I technically wouldn't really
5   need it, but I'm sure there are, yes.
6       Q.   Okay.  Let me pass over to you
7   what's been marked as Exhibit 1 for these
8   depositions.  That's just a print of a
9   photograph that was provided to us in the
10  discovery process.  I realize it's a little
11  grainy.
12          (Whereupon, Exhibit 1 was
13  marked for identification.)
14          Have you seen that before?
15      A.   Yes.
16      Q.   Okay.  And the image that
17  you've seen before wasn't as grainy?
18      A.   It was not, no.
19      Q.   Okay.  You could see it clearly
20  on your phone, I take it?
21      A.   Yes.
22      Q.   And tell us what that is then?
23      A.   This is the bridge, and this is
24  the fendering inside of the bridge.
25      Q.   Can you tell what vantage point

1   that photograph was taken from?
2       A.   I'm not sure.  I don't know.
3       Q.   And -- but this was one of the
4   photos that was sent to you on June 15th?
5       A.   Yes.
6       Q.   From the tug?
7       A.   Yes.
8       Q.   All right.  Do you see any
9   damage to the bridge in that photo?
10      A.   I do not, no.
11      Q.   Can you hand that to me just
12  for one second?
13      A.   Sure.  There you go.
14      Q.   Actually, you can keep it in
15  front of you.
16      A.   Are you sure?
17      Q.   Yeah.  Once we get a good image
18  of this, I may need to ask you some more
19  questions in the future.  But what I want
20  to know now is looking at this at the very
21  top of the photograph, does it appear that
22  the bridge is offset from the pier to you?
23          MR. RODGERS:  Objection.
24          MR. CHAPMAN:  I'm just asking
25      what he sees.

1       A.   I've never seen this bridge in
2   person, so I really can't answer what it is
3   or isn't supposed to look like.
4       Q.   Okay.  And you can put that on
5   the side or -- yeah, we'll just put it
6   right here.
7       A.   Sure.
8       Q.   So let me pass you what's been
9   marked as Exhibit 2.
10          (Whereupon, Exhibit 2 was
11  marked for identification.)
12      A.   Sure.
13      Q.   So four more photos.
14          Are those the copies of the
15  photos of the barge that you received by
16  text?
17      A.   Yes, they are.
18      Q.   Okay.  Again, they're a little
19  grainy, but I assume that whatever you were
20  able to see on your phone was clearer than
21  this?
22      A.   Yes, it was.
23      Q.   And what were
24  you -- what -- did you ask them to provide
25  pictures of the barge?

1       A.   I did, yes.
2       Q.   All right.  And were these
3   pictures sufficient to satisfy you that
4   there was no damage to the barge?
5       A.   Yes, there were.
6       Q.   Did you tell them specifically
7   what areas of the barge to take picture of?
8       A.   No.
9       Q.   These photos all appear to
10  depict the forward end, the raked end of
11  the barge --
12      A.   Yes.
13      Q.   -- in some fashion, correct?
14      A.   Yes, sir.
15      Q.   There's no photos of the stern
16  of the barge?
17      A.   No, there are not.
18      Q.   And there's one photo where you
19  can sort of see the port side of the barge?
20      A.   This last one?
21      Q.   Yeah, Number 248 in the
22  exhibit.
23      A.   Yeah, I got it.
24      Q.   But there's nothing of the
25  starboard side?

LEONARD BALDASSARE

April 29, 2025

Page 86

1      A.    No.
2      Q.    Okay.  And it looks like this
3   barge is equipped with a rub system
4   consisting of tires hanging over the side,
5   right?
6      A.    Yes.
7      Q.    Did Captain Miller or any
8   member of the crew indicate which side of
9   the barge contacted the fender system when
10  you interviewed them?
11     A.    They did not.
12     Q.    Did they say whether -- was
13  there any information provided to you by
14  the crew as to which side of the bridge
15  they contacted?
16     A.    No, not specifically.  I would
17  assume that it was this --
18
19
20         MR. RODGERS:  Don't guess.
21     Tell him what you no.
22     A.    No, they did not.  They did
23  not.
24     Q.    Okay.
25     A.    They sent me this photo.

Page 87

1      Q.    That's Exhibit 1?
2      A.    Correct.
3      Q.    All right.  But you don't know
4   whether that's in east side, west side,
5   north side or south side, right?
6      A.    I do not know.  I just know
7   from what the photo --
8      Q.    Okay.
9      A.    -- that they sent me.
10     Q.    Okay.  Let me pass you Exhibit
11  6, which was produced to us in discovery.
12         Does that appear to be a
13  collection of daily logs from the Mackenzie
14  Rose beginning June 12th, 2024?
15         (Whereupon, Exhibit 6 was
16  marked for identification.)
17     A.    Yes.
18     Q.    And this is printed out from
19  the Helm system, correct?
20     A.    Yes.
21     Q.    Right.  So if you turn to the
22  June 15th, '24, daily log, these -- it has
23  numbers at the bottom of the page, it says,
24  "Carver phone number?"
25     A.    Yeah.

Page 88

1      Q.    You're looking for 56.
2      A.    56?
3      Q.    Yeah.
4      A.    Got it.
5      Q.    Got it.  Okay.  So at the
6   bottom of the page -- so we know that the
7   accident was on June 15th --
8      A.    Yes.
9      Q.    2024.  This appears to be the
10  daily log for that, right?
11     A.    Mm-hmm.
12     Q.    Would've been completed by the
13  master or the mate, or both of them, right?
14     A.    Yes.
15     Q.    So at 16:30, it says there's an
16  incident.  It says, "Mate James Morrissey
17  reports the autopilot was not completely
18  turned off.  He was able to correct and
19  switch back over to hand steering and begin
20  backing on the weeks 281 barge and
21  maneuvering the barge alongside fendering
22  on the northend P-B-L-R-R Bridge, photo
23  taken, proceed slowly away from bridge."
24         I read that correctly?
25     A.    Yes.

Page 89

1      Q.    So in any of your conversations
2   with Captain Miller or the interviews of
3   the crew on the -- whatever day it was, was
4   there any mention of the autopilot somehow
5   being involved in this casualty?
6      A.    No, there was not.
7      Q.    Nobody said that?
8      A.    Nobody said that to me.
9      Q.    Did you ever ask --
10     A.    I did not.
11     Q.    -- whether they were on
12  autopilot or not?
13     A.    No.
14     Q.    In making bridge transits,
15  would you expect them to not to be in
16  autopilot?
17         MR. RODGERS:  Objection to
18     form.  You can answer.
19     A.    Say that again, I'm sorry.
20     Q.    I'm just --
21         MR. RODGERS:  He's not here as
22     an expert, but he can answer as to
23     his knowledge.
24     A.    No.  There would be no reason
25  for them to be in autopilot when

**Page 90**

1  approaching the bridge.
2      Q.   You would expect them not to be
3  on autopilot?
4      A.   Correct, they should be
5  hand-steering.
6      Q.   Okay.  We can put that back in
7  the pile here, sir.
8          MR. RODGERS:  Do you need water
9      or coffee?
10         THE WITNESS:  No, I'm okay.
11         MR. RODGERS:  You're okay?
12         THE WITNESS:  Yeah.
13         MR. CHAPMAN:  Are we okay time
14     wise?
15         THE REPORTER:  Five minutes.
16         MR. CHAPMAN:  We got five
17     minutes?  Why don't we just go ahead
18     and take a break.  I'll regroup and
19     try to --
20         MR. RODGERS:  Sure.
21         MR. CHAPMAN:  Okay.
22         THE REPORTER:  Yes?
23         MR. RODGERS:  Yeah, we're
24     ready.  We don't need to regroup.
25     Let's go off the record.

**Page 91**

1          THE VIDEOGRAPHER:  We are going
2      off the record, the time is 11:44
3      a.m.
4          Off the record.
5          (Whereupon, a short recess was
6      taken.)
7          THE VIDEOGRAPHER:  Beginning
8      Media Number 2.
9          We are back on the record, the
10     time is 12:02 p.m.
11     Q.   All right.  I tried to get a
12  little organized here.
13     A.   Sure.
14     Q.   I'm going to give you five
15  exhibits that I believe are the written
16  statements you talked about.
17     A.   Okay.
18     Q.   And they're stapled together
19  with some typed-up versions of the
20  statements as well.  But I want you to just
21  focus on Page 1 of each of these
22  exhibits --
23     A.   Yes, sir.
24     Q.   -- to confirm this for me.
25  But it is Exhibits 9, 11, 13, 15, and 17.

**Page 92**

1          THE VIDEOGRAPHER:  Let me
2      apologize.  Counsel, please, your
3      microphone.
4          MR. CHAPMAN:  Did you hear that
5      okay or not?  Is it on the record?
6          THE VIDEOGRAPHER:  Yes, but I
7      hear the noise.
8          MR. CHAPMAN:  Apologies.
9      Q.   So the first one is signed to
10  Captain Chris Miller, Number 9.  Is that
11  the written statement that you received
12  from Captain Miller?
13     A.   Yes.
14     Q.   All right.  And then moving on
15  to 11, that first page.  Is that the
16  written statement you received from
17  deckhand Jacques Bass Morrissey?
18     A.   Yes.
19     Q.   And then the next one, Exhibit
20  13, the first page, is that the witness
21  statement you received from Engineer Jason
22  McGrath?
23     A.   Yes.
24     Q.   And then Exhibit 15, the first
25  page is that the written --

**Page 93**

1      A.   Wait, this says Exhibit 17.
2      Q.   I'm sorry, it should -- didn't
3  I have 15 now?
4      A.   Oh, yeah.  I only have four.
5  You said --
6      Q.   -- might be one.  You got 15?
7      A.   Sorry.  Yes, I got 15.
8      Q.   Okay, good.
9      A.   Sorry about that.
10     Q.   So 15, the first page, is that
11  the statement you received from deckhand
12  Sharif Porter?
13     A.   Yes.
14     Q.   All right.  And then the last
15  one, which is Exhibit 17.  It's not signed,
16  but is that the witness statement that you
17  received from Captain Morrissey?
18     A.   I'm not sure if this is
19  handwriting, but it could be his, yeah.
20         MR. RODGERS:  Jim, when
21     you -- you're talking about the first
22     page --
23         MR. CHAPMAN:  Just the first
24     page.
25         MR. RODGERS:  -- of the

**LEONARD BALDASSARE**

April 29, 2025

---

Page 94

1  exhibit, right.
2          MR. CHAPMAN:  Yeah.
3          MR. RODGERS:  Okay.
4          MR. CHAPMAN:  Yeah.
5      Q.  Yes.  So just -- it says,
6  "Outbound Norfolk Southern branch with
7  weeks 281."  That's the barge that the
8  Mackenzie Rose was pushing at the time,
9  right?
10     A.  Correct, yes.
11     Q.  Okay.  And it talks about
12 touching on the bridge, no damage to barge,
13 and no visible damage to bridge.
14     A.  Mm-hmm.
15     Q.  So if we have accounted for the
16 other four statements that do have names on
17 them, does this -- does that in any way
18 refresh your recollection that this is the
19 one you received from Captain Morrissey?
20     A.  Yes.
21     Q.  Okay.  And just to be clear,
22 the written statements are -- the first
23 page of each of the exhibits are the only
24 statements that you received during the
25 course of your investigation?

Page 95

1      A.  Yes.
2      Q.  Right?  Okay.  So I do want to
3  ask you a question or two about some of the
4  other documents that are attached within
5  these exhibits.
6      A.  Okay.
7      Q.  So if we start with Number 9,
8  the one from Captain Miller?
9      A.  Mm-hmm.
10     Q.  There's a -- I'll call it a
11 typed-up version of his statement, right?
12     A.  Yes.
13     Q.  During the course of your
14 investigation, did you ever see this
15 statement?
16     A.  No.
17     Q.  Did -- you didn't request it
18 then--
19     A.  No.
20     Q.  -- from Captain Miller?
21         Do you know if anybody else
22 requested a typed-up version of this
23 statement?
24     A.  I don't know.
25     Q.  Okay.  And then the third page

Page 96

1  of Exhibit 9, which is numbered Carver
2  000049, looks like it's on some kind of
3  Carver Marine Towing letterhead?
4          (Whereupon, Exhibit 9 was
5  marked for identification.)
6      A.  Yes.
7      Q.  Right.  Did you ever receive
8  this as part of your investigation?
9      A.  No, I did not.
10     Q.  Okay.  And before you went out
11 on paternity leave, had this ever showed up
12 to your knowledge?
13     A.  No.  Not to my knowledge, no.
14     Q.  Okay.  Do you have any
15 understanding of who may have requested or
16 solicited either of these two typed
17 statements from Captain Miller?
18     A.  I do not know who would have.
19     Q.  All right.  So all of these
20 other statements are similarly
21 done -- these exhibits are similarly done.
22 If you look at them you'll see the
23 deckhands, the engineer?
24     A.  Yes.
25     Q.  They all --

Page 97

1      A.  The same format.
2      Q.  There's a typed-up version and
3  then there's a -- something on the company
4  type letterhead?
5      A.  Right.
6      Q.  Okay.  And you've never seen
7  those at any point during your
8  investigation?
9      A.  No, I have not.
10     Q.  And the one for Captain
11 Morrissey does not have that, kind of, last
12 page with the letterhead typed-up
13 statement?
14     A.  Right.
15     Q.  Right.  Okay.  But the other
16 four do?
17     A.  Correct.
18     Q.  Yep.  At any time before you
19 left Carver, did you ever see those
20 typed-ups versions of any of these
21 statements?
22     A.  No, I have not.
23     Q.  Anybody ever tell you or lead
24 you to believe that there were type-up
25 versions of those statements?

---

**LEONARD BALDASSARE**

April 29, 2025

Page 98

1      A.    No.
2      Q.    Before today, have you see
3  them?
4           MR. RODGERS:  Other than with
5      his attorney?
6           MR. CHAPMAN:  Yeah.
7      A.    Just with my attorney.
8      Q.    Okay.  And that's been recent?
9      A.    Yes.
10     Q.    Okay.  Any explanation to your
11 knowledge, you know, within your knowledge
12 as to why there are typed-up versions in
13 addition to the handwritten ones?
14     A.    No.
15     Q.    And just looking at the
16 handwritten ones in each of these five
17 exhibits, does that refresh your
18 recollection whether you were given like
19 the original version -- the original, you
20 know, written out version versus them being
21 e-mailed to you, or photocopied and
22 delivered to you?
23     A.    They might have been like
24 handed to me.
25     Q.    Okay.  And then it looks like

Page 99

1  on some of sort of small notepad.
2      A.    Yes.
3      Q.    Do you remember the color of
4  the paper?
5      A.    I do not.
6      Q.    Okay.  Do you know or recall
7  whether these statements -- the handwritten
8  statements, had already been prepared
9  before you interviewed the crew?
10     A.    The -- when they got back to
11 New York harbor?
12     Q.    Yes.
13     A.    No.  This wasn't -- these
14 weren't -- no.  This was after I had
15 already spoken to everyone.
16     Q.    Let me pass to you Exhibit 19,
17 Captain -- or Mr. Baldassare, which I
18 believe is the compilation of the 2692
19 filled with the United States Coast Guard?
20     A.    Yes.
21     Q.    If you look at the first page
22 there -- excuse me -- the second page, the
23 bottom of the second page, it has a
24 signature on it as to who completed it or
25 signed it --

Page 100

1      A.    Right.
2      Q.    -- and sent it out.  And it's
3  signed by Mr. Moore, correct?
4      A.    Correct.
5      Q.    Not you.  Did you ever sign
6  it --
7           MR. RODGERS:  I'm sorry.  Do
8      you mean the electronic signature, or
9      is it --
10          MR. CHAPMAN:  Yeah.  It's got a
11     digital signature on there.
12     Q.    You see the digital signature?
13     A.    Yes.
14     Q.    And what's -- might as well
15 read it.  What's the date and time?
16     A.    For the digital?
17     Q.    Yes.
18     A.    June 26, 2024, 08:48.
19     Q.    Okay.  Do you recall ever
20 signing a 2692 that was submitted to the
21 Coast Guard in connection with this
22 investigation?
23     A.    No.  I was out on paternity
24 leave when this was submitted.
25     Q.    Yeah.  But my question is,

Page 101

1  before you went out on paternity leave, did
2  you ever sign a 2692 that was submitted to
3  the Coast Guard?
4      A.    I filled out the 2692 that we
5  discussed earlier that I sent to Brian,
6  that he was going to be reviewing and
7  sending to the Coast Guard.
8      Q.    So the original 2692 that you
9  sent to Mr. Moore, what did it say it
10 happened to the bridge?
11     A.    Exactly what the vessel told me
12 when they called me on Saturday that they
13 had gotten out of shape coming through,
14 that they landed on the fendering inside of
15 the bridge, slid along the fendering and
16 that there was no visible damage.
17     Q.    And do you know whether
18 Mr. Moore every submitted that to the Coast
19 Guard?
20     A.    I do not know.
21     Q.    If you look on Page 1, and
22 Block 10 of this exhibit?
23     A.    You said Block 10?
24     Q.    Block 10.
25     A.    Yep.

**LEONARD BALDASSARE**

April 29, 2025

---

Page 102

```
1        Q.    It says, "The above vessel was
2   involved in a marine casualty consisting
3   in -- " and there's a bunch of things you
4   could check off.
5        A.    Yep.
6        Q.    The first one is checked,
7   right?
8        A.    Yes, sir.
9        Q.    "Unintended grounding or an
10  unintended strike of (allision with) a
11  bridge," right?
12       A.    Yes.
13       Q.    The draft or form that you
14  filled out and sent to Mr. Moore, was that
15  box checked?
16       A.    I don't recall.
17       Q.    And if you look down in Block
18  20, titled -- under Section 4, casualty
19  information?
20       A.    Got it.
21       Q.    It says, "Describe the extent
22  of property damage."
23       A.    Mm-hmm.
24       Q.    And it says, "Northend TBL
25  Railroad Bridge was offset from its
```

Page 103

```
1   foundation."
2             Did it say that in the draft
3   that you sent to Mr. Moore?
4        A.    No.
5        Q.    What did it say?
6        A.    I don't recall, but it didn't
7   say that.
8        Q.    Okay.  If you turn to the next
9   page of Exhibit 19, which is Carver
10  0000112, it's like the next page of the
11  2692.
12       A.    Yep.
13       Q.    Under Block 25 --
14       A.    Yep.
15       Q.    -- A, under, "Activity or
16  operation being conducted at the time of
17  the casualty," it describes -- I mean, I'll
18  just read it.  "The towing vessel Mackenzie
19  Rose was pushing the deck barge weeks 281
20  ahead and push gear.  They were outbound at
21  the Norfolk Southern branch for sea.  The
22  officer on watch, James Morrissey, was in
23  autopilot and didn't switch over to non
24  follow up hand steering, but thought he
25  did.  The vessel continued to track the
```

Page 104

```
1   port and made -- and before the officer,
2   they -- " excuse me.  "Before the OOW was
3   able to correct it after switching to non
4   follow up, the bow of the barge made
5   contact with the Western section of the
6   bridge."  The draft that you sent to
7   Mr. Moore, did it include that statement?
8        A.    No.  Because that's not the
9   information that I was given.
10       Q.    Okay.  What do you recall it
11  saying?
12       A.    Exactly what I said before.  As
13  they were coming through the bridge, they
14  got out of shape, landed on the fendering,
15  and slid through the bridge, and that there
16  was no physical damage to the bridge,
17  vessel or barge.
18       Q.    So during the course of your
19  investigation before you went on paternity
20  leave, did you ever learn that this is in
21  fact what happened as described in Block
22  25A of this exhibit?
23       A.    No.
24       Q.    Never learned that?
25       A.    No.
```

Page 105

```
1        Q.    When was the first time you
2   learned that this is the report that was
3   submitted to the Coast Guard?
4
5
6             MR. RODGERS:  Other than with
7        me.
8        Q.    Well --
9        A.    Just this morning with
10  Jim -- with Mr. Rodgers.
11            MR. RODGERS:  You don't
12       want -- need to tell him what we
13       discussed.
14       Q.    That -- so prior to you meeting
15  with the attorney for Carver today, you did
16  not know that this was the report that was
17  submitted to the Coast Guard in connection
18  with allision with the bridge?
19       A.    Correct, I did not know.
20       Q.    Okay.  So if you go to the next
21  page.
22       A.    Yep.
23       Q.    There's some instructions about
24  completing the form in about the middle of
25  the page.  You'll see Number 6?
```

**LEONARD BALDASSARE**

April 29, 2025

Page 106

1      A.    Yep.
2      Q.    "Once completed, deliver e-mail
3  or fax this form within five days of the
4  casualty to the Coast Guard sector Marine
5  safety unit, or activity nearest the
6  location of the casualty, or if at sea,
7  nearest the arrival port."  Then
8  there's -- looks like there's a -- some
9  portal in the cloud that you could log
10 into.
11     A.    Yep.
12     Q.    This form is not signed by
13 Mr. Moore until digitally on June 26th,
14 2024?
15     A.    Correct.
16     Q.    So that's like 11 days post
17 casualty, right?
18     A.    Yes.
19     Q.    Okay.  Do you know if any form
20 2692 was submitted to the Coast Guard
21 within the five-day requirement?
22     A.    I do not know.
23     Q.    So if you turn to the next
24 page.  This is Carver 0000114, and it's the
25 form 2692B regarding mandatory drug

Page 107

1  testing?
2      A.    Yep.
3      Q.    Right.  Generally, any time
4  there is a marine casualty, marine incident
5  like this, the crew is supposed to be
6  tested for drugs and alcohol, right?
7      A.    Yes.
8      Q.    Okay.  And there's a -- the
9  Coast Guard's laid out pretty narrow time
10 limits for getting that done, right?
11     A.    Yes.
12     Q.    So this report is basically
13 saying that there was no drug testing,
14 there was no alcohol testing,
15 post-incident, right?
16     A.    Correct.
17           MR. RODGERS:  Just for the
18     record, it says within 32 hours.
19     Q.    So in Block 7, it says, "In the
20 incident in question from June 15th, 2024,
21 there was no evidence of loss of
22 propulsion, loss of steering or damage to
23 the vessel and its barge, and a drug and
24 alcohol test would only be administered if
25 the above incidents occurred."

Page 108

1            Leaving aside whether that's a
2  correct interpretation or regulation, okay,
3  I'm not really worried about that, did you
4  draft that?
5      A.    I believe so, yes.
6      Q.    Okay.  And I ask because it
7  appears to be signed by you digitally,
8  right?
9      A.    Yes.
10     Q.    Now, would a 2692B be submitted
11 without the 2692 form --
12     A.    No.
13     Q.    -- or would they go hand and
14 hand?
15     A.    They all get submitted
16 together.
17     Q.    Okay.  So your digital
18 signature on here is dated June 19th, 2024?
19     A.    Yes.
20     Q.    Right?  So does that in any way
21 refresh your recollection that you signed a
22 2692 form that was submitted on June 19th,
23 2024 to the Coast Guard?
24     A.    No.
25     Q.    And you --

Page 109

1      A.    I filled out the 2692 on the
2  17th and sent it to Brian for review --
3      Q.    Okay.
4      A.    -- and submission.
5      Q.    All right.  But it appears that
6  you filed this 2692B out on the 19th,
7  right?
8      A.    Yes.
9      Q.    And who would've been
10 responsible for then submitting it to the
11 Coast Guard?
12     A.    Brian.
13     Q.    But you don't believe that you
14 signed the 2692 form, correct?
15           MR. RODGERS:  Objection to
16     form.  I'm not sure he testified to
17     that.
18     A.    I'm not really sure what you're
19 asking me.  Are you asking me about the
20 first part of this?
21     Q.    Yeah.
22     A.    Yeah.  This is -- I
23 didn't -- this is all Brian, this not me.
24     Q.    Yeah.  No.  I get the 2692
25 that's in this exhibit.

**LEONARD BALDASSARE**

April 29, 2025

1   A.    Okay.
2   Q.    What I'm trying to find out is
3   whether you have any memory of actually
4   signing the 2692 form that was submitted to
5   the Coast Guard that would've accompanied
6   this 2692B form that's in Exhibit 19?
7   **A.    Yes.  I filled it out on the**
8   **17th, sent it to Brian for his review and**
9   **submission.  What he did with it from**
10  **there, I don't know.**
11  Q.    So how was it that then you
12  came to fill out the 2692B on June 19th?
13  **A.    I don't know.**
14  Q.    Did you send it after you
15  signed it to Mr. Moore?
16  **A.    On the 17th.**
17  Q.    Well, we can agree that you
18  didn't sign this on the 17th of June.  That
19  is the 2692B, right?
20  **A.    Yeah.**
21  Q.    Okay.  Well, all I'm trying to
22  find out is after you signed it, the 2692B,
23  on June 19th, did you then send it to
24  Mr. Moore?
25  **A.    Yes.**

1   Q.    Okay.  And you did not file the
2   2692B with the Coast Guard?
3   **A.    No.**
4   Q.    Okay.  The last part of this
5   form in Exhibit 19 is the 2692A?
6   **A.    Mm-hmm.**
7   Q.    Which is a barge addendum for a
8   report under 2692, and it is numbered
9   Carver 00016.  You see that?
10  **A.    Yep.**
11  Q.    It doesn't say who filled it
12  out.  There's no place on this form where
13  you add a name of somebody completing this
14  form.  Do you recall whether you completed
15  this form, the barge addendum?
16  **A.    I do not recall.**
17  Q.    It -- in Block 3K, or at least
18  the description, the property damage next
19  to it, it says, "Displacement of Belt Line
20  bridge support structure."  You see that?
21  **A.    Yes.**
22  Q.    Is that something you would've
23  drafted?
24  **A.    No.**
25  Q.    And you are pretty certain of

1   that?  I just -- how is it that you --
2
3
4        MR. RODGERS:  Objection to
5   form.
6   Q.    How is it that you know that
7   you didn't draft it?
8        MR. RODGERS:  You can answer
9   that.
10  Q.    Yeah.
11       MR. RODGERS:  If you know.
12  **A.    Because the information**
13  **provided to me during the time when this**
14  **was filled out, never was this statement**
15  **told me to from anyone about the support**
16  **structure issue.**
17  Q.    You went out on paternity leave
18  on the 26th --
19  **A.    No.**
20  Q.    -- of June?
21  **A.    The 24th.**
22  Q.    24th of June?
23  **A.    Yes.**
24  Q.    Okay.  I'm sorry.  We learned
25  from Mr. Moore that somebody from the

1   National Transportation Safety Board and
2   from Coast Guard interviewed crew members
3   on the Mackenzie Rose on June 25th --
4        MR. RODGERS:  Objection to
5   form.
6   Q.    -- of 2024.  I know that was
7   after you left on paternity leave.  But did
8   you have any assistance or role in setting
9   up those interviews?
10  **A.    No.**
11  Q.    Do you know who handled that?
12  **A.    I do not know.**
13
14
15       MR. RODGERS:  This for me.
16  **THE WITNESS:  I'm good.  Thank**
17  **you.**
18  Q.    As part of your
19  responsibilities as Port Captain when you
20  were working for Carver, did you ever run
21  reports, I'll say in the Helm system to
22  look at specific things or to, kind of,
23  figure out what was going on?
24  **A.    No, not daily.  If there was an**
25  **incident or issue or something then, yeah,**

**LEONARD BALDASSARE**

**April 29, 2025**

Page 114

1    I would -- I could pull something up.  But
2    it wasn't part of my daily tasks to run
3    reports.
4         Q.    Got you.  Was it in any way in
5    your responsibility to like, I don't know,
6    review the daily logs that were submitted
7    by the vessel or that sort of thing?  Maybe
8    weekly task, monthly task, anything like
9    that?
10        A.    Only if there was an issue with
11   something on the boat for billing purposes.
12        Q.    So it was all incident --
13        A.    Correct.
14        Q.    -- specific?
15        A.    Correct.
16        Q.    Okay.  Was there anybody at
17   Carver Marine Towing when you were the Port
18   Captain that had specific responsibility
19   for training of new hires?  A person like a
20   training manager or training director, that
21   sort of thing?
22        A.    No, not to my knowledge.
23        MR. RODGERS:  You're talking
24        about the crew or generally?
25        MR. CHAPMAN:  Well, that's a

Page 115

1         great question.
2         MR. RODGERS:  Don't adopt my
3         questions.
4         MR. CHAPMAN:  No, no.
5         Q.    So there's seven tugs, right?
6         A.    Yes, sir.
7         Q.    Seven inspected vessels, maybe
8    some uninspected vessels.  How many people
9    work for Carver Marine Towing when you were
10   a Port Captain before you -- you know, at
11   about the time you -- well, mid June of
12   2024?
13        A.    That would be -- if you want to
14   include the dispatchers, eight people.
15        Q.    Okay.  And you don't think of
16   the crew members as being within that
17   universe?
18        A.    Oh, I thought you were just
19   talking shore side.  If you want to include
20   all the crew members --
21        Q.    Yeah.
22        A.    -- figure 10 guys per boat, so
23   that's 70 people.
24        Q.    Okay.
25        A.    Plus the shore side staff, so

Page 116

1    75 to 80 people.
2         Q.    Okay.  And among the shore side
3    folks, nobody was like the training manager
4    or training director?
5         A.    No.
6         Q.    Among the -- I don't know what
7    you call them, the crews, there wasn't
8    anybody that like had the title of being
9    training director?
10        A.    No.
11        Q.    Okay.  Among the shore side
12   personnel, was there anybody that had the
13   assigned responsibility of being the safety
14   manager?
15        A.    Yes.
16        Q.    And who was that?
17        THE WITNESS:  It's okay to --
18        MR. RODGERS:  Yeah.
19        A.    Yeah.  Jason (indiscernible)
20   was the HSQE advisor.
21        Q.    What does HSQE stand for?
22        A.    Health Safety Environmental
23   something.  He was the safety and
24   compliance officer.
25        Q.    And when -- was he hired after

Page 117

1    you started working there?
2         A.    He was, yes.
3         Q.    And how -- just in relationship
4    to the allision, how long before the
5    allision with the Belt Line bridge was he
6    hired?
7         A.    A month or two.
8         Q.    Was he hired for that specific
9    role?
10        A.    No.
11        Q.    What was he hired for?
12        A.    Originally as a dispatcher.
13        Q.    So when did he become
14   the -- you called it the H --
15        A.    Health and safety officer.
16        Q.    Health and safety officer.
17        A.    Yeah.
18        Q.    When did he take on that
19   responsibility?  Before or after the
20   allision?
21        A.    I believe it was right before,
22   but I don't -- I can't give you an exact
23   timeline.
24        Q.    Was he still with Carver when
25   you left?

**LEONARD BALDASSARE**

**April 29, 2025**

Page 118

1   A.   Yes.
2   Q.   Was he still in the same role?
3   A.   Yes.
4   Q.   Let me show you Exhibit 21 that
5   was produced to us by Carver.  And at the
6   top -- I don't know who added this, it
7   says, "Screenshot from Helm event."  You
8   see that?
9   A.   Yeah.
10  Q.   When you go to the Helm system
11  and you look up an incident -- maybe you
12  got to put in the date, time, I don't know,
13  but is this the view that you would get of
14  an incident?
15  A.   I think it would show up a
16  little differently on mine, so I don't
17  know.  I -- mine was a little bit of a
18  different view.
19  Q.   Okay.  This language here, I
20  believe is shown on Exhibit 21 is identical
21  to the statement that appears in Exhibit 6,
22  on page Carver 000056 regarding the
23  incident.  I just want to pass you Exhibit
24  6.
25  A.   Yeah, right here at 16:30?

Page 119

1   Q.   Yeah.
2   A.   Yep.
3   Q.   It says -- I believe they're
4   word for word?
5        MR. RODGERS:  What's your -- do
6    you have a question?
7   Q.   Yeah.  The question is, are
8   they word for word?  Is there any
9   difference between the two?
10  A.   No, it's word for word.
11  Q.   Okay.  So the daily log,
12  Exhibit 6, for June 15th, would've been
13  completed on June 15th, correct?
14  A.   Correct.
15  Q.   All right.  And then it
16  would've been available to view in the Helm
17  system as an incident that occurred on that
18  date, right?
19  A.   Yes.
20  Q.   Okay.  So at least at some
21  point on June 15th, somebody, Captain
22  Miller or Captain Morrissey, entered a note
23  about the incident at 16:30 hours involving
24  the bridge in which they described the use
25  of the autopilot, right?

Page 120

1   A.   Correct.
2   Q.   But you didn't know about that
3   when you conducted your investigation?
4   A.   No, I did not.
5   Q.   Did you ever go look in the
6   Helm system to see what they had entered
7   about the incident?
8   A.   No.  Am I able to ask Jim a
9   question, like -- no?
10  Q.   Yeah.  So here's the deal.
11  When we're doing depositions, it's just
12  like we are testifying at trial.
13  A.   Sure.
14  Q.   You're testifying in trial.  So
15  you wouldn't turn to a lawyer in trial and
16  say, "Hey, I need to ask a question."
17  Judge wouldn't let you do that.
18  A.   Right.
19  Q.   Okay.  If you want to do it on
20  a break --
21  A.   Okay.
22  Q.   -- I can't stop you guys from
23  talking.
24  A.   Understood.
25  Q.   But --

Page 121

1   A.   Okay.
2   Q.   -- if you need a
3   clarification, you're welcome to ask me
4   too.
5   A.   Okay.
6   Q.   And I'll do my best.  If
7   there's something about a question I'm
8   not -- you don't understand, I'm happy to
9   try to help you sort that out.
10  A.   No, it's fine.
11  Q.   Okay.
12       MR. RODGERS:  And you can talk
13   to me whenever you need to, but not
14   really about the testimony.
15       THE WITNESS:  Okay.
16       MR. RODGERS:  But if you need
17   to clarify something, tell
18   Mr. Chapman.
19       THE WITNESS:  Well, the only
20   thing that I wanted to clarify was
21   that in regards to the logs, these
22   are -- they're able to go back in and
23   edit these after the fact.
24  Q.   Oh, is that right?
25  A.   Correct.

**LEONARD BALDASSARE**

April 29, 2025

Page 122

1      Q.    Okay.  So is there an audit
2  trail that would tell you when something is
3  changed?
4        A.    No.
5      Q.    Or what was changed?
6        A.    No.
7      Q.    So even though the daily log
8  has been completed, it's not really final?
9        **A.    It's not final until they close
10  it out for the day.  So they can leave it
11  open for a few hours, and then go back and
12  change or edit if they make a mistake on
13  something.  It's mostly -- it's there so
14  that if they say, "Oh, we picked up the
15  weeks 282, but it was really the weeks
16  281," they can go back and make the
17  correction.**
18      Q.    Like they could do that a week
19  later?
20        **A.    No.  Once they submit it for
21  the day, then that's it.**
22      Q.    So it's -- at the end of the
23  day, it's closed?
24        **A.    Correct.**
25      Q.    And I'll call it, sort of,

Page 123

1  inalterable --
2        **A.    Yes.**
3      Q.    -- at that point?
4        **A.    Yes.  Until they submit it and
5  close it out for the day, it's
6  still -- they can still edit it.**
7      Q.    So looking at Exhibit 6 again
8  for June 15th on Page 56 of this exhibit,
9  are you able to tell when they closed that
10  out?
11        **A.    No.**
12      Q.    Is there another record,
13  another document that would show you when
14  the master's daily report was closed out?
15        **A.    No.**
16      Q.    Let me pass over to you Exhibit
17  36.  That was produced to us in this case,
18  and appears to be -- well, is it -- is some
19  kind of form titled "7.3 master's daily
20  vessel reporting?"
21        **A.    Yes.**
22      Q.    For the Mackenzie Rose, right?
23        **A.    Yes, sir.**
24      Q.    Right?  So this is also a form
25  in the Helm system?

Page 124

1        **A.    Yes.**
2      Q.    And is this the report that
3  then is some how connected to the report
4  that you have there in Exhibit 6?  Are they
5  related to each other?
6        **A.    No, this is a separate form.**
7      Q.    Okay.
8        **A.    This is the master's daily form
9  that they fill out every day.**
10      Q.    All right.  And if you look at
11  the page for June 15th, check -- is -- they
12  have numbers at the bottom, Carver 000019?
13        **A.    Got it.**
14      Q.    Right.  This report says it was
15  filled out by Captain Chris Miller on June
16  15th, 2024 at 23:55 hours?
17        **A.    Yes.**
18      Q.    So he's the master of the
19  vessel, that would've been just before he
20  went off watch?
21        **A.    Yes.**
22      Q.    Right?
23        **A.    Yes.**
24      Q.    Okay.  So he fills out this
25  report and submits it, and once it's

Page 125

1  submitted on -- at this time 23:55 hours,
2  is it like done for the day?
3        **A.    Yes.**
4      Q.    You can't go back in and change
5  it?
6        **A.    No.**
7      Q.    All right.  And then the report
8  that's in Exhibit 6 is more like a logbook,
9  right?
10        **A.    Yes.**
11      Q.    And likewise, once it's
12  submitted, whenever that happens, before
13  the end of the day, it's done.  You can't
14  amend it?
15        **A.    Yes, sir.**
16      Q.    Right.  Okay.  So there's also
17  a rough deck log kept on the boat, right?
18        **A.    Yes.**
19      Q.    It's a journal, covers the
20  whole year, right?
21        **A.    Yes.**
22      Q.    Carver puts those on the boat
23  or provides them for the boat?
24        **A.    No.**
25      Q.    You don't think so?

Page 126

1    A.    No.
2    Q.    Why?
3    A.    I've never been instructed to
4    provide one or put one on the boat for any
5    reason at all.  That's what the Helm system
6    is for.
7    Q.    So in your experience, you've
8    never filled out a rough log?
9    A.    Not working at Carver
10   companies, no.
11   Q.    At Buchanan?
12   A.    Yes.
13   Q.    Vane?
14   A.    No.
15   Q.    Center Line?  Actually, you
16   didn't have a sailing role at Center Line.
17   A.    I wasn't sailing there,
18   correct.
19   Q.    But there's a rough log on the
20   Mackenzie Rose, right?
21   A.    Yes.
22   Q.    So let me pass you Exhibit 23.
23        MR. RODGERS:  Are you okay?
24        THE WITNESS:  Yeah, yeah, I'm
25   fine.

Page 127

1    Q.    So as part of your
2    investigation into this allision, did you
3    ever review the rough log that was on the
4    boat?
5    A.    No.
6    Q.    Did you ever request a copy of
7    the rough log?
8    A.    No.
9    Q.    Did you even know there was a
10   rough log?
11   A.    No.
12   Q.    If you would look at -- this is
13   in Exhibit 23, the page covering Saturday,
14   June 15th of 2024?
15   A.    Yes, got it.
16   Q.    Okay.  It says, "At 16:30, a
17   co-captain reports steering went hard over
18   and he was backing in, we tapped the
19   northend P-B-L-R-R Bridge."  Did I read
20   that correctly?
21   A.    Yes.
22   Q.    Okay.  Do you recognize that
23   handwriting?
24   A.    No.
25   Q.    So you don't know whether it's

Page 128

1    Captain Morrissey or Captain Miller?
2    A.    I do not know.
3    Q.    All right.  Did anybody ever
4    say to you during the course of any
5    interview that they had actually tapped the
6    bridge?
7    A.    No.
8    Q.    Only the fender?
9    A.    Yes, sir.
10   Q.    Did you have any responsibility
11   as Port Captain for making sure that
12   repairs were effected to any of the tugs
13   that you oversaw?
14   A.    Not usually.  In certain
15   instances I would assist the engineering
16   team, but it would be handled by
17   engineering.
18   Q.    Were you aware of any
19   complaints involving either the steering
20   system or the autopilot system on the
21   Mackenzie Rose while you were Port Captain
22   at any time before the allision with the
23   bridge?
24   A.    No.  Nothing was told to me
25   from the vessel that there was any issues.

Page 129

1    Q.    Okay.  So if there were
2    some -- I'll call it problem or concern
3    with navigation, the autopilot system, that
4    sort of thing, how would the crew get that
5    addressed or resolved, or at least
6    inspected?
7    A.    They would reach out to the
8    port engineer who would then set up either
9    a technician, go out to the vessel to make
10   a repair or talk to the engineer and see if
11   it's something that the engineer feels
12   comfortable repairing himself, depending on
13   the extent of the issue.
14   Q.    Okay.  Do you know what a "near
15   miss report" is?
16   A.    Yes.
17   Q.    Is that a form that you fill
18   out in the Helm system?
19   A.    Me personally, or the vessels?
20   Q.    Well, in Carver Marine Towing
21   generally, is that a form that can be
22   filled out in the Helm system?
23   A.    Yes.  But not by shore side
24   personnel.  Just by the vessels.
25   Q.    So it's not a form that you

**LEONARD BALDASSARE**

**April 29, 2025**

Page 130

```
1    would even have access to?
2         A.    No.
3         Q.    If there's one that's submitted
4    by a vessel, are you able to see it?
5         A.    No.  Usually, it goes directly
6    to Brian because he was the one that would
7    have to approve the near misses.
8         Q.    So there's an approval process
9    when there's a near miss?
10        A.    Correct.
11        Q.    And what is -- what's involved
12   in that?
13        A.    I do not know.  I was not an
14   approver.
15        Q.    So you wouldn't even be
16   informed of a near miss?
17        A.    Unless there was a incident,
18   normally not.
19        Q.    So as originally reported to
20   you, where apparently everybody that you
21   interviewed said, "All we did was brush up
22   against the fender system on the
23   bridge -- "
24               MR. RODGERS:  Objection to
25        form.  I'm not sure that's his
```

Page 131

```
1         testimony.  You said "everyone."
2         Q.    You can correct me if I
3    misstated, okay?
4         A.    Okay.
5         Q.    But based on that, would you
6    have considered that to be a near miss,
7    requiring a near miss report in your Helm
8    system?
9               MR. RODGERS:  Objection to
10        form.  If you understand it, you can
11        answer.
12        A.    I'm not really sure what you're
13   asking.  Are you asking if the incident
14   that was reported to me on Saturday the
15   15th, would be considered a near miss?
16        Q.    Sure.
17        A.    In my personnel opinion?
18        Q.    Yes.
19        A.    I'm not an expert in near
20   misses, but --
21               MR. RODGERS:  Well, don't --
22        A.    No, I'm not really --
23               MR. RODGERS:  Stop, stop.
24        Don't -- you're not here to give your
25        opinion, okay.
```

Page 132

```
1               THE WITNESS:  Okay.
2         A.    Then no.
3         Q.    It wouldn't be reported as a
4    near miss or you just don't have an
5    opinion?
6         A.    I don't have an opinion on it.
7         Q.    Okay.  It was -- in your -- why
8    did the boat -- why did Captain Miller
9    contact you on the afternoon of June 15th,
10   2024?
11
12
13               MR. RODGERS:  Objection to
14        form.  You can answer if you
15        understand it.
16        A.    You would have to ask Captain
17   Miller why he felt it necessary to call me.
18        Q.    So you were the Port Captain,
19   and he reported that they had touched the
20   fender system, right?
21        A.    Yes.
22        Q.    Who else would he report it to,
23   if not you?
24        A.    Brian Moore.
25        Q.    Is there some clear kind of
```

Page 133

```
1    reporting chain that he should call Moore
2    first and then you, or call you and if he
3    doesn't reach you, then call Moore?
4         A.    It would be me first.
5         Q.    All right.  So do you know
6    whether he spoke at all to Brian Moore that
7    day?
8         A.    I do not know.
9         Q.    I want to ask you about a
10   couple of sets of invoices or billing
11   records that were provided to us by Carver
12   that came from GMT McCay and Ayers Marine
13   Electronics, which are labeled Exhibit 24
14   and 25.
15        A.    Okay.  You got an extra one
16   there?
17        Q.    All right, thank you.  So 24 is
18   from Ayers Marine Electric?
19        A.    Yep.
20        Q.    And 25 is from GMT McCay,
21   right?
22        A.    Yes.
23        Q.    Would those, I'll say, come
24   across to -- your desk or come to your
25   attention?
```

LEONARD BALDASSARE

**April 29, 2025**

Page 134

1      A.    I can't speak to this one
2   because I wasn't even employed at the time.
3      Q.    That's the GMT McCay?
4      A.    Yes, sir.
5      Q.    And you're talking about
6   something from 2023?
7      A.    Correct.
8      Q.    Okay.
9      A.    So I wasn't employed, so I
10  can't speak to anything on that.
11     Q.    And one second before we go on,
12  but Exhibit 25, the GMT McCay, is three
13  pages.  So the second page is from March of
14  2024?
15     A.    Yes.
16     Q.    All right.  And so, that's my
17  question is, would that have come to your
18  attention in --
19            MR. RODGERS:  The invoice.
20     Q.    Yeah.  The record from McCay?
21     A.    No.  This would go to our
22  accounts payable department.
23     Q.    Okay.  So -- but in the
24  ordinary course, you wouldn't be involved
25  in that at all?

Page 135

1      A.    No.
2      Q.    Right.  Do you have any memory
3   of seeing that or knowing it was some work
4   being done on the Mackenzie Rose in that
5   timeframe?
6      A.    No, not this one.
7      Q.    Okay.  So let's look at the
8   Ayers Marine Electric, that is Exhibit 24.
9      A.    Yep.
10     Q.    Would that have come to your
11  attention in some way or across your desk,
12  so to speak, in connection with your role
13  as Port Captain in 2024?
14     A.    No.  Once again, this would go
15  to accounts payable.  However, I was the
16  one that was instructed to set up the
17  technicians to come down and work on the
18  autopilot for the boat.
19     Q.    Okay.  So you didn't have that
20  role with the GMT McCay work in March of
21  2024?
22     A.    No.
23     Q.    But you did with Ayers?
24     A.    Yes, sir.
25     Q.    In -- and that was in April of

Page 136

1   2024?
2      A.    Yes, sir.
3      Q.    And they came out twice?
4      A.    Yes.
5      Q.    Right.  And to your knowledge,
6   what work was required on the autopilot
7   system?
8      A.    I'm not sure exactly what was
9   required.  I know what they did was replace
10  the actual unit itself.  They ran some new
11  wires and they have fixed everything into
12  the GPS system on the boat.
13     Q.    In April of 2024?
14     A.    Yes.
15     Q.    Do you know what 11problems
16  they were experiencing with the autopilot
17  system?
18     A.    I do not know exactly.  I was
19  just instructed from the engineering team
20  to please assist in setting up a technician
21  to come out there.
22     Q.    So when did you start with
23  Carver in 2024?  And I know you told us
24  January, but what was your start date?
25     A.    It was sometime in mid January.

Page 137

1   I don't know the exact date.
2      Q.    Okay.  Shortly after you
3   arrived, if it was mid January, did you
4   become aware that Captain Morrissey, while
5   piloting the Mackenzie Rose down in
6   Charleston Harbor, hit a pier?
7      A.    No.
8      Q.    You didn't know that?
9      A.    No.
10     Q.    Would that type of thing be
11  reported to you as a Port Captain or not?
12     A.    It would be normally, yes.
13     Q.    Okay.  Let me pass to you
14  Exhibit 3.
15            (Whereupon, Exhibit 3 was
16  marked for identification.)
17     A.    Okay.
18     Q.    This was produced to us by
19  Carver, and at the top it says it's 9.5
20  incident report event pertaining to the
21  Mackenzie Rose.  It looks like somebody
22  filled it out on January 22nd of 2024.  Do
23  you see that?
24     A.    Yeah.  I feel like -- do you
25  know what day of the week this was?

**LEONARD BALDASSARE**

April 29, 2025

1  Because I feel like this happened or this
2  was right before I started.
3      Q.    Okay.
4      A.    This date.
5      Q.    Do you know who Brandon Kuster
6  is?
7      A.    I do.
8      Q.    Who is he or what role did he
9  have at --
10     A.    He was a mate at Carver
11  Companies, he still works there --
12     Q.    He's still --
13     A.     -- to my knowledge.
14     Q.    He's still employed at Carver?
15     A.    Yes.
16     Q.    Okay.  At least he was when you
17  left?
18     A.    Correct.
19     Q.    This Helm -- this report from
20  Helm is some type of form that has to be
21  filled out when there's an incident --
22     A.    Yes.
23     Q.     -- right?  Whether it was for
24  the Mackenzie Rose or not, were there any
25  other 9.5 incident reports that were filled

1  out for any of the vessels while you were
2  employed by Carver?
3      A.    Not to my knowledge.
4      Q.    And you don't think you've ever
5  seen this one?
6      A.    This one I've never seen, no.
7      Q.    Okay.  Was a 9.5 incident
8  report like Exhibit 3, like the one marked
9  as Exhibit 3, ever started for the allision
10  with the Belt Line Bridge?
11     A.    I do not know.
12     Q.    Did you ever open such a form
13  and input any data --
14     A.    No.
15     Q.     -- to support that?  Do you
16  know if any of the -- either the master or
17  the mate did?
18     A.    You would have to ask them, I
19  don't know.
20     Q.    Can this report be filled out
21  by anybody other than the master or the
22  mate?
23     A.    I do not know if -- I don't
24  know.  I'm not sure.
25     Q.    Okay.

1      A.    Yeah.  I'm not sure if -- I
2  would say probably not, but I don't know
3  for sure.
4      Q.    After you started working for
5  Carver, did you ever hear or come to learn
6  that Captain Morrissey, while piloting the
7  Mackenzie Rose, had hit a pier in
8  Charleston, South Carolina?
9      A.    No.
10     Q.    While you were employed by
11  Carver, was Captain Morrissey ever
12  disciplined or reprimanded or anything to
13  your knowledge?
14     A.    Not to my knowledge, and not by
15  me.
16     Q.    Have you had to discipline or
17  reprimand anybody during your employment by
18  Carver?
19          MR. RODGERS:  You can --
20     A.    Yes.
21     Q.    Okay.
22     A.    I have, yeah.
23     Q.    Crew members?
24     A.    Correct.
25     Q.    All right.  Anybody who was in

1  the role of master of a tug?
2      A.    No.  No.
3      Q.    Mate?
4      A.    Yes.
5      Q.    And more than once?
6      A.    Yeah.  Not the same individual,
7  but on a few separate occasions, a few
8  mates needed to, you know, shape up.
9      Q.    And what are the types of
10  things that you would've to counsel them
11  about?
12     A.    Just being more prudent with
13  filling out logs, doing inspections.
14  Their -- just overall, you know, the way
15  they conduct themselves on the boat.
16     Q.    Anything operational?
17     A.    No.  No.
18     Q.    What about deck hands?
19     A.    Yes.
20     Q.    Counseling involved by you or
21  delivered by you?
22     A.    Yes.
23     Q.    All right.  And again, same
24  question, what's the nature of that
25  counseling?

**LEONARD BALDASSARE**

**April 29, 2025**

Page 142

1    A.    Don't be lazy, listen to the
2    captain, do your duties that you're
3    assigned for your watch.  Yeah, that's
4    pretty much it.
5        Q.    Is there a record kept of that
6    counseling?
7        A.    No.  No.  It's more just me
8    coming saying, "Hey, listen.  I spoke to
9    Captain whoever, he's not really thrilled
10   with the way things have been working out.
11   This is me telling you, you know, you need
12   to be better, try harder."
13            Things of that nature.
14       Q.    But it's not like there's
15   something that gets documented in their
16   personnel file?
17       A.    No.  Unless it was a -- like a
18   major thing, then if they were like written
19   up or something like that, then it would be
20   documented.
21       Q.    When you say, "written up," is
22   there a form in Helm for doing that?
23       A.    No, HR has the write-up forms.
24       Q.    Can you access the HR system
25   for those?

Page 143

1        A.    No.  I would have to reach out
2    to HR directly and let them know we're
3    going to be writing this person up for X, Y
4    and Z, and then they would send the form
5    over.
6        Q.    To your knowledge, was Captain
7    Morrissey ever written up --
8        A.    Not to my knowledge.
9        Q.    -- in process?
10       A.    Not to my knowledge and not by
11   me.
12       Q.    Were there occasions while you
13   were employed by Carver as Port Captain
14   that you did reach out to HR and initiated
15   that you -- write-up process on anybody you
16   were counseling?
17       A.    Yes, one time.
18       Q.    One time.  And what position
19   did that person hold?
20       A.    Deck hand.
21       Q.    On the Mackenzie Rose?
22       A.    No.
23       Q.    Did you ever do a check ride
24   with Captain Morrissey?
25       A.    No.

Page 144

1        Q.    Captain Miller?
2        A.    I don't believe so, no.
3        Q.    We can put those over here.
4        A.    Oh, sure.  There you go.
5        Q.    Mr. Baldassare, I'm going to
6    pass to you what has been marked as
7    Exhibits 26, 28, and 30.  Those documents
8    were produced to us in this case, and they
9    appear to be separate near miss reports --
10       A.    Okay.
11       Q.    -- involving the Mackenzie
12   Rose.
13            MR. RODGERS:  Separate reports
14       or separate incidents.
15            MR. CHAPMAN:  Well, Okay.
16       Separate reports of separate
17       incidents, how about that?
18       Q.    It's only Exhibit 28 that has
19   the Helm sort of logo on it with some other
20   data about when it was filled out, who it
21   was filled out by.
22       A.    Right.
23       Q.    You see that?
24       A.    Yes.
25       Q.    But exhibits 26 and 30 contain

Page 145

1    the form response items for separate
2    incidents.  Do you see that?
3        A.    Mm-hmm.
4        Q.    Okay.
5        A.    Yes.
6        Q.    These all were received at some
7    point by Mr. Moore?
8        A.    Yes.
9        Q.    Do you see that in Block 2.2?
10       A.    Yes.
11       Q.    On separate dates.  Looks like
12   Exhibit 26 was in May of 2024, Exhibit 28
13   was in March of 2024 and Exhibit 30 was in
14   April of 2024, right?
15       A.    Yes.
16       Q.    Were you ever aware of any of
17   these near misses --
18       A.    No.
19       Q.    -- that were reported?
20       A.    No, I was not.  As I stated
21   earlier, these -- when these were
22   submitted, they went directly to Brian as
23   he was the approver of the near misses.
24       Q.    In 2024, March, April and May,
25   do you know whether Mr. Moore had a valid

**LEONARD BALDASSARE**

**April 29, 2025**

Page 146

1  Merchant Mariners Document?
2      A.    Did he have one?
3      Q.    Yeah.
4            MR. RODGERS:  I didn't hear it.
5      Q.    I'm asking if you know whether
6  in March, April and May of 2024, Mr. Moore
7  had a valid Merchant Mariners document?
8            MR. RODGERS:  I didn't hear,
9      Merchant Marine, what.
10           MR. CHAPMAN:  Merchant Mariners
11     document.  Did he have a valid --
12           MR. RODGERS:  A license.
13           MR. CHAPMAN:  Yep, mm-hmm.
14     A.    I don't know.  I would -- I
15  don't know, I --
16           MR. RODGERS:  Don't assume
17     anything.
18     A.    Yeah, no.  I don't know.
19     Q.    Okay.  Had you ever sailed with
20  Mr. Moore?
21     A.    No.
22     Q.    So when you worked together in
23  the past, they weren't in the sailing
24  roles?
25     A.    Separate vessels.  He was a

Page 147

1  captain, I was sailing as a mate on a
2  different vessel.
3      Q.    Okay.  Did he ever inform you
4  of these near miss reports?
5      A.    No, he did not.
6      Q.    Okay.  I'm going to pass you
7  Exhibit 32.
8      A.    Sure.
9            MR. RODGERS:  Thank you.
10     Q.    This was produced to us by
11  Carver and it consists of several pages
12  beginning with Carver 00851 through 00885.
13           And it appears to relate
14  exclusively to James D. Morrissey.  Do you
15  know what this report is of?
16     A.    I have no idea.  I have never
17  seen this before.
18     Q.    Okay.  Do you see on -- just
19  looking at the first couple of pages, it
20  looks like it's tracking either training or
21  participation in drills, that sort of
22  thing?
23     A.    Yeah.  Participating in
24  drill -- yeah, weekly task, participating
25  in drill.

Page 148

1      Q.    Okay.
2      A.    Yeah.
3      Q.    Are there -- I don't know what
4  to call them, modules, like a video you
5  would watch or a training document that you
6  would review or quiz, you know, written
7  quiz that you would fill out that were
8  associated with any of these?
9      A.    Not to my knowledge.  No, not
10  to my knowledge.
11     Q.    Okay.  I am thinking that now's
12  a good time to get lunch and then --
13           MR. RODGERS:  Oh, you're not
14     done.
15           I'm kidding.
16           MR. CHAPMAN:  Come back in 45
17     minutes.
18           MR. RODGERS:  Yeah, 45 works.
19           MR. CHAPMAN:  Okay.
20           MR. RODGERS:  Is that okay with
21     your team.
22           MR. CHAPMAN:  Yes.
23           THE VIDEOGRAPHER:  We are going
24     off the record.  The time is 1:06
25     p.m.

Page 149

1            Off the record.
2            (Whereupon, a short recess was
3      taken.)
4            THE VIDEOGRAPHER:  Beginning
5      Media Number 3.  We are back on the
6      record.  The time is 1:59 p.m.
7      Q.    Mr. Baldassare, I'm going to
8  pass over to you Exhibit 34.  You can give
9  me 32, 33.
10     A.    32, yeah.
11     Q.    Great.  Thanks.  That's a
12  document that was provided by Carver.  It
13  appears to be a report of the voyage plan
14  out of the Helm system?
15     A.    Yep, yes.
16     Q.    At the top it says, "7.9 voyage
17  plan-outside New York Harbor for the
18  Mackenzie Rose."
19     A.    Right.
20     Q.    On June 15th, 2024?
21     A.    Yep.
22     Q.    The time is, I guess that's
23  midnight, right?
24     A.    Yes.
25     Q.    It says it was filled out by

LEONARD BALDASSARE

**April 29, 2025**

Page 150

1   you?
2       A.   It does say that, yes.
3       Q.   Okay.  Was it filled out by
4   you?
5       A.   It was not.  So sometimes what
6   happens when the -- whoever is filling out
7   the log or the voyage plan, there's a drop
8   down for who it's filled out by and it's
9   alphabetical.  And a lot of times since my
10  name is BA, it's usually at the top.
11           So instead of dropping down and
12  correct -- picking whoever is filling it
13  out, sometimes they would just leave my
14  name without even realizing it.  That's why
15  it says deleted.
16      Q.   Have you ever filled out a
17  voyage plan --
18      A.   No.
19      Q.   -- in section 7.9?
20      A.   No.
21      Q.   Never?
22      A.   Never.
23      Q.   Okay.  Is there any way to know
24  who filled this out then?
25      A.   I don't think so.  No, I don't

Page 151

1   think so.
2       Q.   So in Section 2 it describes
3   the crew members?
4       A.   Yes.
5       Q.   Master, mate, engineer and two
6   deck hands, right?
7       A.   Yes.
8       Q.   And it's got their names?
9       A.   Yes.
10      Q.   So after the Master Christopher
11  Miller, says deleted.
12      A.   Yep.
13      Q.   What does deleted mean?
14      A.   I do not know.
15      Q.   And I get -- the same questions
16  around the mate and the engineer, where it
17  says, "The mate is James Morrissey and the
18  engineer, Jason McGrath."  It says,
19  "Inactive" after theirs?
20      A.   Right.  I see that.  I don't
21  know what -- why it would say that.
22      Q.   Okay.  Do you know why it says,
23  "Deleted" for you?
24      A.   Like I said earlier, if they
25  put the wrong name they have to go back and

Page 152

1   put the correct name.
2       Q.   And we just don't have that
3   version of whatever the correct name would
4   be?
5       A.   Correct.
6       Q.   All right.  Once this plan is
7   filed can it be amended -- modified?
8       A.   I don't believe so.
9       Q.   So they couldn't change who it
10  was filled out by?
11      A.   No.  They would have to delete
12  it and create a new one.
13      Q.   When you create a voyage plan
14  it says, you know, date filed and then the
15  time, are those drop downs as well --
16      A.   Yeah.
17      Q.   -- or is that autopopulated?
18      A.   No.  This all drop downs except
19  for the external number and the tags,
20  everything else is a drop down.
21      Q.   Even the time -- the date and
22  time?
23      A.   Yes.
24      Q.   Okay.  Did you ever see this in
25  connection with your investigation of the

Page 153

1   allision with the bridge?
2       A.   No, I did not.
3       Q.   It lives in the Helm system
4   though, so if you had looked for it, you
5   could have accessed it?
6       A.   Correct.
7       Q.   In Section 1.2, under voyage
8   planning, it references a Rose Point voyage
9   plan to be attached to the form.  Have you
10  ever seen a Rose Point voyage plan attached
11  to one of these forms?
12      A.   Yes.
13      Q.   And how do you create that?
14      A.   It would be on the Rose Point
15  system on the boat.  They would go in,
16  create a voyage plan and then they can
17  print it out.
18      Q.   So when you create a Rose Point
19  voyage plan, you put in where you start and
20  where you're going?
21      A.   Correct.  With all your way
22  points along the way, security check-ins,
23  traffic check-ins, things of that nature.
24      Q.   So you actually have to what,
25  like drop pins or something, for those in

**LEONARD BALDASSARE**

**April 29, 2025**

Page 154

1  the plan?
2      A.    Yeah, essentially, yes.
3      Q.    And when you then create the
4  plan, so that you can attach it, is it like
5  one click in the Rose Point application to
6  do that?
7      A.    I don't understand your
8  question.
9      Q.    Well, I'm just trying to
10  understand.  It goes on to describe, it
11  says, "Save the voyage plan to your
12  computer, then click on the paper clip,
13  either at the top of the form or the one on
14  the right side."
15              Is that to create the voyage
16  plan, or is that to attach it to this Helm
17  system?
18      A.    That's to attach the voyage
19  plan to the Helm voyage plan -- the Rose
20  Point voyage plan to the Helm voyage plan.
21      Q.    And is the Rose Point voyage
22  plan like a PDF or what type of file is it?
23      A.    I'm not sure what kind of form
24  it comes in, I believe it is a PDF, but I'm
25  not 100 percent sure.

Page 155

1      Q.    Did you ever secure the Rose
2  Point voyage plan from anyone in the crew
3  of the McKenzie Rose for the voyage they
4  were on when they elided with the bridge?
5      A.    No, I did not.
6      Q.    Did you ask them to provide it?
7      A.    No, I did not.
8      Q.    Why not?
9
10
11              MR. RODGERS:  Objection to
12        form.  You can answer if you have an
13        answer.
14      A.    I don't really have an answer.
15  I just didn't request it.
16      Q.    I assume that the voyage plan
17  did not include eliding with the bridge?
18      A.    No.
19      Q.    Would the voyage plan indicate
20  the ranges where the vessel was going to be
21  on autopilot?
22      A.    No.  No.
23      Q.    Does the Rose Point system
24  track when the vessel is or is not on
25  autopilot?

Page 156

1      A.    That, I do not know.
2      Q.    Under Section 5.
3      A.    Yep.
4      Q.    There is a number of risk
5  assessment questions.  And then in Section
6  6 there is a reference to 9.4 GAR model
7  risk assessment.  Do you see that?
8      A.    Yes.
9      Q.    It looks like GAR stands for,
10  Green Amber Red?
11      A.    Yes.
12      Q.    Correct?
13      A.    Correct.
14      Q.    Are you familiar with that risk
15  assessment system?
16      A.    No.
17      Q.    Is there something that
18  the -- whoever filled out this form has
19  access to, to kind of walk them through the
20  assignment of risk scores in Section 6?
21              MR. RODGERS:  Objection.
22        Foundation.
23              MR. CHAPMAN:  Well, he can only
24        answer if he knows, Mr. Rodgers.
25              MR. RODGERS:  He said he

Page 157

1  doesn't fill out these things.
2              MR. CHAPMAN:  That doesn't make
3        any difference.  It's a question of
4        whether he knows --
5              MR. RODGERS:  But now you're
6        asking him --
7              MR. CHAPMAN: -- if there's some
8        reference.
9              MR. RODGERS:  But now you're
10        asking him what somebody who fills it
11        out whether they -- how -- excuse me,
12        how they fill it out.
13              But you can answer if you know,
14        Lenny.
15      A.    I don't know.  I don't know.  I
16  don't fill these out regularly, so.
17      Q.    Are you familiar at all with
18  the GAR model risk assessment --
19      A.    No.
20      Q.     -- process?
21      A.    No.
22      Q.    Do you know what the reference
23  to 9.4 is, in Section 6?
24      A.    It's right here, GAR model risk
25  assessment.

**LEONARD BALDASSARE**

April 29, 2025

Page 158

1    Q.    Yeah.  Do you know what that
2    reference is, it's 9.4 to some other
3    document or system?
4        A.    Oh, I don't know.
5    MR. CHAPMAN:  That was mine.
6    That was mine.  That was mine.
7    MR. RODGERS:  Sorry.
8    MR. CHAPMAN:  It's all right.
9    MR. RODGERS:  Jesus, I'm losing
10   it.  I thought I heard a little
11   voice.
12   Q.    Mr. Baldassare, let me pass you
13   now, Exhibit 4, which we learned yesterday
14   from Mr. Moore our selected sections from
15   the safety management system?
16       (Whereupon, Exhibit 4 was
17   marked for identification.)
18       A.    Mm-hmm.
19   MR. RODGERS:  Objection to
20   form.
21   Q.    If -- let's just start with
22   page -- they're numbered at the bottom,
23   Carver 0000148?
24       A.    This first page here?
25   Q.    Yeah.

Page 159

1        A.    Yep.
2    Q.    It says at the top, "5.1
3    Master's responsibility and authority?"
4        A.    Mm-hmm.
5    Q.    Do you know what the safety
6    management system is that Carver has for
7    marine operations?
8        A.    Yes.
9    Q.    And is it available in
10   electronic version?
11       A.    Yes, it's in Helm.
12   Q.    It's actually in the Helm
13   system?
14       A.    Yes.  They can access it via
15   Helm.
16   Q.    Do you know -- is it like a PDF
17   document in Helm or is it a -- an
18   electronic document that just has a bunch
19   of sections in it?
20       A.    It's -- you could access it
21   both ways.  You can access it
22   electronically in the helm system and then
23   you can also download the entire thing as a
24   PDF.
25   Q.    Okay.  Is there a hard copy

Page 160

1    that's printed out somewhere at Carver
2    Marine?
3        A.    Not to my knowledge.
4    Q.    You never had a hard copy?
5        A.    No, just the electronic.
6    Q.    Okay.  So you don't know how
7    thick the hard copy would be if it was
8    printed out?
9        A.    No.  I admit -- I would assume
10   it's killing a lot of trees.
11   Q.    Okay.  You had access to the
12   safety management system though while you
13   were Port Captain, right?
14       A.    Yes, sir.
15   Q.    And did you ever use it to look
16   things up or check on things?
17       A.    Yes.
18   Q.    Does it have like an index or
19   is it -- do you know?
20       A.    You could search it.  You could
21   do like Control S and a little tab would
22   come up and you can search for just like
23   keywords.  So if you're looking for health
24   and safety, you could just type in, "Health
25   and safety" and it would bring you to all

Page 161

1    the sections that include health and
2    safety.
3    Q.    And then you could just kind of
4    scroll through the document looking at
5    them?
6        A.    Yes.
7    Q.    Do you know whether it has like
8    a table of contents?
9        A.    I believe it does, but I'm not
10   100 percent sure.  But I'm -- I believe it
11   does, yes.
12   Q.    Did -- was there a safety
13   management system in place at Center Line?
14       A.    Yes.
15   Q.    That you had access to?
16       A.    Yes.
17   Q.    And at Vain Brothers?
18       A.    Yes.
19   Q.    That you had access to?
20       A.    Yes.
21   Q.    What about -- it was at
22   Buchanan that you worked at?
23       A.    Yes.
24   Q.    Did they have one too?
25       A.    They did, yes.

**LEONARD BALDASSARE**

April 29, 2025

Page 162

1  Q.   Was it electronic?
2  A.   Yes.
3  Q.   So it suffices to say that
4  you've used the safety management system at
5  not just Carver, but previous employers?
6  A.   Yes.  They're all -- they all
7  vary based on the company, but yes.
8  Q.   Does your new company have a
9  safety management system?
10  A.   It does, yes.
11  Q.   So this starts at 5.1 and these
12  are the only sections that were produced to
13  us, okay?
14  A.   Okay.
15  Q.   But in terms of the overall
16  numbering scheme, if you see on Page 1 or
17  the first page of the exhibit where the
18  exhibit sticker is, would there be sections
19  that come before 5.1?
20  A.   I'm not sure.  I would have to
21  pull the whole thing up, but I don't know.
22  Q.   And would there be sections
23  that come after 9.5?
24  A.   Again, I don't know.  I don't
25  have it memorized.

Page 163

1  Q.   The only way to really know is
2  to look at the document, right?
3  A.   Yes.
4  Q.   Okay.  Do you know what the
5  source of the safety management system is
6  that Carver used, like who they bought it
7  from or rented it from?
8  A.   I do not know.
9  Q.   If you turn to the very end of
10  this exhibit, the last four pages, the
11  first of which begins with the number
12  Carver 000886?
13  A.   Yeah.  With the TBS logo at the
14  top?
15  Q.   Yeah.
16  A.   Yep.
17  Q.   Are you familiar with the
18  company that's referred to as TBS?
19  A.   Yes.
20  Q.   What do you know about them?
21  A.   They're a third-party auditor
22  that -- they manage the Helm system and
23  they manage like the documentation for all
24  the boats, and kind of just make sure that
25  you're staying in compliance with

Page 164

1  everything.  But they are their own
2  separate entity.
3  Q.   Do you know where they're
4  headquartered?
5  A.   I believe in Louisiana.
6  Q.   Okay.  There's an address on
7  here that says, "Daphne, Alabama."  Could
8  that be it?
9  A.   Could be, but I don't know.
10  I've never been to the headquarters.
11  Q.   Okay.
12  A.   We've only dealt with the TBS
13  employees that are in New York.
14  Q.   And who are they?
15  A.   Collin Bryant.
16  Q.   Collin Bryant --
17  A.   Yes.
18  Q.   -- with a T?
19  A.   Yes.
20  Q.   All right.
21  A.   And that's it.  Just him.
22  Sorry.
23  Q.   Just him?
24  A.   Yes.
25  Q.   Is he in Staten Island, New

Page 165

1  York City?
2  A.   I think he's all over the
3  place.  I don't know what his day to day
4  is, but I know he covers New York.
5  Q.   And is he the sales guy or is
6  he the troubleshooting guy with the -- this
7  product?
8  A.   No.  He's -- he comes out and
9  like does the audits and make sure that
10  everything is staying in compliance.
11  Q.   All right.  At your new
12  employer, HNL --
13  A.   Yes.
14  Q.   -- do you also use TBS?
15  A.   No.
16  Q.   Is there another third party
17  provider or do you guys have your own --
18  A.   It's all internal.
19  Q.   One you guys -- that the
20  company developed itself?
21  A.   Yes.  Excuse me.
22  Q.   Is there anything that you know
23  of within the safety management system
24  that's some how very unique to Carver as
25  opposed to kind of a generic safety

**LEONARD BALDASSARE**

April 29, 2025

1 management system?

2     A.    **No, not to my knowledge.**

3     Q.    Have you ever requested changes

4 to the safety management system while you

5 were employed by Carver?

6     A.    **No.**

7     Q.    Do you know if there's a

8 process for doing that?

9     A.    **I believe there is, yes.**

10     Q.    Do you know of any changes that

11 were made to the safety management system

12 while you were employed by Carver?

13     A.    **Not to my knowledge.**

14     Q.    If you can turn to -- all these

15 pages are numbered at the bottom.

16     A.    **Yes.**

17     Q.    I confess they're not

18 necessarily consecutive page numbering, but

19 it looks like it's the third page into this

20 exhibit.  At the top it starts with the

21 word, "The 6.12 deckhand."  Page 150.

22     A.    **Yes, I got it.**

23     Q.    Okay.  Under the operational

24 section towards the bottom of the page --

25     A.    **Mm-hmm.**

1     Q.    -- the fourth bullet says that

2 "One of the deckhands responsibility is to

3 assist the master/mate in making bridges."

4 How does the deckhand assist the master or

5 mate in making bridges?

6

7

8     MR. RODGERS:  Objection to

9 form.  You can answer if you know.

10     A.    **It would just be them going out**

11 **to be on the look out if required or**

12 **needed.  But it would be at the master of**

13 **mates discretion if they thought one was**

14 **needed.**

15     Q.    So then the next bullet down

16 says, "Standing lookout or riding ahead of

17 the tow as a lookout."

18     A.    **Yeah.**

19     Q.    Right?

20     A.    **Essentially the same thing.**

21     Q.    Do the deckhands get any

22 training on how to perform those duties?

23     A.    **No, not to my knowledge.**

24     Q.    Do the masters or mates get any

25 training on the process of assigning

1 lookouts or the circumstances under which a

2 lookout should be assigned?

3     A.    **No.  Like I said, it would be**

4 **at their own discretion if there was fog or**

5 **rain or lack of visibility.**

6     Q.    And so if you can turn to the

7 Section 7.12 on bridge transits.

8     A.    **Okay.**

9     Q.    And it's towards the end.

10     A.    **Shifts 7.12?**

11     Q.    Yes, 7.12 for bridge transits.

12     MR. RODGERS:  Which page is

13   that.

14     Q.    It's got a big yellow bar

15 across the middle of it.  The page number

16 is 910.

17

18

19     MR. RODGERS:  910.  Okay.  Is

20   that near the end or somewhere else.

21     MR. CHAPMAN:  It's closer to

22   the end than the beginning.

23     MR. RODGERS:  Thank you.

24     A.    **Okay, I'm here.**

25     Q.    So bridge transits have their

1 own section in the safety management

2 system, right?

3     A.    **Yes.**

4     Q.    And is that because they create

5 hazardous navigation situations or at least

6 potentially do?

7     A.    **Yes.**

8     Q.    So right in the middle of that

9 page there is this kind of yellow or

10 orange-ish call out in larger font that

11 says, "Under no circumstances shall the

12 wheelman responsible for the transit make

13 the bridge due to pressure or pride."  Do

14 you know what that is warning the master or

15 the mate of?  Like what does that statement

16 mean to them?

17     A.    **It means that if you're not**

18 **comfortable transiting through a bridge for**

19 **any circumstance, then do not do so.**

20     Q.    Is there a reason that it's

21 like popped out important or highlighted in

22 this fashion?

23     A.    **I'm not sure.**

24     Q.    If you look at above

25 that -- the section titled "Before The

**LEONARD BALDASSARE**

**April 29, 2025**

Page 170

1  Transit?"
2  **A.    Yes.**
3  Q.    The second to last bullet says,
4  "Necessity of assigning a crew member with
5  a radio to the head of the tow."  Right?
6  **A.    Yes.**
7  Q.    So if a look out was assigned
8  to the head of the tow, it would have to be
9  at the front end of the barge, right?
10  **A.    Correct.**
11  Q.    That's what that means?
12  **A.    Yes, the valve of the barge.**
13  Q.    Which is -- this barge is 200
14  feet.  So it's at least 200 feet away from
15  the wheelhouse.
16  **A.    Correct.**
17  Q.    The wheel house sits a little
18  back from the bow of the tub, correct?
19  **A.    Yes.**
20  Q.    The only way to communicate
21  then is with a handheld radio?
22  **A.    Yes.**
23  Q.    Between the two?
24  **A.    Yes.**
25  Q.    And what would you expect the

Page 171

1  lookout that's assigned to a circumstance
2  like that to be on the lookout for?
3       MR. RODGERS:  Objection to the
4       extent he's not here as an expert,
5       and he wasn't the master of that
6       particular tug at the time.
7       So are you asking his opinion?
8       MR. CHAPMAN:  Well, I didn't
9       finish because I was going to ask
10       when transiting a bridge.  I mean,
11       this -- the question only relates to
12       putting up post and lookout for a
13       bridge transit, okay, which -- you
14       know, which is contemplated by this
15       bullet.
16  **A.    Okay.**
17  Q.    I'm trying to understand then
18  what is the look out in that circumstance
19  as expected to look out for?
20       MR. RODGERS:  Objection -- same
21       objection.  He's not here as an
22       expert.  And he wasn't on the
23       Mackenzie Rose.  You're asking his
24       opinion, so if have you an --
25       **THE WITNESS:  I can give my**

Page 172

1       opinion on it.
2       MR. RODGERS:  All right.  I
3       don't want you to give your opinion.
4       **THE WITNESS:  Okay.  All right.**
5       **Then I won't answer it.**
6  Q.    If you feel that it's an
7  opinion, you should still give it.  And you
8  can qualify it and say that it's your
9  opinion.
10       MR. RODGERS:  Objection.
11  **A.    I'm just going to go with --**
12       MR. RODGERS:  Don't instruct
13       the witness.
14  **A.    -- what James is telling me to**
15  **do.**
16  Q.    So are you going to answer the
17  question?
18  **A.    No.**
19  Q.    So you're refusing to answer
20  the question?
21       MR. RODGERS:  No.  He's not
22       refusing, he's listening to his
23       attorney.
24       MR. CHAPMAN:  So you're --
25       MR. RODGERS:  What are you

Page 173

1  doing, Jim?  He's listening to me.
2       MR. CHAPMAN:  You're
3       instructing him not to answer then?
4       MR. RODGERS:  Yeah.  If it's an
5       opinion.  He's not here as an expert
6       and he wasn't on the Mackenzie Rose.
7       MR. CHAPMAN:  I'm asking about
8       the companies safety management
9       system, and what the companies
10       expectations are or were around that
11       language, what is the look out
12       supposed to be looking out for during
13       a bridge transit.
14
15
16       MR. RODGERS:  If you have an
17       answer to that as to what the
18       company's expectation is that you
19       know of, you can answer.
20  **A.    Okay.  It would be to make sure**
21  **that the vessel as they are transiting**
22  **through the bridge is doing so safely so**
23  **that there's clearance port and star bird**
24  **overhead, and to make sure that there is no**
25  **traffic or anything like that, that -- you**

LEONARD BALDASSARE

April 29, 2025

Page 174

1  know, the -- that's also my -- that's my
2  opinion.  To make sure there's no traffic,
3  just to ensure the safety going through the
4  bridge.
5       Q.    And then down under the last
6  section titled -- call -- titled "During
7  The Transit."  The third bullet says, "To
8  post lookouts as necessary on the tow."
9  Who's that an instruction to?
10      A.    That would be to either the
11  master or the mate who's over on watch.
12      Q.    Is there a place on any of the
13  reporting forms where you record whether a
14  lookout was posted?
15      A.    Not to my knowledge.
16      Q.    Do you still hold an active
17  license?
18      A.    Yes.
19      Q.    All right.  When does it
20  expire?
21      A.    '27, I think.  I just renewed
22  it recently.
23      Q.    Okay.  Have you ever transited
24  the Southern branch of the Elizabeth River?
25      A.    No.

Page 175

1       Q.    So you're not familiar how the
2  bridges are set up or laid out in that
3  navigational area?
4       A.    No, I'm not.
5       Q.    They would be marked on a
6  chart, correct?
7       A.    They would be, yes.
8       Q.    The Section 7.12 in the middle,
9  right under that section that's highlighted
10 it's titled "Safety Briefing."
11      A.    Yes.
12      Q.    It says that, "As with any
13 operation, the captain responsible for
14 transit should brief the crew and the crew
15 of any assist/tag boats on the plan
16 transit."  That does -- that's not
17 mandatory is it, just say "should be?"
18      A.    Is what, mandatory assist
19 boats?
20      Q.    No.  The safety briefing.  It
21 says, "Should brief the crew."  That's not
22 mandatory, is it?
23      A.    No.
24      Q.    Is there any reason why it's
25 not mandatory?

Page 176

1       A.    I don't know.
2       Q.    Do you think it's a good Marine
3  practice to have a safety briefing before
4  transiting bridges?
5            MR. RODGERS:  Objection.  Don't
6       answer that.  I'm directing the
7       witness not to answer.
8       Q.    If you could turn to the
9  Section 7.9 K titled "Safety Management
10 Form."  And it starts at Page 194.  It
11 looks like this.  It has a little blue bar
12 at the bottom with the number of pages in
13 it.  It says it's -- first page says, "1 of
14 6 pages."  It's probably about halfway
15 through that document.
16           MR. RODGERS:  What was the
17      Bates Number?
18           MR. CHAPMAN:  194.
19           MR. RODGERS:  194.
20           MR. CHAPMAN:  Yes.
21      A.    7.9 K, right?
22      Q.    Yeah.
23      A.    Yeah, I got it.
24      Q.    Yeah.  So this is apparently a
25 section of the safety management plan that

Page 177

1  actually covers a segment of, I'll call it
2  the Intercostal waterway, but basically
3  Norfolk and Virginia and the southern
4  branch of the Elizabeth River, correct?
5       A.    Yes.
6       Q.    And it's got a few bridges that
7  are identified in it and some general notes
8  on the last couple of pages, right?  Do you
9  see that?
10      A.    Yes.
11      Q.    So the first bridge that's
12 identified in this section is the Norfolk
13 and Portsmouth Belt Line Railroad Bridge,
14 correct?
15      A.    Correct.
16      Q.    Is this document one that
17 should be consulted before transiting
18 bridges or before transiting this bridge?
19      A.    Yes.
20      Q.    And do you know whether there
21 were any of the bridges that were transited
22 when they got underway on this voyage
23 before they arrived at the Norfolk and
24 Portsmouth Belt Line Railroad Bridge?
25      A.    Was there any other bridges?

**LEONARD BALDASSARE**

**April 29, 2025**

Page 178

1    Q.    Yeah.
2    A.    Oh, I don't know.
3    Q.    Yeah.  And you didn't ask the
4  crew whether there were other bridges that
5  they had made?
6    A.    No.
7    Q.    Okay.  Did you consult this
8  section of the safety management system as
9  part of your investigation?
10    A.    No.
11    Q.    If you could turn to Section
12  7.16 on lookouts.  The number of that page
13  is Carver 000155, but it's -- it is towards
14  the end of the collection of sections --
15    A.    Oh, because it's not in order,
16  right?
17    Q.    Yeah.
18    A.    Okay.  So zero -- what is it,
19  155?
20    Q.    Yeah.  It's just one page, it
21  looks like this.
22    A.    Got it.
23    Q.    So this is the section of the
24  safety management system on the lookouts,
25  correct?

Page 179

1    A.    Yes, correct.
2    Q.    In the first part under
3  requirements for a look out it -- there's a
4  half a dozen bullets of things that should
5  be considered as relevant factors in
6  deciding whether they're supposed to
7  lookout, correct?
8    A.    Correct.
9    Q.    Okay.  Weather visibility,
10  traffic density and then it says,
11  "Proximity of dangers to navigation."  What
12  are dangers to navigation --
13
14
15        MR. RODGERS:  Objection to
16    form.
17    Q.    -- that would require the
18  posting of a lookout?
19        MR. RODGERS:  Objection to
20    form.  He's not here as an expert.
21    A.    Yeah.  I'm not sure what they
22  would qualify as proximity to dangerous
23  allegation.
24    Q.    Would a bridge transit?
25        MR. RODGERS:  Objection to

Page 180

1    form.
2    A.    I'm not sure.  Again, I'm
3  not -- I didn't write this, so I don't
4  know.
5    Q.    This is intended as guidance
6  though to the master or mate on watch
7  regarding considerations for posting a
8  lookout though, right?
9    A.    Yes.
10    Q.    Okay.  So that's my question
11  is, whether you wrote it or not, is a
12  bridge a danger to navigation?
13        MR. RODGERS:  Objection.  He's
14    not here as an expert.  And you're
15    supposed to premise the questions not
16    as an expert.  You haven't done that
17    all day, okay?  So I'm going to tell
18    him not to answer.  I'm going to
19    direct him not to answer anything
20    that asks for his opinion.
21        MR. CHAPMAN:  You're
22    instructing the witness not to answer
23    the question?
24
25

Page 181

1        MR. RODGERS:  Yes, I am.  I
2    just said that.
3    Q.    And then under procedures, it
4  says, "A look out should be added when
5  necessary to."  And the second bullet is,
6  "To apprise the situation and the risk of
7  collision/ allision," right?
8    A.    Yes.
9    Q.    So the tug while pushing the
10  barge elided with the bridge, right?
11    A.    Yeah.
12        MR. RODGERS:  Can you repeat
13    that?
14        MR. CHAPMAN:  I said --
15        MR. RODGERS:  Hold on, let me
16    go to this.
17        MR. CHAPMAN:  I said, the tug,
18    Mackenzie Rose --
19        MR. RODGERS:  I said, "Can you
20    repeat this?  "Are you going to
21    repeat it.
22        MR. CHAPMAN:  I am.
23        MR. RODGERS:  Okay.
24        MR. CHAPMAN:  The tug Mackenzie
25    Rose while pushing the Weeks 281 on

**LEONARD BALDASSARE**

April 29, 2025

1    June 15th, 2024 elided with the
2    bridge.
3        MR. RODGERS:  To his knowledge?
4    To his knowledge.
5        MR. CHAPMAN:  Well --
6        MR. RODGERS:  He's a fact
7    witness.
8        MR. CHAPMAN:  Exactly, and I'm
9    asking him, did it?
10       MR. RODGERS:  To his
11   knowledge --
12       MR. CHAPMAN:  Did it?
13       MR. RODGERS:  -- you're asking
14   him for a legal conclusion.
15       MR. CHAPMAN:  No.
16       MR. RODGERS:  Yeah, you are.
17   Q.    At any time while you were
18   employed by Carver, did you learn that the
19   tug boat while pushing the weeks 281 elided
20   with the Norfolk and Portland Belt Line
21   Bridge on June 15th, 2024?
22       MR. RODGERS:  You can answer
23   that.
24   **A.    Yes.**
25   Q.    So back to --

1        THE REPORTER:  Can you just
2    speak a little louder?  Sorry.
3    Q.    Back to the safety management
4    system 7.16 on lookout under procedures.
5    It says, "A lookout should be added when
6    necessary to."
7        And then I'm looking at the
8    second bullet, "Apprise the situation and
9    the risk of collision/elision."  See that?
10   **A.    Yeah, I see it.**
11   Q.    So a lookout could have been
12   posted to arise -- to appraise of the risk
13   of an allision with the bridge, correct?
14       MR. RODGERS:  Objection.  Don't
15   answer that.  Directing the witness
16   not to answer that question as it's
17   calling for expert testimony.
18   Q.    The last part of that section
19   on procedure says, "A lookout shall be
20   added when entering any port channel, or
21   any waterway intersection."  What is meant
22   by a port channel -- when entering a port
23   channel, or anyway waterway intersection?
24   What does that mean?
25

1    calls for expert testimony and
2    interpretation of a statute.
3    Just -- I'm going to direct the
4    witness not to answer.
5    Q.    Are you aware of any statute
6    that governs the posting of a lookout when
7    entering a port channel, or a waterway
8    intersection?
9        MR. RODGERS:  Objection.  You
10   can answer if you're aware or not
11   aware.
12   **A.    No, I'm not aware.**
13   Q.    So as far as you know, there's
14   not a statute that would require posting a
15   lookout in either of those
16   circumstances --
17       MR. RODGERS:  Objection.
18   Q.    -- correct?
19       MR. RODGERS:  Mischaracterizes
20   testimony.
21   Q.    If I mischaracterize it, you
22   can correct me.
23   **A.    Can you repeat the question,**
24   **I'm not sure what you're asking me?**
25

1    Q.    Yeah.  I -- what I said was, so
2    there's not a regulation or law that you're
3    aware of that mandates posting a lookout
4    when entering a port channel, or when
5    entering a waterway intersection?
6    **A.    Oh, no, not to my knowledge.**
7    Q.    Okay.  If you could turn to
8    Section 9.5, which is after 7.12, got a
9    sort of big orange call out at the top?
10   **A.    Yep.**
11   Q.    Starting on Page 163.  In that
12   call out titled "Reporting Priorities"
13   there's two things that the master is
14   obligated to do.  First, "To notify the
15   office as soon as practical after a marine
16   casualty," right?
17   **A.    Yes.**
18   Q.    And in the circumstance of this
19   allision, Captain Miller called you after
20   they reportedly made contact with the
21   fender system, right?
22   **A.    Yes.**
23   Q.    Okay.  And then second, it
24   says, "The master will notify the nearest
25   Coast Guard unit as soon as practical after

**LEONARD BALDASSARE**

**April 29, 2025**

Page 186

1   a marine casualty."
2                  To your knowledge, during the
3   course of your investigation, Captain
4   Miller never contacted the Coast Guard, did
5   he?
6        **A.    No, not to my knowledge.**
7        Q.    Regarding the allision?
8        **A.    Right.**
9        Q.    Did you ever tell Captain
10  Miller that you were contacting the Coast
11  Guard?
12       **A.    No.**
13       Q.    Did you ever tell him that
14  Brian Moore was contacting the Coast Guard?
15       **A.    No.**
16       Q.    Did you ever tell him that it
17  was okay to leave -- because you had
18  contacted the Coast Guard?
19       **A.    No, I did not.**
20       Q.    Did you ever say to him in
21  words or substance that you had contacted
22  the Coast Guard and that they had said it
23  was okay to leave?
24       **A.    No, I did not.**
25       Q.    In your safety management

Page 187

1   system regarding accident and incident
2   reporting, the system recites regulations
3   out of 46 CFR.  Do you see that?
4        **A.    Yes.**
5        Q.    And if you go to the next page,
6   about two thirds on the way down, there is
7   a heading called "Notice of Marine Casualty
8   46 CFR 4.05-1?"
9        **A.    Yes.**
10       Q.    Okay.  In Section A -- I'm
11  going to focus on Section A and Subsection
12  1.  So just follow along with me.
13       **A.    Okay.**
14       Q.    Section A says, "Immediately
15  after addressing the result and safety
16  concerns, the owner, agent, master,
17  operator or person in charge shall notify
18  the nearest sector office, Marine
19  Inspection Office or Coast Guard Group
20  office whenever a vessel is involved in a
21  Marine casualty, consisting in Subsection
22  1.
23                  An unintended grounding for an
24  unintended strike of forensic "allision"
25  with a bridge?"  Did I read that correctly?

Page 188

1        **A.    Yes.**
2        Q.    Okay.  So is there any
3   circumstance in the context of this
4   regulation that you know of where you don't
5   have to report an unintended allision with
6   the bridge --
7                  MR. RODGERS:  Objection.
8        Q.    -- immediately to the Coast
9   Guard?
10                 MR. RODGERS:  Objection to the
11           term "allision with the bridge."
12           It's not consistent with his
13           testimony as to what he knew.
14       **A.    As far as I knew they landed on
15  the fenders inside of the bridge.**
16       Q.    And that's not an allision?
17       **A.    That's not an allision.**
18       Q.    Contact with affixed object is
19  not an allision?
20                 MR. RODGERS:  He didn't say
21           that.
22       **A.    That's not what I'm saying,
23  just saying they --**
24       Q.    What are you saying then?
25       **A.    -- they slid through the**

Page 189

1   fenders.
2        Q.    Without contacting them?
3        **A.    From what they told me.**
4        Q.    They did not contact the
5   fender?
6        **A.    They told me that they slid
7   through the fendering system.**
8        Q.    So does that mean they
9   contacted the fender?
10       **A.    I don't know.  I wasn't there.**
11       Q.    Well, you were having a
12  conversation with Captain Miller at
13  the -- literally the point in time when
14  this happened, right?
15       **A.    Yes.**
16       Q.    And when he said to you that
17  they slid through the fenders, what did you
18  understand that to mean?  That they had
19  contacted it or not contacted it?
20       **A.    I'm not sure because he didn't
21  really specify.**
22       Q.    You didn't think it was your
23  obligation to be certain what had actually
24  happened in the conversation you had with
25  him?

**LEONARD BALDASSARE**

**April 29, 2025**

Page 190

1              MR. RODGERS:  Objection to
2      form.
3          A.    In the moment no.  We were just
4      trying to figure exactly what happened.
5          Q.    And when did you learn that
6      they said they had actually contacted the
7      fender system of that bridge?
8          A.    I don't really recall the exact
9      day and time.
10         Q.    But it wasn't on June 15th of
11     2024 is what you're saying?
12         A.    No.  Not that they had struck
13     the bridge, no.
14         Q.    Okay.  So is it your
15     perspective that Captain Miller lied to
16     you?
17             MR. RODGERS:  Objection to
18     form.
19         A.    What'd you say?  I don't -- I'm
20     not going to call him a liar.  I'm just
21     going off of what he told me.
22         Q.    Have you seen a photograph of
23     the actual damage to the bridge?
24         A.    No.
25         Q.    Never?

Page 191

1          A.    Never.
2          Q.    The only photograph you've seen
3      of the bridge is the one that was texted to
4      you within the hour after Captain Miller
5      first reported it to you?
6          A.    Yes.
7          Q.    And no others?
8          A.    No, no others.
9          Q.    If you could turn to Page 166.
10
11
12             MR. RODGERS:  Carver 166.
13             MR. CHAPMAN:  Yeah.
14         Q.    That's in Exhibit 4.  It's
15     a -- looks like a flow chart of some
16     sort --
17         A.    Sure.
18         Q.     -- related to accident or
19     incident reporting?
20         A.    Yes.
21         Q.    Did you consult this at all
22     when you were investigating the allision
23     with the bridge?
24         A.    No.
25         Q.    Why not?

Page 192

1              MR. RODGERS:  Objection to
2      form.  You can answer if --
3          A.    I didn't think that it was
4      necessary to reference this.
5          Q.    Did you even know of it's
6      existence?
7          A.    Yes.
8          Q.    But you didn't think that it
9      was required to review it or follow it?
10             MR. RODGERS:  Objection to
11     form.
12         A.    Yes.
13         Q.    Just so I'm clear what your
14     answer means, you mean -- you're saying
15     what I stated was correct?
16         A.    Correct.
17         Q.    Near the top of the flow chart
18     in kind of a light green color it says,
19     "File SMF 9.2 near miss report?"
20         A.    Yes.
21         Q.    Do you know what SMF stands
22     for?
23         A.    I do not.
24         Q.    Could it be safety management
25     form?

Page 193

1              MR. RODGERS:  Objection to
2      form.  You can answer if you
3      understand.
4          A.    It could be, yes.
5              MR. RODGERS:  But don't guess.
6          Q.    And then at the bottom in red,
7      the mandate is kind of at the bottom of the
8      flow chart, to fill to out an SMF 9.5
9      incident report, correct?
10         A.    Yes.
11         Q.    Okay.  And to your knowledge
12     was an SMF 9.5 incident report prepared for
13     the incident involving the allision with
14     the Belt Line Bridge?
15         A.    I do not know if one was.
16         Q.    If you could turn to Page 168.
17     Do you see the red box on that flow chart
18     it says, "Designated person assumes
19     position as emergency response coordinator
20     for life of incident?"
21         A.    Yes.
22         Q.    Who is Carver's designated
23     person in the safety management system?
24
25

LEONARD BALDASSARE

April 29, 2025

Page 194

1      MR. RODGERS:  At that time.
2      MR. CHAPMAN:  Yeah.
3      **A.    I believe it was Brian Moore.**
4      Q.    Were there any alternates?
5      **A.    I don't know, I would have to**
6  **go back and look.  I don't recall.**
7      Q.    And is that contained somewhere
8  in the safety management system, that
9  designation?
10     **A.    Yes.**
11     Q.    And if you turn to Page 169.
12 This is another flow chart on -- it appears
13 to relate to filling out the Coast Guard
14 form 2692, correct?
15     **A.    Correct.**
16     Q.    And it says, "A vessel accident
17 must be reported if it occurs upon the
18 Naval waters of the United States.  It's
19 territories or possessions or wherever an
20 accident involves a U.S. vessel, wherever
21 the accident may occur.  And the accident
22 must also involve one or more of the
23 following."
24          And the very first item
25 under -- on this flow chart, Number 1, is

Page 195

1  "An unintended grounding or an unintended
2  strike of "allision with" the bridge."
3      **A.    Yes.**
4      Q.    If you had learned that the tug
5  while pushing the barge 281 had damaged the
6  bridge, that has hit it in a way that
7  damaged it, it hit the bridge, would you
8  agree that a 2692 would need to be filled
9  with the Coast Guard?
10         MR. RODGERS:  Objection.  Calls
11     for speculation.  You can answer if
12     you can.
13     **A.    Yes.**
14     Q.    You agree?
15     **A.    Yes.**
16     Q.    And at the bottom there's a
17 heading called "Drug and Alcohol Testing?"
18     **A.    Yep.**
19     Q.    It says, "Any serious marine
20 incident will require drug and alcohol
21 testing of all individuals directly
22 involved."
23          You signed a form that there
24 had been no drug and alcohol testing for
25 this allision, correct?

Page 196

1      **A.    Correct.**
2      Q.    And presumably that was
3  submitted to the Coast Guard?
4      **A.    Yes.**
5      Q.    Okay.  And then it says here
6  right after that C Section 6.  Do you know
7  what Section 6 is?
8      **A.    Assuming it's Section 6 in the**
9  **SMS or safety management system.**
10     Q.    Okay.  When you were employed
11 by Carver as Port Captain, do you know
12 whether new crew personnel were given any
13 specific training on transiting bridges
14 with narrow channels?
15     **A.    To my knowledge, no.**
16     Q.    As part of people, you know,
17 taking on a new -- a crew position, getting
18 hired for a crew position on one of your
19 tugs while you were at harbor, did the
20 company provide any, I don't know, deckhand
21 manual, master's manual, some book that
22 had, you know, instructions regarding
23 navigation, or bridge transit, or vessel
24 safety, that sort of thing?
25     **A.    Just what was in the SMS that**

Page 197

1  **everyone had access too on the vessel.**
2      Q.    So nothing else though?
3      **A.    To my knowledge, no.**
4      Q.    And the SMS, how do you access
5  that on the Mackenzie Rose?
6      **A.    Like I said earlier, you would**
7  **go onto the boat computer, go into Helm and**
8  **then there would be a section to access the**
9  **SMS electronically and also again, download**
10 **the whole PDF, if you wanted to.**
11     Q.    Okay.  And do you know if
12 there's a copy of the SMS that is aboard
13 the Mackenzie Rose that is a, you know,
14 hard copy?
15     **A.    Just the electronic ones.**
16     Q.    And that laptop, is it located
17 in the wheelhouse?
18     **A.    Yes.**
19     Q.    But anybody can log into it and
20 look at the SMS?
21     **A.    Yes.**
22     Q.    Do you know while you were, you
23 know, Port Captain for Carver, whether
24 there was any ongoing training or guidance
25 on how to safely transit bridges with

**LEONARD BALDASSARE**

**April 29, 2025**

1  barges?
2      **A.**   **To my knowledge, I don't know**
3  **of any, no.**
4      Q.   Was there any ongoing training
5  that was focused specifically on lookout
6  duties or the circumstances under which
7  somebody should be posted as a lookout to
8  the head end of the barge?
9      **A.**   **To my knowledge, no.  There**
10  **was --**
11      Q.   Is the only guidance or
12  operating procedure, if I can call it that,
13  regarding the transiting of bridges
14  contained in Section 7.12 of the safety
15  management system --
16      MR. RODGERS:  To his knowledge.
17      MR. CHAPMAN:  Yeah, to his
18      knowledge.
19      **A.**   **To my knowledge, yes.**
20      Q.   It's not like there's a book
21  sitting on the shelf somewhere at the
22  company's office that says "How to safely
23  transit bridges?"
24      **A.**   **No.**
25      Q.   Okay.  Is there any specific

1  training provided to the crew about the
2  proper use of an autopilot system on the
3  company's vessels?
4      **A.**   **No.  Anything related to the**
5  **autopilot would be referenced in the safety**
6  **management system.**
7      Q.   So there maybe a section on the
8  autopilot system, it's just -- we don't
9  have it as part of that collection --
10      **A.**   **Correct.**
11      Q.   -- in Exhibit 4, right?
12      **A.**   **Correct.**
13      Q.   How are masters, or mates, you
14  know, the officer of the watch, expected to
15  know how to appropriately use the autopilot
16  system?
17      MR. RODGERS:  Sorry,
18      could -- let me just read that from
19      the computer.
20      I'm going to object as to form.
21      You can answer if you understand it
22      or know it.
23      **A.**   **It's -- I don't really know how**
24  **to answer it.**
25      Q.   How did you learn how to use an

1  autopilot system, let's start there?
2      **A.**   **From sailing, experience, I was**
3  **shown by a captain.  I was -- before I**
4  **became a full -- like a cut loose mate, I**
5  **was a training mate.  So I sailed as an**
6  **extra wheelhouse personnel for six months.**
7  **Kind of learned all the operating systems.**
8      Q.   On-the-job training?
9      **A.**   **Correct.**
10      Q.   Are there any manuals regarding
11  the use of the autopilot system?
12      **A.**   **Yes.  There's manuals on board**
13  **the vessel.**
14      Q.   Have you actually seen the
15  manual for the autopilot system on the
16  McKenzie Rose when you were employed by
17  Carver?
18      **A.**   **Yes, I have.  When the new**
19  **system was installed, the manual was left**
20  **on board for anyone to reference on the**
21  **boat.**
22      Q.   And that would've been by
23  whoever the technician was that installed
24  it?
25      **A.**   **Correct.**

1      Q.   Was there any training for that
2  new system that was specifically provided
3  to your knowledge?
4      **A.**   **To my knowledge, no.**
5      Q.   So the manual served as kind of
6  a reference if they want to look something
7  up or need to look something up?
8      **A.**   **Yes.**
9
10
11      MR. RODGERS:  Objection to
12      form.  You can answer.
13      **A.**   **Yes.**
14      Q.   Did -- have you ever reviewed
15  that autopilot manual for the new
16  autopilots that were installed on the
17  Mackenzie Rose while you were with Carver?
18      **A.**   **No.**
19      MR. RODGERS:  Do you want some
20      coffee, Jim?  There's new coffee.
21      MR. CHAPMAN:  Did they bring
22      some?
23      MR. RODGERS:  Yeah, they did.
24      MR. CHAPMAN:  Yeah.  Could we
25      just take a five-minute break?

LEONARD BALDASSARE

April 29, 2025

Page 202

1      MR. RODGERS:  Yeah.
2      MR. CHAPMAN:  Would be okay?
3      MR. RODGERS:  Yeah, no, that's
4   good.
5      MR. CHAPMAN:  Okay.
6      MR. RODGERS:  I thought you saw
7   the guy come in.
8      MR. CHAPMAN:  No.
9      THE VIDEOGRAPHER:  We are going
10   off the record.  The time is
11   2:56 p.m.
12      (Whereupon, a short recess was
13   taken.)
14      THE VIDEOGRAPHER:  Beginning
15   Media Number 4.  We are back on the
16   record.  The time is 3:03 p.m.
17   Q.    Mr. Baldassare, during the
18   course of your investigation between the
19   statements that you received and the
20   interviews you conducted of the crew, did
21   you learn that the captain was the only one
22   who was working as a lookout at the time of
23   the allision?
24   **A.    Yes.**
25      MR. RODGERS:  You mean

Page 203

1   Morrissey?
2      MR. CHAPMAN:  Yeah, Captain
3   Morrissey.
4
5      MR. RODGERS:  Well, he was
6   at -- okay.
7   Q.    He was the officer on the
8   watch, right?
9   **A.    Yes.**
10   Q.    Yeah.  And that's because the
11   other deckhand that was on duty at the time
12   was --
13      MR. RODGERS:  Objection.
14   Q.     -- down in the galley, right?
15      MR. RODGERS:  No.  Objection.
16   That's not the testimony in this
17   case.
18   Q.    I'm just asking what you
19   learned in the investigation?
20   **A.    I'm not sure where the other**
21   **deckhand was at the time.**
22   Q.    Well, was there more than one
23   pair of eyes keeping an eye out on the
24   transit of the vessel?
25      MR. RODGERS:  Objection.

Page 204

1   Q.    On the boat, at the time of the
2   allision?
3      MR. RODGERS:  You can answer.
4   **A.    It was Captain Morrissey who**
5   **was on watch, yeah.**
6   Q.    Yeah.  So he was on watch.
7   What I'm asking is whether there was a
8   second person that was providing any kind
9   of lookout with respect to the transit at
10   the time of the allision?
11      MR. RODGERS:  As far as he
12   knows from his investigation.
13      MR. CHAPMAN:  Yeah, exactly.
14   **A.    As far as I know, no.**
15   Q.    And as far as you know, when
16   you were employed by Carver, there was no
17   requirement by Carver that more than one
18   person served as the lookout when
19   transiting bridges, correct?
20
21      MR. RODGERS:  Objection.  He's
22   not here as an expert.  You can
23   answer if you understand the
24   question.
25   **A.    To my knowledge, no, there was**

Page 205

1   **no policy or requirement.**
2   Q.    Are you aware of any best
3   practices in the towing industry that would
4   require posting a lookout at the head end
5   of the barge during a bridge transit?
6      MR. RODGERS:  Could you define
7   best practices.
8      MR. CHAPMAN:  I'm just asking
9   him.
10      MR. RODGERS:  That's a kind of
11   a corporate term.  But if you
12   understand it, you can go ahead.
13   **A.    Yes.**
14   Q.    And are you aware of any best
15   practices in the towing industry that
16   recommend disengaging the autopilot when
17   transiting near a fixed object like a
18   bridge?
19      MR. RODGERS:  Objection to
20   form.  He's not here as an expert.
21   You can answer as to what you
22   know.
23   **A.    Yes, I'm aware.**
24   Q.    And there are?
25   **A.    There are, yes.**

**LEONARD BALDASSARE**

April 29, 2025

Page 206

1    Q.    Can an autopilot system make
2  course corrections?
3              MR. RODGERS:  Objection.  He's
4        not here as an expert on autopilot
5        systems.
6    A.    Yeah, I don't --
7
8              MR. RODGERS:  You can as to
9        your knowledge.
10   A.    To my knowledge, I'm not sure.
11 I'm not a -- I don't -- I'm not sure.
12   Q.    Is there any autopilot system
13 that you've ever used that's capable of
14 making its own course corrections?
15             MR. RODGERS:  Objection to
16       form.  You can answer as to your
17       knowledge.
18   A.    No.  It would -- you would set
19 the course that you wanted and it would
20 hold that course.
21   Q.    It would endeavor to stay on
22 that course?
23   A.    Correct.
24   Q.    Okay.  But if you want to
25 change it, it has to be done manually?

Page 207

1    A.    Yes.
2    Q.    As part of the -- your
3  investigation, did you ever determine
4  whether the radar was in use on the vessel
5  at the time of the allision?
6    A.    Yes, the radar was in use.
7    Q.    And would a radar indicate a
8  fixed object like a bridge?
9    A.    Yes.
10   Q.    I figured the answer was yes.
11             MR. CHAPMAN:  Sorry, made you
12       choke there Mr. Rodgers.
13   A.    Yes, it would.  I didn't know
14 if it was a trick question.
15   Q.    Okay.  The radars on the
16 Mackenzie Rose, did they provide any
17 warning associated with the approach to a
18 fixed object?
19   A.    They would have to set their
20 own CPA if they wanted to be alerted.
21   Q.    Like how far out?
22   A.    Correct.
23   Q.    What does CTA stand for?
24   A.    CPA?
25   Q.    CPA.

Page 208

1    A.    Closest point of approach.
2    Q.    Okay.  And did you find out
3  during your investigation what had been set
4  as the closest point of approach for the
5  radars for some notification?
6    A.    I did not.
7    Q.    Do you know whether there was
8  any CPA that was set?
9    A.    I do not.  They do not tell me.
10 I know the radar was operational from what
11 they told me.
12             THE REPORTER:  And you said
13       CPA, right?
14       THE WITNESS:  Yes.
15             MR. CHAPMAN:  I don't think I
16       have any further questions at this
17       time.  Based on what the judge said
18       though I'm reserving my rights with
19       respect to anything you guys
20       produce --
21             MR. RODGERS:  Yeah.
22             MR. CHAPMAN: -- as ordered last
23       week.
24             MR. RODGERS:  I just ask that
25       we -- if possible we do it -- if any

Page 209

1        follow up with this witness, we do by
2        Zoom or here in New York with me
3        representing him if you want to do it
4        from Norfolk --
5    Q.    We will do our best to
6  accommodate that.  Okay.  I mean that, I
7  don't know how it'll work out, but I don't
8  want to make it difficult, you know.  And
9  we may not need to re-depose you, okay, to
10 ask you more questions.  But if we do,
11 we'll make those arrangements.
12             THE REPORTER:  And Counsel, do
13       you want this expedited and/or, I
14       know you wanted a rough, but do you
15       want it expedited as well for the
16       final --
17             MR. RODGERS:  No.  But I have a
18       couple of questions.
19             MR. CHAPMAN:  Yeah.
20 EXAMINATION BY
21 MR. RODGERS:
22   Q.    So Mr. Baldassare, training of
23 the crew on any particular tug boat is done
24 by the captain, right?
25   A.    Yes, sir.

**LEONARD BALDASSARE**

**April 29, 2025**

Page 210

1    Q.    Or the captain is supervising
2  training, correct?
3    **A.    Yes.**
4    Q.    And that would include any
5  training for lookouts, correct?
6    **A.    Yes, sir.**
7    Q.    And it's the captain of the tug
8  when they're on the way that makes the sole
9  decision to have a lookout?
10    **A.    Yes.**
11    Q.    Okay.  And any instructions
12  that lookout or a particular watch that the
13  lookout is standing, would that generally
14  come from the captain?
15    **A.    Yes.**
16    Q.    To your knowledge?
17    **A.    To my knowledge, yes.**
18    Q.    Okay, and your experience?
19    **A.    Yes, sir.**
20    Q.    Okay.  Now, if you could go
21  to -- well, before you go to anything, I
22  got a few questions.
23         In your investigation, did you
24  determine which bridge Mate Morrissey was
25  on at the time of the incident?

Page 211

1    **A.    What bridge on the vessel?**
2    Q.    Yeah.
3    **A.    I don't -- was not -- no.  I**
4  **did not know.  I would've -- I don't know.**
5    Q.    You don't know --
6    **A.    No.**
7    Q.    -- whether he was on the
8  steering bridge or the lower bridge, the
9  main bridge?
10    **A.    I believe he was on the -- he**
11  **should have been in the upper wheelhouse.**
12    Q.    Okay.  And if -- is -- have you
13  ever been to the upper wheelhouse on that
14  vessel?
15    **A.    Yes.**
16    Q.    The McKenzie Rose is --
17         THE REPORTER:  Just give him a
18     minute to finish.
19         **THE WITNESS:  Sorry.**
20    Q.    And from that steering bridge,
21  upper wheelhouse the mate on watch can see
22  past the barge configured as it was
23  that -- on the day of the incident,
24  correct?
25         MR. CHAPMAN:  Object to the

Page 212

1    form.
2    **A.    Yes.**
3    Q.    It's above the barge, correct?
4    **A.    Yes, yes.**
5    Q.    So is his view unobstructed --
6         MR. CHAPMAN:  Object to the
7    form.
8    **A.    Yes.**
9    Q.    -- as to what you understand
10  the load was?
11    **A.    As to what I understand, yes.**
12    Q.    And if he looks to the
13  starboard side, is it generally
14  unobstructed?
15         MR. CHAPMAN:  Object to the
16    form.
17    **A.    Yes.**
18    Q.    How about the portside?
19         MR. CHAPMAN:  Same objection.
20    **A.    Yes.**
21    Q.    And how about a Stern?
22         MR. CHAPMAN:  Same objection.
23    **A.    Yes.**
24    Q.    If he turns around, obviously?
25    **A.    Yes.**

Page 213

1    Q.    Okay.  Could you go to --
2         THE REPORTER:  Okay.  You guys
3    have to slow down tremendously for
4    me.
5         MR. RODGERS:  I'm sorry.
6         THE REPORTER:  Just slow down a
7    little bit.
8         MR. RODGERS:  You're from New
9    York.
10         THE REPORTER:  I don't care, I
11    can't write --
12         MR. RODGERS:  Okay, sorry.
13    Apologies.
14         THE REPORTER:  I can't write
15    his testimony --
16         MR. RODGERS:  All right, I'm
17    sorry.  Did you get it all?
18         THE REPORTER:  I did actually,
19    but not the point --
20         MR. RODGERS:  All right.
21         THE REPORTER:  Slow down a
22    little bit.  You can read the
23    realtime, I have it.
24         MR. RODGERS:  I don't think
25    it's going to go well down in Eastern

**LEONARD BALDASSARE**

April 29, 2025

1    District, Virginia if I'm questioning
2    anybody.
3         THE REPORTER:  It'll be a lot
4    slower.
5         MR. RODGERS:  I'm going to have
6    to do a training session.
7    Q.    Could you look at Carver 155,
8    which was the lookout, Section 7.16?
9    **A.    Yes.**
10        MR. CHAPMAN:  We're on the SMS
11   Exhibit 4.
12        MR. RODGERS:  Sorry, thank you.
13   Q.    We're in the SMS Exhibit 4,
14   Bates Stamp Number Carver 155.
15        Just hold that thought, I need
16   to check something.  Sorry, I just need two
17   minutes some -- before I -- just -- oh,
18   there they are.
19        Okay.  If you could go back to
20   Exhibit 4, Carver 155.  Could you read into
21   the record under "One man bridge
22   operations?"
23   **A.    Sure.  "One man bridge**
24   **operations.  On vessels where there is an**
25   **unobstructed all around view provided at**

1    **the steering station, as on certain**
2    **pleasure crafts, fishing boats and towing**
3    **vessels or where there is no impairment of**
4    **night vision or other impediment to keeping**
5    **a proper look out, the watch officer or**
6    **helmsmen may safely serve as the lookout.**
7         **However, it is expected that**
8    **this practice will only be followed after**
9    **the situation has been carefully assessed**
10   **on each occasion and it has been clearly**
11   **established that it is prudent to do so.**
12        **Full account shall be taken of**
13   **the weather, conditions of visibility,**
14   **traffic density, and proximity of**
15   **navigational hazards.  It is not the intent**
16   **of these rules to require additional**
17   **personnel forward if none is required to**
18   **enhance safety."**
19   Q.    Thank you.  Now, if a -- in
20   your experience and understanding of
21   lookouts as you -- in the context of being
22   questioned by Mr. Chapman, is it the
23   captain's decision to decide whether
24   lookout is to require enhanced safety?
25        MR. CHAPMAN:  Object to the

1    form.
2    **A.    Yes, it is his decision.**
3    Q.    Okay.  And I'm not going to ask
4    you any opinion questions.  I'm just going
5    to want you to verify.  This is in Section
6    7.16 under the "lookout" section of
7    Carver's SMS book, right?
8    **A.    Yes, that is correct.**
9    Q.    Okay, what you just read?
10   **A.    Yes.**
11   Q.    Okay.  Sorry I lost my list.  I
12   remember, okay.  I don't need the list.
13        Carver 169, can you find that?
14   I'm not sure where that is.  I think it was
15   near the end of those --
16   **A.    Yeah, I got it.**
17   Q.     -- those charts.
18   **A.    Yep.**
19   Q.    I'm glad you got it.  Okay.  Is
20   that in Exhibit 4?
21   **A.    Yes.**
22   Q.    Okay, thank you.
23        All right.  Do you remember
24   talking about this flow chart in Section
25   915 of the SMS with Mr. Chapman?

1    **A.    Yes, I remember.**
2    Q.    Okay.  So I just want to go
3    over a few things, or maybe just one thing.
4    If you go to one, it says, "An unintended
5    grounding or an unintended strike of
6    "allision with" a bridge," correct?
7    **A.    Yes.**
8    Q.    Now, on June 15th, 2024 when
9    you received a call from Captain Miller,
10   did he tell you he had hit the bridge?
11   **A.    No.**
12   Q.    At any time during that day,
13   June 15th, did you find out he had hit the
14   bridge?
15   **A.    No.**
16   Q.    And was it your understanding
17   that he had slid by the fendering system?
18   **A.    Yes.**
19   Q.    That's what he told you?
20   **A.    Yes, that is what he told me.**
21   Q.    Okay.  So just from reviewing
22   this and your knowledge of this flow chart,
23   is it your understanding that based on what
24   Captain Miller told you this reporting
25   requirement was not required on June 15th

**LEONARD BALDASSARE**

April 29, 2025

1  with the knowledge you had?
2      A.    That is correct, with the
3  knowledge of the situation that I was told.
4      Q.    Okay.  I have no further
5  questions.  Thank you.
6           MR. CHAPMAN:  I have a couple
7      of follows up.  Thank you.  MR.
8      RODGERS:  How did I guess.
9  EXAMINATION BY
10 MR. CHAPMAN:
11     Q.    So you got Exhibit 4 there?
12     A.    Yes.
13     Q.    I got a follow up on Page 155,
14 which is the lookout rule?
15     A.    One second.
16     Q.    7.16, lookout.  You got that
17 there?
18     A.    Yes, sir.
19     Q.    You read that very last section
20 called "One man bridge operations," right?
21     A.    I did, yes.
22     Q.    And it looks like it's quoted
23 language from some other source, right?
24     A.    Yes.
25     Q.    And did Carver intentionally

1  include this in it's safety management
2  system or was it something that was
3  included by the folks that sell the safety
4  management system this TBS outlet, if you
5  know?
6           MR. RODGERS:  Objection to
7      form.
8      Q.    If you know.
9      A.    I do not know.
10     Q.    Okay.  In any of that language
11 that you read regarding one man bridge
12 operations, did it talk about transiting
13 bridges?
14     A.    No.
15     Q.    Okay.  Did it talk about narrow
16 channels?
17     A.    No, it did not.
18     Q.    Now, if you could turn to Page
19 169, Section 9.5 of this accident and
20 incident reporting?
21     A.    Got it.
22     Q.    Section --
23           MR. RODGERS:  Somebody there.
24           MR. CHAPMAN:  Is somebody
25      asking a question or they just didn't

1      put themselves on mute?
2           MR. RODGERS:  Cannon Moss.
3      It's your client.
4           THE REPORTER:  Mr. Cannon?
5           MR. RODGERS:  I think it's
6      Mr. Moss.  Is it Moss?
7           THE REPORTER:  Yes.
8           MR. CHAPMAN:  Mr. Moss, were
9      you asking a question or did you just
10     forget to mute yourself?  Looks like
11     he's on mute now.  Okay.
12     Q.    So we're on Page 169 in Exhibit
13 4?
14     A.    Yes, sir.
15     Q.    And Mr. Rodgers asked you a
16 question related to whether this was
17 something that needed to be reported,
18 right?  And based on what you learned
19 during your conversations with Captain
20 Miller, on June 15th, right?
21     A.    Yes, he did.
22     Q.    And I think the word was or the
23 term that was used was slide by, which you
24 understood to mean they had made no contact
25 with the bridge or fender system, correct?

1           MR. RODGERS:  Objection to
2      form.  You can answer if you
3      understand his question.
4      A.    Yes, correct.
5      Q.    That's what you believe?
6      A.    To what I -- to what they told
7  me, yes.
8      Q.    Got it.  So have you ever had
9  another tug crew contact you to inform you
10 that they had slid by a fender system while
11 you were Port Captain at Carver?
12     A.    No.
13     Q.    So if all they did was slide by
14 the fender system, was there any reason for
15 them to call you about it that afternoon?
16           MR. RODGERS:  Objection to
17     form.  You can answer if you --
18     A.    You would have to ask --
19           MR. RODGERS:  Don't guess.
20     A.    You would've to ask Captain
21 Miller his reasoning.  I'm not sure, I just
22 answered the phone when they called.
23     Q.    If all they did was slide by as
24 reported to you, would there be any reason
25 for you to ask them to take some photos and

LEONARD BALDASSARE

**April 29, 2025**

---

**Page 222**

1  send them to you?

2      MR. RODGERS:  Objection to

3      form.  You can answer if you have an

4      answer.

5      **A.    Yes.  Just so I can make sure**

6  **that there was no damage and that they**

7  **weren't lying to me about anything.**

8      Q.    So they called you to tell you

9  that they had slid by and hadn't made any

10  contact with the bridge out of the blue on

11  a Saturday afternoon?

12      MR. RODGERS:  Objection to

13      form.

14      Q.    Okay.  On a Saturday afternoon.

15  And you wanted to check whether they were

16  lying to you, so you had them take some

17  photos and send them to you.  Is that your

18  testimony?

19      MR. RODGERS:  Objection to

20      form.  You can answer if you want to

21      extrapolate on that.

22      **A.    I'd rather not answer.**

23      Q.    Are you going to refuse to

24  answer?

25      **A.    Yes.**

---

**Page 223**

1      Q.    No further questions.

2      MR. RODGERS:  I think I'm done.

3      MR. CHAPMAN:  Yeah, thank you.

4      MR. RODGERS:  Thank you, Mr.

5      Baldassare.

6      **THE WITNESS:  Thank you.**

7      MR. RODGERS:  Thanks for coming

8      in.

9      **THE WITNESS:  No problem.**

10      MR. RODGERS:  Are we done with

11      the witness?

12      MR. CHAPMAN:  Yeah.  I'm sorry

13      it was a little tense.

14      THE VIDEOGRAPHER:  One second.

15      This is the end of the video

16      deposition of Leonard Baldassare.

17      The time is 3:24 p.m.

18      MR. NANAVATI:  Ms. Court

19      reporter, I would like a copy of that

20      proceeding.

21      (Time noted:  3:26 p.m.)

22

23

24

25

---

**Page 224**

1      A C K N O W L E D G M E N T

2

3

4  STATE OF NEW YORK)

5                  :ss

6  COUNTY OF        )

7      I, LEONARD BALDASSARE, hereby certify

8  that I have read the transcript of my

9  testimony taken under oath on 04/29/2025;

10  that the transcript is a true, complete and

11  correct record of what was asked, answered

12  and said during this proceeding, and that

13  the answers on the record as given by me

14  are true and correct.

15

16      _____

              LEONARD BALDASSARE

17

18

19  Signed and subscribed to

    before me this _____ day

20  of _____, 2025

21

22  _____

        Notary Public

23

24

25

---

**Page 225**

1      C E R T I F I C A T E

2

3  STATE OF NEW YORK)

4                  :ss

5  COUNTY OF SUFFOLK  )

6

7      I, LARIN KAYWOOD, a Notary Public

8  within and for the State of New York, do

9  hereby certify:

10      That the witness whose examination is

11  hereinbefore set forth was duly sworn and

12  that such an examination is a true record

13  of the testimony given by such a witness.

14      I further certify that I am not

15  related to any of these parties to this

16  action by blood or marriage, and that I am

17  not in any way interested in the outcome of

18  this matter.

19      IN WITNESS WHEREOF, I have hereunto

20  set my hand this 29th day of April, 2025.

21

22

23      *Larin Kaywood*

24      _____

              Larin Kaywood

25

---

**LEONARD BALDASSARE**

**April 29, 2025**

Page 226

```
1   Errata Sheet
2
3   NAME OF CASE: IN THE MATTER OF COEYMANS MARINE TOWING, LLC
4   DATE OF DEPOSITION: 04/29/2025
5   NAME OF WITNESS: LEONARD BALDASSARE
6   Reason Codes:
7        1. To clarify the record.
8        2. To conform to the facts.
9        3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25                   _____
```

**LEONARD BALDASSARE**

**April 29, 2025**

**Exhibits**

**Exhibit 1**
3:10 82:7,12
87:1

**Exhibit 2**
3:11 84:9,10

**Exhibit 3**
3:12 137:14,
15 139:8,9

**Exhibit 4**
3:13 158:13,
16 191:14
199:11
214:11,13,20
216:20 218:11
220:12,13

**Exhibit 6**
3:15 87:10,11,
15 118:21,23,
24 119:12
123:7 124:4
125:8

**Exhibit 9**
3:16 96:1,4

**Exhibit 15**
3:20 92:24

**Exhibit 17**
3:21 93:1,15

**Exhibit 19**
3:23 99:16
103:9 110:6
111:5

**Exhibit 21**
3:24 118:4,20

**Exhibit 23**
3:25 126:22
127:13

**Exhibit 24**
4:2 133:13
135:8

**Exhibit 25**
4:3 134:12

**Exhibit 26**
4:4 145:12

**Exhibit 28**
4:6 144:18
145:12

**Exhibit 30**
4:7 145:13

**Exhibit 32**
4:9 147:7

**Exhibit 34**
4:10 149:8

**0**

**0000112**
103:10

**0000114**
106:24

**0000148**
158:23

**000019**
124:12

**000049**
96:2

**000056**
118:22

**000155**
178:13

**00016**
111:9

**000886**
163:12

**00851**
147:12

**00885**
147:12

**08:48**
100:18

**1**

**1**
5:3 27:21
82:7,12 87:1
91:21 101:21
162:16 176:13
187:12,22
194:25

**1.2**
153:7

**10**
15:24 71:21
101:22,23,24
115:22

**100**
79:16 154:25
161:10

**10:00**
67:8

**10:22**
5:9

**11**
91:25 92:15
106:16

**11757**
6:4

**11:44**
91:2

**11problems**
136:15

**12**
16:21

**1200**
16:17

**12:02**
91:10

**12th**
87:14

**13**
91:25 92:20

**14**
10:6

**15**
91:25 92:24
93:3,6,7,10

**150**
166:21

**155**
178:19 214:7,
14,20 218:13

**15th**
20:8 48:2
59:23 60:15
62:3,24 63:5,
22 64:3,21
71:23,25 83:4
87:22 88:7
107:20
119:12,13,21
123:8 124:11,
16 127:14
131:15 132:9
149:20 182:1,
21 190:10
217:8,13,25
220:20

**1600**
10:10

**163**

**185:11**

**166**
191:9,12

**168**
193:16

**169**
194:11 216:13
219:19 220:12

**16:30**
88:15 118:25
119:23 127:16

**17**
91:25 93:1,15

**17th**
65:3 66:12,23
68:8,11 71:24
74:11 109:2
110:8,16,18

**19**
99:16 103:9
110:6 111:5

**194**
176:10,18,19

**19th**
108:18,22
109:6 110:12,
23

**1:06**
148:24

**1:59**
149:6

**2**

**2**
84:9,10 91:8
151:2

**2.2**

LEONARD BALDASSARE

April 29, 2025

145:9

**20**
13:22,24
102:18

**200**
170:13,14

**2015**
9:13

**2023**
134:6

**2024**
6:17 11:19
20:8 32:22
48:2 62:3
63:5,22 64:22
87:14 88:9
100:18 106:14
107:20
108:18,23
113:6 115:12
124:16 127:14
132:10 134:14
135:13,21
136:1,13,23
137:22
145:12,13,14,
24 146:6
149:20 182:1,
21 190:11
217:8

**2025**
5:8 14:24
33:18 34:21
59:24

**21**
118:4,20

**22nd**
137:22

**23**
126:22 127:13

**23:55**
124:16 125:1

**24**
87:22 133:13,
17 135:8

**248**
85:21

**24th**
31:12 32:19
112:21,22

**25**
103:13
133:14,20
134:12

**25A**
104:22

**25th**
113:3

**26**
16:18 100:18
144:7,25
145:12

**2692**
68:7,11 80:8,
15,19 99:18
100:20 101:2,
4,8 103:11
106:20
108:11,22
109:1,14,24
110:4 111:8
194:14 195:8

**2692A**
111:5

**2692B**
106:25 108:10
109:6 110:6,
12,19,22
111:2

**26th**
106:13 112:18

**27**
174:21

**28**
144:7,18
145:12

**281**
88:20 94:7
103:19 122:16
181:25 182:19
195:5

**282**
122:15

**29th**
5:8

**2:24-cv-00490**
5:7

**2:56**
202:11

**3**

**3**
137:14,15
139:8,9 149:5

**30**
27:21 144:7,
25 145:13

**32**
107:18 147:7
149:9,10

**33**
149:9

**34**
149:8

**36**
123:17

**3:03**
202:16

**3:24**
223:17

**3:26**
223:21

**3K**
111:17

**4**

**4**
102:18
158:13,16
191:14 199:11
202:15
214:11,13,20
216:20 218:11
220:13

**4.05-1**
187:8

**4/26/1993**
6:22

**40**
13:20

**45**
148:16,18

**46**
187:3,8

**5**

**5**
156:2

**5.1**
159:2 162:11,
19

**56**
88:1,2 123:8

**6**

**6**
87:11,15
105:25
118:21,24
119:12 123:7
124:4 125:8
156:6,20
157:23 176:14
196:6,7,8

**6.12**
166:21

**7**

**7**
107:19

**7.12**
168:7,10,11
175:8 185:8
198:14

**7.16**
178:12 183:4
214:8 216:6
218:16

**7.3**
123:19

**7.9**
149:16 150:19
176:9,21

**70**
115:23

**75**
116:1

**8**

**80**

**LEONARD BALDASSARE**

April 29, 2025

116:1

**88**
6:3

---

**9**

**9**
91:25 92:10
95:7 96:1,4

**9.2**
192:19

**9.4**
156:6 157:23
158:2

**9.5**
137:19 138:25
139:7 162:23
185:8 193:8,
12 219:19

**910**
168:16,19

**915**
216:25

**9:00**
67:8

---

**A**

**a.m.**
5:9 91:3

**ability**
46:13

**aboard**
73:19 78:10
79:5 197:12

**access**
81:13 82:3
130:1 142:24
156:19

159:14,20,21
160:11
161:15,19
197:1,4,8

**accessed**
153:5

**accident**
88:7 187:1
191:18
194:16,20,21
219:19

**accommodate**
209:6

**accompanied**
110:5

**account**
215:12

**accounted**
94:15

**accounts**
134:22 135:15

**acronym**
10:19 28:23

**action**
57:17

**active**
174:16

**actively**
11:9 61:5

**activity**
103:15 106:5

**actual**
79:3 136:10
190:23

**add**
111:13

**added**

118:6 181:4
183:5,20

**addendum**
111:7,15

**addition**
98:13

**additional**
215:16

**address**
6:2,3 69:3,6
164:6

**addressed**
129:5

**addressing**
187:15

**administered**
107:24

**admit**
160:9

**adopt**
115:2

**advisor**
116:20

**affixed**
188:18

**afternoon**
48:18 62:3
132:9 221:15
222:11,14

**agent**
187:16

**agree**
71:17 110:17
195:8,14

**agreed**
60:20 62:14

**agreement**

15:4

**ahead**
21:10 60:13
63:15 90:17
103:20 167:16
205:12

**Alabama**
164:7

**Albany**
15:6,17

**alcohol**
107:6,14,24
195:17,20,24

**alert**
46:8

**alerted**
207:20

**allegation**
179:23

**allision**
18:14 20:9
22:10 25:1
33:24 35:1
39:14 47:19
62:4 63:5,22
64:21 65:1,19
66:16 69:12,
18 70:1,17
71:12,19 72:1
78:4 79:20,23
81:2 102:10
105:18 117:4,
5,20 127:2
128:22 139:9
153:1 181:7
183:13 185:19
186:7 187:24
188:5,11,16,
17,19 191:22
193:13 195:2,

25 202:23
204:2,10
207:5 217:6

**alongs**
37:8,11,15

**alongside**
88:21

**alphabetical**
150:9

**alternates**
194:4

**altogether**
14:25 16:20

**Amber**
156:10

**amend**
125:14

**amended**
152:7

**and/or**
209:13

**Android**
54:21

**annual**
26:14,16 37:7
43:12 44:4,17

**annually**
39:5 44:24

**answers**
46:14 47:10

**Apologies**
92:8 213:13

**apologize**
92:2

**apparently**
130:20 176:24

LEONARD BALDASSARE

April 29, 2025

appearances
5:15

appears
88:9 108:7
109:5 118:21
123:18 147:13
149:13 194:12

application
154:5

applied
12:16,18

appraise
183:12

apprise
181:6 183:8

approach
207:17 208:1,
4

approaching
90:1

appropriately
199:15

approval
130:8

approve
130:7

approver
130:14 145:23

April
5:8 135:25
136:13
145:14,24
146:6

area
175:3

areas
85:7

arise
183:12

arrangements
209:11

arrival
106:7

arrive
56:9

arrived
75:20 137:3
177:23

asks
180:20

assessed
215:9

assessment
38:12 156:5,7,
15 157:18,25

assessments
38:15

assigned
39:8 54:24
116:13 142:3
168:2 170:7
171:1

assigning
167:25 170:4

assignment
30:11 44:14
156:20

assist
128:15 136:20
167:3,4
175:18

assist/tag
175:15

assistance
113:8

Associates
5:14

assume
27:8 52:6 54:4
56:1 60:1
84:19 86:17
146:16 155:16
160:9

assumes
193:18

assuming
27:6 196:8

attach
154:4,16,18

attached
95:4 153:9,10

attempted
66:7

attention
133:25 134:18
135:11

attorney
98:5,7 105:15
172:23

audit
122:1

auditor
163:21

audits
165:9

August
32:21

authority
22:21 159:3

autopilot
88:17 89:4,12,
16,25 90:3
103:23 119:25

128:20 129:3
135:18 136:6,
16 155:21,25
199:2,5,8,15
200:1,11,15
201:15 205:16
206:1,4,12

autopilots
201:16

autopopulated
152:17

aware
128:18 137:4
145:16 184:6,
11,12,13
185:3 205:2,
14,23

Ayers
133:12,18
135:8,23

_____

B

_____

BA
150:10

back
6:16 19:24
21:14 32:18,
21 33:19
34:10 35:11
48:12 57:12
59:18,24
61:21 64:6
76:16 88:19
90:6 91:9
99:10 121:22
122:11,16
125:4 148:16
149:5 151:25
170:18 182:25
183:3 194:6

202:15 214:19

background
6:24

backing
88:20 127:18

Baldassare
5:4,25 6:7
20:13 81:17,
23 99:17
144:5 149:7
158:12 202:17
209:22 223:5,
16

bar
168:14 176:11

barge
30:3,4 39:16
48:9 50:5
57:25 62:11
63:10,14
75:10,11,14,
16,23,24 76:5,
11,13 84:15,
25 85:4,7,11,
16,19 86:3,9
88:20,21 94:7,
12 103:19
104:4,17
107:23 111:7,
15 170:9,12,
13 181:10
195:5 198:8
205:5 211:22
212:3

barges
13:20 37:23
198:1

based
82:1 131:5
162:7 208:17
217:23 220:18

Basic
10:13

basically
17:3 39:17
107:12 177:2

Bass
92:17

Bates
176:17 214:14

begin
88:19

beginning
5:3 87:14 91:7
147:12 149:4
168:22 202:14

begins
163:11

behalf
64:24

Belt
6:10,16 33:24
48:2 61:11
69:13 70:1,12,
17,19,20,24
71:8 72:1
111:19 117:5
139:10
177:13,24
182:20 193:14

big
168:14 185:9

billing
114:11 133:10

bird
173:23

birth
6:21

bit

12:17 51:8
118:17 213:7,
22

Block
101:22,23,24
102:17 103:13
104:21 107:19
111:17 145:9

blue
176:11 222:10

board
36:16 76:1
113:1 200:12,
20

boarded
75:13,20

boat
16:16 25:22
37:21 40:13,
16 53:11,13
54:22 55:2,6
56:14,17 57:4,
12 61:21 62:2,
24 72:2,3
73:11,18,24
74:8 75:21
114:11 115:22
125:17,22,23
126:4 127:4
132:8 135:18
136:12 141:15
153:15 182:19
197:7 200:21
204:1 209:23

boats
11:12,15
16:19 17:4
30:1 37:6
163:24
175:15,19
215:2

book
196:21 198:20
216:7

boss
18:6 71:2

bottom
87:23 88:6
99:23 124:12
158:22
166:15,24
176:12 193:6,
7 195:16

bought
163:6

bow
104:4 170:18

box
102:15 193:17

branch
94:6 103:21
174:24 177:4

Brandon
138:5

break
90:18 120:20
201:25

Brian
11:20,25
17:22 18:11,
20 24:1 37:6,
16 38:11
50:11 56:1
57:15 58:11
62:9 66:13
67:9 68:12
73:16 101:5
109:2,12,23
110:8 130:6
132:24 133:6
145:22 186:14

194:3

Brian's
18:6

bridge
6:16 18:14
30:4 33:24
39:14 48:2,5,
7,8 50:4,19
52:7 57:25
61:11 62:13,
15,18 63:18
65:20 68:3
69:13 72:1,9,
11 78:5 82:23,
24 83:9,22
84:1 86:14
88:22,23
89:14 90:1
94:12,13
101:10,15
102:11,25
104:6,13,15,
16 105:18
111:20 117:5
119:24 127:19
128:6,23
130:23 139:10
153:1 155:4,
17 168:7,11,
25 169:13,18
171:10,13
173:13,22
174:4 177:11,
13,18,24
179:24 180:12
181:10 182:2,
21 183:13
187:25 188:6,
11,15 190:7,
13,23 191:3,
23 193:14
195:2,6,7
196:23 205:5,

18 207:8
210:24 211:1,
8,9,20 214:21,
23 217:6,10,
14 218:20
219:11 220:25
222:10

bridges
167:3,5 175:2
176:4 177:6,
18,21,25
178:4 196:13
197:25
198:13,23
204:19 219:13

briefing
175:10,20
176:3

bring
19:22 160:25
201:21

Brothers
161:17

brought
30:2

brush
130:21

Bryant
164:15,16

Buchanan
7:17,18,24
8:2,4 14:21
126:11 161:22

bullet
167:1,15
170:3 171:15
174:7 181:5
183:8

bullets

LEONARD BALDASSARE

April 29, 2025

179:4

**bunch**
102:3 159:18

**Bunkering**
8:6

**buoys**
52:9

**business**
16:3 21:18
22:5

**business-related**
32:16

---

**C**

**call**
19:2,8 50:9
53:13,24
55:11,25
57:12 61:21
62:24 63:7,8
65:22 66:4,15
67:1,3,6,9,10,
13,18 71:7,8
75:21 95:10
116:7 122:25
129:2 132:17
133:1,2,3
148:4 169:10
174:6 177:1
185:9,12
190:20 198:12
217:9 221:15

**called**
43:5,13,16
48:3,10,12,16
50:13,18
65:17 66:2,8
67:15 74:10
101:12 117:14

185:19 187:7
195:17 218:20
221:22 222:8

**calling**
53:1,4,18
54:9,11
183:17

**calls**
54:17 184:2
195:10

**Cannon**
220:2,4

**capabilities**
36:23

**capability**
77:17

**capable**
206:13

**capacity**
41:22

**captain**
7:8,10 12:16
13:11,17 14:7
15:10 16:22
17:20 19:1,14
22:12,18,24
25:3,9,24
28:15 29:4,7,
10,15,20
31:25 32:24
33:18,22
36:10,21
37:25 41:9,16,
18 42:3,11
44:9 48:3,5,
10,25 50:8,17,
18,25 51:1
52:12,22,23,
25 53:2 54:9
55:12 60:18

61:24 62:7,21,
25 63:3,8
72:9,19 77:3
78:13 86:7
89:2 92:10,12
93:17 94:19
95:8,20 96:17
97:10 99:17
113:19 114:18
115:10
119:21,22
124:15 128:1,
11,21 132:8,
16,18 135:13
137:4,11
140:6,11
142:2,9 143:6,
13,24 144:1
147:1 160:13
175:13 185:19
186:3,9
189:12 190:15
191:4 196:11
197:23 200:3
202:21 203:2
204:4 209:24
210:1,7,14
217:9,24
220:19
221:11,20

**captain's**
28:6 215:23

**captains**
37:2,8 38:9
44:10

**care**
213:10

**carefully**
215:9

**cargo**
22:25 23:6

**Carolina**
140:8

**Caroline**
23:9

**carry**
21:21

**Carver**
5:6 6:14 7:2
11:18 12:10,
13,14,19
13:10 14:2,6,
13,18,23 15:1,
11 16:23
17:18 18:20
20:14,16
21:21 22:13
23:23 24:1,5
25:3,6 29:21
30:8 33:18
37:12 54:18
56:21 57:7
59:10,17 63:4
64:25 65:6,7
69:4,11 79:23
81:12 87:24
96:1,3 97:19
103:9 105:15
106:24 111:9
113:20 114:17
115:9 117:24
118:5,22
124:12 125:22
126:9 129:20
133:11 136:23
137:19
138:10,14
139:2 140:5,
11,18 143:13
147:11,12
149:12 158:23
159:6 160:1
162:5 163:6,

12 165:24
166:5,12
178:13 182:18
191:12 196:11
197:23 200:17
201:17
204:16,17
214:7,14,20
216:13 218:25
221:11

**Carver's**
11:15 193:22
216:7

**case**
5:6 123:17
144:8 203:17

**casualty**
89:5 102:2,18
103:17 106:4,
6,17 107:4
185:16 186:1
187:7,21

**categories**
82:1

**caused**
66:11

**cell**
58:17 66:25
67:2

**center**
7:3,4,12,16
11:12 12:1,3
13:14,16 14:3,
21 51:7
126:15,16
161:13

**certificate**
29:1

**CFR**
187:3,8

LEONARD BALDASSARE

**April 29, 2025**

chain
133:1

change
122:12 125:4
152:9 206:25

changed
122:3,5

channel
52:7 183:20,
22,23 184:8
185:4

channels
196:14 219:16

Chapman
6:6,9 8:18,21
20:2 29:10,13,
15 31:2 35:8,
16 43:10
45:11 51:17,
21 60:12 64:5
69:7 81:24
83:24 90:13,
16,21 92:4,8
93:23 94:2,4
98:6 100:10
114:25 115:4
121:18 144:15
146:10,13
148:16,19,22
156:23 157:2,
7 158:5,8
168:21 171:8
172:24 173:2,
7 176:18,20
180:21
181:14,17,22,
24 182:5,8,12,
15 191:13
194:2 198:17
201:21,24
202:2,5,8

203:2 204:13
205:8 207:11
208:15,22
209:19 211:25
212:6,15,19,
22 214:10
215:22,25
216:25 218:6,
10 219:24
220:8 223:3,
12

charge
187:17

Charleston
137:6 140:8

chart
175:6 191:15
192:17 193:8,
17 194:12,25
216:24 217:22

charts
216:17

check
40:19 42:11
102:4 124:11
143:23 160:16
214:16 222:15

check-ins
153:22,23

checked
102:6,15

Chesapeake
39:15

child
15:21,23

choke
207:12

Chris
28:17 92:10

124:15

Christopher
151:10

circumstance
169:19 171:1,
18 185:18
188:3

circumstances
168:1 169:11
184:17 198:6

City
165:1

clarification
28:25 54:24
67:5 121:3

clarify
55:5 121:17,
20

clear
71:1 94:21
132:25 192:13

clearance
173:23

clearer
84:20

click
154:5,12

client
220:3

clip
52:5 154:12

clips
52:6

close
15:13 122:9
123:5

closed

122:23 123:9,
14

closer
168:21

closest
208:1,4

cloud
106:9

co-captain
127:17

Coast
46:24 47:1,8
61:1,8,15,18
63:21 64:2,20,
25 65:6,7,8
66:7,8,12,15
67:18 68:6,10,
11,15,18
69:25 70:16
71:7 74:10,15
76:15 79:9
80:20 99:19
100:21 101:3,
7,18 105:3,17
106:4,20
107:9 108:23
109:11 110:5
111:2 113:2
185:25 186:4,
10,14,18,22
187:19 188:8
194:13 195:9
196:3

Coastal
10:10

Coeymans
5:5

coffee
40:15 90:9
201:20

COI
16:17 26:17
28:2,22 29:1

collecting
25:17

collection
87:13 178:14
199:9

college
9:7,20

Collin
164:15,16

collision
64:9 181:7

collision/
elision
183:9

color
99:3 192:18

comfortable
129:12 169:18

communicate
170:20

communicated
19:23

communicating
18:25

communication
21:18 32:3
33:12

communications
23:25

community
9:20

**LEONARD BALDASSARE**

April 29, 2025

companies
126:10 138:11
173:8,9

company
6:11 16:8
19:11 21:14,
15,18,23 22:3,
4 24:7 25:2,20
28:12 29:5,25
32:4 33:7
34:21 56:22
58:13,14 59:9
67:2 76:24
97:3 162:7,8
163:18 165:20
196:20

company's
173:18 198:22
199:3

compensation
14:15

competence
44:3

compilation
99:18

complaints
128:19

completed
80:25 88:12
99:24 106:2
111:14 119:13
122:8

completely
88:17

completing
105:24 111:13

compliance
116:24 163:25
165:10

comport
71:16

computer
154:12 197:7
199:19

concern
129:2

concerns
187:16

conclusion
66:18 67:17
182:14

condition
75:21

conditions
215:13

conduct
141:15

conducted
79:4 103:16
120:3 202:20

confess
166:17

configured
211:22

confirm
91:24

confirmed
20:22

congratulations
32:12

CONNECT
38:21 43:7

connected
124:3

connection

6:12 22:9
24:15 38:14
69:24 100:21
105:17 135:12
152:25

consecutive
166:18

considerations
180:7

considered
131:6,15
179:5

consistent
188:12

consisting
86:4 102:2
187:21

consists
147:11

construction
16:4,6,10 30:5

consult
178:7 191:21

consulted
177:17

contact
12:25 50:10
58:17 61:18
64:20 65:13
66:8,11 70:1,
16,19 71:3
104:5 132:9
185:20 188:18
189:4 220:24
221:9 222:10

contacted
64:11,19 65:6,
7,8 66:7
70:12,18 79:9

86:9,15 186:4,
18,21 189:9,
19 190:6

contacting
54:1 69:25
70:20,24
186:10,14
189:2

contained
194:7 198:14

contemplated
171:14

contents
161:8

context
188:3 215:21

continued
56:21 103:25

Contracting
16:2 23:20
24:16

Contreras
5:10

Control
160:21

conversation
18:16 24:3
36:5 49:6,13
52:21 60:6,23
62:1,2,22
67:22 70:14,
24 71:4
189:12,24

conversations
48:24 62:23
89:1 220:19

coordinator
193:19

copies
84:14

copy
68:14 127:6
159:25 160:4,
7 197:12,14
223:19

corporate
205:11

correct
11:1 13:15
14:11,19 15:2
21:3,16 22:2
23:16 25:21
26:2 27:19
29:3 30:23
32:14,23 33:1
39:9 40:14
41:5 42:23
46:21 47:6
52:16 54:10
62:19 79:9
80:22 81:18
85:13 87:2,19
88:18 90:4
94:10 97:17
100:3,4 104:3
105:19 106:15
107:16 108:2
109:14
114:13,15
119:13,14
120:1 121:25
122:24 126:18
130:10 131:2
134:7 138:18
140:24 150:12
152:1,3,5
153:6,21
156:12,13
170:10,16,18
175:6 177:4,

**LEONARD BALDASSARE**

April 29, 2025

14,15 178:25
179:1,7,8
183:13
184:19,23
192:15,16
193:9 194:14,
15 195:25
196:1 199:10,
12 200:9,25
204:19 206:23
207:22 210:2,
5 211:24
212:3 216:8
217:6 218:2
220:25 221:4

**correction**
122:17

**corrections**
206:2,14

**correctly**
77:4 88:24
127:20 187:25

**counsel**
92:2 141:10
209:12

**counseling**
141:20,25
142:6 143:16

**couple**
27:17 37:22
52:6 133:10
147:19 177:8
209:18 218:6

**court**
5:11,16
223:18

**cousin**
24:20

**covering**
127:13

**covers**
125:19 165:4
177:1

**CPA**
207:20,24,25
208:8,13

**crafts**
215:2

**create**
152:12,13
153:13,16,18
154:3,15
169:4

**credentials**
81:16

**crew**
17:6,12 24:25
30:10 41:3
45:5 72:4,14,
16 73:20 74:2,
9,13,22 76:18
77:20,22 78:1,
4,15,21 79:25
86:8,14 89:3
99:9 107:5
113:2 114:24
115:16,20
129:4 140:23
151:3 155:2
170:4 175:14,
21 178:4
196:12,17,18
199:1 202:20
209:23 221:9

**crewed**
17:1 41:2

**crews**
41:3 116:7

**CTA**
207:23

**current**
52:19

**cut**
200:4

**cycle**
42:7

---

**D**

---

**d/b/a**
5:5

**daily**
36:25 87:13,
22 88:10
113:24 114:2,
6 119:11
122:7 123:14,
19 124:8

**Daisy**
23:11

**damage**
6:16 48:8
50:21 60:19
61:4 62:10,11,
13,17 72:13
75:1,5,6 83:9
85:4 94:12,13
101:16 102:22
104:16 107:22
111:18 190:23
222:6

**damaged**
195:5,7

**danger**
180:12

**dangerous**
179:22

**dangers**
179:11,12

**Daphne**
164:7

**data**
38:18 139:13
144:20

**date**
5:7 6:20 20:8
27:25 79:3
100:15 118:12
119:18 136:24
137:1 138:4
152:14,21

**dated**
108:18

**dates**
145:11

**day**
26:2,3 40:1,3,
8,9,10,12 49:1
54:18 60:11,
12 61:18,19
64:8,11,12
67:25 68:7
74:8,14 79:8,
16 89:3
122:10,21,23
123:5 124:9
125:2,13
133:7 137:25
165:3 180:17
190:9 211:23
217:12

**day-to-day**
16:25

**days**
39:18 71:21
78:8 106:3,16

**deal**
18:3 20:16
120:10

**dealt**
164:12

**decide**
215:23

**deciding**
179:6

**decision**
30:18 210:9
215:23 216:2

**deck**
37:4 72:23
103:19 125:17
141:18 143:20
151:6

**deckhand**
92:17 93:11
166:21 167:4
196:20
203:11,21

**deckhands**
78:24 96:23
167:2,21

**define**
205:6

**degree**
9:22

**delete**
56:22 57:9
59:10 152:11

**deleted**
59:14 150:15
151:11,13,23

**deleting**
69:11

**deliver**
106:2

**delivered**
30:4 39:19

**LEONARD BALDASSARE**

**April 29, 2025**

56:12 75:17
76:5 98:22
141:21

**delivering**
37:23

**demand**
20:15

**density**
179:10 215:14

**department**
28:10 82:2
134:22

**depending**
129:12

**depict**
85:10

**deposition**
5:4 6:12 19:20
46:18,20
223:16

**depositions**
82:8 120:11

**describe**
37:18 102:21
154:10

**describes**
103:17 151:2

**description**
111:18

**designated**
193:18,22

**designation**
194:9

**desk**
133:24 135:11

**destination**
63:11

**determine**
207:3 210:24

**developed**
165:20

**device**
54:21

**difference**
119:9 157:3

**differently**
118:16

**difficult**
209:8

**digital**
100:11,12,16
108:17

**digitally**
106:13 108:7

**direct**
180:19 184:4

**directing**
176:6 183:15

**direction**
52:14

**directly**
18:6 130:5
143:2 145:22
195:21

**director**
114:20 116:4,
9

**discipline**
8:25 140:16

**disciplined**
140:12

**discovery**
82:10 87:11

**discretion**

167:13 168:4

**discuss**
57:16 60:22
61:5

**discussed**
60:7 61:12
62:10 101:5
105:13

**discussion**
31:9 60:25
67:16

**disengaging**
205:16

**dispatcher**
117:12

**dispatchers**
115:14

**Displacement**
111:19

**distinction**
19:5

**District**
214:1

**dive**
45:24

**division**
13:25 16:5,12

**dock**
75:20,25

**docking**
26:15

**document**
10:3 77:17
123:13 146:1,
7,11 148:5
149:12 158:3
159:17,18
161:4 163:2

176:15 177:16

**documentation**
163:23

**documented**
142:15,20

**documents**
46:4 95:4
144:7

**download**
159:23 197:9

**downs**
152:15,18

**dozen**
179:4

**draft**
102:13 103:2
104:6 108:4
112:7

**drafted**
111:23

**drifting**
51:9

**drill**
147:24,25

**drills**
147:21

**Drinking**
40:15

**drop**
150:7 152:15,
18,20 153:25

**dropping**
150:11

**drug**
106:25
107:13,23
195:17,20,24

**drugs**
107:6

**dry**
26:14

**due**
169:13

**duly**
5:19

**duration**
55:12

**duties**
16:23 142:2
167:22 198:6

**duty**
203:11

---

**E**

**E-C-D-I-S**
11:7

**e-mail**
19:3,6 67:12
68:22 69:3,19
77:10 106:2

**e-mailed**
20:20 68:18,
20 98:21

**e-mails**
69:11,16

**earlier**
101:5 145:21
151:24 197:6

**east**
87:4

**Eastern**
213:25

**ECDIS**
10:13,16,17

**LEONARD BALDASSARE**

April 29, 2025

11:4

edit
121:23 122:12
123:6

effected
128:12

effort
76:10

Electric
133:18 135:8

electronic
100:8 159:10,
18 160:5
162:1 197:15

electronically
159:22 197:9

Electronics
133:13

elide
47:22

elided
155:4 181:10
182:1,19

eliding
48:1 155:17

Elizabeth
23:11 174:24
177:4

emergency
193:19

employed
25:6,7 34:20
36:14,24 57:7
59:16 69:4
134:2,9
138:14 139:2
140:10 143:13
166:5,12

182:18 196:10
200:16 204:16

employee
29:24

employees
164:13

employer
6:14 165:12

employers
162:5

employment
140:17

end
12:13 27:24
54:5 85:10
122:22 125:13
163:9 168:9,
20,22 170:9
178:14 198:8
205:4 216:15
223:15

endeavor
206:21

ended
9:21

endorsement
10:11,25

engine
75:3

engineer
25:4 28:11,16
29:6 34:16
39:7,8 43:22
72:21 75:2
79:1 92:21
96:23 129:8,
10,11 151:5,
16,18

engineering
28:9 82:3
128:15,17
136:19

engineers
37:4,5

enhance
215:18

enhanced
215:24

enjoying
32:5

ensure
174:3

enter
38:17

entered
119:22 120:6

entering
183:20,22
184:8 185:4,5

entire
12:6 159:23

entity
164:2

Environmental
116:22

equipment
11:3 17:2

equipped
86:3

Erin
23:10

essentially
154:2 167:20

established
215:11

evaluate
44:2

evaluated
38:9 45:1

evaluating
36:22 37:3,5
39:7

evaluation
38:23 43:20,
22 45:5

event
118:7 137:20

evidence
107:21

evolution
28:1

exact
27:25 117:22
137:1 190:8

exam
10:5

EXAMINATION
6:5 209:20
218:9

examined
5:20

exclusively
147:14

excuse
14:21 29:6
34:19 99:22
104:2 157:11
165:21

exercise
8:24

exhibit
82:7,12 84:9,
10 85:22 87:1,

10,15 92:19,
24 93:1,15
94:1 96:1,4
99:16 101:22
103:9 104:22
109:25 110:6
111:5 118:4,
20,21,23
119:12 123:7,
8,16 124:4
125:8 126:22
127:13 133:13
134:12 135:8
137:14,15
139:8,9
144:18
145:12,13
147:7 149:8
158:13,16
162:17,18
163:10 166:20
191:14 199:11
214:11,13,20
216:20 218:11
220:12

exhibits
91:15,22,25
94:23 95:5
96:21 98:17
144:7,25

existence
192:6

expect
42:25 53:23
81:5 89:15
90:2 170:25

expectation
173:18

expectations
173:10

expected

**LEONARD BALDASSARE**

**April 29, 2025**

171:19 199:14 215:7

**expedited**
209:13,15

**experience**
6:25 126:7 200:2 210:18 215:20

**experiencing**
136:16

**expert**
51:16 55:15 89:22 131:19 171:4,22 173:5 179:20 180:14,16 183:17 184:2 204:22 205:20 206:4

**expire**
174:20

**explain**
51:4,18

**explained**
44:16

**explaining**
73:14

**explanation**
98:10

**extent**
102:21 129:13 171:4

**external**
152:19

**extra**
41:21 133:15 200:6

**extrapolate**

222:21

**eye**
203:23

**eyes**
203:23

---

**F**

---

**fact**
51:15 104:21 121:23 182:6

**factors**
179:5

**fair**
13:24

**fairly**
56:11

**familiar**
10:14 156:14 157:17 163:17 175:1

**fashion**
85:13 169:22

**fax**
106:3

**February**
10:6

**feel**
23:22 137:24 138:1 172:6

**feels**
129:11

**feet**
170:14

**felt**
22:15 61:2 132:17

**fender**
86:9 128:8 130:22 132:20 185:21 189:5, 9 190:7 220:25 221:10,14

**fendering**
48:6 50:20 68:4 72:11,12 82:24 88:21 101:14,15 104:14 189:7 217:17

**fenders**
52:7 188:15 189:1,17

**fewer**
14:1

**figure**
113:23 115:22 190:4

**figured**
34:3,11 207:10

**file**
111:1 142:16 154:22 192:19

**filed**
6:14 109:6 152:7,14

**filing**
80:7

**fill**
41:22 68:6 81:3 110:12 124:9 129:17 148:7 157:1, 12,16 193:8

**filled**
38:14 40:19, 23 44:18 45:4 80:15,25 81:6 99:19 101:4 102:14 109:1 110:7 111:11 112:14 124:15 126:8 129:22 137:22 138:21,25 139:20 144:20,21 149:25 150:3, 8,16,24 152:10 156:18 195:8

**filling**
141:13 150:6, 12 194:13

**fills**
124:24 157:10

**final**
122:8,9 209:16

**find**
23:20 110:2, 22 208:2 216:13 217:13

**fine**
35:17 51:24 121:10 126:25

**finish**
8:17 9:1 20:3, 4,5 35:13 171:9 211:18

**fire**
22:13,19

**fired**
22:16,20,22

**fishing**
215:2

**five-day**
106:21

**five-minute**
201:25

**fixed**
47:22 54:1 136:11 205:17 207:8,18

**fleet**
16:25

**flow**
191:15 192:17 193:8,17 194:12,25 216:24 217:22

**focus**
91:21 187:11

**focused**
60:14 198:5

**fog**
168:4

**folder**
69:17

**folders**
69:16

**folks**
116:3 219:3

**follow**
103:24 104:4 187:12 192:9 209:1 218:13

**font**
169:10

**foot**
16:18

LEONARD BALDASSARE

April 29, 2025

forensic
187:24

forget
220:10

form
10:23 21:25
34:1 38:13,18
40:19,23 43:9,
12 44:18
54:15 70:8,22
71:15 74:4
80:11 81:6
89:18 102:13
105:24 106:3,
12,19,25
108:11,22
109:14,16
110:4,6 111:5,
12,14,15
112:5 113:5
123:19,24
124:6,8
129:17,21,25
130:25 131:10
132:14 138:20
139:12 142:22
143:4 145:1
153:9 154:13,
23 155:12
156:18 158:20
167:9 176:10
179:16,20
180:1 190:2,
18 192:2,11,
25 193:2
194:14 195:23
199:20 201:12
205:20 206:16
212:1,7,16
216:1 219:7
221:2,17
222:3,13,20

form's
43:5

formally
45:1,2

format
97:1

forms
43:24 45:4
142:23 153:11
174:13

forward
75:4 85:10
215:17

forwarded
56:17

foundation
103:1 156:22

fourth
167:1

frequently
39:3

front
31:6 83:15
170:9

full
10:21 40:8,9,
10 200:4
215:12

future
83:19

**G**

gallery
78:22

galley
78:15,25 79:1
203:14

GAR
156:6,9
157:18,24

gave
59:23 63:14
67:20 77:2,3

gear
103:20

general
18:22 32:8,9
69:22 177:7

generally
107:3 114:24
129:21 210:13
212:13

generic
165:25

get all
35:10

give
8:19 15:16
16:14 35:19
77:5 91:14
117:22 131:24
149:8 171:25
172:3,7
211:17

glad
216:19

GMT
133:12,20
134:3,12
135:20

good
6:7,8 8:25
23:23 54:24
83:17 93:8
113:16 148:12
176:2 202:4

governs
184:7

GPS
136:12

grade
30:16

graduate
9:12

graduated
10:4

grainy
82:11,17
84:19

great
115:1 149:11

green
156:10 192:18

grounding
102:9 187:23
195:1 217:5

group
58:4 187:19

groups
49:22

Guard
46:24 47:1,8
61:1,8,15,18
63:21 64:2,21,
25 65:6,7,8
66:7,9,12,15
67:18 68:6,10,
11,15,18
69:25 70:16
71:7 74:10,15
76:15 79:9
80:20 99:19
100:21 101:3,
7,19 105:3,17
106:4,20

108:23 109:11
110:5 111:2
113:2 185:25
186:4,11,14,
18,22 187:19
188:9 194:13
195:9 196:3

Guard's
107:9

guess
27:10 58:22
77:14,21
86:20 149:22
193:5 218:8
221:19

guidance
180:5 197:24
198:11

guy
18:20 165:5,6
202:7

guys
45:24 115:22
120:22
165:17,19
208:19 213:2

**H**

H&I
16:2 23:20
24:15

half
7:6,25 11:9
179:4

halfway
176:14

hand
77:8 83:11
88:19 103:24

LEONARD BALDASSARE

April 29, 2025

108:13,14
143:20

**hand-steering**
90:5

**handed**
98:24

**handheld**
170:21

**handle**
28:8

**handled**
76:14 113:11
128:16

**handles**
28:12

**hands**
37:4 72:23
141:18 151:6

**handwriting**
93:19 127:23

**handwritten**
76:25 77:1,6
98:13,16 99:7

**hanging**
86:4

**happened**
29:24 31:12
35:6 41:23
42:18 60:18
65:25 72:4
73:14 101:10
104:21 138:1
189:14,24
190:4

**happy**
121:8

**harbor**
39:25 66:8

99:11 137:6
149:17 196:19

**hard**
127:17 159:25
160:4,7
197:14

**harder**
142:12

**hazardous**
169:5

**hazards**
215:15

**head**
76:24 170:5,8
198:8 205:4

**heading**
187:7 195:17

**headquartered**
164:4

**headquarters**
164:10

**health**
116:22
117:15,16
160:23,24
161:1

**hear**
92:4,7 140:5
146:4,8

**heard**
27:2 158:10

**hearing**
29:19 46:23

**held**
31:10

**Helen**
23:10

**helm**
38:20 43:7,16
45:4 81:1,7,
10,13,21
87:19 113:21
118:7,10
119:16 120:6
123:25 126:5
129:18,22
131:7 138:19,
20 142:22
144:19 149:14
153:3 154:16,
19,20 159:11,
12,15,17,22
163:22 197:7

**helmsmen**
215:6

**Hey**
71:2,7 120:16
142:8

**highlighted**
169:21 175:9

**hired**
12:23 13:1,9
17:11 23:4
36:18 116:25
117:6,8,11
196:18

**hires**
114:19

**hiring**
17:6 36:9

**hit**
47:22 137:6
140:7 195:6,7
217:10,13

**HNL**
165:12

**hold**
10:9 22:25
75:4 143:19
174:16 181:15
206:20 214:15

**home**
15:12 25:14
48:23

**honestly**
47:7 58:15

**horse**
16:17

**hour**
56:11 57:22
58:1 191:4

**hourly**
14:16 26:1

**hours**
39:25 40:1
107:18 119:23
122:11 124:16
125:1

**house**
78:14 170:17

**HR**
13:2,7 17:8,9
142:23,24
143:2,14

**HSQE**
116:20,21

---

**I**

---

**idea**
16:14 28:20
34:13 147:16

**identical**
118:20

**identification**
82:13 84:11
87:16 96:5
137:16 158:17

**identified**
177:7,12

**image**
82:16 83:17

**immediately**
187:14 188:8

**impair**
46:12

**impairment**
215:3

**impediment**
215:4

**important**
169:21

**Inactive**
151:19

**inalterable**
123:1

**inbox**
69:22

**incident**
18:17 29:23
31:11 33:23
39:14 41:23
53:25 61:1
69:18 81:1,6
88:16 107:4,
20 113:25
114:12
118:11,14,23
119:17,23
120:7 130:17
131:13 137:20
138:21,25
139:7 187:1

**LEONARD BALDASSARE**

April 29, 2025

191:19 193:9,
12,13,20
195:20 210:25
211:23 219:20

**incidents**
81:10 107:25
144:14,17
145:2

**inclination**
54:8

**include**
59:4 104:7
115:14,19
155:17 161:1
210:4 219:1

**included**
219:3

**index**
160:18

**indiscernible**
116:19

**individual**
141:6

**individuals**
195:21

**industry**
205:3,15

**inform**
31:25 147:3
221:9

**information**
22:8 86:13
102:19 104:9
112:12

**informed**
73:12 130:16

**Ingrid**
5:10

**initial**
70:14 78:5

**initially**
79:8

**initiated**
143:14

**inland**
13:25

**input**
139:13

**inside**
48:6 72:11
82:24 101:14
188:15

**inspect**
74:25 75:9,11
76:11

**inspected**
23:14 115:7
129:6

**inspection**
29:2 76:13
187:19

**inspections**
141:13

**installed**
200:19,23
201:16

**instance**
18:12 41:19
78:9

**instances**
128:15

**instruct**
172:12

**instructed**
63:21 64:18,
20 68:6 70:10

**initial**
126:3 135:16
136:19

**instructing**
173:3 180:22

**instruction**
174:9

**instructions**
105:23 196:22
210:11

**intend**
51:13

**intended**
52:14 180:5

**intent**
215:15

**intentionally**
218:25

**Intercostal**
177:2

**internal**
165:18

**internally**
79:23

**interpretation**
108:2 184:3

**interrupt**
9:3 60:9

**intersection**
183:21,23
184:9 185:5

**intervene**
35:9

**interview**
78:6,11 128:5

**interviewed**
73:19 74:21
78:13,16

86:10 99:9
113:2 130:21

**interviews**
17:9 78:11
79:5,11 89:2
113:9 202:20

**investigate**
71:25

**investigated**
71:11

**investigating**
71:18 191:22

**investigation**
80:3,16 94:25
95:14 96:8
97:8 100:22
104:19 120:3
127:2 152:25
178:9 186:3
202:18 203:19
204:12 207:3
208:3 210:23

**investigations**
66:1,3

**invite**
12:12

**invoice**
134:19

**invoices**
133:10

**involve**
45:4 194:22

**involved**
15:19 36:9
38:11 52:13
71:18 89:5
102:2 130:11
134:24 141:20
187:20 195:22

**involves**
53:25 194:20

**involving**
33:23 81:10
119:23 128:19
144:11 193:13

**iphone**
54:21,25 55:3,
4,6,16,20

**Island**
15:8,15 66:24
76:3 164:25

**issue**
112:16 113:25
114:10 129:13

**issued**
19:10

**issues**
38:10 128:25

**item**
194:24

**items**
145:1

---

**J**

**Jacob**
34:17

**Jacques**
92:17

**James**
29:16,20
88:16 103:22
147:14 151:17
172:14

**January**
11:19 14:24
26:20 27:21,
25 33:18

LEONARD BALDASSARE

April 29, 2025

34:21 59:24 136:24,25 137:3,22

**Jason**
34:18,19,20 92:21 116:19 151:18

**Jersey**
30:5 76:8

**Jesus**
158:9

**Jim**
6:9 20:1 31:1 45:15 60:9 93:20 105:10 120:8 173:1 201:20

**job**
12:16 24:8 39:19,24 75:17 76:4

**jobs**
12:18 37:22

**journal**
125:19

**judge**
120:17 208:17

**June**
6:17 20:7 31:12 32:19 48:2,20 59:23 60:15 62:3,24 63:5,22 64:3, 21 65:3 66:12, 23 68:11 71:23,24,25 74:11 83:4 87:14,22 88:7 100:18 106:13 107:20

108:18,22 110:12,18,23 112:20,22 113:3 115:11 119:12,13,21 123:8 124:11, 15 127:14 132:9 149:20 182:1,21 190:10 217:8, 13,25 220:20

———————

**K**

**Kaywood**
5:13

**keeping**
203:23 215:4

**keywords**
160:23

**kidding**
148:15

**killing**
160:10

**kind**
8:24 27:22 30:15 35:11 37:8 38:1 39:10 41:2,11 72:18 96:2 97:11 113:22 123:19 132:25 154:23 156:19 161:3 163:24 165:25 169:9 192:18 193:7 200:7 201:5 204:8 205:10

**knew**
29:23 188:13, 14

**knowing**
135:3

**knowledge**
17:15,19 23:24 25:16 30:9 60:20 63:20 64:20, 23 66:6,10 73:14 89:23 96:12,13 136:5 138:13 139:3 140:13, 14 143:6,8,10 148:9,10 160:3 166:2, 13 167:23 174:15 182:3, 4,11 185:6 186:2,6 193:11 196:15 197:3 198:2,9, 16,18,19 201:3,4 204:25 206:9, 10,17 210:16, 17 217:22 218:1,3

**Kuster**
138:5

———————

**L**

**labeled**
133:13

**lack**
168:5

**laid**
107:9 175:2

**landed**
48:6 50:20

72:10 101:14 104:14 188:14

**language**
118:19 173:11 218:23 219:10

**laptop**
197:16

**Laraway**
18:4,17 79:20

**larger**
169:10

**Larin**
5:12,13

**late**
32:21

**law**
185:2

**lawsuit**
6:13

**lawyer**
120:15

**lazy**
142:1

**lbaldassare@ carvercompani es.com**
69:8

**lead**
97:23

**learn**
33:21 104:20 140:5 182:18 190:5 199:25 202:21

**learned**
33:3 47:25 53:6 104:24 105:2 112:24

158:13 195:4 200:7 203:19 220:18

**leave**
14:23 15:3 25:5 27:20 29:5,21 31:14, 22,25 32:6 35:5 48:12 63:10 71:21 78:8 79:19 96:11 100:24 101:1 104:20 112:17 113:7 122:10 150:13 186:17,23

**Leaving**
108:1

**left**
12:10 21:15 23:5,22 24:1,6 25:8,10,12 26:12,19 27:12,18 33:17 34:21, 23 56:24 59:10,17 69:10 97:19 113:7 117:25 138:17 200:19

**legal**
182:14

**Lenny**
157:14

**Leonard**
5:4,24 81:17 223:16

**letter**
76:24

**letterhead**

**LEONARD BALDASSARE**

April 29, 2025

96:3 97:4,12

**liability**
6:15

**liaison**
17:3

**liar**
190:20

**license**
10:5 146:12
174:17

**licensed**
10:7

**lied**
190:15

**Lieutenant**
65:16 67:25
74:19

**life**
193:20

**Lifeboatman**
10:13

**light**
75:21 192:18

**likewise**
71:6 125:11

**limit**
6:15

**limitation**
6:13

**limits**
107:10

**Lindenhurst**
6:4

**Line's**
11:12

**Lines**
6:16

**lining**
51:6

**list**
216:11,12

**listen**
142:1,8

**listening**
172:22 173:1

**literally**
36:8 189:13

**live**
15:8

**lived**
15:13

**lives**
153:3

**load**
212:10

**local**
40:2

**located**
63:14 197:16

**location**
30:5 106:6

**log**
55:11 87:22
88:10 106:9
119:11 122:7
125:17 126:8,
19 127:3,7,10
150:7 197:19

**logbook**
125:8

**login**
81:16

**logistics**
7:3

**logo**
144:19 163:13

**logs**
36:25 87:13
114:6 121:21
141:13

**long**
7:4,23 8:7
12:3 15:8,25
23:19 26:8,22,
25 27:12
63:17 67:21
117:4

**longer**
25:2,3

**looked**
153:4

**lookout**
167:16,17
168:2 171:1,2,
12 174:14
179:7,18
180:8 183:4,5,
11,19 184:7,
16 185:3
198:5,7
202:22 204:9,
18 205:4
210:9,12,13
214:8 215:6,
24 216:6
218:14,16

**lookouts**
168:1 174:8
178:12,24
210:5 215:21

**loose**
200:4

**losing**
158:9

**loss**
107:21,22

**lost**
216:11

**lot**
31:7 41:20
150:9 160:10
214:3

**louder**
183:2

**Louisiana**
164:5

**lower**
211:8

**lunch**
148:12

**lying**
222:7,16

**M**

**machine**
11:4

**Mackenzie**
25:1,10,11
26:9 30:3
41:1,7,25 48:1
53:17 54:3
75:19 77:16
79:25 87:13
94:8 103:18
113:3 123:22
126:20 128:21
135:4 137:5,
21 138:24
140:7 143:21
144:11 149:18
171:23 173:6
181:18,24
197:5,13

201:17 207:16

**made**
30:19 65:12,
22 75:14
104:1,4
166:11 178:5
185:20 207:11
220:24 222:9

**Mae**
23:11

**main**
15:19 211:9

**major**
9:10 142:18

**make**
17:1,2 20:16
30:17 37:9
38:1 46:8
67:3,5,10 75:4
76:10 122:12,
16 129:9
157:2 163:24
165:9 169:12
173:20,24
174:2 206:1
209:8,11
222:5

**makes**
210:8

**making**
67:13 89:14
128:11 167:3,
5 206:14

**man**
214:21,23
218:20 219:11

**manage**
163:22,23

**management**

LEONARD BALDASSARE

April 29, 2025

17:4 30:15,20, 22 158:15 159:6 160:12 161:13 162:4, 9 163:5 165:23 166:1, 4,11 169:1 173:8 176:9, 25 178:8,24 183:3 186:25 192:24 193:23 194:8 196:9 198:15 199:6 219:1,4

**manager**
16:6 17:16 18:23 114:20 116:3,14

**mandate**
193:7

**mandates**
185:3

**mandatory**
106:25 175:17,18,22, 25

**maneuvering**
88:21

**manual**
196:21 200:15,19 201:5,15

**manually**
206:25

**manuals**
200:10,12

**March**
134:13 135:20 145:13,24 146:6

**marine**
5:5,6 7:17 9:11 10:3 16:4,7,10 18:20 96:3 102:2 106:4 107:4 114:17 115:9 129:20 133:12,18 135:8 146:9 159:7 160:2 176:2 185:15 186:1 187:7, 18,21 195:19

**Mariners**
146:1,7,10

**Maritime**
9:7,8

**marked**
82:7,13 84:9, 11 87:16 96:5 137:16 139:8 144:6 158:17 175:5

**Marron**
13:2

**master**
7:20 8:11 38:4 40:23 41:10, 14 42:4 43:18 53:23 54:5,11 88:13 124:18 139:16,21 141:1 151:5, 10 167:4,12 169:14 171:5 174:11 180:6 185:13,24 187:16

**master's**
123:14,19

124:8 159:3 196:21

**master/mate**
167:3

**masters**
38:25 41:6,25 167:24 199:13

**mate**
7:22 8:14,15 10:10 40:23 41:23 43:20 44:13 88:13, 16 138:10 139:17,22 141:3 147:1 151:5,16,17 167:5 169:15 174:11 180:6 200:4,5 210:24 211:21

**mates**
37:3 38:7,8 39:1 141:8 167:13,24 199:13

**matter**
5:5

**Mccay**
133:12,20 134:3,12,20 135:20

**Mcgrath**
25:4 34:17,20 72:21 75:3 92:22 151:18

**Mckenzie**
23:10 155:3 200:16 211:16

**meaning**
51:3 81:22

**means**
18:24 47:21 169:17 170:11 192:14

**meant**
183:21

**Media**
5:3 91:8 149:5 202:15

**medications**
46:12

**meet**
18:7

**meeting**
45:10,15 46:25 47:3 78:5 105:14

**member**
74:2 77:22 78:4 86:8 170:4

**members**
24:25 72:15 73:20 74:10, 14,22 77:25 78:21 79:24 113:2 115:16, 20 140:23 151:3

**memorized**
162:25

**memory**
58:9 68:17 80:18 110:3 135:2

**mention**
89:4

**mentioned**
44:5 80:7

**merchant**
10:3 146:1,7, 9,10

**message**
48:12 56:13 57:2,8 59:5

**messages**
22:4 59:11

**microphone**
92:3

**mid**
115:11 136:25 137:3

**middle**
48:20 105:24 168:15 169:8 175:8

**midnight**
149:23

**miles**
76:7

**Miller**
25:3,5 29:12 41:9 42:3 48:3,10,25 50:8,17,25 52:12,22,25 53:2 55:13 60:18 61:24 62:7,25 63:3,9 72:19 77:3 78:13,17 86:7 89:2 92:10,12 95:8,20 96:17 119:22 124:15 128:1 132:8, 17 144:1 151:11 185:19 186:4,10 189:12 190:15

191:4 217:9,
24 220:20
221:21

**Miller's**
51:22

**mind**
17:25 19:6
45:13,25

**mine**
118:16,17
158:5,6

**minute**
30:25 211:18

**minutes**
67:23 90:15,
17 148:17
214:17

**mischaracterize**
184:22

**Mischaracterizes**
184:20

**misses**
130:7 131:20
145:17,23

**misstated**
131:3

**mistake**
5:12 122:12

**misunderstood**
27:2

**mm-hmm**
12:11 30:6
39:21 44:19
57:23 71:13
88:11 94:14
95:9 102:23

111:6 145:3
146:13 158:18
159:4 166:25

**MMC**
10:5

**model**
156:6 157:18,
24

**modified**
152:7

**modules**
148:4

**moment**
190:3

**Monday**
60:22 65:2,3
66:23 74:16

**money**
41:21

**monitor**
5:9

**month**
117:7

**monthly**
114:8

**months**
15:24 26:11,
14 27:3,5
42:19 59:15,
16 200:6

**Moore**
11:20 12:1
14:2 17:22
18:20,25 24:1
29:9,18 30:22
37:16 50:11
56:1,9 57:11
59:13 60:2,24
61:21 63:2

66:13 67:9
68:24 70:15
71:2,10 79:24
80:19 100:3
101:9,18
102:14 103:3
104:7 106:13
110:15,24
112:25 132:24
133:1,3,6
145:7,25
146:6,20
158:14 186:14
194:3

**morning**
6:7,8 37:21
45:19 46:2
66:14 67:8
105:9

**Morrisey**
42:11

**Morrissey**
25:4 29:5,11,
16,17,20 32:1,
24 33:19,22
36:10 41:16,
17 44:9 48:5
50:18 51:1
52:23 62:21
72:9,19,25
78:14,17
88:16 92:17
93:17 94:19
97:11 103:22
119:22 128:1
137:4 140:6,
11 143:7,24
147:14 151:17
203:1,3 204:4
210:24

**Moss**
220:2,6,8

**move**
15:17,22
52:15

**moving**
52:13 92:14

**MTSB**
46:25

**multiple**
40:3

**mute**
220:1,10,11

**mutual**
15:4

---

**N**

**nail**
79:3

**named**
72:25 73:1

**names**
94:16 151:8

**NANAVATI**
223:18

**narrow**
107:9 196:14
219:15

**National**
113:1

**nature**
52:20 141:24
142:13 153:23

**nav**
11:3

**Naval**
194:18

**navigation**

10:23,24
129:3 169:5
179:11,12
180:12 196:23

**navigational**
175:3 215:15

**nearest**
106:5,7
185:24 187:18

**necessarily**
166:18

**Necessity**
170:4

**needed**
73:13,15
141:8 167:12,
14 220:17

**Nick**
18:3,10,17
79:19

**night**
46:9 215:4

**noise**
92:7

**non-coi**
16:18

**Norfolk**
6:10 65:10,17
66:9 69:13
94:6 103:21
177:3,12,23
182:20 209:4

**normal**
18:24 41:25

**north**
87:5

**northend**
88:22 102:24

**LEONARD BALDASSARE**

April 29, 2025

127:19

**Notary**
5:20

**note**
119:22

**noted**
223:21

**notepad**
99:1

**notes**
177:7

**Notice**
187:7

**notification**
208:5

**notified**
64:2 70:12

**notify**
63:21 64:25
70:16 185:14,
24 187:17

**now's**
148:11

**number**
5:3,6 13:24
58:17 66:1
85:21 87:24
91:8 92:10
95:7 105:25
149:5 152:19
156:4 163:11
168:15
176:12,17
178:12 194:25
202:15 214:14

**numbered**
96:1 111:8
158:22 166:15

**numbering**
162:16 166:18

**numbers**
87:23 124:12

**Nunamann**
28:17,18

---

**O**

**oath**
47:8

**object**
47:22 54:1
188:18 199:20
205:17 207:8,
18 211:25
212:6,15
215:25

**objection**
21:24 33:25
54:14 70:7,21
71:14 74:3
80:10 83:23
89:17 109:15
112:4 113:4
130:24 131:9
132:13 155:11
156:21 158:19
167:8 171:3,
20,21 172:10
176:5 179:15,
19,25 180:13
183:14 184:1,
10,18 188:7,
10 190:1,17
192:1,10
193:1 195:10
201:11
203:13,15,25
204:21 205:19
206:3,15
212:19,22

219:6 221:1,
16 222:2,12,
19

**obligated**
185:14

**obligation**
189:23

**observe**
60:19

**observer**
10:13

**obstructed**
70:9

**occasion**
215:10

**occasions**
47:13 141:7
143:12

**occur**
70:11 194:21

**occurred**
25:1 107:25
119:17

**occurs**
194:17

**office**
15:14,17
45:20 66:9,24
76:3 185:15
187:18,19,20
198:22

**officer**
103:22 104:1
116:24
117:15,16
199:14 203:7
215:5

**offset**

83:22 102:25

**offshore**
13:25

**On-the-job**
200:8

**One's**
72:25

**ongoing**
197:24 198:4

**online**
12:20

**OOW**
104:2

**open**
122:11 139:12

**opening**
51:6 52:8

**operate**
11:11,14

**operating**
38:2 44:12
198:12 200:7

**operation**
15:20 103:16
175:13

**operational**
33:4 141:16
166:23 208:10

**operations**
9:11 16:25
159:7 214:22,
24 218:20
219:12

**operator**
187:17

**opinion**
131:17,25

132:5,6 171:7,
24 172:1,3,7,9
173:5 174:2
180:20 216:4

**opportunities**
44:2

**opportunity**
44:24

**opposed**
165:25

**opposite**
42:9

**option**
15:7,21

**orange**
185:9

**orange-ish**
169:10

**order**
67:20 178:15

**ordered**
208:22

**ordinarily**
42:6

**ordinary**
134:24

**organization**
23:1

**organized**
91:12

**original**
77:5 98:19
101:8

**originally**
117:12 130:19

**Otter**
23:10

**LEONARD BALDASSARE**

April 29, 2025

**outbound**
94:6 103:20

**outbox**
69:22

**outlet**
14:10 219:4

**Outlook**
69:15

**outset**
8:24

**overhead**
173:24

**overlap**
12:5

**oversaw**
128:13

**owned**
24:19

**owner**
187:16

---

**P**

---

**P-B-L-R-R**
88:22 127:19

**p.m.**
91:10 148:25
149:6 202:11,
16 223:17,21

**pages**
134:13
147:11,19
163:10 166:15
176:12,14
177:8

**paid**
33:15

**pair**
203:23

**Palumbo**
65:16 67:25
74:19

**paper**
52:5 99:4
154:12

**part**
16:10 96:8
109:20 111:4
113:18 114:2
127:1 178:9
179:2 183:18
196:16 199:9
207:2

**participating**
147:23,24

**participation**
147:21

**parties**
76:14

**party**
165:16

**pass**
82:6 84:8
87:10 99:16
118:23 123:16
126:22 137:13
144:6 147:6
149:8 158:12

**past**
146:23 211:22

**paternity**
31:13,22,24
32:6 71:21
78:8 79:19
96:11 100:23
101:1 104:19

112:17 113:7

**pause**
8:20 35:19

**pay**
14:12 30:15

**payable**
134:22 135:15

**paycheck**
25:17

**PDF**
154:22,24
159:16,24
197:10

**people**
17:11 24:24
36:23 41:20
115:8,14,23
116:1 196:16

**percent**
79:16 154:25
161:10

**perform**
167:22

**period**
28:4 55:10

**person**
84:2 114:19
143:3,19
187:17
193:18,23
204:8,18

**personal**
21:22 55:19

**personally**
65:23 80:4
81:3 129:19

**personnel**
17:6 45:5

116:12 129:24
131:17 142:16
196:12 200:6
215:17

**perspective**
18:19 190:15

**pertained**
69:12

**pertaining**
137:20

**phone**
19:2,8,10,16,
23 20:7,10
21:2,6,12,14,
17,22,23 22:3,
9 45:22 49:6
50:9 53:7,10,
11,13,16,17
54:20,22,23
55:1,6,9,15,19
56:14,17,22
57:4 58:14,19
59:9,18,21
60:10,11
61:25 63:7,8
66:1,25 67:2,
3,10,13 72:6
82:20 84:20
87:24 221:22

**phones**
21:22

**photo**
62:15 83:9
85:18 86:25
87:7 88:22

**photocopied**
98:21

**photograph**
49:8,11,16
82:9 83:1,21

190:22 191:2

**photos**
50:3,22,23
56:6,9,16,22
57:3,8,16,22,
25 58:10 59:8
60:3,7,17,24
83:4 84:13,15
85:9,15
221:25 222:17

**physical**
104:16

**physically**
66:22

**pick**
48:11 50:12
53:21

**picked**
39:17 48:13
122:14

**picking**
150:12

**picture**
85:7

**pictures**
84:25 85:3

**pier**
83:22 137:6
140:7

**Pike**
23:10

**pile**
90:7

**piloting**
137:5 140:6

**pins**
153:25

**LEONARD BALDASSARE**

April 29, 2025

place
15:12 78:12
111:12 161:13
165:3 174:12

plan
149:13 150:7,
17 152:6,13
153:9,10,16,
19 154:1,4,11,
16,19,20,22
155:2,16,19
175:15 176:25

plan-outside
149:17

planned
28:2

planning
153:8

pleasure
215:2

point
43:1 82:25
97:7 119:21
123:3 145:7
153:8,10,14,
18 154:5,20,
21 155:2,23
189:13 208:1,
4 213:19

points
153:22

policies
37:9

policy
205:1

popped
169:21

port
7:8,10 8:3

12:15 13:11,
17 14:7 15:6,
10,20 16:22
17:20 19:1,13
22:12,18,24
28:6,11,15,16
29:6,7 36:21
37:4 39:6
85:19 104:1
106:7 113:19
114:17 115:10
128:11,21
129:8 132:18
135:13 137:11
143:13 160:13
173:23
183:20,22
184:8 185:4
196:11 197:23
221:11

portal
12:21 106:9

Porter
73:1 93:12

Portland
182:20

portside
212:18

Portsmouth
6:10 69:13
177:13,24

position
13:9,13 14:16
22:25 23:20
25:24,25 26:1
33:4 43:25
143:18 193:19
196:17,18

positions
17:12

possession
21:3,6,12

possessions
194:19

possibility
61:14

Possibly
77:11,15

post
106:16 171:12
174:8

post-incident
107:15

posted
174:14 183:12
198:7

posting
179:18 180:7
184:7,15
185:3 205:4

potentially
169:6

power
16:17

practical
185:15,25

practice
176:3 215:8

practices
205:3,7,15

prayer
46:2

preexisting
24:15

premise
180:15

prepare

45:7,14 46:1
73:22 76:18

prepared
80:3 99:8
193:12

pressure
169:13

pretty
13:12 107:9
111:25 142:4

previous
162:5

previously
7:14 45:20

pride
169:13

print
82:8 153:17

printed
87:18 160:1,8

prior
8:4 43:1
105:14

Priorities
185:12

privy
76:12

problem
129:2 223:9

procedure
183:19 198:12

procedures
37:10 181:3
183:4

proceed
60:21 62:14
88:23

proceeding
6:13 223:20

process
36:22 38:23
44:17 82:10
130:8 143:9,
15 157:20
166:8 167:25

produce
20:7 21:2
208:20

produced
87:11 118:5
123:17 137:18
144:8 147:10
162:12

producing
20:13

product
165:7

program
9:24

project
16:5

proper
199:2 215:5

property
102:22 111:18

propulsion
107:22

provide
22:8 24:6
46:14 73:6
84:24 126:4
155:6 196:20
207:16

provided
47:10 73:10
82:9 86:13

**LEONARD BALDASSARE**

April 29, 2025

112:13 133:11
149:12 199:1
201:2 214:25

**provider**
165:17

**providing**
204:8

**proximity**
179:11,22
215:14

**prudent**
141:12 215:11

**Public**
5:20

**pull**
114:1 162:21

**purposes**
114:11

**pursuant**
20:14

**push**
103:20

**pushing**
94:8 103:19
181:9,25
182:19 195:5

**put**
27:22 47:8
51:25 69:16
84:4,5 90:6
118:12 126:4
144:3 151:25
152:1 153:19
220:1

**puts**
125:22

**putting**
51:19 171:12

---

**Q**

**qualify**
172:8 179:22

**question**
9:1 20:3,4
64:2,4,17
78:20 80:11
95:3 100:25
107:20 115:1
119:6,7 120:9,
16 121:7
134:17 141:24
154:8 157:3
171:11
172:17,20
180:10,23
183:16 184:24
204:24 207:14
219:25 220:9,
16 221:3

**questioned**
215:22

**questioning**
18:13 214:1

**questions**
8:17 35:13
46:13 47:11
83:19 115:3
151:15 156:5
180:15 208:16
209:10,18
210:22 216:4
218:5 223:1

**quick**
56:11

**quit**
35:3

**quiz**
148:6,7

---

**quoted**
218:22

---

**R**

---

**radar**
10:12 207:4,6,
7 208:10

**radars**
207:15 208:5

**radio**
8:25 170:5,21

**railroad**
6:11 62:18
71:3 102:25
177:13,24

**rain**
168:5

**raise**
14:12

**raked**
85:10

**ran**
18:20 136:10

**ranges**
155:20

**rate**
26:2,3

**re-depose**
209:9

**reach**
129:7 133:3
143:1,14

**reached**
66:13 67:16

**read**
64:6 88:24
100:15 103:18

---

127:19 187:25
199:18 213:22
214:20 216:9
218:19 219:11

**ready**
90:24

**realize**
22:19 82:10

**realizing**
150:14

**realtime**
213:23

**reason**
15:16 33:22
34:4,7,12
65:18 70:19
89:24 126:5
169:20 175:24
221:14,24

**reasoning**
221:21

**reasons**
67:17

**recall**
26:5 43:6 49:3
50:2 54:19
56:10 57:5
58:4,5 59:6,7
63:16 67:7
69:11 74:5
77:7,8 99:6
100:19 102:16
103:6 104:10
111:14,16
190:8 194:6

**receive**
49:16,20,21
74:1 77:24
79:12 96:7

---

**received**
73:17 76:22
77:20 84:15
92:11,16,21
93:11,17
94:19,24
145:6 202:19
217:9

**receiving**
25:20

**recent**
98:8

**recently**
174:22

**recess**
91:5 149:2
202:12

**recites**
187:2

**recognize**
127:22

**recollection**
57:24 71:17
94:18 98:18
108:21

**recommend**
22:21 205:16

**record**
5:23 29:1
31:8,10 51:15,
20 52:1 90:25
91:2,4,9 92:5
107:18 123:12
134:20 142:5
148:24 149:1,
6 174:13
202:10,16
214:21

**recorded**

5:15

**records**
133:11

**red**
156:10 193:6,
17

**reference**
24:6 156:6
157:8,22
158:2 192:4
200:20 201:6

**referenced**
199:5

**references**
153:8

**referred**
163:18

**referring**
43:8

**reflecting**
68:22

**refresh**
94:18 98:17
108:21

**refuse**
222:23

**refusing**
172:19,22

**regroup**
90:18,24

**regularly**
157:16

**regulation**
108:2 185:2
188:4

**regulations**
187:2

**relate**
147:13 194:13

**related**
124:5 191:18
199:4 220:16

**relates**
171:11

**relationship**
117:3

**relative**
16:15

**relevant**
179:5

**relocate**
15:5

**remember**
31:19 48:17
77:4 79:15
99:3 216:12,
23 217:1

**remembering**
27:7

**removed**
30:14 32:1
33:3,22

**renewed**
174:21

**rented**
163:7

**repair**
129:10

**repairing**
129:12

**repairs**
128:12

**repeat**
52:2 181:12,

20,21 184:24

**replace**
136:9

**replaced**
59:19

**report**
17:21,25 18:1,
10 61:1,4
65:19 66:5,15
80:2,9,25
105:2,16
107:12 111:8
123:14 124:2,
3,14,25 125:7
129:15 131:7
132:22 137:20
138:19 139:8,
20 147:15
149:13 188:5
192:19 193:9,
12

**reported**
18:15 61:6
130:19 131:14
132:3,19
137:11 145:19
191:5 194:17
220:17 221:24

**reportedly**
185:20

**reporter**
5:12,16,22 6:1
8:16,19,22
28:22 35:18,
21,24 36:2,4,8
44:20 90:15,
22 183:1
208:12 209:12
211:17 213:2,
6,10,14,18,21
214:3 220:4,7

223:19

**reporting**
61:3,10,15
68:5 123:20
133:1 174:13
185:12 187:2
191:19 217:24
219:20

**reports**
81:9 88:17
113:21 114:3
127:17 138:25
144:9,13,16
147:4

**represent**
6:10

**representative**
13:3

**representing**
209:3

**reprimand**
140:17

**reprimanded**
140:12

**request**
24:12 95:17
127:6 155:15

**requested**
20:6 21:2 22:7
74:7 95:22
96:15 166:3

**require**
179:17 184:15
195:20 205:4
215:16,24

**required**
136:6,9
167:11 192:9
215:17 217:25

**requirement**
106:21 204:17
205:1 217:25

**requirements**
179:3

**requiring**
131:7

**reserving**
208:18

**resolved**
129:5

**respect**
204:9 208:19

**response**
145:1 193:19

**responsibile**
37:5,7

**responsibilitie
s**
113:19

**responsibility**
13:18 17:5,10
28:7 30:11
36:13 114:5,
18 116:13
117:19 128:10
159:3 167:2

**responsible**
16:24 17:17
37:3 39:7
109:10 169:12
175:13

**rest**
16:18 78:15

**result**
80:15 187:15

**resulting**
6:15

**LEONARD BALDASSARE**

April 29, 2025

review
36:25 43:12
44:17 46:4
57:16 68:12
109:2 110:8
114:6 127:3
148:6 192:9

reviewed
201:14

reviewing
101:6 217:21

reviews
44:4

ride
37:7,11,15,17
38:12,14
39:11,13,22
40:19,20
42:11 43:9,13
143:23

riding
167:16

rights
208:18

risk
156:4,7,14,20
157:18,24
181:6 183:9,
12

River
174:24 177:4

Road
6:3

Rodgers
20:1,5,12,24
21:9,24 26:10
27:8,10 29:8,
12,14,17
30:24 31:5,15,

18 33:25
35:12 36:6
43:8,11 45:9,
16 51:14,19,
23 54:14 55:5,
8 58:22 60:8,
13 64:1,7,12,
16 69:5 70:7,
21 71:14 74:3
77:14 80:10
81:22 83:23
86:20 89:17,
21 90:8,11,20,
23 93:20,25
94:3 98:4
100:7 105:6,
10,11 107:17
109:15 112:4,
8,11 113:4,15
114:23 115:2
116:18 119:5
121:12,16
126:23 130:24
131:9,21,23
132:13 134:19
140:19 144:13
146:4,8,12,16
147:9 148:13,
18,20 155:11
156:21,24,25
157:5,9 158:7,
9,19 167:8
168:12,19,23
171:3,20
172:2,10,12,
21,25 173:4,
16 176:5,16,
19 179:15,19,
25 180:13
181:1,12,15,
19,23 182:3,6,
10,13,16,22
183:14 184:1,
10,18,20

188:7,10,20
190:1,17
191:12 192:1,
10 193:1,5
194:1 195:10
198:16 199:17
201:11,19,23
202:1,3,6,25
203:5,13,15,
25 204:3,11,
21 205:6,10,
19 206:3,8,15
207:12
208:21,24
209:17,21
213:5,8,12,16,
20,24 214:5,
12 218:8
219:6,23
220:2,5,15
221:1,16,19
222:2,12,19
223:2,4,7,10

Rogers
45:17

role
19:13 22:18
44:12 113:8
117:9 118:2
126:16
135:12,20
138:8 141:1

roles
44:25 146:24

rolls
25:20

room
75:3

Rose
23:10 25:1,10,
11 26:9 30:3

41:1,7,25 48:1
53:17 54:4
75:19 77:16
79:25 87:14
94:8 103:19
113:3 123:22
126:20 128:21
135:4 137:5,
21 138:24
140:7 143:21
144:12 149:18
153:8,10,14,
18 154:5,19,
21 155:1,3,23
171:23 173:6
181:18,25
197:5,13
200:16 201:17
207:16 211:16

Rosenberg
5:14

rough
125:17 126:8,
19 127:3,7,10
209:14

roughly
11:10 13:20

rub
86:3

rule
218:14

rules
215:16

run
13:7 72:18
113:20 114:2

S

safely

38:2 173:22
197:25 198:22
215:6

safety
10:13 17:2
106:5 113:1
116:13,22,23
117:15,16
158:15 159:5
160:12,24,25
161:2,12
162:4,9 163:5
165:23,25
166:4,11
169:1 173:8
174:3 175:10,
20 176:3,9,25
178:8,24
183:3 186:25
187:15 192:24
193:23 194:8
196:9,24
198:14 199:5
215:18,24
219:1,3

sail
7:9,10,18 8:1
30:7

sailed
7:14 11:9
146:19 200:5

sailing
8:9 32:25
41:22 126:16,
17 146:23
147:1 200:2

salaried
14:16,17,20
25:25

sales
165:5

LEONARD BALDASSARE

**April 29, 2025**

satisfy
85:3

**Saturday**
48:18 68:2
101:12 127:13
131:14
222:11,14

**Save**
154:11

scanned
77:10

scanning
77:17

scheme
162:16

scores
156:20

**Screenshot**
118:7

scroll
161:4

sea
103:21 106:6

search
160:20,22

section
102:18 104:5
150:19 151:2
153:7 156:2,5,
20 157:23
166:24 168:7
169:1,25
174:6 175:8,9
176:9,25
177:12 178:8,
11,23 183:18
185:8 187:10,
11,14 196:6,7,
8 197:8

198:14 199:7
214:8 216:5,6,
24 218:19
219:19,22

sections
158:14 159:19
161:1 162:12,
18,22 178:14

sector
16:7 65:10,17
106:4 187:18

secure
155:1

security
153:22

sees
83:25

segment
177:1

selected
158:14

sell
219:3

send
22:4 50:22,23
58:10 67:12
68:10 73:16
110:14,23
143:4 222:1,
17

sending
60:24 101:7

separate
43:24 124:6
141:7 144:9,
13,14,16
145:1,11
146:25 164:2

separated
78:19

serve
215:6

served
19:19 20:23
201:5 204:18

session
214:6

set
69:15 129:8
135:16 175:2
206:18 207:19
208:3,8

sets
133:10

setting
113:8 136:20

shape
48:6 50:20
51:2,3,8
52:11,18
72:10 101:13
104:14 141:8

**Sharif**
93:12

shelf
198:21

**Shifts**
168:10

shipyard
25:12,23
27:13 28:1

shore
6:3 115:19,25
116:2,11
129:23

short

91:5 149:2
202:12

**Shortly**
137:2

show
118:4,15
123:13

showed
96:11

shown
118:20 200:3

shows
53:16

side
84:5 85:19,25
86:4,8,14
87:4,5 115:19,
25 116:2,11
129:23 154:14
212:13

sign
100:5 101:2
110:18

signature
99:24 100:8,
11,12 108:18

signed
92:9 93:15
99:25 100:3
106:12 108:7,
21 109:14
110:15,22
195:23

signing
100:20 110:4

similar
38:7 40:22

similarly
96:20,21

simply
56:17

sir
6:19 19:21
26:21 38:5,24
42:1 47:20
49:2 53:19,22
56:2,15 59:22
61:16 65:4
68:9 75:8,22
85:14 90:7
91:23 102:8
115:6 123:23
125:15 128:9
134:4 135:24
136:2 160:14
209:25 210:6,
19 218:18
220:14

sit
17:8

site
39:19 75:17
76:4

sits
170:17

sitting
198:21

situation
32:7 50:9
181:6 183:8
215:9 218:3

situations
169:5

size
16:15

sleep
46:9

slid

LEONARD BALDASSARE

**April 29, 2025**

48:7 101:15
104:15 188:25
189:6,17
217:17 221:10
222:9

**slide**
220:23
221:13,23

**sliding**
51:7

**slipped**
72:11

**slow**
35:15 213:3,6,
21

**slower**
214:4

**slowly**
88:23

**small**
39:24 99:1

**smaller**
14:10

**SMF**
192:19,21
193:8,12

**SMS**
196:9,25
197:4,9,12,20
214:10,13
216:7,25

**snuff**
17:3

**sole**
210:8

**solicited**
96:16

**someone's**
44:2

**sort**
6:25 13:17
18:15 28:12
37:1 38:22
65:21 85:19
99:1 114:7,21
121:9 122:25
129:4 144:19
147:21 185:9
191:16 196:24

**sounds**
21:20 62:1
71:23

**source**
163:5 218:23

**south**
87:5 140:8

**southern**
94:6 103:21
174:24 177:3

**speak**
61:23 63:3,4
65:22 78:3
134:1,10
135:12 183:2

**specific**
38:3 43:18,20,
21 113:22
114:14,18
117:8 196:13
198:25

**specifically**
85:6 86:16
198:5 201:2

**speculation**
195:11

**spell**

11:5 28:19

**spells**
13:4

**spend**
40:12

**spoke**
13:2 50:8
55:12 57:11
60:17 72:4
73:3 78:24,25
133:6 142:8

**spoken**
26:6 99:15

**staff**
115:25

**Stamp**
214:14

**stand**
116:21 207:23

**standby**
57:19

**standing**
167:16 210:13

**stands**
29:1 156:9
192:21

**stapled**
91:18

**star**
173:23

**starboard**
85:25 212:13

**start**
9:1 11:17
45:12 51:7
95:7 136:22,
24 153:19
158:21 200:1

**started**
12:7 39:15
117:1 138:2
139:9 140:4

**Starting**
185:11

**starts**
162:11 166:20
176:10

**state**
5:22

**stated**
145:20 192:15

**statement**
77:21,25
92:11,16,21
93:11,16
95:11,15,23
97:13 104:7
112:14 118:21
169:15

**statements**
73:7,9,13,18,
23 74:2 76:17,
23 77:6,19
79:12 91:16,
20 94:16,22,
24 96:17,20
97:21,25 99:7,
8 202:19

**Staten**
15:15 66:24
76:2 164:25

**States**
99:19 194:18

**station**
215:1

**statute**
184:3,6,15

**stay**
206:21

**staying**
163:25 165:10

**STCW**
10:12

**steering**
51:12 88:19
103:24 107:22
127:17 128:19
211:8,20
215:1

**stern**
85:15 212:21

**sticker**
162:18

**stood**
63:17

**stop**
120:22 131:23

**Stopping**
36:3

**story**
72:5

**strike**
102:10 187:24
195:2 217:5

**struck**
190:12

**structure**
111:20 112:16

**stuff**
40:2 82:4

**submission**
68:15 109:4
110:9

**submit**

LEONARD BALDASSARE

April 29, 2025

submits
124:25

submitted
100:20,24
101:2,18
105:3,17
106:20
108:10,15,22
110:4 114:6
125:1,12
130:3 145:22
196:3

submitting
109:10

subpoena
19:19 20:6,15,
18,23 21:1

Subsection
187:11,21

subsequently
49:16

substance
186:21

substances
46:12

suffices
162:3

sufficient
85:3

suggest
71:2

SUNY
9:7,8,19,22
10:4

supervising
210:1

support
111:20 112:15
139:15

supposed
84:3 107:5
173:12 179:6
180:15

swear
5:17

switch
88:19 103:23

switching
104:3

sworn
5:20

system
81:1,7,10,14,
21 86:3,9
87:19 113:21
118:10 119:17
120:6 123:25
126:5 128:20
129:3,18,22
130:22 131:8
132:20 136:7,
12,17 142:24
149:14 153:3,
15 154:17
155:23 156:15
158:3,15
159:6,13,22
160:12 161:13
162:4,9 163:5,
22 165:23
166:1,4,11
169:2 173:9
178:8,24
183:4 185:21
187:1,2 189:7
190:7 193:23
194:8 196:9

support
111:20 112:15
139:15

198:15 199:2,
6,8,16 200:1,
11,15,19
201:2 206:1,
12 217:17
219:2,4
220:25
221:10,14

systems
200:7 206:5

---

T

tab
160:21

table
161:8

tags
152:19

taking
6:11 46:11
196:17

talk
30:25 52:22
62:8,21,25
65:15 72:15
74:9,13 79:19,
22 121:12
129:10
219:12,15

talked
20:19 45:24
56:8 60:1
61:20 67:24
74:14 78:18,
22 91:16

talking
35:11 38:19
39:23 54:5
60:9 64:8

74:19 93:21
114:23 115:19
120:23 134:5
216:24

talks
94:11

tapped
127:18 128:5

task
114:8 147:24

tasks
114:2

TBL
102:24

TBS
163:13,18
164:12 165:14
219:4

team
128:16 136:19
148:21

technically
42:8 82:4

technician
129:9 136:20
200:23

technicians
135:17

telling
142:11 172:14

tense
223:13

term
47:18 188:11
205:11 220:23

terms
23:23 162:15

territories
194:19

test
107:24

tested
107:6

testified
5:21 46:16,22
47:16 109:16

testify
45:8

testifying
51:15,24
120:12,14

testimony
46:1 121:14
131:1 183:17
184:2,21
188:13 203:16
213:15 222:18

testing
17:11 107:1,
13,14 195:17,
21,24

text
22:4,8 56:13
57:8 59:4,11
67:12 84:16

texted
191:3

texting
24:3

then--
95:18

there'd
43:17 68:21

thick
160:7

LEONARD BALDASSARE

April 29, 2025

**thing**
6:25 13:12
18:15 28:13
37:1 114:7,21
121:20 129:4
137:10 142:18
147:22 159:23
162:21 167:20
196:24 217:3

**things**
18:11 19:7
22:8 52:20
102:3 113:22
141:10
142:10,13
153:23 157:1
160:16 179:4
185:13 217:3

**thinking**
148:11

**third-party**
163:21

**thirds**
187:6

**thought**
17:24 29:11,
13 103:24
115:18 158:10
167:13 202:6
214:15

**thrilled**
142:9

**tide**
52:19

**time**
5:9 7:11 11:23
12:6 13:7 15:7
25:15 26:6
28:4 31:8
33:17 44:23

46:19 48:16
49:21 55:10
56:20 57:6
58:4,7 59:9
61:2 67:5
69:10 79:3,18
81:12 90:13
91:2,10 94:8
97:18 100:15
103:16 105:1
107:3,9
112:13 115:11
118:12 125:1
128:22 134:2
143:17,18
148:12,24
149:6,22
152:15,21,22
171:6 182:17
189:13 190:9
194:1 202:10,
16,22 203:11,
21 204:1,10
207:5 208:17
210:25 217:12
223:17,21

**timeframe**
27:22 135:5

**timeline**
117:23

**times**
41:20 45:21
150:9

**tires**
86:4

**title**
116:8

**titled**
102:18 123:19
169:25 174:6
175:10 176:9

185:12

**today**
6:12 19:17
20:11 34:14
45:8,18 55:17
98:2 105:15

**Today's**
5:7

**told**
12:9,17 44:9
48:3 50:9,17,
25 53:5 56:3,4
57:15,21
60:18 62:9,12,
20 66:20 68:2
70:15 71:10
72:5,6 101:11
112:15 128:24
136:23 189:3,
6 190:21
208:11
217:19,20,24
218:3 221:6

**Tom**
13:2

**Ton**
10:10

**top**
83:21 118:6
137:19 149:16
150:10 154:13
159:2 163:14
166:20 185:9
192:17

**touched**
68:4 132:19

**touching**
94:12

**tow**
167:17 170:5,

8 174:8

**towing**
5:6 8:12 18:21
96:3 103:18
114:17 115:9
129:20 205:3,
15 215:2

**track**
103:25 155:24

**tracking**
147:20

**traffic**
153:23 173:25
174:2 179:10
215:14

**trail**
122:2

**training**
17:16,18
114:19,20
116:3,4,9
147:20 148:5
167:22,25
196:13 197:24
198:4 199:1
200:5,8 201:1
209:22 210:2,
5 214:6

**transit**
169:12 170:1
171:13 173:13
174:7 175:14,
16 179:24
196:23 197:25
198:23 203:24
204:9 205:5

**transited**
174:23 177:21

**transiting**
169:18 171:10

173:21 176:4
177:17,18
196:13 198:13
204:19 205:17
219:12

**transits**
89:14 168:7,
11,25

**transmission**
68:22

**Transportation**
113:1

**trees**
160:10

**tremendously**
213:3

**trial**
46:23 120:12,
14,15

**trick**
207:14

**troubleshootin
g**
165:6

**truthful**
46:14

**tub**
170:18

**Tuesday**
5:8

**tug**
16:16,25 44:4
50:6 53:7,17
54:3 62:11
63:13 75:19,
24 77:16
79:25 83:6
141:1 171:6
181:9,17,24

LEONARD BALDASSARE

April 29, 2025

182:19 195:4
209:23 210:7
221:9

**tugboat**
75:7

**tugs**
13:19,21 14:1,
6 16:9 17:1
23:4 115:5
128:12 196:19

**turn**
34:16 87:21
103:8 106:23
120:15 163:9
166:14 168:6
176:8 178:11
185:7 191:9
193:16 194:11
219:18

**turned**
21:14 59:17
88:18

**turns**
212:24

**two-week**
44:13

**two-year**
9:24

**type**
11:2 38:10
39:23 77:24
97:4 137:10
138:20 154:22
160:24

**type-up**
97:24

**typed**
76:23 96:16

**typed-up**

77:25 91:19
95:11,22 97:2,
12,20 98:12

**types**
141:9

_____

**U**

_____

**U.S.**
194:20

**understand**
6:18 27:4
44:6,23 46:7,
13 47:18 52:5
80:12 121:8
131:10 132:15
154:7,10
171:17 189:18
193:3 199:21
204:23 205:12
212:9,11
221:3

**understanding**
96:15 215:20
217:16,23

**understood**
9:4 31:20
52:12 64:7
120:24 220:24

**underway**
63:18 177:22

**uninspected**
23:17 115:8

**unintended**
102:9,10
187:23,24
188:5 195:1
217:4,5

**unique**
165:24

**unit**
106:5 136:10
185:25

**United**
99:19 194:18

**universe**
115:17

**unobstructed**
212:5,14
214:25

**upper**
17:4 30:14,20,
21 211:11,13,
21

**usual**
36:4

_____

**V**

_____

**Vain**
161:17

**valid**
145:25 146:7,
11

**valve**
170:12

**Vane**
8:6,7 9:5
11:21 126:13

**vantage**
82:25

**vary**
162:7

**verify**
216:5

**version**
95:11,22 97:2
98:19,20

152:3 159:10

**versions**
91:19 97:20,
25 98:12

**versus**
19:7 98:20

**vessel**
30:14 38:2,4
39:8 41:18
43:19,21,23
44:10 47:21
48:9 51:9
52:13,17 53:1,
12,24,25 54:5
60:21 73:19
74:25 75:6,13
76:1 78:10
79:5 101:11
102:1 103:18,
25 104:17
107:23 114:7
123:20 124:19
128:25 129:9
130:4 147:2
155:20,24
173:21 187:20
194:16,20
196:23 197:1
200:13 203:24
207:4 211:1,
14

**vessels**
7:21 8:12
13:16 23:15,
17 54:18
81:11 115:7,8
129:19,24
139:1 146:25
199:3 214:24
215:3

**video**

148:4 223:15

**view**
81:21 118:13,
18 119:16
212:5 214:25

**Virginia**
39:16 177:3
214:1

**virtue**
20:18

**visibility**
168:5 179:9
215:13

**visible**
72:13 94:13
101:16

**vision**
215:4

**voice**
158:11

**voyage**
39:23 40:4
72:3 149:13,
16 150:7,17
152:13 153:7,
8,10,16,19
154:11,15,18,
19,20,21
155:2,3,16,19
177:22

_____

**W**

_____

**wait**
35:12 93:1

**waiting**
56:6

**walk**
156:19

**LEONARD BALDASSARE**

April 29, 2025

**walked**
75:3

**wanted**
121:20 197:10
206:19 207:20
209:14 222:15

**wanting**
15:17 67:18

**warning**
169:14 207:17

**Washington**
8:3

**waste**
31:7

**watch**
36:24 103:22
124:20 142:3
148:5 174:11
180:6 199:14
203:8 204:5,6
210:12 211:21
215:5

**water**
90:8

**waters**
194:18

**waterway**
177:2 183:21,
23 184:8
185:5

**ways**
159:21

**weather**
179:9 215:13

**week**
26:24 41:11,
12 45:20,22
122:18 137:25
208:23

**weekly**
114:8 147:24

**weeks**
23:21 27:17
31:13,21 32:5
41:15 88:20
94:7 103:19
122:15 181:25
182:19

**west**
87:4

**Western**
104:5

**What'd**
10:15 190:19

**wheel**
78:14 170:17

**wheelhouse**
37:25 53:5
78:18 170:15
197:17 200:6
211:11,13,21

**wheelman**
169:12

**who'd**
7:1,15 12:25
65:15

**Why'd**
15:3

**Wind**
52:19

**wires**
136:11

**wise**
13:13 14:15
90:14

**wishes**
32:13

**word**
119:4,8,10
166:21 220:22

**words**
51:22 186:21

**work**
6:24 7:1,2,15
11:20,25
15:11,12 16:5,
18 24:16
36:25 40:24
42:9,22 44:3
55:23 56:21
58:18 69:5
115:9 135:3,
17,20 136:6
209:7

**worked**
11:22,23
15:14 17:18
37:12 41:11,
14 146:22
161:22

**working**
16:1 21:21
23:5 25:15,22
26:1 29:25
41:20 66:23
113:20 117:1
126:9 140:4
142:10 202:22

**works**
138:11 148:18

**worried**
108:3

**would've**
42:16,17 43:2
55:10 62:2
74:18 77:20
88:12 109:9
110:5 111:22

119:12,16
124:19 141:10
200:22 211:4
221:20

**write**
180:3 213:11,
14

**write-up**
142:23 143:15

**writing**
143:3

**written**
73:7,9,18,22
74:1 76:17,23
77:21 79:12
80:2,8 91:15
92:11,16,25
94:22 98:20
142:18,21
143:7 148:6

**wrong**
151:25

**wrote**
180:11

---

**Y**

**yard**
26:9,12,19,23
27:4 72:2 76:2

**year**
7:25 9:22 12:8
14:25 37:12
40:6 42:14
125:20

**years**
7:6 8:8 9:14,
15,16 11:9

**yellow**
168:14 169:9

**yesterday**
12:10 158:13

**York**
6:4 8:3 10:10
36:6 99:11
149:17 164:13
165:1,4 209:2
213:9

**young**
15:21

---

**Z**

**Zoom**
47:3 209:2