# EXHIBIT 14

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
         ---------------------------------------X
         IN THE MATTER OF COEYMANS MARINE
         TOWING, LLC D/B/A CARVER MARINE
         TOWING AS OWNER AND OPERATOR OF M/T
         MACKENZIE ROSE, (IMO NO. 8968765) HER
         CARGO, ENGINES, BOILERS, TACKLE, EQUIPMENT,
         APPAREL, AND APPURTENANCES, ETC., IN REM,
         ("M/T MACKENZIE ROSE"),

                                   CIVIL ACTION
                                   NO: 2:24-cv-00490-MSD-LRL

         PETITIONING FOR EXONERATION FROM OR
         LIMITATION OF LIABILITY IN ALLISION WITH
         NORFOLK AND PORTSMOUTH BELT LINE RAILROAD
         COMPANY MAIN LINE RAILROAD BRIDGE
         (THE "BRIDGE") OCCURRING JUNE 15, 2024 IN
         AND ABOUT THE ELIZABETH RIVER, VIRGINIA.

         ---------------------------------------X

                              June 17, 2025
                              10:08 a.m.



              AN IN PERSON VIDEOTAPED DEPOSITION of

         Nicholas Laraway, taken by the respective

         parties, pursuant to Order, before Larin

         Kaywood, a Notary Public for and within the

         State of New York.
```

JOB NO.: 114501

**Page 2**

```
 1          A P P E A R A N C E S:
 2   CRENSHAW, WARE & MARTIN, P.L.C.
       Attorneys for Defendant Norfolk
 3     Portsmouth Belt Line Railroad Company
       150 W. Main Street Suite 1500
 4     Norfolk, Virginia 23510
     BY:  JIM CHAPMAN, ESQ.
 5   E-mail: Jchapman@cwm-law.com
 6   CLYDE & CO US LLP
       Attorneys for Coeymans Marine Towing, LLC
 7     30 S. Wacker Drive, Suite 2600
       Chicago, IL 60606
 8   BY:  JAMES H. Rodgers, ESQ.
     E-mail:  James.rodgers@clydeco.us
 9
10   SINNOTT, NUCKOLS & LOGAN, PC
       Attorney for Evanston Insurance Company,
11     s/s/o Norfolk and Portsmouth Belt Line
       Railroad Company
12     13811 Village Mill Drive
       Midlothian, Virginia 23114
13   BY: MARK C. NANAVATI, ESQ.
       NICHOLAS J. LEWIS, ESQ.
14   E-mail:  Mnanavati@snllaw.com
                Cjones@snllaw.com
15
16   Also Present:  Josef Malik, Chief legal
     officer, Carver Companies.
17   Ryan.
18   Ingrid Contreras, The videographer
19
20
21
22             *    *    *    *    *
23
24
25
```

**Page 3**

```
 1                    INDEX
 2   EXAMINATION OF Nicholas Laraway
 3   EXAMINATION BY                      PAGE
     MR. CHAPMAN                            5
 4
 5
                   EXHIBITS
 6            MARKED FOR IDENTIFICATION
 7   DESCRIPTION                         PAGE
 8   Exhibit 1 - Deposition Notice         7
 9   Exhibit 2 - 6/20/24 Laraway email re evidence    14
                 Preservation request ESI 0307 - 0311
10
     Exhibit 3 - 6/20/24 Laraway email FW:Accident    27
11               Moore ESI 0191-0192
12   Exhibit 4 - 12/6/21 Marine Safety Consultants    33
                 To Dime Community Bank - Condition &
13               Valuation Survey Report Dime 000231-237
14   Exhibit 5 - USCG General Index or Abstract of    39
                 Title Mary Gellaty/Mackenzie Rose
15               NPBL0052 - 0053
16   Exhibit 6 - 12/27/21 Mi-Ro Ltr to Dime Community  43
                 Bank re: Desktop Opinion of Tugboat
17               Mackenzie Rose
18   Exhibit 7 - Schedule of Vessels - Hull Effective  47
                 11/1/23 Carver 0673-0674
19
     Exhibit 8 - DLS Marine Survey &amp; Appraisal     49
20               Carver 1929 - 1957
21   Exhibit 9 - Meyerrose 4/1/2025 Survey Produced by  57
                 Carver (need Bates #)
22
     Exhibit 10 - SMS 6.4 Drug &amp; Alcohol Policy    99
23                TBS Helm Connect 0843 -0852
24   Exhibit 11 - 7/29/24 Feeney email FS: CMT-AMS     103
                  Drug Testing ESI 0201-0217
25
```

**Page 4**

```
 1   Exhibit 12 - 10/3/24 Morrissey termination letter  106
 2   Exhibit 13 - SMS 8.8F Collision/Allision TBS       118
                  Helm Connect 000996-997
 3
     Exhibit 14 - 7/3/24 Galioto email FW               122
 4                Photos to Moore
                  ESI 0313 - 0319
 5
     Exhibit 15 - 6/16/24 Miller email with crew        126
 6                statements
                  ESI 0038 - 0042
 7
     Exhibit 16 - 6/28/24 Miller email re:              135
 8                Incident report (not attached)
                  ESI 0541
 9
     Exhibit 17 - 6/24/24 Miller email with Helm        136
10                Log June 15 RR Accident
                  ESI 0527 - 0531
11
     Exhibit 18 - 6/24/24 Moore email re: Helm Logs     144
12                Meeting Notes
                  ESI 0532
13
     Exhibit 19 - 7/19/24 Galioto email re:             147
14                CMT Safety Info to Moore
                  ESI 0020 - 0037
15
     Exhibit 20 - 6/14/2024 The General Ship Repair     161
16                Invoice TGSR 000009
17   Exhibit 21 - 6/9/25 Declaration of Josef Malik     164
18
19        NAME/DESCRIPTION (MCGRATH)
20
     Exhibit 1 5/20/2024 Mackenzie Rose Daily
21            Log TBS Helm Connect 000503-504
22
23
24
25
```

**Page 5**

```
 1        THE VIDEOGRAPHER:  This is the
 2   beginning of Media Number 1 in the
 3   deposition of Nicholas Laraway in the
 4   matter of Coeymans Marine Towing,
 5   LLP, d/b/a Carver Marine Towing, Inc.
 6   Case number 224-cv-009 -- I'm sorry,
 7   00490.
 8        Today's date is Tuesday, June
 9   17th, 2025, and the time on the
10   monitor is 10:08 a.m.
11        My name is Ingrid Contreras and
12   I'm the videographer.  The court
13   reporter is Larin Kaywood.  We are
14   here with First Legal.
15        Counsel, please introduce
16   yourself after which the court
17   reporter will swear in the witness.
18        MR. CHAPMAN:  James Chapman
19   with the law firm of Crenshaw, Ware &
20   Martin, on behalf of the plaintiff,
21   Norfolk and Portsmouth Belt Line
22   Railroad Company.
23        MR. RODGERS:  James Rodgers of
24   Clyde & Co, on behalf of Coeymans
25   Marine, d/b/a Carver Marine Towing.
```

**NICHOLAS LARAWAY**

June 17, 2025

1          MR. MALIK:  Josef Malik, chief
2     legal officer for Carver Companies.
3  N I C H O L A S    L A R A W A Y, having
4  first been duly sworn by a Notary Public
5  for and within the State of New York, upon
6  being examined, testified as follows:
7          THE REPORTER:  Can I have your
8     first and last name for the record,
9     please?
10         **THE WITNESS:  Nicholas Laraway.**
11         THE REPORTER:  And your
12     address?
13         **THE WITNESS:  104 Dutchman**
14     **Lane, Schenectady, New York 12303.**
15         THE REPORTER:  Can you spell
16     Schenectady again?
17         THE WITNESS:
18     S-C-H-E-N-E-C-T-A-D-Y.
19         THE REPORTER:  And what is zip
20     code?
21         **THE WITNESS:  12303.**
22         THE REPORTER:  One second.
23  EXAMINATION BY
24  MR. CHAPMAN:
25     Q.    Good morning, Mr. Laraway.

1     **A.    Good morning.**
2     Q.    You are here on behalf of the
3  company to testify on a number of topics
4  that were identified in the deposition
5  notice.
6          Is that your understanding?
7     **A.    Yes, sir.**
8     Q.    I take it you've seen the
9  deposition notice?
10    **A.    Yes, sir.**
11         MR. CHAPMAN:  Can you mark that
12     as one, please?
13         THE REPORTER:  Already had it
14     on here, thank you.
15         (Whereupon, Exhibit 1 was
16     marked for identification.)
17    Q.    And that is the notice of the
18  deposition of Coeymans Marine Towing, d/b/a
19  Carver Marine Towing.
20         And attached as Exhibit A,
21  there's some definitions and a couple of
22  dozen topics.
23         See that?
24    **A.    I do.**
25    Q.    You've had a chance to review

1  it prior to the deposition?
2     **A.    I have.**
3     Q.    And it's your understanding
4  that you've been designated to testify on
5  those topics?
6     **A.    Yes.**
7     Q.    Right.  How long have you been
8  employed by, I'll call it Carver, but I
9  don't know whether it's Coeymans Marine
10  Towing, d/b/a as Carver or sort of what's
11  your role there?
12    **A.    I've been employed with Carver**
13  **Companies in a number of roles since 2011.**
14    Q.    Did you work anywhere else
15  before working for Carver?
16    **A.    Prior to 2011, I had worked a**
17  **number of part-time jobs including working**
18  **for Carver and miscellaneous jobs during**
19  **the summers.**
20         **But I began my full-time**
21  **employment with Carver right out of school.**
22    Q.    Are you connected via family to
23  the Carver organization?
24    **A.    I am.**
25    Q.    Can you tell us about that?

1     **A.    Carver Laraway, the founder and**
2  **chairman of the board is my uncle.**
3     Q.    So were you in college working
4  part-time?
5     **A.    Yes.**
6     Q.    Before you joined the
7  companying?
8     **A.    (Nodding.)**
9     Q.    When did you graduate?
10    **A.    2010.**
11    Q.    And what's your degree?
12    **A.    In economics and business.**
13    Q.    Do you hold any U.S. Coast
14  Guard licenses?
15    **A.    I do not.**
16    Q.    Have you ever sailed on any
17  vessel as a member of the crew?
18    **A.    I have not.**
19    Q.    I take it that you're a
20  salaried employee?
21    **A.    I am.**
22    Q.    What is your current title?
23    **A.    My current title is the**
24  **executive director of administration of**
25  **Carver Companies.**

Page 10

1    Q.    Who do you report to?
2    A.    I report to the board of
3    directors.
4    Q.    So one of the topics is kind of
5    the relationships of Carver Companies.
6          Can you tell us about that?
7    A.    Certainly.  So Carver Companies
8    is a large diversified industrial
9    organization that does a number of -- it
10   works within a number of different
11   industries and a number of different
12   geographical locations.
13         We do construction, earth work
14   and infrastructure in New York and South
15   Carolina.  We have a deep water industrial
16   port at our Port of Coeymans facility in
17   Coeymans, New York just south of Albany.
18         Adjacent to that we have a 300
19   acre industrial park that facilitates the
20   movement of cargo to and from the Port of
21   Coeymans.  We have a number of ancillary
22   businesses in Upstate New York.
23         Certainly, we have the Coeymans
24   Marine Towing business now doing business
25   as Carver Marine Towing that operates on

Page 11

1    the East and occasionally the Gulf Coast of
2    the U.S.
3          We have a Marine steelworks
4    division that supports the marine towing
5    division and does shipyard type work for
6    other customers.
7          And then we have another deep
8    water port in North Charleston, South
9    Carolina.  We have stevedoring businesses
10   that support our ports and do work for
11   other industrial maritime companies.
12         We previously had a materials
13   business that we sold in August of 2020 to
14   Heidelberg Materials.  And we have a quarry
15   in Bayside, New Brunswick in Canada, and a
16   port that is adjacent to that that
17   facilitates the shipment of our stone from
18   our quarry to a number of locations on the
19   East and Gulf Coast.
20   Q.    That's quite a portfolio.
21         Thank you for sharing that.
22   A.    Yes, sir.
23   Q.    When did you get into the
24   marine towing business, or when did Carver
25   get into the marine towing business?

Page 12

1    A.    Carver Companies got into the
2    marine towing business in 2014.
3    Q.    Acquired another operator, or
4    did you stand up your own fleet?
5    A.    It was a partnership that was
6    formed with another operator in the New
7    York City market and acquired a push boat
8    and a number of barges in the Gulf and
9    relocated them to New York to begin
10   operations.
11   Q.    And who was your partner back
12   then?
13   A.    The partner was Roy White of
14   Greater New York Marine Towing.
15   Q.    Do you have any official role
16   titles, whether it's a manager, or
17   otherwise in, I'll call it Carver Marine
18   Towing because that's the d/b/a of, I
19   still -- I can never pronounce it.
20   Coeymans.
21   A.    Coeymans.
22   Q.    Coeymans Marine Towing.
23   A.    I have an official title within
24   Carver Companies, and support the
25   management of Coeymans Marine Towing, but

Page 13

1    no standalone specific title as part of
2    Coeymans or Carver Marine Towing.
3    Q.    Okay.  Yeah.  You may be aware
4    that Mr. Moore told us that he was the
5    general manager.  I don't still know
6    whether that's an official title or whether
7    it's just sort of an operating role that he
8    has.
9          Is there a -- is Coeymans
10   Marine Towing a member managed LLC?
11   A.    I don't recall specifically if
12   it's member managed.
13   Q.    Okay.  But as an entity its
14   owned by the Carver Companies as part of
15   this holding entity that you described?
16   A.    That is correct.
17   Q.    Okay.  Do you know if there are
18   any officers of Carver Marine Towing?
19   A.    Carver Laraway is the managing
20   member.
21   Q.    That's your uncle?
22   A.    Correct.
23   Q.    And you may have said this, I
24   apologize, but Carver Companies is
25   privately owned?

NICHOLAS LARAWAY

June 17, 2025

1    A.    Correct.

2    Q.    How did you first learn of the
3  incident involving the Tug Mackenzie Rose
4  alliding with the Norfolk and Portsmouth
5  Belt Line Bridge in June of 2024?

6    A.    I first became aware that it
7  hit the bridge when I received an e-mail
8  from what I recall was an attorney for the
9  bridge with a letter that was addressed to
10  myself.

11        MR. CHAPMAN:  Can you mark that
12      as two, please?

13        (Whereupon, Exhibit 2 was
14      marked for identification.)

15    Q.    They were provided to us
16  recently a number of e-mails including this
17  one that's been marked as Exhibit 2.

18        Do you recognize it?

19    A.    Yes.

20    Q.    It appears that you're actually
21  forwarding it to somebody or others based
22  on the top header.

23        You see that?

24    A.    Yes.

25    Q.    But down underneath there's a

1  e-mail that was sent to you and Mr. Moore
2  on June 20th, 2024, with a letter attached
3  to it offered by me.

4        Do you see that?

5    A.    Yes, sir.

6    Q.    Okay.  That is the first time
7  you knew of anything involving the tug
8  alliding with the Belt Line Bridge?

9    A.    That's correct.

10    Q.    Okay.  At the top of this
11  e-mail, in the two line, it has a number of
12  names in quotation marks.  I'm not really
13  sure why that is, but just to kind of run
14  them down.  Brian Moore, the general
15  manager of Carver Marine Towing, correct?

16    A.    Correct.

17    Q.    What is CMT dispatch?

18    A.    That is a group e-mail for the
19  dispatchers of Carver Marine Towing.

20    Q.    So all of the dispatchers would
21  receive a copy if you send it to that
22  group?

23    A.    Yes.

24    Q.    Do you know how many
25  dispatchers there were at the time?

1    A.    I believe there were two.

2    Q.    Okay.  And the next name,
3  Leonard Baldassare, he no longer works for
4  Carver, but at the time he was the port
5  captain of Carver Marine Towing, correct?

6    A.    That is correct.

7    Q.    Who is Mark Pearson?

8    A.    Mark Pearson is a captain that
9  has been with or who had been with Carver
10  Company since we formed the marine towing
11  division.  He was one of our senior
12  captains and...

13    Q.    So he started from the very
14  beginning like in 2014?

15    A.    Yep, he was our first captain.

16    Q.    And is he still employed by the
17  company?

18    A.    He recently retired.

19    Q.    And then on the CCs it has
20  three -- what look like three e-mail
21  addresses.  I don't know what their
22  addresses are, but do you know who Anthony
23  is?

24    A.    That is Antony Cardona, Jr.,
25  our attorney at the time.

1    Q.    Does he still represent Carver?

2    A.    Not on any specific matters at
3  the moment.

4    Q.    Okay.  And who is Junior?

5    A.    I believe those would go
6  together.

7    Q.    They have --

8    A.    Anthony Cardona, Jr.

9    Q.    Okay.  So that's really one
10  e-mail recipient?

11    A.    I believe so.

12    Q.    Okay.  And who's Carlo?  Is it
13  Agneta?

14    A.    Agneta.  He is our insurance
15  broker with Marshall & Sterling.

16    Q.    So I didn't find any response
17  to this e-mail and what's been produced so
18  far, but do you recall receiving a response
19  from any of these individuals by e-mail?

20    A.    I don't recall specifically.

21    Q.    Did anybody call you about it?

22    A.    Yes.

23    Q.    Who?

24    A.    Well, from what I recall, the
25  first phone call I received was from our

**NICHOLAS LARAWAY**

June 17, 2025

Page 18

1  attorney having read this letter with some
2  serious accusations.
3          MR. RODGERS:  Don't tell him
4      what your attorney said to you.
5      Q.    Yeah.  I'm not asking for
6  whatever your conversation was --
7      A.    Yes.
8      Q.    -- with your attorney, but I am
9  asking you about who else called you and
10  what conversations you had with them?
11      A.    And the other conversation I
12  recall was receiving a call from Brian
13  Moore.
14      Q.    And what did Mr. Moore tell
15  you?
16      A.    From what I recall, he was
17  aware that there was a incident with the
18  Mackenzie Rose that was referenced in the
19  letter.  And he talked through what he knew
20  at the time, and that they were
21  investigating what was going on.
22      Q.    Did he tell you whether he had
23  notified the Coast Guard?
24      A.    I don't recall.
25      Q.    Did he tell you whether he had

Page 19

1  been contacted by the Coast Guard?
2      A.    I don't recall.
3      Q.    And did he tell you whether he
4  knew anyone else who'd been contacted by
5  the Coast Guard regarding the incident?
6      A.    I don't recall.
7      Q.    Do you have any memory of
8  responding to the e-mail that was sent to
9  you on my behalf on June 20th of 2024 as
10  indicated at 10:41 a.m. on that date in
11  Exhibit 2?
12      A.    I did not directly respond to
13  that e-mail --
14      Q.    Did you --
15      A.    -- from what I can recall.
16      Q.    Did you direct anyone else to?
17      A.    I believe our attorney reached
18  out to begin correspondence.
19      Q.    And who was your attorney?
20      A.    Anthony Cardona, Jr.
21      Q.    Is it your understanding that
22  Mr. Cardona reached out to me?
23          COUNSEL:  Hey, Jim, can you
24      identify for the record, what Bates
25      label that is?

Page 20

1          MR. CHAPMAN:  Yeah, Carver
2      ESI000307.
3      A.    I don't know specifically.
4      Q.    Did you have any conversation
5  with your insurance broker, Mr. Agneta?
6      A.    I eventually had conversations
7  with Mr. Agneta about it.  I don't recall
8  specifically when the first one was.
9      Q.    Could have been on June 20th,
10  2024?
11      A.    It certainly could have.
12      Q.    When you received this e-mail
13  with the attached letter, it included this
14  photograph, didn't it?
15      A.    It did.
16      Q.    Did it appear to you that there
17  was something amiss with the bridge?
18          MR. RODGERS:  Objection to
19      form.
20          Can you rephrase that?
21          MR. CHAPMAN:  What's wrong with
22      the form?
23          MR. RODGERS:  You have to ask
24      him what he saw or what he sees.
25          MR. CHAPMAN:  I'm just

Page 21

1      asking --
2          MR. RODGERS:  I object to the
3      term "amiss."
4      Q.    Did it appear --
5          MR. RODGERS:  Can you rephrase
6      it?
7          MR. CHAPMAN:  Okay.
8      Q.    Did it appear the bridge was
9  out of the alignment from the picture
10  attached to the letter that was sent to you
11  on June 20th, 2024?
12          MR. RODGERS:  Just when he
13      looked at it then?
14          MR. CHAPMAN:  Yes.
15      A.    Yes.  It looked like it
16  possibly could have been out of alignment.
17      Q.    This letter specifically
18  requested that a Carver undertake to
19  preserve and retain various information.
20          Did you initiate any steps to
21  do that?
22          MR. RODGERS:  Objection to the
23      extent that it asks for legal advice
24      that he received, but you can answer
25      as to your understanding.

**NICHOLAS LARAWAY**

June 17, 2025

---

Page 22

1    A.    My understanding was that that
2  was requested of us and that we were to do
3  that.
4    Q.    My question though was, did you
5  do anything to do that?
6    A.    When I spoke with Brian, I
7  asked him to make sure that he obtained
8  everything and compiled it for our attorney
9  because our attorney was taking lead on
10 correspondence moving forward.
11   Q.    And sitting here today, do you
12 know whether anything was ever done to
13 secure any of the mobile devices that were
14 utilized for communication between the tug
15 and either Mr. Baldassare and Mr. Moore on
16 June 15th, 2024?
17   A.    I believe Mr. Baldassare's
18 phone has been provided and that the tug
19 phone has as well.
20        I am not certain, but I believe
21 there were actions taken to follow the
22 request in the letter.
23   Q.    And provided to whom when you
24 say provided?
25        MR. RODGERS:  That's -- you're

---

Page 23

1        asking him about attorney-client
2        communications dealing with this
3        litigation.
4            MR. CHAPMAN:  No.  I'm just
5        asking about the physical devices.
6        The phone on the tug and
7        Mr. Baldassare's phone or any other
8        phone that was involved in the
9        communications that occurred on June
10       15th, 2024 between the tug and either
11       Mr. Moore or Mr. Baldassare.
12   A.    I don't know the specific
13 actions that were taken by Brian to comply
14 with that.
15   Q.    And this is what I'm asking is,
16 today you still don't know?
17       MR. CHAPMAN:  I'm not
18       asking --
19       MR. RODGERS:  By counsel we are
20       providing the records of
21       Mr. Baldassare's phone, and the tug
22       phone, and I think you know that.
23       That's what we've provided or
24       we had access to, so.
25       MR. CHAPMAN:  Actually I don't

---

Page 24

1        know that, but I appreciate you
2        telling me that.
3            MR. RODGERS:  Well, it's in
4        the -- it's in our response.
5            MR. CHAPMAN:  We don't need to
6        have a debate about it, but
7        Mr. Malik's declaration says
8        otherwise.  And --
9            MR. RODGERS:  No.  Because it
10       wasn't -- we didn't -- we had to get
11       a vendor to do that.
12           So I'm just giving you
13       the -- by counsel.  I'm not sure the
14       witness has any knowledge, but you
15       can tell him what you know.
16   A.    I don't have specific
17 knowledge.
18   Q.    About what's happened to the
19 phones?  Just so we're clear on what we're
20 talking about.
21       MR. RODGERS:  Personal
22       knowledge?
23       MR. CHAPMAN:  Yes.
24   A.    I don't have personal knowledge
25 of how that information was obtained and

---

Page 25

1  provided to our insurance counsel.
2    Q.    Fair enough.  My question
3  though really relates to, you're the
4  corporate representative.
5    A.    Correct.
6    Q.    And I'm just trying to
7  understand from your perspective, being the
8  corporate representative, what does Carver
9  say or you say on their behalf about the
10 status of those two phones I have been
11 asking about.
12       They have been recovered?  They
13 have been secured?
14       MR. RODGERS:  Objection.
15       Counsel, he's already answered that.
16       Don't answer that.
17       MR. CHAPMAN:  You are not under
18       oath, Mr. Rodgers.
19       MR. RODGERS:  Don't -- well, I
20       don't know -- this is discovery we're
21       providing you as counsel, so he's
22       already answered.
23       Do you want to ask the same
24       question again?
25       Go ahead.

**NICHOLAS LARAWAY**

June 17, 2025

Page 26

```
1      Q.     How about we have the court
2  reporter read it back?
3             MR. RODGERS:  And the corporate
4      position is what counsel has provided
5      in this discovery.  That's the
6      corporate position.
7             If you want to ask him his
8      personal knowledge, he's here to
9      answer that.
10            (Whereupon, the above record
11     was read back by the court reporter.)
12     A.     I personally was not involved
13  in the process to secure and provide the
14  phones to our counsel.
15     Q.     Is that your understanding though
16  that it has occurred?
17     A.     That is my understanding.
18     Q.     You mentioned earlier the
19  context of the company's businesses that
20  you engage in cargo handling operations.
21  Is that both South Carolina and your
22  facility in New York?
23     A.     Correct.
24     Q.     Is that all bulk cargo or do
25  you guys handle like containerized traffic
```

Page 27

```
1  or what?
2      A.     It's predominantly bulk, but
3  not exclusively.
4      Q.     So some intermodal or not?
5      A.     A bit of containers, some break
6  bulk and variety of other things from time
7  to time.
8      Q.     Are either of the facilities
9  rail served?
10     A.     The facility in Queens is not
11  rail served.  The facility in North
12  Charleston has a limited rail spur.
13     Q.     And what railroads serve that
14  facility in North Charleston?
15     A.     Palmetto Rail.
16     Q.     That's a short line is, isn't
17  it?
18     A.     I don't know.
19            MR. CHAPMAN:  Would you mark
20     that as three, please?
21            (Whereupon, Exhibit 3 was
22     marked for identification.)
23     Q.     Mr. Laraway, that appears to
24  be -- well, you've been handed Exhibit 3,
25  which appears to be another e-mail from you
```

Page 28

```
1  this time only addressed to Brian Moore
2  also on June 20th of 2024.
3             Do you see that?
4      A.     Mm-hmm.
5      Q.     You need to say yes or no?
6      A.     Yeah.
7      Q.     Thank you.
8             MR. RODGERS:  Jim, do you mind
9      stating the Bates stamp just for the
10     record?
11            MR. CHAPMAN:  Sure.  It's
12     Carver ESI 000191.
13     Q.     Let me just start with, who is
14  Dan Albright?
15     A.     Dan Albright is a salesman for
16  Carver Companies.
17     Q.     And it appears that he
18  forwarded you something that was obtained
19  from CSX on June 18th of 2024.
20            See that?
21     A.     I do.
22     Q.     Did you read it at the time
23  that he forwarded it to you?
24     A.     I don't recall having read it
25  at the time.
```

Page 29

```
1      Q.     Does he routinely forward you
2  things of the nature like this?
3      A.     Often.
4      Q.     And when you say he is in
5  sales, for which Carver entity?
6      A.     He sells a lot of different
7  services including property maintenance.
8  He's sold port services, aggregate sales.
9  At the time, construction work, emergency
10  response.
11     Q.     Is he still employed by Carver?
12     A.     He is.
13     Q.     Do you know whether he
14  forwarded this e-mail to anybody besides
15  you on June 18th, 2024?
16     A.     I don't know.
17     Q.     Did he call you after
18  forwarding it to you?
19     A.     Not that I recall.
20     Q.     Did you have any conversation
21  with him after he forwarded you this e-mail
22  regarding its substance?
23     A.     Not that I recall.
24     Q.     Is the railroad known as CSX a
25  customer of Carver?
```

## NICHOLAS LARAWAY

June 17, 2025

Page 30

1      A.      It is.
2      Q.      And what type of business does
3  Carver deal with CSX?
4      A.      We have provided aggregate
5  materials and ballast to them at a number
6  of locations.  As I have mentioned before,
7  we provide emergency response for them.
8          CSX is Dan's largest client and
9  he services them all over the East Coast on
10  various projects from time to time, so he
11  is in frequent contact with CSX
12  representatives.
13      Q.      When you say emergency
14  response, you mean, like, if they have a
15  derailment or something?
16      A.      Historically, derailments,
17  washouts.  In New York, they have a lot of
18  issues related to snow and we've helped
19  them out with snowplowing and removal.  And
20  a lot of equipment rental.
21      Q.      Is all of that relationship
22  with CSX in the New York area?
23      A.      It is not.
24      Q.      So it extends down into South
25  Carolina?

Page 31

1      A.      It is in New England and in the
2  southeast, South Carolina, Georgia.
3      Q.      And you -- referring back to
4  Exhibit 2 --
5      A.      Mm-hmm.
6      Q.      -- it appears that two days
7  later you got the letter that my assistant
8  sent to you on June 20th of 2024.
9          Did you connect the dots at
10  that point that these were related?
11      A.      I certainly had questions as to
12  whether they were related, which is why I
13  remember sending that to Brian.
14      Q.      Okay.  Did you have any
15  conversation with Brian Moore afterwards
16  about this?
17      A.      I mean, on the 20th there was
18  ongoing conversations related to the
19  letter.
20          I don't recall if this specific
21  e-mail came up in those conversations.
22      Q.      Just to be clear, did you
23  actually talk to your lawyer, I forget his
24  name now, Anthony, Jr.  On -- I'm sorry
25  Anthony Cardona, Jr., on June 20th, 2024?

Page 32

1      A.      Absolutely.
2      Q.      Okay.  Did you talk to Brian
3  Moore that day?
4      A.      Yes.
5      Q.      Did you talk to Leonard
6  Baldassare that day?
7      A.      I did not.  Not that I recall.
8      Q.      You -- well, do you recall
9  talking to anybody else that sort of worked
10  in the marine towing -- Carver Marine
11  Towing besides Mr. Moore on June 20th?
12      A.      Not specifically.
13      Q.      Did you talk to Dan Albright
14  that day, June 20th?
15      A.      Not that I recall.
16      Q.      How long has Carver owned the
17  Tug Mckenzie Rose?
18      A.      Since 2020.
19      Q.      How much did Carver pay for it
20  when it was acquired?
21      A.      I believe it was approximately
22  a million dollars.
23      Q.      One million?
24          THE REPORTER:  Yes?
25      A.      Yes, sorry.

Page 33

1      Q.      And after acquiring it, did
2  Carver have any work done on it?
3      A.      There has been work done on it
4  since we've acquired it, yes.
5      Q.      Did it require, I don't know,
6  refurbishing or anything to make it
7  operational when you acquired it?
8      A.      Not that I recall.
9      Q.      Who was it acquired from?
10      A.      I believe it was Gellatly.  A
11  company with a name that included Gellatly.
12  I don't recall the specific entity.
13          THE REPORTER:  Can you just
14      spell that?
15      THE WITNESS:  Sure,
16  G-E-L-A-P-E-L-Y, Possibly.
17          MR. RODGERS:  Jim, I think it's
18      on survey that we got.
19          MR. CHAPMAN:  Can you mark that
20      as -- we are on 4 now?
21          Thank you.
22      A.      I was close.
23          (Whereupon, Exhibit 4 was
24      marked for identification.)
25      Q.      You've been passed on Exhibit

NICHOLAS LARAWAY

June 17, 2025

Page 34

1  4, which is the abstract of title for the
2  vessel, which with we obtained from the
3  Coast Guard National Vessel Documentation
4  Center.
5        And it appears to document that
6  it was sold by Gellatly & Criscione
7  Services Corp. to Carver Marine -- Coeymans
8  Marine Towing, correct?
9        A.    That is correct.
10       Q.    And that it appears that at the
11  time of the acquisition there was a
12  $2 million mortgage placed on the vessel?
13       A.    That appears to be correct.
14       Q.    Okay.  So you told us earlier
15  that you thought you'd paid a million
16  dollars for it, but there's a $2 million
17  mortgage.
18        Is -- can you explain the
19  difference?
20       A.    From what I recall, at the time
21  we purchased it and there was some equity
22  in the vessel and we had planned to do some
23  work in the future, so we were able to take
24  out a mortgage for more than we paid for.
25       Q.    So you paid the seller a

Page 35

1  million dollars, but succeeded in putting a
2  mortgage on it for $2 million; is that
3  right?
4        A.    That's correct.
5        Q.    And who was that mortgage with?
6        A.    BNB Bank.
7        Q.    Is BNB Bank still in existence
8  today?
9        A.    They are not.  They were
10  acquired by another bank.
11       Q.    And do you know who they were
12  acquired by?
13       A.    Dime Bank.
14             MR. RODGERS:  His knowledge of
15        who acquired them, Jim, right?
16        Jim?
17             MR. CHAPMAN:  Yes.
18             MR. RODGERS:  His knowledge.
19             MR. CHAPMAN:  That's what he
20        said.  I know.
21             MR. RODGERS:  I know.  He
22        doesn't work for Dime Bank.
23             MR. CHAPMAN:  I get that.
24       Q.    And continuing with Exhibit 4,
25  it appears further on in 2022 that there

Page 36

1  was another mortgage placed on the vessel
2  in the amount of $2,921,213.50, correct?
3        A.    That is correct.
4        Q.    Okay.  And for some reason that
5  mortgage was terminated just 30 days later
6  and it was reestablished -- actually it
7  looks like the same mortgage was -- must
8  have been recorded twice for some reason.
9             MR. RODGERS:  So one -- one
10        says satisfaction.
11       Q.    Yeah.  Well, the final entry on
12  this abstract of title says that there is a
13  preferred ship mortgage in the amount of
14  $2,921,213.50 that was filed on March 13th
15  of 2022.
16        Do you see that?
17       A.    I do.
18       Q.    Okay.  With Dime -- and the
19  mortgage is Dime Community Bank.
20        So is there a mortgage in that
21  amount on the vessel today?
22       A.    There is a mortgage on the
23  vessel.  To my knowledge, there is a
24  mortgage on the vessel that had an original
25  amount of that.

Page 37

1        Q.    It's been paid down some?
2        A.    Of course, yes.
3        Q.    Okay.  All right.
4             And do you know whether Dime
5  Community Bank had the vessel appraised
6  before they allowed a mortgage in that
7  amount?
8        A.    I don't know specifically if
9  Dime had it appraised.
10       Q.    So who on behalf of Carver
11  would've signed these loan documents?
12       A.    Carver Laraway.
13       Q.    Your uncle?
14       A.    Yes.
15       Q.    All right.  Would you have
16  reviewed them before he signed them?
17       A.    Yes.
18       Q.    Okay.  Were you involved in
19  some way in the, I'll call it refinancing,
20  to put an almost $3 million mortgage on it
21  in 2022?
22       A.    I -- from what I recall, I was.
23       Q.    And do you know whether there
24  was a loaned value requirement that Dime
25  Bank imposed in making this loan?

NICHOLAS LARAWAY

June 17, 2025

Page 38

1         Was there some limit on how
2    much they would loan on the vessel based on
3    its value?
4         **A.    I don't recall specifically.**
5         Q.    Have you ever seen an appraisal
6    for more than that amount of money, 2.9
7    million -- 2,921,213.50?
8             MR. RODGERS:  You're talking
9         about the appraisal --
10            MR. CHAPMAN:  Yeah, I'm asking
11        if he's -- yeah.
12            MR. RODGERS:  -- either a
13        survey or appraisal?
14            MR. CHAPMAN:  Either one, yeah.
15            MR. RODGERS:  Okay.
16        **A.    I recall having seen surveys of**
17   **that vessel that were at a larger number**
18   **than that, yes.**
19        Q.    Okay.  And what's the largest
20   number that you've seen it valued at based
21   on a survey?
22            MR. RODGERS:  Objection.  You
23        have the document and I ask that you
24        put it in front of him.
25            MR. CHAPMAN:  Well, I'm testing

Page 39

1        him memory first, Mr. Rodgers.
2            MR. RODGERS:  All right.  You
3        can test his memory.
4            If you know.
5        **A.    The largest appraisal that I've**
6   **seen is the 2025 appraisal that had a range**
7   **that was over $4 million.  I don't recall**
8   **the specific amount or range.**
9        Q.    Okay.
10            MR. CHAPMAN:  Can you mark that
11        as 5, please?
12            (Whereupon Exhibit 5 was marked
13        for identification.)
14        Q.    You've been passed Exhibit 5,
15   which is a condition and valuation survey
16   report addressed to Dime Community Bank on
17   the Tug Mackenzie Rose that's dated late
18   20 -- September 6th, 2021.
19            Do you see that?
20        **A.    I do.**
21        Q.    Okay.  Have you previously seen
22   that?
23            MR. RODGERS:  Just before you
24        answer.
25            Have you produced this?

Page 40

1             MR. CHAPMAN:  Yes.  And my
2    apologies, this was printed before we
3    actually responded to your discovery
4    last week, so it didn't have the
5    Bates Numbers on it, but it's Bates
6    Number Dime 000231.  The documents we
7    got pursuant to subpoena from Dime.
8             MR. RODGERS:  That was produced
9         to us?
10            MR. CHAPMAN:  Mm-hmm.  Yeah.
11        And the -- it ends in 237.  So it's
12        231 to 237.
13        Q.    Anyway, my question was, have
14   you seen this before?
15        **A.    I may have at the time.**
16        Q.    Okay.
17        **A.    I don't specifically recall.**
18        Q.    Yeah.  If you turn to the
19   second to last page, it's Page 6 of 7 of
20   the exhibit.  There at the bottom it says,
21   "Estimated fair market value, $4 million,"
22   right?
23        **A.    That is correct.**
24        Q.    And is that your memory that
25   you recall seeing or knowing of an

Page 41

1    appraisal in that amount or was it higher?
2        **A.    Can you repeat the question?**
3        Q.    Yeah.  You had previously said
4    that you had seen another appraisal and you
5    recall that it was, I think your words were
6    more than four million, but that's what I'm
7    trying to find out.  Is this that
8    appraisal?
9             MR. RODGERS:  I think he's
10        talking about a recent one.
11            This is 2021, right?
12            MR. CHAPMAN:  Yeah.
13        **A.    I testified from what -- I**
14   **testified that the largest appraisal I**
15   **recall having seen was from 2025 and it had**
16   **a range on it.**
17        Q.    Okay.
18            MR. RODGERS:  And I believe you
19        have that from Meyerrose.
20        Q.    Okay.  So that's -- I'm curious
21   about that because was it your testimony
22   that that appraisal that you've seen from
23   2025 was for $4 million or more?
24        **A.    From what I recall, yes.**
25        Q.    Okay.  But you don't think it

**NICHOLAS LARAWAY**

June 17, 2025

Page 42

1  was from this appraisal from 2021 that's
2  marked as Exhibit 5?
3          MR. RODGERS:  Objection to
4      form.  You can answer if you
5      understand the question.
6      **A.      Correct.**
7      Q.      Okay.  If you look at the first
8  page of Exhibit 5, it has the name of a
9  person, or an e-mail for a person,
10  Jennifer, I don't know how it's pronounced,
11  deblasi@dime.com.
12          See that?
13      **A.      I do.**
14      Q.      Do you know who that person is?
15      **A.      She is a member of the staff at
16  Dime that we've dealt with on a number of
17  transactions in the past.**
18      Q.      Okay.  Was she previously with
19  BNB Bank?
20      **A.      From what I recall, she was.**
21      Q.      Okay.  And to your knowledge,
22  is she still employed by Dime?
23      **A.      I'm not sure.**
24          MR. RODGERS:  Just for the
25      record, the Exhibit 5 the -- it

Page 43

1      references itself as a survey, not as
2      an appraisal.
3          MR. CHAPMAN:  Yeah.
4          MR. RODGERS:  Just to be
5      accurate.
6      Q.      Yes.  Page 1, it appears that
7  the title is condition and valuation survey
8  report.
9          MR. RODGERS:  Thank you.
10          MR. CHAPMAN:  Can you mark that
11      as 6, please?
12          (Whereupon, Exhibit 6 was
13      marked for identification.)
14      Q.      This is also a letter -- excuse
15  me, a document that was obtained from Dime
16  Community Bank pursuant to subpoena and
17  it's -- although it doesn't have the number
18  on it, it is Dime000159.
19          And it appears to be some sort
20  of desk review of the other appraisal.
21          It appears to be a desk review
22  of somebody else or the other appraisal, to
23  which it refers.
24          Do you see that?
25      **A.      I do.**

Page 44

1      Q.      It's addressed to Jennifer
2  Pepera.  Is that a different person than
3  Jennifer DeBlasi, if you know?
4      **A.      I'm not sure.**
5      Q.      Do you know the name Jennifer
6  Pepera at Dime Community Bank?
7      **A.      It doesn't specifically ring a
8  bell.**
9      Q.      Okay.  But this is a -- at
10  least a letter purporting to be a desktop
11  opinion of an appraisal of the -- excuse
12  me, of a survey of the Tug Mackenzie Rose,
13  correct?
14          MR. RODGERS:  Are you going to
15      ask him if he has seen it before --
16          MR. CHAPMAN:  No.  I'm just
17      asking him if that's what it appears
18      to be.
19          MR. RODGERS:  I prefer if you
20      ask him, Have you seen it before?
21      But...
22          MR. CHAPMAN:  How about if he
23      answers that question first and then
24      I'll ask him if he's seen it before?
25          MR. RODGERS:  It should be the

Page 45

1      first question, Jim.  You know better
2      than that.
3      **A.      Can I answer?**
4      Q.      Yeah, you can.
5      **A.      It appears to be.**
6      Q.      Okay.  And do you know whether
7  you've seen it before?
8      **A.      I don't recall having seen this
9  before.**
10      Q.      Do you know how much insurance
11  coverage for loss of the Tug Mackenzie Rose
12  the company carries on it?
13          MR. RODGERS:  Back then, at the
14      time or now?
15      Q.      Well, at the time of the
16  allision with the Belt Line Bridge --
17      **A.      I --**
18      Q.      -- June of 2024.
19      **A.      I do not specifically recall.**
20      Q.      Okay.  Is there somebody else
21  in your organization who handles insurance
22  for Carver Marine Towing?
23      **A.      Yes.**
24      Q.      Who's that?
25      **A.      It's currently being handled by**

**NICHOLAS LARAWAY**

June 17, 2025

Page 46

1  our financial controller.
2      Q.    And who is that?
3      A.    **Her name is Melissa Jochum.**
4      Q.    Jochum or Yoakum?
5      A.    **J-O-C-H-U-M.**
6      Q.    Okay.
7      A.    **She handles the nuts and bolts**
8  **of valuations, adding and subtracting**
9  **equipment.**
10          MR. RODGERS:  Just for the
11     record, Carver has produced the
12     information on the insurance
13     regarding them tug and company
14     pursuant to your demand, Jim, and the
15     further answer of this lawsuit.
16          MR. RYAN:  May I ask, is
17     Mr. Rodgers miced up, because I
18     don't -- it's very difficult to hear
19     the objections or whatever's being
20     said?
21          MR. RODGERS:  I'm very soft
22     spoken.
23          You get that?
24          MR. RYAN:  I heard the last
25     part, not the part before.

Page 47

1          MR. RODGERS:  I'll speak
2     louder.
3          Is this Ryan?
4          MR. CHAPMAN:  Yeah.
5          MR. RYAN:  Yes, thank you.
6          MR. CHAPMAN:  Can you mark that
7     as 7, please?
8          Thank you.
9          (Whereupon, Exhibit 7 was
10     marked for identification.)
11          MR. RODGERS:  Just for the
12     record, it's Carver00073 and 7 -- no
13     I'm sorry.
14          MR. CHAPMAN:  It's 673.
15          MR. RODGERS:  673 and 674.
16     Q.    Here is a copy for you.
17          Mr. Laraway, this was produced
18  by the company in discovery.  And I believe
19  it to be a schedule of vessels and
20  the -- including the mounts for which they
21  are insured.
22          And at the top of the second
23  page of this exhibit, it list the Mackenzie
24  Rose.  Do you see that very first line?
25     A.    **I do.**

Page 48

1      Q.    And it says that it's the
2  amount insured/agreed, value is $3,070,000,
3  correct?
4      A.    **That is correct.**
5      Q.    Do you understand why it is
6  insured for that amount?
7          MR. RODGERS:  In this document?
8          MR. CHAPMAN:  No.
9          MR. RODGERS:  In this document.
10     Q.    Not necessarily in this
11  document, but I'm just trying to understand
12  why the company is insured it in that
13  amount.
14          MR. RODGERS:  Just for the
15     record, it's -- I think it's dated
16     11/1/2023.
17          You can answer, if you know.
18     A.    **The company generally insures**
19  **the vessel for -- the vessels for a minimum**
20  **of the fair market value, and when there's**
21  **a higher replacement value, we try and**
22  **insure them for more because if in the**
23  **event that we needed to utilize the**
24  **insurance, we would need to generally**
25  **replace it with something.**

Page 49

1      Q.    And is it your understanding
2  that amount, that $3,070,000 is a valuation
3  that's been agreed to between Carver and
4  its insurance company, which appears to be
5  Travelers?
6          MR. RODGERS:  On that
7     date -- on the date of the document?
8      A.    **That is my general**
9  **understanding.**
10     Q.    Okay.  And that that would be
11  the agreed value for the life of this
12  particular policy, correct?
13     A.    **Subject to any change, but yes.**
14     Q.    Yeah.  Okay.
15          MR. RODGER:  Yeah.  This what
16     we produced.  It should say --
17          MR. CHAPMAN:  Where's the next
18     exhibit, please?
19          THE REPORTER:  That's the next
20     one.
21     Q.    I'm going to pass Exhibit 8,
22  Carver 001929 through 1917.
23          (Whereupon, Exhibit 8 was
24     marked for identification.)
25          MR. RODGERS:  Do you have one

NICHOLAS LARAWAY

June 17, 2025

Page 50

1      for me?
2              MR. CHAPMAN:  Sure.
3              MR. RODGERS:  Or just take
4      yours.
5              MR. CHAPMAN:  You ignore my
6      note.  He's already answered the
7      question, but this...
8              MR. RODGERS:  Can I mark it or
9      you need it back?
10             MR. CHAPMAN:  No, you can mark
11     it up.
12             MR. RODGERS:  Just so you know,
13     I'll cross that out.
14             MR. CHAPMAN:  Yeah.
15     Q.      This document was produced to
16 us by Carver, so I presume that it's in
17 Carvers files, correct?
18     A.      Yes.
19     Q.      Okay.  And it is a -- there's a
20 summary page on the front, but then on
21 page, the second page of this exhibit, it
22 says "Appraisal as of January 21, 2020 on
23 the Mary Gellatly."  Right?
24     A.      That is correct.
25     Q.      Okay.  So this presumably was

Page 51

1 done before it was acquired.  And it was
2 done for the account of Carver according to
3 the certification there on Page 1930,
4 correct?
5     A.      That is correct.
6     Q.      Okay.  And the fair market
7 value opinion as of January 31, 2020 is
8 stated on the first page is $3,070,000,
9 correct?
10    A.      That is correct.
11    Q.      Okay.  That's not the
12 replacement cost, correct?
13    A.      Correct.
14    Q.      All right.  And to your
15 knowledge, has the vessel been
16 assured -- insured on an agreed value basis
17 for $3,070,000 going back to 2020, to your
18 knowledge?
19    A.      I don't specifically know.
20    Q.      Any reason to think that it
21 would be something different than that?
22             MR. RODGERS:  If you know.
23     Don't guess.
24    A.      I don't specifically know.
25    Q.      Okay.  And who in your

Page 52

1 organization would you expect to know?
2     A.      I would've expected Brian Moore
3 as the general manager, Melissa Jochum who
4 could look that up, but she wouldn't have
5 specific knowledge because she hasn't been
6 here that whole time.
7     Q.      Okay.  The way to test that is
8 to actually go back and look at all
9 those --
10    A.      Of course.
11    Q.      -- previous policies and see
12 what it's insured for, correct?
13    A.      Correct.
14    Q.      All right.  Has the amount of
15 insurance for the vessels been increased,
16 to your knowledge since the casualty, since
17 the allision?
18    A.      I believe that it has been
19 increased recently in 2025 after completion
20 of a shipyard that was done.
21    Q.      Okay.  Do you know what it is
22 now?
23    A.      I don't specifically know.
24    Q.      Is it over four million.
25             MR. RODGERS:  The insurance?

Page 53

1              MR. CHAPMAN:  Yeah, the agreed
2      value.
3              MR. RODGERS:  Or the --
4              MR. CHAPMAN:  The agreed value.
5              MR. RODGERS:  Yeah.
6              MR. CHAPMAN:  Yeah.
7     A.      I would believe so.
8     Q.      Okay.  So you did mention that
9 there was a -- you thought a 2025 survey
10 that you've seen and it provides a
11 valuation that you think exceeds
12 $4 million.
13             And is it your understanding
14 that on that basis, it's been insured for
15 whatever that survey reported the fair
16 market value to be?
17             MR. RODGERS:  Objection to
18     form.  You can answer if you
19     understand the question.
20    A.      That would be my understanding
21 of the process to increase the insurance
22 value, yes.
23    Q.      Okay.  Is there any reason we
24 can't get a copy of that appraisal?
25             MR. RODGERS:  You have it, it's

**NICHOLAS LARAWAY**

June 17, 2025

Page 54

1    Meyerrose.
2           MR. CHAPMAN:  Meyerrose did one
3    in 2024 for your limitation actually.
4           MR. RODGERS:  No, I believe
5    they did one in 2025.
6           MR. CHAPMAN:  Well, I --
7           MR. RODGERS:  So --
8           MR. CHAPMAN:  I'd need to see
9    it.  Can you give me the Bates
10   Numbers?  We'll be happy to go look
11   it up.
12          MR. RODGERS:  Yeah.  Just give
13   us a second.  I'm talking to counsel.
14          One shows April 1st 20 -- yeah.
15   2025.  See if this dates -- no, there
16   isn't on this one.  Yeah, 001962.
17          MR. CHAPMAN:  What does it
18   start with though?
19          MR. RODGERS:  Carver.
20          MR. CHAPMAN:  Just says Carver?
21          MR. RODGERS:  What number?
22          MR. CHAPMAN:  Yeah.  Some of
23   your productions say Carver and some
24   have a long name.
25          MR. RODGERS:  This is what I

Page 55

1    sent to you after I looked at
2    Meyerrose.  Remember we -- you
3    subpoenaed them.
4           MR. CHAPMAN:  Okay.
5           MR. RODGERS:  And then I -- we
6    did a privilege review copy and sent
7    it to you.
8           MR. CHAPMAN:  All right.  Did
9    you hold anything on the basis of
10   privilege?
11          MR. RODGERS:  On that?
12          MR. CHAPMAN:  Yeah.
13          MR. RODGERS:  No. No.
14          MR. CHAPMAN:  Carver, what is
15   it?  001963?
16          MR. RODGERS:  That's correct.
17          MR. CHAPMAN:  Okay.
18          MR. RODGERS:  Do you want to
19   take a break and --
20          MR. CHAPMAN:  Yeah, I'd like to
21   take a look at it.
22          MR. RODGERS:  -- it's passed an
23   hour, so I'll see if I have a copy in
24   my office.
25          MR. CHAPMAN:  Okay.

Page 56

1           MR. RODGERS:  If not, I'll
2    print it out.
3           MR. CHAPMAN:  All right.
4           MR. RODGERS:  You guys, we have
5    coffee here.  This is also a coffee
6    room.
7           THE REPORTER:  Okay.
8           MR. RODGERS:  Opposing
9    counsel's not allowed to go in.
10          THE VIDEOGRAPHER:  We are going
11   off the record.  The time is 11:05
12   a.m.
13          Off the record.
14          (Whereupon, a short recess was
15   held at this time.)
16          THE VIDEOGRAPHER:  Beginning
17   Media Number 2.  We are back on the
18   record.  The time is 11:18 a.m.
19   Q.   We'll come back to the
20   appraisal in a little bit.  Here it is.
21          MR. RODGERS:  Copies in the
22   bottom.
23          MR. NANANVATI:  That's
24   there -- wait, which is the original?
25          MR. RODGERS:  Copies in the

Page 57

1    bottom.
2           MR. NANANVATI:  Okay, good.
3           MR. RODGERS:  I guess that one
4    has -- it's -- yeah.  The ones to
5    mark, this one, Jim?
6           MR. CHAPMAN:  Yeah, what'll
7    that be?  9?
8           **THE WITNESS:  This one was 8.**
9           THE REPORTER:  8?
10          **THE WITNESS:  Nope, this was 8.**
11          MR. CHAPMAN:  Yeah.  That's 8,
12   so this would be 9.
13          THE REPORTER:  Thank you.
14   Marked.
15          (Whereupon, Exhibit 9 was
16   marked for identification.)
17   Q.   I didn't realize it was quite
18   such a thick document, but I think we're
19   looking at maybe the first 10 pages of this
20   thing and the rest of it is all
21   photographs.
22          But is this the survey that you
23   were recalling in your earlier testimony
24   that it was done in 2025 by Meyerrose and
25   Company?

NICHOLAS LARAWAY

June 17, 2025

Page 58

1      A.    Yes.
2      Q.    And it appears that the
3  valuation set forth in this report marked
4  Exhibit 9, is four and a half to five
5  million dollars, if I am reading Page 9
6  correctly?
7      A.    That is correct.
8      Q.    And do you know how much
9  it -- the vessel's currently insured for
10 then?
11     A.    I don't know specifically.
12     Q.    Did you understand they went
13 up?
14     A.    Yes.
15     Q.    Got you.  So at the time of the
16 allision, what is Carver's understanding of
17 the value of the vessel, the Tug Mackenzie
18 Rose?
19     A.    Approximately two and a half
20 million dollars.
21     Q.    And what is that based upon?
22     A.    A survey that was done recently
23 after the allision.
24     Q.    And was that the survey by
25 Mr. Meyerrose?

Page 59

1      A.    That is my understanding.
2      Q.    Okay.  Have you seen that
3  survey recently, Mr. Laraway?
4      A.    Yes.
5      Q.    Let me show you what was
6  previously marked in Mr. Moore's deposition
7  as Exhibit 33.
8      A.    Thank you.
9          MR. RODGERS:  Jim?
10         MR. CHAPMAN:  I do not have an
11     extra copy of it.  That's the
12     original from the previous
13     deposition.
14         MR. RODGERS:  Okay.  Yeah.
15     Good.  Let me have this.
16     Q.    Is that the survey you're
17 talking about?
18     A.    Yes, sir.
19     Q.    And the valuation is two and a
20 half million dollars?
21     A.    That's the high end of the
22 range, yes, sir.
23     Q.    Okay.  Other than that survey,
24 is there anything else on which Carver
25 bases its valuation of the Tug Mackenzie

Page 60

1  Rose as of the date of the allision in
2  2024?
3          MR. RODGERS:  Objection to
4      form.  You can answer if you
5      understand it.
6      A.    Nothing specifically that I can
7  bring to mind.
8      Q.    Okay.  I mean, okay.
9      A.    Industry experience.
10     Q.    I'm sorry?
11     A.    I said the industry experience
12 of our leaders.
13     Q.    Which includes yours?
14     A.    Which would include more
15 specifically Brian Moore as the general
16 manager and expert in the maritime field.
17     Q.    And has he ever told you that
18 he thought that as of the date of the
19 casualty, the vessel was worth something
20 betwee -- up to two and a half million
21 dollars?
22     A.    I don't recall having that
23 specific conversations with him.
24     Q.    All right.  Great.  Thank you.
25 I'll take that back.  Thank you.

Page 61

1          The vessel at -- Tug Mackenzie
2  Rose, at the time of the of allision, was
3  pushing a Weeks barge to a job site where
4  some bridge components or things that were
5  needed to construct a bridge would do; is
6  that right?
7      A.    It was pushing a Weeks barge to
8  or from a job site, I don't know.
9      Q.    Okay.
10     A.    In which direction.
11     Q.    And how much was Carver being
12 paid for making that transit?
13     A.    I don't know the specific
14 amount.
15     Q.    You don't?
16     A.    Not off the top of my head.
17     Q.    Carver would have been paid
18 something for --
19     A.    Absolutely.
20     Q.    -- delivering that cargo,
21 right?
22     A.    Yes.
23     Q.    And what job was it for?
24     A.    We were hired by -- my
25 understanding is that we were hired by

NICHOLAS LARAWAY

June 17, 2025

Page 62

1   Skanska on a one-off basis to move this
2   barge for a project they were participating
3   in.
4        Q.    So this is not like a long-term
5   project where you were making lots of runs?
6   It was just once?
7        A.    They contacted us on a one-off
8   basis to move it as they do from time to
9   time.
10       Q.    And how much did they pay
11  Carver to do the job?
12       A.    It was a lump some fee.  I do
13  not recall the specific amount.  I believe
14  it was in the documents we provided.
15            MR. CHAPMAN:  Is that true?  Is
16       that -- Mr. Rodgers, is that a
17       document that's actually been
18       produced so far?
19            MR. RODGERS:  I know we were
20       looking for it.  I'm not sure if
21       we've produced it yet.
22       Q.    So just to be clear, if you can
23  take a look at Exhibit 1 really quick.
24            On the list of topics.
25       A.    Mm-hmm.

Page 63

1        Q.    Topic Number 7 is freight
2   towage or higher received or owed for the
3   service of the vessel at the time of the
4   incident.
5        A.    Yes.
6        Q.    Right.  So I'm trying to
7   understand, what did you do to prepare
8   yourself to be able to testify on that
9   topic?
10            MR. RODGERS:  Objection.  Don't
11       testify as to what you've discussed
12       with your lawyers, me or any other
13       lawyer.
14            You may -- can I confer with
15       the witness?
16       Q.    Let me ask this --
17            MR. RODGERS:  It's to your
18       benefit.
19            MR. CHAPMAN:  Let me ask
20       this --
21            MR. RODGERS:  All right.  Go
22       ahead.
23       Q.    Did Carver invoice Skanska for
24  this job?
25       A.    I believe so.

Page 64

1        Q.    Okay.  Did Skanska demand some
2   reduction, or some credit or discount --
3        A.    Not that I'm aware of.
4        Q.    -- that resulted in Carver not
5   getting paid?
6        A.    Not that I'm aware of.
7        Q.    Okay.  So to your knowledge,
8   Skanska paid whatever they were invoiced
9   for?
10       A.    That is my understanding.
11       Q.    Have you ever seen that
12  invoice?
13       A.    I do not recall having seen the
14  specific invoice.
15       Q.    Okay.  Did you talk to anybody
16  besides the lawyers about the amount of
17  that invoice?
18       A.    I did.
19       Q.    Okay, and what were you told?
20       A.    I was told that we did the work
21  for Skanska.  They reached to us on a
22  one-off basis to move it and we charged
23  them lump sum.  I do not recall the amount,
24  that is the simple problem here.
25       Q.    You think somebody did tell you

Page 65

1   the amount, you just don't remember it?
2        A.    Correct.
3        Q.    Okay.  So is there some way to
4   find that out?
5            MR. RODGERS:  Yes.
6        A.    Yes.
7            MR. RODGERS:  I believe in our
8       response.  We may have said we were
9       still searching for that.  And that
10      would be the witness, I believe, has
11      been searching for it, no.  Maybe
12      not.
13       A.    I spoke to our salesmen about
14  the information, asked him to forward it
15  over.  We spoke about it over the phone, he
16  did not send it to me yet, but we spoke
17  about it.  That's how I have the knowledge
18  of the business arrangement.
19       Q.    Who was the salesman?
20       A.    Dylan Galm.
21       Q.    Well, let me just kind of ask a
22  little bit around that then.  Is there a
23  process to give a quote, this is what it's
24  going to cost or did they just call you up
25  and say hey, we need you to move this barge

NICHOLAS LARAWAY

June 17, 2025

Page 66

1  for us.  Tell us what it's going to be or
2  send us an invoice when you're done?
3      **A.    The process generally includes**
4  **quoting from time to time, when it's, "Can**
5  **you do something for me?  Give me a number,**
6  **we do it," and we send an invoice and we**
7  **get paid for it.  So it could happen in**
8  **either scenario.**
9      Q.    Okay.  And do you know what
10  happened in this scenario with Skanska?
11      **A.    Dylan indicated with -- to me**
12  **when I spoke to him that there was a rate**
13  **sheet provided, a one off, and that we did**
14  **the work, we invoiced him for it and to his**
15  **knowledge, we were paid for it.  And I can**
16  **obtain that number for you during a break**
17  **if you'd like.**
18      Q.    Okay.
19          MR. RODGERS:  If not, we'll
20      leave a -- you could leave a space in
21      the record for that amount and we'll
22      get it to counsel.
23      **A.    _____**
24  **_____.**
25      Q.    So I want to ask you some

Page 67

1  questions about topic number nine.  The
2  operation course and speed of the vessel on
3  the day of the incident.
4          Did you talk to anybody, not
5  the lawyers, but did you talk to anybody
6  besides the lawyers to educate yourself
7  about the operation course and speed of the
8  vessel on the date of the incident?
9          MR. RODGERS:  Subject to, I
10      believe our objection --
11      Q.    Yes.
12          MR. RODGERS:  -- in the written
13      objections, he can answer.
14      **A.    I did not.**
15      Q.    Okay.  Why not?
16          MR. RODGERS:  Objection to
17      form.
18      **A.    I spoke with our attorneys, I**
19  **reviewed the information we provided and I**
20  **believe that Brian Moore and Lenny are the**
21  **appropriate people to testify as to those**
22  **items related to the actions of the tugboat**
23  **on that day.**
24      Q.    So you are not in a position to
25  testify about that topic based on anything

Page 68

1  you've done to prepare for this deposition?
2          MR. RODGERS:  He's relying on
3      the testimony of Mr. Moore and
4      Mr. Baldassare.
5      Q.    Maybe I'm -- I apologize.
6          MR. RODGERS:  As well as the
7      documents produced to date.
8      Q.    I may have misunderstood your
9  answer.  You said that that information
10  would be in the hands of or in the minds of
11  or knowledge of Mr. Moore and
12  Mr. Baldassare?
13      **A.    And what they have testified**
14  **to, and all of the information we have**
15  **provided today.**
16      Q.    Okay.  And did you read their
17  testimony?
18      **A.    I did not.**
19      Q.    Did you read a summary of their
20  testimony?
21          MR. RODGERS:  Objection.
22      Attorney-client.  Don't answer that.
23      Q.    I'm not asking what's in the
24  summary --
25          MR. RODGERS:  Don't answer

Page 69

1      that.
2      Q.    I'm only asking whether you
3  have read a summary of their testimony.
4          MR. RODGERS:  Objection.  Does
5      that include what the attorneys have
6      provided?
7          MR. CHAPMAN:  It might have.
8      I'm not asking what the substance
9      was.
10          MR. RODGERS:  Don't answer any.
11      No.  You're answering what we did to
12      prep him and that -- I mean, you're
13      asking what we did to prep him.
14          MR. CHAPMAN:  Well, are you
15      telling the witness not to answer,
16      Mr. Rodgers?
17          MR. RODGERS:  I think I
18      objected.
19      Q.    Okay.  I understand your
20  objection.  I'm just asking, did you read a
21  summary of what either Mr. Baldassare or
22  Mr. Moore testified to?
23          MR. RODGERS:  You can answer if
24      you read a summary.  Not what you
25      read.

## NICHOLAS LARAWAY

June 17, 2025

Page 70

1      **A.    I did read summaries.**
2          Q.    And do you know who prepared
3  the summaries?
4          MR. RODGERS:  What was the -- I
5      didn't hear you.
6          Q.    I said do you know who prepared
7  the summaries?
8          MR. RODGERS:  Don't answer
9      that.  I'm directing the witness not
10     to answer.
11         Q.    Well, I'm just trying to
12 understand.  Was it like ChatGPT that
13 prepared them or was it an actual human
14 being, if you know?
15         MR. RODGERS:  You're asking him
16     if it came from his attorneys or from
17     somebody else?
18         MR. CHAPMAN:  Well, it might
19     have come from his attorneys.
20         MR. RODGERS:  Well, why don't
21     you establish that so you're not
22     asking him privileged information?
23         MR. CHAPMAN:  Well, I started
24     by asking if he knew who had prepared
25     the summaries.

Page 71

1          MR. RODGERS:  You're getting
2      into attorney-client preparation.
3      You can answer if your attorneys
4      provided you, or somebody else.
5      **A.    It was provided by my**
6  **attorneys.**
7          Q.    So --
8          MR. RODGERS:  In preparation
9      for this deposition?
10     **THE WITNESS:  Yes.**
11         MR. RODGERS:  I just want to
12     make that clear, Jim, that we -- that
13     he's prepared himself.
14         Q.    And do you -- what was the
15 speed of the vessel when it allided with
16 the Belt Line Bridge on June 15th, 2024?
17         MR. RODGERS:  Objection.  Asked
18     and answered.  You can answer it
19     again.
20     **A.    I would rely on the testimony**
21 **of Brian and Lenny as well as the documents**
22 **we've provided in discovery.**
23         Q.    Okay.  But what was the speed?
24 I can -- I hear you saying you're relying
25 on them.

Page 72

1      **A.    I don't know off the top of my**
2  **head.**
3          Q.    You don't?
4      **A.    I do not.**
5          Q.    What was the heading of the Tug
6  Mackenzie Rose at the time that it allided
7  with the Norfolk and Portsmouth Belt Line
8  Bridge on June 15th, 2024?
9          MR. RODGERS:  Objection.  Asked
10     and answered.  You can --
11     **A.    I would repeat my prior answer.**
12         Q.    How long ago did you review the
13 summaries that you've mentioned of the
14 testimony of Mr. Baldassare or Mr. Moore?
15         MR. RODGERS:  Objection.  I'm
16     directing the witness not to answer.
17     And I know what you are doing, Jim.
18     You are trying into get into
19     the -- attorney-client work
20     process.
21         Q.    I'm --
22         MR. RODGERS:  Yeah, you are.
23     So don't answer that.  Maybe ask it a
24     different way.  I don't think there's
25     another way, but ask it and I'll let

Page 73

1      him answer.
2          Q.    At the time of the allision,
3  what was Carver's procedure for reporting
4  allisions?
5      **A.    The procedure was contained**
6  **within the safety management system.**
7          Q.    Is that the section called the
8  incident response, section 9.5?
9      **A.    I believe so, yes.**
10         Q.    Let me pass over to you the
11 document that was marked as Exhibit 4
12 during Mr. Moore's deposition.  These are
13 sections of the safety management system
14 previously produced to us by Carver.  I
15 want to ask you some questions about them.
16         MR. RODGERS:  You don't have a
17     copy for me?
18         MR. CHAPMAN:  I don't.  I
19     brought the original and the copy
20     that I took.
21         MR. RODGERS:  It's all right.
22         MR. CHAPMAN:  From the deps.
23     But if you want to --
24         MR. RODGERS:  Well, let me go
25     through it quickly.

NICHOLAS LARAWAY

June 17, 2025

Page 74

1          MR CHAPMAN:  You still have
2    your copy back in your office?
3          MR. RODGERS:  I'd have to have
4    like 50 documents in here.  It's
5    okay.  I know what this is.
6    Q.    So if you look towards the end
7    of the document and I didn't have anything
8    to do with numbering.  So these seem like
9    they are not numbered in the right order,
10   but they follow the section numbers of the
11   safety management system.  You see that?
12   A.    Okay.
13   Q.    Based on the title page.  So
14   towards the end, you should see a page that
15   looks like this and --
16   A.    What does it say on the bottom?
17   Carver number?
18   Q.    It says Carver number 163.
19         MR. RODGERS:  163?
20   Q.    Mm-hmm.  000163.
21         MR. RODGERS:  You know, Jim,
22   let's take a break.  I'm going to
23   just see if -- I think I have a pile
24   of the exhibits we used that week and
25   that should be in it, right?

Page 75

1          MR. CHAPMAN:  Yeah.  That's
2    fine.  You want to go grab it?
3          MR. RODGERS:  Two minutes.
4    Yeah.
5          THE VIDEOGRAPHER:  We are going
6    off the record.  The time is 11:40
7    a.m.
8          THE VIDEOGRAPHER:  Beginning
9    Media Number 3.  We are back on the
10   record.  The time is 11:50 a.m.
11   Q.    Mr. Laraway, do you have
12   Exhibit 4 from Mr. Moore's deposition in
13   front of you?
14   A.    I do.
15   Q.    And then we were referring to
16   the section labeled 9.5 accident/incident
17   reporting.
18   A.    I can take this apart, right?
19         MR. RODGERS:  Yes.
20   Q.    Starts at Carver 000163.  You
21   see that?
22   A.    I do.
23   Q.    Okay.  And it's clear this is
24   the safety management system requirements
25   around what needs to be done as far as an

Page 76

1    incident or accident reporting procedure,
2    correct?
3    A.    That is my understanding.
4    Q.    Okay.  Have you reviewed this
5    before your testimony today?
6    A.    I have in general reviewed it,
7    yes.
8    Q.    So the two reporting
9    priorities, first is the master and that's
10   the master of the tug, or master of the
11   vessel, correct?
12   A.    Yes.
13   Q.    "We'll notify the office as
14   soon as practical after a marine casualty."
15   And second bullet, "The master will notify
16   the nearest USCG unit," which I take to
17   mean U.S. Coast Guard unit, "as soon as
18   practical after a marine casualty," right?
19   A.    That's what that says, yes.
20   Q.    Okay.  And that's Carver's
21   procedure; isn't it?
22   A.    That is what that says, yes.
23   Q.    All right.  And then it appears
24   to actually include the entire text of a
25   few sections of the code of federal

Page 77

1    regulations as part of the
2    incident/accidents' reporting procedures,
3    right?  It doesn't?
4    A.    I'm sorry.  No, he --
5    Q.    Oh, he took it away from you?
6    A.    Yes.
7          MR. RODGERS:  Yeah, I did.
8    Just an objection to the extent
9    you're asking him any kind of a legal
10   question or conclusion.
11   Q.    So --
12         MR. RODGERS:  Could you refer
13   to what you're saying when you say code of
14   federal regulation?  What you are pointing
15   to?
16   Q.    Yeah.  They're on Page 163
17   under the heading "Marine Casualty or
18   Incident."  It refers to 46 CFR 4.03-1,
19   correct?
20   A.    Correct.
21   Q.    All right.  And on the
22   following pages it prefers to further
23   sections of 46 CFR 4.03, 4.05?
24   A.    That is correct.
25   Q.    Yeah.  Okay.  So Carver's

NICHOLAS LARAWAY

June 17, 2025

Page 78

1  policy is to follow the code of federal
2  regulations?
3          MR. RODGERS:  Objection to
4      form.
5          You can answer if you
6      understand the question.
7      A.    Our policy is to follow these
8  specific regulations.
9      Q.    Okay.  So if you turn to Page
10  164, under the section, "Notice of Marine
11  Casualty 46 CFR 4.05-1," in Section A, it
12  says, "Immediately after addressing
13  resultant safety concerns, the owner,
14  agent, master operator or person in charge
15  shall notify the nearest Sector Office,
16  Marine Inspection Office or Coast Guard
17  Group Office whenever a vessel is involved
18  in a marine casualty consisting in," and
19  it's got a bunch of sub parts, right?
20     A.    It does.
21     Q.    So the first one is "Unintended
22  grounding or unintended strike of (allision
23  with) a bridge," correct?
24     A.    That's correct.
25     Q.    Okay.  To Carver's knowledge or

Page 79

1  understanding, was the allision with the
2  Norfolk and Portsmouth Belt Line Bridge on
3  June 15th, 2024 unintended?
4          MR. RODGERS:  Just what he
5      understood at the time?  What they
6      understood at the time or now?
7      Q.    I'm asking him whether
8  he -- whether Carver believes that it was
9  unintended?
10         MR. RODGERS:  Okay.
11     A.    Yes.
12     Q.    Okay.  You don't have any
13  information to suggest that it was an
14  intended allision, correct?
15     A.    Correct.
16     Q.    Okay.  So in the context of
17  this reporting obligation, did Carver
18  immediately notify any of these Coast Guard
19  designated offices regarding the allision
20  with the Belt Line Bridge?
21     A.    Carver referring to myself and
22  the company, or Carver Marine Towing, or
23  anyone?
24     Q.    Okay.  Well, you are here on
25  behalf of Carver Marine Towing?

Page 80

1      A.    Yes.
2      Q.    Or Coeymans doing business as
3  Carver Marine Towing, right?
4      A.    Yes.
5      Q.    So in that capacity, I am
6  asking, did Carver notify any of those
7  Coast Guard offices immediately after the
8  allision?
9      A.    I'm not aware that they did.
10     Q.    Okay.  And when is the first
11  time that Carver notified the Coast Guard
12  of the allision?
13     A.    My understanding is that the
14  first correspondence with the Coast Guard
15  regarding this was days after it happened.
16     Q.    And what is Carver's
17  understanding of the reasons why it did not
18  notify the Coast Guard immediately after
19  the allision?
20     A.    My understanding from preparing
21  for this deposition is that the original
22  report provided to Lenny was that it was
23  strike between the barge and fendering and
24  not the bridge structure.  It was not until
25  days later that the fact that the bridge

Page 81

1  was struck came to light.
2      Q.    And who reported that
3  information to -- you called him Lenny,
4  that's Mr. Baldassare, right?
5      A.    Leonard.  Yep.
6      Q.    Who reported that information
7  to Mr. Baldassare?
8      A.    It was the captain or the mate,
9  I don't recall specifically.
10     Q.    The captain being Christopher
11  Miller?
12     A.    Yes.
13     Q.    Who's now deceased?
14     A.    Yes.
15     Q.    And the mate being James
16  Morrissey?
17     A.    Correct.
18     Q.    Who no longer works for the
19  company?
20     A.    Correct.
21     Q.    So is it Carver's assessment
22  that one or both of them conveyed false
23  information to Mr. Baldassare?
24         MR. RODGERS:  Objection to the
25     term false, but you can answer if you

**NICHOLAS LARAWAY**

June 17, 2025

Page 82

1    understand the question.
2        **A.    It is my understanding that**
3    **incorrect information was provided to**
4    **Lenny.**
5        Q.    By either Captain Miller or
6    Captain Morrissey?
7        **A.    Correct.**
8        Q.    How did Carver then become
9    aware that that information was incorrect?
10        MR. RODGERS:  Go ahead if you
11      know.
12        **A.    I would have to rely on the**
13    **testimony of Lenny and Brian as to how they**
14    **become aware that the information was**
15    **correct.**
16        Q.    Was it my letter that was
17    e-mailed to you on June 20th, 2024?
18        MR. RODGERS:  When the witness
19      had knowledge?
20        Q.    Yes.  Mm-hmm.
21        **A.    That is when I first had**
22    **knowledge that there was a strike between**
23    **the barge and the bridge.**
24        Q.    And did you come to learn that
25    either Mr. Baldassare and Mr. Moore knew of

Page 83

1    the strike with the bridge?  With the
2    bridge, not the fender system prior to the
3    letter that I sent to you on June 20th,
4    2024?
5        MR. RODGERS:  Who were the
6      employees you just mentioned?
7        Q.    Moore and Baldassare.
8        **A.    That is my understanding.**
9        Q.    That they did know of it before
10    I sent the letter to you?
11        MR. RODGERS:  Objection.  No.
12      That's not what he's saying.
13        MR. CHAPMAN:  Maybe I
14      misunderstood.  That's what I'm
15      trying to tease out.
16        MR. RODGERS:  I think you're
17      mixing up not intentionally, but
18      he -- and the witness could be
19      getting mixed up what the captain and
20      Morrissey knew, and what Moore and
21      Baldassare knew.
22        Q.    That's what I'm trying to find
23    out.
24        MR. RODGERS:  Well, it's
25      getting mixed up because you asked

Page 84

1    first the Captain Morrissey, but now
2    it's Baldassare, and I don't want him
3    confused.
4        Q.    I'm just trying to find out if
5    you became aware that Mr. Moore or
6    Mr. Baldassare knew that the original
7    information that was provided by either
8    Captain Morrissey or Captain Miller on the
9    date of the allision was incorrect at any
10    time before you received my letter on June
11    20th of 2024?
12        **A.    I am not aware of when they**
13    **specifically learned that they had been**
14    **provided incorrect information about it**
15    **hitting the fendering, not the bridge.**
16        Q.    But did you come to learn that
17    they knew of it before you did?
18        MR. RODGERS:  Objection.
19        Q.    That they knew of the incorrect
20    information before you did?
21        MR. RODGERS:  Objection to
22      form.  You're making a statement.  You are
23      asking if he knows that they knew
24      beforehand or are you telling him they knew
25      beforehand?  So my objection is to the

Page 85

1    form.
2        MR. CHAPMAN:  If you want to
3      make a form objection, just make a form
4      objection rather than continuing to --
5        MR. RODGERS:  I mean, if you
6      are not going to re-do the question,
7      then I'll just tell him not to answer
8      it.  So I'd ask that you redo the
9      question in a proper form.
10        MR. CHAPMAN:  Okay.
11        MR. RODGERS:  So it's not to
12      confuse the witness.
13        MR. CHAPMAN:  So I'm not going
14      to re-ask the question.  Okay.  If
15      you want me to tell him not to
16      answer, that's your call.
17        MR. RODGERS:  I know you want
18      me to do that, but we'll see what
19      happens.  You want to repeat the
20      question?
21        **A.    Can you repeat the question?**
22        MR. CHAPMAN:  Sure.  Madam
23      Court Reporter, could you read it
24      back, please?
25        (Whereupon, the above record

Page 86

1    was read back by the court reporter.)
2            MR. RODGERS:  Do you understand
3        the question?
4        A.    I understand the question.  I'm
5    not sure as to those facts, you would have
6    to rely on their testimony as to when they
7    became aware.
8        Q.    To Carver's understanding, did
9    anyone contact the Norfolk and Portsmouth
10   Belt Line regarding the allision at any
11   time prior to my letter to you on June
12   20th, 2024?
13       A.    Not that I'm aware of.
14       Q.    As part of your
15   responsibilities with Carver, have you ever
16   had occasion to access the safety
17   management system for Carver Marine Towing?
18       A.    Access it?  I have never had
19   occasion to access it directly, no.
20       Q.    Okay.  You -- so never go to
21   look things up, or try to understand what's
22   in it or that's sort of thing --
23           MR. RODGERS:  Objection to
24        form.
25       Q.    -- in your role with Carver?

Page 87

1            MR. RODGERS:  You can answer.
2        Objection to form.
3        A.    I have not been required to
4    access it.  If I ever had any questions, I
5    would ask it of the general managers.
6        Q.    So any of the sections that you have
7    safety management system that you have
8    reviewed have been in connection with
9    attempting to prepare for this deposition,
10   right?
11       A.    Any of the sections that I have
12   reviewed recently have been in connection
13   with this deposition, correct?
14       Q.    All right.  So let me ask you
15   the, again referring to Exhibit 4.  And you
16   may want to put a paper clip back on that
17   just so it doesn't get all out of order?
18       A.    I can just -- I'll close it and
19   get back there if I need to.
20       Q.    Okay.  So there is a section
21   7.3 in Exhibit 4, which looks like a form
22   that you would fill out.
23           It starts at the --
24       A.    I can, yeah.
25       Q.    Bates Number at the bottom is

Page 88

1    Carver 000898.
2            Have you reviewed that before
3    today?
4            MR. RODGERS:  Hasn't seen it
5        before the deposition.
6        Q.    Well, you can call it seen,
7    yeah.  I'm just trying to find out if it
8    was something that you looked at before
9    today?
10           MR. RODGERS:  I prefer if you
11       ask him, has he seen it before today?
12       A.    I have seen the form.  I
13   haven't reviewed it --
14       Q.    Okay.
15       A.    -- in specific detail.
16       Q.    If you turn to the second page
17   of the form.  Page 899.  There is a
18   numbered section 1.13, "Lookout."  You see
19   that?
20       A.    Yes.
21       Q.    Okay.  It says, "It's
22   required."  Do you see the text required
23   over in the right-hand side?
24       A.    That's correct.
25       Q.    Okay.  Do you know the purpose

Page 89

1    of requiring lookout information as part of
2    this form?
3            MR. RODGERS:  Objection to
4        form.  He is not here as an expert.
5        You can answer as to what he knows.
6        A.    As to my personal knowledge, I
7    do not know why.
8        Q.    Okay.  This is a Carver form
9    though?
10       A.    Correct.
11       Q.    Okay.  If you could turn to the
12   section beginning with 7.5 titled
13   "Navigation."  The Bates Number is Carver
14   000817.
15           Do you see the form -- excuse
16   me, the section?
17       A.    I do.
18       Q.    Okay.  It actually begins on
19   the prior page.  So it begins on 816.  But
20   I do want to ask you a question about 817.
21   In the middle of the page it says, "Use of
22   autopilot if equipped."  Do you see that?
23       A.    I do.
24       Q.    Was the Mackenzie Rose equipped
25   with an autopilot?

Page 90

1    A.    That is my understanding.
2    Q.    Okay.  And as part of the
3 navigation section of the safety management
4 system, there's no company prohibition on
5 using the automatic pilot that's placed on
6 any of the operators of the vessels,
7 correct?
8         MR. RODGERS:  Objection.  If
9      you're asking him as an expert or as
10      mariner, he's already testified he's
11      not.  To the extent of your
12      knowledge, you can answer.
13    A.    Can you repeat the question,
14 please?
15    Q.    Yeah.  Could you read it back,
16 please?
17         (Whereupon, the above record
18      was read back by the court reporter.)
19         MR. RODGERS:  Same objection.
20      Jim, are you asking him what it
21      says or are you asking him what he
22      knows?
23         MR. CHAPMAN:  Well, I'm asking
24      him about the contents of the safety
25      management system and specifically

Page 91

1      focused on the company's policy
2      regarding the use of autopilot.  And
3      I just want to be sure that we
4      understand it.
5    Q.    And my question is, whether
6 there is any company policy prohibiting the
7 use of the autopilot?
8    A.    I would rely on the depositions
9 of Brian and Lenny to speak to the
10 specifics.  But based upon reading this,
11 there does not appear to be any prohibition
12 in writing in this document.
13    Q.    Are you aware of any
14 prohibition that is somehow not in writing?
15    A.    I'm not aware.
16    Q.    If you could turn to the
17 section titled 7.1, Bridge Transits.  The
18 Bates Number is Carver 000910.
19         This section appears to provide
20 instructions regarding bridge transits by
21 vessels, correct?
22    A.    That appears to be correct.
23    Q.    And right in the middle of the
24 page, it says, kind of in a call out,
25 yellow or orange-ish color.  "Under no

Page 92

1 circumstances shall the wheelman
2 responsible for the transit make the bridge
3 due to pressure or pride."  What does that
4 mean?
5         MR. RODGERS:  Objection to
6      form.  You can answer if you
7      understand the question.
8    A.    I would rely on the depositions
9 of Brian and Lenny.  As to the specifics of
10 what that means, I would be making an
11 educated guess.
12    Q.    So you don't know?
13    A.    Not specifically.
14    Q.    And then right underneath it,
15 it has a heading called "Safety Briefing"?
16    A.    Correct.
17    Q.    Was there a safety briefing
18 before the transit of any of the bridges on
19 the Southern branch of the Elizabeth River?
20         MR. RODGERS:  Objection to
21      form.
22         MR. CHAPMAN:  Let me just
23      finish.
24         MR. RODGERS:  Sorry.
25    Q.    Prior to the allision on June

Page 93

1 15th, 2024?
2    A.    I would rely upon the documents
3 provided and the depositions of Brian Lenny
4 and all the crew members to answer that
5 question.  I'm not directly aware
6 personally.
7    Q.    What training does Carver
8 provide to its employees regarding bridge
9 transits.
10    A.    I would rely upon the
11 depositions of Brian and Lenny as to those
12 answers and all of the documents provided
13 in discovery.  I do not specifically know.
14    Q.    Are you -- does Carver know of
15 any training that was specifically provided
16 to Captain Morrissey regarding bridge
17 transits?
18    A.    I would answer the question the
19 same way I answered the prior one.
20    Q.    Which is you don't know and
21 you'd rely on what other people had to say
22 about it?
23    A.    Correct.
24    Q.    If I'm correctly summarizing
25 your answer.

Page 94

1        MR. RODGERS:  Relying on
2    specific testimony and the documents
3    produced to date, not just anyone.
4    Q.    What testing, if any, does
5    Carver provide regarding the captain's
6    knowledge and the capabilities regarding
7    bridge transits?
8        MR. RODGERS:  Objection.  The
9    captain's not been -- not testified
10    and he is deceased and Mr. Morrissey
11    is scheduled for next week.  So the
12    witness cannot possibly know that.
13        MR. CHAPMAN:  So once again,
14    there you go off doing your best to
15    coach the witness into an answer,
16    Mr. Rodgers.
17        MR. RODGERS:  I'm not coaching.
18        MR. CHAPMAN:  And I just ask
19    that if you have a form objection,
20    just make it and then we'll proceed
21    with the witnesses knowledge.
22        MR. RODGERS:  You were asking
23    him about testimony that hasn't
24    happened and you know better than
25    anybody it hasn't happened.  So it's

Page 95

1    an improper question.
2    Q.    Could you read the question
3    back?
4        (Whereupon, the above record
5    was read back by the court reporter.)
6        THE WITNESS:  Can I answer?
7        MR. RODGERS:  If you can
8    answer.
9    A.    I would reiterate the same
10    statement as before.  We would have to rely
11    on the testimony of Brian, Lenny, the
12    captain which we can't have, the future
13    testimony of the mate and the documents
14    provided through discovery.  I do not
15    personally have any firsthand knowledge of
16    any training.
17    Q.    Does Carver have records of the
18    training of its personnel at Carver Marine
19    Towing?
20    A.    There -- can you repeat the
21    question?
22    Q.    Does Carver maintain records of
23    the training that is provided to the people
24    that work for Carver Marine Towing?
25    A.    I believe we do.

Page 96

1    Q.    And what's that belief based
2    on?
3    A.    Any sanction training that we
4    provide or that someone is -- comes with is
5    stored within their personnel files.
6    Q.    Have you reviewed any such
7    training records for Captain James
8    Morrissey?
9    A.    I specifically have not.
10    Q.    Do you know if they exist?
11    A.    Anything that exists has been
12    provided through the discovery that we have
13    conducted.  That I'm aware of.
14    Q.    So you don't know whether it
15    exists or not but if it does, you believe
16    it's been provided in discovery?
17    A.    Correct.
18    Q.    To Carver's knowledge, was a
19    lookout posted for the bridge transit of
20    the Norfolk and Portsmouth Belt Line Bridge
21    on June 15th, 2024?
22    A.    Not that I'm aware of.
23        MR. RODGERS:  You okay?
24        THE WITNESS:  Is now a good
25    time for a break or?

Page 97

1        MR. RODGERS:  It's up to you.
2    You're the witness.
3    Q.    Do you need to take a break?
4    A.    If we can, I'd just like to use
5    the restroom real quick.
6    Q.    Yeah.  Sure.
7    A.    Are we done with this document?
8    Q.    I think so, yeah.
9    A.    Okay.
10        THE VIDEOGRAPHER:  We are going
11    off the record.  The time is 12:18 p.m.
12        Off the record.
13        (Whereupon, a short recess was
14    held.)
15        THE VIDEOGRAPHER:  Beginning
16    Media Number 4.  We are back on the record.
17    The time is 12:32 p.m.
18    Q.    Mr. Laraway, what training was
19    provided to the captains of the tugs
20    regarding the use of the autopilot on any
21    of the tugs that were equipped with it?
22    A.    I would rely on the testimony
23    of Brian and Lenny, any documents in
24    evidence and the future testimony of
25    Morrissey.  I'm not specifically aware

NICHOLAS LARAWAY

June 17, 2025

Page 98

1  myself.
2      Q.    And you haven't done anything
3  to become aware?
4      **A.    I didn't hear you.**
5      Q.    And you haven't done anything
6  to become aware?
7          MR. RODGERS:  Objection.  He
8      didn't say that.
9          MR. CHAPMAN:  Well, he said he
10     was not specifically aware himself.
11     That's what I'm trying to understand.
12     Q.    You haven't done anything to
13  specifically become aware?
14         MR. RODGERS:  Objection.  You
15     can answer if you want.  If you
16     understand it.
17     **A.    I understand the question.**
18  **I -- during my preposition, I did not**
19  **become aware of specific training related**
20  **to use of the autopilot.**
21     Q.    So you would rely on, I think
22  you said Mr. Baldassare or Mr. Moore or
23  documents?
24     **A.    Or documents or Morrissey,**
25  **testimony forthcoming.**

Page 99

1          MR. CHAPMAN:  What exhibit are
2  we up to?
3          THE REPORTER:  I think 10.
4          MR. CHAPMAN:  Okay.
5          Will you mark that as 10,
6  please.
7          (Whereupon, Exhibit 10 was
8  marked for identification.)
9      Q.    Mr. Laraway, you've been handed
10  what's been marked as Exhibit 10, which is
11  Section 6.4 from the safety management
12  system.
13         Do you see that?
14     **A.    Yes.**
15     Q.    I just want to kind of start on
16  Page 1 there.  Basically, the use of
17  alcohol in connection with any sort of
18  vessel operations is prohibited by the
19  company, correct?
20     **A.    Correct.**
21     Q.    Okay.  If you turn to the third
22  page of this exhibit, for those of you who
23  are on the call, it's marked as Carver TBS
24  Helm CONNECT 00.  Starts at 843 and the
25  page I'm on now is 845.

Page 100

1          Near the bottom it talks about
2  testing.  You see that?
3      **A.    I do.**
4      Q.    And it says, "All employees and
5  applicants are required to participate in
6  prohibitive substance screenings for the
7  following reasons."  And the first one is
8  preemployment, A, B on the next page is
9  random sampling and then C is
10  post-incident?
11         Do you see that?
12     **A.    I do.**
13     Q.    "So any employee directly
14  involved in an accident, injury or incident
15  involving human error or any required
16  reporting by the U.S. Coast Guard will be
17  subjected to sampling to rule out the
18  involvement of prohibited substances,"
19  right?  Is that what it says?
20     **A.    It is.**
21     Q.    There wasn't any post-incident
22  alcohol testing of any of the members of
23  the crew following the allision of the
24  Mackenzie Rose with the Belt Line Bridge on
25  June 15th, 2024, correct?

Page 101

1          MR. RODGERS:  Just alcohol?
2      Q.    Well, I'm asking about alcohol
3  right now, but yeah, this refers to
4  prohibited substances.
5          MR. RODGERS:  Objection to
6      form.  You can answer it.
7      Q.    My first question was about
8  alcohol.  There wasn't any alcohol testing,
9  was there?
10     **A.    Not that I'm aware.**
11     Q.    Okay.  In section D, it says,
12  "Alcohol test kits are on board the vessel
13  to meet the two-hour alcohol testing
14  deadline."  Are there in fact alcohol test
15  kits on the vessel?
16     **A.    I would have to rely upon the**
17  **testimony of Brian and Lenny and the**
18  **documents provided in evidence.  I'm not**
19  **certain.**
20     Q.    Okay.  And then there's a
21  further drug testing deadline for
22  prohibited substances that has to be done
23  within 32 hours.
24         You see that?
25     **A.    I see that.**

**NICHOLAS LARAWAY**

**June 17, 2025**

Page 102

1      Q.      And there wasn't any such drug
2   testing of any members of the crew of the
3   Mackenzie Rose within that period of time
4   following the allision with the Belt Line
5   Bridge, correct?
6      A.      Not that I'm aware of.
7           MR. RODGERS:  You said drug
8      testing.
9           MR. CHAPMAN:  I said drug
10      testing, yes.
11      Q.      In the aftermath of the
12   allision with the Belt Line Bridge on June
13   15th, 2024, did Carver change anything
14   related to its drug testing protocols or
15   policies?
16           MR. RODGERS:  Objection.
17      Foundation.  You can answer if you
18      know.
19      A.      I'm unaware.
20      Q.      Who is Thomas Feeney?
21      A.      Tom Feeney is an operations
22   manager for Carver Marine Towing.
23      Q.      Is he still employed by Carver?
24      A.      He is.
25      Q.      Since the allision with the

Page 103

1   Belt Line Bridge in June of 2024, has
2   Carver hired a vendor to manage its drug
3   and alcohol testing?
4      A.      The company may have.  I'm not
5   aware of any.  That doesn't mean it didn't
6   happen.  We've had relationships with
7   multiple drug testing vendors in the past.
8   I'm not sure if we're using the same one or
9   if it's switched.
10           MR. CHAPMAN:  Can you mark that
11      as Exhibit 11, please?
12           (Whereupon, Exhibit 11 was
13      marked for identification.)
14      Q.      You've been passed a document
15   marked Exhibit 11 which appears to be an
16   e-mail from Thomas Feeney on July 29th,
17   2024 to Brian Moore, Leonard Baldassare and
18   Jason Galioto.  Do you see that?
19      A.      I do.
20      Q.      For those of you who are
21   attending remotely, the production number
22   is Carver ESI000201.  And it appears to be
23   an e-mail that has been forwarded by
24   Mr. Feeney to others in the Carver Marine
25   Towing end of the business about some sort

Page 104

1   of drug testing consortium.  Do you see
2   that?
3      A.      I do see that.
4      Q.      And the company that they were
5   talking to was American Maritime Safety,
6   Inc.?
7      A.      That's what it appears to be.
8      Q.      Okay.  Attached to this e-mail,
9   apparently somebody forwarded it to
10   Mr. Feeney is a membership services
11   agreement?  Starting at --
12           MR. RODGERS:  Just on the
13      record, just an objection to the line
14      of questioning or remedial, but the
15      witness can answer to his knowledge.
16           And if just -- I'm going to
17      have that as standing objection.
18      Q.      Sure.  It be -- the page number
19   is 212.
20      A.      Okay.
21      Q.      Has Carver entered into this
22   agreement or an agreement like this with
23   AMS, America Maritime Safety?
24      A.      I am not aware if we have, or
25   have not.

Page 105

1      Q.      Is there any other vendor of
2   these type of services that Carver has
3   entered into an agreement with?
4      A.      What type of services?
5      Q.      These drug testing services.
6      A.      We have a standard vendor that
7   Carver Companies utilizes for
8   pre-employment, random and post-incident
9   drug and alcohol testing at a number of our
10   locations.
11      Q.      Those -- are those shoreside
12   facilities?  When you say a number of those
13   locations, I'm just trying to understand
14   your answer.
15      A.      My understanding is that that
16   vendor provides the service for our
17   shoreside locations and when requested for
18   our tug and fleet as well.
19      Q.      And who is that vendor?
20      A.      The companies name is Foro,
21   F-O-R-O.  I don't know much beyond that.
22      Q.      Okay.  You didn't sign the
23   contract?
24      A.      Not that I'm aware of.  Not
25   that I can recall.

**NICHOLAS LARAWAY**

June 17, 2025

Page 106

1    Q.    Okay.
2          MR. CHAPMAN:  Can you mark this
3    as 12, please?
4          (Whereupon, Exhibit 12 was
5    marked for identification.)
6    Q.    You've been passed Exhibit 11,
7    which appears to be a letter and
8    some -- oh, I'm sorry.  I apologize.
9          You've been passed Exhibit 12.
10   Thank you, Madam Court Reporter.
11         Mr. Laraway, you've been passed
12   Exhibit 12, a letter from Carver to
13   Mr. Morrissey, James Morrissey, with a
14   couple of details, pages detailing, I guess
15   some kind of internal processing related to
16   his termination.
17         Do you see that?
18   A.    I do.
19   Q.    Okay.  Was Captain Morrissey
20   disciplined in any way after the allision
21   with the Belt Line Bridge?
22   **A.    He was sus -- my understanding**
23   **is he was suspended pending the outcome of**
24   **multiple investigations.**
25   Q.    So how soon was he suspended

Page 107

1    after the allision?
2    **A.    For specifics, we would need to**
3    **rely on the documents and evidence on the**
4    **testimony of Brian and Lenny.  I would only**
5    **be able to speak to what I recall.**
6    Q.    Yeah.  So there's a collection
7    of documents from what I presume to be his
8    personal -- personnel jacket, personnel
9    file --
10   A.    Yes, sir.
11   Q.    -- that was produced.  I
12   couldn't find anything in there about him
13   being suspended.  I only find this
14   reference to a termination.  Is there a
15   status that would normally be entered in
16   the system that says the employee was
17   suspended?
18   **A.    I don't operate within the HRIS**
19   **system.  I can't speak to -- if that is a**
20   **possible status or not.**
21   Q.    When you say HRIS, what is that
22   an acronym for?
23   **A.    HR Information System.**
24   Q.    Human Resources Information
25   System?

Page 108

1    A.    Yes.
2    Q.    So if you look on the second
3    page of Exhibit 12, which looks like it's
4    some sort of print out from that system; is
5    that right?
6    **A.    That is correct.**
7    Q.    Okay.  So who is Sybil
8    Linstead?
9    **A.    Sybil is one of our HR**
10   **generalists.**
11   Q.    Still employed by the company?
12   **A.    Yes.**
13   Q.    And then a little further down,
14   under administrator termination, it says,
15   "Administered -- initiated for James
16   Morrissey, initiated by Thomas Marin."
17   Is -- am I pronouncing that correctly?
18   A.    You are.
19   Q.    And who is Mr. Marin?
20   **A.    He is our chief HR officer,**
21   **CHRO.**
22   Q.    Does he still work for the
23   company?
24   **A.    He does not.**
25   Q.    And do you recall about when he

Page 109

1    left?
2    **A.    About three or four months ago,**
3    **it was recent.**
4    Q.    Did he take another position
5    somewhere else?
6    **A.    He did.**
7    Q.    And do you know where he went?
8    **A.    Where Tom went.**
9    Q.    Yeah.
10   **A.    He is working for some service**
11   **provider of SUNY in the Albany area.  I**
12   **don't know the specific company but.**
13   Q.    A service provider of SUNY, you
14   mean as and acronym for?
15   **A.    State University of New York.**
16   **They provide services for -- as a**
17   **subcontractor or vendor of SUNY.**
18   Q.    So on the second -- on the next
19   page of Exhibit 12.
20   **A.    Mm-hmm.**
21   Q.    It says -- it's a continuation,
22   I presume, of the printout from that
23   system.  It says, "Eligible for rehire."
24   Do you see that line?
25   A.    I do.

NICHOLAS LARAWAY

June 17, 2025

Page 110

1    Q.    No.  Why is he not eligible for
2  rehire?
3    A.    That would be a question to be
4  answered by Brian or Tom.
5    Q.    Did you personally, I'm asking
6  you in your personal capacity, have any
7  involvement in his termination?
8    A.    Other than awareness that it
9  was happening, I was not involved in the
10  process, no.
11    Q.    So what was the reason for his
12  termination?
13    A.    While under paid suspension
14  during the investigation, Brian or some
15  member of his team became aware that
16  Mr. Morrissey began employment for another
17  company.  And he didn't feel it appropriate
18  to continue to pay him as a suspended
19  mariner while he was working for someone
20  else.
21    Q.    So he was still on the payroll,
22  so to speak and getting paid even though he
23  wasn't working?
24    A.    Correct.  Paid suspension, is
25  my understanding.

Page 111

1    Q.    And who did he go to work for
2  while he was still on your payroll?
3    A.    I don't know.
4    Q.    So the last entry on this page
5  says, "Notes."  There's nothing in the
6  before column but then in the submitted
7  column it says, "Ongoing Coast Guard
8  investigations.  See documents."
9    A.    That is what it says.
10    Q.    What documents are those?
11    A.    I don't have personal knowledge
12  as to what they are.  I would rely on the
13  testimony of Brian and the documents
14  submitted.
15    Q.    Did you review the records
16  produced to us regarding Mr. Morrissey?
17    A.    I generally reviewed hundreds
18  of documents.  I don't know specifically if
19  I reviewed those specific documents.
20    Q.    Yeah.  I'm just trying to
21  understand if there --
22    A.    Yeah.
23    Q.    Are there any?  It says, "See
24  documents."  Are there any other documents
25  that relate to Mr. Morrissey in these kind

Page 112

1  of personnel file that I haven't seen,
2  right?
3    A.    Yes.
4    Q.    I realize you can't read my
5  mind.
6    A.    Yes.
7    Q.    But I'm just -- I didn't see
8  any and just trying to figure out what the
9  reference is to "see documents."
10    A.    I can't attest -- I didn't
11  write this nor was I involved in the
12  execution of this.  So I can't.
13  Specifically somebody's buzzing.
14    Q.    So would Sybil Linstead have
15  made all of these entries?
16    A.    Based upon my understanding of
17  what is written here, it could have been
18  Sybil or it could have been Tom.
19         I don't know if this was a
20  printout that Sybil did and Tom filled the
21  whole thing out or if Tom did the whole
22  thing.  I'm not familiar enough with the
23  system to say which one of two of them.
24    Q.    So we can go back to Page 1.
25  It says, the very first sentence, "In

Page 113

1  accordance with New York, NY Labor Law," I
2  assume that means New York Labor Law,
3  "195(6), this letter is to provide written
4  notice that your employment with Carver
5  Companies terminated on 9/27/2024, right."
6  And then it further says, "Your last day
7  work was on about 9/27/2024."
8         If I understood your earlier
9  testimony, he didn't actually work that
10  day, he was just in a suspended status.
11    A.    That is my understanding.
12    Q.    He may have been working for
13  somebody else at the time?
14    A.    He may have.
15    Q.    Okay.  So was he an employee of
16  Carver Companies as it says in that first
17  line?
18    A.    He was an employee of Carver
19  Companies Payroll, that is correct, LLC.
20    Q.    So at the end -- well, let me
21  just kind of unpack that.  Carver -- I'm
22  sorry.  You said it's Carver Companies
23  Payroll, LLC?
24    A.    That is correct.
25    Q.    What is that?

## NICHOLAS LARAWAY

**June 17, 2025**

Page 114

1    A.    It is an entity of ours that
2 processes payroll for all our hourly and
3 day rate employees that work for various
4 Carver entities.
5    Q.    Not just Carver Marine Towing?
6    A.    No.
7    Q.    But doesn't handle salaried
8 personnel?
9    A.    Correct.
10    Q.    Okay.  It's signed or at least
11 has a signature block for Sybil Laraway.
12 Who is that?
13    A.    That is Sybil's maiden name.
14    Q.    Oh, this is Sybil Linstead?
15    A.    Yes.
16    Q.    They are one and the same?
17    A.    Yes.
18    Q.    Okay.  Are you related to her?
19    A.    She is my cousin.
20    Q.    There's a -- this has been
21 photocopied and provided to us in
22 discovery.  And it appears to have a pink
23 sticky note on it.
24        Do you see that?
25    A.    It does.

Page 115

1    Q.    Do you know whether there is
2 anything under that sticky note that we
3 can't see because it's covering it?
4    A.    I don't specifically know that
5 there is nothing under there, but I do not
6 believe there is.
7    Q.    Okay.  And what makes you think
8 that?
9    A.    Based upon where her signature
10 block is, I wouldn't believe.  And knowing
11 how our signature blocks are set up, I
12 wouldn't believe there is anything to the
13 right of her e-mail signature block or
14 letter's signature block, whatever it is.
15    Q.    Okay.  Was any action taken
16 against Captain Christopher Miller,
17 disciplinary or employment-wise, as a
18 result of the allision with the Belt Line
19 Bridge?
20    A.    Not that I'm aware of.
21    Q.    So he stayed on the payroll,
22 right?  And continued to work for Carver?
23    A.    That's my understanding.
24    Q.    Okay.  At least until he passed
25 away this year?

Page 116

1    A.    Until he went out sick before
2 he passed away.
3    Q.    Okay.  So besides being
4 suspended and I guess not performing duties
5 at some point following the allision with
6 the Belt Line Bridge, was there any other
7 employment or disciplinary action taken
8 against Mr. Morrissey up until the time he
9 was terminated?
10    A.    My understanding is the
11 investigation internally and with the Coast
12 Guard remained ongoing, and that we were
13 waiting until there was a conclusion to
14 that before we took any further action.
15    Q.    So is it fair to say that if
16 hadn't been terminated because it turned
17 out for a period that he was working for
18 somebody else, he would still be in a
19 suspended status?
20        MR. RODGERS:  Objection to
21     form.  It calls for speculation.
22    Q.    Let me just finish -- pending
23 your receipt or whatever the Coast Guard's
24 investigation was?
25    A.    It was -- it certainly is

Page 117

1 possible that that could be the case.
2    Q.    Who is Jason Galioto?
3    A.    He is an employee of Carver
4 Marine Towing.
5    Q.    And what's his position?
6    A.    He works in compliance and
7 safety predominantly.
8    Q.    Do you know when he was first
9 hired?
10    A.    He's been employed here since
11 prior to the incident but I don't recall
12 specifically when he was hired.
13    Q.    Okay.
14        MR. CHAPMAN:  So this is a
15     convenient time to take a break and grab
16     some lunch.
17        MR. RODGERS:  Yeah.
18        MR. CHAPMAN:  All right.
19        MR. RODGERS:  What time do you
20     want?
21        MR. CHAPMAN:  You want to come
22     back at 2:00?
23        THE VIDEOGRAPHER:  We are going
24     off the record.  The time is 12:58 p.m.
25        Off the record.

**NICHOLAS LARAWAY**

June 17, 2025

Page 118

1    (Whereupon, a short recess was
2    held at this time.)
3    THE VIDEOGRAPHER:  Beginning
4    Media Number 5.  We are back on the record.
5    The time is 2:06 p.m.
6    Q.    Would you mark that as the next
7    exhibit?
8    THE REPORTER:  I believe 13.
9    MR. CHAPMAN:  13, yeah.
10    (Whereupon, Exhibit 13 was
11    marked for identification.)
12    Q.    Mr. Laraway, this is another
13    section out of the Carver Safety
14    Management, number 8.8F, titled
15    "Collision/allision."
16    Do you see that?
17    A.    I do.
18    Q.    And the reference is Carver TBS
19    Helm CONNECT 00996 and 997.  It looks like
20    Page 1 covers collisions; is that correct?
21    A.    That appears to be correct.
22    Q.    And then Page 2 covers
23    allisions.  That is hidden fixed objects.
24    The first of which is, what to do if you
25    hit an aid to navigation, and the second,

Page 119

1    what to do if you hit a structure, correct?
2    A.    That is correct.
3    Q.    And so kind of like the
4    incident reporting, number one for hitting
5    a structure is to notify the company,
6    correct?
7    A.    Correct.
8    Q.    Number two is to notify the
9    appropriate person in charge.  It's got a
10    parenthetical, (The lock master, the bridge
11    tender, the doc master, et cetera.)  Do you
12    see that?
13    A.    I do.
14    Q.    You've already confirmed that
15    the company did not notify the bridge when
16    it happened, right?
17    A.    That is correct.
18    Q.    And then it says to notify the
19    U.S. Coast Guard if appropriate.  And we've
20    already seen that your 9.5 of the SMS says
21    if you hit -- unintended contact with a
22    bridge requires notifications to the Coast
23    Guard and that didn't happen, correct?
24    A.    Correct.
25    Q.    It says, "Document the damage

Page 120

1    including photographs."  There's one
2    photograph that has been produced in
3    discovery and I'm still sort of chasing the
4    original native version of it.  But I want
5    to show you that one photograph, which was
6    marked as Exhibit 1 at Mr. Moore's
7    deposition.
8    Have you seen that photograph
9    before?
10    A.    I have.
11    Q.    Okay.  And did you see it
12    in -- I'll ask it in the first month after
13    the incident, after the allision?
14    A.    From what I can recall, yes.
15    Q.    Yeah.  And did somebody forward
16    that to you?
17    A.    I don't recall how I came upon
18    it.
19    Q.    Okay.  So it could have been
20    like an attachment to an e-mail?
21    A.    It could have.
22    Q.    It could have been somebody
23    texted it to you?
24    A.    It could have.
25    Q.    Yeah.  Somebody might have

Page 121

1    printed it out -- I'm sorry, this sounds
2    silly, but I'm just trying to understand
3    what the range of options are.
4    Somebody printed it and you saw it like in
5    the paper version that is right there?
6    A.    Certainly.
7    Q.    If you look at Exhibit 1 there,
8    it's a little grainy, it's not like super
9    clear.
10    Have you ever seen one that is
11    not grainy like that?
12    A.    I don't recall if the one that
13    I saw was less grainy or of the same
14    quality.
15    Q.    The one you saw, you know, in
16    the month or so after the allision, did it
17    lead you to believe that there had been
18    some damage to the bridge itself?
19    A.    Knowing what I saw in the
20    letter you sent me and the nature of the
21    bridge and the photo, it lead me to believe
22    that that was correct.
23    Q.    Okay.  Do you know whether any
24    other photographs of the bridge were taken
25    by the tug?

NICHOLAS LARAWAY

June 17, 2025

Page 122

1      A.    I would rely upon the testimony
2   of Brian and Lenny and documents produced,
3   and I'm personally I'm unaware of any
4   additional.
5      Q.    All right.  I'll take number
6   one back.  Thank you.
7      A.    You're welcome.
8      Q.    Can you mark that as 14,
9   please?
10          (Whereupon, Exhibit 14 was
11      marked for identification.)
12      Q.    You've been handed what's been
13   marked as Exhibit 14, which is an e-mail
14   produced in discovery.  It begins with
15   Carver ESI000313 and ends with 319.  And it
16   appears to be an e-mail sent by Jason
17   Galioto to Brian Moore on July 3rd, 2024.
18   Do you see that?
19      A.    That appears to be correct.
20      Q.    And he appears to be forwarding
21   e-mail received from the Tug Mackenzie
22   Rose, sent July 2nd, 2024.
23          Do you see that?
24      A.    Yes.
25      Q.    So who is able to use the

Page 123

1   tugmackenzierose@carvercompanies.com e-mail
2   address to send things or to send e-mails?
3      A.    I would rely on the testimony
4   of Brian and Lenny.  However, my
5   understanding is the captain and mate on
6   watch during any hitch have access to that
7   e-mail.
8      Q.    Okay.  So does Carver know who
9   actually sent these photographs from that
10   Tug Mackenzie Rose e-mail address?
11      A.    I would --
12          MR. RODGERS:  He is talking
13      about, yeah, from the tug.
14      Q.    Yeah, from the tug.  It
15   says -- somebody's written, "Here are the
16   photos I took of the bridge and bow of the
17   barge June 15th after the allision with the
18   bridge."  But...
19      A.    I mean, I can make an
20   assumption but it's not signed and this is
21   the first time I'm seeing this.
22          MR. RODGERS:  Don't guess.
23      Q.    Oh, you haven't seen this
24   before?  Okay.
25          MR. RODGERS:  Don't guess.

Page 124

1      A.    Yeah.
2      Q.    All right.  Okay.  And there
3   appear to be five digital images embedded
4   in the e-mail which says -- it's at
5   the -- on Page 2.  It says, "It's sent from
6   my iPhone."  Is the Tug's phone an iPhone?
7      A.    All company issued phones are
8   iPhones.
9      Q.    Okay.
10      A.    So that is a probability.
11      Q.    Okay.  And then the next five
12   pages are slightly larger images of the
13   ones that are embedded in the e-mail.
14   First of the bridge and then four of the
15   barge, correct?
16      A.    That appears to be correct,
17   yes.
18      Q.    All right.  So if we go back to
19   the first page and you see where it says
20   attachments.
21      A.    I do.
22      Q.    And it starts with IMG1731.JPG
23   and the iPhone protocol is, you know,
24   obviously given number to each photograph
25   as it's taken.

Page 125

1          Do you know what photographs or
2   what's depicted in the photographs that
3   would have been numbered IMG1732 through
4   1737 are?
5      A.    I do not.
6      Q.    And do you know if they were
7   ever requested internally since there
8   appears to be a gap of a few photographs?
9      A.    I would rely on the testimony
10   of Brian, Lenny and the documents in
11   evidence, but I'm not personally familiar
12   with that request, if any.
13      Q.    Does the Tug Mackenzie Rose
14   have any other e-mail address that is
15   like -- is there is a
16   mackenzierose2@carvercompanies, or some
17   other kind of e-mail handle that is
18   considered a -- I'll call it a, you know,
19   tug or official e-mail address?
20      A.    I would rely on the testimony
21   of Brian and Lenny, but I'm not aware of
22   any other e-mail address personally.
23      Q.    In the aftermath of the
24   incident, you know, say in June or July of
25   2024, did you read any of the statements

Page 126

1  that were submitted by the crew of the tug?
2       A.    I did not personally at that
3  time, no.
4       Q.    Did anybody inform you of their
5  contents?
6       A.    Brian updated me generally as
7  to what was going on.  I would assume part
8  of that included updates related to the
9  statements.
10      Q.    Did you understand that crew
11 statements had been taken or obtained in
12 some way?
13      A.    Yes.
14      Q.    Would you mark this as 15,
15 please?
16            (Whereupon, Exhibit 15 was
17 marked for identification.)
18      Q.    You've been handed what's been
19 marked as Exhibit 15, which is an e-mail
20 sent June 16th, 2024 to Leonard Baldassare
21 and Brian Moore.  And in the -- it says
22 it's sent from admin services but the
23 e-mail address appears to be
24 chris.miller63@hotmail.com.
25            You see that?

Page 127

1       A.    I do.
2       Q.    Okay.  So Chris Miller is one
3  of the captains at Mackenzie Rose, right?
4       A.    Was.
5       Q.    Yes, correct.  Was.  So is
6  chrismiller63@hotmail.com considered like
7  an official or Carver Companies' e-mail
8  that he is sending this from?
9       A.    It is not.
10      Q.    All right.  There is no
11 prohibition against him doing that though?
12 He did it?
13      A.    He did.
14      Q.    All right.  Okay.  And did
15 either Brian Moore or Leonard Baldassare
16 share the content of these crew statements
17 with you in and about the time they
18 received them?
19      A.    No.  Not that I recall.
20      Q.    Okay.  I think you told us you
21 didn't find out that there had been an
22 incident until you received my letter on
23 the 20th, correct?
24      A.    That is correct.
25      Q.    Okay.  So if you could just

Page 128

1  take a look at each of these statements
2  with me?
3       A.    Mm-hmm.
4       Q.    The first one is the chief
5  engineer, Mr. McGrath who says, "Was in my
6  room, felt abrupt stop," right?
7  And then the next one is from one of the
8  deckhands, Sharif Porter, "I was in bed
9  sleeping, I felt the boat sliding.  I
10 thought we popped the push gear."
11            And then the next one, the
12       other deckhand, Jarkeis Morrissey, in
13       the third sentence says, "I was in
14       the galley cleaning up and put away
15       the food when we hit something."
16       Right.
17            And then the last one
18       Christopher Miller, the captain who
19       says, "I, Christopher Miller, was in
20       my bed resting when I felt a bump."
21       If this information had been
22       shared with you when it came in, what
23       would it have lead you to do, if
24       anything?  Maybe nothing, but if
25       anything.

Page 129

1            MR. RODGERS:  Objection.  Calls
2       for speculation.
3            You can answer if you
4       understand the question.
5       A.    Understanding the question and
6  knowing what -- if this information was
7  provided to me along with the information
8  that I am aware was shared with Lenny at
9  the time that there was an issue with the
10 fendering or a tap as it said in this
11 e-mail, I would make sure that Brian and
12 Lenny conducted a full investigation to
13 confirm the facts.
14      Q.    And it wasn't until after
15 getting the letter from me that that
16 started?
17            MR. RODGERS:  Objection.  That
18       he did that or?
19            MR. CHAPMAN:  Yeah.  I'm just
20       asking.
21            MR. RODGERS:  Or that or Lenny
22       and Brian Moore doing an
23       investigation.  Those two different
24       things?
25            MR. CHAPMAN:  Yeah.

## NICHOLAS LARAWAY

June 17, 2025

Page 130

1      **A.**    **You're asking me when I did**
2 **what I just described or when I became**
3 **aware of it. What is the question?**
4      Q.    The investigation.
5      **A.**    **Mm-hmm.**
6      Q.    Was there an investigation
7 initiated before your receiving of my
8 letter on June 20th?
9      MR. RODGERS: Objection of form
10    on the term investigation.
11      If you understand the question,
12    you can answer.
13      **A.**    **I would rely specifically on**
14 **the testimony of Brian and Lenny and all**
15 **the documents provided through discovery.**
16 **But my understanding is that they were**
17 **reviewing what had happened.**
18      Q.    Yeah. Can you give us any more
19 detail on what you mean by reviewing what
20 happened?
21      **A.**    **I cannot because I wasn't aware**
22 **of it at the time.**
23      Q.    Just to be sure, you haven't
24 actually read their testimony, you've only
25 read --

Page 131

1      MR. RODGERS: Objection.
2    Objection. You're getting into
3    preparation.
4      And by the way, just for the
5    record, these statements, whatever
6    they mean, are dated June 15th, and
7    have a certain time on it. So
8    obviously there was some -- there
9    were -- that the employees were being
10    asked by somebody to write down a
11    statement. So when you say there was
12    no investigation, I take issue with
13    that.
14      MR. CHAPMAN: Are you done with
15    your speaking objection?
16      MR. RODGERS: Well, I'm, you
17    know, just straightening up the
18    record.
19      **A.**    **Can you repeat the question?**
20      Q.    I can't even remember the
21 question.
22      **A.**    **Me either.**
23      MR. RODGERS: Me either.
24      MR. NANAVATI: The question
25    was, did you actually read the

Page 132

1 transcript or just read a summary?
2      MR. RODGERS: Objection. Don't
3 answer that.
4      MR. CHAPMAN: So you're
5 instructing the client --
6      MR. NANAVATI: You're saying
7 that he can't answer what he did to
8 prepare for a deposition --
9      MR. RODGERS: Who's this?
10 Who's speaking?
11      MR. NANAVATI: Mark Nanavati.
12      MR. RODGERS: Okay. Well, you
13 can't do the tag team thing. If you
14 want to ask questions on Evanston's
15 account, then you can do that when
16 Mr. Chapman is completed.
17      MR. NANAVATI: I'm not asking
18 questions. I'm challenging your
19 objections which are without merit.
20      MR. RODGERS: Okay. Well, good
21 for you but that's not going to
22 happen because we are not doing tag
23 team.
24      My objection is
25    you -- is -- and I'll repeat it,

Page 133

1 you're asking for attorney-client
2 privilege information. He's already
3 answered that he read summaries. Not
4 you, Mark. I'm talking to Jim.
5      Q.    And all I'm trying to do is be
6 clear. The only thing you read was
7 summaries. You didn't actually read the
8 testimony of either Baldassare or Moore,
9 correct?
10      MR. RODGERS: Objection. He's
11 told you what he did. He is not
12 going to tell you what he didn't do
13 and we are not going there. So I'm
14 going to tell him not answer -- and
15 excuse me, I'm going to direct the
16 witness not to answer based on
17 attorney-client privilege and
18 preparation for this deposition.
19      Q.    Do you know what an incident
20 report is in the Helm CONNECT system?
21      **A.**    **I understand the gist of what**
22 **it is.**
23      Q.    Okay. Tell us what you
24 understand it to be?
25      **A.**    **An incident report is a**

NICHOLAS LARAWAY

June 17, 2025

Page 134

1  document filled out by crew when an
2  incident or near miss or other event
3  happens in the Helm CONNECT system which is
4  our SMS.
5       Q.    And are there any notifications
6  to management when an incident report is
7  filled out in the Helm CONNECT system?
8            MR. RODGERS:  I'm sorry, could
9       you repeat that?  I missed it.
10      Q.    I said -- I asked, are there
11 any notifications to management when an
12 incident report is filled out in the Helm
13 CONNECT system?
14      A.    Management meaning CMT
15 management or company management?
16      Q.    I don't know if there -- I
17 don't understand on how you distinguish
18 them.  I'm basically asking would like
19 Mr. Moore or Mr. Baldassare or somebody
20 else in the management of the towing
21 business get a notification?
22      A.    I would rely on the testimony
23 of Mr. Moore and Lenny as to whether or not
24 they receive notifications regarding
25 incident reports from Helm.  I do not

Page 135

1  receive incident reports from Helm.
2       Q.    Yeah, no, I get that.  But I'm
3  just asking what your understanding is.
4  Are they supposed to get a report, not
5  whether they actually did?
6       A.    I'm not certain how the
7  interworkings of Helm work as it relates to
8  incident reporting notification.
9       Q.    Can we mark that as 16 now?
10           (Whereupon, Exhibit 16 was
11 marked for identification.)
12      Q.    You've been passed Exhibit 16,
13 which appears to be an e-mail on June 28th
14 from the Tug Mackenzie Rose to Brian Moore
15 with a subject line, "I've finished the
16 incident report 6,15/24."
17           Do you see that?
18      A.    I do.
19      Q.    I'll represent to you that
20 there is nothing attached to this e-mail in
21 the way it was produced to us which is
22 Carver ESI000541.
23           Have you ever seen an incident
24 report for the bridge allision?
25           MR. RODGERS:  Just could you be

Page 136

1            more specific because there's Coast
2       Guard reports?  There's internal
3       reports.
4       Q.    I'm asking about -- that's a
5  good question.  I'm asking about the
6  incident report in the Helm CONNECT system
7  for this bridge allision.
8       A.    I don't specifically recall if
9  that was something that I reviewed as part
10 of my preparation for this deposition, and
11 I don't recall having seen anything in the
12 months after the event.
13      Q.    Do you know if there is an
14 incident report in the Helm CONNECT system
15 for the bridge allision?
16      A.    I would rely on Brian and
17 Lenny's testimony and what we've submitted
18 through our discovery process.  I'm not
19 specifically aware if there is one
20 personally.
21      Q.    Can you mark that as 17,
22 please?
23           (Whereupon, Exhibit 17 was
24 marked for identification.)
25      Q.    Mr. Laraway, you've been handed

Page 137

1  a document marked as Exhibit 17, which
2  appears to be an e-mail from the Tug
3  Mackenzie Rose, on June 24th, 2024, to
4  Brian Moore and Leonard Baldassare.  The
5  subject of which is "Helm log, June 15, RR
6  incident."
7            Do you see that?
8       A.    I do.
9       Q.    This one actually references an
10 attachment and based on the way that it was
11 produced by Carver, I believe that the
12 following four pages are the attachment.
13 But it's marked Carver ESI000527 through
14 531.
15           And since it came from the Tug
16 Mackenzie Rose e-mail, there's -- is there
17 any way to determine who actually sent it?
18      A.    I'm not aware of how we could
19 determine the specific individual, no.
20      Q.    Okay.  If you look at the
21 attachment on the first page, 528.  On the
22 second line it says "Entry type incident."
23 And you can't read it all but it looks like
24 something was logged at 1630 hours on June
25 15th, 2024, by Christopher (Chris) at

**NICHOLAS LARAWAY**

June 17, 2025

Page 138

1 Norfolk, Virginia with a description.  You
2 see that?
3        **A.    I see it.**
4        Q.    All right.  And the description
5 says, "Mate James Morrissey reports the
6 autopilot was not completely turned off as
7 he was able to correct and switch back over
8 to hand steering and began backing on the
9 Weeks 281 barge and maneuvered the barge
10 alongside fendering on the north and PBL RR
11 bridge.  Photo taken, proceeds slowly away
12 from bridge."
13        In the aftermath of the
14 allision, saying that month or so following
15 June 15th, did you learn that the autopilot
16 had been used while they were making this
17 wedge in the vicinity of the bridge?
18        MR. RODGERS:  Objection.
19        **A.    I do not recall when I became**
20 **aware of the use of autopilot as it related**
21 **to this incident.**
22        Q.    Okay.  Do you have an
23 understanding what he -- it is meant by the
24 autopilot was not completely turned off?
25        **A.    I would rely on the testimony**

Page 139

1 **of Brian and Lenny and Mate Morrissey**
2 **eventually and the documents we've**
3 **provided, I don't.**
4        Q.    To your knowledge, is there
5 some way that an autopilot can be somehow
6 not completely turned off?
7        MR. RODGERS:  Objection.  He's
8        already testified he is not a
9        mariner, and he's also not here as an
10        expert.
11        You can answer if you have an
12        answer.
13        **A.    I'd rely on the testimony of**
14 **Brian, Lenny, and the mate, and the**
15 **documents in evidence.  I have no knowledge**
16 **of how an autopilot system works.**
17        Q.    Do you know whether this
18 document that we are looking at right now,
19 this PDF printout that's attached to the
20 e-mail marked Exhibit 17, is in fact
21 incident report in the Helm CONNECT system
22 for the bridge allision?
23        **A.    I do not know if it is in the**
24 **Helm CONNECT system.  I would rely on the**
25 **testimony of Brian, Lenny, and the**

Page 140

1 **documents we've produced.**
2        Q.    What is Carver's understanding
3 of the reason the tug and barge allided
4 with the bridge?
5        MR. RODGERS:  Just what is
6 Carver's understanding?
7        MR. CHAPMAN:  Yeah.
8        MR. RODGERS:  At that time or
9 now.
10        Q.    You can give me both?
11        MR. RODGERS:  No.  He can
12 testify as to what his understanding was at
13 the time he learned of it and what his
14 understanding is now, if you understand
15 that.
16        Why don't you ask him
17 separately, Jim, so we keep it simple?
18        MR. CHAPMAN:  So I don't think
19 I have to but I'll humor you, Mr. Rodgers.
20        MR. RODGERS:  Well, just to add
21        another objection.  It was asked and
22        answered about two hours ago, but
23        again, just split up the question.
24        It would be easier for the witness to
25        understand.

Page 141

1        Q.    So question one, what is
2 Carver's understanding of the reason that
3 tug and barge allided with the bridge?
4        **A.    My understanding?**
5        Q.    No, Carver's.
6        MR. RODGERS:  Objection to the
7        form.  If you don't understand the
8        question, then you don't -- then
9        don't answer it.
10        **A.    Can you rephrase the question?**
11        Q.    I don't think so.  What is it
12 that you don't understand about the
13 question?
14        MR. RODGERS:  Objection.
15        Don't answer that.
16        Jim, what are you doing here?
17        MR. CHAPMAN:  I'm trying to
18 clarify for him.  You're the one that's
19 made the objection.
20        MR. RODGERS:  No.  No.  No.  He
21 and I have both asked you to split it up.
22 You're asking Carver.  You are not saying
23 then or now.  So I -- it's -- just rephrase
24 it or withdraw the question.
25        Q.    So I'm using present tense.

**NICHOLAS LARAWAY**

June 17, 2025

Page 142

1  What is Carver's understanding or the
2  reason the tug and barge allided with the
3  bridge?
4          MR. RODGERS:  Object -- same
5      objection.
6          Do you understand the question.
7      A.    I did.  The company's
8  understanding of what happened when the tug
9  allided with the bridge was that originally
10 Morrissey stated that he got in with the
11 fenders, later amended the story multiple
12 times.  Finally, during -- based on my
13 understanding, during conversations with
14 the Coast Guard, he stated that he got in
15 and hit the bridge while he was piloting
16 the vessel.
17     Q.    And did -- he was using the
18 autopilot to pilot the vessel?
19     A.    I would rely on other people's
20 testimony to that.  I'm not specifically
21 sure.
22         MR. RODGERS:  And objection to
23 the extent as the document speaks for
24 itself that you've shown the witness, which
25 is and in some kind of an incident log that

Page 143

1  says, "Mate James Morrissey reports the
2  autopilot was not completely turned off.
3  He was able to correct and switch back over
4  to hand steering and began backing on the
5  Weeks 281 barge," et cetera, et cetera.
6          So that's the document in front
7  of him and you are asking him to guess at
8  something when the document says what it
9  says.
10     Q.    Is there anything else to add
11 to your answer?
12     A.    I mean the Coast Guard
13 investigation has not been completed.  So
14 we have an understanding of what we believe
15 happened, but we do not have the final
16 incident report or investigative report
17 from the Coast Guard.
18     Q.    There wasn't anybody else at
19 the Helm at the time of the allision other
20 than Captain James Morrissey, correct?
21     A.    That is my understanding.
22     Q.    Was there any damage to the tug
23 as a result of alliding with the bridge?
24     A.    I would rely on the testimony
25 of Brian, Lenny, and the information in

Page 144

1  evidence.  But I'm aware -- unaware of any
2  damage to the tug as a result of the
3  allision to the bridge.
4      Q.    Was there any damage to the
5  barge as a result of alliding with the
6  bridge?
7      A.    I would repeat that answer as
8  it relates to the barge.  There was
9  potentially some superficial damage but no
10 noticeable damage that we were made aware
11 of previously or subsequently that I'm
12 aware of.
13     Q.    Did Weeks Marine make any claim
14 against the company on account of damage to
15 its barge?
16     A.    Not that I'm aware of.
17     Q.    Okay.  Can you mark that as 18,
18 please?
19         Thank you.
20         (Whereupon, Exhibit 18 was
21     marked for identification.)
22     Q.    Mr. Laraway, you've been handed
23 what's been marked as Exhibit 18, an e-mail
24 sent June 24th, 2024 from Brian Moore to a
25 number of people.

Page 145

1          You've told us who Thomas
2  Feeney is, Lenny Baldassare, Jason Galioto.
3  Who is Dylan Galm?
4      A.    He's our salesman.
5      Q.    You referred to him previously
6  I think in another answer.
7      A.    I did.
8      Q.    And who is Melissa Kool?
9      A.    She was the financial
10 controller for this business unit for a
11 brief period of time including the June of
12 last year.
13     Q.    Does she still work for the
14 company?
15     A.    She does, just not in that
16 role.
17     Q.    You've told us who the CMT
18 dispatch is.
19         In Mr. Moore's e-mail, the
20 second dark bullet, you see it there?  It
21 says, "In the past we were charging one way
22 and now we are charging each way from JC to
23 PN."
24         Did I read that correctly?
25     A.    You did read that correctly.

**NICHOLAS LARAWAY**

June 17, 2025

Page 146

1      Q.      Do you know what JC or PN are?
2      A.      I do not.
3      Q.      And then it says, "Note light
4  tug in invoice."  Do you see that?
5      A.      Yes.
6      Q.      Does this somehow relate to
7  getting paid for work that Carver Marine
8  Towing is doing with its tugs?
9      A.      I would rely on Brian's
10 testimony and the evidence that we have
11 provided.  I'm -- I would be guessing.
12     Q.      So the second to last
13 bullet -- dark bullet that begins with
14 "Logs are awful."
15         There is two bullets underneath
16 it.  One says, "Resend the logs."  The
17 second one says, "Resend the logs standards
18 and show what needs to be entered."
19         Do you know what the log
20 standards are?
21     A.      I personally do not.
22     Q.      Do you have any information
23 about when they may have been sent
24 previously by, I guess, somebody, the crew?
25     A.      I would rely on Brian's

Page 147

1  testimony and the evidence we provided or
2  the documents we've provided.
3         I don't know what they are to
4  surmise when they may have been previously
5  provided.
6      Q.      Okay.
7         MR. CHAPMAN:  Can you mark that
8    as 19, please?
9         THE REPORTER:  19 or --
10     Q.      I think we're on 19.
11        THE REPORTER:  19.
12     A.      Okay.
13        (Whereupon, Exhibit 19 was
14 marked for identification.)
15     Q.      Mr. Laraway, you've been handed
16 a document marked Exhibit 19, which is an
17 e-mail sent July 7 -- excuse me, July 19th,
18 2024 from Jason Galioto to Brian Moore,
19 with an attachment in the form of, it looks
20 like an Excel spreadsheet titled "Near
21 Miss-Incidents, JHA."
22        Do you see that?
23     A.      I do.
24     Q.      Okay.  There -- this begins
25 with Carver ESI000020, and with the -- what

Page 148

1  I believe is the attachment, which is a
2  printout of the spreadsheet.  It ends in
3  Carver ESI000037.
4         If you turn to the second page,
5  which is the beginning of the spreadsheet.
6         Have you ever seen this before?
7      A.      Not that I recall.
8      Q.      Okay.  On it, I just want to
9  direct your attention to three entries on
10 Page 1.  There's one on February 28, one on
11 April 1st, and another one on May 3rd
12 involving the Mackenzie Rose.
13        You see those?
14     A.      I do.
15     Q.      First one says, "Equipment
16 issue" and the other two say, "Navigation
17 equipment."
18     A.      Yes.
19     Q.      It's a little hard to follow,
20 but it looks like the second page.  When
21 it's printed out is just sort of whatever
22 was in the next column.
23        If you were to look at it in an
24 Excel spreadsheet, I think it would kind of
25 all line up.  But the -- you don't have any

Page 149

1  memory of seeing this spreadsheet at any
2  time before today?
3      A.      I mean, it may have been
4  in -- it definitely was in all of the
5  documents, but I don't recall having
6  reviewed this.
7      Q.      Okay.  If you look at the
8  February 28 entry for the Mackenzie Rose,
9  where it says, "Equipment issue," on the
10 following Page 22.
11        It says, "Autopilot failure
12 that if had gone overlooked may have
13 resulted in a navigation incident."
14        Do you see that?
15     A.      I see that.
16     Q.      And the one on April 1st for
17 the Mackenzie Rose, almost in about the
18 middle of the second page it says, "SAT
19 compass failed causing erratic inputs in
20 the autopilot texts sent to
21 nav -- investigate."
22        Do you see that?
23     A.      I see that.
24        MR. RODGERS:
25 Just -- objection.  Just the -- whether we

NICHOLAS LARAWAY

June 17, 2025

Page 150

1  produced it this way or whatever.
2        MR. CHAPMAN:  It's the way it
3     prints out.  I mean, I --
4        MR. RODGERS:  Okay.
5        MR. CHAPMAN:  -- well, I can't
6     control that --
7        MR. RODGERS:  It's not lined
8     up, so we're just --
9        MR. CHAPMAN:  I get it.  It's
10    not easy --
11       MR. RODGERS:  I just want to
12    make that --
13       MR. CHAPMAN:  We're navigating
14    our way through it.
15       MR. RODGERS:  Very good.
16    Q.    So here's my question.  Where
17 it says, "Text sent to investigate," what
18 was investigated?
19    A.    I mean, I would rely on the
20 testimony of Brian and Lenny and the other
21 members of the crew that had any knowledge
22 in the documents we produced.
23       I would have to make an
24 assumption based upon what I'm reading here
25 to say exactly what's on --

Page 151

1        MR. RODGERS:  Don't assume --
2     A.    -- I'm not going to do that.
3        MR. RODGERS:  Yeah, don't
4     assume or guess.
5     Q.    So that I'm -- so basically you
6  don't know and you would depend on whatever
7  others have said or what documents have
8  been produced about it; is that fair?
9     A.    Correct.
10       MR. RODGERS:  Objection.
11    Q.    All right, and then the --
12       MR. RODGERS:  Object.  I am not
13    done.
14       MR. CHAPMAN:  I apologize.  I
15    thought you were.
16       MR. RODGERS:  You have the
17    documents that relate to those texts
18    and you've questioned people on them.
19       So if you want to put those in
20    front of him, you can ask questions,
21    but this is -- you're -- this is not
22    specific and you're asking him to
23    guess --
24       MR. CHAPMAN:  Well --
25       MR. RODGERS:  -- but he's

Page 152

1     answered, so just continue, please.
2     Q.    So the one on May 3rd, okay,
3  for the Mackenzie Rose, it says,
4  "Navigation equipment."
5        Do you see that?
6     A.    Yes.
7        MR. RODGERS:  Again, I'm going
8     to object, because this incident is
9     in Helm CONNECT and you have other
10    documents which are more specific.
11       Ask your question.
12    Q.    And it appears that the line
13 related to that on the following page says,
14 "Rudder went hard over," and so it says.
15       Do you have any information
16 about that?
17    A.    I would have to rely on the
18 testimony of others, Brian and Lenny and
19 the crew and the documents produced.
20    Q.    And do you know whether any
21 techs, technicians were charged with
22 investigating that one?
23    A.    That one specifically, I would
24 rely on the testimony of Brian and Lenny,
25 the others and the documents we've

Page 153

1  produced.
2        I do not specifically have
3  knowledge as to what any techs may or may
4  not have investigated.
5     Q.    So back to Page 1 of Exhibit
6  19, the e-mail itself?
7     A.    Mm-hmm.
8     Q.    Under the caption or heading
9  called, "Incident reports."  It says that
10 there were so many in first quarter, so
11 many in second quarter and then year to
12 date.
13       And then right after that
14 there's a dated entry May 21, 2024.  It
15 says, "The Mackenzie Rose filed one for the
16 autopilot inducing a hard turn to port."
17       Do you see that?
18    A.    I do see that.
19    Q.    That one for some reason's not
20 listed on this spreadsheet that we're
21 looking at, Page 2.
22       But my question is, do you know
23 whether there was any investigation
24 regarding that report of the autopilot
25 inducing a hard turn to port?

NICHOLAS LARAWAY

June 17, 2025

Page 154

1          MR. RODGERS:  What date was
2      that?
3          MR. CHAPMAN:  May 21, 2024.
4      **A.    I would've to rely on the**
5  **testimony of Brian and Lenny and the**
6  **documents we've provided.**
7          **I don't have any knowledge of**
8  **any investigation.**
9      Q.    Okay.  And then the next entry
10  on Page 1 of Exhibit 19, it's dated
11  6/15/24.
12          It says Mackenzie Rose bridge
13  incident which as everyone knows is under
14  legal review.
15          Do you see that?
16     **A.    I do.**
17     Q.    Okay.  Was there any
18  investigation by technicians or otherwise
19  of the autopilot in the aftermath of -- or
20  the steering system, either one, in the
21  aftermath of --
22          MR. RODGERS:  Objection to
23      form.
24     Q.    -- the allision with the
25  bridge?

Page 155

1          MR. RODGERS:  You can answer.
2      **A.    I would have to rely on the**
3  **testimony of Brian and Lenny and the**
4  **documents provided.**
5          **I do not -- I'm not**
6  **specifically aware of any autopilot**
7  **investigation.**
8      Q.    And did you do anything to
9  determine that?  I mean --
10          MR. RODGERS:  Objection.
11     Q.    -- I hear what you've said you
12  would rely on others --
13          MR. CHAPMAN:  Let me finish
14      my -- -
15          MR. RODGERS:  No I --
16          MR. CHAPMAN:  No, let me finish
17      my question and you can object.
18          MR. RODGERS:  Okay, finish the
19      question.
20     Q.    My -- I heard what you said
21  that you would rely on the testimony of
22  Brian and Lenny and documents that have
23  been produced.
24          But I'm just asking, did you do
25  anything to specifically determine whether

Page 156

1  there was any effort to investigate the
2  autopilot in the aftermath of the allision
3  with the bridge?
4          MR. RODGERS:  Objection.
5      Immediately after the reporting to
6      the Coast Guard, the Coast Guard
7      conducted an investigation.
8          They investigated every aspect
9      of this, which you were aware of
10     because you were there at the
11     hearings or the interviews.  And
12     that's who did the investigation.
13         You are asking if they did
14     their own investigation when the
15     Coast Guard was investigating it?
16         MR. CHAPMAN:  That's exactly
17     what I'm asking.
18         MR. RODGERS:  At the same time?
19         MR. CHAPMAN:  That's exactly
20     what I'm asking.
21         MR. RODGERS:  Okay.
22     **A.    And my answer would remain the**
23  **same.  Brian and Lenny were conducting the**
24  **investigation in conjunction with the Coast**
25  **Guard.**

Page 157

1          **I would rely on their testimony**
2  **as to the process and results of the**
3  **investigation and the documents in**
4  **evidence.**
5          **I am not personally involved**
6  **with any investigation regarding the**
7  **autopilot.**
8      Q.    So including whether there were
9  any technicians engaged to come and check
10  it out?
11     **A.    Correct.**
12     Q.    So if -- just continuing to
13  look at Exhibit 19, a little further down
14  beginning on Page 25, that is the Carver
15  ESI000025.
16         Do you have that?
17     **A.    I do.**
18     Q.    So that's a -- appears to be
19  another spreadsheet that's been printed out
20  and produced this way, but there's a
21  reference to May 21, 2024, Mackenzie Rose
22  in the navigation category.
23         And then if you turn to the
24  next page, where you think the spreadsheet
25  extends out, it says, "Autopilot put boat

Page 158

1    in hard left turn."
2              Is that right?
3        A.    I see that.
4        Q.    And whether there was any
5    investigation by technicians or otherwise
6    of that, do you have any knowledge?
7        A.    I would rely on the testimony
8    of Brian and Lenny on that front.
9              I do not have specific
10   firsthand knowledge as to if that specific
11   thing was reviewed --
12       Q.    Okay.
13       A.    -- without -- off the top of my
14   head.
15       Q.    Okay.  Let me pass over to you
16   what was marked as Exhibit 6 at Mr. Moore's
17   deposition.
18             MR. CHAPMAN:  I'm sorry, I
19        don't have one for you, Mr. Rodgers.
20       Q.    But I believe this is about
21   five days of daily logs for the Mackenzie
22   Rose, beginning three days before the
23   bridge allision, the day of the bridge
24   allision and then the day following,
25   essentially June 12th to June 16th, 2024.

Page 159

1              You see that?
2        A.    I do.
3        Q.    All right.  Have you seen these
4    before today?
5        A.    I may have seen them during my
6    review and preparation for my deposition.
7        Q.    All right.  So on June 12th,
8    2024 the vessel was apparently at a
9    shipyard in Baltimore standing by for
10   repairs.
11             You see that?
12       A.    That is what that says, yes.
13       Q.    Do you know the purpose of
14   those repairs?
15       A.    I would have to rely on the
16   testimony of Brian and Lenny.  I do
17   not -- and the crew.
18       Q.    So are you aware that the
19   vessel had taken the barge, the Weeks 281,
20   dropped it off and, the City of Chesapeake
21   on the Southern Branch of the Elizabeth
22   River, and then had gone up to Baltimore to
23   have some repairs, where it stayed for few
24   days before returning to the Norfolk to
25   pick up the barge?

Page 160

1              MR. RODGERS:  Are you telling
2        him that or?
3              MR. CHAPMAN:  No.  I'm just
4        asking if he's aware of it.
5        A.    I'm not specifically aware of
6    that sequence.
7        Q.    Okay.  Is there a different
8    sequence that you're aware of or --
9        A.    No.  I'm just not aware of the
10   specific days leading up to the incident.
11       Q.    Okay.  So I'm just interested
12   in what repairs, you know, were made to the
13   vessel.
14             So out of curiosity, we sent a
15   subpoena to the General Ship Repair
16   Corporation in Baltimore.
17             MR. RODGERS:  Did you produce
18        these to us?
19             MR. CHAPMAN:  Yep, mm-hmm.
20        Sure did.
21             And that's 21?
22             THE REPORTER:  I believe it is
23        20.
24             MR. CHAPMAN:  Okay.
25             MR. RODGERS:  Is that 20?

Page 161

1              MR. CHAPMAN:  20.
2              (Whereupon, Exhibit 20 was
3        marked for identification.)
4        Q.    You've been handed Exhibit 20,
5    which is a invoice that was produced
6    pursuant to a subpoena by the General Ship
7    Repair Corporation, dated June 14th, 2024,
8    to Tug Mackenzie Rose and Carver Companies.
9              Do you see that?
10       A.    I do.
11       Q.    And it says on it that there
12   two items that are being invoiced.  The
13   first is, "To prepare and weld to keeper
14   plate onto the port rudder post."
15             See that?
16       A.    I do.
17       Q.    Do you know what the reason or
18   the need for that repair was?
19       A.    I would rely on the testimony
20   of Brian, Lenny, the crew, and the
21   documents we have produced.
22             I personally don't even know
23   what a keeper plate is, so I cannot attest
24   to that.
25       Q.    Okay.  And then second -- the

**NICHOLAS LARAWAY**

**June 17, 2025**

Page 162

1  second item there is, "Provides straps to
2  secure STBD," which I presume to be an
3  abbreviation for starboard-side fender for
4  transit.
5          Do you know what the purpose of
6  that repair was?
7      **A.   I would reiterate the same**
8  **answer. I would rely on the testimony of**
9  **Brian, Lenny, the crew and the documents**
10 **we've provided.**
11         **I don't know why they would do**
12 **that.**
13     Q.   And do you know any reason for
14 why these repairs would be done in
15 Baltimore?
16     **A.   I would rely on the testimony**
17 **of Brian and Lenny. I don't.**
18     Q.   Can you hand me Exhibit 6 back
19 so I don't lose track of it, please?
20     **A.   Yes, sir.**
21     Q.   Thank you.
22         MR. CHAPMAN:  We've been going
23     a little bit over an hour. Why don't
24     we take a short break and come back?
25         THE VIDEOGRAPHER:  We are going

Page 163

1      off the record. The time is
2      3:03 p.m.
3          (Whereupon, a short recess was
4      taken.)
5          THE VIDEOGRAPHER:  Beginning
6      Media Number 6. We are back on the
7      record. The time is 3:17 p.m.
8      Q.   Mr. Laraway, I have a few
9  questions about the condition of the
10 vessel.
11         It was equipped with what's
12 referred to as AIS, an automated kind of
13 tracking system; is that right?
14         MR. RODGERS:  You're telling
15     him or asking him?
16         MR. CHAPMAN:  I'm just -- well,
17     I'm asking him to confirm it because
18     I know that it was, but yeah.
19     **A.   That is my understanding.**
20     Q.   Okay. So and is AIS or the
21 automated tracking system used on all of
22 the Carver vessels, to your knowledge?
23     **A.   I would have to rely on the**
24 **testimony of Brian or Lenny. I don't know**
25 **specifically that it's on all of our**

Page 164

1  vessels.
2      Q.   Okay. Have you ever seen any
3  information that was extracted from the AIS
4  system pertaining to the allision with the
5  Belt Line's Bridge?
6      **A.   Not that I recall.**
7      Q.   Did the Mackenzie Rose have a
8  working radar system at the time of the
9  allision with the bridge?
10     **A.   I would have to rely on the**
11 **testimony of Brian, Lenny, the other**
12 **members of the crew and the documents we've**
13 **produced.**
14     Q.   So just to be clear, you don't
15 know and you presume that they do, right?
16         MR. RODGERS:  Objection to
17     form.
18     **A.   Correct.**
19         MR. CHAPMAN:  Could you mark
20     this as 21?
21     **A.   Thank you.**
22         (Whereupon, Exhibit 21 was
23 marked for identification.)
24     Q.   You've been handed a document
25 marked as Exhibit 21, which is a

Page 165

1  declaration of Josef Malik. Am I
2  pronouncing the last name correctly, sir?
3  Which is dated on June 9th, 2025, as
4  reflected on Page 3.
5          Do you see that?
6      **A.   Yes.**
7      Q.   All right, have you
8  previously --
9          MR. RODGERS:  Just to be clear,
10     this has to do with the documents we
11     produced?
12         MR. CHAPMAN:  Yeah, mm-hmm.
13         MR. RODGERS:  Okay.
14     Q.   Have you previously seen this?
15     **A.   I have.**
16         MR. RODGERS:  I didn't hear
17     that.
18         **THE WITNESS:  I have.**
19     Q.   Did you have any --
20         MR. RODGERS:  No, I didn't hear
21     the question.
22         MR. CHAPMAN:  I said, have you
23     previously seen this?
24         MR. RODGERS:  Okay.
25         MR. CHAPMAN:  That is before I

Page 166

1        just handed it to him, marked as
2        Exhibit 21.
3            MR. RODGERS:   I understand
4        that.
5            MR. CHAPMAN:   Okay.
6            MR. RODGERS:   I have some
7        hearing loss --
8            MR. CHAPMAN:   Yeah.
9            MR. RODGERS:   -- in my ear from
10       too much gun --
11           MR. CHAPMAN:   Yeah.
12           MR. RODGERS:   -- Navy gunfire,
13       I should say.
14       Q.    Have you -- do you have any
15   involvement in preparing it?
16       A.    Preparing this document?
17       Q.    Correct.
18       A.    I did not.
19       Q.    At the time you saw it, had it
20   already been signed by Mr. Malik?
21       A.    Yes.
22       Q.    Did you participate in any way
23   in the searches that are described in
24   Mr. Malik's declaration?
25           MR. RODGERS:   And what do you

Page 167

1        mean participate?  In what capacity?
2            MR. CHAPMAN:   In any capacity.
3        I'm just -- that's my question.
4        Q.    Did you participate in any of
5    the searches that are described --
6            MR. RODGERS:   Other than
7        communication with his lawyers, us,
8        me?
9            MR. CHAPMAN:   Well, if the
10       witness doesn't understand the word
11       search, we'll sort that out too.
12       Q.    But I'm just asking if you
13   participated in any of the searches that
14   are described in Mr. Malik's declaration,
15   Exhibit 21.
16       A.    Beyond providing access to my
17   data if requested, I don't recall having
18   specifically participated in searching for
19   any of this stuff.
20       Q.    And what do you mean by
21   providing access to your data?
22           MR. RODGERS:   Just -- okay.  Go
23       ahead.
24           You are talking to -- is your
25       question about what his lawyers asked

Page 168

1        him to do?
2            MR. CHAPMAN:   My question is
3        what he meant by providing access to
4        his data or what he referred to as
5        his data.
6            MR. RODGERS:   You can answer
7        that.
8        A.    I mean, we have numerous cases
9    ongoing.  I've provided my cellphone.  I
10   don't know if that was something that
11   was -- without reading through this thing
12   entirely, I don't know if that's something
13   that's been searched in conjunction with
14   this case or if that other cases.  We have
15   three active lawsuits going on at the
16   moment.
17       Q.    Okay.  If you look at Page 4,
18   it's titled, "Addendum A, e-mail ESI
19   search."
20           Do you see that?
21       A.    Yep.
22       Q.    So it describes custodians, and
23   I don't see your name or your e-mail among
24   them.
25       A.    Okay.

Page 169

1        Q.    Right.  So does that in any way
2    inform you about?
3        A.    If that's the case then I did
4    not participate in the search for this
5    data.
6        Q.    Okay.  If you -- again, on Page
7    4 under custodians, the third bullet.
8            MR. RODGERS:   Just -- I'm
9        sorry, Jim, but I think this
10       affidavit or -- I'm sorry,
11       declaration is for all our efforts
12       and the addendum is just the e-mail
13       ESI search.
14           MR. CHAPMAN:   Yeah.  And that's
15       what I'm asking about right now.
16           MR. RODGERS:   Just that did you
17       understand that he was just asking
18       about that?
19           THE WITNESS:   I understand that
20       now.
21           MR. CHAPMAN:   Yep.
22           MR. RODGERS:   Now he
23       understands that Jim.
24           MR. CHAPMAN:   Okay.
25       Q.    So my question is, the third

Page 170

1  bullet there on the custodian says,
2  "Cmiller@carvercompanies.com."  It's got
3  this parenthetical, (Captain Chris Miller,
4  check.  This is correct Carver e-mail.)
5          Do you know whether Captain
6  Miller, at least while he was alive, had an
7  e-mail address of
8  cmiller@carvercompanies.com?
9      **A.    I personally do not know if**
10  **that is his e-mail or if that e-mail ever**
11  **existed.**
12      Q.    Do you know of any, in the next
13  bullet it says, "Crew members with a Carver
14  e-mail address," but doesn't list anybody.
15          Do you know of any other crew
16  members that had Carver Company's e-mail
17  addresses on the Tug Mackenzie Rose?
18      **A.    I personally am not aware of**
19  **any.**
20          MR. CHAPMAN:  So I don't have
21      any further questions at this time.
22      And pass the witness to, you know,
23      others on the Zoom if they have any
24      questions or whether you need to do
25      any follow up.

Page 171

1          MR. NANAVATI:  I'm just -- this
2      is Mark Nanavati.  Just a couple of
3      questions.
4  EXAMINATION
5  BY MR. NANAVATI:
6      Q.    And if I missed this I
7  apologize and I am confident that Jim will
8  object.
9          But do you know whether or not
10  there was working radar on Mackenzie Rose
11  on the date of the allision?
12          MR. RODGERS:  Objection.  Asked
13      and answered, but you can answer.
14      **A.    I would rely on the testimony**
15  **of Brian, Lenny, the crew, the documents**
16  **we've provided.**
17          **And as we summarized in the**
18  **end, I have no reason to believe there**
19  **wasn't, but I don't know firsthand.**
20      Q.    Okay.  And when you are saying
21  that you're relying on the testimony of
22  Brian, Lenny, the crew, what other crew are
23  you relying on?
24      **A.    For that answer specifically or**
25  **for all of the times I said that.**

Page 172

1      Q.    Let's start with that answer
2  specifically.
3          MR. RODGERS:  Just for the
4      record, Mark, is, when he states that
5      he is relying on the crew's testimony
6      to date, which you're aware of was
7      testified, but we also have Jason
8      McGrath tomorrow and potentially
9      Morrissey on next week, and Captain
10      Miller unfortunately passed away.
11          That's what he's referring to,
12      but he can still answer the question
13      if --
14          MR. NANAVATI:  Well, I mean,
15      now that you've answered it for him.
16      Q.    Is Mr. Rodger's answer, your
17  answer?
18          MR. RODGERS:  Is that --
19      **A.    Yes.**
20          MR. RODGERS:  -- what I said,
21      correct?
22      **A.    Correct.**
23      Q.    Okay.  And when you're saying
24  documents produced in response to that
25  question, which documents are you referring

Page 173

1  to?
2      **A.    I mean, there were thousands of**
3  **documents produced throughout the discovery**
4  **is my understanding.**
5          **I have reviewed many of them.**
6  **I can't speak to which ones specifically**
7  **would attest to the working condition of**
8  **the radar if any.**
9      Q.    So you're suggesting that we go
10  through the documents and pick ones out
11  that's responsive to the question and that
12  will be your answer?
13          MR. RODGERS:  Objection to
14      form.  Of course you just answered
15      your own question, yes.  You should
16      do your homework.
17      Q.    So you can't identify a single
18  document as you sit here today that would
19  answer the question regarding the status of
20  the radar on the date of the allision, can
21  you?
22      **A.    Not specifically, no.**
23      Q.    Okay.  I don't have any further
24  questions for you, sir.  I appreciate your
25  time.

Page 174

1    A.    Thank you.
2         MR. RODGERS:  Anybody else?
3         I need a few minutes with the
4    witness and Mr. Malik and then we'll
5    come back.
6         But you're done for -- other
7    than follow up to follow up.
8         MR. CHAPMAN:  Yeah.
9         MR. RODGERS:  Let's -- yeah.
10   All right.  It'll just be a couple
11   minutes.
12        THE VIDEOGRAPHER:  Okay.  We
13   are going off the record.  The time
14   is 3:29 p.m.
15        Off the record.
16        (Whereupon, a discussion was
17   held off the record.)
18        THE VIDEOGRAPHER:  Beginning
19   Media Number 7.  We are back on the
20   record.  The time is 3:20 -- 35 p.m.
21        MR. RODGERS:  Okay.  We have no
22   follow-up questions at this time.
23        Thank you, Jim.  Thank you,
24   Mark.
25        THE REPORTER:  And --

Page 175

1         MR. RODGERS:  And thank you
2    Madam Reporter and Madam
3    Stenographer -- no, Madam
4    Videographer.
5         THE REPORTER:  And would you
6    like a copy of a rough and a copy of
7    the transcript?
8         MR. RODGERS:  No, just the
9    transcript.
10        THE REPORTER:  Okay.
11        Mark, copy of the transcript?
12        MR. NANAVATI:  Yes, please.
13        THE REPORTER:  And would you
14   like a rough draft as well?
15        MR. NANAVATI:  No, thank you.
16        THE REPORTER:  Okay, got it.
17   Thank you so much.
18        MR. RODGERS:  Are we closed?
19        MR. CHAPMAN:  Till tomorrow.
20        MR. RODGERS:  Okay.
21        THE VIDEOGRAPHER:  Okay.  This
22   is the end of the video deposition of
23   Nicholas Laraway.
24        The time is 3:36 p.m.  And we
25   are off the record.

Page 176

1         (Thereupon, the examination
2    was concluded at 3:36 P.M.

Page 177

1         A C K N O W L E D G M E N T
2
3
4    STATE OF NEW YORK)
5                    :ss
6    COUNTY OF        )
7         I, Nicholas Laraway, hereby certify
8    that I have read the transcript of my
9    testimony taken under oath on 06/17/2025;
10   that the transcript is a true, complete and
11   correct record of what was asked, answered
12   and said during this proceeding, and that
13   the answers on the record as given by me
14   are true and correct.
15
                 _____
16               Nicholas Laraway
17
18
     Signed and subscribed to
19   before me this _____ day
     of _____, 2025
20
21
     _____
22      Notary Public
23
24
25

**NICHOLAS LARAWAY**

June 17, 2025

**Page 178**

```
1                C E R T I F I C A T E
2    STATE OF NEW YORK)
                            :ss
3    COUNTY OF SUFFOLK  )
4        I, LARIN KAYWOOD, a Notary Public
5    within and for the State of New York, do
6    hereby certify:
7        That the witness whose examination is
8    hereinbefore set forth was duly sworn and
9    that such an examination is a true record
10   of the testimony given by such a witness.
11       I further certify that I am not
12   related to any of these parties to this
13   action by blood or marriage, and that I am
14   not in any way interested in the outcome of
15   this matter.
16       IN WITNESS WHEREOF, I have hereunto
17   set my hand this 17th day of June, 2025.
18
19
20              Larin Kaywood
                _____
21                   Larin Kaywood
22
23
24
25
```

**Page 179**

```
1    Errata Sheet
2
3    NAME OF CASE: IN THE MATTER OF COEYMANS MARINE TOWING
4    DATE OF DEPOSITION: 06/17/2025
5    NAME OF WITNESS: NICHOLAS LARAWAY
6    Reason Codes:
7        1. To clarify the record.
8        2. To conform to the facts.
9        3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24
25              _____
```

**NICHOLAS LARAWAY**

June 17, 2025

---

**$**

**$2**
34:12,16 35:2

**$2,921,213.50**
36:2,14

**$3**
37:20

**$3,070,000**
48:2 49:2
51:8,17

**$4**
39:7 40:21
41:23 53:12

---

**0**

**00**
99:24

**000163**
74:20 75:20

**000191**
28:12

**000231**
40:6

**000817**
89:14

**000898**
88:1

**000910**
91:18

**001929**
49:22

**001962**
54:16

**001963**
55:15

**00490**
5:7

**00996**
118:19

---

**1**

**1**
5:2 7:15 43:6
62:23 99:16
112:24 118:20
120:6 121:7
148:10 153:5
154:10

**1.13**
88:18

**10**
57:19 99:3,5,
7,10

**104**
6:13

**10:08**
5:10

**10:41**
19:10

**11**
103:11,12,15
106:6

**11/1/2023**
48:16

**11:05**
56:11

**11:18**
56:18

**11:40**
75:6

**11:50**
75:10

**12**
106:3,4,9,12
108:3 109:19

**12303**
6:14,21

**12:18**
97:11

**12:32**
97:17

**12:58**
117:24

**12th**
158:25 159:7

**13**
118:8,9,10

**13th**
36:14

**14**
122:8,10,13

**14th**
161:7

**15**
126:14,16,19
137:5

**15th**
22:16 23:10
71:16 72:8
79:3 93:1
96:21 100:25
102:13 123:17
131:6 137:25
138:15

**16**
135:9,10,12

**163**
74:18,19
77:16

**1630**
137:24

**164**
78:10

**16th**
126:20 158:25

**17**
136:21,23
137:1 139:20

**1737**
125:4

**17th**
5:9

**18**
144:17,20,23

**18th**
28:19 29:15

**19**
147:8,9,10,11,
13,16 153:6
154:10 157:13

**1917**
49:22

**1930**
51:3

**195(6)**
113:3

**19th**
147:17

**1st**
54:14 148:11
149:16

---

**2**

**2**
14:13,17
19:11 31:4

**56:17 118:22**
124:5 153:21

**2,921,213.50**
38:7

**2.9**
38:6

**20**
39:18 54:14
160:23,25
161:1,2,4

**2010**
9:10

**2011**
8:13,16

**2014**
12:2 16:14

**2020**
11:13 32:18
50:22 51:7,17

**2021**
39:18 41:11
42:1

**2022**
35:25 36:15
37:21

**2024**
14:5 15:2 19:9
20:10 21:11
22:16 23:10
28:2,19 29:15
31:8,25 45:18
54:3 60:2
71:16 72:8
79:3 82:17
83:4 84:11
86:12 93:1
96:21 100:25
102:13 103:1,
17 122:17,22

---

125:25 126:20
137:3,25
144:24 147:18
153:14 154:3
157:21 158:25
159:8 161:7

**2025**
5:9 39:6
41:15,23
52:19 53:9
54:5,15 57:24
165:3

**20th**
15:2 19:9 20:9
21:11 28:2
31:8,17,25
32:11,14
82:17 83:3
84:11 86:12
127:23 130:8

**21**
50:22 153:14
154:3 157:21
160:21
164:20,22,25
166:2 167:15

**212**
104:19

**22**
149:10

**224-cv-009**
5:6

**231**
40:12

**237**
40:11,12

**24th**
137:3 144:24

**25**

157:14

**28**
148:10 149:8

**281**
138:9 143:5
159:19

**28th**
135:13

**29th**
103:16

**2:00**
117:22

**2:06**
118:5

**2nd**
122:22

---

**3**

**3**
27:21,24 75:9
165:4

**30**
36:5

**300**
10:18

**31**
51:7

**319**
122:15

**32**
101:23

**33**
59:7

**35**
174:20

**3:03**

163:2

**3:17**
163:7

**3:20**
174:20

**3:29**
174:14

**3:36**
175:24 176:2

**3rd**
122:17 148:11
152:2

---

**4**

**4**
33:20,23 34:1
35:24 73:11
75:12 87:15,
21 97:16
168:17 169:7

**4.03**
77:23

**4.03-1**
77:18

**4.05**
77:23

**4.05-1**
78:11

**46**
77:18,23
78:11

---

**5**

**5**
39:11,12,14
42:2,8,25
118:4

**50**
74:4

**528**
137:21

**531**
137:14

---

**6**

**6**
40:19 43:11,
12 158:16
162:18 163:6

**6,15/24**
135:16

**6.4**
99:11

**6/15/24**
154:11

**673**
47:14,15

**674**
47:15

**6th**
39:18

---

**7**

**7**
40:19 47:7,9,
12 63:1
147:17 174:19

**7.1**
91:17

**7.3**
87:21

**7.5**
89:12

---

**8**

**8**
49:21,23 57:8,
9,10,11

**8.8F**
118:14

**816**
89:19

**817**
89:20

**843**
99:24

**845**
99:25

**899**
88:17

---

**9**

**9**
57:7,12,15
58:4,5

**9.5**
73:8 75:16
119:20

**9/27/2024**
113:5,7

**997**
118:19

**9th**
165:3

---

**A**

**a.m.**
5:10 19:10
56:12,18 75:7,

10
abbreviation
162:3

abrupt
128:6

Absolutely
32:1 61:19

abstract
34:1 36:12

access
23:24 86:16,
18,19 87:4
123:6 167:16,
21 168:3

accident
76:1 100:14

accident/
incident
75:16

accordance
113:1

account
51:2 132:15
144:14

accurate
43:5

accusations
18:2

acquired
12:3,7 32:20
33:4,7,9
35:10,12,15
51:1

acquiring
33:1

acquisition
34:11

acre
10:19

acronym
107:22 109:14

action
115:15 116:7,
14

actions
22:21 23:13
67:22

active
168:15

actual
70:13

add
140:20 143:10

addendum
168:18 169:12

adding
46:8

additional
122:4

address
6:12 123:2,10
125:14,19,22
126:23 170:7,
14

addressed
14:9 28:1
39:16 44:1

addresses
16:21,22
170:17

addressing
78:12

adjacent
10:18 11:16

admin
126:22

Administered
108:15

administration
9:24

administrator
108:14

advice
21:23

affidavit
169:10

aftermath
102:11 125:23
138:13
154:19,21
156:2

agent
78:14

aggregate
29:8 30:4

Agneta
17:13,14 20:5,
7

agreed
49:3,11 51:14
53:1,4

agreement
104:11,22
105:3

ahead
25:25 63:22
82:10 167:23

aid
118:25

AIS
163:12,20
164:3

Albany
10:17 109:11

Albright
28:14,15
32:13

alcohol
99:17 100:22
101:1,2,8,12,
13,14 103:3
105:9

alignment
21:9,16

alive
170:6

allided
71:15 72:6
140:3 141:3
142:2,9

alliding
14:4 15:8
143:23 144:5

allision
45:16 52:17
58:16,23 60:1
61:2 73:2
78:22 79:1,14,
19 80:8,12,19
84:9 86:10
92:25 100:23
102:4,12,25
106:20 107:1
115:18 116:5
120:13 121:16
123:17 135:24
136:7,15
138:14 139:22
143:19 144:3
154:24 156:2
158:23,24
164:4,9
171:11 173:20

allisions
73:4 118:23

allowed
37:6 56:9

alongside
138:10

amended
142:11

America
104:23

American
104:5

amiss
20:17 21:3

amount
36:2,13,21,25
37:7 38:6 39:8
41:1 48:2,6,13
49:2 52:14
61:14 62:13
64:16,23 65:1
66:21

AMS
104:23

ancillary
10:21

answering
69:11

answers
44:23 93:12

Anthony
16:22 17:8
19:20 31:24,
25

Antony
16:24

apologies
40:2

apologize
13:24 68:5
106:8 151:14
171:7

apparently
104:9 159:8

appears
14:20 27:23,
25 28:17 31:6
34:5,10,13
35:25 43:6,19,
21 44:17 45:5
49:4 58:2
76:23 91:19,
22 103:15,22
104:7 106:7
114:22 118:21
122:16,19,20
124:16 125:8
126:23 135:13
137:2 152:12
157:18

applicants
100:5

appraisal
38:5,9,13
39:5,6 41:1,4,
8,14,22 42:1
43:2,20,22
44:11 50:22
53:24 56:20

appraised
37:5,9

approximately
32:21 58:19

April
54:14 148:11
149:16

area
30:22 109:11

arrangement
65:18

asks
21:23

aspect
156:8

assessment
81:21

assistant
31:7

assume
113:2 126:7
151:1,4

assumption
123:20 150:24

assured
51:16

attached
7:20 15:2
20:13 21:10
104:8 135:20
139:19

attachment
120:20
137:10,12,21
147:19 148:1

attachments
124:20

attempting
87:9

attending
103:21

attention
148:9

attest
112:10 161:23
173:7

attorney
14:8 16:25
18:1,4,8
19:17,19 22:8,
9

attorney-client
23:1 68:22
71:2 72:19
133:1,17

attorneys
67:18 69:5
70:16,19 71:3,
6

August
11:13

automated
163:12,21

automatic
90:5

autopilot
89:22,25 91:2,
7 97:20 98:20
138:6,15,20,
24 139:5,16
142:18 143:2
149:11,20
153:16,24
154:19 155:6
156:2 157:7,
25

aware
13:3 14:6
18:17 64:3,6
80:9 82:9,14
84:5,12 86:7,
13 91:13,15
93:5 96:13,22
97:25 98:3,6,
10,13,19
101:10 102:6
103:5 104:24

105:24 110:15
115:20 125:21
129:8 130:3,
21 136:19
137:18 138:20
144:1,10,12,
16 155:6
156:9 159:18
160:4,5,8,9
170:18 172:6

awareness
110:8

awful
146:14

**B**

back
12:11 26:2,11
31:3 45:13
50:9 51:17
52:8 56:17,19
60:25 74:2
75:9 85:24
86:1 87:16,19
90:15,18 95:3,
5 97:16
112:24 117:22
118:4 122:6
124:18 138:7
143:3 153:5
162:18,24
163:6 174:5,
19

backing
138:8 143:4

Baldassare
16:3 22:15
23:11 32:6
68:4,12 69:21
72:14 81:4,7,
23 82:25 83:7,

21 84:2,6
98:22 103:17
126:20 127:15
133:8 134:19
137:4 145:2

Baldassare's
22:17 23:7,21

ballast
30:5

Baltimore
159:9,22
160:16 162:15

bank
35:6,7,10,13,
22 36:19 37:5,
25 39:16
42:19 43:16
44:6

barge
61:3,7 62:2
65:25 80:23
82:23 123:17
124:15 138:9
140:3 141:3
142:2 143:5
144:5,8,15
159:19,25

barges
12:8

based
14:21 38:2,20
58:21 67:25
74:13 91:10
96:1 112:16
115:9 133:16
137:10 142:12
150:24

bases
59:25

**NICHOLAS LARAWAY**

June 17, 2025

basically
99:16 134:18
151:5

basis
51:16 53:14
55:9 62:1,8
64:22

Bates
19:24 28:9
40:5 54:9
87:25 89:13
91:18

Bayside
11:15

bed
128:8,20

began
8:20 110:16
138:8 143:4

begin
12:9 19:18

beginning
5:2 16:14
56:16 75:8
89:12 97:15
118:3 148:5
157:14 158:22
163:5 174:18

begins
89:18,19
122:14 146:13
147:24

behalf
5:20,24 7:2
19:9 25:9
37:10 79:25

belief
96:1

believes

79:8

bell
44:8

Belt
5:21 14:5 15:8
45:16 71:16
72:7 79:2,20
86:10 96:20
100:24 102:4,
12 103:1
106:21 115:18
116:6 164:5

benefit
63:18

betwee
60:20

bit
27:5 56:20
65:22 162:23

block
114:11
115:10,13,14

blocks
115:11

BNB
35:6,7 42:19

board
9:2 10:2
101:12

boat
12:7 128:9
157:25

bolts
46:7

bottom
40:20 56:22
57:1 74:16
87:25 100:1

bow
123:16

branch
92:19 159:21

break
27:5 55:19
66:16 74:22
96:25 97:3
117:15 162:24

Brian
15:14 18:12
22:6 23:13
28:1 31:13,15
32:2 52:2
60:15 67:20
71:21 82:13
91:9 92:9
93:3,11 95:11
97:23 101:17
103:17 107:4
110:4,14
111:13 122:2,
17 123:4
125:10,21
126:6,21
127:15
129:11,22
130:14 135:14
136:16 137:4
139:1,14,25
143:25 144:24
147:18 150:20
152:18,24
154:5 155:3,
22 156:23
158:8 159:16
161:20 162:9,
17 163:24
164:11
171:15,22

Brian's
146:9,25

bridge
14:5,7,9 15:8
20:17 21:8
45:16 61:4,5
71:16 72:8
78:23 79:2,20
80:24,25
82:23 83:1,2
84:15 91:17,
20 92:2 93:8,
16 94:7 96:19,
20 100:24
102:5,12
103:1 106:21
115:19 116:6
119:10,15,22
121:18,21,24
123:16,18
124:14 135:24
136:7,15
138:11,12,17
139:22 140:4
141:3 142:3,9,
15 143:23
144:3,6
154:12,25
156:3 158:23
164:5,9

bridges
92:18

briefing
92:15,17

bring
60:7

broker
17:15 20:5

brought
73:19

Brunswick
11:15

bulk
26:24 27:2,6

bullet
76:15 145:20
146:13 169:7
170:1,13

bullets
146:15

bump
128:20

bunch
78:19

business
9:12 10:24
11:13,24,25
12:2 30:2
65:18 80:2
103:25 134:21
145:10

businesses
10:22 11:9
26:19

buzzing
112:13

---

**C**

---

call
8:8 12:17
17:21,25
18:12 29:17
37:19 65:24
85:16 88:6
91:24 99:23
125:18

called
18:9 73:7 81:3
92:15 153:9

calls
116:21 129:1

June 17, 2025

**Canada**
11:15

**capabilities**
94:6

**capacity**
80:5 110:6
167:1,2

**captain**
16:5,8,15
81:8,10 82:5,6
83:19 84:1,8
93:16 95:12
96:7 106:19
115:16 123:5
128:18 143:20
170:3,5 172:9

**captain's**
94:5,9

**captains**
16:12 97:19
127:3

**caption**
153:8

**Cardona**
16:24 17:8
19:20,22
31:25

**cargo**
10:20 26:20,
24 61:20

**Carlo**
17:12

**Carolina**
10:15 11:9
26:21 30:25
31:2

**carries**
45:12

**Carver**
5:5,25 6:2
7:19 8:8,10,
12,15,18,21,
23 9:1,25
10:5,7,25
11:24 12:1,17,
24 13:2,14,18,
19,24 15:15,
19 16:4,5,9
17:1 20:1
21:18 25:8
28:12,16 29:5,
11,25 30:3
32:10,16,19
33:2 34:7
37:10,12
45:22 46:11
49:3,22 50:16
51:2 54:19,20,
23 55:14
59:24 61:11,
17 62:11
63:23 64:4
73:14 74:17,
18 75:20 79:8,
17,21,22,25
80:3,6,11 82:8
86:15,17,25
88:1 89:8,13
91:18 93:7,14
94:5 95:17,18,
22,24 99:23
102:13,22,23
103:2,22,24
104:21 105:2,
7 106:12
113:4,16,18,
21,22 114:4,5
115:22 117:3
118:13,18
122:15 123:8
127:7 135:22
137:11,13

141:22 146:7
147:25 148:3
157:14 161:8
163:22 170:4,
13,16

**Carver's**
58:16 73:3
76:20 77:25
78:25 80:16
81:21 86:8
96:18 140:2,6
141:2,5 142:1

**Carver00073**
47:12

**Carvers**
50:17

**case**
5:6 117:1
168:14 169:3

**cases**
168:8,14

**casualty**
52:16 60:19
76:14,18
77:17 78:11,
18

**category**
157:22

**causing**
149:19

**CCS**
16:19

**cellphone**
168:9

**Center**
34:4

**certification**
51:3

**cetera**
119:11 143:5

**CFR**
77:18,23
78:11

**chairman**
9:2

**challenging**
132:18

**chance**
7:25

**change**
49:13 102:13

**Chapman**
5:18 6:24 7:11
14:11 20:1,21,
25 21:7,14
23:4,17,25
24:5,23 25:17
27:19 28:11
33:19 35:17,
19,23 38:10,
14,25 39:10
40:1,10 41:12
43:3,10 44:16,
22 47:4,6,14
48:8 49:17
50:2,5,10,14
53:1,4,6 54:2,
6,8,17,20,22
55:4,8,12,14,
17,20,25 56:3
57:6,11 59:10
62:15 63:19
69:7,14 70:18,
23 73:18,22
74:1 75:1
83:13 85:2,10,
13,22 90:23
92:22 94:13,
18 98:9 99:1,4

102:9 103:10
106:2 117:14,
18,21 118:9
129:19,25
131:14 132:4,
16 140:7,18
141:17 147:7
150:2,5,9,13
151:14,24
154:3 155:13,
16 156:16,19
158:18 160:3,
19,24 161:1
162:22 163:16
164:19
165:12,22,25
166:5,8,11
167:2,9 168:2
169:14,21,24
170:20 174:8
175:19

**charge**
78:14 119:9

**charged**
64:22 152:21

**charging**
145:21,22

**Charleston**
11:8 27:12,14

**chasing**
120:3

**Chatgpt**
70:12

**check**
157:9 170:4

**Chesapeake**
159:20

**chief**
6:1 108:20
128:4

**Chris**
127:2 137:25
170:3

**chris.
miller63@
hotmail.com.**
126:24

**chrismiller63@
hotmail.com**
127:6

**Christopher**
81:10 115:16
128:18,19
137:25

**CHRO**
108:21

**circumstances**
92:1

**City**
12:7 159:20

**claim**
144:13

**clarify**
141:18

**cleaning**
128:14

**clear**
24:19 31:22
62:22 71:12
75:23 121:9
133:6 164:14
165:9

**client**
30:8 132:5

**clip**
87:16

**close**
33:22 87:18

**closed**
175:18

**Clyde**
5:24

**cmiller@
carvercompani
es.com**
170:8

**Cmiller@
carvercompani
es.com.**
170:2

**CMT**
15:17 134:14
145:17

**coach**
94:15

**coaching**
94:17

**Coast**
9:13 11:1,19
18:23 19:1,5
30:9 34:3
76:17 78:16
79:18 80:7,11,
14,18 100:16
111:7 116:11,
23 119:19,22
136:1 142:14
143:12,17
156:6,15,24

**code**
6:20 76:25
77:13 78:1

**Coeymans**
5:4,24 7:18
8:9 10:16,17,
21,23 12:20,
21,22,25 13:2,
9 34:7 80:2

**coffee**
56:5

**collection**
107:6

**college**
9:3

**Collision/
allision**
118:15

**collisions**
118:20

**color**
91:25

**column**
111:6,7
148:22

**communicatio
n**
22:14 167:7

**communicatio
ns**
23:2,9

**Community**
36:19 37:5
39:16 43:16
44:6

**companies**
6:2 8:13 9:25
10:5,7 11:11
12:1,24 13:14,
24 28:16
105:7,20
113:5,16,19,
22 161:8

**Companies'**
127:7

**company**
5:22 7:3
16:10,17

33:11 45:12
46:13 47:18
48:12,18 49:4
57:25 79:22
81:19 90:4
91:6 99:19
103:4 104:4
108:11,23
109:12 110:17
119:5,15
124:7 134:15
144:14 145:14

**company's**
26:19 91:1
142:7 170:16

**companying**
9:7

**compass**
149:19

**compiled**
22:8

**completed**
132:16 143:13

**completely**
138:6,24
139:6 143:2

**completion**
52:19

**compliance**
117:6

**comply**
23:13

**components**
61:4

**concerns**
78:13

**concluded**
176:2

**conclusion**
77:10 116:13

**condition**
39:15 43:7
163:9 173:7

**conducted**
96:13 129:12
156:7

**conducting**
156:23

**confer**
63:14

**confident**
171:7

**confirm**
129:13 163:17

**confirmed**
119:14

**confuse**
85:12

**confused**
84:3

**conjunction**
156:24 168:13

**connect**
31:9 99:24
118:19 133:20
134:3,7,13
136:6,14
139:21,24
152:9

**connected**
8:22

**connection**
87:8,12 99:17

**considered**
125:18 127:6

**NICHOLAS LARAWAY**

June 17, 2025

consisting
78:18

consortium
104:1

construct
61:5

construction
10:13 29:9

contact
30:11 86:9
119:21

contacted
19:1,4 62:7

contained
73:5

containerized
26:25

containers
27:5

content
127:16

contents
90:24 126:5

context
26:19 79:16

continuation
109:21

continue
110:18 152:1

continued
115:22

continuing
35:24 85:4
157:12

contract
105:23

Contreras
5:11

control
150:6

controller
46:1 145:10

convenient
117:15

conversation
18:6,11 20:4
29:20 31:15

conversations
18:10 20:6
31:18,21
60:23 142:13

conveyed
81:22

Copies
56:21,25

copy
15:21 47:16
53:24 55:6,23
59:11 73:17,
19 74:2 175:6,
11

Corp
34:7

corporate
25:4,8 26:3,6

Corporation
160:16 161:7

correct
13:16,22 14:1
15:9,15,16
16:5,6 25:5
26:23 34:8,9,
13 35:4 36:2,3
40:23 42:6
44:13 48:3,4

49:12 50:17,
24 51:4,5,9,
10,12,13
52:12,13
55:16 58:7
65:2 76:2,11
77:19,20,24
78:23,24
79:14,15
81:17,20 82:7,
15 87:13
88:24 89:10
90:7 91:21,22
92:16 93:23
96:17 99:19,
20 100:25
102:5 108:6
110:24
113:19,24
114:9 118:20,
21 119:1,2,6,
7,17,23,24
121:22 122:19
124:15,16
127:5,23,24
133:9 138:7
143:3,20
151:9 157:11
164:18 166:17
170:4 172:21,
22

correctly
58:6 93:24
108:17
145:24,25
165:2

corresponden
ce
19:18 22:10
80:14

cost
51:12 65:24

counsel
5:15 19:23
23:19 24:13
25:1,15,21
26:4,14 54:13
66:22

counsel's
56:9

couple
7:21 106:14
171:2 174:10

court
5:12,16 26:1,
11 85:23 86:1
90:18 95:5
106:10

cousin
114:19

coverage
45:11

covering
115:3

covers
118:20,22

credit
64:2

Crenshaw
5:19

crew
9:17 93:4
100:23 102:2
126:1,10
127:16 134:1
146:24 150:21
152:19 159:17
161:20 162:9
164:12
170:13,15
171:15,22

crew's
172:5

Criscione
34:6

cross
50:13

CSX
28:19 29:24
30:3,8,11,22

curiosity
160:14

curious
41:20

current
9:22,23

custodian
170:1

custodians
168:22 169:7

customer
29:25

customers
11:6

_____

**D**

d/b/a
5:5,25 7:18
8:10 12:18

daily
158:21

damage
119:25 121:18
143:22 144:2,
4,9,10,14

Dan
28:14,15
32:13

Dan's
30:8

dark
145:20 146:13

data
167:17,21
168:4,5 169:5

date
5:8 19:10 49:7
60:1,18 67:8
68:7 84:9 94:3
153:12 154:1
171:11 172:6
173:20

dated
39:17 48:15
131:6 153:14
154:10 161:7
165:3

dates
54:15

day
32:3,6,14
67:3,23 113:6,
10 114:3
158:23,24

days
31:6 36:5
80:15,25
158:21,22
159:24 160:10

deadline
101:14,21

deal
30:3

dealing
23:2

dealt
42:16

debate
24:6

Deblasi
44:3

deblasi@dime.
com.
42:11

deceased
81:13 94:10

deckhand
128:12

deckhands
128:8

declaration
24:7 165:1
166:24 167:14
169:11

deep
10:15 11:7

definitions
7:21

degree
9:11

delivering
61:20

demand
46:14 64:1

depend
151:6

depicted
125:2

deposition
5:3 7:4,9,18
8:1 59:6,13
68:1 71:9
73:12 75:12
80:21 87:9,13
88:5 120:7

132:8 133:18
136:10 158:17
159:6 175:22

depositions
91:8 92:8
93:3,11

deps
73:22

derailment
30:15

derailments
30:16

describes
168:22

description
138:1,4

designated
8:4 79:19

desk
43:20,21

desktop
44:10

detail
88:15 130:19

detailing
106:14

details
106:14

determine
137:17,19
155:9,25

devices
22:13 23:5

difference
34:19

difficult
46:18

digital
124:3

Dime
35:13,22
36:18,19 37:4,
9,24 39:16
40:6,7 42:16,
22 43:15 44:6

Dime000159
43:18

direct
19:16 133:15
148:9

directing
70:9 72:16

direction
61:10

directly
19:12 86:19
93:5 100:13

director
9:24

directors
10:3

disciplinary
115:17 116:7

disciplined
106:20

discount
64:2

discovery
25:20 26:5
40:3 47:18
71:22 93:13
95:14 96:12,
16 114:22
120:3 122:14
130:15 136:18
173:3

discussed
63:11

discussion
174:16

dispatch
15:17 145:18

dispatchers
15:19,20,25

distinguish
134:17

diversified
10:8

division
11:4,5 16:11

doc
119:11

document
34:5 38:23
43:15 48:7,9,
11 49:7 50:15
57:18 62:17
73:11 74:7
91:12 97:7
103:14 119:25
134:1 137:1
139:18 142:23
143:6,8
147:16 164:24
166:16 173:18

Documentatio
n
34:3

documents
37:11 40:6
62:14 68:7
71:21 74:4
93:2,12 94:2
95:13 97:23
98:23,24

101:18 107:3,
7 111:8,10,13,
18,19,24
112:9 122:2
125:10 130:15
139:2,15
140:1 147:2
149:5 150:22
151:7,17
152:10,19,25
154:6 155:4,
22 157:3
161:21 162:9
164:12 165:10
171:15
172:24,25
173:3,10

**dollars**
32:22 34:16
35:1 58:5,20
59:20 60:21

**dots**
31:9

**dozen**
7:22

**draft**
175:14

**dropped**
159:20

**drug**
101:21 102:1,
7,9,14 103:2,7
104:1 105:5,9

**due**
92:3

**duly**
6:4

**Dutchman**
6:13

**duties**
116:4

**Dylan**
65:20 66:11
145:3

---

### E

**e-mail**
14:7 15:1,11,
18 16:20
17:10,17,19
19:8,13 20:12
27:25 29:14,
21 31:21 42:9
103:16,23
104:8 115:13
120:20
122:13,16,21
123:1,7,10
124:4,13
125:14,17,19,
22 126:19,23
127:7 129:11
135:13,20
137:2,16
139:20 144:23
145:19 147:17
153:6 168:18,
23 169:12
170:4,7,10,14,
16

**e-mailed**
82:17

**e-mails**
14:16 123:2

**ear**
166:9

**earlier**
26:18 34:14
57:23 113:8

**earth**
10:13

**easier**
140:24

**East**
11:1,19 30:9

**easy**
150:10

**economics**
9:12

**educate**
67:6

**educated**
92:11

**effort**
156:1

**efforts**
169:11

**eligible**
109:23 110:1

**Elizabeth**
92:19 159:21

**embedded**
124:3,13

**emergency**
29:9 30:7,13

**employed**
8:8,12 16:16
29:11 42:22
102:23 108:11
117:10

**employee**
9:20 100:13
107:16
113:15,18
117:3

**employees**

**employment**
8:21 110:16
113:4 116:7

**employment-
wise**
115:17

**end**
59:21 74:6,14
103:25 113:20
171:18 175:22

**ends**
40:11 122:15
148:2

**engage**
26:20

**engaged**
157:9

**engineer**
128:5

**England**
31:1

**entered**
104:21 105:3
107:15 146:18

**entire**
76:24

**entities**
114:4

**entity**
13:13,15 29:5
33:12 114:1

**entries**
112:15 148:9

**entry**
36:11 111:4

83:6 93:8
100:4 114:3
131:9

**employment**
8:21 110:16
113:4 116:7

137:22 149:8
153:14 154:9

**equipment**
30:20 46:9
148:15,17
149:9 152:4

**equipped**
89:22,24
97:21 163:11

**equity**
34:21

**erratic**
149:19

**error**
100:15

**ESI**
28:12 168:18
169:13

**ESI000020**
147:25

**ESI000025**
157:15

**ESI000037**
148:3

**ESI000201**
103:22

**ESI000307**
20:2

**ESI000313**
122:15

**ESI000527**
137:13

**ESI000541**
135:22

**essentially**
158:25

**establish**

70:21

**Estimated**
40:21

**Evanston's**
132:14

**event**
48:23 134:2
136:12

**eventually**
20:6 139:2

**evidence**
97:24 101:18
107:3 125:11
139:15 144:1
146:10 147:1
157:4

**examination**
6:23 171:4
176:1

**examined**
6:6

**exceeds**
53:11

**Excel**
147:20 148:24

**exclusively**
27:3

**excuse**
43:14 44:11
89:15 133:15
147:17

**execution**
112:12

**executive**
9:24

**exhibit**
7:15,20 14:13,
17 19:11

27:21,24 31:4
33:23,25
35:24 39:12,
14 40:20 42:2,
8,25 43:12
47:9,23 49:18,
21,23 50:21
57:15 58:4
59:7 62:23
73:11 75:12
87:15,21 99:1,
7,10,22
103:11,12,15
106:4,6,9,12
108:3 109:19
118:7,10
120:6 121:7
122:10,13
126:16,19
135:10,12
136:23 137:1
139:20
144:20,23
147:13,16
153:5 154:10
157:13 158:16
161:2,4
162:18
164:22,25
166:2 167:15

**exhibits**
74:24

**exist**
96:10

**existed**
170:11

**existence**
35:7

**exists**
96:11,15

**expect**

52:1

**expected**
52:2

**experience**
60:9,11

**expert**
60:16 89:4
90:9 139:10

**explain**
34:18

**extends**
30:24 157:25

**extent**
21:23 77:8
90:11 142:23

**extra**
59:11

**extracted**
164:3

---

**F**

**F-O-R-O**
105:21

**facilitates**
10:19 11:17

**facilities**
27:8 105:12

**facility**
10:16 26:22
27:10,11,14

**fact**
80:25 101:14
139:20

**facts**
86:5 129:13

**failed**

149:19

**failure**
149:11

**fair**
25:2 40:21
48:20 51:6
53:15 116:15
151:8

**false**
81:22,25

**familiar**
112:22 125:11

**family**
8:22

**February**
148:10 149:8

**federal**
76:25 77:14
78:1

**fee**
62:12

**feel**
110:17

**Feeney**
102:20,21
103:16,24
104:10 145:2

**felt**
128:6,9,20

**fender**
83:2 162:3

**fendering**
80:23 84:15
129:10 138:10

**fenders**
142:11

**field**

60:16

**figure**
112:8

**file**
107:9 112:1

**filed**
36:14 153:15

**files**
50:17 96:5

**fill**
87:22

**filled**
112:20 134:1,
7,12

**final**
36:11 143:15

**Finally**
142:12

**financial**
46:1 145:9

**find**
17:16 41:7
65:4 83:22
84:4 88:7
107:12,13
127:21

**fine**
75:2

**finish**
92:23 116:22
155:13,16,18

**finished**
135:15

**firm**
5:19

**firsthand**
95:15 158:10

171:19

**fixed**
118:23

**fleet**
12:4 105:18

**focused**
91:1

**follow**
22:21 74:10
78:1,7 148:19
170:25 174:7

**follow-up**
174:22

**food**
128:15

**forget**
31:23

**form**
20:19,22 42:4
53:18 60:4
67:17 78:4
84:22 85:1,3,9
86:24 87:2,21
88:12,17 89:2,
4,8,15 92:6,21
94:19 101:6
116:21 130:9
141:7 147:19
154:23 164:17
173:14

**formed**
12:6 16:10

**Foro**
105:20

**forthcoming**
98:25

**forward**
22:10 29:1
65:14 120:15

**forwarded**
28:18,23
29:14,21
103:23 104:9

**forwarding**
14:21 29:18
122:20

**Foundation**
102:17

**founder**
9:1

**freight**
63:1

**frequent**
30:11

**front**
38:24 50:20
75:13 143:6
151:20 158:8

**full**
129:12

**full-time**
8:20

**future**
34:23 95:12
97:24

---

**G**

**G-E-L-A-P-E-L-Y**
33:16

**Galioto**
103:18 117:2
122:17 145:2
147:18

**galley**
128:14

**Galm**
65:20 145:3

**gap**
125:8

**gear**
128:10

**Gellatly**
33:10,11 34:6
50:23

**general**
13:5 15:14
49:8 52:3
60:15 76:6
87:5 160:15
161:6

**generalists**
108:10

**generally**
48:18,24 66:3
111:17 126:6

**geographical**
10:12

**Georgia**
31:2

**get all**
87:17

**gist**
133:21

**give**
54:9,12 65:23
66:5 130:18
140:10

**giving**
24:12

**good**
6:25 7:1 57:2
59:15 96:24
132:20 136:5

150:15

**grab**
75:2 117:15

**graduate**
9:9

**grainy**
121:8,11,13

**Great**
60:24

**Greater**
12:14

**grounding**
78:22

**group**
15:18,22
78:17

**Guard**
9:14 18:23
19:1,5 34:3
76:17 78:16
79:18 80:7,11,
14,18 100:16
111:7 116:12
119:19,23
136:2 142:14
143:12,17
156:6,15,25

**Guard's**
116:23

**guess**
51:23 57:3
92:11 106:14
116:4 123:22,
25 143:7
146:24 151:4,
23

**guessing**
146:11

**Gulf**
11:1,19 12:8

**gun**
166:10

**gunfire**
166:12

**guys**
26:25 56:4

---

**H**

**half**
58:4,19 59:20
60:20

**hand**
138:8 143:4
162:18

**handed**
27:24 99:9
122:12 126:18
136:25 144:22
147:15 161:4
164:24 166:1

**handle**
26:25 114:7
125:17

**handled**
45:25

**handles**
45:21 46:7

**handling**
26:20

**hands**
68:10

**happen**
66:7 103:6
119:23 132:22

**happened**

24:18 66:10
80:15 94:24,
25 119:16
130:17,20
142:8 143:15

**happening**
110:9

**happy**
54:10

**hard**
148:19 152:14
153:16,25
158:1

**head**
61:16 72:2
158:14

**header**
14:22

**heading**
72:5 77:17
92:15 153:8

**hear**
46:18 70:5
71:24 98:4
155:11
165:16,20

**heard**
46:24 155:20

**hearing**
166:7

**hearings**
156:11

**Heidelberg**
11:14

**held**
56:15 97:14
118:2 174:17

**Helm**

99:24 118:19
133:20 134:3,
7,12,25 135:1,
7 136:6,14
137:5 139:21,
24 143:19
152:9

**helped**
30:18

**hey**
19:23 65:25

**hidden**
118:23

**high**
59:21

**higher**
41:1 48:21
63:2

**hired**
61:24,25
103:2 117:9,
12

**Historically**
30:16

**hit**
14:7 118:25
119:1,21
128:15 142:15

**hitch**
123:6

**hitting**
84:15 119:4

**hold**
9:13 55:9

**holding**
13:15

**homework**
173:16

**hour**
55:23 162:23

**hourly**
114:2

**hours**
101:23 137:24
140:22

**HR**
107:23 108:9,
20

**HRIS**
107:18,21

**human**
70:13 100:15
107:24

**humor**
140:19

**hundreds**
111:17

**I**

**identification**
7:16 14:14
27:22 33:24
39:13 43:13
47:10 49:24
57:16 99:8
103:13 106:5
118:11 122:11
126:17 135:11
136:24 144:21
147:14 161:3
164:23

**identified**
7:4

**identify**
19:24 173:17

**ignore**

50:5

**images**
124:3,12

**IMG1731.JPG**
124:22

**IMG1732**
125:3

**immediately**
78:12 79:18
80:7,18 156:5

**imposed**
37:25

**improper**
95:1

**incident**
14:3 18:17
19:5 63:4
67:3,8 73:8
76:1 77:18
100:14 117:11
119:4 120:13
125:24 127:22
133:19,25
134:2,6,12,25
135:1,8,16,23
136:6,14
137:6,22
138:21 139:21
142:25 143:16
149:13 152:8
153:9 154:13
160:10

**incident/
accidents'**
77:2

**include**
60:14 69:5
76:24

**included**

20:13 33:11
126:8

**includes**
60:13 66:3

**including**
8:17 14:16
29:7 47:20
120:1 145:11
157:8

**incorrect**
82:3,9 84:9,
14,19

**increase**
53:21

**increased**
52:15,19

**individual**
137:19

**individuals**
17:19

**inducing**
153:16,25

**industrial**
10:8,15,19
11:11

**industries**
10:11

**industry**
60:9,11

**inform**
126:4 169:2

**information**
21:19 24:25
46:12 65:14
67:19 68:9,14
70:22 79:13
81:3,6,23
82:3,9,14

84:7,14,20
89:1 107:23,
24 128:21
129:6,7 133:2
143:25 146:22
152:15 164:3

**infrastructure**
10:14

**Ingrid**
5:11

**initiate**
21:20

**initiated**
108:15,16
130:7

**injury**
100:14

**inputs**
149:19

**Inspection**
78:16

**instructing**
132:5

**instructions**
91:20

**insurance**
17:14 20:5
25:1 45:10,21
46:12 48:24
49:4 52:15,25
53:21

**insure**
48:22

**insured**
47:21 48:6,12
51:16 52:12
53:14 58:9

**insured/agreed**

48:2

**insures**
48:18

**intended**
79:14

**intentionally**
83:17

**interested**
160:11

**intermodal**
27:4

**internal**
106:15 136:2

**internally**
116:11 125:7

**interviews**
156:11

**interworkings**
135:7

**introduce**
5:15

**investigate**
149:21 150:17
156:1

**investigated**
150:18 153:4
156:8

**investigating**
18:21 152:22
156:15

**investigation**
110:14
116:11,24
129:12,23
130:4,6,10
131:12 143:13
153:23 154:8,
18 155:7

156:7,12,14,
24 157:3,6
158:5

**investigations**
106:24 111:8

**investigative**
143:16

**invoice**
63:23 64:12,
14,17 66:2,6
146:4 161:5

**invoiced**
64:8 66:14
161:12

**involved**
23:8 26:12
37:18 78:17
100:14 110:9
112:11 157:5

**involvement**
100:18 110:7
166:15

**involving**
14:3 15:7
100:15 148:12

**iphone**
124:6,23

**iphones**
124:8

**issue**
129:9 131:12
148:16 149:9

**issued**
124:7

**issues**
30:18

**item**
162:1

**items**
67:22 161:12

---

**J**

**J-O-C-H-U-M**
46:5

**jacket**
107:8

**James**
5:18,23 81:15
96:7 106:13
108:15 138:5
143:1,20

**January**
50:22 51:7

**Jarkeis**
128:12

**Jason**
103:18 117:2
122:16 145:2
147:18 172:7

**JC**
145:22 146:1

**Jennifer**
42:10 44:1,3,5

**JHA**
147:21

**Jim**
19:23 28:8
33:17 35:15,
16 45:1 46:14
57:5 59:9
71:12 72:17
74:21 90:20
133:4 140:17
141:16 169:9,
23 171:7
174:23

**job**
61:3,8,23
62:11 63:24

**jobs**
8:17,18

**Jochum**
46:3,4 52:3

**joined**
9:6

**Josef**
6:1 165:1

**Jr**
16:24 17:8
19:20 31:24,
25

**July**
103:16
122:17,22
125:24 147:17

**June**
5:8 14:5 15:2
19:9 20:9
21:11 22:16
23:9 28:2,19
29:15 31:8,25
32:11,14
45:18 71:16
72:8 79:3
82:17 83:3
84:10 86:11
92:25 96:21
100:25 102:12
103:1 123:17
125:24 126:20
130:8 131:6
135:13 137:3,
5,24 138:15
144:24 145:11
158:25 159:7
161:7 165:3

Junior
17:4

**K**

Kaywood
5:13

keeper
161:13,23

kind
10:4 15:13
65:21 77:9
91:24 99:15
106:15 111:25
113:21 119:3
125:17 142:25
148:24 163:12

kits
101:12,15

knew
15:7 18:19
19:4 70:24
82:25 83:20,
21 84:6,17,19,
23,24

knowing
40:25 115:10
121:19 129:6

knowledge
24:14,17,22,
24 26:8 35:14,
18 36:23
42:21 51:15,
18 52:5,16
64:7 65:17
66:15 68:11
78:25 82:19,
22 89:6 90:12
94:6,21 95:15
96:18 104:15
111:11 139:4,

15 150:21
153:3 154:7
158:6,10
163:22

Kool
145:8

**L**

label
19:25

labeled
75:16

Labor
113:1,2

Lane
6:14

Laraway
5:3 6:10,25
9:1 13:19
27:23 37:12
47:17 59:3
75:11 97:18
99:9 106:11
114:11 118:12
136:25 144:22
147:15 163:8
175:23

large
10:8

larger
38:17 124:12

largest
30:8 38:19
39:5 41:14

Larin
5:13

late
39:17

law
5:19 113:1,2

lawsuit
46:15

lawsuits
168:15

lawyer
31:23 63:13

lawyers
63:12 64:16
67:5,6 167:7,
25

lead
22:9 121:17,
21 128:23

leaders
60:12

leading
160:10

learn
14:2 82:24
84:16 138:15

learned
84:13 140:13

leave
66:20

left
109:1 158:1

legal
5:14 6:2 21:23
77:9 154:14

Lenny
67:20 71:21
80:22 81:3
82:4,13 91:9
92:9 93:3,11
95:11 97:23
101:17 107:4

122:2 123:4
125:10,21
129:8,12,21
130:14 134:23
139:1,14,25
143:25 145:2
150:20
152:18,24
154:5 155:3,
22 156:23
158:8 159:16
161:20 162:9,
17 163:24
164:11
171:15,22

Lenny's
136:17

Leonard
16:3 32:5 81:5
103:17 126:20
127:15 137:4

letter
14:9 15:2
18:1,19 20:13
21:10,17
22:22 31:7,19
43:14 44:10
82:16 83:3,10
84:10 86:11
106:7,12
113:3 121:20
127:22 129:15
130:8

letter's
115:14

licenses
9:14

life
49:11

light
81:1 146:3

limit
38:1

limitation
54:3

limited
27:12

Line's
164:5

lined
150:7

Linstead
108:8 112:14
114:14

list
47:23 62:24
170:14

listed
153:20

litigation
23:3

LLC
13:10 113:19,
23

LLP
5:5

loan
37:11,25 38:2

loaned
37:24

locations
10:12 11:18
30:6 105:10,
13,17

lock
119:10

log
137:5 142:25

146:19

**logged**
137:24

**logs**
146:14,16,17
158:21

**long**
8:7 32:16
54:24 72:12

**long-term**
62:4

**longer**
16:3 81:18

**looked**
21:13,15 55:1
88:8

**lookout**
88:18 89:1
96:19

**lose**
162:19

**loss**
45:11 166:7

**lot**
29:6 30:17,20

**lots**
62:5

**louder**
47:2

**lump**
62:12 64:23

**lunch**
117:16

---

**M**

---

**Mackenzie**

14:3 18:18
39:17 44:12
45:11 47:23
58:17 59:25
61:1 72:6
89:24 100:24
102:3 122:21
123:10 125:13
127:3 135:14
137:3,16
148:12 149:8,
17 152:3
153:15 154:12
157:21 158:21
161:8 164:7
170:17 171:10

**mackenzierose
2@
carvercompani
es**
125:16

**Madam**
85:22 106:10
175:2,3

**made**
112:15 141:19
144:10 160:12

**maiden**
114:13

**maintain**
95:22

**maintenance**
29:7

**make**
22:7 33:6
71:12 85:3
92:2 94:20
123:19 129:11
144:13
150:12,23

**makes**
115:7

**making**
37:25 61:12
62:5 84:22
92:10 138:16

**Malik**
6:1 165:1
166:20 174:4

**Malik's**
24:7 166:24
167:14

**manage**
103:2

**managed**
13:10,12

**management**
12:25 73:6,13
74:11 75:24
86:17 87:7
90:3,25 99:11
118:14 134:6,
11,14,15,20

**manager**
12:16 13:5
15:15 52:3
60:16 102:22

**managers**
87:5

**managing**
13:19

**maneuvered**
138:9

**March**
36:14

**Marin**
108:16,19

**marine**

5:4,5,25 7:18,
19 8:9 10:24,
25 11:3,4,24,
25 12:2,14,17,
22,25 13:2,10,
18 15:15,19
16:5,10 32:10
34:7,8 45:22
76:14,18
77:17 78:10,
16,18 79:22,
25 80:3 86:17
95:18,24
102:22 103:24
114:5 117:4
144:13 146:7

**mariner**
90:10 110:19
139:9

**maritime**
11:11 60:16
104:5,23

**mark**
7:11 14:11
16:7,8 27:19
33:19 39:10
43:10 47:6
50:8,10 57:5
99:5 103:10
106:2 118:6
122:8 126:14
132:11 133:4
135:9 136:21
144:17 147:7
164:19 171:2
172:4 174:24
175:11

**marked**
7:16 14:14,17
27:22 33:24
39:12 42:2
43:13 47:10

49:24 57:14,
16 58:3 59:6
73:11 99:8,10,
23 103:13,15
106:5 118:11
120:6 122:11,
13 126:17,19
135:11 136:24
137:1,13
139:20
144:21,23
147:14,16
158:16 161:3
164:23,25
166:1

**market**
12:7 40:21
48:20 51:6
53:16

**marks**
15:12

**Marshall**
17:15

**Martin**
5:20

**Mary**
50:23

**master**
76:9,10,15
78:14 119:10,
11

**mate**
81:8,15 95:13
123:5 138:5
139:1,14
143:1

**materials**
11:12,14 30:5

**matter**
5:4

matters
17:2

**Mcgrath**
128:5 172:8

**Mckenzie**
32:17

meaning
134:14

means
92:10 113:2

meant
138:23 168:3

**Media**
5:2 56:17 75:9
97:16 118:4
163:6 174:19

meet
101:13

**Melissa**
46:3 52:3
145:8

member
9:17 13:10,12,
20 42:15
110:15

members
93:4 100:22
102:2 150:21
164:12
170:13,16

membership
104:10

memory
19:7 39:1,3
40:24 149:1

mention
53:8

mentioned
26:18 30:6
72:13 83:6

merit
132:19

**Meyerrose**
41:19 54:1,2
55:2 57:24
58:25

miced
46:17

middle
89:21 91:23
149:18

**Miller**
81:11 82:5
84:8 115:16
127:2 128:18,
19 170:3,6
172:10

million
32:22,23
34:12,15,16
35:1,2 37:20
38:7 39:7
40:21 41:6,23
52:24 53:12
58:5,20 59:20
60:20

mind
28:8 60:7
112:5

minds
68:10

minimum
48:19

minutes
75:3 174:3,11

miscellaneous

8:18

**Miss-incidents**
147:21

missed
134:9 171:6

misunderstoo
d
68:8 83:14

mixed
83:19,25

mixing
83:17

mm-hmm
28:4 31:5
40:10 62:25
74:20 82:20
109:20 128:3
130:5 153:7
160:19 165:12

mobile
22:13

moment
17:3 168:16

money
38:6

monitor
5:10

month
120:12 121:16
138:14

months
109:2 136:12

**Moore**
13:4 15:1,14
18:13,14
22:15 23:11
28:1 31:15
32:3,11 52:2

60:15 67:20
68:3,11 69:22
72:14 82:25
83:7,20 84:5
98:22 103:17
122:17 126:21
127:15 129:22
133:8 134:19,
23 135:14
137:4 144:24
147:18

**Moore's**
59:6 73:12
75:12 120:6
145:19 158:16

morning
6:25 7:1

**Morrissey**
81:16 82:6
83:20 84:1,8
93:16 94:10
96:8 97:25
98:24 106:13,
19 108:16
110:16
111:16,25
116:8 128:12
138:5 139:1
142:10 143:1,
20 172:9

mortgage
34:12,17,24
35:2,5 36:1,5,
7,13,19,20,22,
24 37:6,20

mounts
47:20

move
62:1,8 64:22
65:25

movement
10:20

moving
22:10

multiple
103:7 106:24
142:11

---

**N**

names
15:12

**Nanavati**
56:23 57:2
131:24 132:6,
11,17 171:1,2,
5 172:14
175:12,15

**National**
34:3

native
120:4

nature
29:2 121:20

nav
149:21

navigating
150:13

navigation
89:13 90:3
118:25 148:16
149:13 152:4
157:22

**Navy**
166:12

nearest
76:16 78:15

necessarily

48:10

**needed**
48:23 61:5

**Nicholas**
5:3 6:10
175:23

**Nodding**
9:8

**Norfolk**
5:21 14:4 72:7
79:2 86:9
96:20 138:1
159:24

**north**
11:8 27:11,14
138:10

**Notary**
6:4

**note**
50:6 114:23
115:2 146:3

**Notes**
111:5

**notice**
7:5,9,17 78:10
113:4

**noticeable**
144:10

**notification**
134:21 135:8

**notifications**
119:22 134:5,
11,24

**notified**
18:23 80:11

**notify**
76:13,15
78:15 79:18

80:6,18 119:5,
8,15,18

**number**
5:2,6 7:3 8:13,
17 10:9,10,11,
21 11:18 12:8
14:16 15:11
30:5 38:17,20
40:6 42:16
43:17 54:21
56:17 63:1
66:5,16 67:1
74:17,18 75:9
87:25 89:13
91:18 97:16
103:21 104:18
105:9,12
118:4,14
119:4,8 122:5
124:24 144:25
163:6 174:19

**numbered**
74:9 88:18
125:3

**numbering**
74:8

**numbers**
40:5 54:10
74:10

**numerous**
168:8

**nuts**
46:7

**NY**
113:1

_____

**O**

_____

**oath**
25:18

**object**
21:2 142:4
151:12 152:8
155:17 171:8

**objected**
69:18

**objection**
20:18 21:22
25:14 38:22
42:3 53:17
60:3 63:10
67:10,16
68:21 69:4,20
71:17 72:9,15
77:8 78:3
81:24 83:11
84:18,21,25
85:3,4 86:23
87:2 89:3
90:8,19 92:5,
20 94:8,19
98:7,14 101:5
102:16
104:13,17
116:20 129:1,
17 130:9
131:1,2,15
132:2,24
133:10 138:18
139:7 140:21
141:6,14,19
142:5,22
149:25 151:10
154:22 155:10
156:4 164:16
171:12 173:13

**objections**
46:19 67:13
132:19

**objects**
118:23

**obligation**
79:17

**obtain**
66:16

**obtained**
22:7 24:25
28:18 34:2
43:15 126:11

**occasion**
86:16,19

**occasionally**
11:1

**occurred**
23:9 26:16

**offered**
15:3

**office**
55:24 74:2
76:13 78:15,
16,17

**officer**
6:2 108:20

**officers**
13:18

**offices**
79:19 80:7

**official**
12:15,23 13:6
125:19 127:7

**one-off**
62:1,7 64:22

**ongoing**
31:18 111:7
116:12 168:9

**operate**
107:18

**operates**

10:25

**operating**
13:7

**operation**
67:2,7

**operational**
33:7

**operations**
12:10 26:20
99:18 102:21

**operator**
12:3,6 78:14

**operators**
90:6

**opinion**
44:11 51:7

**Opposing**
56:8

**options**
121:3

**orange-ish**
91:25

**order**
74:9 87:17

**organization**
8:23 10:9
45:21 52:1

**original**
36:24 56:24
59:12 73:19
80:21 84:6
120:4

**originally**
142:9

**outcome**
106:23

**overlooked**

149:12

**owed**
63:2

**owned**
13:14,25
32:16

**owner**
78:13

**P**

**p.m.**
97:11,17
117:24 118:5
163:2,7
174:14,20
175:24 176:2

**pages**
57:19 77:22
106:14 124:12
137:12

**paid**
34:15,24,25
37:1 61:12,17
64:5,8 66:7,15
110:13,22,24
146:7

**Palmetto**
27:15

**paper**
87:16 121:5

**parenthetical**
119:10 170:3

**park**
10:19

**part**
13:1,14 46:25
77:1 86:14
89:1 90:2

126:7 136:9

**part-time**
8:17 9:4

**participate**
100:5 166:22
167:1,4 169:4

**participated**
167:13,18

**participating**
62:2

**partner**
12:11,13

**partnership**
12:5

**parts**
78:19

**pass**
49:21 73:10
158:15 170:22

**passed**
33:25 39:14
55:22 103:14
106:6,9,11
115:24 116:2
135:12 172:10

**past**
42:17 103:7
145:21

**pay**
32:19 62:10
110:18

**payroll**
110:21 111:2
113:19,23
114:2 115:21

**PBL**
138:10

**PDF**
139:19

**Pearson**
16:7,8

**pending**
106:23 116:22

**people**
67:21 93:21
95:23 144:25
151:18

**people's**
142:19

**Pepera**
44:2,6

**performing**
116:4

**period**
102:3 116:17
145:11

**person**
42:9,14 44:2
78:14 119:9

**personal**
24:21,24 26:8
89:6 107:8
110:6 111:11

**personally**
26:12 93:6
95:15 110:5
122:3 125:11,
22 126:2
136:20 146:21
157:5 161:22
170:9,18

**personnel**
95:18 96:5
107:8 112:1
114:8

**perspective**
25:7

**pertaining**
164:4

**phone**
17:25 22:18,
19 23:6,7,8,
21,22 65:15
124:6

**phones**
24:19 25:10
26:14 124:7

**photo**
121:21 138:11

**photocopied**
114:21

**photograph**
20:14 120:2,5,
8 124:24

**photographs**
57:21 120:1
121:24 123:9
125:1,2,8

**photos**
123:16

**physical**
23:5

**pick**
159:25 173:10

**picture**
21:9

**pile**
74:23

**pilot**
90:5 142:18

**piloting**
142:15

**pink**
114:22

**plaintiff**
5:20

**planned**
34:22

**plate**
161:14,23

**PN**
145:23 146:1

**point**
31:10 116:5

**pointing**
77:14

**policies**
52:11 102:15

**policy**
49:12 78:1,7
91:1,6

**popped**
128:10

**port**
10:16,20 11:8,
16 16:4 29:8
153:16,25
161:14

**Porter**
128:8

**portfolio**
11:20

**ports**
11:10

**Portsmouth**
5:21 14:4 72:7
79:2 86:9
96:20

**position**

26:4,6 67:24
109:4 117:5

**possibly**
21:16 33:16
94:12

**post**
161:14

**post-incident**
100:10,21
105:8

**posted**
96:19

**potentially**
144:9 172:8

**practical**
76:14,18

**pre-employment**
105:8

**predominantly**
27:2 117:7

**preemployment**
100:8

**prefer**
44:19 88:10

**preferred**
36:13

**prefers**
77:22

**prep**
69:12,13

**preparation**
71:2,8 131:3
133:18 136:10
159:6

**prepare**

63:7 68:1 87:9
132:8 161:13

**prepared**
70:2,6,13,24
71:13

**preparing**
80:20 166:15,
16

**preposition**
98:18

**present**
141:25

**preserve**
21:19

**pressure**
92:3

**presume**
50:16 107:7
109:22 162:2
164:15

**previous**
52:11 59:12

**previously**
11:12 39:21
41:3 42:18
59:6 73:14
144:11 145:5
146:24 147:4
165:8,14,23

**pride**
92:3

**print**
56:2 108:4

**printed**
40:2 121:1,4
148:21 157:19

**printout**
109:22 112:20

139:19 148:2

**prints**
150:3

**prior**
8:1,16 72:11
83:2 86:11
89:19 92:25
93:19 117:11

**priorities**
76:9

**privately**
13:25

**privilege**
55:6,10 133:2,
17

**privileged**
70:22

**probability**
124:10

**problem**
64:24

**procedure**
73:3,5 76:1,21

**procedures**
77:2

**proceed**
94:20

**proceeds**
138:11

**process**
26:13 53:21
65:23 66:3
72:20 110:10
136:18 157:2

**processes**
114:2

**processing**

106:15

**produce**
160:17

**produced**
17:17 39:25
40:8 46:11
47:17 49:16
50:15 62:18,
21 68:7 73:14
94:3 107:11
111:16 120:2
122:2,14
135:21 137:11
140:1 150:1,
22 151:8
152:19 153:1
155:23 157:20
161:5,21
164:13 165:11
172:24 173:3

**production**
103:21

**productions**
54:23

**prohibited**
99:18 100:18
101:4,22

**prohibiting**
91:6

**prohibition**
90:4 91:11,14
127:11

**prohibitive**
100:6

**project**
62:2,5

**projects**
30:10

**pronounce**

12:19

**pronounced**
42:10

**pronouncing**
108:17 165:2

**proper**
85:9

**property**
29:7

**protocol**
124:23

**protocols**
102:14

**provide**
26:13 30:7
91:19 93:8
94:5 96:4
109:16 113:3

**provided**
14:15 22:18,
23,24 23:23
25:1 26:4 30:4
62:14 66:13
67:19 68:15
69:6 71:4,5,22
80:22 82:3
84:7,14 93:3,
12,15 95:14,
23 96:12,16
97:19 101:18
114:21 129:7
130:15 139:3
146:11 147:1,
2,5 154:6
155:4 162:10
168:9 171:16

**provider**
109:11,13

**providing**

NICHOLAS LARAWAY

June 17, 2025

23:20 25:21
167:16,21
168:3

**Public**
  6:4

**purchased**
  34:21

**purporting**
  44:10

**purpose**
  88:25 159:13
  162:5

**pursuant**
  40:7 43:16
  46:14 161:6

**push**
  12:7 128:10

**pushing**
  61:3,7

**put**
  37:20 38:24
  87:16 128:14
  151:19 157:25

**putting**
  35:1

_____

**Q**

**quality**
  121:14

**quarry**
  11:14,18

**quarter**
  153:10,11

**Queens**
  27:10

**question**
  22:4 25:2,24

40:13 41:2
42:5 44:23
45:1 50:7
53:19 77:10
78:6 82:1
85:6,9,14,20,
21 86:3,4
89:20 90:13
91:5 92:7
93:5,18 95:1,
2,21 98:17
101:7 110:3
129:4,5 130:3,
11 131:19,21,
24 136:5
140:23 141:1,
8,10,13,24
142:6 150:16
152:11 153:22
155:17,19
165:21 167:3,
25 168:2
169:25
172:12,25
173:11,15,19

**questioned**
  151:18

**questioning**
  104:14

**questions**
  31:11 67:1
  73:15 87:4
  132:14,18
  151:20 163:9
  170:21,24
  171:3 173:24
  174:22

**quick**
  62:23 97:5

**quickly**
  73:25

**quotation**
  15:12

**quote**
  65:23

**quoting**
  66:4

_____

**R**

**radar**
  164:8 171:10
  173:8,20

**rail**
  27:9,11,12,15

**railroad**
  5:22 29:24

**railroads**
  27:13

**random**
  100:9 105:8

**range**
  39:6,8 41:16
  59:22 121:3

**rate**
  66:12 114:3

**re-ask**
  85:14

**re-do**
  85:6

**reached**
  19:17,22
  64:21

**read**
  18:1 26:2,11
  28:22,24
  68:16,19 69:3,
  20,24,25 70:1
  85:23 86:1

90:15,18 95:2,
5 112:4
125:25
130:24,25
131:25 132:1
133:3,6,7
137:23
145:24,25

**reading**
  58:5 91:10
  150:24 168:11

**real**
  97:5

**realize**
  57:17 112:4

**reason**
  36:4,8 51:20
  53:23 110:11
  140:3 141:2
  142:2 161:17
  162:13 171:18

**reason's**
  153:19

**reasons**
  80:17 100:7

**recall**
  13:11 14:8
  17:18,20,24
  18:12,16,24
  19:2,6,15 20:7
  28:24 29:19,
  23 31:20 32:7,
  8,15 33:8,12
  34:20 37:22
  38:4,16 39:7
  40:17,25 41:5,
  15,24 42:20
  45:8,19 60:22
  62:13 64:13,
  23 81:9
  105:25 107:5

108:25 117:11
120:14,17
121:12 127:19
136:8,11
138:19 148:7
149:5 164:6
167:17

**recalling**
  57:23

**receipt**
  116:23

**receive**
  15:21 134:24
  135:1

**received**
  14:7 17:25
  20:12 21:24
  63:2 84:10
  122:21
  127:18,22

**receiving**
  17:18 18:12
  130:7

**recent**
  41:10 109:3

**recently**
  14:16 16:18
  52:19 58:22
  59:3 87:12

**recess**
  56:14 97:13
  118:1 163:3

**recipient**
  17:10

**recognize**
  14:18

**record**
  6:8 19:24
  26:10 28:10

42:25 46:11
47:12 48:15
56:11,13,18
66:21 75:6,10
85:25 90:17
95:4 97:11,12,
16 104:13
117:24,25
118:4 131:5,
18 163:1,7
172:4 174:13,
15,17,20
175:25

**recorded**
36:8

**records**
23:20 95:17,
22 96:7
111:15

**recovered**
25:12

**redo**
85:8

**reduction**
64:2

**reestablished**
36:6

**refer**
77:12

**reference**
107:14 112:9
118:18 157:21

**referenced**
18:18

**references**
43:1 137:9

**referred**
145:5 163:12
168:4

**referring**
31:3 75:15
79:21 87:15
172:11,25

**refers**
43:23 77:18
101:3

**refinancing**
37:19

**reflected**
165:4

**refurbishing**
33:6

**regulation**
77:14

**regulations**
77:1 78:2,8

**rehire**
109:23 110:2

**reiterate**
95:9 162:7

**relate**
111:25 146:6
151:17

**related**
30:18 31:10,
12,18 67:22
98:19 102:14
106:15 114:18
126:8 138:20
152:13

**relates**
25:3 135:7
144:8

**relationship**
30:21

**relationships**
10:5 103:6

**relocated**
12:9

**rely**
71:20 82:12
86:6 91:8 92:8
93:2,10,21
95:10 97:22
98:21 101:16
107:3 111:12
122:1 123:3
125:9,20
130:13 134:22
136:16 138:25
139:13,24
142:19 143:24
146:9,25
150:19
152:17,24
154:4 155:2,
12,21 157:1
158:7 159:15
161:19 162:8,
16 163:23
164:10 171:14

**relying**
68:2 71:24
94:1 171:21,
23 172:5

**remain**
156:22

**remained**
116:12

**remedial**
104:14

**remember**
31:13 55:2
65:1 131:20

**remotely**
103:21

**removal**

30:19

**rental**
30:20

**repair**
160:15 161:7,
18 162:6

**repairs**
159:10,14,23
160:12 162:14

**repeat**
41:2 72:11
85:19,21
90:13 95:20
131:19 132:25
134:9 144:7

**rephrase**
20:20 21:5
141:10,23

**replace**
48:25

**replacement**
48:21 51:12

**report**
10:1,2 39:16
43:8 58:3
80:22 133:20,
25 134:6,12
135:4,16,24
136:6,14
139:21 143:16
153:24

**reported**
53:15 81:2,6

**reporter**
5:13,17 6:7,
11,15,19,22
7:13 26:2,11
32:24 33:13
49:19 56:7

57:9,13 85:23
86:1 90:18
95:5 99:3
106:10 118:8
147:9,11
160:22 174:25
175:2,5,10,13,
16

**reporting**
73:3 75:17
76:1,8 77:2
79:17 100:16
119:4 135:8
156:5

**reports**
134:25 135:1
136:2,3 138:5
143:1 153:9

**represent**
17:1 135:19

**representative**
25:4,8

**representative
s**
30:12

**request**
22:22 125:12

**requested**
21:18 22:2
105:17 125:7
167:17

**require**
33:5

**required**
87:3 88:22
100:5,15

**requirement**
37:24

**requirements**

75:24

**requires**
119:22

**requiring**
89:1

**Resend**
146:16,17

**Resources**
107:24

**respond**
19:12

**responded**
40:3

**responding**
19:8

**response**
17:16,18 24:4
29:10 30:7,14
65:8 73:8
172:24

**responsibilities**
86:15

**responsible**
92:2

**responsive**
173:11

**rest**
57:20

**resting**
128:20

**restroom**
97:5

**result**
115:18 143:23
144:2,5

**resultant**

78:13

**resulted**
64:4 149:13

**results**
157:2

**retain**
21:19

**retired**
16:18

**returning**
159:24

**review**
7:25 43:20,21
55:6 72:12
111:15 154:14
159:6

**reviewed**
37:16 67:19
76:4,6 87:8,12
88:2,13 96:6
111:17,19
136:9 149:6
158:11 173:5

**reviewing**
130:17,19

**right-hand**
88:23

**ring**
44:7

**River**
92:19 159:22

**RODGER**
49:15

**Rodger's**
172:16

**Rodgers**
5:23 18:3
20:18,23 21:2,

5,12,22 22:25
23:19 24:3,9,
21 25:14,18,
19 26:3 28:8
33:17 35:14,
18,21 36:9
38:8,12,15,22
39:1,2,23 40:8
41:9,18 42:3,
24 43:4,9
44:14,19,25
45:13 46:10,
17,21 47:1,11,
15 48:7,9,14
49:6,25 50:3,
8,12 51:22
52:25 53:3,5,
17,25 54:4,7,
12,19,21,25
55:5,11,13,16,
18,22 56:1,4,
8,21,25 57:3
59:9,14 60:3
62:16,19
63:10,17,21
65:5,7 66:19
67:9,12,16
68:2,6,21,25
69:4,10,16,17,
23 70:4,8,15,
20 71:1,8,11,
17 72:9,15,22
73:16,21,24
74:3,19,21
75:3,19 77:7,
12 78:3 79:4,
10 81:24
82:10,18 83:5,
11,16,24
84:18,21 85:5,
11,17 86:2,23
87:1 88:4,10
89:3 90:8,19
92:5,20,24

94:1,8,16,17,
22 95:7 96:23
97:1 98:7,14
101:1,5 102:7,
16 104:12
116:20
117:17,19
123:12,22,25
129:1,17,21
130:9 131:1,
16,23 132:2,9,
12,20 133:10
134:8 135:25
138:18 139:7
140:5,8,11,19,
20 141:6,14,
20 142:4,22
149:24 150:4,
7,11,15 151:1,
3,10,12,16,25
152:7 154:1,
22 155:1,10,
15,18 156:4,
18,21 158:19
160:1,17,25
163:14 164:16
165:9,13,16,
20,24 166:3,6,
9,12,25 167:6,
22 168:6
169:8,16,22
171:12 172:3,
18,20 173:13
174:2,9,21
175:1,8,18,20

**role**
8:11 12:15
13:7 86:25
145:16

**roles**
8:13

**room**

56:6 128:6

**Rose**
14:3 18:18
32:17 39:17
44:12 45:11
47:24 58:18
60:1 61:2 72:6
89:24 100:24
102:3 122:22
123:10 125:13
127:3 135:14
137:3,16
148:12 149:8,
17 152:3
153:15 154:12
157:21 158:22
161:8 164:7
170:17 171:10

**rough**
175:6,14

**routinely**
29:1

**Roy**
12:13

**RR**
137:5 138:10

**rudder**
152:14 161:14

**rule**
100:17

**run**
15:13

**runs**
62:5

**Ryan**
46:16,24 47:3,
5

## S

**S-C-H-E-N-E-C-T-A-D-Y**
6:18

**safety**
73:6,13 74:11
75:24 78:13
86:16 87:7
90:3,24 92:15,
17 99:11
104:5,23
117:7 118:13

**sailed**
9:16

**salaried**
9:20 114:7

**sales**
29:5,8

**salesman**
28:15 65:19
145:4

**salesmen**
65:13

**sampling**
100:9,17

**sanction**
96:3

**SAT**
149:18

**satisfaction**
36:10

**scenario**
66:8,10

**schedule**
47:19

**scheduled**

94:11

**Schenectady**
6:14,16

**school**
8:21

**screenings**
100:6

**search**
167:11 168:19
169:4,13

**searched**
168:13

**searches**
166:23 167:5,
13

**searching**
65:9,11
167:18

**section**
73:7,8 74:10
75:16 78:10,
11 87:20
88:18 89:12,
16 90:3 91:17,
19 99:11
101:11 118:13

**sections**
73:13 76:25
77:23 87:6,11

**Sector**
78:15

**secure**
22:13 26:13
162:2

**secured**
25:13

**sees**
20:24

**seller**
34:25

**sells**
29:6

**send**
15:21 65:16
66:2,6 123:2

**sending**
31:13 127:8

**senior**
16:11

**sentence**
112:25 128:13

**separately**
140:17

**September**
39:18

**sequence**
160:6,8

**serve**
27:13

**served**
27:9,11

**service**
63:3 105:16
109:10,13

**services**
29:7,8 30:9
34:7 104:10
105:2,4,5
109:16 126:22

**set**
58:3 115:11

**share**
127:16

**shared**
128:22 129:8

**Sharif**
128:8

**sharing**
11:21

**sheet**
66:13

**ship**
36:13 160:15
161:6

**shipment**
11:17

**shipyard**
11:5 52:20
159:9

**shoreside**
105:11,17

**short**
27:16 56:14
97:13 118:1
162:24 163:3

**show**
59:5 120:5
146:18

**shown**
142:24

**shows**
54:14

**sick**
116:1

**side**
88:23

**sign**
105:22

**signature**
114:11 115:9,
11,13,14

**signed**

37:11,16
114:10 123:20
166:20

**silly**
121:2

**simple**
64:24 140:17

**single**
173:17

**sir**
7:7,10 11:22
15:5 59:18,22
107:10 162:20
165:2 173:24

**sit**
173:18

**site**
61:3,8

**sitting**
22:11

**Skanska**
62:1 63:23
64:1,8,21
66:10

**sleeping**
128:9

**sliding**
128:9

**slightly**
124:12

**slowly**
138:11

**SMS**
119:20 134:4

**snow**
30:18

**snowplowing**

30:19

**soft**
46:21

**sold**
11:13 29:8
34:6

**somebody's**
112:13 123:15

**sort**
8:10 13:7 32:9
43:19 86:22
99:17 103:25
108:4 120:3
148:21 167:11

**sounds**
121:1

**south**
10:14,17 11:8
26:21 30:24
31:2

**southeast**
31:2

**Southern**
92:19 159:21

**space**
66:20

**speak**
47:1 91:9
107:5,19
110:22 173:6

**speaking**
131:15 132:10

**speaks**
142:23

**specific**
13:1 17:2
23:12 24:16
31:20 33:12

39:8 52:5
60:23 61:13
62:13 64:14
78:8 88:15
94:2 98:19
109:12 111:19
136:1 137:19
151:22 152:10
158:9,10
160:10

**specifically**
13:11 17:20
20:3,8 21:17
32:12 37:8
38:4 40:17
44:7 45:19
51:19,24
52:23 58:11
60:6,15 81:9
84:13 90:25
92:13 93:13,
15 96:9 97:25
98:10,13
111:18 112:13
115:4 117:12
130:13 136:8,
19 142:20
152:23 153:2
155:6,25
160:5 163:25
167:18 171:24
172:2 173:6,
22

**specifics**
91:10 92:9
107:2

**speculation**
116:21 129:2

**speed**
67:2,7 71:15,
23

**spell**
6:15 33:14

**split**
140:23 141:21

**spoke**
22:6 65:13,15,
16 66:12
67:18

**spoken**
46:22

**spreadsheet**
147:20 148:2,
5,24 149:1
153:20
157:19,24

**spur**
27:12

**staff**
42:15

**stamp**
28:9

**stand**
12:4

**standalone**
13:1

**standard**
105:6

**standards**
146:17,20

**standing**
104:17 159:9

**starboard-side**
162:3

**start**
28:13 54:18
99:15 172:1

**started**

16:13 70:23
129:16

**Starting**
104:11

**starts**
75:20 87:23
99:24 124:22

**State**
6:5 109:15

**stated**
51:8 142:10,
14

**statement**
84:22 95:10
131:11

**statements**
125:25 126:9,
11 127:16
128:1 131:5

**states**
172:4

**stating**
28:9

**status**
25:10 107:15,
20 113:10
116:19 173:19

**stayed**
115:21 159:23

**STBD**
162:2

**steelworks**
11:3

**steering**
138:8 143:4
154:20

**Stenographer**
175:3

**steps**
21:20

**Sterling**
17:15

**stevedoring**
11:9

**sticky**
114:23 115:2

**stone**
11:17

**stop**
128:6

**stored**
96:5

**story**
142:11

**straightening**
131:17

**straps**
162:1

**strike**
78:22 80:23
82:22 83:1

**struck**
81:1

**structure**
80:24 119:1,5

**stuff**
167:19

**subcontractor**
109:17

**subject**
49:13 67:9
135:15 137:5

**subjected**
100:17

**NICHOLAS LARAWAY**

June 17, 2025

submitted
111:6,14
126:1 136:17

subpoena
40:7 43:16
160:15 161:6

subpoenaed
55:3

subsequently
144:11

substance
29:22 69:8
100:6

substances
100:18 101:4,
22

subtracting
46:8

succeeded
35:1

suggest
79:13

suggesting
173:9

sum
64:23

summaries
70:1,3,7,25
72:13 133:3,7

summarized
171:17

summarizing
93:24

summary
50:20 68:19,
24 69:3,21,24
132:1

summers
8:19

SUNY
109:11,13,17

super
121:8

superficial
144:9

support
11:10 12:24

supports
11:4

supposed
135:4

surmise
147:4

survey
33:18 38:13,
21 39:15 43:1,
7 44:12 53:9,
15 57:22
58:22,24 59:3,
16,23

surveys
38:16

sus
106:22

suspended
106:23,25
107:13,17
110:18 113:10
116:4,19

suspension
110:13,24

swear
5:17

switch
138:7 143:3

switched
103:9

sworn
6:4

Sybil
108:7,9
112:14,18,20
114:11,14

Sybil's
114:13

system
73:6,13 74:11
75:24 83:2
86:17 87:7
90:4,25 99:12
107:16,19,23,
25 108:4
109:23 112:23
133:20 134:3,
7,13 136:6,14
139:16,21,24
154:20
163:13,21
164:4,8

___

**T**

___

tag
132:13,22

taking
22:9

talk
31:23 32:2,5,
13 64:15 67:4,
5

talked
18:19

talking
24:20 32:9
38:8 41:10

54:13 59:17
104:5 123:12
133:4 167:24

talks
100:1

tap
129:10

TBS
99:23 118:18

team
110:15
132:13,23

tease
83:15

technicians
152:21 154:18
157:9 158:5

techs
152:21 153:3

telling
24:2 69:15
84:24 160:1
163:14

tender
119:11

tense
141:25

term
21:3 81:25
130:10

terminated
36:5 113:5
116:9,16

termination
106:16 107:14
108:14 110:7,
12

test
39:3 52:7
101:12,14

testified
6:6 41:13,14
68:13 69:22
90:10 94:9
139:8 172:7

testify
7:3 8:4 63:8,
11 67:21,25
140:12

testimony
41:21 57:23
68:3,17,20
69:3 71:20
72:14 76:5
82:13 86:6
94:2,23 95:11,
13 97:22,24
98:25 101:17
107:4 111:13
113:9 122:1
123:3 125:9,
20 130:14,24
133:8 134:22
136:17 138:25
139:13,25
142:20 143:24
146:10 147:1
150:20
152:18,24
154:5 155:3,
21 157:1
158:7 159:16
161:19 162:8,
16 163:24
164:11
171:14,21
172:5

testing
38:25 94:4

100:2,22
101:8,13,21
102:2,8,10,14
103:3,7 104:1
105:5,9

**text**
76:24 88:22
150:17

**texted**
120:23

**texts**
149:20 151:17

**thick**
57:18

**thing**
57:20 86:22
112:21,22
132:13 133:6
158:11 168:11

**things**
27:6 29:2 61:4
86:21 123:2
129:24

**Thomas**
102:20 103:16
108:16 145:1

**thought**
34:15 53:9
60:18 128:10
151:15

**thousands**
173:2

**Till**
175:19

**time**
5:9 15:6,25
16:4,25 18:20
27:6,7 28:1,
22,25 29:9

30:10 34:11,
20 40:15
45:14,15 52:6
56:11,15,18
58:15 61:2
62:8,9 63:3
66:4 72:6 73:2
75:6,10 79:5,6
80:11 84:10
86:11 96:25
97:11,17
102:3 113:13
116:8 117:15,
19,24 118:2,5
123:21 126:3
127:17 129:9
130:22 131:7
140:8,13
143:19 145:11
149:2 156:18
163:1,7 164:8
166:19 170:21
173:25
174:13,20,22
175:24

**times**
142:12 171:25

**title**
9:22,23 12:23
13:1,6 34:1
36:12 43:7
74:13

**titled**
89:12 91:17
118:14 147:20
168:18

**titles**
12:16

**today**
22:11 23:16
35:8 36:21

68:15 76:5
88:3,9,11
149:2 159:4
173:18

**Today's**
5:8

**told**
13:4 34:14
60:17 64:19,
20 127:20
133:11 145:1,
17

**Tom**
102:21 109:8
110:4 112:18,
20,21

**tomorrow**
172:8 175:19

**top**
14:22 15:10
47:22 61:16
72:1 158:13

**topic**
63:1,9 67:1,25

**topics**
7:3,22 8:5
10:4 62:24

**towage**
63:2

**towing**
5:4,5,25 7:18,
19 8:10 10:24,
25 11:4,24,25
12:2,14,18,22,
25 13:2,10,18
15:15,19 16:5,
10 32:10,11
34:8 45:22
79:22,25 80:3
86:17 95:19,

24 102:22
103:25 114:5
117:4 134:20
146:8

**track**
162:19

**tracking**
163:13,21

**traffic**
26:25

**training**
93:7,15 95:16,
18,23 96:3,7
97:18 98:19

**transactions**
42:17

**transcript**
132:1 175:7,9,
11

**transit**
61:12 92:2,18
96:19 162:4

**transits**
91:17,20 93:9,
17 94:7

**Travelers**
49:5

**true**
62:15

**Tuesday**
5:8

**tug**
14:3 15:7
22:14,18 23:6,
10,21 32:17
39:17 44:12
45:11 46:13
58:17 59:25
61:1 72:5

76:10 105:18
121:25 122:21
123:10,13,14
125:13,19
126:1 135:14
137:2,15
140:3 141:3
142:2,8
143:22 144:2
146:4 161:8
170:17

**Tug's**
124:6

**tugboat**
67:22

**tugmackenzier
ose@
carvercompani
es.com**
123:1

**tugs**
97:19,21
146:8

**turn**
40:18 78:9
88:16 89:11
91:16 99:21
148:4 153:16,
25 157:23
158:1

**turned**
116:16 138:6,
24 139:6
143:2

**two-hour**
101:13

**type**
11:5 30:2
105:2,4
137:22

**U**

**U.S.**
9:13 11:2
76:17 100:16
119:19

**unaware**
102:19 122:3
144:1

**uncle**
9:2 13:21
37:13

**underneath**
14:25 92:14
146:15

**understand**
25:7 42:5
48:5,11 53:19
58:12 60:5
63:7 69:19
70:12 78:6
82:1 86:2,4,21
91:4 92:7
98:11,16,17
105:13 111:21
121:2 126:10
129:4 130:11
133:21,24
134:17
140:14,25
141:7,12
142:6 166:3
167:10
169:17,19

**understanding**
7:6 8:3 19:21
21:25 22:1
26:15,17 49:1,
9 53:13,20
58:16 59:1
61:25 64:10

76:3 79:1
80:13,17,20
82:2 83:8 86:8
90:1 105:15
106:22 110:25
112:16 113:11
115:23 116:10
123:5 129:5
130:16 135:3
138:23 140:2,
6,12,14 141:2,
4 142:1,8,13
143:14,21
163:19 173:4

**understands**
169:23

**understood**
79:5,6 113:8

**undertake**
21:18

**unintended**
78:21,22 79:3,
9 119:21

**unit**
76:16,17
145:10

**University**
109:15

**unpack**
113:21

**updated**
126:6

**updates**
126:8

**Upstate**
10:22

**USCG**
76:16

**utilize**
48:23

**utilized**
22:14

**utilizes**
105:7

**V**

**valuation**
39:15 43:7
49:2 53:11
58:3 59:19,25

**valuations**
46:8

**valued**
38:20

**variety**
27:6

**vender**
24:11

**vendor**
103:2 105:1,6,
16,19 109:17

**vendors**
103:7

**version**
120:4 121:5

**vessel**
9:17 34:2,3,
12,22 36:1,21,
23,24 37:5
38:2,17 48:19
51:15 58:17
60:19 61:1
63:3 67:2,8
71:15 76:11
78:17 99:18
101:12,15

142:16,18
159:8,19
160:13 163:10

**vessel's**
58:9

**vessels**
47:19 48:19
52:15 90:6
91:21 163:22
164:1

**vicinity**
138:17

**video**
175:22

**Virginia**
138:1

**W**

**wait**
56:24

**waiting**
116:13

**Ware**
5:19

**washouts**
30:17

**watch**
123:6

**water**
10:15 11:8

**wedge**
138:17

**week**
40:4 74:24
94:11 172:9

**Weeks**
61:3,7 138:9

143:5 144:13
159:19

**weld**
161:13

**what'll**
57:6

**whatever's**
46:19

**wheelman**
92:1

**White**
12:13

**who'd**
19:4

**withdraw**
141:24

**witnesses**
94:21

**word**
167:10

**words**
41:5

**work**
8:14 10:13
11:5,10 29:9
33:2,3 34:23
35:22 64:20
66:14 72:19
95:24 108:22
111:1 113:7,9
114:3 115:22
135:7 145:13
146:7

**worked**
8:16 32:9

**working**
8:15,17 9:3
109:10

**NICHOLAS LARAWAY**

June 17, 2025

110:19,23
113:12 116:17
164:8 171:10
173:7

**works**
10:10 16:3
81:18 117:6
139:16

**worth**
60:19

**would've**
37:11 52:2
154:4

**write**
112:11 131:10

**writing**
91:12,14

**written**
67:12 112:17
113:3 123:15

**wrong**
20:21

---

**Y**

**year**
115:25 145:12
153:11

**yellow**
91:25

**Yoakum**
46:4

**York**
6:5,14 10:14,
17,22 12:7,9,
14 26:22
30:17,22
109:15 113:1,
2

---

**Z**

**zip**
6:19

**Zoom**
170:23