IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | Civil Action No. 2:24-cv-00490-MSD-LRL |

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S AND EVANSTON INSURANCE COMPANY'S JOINT MEMORANDUM IN OPPOSITION TO PETITIONER'S MOTION FOR PROTECTIVE ORDER**

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") and Evanston Insurance Company ("Evanston"), by counsel, for their Joint Memorandum in Opposition to the Motion for Protective Order filed by Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver"), state as follows:

**Introduction**

Just over a year ago, on June 15, 2024, Carver's tug M/T MACKENZIE ROSE, pushing a 200-foot loaded barge, struck the western span of the Belt Line's main line railroad bridge and nearly toppled the structure, causing more than $15 million in damages.  It did so, apparently, because the autopilot on the tug malfunctioned and turned hard to port, something the same system on the same tug had done weeks earlier on May 21, 2024.  After striking the bridge, the tug backed up, navigated into the channel, and under instruction from Carver's Port Engineer in New York, left the scene without a word to the Belt Line or the U.S. Coast Guard.

Upon discovering what happened, the Belt Line notified the Coast Guard and sued Carver in this Court.  Carver then filed a limitation action, seeking to limit its liability to $2.5 million.

This Court consolidated the Belt Line's lawsuit into the limitation action, and the Belt Line and Evanston (as insurer) filed claims for recovery. Both claimants dispute Carver's ability to limit its liability.

As this Court is aware, the Belt Line and Evanston have tried mightily to obtain even basic discovery from Carver. These efforts are outlined in a separate brief filed by the Belt Line and Evanston arising out of Carver's obstructive tactics in depositions. *See* ECF 69. The background in that brief is incorporated herein. Carver's obstruction began with its hit-and-run departure from the scene, extended into this litigation with its failure to respond to discovery until ordered by this Court (after overruling nearly every objection Carver raised, ECF 50), continued with Carver's refusal to allow the Belt Line's and Evanston's tug captain expert to inspect the tug (a subject of a pending Motion to Compel, ECF 67), pervaded every deposition of Carver's past and present employees (ECF 69), and persists to this day with, among other things, still no production of text communications from Carvers' General Manager after the incident.

These are not normal discovery obstructions. Pasted below, for example, is Carver's response to the Belt Line's Request for Admission No. 1, seeking admission of perhaps the most basic fact in the whole case: that the tug, pushing the barge, hit the bridge. Carver denies this fact, even though it is the very reason Carver filed its limitation action.

      1.    Admit that on June 15, 2024, the **Vessel**, while pushing the **Barge**, allided with the western section of the **Bridge**.

**AMENDED RESPONSE:**

> **Petitioner DENIES Request 1, as stated. Answering further, Belt Line defines "Vessel" as the "M/T Mackenzie Rose," which did not strike any part of the Bridge. Carver admits that video footage as provided by the Belt Line appears to show the Barge came into contact with the western section of the Bridge, however Petitioner DENIES this request, as stated.**

> **Additionally, Mr. Morrissey has not appeared for his deposition, and Norfolk has a pending motion to compel Mr. Morrissey to appear or for sanctions. In addition, the United States Coast Guard has not released the transcript of Mr. Morrissey's interview with the Coast Guard at this time, such that Petitioner does not have full information as to the accident.**
>
> **This answer is subject to the following objections: This request is compound and confusing as to the mechanics of the accident at issue in this case, which are yet to be determined. In addition, the term "allided" improperly calls for a legal opinion and interpretation. Also, the term "allided" is not defined for purposes of this First Request for Admissions.**

*See* Carver's Amended RFA Responses (**Exhibit A** hereto).[1] This denial contradicts even Carver's own factual background in its instant brief, where Carver states, "The various claims all result from an allision between a barge that was being pushed by the M/V MACKENZIE ROSE and a bridge owned by Respondent/Claimant, Belt Line." Brief, p. 4, ¶ 2 (ECF 72).

Out of the Belt Line's 26 requests, Carver admitted a total of zero, including other basics like the fact that the tug was in autopilot as stated by the operator, or the fact that Carver did not notify the Belt Line or Coast Guard before departing. For only five of the requests, Carver stated that it lacked sufficient information to admit or deny, but amazingly, those related to Carver's own affirmative defenses—for which it should have had factual support. If a motion is required to deem these facts admitted under Rule 36, it will not be because of harassment or bad faith by the Belt Line. It will be because of Carver's strange view of what passes for acceptable discovery practice in this District.

At the same time, Carver has sought to stifle further discovery—and any further need to comply with this Court's Order (ECF 50)—by sending the Belt Line and Evanston declarations of Carver's employee, Jason Galioto, and its general counsel, Josef Malik, that nothing else remains.

---

[1] Carver's answer is "amended" because the Belt Line and Evanston have already had to push Carver on this point (like others) to no avail.

But the declarations themselves show the need for the depositions that Carver wants to avoid. As just one example, in an effort to explain a lack of radar logs in Carver's production, the declaration of Mr. Malik confirms Carver's statement that, "The Makenzie Rose did not have radar." Yet photos of the wheelhouse on the tug depict an operational radar screen. No privilege or objection prevents the Belt Line and Evanston from exploring this and similar issues in deposition.

Carver's Motion for Protective Order appears to be an effort to divert the Court from the Belt Line's and Evanston's pending motions, or to dissuade the Belt Line and Evanston from pushing on Carver's erroneous non-admissions and declarations. Its brief is divided loosely into three issues: (1) that the Belt Line and Evanston seek improper depositions of Josef Malik and Jason Galioto, which Carver believes are unnecessary due to declarations by the witnesses; (2) that the Belt Line's and Evanston's discovery efforts, as a whole, amount to harassment; and (3) that the Belt Line's and Evanston's obstruction motion related to Carver's deposition tactics should be withdrawn. Because all these arguments are flawed, and because the relief Carver seeks is not at all clear (except to prevent legitimate discovery), the Belt Line and Evanston respectfully ask the Court to deny the motion.[2]

---

[2] While Carver complains about the effectiveness of its meet and confer efforts with the Belt Line and Evanston, all those meetings have involved discussion of the relief sought and possible paths to resolution. Even before the Belt Line's and Evanston's obstruction motion on depositions, the parties exchanged letters and emails, met by Zoom, and Carver promised to provide possible solutions over the next two days. (It ended up sending a letter offering no solutions.) The meet and confer here, however, was fundamentally different. In the meeting that preceded this motion, Carver simply told the Belt Line it was going to file its motion and that it wanted the Court to supervise discovery. In response to questions about why and what that might look like, Carver offered no insight. Even after reading Carver's brief, the Belt Line and Evanston still do not know exactly what Carver seeks.

**Standard of Review**

A motion for a protective order "must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action." Fed. R. Civ. P 26(c)(1). The court may only issue a protective order when good cause exists to protect the moving party "from annoyance, embarrassment, oppression, or undue burden or expense." *Id*. "To obtain a protective order under Rule 26(c), the party resisting discovery must establish that the information sought is covered by the rule and that it will be harmed by disclosure." *Cook Grp., Inc. v. C.R. Bard, Inc. (In re Wilson)*, 149 F.3d 249, 252 (4th Cir. 1998). If the movant demonstrates good cause, "the party seeking the materials then must establish that the information is sufficiently necessary and relevant to his case to outweigh the harm of disclosure." *Id*. at 252.

**Argument**

**I.    The Belt Line properly seeks to depose Mr. Malik and Mr. Galioto.**

Pursuant to Federal Rule of Civil Procedure 30, "a party may, by oral questions, depose any person, including a party, without leave of court except as provided in Rule 30(a)(2)." Fed. R. Civ. P. 30(a)(1). On July 3, 2025, the Belt Line sent Notices for Depositions for multiple Carver witnesses, including Mr. Malik and Mr. Galioto. The Notices of Deposition are attached hereto as **Exhibit B** and **C**. Despite Carver's protests, both Mr. Malik and Mr. Galioto possess information relevant to this matter and the Belt Line is entitled to depose them.

**A.    The Belt Line is entitled to depose Mr. Malik.**

**1.    Mr. Malik's testimony is relevant.**

In conjunction with its discovery responses to the Belt Line's First and Second Requests for Production, Carver produced a signed declaration of Mr. Malik in which he makes assertions

about the completeness of Carver's discovery responses and the searches conducted. A copy of the Declaration and accompanying Addendum is attached hereto as **Exhibit D**.

The declaration is confounding in many respects, which is why the Belt Line and Evanston seek to depose its author. For example, as noted above, Mr. Malik states that Carver's response to First RFP No. 20 (seeking radar logs) is complete and accurate, yet the response seems inconsistent with reality on the tug. Carver's response, which Mr. Malik affirmed at Paragraph 7 of his declaration, states, "The Mackenize Rose did not have radar. The production is complete."

> 20.   Produce the Vessel's radar logs for the period of June 10-20, 2024.
>
> **RESPONSE REQUEST NO. 20**
>
> Subject to and without waiving written objections served February 19, 2025, Carver Marine will endeavor to locate documents responsive to Request No. 20 for the Vessel's radar logs for the period of June 10, 2024, through June 15, 2024, the date of the Incident.
>
> <u>FOURTH SUPPLEMENTAL RESPONSE TO REQUEST NO. 20:</u>
>
> Carver withdraws it objection to Request no. 20 per the Court's Order of 4/24/25 [Doc. 50]. Carver is not in possession of any documents responsive to Request no. 20. The Makenzie Rose did not have radar. The production is complete.

However, photos of the upper and lower wheelhouse in the M/T MACKENZIE ROSE seem to unquestionably depict an operational radar.

Upper Wheelhouse    Lower Wheelhouse 

Paragraph 8 of the declaration likewise states that responses to Second RFP Nos. 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, and 14 are complete, yet documents produced after the declaration indicate

6

the existence of other information. Most notably, in response to Second RFP No. 10 (requesting documents related to previous failures of the steering or autopilot systems), Carver stated, and Mr. Malik affirmed, that no additional documents existed:

> 10. Produce all **documents** relating to or evidencing any time within the past 10 years that the navigation, steering, or autopilot system on the **Vessel** malfunctioned.
>
> **FIFTH SUPPLEMENTAL RESPONSE TO REQUEST NO. 10:**
>
> Carver withdraws it objection to Request no. 10 per the Court's Order of 4/24/25 [Doc. 50]. Carver is not in possession of any additional documents responsive to Request no. 10. The production is complete.

Yet on July 17, 2025, some 38 days after Mr. Malik's declaration of completeness, Carver produced another incident report dated May 21, 2024, a copy of which is attached as **Exhibit E**. This incident report (from mere weeks before the June 15, 2024 allision), identifies the *same* autopilot failure that appears to have occurred in this case:

| 10 | NATURE AND CIRCUMSTANCE OF THE CASUALTY | |
|---|---|---|
| 10.1 | 1. Activity or Operation being conducted at the time of the casualty: | SB IN AUTO PILOT |
| 10.2 | 2. Description of the Casualty (casualty events and conditions and ctions that were believed to be causal factors as well as any hazards created as a result of the casualty. | STEERING WENT HARD LEFT |

Carver's explanation for this production in its brief makes a deposition of Mr. Malik even more important, since Carver seems to indicate a lack of proper controls for reporting incidents, maintaining files, and fixing problems. As Carver concedes in its brief, the May 21, 2024 report seems to have "not been finalized internally at Carver" for months after the incident:

> This particular record had not been captured through the HelmConnect data gathering because it had not been finalized internally at Carver. It therefore was never transmitted to the HelmConnect system. So, when HelmConnect pulled all records, this particular record was not captured. Nonetheless, Carver located it on

7

>its own system while searching for other documents and produced the record as soon as it was located.

Brief, p. 8, ¶ 12 (ECF 72).

Paragraph 9 of the declaration states that Carver is searching for, but at that time had not yet located, cell phone data for two company-issued phones responsive to First RFP Nos. 30 & 34. Those requests, which this Court ordered to be answered (ECF 50), were not limited to company-issued phones. Rather, they sought all "documents" and "communications" after the allision:

> 30. Produce any and all **documents** and records memorializing or evidencing steps taken by anyone to report the **Incident** under 46 CFR 4.05-1.

> 34. Produce any and all documents and records not already produced, reflecting or memorializing communications pertaining to the Incident to or from **you**, the **Vessel's** officers or crewmembers, or any government entity, including but not limited to the United States Coast Guard, on or after June 15, 2024.

In Mr. Malik's declaration, however, Carver admits that it did not even attempt to obtain this information until June 5, 2025, 41 days after this Court ordered the responses, and to this day, Carver still has not produced communications from Brian Moore, its General Manager who fielded issues in the immediate aftermath of the incident.

This is not an exhaustive list. Even so, the above examples sufficiently demonstrate the Belt Line's and Evanston's need to depose Mr. Malik regarding his declaration, including Carver's document controls, reporting procedures, collection efforts, and potential spoliation issues.

### 2. Mr. Malik's testimony sought here is not privileged.

Carver cannot avoid the relevance of Mr. Malik's testimony under the guise of attorney-client or work-product privilege. The fact that Mr. Malik is an attorney is irrelevant to his declaration. Carver itself chose to have its general counsel sign the statement.

While the Belt Line acknowledges that under certain circumstances, in-house counsel's thought processes are protected under the work-product doctrine, this protection does not extend to factual information merely because it was obtained or organized by an attorney. *See Mead Corp. v. Riverwood Natural Res. Corp.*, 145 F.R.D. 512, 518 (D. Minn. 1992). Nor are communications between an in-house attorney and his client protected when they relate to possible loss or spoliation of evidence, as the Belt Line seeks to explore here: "[C]ommunications between lawyer and client respecting spoliation of evidence… [are] fundamentally inconsistent with the asserted principles behind recognition of the attorney-client privilege." *Rambus*, *Inc. v. Infineon Techs.*, 222 F.R.D. 280, 289 (E.D. Va. 2004) (holding "it is inconceivable that the Fourth Circuit would find that a client's interest in confidential communications and work product respecting destruction of documents in anticipation of litigation would outweigh the societal need to assure the integrity of the process by which litigation is conducted which, of course, is the purpose of prohibiting spoliation of evidence.").

In response to the Belt Line's Notice of Deposition for Mr. Malik, on July 15, 2025, Carver's counsel sent an email to the Belt Line's counsel raising privilege as an issue. *See* July 15, 2025 email attached as **Exhibit F**. The Belt Line responded in a letter on July 17, 2025, explaining the error in Carver's position, after which the parties met and conferred. *See* July 17, 2025 letter attached as **Exhibit G**.

As explained in the letter, the Belt Line's purpose in deposing Mr. Malik is to seek information regarding the statements made by him in his June 9, 2025 declaration. These statements do not reflect legal advice or work product. They declare what Carver did and why Carver did not intend to do more. Because there are material issues with discrepancies in the

9

declaration and the production from Carver, the Belt Line and Evanston are entitled to depose Mr. Malik about those discrepancies.³

### B. The Belt Line is entitled to depose Mr. Galioto.

The Belt Line is also entitled to depose Mr. Galioto, who is the Compliance and Logistics Supervisor for Carver, notwithstanding that Carver provided an affidavit from him claiming his lack of involvement in the allision. *See* Affidavit of Mr. Galioto attached as **Exhibit H**. Mr. Galioto has direct knowledge of actions taken by Carver after the allision and the Belt Line is entitled to depose him on those actions.

Carver incorrectly claims that because Mr. Galioto did not begin his current role until after the allision, he has no pertinent information. Mr. Galioto appears on several emails immediately following the allision and discussions related to steps Carver took in response to the allision. This information is relevant to the parties' claims and defenses, since steps taken after the allision can reflect directly on problems with the vessel before the allision.

One obvious point of relevance is the Belt Line's and Evanston's limitation defense that Carver knew or should have known the M/T MACKENZIE ROSE was unseaworthy at the time of the incident. This defense goes squarely to Carver's privity or knowledge of the cause of the allision, which would undercut its ability to limit liability. *See* 46 U.S.C. § 30523(b); *see also Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 166 (4th Cir. 1984) ("a shipowner seeking limitation of liability bears the burden of proving that he was without privity or knowledge of the condition or negligence responsible for the collision.").

---

³ Carver's related argument that this Court should prevent the deposition under a theory that deposing Mr. Malik would be disproportionate to the needs of the case is likewise unavailing. Rule 26(b)(1) permits discovery of any matter relevant to the parties' claims or defenses and proportional to the needs of the case. This is a $15 million dollar maritime hit-and-run case where Carver seeks to limit its liability to $2.5 million. The Belt Line and Evanston are well within their rights to question Mr. Malik on his sworn statements.

Mr. Galioto's involvement bears on that inquiry. For example, he apparently oversees reports of "near misses" and "incidents" by Carver's vessels, including the M/T MACKENZIE ROSE, as demonstrated by his July 19, 2024 email to Brian Moore, Carver's General Manager. *See* July 19, 2024 email attached as **Exhibit I**. In that email, from just days after the allision in this case, Mr. Galioto identifies not only the bridge strike, but also Carver's reporting programs (in effect or in discussion) and the previous May 21, 2024 incident, where he notes, "The Mackenzie Rose filed one for the autopilot inducing a hard turn to port."

> There have been some random discussions with various captains and mates about using this program to help enhance safety. In my opinion even if it is not really a Near Miss it at least has the crews thinking about it which is a win in my book. In the attachment you will find a brief one line summary of each event and a listing of submissions by quarter and by the tug.
> **INCIDENT REPORTS**
> 1Q2024 there were 3 Incident Reports;
> 2Q2024 there were 2 additional Incident Reports;
> YTD 2024 we have 5 incidents in Helm.
> 5/21/24: The Mackenzie Rose filed one for the autopilot inducing a hard turn to port.
> 6/15/24: Mackenzie Rose bridge incident which as everyone knows is under legal review.

He therefore has personal knowledge of information directly related to the Belt Line's and Evanston's claims, and the Belt Line and Evanston should be permitted to question him regarding that information.

II.     **The Belt Line and Evanston have acted in good faith and in accordance with the Rules despite Carver's obstructionist approach to discovery.**

Carver also argues that the Belt Line and Evanston have acted in bad faith, warranting some kind of judicial intervention in future discovery activities. It goes so far as to state that the Belt Line and Evanston have engaged in "abusive" and "unduly burdensome" practices as well as "*ad hominem* attacks." But the Belt Line's and Evanston's insistence on complete and full discovery should not be misconstrued as bad faith. To date, the Belt Line and Evanston have brought only the most egregious obstructions to this Court when the parties could not resolve them.

11

### A.   The Belt Line and Evanston have complied with Rule 37 in requesting and participating in meet and confers.

Counsel for the Belt Line and Evanston have consistently complied with Federal Rules of Civil Procedure and EDVA Local Rules despite having to deal with endless discovery obstructions. They have also meaningfully participated in meet and confers and attempted to resolve pending disputes before bringing any motion before this Court. Carver improperly argues that these efforts were not in good faith simply because the Belt Line and Evanston did not yield to Carver's positions.

Local Rule 37 states that "no motion concerning discovery matters may be filed until counsel shall have conferred in person or by telephone to explore with opposing counsel the possibility of resolving the discovery matters in controversy." The parties have done just that, but on the points that have required a motion, could not reach a resolution. And in several instances, like seeking an inspection of the tug by their expert, the Belt Line and Evanston have attempted to work with Carver for months (not just weeks), to no avail.

Carver specifically points to the July 8, 2025 meet and confer videoconference regarding the Belt Line's issues with Carver's deposition objections as a failure to confer in good faith. As its reasons for this assertion, Carver states that the Belt Line "transparently informed Carver of [its] true purpose," and failed to provide a list of topics or questions that were not answered in deposition. *See* Brief, p. 11. Yet Carver ignores the relief the Belt Line sought and the letters and emails that preceded the meet and confer, not to mention exchanges at the depositions themselves and in advance of the Rule 30(b)(6) deposition. There is no requirement under the Rules that the Belt Line must adopt the resolution strategy that Carver proposes in a meet and confer.

As an opposing position, the Belt Line and Evanston requested, both orally and in writing, that Carver provide some feasible alternative solutions to remedy the prejudice created by Carver's

12

deposition obstructions.  Carver's counsel agreed to do so (volunteering to respond within 48 hours), but never did.  Carver simply sent the letter attached to its latest Motion as Ex. A-25, standing on its original position.  Based on that, the Belt Line and Evanston properly moved the Court to help resolve the dispute.  This is hardly bad faith.  It is a necessary response to Carver's evasion of the Belt Line's investigation of its privity and knowledge.

### B. Mr. Rodgers' Declaration misstates the discovery dealings between the parties.

The declaration from Carver's *pro hac vice* counsel attached to its Motion exemplifies the difficulties with Carver's approach to discovery.  Statement after statement is misleading or altogether incorrect.  A few examples demonstrate the point:

~

> 11. On May 9, 2025, Carver arranged for the inspection of the Mackenzie Rose in Charleston, South Carolina. **The Belt Line's expert failed to appear**. Counsel for Carver was present.

This statement is false.  The tug expert did not just fail to appear.  His flight was cancelled after he booked the last available flight to Charleston, South Carolina, when Carver provided less than 24-hours notice for the inspection.  *See* ECF 68, Ex. 3.  As the Belt Line's and Evanston's Motion to Compel states, "Unfortunately, due to severe weather, the expert's flight was delayed for hours until it was ultimately cancelled.  There was no flight available that would allow the expert to arrive in time for an 8:00 a.m. inspection (or even before noon)."  ECF 68, pp. 3-4.

~

> 22. On June 3, 2025, the Belt Line sent a letter to Carver with document demands that were purported to be identical to the Belt Line's original demands; however, the demands contained numerous requests that were being made for the first time, including documents purportedly identified during Carver depositions. **This was a material misrepresentation which is now being repeated in the Belt Line's dispositive motion, i.e., that the Belt Line is prejudiced vis-à-vis Carver depositions for Carver's failure to produce, when in fact, the Belt Line failed to demand relevant documents prior to the depositions.** See the Belt Line's letter as **Ex. 7** and Carver's June 10th response as **Ex. 8**.

13

This statement is also inaccurate. In its June 3, 2025 letter, the Belt Line listed documents that had been identified in depositions of Carver's witnesses, *and were responsive to requests already propounded on Carver*, but had not yet been produced. The letter cites the requests, nearly all of which were also subject to this Court's Order compelling production. *See* ECF 50.

~

25. On June 5, 2025, Carver voluntarily retained KL Discovery, a third-party vendor, to obtain text messages and data from Lenny Baldassare's work phone and the Mackenzie Rose tug cell phone in response to the Belt Line's request for documents. The cost of retrieving and extracting the text messages, which were not in Carver's possession, is being borne by Carver.

This statement is misleading. Carver's text message search was not altruistic or voluntary. It was *ordered* by this Court after Carver failed to produce the documents originally. *See* ECF 50 (compelling production of Carver's communications after the incident).

~

36. On June 13, 2025, the parties held a telephone conference to discuss Carver's objections to the Belt Line's 30(b)(6) topics. In that telephone conference, Carver again explained that it would be adopting the factual testimony of the members of the crew who had been deposed. Following this discussion, the Belt Line drafted a letter to Carver purporting to memorialize the conversation. See the Belt Line's letter as **Ex. 12.** Carver's counsel disagreed with the Belt Line's interpretation of the discussion. Notwithstanding, Carver agreed to produce Mr. Laraway without withdrawing its objections. See Carver's response as **Ex. 13**.

This is also misleading. While the meet and confer occurred and the parties discussed Carver's objections to the Rule 30(b)(6) topics, Carver never revealed that Mr. Laraway would be completely unprepared and repeatedly refer to generic testimony of all other Carver witnesses and all documents in the case. Counsel for the Belt Line flew to New York to take this deposition, justifiably thinking Mr. Laraway would testify as a proper Rule 30(b)(6) witness.

14

~

39. On June 23, 2025, the Belt Line sent a letter to Carver alleging breach of the Court's Order and requesting additional records. See **Ex. 16**. Even though Carver disagreed with the allegations outlined in the letter, Carver contacted TBS (its third-party vendor) for clarification and assistance and produced supplemental records to the Belt Line. See Carver's Response as **Ex. 17**.

Like the statement about text messages above, this is misleading and couches Carver's supplemental production as a favor to the Belt Line and Evanston. The documents produced by Carver were ordered to be produced by this Court, and produced late. *See* ECF 50.

~

47. On July 8, 2025, the parties met and conferred regarding the Belt Line's demand that Carver dismiss its limitations action as a voluntary discovery sanction. Carver asked Belt Line's counsel to address what additional discovery was needed or to identify how the Belt Line was prejudiced by the answers to discovery, which they would not or could not do. The premise of the requested discussion was that the sole solution that would be acceptable to Belt Line and Evanston was dismissal.

This is incorrect. Counsel for the Belt Line and Evanston asked in the meet and confer for Carver to provide an alternative resolution. Counsel for Evanston then sent an email confirming Carver's agreement to do so. *See* ECF 69, Ex. C. It was not the duty of the Belt Line or Evanston to come up with ways to fix Carver's obstructions. What Carver provided was a letter that offered no solutions, and instead declared that all of Carver's obstructions were proper. *Id.*, Ex. D.

~

51. On July 15, 2025, the Belt Line and Evanston filed a Joint Motion to Compel Inspection of the Mackenzie Rose and for Sanctions, even though Carver's counsel was still consulting with its client to arrange for the inspection. **The Belt Line filed the Motion to Compel the Inspection of the Mackenzie Rose without meeting and conferring with Carver.** See the email from Carver's counsel as **Ex. 26**.

This is false. Counsel had been working to reschedule the tug inspection since May 9, 2025, when the first inspection occurred and the expert's flight was cancelled. Carver's counsel at the inspection was cooperatively willing to schedule a new inspection given the short notice,

15

until Mr. Rodgers decided differently. The parties discussed this in multiple meet and confers and by email from May until the Belt Line and Evanston were forced to file a Motion to Compel.

~

> declined to withdraw the same. Likewise, the undersigned counsel requested that the Belt Line withdraw its motion to compel inspection of the tug. Mr. Chapman declined to withdraw the same. Finally, undersigned counsel requested that the Belt Line withdraw its positions on Mr. Malik's deposition as set forth above in its letter on July 17, Mr. Chapman declined to withdraw same. See Carver's counsel's email as **Ex. 32**.

This is false. The Belt Line's counsel agreed to hold the Motion to Compel in abeyance if Carver scheduled the new inspection, and to remove it if the inspection occurred. That position is explicitly stated in the July 22, 2025 email (with red responses) attached hereto as **Exhibit J**. To date, it has not happened.

For all these reasons, Carver's allegations of bad faith are wrong, and Mr. Rodgers' declaration does not support Carver's Motion for Protective Order.

**III.  The Belt Line and Evanston were not required to accept inadequate remedies for the prejudice caused by Carver as explained in the Motion for Rule 30 Relief (ECF 69).**

Carver's final argument appears to address the Belt Line's Motion for Rule 30 Relief, arguing that it was improvidently filed. The Belt Line and Evanston already presented their position in the Joint Motion for Rule 30 Relief and accompanying Brief in Support and incorporate those arguments herein.

At base, Carver's Motion argues that before filing the Joint Motion for Rule 30 Relief, the Belt Line should have called the Court, sought to re-depose the witnesses, or propounded new interrogatories for the obstructed information. *See* Brief, p. 12. As the Belt Line and Evanston explained in detail in their brief, however, they did not (and do not) seek this relief because it will be fundamentally inadequate. Rule 30 does not require a phone call to the Court, and no phone call to the Court could have cured the Rule 30(b)(6) deponent's total lack of knowledge on nearly

16

every topic presented. Re-deposition now will only give Carver's witnesses an opportunity to better prepare for known lines of questioning, after the Belt Line and Evanston have disclosed their expert witness reports. And new interrogatories will only result in the same kinds of non-answers that Carver gave to the Belt Line's Requests for Admissions.

In short, none of the options posed by Carver are an effective remedy for its obstruction, and the burden is not on the Belt Line and Evanston to solve the problem Carver itself created with its conduct. The only sufficient remedy is the relief sought by the Belt Line and Evanston in their Joint Motion for Rule 30 Relief.

## Conclusion

For all these reasons, the Belt Line and Evanston respectfully request that this Court enter an Order denying Carver's Motion for Protective Order and compelling Carver to produce Mr. Malik and Mr. Galioto for deposition.

Dated: July 25, 2025

NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

By: _____/s/ W. Ryan Snow_____
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl, VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cmw-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

EVANSTON INSURANCE COMPANY,
a/s/o NORFOLK AND PORTSMOUTH
BELT LINE RAILROAD COMPANY


    */s/ Mark C. Nanavati*
Mark C. Nanavati, VSB No. 38709
G. Christopher Jones, Jr., VSB No. 82260
SINNOTT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com

Zachary M. Jett, VSB No. 93285
BUTLER WEIHMULLER KATZ CRAIG LLP
11525 N. Community House Road, Ste 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

## CERTIFICATE OF SERVICE

      I certify that on this 25th day of July 2025, a true and correct copy of the foregoing was served on the parties via the CM/ECF electronic filing system as follows:

James H. Rodgers, Esq. *(pro hac vice)*
CLYDE & CO US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 702-6771
(212) 710-3950
*James.Rodgers@clydeco.us*

Harold L. Cohen. Esq.
CLYDE & CO US LLP
1221 Brickell Ave #1600
Miami, Florida 33131
(202) 747-5108
(202) 747-5150
*Harry.Cohen@clydeco.us*

Rachel Werner, Esq. *(pro hac vice)*
CLYDE & CO US LLP
One North Central Avenue, Suite 1030
Pheonix, Arizona 85004
(480) 746-4580
(480) 746-4569 Direct
(480) 746-4556 Fax
*Rachel.werner@clydeco.us*

Michael Roman, Esq.
Dawn Johnson, Esq.
Siobhan Murphy, Esq.
CLYDE & CO US LLP
30 S. Wacker Drive, Ste 2600
Chicago, IL 60606
Tel No.: (312) 635-6971
Fax No.: (312)635-6950
*Michael.Roman@clydeco.us*
*Dawn.Johnson@clydeco.us*
*Siobhan.Murphy@clydeco.us*
*Attorneys for Coeymans Marine Towing, LLC, d/b/a Carver Marine Towing*

Michael Roman, Esq.
Dawn Johnson, Esq.
Siobhan Murphy, Esq.
CLYDE & CO US LLP
30 S. Wacker Drive, Ste 2600
Chicago, IL 60606
Tel No.: (312) 635-6971
Fax No.: (312)635-6950
*Michael.Roman@clydeco.us*
*Dawn.Johnson@clydeco.us*
*Siobhan.Murphy@clydeco.us*
*Attorneys for Coeymans Marine Towing, LLC, d/b/a Carver Marine Towing*

James Morrissey (via electronic mail)
4723 Baywood Drive
Lynnhaven, FL 32444
jdmorrissey15@gmail.com


                              */s/ W. Ryan Snow*