**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S
AND EVANSTON INSURANCE COMPANY'S
<u>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") and Evanston Insurance Company ("Evanston"), by counsel, pursuant to Fed. R. Civ. P. 56 and Local Rule 56, submit the following memorandum in support of their Motion for Summary Judgment against Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver").



## Table of Contents

**Introduction and Background** ................................................................................................ 1

**Statement of Undisputed Facts** ............................................................................................. 2

    *Carver hits the Bridge* ........................................................................................................ 2

    *Carver leaves the scene without notifying anyone* ........................................................... 6

    *Carver attempts to cover up the events* ............................................................................. 8

    *The Bridge is a published hazard to navigation in a narrow channel* ............................. 12

    *Carver was using autopilot at the time of the Allision* ................................................... 12

    *Carver knew of problems with the autopilot before the Allision* .................................... 13

    *Carver did not restrict use of autopilot despite multiple reasons to do so* ..................... 14

    *Carver supplied an incompetent crew on the day of the Allision* ................................... 16

**Standard of Review** ............................................................................................................ 16

**Argument** ............................................................................................................................ 17

  I.   The Belt Line and Evanston are entitled to judgment on their Claims as a matter of law. ................. 17

      A.  Carver cannot overcome the presumption of fault under the Oregon Rule. .................. 17

      B.  Even without the Oregon Rule, the undisputed facts establish Carver's liability ......... 18

  II.  Carver is not entitled to relief under the Limitation of Liability Act due to its privity and knowledge of the conditions that caused the Allision ........................................................ 19

      A.  Carver knew the autopilot system on the tug had malfunctioned before the Allision, but failed to properly repair it or prohibit its use. ......................................................... 20

      B.  Carver knew the Simrad manual for the autopilot system prohibited autopilot use "in heavy traffic areas," "narrow waters," or "hazardous situations," but failed to restrict its use in transiting the Bridge ....................................................................................... 21

      C.  Carver supplied an incompetent crew for the M/T MACKENZIE ROSE, rendering the tug unseaworthy at the time of the Allision. .......................................................... 22

  III. Carver is not entitled to relief under the Limitation of Liability Act due to its unclean hands. ........... 23

      A.  The reporting requirements of 46 C.F.R. 4.05-1 exist to protect the public ...................23

      B.  Admiralty courts are Courts of Equity and the Limitation of Liability Act is rooted in equitable principles .......................................................................................................... 25

      C.  The equitable doctrine of unclean hands bars Carver from limiting its liability ............. 27

**Conclusion** .......................................................................................................................... 30

## **Introduction and Background**

On Saturday afternoon, June 15, 2024, the tug M/T MACKENZIE ROSE, owned and operated by Carver, pushing a 200-foot loaded barge, ran headlong into the Belt Line's Main Line Railroad Bridge that spans the Southern Branch of the Elizabeth River between Chesapeake and Portsmouth, Virginia (the "Bridge"). The impact was so severe that it displaced the steel super-structure of the Bridge by nearly 7 feet, left the western truss balancing on 3 of its 4 legs, and rendered the Bridge totally inoperable.



Taken by Tug on 06/15/24          Taken by Belt Line on 06/17/24



Even so, the tug backed up, maneuvered through the Bridge opening, and left for New York without a word to the Belt Line or the U.S. Coast Guard as required by 46 C.F.R. 4.05-1. To date, damages exceed $15.5 million. Carver seeks to limit its liability to $2.5 million.

1

On June 25, 2024, the Belt Line filed a Complaint in Admiralty against Carver seeking damages as a result of the allision. *See* Case 2:24-cv-00407, ECF 1. On August 8, 2024, Carver filed a Complaint for Exoneration from or Limitation of Liability under the Limitation of Liability Act, 6 U.S.C. § 30523 (the "Act"). ECF 1. On December 5, 2024, the Belt Line and Evanston, as its insurer, filed Claims in the limitation action. ECF 22 & 25. This Court ordered the two cases consolidated on December 20, 2024. ECF 30.

For the reasons below, based on the undisputed facts, the Belt Line and Evanston are entitled to judgment as a matter of law on their Claims, and Carver is not entitled to exoneration or limitation of liability under the Act. The Oregon Rule and ample evidence of Carver's fault for the allision establish its liability, while Carver's privity and knowledge of the conditions that caused the allision and its unclean hands prevent limitation of liability. The Belt Line and Evanston therefore respectfully request that this Court grant their Motion for Summary Judgment.

## Statement of Undisputed Facts[1]

### *Carver hits the Bridge*

1.     The Belt Line is the owner of the Main Line Railroad Bridge depicted above that spans the Southern Branch of the Elizabeth River between Chesapeake and Portsmouth, Virginia. *See* Cannon Moss Declaration attached as **Exhibit A**. The Bridge is a 385-foot-long steel vertical lift bridge with a clearance of 300 feet between the fenders. *Id.*

2.     On June 15, 2024, at approximately 4:26 p.m. EST, Carver's tug, the M/T MACKENZIE ROSE, pushing the loaded barge WEEKS 281, allided with the Bridge (the "Allision"). *See* ECF 1, p. 2.

---

[1]     This Statement of Undisputed Facts is based on facts known to date. The Belt Line and Evanston have filed a Motion for Relief under Rule 30 (ECF 69) and have noticed a deposition of the tug operator, James Morrissey, as authorized by this Court (ECF 88). They reserve the right to amend this statement to the extent appropriate.

3.      The barge being pushed by the M/T MACKENZIE ROSE struck the western truss on the Portsmouth side of the Bridge, outside the navigable channel, while the Bridge was in the raised stationary position.  *See* **Exhibit A** (Moss Declaration); **Exhibit B** (photos of damage).

4.      The impact of the Allision significantly displaced the steel superstructure of the Bridge, moving it nearly 7 feet and leaving the western truss balancing on 3 of its 4 legs. *See* **Exhibit A** (Moss Declaration); **Exhibit B** (photos of damage).

5.      Rose Point data produced by Carver for the M/T MACKENZIE ROSE on June 15, 2024 shows the tug traveling northbound under the Jordan Bridge, turning to port, and proceeding outside the fender into the western truss of the Belt Line's Bridge as depicted below.  *See* **Exhibit C** (video of Rose Point data).



06/15/24 16:24 Tug transiting Jordan Bridge      06/15/24 16:26 Tug hitting Belt Line Bridge

6.      Video surveillance footage shows the M/T MACKENZIE ROSE pushing the WEEKS 281 into the western truss of the Bridge, then backing up, adjusting course, and maneuvering through the Bridge opening.  *See* **Exhibit D** (video from Belt Line surveillance cameras); **Exhibit E** (video from industry surveillance camera); **Exhibit A** (Moss Declaration).

7.      At approximately 4:36 p.m. EST on June 15, 2024, Carver's Port Captain in New York, Leonard Baldassare, texted Carver's General Manager in New York, Brian Moore,

confirming that the tug allided with the Bridge.  *See* **Exhibit F** at CARVER 001871 (texts between Baldassare and Moore).



8.      At the time of the Allision, Carver's General Manager, Mr. Moore, was a management level employee in charge of all day-to-day operations at Carver, including regulatory compliance as stated in his deposition below.  *See* **Exhibit G** (Moore Dep. 17:3-12).

```
3          A.      Sure.  I oversee the day-to-day
4    operations of Carver Marine Towing, working with my
5    team that I have here in place to ensure that the
6    daily activities are done, that the regulations and
7    policies are complied with, that customer and
8    business development is grown, and then also working
9    interdepartmentally with the other divisions from the
10   ports to other stevedoring to ensure that
11   everything's done safely and efficiently throughout
12   day-to-day operations.
```

9.      At the time of the Allision, Carver's Port Captain, Mr. Baldassare, was a management level employee in charge of all operations of Carver's tug fleet, including serving as a liaison to Carver's upper-level management.  *See* **Exhibit H** (Baldassare Dep. 16:22-17:4).

```
22         Q.      When you were Port Captain for
23   Carver, tell us what your duties were?
24         A.      I was responsible for the
25   day-to-day operations of the tug fleet.  So
```

4

```
1     I would make sure the tugs were crewed, I
2     would make sure that safety equipment was
3     up to snuff.  Just basically be the liaison
4     between the boats and upper management.
```

10.    On June 15, 2024, the M/T MACKENZIE ROSE crew included Captain Christopher Miller, Mate James Morrissey, Engineer Jason McGrath, Deckhand Sharif Porter, and Deckhand Jarkeis Morrissey.  *See* **Exhibit I** (Daily Log 06/15/24).

11.    At the time of the Allision, James Morrissey was the operator of the tug.  *See* **Exhibit I** (Daily Log 06/15/24).  Mr. Morrissey also served as Co-Captain of the tug while Captain Miller was off duty, as was the case at the time of the Allision.  *Id*.

12.    The rough logbook (paper log) for the M/T MACKENZIE ROSE in Carver's vessel records shows an incident at 4:30 p.m. EST on June 15, 2024 wherein the "Co Captain" (James Morrissey) reported that the "steering went hard over" and "we tapped the North & PBL RR Bridge." *See* **Exhibit J** (Rough Log Entry 06/15/24).

> 16:30  Co Captain Reports steering went Hard over and he was backing and we tapped The North & PBL RR Bridge

13.    The electronic logbook entry for the M/T MACKENZIE ROSE in Carver's fleet management software system (the HELM system) shows an incident at 4:30 p.m. EST on June 15, 2024 wherein James Morrissey reported that the tug maneuvered alongside the fendering of the Bridge.  *See* **Exhibit I** (Daily Log 06/15/24).

14.    To date, the Allision has caused $15,542,871.55 in damages, not including interest, costs, attorneys' fees, and punitive damages.  *See* **Exhibit A** (Moss Declaration).

*Carver leaves the scene without notifying anyone*

15.     46 C.F.R. 4.05-1 requires that "the owner, agent, master, operator, or person in charge, shall notify the nearest Sector Office, Marine Inspection Office or Coast Guard Group Office whenever a vessel is involved in a marine casualty consisting in … (a) An unintended grounding, or an unintended strike of (allision with) a bridge."

16.     Carver has a Safety Management System ("SMS") that sets forth Carver's policies for the operation of its vessels as required by 46 C.F.R. 138.205.  *See* **Exhibit K** (SMS excerpts).

17.     Carver's SMS requires that, in the event of an allision, the master of the tug or the crew in the wheelhouse must "a) Notify the Company; [and] b) Notify the Coast Guard."  *See* **Exhibit K** at CARVER HELM CONNECT 000996 (SMS excerpts).

18.     Approximately one hour after the Allision, at 5:24 and 5:28 p.m. EST on June 15, 2024, Carver's Port Captain, Mr. Baldassare, notified the crew on the tug that the U.S. Coast Guard had allowed the vessel to leave Norfolk and continue to New York.  *See* **Exhibit L** at CARVER ESI 001889 (texts between Baldassare and tug phone).

19.     The texts from Mr. Baldassare to the tug cell phone are shown below as produced by Carver.  *See* **Exhibit L** at CARVER ESI 001890 (texts between Baldassare and tug phone).

From: +18382072960 Lenny  Baldassare
To: +15187084887 (owner)
I'm on with CG now. Continue on the slow bell I'll let you know what they wanna do shortly

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +15187084887 | | 6/15/2024 5:24:44 PM(UTC-4) | |

Status: Read

6/15/2024 5:24:34 PM(UTC-4)



20.     The tug crew followed the Port Captain's instructions to continue to New York harbor as shown in the rough log entry for June 15, 2024 below.  *See* **Exhibit J** (Rough Log Entry 06/15/24).



21.     Despite the Port Captain's statement to the tug crew, no one at Carver notified the U.S. Coast Guard of the Allision on June 15, 2024.  *See* **Exhibit M** (Carver Rule 30(b)(6) Dep. 76:8-80:15).  Carver's Rule 30(b)(6) designee confirmed in his deposition that Carver did not notify the U.S. Coast Guard and first communicated with them "days after it happened."  *Id.*

```
 5        Q.    So in that capacity, I am
 6   asking, did Carver notify any of those
 7   Coast Guard offices immediately after the
 8   allision?
 9        A.    I'm not aware that they did.
10        Q.    Okay.  And when is the first
11   time that Carver notified the Coast Guard
12   of the allision?
13        A.    My understanding is that the
14   first correspondence with the Coast Guard
15   regarding this was days after it happened.
```

22.    No one at Carver notified the Belt Line of the Allision on June 15, 2024, or at any time thereafter.  *See* **Exhibit G** (Moore Dep. 170:13-19, 175:21-24).

23.    Two days after the Allision, on June 17, 2024, the Belt Line's operations manager, Nathan Rose, and Vice President of Operations, William O'Brien, discovered that the Bridge had been struck and was not operational.  *See* **Exhibit N** (O'Brien Dep. 24:17-25:7, 30:6-31:7).

24.    The Belt Line reported the Allision to the U.S. Coast Guard on June 17, 2024.  *See* **Exhibit O**  (Moss Dep. 204:6-19).

25.    That same day, June 17, 2024, the U.S. Coast Guard contacted Carver about the Allision.  *See* **Exhibit P** (Voicemail from USCG Lt. Palomba).

26.    On June 20, 2024, counsel for the Belt Line sent a letter to Carver regarding the damage caused by the Allision and demanding that Carver preserve all documents, information, and ESI related to the incident.  *See* **Exhibit Q** (Preservation Letter).

*Carver attempts to cover up the events*

27.    Text messages produced by Carver between Carver's Port Captain, Mr. Baldassare, and Carver's General Manager, Mr. Moore, indicate that Carver's tug captain had intended to notify the U.S. Coast Guard of the Allision.  *See* **Exhibit F** (texts between Baldassare and Moore).





28.     Instead of notifying the U.S. Coast Guard or the Belt Line on June 15, 2024, text messages produced by Carver between Mr. Baldassare and Mr. Moore indicate that Carver's management misled the tug captain into leaving the scene and that Mr. Baldassare "yelled at" him for wanting to report the incident.  *See* **Exhibit F** (texts between Baldassare and Moore).



9









29.    Carver's SMS requires drug and alcohol testing immediately after all serious marine incidents in accordance with 33 C.F.R. 95.  *See* **Exhibit K** at CARVER HELM CONNECT 000844 (SMS excerpts).  Under 46 C.F.R. 4.03-2(a), a serious marine incident includes any bridge allision and any marine casualty with property damage in excess of $200,000.

30.    Carver did not test the crew of the tug for drug and alcohol use on the day of the Allision, and because Carver did not report the incident to the U.S. Coast Guard, no one else did either.  *See* **Exhibit M** (Carver Rule 30(b)(6) Dep. 101:7-10; 101:20-102:6).

```
 7        Q.   My first question was about
 8    alcohol.  There wasn't any alcohol testing,
 9    was there?
10        A.   Not that I'm aware.
 1        Q.   And there wasn't any such drug
 2    testing of any members of the crew of the
 3    Mackenzie Rose within that period of time
 4    following the allision with the Belt Line
 5    Bridge, correct?
 6        A.   Not that I'm aware of.
```

31.    The M/T MACKENZIE ROSE has video cameras in the lower wheelhouse and at the stern, yet Carver has never produced data or videos from any such cameras despite being requested to do so in the Belt Line's Requests for Production Nos. 9, 14, and 15.  *See* **Exhibit R** (photos of the tug on 08/19/25); **Exhibit S** (Belt Line's First RFPs).

32.    Carver's General Manager, Mr. Moore, disposed of his cell phone that he used on June 15, 2024, and Carver has never produced texts or ESI from that phone despite being requested to do so by the Belt Line and ordered to do so by this Court.  *See* **Exhibit G** (Moore Dep. 27:15-21); **Exhibit S** (Belt Line's First RFPs); ECF 50 (Order requiring response to RFP 34).[2]

---

[2]    Mr. Moore is no longer employed by Carver but was employed by Carver at the time of the preservation letter and throughout most of this case.  *See* **Exhibit T** (08/13/25 Letter to Carver).

```
17        A.      It's my personal cell phone.
18        Q.      Do you still have the same cell phone
19   from June of 2024 that you have today?
20        A.      No.  It's been upgraded to different
21   iPhones, just through the family plan.
```

33.    Carver performed "maintenance" work on the tug on June 18, 2024, just days after the Allision, before the Belt Line, Evanston, or the U.S. Coast Guard could inspect it.  *See* **Exhibit U** at CARVER HELM CONNECT 000549-550 (Daily Log Entry 06/18/24).

## Daily Log
### Mackenzie Rose
06/18/2024

**Logs**

| Log Time | Description |
| --- | --- |
| 05:00 | Standby for Orders - CMT Staten Island, NY (Greyship) - STANDING BY FOR ORDERS |
| 07:30 | Other - CMT Staten Island, NY (Greyship) - I had a meeting with Brian Moore and Lenny B about tug issues. |
| 09:00 | Other - CMT Staten Island, NY (Greyship) - LOADING SUPPLIES AND DOING MAINTANANCE ON THE TUG. |

*The Bridge is a published hazard to navigation in a narrow channel*

34.    At all times relevant, the Bridge was and is a published hazard to navigation in 33 C.F.R. 117.997.

35.    Carver's Port Captain, Mr. Baldassare, confirmed that bridges are considered hazards to navigation.  *See* **Exhibit H** (Baldassare Dep. 169:4-7).

36.    The width of the Bridge opening between the fenders constitutes a narrow channel. *See* **Exhibit V** (Lewis Dep. 99:20-100:6).

*Carver was using autopilot at the time of the Allision*

37.    Carver was operating the tug in autopilot at the time of the Allision.  *See* **Exhibit I** (Daily Log from 06/15/24).

38.    The daily log for the M/T MACKENZIE ROSE for June 15, 2024 states that James Morrissey did not turn off the autopilot until he began backing away from the Bridge.  *Id.*

| 16:30 | Incident - Norfolk, VA - Mate James Morrissey reports the auto pilot was not completely turned off he was able to correct and switch back over to hand steering and begin backing on the Weeks 281 Barge and maneuvered the barge alongside fendering on the North and PBL RR Bridge, photo taken, proceed slowly away from bridge. |
|---|---|

39.    On June 15, 2024, Carver's General Manager, Mr. Moore, asked Carver's Port Captain, Mr. Baldassare, to "see how we can resolve the steering issue" in reference to the Allision. *See* **Exhibit F** (texts between Baldassare and Moore).

40.    On July 2, 2024, two weeks after the Allision, an engineer on board the M/T MACKENZIE ROSE noted error codes on the autopilot and reported this error to Carver via text message.  *See* **Exhibit L** (text messages from tug phone to Moore).

*Carver knew of problems with the autopilot before the Allision*

41.    Before the Allision, the M/T MACKENZIE ROSE had a history of issues with its autopilot system.  *See* **Exhibits  W, X, Y, Z, and AA** (Incident and Near Miss Reports).

42.    Carver replaced at least part of the autopilot system in November of 2023 after reported issues with the system.  *See* **Exhibit BB** at CARVER000251 (Mackay Marine Invoice); **Exhibit G** (Moore Dep. 166:22-167:3).

43.    On February 28, 2024, Captain Miller filed a "near miss report" in Carver's HELM system records describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "AUTO PILOT STOPPED TUG TOOK A HARD LEFT INTO OTHERN (*sic*) TRAFFIC LANE." *See* **Exhibit W** at CARVER 000037 (02/28/24 Near Miss Report); **Exhibit G** (Moore Dep. 298:21-301:11).

44.    On March 2, 2024, Mackay Marine performed work for Carver on the autopilot system on the M/T MACKENZIE ROSE after Carver complained of issues with the system.  *See*

**Exhibit BB** at CARVER 000252 (Mackay Marine Invoice); **Exhibit G** (Moore Dep. 276:17-277:5).

45.    On April 1, 2024, after the work by Mackay Marine, Captain Miller filed another "near miss report" in Carver's HELM system records describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "autopilot to go into standby and hard right to heavy seas." *See* **Exhibit X** at CARVER 000039 (04/01/24 Near Miss Report); **Exhibit G** (Moore Dep. 303:2-8, 308:4-10).

46.    On April 3-5 and 10-11, 2024, Ayers Marine Electronics performed work for Carver on the autopilot system on the M/T MACKENZIE ROSE.  *See* **Exhibit CC** (Ayers Marine Invoice); **Exhibit G** (Moore Dep. 271:22-272:15).

47.    Carver's General Manager, Mr. Moore, testified that no further work was done to the autopilot system on the tug after April 2024.  *See* **Exhibit G** (Moore Dep. 275:24-276:6).

48.    On May 3, 2024, just 6 weeks before the Allision, Captain Miller, as confirmed by Mate Erik Walordy, filed a "near miss report" in Carver's HELM system records describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "the steering went into standby and the rudder came hard over without alarm." *See* **Exhibit Y** (05/03/24 Near Miss Report); **Exhibit DD** (Walordy Dep. 24:18-26:19).

49.    On May 21, 2024, 3½ weeks before the Allision, Captain Milled filed an incident report in Carver's HELM system records describing an incident with the M/T MACKENZIE ROSE wherein the steering went unexpectedly hard left when the tug was in autopilot.  *See* **Exhibit Z** (05/21/24 Incident Report).

*Carver did not restrict use of autopilot despite multiple reasons to do so*

50.    The operator manual for the Simrad autopilot system on the M/T MACKENZIE ROSE on June 15, 2024 prohibits use of automatic steering "in heavy traffic areas or in narrow

14

waters" and requires users to "always switch the autopilot to standby and reduce speed in due time to avoid hazardous situations."  *See* **Exhibit EE** at CARVER 001999 (Simrad manual excerpt).

---

Do not use automatic steering when:
· In heavy traffic areas or in narrow waters
· In poor visibility or extreme sea conditions
· When in areas where use of an autopilot is prohibited by law

When using an autopilot:
· Do not leave the helm unattended
· Do not place any magnetic material or equipment near the heading sensor used by the autopilot system
· Verify at regular intervals the course and position of the vessel
· Always switch the autopilot to standby and reduce speed in due time to avoid hazardous situations

---

51.     Carver possessed the Simrad autopilot manual for the tug as part of its vessel records produced in this case.  *See* **Exhibit EE** (Simrad manual with CARVER bates stamp).

52.     Carver's Port Captain, Mr. Baldassare, testified that autopilot should not have been used when the tug was approaching the Bridge.  *See* **Exhibit H** (Baldassare Dep. 89:14-90:5).

---

```
14        Q.    In making bridge transits,
15     would you expect them to not to be in
16     autopilot?
24        A.    No.   There would be no reason
25     for them to be in autopilot when
1     approaching the bridge.
2         Q.    You would expect them not to be
3     on autopilot?
4         A.    Correct, they should be
5     hand-steering.
```

---

53.     Notwithstanding the Simrad manual and the many problems with the autopilot that had not been fixed, Carver did not prohibit use of the autopilot on the M/T MACKENZIE ROSE before the Allision.  *See* **Exhibit G** (Moore Dep. 281:8-23); **Exhibit M** (Carver Rule 30(b)(6) Dep. 91:5-12).

54.     Notwithstanding the Simrad manual and Mr. Baldassare's testimony, Carver's SMS contains no restriction on the use of autopilot in heavy traffic areas, narrow waters, or near hazards

to navigation.  *See* **Exhibit G** (Moore Dep. 281:17-23); **Exhibits K** (SMS excerpts); **Exhibit M** (Carver Rule 30(b)(6) Dep. 91:5-12).

*Carver supplied an incompetent crew on the day of the Allision*

55.    Carver's SMS contains various training modules for operation of Carver's vessels, but does not contain any training module for transiting bridges.  *See* **Exhibit K** (SMS excerpts).

56.    James Morrissey received no training from Carver on transiting bridges before operating the tug on the day of the Allision.  *See* **Exhibit FF** (records of Morrissey's training).

57.    James Morrissey received no training from Carver on the use of autopilot before operating the tug on the day of the Allision.  *See* **Exhibit FF** (records of Morrissey's training).

58.    In January 2024, 5 months before the Allision, James Morrissey struck a pier while operating the M/T MACKENZIE ROSE, causing over $75,000 in damages.  *See* **Exhibit AA** (01/22/24 Incident Report).

59.    After the January 2024 allision, James Morrissey was not disciplined by Carver or required to go through any additional training.  *See* **Exhibit G** (Moore Dep. 88:6-89:16).

## Standard of Review

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**<u>Argument</u>**

I.    **The Belt Line and Evanston are entitled to judgment on their Claims as a matter of law.**

A.    **Carver cannot overcome the presumption of fault under the Oregon Rule.**

Under the "Oregon Rule" of general maritime law, when a moving vessel allides with a stationary object like a bridge, the vessel is presumed at fault. *See The Oregon*, 158 U.S. 186, 197 (1895); *Yarmouth Sea Prods. v. Scully*, 131 F.3d 389, 393 (4th Cir. 1997); *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977). This presumption "suffices to make out a prima facie case of negligence against the vessel." *Woods v. U.S. Dept. Of Trans.*, 681 F.2d 988, 990 (5th Cir. 1982). What is more, "[t]his presumption applies to the operator as well as the vessel and to all parties participating in the management of the vessel at the time of the contact." *Id.*; *see also Merrill Trust Co. v. Bradford*, 507 F.2d 467, 471 (1st Cir. 1974). The burden of proof then shifts to the vessel to prove that it was without fault in the allision, that the stationary object was at fault, or that the allision was inevitable. *See Bunge*, 558 F.2d at 794.

Based on the undisputed facts above, Carver is presumed at fault for the Allision and the damages that flow from it. The M/T MACKENZIE ROSE, a vessel owned and operated by Carver, allided with the Bridge, a stationary object owned by the Belt Line, thereby triggering the Oregon Rule. *See* Undisp. Facts ¶¶ 1-6 and exhibits cited therein. Carver has adduced no facts in discovery to overcome this presumption, nor can it. The Bridge was in a raised open position and was properly identified as a published hazard to navigation in the Code of Federal Regulations. *See* Undisp. Facts ¶ 3 and 34; *see also* 33 C.F.R. 117.997 (identifying Bridge). Accordingly, on this evidence alone, Carver is liable for the damages caused by the Allision and the Belt Line and Evanston are entitled to summary judgment on their Claims.

17

**B.     Even without the Oregon Rule, the undisputed facts establish Carver's liability.**

Even absent the presumption in the Oregon Rule, Carver and the M/T MACKENZIE ROSE are undisputedly at fault for the Allision.  At all times relevant, the M/T MACKENZIE ROSE and her owners owed the Belt Line a legal duty under general maritime law to "approach the bridge with reasonable skill and care to avoid injuring it, having in mind the difficulty and peril occasioned by the bridge itself."  *United States v. Norfolk-Berkley Bridge Corp*., 29 F.2d 115, 125 (E.D. Va. 1928).  As the Fifth Circuit observed almost 50 years ago, "Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way." *Bunge Corp*., 558 F.2d at 795.

Carver and those under its responsibility breached this duty by, among other things, failing to maintain control of the tug and barge, allowing the tug and barge to move outside the navigable channel on the approach to the Bridge, failing to properly transit through the fenders of the Bridge, failing to maintain a properly functioning autopilot system or otherwise prohibit its use, failing to properly train the crew of the tug on transiting bridges before the Allision, failing to properly train the crew of the tug on use of the Simrad autopilot system before the Allision, and failing to enforce policies for safe operation of the M/T MACKENZIE ROSE such as a prohibition on the use of autopilot when transiting bridges.  *See* Undisp. Facts, ¶¶ 1-14, 41-49, 50-59; *see also* **Exhibit H** (Baldassare Dep. 89:14-90:5) (confirming that autopilot should not have been used when the tug was approaching the Bridge).

As a direct result of these breaches, the M/T MACKENZIE ROSE allided with the Bridge. Carver is therefore liable for the resulting damages, and the Belt Line and Evanston are entitled to summary judgment on their Claims.

18

II.    **Carver is not entitled to relief under the Limitation of Liability Act due to its privity and knowledge of the conditions that caused the Allision.**

Limitation of liability or exoneration under the Limitation of Liability Act is an extraordinary remedy.  *See* 46 U.S.C. § 30523; *see also Hartford Accident & Indem. Co. v. S. Pac. Co.*, 273 U.S. 207, 218 (1927) (stating, "[it] differs from the ordinary admiralty suit, in that, by reason of the statute and rules, the court of admiralty has *power to do what is exceptional in a court of admiralty*—to grant an injunction, and by such injunction bring litigants, who do not have claims which are strictly admiralty claims, into the admiralty court.") (emphasis added).

Under 46 U.S.C. § 30523, to limit liability, a shipowner must prove that it lacked "privity or knowledge" of the negligence or fault that caused the allision.  *See* 46 U.S.C. § 30523(b); *see also Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 166 (4th Cir. 1984) ("a shipowner seeking limitation of liability bears the burden of proving that he was without privity or knowledge of the condition or negligence responsible for the collision.").  In other words, "[t]o obtain the benefit of the Act the owners must establish a right to it.  That involves the always difficult—and oftentimes impossible—burden of establishing that the casualty occurred without the owner's privity and fault, *including pre-voyage unseaworthiness*.  The books are filled with hundreds of cases denying limitation of liability."  *Crown Zellerbach v. Ingram Indus.,* 783 F.2d 1296, 1303 (5th Cir. 1986) (emphasis added).

A shipowner's privity or knowledge is not limited to action or inaction on the date of the incident.  *See Crown,* 783 F.2d at 1303.  "A vessel can be rendered unseaworthy by having either *insufficient equipment* or an *insufficiently competent and trained crew*."  *SCF Waxler Marine, LLC v. Aris T M/V,* 24 F.4th 458, 472 (5th Cir. 2022) (citations omitted, emphasis added).

Based on the undisputed facts here, Carver cannot meet its burden to limit liability for at least three reasons:  first, Carver knew the autopilot system on the tug had malfunctioned multiple

19

times, but failed to properly repair it or prohibit its use before the Allision; second, Carver knew the Simrad manual for the autopilot system prohibited use of autopilot in heavy traffic areas, in narrow waters, or near hazards to navigation, but failed to restrict its use in transiting the Bridge; and third, Carver supplied an incompetent crew on the day of the Allision, with the operator in particular lacking training on bridge transits or use of the autopilot system on the tug. All these failures led to the damages that Carver now seeks to avoid.

A.    **Carver knew the autopilot system on the tug had malfunctioned before the Allision, but failed to properly repair it or prohibit its use.**

The operational history of the autopilot system on the M/T MACKENZIE ROSE is replete with malfunctions, each causing the system to turn without reason (sometimes without an alarm), including in the weeks just before the Allision. Carver undisputedly knew of them because they were reported in Carver's HELM system records. Despite this knowledge, Carver failed to properly repair the autopilot system or otherwise prohibit its use before the Allision. *See* Undisp. Facts, ¶ 41-49 and exhibits cited therein.

For months at the outset of this case, Carver insisted that the serial malfunctions made no difference because, in its view, all of them were solved when Ayers Marine repaired the system in April 2024. That argument fell apart when the Belt Line and Evanston discovered two documents in Carver's HELM system from *after* the work by Ayers Marine: (1) a "near miss report" for the tug from May 3, 2024, just 6 weeks before the Allision; and (2) an "incident report" for the tug from May 21, 2024, just 3½ weeks before the Allision. *See* Undisp. Facts, ¶¶ 48-49.

The May 3, 2024 report describes a near miss of the M/T MACKENZIE ROSE and cites the reason as "the steering went into standby and the rudder came hard over without alarm." *See* Undisp. Facts, ¶ 48 and **Exhibit Y** (05/03/24 Near Miss Report). The May 21, 2024 report describes a similar incident wherein the steering went unexpectedly left when the tug was in

20

autopilot, remarkably like the turn the tug took on the approach to the Bridge here.  *See* Undisp. Facts, ¶ 49 and **Exhibit Z** (05/21/24 Incident Report); *see also* Undisp. Facts, ¶ 5 and **Exhibit C** (Rose Point data showing tug turning left outside the channel).

Notwithstanding these reports, it is undisputed that Carver performed no work on the autopilot system between April 2024 and the Allision on June 15, 2024, nor did Carver prohibit its use until proper repairs could be made.  *See* Undisp. Facts, ¶ 47 and **Exhibit G** (Moore Dep. 275:24-276:6) (confirming no work on autopilot after April 2024).

These facts preclude Carver's limitation effort.  Undisputedly, the M/T MACKENZIE ROSE, in its approach to the Bridge on June 15, 2024, turned left while in autopilot, just like in previous incidents, veered outside the navigable channel, and hit the Bridge before the operator could switch to hand steering.  *See* Undisp. Facts, ¶¶ 37-38.  The result of this error incapacitated the Bridge for almost 5 months and caused more than $15.5 million in damages.

**B.    Carver knew the Simrad manual for the autopilot system prohibited autopilot use "in heavy traffic areas," "narrow waters," or "hazardous situations," but failed to restrict its use in transiting the Bridge.**

Independently of the prior malfunctions, Carver also cannot limit its liability because it knew of and ignored the written restrictions in the operator manual for the Simrad autopilot system installed on the M/T MACKENZIE ROSE.  The manual explicitly prohibits use of autopilot in "heavy traffic areas or in narrow waters," and requires users to "always switch the autopilot to standby and reduce speed in due time to avoid hazardous situations."  *See* Undisp. Facts, ¶ 50 and **Exhibit EE** (Simrad manual).

It is undisputed that Carver both (1) possessed this manual, and (2) knew the Bridge was a published hazard to navigation in a narrow channel.  *See* Undisp. Facts, ¶¶ 34-36, 53; *see also* 33 C.F.R. 117.997 (identifying Bridge in the Code of Federal Regulations).  In fact, Carver's own Port Captain, Mr. Baldassare, undisputedly testified that autopilot should not have been used when

approaching the Bridge.  *See* Undisp. Facts, ¶ 52 and **Exhibit H** (Baldassare Dep. 89:14-90:5).
Despite this knowledge, Carver failed to prohibit the crew from using the autopilot system in the
approach to the Bridge here.  Like its failure above, this alone precludes Carver's ability to limit
its liability.  *See SCF Waxler Marine*, 24 F.4th at 472; *Hellenic Lines*, 730 F.2d at 166.

### C.    Carver supplied an incompetent crew for the M/T MACKENZIE ROSE, rendering the tug unseaworthy at the time of the Allision.

Compounding the errors above, Carver also failed to supply a competent and trained crew
for the M/T MACKENZIE ROSE on the day of the Allision, rendering the tug unseaworthy and
prohibiting Carver from limiting its liability.  As the Fifth Circuit explained in *SCF Waxler Marine*,
"[t]he privity or knowledge standard obliges the owner to select a competent master.  It also
requires the owner to *properly train the master and crew*."  *SCF Waxler Marine*, 24 F.4th at 472.

It is undisputed that Carver did not train the operator of the tug, James Morrissey, on the
proper procedures for transiting bridges and other known hazards to navigation before allowing
him to operate the tug on the day of the Allision.  *See* Undisp. Facts, ¶ 56 and **Exhibit FF** (records
of Morrissey's training).  It is also undisputed that Carver did not train Mr. Morrissey on use of the
Simrad autopilot system installed on the tug before allowing him to operate the tug in autopilot on
the day of the Allision.  *See* Undisp. Facts, ¶ 57 and **Exhibit FF** (records of Morrissey's training).
And it is undisputed that, in January 2024, just 5 months before the Allision, Mr. Morrissey struck
a pier while operating the M/T MACKENZIE ROSE, causing over $75,000 in damages, but was
neither disciplined by Carver nor required to undergo any additional training as a result.  *See*
Undisp. Facts, ¶¶ 58-59 and **Exhibit AA** (01/22/24 Incident Report).

For all these reasons, Carver is not entitled to limit its liability, and the Belt Line and
Evanston respectfully request that this Court grant judgment in their favor on Carver's Limitation
Complaint.

III.    **Carver is not entitled to relief under the Limitation of Liability Act due to its unclean hands.**

Carver's unclean hands also prevent it from obtaining relief under the Act.  As explained below, the Act is rooted in equitable principles, so only those parties who come to the Court with clean hands can access the extraordinary relief it affords.  The threshold question here is whether Carver, having ignored one federal law that requires immediate reporting of allisions for public safety, can nonetheless benefit from another federal law to limit its liability to the value of the offending tug, allegedly $2.5 million.  *See* 46 C.F.R. 4.05-1(a) and 46 U.S.C. § 30523.  While the Belt Line and Evanston concede that they have found no reported precedent directly on point, three factors militate strongly against Carver limiting its liability here based on its unclean hands:  (1) the public safety purpose of the reporting requirements, (2) the equitable underpinnings of the Limitation of Liability Act, and (3) the egregious nature of Carver's evasion.

A.    **The reporting requirements of 46 C.F.R. 4.05-1 exist to protect the public.**

Federal law requires two distinct notices after any allision with a bridge.  First, 46 C.F.R. 4.05-1(a) requires the vessel owner to immediately report the allision to the nearest U.S. Coast Guard office;[3] and second, 46 C.F.R. 405-10(a) requires a vessel owner to file a written report on form CG-2692 (Report of Marine Casualty) within five days of the allision.[4]  It is undisputed that Carver never made the first report, leaving both the Coast Guard and the Belt Line unaware of

---

[3]    46 C.F.R. 4.05-1(a)(1) states:  "*Immediately* after the addressing of resultant safety concerns, the owner, agent, master, operator, or person in charge, *shall notify* the nearest Sector Office, Marine Inspection Office or Coast Guard Group Office whenever a vessel is involved in a marine casualty consisting in — (1) An unintended grounding, or an unintended strike of (allision with) a bridge; . . ."  *Id*. (emphasis added).

[4]    46 C.F.R. 4.05-10(a) states, in pertinent part:  "The owner, agent, master, operator, or person in charge must, within 5 days, file a written report of any marine casualty required to be reported under § 4.05-1.  *This written report is in addition to the immediate notice required by § 4.05-1.*  This written report . . . must be provided on Form CG-2692 [Report of Marine Casualty], and supplemented as necessary . . ."  *Id*. (emphasis added).

the damage. *See* Undisp. Facts, ¶¶ 21-22. It is also undisputed that Carver's Port Captain, in collusion with its General Manager, deceived the crew of the tug into thinking that Carver *had* made the required report and that the Coast Guard had released the vessel without any inspection, interviews, drug and alcohol testing, or other investigation. *See* Undisp. Facts, ¶¶ 18-21.

The reporting requirement in 46 C.F.R. 4.05-1 exists for a reason. On September 22, 1993, barges being pushed by a tugboat struck and displaced the Big Bayou Canot Bridge near Mobile, Alabama.[5] Several minutes later, an Amtrak train called Sunset Limited reached the bridge and derailed, resulting in deaths of 47 people and injuries to 103 more. The crew of the tugboat did not notify the U.S. Coast Guard until the Coast Guard had already started pulling bodies out of the water.[6]

In response to the incident, the Coast Guard conducted a study "to provide mechanisms that will help prevent another disaster" like the Sunset Limited derailment. *See* 63 Fed. Reg. 19190, 19190 (Apr. 17, 1998). The study resulted in several recommendations to enhance safety in the towing industry, one of which included "improv[ing] how information concerning allisions is reported." *Id*. at 19191. These recommendations culminated in the two regulations above.

Importantly here, because of the severe risk to the public of *any* damage to a bridge (visible or not), 46 C.F.R. 4.05-1(a)(1) does not impose a damage threshold associated with the duty to report. In other words, all bridge allisions, even those that do not result in visible damage, must be reported immediately.[7]

---

[5]    *Derailment of Amtrak NO. 2 on the CSXT Big Bayou Canot Bridge*, N.T.S.B, https://www.ntsb.gov/investigations/Pages/DCA93MR007.aspx (last updated June 23, 2025).

[6]    *Train Derails in Alabama Swamp*, HISTORY.COM EDITORS, https://www.history.com/this-day-in-history/September-22/train-derails-in-alabama-swamp (last updated August 22, 2025).

[7]    Federal law also protects the Coast Guard's investigative process from being used in civil actions, including the CG-2692 form required under 46 C.F.R. 4.05-10(a). *See* 46 U.S.C. § 6308.

**B.      Admiralty courts are Courts of Equity and the Limitation of Liability Act is rooted in equitable principles.**

While the need for and relevance of 46 C.F.R. 4.05-1 is readily apparent, the continued need for and relevance of the Limitation of Liability Act is far less obvious.  As one commentator observed, "By the mid-twentieth century, courts were questioning the continued expediency of a Limitation Act more than a hundred years old.  What Justice Black wrote in *Maryland Casualty Co. v. Cushing* has often since been quoted:

> Judicial expansion of the Limited Liability Act at this date seems especially inappropriate.  Many of the conditions of the shipping industry which induced the 1851 Congress to pass the act no longer prevail.  And later Congresses, when they wished to aid shipping, provided subsidies paid out of the public treasury, rather than subsidies paid by injured persons."

Donald C. Greenman, "Limitation of Liability Unlimited," 32 J. Mar. L. & Com. 279, 285 (April 2001) (quoting *Maryland Casualty Co. v. Cushing*, 347 U.S. 409, 437 (1954)); *see also Esta Later Charters, Inc. v. Ignacio*, 875 F.2d 234, 238 (9th Cir. 1989) (same); *Hercules Carriers, Inc. v. Florida*, 768 F.2d 1558, 1565 (11th Cir. 1985) (same); *Hines, Inc. v. U.S.*, 551 F.2d 717, 728 (6th Cir. 1977) (same); *In re Barracuda Tanker Corp.*, 409 F.2d 1013, 1015 (2d Cir. 1969) (same).

What remains clear, however, is that federal courts administering the Act do so as admiralty courts sitting in equity.  *See Hartford*, 273 U.S. 207, 214-15 (1927).  It is well established that "[a] court of admiralty is, as to all matters falling within its jurisdiction, a court of equity.  Its hands are not tied up by the rigid and technical rules of the common law, but it administers justice upon the large and liberal principles of courts which exercise a general equity jurisdiction."  *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1089 (5th Cir. 1982); *see also Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 104327, at *31-32 (E.D. Va. 2009) ("[a] Court sitting in admiralty is a court of equity and has the authority to award what is fair and just in light of all the facts and circumstances of the case").

It is also clear that federal courts sitting in admiralty can entertain equitable defenses like unclean hands even in the context of statutory remedies. *See Cape Charles Marine Servs., Inc. v. M/Y Briar Patch*, 2023 U.S. Dist. LEXIS 222354 (E.D. Va. 2023) (analyzing maritime lien under Commercial Instruments and Maritime Liens Act, 46 U.S.C. §§ 31341, *et seq*.). In *Cape Charles*, for example, while this Court ultimately found insufficient evidence of unclean hands, it held that "[i]n certain circumstances, '[e]vidence of unclean hands or bad faith on the part of [the lienholder] might be grounds to *disregard or equitably transfer its [maritime] lien*'" otherwise permitted under CIMLA. *Id*. at *9 (emphasis added, collecting cases).

The Limitation of Liability Act is also rooted in equity, dating back to its enactment in 1851. The Supreme Court described the history of the Act in *Hartford*, 273 U.S. at 214: "These decisions establish, first, that the great object of the [limitation] statute was to encourage shipbuilding and to induce the investment of money in this branch of industry, by limiting the venture of those who build the ship to the loss of the ship itself or her freight then pending, in cases of damage or wrong, happening without the privity or knowledge of the ship owner, and by the fault or neglect of the master or other persons on board. . ." *Id*. The Court stated further that:

> . . . the origin of this proceeding for limitation of liability is to be *found in the general maritime law*, differing from the English maritime law; and that such a proceeding is entirely within the constitutional grant of power to Congress to establish courts of admiralty and maritime jurisdiction, *Norwich v. Wright*, 13 Wall. 104; . . . that the *proceeding is equitable in its nature* and is to be likened to a bill to enjoin multiplicity of suits, *Providence Steamship Co. v. Hill Manufacturing Company*, 109 U.S. 578; . . . [and] that, on reference to a commissioner and the coming in of his report, it shall be determined, first, whether the owner and his vessel are liable at all; second, whether the owner may avoid all liability except that of the vessel and pending freight; third, what the amount of the just claims are; and, fourth, how the fund in court should be divided between the claimants.

*Id*. at 214-15 (emphasis added). The Court thus summarized the process under the Act as follows: "It is the *administration of equity* in an admiralty court." *Id.* at 216 (emphasis added).

26

Today, consistent with this history, "[l]imitation actions are *equitable proceedings* in which courts must consider 'the rights of all claimants in addition to . . . the rights of the insureds and the insurors.'" *In re Complaint of Paradise Holdings, Inc.*, 795 F.2d 756, 761 (9th Cir. 1986) (emphasis added) (*quoting New York Marine Managers v. Helena Marine Service*, 758 F.2d 313, 316 (8th Cir. 1985)); *see also* 46 U.S.C. § 30529(c) and Fed. R. Civ. P. Supp. R. F(3) (describing injunctive powers in limitation actions); *Freedom Unlimited v. Taylor Lane Yacht & Ship, LLC*, 2021 U.S. App. LEXIS 24524, at *4 (11th Cir. 2021) (describing the "equitable proceeding known as a concursus" in limitation actions); *Texas Gulf Sulphur Co. v. Blue Stack Towing Co.*, 313 F.2d 359, 362 (5th Cir. 1963) (discussing acceptance of late claims under equitable principles in a limitation action). In short, equity governs application of the Act.

### C.    The equitable doctrine of unclean hands bars Carver from limiting its liability.

As a matter of equity, Carver's actions in the immediate aftermath of the Allision bar its ability to obtain relief under the Act. A vessel owner should not be allowed to knowingly violate federal law designed to protect the public, then, having fled the scene, lied to its crew, and spoliated evidence, venture into admiralty court and obtain the extraordinary relief of limiting its liability for the damages it caused.[8] To hold otherwise would only encourage such conduct, since it rewards the offending party after depriving the U.S. Coast Guard and injured party of the ability to properly investigate. Here, for example, having successfully prevented an immediate investigation, Carver hopes to avoid more than $13 million of the $15.5 million in damages it caused to the Belt Line.

---

[8] The spoliation of evidence rule applies in maritime cases. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995); *see also* Undisp. Facts, ¶¶ 31-32 (describing spoliation of tug surveillance video and Mr. Moore's phone records); Belt Line's and Evanston's Motion and Memorandum for Relief under Rule 30 (ECF 69 and 70) (describing obstruction by spoliation).

To establish a defense of unclean hands, a defendant must show that the plaintiff's conduct (1) was willful and inequitable; (2) was directly related to the claim asserted; and (3) injured the defendant. *Harrods Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 679-80 (E.D. Va. 2001). The guiding principle "is the equitable maxim that he who comes into equity must come with clean hands." *Mas v. Coca-Cola Co*., 163 F.2d 505, 509 (4th Cir. 1947). The Fourth Circuit has held that, "[t]his maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Id*. The reasoning is similar to that in a salvage case, where this Court has held that, "[i]n seeking a salvage award, a salvor must come to the court with clean hands, acting 'in entire good faith and with honesty of purpose.'" *R.M.S. Titanic v. Wrecked & Abandoned Vessel, etc*., 742 F. Supp. 2d 784, 803 (E.D. Va. 2010) (quoting *Columbus-America Disc. Grp. v. Atl. Mut. Ins. Co*., 56 F.3d 556, 569 (4th Cir. 1995). "If a salvor comes to the court with unclean hands, its award may be reduced or entirely forfeited, depending on the level of misconduct." *Id*. (citing *Columbus-America Disc. Grp. v. Atl. Mut. Ins. Co*., 974 F.2d 450, 468 (4th Cir. 1992).

In this case, the undisputed material facts establish Carver's unclean hands. First, it is undisputed that Carver's tug, pushing a loaded barge, struck the Bridge with such force that it massively damaged the steel superstructure and shoved it nearly 7 feet, leaving the western truss suspended in midair on 3 of its 4 legs. *See* Undisp. Facts, ¶¶ 1-4. It is also undisputed that, despite this near-catastrophic allision, Carver backed up the tug, realigned its heading, and left the scene without a word to the U.S. Coast Guard as required by 46 C.F.R. 405-1(a) (and Carver's own SMS) or the Belt Line as owner of the bridge. *Id*., ¶¶ 5-6, 21-22. And it is undisputed that Carver did so by means of deceit, with texts between its Port Captain and General Manager showing that its

management falsely misled the tug crew into thinking that the U.S. Coast Guard had cleared them to leave without an investigation. *Id.*, ¶¶ 27-28. Absent the Belt Line's surveillance systems, Carver's conduct might have gone undetected, allowing it to avoid liability entirely.

Second, it is undisputed that Carver's covert departure from the scene is directly related to the Allision for which it now seeks exoneration. It makes no difference whether the inequitable conduct *caused* the Allision. A party's inequitable conduct is directly related to a claim where "there is a close nexus between [the] party's [inequitable] conduct and the transactions on which that party seeks relief." *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 810 (4th Cir. 2001); *see also Mas*, 163 F.2d at 508. Here, Carver fled the scene of the very Allision from which it now seeks exoneration or a limitation of liability. Based on the text messages between Messrs. Baldassare and Moore, the entire aim of Carver's inequitable conduct was to *cover up* that Allision, or at least Carver's involvement in it. *See* Undisp. Facts, ¶¶ 27-28.

Third, it is undisputed that Carver's evasion put the public and the Belt Line at incredible risk, including the Belt Line's customers that use the Bridge, and injured the Belt Line by depriving it of an immediate investigation. As a result of the evasion, neither the Belt Line nor the U.S. Coast Guard was able to inspect and photograph the condition of the vessel at the scene, petition the Court to hold the vessel in Norfolk, or insist on immediate drug and alcohol tests of the crew, among other things. It is undisputed that the tug underwent maintenance work almost immediately after returning to New York, before any inspection was performed (Undisp. Facts, ¶36); that Carver still has never produced the vessel's surveillance video (*id.*, ¶ 31); and that Carver fired the tug operator, who has since evaded deposition (*see* ECF 62 and 88). Finally, it is undisputed that if Carver's evasion allows it to successfully limit its liability, the Belt Line and Evanston will be out up to $13 million of the $15.5 million in damages caused by Carver.

All these factors establish Carver's unclean hands, and all of them prevent Carver from limiting its liability under the Act.  Accordingly, the Belt Line and Evanston respectfully request that this Court grant judgment in their favor on Carver's Limitation Complaint.

<u>Conclusion</u>

WHEREFORE, the Belt Line and Evanston respectfully request that this Court (1) dismiss Carver's Complaint for Exoneration from or Limitation of Liability; (2) grant the Belt Line and Evanston judgment on their Claims against Carver in an amount to be proven at trial; and (3) award the Belt Line and Evanston all other just and necessary relief.

Dated:  August 27, 2025

NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

By:  _____ */s/ James L. Chapman, IV* _____
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl, VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cmw-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*
EVANSTON INSURANCE COMPANY, a/s/o NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY


_____ */s/ Mark C. Nanavati* _____
Mark C. Nanavati, VSB No. 38709
G. Christopher Jones, Jr., VSB No. 82260
SINNOTT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)

(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com

Zachary M. Jett, VSB No. 93285
BUTLER WEIHMULLER KATZ CRAIG LLP
11525 N. Community House Road, Ste 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company,
a/s/o Norfolk and Portsmouth Belt Line
Railroad Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of August 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all registered counsel of record, and mailed to:

James Morrissey
4723 Baywood Drive
Lynnhaven, FL 32444

By: _____*/s/ James L. Chapman, IV*_____
James L. Chapman, IV, VSB No. 21983
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt
Line Railroad Company*