# Exhibit H

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

------------------------------------------X
IN THE MATTER OF COEYMANS MARINE
TOWING, LLC D/B/A CARVER MARINE
TOWING AS OWNER AND OPERATOR OF M/T
MACKENZIE ROSE, (IMO NO. 8968765) HER
CARGO, ENGINES, BOILERS, TACKLE, EQUIPMENT,
APPAREL, AND APPURTENANCES, ETC., IN REM,
("M/T MACKENZIE ROSE"),

                                    CIVIL ACTION NO:
                                    2:24-CV-00490

PETITIONING FOR EXONERATION FROM OR
LIMITATION OF LIABILITY IN ALLISION WITH
NORFOLK AND PORTSMOUTH BELT LINE RAILROAD
COMPANY MAIN LINE RAILROAD BRIDGE
(THE "BRIDGE") OCCURRING JUNE 15, 2024 IN
AND ABOUT THE ELIZABETH RIVER, VIRGINIA.

------------------------------------------X


                    April 29, 2025

                    10:18 a.m.

     AN IN PERSON VIDEOTAPED DEPOSITION of

of Leonard Baldassare, a Defendant herein,

taken by the respective parties, pursuant

to Order, before Larin Kaywood, a Notary

Public for and within the State of New

York.




JOB NO.: 112214

LEONARD BALDASSARE

April 29, 2025

```
 1   ask you, who are you working for now?
 2        A.    H&L Contracting.
 3        Q.    And what is their business?
 4        A.    Marine construction is the
 5   division that I work in.  I'm a project
 6   manager.  But they do various construction,
 7   but I'm in the marine sector of the
 8   company.
 9        Q.    Are there any tugs that are
10   part of the marine construction --
11        A.    Yes.
12        Q.     -- division?
13        A.    Yes, there are.
14        Q.    Are they -- give me some idea,
15   relative size?
16        A.    So we have one tug boat that's
17   1200 horse power, it has a COI, and then
18   the rest are all under 26 foot non-COI work
19   boats.
20        Q.    How many altogether?
21        A.    I think about 12.
22        Q.    When you were Port Captain for
23   Carver, tell us what your duties were?
24        A.    I was responsible for the
25   day-to-day operations of the tug fleet.  So
```

```
 1    I would make sure the tugs were crewed, I
 2    would make sure that safety equipment was
 3    up to snuff.  Just basically be the liaison
 4    between the boats and upper management.
 5         Q.   Did you have any responsibility
 6    for hiring crew personnel?
 7         A.   I did not, no.  That all went
 8    through HR.  I would sometimes sit in on
 9    the interviews, but it would go through HR.
10         Q.   Did you have any responsibility
11    for testing people that were hired into
12    crew positions?
13         A.   No, I did not.
14         Q.   Did somebody else?
15         A.   Not to my knowledge, no.
16         Q.   Was there a training manager,
17    or somebody that was responsible for
18    training when you worked for Carver?
19         A.   No, not to my knowledge.
20         Q.   As a Port Captain, who did you
21    report to?
22         A.   Brian Moore.
23         Q.   Was there anybody else that
24    you, I don't know, thought of having to
25    report to in your mind, somebody else
```

```
 1         Q.   So in any of your conversations
 2    with Captain Miller or the interviews of
 3    the crew on the -- whatever day it was, was
 4    there any mention of the autopilot somehow
 5    being involved in this casualty?
 6         A.   No, there was not.
 7         Q.   Nobody said that?
 8         A.   Nobody said that to me.
 9         Q.   Did you ever ask --
10         A.   I did not.
11         Q.    -- whether they were on
12    autopilot or not?
13         A.   No.
14         Q.   In making bridge transits,
15    would you expect them to not to be in
16    autopilot?
17              MR. RODGERS:  Objection to
18         form.  You can answer.
19         A.   Say that again, I'm sorry.
20         Q.   I'm just --
21              MR. RODGERS:  He's not here as
22         an expert, but he can answer as to
23         his knowledge.
24         A.   No.  There would be no reason
25    for them to be in autopilot when
```

```
 1    approaching the bridge.
 2         Q.   You would expect them not to be
 3    on autopilot?
 4         A.   Correct, they should be
 5    hand-steering.
 6         Q.   Okay.  We can put that back in
 7    the pile here, sir.
 8              MR. RODGERS:  Do you need water
 9         or coffee?
10              THE WITNESS:  No, I'm okay.
11              MR. RODGERS:  You're okay?
12              THE WITNESS:  Yeah.
13              MR. CHAPMAN:  Are we okay time
14         wise?
15              THE REPORTER:  Five minutes.
16              MR. CHAPMAN:  We got five
17         minutes?  Why don't we just go ahead
18         and take a break.  I'll regroup and
19         try to --
20              MR. RODGERS:  Sure.
21              MR. CHAPMAN:  Okay.
22              THE REPORTER:  Yes?
23              MR. RODGERS:  Yeah, we're
24         ready.  We don't need to regroup.
25         Let's go off the record.
```

```
 1   own section in the safety management
 2   system, right?
 3        A.   Yes.
 4        Q.   And is that because they create
 5   hazardous navigation situations or at least
 6   potentially do?
 7        A.   Yes.
 8        Q.   So right in the middle of that
 9   page there is this kind of yellow or
10   orange-ish call out in larger font that
11   says, "Under no circumstances shall the
12   wheelman responsible for the transit make
13   the bridge due to pressure or pride."  Do
14   you know what that is warning the master or
15   the mate of?  Like what does that statement
16   mean to them?
17        A.   It means that if you're not
18   comfortable transiting through a bridge for
19   any circumstance, then do not do so.
20        Q.   Is there a reason that it's
21   like popped out important or highlighted in
22   this fashion?
23        A.   I'm not sure.
24        Q.   If you look at above
25   that -- the section titled "Before The
```