# Exhibit M

```
IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
------------------------------------------X
IN THE MATTER OF COEYMANS MARINE
TOWING, LLC D/B/A CARVER MARINE
TOWING AS OWNER AND OPERATOR OF M/T
MACKENZIE ROSE, (IMO NO. 8968765) HER
CARGO, ENGINES, BOILERS, TACKLE, EQUIPMENT,
APPAREL, AND APPURTENANCES, ETC., IN REM,
("M/T MACKENZIE ROSE"),

                                    CIVIL ACTION
                                    NO: 2:24-cv-00490-MSD-LRL

PETITIONING FOR EXONERATION FROM OR
LIMITATION OF LIABILITY IN ALLISION WITH
NORFOLK AND PORTSMOUTH BELT LINE RAILROAD
COMPANY MAIN LINE RAILROAD BRIDGE
(THE "BRIDGE") OCCURRING JUNE 15, 2024 IN
AND ABOUT THE ELIZABETH RIVER, VIRGINIA.

------------------------------------------X

                              June 17, 2025
                              10:08 a.m.
```

AN IN PERSON VIDEOTAPED DEPOSITION of Nicholas Laraway, taken by the respective parties, pursuant to Order, before Larin Kaywood, a Notary Public for and within the State of New York.

JOB NO.: 114501

```
 1   incident or accident reporting procedure,
 2   correct?
 3       A.    That is my understanding.
 4       Q.    Okay.  Have you reviewed this
 5   before your testimony today?
 6       A.    I have in general reviewed it,
 7   yes.
 8       Q.    So the two reporting
 9   priorities, first is the master and that's
10   the master of the tug, or master of the
11   vessel, correct?
12       A.    Yes.
13       Q.    "We'll notify the office as
14   soon as practical after a marine casualty."
15   And second bullet, "The master will notify
16   the nearest USCG unit," which I take to
17   mean U.S. Coast Guard unit, "as soon as
18   practical after a marine casualty," right?
19       A.    That's what that says, yes.
20       Q.    Okay.  And that's Carver's
21   procedure; isn't it?
22       A.    That is what that says, yes.
23       Q.    All right.  And then it appears
24   to actually include the entire text of a
25   few sections of the code of federal
```

```
 1   regulations as part of the
 2   incident/accidents' reporting procedures,
 3   right?  It doesn't?
 4         A.    I'm sorry.  No, he --
 5         Q.    Oh, he took it away from you?
 6         A.    Yes.
 7               MR. RODGERS:  Yeah, I did.
 8          Just an objection to the extent
 9           you're asking him any kind of a legal
10            question or conclusion.
11         Q.    So --
12               MR. RODGERS:  Could you refer
13   to what you're saying when you say code of
14   federal regulation?  What you are pointing
15   to?
16         Q.    Yeah.  They're on Page 163
17   under the heading "Marine Casualty or
18   Incident."  It refers to 46 CFR 4.03-1,
19   correct?
20         A.    Correct.
21         Q.    All right.  And on the
22   following pages it prefers to further
23   sections of 46 CFR 4.03, 4.05?
24         A.    That is correct.
25         Q.    Yeah.  Okay.  So Carver's
```

```
 1   policy is to follow the code of federal
 2   regulations?
 3              MR. RODGERS:  Objection to
 4        form.
 5              You can answer if you
 6         understand the question.
 7        A.    Our policy is to follow these
 8   specific regulations.
 9        Q.    Okay.  So if you turn to Page
10   164, under the section, "Notice of Marine
11   Casualty 46 CFR 4.05-1," in Section A, it
12   says, "Immediately after addressing
13   resultant safety concerns, the owner,
14   agent, master operator or person in charge
15   shall notify the nearest Sector Office,
16   Marine Inspection Office or Coast Guard
17   Group Office whenever a vessel is involved
18   in a marine casualty consisting in," and
19   it's got a bunch of sub parts, right?
20        A.    It does.
21        Q.    So the first one is "Unintended
22   grounding or unintended strike of (allision
23   with) a bridge," correct?
24        A.    That's correct.
25        Q.    Okay.  To Carver's knowledge or
```

```
 1   understanding, was the allision with the
 2   Norfolk and Portsmouth Belt Line Bridge on
 3   June 15th, 2024 unintended?
 4             MR. RODGERS:  Just what he
 5       understood at the time?  What they
 6       understood at the time or now?
 7        Q.   I'm asking him whether
 8   he -- whether Carver believes that it was
 9   unintended?
10             MR. RODGERS:  Okay.
11        A.   Yes.
12        Q.   Okay.  You don't have any
13   information to suggest that it was an
14   intended allision, correct?
15        A.   Correct.
16        Q.   Okay.  So in the context of
17   this reporting obligation, did Carver
18   immediately notify any of these Coast Guard
19   designated offices regarding the allision
20   with the Belt Line Bridge?
21        A.   Carver referring to myself and
22   the company, or Carver Marine Towing, or
23   anyone?
24        Q.   Okay.  Well, you are here on
25   behalf of Carver Marine Towing?
```

NICHOLAS LARAWAY

June 17, 2025

```
 1      A.    Yes.
 2      Q.    Or Coeymans doing business as
 3  Carver Marine Towing, right?
 4      A.    Yes.
 5      Q.    So in that capacity, I am
 6  asking, did Carver notify any of those
 7  Coast Guard offices immediately after the
 8  allision?
 9      A.    I'm not aware that they did.
10      Q.    Okay.  And when is the first
11  time that Carver notified the Coast Guard
12  of the allision?
13      A.    My understanding is that the
14  first correspondence with the Coast Guard
15  regarding this was days after it happened.
16      Q.    And what is Carver's
17  understanding of the reasons why it did not
18  notify the Coast Guard immediately after
19  the allision?
20      A.    My understanding from preparing
21  for this deposition is that the original
22  report provided to Lenny was that it was
23  strike between the barge and fendering and
24  not the bridge structure.  It was not until
25  days later that the fact that the bridge
```

```
 1            focused on the company's policy
 2            regarding the use of autopilot.  And
 3            I just want to be sure that we
 4            understand it.
 5       Q.   And my question is, whether
 6  there is any company policy prohibiting the
 7  use of the autopilot?
 8       A.   I would rely on the depositions
 9  of Brian and Lenny to speak to the
10  specifics.  But based upon reading this,
11  there does not appear to be any prohibition
12  in writing in this document.
13       Q.   Are you aware of any
14  prohibition that is somehow not in writing?
15       A.   I'm not aware.
16       Q.   If you could turn to the
17  section titled 7.1, Bridge Transits.  The
18  Bates Number is Carver 000910.
19            This section appears to provide
20  instructions regarding bridge transits by
21  vessels, correct?
22       A.   That appears to be correct.
23       Q.   And right in the middle of the
24  page, it says, kind of in a call out,
25  yellow or orange-ish color.  "Under no
```