IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/V Mackenzie Rose, (IMO No. 8968765) her cargo, engines, boilers, tackle, equipment, apparel, and appurtenances, etc., *in rem*, ("M/T MACKENZIE ROSE"), petitioning for Exoneration from or Limitation of Liability in allision with Belt Line Main Line Railroad Bridge (the "Bridge") occurring June 15, 2024 in and about the Elizabeth River, Virginia. | Civil Action No: 2:24-cv-00490 |

**PETITIONER'S BRIEF IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF CAPTAIN NICHOLAS J. LEWIS**

Petitioner, Coeymans Marine Towing, LLC d/b/a Carver Marine Towing, for its Brief in Support of Its Motion to Exclude the Testimony and Opinions of Captain Nicholas J. Lewis ("Capt. Lewis"), states as follows:

**I. Capt. Lewis's Credentials and Opinions.**

Capt. Lewis is Claimants' purported marine industry expert who intends to offer opinions on duty and causation of the allision. From 1974 until retirement in 2006, Capt. Lewis worked for various shipping companies as a licensed mariner on tankers hauling oil or other hazardous material. **Exhibit 1**, Lewis Tr. at 12:4-19; 13:20-14:6; 14:17-15:10; 15:24-16:13; 16:23-17:15; 21:12-15; 22:4-10. Capt. Lewis transited the Elizabeth River one time on a light tugboat but cannot recall if he navigated the Eastern or Southern branch of the river. *Id.* at 33:13-34:15. He has never pushed or towed a barge with a towing vessel on the Elizabeth River. *Id.* at 34:16-19. At least 99% of his mariner experiences are from working on vessels towing or hauling oil or other hazardous materials. *Id.* at 90:2-5.

1

Capt. Lewis notably agrees that navigational error caused the bridge strike, specifically that "[t]he Officer on Watch (James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode) in a confined navigational channel, resulting in loss of directional control." **Exhibit 2**, Lewis Report at 12; see also **Ex. 1,** Tr. at 40:1-24 ("Yeah. [Morrissey] did something wrong"). In light of Claimants' navigational error problem, Capt. Lewis asserts additional opinions on seaworthiness that relate to Carver's autopilot policies and training. These include:

- "The company TSMS (Tug Safety Management System) lacked policy guidance prohibiting use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion" (**Opinion #5**).

- "The use of autopilot in a narrow inland waterway while approaching a fixed railroad bridge was in direct contradiction to established safe seamanship practices and warnings in the Simrad AP70MK2 Autopilot Manual" (**Opinion #6**).

- "Carver deprived the Norfolk and Portsmouth Belt Line Railroad Company protections afforded by the autopilot manufacturer which created unseaworthy conditions aboard the Mackenzie Rose and was a cause of the allision" (**Opinion #7**).

- "The company TSMS (Tug Safety Management System) did not prohibit autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion" (**Opinion #9**).

- "Carver gave no official training to its operators with regard to how to safely transit a waterway when approaching a bridge, when a proper lookout should be posted, and had no restrictions on the use of autopilot (**Opinion #10**)."

Capt. Lewis bases these opinions on his experiences working for oil companies, industry standards applicable to transporting oil, and former employers' policies that prohibit use of autopilot on oil tankers. **Ex. 1**, Tr. at 51:1-13; 53:17-54:16. Capt. Lewis's experiences and referenced policies are consistent with 33 CFR § 164.13.[1] Capt. Lewis agrees that no law prohibited Mate Morrissey from

---

[1] This code section applies to a "tanker," defined as a "self-propelled vessel, including integrated tug and barge combinations, constructed or adapted primarily to carry oil or hazardous material"

2

using autopilot to transit on the Elizabeth River on June 15, 2024 because the *M/V Mackenzie Rose* was not hauling oil or hazardous material. **Ex. 1**, Tr. at 49:16-50:7.

Capt. Lewis also opines: "No lookout was posted in violation of 33 C.F.R. §83.05 (Rule 5 – Lookout), a critical error during confined water navigation in daylight while pushing ahead a barge." **Ex. 2** at p. 13 (**Opinion #8**).[2] The lookout opinion is based on Capt. Lewis' experiences on oil tankers and his policy to always have an additional "[able-bodied seaman] on watch" in the wheelhouse while transiting rivers on tankers. **Ex. 1**, Tr. at 56:1-24. He does not know if a regulation other than Rule 5 applies to oil tankers. *Id.* at 17-24; *cf.* 33 C.F.R. §164.13(c) ("Each tanker must navigate with at least two officers … on watch on the bridge"). Nevertheless, Capt. Lewis believes Rule 5 "is just a minimum" and the safer practice is to "always have a lookout at hand in the wheelhouse" like he did on tankers. *Id.* at 55:23-56:7.

Most of Capt. Lewis's other "findings" summarize his observations of the discovery record and Carver's credibility, including:

- "The unit made direct contact with the bridge, causing visible structural movement (as evidenced by surveillance video), which is contrary to crew statements of "no damage" or "minor impact" (**Opinion #1**);

- "The unit deviated outside the navigational channel without cause and continued forward at approximately 5.2 knots toward a fixed portion of the Norfolk and Portsmouth Belt Line Railroad Bridge (**Opinion #2**)";

- "The deck logbook entry was inaccurate and misleading, stating the unit had maneuvered onto fendering and away from the Bridge when in fact it struck the western structure directly" (**Opinion #3**);

---

and restricts the use of a "heading or track control system" only if (1) the tanker is 1/2 nautical miles beyond the territorial baseline and is not within waters specified as "anchorages" or "precautionary areas"; (2) there is a competent person present to assume manual control as necessary; and (3) the system meets certain requirements. See 33 CFR § 164.13(a), (d).

[2] Rule 5 states: "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal situation and of the risk of collision." 33 C.F.R. § 83.05.

- "Post-incident accounts from multiple crew members were inconsistent, with discrepancies in timing, actions taken, and observations" (**Opinion #12**);

- "The Coast Guard was not promptly notified of the allision, in violation of 45 C.F.R. 4.05-1. This delayed investigation of and post-incident drug and alcohol testing and created potentially dangerous conditions for the Norfolk and Portsmouth Belt Line Railroad Company and the public at large" (**Opinion #11**).

Finally, Capt. Lewis finds that the autopilot system had a "hard over rudder incident" on May 21, 2024 and opines: "By not having the autopilot repaired [after May 2024] and not restricting the use of the autopilot, Carver management was a cause of the allision with the NPBL Bridge." **Ex. 2** at p. 13 (**Opinion #13**). He concedes, however, there was no "hard over event" on June 15, 2024 that actually caused the allision:

> Q: So I'm not talking about speculation. What you have in front of you thus far without talking to Morrissey and none us have except for Mr. Chapman who was at this hearing and knows what he said, but I wasn't. I hadn't been hired yet. But based on what you've been given, which are the 2692 and other documents and the Rose Point data, there's no indication that the vessel went hard over; correct?
>
> [Objection]
>
> A. Correct.
>
> Q. So there's no indication, no evidence that you've been able to review that the incident in May with the autopilot, that same exact incident hard over occurred on June 15, 2024; correct?
>
> [Objection]
>
> A. Correct. But I still don't – I still say it could have happened …

**Ex. 1**, Tr. at 123:4-21.

## II. Legal Standard.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *United States v. Wilson*, 484 F.3d 267, 274-75 (4th Cir. 2007). Under the Rule:

4

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Stated otherwise, expert testimony is admissible "if it concerns (1) scientific, technical, or other specialized knowledge that will (2) aid the jury or other trier of fact to understand or resolve a fact at issue." *Westberry v. Gislavad Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999). The first prong requires the court to examine "whether the reasoning or methodology underlying the expert's proffered opinion is reliable" and the second prong asks the court to analyze "whether the opinion is relevant to the facts at issue." *Id.*; see also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"). "The proponent of the testimony must establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

**III.   Argument.**

    **A.  Capt. Lewis's Opinions Nos. 5, 6, 7, 9 and 10 are unreliable and irrelevant.**

Reliability is "determined by the principles and methodology employed by the expert," *Holseapple v. Barrett*, 5 Fed. App'x 177, 179 (4th Cir. 2001), and the Court may look for a discernible basis in "government of industrywide standard" or regular practices in the industry. *Conrad v. CSX Transp., Inc.*, No. MJG-14-51, 2015 U.S. Dist. LEXIS 78188, 2015 WL 3797873

at *5 (D. Md. June 17, 2015), *aff'd* 633 Fed. App'x 134 (4th Cir. 2016). "Experiential expert testimony," like Capt. Lewis's, "does not rely on anything like a scientific method." *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007). "While a district court's task in examining the reliability of experiential expert testimony is therefore somewhat more opaque, the district court must nonetheless require an experiential witness 'to explain how his experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliability applied to the facts.'" *Id.* (citation omitted).

To begin, Capt. Lewis's Opinions 5, 6, 7, 9 and 10 should be excluded because he fails to actually identify the standard of care on which he opines. There are references in his Report to "well established standards of safe marine practice" (Ex. 1 at p. 13) and statements that Capt. Lewis holds his opinions to a "reasonable degree of professional certainty" (*id.* at p. 2), but the Report does not cite to any rule, regulation, publication or other authority saying how Capt. Lewis derives "standards of safe marine practice" or explain how these purported standards are common across the industry. This failure renders Capt. Lewis's opinions unreliable and is a standalone basis to bar Capt. Lewis's Opinions 5, 6, 7, 9 and 10. *Robles v. USA*, No. 2:19-cv-111, 2020 U.S. Dist. LEXIS 248493, *7-8 (E.D. Va. October 15, 2020) (overruling objections to Magistrate Judge's ruling excluding marine industry expert because "Captain McKamie never opined as to what the relevant industry standards are, meaning there was no benchmark for the appropriate industry standard of care that could make Captain McKamie's opinions a product of reliable principles and methods under Rule 702"). (internal quotations omitted).

Capt. Lewis did attempt to expand upon his purported autopilot standards in deposition. He never used autopilot in "inland waters" because "at least 99%" of his experience as a mariner comes from "pushing or pulling oil barges" while working for oil companies like Exxon. **Ex. 1**,

6

Tr. 90:2-5. Capt. Lewis further conceded that Exxon and oil companies had those policies in place because specific CFR regulations made it illegal for oil tankers to use autopilot in certain situations. **Ex. 1**, Tr. 8:24-910:1; 15:12-16; 49:16-19. Capt. Lewis also agrees that it is not against the law for other vessels to use autopilot in the situations the CFR prohibits for oil tankers. *Id.* 49:20-50:7; 79:15-21. Capt. Lewis thus established his "standards of safe marine practice" from his experiences as a mariner aboard oil tankers while working for oil companies that had policies to comply with regulations applicable to transporting oil. None of those experiences or regulations apply to Carver or this case.

In toto, Capt. Lewis's opinions 5, 6, 7, 9 and 10 amount to an attempt to apply heightened standards to Carver – restricting the use of autopilot on the Elizabeth River and training its crew on the restrictions – that have no foundation in government regulation, industry standard or common practice outside of oil tanker operations. This case has nothing to do with pushing or pulling oil barges. Capt. Lewis's oil tanker experiences are simply inapposite to the circumstances of this case and his opinions are unreliable. The regulations applicable to Carver's towing vessel *M/V Mackenzie Rose* include 46 C.F.R. § 140.670, which specifically excepts from its purview "towing vessels in compliance with the requirements in 33 CFR 164.13(d)" applicable to oil tankers. Despite Capt. Lewis's personal opinion that autopilot should not be used in "confined navigational channels or near infrastructure," 46 C.F.R. § 140.670 specifically <u>authorizes</u> its use "*in areas of high traffic density, conditions of restricted visibility, and other hazardous navigational situations*" so long as "(a) it is possible to immediately establish manual control of the ship's steering; (b) a competent person is ready at all times to take over steering control; and (c) the changeover from automatic to manual steering and vice versa is made by, or under, the

7

supervision of the officer in charge of the navigational watch." 46 C.F.R. § 140.670 (emphasis added).

The officer in charge on June 15, 2024 was Mate Morrissey, who Capt. Lewis concedes was at the helm and ready to switch over to manual except that he failed to properly do so. See **Ex. 2** at Opinion #4; see also **Ex. 1**, Tr. at 66:15-22. Capt. Lewis simply opines that different regulations applicable to oil tankers and his experiences hauling oil should apply to the *M/V Mackenzie Rose*. Without an applicable regulation or genuine standard prohibiting the use of autopilot, Capt. Lewis's opinions about Carver's policies and training on the use of autopilot is the type of unreliable *ipse dixit* that should be excluded under Rule 702 and *Daubert*. *Gen. Elec. Co. v. Joiner*, 522 U.S. 135, 146, 118 S. Ct. 512, 239 L.Ed. 2d 508 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); see also *Daubert*, 509 U.S. at 590 (The "knowledge" required under Rule 702 "connotes more than subjective belief or unsupported speculation").

Moreover, Capt. Lewis's Opinions 5, 6, 7, 9, and 10 should be excluded as speculative. Taking these opinions at face value, Capt. Lewis assumes that if Carver (1) had policies in place restricting the use of autopilot on the Elizabeth River and (2) trained Mate Morrissey on those company policies and the autopilot manufacturer's manual, then Mate Morrissey would have followed the same and would not have struck the Bridge on June 15, 2024. Capt. Lewis bakes too many assumptions into his causation chain for his opinions to be anything other than rank speculation. Regardless of whether Mate Morrissey was hand-steering or using autopilot, he still would have had the obligation to observe and avoid striking a railroad bridge that spans hundreds of feet across the Elizabeth River. The facts of this case are that Mate Morrissey failed to do one

8

or the other, or both. Having a company policy about when and how to use autopilot and training on that policy does not equate to Mate Morrissey avoiding the allision on June 15, 2024. Capt. Lewis's opinions are "too great an analytical gap" and should be excluded. *GE v. Joiner*, 522 U.S. 136, 146 (1997)

In addition, Opinions 5, 6, 7, 9, and 10 should be excluded under *Daubert* as irrelevant and unhelpful to the Court in determining the issues in the case. As stated above, Capt. Lewis just applies regulations and his experiences on oil tankers to a case involving a towing vessel that was hauling scrap steel. Capt. Lewis's opinions have no relevancy to the actual facts and circumstances of this case and thus will not assist the trier of fact in resolving disputed issues at trial. See *Kumho Tire Co.,* 526 U.S. at 141.

For these reasons, Capt. Lewis's Opinions 5, 6, 7, 9 and 10 should be excluded from evidence.

### B. Opinion #8 should be excluded as unreliable, unhelpful, irrelevant, and a common sense opinion.

For his eighth opinion, Capt. Lewis finds that Carver violated 33 C.F.R. §83.05 (Rule 5 – Lookout) by failing to "post a lookout" who presumably would have observed the Bridge and assisted Mate Morrissey in avoiding it. This opinion is first unreliable because that section of the Code says nothing about "posting" a lookout. Once again, Capt. Lewis bases his opinion on his experiences as an oil tanker mariner and regulations applicable to oil tankers that call for a vessel operator to have a second watchman in the wheelhouse in certain situations. **Ex. 1**, Tr. at 56:1-24; 17-24; *cf.* 33 C.F.R. §164.13(c). Those oil tanker regulations have no relevancy to this case and thus Capt. Lewis's Opinion #8 is unreliable and should be excluded.

Moreover, failure to maintain a proper lookout is proof of nothing of substance in this Limitation Act proceeding. "Generally, failure to maintain a proper lookout is a fault contributing

9

to maritime injury, and the facts proving otherwise are usually within the sole knowledge of the negligent vessel." *Williamson v. The Carolina,* 158 F. Supp. 417, 421 (E.D.N.C. 1958). Establishing that Mate Morrissey failed to keep a proper look out before striking the Bridge does not impact the issues of privity or knowledge of alleged unseaworthiness. His failure to keep a proper lookout is simply more proof of navigational error and support for Carver's petition under the Limitation Act. Capt. Lewis's Opinion 8 should be excluded as irrelevant to Claimants' cause.

Finally, there is no need for expert testimony on whether Mate Morrissey failed to keep a proper lookout. "Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of jurors because such testimony, almost by definition, can be of no assistance." *Scott v. Sears, Roebuck, & Co.,* 789 F.2d 1052, 1055 (4th Cir. 1986). Determining whether Mate Morrissey failed to keep a proper lookout is well within this Court's capabilities without the assistance of Capt. Lewis's purported expertise. *E.g. Vanderpool v. Edmondson*, No. 1:01-cv-147, 2005 U.S. Dist. LEXIS 8611, at *20 (E.D. Tenn. Mar. 23, 2005) ("As a matter of common sense, a person piloting a boat should maintain a lookout by sight and hearing to avoid collisions. It would be an easy task for the Court and advisory jury to understand and accurately apply 33 U.S.C. §§ 2005 and 2007 (Coast Guard Rules 5 and 7) at trial without expert testimony"); *Taylor v. B&J Martin, Inc*., 611 F. Supp. 3d 278, 283 (E.D. La. 2020) ("[E]xpert testimony should be excluded in a bench trial if the Court finds that the proffered testimony deals only with common sense issues with which the Court, in its role as trier of fact, needs no expert assistance to resolve."). Capt. Lewis's Opinion 8 should be excluded.

### C. Opinions 1, 2, 3, 11 and 12 are irrelevant and improper expert testimony.

This set of opinions from Capt. Lewis contain his observations of documents, witness credibility or irrelevant issues and should be excluded as irrelevant and improper expert testimony.

Testimony which merely operates to lend unnecessary expert commentary to determinations that the jury is capable of making on its own—such as comparing photographs or evaluating testimony reflecting competing versions of events—is inadmissible because it does not actually aid the jury in deciding factual disputes. See *United States v. Dorsey*, 45 F.3d 809, 815 (4th Cir. 1995); *West v. Raimond*, Nos. 92-1167, 92-1172, 1993 U.S. App. LEXIS 27161, at *13 (4th Cir. Oct. 19, 1993).

Capt. Lewis's Opinions 1, 2, 3, and 11 offer nothing more improper commentary and observations of the factual record, including allegations that Carver's crew made "misleading" or "inaccurate" statements after the incident that are "contrary" to videos and other evidence. See **Ex. 1**, p.13. The various versions of what occurred on and before June 15, 2024 are factual issues for the Court decide and there is no need for Capt. Lewis's charged "opinions" on these matters. See *Dorsey*, 45 F.3d at 815. Opinions 1, 2, 3 and 11 should thus be excluded.

Likewise, Opinion 12 should be excluded as Carver's post-incident reporting has no relevancy to determining the cause of the allision or issues of privity and knowledge. Moreover, his commentary that Carver's purported late reporting to the Coast Guard "created potentially dangerous conditions … for the public at large" is unfounded, inflammatory and improper for expert testimony and should be excluded.

### D. Opinions 13, 14 and 15 are unreliable, speculative, and unfounded and should be excluded.

Capt. Lewis's Opinion 13 asserts that Carver's management was a cause of the allision because it failed to repair the autopilot after a May 2023 "hard over event." Capt. Lewis conceded in deposition that there was no "hard over" event on June 15, 2024 that caused or contributed to the incident. Ex. 1, Tr. at 123:4-21. He even went so far, after conceding no actual facts exist to suggest autopilot failure, that "it could have happened." *Id.* Given these admissions, discussion of the May issues is rank speculation. This opinion is unsupported by any facts at all. *Guillory v.*

11

*Domtar Indus. Inc*., 95 F.3d 1320, 1331 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all"). Accordingly, Opinion 13 should be excluded.

Finally, Capt. Lewis summarizes his opinions on seaworthiness discussed above in his fourteenth and fifteenth findings: "In my opinion, given the lack of training to the crew, the lack of policies and procedures regarding use of an autopilot or lookout during bridge transits, the known issues with the autopilot, and Captain Morrissey's prior allision, the Tug Mackenzie Rose was Unseaworthy. Carver should not have allowed this Tug to sail with this crew." **Ex. 2** at p. 14; see also Opinion #14 ("These failures … singularly or in combination … violated well established standards of safe marine practice, and were causes of the allision incident"). These conclusory summarizations of Capt. Lewis's opinions are unreliable, irrelevant, and unfounded for the same reasons as that each opinion fails independently, as discussed above. Opinions 14 and 15 should therefore be excluded.

**IV.     Conclusion.**

Capt. Lewis intends to offer opinions on autopilot use based on his experiences and knowledge of maritime standards that are unique to oil companies and have no bearing on the circumstances of this case. His opinions on the autopilot policies and training are, therefore, unreliable and irrelevant and should be excluded. Capt. Lewis's remaining opinions are either improper testimony for an expert or deal with issues that are irrelevant to determining the merits of this case. For the foregoing reasons, Capt. Lewis's Opinions 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15 should be excluded from evidence in this matter under Rule 702 and *Daubert*.

WHEREFORE, Petitioner Coeymans Marine Towing, LLC respectfully requests that the Court grant its Motion to Exclude Testimony and Opinions of Captain Nicholas J. Lewis and enter

an Order barring Claimants from eliciting or offering Captain Nicholas J. Lewis's Opinions 1, 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15 into evidence at any stage of this litigation, and for all other relief in favor of Petitioner as the Court deems just and proper.

Respectfully submitted,

Dated: August 29, 2025            **CLYDE & CO US LLP**

By: /s/ Harold L. Cohen
Harold L. Cohen (VSB No.:98148)
1221 Brickell Avenue, Suite 1600
Miami, FL 33131
Tel: 305-446-2646
Fax: 305-441-2374
Email: harry.cohen@clydeco.us;


James H. Rodgers*
Clyde & Co US LLP
45 Lexington Avenue, 16th Floor
New York, NY 10174
Phone: (212) 702-6771
Email: james.rodgers@clydeco.us

Michael J. Roman*
Dawn L. Johnson
Siobhan M. Murphy*
Clyde & Co US LLP
30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email: michael.roman@clydeco.us
dawn.johnson@clydeco.us
Siobhan.murphy@clydeco.us

Rachel Werner*
One North Central Avenue, Suite 1030
Pheonix, Arizona 85004
Phone: 480-746-4556
Email: rachel.werner@clydeco.us
*pro hac vice

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2025, a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will serve all counsel of record by electronic mail as follows:

Mark C. Nanavati, Esq. (VSB No.: 38709)
G. Christopher Jones, Jr., Esq. (VSB No.: 82260)
SINNOT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)
(804) 893-3862 (Jones)
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com
*Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

Zachary M. Jett, Esq. (VSB #93285)
BUTLER WEIHMULLER KATZ, et al
11525 North Community House Road
Suite 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

*/s/ Harold L. Cohen*