## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division
                        In Admiralty
 3
 4            CIVIL ACTION NO: 2:24-cv-00490
 5
    In the Matter of COEYMANS MARINE
 6  TOWING, LLC D/B/A CARVER MARINE
    TOWING as Owner and Operator of M/T
 7  Mackenzie Rose, (IMO No. 8968765) her cargo,
    engines, boilers, tackle, equipment, apparel, and
 8  appurtenances, etc., in rem, petitioning for
    Exoneration from or Limitation of Liability in
 9  allision with Norfolk and Portsmouth Belt Line
    Railroad Company Main Line Railroad Bridge
10  occurring June 15, 2024 in and about the
    Elizabeth River, Virginia.
11  _____
12
                    DEPOSITION OF
13            CAPTAIN NICHOLAS J. LEWIS
14
              Taken on Behalf of the Claimant
15
    DATE TAKEN:    August 13, 2025
16  TIME:          12:00 p.m. - 5:15 p.m.
    PLACE:         6767 N. Wickham Road
17                 Melbourne, Florida
18
        Examination of the witness taken before:
19
              Yvette S. Harrison, RPR, FPR,
20                  Court Reporter
        and Notary Public, State of Florida at Large.
21
22
23
24
25
```

## Page 2

```
 1                    APPEARANCES
 2          JAMES H. RODGERS, ESQUIRE
            RACHEL WERNER, ESQUIRE
 3               CLYDE & CO US LLP
               405 Lexington Avenue
 4          New York, New York 10174
                  212-702-6771
 5          james.rodgers@clydeco.us
            rachel.werner@clydeco.us
 6  Counsel for Coeymans Marine Towing,
       LLC d/b/a Carver Marine Towing
 7              Via Zoom
 8          ZACHARY M. JETT, ESQUIRE
        BUTLER WEIHMULLER KATZ, ET AL
 9  11525 North Community House Road, Suite 300
         Charlotte, North Carolina 28277
10              704-543-2321
             zjett@butler.legal
11  Counsel for Evanston Insurance Company,
    a/s/o Norfolk and Portsmouth Belt Line
12           Railroad Company
13       JAMES L. CHAPMAN, ESQUIRE
           W. RYAN SNOW, ESQUIRE
14   CRENSHAW, WARE & MARTIN, PLC
       15o W. Main Street, Suite 1923
15        Norfolk, Virginia 23510
                757-623-3000
16          jchapman@cwm-law.com
    Counsel for Norfolk and Portsmouth
17      Belt Line Railroad Company
                Via Zoom
18
         MARK C. NANAVATI, ESQUIRE
19      SINNOT, NUCKOLS & LOGAN, PC
            1381 Village Mill Drive
20      Midlothian, Virginia 23114
                804-893-3866
21          mnanvati@snllaw.com
    Counsel for Evanston Insurance Company a/s/o
22  Norfolk and Portsmouth Belt Line Railroad Company
                Via Zoom
23
                ALSO PRESENT
24        Captain Sam Stephenson
                Via Zoom
25
```

## Page 3

```
 1              INDEX OF PROCEEDINGS
 2       DEPOSITION OF CAPTAIN NICHOLAS J. LEWIS
 3                                         PAGE NO.
 4  DIRECT EXAMINATION BY MR. RODGERS          4
    CROSS EXAMINATION BY MR. JETT            133
 5  REDIRECT EXAMINATION BY MR. RODGERS      150
 6  CERTIFICATE OF OATH                      169
    CERTIFICATE OF REPORTER                  170
 7  ERRATA                                   171
 8              INDEX OF EXHIBITS
 9
10       COYMANS MARINE TOWINGS EXHIBITS
11  NO.        DESCRIPTION              PAGE NO.
12   1   Captain's Report of the Tug Mackenzie Rose   168
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1  WHEREUPON:
 2        CAPTAIN NICHOLAS J. LEWIS,
 3    A witness herein, acknowledged having been duly
 4    sworn and testified upon his oath as follows:
 5        THE WITNESS:  I do.
 6            DIRECT EXAMINATION
 7  BY MR. RODGERS:
 8    Q.  Good morning, Captain Lewis.  My name is Jim
 9  Rodgers from Clyde & Co.  I represent Coeymans Marine
10  Towing doing business as Carver Marine Towing as well as
11  the vessel Mackenzie Rose.
12    A.  Good morning.
13    Q.  Captain Lewis, have you ever been deposed
14  before?
15    A.  Yes.
16    Q.  Okay.  So I'm just going to give you some brief
17  instructions.  I'm going to ask you a series of
18  questions.  If you don't understand my question, just ask
19  me to repeat it or rephrase it and I will.
20    A.  Okay.
21    Q.  If you need a break, just let me know or let
22  your attorney know and we'll accommodate you for any
23  break at any time during this proceeding.  Okay?
24    A.  Yes.
25    Q.  All right.  Thank you.  Could you state your
```



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025

5—8

**Page 5**

1  full name and address, your home address for the record?
2  A.  Nicholas J. Lewis, L-E-W-I-S, 3830 Shady Run
3  Road, Melbourne, Florida 32934.
4  Q.  Thank you.  And I understand you're here as one
5  of the experts in this case?
6  A.  Yes.
7  Q.  Could you tell us who retained you?
8  A.  Mark Nanavati.
9  Q.  And do you know what party retained you, who he
10  represents?
11  A.  Evanston Insurance.
12  Q.  Okay.  Are you as an expert testifying on
13  behalf of any other party?
14  A.  Yes.  I think Jim Chapman and --
15  Q.  His client?
16  A.  Yes.
17  Q.  Norfolk and Portsmouth Belt Line Railroad
18  Company?
19  A.  Yes, that's Jim Chapman.
20  Q.  Okay.  Jim Chapman is the lawyer for them?
21  A.  Yes.
22  Q.  Okay.  I just want to go through some
23  background questions.  Are you ready?
24  A.  Okay.
25  Q.  And I have the -- I have your CV which saves a

**Page 6**

1  lot of time.  You graduated from Fort Schuyler?
2  A.  Yes.
3  Q.  What year?
4  A.  1973.
5  Q.  Okay.  And what was your degree in?
6  A.  Marine transportation.
7  Q.  Can you briefly describe what that major
8  covers?
9  A.  It covers all forms of transportation in the
10  marine industry, ships, tug boats, barges, charters,
11  pretty much covers the whole basis of the whole industry
12  as far as maritime goes.
13  Q.  Okay.  After you graduated did you sit for US
14  Coast Guard license?
15  A.  I did that before I graduated, yes.
16  Q.  And what license did you get at that time?
17  A.  Third mate, oceans, steam, and motor unlimited.
18  Q.  So once you got that license you were eligible
19  to -- well, you tell me what you were eligible to stand
20  watch for generally.
21  A.  I could stand watch as a third mate on a ship
22  and I could stand watch on a tugboat or any vessel
23  unlimited tonnage at the time as a third mate.
24  Q.  Okay.  Do you hold a license now?
25  A.  Not an active one.  I'm retired.

**Page 7**

1  Q.  Okay.  What other licenses did you hold after
2  your third mate license?
3  A.  Master steam and motor, 1600 ton, upon oceans.
4  Q.  Anything else?
5  A.  No, that's it.  I mean, radar observer and
6  stuff like that.
7  Q.  Okay.  Can you describe for us generally what a
8  1600 ton master's license would cover, what types of
9  vessels?
10  A.  Tugboats.  I mostly worked on tugboats and the
11  tonnage was usually much less than 1600 and just usually
12  pushed around oil barges.
13  Q.  Was the 1600 -- the 1600 covered tugboats;
14  correct?
15  A.  Yes, yes.
16  Q.  Did it cover any other vessel or a certain type
17  of vessel?
18  A.  Anything under 1600 tons I could have been
19  captain of.
20  Q.  Okay.  I'm looking at your CV and I just want
21  to go over a few things.  From 1973 to '74 you worked for
22  FW Hartmann?
23  A.  Yes.
24  Q.  As a boarding agent?
25  A.  Correct.

**Page 8**

1  Q.  Did that include any sea time?
2  A.  No.
3  Q.  Okay.  1974 to 1980 you worked for Sun
4  Transport, Inc.?
5  A.  Correct.
6  Q.  And I note that you put down at different times
7  you were captain, chief mate and also a third mate on
8  vessels such as coastal tankers and tugs; correct?
9  A.  Correct.
10  Q.  On the '74 to 1975 the coastal tankers, do you
11  remember what those tankers carried?
12  A.  Oil, gasoline and oil.
13  Q.  So and you were the third -- you were on the
14  tanker, right, not a tugboat?
15  A.  Right.  The tanker as a third mate.
16  Q.  Okay.  And then the chief mate aboard tugs for
17  New England Sun, do you remember that, 1975 to 1977?
18  A.  Yes.
19  Q.  And you were is it -- you were transporting oil
20  products?
21  A.  Oil barges, yeah, we moved oil barges.
22  Q.  Anything else?
23  A.  No.
24  Q.  Okay.  To your knowledge can a vessel carrying
25  oil legally use the autopilot in inland waters?



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
9–12

Page 9

1    A.  Not in my -- not in my experience.

2    Q.  And do you know if that's regulated by the CFR

3  or some other regulation?

4    A.  No.  It's company -- company -- company manual.

5  It's under their direction.

6    Q.  Okay.  You don't know if the CFR prohibits it?

7    A.  I think the CFR does prohibit it for carrying

8  oil, for oil transport.

9    Q.  You're not sure?

10    A.  No, I think I'm almost positive.

11    Q.  Okay.  And the CFR we're talking about code of

12  federal regulation, right, we're talking the same thing?

13    A.  Yes.

14    Q.  Do you know what the CFR states regarding

15  autopilot for a vessel carrying oil or hazardous

16  material?

17    A.  If I remember correctly, I think it basically

18  says in close quarters situation in inland waters you

19  shouldn't be using the autopilot.

20    Q.  For oil or when you're carrying oil or

21  hazardous material?

22    A.  Correct.

23    Q.  Okay.  And to your understanding that's

24  prohibiting vessels carrying just oil or hazardous

25  material; correct?

Page 10

1    A.  Correct.

2    Q.  Okay.  Do you know how far offshore a vessel

3  carrying oil or hazardous substance must stay off shore

4  to use the autopilot?

5    A.  Inland I think it was 12 miles.  Coastwise goes

6  12 miles.

7    Q.  Is it --

8    A.  Inland waters is I guess once you get inside

9  the sea buoy coming into port.

10    Q.  Okay.  Do you know if at the time you were

11  working if the CFR prohibited the use of the autopilot

12  within one half mile of the baseline, territorial

13  baseline?

14    A.  I don't recall.

15    Q.  Did you ever use autopilot when you were on a

16  tanker with oil and/or hazardous material?

17    A.  Yes, out at sea.

18    Q.  And not in inland waters because of the CFR

19  prohibition?

20    A.  Correct.

21    Q.  At that time were the -- were the tankers

22  and/or barges double hulled?

23    A.  No.

24    Q.  Do you recall a time when they -- the

25  requirement became that they needed to be double hulled?

Page 11

1    A.  Open 90.

2    Q.  Open 90.  Okay.  Did you ever go to sea after

3  open 90?

4    A.  Yes.

5    Q.  On an oil tanker or barge?

6    A.  Yes.  I worked on the oil tankers American

7  Progress and Columbia -- Seariver Columbia and Seariver

8  American Progress.

9    Q.  Do you know if the Mackenzie Rose -- well,

10  strike that.  You understand you're here to offer some

11  opinions regarding the Mackenzie Rose and an incident

12  that occurred with a railroad bridge on the Elizabeth

13  River; correct?

14    A.  Correct.

15    Q.  Okay.  Do you know if the barge, the Mackenzie

16  Rose, was pushing or was carrying oil or material,

17  hazardous material?

18    A.  I think it was carrying construction material.

19    Q.  So it was not carrying oil or hazardous

20  material --

21    A.  No.

22    Q.  -- to your understanding?

23    A.  Not to -- yeah, no, it wasn't carrying oil.

24    Q.  Okay.  Do you know the difference between a

25  1600 ton master's license and an unlimited master

Page 12

1  mariner's license?

2    A.  Well, unlimited master's license covers any

3  tonnage anywhere in the world on any kind of ship.

4    Q.  Okay.  I'm looking at your CV if you want to

5  refer to it.  When you were with Sun Transport between

6  1974 and 1980 and between '75 and '77 you state you were

7  chief mate aboard Sun Tugs?

8    A.  Yes.

9    Q.  Do you have that in front of you?

10    A.  No.

11    Q.  All right.  Well, in your CV --

12    A.  Wait a minute, wait a minute, I have it.

13    Q.  Yeah.  It's on page three.

14    A.  Yeah, I got it.

15    Q.  Okay.  And you say you were transporting oil

16  products; correct?

17    A.  Yes.

18    Q.  Would those have been in barges?

19    A.  Yes.

20    Q.  And you talk about Newark, New Jersey to ports

21  along the Atlantic Coast.  Can you name the ports that

22  you can recall that you pulled into?

23    A.  On the East Coast?

24    Q.  Uh-huh.

25    A.  From Bangor, Maine, down to Richmond, Virginia,



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
13–16

Page 13

1 and actually Gulf of Mexico, Florida, Louisiana, all over
2 from Texas to New York. I mean, that's in my career.
3 Sun Transport I went as far south as Norfolk.
4    Q. Did you go to the port in Norfolk?
5    A. Yes.
6    Q. Did you ever sail in the Elizabeth River?
7    A. Yeah. But I don't know if it was the southern
8 branch or the eastern branch, I don't recall.
9    Q. When you received this assignment and saw the
10 facts and the bridge and where it happened, do you recall
11 if you'd ever navigated that area of the Elizabeth River?
12    A. It didn't look familiar because I think it was
13 the eastern branch because I used to go to Colonna's
14 Shipyard and I think that's on the eastern branch.
15    Q. And for Richmond you said you went to Richmond?
16    A. Yes.
17    Q. Was that through the James River or some other
18 way?
19    A. Yes, James River.
20    Q. Okay. And then in 1977 to 1980 you were the
21 youngest chief mate in Sun's history to be promoted to
22 captain?
23    A. Yes.
24    Q. Congratulations.
25    A. Thanks.

Page 14

1    Q. You were on board the New England Sun and the
2 Barge Albany Sun, do you see that?
3    A. Yes.
4    Q. And, again, you were transporting oil products,
5 meaning you were on a tug transporting or pushing or
6 pulling barges; correct?
7    A. Correct.
8    Q. And the same question as earlier, which ports
9 do you recall on the East Coast you pulled into?
10    A. Portland, Boston, New Haven, Port Jefferson,
11 New York Harbor in Newport, Newark, south to Baltimore,
12 Norfolk and all the way to Puerto Rico.
13    Q. Okay. In Norfolk would your answer be the same
14 as to the earlier time period when you were chief mate
15 regarding the Elizabeth River and the branch?
16    A. Yes.
17    Q. Okay. Now '80 to '81 you worked for Interstate
18 Towing?
19    A. Correct.
20    Q. And you were chief mate aboard the Tug
21 Clipper --
22    A. Correct.
23    Q. -- towing barges? Were those oil barges or
24 some other barges?
25    A. Oil barges.

Page 15

1    Q. Okay. And just going forward 1981 to '86 I
2 guess you were with Exxon?
3    A. Yes.
4    Q. Coastal and Harbor Tugs 1981 to 1986, were
5 those also for oil shipments?
6    A. Yes. We also docked and undocked ships, but
7 they were all oil ships -- oil tanker ships, oil tankers.
8    Q. So thus far up until '86 from 1974 is it fair
9 to say you were -- when you were on tugs, it would be for
10 towing or pushing oil barges; correct?
11    A. Correct.
12    Q. And due to the regulations at no time when you
13 were in inland waters would you have been using autopilot
14 because of the CFR provision; correct?
15    A. Correct.
16    Q. Now if we go to 1986 Exxon Garden State, you
17 were the lead captain I see?
18    A. Yes.
19    Q. I'm guessing because it's Exxon it was oil or
20 hazardous material?
21    A. Yes, it was oil.
22    Q. Yes?
23    A. Yes, it was oil.
24    Q. Okay. And then '87 to '92 you were on the
25 Exxon Golden State as well as the Barge Exxon 503?

Page 16

1    A. Okay. Just trying to get where it says it.
2 '86. I have '81 and 2006.
3    Q. I'm sorry, it's your page two, 1987 to '92
4 bottom of the page Exxon.
5    A. I got it. I found the page.
6    Q. Yeah.
7    A. I had it over there.
8    Q. Okay. You from different times but the same
9 period were you either the chief mate and/or the captain?
10    A. Yes.
11    Q. Okay. And were those operations also with oil
12 barges?
13    A. Correct.
14    Q. Now in 1992 I see you became a port captain or
15 also known as a fleet supervisor; is that correct?
16    A. Yes.
17    Q. And how long were you a port captain?
18    A. Just about a year. It was a temporary shore
19 assignment.
20    Q. Okay. So during in 1992 when you were fleet
21 supervisor you didn't have any sea time; correct?
22    A. Correct.
23    Q. All right. Let's move forward to 1993 to 2003
24 you said your ocean and harbor tugs you captained all
25 three tugs --



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025

17–20

Page 17

1   A.  Yes.
2   Q.  -- in San Francisco?
3   A.  Yes.
4   Q.  And was that all West Coast steaming?
5   A.  Yes.
6   Q.  And I assume you lived out there?
7   A.  No, commuted every three weeks.
8   Q.  Wow.  From where?
9   A.  Florida.  Well, first New York and then Long
10  Island, New York, and then Florida.
11  Q.  Okay.  What company was that for?
12  A.  Seariver, Seariver which was Exxon.
13  Q.  Okay.  Were those ocean harbor tugs that you
14  were captain of were they oil as well?
15  A.  Well, we docked and undocked tankers.
16  Q.  Okay.  So was it mostly you were working in the
17  harbor or were you out working in the ocean?
18  A.  No.  It was mostly all harbor work until I took
19  a barge up to Anchorage, Alaska.
20  Q.  Okay.  And so the ships you were docking they
21  were oil tankers?
22  A.  Yes.
23  Q.  Okay.  And where did you do that?
24  A.  We escorted them in from sea to the Anchorage
25  or to docks.

Page 18

1   THE COURT REPORTER:  Just wait for his question
2   because you're cutting him off and I can't hear him.
3   THE WITNESS:  Sorry.
4   BY MR. RODGERS:
5   Q.  So when you escorted them in from sea, I'm
6   assuming the same CFR would have applied as far as
7   autopilot?
8   A.  No, I was on a light tugboat.
9   Q.  Okay.  Were you pushing or towing a tanker?
10  A.  I was following it.  I usually had a line up on
11  the stern.  So I was definitely not on autopilot.
12  Q.  Were you there more as a safety?
13  A.  Yes.  It's called an escort tug.  And it was a
14  California law going into San Francisco.
15  Q.  Okay.  So if it loses power you can --
16  A.  I can control it.  I can at least steer it
17  somehow.
18  Q.  Yeah, okay.  That makes sense.
19  A.  Slow it down so it doesn't hit the Bay Bridge
20  or Alcatraz.
21  Q.  Yeah.  No, no.  I guess by then were the
22  tankers double hulled as well?
23  A.  No, not all of them.  They weren't double
24  hulled.  It was the Valdez and the Long Beach.
25  Q.  It was the Valdez before it ran aground?

Page 19

1   A.  Yes.  But that was -- that was before '93
2   because I was out there for about three months.  But
3   afterwards it was the Long Beach, the Venetia, the
4   Baytown.  What the hell is the name of the other one?  It
5   was about three or four ships that they had running on
6   the West Coast up to Alaska, up to Valdez.
7   Q.  Right.  Did you know Frank Iarossi?
8   A.  Sure did.  Well, he was my boss.
9   Q.  Was he president of Exxon Shipping at the time
10  you knew him or not?
11  A.  He was president of Seariver and I think he was
12  there when -- yeah, it was definitely he was Exxon before
13  it changed its name.  It changed its name after the
14  Valdez.
15  Q.  Did it now?
16  A.  Yeah.  Well, everybody thought the double Xs
17  stood for money.  So that's why they changed the name.
18  They didn't have -- at that time they didn't have a good
19  reputation as Exxon.
20  Q.  It wasn't a good day; right?
21  A.  No.
22  Q.  Did you know Captain Hazelwood?
23  A.  I went to the same school.  I didn't know him
24  personally, but I knew of him.
25  Q.  Were you the same year as he was?

Page 20

1   A.  No.  He was -- he graduated just before I did,
2   I went to school.
3   Q.  Okay.  Great.
4   MR. JETT:  Let him finish.
5   BY MR. RODGERS:
6   Q.  Well, it seems that from that -- from then --
7   well, even before that, but up through 2006 you were with
8   Seariver and/or Exxon; right?
9   A.  Correct.
10  Q.  Okay.  So I'm just going to -- I want to go to
11  the first page S/R Everett Barge, S/R New York, do you
12  see that?
13  A.  Yes.
14  Q.  And could you explain the articulating tug and
15  barge briefly what that is?
16  A.  It's a tug that has hydraulic pins that come
17  out from the side of the bow and the barge has a track
18  along the side and your tug, the pins fit into we called
19  it you're in the notch and it fits on to the pins and
20  that's how you stay in the notch.  There's no cables
21  anymore.  You're not attached by cables or rope and
22  that's how you steer the boat and you stay there up to 20
23  foot seas.
24  The articulating part is the bow of the tug
25  does not touch the notch.  So if you're in rough weather,



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS                              August 13, 2025
MATTER OF COEYMANS MARINE TOWING, LLC                  21–24

Page 21

1  the barge will go down, the tug will go up, you'll sort
2  of rotate and that way you don't break the equipment.
3  That's what the articulating is for.  So this is the
4  first tugboat in my life I had a seatbelt.
5      Q.  So that's different than the notch system;
6  right?
7      A.  Well, it's a notch, but it's a different kind
8  of notch.
9          MR. JETT:  You got to let him finish his
10     question.
11  BY MR. RODGERS:
12     Q.  And, again, so let's just go quickly from 2000
13  to 2004, all the work you were doing dealt with either
14  oil barges or oil tanks?
15     A.  Correct.
16     Q.  And tugs as well?
17     A.  Yes.
18     Q.  Okay.  Were you more -- well, trying to figure
19  out were you involved in supervision or management
20  through that time period 2001 to 2004 --
21     A.  I was sailing then as the third mate on ships.
22     Q.  Huh?
23     A.  I sailed as third mate because they got rid --
24  the tugboats were sold.
25     Q.  Okay.  And then -- okay.  You note '81 to 2006

Page 22

1  with the same company.  I see.  Okay.  So then that was
2  originally Exxon and then Seariver Maritime?
3      A.  Correct.
4      Q.  And 2004 to 2006 it looks like you were on
5  board a tanker?
6      A.  Yes.
7      Q.  Okay.  So is it fair to say your whole career
8  since you started with Exxon and/or Seariver Maritime was
9  dealing with oil tankers and/or oil barges?
10     A.  I'd say 95 percent, yes.
11     Q.  And then I assume you retired in 2006?
12     A.  Correct.
13     Q.  Okay.  And then 2009 to present you've been
14  doing what you're doing today; right?
15     A.  Yes.
16     Q.  All right.  So the last time you sailed on your
17  license was it as a captain or third mate?
18     A.  Third mate.
19     Q.  And when was the last time you actually sailed
20  before you retired?
21     A.  I retired September '06 so I was sailing in
22  August of '06.
23     Q.  Until 2006?
24     A.  Yes.
25     Q.  Okay.  Now throughout your career did you have

Page 23

1  any continuing education with regards to your US Coast
2  Guard license?
3      A.  We had a lot of training as far as with
4  electronics.  When I was doing tractor towing -- I mean,
5  escort towing we used to go on tractor tugs and learn
6  that because we started getting tractor tugs and all
7  sorts of firefighting, bridge resource management.  I
8  think I have it.
9      Q.  Is it listed?
10     A.  Yes.
11     Q.  Okay.  All right.  I see.  When you go to your
12  education after Schuyler on page four, are those the list
13  of training is that all related to your Coast Guard
14  license?
15     A.  Yes.  Some to maintain it, some to renew it.
16     Q.  Are there any things in that -- on that list
17  that have to do with requirements by Exxon/Seariver?
18     A.  Well, they were all their requirements as far
19  as well as the Coast Guards.
20     Q.  Okay.  Now when you said electronics that you
21  had some training, could you just describe what types of
22  electronics?
23     A.  The ECDIS, the electronic chart display and
24  information system.
25     Q.  Uh-huh.

Page 24

1      A.  Would show the chart on a screen and it was
2  coordinated with autopilot, radar, GPS, so you knew
3  exactly where you were.  AIS later on came in and it
4  showed you everything that you were looking forward at
5  and also what was coming at you or, you know, what was
6  nearby you.
7      Q.  Now did you take any specific training for
8  autopilot with regards to electronics?
9      A.  I'm trying.  I don't think I -- a specific
10  autopilot training I don't -- no, I don't recall.
11     Q.  Did you ever receive any specific training
12  since your Port Schuyler days with the use of autopilot
13  as a bridge watch standard?
14     A.  Yes.  That was part of the Bridge Resource
15  Management course.
16     Q.  Is that on this list?
17     A.  Yes.  ARPA and Bridge Resource Management.
18     Q.  Okay.  And when did you take that, if you
19  recall?
20     A.  Probably sometime in the 90s.
21     Q.  Okay.  Do you recall -- were they training you
22  on -- when you went to that, where was that course?
23     A.  San Diego.
24     Q.  And do you recall what type of autopilot they
25  trained you on, like what model or what company?



Page 25

1    A.   No, I don't recall.
2    Q.   Okay.  Now your professional credentials beyond
3  your licenses I see radar observer.  Can you just briefly
4  describe what that is?
5    A.   To get your license you have to be a radar
6  observer.  A radar observer means you know how to look at
7  a radar and you know how to plot.  If something is coming
8  at you, you know, if you have to change course or do
9  whatever, do what's necessary to avoid collision.
10        And it's a test, you take a test.  It's like a
11  one day course.  You take it at one of the nautical
12  schools.  And I usually took it down in Ft. Lauderdale.
13  I don't remember -- Professional Maritime it was called
14  and it was just so you showed your proficiency in using
15  the radar and knowing how to avoid a collision.
16    Q.   Okay.  Now at Port Schuyler did you have
17  midshipman summers like cruises?
18    A.   Yes, three.
19    Q.   I take it you were trained on Moboard, how to
20  use that?
21    A.   On what?
22    Q.   Moboard.
23    A.   What's Moboard?
24    Q.   Charting.
25    A.   Oh, yes, yes, definitely.  And autopilot with

Page 26

1  that also.
2    Q.   So on the chart, the navigation chart you
3  started with what I call Moboard, you know, with the
4  parallel?
5    A.   Yeah, parallel rulers.
6    Q.   Did that end at some time where you didn't need
7  to do that?
8    A.   Well, they don't have paper charts anymore.
9    Q.   So it's all like Satnav or --
10    A.   It's all done electronically.  Yeah, it's all
11  done electronically now.
12        MR. JETT:  You got to let him finish his
13  question.
14  BY MR. RODGERS:
15    Q.   Okay.  If we could get to page -- I don't know
16  what page it is, it's one of one, but it's actually four
17  or five pages in.  It's the cases you worked on.
18    A.   Okay, okay.
19    Q.   Do you have that?
20    A.   Yes.
21    Q.   In 2019 you worked on Daniel Pacelli versus
22  Vane Line Bunkering.  Do you see that?
23    A.   Yes.
24    Q.   Who were you retained by for that case?
25    A.   What the heck was his name?  I don't remember

Page 27

1  his name.
2    Q.   Was it a defendant?
3    A.   Yeah.  I was for Pacelli.
4    Q.   It says Bunkering.  Was it like an oil barge or
5  tug or what was it?
6    A.   Vane Line Bunker was a barge company.
7  Mr. Pacelli got hurt while loading -- after loading an
8  oil barge in Newark, New Jersey.
9    Q.   So it was a longshoreman case?
10    A.   No, he was -- he was a tanker man.
11    Q.   Oh, he was a crew member.  Okay.  So but that
12  had nothing -- is it fair to say that didn't involve a
13  tug as far as the case itself?
14    A.   No, it did not.
15    Q.   Okay.  And then if you go to 9/24/20, 2020 I
16  guess, Specialist and Other Vessel Owner Limitation
17  Actions.  Do you see that with the Tappan Zee?
18    A.   Yes.
19    Q.   I assume that dealt with the new Tappan Zee
20  Bridge?
21    A.   Yes, during the construction.
22    Q.   And was that case an injury case?
23    A.   That was a death case and injury and the vessel
24  sinking.
25    Q.   Okay.  Oh, is that when somebody fell between

Page 28

1  the vessels?
2    A.   No.  What happened was the tug was towing a
3  crane barge, a big crane barge for weeks and he got one
4  helper tug and there was a big crane working on the
5  bridge by the opening of the bridge where the channel was
6  with all sorts of marked buoys.  And the tug operator ran
7  the tug and the barge and everything into that other
8  crane.  By doing so the tugboat he was on sunk and the
9  three men aboard passed, you know, they died.
10    Q.   Yeah.  That sounds familiar.  That case.
11    A.   It was a big one.
12    Q.   And who did you -- who were you retained by,
13  which party, the tug or the barge or somebody else?
14    A.   Tappan Zee Bridge Company.
15    Q.   Oh, the bridge company.  Okay.  The Mario Cuomo
16  Bridge?
17    A.   That's what it's called now.
18    Q.   Okay.  So far; right?
19    A.   Yeah.  He'll keep his name there.  I don't
20  think his son would.
21    Q.   The next one 11/06/2020 Trollinger versus Space
22  Exploration, do you see that?
23    A.   Yes.
24    Q.   Do you recall what type of case that was?
25    A.   An injury case.  Steve Trollinger I



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
29–32

Page 29

1  represented, he was the person injured.  It was against
2  Elon Musk.  Trollinger was an engineer when he was
3  first -- when Musk was first doing the -- landing the
4  rockets on the barges.
5      Q.  Yeah.
6      A.  Well, this was out in California.  And what
7  happened was one of the rockets landed and blew up is the
8  beginning stages.  And the engineers went out on the
9  barge afterwards to check it out, see what happened, see
10  what they could do, put out fires.  And when they were
11  getting off the vessel to go on to a tugboat, Steve
12  Trollinger got caught between the tug and the barge and
13  lost his leg.
14      Q.  His leg?
15      A.  Yes.  The lower part of his leg.
16      Q.  So you did that by zoom from Melbourne?
17      A.  No.  I actually -- I'm trying to think where we
18  did that.  I think I went to California.
19      Q.  Okay.  It says via zoom meeting Melbourne.
20      A.  Oh, it does say.  Oh, okay.
21      Q.  Is that where you're from, that area?
22      A.  Yes.
23      Q.  So I guess you go out now and you can see the
24  actual launches; right?
25      A.  Oh, right out my window.

Page 30

1      Q.  Yeah.  They're pretty crazy.
2      A.  It's like twice a week.  It's unbelievable.
3      Q.  Yeah, I seen them from Sebastian.
4      A.  It's unbelievable.
5      Q.  It's amazing.  Okay.  So now the next case
6  December of 2023?
7      A.  Yes.
8      Q.  Martina Garza, that's against Great Lakes
9  Dredge & Dock?
10      A.  Yes.
11      Q.  What kind of case was that briefly?
12      A.  Great Lakes Tug & Barge had brought a barge
13  into -- had brought a tug and barge into like a shipyard
14  area.  I'm trying to think of the location.  If I'm not
15  mistaken, I think it was -- I forget the exact location.
16  But what happened was the -- to tie up the tugboat to the
17  dock there was no one on the dock to take a line for the
18  barge or the tug.  So one of the deckhands went ashore,
19  went on the equipment to look for somebody, they found
20  nobody.  Him and the captain cut off the tug to go see if
21  they could find somebody to get help and the captain fell
22  into one of these big holes that was on the barge and --
23  dredge barge and he died.
24      Q.  And who did you get retained by, what party?
25  Or was it Great Lakes?

Page 31

1      A.  No.  It was Martinez, it was the Martinez
2  family.
3      Q.  Oh, it was the plaintiff?
4      A.  Yes.
5      Q.  Okay.  And then 2024 Zachary Latiolais versus
6  Seabulk, who retained you in this case?
7      A.  Zachary Latiolais.  He was an injured
8  plaintiff.
9      Q.  Was that on a tug?
10      A.  Yes.
11      Q.  Okay.  And so these are the cases before this
12  case that you've been retained for; right?
13      A.  And I was deposed for, yes.
14      Q.  Okay.  And is it fair to say none of these have
15  to do with an allision or an alleged allision?
16      A.  No.  Well, yeah, the Tappan Zee Bridge does.
17      Q.  So the Tappan Zee, the personal injury case?
18      A.  Yes.
19      Q.  So they hit -- what did they do again?  They
20  hit the bridge?
21      A.  No.  They hit the crane that was working on the
22  bridge that was attached, you know, it was secured to the
23  outer I guess it would be the west side abutment of the
24  new bridge.
25      Q.  Okay.  Okay.  So it wasn't a bridge, it was

Page 32

1  a --
2      A.  It was basically a dredge hitting it.
3      Q.  Was it spudded down, the barge?
4      A.  It was spudded down and it was secured to other
5  barges and there was a whole conglomeration of equipment
6  there.
7      Q.  Okay.  So in your opinion that's an allision
8  because it was spudded down; right?
9      A.  Yes.
10      Q.  Okay.  So, again, the question I'll ask you a
11  different way.  Did any of these cases involve an
12  allision with a permanent structure such as a bridge or a
13  dock or a pier?
14      A.  No.
15      Q.  Okay.  All right.  You okay?  Do you need a
16  break or you okay?
17      A.  No, I'm good.
18      Q.  So it took me a while, but I guess we'll get to
19  your retention here.  Do you recall when you were
20  retained by Mr. Nanavati what specifically he asked you
21  to do?
22      A.  To report on the allision with the Belt Line
23  Bridge.
24      Q.  Did he say it was an allision or was that just
25  a term you're using for the case?



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
33—36

Page 33

1    A.  No.  I think -- I think it was presented that
2  way.  It was tug and barge hit a bridge.
3    Q.  You understand -- is it your understanding that
4  at some point the barge made contact with the bridge?
5    A.  Yes.
6    Q.  Is that your understanding?
7    A.  Yes.
8    Q.  And which bridge do you understand was struck
9  by the barge?
10    A.  The Belt Line Bridge.
11    Q.  Okay.  Did you -- did you inspect that bridge?
12    A.  No.
13    Q.  Okay.  Did you go to the area where the
14  incident happened?
15    A.  No.
16    Q.  And as far as your memory is when you did
17  transit the Elizabeth River, you don't recall whether you
18  transited the southern branch where the bridge is?
19    A.  Correct.
20    Q.  Okay.  And, again, based on your recollection
21  earlier when you looked at the materials,
22  it refreshed your recollection that you had transited
23  that area; correct?
24    A.  Correct.
25    Q.  Is it fair to say whatever part of the

Page 34

1  Elizabeth River you transited during your career, it
2  would have been on a tug pushing or pulling an oil barge?
3    A.  Yes.  I think it would have been a light
4  tugboat too going to the shipyard.
5    Q.  But with an oil barge; correct?
6    A.  I don't recall having a barge.
7    Q.  What were you doing in the Elizabeth River with
8  a tug?
9    A.  Getting it fixed at Colonna Shipyard.
10    Q.  And where was it fixed, Colonna?
11    A.  Colonna Shipyard.  I think it was the eastern
12  branch, but I don't remember.
13    Q.  Is that the only time you transited the
14  Elizabeth River to bring a tug to a yard?
15    A.  Yes.
16    Q.  Okay.  So just to state the obvious, during
17  your career you never pushed or towed a barge up or down
18  the Elizabeth River, is that fair to say?
19    A.  Not that I can recall.
20    Q.  Okay.  If you can look at page one of your
21  report.
22    A.  Okay.
23    Q.  The second paragraph it says of your report:
24  "The purpose of my investigation was to determine if the
25  action/inaction of the Captain aboard the Tug Mackenzie

Page 35

1  Rose and the owners of the tug, Coeymans Marine Towing,
2  LLC and Harbor Marine Towing, LLC, hereinafter Coeymans
3  Carver, created unreasonably dangerous conditions that
4  caused the allision with the bridge."  Do you see that?
5    A.  Yes.
6    Q.  When you say the captain, you talking about
7  Captain Miller or are you talking about Mate Morrissey?
8    A.  Mate Morrissey.
9    Q.  Okay.  And when you're talking about the
10  owners, who are you referring to?  What does that cover
11  as far as what you were doing?
12    A.  Well, it was mostly covering -- Carbon Marine
13  was in charge of the vessel at the time of the incident.
14  But Coeymans -- I think Carver -- Coeymans owned it and
15  Carver operated it.  I think that's how it works.
16    Q.  Well, even if it doesn't, I'm not asking you
17  that.  So, you know, I'm not asking whether you know that
18  or not.
19    A.  Uh-huh.
20    Q.  But the charter to you was, whether it was
21  Coeymans or Carver, is the company not some person in the
22  company, is that -- is that what you're talking about?
23    A.  Yes.
24    Q.  Okay.  Did you read the deposition of Nick
25  Laraway?

Page 36

1    A.  Yes.
2    Q.  Do you understand what his position was at the
3  time of the incident, his position at Carver?
4    A.  Yes.
5    Q.  And what was it?
6    A.  Executive -- executive manager, something to
7  that effect.  He like did operations, some kind of --
8  something to do with operations.
9    Q.  And when you say unreasonably dangerous
10  conditions that caused the allision.  Do you see that?
11    A.  Yes.
12    Q.  And is that an either/or, either caused by Mate
13  Morrissey or caused in a different way by the company?
14    A.  I'd say both.
15    Q.  Okay.  And so you weren't -- is it fair to say
16  you weren't asked to determine if the actions or
17  inactions of Captain Miller were unreasonably dangerous,
18  is that fair to say?
19    A.  Yeah.  I should have put Morrissey there, but
20  he was a captain, I guess that's why.
21    Q.  Yes, yes, you're correct.  He was licensed as a
22  captain, but acting at the time as a mate; correct?
23    A.  Correct.
24    Q.  So you were not asked to assess the conduct of
25  Captain Miller, the acting captain on the tug, is that



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
37–40

Page 37

1  fair to say?
2      A.  Yes.
3      Q.  Okay.  Before we get through your report, did
4  you determine what Mate Morrissey did in your opinion
5  that caused the incident or did not do?
6      A.  He hit a bridge.  I mean, hit the bridge on the
7  wrong side of the channel with a tug and barge.
8      Q.  Yeah, I understand that.  But did you determine
9  what he did or did not do which caused that?
10     A.  Well, from what he says he lost -- the vessel
11  went hard left while he was steering on autopilot.  When
12  he switched over, he didn't switch over properly and the
13  vessel kept going off course.  And he finally got it
14  switched over and headed straight ahead, but he didn't
15  head for the opening of the bridge.  He headed for the I
16  guess that would be the east side, south side of the
17  bridge -- west side, was that west side of the bridge
18  outside the channel, outside the center of the draw where
19  the bridge opening was.
20     Q.  Well, if you go to your page 12 under findings.
21     A.  Uh-huh.
22     Q.  And number four could you just read that into
23  the record?
24     A.  "The Officer of the Watch Captain James
25  Morrissey failed to properly disengage the autopilot and

Page 38

1  did not switch to manual steering (non-follow-up mode) in
2  a confined navigational channel, resulting in a loss of
3  directional control."
4      Q.  Okay.  Now having read your finding in the
5  report, is that what you believe Mate Morrissey failed to
6  do?
7      A.  That's what his statement says.
8      Q.  Okay.  And you agree it doesn't say anything
9  about the rudder going hard over; correct?
10     A.  No, not -- yeah.  In the beginning it did on
11  the first report and then afterwards it was like it
12  didn't say he went hard left.
13     Q.  Afterwards he changed his mind, didn't he?
14     A.  Yes.
15     Q.  He actually changed -- I shouldn't say his
16  mind, he changed his story; correct?
17     A.  Correct.
18     Q.  And his story, would you agree, is at least let
19  me get to the page again, sorry, if you go to four again,
20  paragraph four, excuse me, paragraph four, page 12, would
21  you agree that your -- one of your findings is consistent
22  with his later story; correct?
23     A.  Yes.
24     Q.  Are you familiar with the two steps for that
25  system necessary to engage and disengage the autopilot?

Page 39

1      A.  Yes.
2      Q.  And what are the two steps?
3      A.  It's on, you switch over to non-follow-up and
4  you have non-follow-up and you start steering with the
5  stick, the joystick.
6      Q.  And so based on your review of the documents
7  and the evidence that we're giving to you that are a part
8  of this lawsuit -- strike that.  Let me rephrase that.
9      Are you familiar with that two step process as
10  a tugboat captain?
11     A.  Switching from autopilot to hand steering?
12     Q.  Yeah.
13     A.  Yeah, very familiar.
14     Q.  And in the systems you've used is it similar
15  the same where you first press a button for standby and
16  then you turn the switch to the NFU new mode?
17     A.  No.  When I had automatic pilot, it was just a
18  switch.
19     Q.  Okay.  But you understood this system just
20  based on what you reviewed?
21     A.  Yes.  And looking at the manual.
22     Q.  Was you press the standby button; right?
23     A.  Yes.
24     Q.  And then you turn the switch; correct?
25     A.  Correct.

Page 40

1      Q.  And your review of documents and his later
2  statement concluded that either he didn't do both, press
3  the button or turn the switch or he pressed the button
4  and didn't turn the switch; right?  One of those?
5      A.  Yeah.  He did something wrong.
6      Q.  Okay.  And so based on the later statement when
7  he finally fessed up I guess is the term he didn't -- the
8  rudder didn't go hard over as far as your review, right,
9  when you reviewed all the documents; is that fair to say?
10     A.  Yes.
11         MR. JETT:  Object to the form.
12  BY MR. RODGERS:
13     Q.  And did you also review the Rose Point data,
14  you know, the computer track?
15     A.  Yes.
16     Q.  And would you agree that it does not on its
17  face show the track going hard left at all, it shows a
18  gradual movement to the left; correct?
19     A.  Correct.
20     Q.  So if as a tug captain and as an expert
21  reviewing that, would you agree supports his later story
22  as opposed to his first story which was the rudder went
23  hard left?
24     A.  Yes.
25     Q.  Okay.  And is that -- have you ever dealt with



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
41–44

Page 41

1  the Rose Point system or that type of tracking system?
2      A.  No.
3      Q.  Not at all?  Like not in a different form, a
4  different company, something?
5      A.  No.  I've been on vessels where I've seen it
6  work and operate, but I -- my career ended before it came
7  into existence.
8      Q.  Your what?
9      A.  It didn't -- it wasn't there when I was working
10  on the vessels.
11      Q.  Okay.  Was there some other type of system that
12  tugs used that reported the course and speed so it could
13  be looked at later?
14      A.  Yeah.  We had the automatic chart.
15      Q.  Okay.
16      A.  For navigation and it was attached to your GPS
17  and radar.  That's what we had and it did keep a record.
18      Q.  So in your opinion the Rose Point data that you
19  saw on that system, is that more or less a newer version
20  of the system you used?
21      A.  Yes.
22      Q.  In your review of the documents did you find
23  any evidence that Captain Miller was on the bridge at the
24  time of the incident?
25      A.  No.

Page 42

1      Q.  And, in fact, he was down below; correct?
2      A.  Sleeping in his bunk.
3      Q.  And would you agree that based on at least the
4  initial statements of all the crew members that there
5  were no other witnesses to the incident other than James
6  Morrissey?
7      A.  I would.
8      Q.  When I say the incident, I mean, leading up to
9  the barge striking the bridge and then backing down back
10  into the channel.  Would you agree at that period of time
11  there were no other witnesses other than James Morrissey?
12      A.  Well, I think the captain came up after they
13  hit the bridge and he might have been there when he
14  backed out and cleared up.
15      Q.  You're not sure?
16      A.  No.
17      Q.  Okay.  But if we went -- we could just go back
18  to his statement and see; right?
19      A.  Correct.
20      Q.  And you agree though at the time leading up to
21  the incident and then the incident itself, the striking
22  of the barge hitting the bridge, the only witness was
23  James Morrissey?
24      A.  Yes.
25      Q.  If you go to your paragraph 13 of your report,

Page 43

1  the last page, the findings.
2      A.  Yep.
3      Q.  After you received all the documents, including
4  the information showing that Mr. Morrissey's first
5  statement to the captain was not true and also your
6  other -- well, it's not a good question.
7          You first indicate -- it was first indicated
8  that based on his initial statement the rudder had -- the
9  autopilot had failed and the rudder had gone hard over;
10  right?
11      A.  Correct.
12      Q.  After reviewing the later documentation, which
13  would include the Rose Point and the later statements by
14  Mr. Morrissey, you would agree as you sit here today that
15  the autopilot did not fail; correct?
16          MR. JETT:  Object to the form.
17  BY MR. RODGERS:
18      Q.  At that time, at that time.
19          MR. JETT:  Same objection.
20      A.  I can't say because I don't know how he
21  switched over or what he did.
22  BY MR. RODGERS:
23      Q.  Okay.  Well, it didn't fail --
24      A.  I don't know --
25      Q.  Okay.  Go ahead.

Page 44

1      A.  I can't say he didn't because, you know, I
2  don't know what -- I don't really know what happened
3  there.
4      Q.  Okay.
5      A.  Nothing is clear.
6      Q.  But you can agree with me that the vessel
7  didn't go hard over; right?
8      A.  Yes.
9      Q.  So you can agree with me that the portion of
10  whatever first statement he made where the autopilot
11  failed and the vessel went hard over is not true;
12  correct?
13          MR. JETT:  Objection.
14      A.  That it went hard over, no.  The autopilot did
15  something because when he changed over to the hand, to
16  the NFU, he continued on the course he was on and for
17  some reason hit the bridge.
18  BY MR. RODGERS:
19      Q.  So --
20      A.  Don't know whether he was on autopilot or hand
21  pilot at that time.
22      Q.  Well --
23      A.  He was trying to switch it over.
24      Q.  Well, your paragraph four says that he failed
25  to disengage the autopilot.



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
45–48

Page 45

1    A.  Well, that's what he first -- what he says.
2    Q.  It didn't -- it doesn't say the autopilot that
3  he properly disengaged it; correct?  It doesn't say --
4  your conclusion is not that he properly disengaged it but
5  the autopilot just didn't work.  Your statement is:  "The
6  Officer of the Watch Captain James Morrissey failed to
7  properly disengage the autopilot and did not switch to
8  manual steering (non-follow-up mode)."  Do you see that?
9    A.  Yes.
10   Q.  That's your finding on that issue; correct?
11   A.  And I agree with it.
12   Q.  Okay.  And it's not that he switched over
13  properly, he did all the steps, but the autopilot didn't
14  work, that was not your finding; correct?
15      MR. JETT:  Objection, form.
16   A.  Say that again.
17  BY MR. RODGERS:
18   Q.  No.  Withdraw that.  I'll just stay with the
19  last answer, Captain Lewis.
20   A.  Okay.
21   Q.  The other part of the section four is you say
22  in a confined navigational channel.  Do you see that?
23   A.  Yes.
24   Q.  Can you -- can you explain to all of us what
25  you believe a confined navigational channel is?

Page 46

1    A.  Whenever you're in a river, bridges, going
2  through bridges, that to me is a confined channel
3  irregardless of the width.
4    Q.  In other words, you're not out at sea; correct?
5    A.  You're not at sea, but you're in a river
6  transiting a river.
7    Q.  Okay.  Do you know the difference between
8  confined navigational channel and restricted waters, if
9  any?
10   A.  Yeah.  Restricted waters or confined space --
11  actually it's pretty much the same.  Restricted waters --
12   Q.  I mean, you're an expert, I need an answer.
13  Are they different or are they the same?
14   A.  Ask the question again.
15   Q.  I'm not too much younger than you so my memory
16  is not too great.  So I'm going ask the reporter to read
17  it.
18   A.  That's fine.
19      (The question was read back.)
20   A.  I would say basically they're both -- a
21  confined navigation channel and a restricted channel are
22  pretty much the same.  Restricted might be limiting what
23  kind of vessel you are or other kinds of differences.
24  But a restricted channel says say you're a Navy vessel or
25  stuff, you can't go there.  Confined navigational channel

Page 47

1  to me is rivers, channels coming in and out of port.  I
2  think a restricted channel is probably determined by the
3  Coast Guard or military service or somebody.
4  BY MR. RODGERS:
5    Q.  Okay.  So, well, for instance, if you're in --
6  if you're in a channel coming into a port and you're a
7  large oil tanker, there's not a lot of room to maneuver;
8  correct?
9    A.  Yes.
10   Q.  That's restricted; right?
11   A.  Yeah.  Restricted in your ability to maneuver.
12   Q.  But if you're on a small yacht in the same
13  channel, you're not in restricted waters regarding your
14  vessel; correct?  Because you have -- you can maneuver;
15  correct?
16   A.  Correct.
17   Q.  Okay.  And the same with this river, I
18  understand this river is near either a naval shipyard or
19  a naval base; is that correct?
20   A.  Yes.
21   Q.  And if you look at the bridge, the railroad
22  bridge, I think it's 142 feet high when it's -- when it's
23  open or lifted?
24   A.  Yes.
25   Q.  And what was it -- would you agree I mean just

Page 48

1  from your review is that about what it's at?
2    A.  Yes.  And it's 300 foot wide.
3    Q.  That's pretty large; right?
4       MR. JETT:  Objection.
5    A.  Yeah, it's large.
6  BY MR. RODGERS:
7    Q.  And perhaps, you have to ask the railroad, but
8  it's that kind of room is from time to time they have to
9  bring naval vessels through that waterway; correct?
10   A.  Correct.
11   Q.  And you would agree that let's say -- you would
12  agree that the size of a tug and the barge, these size of
13  the Mackenzie Rose and the barge is no where near the
14  size of say an aircraft carrier; correct?
15   A.  No.
16   Q.  Or a heavy cruiser?
17   A.  Correct.
18   Q.  Or an oil tanker?
19   A.  Correct.
20   Q.  So would you agree that the Mackenzie Rose and
21  the barge on the Elizabeth River where it was at, where
22  that bridge is and the river leading up to that bridge,
23  that's not what you would call restricted waters for that
24  particular vessel, would you agree with that?
25   A.  Maybe not restricted, but it's still a confined



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
49–52

Page 49

1 channel. And it's still a channel that if he had lost
2 steering, had lost his motor -- his power, he could have
3 wound up sideways and had a 1.9 knot ebb current, he
4 could have just went sliding and he could have went. Was
5 it going to go through the bridge sideways for 300 feet
6 and he was 300 feet long?
7    Q. You're speculating; right? That doesn't
8 happen.
9    A. No, it didn't happen, but it could be. So when
10 you're steering, when you're going through a navigational
11 channel and stuff like this, I always look at worse
12 scenario. If everything works perfectly, sure you would
13 go through it. But if something goes wrong, I want to
14 have the ability to maneuver to be able to save myself,
15 you know.
16    Q. And if you were on a tug pushing an oil barge,
17 you wouldn't have been in autopilot because it was
18 against the law; correct?
19    A. Correct.
20    Q. But it's not against the law for other vessels;
21 correct?
22    A. It's the minimum. You know, I mean, they don't
23 have to be --
24    Q. It's not against --
25    A. No, it's not against the law, no.

Page 50

1    Q. It's not against the law; correct?
2    A. Correct.
3    Q. To use autopilot for a vessel that is not
4 carrying oil or hazardous material; correct?
5    A. Correct. But in my opinion it's not safe.
6 It's not a safe way -- not safe seamanship for operating
7 a vessel on autopilot when you're in a river.
8    Q. Fair enough. But you never actually navigated
9 this vessel with a tug -- I'm sorry, this river with a
10 tug and a barge; right?
11    A. Not that I recall.
12    Q. Now you mentioned training in your report,
13 correct, the crew training?
14    A. Yes.
15    Q. Now I believe you said there was no training,
16 is that fair to say, or should I look it up in your
17 report?
18    A. There was no company training.
19    Q. Okay. Would you agree there was -- well,
20 strike. You agree there was on-the-job training by the
21 captain and/or the mate with regards to the crew members;
22 correct?
23    A. Yes, minimal.
24    Q. What does that mean?
25    A. I mean, to me --

Page 51

1    Q. In your opinion?
2    A. Yeah, my opinion. I mean, they did the
3 emergency drills and stuff like that, but there's a lot
4 more things that can go wrong that I was trained ashore
5 at conferences and stuff about all sorts of different
6 operational equipment abilities, navigation priorities.
7       And we were always -- I was as far as steering
8 with automatic pilot in my career and working with an oil
9 barge and stuff, we would never be on automatic pilot in
10 a situation like this.
11    Q. Agree. But you already testified that's
12 because it's not lawful with an oil barge; correct?
13    A. Right.
14       MR. JETT: Objection.
15    A. But if I was on any other piece of equipment,
16 that's my habit. That's what my industry does. We
17 always run hand steering going in any kind of river or
18 channel, going up the Hudson River, going up the
19 Mississippi, you know. Hand steering was -- it was like
20 the safest way to do it.
21 BY MR. RODGERS:
22    Q. Well, it was also --
23    A. To me you couldn't trust an automatic pilot
24 when you had a lot of maneuverability to do.
25    Q. Yes. But the work you did it was actually the

Page 52

1 only legal way you could do it; correct?
2    A. Correct.
3       MR. JETT: Objection.
4 BY MR. RODGERS:
5    Q. Under the CFR? You could not use autopilot
6 pushing or towing an oil barge; correct?
7       MR. JETT: Objection.
8    A. Correct.
9 BY MR. RODGERS:
10    Q. In inland waters; right?
11    A. In inland, yes.
12    Q. You could do it out at sea, right, out in the
13 ocean?
14    A. Yes.
15    Q. Okay. So your opinion what is -- your opinion
16 is even though this is not an oil barge you're pushing
17 or pulling an oil barge, it's your opinion that Mate
18 Morrissey should not have been using autopilot?
19       MR. JETT: Objection.
20    A. Yes.
21 BY MR. RODGERS:
22    Q. Okay. That's your opinion though; correct?
23    A. My opinion and to me it was standard operating
24 procedure in the industry.
25    Q. Yes. But your opinion is not based on any



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
53–56

Page 53

1 experience going up and down a river pushing or towing a
2 non oil barge; is that fair to say?
3       MR. JETT:  Objection.
4    A.  No.  I pushed a barge up the Cook's Inlet to
5 Anchorage and it was --
6 BY MR. RODGERS:
7    Q.  To where?
8    A.  To Anchorage, Alaska.  It was a rock salt barge
9 called --
10    Q.  A what?
11    A.  A rock salt barge.  I was delivering rock salt
12 to Anchorage.
13    Q.  And what river was that?
14    A.  Cook's Inlet.
15    Q.  And where is that?
16    A.  Alaska.
17    Q.  Is that the only time you pushed a non oil
18 barge in your what is it 25 years of being on tugs; is
19 that about right?
20    A.  I moved some scows and stuff like that, but
21 short distances.  But yeah.  I mean, to me inside a
22 harbor and stuff I would never be on autopilot, it just
23 was my practice.  It was company policy too.
24    Q.  Well, you worked for an oil company; correct?
25    A.  Yes.

Page 54

1    Q.  So that would be their policy; correct?  If
2 most, if not all, of their barges carried oil or
3 hazardous materials, that would be their policy; correct?
4    A.  Yes.
5    Q.  And it's fair to say that's the policy that you
6 lived because it was the law does not relate
7 necessarily to the rest of the industry, would you agree
8 with that?
9       MR. JETT:  Objection.
10    A.  Yeah.  I guess.  But to me the -- I just don't
11 see why anybody, I don't care what you're pushing, what
12 you're on would be on automatic pilot in a small confined
13 area.  And to me that channel was a confined area.
14       I would want to have the ability to get out of
15 the way as soon as I can, especially if you lose
16 steering.  You want your ability to maneuver and stuff
17 like that and to me autopilot doesn't allow for that.
18 BY MR. RODGERS:
19    Q.  When you -- okay.  Fair enough.  When you used
20 it out at sea, did you -- when you put it on autopilot,
21 did you ever leave the bridge unattended?
22    A.  No.  No.  We have -- that's why you have a
23 second person on watch if you have to go to the bathroom,
24 he comes up and watches it and you go down below.
25    Q.  Is the second person on either an oil tanker or

Page 55

1 on a tug pushing or pulling an oil barge, is that
2 required by law for two people to be on a bridge?
3    A.  Well, we -- depending on where we were, we
4 always had two people up on the bridge in the confined
5 areas underway in rivers and stuff like that.  We always
6 had him as a lookout.
7    Q.  And that was pushing or pulling oil barges;
8 correct?
9    A.  Correct.
10    Q.  And that was when you were lawfully not
11 permitted to use automatic pilot; correct?
12    A.  Correct.  Also out at sea we would -- he
13 wouldn't have to be in the wheelhouse as a lookout
14 because we're in the ocean.  But, I mean, I would have --
15 he'd be on -- he'd be on standby.  He'd be on my watch.
16 He'd be --
17    Q.  Now is there a different lookout rule that you
18 know of that applies to oil -- excuse me, strike that,
19 reporter, sorry.
20       With regards to tugs pushing or towing an oil
21 barge, to your knowledge is there a separate regulation
22 or law regarding lookouts?
23    A.  No.  But the rule five lookout rule is just a
24 minimum.  I mean, we've always had a lookout, you know.
25 It was irregardless whether it was an oil barge or a scow

Page 56

1 or whatever, I would always have a lookout at hand in the
2 wheelhouse with me, if possible, underway in a river, in
3 a river transit, daylight or nighttime.
4    Q.  With an oil barge; correct?  Where you could
5 not use automatic pilot; correct?
6       MR. JETT:  Object to the form.
7    A.  Right.
8 BY MR. RODGERS:
9    Q.  Do you know of any -- strike that.  Was there a
10 policy at Exxon in inland waters that you have an
11 additional lookout?
12    A.  It's not an additional lookout.  He's a
13 person -- he's my AB on watch.
14    Q.  But that was an Exxon requirement?  Was that a
15 policy?
16    A.  I don't know if was in writing, but it was my
17 policy.
18    Q.  But do you know what the company generally did?
19 Did you talk to other captains?
20    A.  I mean, I know what we all did.  And I know
21 most of the guys I knew that did it and my mates.  We all
22 had lookouts in inland waters going up and down rivers.
23    Q.  Where was the lookout?
24    A.  He was usually on the bridge with me.  Or in
25 certain areas like the Mississippi or whatever he would



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
57—60

Page 57

1  be up on the bow of the barge in case of an emergency
2  he'd be able to drop the anchor.
3      Q.  And when you were -- was that something ordered
4  by the captain or was that something that the mate on
5  watch decided to do?
6      A.  I don't understand the question.
7      Q.  Well, you've been captain of a tug; correct?
8      A.  Yes.
9      Q.  Did you usually have another officer called a
10  mate who would stand bridge watch?
11      A.  Yes.
12      Q.  Okay.  So if you were -- if you were the mate
13  not the captain, if you were the mate standing bridge
14  watch on a tugboat pushing or pulling an oil barge, was
15  it your decision to use that AB as a lookout or was it
16  the captain of the tug's decision?
17      A.  It would have been my decision as mate also.
18      Q.  I'm asking when you were mate, could you make
19  that decision without going to ask the captain?
20      A.  Well, it was standing operating procedure for
21  us.
22      Q.  It was standard operating procedure at Exxon to
23  have the AB on watch with the officer; correct?
24      A.  In a river, yes, in close quarters situation.
25      Q.  Okay.  And that was an Exxon rule; correct?

Page 58

1      MR. JETT:  Objection.
2      A.  Exxon.  I worked with Sunoco and I worked for
3  Ameritrans, I did it with all three.
4  BY MR. RODGERS:
5      Q.  Did they all deal with oil barges?
6      A.  Yes.
7      MR. RODGERS:  I think it's a good time to take
8  a break.  I don't know who is with you, Zach?
9      MR. JETT:  Yeah.  Now is a good time, Jim,
10  thank you.
11      MR. RODGERS:  Ten minutes, 15, whatever you
12  want, Zach.
13      MR. JETT:  Let's do 15 minutes.
14      (A break was taken.)
15  BY MR. RODGERS:
16      Q.  So if we could -- I want to ask you about this
17  Coast Guard 2692.  Are you familiar with that form?
18      A.  Yes.
19      Q.  And did you look at any 2692s in relation to
20  this case?
21      A.  Yes, the two of them.
22      Q.  Okay.  And the first one was -- okay.  Well,
23  let's go to the second one.
24      MR. RODGERS:  Rachel, can you direct, no rush,
25  can you direct the reporter or whoever to put that

Page 59

1  up I guess.
2      MS. WERNER:  So e-mailed the exhibits to the
3  court reporter.
4      MR. RODGERS:  So let me look at the number.
5  There's a number of previous exhibits I think.
6      MR. JETT:  Let's go off the record real quick
7  and make sure we can pull up the exhibits.
8      (A discussion was held off the record.)
9  BY MR. RODGERS:
10      Q.  So a couple of preliminary questions.  Captain,
11  did you look at both of the 2692s?
12      A.  Yes.
13      Q.  Without putting it up, was it your
14  understanding that the first 2692 filed by the company
15  was based on Mr. Morrissey's earlier statements that
16  turned out not to be true; is that fair to say?
17      A.  And signed by what's his name, Lenny.
18      Q.  Oh, Lenny.  Lenny Baldassare?
19      A.  Right.
20      Q.  The port captain?
21      A.  Yes.
22      Q.  And are you familiar with the form 2692?
23      A.  Yes, sir.
24      Q.  And is it your understanding it's generally
25  against the law to file a false 2692?

Page 60

1      A.  Yes.
2      Q.  Intentionally; right?
3      A.  Right.
4      Q.  And do you understand that the one that we have
5  here that's dated I believe it's June 25, 2024, do you
6  see that?  The second page I guess.
7      A.  Yes, on the bottom, yes.
8      Q.  Okay.  Would you agree that if the company
9  finds out that for whatever reason the initial 2692 was
10  incorrect and they file an amended 2692 or a new one,
11  that they're not going to -- they're not going to file a
12  false amended 2692, is that your understanding?  Would
13  you agree with that just common sense?
14      MR. JETT:  Objection.
15      A.  Yes.
16  BY MR. RODGERS:
17      Q.  Okay.
18      A.  I would hope.
19      Q.  One would.  So I just want to -- did you --
20  sorry, reporter, I'm going to rephrase.  Yvette, right?
21      THE COURT REPORTER:  Yes.
22      MR. RODGERS:  Yes, sorry.  I mumble a little
23  bit.
24  BY MR. RODGERS:
25      Q.  Did you read this as part of your review, this



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
61–64

Page 61

1   June 25th amended 2692?  If it's okay, I'll call it
2   amended.  Is that okay?
3       A.  Fine, yes.  I've read it.
4       Q.  Okay.  Did you read that before you made your
5   final conclusions?
6       A.  Yes.  It was part of the original data I
7   received.
8       Q.  Did you understand that it was based at least
9   in part on Mr. Morrissey's either statement or testimony
10  before the Coast Guard?
11      A.  When I first read it, no.  But now I do.
12      Q.  So you would agree that this was -- strike
13  that.  It's your understanding that this 2692 is based at
14  least in part on Mate Morrissey's statement or testimony
15  to the US Coast Guard; correct?
16          MR. JETT:  Objection.
17      A.  Yes.
18  BY MR. RODGERS:
19      Q.  Okay.  Can you just read the first, and it's
20  page two, the first typed paragraph called 25A?  Do you
21  mind reading that into the record?
22      A.  You want me to read it?
23      Q.  Yeah.  I just want you to read.  You want me to
24  read it?  I'll read it, but I would prefer you.
25      A.  No, I'll read.  No, I still remember how to

Page 62

1   read.  "The towing vessel Mackenzie Rose was pushing the
2   deck barge Weeks 281 ahead in push gear.  They were
3   outbound the Norfolk Southern Branch for sea.  The
4   officer on watch, James Morrissey, was in autopilot and
5   didn't switch over to non-follow-up hand steering but
6   thought he did.  The vessel continued to track to port
7   and before the officer of the watch was able to correct
8   it after switching to non-follow-up, the bow of the barge
9   made contact with the western section of the bridge."
10      Q.  Thank you.  Now based on that statement it
11  appears that he did switch eventually before the barge
12  hit the bridge; correct?
13      A.  Yes.
14      Q.  Okay.  But not in time to prevent it from
15  hitting the bridge; correct?
16          MR. JETT:  Objection.
17      A.  Correct.
18  BY MR. RODGERS:
19      Q.  Okay.  If you can read 26B which is under --
20  the first thing you just read was called -- was 25A
21  activity or operation being conducted at the time of the
22  casualty.  Do you see that on the form?
23      A.  Yes.
24      Q.  Okay.  25B is the description of the casualty
25  and then in parenthesis, and I'm reading the form itself

Page 63

1   not what was typed, casualty events and the conditions
2   and actions that were believed to be causal factors as
3   well as any hazards created as a result of the casualty.
4   Attach additional sheets as necessary.  Do you see that?
5       A.  Yes.
6       Q.  And then the typed written portion would be
7   what Carver typed in; correct?
8       A.  Yes.
9       Q.  And it appears that the signature line is Brian
10  Moore general manager; correct?
11      A.  Yes.
12      Q.  Okay.  Could you read what 25B says?
13      A.  Okay.  The officer --
14      Q.  I appreciate it.
15      A.  "The officer of the watch had failed to
16  properly switch to hand steering and also gave minimal
17  engine orders at first in order to prevent further
18  headway or course change.  The officer of the watch
19  stated that once he did switch to hand steering, he gave
20  a slower stern at first and then fuller stern.  Once
21  contact was made with the bridge structure, the vessel
22  was barely making headway and began to make a sternway.
23  The officer of the watch was backing into the main
24  channel and regained control of the vessel."
25      Q.  Okay.  Is that another paragraph or one of the

Page 64

1   paragraphs you relied on in ultimately forming your
2   findings?
3       A.  No.
4       Q.  Okay.  And why not?
5       A.  Because it's not fact.
6       Q.  Okay.  So what are you saying is not correct in
7   this paragraph?
8       A.  In reviewing the video, the tug doesn't back
9   down until he hits the bridge.  He's doing like 5.2
10  knots.
11      Q.  Okay.  So you disagree with the portion that
12  this form says that he went to slower stern; correct?
13      A.  Correct.  And then fuller stern.  He didn't go
14  to fuller stern until after he hit the bridge.
15      Q.  Okay.  And the first paragraph, you see that?
16      A.  Yes.
17      Q.  25A.  We'll get back to 25B.  25A, do you see
18  that?
19      A.  Yes.
20      Q.  Is that consistent, that paragraph, just that
21  one consistent with your finding?
22      A.  No.
23      Q.  What part is not -- that you don't agree with?
24      A.  He continued -- the vessel continued to track
25  to port and before he was able to correct it, after



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
65–68

Page 65

1 switching to non-follow-up, the bow of the barge made
2 contact with the western section of the bridge.
3    Q.  Okay.  So what is in that sentence that you
4 don't agree with?
5    A.  He should have been changing course about a
6 quarter of a mile before.  Once he saw he was outside the
7 opening of the bridge, he continued straight ahead at
8 five knots with no opening.  If he was there looking at
9 it, there's no way in hell he would have kept going at
10 five knots.
11    Q.  Well, I'm not asking you what he should have
12 done.  I'm asking you is based on that paragraph and
13 based on what you know from the Rose Point data, is that
14 consistent with what you saw in the evidence, not what he
15 should have done but what happened?
16       MR. JETT:  Objection.
17    A.  No.
18 BY MR. RODGERS:
19    Q.  Okay.  You agreed in your number four finding
20 that he failed to switch over to the NFU; correct?
21    A.  Correct.
22    Q.  Okay.  And that portion you agree with;
23 correct?
24    A.  Yes.
25    Q.  And then the portion where he says he didn't

Page 66

1 switch over to non-follow-up steering but thought he did,
2 do you agree with that?
3    A.  It's written there.  Not necessarily agree.
4    Q.  Does that make sense that he wouldn't be able
5 to hand steer if it was still on automatic pilot?
6    A.  Right.  But automatic pilot he could have
7 turned to the right also if he had been steering all the
8 way up the river.
9    Q.  All right.  Would you agree that if he doesn't
10 turn off autopilot, that he cannot --
11    A.  Change course.
12    Q.  He cannot change course by hand steering; is
13 that correct?
14    A.  Correct.
15    Q.  Okay.  So you agree that that's initially what
16 happened, he thought he turned it off, he didn't and then
17 he couldn't steer, and then he realized he can't steer
18 and then he turns it off, and then before he can avoid
19 the contact with the bridge, the barge hits the bridge?
20 Do you agree with that?
21       MR. JETT:  Object to the form.
22    A.  Yes.
23 BY MR. RODGERS:
24    Q.  Okay.  I just want us to be on the same page
25 with what we agree on and what we don't.  So that's the

Page 67

1 purpose of this drill.  Okay?
2    A.  Okay.
3    Q.  You're now if you go back to 25B, the second
4 paragraph, the OOW had failed to properly switch to hand
5 steering.  Do you see that?
6    A.  Yes.
7    Q.  You agree with that; correct?
8    A.  Yes.
9    Q.  And that's in your paragraph four of your
10 findings; correct?
11    A.  Yes.
12    Q.  Now did you see the video?
13    A.  Yes.
14    Q.  And is -- and the video shows the barge with
15 the tug pushing it coming into contact with the bridge;
16 correct?
17    A.  Correct.
18    Q.  And then it backs down and then you see the
19 black smoke; correct?
20    A.  Yes, after it hits the bridge.
21    Q.  Okay.  Are you going to see black smoke if
22 you're just transiting anywhere and you -- in your
23 opinion and you do a slower stern, is that going to show
24 black smoke in your experience?
25    A.  From going ahead, yes.  Going from a head to a

Page 68

1 stern, usually, yes.
2    Q.  Usually.  What does usually mean?
3    A.  I mean, most of the times.  Anytime I go with
4 stern and I've been moving ahead, I get black smoke.
5    Q.  I don't mean full stern, I mean slower stern.
6    A.  No.  You'll get some smoke and then once you
7 give it the juice, she'll go black, black.
8    Q.  She'll go black once you get fuller stern;
9 correct?
10    A.  Correct.
11    Q.  But not necessarily if you just go slower
12 stern; correct?
13       MR. JETT:  Objection.
14    A.  Correct.
15 BY MR. RODGERS:
16    Q.  Okay.  So when you looked at the video, which I
17 hope we don't have to show and go through it, you see the
18 vessel on the barge moving along and you don't see
19 certainly any black smoke prior to hitting the bridge;
20 correct?
21    A.  Correct.
22    Q.  Okay.  But you can't as you sit here today say
23 that he, during that time before he hit the bridge, he
24 had not gone slower stern; correct?
25       MR. JETT:  Objection to the form.



CAPTAIN NICHOLAS J. LEWIS                                    August 13, 2025
MATTER OF COEYMANS MARINE TOWING, LLC                       69–72

Page 69

1    A.  No.  In my opinion -- in my opinion looking at
2  that video he never slowed down.
3  BY MR. RODGERS:
4    Q.  Okay.  But you would agree that that is just,
5  what, the last hundred yards, 200 yards before he hit the
6  bridge, comes into the view of the camera, would you
7  agree with that?
8    A.  Yes.
9    Q.  Okay.  And can you -- how can you tell what the
10  speed is looking at that video?  Do you want us to pull
11  it up?  I don't know if we have it but.
12    A.  The speed was the same as it was in the
13  beginning when we first started seeing it.  And then when
14  he said he lost steering, at that point you're heading
15  for -- you're not even heading for the opening of the
16  bridge.  How do you not slow down?
17    Q.  I'm just asking you your not slowing down
18  opinion is just what you saw on the video; correct?
19    A.  Correct.
20    Q.  The moments before the video or even 30 seconds
21  before the video you can't tell us as you sit here today
22  what speed he was doing and whether or not he slowed
23  down; right?
24       MR. JETT:  Objection.
25

Page 70

1  BY MR. RODGERS:
2    Q.  Because it's not on the video, would you agree
3  with that?
4    A.  I can't do it from the video, but I can do it
5  from the Rose Point.
6    Q.  Okay.
7    A.  The Rose Point shows the speed that he's going.
8  And Rose Point stops, it doesn't really show like he's
9  hitting the bridge, but all of a sudden he's slowing down
10  quickly which coincides with him going fuller stern but
11  he'd already hit the bridge.
12  BY MR. RODGERS:
13    Q.  So is it your opinion, and correct me if I'm
14  wrong, is it your opinion that he failed to properly
15  switch off the autopilot and then properly engaged --
16  disengaged it, went to hand steering, but that was too
17  late to either maneuver the vessel away from the bridge
18  or to slow the vessel down; is that pretty much your
19  opinion?
20       MR. JETT:  Object to the form.
21  BY MR. RODGERS:
22    Q.  Or conclusion I should say.
23    A.  Well, he definitely didn't have time -- he
24  definitely did not slow down before he hit the bridge.
25

Page 71

1    Q.  In your opinion?
2    A.  That's my opinion.
3    Q.  But you agree that based on everything you saw,
4  including this 2692, that he failed to switch from
5  autopilot to hand steering; correct?
6    A.  Okay.  According -- yeah, according to the
7  document.
8    Q.  That's also your finding in paragraph four?
9    A.  Yes.
10    Q.  Okay.  We don't have a disagreement on that;
11  correct?
12    A.  No.
13    Q.  Okay.
14    A.  But that has nothing to do with his speed.
15    Q.  No, I know.  I know.  I'm just trying to find
16  what part of this that you agree with and what you don't.
17  Okay?
18    A.  Okay.
19    Q.  And was that series of decisions and events was
20  that by Mate Morrissey?
21    A.  Well, he was the one in the wheelhouse.
22    Q.  So he was the one -- the licensed captain in
23  the Coast Guard; correct?
24    A.  Yes.
25    Q.  And he was the one navigating the tug and the

Page 72

1  barge; correct?
2    A.  Correct.
3    Q.  And he was making all the decisions at the time
4  on maneuvering the tug and barge; is that correct?
5       MR. JETT:  Object to the form.
6    A.  Apparently.  He was in the wheelhouse.
7  BY MR. RODGERS:
8    Q.  And is that what you would expect from a US
9  Coast Guard licensed captain?
10       MR. JETT:  Objection.
11    A.  A confident one, yes.
12  BY MR. RODGERS:
13    Q.  To be able to do that; correct?
14    A.  He should be able to.
15       MR. RODGERS:  All right.  I'm sorry, reporter,
16  I talked over the witness.  Did you get all of that?
17       THE COURT REPORTER:  I think so.
18  BY MR. RODGERS:
19    Q.  And as far as you know based on what you've
20  seen on the day of the incident Mate Morrissey was a
21  licensed captain; correct?  By the Coast Guard, he was
22  licensed?
23    A.  Yes.
24    Q.  And he had no -- as far as you know his license
25  had not been suspended; correct?



CAPTAIN NICHOLAS J. LEWIS                                                    August 13, 2025
MATTER OF COEYMANS MARINE TOWING, LLC                                        73–76

Page 73

1    A.  Correct.
2    Q.  Okay.  So the licensed captain is also a
3  licensed mate; correct?  He was acting as a mate;
4  correct?
5    A.  Yes.
6    Q.  Fully licensed by the Coast Guard; correct?
7    A.  Correct.
8    Q.  And would you agree that he made the mistake?
9      MR. JETT:  Object to the form.  You can answer,
10    if you know.
11    A.  Made the mistake of?
12  BY MR. RODGERS:
13    Q.  You think there were mistakes made by Mate
14  Morrissey?
15      MR. JETT:  Objection.
16    A.  Yes.
17  BY MR. RODGERS:
18    Q.  Okay.  They weren't made on the bridge by
19  Captain Miller; correct?
20    A.  Correct.
21    Q.  All right.
22      MR. RODGERS:  So let's -- thank you.  Sorry,
23    reporter, if it got a little bit hairy, but we'll
24    see what happens.
25

Page 74

1  BY MR. RODGERS:
2    Q.  Let's go back to your report.  Thanks, Rachel.
3  I don't know how we get rid of that thing if we even have
4  to.  All right.  Let's go to your report.  I'm a little
5  curious on a number of things, but this one I just want
6  to ask you about.  On page -- I don't know what page it
7  is, but let's go to three.  Okay.  Four.  The top of
8  four.  You see where you say he negligently and
9  recklessly deviated, do you see that?
10    A.  Yes.
11    Q.  Were you asked to opine on that?  I mean, let
12  me rephrase it.  You understand negligently and
13  recklessly, those are legal terms of art; right?
14    A.  Yeah.  I have the definitions down below.
15    Q.  Okay.  But were you asked by your attorneys to
16  opine on those legal terms of art to make a conclusion on
17  negligence and recklessness?
18    A.  No, it's my conclusion.
19    Q.  Okay.  Are you familiar with Black's Law
20  Dictionary?
21    A.  No.
22    Q.  Are you a lawyer?
23    A.  No.
24    Q.  Are you familiar with the maritime case law
25  that defines negligence?

Page 75

1    A.  No.
2    Q.  Okay.  So this -- your conclusion that he
3  negligently and recklessly deviated outside the
4  navigational channel, the basis of your understanding of
5  negligence and recklessness came from Merriam's Webster
6  Dictionary; is that fair to say?
7    A.  Correct.
8    Q.  And no other legal source?
9    A.  No.
10    Q.  Okay.  Give me a second.  Okay.  If you go to
11  page -- you may have answered this, but let's look at
12  your report.  Page five the middle paragraph you say:
13  "The video shows the tug moving ahead at over five knots
14  when the barge hit the structure of the bridge, et
15  cetera, et cetera."
16      You can't tell by looking at the video that it
17  was going five knots; is that fair to say?
18    A.  Looking at the video I know he's moving, but
19  I'm going by the rock -- by the -- what you call it, the
20  Rose Point, that had speeds on it.
21    Q.  I understand.  But this statement says the
22  video shows.  Would you want to amend that?  That's
23  not -- your five knots is not based on video; correct?
24    A.  No.
25    Q.  You're basing it on something else?

Page 76

1    A.  I'm basing it on the video and observation,
2  that boat was moving fast.  And then with the assistance
3  of the Rose Point.
4    Q.  Okay.
5    A.  I didn't put that in.
6    Q.  Without the Rose Point you really couldn't
7  definitively say it was five knots just looking at the
8  video; is that correct?
9    A.  I don't know.  To me, it looked like it was
10  doing fast.  Five knots is pretty quick and he was moving
11  quick.
12    Q.  Okay.  But just for the record you can't --
13  nobody can definitively look at the video and say he was
14  doing five knots; correct?
15    A.  Okay.
16    Q.  So you supplemented it by looking at the Rose
17  Point, is that your answer?
18    A.  Yes.
19    Q.  Okay.  If you go to the analysis you -- in the
20  middle of your first paragraph I'll quote:  "It is my
21  expert opinion that several navigational, procedural and
22  managerial failures contributed to and caused the subject
23  to hit and run allision."  Do you see that?
24    A.  Yes.
25    Q.  Okay.  And I think we went over it, but let's



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
77–80

Page 77

1  just for the record when you say navigational, could you
2  just set forth which navigational failures that you
3  concluded?
4      A.  Being on automatic pilot in a closed -- in a
5  confined space, in a confined channel.  Not putting --
6  the company procedural manual is not following the manual
7  of the Simrad autopilot which states to not be on
8  autopilot when you're transiting in a close quarter -- a
9  close quarter situation.  That's navigational.
10      Q.  And his -- and Morrissey's failure to switch
11  over; correct?
12      A.  That's the procedure, yeah.
13      Q.  Oh, that's procedural.  All right.  So I'm
14  going to ask you --
15      A.  I mean, it's navigational, procedural, all
16  three pretty much coincide.
17      Q.  I know, but I'm not asking you about
18  managerial.  I'm asking about navigational.  Are you
19  saying Mate Morrissey's failure to switch from autopilot
20  to NFU was navigational or procedural?
21      A.  Navigational.
22      Q.  Okay.  So did you set forth what you consider
23  the procedural failures that contributed to this alleged
24  allision?
25      A.  That he was on automatic pilot to begin with.

Page 78

1      Q.  Okay.  And you've already testified that you
2  believe he shouldn't have been; correct?
3      A.  Yes.
4      Q.  So we're not going to beat a dead horse; right?
5      A.  No.  But the manual also states that he
6  shouldn't have been on automatic pilot.
7      Q.  Yes.  Thank you.  So is it your testimony that
8  the Simrad manual is what governs this not the CFR?
9      A.  Well, I would say it's a part of it, it's part
10  of the procedure.  Especially when you have a vessel
11  who's had a lot of problems with the automatic pilot.
12      Q.  Okay.  Strike that as non-responsive.  What is
13  the part of the Simrad or Simrad manual that you're
14  saying prohibits the use of autopilot in this situation?
15      A.  Yeah, on the next page it's written.
16      Q.  Thank you.  In heavy traffic areas; right?  I'm
17  reading from it.  "Do not use automatic steering when in
18  heavy traffic areas."  Right?
19      A.  Yeah.
20      Q.  You see that?
21      A.  In confined and land waterways.
22      Q.  Can I finish, please?
23      A.  Okay.
24      Q.  I got to ask you the question.
25      A.  Go ahead.

Page 79

1      Q.  Is there any evidence that there was heavy
2  traffic on the river at the time of the incident?
3      A.  No.
4      Q.  Okay.  "In poor visibility or extreme sea
5  conditions."  Do you see that?
6      A.  Yes.
7      Q.  Was there poor visibility that day?
8      A.  No.
9      Q.  Any evidence of extreme sea conditions?
10      A.  No.
11      Q.  Okay.  The third one is when an area where use
12  of an automatic pilot is prohibited by law.  Do you see
13  that?
14      A.  Yes.
15      Q.  And you already conceded, have you not, that in
16  inland waters when it's not an oil barge there's no CFR
17  prohibition; correct?  Using autopilot; correct?
18          MR. JETT:  Object to the form.
19  BY MR. RODGERS:
20      Q.  That's what you testified earlier; correct?
21      A.  Yes.
22      Q.  I'm waiting for your answer.
23      A.  I didn't hear a question.
24      Q.  Oh, okay.  Sorry.
25          MR. RODGERS:  Yvette, could you read it to

Page 80

1  Captain Lewis?
2          THE COURT REPORTER:  His answer was yes.  But
3  do you me to read the question back?
4          MR. RODGERS:  I don't know if he gave an
5  answer, did he?
6          MR. CHAPMAN:  He answered yes and was waiting
7  for the next question.
8          MR. RODGERS:  Oh.  Well, I want my question and
9  I don't think he answered.
10          THE COURT REPORTER:  I have an answer as yes.
11          (The question was read back.)
12  BY MR. RODGERS:
13      Q.  Is that your answer?  She didn't get it wrong
14  or I didn't?
15      A.  No, that's what I answered.
16      Q.  Okay.  So this three areas where the Simrad
17  autopilot manual says not to use it and we just went over
18  those three and none of those apply to this situation;
19  correct?
20          MR. JETT:  Object to the form.
21      A.  Correct.
22  BY MR. RODGERS:
23      Q.  So you're moving on to the next page.  All
24  right.  By the way, did you read Captain Stephenson's
25  report where he -- did you read his report?



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
81–84

Page 81

1   A. Yes.
2       Q. And did you see where he made a survey by
3   checking with various companies and whether they use
4   autopilot in this situation, do you recall that?
5       A. Yes.
6       Q. And do you agree with what all those companies
7   said or do you disagree?
8       A. Disagree.
9       Q. Okay. So I'm going to read -- I'm not going to
10  read from, but I'm looking at the captain's report and he
11  said he surveyed pilots from certain pilot associations.
12  Okay?
13      A. Yes.
14      Q. And he said after listing them they as well
15  navigated rivers and waterways using autopilot when
16  conditions are appropriate. Do you see that?
17      A. I don't have the report in front of me.
18      Q. Oh, sorry. But you recall reading that, I'm
19  sorry?
20      A. I recall not agreeing with him. I don't recall
21  everything he said.
22      Q. So I'm going to say -- I'm just going to go
23  through each one. So he surveyed pilots from Sandy Hook
24  Pilot Association New York, do you recall seeing that?
25      A. Yeah. I remember him listing a bunch of them.

Page 82

1   I didn't memorize them.
2       Q. I'm reading it. I mean, if you don't believe
3   me, I'll get the report up on the screen.
4       A. No. I don't need -- I don't need the report.
5       Q. So you disagree with the pilots that Captain
6   Stephenson talked to from Sandy Hook Pilot Association of
7   New York; correct?
8       A. Yes.
9       Q. Okay. He also listed American Harbor & Docking
10  Pilots Association Philadelphia as also saying that they
11  can navigate rivers and waterways using autopilot when
12  conditions are appropriate.
13          So you are testifying that you disagree with
14  the American Harbors & Docking Pilots Association out of
15  Philadelphia; is that correct?
16          MR. JETT: Object to the form.
17      A. Yes.
18  BY MR. RODGERS:
19      Q. You disagree with them. And the next one -- by
20  the way, it's the same question, it's just a different
21  association.
22      A. Yeah. I disagree with all of them, how is
23  that?
24      Q. You disagree -- well, I want to get them on
25  record. St. John's Bar Pilot Association out of

Page 83

1   Jacksonville, you disagree with them?
2       A. Yes.
3       Q. And I'm reading from his report just for the
4   record.
5       A. I believe you.
6       Q. Yeah. Well, you better be or I'm in trouble.
7   Crescent River Pilot Associations out of the Mississippi
8   River, you disagree with them?
9       A. Wholeheartedly.
10      Q. Why wholeheartedly?
11      A. Because I've been up that river many times with
12  pilots aboard and we never used autopilot.
13      Q. Okay. Was that with oil barges?
14      A. Oh, yeah.
15      Q. Okay. But this was not an oil barge; right?
16  You agree with me on that?
17      A. Right.
18      Q. Okay. And then just two more. Galveston Texas
19  City Pilots Galveston, you disagree with them as well?
20      A. Yes.
21      Q. And the last one he surveyed was Port
22  Everglades Pilot Association out of Fort Lauderdale, you
23  disagree with them as well?
24      A. Yes. I've been in there many times and we
25  never went in on autopilot.

Page 84

1       Q. But that was with oil barges; correct?
2       A. Right.
3       Q. Okay. So that had to do with autopilot. I may
4   ask you about his surveys with other companies, but the
5   issue of autopilot that's who he surveyed. Just want to
6   put that in the record, Captain, so I'm not confusing
7   anybody. Most importantly I'm not confusing you because
8   you're the witness.
9           So you then -- okay. Let's go to page seven.
10  You cited US Inland Rules of the road, Rule 5. Do you
11  see that, the lookout?
12      A. Yes.
13      Q. And you cited every -- I'm going to quote what
14  you quoted, which I'm assuming you're correct from
15  33CFR-83.05. This is what you quoted: "Every vessel
16  shall at all times maintain a proper lookout by sight and
17  hearing as well as by all available means appropriate in
18  the prevailing circumstances and conditions so as to make
19  a full appraisal of the situation and of the risk of
20  collision." Do you see that?
21      A. Yes.
22      Q. Is that the only regulation or policy you
23  looked at regarding this case as far as lookout is
24  concerned?
25      A. Yeah. Rule 5 is the lookout rule.



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
85–88

Page 85

1    Q.  Did you look at the SMS of -- that was provided
2   of Carver?
3    A.  Yes.  It's pretty much word for word what this
4   says.
5    Q.  Okay.  We're going to pull up a section of the
6   SMS and I'm just -- and I'll read it or you can read it.
7   We'll read it together and then I'll ask you a few
8   questions on it.
9        MR. RODGERS:  Rachel, let me see what the
10       original section was.  Are you looking or do you
11       need me to?
12       MS. WERNER:  We're pulling up the lookout
13       document.  This would be the SMS exhibit from Brian
14       Moore.  One second.  Let me pull that up.
15       MR. RODGERS:  Just while you're doing that,
16       Reporter, did Rachel give you the exhibit number?
17       THE COURT REPORTER:  No.
18       MR. RODGERS:  We'll do that in a minute.
19   BY MR. RODGERS:
20    Q.  Do you see the 7.16 called lookout on the
21   screen?
22    A.  Yes.
23    Q.  Okay.  And that -- I don't know what the
24   exhibit number it's from, but there's -- we can start
25   with the Carver Bates stamp number wherever that is.

Page 86

1   Okay.  000155 is the Carver Bates stamp number and
2   it's -- we'll get to the exhibit number letter whenever a
3   little later.
4        Did you look at this section?  Well, no, strike
5   that.  I'm sorry.  Was this made available to you 7.16
6   lookout?
7    A.  Yes.  And I read it.
8    Q.  And where do you understand this document comes
9   from that we're looking at?  The document, not the
10   wording in it, but the document itself.
11    A.  It comes from the Safety Management System.
12    Q.  Okay.  So your understanding is as far as a
13   lookout that there was in the Safety Management System of
14   Carver a lookout provision; correct?
15    A.  Yes.
16    Q.  Okay.  Did you look at -- now we're not looking
17   at it, we're looking at you.
18       MS. WERNER:  My computer is glitching one
19       second.
20       MR. RODGERS:  That's all right.  Take your
21       time.  No pressure.  Yet.
22       MS. WERNER:  My apologies, we're back.
23   BY MR. RODGERS:
24    Q.  It's back, yeah.  Do you see the one-man bridge
25   operations?

Page 87

1    A.  Yes.
2    Q.  Do you want to read it into the record, or I
3   can, it's up to you?
4    A.  You can read it.  You can see it better than I
5   can.
6    Q.  All right.  So I'm just going to read and then
7   ask you a few questions.  "On vessels where there is an
8   unobstructed all around view provided at the steering
9   station as on certain pleasure craft, fishing boats, and
10  towing vessels or where there's no impairment of night
11  vision or other impediment to keeping a proper lookout,
12  the watch officer and helmsman may safely serve as the
13  lookout."  Do you see that?
14    A.  Yes.
15    Q.  Are you familiar with that section --
16    A.  Yes.
17    Q.  -- before you -- before you saw this?
18    A.  Yes.
19    Q.  You've seen a one-man bridge operation section
20  before you saw this document?
21    A.  Yes.
22    Q.  Where have you seen that?
23    A.  In another case I'm working on Forced Maritime
24  Safety Management System.
25    Q.  Okay.  You would agree that this was a towing

Page 88

1   vessel; correct?
2    A.  Yes.
3    Q.  And he was at at least one of the steering
4   stations, correct, the upper wheelhouse?
5        MR. JETT:  Object to the form.
6    A.  Yes.
7   BY MR. RODGERS:
8    Q.  Okay.  And would you agree that it was a clear
9   day?
10    A.  Yes.
11    Q.  Do you have an opinion as to -- well, strike
12  that.  Do you agree that he had an unobstructed all around
13  view at the steering station?
14       MR. JETT:  Object to the form.
15    A.  Yes.
16   BY MR. RODGERS:
17    Q.  And there was the night vision is inapplicable
18  because it was broad daylight; correct?
19    A.  Correct.
20    Q.  In your opinion was there any impediment to
21  keeping a proper lookout on that day?
22    A.  No.
23    Q.  So would you agree that on that day in that
24  situation the watch officer, who is Mr. Morrissey, mate,
25  he can safely serve as the lookout according to this



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
89–92

Page 89

1  one-man bridge operation policy; correct?
2      A.  According to the SMS, yes.
3      Q.  Okay.  You want me to read -- and do you have
4  any disagreement with that policy?
5      A.  Yeah.  It's just a basic.  There's nothing says
6  you can't have a lookout.  There's no reason -- my
7  philosophy, my standard in my training and in my
8  operating of a vessel in a narrow channel I've always had
9  a lookout.
10     Q.  And I don't disbelieve you, but also you would
11  agree that your entire career on tugs was pushing or
12  towing oil barges; correct?
13     A.  That has nothing to do with a lookout.  I also
14  operated a tugboat without a barge, went out without a
15  barge, I just operated the tugboat.  We didn't use
16  autopilot and we didn't have a lookout on a light
17  tugboat.  But this is pushing a barge in a river.
18     Q.  Okay.  But the question --
19     A.  I don't care what the barge is, it should have
20  a lookout.
21     Q.  All right.  All right.  Listen, that's your
22  answer.
23     A.  Yep.
24     Q.  But you didn't answer the question.  Although I
25  want to keep your answer.  But I can't even remember my

Page 90

1  question.  Okay.
2          You would agree that your experience, at least
3  99 percent of it, was pushing or towing oil barges;
4  correct?
5      A.  Yes.
6      Q.  You would agree that oil barges even before
7  OPA90 are specific situations; correct?
8      A.  Correct.
9      Q.  Not a great question.  But just in the
10  vernacular towing or pushing oil barges anywhere, but
11  especially in inland waters, is a different animal than
12  other barges and tugs; is that a fair statement?
13         MR. JETT:  Objection.
14     A.  Yes.
15  BY MR. RODGERS:
16     Q.  As well as if you had other hazardous materials
17  in inland water as well; right?
18     A.  Yes.
19     Q.  And that's because of the danger of oil spills;
20  correct?
21     A.  Explosions, yes.
22     Q.  Okay.  So you would agree that your use of
23  lookouts predominately had to do with your experience
24  pushing or towing oil barges; is that a fair statement?
25     A.  Yes.

Page 91

1      Q.  And according to the one-man bridge operations
2  it's acceptable under the conditions in this section for
3  the watch officer to act as his own lookout; correct?
4      A.  Correct.
5      Q.  That's what it says?
6      A.  Yes.
7      Q.  Okay.  Now I'm going to read the whole thing
8  because I don't want to be unfair and I want to give you
9  a chance.  Whoa, no, no.  Okay.  Thanks, Rach.
10         "However, it's expected this practice will only
11  be followed after the situation has been carefully
12  assessed on each occasion and has been clearly
13  established that it is proven to do so.  Full accounts
14  shall be taken of the weather, conditions of visibility,
15  traffic density, and proximity of navigational hazards."
16  Do you see that?
17     A.  Yes.
18     Q.  "It is not the intent of these rules to require
19  additional personnel forward if none is required to
20  enhance safety."  Do you see that?
21     A.  Yes.
22     Q.  Now is it -- would you agree that a fully
23  licensed mate, who's also a fully licensed captain by the
24  Coast Guard, within his responsibility and duty is
25  qualified to assess the situation?

Page 92

1      A.  He should be.
2      Q.  Should be; right?  Every single second a
3  captain -- strike that.  Every single section a qualified
4  mate is up on the bridge, he or she is actually assessing
5  a situation; correct?
6         MR. JETT:  Objection.
7      A.  Hopefully, yes.
8  BY MR. RODGERS:
9      Q.  Hopefully, yes.  And that's what you were
10  trained at -- that type of responsibility and
11  accountability you were trained at Port Schuyler on that;
12  correct?
13     A.  Correct.
14     Q.  And you understood that completely when you sat
15  for your exam to be a mate; right?
16     A.  Yes.
17     Q.  And you understood that completely in all your
18  years pushing and towing oil barges around the country;
19  correct?
20     A.  Correct.
21     Q.  And you would agree as you sit here today that
22  Mate Morrissey was fully qualified on that day to assess
23  whether or not he needed to have an extra lookout or not,
24  would you agree to that statement?
25         MR. JETT:  Object to the form.



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025

93–96

Page 93

1    A.  No.  No, I don't because I don't think he was
2  up to the task, put it that way.
3  BY MR. RODGERS:
4    Q.  Okay.  Okay.  That's a different issue.
5    A.  But, I mean, if he had -- go ahead.
6    Q.  Well, let's -- you're an expert.  Assuming that
7  his license was valid, assuming that and there was no
8  reason for it not to be suspended, then he was fully
9  qualified to make that assessment assuming what I just
10  said, would you agree with that?
11    A.  According to the Coast Guard, yes.
12    Q.  Okay.  Let's move on I guess.  Thank you,
13  Rachel.  Well, keep that section up.  Never mind, I'm
14  sorry.  As long as it's handy.
15      So would you agree, Captain, that based on that
16  SMS section on lookout that Mate Morrissey was following
17  Carver's policy?
18    A.  Yes.
19    Q.  That's in one -- sorry.  Yes?
20    A.  Yes.
21    Q.  Okay.  And that's clearly laid out in that
22  section 7.16; correct?
23    A.  Correct.
24    Q.  As to lookout; correct?
25    A.  Correct.

Page 94

1    Q.  Okay.  You also -- oh, okay.  No, no, we'll get
2  to that later.  Sorry.  On training -- let's go to
3  training.  Is it your testimony that there was no
4  training whatsoever or that -- including no on-the-job
5  training or there was no formal training in some other
6  venue?  What is your actual opinion as to training for
7  that particular crew?
8    A.  I didn't see any information showing that the
9  crew, which most of them were very new to the company,
10  had any kind of company training.  The only training
11  mentioned is being trained during emergency exercises and
12  stuff of how to do things or whatever and to me that's an
13  inefficient use.
14      The company should be training people before
15  they come on the boat and not just by handing them a
16  manual or handing them something to read.  There should
17  be some hands on training.  And Carver in my -- I didn't
18  see any of that and they didn't even have a safety
19  officer.  We always had a safety officer that controlled
20  the training.  We kept records of every single thing they
21  did and when they were due to have it renewed, et cetera.
22  So training was a lot -- a lot different in my company.
23    Q.  Go ahead, sorry.  Did you get that, Reporter,
24  sorry I interrupted?
25    A.  I'm good.

Page 95

1    MR. JETT:  Did you finish?
2    THE WITNESS:  Yeah.
3    THE COURT REPORTER:  Yes.
4  BY MR. RODGERS:
5    Q.  You would agree with this, Captain, that Exxon
6  Shipping and Exxon Oil Company is a completely different
7  company than Carver Towing?  You would agree to that;
8  right?
9    A.  Of course, yes.
10    Q.  Are they not one of the biggest oil companies
11  in the world?
12    A.  Yes.
13    Q.  And was the Exxon Shipping one of the
14  biggest -- well, they were a big company shipping their
15  own oil; right?
16    A.  Not really.  They weren't that big.
17    Q.  They weren't that big.  How big were they at
18  the time you worked for them?
19    A.  Maybe they had seven ships and six tugboats,
20  seven tugboats and maybe ten barges.
21    Q.  And after OP90 isn't it true that Bouchard
22  Transportation did a lot of inland movement of Exxon oil?
23    A.  I don't know.
24    Q.  You don't know?
25    A.  Nope.

Page 96

1    Q.  You ever heard of Bouchard?
2    A.  Yeah, of course I heard of Bouchard.
3    Q.  And didn't Exxon after OPA90, didn't they start
4  unloading their tankers on to third party barges to avoid
5  the liability of OPA90, if you know?  If you don't, you
6  don't.
7    A.  No, I don't.  I wasn't in New York Harbor at
8  that time.
9    Q.  Not New York Harbor, the whole country.
10    A.  Yeah, but I don't remember Bouchard being
11  around the whole country.
12    Q.  Do you remember any other third party companies
13  moving Exxon oil as opposed to you as in your tugs and
14  barges that were part of Exxon?
15    MR. JETT:  Object to the form.
16    A.  I might.
17  BY MR. RODGERS:
18    Q.  If you understand it.
19    A.  I think Eklof might have moved oil and barges
20  in New York Harbor from Conhope to Bayway, places like
21  that.  I recall Bouchard being coming to the docks and
22  loading at Bayway, but I don't know where they were going
23  or what they were loading and what for.  I don't know
24  anything about the chartering or hiring about cargo.
25    Q.  All right.  All right.  Point made.  But you



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
97–100

Page 97

1 would agree Exxon Shipping and Exxon Oil are different in
2 size and scope than Carver; correct?
3    A.  Yes.
4    Q.  Did you look at -- because you opined on the
5 company, did you look at all the materials regarding the
6 company --
7    A.  Which company?
8    Q.  -- that were provided to you?  Carver, Carver.
9    A.  No.
10    Q.  Do you know what the size of the company they
11 are?
12    A.  No.
13    Q.  Do you know what they do?
14    A.  I know they have a lot of tugs and barges.
15 They move a lot of rock and stuff, concrete out of
16 Coeymans.  As far as the amount they have or what they do
17 I didn't look into that.  I didn't see a need to.
18    Q.  Well, you were opining on the managerial issues
19 at Carver.  Don't you think you should have looked at the
20 size of the company and the organizational structure?
21    A.  I was looking at how they managed the tug,
22 Mackenzie Rose.
23    Q.  And so -- and you read Nick Laraway's
24 deposition you said?
25    A.  Yeah.  I listened to it too.

Page 98

1    Q.  And after listening -- well, strike that.  Did
2 you read Brian Moore's deposition?
3    A.  Yes.
4    Q.  When you say managerial, are you talking about
5 what the port captain did with the crews and the
6 captains?
7    A.  Yeah, Laraway too.  Laraway didn't seem to know
8 anything.  Every question he was asked about the
9 operation of the vessel he referred to talking to Moore
10 or the port engineer, Lenny, port captain.  What was
11 his -- I can't remember his name.
12    Q.  Baldassare, Lenoard Baldassare.
13    A.  Yes.
14    Q.  So wouldn't you expect Lenoard Baldassare to
15 know what a port captain knows?
16    A.  I would think.
17    Q.  And wouldn't you expect Brian Moore's general
18 manager to know what the general manager knows?
19    A.  He didn't know much either.  He kept referring
20 to Lenny.
21    Q.  Yeah.  Strike that as non-responsive.
22    MR. JETT:  Objection.
23 BY MR. RODGERS:
24    Q.  Are you saying Nick Laraway should have been
25 down on Staton Island acting as a port captain?

Page 99

1    A.  No.
2    Q.  Are you saying Nick Laraway should have been on
3 the tug at the time of the incident --
4    A.  No.
5    Q.  -- the president of the company?
6    A.  No.  I would have thought he might know more
7 than what he knew in the deposition about what was going
8 on especially --
9    Q.  Did your lawyer tell you that?
10    A.  Especially after someone hit the bridge.
11    Q.  Did your lawyer tell you that?
12    MR. JETT:  Objection.
13    A.  Tell me what?
14    MR. JETT:  Don't answer that.
15 BY MR. RODGERS:
16    Q.  That he doesn't know anything?
17    A.  It's my opinion from watching him.
18    Q.  Okay.  Him not knowing anything in your opinion
19 did that have anything to do with -- strike that.
20    Explain what you mean by managerial failings
21 specifically, give me specifics because it's your report.
22    A.  Okay.  Carver knew there was a problem on the
23 tug with the automatic pilot.  They had two incidents in
24 May, prior to that in April, March and April there were
25 two repairs done to the new autopilot that went on the

Page 100

1 vessel in November '23.  In May they had two more
2 incidents.  This is June.  They made no distinction, no
3 specification to the company to do anything different
4 about the autopilot.  In my opinion they should have been
5 given an order not to be on autopilot on that vessel
6 going in a narrow channel.
7    Q.  Okay.  But you agree in your section four that
8 in fact it wasn't the autopilot that failed, it was James
9 Morrissey that failed; correct?
10    A.  But still the autopilot should never have been
11 on in my opinion.
12    Q.  You agree that it was not the autopilot it was
13 James Morrissey --
14    MR. JETT:  Objection.
15 BY MR. RODGERS:
16    Q.  -- that caused the incident; correct?
17    MR. JETT:  Objection.
18    A.  No, I can't answer that.  James Morrissey was
19 on autopilot.  Okay.  So the autopilot took him in a
20 location where he shouldn't have been.  When he tried to
21 switch over, he didn't switch over correctly.  Then he
22 finally did switch over.  Okay, fine, you switch over
23 now.  How do you still hit the bridge when the opening is
24 45 degrees to your right?
25



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
101–104

1  BY MR. RODGERS:
2      Q.   Well, let's do this because you're an expert.
3  Assuming, okay, assuming that the autopilot is permitted
4  to be used in the Elizabeth River on that day, okay,
5  assuming.  You with me?
6      A.   Yes.
7      Q.   That there's -- that it's both appropriate
8  procedure and it's not unlawful to use the autopilot at
9  the time he was using it.  I'm asking you to assume that;
10  correct?
11      A.   Okay.
12      Q.   Assuming that, that the autopilot was
13  permitted -- you're looking over at your lawyer, is there
14  something he's doing?
15      A.   No.
16      Q.   Assuming that and there's the tug and the barge
17  moving along, then the only mistake, assuming that was
18  Mr. Morrissey, Mate Morrissey failing to properly
19  disengage the autopilot and switch to manual steering;
20  correct?
21      MR. JETT:  Object to the form.
22      A.   Correct.
23  BY MR. RODGERS:
24      Q.   So assuming the facts I gave you, that was the
25  cause of the incident; am I correct?

1      MR. JETT:  Object.
2  BY MR. RODGERS:
3      Q.   Assuming the facts I gave you.
4      MR. JETT:  Objection.
5      A.   No, that's not the only cause of the incident.
6  BY MR. RODGERS:
7      Q.   Okay.  Assuming the facts that I gave you the
8  autopilot -- did the cause of the incident was not the
9  autopilot mechanically or electronically failing, it was
10  Mr. Morrissey failing to properly disengage the
11  autopilot; correct?
12      MR. JETT:  Objection.
13      A.   According to the second 2692, yes.
14  BY MR. RODGERS:
15      Q.   Okay.  Now I know we disagree and you just
16  stated it quite clearly that -- and let me get this
17  right.  You believe that the autopilot should not have
18  been in use at the time; correct?
19      A.   Correct.
20      Q.   So it's kind of like if this didn't happen,
21  then this wouldn't have happened; right?
22      A.   Right.
23      Q.   And then the big issue is the first part,
24  whether or not it could have, should have, would have
25  been in use; right?

1      A.   Right.
2      Q.   So we disagree on that.  You agree we're just
3  disagreeing on that part?
4      A.   I disagree with you, yes.
5      Q.   All right.  I just want to get what your
6  opinion is going to be at trial.  I don't want you
7  surprising me and ambushing me.  All right.  So let's go
8  to the -- I'm sorry I'm bouncing around, but I think it
9  goes quicker when I bounce.
10      MR. JETT:  That's fine.  Jim, when you get a
11  chance at the next good stopping point, can we take
12  a break?
13      MR. RODGERS:  Who is that?
14      MR. JETT:  Zach.
15      MR. RODGERS:  Oh, you sound like Mark.  You've
16  been working too long.
17      MR. JETT:  No, I'm sitting here.  Whenever you
18  get to a good stopping place.
19      MR. RODGERS:  Oh, this is good time.  You can
20  do that, Captain, just tell me how long.
21      MR. JETT:  Ten minutes.
22      MR. RODGERS:  Okay.  Good.  We'll see you in
23  ten.  Thank you.
24      (A break was taken.)
25

1  BY MR. RODGERS:
2      Q.   Okay.  Captain, when you were a captain of the
3  various tugs you were on, did you do training on the
4  tugs?
5      A.   Yes.
6      Q.   What type of training just generally if you can
7  remember?
8      A.   Same thing emergency procedures.  We would do
9  bridge resource management with the mates.  I did a lot
10  of training of the mates on the vessel in steering and
11  when we were in harbor mode teaching them how to come
12  alongside a ship, et cetera and stuff like that.  Boat
13  handling was a big one.  And then when we had the barges,
14  it would be cargo handling.
15      Q.   It would be what?
16      A.   Cargo handling, loading and discharging barges
17  and showing the people how to strip a tank, how to top
18  off a tank.  I mean, that's the hands on, you got to be
19  there to do that.
20      Q.   So you were either a mate or a captain would
21  you -- and if you assigned lookouts, did you train them
22  at all like the younger guys who were new?
23      A.   To be a lookout?
24      Q.   Yeah.  Like just tell them what to do, how to
25  do it?



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
105–108

Page 105

1  A.  No.  You would tell them what you wanted, you
2  know, what you expected of them.  And after one or two
3  times of doing it, unless it was fog or some really bad
4  weather situation, visibility situations, it was pretty
5  basic.  It was just I want you to be there to be another
6  set of eyes, you know, in case I don't see something, you
7  know.  Especially like New York Harbor and Mississippi,
8  you got a lot of little boats running around and they
9  don't care where you are, you know, they're going to
10  come.
11  Q.  Yeah.  So basically there's the whatever is in
12  the CFR, whatever is in say in our case and Carver's
13  case, the SMS and whatever the mate or the captain tell
14  the lookouts, is that kind of the world of lookout
15  training and requirements?
16  A.  Yeah.  I guess it would be a training and
17  depends on who you have as your deckhand and AB whether
18  they're competent enough to be a good lookout to know and
19  you got to train them.  If they're not trainable, you get
20  rid of them.
21  Q.  Okay.  Now your opinion though doesn't include,
22  other than Mate Morrissey, what he did or didn't do, any
23  opinion as to an additional lookout, right, because in
24  this case there wasn't one; right?
25  A.  Right.  In my practice, in my standard of the

Page 106

1  industry that I know and not just oil barges of guys I
2  know who work on, you know, moving scows and stuff like
3  that, there's very little bit of first of all automatic
4  pilot going in and out the rivers and there's a lot of
5  times in the narrow channel, narrow river we would always
6  have a second lookout besides me in the wheelhouse.
7  Q.  On oil barges; right?
8  A.  Well, yeah, that's what I worked on.  But I
9  know it was done on other pieces of equipment also, you
10  know.  In New York Harbor especially because New York
11  Harbor was a very busy place and --
12  Q.  Yeah.  Okay.  We're not talking about New York
13  Harbor though for this case.  We're talking about the
14  Elizabeth River; right?
15  A.  Right.
16  Q.  Okay.  So --
17  A.  But if this guy had a lookout there, he might
18  not have hit the bridge.  You know, he might have seen
19  that he was heading for the wrong side of the bridge and
20  said, hey, cap, move over.  You know, that's what they're
21  there for to help you if you screw up, if you don't know
22  if something happened and they're not -- you don't see
23  what's happening, they're there to help you.  They're
24  your second set of eyes.
25  Q.  So is that one of your opinions, is that what

Page 107

1  you're going to testify to at trial?
2  A.  Sure.
3  Q.  Now have you ever used autopilot in inland
4  waters?
5  A.  Have I?
6  Q.  Yes.
7  A.  I really can't say I have.
8  Q.  So it's fair to say that you actually don't
9  have any experience with using autopilot at all in inland
10  waters; correct?
11  A.  No, certain inland waters.  I'm trying to think
12  of where it would be a good example.  Like the lower end
13  of the Hudson River from the battery up to the George
14  Washington Bridge, I forget how many miles it is, but
15  it's pretty wide open space and you might try autopilot.
16  I would never do it because there's rocks and all sorts
17  of and it's not that wide.
18  But I've used automatic pilot, you know, when
19  you're using it going in and out of rivers before you get
20  there.  I mean, I know how an automatic pilot works.
21  Q.  Yeah.  But you -- the question is you haven't
22  used it in inland waters, actually used it; correct?
23  A.  Correct.
24  Q.  Okay.  So is it fair to say the use of it as a
25  navigational tool in inland waters you don't -- you don't

Page 108

1  have any experience with that; correct?
2  A.  Yeah, I'd say correct.
3  Q.  Okay.
4  A.  Well, I have to take that back.  Running a
5  light tugboat say like sometimes I'd be in New York
6  Harbor, I'd be heading out east to Long Island Sound to
7  pick up a barge or whatever, then I'd be on automatic
8  pilot with a light tugboat not with a barge but just a
9  light tug.
10  Q.  Okay.  So you want -- you've done that how many
11  times?
12  A.  I don't know.  Quite a few.  You run light
13  tugboat all throughout the harbors.  San Francisco you --
14  Q.  You talking about a harbor tug?
15  A.  Yeah.
16  Q.  I mean, we talking about something like this
17  size?  Is that a light tugboat?
18  A.  That looks like a small fishing boat.  Yeah.
19  But the tugboat I'm talking about was 150 foot long and
20  40 feet wide.
21  Q.  I'm talking about a light tugboat.  Does that
22  look --
23  A.  That's a light tugboat.
24  Q.  -- like what I call a harbor tug?
25  A.  You could call that a harbor tug I guess.  It



CAPTAIN NICHOLAS J. LEWIS                                    August 13, 2025
MATTER OF COEYMANS MARINE TOWING, LLC                       109–112

Page 109

1  doesn't look like one.
2     Q.  I can tell you it's outboard profile and deck
3  34 foot steel diesel tug, Gallagher Brothers, Sparkman
4  and Stephens is the architect, 1954.
5     A.  Oh, that's, okay.
6     Q.  But that's -- I can tell you that's a tug, the
7  question is does that look like a light -- what you call
8  a light tug or a harbor tug?
9     A.  I mean, that looks like a yacht.
10    Q.  I'm talking about this one.  It might look like
11 a yacht, but I just read to you from the architect.
12    A.  Yeah, I know what you read, but that's not a
13 tugboat.
14       MR. JETT:  Objection.
15 BY MR. RODGERS:
16    Q.  So how big is a light tug?
17    A.  My light tug was 150 feet long, 40 foot wide
18 drawing 22 feet in San Francisco.
19    Q.  What makes it a light tug?
20    A.  You don't have a barge, you're just a tugboat
21 moving from point A to point B.
22    Q.  So it's not necessarily a harbor tug, it's
23 because it's not moving a barge why you call it a light
24 tug?
25    A.  Yes.

Page 110

1     Q.  So it could be a very large tug?
2     A.  That's what the one -- that's what the Golden
3  State was.  And in New York Harbor we had like 135 foot
4  tugs that if the barge is loading or discharging, you
5  might leave it to go get another barge or go dock a ship
6  or do some other thing and you'd be running in the harbor
7  and in that situation a lot of times you would be on
8  autopilot.
9     Q.  Without a barge?
10    A.  Without a barge.
11    Q.  So it's fair to say you don't have any
12 experience pushing or towing a barge with an autopilot in
13 any inland river; is that correct?
14    A.  Yes.
15    Q.  So it's fair to say that as far as the
16 navigational use of an autopilot in an inland river with
17 pushing or towing a tug you don't have any experience in;
18 is that correct?
19    A.  Yes.
20    Q.  All right.  You opined on the post incident
21 reporting situation.  Do you recall that in your report?
22    A.  Where?  I don't know what you're talking -- I
23 don't recall what you're talking about.
24    Q.  Look at your report.  I'm trying to speed
25 things up.  That's all right.  By the way, did you look

Page 111

1  at the various invoices of the repairs made to the
2  autopilot?
3     A.  Yes.
4     Q.  Did you recall in April that Ayer's came on
5  board and did repairs to also replace the software --
6     A.  Yes.
7     Q.  -- of the autopilot, did you know that?
8     A.  Yeah.  I read the -- I read what they did the
9  same thing in March, GMT.
10    Q.  But you agree with me that based on at least
11 Morrissey's, what we know now Morrissey's true story that
12 the autopilot mechanics and electronics didn't fail, he
13 failed to switch it and that your -- your testimony will
14 be that it shouldn't have been on to begin with, is that
15 a good summary of what you're going to testify to?
16    A.  Yes.
17       MR. JETT:  Object to form.
18 BY MR. RODGERS:
19    Q.  So when you say that -- when you conclude, for
20 instance, by not having the autopilot repaired and not
21 restricting the use of the autopilot, Carver Management
22 was the cause of the allision with the NPBL Bridge
23 paragraph 13 of your findings.  Do you see that?
24    A.  Yep.
25    Q.  All right.  Based now on your testimony would

Page 112

1  you like to amend that as you sit here today to take out
2  the part by not having the autopilot repaired and just
3  amend it to by not restricting the use of the autopilot?
4     Is that fair to say that that should be --
5  based on your testimony, that should be amended to take
6  out by not having the autopilot repaired?
7       MR. JETT:  Objection.
8     A.  No.  He should have had the autopilot should
9  have been repaired.
10 BY MR. RODGERS:
11    Q.  But you've already conceded and agreed that
12 that's not what happened with the autopilot, it didn't
13 malfunction.  The mate malfunctioned; correct?  Mate
14 Morrissey malfunctioned?
15       MR. JETT:  Objection.
16    A.  The point is it should never have been on to
17 begin with in my opinion.
18 BY MR. RODGERS:
19    Q.  And I understand --
20    A.  You've got --
21       MR. JETT:  Sorry, one at a time.
22       MR. RODGERS:  Can you get any louder, Zach, I
23 can't always hear you?
24       MR. JETT:  Sorry.  I'm just advising him one at
25 a time.  All right.  Did you finish your answer?



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
113–116

Page 113

1    THE WITNESS: I forget the question.
2    MR. JETT: Can you read back the question and
3    make sure he answered?
4    MR. RODGERS: No. I'm going to rephrase it.
5    BY MR. RODGERS:
6    Q. If you go to 13, we've already spent a lot of
7    time today where your issue now with the autopilot
8    appears, and again correct me if I'm wrong, that it
9    shouldn't have been being used at the time of being used;
10   correct?
11   A. Correct.
12   Q. So you're sticking with the part of 13 that
13   says not restricting the use of the autopilot; right?
14   A. Yes.
15   Q. You're saying that's harbor management, in your
16   opinion, that's their fault and you're saying that was a
17   cause or part of the cause of the allision; correct?
18   A. Yes. And the company not having it repaired
19   and then letting them use it is bad management. You're
20   sending out a vessel --
21   Q. You can't --
22   THE COURT REPORTER: I can't.
23   MR. RODGERS: Sorry, sorry, Yvette.
24   MR. JETT: You finish then and then Jim will ask
25   another question.

Page 114

1    BY MR. RODGERS:
2    Q. You can finish.
3    A. I'm finished.
4    Q. We've already discussed this ad nauseam on my
5    part, not yours, that paragraph four which after you read
6    all the different documents: "The officer of the watch
7    Captain James Morrissey failed to properly disengage the
8    autopilot and did not switch to manual steering
9    non-follow-up mode." Do you see that?
10   A. Yes, yes.
11   Q. Okay. And that was Mate Morrissey's error;
12   correct?
13   A. Yes.
14   Q. It was his navigational error; correct?
15   A. Correct.
16   Q. It was not the autopilot failing and the rudder
17   going hard over; right? We've already established that
18   you agree that didn't happen; correct?
19   A. Yes.
20   Q. Okay. So it more or less makes whether or not
21   the autopilot was repaired correctly or not a moot point,
22   does it not?
23   A. No.
24   Q. Because it's not --
25   A. Not to me.

Page 115

1    Q. Are you saying the autopilot failed, that it
2    went hard over?
3    A. I'm just saying that the autopilot should never
4    have been on.
5    Q. I get that and I'm accepting that as your
6    opinion. And I just want to make sure that 13, which has
7    two different opinions, not different, I'm sorry, two
8    reasons, that the first reason is not actually
9    applicable.
10   A. I can't --
11   Q. And you're going to amend it or we have to go
12   through this at trial. Because the second part I
13   understand is your position and you're holding that
14   position that we never should have used it, we should
15   have restricted it.
16      I'm asking you if you are just by your
17   testimony going to amend 13 and withdraw the part by not
18   having the autopilot repaired?
19   A. No. I'm not amending it because we don't know
20   what Morrissey did or what really happened. We haven't
21   been able -- he didn't testify for any deposition or
22   anything and he changed his story according to what the
23   records and paperwork I get.
24   Q. So what are you -- I don't see where you can be
25   consistent with that because you've adopted or you

Page 116

1    concluded that it was Mate Morrissey's failure to
2    properly disengage the autopilot and not switch to manual
3    steering.
4       So either you're with that or you're not. And
5    if you're not with that and you want to say that somehow
6    that the autopilot failed, then we'll go into every
7    single invoice, we'll take an hour or two to go into
8    that. But it just seems like a moot point if you've
9    already conceded, or not conceded, but agreed that his
10   final statement, which was reflected I believe in 2692,
11   but also other areas, you've adopted the fact that it did
12   not -- it did not go hard left, which was his original
13   story, it in fact he messed up. And that's confirmed by
14   the Rose Point as you've already agreed.
15      So I don't understand why you would want to
16   continue to say that -- alleging that the autopilot was
17   not repaired by Carver was one of the causes of the
18   allision. Or were you willing to amend it and take that
19   portion of 13 out?
20      On this one I'll even give you another thing,
21   I'll let you discuss it with your lawyers. Is that okay,
22   Zach? You want him to talk to you outside my?
23   MR. JETT: That's fine. You can continue.
24   He'll answer the question. I mean --
25   MR. RODGERS: He's looking. I know he's



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
117–120

Page 117

1    reading and thinking.  So take your time.
2        A.  It's hard to say.  I just feel -- maybe I have
3    to reword it or something.
4    BY MR. RODGERS:
5        Q.  Well, take your time.  I'm in no rush.  And if
6    you want, I don't care however we get there, if you want
7    a break to do it, but I want to get it right.  I think
8    you've been up front with me all day so.  This is not
9    a -- it's not an exercise in trying to trick you or
10   anything.  I'm writing something so don't feel rushed.  I
11   have some other questions I may have for you.
12       A.  I have to reword it someway where it says that.
13   Can I take a five minute break?
14       Q.  Yes.  Please do.
15       A.  I want to figure out how to reword it.
16       Q.  And if you want to talk to your attorney, I'm
17   agreeing that that's okay with these guys.
18       A.  Yeah.  I need to take a break, think about
19   this.
20           MR. JETT:  Okay.  Thank you.
21           (A break was taken.)
22   BY MR. RODGERS:
23       Q.  Do you remember the question or you want me to
24   repeat it or you ready to supplement it or whatever?
25       A.  I'm not going to supplement anything.  I'm

Page 118

1    going to keep it the way it is because I can't say if the
2    autopilot did or did not have a failure.  My main reason
3    being is why was the tugboat where it was?  Why was he
4    way over to the left instead of being in the center of
5    the channel?
6        Q.  I --
7        A.  And being that -- wait a minute, let me finish.
8    And being that Morrissey made the statement initially
9    that he went hard left, we don't know what his statement
10   on the 2692 is true or not.  We don't know if the company
11   did it or who did it, all I know is that he hasn't been
12   here to give testimony to let us know what happened in
13   reality.
14           So, in my opinion, the company should have
15   repaired the autopilot before they let anybody do it.
16   Since they didn't, they should have instructed the crew
17   not to use the autopilot.
18       Q.  Okay.  So did you look at the autopilot repair
19   records?
20       A.  Yeah.  What does that got to do with anything?
21       Q.  Well, you're saying they didn't repair it, but
22   in fact --
23       A.  No, they didn't repair it.
24       Q.  Can I finish?  I need to finish, Captain.
25       A.  I'm sorry, go ahead.

Page 119

1        Q.  I need to finish.  The evidence clearly shows
2    they repaired it in April; correct?
3        A.  Yes.
4        Q.  So you can't say as you sit here today that
5    they did not repair it based on those invoices; correct?
6            MR. JETT:  Object to the form.  You can answer.
7        A.  No, because they had incidents in May and
8    didn't get them repaired.
9    BY MR. RODGERS:
10       Q.  But you can't say they did not repair it?
11       A.  How can I say they didn't repair it if they had
12   incidents again in May, two incidents where the vessel
13   went hard left and turned around on itself and went into
14   the heavy weather and they did nothing about that?
15       Q.  Okay.  So you're withdrawing your conclusions
16   now I think.  Either you're going to accept his first
17   statement, which everybody knows was a lie because he
18   testified at the Coast Guard something differently and
19   you're going to accept that and you're going to reject
20   the statement he made which is reflected on the 2692?  I
21   just want to know where you stand.
22           MR. JETT:  Objection.
23       A.  Yep.  I disagree with the 2692 which shouldn't
24   even be in there.
25

Page 120

1    BY MR. RODGERS:
2        Q.  Okay.  So you're going to withdraw your
3    findings?
4        A.  No.
5        Q.  You going to redo them on your --
6        A.  No.  Why?
7        Q.  What are you going to do here?
8        A.  My number four findings says exactly what it
9    says.
10       Q.  So you're still going to stay with your
11   finding:  "The officer of the watch Captain James
12   Morrissey failed to properly disengage the autopilot and
13   did not switch the manual steering (non-follow-up mode)
14   in a combined navigational -- confined navigational
15   channel resulting in a loss of directional control?"
16       A.  Right.
17       Q.  Is that your -- is that your finding?
18       A.  Yes.
19       Q.  Okay.  And you don't have a problem with it
20   being inconsistent with the first part of paragraph 13?
21           MR. JETT:  Object to the form.
22       A.  No, I don't.
23   BY MR. RODGERS:
24       Q.  Okay.  Now what part of the autopilot should
25   have been repaired?



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
121–124

Page 121

1  A.  How do I know?
2  Q.  I don't know.
3  A.  I'm not an autopilot repairman.
4  Q.  Okay.  Okay.  Let's take a deep breath.  You're
5  saying it should have been repaired and I'm asking you
6  what part of the autopilot should have been repaired,
7  which I'm entitled to ask.
8  A.  When the repairman looked at it and wondered
9  why did it go hard left.  Not here when it went hard left
10  in May, in the incident in May when the tug turned around
11  and almost hit the barge.
12  Q.  You've agreed though now that looking at the
13  Rose Point it didn't go hard left; correct?  You've
14  already testified to that under oath, do you want to
15  retract that?
16  A.  I'm not talking about it going hard left here.
17  I'm talking about it going hard left in May.
18  Q.  So it went hard left in May, but it didn't go
19  hard left on the day of the incident.  You would agree
20  with that?
21  A.  It doesn't appear to be, but I don't know.  I'd
22  like to talk to Morrissey and get his input.
23  Q.  We'd all like to talk to Morrissey, but we may
24  never get to talk to Morrissey.  But the bottom line is
25  you looked at the Rose Point; right?

Page 122

1  A.  Yes.
2  Q.  You have no reason to believe that that's not
3  correct; right?
4  A.  That he went hard left, no.  But maybe that he
5  couldn't switch to autopilot.  I mean, autopilot to NFU.
6  Because why was he where he was?  That's what I want to
7  know.  If the autopilot was working correctly and doing
8  everything properly, why was he on the left side of the
9  channel not even close to the center of the bridge?  What
10  put him there?  Was he even there?  Was he paying
11  attention?  What happened?  There's no reason for him to
12  be on that side of the river.
13  Q.  Do you want me to testify?  You're asking me
14  questions.
15  A.  I'm just saying.  I'm sticking with what I got
16  here.
17  Q.  Do you agree that the Rose Point data shows
18  that it did not go hard over?
19  A.  Yes.  And I don't say it went hard over here.
20  Q.  So whatever happened in May where it went hard
21  over, that particular issue did not happen on June 15th,
22  2024; correct?
23  MR. JETT:  Object to the form.
24  A.  Apparently not according to the last statement
25  made on the 2692.

Page 123

1  BY MR. RODGERS:
2  Q.  And according to the Rose Point data; correct?
3  A.  Rose Point, yeah, yes.
4  Q.  So I'm not talking about speculation.  What you
5  have in front of you thus far without talking to
6  Morrissey and none of us have except Mr. Chapman who was
7  at his hearing and knows what he said, but I wasn't.  I
8  hadn't been hired yet.  But based on what you've been
9  given, which are the 2692 and other documents and the
10  Rose Point data, there's no indication that the vessel
11  went hard over; correct?
12  MR. JETT:  Objection.
13  A.  Correct.
14  BY MR. RODGERS:
15  Q.  So there's no indication, no evidence that
16  you've been able to review that the incident in May with
17  the autopilot, that same exact incident hard over
18  occurred on June 15th, 2024; correct?
19  MR. JETT:  Objection.
20  A.  Correct.  But I still don't -- I still say it
21  could have happened.  It's just hard to say because we
22  don't know what this guy did and what he said.  I don't
23  believe in what they said on 2692.  The company wrote
24  that report.
25

Page 124

1  BY MR. RODGERS:
2  Q.  Do you believe what he said to the Coast Guard
3  is close to the truth?
4  A.  I haven't seen anything from what he wrote to
5  the Coast Guard.
6  Q.  I know.  You can ask Mr. Chapman, he was there,
7  I wasn't.  Okay.  But he's not sending me anything so I
8  don't know.  We do have a subpoena to the Coast Guard,
9  I'll let you know and the NTSB and we may have to make a
10  motion to the judge to ask for those transcripts.
11  Okay.  So the one person who knows what he did
12  is AWOL.  It's nobody's fault except Mr. Morrissey and
13  that's the way it is.  You've been asked to come in and
14  opine on the evidence in front of you.  Okay?
15  A.  Right.
16  Q.  And I'm not going to tell you your job as an
17  expert, that's your lawyer's job.  But that's the
18  questions I'm asking.  And I understand your frustration
19  with not being able to ask Mr. Morrissey a few questions.
20  You can join the line.  It's long.  All right.
21  So let's move on to the few other findings.
22  Oh, just two questions.  When did your final license
23  expire in?  Do you remember what year?
24  A.  2012.
25  Q.  Okay.  And which license was that?



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
125–128

Page 125

1    A.  All of them.  I mean, they were all combined.
2    There's only one.
3    Q.  Oh, okay.  And then did you look at the COI,
4    the certificate of inspection?
5    A.  Yes.
6    Q.  And would you agree that the manning on the
7    Mackenzie Rose on the day of the incident was consistent
8    with the COI?
9    A.  Yes.
10    THE COURT REPORTER:  With the C?
11    THE WITNESS:  The certificate of inspections.
12    MR. RODGERS:  I can't hear the objections if
13    that's you, Zach.
14    MR. JETT:  The court reporter was asking what
15    the COI was.
16    BY MR. RODGERS:
17    Q.  It's the certificate of inspection; correct?
18    A.  Yes.
19    MR. RODGERS:  So you might want to put that in,
20    reporter, certificate of inspection.
21    THE COURT REPORTER:  Okay.
22    MR. RODGERS:  COI is the acronym, I apologize.
23    BY MR. RODGERS:
24    Q.  All right.  So let's go through your findings.
25    Try to get through this.  I know it's been a long day for

Page 126

1    both of us.  Not as long as a midwatch maybe, but close.
2    Do you have any reason to believe based on the
3    evidence that you've been able to look at that Captain
4    Miller knew that Mate Morrissey was going to fail to turn
5    off the switch on the autopilot?
6    A.  I know nothing about Captain Miller, he's dead,
7    can't ask him.
8    Q.  Is there anything in the evidence that you've
9    seen that leads you to believe that he knew that that was
10    going to happen when he went off to the rack?
11    A.  How would anybody know it's going to happen?
12    Q.  Okay.  So he didn't know it was going to
13    happen.  Would you agree --
14    A.  I can't speak for him, I don't know him and I
15    don't know what he was thinking.
16    Q.  Okay.  So if you go to three in your findings,
17    right.  "The deck logbook entry was inaccurate and
18    misleading, stating the unit had maneuvered onto
19    fendering and away from the bridge when in fact it struck
20    the fixed western structure directly."  Do you see that?
21    A.  Yes.
22    Q.  That's your finding, but would you agree that's
23    not one of the findings that you're saying caused the
24    incident; right?  You're just making a finding on the
25    fact?

Page 127

1    A.  Right.
2    Q.  Okay.  All right.  I'm just trying to clear
3    everything up on your findings because I don't want us to
4    be confused at trial.  If you go to 11, you want to read
5    that for me?
6    A.  "The Coast Guard was not promptly notified of
7    the allision, in violation of 46 blah, blah, blah.  This
8    delayed official investigation and post incident drug and
9    alcohol testing and created potentially dangerous
10    conditions for the Norfolk and Portsmouth Belt Line
11    Railroad Company and the public at large."
12    Q.  Okay.  So that statement is a finding which you
13    would agree it has to do with actions or inactions that
14    occurred after the incident; right?
15    A.  Yes.  Immediately after.
16    Q.  So 11 doesn't -- is not something that you're
17    testifying caused the incident; right?  It's something
18    that happened post incident; am I correct in that?
19    A.  Yes.
20    Q.  Okay.
21    A.  It shows the inability of Carver to do the
22    right -- did not do the right thing by notifying the
23    Coast Guard.
24    Q.  And I understand that and you're free to tell
25    the judge that at trial.  And he's free to do what he

Page 128

1    wants with that.  Number 12 I will read it.  "Post
2    incident accounts from multiple crew members were
3    inconsistent, with discrepancies and timing, actions
4    taken, and observations."  Do you see that?
5    A.  Yes.
6    Q.  You'd agree that that's your finding on post
7    incident issues; correct?
8    A.  Yes.
9    Q.  Not a finding that had anything to do with the
10    cause of the incident; am I correct in that?
11    A.  Yes.  It's after the incident.
12    Q.  Okay.  We've already gone through 13.  And 14
13    let's see.  14 I think we've gotten into the substance of
14    it.
15    A.  Yeah.
16    Q.  That is your conclusion on the failures you're
17    saying it's all three, navigational, procedural and
18    managerial; right?
19    A.  Correct.
20    Q.  Okay.  And then in 15 you're saying that
21    Mackenzie Rose was unseaworthy.  Do you see that?
22    A.  Yes.
23    Q.  Was at the time.  You understand seaworthiness
24    is a legal term of art in the context of maritime law?
25    A.  Yes.



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
129–132

Page 129

1    Q.  So you understand you're making a legal
2   conclusion?
3         MR. JETT:  Object to the form.
4   BY MR. RODGERS:
5    Q.  Or are you using it in another manner?
6    A.  I'm using it to say the vessel was not
7   seaworthy.  If that's legal, I guess.  I don't know if
8   that's legal or not.
9    Q.  You don't have to listen to me.  If you're
10  using it in another manner, you can tell us.  I'm telling
11  you it's a legal term of art in this particular lawsuit,
12  it's one of the things the judge is going to determine.
13        So if you're using it in another manner, you
14  can tell us.  I just want to be clear that I'm not sure
15  why you're saying it's unseaworthy.
16   A.  Because of the procedures -- regarding using
17  the autopilot, not having a lookout during bridge
18  transits, the known issues with the autopilot, no
19  repairs.  And Captain Morrissey's prior allision where
20  nothing was done to correct him or discipline him or show
21  him what he did wrong.  And the crew, in my opinion, was
22  mostly brand new.  I think Mr. Porter was the only guy
23  that had been there any length of time, everyone else was
24  relatively new in the last seven months so.
25   Q.  New to the voyage or new to the company?

Page 130

1    A.  New to the company.
2    Q.  Mr. Miller was new to the company?
3    A.  Yeah.  I don't have a beginning date for him.
4   There was nothing in his records.
5    Q.  How about Mr. Morrissey?
6    A.  Morrissey was hired in like December.
7    Q.  What about Mr. Jarkeis Morrissey, the deckhand?
8    A.  He was hired in April.
9    Q.  And what about Mr. McGrath the engineer?
10   A.  He was -- he might have been December or
11  November, I don't have the exact dates.
12   Q.  And did you establish whether they had
13  experience before they came to Carver and Mackenzie Rose?
14   A.  I would imagine they did because they had
15  licenses, but I have -- there's no records of what they
16  did before in any of the information I read.
17   Q.  So you're saying the minute somebody changes
18  vessels and owners that they're not qualified?
19        MR. JETT:  Object to form.
20   A.  No.  Excuse me?
21        MR. JETT:  Go ahead.
22   A.  No, I'm not saying that they're not qualified.
23  I just don't think that they were trained to be a proper
24  crew to operate this vessel.
25

Page 131

1   BY MR. RODGERS:
2    Q.  Okay.  But they were trained from time to time
3   by either the captain or the mate; correct?  Onboard?
4    A.  According to the Carver, yes, according to the
5   emergency drills.
6    Q.  And according to the deckhands they actually
7   testified and Mr. Baldassare testified, do you recall
8   that, that there was training on board?
9    A.  Yes, onboard.
10   Q.  So you would agree that it cannot be said that
11  they had no training; right?  You would agree that that's
12  not true?  It's just you're saying they didn't have
13  training pursuant to what you think training should be?
14   A.  Right.
15   Q.  Is that a fair statement?
16   A.  Okay.
17   Q.  Is that fair?
18   A.  Yes.
19   Q.  Have I got it right?
20   A.  Yes.
21   Q.  "Carver should not have allowed this tug to
22  sail with this crew."  Do you see that?
23   A.  Yes.
24   Q.  That's a pretty strong statement.
25   A.  Yes, it is.

Page 132

1    Q.  What do you mean by that?
2    A.  I just don't think they were qualified to take
3   the vessel where they were going as shown by what
4   happened hitting the bridge.
5    Q.  So every time there's a maritime incident or an
6   accident regardless of the cause is it your conclusion
7   that that vessel should not have sailed to begin with?
8   Is that the way you look at maritime casualties?
9    A.  No, that's not what I'm saying.  I'm talking
10  about this crew.
11        MR. RODGERS:  All right.  I need about ten
12  minutes.  I'm going to check my documents and other
13  things because I might be done.  Don't take my word
14  for it.  But I'm going to just check my documents
15  and things that I might have missed and let's
16  reconvene in ten.  Okay, Captain?
17        THE WITNESS:  Okay.
18        (A break was taken.)
19        MR. RODGERS:  Okay.  So I'm done.  I want to
20  thank you for showing up and going through all the
21  questions.  I'm sure it's not fun for you.  And
22  just, Reporter, before we go off can I get an
23  expedited copy including a mini?
24        MR. JETT:  Yeah, I'm going to have some
25  redirect on that.



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
133—136

Page 133

1    MR. RODGERS:  Sorry, sorry.
2    MR. JETT:  That's all right.  I don't know if
3  anyone else did.
4    MR. RODGERS:  I don't know who is talking.
5    MR. JETT:  Zach.  I'm in with captain.
6    MR. RODGERS:  Yeah, you're hiding.  All right.
7  Go ahead.
8    MR. JETT:  I'm right here.  I'm right next to
9  him.
10    MR. RODGERS:  I just see a big Yeti bottle.  Go
11  ahead.
12    MR. JETT:  We're on a very small screen.
13    THE WITNESS:  New York Giants.
14        CROSS EXAMINATION
15  BY MR. JETT:
16    Q.  All right.  Captain Lewis, I've just got a
17  couple clean up questions for you.  Can you hear me all
18  right out in cyberspace everyone?  Can you hear me Jim?
19    MR. RODGERS:  I can now hear you, yes.
20    MR. CHAPMAN:  All good, yes.
21  BY MR. JETT:
22    Q.  All right.  Captain, you were asked some
23  questions about physically inspecting the mainline
24  bridge.
25    A.  Yes.

Page 134

1    Q.  Do you remember those questions?  And you, in
2  fact, did not actually go out to see the bridge as part
3  of your investigation of this case; is that right?
4    A.  Correct.
5    Q.  Did you have an opportunity to look at
6  photographs?
7    A.  Yes.
8    Q.  All right.  Did you have an opportunity to look
9  at drone images of the bridge?
10    A.  Yes.
11    Q.  How about Google Earth images?
12    A.  Yes.
13    Q.  Do you feel that you fairly apprised yourself
14  of what the bridge looked like, its dimensions and its
15  surroundings?
16    A.  Yes.
17    Q.  Would going to the bridge physically have done
18  anything to impact your decisions in this case?
19    A.  No.
20    Q.  You were asked some questions about any
21  assessment that you made of Captain Miller.  Do you
22  recall those questions?
23    A.  Yes.
24    Q.  And did you or did you not make any assessment
25  of Captain Miller?

Page 135

1    A.  In what sense?
2    Q.  Well, did you -- did you evaluate what Captain
3  Miller did either in response to the allision or anything
4  else?
5    A.  The only thing I said about Captain Miller that
6  I know is his statements and the fact he had told the
7  company to call the Coast Guard, which he could have
8  done, and nobody apparently notified the Coast Guard at
9  that time when the incident happened.
10    Q.  Is that something you would expect the captain
11  to do following an allision?
12    A.  A captain can do that.
13    Q.  Okay.  And Mr. Miller, Captain Miller did not
14  do that in this scenario, did he?
15    A.  No.
16    Q.  We've not been able to depose Mr. Miller
17  because regrettably he's deceased; is that right?
18    A.  Yes.
19    Q.  And, likewise, you've mentioned we've not been
20  able to -- you've not been able to read a deposition
21  testimony of Mate Morrissey; right?
22    A.  Correct.
23    Q.  And that's because he failed to show for his
24  deposition; correct?
25    A.  Twice.

Page 136

1    Q.  Okay.  All right.  Based on the evidence that
2  you've reviewed, how many witnesses are you aware of to
3  the allision?
4    A.  According to the statements, the only one that
5  would have actually seen it would have been Morrissey,
6  would have been the mate.
7    Q.  Okay.  Now you were asked some questions in
8  your report about some of the Simrad warnings?
9    A.  Yes.
10    Q.  About the use of autopilot?
11    A.  Uh-huh.
12    Q.  Is Simrad the manufacturer of the autopilot
13  that was on board the Mackenzie Rose at the time of the
14  allision in June of 2024?
15    A.  Yes.
16    Q.  And did you have an opportunity to review the
17  manual in that case?
18    A.  Yes.
19    Q.  All right.  Now in your review of the manual
20  did you identify instances where the autopilot should not
21  be used?
22    A.  Yes.
23    Q.  Okay.  What did you identify as instances where
24  the autopilot should not be used?  And I'm specifically
25  referring to page six of your report, sir.



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
137–140

Page 137

1   A.  Okay.  Basic safe operation with the autopilot,
2   basic operation.  I have highlighted in heavy traffic
3   areas or in narrow waters.
4      Q.  Okay.
5      A.  Which I think the tug and barge was in narrow
6   waters.  "Do not leave the helm unattended and always
7   switch the autopilot to standby and reduce speed in due
8   time to avoid hazardous situations, verify regular
9   intervals the course and position of the vessel.  And use
10  of autopilot in confined inland waterways, particularly
11  when approaching a fixed structure such as a railroad
12  bridge, violates best practices and specific warnings
13  found in the Simrad manual.  The autopilot used in the
14  upper wheelhouse on the tug Mackenzie Rose at the time of
15  the allision was the Simrad."
16     Q.  Okay.  And so specifically as to the first
17  highlighted bullet point under do not use automatic
18  steering when, you were asked about in heavy traffic;
19  right?
20     A.  Right.
21     Q.  Were you asked about in narrow waters?
22     A.  No.
23     Q.  All right.  So is it your opinion the autopilot
24  should not have been used while transitioning the
25  Mainline Bridge in the Elizabeth River?

Page 138

1      A.  Yes, it should not have been used.
2      Q.  Okay.  Why not?
3      A.  Because you should be on hand steering to me in
4   any narrow waters and the manual states not to do that.
5      Q.  Okay.  In your review of this allision incident
6   and understanding that the vessel was in autopilot at the
7   time, were you able to determine if Mate Morrissey or
8   anyone else in the vessel verified at regular intervals
9   the course and position of the vessel?
10     A.  No.
11     Q.  Okay.  Is there any evidence of that that you
12  saw?
13     A.  Of the vessel?
14     Q.  Of a review at regular intervals of the course
15  and position of the vessel.
16     A.  I don't -- I don't think so.
17     Q.  Okay.
18     A.  No, I don't recall giving exact positions.
19     Q.  If in your expertise and in your opinion if
20  someone on board, either Mate Morrissey or someone else,
21  had reviewed the position of the vessel at any regular
22  interval, do you think they would have been able to
23  determine they were headed towards the Mainline Bridge?
24     A.  Yes.
25     Q.  Okay.  You were asked some questions about the

Page 139

1   2692.  There's two separate 2692s filled out; is that
2   right?
3      A.  Correct.
4      Q.  All right.  Now I noticed you didn't quote or
5   other than reference the 2692, either of them, in your
6   report; is that right?
7      A.  Yes.
8      Q.  Why was that?
9      A.  Because you're not allowed to quote.  You can
10  reference but you can't copy or do anything with the 2692
11  according to the law.
12     Q.  Okay.  Well, let me ask you a little bit
13  differently so it's clear.  Did the -- did you rely on
14  the 2692 as a basis in forming your expert opinion?
15     A.  Partially.
16     Q.  Okay.
17     A.  I mean, I would say partially only because I
18  read it.
19     Q.  Okay.
20     A.  I mean.  But as far as the 25A and 25B were I
21  couldn't -- I couldn't use that as a reference to making
22  my report.
23     Q.  Okay.  So you couldn't rely on that in making
24  your report?
25     A.  Correct.

Page 140

1      Q.  Okay.  I'm not sure if you were asked this, I
2   jotted this down, so forgive me if you were.  There were
3   a lot of questions.  Did you ever push a tug without a
4   barge?
5      A.  Yes.
6      Q.  Okay.  You did.  That's right, up in the Hudson
7   River you testified.
8      A.  Anywhere I ran a tugboat, you always ran a
9   light tugboat.
10     Q.  All right.  You were asked some questions about
11  captain -- Captain Sam Stephenson's survey of other
12  harbor pilots.  Do you recall those questions?
13     A.  Yes.
14     Q.  What's a harbor pilot's role?
15     A.  Usually they meet a vessel at the sea buoy and
16  take them into the port and a lot of ports they do the
17  docking of the vessel also.
18     Q.  Okay.  Do they actually sail the vessel on the
19  way in or are they guiding the captain to port?
20     A.  They're an adviser, you know.  A pilot is not
21  the captain.  The captain is always the captain except in
22  the Panama Canal.  And the pilot he's there to assist and
23  make sure the ship does the right thing.
24     Q.  Okay.
25     A.  Is heading in the right direction.



Page 141

1    Q.  So who has the final say if there's a captain
2  aboard a vessel?
3    A.  The captain.
4    Q.  How about if there's a pilot aboard the vessel
5  with a captain?
6    A.  He's an adviser to the captain.
7    Q.  But the captain has the final say?
8    A.  Yes.
9    Q.  All right.  So would a survey of harbor pilots
10  have assisted you in forming your opinion in this case?
11    A.  No.
12    Q.  Okay.  All right.  And that's as to a pilot's
13  opinion for the appropriate use of an autopilot in the
14  Elizabeth River; right?
15    A.  Correct.
16    Q.  You were asked some questions about Mate
17  Morrissey and his actions prior to the allision and one
18  of them referenced his position in the upper wheelhouse.
19        Do you know for certain if Mr. Morrissey was in
20  the upper wheelhouse at the time of the allision?
21    A.  No.
22    Q.  Do you know where Mr. Morrissey was at the time
23  of the allision?
24    A.  No.
25    Q.  Okay.  And that's because we don't have

Page 142

1  firsthand testimony from anyone who witnessed
2  Mr. Morrissey's whereabouts or from Mr. Morrissey
3  himself; is that right?
4    A.  Correct.
5    Q.  You were asked a few questions early on about
6  the video and black smoke that you saw.  Do you recall
7  that?
8    A.  Yes.
9    Q.  Just for clarity I don't think we identified
10  which video you were talking about.  And you've seen more
11  than one video in this case; is that fair?
12    A.  Yes.  I think I have it referenced in my
13  report.
14    Q.  Okay.  If you could find that and just confirm
15  which video we were talking about when you described
16  seeing black smoke just so we're clear on the record.  If
17  you reference page three.
18    A.  It was three?
19    Q.  Yeah.
20        MR. RODGERS:  Which number?
21        MR. JETT:  Page number three on his report I
22    believe was the video that was referenced.  I just
23    wanted to clear it up for the record.
24    A.  Here it is.  The video NPBL000201-2024-06-15.
25  Allision events surveillance video one.

Page 143

1  BY MR. JETT:
2    Q.  Okay.  And do you know where that video was
3  taken?
4    A.  It looks like a cement dock that was there.
5    Q.  Okay.  So shoreside?
6    A.  Yes.
7    Q.  All right.  And that's when we talked about the
8  black smoke, you were referring to that video?
9    A.  Yes.
10    Q.  All right.  And I asked you a question about
11  Captain Sam Stephenson's report.  Did you have an
12  opportunity to review that report?
13    A.  Yes.
14    Q.  And, in fact, we reviewed that in preparation
15  for your deposition here today; is that right?
16    A.  Yes, we did.
17    Q.  Okay.  I'm going to direct your attention, I
18  don't know how to pull it up on the screen, but page 16
19  of his report.  Page 16 of Captain Sam Stephenson's
20  report has an image.  I'll just put it in front of you.
21  Have you seen this image before?
22    A.  Yes.
23    Q.  Okay.
24    A.  And I reviewed it.
25    Q.  And you reviewed it.  And it depicts a still

Page 144

1  frame with three different lines, a yellow line, a blue
2  line and a red line; is that right?
3    A.  Correct.
4    Q.  Okay.  And it's my understanding that this was
5  plotted based on Captain Stephenson's report it was
6  plotted from the Rose Point data.  Is that your
7  understanding?
8        MR. RODGERS:  Objection, objection, foundation.
9        MR. JETT:  Okay.  Well, we can refer back to
10    Captain Stephenson's report.
11        MR. RODGERS:  You're asking him to testify what
12    Captain Stephenson meant.
13        MR. JETT:  No.
14        MR. RODGERS:  Other than what's in writing.
15        MR. JETT:  No, no, I just want to ask him a
16    clarifying question about that.
17        MR. RODGERS:  All right.
18  BY MR. JETT:
19    Q.  You testified earlier in response to some
20  questions that it did not appear that the vessel had gone
21  hard left at any time prior to the allision.  Do you
22  recall that testimony, sir?
23    A.  Yes.
24    Q.  Okay.  In looking at that still image from
25  Captain Stephenson's report, does it appear to you that



EXHIBIT 1

CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
145–148

Page 145

1 the vessel went left at any point after it goes under the
2 south Jordan River Bridge and before the allision event?
3    A.   Well, as it passes through the Jordan Bridge it
4 heads left of the center draw of the NPBL Bridge and
5 about two minutes in it makes a hard -- not a hard left,
6 but it makes a left hand turn towards the outside of the
7 channel.
8    Q.   Okay.
9    A.   Of the bridge.
10    Q.   All right.  So does it appear that the vessel
11 did go left prior to the allision with the Mainline
12 Bridge?
13    A.   Yes.
14       MR. RODGERS:  Objection.  Objection to form.
15 BY MR. JETT:
16    Q.   Okay.
17    A.   It started left coming out through the bridge
18 and then it went left at 162624 towards where the
19 allision happened.
20    Q.   Okay.
21    A.   So it did go left.
22    Q.   Okay.  You were asked some questions about the
23 sea worthiness and the definition of seaworthy.  Do you
24 recall that, Captain?
25    A.   Yes.

Page 146

1    Q.   When you were using the term seaworthy, does
2 that have a certain meaning to you as a captain?
3    A.   Yes.
4    Q.   Okay.  What does seaworthiness mean to you?
5    A.   A vessel is equipped and ready to do its job,
6 operate safely.
7    Q.   Okay.
8    A.   It's ready to go to sea.
9    Q.   Okay.  And you opined one of your opinions was
10 that in your opinion that the Mackenzie Rose was not
11 seaworthy at the time of the allision; is that right?
12    A.   Yes.
13    Q.   Okay.  And there was some back and forth about
14 that, but I want to give you an opportunity to explain.
15 What did you mean when you opined that the vessel was not
16 seaworthy prior to the allision?
17    A.   To me proper training, lack of policies and
18 procedures regarding the autopilot.  The fact that they
19 didn't repair the autopilot.  There was no lookout during
20 the bridge transit, which was standard SOP for me when I
21 worked.  And also I just felt that the crew was not
22 trained enough and not prepared to be -- to take that
23 vessel to sea.
24    Q.   It sounds like those are personnel related
25 issues as to --

Page 147

1       MR. RODGERS:  Objection.
2 BY MR. JETT:
3    Q.   -- your definition of seaworthiness?
4    A.   Yes.
5    Q.   Sorry.  Okay.  Are there other elements in your
6 opinion that go into sea worthiness as to the vessel
7 itself?
8    A.   Yes.  To the -- well, again we go back to the
9 autopilot, it's safety.  We go back to the vessel's
10 equipment should be working properly.  The vessel's
11 equipment does not work properly, it technically makes it
12 unseaworthy.  Unseaworthy is very broad term that entails
13 a lot of things.  And I had a definition of unseaworthy
14 in my papers, but I don't have it with me.
15    Q.   Okay.  All right.  The report that you have
16 authored in this case, have you been given an opportunity
17 to testify about all of your findings in this case?
18    A.   Yes.
19    Q.   Okay.  Having sat through a deposition here
20 today, are there any findings or conclusions that you
21 wish to change?
22    A.   The only thing I think I said when we were
23 talking about the Rose Point, that the vessel didn't go
24 left.  But looking at this now and recalling it from when
25 I read it Monday and also reviewing it yesterday, it does

Page 148

1 go left.
2    Q.   Okay.  Now the Rose Point that you were
3 testifying about, what was that?  What did you say?
4    A.   That was the one -- I don't know the number --
5 the number on that one, but it had like a chart and it
6 was like a blue vessel moving through the thing and it
7 showed you the course, the speed and that's where I got
8 the 5.2 knots and...  But at that -- in that one I did
9 not see a left turn.
10    Q.   Okay.
11    A.   That's why I said that earlier.
12    Q.   Okay.  But now -- now in reviewing the plotted
13 points.
14    A.   Yeah, it definitely went left.  But, like I
15 say, it was going left from the minute it got underneath
16 the Jordan Bridge.
17    Q.   All right.  Okay.
18    A.   Because if you look at the -- Stephenson drew
19 lines and these are the yellow lines.  It was heading
20 directly for the west abutment of the bridge not to the
21 center.  And then when it got to 1626 it made -- it
22 veered about ten, 15 degrees left, which headed right
23 towards the location of the allision.
24    Q.   Okay.  And there was some questions earlier
25 about operating a light tug and that's just a tug without



CAPTAIN NICHOLAS J. LEWIS                                    August 13, 2025
MATTER OF COEYMANS MARINE TOWING, LLC                       149–152

1  a barge; right?
2     A.  Right, uh-huh.
3     Q.  Okay.  And so even when you're operating a
4  light tug, and that is one without a barge, do you use
5  autopilot then?
6     A.  Sometimes depending on where you are, how long
7  of a trip it is.  If I'm just running from say like New
8  York Harbor in the Kills, which is a narrow, no, you
9  would be on hand steering the whole time because of the
10  traffic.
11     When up get out into sort of open waters, even
12  though you're in the river, like the Hudson River, the
13  lower end, it's pretty wide open.  With a light tug I'm
14  going up to Newburg say to pick up a barge, I would be on
15  automatic pilot going up to the GW Bridge till I got to
16  where the river narrowed.
17     Q.  All right.  Just to be clear, when you're
18  transitioning the bridge, that's hand steering only;
19  right?
20     A.  Yes.
21     Q.  Okay.  All right.  All right, Captain.  I think
22  those are all the questions.  I'm not sure if there will
23  be redirect, but I appreciate your time and thank you for
24  clearing those up for me.
25     A.  Thank you.

1     MR. RODGERS:  Yeah, I have redirect.
2        REDIRECT EXAMINATION
3  BY MR. RODGERS:
4     Q.  Did you inspect the tug?
5     A.  Not yet.
6     Q.  Okay.  We've got information that you'll be
7  there on August 18th?
8     A.  Yes.
9     Q.  At 1 p.m., okay, in Staton Island; right?
10     A.  Yes, sir.
11     Q.  Now the first time I think it was early July,
12  maybe it was late June there was a scheduled tug
13  inspection in Charleston.  Do you remember that?
14     A.  Yes.
15     MR. JETT:  Objection.
16  BY MR. RODGERS:
17     Q.  And there was a problem with your flight.  Do
18  you remember that?
19     A.  Yes.
20     Q.  And then you might recall that -- did you know
21  your attorneys made a motion to compel an inspection of
22  the tug?
23     A.  No.
24     Q.  All right.  I'll represent to you that they
25  did.  And although we had told them that we would

1  probably allow you to come back and inspect the tug, they
2  made a motion anyway.  But whatever.
3     Do you remember July 28th there was a date of
4  inspection in New York?
5     A.  Yes.  I couldn't make it.
6     Q.  But did your attorneys tell you about it?
7     A.  Yes.
8     Q.  When did they tell you about it?
9     A.  The 27th, 26th.
10     Q.  Were you out of town?
11     A.  No, I was on another case.
12     Q.  Where?
13     A.  Here.
14     Q.  Where is here?
15     A.  Florida, Melbourne, Florida.
16     Q.  Do you not have the name of the case?
17     A.  Dufrain Wade (phonetic).
18     Q.  Is that on your list?
19     A.  No.  I haven't done anything.  I've only done a
20  report with it.
21     Q.  Were you at a deposition on the 28th?
22     A.  No.  I was in -- I had a zoom meeting on my
23  report.  My report was due the 29th.
24     Q.  So you could have flown up for the 28th and
25  gone to the inspection; correct?

1     MR. JETT:  Objection.
2  BY MR. RODGERS:
3     Q.  Right?  But you made a priority for another
4  case; is that fair to say?
5     MR. JETT:  Objection.  Objection to this line
6  of questioning.  This has been resolved by the court
7  and we'll go to the inspection on Monday.
8     MR. RODGERS:  We'll see.  We'll see.  I'm just
9  trying to find out what happened in case the issue
10  comes up again.
11     MR. JETT:  Well, we had agreed to be there --
12  hey, we agreed to be there.
13     MR. RODGERS:  No speaking objection.  I'm going
14  to finish because you brought up inspection.
15  BY MR. RODGERS:
16     Q.  Did you -- you weren't out of the country,
17  right, on the 28th?
18     A.  Nope.
19     Q.  Okay.  You weren't in the hospital; correct?
20     A.  No.
21     Q.  Did your attorneys tell you they had made a
22  motion to the court to compel us to make that tug
23  available?
24     MR. JETT:  Objection, asked and answered.
25     MR. RODGERS:  You can answer again.



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
153–156

Page 153

1    A.  For which time, this time?
2  BY MR. RODGERS:
3    Q.  For the 28th.
4    A.  Not that I recall.  All I know is it was very
5  late notice and I had things already I had to do.
6    Q.  Late notice from your attorneys?
7    A.  Yes.
8    Q.  Okay.
9      MR. JETT:  From Carver.
10  BY MR. RODGERS:
11    Q.  On August 18th are you going to -- and again
12  you have to understand, Captain, this is being litigated
13  continuously, this issue.  So I just need to know are you
14  flying up the night before on the 17th?
15    A.  No, the morning of the 18th.
16    Q.  All right.  And if for some reason, as you know
17  better than anybody, there's an operational change where
18  suddenly it's not the 18th but it's, I don't know, the
19  morning of the 19th, do you have anything in your
20  schedule that would prevent you from staying over and
21  seeing it on the 19th?
22    A.  No.
23    Q.  On the Simrad, had you used a Simrad before on
24  your oil barge tug?
25    A.  Not that I recall.

Page 154

1    Q.  So had you ever -- how did you get a copy of
2  the Simrad manual?  Did your attorney send it to you?
3    A.  It was part of the data -- the discovery.  I
4  don't know.
5    Q.  Okay.  Had you seen it before?
6    A.  What?
7    Q.  Ever.  Had you ever seen a Simrad manual before
8  that?
9    A.  No.
10    Q.  Okay.  Had you ever referred to the -- to the
11  manufacturer's manual when making a decision in a
12  navigational sense when or when not to use an autopilot?
13    A.  Not that I can recall.
14    Q.  So if the Simrad -- if your -- when you were
15  dealing with oil barges and as a tug captain or mate,
16  would you go to the manufacturer's manual to determine
17  whether you could use the autopilot in inland waters with
18  an oil barge?
19    A.  I couldn't anyway.
20    Q.  No, but would you go to that manual to see what
21  they said about using it in inland waters?
22    A.  If it said that, I would have read it.  But I
23  go to the manual to properly use the autopilot.
24    Q.  Okay.  And you go to the CFR or other laws to
25  decide whether you lawfully can use the autopilot;

Page 155

1  correct?
2    A.  Well, yes.  My company sent me that information
3  in their SMS.
4    Q.  So you followed the SMS of Exxon?
5    A.  Yes.  And the CFR, they reference the CFR.
6    Q.  Narrow waters, would you agree that you and
7  Captain Stephenson in this instance just disagree on the
8  issue of narrow waters in the Elizabeth River on that
9  particular day of the incident?
10    A.  Yes.
11    Q.  Okay.  On the pilots -- I may have missed
12  something.  The question, if I recall, your counsel asked
13  you was dealing with pilots and use of autopilot; right?
14    A.  Yes.
15    Q.  Okay.  And was your testimony that the
16  situation with the pilot is different than a situation
17  such as --
18      THE COURT REPORTER:  Such as what, I'm sorry?
19      MR. RODGERS:  Such as the situation with the
20      Elizabeth River and I'll add on the day of the
21      incident.
22    A.  I don't understand the question.
23  BY MR. RODGERS:
24    Q.  All right.  I'll withdraw it since you don't
25  understand it.  You said that you looked at the actual

Page 156

1  Rose Point; correct?
2    A.  Yes.
3    Q.  You didn't see any hard left on the actual Rose
4  Point; correct?
5    A.  It didn't appear to be, no.
6    Q.  And you didn't note in your report that you saw
7  any left turn; correct?
8    A.  Correct.
9    Q.  Okay.  And that's what's in your report; right?
10    A.  I don't think it says anything about not going
11  left.
12    Q.  It doesn't say it went left or hard left;
13  right?
14    A.  Right.
15    Q.  And --
16    A.  It just says he had a hard time I think
17  shifting over to NFU.
18    Q.  Okay.  And you've been shown Captain
19  Stephenson's diagram with his particular points and
20  lines; correct?
21    A.  Yes.
22    Q.  So you're not basing -- the testimony you just
23  made -- excuse me, that you just said regarding whether
24  it went left or not, it's not based on the Rose Point,
25  it's based solely on Captain Stephenson's photo and



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
157—160

Page 157

1  notations on page 16 of his report; correct?
2      A.  Yes.  Which I think are based on AIS positions.
3      Q.  Well, you may think that, but you're basing
4  your testimony on that particular diagram created by
5  Captain Stephenson; correct?
6      A.  Yes.
7      Q.  You would agree that the evidence in the case
8  regarding the track is the Rose Point evidence; correct?
9      A.  That's one of them, yes.
10     Q.  Well, that's the main evidence; correct?  It's
11  not like your opinion and your drawing, it's not Captain
12  Stephenson's drawing, right, it's the Rose Point chart?
13     A.  It's the Rose Point --
14     Q.  Right.
15     A.  It's the Rose Point video.
16     Q.  That's the actual evidence in the case;
17  correct?
18     A.  Yes, that I received.
19     Q.  Based on that, your testimony earlier today,
20  based on that was that there -- there does not appear to
21  be any hard left turn; correct?
22     A.  Yes.
23     Q.  Now if you look at page -- I'm going to read
24  from Captain Stephenson's report on where one-man bridge
25  operations are allowed, okay.  I'm just going to -- I'm

Page 158

1  just going to read where he surveyed certain tug
2  companies who agreed with him on one-man bridge
3  operations.  Okay?
4      A.  Okay.
5      Q.  All right.  He lists McAllister Towing.  Are
6  you agreeing with McAllister Towing's policy allowing
7  one-man bridge operations vis-a-vis the lookout issue?
8      A.  No.
9      Q.  Okay.  Well, they're agreeing with Captain
10  Stephenson.  Are you agreeing with McAllister?
11         MR. JETT:  Hold on.  What page are we on?
12  Where are you, Jim?
13         MR. RODGERS:  Sorry, 21.
14  BY MR. RODGERS:
15     Q.  So I'll read it with the following companies
16  have one-man bridge operations aboard tugs when
17  conditions permit.  The first name is McCallister.  Okay?
18         MR. JETT:  I'm going to put it in front of the
19  witness.
20     A.  Okay.
21  BY MR. RODGERS:
22     Q.  As you sit here today are you disagreeing with
23  McAllister what their policies permit?
24     A.  When and where conditions permit it.
25     Q.  I understand.  But are you disagreeing with

Page 159

1  that statement that McAllister is agreeing with Captain
2  Stephenson?  You do disagree with Captain Stephenson.
3  Are you also disagreeing with McAllister on that
4  condition?
5      A.  Of a one-man operation in the wheelhouse?
6      Q.  Yes.
7      A.  In a closed quarters situation?  I don't
8  have -- I can't remember what it said.
9      Q.  Well, are you disagreeing with McAllister?
10     A.  I'm disagreeing with it if it says in a closed
11  quarters situation.
12     Q.  Are you disagreeing with Beso Towboat?
13     A.  I'm disagreeing with all of them if that's what
14  they say.
15     Q.  Okay.  Now -- and you agree that your
16  experiences with oil barges and tugs; correct?
17     A.  Correct.
18     Q.  Is Cook's Inlet a narrow waterway?
19     A.  No.
20     Q.  It's a big bay; right?
21     A.  Yes.  It's a big inlet.
22     Q.  And that's the only time you pushed or towed a
23  barge that wasn't an oil barge that you can recall?
24     A.  Yes.
25     Q.  But it wasn't in a river such as the Elizabeth

Page 160

1  River; right?
2      A.  No.  But it was inland.  It was coming into
3  Cook's Inlet can be very rough, which it was.  And I
4  wasn't for this, I wasn't on hand steering -- I mean, I
5  wasn't on autopilot.
6      Q.  Okay.  But you agree that's not -- that's not a
7  to use your term a narrow waterway --
8      A.  Probably not.
9      Q.  -- whether it's in --
10     A.  I'm sorry, my fault.
11     Q.  My fault, sorry.
12     A.  It's not a narrow waterway initially for the
13  first ten, 15 miles until you get above Homer.
14     Q.  Okay.  So you never been -- you never used
15  autopilot or pushed or towed a non oil barge in a
16  waterway such as Elizabeth River; is that a fair
17  statement?
18     A.  Yes.
19     Q.  Now you're choosing today not to accept that
20  the 1292, the second 1292 and the facts that are listed
21  in there; is that correct?
22         MR. JETT:  Object to the form.
23     A.  2692?
24  BY MR. RODGERS:
25     Q.  Yeah.  What did I say?



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
161–164

Page 161

1    A.  12.

2    Q.  Is that what you're saying today, that you're
3  not accepting that?

4    A.  No.

5    Q.  Okay.  But you're accepting -- if I understand
6  you correctly, it's in your report, you're accepting an
7  incident report where it says on your page five:
8  "Incident, Norfolk, Virginia, I'm reading from your
9  report, Mate James Morrissey reports the autopilot was
10  not completely turned off, he was able to correct and
11  switch back over to manual steering and began backing on
12  the Weeks 281 Barge, sorry reporter, and maneuvered the
13  barge alongside fendering on the north of PBL RR Bridge,
14  photo taken.  Proceed slowly away from bridge."  Do you
15  see that?

16    A.  Yes.

17    Q.  So you're accepting that, right, to get to your
18  conclusion that's in your finding number four; correct?

19    A.  Yes.

20    Q.  Okay.  And doesn't the 2692 essentially say the
21  same thing?

22    MR. JETT:  Objection.

23    A.  It might be, but this was the exact statement
24  from Morrissey.

25

Page 162

1  BY MR. RODGERS:

2    Q.  Okay.  And that supports that he failed to --
3  that he failed to in your words that he:  "Failed to
4  properly disengage the autopilot and did not switch to
5  manual steering, non-follow-up mode."  Do you see that?

6    A.  Right.

7    Q.  In the report in number four.

8    A.  In number four?

9    Q.  Yeah, your finding number four.

10    A.  Yes.

11    Q.  Okay.  And is it your testimony today that
12  you're basing at least in part number four on the entry
13  that I just read to you on page --

14    A.  Yes.

15    Q.  Yes?

16    A.  "Reports the autopilot was not completely
17  turned off, he was able to correct and switch back over
18  to hand."

19    Q.  Okay.  So I'm a little confused why you
20  wouldn't accept a 2692 amended one put in by the company
21  which says essentially the same thing which if it's false
22  is a felony.

23    So I'm asking you why you're not accepting that
24  where you accepted apparently a log entry which says
25  essentially the same thing.  Would you not agree?

Page 163

1    A.  I don't know.  I got to read the -- I don't
2  have the 2692.

3    Q.  Well, I think I made my point.

4    A.  If it says the exact same thing, then I do
5  agree with that, but I don't think it says the exact same
6  thing.

7    Q.  And that's not hard over, right, Mate Morrissey
8  eventually -- his statement -- his eventual statement and
9  proof is that he didn't go hard over, he forgot to turn a
10  switch off; correct?

11    A.  Yes.

12    MR. JETT:  Objection.

13    A.  Well, this doesn't say he went hard over.

14  BY MR. RODGERS:

15    Q.  No, I know it doesn't.  That's the point.  It
16  doesn't say hard over in the entry that you cited.  It
17  says the autopilot is not completely turned off.  Do you
18  see that?

19    A.  Yes.

20    Q.  And that's your June 15th, 2024, logbook entry
21  that you cited?

22    A.  Yes.

23    MR. JETT:  Objection.

24  BY MR. RODGERS:

25    Q.  On page five; correct?

Page 164

1    A.  Correct.

2    Q.  Of your report?

3    A.  Correct.

4    Q.  And then that's in part how you made your
5  determination in your finding four; correct?

6    MR. JETT:  Objection.

7    A.  Yeah.  I think I've answered all of this.

8    MR. JETT:  Yeah.

9  BY MR. RODGERS:

10    Q.  You might have, but your lawyer has brought you
11  back to talk about why the 1292 is not believable and I
12  have to follow-up because he asked you that.  I'm not
13  sure what he discussed with you and I'm not allowed to
14  ask.

15    But the logbook entry that you cited and quoted
16  is in part the basis for you putting in the first part of
17  point four of your finding:  "The officer of the watch
18  Captain James Morrissey failed to properly disengage the
19  autopilot and did not switch the manual steering
20  non-follow-up mode."  Do you see that?

21    A.  Yes.

22    MR. JETT:  Objection.  I think we covered this.

23  BY MR. RODGERS:

24    Q.  Correct?

25    A.  Say that again.



CAPTAIN NICHOLAS J. LEWIS                                          August 13, 2025
MATTER OF COEYMANS MARINE TOWING, LLC                             165–168

1    Q.  And you stood by that; correct?
2    A.  Yes.
3    Q.  Okay.  That doesn't say anything about the
4  autopilot failing mechanically, electronically.  All I'm
5  asking you is what it says not any other explanation.  It
6  doesn't say that in your point four; correct?
7        MR. JETT:  Objection.  He's not been designated
8  as an autopilot expert.
9        MR. RODGERS:  Exactly.  Well, that's not the
10  point.  You've asked him something to change his
11  testimony and he's under oath and he's now changed
12  it after the break and I want to make sure that he's
13  clear as to what his statement is in the report and
14  what his testimony is.
15        MR. JETT:  I think you've adequately asked him
16  that.
17  BY MR. RODGERS:
18    Q.  I'm asking are you standing by your part four?
19        MR. JETT:  He's testified repeatedly that he's
20  standing by everything in his report and it's not
21  going to be amended.
22        MR. RODGERS:  You know, Zach, your firm has
23  brought me to court over speaking objections.  It's
24  a little bit hypocritical.  So can I just finish the
25  question and let the captain go?  I didn't ask you

1  to do the follow-up and have his testimony changed.
2  So I want him -- to be fair to you, Captain, you're
3  the one under oath, not your lawyer and I just want
4  to make sure that you're clear with your report.
5        MR. JETT:  The same objection.
6  BY MR. RODGERS:
7    Q.  Point four, page 12.
8        MR. JETT:  Asked and answered.
9  BY MR. RODGERS:
10    Q.  You're leaving that as it is; correct?
11        MR. JETT:  Same objection, asked and answered.
12    A.  Yes.
13  BY MR. RODGERS:
14    Q.  Okay.  And that is consistent with the actual
15  Rose Point chart that you saw in the materials you
16  reviewed; correct?
17        MR. JETT:  Objection.
18  BY MR. RODGERS:
19    Q.  In other words, there's no hard over on the
20  original Rose Point chart, you did not see that on the
21  chart; correct?
22        MR. JETT:  Objection.
23    A.  Correct.
24        MR. RODGERS:  Okay.  All right.  Again, I thank
25  you.  I don't know if he's going to ask you

1  redirect, redirect.  I don't think you can, Zach.  I
2  think we can let the captain go.  You tell me.  I'm
3  done unless there's some more redirect.
4        MR. JETT:  We'll go off the record for a
5  moment.
6        (A discussion was held off the record.)
7        MR. JETT:  We're done.  No redirect.
8        MR. RODGERS:  Okay.
9        MR. JETT:  We will read and sign.
10        THE COURT REPORTER:  And would you like a copy?
11        MR. JETT:  I would like a copy.  I'll take a
12  condensed PDF with any exhibits they send you.
13        THE COURT REPORTER:  I don't think we marked
14  any.  I mean, he showed them, but I don't think we
15  marked them.
16        MR. RODGERS:  Yeah, reporter.  You'll do my
17  expedited?  I don't know if we marked it.  We
18  referred to prior marked exhibits so I don't think
19  we need to.
20        THE COURT REPORTER:  Okay.  Yeah, I was going
21  to say I don't think we marked any for this
22  deposition.
23        MR. RODGERS:  No, we previously marked.
24        MS. WERNER:  They were previously marked in
25  Brian Moore's deposition.

1        MR. JETT:  I don't know if you all intended to
2  mark his report that was referred to or not.
3        MR. RODGERS:  Yeah, I didn't mark it.  Are you
4  marking it?  I guess we should; right?
5        MR. JETT:  I mean, we can just mark it as late
6  Exhibit Number 1 to this deposition or whatever you
7  want to do, that's fine.
8        MR. RODGERS:  All right.
9        (Coeymans Marine Exhibit No. 1 was Marked for
10  Identification.)
11        (The reading and signing of the deposition were
12  reserved.)
13        (The deposition was concluded at 5:15 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25



CAPTAIN NICHOLAS J. LEWIS
MATTER OF COEYMANS MARINE TOWING, LLC

August 13, 2025
169—171

Page 169

```
1
2                    CERTIFICATE OF OATH
3
4
     STATE OF FLORIDA  )
5
     COUNTY OF BREVARD )
6
7
8              I, YVETTE S. HARRISON, RPR, FPR,
9         the undersigned authority, hereby
10            certify that the witness
11          CAPTAIN NICHOLAS J. LEWIS
12            was duly sworn by me.
13       WITNESS MY HAND AND OFFICIAL SEAL
14          this 13th day of August 2025
15             at Melbourne, Florida.
16
17
18       _____
           YVETTE S. HARRISON, RPR
19     Notary Public, State of Florida at Large
              Certificate No. CC717086
20       My Commission Expires: November 17, 2025
21
22
23
24
25
```

Page 170

```
1                CERTIFICATE OF REPORTER
2
3   STATE OF FLORIDA  )
4   COUNTY OF BREVARD )
5          I, YVETTE S. HARRISON, Registered
      Professional Reporter, Florida Professional
6     Reporter, do hereby certify that I was
      authorized to and did stenographically
7     report the deposition of CAPTAIN NICHOLAS J. LEWIS;
      that a review of the transcript was requested;
8     and that the foregoing transcript,
      pages 1 through 170, inclusive, are a true
9     and correct record of my stenographic notes.
          I further certify that I am not a relative,
10    employee, or attorney, or counsel of any of the
      parties, nor am I a relative or employee of any
11    of the parties' attorney or counsel connected
      with the action, nor am I financially
12    interested in the action.
13
14       DATED this 14th day of August 2025.
15
16
17       _____
18         YVETTE S. HARRISON
             Registered Professional Reporter
19           Florida Professional Reporter
20
21
22
23
24
25
```

Page 171

```
1   CAPTAIN NICHOLAS J. LEWIS; August 13, 2025
2                         ERRATA
3      DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
4   IN RE:    COEYMANS MARINE TOWING
5   CASE NO:  2:24-cv-00490
6   Page & Line
    Number              CHANGE              REASON
7   -------------------------------------------------------
8   _____  _____  _____
9   _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21     Under penalties of perjury, I declare that I have
22  read my deposition and that it is true and correct
23  subject to any changes in form or substance
24  entered here.
25  Dated:_____   CAPTAIN NICHOLAS J. LEWIS
```

