**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC d/b/a CARVER MARINE TOWING, as Owner and Operator of the *M/T Mackenzie Rose*, (IMO No. 8968765), *et al.* | Civil Action No. 2:24-cv-00490-MSD LRL |

**PETITIONER'S BRIEF IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF JOHN POULSON**

Petitioner, Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver"), for its Brief in Support of Its Motion to Exclude Testimony and Opinions of John Poulson ("Mr. Poulson"), states as follows:

**I.    Mr. Poulson's Credentials and Opinions.**

Claimant Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") intends to proffer Mr. Poulson as an expert witness to opine on valuation of Carver's tug, the *M/T Mackenzie Rose*, as of the June 15, 2024 allision. Mr. Poulson has over fifty (50) years' experience surveying and valuing vessels and equipment within the marine industry for insurers, litigants, and other market participants. See **Exhibit 1** (CV).

In this case, Mr. Poulson says he employed the (1) "comparable sales method" (2) "replacement cost approach" and (3) "generated income approach" in arriving at his opinion that "the estimated market value of the tug MACKENZIE ROSE as of June 15, 2024, was USD 4.0 Million." **Exhibit 2**, Report at ¶7.2.

Under his comparable sales method, Mr. Poulson did not actually compare *sales* of like-kind vessels. Rather, he compared *offer prices* listed by sellers and did not factor in the actual fair

1

market value of those vessels, which Mr. Poulson correctly defines as the agreed upon sales price between willing buyers and sellers in the market:

> 10  Q. And then, in order to get the fair
> 11  market value under your definition, you would
> 12  have to have gotten what the buyer agreed to pay
> 13  for it, correct?
> 14      MR. CHAPMAN: Objection to form.
> 15  Q. Is that correct?
> 16  A. Whatever the final sale price would be,
> 17  it would be an agreed price. The buyer may have
> 18  a different idea as to what the fair market
> 19  value is to what the seller does, and they would
> 20  negotiate a final number based on what the
> 21  seller considers to be what he thinks is the
> 22  fair market value.
> 23  Q. And based on what the buyer considers
> 24  what he thinks the fair market value is, right?
> 25  A. Yes.
>
> Page 48
> 1       J. S. POULSON, MSc
> 2  Q. And then, the negotiated price is the
> 3  fair market value, pursuant to your definition,
> 4  correct?
> 5  A. The negotiated price, yes.
> 6  Q. And just to be clear, that negotiated
> 7  fair market value price is not reflected in the
> 8  figures or numbers in Figure 1, correct?
> 9      MR. CHAPMAN: Objection to form.
> 10  Q. Correct?
> 11  A. It's the offer price in Figure 1.
> 12  Q. Thank you. And then, if we go to

**Exhibit 3**, Tr. 47-48; see also **Ex. 2** at ¶6.8.

For his replacement cost valuation, Mr. Poulson utilized a $14M replacement cost estimate and applied a 70% depreciation rate to value the *M/V Mackenzie Rose* as of June 15, 2024 at $4.4M. Mr. Poulson derived the $14M figure from "known construction costs in 2024" of one new build vessel that had higher horsepower and different engines than the *M/V Mackenzie Rose*. **Ex. 3**, Tr. 65:5-11 ("It's an estimate. Because as I say, it's difficult to apply a replacement for the exact same configuration in today's market when the twin-screw arrangement isn't customarily built now, replaced with the as is now common Z-Drives"). Mr. Poulson's 70% depreciation rate was

generated "just as a general depreciation factor over the life of the tug. It's not a straight line new build, so it would depreciate significantly over the first few years, and then it will level off."

For his income generation method, Mr. Poulson determined the Carver's tug had an $8,500 hire rate, "which if realized will generate an annual income stream of USD 2,640,000." Mr. Poulson then assumed a net income on that figure of 20% and applied a capitalization rate of 12% to arrive at a $4.4M valuation of the tug. **Ex. 2**, ¶6.10. Mr. Poulson did not derive any of these figures from Carver's records and instead used estimates that he believes are "fairly customary rates" based on his experiences. **Ex. 3**, Tr. at 67.

Ultimately, Mr. Poulson's $4.0M valuation opinion is derived from his version of the comparable sales method. The other two methods were employed simply to check the comparable sales valuation:

> Q: Okay. And then, correct me if I'm wrong, is your ultimate estimate of the value of the tug at the time of the incident, is that generally based on comparable sales, and then you kind of did a check by going through replacement costs and income approach; is that fair to say?
>
> [Objection]
>
> A. Yes.
>
> Q. So is it fair to say that your primary basis for getting to $4 million is your comparable sales analysis?
>
> A. Generally that's the approach, yes.

*Id.*, Tr. at 72-73.

## II. Legal Standard.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *United States v. Wilson*, 484 F.3d 267, 274-75 (4th Cir. 2007). Under the Rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

3

>   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>   (b) the testimony is based on sufficient facts or data;
>
>   (c) the testimony is the product of reliable principles and methods; and
>
>   (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Stated otherwise, expert testimony is admissible "if it concerns (1) scientific, technical, or other specialized knowledge that will (2) aid the jury or other trier of fact to understand or resolve a fact at issue." *Westberry v. Gislavad Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999). The first prong requires the court to examine "whether the reasoning or methodology underlying the expert's proffered opinion is reliable" and the second prong asks the court to analyze "whether the opinion is relevant to the facts at issue." *Id.*; see also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). "The proponent of the testimony must establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

### III. Argument.

#### A. Mr. Poulson's comparable sales methodology is flawed and his valuation opinion is unreliable.

The comparable sales methodology is an industry standard of assessing market value of vessels in admiralty actions. *Carl Sawyer, Inc. v. Poor*, 180 F.2d 962, 963 (5th Cir. 1950) (citing *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146, 45 S. Ct. 465 (1925)). Mr. Poulson's problem is he did not actually employ the comparable sales method accepted under *Daubert* and

4

admiralty law. Mr. Poulson used only sellers' offer prices of similar vessels and equated a rough average of the sellers' offer prices to the fair market value of the vessels. Mr. Poulson utilized sellers' offer prices only despite agreeing that "fair market value as defined is an agreed price between a willing seller and a willing buyer." **Ex. 3** at 45:7-11; see also *United States v. Cartwright*, 411 U.S. 546, 551, 93 S. Ct. 1713, 36 L. Ed. 2d 258 (1973) ("Fair Market Value" has been defined as "the price at which property would change hands in a transaction between a willing buy and a willing seller, neither being under a compulsion to buy or to sell and both having reasonable knowledge of the relevant facts").

Offer prices are not sales prices, and offer prices do not determine the fair market value of a vessel under a genuinely employed comparable sales method of valuation. Mr. Poulson's use of offer prices for his comparable sales methodology renders his approach flawed and outside of the bounds of acceptable methodology and thus makes his $4.0 Million valuation opinion of the *M/T Mackenzie Rose* is unreliable under Rule 702 and *Daubert*. Mr. Poulson's testimony and opinions should therefore be barred.

### B. Mr. Poulson's other methodologies are unreliable because they are based on the flawed comparable sales approach.

Mr. Poulson concedes that he only utilized the replacement cost and income methodologies as a check and balance of his $4.0 Million valuation derived from his unique and flawed version of the comparable sales methodology. Since the original $4.0 Million valuation opinion is unreliable due to the flawed methodology, whatever Mr. Poulson's "confirmatory" opinions utilizing the secondary and tertiary methodologies are inherently unreliable and flawed. This is a standalone basis to preclude any opinion derived from the replacement cost and income methodologies.

Moreover, replacement cost and other methodologies are only utilized in admiralty actions where the comparable sales methodology cannot reliably be used due to insufficient market data. See *In re Omega Protein, Inc.*, 2015 U.S. Dist. LEXIS, at * 16 (W.D. La. October 26, 2015) (citing *E.I. Dupont de Nemours & Co, Inc. v. Robin Hood Shifting & Fleeting Serv., Inc.*, 899 F.2d 377, 379 (5th Cir. 1990) ("If no comparable sales are available, courts may consider evidence such as replacement cost, depreciation, expert opinion, the amount of insurance, the cost of reproduction less depreciation, the vessel's condition, and the uses to which it can be put"). Mr. Poulson has not provided any firm grounds to show there is insufficient market information to employ the genuine comparable sales methodology and thus he cannot skip to the alternative methods for valuing the *M/T Mackenzie Rose*.

Indeed, Mr. Poulson's expert report cites to a May 2024 Tug Market Report that indicating that "the global tugboat market was valued at USD 433.6 million in 2024" and expected to grow to $1.1 Billion by 2032, with at least 72 tugboats for sale in the U.S. and another 170 tugs for sale worldwide. This suggests a robust market for used tugboats and a sufficient data pool from which Mr. Poulson could have pulled historical sales data for comparable tugs and apply a genuine comparable sales methodology for valuation. The reasonable inference is Mr. Poulson chose only the sellers' starting offer prices for his methodology because that inflated the purported value of the *M/T Mackenzie Rose* to $4.0 Million instead of the reasonable $2.0-$2.25M valuation offered by Carver's valuation expert, Meyerrose.

In any event, the replacement cost and income methodologies have no place in this case because Belt Line and its expert have not shown the tried-and-true comparable sales methodology is incapable of being applied to value the *M/T Mackenzie Rose*. Mr. Poulson's backup replacement

6

cost and income methodologies should therefore be disregarded and any opinion derived therefore should be barred from evidence.

### IV. Conclusion

Mr. Poulson may well be a qualified expert in valuing vessels for the marine industry. In this case, however, he strayed from applying the appropriate comparable sales methodology by using wrong inputs that rendered his bespoke method flawed and unreliable. Mr. Poulson's testimony and valuation opinions should therefore be barred from evidence at all stages of this litigation.

WHEREFORE, Petitioner Coeymans Marine Towing, LLC respectfully requests that the Court grant its Motion to Exclude the Testimony and Opinions of John Poulson, and enter an Order prohibiting any party from offering Mr. Poulson, his testimony, and his expert opinions into evidence at any stage of this litigation, and award all other relief in favor of Petitioner as the Court deems just and proper.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: September 2, 2025 | **CLYDE & CO US LLP** |
|  | By: /s/ Harold L. Cohen<br>Harold L. Cohen  (VSB No.:98148)<br>1221 Brickell Avenue, Suite 1600<br>Miami, FL  33131<br>Tel: 305-446-2646<br>Fax: 305-441-2374<br>Email: harry.cohen@clydeco.us; |
|  | James H. Rodgers*<br>Clyde & Co US LLP<br>45 Lexington Avenue, 16th Floor<br>New York, NY 10174<br>Phone: (212) 702-6771<br>Email: james.rodgers@clydeco.us |

Michael J. Roman*
Dawn L. Johnson
Siobhan M. Murphy*
Clyde & Co US LLP
30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email: michael.roman@clydeco.us
dawn.johnson@clydeco.us
Siobhan.murphy@clydeco.us

Rachel Werner*
One North Central Avenue, Suite 1030
Pheonix, Arizona 85004
Phone: 480-746-4556
Email: rachel.werner@clydeco.us
*pro hac vice

**CERTIFICATE OF SERVICE**

      I hereby certify that on September 2, 2025, a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will serve all counsel of record by electronic mail as follows:

Mark C. Nanavati, Esq. (VSB No.: 38709)
G. Christopher Jones, Jr., Esq. (VSB No.: 82260)
SINNOT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)
(804) 893-3862 (Jones)
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com
*Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

Zachary M. Jett, Esq. (VSB #93285)
BUTLER WEIHMULLER KATZ, et al
11525 North Community House Road
Suite 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

                                      */s/ Harold L. Cohen*