**Page 1**

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF VIRGINIA
 2   Norfolk Division
     In Admiralty
 3   Civil Action No. 2:24-cv-00490
     -------------------------------------X
 4   In the Matter of COEYMANS MARINE
     TOWING, LLC D/B/A CARVER MARINE TOWING
 5   as Owner and Operator of M/T
     Mackenzie Rose, (IMO No. 8968765) her
 6   cargo, engines, boilers, tackle,
     equipment, apparel, and appurtenances,
 7   etc., in rem, petitioning for Exoneration
     from or Limitation of Liability in allision
 8   with Norfolk and Portsmouth Belt Line
     Railroad Company Main Line Railroad Bridge
 9   occurring June 15, 2024 in and about the
     Elizabeth River, Virginia.
10   -------------------------------------X
11
12           EXPERT WITNESS TESTIMONY VIA ZOOM
13               OF JOHN S. POULSON, MSc
14                   August 27, 2025
15
16
17
18
19
20
21
22   Reported by:
23   SARA FREUND, CSR
24
25
```

**Page 2**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12                  August 27, 2025
13                   10:39 a.m.
14
15
16
17
18
19           EXPERT WITNESS TESTIMONY VIA ZOOM OF
20   JOHN S. POULSON, MSc, on the above-mentioned
21   date and time, before Sara Freund, a Certified
22   Shorthand Reporter and Notary Public within and
23   for the State of New York.
24
25
```

**Page 3**

```
 1   A P P E A R A N C E S:
 2
 3   CLYDE & CO.
           Attorneys for Coeymans Marine Towing, LLC
 4         d/b/a Carver Marine Towing
           405 Lexington Avenue - 16th floor
 5         New York, New York 10174
     BY: JAMES H. RODGERS, ESQ.
 6
 7   CRENSHAW, WARE & MARTIN, P.L.C.
           Attorneys for Norfolk and Portsmouth
 8         Belt Line Railroad Company and Witness
           150 W. Main Street - Suite 1923
 9         Norfolk, Virginia 23510
     BY: JAMES CHAPMAN, ESQ.
10         W. RYAN SNOW, ESQ.
11
12   SINNOT, NUCKOLS & LOGAN, PC
           Attorneys for Evanston Insurance Company
13         13811 Village Mill Drive
           Midlothian, Virginia 23114
14   BY: MARK C. NANVATI, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1          J. S. POULSON, MSc
 2   J O H N  S.  P O U L S O N,  M S c, after having
 3   first been duly sworn by a Notary Public of the
 4   State of New York, was examined and testified as
 5   follows:
 6      Q.  State your name and address for the
 7   record.
 8      A.  John Stanley Poulson, 8 Rose Street,
 9   Plainview, New York.
10   EXAMINATION BY
11   MR. RODGERS:
12      Q.  Good morning, Mr. Poulson.
13      A.  Good morning.
14      Q.  Am I pronouncing it correctly, Poulson?
15      A.  Yes, that's correct.
16      Q.  Have you ever been deposed before
17   today?
18      A.  Yes.
19      Q.  Approximately how many times?
20      A.  Around between 25 and 30.  Well, that
21   includes court testimony, so perhaps 25
22   depositions and some court appearances.
23      Q.  So I just want to go through some rules
24   briefly since you've done this before.  I'm
25   going to ask you some questions.  As you know,
```


EXHIBIT 3

JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
5–8

Page 5

1                 J. S. POULSON, MSc
2  if you don't understand them or hear them, just
3  ask me to repeat them, okay?
4      A.  Yes.
5      Q.  If you need to take a break at any
6  time, just let me know and we'll facilitate
7  that.
8      A.  Yes.
9      Q.  And if you need to speak to your
10  attorney, you can speak to your attorney, not
11  with a pending question, but just between
12  questions, if you need to talk to your attorney,
13  just ask me and we'll facilitate that as well,
14  okay?
15      A.  Yes.  Thank you.
16      Q.  What's your current position?
17      A.  I'm chief surveyor for Poulson Marine
18  Consultants, PMC, LLC.
19      Q.  Are you the owner of that company?
20      A.  No.
21      Q.  Who is the owner?
22      A.  My wife.
23      Q.  Are you the president?
24      A.  I think I'm CEO.  She's the boss.
25      Q.  Do you have any employees other than

Page 6

1                 J. S. POULSON, MSc
2  yourself?
3      A.  No.
4      Q.  And how long have you been working
5  under the name PMC?
6      A.  Since June 24, 2021.
7      Q.  And before that, what was your prior
8  position?
9      A.  Titles, I had a brief period at Charles
10  Taylor as chief surveyor.  Prior to that, I was
11  at Atlantic Marine Associates as chief surveyor.
12  Prior to that, I was president of Noble Denton,
13  GL Noble Denton as it became.  And before that,
14  I was head of the Technical Department at
15  Shipowners Claims Bureau.  And prior to that, I
16  was regional manager for BMT Salvage for the
17  Americas.  And prior to that, I was a surveyor
18  with Salvage Association New York, and prior to
19  that, surveyor at Salvage Association in
20  Antwerp, Belgium.  So that started in 1989,
21  after my seagoing career, through to today.
22      Q.  When you were at sea, were you working
23  as an engineer?
24      A.  Yes, chief engineer.
25      Q.  If we can start with Charles Taylor,

Page 7

1                 J. S. POULSON, MSc
2  were you doing surveying there?
3      A.  Yes.  I was doing surveying, loss
4  prevention, mostly casualty surveying and some
5  valuation work.  I was there briefly.
6      Q.  Okay.  Can you just describe the types
7  of surveys you did; were they damage surveys or
8  something else?
9      A.  Well, throughout my career, a lot of
10  casualty work, a lot of condition survey work,
11  valuations.
12      Q.  What type of valuations generally?
13      A.  Condition and valuation surveys over
14  the years.
15      Q.  I'm asking about Charles Taylor.
16      A.  Oh, Charles Taylor, yeah, just
17  condition and valuation surveys.  There may have
18  been some valuation in damage, some value work
19  for Charles Taylor.
20      Q.  And what type of vessels were you
21  looking at when you were with Charles Taylor?
22      A.  A vast array of vessels:  ocean-going,
23  tugs, yachts, all matter of vessels, barges.
24      Q.  And you were doing the surveys on
25  behalf of Charles Taylor?

Page 8

1                 J. S. POULSON, MSc
2      A.  Yes.
3      Q.  And do you recall what was the purpose
4  of the surveys, the condition and valuation
5  surveys?
6      A.  Some pre-purchase, condition and
7  valuation for insurance purposes.
8      Q.  When you say condition, would that be
9  you'd be checking the haul of the engines and
10  everything else?
11      A.  Vessel inspections prior to the
12  valuation aspect.  And that varied through all
13  of the companies that I worked for and that I
14  ran.
15      Q.  And when you say valuation, can you
16  describe that generally?  You said condition and
17  valuation, so when you did the valuation part,
18  what did that entail?
19      A.  Usually fair market value, and the vast
20  majority of the time would be for insurance
21  purposes.  But during my period at Shipowners
22  Claims and Atlantic Marine Associates, a lot of
23  the valuations I was asked for were with regard
24  to casualties and limitation of liability
25  issues.



JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
9–12

Page 9

J. S. POULSON, MSc

1
2    Q.   And the insurance valuations, did you
3  look at those differently than any other type of
4  valuation?
5    A.   No.  I have principally always
6  presented a fair market value and given that to
7  the instructing parties.
8    Q.   You have your report in front of you,
9  right?
10    A.   I do.
11    Q.    First of all, can you state who hired
12  you and why you were hired for this particular
13  case?
14    A.   I was hired by Mr. Chapman to provide a
15  valuation of the Mackenzie Rose in 2024, as it
16  was in 2024.
17    Q.   Was there any other purpose of your
18  valuation or survey?
19    A.   No.
20    Q.   Now, your report is dated August 8,
21  2025, correct?
22    A.   Yes.
23    Q.   In your report you stated on page 4,
24  Access of tug for survey was not provided by the
25  owners; do you see that?

Page 10

J. S. POULSON, MSc

1
2    A.   Yes.
3    Q.   Did your attorney, prior to the recent
4  inspection, ever tell you that there was access
5  to the tug?
6    MR. CHAPMAN:  I'm going to object.  The
7  conversations I had with him are
8  privileged.
9    A.   As I recall, we had discussions on when
10  the tug would be available and when I would be
11  available to carry out an inspection.
12    Q.   Were you ever told that the tug was
13  available July 28, 2025?
14    A.   I don't recall exactly.
15    Q.   Are you aware that the tug was made
16  available for inspection on July 28, 2025?
17    MR. NANAVATI:  Objecting to form.  One
18  of our other experts was not available on
19  that day, so that question is improper.
20    MR. RODGERS:  Jim and Mark, you need to
21  make up your mind who's going to be doing
22  this because we're not doing tag team
23  again.
24    MR. NANAVATI:  Jim represents one
25  party.  I represent another party.  We both

Page 11

J. S. POULSON, MSc

1
2  have rights to object.
3    MR. RODGERS:  But you just made a
4  coaching objection, so thank you for that.
5    Can you mark that for a ruling?
6    Q.   Were you available July 28, 2025 to
7  inspect the Mackenzie Rose?
8    MR. NANAVATI:  Same objection.
9  Completely improper.
10    MR. RODGERS:  Mark that for a ruling.
11    Q.   You can answer, Mr. Poulson.
12    MR. NANAVATI:  Same objection.
13    A.   I don't recall, but I would have
14  advised counsel as to my availability certainly.
15    Q.   Were you in the New York City area on
16  July 28, 2025?
17    MR. NANAVATI:  Same objection.
18    A.   I can check my calendar.  I'm not sure
19  where I was.
20    Q.   We'll keep a blank in the transcript
21  and you can just tell your lawyer later and we
22  can supplement it, okay?
23    A.   Sure, certainly.
24    INSERT:_____
25    Q.   Or maybe during a break or whenever

Page 12

J. S. POULSON, MSc

1
2  it's convenient.  What about in late June, early
3  July, were you ever told that the Mackenzie Rose
4  was available during that time period?
5    A.   Possibly.  I'll have to consult with
6  counsel as to the back-and-forth on the
7  availability.  I'm happy to do that and answer
8  that.  I know there were a few attempts to get
9  the survey done but --
10    Q.   We'll leave a blank in the record and
11  when you get that information you can tell your
12  lawyer.
13    MR. RODGERS:  And by counsel, if you
14  can let me know, Jim, Mark, whoever is the
15  counsel.
16    INSERT:_____
17    Q.   When were you retained?  I know you
18  said it earlier, but I forgot.
19    A.   I'll have to check the date I was
20  retained also.
21    Q.   Was it before July?
22    A.   Just bear with me, let me just look --
23  July 11.
24    Q.   Thank you.  Now, if you go to your main
25  report -- I also have your supplemental one of

JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
13—16

Page 13

1          J. S. POULSON, MSc
2  today, I received it today, but going to your
3  main report, when you did the main report that's
4  dated August 8, 2025, you had not conducted the
5  inspection yet, correct?
6      A.  That's correct.
7      Q.  When you wrote the report, did you know
8  that the Mackenzie Rose had just completed an
9  overhaul in April of 2025?
10      A.  That information was in the 2025 report
11  from Jason Meyerrose, yes.
12      Q.  So you saw that before you did your
13  report?
14      A.  Yes.
15      Q.  Now, did you take that into account
16  regarding your valuation of the tug's value at
17  the time of the incident?
18          MR. CHAPMAN:  Objection to form.
19      Sorry, take what into account, the
20  maintenance and the dry dock aspect?
21      Q.  Yes.
22      A.  Yes.
23      Q.  I'm talking about your initial
24  $4 million assessment at the time of the
25  incident, June 15, 2024.

Page 14

1          J. S. POULSON, MSc
2      A.  Yes.
3      Q.  The overhaul was after that date,
4  correct?
5      A.  Correct, yes.
6      Q.  Does the number of the value you put on
7  the tug for June 15, 2025 include added value of
8  the overhaul that was completed in April 2025?
9          MR. CHAPMAN:  Objection to form.  I
10      think you confused your dates.
11          MR. RODGERS:  Yes.  Let me rephrase
12      that.
13      Q.  You evaluated the value of the tug as
14  of June 15, 2024, correct?
15      A.  Correct.
16      Q.  And you understand the overhaul went
17  from October 2024 to approximately April 2025,
18  correct?
19      A.  Yes.
20          MR. CHAPMAN:  Objection to form.
21      Q.  Do you understand the question?
22      A.  Yes, I understand the question, and,
23  yes, I did take into account that.  I also took
24  into account the reported period of overhaul in
25  2016, the five-yearly again in 2021, and, yes,

Page 15

1          J. S. POULSON, MSc
2  it was overhauled again, maintenance carried out
3  in 2025.  My valuation of it in 2024 takes all
4  that into account.
5      Q.  Including an overhaul that occurred
6  after the date you're evaluating for?
7      A.  Having read what was involved in the
8  shipyard period, yes.  It doesn't alter my
9  valuation.
10      Q.  Maybe you can explain that to me.  As
11  of June 15, 2024, the vessel had not gone into
12  the overhaul that occurred between October 2024
13  and April 2025, correct?
14      A.  That's correct.  The Meyerrose report
15  of 2024 mentions the 2016, the 2021 overhaul
16  periods, and concludes that the tug was in
17  above-satisfactory condition.
18      Q.  Let me try to clear this up, because I
19  think I'm confusing you.  You evaluated the
20  value of the tug as of June 15, 2024, correct?
21      A.  Its value on June 15, 2024, yes.
22      Q.  And you understand that was the date of
23  the incident that's the subject of this lawsuit,
24  correct?
25      A.  Correct, yes.

Page 16

1          J. S. POULSON, MSc
2      Q.  And as of that date, the 2025 overhaul
3  had not been conducted, correct?
4      A.  Correct.
5      Q.  So is it fair to say that your
6  $4 million number could not include the overhaul
7  that was subsequent to the incident?
8          MR. CHAPMAN:  Objection to the form of
9      the question.
10      A.  The overhaul of the tug through the end
11  of 2024, into '25, constitutes maintenance, i.e.
12  to maintain the tug, it's periodical dry docking
13  for regulator purposes, ABS, Coast Guard, but it
14  doesn't necessarily increase its value.  It
15  doesn't increase its value.  What you're doing
16  is maintaining -- you're just maintaining the
17  tug in the condition that it's expected to be,
18  and which was above satisfactory in 2024, but
19  periodical maintenance is part of the overhead
20  of running that tug.
21      Q.  So did you add any value to the tug
22  that you evaluated for the date June 15, 2024
23  based on a later overhaul?
24      A.  I did not add value to the tug's value
25  in 2024 for something done in 2025, no.



JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
17—20

Page 17

1          J. S. POULSON, MSc
2    Q.   Okay, you cleared it up.
3    A.   Okay.
4    Q.   Are you aware of how much the 2024-2025
5  overhaul cost Carver?
6    A.   I'm not sure I've seen the numbers for
7  that.
8    Q.   When you say maintenance, when new
9  parts are put in, you consider that maintenance?
10   A.   To replace old parts, yes.
11   Q.   And explain why after replacing parts
12  and putting in new steel and other things,
13  whether it's electronics, whether it's the hull,
14  whether it's the engine, why that vessel that's
15  gone through an extensive overhaul is not worth
16  more than before the overhaul as far as market
17  value, can you explain that in your opinion?
18       MR. CHAPMAN:  Objection to form.
19   Q.   You can answer.
20   A.   The nature of the work carried out was
21  to maintain the tug's status, so this does not
22  necessarily increase the value of a tug.  It
23  actually doesn't.  And if I may, last year I had
24  examples of valuations on fishing vessels, a
25  passenger vessel, where, for example, the

Page 18

1          J. S. POULSON, MSc
2  passenger vessel owner invested over a million
3  dollars in its dry docking, and my valuation,
4  which was accepted, because I explained what
5  you're doing is only maintaining.  Yes, there is
6  an element of upgrade, but my valuation at the
7  end was less than what was spent on that vessel.
8  So maintaining a tug will not increase its
9  value.  It will maintain its value.
10   Q.   Do you know what was done to the
11  tugboat specifically during the 2024-2025
12  overhaul?
13   A.   There was steelwork done in the ballast
14  tanks, the forepeak, some steelwork on the hull,
15  there was engine overhauls.
16   Q.   Did you review the ABS files with
17  regard to this vessel?  Let me rephrase that.
18  Were you given to review the ABS file that we
19  obtained through subpoena regarding the
20  Mackenzie Rose?
21   A.   Let me just check my list of
22  documentation, please.
23       (Witness scanning document).
24   A.   I don't see it in the documentation
25  reviewed in my report, so possibly not.

Page 19

1          J. S. POULSON, MSc
2    Q.   Is it fair to say as you sit here today
3  you do not know what items required by ABS were
4  completed during the 2024-2025 overhaul; is that
5  correct?
6    A.   I don't recall reading the ABS report,
7  but I would imagine that the steelwork that was
8  carried out was to comply with the ABS
9  requirements certainly.
10   Q.   As you sit here today, do you know
11  whether this was classed with ABS, or was it a
12  load line; do you know one way or the other?
13   A.   I believe it was classed with ABS.
14   Q.   Where did you get that information?
15   A.   Or it may be just a load line, but ABS
16  were in attendance.  I believe it's mentioned in
17  the Meyerrose report.
18   Q.   So you're relying on the Meyerrose
19  report to determine if it was classed by ABS?
20   A.   I may have looked elsewhere.
21   Q.   Did you check the ABS register?
22   A.   No, I didn't check the ABS register,
23  no.
24   Q.   Do you know the difference between a
25  vessel which is classed by a classification

Page 20

1          J. S. POULSON, MSc
2  society and one that issues a load line?
3    A.   Yes.
4    Q.   What's the difference, to your
5  knowledge?
6    A.   Load line is a load line, and it
7  doesn't include machinery.
8    Q.   And could you describe what your
9  understanding of load line certification is,
10  generally, with the class societies?
11   A.   It is certification of the hull, its
12  integrity to the main deck, watertight integrity
13  throughout the vessel, all deck openings --
14  integrity, hull integrity.
15   Q.   And you recently inspected the vessel,
16  right?
17   A.   Yes.
18   Q.   And based on that investigation, did
19  your opinions change at all about this vessel,
20  this tugboat?
21   A.   No.
22   Q.   Let's go to your report.  On page 5 you
23  state, The tug has evidently been maintained to
24  a standard under the current ownership that
25  would not detract from its value.  Do you see



EXHIBIT 3

JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
21–24

Page 21

1          J. S. POULSON, MSc
2  that on page 5?
3      A.  Yes.
4      Q.  And when you say evidently been
5  maintained to a standard, could you describe
6  what you mean by that?
7      A.  That it was satisfactory.  There was
8  nothing about it that would detract from its
9  value.
10      Q.  So you found it to be shipshape; is
11  that fair to say?
12      A.  I don't use the term shipshape.
13      Q.  What do you use?
14      A.  Satisfactory.
15      Q.  And is there any higher standard in
16  your parlance or your industry, or is
17  satisfactory the standard you use?
18      A.  It's a well-used term.  On occasion, I
19  will expand upon that if it's particularly
20  outstanding in its condition, if you'd like.
21      Q.  And, again, satisfactory is generally
22  what you refer to a vessel when it's maintained
23  correctly; is that fair to say?
24      A.  Yes.
25      Q.  Now, could you briefly go through your

Page 22

1          J. S. POULSON, MSc
2  education starting after secondary school?
3      A.  I left grammar school in the UK in
4  1975. I joined my first shipping company, The
5  Bank Line Ltd, at 16, where I did my first
6  studies for National Diploma in Marine
7  Engineering, which was combined with warship
8  time, followed by a year of sea time, followed
9  by another two years of study towards my
10  professional certificates.  This is at South
11  Shield Marine College in the UK.  After that, I
12  went to sea as a junior engineer and progressed
13  through the ranks to chief engineer by 1987.  I
14  did my professional licenses along the way.  In
15  1986, I obtained my Class 1 Certificate of
16  Competency Unlimited, and later in life I took
17  my Masters degree at the University of
18  Portsmouth in the UK.
19      Q.  So on the degrees you listed, as I
20  understand, in the UK a Master's is equivalent
21  to a Bachelor's, or is that not true?
22      A.  Same system.
23      Q.  So where did you get your Bachelor's or
24  equivalent of your Bachelor's?
25      A.  My Class 1 certificate and war

Page 23

1          J. S. POULSON, MSc
2  experience was accepted for study in a Master's
3  program.
4      Q.  So are you referring to what you call
5  the National Diploma in Marine Engineering?
6      A.  No, the First Class 1 Certificate of
7  Competency in Marine Engineering Unlimited
8  issued by the UK Government, Department of
9  Transport.
10      Q.  So with that, you're then eligible to
11  apply for a Masters degree?
12      A.  With supporting work or career
13  experience.
14      Q.  On page 10, paragraph 6.6, you say, In
15  2024, PMC carried out 17 condition and valuation
16  surveys of vessels for insurance or pre-purchase
17  purposes; do you see that?
18      A.  Yes.
19      Q.  How many of those were tugs?
20      A.  Seven tugs.
21      Q.  What were the rest?
22      A.  Some barges, one or two fishing
23  vessels, a passenger vessel, an oyster farm
24  tender vessel.  In addition to that, I did a
25  floating marina facility evaluation on a

Page 24

1          J. S. POULSON, MSc
2  shipyard during its purchase in Philadelphia.
3      Q.  What category of tug would you put the
4  Mackenzie Rose in?
5      A.  It's a towing vessel.
6      Q.  Is it ocean-going, is it a harbor tug?
7  What's your understanding of what type of tug it
8  is?
9      A.  Coastwise towing vessel.
10      Q.  Is it your understanding it's not fit
11  for harbor work due to its size; would you agree
12  with that?
13          MR. CHAPMAN:  Objection to form.
14      Q.  You can answer.
15      A.  I'm sorry, could you explain?
16      Q.  I'll rephrase it.  Do you know the
17  difference between a harbor tug and an ocean-
18  going tug?
19          MR. CHAPMAN:  Objection to form.
20      Q.  You can answer.
21      A.  In principle, yes.
22      Q.  Is the ocean-going tug generally
23  larger?
24      A.  Not necessarily.
25      Q.  Is it generally configured differently



JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
25–28

Page 25

1    J. S. POULSON, MSc
2  than a harbor?
3       MR. CHAPMAN:  Objection to form.
4    A.  It can be.
5    Q.  Explain the difference in
6  configuration, to your understanding.
7    A.  Principally, a harbor tug may not have
8  a main towing winch.  It may or it may not.
9    Q.  Any other difference?
10   A.   The whole form would generally be
11  different for a tug coastwise, and then
12  ocean-going tugs would have a different form,
13  generally.
14   Q.   Can you describe each form generally,
15  the form of an ocean-going tug and the form of a
16  harbor tug?
17       MR. CHAPMAN:  Objection to form.
18   Q.  You can answer.
19   A.  Ocean-going, I would say, normally
20  would have a forceful raised bow, harbor tugs
21  less so, generally without a winch.  As far as
22  construction is concerned, similar
23  accommodation, wheelhouse navigation.  Machinery
24  --
25   Q.  Similar machinery?

Page 26

1       J. S. POULSON, MSc
2       MR. CHAPMAN:  Objection to form.
3    Q.  Similar machinery?
4    A.  Similar, engines-wise, yes.
5    Q.  So you earlier described the Mackenzie
6  Rose as ocean-going, correct?
7       MR. CHAPMAN:  Objection to form.
8    A.  I believe I described it as a towing
9  vessel coastwise.
10   Q.   And describe what that means
11  specifically.
12   A.  A tug of the form of Mackenzie Rose is
13  characteristic of a towing vessel suited for
14  coastwise towing.
15   Q.  It's generally not designed to be a
16  harbor tug; is that a fair statement?
17       MR. CHAPMAN:  Objection to form.
18   A.  It depends what it's being asked to do
19  in a harbor.  It can tow in a harbor certainly.
20  It can move barges around any harbor.  It can
21  move anything, anywhere, really, where there is
22  no draft restriction for the tug.  I don't think
23  there's any restriction on its operation other
24  than that.
25   Q.  So it's your testimony that a towing

Page 27

1    J. S. POULSON, MSc
2  vessel coastwise tug can be used as a harbor
3  tug; is that your testimony?
4       MR. CHAPMAN:  Objection to form.
5    A.  A tug will go in and out of harbors as
6  part of its routine performance.
7    Q.  In your experience, are you familiar
8  with any companies in the ports that
9  specifically run harbor tugs?
10       MR. CHAPMAN:  Objection to form.
11   A.  Yes.
12   Q.   What are those companies that you know
13  of?
14   A.   The two main companies are McAllister
15  and Moran in New York.
16   Q.   Have you surveyed any of their tugs
17  during your career?
18   A.  Yes.
19   Q.   Have you ever surveyed any of their
20  tugs that would be classified as a harbor tug?
21   A.  Yes.
22   Q.   And they also have towing vessel coast-
23  wise tugs, right?
24       MR. CHAPMAN:  Objection to form.
25   A.  Yes, they do.

Page 28

1       J. S. POULSON, MSc
2    Q.  McAllister and Moran, correct?
3    A.  Yes.
4    Q.  Any other companies in New York that
5  you can think of?
6    A.  For ship assists, McAllister and Moran
7  are the two principal companies, New York,
8  Philadelphia, Baltimore, Eastern Seaboard.
9  There are a multitude of companies operating
10  within the harbor with towing vessels.
11   Q.   When you surveyed McAllister and Moran
12  harbor tugs, were they -- let's go with
13  McAllister, you surveyed a McAllister harbor
14  tug, correct?
15   A.  They operate in the harbor, but they're
16  towing vessels as well.  They're tugs I surveyed
17  for 30 years now.
18   Q.  You earlier answered that McAllister
19  and Moran have both harbor tugs and coastwise.
20   A.  They have tugs that you would call
21  ship-assist tugs now, and they have towing tugs,
22  but the towing tugs have been used for ship
23  assists, as well, I know that.
24   Q.  What is a ship-assist tug?  Is that
25  what I'm calling a harbor tug, or is that



EXHIBIT 3

JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
29–32

Page 29

1    J. S. POULSON, MSc
2    something else?
3    A.   I'm not sure what you're calling a
4    harbor tug, but I think you mean ship assists,
5    as well as assisting vessels to berth and at
6    berth.
7    Q.   Okay, I'm going to adopt that because
8    you're the expert.  A ship assist then is
9    generally what a company like McAllister would
10   use to bring in vessels and help vessels depart
11   ports; is that fair to say?
12   A.   Ship assist, yes, that's the
13   description, yes.
14   Q.   Have you ever done a condition and
15   valuation report for a ship-assist tug?
16   A.   Not in my recollection.
17   Q.   In your opinion, would a ship-assist
18   tug have a different market than a towing vessel
19   coastwise tug?
20   A.   There are dedicated harbor tugs that I
21   have surveyed for various reasons, and they have
22   a different configuration, yes.
23       (Whereupon, the last question was read
24   back.)
25   A.   There are dedicated -- what you were

Page 30

1    J. S. POULSON, MSc
2    referring to as -- there are dedicated harbor
3    tugs used only -- I wouldn't say only.  They're
4    used principally for ship assists, berthing and
5    unberthing, but would still be used for towing
6    within harbor limits.
7    MR. RODGERS:  Strike that as
8    unresponsive.
9    Q.   That wasn't the question.
10   MR. CHAPMAN:  I object.  He did answer
11   the question.
12       (Whereupon, the last question was read
13   back.)
14   A.   If it's a dedicated harbor tug, yes.
15   Q.   In your experience and opinion, would a
16   ship-assist tug have a lesser or greater value
17   than a coastwise tug?
18   MR. CHAPMAN:  Objection to form.
19   A.   If you're comparing a dedicated ship-
20   assist harbor tug with a towing tug, there may
21   be a difference in values, yes.
22   Q.   Generally, in your opinion, is one of a
23   higher fair market value than the other,
24   generally?
25   MR. CHAPMAN:  Objection to form.

Page 31

1    J. S. POULSON, MSc
2    A.   They're two different categories.  The
3    value is in the value to the owner of the tug
4    and the business that he has for the tug.
5    That's a hard question to answer.  I don't think
6    -- you're comparing apples with oranges if we're
7    talking about dedicated harbor tugs.
8    Q.   I'm not asking about the value to the
9    owner but generally the dollar value in the
10   market, not a specific owner.
11   MR. CHAPMAN:  Objection to form.
12   A.   It would depend on specifications,
13   absolutely.
14   Q.   Which would generally be higher, I
15   think, in the market, a ship-assist tug or a
16   coastwise tug?
17   MR. CHAPMAN:  Objection to form.
18   A.   It depends entirely on its construction
19   specifications.
20   Q.   If you go to page 11, I think you
21   described Figure 2 but not figure 1 -- okay, you
22   do on page 10.  I'm reading from 6.6, your
23   paragraph, In researching comparable tugs, tugs
24   with the principal particulars in the table,
25   Figure 1 below, were offered for sale in 2024.

Page 32

1    J. S. POULSON, MSc
2    And then you have Figure 1 on page 11; do you
3    see that?
4    A.   Yes.
5    Q.   And you had one built in 1970, right?
6    A.   Yes.
7    Q.   Do you know what type of tug that was
8    as you sit here today?
9    A.   Yes.
10   Q.   What type of tug was it, the 1970 tug?
11   A.   It was a similar.  That's just an older
12   -- similar configuration to the Mackenzie Rose.
13   It was --
14       (Crosstalk)
15   Q.   Can you give a name?
16   A.   I don't have a name.  It was taken from
17   a broker's portal.
18   Q.   Sorry, a broker's what?
19   A.   Website or portal.  This owner is
20   actually ABS-classed East Coast and had AICO
21   engines, I believe.
22   Q.   Is there any indication that the
23   engines had been replaced during its lifetime?
24   A.   No.  It was as-offered with the same
25   engines.


EXHIBIT 3

JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
33–36

Page 33

1        J. S. POULSON, MSc
2    Q.  It was ABS-classed, correct?
3    A.  Yes.  I believe so.
4    Q.  Are you aware the Mackenzie Rose is not
5  ABS-classed?
6    A.  Yes.
7    Q.  It has a load line, correct?
8    A.  It has an ABS load line, yes.  I saw
9  that during the survey.
10    Q.  Did you get any information on the 1970
11  tug, whether it had been through any overhauls
12  in its lifetime?
13    A.  There were comments on its maintenance.
14    Q.  Do you recall what the comments were?
15        (Witness scanning document).
16    Q.  Are you looking through different
17  documents than your report?
18    A.  I'm looking at the document for the
19  offer.  It describes a towing winch, double
20  drum, 2,700 feet of two-inch tow wire, ABS Class
21  towing machinery, A1 towing, all oceans, current
22  USCG, Subchapter M COI.
23    Q.  And it's length is 16 feet longer than
24  the Mackenzie Rose, correct?
25    A.  112 feet long.

Page 34

1        J. S. POULSON, MSc
2    Q.  The Mackenzie Rose you had as 96 feet?
3    A.  I believe so, yes.
4    Q.  96.4.  So it was a larger tug than the
5  Mackenzie Rose, correct?
6        MR. CHAPMAN:  Objection to form.
7    A.  It was a little bit bigger, yes.
8    Q.  And you listed the horsepower at 4100,
9  right?
10    A.  Actually, that's an error on my part.
11    Q.  What's the horsepower?
12    A.  It's 4,370.
13    Q.  Do you know what the horsepower is on
14  the Mackenzie Rose?
15    A.  4,200.
16    Q.  And that 1970 vessel you listed as a
17  comparable tug to the Mackenzie Rose?
18    A.  Based on size and the horsepower and
19  towing winch, yes.  When I was researching
20  comparables, there weren't many; in fact, I
21  couldn't find any at the time built in 2000, or
22  the year I was looking for.  The reason I have
23  the valuations from 2024, is that I was carrying
24  out a condition and valuation survey on not a
25  sister tug but another tug built by the same

Page 35

1        J. S. POULSON, MSc
2  yard that built the Mackenzie Rose.  The survey
3  was on April 8th or 9th, 2024.  I issued my
4  report on April 29, 2024.  And I was looking for
5  comparables between the date of survey -- at
6  some point between the date of survey, issuing
7  my report on April 29, 2024, to give a value for
8  the tug that I surveyed at that time.
9    Q.  You said it was the same yard but not a
10  sister tug?
11    A.  It was slightly different.
12    Q.  What was the name?
13    A.  It is the Saint Emillion,
14  E-M-I-L-L-I-O-N.
15    Q.  Do you know who owns that?
16        MR. CHAPMAN:  You mean currently?
17    Q.  Do you know who owned it when you
18  surveyed it?
19    A.  At the time, I believe the owner was
20  Apex Oil, but I can't -- I don't think it's
21  possible to be absolutely certain who is the
22  actual owner, but I believe if they weren't the
23  owners, the operator was Apex Oil.
24    Q.  But that's not on this chart?
25    A.  No.

Page 36

1        J. S. POULSON, MSc
2    Q.  You did your condition survey before
3  you did this report on the Saint Emillion?
4    A.  This was in 2024 in April, at the end
5  of April 2024.
6    Q.  And was the Saint Emillion a coastwise
7  tug?
8    A.  Yes.  She's the same configuration as
9  the Mackenzie Rose.
10    Q.  Why didn't you put it in this chart?
11    A.  That chart is comparables from external
12  sources.  My valuation of the Saint Emillion was
13  my valuation.
14    Q.  What is your valuation of that?
15    A.  The Saint Emillion, the fair market
16  value I gave is $4.8 million.
17    Q.  And did you do that prior to a sale?
18    A.  It was for insurance purposes.
19    Q.  And do you know if it was sold since
20  then?
21    A.  I don't.  The survey was the tug and
22  the barge that it generally moves.
23    Q.  So you didn't put that in your chart
24  because you had determined the value, correct?
25    A.  That's correct.



JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
37—40

Page 37

1          J. S. POULSON, MSc
2      (Whereupon, recess was taken.)
3    Q.   Getting back to your report, page 11,
4  you listed a 2006 tug; do you see that?
5      MR. CHAPMAN:  You're talking about
6  Figure 1?
7    A.   Yes.
8    Q.   And do you know the name of that tug?
9    A.   I don't.  Typically, when brokers are
10  offering vessels for sale, they don't publish
11  names or IMO number for confidentiality reasons.
12  Sellers generally don't wish it to be public
13  that they are selling assets necessarily.  So
14  to get further would require a potential buyer
15  or an agent of a buyer or another broker to get
16  further details than that.
17    Q.   What was the website you were looking
18  for the 2006 tug?
19    A.   That is Ocean Marine.
20    Q.   Is that the same with all those listed?
21    A.   I may have looked elsewhere, but I find
22  Ocean Marine to be useful.  They usually have a
23  wide inventory on there.  It's Ocean Marine
24  Brokerage Services, Louisiana.
25    Q.   What is Marcon Tug Market Reports?  You

Page 38

1          J. S. POULSON, MSc
2  listed that on page 9 in your documentation.
3    A.   Yes, Marcon.  They're prominent in the
4  tug market.  They issue reports on the state of
5  the market for tugs generally worldwide and in
6  the U.S.
7    Q.   Did you refer to that on any of the
8  items in figure 1?
9    A.   No.
10    Q.   On the 2006 tug, was that a comparable
11  tug comparable to the Mackenzie Rose?
12    A.   It's less power, it's not quite as old.
13  At that time I focused on what I could find at
14  the time, in 2004.  As I said, I was researching
15  for the valuation on the Saint Emillion at the
16  time, so given that this is all relevant to
17  2004, these are what I could find at that time.
18    Q.   Were these figures something you
19  derived at when you were working on the Saint
20  Emillion survey?
21    A.   Yes.  And relevant, given that the
22  Saint Emillion is similar to the McKenzie Rose,
23  not identical but similar.
24    Q.   What's the difference between the Saint
25  Emillion and the Mackenzie Rose?

Page 39

1          J. S. POULSON, MSc
2    A.   She's slightly longer.  The
3  configuration is exactly the same.  There is a
4  difference in the machinery, but to look at, the
5  tugs are very similar -- well, as you might
6  expect; they're built by Sea Boats in the same
7  yard.
8    Q.   What was the horsepower of the Saint
9  Emillion?
10    A.   4,800.
11    Q.   So that's more horsepower than the
12  Mackenzie Rose, correct?
13    A.   Yes.
14    Q.   Do you know what year the Saint
15  Emillion was built?
16    A.   The Saint Emillion was built in 2008 by
17  Sea Boats Shipyard, Fall River.
18    Q.   So it's a newer tug than the Mackenzie
19  Rose, correct?
20    A.   Yes.
21    Q.   And has a higher horsepower.
22    A.   300 or so horsepower.  I've seen two
23  numbers for the Mackenzie Rose, 4,200 and 4,500.
24    Q.   And all the numbers in figure 1 you did
25  not specifically look up for this assignment,

Page 40

1          J. S. POULSON, MSc
2  correct?  You looked those up when you were
3  doing the Saint Emillion survey; is that
4  correct?
5    A.   Yes, in April 2024.  Hence, the
6  relevance to my report.
7    Q.   And getting back to your figure, the
8  2011 vessel, do you remember what type of tug
9  that was?
10    A.   Yes, I can tell you, similar
11  configuration.
12    Q.   What do you mean by that, similar
13  configuration?
14    A.   As a towing tug, winch, twin screw.
15    Q.   It's 24 feet longer, correct?
16    A.   It is 111 feet in length, so that's 14
17  or 15 feet longer, maybe 14.
18    Q.   It says 120 on your chart.
19      MR. CHAPMAN:  Objection to form.
20    A.   I think that's an overall.  The
21  registered length is 111.
22    Q.   So what is 120?
23    A.   Sometimes they call length overall,
24  which would include the bow extension, if you'd
25  like, bow flare, an overall length.  And a



Page 41

1           J. S. POULSON, MSc
2  registered length would be at the waterline.
3      Q.   What's the registered length of the
4  Mackenzie Rose?
5      A.   I'm not sure I have it.
6      Q.   You said length overall in the report
7  on page 4.
8      A.   Okay.
9      Q.   When you say length overall, 96.4 feet,
10  and then when you put 120 feet on the 2011 tug,
11  are you using the same measure?
12     A.   Those are the stated dimensions, that's
13  all I can say.
14     Q.   So the 2011 is approximately 24 feet
15  longer, correct, according to the numbers on the
16  chart and the numbers on page 4 of your report?
17     A.   Based on that, yes.
18     Q.   And what more do you know about the
19  2011 tug?
20     A.   It's ABS load line. It has, I believe,
21  Caterpillar main engines, tilted main ironworks
22  with a Markey towing winch.
23     Q.   Do you know what type of towing winch
24  was on the Mackenzie Rose?
25     A.   Yes. In 2024, it was reported to be a

Page 42

1           J. S. POULSON, MSc
2  Johnson.
3      Q.   Is there any difference in those towing
4  winches?
5      A.   Same function, similar configuration,
6  different maker.
7      Q.   What about, is there a difference with
8  ALCO diesel engines and Caterpillar, in your
9  opinion?
10     A.   The ALCO is an older design engine, a
11  bigger engine physically.
12     Q.   When you say older, you mean the design
13  or the manufacturer?
14     A.   The design.
15     Q.   So is the Caterpillar considered an
16  upgraded version of an engine for a tug?
17         MR. CHAPMAN:  Objection to form.
18     A.   Not in my opinion.
19     Q.   What about the opinion of the industry?
20         MR. CHAPMAN:  Objection to form.
21     Q.   If you know?
22     A.   They're a well-used engine. From my
23  own experience, not the best engines, but
24  they're used a lot in the industry, certainly,
25  of course.

Page 43

1           J. S. POULSON, MSc
2      Q.   In other words, chosen by the yards
3  when they build the tugs?
4      A.   The yard will offer the engines that
5  they would like to build the tug with, and it's
6  up to the owner to specify otherwise, if they
7  wish.
8      Q.   When you say well-used, you mean in the
9  industry, chosen more than another type of
10  engine currently, or what do you mean by that?
11     A.   In the U.S. they're frequently chosen,
12  yes.
13     Q.   Does that, in your opinion, affect the
14  value during a survey, whether it's a
15  Caterpillar or an ALCO?
16     A.   No.
17     Q.   Now 2005, you have a vessel, again,
18  it's 120 feet and 4,800 horsepower. So that
19  vessel is larger and more horsepower than the
20  Mackenzie Rose, correct?
21     A.   Yes.
22     Q.   Was that a coastwise-only vessel, or
23  was it a combination of coastwise and ship
24  assist or something else?
25     A.   There is no information on this. I can

Page 44

1           J. S. POULSON, MSc
2  see just similar a configuration as the towing
3  winch, that's the length, horsepower --
4         (Crosstalk)
5      Q.   In Figure 1, were these sale prices or
6  what the broker put them up for?
7      A.   This is from the broker's site.
8      Q.   Was it a sale price, or was it the
9  price that it was being offered for?
10     A.   I take it to be the offer price.
11     Q.   Is it fair to say on Figure 1 you don't
12  actually know what the sale price was for any of
13  those, is that fair to say, the final sale price
14  that it actually sold for?
15     A.   Yes, that's fair to say. In the final
16  analysis of transaction, that's an unknown.
17     Q.   Well, there's publications you can go
18  to, right, to see what the final sale prices
19  were on certain tugs or vessels?
20     A.   I've not gone there.
21     Q.   But are there publications where you
22  can research and see what final sale prices are?
23     A.   There may be, but I'm not aware of
24  them -- well, let me correct that. There are
25  some, yes. There are some, yes. There is a



JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
45–48

Page 45

1        J. S. POULSON, MSc
2    website company I was frequently in touch with,
3    Compass Maritime, who did publish actual sales.
4    But again, that's to the best of their
5    knowledge.  The final details of a transaction
6    are privy really to the buyer and the seller.
7        Q.   Would you agree that fair market value
8    is what's actually paid for an item?
9        A.   Fair market value, as defined, is an
10   agreed price between a willing seller and a
11   willing buyer.
12       Q.   So none of these figures in Figure 1
13   are fair market values, correct?
14           MR. CHAPMAN:  Objection to form.
15       A.   They're offer prices.
16       Q.   And on your definition of fair market
17   value, this Figure 1 does not indicate any
18   actual fair market values for these vessels,
19   correct, under your definition?
20           MR. CHAPMAN:  Objection to form.
21       A.   You can answer.
22       A.   I think they're presented as the fair
23   market value for sale.  The seller is intent on
24   selling, obviously they're there for an offer of
25   what they consider to be fair market value.

Page 46

1        J. S. POULSON, MSc
2        (Whereupon, the last portion of
3        testimony was read back.)
4        Q.   So Mr. Poulson, that's your definition
5    of fair market value, correct?
6            MR. CHAPMAN:  Objection to form.
7        Q.   Correct?
8        A.   Yes.  It's not just mine.  It's an
9    industry-accepted definition for fair market
10   value.
11       Q.   So Figure 1, under your definition, is
12   not a fair market value, correct, it's just the
13   offer price?
14           MR. CHAPMAN:  Objection to form.
15       A.   It's what the seller considers to be a
16   fair market value.
17       Q.   But it's not a fair market value as to
18   the definition that was just read to you,
19   correct, that you answered?
20           MR. CHAPMAN:  Objection to form.
21       A.   Well, if a buyer agrees to the offer
22   price, then it would be agreed between a willing
23   buyer and a willing seller.
24       Q.   But you don't have that information in
25   Figure 1, right?  You just have the offer.

Page 47

1        J. S. POULSON, MSc
2            MR. CHAPMAN:  Objection to form.
3        (Colloquy crosstalk)
4        Q.   So basically, you have half of the fair
5    market value represented in Figure 1, correct?
6    You have the offer price, correct?
7            MR. CHAPMAN:  Objection to form.
8        Q.   You can answer if you understand it.
9        A.   Yes.
10       Q.   And then, in order to get the fair
11   market value under your definition, you would
12   have to have gotten what the buyer agreed to pay
13   for it, correct?
14           MR. CHAPMAN:  Objection to form.
15       Q.   Is that correct?
16       A.   Whatever the final sale price would be,
17   it would be an agreed price.  The buyer may have
18   a different idea as to what the fair market
19   value is to what the seller does, and they would
20   negotiate a final number based on what the
21   seller considers to be what he thinks is the
22   fair market value.
23       Q.   And based on what the buyer considers
24   what he thinks the fair market value is, right?
25       A.   Yes.

Page 48

1        J. S. POULSON, MSc
2        Q.   And then, the negotiated price is the
3    fair market value, pursuant to your definition,
4    correct?
5        A.   The negotiated price, yes.
6        Q.   And just to be clear, that negotiated
7    fair market value price is not reflected in the
8    figures or numbers in Figure 1, correct?
9            MR. CHAPMAN:  Objection to form.
10       Q.   Correct?
11       A.   It's the offer price in Figure 1.
12       Q.   Thank you.  And then, if we go to
13   Figure 2, I'm not sure, when you say insured
14   value, if you can educate me here.  Do you
15   consider fair market value and insured value to
16   be the same or something different?
17           MR. CHAPMAN:  Objection to form.
18       A.   They can be different, but, generally,
19   they follow the market value.
20       Q.   When you say generally, in your
21   opinion, the market value is the insured value?
22       A.   Not necessarily.  An insured value is a
23   negotiated value between the owner and the
24   insurers, but the insurers will look to the
25   market value when accepting the placing of the



EXHIBIT 3

Page 49

1          J. S. POULSON, MSc
2  insurance.  Owners may insure for higher or
3  lower, it depends on how it's negotiated as far
4  as the contract of insurance is concerned.  The
5  2006 tug, I did value in 2024.
6     Q.   So the 2006 tug that's in Figure 2,
7  that's based on a valuation you did, or PMC did?
8     A.   Yes, PMC.
9     Q.   And the 6.75 was the insured value?
10    A.   Yes.
11    Q.   Who determined that, you or the
12 insurance company or somebody else?
13    A.   I believe I valued the tug at
14 $6.5 million.
15    Q.   And that's got a higher horsepower, and
16 it's about 15 feet longer than the Mackenzie
17 Rose, correct?
18    A.   Correct.
19    Q.   And it was newer.
20    A.   Yes.
21    Q.   Were any of the others in Figure 2, the
22 other vessels, evaluated by you?
23    A.   No.
24    Q.   So as you sit here today, do you know
25 if the values that you said are insured values,

Page 50

1          J. S. POULSON, MSc
2  do you know if those are fair market values or
3  some other value, either higher than fair market
4  value or lower than fair market value?
5     A.   I can only tell you that they're
6  insured values.
7     Q.   And where would you have gotten that
8  information?
9     A.   In the course of my other functions
10 surveying.
11    Q.   So these are not vessels that you
12 evaluated, but that you knew about from your
13 work?
14       MR. CHAPMAN:  Objection to form.
15    A.   Yes.  I've seen them, I've been on
16 them, maybe all of them, but not valued them.
17    Q.   Again, is it fair to say other than the
18 one that you valued at 6.5, the other vessels,
19 you can't sit here today and tell me that those
20 insured values are equal to the fair market
21 values for those tugs, correct?
22       MR. CHAPMAN:  Objection to form.
23    A.   Like I told you, I didn't value the
24 others, and I cannot say what the insured values
25 are with respect to the market values.

Page 51

1          J. S. POULSON, MSc
2     Q.   Thank you.  The Documents Reviewed, did
3  you review any deposition transcripts in this
4  case?
5     A.   I don't believe so.
6     Q.   So are you aware that Nick Laraway of
7  Carver testified that the Mackenzie Rose was
8  bought in 2020 for $1 million?
9       MR. CHAPMAN:  Objection to form.
10    A.   I don't believe so.
11    Q.   Is that information that would have
12 helped you with your valuation as to the market
13 value?
14       MR. CHAPMAN:  Objection to form.
15    A.   I can't say either way under what
16 circumstances the tug was bought, I'm not aware.
17    Q.   Assuming that it was bought for a
18 million dollars in 2020, assuming that, would
19 that have affected your valuation for your
20 survey that you did for Mr. Chapman?
21    A.   No.  Absent any other knowledge, my
22 valuation is based on the physical styling of
23 the tug as it was on June 15, 2024.
24    Q.   Well, according to your own definition,
25 the fair market value is the negotiated price,

Page 52

1          J. S. POULSON, MSc
2  correct, between buyer and seller; is that
3  correct?
4       MR. CHAPMAN:  Objection to form.
5     A.   Yes.
6     Q.   And the last negotiated price between a
7  buyer and a seller, assuming, since you haven't
8  read his testimony, assuming that the last
9  negotiated sale price of the Mackenzie Rose was
10 in 2020, and it was for a million dollars, then
11 you would agree that that was the most current
12 fair market value of the Mackenzie Rose,
13 correct?
14       MR. CHAPMAN:  Objection to form.
15    A.   I can only say that in my opinion, in
16 2024, the fair market value was as I stated, $4
17 million.
18    Q.   And that's based on a number of
19 formulas.  Your first one, Comparable Sales
20 Approach, you see that, 6.8?
21    A.   Yes.
22    Q.   And you listed your estimate, $4
23 million.  What is that based on under the
24 Comparable Sales approach?
25    A.   Comparable sales.



Page 53

1        J. S. POULSON, MSc
2     Q.   In other words, comparable fair market
3  value, right?
4     A.   Yes.
5     Q.   And you're basing the $4 million in
6  part on Figure 1, correct, the values in Figure
7  1?
8     A.   In part, yes.
9     Q.   And you agree now as you sit here that
10  those values that are in that chart are not fair
11  market values, correct?
12        MR. CHAPMAN:  Objection to form.
13     Q.   Those are offer values, correct?
14     A.   They're offer values, and if the buyer
15  met those values, then that would be the fair
16  market value as stated in the offer price.  But
17  we don't know the finite details of the final
18  transaction.
19     Q.   So they're not fair market values,
20  correct?
21     A.   They're fair market values according to
22  the seller.
23     Q.   And with Figure 2, other than the 2006
24  tug, the other tugs, you cannot say as you sit
25  here today whether the insured value equals the

Page 54

1        J. S. POULSON, MSc
2  fair market value of the other tugs, correct?
3     A.   Whether they are identical or not, no,
4  but they would normally be close.
5     Q.   You don't know as you sit here today
6  what they are, correct?  You don't know what the
7  fair market value was of the tugs in Figure 2,
8  correct?  Whether they're close or not, you
9  don't know the fair market value, correct?
10        MR. CHAPMAN:  Objection to form.
11     Q.   Is that correct, sir?
12     A.   I didn't value them, but, presumably,
13  somebody did to arrive at the insured value.
14     Q.   Your lawyer did not give you the
15  deposition of Nicholas Laraway that was taken on
16  June 17, 2025; is that correct?
17     A.   I don't believe so, but Counsel would
18  be able to confirm that.
19     Q.   You don't recall reading any testimony,
20  correct, in this case, for the witnesses for
21  this case; is that correct?
22     A.   Correct.
23     Q.   And I'll represent to you that on page
24  9 of Mr. Laraway's deposition of June 17, 2025,
25  he testified that his current title is Executive

Page 55

1        J. S. POULSON, MSc
2  Director of Administration of Carver Companies,
3  okay?
4     A.   Okay.
5     Q.   That's not a question.  I just want to
6  make sure you understand that.  And he was
7  presented by Carver as a corporate witness, what
8  we call a 30(b)(6) witness in this case, okay?
9     A.   Okay.
10     Q.   Which means his testimony presumably
11  represents the company, okay?  I'm just giving
12  you some information so you're not looking at
13  this in a vacuum.  I'm going to go through some
14  questions and answers.  Mr. Chapman is
15  questioning him, okay?  And starting on page 32,
16  the question was:
17        "Question:  How long has Carver owned
18     the tug Mackenzie Rose?
19        Answer:  Since 2020.
20        Question:  How much did Carver pay for
21     it when it was acquired?
22        Answer:  I believe it was approximately
23     a million dollars.
24        Question:  $1 million?
25        Answer:  Yes.  Sorry."

Page 56

1        J. S. POULSON, MSc
2  And then the question on page 33:
3        "Question:  And after acquiring it, did
4     Carver have any work done on it?
5        Answer:  There's been work done on it
6     since we acquired it, yes.
7        Question:  Did it require -- I don't
8     know -- refurbishing or anything to make it
9     operational when you acquired it?
10        Answer:  Not that I recall.
11        Question:  Who was it acquired from?
12        Answer:  I believe it was Gellate,
13     Gellatly, a company with a name that
14     includes Gellatly or Gellatly, I don't
15     recall the specific entity."
16  Assuming that that is correct, what I just read
17  to you from the 30(b)(6) witness from Carver,
18  would it have been important for you to know
19  what the sales price had been of the Mackenzie
20  Rose before doing a valuation of the vessel in
21  2024?
22        MR. CHAPMAN:  Objection to form.
23     A.   Not specifically.  I looked at tugs
24  without necessarily knowing any of the
25  transaction history.  Usually I don't know



Page 57

1          J. S. POULSON, MSc
2  anything of the transaction history, acquisition
3  prices or other negotiations.  All I can offer
4  is an opinion of it on the day as of.
5      Q.   Yes.  But you testified that you based,
6  in part, your assessment of $4 million on a
7  review of fair market values, correct?
8          MR. CHAPMAN:  Objection to form.
9      A.   Current.
10     Q.   And those fair market values in your
11  definition would be the negotiated amount, the
12  sales amount between the buyer and the seller,
13  correct?
14     A.   That's correct.
15     Q.   And usually when you do a fair market
16  value analysis, you have to look at comparables,
17  correct?
18     A.   Yes.
19     Q.   But here it was actually a last-known
20  fair market value, an actual sale price of
21  $1 million, correct?
22         MR. CHAPMAN:  Objection to form.
23     A.   That's what you just told me, yes.
24     Q.   Assuming that I'm telling you the
25  truth, and I'm reading this from a sworn

Page 58

1          J. S. POULSON, MSc
2  deposition transcript, assuming that, then the
3  last fair market value of this vessel prior to
4  your valuation was 2020, when it sold for
5  $1 million, correct?
6          MR. CHAPMAN:  Objection to form.
7      A.   It was the agreed price.
8      Q.   It's the fair market value pursuant to
9  the formula that you gave us earlier, correct?
10     A.   Perhaps we could say that they managed
11  to acquire it for less than the fair market
12  value through whatever the circumstances.  I
13  have no idea what the circumstances of the sale
14  were.
15     Q.   Just like you have no idea what the
16  circumstances are of any of the comparables you
17  looked at, correct?
18         MR. CHAPMAN:  Objection to form.
19     Q.   Is that correct, sir?
20     A.   I know physical attributes of the
21  vessels are out there.
22     Q.   I think you're evading the question,
23  sir.
24         MR. CHAPMAN:  Objection to form.
25     Q.   You've given us a formula without

Page 59

1          J. S. POULSON, MSc
2  conditions, fair market value is what the buyer
3  and seller agree, correct?
4          MR. CHAPMAN:  Objection to form.
5      Q.   Is that correct, sir?
6      A.   Yes.
7      Q.   And the last known fair market value
8  for this vessel, actual fair market value with
9  your formula, was 2020, it was a million
10  dollars; do you agree with that?
11         MR. CHAPMAN:  Objection to form.
12     Q.   Based on what I read to you.
13     A.   The agreed sale price was a million
14  dollars, I can agree to that, yes.
15         MR. CHAPMAN:  Object to the answer as
16  nonresponsive.
17         MR. RODGERS:  Well, you're his lawyer,
18  I don't think you can do that, but you did
19  it.
20         (Whereupon, the last question and
21  answer were read back.)
22     Q.   And under your formula, the agreed sale
23  price for any vessel is equivalent to the fair
24  market value at that time, correct?
25         MR. CHAPMAN:  Objection to form.

Page 60

1          J. S. POULSON, MSc
2      Q.   You agree with that, sir?
3      A.   I'm sorry, could you repeat that one,
4  please?
5          (Whereupon, the last question was read
6  back.)
7      A.   Based on my assessment of the tug at
8  the time, in 2024, the purchase price, I think
9  it's fair to say, was below fair market value.
10         MR. RODGERS:  Strike that as non-
11  responsive.
12     Q.   I'm asking you about your formula and
13  what the sale price was.  Assuming what I read
14  to you from Mr. Laraway's deposition is correct,
15  the sale price was a million dollars in 2020,
16  correct?
17     A.   Yes.
18     Q.   And according to your formula, the sale
19  price of a vessel is equal to the fair market
20  value of that vessel at the time of the sale,
21  correct?
22         MR. CHAPMAN:  Objection to form.
23     A.   That's the generally accepted
24  definition.
25     Q.   Okay, thank you.  And Mr. Mayerrose, in



EXHIBIT 3

Page 61

J. S. POULSON, MSc

1  J. S. POULSON, MSc
2  2024, in his survey valued the Mackenzie Rose
3  above that number, correct?
4     A.   Yes.
5     Q.   He valuated it between $2.25 million
6  and $2.5 million, correct?
7     A.   Correct.
8     Q.   The maximum is $2.5 under his survey,
9  correct?
10    A.   Yes.  And in 2025, he had a maximum of
11  $5 million.
12    Q.   That's not the question.  I'm asking
13  about the 2024 survey he did after the incident,
14  the maximum was $2.5, correct?
15    A.   Yes.  I answered yes.
16    Q.   He was onboard the vessel in July of
17  2024, before it went into the yard, correct?
18    A.   Yes.
19    Q.   Approximately ten days after the
20  incident, correct?
21    A.   I can't remember how many days, but,
22  yes, along those lines.
23    Q.   And to your knowledge, the incident
24  didn't cause any damage to the tug, correct?
25    A.   I'm not seeing anything.

Page 62

J. S. POULSON, MSc

1  J. S. POULSON, MSc
2     Q.   I represent to you that there was no
3  damage to the tug as a result of the incident,
4  okay?
5     A.   Okay.
6     Q.   Assuming that, then is it fair to say
7  that Mr. Meyerrose's survey was an inspection of
8  the Mackenzie Rose, it was in the same condition
9  as it was at the time of the incident, fair to
10  say?
11        MR. CHAPMAN:  Objection to form.
12    A.   Yes.
13    Q.   Have you heard of the Gellatly Company,
14  Mr. Poulson?
15    A.   I've heard of them, yes.
16    Q.   Are they a towing company?
17    A.   They have tugs.
18    Q.   Where do they operate?
19    A.   In New York, I believe.
20    Q.   To your knowledge, are they still in
21  business?
22    A.   I'm not sure.
23    Q.   Have you ever surveyed any of their
24  tugs?
25    A.   Possibly over the years, possibly.

Page 63

J. S. POULSON, MSc

1  J. S. POULSON, MSc
2     Q.   So if we go to 6.9 of your report on
3  page 11, Replacement Cost Approach; do you see
4  that?
5     A.   Yes.
6     Q.   And you looked at the replacement cost
7  of $14 million; do you see that?
8     A.   Yes.
9     Q.   And you say it's supported by known tug
10  construction costs in 2024.
11    A.   Yes.
12    Q.   Specifically, did you refer to anything
13  to get at that, or is it just your general
14  knowledge, or did you look at anything?
15    A.   I know of new construction in 2024,
16  something that was started in 2024, will be
17  delivered in 2025, to estimate the replacement
18  cost in 2024 --
19        (Crosstalk)
20    Q.   What yard did you look at or yards?
21    A.   Owners, actually, tug owners.
22    Q.   You asked them or checked with them?
23    A.   Yes.
24    Q.   Which owners, which companies?
25    A.   Well, Moran and McAllister.

Page 64

J. S. POULSON, MSc

1  J. S. POULSON, MSc
2     Q.   And what type of tugs did you ask them
3  about, or did they give you information on
4  specifically what type of tug?
5     A.   Towing tugs.  Also, the basics of the
6  tugs and horsepowers, they're not identical.
7  They're similar size, larger horsepower, new
8  deliveries.  In 2024, tug building has gone away
9  from conventional twin screws now to Z drive, so
10  it's difficult to compare with conventional
11  twin-screw tugs.  Based on the values, as I
12  understand it, that tugs are ordered and
13  delivered, I arrived at the $14 million.
14    Q.   And you just testified that those were
15  different tugs in the sense that the horsepower
16  was higher?
17    A.   Yes, considerably higher.
18    Q.   And what about the length?
19    A.   The tugs are actually similar length,
20  actually slightly less.
21    Q.   So that higher horsepower, when you did
22  your $14 million for replacement cost, did you
23  take that into account; did you lower the number
24  at all?
25    A.   Yes.  These tugs range between $18 and



JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
65–68

Page 65

1    J. S. POULSON, MSc
2    $20 million.
3    Q.  So you took into account the lower
4    horsepower and then estimated $14 million?
5    A.  It's an estimate.  Because as I say,
6    it's difficult to apply a replacement for the
7    exact same configuration in today's market when
8    that twin-screw arrangement isn't customarily
9    built now, replaced with the, as is now common,
10   Z drive.  So $14 million I think is a fair
11   estimate.
12   Q.  And when you say Z drive, is that a
13   single screw?
14   A.  Twin screw, they're Azimuth,
15   multi-directional.  It means they rotate
16   360 degrees.
17   Q.  The screw itself?
18   A.  The nozzles and the screw.
19   Q.  And they have nozzles, okay.  Did the
20   other vessels like Mackenzie Rose have nozzles?
21   A.  No.
22   Q.  So to maneuver the newer Z drive ones,
23   you use both the prop and the nozzle.
24   A.  They're one unit.
25   Q.  And they can maneuver more easily, is

Page 66

1    J. S. POULSON, MSc
2    that the theory behind all that?
3    A.  Yes.
4    Q.  Is Z drive an industry term?
5    A.  Yes.
6    Q.  Is it one manufacturer of that system?
7    A.  No.  There is a few.
8    Q.  That makes it more expensive than the
9    traditional two-screw, non-nozzle tug; is that
10   fair to say?
11   A.  It's somewhat more expensive, yes.
12   Q.  And then, Mr. Meyerrose had a lower
13   replacement cost, something in the 12 range; do
14   you recall that?
15   A.  I believe so.
16   Q.  In the second report, the replacement
17   cost was in the 12 range, correct?
18       MR. CHAPMAN:  Objection to form.
19   A.  Yes.
20   Q.  So you and Mr. Meyerrose, you disagree
21   with the replacement cost estimate, correct?
22   A.  Correct.
23   Q.  So that was one element of your
24   analysis in 6.9.  The other one, you applied a
25   reasonable depreciation factor of 70 percent

Page 67

1    J. S. POULSON, MSc
2    over its life to account for age and market
3    changes.  Can you tell us where you got the
4    70 percent from?
5    A.  Just a general depreciation factor over
6    the life of the tug.  It's not a straight line
7    new build, so it would depreciate significantly
8    over the first few years, and then it will level
9    off.  So I think 70 percent is a fair overall.
10   If you lose 30 percent over the first five
11   years, and then, subject to maintenance and --
12       (Crosstalk)
13   Q.  Okay.  Did you look into the
14   pre-incident yard periods before applying the
15   70 percent?
16   A.  The 70 percent would apply in any
17   event.  It takes into account actually
18   maintaining the tug.  A well-maintained tug, the
19   depreciation would slow.
20   Q.  If a tug has a major overhaul,
21   including engine work and the hull and new steel
22   and other parts of the vessel, does that affect
23   the depreciation factor?
24       MR. CHAPMAN:  Objection to form.
25   A.  No.  The maintenance carried out is

Page 68

1    J. S. POULSON, MSc
2    expected to be carried out; otherwise, the tug
3    will not see its life expectancy through.
4    Q.  So your opinion is, an overhaul, no
5    matter how expensive, is maintenance; is that
6    your opinion?
7    A.  Yes.
8    Q.  The 70 percent, again, is that your
9    opinion from your experience or anything you
10   based it on other than your experience?
11   A.  Just my experience.
12   Q.  It's just a thumbnail kind of figure
13   that you came to because of your experience?
14       MR. CHAPMAN:  Objection to form.
15   A.  Through looking at the values of the
16   tugs, their age, building costs.
17   Q.  You didn't look at anything
18   specifically for this survey to get at
19   70 percent, right?  You came to that number
20   based on your experience; is that correct?
21   A.  Yes.
22   Q.  Then 6.10, you did a Generated Income
23   Approach.
24       (Whereupon, recess was taken.)
25   Q.  Mr. Poulson, I just want to clear up, I



Page 69

1          J. S. POULSON, MSc
2   think I was quoting Mr. Meyerrose's replacement
3   value from his 2025 survey, just to be clear on
4   his survey done in 2024, just after the
5   incident, the estimated replacement value of $9
6   million; does that ring a bell?
7      A.  Yes.
8      Q.   So getting back to where we were,
9   paragraph 6.10, page 11, Generated Income
10  Approach, you say, Typical utilization of a tug
11  of the Mackenzie Rose's specification is around
12  85 percent with daily hire rates in the region
13  of U.S. $8,500, which, if realized, will
14  generate an annual income stream of U.S.
15  $2,640,000; do you see that?
16     A.  Yes.
17     Q.   Could you just break down the sentence
18  and explain what it means in lay people's terms,
19  let's say?
20         MR. CHAPMAN:  Objection to form.
21         MR. RODGERS:  You're saying I'm not a
22  lay person?
23         MR. CHAPMAN:  You want me to tell you
24  what my form objection is?
25     A.  If a tug can attain an $8,500 hire

Page 70

1          J. S. POULSON, MSc
2   rate, and it's used 85 percent of the time, we
3   have an income stream of $2,640,000.
4      Q.   Where did you get $8,500 a day from?
5      A.  It's a fairly customary rate.  They're
6   all subject to negotiations for individual
7   contracts.  I am asked to approve tug contracts
8   occasionally in the course of other tug
9   employments and just through discussion with tug
10  owners generally.  It's an average rate.  It can
11  be higher, it can be lower, but it's a fair rate
12  for something like the Mackenzie Rose.
13     Q.   You didn't get that information from
14  Carver, right?
15     A.  I did not.
16     Q.   As you sit here today, do you know the
17  what actual hire rate for the Mackenzie Rose was
18  back in 2024?
19     A.  It would vary from contract to
20  contract, so I'm not aware of it at the time
21  exactly, but it can vary certainly.  It depends
22  from contract to contract, whether it's a long
23  term hire or a daily spot hire, it can be on an
24  hourly basis.  Other factors can be applied,
25  fuel surcharges.  But it's a fair rate to use, I

Page 71

1          J. S. POULSON, MSc
2   believe.
3      Q.   I guess what I'm getting at is, you
4   agree it's an estimated rate that you estimated,
5   correct?
6          MR. CHAPMAN:  Objection to form.
7      A.  Based on my experience and knowledge in
8   the market, yes.
9      Q.   And then, you said you estimated the
10  net income at 20 percent.  Where did you get
11  that number from?
12     A.  Just as a typical net operating income,
13  so gross minus operating costs.
14     Q.   Again, was that an estimate, or did you
15  get them from some industry study or some
16  industry booklet or some kind of publication?
17     A.  Just an estimate based on prior
18  discussions with tug owners as to how they get
19  to their daily rates, for example.  So they're
20  based on the market, the cost, based on their
21  operating costs for crew, maintenance,
22  insurance, port charges, etc.
23     Q.   Were you ever given any actual towing
24  agreement or invoice regarding this particular
25  voyage?  And when I say this voyage, I mean the

Page 72

1          J. S. POULSON, MSc
2   voyage that led to the incident.
3      A.  I believe I was given that, yes.
4      Q.   Do you know what the daily rate was?
5      A.  I don't recall at the time exactly, but
6   I have seen it, I think, but I think it was a
7   lump sum at the time.
8      Q.   Did you figure out the length of the
9   voyage and then what the daily rate would be?
10     A.  I'm not sure I ever knew the length of
11  the voyage.  But the lump sum agreement is a
12  lump sum agreement.
13     Q.   Does $60,000 ring a bell?
14     A.  Yes.
15     Q.   You received that information after
16  your initial report?
17     A.  No.  I believe I had that.
18     Q.   Okay.  And then, correct me if I'm
19  wrong, is your ultimate estimate of the value of
20  the tug at the time of the incident, is that
21  generally based on comparable sales, and then
22  you kind-of did a check by going through
23  replacement cost and income approach; is that
24  fair to say?
25         MR. CHAPMAN:  Objection.



JOHN S. POULSON MSC                                                    June 15, 2024
COEYMANS MARINE TOWING                                                        73–76

Page 73

1                J. S. POULSON, MSc
2     A.    Yes.
3     Q.    So is it fair to say that your primary
4  basis for getting to $4 million is your
5  comparable sales analysis?
6     A.    Generally, that's the approach, yes.
7        MR. RODGERS:  And I haven't marked
8     anything.  But if we can mark it in the
9     record and I'll have them marked and then
10    sent to counsel and the reporter.  Mr.
11    Poulson's August 8, 2025 report, well mark
12    that as Exhibit A to this deposition.  And
13    Exhibit B would be his addendum report of
14    August 25, 2025.  And Exhibit C is the
15    Meyerrose report dated July 7, 2024.  We'll
16    mark them and then send a copy of them
17    without all my scribble and send them to
18    the reporter and all counsel.
19        (Whereupon, Exhibits A, B and C were
20    referenced.)
21    Q.    Prior to this case, were you familiar
22  with Meyerrose and Co.?
23    A.    Yes.
24    Q.    Both companies work in the same
25  industry, correct, as in the maritime industry?

Page 74

1                J. S. POULSON, MSc
2     A.    Yes.
3     Q.    And both do, among other things, marine
4  surveying and also act as consultants; is that
5  fair to say?
6     A.    Yes.
7     Q.    I want to go to your previous
8  testimony, if you have your report.
9     A.    Yes.
10    Q.    So if you go to the last page, your
11  signature page is dated August 7th, but the
12  report is dated August 8th.  Is that kind of a
13  typo?  I'm looking at your signature page.  I
14  just want to make sure it's the correct
15  signature page to your report.  The last page of
16  your report has, among other things, your
17  signature; you see that?
18    A.    Yes.
19    Q.    And that's the signature page for the
20  report that is dated on the first page as
21  August 8th, right?
22    A.    Yes.
23    Q.    In the first case that you listed as
24  prior testimony, this is just for the last four
25  years?

Page 75

1                J. S. POULSON, MSc
2     A.    This is just the last four years, yes.
3     Q.    And if you look at the case of Moda
4  Ingleside Oils Terminal LLC versus Riverside,
5  what was your purpose of being retained in this
6  case?
7     A.    This case was a collision at an oil
8  terminal between two vessels.
9     Q.    And who retained you?
10    A.    The attorneys for the Riverside vessel.
11    Q.    What were you retained to opine on?
12    A.    It was a technical issue principally
13  concerning the main engine of the Riverside.
14    Q.    And so you were not retained to do a
15  valuation of either vessel?
16    A.    Not in that case, no.
17    Q.    So going to number 2, Bertling Transgas
18  Tankers S,A.C., etc., who retained you, and what
19  were you retained to do in that case?
20    A.    Bertling, the case was brought by the
21  owners or charters of the vessel against the
22  shipyard in Panama.
23    Q.    And who retained you?
24    A.    The attorneys for the owners of the
25  vessel.

Page 76

1                J. S. POULSON, MSc
2     Q.    What were you asked to opine on in that
3  case?
4     A.    Repairs affected to the vessel in dry
5  dock.
6     Q.    Is it fair to say you weren't retained
7  to do a valuation of the vessel?
8     A.    Yes.
9     Q.    Going to 3, the United Marine Offshore
10  LLC, etc. case; do you see that?
11    A.    Yes.
12    Q.    And that was a limitation liability
13  proceeding?
14    A.    Yes.
15    Q.    And who retained you, and what was the
16  purpose of your retention?
17    A.    It was a collision between the Miss
18  Julie and the owners of the vessel that I
19  represented.
20    Q.    Who did you represent -- the Miss
21  Julie?
22    A.    No.  The vessel that was struck by the
23  Miss Julie.
24    Q.    Were you retained to do a valuation?
25    A.    Only insofar as it was affected by the



JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
77–80

Page 77

1            J. S. POULSON, MSc
2    damage sustained to the vessel, the cost of
3    repairs as it affected the value of the vessel
4    was concerned, yes.
5        Q.   But you weren't retained to do the
6    value of the vessel for the purpose of the
7    limitation; is that correct?
8        A.   Correct.
9        Q.   Do you know who was in that case, what
10   company?
11       A.   I don't.
12       Q.   Number 4, in the matter of Pan Ocean
13   Company Limited, etc., you see that in your
14   list?
15       A.   Yes.
16       Q.   And what were you retained for in that
17   case?
18       A.   It was a fuel quality dispute.
19       Q.   Who were you retained on behalf of?
20       A.   World Fuel Services.
21       Q.   And is it fair to say that you weren't
22   retained to do a valuation of the vessel?
23       A.   Correct.
24       Q.   These are just the past four years,
25   correct?

Page 78

1            J. S. POULSON, MSc
2        A.   Yes.
3        Q.   But you said you testified in
4    approximately 25 cases?
5            MR. CHAPMAN:  Objection to form.
6        A.   Yes.
7        Q.   In any of those cases, were you
8    retained to do a valuation of the vessel?
9        A.   The actual total is 29 between court
10   appearances and depositions.  In one case I gave
11   testimony in court on valuation.
12       Q.   At trial?
13       A.   At trial.
14       Q.   Who was that on behalf of?
15       A.   On behalf of the owners of a ship that
16   was lost in a fire and it became a constructive
17   total loss or possibly an actual total loss, but
18   my testimony was on the equivalency of the
19   replacement vessel and its value compared to the
20   vessel that was lost.
21       Q.   Was this a limitation proceeding?
22       A.   No.  This was litigation.  It was in
23   part against the shipyard that caused the fire
24   and in part against the Panama Canal Commission
25   for their effort or lack of effort to deal with

Page 79

1            J. S. POULSON, MSc
2    the fire.  So the underwriters in that case
3    asked that part of my testimony, or my testimony
4    was to attest to the value of the vessel that
5    the owners bought to replace the one that was
6    lost.  This was in the Eastern District of
7    Louisiana Court.
8        Q.   So you were just asked to determine the
9    value of the new vessel?
10       A.   I was specifically asked to comment on
11   the equivalence of the replacement vessel, its
12   value against the value of the ship that was
13   lost.
14       Q.   Now, to do that, were you required to
15   do a fair market value of the ship that was
16   lost?
17       A.   No.  I was asked to comment on the
18   physical attributes from a technical point of
19   view of the equivalence of the two vessels.
20       Q.   So was it a comparison of the equipment
21   and what each vessel had as opposed to the value
22   of each vessel?
23       A.   That part of the trial was solely
24   related to cost, so the judge had asked that the
25   cost issue be resolved before the liability

Page 80

1            J. S. POULSON, MSc
2    issue was addressed in a subsequent trial, which
3    I attended in Panama.
4        Q.   Can you find the name of that case and
5    give it to your attorney?
6            MR. RODGERS:  And by counsel, we
7        request the name of the case and the Docket
8        number.
9        Q.   Do you know what year that was?
10       A.   It would be around 2000.
11       Q.   So to the best of your memory, all
12   other cases that you have testified to did not
13   involve you doing a valuation of a vessel; is
14   that fair to say?
15       A.   I'm just having a quick look, but, yes,
16   to the best of my recollection I have not had to
17   testify to valuation.
18       Q.   Is most of the work that you do
19   currently that you're surveying, is it
20   predominantly damage work as opposed to
21   valuation work, or is there a percentage or
22   something along that line?
23       A.   It varies.  It certainly includes a
24   good proportion of damage.  Last year, 2024,
25   pre-purchase surveys and valuations and



EXHIBIT 3

Page 81

1          J. S. POULSON, MSc
2    condition and valuations accounted for about --
3    actually, if I include the shipyard valuation
4    and the other entity, it's about 25 percent in
5    number.
6        Q.   Going through your CV again, what did
7    you do at GL Noble Denton?
8        MR. CHAPMAN:  Objection to form.
9        Q.   You can answer.
10       A.   I ran the survey -- well, I opened the
11   New York office of GL Noble -- actually, it was
12   Noble Denton when I joined the company.  It was
13   acquired by GL.  But I opened the survey office
14   in New York and ran essentially the survey for
15   the Americas and pretty much worldwide, in
16   conjunction with our Linden office.
17       Q.   GL is Germanischer Lloyd?
18       A.   Yes.
19       Q.   Is GL Noble Denton, is that the class
20   society's name, or is that like an affiliated
21   company?
22       A.   Well, it actually became DMV GL Noble
23   Denton.  I'm not entirely sure of the current
24   status.
25       Q.   When you opened up the office, was it

Page 82

1          J. S. POULSON, MSc
2    as the classed society?
3        A.   Absolutely not, no.  And I spent a lot
4    of time making the distinction that we have
5    nothing to do with the classification society.
6        Q.   I'm aware of that issue.
7             What kind of surveying were you doing
8    at GL Noble Denton?
9        A.   All manner of surveys, principally
10   casualty surveys, warranty surveys, condition
11   surveys, P&I surveys, expert witness.
12       Q.   And what about the Salvage Association,
13   what type of surveying were you involved in
14   there?
15       A.   The same as for GL Noble Denton.
16       Q.   So getting to your addendum report of
17   August 25, 2025, in your opinion, after the
18   inspection you did last week you maintained your
19   estimate of $4 million, correct?
20       A.   Yes.
21       Q.   And that's your opinion of the value of
22   the Mackenzie Rose as of the date of the
23   incident, June 15, 2024; is that correct?
24       A.   Correct.
25       Q.   And is it fair to say you dispute Mr.

Page 83

1          J. S. POULSON, MSc
2    Meyerrose's estimate of 2.25 to 2.5?
3        A.   Well, that estimate, yes.  He
4    subsequently put it between 4.5 and 5.
5        Q.   Okay.  I just want to make sure what
6    you two disagree about and what part you
7    disagree about.  So he did a post overhaul
8    inspection and then he evaluated it to the
9    numbers you just mentioned, correct?
10       A.   Yes.
11       Q.   Then, if you go to paragraph 6.3 of
12   your report, which is on page 10, you see that?
13       A.   Yes.
14       Q.   So your statement is, There is no
15   indication in the reports as to the reasoning
16   behind the vast change in valuations over the
17   approximate ten-month intervening period; do you
18   see that?
19       A.   Yes.
20       Q.   And he, I believe, has increased the
21   value due to the overhaul.  He has done that,
22   but you agree that that's what he's done?  I'm
23   not saying you agree with it.  I'm just saying
24   would you agree that that appears to be what
25   he's done there?

Page 84

1          J. S. POULSON, MSc
2        MR. CHAPMAN:  Objection to form.
3        A.   I can't answer that.  I don't know.  I
4    don't know.
5        Q.   Did you look at the April 2025 post
6    overhaul survey of Mr. Meyerrose'?
7        A.   Yes.
8        Q.   And in that survey, did he itemize all
9    the work that had been done on the vessel?
10       A.   Yes.
11       Q.   And is it your opinion as you sit here
12   today that that work, in your opinion, does not
13   add value to the tug?
14       MR. CHAPMAN:  Objection to form.
15       A.   Correct.  As we discussed, the list is
16   of maintenance.
17       Q.   Okay.  I understand that.  You
18   testified to that.  When you say maintenance,
19   you don't mean oiling the engine, right?  You
20   mean that there was work done, major work,
21   correct?  You just see that your term of art is
22   all of that is what you call maintenance of the
23   vessel; is that fair to say?
24       MR. CHAPMAN:  Objection to form.
25       A.   Yes.  It's part of a scheduled dry



Page 85

1         J. S. POULSON, MSc
2    docking to examine tanks, carry out necessary
3    repairs, that's the time to overhaul engines,
4    etc. But the category, in my opinion, is
5    maintenance.
6         Q.   Is it fair to say that, in your
7    opinion, overhaul work done on any vessel does
8    not add value to that vessel; is that your
9    opinion?
10        MR. CHAPMAN: Objection to form.
11        A.   Overhauls are a necessary function of
12   owning a vessel, and it's not upgrading, it's
13   maintaining.
14        Q.   But would you agree that if you --
15   let's assume that there is no load line or ABS
16   classification, that a vessel is purchased that
17   needs a major overhaul, that it generally would
18   be worth less to the buyer, correct, because the
19   buyer has to then put money into bringing it up
20   to speed; is that fair to say?
21        MR. CHAPMAN: Objection to form.
22        A.   It would depend on what the vessel
23   needed at the time of purchase.  If there were
24   issues that needed rectifying, it would still,
25   unless it's -- well, even if it's a damage

Page 86

1         J. S. POULSON, MSc
2    issue, you're still bringing it to where it
3    should be.
4         Q.   Right now these questions are geared to
5    understanding your opinion, as opposed to me
6    disagreeing with your opinion.  You and Mr.
7    Meyerrose will agree to disagree, maybe, on that
8    issue, but I just want to make sure I'm clear as
9    to what your opinion is, generally, and as to
10   this vessel, okay; does that make sense?
11        A.   Yes.
12        MR. CHAPMAN: Objection to form.
13        Q.   Why don't we take five minutes so I can
14   look through my notes.  If I don't see anything
15   interesting, I think maybe we can finish up.
16   Mr. Chapman may have questions for you and then
17   I may have follow-up, but let me get five
18   minutes to see if I missed anything.
19        (Whereupon, recess was taken.)
20        Q.   Mr. Poulson, I have no further
21   questions subject to follow-up.  I want to thank
22   you for being here today.  I enjoyed our
23   discussion and enjoyed getting to know you.
24   I'll say my goodbyes unless Mr. Chapman has
25   something.

Page 87

1         J. S. POULSON, MSc
2         A.   Thank you.
3    EXAMINATION BY
4    MR. CHAPMAN:
5         Q.   I do have one thing that I want to
6    explore, based on questioning by Mr. Rodgers,
7    and that is testimony that you have not seen or
8    otherwise had a chance to consider that came
9    from the deposition of a gentleman named
10   Nicholas Laraway.  Is everybody able to see my
11   screen?
12        A.   Yes.
13        Q.   This is the transcript of the
14   deposition of Mr. Laraway.  I'm on page 32 of
15   it.  I'll just scroll up to the beginning so you
16   can see the style of this case, the videotape
17   deposition of Mr. Laraway.  As I said, this is a
18   transcript.  Beginning on page 32, Mr. Rodgers
19   read to you some testimony beginning at line 19,
20   it says, How much did Carver pay for it when it
21   was acquired?  We're talking about the Mackenzie
22   Rose here.  How much did Carver pay for it?  I
23   believe it was approximately $1 million.  And
24   then continuing over to page 32, After acquiring
25   it, did Carver have any work done on it?  There

Page 88

1         J. S. POULSON, MSc
2    has been work done on it since it was acquired?
3    Yes.  Did it require refurbishing or anything to
4    make it operational when you acquired it?  Not
5    that I recall.  Who was it acquired from?  I
6    believe it was Gellatly, a company with their
7    name included Gellatly, I don't recall a
8    specific entity.  The witness was asked to spell
9    it.  There is comment by Mr. Rodgers, and then
10   we had Exhibit 4 to this deposition marked,
11   which was the abstract and title for the vessel
12   obtained from the Coast Guard National Vessel
13   Documentation Center, and it appears to document
14   that it was sold by Gellatly and Criscione
15   Services Corp. to Carver Marine Coeymans Marine
16   Towing, correct?  And Mr. Laraway's answer was,
17   That is correct.  And it appears that at the
18   time of the acquisition there was a $2 million
19   mortgage placed on the vessel.  Answer, that
20   appears to be correct.  So you told us earlier
21   that you thought you'd paid a million dollars
22   for it, but there's a $2 million mortgage.  Can
23   you explain the difference?  And his answer is,
24   beginning at line 20 on page 34, From what I
25   recall, at the time we purchased it, there was



JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
89–92

Page 89

J. S. POULSON, MSc

1
2  some equity in the vessel, and we had planned to
3  do some work in the future, so we were able to
4  take out a mortgage for more than we paid for.
5  So you paid a seller a million dollars and
6  succeeded in putting a mortgage on it for
7  $2 million; is that right?  That's correct.
8        Now, knowing that that was his
9  testimony, Mr. Poulson, does it appear to you
10  that that million-dollar purchase price that Mr.
11  Laraway testified about was a fair market value?
12        MR. RODGERS:  Objection.
13     Q.  At the time it was acquired by Carver
14  in 2020?
15     A.  I think, as I testified earlier, it was
16  below fair market value.
17     Q.  Great, thank you.  I don't have any
18  further questions.
19  FURTHER EXAMINATION BY
20  MR. RODGERS:
21     Q.  Just a followup, Mr. Poulson.  Your
22  formula, though, for fair market value is the
23  negotiated price between buyer and seller,
24  correct?
25     A.  A willing buyer and a willing seller.

Page 90

J. S. POULSON, MSc

1
2     Q.  And in determining that, it's fair to
3  say when you do determine that, you don't check
4  mortgages, you don't check insurance policies,
5  correct, generally?
6     A.  Generally, yes.
7     Q.  So based on your testimony of your
8  formula, the fair market value, which is the
9  value that the tug sold for in 2020, is or was
10  $1 million according to your formula, correct?
11     A.  Which, as I said, is between a willing
12  buyer and a willing seller.  I don't know the
13  circumstances of the sale, so I maintain that
14  that is below market value.
15     Q.  Based on what?
16     A.  Based on my valuation of the tug.
17     Q.  So your formula is not your formula, is
18  that what you're saying?
19     A.  No.  I'm saying it's between a willing
20  buyer and a willing seller.  I don't know the
21  condition of the tug when it was bought, and I
22  don't know the circumstances under which it was
23  sold.
24     Q.  Okay, fair enough.  So what would be
25  the situation where there was no willing seller,

Page 91

J. S. POULSON, MSc

1
2  or if the government declared eminent domain and
3  forced an owner to sell a vessel, would that be
4  an instance where it was not a willing seller?
5        MR. CHAPMAN:  Objection to form.
6     A.  I think that's a possibility.  But
7  companies in difficulty sell assets.  An asset
8  sale can be triggered for many reasons.
9     Q.  But you don't know if there are any
10  reasons in the case in 2020, correct?  You
11  didn't know before today what the sale price
12  was, correct?
13     A.  Correct.
14     Q.  So again, your formula -- I don't know
15  if you stated it this way at the beginning, but
16  as of now, your formula is the fair market value
17  is the negotiated price between a willing buyer
18  and a willing seller, correct, that's your
19  formula?
20        MR. CHAPMAN:  Objection to form.
21     A.  It's the generally accepted industry
22  term.
23     Q.  Is that your formula?
24     A.  That's what I stated in my report.
25     Q.  All right, thank you.  It's been a

Page 92

J. S. POULSON, MSc

1
2  pleasure.
3  FURTHER EXAMINATION BY
4  MR. CHAPMAN:
5     Q.  Mr. Poulson, in your professional
6  experience and expertise, do banks make loans on
7  vessels for more than the fair market value?
8        MR. RODGERS:  Objection, foundation.
9     Q.  You can answer.
10     A.  I'm not aware of that practice.
11     Q.  Thank you.
12        MR. CHAPMAN:  No further questions.
13  Anything else, Mr. Rodgers?
14        MR. RODGERS:  There is.
15  FURTHER EXAMINATION BY
16  MR. RODGERS:
17     Q.  In your experience, do banks sometimes
18  make loans on appraisals of vessels?
19     A.  Yes.
20     Q.  And do insurance companies issue
21  policies from time to time on appraisals of
22  vessels?
23     A.  My own experience is based on valuation
24  surveys.
25     Q.  And all those are different than an



EXHIBIT 3

Page 93

1        J. S. POULSON, MSc
2  actual fair market value, correct?
3        MR. CHAPMAN:  Objection to form.
4     Q.  Is that correct, in your experience and
5  opinion?
6     A.  In my experience, the insurance company
7  will insure a vessel based on its valuation and
8  its market value.
9     Q.  What about an appraisal, have you ever
10  done an appraisal on a vessel that went to an
11  insurance company?
12        MR. CHAPMAN:  Objection to form.
13     A.  You're distinguishing between an
14  appraisal and a valuation?
15     Q.  Yes.  An appraisal where an insurance
16  company has asked either the owner or you to go
17  appraise a vessel before they issue a policy.
18        MR. CHAPMAN:  Objection to form.
19     A.  The condition and valuation surveys
20  that I've carried out have been for insurance
21  purposes.
22     Q.  Have you included the actual sales of
23  the vessel when you've done that?
24        MR. CHAPMAN:  Objection to form.
25     A.  I've only done it if asked in the past.

Page 94

1        J. S. POULSON, MSc
2  Normally, no.
3     Q.  What about with a bank, have you ever
4  done a valuation survey so a bank can issue a
5  mortgage?
6     A.  I cannot say where my valuations have
7  been used, if they've been used by a bank or
8  not.
9     Q.  So it's fair to say sitting here today
10  you don't have any expertise on what a bank may
11  rely on in order to issue a mortgage to a vessel
12  owner, is that fair to say?
13        MR. CHAPMAN:  Objection to form.
14     Q.  You're not a banker, correct?
15     A.  I'm not a banker.
16     Q.  So as you sit here today, is it fair to
17  say that you do not have expertise in the basis
18  for when a bank issues a vessel mortgage?
19        MR. CHAPMAN:  Objection to form.
20     A.  I'm not experienced the way banks issue
21  mortgages, no.
22     Q.  Thank you.
23        MR. RODGERS:  I have no further
24  questions unless there's follow-up.
25        MR. CHAPMAN:  I think this concludes

Page 95

1        J. S. POULSON, MSc
2  the deposition.  The witness will read and
3  sign.
4        MR. RODGERS:  Ordering a rough draft
5  and a three-day expedite for Tuesday,
6  September 2.
7        MR. CHAPMAN:  Regular delivery, a TXT
8  file and full-size PDF.
9     (Time noted:  2:37 p.m.)
10
11  _____
12        JOHN S. POULSON, MSc
13
14  Subscribed and sworn to
15  before me this        day
16  of            2025.
17
18
19     Notary Public
20
21
22
23
24
25

Page 96

1            I N D E X
2  EXAMINATION BY                    PAGE
3  MR. RODGERS                   4, 89, 92
4  MR. CHAPMAN                      87, 92
5
6    N E W  R E F E R E N C E D  E X H I B I T S
7  NO.      DESCRIPTION              PAGE
8  EX-A     Poulson report-8/8/25      73
9  EX-B     Poulson addendum report-8/25/25   73
10  EX-C     Meyerrose report-7/7/24     73
11
12          R E Q U E S T S
13  DESCRIPTION                     PAGES
14  Insert-Availability-7/28/25        11
15  Insert-Availability                12
16  Case and Docket number             80
17
18            R U L I N G S
19  PAGE:
20  11, 11
21
22
23
24
25



EXHIBIT 3

JOHN S. POULSON MSC
COEYMANS MARINE TOWING

June 15, 2024
97–99

Page 97

```
 1            C E R T I F I C A T E
 2   STATE OF NEW YORK)
 3              SS.:)
 4   COUNTY OF KINGS  )
 5
 6       I, SARA FREUND, CSR, a Notary Public within
 7   and for the State of New York, do hereby
 8   certify:
 9       THAT JOHN S. POULSON, MSc, the witness
10   whose deposition is hereinbefore set forth, was
11   duly sworn by me and that such deposition is a
12   true record of the testimony given by such
13   witness.
14       I further certify that I am not related to
15   any of the parties to this action by blood or
16   marriage; and that I am in no way interested in
17   the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto set my
19   hand on this 27th day of August, 2025.
20
21              Sara Freund
22              SARA FREUND, CSR
23
24
25
```

Page 99

```
 1            E R R A T A   S H E E T
 2   PAGE    LINE
 3   _____  _____CHANGE:_____
 4   REASON:_____
 5   _____  _____CHANGE:_____
 6   REASON:_____
 7   _____  _____CHANGE:_____
 8   REASON:_____
 9   _____  _____CHANGE:_____
10   REASON:_____
11   _____  _____CHANGE:_____
12   REASON:_____
13   _____  _____CHANGE:_____
14   REASON:_____
15   _____  _____CHANGE:_____
16   REASON:_____
17   _____  _____CHANGE:_____
18   REASON:_____
19   _____  _____CHANGE:_____
20   REASON:_____
21   _____  _____CHANGE:_____
22   REASON:_____
23
24
25
```

Page 98

```
 1        DEPOSITION ERRATA SHEET
 2   Our Assignment No. 13352637
 3   CASE NAME: Coeymans Marine v Norfolk and
     Portsmouth Railroad
 4
 5        DECLARATION UNDER PENALTY OF PERJURY
 6   I declare under penalty of perjury that I have
 7   read the entire transcript of my deposition
 8   taken in the captioned matter, or that it has
 9   been read to me, and the same is true and
10   accurate, except for changes and/or corrections,
11   if any, as indicated by me on the DEPOSITION
12   ERRATA SHEET hereof, with the understanding that
13   I offer these changes as if still under oath.
14
15   _____
        JOHN S. POULSON, MSc
16
17   Subscribed and sworn to on the ____day of
18   _____,  2025, before me,_____,
19   Notary Public, in and for the State of New York
20
21
22
23
24
25
```

