## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division
### In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765) her cargo, engines, boilers, tackle, equipment, apparel, and appurtenances, etc., *in rem,* ("M/T MACKENZIE ROSE"), petitioning for Exoneration from or Limitation of Liability in allision with Belt Line Main Line Railroad Bridge (the "Bridge") occurring June 15, 2024 in and about the Elizabeth River, Virginia. | **Civil Action No: 2:24-cv-00490** |

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Petitioner in Limitation, Coeymans Marine towing, LLC, d/ b/a Carver Marine Towing ("Carver"), by and through its undersigned counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Eastern District of Virginia Local Civil Rules, herewith submits this Memorandum in Support of its Motion for Summary Judgment filed herewith in the above referenced matter.  In support, the Petitioner states as follows:

## TABLE OF CONTENTS

I.      INTRODUCTION..................................................................................................... 2

II.     STATEMENT OF FACTS ....................................................................................... 2

III.    STANDARD OF REVIEW ...................................................................................... 15

IV.     ARGUMENT ........................................................................................................... 17

   A. Carver is entitled to limit its liability as a matter of law because a vessel
      operators navigational error cannot be imputed to the vessel owner .................. 17

      1.  Mate Morrisey's navigational error was the sole proximate cause of the allision.21

      2.  Mate Morrissey and the crew were licensed by the U.S. Coast Guard................ 22

      3.  The vessel was properly manned. ........................................................................ 22

      4.  Mr. Morrissey was properly acting as watch stander. ......................................... 22

      5.  Autopilot is not prohibited for use while transiting a waterway with
          bridges. ................................................................................................................ 25

   B. Carver is entitled to limit its liability as a matter of law where Carver provided a
      seaworthy vessel and entrusted navigational decisions to a competenet crew and
      where naviational errors of pilotwere not wihtin te privitty or knowledge of
      Carver .................................................................................................................. 27

i

## I.    INTRODUCTION

This lawsuit involves an accident caused by an error of Mate James Morrissey who was the sole licensed mariner operating a tug, the MACKENZIE ROSE, when a barge being pushed by the tug allided with the Belt Line Main Bridge on June 15, 2024. Carver seeks an order limiting its liability in accordance with federal law. At the time of the allision, the tug was operated by Carver personnel, Mate Morrissey who was in the wheelhouse.  The Captain, Christopher Miller, now deceased, was below deck on rest, along with two crew members and the tug engineer.

The undisputed facts entitle Carver to limit liability to the value of the tug (value to be determined at trial).   The undisputed facts show that the MACKENZIE ROSE was seaworthy and fully operational on the date of the allision.  There is no dispute that Captain James Morrissey was a United States Coast Guard-licensed and experienced captain. There is no factual dispute that the allision was caused by Mate Morrissey's error in navigation in failing to turn off the auto pilot in time sufficient to avert allision with the bridge, as he, when pressed, admitted as such in the days following the incident to Carver personnel.  Carver is entitled to summary judgment and limitation of liability as an admitted navigational error cannot be imputed to Carver as the vessel owner, and therefore, Carver had no privity of knowledge as to this navigational error made by a duly-qualified pilot were not within privity or knowledge of the owner.

## II.    STATEMENT OF FACTS

Carver submits the following facts, supported by evidence submitted with the brief:

1.    This lawsuit arises from a June 15, 2024 incident when a barge being pushed by the M/T MACKENZIE ROSE (the "tug" or "vessel") allided with a bridge over the Elizabeth River, in Norfolk, Virginia (the "incident"). (Doc. 1, Complaint, ¶¶ 1-3).

2.      Carver, located in Coeymans, New York, is and was both the owner and the operator of the tug, a steel-hulled tugboat approximately 96.4 feet in length, weighing 343 gross tons. (Compl., ¶ 2).

3.      On the date of the incident, the tug was pushing a standard deck barge known as Weeks 281 along the Southern Branch of the Elizabeth River. (Compl., ¶ 20).

4.      At the time of the incident, the weather was clear, visibility was good, up to 10 miles), the tide was about 21 feet with no "chop."  (**Exhibit 1, Brian Moore Dep.**, 83:15-84:12).

5.      James Morrisey, a United States Coast Guard licensed Master, was stationed in the upper wheelhouse and navigating the tug as the Mate on Watch, while Coast Guard licensed Captain Chris Miller was below deck on rest. At approximately 4:25 pm, the bow of the barge made contact with the western section of the Norfolk and Portsmouth Belt Line Railroad Company's bridge (the "bridge"). (**Exhibit 2, revised 2692 form dated 6/25/24**, CARVER 111-112; **Exhibit 3, Capt. Chris Miller handwritten statement**, CARVER 47).

6.      The upper wheelhouse is situated well above the barge, providing an unobstructed all-round view from the steering station, such that there is no impairment to keeping a proper lookout:



*See* (**Exhibit 4, Report and Findings of Captain Sam Stephenson**, J.D. at p. 20 (Petitioner's expert) (depicting photos taken at inspection on July 28, 2025)).

7.      No other crew members witnessed the barge make contact with the bridge. (**Group Exhibit 5**, **Statement of Chris Miller**, Carver 49; **Sharif Porter Dep**., 22:13-23:22; **Jarkeis Morrissey Dep**. 20:19-21:10; **Jason McGrath Dep**., 30:15-31:22)

8.      Carver Laraway, the President and sole member of Carver Marine Towing, was not present on the tug the day of the incident. (**Exhibit 6, Nick Laraway Dep.,** 13:17-22).

9.      Nick Laraway, Carver's then Chief Operating Officer, was not present on the tug the day of the incident. (Ex. 1, Moore Dep., 25:17-26:6). He first became aware of the incident on June 20, 2024, after receiving an email with a letter addressed to him from the Belt Line's counsel alleging that the tug allided with the bridge. (Ex. 6, Laraway Dep.,14:2-15:9).

10.     Carver's General Manager, Brian Moore, was not present on the tug the day of the incident. (Ex.1, Moore Dep., 10:5-6; 29:18-21). He first learned of it when he received a call from Carver Port Captain, Leonard Baldassare, who told him that the tug made contact with the fendering of the bridge. (Ex.1, Moore Dep., 49:16-50:6).

11.     At the time of the incident, the tug maintained an American Bureau of Shipping ("ABS") International Load Lcohenine Certificate, Certificate No. 0139443-4873687-025 (exp. 8/11/2026) (**Exhibit 7**, **ABS Survey, 9/2/2021**, ABS–0089-0095).

12.     At the time of the incident, the crew manning of the tug was compliant with its USCG Certificate of Inspection (COI). (**Group Exhibit 8, COI** CARVER 001728-1731, **Daily Log 6/15/24** listing crew CARVER 56-57).

13.     Mate Morrissey was standing watch pursuant to Carver's SMS section 7.16 regarding Look Outs, which permits one-man bridge operations:

> **One-Man Bridge Operations**
> "On vessels where there is an unobstructed all-around view provided at the steering station, as on certain pleasure craft, fishing boats, and towing vessels, or where there is no impairment of night vision or other impediment to keeping a proper look-out, the watch officer or helmsman may safely serve as the look-out. However, it is expected that this practice will only be followed after the\ situation has been carefully assessed on each occasion and it has been clearly established that it is prudent to do so. Full account shall be taken of the weather, conditions of visibility, traffic density, and proximity of navigational hazards. It is not the intent of these rules to require additional personnel forward, if none is required to enhance safety."
>
> *Senate Report N. 96-979, 96thCongress, 2nd Session (1980) at 7-8*

(**Exhibit 9, SMS 7.16 Look Out**, CARVER 155 (citing 46 CFR 140.630 / 33 CFR 83 Rule 5); Ex. 1, Moore Dep., 113:20-114:20 (noting the mate/master's responsibilities to oversee lookouts and to determine when a lookout is necessary); **Exhibit 10, Leonard Baldassare Dep**., 184:6-185:6, 204:4-205:1 (no knowledge of requirement by Carver for more than one person to serve as the lookout when transiting bridges).

14.     Following the incident, Capt. Chris Miller went to the upper wheelhouse where Mate Morrissey reported that the tug went hard over and the rudder stuck. (Ex. 3 Chris Miller Handwritten Statement**,** CARVER 47). Mate Morrissey documented that he, ". . . experienced a steering malfunction causing tug and barge to turn to port and touch up on bridge before it could be corrected, no damage to barge and no visible damage to bridge." (**Exhibit 11, James Morrissey Handwritten Statement**, CARVER 94).

15.     Capt. Chris Miller reported the incident to Port Capt. Lenny Baldassare. Mr. Baldassare testified that when he spoke to Capt. Miller, he relayed the account of events provided by Mate Morrisey: that the vessel got "bent out of shape" and that he lost control of the vessel and slid into the bridge's fendering system. (Ex. 10, Baldassare Dep., 48:3-9). Mr. Baldassare received 4-5 photos of the tug, bridge, and barge, and understood from Capt. Miller (as told to him by Mate Morrissey and the crew members) that there was no visible damage to the tug, barge or bridge. (Ex. 10, Baldassare Dep., *supra*).

16.     Mr. Baldassare relayed the information he received from Capt. Miller to Mr. Moore and they both agreed that since there was no observable damage in the photos that it would be okay for the vessel to proceed to New York (Ex. 10, Baldassare Dep., 50:7-24;60:16-22). Neither Mr. Moore nor Mr. Baldassare reported the incident to the United States Coast Guard because there was no visible damage to report and, as reported to them, the bridge had not been struck. (Ex. 10, Baldassare Dep., 60:1-61:4). At no time on June 15, 2024, did Mr. Baldassare nor Mr. Moore know that the barge made contact with the bridge, not just the bridge's fendering system. (Ex. 10, Baldassare Dep., 217:8-15; Ex. 1, Moore Dep., 53:5-19).

17.    When the tug arrived in New York, Mr. Baldassare met and spoke with all of the crew members and instructed them to prepare written statements about what happened with the incident.  (Ex. 10, Baldassare Dep., 73:2-74:8).

18.    Mr. Baldassare interviewed Mate Morrisey and Capt. Miller and the rest of the crew in the tug galley. (Ex. 10, Baldassare Dep., 78:10-15).

19.    Mate Morrissey had no disciplinary history at Carver prior to the subject incident. (Ex. 1, Moore Dep., 88:6 – 89:25;  *see also, e.g.*, (**Exhibit 12**, **Answer to Request No. 4 of Carver Marine Towing's Fifth Supplemental Response to Norfolk Belt Line's Second Set of Requests for Production of Documents and Affidavit of Josef Malk in Support**.)

20.    None of the crew claimed that the autopilot was involved in the incident. (Ex. 10, Baldassare Dep., 89:1-8).

21.    On Monday, June 17, 2024, Mr. Baldassare contacted the Coast Guard to report the bridge incident after Mr. Moore ordered him to do so. (Ex. 10, Baldassare Dep., 64:24-66:16).

22.    On June 19, 2024, Mr. Baldassare completed the Coast Guard 2692 form as instructed by Lt. Meghan Palumba, Marine Investigator, United States Coast Guard, Sector Virginia (Ex. 10, Baldassare Dep., 67:24-68:7. On June 20, 2024, Mr. Baldassare submitted the CG-2692 form to the Coast Guard based on the details reported by Capt. Miller. (**Exhibit 13, Initial 2692-B form 6/19/24**, CARVER 114-117; **Exhibit 14, email from Lenny to Lt. Palumba w/ 2692 form**, CARVER ESI 1274-1275).

23.    The Coast Guard requested a revised Form CG-2692 from Carver after receiving video footage of the barge making contact with the bridge, not just the bridge fendering system, as initially reported by Mate Morrisey to Captain Miller and the crew and learning that Mate Morrisey had initially lied about the auto pilot failure. (Ex. 1, Moore Dep., 241:9-244:17).

24.    On June 25, 2024, Mr. Moore submitted a revised Form CG-2692 and 2692A on behalf of Carver, reporting a serious marine casualty pursuant to 46 CFR 4.05-1 and 4.05-10. This revised CG-2692 Form memorializes the actual cause of the allision - a navigation error by Mate Morrissey.  The revised 2692 stated, *inter alia*:

25. Nature and Circumstance of the Casualty:

25a. Activity or Operation Being Conducted at the Time of the Casualty:
THE TOWING VESSEL MACKENZIE ROSE WAS PUSHING THE DECK BARGE WEEKS 281, AHEAD IN PUSH GEAR. THEY WERE OUTBOUND THE NORFOLK SOUTHERN BRANCH FOR SEA. THE OFFICER ON WATCH, JAMES MORRISSEY, WAS IN AUTOPILOT AND DIDN'T SWITCH OVER TO NON FOLLOW UP HAND STEERING BUT THOUGHT HE DID. THE VESSEL CONTINUED TO TRACK TO PORT AND BEFORE THE OOW WAS ABLE TO CORRECT IT AFTER SWITCHING TO NON FOLLOW UP, THE BOW OF THE BARGE MADE CONTACT WITH THE WESTERN SECTION OF BRIDGE.


25b. Description of the Casualty
THE OOW HAD FAILED TO PROPERLY SWITCH TO HAND STEERING AND ALSO GAVE MINIMAL ENGINE ORDERS AT FIRST IN ORDER TO PREVENT FURTHER HEADWAY OR COURSE CHANGE. THE OOW STATED THAT ONCE HE DID SWITCH TO HAND STEERING, HE GAVE A SLOW ASTERN AT FIRST AND THEN FULL ASTERN. ONCE CONTACT WAS MADE WITH THE BRIDGE STRUCTURE, THE VESSEL WAS BARELY MAKING HEADWAY AND BEGAN TO MAKE ASERTN [sic] WAY. THE OOW WAS BACKING INTO THE MAIN CHANNEL AND REGAINED CONTROL OF THE VESSEL.

*See also* Brian Moore's testimony: tying in the 2692 form and the hearing with USCG/NTSB – See below for relevant sections of Moore testimony *infra* (SUMF ¶ 4 at Ex. 1, Moore Dep., 241:9-246:2):

Q.    Okay. So this is Carver 000111 through 117, and if you look at the second page of the exhibit, it appears to have been signed by you.
A.    Yes. Digital signature.

*See* (SUMF ¶ 4 at Ex. 1, Moore Dep. 239:23-240:2)

Q.      Okay. And you signed it on -- it's dated June 25th, but you said you digitally signed it on June 26th, correct?

A.      Yep.

Q.      So it would have been submitted to the Coast Guard on what date?

A.      I would believe it would have been the 26th.

Q.      Okay. Did you have the assistance of counsel in preparing this form?

A.      I did not.

*See* (SUMF ¶ 4 at Ex. 1, Moore Dep. 240:12-22)

A.      No. There was a -- there was a revision made from the Coast Guard, one that they requested.

Q.      The Coast Guard asked for a revision?

A.      Yes, sir.

Q.      And what did they request that you revise?

A.      I don't remember off the top of my head exactly what it was, but they -- Lieutenant requested  a revision.

Q.      Lieutenant Palomba?

A.      Yes.

Q.      And did she request the revision before you signed it on the 26th of June 2024?

A.      I believe so.

Q.      So was there a separate form submitted prior to this one that's signed on the 26th of June?

A.      I would have to reference the dates. I don't remember off the top of my head.

Q.      So there was a -- but there would have been two forms, Coast Guard Form 2692s, that were submitted to the Coast Guard?

A.      Yes --

Q.      And --

A.      -- I believe so.

Q.      -- you don't recall what she asked you to revise?

A.      Not right now, I don't.

Q.      All right.

**A.      Oh, okay. So I do -- now reading this, the first one was the initial one I believe Lenny submitted of the bridge fendering. And then after we discovered the fact that it was the bridge, when she had notified us on here, the bridge structure. So the first one was for the bridge fendering, and then she asked us to -- Lenny and I to -- I don't know if it came through Lenny or if it came through me, whatever it was, but that is the whole e-mail chain asking for a revision.**

Q.      All right. So there was one that was submitted that just described the extent of property damage to the fendering system?

A.      Yes, sir.

Q.      And that was not correct?

  A.  After we realized it was, in fact, the bridge, that's when she asked us to submit the revision.

*See* (SUMF ¶ 4 at Ex. 1, Moore Dep. 241:9 – 243:6)

  Q.  So how did you arrive at the determination that, in fact, the barge had hit the bridge rather than the fendering system?

  A.  That's when Lieutenant Palomba called us and said it did, in fact, hit it.

  Q.  And did you receive any photographic evidence from the Coast Guard to that effect?

  A.  No. She did say there was a video, but she didn't have it and I didn't have it at the time, but that's why she requested us to change it.

  Q.  Was that in an e-mail that she sent to you?

  A.  Yes, sir.

  Q.  So there's a 2692-B form that's part of this that was apparently submitted and signed by Mr. Baldassare on June 19th –

  A.  Yes, sir.

  Q.  -- 2024. Do you know if that's the date that he would have submitted the original 2692?

  A.  I couldn't tell you. I don't know.

  Q.  On page 1 of Exhibit 19, in block 10, the box for Unintended grounding or unintended strike of (allision with) a bridge is checked. Right?

  A.  Yes, sir.

  Q.  Was that box checked when the first form was submitted?

  A.  I do not know off the top of my head.

  Q.  The entries in block 25A and block 25B, were those drafted by you?

  A.  Yes, I believe so.

  **Q.  So in 25A, the second sentence says The officer on watch, James Morrissey, was in auto pilot and didn't switch over to non-followup hand steering, but thought he did. Sir, is there any reference to being in auto pilot in either of Mr. Morrissey's statements?**

  **A.  Not in the statements I can recall, but it was during the NTSB interview with the Coast Guard on board, as well. That's when I believe Lieutenant asked me to revise it, after she heard.**

  Q.  Did you attend that interview?

  A.  Yes, sir.

  Q.  And it was aboard the vessel?

  A.  Yep.

  Q.  Like in the galley or –

  A.  In the wheelhouse.

  Q.  Oh, in the wheelhouse?

  A.  Yes, sir.

  Q.  And who all was present?

A.     It was the gentleman from NTSB; and then there was three people, via Teams or Zoom, from Coast Guard sector Norfolk; and then it was individually different counsel before Clyde Co.

MR. RODGERS: For Carver?

THE WITNESS: Yes.

A.     Our Carver -- our counsel, and then the individuals being interviewed.

Q.     So Mr. Abel, an attorney in Norfolk, Virginia, was present for those interviews?

A.     Yes, sir.

Q.     And were all five crew members interviewed by the Coast Guard?

A.     I don't recall all five being interviewed. I believe they did Captain Chris -- correction.
They did everybody who was on board. Captain Morrissey was already off, because the NTSB had arrived a couple days later, and I believe they did his via Teams or Zoom, whatever it was, separately. But I was not there for that one.

Q.     So there was a person from the National Transportation Safety Board present in person for those interviews?

A.     Yes, sir.

Q.     All right. And you were there?

A.     Yes, sir. Q. Was Mr. Baldassare there?

A.     I don't recall if he was.

Q.     And you said Mr. Able was there, Christopher Abel, correct?

A.     Yes. Q. And then who was actually interviewed among the crew members in person on that occasion?

A.     Captain Chris Miller, AB Jarkeis Morrissey, able-bodied Sherif Porter, and Engineer Jason McGrath.

Q.     So everybody but Captain Morrissey?

A.     Yes, sir.

Q.     And you believe Captain Morrissey was interviewed later by Zoom -- via Zoom?

A.     Yes.

*See* (SUMF 4, Ex. 1, Moore Dep. 244:8 – 248:3)

25.     As evidenced by the revised 2692 form, *inter alia*, Mate Morrissey retracted his initial statement that the incident was due to a steering malfunction. *See* (**Group Exhibit 15**, **Revised Statement of Statement of Chris Miller** at CARVER 49; **Revised Statement of Jarkeis Morrisey** at CARVER 72; **Revised Statement of Sharif Porter** at CARVER 84; and **Revised Statement of Jason McGrath** at CARVER 82); *See also* Ex. 6, Laraway Dep. 80:16-82:7 ("it is

my understanding that Lenny was told false information"); *See* Ex. Brian Moore Dep. 241:9-246:2, *supra*). Instead, as evidenced by the *inter alia* revised 2692 form, Mate Morrissey testified at the USCG hearing and testified that the incident occurred because he failed to properly switch from autopilot to hand steering.[1] (Ex, 2, revised 2692 form dated 6/25/24, CARVER 111-112). As set forth in the revised 2692 form, prior to the incident, Mate Morrissey attempted to switch from autopilot to hand steering but failed to engage the Non-Follow Up ("NFU") switch, a necessary step in the procedure to switch from autopilot to hand steering. (Ex. 2 revised 2692 form dated 6/25/24, CARVER 111-112). Upon realizing that he had not properly disengaged the autopilot, Mate Morrissey then properly engaged the NFU switch and changed over to hand steering prior to the incident. (Ex. 2, revised 2692 form dated 6/25/24, CARVER 111-112).

Based on the photos below, the two-step process used to switch from autopilot to hand steering is as follows: (1) first the Standby (STBY) button on the autopilot needs to be pressed, second steering needs to be switched from autopilot (auto) to NFU by engaging the switch.

---

[1] The USCG has not completed its investigation. As such, they will not release the transcript of Mate Morrissey's interview statement. Carver has subpoenaed the NTSB and USCG for this evidence. Should the evidence not be forthcoming, Carver will file an Order to Show cause if necessary. The claimants have filed a claim against Mate Morrissey and have noticed and scheduled his deposition. He did not appear. Recently, the court on motion has ordered Mr. Morrissey to appear for deposition in 14 days.



#1 – Press STBY (Standby)



#2 – Engage switch from Auto to NFU



*See* SUMF 6, *supra*, at Captain Stephenson Report, at pp. 31-32 (photos taken at inspection on July 28, 2025).

26.    Before the switch to hand steering took effect, the bow of the barge made contact with the western section of the bridge. (Ex. 2**,** 2692 form dated 6/25/24, CARVER 111-112; **Exhibit 16, Tug cell text,** CARVER ESI 1897; and **Exhibit 17** CARVER ESI 523 (**screen shot of incident**). In the tug's Bridge Log of June 15, 2024, Capt. Chris Miller stated:

> Mate James Morrissey reports the autopilot was not completely turned off he was able to correct and switch back over to hand steering and begin backing on the Weeks 281 barge and maneuvered the barge alongside fendering on the North and PBL RR Bridge, photo taken. proceed slowly away from bridge.

(**Exhibit 18, 6/15/24 Daily Log**, CARVER 56; Ex. 17, CARVER ESI 523 (screen shot of incident with same text). Similarly, in a June 28, 2024 email from Capt. Miller to Brian more, Capt. Miller states:



From: +18455944410 Brian Moore
To: +15187084887 (owner)

I'll call you very shortly but his interview statement to CG said it never went hard over and it was midship the entire time.

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +15187084887 | | 6/28/2024 10:01:32 AM(UTC-4) | |

Status: Read

6/28/2024 10:01:19 AM(UTC-4)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x7A7CC9 (Table: message, handle; Size: 26599424 bytes)

CARVER ESI 001897

See (Ex. 16, CARVER ESI 1897). See also SUMF 6, *supra*, at Capt. Stephenson's report, p. 30 (discussing same).

27.     Capt. Nicholas J. Lewis, Claimants' purported marine industry expert who intends to offer opinions on duty and causation of the allision, agrees that navigational error caused the bridge strike, specifically that "[t]he Officer on Watch (James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode) in a confined navigational channel, resulting in loss of directional control."  (**Exhibit 19**, Lewis Report at 12; see also **Exhibit 20,** Lewis Dep, 40:1-24 ("Yeah. [Morrissey] did something wrong")).

### III.    STANDARD OF REVIEW

Summary Judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The summary judgment procedure was "designed 'to secure the just, speedy and inexpensive determination of every action." *Celotex Corp v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548 (1986) (citation omitted).  "All reasonable inferences [must be] drawn. . . in the light most favorable to the nonmoving party. *Webster v. U.S. Dept. of Agriculture*, 685 F.3d 411, 421 (4th Cir. 2012).  However, a party opposing a properly supported motion for summary judgment "may

not rest upon the mere allegations of denials of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club. Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). Summary judgment is not a disfavored procedural shortcut, rather, it is an important mechanism for disposing of claims that have no factual basis. *First Sentinel Bank v. United States*, 364 F. Supp. 3d 615, 617 (W.D. Va. 2019) (citing *Celotex*, 477 U.S. at 327).

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, (1986). The party opposing summary judgment may not rest upon mere allegations or denials. Rather, the n on-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 US. At 248. To defeat a summary judgment motion, "the non-moving party must rely on more than conclusory allegations, 'mere speculation,' the 'building of one inference upon another,' the mere existence of a scintilla of evidence,' or the appearance of some 'metaphysical doubt' concerning a material fact." *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). Unsupported speculation is not enough to withstand a motion for summary Judgment. *Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769 (2007). While a District Court is accorded discretion in determining whether to grant summary judgment, it has an "affirmative obligation … to prevent factually unsupported claims . . . from proceeding to trial." *Warren v. Tri Tech Labs, Inc.*, 993 F. Supp. 2d. 609, 613 (W.D. Va.), *aff'd,*

580 F. Appx 182 (4th Cir. 2014) (citing *Felty v Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)).

## IV.    ARGUMENT

### A.    CARVER IS ENTITLED TO LIMIT ITS LIABILITY AS A MATTER OF LAW BECAUSE A VESSEL OPERATOR'S NAVIGATIONAL ERROR CANNOT BE IMPUTED TO THE VESSEL OWNER.

Federal maritime law applies to Petitioner's claims because the accident occurred on navigable water and due to the Admiralty Extension Act. SCHOENBAUM, ADMIRALTY AND MARITIME LAW, §3-3 at 84; 46 U.S.C. § 740 (extending admiralty jurisdiction to all injuries caused by a vessel on navigable waters). The Limitation of Shipowners Liability Act, 46 USC § 30501, et seq. provides at § 305051that a vessel owner may limit its liability to the value of the vessel and its pending freights at the end of the voyage on which the casualty occurs, if the fault causing the loss occurred without his "privity or knowledge." Under the Limitation Act, as implemented by Rule F (Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure), the determination of whether a shipowner may limit liability involves a two-step analysis: (1) a determination of what acts of negligence[2] <u>caused</u> the casualty and; (2) whether the shipowner had "privity or knowledge" of the acts which caused the casualty. This procedure requires the claimant to prove what negligent acts or omissions caused the casualty with the burden then shifting to the owner to prove lack of privity or knowledge of the <u>cause</u> of the casualty. *In re Marine Sports, Inc*, 840 F.Supp 46, 1994 AMC 1678 (D.Md. 1993) (emphasis added); *Empresas Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir.1983).

---

[2] The elements of a negligence claim in a limitation of liability proceeding under the Limitation of Liability Act are the same as the elements of negligence under common law: duty, breach of duty, causation, and damages. *In re Bald Head Island Transp. Inc*, 124 F. Supp. 3d 658, 671 (2015 (E.D. N.C 2015).

Without conceding negligence, this motion is asking the Court to determine whether Carver, who might not be entitled to exoneration, should still be entitled to limitation of liability. In the second step, a vessel owner seeking to limit his liability bears the burden of proving that he did not have privity or knowledge of the condition or negligence that <u>caused</u> the accident. *Hellenic Lines, Ltd. v. Prudential Lines, Inc*., 813 F.2d 634, 638 (Cir. 1987) (emphasis added); *McAllister Towing of Virginia*, 2012 WL 143877 *23 (E.D. Va. 2012). For purposes of limitation "it has been commonly held or declared that privity as used in the statute means some personal participation of the owner in the fault or negligence which caused or contributed to the loss or injury." *Coryell v, Phipps*, 317 U.S. 406, 411, 87 L.E.D. 363, 63 S.Ct. 291 (1942). "The term 'knowledge' is used in its every day meaning *i.e.,* did Petitioner 'know' of the alleged negligent conditions on his boat on which the State Court complaint is based? One who is not on notice as to the existence of any defect in [the boat] cannot be denied limitation as regards a loss,'" *In re Livolsi*, 2005 WL 3675967, 2005 U.S. Dist. LEXIS 1293; 2005 AMC 1070 (Dist. Conn. 2005) (quoting *Coryell v, Phipps*, *supra* at 317 U.S. 412); *Hellenic Lines, Ltd*, 813 F.2d at 638 ("Privity and knowledge," means that a vessel owner knew or should have known that a certain condition exists."). "When a corporation owns the vessel, the test is whether culpable participation or neglect of duty can be attributed to an officer, managing agent, supervisor, or other high-level employee of the corporation." *Carr v. PMS Fishing Corp.,* 191 F.3d 1, 4 (1st Cir.1999).

The operational negligence of an otherwise competent captain is not charged to the owner's privity or knowledge for purposes of the Limitations Act where the owner was not present on the vessel, and it could exert no control over the captain's actions. *See In re Manhattan by Sail*, Inc., 2018 WL 6684768, 2018 AMC 2642 (S.D.N.Y. 2018) (limitation allowed where cruise passenger's injury resulted from crewmember's mishandling of sail's halyard line); *In re Seagram*

*Barge Company,* 219 F. Supp. 3d 749, 2017 AMC 184 (N.D. Ill. 2016) (conduct of tug captain, even if negligent, was not within owner's knowledge or privity as it involved only the captain's operational decisions outside control of owner's shoreside personnel). The competence of a ship's crew depends on (1) whether the "captain, pilot and navigator" are properly licensed; (2) whether they have satisfactory safety records; (3) whether they are is familiar with the vessel and the waters on which it travels; and (4) whether the captain is adequately trained. *In re Sea Wolf Marine Towing & Transp., Inc*., 2007 U.S. Dist. LEXIS 82565; 2008 AMC 131 (SDNY 2007) (*citing Illinois Constructors Corp*. 715 F. Supp. 872, 886 (N.D. Ill. 1989)). On the date of the allision, it is not disputed, Capt. Christpher Miller, the captain and Mate James Morrissey, the pilot on Watch, were both U.S. Coast Guard-licensed pilots and competent to pilot the MACKENZIE ROSE on June 15, 2024 as discussed in detail, *infra*.

Like other jurisdictions, the Eastern District of Virginia has recognized the limited scope of control that an owner has over his agents: where the owner is so far removed from the vessel that he cannot reasonably exert control over the captain or pilot's conduct, the pilot's navigational errors at sea are generally not within the privity of knowledge of the owner. *McAllister Towing of Virginia*, 2012 WL 143877 *23.  In that case, the Court found that a vessel owner was not entitled to exoneration but was entitled to limit liability where the vessel owner was found not to have privity or knowledge of the negligent release of the tug's tow wire. *McAllister Towing*, 2012 WL 143877 at *23-24.  In support of its ruling, the Court reasoned that the Captain and crew of the subject vessel were "clearly competent to man the KATIE G. and to navigate her through the Norfolk Harbor Reach Channel" on the date of the incident, as they had  navigated the KATIE G. from Norfolk, Virginia to Baltimore, Maryland over a hundred times without incident" prior to the subject incident.  *Id.* The Court found that the vessel owner was not on notice of any negligence

by the Captain and crew, "even if senior management had observed the crew's towing procedure in the past because written guidance on the stream tow was impossible because variables that affect when and where a captain should lengthen the tow wire included weather and traffic conditions." *McAllister Towing*, 2012 WL 143877 at *23-24. Further, the Court reasoned that there was no evidence that prior to the date of the incident that the KATIE G. had any incidents related to lengthening an excess amount of tow wire. *Id.* Therefore, the Court held that "this one-time error" on the part of the Captain and his crew did not warrant a denial of limitation of liability for McAllister. *McAllister Towing*, 2012 WL 143877 at *23-24.

Similarly, in a case that is comparable to the case at bar, in *Illinois Constructors*, the U.S. District Court for the Northern District of Illinois held that a vessel owner was entitled to limit its liability to the value of the vessel where the Court found that the owner provided a seaworthy vessel with a competent crew, the captains were licensed pilots with many years of experience on the Illinois River and on the subject vessel. 715 F. Supp. at 882-83. The court also found that the Captain's navigational errors in misjudging the position of the vessel with respect to the Bridge and responding inadequately to the grounding and force of downstream current, was not a navigational error of a pilot within the privity and knowledge of the vessel owner. *Id.*

The law is clear: a vessel operator's navigational errors are not imputed to the vessel owner where the vessel owner has no privity of knowledge of the error made by an otherwise competent Captain and crew. As a matter of law, Carver cannot be charged with privity of knowledge of Mate Morrisey's navigational error and is therefore entitled to limit liability to the value of its vessel, the MACKENZIE ROSE. The following undisputed facts which support this conclusion are set forth below.

1.    **Mate Morrisey's navigational error was the sole proximate cause of the allision.**

Based on the undisputed facts, *supra*, Mate Morrissey's navigational error in failing to switch over to hand steering, was the sole error which caused the allision.  On the date of the incident, the tug, operated by James Morrissey, was pushing the barge along the Southern Branch of the Elizabeth River for delivery to Staten Island, New York. Statement of Undisputed Facts ("SUMF"), ¶ 3.  Mate Morrisey, a United States Coast Guard licensed master and an employee of Carver, was stationed in the upper wheelhouse and navigating the tug as the Mate on Watch, while Coast Guard licensed Captain Christopher Miller was below deck along with the other crew members**.** SUMF, ¶ 5.  At approximately 4:30 pm, the barge made contact with the western section of the Belt Line's bridge. SUMF, ¶ 5.   No other crew members witnessed the tug make contact with the bridge. ¶ 7.

As evidenced by the revised 2692 form, the testimony of Brian Moore and that provided to the United States Coast Guard and NTSB during Mr. Morrissey's interview, Mate Morrissey admitted that the incident in fact occurred because of his own navigational error when he failed to properly switch from autopilot to hand steering.  SUMF, ¶¶ 24-25**.** The undisputed fact is that Mate Morrissey attempted to switch from autopilot to hand steering but failed to engage the Non-Follow Up switch, a necessary step in the procedure to switch from autopilot to hand steering. *Id*. Upon realizing his error, Mate Morrissey then properly engaged the NFU switch and changed over to hand steering prior to the allision. SUMF, ¶¶ 24-25.  Critically, Petitioner's own marine liability expert, Capt. Nichol J. Lewis**,** agreed under oath that the navigational error by James Morrissey, the officer on watch, caused the bridge strike, when he failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode) resulting in loss of directional control.  SUMF, ¶ 27**.**

Based on the undisputed facts in view of written evidence and testimony submitted to the USCG and NTSB, Mate Morrissey failed to engage the switch from Auto to NFU when he thought he did. This failure by Mate Morrissey as well as his lack of situational awareness was the sole cause of the allision. *See* SUMF ¶ 6, Report of Capt. Stephenson, pp. 31-34.

The following additional undisputed facts that support a finding of navigational error and lack of privity by Carver as the vessel owner are as follows:

### 2.     Mate Morrissey and the crew were licensed by the U.S. Coast Guard.

The parties do not dispute that the Mackenzie Rose had not one, but two licensed US Coast Guard masters aboard. Captain Christopher Miller, who was below deck on rest, was the captain for that voyage. James Morrissey was the acting mate and was stationed in the upper wheelhouse piloting the tug at the time of the incident. *See* SUMF, ¶ 5.

### 3.     The vessel was properly manned.

The US Coast Guard Certificate of Inspection requires five crewmembers for the MACKENZIE ROSE. One master, one licensed mate, two able seamen, and one ordinary seaman. *See, e.g.,* SUMF, ¶ 12. The undisputed facts are that in addition to Captain Miller and Mate Morrisey, the other three crew members were the vessel's engineer and two deckhands, all of whom were below deck at the time of the incident. SUMF, ¶ 7. Captain Sam Stephenson will testify that the crew was in compliance with the work and rest requirements of six hours on/six hours off. *See* SUMF ¶ 6, Report of Capt. Stephenson, pp 17-18.

The facts are undisputed that the Mackenzie Rose was compliant with U.S. with Coast Guard regulations and crew requirements as set forth in the vessel's U.S.C.G. COI.

### 4.     Mr. Morrissey was properly acting as watch stander.

The lookout rule requires that every vessel, including towboats, "at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing

circumstances and conditions so as to make a full appraisal of the situation and the risk of collision." *See Illinois Constructors Corp. v. Logan transp. Inc.*, 715 F. Supp. 872, 880 (N.D. Ill. 1989). What constitutes a proper lookout depends on the facts and circumstances of each case. *Id*. *See* 46 CFR §140.630 (Lookout); 33 CFR §83.05 ("Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."). Captain Stephenson will testify that for a look-out to be "proper," the officer of the watch must have enough information to make "a full appraisal of the situation and risk of collision." *See* SUMF ¶ 6, Report of Capt. Stephenson, p. 19.

Thus, under appropriate circumstances, a captain or pilot of a towboat may serve as a lookout and an additional lookout on the bow of the tow is not necessary unless required to enhance safety. *See Illinois Constructors*, 715 F. Supp. at 883 (holding that plaintiff presented no evidence that a forward lookout in addition to vessel operator was necessary under the facts and circumstances where additional lookouts customarily not used in bridge area given the river conditions a pilot in the elevated wheelhouse had an obstructed view of the area, the captain had navigated in this area many times without an additional lookout, the night of the allision was clear, the waters clam, and the trip uneventful with no prior notices of any problems along river and vessel had no difficulty navigating). Carver's TSMS section 7.16 regarding Look Outs permits one-man bridge operations:

**One-Man Bridge Operations**
"On vessels where there is an unobstructed all-around view provided at the steering station, as on certain pleasure craft, fishing boats, and towing vessels, or where there is no impairment of night vision or other impediment to keeping a proper look-out, the watch officer or helmsman may safely serve as the look-out. However, it is expected that this practice will only be followed after the\ situation has been carefully assessed on each occasion and it has been clearly established that it is prudent to do so. Full account shall be taken of the weather, conditions of visibility,

23

traffic density, and proximity of navigational hazards. It is not the intent of these rules to require additional personnel forward, if none is required to enhance safety."

*Senate Report N. 96-979, 96thCongress, 2nd Session (1980) at 7-8*

SUMF, ¶ 6, Report of Capt. Stephenson, at p. 24 and SUMF ¶ 13.

In addition, Carver's Navigation Policy under Section 7.5 Navigation states:

"It is the company's policy to be in strict compliance with US Coast Guard Navigation Rules regarding look-outs." Inland Navigation Rule #5 states: "every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."

The vessel operator shall appoint and instruct a qualified person to perform lookout duties in any situation deemed appropriate by the operator.

SUMF, ¶ 6, Report of Capt. Stephenson, at p. 24.

Based on its plain wording, Carver's Look-out policy is consistent with 33 CFR § 83.05 Look-out (Rule 5) and 46 CFR § 140.630 Lookout. Carver's policy requires vessels to maintain a proper look-out at all times and leaves it to the discretion of the operator (watch officer) to determine if an additional look-out is appropriate. SUMF, ¶ 6.

The weather was excellent with clear skies and calm waters SUMF, ¶ 4. The upper wheelhouse of the Mackenzie Rose where Mate Morrisey was standing watch on June 15, 2024 had 360 degree visibility. SUMF, ¶ 6. The undisputed facts under the federal regulations and Carver's own TSMS which was consistent with the law, and under the conditions at the time of the allision, were appropriate for Mate Morrisey to act as the watch officer and also as the lookout. Given these conditions, it was appropriate and customary under the prevailing conditions (good weather, clear visibility, low traffic)[3] for Mate Morrissey to be the watch officer and look-out aboard the Mackenzie Rose on June 15, 2024 prior to the incident.

---

[3] *See e.g.*, Video of the Makenzie Rose and barge Week 281 just prior to incident.

Last, Capt. Stephenson provides expert opinion, based on a survey of major east coast tug and barge operators, which satisfies the "Daubert" objective requirement, that  it was custom and practice within the industry stand that a one-man bridge operational without an additional look-out aboard would have been industry standard on June 15, 2024 due to good weather, visibility and light vessel traffic.  *See* SUMF ¶ 27, Lewis Report (which does not dispute this fact). [4]

### 5.    AUTOPILOT IS NOT PROHIBITYED FOR USEWHILE TRANSITING A WATERWAY WITH BRIDGES.

On the undisputed evidence, the autopilot was turned off at the time of the incident and did not cause the accident. Navigational error by Mate Morrissey caused the incident. It is accepted practice – and not prohibited- for small vessels such as tugs to use autopilot while transiting inland waters under certain conditions. The Code of Federal Regulations provides that:

**Use of auto pilot.**

Except for towing vessels in compliance with requirements in 33 CFR 164.13(d), when an automatic pilot is used in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigational situations, the master must ensure that:

(a) It is possible to immediately establish manual control of the ship's steering;

(b) A competent person is ready at all times to take over steering control; and

(c) The changeover from automatic to manual steering and vice versa is made by, or under, the supervision of the officer in charge of the navigational watch.

46 C.F.R. § 140.670. The exception noted above is for tank vessels that carry hazardous material or oil are prohibited from using autopilot in inland waters (33 CFR 164.13(d)). The barge *Weeks 281* which the Mackenzie Rose was pushing was not carrying hazardous material or oil, thus 33

---

[4] Claimants' expert Lewis may be subject to a Daubert Motion on this issue.

CFR 164.13(d) is not applicable. The MACKENZIE ROSE fulfilled the requirements of 46 CFR

140.670 with regards to the use of autopilot as stated below.

1. The barge was not carrying hazardous material or oil during the transit on June 15th, 2024.

2. It was possible to immediately establish manual control of the ship's steering.

3. Mate Morrissey, a US Coast Guard licensed master, is considered a "competent person" by the US Coast Guard which issued his master's license. At the time, his license was active and unsuspended.

4. Mate Morrissey was the officer in charge of the navigational watch aboard the Mackenzie Rose and any change over in steering was made under his supervision.

Consistent with the CFR, quoted above, Carver's Navigational Manual, TSMS, 7.15 Navigation,

has a section, Use of Auto Pilot (if equipped) which stated the following.

> When an automatic pilot is used in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigational situation, the master must ensure that:
>
> - It is possible to immediately establish manual control of the ship's steering;
> - A competent person is always ready to take over steering control; and
> - The changeover from automatic to manual steering and vice versa is made by, or under, the supervision of the officer in charge of the navigation watch.

SUMF 6, at Ex. 4, Capt. Stephenson's Report, pp. 49-50.  The Navigation instructions in Carver's

Navigation Manual, above, are consistent with the requirements found in the Code of CFRs.

Section 140.670 and Carver's Navigational Manual both require that operator be able to "establish

manual control of the Ship's steering," and that a "competent person" stand ready to take over

from automatic pilot to manual steering.  See SUMF ¶ 6 at Ex. 4, Capt. Stephenson Report, p. 50

(comparing Carver's TSMS 7.5 Navigation with Section 140.670).  Carver's navigational manual

complied with the Code of Federal Regulations.  The Officer of the Watch was given instructions

by Carver on the use of autopilot under various conditions.  Under the above requirements, Capt.

Stephenson will testify that there would be no justification in prohibiting the use of autopilot so long as the operator complies with 46 CFR 140.670 – Use of Auto Pilot.  *See* SUMF ¶ 6 at Ex. 4, Capt. Stephenson Report, p. 50

As noted, it is undisputed, as well as common and appropriate under the regulations and TSMS for Carver to permit to use autopilot aboard vessels such as tug and barges in inland waters while navigating. As the opening of the bridge span between the fenders for navigation was over six times the beam of the MACKENZIE ROSE and barge, this is not a case where the transit was narrow. On these facts, it was acceptable for a vessel such as the MACKENZIE ROSE to have engaged its autopilot while transiting toward the Norfolk Railroad bridge.  *See* SUMF, ¶ 6, Capt. Stephenson Report at pp. 31-34. On the facts, of course, the Mate, who was on the bridge at the controls, had turned off the autopilot before the impact, but even if that were not the case, the use of the autopilot was permissible under the CFR and custom and practice in the industry.  In sum, it was not negligent for Carver to permit pilots to use autopilot under these circumstances even though it was a navigational error by Morrissey in his attempt to switch off the autopilot into manual control.  The undisputed facts in this regard entitle Carver to limitation of liability as a matter of law.

**B. CARVER IS ENTITLED TO LIMIT IS LIABILITY WHERE CARVER PROVIDED A SEAWORTHY VESSEL AND ENTRUSTED NAVIATIONAL DECISIONS TO A COMPETENT CREW AND WHERE THE NAVIGATIONAL ERRORS OF PILOT WERE NOT WIHTIN THE PRIVITY OR KNOWLEDGE OF CARVER.**

As set forth above, the Fourth Circuit, like other jurisdictions, recognizes that "where the owner is so far removed from the vessel that he cannot reasonably exert control over the captain or pilot's conduct, the captain/pilot's navigational errors are generally not within the privity or knowledge of the owner. *Complaint of Hellenic*, Inc. 251 F. 3d at 396; *In re Bowfin* M.V, 339 F. 3d 1137 (9th Cir. 2003) (holding that shipowner was entitled to limitation where sole and proximate cause of

collision was spontaneous negligent navigation errors of master of tug, not master's fatigue; *In re Mo Barge Lines*, 360 F. 3d 885 (8th Cir. 2004) (upholding shipowner's limitation of liability where it had hired "licensed, competent operator" who had been accident-free for several years before committing one-time pilot error).

Carver Marine Towing, located in Coeymans, New York, is and was both the owner and the operator of the tug. SUMF, ¶ 2. Carver's General Manager, Brian Moore, was not present on the tug the day of the incident. SUMF, ¶ 10. Mr. Moore first learned of the incident the day it occurred when he received a call from Carver Port Captain, Leonard Baldassare, who told him that the tug made contact with the fendering of the bridge. Mr. Baldassare was likewise not on the tug but in New York. SUMF, ¶ 10. Nick Laraway, Carver then Chief Operating Officer, was not present on the tug the day of the incident. SUMF, ¶ 9. Mr. Laraway first became aware of the incident on June 20, 2024, after receiving an email with a letter addressed to him from the Belt Line's counsel alleging the tug made contact with the bridge and was damaged. SUMF, ¶ 9. Carver Laraway, the Principal of Carver Marine Towing, was not present on the tug the day of the incident. SUMF, ¶ 8. Carver Laraway, Nick Laraway Brian Moore and Leonard Baldassare were all in New York over 500 nautical miles from the tug after the incident. *See* SUMF ¶¶ 2, 8, 9, 10.

Based on the undisputed facts, above, Mate Morrissey was competent to sail the tug. He had a proven record of safely handling vessels of this type, he held a USCG Master's license and was properly trained. Carver admits and the uncontested facts show that a navigational error by James Morrissey, USCG, fully licensed Mate (and Master), was the cause of the incident.

Accordingly, Carver is entitled to limit its liability because the undisputed facts demonstrate that Carver had no notice of that navigational error or that there was any risk of it. The undisputed facts are that apart from the crew members aboard the Mackenzie Rose on June

15, 2024, no one from Carver management was present on the tug on the day of the incident, nor supervised or directed nor had any power to control the piloting of Mate Morrissey, Mate Morrissey's navigation or management of the tug on that day, and Carver had absolutely no knowledge of the events leading up to the casualty. These facts demonstrate beyond dispute that Carver had no knowledge of or privity as defined by the Limitation Act of the <u>cause</u> of the casualty.

Thus, even if the claimants were able to meet their initial burden of showing negligence on Mate Morrissey's part, Carver's liability is still limited because the undisputed evidence establishes Carver lack of privity.

WHEREFORE, for the foregoing reasons, Carver respectfully requests that the Court grant summary judgment in its favor that Carver is entitled to limit its liability, as that an admitted navigational error cannot be imputed to Carver as the vessel owner, and there, Carver had no privity of knowledge as to this navigational error made by a duly-qualified pilot.

**Dated: September 2, 2025**                    **CLYDE & CO US LLP**

By: /s/ Harold L. Cohen
Harold L. Cohen  (VSB No.:98148)
1221 Brickell Avenue, Suite 1600
Miami, FL  33131
Tel: 305-446-2646
Fax: 305-441-2374
Email: harry.cohen@clydeco.us;

James H. Rodgers*
Clyde & Co US LLP
45 Lexington Avenue, 16th Floor
New York, NY 10174
Phone: (212) 702-6771
Email: james.rodgers@clydeco.us

Michael J. Roman*
Dawn L. Johnson
Siobhan M. Murphy*
Clyde & Co US LLP

30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email: michael.roman@clydeco.us
dawn.johnson@clydeco.us
Siobhan.murphy@clydeco.us

Rachel Werner*
One North Central Avenue, Suite 1030
Pheonix, Arizona 85004
Phone: 480-746-4556
Email: rachel.werner@clydeco.us
*pro hac vice

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765) her cargo, engines, boilers, tackle, equipment, apparel, and appurtenances, etc., *in rem,* ("M/T MACKENZIE ROSE"), petitioning for Exoneration from or Limitation of Liability in allision with Belt Line Main Line Railroad Bridge (the "Bridge") occurring June 15, 2024 in and about the Elizabeth River, Virginia. | **Civil Action No: 2:24-cv-00490** |

**INDEX OF EXHIBITS CITED IN**
**CARVER'S MOTION FOR SUMMARY JUDGMENT**

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| EXHIBIT 1 | Brian Moore Deposition taken 4/28/25 with Exhibit 19 |
| EXHIBIT 2 | Revised 2692 form dated 6/25/24, CARVER 000111-000112 |
| EXHIBIT 3 | Capt. Chris Miller handwritten statement, CARVER 000047 |
| EXHIBIT 4 | Report and Findings of Captain Sam Stephenson, J.D. |
| GROUP EXHIBIT 5 | Statement of Chris Miller, Carver 000049; Sharif Porter Dep., 22:13-23:22; Jarkeis Morrissey Deposition 20:19-21:10; Jason McGrath Dep., 30:15-31:22 |
| EXHIBIT 6 | Nick Laraway Deposition taken 6/17/25 |
| EXHIBIT 7 | ABS Survey, 9/2/2021, ABS–0089-0095 |
| GROUP EXHIBIT 8 | COI CARVER 001728-001731, Daily Log 6/15/24 listing crew, CARVER 000056-000057 |
| EXHIBIT 9 | 7.16 Look Out, CARVER 000155 |
| EXHIBIT 10 | Leonard Baldassare Deposition taken 04/29/25 |
| EXHIBIT 11 | James Morrissey Handwritten Statement, CARVER 000094 |

31

| EXHIBIT 12 | Answer to Interrogatory No. 4 of Carver Marine Towing's Fifth Supplemental Response to Norfolk Belt Line's Second Set of Requests for Production of Documents with Affidavit of Josef Malk in Support |
|---|---|
| EXHIBIT 13 | Initial 2692-B form 6/16/24, CARVER 00114-117 |
| EXHIBIT 14 | Email from Lenny to Lt. Palomba with 2692 form, CARVER ESI 001274-001275 |
| GROUP EXHIBIT 15 | Revised Statement of Chris Miller at CARVER 49; Revised Statement of Jarkeis Morrisey at CARVER 000072; Revised Statement of Sharif Porter at CARVER 000084; and Revised Statement of Jason McGrath at CARVER 000082 |
| EXHIBIT 16 | Tug cell text, CARVER ESI 001897 |
| EXHIBIT 17 | CARVER ESI 000523 (screen shot of incident) |
| EXHIBIT 18 | 6/15/24 Daily Log, CARVER 000056 |
| EXHIBIT 19 | Capt. Nicholas J. Lewis Report |
| EXHIBIT 20 | Nicholas J. Lewis Deposition, 40:1-24 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2025, a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will serve all counsel of record by electronic mail as follows:

Mark C. Nanavati, Esq. (VSB No.: 38709)
G. Christopher Jones, Jr., Esq. (VSB No.: 82260)
SINNOT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)
(804) 893-3862 (Jones)
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com
*Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

Zachary M. Jett, Esq. (VSB #93285)
BUTLER WEIHMULLER KATZ, et al
11525 North Community House Road
 Suite 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
 mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

*/s/ Harold L. Cohen*

33