# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division In Admiralty
CIVIL ACTION NO.   2:24-cv-00490
- - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of COEYMANS MARINE TOWING, LLC d/b/a
CARVER MARINE TOWING as Owner and Operator of M/T
MACKENZIE ROSE, (IMO No. 8968765), her cargo,
engines, boilers, tackle, equipment, apparel, and
appurtenances, etc., IN REM, ("M/T MACKENZIE ROSE"),
petitioning for Exoneration from or Limitation of
Liability in allision with Norfolk and Portsmouth

Belt Line Railroad Company Main Line Railroad Bridge
(the "Bridge") occurring June 15, 2024 in and about
the Elizabeth River, Virginia.

- - - - - - - - - - - - - - - - - - - - - - - - - -



        TRANSCRIPT of the stenographic notes of the

videotaped deposition of Brian Moore in the

above-entitled matter, as taken by and before

LORRAINE B. ABATE, a Certified Shorthand Reporter and

Notary Public of the State of New York, and

Registered Professional Reporter, held at the offices

of Clyde & Co., 405 Lexington Avenue, New York, New

York, on April 28, 2025, commencing at 10:44 a.m.,

pursuant to Notice.




Job No. 112213

**BRIAN MOORE**

**April 28, 2025**

```
 1   A P P E A R A N C E S:

 2

 3              CRENSHAW, WARE & MARTIN, PLC
                Attorneys for Norfolk and Portsmouth
 4              Belt Line Railroad Company
                   150 West Main Street, Suite 1500
 5                 Norfolk, Virginia 23510
                BY: JAMES L. CHAPMAN IV, ESQ.
 6                 (757)623-3000
                jchapman@cwm-law.com
 7

 8

 9              CLYDE & CO. ESQS.
                Attorneys for Coeymans Marine Towing,
10              LLC, d/b/a Carver Marine Towing
                   405 Lexington Avenue
11                 New York, New York 10174
                BY: JAMES RODGERS, ESQ.
12                 (212)702-6771
                james.rodgers@clydeco.us
13

14

15   A L S O   P R E S E N T:

16              Ingrid Contreras, Videographer

17

18

19

20

21

22

23

24

25
```

BRIAN MOORE

**April 28, 2025**

```
 1   A L S O   P R E S E N T

 2

 3   (VIA VIDEOCONFERENCE)

 4

 5              CRENSHAW, WARE & MARTIN, PLC
                Attorneys for Norfolk and Portsmouth
 6              Belt Line Railroad Company
                   150 West Main Street, Suite 1500
 7                 Norfolk, Virginia 23510
                BY: W. RYAN SNOW, ESQ.
 8                   MACKENZIE PENSYL, ESQ.

 9              SINNOT, NUCKOLS & LOGAN, P.C.
                Attorneys for Evanston Insurance
10              Company, s/s/o Norfolk and Portsmouth
                Belt Line Railroad Company
11                 13811 Village Mill Drive
                   Midlothian, Virginia 23114
12              BY: MARK C. NANAVATI, ESQ.
                   (804)893-3866
13              mnanavati@snllaw.com

14              CLYDE & CO. ESQS.
                Attorneys for Coeymans Marine Towing,
15              LLC, d/b/a Carver Marine Towing
                   One North Central Avenue, Suite 1030
16                 Phoenix, Arizona 8504
                BY: RACHEL WERNER, ESQ.
17                 (480)746-4569
                Rachel.werner@clydeco.us
18
                BUTLER WEIHMULLER KATZ CRAIG LLP
19              Attorneys for Evanston Insurance Company
                s/s/o Norfolk and Portsmouth Belt Line
20              Railroad Company
                   11525 N. Community House Road, S. 300
21                 Charlotte, North Carolina  28277
                BY: ZACHARY M. JETT, ESQ.
22                 (704) 543-2321
                   zjett@butler.legal
23
                MR. CANNON MOSS, Norfolk & Portsmith
24                              Belt Line Railroad

25
```

BRIAN MOORE

**April 28, 2025**

```
 1                   I N D E X

 2

 3   WITNESS           EXAMINATION BY             PAGE

 4   Brian Moore     Mr. Chapman                     8

 5                   Mr. Rodgers                    359

 6

 7                 E X H I B I T S

 8   EXHIBIT                                        PAGE

 9   Exhibit 1   Copy of Photo                       69

10   Exhibit 2   Copy of Photos                      70

11   Exhibit 3   9.5 Incident Report-Event           75

12   Exhibit 4   Labelled Sections Produced by

13               Carver Listing                      93

14   Exhibit 5   Crew Matrix of MACKENZIE ROSE      188

15   Exhibit 6   Daily Logs June 12-16, 2024        189

16   Exhibit 7   Log Entries                        204

17   Exhibit 8   Christopher Lee Miller

18               Employment Records                 205

19   Exhibit 9   Handwritten and Typed Statements

20               of Christopher Lee Miller          209

21   Exhibit 10  Jarkeis Jamal Bass Morrissey

22               Employment Records                 214

23

24

25
```

BRIAN MOORE

**April 28, 2025**

```
 1              E X H I B I T S

 2   EXHIBIT                                      PAGE
```

```
 3   Exhibit 11  Handwritten and Typed

 4               Statements of

 5               Jarkeis Jamal Bass Morrissey      216

 6   Exhibit 12  Jason Thomas McGrath Employment

 7               Records                          226

 8   Exhibit 13  Handwritten and Typed Statements

 9               of Jason Thomas McGrath          227

10   Exhibit 14  Sharif Porter Employment Records 230

11   Exhibit 15  Handwritten and Typed Statements

12               of Sharif Porter                 230

13   Exhibit 16  James Morrissey's Employment Records  232

14   Exhibit 17  Handwritten and Typed Statements

15               Of Captain Morrissey             233

16   Exhibit 18  Crew Hours Report                235

17   Exhibit 19  CG-2692 Report                   239

18   Exhibit 20  Daily Engine Room Logs           257

19   Exhibit 21  Helm Screenshot                  261

20   Exhibit 22  Handwritten Logs                 263

21   Exhibit 23  Handwritten Logs                 265

22   Exhibit 24  Ayers Marine Electronics Documents  271

23   Exhibit 25  GMT Mackay Marine Invoices       276

24   Exhibit 26  9.2 Near Miss Report             288
```

```
25
```

**BRIAN MOORE**

April 28, 2025

```
 1              E X H I B I T S

 2   EXHIBIT                                        PAGE

 3   Exhibit 27  Daily Log                          291

 4   Exhibit 28  9.2 Near Miss Report               297

 5   Exhibit 29  Daily Log                          300

 6   Exhibit 30  9.2 Near Miss Report               302

 7   Exhibit 31  Daily Log                          306

 8   Exhibit 32  Training Records                   308

 9   Exhibit 33  Vessel Survey                      316

10   Exhibit 34  Voyage Plan                        321

11   Exhibit 35  Master's Daily Report              327

12   Exhibit 36  Master's Daily Report              330

13   Exhibit 37  Master's Daily Report Log          333

14   Exhibit 38  Certificate of Inspection          335

15   Exhibit 39  Letter dated June 20, 2024         337

16

17

18        * * * EXHIBITS RETAINED BY COUNSEL * * *

19

20

21

22

23

24

25
```

BRIAN MOORE

**April 28, 2025**

```
 1            DIRECTIONS NOT TO ANSWER

 2                  PAGE

 3            30

 4            163

 5            356

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2              THE VIDEOGRAPHER:  This is the beginning
 3         of Media No. 1 in the deposition of Brian Moore,
 4         in the master of Coeymans Marine d/b/a Carver
 5         Marine Towing Line, Case No. 2:24-cv-00490.
 6              Today's date is Monday, April 28, 2025,
 7         and the time in the monitor is 10:44 a.m.
 8              My name is Ingrid Contreras, and I am
 9         the videographer.  The court reporter is
10         Lorraine Abate.  We are here with Rosenberg and
11         Associate, Inc.
12              All appearances are noted on the record.
13              Now the court reporter will swear in the
14         witness.
15    B R I A N   M O O R E,
16         Having been first duly sworn by a Notary
17         Public of the State of New York, was
18         examined and testified as follows:
19    EXAMINATION BY MR. CHAPMAN:
20         Q.    Good morning, Mr. Moore.
21         A.    Good morning.
22         Q.    My name is Jim Chapman.  I represent the
23    Norfolk and Portsmouth Belt Line Railroad, and we're
24    here today to ask you some questions related to the
25    lawsuit that is currently pending as the subject of
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   the limitation action file by your company in the
 3   Eastern District of Virginia.
 4               I don't know -- have you ever been
 5   deposed before?
 6        A.      No, I have not.
 7        Q.      But just a couple of ground rules.
 8        A.      Yep.
 9        Q.      I'll do my best to ask questions that
10   are clear, but if they're not, feel free to ask me
11   for clarification and I'll endeavor to provide that.
12        A.      Okay.
13        Q.      It's good to maintain sort of good radio
14   approach to this.  Let me finish my question before
15   you start answering, and I'll do my best to avoid
16   interrupting you during your answer.
17        A.      Okay.
18        Q.      Is that okay?
19        A.      Very well.
20        Q.      Okay.  Where do you currently live,
21   Mr. Moore?
22        A.      I currently reside in Kingston, New
23   York.
24        Q.      What is the street address there?
25        A.      7 Fairview Avenue.
```

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          Q.     And your date of birth?
 3          A.     October 13th, 1982.
 4          Q.     What's your current position with
 5   Carver?
 6          A.     Current position is general manager.
 7          Q.     So the company is known legally as -- I
 8   don't know how to pronounce it -- Coeysman?
 9          A.     Coeymans Marine Towing.
10          Q.     Coeymans?
11          A.     Yeah, Coeymans.
12          Q.     Coeymans?
13          A.     Yep.
14          Q.     Okay.  Thank you.
15                 Coeymans Marine Towing --
16          A.     Yeah.
17          Q.     -- LLC, but it trades as Carver Marine
18   Towing, correct?
19          A.     Correct.
20          Q.     Okay.  So when I refer to Carver, I'm
21   talking about Carver Marine Towing.  Is that -- can
22   we --
23          A.     Yes.
24          Q.     -- agree to that?
25          A.     Yep.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          Q.     All right.  So -- I'm sorry.  When did
 3   you say you started with Carver?
 4          A.     December -- you didn't ask that one.  So
 5   December of 2022.
 6          Q.     And who did you work for before Carver?
 7          A.     I worked for Centerline Logistics.
 8          Q.     What did you do for them?
 9          A.     I was the director of Atlantic
10   operations.
11          Q.     So you said Atlantic operations?
12          A.     Yes, sir.
13          Q.     And how long were you with Centerline?
14          A.     Approximately five years.
15          Q.     I want to take it back before that.
16          A.     Sure.
17          Q.     Who did you work for prior to
18   Centerline?
19          A.     So I was a captain at Vane Brothers.
20          Q.     Vane Brothers is in the towing
21   business --
22          A.     Yes, sir.  Yep.
23          Q.     -- oil?
24          A.     Yep.  Marine transportation for
25   petroleum products.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2        Q.     All right.  How long were you at Vane?
 3        A.     Also approximately five years.
 4        Q.     Do you start there as captain?
 5        A.     I started out for a couple months as a
 6    mate, and then transitioned over to a captain.
 7        Q.     Do you still hold a license?
 8        A.     It's in Coast Guard holdup, what they
 9    put on -- what do they call it?  When you don't sail
10    out anymore, you're put into -- not purgatory, but --
11               MR. RODGERS:  Suspension?
12        A.     No.  Contingency?  Not contingency.
13        Q.     Inactive?
14        A.     Inactive, yea.  I don't know -- there's
15    a word for it the Coast Guard uses, but it's -- yes,
16    it's inactive, but on like ready reserve.
17        Q.     When -- so what was the, I'll call it,
18    the last expiration date of the license that's now
19    inactive?
20        A.     Oh, approximately a year and a half ago.
21        Q.     And tell us what the license was.
22        A.     Sure.  So I hold a 200-ton masters of
23    New York Coastal with a master of towing and limited
24    first class pilotage for the Hudson River in New York
25    Harbor.
```

```
 1                   Moore - April 28, 2025
 2         Q.     Any other endorsements on it?
 3         A.     Able bodied seaman, but other than that,
 4   I did have STCW basic safety training, but I never --
 5   didn't need to take the class anymore, so I wasn't
 6   shipping out international.
 7         Q.     So just so everybody's clear, what does
 8   STWC stand for?
 9         A.     The standards -- S -- standard training
10   something watch keeping.  So it's an international
11   standard set by whomever.
12         Q.     Okay.  It's an endorsement that you get
13   on the license by virtue of training, correct?
14         A.     Correct.  So basic safety training is
15   the endorsement that falls under the STCW.
16         Q.     Who did you work for before Vane?
17         A.     I worked with the Hudson River Pilots
18   for approx -- just shy of two years.
19         Q.     Is that like a harbor pilot position?
20         A.     Yeah, Hudson River pilot.  Yep.
21         Q.     Guiding ships in --
22         A.     Yes, sir.
23         Q.     -- in and out, guiding ships in and out
24   of the Hudson River?
25         A.     Yes, sir.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2         Q.     How long was that?
 3         A.     Just shy of two years.
 4         Q.     Same license?
 5         A.     Yes.
 6         Q.     And before Hudson River Pilots, who did
 7  you work for?
 8         A.     I worked for K-Sea Transportation.
 9         Q.     And K-Sea is K-C --
10         A.     Hyphen.
11         Q.     -- K-C, the two letters, correct?
12         A.     So it's K-S-E-A.
13         Q.     S-E-A.  I apologize.
14         A.     Yeah.
15         Q.     K-Sea.  Doing what?
16         A.     Chief mate and harbor and ocean-going
17  tug and barge.
18         Q.     When did you get your A/V ticket?
19         A.     Early 2000s.  I don't recall.
20         Q.     Did you sail for anybody before K-Sea
21  Transportation?
22         A.     Not in a professional mariner sense.  I
23  shipped out in Norway for three months as like a
24  cadet observer, in '99 to 2000, and then before that,
25  it was just small, recreational boat stuff, sea tow,
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2    when I was in high school.

3         Q.    So did you grow up in the United States?

4         A.    Yes.

5         Q.    It sounds like you went to a maritime

6    academy over in Europe?

7         A.    I did not.  No.  I was -- I'm a

8    Hawespiper, so I started -- so on my 18th, my father

9    took me down to the battery for the US Coast Guard

10   Center, and I got my 100-ton license, I believe it

11   was, and my ordinary seaman MMC, my Z card, and --

12   that was October.  And then by February, I started

13   shipping out with K-Sea Transportation as an OS.

14        Q.    Did your father sail?

15        A.    He did not.  My family in Norway sailed

16   out --

17        Q.    Okay.  And you --

18        A.    -- from my mother's side.

19        Q.    So you described yourself as being a

20   cadet for three months or so?

21        A.    It's a -- more like -- it was a cadet

22   observer.  My -- sorry.  My uncle was a chief

23   engineer on board a European Norwegian-based ship.

24   So I wasn't sure what I wanted to do in life as a 17,

25   18-year-old kid, so they took me on for just shy of

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2     three months.  I was still in high school at the
 3     time.  And I rode with them, observed them to kind of
 4     see if I wanted to do deep sea or tugs and barges.
 5          Q.    Do you consider yourself more of a brown
 6     water guy --
 7          A.    Yes.
 8          Q.    -- than blue water?
 9          A.    Yeah.
10          Q.    Okay.  Your position as general manager
11     with Carver, is that a salaried or hourly position?
12          A.    It's salary.
13          Q.    Who hired you?
14          A.    Carver Laraway.
15          Q.    Is that Mr. Carver Laraway?
16          A.    Yeah, but it was by way of HR.
17          Q.    Can you tell us what the duties of your
18     position as general manager --
19          A.    Sure.
20          Q.    -- of Carver are.
21                MR. RODGERS:  I'm sorry.  At the time of
22          the incident or now?
23          Q.    Why don't we start with now, and then
24     I'll ask if they're different, you can tell me how
25     they're different.  Okay?
```

```
 1                  Moore - April 28, 2025
 2              So just what are your duties now?
 3         A.    Sure.  I oversee the day-to-day
 4    operations of Carver Marine Towing, working with my
 5    team that I have here in place to ensure that the
 6    daily activities are done, that the regulations and
 7    policies are complied with, that customer and
 8    business development is grown, and then also working
 9    interdepartmentally with the other divisions from the
10    ports to other stevedoring to ensure that
11    everything's done safely and efficiently throughout
12    day-to-day operations.
13         Q.    How many tugs does Carver Marine Towing
14    operate?
15         A.    Eight of them are going to be US Coast
16    Guard inspected, and then we have two small, we call
17    them, fleeting tugs that are 26 feet or less.  Those
18    are just based in the port to help support moving
19    barges around from one side of the dock to the other.
20         Q.    Kind of like push boats?
21         A.    Exactly.
22         Q.    Are the duties you have today different
23    than the duties you had in June of 2024?
24         A.    It's still the same.
25         Q.    So I didn't hear you mention anything
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2   about safety, and if you did, I apologize, but I
 3   didn't -- I don't think I heard that.
 4                 Is that a responsibility that you have?
 5        A.    Yes.  Yep.  So compliance.  I
 6   incorporate that with compliance and safety.
 7        Q.    All right.  And how -- are there people
 8   at Carver Marine Towing that report directly to you?
 9        A.    Yes.
10        Q.    Who are they, and what are their
11   positions?
12        A.    In -- today or during the incident?
13        Q.    Let's focus on the incident that is back
14   in June of 2024.
15        A.    Okay.  So I had a port captain, Lenny
16   Baldassare.  I had a port engineer, Christian
17   Nunnaman.
18        Q.    Can you spell that.
19        A.    N-U-N-N-A-M-A-N.
20        Q.    And it was Christian?  Is it C-H-R-I?
21        A.    Yes.
22        Q.    I know that Mr. Baldassare isn't with
23   the company anymore.
24        A.    Yeah.
25        Q.    Is -- I'm going to butcher the
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    pronunciation.  The port engineer, Christian
 3    Nunnaman?
 4         A.    Nunnaman.
 5         Q.    Nunnaman, is he still with the company?
 6         A.    Yes.  He's in a different division right
 7    now, though.
 8         Q.    He's no longer with Marine Towing --
 9         A.    Yeah, correct.  He's with the shipyard
10    division.
11         Q.    Who else in June of 2024 reported to
12    you?
13         A.    Had Thomas Feeney.
14         Q.    And what was his position?
15         A.    Operations and special projects manager.
16         Q.    Ed or Edward Thomasini?
17         A.    Say it again.
18         Q.    His name is Ed --
19         A.    Thomas.
20         Q.    Oh, I'm sorry.
21         A.    Yeah.  First name is Thomas.
22         Q.    Thomas.  I misspoke.  I misunderstood
23    that.
24         A.    Last name is Feeney, F-E-E-N-E-Y.
25         Q.    Any other people that directly reported
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   to you?
 3        A.     We had a fairly new hire, Jason Galioto,
 4   G-A-L-I-O-T-O.
 5        Q.     What was Mr. Galioto's position?
 6        A.     During that time, it was -- I hired him
 7   as a dispatch -- I'm sorry, correction.  A logistics
 8   coordinator trainee and vetting.
 9        Q.     So he was responsible for, I'm sorry,
10   training?
11        A.     No.  So he -- a logistics coordinator
12   training.  So almost like a fill-in dispatcher that
13   would receive phone calls and work with customers in
14   dispatching tugs.
15        Q.     Did he have any other duties?
16        A.     I say vetting, but that was more of a
17   Coast Guard regulatory compliance, ABS compliance.
18        Q.     Vetting of what?
19        A.     Vetting of the vessels, like the
20   paperwork that's associated with it.
21        Q.     Just give me a for instance, what you
22   mean by the paperwork.
23        A.     Well, he's advanced.  I've groomed him
24   into a different role now, but at the time, he was a
25   fairly new hire.  So I don't recall his hire date,
```

BRIAN MOORE

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2   but I would have to look at it.  But he was mainly
 3   then concentrating on dispatch and learning that.
 4         Q.    I'm just trying to understand when you
 5   say vetting of vessels, what paperwork would he be
 6   responsible for reviewing?
 7         A.    It's -- so it's pretty much making sure
 8   that all our COIs are up to date, make sure the load
 9   line inspections are up to date; and we recently
10   began a sire process, S-I-R-E, which is an inspection
11   process for tugs to work in the oil and gas industry.
12         Q.    And that was his responsibility, at
13   least when he was initially hired?
14         A.    It was part of it.  It really wasn't his
15   full responsibility.
16         Q.    Anybody else that directly reported to
17   you in June of 2024?
18         A.    We had two dispatchers, logistics
19   coordinators.  One is Will Gedney, G-E-D-N-E-Y, and
20   the other one was RJ Theevinet, T-H-E-E-V-I-N-E-T.  I
21   believe that's the spelling.
22         Q.    Anybody else?
23         A.    That is it.
24         Q.    Okay.  So is the -- is Thomas Feeney
25   still with the company?
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2          A.      Yes.

3          Q.      And you told us Jason Galioto has moved

4    on to another role or another division?

5          A.      No.  He's still with -- under my -- he's

6    still under my org chart.

7          Q.      Okay.  Does he have a different role?

8          A.      I believe his title is now marine safety

9    and compliance.

10          Q.      When did he take on that role?

11          A.      I don't know, off the top of my head.

12          Q.      Sometime after the incident in June of

13    2024 with the Belt Line Bridge?

14          A.      Correct.

15          Q.      Was there anybody that had a

16    responsibility for marine safety and compliance that

17    reported to you in June of 2024?

18          A.      There was no direct position for that.

19          Q.      Are both of the dispatchers still

20    working for Carver?

21          A.      One is.  William Gedney.

22          Q.      Okay.  All right.  Do you still have two

23    dispatchers, though?

24          A.      We actually have two dispatchers now and

25    a senior logistics coordinator that oversees them.

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2         Q.    Okay.  And who is that?
3         A.    He's Kevin Twomey, T-W-O-M-E-Y.
4         Q.    Are you the manager of the limited
5    liability company?  Again, I'm going to butcher the
6    name, Coeysman?
7         A.    That's close.  It's Coeysman.
8         Q.    Coeysman?
9         A.    Yes.  Carver Marine Towing, yeah.
10        Q.    Yeah.
11        A.    Coeysman Marine Towing, LLC.
12        Q.    Yes.
13        A.    Yes, I'm the general manager of that.
14        Q.    Okay.  Do you know what the -- my
15   question's a little bit different.
16              Are you the manager?  There's a distinct
17   title for limited liability companies.
18        A.    Oh.
19        Q.    Are you the manager?
20        A.    No.  No, sir.
21        Q.    Do you know who is?
22        A.    I do not know off the top of my head.
23        Q.    Do you know if there are any officers of
24   Carver Marine Towing?
25        A.    I do not know.
```

BRIAN MOORE

April 28, 2025

```
 1                  Moore - April 28, 2025
 2         Q.     I heard you say that one of your
 3  responsibilities is business development.  Did I get
 4  that correct?
 5         A.     Correct.  Yep.
 6         Q.     So kind of like a -- almost a sales role
 7  or --
 8         A.     Right.  Correction.  Also, I had Dillon
 9  Galm also working underneath me at the time.
10         Q.     Okay.
11         A.     He's a business development manager for
12  Carver Marine Towing, and some other divisions as
13  well, too.
14                MR. RODGERS:  Sorry --
15         Q.     Dillon --
16                MR. RODGERS:  -- you're talking -- I'm
17         sorry.  Jim, are you talking about at the time?
18         Is that the question?
19                THE WITNESS:  Correct.
20         A.     So he's still employed with us, but at
21  the time, yeah, Dillon Galm also fell underneath me
22  as well.
23         Q.     How do you spell his last name?
24         A.     G-A-L-M.
25         Q.     Does he still have that role?
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2          A.     Yes.
 3          Q.     So do you consider yourself to have
 4   the -- what's generally called P&L responsibility for
 5   Carver Marine Towing?
 6          A.     Yes.
 7          Q.     Okay.  And by that, I mean profit and
 8   loss responsibility.
 9          A.     Yes, sir.
10          Q.     It sounds like it operates as a division
11   of a bigger Carver entity or a Carver holding
12   company; is that fair?
13          A.     Correct.
14          Q.     And so you have to be profitable to kind
15   of report up to the holding company, right?
16          A.     Yep.
17          Q.     Okay.  Who do you report to?
18          A.     I report to Nick Laraway.
19          Q.     And is he related to Carver Laraway?
20          A.     Yes.  I believe he is a nephew.
21          Q.     Do you know what his position is?  That
22   is, do you know what Nick Laraway's position is?
23          A.     Chief operations officer.
24          Q.     And --
25                 MR. RODGERS:  And again, is this then or
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          now?  I just want it to be clear.
 3                    MR. CHAPMAN:  Fair question.
 4          Q.    That's now, right?
 5          A.    At the time it was chief operations
 6     officer, and I'd -- I would still say the same, yes.
 7          Q.    Okay.  And the gentleman you said hired
 8     you, Mr. Carver Laraway?
 9          A.    I interviewed with Carver.
10          Q.    Okay.  What was his position when you
11     interviewed with him?
12          A.    CEO.
13          Q.    And his -- maybe it's his nephew, but
14     Nick Laraway, who's the chief operating officer, is
15     that for all of the Carver divisions?
16          A.    Yes, sir.
17          Q.    Do the two of you communicate with
18     e-mail?
19          A.    Yeah.  E-mails, phone calls, in-persons.
20          Q.    And what is Nick Laraway's e-mail
21     address?
22          A.    It's N, like November, Laraway,
23     L-A-R-A-W-A-Y, @carvercompanies.com.
24          Q.    You said you also speak to him.  Do you
25     also text with him?
```

```
 1                    Moore - April 28, 2025
 2          A.      Yeah.
 3          Q.      Do you know what his cell phone number
 4    is?
 5          A.      I don't, off the top of my head.
 6          Q.      Do you guys use any other written
 7    messaging systems like Signal or WhatsApp or --
 8          A.      No.
 9          Q.      -- those?
10          A.      No.
11          Q.      So if you're texting with him, you're
12    using the SMS system --
13          A.      Correct.
14          Q.      -- on your cell phone?  Okay.
15                  Does the company provide you with a cell
16    phone?
17          A.      It's my personal cell phone.
18          Q.      Do you still have the same cell phone
19    from June of 2024 that you have today?
20          A.      No.  It's been upgraded to different
21    iPhones, just through the family plan.
22          Q.      So you have an iPhone?
23          A.      Yes.
24          Q.      Do you know what model?
25          A.      It's 15 Pro.
```

```
 1                Moore - April 28, 2025
 2       Q.      15 Pro?
 3       A.      Yeah.
 4       Q.      Besides Nick Laraway, is there anybody
 5  else that you report to in your role as general
 6  manager of Carver Marine Towing?
 7       A.      No.
 8       Q.      Can you approve payment of invoices?
 9       A.      Yes.
10       Q.      Is there any limit to what you can
11  approve?  Do you have to get permission from anybody
12  if it's above a certain amount?
13       A.      There are certain thresholds that
14  they're put into place with higher limits, but at the
15  time, it was -- during the incident, there was no
16  limits.
17       Q.      Okay.  Can you hire people to work for
18  Carver Marine Towing?
19       A.      I can recommend, then that then goes
20  through HR.
21       Q.      And is the HR function like part of the
22  holding company of Carver or is it -- do you guys
23  have your own kind of HR person at Carver Marine
24  Towing?
25       A.      It would be part of the holding company.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2        Q.      And the opposite end of that question,
 3   can you terminate people from Carver Marine Towing?
 4        A.      By way of HR.
 5        Q.      So if you wanted to hire somebody and
 6   said hire them, would they then hire that person?
 7        A.      They would go through the process and
 8   then escalate it to the next level.
 9        Q.      Have you ever been turned down on a hire
10   that you've recommended?
11        A.      I don't recall.
12        Q.      Have you had to terminate anybody who
13   worked for Carver Marine Towing?
14        A.      I have, yes.
15        Q.      And have you ever been turned down on a
16   termination recommendation?
17        A.      No, sir.
18        Q.      Do you hold any other positions inside
19   the Carver organization besides general manager of
20   Carver Marine Towing?
21        A.      No, sir.
22        Q.      When did Mr. Baldassare leave Carver?
23        A.      I don't recall off the top of my head.
24   Three months ago.  That is an estimate.
25        Q.      Do you know why he left?
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2   (DIR)
3              MR. RODGERS:  Don't answer that.  That
4        is -- I'm directing the witness not to answer.
5              And by way of counsel, you can put in a
6        demand and we'll take it under advisement.
7        Concerned about employment law here and also
8        potential agreements that may have been signed,
9        for Mr. Baldassare's sake.
10             MR. CHAPMAN:  I'm not understanding what
11       you're saying.
12             MR. RODGERS:  Well, I'm just putting
13       that on the record.
14             MR. CHAPMAN:  Is there a privilege in
15       play?
16             MR. RODGERS:  I'm directing him not to
17       answer.
18             MR. CHAPMAN:  Okay.  But is there a
19       privilege that you're standing on?
20             MR. RODGERS:  There's federal law that's
21       involved with HR --
22             MR. CHAPMAN:  It's --
23             MR. RODGERS:  -- in any termination.
24             MR. CHAPMAN:  So under Rule 32, you can
25       direct a witness not to answer if it is based on
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          the preservation of --
 3                    MR. RODGERS:  Don't -- Jim, don't
 4          lecture me.  I'm telling him not to answer.
 5          That's what I'm telling him not to answer.
 6          Okay?
 7          Q.    And just to be clear, are you going to
 8     follow Mr. Rodgers' direction not to answer --
 9                    MR. RODGERS:  Yes.
10          Q.    -- that question?
11                    MR. RODGERS:  Yes, he is.
12          A.    Yes.
13          Q.    Do you know whether Mr. Baldassare was
14     terminated from Carver?
15          A.    I do not know.
16          Q.    Do you know whether he was asked to
17     resign from Carver?
18          A.    I do not know.
19          Q.    Do you know where he's working now?
20          A.    I believe he's working for H&L.
21          Q.    What is H&L?
22          A.    A small marine towing company in --
23     based in Long Island, in dredging.
24                    MR. RODGERS:  And just for the record,
25          Jim, as you know, Mr. Baldassare is coming in
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025

 2         tomorrow morning for deposition.

 3                  MR. CHAPMAN:  Yeah.

 4                  I think I'm entitled to test this

 5         witness' knowledge, though.

 6                  MR. RODGERS:  No, no.  You are.  I'm

 7         just putting that on the record for the lone

 8         reader out there who's reading this one day.

 9         Q.    When was the last time you communicated

10    with Mr. Baldassare?

11         A.     I wished him a happy birthday.

12         Q.    And that was?

13         A.     That was actually yesterday.

14         Q.    Did you text him happy birthday or did

15    you call him and tell him happy birthday?

16         A.     I texted him happy birthday.

17                But other than that, before that, it

18    was -- we haven't spoken prior to him leaving.

19         Q.    So you --

20         A.     I'm sorry, correction.  I didn't speak

21    to him post leaving.

22         Q.    Okay.  So between whenever he left three

23    months ago and your text to him yesterday about happy

24    birthday -- wishing him a happy birthday, there's

25    been no communication between the two of you?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2          A.    Yes, sir.
 3          Q.    And I just want to be clear.  That's --
 4   you mentioned a text, but you haven't spoken to him
 5   either, correct?
 6          A.    No, sir.
 7          Q.    Or e-mailed with him?
 8          A.    No.
 9          Q.    Did you provide a reference for him when
10   he left the company?
11          A.    No.  He did not request it.
12          Q.    Do you know if the company provided a
13   reference for him?
14          A.    I do not know.
15          Q.    Do you know if he is in a do not hire
16   classification since leaving Carver?
17                MR. RODGERS:  I didn't hear that, Jim.
18                MR. CHAPMAN:  I asked do you know if he
19          is in a do not hire classification since he left
20          Carver.
21          A.    I do not know.
22          Q.    Who is the person that heads HR for the
23   Carver companies?
24          A.    At the time of the incident or today?
25          Q.    Today.
```

```
 1                    Moore - April 28, 2025
 2          A.      Samantha Galliazano [sic].  I need to
 3     reference the -- how to spell her last name.
 4     G-A-L-L-I-Z-O.
 5          Q.      G-A-L-L-I-D-O?
 6          A.      Z-O.
 7          Q.      Z-O.  Galliazo?
 8          A.      Not correct, but it's close.
 9          Q.      Okay.  And was there a different person
10     there in June of 2024?
11          A.      Yes.
12          Q.      Who?
13          A.      Tom Biden.
14          Q.      Can you spell his last --
15          A.      I'm sorry, correction.  Tom Marron,
16     M-A-R-R-O-N.
17          Q.      Does Mr. Marron still have a position
18     within the Carver organization?
19          A.      He does not.
20          Q.      There's three other people in particular
21     I want to ask you some similar questions about that
22     were all assigned to the tug, MACKENZIE ROSE, on
23     June 15th of 2024 when the incident happened.
24                  That's Captain Miller, Captain
25     Morrissey, and the engineer, McGrath.
```

```
 1                  Moore - April 28, 2025
 2        A.      Okay.
 3        Q.      Okay.  They're all gone from Carver
 4   Marine Towing now?
 5        A.      Yes, sir.
 6        Q.      Okay.  Do you know when Miller left
 7   Carver?
 8        A.      I would have to reference it, but it was
 9   close to October or November of 2024.  He didn't
10   leave Carver then.  He was -- the -- his vessel was
11   going into shipyard, so we didn't have an extra spot
12   for him, so he was just off for an extended period of
13   time.  And come to find out on Friday, I heard that
14   he passed away.
15        Q.      So Captain Miller passed away?
16        A.      In the end of March.
17                He was working with HR for some
18   long-term disability that I didn't really have
19   reference to or idea abouts, but I just heard --
20   discovered that on Friday.
21        Q.      But he did not work for the company
22   since about October or November of 2024?
23        A.      I would have to reference.  He might
24   have filled in some days here and there, but I don't
25   recall.
```

1                   Moore - April 28, 2025

2       Q.    Was he ever terminated from employment

3    by Carver?

4       A.    I don't know.

5       Q.    Do you know if he was ever asked to

6    resign?

7       A.    No.

8             MR. RODGERS:  I'm going to, again,

9       direct him not to answer on --

10            MR. CHAPMAN:  About Miller?

11            MR. RODGERS:  Yeah, but Miller wasn't

12       terminated.  He just testified that he was on

13       leave, and then he passed away, which we just

14       found out as well.

15      Q.    So let me move on to Captain Morrissey.

16      A.    Okay.

17      Q.    When did Captain Morrissey leave the

18   employment of Carver?

19      A.    Shortly after the incident, he was

20   placed on paid suspension pending an investigation.

21      Q.    So he completed the voyage with the

22   barge up to wherever its destination was, and then he

23   went on admin leave?

24      A.    Correct.

25      Q.    Okay.  And did he ever come off admin

**BRIAN MOORE**

**April 28, 2025**

1                     Moore - April 28, 2025

2    leave?

3         A.    I -- he never came -- he never went back

4    to sea after that incident with us.  I don't know if

5    he was officially termed or what his role was,

6    because he also shipped out somewhere else for a

7    different company.

8         Q.    And what company was that?

9         A.    I don't recall off the top of my head.

10   It's a small petroleum products carrying company in

11   New York Harbor.

12        Q.    And where is it located?

13        A.    Staten Island, New Jersey, either one.

14   I don't know.  I would have to --

15        Q.    What is your -- I'm just asking based on

16   your memory, okay?

17        A.    Yeah.

18        Q.    But I'm just asking your memory.

19              How soon did that happen after the

20   incident in June of 2024 involving the bridge?

21        A.    Within three months?

22        Q.    And do you know whether he was

23   terminated?

24        A.    I don't know officially.

25        Q.    Do you know whether he was asked to

```
 1                    Moore - April 28, 2025
 2  resign?
 3        A.      That, I don't know.
 4        Q.      Who would know?
 5        A.      HR.
 6        Q.      And by then, had Samantha Gallizo
 7  arrived in a new role or was that still Mr. Marron?
 8        A.      It's to be -- it still would have been
 9  Mr. Marron.
10        Q.      Okay.  How many people, to your
11  knowledge, work in that HR function for the Carver
12  organization?
13        A.      Three to four.
14            MR. RODGERS:  Just for the record, Jim,
15        are you treating him as a 30(b)(6) witness?
16        Because he hasn't been designated.
17            MR. CHAPMAN:  Well, no, I understand
18        that, and we may take a 30(b)(6), but I'm
19        just -- to me he sounds like a --
20            MR. RODGERS:  His general -- you're
21        asking his general knowledge.
22            MR. CHAPMAN:  To me, he sounds like a
23        managing agent, at least for Carver Marine
24        Towing, but I don't know whether that's a --
25            MR. RODGERS:  Well, he's an employee.
```

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2              MR. CHAPMAN:  Well, yeah.  Agree on or
 3         not.
 4              MR. RODGERS:  But, I mean, you're just
 5         asking him his knowledge in this case?
 6              MR. CHAPMAN:  Yes.  I'm -- and I'm
 7         trying to figure out whether there's anybody
 8         else that we're going to need to depose along
 9         the way, okay?  So...
10         Q.    And I got the same questions about
11    McGrath.
12         A.    Okay.
13         Q.    When did he leave Carver?
14         A.    I honestly don't know, off the top of my
15    head.  He was -- his license was due to expire before
16    he was coming back to the vessel, so we pretty much
17    put -- told him that he couldn't come back to the
18    vessel until his license was updated; and I forgot
19    how many months past that -- without his license
20    being updated that HR would have like simply -- I
21    don't know, if he -- let him go or whatever it is,
22    but he never returned after that.
23         Q.    The company has replaced him --
24         A.    Yes, sir.
25         Q.    -- presumably, just like it's replaced
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2      Mr. Miller -- Captain Miller and Captain Morrissey,
3      right?
4            A.     Yes, sir.
5            Q.     Do you know where McGrath is working
6      now?
7            A.     I do not.
8            Q.     Did you communicate with Captain Miller
9      at all between when he left in October/November 2024
10     and when he passed away?
11           A.     I did not.
12           Q.     What about Captain Morrissey?
13           A.     I did not.
14           Q.     From the time he went on admin leave
15     until he was gone, whenever that happened, did you
16     communicate with him?
17           A.     I did not.
18           Q.     Same question about Engineer McGrath.
19     Between whenever he left, which you don't know, and
20     now, have you communicated with him?
21           A.     I did not.
22           Q.     Do you know who was responsible for
23     hiring Captain Morrissey to work for Carver Marine
24     Towing?
25           A.     It would have been through HR.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2        Q.     Is that because he would have been
 3   recommended as a hire by somebody in the towing
 4   company?
 5        A.     No, not necessarily.  He could also
 6   apply for the position.
 7        Q.     Okay.  So do you know how he became an
 8   employee of Carver Marine Towing?
 9        A.     I don't.
10        Q.     Was he hired when Mr. Marron was head of
11   HR?
12        A.     Yes, sir.
13        Q.     Do you know whether he had ever worked
14   for Carver Marine Towing before he was hired?
15        A.     I don't know.
16        Q.     What process is involved in evaluating
17   the competence of a Coast Guard licensed personnel
18   when you -- they're under consideration to be hired
19   by the company?
20             MR. RODGERS:  To his knowledge?
21             MR. CHAPMAN:  Yeah.
22             MR. RODGERS:  Just what you know.
23        A.     Okay.  So they would apply online or
24   they would have to submit a resumé, or if they didn't
25   have a resumé, they would -- HR would then talk to
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   them about their previous history, go through the
 3   motions of that, then advance him to one of the other
 4   port captains or senior captains to interview him as
 5   well to understand a better understanding of what
 6   he's done in the past.
 7                  And then once they say yes, we would
 8   like to -- take him on to HR.  HR then would process
 9   him through a background check, process online.  I
10   don't know exactly what it is, but they would run
11   through the background check to make sure he had any
12   outstanding histories or, you know, an outstanding --
13   upstanding character.
14                  They would cross-reference his merchant
15   mariner's reference number to the US Coast Guard home
16   port reference, where they would look up to make sure
17   his license is still active, valid, he has the
18   appropriate tonnage for what he's doing, and then
19   take that from there.
20        Q.    Would they check his S&R history?
21        A.    I don't know what S&R is.
22        Q.    Suspension and revocation history.
23        A.    Through the Coast Guard?
24        Q.    Yeah.
25        A.    I don't know.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1              Moore - April 28, 2025
 2        Q.    Okay.  You said he would be interviewed
 3   by you -- the port captain or one of the --
 4        A.    Senior captains.
 5        Q.    Senior captains.
 6              And that's a senior captain who's
 7   assigned to one of the tugs?
 8        A.    No.  It's -- one of our senior captains
 9   would be Mark Pearson, who has been here since
10   2000 -- since Carver Marine Towing started.
11        Q.    Does he not sail?
12        A.    He will fill in when needed.
13        Q.    So he still has a license?
14        A.    Yes, sir.
15        Q.    What was his name again?
16        A.    Mark Pearson, P-E-A-R-S-O-N.
17        Q.    He was there when you joined Carver?
18        A.    Yes, sir.
19        Q.    Are there any other senior captains that
20   could have interviewed Mr. -- Captain Morrissey?
21        A.    He'd be the only one.
22        Q.    You also mentioned that the port captain
23   could have interviewed him?
24        A.    Yeah, which would have been Lenny.
25        Q.    All right.  Mr. Baldassare?
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2         A.    Yes, sir.
 3         Q.    Who was the port captain before
 4  Mr. Baldassare?
 5         A.    I don't know.  That would have been
 6  before my time.
 7         Q.    Mr. Baldassare came to work at Carver
 8  about the same time you did, then?
 9         A.    I would have to look again, but six to
10  eight months later.
11         Q.    Okay.  So was there a port captain when
12  you started working for Carver?
13         A.    There was a senior captain.
14         Q.    Was that Pearson?
15         A.    Yes, sir.
16         Q.    So the role that Mr. Baldassare took on
17  was new as a port captain for Carver Marine?
18         A.    Yes.
19         Q.    Okay.  Do you know whether Captain
20  Morrissey had been assigned to work in any other
21  vessels besides the MACKENZIE ROSE?
22         A.    I would have to look.  I don't know if
23  he filled in on any other vessels or not, but his
24  primary vessel was the MACKENZIE ROSE.
25         Q.    When you say you would have to look, is
```

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   there some system or database that would allow you to
 3   determine relatively quickly what other vessels he
 4   served on?
 5        A.    Payroll would have to pull his time to
 6   see what vessel he was assigned to.
 7        Q.    What did you do to prepare to testify
 8   today?
 9        A.    In what regard?
10        Q.    Well, you knew you were going to be
11   deposed today, right?
12        A.    Well, yes.
13        Q.    Is that --
14        A.    Yeah.  I just needed to show up today,
15   yes.
16        Q.    Right.  I'm just asking what you did to
17   prepare.
18             MR. RODGERS:  Well --
19        Q.    Just so I'm clear, I'm not interested in
20   whatever you and Mr. Rodgers may have discussed.  I
21   don't know whether you even discussed anything with
22   him.  I'm only trying to find out from your
23   perspective what you did to prepare.
24        A.    Honestly, nothing out of the ordinary to
25   prepare for this.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2        Q.     Okay.  Didn't review any documents?
 3        A.     Only --
 4               MR. RODGERS:  Other than with counsel.
 5        A.     Only with -- with counsel.
 6               MR. RODGERS:  Wait, wait, wait.
 7               MR. CHAPMAN:  And that's fair.
 8               MR. RODGERS:  Hold on.
 9               MR. CHAPMAN:  That's fair.
10               MR. RODGERS:  I'm sorry.  Sorry.
11               MR. CHAPMAN:  If he only looked at them
12        with you, that's fine.
13               MR. RODGERS:  Yeah, okay.
14               MR. CHAPMAN:  That's his answer.  Okay.
15        Q.     Did you talk to anyone besides
16   Mr. Rodgers to prepare for the deposition today?
17        A.     No.
18        Q.     Did you text with anyone to help prepare
19   for the deposition today?
20        A.     I did not.
21        Q.     Did you e-mail with anyone to help
22   prepare yourself for the deposition today?
23        A.     I did not.
24        Q.     Couple of questions just -- this -- kind
25   of go to what's called competence, but did you sleep
```

BRIAN MOORE

**April 28, 2025**

1                   Moore - April 28, 2025
2    okay last night?
3         **A.      I did.**
4         Q.     Okay.  And are you taking any
5    medications or substances that would impair your
6    ability to understand my questions and provide
7    truthful answers?
8         **A.      I do not take.**
9         Q.     Have you ever testified before?
10        **A.      I have worked for some depositions on**
11   **behalf of the -- in support of the US -- United**
12   **States Coast Guard, and also for another injury claim**
13   **prior to my arrival at the other company, but never**
14   **on my own behalf, I guess I would say.**
15        Q.     Okay.  Just so I'm clear, are you
16   referencing testimony that you provided in the Coast
17   Guard hearing into this incident?
18        **A.      No.  It was for a different incident**
19   **from four years ago, five years ago.**
20        Q.     And that was also a Coast Guard
21   investigation?
22        **A.      Yes, but not through us.  It was for a**
23   **school that had some suspicious endorsements issued**
24   **out down in Virginia, I believe it was.**
25        Q.     That was a prior employer?

**BRIAN MOORE**

**April 28, 2025**

 1                    Moore - April 28, 2025
 2        A.     Yes, sir.
 3        Q.     Okay.  And you've not given testimony in
 4   any other matters?
 5        A.     No, sir.
 6        Q.     Okay.  And you've -- I think you -- I
 7   think you said maybe -- I don't know if you said this
 8   on the record, but you've never been deposed before?
 9   You've never been through this experience of --
10        A.     No.  No, sir, I have not.  Not for this.
11        Q.     Okay.
12               MR. RODGERS:  Well, I think he's asking
13        at any time, not just this case.
14               THE WITNESS:  Well, yes.  So the injury
15        from the other employer, there was a previous
16        jury case that I was there.  So that was a
17        deposition based in New Jersey that I did for
18        it, where I was with -- for Centerline
19        Logistics.
20        Q.     But other than that, you've never been
21   deposed before?
22        A.     No, absolutely not.
23        Q.     All right.  Thank you for that
24   clarification.
25               Do you understand the term allision?  Do

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    you know what an allision is?
 3         A.      Yes.
 4         Q.      Okay.  Tell us your understanding of the
 5    meaning of the word allision.
 6                  MR. RODGERS:  Just -- just -- so you're
 7         not asking him the legal term of art?
 8                  MR. CHAPMAN:  No.  I'm just asking him
 9         what -- like what does he think an allision is.
10         It's not a trick question.  Okay?
11         A.      You're talking about -- yeah.  My
12    understanding of allision is a vessel making contact
13    with a non-moveable object.
14         Q.      A fixed object?
15         A.      Fixed objects, yeah.
16         Q.      All right.  So tell us how you first
17    learned about the MACKENZIE ROSE alliding with the
18    Belt Line Bridge.
19         A.      The first initial call came through
20    after -- Lenny called me on the weekend.  He received
21    the calls through the boat's, the MACKENZIE ROSE, and
22    from what he spoke to me about it is that they
23    made -- they made contact with the fendering of the
24    bridge.
25         Q.      That's what Mr. Baldassare told you?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          A.      Yes, I believe so.
 3          Q.      What were you doing at the time he
 4    called you?
 5          A.      I was working in my backyard just doing
 6    chores at home.
 7          Q.      So middle of the summer.  Were you like
 8    mowing the grass or --
 9          A.      Yeah.  I -- I don't remember exactly
10    what it was.  Probably just cleaning up the yard,
11    just -- didn't have my phone directly in my pocket,
12    and then it wasn't until I went back inside and
13    picked it up.
14          Q.      So he had left a message to call or
15    what --
16          A.      He -- I believe he called twice.  I
17    don't remember exactly what it was, but usually on
18    weekends when somebody calls from the team, I always
19    call them right back.
20          Q.      So did he leave a message on your phone?
21          A.      I don't recall that.
22          Q.      What time do you recall calling him
23    back?
24          A.      Mid-afternoon.  I don't remember.
25          Q.      And he told you that the crew of the
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    tug -- somebody in the crew of the tug had reported
 3    that they had contacted the fendering system of the
 4    bridge?
 5              MR. RODGERS:  Objection to form.
 6              You can answer.
 7              Do you understand his question?
 8        Q.    If I -- just so I'm clear, if I'm --
 9        A.    Yeah.  They --
10              MR. RODGERS:  Just hold off.
11        Q.    I just want to respond to his objection.
12              If I've misstated what you said
13    previously, then feel free to correct me.  I thought
14    that's what you said.
15        A.    Sure.  Can you repeat the question,
16    then.
17        Q.    Yeah.  When you spoke to Mr. Baldassare,
18    he told you that someone in the crew of the tug had
19    reported that they had contacted the fendering system
20    of the Belt Line Bridge; is that right?
21        A.    Yes.  He didn't mention a name, he just
22    said the MACKENZIE ROSE, as a general.
23        Q.    And did you have any conversation with
24    him about that, any discussion, any -- like here's
25    what we need to do next, or can you get some more
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   information?  I'm just trying to unpack that.
 3        A.      It was more of a find out what happened.
 4   You know, I think I requested them get photos, see
 5   what happened.
 6                It -- when you receive that kind of
 7   phone call, it's initially gather all the facts you
 8   can, what happened, is everything okay, and then take
 9   it step by step after that.
10        Q.      Okay.  So did you have more than one
11   conversation with Mr. Baldassare?
12        A.      Throughout the day?  Yes.
13        Q.      Do you recall how many?
14        A.      No, I do not.
15        Q.      More than two?
16        A.      I don't know.
17        Q.      So it sounds like you told him to get
18   some photos and find out more.
19                What did you specifically want to know?
20        A.      How much damage there was to everything,
21   either it -- let it be the bridge fendering or the
22   barge, or whatever it may have happened.
23        Q.      Did you ever learn which part of the
24   bridge was actually contacted that afternoon on
25   June 15th --
```

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          A.      No, sir.
 3          Q.      -- 2024?
 4          A.      No.
 5          Q.      Did you ever have any understanding that
 6     the part of the bridge that had been contacted was
 7     not the fender system --
 8          A.      It wasn't --
 9          Q.      -- that afternoon?
10                  MR. RODGERS:  Wait.  Hold on.
11                  Could you just repeat that.  I --
12                  MR. CHAPMAN:  Yeah.
13          Q.      I said did you ever have any
14     understanding that the part of the bridge that the
15     tug and barge contacted was not the fendering system?
16                  MR. RODGERS:  On that day?
17                  MR. CHAPMAN:  On that day.  Yeah, on
18          that day.
19          A.      I did not.
20          Q.      Did you learn later --
21          A.      Yes.
22          Q.      -- that it was not the fendering system?
23          A.      Not that day, but yes, later.
24          Q.      Okay.  I'll get to that in a minute, but
25     I'm just trying to understand what you knew --
```

```
 1                    Moore - April 28, 2025
 2          A.     Yes, sir.
 3          Q.     -- that day.
 4                 I'm just trying to understand what you
 5     knew that day.
 6                 We're not doing really good at the radio
 7     discipline thing.
 8          A.     I'll have to hold it like an actual
 9     mike, then.
10                 MR. RODGERS:  That's off the record.
11          It's up to Mr. Chapman.
12                 MR. CHAPMAN:  Well, it's going to be on
13          the video record, so it might as well be on
14          the transcript, too.
15                 MR. RODGERS:  All right.
16          Q.     So there was at least one other
17     conversation you had with Mr. Baldassare that
18     afternoon --
19          A.     Yes.
20          Q.     -- right?
21          A.     Yes, sir.
22          Q.     Did you ever talk to anybody that was a
23     member of the crew of the tug that afternoon?
24          A.     No.
25          Q.     So did Mr. Baldassare call you back,
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2   then, for that second call?
3        A.    Yes.
4        Q.    And what did you learn at that time?
5        A.    I believe it was when -- after the fact
6   that they went to the anchorage to break free from
7   the barge, and then make turns of the entire barge to
8   check for any damage as well.
9        Q.    Did you ever receive a photograph or
10  photographs of the bridge that afternoon?
11       A.    I don't recall if it was that afternoon,
12  besides the one wheelhouse photo that they took
13  looking directly at beam of it.
14       Q.    Okay.  And you received that photo that
15  afternoon?
16       A.    I don't recall.
17       Q.    Where is that photo today, if you know?
18       A.    I don't know.
19       Q.    Who sent it to you?
20       A.    I don't remember.
21             MR. RODGERS:  Just by Counsel, I'm not
22       sure what the photo is.
23             MR. CHAPMAN:  I think the photo he
24       described was the one that was taken apparently
25       from the wheelhouse.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2             MR. RODGERS:  Okay.
 3             MR. CHAPMAN:  Or the -- or from the tug
 4        as it passed by the bridge opening -- passed
 5        through the bridge opening.
 6             THE WITNESS:  That is the photo, yes.
 7        Q.    All right.  So you've seen a photo that
 8   you can see the fendering system, and you can see the
 9   bridge going out to the west, right?
10        A.    Correct.
11        Q.    Okay.  And when did you first see that
12   photo?
13        A.    I don't recall exactly.
14        Q.    Was it on your phone?
15        A.    My phone or Lenny's phone or e-mailed
16   from the boat phone.  I would have to look it up.
17        Q.    So if you received it electronically,
18   there would be some kind of electronic record of
19   receipt --
20        A.    Correct.
21        Q.    -- or being sent, correct?
22        A.    Yes.
23        Q.    Does the boat, the MACKENZIE ROSE, have
24   its own designated phone?
25        A.    Yes.
```

```
 1                 Moore - April 28, 2025
 2        Q.     Where is it kept?  Where is it supposed
 3    to be kept?
 4        A.     It's with the officer of the watch.
 5        Q.     Do you know whether the -- where that
 6    phone is today that was on the MACKENZIE ROSE at the
 7    time of this bridge allision?
 8        A.     It could be with IT or with counsel.
 9               MR. RODGERS:  Don't guess.
10        A.     So no, I don't know.
11        Q.     So in the second conversation, I'll call
12    it, that you had with Mr. Baldassare, what did you
13    learn about what had happened?
14        A.     That there was no damage to the
15    fendering, and on initial walk of the barge, there
16    was no damage noted.  So that was probably what came
17    in -- came by way of the second phone call.
18        Q.     Do you know if the crew of the tug made
19    any inspection of the bridge to determine whether
20    there was any damage to it?
21        A.     Besides taking that one photo as they
22    passed through.
23        Q.     That's all they did --
24        A.     Well --
25        Q.     -- as far as you know?
```

```
 1                    Moore - April 28, 2025
 2          A.     As far as I know.
 3          Q.     Nobody got off the boat and walked the
 4   bridge or came up alongside of the bridge, other than
 5   in that one photo?
 6          A.     I don't believe so.
 7                 MR. RODGERS:  Well, don't guess.
 8          Q.     So --
 9          A.     So -- correction.  Yes, I don't know.
10          Q.     At any time, did it occur to you that
11   the Coast Guard needed to be contacted?
12                 MR. RODGERS:  Objection to form.
13                 You can answer.
14          A.     It would have been within that five-day
15   window of a bridge allision with fendering.
16          Q.     And not before?  Coast Guard needed --
17   did -- you're saying you -- it did not occur to you
18   that the Coast Guard should be contacted immediately
19   because of the allision?
20          A.     Well, given that it was reported that it
21   was just a fendering and there was no damage to the
22   fendering or the barge, I wouldn't understand the
23   severity of what the tug did or didn't do.
24          Q.     Yeah, I hear what you're saying, but do
25   you know what the regulatory requirement is?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2              MR. RODGERS:  Objection.  It's a --
 3         you're asking about the law or what he knows?
 4              MR. CHAPMAN:  I'm just -- again, I'm
 5         asking him what he knows or what he thinks
 6         regarding -- I'm trying to understand what --
 7              MR. RODGERS:  Well, he just testified
 8         that it -- he understood there was a five-day
 9         window.
10              MR. CHAPMAN:  I'll back up.  I'll back
11         up.
12         Q.    Was the Coast Guard notified on
13    June 15th, 2024, that the tug had allided with the
14    bridge?
15         A.    I don't know.
16         Q.    Who would know?
17         A.    Lenny Baldassare.
18         Q.    Did he ever tell you that he had
19    notified the Coast Guard?
20         A.    I don't recall that, either.
21         Q.    So my question, then, is did you do
22    anything to confirm whether the Coast Guard had been
23    notified on June 15th, 2024, of the allision?
24              MR. RODGERS:  Objection to form.
25              You can answer if you understand it.
```

```
 1                  Moore - April 28, 2025
 2        A.     So say it -- repeat the question,
 3   please.
 4                  MR. CHAPMAN:  I'll do it this way.
 5                  Madam court reporter, would you read my
 6        question back to the witness.
 7                  (The record was read.)
 8        A.     No.
 9        Q.     Did you notify Mr. Laraway on June 15th,
10   2024, of the allision?
11        A.     It would have been on the 15th or 16th.
12        Q.     And how did you notify him?
13        A.     I -- I don't exactly recall.  I believe
14   I called him.
15        Q.     What did you tell him?
16        A.     That the MACKENZIE ROSE made contact
17   with the bridge fendering and we were looking into it
18   further.
19        Q.     Now, this would have been Nick Laraway;
20   is that right?
21        A.     Yes, sir.
22        Q.     Is Nick Laraway licensed by the Coast
23   Guard, to your knowledge?
24        A.     No.
25        Q.     He's not licensed, to your knowledge?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    That's my --
 3         A.     To my knowledge.
 4         Q.     Okay.  Do you have any reason to believe
 5    that he's licensed by the Coast Guard?
 6         A.     I have no reason to believe it.
 7         Q.     Did you say anything to him about
 8    whether the Coast Guard needed to be notified of the
 9    allision?
10         A.     I did not.
11         Q.     Did you only have one conversation with
12    him to notify him of the allision?
13         A.     I believe so.
14         Q.     Did you send him any photographs that
15    you had?
16         A.     I don't recall.
17         Q.     Is there anything that would help your
18    memory to recall whether you sent him photographs?
19         A.     Not -- no.
20         Q.     On June 15th, 2024, after the
21    allision -- you first learned of the allision from
22    Mr. Baldassare, were you ever on a call regarding the
23    fact of the allision with any -- with more than one
24    person, like a three-way call, four-way call?
25         A.     Besides Lenny, no, I don't -- no.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2        Q.    Did you give instructions to anyone else
 3   on behalf of Carver to notify the Coast Guard on
 4   June 15th, 2024?
 5        A.    No.
 6        Q.    Did you inform the master of the
 7   MACKENZIE ROSE that the boat was free to leave
 8   Norfolk without notifying the Coast Guard?
 9        A.    I did not.
10        Q.    Do you know of anybody that did?
11        A.    I don't know.
12        Q.    When did anyone on behalf of Carver
13   first notify the US Coast Guard of the allision with
14   the Belt Line Bridge?
15        A.    I believe it was within 48 hours of
16   Lieutenant Palomba of sector Norfolk.  She reached
17   out to Lenny and spoke to him about it.
18        Q.    So just so we're clear and it's not
19   confusing, her name is Lieutenant Palomba?
20        A.    Yes.
21        Q.    Right.
22              MR. RODGERS:  With an A at the end.
23              MR. CHAPMAN:  I think the -- yeah.  I
24        think the spelling is P-A-L-O-M-B-A, Palombo --
25        Palomba.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2              MR. RODGERS:  And we're -- Detective
 3        Columbo.  I don't know.
 4              MR. CHAPMAN:  Yeah.
 5        Q.    So it's your testimony that she
 6   contacted Mr. Baldassare, and then within 48 hours of
 7   that initial contact from the Coast Guard, then the
 8   Coast Guard was notified?
 9        A.    No.  Incorrect.
10        Q.    I misunderstood, then.
11        A.    Correct.
12              So it was within 48 hours of the
13   incident, I believe, is when Lieutenant contacted
14   Lenny informing him that the MACKENZIE ROSE did
15   strike the bridge.
16              MR. RODGERS:  Just for the record, is
17        that your understanding?
18              THE WITNESS:  Yes.
19        Q.    Okay.  And you think that was within
20   48 hours of the allision?
21        A.    I believe so, yes.
22        Q.    And then at no time before that had
23   Carver or anybody on behalf of Carver informed the
24   Coast Guard of the allision; is that right?
25              MR. RODGERS:  Objection to form.
```

```
 1                   Moore - April 28, 2025

 2                 You can answer what you know.

 3        A.      No.

 4        Q.      I'm not sure that answered my question

 5   the way you intended, but --

 6        A.      Okay.  Pause -- repeat the question.

 7        Q.      Yeah.

 8                 MR. CHAPMAN:  Could you read that back

 9        for us, please.

10                 (The record was read.)

11        A.      Correct.

12        Q.      Yeah.  Thank you.

13                 Was anybody with Carver Marine Towing

14   responsible for investigating the allision?

15        A.      Nobody directly.

16        Q.      When you say nobody directly, was

17   somebody indirectly responsible?

18        A.      No.  It was more of a team effort,

19   collaborative.

20        Q.      So who was in charge?  Was it you?

21        A.      It would have been Lenny and myself to

22   look into it.

23        Q.      Okay.  When did the tug and barge arrive

24   in New York?

25        A.      I don't recall.
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2          Q.     Was it within 48 hours of the allision?

3          A.     Yes.

4          Q.     So as a part of the investigation that

5     you and Mr. Baldassare did, was anybody interviewed?

6          A.     Statements were taken by the crew --

7     from the crew.

8          Q.     When did that happen?

9          A.     The initial statements would have been

10    on the day, and then Lenny met with them in person

11    upon arrival to New York Harbor.

12         Q.     Was the crew instructed to make

13    statements on the day of the allision?

14         A.     Yes.  We asked them to provide

15    statements.

16         Q.     When you say we, was that communicated

17    by you?

18         A.     No.  I say we as in Carver, but it would

19    have been by Lenny to ask them to get statements.

20         Q.     When did you first see the statements

21    from the crew?

22         A.     I don't remember.

23         Q.     Were they e-mailed to you?

24         A.     I believe so.

25         Q.     By whom?

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2         A.     I don't recall if it was the tug or
 3    Lenny.
 4         Q.     Does the tug have its own e-mail
 5    account?
 6         A.     It does.
 7         Q.     And what is the name of that e-mail or
 8    what's the...
 9         A.     I believe it's
10    tugmackenzie@carvercompanies.com.
11         Q.     Who has the ability to send e-mails from
12    that e-mail address on the tug?
13         A.     Anybody on board.
14         Q.     So it's not -- are there special login
15    credentials required to access that account?
16         A.     There's a password for the -- that
17    laptop that the crew would have.  Primarily, it's
18    going to be based -- they can be coming from the
19    captain or the mate to send e-mails.
20         Q.     Where is that laptop with the e-mail
21    account located on the tug?
22         A.     I believe it's still on board.
23         Q.     Okay.  And is it in the wheelhouse or in
24    the master's room or...
25         A.     It's in the wheelhouse.
```

```
 1              Moore - April 28, 2025
 2      Q.    But it's one password, right?  Everybody
 3  has -- everybody that wants to use it needs to know
 4  that password?
 5      A.    Yes.
 6      Q.    Okay.  Do you know how many statements
 7  were taken from the crew?
 8              MR. RODGERS:  You mean how many crew
 9        members or --
10              MR. CHAPMAN:  We can start there.
11      Q.    Did everybody -- every member of the
12  crew provide a statement, to your knowledge?
13      A.    To my knowledge.
14      Q.    And did they provide more than one
15  statement or did they only provide one statement?
16      A.    They provided a handwritten statement,
17  and usually handwritten statements are illegible and
18  not clear, and that we would ask them to retype it
19  up.  Lenny would have had them type it up.
20      Q.    And what was the purpose of getting
21  statements?
22              MR. RODGERS:  Objection to form.
23              You can answer it if you understand it.
24      A.    Just with any incident, a statement
25  should be provided.
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2        Q.    Was there any written report prepared of

3   the investigation?

4        **A.    There was --**

5              MR. RODGERS:  Objection.  Can you be

6        more specific.

7              MR. CHAPMAN:  I don't know that I can.

8        I'm just asking.  He's told -- he's --

9              MR. RODGERS:  By who?  By Carver or by

10       him, by anybody?

11             MR. CHAPMAN:  Fair.  That's a fair

12       inquiry.

13       Q.    Was there ever a written report of the

14   investigation prepared by Carver?

15       **A.    Of the investigation, no.**

16       Q.    So there were statements obtained, but

17   no written report prepared?

18       **A.    Correct.**

19             MR. CHAPMAN:  We can go off.

20             THE VIDEOGRAPHER:  We are going off the

21       record.  The time is 11:53 a.m.

22             (Discussion held off the record.)

23             MR. NANAVATI:  Yes, I would like a copy

24       of the transcript, please.

25             MR. JETT:  I do not need a copy.  Thank

```
 1                   Moore - April 28, 2025

 2       you.

 3                   THE VIDEOGRAPHER:  Beginning Media No.

 4       2.  We are back on the record.  The time is

 5       12:05 p.m.

 6  BY MR. CHAPMAN:

 7       Q.    And just to kind of follow up where we

 8  were talking about this investigation that you and

 9  Mr. Baldassare did.

10                   What photographs did you actually see

11  during the course of, I'll call it, that

12  investigation?

13       A.      There's a set of the photos of the

14  barge, the bow, port, starboard and stern -- I

15  believe the stern -- and then the one that beam photo

16  from the bridge -- I'm sorry, from the wheelhouse of

17  looking west towards the bridge, and that's it.

18                   MR. RODGERS:  Off the record.

19                   (Discussion held off the record.)

20                   MR. CHAPMAN:  Let's mark this as

21       Exhibit 1, please.

22                   (Exhibit 1, Copy of Photo, marked for

23       identification, as of this date.)

24       Q.    I passed you a copy of a photograph that

25  was provided to the Belt Line as a part of the
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    production in discovery in this case, and this is as
 3    good as it gets, the image, when you look at it this
 4    way.  It's a digital thing, but it says -- it's just
 5    a thumbnail, so it's not like the full size.
 6        A.    Okay.
 7        Q.    Okay.  But is this one of the
 8    photographs that you received as -- or reviewed as
 9    part of your investigation?
10        A.    Yes, sir.
11        Q.    Okay.  Do you know where the original
12    native digital photograph is that would allow us to
13    see this more clearly?
14        A.    I don't know exactly, but it would have
15    came from MACKENZIE ROSE's boat phone.
16        Q.    All right.  Okay.  And I'm going to have
17    a similar set of questions.
18              MR. RODGERS:  Off the record.
19              (Discussion held off the record.)
20              MR. CHAPMAN:  Mark this as 2, please.
21              (Exhibit 2, Copy of Photos, marked for
22         identification, as of this date.)
23              MR. CHAPMAN:  Here is a copy for you.
24        Q.    You've been passed some photographs that
25    are collectively marked as Exhibit 2, labeled Carver
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    00245 through Carver 00248, that appear to depict a
 3    barge.
 4                  Are these photos that you reviewed
 5    during your investigation with Mr. Baldassare?
 6         A.     Yes.
 7         Q.     These all appear to depict the rake end
 8    of a barge.  Would you agree?
 9         A.     Yes.  This would be the bow.
10         Q.     Okay.  So you had mentioned that you saw
11    some photos of the port and starboard and stern of
12    the barge as well.
13         A.     I -- I wasn't sure of the stern, but
14    when I had referenced to the port/starboard, I mean
15    like you could see the port.  I guess you can't quite
16    see the starboard side, but I knew I was able to see
17    the side of it as well, too.
18         Q.     All right.  So Carver 00248, you're
19    saying depicts the -- an angle of the port side of
20    the barge, correct?
21         A.     Correct.
22         Q.     Okay.
23                  MR. RODGERS:  Which one is that?
24                  THE WITNESS:  248.
25                  MR. CHAPMAN:  The last one in this
```

```
 1                  Moore - April 28, 2025
 2        collection.
 3        Q.     And this barge was laden with cargo,
 4    correct?
 5        A.     Yes.  It had special project cargo on
 6    deck.
 7        Q.     Which was bound for where?
 8        A.     The Hackensack River, New York Harbor.
 9        Q.     Was there a bridge project going up
10    there that you were supporting?
11        A.     Yes.
12        Q.     Who was your customer for this transit?
13        A.     I actually don't know who the exact
14    customer it was for.
15        Q.     Somebody building the bridge?
16        A.     Yes.  Skanska was building the bridge,
17    and who we'd be working with.  I don't know if this
18    was directly by them or who signed us up for it.
19        Q.     Did you have all of the towing related
20    to the construction of this bridge?
21        A.     Not all of it.
22        Q.     But some of it?
23        A.     Yes.
24        Q.     So how was Carver going to be paid for
25    towing whatever was on this barge up to that bridge
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    project in Hackensack?
 3         A.     I --
 4                MR. RODGERS:  Just -- you mean who was
 5         going to pay him or --
 6                MR. CHAPMAN:  Yeah.
 7                MR. RODGERS:  Yeah.  Okay.
 8                MR. CHAPMAN:  That's what I'm asking.
 9         A.     Yeah.  I don't know exactly.  I would
10    have to refer to the terms and conditions, the
11    agreements.
12         Q.     Do you know how much you were being paid
13    for each trip?
14         A.     I don't know.
15         Q.     Where would that information reside?
16         A.     It would be with accounting.
17         Q.     So just kind of part of your P&L
18    responsibility?
19         A.     Yes.
20         Q.     But you just don't have it like
21    immediately of mind, right?
22         A.     Correct.
23         Q.     Okay.  But there would have been some
24    freight due for this voyage, right?
25         A.     Correct.
```

**BRIAN MOORE**

**April 28, 2025**

| | |
|---|---|
| 1 | Moore - April 28, 2025 |
| 2 | Q.    I'm going to get out a copy of it in a |
| 3 | little bit, but one of the documents that was |
| 4 | produced to us in this case was a report of an |
| 5 | allision when Captain Morrissey was at the wheel of |
| 6 | the MACKENZIE ROSE in January of 2024, when he hit a |
| 7 | pier in -- or near Charleston, South Carolina. |
| 8 | A.    Yes, sir. |
| 9 | Q.    Do you recall that? |
| 10 | A.    I do. |
| 11 | Q.    That report is on a form -- a company |
| 12 | form that says like 9.5 incident report or something |
| 13 | like that on it. |
| 14 | A.    Okay. |
| 15 | Q.    Okay? |
| 16 | Was a form like that ever prepared for |
| 17 | this allision with the Belt Line Bridge? |
| 18 | MR. RODGERS:  Just -- could you show him |
| 19 | the form that you're referring to. |
| 20 | MR. CHAPMAN:  It'd take me a minute to |
| 21 | find it.  So... |
| 22 | MS. WERNER:  Would you like the Bates |
| 23 | label, Jim?  This is Rachel Werner.  Jim needs |
| 24 | the Bates label.  I'm happy to read it to him so |
| 25 | he can provide the witness the document. |

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2                MR. RODGERS:  So she's getting you the
 3       Bates number.
 4                MR. CHAPMAN:  Yeah, one second.
 5                MR. RODGERS:  You know, why don't I get
 6       my Bates number docs, okay?  Maybe we can --
 7       Jim?
 8                MR. CHAPMAN:  I think I've got it.
 9                MR. RODGERS:  And it might even have
10       better photos, if you want to wait two minutes.
11                MR. CHAPMAN:  I think it starts with
12       829.
13                MR. NANAVATI:  It is.
14                MS. WERNER:  That's right.
15                MR. NANAVATI:  It's 829.
16                MR. RODGERS:  Off the record.
17                (Discussion held off the record.)
18                (Exhibit 3, 9.5 Incident Report-Event,
19       marked for identification, as of this date.)
20                MR. RODGERS:  Could you ID the numbers
21       just so Rachel and your people can hear it.
22                MR. CHAPMAN:  Yeah, I will.
23                MR. RODGERS:  I mean, the Bates numbers.
24                MR. CHAPMAN:  Yeah.
25       Q.    So Mr. Moore, you've been passed a copy
```

**BRIAN MOORE**

**April 28, 2025**

```
 1              Moore - April 28, 2025
 2   marked -- a copy of a report marked as Exhibit 3
 3   covering Carver Bates labels 00829 through 00847.
 4        A.    Yes, sir.
 5        Q.    Okay.  Is this the report that was
 6   filled out in -- for the incident in January of 2024
 7   when Captain Morrissey, while at the helm, hit a
 8   pier?
 9        A.    Yes, sir.
10        Q.    Okay.  So my question is was a report
11   like this filled out for the Belt Line Bridge
12   allision on June 15th, 2024?
13        A.    I don't recall.  I would have to
14   reference.
15        Q.    Okay.  How would you go check to see if
16   there was such a report or a --
17        A.    It would all be through the Helm
18   operating system.
19        Q.    And you're referring to a logo on page 1
20   of Exhibit 3 that says Helm?
21        A.    Yes, sir.
22        Q.    Tell us about that.
23        A.    The Helm operating system is our overall
24   component where tugs will enter in daily logs,
25   entries, position reports.  It's part of our
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    preventive maintenance system if tugs have issues.
 3    So to submit repair tickets, and also, part of the
 4    near misses and incident reports and everything else.
 5         Q.    And it looks to me like there's a number
 6    of fields that have to be filled in as part of
 7    preparing this report, right?
 8         A.    There's a lot of options for the fields.
 9    Not all are applicable.
10         Q.    So is -- if you were to look at this in
11    the system, are there fields that are required that
12    have to be filled in?
13         A.    I don't know off the top of my head.
14         Q.    So if you look on the second page of
15    Exhibit 3, under 3.2 it says Master, James D.
16    Morrissey, and then there's a parentheses after that
17    that says Inactive --
18         A.    Yes.
19         Q.    -- right?
20               What does the inactive mean?
21         A.    It means that they're not currently
22    active in the Helm operating as a crew member.
23         Q.    So this report was run after he left the
24    employ of the company?
25         A.    I don't know when this report was run.
```

**BRIAN MOORE**

**April 28, 2025**

1             Moore - April 28, 2025
2   You can pull up these reports at any time.
3        Q.    And -- but if somebody is still
4   currently with the company, it wouldn't say inactive
5   after their name?
6        A.    Correct.
7        Q.    Okay.  So on the first page, it says it
8   was filled by Brandon Kuster.
9        A.    Yes.
10       Q.    Who is Brandon Kuster?
11       A.    He's a captain with Carver Marine
12   Towing.
13       Q.    Was he the master of the MACKENZIE ROSE
14   on the date of this allision that's reported in
15   Exhibit 3?
16       A.    I don't believe so.  I believe he was
17   sailing as mate.  Still as a captain, but sailing as
18   mate.
19       Q.    So would Morrissey have been the master
20   of the vessel at the time this allision occurred?
21       A.    Yes.
22       Q.    Is there a reason that Morrissey doesn't
23   fill the form out himself?
24       A.    Not that I would know.
25       Q.    If you can go to page 00832,

```
 1                  Moore - April 28, 2025
 2   Section 4.8.  It looks like there's a question or a
 3   field to be completed about property damage.
 4        A.    Yes, sir.
 5        Q.    And it says Occurrence causing project
 6   damage in excess of $75,000.
 7              Do you know why that figure is in this
 8   report?
 9        A.    I believe that is auto populated through
10   Helm as the -- or was, I believe, the Coast Guard
11   threshold for reportable incidents.
12        Q.    Okay.  And is Done part of a drop-down
13   menu?
14        A.    I don't -- I don't know.
15        Q.    Okay.  Did you understand that the
16   damage caused to the pier in this allision in January
17   of 2024 exceeded $75,000?
18        A.    At the time, nobody knew what the damage
19   would cost.
20        Q.    And did you since learn that it was in
21   excess of $75,000?
22        A.    Did I what?
23        Q.    Did you -- have you since learned the
24   damage was in excess of $75,000 to the pier?
25        A.    I don't recall the exact number off top
```

```
 1                   Moore - April 28, 2025
 2    of my head.  Our Charleston team was handling that
 3    since it's their area.
 4         Q.    And this says -- if we go back to page 1
 5    of Exhibit 3, it says that it was filled -- I assume
 6    that means filled out, on January 22nd of 2024 at
 7    0855 hours, right?
 8         A.    Yes, sir.
 9         Q.    So it's just before 9 a.m., right?
10    Right?
11         A.    Oh, yes.  Sorry.  Yes.
12         Q.    I'm not saying that's the time of the
13    accident, I'm saying that that's when the form was
14    completed --
15         A.    Correct.
16         Q.    -- right?
17               MR. RODGERS:  To his knowledge, also.
18         A.    Yes, to my knowledge.
19               MR. RODGERS:  Well, he's got to ask you
20         that.
21               THE WITNESS:  I wasn't there, but...
22         Q.    Yeah.
23               Have you ever completed one of these
24    forms yourself?
25         A.    I have not.
```

```
 1                   Moore - April 28, 2025
 2        Q.      Okay.  At the end on page 000846 of
 3   Exhibit 3, it references at the bottom of that page
 4   Attachments.
 5        A.      Yes.
 6        Q.      Do you see that?
 7                And then you got to go the next page to
 8   see what they are.  But it looks like there's a
 9   Witness Statement from every member of the crew?
10                Is that -- is that what we're seeing
11   here?
12        A.      To my knowledge, yes.
13        Q.      Okay.  And it was like a -- looks like
14   it's a Word document, docx, as the file type?
15        A.      I believe so.
16        Q.      Those attachments, though, aren't
17   printed as part of this exhibit we're looking at,
18   correct?
19        A.      They're not in this exhibit, no.
20        Q.      So we don't know -- but presumably, they
21   exist in your system somewhere, right?
22        A.      Yes.
23        Q.      Okay.  And if you look on Carver 00845
24   in Exhibit 3, under 19.8, it says Chemical Testing.
25                Do you see that?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          A.      Yes.
 3          Q.      And somebody's entered Done, right?
 4          A.      Yes, sir.
 5          Q.      So -- and then right below at 19.9,
 6  Results from Chemical Testing, says Immediate swap
 7  conducted as negative, and crew was sent to clinic
 8  for formal testing.  All negative.  Right?
 9          A.      Yes, that's what it says.
10          Q.      So would there be some chemical testing
11  results for the crew members as part of this
12  investigation?
13          A.      Yes.
14          Q.      Okay.  But they're not part of this
15  incident report.  They're not attached to it or --
16          A.      Correct.
17          Q.      Where would they live in your system?
18          A.      I don't know.  I -- I don't know.  I
19  believe also in Helm, but not sure off the top of my
20  head.
21          Q.      Is there like a personnel file for each
22  employee of the towing company?
23          A.      Yes, there is.
24          Q.      And is that in an electronic employment
25  file or is there like a folder with, you know, paper
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    documents or copies of things in it, too?
 3         A.    I don't know, actually.  That's all
 4    through HR.  I don't have access to the HR files.
 5         Q.    Do you know whether it's required that
 6    the results of chemical testing be included in their
 7    personnel files?
 8         A.    I don't know.
 9         Q.    With respect to the conditions at the
10    time of this incident, if you could take a look at
11    Carver 00083.
12         A.    830?
13         Q.    Yeah, 833.
14         A.    Oh, 833.  Got it.
15         Q.    And just confirming, it says the weather
16    was clear, right?
17         A.    Yes.
18         Q.    It was daylight hours?
19         A.    Yes.
20         Q.    Visibility was good?
21         A.    Yes.
22         Q.    Up to 10 miles?
23         A.    Yes.
24               MR. RODGERS:  Are you going to read the
25    rest, Jim?
```

```
 1                    Moore - April 28, 2025
 2              MR. CHAPMAN:  Well, I...
 3              MR. RODGERS:  Like the wind speed?
 4       Q.    So if you continue on page 34 -- excuse
 5  me.  Yeah, 834.  It's got the air temperature, wind
 6  speed, wind direction, water speed, that it was an
 7  ebb tide.  The tide was about 2.1 feet, right?
 8       A.    Yes, sir.
 9       Q.    And the sea state at zero.
10              Presumably no chop --
11       A.    Correct.
12       Q.    -- right?  Okay.
13              MR. RODGERS:  Are you going to be asking
14         him about the wind speed?
15              MR. CHAPMAN:  No, but you can when you
16         decide to follow up.
17              MR. RODGERS:  Oh, okay.
18              MR. CHAPMAN:  I think it's accurately --
19         or it's been recorded there, and it says what it
20         says.  So...
21       Q.    Is there any place in this form where
22  there's an entry regarding whether a lookout was
23  posted at the time of the incident?
24       A.    I don't know.
25              MR. RODGERS:  For the record, this is
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2          the January incident, right?
3                    MR. CHAPMAN:  Correct.
4                    MR. RODGERS:  Okay.  Thanks.
5          Q.    On page 000840, it describes -- it has
6     Damage to Property under Section 12.
7                    Do you see that?
8          A.    Yes, sir.
9          Q.    And it says under 12.1 that the property
10    is the corner of Pier K, piling on north side of the
11    dock --
12         A.    Correct.
13         Q.    -- right?
14                   And then the owner of the property is
15    Stevens Towing.
16                   Is Stevens owned by Carver?
17         A.    No.
18         Q.    So this is presumably Stevens Towing's
19    dock?
20                   MR. RODGERS:  And --
21         A.    It's actually the -- sorry.  It's
22    actually the Port Authority's dock.
23         Q.    Oh, okay.
24         A.    So...
25         Q.    So the South Carolina Ports Authority's
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   dock was damaged?
 3         A.    Correct.  Stevens Towing leases it out
 4   from them.
 5         Q.    Okay.
 6               As part of your investigation of the
 7   Belt Line Bridge allision, the one in June of 2024,
 8   do you know whether Will Gedney was contacted at all
 9   during the -- that allision on June 15th, 2024?
10         A.    I don't know.
11         Q.    Do you know who the dispatcher was on --
12   that was on duty at that time?
13         A.    Not to my knowledge right now.
14         Q.    Do you have a dispatcher on 24/7?
15         A.    Yes.
16         Q.    Is there any log of calls made to or by
17   the dispatcher as they occur?
18         A.    Like a documented call log?
19         Q.    Yes.
20         A.    No.
21         Q.    How would the tug reach the dispatcher
22   if they felt the need to contact the dispatch; cell
23   phone?
24         A.    Cell phone, yes.
25         Q.    And just so I'm clear, to your
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   knowledge, you don't know whether such an incident
 3   report like Exhibit 3 was prepared for the allision
 4   with the Belt Line Bridge that took place -- that
 5   occurred on June 15th, 2024?
 6        A.    Not to my knowledge right now, of its
 7   existence or nonexistence.
 8        Q.    Can you go into the Helm system and look
 9   for it?
10        A.    Yes, sir.
11        Q.    Just put in the date or --
12        A.    Yep.  You can --
13        Q.    -- and the vessel?
14        A.    You can reference incidents by vessels.
15        Q.    Okay.  So this -- on page 1 of
16   Exhibit 3, it says there's a tag incident, right?
17        A.    Yes.
18        Q.    You see that there?
19        A.    Yes, sir.
20        Q.    What other tags are there for an
21   incident report event like this?
22        A.    I don't know exactly.
23        Q.    Right now, do you know if that's a
24   drop-down menu?
25        A.    I believe it's all through a drop-down
```

```
 1                  Moore - April 28, 2025
 2    menu, and then they would designate it from there.
 3         Q.      Okay.
 4         A.      But the tags could also just be a
 5    reference to searchability within the system.
 6         Q.      Do employees ever get, I'll say,
 7    reprimanded or disciplined in any way from messing
 8    stuff up?
 9              MR. RODGERS:  Objection to form.
10              You can answer if you understand it.
11         A.      Within Carver companies?
12         Q.      Yeah, I'll rephrase.
13              Do employees of Carver Marine Towing
14    ever get disciplined for damaging property?
15         A.      There's a formal write-up within Carver
16    companies.  I don't recall of any formal write-ups.
17    It would go through HR for write-ups and discipline
18    actions.
19         Q.      So would somebody from HR be completely
20    responsible for that or would there be somebody at
21    the towing company that had to initiate it or sort of
22    spell out what the issue was?
23         A.      Correct.  It would be -- it would go
24    through us for that.  It would be -- I say us; that's
25    Carver Marine Towing.  But it could go through
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2    somebody at Carver Marine Towing to initiate the
3    disciplinary action.
4         Q.    And how do you get that process started?
5    Is there some form you have to fill out, or is it
6    just pick up the phone and call somebody in HR and
7    say hey, I need to do this?
8         A.    It's as --
9         Q.    How does it work?
10        A.    -- simple as a phone call.  It could be
11   e-mail.  Because I've -- don't recall seeing any of
12   the Carver Marine Towing reports for disciplinary
13   action.  It's all a Carver companies' form.
14        Q.    Was Captain Morrissey disciplined for
15   damaging the South Carolina Port Authority dock in
16   January of 2024?
17        A.    For that incident, no.
18        Q.    Did anybody counsel him or...
19        A.    We interviewed him and spoke to him
20   about the incidents, and we didn't deem it necessary
21   given the fact that the -- the way the departure was
22   with the winds and currents and the sets that he --
23   occurred; that it was a common -- not say it's a
24   common, but it's a probability that could happen, and
25   he really -- he was not directly disciplined for it.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        Q.      Did the tug allied with the dock or did
 3   a barge that it was handling allied with the dock?
 4        A.      A barge.
 5        Q.      Do you know whose barge it was?
 6        A.      Our barge.
 7        Q.      So you also operate a fleet of barges?
 8        A.      True.   Correct.
 9        Q.      To your knowledge, has Captain Morrissey
10   ever been disciplined for the incident -- the
11   allision with the Belt Line Bridge in 2024?
12        A.      He was suspended with pay pending that
13   investigation.
14        Q.      But was he disciplined?
15             MR. RODGERS:   Objection to form.
16        A.      A disciplinary form?   No.
17        Q.      I'm sorry?
18             MR. RODGERS:   Asked and answered is my
19        objection, but you can answer if you understand
20        his question.
21        A.      To me, the suspension was the
22   disciplinary.
23        Q.      So he still collected full -- collect
24   full pay while he was on admin leave, right?
25        A.      Yes.
```

```
 1                    Moore - April 28, 2025
 2        Q.     Was there any counseling?
 3               MR. RODGERS:  I'm just -- sorry.  Jim,
 4        you call it admin leave.  I don't know if that's
 5        his term, but maybe you can straighten it out.
 6        A.     Correct.  So he wasn't on admin leave.
 7   He didn't have any day-to-day operations with Carver
 8   Marine Towing during his suspension.
 9        Q.     So he just didn't come into the office,
10   but he received his full pay?
11        A.     Yes.
12        Q.     And how long did that go on?
13        A.     I don't recall.  Multiple months.
14        Q.     Did you ever interview him personally
15   regarding this allision?
16        A.     No.
17        Q.     Do you know who interviewed him
18   personally?
19        A.     Lenny would have.  Lenny Baldassare
20   would have interviewed him.
21        Q.     And did he tell you about his interview
22   with Captain Morrissey?
23        A.     I'm sure he did.
24        Q.     Are there any notes that he made of his
25   interview with Captain Morrissey?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025

 2       A.      Not that I know.

 3       Q.      Not that you've seen?

 4       A.      Not that I know of.

 5              MR. RODGERS:  Just for the record, I

 6       think he's testified that he -- that -- you're

 7       talking about Lenny interviewing him?

 8              THE WITNESS:  Yes.  Correct.

 9              MR. RODGERS:  I think he talked to

10       everybody when they got back to Staten Island.

11       So it didn't sound like the question and answer

12       reflected that.  I think he was confused.

13              MR. CHAPMAN:  You know, you're fully

14       welcome when I'm done to clarify anything.

15       Just -- I would ask that you limit the speaking

16       objections.

17              MR. RODGERS:  I've had very few speaking

18       objections, if any.  I just want to clarify to

19       the witness now so there's not incorrect

20       testimony, and I shouldn't have to fix it if

21       it's done correctly.

22       Q.      Just so I'm clear on what you've said,

23   you're not aware of any notes that Mr. Baldassare

24   made regarding his interview with Captain Morrissey?

25       A.      Correct.
```

**BRIAN MOORE**

**April 28, 2025**

1              Moore - April 28, 2025

2        Q.      Okay.  You've seen statements that the

3    crew members provided in the aftermath of the

4    allision, right?

5        A.      Correct.

6        Q.      And my question is whether you have ever

7    seen any notes that Mr. Baldassare may have

8    prepared -- I don't know whether he did or not -- of

9    his investigation?

10        A.      No.

11        Q.      You haven't seen them?

12        A.      I've not seen any notes.

13        Q.      Okay.

14              MR. CHAPMAN:  Would you mark that as 4,

15        please.

16              (Exhibit 4, Labelled Sections Produced

17        by Carver Listing, marked for identification, as

18        of this date.)

19        Q.      Mr. Moore, you've been given Exhibit 4

20    to your deposition, which has a cover page on it that

21    was prepared by my office trying to identify the

22    sections of documents that Carver produced to us in

23    this case that appear to be part of some type of

24    system, but they're largely labeled with a number in

25    the first column, the section number, title of the

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   document, and then the Bates ranges, which are
 3   various.  I reorganized them from the way they were
 4   produced so that they follow the section number
 5   ordering.
 6        A.    Okay.
 7        Q.    Because I think that makes more sense.
 8   It may not, but I think it does.
 9        A.    Okay.
10        Q.    All right.  So if you look at the first
11   page underneath the cover, which is labeled Carver
12   000148 titled Master's Authority -- excuse me,
13   Matter's Responsibility and Authority, it looks like
14   it's Section 5.1 --
15        A.    Yes, sir.
16        Q.    -- right?
17              MR. RODGERS:  And so for the record,
18        could you put the Bates stamp numbers --
19              MR. CHAPMAN:  I did.
20              MR. RODGERS:  No.  Right now, 148?
21              MR. CHAPMAN:  Yeah.  I just -- I
22        referenced that, I believe --
23              MR. RODGERS:  Okay.
24              MR. CHAPMAN:  -- so -- and they're also
25        listed --
```

```
 1                  Moore - April 28, 2025
 2             MR. RODGERS:  And it's for the people
 3        listening on both sides.
 4             MR. CHAPMAN:  Yeah.
 5             Anybody on the line that needs me to
 6        read that number again?
 7             MR. NANAVATI:  I'm okay.  Thanks.
 8        Q.    Mr. Moore --
 9        A.    Yes, sir.
10        Q.    -- where did this come from, this 5.1?
11        A.    This is all encapsulated within our
12   towing TSMS or Towing Safety Management System, and
13   that is also found in Helm.
14        Q.    So the -- I'll call it the safety
15   management system.
16        A.    Yes.
17        Q.    But that's a requirement of SOLAS, isn't
18   it?
19        A.    Not a requirement of SOLAS.  It was a --
20   it's a requirement of all tug and barge companies --
21        Q.    Okay.
22        A.    -- subchapter M related.
23        Q.    So the lowest numbered section that was
24   produced to us in this litigation is 5.1.  There's
25   nothing before that.
```

```
 1                    Moore - April 28, 2025
 2              But I presume that there must be some
 3    numbers that precede Section 5.1; is that right?
 4         A.    Correct.
 5         Q.    Okay.  So what is the lowest section
 6    number that you know of?  Is it like 1.1 or --
 7         A.    It would be 1 --
 8         Q.    Okay.
 9         A.    -- .1.
10         Q.    All right.  And is there like an index
11    or some table of contents in this safety management
12    system?
13         A.    Yes.
14         Q.    How many -- like it starts at 1.  How
15    high does it go?
16         A.    I don't know off the top of my head.
17         Q.    Above 9.5?
18         A.    I couldn't answer that correctly.
19         Q.    Okay.  Have you ever seen it printed
20    out?
21         A.    Yes.
22         Q.    And how thick is it?
23         A.    Approximately two inches thick.
24         Q.    Okay.  So if you hold this up to the
25    video, this is maybe half an inch thick?
```

```
 1                    Moore - April 28, 2025
 2              MR. RODGERS:  Objection.
 3         A.     No.  It's not -- not quite that, but
 4    it's a little bit thicker than this.
 5         Q.     Okay.  Suffice to say, this is not the
 6    entire safety management system, right?
 7         A.     Correct.
 8         Q.     Okay.  So just kind of running through
 9    it with me at a high level, I want to understand
10    what's here.
11              Section 5.1, which is Carver 148 and
12    149, right?
13         A.     Yes, sir.
14         Q.     Section 6.12, which is Carver 150 and
15    151, right?
16         A.     Yes, sir.
17         Q.     Section 6.13, which is Carver 152
18    through 154?
19         A.     Yes, sir.
20         Q.     And then it jumps up to 7.2, and the
21    Bates No. is 908?
22         A.     Okay.  I don't have 908.
23         Q.     Yeah, it's probably easier to follow
24    along with the cover page, because as I said, they're
25    not in the Bates numbered order, they're in the order
```

```
 1                    Moore - April 28, 2025
 2    of the sections.
 3          A.      Got it.
 4          Q.      So I'm just asking is -- you see 5.1 and
 5    then you see 6.12?
 6          A.      Yes, sir.
 7          Q.      And then you see 6.13?
 8          A.      Yes.
 9          Q.      And then 7.2 is the next one?
10          A.      Correct.
11          Q.      And that is Bates numbered 908.  You
12    just -- if you see the number in the lower right.
13                  And then 7.3?
14          A.      Yes.
15          Q.      Which is 898 to 906.
16                  7.4, which is 909?
17          A.      Yes.
18          Q.      7.9, which is 897?
19          A.      You forgot 7.5, but --
20          Q.      Oh, I skipped that.  Thank you.
21          A.      But yes --
22          Q.      Yeah.
23          A.      -- 7.5 and 7.9.
24          Q.      Okay.  7.5, which is 816 to 520.
25                  And then 7.9, which is 897, right?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        A.     Yes, sir.
 3        Q.     And then 7.9K, which is 194 to 199?
 4        A.     Yes, sir.
 5        Q.     I do want to ask, do you know why
 6   there's a sub letter to 7.9?
 7        A.     I don't know.
 8        Q.     And immediately following is 7.9P, which
 9   is numbered 201 to 226.
10               Do you see that?
11        A.     Yes, sir.
12        Q.     Do you know whether there are
13   subsections of Section 7.9, like A through Z or A
14   through some letter, and the only thing that we've
15   been provided with are K and P?
16               MR. RODGERS:  Objection to form.
17        Q.     I'm just asking --
18        A.     I don't know.
19        Q.     -- if you know whether there are other
20   subsections.
21        A.     Not without having it in front of me, I
22   couldn't reference it.
23        Q.     Okay.  And then it's followed by 7.12 on
24   Bridge Transits --
25        A.     Yes, sir.
```

**BRIAN MOORE**

**April 28, 2025**

| | |
|---|---|
| 1 | Moore - April 28, 2025 |
| 2 | Q.    -- Bates No. 910. |
| 3 |      Then 7.16 on Lookouts -- |
| 4 | A.    Yes, sir. |
| 5 | Q.    -- which is numbered 155. |
| 6 |      And then 8.8M on Steering Failure, which |
| 7 | is numbered 162, correct? |
| 8 | A.    Yes, sir. |
| 9 | Q.    And then I guess same question.  The 8.8 |
| 10 | is a subletter M. |
| 11 |      Do you know whether there's like A |
| 12 | through L or anything after M? |
| 13 | A.    I would have to reference it. |
| 14 | Q.    Okay.  And then the last numbered |
| 15 | section is 9.5 on Accident and Incident Reporting, |
| 16 | 163 to 169. |
| 17 |      Do you see that? |
| 18 | A.    Yes, sir. |
| 19 | Q.    The last thing that's in here doesn't |
| 20 | have a section number on it, but if you could turn to |
| 21 | the last four pages, which are numbered 886 through |
| 22 | 889. |
| 23 | A.    Okay. |
| 24 | Q.    It at the top says that it is, in red, |
| 25 | Health and Safety Plan within TSMS. |

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2                  Do you see that heading?
 3         A.       Yes, sir.
 4         Q.       So you told us what the TSMS is, the
 5    Towing Safety Management System.
 6                  Is this part of it, this document, these
 7    last four pages?
 8         A.       I would have to reference it.  It is
 9    extensive, so I don't really know off the top of my
10    head.
11         Q.       Yeah.  I mean, there's four pages, but
12    they reference a lot of the Code of Federal
13    Regulation, and then some other sections of the
14    TSMS --
15         A.       Yes, sir.
16         Q.       -- right?
17                  I do have a question.  In that far right
18    column on page 886, it says TSMS/HSP Section?
19         A.       Yes, sir.
20         Q.       I assume HSP is Health and Safety Plan?
21         A.       Yes.  That would -- to my knowledge,
22    yes.
23         Q.       Is that a separate document, the Health
24    and Safety Plan?
25         A.       No.  It's all incorporated.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2         Q.    It's all part of the --
 3         A.    Part of the --
 4         Q.    -- the TSMS?
 5         A.    In Helm.
 6         Q.    Okay.  So if you go into your Helm
 7  system, you can access the entire TSMS, right?
 8         A.    Yes.
 9         Q.    And you can access all of the forms that
10  have to be filled out as part of performing your
11  duties, right?
12         A.    Yes, sir.
13         Q.    What else is in Helm?
14         A.    There's multiple forms where you could
15  fill out for evaluations, near misses, voyage plan,
16  references, how to handle coal.  It's all documented
17  on -- it's all -- it's added by Tug & Barge
18  Solutions, TBS, who is our provider of the Health and
19  Safety, TSMS.
20         Q.    So Tug & Barge Solutions is a company
21  that you buy or rent this towing safety management
22  system from --
23         A.    Correct.  They're a third-party
24  organization that works with us to ensure that this
25  plan is what we are looking for, compared to other
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    companies that they also provide for.
 3         Q.    And do they represent that their -- that
 4    the TSMS that they make available to you is in
 5    compliance with whatever regulatory requirements
 6    exist?
 7         A.    I don't know off the top of my head.
 8         Q.    So do you rent or buy the Helm system
 9    from them?
10         A.    Helms system is a separate operating
11    system that goes through Tug & Barge Solutions, TBS,
12    but Helm is its own separate organization that TBS
13    provides that service to us with.
14         Q.    So you pay like a subscription to Helm
15    and a subscription to TBS?
16         A.    We pay one subscription cost to TBS for
17    all-encompassing.
18         Q.    All right.  And so TBS provides the Helm
19    system and it provides the safety management system?
20         A.    Correct.
21         Q.    Does it provide anything else?
22         A.    They also can perform other services,
23    but nothing that's on the day-to-day operations they
24    do.  They can do condition value surveys,
25    post-incident surveys, but there's other
```

```
 1                    Moore - April 28, 2025
 2    organizations that do the same.
 3                    So we utilize TBS just for the Helm and
 4    also the TSMS section.
 5         Q.    You mentioned post-incident surveys.
 6                    Did Carver hire a surveyor to go inspect
 7    the damage that the MACKENZIE ROSE did to the
 8    Carolina Port Authority dock in January of 2024?
 9         A.    I don't know off the top of my head.
10         Q.    If you obtained a survey, where would
11    that be kept?
12         A.    I have --
13                    MR. RODGERS:  Just for the record, you
14         mean the damage to the pier --
15                    MR. CHAPMAN:  Damage to the pier.
16                    MR. RODGERS:  -- in January 2024?
17                    MR. CHAPMAN:  Correct.
18         A.    I don't recall seeing one, but it --
19    there's no designated spot for it besides an e-mail
20    or in Box we use.
21         Q.    Box is a file storage --
22         A.    Correct.
23         Q.    -- product, right?
24         A.    Yes, sir.
25         Q.    The access that you have to Helm and the
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   safety management system, is that all cloud-based?
 3          A.      Yes.
 4          Q.      So you got to login to the cloud to
 5   access your account?
 6          A.      Yes.
 7          Q.      Can Carver edit the safety management
 8   system?
 9          A.      We can only recommend.
10          Q.      And if you wanted to make a change to it
11   or recommend a change to it, how would that take
12   place?
13          A.      It's easy as calling TBS to go through
14   the motions or submitting a management of change
15   within the operating system.
16          Q.      To your knowledge, has Carver ever done
17   that?
18          A.      We have made revisions.  I don't know
19   off the top of my head what they were, but they have
20   been made through -- through TBS.
21          Q.      And is there an audit log of any
22   revisions that are made at your request to the safety
23   management system?
24          A.      I don't -- I don't know off the top of
25   my head.
```

```
 1                 Moore - April 28, 2025
 2        Q.      Is there an IT person that has some
 3   responsibility for managing or making those changes
 4   to the TSMS?
 5        A.      It would be through TBS, not our IT
 6   department.
 7        Q.      So if you look at the -- at Section 5.1
 8   of Exhibit 4, it has a revision date on it at the
 9   top, July of 2021?
10        A.      Yes, sir.
11        Q.      Do you know what was revised in this?
12   And I realize you weren't there, but I'm just trying
13   to understand the scope of what you might know.
14        A.      I do not know.
15        Q.      So do you know if this has changed in
16   any way since July 15th of 2024?  I'm just focused on
17   Section 5.1.
18        A.      No, I don't believe so.
19                MR. RODGERS:  Don't guess.
20                THE WITNESS:  That's correct.
21        A.      I -- not to my knowledge.
22        Q.      So moving on to Section 6.12 titled
23   Deckhand, which is -- starts at page 150.
24        A.      Yes, sir.
25        Q.      It says, again, Revision Date, July 1,
```

```
 1                  Moore - April 28, 2025
 2    2021.
 3                  Has any change been made to it since
 4    that, since June 15th, 2024?
 5         A.     Not to my knowledge.
 6         Q.     On page 150 under the heading
 7    Operational --
 8         A.     Yes, sir.
 9         Q.     -- it looks like the third bullet
10    down -- fourth bullet down, maybe third bullet down,
11    Assisting the master/mate in making bridges.
12                  Do you see that?
13         A.     Yes, sir.
14         Q.     What is the deckhand supposed to do to
15    assist the master or mate in making bridges?
16         A.     A common practice would be for
17    deckhands, if the officer on watch requests it, to go
18    out and provide distances or identify any hazards.
19         Q.     Is that the same thing as the fourth
20    bullet where it says Standing lookout or riding the
21    head of a tow as a lookout?
22                  Are those the same or are they uniquely
23    different?
24                  MR. RODGERS:  Just for the record, he's
25         not here as an expert, so that's to his
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2       knowledge of duties of a deckhand.
 3       A.      Correct.  It would be through the same,
 4  if you're also transiting through locks, bridges or
 5  even on approach to a dock.
 6       Q.   So how are deckhands trained in their
 7  responsibility regarding assisting the master or mate
 8  in making bridges?
 9       A.      They have their own training for vessel
10  orientation and initial on hire, but I could not --
11  not to my knowledge, I don't know about specifically
12  for passage to bridges or locks or...
13       Q.   Who is responsible for training new
14  hires at Carver in -- from the time you've been
15  there, and maybe it's changed, but just going back to
16  since you've been there?
17              MR. RODGERS:  Objection to form.
18              You can answer if you know -- understand
19       the question.
20       A.      I'm not sure who would be responsible
21  for training.
22       Q.   So there isn't anybody that you know of
23  that has training responsibility at Carver Marine
24  Towing?
25              MR. RODGERS:  Objection to form.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2          A.      Not directly assigned a training spot.
 3          Q.      There's no one that has that role?
 4   That's my question.  No one has --
 5                  MR. RODGERS:  Object --
 6          Q.      No one has -- let me --
 7                  MR. RODGERS:  You're talking about on
 8          the vessel or are you talking about in the
 9          company?
10                  MR. CHAPMAN:  I'm talking about in --
11                  MR. RODGERS:  It's confusing.
12          Q.      At Carver Marine Towing, is there
13   somebody that uniquely has the responsibility for
14   training new hires?
15          A.      The master or mate, whoever that signs
16   them off in within Helm as -- and appropriate to
17   stand watch.
18          Q.      And does the master or mate that has
19   that responsibility also receive training in what
20   they're supposed to train the deckhands in?
21          A.      I don't know.
22          Q.      Is --
23                  MR. RODGERS:  Don't guess.
24          Q.      Is it spelled out anywhere in this TSMS
25   system what training is required or how it's to be
```

```
1                    Moore - April 28, 2025
2   conducted, that sort of thing?
3        A.     I would have to reference it.
4        Q.     You don't know?
5        A.     No, not off the top of my head.  I would
6   have to reference that.
7        Q.     If you turn to the next page, which is
8   151 in Exhibit 4.
9        A.     Yes, sir.
10       Q.     It says near the top, third bullet
11  down -- I think this is a continuation of the
12  Operational section.
13              It says Know their assigned duties on
14  the Station Bill?
15       A.     Yes, sir.
16       Q.     Station Bill is capitalized.
17              Do you see that?
18       A.     Mine's not.  Correction.  Yes.
19       Q.     That their --
20       A.     Station Bill, yes.
21       Q.     Yeah.
22              What is a station bill?
23       A.     A station bill is posted on all vessels
24  noting that -- during the time of an emergency or
25  incidents, where that assigns a crew member or a
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2    person in addition to crew is reporting to, and their
3    responsibilities in that role.
4          Q.    Is there a separate station bill for
5    each vessel?
6          A.    There -- I don't know off the top of my
7    head.
8          Q.    Yeah.  I'm just trying to distinguish.
9    Maybe there's a generic station bill that goes on
10   every vessel, but there might be unique station bills
11   for each vessel?
12         A.    Master would have to -- master would
13   change it and have ultimate responsibility for
14   assigning the said roles for the crews.
15         Q.    So that was going to be my next
16   question, is who prepares the station bill?
17         A.    We have a -- the generic station bill
18   that covers the roles of captain, down to -- in
19   addition to crew, and then it would be up to the
20   master each time they sail; and if they wanted to
21   change it, they would have to change it and post it.
22         Q.    And is that a document that lives in
23   this Helm system?
24         A.    Not to my knowledge.
25         Q.    Do you know whether it's covered by any
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2    separate section of the safety management system?

**3          A.      I would have to reference it in there.**

4          Q.      So you don't know?

**5          A.      No, off the top of my head.**

6                  THE VIDEOGRAPHER:  We are going off the

7          record.  The time is 1:01 p.m.

8                  (There was a recess taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025

 2            A F T E R N O O N   S E S S I O N

 3                THE VIDEOGRAPHER:  Beginning Media No.

 4       3.  We are back on the record.  The time is

 5       1:46 p.m.

 6   B R I A N   M O O R E,

 7       Having been previously duly sworn was

 8       examined and testified further as follows:

 9   EXAMINATION BY MR. CHAPMAN:  (Continued)

10       Q.    All right.  Thank you.

11             We were looking at Exhibit 4, and we

12   were on the Section 6.13 on page 153.

13       A.    Okay.

14       Q.    Let's see.  They're all bullets, but it

15   looks like eight bullets down, it says the -- for the

16   mate, captain/relief captain, his responsibilities

17   are to act as a lookout and oversee lookouts --

18       A.    Yes, sir.

19       Q.    -- right?

20             So what does it mean to oversee

21   lookouts?

22             MR. RODGERS:  Same objection.  He's not

23       here as an expert, but he'll testify as to his

24       knowledge.

25             Go ahead.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        A.    I would say when to call out a lookout,
 3   if I'm putting myself in the captain's hat on here.
 4        Q.    Have you ever assigned a lookout at any
 5   time while you were operating a vessel?
 6        A.    I have, in restricted visibility.
 7              MR. RODGERS:  What number is that?
 8              THE WITNESS:  It's eighth bottom down --
 9        eighth bullet point down.
10              MR. RODGERS:  613?
11              THE WITNESS:  Yes.
12        Q.    Is there any training on acting as a
13   lookout or overseeing lookouts within the mate's
14   responsibilities?
15        A.    No, there's no per se training.  The
16   officer of the watch would instruct the lookout to --
17   what to look out for, where we're at, identify
18   there's other vessels or buoys or anything that it
19   might see further ahead of them that wouldn't be able
20   to see them.
21        Q.    Yeah, that's great.
22              My question, is that written down
23   anywhere?  I mean, is that part of the specific
24   training or some other document that these are the
25   things you need to look for?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2         A.        No, not to my knowledge.
 3         Q.        Under Safety/Operations, the fourth
 4    bullet there says Properly relieve (or be relieved)
 5    on watch and log it.
 6                   Where are they to log it?
 7         A.        They would log it either in the rough
 8    deck log or in Helm itself.
 9         Q.        They could do it either way?
10         A.        Yeah.
11         Q.        The T -- the safety management system
12    doesn't specify whether to always do it one way or
13    the other, right?
14         A.        Not to my knowledge.
15         Q.        Where is the rough deck log kept on the
16    vessel?
17         A.        It's in the bridge, in the wheelhouse.
18         Q.        The deck log, I've seen a few pages of
19    it that were produced -- the rough deck log, a few
20    pages that were produced.
21                   It looks like it's one of those logbooks
22    that has an entry for every page of the year or a
23    page for every day of the year; is that right?
24         A.        Yeah, it's one of those red journal --
25    red journal books.
```

BRIAN MOORE

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2        Q.    So there's a 2024 log, and it starts
 3   January 1 and ends December 31, right?
 4        A.    If they're using it for that.  The
 5   official logbook's in Helm that would -- we encourage
 6   them to use.  The rough deck log would be for
 7   anything they write down.  If they're sailing and
 8   need to jot down notes or anything else, that's
 9   the -- you know, then they can clean up when they get
10   to the computer.
11        Q.    So I'm specifically interested in the
12   logbook for 2024 on the MACKENZIE ROSE.  Where is it
13   now?
14        A.    I would have to check and see where it's
15   at right now.
16        Q.    Did you give it to the lawyers?
17        A.    I don't recall.
18             MR. RODGERS:  What was that?
19             THE WITNESS:  The red logbook, the rough
20        deck log.
21             MR. RODGERS:  No.
22             What was his -- your question, Jim?
23             I didn't mean you.
24             MR. CHAPMAN:  I said did you give it to
25        your lawyers.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2                   MR. RODGERS:  Oh, okay.  Okay.
 3           Q.      So if you go over to the next page, 154.
 4           A.      Yes.
 5           Q.      At the very top, it says Ensure that all
 6   navigation is conducted clear of dangers and with due
 7   regard for prevailing conditions and vessel
 8   capabilities, including defining specific courses to
 9   be steered and any special precautions or
10   instructions required of navigation personnel.
11                   In terms of defining specific courses to
12   be steered, is there some place that that would be
13   recorded?
14           A.      They would put that on the Rose Point,
15   the electronic charting system.  They would -- that's
16   where it would have been logged.
17           Q.      Okay.  And no place else?
18           A.      No.  That -- once they got rid of the
19   paper charts, they would -- eliminated the pencil in
20   the chart.
21           Q.      Is Rose Point the vendor of the Rose
22   Point charting system or navigation system?
23           A.      Yes.
24           Q.      So you subscribe to that as well?
25           A.      Correct.
```

**BRIAN MOORE**

**April 28, 2025**

```
1                   Moore - April 28, 2025
2         Q.      And it -- does that also operate, I'll
3   call it, in the cloud?
4         A.      Actually, I don't know.  It's based --
5   it's a computer program that you download to the said
6   laptop, and so it's downloaded -- chart updates and
7   everything else is downloaded directly to -- to the
8   laptop itself.
9         Q.      Who's responsible for updating it?
10        A.      The master or mate.
11        Q.      So maybe my question's not clear, so I
12  apologize for that.
13               I'm trying to figure out, the Rose Point
14  pushes out, I'll call them updates --
15        A.      Yes.
16        Q.      -- to the system from time to time.  I
17  don't know if they have like a regular release
18  schedule, that sort of thing.
19               Does that have to be downloaded to the
20  laptop on the boat?
21        A.      Yes.  It would be -- when you sync the
22  program to get your weekly updates, it would also
23  download any operational updates, from my knowledge.
24        Q.      And that's what, a weekly sync --
25        A.      It's --
```

BRIAN MOORE

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2        Q.      -- synchronization?
 3        A.      It's up to the vessel, but it's to be
 4   done weekly, and you have to prompt it to do it.
 5        Q.      So is there a specific day of the week?
 6        A.      No.
 7        Q.      Is the specificity around doing it on a
 8   weekly basis laid out somewhere in the safety
 9   management system?
10        A.      I believe so, but I -- correction.  I
11   don't know off the top of my -- off the top of my
12   head.
13        Q.      Was anything downloaded from the Rose
14   Point system on the MACKENZIE ROSE immediately after
15   the allision with the bridge on June 15, 2024?
16        A.      The file -- the Rose Point screen
17   display, like file format, was downloaded after they
18   arrived in New York Harbor, and that's broken out
19   in -- I believe it's in one-hour increments.
20        Q.      And how -- when you say it was
21   downloaded, is that right --
22        A.      Yeah, correct.
23        Q.      -- if I understand that correctly?
24        A.      Yep.
25        Q.      So what duration was downloaded?
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2         A.     I don't know off the top of my head.
 3    Before and after the incident, I couldn't tell you.
 4    I know it was during the incident, but I would have
 5    to reference the time -- time stamp.
 6         Q.     What was done with it --
 7         A.     It was e-mailed --
 8         Q.     -- once it was downloaded?
 9         A.     It was e-mailed over to somebody in the
10    Carver team.
11         Q.     Somebody with --
12         A.     Somebody in the Carver team, either
13    Lenny or whomever.
14         Q.     Did anybody provide it to the Coast
15    Guard?
16         A.     Yes.
17         Q.     Do you know who?
18         A.     I believe Lenny did it.
19         Q.     Has anything been done, to your
20    knowledge, to delete that information from the Rose
21    Point system on the MACKENZIE ROSE?
22         A.     The Rose Point data backup is only for
23    30 days.  So that's why after a post-incident, we
24    extract the file to save it as its entirety.
25         Q.     As part of your investigation, did you
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    review the Rose Point data once it was downloaded?
 3        A.    I did.
 4        Q.    And what did you observe relative to
 5    the --
 6              MR. RODGERS:  Objection to form.
 7              You can answer if you remember.
 8              MR. CHAPMAN:  Well, let me finish my
 9        question.
10              MR. RODGERS:  Sure.
11        Q.    What did you observe relative to the
12    allision with the bridge from the Rose Point data?
13              MR. RODGERS:  Well, you know, just don't
14        answer yet.
15              THE WITNESS:  Sure.
16              MR. RODGERS:  I'd prefer you show him
17        the Rose Point data.
18              MR. CHAPMAN:  I don't have it.  Okay?
19        You guys haven't --
20              MR. RODGERS:  How can you not have it?
21              MR. CHAPMAN:  Because you haven't
22        produced it.
23              MR. RODGERS:  We've produced it.
24              MR. CHAPMAN:  I have -- no, you didn't.
25        I have the Rose Point data that runs all the way
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2         up to about the Gilmerton reach in the southern
 3         branch of the Elizabeth River, and that's the
 4         last data.  It never gets the vessel up to the
 5         bridge.
 6               So I'm just asking this witness what did
 7         he see.
 8         A.    I would have to --
 9               MR. RODGERS:  Go ahead.  Yeah, if you
10         remember what you saw, go ahead.
11         A.    It'd be better off to reference it
12  again.
13         Q.    I'm just testing your memory of what --
14         A.    Yeah, which I -- I understand.
15         Q.    What do you remember?
16         A.    It was -- I remember him coming around
17  and not having any -- any hard course changes and
18  kind of just gradualently [sic] constant radius turn
19  right into it.  But it doesn't overlay the length of
20  the barge.  It's not like a ship's overlay.  It
21  doesn't show you like true length, width.  It just
22  shows you the icon for the vessel.
23         Q.    Hitting the west pier of the bridge?
24               MR. RODGERS:  Objection.
25         A.    Into the area --
```

BRIAN MOORE

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2              MR. RODGERS:  Objection.  You're asking
 3        him if the Rose Point shows the hit?
 4        A.    It doesn't --
 5              MR. RODGERS:  Whatever you remember
 6        or -- you can answer.
 7        A.    Right.  It doesn't clearly show the
 8   icon.
 9        Q.    It shows it tracking towards the west
10   pier of the bridge?
11        A.    Close to the west pier where the --
12        Q.    And can you see the vessel then
13   reversing and kind of backing away from the bridge?
14              MR. RODGERS:  On the Rose Point?
15              MR. CHAPMAN:  On the Rose Point, yes.
16        A.    Yes.  It -- it tracks the whole thing,
17   every minute.
18        Q.    But my question is very specific.
19              Can you see on the Rose Point the vessel
20   backing away from the western pier of the bridge?
21              MR. RODGERS:  On the Rose Point?
22        A.    Yeah, you could see the vessel backing
23   away from the cluster of the bridge.  It's -- it's
24   not like it's definitive, but yes, it does back away
25   after it.
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2         Q.      And I don't know how definitive the Rose
 3    Point data is, but can you see it as it transits
 4    through the opening of the bridge through the
 5    channel?
 6         A.      Yes.
 7         Q.      And did it appear to contact either the
 8    western or the eastern fender when doing so?
 9         A.      It was -- it favored the western end of
10    the channel.
11         Q.      Could you tell whether it contacted the
12    western fender?
13         A.      No, I can't from visual.
14         Q.      If you could turn to the next page which
15    is, I think, Distracted Operations.
16         A.      Yep.  7.2.
17         Q.      Yeah, Section 7.2.  And the reference is
18    to Carver 908.
19                 MR. RODGERS:  What number is -- 908?
20         Okay.  Got you.
21                 MR. CHAPMAN:  908, yeah.
22         Q.      So in the third sentence of that first
23    paragraph, it says Examples of inattentive operations
24    can include eating, drinking, smoking, use of
25    personal electronics devices including
```

**BRIAN MOORE**

**April 28, 2025**

1                     Moore - April 28, 2025

2    nontask-related cell phone use, and distractions that

3    take you away from your primary duties/tasks for the

4    safe operation of the vessel.

5                     So basically, Carver is spelling out

6    those are not allowed during the vessel operation,

7    right?

8         **A.      Correct.**

9         Q.    Is this section unique to the master or

10   the officer of the watch?

11        **A.      This would be for the officer of the**

12   **watch.**

13        Q.    Okay.  Because I just -- I -- it didn't

14   say that it was --

15        **A.      True.**

16        Q.    -- specifically, and that's what I'm

17   trying to understand.

18        **A.      Connection.  It doesn't define that.  It**

19   **could be any of the crew members aboard the vessel,**

20   **if it's a deckhand, engineer, or whatever it may be.**

21        Q.    As part of your investigation with

22   Mr. Baldassare, did you ever learn that Captain

23   Morrissey was distracted in any way during his

24   operation of the vessel as a cause of the allision?

25        **A.      Not to my knowledge.**

**BRIAN MOORE**

**April 28, 2025**

```
1                 Moore - April 28, 2025
2        Q.    Did you ask him to provide his cell
3   phone to you to see whether it indicated whether he
4   had been using it at the time of the allision?
5        A.    We did not.
6        Q.    Was any inquiry made of him whether he
7   was eating, drinking -- I don't know whether he
8   smokes or not, but -- or smoking at the time of the
9   allision?
10       A.    I didn't do the interview, so Lenny
11  would know that one.
12       Q.    Is there any requirement in this
13  distracted operations to place your cell phone in
14  airplane mode when you are the officer of the watch?
15       A.    Not to my knowledge.
16       Q.    So if you turn to the next page, which
17  is -- starts with Carver 8998, and titled 7.3
18  Master's Daily Vessel Reporting.
19             I don't know whether there's actually a
20  section in the TSMS titled 7.3 Master's Daily Vessel
21  Reporting or if it's only this form that has to be
22  filled out.  Do you know?
23       A.    I believe this is the form number in
24  Helm.
25       Q.    Yeah.  No, I get that.
```

BRIAN MOORE

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2              What I'm trying to figure out is whether
 3     there's a separate section in the TSMS that may have
 4     the title 7.3 Master's Daily Vessel Reporting.
 5         A.    I don't know off the top of my head.  I
 6     have to reference it.
 7         Q.    So this is a -- I'll call it a blank
 8     form which has been printed out and it's kind of --
 9     nobody's entered any data in it, correct?
10         A.    Yes, sir.
11         Q.    And it runs through page 906, right?
12         A.    Yes, sir.
13         Q.    This is submitted in Helm every day,
14     right?
15         A.    Correct.
16         Q.    Or should be?
17         A.    Yes, sir.
18         Q.    And who at Carver reviews these forms
19     for, I'll call it, compliance, right?
20         A.    They are -- it's not auto populated to a
21     specific individual.  They're just there for
22     reference, and if it's not done by the captain or
23     crew, it does get added -- flagged as incomplete, so
24     then that would raise a flag of they didn't do it.
25         Q.    So in the Helm system, there's like a
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    red mark or some kind of notification --
 3         A.      Correct.
 4         Q.      -- that tells you that the form has not
 5    been completed?
 6         A.      Correct.
 7         Q.      And how soon after the day is over does
 8    that red mark appear?
 9         A.      I don't know off the top of my head.
10         Q.      Who monitors that?
11         A.      Everybody has the opportunity to monitor
12    it.
13         Q.      When you say everybody, you mean you do?
14         A.      Yeah.  Everybody within the Carver
15    Marine Towing division.
16         Q.      Okay.  So Mr. Baldassare would?
17         A.      He would also have access to it, yes.
18         Q.      So just looking at this form, it looks
19    like there's a number of fields that have to be
20    filled out, and then they say, over on the right-hand
21    side of each page, Required.
22                 Do you see that?
23         A.      Yes, sir.
24         Q.      And then there's a few that have --
25    looks like a -- is this a drop-down menu?  Like on
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   the page 899, it says Lookout?
 3         A.      Lookout also has the options, 1.13.
 4         Q.      Yeah.  It looks like it's required to be
 5   filled out, if that's what that word required means,
 6   but that it's a drop-down or say which -- it says no,
 7   yes or N/A.
 8         A.      Correct.  To complete the form, all of
 9   the required boxes would have to be acknowledged.
10         Q.      So only to finish until you filled out
11   all the required?
12         A.      Correct.
13         Q.      Okay.  So I presume N/A means not
14   applicable?
15         A.      Yes.
16         Q.      Is --
17              MR. RODGERS:  I'm sorry.  What Bates
18         stamp number are you on?
19              MR. CHAPMAN:  899.
20              MR. RODGERS:  899?
21              MR. CHAPMAN:  Yeah.
22         Q.      And if the Lookout box is checked yes,
23   then there should be somebody's name in the next box,
24   1.14?
25         A.      Yes, sir.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2        Q.      And the times that the lookout was on
 3   watch, right?
 4        A.      Yes, sir.
 5        Q.      There's not a regular review of these,
 6   like somebody sits down at the end of every week and
 7   checks how they --
 8               MR. RODGERS:  Objection to form.
 9        Q.      -- checks how they filled them out or
10   that sort of thing?
11               MR. RODGERS:  Did you get -- did you get
12        that?
13               (The record was read.)
14               MR. RODGERS:  Okay.  Objection, form.
15               You can answer, Brian.
16               THE WITNESS:  Okay.
17               MR. RODGERS:  Sorry.
18               Sorry, Jim.
19        A.      I don't believe that there's somebody
20   who individually looks at them.
21        Q.      Nobody is tasked with that
22   responsibility?
23        A.      Correct.
24        Q.      Okay.  Then it looks like on pages 905
25   and 906, there's some certification requirement.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          A.      Correct.
 3          Q.      And if I'm reading this correctly, on
 4   page 906, both the captain and the mate must sign
 5   this form, right?
 6          A.      Yes.
 7          Q.      So is there any place in this log where
 8   it's required to note an incident that has occurred
 9   during this date that it's being submitted for?
10          A.      No, not on this form.  This form is done
11   at the end -- correction, at the beginning of every
12   day, prior to anything transpiring.
13          Q.      When you say at the beginning, like
14   12:01 a.m.?
15          A.      Correct.
16          Q.      So it's really a review of the prior
17   day?
18                  MR. RODGERS:  Objection to form.
19                  MR. CHAPMAN:  Good objection.
20          Q.      It's a log of the activities of the
21   prior day; is that correct?
22          A.      I don't know if I could answer that
23   correctly.
24          Q.      Well, it's a 24-hour log, right?
25          A.      Correct.
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2        Q.      So it's either the day of or the day

3    before, depending on when it's filled out?

4        **A.      Correct.**

5        Q.      If you wanted to create a report or

6    print out a period of time for the specific vessel,

7    MACKENZIE ROSE, say nine months or ten months, what

8    would you have to do in the Helm system to produce

9    that?

10       **A.      That would require a lot of work**

11   **individually, I believe.  You would have to go**

12   **through each individual day and pull each individual**

13   **log and save it as a PDF.**

14       Q.      And when you save something as a PDF, is

15   there like a Save to PDF button or how does that

16   work?

17       **A.      I would have to reference it again, but**

18   **you can go to Print and then you can change your**

19   **formatting from Printer to a PDF.**

20       Q.      Okay.  So if you could turn to the next

21   Section 7.4 on Vessel Manning --

22       **A.      Yes, sir.**

23       Q.      -- which is Carver 909.

24               I should ask.  There's a few pages in

25   here that have photographs imbedded in them.

```
 1                   Moore - April 28, 2025
 2               Are these photographs that Carver has
 3     included or are these photographs that whoever you
 4     buy the system from has included?
 5        A.        These photographs are supplied by TBS.
 6        Q.        Basically, this is just a direction that
 7     you have to man the vessel in accordance with the
 8     certificate of inspection, correct?
 9        A.        Correct.
10        Q.        Can you turn to Section 7.12.  It is
11     Carver Bates numbered 910.
12        A.        What section was that again?
13        Q.        It's called Bridge Transit, 7.12.  It is
14     towards the end of that document.
15        A.        And the Bates number was?
16        Q.        910.
17               It looks like this.  There's a big
18     yellow bar in the middle of it.
19        A.        Okay.
20        Q.        Found it?
21        A.        Bridge Transits.  Yeah.
22        Q.        So I don't know what 7.10 or 7.11 say,
23     but what's the reason for having a separate section
24     in the safety management system regarding bridge
25     transits?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2               MR. RODGERS:  Objection to form.
 3               You can answer if you know.
 4        A.    I don't know.
 5        Q.    Is it because they're a hazardous
 6   navigational system?
 7               MR. RODGERS:  Objection.
 8        A.    No.
 9        Q.    So would you agree with me that every
10   bridge has a certain width that you've got to pass
11   the -- whatever you're -- whether it's your tug or
12   you're pushing a barge through --
13        A.    Correct.
14        Q.    -- right?
15               So it's a restricted channel?
16               MR. RODGERS:  Objection.  He's not here
17        as an expert.
18               You can answer as to your knowledge.
19        A.    I wouldn't say it's a restricted
20   channel.
21        Q.    You would not?
22        A.    No.  It's an everyday navigational
23   channel, especially in Norfolk or New York.
24        Q.    Have you operated a tug in the southern
25   branch of the Elizabeth River?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2        A.     I have spent a lot of time in the
 3   southern branch.
 4        Q.     And that's not for Carver, though?
 5        A.     Yep.  With K-Sea Transportation and Vane
 6   Brothers.
 7        Q.     Okay.  So there are -- do you know where
 8   they picked up this barge in Norfolk, or actually in
 9   Chesapeake?
10        A.     Reference to the area?  Yes, I'm
11   familiar with it, all the way down the -- near the
12   end.
13        Q.     Yeah.
14               So it was picked up at a company called
15   Coastal Precast Systems.
16        A.     Correct.
17        Q.     A barge loaded with some kind of recast
18   concrete --
19        A.     Yes, sir.
20        Q.     -- cargo, right?
21        A.     Yep.
22        Q.     And do you know how many bridges they
23   had to transit to get out to the sea buoy?
24        A.     Not off the top of my head.
25        Q.     More than one?
```

```
 1                    Moore - April 28, 2025
 2          A.       More than one, correct.
 3          Q.       More than two?
 4          A.       More than two.
 5          Q.       Was there any bridge planning that you
 6    know of or that you learned of during your
 7    investigation?
 8                   MR. RODGERS:  Objection to form.
 9                   You can answer if you understand the
10          question.
11          A.       They would have made radio contact with
12    the bridge operators that are in the close --
13    enclosed conditions.  Other than that, it's a fairly
14    open channel of water.
15          Q.       So was there any consideration that you
16    know of given to assigning a crew member with a radio
17    to the head of the tow?
18                   MR. RODGERS:  Objection to form.
19          A.       Not to my knowledge.
20          Q.       The vessel had handheld radios, correct?
21          A.       Correct.
22          Q.       Right in the middle of that page,
23    there's this kind of highlighted statement, sort of
24    yellow or orange in color.
25                   It says Under no circumstances shall the
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2    wheelman responsible for the transit make the bridge
 3    due to pressure or pride.
 4                   What is the purpose of that statement?
 5                   MR. RODGERS:  Objection to form.
 6                   You can answer.
 7         A.        I don't know.
 8         Q.        Well, if you were the operator of the
 9    tug and read that before you made a bridge transit,
10    what would be your takeaway?
11                   MR. RODGERS:  Objection.  It calls for
12         speculation and opinion.
13         A.        Well, I don't know how to answer that
14    one.
15         Q.        I'm sorry?
16         A.        I don't know how to answer that one.
17         Q.        Well, so you're the general manager of
18    Carver.
19         A.        Yes.
20         Q.        And you expect your employees to follow
21    what's in this safety management system, right?
22         A.        Correct.
23         Q.        So what is your expectation about what
24    they're going to do when it says Under no
25    circumstances, shall the wheelman responsible for the
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   transit make the bridge due to pressure or pride?
 3                    MR. RODGERS:  Objection to form.
 4        A.    The -- I'm --
 5                    MR. RODGERS:  Don't guess.
 6              THE WITNESS:  Yep.
 7                    MR. RODGERS:  Whatever you know.  Tell
 8        him what you know.
 9        A.    I don't know.
10        Q.    You don't know?
11        A.    I don't know what this statement would
12   lean to.
13        Q.    Not even an inkling?
14                    MR. RODGERS:  Objection.  He's -- you're
15        harassing the witness, Jim.
16        A.    I didn't build -- I didn't make this
17   SMS, so it was here prior to me, so I'm not sure.
18        Q.    Have you ever reviewed the safety
19   management system in your role as general manager?
20        A.    I've gone through it, yes.
21        Q.    So when you've gone through it in the
22   past and you got to this place, what did it occur to
23   you was meant by it?
24                    MR. RODGERS:  Objection.
25        A.    This is just one sentence out of
```

BRIAN MOORE

**April 28, 2025**

```
 1                     Moore - April 28, 2025
 2     thousands in this whole thing to review.  So I don't
 3     have a clear definitive answer for this statement.
 4          Q.    The section right underneath it is
 5     called Safety Briefing, on this page.
 6                Do you see that?
 7          A.    Yep.
 8          Q.    In your investigation with
 9     Mr. Baldassare, did you find that the -- a captain
10     responsible for the transit through the belt line
11     bridge on June 15th, 2024 briefed the crew on the
12     planned transit?
13          A.    I would have to reference that with
14     Lenny -- or refer that to Lenny, because it was
15     during his initial interviews with the crews.
16          Q.    You didn't ask?
17          A.    No, I did not.
18          Q.    Do you know whether -- under the next
19     section that says During the transit, the first
20     bullet says Radar should be on and set to the proper
21     range.
22                Do you know whether the radar was in
23     use?
24          A.    Not to my -- I -- I don't know, to my
25     knowledge.
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2                MR. RODGERS:  Just to be clear, at the
3          time of the incident?
4                MR. CHAPMAN:  Yes.
5                MR. RODGERS:  Okay.  That's the question
6          he's asking you.
7        A.    Yeah, I -- I don't know off the top of
8    my head, to my knowledge.
9        Q.    Is that information contained in the
10   Rose Point data that was downloaded?
11       A.    It is not.
12       Q.    Where would one obtain that information
13   if you wanted to know whether the radar was in use at
14   the time of the allision?
15       A.    I don't know where you would get that
16   from.
17       Q.    Then the third bullet under During
18   Transit, it says Post lookouts as necessary on the
19   tow.
20               Do you see that?
21       A.    Yes, sir.
22       Q.    Is there any training provided by Carver
23   regarding the circumstances under which lookouts
24   should be posted as necessary on the tow during a
25   bridge transit?
```

**BRIAN MOORE**

**April 28, 2025**

```
1                  Moore - April 28, 2025
2          A.      I would have to reference the SMS on
3   what the requirements would be for.
4          Q.      So there might be some other section of
5   the SMS; is that what you're saying?
6          A.      It's possible.  I would need to look
7   into it.
8          Q.      So if you could turn to Section 7.5.
9   It's a little before 7.12 there.
10         A.      Okay.
11         Q.      And the page is Carver 000816.
12                 MR. RODGERS:  7.15?
13                 MR. CHAPMAN:  No.  7.5.
14                 MR. RODGERS:  Oh, okay.
15         A.      Got it.
16         Q.      Okay.  Towards the bottom of page 816,
17  it says Towing vessels must be equipped with the
18  following equipment as applicable to the area of
19  operation.  The first bullet is a fathometer.
20                 Is the MACKENZIE ROSE equipped with a
21  fathometer?
22         A.      Correct.
23         Q.      And do you know whether it was in use at
24  the time of the allision with the Belt Line Bridge?
25         A.      It's always in use.  It doesn't turn
```

```
 1                    Moore - April 28, 2025
 2    off.
 3         Q.    Yeah.
 4               Is that reflected in the Rose Point
 5    data?
 6         A.    No.  They're not synced.
 7         Q.    So -- but you -- but it -- to your
 8    knowledge, it's always on --
 9         A.    Correct.
10         Q.    -- right?
11               And what information will a fathometer
12    tell you?
13         A.    The under keel clearance from the
14    tugboat.
15         Q.    And do you know how deep draft the
16    MACKENZIE ROSE is?
17         A.    At the time, no, I don't know.  I have
18    an idea.  She drafts 15 to 16 feet.
19         Q.    And then the fathometer would tell you
20    how much clearance there is underneath that keel
21    draft --
22         A.    Correct.
23         Q.    -- to the bottom?
24         A.    Correct.  To the sensor on the bottom.
25         Q.    And a little further down, it's like the
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2     third bullet from the bottom, it says Radars --
 3          A.      Yes, sir.
 4          Q.      -- as a piece of equipment.
 5                  Do you know how many radars there are on
 6     the MACKENZIE ROSE?
 7          A.      There's two radars.
 8          Q.      And the next bullet down, Handheld VHF.
 9                  I assume that's a radio --
10          A.      Correct.
11          Q.      -- right?
12                  Do you know how many handheld VHFs the
13     MACKENZIE ROSE has as a complement?
14          A.      More than two.  I don't know exact
15     number, though.
16          Q.      Okay.  You can turn to the next page,
17     please.
18                  In the first section there under
19     Maintenance of Navigation Equipment, it looks like
20     there's three paragraphs, but in the middle
21     paragraph, the longer of the three, last sentence
22     says The failure and subsequent repair or replacement
23     of navigational safety equipment must be recorded.
24     The record must be in the TVR, official logbook, or
25     in accordance with the HSP applicable to the vessel.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2              Can you tell us what a TVR is.
 3        A.      I don't know off the top of my head.  I
 4   believe it's the old towing vessel record that they
 5   used to utilize before the digital logs.
 6        Q.      Before what?
 7        A.      Digital logs.
 8        Q.      Okay.  And then the official logbook, is
 9   it -- what is that?
10        A.      It would be Helm, the logbook entries in
11   Helm.
12        Q.      So is the TVR the old deck log that sits
13   in the wheelhouse?
14        A.      I -- from my history, I think -- believe
15   the TVR is where -- the old blue logbook entries that
16   you would submit every day as like a running deck
17   log -- correction, as a running logbook entry.
18        Q.      So it would still be submitted
19   electronically?
20        A.      TVRs were a hard copy blue book binder
21   that was on the older towing vessels.
22        Q.      Okay.  And then the last one, it says Or
23   in accordance with the HSP applicable to the vessel.
24              What is an HSP?
25        A.      I don't know.  I'd have to look at the
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    key, but I couldn't tell you exactly with that one.
 3         Q.    So when you say the key, there's a key
 4    or a glossary or something for those --
 5         A.    If there was one.  You would have to
 6    find a reference somewhere else.
 7         Q.    Okay.  Then the next section says Use of
 8    auto pilot, (if equipped)?
 9         A.    Yep.
10         Q.    So is there any time that an auto
11    pilot -- that auto pilot use is prohibited by the
12    company?
13              MR. RODGERS:  I'm sorry.  By the SMS or
14         some other group?
15              MR. CHAPMAN:  I'm just asking about
16         Section 7.5 on navigation.  It says use of auto
17         pilot (if equipped).
18         Q.    Is there any time that the company
19    prohibits the use of the auto pilot system?
20         A.    I would have to reference the SMS again.
21         Q.    You would agree with me that this
22    section doesn't prohibit it, though; is that right?
23              MR. RODGERS:  Objection.  Speaks for
24         itself.  Document speaks for itself.  You can
25         answer, if you read it and look at it.
```

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2       A.     Right, I don't see anything in here that
 3  says that.
 4       Q.     I'm sorry.  What was your answer?
 5       A.     Oh.  So I don't see anything that says
 6  that.
 7       Q.     Okay.  It does call out that when it's
 8  used in three different situations, the master has to
 9  ensure several things identified in those three
10  bullets, correct?
11       A.     Correct.
12       Q.     Has the section on Use of Auto Pilot
13  changed at all since June 15th, 2024?
14       A.     Not to my knowledge.
15       Q.     Okay.  The MACKENZIE ROSE is equipped
16  with an auto pilot system, isn't it?
17       A.     Correct.
18       Q.     And it has two stations, right?
19       A.     Yes.
20       Q.     One in the wheelhouse and one in the
21  upper wheelhouse?
22       A.     Correct.
23       Q.     And the next section titled Observing
24  the "Lookout" Policy, which states -- it's got a --
25  it looks like, in quotation marks, the company's
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    policy on lookouts, right?
 3          A.      Yes, sir.
 4          Q.      Okay.  And then it goes on to say that
 5    the vessel operator shall appoint and instruct a
 6    qualified person to perform lookout duties in any
 7    situation deemed appropriate by the operator.
 8                  What training is the operator provided
 9    on making the determination as to whether it is
10    appropriate to appoint a lookout?
11          A.      I would have to reference the SMS on
12    that one directly.
13          Q.      Do you know if there's a section of this
14    safety management system that covers training?
15          A.      I would have to reference it as well,
16    too.
17          Q.      A little further down under this same
18    section, it says In any situation he/she deems
19    appropriate, the vessel captain on watch shall take
20    precautions including, but not limited to, the
21    following, and then there's, it looks like, seven
22    bullets.
23                  And the fourth one is Communicating with
24    the company dispatcher in accordance with the vessel
25    to dispatcher communications procedure.
```

```
 1                   Moore - April 28, 2025
 2                   What is the vessel to dispatcher
 3     communications procedure?
 4          A.      I don't know of a procedure in this SMS
 5     for that.
 6          Q.      Okay.  Is there any logging of
 7     communications between the vessel and the dispatcher?
 8          A.      There is not.
 9          Q.      There's discussion or some information
10     about electronic charts and publications on page 819
11     of Section 7.5.
12          A.      Okay.
13          Q.      I understood your prior description of
14     the Rose Point system is it has all of the charts in
15     it, right?
16          A.      It has all the charts designated to the
17     vessel's area, yes.  You can download additional
18     charts, if you were to transit somewhere else.
19          Q.      So was it confirmed that the vessel, the
20     MACKENZIE ROSE, had the, I'll call them, necessary
21     charts or the charts that covered this segment of the
22     transit from Coastal Precast on the southern branch
23     of Elizabeth River to wherever it was going in New
24     Jersey?
25          A.      Yes.  The captain would also, or the
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   mate, ensure that the -- prior to any voyage, that it
 3   has the appropriate charts -- every voyage it has the
 4   appropriate charts.
 5        Q.      And does he log that somewhere?
 6        A.      No.  There is a -- no, there's no logs
 7   for that.
 8        Q.      And how does he know that he has all the
 9   charts, then?
10        A.      He would probably -- well, assumption,
11   but you would have to know where your origin and
12   destination port is, and then scroll through Rose
13   Point to ensure that every chart is there, from start
14   to end.
15        Q.      So it's basically a manual check --
16        A.      Correct.
17        Q.      -- on what electronic information is in
18   Rose Point?
19        A.      Correct.
20        Q.      And if he is missing a chart, what then?
21        A.      I would have to reference it, but you
22   can then go into the chart catalogue and then
23   download said chart that you need.
24        Q.      And the company pays the bill for that?
25        A.      Yeah.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2      Q.    All right.  Moving to the Section 7.9 on
 3   Voyage Planning.  It's the next one in there --
 4      A.    Okay.
 5      Q.    -- which is Carver 897.
 6            Do you have that?
 7      A.    Yes.
 8      Q.    It mentions in that first paragraph The
 9   Voyage Planning Data Book is to be used for the
10   planning as well as the following.
11            And what is the Voyage Planning Data
12   Book?
13      A.    It is a form in -- within Helm that
14   covers from Maine all the way down to Florida and the
15   Gulf of Mexico region of particulars to look out for;
16   bridges, navigation, obstructions, vessel traffic
17   services, and other local knowledge that might be
18   prudent to the voyage.
19      Q.    So it's a Helm form labeled 7.9 or
20   something?
21      A.    Yeah.  Not necessarily a form, but it is
22   a document contained inside of Helm.
23      Q.    And does it have to be filled out in
24   some way?
25      A.    That is not filled out.  That is just a
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2     document that they can open up and reference for
 3     their area.
 4          Q.    Under the first bullet, it says
 5     Applicable information from nautical charts and
 6     publications.  See paragraph (b) of some other
 7     section.  I don't know what 164.72 is.  But including
 8     Coast Pilot, Coast Guard Light List and Coast Guard
 9     Local Notice to Mariners for the port of departure,
10     all ports of call and the destination.
11                    Do you know whether horizontal bridge
12     clearances would be on either the charts or the Local
13     Notice to Mariners or the Coast Pilot?
14          A.    The bridges you mentioned are located on
15     all charts, navigation charts.
16          Q.    You can see basically where the channel
17     opening is and then where the obstructions are, if
18     there are any?
19          A.    Yeah, correct.  Within the navigational
20     channel, and it also identifies the air clearance,
21     vertical clearance, horizontal clearance, and the
22     type of bridge it is.
23          Q.    About midway down, the -- it looks like
24     the fourth bullet says Forward and after drafts of
25     the barge or barges and under keel and vertical
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    clearances (air gaps) for all bridges, ports and
 3    berthing areas.
 4              Is there some specific section of this
 5    data -- voyage planning data book that highlights all
 6    that or spells it out that you have to consider when
 7    you're making or planning a voyage?
 8         A.    You would reference the voyage planning
 9    data book.  As for the air drafts and horizontal
10    clearances, that, I do not know, but you would
11    reference the navigational chart.
12         Q.    Are the drafts, forward and after drafts
13    of the barges or barge, actually recorded somewhere?
14         A.    I would have to reference into that,
15    where they would enter that in.
16         Q.    Okay.  The last two bullets in this
17    section are The voyage plan is recorded on 7.9 Voyage
18    Planning Form.
19              So it sounds like there is a form to be
20    filled out for the voyage planning?
21         A.    There is, but you would note your deep
22    draft of the vessel --
23         Q.    Okay.
24         A.    -- not necessarily the barge, I believe.
25         Q.    The Voyage Planning Form, who fills that
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    out?
 3         A.    The officer of the watch, if it's -- it
 4    could be the captain or the mate, whoever's doing it
 5    prior to departure.
 6         Q.    Whoever the person that's on watch --
 7         A.    Correct.
 8         Q.    -- that has the license?
 9         A.    Yep.
10         Q.    Okay.  And then last, it says Conduct a
11    risk assessment using 9.4 Risk Assessment form -- or
12    excuse me, 9.4 Risk Assessment-GAR form.
13               Do you know what that is?
14         A.    I know what the Risk Assessment form is.
15    I don't know what -- I don't know what GAR stands
16    for.
17         Q.    So is a Risk Assessment form something
18    else that also has to be filled out?
19         A.    Only if it's outside of the ordinary
20    operations.
21         Q.    And is there something that specifies
22    when you have to fill out the Risk Assessment form
23    and when it's not required?
24         A.    I would have to look at 9.14, the risk
25    assessment.
```

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2        Q.      You said 9.14?
 3        A.      Oh, sorry.  Correction.
 4                9.4.  I would have to reference the risk
 5   assessment.
 6        Q.      Okay.  Well, that wasn't in the
 7   documents that were produced, so we'll figure that
 8   out.
 9                So the next section is 7.9K titled
10   Navigation Watch Assessment, Norfolk, Virginia Data.
11                Do you see that?
12        A.      Yes, sir.
13        Q.      Starts on page Carver 000194, right?
14        A.      Yes.
15        Q.      So we looked at 7.9, Bridge Planning,
16   and now we're kind of -- the next thing that was
17   produced to us, anyway, was 7.9K, which looks like it
18   covers just Norfolk, Virginia, and the southern
19   branch; is that right?
20        A.      Yes, I believe so.
21        Q.      It looks to me like it includes a few
22   bridges in Norfolk or along the southern branch; is
23   that correct?
24        A.      Yes.
25        Q.      And it looks like the -- it starts with
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    the Norfolk and Portsmouth Belt Line Bridge, right?
 3         A.      Yes.
 4         Q.      And that's at mile marker 9.9, right?
 5         A.      Correct.
 6         Q.      And mile marker 9.9 is with reference to
 7    what?
 8         A.      That one, I do not know off the top of
 9    my head.
10         Q.      Okay.  But -- and that's measured in
11    nautical miles, isn't it?
12         A.      Mile markers on the intercoastal I
13    believe are measured in statute miles.
14         Q.      Statute miles?
15         A.      Correct.
16         Q.      Okay.
17         A.      And then -- it's an assumption, but...
18         Q.      All right.  So -- then the next page has
19    got the Jordan Bridge and the Norfolk Southern
20    Railway Bridge, and then the last two on the
21    following page are the Gilmerton Bridge and the I-64
22    Bridge, and the location of each bridge.  The mile
23    marker location is stated for each, right?
24         A.      Correct.
25         Q.      So if I told you that during this
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    transit from Coastal Precast Systems, the barge being
 3    pushed by the tug had to transit from the Gilmerton
 4    Bridge or through the Gilmerton Bridge, through the
 5    Norfolk Southern Railway Bridge, through the Jordan
 6    Bridge and ultimately, to arrive at the Norfolk and
 7    Portsmouth Belt Line Bridge, that would involve a
 8    transit of a little over five miles, assuming those
 9    mile marker locations are correct?
10         A.    Correct.
11         Q.    Okay.  And during your investigation,
12    did you learn anything about the speed of the
13    MACKENZIE ROSE while it was made up and pushing gear
14    to the barge from when it left the dock at Coastal
15    Precast to up until it allided with the bridge?
16         A.    I would have to reference the Rose Point
17    data.  I don't remember it specifically.
18         Q.    That would -- that is a data point that
19    would be contained in the Rose Point data?
20         A.    Correct.
21         Q.    And do you know how often that data is
22    captured in Rose Point?  Like is it every minute,
23    every 30 seconds, or do you know?
24         A.    It's very frequent.  I don't know
25    exactly how many seconds in between.
```

**BRIAN MOORE**

**April 28, 2025**

| | |
|---|---|
| 1 | Moore - April 28, 2025 |
| 2 | Q.    And I think you said earlier you can |
| 3 | look at it in like one hour chunks -- |
| 4 | A.    Correct. |
| 5 | Q.    -- right?  Okay. |
| 6 | Incident to your investigation, did you |
| 7 | ever see any video of the barge in operation before |
| 8 | it allided with the bridge? |
| 9 | MR. RODGERS:  Before he met with his |
| 10 | attorneys? |
| 11 | MR. CHAPMAN:  Yeah.  I'm asking during |
| 12 | his investigation. |
| 13 | MR. RODGERS:  Okay. |
| 14 | MR. CHAPMAN:  Yeah. |
| 15 | A.    Yeah, only with counsel that I had seen |
| 16 | the -- |
| 17 | MR. RODGERS:  All right.  No, that's |
| 18 | what you looked at. |
| 19 | MR. CHAPMAN:  That's fine. |
| 20 | MR. RODGERS:  So just -- I'm sorry, Jim. |
| 21 | So he's clear, you didn't -- during your |
| 22 | investigation, you didn't look at the video? |
| 23 | THE WITNESS:  I seen the video after the |
| 24 | fact with counsel. |
| 25 | MR. RODGERS:  Okay. |

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2            THE WITNESS:  That wasn't provided
 3       before that to me.
 4       Q.    Okay.  If you could look on page 199 of
 5   Section 7.9K.  At the very end, it has something
 6   that's called a Disclaimer.  7.9.K.9, Disclaimer?
 7       A.    Yes, sir.
 8       Q.    So is that a disclaimer that the --
 9   this, you know, marine safety and compliance group,
10   TBS group, whoever supplied this system to you
11   included, or is this a disclaimer by Carver that is
12   included in its own safety management system?
13       A.    This all came directly from Tug & Barge,
14   TBS, Tug & Barge Solutions.
15       Q.    Okay.  So then the next section is 7.9P,
16   starting at page Carver 000201.
17       A.    Yes, sir.
18       Q.    It says Safety Management Form, 7.9P,
19   Navigation watch assessment in Norfolk, Virginia to
20   North Carolina/South Carolina state line data.
21            So it looks like it covers about 340
22   miles of the intercoastal from mile marker zero down
23   to mile marker 340.8; is that right?
24       A.    Yes.
25       Q.    So is this the voyage planning data
```

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    book?
 3               MR. RODGERS:  I'm sorry -- could you --
 4          is what the voyage, that page?
 5               MR. CHAPMAN:  Well, these pages, which
 6          start at 201 and go through -- it says it's 26
 7          pages long.  So it says at the bottom page 1 of
 8          26, and then it runs through 26 of 26, from
 9          Carver 000201 through Carver 000226.
10          Q.    I'm just trying to understand if this is
11    the document that's referenced in 7.9, Voyage
12    Planning, as the planning data book.
13          A.    To the best of my knowledge it is, yes.
14          Q.    Okay.  And it appears to provide
15    essentially the same information about those first
16    few pages that we looked at in 7.9K, but continues
17    all the way down to the South Carolina line, like
18    every bridge that could be encountered?
19          A.    Yes, sir.
20          Q.    Okay.  There's a lot of information
21    that's provided about bridges in this TSMS.  It makes
22    me think it's important to the safe operation of the
23    tug.
24          A.    Well, there's a lot of bridges in every
25    part of a navigation channel.  All -- anything that's
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    not in a navigation channel should be -- is
 3    important.
 4         Q.    Okay.  So are there other parts of this
 5    SMS that describe other areas that don't involve
 6    bridges, to your knowledge, that are important to the
 7    navigation of the vessel?
 8         A.    In reference to like?
 9         Q.    Safety.
10              MR. RODGERS:  Objection to form.
11         A.    I -- there's a lot of it in the SMS, so
12    I would have to reference to what it may be.  I don't
13    know -- I don't know that off -- it's like
14    open-ended.  I don't know.
15         Q.    Well, what other things would you think
16    are important besides bridge transits --
17              MR. RODGERS:  Objection --
18         Q.    -- relative to the safety of vessel
19    operations?
20              MR. RODGERS:  Objection to form.  You
21         can answer if you understand the question.
22         A.    To me, also drills, compliance of the
23    vessel to ensure that it's safe and sea-worthy.
24         Q.    Yeah.  I'm more focused on the voyage
25    itself, like what other --
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2         A.       Weather.
 3         Q.       -- call them hazards, obstructions,
 4    whatever you want to call them, right?
 5         A.       Yeah, that would be noted on the chart
 6    itself.  But weather planning, anything that might
 7    occur in VTS manuals.  So there's a lot of -- in this
 8    industry, there's a lot of hazards that -- if you
 9    look at them, that you take in your daily -- you take
10    in your daily operations when you're providing a safe
11    navigation.
12         Q.       So bridges are just one of them?
13         A.       Correct.
14         Q.       Okay.
15                   All right.  Now, if you could go to the
16    end of that.  I've already asked some questions about
17    7.12 on Bridge Transits, which is the next section.
18         A.       Yes, sir.
19         Q.       And the very next page is Section 7.16
20    on Lookouts, which is Carver 000155.
21                   Do you have that there?
22         A.       Yes.
23         Q.       Under the second section there, it says
24    Requirements for a Lookout.
25         A.       Yes.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2        Q.     It's got six bullets to consider.  In --
 3   I'm just reading this.  In determining the
 4   requirement for a lookout, the person in charge of
 5   the navigation watch must take full account of the
 6   relevant factors including, but not limited to, and
 7   then there's six bullets.
 8                 And I want to ask you about the fourth
 9   one there, which is Proximity of dangers to
10   navigation.
11        A.     Okay.
12        Q.     So what is a danger to navigation?
13                 MR. RODGERS:  Objection.  He's not here
14         as an expert witness.
15                 Are you asking him his understanding?
16                 MR. CHAPMAN:  Well, I'm just asking him
17         as the general manager of the company, what's a
18         danger to navigation in their line of business?
19                 MR. RODGERS:  Objection.
20                 You can answer as to your understanding,
21         if you have any.
22        A.     Anything that is a risk to people,
23   property or environment.
24        Q.     Would that include bridges?
25                 MR. RODGERS:  Objection to form.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        A.      It's part of their regular navigation
 3   that they incur every day.
 4        Q.      But they present a danger to navigation,
 5   don't they?
 6                 MR. RODGERS:  Objection, argumentative.
 7                 Objection.
 8                 You can answer if you understand.
 9        A.      I don't understand.
10        Q.      You don't understand a bridge as being a
11   danger to navigation?
12                 MR. RODGERS:  Objection, argumentative.
13        You're harassing the witness now.
14        A.      I don't know how to answer that one.
15   (DIR)
16                 MR. RODGERS:  Objection.  No -- just
17        don't answer.
18                 You're asking his opinion.  He's not
19        here as an expert.
20        Q.      This is Carver's safety management
21   system, correct?
22        A.      Correct.
23        Q.      Okay.  And under this section on
24   Requirements for Lookout, one of the things to
25   consider is the proximity of dangers to navigation.
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    Yes?
 3              A.      Yes.
 4              Q.      My question is really simple.
 5                      Is a bridge a danger to navigation?
 6                      MR. RODGERS:  Objection.  He's not here
 7         as an expert.  He's here in his capacity at
 8         Carver.
 9                      You're asking him expert testimony, and
10         you're being argumentative.
11                      MR. CHAPMAN:  I'm just trying to get an
12         answer, sir.
13                      MR. RODGERS:  Well, I already told him
14         not to answer, if it's going to be an opinion.
15                      MR. CHAPMAN:  So is -- are you
16         instructing --
17                      MR. RODGERS:  He's already told you he
18         doesn't -- he told you he doesn't have an
19         answer, then you're argumentative.  So he's
20         answered the question.
21                      MR. CHAPMAN:  Are you instructing the
22         witness not to answer the question?
23                      MR. RODGERS:  I already did, and he
24         already answered the question, so I think it's
25         moot.
```

```
 1                Moore - April 28, 2025

 2                MR. CHAPMAN:  Well, I disagree.  He has

 3        not answered the question.

 4        A.    Well, I think if you look at all the

 5   factors into this, but not limited to, like it says,

 6   that you're taking all of this into your daily

 7   prudent navigational assessment of something; that

 8   you're going to look at everything as a danger.  It's

 9   including recreational vessels, including the

10   weather, including whatever it may be, from A to B,

11   and as long as it's part of on the water, then

12   everything is to be looked at independently.

13        Q.    Including bridges?

14                MR. RODGERS:  Objection to form.

15        A.    It doesn't say that.  So I don't know

16   how to reference what the proximity of the dangers to

17   navigation would be.

18        Q.    What training is provided to the officer

19   of the watch regarding dangers to navigation and the

20   need to post a lookout?

21                MR. RODGERS:  Objection to form.

22        A.    You would have to look at -- further

23   into the SMS to see what defines it.

24        Q.    Could you turn to Section 8.8, which I

25   think is the next page --
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2          A.      Yes.
 3          Q.      -- Carver 000162.
 4                  During the course of your investigation,
 5   did you learn whether there had been any kind of
 6   failure of steering that caused the allision?
 7          A.      No, not to my knowledge that there was
 8   any failure of it.
 9          Q.      Had there been any problems with the
10   auto pilot system on the MACKENZIE ROSE in the months
11   in 2024 preceding the allision on June 15th, 2024?
12          A.      There were some instances where we --
13   that the crews noted deficiencies in the auto pilot
14   system.  So dating back to, I don't know, late '23
15   that we started working on it and addressing it.
16                  Then they were in -- they weren't
17   consistent, so -- and then when we replaced the
18   system in April, the whole -- I believe it was April,
19   that's when the inconsistencies started to go away,
20   and we didn't have any other issues with the auto
21   pilot since then.
22          Q.      So when -- you said the auto pilot
23   system was replaced in April of 2024?
24          A.      It started in -- I believe it started in
25   November with technicians, and then ended up in April
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   with some various techs to come aboard and to go
 3   through the system to groom it up.
 4        Q.    And there were no problems with it
 5   thereafter?
 6        A.    No, sir.
 7        Q.    Could you turn to the next section,
 8   which is titled 9.5, Accident/Incident Reporting.
 9        A.    Right.
10        Q.    And it begins with Carver 000163 through
11   Carver 000169.
12              Now, we looked at a report earlier which
13   was marked Exhibit 3.
14        A.    Okay.
15        Q.    You still have that there --
16        A.    Yes, sir.
17        Q.    -- right?
18              And at the top it says 9.5, Incident
19   Report.  That's the report when Captain Morrissey,
20   while operating the MACKENZIE ROSE, allided with the
21   pier in Charleston, right?
22        A.    Yes.
23        Q.    Okay.  So that report looks like it's
24   related to this section of the safety management
25   system on accident and incident reporting; is that
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    right?
 3          A.     I believe so, to the best of my
 4    knowledge.
 5          Q.     So at the very top of page 163, it says
 6    Reporting Priorities in a -- kind of a callout box
 7    that is orange-ish in color.
 8                 There's a call-out box that's orange-ish
 9    in color, right?
10                 It says The master will notify the
11    office as soon as practicable after a marine
12    casualty.
13                 And then The master will notify the
14    nearest Coast Guard unit as soon as practicable after
15    a marine casualty.
16                 And it looks like it's -- those are two
17    obligations of the master, right?
18          A.     Okay.
19          Q.     So who was the master of the MACKENZIE
20    ROSE on the date of the casualty, the date of the
21    allision with the Belt Line Bridge?
22          A.     The master was -- oh, I don't -- I'm
23    drawing a blank of his name right now.
24          Q.     The deceased --
25          A.     Yes.
```

BRIAN MOORE

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2        Q.     The deceased, Captain Miller?
 3        A.     Chris.  Chris Miller.
 4        Q.     Okay.
 5        A.     Yes, sir.
 6        Q.     Okay.  So it was his obligation to
 7   notify the office, right?
 8        A.     Yes.
 9        Q.     And then it was his obligation to notify
10   the Coast Guard, right?
11               MR. RODGERS:  Objection to form.
12        Q.     That's what it says in your 9.5.
13        A.     Yeah.  Then it also says The master may
14   designate the reporting to another person of the
15   crew.  Yeah.
16        Q.     It doesn't relieve the master of the
17   responsibility of notifying the Coast Guard, correct?
18               MR. RODGERS:  Objection.  Argumentative.
19   The document speaks for itself.
20        Q.     Right?
21        A.     Oh.  Well, looking at this, it's also
22   common practice for a person at shore to do it as
23   well, because the master has to regain control of his
24   vessel if there's a larger issue.  So usually, the
25   shore side of any company will notify it.
```

**BRIAN MOORE**

**April 28, 2025**

1                      Moore - April 28, 2025

2          Q.     It says The master may designate the

3     reporting to another person on the crew if it is not

4     practical for him/her to make the reports.

5                 It doesn't say that the master may

6     designate the reporting to another person not in the

7     crew, correct?

8          A.     It does not say that.

9          Q.     Okay.  So was the master of the

10    MACKENZIE ROSE the first person to notify

11    Mr. Baldassare?

12         A.     That, I don't know.

13         Q.     It is fair to say the master never

14    notified the Coast Guard of the allision with the

15    bridge, correct?

16                MR. RODGERS:  Objection.  You're talking

17         about on the day of?

18                MR. CHAPMAN:  On the day of.

19         A.     Not to my knowledge.

20         Q.     Okay.  So below that orange-ish box, it

21    looks like 46 CFR 4.03-1 regarding Marine Casualty or

22    Incident is reprinted verbatim, right?

23         A.     Yes, sir.

24                MR. RODGERS:  What is the doc -- the

25         Bates number?

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2              MR. CHAPMAN:  Carver 000163.
 3              MR. RODGERS:  168?  No?
 4              MR. CHAPMAN:  No, 163.
 5         Q.    And it describes what the -- a marine
 6    casualty or incident is, and it talks about the need
 7    to report them, correct?
 8         A.    Yes.
 9         Q.    So under, it looks like, paragraph No. 4
10    on that page, towards the bottom, it says Any
11    incident described below (from 46 CFR 4.05-1(a).
12    That's a mouthful.
13              But the very first one is An unintended
14    grounding, or an unintended strike of a bridge,
15    right?
16              You see that?
17         A.    Yes.
18         Q.    So this is not based on whether there
19    was any visible damage, observable damage or like
20    wheel damage, it's just if there is an allision, it
21    has to be reported, right?
22              MR. RODGERS:  Objection.  The document
23         speaks for itself.
24         Q.    Correct?
25         A.    With a bridge separate from a fendering
```

 1                    Moore - April 28, 2025
 2    system.
 3          Q.     Just so I'm clear, you're taking the
 4    position that because it was only reported to you or
 5    to Mr. Baldassare that the vessel allided with the
 6    fendering system, that it wasn't required to report
 7    that to the Coast Guard at that instant in time?
 8                    MR. RODGERS:  Objection to form.  You're
 9          asking for his opinion or what he did?
10                    MR. CHAPMAN:  I'm asking to understand
11          why the Coast Guard wasn't contacted --
12                    MR. RODGERS:  Okay.  Coast Guard --
13                    MR. CHAPMAN:  -- in the context of this
14          regulation and --
15                    MR. RODGERS:  You don't know if the
16          Coast Guard was contacted or not because you
17          haven't deposed everybody.  So you know, if you
18          want to argue with him, you're assuming a fact
19          not into evidence yet, as to who and when
20          Lieutenant Palomba was either called or who she
21          called, which has not been established yet by
22          actual knowledge.
23          A.     But also on here it just says Allision
24    of a bridge that creates a hazard to navigation, the
25    environment or safety of the vessel -- creates a

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2    hazard to navigation -- a hazard to navigation, the

3    equipment or the safety of the vessel or that meets

4    any creditation of paragraphs (a)(3) through 8.

5         Q.    So you're reading at subnumeral iis?

6         A.    Yes, sir.

7         Q.    And it starts with An unintend -- excuse

8    me, An intended grounding or an intended strike of a

9    bridge.  Right?

10             Are you saying that Captain Morrissey

11    intended to strike the Belt Line Bridge?

12             MR. RODGERS:  Objection.  Argumentative.

13        He's not here as an expert.

14             MR. CHAPMAN:  Well, he's the one who

15        read it to me.  I'm just trying to understand --

16             MR. RODGERS:  All right.  Well, it's --

17             MR. CHAPMAN:  -- the reasons for that.

18             MR. RODGERS:  He's not here as an

19        expert.  He's here as a fact witness.  Please

20        ask him what he knows.

21        A.    Right.  So I was just reading this.  So

22    by reading the first section of i versus iis.

23             So it would have to be looked into

24    further.

25        Q.    Do you have any information that Captain

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   Morrissey intended to strike the bridge?
 3        A.     No.
 4        Q.     So your investigation informs you that
 5   it was an unintended strike of the bridge?
 6        A.     Yes.
 7        Q.     And as an unintended strike of the
 8   bridge, your safety management system obligates you
 9   to follow the Code of Federal Regulations to
10   immediately notify the Coast Guard, doesn't it?
11               MR. RODGERS:  Objection.  There's no
12          evidence that the company did not notify the
13          Coast Guard.
14        A.     I didn't notify the Coast Guard.
15        Q.     Did anybody on behalf of Carver notify
16   the Coast Guard?
17               MR. RODGERS:  If you know.  Don't guess.
18        A.     I don't know.
19        Q.     If you could turn to the next page,
20   Carver 000164.
21        A.     Okay.
22        Q.     About two-thirds of the way down in the
23   page, it says -- there's a heading called Notice of
24   Marine Casualty --
25        A.     Yes.
```

**April 28, 2025**

```
1                  Moore - April 28, 2025
2         Q.     46 CFR 4.05-1.
3                So in Section A, it says Immediately
4    after the addressing the resultant safety concerns,
5    the owner, agent, master, operator, or person in
6    charge shall notify the nearest sector office, marine
7    inspection office, or Coast Guard group office
8    wherever a vessel is involved in a marine casualty
9    consisting in section 1, an unintended grounding or
10   an unintended strike of (allision with) a bridge.
11               Do you see that?
12        A.     Yes.
13        Q.     Did anyone, to your knowledge, on behalf
14   of Carver or the vessel, notify any of those Coast
15   Guard operations immediately after addressing
16   resultant safety concerns from the --
17               MR. RODGERS:  Same objection.
18        Q.     -- from the allision on June 15th, 2024?
19        A.     I didn't notify any of these identified
20   groups, so I don't know who was --
21        Q.     And my question was a little broader
22   than that; if you know of anybody on behalf of Carver
23   that did that.
24        A.     Not to my knowledge.
25        Q.     Okay.  Were there any resultant safety
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   concerns for the vessel or the barge or the crew
 3   resulting from the allision with the bridge on
 4   June 15th, 2024?
 5        A.     No.
 6        Q.     So there is a -- kind of a flowchart on
 7   page 00166.
 8               Do you see that?
 9        A.     Yep.
10        Q.     Okay.  And it looks like it pertains to,
11   you know, if there's damage to the towing vessel or
12   the barges or an allision with a fixed object or an
13   aid to navigation, right?
14        A.     Yes, sir.
15        Q.     And this is sort of a flowchart of what
16   to do --
17        A.     Yes.
18        Q.     -- right?
19               And who is this directed to?  Who's
20   supposed to follow this flowchart when this happens?
21        A.     I don't know.  It doesn't clearly
22   identify that.
23        Q.     So it's not a very clear flowchart in
24   terms of who's responsible for this?
25        A.     This one does not say it.
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          Q.     I'm sorry?
 3          A.     It does not say it.
 4          Q.     So a lot of these boxes are green or
 5   shades of green, but there's one kind of in the
 6   middle of the -- near the top, but in the color
 7   scheme, looks like it's sort of yellowish --
 8          A.     Yes.
 9          Q.     -- that says file SMF 9.2, Near Miss
10   Report?
11                 Do you see that?
12          A.     Yes.
13          Q.     So what is an SMF?
14          A.     I do not know what SMF is.
15          Q.     Okay.  And at the very bottom in red, it
16   says Fill out SMF 9.5 Incident Report, right?
17          A.     Yes.
18          Q.     Is an SMF 9.5 different from an SMF 9.2?
19          A.     There are two different reports.
20   There's incident reports and there's incident -- I'm
21   sorry, there's near miss reports and then there's
22   incident reports.
23          Q.     And is a near miss report a 9.2 report?
24          A.     Yes.
25          Q.     And an incident report is a 9.5 report?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          A.      Correct.
 3          Q.      And we saw the 9.5 report, which is
 4   marked as Exhibit 3, when Captain Morrissey -- well,
 5   kind of the MACKENZIE ROSE hit that pier in
 6   Charleston --
 7          A.      Right.
 8          Q.      -- correct, 9.5?
 9                  And I've asked you a bunch of questions,
10   whether there's a 9.5 report for the allision with
11   the Belt Line Bridge, and your answer, my
12   recollection, is I don't know.
13          A.      I would have to reference it.
14          Q.      I'm sorry?
15          A.      I would have to reference it.
16          Q.      Yeah.  Okay.
17                  I'll tell you, we haven't received one,
18   okay?  That's why I'm asking.
19          A.      Okay.
20          Q.      Do you know if there is a 9.2 near miss
21   report for the allision with the bridge on June 15th,
22   2024?
23          A.      It's another one that I would have to go
24   and reference.
25          Q.      But those would be the only two types of
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   reports that the company would make pursuant to this
 3   safety management system; is that right?
 4        A.    Correct.
 5        Q.    Okay.  In very small print near the
 6   bottom of this flowchart, over in kind of the
 7   right-hand corner, it says See injury flowchart on
 8   page 7.
 9        A.    Okay.
10        Q.    And if you turn the page, there's like
11   two more flowcharts, right?
12             Do you know whether -- so there's three
13   more flowcharts on the next three pages.
14             Are any of them the injury flowchart
15   that's referenced in -- referenced on page 166?
16        A.    None that I could see.
17        Q.    Would those be for personal injuries or
18   property damage, or do you know?
19        A.    They would be for personal injuries,
20   medical-related.
21        Q.    Not property damage?
22        A.    I -- not to my knowledge, no.
23        Q.    All right.  So if you turn to the next
24   page, which is 167 --
25        A.    Okay.
```

**BRIAN MOORE**

**April 28, 2025**

```
1              Moore - April 28, 2025
2         Q.    -- am I correct that this is a -- some
3   kind of flowchart or some -- I don't know whether
4   it's a flowchart, but -- I don't know what you would
5   call it, but it pertains to some kind of
6   environmental problem, like an oil spill?
7         A.    Correct.
8         Q.    And then it's only in play if it's an
9   oil spill or some kind of discharge?
10        A.    I believe so.
11        Q.    I want to ask, at the very lower
12  right-hand corner, the box in the lowest right-hand
13  corner on page 167, it references a DP.
14              The DP should be on scene to gather
15  statements, coordinate communications, take
16  photos/video and compile data.
17              What's a DP?
18        A.    I would have to reference it, but I
19  believe it's designated person.
20        Q.    Sometimes referred to as a designated
21  person ashore?
22              MR. RODGERS:  Objection.
23        Q.    Or do you know?
24        A.    No, I don't know.
25        Q.    So who in Carver -- Carver Marine Towing
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2  is the designated person?
 3         A.      That would be me.
 4         Q.      You?
 5         A.      Yes, sir.  That -- correction.  I'm a
 6  designated person ashore.
 7         Q.      You're the DPA?
 8         A.      Yeah.
 9         Q.      So in this circumstance, who is the --
10  is there somebody else that's a designated person
11  besides you?
12         A.      We'd have to reference to see who it is,
13  but usually it's the captains are the designated
14  persons, because they're the -- always there at the
15  incidents.
16         Q.      Okay.
17                 MR. CHAPMAN:  We have to take a break,
18         because the videographer has informed us there's
19         only a couple of minutes left on our tape.
20                 THE WITNESS:  Okay.
21                 MR. CHAPMAN:  So we will take a short
22         break.
23                 THE VIDEOGRAPHER:  We are going off the
24         record.  The time is 3:16 p.m.
25                 (There was a recess taken.)
```

**BRIAN MOORE**

**April 28, 2025**

1                   Moore - April 28, 2025

2             THE VIDEOGRAPHER:  Beginning Media No.

3       4.  We are back on the record.  The time is 3:24

4       p.m.

5    BY MR. CHAPMAN:

6        Q.    Mr. Moore, the next page in this exhibit

7    number Carver 000168 has another flowchart.

8        **A.    Yes, sir.**

9        Q.    Does this also pertain to chemical

10   releases or oil spills or is this something

11   different?

12       **A.    That one, I could not tell you clearly.**

13       Q.    In the red box in the middle near the

14   top, it says Designated person assumes position as

15   emergency response coordinator for life of incident.

16             Would you be the designated person?

17       **A.    I think there's -- needs to be clarity**

18   **of designated person ashore versus designated person.**

19       Q.    Is there some other place in the SMS

20   where it defines that or describes that so that we

21   would know which one is being referred to here?

22       **A.    I don't know off the top of my head.  I**

23   **would have to look into it.**

24       Q.    You said earlier that you were the

25   designated person for maybe certain things.  I'm not

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   sure.
 3                    Is that -- is there some document that
 4   says Brian Moore is the designated person for A, B,
 5   C, D, E or something along those lines?
 6        A.      There's a designated person ashore
 7   section, and that --
 8        Q.      Of the SMS?
 9        A.      Correct.
10                -- and that would reference anything on
11   it.  I have to look at it.
12        Q.      And would it actually spell out who that
13   person is?
14        A.      Yes.
15        Q.      Do you know when this SMS was adopted by
16   Carver?
17        A.      Before my hiring.  I don't know.
18        Q.      Just looking at all this, you know,
19   revision date, every one of these pages I think says
20   July 1, 2021.
21                Is that when it was first adopted --
22        A.      I --
23        Q.      -- do you know?
24        A.      That, I do not know.
25        Q.      If you turn to the next page, Carver
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    000169, it looks like -- at the top it says it's a
 3    CG-2692 flowchart --
 4         A.    Yes, sir.
 5         Q.    -- right?
 6               What is a CG-2692?
 7         A.    It stands for a Coast Guard 2692
 8    reportable incident form.
 9         Q.    And this is the steps you're supposed to
10    follow to fill it out or the circumstances under
11    which you have to submit one?
12         A.    I would have to look into it, but I
13    haven't referenced this one in quite a while.
14         Q.    Well, the very top color block, which is
15    sort of blue-green, says that you have to submit one
16    for an unintended grounding or an unintended strike
17    of (allision with) a bridge, right?
18         A.    It does say that, yes.
19         Q.    And we're going to get to the one that
20    you submitted, but -- because I know there is one.
21    We were provided a copy.
22               At the very end of this page, it says
23    Drug and Closing Testing.
24               And just confirming, there was no drug
25    and alcohol testing done on any member of the crew as
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2   a result of this allision with the Norfolk and
 3   Portsmouth Belt Line Bridge during the time allowed
 4   by the Coast Guard, correct?
 5        A.    I would have to refer to Lenny on that
 6   one, what was called in; and I don't know off the top
 7   of my head.
 8        Q.    At the very end, it says See Section 6.
 9              Do you know what Section 6 is that is
10   being referred to?
11        A.    I do not.
12        Q.    If you could turn to the next page,
13   Carver 000886.  This is the first of four pages that
14   are somehow related to the health and safety plan
15   within the safety management system, right?
16        A.    Yes, sir.
17        Q.    Under No. 6 on the left-hand column, it
18   refers to a section of the Code of Federal
19   Regulations, and then it says there's a requirement.
20              And it says that All machinery and
21   equipment that is not in proper working order,
22   (including missing or malfunctioning guards or safety
23   devices), must be removed, made safe through marking,
24   tagging or covering, or otherwise made unusable.
25              This doesn't appear to distinguish
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   like -- I assume that it relates to whatever's on the
 3   vessel, but is there any definition of equipment that
 4   excludes navigational equipment or steering
 5   equipment?
 6        A.     Not to my knowledge.  We would have to
 7   look into that further.
 8        Q.     So if there was something that was not
 9   in proper working order in the nature of the steering
10   equipment or the navigation equipment, there would be
11   a requirement to either remove it, make it safe
12   through marking, tagging or covering or otherwise
13   making it unusable?
14             MR. RODGERS:  Objection.  It's citing a
15        CFR statute, and he's not here to opine on the
16        CFR statute or section.  And you're just reading
17        from this, so the document speaks for itself.
18        A.     I would have -- I would have to look
19   into the health and safety within the TSMS.
20        Q.     If you turn over to page 3 of 4 of this
21   document, which is Carver 000888, about the middle of
22   that page, you see reference line -- a No. 31?
23        A.     Yes, sir.
24        Q.     And the requirement is Procedures for
25   reporting unsafe conditions?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2                   A little further over, there's a
 3      reference to -- it says 2.3 and then S/6.11.
 4                   Do you know what those are references
 5      to?
 6           A.      Not off the top of my head, but
 7      something in the TSMS/HSP.
 8           Q.      Okay.  Something in the safety
 9      management system --
10           A.      Right.
11           Q.      -- like another section?
12           A.      Yes, sir.
13           Q.      Okay.  And then likewise, on the last
14      page, the very last numbered line, it says Carver
15      000889, says 43.  The requirement is All training
16      required in this section must be documented in owner
17      or managing operator's records.  And then there's
18      a -- looks like a reference to SMF 2.3 and S/Helm.
19                   Do you know what those are?
20           A.      Helm, I do.  I don't know what SMF
21      stands for.  I would have to look into that one.
22           Q.      All right.
23                   MR. CHAPMAN:  Would you mark that as
24           Exhibit 5, please.
25                   (Exhibit 5, Crew Matrix of MACKENZIE
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2          ROSE, marked for identification, as of this
 3          date.)
 4          Q.     You've been handed Exhibit 5, one page,
 5   numbered Carver 000050, titled Tug MACKENZIE ROSE
 6   Crew Matrix, on June 15, 2024.
 7                  To your knowledge, are these the five
 8   individuals that were assigned to the crew at the
 9   time of the allision with the Norfolk and Portsmouth
10   Belt Line Bridge?
11          A.     Yes, sir.
12          Q.     Do you know what the reference is to the
13   document number?
14          A.     The reference number is an individual
15   mariner's number.  The document number, I believe, is
16   just the printed edition of the MM -- merchant
17   mariner credential.
18          Q.     So the reference number is the actual
19   number they were assigned on their merchant mariner
20   document?
21          A.     The reference number stays with you.
22   Yes.
23          Q.     Okay.  And the document number is just
24   like a form number?
25          A.     It is just -- I don't know.  The Coast
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    Guard would have to answer that one, but I believe
 3    it's just the printed document version of that one.
 4         Q.    Okay.
 5         A.    But the reference number is how you
 6    would look up a mariner.
 7         Q.    All right.  So to your knowledge, do you
 8    know when Captain Miller was hired?
 9         A.    Not off the top of my head.
10         Q.    What about the mate, James Morrissey?
11         A.    Also not off the top of my head.
12         Q.    The deckhand, Sharif Porter?
13         A.    Not off the top of my head.
14         Q.    The deckhand, Jarkeis -- I don't know if
15    I'm pronouncing that right, but Jarkeis Morrissey?
16         A.    I -- nope, not off the top of my head,
17    either.
18         Q.    And the engineer, Jason McGrath?
19         A.    Same.  I'd have to look it up.
20               MR. CHAPMAN:  Would you mark that as 6,
21         please.
22               (Exhibit 6, Daily Logs, June 12 - 16,
23         2024, marked for identification, as of this
24         date.)
25         Q.    You've been handed Exhibit 6, which I
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025

 2    believe are logs covering four days of the MACKENZIE

 3    ROSE, beginning June 12th, 2024 through June 16th,

 4    2024.  Maybe five days.

 5                  Yeah, five days.

 6         A.       Yes.

 7         Q.       Which are Carver 000051 through 59.

 8                  Do you have those?

 9         A.       I do.

10         Q.       These look like they were printed out

11    from your Helm system?

12         A.       Correct.

13         Q.       So the very first entries on June 12th

14    say shipyard-manned.

15                  And then they drop down to -- it looks

16    like, 01 a.m.  Standby for repairs, Baltimore,

17    Maryland.  Correct?

18         A.       Yes, sir.

19         Q.       Do you know what repairs the vessel was

20    undergoing in Baltimore?

21         A.       I do.  We had some time in between jobs,

22    so we reached out to General Ship in Baltimore to

23    replace some fendering that had fallen off at sea,

24    and I believe it was on the port or starboard side,

25    like midship.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          Q.      When you say fendering, you mean like
 3     the tire or whatever rubber setup you've got?
 4          A.      Correct.  Yeah, the rubber set -- it was
 5     either a tire or a hard defender, but it was the
 6     suspended rubber fendering.
 7          Q.      Then it looks like it -- there was some
 8     crew changes that took place that day, correct?
 9          A.      I believe so.
10          Q.      So Captain Miller came aboard along with
11     Deckhand Porter and Engineer McGrath, correct?
12          A.      Yes.
13          Q.      And then three people went off;
14     O'Rourke, Hogge, and Warlordy?
15          A.      Yes.
16          Q.      Which one of them was the captain?
17          A.      None of them.
18          Q.      None of them?
19          A.      No.
20          Q.      Okay.  Had the captain already left the
21     vessel?
22          A.      Chris -- we would have to reference it,
23     but Chris Miller and -- I don't know off the top of
24     my head how that crew changed, shifted around.  I
25     would have to look that one up.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          Q.     Okay.  Down at the bottom, it says Crew
 3   on board, and there's six names, right?
 4          A.     Yes.
 5          Q.     Miller is the master, and Morrissey is
 6   technically also a master, but he's the mate, right?
 7          A.     Correct.
 8          Q.     So -- and who fills out this form?
 9          A.     The officer of the watch, whoever gets
10   to it.
11          Q.     Is this the form that, I don't know,
12   comes in weekly --
13          A.     This is --
14          Q.     -- to the company?
15          A.     This -- no, this is daily.
16          Q.     Daily.
17          A.     So --
18          Q.     Okay.  All right.
19                 We already talked about that there --
20   there isn't anybody that reviews it unless there's --
21   like you didn't submit it and there's a flag or
22   something to --
23          A.     Correct.
24          Q.     Right?  Okay.
25                 Is there any reason you couldn't review
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   it --
 3        A.     Yeah, absolutely.  Anybody can log in at
 4   any time.
 5        Q.     There's no like approval process or
 6   anything, though?
 7        A.     Not for these, no.
 8        Q.     If it's not submitted on the day that
 9   it's due, is there a way to go into the system and
10   like add it later?
11        A.     I don't believe so.  I think it saves --
12   if you're offshore and there's no internet
13   connection, it still saves -- that it will compile
14   them until you get back into cell phone service
15   range, if you don't have satellite communications,
16   and then it will input them all at once.
17        Q.     Once it is completed on the boat, can it
18   be amended?  Can somebody go back and change it?
19        A.     I don't know off the top of my head.
20        Q.     Once it's submitted to the company, can
21   it be changed?
22        A.     That one, I don't know off the top of my
23   head, either.
24        Q.     Do you know whether there's any like
25   audit log of when the entries are made or when the
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    form is submitted?
 3         A.      No, not that I know of.
 4         Q.      So there's a third deckhand that's on
 5    the boat on the 12th, Robert DiCanio.
 6                 You see that?
 7         A.      Yeah, I do see that.
 8         Q.      And if you go to the next page, 52 and
 9    53, there's only five crew members listed.
10                 So DiCanio is gone, right?
11         A.      Correct.
12         Q.      There's no reference to him leaving the
13    boat in any of the log entries, though, correct?
14         A.      No.  It's up to the officer on the
15    watch, and they have forgotten at times before to log
16    it.
17         Q.      So they don't have to keep track of
18    who's on and not on the boat?
19         A.      They do.  They might have not just
20    logged it in the logbook entry.
21         Q.      The very top of page 52 there, it says
22    Tug needs some issues resolved.
23                 Were there any issues other than the
24    replacement of the fendering you've described?
25         A.      No, sir.
```

```
 1                   Moore - April 28, 2025
 2        Q.     And General Ship Repair was paid for the
 3   work they did?
 4        A.     I would have to look at it also and
 5   through the e-mails with the foreman on there, but
 6   their ultimate -- once they looked into it, they
 7   couldn't make the repairs, because they would have to
 8   remove fuel from fuel tanks.  Because they're
 9   adjacent to -- the welding was adjacent to a fuel
10   tank, and they wouldn't be able to do it.
11        Q.     So they stayed at General Ship for a
12   couple of days, ultimately couldn't get the repairs
13   done?
14        A.     Correct.
15        Q.     So if you turn to page 54 --
16        A.     Okay.
17        Q.     -- it looks like for the 7:55 a.m.
18   entry, somebody spoke with the shipyard project
19   manager about welding the pin keepers and helping
20   with attaching the rub rails as a temporary fix.
21               And it looks like there was some welding
22   work done.
23               (Discussion held off the record.)
24               MR. CHAPMAN:  I'll start over.
25               MR. RODGERS:  Sorry.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2              MR. CHAPMAN:  No worries.
 3              MR. RODGERS:  I thought it would be
 4         quiet.
 5              MR. CHAPMAN:  Yeah.
 6         Q.    It mentions about welding the pin
 7    keepers and helping with attaching this rub rail with
 8    10,000 pound straps as a temporary fix.
 9              And apparently, there were some welders
10    on board, they did some welding, and resecured the
11    rug rails/pudding.  I don't know what a pudding is,
12    but maybe you do.
13         A.    I've only known bow pudding is an old
14    tugboat term for bow fendering --
15         Q.    Okay.  All right.
16         A.    -- so I would assume it's that.
17         Q.    But it looks like there was some welding
18    work done.
19         A.    To probably work on the temporary
20    straps.  And I would have to look at -- I would have
21    to speak to Lenny about it, because he was also
22    overseeing that one, but I believe the pin was the
23    shackle pins to secure it.
24         Q.    So presumably, General Ship would have
25    invoiced you for some of this work?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2         A.      He very well might have, but I don't
 3    remember a PO coming through or an invoice coming
 4    through, but it's something we'd have to look up.
 5         Q.      Okay.  And then it finally got on -- the
 6    tug got underway that evening, it looks like around
 7    1900 hours, right?
 8         A.      Yep.
 9         Q.      And made, it looks like, 9 or 10 knots
10    steaming from Norfolk, right?
11         A.      Yes, sir.
12         Q.      And that was light boat.  They're not
13    pushing a barge or anything?
14         A.      Correct.  Light boat.
15         Q.      Is that a typical speed for that vessel,
16    do you know?
17         A.      For a light boat it is, yeah.
18         Q.      Okay.  And then they finally arrived --
19    I'm looking at page 56 now for the 15th.
20                 Finally arrived in Norfolk.  It looks
21    like they contacted somebody named Brian Hale from
22    Sabine Marine Surveyor to meet them at the boat?
23         A.      He is a -- he was working for Skanska or
24    the customer as a -- to ensure the cargo was secure
25    to the barge.
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2         Q.      So he was going to survey that it was

3    appropriately lashed and that sort of thing?

4         A.      Yes, sir, prior to getting underway.

5         Q.      So it looks like they met -- arrived at

6    the pier around 11:30 a.m., right?

7         A.      Yes, sir.

8         Q.      And would it take three and a half hours

9    for him to complete a survey before they could get

10   underway?

11        A.      It's not that unusual.

12        Q.      Do you get a report of that survey?

13        A.      I don't recall getting that report.  I

14   believe that one went straight to Skanska.  I would

15   have to look into it.

16        Q.      You said this was the north portal

17   bridge?

18        A.      Correct.

19        Q.      That's done now, isn't it?

20        A.      Yes, sir.

21        Q.      And then sometime around 1630, there's

22   an entry about incident, Norfolk, Virginia.

23               You see that?

24        A.      Yes, sir.

25        Q.      Mate James Morrissey reports the auto

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   pilot was not completely turned off.  He was able to
 3   correct and switch back over to hand steering and
 4   begin backing on the Weeks 281 barge and maneuvered
 5   the barge alongside fendering on the north and PBL RR
 6   bridge.  Photo taken.  Proceed slowly away from
 7   bridge.
 8                    Do you know who made that entry?
 9        A.    I do not.
10        Q.    So there's a reference to a photo being
11   taken.
12                    Is that the photo that we looked at
13   earlier that's kind of grainy?  We marked it I think
14   as --
15        A.    1.  Exhibit 1.
16        Q.    Yes.
17        A.    Yep.  I believe that's what it would be
18   in reference to.
19        Q.    Okay.  Is that the only bridge photo
20   that you can recall seeing?
21        A.    Yes, sir.
22        Q.    Have you ever looked at it on a large
23   screen, like a big monitor, see what you can see?
24        A.    Besides like a computer monitor?
25        Q.    Well, it could be a computer monitor.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        A.      Yeah, a computer monitor.
 3        Q.      Okay.  And did it look as grainy as the
 4   one that's been marked as Exhibit 1?
 5        A.      I don't recall.  I assume that was just
 6   because of printing on that.
 7        Q.      Okay.  Was Skanska ever notified of the
 8   incident?
 9        A.      Yeah.
10        Q.      And who was contacted at Skanska?
11        A.      I don't know off the top of my head.
12        Q.      Who was your primary contact at Skanska?
13        A.      I would have to look it up for that,
14   because it wasn't directly part of the portal main
15   part that I was involved with.  But Jason Meyerrose
16   of Meyerrose & Sons, I believe, did the off-hire in
17   New York Harbor.
18        Q.      When you say the on-hire/off-hire,
19   you're talking about the Weeks 281 barge?
20        A.      Correct.
21        Q.      Right.
22                Did you guys lease that from Weeks?
23        A.      No, we did not lease it.  We just
24   transported it.
25        Q.      Okay.  So Skanska was Weeks' customer
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   for the barge rental?
 3        A.     Yes.
 4        Q.     All right.  So -- and my question is --
 5   my question was who was your primary contact at
 6   Skanska for this bridge job?
 7        A.     Nobody to me directly for this transport
 8   of it.
 9               Then for Skanska South, there was a
10   bunch of different project managers throughout the
11   last two years for that.  It varied from Dan Paya to
12   Kat Wen.  But they all had independent roles of set
13   specific tasks.
14        Q.     You said Dan.  What was his last name?
15        A.     Paya, P-A-Y-A.
16        Q.     And Katlin?
17        A.     Kate Wen --
18        Q.     Kate?
19        A.     W-E-N.
20        Q.     Kate Wen, W-E-N?
21        A.     Yep.
22        Q.     Okay.
23               So at 1820 hours, the top of page 57,
24   there's an entry that says Other.
25               Is Other like a tag in the system,
```

```
 1                    Moore - April 28, 2025
 2    Other?
 3          A.        Correct.
 4          Q.        And it says In Navy anchorage.  Break
 5    loose.  Take photos of barge.  "No damage detected."
 6    Right?
 7          A.        Correct.
 8          Q.        Do you know why those are in quote
 9    marks?
10          A.        No.  That, I do not.
11          Q.        Do you know who made that entry?
12          A.        Also do not know that.
13          Q.        And the photos of the barge, we looked
14    at four pictures of the barge.  Again, somewhat
15    grainy.
16                    Are those the photos that were taken, to
17    your knowledge, at that time?
18          A.        To -- yes.
19          Q.        And then they finally got underway
20    around 7 p.m., right?
21          A.        Yes, sir.
22          Q.        They note their underway speed on tow
23    wire as, it looks like, 6.6 knots, and then
24    eventually 7.9 knots.
25                    Is that the normal speed for a -- for
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2   this tug towing a barge on the wire?
 3        A.     Yeah.  It all depends on what the -- the
 4   tide and current's doing, if -- how many layers of
 5   wire he has out so he doesn't put it in full ahead.
 6                So I'm not sure where he was at at that
 7   moment, but it all depends on the currents.
 8        Q.     And it looks like around 9:30 p.m.,
 9   2133 hours, on the 15th, they went to three plus
10   layers out?
11        A.     Yes.
12        Q.     What distance is that?
13        A.     Each tow winch drum is different.  The
14   captains would know it, but it all depends on -- each
15   layer is one layer across the top drum.
16        Q.     And there's a number of references to
17   CSE, and then some distance.  108-T, CSE 97-T.
18                Do you see those entries?
19        A.     I do.
20        Q.     What is that a reference to?
21        A.     I don't know off the top of my head.
22        Q.     So looking at the next day, June 16th,
23   2024, it looks like it's underway the whole day.  It
24   does not arrive at destination on the 16th; is that
25   right?
```

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2          A.      No, it does not.
 3          Q.      And that's on Carver pages 58, 59,
 4   right?
 5          A.      Yes, sir.
 6          Q.      So do you know when it arrived at
 7   destination?
 8          A.      I would have to reference the logs and
 9   these latitude and longitude positions.
10          Q.      Just -- we could figure that out if we
11   saw the next page or two?
12          A.      Correct.
13          Q.      Okay.
14                  MR. CHAPMAN:  Mark that as 7, please.
15                  (Exhibit 7, Log Entries, marked for
16          identification, as of this date.)
17          Q.      I've handed you Exhibit 7, Mr. Moore.
18                  I don't know what to call this, but it's
19   consecutively numbered Carver 000060 through 000066.
20                  And on 000065, it has the words slip
21   sheet.
22          A.      I have no clue what that referenced to.
23          Q.      I can't -- maybe these are in some
24   order, maybe they're not.  I don't know.  It's just
25   the way it was produced to me.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2              Do you know what these are?
 3       A.      No, sir, I do not.
 4       Q.      I mean, they look a little bit like
 5  logbook entries, but is there some other way to print
 6  or publish information that's in this Helm system
 7  that produces a record that looks like -- something
 8  like a spreadsheet?
 9       A.      There is a way to print it in either
10  Excel or PDF.  When you -- prints a daily log or
11  whatever it may be, it prints it to either/or.  I
12  think you have to acknowledge which one it is.
13       Q.      Okay.  This looks like it was printed in
14  Excel.
15       A.      It does look like that.
16       Q.      Okay.
17              MR. CHAPMAN:  Mark that as 8, please.
18              (Exhibit 8, Christopher Lee Miller
19       Employment Records, marked for identification,
20       as of this date.)
21       Q.      You've been handed Exhibit 8, which I
22  understand to be the merchant mariner credential for
23  Captain Miller.
24       A.      Yes, sir.
25       Q.      And these pages are not quite in order.
```

```
 1                  Moore - April 28, 2025
 2   They were produced to us this way, but I put the
 3   credential on top and put a drug test that came with
 4   them, described as a pre-employment drug test, at the
 5   end.
 6                  So it starts with page 44, 45, 46, and
 7   then ends with page 43.
 8                  You see that?
 9        A.       Yes, sir.
10        Q.       Okay.  So these appear to be documents
11   that you would take up when you're hiring somebody,
12   or if there is a new credential, you would update
13   your system with it, right?
14        A.       Correct.
15        Q.       Do those live in some PDF electronic
16   file or do they live in a paper file or --
17        A.       They were -- they would go to HR.  I
18   don't know how HR is doing it, if it's paper or
19   digital, off the top of my head, but they would have
20   them there.
21                  And then also in Helm, if they had --
22   give them and gave it to us, we would put that
23   document into Helm so we can also monitor the crews'
24   licenses to make sure they're not expiring and what
25   license is set for each individual person so we know
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   where to send them or where not to send them.
 3          Q.     So I've been around this business for a
 4   long time as a lawyer --
 5          A.     Yeah.
 6          Q.     -- and what I've come to learn is even
 7   though there's an electronic record that HR has got,
 8   oftentimes people have their own sort of private like
 9   little files on people.
10                 MR. RODGERS:  Objection.
11          Q.     And I'm trying to understand.
12                 Do you have paper files on any of your
13   employees with Carver?
14                 MR. RODGERS:  Objection to form.
15                 You can answer if you --
16          A.     No, I do not.
17          Q.     Okay.  Have you ever, as an employee of
18   Carver?
19          A.     No, I have not.
20          Q.     I mean, it's not like you've gotten
21   any -- gotten rid of them since you started working
22   for Carver?
23          A.     No, absolutely not.
24          Q.     All right.  Do you know of anybody else
25   within Carver that kind of maintains their own
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   personal file of records on other people?
 3        A.     No.  It would just all go through HR
 4   then.
 5        Q.     So the last page of Exhibit 8 is a
 6   Predrug -- Pre-Employment Drug Screen for Captain
 7   Miller --
 8        A.     Yes, sir.
 9        Q.     -- correct?
10               And the specimen was collected on
11   January 17th, 2024, right?
12        A.     Yes, sir.
13        Q.     And there's a test verification on
14   January 20th of 2024, right?
15        A.     Yep.
16        Q.     So that's the earliest, presumably,
17   Captain Miller would have gone to work for Carver
18   Marine Towing?
19        A.     I would believe so.
20        Q.     Okay.  Do you have any knowledge that he
21   ever previously worked for Carver Marine Towing?
22        A.     No.  That, I do not.
23        Q.     And this is the same Captain Miller you
24   testified previously that you learned he recently
25   passed away?
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

**2**        A.    **Yes, sir.**

3        Q.    Okay.

4              MR. CHAPMAN:  I'm going to apologize.  I

5        did not get a chance to staple these back

6        together.  I don't know if there's a stapler in

7        this room.

8                    You are awesome.  Thank you.

9                    This is going to be No. 9.

10                   (Exhibit 9, Handwritten and Typed

11        Statements of Christopher Lee Miller, marked for

12        identification, as of this date.)

13        Q.    Mr. Moore, you've been handed Exhibit 9,

14   which I believe are a collection of statements by

15   Captain Miller.

**16**       A.    **Yes, sir.**

17        Q.    So the first one, which is Carver

18   000047, is a handwritten statement, right?

**19**       A.    **Yep.**

20        Q.    Appears to be signed by him, correct?

**21**       A.    **Yes.**

22        Q.    The second one, Carver 000048, is a

23   typed-up version of that statement, right?

**24**       A.    **Yes, sir.**

25        Q.    It's not really signed by him, but it's

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025

2    got an entry, June 15th, 1659.  Statement of incident

3    that happened at approximately 1630 with the North

4    MPVL railroad bridge, right?

5         A.    Yes, sir.

6         Q.    Okay.  And then the third page, 000049,

7    is on Carver Marine letterhead of some form.  Says

8    re:  Incident report.  It's got the date and time

9    particulars, right?

10         A.    Yes, sir.

11         Q.    And it, too, looks like it's signed by

12    Captain Miller, right?

13         A.    Yes, sir.

14         Q.    So what do you know about when Captain

15    Miller prepared this handwritten statement?

16         A.    I do not know when -- this was.  This

17    would be the first -- first statement --

18         Q.    Okay.

19         A.    -- the handwritten one.

20         Q.    So of these three, do they go in like,

21    I'll call it, chronological order of when you think

22    they were prepared?

23         A.    Well, this one, because I know they

24    handwrit -- handwrote it, and I said you need to have

25    them typed out.
```

**April 28, 2025**

```
1                    Moore - April 28, 2025
2          Q.    All right.  So were they given any
3     direction on what to put in their handwritten
4     statement?
5          A.    Not from me.  Not that I know of.
6          Q.    Were they given any direction about what
7     to put in the typed statement, which is page 48?
8          A.    No, not that I know of.
9          Q.    And then finally, the typed statement
10    but on Carver Marine letterhead, it's signed, page
11    49.
12                Were they given any instruction about
13    what to include in those -- in this report?
14         A.    No, sir.
15         Q.    Do you know of anybody who prepared
16    either of the typed statements for them?
17         A.    I do not know off the top of my head.
18    I've only -- no, I do not know.
19         Q.    So if the -- if the middle statement,
20    I'll call it, page 48, was prepared at June -- on
21    June 15th at 1659, the handwritten statement would
22    have been prepared before that?
23         A.    Most likely, yes.
24         Q.    All right.  And do you know whether the
25    final one in this exhibit, page 49, was actually
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   prepared on 15 June 2024 or it just references the
 3   allision on June 15, 2024?
 4        A.     That, I don't know either.
 5        Q.     Would Captain Miller have access to
 6   Carver Marine Towing letterhead?
 7        A.     They have all -- over the course of
 8   time, every vessel has seen the letterheads come
 9   through.  They've -- there's no official letterhead,
10   but they've all been utilized before another.
11        Q.     So if these were all prepared on 15 June
12   2024, the vessel was still underway to the bridge job
13   site, right?
14        A.     Correct.
15        Q.     And so would it --
16               MR. RODGERS:  Just objection.  I don't
17          think the first one is dated.
18               MR. CHAPMAN:  You're correct.  It's not.
19          Has no date on it.
20               MR. RODGERS:  Oh, I thought you said --
21               MR. CHAPMAN:  Right.  No.
22               MR. RODGERS:  -- they were all --
23               MR. CHAPMAN:  No.  I just -- if they all
24          pertain to the allision with the bridge and
25          they -- the first one could not have been
```

```
 1                    Moore - April 28, 2025
 2        prepared before sometime on June 15th.
 3                    MR. RODGERS:  No.  I'm just saying your
 4        question was so these were all prepared on 15
 5        June 2024.
 6                    MR. CHAPMAN:  Yeah, yeah.  That's what I
 7        said.
 8        Q.     If they were, right --
 9                    MR. RODGERS:  Okay.
10        Q.     -- how did they arrive at -- in the
11   possession of Carver, right?  Were they e-mailed
12   or --
13        A.     I believe -- actually, I don't know the
14   exact method, how they got to Lenny on that one.
15        Q.     Do you believe that Mr. Baldassare
16   received these?
17        A.     Yes.  Either by -- directly from the
18   boat e-mail for this handwritten one or a photo.  I'm
19   not -- don't know.
20        Q.     Did you see these as part of your
21   investigation before submitting the 2692 to the Coast
22   Guard?
23        A.     I don't remember off the top of my head.
24   I remember reading these, the initial hand --
25                    MR. RODGERS:  You got to say what you're
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2       looking at.
 3                 THE WITNESS:  Sorry.
 4       A.     Correction.  I remember reading the
 5  handwritten one before anything went out, but
 6  after -- I don't recall the other two between now and
 7  when the initial 2692 was submitted.
 8       Q.     Do you recall reading the handwritten
 9  one before the vessel actually departed Norfolk?
10       A.     No.  I don't -- I can't recall if it was
11  en route already or wherever it was in the course of
12  actions.
13       Q.     Okay.  Was it before the vessel arrived
14  at the bridge?
15       A.     Correct.
16       Q.     The job site?
17       A.     Before it arrived in New York Harbor,
18  correct.
19       Q.     Okay.  All right.
20                 MR. CHAPMAN:  All right.  Let's hope I
21       sort of get these stapled together eventually.
22                 So this will be 10.
23                 (Exhibit 10, Jarkeis Jamal Bass
24       Morrissey Employment Records, marked for
25       identification, as of this date.)
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          Q.     All right.  You've been handed
 3   Exhibit 10, which I understand to be the merchant
 4   mariner's document for Jarkeis Jamal Bass Morrissey,
 5   a copy of his TWIC card, and a pre-employment drug
 6   screen.
 7          A.     Yes, sir.
 8          Q.     Carver 000067 through 69, right?
 9          A.     Yep.
10          Q.     So on page 67, it says that his
11   mariner's document was issued 11 March 2024.
12                 Do you see that?
13          A.     Yes, sir.
14          Q.     Do you know if this is his first
15   merchant marine document?
16          A.     I don't know off the top of my head.  I
17   do know he did have prior experience with another
18   company.
19          Q.     Okay.  And then looking at the last page
20   of this exhibit, it looks like the specimen for his
21   pre- employment was collected on March -- excuse me,
22   April 29th of 2024, and verified on April 30th of
23   2024, right?
24          A.     Yes, sir.
25          Q.     So the earliest he could have come to
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    work for Carver Marine Towing would have been
 3    April 30, 2024?
 4         A.     Yes --
 5         Q.     So he --
 6         A.     -- to my knowledge.
 7         Q.     So he had been working for about a month
 8    and a half at the time of this accident, right?
 9         A.     Yes, sir.
10         Q.     All right.
11                MR. CHAPMAN:  Let's mark this as 11,
12         please.
13                (Exhibit 11, Handwritten and Typed
14         Statements of Jarkeis Bass Morrissey, marked for
15         identification, as of this date.)
16         Q.     So you've been handed Exhibit 11, three
17    pages of statements by Jarkeis Bass Morrissey.  The
18    first is page Carver 000071 through 000072.
19                Excuse me.  They're out of order.
20                It covers -- contained within the
21    exhibit is 000070 through 72.
22         A.     Yeah.
23         Q.     But the first one is the handwritten
24    one, and I put them all in the same order just to
25    make it easier, right?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        A.      Yep.
 3        Q.      So you've seen the handwritten
 4   statement, obviously?
 5        A.      Yes, sir.
 6        Q.      Sometime in connection with your
 7   investigation --
 8        A.      Yep.
 9        Q.      -- right?
10               And then it is followed by the typed-up
11   statement of the incident, right?
12        A.      Yes, sir.
13        Q.      And then finally, a report on Carver
14   Marine Towing letterhead that appears to be signed by
15   Mr. Jarkeis Morrissey, right?
16        A.      Yes, sir.
17        Q.      All right.  So Mr. Morrissey's --
18   Jarkeis Morrissey's statement, in his handwritten one
19   and in his typed-up one -- these are pages 71 and
20   then 70 -- there's a reference to losing steering.
21               He says We left at 1500.  Everything was
22   good.  An hour later, the boat lost steering in the
23   upper wheelhouse.  Right?  That's what he said?
24        A.      Yes, sir.
25        Q.      Okay.  And then he goes on to say that
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2    he was in the galley cleaning up and put away the
3    food when we hit something.  I went to the wheelhouse
4    to make sure everything was okay.  He said we lost
5    steering.
6                    There's two places in here where he says
7    the boat lost steering, but in the final Carver
8    Marine Towing letterhead incident report, it doesn't
9    say anything about losing steering.
10                    Did you ever ask Mr. Morrissey, Jarkeis
11   Morrissey, why he mentioned losing the steering in
12   the first two statements, and said nothing about it
13   in the third one?
14        A.    No, sir, I did not.
15        Q.    And in the first two statements, he says
16   that he was in the galley putting away food, and then
17   they hit something.  We hit something.  But he
18   doesn't mention anything about hitting anything in
19   his third Carver Marine Towing letterhead.
20                    You see that?
21        A.    Yes, sir.
22        Q.    Did you ever ask him why he did not say
23   anything about hitting something in his statement on
24   page 72?
25        A.    No, sir, I did not.  I did not speak to
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2    him about that.

3        Q.    Do you know if anybody did?

4        A.    **Not that I would know of.**

5        Q.    Did Mr. Baldassare say anything to you

6    to help clarify that?

7        A.    **No.  I -- I only really remember seeing**

8    **the handwritten ones, and then I don't quite really**

9    **remember these statements of the hand-typed ones.**

10       Q.    All right.  So let's go back to No. 9,

11   which was the statement of Captain Miller.

12       A.    **Okay.**

13       Q.    In the first two pages, 47 and 48, it

14   says that I was in my rack resting when I felt a bump

15   in the handwritten one.

16             And in the typed one, it says I,

17   Christopher Miller, was in my bed resting when I felt

18   a bump.

19             And in the final statement, the one

20   that's on Carver Marine letterhead, it says While off

21   watch in my room, I felt the vessel slow down and

22   felt a sliding.

23             Now, that's different than saying he

24   felt a bump, right?

25       A.    **Yeah.  Yes, it is.**

BRIAN MOORE

**April 28, 2025**

```
 1              Moore - April 28, 2025
 2      Q.    Okay.  And do you have -- do you know
 3   what he meant by sliding?
 4      A.    No, sir, I do not.
 5      Q.    But he didn't use the word bump or
 6   describe it as a bump in --
 7      A.    No, he did not.
 8      Q.    -- this third statement, right?
 9      A.    Correct.
10      Q.    Did you ever interview him or speak with
11   him to try to understand what he meant by sliding?
12      A.    No.  The only time I ever spoke to any
13   of the guys is when the NTSB was on board.
14      Q.    When did the NTSB show up?
15      A.    I don't remember off the top of my head.
16   It was fairly shortly after their arrival into New
17   York.
18              MR. RODGERS:  Were you asking that
19         question, Jim, on Miller's final statement?
20              MR. CHAPMAN:  Yeah.  This was Captain
21         Miller's statement.
22              MR. RODGERS:  I think he says sliding.
23              MR. CHAPMAN:  It says, first sentence
24         Felt us sliding.
25              MR. RODGERS:  Well, I guess he does,
```

**BRIAN MOORE**

**April 28, 2025**

```
1                  Moore - April 28, 2025
2        then.  Sorry.  Withdrawn.
3                  THE VIDEOGRAPHER:  Mr. Moore, I'm sorry.
4        Can you please move just a little bit.
5                  THE WITNESS:  This way?
6                  THE VIDEOGRAPHER:  Yes.  Thank you.
7        Q.    So in his written statement, handwritten
8    statement, he said that he ran up top to speak with
9    James Morrissey, and he informed me that the tug went
10   hard over.
11                 He said the -- I don't know what that
12   word is.  Something stuck -- struck?
13                 Do you know what he meant by that?
14       A.    No.  No, I don't know what that word is.
15                 MR. RODGERS:  You mean what does it say?
16                 MR. CHAPMAN:  It said -- yeah.  He said
17       the something stuck or struck.
18       Q.    He goes on to say I called Brian Moore
19   and Lenny Baldassare immediately to report incident.
20                 You testified earlier that you did not
21   speak to anybody in the crew, though --
22       A.    Correct.
23       Q.    -- right?
24       A.    Yep.  He called my phone, but I was out
25   in the backyard, so I didn't receive it.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2        Q.     So you didn't call him back?
 3        A.     I called Lenny back.
 4        Q.     You called Mr. Baldassare?
 5        A.     Yes, sir.
 6        Q.     Okay.  Then it goes on to say Lenny
 7   informed me that he and Brian will inform Coast Guard
 8   of incident.  Waiting on orders.  Right?
 9        A.     That's what it says, yes.
10        Q.     Did you ever give Mr. Baldassare
11   instructions to notify the Coast Guard of the
12   incident?
13        A.     I did not.  I told him to look into it
14   further.
15        Q.     And did Mr. Baldassare say to you that
16   he was going to notify the Coast Guard of the
17   incident?
18        A.     I don't recall him saying that.
19        Q.     Meaning he might have said it and you
20   just don't remember it, or meaning you just don't
21   have a memory of him saying something like that?
22        A.     No, I don't -- almost a year ago, I
23   don't remember exactly what he said there in that
24   phone call.
25        Q.     So his typed statement, which is page
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2    48, he says Mr. Morrissey informed me that the tug's

3    rudder went hard over and wouldn't respond, resulting

4    in the Weeks 281 barge to tap the side of the

5    railroad bridge.

6              I took a quick photo of the bridge where

7    we tapped it with no seen damage from what we saw in

8    the photo.

9              I called Brian Moore and left a message,

10   and then called Lenny and -- Lenny Baldassare and

11   spoke with him of the incident.  He then informed me

12   that he and Brian would inform the Coast Guard of the

13   incident.

14             Did Captain Miller ever say to you after

15   this incident at any time, you know, the following

16   day or after arrival into New York or any time

17   thereafter, that Lenny told him that he was going to

18   tell the Coast Guard of the incident?

19        **A.     In speaking with Captain Miller?  No, I**

20   **don't recall him speaking about that.**

21        Q.     Okay.  So it says Then finally, we went

22   to a slow or bell and waited for orders and

23   information.  And then the statement ends.

24        **A.     Yes, sir.**

25        Q.     Like do you know what happened after

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025

 2   that?

 3        A.    No.  I assume by slow bell, they meant

 4   to anchorage to look into it further.

 5        Q.    So in the typed-up version on company

 6   letterhead, Captain Miller says that when he went up

 7   to the wheelhouse to check on the mate, and he

 8   informed me that he had gotten out of shape upon his

 9   approach to the bridge.

10             What does that mean to you, when he says

11   the mate told him he had gotten out of shape on his

12   approach to the bridge?

13        A.    That means while -- if I'm looking at

14   it, the way he -- the way he was steering is that he

15   was -- it wasn't in line for the center span.  So he

16   got out of shape.

17        Q.    Is that a term of art in the maritime

18   business --

19        A.    Yes.

20        Q.    -- getting out of shape?

21        A.    Yep.  It's when you're -- when you're

22   not at -- when you're not in -- where you should be.

23        Q.    There's no mention in this typed-up

24   version on page 49 about feeling a bump while he was

25   in his room, right?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2          A.      Yep.
 3          Q.      There's no mention of the mate telling
 4  him that the tug's rudder went hard over and wouldn't
 5  respond, right?
 6          A.      Correct.
 7          Q.      Or that the Weeks barge tapped the side
 8  of the railroad bridge, right?
 9          A.      Correct.
10          Q.      And even though he says that he took a
11  photo of it in both his -- take that back.
12                  Even though he says in the typed-up
13  statement that he did, which is page 48, that he took
14  a photo of the bridge where we tapped it, there's no
15  mention of that in the typed-up statement on Carver
16  letterhead, correct?
17          A.      Of the photo?  No, there's not.
18          Q.      In terms of your investigation, you
19  didn't make any effort to sort out the discrepancies
20  between these statements --
21          A.      No, not --
22          Q.      -- submitted by Captain Miller, correct?
23                  MR. RODGERS:  Objection to form.
24                  You can answer.
25          A.      No.
```

BRIAN MOORE

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2              MR. CHAPMAN:  So this is 12.
 3              (Exhibit 12, Jason Thomas McGrath
 4        Employment Records, marked for identification,
 5        as of this date.)
 6        Q.    So you've been handed Exhibit 12, which
 7   is the collection of documents about Jason McGrath,
 8   his position as engineer, I believe, and a
 9   pre-employment drug screen.
10        A.    Yes, sir.
11        Q.    Pages Carver 000080 through -- I take
12   that back.  They're a bit out of order.  It's 80 and
13   81, which is his merchant mariner's document, and
14   then at the end, 78, which is his drug screen, right?
15        A.    Yes, sir.
16        Q.    So according to this credential on page
17   80, his document was going to expire on 25 June '24,
18   right?
19        A.    Yep.
20        Q.    So ten days before the allision, right?
21        A.    After allision?
22        Q.    Excuse me.  Thank you for correcting
23   that.
24              Yeah, ten days after the allision?
25        A.    Yes, sir.
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        Q.    Okay.  And I think you told us earlier
 3   that he just never got it renewed, right?
 4        A.    Correct.  He was --
 5        Q.    Okay.
 6        A.    -- according to him, he was pending
 7   Coast Guard.
 8        Q.    Yeah.
 9              And then his pre-employment drug screen
10   was on December 11th, 2023?
11        A.    Yes, sir.
12        Q.    And verified on December 12th.
13              So that would have been when he came --
14   earliest he could have come to work for your company,
15   right?
16        A.    Yes, sir.
17        Q.    Right.  And to your knowledge, had he
18   previously worked for Carver Marine Towing?
19        A.    No.  Not to my knowledge.
20              E.
21        Q.    All right.
22              MR. CHAPMAN:  Mark this as 13, please.
23              (Exhibit 13, Handwritten and Typed
24         Statements of Jason Thomas McGrath, marked for
25         identification, as of this date.)
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2        Q.    So you've been given Exhibit -- this is
 3   13?
 4        A.    Yes.
 5        Q.    Which are the statements that
 6   Mr. McGrath did.
 7              The first one is a handwritten one,
 8   signed by him.  The second one, the typed one.  And
 9   the third one on the Carver Marine letterhead.
10              The document numbers are in order,
11   000079, 83 and then 82.
12              So on the handwritten statement, we
13   could agree that Engineer McGrath was a man of a few
14   words --
15        A.    Yes, sir.
16        Q.    -- right?
17              It says Was in my room.  Felt abrupt
18   stop.  Went to upper wheelhouse to see what happened.
19   Checked engine room.
20              And then on the next page, which is 83,
21   it -- word for word, the same thing, right?
22        A.    Yes, sir.
23        Q.    Okay.  And then on the last page, which
24   is on the Carver Marine letterhead, a little more
25   detail.  Says he was in his room completing engine
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2  room paperwork, he felt the boat slow down, and

3  shimmy.

4              Now, that's different than saying an

5  abrupt stop, correct?

**6         A.    Yes, sir.**

7         Q.    And he said that it had landed on the

8  bridge fendering, he went down to the engine room to

9  make sure there were no issues, and then he went to

10  the wheelhouse, and the mate informed him he had

11  touched up on the bridge fendering.  Right?

**12         A.    Yes, sir.**

13         Q.    So it's a little out of order in terms

14  of what he did when, after feeling the abrupt stop,

15  but it mentions nothing about the abrupt stop in the

16  typed-up Carver Marine letterhead report, page 82,

17  correct?

**18         A.    Correct.**

19         Q.    And did you make any effort to try to

20  understand that discrepancy during the course of your

21  investigation before submitting the 2692?

22              MR. RODGERS:  Objection to form.

23         Foundation.

**24         A.    No.**

25              MR. CHAPMAN:  14.

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2              (Exhibit 14, Sharif Porter Employment
 3        Records, marked for identification, as of this
 4        date.)
 5        Q.    This is the only document that I have
 6   pertaining -- that was produced pertaining to Sharif
 7   Porter, but it's a copy of one page out of his
 8   mariner credential, right?
 9        A.    Okay.
10        Q.    I don't have anything regarding a drug
11   screen.
12              Do you know when he was hired?
13        A.    No.  He's one of the older deckhands
14   within the older deckhands, senior deckhands in the
15   company, so I don't know exactly when he was hired.
16        Q.    Was he there when you started working?
17        A.    Yes, sir.
18        Q.    Okay.  And he's still working there,
19   right?
20        A.    Yes, sir.
21              MR. CHAPMAN:  15.
22              (Exhibit 15, Handwritten and Typed
23        Statements of Sharif Porter, marked for
24        identification, as of this date.)
25        Q.    You've been handed Exhibit 15, which I
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    believe are all of the statements from Sharif Porter.
 3    They're not in numerical order, but they consist of
 4    Carver 000086, his handwritten statement; 000085, the
 5    typed-up statement that presumably he did; and then
 6    finally 000084, which is the one on Carver Marine
 7    Towing letterhead.
 8                    You have those?
 9         A.    Yes, sir.
10         Q.    So this says, on the handwritten one, I
11    was in bed sleeping.  I felt the boat sliding.
12    Thought we popped the push gear.  Went up to a
13    wheelhouse.  That was when the captain told me the
14    boat went hard over.
15                    And then the typed-up version of that,
16    his -- on page 85, appears to be word for word with
17    his handwritten statement, right?
18         A.    Yes, sir.
19         Q.    And then finally, the one on Carver
20    Marine letterhead says, very similar, that he felt
21    the boat slide.  Thought we had popped a push gear,
22    and went out on the deck to check.  However, I
23    noticed we had landed against the fenders of the
24    bridge to slide through safely.
25                    But nothing about the captain telling
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2   him that the boat went hard over, correct?
 3        A.      No, not in this one.
 4        Q.      So again, did -- as part of your
 5   investigation before submitting the 2692 to the Coast
 6   Guard, did you make any effort to sort out any
 7   discrepancy in Mr. Porter's statements?
 8                MR. RODGERS:  Objection.  No foundation.
 9                You can answer.
10        A.      No, sir.  No, sir.
11                MR. CHAPMAN:  This will be 16.
12                (Exhibit 16, James Morrissey's
13        Employment Records, marked for identification,
14        as of this date.)
15        Q.      Mr. Moore, you've been handed
16   Exhibit 16, which is Captain James Morrissey's
17   merchant mariner credential, and then the drug test
18   results post-accident.  And the documents are
19   numbered Carver 000091 through 93.
20                And then the last page, which is the
21   test results, is Carver 000088.
22                Do you have those?
23        A.      Yes, sir.
24        Q.      Okay.
25                MR. RODGERS:  Just for the record, it
```

```
 1                  Moore - April 28, 2025
 2         was post-accident, the January incident.
 3                  MR. CHAPMAN:  I'll clarify that.
 4                  MR. RODGERS:  Oh, okay.
 5                  MR. CHAPMAN:  Yeah, I'll clarify that.
 6         Don't worry.
 7                  MR. RODGERS:  All right.
 8         Q.     So there's -- we weren't produced a
 9    pre-employment drug screen.
10                  So do you know when Captain Morrissey
11    was hired?
12         A.     No, not off the top of my head.
13         Q.     Was he working there when you arrived?
14         A.     No.
15         Q.     Okay.  So the post-accident drug
16    screening was related to the allision with the pier
17    in South Carolina in January of '24, right?
18         A.     Yes, sir.
19                  MR. CHAPMAN:  Could you mark this as 17.
20                  (Exhibit 17, Handwritten and Typed
21         Statements of Captain Morrissey, marked for
22         identification, as of this date.)
23         Q.     You've been handed Exhibit 17, which
24    consists of two pages numbered Carver 000094 and 95,
25    which is what I believe is a handwritten statement
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    from Captain Morrissey and then a typed-up statement
 3    from Captain Morrissey.
 4         A.    Yes, sir.
 5         Q.    Now, the handwritten statement doesn't
 6    identify his name or any signature on it.
 7                And the typed-up statement is -- at
 8    least has Captain James Morrissey on it, right?
 9         A.    Yes, sir.
10         Q.    So in his handwritten statement, he says
11    Outbound Norfolk southern branch with Weeks 281.
12    Experienced a steering malfunction, causing tug and
13    barge to turn to port and touch up on bridge before
14    it could be corrected.  No damage to bridge and no
15    visible -- excuse me.  No damage to barge and no
16    visible damage to bridge.
17                And he says essentially the same thing
18    in his typed-up version, except that he's added his
19    name.  I, James Morrissey, was operating outbound in
20    Norfolk, Virginia, southern branch of the Elizabeth
21    River with barge Weeks 281.  The tug experienced a
22    steering malfunction, causing the tug and barge to
23    turn to port on touch up on the bridge before it
24    could be corrected.
25                Again, goes on to say No damage to the
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   barge and no visible damage to the bridge.
 3              So basically, the same thing in both of
 4   those statements?
 5        A.    Yes, sir.
 6        Q.    We were not provided a copy of a
 7   statement on Carver Marine Towing letterhead.
 8              Do you know whether one exists?
 9        A.    I do not know if one exists or not.
10        Q.    Okay.  Do you know why you have them
11   from the other four members of the crew but not
12   Captain Morrissey?
13        A.    No.  I did not receive those statements.
14   Lenny did.
15        Q.    All right.
16              MR. CHAPMAN:  So this will be 18.
17              (Exhibit 18, Crew Hours Report, marked
18        for identification, as of this date.)
19        Q.    All right.  So I handed you Exhibit 18,
20   which looks like some sort of screenshot or -- of a
21   tracking system, a logging system of some sort,
22   beginning with Carver 0000096 through 0000110, and
23   then there are four more pages, which are numbered
24   000029 through 000232.
25              So looking at the first page of
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2   Exhibit 18, what are we looking at?
 3        A.      This is -- it looks -- this is a view
 4   from what you would see in Helm.
 5        Q.      All right.  And a view of what?
 6        A.      The time sheets, which I believe are
 7   just who the crew is on at the time.  Not a work/rest
 8   hours.
 9        Q.      So there's a limit of 12 hours of work,
10   right?
11        A.      Yes, sir.
12        Q.      Okay.  And there's a red -- four of them
13   are green; one of them is red.
14                What do those colors signal?
15        A.      I believe it's broken into 30, 60,
16   90 days.  Anything over 90 days, your license is
17   good, green; anything 60 is yellow; and then red is
18   30 days or less.
19        Q.      So we know McGrath's license was going
20   to expire in 10 days, right?
21        A.      Correct.
22        Q.      So that's why this is red on --
23        A.      Yes, sir.
24        Q.      -- Exhibit 18?
25        A.      Yes.
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2         Q.    All right.  And are we looking at
 3   entries from June 1, 2024 on this page?
 4         A.    Yes, I believe so.  I couldn't exactly
 5   tell you.
 6         Q.    Okay.  And the next page, do you know
 7   what it is?
 8         A.    I can't read mine.
 9         Q.    I can't read mine either.
10         A.    Okay.  Then no, I --
11         Q.    That's the way it was given to us.
12         A.    Then I -- no, sir, I do not know what
13   this is.
14         Q.    Okay.  I mean, I'm led to believe that
15   somehow it's related to the same subject, but I don't
16   know that to be true.
17         A.    I believe so, on the words that I can
18   read out, but I don't know.
19         Q.    Are these available in a more legible
20   version?
21         A.    I would have to -- I'm sure there is.  I
22   got to figure out what this is first.
23         Q.    Okay.  And then if you go back to --
24   this goes on for several pages, but if you go back
25   past 110, then the very next page that's included is
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    229.
 3            A.      Yep.
 4            Q.      And this sort of looks like maybe time
 5    sheet or hours worked or something data?
 6            A.      This looks like a work/rest log.
 7            Q.      Okay.  Would that be in the same system?
 8            A.      In Helm?  Yes, sir.
 9            Q.      So if you go back to page 1 of 18,
10    there's five tabs at the top.
11            A.      Yep.
12            Q.      Crew, Crew Chain, Time Sheets, Work/Rest
13    and History, right?
14            A.      Yes, sir.
15            Q.      So we're looking at the time sheets
16    page?
17            A.      Time sheets had payroll -- I'm sorry.
18    Is the payroll-oriented one.
19            Q.      Okay.  And the rest of these all have
20    kind of different views?
21            A.      Yes, sir.
22            Q.      But this is specifically for the
23    MACKENZIE ROSE, which is listed in the Asset -- Asset
24    box?
25            A.      Yep.
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2          Q.      And are more legible copies of pages 229

3   to 232 available?

4          A.      **If I can figure out what these are --**

5          Q.      All right.  They too --

6          A.      **-- but I believe so.**

7          Q.      They look like they came from the Helm

8   system, too?

9          A.      **Yes, or an Excel.**

10          Q.      Okay.

11                  MR. CHAPMAN:  All right.  This is 19.

12                  (Exhibit 19, CG-2692 Report, marked for

13          identification, as of this date.)

14          Q.      Mr. Moore, you've been handed

15   Exhibit 19 --

16          A.      **Yes, sir.**

17          Q.      -- which I believe consists of the

18   2692 --

19          A.      **Yes.**

20          Q.      -- filed with the Coast Guard in the

21   aftermath of the bridge allision, right?

22          A.      **Yes, sir.**

23          Q.      Okay.  So this is Carver 000111 through

24   117, and if you look at the second page of the

25   exhibit, it appears to have been signed by you.

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2          A.      Yes.  Digital signature.
 3          Q.      And it says it's digitally signed.
 4                  What platform did you use to digitally
 5     sign it?
 6          A.      I don't know off the top of my head.  I
 7     believe it's on the Coast Guard form, so I don't know
 8     how it reads it, if it's Adobe or not.
 9          Q.      So it wasn't signed like with your Box
10     document management system?
11          A.      Oh, no.
12          Q.      Okay.  And you signed it on -- it's
13     dated June 25th, but you said you digitally signed it
14     on June 26th, correct?
15          A.      Yep.
16          Q.      So it would have been submitted to the
17     Coast Guard on what date?
18          A.      I would believe it would have been the
19     26th.
20          Q.      Okay.  Did you have the assistance of
21     counsel in preparing this form?
22          A.      I did not.
23          Q.      So are there any drafts of this form
24     that exist before it was actually submitted to the
25     Coast Guard?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2         A.      There -- this was -- any -- sorry,
 3    correction.
 4                 Any drafts?  What do you mean?
 5         Q.      Yeah.  Like you -- maybe you -- this is
 6    the fifth draft that you went through, right?
 7         A.      Oh.
 8         Q.      I don't know.  That's what I'm asking.
 9         A.      No.  There was a -- there was a revision
10    made from the Coast Guard, one that they requested.
11         Q.      The Coast Guard asked for a revision?
12         A.      Yes, sir.
13         Q.      And what did they request that you
14    revise?
15         A.      I don't remember off the top of my head
16    exactly what it was, but they -- Lieutenant requested
17    a revision.
18         Q.      Lieutenant Palomba?
19         A.      Yes.
20         Q.      And did she request the revision before
21    you signed it on the 26th of June 2024?
22         A.      I believe so.
23         Q.      So was there a separate form submitted
24    prior to this one that's signed on the 26th of June?
25         A.      I would have to reference the dates.  I
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2  don't remember off the top of my head.
 3        Q.    So there was a -- but there would have
 4  been two forms, Coast Guard Form 2692s, that were
 5  submitted to the Coast Guard?
 6        A.    Yes --
 7        Q.    And --
 8        A.    -- I believe so.
 9        Q.    -- you don't recall what she asked you
10  to revise?
11        A.    Not right now, I don't.
12        Q.    All right.
13        A.    Oh, okay.  So I do -- now reading this,
14  the first one was the initial one I believe Lenny
15  submitted of the bridge fendering.  And then after we
16  discovered the fact that it was the bridge, when she
17  had notified us on here, the bridge structure.
18              So the first one was for the bridge
19  fendering, and then she asked us to -- Lenny and I
20  to -- I don't know if it came through Lenny or if it
21  came through me, whatever it was, but that is the
22  whole e-mail chain asking for a revision.
23        Q.    All right.  So there was one that was
24  submitted that just described the extent of property
25  damage to the fendering system?
```

BRIAN MOORE

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2         A.      Yes, sir.
 3         Q.      And that was not correct?
 4         A.      After we realized it was, in fact, the
 5   bridge, that's when she asked us to submit the
 6   revision.
 7         Q.      Okay.  When did Mr. Baldassare submit
 8   his version of the 2692?
 9         A.      I don't know off the top of my head.  It
10   was between the incident and -- I don't remember
11   exactly.  I --
12                   MR. RODGERS:  Don't guess.  Don't --
13         Q.      And does the company still have a copy
14   of the one that Mr. Baldassare submitted?
15         A.      I have not seen it, but I'm sure the
16   Coast Guard has it in hand.  I don't remember
17   recalling it, the first one, because I didn't sign
18   the first one.
19         Q.      Did the company delete it from its
20   records?
21         A.      No.  There's not way.
22         Q.      Okay.  So you'd still have it?
23         A.      It -- probably within Lenny's e-mails.
24         Q.      Okay.  And does the company still have
25   Mr. Baldassare's e-mails?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2         A.    I don't know off the top of my head.  IT
 3   would have all that.
 4         Q.    So in the form that Mr. Baldassare
 5   submitted, were there different descriptions in block
 6   25A and B?
 7         A.    I would have to reference it.
 8         Q.    So how did you arrive at the
 9   determination that, in fact, the barge had hit the
10   bridge rather than the fendering system?
11         A.    That's when Lieutenant Palomba called us
12   and said it did, in fact, hit it.
13         Q.    And did you receive any photographic
14   evidence from the Coast Guard to that effect?
15         A.    No.  She did say there was a video, but
16   she didn't have it and I didn't have it at the time,
17   but that's why she requested us to change it.
18         Q.    Was that in an e-mail that she sent to
19   you?
20         A.    Yes, sir.
21         Q.    So there's a 2692-B form that's part of
22   this that was apparently submitted and signed by
23   Mr. Baldassare on June 19th --
24         A.    Yes, sir.
25         Q.    -- 2024.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2               Do you know if that's the date that he
 3      would have submitted the original 2692?
 4          A.     I couldn't tell you.  I don't know.
 5          Q.     On page 1 of Exhibit 19, in block 10,
 6      the box for Unintended grounding or unintended strike
 7      of (allision with) a bridge is checked.  Right?
 8          A.     Yes, sir.
 9          Q.     Was that box checked when the first form
10      was submitted?
11          A.     I do not know off the top of my head.
12          Q.     The entries in block 25A and block 25B,
13      were those drafted by you?
14          A.     Yes, I believe so.
15          Q.     So in 25A, the second sentence says The
16      officer on watch, James Morrissey, was in auto pilot
17      and didn't switch over to non-followup hand steering,
18      but thought he did.
19               Sir, is there any reference to being in
20      auto pilot in either of Mr. Morrissey's statements?
21          A.     Not in the statements I can recall, but
22      it was during the NTSB interview with the Coast Guard
23      on board, as well.  That's when I believe Lieutenant
24      asked me to revise it, after she heard.
25          Q.     Did you attend that interview?
```

```
 1                   Moore - April 28, 2025

 2          A.     Yes, sir.

 3          Q.     And it was aboard the vessel?

 4          A.     Yep.

 5          Q.     Like in the galley or --

 6          A.     In the wheelhouse.

 7          Q.     Oh, in the wheelhouse?

 8          A.     Yes, sir.

 9          Q.     And who all was present?

10          A.     It was the gentleman from NTSB; and then

11   there was three people, via Teams or Zoom, from Coast

12   Guard sector Norfolk; and then it was individually a

13   different counsel before Clyde Co.

14                 MR. RODGERS:  For Carver?

15                 THE WITNESS:  Yes.

16          A.     Our Carver -- our counsel, and then the

17   individuals being interviewed.

18          Q.     So Mr. Abel, an attorney in Norfolk,

19   Virginia, was present for those interviews?

20          A.     Yes, sir.

21          Q.     And were all five crew members

22   interviewed by the Coast Guard?

23          A.     I don't recall all five being

24   interviewed.  I believe they did Captain Chris --

25   they -- correction.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2                They did everybody who was on board.
 3    Captain Morrissey was already off, because the NTSB
 4    had arrived a couple days later, and I believe they
 5    did his via Teams or Zoom, whatever it was,
 6    separately.  But I was not there for that one.
 7        Q.    So there was a person from the National
 8    Transportation Safety Board present in person for
 9    those interviews?
10        A.    Yes, sir.
11        Q.    All right.  And you were there?
12        A.    Yes, sir.
13        Q.    Was Mr. Baldassare there?
14        A.    I don't recall if he was.
15        Q.    And you said Mr. Able was there,
16    Christopher Abel, correct?
17        A.    Yes.
18        Q.    And then who was actually interviewed
19    among the crew members in person on that occasion?
20        A.    Captain Chris Miller, AB Jarkeis
21    Morrissey, able-bodied Sharif Porter, and Engineer
22    Jason McGrath.
23        Q.    So everybody but Captain Morrissey?
24        A.    Yes, sir.
25        Q.    And you believe Captain Morrissey was
```

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   interviewed later by Zoom -- via Zoom?
 3        A.     Yes.
 4        Q.     Were you present for that?
 5        A.     No.
 6        Q.     Who, to your knowledge, was present for
 7   that?
 8        A.     I don't know off the top of my head.
 9        Q.     Did Mr. Baldassare ever report being
10   present for it?
11        A.     No.
12        Q.     And did they interview Mr. Morrissey
13   while he was at home or, you know, something like
14   that?
15        A.     I don't -- I don't know where he was.
16        Q.     All these interviews that happened in
17   person were on the same day?
18        A.     Yes.
19        Q.     Would that have been June 25th of 2024?
20        A.     I would have to look up to see when the
21   NTSB arrived.  I don't know exactly.
22        Q.     Was Mr. Meyerrose aboard the vessel that
23   day?
24        A.     He was also aboard the vessel, because
25   the boat was just free, and he was on board to do a
```

```
 1                    Moore - April 28, 2025
 2    survey of the vessel.
 3           Q.      That day?
 4           A.      Yes, sir.
 5           Q.      Okay.  And had you hired him to do a
 6    survey?
 7           A.      Yes.
 8           Q.      It wasn't Mr. Able that hired him?
 9           A.      No, but it went through me, but I don't
10    recall if it was suggested by Mr. Able or not.
11           Q.      What was the purpose of having the
12    vessel surveyed?
13           A.      Inspected for damage.
14           Q.      Not to value the vessel?
15           A.      I believe they also did a condition
16    value of the vessel, too.
17           Q.      So just to be clear, then, when did you
18    actually learn that Morrissey said he was in auto
19    pilot and did not switch over to non-followup hand
20    steering, even though he thought he did?  When did
21    you learn that?
22           A.      I don't remember exactly when.  No, I
23    don't remember exactly when, if it was Captain Chris
24    Miller, where James Morrissey was.  Because James
25    wasn't there, obviously.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1              Moore - April 28, 2025
 2              But I don't recall if the interview was
 3     with James also that day or if it was separate -- a
 4     separate day.
 5        Q.    So you never -- since you didn't attend
 6     that interview, you never heard him say that, right?
 7              MR. RODGERS:  Objection to form.
 8        A.    I'm -- it's over a year -- almost a year
 9     ago.  I'm trying to remember exactly what was
10     happening.  There was a lot going on at that time.  I
11     don't remember exactly who, what, where, why of that
12     one.  It would -- but it would have to reference the
13     NTSB transcript.
14        Q.    And do you have a copy of it?
15        A.    No, sir.
16        Q.    You do?
17        A.    No, sir, I said.
18        Q.    So this is what I'm trying to
19     understand.  If Morrissey wasn't interviewed that day
20     and you didn't attend Morrissey's interview, how is
21     it that you knew to state that Morrissey was in auto
22     pilot and didn't switch over to non-followup hand
23     steering but thought he did?
24              MR. RODGERS:  Objection.  And just to be
25         clear, I thought he said Morrissey was
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2       interviewed by Teams or Zoom --
 3              THE WITNESS:  Yeah.
 4              MR. RODGERS:  -- that day.
 5              MR. CHAPMAN:  Well, don't put words in
 6       his mouth, okay?  Don't put words in his mouth.
 7              MR. RODGERS:  No, it's what I heard him
 8       testify to.  You're putting words into his
 9       mouth.
10              THE WITNESS:  Right.  So --
11              MR. RODGERS:  You're saying he wasn't
12       interviewed.  He said he was.  Can we clear it
13       up one way or the other.
14       A.      The clarification is I don't remember
15  exactly who was where during that.  It was obviously
16  a long day of that, too.  So I don't remember exactly
17  when James was interviewed for that, but I definitely
18  remember hearing that from Captain Miller and/or
19  James, but I would have to reference that one.
20       Q.      Do you know whether Captain Miller was
21  also in the wheelhouse when Captain Morrissey was at
22  the conn at the time of the allision?
23       A.      No, I don't know exactly if not, but he
24  says he wasn't.
25       Q.      And his statement was that he was not?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          A.      Right.
 3          Q.      He was down in the rack, right?
 4          A.      Correct.
 5          Q.      So in the block 25B, in this exhibit,
 6   page 112 --
 7          A.      Yep.
 8          Q.      -- the first sentence says The OOW --
 9   officer of the watch, right?
10          A.      Yes, sir.
11          Q.      -- had failed to properly switch to hand
12   steering and also gave minimal engine orders at first
13   in order to prevent further headway of a course
14   change.
15                  So how do you know that he gave minimal
16   engine orders at first?
17          A.      Because that must have also been -- so
18   then recollection of it would have been -- of me
19   being with him on that -- in Teams meeting, because
20   that's what I remember of that, of what he -- of he
21   said.
22                  First it was initial, I started to
23   throttle back a little bit, and then went to stern.
24          Q.      How do you give engine orders from the
25   wheelhouse or the upper pilot house on that tug?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          A.      It has its own separate connestation up
 3     there as well.
 4          Q.      Yeah.
 5                  So he has engine control --
 6          A.      Yes, sir.
 7          Q.      -- up in that station?
 8          A.      Yep.
 9          Q.      He doesn't have to inform the engineer
10     to do anything in the engine space, right?
11          A.      No.
12          Q.      So when you say he gave minimal engine
13     orders, what does that mean?
14          A.      From whatever speed he was at, to not --
15     he didn't go from there to full stern.
16          Q.      So in the second sentence in block 25B,
17     it says The OOW, officer of the watch, stated that
18     once he did switch to hand steering, he gave a slow
19     astern at first and then full astern, right?
20          A.      Yes, sir.
21          Q.      So what was required or how did he
22     explain the process of switching to hand steering?
23          A.      I don't recall him -- I don't recall him
24     describing the process.
25          Q.      So --
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2         A.    I don't remember the process.
 3         Q.    All right.
 4               (Discussion held off the record.)
 5         Q.    So on the 2692-B that was completed by
 6   Mr. Baldassare, it looks like signed by him on
 7   June 19th, this is the report of the mandatory
 8   chemical testing --
 9         A.    Yes.
10         Q.    -- following a serious marine incident,
11   right?
12               And this reflects that all five members
13   of the crew held Coast Guard credentials, right --
14         A.    Yes.
15         Q.    -- in Section 3, block 5?
16               And then in block 6, no one was -- no
17   one underwent a drug test urine sampling within
18   32 hours of the incident, correct?
19         A.    Correct.
20         Q.    And no one was tested for alcohol within
21   two hours of the incident, correct?
22         A.    Correct.
23         Q.    And in block 7, did Mr. Baldassare
24   review what he reported in that section before
25   submitting this report to the Coast Guard?
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        A.      I would believe so.
 3                MR. RODGERS:  Don't guess.
 4        A.      No.  So then no, I didn't -- I didn't
 5   type this up or review it, so I don't know what he
 6   would have done.
 7        Q.      You're saying he didn't run it by you,
 8   though?
 9                MR. RODGERS:  Objection.  I don't think
10        he said that.
11        Q.      Well, if he did, you can correct me.
12   I'm sorry.  I --
13        A.      No, it's right.  I don't recall him
14   running this by me for this one, because I believe it
15   was all in that same Coast Guard e-mail thread.
16        Q.      Did you e-mail with anybody besides
17   Lieutenant Palomba at the Coast Guard regarding this
18   incident?
19        A.      Nobody separately that she wasn't
20   involved with.
21        Q.      Did you e-mail separately with the -- I
22   forget the guy's name, with the National
23   Transportation Safety Board?
24        A.      Lucas Wisnowski?
25        Q.      Yeah.  Okay.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2         A.      No.  Nothing directed.  Didn't have
 3    counsel in it or the Coast Guard, I believe.
 4         Q.      All right.  Do you still have those
 5    e-mails?
 6         A.      Yes.
 7         Q.      In the report of mandatory chemical
 8    testing of 2692-B, page 1114, none of the blocks in
 9    No. 4 are checked.
10                  Do you know why?
11         A.      I do not know why.
12         Q.      Do you know if one was ever completed
13    that was checked, those blocks were checked?
14         A.      I do not know.
15         Q.      And then if you turn to page 116, this
16    is the 2692-A Barge Addendum?
17         A.      Yes, sir.
18         Q.      Do you know who completed this report?
19         A.      I also believe it was Lenny.
20         Q.      All right.  It describes the extent of
21    the property damage in block 3K --
22         A.      Yes, sir.
23         Q.      -- or next to 3K.  Displacement of Belt
24    Line Bridge support structure.
25                  You think Mr. Baldassare told them that?
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2          MR. RODGERS:  Objection.  Calls for

3     speculation.

4          **A.     This would have been submitted.  It's --**

5          Q.     I can't find a date on it, so I don't

6     know when it was submitted.

7          **A.     No, it's true.  There's no date on it,**

8     **but it -- this would also be in that e-mail thread**

9     **with the Coast Guard.  It was probably a request by**

10    **Lieutenant to submit this one as well.**

11         Q.     Okay.

12              MR. CHAPMAN:  I think this is 20.

13              (Exhibit 20, Daily Engine Room Logs,

14       marked for identification, as of this date.)

15              THE VIDEOGRAPHER:  We are going off the

16       record.  The time is 5:06 p.m.

17              (Discussion off the record.)

18              THE VIDEOGRAPHER:  Beginning Media No.

19       5.  We are back on the record.  The time is 5:17

20       p.m.

21    BY MR. CHAPMAN:

22         Q.     Mr. Moore, you've been handed

23    Exhibit 20, which I believe is a collection of Daily

24    Engine Room Logs covering roughly June 12th through

25    June 16th, 2024.

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025

 2                 They're in this exhibit in the order in

 3     which they were produced, which is Carver 000118

 4     through 147, although they're not necessarily all in

 5     that kind of right chronological order.

 6          A.     Yes, sir.

 7          Q.     Okay.  So just looking at page 1, this

 8     is a report on the hours on the engines or the

 9     gensets on the boat, right?

10          A.     Yes.

11          Q.     Is there a reason that Brandon Kuster

12     would fill this out versus the engineer?

13          A.     There's a way -- and it's more of a Helm

14     operating issue, that you -- if you don't log out, it

15     just keeps you logged in for the entire time.

16                 So it's common a lot of the -- the crews

17     will forget to log out when they crew change or

18     whatever may happen, and there's a separation of

19     engine room logs versus wheelhouse logs.  So a

20     separate person can be logged in for engineering as

21     they can be for wheelhouse logs.

22          Q.     So if I understood what you said,

23     McGrath might have filled this out?

24          A.     Correct.

25                 MR. RODGERS:  Objection.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2        Q.     He filled it out as -- logged in as
 3   Kuster?
 4        A.     Mistakenly, yes.
 5        Q.     Okay.  Is there any way to know who
 6   actually filled it out, then?
 7        A.     We can -- you would look at Brandon
 8   Kuster, if he was assigned to a different vessel
 9   somewhere else in the payroll.
10        Q.     Well, okay.
11               And then it says Inspected, June 13th,
12   2024, 1503, so then this report was prepared around
13   three o'clock in the afternoon?  See that on page 1?
14        A.     Yes, that's correct, when they did that.
15        Q.     And like the daily logs, is this also
16   submitted to the company?
17        A.     Yeah.  It is able to be seen by anybody
18   in Helm.
19        Q.     And is there anybody with sort of
20   specific responsibility for reviewing these as
21   they're -- they come into the company?
22        A.     No.
23        Q.     But anybody who has access to Helm could
24   look at them --
25        A.     Yes, sir.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1              Moore - April 28, 2025
 2        Q.      -- right?
 3               Do they also get flagged if they're not
 4   timely filled out?
 5        A.      I believe so -- correction.  They do.
 6        Q.      So the first several pages cover hours
 7   on the engine, and then beginning on page 128, and
 8   where it looks to me like those start some separate
 9   report on readings, you know, oil pressure, water
10   system, that sort of thing?
11        A.      Yes, sir.
12        Q.      That's a separate report though,
13   correct?
14        A.      Yes.
15        Q.      All right.  And then if you go to page
16   136, it looks like this is yet another sort of engine
17   room log report.  I don't know what the shortening
18   actually means, maintenance procedure report?
19        A.      I don't know what that is shortened for
20   either.
21        Q.      Okay.  But it's a third engine room log
22   report, correct?
23        A.      Yes, sir.
24        Q.      That all have to be filled out
25   presumably by the engineer, even though it says
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2    Mr. Kuster filled them out?
 3         A.     Correct.
 4         Q.     You wouldn't expect the captain to fill
 5    those reports out, would you?
 6         A.     No, sir.
 7         Q.     All right.
 8                MR. CHAPMAN:  Mark this 21, please.
 9                (Exhibit 21, Helm Screenshot, marked for
10         identification, as of this date.)
11         Q.     You've been handed a one-page exhibit
12    marked 21, which is Carver 000200, and at the top it
13    says Screenshot from Helm of Event.
14                And do you know how this was obtained or
15    what we're looking at here?
16         A.     No, sir, I do not.
17         Q.     And this is as clear as the copy that I
18    got.
19         A.     Right.  No, I actually do not know this
20    one.
21         Q.     So I can read.  In the middle there it
22    says Mate James Morrissey reports the auto pilot was
23    not completely turned off.  He was able to correct
24    and switch back over to hand steering and began
25    backing on the Weeks 281 barge and maneuvered the
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   barge alongside fendering on the north, and PBL
 3   railroad bridge.  Photo taken.  Proceeds slowly away
 4   from the bridge.
 5              So I can't really tell, but it looks
 6   like it might have been Captain Miller, Christopher
 7   Miller --
 8        A.    Yes, sir.
 9        Q.    -- that prepared this.
10              I mean, is this available in some other
11   view where you could actually read the whole thing
12   and understand all the details?
13        A.    I don't know.  I wouldn't know how to
14   access this.
15        Q.    Okay.
16        A.    It's hard to reference.
17        Q.    So it says that the time is 1530 on
18   June 15, 2024.
19              You see that?
20        A.    Yes, sir.
21        Q.    So do you know what -- is that the time
22   that it was entered or is that -- like what is that?
23        A.    I could not tell you.
24        Q.    Are there any attachments?
25        A.    It looks like zero attachments.
```

BRIAN MOORE

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2        Q.     Do you know if this is the screen where
 3   an entry would be made?
 4        A.     I don't know exactly.  I don't remember
 5   what the entry screens would look like.
 6        Q.     Okay.  It looks like there's a drop-down
 7   selection box where it says Incident?
 8        A.     Yes, sir.
 9        Q.     So do you know what else you can record
10   in here besides an incident?
11        A.     No, I don't know off the top of my head.
12               MR. CHAPMAN:  Can we mark this as 22.
13               (Exhibit 22, Handwritten Logs, marked
14          for identification, as of this date.)
15               THE WITNESS:  Are these yours?
16               MR. CHAPMAN:  Yeah.
17               THE WITNESS:  Thank you.
18        Q.     Mr. Moore, you've been handed
19   Exhibit 22, which I take to be the Rough Engine Log
20   for the MACKENZIE ROSE?
21        A.     Yes, sir.
22        Q.     It doesn't say MACKENZIE ROSE on it
23   anywhere, but it looks like one of those journal-type
24   logbooks you were describing earlier.  This one for
25   2024 --
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        A.     Yes.
 3        Q.     -- right?
 4               Is this the same data that is then
 5   entered into that Helm record?
 6        A.     I would -- I don't know exactly if it's
 7   the day of or prior day of.  I would have to look at
 8   it.
 9        Q.     So the whole book, all 365 pages, is
10   somewhere, right?
11        A.     Yes.
12        Q.     Do you know where?
13        A.     No.
14        Q.     Is it your practice to take them off the
15   boat when there's a new year and store them
16   somewhere?
17        A.     We don't necessarily store them, because
18   they're not really a required -- you know, it would
19   be similar to like a notepad being stored in the
20   wheelhouse, that you would write notes and comments
21   and positions down.  So not necessarily.  Now of the
22   fact that because we have the digital logs.
23        Q.     Do you recall being asked to keep it for
24   any reason?
25        A.     I don't recall exactly being asked to
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    keep it, but I'm sure we took it off the vessel after
 3    the fact.
 4         Q.    All right.  These are pages that were
 5    photocopied from it, though?
 6         A.    Yes.
 7         Q.    Okay.
 8               MR. CHAPMAN:  Mark that as 23, please.
 9               (Exhibit 23, Handwritten Logs, marked
10          for identification, as of this date.)
11         Q.    You've been handed Exhibit 23, and to my
12    understanding, this is the deck log, the rough deck
13    log --
14         A.    Yes, sir.
15         Q.    -- from the MACKENZIE ROSE, covering
16    June 12th through June 16th, 2024 --
17         A.    Yes.
18         Q.    -- correct?
19         A.    Correct.
20         Q.    Again, same question.  Where does the
21    book with all 365 pages in it go?
22         A.    I don't know where it is currently, but
23    I believe we took it off the vessel.
24         Q.    All right.  Do you recall being asked to
25    retain this?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        A.     I don't recall.
 3        Q.     So if you could turn to page 242 in the
 4   exhibit.
 5               Do you know whose handwriting is whose?
 6        A.     I do not.
 7        Q.     It would have been either Morrissey or
 8   Miller, right?
 9        A.     I believe so.
10        Q.     So it -- I'm not really sure how this --
11   it looks to me like some of the time stamps might be
12   cut off over on the left-hand side of this page.
13               But what looks like 1:30 says Arrive
14   light boat at barge.  Meet with Brian Hales,
15   Surveyor.
16               On the Helm log, it says 11:30.  That's
17   what leads me to believe that maybe the 1 is cut off,
18   right?
19        A.     Right.
20        Q.     And then the next entry there, it
21   says -- it looks like it says 2, right, two
22   o'clock --
23        A.     Yes, sir.
24        Q.     -- Brian Hales off tug and barge.
25               Maybe that's noon, but if it was 2 p.m.,
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    I would assume they would put 1400.
 3           A.     I would assume it, but they very well
 4    might have.
 5           Q.     Okay.  But it says Brian Hales off tug
 6    and barge.  And then somebody's made the entry Weeks
 7    281, MACKENZIE ROSE, 14.
 8                  And then there's the next kind of line
 9    underneath it -- written underneath that says Drafts.
10    4-foot, 6-inch bow.  5-foot, 0-inch stern, right?
11           A.     Yes, sir.
12           Q.     Now, you told us earlier that the tug
13    drew 16 feet?
14           A.     It was estimated, 15 to 16 feet.
15           Q.     Okay.  Are these tug drafts or barge
16    drafts, to your reading of it?
17           A.     The 14 feet would be the tow draft and
18    then the 4-foot, 6 and 5-foot, 0 would be the barge
19    drafts.
20           Q.     So she was slightly down at the stern by
21    a few inches, right?
22           A.     Correct.
23           Q.     Okay.  Then it 1630, it says Cocaptain
24    reports steering went hard over, and he was backing
25    in.  We tapped the north end PBL railroad bridge.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2                  Now, that entry doesn't show up in the
 3      Helm system, does it?
 4          A.      No.
 5          Q.      But it's here in the rough log?
 6          A.      Yes.
 7          Q.      When did you get a copy of this rough
 8      log?
 9          A.      Not until well after the fact.
10          Q.      You didn't ask the folks in the boat to
11      photocopy it or take a picture of it and send it to
12      you?
13          A.      No, because we don't utilize the rough
14      logs.  Their own personal -- not -- sorry,
15      correction.  They're not for personal use, but
16      they're for their guys to write notes down.  So when
17      they do get squared away, they can safely type it
18      into the laptop.
19          Q.      But they never typed that into the Helm
20      report for June 15th, 2024, did they?
21          A.      No, but not everything that's on here is
22      an official logbook entry.
23          Q.      So when you allide with a bridge, unless
24      it goes into the Helm system, it's just not an
25      official logbook entry?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2              MR. RODGERS:  Objection.
 3         A.      They wrote -- on the logbook entry, they
 4    wrote Incident in Helm.
 5         Q.      And -- but they didn't write that the
 6    steering went hard over in Helm, did they?
 7         A.      I don't remember.
 8              MR. RODGERS:  You have to show it to
 9         him.
10         Q.      And then at 1635, it says Called Brian
11    Moore and Lenny B.
12              That's Lenny Baldassare, correct?
13         A.      Yes, sir.
14         Q.      To report incident.
15              And then 1650, Multiple calls made
16    between management.
17              Now, would that have been from the
18    company's phone on the tug?
19         A.      I -- yes.  It would have been.  It
20    should have been, but I can't guarantee the other
21    calls.
22         Q.      Okay.  And then the 1655, Lenny B
23    reports that Coast Guard is letting us proceed to
24    NYH, New York Harbor?
25         A.      Yes, sir.
```

BRIAN MOORE

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2         Q.      So they've made that as a report in this
 3    log, right?
 4         A.      Yep.
 5         Q.      They don't mention taking any photos of
 6    the bridge, though, right?
 7         A.      Nope, note in here.
 8         Q.      This logbook, the hard copy -- we would
 9    call it the rough deck log -- that's provided by the
10    company to the tug, isn't it?
11         A.      They can request it on their dailies or
12    like supplies, requisitions, and then they're just
13    issued out part of --
14         Q.      The company's got a stock of them and
15    provides them --
16         A.      No.
17         Q.      -- year over year?
18         A.      No, we do not.  It would be purchased as
19    per the boats, because not everybody uses it.  Some
20    guys will use a simple note sheet or a, you know,
21    piece of paper for their daily rough notes.
22         Q.      The company pays for this logbook to be
23    on the boat, though, right?
24         A.      I would have to look at and see if we
25    purchased the log.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2        Q.     Who would buy it if the company didn't?
 3        A.      Purchasing.  Oh, the captains or crews.
 4   I've done that before in my past when I sailed.
 5        Q.     And would they be reimbursed for it?
 6        A.      If they submitted for it, they would,
 7   but -- correction.  If they submitted for it,
 8   probably not because it's not a regular order, but
 9   lots of guys carry their own personal notebooks for
10   their travels and their history.
11        Q.     So on this logbook, it doesn't like say
12   Carver inside of it or on the cover or --
13        A.      No, sir.
14        Q.      It says Tug MACKENZIE ROSE on it or
15   something like that?
16        A.      I don't know what that one would --
17   says.  They usually just say red journal and it has
18   the date.  2024, 2025.
19        Q.     Okay.
20                MR. CHAPMAN:  Would you mark that as 24,
21        please.
22                (Exhibit 24, Ayers Marine Electronics
23        Documents, marked for identification, as of this
24        date.)
25        Q.      This is -- you've been handed
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   Exhibit 24, Mr. Moore, which is two pages of what
 3   look like either invoices or repair orders from Ayers
 4   Marine Electronics in Chesapeake, Virginia,
 5   pertaining to the MACKENZIE ROSE, numbered Carver
 6   0000249 and 250.
 7                  You see that?
 8        A.    Yes, sir.
 9        Q.    What do these represent?
10        A.    These are some of the technician reports
11   to work on the auto pilot and some other items as
12   VHF -- such as VHF radios and a Nema expander, which
13   is utilized for syncing of equipments, either GPSs or
14   computers or VHFs.  I don't know exactly what it's
15   for, but I've seen them before.
16        Q.    On page 249, the first page of this
17   exhibit, there's a -- sort of a description of work
18   performed, and it says Tested and checked all auto
19   pilot connections.  Found auto pilot back on, was at
20   120 ohms.  I think that's ohms.
21        A.    That looks like an ohms to me, yes.
22        Q.    All right.  So do you know what it's
23   supposed to be?
24        A.    No, sir, I do not.
25        Q.    Do you know whether 120 ohms is kind of
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   like the right --
 3        A.     I -- that is -- far exceeds my knowledge
 4   of that.  I don't know.
 5        Q.     All right.  Do you know what date this
 6   work was done?
 7        A.     The labor hours have it April 3rd, 4th
 8   and April 5th.
 9        Q.     And is there a separate invoice that
10   would go with this to sort of document that they
11   billed you for it and you paid it?
12        A.     Correct.  Yes.
13        Q.     And how does the company kind of keep
14   track of that stuff?
15        A.     With their accounts payable and
16   receivables team.
17        Q.     So this is like a vendor folder for
18   Ayers Marine?
19        A.     Yes.
20        Q.     And then the second page of Exhibit 24
21   actually has dates in it.  It looks like April 10th
22   and 11th --
23        A.     Yes, sir.
24        Q.     -- 2024.
25               And that would be just like a week later
```

```
 1                    Moore - April 28, 2025
 2   thereabouts or few days later?
 3         A.      Somewhere in there, yes.
 4         Q.      And under the work performed, it says
 5   Diagnose complaint that rudder went hard over
 6   underway.  Checked over steering system.  Updated
 7   software in auto pilot.  Replace solid state relays
 8   with mechanical ones.  May have caused issue.
 9                 All right.  So you know what any of that
10   means?
11         A.      Not expertly, I don't know.
12         Q.      Okay.  So do you know who installed the
13   solid state relays?
14         A.      I would have to reference it, but I
15   believe it was GMT/Mackay.
16         Q.      And Ayers decided to replace them with
17   mechanical ones --
18         A.      Correct.
19         Q.      -- right?
20                 Now, a little further down, there's
21   like a -- somebody's drawn an arrow, and it looks
22   like it continues below.
23                 See the end, it says -- near the end, it
24   says Install VPS battery backup on auto pilot.  Upper
25   monitor not working.  Found one laptop lid was open
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   causing issue.
 3              Do you know what they did there?
 4        A.    No, I do not know what a VPS battery
 5   backup is.
 6        Q.    Is a VPS battery backup associated with
 7   the auto pilot?
 8        A.    Correction.  I believe it's a UPS --
 9        Q.    UPS, okay.
10        A.    -- battery backup, and that is -- so if
11   you were to lose the main engines or generator, the
12   -- our battery backups would have -- allow you
13   technically 24 hours' navigation on certain pieces of
14   equipment.
15        Q.    Okay.  And then some upper monitor not
16   working.
17              Is that the auto pilot monitor?
18        A.    Unlikely.  That's most likely the Rose
19   Point monitor.
20        Q.    So it sounds like they're still doing
21   some work on the auto pilot, including updating
22   software and replacing some relays, right?
23        A.    Yes.
24        Q.    And is this the last work that Carver
25   knows was done on the auto pilot --
```

BRIAN MOORE

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2         A.     Yes, sir.
 3         Q.     -- before the allision with the bridge?
 4         A.     Yeah.  To my knowledge, there was
 5   no additional auto pilot work done before -- after
 6   this -- sorry, correction -- and after the allision.
 7         Q.     Okay.
 8                MR. CHAPMAN:  So would you mark these as
 9         25, please.  Mark this as 25.
10                (Exhibit 25, GMT Mackay Marine Invoices,
11         marked for identification, as of this date.)
12         Q.     You've been handed Exhibit 25.  You
13   mentioned GMT Mackay as another repair company --
14         A.     Yes, sir.
15         Q.     -- on your marine electronics.
16         A.     Yes, sir.
17         Q.     All right.  So Exhibit 25 consists of
18   three pages labeled Carver 000251, 252, and 821, just
19   because the way they were produced to us, but I
20   believe this is all of the ones that were produced.
21                So can you tell us what GMT Mackay was
22   doing on the MACKENZIE ROSE.
23         A.     The vessel was down in New Orleans
24   getting ready to pick up some barges, and the -- it
25   looks like Lars, or sorry, Christian Nunnaman called
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    in a technician, GMT Mackay, and they flew down there
 3    to get on the vessel to look at their auto pilot, and
 4    then some other various items that they swapped out
 5    as well, too.
 6         Q.    So looking at the first page of that, it
 7    looks like the invoice is dated December 4th --
 8    excuse me, December 5th --
 9         A.    Yes, sir.
10         Q.    -- right?
11               And they removed some -- removed a
12    defective AP50 Simrad auto pilot system, right?
13         A.    Yes.
14         Q.    So -- and then they installed two new
15    ones, which looks like they have different series
16    numbers, AP70 MMK2, right?
17         A.    Yes.
18         Q.    So I guess that's the new and improved
19    version, right?
20         A.    Yes, sir.
21         Q.    And installing two, does that mean one
22    went in the wheelhouse and the other one went in the
23    upper house?
24         A.    Correct.
25         Q.    But they're basically identical auto
```

BRIAN MOORE

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2    pilot systems in each house?
 3          A.     Yeah.  There would be no -- there would
 4    be no real differences between the two.
 5          Q.     Are they connected in any way?
 6          A.     I don't know off the top of my head.
 7          Q.     And is there any indication that they
 8    installed those solid state relays?
 9          A.     I don't know what the relay would do,
10    but no, it does not say that on here.
11          Q.     Okay.
12          A.     But I don't know exactly.
13          Q.     So it's possible they didn't replace any
14    relays and they just reused what was on the boat?
15                 MR. RODGERS:  Objection to form.
16          A.     I don't know how -- I'm not that versed
17    in engineering.
18          Q.     So who is the guy in Carver that is?
19          A.     Well, this is why we hire the
20    technicians out, the -- as the experts into it.
21          Q.     So it says it was billed to Mickey
22    Hilton.  Who is Mickey Hilton?
23          A.     Mickey Hilton was a former port engineer
24    that was not there when I came there.  So I think
25    it's just in their accounting system as the last
```

```
 1                    Moore - April 28, 2025
 2    known contact.
 3         Q.    All right.  So likewise on page 2 of
 4    this exhibit, which is numbered 252, it's also
 5    addressed to Mickey Hilton, right --
 6         A.    Yes, sir.
 7         Q.    -- billed to Mickey Hilton?
 8               Somehow it gets to you or somebody to
 9    authorize payment?
10         A.    Yes.  It goes through A/P, A/R.
11         Q.    Okay.  You don't have to approve this?
12         A.    Yes.
13         Q.    You do?
14         A.    I would approve it after the fact, and
15    once it comes in through invoicing.
16         Q.    All right.  So the invoice shows up, you
17    approve it, and then it gets paid?  Is that the
18    process, as I understand it?
19         A.    Yes.
20         Q.    Okay.  So this one is dated March 5th
21    of '24, and it looks like it was for some work on
22    March 2nd of '24.  A complaint about the auto pilot
23    switch to standby intermittently, right?
24         A.    Yes.
25         Q.    And then it says they couldn't repeat
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   the problem, but noticed that some lever, the FU-80
 3   FFU lever, had liquid spilled damage.
 4                  Right?
 5        A.    Yes, sir.
 6        Q.    Do you know what the FU-80 FFU lever is?
 7        A.    I do.  It's a full followup lever that
 8   looks like a little joy stick on your console that
 9   you would use to steer the vessel.
10        Q.    So is that related to the non-followup?
11        A.    The non-followup and full followup are
12   two separate, independent things.
13               Full followup is when you adjust, the
14   lever stays in that rudder angle.
15               Non-followup has a spring return where
16   you click it and it comes right back and it will stay
17   in that rudder.
18               So full followup, if you hold it, it
19   will keep going; it will swing with you.
20               Non-followup always returns to center,
21   but will hold the rudder.
22        Q.    So if you want to switch over to manual
23   steering, do you have to be a non-followup?
24        A.    I don't know off the top of my head how
25   that system was set up.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2      Q.     Like every boat's different?
 3      A.     You -- I would have to look at it,
 4  honestly.  It would be -- it would be auto pilot to
 5  full followup, and there's specific steps.  You just
 6  switch this off and switch that, but I don't know how
 7  this one's set up.
 8      Q.     But there was no prohibition against the
 9  captain using the auto pilot system for the transit
10  that they were making before they allided with the
11  bridge, right?
12             MR. RODGERS:  Objection to form.
13             You can answer if you understand the
14      question.
15      A.     Repeat the question.
16      Q.     Yeah.
17             There was no prohibition -- Carver
18  didn't prohibit the captain from using the auto pilot
19  system in the transit that he was making, you know,
20  down the southern branch of the Elizabeth River
21  before the allision?
22      A.     No.  It's up to the captain's discretion
23  to make that judgment call.
24      Q.     So on this invoice that we were just
25  looking at, March 5, 2024, page 252, it says Also the
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   complaint of auto pilot high response.
 3                    Do you know what the high response
 4   refers to?
 5        A.     No, I do not.
 6        Q.     So the technician says he checked the
 7   auto pilot settings, showed crew to set up the rudder
 8   gain, and counter-rudder and set up rudder limits, if
 9   needed.
10                    Do you know what that means?
11        A.     Not exactly.
12        Q.     Sounds like it's related to the
13   rudder --
14                    MR. RODGERS:  Objection.
15        Q.     -- right?
16        A.     It's related to the auto pilot.
17        Q.     Because the auto pilot controls the
18   rudder?
19                    MR. RODGERS:  Objection.
20        A.     There's no other way to not.
21        Q.     Well, that's what I figured --
22        A.     Yeah.
23        Q.     -- you know.
24                    Your lawyer's objecting.  I'm just
25   trying to understand.
```

1                    Moore - April 28, 2025

2          **A.      Right.  But I'm not --**

3                    MR. RODGERS:  No.  You're just putting

4          words into this mouth.  That's all.

5          **A.      But I'm not a technician, so I don't**

6  **really understand what the high response rate and the**

7  **gain counter-rudder settings are for that system.**

8          Q.      Okay.  So it looks like -- it says

9  Service org and primary tech on both of these pages,

10 Kands.

11                   Is that a person?

12         **A.      I do not know, actually.**

13         Q.      Then the last page of this exhibit is an

14 invoice dated December 1, 2023.  It looks like it's

15 for shipping some stuff, four rudder angle

16 indicators.

17                   Are those necessary for the auto pilot

18 to work properly?

19         **A.      I do not know how they are corollated to**

20 **it.**

21         Q.      What's a rudder angle indicator tell

22 you?

23         **A.      What's -- where the position -- where**

24 **the rudder position is.**

25         Q.      And why are four of them required on the

```
 1                    Moore - April 28, 2025
 2    MACKENZIE ROSE?
 3         A.     I do not know that as well, if it's --
 4    some are spares or they just replaced a couple.
 5              MR. RODGERS:  Don't guess.
 6         A.     Oh, yeah.  I don't know, actually.
 7         Q.     I mean, you would expect there to be
 8    two, right?  One for upper house and one for the
 9    wheelhouse?
10              MR. RODGERS:  Objection to form.
11              You can answer.
12         A.     Yeah, there are -- what -- each
13    concentration has a rudder angle indicator.
14         Q.     Yeah.  So maybe two of them for another
15    boat?
16              MR. RODGERS:  Objection.
17         A.     I don't know.
18         Q.     Okay.  It sounds like the Simrads were
19    replaced in late 2023, and then there's some work
20    that Ayers and Mackay are both doing in 2024 --
21              MR. RODGERS:  Objection.
22         Q.     -- related to the auto pilot system,
23    correct?
24              MR. RODGERS:  Objection to form.
25         A.     It -- the invoicing starts on the --
```

```
 1                    Moore - April 28, 2025
 2    late 2023.
 3         Q.    And that's --
 4         A.    But there's different components.  They
 5    did more than just auto pilot, it looks like.
 6         Q.    Yep.  Yeah, I'm not saying it's all
 7    related to auto pilot, but some of it clearly is
 8    related replacing the two auto pilots on the boat,
 9    right?
10         A.    Correct.
11         Q.    In late '23, along with the rudder angle
12    indicators, right?
13         A.    Yeah.  I don't -- honestly don't know
14    what the rudder angle indicators are for.  I don't
15    know how they correlate to it, but that is -- they
16    were ordered.
17         Q.    Okay.  And then there's an invoice from
18    Mackay, as well as two of them from Ayers, in 2024,
19    March and April timeframe, related to work on the
20    auto pilot system on the MACKENZIE ROSE --
21         A.    Correct.
22         Q.    -- in response to complaints about it,
23    right?
24              MR. RODGERS:  Objection to form.
25         A.    I don't know about the complaints on
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2    them, but they were replaced for -- to ensure that
 3    they worked.
 4         Q.    Are you saying they were replaced again
 5    in 2024?
 6                MR. RODGERS:  Objection.
 7         A.    After Ayers completed their replacements
 8    and upgrades, whatever it was needed, I guess, there
 9    was no issues after that.
10         Q.    Okay.  I'm not trying to argue with you,
11    but I understood that Mackay replaced them in late
12    2023 --
13                MR. RODGERS:  Objection.
14         Q.    -- and that Mackay and Ayers then did
15    some more work on them in 2024.  Mackay in March of
16    2024, and Ayers twice in April of 2024, and that's
17    when --
18                MR. RODGERS:  Objection to the term
19         replaced.
20                MR. CHAPMAN:  Let me just finish.
21         Q.    -- and that's what those invoices that
22    we've been looking at as Exhibits 24 and 25 tell us;
23    is that right?
24                MR. RODGERS:  Objection.  That -- you're
25         not asking a question, you're making a
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2       statement, and I object to the term replaced in
 3       that context.  So why don't you reword it,
 4       maybe.
 5               MR. CHAPMAN:  That was a long one.
 6       Q.    Do you understand my question?
 7       A.    If you can repeat it.
 8               MR. RODGERS:  You want to read it over.
 9       Q.    The Mackay invoices document that the
10  two auto pilot systems on the MACKENZIE ROSE were
11  replaced in late 2023 --
12               MR. RODGERS:  Objection.
13       Q.    -- right?
14       A.    I don't know exactly when they were
15  replaced or the components or what was exactly done.
16  The technicians would have the best understanding of
17  that.
18       Q.    So can we agree that the invoices
19  document the work that was done by both Mackay and
20  Ayers?
21       A.    Mackay and Ayers definitely did work on
22  multiple systems, including the auto pilot system.
23       Q.    Okay.  And to the extent there was work
24  on the auto pilot system, those are documented on
25  those documents that you received from Mackay and
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    Ayers, correct?
 3         A.        Correct.
 4         Q.        Okay.  Were there any other complaints
 5    about the auto pilot system after Ayers last worked
 6    on it in April of 2024 and the allision with the
 7    bridge on June 15, 2024?
 8         A.        Not that I'm aware of.
 9                   MR. CHAPMAN:  Would you mark this as 26,
10         please.
11                   (Exhibit 26, 9.2 Near Miss Report,
12         marked for identification, as of this date.)
13         Q.        Mr. Moore, you've been handed
14    Exhibit 26, which is Carver 000041 and 42 --
15         A.        Yes, sir.
16         Q.        -- and it looks like a report from your
17    Helm system called a Near Miss Report --
18         A.        Yes.
19         Q.        -- right?
20                   And the only date that I see on it is --
21    it says it was approved on May 6th of 2024.
22                   You see that?
23         A.        Yes, sir.
24         Q.        Which is the date that it was received.
25    Maybe they're the same thing.  I don't know.  And
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    that it was received by you, right?
 3         A.     Yes.
 4         Q.     So when it's received by you, do you get
 5    a notification?
 6         A.     No.  So I have to go into Helm and
 7    acknowledge the individual near miss reports that the
 8    vessels compile.
 9         Q.     Okay.  And --
10         A.     But it's not -- sorry.
11                It's not done daily or we -- it's when I
12    log into it and get to it.
13         Q.     So it's a -- you get them because why?
14    You're the general manager or the designated person
15    or what?
16         A.     Yeah.  Because I'm the general manager,
17    yep.
18         Q.     Okay.  Does anybody else get them?
19         A.     I don't know if anybody else gets it.  I
20    believe these just come directly to me, but anybody
21    else can log into Helm to see them as well.
22         Q.     And how often do you log into Helm and
23    check these?
24         A.     It all depends on how busy I get, and
25    with other things.  It's -- it could be every few
```

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   weeks.  It could be -- I've gone longer before.  It
 3   could be -- every couple of days I try to, but
 4   there's been times where it's been much longer.
 5        Q.    So this particular one, on May 6th of
 6   2024, do you have any memory of when you actually
 7   looked at it?
 8        A.    No, I do not have a memory of that one.
 9        Q.    Do you know whether it was before the
10   allision with the bridge?
11        A.    Well, my received date would be before
12   the allision with the bridge.
13        Q.    I know that.  I'm asking you do you have
14   any memory of when you looked at it; and if so, was
15   it before the allision --
16        A.    Oh.
17        Q.    -- of the MACKENZIE ROSE with the
18   Norfolk and Portsmouth Belt Line Bridge?
19        A.    Correction.  I do not know when I looked
20   at it.
21        Q.    So in Helm when you look at it, is there
22   something that you check that I've read it or
23   something that says I approve it or --
24        A.    That would be -- that would be the
25   receive date.
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2          Q.      Okay.  So we're under Section 2 where it

3    says Office Use Only.  Approved on May 6, 2024.

4                  That was the date that you actually

5    looked at it or is that the date that it just came

6    into the system and you don't know when you looked at

7    it?

8          A.      **That was the day that I logged in and**

9    **acknowledged it, receipt of it.**

10         Q.      Okay.  And was that also the same day it

11   was received; that is, Captain Miller submitted it

12   that date?

13         A.      **No, not necessarily.**

14         Q.      So how do we know what date Captain

15   Miller submitted it?

16         A.      **I do not know that answer.**

17                 MR. CHAPMAN:  Mark this as 27, please.

18                 (Exhibit 27, Daily Log, marked for

19            identification, as of this date.)

20         Q.      You've been handed Exhibit 27,

21   Mr. Moore, which consists of three pages labeled

22   Carver 000030 through 32.

23                 You see that?

24         A.      **Yes, sir.**

25         Q.      And if you look on the second page of

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    this exhibit, which is page 31, at 1235, it says
 3    there's a near miss report --
 4         A.    Yes.
 5         Q.    -- right?
 6                Is this the near miss report that you
 7    approved or reviewed on May 6th of 2024?
 8         A.    I do not know how to line those two up.
 9                MR. RODGERS:  Do you have one for me?
10                MR. CHAPMAN:  Oh, I apologize.  I'm
11    sorry.  Yes, I do.
12                MR. RODGERS:  Thanks.
13         Q.    How do you match them up?  What's the
14    process to go through to match them up?
15         A.    I do not know, actually.
16         Q.    I'm sorry.  You what?
17         A.    I do not know, actually, how to match
18    them up.
19         Q.    Okay.  So this is clearly a near miss
20    report entered by the captain in the Helm system as
21    shown on Exhibit 27 at 12:35 on May 3rd?
22         A.    Yes.  And it -- and also, multiple other
23    drills and whatnot for the time before that, and time
24    after.  So I don't know if he was just filling out
25    all the forms in -- all at once and just putting in
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    information.
 3          Q.     All right.  So I see what I think you're
 4    saying; about he entered a bunch of drills or
 5    something like that, right?
 6          A.     Yes, sir.
 7          Q.     Okay.  But is there a way in the Helm
 8    system to go in and look at this specific entry on
 9    the 3rd of May of 2024 and determine what was
10    actually reported as a near miss at that time?
11          A.     I would have to look into it, into Helm.
12    I'm not familiar how to pull that up.
13          Q.     All right.  Because there's clearly, as
14    you can see in Exhibit 26, something that you are
15    reviewing and approving like three days later, right?
16          A.     Yep.
17          Q.     That is a near miss report.  And I'm
18    just trying to figure out is there some match up
19    between the two of those?
20          A.     I would have to look into Helm further.
21          Q.     Okay.  But there's a way to figure that
22    out in Helm or not?
23          A.     I honestly do not know.  I would have to
24    look into it.  I don't know how to easily navigate
25    through Helm to pull up what he -- historicals.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2       Q.    So this -- Captain Miller entered a
 3  report on the -- some date before you read this on
 4  May 6th, according to Exhibit 26, that says while he
 5  was transiting southbound and entering information,
 6  the steering went into standby and the rudder came
 7  hard over without alarm.  By the time the captain
 8  realized the situation, we were steaming full ahead
 9  at the loaded barge.  The captain pulled back power
10  so the rudder would respond and came away from the
11  barge with a few feet to spare.  The wire dragged on
12  the bottom and sustained minimal damage.
13             That's what Captain Miller submitted,
14  right?
15       A.    Yes, sir.
16       Q.    Okay.  So we know -- do you -- in terms
17  of wire dragging on the bottom, does that mean they
18  had a tug on the tow wire?
19       A.    I don't know how -- you could -- yeah,
20  you would then put the two wires on the bottom of the
21  seabed.
22       Q.    Okay.  So it looks like he's talking
23  about entering a bunch of data into the electronic
24  log, and the steering somehow acted up and went hard
25  over, and no alarm, right?
```

```
 1                 Moore - April 28, 2025
 2        A.     I don't know if there was an alarm.
 3               MR. RODGERS:  Are you looking at this
 4        one?  I think you're looking at --
 5               MR. CHAPMAN:  Yeah, Exhibit 26.
 6        Q.     When it says under the description of
 7   the near miss, right, Section 1.5?
 8        A.     Yep.
 9        Q.     That's where I'm reading.
10               So on Exhibit 26, the second page under
11   Section 2.3, it says Lessons learned.  Employee who
12   is approving this near miss shoreside should also
13   complete the Lessons Learned Form 9.7 in correlation
14   to the near miss.
15               So in Section 2.3, do you know whether
16   the lessons learned created is a required field that
17   has to be completed?
18        A.     It is not a required field.
19        Q.     Okay.  So you've added the word no there
20   to it, right?
21        A.     Correction.  I don't know exactly right
22   now if it's a required field or not.  It could be.
23        Q.     But even if it is a required field, you
24   checked the box no?
25        A.     Correct.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1              Moore - April 28, 2025
 2       Q.    Okay.  So there was no lesson learned as
 3  a result of what Captain Miller was reporting?
 4       A.    No, because I would have had Lenny or
 5  somebody else call and find out from it before I
 6  finally approved it.  So I don't recall if it was him
 7  just entering near misses, because we encouraged near
 8  misses with all the crews.  So I don't know if that's
 9  an accurate one or if it was the steering pump or if
10  it was this or that.  Like it just is him entering
11  all these logs in before and after.  I don't know if
12  it was an accurate near miss or not.
13       Q.    Is there any documentation of your
14  contact with Mr. Baldassare related to this near miss
15  report?
16       A.    No.
17       Q.    And is there any indication that any
18  electronic technician or other technician went out to
19  check out what the captain was reporting about the
20  steering going into standby, rudder coming hard over
21  without alarm?
22              MR. RODGERS:  Objection, foundation.
23              You can answer if you know.
24       A.    Not that I know of.
25              MR. CHAPMAN:  Could you mark this as 28,
```

BRIAN MOORE

**April 28, 2025**

```
 1                      Moore - April 28, 2025
 2          please.
 3                      (Exhibit 28, 9.2 Near Miss Report,
 4          marked for identification, as of this date.)
 5          Q.      So this appears to be an -- Exhibit 28
 6      appears to be another near miss report from the Helm
 7      system, right?
 8          A.      Yes, sir.
 9          Q.      And if you could compare this to
10      Exhibit 26.
11          A.      Okay.
12          Q.      And so it looks like there's some
13      heading information at the top of Exhibit 28 that
14      should be available on Exhibit 26, but it's just not
15      there, right?
16                      MR. RODGERS:  Objection.  I think
17          there's two different dates of the incidents.
18                      MR. CHAPMAN:  Yeah, I agree.  There are
19          two different dates.
20          Q.      The question I'm asking, though, is
21      Exhibit 28 has a -- some information at the top
22      titled 9.2 Near Miss Report.  It's got some external
23      number, a tag that it's clearly related to the
24      MACKENZIE ROSE, who completed it, and the time it was
25      completed, right?
```

```
 1                  Moore - April 28, 2025
 2          A.     Yes.
 3          Q.     Okay.  Is there any reason why the
 4  document now marked as Exhibit 26 wouldn't have the
 5  same type of information at the top of it?
 6          A.     I don't know.  I didn't submit these.  I
 7  don't know where this one came from.
 8          Q.     You're talking about 26?
 9          A.     Correct.  Correction.
10          Q.     Okay.
11          A.     Yep.  So I don't know.
12          Q.     Other than that, the reference to form
13  response items and all the things that appear
14  underneath it, appear to be in line with what you
15  fill out in a near miss report, right, between the
16  two exhibits.
17          A.     There's some missing boxes from like
18  two points -- or no, it's in here.  Okay.  It's just
19  a different page.
20                 Yeah, everything else looks similar.
21          Q.     Okay.  So referring to Exhibit 28, then,
22  the report was in auto pilot failure --
23          A.     Yes.
24          Q.     -- while they were underway to New York?
25                 MR. RODGERS:  Objection to the term
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          failure.  It just says auto pilot stopped.
 3                    THE WITNESS:  On 28.
 4                    MR. CHAPMAN:  I think it says auto pilot
 5          failure under Near Miss Subject, right, 1.5.1.1?
 6                    MR. RODGERS:  Oh, up there.  Yeah, I'm
 7          looking lower down on the page.
 8          A.        Okay.  Yeah, 1.1 says auto pilot
 9     failure.
10          Q.        Okay.  So --
11                    MR. RODGERS:  Oh.
12          Q.        And then 1.5 says auto pilot stopped,
13     tug took a hard left into other traffic lane, right?
14          A.        Yes.
15          Q.        And again, this came to you on
16     March 4th, 2024?
17          A.        Yes.
18          Q.        And you approved it that date --
19          A.        Yes, sir.
20          Q.        -- right?
21                    Again, you either checked from the
22     drop-down or entered no in response to lessons
23     learned created, right?
24          A.        Yes.
25          Q.        And was there any follow-on
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   investigation, or you know, dispatch of technicians
 3   to go take a look at it, in terms of what had been
 4   reported?
 5        A.    I don't know off the top of my head if
 6   anybody else ordered technicians.
 7        Q.    So if you look again at Exhibit 25 --
 8        A.    Yes.
 9        Q.    -- you see that's a GMT Mackay invoice?
10        A.    Yep.
11        Q.    The second page of that exhibit, page
12   252, references some work in early March, invoice
13   dated March 5th, 2024 --
14        A.    Yes, sir.
15        Q.    -- regarding the auto pilot, correct?
16        A.    Yep.
17        Q.    And this is the one where he said he --
18   there was a complaint, but he couldn't repeat the
19   problem, right?
20        A.    Correct.
21        Q.    Okay.  So you sent somebody out to look
22   at it?
23        A.    Yes, sir.
24              MR. CHAPMAN:  Mark this as 29, please.
25              (Exhibit 29, Daily Log, marked for
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2        identification, as of this date.)
 3        Q.    So Mr. Moore, I believe that this is the
 4   daily log on February 28th that's marked as
 5   Exhibit 29 that relates to the near miss report
 6   marked Exhibit 28.
 7              And if you look on Exhibit 29, you'll
 8   see that there was a near miss report entered at
 9   0700 hours.
10              Do you see that?
11        A.    Yes, sir.
12              MR. RODGERS:  Well, I don't -- oh,
13        sorry.
14        Q.    And then if you look on Exhibit 28,
15   you'll see at the top it says Filled, February 28,
16   2024 at 0700 hours, right?
17        A.    Yes, sir.
18        Q.    So it appears those two correlate,
19   right?
20        A.    It appears that way.
21              MR. RODGERS:  Which exhibits correlate?
22              MS. WERNER:  What is the Bates for
23        Exhibit 29, please?
24              MR. CHAPMAN:  25 and 26, I think.  Yeah,
25        25 and 26.
```

BRIAN MOORE

**April 28, 2025**

```
 1                   Moore - April 28, 2025

 2              MR. RODGERS:  And what correlates to

 3      what?  29 correlates to what exhibit?

 4              MR. CHAPMAN:  28.  The time entries.

 5              MR. RODGERS:  The February -- the

 6      February --

 7              MR. CHAPMAN:  Yeah, the time entries.

 8              MR. RODGERS:  Okay.  February.  Okay.

 9              MR. CHAPMAN:  Yeah.  Okay.

10      Q.    So there's a way to at least

11  cross-reference those if you have the information at

12  the top of Exhibit 28?

13      A.    Yes, sir.

14      Q.    Okay.

15      A.    Well, this one on Exhibit 29, at 0700,

16  they were still at the dock.

17      Q.    Have you looked at the rough log for

18  February 28, 2024?

19      A.    No.  Sorry, I have not.

20      Q.    Okay.

21              MR. CHAPMAN:  Mark this as 30, please.

22              (Exhibit 30, 9.2 Near Miss Report,

23      marked for identification, as of this date.)

24      Q.    Do you have Exhibit 30?

25      A.    Yes.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2         Q.     This is a two-page exhibit marked Carver
 3    000039 and 40 and appears to be another near miss
 4    report, correct?
 5         A.     Yes, sir.
 6         Q.     That was -- appears to have been
 7    received and approved by you on April 19th, 2024?
 8         A.     Yes.
 9         Q.     And it references the loss of satellite
10    compass?
11         A.     Yes.
12         Q.     What do you understand that to mean?
13    Did it like fall overboard or --
14         A.     I would -- it could be loss of a signal
15    from a satellite compass.
16         Q.     Okay.  Or that it failed, it went bad or
17    something like that?
18         A.     Yeah, it could be multiple things.
19         Q.     Is that important in navigation?
20         A.     It --
21                MR. RODGERS:  Objection.  He's not here
22         as an expert.
23         A.     You can still navigate the vessel
24    without a satellite compass.
25         Q.     So yeah.  Under the Section 1.5
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2   Description of Near Miss, it looks like Captain
3   Miller is reporting that it caused the auto pilot to
4   go into standby and hard right to heavy seas?
5        A.    Yes, that's what it says.
6        Q.    Okay.  Was this particular near miss
7   report or the loss of the satellite compass ever
8   checked out by technicians?
9              MR. RODGERS:  Can you show him the whole
10        document.
11        A.    Yeah, I don't -- what are we looking at
12   here?
13              Well, yes, we had the technicians, but I
14   don't -- I would have to look at the reference for --
15   to correlate it, the timing of it.
16        Q.    Well, I note under Section 2.5 on page
17   40, that is the second page of this exhibit, under
18   the heading Remedial Activities of Training.  We had
19   technicians come in and completely swap all the
20   electronics that's associated with the navigation.
21   Since the replacement, all components are fully
22   operational.
23              Is that what you entered?
24        A.    Yes, sir.
25        Q.    So what are you talking about there in
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    terms of completely swap all the electronics?
 3          A.     It's just the various auto pilot
 4    components that's needed with the different -- the
 5    different technicians.
 6          Q.     So are you saying there wasn't anything
 7    else to be done?
 8          A.     The -- once the technician changes out
 9    the component and then they operationally test it,
10    like I'm to believe that it's fully operational.
11          Q.     So we know Mackay replaced the auto
12    pilots in late 2023, right?
13                MR. RODGERS:  Objection to the term
14          replaced.
15          A.     They --
16                MR. RODGERS:  That's your term, not --
17          A.     -- they worked on.  They worked on.
18                MR. RODGERS:  Wait until my objection's
19          finished.  Sorry.
20                That's your term, Jim, not his term.  So
21          can you correct your -- go ahead.
22          A.     Mackay did work on the auto pilot
23    system.
24          Q.     Okay.  They put in two new AP70s to
25    replace the two AP50s, right?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                     Moore - April 28, 2025
 2          A.      Yes.
 3          Q.      Okay.  So is that what you're referring
 4   to when you say in Section 2.5 in Exhibit 30 --
 5                  MR. RODGERS:  Objection.
 6          Q.      -- that you had technicians come in and
 7   completely swap all the electronics that's associated
 8   with the navigation?
 9          A.      It doesn't necessarily refer to Mackay.
10   It also refers to Ayers as well, too.
11          Q.      And the last work by Ayers on the
12   MACKENZIE ROSE electronics was in early April of
13   2024, correct?
14          A.      Correct.
15          Q.      So there wasn't any more work done on
16   the MACKENZIE ROSE auto pilot after this report?
17          A.      Yeah, but the -- my approval date isn't
18   necessarily the submission date.
19          Q.      So your lawyer's also produced to us a
20   log for April 1, 2024.
21                  MR. CHAPMAN:  Let's mark that as 31,
22          please.
23                  (Exhibit 31, Daily Log, marked for
24          identification, as of this date.)
25          Q.      And you see at 9:34 --
```

```
 1                    Moore - April 28, 2025
 2          A.      Yes.
 3          Q.      -- on Exhibit 31 -- well, let me stop.
 4                  So Exhibit 31 is the daily log for
 5    April 1, 2024 of the MACKENZIE ROSE, correct?
 6          A.      Yes.
 7          Q.      Consisting of three pages, Carver 0000
 8    27 to 29, right?
 9          A.      Yes.
10          Q.      And on the first page at 9:34 a.m., it
11    says Near Miss Report, correct?
12          A.      It does.
13          Q.      And I don't know how you would correlate
14    these together.  Maybe if we had the information at
15    the top of the exhibit marked 30 from the Helm
16    system, we would know whether it's the same date and
17    time on the Near Miss Report.  But these were
18    produced to me and represented that somehow they were
19    related.
20                  MR. RODGERS:  Objection.
21          Q.      So that's what I'm trying --
22                  MR. RODGERS:  Objection to what they --
23          what we represented to you.
24                  MR. CHAPMAN:  Okay.  Well, if I'm not
25          correct, then you can correct me.
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2                  MR. RODGERS:  I guess if we have time
 3          to.
 4          Q.    If, in fact, this entry on April 1 in
 5   the daily log of a near miss report is, in fact, the
 6   one that is being approved on April 19th by you, it
 7   could well be that the Ayers Marine people came in
 8   and looked at this on April 3rd, April 4th,
 9   April 10th, April 11th, right?
10          A.    It's possible.
11          Q.    Okay.  So that's -- is that what you're
12   referring to in Section 2.5 of Exhibit 30?
13          A.    I don't know exactly, but once Ayers,
14   the technician, signs off on it, I would have then
15   gone in later and approved it and wrote that as a
16   note in there.
17          Q.    Okay.
18                  MR. CHAPMAN:  Would you mark this as 32,
19          please.
20                  (Exhibit 32, Training Records, marked
21          for identification, as of this date.)
22          Q.    Mr. Moore, you've been handed
23   Exhibit 32, which consists of Carver 000851 through
24   885 --
25          A.    Yes, sir.
```

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        Q.      -- which are, to my knowledge,
 3   consecutive.
 4                What are these, or what is this?
 5        A.      This is pulled -- this is a report
 6   pulled from Helm.
 7        Q.      A report of what?
 8        A.      I don't know exactly.
 9        Q.      It looks like it pertains exclusively to
10   James D. Morrissey.
11        A.      Okay.  I don't know.  I don't --
12        Q.      I'm just asking you to confirm that it
13   pertains to him.
14        A.      Well, he's on it, so --
15        Q.      Okay.
16        A.      -- I don't see any other name so far.
17        Q.      And under the column Type, do you know
18   what these are?
19        A.      Those are the drills and reports that
20   the vessel would put in for various -- various
21   things.
22        Q.      In fact, they look to me like a record
23   of all of the training that he was reported as having
24   participated in --
25        A.      I don't know.
```

**April 28, 2025**

```
 1                    Moore - April 28, 2025

 2         Q.      -- or drills.

 3                 MR. RODGERS:  Well, don't guess.

 4                 MR. CHAPMAN:  Okay.

 5         Q.      So here is my question; under -- just

 6    looking at page 1, it's the second entry, June, Week

 7    3 Safety Training Quiz.

 8                 Are written quizzes given to the crew

 9    members on your vessels?

10         A.      No.  I have not -- I have not seen a

11    written -- a written quiz issued out.

12         Q.      So do you know what the content, or is

13    there a way to find out what the content of the

14    safety training quiz for June, Week 3 was?

15         A.      I don't know.  I'd have to look into

16    Helm into it.

17         Q.      Do you know what the icon in the very

18    far left column is?

19         A.      I don't know what that represents, that

20    icon.

21         Q.      Who would know?

22         A.      TBS or Helm.

23         Q.      Sorry?

24         A.      TBS or Helm, what that icon represents.

25         Q.      Is there a person in the Carver
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   organization who would know?
 3        A.      There's people I can assume, but not
 4   necessarily.  It could be multiple things.  I don't
 5   know what it is.
 6        Q.      So you require a tracking of training of
 7   members of the crew as it occurs, right?
 8        A.      Yes, sir.
 9        Q.      It has to be entered somehow in the Helm
10   system, and maybe it goes in through the daily log.
11   I don't know.  But you do track it?
12        A.      Yeah.  These are the weekly -- these are
13   all drills and training that that person is involved
14   with.
15        Q.      And who comes up with these drills and
16   training?
17        A.      It's -- they're auto populated by
18   TBS/Helm.
19        Q.      So what I'm trying to understand
20   is the -- who's the instructor, No. 1, right?  Who
21   does the instruction or the testing?
22        A.      I don't know if -- I don't know about
23   the safety quiz.  I don't know if there is an actual
24   quiz involved, like besides your general arm testings
25   and your fire-fighting drills and your man overbroad
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2    drills.  That's all done by the captain of the
 3    vessel.
 4         Q.    And that training is at the captain's
 5    discretion?
 6         A.    Yes.
 7         Q.    Like whatever he feels like he should
 8    train on, or is there a cycle?
 9         A.    No.  There's a cycle of -- like a matrix
10    that is auto populated into -- by Helm and TBS to
11    make sure that you're covering all the bases
12    necessary quarterly to do it.
13         Q.    So who has planned out this training?
14         A.    TBS/Helm.
15         Q.    So you've outsourced to TBS the training
16    planning?
17         A.    Yes, sir.
18         Q.    Do you have any input into the things
19    that people should be trained on?
20         A.    We can -- I don't know off the top of my
21    head, actually.  I'm sure we can have input on
22    changes that we would like to see to it.
23         Q.    Who's currently responsible for training
24    at Carver, Carver Marine Towing?
25         A.    There's nobody assigned to training.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          Q.      Okay.  The same was true in June of
 3    2024?
 4          A.      Yes.
 5          Q.      Has there ever been anybody assigned to
 6    have that training responsibility while you've been
 7    general manager?
 8          A.      We have TBS come in and perform
 9    third-party drills and training with the crew
10    members, with the various vessels and crew members.
11          Q.      Yeah.  So my question, though, is there
12    somebody while you've been general manager that has
13    had training responsibility?
14          A.      There's -- Jason Galioto will work with
15    TBS to bring TBS for training.
16          Q.      Now, he's the one that you said had a
17    new position, though?
18          A.      In -- last year he did, yes.
19          Q.      Okay.
20          A.      So now he's --
21          Q.      Is he still doing it or --
22          A.      He's doing marine compliance.
23          Q.      That's a -- that is training or isn't?
24          A.      No, it's not -- no, it's not necessarily
25    training.  It's involving the training of TBS to come
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    in and do the training for us, as they're the experts
 3    on it.
 4         Q.    But there's nobody that has the
 5    designated title of safety manager -- excuse me,
 6    training manager --
 7         A.    Correct.
 8         Q.    -- at Carver?
 9         A.    That's correct.
10         Q.    Okay.  Does anybody check on the scope
11    of this training or follow up to make sure that it's
12    adequate?
13         A.    We do annual internal audits with TBS
14    and another third-party organization, that they come
15    and they'll go over the various components of the SMS
16    to ensure that we're following their procedures, and
17    that also, you know, raise any questions or concerns.
18         Q.    Who's your contact at TBS?
19         A.    It'd be Collin Bryant.
20         Q.    Collin Bryant?
21         A.    Yep, in --
22         Q.    Where is he located?
23         A.    In Vermont.
24         Q.    Vermont?
25         A.    Yes.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        Q.      Okay.
 3        A.      And then there's Pat Folan, based in
 4   Alabama.
 5        Q.      Can you spell Pat's last name.
 6        A.      F-O-L-A-N.
 7        Q.      And they're both with this TBS --
 8        A.      Yes.
 9        Q.      -- tug and barge service or something
10   like that?
11        A.      Yes.
12        Q.      Okay.  Do you know who generated this
13   report --
14        A.      I do not.
15        Q.      -- that's marked Exhibit 32?
16        A.      No, sir, I do not.
17        Q.      Was Captain Morrissey ever assigned
18   duties to train new hires?
19        A.      I don't know about assigned for training
20   besides vessel orientations of new crew members to
21   that vessel.
22        Q.      Would he have received any training or
23   instruction on how to do that?
24        A.      Not to my knowledge.
25                MR. CHAPMAN:  Mark this as 33.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2                 (Exhibit 33, Vessel Survey, marked for
 3          identification, as of this date.)
 4          Q.    I'm passing you a copy of what's been
 5   marked as Exhibit 33, which I believe is
 6   Mr. Meyerrose's survey --
 7          A.    Yes, sir.
 8          Q.    -- published on July 7th, 2024, Carver
 9   000796 through 815.
10                The photos that are in here look like
11   they're all dated June 25th, 2024.
12                Do you see that?
13          A.    Yes, sir.
14          Q.    And your recollection is he was aboard
15   the vessel on the same day as the interviews were
16   being done, right?
17          A.    Yes.
18          Q.    Okay.  There are a number of photos
19   attached to his report that start on page 805 --
20          A.    Yes, sir.
21          Q.    -- all the way to the end, page 815.
22                Have you ever seen the full-size version
23   of these photos?
24          A.    No.
25          Q.    Have you ever asked Mr. Meyerrose to
```

1                    Moore - April 28, 2025

2    send them to you?

3         A.    I have not specifically asked for them.

4         Q.    If you go to page 810.

5         A.    Okay.

6         Q.    The photo in the lower left is labeled

7    Upper Pilot House.

8         A.    Yes, sir.

9         Q.    So I think it's everybody's

10   understanding that's where Captain Morrissey was when

11   the allision occurred?

12        A.    That's my understanding, yes.

13        Q.    Just looking at that photo, can you tell

14   which of them is the auto pilot -- which device

15   arrayed in this picture is the auto pilot?

16        A.    It would be the one to the far right of

17   the screen, slightly above the fire extinguisher.

18        Q.    Okay.  If I gave you a pen, could you

19   circle it for us on this exhibit?

20        A.    Sure.

21        Q.    And then I'm going to ask you to put

22   your initials next to it and date it so that anybody

23   that looks at it later will know who did that.  Okay?

24        A.    Well, then, no, I won't.

25        Q.    Well, you have to.

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2          A.     Well --
 3                 MR. RODGERS:  He doesn't have to.
 4          A.     No, because I'm not familiar with it,
 5   so...
 6                 MR. RODGERS:  Then don't do it.
 7          Q.     I'm just asking you -- I'm not asking
 8   you to say absolutely for certain that's what it is.
 9   It's just the --
10          A.     Then --
11          Q.     -- what you believe --
12          A.     No.
13          Q.     -- it to be.
14          A.     Not doing it.
15          Q.     So you're telling us --
16          A.     You can come aboard the vessel and look
17   at it again or question Jason Meyerrose on it.
18          Q.     Yeah.  So I don't want to argue with you
19   about it, but I've been asking to board the vessel
20   for a couple of months now, okay?
21          A.     That's --
22                 MR. RODGERS:  I thought we had a date
23          for it.
24          A.     That's not me.
25                 MR. CHAPMAN:  No, we don't have a date.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2          Q.     All right.  So just to be clear, you
 3   can't reliably pick out which of those devices that
 4   are seen in a photograph --
 5                  MR. RODGERS:  Objection.  Objection.
 6          Wait.  He just said he's not going to do it in
 7          the manner you asked him.  He's not the captain,
 8          and he's not here as an expert.  And you will
 9          get your inspection --
10                  MR. CHAPMAN:  Great.
11                  MR. RODGERS:  -- as you know.
12                  And we'll get ours of the bridge, right?
13                  MR. CHAPMAN:  Offered this Friday, if
14          you want to come look at it, okay?  It's
15          available.
16          Q.     So let me flip back --
17          A.     Sure.
18          Q.     -- to page 800.
19          A.     Okay.
20          Q.     There's two lines that are highlighted
21   on that page.  This document was produced to me with
22   that highlighting, so I don't know who put that
23   there.
24          A.     Okay.
25          Q.     But I want to ask you, did you?
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

**2**        **A.        No.**

3          Q.        Okay.  So the first item says Two

4    non-followup steering controllers.

5                    And on that boat, there would be one in

6    the upper wheelhouse and then the wheelhouse, right?

**7**        **A.        I couldn't attest to if there's one --**

**8    an up and lower, but I would have to look at.**

9          Q.        If it says there's two, that would maybe

10    indicate that there's one in the wheelhouse and one

11    in the upper?

**12**        **A.        It's a possibility.**

13          Q.        Okay.  And then it says there's one

14    Simrad AP50 auto pilot.

15                    Do you know whether there's only one

16    auto pilot on that boat?

**17**        **A.        Not to my knowledge.**

18          Q.        Okay.  You think there's two?

**19**        **A.        I believe so, yes.**

20          Q.        Okay.  When you were aboarded on

21    June 25th, did you look at the auto pilots?

**22**        **A.        In the lower wheelhouse, because it's**

**23    right in front of you, but I didn't go up to the**

**24    upper wheelhouse to look at it.**

25          Q.        And do you know whether it was an AP50

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    in the lower wheelhouse?
 3         A.     No, not that -- not -- I don't know
 4    if -- exactly, because I didn't look at the
 5    make/model of it.
 6         Q.     The reason I'm asking is Mackay said it
 7    installed two AP70s, and this says there's an AP50.
 8    I'm just trying to understand why.
 9         A.     So you would have to follow up with
10    Jason on this one, but Jason's done multiple surveys
11    of the vessel over his history.  So I know that he
12    utilizes the preexisting and notes any changes on it.
13    So that could be a simple typo by Jason Meyerrose.
14              MR. CHAPMAN:  Could you mark this as 34,
15         please.
16              (Exhibit 34, Voyage Plan, marked for
17         identification, as of this date.)
18         Q.     So you've got Exhibit 34?
19         A.     Yes, sir.
20         Q.     Yeah.  So this appears to be a voyage
21    plan labeled Carver 000890 through 896.
22         A.     Yep.
23         Q.     And it appears to be a voyage plan for
24    the MACKENZIE ROSE on June 15, 2024, correct?
25         A.     Yes, sir.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2        Q.    So who is it filled out by?
 3        A.    It says Lenny Baldassare on here.
 4        Q.    Yeah.  So is there a reason why his name
 5   appears in here?
 6        A.    No, I do not know.
 7        Q.    I'm sorry?
 8        A.    No, I do not know.
 9        Q.    Okay.  Would you ordinarily expect the
10   master or the mate to fill out the voyage plan?
11        A.    I want to believe so, yes.
12        Q.    Okay.  It says it was filled out
13   June 15, 2024, 0000 hours, which I take to be
14   midnight --
15        A.    Yes.
16        Q.    -- right?
17        A.    Yes.
18        Q.    And do you have any information that
19   Mr. Baldassare was up late at night on the 15th or --
20        A.    No, I do not know.
21        Q.    -- or late on the night of the 14th and
22   filling it out in the wee hours of the 15th?
23        A.    I do not know.
24        Q.    Okay.  And then it looks like it
25   describes all the crew members.  And the tow was
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2    going to be configured as pushing ahead, with an
3    overall length of 300 feet and a width of 55 feet,
4    and the draft of the tug was 14 feet, correct?
5         A.     On here, yes.
6         Q.     When it says in block 3.5, Air draft of
7    tug and tow, do you know whether the barge was
8    sitting up higher or the tug would have been sitting
9    up higher?
10        A.     The tug was much higher.
11        Q.     Okay.  And then there's references to
12   the barge loaded the forward and aft drafts, and it
13   looks like they reported it as being slightly down by
14   the head at 6 feet, and 5 feet at the stern; is that
15   right?
16        A.     That's what it says on here.
17        Q.     Okay.  And then -- okay.  I see it now.
18   The air draft of the cargo -- I mean, the barge was
19   10 feet, right?
20        A.     Yes, sir.
21        Q.     Okay.  There's an indication that there
22   was a predeparture safety meeting conducted in block
23   5.5?
24        A.     Yes.  Yep.
25        Q.     And a prearrival safety meeting?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2         A.     Yes.
 3         Q.     And that a weather forecast was
 4  obtained, right?
 5         A.     Yes.
 6         Q.     And I guess reviewed, right?  Correct?
 7         A.     Yes, sir.
 8         Q.     Okay.  So then on Section 6, it's called
 9  a 9.4 GAR risk assessment -- model risk assessment.
10  I think we saw something earlier that referenced
11  that, and you didn't know what GAR meant?
12         A.     Yes, sir.
13         Q.     Does this give you any more information
14  about what a GAR is?
15         A.     No.  I still don't know what GAR stands
16  for.
17         Q.     Could it be green, amber, red?
18                MR. RODGERS:  Objection.
19                You can answer if it refreshes your
20         recollection.  Don't guess.
21         A.     Looking at 6.1, it does say GAR model
22  and then parentheses green, amber, red.
23                So yes, that refreshes it.
24         Q.     And then it looks like there's some
25  entries for risk scores in 6.2, 6.4, 6.6, 6.8, 6.10,
```

1                    Moore - April 28, 2025

2    and 6.12, right?

**3        A.      Yes, sir.**

4        Q.      And there's a total risk score in 6.14.

5                Do you know what resources

6    Mr. Baldassare would have used in order to determine

7    these risk scores?

**8        A.      No, sir, I do not.**

9        Q.      Is there something in the safety

10   management system that sort of gives you risk score

11   ranges or things that you need to consider?

**12       A.      It would have to be referenced in 9.4.**

13       Q.      And that's Section 9.4 of the safety

14   management system?

**15       A.      Yes, sir.**

16       Q.      Okay.  If you go back to the first page

17   of this report, in block 1.2 it says Please attach

18   your Rose Point voyage plan to this form.  To do so,

19   save the voyage plan to your computer and then click

20   on the paper clip, either at the top of the form or

21   the one on the right side.

22               So it sounds like there's a way to

23   create a voyage plan in Rose Point and then attach it

24   to this document?

**25       A.      Yes.  You can create a -- correction.**

BRIAN MOORE

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   You can create a course in Rose Point, not
 3   necessarily a voyage plan in Rose Point.
 4        Q.    So do you know whether there was a
 5   voyage plan in Rose Point for this particular voyage?
 6        A.    I don't know if the courses were entered
 7   into Rose Point.
 8        Q.    I mean, there's certainly a Rose Point
 9   tracking, because it's harvesting data at a -- some
10   regular interval about the track of the voyage,
11   right?
12        A.    Yes.
13        Q.    Okay.  But this voyage plan from Rose
14   Point sounds like a separate document that can be
15   created -- that needs to be created before you set
16   out, right?
17        A.    Not to my knowledge.  I don't -- it
18   could be the verbiage is different or I've never seen
19   a Rose Point independent of -- sorry, correction.
20   I've never seen a voyage plan independent on Rose
21   Point.
22        Q.    The Helm system anticipates there will
23   be one, though, right?
24        A.    On here, yes.
25        Q.    And is that provided for your safety
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2    management system?
 3           A.      What the Rose Point would provide you is
 4    the courses, the weigh points, and any restrictions
 5    to drafts and whatnot.  So you can interpolate that
 6    as a voyage plan if you add additional other
 7    information to it.
 8           Q.      All right.
 9                  MR. CHAPMAN:  She needs to go off the
10           record, and everybody needs to take a break.
11                  THE WITNESS:  Okay.
12                  MR. RODGERS:  Great.
13                  THE VIDEOGRAPHER:  We are going off the
14           record.  The time is 6:50 p.m.
15                  (There was a recess taken.)
16                  THE VIDEOGRAPHER:  Beginning Media No.
17           6.  We are back on the record.  The time is 6:59
18           p.m.
19                  MR. CHAPMAN:  Would you mark this as the
20           next exhibit, please.
21                  (Exhibit 35, Master's Daily Report,
22           marked for identification, as of this date.)
23           Q.      You've been passed Exhibit 35,
24    Mr. Moore, which looks like the standard form for the
25    daily vessel reporting for the MACKENZIE ROSE --
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2          A.     Yes.
 3          Q.     -- in Helm, right?
 4          A.     Yes, sir.
 5          Q.     And this one's not filled out.  So you
 6     can see, I think, all the ones that showed where
 7     something is required or not required, right?
 8          A.     Yes.
 9          Q.     And it is pages 000898 through 906.
10                 On the second page of this exhibit under
11     block 1.13 where it says Lookout --
12          A.     Yes, sir.
13          Q.     -- that's a -- looks like it's a -- you
14     have to check one of those boxes.  It's required,
15     right?
16          A.     Yep.
17          Q.     If you check yes, does it open any
18     further drop-down, like you have to pick who was the
19     lookout?
20          A.     I don't know off the top of my head.
21          Q.     Or would it give you any way in which it
22     would identify a specific time that the lookout was
23     on watch?
24          A.     I don't know.  I'd have to look into it.
25          Q.     And on the second to last page, 905,
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   under Section 5.3 of this form, it says If a
 3   prebridge transit or lock transit meeting was
 4   conducted, check Done, right?
 5        A.     Yes, sir.
 6        Q.     So I guess it's either yes or no.  It
 7   doesn't look like it's required on this form, though?
 8        A.     It is not.
 9        Q.     Okay.  So if you don't check it, it just
10   stays blank?
11        A.     As far as I know.
12        Q.     Okay.  And if you do check it, it just
13   says yes, we had one or it was done?
14        A.     I don't know what the -- what the icon
15   would look like.
16        Q.     So there's a section in Helm on Bridge
17   Transit that requires a pretransit meeting or
18   conversation around transit and bridges, isn't there?
19        A.     I would have to reference.  There's a
20   predeparture and a prearrival.
21        Q.     But there's a separate section on bridge
22   transits?
23        A.     There is a separate section on bridge
24   transits.
25        Q.     That requires you to do that, right?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2          A.      I would have to look at it, but...
 3          Q.      But the only way you track whether it
 4   was done is if the master checks this box, right?
 5          A.      I -- yes.
 6          Q.      And that's part of your safety
 7   management system?
 8          A.      Yep.
 9                  MR. CHAPMAN:  Would you mark that as 36,
10          please.
11                  (Exhibit 36, Master's Daily Report,
12          marked for identification, as of this date.)
13          Q.      You've been handed Exhibit 36, which
14   consists of Carver 000001 to 24, which I think are
15   the reports -- the daily reports from June 12th
16   of '24 through June 16th of '24.
17          A.      Yes, sir.
18          Q.      Excuse me.  I think it actually goes --
19   only goes through June 15th of 2024 --
20          A.      Yes, it does.
21          Q.      -- not the 16th.
22                  So these are the forms that are actually
23   filled out over that time period.
24                  And so if you look at page 19 --
25          A.      Okay.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        Q.    -- this is the one for the 15th, and it
 3   looks like it was filled out by Captain Miller at
 4   2355 hours.
 5        A.    Yes, sir.
 6        Q.    That would have been probably the tail
 7   end of his second watch --
 8        A.    Yes.
 9        Q.    -- right?
10              And if you look in block 1.13 on page
11   20, it's just -- the Lookout is N/A, not applicable?
12        A.    Yes.
13        Q.    So the options are yes, no, not
14   applicable, right?
15        A.    Correct.
16        Q.    So you're transiting four bridges from
17   Coastal Precast Systems down to the sea buoy.
18              Why is there no lookout for those?  Why
19   is it not applicable?
20              MR. RODGERS:  Objection.
21        A.    It's not restrictive visibility.
22        Q.    That's the only reason?
23        A.    It's up to the captain's discretion.  If
24   there's congestion, if there's recreational vessels.
25   There's multiple things.  It's up to the captain to
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2    decide lookouts or not.
 3                 MR. RODGERS:  What section was that?
 4         Sorry.
 5                 MR. CHAPMAN:  1.13.
 6                 THE WITNESS:  It's on 20.
 7                 MR. CHAPMAN:  Yeah, page 20.
 8                 MR. RODGERS:  On 6/15/24, right?
 9                 MR. CHAPMAN:  Yeah.
10                 THE WITNESS:  Yes.
11                 MR. RODGERS:  Okay.  Got you.
12         Q.    So from Carver's perspective, it's
13    completely up to the captain's discretion or whoever
14    the officer of the watch is whether to post a
15    lookout, right?
16                 MR. RODGERS:  Objection to form.
17                 You can answer.
18         A.    Captain has ultimate -- overall
19    authority of the vessel.
20         Q.    I realize that.  I'm just -- but my
21    question is it's -- Carver is basically saying it's
22    the captain's discretion whether to have a lookout
23    posted during --
24         A.    I would have to --
25         Q.    -- that transit?
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        A.      I would have to reference the SMS for
 3   any lookout particulars, but yes, it would be up to
 4   the captain or the officer on the watch.
 5                  MR. CHAPMAN:  Would you mark that as the
 6           next exhibit, please.  I think it's 37.
 7                  (Exhibit 37, Master's Daily Report Log,
 8           marked for identification, as of this date.)
 9        Q.      So Mr. Moore, you've been handed
10   Exhibit 37, which is Carver 156 through -- I think
11   it's 160?  Check the last page there.
12        A.      Yes.
13        Q.      Might be 161, but --
14        A.      161.
15        Q.      Okay.  So that looks to me to be
16   virtually identical to the one that begins on
17   Exhibit 36, beginning at page 19.
18                  You can pull 36 out and look at page 19
19   of Exhibit 36.
20        A.      Page 19?
21        Q.      Yeah.
22        A.      Okay.
23        Q.      You see that?
24                  All of the information looks the same
25   with one exception, and that is in the filled block
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   at the top of the form, it's the same date, but
 3   there's a difference of one hour.
 4                    The one in Exhibit 36 is at 2355 hours,
 5   and the one in Exhibit 37 is at 2255 hours.
 6                    Is there a way to submit duplicate
 7   reports in this Helm system?
 8        A.    Not that -- not to my knowledge.
 9        Q.    Is there a reason that you know of that
10   there would be a second report that appears to be
11   dated an hour earlier?
12        A.    No, I do not know.
13        Q.    Once a report is submitted, can the
14   timing -- can the reference to the time of the report
15   be changed in any way?
16        A.    Until the captain closes it out, you
17   can -- once he signs off on it for the day, you can
18   enter as needed.
19        Q.    You mean until he signs off on it?
20        A.    Yeah, correct.
21        Q.    Okay.
22        A.    But I don't know how -- I don't know how
23   the time stamps would be different on that one.
24        Q.    Okay.
25                    MR. CHAPMAN:  Mark this as 38, please.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2                  (Exhibit 38, Certificate of Inspection,
 3            marked for identification, as of this date.)
 4            Q.    Mr. Moore, I believe this is the
 5      Certificate of Inspection for the MACKENZIE ROSE --
 6            A.    Yes, sir.
 7            Q.    -- numbered Carver 000792 through 794,
 8      correct?
 9            A.    Yes, it is.
10            Q.    And this is the one that was in effect
11      when the allision occurred, right?
12            A.    Yep.
13            Q.    So if you look on page 2, about the
14      middle of the page, it begins with the statement This
15      vessel has been certificated in accordance with the
16      Towing Safety Management System (TSMS) option
17      utilizing the external survey program.  The Towing
18      Vessel Inspection Bureau is the approved third-party
19      organization.  The TSMS certificate number associated
20      with this vessel is CMT-2018-99.
21                  Where do we find that document?
22            A.    We would have to get it from the Towing
23      Vessel Inspection Bureau, TVIB.
24            Q.    And who are they?
25            A.    They're similar to -- correction.  So
```

```
 1                    Moore - April 28, 2025
 2   Coast Guard is short on manpower.  So years ago when
 3   they initiated Subchapter M, they designated
 4   third-party options.  One could be either Coast Guard
 5   approval; one would be American Bureau of Shipping;
 6   another one could be Towing Vessel Inspection Bureau.
 7   I'm not sure if there's other ones, but there's other
 8   third-party organizations that inspect the vessels
 9   due to the Coast Guard's manpower shortage.
10        Q.    So this outfit, Towing Vessel Inspection
11   Bureau, is the one that has actually inspected the
12   vessel?
13        A.    Yes.  The Coast Guard has the option to
14   call upon the vessel, but yes, TVIB was the
15   inspectors.
16        Q.    So you have a certificate issued by the
17   Towing Vessel Inspection Bureau?
18        A.    Somewhere there must be, yes.  I would
19   have to reference it, pull it up.
20        Q.    It sounds like it would have been
21   submitted to the Coast Guard?
22        A.    Well, the Coast Guard -- yes.
23   Correction.  It -- so the Coast Guard receives the
24   inspection report from TVIB, and then once they
25   approve that inspection report, the Coast Guard
```

BRIAN MOORE

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2   issues out the certificate of inspections.
 3        Q.    And when this COI, certificate of
 4   inspection, was last issued, were there any
 5   requirements that the Coast Guard imposed or the
 6   Towing Vessel Inspection Bureau imposed that you had
 7   to -- required some correction of the vessel before a
 8   certificate would be issued?
 9        A.    No.  They won't issue a COI with any
10   open items.
11        Q.    But they would notify you what the open
12   items are --
13        A.    Correct, yes.
14        Q.    -- right?
15              And that was -- my question is were
16   there any?
17        A.    That was before my time.  I wasn't aware
18   of any.
19              MR. CHAPMAN:  Would you mark this as the
20         next exhibit, please.
21              (Exhibit 39, Letter dated June 20, 2024,
22         marked for identification, as of this date.)
23        Q.    Mr. Moore, you've been handed
24   Exhibit 39 --
25        A.    Correct.
```

**BRIAN MOORE**

**April 28, 2025**

```
  1                 Moore - April 28, 2025
  2         Q.      -- to the deposition, which is a letter
  3    that I sent to Mr. Nick Laraway dated June 20, 2024,
  4    and it shows a copy to you on page 2.
  5         A.      Okay.
  6         Q.      So is that your e-mail at Carver?
  7         A.      Yes.
  8         Q.      So do you recall receiving this letter?
  9         A.      I don't recall it, but I've seen it.
 10         Q.      It was asking you to preserve -- asking
 11    Mr. Laraway to preserve information that might
 12    otherwise be lost, right?
 13         A.      Yes, sir.
 14         Q.      Okay.  Did you do anything in response
 15    to it to preserve any of the requested information?
 16         A.      I did not do anything in particular.
 17         Q.      Do you know whether Mr. Laraway did?
 18         A.      No, I don't know what Mr. Laraway did,
 19    either.
 20         Q.      And it specifically requests around
 21    preserving texts, e-mails, voicemails and messaging
 22    service communications.
 23                 You told us that the phone that you had
 24    at the time you since replaced --
 25         A.      Yes.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2        Q.      -- right?
 3                So were the texts, e-mails, voicemails,
 4   or other messages on that device preserved before you
 5   got rid of it?
 6        A.      It would still be a cloud-based backup
 7   for the iCloud, which is an iPhone.  So I'm not sure.
 8   I -- correction.
 9                MR. RODGERS:  Just --
10        A.      Let me --
11                MR. RODGERS:  -- hold on, hold on, hold
12        on.
13                Is there a reason this was sent to
14        Mr. Laraway and not Carver's attorneys?
15                MR. CHAPMAN:  Yeah.  I wasn't aware that
16        they had counsel at the time.
17                MR. RODGERS:  Well, I don't -- I don't
18        want him to discuss anything that has to do with
19        what they did to preserve.  That's not
20        appropriate.
21                MR. CHAPMAN:  I'm --
22                MR. RODGERS:  I understand the letter.
23                MR. CHAPMAN:  -- I'm entitled to ask him
24        what he did.
25                MR. RODGERS:  No.  You're entitled to
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2      demand this, and we then produce, and -- you
 3      know, you're not entitled to do this, because it
 4      actually impedes on what his former lawyer asked
 5      him to do or we asked him to do.  And that's
 6      attorney-client privilege, until the court tells
 7      us otherwise.
 8             MR. CHAPMAN:  So --
 9             MR. RODGERS:  We're not here to have a
10      hearing on preservation.  It's not fair to the
11      witness, and I don't think it's appropriate, to
12      be honest.  So I'm not going to have him answer
13      whether he or Carver actually complied with your
14      letter.  You're not his attorney, and you sent
15      it directly to a party, and whether or not you
16      knew who the attorney was is beside the point.
17      If you find out later that there's been things
18      that weren't preserved, then you make your
19      motion.
20             MR. CHAPMAN:  And I'm testing right now
21      what was preserved.
22             MR. RODGERS:  Well, I'm going to tell
23      him not to answer to anything that has to do
24      with this letter.  You've asked him if he
25      preserved things during this deposition, and he
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2        answered you whether he thought they had it or
 3        whatever, but not to this letter.  This is
 4        not -- this is not appropriate.
 5               MR. CHAPMAN:  Are you done?
 6               MR. RODGERS:  Not really, but you can
 7        go.
 8        Q.    So you said that you had preserved
 9   things in the cloud.  Is that your Apple iCloud
10   account?
11        A.    Yeah.  I -- so I didn't -- I didn't
12   specifically back it up to there, but I would -- I'd
13   not say assume, because it's bad thing, but when you
14   transfer it over, it would be done through AT&T or
15   whoever.
16        Q.    When was your first contact with an
17   attorney representing Carver in connection with the
18   allision?
19        A.    I believe it was with Travelers
20   directly, and then until they assigned Chris Abel.
21        Q.    When did that occur?
22        A.    I don't remember off the top of my head.
23        Q.    If you could turn to the last page of
24   this exhibit.
25        A.    Yep.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2         Q.    Have you seen this photograph before?
 3         A.    Yes.  After the fact, yes.
 4         Q.    Obviously, this was taken from the land
 5    side?
 6         A.    Yes, sir.
 7         Q.    Okay.  Did you have this photograph
 8    before you submitted the report to the Coast Guard?
 9         A.    No.
10         Q.    You didn't see it before then?
11         A.    No, sir.
12               MR. RODGERS:  Is that not the normal way
13          the track moves?  A little bit of a roller
14          coaster.
15         Q.    Are there any written materials, manuals
16    or handbooks, that are given to new hires at the
17    towing company?
18         A.    I would have to refer to HR.  Once
19    issued out, there's an employee benefits guide, and I
20    don't exactly remember what else is issued out, if
21    anything.
22         Q.    Is there anything provided to them in
23    the nature of the marine work that they're going to
24    be doing?
25         A.    No.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                  Moore - April 28, 2025
 2         Q.     Like a safety rule book or that sort of
 3  thing?
 4         A.     No.  They're to review the SMS on vessel
 5  orientation.
 6         Q.     So when you say review the SMS, can you
 7  tell us what's involved with a new hire doing that.
 8         A.     They -- the onboard captain or mate or
 9  whoever the assigned person is, whenever it's a --
10  either a new deckhand to another captain, they go
11  through the motions of inspecting the vessel, make
12  sure all the -- they know where all the safety
13  equipment is; and then I believe also on there is
14  where to reference the SMS and login to access it.
15  But I would have to look at the onboarding sheets to
16  be more accurate.
17         Q.     So there's -- is that a Helm sheet,
18  onboarding sheet?
19         A.     Yes, correct.  Yes, sir.
20         Q.     Okay.  It would tell you something about
21  the orientation training that they got?
22         A.     Yes.
23         Q.     All right.  And that would be something
24  provided for in your safety management system, what
25  they're supposed to be trained on?
```

**BRIAN MOORE**

**April 28, 2025**

1                    Moore - April 28, 2025

2        A.      I would have to reference the SMS, but

3   yes, it -- that form is in Helm.

4        Q.      And who completes that form?

5        A.      The onboard captain or mate or

6   designated crew member giving the orientation.

7        Q.      And is there any sort of oversight of

8   that process, somebody ensures that it was done,

9   before people are allowed to sail on one of your

10  tugs?

11       A.      I would have to reference it, but I

12  believe it auto populates once a new crew member is

13  assigned to that vessel.

14       Q.      And it's -- but it's overseen by either

15  the master or the mate --

16       A.      Correct, yes.

17       Q.      -- on the vessel?

18       A.      Yes, sir.

19       Q.      So can the deckhands access the safety

20  management system?

21       A.      Yes, they should be able to.

22       Q.      How do they do that?

23       A.      Through the wheelhouse computer.

24       Q.      So the only access on the vessel is in

25  the wheelhouse on the laptop in there?

**BRIAN MOORE**

**April 28, 2025**

 1                  Moore - April 28, 2025

 2          A.     Yes, because that's the most updated --

 3   the most updated document control.

 4          Q.     So if a deckhand wanted to enter a

 5   complaint about how a master was either treating him

 6   or some concern that he didn't feel like was being

 7   sufficiently addressed, is there a system for that in

 8   Carver to -- that they can make a complaint and not

 9   be treated like a whistleblower or something like

10   that?

11          A.     Right.  So they have -- every crew

12   member is issued at the stop work authority, so they

13   can, you know, voice their opinion to whomever there.

14                 The role is a designated person ashore

15   is also to be the middleman from the crew member to

16   another manager or sorts, where I would -- or

17   whomever the DPA is at the time, would go through it,

18   hear them out, and then steer it in the right avenue.

19   It's through HR or if it's through engineering or if

20   it's through deck operations.  So that's me falling

21   under DPA, and then HR also is very open on having an

22   open door policy with HR.

23          Q.     So it sounds like there's a pretty, I'll

24   say, robust policy about making sure people have

25   their say around stop work or safety issues, that

**BRIAN MOORE**

**April 28, 2025**

```
 1                     Moore - April 28, 2025
 2    sort of thing --
 3         A.      Yes, sir.
 4         Q.      -- right?
 5                 And is that monitored or kind of
 6    supervised in some way?
 7         A.      I don't have the knowledge on that one,
 8    how it would be monitored.
 9         Q.      Do you have any input into it or have
10    any oversight on it?
11         A.      I've never gotten any calls, e-mails, or
12    any purpose to utilize that from any deckhand or crew
13    members or anybody.  So HR would have the best
14    insight on that.
15         Q.      So it might have happened, and it went
16    through HR or something and you weren't dialed into
17    it?
18         A.      It is possible.
19         Q.      For these new hires, are there any
20    testing that's done to, you know, ensure that they
21    know how to perform the duties on the tug before
22    they're allowed to serve?
23         A.      Before there is the -- I would have the
24    right -- I don't know off the top of my head.  It's
25    in the SMS, but there are forms for crew members to
```

```
 1                    Moore - April 28, 2025
 2    get signed off on assessments.
 3         Q.     Who does the assessment?
 4         A.     A senior captain or a -- some sort of
 5    the port captain role.
 6         Q.     And is lookout training part of that
 7    process?
 8         A.     Not that I'm aware of.
 9         Q.     Is bridge transiting part of that
10    process?
11         A.     Not that I'm aware of.
12         Q.     During the investigation you did before
13    submitting the report to the Coast Guard, did you
14    determine that the auto pilot system was actually
15    engaged during the transit that led to the allision?
16         A.     I didn't -- I couldn't identify it, if
17    it was actually engaged or not.  I don't know if
18    there's a report that auto pilot system produces or
19    not.
20         Q.     You just know what Captain Morrissey
21    told you?
22         A.     Yes, sir.
23         Q.     Or what Captain Morrissey said, whether
24    it was to you or others --
25         A.     Yes, sir.
```

```
 1                 Moore - April 28, 2025
 2        Q.      -- right?
 3                Can any data be downloaded from the auto
 4    pilot?
 5        A.      Not by -- not that I know of.
 6        Q.      Did you have any technicians come in and
 7    determine whether it could be downloaded to --
 8        A.      I do believe we did ask Ayers after the
 9    fact and GMT, and they -- I would have to reference
10    that one with Lenny, but I believe they both said
11    they couldn't, or none that I knew of.
12        Q.      Did you talk to them personally?
13        A.      No, sir.
14        Q.      You believe Mr. Baldassare did?
15        A.      I believe so, yes.
16        Q.      Did he report to you that he had?
17        A.      I remember it coming up in conversation
18    by way of counsel requests probably, to see if we can
19    get more data on it.
20        Q.      Do you know who he spoke with at either
21    Ayers or Mackay?
22        A.      I do not.
23        Q.      Is there any sort of, I'll call it, a
24    ride-along procedure where somebody's a new hire, or
25    maybe they're not even a new hire, but they've been
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   with the company for some period of time and somebody
 3   rides along, just to sort of keep an eye on them and
 4   making sure that they're doing what they're supposed
 5   to, that sort of thing?
 6        A.    Yes.  There's forms in Helm for
 7   navigation assessments that are done by senior
 8   captains, port captains or somebody of that level.
 9        Q.    And they would actually accompany the
10   vessel on a voyage --
11        A.    Yes, sir.
12        Q.    -- to do that?
13        A.    Yeah.
14        Q.    So is there somebody specific in the
15   Carver Marine Towing organization that typically does
16   that?
17        A.    It was always performed by a senior
18   captain or a port captain.
19        Q.    You mentioned a guy who was a senior
20   captain, and I don't recall his name now, but is he
21   one of those senior captains?
22        A.    He would be, yes, one of them.
23        Q.    Are there others?
24        A.    At the time, there was one.  Now we have
25   two work -- I call them working port captains.
```

BRIAN MOORE

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2        Q.    So it would be one or the other?
 3        A.    Yes.
 4        Q.    Okay.  So who's the other guy?
 5        A.    Mark Pearson.
 6        Q.    Mark Pearson?
 7        A.    Yes.  He's the guy you referenced
 8   before, earlier.
 9        Q.    Oh, I apologize.  I thought Pearson was
10   the only one.  You've -- but you've since hired
11   somebody else?
12        A.    I have -- we transitioned another one,
13   Adam Clark, who has also been with the company for a
14   while, but he was sailing as captain.  And a few
15   months ago, we escalated him up to a working port
16   captain.  So still sails actively, opposite of
17   Captain Mark Pearson.
18        Q.    And I'm sorry.  I -- you said his name
19   and it -- what was it again?
20        A.    Adam Clark.
21        Q.    Adam Clark?
22        A.    Yes, sir.
23        Q.    Is Clark with an E?
24        A.    C-L-A-R-K.
25        Q.    And how frequently are those, I'll call
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    them, ride-alongs?
 3         A.    Oh.  They're performed annually, at
 4    minimum.
 5         Q.    And is there a report in Helm that gets
 6    filled out for those?
 7         A.    Yes, sir.
 8         Q.    What's that called?
 9         A.    I would have to reference it, but I
10    believe it's called Navigation Assessment.
11         Q.    And it -- does it have its like own
12    section in the safety management system?
13         A.    It has its own section in forms, under
14    Helm.
15         Q.    Okay.  Has the company ever disciplined
16    anyone for failing to comply with your safety
17    procedures related to bridge transits?
18         A.    Not that I'm aware of.
19         Q.    What about lookout postings?
20         A.    Not that I'm aware of.
21         Q.    What about use of the auto pilot?
22         A.    Also, not that I'm aware of.
23         Q.    Are you aware of any best practices in
24    the towing industry that recommend disengaging auto
25    pilots when transiting near fixed objects like
```

```
 1                    Moore - April 28, 2025
 2    bridges?
 3         A.      No, I'm not.
 4         Q.      What's the purpose of having an auto
 5    pilot on the MACKENZIE ROSE?
 6              MR. RODGERS:  Objection.  He's not an
 7         expert.
 8              You can testify if you know.
 9         A.      I honestly don't know the purpose of it,
10    besides holding course.
11         Q.      Can an auto pilot system adjust for
12    changes in either river current or the drift of the
13    barge or make course corrections on its own?
14         A.      I --
15              MR. RODGERS:  He's not -- again, he's
16         not here as an expert, but he can testify as to
17         his own understanding.
18         A.      I don't know.  I've not come across
19    that.
20         Q.      I'm sorry.  You've not come across an
21    auto pilot system that can do any of those things?
22         A.      That can course --
23         Q.      Correct.
24         A.      -- can change course on your own?  No.
25    We -- in the tug and barge world, that's not a common
```

```
 1              Moore - April 28, 2025
 2   thing.
 3        Q.    Okay.  So is it a common thing that the
 4   auto pilot, for whatever reason, will cause the
 5   rudders to go hard over?
 6              MR. RODGERS:  Objection.
 7        A.    I've never -- I've never had that occur
 8   in my history of sailing.
 9        Q.    You're talking about your own --
10        A.    Yes.
11        Q.    -- history of operating towing vessels,
12   right?
13        A.    Yes.
14        Q.    Okay.  So you never experienced that?
15        A.    No, sir.
16        Q.    So you would say it's not normal, in
17   your experience?
18              MR. RODGERS:  Well, he just--
19        A.    Correct.
20              MR. RODGERS:  His testimony was that he
21        didn't experience it.  Not normal to him.
22              THE WITNESS:  It's not normal to me,
23        correct.
24              MR. RODGERS:  Is that fair?
25              THE WITNESS:  Yes.
```

```
 1                  Moore - April 28, 2025
 2                  MR. RODGERS:  All right.  Sorry.  I
 3          don't want to put anything out there.
 4          Q.     Does safely transiting under bridges
 5    require any specific training beyond general vessel
 6    handling?
 7          A.     No, sir.
 8          Q.     So anyone that can handle a vessel
 9    shouldn't have any problem getting a vessel under a
10    bridge?
11          A.     It all depends on the size of the bridge
12    opening, but there's -- it's a common -- it's very
13    common in the industry, so it's not an
14    abnormal event.
15          Q.     Are you aware of any industry or best
16    practices that recommend posting additional lookouts
17    when transiting under bridges?
18          A.     No, sir, I'm not.
19          Q.     Is it consistent with good seamanship to
20    rely on an auto pilot while approaching a bridge?
21                  MR. RODGERS:  Objection.  He's not here
22          as an expert witness.
23          A.     It's up to the offshore and the watch
24    and their judgment.
25          Q.     In your experience -- just talking about
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2    your experience -- have you transited bridges while
 3    on auto pilot?
 4                MR. RODGERS:  Objection.
 5        A.    It's been a while.  I would have to
 6    recall it, but I've used both auto pilots, enhanced
 7    steering in all different areas of the Atlantic
 8    seaboard.
 9        Q.    And so you're saying that you actually
10    have used auto pilot when transiting bridges?
11                MR. RODGERS:  Objection.
12        A.    No, I -- not that I recall.
13        Q.    Has it ever been company policy while
14    you have been general manager at Carver to require a
15    dedicated lookout while transiting bridges?
16        A.    No, sir, not that I know of.  Not that
17    I'm aware of.
18        Q.    Would you expect a properly trained crew
19    to avoid hitting a bridge or alliding a bridge?
20                MR. RODGERS:  Objection.  Objection.
21                It's 7:40 at night, and now you're just
22                fishing.  You're repeating the same question
23                about auto pilot, which would be fine at ten
24                o'clock in the morning, but I still have some
25                questions.
```

**BRIAN MOORE**

**April 28, 2025**

1                 Moore - April 28, 2025

2        Q.    So my question was would you expect a

3   properly trained crew to avoid striking a stationary

4   object like a bridge?

5   (DIR)

6                 MR. RODGERS:  Objection.  That's

7           harassing the witness.

8                 Don't answer that.

9        **A.    I've --**

10                MR. RODGERS:  I said don't --

11       **A.    Yeah, I would -- I --**

12                MR. RODGERS:  Don't answer that.  That

13          means don't answer that.  Nothing.

14                MR. CHAPMAN:  So your --

15                MR. RODGERS:  Directing the witness not

16          to answer.

17                MR. CHAPMAN:  So your instruction is not

18          to answer?

19                MR. RODGERS:  I'm directing the witness,

20          yes, not to answer whether it's good policy to

21          hit a bridge.

22                MR. CHAPMAN:  So I don't have any

23          further questions at this time.  I'm reserving

24          my right, as the judge provided, with respect to

25          any documents that you guys produce within the

**BRIAN MOORE**

**April 28, 2025**

```
 1                Moore - April 28, 2025
 2     timeframe he allowed at the hearing on Friday.
 3                MR. RODGERS:  Yeah, I -- that's fine.  I
 4     just want to put on the record we'd like any
 5     followup to be virtual or here, or at least me
 6     and the witness here, if you want to Zoom from
 7     Norfolk, but we can work that out.
 8                Are you going to put -- you didn't make
 9     any demands to counsel.  Are you going to put
10     the stuff in writing that you were asking him
11     for, like soon?
12                MR. CHAPMAN:  Yeah.  I'll just --
13                MR. RODGERS:  Or is Mackenzie going to
14     do it?
15                MR. CHAPMAN:  I think we've previously
16     done that, but to the extent that --
17                MR. RODGERS:  Oh, you think that --
18                MR. CHAPMAN:  -- to the extent there's
19     something else that came up in this deposition,
20     yes --
21                MR. RODGERS:  Okay.
22                MR. CHAPMAN:  -- we will.
23                MR. NANAVATI:  Again, this is Mark
24     Nanavati.  I tried to keep a list of things that
25     came up during the deposition that I think might
```

```
 1                  Moore - April 28, 2025
 2      be new.  I shot them to you, and we can talk
 3      about it and make sure I got it right and send
 4      it to them and see what we can get.
 5              MR. RODGERS:  I can't hear.  What did he
 6      say?
 7              MR. CHAPMAN:  I think he was saying --
 8              MR. NANAVATI:  I said I put together a
 9      list of things --
10              MR. RODGERS:  I don't know who that is.
11      Who is that?
12              MR. CHAPMAN:  Nanavati.
13              MR. RODGERS:  Oh, Mark.  Okay.  What is
14      he saying?
15              MR. NANAVATI:  You guys were talking
16      about documents that may have come up during the
17      deposition.  I tried to make a list during the
18      course.  I said I'll send them to Jim so we can
19      review them and get that list to you.
20              MR. RODGERS:  Okay.  Thanks.
21              All right.  I just have some follow-up
22      questions.
23              THE WITNESS:  Okay.
24              MR. RODGERS:  Only should take two
25      hours.  No.  You're not laughing.
```

**BRIAN MOORE**

**April 28, 2025**

```
 1                    Moore - April 28, 2025
 2   EXAMINATION BY MR. RODGERS:
 3        Q.    So if you could just go to -- let me
 4   find the exhibit number.  For example, Exhibit 13.
 5        A.    Okay.
 6        Q.    So if you look at Exhibit 13, which is
 7   Carver 79 to 82, that last document, the typewritten
 8   state -- what appears to be a typewritten statement
 9   on Carver letterhead, had you seen that before today?
10        A.    The letterhead or the statement?
11        Q.    No, the statement.
12        A.    No, I don't recall seeing these.
13        Q.    Okay.  Other than what your attorneys --
14        A.    Right, correct.
15        Q.    -- you hadn't seen it before?
16        A.    No, sir.
17        Q.    Okay.  But on the handwritten one, did
18   you recall seeing it at the time of the
19   investigation?
20        A.    Yes.
21        Q.    Okay.  All right.  If you go to
22   Exhibit 30 and 31.
23        A.    Okay.
24        Q.    So Mr. Chapman went over these two.
25   We're not sure if they're connected, but they may be.
```

BRIAN MOORE

**April 28, 2025**

```
 1                   Moore - April 28, 2025
 2  So I'm asking you to the extent that these two are
 3  connected.
 4                   There's a daily log, April 1st, right?
 5       A.     Yes, sir.
 6       Q.     And at 9:34, it says 9.2 Near Miss
 7  Report.
 8                   Do you see?
 9       A.     Yes, sir.
10       Q.     And that was before Ayers came on board
11  to do their work, correct?
12       A.     Yes, sir.
13       Q.     Okay.  And then just assuming for this
14  deposition that Exhibit 30, a near miss report which
15  has a receipt date I guess by you, 4/19/2024, right?
16       A.     Yes, sir.
17       Q.     Assuming that that relates back to 4/1,
18  April 1st, if you look at 1.1, Near Miss Subject, it
19  says Loss of satellite compass.  Right?
20       A.     Yes, sir.
21       Q.     It doesn't say failure of auto pilot,
22  does it?
23       A.     No.
24       Q.     And the same with description of near
25  miss, it says Satellite compass failed causing the
```

**BRIAN MOORE**

**April 28, 2025**

```
1                    Moore - April 28, 2025
2    auto pilot to go into standby and hard right to heavy
3    seas.  Correct?
4         A.    Yes, sir.
5         Q.    Now, in the other ones you were shown
6    the near miss reports, there were some where it had a
7    subject area of 1.1 that stated auto pilot failure,
8    right?
9         A.    Yes, sir.
10        Q.    So would you assume that in the one
11   that's Exhibit 30, if there was an auto pilot
12   failure, it would say that in the 1.1 section?
13                  MR. CHAPMAN:  Object to form.
14        Q.    You can answer.
15        A.    Yes, it would be stated.
16        Q.    Okay.  And it's not, right?
17                  MR. CHAPMAN:  Objection.
18        A.    No.  Well, it would -- this one says
19   loss of satellite compass.
20        Q.    But notwithstanding that, in -- a few
21   days later, April 3rd, 4th and 5th, you brought in
22   Ayers, right?
23        A.    Yes, sir.
24        Q.    Okay.  So I just want to go to Ayers'
25   invoices, which are Exhibit 24.
```

**BRIAN MOORE**

**April 28, 2025**

| | |
|---|---|
| 1 | Moore - April 28, 2025 |
| **2** | **A.    Okay.  24.** |
| 3 | Q.    If you go to the second -- it's Bates |
| 4 | stamp -- Carver Bates stamp 249 and 250, right? |
| 5 | You see that? |
| **6** | **A.    Where am I looking at?** |
| 7 | Q.    Over here.  Sorry, these numbers. |
| 8 | Those -- |
| **9** | **A.    Oh.  Yes, sir.  Yeah.  Sorry, there it** |
| **10** | **is.** |
| 11 | Q.    Those are just for the lawyers, |
| 12 | actually, but they're both Exhibit 24. |
| 13 | If you go to the second page which seems |
| 14 | to reflect a work order for April 10th and |
| 15 | April 11th. |
| 16 | Do you see that on the left side? |
| **17** | **A.    Yes, sir.** |
| 18 | Q.    Okay.  And if I'm reading it correctly, |
| 19 | it says Updated software and auto pilot. |
| 20 | Do you see that? |
| **21** | **A.    Yes.** |
| 22 | Q.    And it replaced solid state relays with |
| 23 | mechanical ones, right? |
| **24** | **A.    Yes.** |
| 25 | Q.    And then the technician says May have |

BRIAN MOORE

**April 28, 2025**

1                    Moore - April 28, 2025

2    caused the -- caused issue.  Right?

**3         A.     Yes.**

4         Q.     Was it your understanding, after Ayers

5    put in the new software and worked on the auto pilot

6    system on the MACKENZIE ROSE in April, that they had

7    fixed the problem?

**8         A.     Yes, sir.**

9              MR. CHAPMAN:  Object to the form.

10        Q.     Okay.  And if you could go to 26 and 27.

**11        A.     Okay.**

12        Q.     27 is the daily log for the MACKENZIE

13   ROSE on May 3rd, 2024, correct?

**14        A.     Yes, sir.**

15        Q.     And if you go to the second page -- and

16   just for the lawyers, it's -- and the reporter, it's

17   Carver 30 through Carver 32 is Exhibit 27.

18             If you go to the second page at 12:35,

19   it says 9.2 Near Miss Report.  Correct?

**20        A.     Yes, sir.**

21        Q.     Now again, assuming 26, Exhibit 26,

22   which is Carver 41 and 42, assuming that that is the

23   near miss report for April -- for -- excuse me, for

24   April -- May 3rd, I'm going to ask you a few

25   questions.  Okay?

BRIAN MOORE

**April 28, 2025**

```
 1                 Moore - April 28, 2025
 2         A.     Okay.
 3         Q.     And again, we're just assuming that
 4   Exhibit 26 is for the April -- the May 3rd date,
 5   right?
 6         A.     Yes, sir.
 7         Q.     Now, if you go to 1.1, could you read
 8   both columns.
 9         A.     Lost steering rudder, hard over.
10         Q.     And to the left, what does it say?
11         A.     Oh.  To the left of that is near miss
12   subject.
13         Q.     Okay.  Is there anywhere in 1.1 that it
14   says failure of auto pilot?
15         A.     No, sir.
16         Q.     Okay.  Can you read the description of
17   1.5.
18         A.     Yeah.  Description of Near Miss.  While
19   transiting southbound, the captain was entering --
20                MR. RODGERS:  You got to go a little
21         slower for the reporter.
22         A.     -- was entering information into the
23   electronic log, when the steering went into standby
24   and the rudder came hard over without alarm.
25                By the time the captain realized the
```

```
 1                    Moore - April 28, 2025
 2    situation, we were steaming full ahead at the loaded
 3    barge.
 4                    The captain pulled back power so that
 5    the rudder would respond, and it came away from the
 6    barge within a few feet to spare.
 7                    The wire dragged on the bottom and
 8    sustained minimal damage.
 9         Q.    Okay.  Is there anything in that
10    paragraph that refers to the auto pilot?
11         A.    No, sir.
12         Q.    Okay.  And then Actions Taken to Prevent
13    Repeat of Incident, 1.6, could you read that.
14         A.    Stand a diligent watch, be aware of
15    system failures without alarms, keep equipment in
16    work -- proper working order.
17         Q.    Okay.  Is there anything in that
18    paragraph that mentions auto pilot?
19         A.    No, sir.
20         Q.    Okay.  Thank you.
21              MR. RODGERS:  Now, I think that might be
22         it, but give me a second.
23              Okay.  I have no further questions.
24         Thank you.
25              THE WITNESS:  Okay.  Very well.
```

1              **Moore - April 28, 2025**

2              MR. RODGERS:  Jim?

3              MR. CHAPMAN:  No, other than as stated

4        before, reserve our rights.

5              MR. RODGERS:  Mark?

6              MR. NANAVATI:  No, I'm good.

7              THE VIDEOGRAPHER:  This is the end of

8        the video deposition of Brian Moore.  The time

9        is 7:53 p.m.

10              (Time noted: 7:53 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**BRIAN MOORE**

**April 28, 2025**

```
 1              C E R T I F I C A T I O N

 2

 3    STATE OF NEW YORK        )

 4                             )    ss:

 5    COUNTY OF WESTCHESTER    )

 6

 7

 8         I, LORRAINE B. ABATE, a Certified Shorthand

 9    Reporter and Notary Public of the State of New York

10    and Registered Professional Reporter, do hereby

11    certify the foregoing to be a true and accurate

12    transcript of my original stenographic notes taken of

13    Brian Moore at the time and place hereinbefore set

14    forth.

15         I further certify that I am not related, by

16    blood or marriage, to any of the parties in this

17    matter and that I am in no way interested in the

18    outcome of this matter.

19

20    Dated: May 9, 2025

21

22

23

24            _Lorraine B. Abate_
              LORRAINE B. ABATE, CSR, RPR
25            License No. 000965
```

**BRIAN MOORE**

April 28, 2025

| | | | | |
|---|---|---|---|---|
| **$** | 209:18 | 232:19 | 316:9 | 190:16 |
| | **000048** | **000094** | **000816** | **0700** |
| **$75,000** | 209:22 | 233:24 | 141:11 | 301:9,16 |
| 79:6,17,21,24 | **000049** | **000111** | **00083** | 302:15 |
| | 210:6 | 239:23 | 83:11 | **0855** |
| **(** | **000050** | **000118** | **000840** | 80:7 |
| | 188:5 | 258:3 | 85:5 | |
| **(a)(3)** | **000051** | **000148** | **000846** | **1** |
| 173:4 | 190:7 | 94:12 | 81:2 | |
| **(b)** | **000060** | **000155** | **000851** | **1** |
| 151:6 | 204:19 | 161:20 | 308:23 | 8:3 69:21,22 |
| | **000065** | **000162** | **000886** | 76:19 80:4 |
| **0** | 204:20 | 166:3 | 185:13 | 87:15 96:7,9, |
| | **000066** | **000163** | **000888** | 14 106:25 |
| **0** | 204:19 | 167:10 171:2 | 186:21 | 116:3 159:7 |
| 267:18 | **000067** | **000164** | **000889** | 175:9 183:20 |
| **0-inch** | 215:8 | 174:20 | 187:15 | 199:15 200:4 |
| 267:10 | **000070** | **000168** | **000890** | 237:3 238:9 |
| **0000** | 216:21 | 182:7 | 321:21 | 245:5 258:7 |
| 307:7 322:13 | **000071** | **000169** | **000898** | 259:13 |
| **000001** | 216:18 | 167:11 184:2 | 328:9 | 266:17 |
| 330:14 | **000072** | **000194** | **00166** | 283:14 |
| **0000096** | 216:18 | 154:13 | 176:7 | 306:20 307:5 |
| 235:22 | **000079** | **000200** | **00245** | 308:4 310:6 |
| **0000110** | 228:11 | 261:12 | 71:2 | 311:20 |
| 235:22 | **000080** | **000201** | **00248** | **1.1** |
| **0000249** | 226:11 | 158:16 159:9 | 71:2,18 | 96:6 299:8 |
| 272:6 | **000084** | **000226** | **00829** | 360:18 361:7, |
| **000029** | 231:6 | 159:9 | 76:3 | 12 364:7,13 |
| 235:24 | **000085** | **000232** | **00832** | **1.13** |
| **000030** | 231:4 | 235:24 | 78:25 | 129:3 328:11 |
| 291:22 | **000086** | **000251** | **00845** | 331:10 332:5 |
| **000039** | 231:4 | 276:18 | 81:23 | **1.14** |
| 303:3 | **000088** | **000792** | **00847** | 129:24 |
| **000041** | 232:21 | 335:7 | 76:3 | **1.2** |
| 288:14 | **000091** | **000796** | **01** | 325:17 |
| **000047** | | | | **1.5** |
| | | | | 295:7 299:12 |
| | | | | 303:25 |
| | | | | 364:17 |

**BRIAN MOORE**

April 28, 2025

| | | | | |
|---|---|---|---|---|
| **1.5.1.1**<br>299:5 | **11th**<br>227:10<br>273:22 308:9<br>362:15 | **267:7,17**<br>323:4 | **154**<br>97:18 117:3 | **1635**<br>269:10 |
| **1.6**<br>365:13 | | **1400**<br>267:2 | **155**<br>100:5 | **164.72**<br>151:7 |
| **10**<br>83:22 197:9<br>214:22,23<br>215:3 236:20<br>245:5 323:19 | **12**<br>85:6 189:22<br>226:2,3,6<br>236:9 | **147**<br>258:4 | **156**<br>333:10 | **1650**<br>269:15 |
| | | **148**<br>94:20 97:11 | **15th**<br>34:23 52:25<br>59:13,23<br>60:9,11 61:20<br>62:4 76:12<br>86:9 87:5<br>106:16 107:4<br>139:11<br>146:13<br>166:11<br>175:18 176:4<br>178:21<br>197:19 203:9<br>210:2 211:21<br>213:2 268:20<br>322:19,22<br>330:19 331:2 | **1655**<br>269:22 |
| **10,000**<br>196:8 | **12.1**<br>85:9 | **149**<br>97:12 | | **1659**<br>210:2 211:21 |
| **100-ton**<br>15:10 | **120**<br>272:20,25 | **14th**<br>322:21 | | **166**<br>179:15 |
| **108-T**<br>203:17 | **1235**<br>292:2 | **15**<br>27:25 28:2<br>119:15<br>142:18 188:6<br>212:2,3,11<br>213:4 230:21,<br>22,25 262:18<br>267:14 288:7<br>321:24<br>322:13 | | **167**<br>179:24<br>180:13 |
| **10:44**<br>8:7 | **128**<br>260:7 | | | **168**<br>171:3 |
| **10th**<br>273:21 308:9<br>362:14 | **12:01**<br>131:14 | | | **169**<br>100:16 |
| **11**<br>215:11<br>216:11,13,16 | **12:05**<br>69:5 | **150**<br>97:14 106:23<br>107:6 | **16**<br>142:18<br>189:22<br>232:11,12,16<br>267:13,14 | **16th**<br>60:11 190:3<br>203:22,24<br>257:25<br>265:16<br>330:16,21 |
| **110**<br>237:25 | **12:35**<br>292:21<br>363:18 | **1500**<br>217:21 | | |
| **1114**<br>256:8 | **12th**<br>190:3,13<br>194:5 227:12<br>257:24<br>265:16<br>330:15 | **1503**<br>259:12 | **160**<br>333:11 | **17**<br>15:24 233:19,<br>20,23 |
| **112**<br>252:6 | | **151**<br>97:15 110:8 | **161**<br>333:13,14 | **17th**<br>208:11 |
| **116**<br>256:15 | **13**<br>227:22,23<br>228:3 359:4,6 | **152**<br>97:17 | **162**<br>100:7 | **18**<br>235:16,17,19<br>236:2,24<br>238:9 |
| **117**<br>239:24 | **136**<br>260:16 | **153**<br>113:12 | **163**<br>100:16 168:5<br>171:4 | |
| **11:30**<br>198:6 266:16 | **13th**<br>10:3 259:11 | **1530**<br>262:17 | **1630**<br>198:21 210:3<br>267:23 | **18-year-old**<br>15:25 |
| **11:53**<br>68:21 | **14**<br>229:25 230:2 | | | **1820**<br>201:23 |

**BRIAN MOORE**

April 28, 2025

**18th**
15:8

**19**
239:11,12,15
245:5 330:24
333:17,18,20

**19.8**
81:24

**19.9**
82:5

**1900**
197:7

**194**
99:3

**1982**
10:3

**199**
99:3 158:4

**19th**
244:23 254:7
303:7 308:6

**1:01**
112:7

**1:30**
266:13

**1:46**
113:5

**1st**
360:4,18

---

**2**

**2**
69:4 70:20,
21,25 266:21,
25 279:3
291:2 335:13
338:4

**2.1**
84:7

**2.3**
187:3,18
295:11,15

**2.5**
304:16 306:4
308:12

**20**
257:12,13,23
331:11 332:6,
7 337:21
338:3

**200-ton**
12:22

**2000**
14:24 43:10

**2000s**
14:19

**201**
99:9 159:6

**2021**
106:9 107:2
183:20

**2022**
11:5

**2023**
227:10
283:14
284:19 285:2
286:12
287:11
305:12

**2024**
17:23 18:14
19:11 21:17
22:13,17
27:19 34:10,
23 35:9,22

37:20 40:9
53:3 59:13,23
60:10 61:20
62:4 74:6
76:6,12 79:17
80:6 86:7,9
87:5 89:16
90:11 104:8,
16 106:16
107:4 116:2,
12 119:15
139:11
146:13
166:11,23
175:18 176:4
178:22 188:6
189:23 190:3,
4 203:23
208:11,14
212:2,3,12
213:5 215:11,
22,23 216:3
237:3 241:21
244:25
248:19
257:25
259:12
262:18
263:25
265:16
268:20
271:18
273:24
281:25
284:20
285:18 286:5,
15,16 288:6,
7,21 290:6
291:3 292:7
293:9 299:16
300:13
301:16
302:18 303:7
306:13,20

307:5 313:3
316:8,11
321:24
322:13
330:19
337:21 338:3
363:13

**2025**
8:1,6 9:1 10:1
11:1 12:1
13:1 14:1
15:1 16:1
17:1 18:1
19:1 20:1
21:1 22:1
23:1 24:1
25:1 26:1
27:1 28:1
29:1 30:1
31:1 32:1
33:1 34:1
35:1 36:1
37:1 38:1
39:1 40:1
41:1 42:1
43:1 44:1
45:1 46:1
47:1 48:1
49:1 50:1
51:1 52:1
53:1 54:1
55:1 56:1
57:1 58:1
59:1 60:1
61:1 62:1
63:1 64:1
65:1 66:1
67:1 68:1
69:1 70:1
71:1 72:1
73:1 74:1
75:1 76:1
77:1 78:1

79:1 80:1
81:1 82:1
83:1 84:1
85:1 86:1
87:1 88:1
89:1 90:1
91:1 92:1
93:1 94:1
95:1 96:1
97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1

**BRIAN MOORE**

April 28, 2025

| | | | | |
|---|---|---|---|---|
| 167:1 168:1 | 255:1 256:1 | 342:1 343:1 | 271:20,22 | 320:21 |
| 169:1 170:1 | 257:1 258:1 | 344:1 345:1 | 272:2 273:20 | **26** |
| 171:1 172:1 | 259:1 260:1 | 346:1 347:1 | 275:13 | 17:17 159:6,8 |
| 173:1 174:1 | 261:1 262:1 | 348:1 349:1 | 279:21,22 | 288:9,11,14 |
| 175:1 176:1 | 263:1 264:1 | 350:1 351:1 | 286:22 | 293:14 294:4 |
| 177:1 178:1 | 265:1 266:1 | 352:1 353:1 | 330:14,16 | 295:5,10 |
| 179:1 180:1 | 267:1 268:1 | 354:1 355:1 | 361:25 362:2, | 297:10,14 |
| 181:1 182:1 | 269:1 270:1 | 356:1 357:1 | 12 | 298:4,8 |
| 183:1 184:1 | 271:1,18 | 358:1 359:1 | **24-hour** | 301:24,25 |
| 185:1 186:1 | 272:1 273:1 | 360:1 361:1 | 131:24 | 363:10,21 |
| 187:1 188:1 | 274:1 275:1 | 362:1 363:1 | **24/7** | 364:4 |
| 189:1 190:1 | 276:1 277:1 | 364:1 365:1 | 86:14 | **2692** |
| 191:1 192:1 | 278:1 279:1 | 366:1 | **242** | 184:7 213:21 |
| 193:1 194:1 | 280:1 281:1 | **20th** | 266:3 | 214:7 229:21 |
| 195:1 196:1 | 282:1 283:1 | 208:14 | **248** | 232:5 239:18 |
| 197:1 198:1 | 284:1 285:1 | **21** | 71:24 | 243:8 245:3 |
| 199:1 200:1 | 286:1 287:1 | 261:8,9,12 | **249** | **2692-A** |
| 201:1 202:1 | 288:1 289:1 | **2133** | 272:16 362:4 | 256:16 |
| 203:1 204:1 | 290:1 291:1 | 203:9 | **25** | **2692-B** |
| 205:1 206:1 | 292:1 293:1 | **22** | 226:17 276:9, | 244:21 254:5 |
| 207:1 208:1 | 294:1 295:1 | 263:12,13,19 | 10,12,17 | 256:8 |
| 209:1 210:1 | 296:1 297:1 | **2255** | 286:22 300:7 | **2692s** |
| 211:1 212:1 | 298:1 299:1 | 334:5 | 301:24,25 | 242:4 |
| 213:1 214:1 | 300:1 301:1 | **226** | **250** | **26th** |
| 215:1 216:1 | 302:1 303:1 | 99:9 | 272:6 362:4 | 240:14,19 |
| 217:1 218:1 | 304:1 305:1 | **229** | **252** | 241:21,24 |
| 219:1 220:1 | 306:1 307:1 | 238:2 239:2 | 276:18 279:4 | **27** |
| 221:1 222:1 | 308:1 309:1 | **22nd** | 281:25 | 291:17,18,20 |
| 223:1 224:1 | 310:1 311:1 | 80:6 | 300:12 | 292:21 307:8 |
| 225:1 226:1 | 312:1 313:1 | **23** | **25A** | 363:10,12,17 |
| 227:1 228:1 | 314:1 315:1 | 166:14 265:8, | 244:6 245:12, | **28** |
| 229:1 230:1 | 316:1 317:1 | 9,11 285:11 | 15 | 8:1,6 9:1 10:1 |
| 231:1 232:1 | 318:1 319:1 | **232** | **25B** | 11:1 12:1 |
| 233:1 234:1 | 320:1 321:1 | 239:3 | 245:12 252:5 | 13:1 14:1 |
| 235:1 236:1 | 322:1 323:1 | **2355** | 253:16 | 15:1 16:1 |
| 237:1 238:1 | 324:1 325:1 | 331:4 334:4 | **25th** | 17:1 18:1 |
| 239:1 240:1 | 326:1 327:1 | **24** | 240:13 | 19:1 20:1 |
| 241:1 242:1 | 328:1 329:1 | 226:17 | 248:19 | 21:1 22:1 |
| 243:1 244:1 | 330:1 331:1 | 233:17 | 316:11 | 23:1 24:1 |
| 245:1 246:1 | 332:1 333:1 | | | 25:1 26:1 |
| 247:1 248:1 | 334:1 335:1 | | | |
| 249:1 250:1 | 336:1 337:1 | | | |
| 251:1 252:1 | 338:1 339:1 | | | |
| 253:1 254:1 | 340:1 341:1 | | | |

**BRIAN MOORE**

April 28, 2025

| | | | | |
|---|---|---|---|---|
| 27:1 28:1 | 115:1 116:1 | 203:1 204:1 | 291:1 292:1 | 223:4 234:11, |
| 29:1 30:1 | 117:1 118:1 | 205:1 206:1 | 293:1 294:1 | 21 261:25 |
| 31:1 32:1 | 119:1 120:1 | 207:1 208:1 | 295:1 296:1, | 267:7 |
| 33:1 34:1 | 121:1 122:1 | 209:1 210:1 | 25 297:1,3,5, | **28th** |
| 35:1 36:1 | 123:1 124:1 | 211:1 212:1 | 13,21 298:1, | 301:4 |
| 37:1 38:1 | 125:1 126:1 | 213:1 214:1 | 21 299:1,3 | **29** |
| 39:1 40:1 | 127:1 128:1 | 215:1 216:1 | 300:1 301:1, | 300:24,25 |
| 41:1 42:1 | 129:1 130:1 | 217:1 218:1 | 6,14,15 | 301:5,7,23 |
| 43:1 44:1 | 131:1 132:1 | 219:1 220:1 | 302:1,4,12,18 | 302:3,15 |
| 45:1 46:1 | 133:1 134:1 | 221:1 222:1 | 303:1 304:1 | 307:8 |
| 47:1 48:1 | 135:1 136:1 | 223:1 224:1 | 305:1 306:1 | **29th** |
| 49:1 50:1 | 137:1 138:1 | 225:1 226:1 | 307:1 308:1 | 215:22 |
| 51:1 52:1 | 139:1 140:1 | 227:1 228:1 | 309:1 310:1 | **2:24-cv-00490** |
| 53:1 54:1 | 141:1 142:1 | 229:1 230:1 | 311:1 312:1 | 8:5 |
| 55:1 56:1 | 143:1 144:1 | 231:1 232:1 | 313:1 314:1 | **2nd** |
| 57:1 58:1 | 145:1 146:1 | 233:1 234:1 | 315:1 316:1 | 279:22 |
| 59:1 60:1 | 147:1 148:1 | 235:1 236:1 | 317:1 318:1 | |
| 61:1 62:1 | 149:1 150:1 | 237:1 238:1 | 319:1 320:1 | |
| 63:1 64:1 | 151:1 152:1 | 239:1 240:1 | 321:1 322:1 | ——— |
| 65:1 66:1 | 153:1 154:1 | 241:1 242:1 | 323:1 324:1 | **3** |
| 67:1 68:1 | 155:1 156:1 | 243:1 244:1 | 325:1 326:1 | |
| 69:1 70:1 | 157:1 158:1 | 245:1 246:1 | 327:1 328:1 | **3** |
| 71:1 72:1 | 159:1 160:1 | 247:1 248:1 | 329:1 330:1 | 75:18 76:2,20 |
| 73:1 74:1 | 161:1 162:1 | 249:1 250:1 | 331:1 332:1 | 77:15 78:15 |
| 75:1 76:1 | 163:1 164:1 | 251:1 252:1 | 333:1 334:1 | 80:5 81:3,24 |
| 77:1 78:1 | 165:1 166:1 | 253:1 254:1 | 335:1 336:1 | 87:3,16 113:4 |
| 79:1 80:1 | 167:1 168:1 | 255:1 256:1 | 337:1 338:1 | 167:13 178:4 |
| 81:1 82:1 | 169:1 170:1 | 257:1 258:1 | 339:1 340:1 | 186:20 |
| 83:1 84:1 | 171:1 172:1 | 259:1 260:1 | 341:1 342:1 | 254:15 310:7, |
| 85:1 86:1 | 173:1 174:1 | 261:1 262:1 | 343:1 344:1 | 14 |
| 87:1 88:1 | 175:1 176:1 | 263:1 264:1 | 345:1 346:1 | **3.2** |
| 89:1 90:1 | 177:1 178:1 | 265:1 266:1 | 347:1 348:1 | 77:15 |
| 91:1 92:1 | 179:1 180:1 | 267:1 268:1 | 349:1 350:1 | **3.5** |
| 93:1 94:1 | 181:1 182:1 | 269:1 270:1 | 351:1 352:1 | 323:6 |
| 95:1 96:1 | 183:1 184:1 | 271:1 272:1 | 353:1 354:1 | **30** |
| 97:1 98:1 | 185:1 186:1 | 273:1 274:1 | 355:1 356:1 | 120:23 |
| 99:1 100:1 | 187:1 188:1 | 275:1 276:1 | 357:1 358:1 | 156:23 216:3 |
| 101:1 102:1 | 189:1 190:1 | 277:1 278:1 | 359:1 360:1 | 236:15,18 |
| 103:1 104:1 | 191:1 192:1 | 279:1 280:1 | 361:1 362:1 | 302:21,22,24 |
| 105:1 106:1 | 193:1 194:1 | 281:1 282:1 | 363:1 364:1 | 306:4 307:15 |
| 107:1 108:1 | 195:1 196:1 | 283:1 284:1 | 365:1 366:1 | 308:12 |
| 109:1 110:1 | 197:1 198:1 | 285:1 286:1 | | 359:22 |
| 111:1 112:1 | 199:1 200:1 | 287:1 288:1 | **281** | |
| 113:1 114:1 | 201:1 202:1 | 289:1 290:1 | 199:4 200:19 | |

**BRIAN MOORE**

April 28, 2025

360:14
361:11
363:17

**30(b)(6)**
38:15,18

**300**
323:3

**30th**
215:22

**31**
116:3 186:22
292:2 306:21,
23 307:3,4
359:22

**32**
30:24 254:18
291:22
308:18,20,23
315:15
363:17

**33**
315:25 316:2,
5

**34**
84:4 321:14,
16,18

**340**
158:21

**340.8**
158:23

**35**
327:21,23

**36**
330:9,11,13
333:17,18,19
334:4

**365**
264:9 265:21

**37**
333:6,7,10
334:5

**38**
334:25 335:2

**39**
337:21,24

**3:16**
181:24

**3:24**
182:3

**3K**
256:21,23

**3rd**
273:7 292:21
293:9 308:8
361:21
363:13,24
364:4

---

**4**

**4**
93:14,16,19
106:8 110:8
113:11 171:9
182:3 186:20
256:9

**4-foot**
267:10,18

**4.03-1**
170:21

**4.05-1**
175:2

**4.05-1(a)**
171:11

**4.8**
79:2

**4/1**
360:17

**4/19/2024**
360:15

**40**
303:3 304:17

**41**
363:22

**42**
288:14
363:22

**43**
187:15 206:7

**44**
206:6

**45**
206:6

**46**
170:21
171:11 175:2
206:6

**47**
219:13

**48**
62:15 63:6,
12,20 65:2
211:7,20
219:13 223:2
225:13

**49**
211:11,25
224:24

**4th**
273:7 277:7
299:16 308:8
361:21

---

**5**

**5**
187:24,25
188:4 254:15
257:19
281:25
323:14

**5-foot**
267:10,18

**5.1**
94:14 95:10,
24 96:3 97:11
98:4 106:7,17

**5.3**
329:2

**5.5**
323:23

**52**
194:8,21

**520**
98:24

**53**
194:9

**54**
195:15

**55**
323:3

**56**
197:19

**57**
201:23

**58**
204:3

**59**
190:7 204:3

**5:06**
257:16

**5:17**
257:19

**5th**
273:8 277:8
279:20
300:13
361:21

---

**6**

**6**
185:8,9,17
189:20,22,25
254:16
267:18 291:3
323:14 324:8
327:17

**6-inch**
267:10

**6.1**
324:21

**6.10**
324:25

**6.12**
97:14 98:5
106:22 325:2

**6.13**
97:17 98:7
113:12

**6.14**
325:4

**6.2**
324:25

**6.4**
324:25

**6.6**
202:23

**BRIAN MOORE**

April 28, 2025

324:25

**6.8**
324:25

**6/15/24**
332:8

**60**
236:15,17

**613**
114:10

**67**
215:10

**69**
215:8

**6:50**
327:14

**6:59**
327:17

**6th**
288:21 290:5
292:7 294:4

---

**7**

**7**
9:25 179:8
202:20
204:14,15,17
254:23

**7.10**
133:22

**7.11**
133:22

**7.12**
99:23 133:10,
13 141:9
161:17

**7.15**
141:12

**7.16**
100:3 161:19

**7.2**
97:20 98:9
124:16,17

**7.3**
98:13 126:17,
20 127:4

**7.4**
98:16 132:21

**7.5**
98:19,23,24
141:8,13
145:16
148:11

**7.9**
98:18,23,25
99:6,13
150:2,19
152:17
154:15
159:11
202:24

**7.9.K.9**
158:6

**7.9K**
99:3 154:9,17
158:5 159:16

**7.9P**
99:8 158:15,
18

**70**
217:20

**71**
217:19

**72**
216:21
218:24

**78**
226:14

**79**
359:7

**794**
335:7

**7:40**
355:21

**7:53**
366:9,10

**7:55**
195:17

**7th**
316:8

---

**8**

**8**
173:4 205:17,
18,21 208:5

**8.8**
100:9 165:24

**8.8M**
100:6

**80**
226:12,17

**800**
319:18

**805**
316:19

**81**
226:13

**810**
317:4

**815**
316:9,21

**816**

**98:24 141:16**

**819**
148:10

**82**
228:11
229:16 359:7

**821**
276:18

**829**
75:12,15

**83**
228:11,20

**830**
83:12

**833**
83:13,14

**834**
84:5

**85**
231:16

**885**
308:24

**886**
100:21
101:18

**889**
100:22

**896**
321:21

**897**
98:18,25
150:5

**898**
98:15

**899**
129:2,19,20

**8998**
126:17

---

**9**

**9**
80:9 197:9
209:9,10,13
219:10

**9.14**
153:24 154:2

**9.2**
177:9,18,23
178:20
288:11 297:3,
22 302:22
360:6 363:19

**9.4**
153:11,12
154:4 324:9
325:12,13

**9.5**
74:12 75:18
96:17 100:15
167:8,18
169:12
177:16,18,25
178:3,8,10

**9.7**
295:13

**9.9**
155:4,6

**90**
236:16

**905**
130:24
328:25

**906**
98:15 127:11
130:25 131:4

328:9

**908**
97:21,22
98:11 124:18,
19,21

**909**
98:16 132:23

**910**
100:2 133:11,
16

**93**
232:19

**95**
233:24

**97-T**
203:17

**99**
14:24

**9:30**
203:8

**9:34**
306:25
307:10 360:6

**@**

**@**
**carvercompa**
**nies.com**
26:23

**A**

**a.m.**
8:7 68:21
80:9 131:14
190:16
195:17 198:6
307:10

**A/p**
279:10

**A/r**
279:10

**A/v**
14:18

**AB**
247:20

**Abate**
8:10

**Abel**
246:18
247:16
341:20

**ability**
47:6 66:11

**able-bodied**
247:21

**abnormal**
354:14

**aboard**
125:19 167:2
191:10 246:3
248:22,24
316:14
318:16

**aboarded**
320:20

**abouts**
35:19

**abrupt**
228:17 229:5,
14,15

**ABS**
20:17

**absolutely**
48:22 193:3
207:23 318:8

**academy**
15:6

**access**
66:15 83:4
102:7,9
104:25 105:5
128:17 212:5
259:23
262:14
343:14
344:19,24

**accident**
80:13 100:15
167:25 216:8

**Accident/**
**incident**
167:8

**accompany**
349:9

**accordance**
133:7 143:25
144:23
147:24
335:15

**account**
66:5,15,21
105:5 162:5
341:10

**accounting**
73:16 278:25

**accounts**
273:15

**accurate**
296:9,12
343:16

**accurately**
84:18

**acknowledge**
205:12 289:7

**acknowledge**
**d**
129:9 291:9

**act**
113:17

**acted**
294:24

**acting**
114:12

**action**
9:2 89:3,13

**actions**
88:18 214:12
365:12

**active**
42:17 77:22

**actively**
350:16

**activities**
17:6 131:20
304:18

**actual**
54:8 172:22
188:18
311:23

**Adam**
350:13,20,21

**add**
193:10 327:6

**added**
102:17
127:23
234:18
295:19

**Addendum**
256:16

**addition**
111:2,19

**additional**
148:17 276:5
327:6 354:16

**address**
9:24 26:21
66:12

**addressed**
279:5 345:7

**addressing**
166:15 175:4,
15

**adequate**
314:12

**adjacent**
195:9

**adjust**
280:13
352:11

**admin**
36:23,25
40:14 90:24
91:4,6

**Adobe**
240:8

**adopted**
183:15,21

**advance**
42:3

**advanced**
20:23

**advisement**
30:6

**aft**
323:12

**aftermath**
93:3 239:21

**afternoon**

52:24 53:9
54:18,23
55:10,11,15
259:13

**agent**
38:23 175:5

**agree**
10:24 39:2
71:8 134:9
145:21
228:13
287:18
297:18

**agreements**
30:8 73:11

**ahead**
113:25
114:19 122:9,
10 203:5
294:8 305:21
323:2 365:2

**aid**
176:13

**air**
84:5 151:20
152:2,9
323:6,18

**airplane**
126:14

**Alabama**
315:4

**alarm**
294:7,25
295:2 296:21
364:24

**alarms**
365:15

**alcohol**
184:25

254:20

**all-
encompassin
g**
103:17

**allide**
268:23

**allided**
59:13 156:15
157:8 167:20
172:5 281:10

**alliding**
49:17 355:19

**allied**
90:2,3

**allision**
48:25 49:2,5,
9,12 57:7
58:15,19
59:23 60:10
61:9,12,21,23
62:13 63:20,
24 64:14
65:2,13 74:5,
17 76:12
78:14,20
79:16 86:7,9
87:3 90:11
91:15 93:4
119:15
121:12
125:24 126:4,
9 140:14
141:24 166:6,
11 168:21
170:14
171:20
172:23
175:10,18
176:3,12
178:10,21

184:17 185:2
188:9 212:3,
24 226:20,21,
24 233:16
239:21 245:7
251:22 276:3,
6 281:21
288:6 290:10,
12,15 317:11
335:11
341:18
347:15

**allowed**
125:6 185:3
344:9 346:22
357:2

**alongside**
58:4 199:5
262:2

**amber**
324:17,22

**amended**
193:18

**American**
336:5

**amount**
28:12

**anchorage**
55:6 202:2
224:4

**and/or**
251:18

**angle**
71:19 280:14
283:15,21
284:13
285:11,14

**annual**
314:13

**annually**
351:3

**answering**
9:15

**answers**
47:7

**anticipates**
326:22

**anymore**
12:10 13:5
18:23

**AP50**
277:12
320:14,25
321:7

**AP50S**
305:25

**AP70**
277:16

**AP70S**
305:24 321:7

**apologize**
14:13 18:2
118:12 209:4
292:10 350:9

**apparently**
55:24 196:9
244:22

**appearances**
8:12

**appears**
159:14
209:20
217:14
231:16
239:25 297:5,
6 301:18,20
303:3,6
321:20,23

322:5 334:10
359:8

**Apple**
341:9

**applicable**
77:9 129:14
141:18
143:25
144:23 151:5
331:11,14,19

**apply**
41:6,23

**appoint**
147:5,10

**approach**
9:14 108:5
224:9,12

**approaching**
354:20

**appropriately**
198:3

**approval**
193:5 306:17
336:5

**approve**
28:8,11
279:11,14,17
290:23
336:25

**approved**
288:21 291:3
292:7 296:6
299:18 303:7
308:6,15
335:18

**approving**
293:15
295:12

BRIAN MOORE

April 28, 2025

| | | | | |
|---|---|---|---|---|
| **approx** | 81:1 82:1 | 167:1 168:1 | 254:1 255:1 | 337:1 338:1 |
| 13:18 | 83:1 84:1 | 169:1 170:1 | 256:1 257:1 | 339:1 340:1 |
| **approximatel** | 85:1 86:1 | 171:1 172:1 | 258:1 259:1 | 341:1 342:1 |
| **y** | 87:1 88:1 | 173:1 174:1 | 260:1 261:1 | 343:1 344:1 |
| 11:14 12:3,20 | 89:1 90:1 | 175:1 176:1 | 262:1 263:1 | 345:1 346:1 |
| 96:23 210:3 | 91:1 92:1 | 177:1 178:1 | 264:1 265:1 | 347:1 348:1 |
| | 93:1 94:1 | 179:1 180:1 | 266:1 267:1 | 349:1 350:1 |
| **April** | 95:1 96:1 | 181:1 182:1 | 268:1 269:1 | 351:1 352:1 |
| 8:1,6 9:1 10:1 | 97:1 98:1 | 183:1 184:1 | 270:1 271:1 | 353:1 354:1 |
| 11:1 12:1 | 99:1 100:1 | 185:1 186:1 | 272:1 273:1, | 355:1 356:1 |
| 13:1 14:1 | 101:1 102:1 | 187:1 188:1 | 7,8,21 274:1 | 357:1 358:1 |
| 15:1 16:1 | 103:1 104:1 | 189:1 190:1 | 275:1 276:1 | 359:1 360:1, |
| 17:1 18:1 | 105:1 106:1 | 191:1 192:1 | 277:1 278:1 | 4,18 361:1,21 |
| 19:1 20:1 | 107:1 108:1 | 193:1 194:1 | 279:1 280:1 | 362:1,14,15 |
| 21:1 22:1 | 109:1 110:1 | 195:1 196:1 | 281:1 282:1 | 363:1,6,23,24 |
| 23:1 24:1 | 111:1 112:1 | 197:1 198:1 | 283:1 284:1 | 364:1,4 365:1 |
| 25:1 26:1 | 113:1 114:1 | 199:1 200:1 | 285:1,19 | 366:1 |
| 27:1 28:1 | 115:1 116:1 | 201:1 202:1 | 286:1,16 | |
| 29:1 30:1 | 117:1 118:1 | 203:1 204:1 | 287:1 288:1,6 | **area** |
| 31:1 32:1 | 119:1 120:1 | 205:1 206:1 | 289:1 290:1 | 80:3 122:25 |
| 33:1 34:1 | 121:1 122:1 | 207:1 208:1 | 291:1 292:1 | 135:10 |
| 35:1 36:1 | 123:1 124:1 | 209:1 210:1 | 293:1 294:1 | 141:18 |
| 37:1 38:1 | 125:1 126:1 | 211:1 212:1 | 295:1 296:1 | 148:17 151:3 |
| 39:1 40:1 | 127:1 128:1 | 213:1 214:1 | 297:1 298:1 | 361:7 |
| 41:1 42:1 | 129:1 130:1 | 215:1,22 | 299:1 300:1 | |
| 43:1 44:1 | 131:1 132:1 | 216:1,3 217:1 | 301:1 302:1 | **areas** |
| 45:1 46:1 | 133:1 134:1 | 218:1 219:1 | 303:1,7 304:1 | 152:3 160:5 |
| 47:1 48:1 | 135:1 136:1 | 220:1 221:1 | 305:1 306:1, | 355:7 |
| 49:1 50:1 | 137:1 138:1 | 222:1 223:1 | 12,20 307:1,5 | |
| 51:1 52:1 | 139:1 140:1 | 224:1 225:1 | 308:1,4,6,8,9 | **argue** |
| 53:1 54:1 | 141:1 142:1 | 226:1 227:1 | 309:1 310:1 | 172:18 |
| 55:1 56:1 | 143:1 144:1 | 228:1 229:1 | 311:1 312:1 | 286:10 |
| 57:1 58:1 | 145:1 146:1 | 230:1 231:1 | 313:1 314:1 | 318:18 |
| 59:1 60:1 | 147:1 148:1 | 232:1 233:1 | 315:1 316:1 | |
| 61:1 62:1 | 149:1 150:1 | 234:1 235:1 | 317:1 318:1 | **argumentativ** |
| 63:1 64:1 | 151:1 152:1 | 236:1 237:1 | 319:1 320:1 | **e** |
| 65:1 66:1 | 153:1 154:1 | 238:1 239:1 | 321:1 322:1 | 163:6,12 |
| 67:1 68:1 | 155:1 156:1 | 240:1 241:1 | 323:1 324:1 | 164:10,19 |
| 69:1 70:1 | 157:1 158:1 | 242:1 243:1 | 325:1 326:1 | 169:18 |
| 71:1 72:1 | 159:1 160:1 | 244:1 245:1 | 327:1 328:1 | 173:12 |
| 73:1 74:1 | 161:1 162:1 | 246:1 247:1 | 329:1 330:1 | **arm** |
| 75:1 76:1 | 163:1 164:1 | 248:1 249:1 | 331:1 332:1 | 311:24 |
| 77:1 78:1 | 165:1 166:1, | 250:1 251:1 | 333:1 334:1 | **arrayed** |
| 79:1 80:1 | 18,23,25 | 252:1 253:1 | 335:1 336:1 | 317:15 |

**arrival**
47:13 65:11
220:16
223:16

**arrive**
64:23 156:6
203:24
213:10 244:8
266:13

**arrived**
38:7 119:18
197:18,20
198:5 204:6
214:13,17
233:13 247:4
248:21

**arrow**
274:21

**art**
49:7 224:17

**ashore**
180:21 181:6
182:18 183:6
345:14

**assessment**
153:11,14,17,
22,25 154:5,
10 158:19
165:7 324:9
347:3 351:10

**Assessment-gar**
153:12

**assessments**
347:2 349:7

**Asset**
238:23

**assigned**
34:22 43:7

44:20 45:6
109:2 110:13
114:4 188:8,
19 259:8
312:25 313:5
315:17,19
341:20 343:9
344:13

**assigning**
111:14
136:16

**assigns**
110:25

**assist**
107:15

**assistance**
240:20

**assisting**
107:11 108:7

**Associate**
8:11

**assume**
80:5 101:20
143:9 186:2
196:16 200:5
224:3 267:2,3
311:3 341:13
361:10

**assumes**
182:14

**assuming**
156:8 172:18
360:13,17
363:21,22
364:3

**assumption**
149:10
155:17

**astern**

253:19

**AT&T**
341:14

**Atlantic**
11:9,11 355:7

**attach**
325:17,23

**attached**
82:15 316:19

**attaching**
195:20 196:7

**attachments**
81:4,16
262:24,25

**attend**
245:25 250:5,
20

**attest**
320:7

**attorney**
246:18
340:14,16
341:17

**attorney-client**
340:6

**attorneys**
157:10
339:14
359:13

**audit**
105:21
193:25

**audits**
314:13

**authority**
89:15 94:12,
13 104:8

332:19
345:12

**Authority's**
85:22,25

**authorize**
279:9

**auto**
79:9 127:20
145:8,10,11,
16,19 146:12,
16 166:10,13,
20,22 198:25
245:16,20
249:18
250:21
261:22
272:11,18,19
274:7,24
275:7,17,21,
25 276:5
277:3,12,25
279:22 281:4,
9,18 282:2,7,
16,17 283:17
284:22 285:5,
7,8,20
287:10,22,24
288:5 298:22
299:2,4,8,12
300:15 304:3
305:3,11,22
306:16
311:17
312:10
317:14,15
320:14,16,21
344:12
347:14,18
348:3 351:21,
24 352:4,11,
21 353:4
354:20 355:3,

6,10,23
360:21 361:2,
7,11 362:19
363:5 364:14
365:10,18

**avenue**
9:25 345:18

**avoid**
9:15 355:19
356:3

**aware**
92:23 288:8
337:17
339:15 347:8,
11 351:18,20,
22,23 354:15
355:17
365:14

**awesome**
209:8

**Ayers**
271:22 272:3
273:18
274:16
284:20
285:18 286:7,
14,16 287:20,
21 288:2,5
306:10,11
308:7,13
348:8,21
360:10
361:22 363:4

**Ayers'**
361:24

---

**B**

**back**
11:15 18:13
37:3 39:16,17

50:12,19,23
54:25 59:10
60:6 64:8
69:4 80:4
92:10 108:15
113:4 123:24
166:14 182:3
193:14,18
199:3 209:5
219:10 222:2,
3 225:11
226:12
237:23,24
238:9 252:23
257:19
261:24
272:19
280:16 294:9
319:16
325:16
327:17
341:12
360:17 365:4

**background**
42:9,11

**backing**
123:13,20,22
199:4 261:25
267:24

**backup**
120:22
274:24 275:5,
6,10 339:6

**backups**
275:12

**backyard**
50:5 221:25

**bad**
303:16
341:13

**Baldassare**
18:16,22
29:22 31:13,
25 32:10
43:25 44:4,7,
16 49:25
51:17 52:11
54:17,25
57:12 59:17
61:22 63:6
65:5 69:9
71:5 91:19
92:23 93:7
125:22
128:16 139:9
170:11 172:5
213:15 219:5
221:19 222:4,
10,15 223:10
243:7,14
244:4,23
247:13 248:9
254:6,23
256:25
269:12
296:14 322:3,
19 325:6
348:14

**Baldassare's**
30:9 243:25

**Baltimore**
190:16,20,22

**bar**
133:18

**barge**
14:17 36:22
52:22 53:15
55:7 57:15
58:22 64:23
69:14 71:3,8,
12,20 72:3,25
90:3,4,5,6

95:20 102:17,
20 103:11
122:20
134:12 135:8,
17 151:25
152:13,24
156:2,14
157:7 158:13,
14 176:2
197:13,25
199:4,5
200:19 201:2
202:5,13,14
203:2 223:4
225:7 234:13,
15,21,22
235:2 244:9
256:16
261:25 262:2
266:14,24
267:6,15,18
294:9,11
315:9 323:7,
12,18 352:13,
25 365:3,6

**barges**
16:4 17:19
90:7 151:25
152:13
176:12
276:24

**based**
17:18 30:25
31:23 37:15
48:17 66:18
118:4 171:18
315:3

**bases**
312:11

**basic**
13:4,14

**basically**
125:5 133:6
149:15
151:16 235:3
277:25
332:21

**basis**
119:8

**Bass**
214:23 215:4
216:14,17

**Bates**
74:22,24
75:3,6,23
76:3 94:2,18
97:21,25
98:11 100:2
129:17
133:11,15
170:25
301:22 362:3,
4

**battery**
15:9 274:24
275:4,6,10,12

**beam**
55:13 69:15

**bed**
219:17
231:11

**began**
21:10 261:24

**begin**
199:4

**beginning**
8:2 69:3
113:3 131:11,
13 182:2
190:3 235:22
257:18 260:7

327:16
333:17

**begins**
167:10
333:16
335:14

**behalf**
47:11,14
62:3,12 63:23
174:15
175:13,22

**bell**
223:22 224:3

**belt**
8:23 22:13
49:18 51:20
62:14 69:25
74:17 76:11
86:7 87:4
90:11 139:10
141:24 155:2
156:7 168:21
173:11
178:11 185:3
188:10
256:23
290:18

**benefits**
342:19

**berthing**
152:3

**Biden**
34:13

**big**
133:17
199:23

**bigger**
25:11

**bill**

110:14,16,20,
22,23 111:4,
9,16,17
149:24

**billed**
273:11
278:21 279:7

**bills**
111:10

**binder**
144:20

**birth**
10:2

**birthday**
32:11,14,15,
16,24

**bit**
23:15 74:3
97:4 205:4
221:4 226:12
252:23
342:13

**blank**
127:7 168:23
329:10

**block**
184:14 244:5
245:5,12
252:5 253:16
254:15,16,23
256:21 323:6,
22 325:17
328:11
331:10
333:25

**blocks**
256:8,13

**blue**
16:8 144:15,

20

**blue-green**
184:15

**board**
15:23 66:13,
22 192:3
196:10
220:13
245:23 247:2,
8 248:25
255:23
318:19
360:10

**boat**
14:25 56:16,
23 58:3 62:7
70:15 118:20
193:17 194:5,
13,18 197:12,
14,17,22
213:18
217:22 218:7
229:2 231:11,
14,21 232:2
248:25 258:9
264:15
266:14
268:10
270:23
278:14
284:15 285:8
320:5,16

**boat's**
49:21 281:2

**boats**
17:20 270:19

**bodied**
13:3

**book**
144:20 150:9,
12 152:5,9

159:2,12
264:9 265:21
343:2

**books**
115:25

**bottom**
81:3 114:8
141:16
142:23,24
143:2 159:7
171:10
177:15 179:6
192:2 294:12,
17,20 365:7

**bound**
72:7

**bow**
69:14 71:9
196:13,14
267:10

**box**
104:20,21
129:22,23
168:6,8
170:20
180:12
182:13
238:24 240:9
245:6,9 263:7
295:24 330:4

**boxes**
129:9 177:4
298:17
328:14

**branch**
122:3 134:25
135:3 148:22
154:19,22
234:11,20
281:20

**Brandon**
78:8,10
258:11 259:7

**break**
55:6 181:17,
22 202:4
327:10

**Brian**
8:3 130:15
183:4 197:21
221:18 222:7
223:9,12
266:14,24
267:5 269:10
366:8

**bridge**
22:13 37:20
49:18,24
51:4,20
52:21,24
53:6,14 55:10
56:4,5,9 57:7,
19 58:4,15
59:14 60:17
62:14 63:15
69:16,17
72:9,15,16,
20,25 74:17
76:11 86:7
87:4 90:11
99:24 115:17
119:15
121:12 122:5,
23 123:10,13,
20,23 124:4
133:13,21,24
134:10 136:5,
12 137:2,9
138:2 139:11
140:25
141:24
151:11,22

154:15 155:2,
19,20,21,22
156:4,5,6,7,
15 157:8
159:18
160:16
161:17
163:10 164:5
168:21
170:15
171:14,25
172:24 173:9,
11 174:2,5,8
175:10 176:3
178:11,21
184:17 185:3
188:10
198:17 199:6,
7,19 201:6
210:4 212:12,
24 214:14
223:5,6
224:9,12
225:8,14
229:8,11
231:24
234:13,14,16,
23 235:2
239:21
242:15,16,17,
18 243:5
244:10 245:7
256:24 262:3,
4 267:25
268:23 270:6
276:3 281:11
288:7 290:10,
12,18 319:12
329:16,21,23
347:9 351:17
354:10,11,20
355:19 356:4,
21

bridges
107:11,15
108:4,8,12
135:22
150:16
151:14 152:2
154:22
159:21,24
160:6 161:12
162:24
165:13
329:18
331:16 352:2
354:4,17
355:2,10,15

briefed
139:11

Briefing
139:5

bring
313:15

broader
175:21

broken
119:18
236:15

Brothers
11:19,20
135:6

brought
361:21

brown
16:5

Bryant
314:19,20

build
138:16

building
72:15,16

bullet
107:9,10,20
110:10 114:9
115:4 139:20
140:17
141:19 143:2,
8 151:4,24

bullets
113:14,15
146:10
147:22
152:16 162:2,
7

bump
219:14,18,24
220:5,6
224:24

bunch
178:9 201:10
293:4 294:23

buoy
135:23
331:17

buoys
114:18

Bureau
335:18,23
336:5,6,11,17
337:6

business
11:21 17:8
24:3,11
162:18 207:3
224:18

busy
289:24

butcher
18:25 23:5

button

132:15

buy
102:21 103:8
133:4 271:2

___

**C**

C-H-R-I
18:20

C-L-A-R-K
350:24

cadet
14:24 15:20,
21

call
12:9,17 17:16
32:15 49:19
50:14,19 52:7
54:25 55:2
57:11,17
61:22,24
69:11 86:18
89:6,10 91:4
95:14 114:2
118:3,14
127:7,19
146:7 148:20
151:10 161:3,
4 180:5
204:18
210:21
211:20 222:2,
24 270:9
281:23 296:5
336:14
348:23
349:25
350:25

call-out
168:8

called
25:4 46:25
49:20 50:4,16
60:14 133:13
135:14 139:5
158:6 172:20,
21 174:23
185:6 221:18,
24 222:3,4
223:9,10
244:11
269:10
276:25
288:17 324:8
351:8,10

calling
50:22 105:13

callout
168:6

calls
20:13 26:19
49:21 50:18
86:16 137:11
257:2 269:15,
21 346:11

capabilities
117:8

capacity
164:7

capitalized
110:16

captain
11:19 12:4,6
18:15 34:24
35:15 36:15,
17 40:2,8,12,
23 43:3,6,20,
22 44:3,11,
13,17,19
66:19 74:5
76:7 78:11,17

89:14 90:9
91:22,25
92:24 111:18
113:16
125:22
127:22 131:4
139:9 147:19
148:25 153:4
167:19 169:2
173:10,25
178:4 189:8
191:10,16,20
205:23 208:6,
17,23 209:15
210:12,14
212:5 219:11
220:20
223:14,19
224:6 225:22
231:13,25
232:16
233:10,21
234:2,3,8
235:12
246:24 247:3,
20,23,25
249:23
251:18,20,21
261:4 262:6
281:9,18
291:11,14
292:20 294:2,
7,9,13 296:3,
19 304:2
312:2 315:17
317:10 319:7
331:3,25
332:18 333:4
334:16 343:8,
10 344:5
347:4,5,20,23
349:18,20
350:14,16,17
364:19,25

365:4

**captain's**
114:3 281:22
312:4 331:23
332:13,22

**captain/relief**
113:16

**captains**
42:4 43:4,5,8,
19 181:13
203:14 271:3
349:8,21,25

**captured**
156:22

**card**
15:11 215:5

**cargo**
72:3,5 135:20
197:24
323:18

**Carolina**
74:7 85:25
89:15 104:8
158:20
159:17
233:17

**Carolina/
south**
158:20

**carry**
271:9

**carrying**
37:10

**Carver**
8:4 10:5,17,
20,21 11:3,6
16:11,14,15,
20 17:4,13
18:8 22:20

23:9,24 24:12
25:5,11,19
26:8,9,15
28:6,18,22,23
29:3,13,19,
20,22 31:14,
17 33:16,20,
23 34:18
35:3,7,10
36:3,18
38:11,23
39:13 40:23
41:8,14
43:10,17
44:7,12,17
62:3,12 63:23
64:13 65:18
68:9,14 70:25
71:2,18 72:24
76:3 78:11
81:23 83:11
85:16 88:11,
13,15,25
89:2,12,13
91:7 93:17,22
94:11 97:11,
14,17 104:6
105:7,16
108:14,23
109:12
120:10,12
124:18 125:5
126:17
127:18
128:14
132:23 133:2,
11 135:4
137:18
140:22
141:11 150:5
154:13
158:11,16
159:9 161:20
164:8 166:3

167:10,11
171:2 174:15,
20 175:14,22
180:25 182:7
183:16,25
185:13
186:21
187:14 188:5
190:7 204:3,
19 207:13,18,
22,25 208:17,
21 209:17,22
210:7 211:10
212:6 213:11
215:8 216:2,
18 217:13
218:7,19
219:20
225:15
226:11
227:18 228:9,
24 229:16
231:4,6,19
232:19,21
233:24 235:7,
22 239:23
246:14,16
258:3 261:12
271:12 272:5
275:24
276:18
278:18
281:17
288:14
291:22 303:2
307:7 308:23
310:25
312:24 314:8
316:8 321:21
330:14
332:21
333:10 335:7
338:6 340:13
341:17 345:8

349:15
355:14 359:7,
9 362:4
363:17,22

**Carver's**
163:20
332:12
339:14

**case**
8:5 39:5
48:13,16 70:2
74:4 93:23

**casualty**
168:12,15,20
170:21 171:6
174:24 175:8

**catalogue**
149:22

**caused**
79:16 166:6
274:8 304:3
363:2

**causing**
79:5 234:12,
22 275:2
360:25

**cell**
27:3,14,15,
17,18 86:22,
24 125:2
126:2,13
193:14

**center**
15:10 224:15
280:20

**Centerline**
11:7,13,18
48:18

**CEO**

26:12

**certificate**
133:8 335:2,
5,19 336:16
337:2,3,8

**certificated**
335:15

**certification**
130:25

**CFR**
170:21
171:11 175:2
186:15,16

**CG-2692**
184:3,6
239:12

**chain**
238:12
242:22

**chance**
209:5

**change**
105:10,11,14
107:3 111:13,
21 132:18
193:18
244:17
252:14
258:17
352:24

**changed**
106:15
108:15
146:13
191:24
193:21
334:15

**channel**
124:5,10

134:15,20,23
136:14
151:16,20
159:25 160:2

**Chapman**
8:19,22 26:3
30:10,14,18,
22,24 32:3
33:18 36:10
38:17,22
39:2,6 41:21
46:7,9,11,14
49:8 53:12,17
54:11,12
55:23 56:3
59:4,10 60:4
62:23 63:4
64:8 67:10
68:7,11,19
69:6,20
70:20,23
71:25 73:6,8
74:20 75:4,8,
11,22,24
84:2,15,18
85:3 92:13
93:14 94:19,
21,24 95:4
104:15,17
109:10 113:9
116:24 121:8,
18,21,24
123:15
124:21
129:19,21
131:19 140:4
141:13
145:15
157:11,14,19
159:5 162:16
164:11,15,21
165:2 170:18
171:2,4

172:10,13
173:14,17
181:17,21
182:5 187:23
189:20
195:24 196:2,
5 204:14
205:17 209:4
212:18,21,23
213:6 214:20
216:11
220:20,23
221:16 226:2
227:22
229:25
230:21
232:11 233:3,
5,19 235:16
239:11 251:5
257:12,21
261:8 263:12,
16 265:8
271:20 276:8
286:20 287:5
288:9 291:17
292:10 295:5
296:25
297:18 299:4
300:24
301:24 302:4,
7,9,21 306:21
307:24
308:18 310:4
315:25
318:25
319:10,13
321:14 327:9,
19 330:9
332:5,7,9
333:5 334:25
337:19
339:15,21,23
340:8,20
341:5 356:14,

17,22 357:12,
15,18,22
358:7,12
359:24
361:13,17
363:9 366:3

**character**
42:13

**charge**
64:20 162:4
175:6

**Charleston**
74:7 80:2
167:21 178:6

**chart**
22:6 117:20
118:6 149:13,
20,22,23
152:11 161:5

**charting**
117:15,22

**charts**
117:19
148:10,14,16,
18,21 149:3,
4,9 151:5,12,
15

**check**
42:9,11,20
55:8 76:15
116:14
149:15 224:7
231:22
289:23
290:22
296:19
314:10
328:14,17
329:4,9,12
333:11

**checked**
129:22
228:19 245:7,
9 256:9,13
272:18 274:6
282:6 295:24
299:21 304:8

**checks**
130:7,9 330:4

**chemical**
81:24 82:6,10
83:6 182:9
254:8 256:7

**Chesapeake**
135:9 272:4

**chief**
14:16 15:22
25:23 26:5,14

**chop**
84:10

**chores**
50:6

**Chris**
169:3 191:22,
23 246:24
247:20
249:23
341:20

**Christian**
18:16,20 19:2
276:25

**Christopher**
205:18
209:11
219:17
247:16 262:6

**chronological**
210:21 258:5

**chunks**

157:3

**circle**
317:19

**circumstance**
181:9

**circumstance
s**
136:25
137:25
140:23
184:10

**citing**
186:14

**claim**
47:12

**clarification**
9:11 48:24
251:14

**clarify**
92:14,18
219:6 233:3,5

**clarity**
182:17

**Clark**
350:13,20,21,
23

**class**
12:24 13:5

**classification**
33:16,19

**clean**
116:9

**cleaning**
50:10 218:2

**clear**
9:10 13:7
26:2 31:7
33:3 45:19

47:15 51:8
62:18 67:18
83:16 86:25
92:22 117:6
118:11 139:3
140:2 157:21
172:3 176:23
249:17
250:25
251:12
261:17 319:2

clearance
142:13,20
151:20,21

clearances
151:12 152:2,
10

click
280:16
325:19

clinic
82:7

clip
325:20

close
23:7 34:8
35:9 123:11
136:12

closes
334:16

Closing
184:23

cloud
105:4 118:3
341:9

cloud-based
105:2 339:6

clue
204:22

cluster
123:23

Clyde
246:13

CMT-2018-99
335:20

coal
102:16

Coast
12:8,15 15:9
17:15 20:17
41:17 42:15,
23 47:12,16,
20 58:11,16,
18 59:12,19,
22 60:22
61:5,8 62:3,8,
13 63:7,8,24
79:10 120:14
151:8,13
168:14
169:10,17
170:14 172:7,
11,12,16
174:10,13,14,
16 175:7,14
184:7 185:4
188:25
213:21 222:7,
11,16 223:12,
18 227:7
232:5 239:20
240:7,17,25
241:10,11
242:4,5
243:16
244:14
245:22
246:11,22
254:13,25
255:15,17
256:3 257:9

269:23 336:2,
4,9,13,21,22,
23,25 337:5
342:8 347:13

Coastal
12:23 135:15
148:22 156:2,
14 331:17

coaster
342:14

Cocaptain
267:23

Code
101:12 174:9
185:18

Coeymans
8:4 10:9,10,
11,12,15

Coeysman
10:8 23:6,7,8,
11

COI
337:3,9

COIS
21:8

collaborative
64:19

collect
90:23

collected
90:23 208:10
215:21

collection
72:2 209:14
226:7 257:23

collectively
70:25

Collin
314:19,20

color
136:24 168:7,
9 177:6
184:14

colors
236:14

Columbo
63:3

column
93:25 101:18
185:17
309:17
310:18

columns
364:8

comments
264:20

common
89:23,24
107:16
169:22
258:16
352:25 353:3
354:12,13

communicate
26:17 40:8,16

communicated
32:9 40:20
65:16

Communicating
147:23

communication
32:25

communications
147:25 148:3,
7 180:15
193:15
338:22

companies
23:17 33:23
88:11,16
95:20 103:2

companies'
89:13

company
9:2 10:7
18:23 19:5
21:25 23:5
25:12,15
27:15 28:22,
25 31:22
33:10,12
35:21 37:7,8,
10 39:23
41:4,19 47:13
74:11 77:24
78:4 82:22
88:21 102:20
109:9 135:14
145:12,18
147:24
149:24
162:17
169:25
174:12 179:2
192:14
193:20
215:18 224:5
227:14
230:15
243:13,19,24
259:16,21
270:10,22
271:2 273:13

276:13
342:17 349:2
350:13
351:15
355:13

**company's**
146:25
269:18
270:14

**compare**
297:9

**compared**
102:25

**compass**
303:10,15,24
304:7 360:19,
25 361:19

**competence**
41:17 46:25

**compile**
180:16
193:13 289:8

**complaint**
274:5 279:22
282:2 300:18
345:5,8

**complaints**
285:22,25
288:4

**complement**
143:13

**complete**
129:8 198:9
295:13

**completed**
36:21 79:3
80:14,23
128:5 193:17
254:5 256:12,

18 286:7
295:17
297:24,25

**completely**
88:19 199:2
261:23
304:19 305:2
306:7 332:13

**completes**
344:4

**completing**
228:25

**compliance**
18:5,6 20:17
22:9,16 103:5
127:19 158:9
160:22
313:22

**complied**
17:7 340:13

**comply**
351:16

**component**
76:24 305:9

**components**
285:4 287:15
304:21 305:4
314:15

**computer**
116:10 118:5
199:24,25
200:2 325:19
344:23

**computers**
272:14

**concentrating**
21:3

**concentration**
284:13

**concern**
345:6

**Concerned**
30:7

**concerns**
175:4,16
176:2 314:17

**concrete**
135:18

**condition**
103:24
249:15

**conditions**
73:10 83:9
117:7 136:13
186:25

**Conduct**
153:10

**conducted**
82:7 110:2
117:6 323:22
329:4

**configured**
323:2

**confirm**
59:22 309:12

**confirmed**
148:19

**confirming**
83:15 184:24

**confused**
92:12

**confusing**
62:19 109:11

**congestion**
331:24

**conn**

251:22

**connected**
278:5 359:25
360:3

**connection**
125:18
193:13 217:6
341:17

**connections**
272:19

**connestation**
253:2

**consecutive**
309:3

**consecutively**
204:19

**consideration**
41:18 136:15

**consist**
231:3

**consistent**
166:17
354:19

**consisting**
175:9 307:7

**consists**
233:24
239:17
276:17
291:21
308:23
330:14

**console**
280:8

**constant**
122:18

**construction**
72:20

**contact**
49:12,23
60:16 63:7
86:22 124:7
136:11
200:12 201:5
279:2 296:14
314:18
341:16

**contacted**
51:3,19 52:24
53:6,15
58:11,18
63:6,13 86:8
124:11
172:11,16
197:21
200:10

**contained**
140:9 150:22
156:19
216:20

**content**
310:12,13

**contents**
96:11

**context**
172:13 287:3

**contingency**
12:12

**continuation**
110:11

**continue**
84:4

**Continued**
113:9

**continues**
159:16
274:22

BRIAN MOORE

April 28, 2025

Contreras
8:8

control
169:23 253:5
345:3

controllers
320:4

controls
282:17

conversation
51:23 52:11
54:17 57:11
61:11 329:18
348:17

coordinate
180:15

coordinator
20:8,11 22:25
182:15

coordinators
21:19

copies
83:2 239:2

copy
68:23,25
69:22,24
70:21,23 74:2
75:25 76:2
144:20
184:21 215:5
230:7 235:6
243:13
250:14
261:17 268:7
270:8 316:4
338:4

corner
85:10 179:7
180:12,13

corollated
283:19

correct
10:18,19
13:13,14
14:11 19:9
22:14 24:4,5,
19 25:13
27:13 33:5
34:8 36:24
51:13 56:10,
20,21 63:11
64:11 68:18
71:20,21 72:4
73:22,25 78:6
80:15 81:18
82:16 84:11
85:3,12 86:3
88:23 90:8
91:6 92:8,25
93:5 96:4
97:7 98:10
100:7 102:23
103:20
104:17,22
106:20 108:3
117:25
119:22 125:8
127:9,15
128:3,6
129:8,12
130:23 131:2,
15,21,25
132:4 133:8,9
134:13
135:16 136:2,
20,21 137:22
141:22 142:9,
22,24 143:10
146:10,11,17,
22 149:16,19
151:19 153:7
154:23 155:5,

15,24 156:9,
10,20 157:4
161:13
163:21,22
169:17 170:7,
15 171:7,24
178:2,8 179:4
180:2,7 183:9
185:4 190:12,
17 191:4,8,11
192:7,23
194:11,13
195:14
197:14
198:18 199:3
200:20 202:3,
7 204:12
206:14 208:9
209:20
212:14,18
214:15,18
220:9 221:22
225:6,9,16,22
227:4 229:5,
17,18 232:2
236:21
240:14 243:3
247:16 252:4
254:18,19,21,
22 255:11
258:24
259:14
260:13,22
261:3,23
265:18,19
267:22
269:12
273:12
274:18
277:24
284:23
285:10,21
288:2,3
295:25 298:9

300:15,20
303:4 305:21
306:13,14
307:5,11,25
314:7,9
321:24 323:4
324:6 331:15
334:20 335:8
337:13,25
343:19
344:16
352:23
353:19,23
359:14
360:11 361:3
363:13,19

corrected
234:14,24

correcting
226:22

correction
20:7 24:8
32:20 34:15
58:9 110:18
119:10
131:11
144:17 154:3
181:5 214:4
241:3 246:25
260:5 268:15
271:7 275:8
276:6 290:19
295:21 298:9
325:25
326:19
335:25
336:23 337:7
339:8

corrections
352:13

correctly

92:21 96:18
119:23 131:3,
23 362:18

correlate
285:15
301:18,21
304:15
307:13

correlates
302:2,3

correlation
295:13

cost
79:19 103:16

counsel
30:5 46:4,5
55:21 57:8
89:18 157:15,
24 240:21
246:13,16
256:3 339:16
348:18 357:9

counseling
91:2

counter-
rudder
282:8 283:7

couple
9:7 12:5
46:24 181:19
195:12 247:4
284:4 290:3
318:20

courses
117:8,11
326:6 327:4

court
8:9,13 60:5
340:6

**cover**
93:20 94:11
97:24 260:6
271:12

**covered**
111:25
148:21

**covering**
76:3 185:24
186:12 190:2
257:24
265:15
312:11

**covers**
111:18
147:14
150:14
154:18
158:21
216:20

**create**
132:5 325:23,
25 326:2

**created**
295:16
299:23
326:15

**creates**
172:24,25

**credential**
188:17
205:22 206:3,
12 226:16
230:8 232:17

**credentials**
66:15 254:13

**creation**
173:4

**crew**

50:25 51:2,18
54:23 57:18
65:6,7,12,21
66:17 67:7,8,
12 77:22 81:9
82:7,11 93:3
110:25 111:2,
19 125:19
127:23
136:16
139:11
169:15 170:3,
7 176:2
184:25
187:25 188:6,
8 191:8,24
192:2 194:9
221:21
235:11,17
236:7 238:12
246:21
247:19
254:13
258:17 282:7
310:8 311:7
313:9,10
315:20
322:25 344:6,
12 345:11,15
346:12,25
355:18 356:3

**crews**
111:14
139:15
166:13
258:16 271:3
296:8

**crews'**
206:23

**cross-
reference**
42:14 302:11

**CSE**
203:17

**current**
10:4,6 352:12

**current's**
203:4

**currents**
89:22 203:7

**customer**
17:7 72:12,14
197:24
200:25

**customers**
20:13

**cut**
266:12,17

**cycle**
312:8,9

**D**

**d/b/a**
8:4

**dailies**
270:11

**daily**
17:6 76:24
126:18,20
127:4 161:9,
10 165:6
189:22
192:15,16
205:10
257:13,23
259:15
270:21
289:11
291:18
300:25 301:4
306:23 307:4

308:5 311:10
327:21,25
330:11,15
333:7 360:4
363:12

**damage**
52:20 55:8
57:14,16,20
58:21 79:3,6,
16,18,24 85:6
104:7,14,15
171:19,20
176:11
179:18,21
202:5 223:7
234:14,15,16,
25 235:2
242:25
249:13
256:21 280:3
294:12 365:8

**damaged**
86:2

**damaging**
88:14 89:15

**Dan**
201:11,14

**danger**
162:12,18
163:4,11
164:5 165:8

**dangers**
117:6 162:9
163:25
165:16,19

**data**
120:22 121:2,
12,17,25
122:4 124:3
127:9 140:10
142:5 150:9,

11 152:5,9
154:10
156:17,18,19,
21 158:20,25
159:12
180:16 238:5
264:4 294:23
326:9 348:3,
19

**database**
45:2

**date**
8:6 10:2
12:18 20:25
21:8,9 69:23
70:22 75:19
78:14 87:11
93:18 106:8,
25 131:9
168:20
183:19 188:3
189:24
204:16
205:20
209:12 210:8
212:19
214:25
216:15 226:5
227:25 230:4,
24 232:14
233:22
235:18
239:13
240:17 245:2
257:5,7,14
261:10
263:14
265:10
271:18,24
273:5 276:11
288:12,20,24
290:11,25
291:4,5,12,

14,19 294:3
297:4 299:18
301:2 302:23
306:17,18,24
307:16
308:21 316:3
317:22
318:22,25
321:17
327:22
330:12 333:8
334:2 335:3
337:22
360:15 364:4

dated
212:17
240:13 277:7
279:20
283:14
300:13
316:11
334:11
337:21 338:3

dates
241:25
273:21
297:17,19

dating
166:14

day
32:8 52:12
53:16,17,18,
23 54:3,5
65:10,13
115:23 119:5
127:13 128:7
131:12,17,21
132:2,12
144:16 163:3
170:17,18
191:8 193:8
203:22,23

223:16
248:17,23
249:3 250:3,
4,19 251:4,16
264:7 291:8,
10 316:15
334:17

day-to-day
17:3,12 91:7
103:23

daylight
83:18

days
35:24 120:23
190:2,4,5
195:12
226:20,24
236:16,18,20
247:4 274:2
290:3 293:15
361:21

deceased
168:24 169:2

December
11:4,5 116:3
227:10,12
277:7,8
283:14

decide
84:16 332:2

decided
274:16

deck
72:6 115:8,
15,18,19
116:6,20
144:12,16
231:22
265:12 270:9
345:20

deckhand
106:23
107:14 108:2
125:20
189:12,14
191:11 194:4
343:10 345:4
346:12

deckhands
107:17 108:6
109:20
230:13,14
344:19

dedicated
355:15

deem
89:20

deemed
147:7

deems
147:18

deep
16:4 142:15
152:21

defective
277:12

defender
191:5

deficiencies
166:13

define
125:18

defines
165:23
182:20

defining
117:8,11

definition

186:3

definitive
123:24 124:2
139:3

delete
120:20
243:19

demand
30:6 340:2

demands
357:9

departed
214:9

department
106:6

departure
89:21 151:9
153:5

depending
132:3

depends
203:3,7,14
289:24
354:11

depict
71:2,7

depicts
71:19

depose
39:8

deposed
9:5 45:11
48:8,21
172:17

deposition
8:3 32:2
46:16,19,22
48:17 93:20

338:2 340:25
357:19,25
358:17
360:14 366:8

depositions
47:10

describe
160:5 220:6

describes
85:5 171:5
182:20
256:20
322:25

describing
253:24
263:24

description
148:13
272:17 295:6
304:2 360:24
364:16,18

descriptions
244:5

designate
88:2 169:14
170:2,6

designated
38:16 56:24
104:19
148:16
180:19,20
181:2,6,10,13
182:14,16,18,
25 183:4,6
289:14 314:5
336:3 344:6
345:14

destination
36:22 149:12
151:10

203:24 204:7

detail
228:25

details
262:12

detected
202:5

Detective
63:2

determination
147:9 244:9

determine
45:3 57:19
293:9 325:6
347:14 348:7

determining
162:3

development
17:8 24:3,11

device
317:14 339:4

devices
124:25
185:23 319:3

Diagnose
274:5

dialed
346:16

Dicanio
194:5,10

difference
334:3

differences
278:4

digital
70:4,12
144:5,7

206:19 240:2
264:22

digitally
240:3,4,13

diligent
365:14

Dillon
24:8,15,21

DIR
30:2 163:15
356:5

direct
22:18 30:25
36:9

directed
176:19 256:2

directing
30:4,16
356:15,19

direction
31:8 84:6
133:6 211:3,6

directly
18:8 19:25
21:16 50:11
55:13 64:15,
16 72:18
89:25 109:2
118:7 147:12
158:13
200:14 201:7
213:17
289:20
340:15
341:20

director
11:9

disability
35:18

disagree
165:2

discharge
180:9

disciplinary
89:3,12
90:16,22

discipline
54:7 88:17

disciplined
88:7,14
89:14,25
90:10,14
351:15

disclaimer
158:6,8,11

discovered
35:20 242:16

discovery
70:2

discrepancies
225:19

discrepancy
229:20 232:7

discretion
281:22 312:5
331:23
332:13,22

discuss
339:18

discussed
45:20,21

discussion
51:24 68:22
69:19 70:19
75:17 148:9
195:23 254:4
257:17

disengaging
351:24

dispatch
20:7 21:3
86:22 300:2

dispatcher
20:12 86:11,
14,17,21
147:24,25
148:2,7

dispatchers
21:18 22:19,
23,24

dispatching
20:14

Displacement
256:23

display
119:17

distance
203:12,17

distances
107:18

distinct
23:16

distinguish
111:8 185:25

distracted
124:15
125:23
126:13

distractions
125:2

District
9:3

division
19:6,10 22:4
25:10 128:15

divisions
17:9 24:12
26:15

doc
170:24

dock
17:19 85:11,
19,22 86:2
89:15 90:2,3
104:8 108:5
156:14
302:16

docs
75:6

document
74:25 81:14
94:2 101:6,23
111:22
114:24
133:14
145:24
150:22 151:2
159:11
169:19
171:22 183:3
186:17,21
188:13,15,20,
23 189:3
206:23 215:4,
11,15 226:13,
17 228:10
230:5 240:10
273:10 287:9,
19 298:4
304:10
319:21
325:24
326:14
335:21 345:3
359:7

April 28, 2025

documentation 296:13

documented
86:18 102:16
187:16
287:24

documents
46:2 74:3
83:2 93:22
154:7 206:10
226:7 232:18
271:23
287:25
356:25
358:16

docx
81:14

door
345:22

download
118:5,23
148:17
149:23

downloaded
118:6,7,19
119:13,17,21,
25 120:8
121:2 140:10
348:3,7

DP
180:13,14,17

DPA
181:7 345:17,
21

draft
142:15,21
152:22 241:6
267:17 323:4,
6,18

drafted
245:13

drafts
142:18
151:24 152:9,
12 240:23
241:4 267:9,
15,16,19
323:12 327:5

dragged
294:11 365:7

dragging
294:17

drawing
168:23

drawn
274:21

dredging
31:23

drew
267:13

drift
352:12

drills
160:22
292:23 293:4
309:19 310:2
311:13,15,25
312:2 313:9

drinking
124:24 126:7

drop
190:15

drop-down
79:12 87:24,
25 128:25
129:6 263:6
299:22
328:18

drug
184:23,24
206:3,4 208:6
215:5 226:9,
14 227:9
230:10
232:17 233:9,
15 254:17

drum
203:13,15

due
39:15 73:24
117:6 137:3
138:2 193:9
336:9

duly
8:16 113:7

duplicate
334:6

duration
119:25

duties
16:17 17:2,
22,23 20:15
102:11 108:2
110:13 147:6
315:18
346:21

duties/tasks
125:3

duty
86:12

**E**

e-mail
26:18,20
46:21 66:4,7,
12,20 89:11
104:19

213:18
242:22
244:18
255:15,16,21
257:8 338:6

e-mailed
33:7 56:15
65:23 120:7,9
213:11

e-mails
26:19 66:11,
19 195:5
243:23,25
256:5 338:21
339:3 346:11

earlier
157:2 167:12
182:24
199:13
221:20 227:2
263:24
267:12
324:10
334:11 350:8

earliest
208:16
215:25
227:14

early
14:19 300:12
306:12

easier
97:23 216:25

easily
293:24

eastern
9:3 124:8

easy
105:13

eating
124:24 126:7

ebb
84:7

Ed
19:16,18

edit
105:7

edition
188:16

Edward
19:16

effect
244:14
335:10

efficiently
17:11

effort
64:18 225:19
229:19 232:6

eighth
114:8,9

either/or
205:11

electronic
56:18 82:24
117:15
148:10
149:17
206:15 207:7
294:23
296:18
364:23

electronically
56:17 144:19

electronics
124:25
271:22 272:4

276:15
304:20 305:2
306:7,12

**eliminated**
117:19

**Elizabeth**
122:3 134:25
148:23
234:20
281:20

**emergency**
110:24
182:15

**employ**
77:24

**employed**
24:20

**employee**
38:25 41:8
82:22 207:17
295:11
342:19

**employees**
88:6,13
137:20
207:13

**employer**
47:25 48:15

**employment**
30:7 36:2,18
82:24 205:19
214:24
215:21 226:4
230:2 232:13

**en**
214:11

**encapsulated**
95:11

**enclosed**
136:13

**encountered**
159:18

**encourage**
116:5

**encouraged**
296:7

**end**
29:2 35:16
62:22 71:7
81:2 124:9
130:6 131:11
133:14
135:12
149:14 158:5
161:16
184:22 185:8
206:5 226:14
267:25
274:23
316:21 331:7
366:7

**endeavor**
9:11

**ended**
166:25

**endorsement**
13:12,15

**endorsements**
13:2 47:23

**ends**
116:3 206:7
223:23

**engaged**
347:15,17

**engine**
228:19,25

229:8 252:12,
16,24 253:5,
10,12 257:13,
24 258:19
260:7,16,21
263:19

**engineer**
15:23 18:16
19:2 34:25
40:18 125:20
189:18
191:11 226:8
228:13
247:21 253:9
258:12
260:25
278:23

**engineering**
258:20
278:17
345:19

**engines**
258:8 275:11

**enhanced**
355:6

**ensure**
17:5,10
102:24 117:5
146:9 149:2,
13 160:23
197:24 286:2
314:16
346:20

**ensures**
344:8

**enter**
76:24 152:15
334:18 345:4

**entered**
82:3 127:9

262:22 264:5
292:20 293:4
294:2 299:22
301:8 304:23
311:9 326:6

**entering**
294:5,23
296:7,10
364:19,22

**entire**
55:7 97:6
102:7 258:15

**entirety**
120:24

**entitled**
32:4 339:23,
25 340:3

**entity**
25:11

**entries**
76:25 144:10,
15 190:13
193:25
194:13
203:18
204:15 205:5
237:3 245:12
302:4,7
324:25

**entry**
84:22 115:22
144:17
194:20
195:18
198:22 199:8
201:24
202:11 210:2
263:3,5
266:20 267:6
268:2,22,25
269:3 293:8

308:4 310:6

**environment**
162:23
172:25

**environmental**
180:6

**equipment**
141:18 143:4,
19,23 173:3
185:21 186:3,
4,5,10 275:14
343:13
365:15

**equipments**
272:13

**equipped**
141:17,20
145:8,17
146:15

**escalate**
29:8

**escalated**
350:15

**essentially**
159:15
234:17

**established**
172:21

**estimate**
29:24

**estimated**
267:14

**Europe**
15:6

**European**
15:23

evaluating
41:16

evaluations
102:15

evening
197:6

event
87:21 261:13
354:14

eventually
202:24
214:21

everybody's
13:7 317:9

everyday
134:22

everything's
17:11

evidence
172:19
174:12
244:14

exact
72:13 79:25
143:14
213:14

EXAMINATIO
N
8:19 113:9
359:2

examined
8:18 113:8

Examples
124:23

exceeded
79:17

exceeds
273:3

Excel
205:10,14
239:9

exception
333:25

excess
79:6,21,24

excludes
186:4

exclusively
309:9

excuse
84:4 94:12
153:12 173:7
215:21
216:19
226:22
234:15 277:8
314:5 330:18
363:23

exhibit
69:21,22
70:21,25
75:18 76:2,20
77:15 78:15
80:5 81:3,17,
19,24 87:3,16
93:16,19
106:8 110:8
113:11
167:13 178:4
182:6 187:24,
25 188:4
189:22,25
199:15 200:4
204:15,17
205:18,21
208:5 209:10,
13 211:25
214:23 215:3,
20 216:13,16,

21 226:3,6
227:23 228:2
230:2,22,25
232:12,16
233:20,23
235:17,19
236:2,24
239:12,15,25
245:5 252:5
257:13,23
258:2 261:9,
11 263:13,19
265:9,11
266:4 271:22
272:2,17
273:20
276:10,12,17
279:4 283:13
288:11,14
291:18,20
292:2,21
293:14 294:4
295:5,10
297:3,5,10,
13,14,21
298:4,21
300:7,11,25
301:5,6,7,14,
23 302:3,12,
15,22,24
303:2 304:17
306:4,23
307:3,4,15
308:12,20,23
315:15 316:2,
5 317:19
321:16,18
327:20,21,23
328:10
330:11,13
333:6,7,10,
17,19 334:4,5
335:2 337:20,
21,24 341:24

359:4,6,22
360:14
361:11,25
362:12
363:17,21
364:4

exhibits
286:22
298:16
301:21

exist
81:21 103:6
240:24

existence
87:7

exists
235:8,9

expander
272:12

expect
137:20 261:4
284:7 322:9
355:18 356:2

expectation
137:23

experience
48:9 215:17
353:17,21
354:25 355:2

experienced
234:12,21
353:14

expert
107:25
113:23
134:17
162:14
163:19 164:7,
9 173:13,19

359:4,6,22
303:22 319:8
352:7,16
354:22

expertly
274:11

experts
278:20 314:2

expiration
12:18

expire
39:15 226:17
236:20

expiring
206:24

explain
253:22

extended
35:12

extensive
101:9

extent
242:24
256:20
287:23
357:16,18
360:2

external
297:22
335:17

extinguisher
317:17

extra
35:11

extract
120:24

eye
349:3

**F**

**F-E-E-N-E-Y**
19:24

**F-O-L-A-N**
315:6

**fact**
55:5 61:23
89:21 157:24
172:18
173:19
242:16 243:4
244:9,12
264:22 265:3
268:9 279:14
308:4,5
309:22 342:3
348:9

**factors**
162:6 165:5

**facts**
52:7

**failed**
252:11
303:16
360:25

**failing**
351:16

**failure**
100:6 143:22
166:6,8
298:22 299:2,
5,9 360:21
361:7,12
364:14

**failures**
365:15

**fair**
25:12 26:3

46:7,9 68:11
170:13
340:10
353:24

**fairly**
20:3,25
136:13
220:16

**Fairview**
9:25

**fall**
303:13

**fallen**
190:23

**falling**
345:20

**falls**
13:15

**familiar**
135:11
293:12 318:4

**family**
15:15 27:21

**father**
15:8,14

**fathometer**
141:19,21
142:11,19

**favored**
124:9

**February**
15:12 301:4,
15 302:5,6,8,
18

**federal**
30:20 101:12
174:9 185:18

**feel**
9:10 51:13
345:6

**feeling**
224:24
229:14

**feels**
312:7

**Feeney**
19:13,24
21:24

**feet**
17:17 84:7
142:18
267:13,14,17
294:11 323:3,
4,14,19 365:6

**fell**
24:21

**felt**
86:22 219:14,
17,21,22,24
220:24
228:17 229:2
231:11,20

**fender**
53:7 124:8,12

**fendering**
49:23 51:3,19
52:21 53:15,
22 56:8 57:15
58:15,21,22
60:17 171:25
172:6 190:23
191:2,6
194:24
196:14 199:5
229:8,11
242:15,19,25
244:10 262:2

**fenders**
231:23

**FFU**
280:3,6

**field**
79:3 295:16,
18,22,23

**fields**
77:6,8,11
128:19

**figure**
39:7 79:7
118:13 127:2
154:7 204:10
237:22 239:4
293:18,21

**figured**
282:21

**file**
9:2 81:14
82:21,25
104:21
119:16,17
120:24 177:9
206:16 208:2

**filed**
239:20

**files**
83:4,7 207:9,
12

**fill**
43:12 78:23
89:5 102:15
153:22
177:16
184:10
258:12 261:4
298:15
322:10

**fill-in**
20:12

**filled**
35:24 44:23
76:6,11 77:6,
12 78:8 80:5,
6 102:10
126:22
128:20 129:5,
10 130:9
132:3 150:23,
25 152:20
153:18
258:23 259:2,
6 260:4,24
261:2 301:15
322:2,12
328:5 330:23
331:3 333:25
351:6

**filling**
292:24
322:22

**fills**
152:25 192:8

**final**
211:25 218:7
219:19
220:19

**finally**
197:5,18,20
202:19 211:9
217:13
223:21 231:6,
19 296:6

**find**
35:13 45:22
52:3,18 74:21
139:9 145:6
257:5 296:5
310:13

335:21
340:17 359:4

**fine**
46:12 157:19
355:23 357:3

**finish**
9:14 121:8
129:10
286:20

**finished**
305:19

**fire**
317:17

**fire-fighting**
311:25

**fishing**
355:22

**five-day**
58:14 59:8

**fix**
92:20 195:20
196:8

**fixed**
49:14,15
176:12
351:25 363:7

**flag**
127:24
192:21

**flagged**
127:23 260:3

**fleet**
90:7

**fleeting**
17:17

**flew**
277:2

**flip**
319:16

**Florida**
150:14

**flowchart**
176:6,15,20,
23 179:6,7,14
180:3,4 182:7
184:3

**flowcharts**
179:11,13

**focus**
18:13

**focused**
106:16
160:24

**Folan**
315:3

**folder**
82:25 273:17

**folks**
268:10

**follow**
31:8 69:7
84:16 94:4
97:23 137:20
174:9 176:20
184:10
314:11 321:9

**follow-on**
299:25

**follow-up**
358:21

**followup**
280:7,11,13,
18 281:5
357:5

**food**

218:3,16

**forecast**
324:3

**foreman**
195:5

**forget**
255:22
258:17

**forgot**
39:18 98:19

**forgotten**
194:15

**form**
51:5 58:12
59:24 63:25
67:22 74:11,
12,16,19
78:23 80:13
84:21 88:9
89:5,13
90:15,16
99:16 108:17,
25 121:6
126:21,23
127:8 128:4,
18 129:8
130:8,14
131:5,10,18
134:2 136:8,
18 137:5
138:3 150:13,
19,21 152:18,
19,25 153:11,
12,14,17,22
158:18
160:10,20
162:25
165:14,21
169:11 172:8
184:8 188:24
192:8,11

194:2 207:14
210:7 225:23
229:22 240:7,
21,23 241:23
242:4 244:4,
21 245:9
250:7 278:15
281:12
284:10,24
285:24
295:13
298:12
325:18,20
327:24 329:2,
7 332:16
334:2 344:3,4
361:13 363:9

**formal**
82:8 88:15,16

**format**
119:17

**formatting**
132:19

**forms**
80:24 102:9,
14 127:18
242:4 292:25
330:22
346:25 349:6
351:13

**forward**
151:24
152:12
323:12

**found**
36:14 95:13
133:20
272:19
274:25

**foundation**
229:23 232:8

296:22

**four-way**
61:24

**fourth**
107:10,19
115:3 147:23
151:24 162:8

**free**
9:10 51:13
55:6 62:7
248:25

**freight**
73:24

**frequent**
156:24

**frequently**
350:25

**Friday**
35:13,20
319:13 357:2

**front**
99:21 320:23

**FU-80**
280:2,6

**fuel**
195:8,9

**full**
21:15 70:5
90:23,24
91:10 162:5
203:5 253:15,
19 280:7,11,
13,18 281:5
294:8 365:2

**full-size**
316:22

**fully**
92:13 304:21

305:10

function
28:21 38:11

**G**

G-A-L-I-O-T-O
20:4

G-A-L-L-I-D-O
34:5

G-A-L-L-I-Z-O
34:4

G-A-L-M
24:24

G-E-D-N-E-Y
21:19

gain
282:8 283:7

Galioto
20:3 22:3
313:14

Galioto's
20:5

galley
218:2,16
246:5

Galliazano
34:2

Galliazo
34:7

Gallizo
38:6

Galm
24:9,21

gaps
152:2

GAR

153:15 324:9,
11,14,15,21

gas
21:11

gather
52:7 180:14

gave
206:22
252:12,15
253:12,18
317:18

gear
156:13
231:12,21

Gedney
21:19 22:21
86:8

general
10:6 16:10,18
23:13 28:5
29:19 38:20,
21 51:22
137:17
138:19
162:17
190:22 195:2,
11 196:24
289:14,16
311:24 313:7,
12 354:5
355:14

generally
25:4

generated
315:12

generator
275:11

generic
111:9,17

gensets
258:9

gentleman
26:7 246:10

Gilmerton
122:2 155:21
156:3,4

give
20:21 62:2
116:16,24
206:22
222:10
252:24
324:13
328:21
365:22

giving
344:6

glossary
145:4

GMT
276:10,13,21
277:2 300:9
348:9

GMT/
MACKAY
274:15

good
8:20,21 9:13
54:6 70:3
83:20 131:19
217:22
236:17
354:19
356:20 366:6

GPSS
272:13

gradualently
122:18

grainy
199:13 200:3
202:15

grass
50:8

great
114:21
319:10
327:12

green
177:4,5
236:13,17
324:17,22

groom
167:3

groomed
20:23

ground
9:7

grounding
171:14 173:8
175:9 184:16
245:6

group
145:14 158:9,
10 175:7

groups
175:20

grow
15:3

grown
17:8

guarantee
269:20

Guard
12:8,15 15:9
17:16 20:17
41:17 42:15,

23 47:12,17,
20 58:11,16,
18 59:12,19,
22 60:23
61:5,8 62:3,8,
13 63:7,8,24
79:10 120:15
151:8 168:14
169:10,17
170:14 172:7,
11,12,16
174:10,13,14,
16 175:7,15
184:7 185:4
189:2 213:22
222:7,11,16
223:12,18
227:7 232:6
239:20 240:7,
17,25 241:10,
11 242:4,5
243:16
244:14
245:22
246:12,22
254:13,25
255:15,17
256:3 257:9
269:23 336:2,
4,13,21,22,
23,25 337:5
342:8 347:13

Guard's
336:9

guards
185:22

guess
47:14 57:9
58:7 71:15
100:9 106:19
109:23 138:5
174:17

220:25
243:12 255:3
277:18 284:5
286:8 308:2
310:3 324:6,
20 329:6
360:15

**guide**
342:19

**guiding**
13:21,23

**Gulf**
150:15

**guy**
16:6 278:18
349:19 350:4,
7

**guy's**
255:22

**guys**
27:6 28:22
121:19
200:22
220:13
268:16
270:20 271:9
356:25
358:15

---

**H**

**H&I**
31:20,21

**Hackensack**
72:8 73:2

**Hale**
197:21

**Hales**
266:14,24
267:5

**half**
12:20 96:25
198:8 216:8

**hand**
199:3 213:24
243:16
245:17
249:19
250:22
252:11
253:18,22
261:24

**hand-typed**
219:9

**handbooks**
342:16

**handed**
188:4 189:25
204:17
205:21
209:13 215:2
216:16 226:6
230:25
232:15
233:23
235:19
239:14
257:22
261:11
263:18
265:11
271:25
276:12
288:13
291:20
308:22
330:13 333:9
337:23

**handheld**
136:20 143:8,
12

**handle**
102:16 354:8

**handling**
80:2 90:3
354:6

**handwrit**
210:24

**handwriting**
266:5

**handwritten**
67:16,17
209:10,18
210:15,19
211:3,21
213:18 214:5,
8 216:13,23
217:3,18
219:8,15
221:7 227:23
228:7,12
230:22 231:4,
10,17 233:20,
25 234:5,10
263:13 265:9
359:17

**handwrote**
210:24

**happen**
37:19 65:8
89:24 258:18

**happened**
34:23 40:15
52:3,5,8,22
57:13 210:3
223:25
228:18
248:16
346:15

**happening**
250:10

**happy**
32:11,14,15,
16,23,24
74:24

**harassing**
138:15
163:13 356:7

**harbor**
12:25 13:19
14:16 37:11
65:11 72:8
119:18
200:17
214:17
269:24

**hard**
122:17
144:20 191:5
221:10 223:3
225:4 231:14
232:2 262:16
267:24 269:6
270:8 274:5
294:7,24
296:20
299:13 304:4
353:5 361:2
364:9,24

**harvesting**
326:9

**hat**
114:3

**Hawespiper**
15:8

**hazard**
172:24 173:2

**hazardous**
134:5

**hazards**
107:18 161:3,

8

**he'll**
113:23

**he/she**
147:18

**head**
22:11 23:22
27:5 29:23
37:9 39:15
41:10 77:13
80:2 82:20
96:16 101:10
103:7 104:9
105:19,25
107:21 110:5
111:7 112:5
119:12 120:2
127:5 128:9
135:24
136:17 140:8
144:3 155:9
182:22 185:7
187:6 189:9,
11,13,16
191:24
193:19,23
200:11
203:21
206:19
211:17
213:23
215:16
220:15
233:12 240:6
241:15 242:2
243:9 244:2
245:11 248:8
263:11 278:6
280:24 300:5
312:21
323:14
328:20

341:22
346:24

**heading**
101:2 107:6
174:23
297:13
304:18

**heads**
33:22

**headway**
252:13

**health**
100:25
101:20,23
102:18
185:14
186:19

**hear**
17:25 33:17
58:24 75:21
345:18 358:5

**heard**
18:3 24:2
35:13,19
245:24 250:6
251:7

**hearing**
47:17 251:18
340:10 357:2

**heavy**
304:4 361:2

**held**
68:22 69:19
70:19 75:17
195:23 254:4,
13

**helm**
76:7,17,20,23
77:22 79:10

82:19 87:8
95:13 102:5,
6,13 103:8,
12,14,18
104:3,25
109:16
111:23 115:8
116:5 126:24
127:13,25
132:8 144:10,
11 150:13,19,
22 187:20
190:11 205:6
206:21,23
236:4 238:8
239:7 258:13
259:18,23
261:9,13
264:5 266:16
268:3,19,24
269:4,6
288:17 289:6,
21,22 290:21
292:20 293:7,
11,20,22,25
297:6 307:15
309:6 310:16,
22,24 311:9
312:10
326:22 328:3
329:16 334:7
343:17 344:3
349:6 351:5,
14

**Helms**
103:10

**helping**
195:19 196:7

**hey**
89:7

**high**
15:2 16:2

96:15 97:9
282:2,3 283:6

**higher**
28:14 323:8,
9,10

**highlighted**
136:23
319:20

**highlighting**
319:22

**highlights**
152:5

**Hilton**
278:22,23
279:5,7

**him/her**
170:4

**hire**
20:3,25 28:17
29:5,6,9
33:15,19 41:3
104:6 108:10
278:19 343:7
348:24,25

**hired**
16:13 20:6
21:13 26:7
41:10,14,18
189:8 230:12,
15 233:11
249:5,8
350:10

**hires**
108:14
109:14
315:18
342:16
346:19

**hiring**

40:23 183:17
206:11

**historicals**
293:25

**histories**
42:12

**history**
42:2,20,22
144:14
238:13
271:10
321:11 353:8,
11

**hit**
74:6 76:7
123:3 178:5
218:3,17
244:9,12
356:21

**hitting**
122:23
218:18,23
355:19

**Hogge**
191:14

**hold**
12:7,22 29:18
46:8 51:10
53:10 54:8
96:24 280:18,
21 339:11

**holding**
25:11,15
28:22,25
352:10

**holdup**
12:8

**home**
42:15 50:6

248:13

**honest**
340:12

**honestly**
39:14 45:24
281:4 285:13
293:23 352:9

**hope**
214:20

**horizontal**
151:11,21
152:9

**hour**
157:3 217:22
334:3,11

**hourly**
16:11

**hours**
62:15 63:6,
12,20 65:2
80:7 83:18
197:7 198:8
201:23 203:9
235:17 236:8,
9 238:5
254:18,21
258:8 260:6
273:7 301:9,
16 322:13,22
331:4 334:4,5
358:25

**hours'**
275:13

**house**
252:25
277:23 278:2
284:8 317:7

**HR**
16:16 28:20,

21,23 29:4
30:21 33:22
35:17 38:5,11
39:20 40:25
41:11,25 42:8
83:4 88:17,19
89:6 206:17,
18 207:7
208:3 342:18
345:19,21,22
346:13,16

**HSP**
101:20
143:25
144:23,24

**Hudson**
12:24 13:17,
20,24 14:6

**Hyphen**
14:10

**I**

**I-64**
155:21

**icloud**
339:7 341:9

**icon**
122:22 123:8
310:17,20,24
329:14

**ID**
75:20

**idea**
35:19 142:18

**identical**
277:25
333:16

**identification**
69:23 70:22

75:19 93:17
188:2 189:23
204:16
205:19
209:12
214:25
216:15 226:4
227:25 230:3,
24 232:13
233:22
235:18
239:13
257:14
261:10
263:14
265:10
271:23
276:11
288:12
291:19 297:4
301:2 302:23
306:24
308:21 316:3
321:17
327:22
330:12 333:8
335:3 337:22

**identified**
146:9 175:19

**identifies**
151:20

**identify**
93:21 107:18
114:17
176:22 234:6
328:22
347:16

**iis**
173:5,22

**illegible**
67:17

**image**
70:3

**imbedded**
132:25

**immediately**
58:18 73:21
99:8 119:14
174:10 175:3,
15 221:19

**impair**
47:5

**impedes**
340:4

**important**
159:22 160:3,
6,16 303:19

**imposed**
337:5,6

**improved**
277:18

**in-persons**
26:19

**inactive**
12:13,14,16,
19 77:17,20
78:4

**inattentive**
124:23

**inch**
96:25

**inches**
96:23 267:21

**incident**
16:22 18:12,
13 22:12
28:15 33:24
34:23 36:19
37:4,20

47:17,18
63:13 67:24
74:12 75:18
76:6 77:4
82:15 83:10
84:23 85:2
87:2,16,21
89:17 90:10
100:15 120:3,
4 131:8 140:3
157:6 167:18,
25 170:22
171:6,11
177:16,20,22,
25 182:15
184:8 198:22
200:8 210:2,8
217:11 218:8
221:19 222:8,
12,17 223:11,
13,15,18
233:2 243:10
254:10,18,21
255:18 263:7,
10 269:4,14
365:13

**incidents**
79:11 87:14
89:20 110:25
181:15
297:17

**include**
124:24
162:24
211:13

**included**
83:6 133:3,4
158:11,12
237:25

**includes**
154:21

**including**
117:8 124:25
147:20 151:7
162:6 165:9,
10,13 185:22
275:21
287:22

**incomplete**
127:23

**inconsistenci
es**
166:19

**incorporate**
18:6

**incorporated**
101:25

**incorrect**
63:9 92:19

**increments**
119:19

**incur**
163:3

**independent**
201:12
280:12
326:19,20

**independentl
y**
165:12

**index**
96:10

**indication**
278:7 296:17
323:21

**indicator**
283:21
284:13

**indicators**

283:16
285:12,14

**indirectly**
64:17

**individual**
127:21
132:12
188:14
206:25 289:7

**individually**
130:20
132:11
246:12

**individuals**
188:8 246:17

**industry**
21:11 161:8
351:24
354:13,15

**inform**
62:6 222:7
223:12 253:9

**information**
52:2 73:15
120:20 140:9,
12 142:11
148:9 149:17
151:5 159:15,
20 173:25
205:6 223:23
293:2 294:5
297:13,21
298:5 302:11
307:14
322:18
324:13 327:7
333:24
338:11,15
364:22

**informed**

63:23 181:18
221:9 222:7
223:2,11
224:8 229:10

**informing**
63:14

**informs**
174:4

**Ingrid**
8:8

**initial**
49:19 57:15
63:7 65:9
108:10
139:15
213:24 214:7
242:14
252:22

**initially**
21:13 52:7

**initials**
317:22

**initiate**
88:21 89:2

**initiated**
336:3

**injuries**
179:17,19

**injury**
47:12 48:14
179:7,14

**inkling**
138:13

**input**
193:16
312:18,21
346:9

**inquiry**

68:12 126:6

**inside**
29:18 50:12
150:22
271:12

**insight**
346:14

**inspect**
104:6 336:8

**inspected**
17:16 249:13
259:11
336:11

**inspecting**
343:11

**inspection**
21:10 57:19
133:8 175:7
319:9 335:2,
5,18,23
336:6,10,17,
24,25 337:4,6

**inspections**
21:9 337:2

**inspectors**
336:15

**Install**
274:24

**installed**
274:12
277:14 278:8
321:7

**installing**
277:21

**instance**
20:21

**instances**
166:12

**instant**
172:7

**instruct**
114:16 147:5

**instructed**
65:12

**instructing**
164:16,21

**instruction**
211:12
311:21
315:23
356:17

**instructions**
62:2 117:10
222:11

**instructor**
311:20

**intended**
64:5 173:8,11
174:2

**intercoastal**
155:12
158:22

**interdepartme
ntally**
17:9

**interested**
45:19 116:11

**intermittently**
279:23

**internal**
314:13

**international**
13:6,10

**internet**
193:12

**interpolate**
327:5

**interrupting**
9:16

**interval**
326:10

**interview**
42:4 91:14,
21,25 92:24
126:10
220:10
245:22,25
248:12 250:2,
6,20

**interviewed**
26:9,11 43:2,
20,23 65:5
89:19 91:17,
20 246:17,22,
24 247:18
248:2 250:19
251:2,12,17

**interviewing**
92:7

**interviews**
139:15
246:19 247:9
248:16
316:15

**investigating**
64:14

**investigation**
36:20 47:21
65:4 68:3,14,
15 69:8,12
70:9 71:5
82:12 86:6
90:13 93:9
120:25
125:21 136:7

139:8 156:11
157:6,12,22
166:4 174:4
213:21 217:7
225:18
229:21 232:5
300:2 347:12
359:19

**invoice**
197:3 273:9
277:7 279:16
281:24
283:14
285:17 300:9,
12

**invoiced**
196:25

**invoices**
28:8 272:3
276:10
286:21 287:9,
18 361:25

**invoicing**
279:15
284:25

**involve**
156:7 160:5

**involved**
30:21 41:16
175:8 200:15
255:20
311:13,24
343:7

**involving**
37:20 313:25

**iphone**
27:22 339:7

**iphones**
27:21

**Island**
31:23 37:13
92:10

**issue**
88:22 169:24
258:14 274:8
275:2 337:9
363:2

**issued**
47:23 215:11
270:13
310:11
336:16 337:4,
8 342:19,20
345:12

**issues**
77:2 166:20
194:22,23
229:9 286:9
337:2 345:25

**item**
320:3

**items**
272:11 277:4
298:13
337:10,12

---

**J**

**Jamal**
214:23 215:4

**James**
77:15 189:10
198:25 221:9
232:12,16
234:8,19
245:16
249:24 250:3
251:17,19
261:22
309:10

**January**
74:6 76:6
79:16 80:6
85:2 89:16
104:8,16
116:3 208:11,
14 233:2,17

**Jarkeis**
189:14,15
214:23 215:4
216:14,17
217:15,18
218:10
247:20

**Jason**
20:3 22:3
189:18
200:15 226:3,
7 227:24
247:22
313:14
318:17
321:10,13

**Jason's**
321:10

**Jersey**
37:13 48:17
148:24

**JETT**
68:25

**Jim**
8:22 24:17
31:3,25 33:17
38:14 74:23
75:7 83:25
91:3 116:22
130:18
138:15
157:20
220:19
305:20

358:18 366:2

**job**
201:6 212:12
214:16

**jobs**
190:21

**joined**
43:17

**Jordan**
155:19 156:5

**jot**
116:8

**journal**
115:24,25
271:17

**journal-type**
263:23

**joy**
280:8

**judge**
356:24

**judgment**
281:23
354:24

**July**
106:9,16,25
183:20 316:8

**jumps**
97:20

**June**
17:23 18:14
19:11 21:17
22:12,17
27:19 34:10,
23 37:20
52:25 59:13,
23 60:9 61:20
62:4 76:12

86:7,9 87:5
107:4 119:15
139:11
146:13
166:11
175:18 176:4
178:21 188:6
189:22 190:3,
13 203:22
210:2 211:20,
21 212:2,3,11
213:2,5
226:17 237:3
240:13,14
241:21,24
244:23
248:19 254:7
257:24,25
259:11
262:18
265:16
268:20 288:7
310:6,14
313:2 316:11
320:21
321:24
322:13
330:15,16,19
337:21 338:3

**jury**
48:16

**just--**
353:18

---

**K**

**K-C**
14:9,11

**K-S-E-A**
14:12

**K-SEA**
14:8,9,15,20

15:13 135:5

**Kands**
283:10

**Kat**
201:12

**Kate**
201:17,18,20

**Katlin**
201:16

**keel**
142:13,20
151:25

**keepers**
195:19 196:7

**keeping**
13:10

**Kevin**
23:3

**key**
145:2,3

**kid**
15:25

**kind**
16:3 17:20
24:6 25:14
28:23 46:24
52:6 56:18
69:7 73:17
97:8 122:18
123:13 127:8
128:2 135:17
136:23
154:16 166:5
168:6 176:6
177:5 178:5
179:6 180:3,
5,9 199:13
207:25
238:20 258:5

267:8 272:25
273:13 346:5

**Kingston**
9:22

**knew**
45:10 53:25
54:5 71:16
79:18 250:21
340:16
348:11

**knots**
197:9 202:23,
24

**knowledge**
32:5 38:11,21
39:5 41:20
60:23,25 61:3
67:12,13
80:17,18
81:12 86:13
87:2,6 90:9
101:21
105:16
106:21 107:5
108:2,11
111:24
113:24 115:2,
14 118:23
120:20
125:25
126:15
134:18
136:19
139:25 140:8
142:8 146:14
150:17
159:13 160:6
166:7 168:4
170:19
172:22
175:13,24
179:22 186:6

188:7 189:7
202:17
208:20 216:6
227:17,19
248:6 273:3
276:4 309:2
315:24
320:17
326:17 334:8
346:7

**Kuster**
78:8,10
258:11 259:3,
8 261:2

**L**

**L-A-R-A-W-A-Y**
26:23

**label**
74:23,24

**labeled**
70:25 93:24
94:11 150:19
276:18
291:21 317:6
321:21

**Labelled**
93:16

**labels**
76:3

**labor**
273:7

**laden**
72:3

**laid**
119:8

**land**
342:4

**landed**
229:7 231:23

**lane**
299:13

**laptop**
66:17,20
118:6,8,20
268:18
274:25
344:25

**Laraway**
16:14,15
25:18,19
26:8,14,22
28:4 60:9,19,
22 338:3,11,
17,18 339:14

**Laraway's**
25:22 26:20

**large**
199:22

**largely**
93:24

**larger**
169:24

**Lars**
276:25

**lashed**
198:3

**late**
166:14
284:19 285:2,
11 286:11
287:11
305:12
322:19,21

**latitude**
204:9

**laughing**
358:25

**law**
30:7,20 59:3

**lawsuit**
8:25

**lawyer**
207:4 340:4

**lawyer's**
282:24
306:19

**lawyers**
116:16,25
362:11
363:16

**layer**
203:15

**layers**
203:4,10

**leads**
266:17

**lean**
138:12

**learn**
52:23 53:20
55:4 57:13
79:20 125:22
156:12 166:5
207:6 249:18,
21

**learned**
49:17 61:21
79:23 136:6
208:24
295:11,13,16
296:2 299:23

**learning**
21:3

April 28, 2025

lease
200:22,23

leases
86:3

leave
29:22 35:10
36:13,17,23
37:2 39:13
40:14 50:20
62:7 90:24
91:4,6

leaving
32:18,21
33:16 194:12

lecture
31:4

led
237:14
347:15

Lee
205:18
209:11

left
29:25 32:22
33:10,19 35:6
40:9,19 50:14
77:23 156:14
181:19
191:20
217:21 223:9
299:13
310:18 317:6
362:16
364:10,11

left-hand
185:17
266:12

legal
49:7

legally
10:7

legible
237:19 239:2

length
122:19,21
323:3

Lenny
18:15 43:24
49:20 59:17
61:25 62:17
63:14 64:21
65:10,19 66:3
67:19 91:19
92:7 120:13,
18 126:10
139:14 185:5
196:21
213:14
221:19 222:3,
6 223:10,17
235:14
242:14,19,20
256:19
269:11,12,22
296:4 322:3
348:10

Lenny's
56:15 243:23

lesson
296:2

lessons
295:11,13,16
299:22

letter
99:6,14
337:21 338:2,
8 339:22
340:14,24
341:3

letterhead
210:7 211:10
212:6,9
217:14 218:8,
19 219:20
224:6 225:16
228:9,24
229:16 231:7,
20 235:7
359:9,10

letterheads
212:8

letters
14:11

letting
269:23

level
29:8 97:9
349:8

lever
280:2,3,6,7,
14

liability
23:5,17

license
12:7,18,21
13:13 14:4
15:10 39:15,
18,19 42:17
43:13 153:8
206:25
236:16,19

licensed
41:17 60:22,
25 61:5

licenses
206:24

lid
274:25

Lieutenant
62:16,19
63:13 172:20
241:16,18
244:11
245:23
255:17
257:10

life
15:24 182:15

light
151:8 197:12,
14,17 266:14

likewise
187:13 279:3

limit
28:10 92:15
236:9

limitation
9:2

limited
12:23 23:4,17
147:20 162:6
165:5

limits
28:14,16
282:8

lines
183:5 319:20

liquid
280:3

list
151:8 357:24
358:9,17,19

listed
94:25 194:9
238:23

listening
95:3

Listing
93:17

litigation
95:24

live
9:20 82:17
206:15,16

lives
111:22

LLC
10:17 23:11

load
21:8

loaded
135:17 294:9
323:12 365:2

local
150:17 151:9,
12

located
37:12 66:21
151:14
314:22

location
155:22,23

locations
156:9

lock
329:3

locks
108:4,12

log
86:16,18
105:21 115:5,
6,7,8,15,18,
19 116:2,6,20
131:7,20,24
132:13

144:12,17
149:5 193:3,
25 194:13,15
204:15
205:10 238:6
258:14,17
260:17,21
263:19
265:12,13
266:16 268:5,
8 270:3,9,25
289:12,21,22
291:18
294:24
300:25 301:4
302:17
306:20,23
307:4 308:5
311:10 333:7
360:4 363:12
364:23

**logbook**
116:12,19
143:24 144:8,
10,15,17
194:20 205:5
268:22,25
269:3 270:8,
22 271:11

**logbook's**
116:5

**logbooks**
115:21
263:24

**logged**
117:16
194:20
258:15,20
259:2 291:8

**logging**
148:6 235:21

**login**
66:14 105:4
343:14

**logistics**
11:7 20:7,11
21:18 22:25
48:19

**logo**
76:19

**logs**
76:24 144:5,7
149:6 189:22
190:2 204:8
257:13,24
258:19,21
259:15
263:13
264:22 265:9
268:14
296:11

**lone**
32:7

**long**
11:13 12:2
14:2 31:23
91:12 159:7
165:11 207:4
251:16 287:5

**long-term**
35:18

**longer**
19:8 143:21
290:2,4

**longitude**
204:9

**looked**
46:11 154:15
157:18
159:16
165:12

167:12
173:23 195:6
199:12,22
202:13 290:7,
14,19 291:5,6
302:17 308:8

**lookout**
84:22 107:20,
21 113:17
114:2,4,13,16
129:2,3,22
130:2 146:24
147:6,10
161:24 162:4
163:24
165:20
328:11,19,22
331:11,18
332:15,22
333:3 347:6
351:19
355:15

**lookouts**
100:3 113:17,
21 114:13
140:18,23
147:2 161:20
332:2 354:16

**loose**
202:5

**Lorraine**
8:10

**lose**
275:11

**losing**
217:20 218:9,
11

**loss**
25:8 303:9,14
304:7 360:19
361:19

**lost**
217:22 218:4,
7 338:12
364:9

**lot**
77:8 101:12
132:10 155:22
159:20,24
160:11 161:7,
8 177:4
250:10
258:16

**lots**
271:9

**lower**
98:12 180:11
299:7 317:6
320:8,22
321:2

**lowest**
95:23 96:5
180:12

**Lucas**
255:24

---

**M**

**M-A-R-R-O-N**
34:16

**machinery**
185:20

**Mackay**
276:10,13,21
277:2 284:20
285:18
286:11,14,15
287:9,19,21,
25 300:9
305:11,22
306:9 321:6

348:21

**Mackenzie**
34:22 44:21,
24 49:17,21
51:22 56:23
57:6 60:16
62:7 63:14
70:15 74:6
78:13 104:7
116:12
119:14
120:21 132:7
141:20
142:16 143:6,
13 146:15
148:20
156:13
166:10
167:20
168:19
170:10 178:5
187:25 188:5
190:2 238:23
263:20,22
265:15 267:7
271:14 272:5
276:22 284:2
285:20
287:10
290:17
297:24
306:12,16
307:5 321:24
327:25 335:5
352:5 357:13
363:6,12

**Madam**
60:5

**made**
49:23 57:18
60:16 86:16
91:24 92:24

BRIAN MOORE

April 28, 2025

105:18,20,22
107:3 126:6
136:11 137:9
156:13
185:23,24
193:25 197:9
199:8 202:11
241:10 263:3
267:6 269:15
270:2

**main**
200:14
275:11

**Maine**
150:14

**maintain**
9:13

**maintains**
207:25

**maintenance**
77:2 143:19
260:18

**make**
21:8 42:11,16
55:7 65:12
103:4 105:10
137:2 138:2,
16 170:4
179:2 186:11
195:7 206:24
216:25 218:4
225:19 229:9,
19 232:6
281:23
312:11
314:11
340:18
343:11 345:8
352:13 357:8
358:3,17

**make/model**
321:5

**makes**
94:7 159:21

**making**
21:7 49:12
106:3 107:11,
15 108:8
147:9 152:7
186:13
281:10,19
286:25
345:24 349:4

**malfunction**
234:12,22

**malfunctionin
g**
185:22

**man**
133:7 228:13
311:25

**management**
95:12,15
96:11 97:6
101:5 102:21
103:19 105:2,
7,14,23 112:2
115:11 119:9
133:24
137:21
138:19
147:14
158:12,18
163:20
167:24 174:8
179:3 185:15
187:9 240:10
269:16
325:10,14
327:2 330:7
335:16

343:24
344:20
351:12

**manager**
10:6 16:10,18
19:15 23:4,
13,16,19
24:11 28:6
29:19 137:17
138:19
162:17
195:19
289:14,16
313:7,12
314:5,6
345:16
355:14

**managers**
201:10

**managing**
38:23 106:3
187:17

**mandatory**
254:7 256:7

**maneuvered**
199:4 261:25

**manner**
319:7

**Manning**
132:21

**manpower**
336:2,9

**manual**
149:15
280:22

**manuals**
161:7 342:15

**March**
35:16 215:11,

21 279:20,22
281:25
285:19
286:15
299:16
300:12,13

**marine**
8:4,5 10:9,15,
17,21 11:24
17:4,13 18:8
19:8 22:8,16
23:9,11,24
24:12 25:5
28:6,18,23
29:3,13,20
31:22 35:4
38:23 40:23
41:8,14 43:10
44:17 64:13
78:11 88:13,
25 89:2,12
91:8 108:23
109:12
128:15 158:9
168:11,15
170:21 171:5
174:24 175:6,
8 180:25
197:22
208:18,21
210:7 211:10
212:6 215:15
216:2 217:14
218:8,19
219:20
227:18 228:9,
24 229:16
231:6,20
235:7 254:10
271:22 272:4
273:18
276:10,15
308:7 312:24

313:22
342:23
349:15

**mariner**
14:22 188:17,
19 189:6
205:22 230:8
232:17

**mariner's**
42:15 188:15
215:4,11
226:13

**Mariners**
151:9,13

**maritime**
15:5 224:17

**mark**
43:9,16 69:20
70:20 93:14
128:2,8
187:23
189:20
204:14
205:17
216:11
227:22
233:19 261:8
263:12 265:8
271:20 276:8,
9 288:9
291:17
296:25
300:24
302:21
306:21
308:18
315:25
321:14
327:19 330:9
333:5 334:25
337:19 350:5,

6,17 357:23
358:13 366:5

**marked**
69:22 70:21,
25 75:19 76:2
93:17 167:13
178:4 188:2
189:23
199:13 200:4
204:15
205:19
209:11
214:24
216:14 226:4
227:24 230:3,
23 232:13
233:21
235:17
239:12
257:14 261:9,
12 263:13
265:9 271:23
276:11
288:12
291:18 297:4
298:4 300:25
301:4,6
302:23 303:2
306:23
307:15
308:20
315:15 316:2,
5 321:16
327:22
330:12 333:8
335:3 337:22

**marker**
155:4,6,23
156:9 158:22,
23

**markers**
155:12

**marking**
185:23
186:12

**marks**
146:25 202:9

**Marron**
34:15,17
38:7,9 41:10

**Maryland**
190:17

**master**
8:4 12:23
62:6 77:15
78:13,19
107:15 108:7
109:15,18
111:12,20
118:10 125:9
146:8 168:10,
13,17,19,22
169:13,16,23
170:2,5,9,13
175:5 192:5,6
322:10 330:4
344:15 345:5

**master's**
66:24 94:12
126:18,20
127:4 327:21
330:11 333:7

**master/mate**
107:11

**masters**
12:22

**match**
292:13,14,17
293:18

**mate**
12:6 14:16
66:19 78:17,

18 107:15
108:7 109:15,
18 113:16
118:10 131:4
149:2 153:4
189:10 192:6
198:25 224:7,
11 225:3
229:10
261:22
322:10 343:8
344:5,15

**mate's**
114:13

**materials**
342:15

**matrix**
187:25 188:6
312:9

**Matter's**
94:13

**matters**
48:4

**Mcgrath**
34:25 39:11
40:5,18
189:18
191:11 226:3,
7 227:24
228:6,13
247:22
258:23

**Mcgrath's**
236:19

**meaning**
49:5 222:19,
20

**means**
77:21 80:6
129:5,13

224:13
260:18
274:10
282:10
356:13

**meant**
138:23 220:3,
11 221:13
224:3 324:11

**measured**
155:10,13

**mechanical**
274:8,17
362:23

**Media**
8:3 69:3
113:3 182:2
257:18
327:16

**medical-
related**
179:20

**medications**
47:5

**meet**
197:22
266:14

**meeting**
252:19
323:22,25
329:3,17

**meets**
173:3

**member**
54:23 67:11
77:22 81:9
110:25
136:16
184:25 344:6,

12 345:12,15

**members**
67:9 82:11
93:3 125:19
194:9 235:11
246:21
247:19
254:12 310:9
311:7 313:10
315:20
322:25
346:13,25

**memory**
37:16,18
61:18 122:13
222:21 290:6,
8,14

**mention**
17:25 51:21
218:18
224:23 225:3,
15 270:5

**mentioned**
33:4 43:22
71:10 104:5
151:14
218:11
276:13
349:19

**mentions**
150:8 196:6
229:15
365:18

**menu**
79:13 87:24
88:2 128:25

**merchant**
42:14 188:16,
19 205:22
215:3,15
226:13

232:17

message
50:14,20
223:9

messages
339:4

messaging
27:7 338:21

messing
88:7

met
65:10 157:9
198:5

method
213:14

Mexico
150:15

Meyerrose
200:15,16
248:22
316:25
318:17
321:13

Meyerrose's
316:6

Mickey
278:21,22,23
279:5,7

Mid-afternoon
50:24

middle
50:7 133:18
136:22
143:20 177:6
182:13
186:21
211:19
261:21
335:14

middleman
345:15

midnight
322:14

midship
190:25

midway
151:23

mike
54:9

mile
155:4,6,12,22
156:9 158:22,
23

miles
83:22 155:11,
13,14 156:8
158:22

Miller
34:24 35:6,15
36:10,11
40:2,8 169:2,
3 189:8
191:10,23
192:5 205:18,
23 208:7,17,
23 209:11,15
210:12,15
212:5 219:11,
17 223:14,19
224:6 225:22
247:20
249:24
251:18,20
262:6,7 266:8
291:11,15
294:2,13
296:3 304:3
331:3

Miller's

220:19,21

mind
73:21

mine
237:8,9

Mine's
110:18

minimal
252:12,15
253:12
294:12 365:8

minimum
351:4

minute
53:24 74:20
123:17
156:22

minutes
75:10 181:19

misses
77:4 102:15
296:7,8

missing
149:20
185:22
298:17

misspoke
19:22

misstated
51:12

Mistakenly
259:4

misunderstood
19:22 63:10

MM
188:16

MMC
15:11

MMK2
277:16

mode
126:14

model
27:24 324:9,
21

moment
203:7

Monday
8:6

monitor
8:7 128:11
199:23,24,25
200:2 206:23
274:25
275:15,17,19

monitored
346:5,8

monitors
128:10

month
216:7

months
12:5 14:23
15:20 16:2
29:24 32:23
37:21 39:19
44:10 91:13
132:7 166:10
318:20
350:15

Moore
8:1,3,20 9:1,
21 10:1 11:1
12:1 13:1
14:1 15:1

16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1 49:1
50:1 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1 71:1
72:1 73:1
74:1 75:1,25
76:1 77:1
78:1 79:1
80:1 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1,19
94:1 95:1,8
96:1 97:1
98:1 99:1
100:1 101:1
102:1 103:1

| | | | | |
|---|---|---|---|---|
| 104:1 105:1 | 191:1 192:1 | 271:1 272:1,2 | 354:1 355:1 | 315:17 |
| 106:1 107:1 | 193:1 194:1 | 273:1 274:1 | 356:1 357:1 | 317:10 |
| 108:1 109:1 | 195:1 196:1 | 275:1 276:1 | 358:1 359:1 | 347:20,23 |
| 110:1 111:1 | 197:1 198:1 | 277:1 278:1 | 360:1 361:1 | **Morrissey's** |
| 112:1 113:1 | 199:1 200:1 | 279:1 280:1 | 362:1 363:1 | 217:17,18 |
| 114:1 115:1 | 201:1 202:1 | 281:1 282:1 | 364:1 365:1 | 232:12,16 |
| 116:1 117:1 | 203:1 204:1, | 283:1 284:1 | 366:1,8 | 245:20 |
| 118:1 119:1 | 17 205:1 | 285:1 286:1 | **moot** | 250:20 |
| 120:1 121:1 | 206:1 207:1 | 287:1 288:1, | 164:25 | **mother's** |
| 122:1 123:1 | 208:1 209:1, | 13 289:1 | **morning** | 15:18 |
| 124:1 125:1 | 13 210:1 | 290:1 291:1, | 8:20,21 32:2 | **motion** |
| 126:1 127:1 | 211:1 212:1 | 21 292:1 | 355:24 | 340:19 |
| 128:1 129:1 | 213:1 214:1 | 293:1 294:1 | **Morrissey** | **motions** |
| 130:1 131:1 | 215:1 216:1 | 295:1 296:1 | 34:25 36:15, | 42:3 105:14 |
| 132:1 133:1 | 217:1 218:1 | 297:1 298:1 | 17 40:2,12,23 | 343:11 |
| 134:1 135:1 | 219:1 220:1 | 299:1 300:1 | 43:20 44:20 | **mouth** |
| 136:1 137:1 | 221:1,3,18 | 301:1,3 302:1 | 74:5 76:7 | 251:6,9 283:4 |
| 138:1 139:1 | 222:1 223:1,9 | 303:1 304:1 | 77:16 78:19, | **mouthful** |
| 140:1 141:1 | 224:1 225:1 | 305:1 306:1 | 22 89:14 90:9 | 171:12 |
| 142:1 143:1 | 226:1 227:1 | 307:1 308:1, | 91:22,25 | **move** |
| 144:1 145:1 | 228:1 229:1 | 22 309:1 | 92:24 125:23 | 36:15 221:4 |
| 146:1 147:1 | 230:1 231:1 | 310:1 311:1 | 167:19 | **moved** |
| 148:1 149:1 | 232:1,15 | 312:1 313:1 | 173:10 174:2 | 22:3 |
| 150:1 151:1 | 233:1 234:1 | 314:1 315:1 | 178:4 189:10, | **moves** |
| 152:1 153:1 | 235:1 236:1 | 316:1 317:1 | 15 192:5 | 342:13 |
| 154:1 155:1 | 237:1 238:1 | 318:1 319:1 | 198:25 | **moving** |
| 156:1 157:1 | 239:1,14 | 320:1 321:1 | 214:24 215:4 | 17:18 106:22 |
| 158:1 159:1 | 240:1 241:1 | 322:1 323:1 | 216:14,17 | 150:2 |
| 160:1 161:1 | 242:1 243:1 | 324:1 325:1 | 217:15 | **mowing** |
| 162:1 163:1 | 244:1 245:1 | 326:1 327:1, | 218:10,11 | 50:8 |
| 164:1 165:1 | 246:1 247:1 | 24 328:1 | 221:9 223:2 | **MPVL** |
| 166:1 167:1 | 248:1 249:1 | 329:1 330:1 | 233:10,21 | 210:4 |
| 168:1 169:1 | 250:1 251:1 | 331:1 332:1 | 234:2,3,8,19 | **multiple** |
| 170:1 171:1 | 252:1 253:1 | 333:1,9 334:1 | 235:12 | 91:13 102:14 |
| 172:1 173:1 | 254:1 255:1 | 335:1,4 336:1 | 245:16 247:3, | 269:15 |
| 174:1 175:1 | 256:1 257:1, | 337:1,23 | 21,23,25 | 287:22 |
| 176:1 177:1 | 22 258:1 | 338:1 339:1 | 248:12 | 292:22 |
| 178:1 179:1 | 259:1 260:1 | 340:1 341:1 | 249:18,24 | 303:18 311:4 |
| 180:1 181:1 | 261:1 262:1 | 342:1 343:1 | 250:19,21,25 | |
| 182:1,6 | 263:1,18 | 344:1 345:1 | 251:21 | |
| 183:1,4 184:1 | 264:1 265:1 | 346:1 347:1 | 261:22 266:7 | |
| 185:1 186:1 | 266:1 267:1 | 348:1 349:1 | 309:10 | |
| 187:1 188:1 | 268:1 269:1, | 350:1 351:1 | | |
| 189:1 190:1 | 11 270:1 | 352:1 353:1 | | |

321:10
331:25

## N

N-U-N-N-A-M-A-N
18:19

N/a
129:7,13
331:11

named
197:21

names
192:3

Nanavati
68:23 75:13,
15 95:7
357:23,24
358:8,12,15
366:6

National
247:7 255:22

native
70:12

nature
186:9 342:23

nautical
151:5 155:11

navigate
293:24
303:23

navigation
117:6,10,22
143:19
145:16
150:16
151:15
154:10

158:19
159:25 160:2,
7 161:11
162:5,10,12,
18 163:2,4,
11,25 164:5
165:17,19
172:24 173:2
176:13
186:10
275:13
303:19
304:20 306:8
349:7 351:10

navigational
134:6,22
143:23
151:19
152:11 165:7
186:4

Navy
202:4

nearest
168:14 175:6

necessarily
41:5 150:21
152:24 258:4
264:17,21
291:13 306:9,
18 311:4
313:24 326:3

needed
43:12 45:14
58:11,16 61:8
282:9 286:8
305:4 334:18

negative
82:7,8

Nema
272:12

nephew
25:20 26:13

Nick
25:18,22
26:14,20 28:4
60:19,22
338:3

night
47:2 322:19,
21 355:21

nobody's
127:9

non-followup
245:17
249:19
250:22
280:10,11,15,
20,23 320:4

non-
moveable
49:13

nonexistence
87:7

nontask-
related
125:2

noon
266:25

Norfolk
8:23 62:8,16
134:23 135:8
154:10,18,22
155:2,19
156:5,6
158:19 185:2
188:9 197:10,
20 198:22
214:9 234:11,
20 246:12,18
290:18 357:7

normal
202:25
342:12
353:16,21,22

north
85:10 158:20
198:16 199:5
210:3 262:2
267:25

Norway
14:23 15:15

Norwegian-
based
15:23

Notary
8:16

note
131:8 152:21
202:22 270:7,
20 304:16
308:16

notebooks
271:9

noted
8:12 57:16
161:5 166:13
366:10

notepad
264:19

notes
91:24 92:23
93:7,12 116:8
264:20
268:16
270:21
321:12

Notice
151:9,13
174:23

noticed
231:23 280:2

notification
128:2 289:5

notified
59:12,19,23
61:8 63:8
170:14 200:7
242:17

notify
60:9,12 61:12
62:3,13
168:10,13
169:7,9,25
170:10
174:10,12,14,
15 175:6,14,
19 222:11,16
337:11

notifying
62:8 169:17

noting
110:24

notwithstandi
ng
361:20

November
26:22 35:9,22
166:25

NTSB
220:13,14
245:22
246:10 247:3
248:21
250:13

number
27:3 42:15
75:3,6 77:5
79:25 93:24,
25 94:4 95:6

96:6 98:12
100:20 114:7
124:19
126:23
128:19
129:18
133:15
143:15
170:25 182:7
188:13,14,15,
18,19,21,23,
24 189:5
203:16
297:23
316:18
335:19 359:4

**numbered**
95:23 97:25
98:11 99:9
100:5,7,14,21
133:11
187:14 188:5
204:19
232:19
233:24
235:23 272:5
279:4 335:7

**numbers**
75:20,23
94:18 96:3
228:10
277:16 362:7

**numerical**
231:3

**Nunnaman**
18:17 19:3,4,
5 276:25

**NYH**
269:24

---

## O

**O'ROURKE**
191:14

**object**
49:13,14
109:5 176:12
287:2 356:4
361:13 363:9

**objecting**
282:24

**objection**
51:5,11 58:12
59:2,24 63:25
67:22 68:5
88:9 90:15,19
97:2 99:16
108:17,25
113:22 121:6
122:24 123:2
130:8,14
131:18,19
134:2,7,16
136:8,18
137:5,11
138:3,14,24
145:23
160:10,17,20
162:13,19,25
163:6,7,12,16
164:6 165:14,
21 169:11,18
170:16
171:22 172:8
173:12
174:11
175:17
180:22
186:14
207:10,14
212:16

225:23
229:22 232:8
250:7,24
255:9 257:2
258:25 269:2
278:15
281:12
282:14,19
284:10,16,21,
24 285:24
286:6,13,18,
24 287:12
296:22
297:16
298:25
303:21
305:13 306:5
307:20,22
319:5 324:18
331:20
332:16 352:6
353:6 354:21
355:4,11,20
356:6 361:17

**objection's**
305:18

**objections**
92:16,18

**objects**
49:15 351:25

**obligates**
174:8

**obligation**
169:6,9

**obligations**
168:17

**observable**
171:19

**observe**
121:4,11

**observed**
16:3

**observer**
14:24 15:22

**Observing**
146:23

**obstructions**
150:16
151:17 161:3

**obtain**
140:12

**obtained**
68:16 104:10
261:14 324:4

**occasion**
247:19

**occur**
58:10,17
86:17 138:22
161:7 341:21
353:7

**occurred**
78:20 87:5
89:23 131:8
317:11
335:11

**Occurrence**
79:5

**occurs**
311:7

**ocean-going**
14:16

**October**
10:3 15:12
35:9,22

**October/
november**
40:9

**observed**
16:3

**off-hire**
200:16

**Offered**
319:13

**office**
91:9 93:21
168:11 169:7
175:6,7 291:3

**officer**
25:23 26:6,14
57:4 107:17
114:16
125:10,11
126:14 153:3
165:18 192:9
194:14
245:16 252:9
253:17
332:14 333:4

**officers**
23:23

**official**
116:5 143:24
144:8 212:9
268:22,25

**officially**
37:5,24

**offshore**
193:12
354:23

**oftentimes**
207:8

**ohms**
272:20,21,25

**oil**
11:23 21:11
180:6,9
182:10 260:9

**older**

**on-hire/off-hire**
200:18

**onboard**
343:8 344:5

**onboarding**
343:15,18

**one's**
281:7 328:5

**one-hour**
119:19

**one-page**
261:11

**online**
41:23 42:9

**OOW**
252:8 253:17

**open**
136:14 151:2
274:25
328:17
337:10,11
345:21,22

**open-ended**
160:14

**opening**
56:4,5 124:4
151:17
354:12

**operate**
17:14 90:7
118:2

**operated**
134:24

**operates**
25:10

**operating**
26:14 76:18,
23 77:22
103:10
105:15 114:5
167:20
234:19
258:14
353:11

**operation**
125:4,6,24
141:19 157:7
159:22

**operational**
107:7 110:12
118:23
304:22
305:10

**operationally**
305:9

**operations**
11:10,11
17:4,12 19:15
25:23 26:5
91:7 103:23
124:15,23
126:13
153:20
160:19
161:10
175:15
345:20

**operator**
137:8 147:5,
7,8 175:5

**operator's**
187:17

**operators**
136:12

**opine**

186:15

**opinion**
137:12
163:18
164:14 172:9
345:13

**opportunity**
128:11

**opposite**
29:2 350:16

**option**
335:16
336:13

**options**
77:8 129:3
331:13 336:4

**orange**
136:24

**orange-ish**
168:7,8
170:20

**order**
97:25 185:21
186:9 204:24
205:25
210:21
216:19,24
226:12
228:10
229:13 231:3
252:13 258:2,
5 271:8 325:6
362:14
365:16

**ordered**
285:16 300:6

**ordering**
94:5

**orders**

222:8 223:22
252:12,16,24
253:13 272:3

**ordinarily**
322:9

**ordinary**
15:11 45:24
153:19

**org**
22:6 283:9

**organization**
29:19 34:18
38:12 102:24
103:12 311:2
314:14
335:19
349:15

**organizations**
104:2 336:8

**orientation**
108:10 343:5,
21 344:6

**orientations**
315:20

**origin**
149:11

**original**
70:11 245:3

**Orleans**
276:23

**OS**
15:13

**outbound**
234:11,19

**outfit**
336:10

**outsourced**
312:15

**outstanding**
42:12

**overboard**
303:13

**overbroad**
311:25

**overlay**
122:19,20

**oversee**
17:3 113:17,
20

**overseeing**
114:13
196:22

**overseen**
344:14

**oversees**
22:25

**oversight**
344:7 346:10

**owned**
85:16

**owner**
85:14 175:5
187:16

---

**P**

**P&I**
25:4 73:17

**P-A-L-O-M-B-A**
62:24

**P-A-Y-A**
201:15

**P-E-A-R-S-O-N**
43:16

p.m.
69:5 112:7
113:5 181:24
182:4 202:20
203:8 257:16,
20 266:25
327:14,18
366:9,10

pages
100:21 101:7,
11 115:18,20
130:24
132:24 159:5,
7,16 179:13
183:19
185:13 204:3
205:25
216:17
217:19
219:13
226:11
233:24
235:23
237:24 239:2
260:6 264:9
265:4,21
272:2 276:18
283:9 291:21
307:7 328:9

paid
36:20 72:24
73:12 195:2
273:11
279:17

Palomba
62:16,19,25
172:20
241:18
244:11
255:17

Palombo
62:24

paper
82:25 117:19
206:16,18
207:12
270:21
325:20

paperwork
20:20,22 21:5
229:2

paragraph
124:23
143:21 150:8
151:6 171:9
365:10,18

paragraphs
143:20 173:4

parentheses
77:16 324:22

part
21:14 28:21,
25 52:23
53:6,14 65:4
69:25 70:9
73:17 76:25
77:3,6 79:12
81:17 82:11,
14 86:6 93:23
101:6 102:2,
3,10 114:23
120:25
125:21
159:25 163:2
165:11
200:14,15
213:20 232:4
244:21
270:13 330:6
347:6,9

participated
309:24

particulars
150:15 210:9
333:3

parts
160:4

party
340:15

pass
134:10

passage
108:12

passed
35:14,15
36:13 40:10
56:4 57:22
69:24 70:24
75:25 208:25
327:23

passing
316:4

password
66:16 67:2,4

past
39:19 42:6
138:22
237:25 271:4

Pat
315:3

Pat's
315:5

Pause
64:6

pay
73:5 90:12,24
91:10 103:14,
16

Paya
201:11,15

payable
273:15

payment
28:8 279:9

payroll
45:5 238:17
259:9

payroll-
oriented
238:18

pays
149:24
270:22

PBL
199:5 262:2
267:25

PDF
132:13,14,15,
19 205:10
206:15

Pearson
43:9,16 44:14
350:5,6,9,17

pen
317:18

pencil
117:19

pending
8:25 36:20
90:12 227:6

people
18:7 19:25
28:17 29:3
34:20 38:10
75:21 95:2
162:22
191:13 207:8,
9 208:2
246:11 308:7

payable
311:3 312:19
344:9 345:24

perform
103:22 147:6
313:8 346:21

performed
272:18 274:4
349:17 351:3

performing
102:10

period
35:12 132:6
330:23 349:2

permission
28:11

person
28:23 29:6
33:22 34:9
61:24 65:10
106:2 111:2
147:6 153:6
162:4 169:14,
22 170:3,6,10
175:5 180:19,
21 181:2,6,10
182:14,16,18,
25 183:4,6,13
206:25 247:7,
8,19 248:17
258:20
283:11
289:14
310:25
311:13 343:9
345:14

personal
27:17 124:25
179:17,19
208:2 268:14,
15 271:9

personally
91:14,18
348:12

personnel
41:17 82:21
83:7 117:10

persons
181:14

perspective
45:23 332:12

pertain
182:9 212:24

pertaining
230:6 272:5

pertains
176:10 180:5
309:9,13

petroleum
11:25 37:10

phone
20:13 26:19
27:3,14,16,
17,18 50:11,
20 52:7
56:14,15,16,
24 57:6,17
70:15 86:23,
24 89:6,10
125:2 126:3,
13 193:14
221:24
222:24
269:18
338:23

photo
55:12,14,17,
22,23 56:6,7,
12 57:21 58:5
69:15,22
199:6,10,12,

19 213:18
223:6,8
225:11,14,17
262:3 317:6,
13

photocopied
265:5

photocopy
268:11

photograph
55:9 69:24
70:12 319:4
342:2,7

photographic
244:13

photographs
55:10 61:14,
18 69:10
70:8,24
132:25 133:2,
3,5

photos
52:4,18 69:13
70:21 71:4,11
75:10 202:5,
13,16 270:5
316:10,18,23

photos/video
180:16

pick
89:6 276:24
319:3 328:18

picked
50:13 135:8,
14

picture
268:11
317:15

pictures

202:14

piece
143:4 270:21

pieces
275:13

pier
74:7 76:8
79:16,24
85:10 104:14,
15 122:23
123:10,11,20
167:21 178:5
198:6 233:16

piling
85:10

pilot
13:19,20
145:8,11,17,
19 146:12,16
151:8,13
166:10,13,21,
22 199:2
245:16,20
249:19
250:22
252:25
261:22
272:11,19
274:7,24
275:7,17,21,
25 276:5
277:3,12
278:2 279:22
281:4,9,18
282:2,7,16,17
283:17
284:22 285:5,
7,20 287:10,
22,24 288:5
298:22 299:2,
4,8,12 300:15

304:3 305:3,
22 306:16
317:7,14,15
320:14,16
347:14,18
348:4 351:21
352:5,11,21
353:4 354:20
355:3,10,23
360:21 361:2,
7,11 362:19
363:5 364:14
365:10,18

pilotage
12:24

pilots
13:17 14:6
285:8 305:12
320:21
351:25 355:6

pin
195:19 196:6,
22

pins
196:23

place
17:5 28:14
84:21 87:4
105:12
117:12,17
126:13 131:7
138:22
182:19 191:8

places
218:6

plan
27:21 100:25
101:20,24
102:15,25
152:17
185:14

321:16,21,23
322:10
325:18,19,23
326:3,5,13,20
327:6

planned
139:12
312:13

planning
136:5 150:3,
9,10,11
152:5,7,8,18,
20,25 154:15
158:25
159:12 161:6
312:16

platform
240:4

play
30:15 180:8

PO
197:3

pocket
50:11

point
114:9 117:14,
21,22 118:13
119:14,16
120:21,22
121:2,12,17,
25 123:3,14,
15,19,21
124:3 140:10
142:4 148:14
149:13,18
156:16,18,19,
22 275:19
325:18,23
326:2,3,5,7,8,
14,19,21
327:3 340:16

April 28, 2025

points
  298:18 327:4

policies
  17:7

policy
  146:24 147:2
  345:22,24
  355:13
  356:20

popped
  231:12,21

populated
  79:9 127:20
  311:17
  312:10

populates
  344:12

port
  17:18 18:15,
  16 19:2 42:4,
  16 43:3,22
  44:3,11,17
  69:14 71:11,
  15,19 85:22
  89:15 104:8
  149:12 151:9
  190:24
  234:13,23
  278:23 347:5
  349:8,18,25
  350:15

port/
starboard
  71:14

portal
  198:16
  200:14

Porter
  189:12
  191:11 230:2,

7,23 231:2
247:21

Porter's
  232:7

ports
  17:10 85:25
  151:10 152:2

Portsmouth
  8:23 155:2
  156:7 185:3
  188:9 290:18

position
  10:4,6 13:19
  16:10,11,18
  19:14 20:5
  22:18 25:21,
  22 26:10
  34:17 41:6
  76:25 172:4
  182:14 226:8
  283:23,24
  313:17

positions
  18:11 29:18
  204:9 264:21

possession
  213:11

possibility
  320:12

post
  32:21 111:21
  140:18
  165:20
  332:14

post-accident
  232:18 233:2,
  15

post-incident
  103:25 104:5

120:23

posted
  84:23 110:23
  140:24
  332:23

posting
  354:16

postings
  351:19

potential
  30:8

pound
  196:8

power
  294:9 365:4

practicable
  168:11,14

practical
  170:4

practice
  107:16
  169:22
  264:14

practices
  351:23
  354:16

pre-
  215:21

pre-
employment
  206:4 208:6
  215:5 226:9
  227:9 233:9

prearrival
  323:25
  329:20

prebridge
  329:3

Precast
  135:15
  148:22 156:2,
  15 331:17

precautions
  117:9 147:20

precede
  96:3

preceding
  166:11

predeparture
  323:22
  329:20

Predrug
  208:6

preexisting
  321:12

prefer
  121:16

prepare
  45:7,17,23,25
  46:16,18,22

prepared
  68:2,14,17
  74:16 87:3
  93:8,21
  210:15,22
  211:15,20,22
  212:2,11
  213:2,4
  259:12 262:9

prepares
  111:16

preparing
  77:7 240:21

present
  163:4 246:9,
  19 247:8
  248:4,6,10

preservation
  31:2 340:10

preserve
  338:10,11,15
  339:19

preserved
  339:4 340:18,
  21,25 341:8

preserving
  338:21

pressure
  137:3 138:2
  260:9

presume
  96:2 129:13

pretransit
  329:17

pretty
  21:7 39:16
  345:23

prevailing
  117:7

prevent
  252:13
  365:12

preventive
  77:2

previous
  42:2 48:15

previously
  51:13 113:7
  208:21,24
  227:18
  357:15

pride
  137:3 138:2

Primarily
  66:17

**primary**
44:24 125:3
200:12 201:5
283:9

**print**
132:6,18
179:5 205:5,9

**printed**
81:17 96:19
127:8 188:16
189:3 190:10
205:13

**Printer**
132:19

**printing**
200:6

**prints**
205:10,11

**prior**
11:17 32:18
47:13,25
131:12,16,21
138:17
148:13 149:2
153:5 198:4
215:17
241:24 264:7

**Priorities**
168:6

**private**
207:8

**privilege**
30:14,19
340:6

**Pro**
27:25 28:2

**probability**
89:24

**problem**
180:6 280:2
300:19 354:9
363:7

**problems**
166:9 167:4

**procedure**
147:25 148:3,
4 260:18
348:24

**procedures**
186:24
314:16
351:17

**proceed**
199:6 269:23

**Proceeds**
262:3

**process**
21:10,11 29:7
41:16 42:8,9
89:4 193:5
253:22,24
254:2 279:18
292:14 344:8
347:7,10

**produce**
132:8 340:2
356:25

**produced**
74:4 93:16,22
94:4 95:24
115:19,20
121:22,23
154:7,17
204:25 206:2
230:6 233:8
258:3 276:19,
20 306:19
307:18

319:21

**produces**
205:7 347:18

**product**
104:23

**production**
70:2

**products**
11:25 37:10

**professional**
14:22

**profit**
25:7

**profitable**
25:14

**program**
118:5,22
335:17

**prohibit**
145:22
281:18

**prohibited**
145:11

**prohibition**
281:8,17

**prohibits**
145:19

**project**
72:5,9 73:2
79:5 195:18
201:10

**projects**
19:15

**prompt**
119:4

**pronounce**
10:8

**pronouncing**
189:15

**pronunciation**
19:2

**proper**
139:20
185:21 186:9
365:16

**properly**
115:4 252:11
283:18
355:18 356:3

**property**
79:3 85:6,9,
14 88:14
162:23
179:18,21
242:24
256:21

**provide**
9:11 27:15
33:9 47:6
65:14 67:12,
14,15 74:25
103:2,21
107:18
120:14 126:2
159:14 327:3

**provided**
33:12 47:16
67:16,25
69:25 93:3
99:15 140:22
147:8 158:2
159:21
165:18
184:21 235:6
270:9 326:25
342:22
343:24
356:24

**provider**
102:18

**providing**
161:10

**proximity**
162:9 163:25
165:16

**prudent**
150:18 165:7

**Public**
8:17

**publications**
148:10 151:6

**publish**
205:6

**published**
316:8

**pudding**
196:11,13

**pull**
45:5 78:2
132:12
293:12,25
333:18
336:19

**pulled**
294:9 309:5,6
365:4

**pump**
296:9

**purchased**
270:18,25

**Purchasing**
271:3

**purgatory**
12:10

**purpose**

67:20 137:4 249:11 346:12 352:4, 9

**pursuant**
179:2

**push**
17:20 231:12, 21

**pushed**
156:3

**pushes**
118:14

**pushing**
134:12 156:13 197:13 323:2

**put**
12:9,10 28:14 30:5 39:17 87:11 94:18 117:14 203:5 206:2,3,22 211:3,7 216:24 218:2 251:5,6 267:2 294:20 305:24 309:20 317:21 319:22 354:3 357:4,8,9 358:8 363:5

**putting**
30:12 32:7 114:3 218:16 251:8 283:3 292:25

**Q**

**qualified**
147:6

**quarterly**
312:12

**question**
9:14 24:18 26:3 29:2 31:10 40:18 49:10 51:7,15 59:21 60:2,6 64:4,6 76:10 79:2 90:20 92:11 93:6 100:9 101:17 108:19 109:4 111:16 114:22 116:22 121:9 123:18 136:10 140:5 160:21 164:4, 20,22,24 165:3 175:21 201:4,5 213:4 220:19 265:20 281:14,15 286:25 287:6 297:20 310:5 313:11 318:17 332:21 337:15 355:22 356:2

**question's**
23:15 118:11

**questions**
8:24 9:9 34:21 39:10

46:24 47:6 70:17 161:16 178:9 314:17 355:25 356:23 358:22 363:25 365:23

**quick**
223:6

**quickly**
45:3

**quiet**
196:4

**quiz**
310:7,11,14 311:23,24

**quizzes**
310:8

**quotation**
146:25

**quote**
202:8

**R**

**Rachel**
74:23 75:21

**rack**
219:14 252:3

**radar**
139:20,22 140:13

**radars**
143:2,5,7

**radio**
9:13 54:6 136:11,16 143:9

**radios**
136:20 272:12

**radius**
122:18

**rail**
196:7

**railroad**
8:23 210:4 223:5 225:8 262:3 267:25

**rails**
195:20

**rails/pudding**
196:11

**Railway**
155:20 156:5

**raise**
127:24 314:17

**rake**
71:7

**ran**
221:8

**range**
139:21 193:15

**ranges**
94:2 325:11

**rate**
283:6

**reach**
86:21 122:2

**reached**
62:16 190:22

**read**
60:5,7 64:8,

10 74:24 83:24 95:6 130:13 137:9 145:25 173:15 237:8, 9,18 261:21 262:11 287:8 290:22 294:3 364:7,16 365:13

**reader**
32:8

**reading**
32:8 131:3 162:3 173:5, 21,22 186:16 213:24 214:4, 8 242:13 267:16 295:9 362:18

**readings**
260:9

**reads**
240:8

**ready**
12:16 276:24

**real**
278:4

**realize**
106:12 332:20

**realized**
243:4 294:8 364:25

**reason**
61:4,6 78:22 133:23 192:25 258:11 264:24 298:3

321:6 322:4
331:22 334:9
339:13 353:4

**reasons**
173:17

**recall**
14:19 20:25
29:11,23
35:25 37:9
50:21,22
52:13 55:11,
16 56:13
59:20 60:13
61:16,18
64:25 66:2
74:9 76:13
79:25 88:16
89:11 91:13
104:18
116:17
198:13
199:20 200:5
214:6,8,10
222:18
223:20 242:9
245:21
246:23
247:14
249:10 250:2
253:23
255:13
264:23,25
265:24 266:2
296:6 338:8,9
349:20 355:6,
12 359:12,18

**recalling**
243:17

**recast**
135:17

**receipt**

56:19 291:9
360:15

**receivables**
273:16

**receive**
20:13 52:6
55:9 109:19
221:25
235:13
244:13
290:25

**received**
49:20 55:14
56:17 70:8
91:10 178:17
213:16
287:25
288:24 289:2,
4 290:11
291:11 303:7
315:22

**receives**
336:23

**receiving**
338:8

**recently**
21:9 208:24

**recess**
112:8 181:25
327:15

**recollection**
178:12
252:18
316:14
324:20

**recommend**
28:19 105:9,
11 351:24
354:16

**recommendat
ion**
29:16

**recommende
d**
29:10 41:3

**record**
8:12 30:13
31:24 32:7
38:14 48:8
54:10,13
56:18 60:7
63:16 64:10
68:21,22
69:4,18,19
70:18,19
75:16,17
84:25 92:5
94:17 104:13
107:24 112:7
113:4 130:13
143:24 144:4
181:24 182:3
195:23 205:7
207:7 232:25
254:4 257:16,
17,19 263:9
264:5 309:22
327:10,14,17
357:4

**recorded**
84:19 117:13
143:23
152:13,17

**records**
187:17
205:19 208:2
214:24 226:4
230:3 232:13
243:20
308:20

**recreational**
14:25 165:9
331:24

**red**
100:24
115:24,25
116:19 128:2,
8 177:15
182:13
236:12,13,17,
22 271:17
324:17,22

**refer**
10:20 73:10
139:14 185:5
306:9 342:18

**reference**
33:9,13 34:3
35:8,19,23
42:15,16
76:14 87:14
88:5 99:22
100:13 101:8,
12 110:3,6
112:3 120:5
122:11
124:17 127:6,
22 132:17
135:10
139:13 141:2
145:6,20
147:11,15
149:21 151:2
152:8,11,14
154:4 155:6
156:16 160:8,
12 165:16
178:13,15,24
180:18
181:12
183:10
186:22 187:3,

18 188:12,14,
18,21 189:5
191:22
194:12
199:10,18
203:20 204:8
217:20
241:25 244:7
245:19
250:12
251:19
262:16
274:14
298:12
304:14
329:19 333:2
334:14
336:19
343:14 344:2,
11 348:9
351:9

**referenced**
71:14 94:22
159:11
179:15
184:13
204:22
324:10
325:12 350:7

**references**
81:3 102:16
180:13 187:4
203:16 212:2
300:12 303:9
323:11

**referencing**
47:16

**referred**
180:20
182:21
185:10

**referring**
74:19 76:19
298:21 306:3
308:12

**refers**
185:18 282:4
306:10
365:10

**reflect**
362:14

**reflected**
92:12 142:4

**reflects**
254:12

**refreshes**
324:19,23

**regain**
169:23

**regard**
45:9 117:7

**region**
150:15

**regular**
118:17 130:5
163:2 271:8
326:10

**regulation**
101:13
172:14

**regulations**
17:6 174:9
185:19

**regulatory**
20:17 58:25
103:5

**reimbursed**
271:5

**related**
8:24 25:19
72:19 95:22
167:24
185:14
233:16
237:15
280:10
282:12,16
284:22 285:7,
8,19 296:14
297:23
307:19
351:17

**relates**
186:2 301:5
360:17

**relative**
121:4,11
160:18

**relay**
278:9

**relays**
274:7,13
275:22 278:8,
14 362:22

**release**
118:17

**releases**
182:10

**relevant**
162:6

**reliably**
319:3

**relieve**
115:4 169:16

**relieved**
115:4

**rely**

354:20

**Remedial**
304:18

**remember**
50:9,17,24
55:20 65:22
121:7 122:10,
15,16 123:5
156:17 197:3
213:23,24
214:4 219:7,9
220:15
222:20,23
241:15 242:2
243:10,16
249:22,23
250:9,11
251:14,16,18
252:20 254:2
263:4 269:7
341:22
342:20
348:17

**remove**
186:11 195:8

**removed**
185:23
277:11

**renewed**
227:3

**rent**
102:21 103:8

**rental**
201:2

**reorganized**
94:3

**repair**
77:3 143:22
195:2 272:3
276:13

**repairs**
190:16,19
195:7,12

**repeat**
51:15 53:11
60:2 64:6
279:25
281:15 287:7
300:18
365:13

**repeating**
355:22

**rephrase**
88:12

**replace**
190:23 274:7,
16 278:13
305:25

**replaced**
39:23,25
166:17,23
284:4,19
286:2,4,11,19
287:2,11,15
305:11,14
338:24
362:22

**replacement**
143:22
194:24
304:21

**replacements**
286:7

**replacing**
275:22 285:8

**report**
18:8 25:15,
17,18 28:5
68:2,13,17
74:4,11,12

76:2,5,10,16
77:7,23,25
79:8 82:15
87:3,21 132:5
167:12,19,23
171:7 172:6
177:10,16,23,
25 178:3,10,
21 198:12,13
210:8 211:13
217:13 218:8
221:19
229:16
235:17
239:12 248:9
254:7,25
256:7,18
258:8 259:12
260:9,12,17,
18,22 268:20
269:14 270:2
288:11,16,17
292:3,6,20
293:17 294:3
296:15 297:3,
6,22 298:15,
22 301:5,8
302:22 303:4
304:7 306:16
307:11,17
308:5 309:5,7
315:13
316:19
325:17
327:21
330:11 333:7
334:10,13,14
336:24,25
342:8 347:13,
18 348:16
351:5 360:7,
14 363:19,23

**Report-event**

75:18

**reportable**
79:11 184:8

**reported**
19:11,25
21:16 22:17
51:2,19 58:20
78:14 171:21
172:4 254:24
293:10 300:4
309:23
323:13

**reporter**
8:9,13 60:5
363:16
364:21

**reporting**
100:15 111:2
126:18,21
127:4 167:8,
25 168:6
169:14 170:3,
6 186:25
296:3,19
304:3 327:25

**reports**
76:25 77:4
78:2 89:12
170:4 177:19,
20,21,22
179:2 198:25
261:5,22
267:24
269:23
272:10 289:7
309:19
330:15 334:7
361:6

**represent**
8:22 103:3
272:9

**represented**
307:18,23

**representing**
341:17

**represents**
310:19,24

**reprimanded**
88:7

**reprinted**
170:22

**request**
33:11 105:22
241:13,20
257:9 270:11

**requested**
52:4 241:10,
16 244:17
338:15

**requests**
107:17
338:20
348:18

**require**
132:10 311:6
354:5 355:14

**required**
66:15 77:11
83:5 109:25
117:10
128:21 129:4,
5,9,11 131:8
153:23 172:6
187:16
253:21
264:18
283:25
295:16,18,22,
23 328:7,14
329:7 337:7

**requirement**
58:25 95:17,
19,20 126:12
130:25 162:4
185:19
186:11,24
187:15

**requirements**
103:5 141:3
161:24
163:24 337:5

**requires**
329:17,25

**requisitions**
270:12

**resecured**
196:10

**reserve**
12:16 366:4

**reserving**
356:23

**reside**
9:22 73:15

**resign**
31:17 36:6
38:2

**resolved**
194:22

**resources**
325:5

**respect**
83:9 356:24

**respond**
51:11 223:3
225:5 294:10
365:5

**response**
182:15 282:2,

3 283:6
285:22
298:13
299:22
338:14

**responsibiliti
es**
24:3 111:3
113:16
114:14

**responsibility**
18:4 21:12,15
22:16 25:4,8
73:18 94:13
106:3 108:7,
23 109:13,19
111:13
130:22
169:17
259:20 313:6,
13

**responsible**
20:9 21:6
40:22 64:14,
17 88:20
108:13,20
118:9 137:2,
25 139:10
176:24
312:23

**rest**
83:25 238:19

**resting**
219:14,17

**restricted**
114:6 134:15,
19

**restrictions**
327:4

**restrictive**

331:21

**result**
185:2 296:3

**resultant**
175:4,16,25

**resulting**
176:3 223:3

**results**
82:6,11 83:6
232:18,21

**resumé**
41:24,25

**retain**
265:25

**return**
280:15

**returned**
39:22

**returns**
280:20

**retype**
67:18

**reused**
278:14

**reversing**
123:13

**review**
46:2 121:2
130:5 131:16
139:2 192:25
254:24 255:5
343:4,6
358:19

**reviewed**
70:8 71:4
138:18 292:7
324:6

reviewing
21:6 259:20
293:15

reviews
127:18
192:20

revise
241:14
242:10
245:24

revised
106:11

revision
106:8,25
183:19 241:9,
11,17,20
242:22 243:6

revisions
105:18,22

revocation
42:22

reword
287:3

rid
117:18
207:21 339:5

ride-along
348:24

ride-alongs
351:2

rides
349:3

riding
107:20

right-hand
128:20 179:7
180:12

rights
366:4

risk
153:11,12,14,
17,22,24
154:4 162:22
324:9,25
325:4,7,10

river
12:24 13:17,
20,24 14:6
72:8 122:3
134:25
148:23
234:21
281:20
352:12

RJ
21:20

Robert
194:5

robust
345:24

rode
16:3

Rodgers
12:11 16:21
24:14,16
25:25 30:3,
12,16,20,23
31:3,9,11,24
32:6 33:17
36:8,11
38:14,20,25
39:4 41:20,22
45:18,20
46:4,6,8,10,
13,16 48:12
49:6 51:5,10
53:10,16
54:10,15

55:21 56:2
57:9 58:7,12
59:2,7,24
62:22 63:2,
16,25 67:8,22
68:5,9 69:18
70:18 71:23
73:4,7 74:18
75:2,5,9,16,
20,23 80:17,
19 83:24
84:3,13,17,25
85:4,20 88:9
90:15,18 91:3
92:5,9,17
94:17,20,23
95:2 97:2
99:16 104:13,
16 106:19
107:24
108:17,25
109:5,7,11,23
113:22 114:7,
10 116:18,21
117:2 121:6,
10,13,16,20,
23 122:9,24
123:2,5,14,21
124:19
129:17,20
130:8,11,14,
17 131:18
134:2,7,16
136:8,18
137:5,11
138:3,5,7,14,
24 140:2,5
141:12,14
145:13,23
157:9,13,17,
20,25 159:3
160:10,17,20
162:13,19,25
163:6,12,16

164:6,13,17,
23 165:14,21
169:11,18
170:16,24
171:3,22
172:8,12,15
173:12,16,18
174:11,17
175:17
180:22
186:14
195:25 196:3
207:10,14
212:16,20,22
213:3,9,25
220:18,22,25
221:15
225:23
229:22 232:8,
25 233:4,7
243:12
246:14 250:7,
24 251:4,7,11
255:3,9 257:2
258:25 269:2,
8 278:15
281:12
282:14,19
283:3 284:5,
10,16,21,24
285:24 286:6,
13,18,24
287:8,12
292:9,12
295:3 296:22
297:16
298:25 299:6,
11 301:12,21
302:2,5,8
303:21 304:9
305:13,16,18
306:5 307:20,
22 308:2
310:3 318:3,

6,22 319:5,11
324:18
327:12
331:20 332:3,
8,11,16
339:9,11,17,
22,25 340:9,
22 341:6
342:12 352:6,
15 353:6,18,
20,24 354:2,
21 355:4,11,
20 356:6,10,
12,15,19
357:3,13,17,
21 358:5,10,
13,20,24
359:2 364:20
365:21 366:2,
5

Rodgers'
31:8

role
20:24 22:4,7,
10 24:6,25
28:5 37:5
38:7 44:16
109:3 111:3
138:19
345:14 347:5

roles
111:14,18
201:12

roller
342:13

room
66:24 209:7
219:21
224:25
228:17,19,25
229:2,8

257:13,24
258:19
260:17,21

Rose
34:22 44:21,
24 49:17,21
51:22 56:23
57:6 60:16
62:7 63:14
74:6 78:13
104:7 116:12
117:14,21
118:13
119:13,14,16
120:20,21,22
121:2,12,17,
25 123:3,14,
15,19,21
124:2 132:7
140:10
141:20 142:4,
16 143:6,13
146:15
148:14,20
149:12,18
156:13,16,19,
22 166:10
167:20
168:20
170:10 178:5
188:2,5 190:3
238:23
263:20,22
265:15 267:7
271:14 272:5
275:18
276:22 284:2
285:20
287:10
290:17
297:24
306:12,16
307:5 321:24

325:18,23
326:2,3,5,7,8,
13,19,20
327:3,25
335:5 352:5
363:6,13

ROSE's
70:15

Rosenberg
8:10

rough
115:7,15,19
116:6,19
263:19
265:12 268:5,
7,13 270:9,21
302:17

roughly
257:24

route
214:11

RR
199:5

rub
195:20 196:7

rubber
191:3,4,6

rudder
223:3 225:4
274:5 280:14,
17,21 282:7,
8,13,18
283:15,21,24
284:13
285:11,14
294:6,10
296:20 364:9,
24 365:5

rudders

353:5

rug
196:11

rule
30:24 343:2

rules
9:7

run
42:10 77:23,
25 255:7

running
97:8 144:16,
17 255:14

runs
121:25
127:11 159:8

_____

S

_____

S&r
42:20,21

S-E-A
14:13

S-I-R-E
21:10

S/6.11.
187:3

S/helm
187:18

Sabine
197:22

safe
125:4 159:22
160:23
161:10
185:23
186:11

safely
17:11 231:24
268:17 354:4

safety
13:4,14 18:2,
6 22:8,16
95:12,14
96:11 97:6
100:25 101:5,
20,24 102:19,
21 103:19
105:2,7,22
112:2 115:11
119:8 133:24
137:21
138:18 139:5
143:23
147:14 158:9,
12,18 160:9,
18 163:20
167:24
172:25 173:3
174:8 175:4,
16,25 179:3
185:14,15,22
186:19 187:8
247:8 255:23
310:7,14
311:23 314:5
323:22,25
325:9,13
326:25 330:6
335:16 343:2,
12,24 344:19
345:25
351:12,16

Safety/
operations
115:3

sail
12:9 14:20
15:14 43:11

111:20 344:9

sailed
15:15 271:4

sailing
78:17 116:7
350:14 353:8

sails
350:16

sake
30:9

salaried
16:11

salary
16:12

sales
24:6

Samantha
34:2 38:6

sampling
254:17

satellite
193:15 303:9,
15,24 304:7
360:19,25
361:19

save
120:24
132:13,14,15
325:19

saves
193:11,13

scene
180:14

schedule
118:18

scheme
177:7

school
 15:2 16:2
 47:23

scope
 106:13
 314:10

score
 325:4,10

scores
 324:25 325:7

screen
 119:16
 199:23 208:6
 215:6 226:9,
 14 227:9
 230:11 233:9
 263:2 317:17

screening
 233:16

screens
 263:5

screenshot
 235:20 261:9,
 13

scroll
 149:12

sea
 14:25 16:4
 37:4 84:9
 135:23
 190:23
 331:17

sea-worthy
 160:23

seabed
 294:21

seaboard
 355:8

seaman
 13:3 15:11

seamanship
 354:19

searchability
 88:5

seas
 304:4 361:3

seconds
 156:23,25

section
 79:2 85:6
 93:25 94:4,14
 95:23 96:3,5
 97:11,14,17
 99:13 100:15,
 20 101:18
 104:4 106:7,
 17,22 110:12
 112:2 113:12
 124:17 125:9
 126:20 127:3
 132:21
 133:10,12,23
 139:4,19
 141:4,8
 143:18 145:7,
 16,22 146:12,
 23 147:13,18
 148:11 150:2
 151:7 152:4,
 17 154:9
 158:5,15
 161:17,19,23
 163:23
 165:24 167:7,
 24 173:22
 175:3,9 183:7
 185:8,9,18
 186:16
 187:11,16

254:15,24
 291:2 295:7,
 11,15 303:25
 304:16 306:4
 308:12 324:8
 325:13 329:2,
 16,21,23
 332:3 351:12,
 13 361:12

sections
 93:16,22 98:2
 101:13

sector
 62:16 175:6
 246:12

secure
 196:23
 197:24

segment
 148:21

selection
 263:7

send
 61:14 66:11,
 19 207:2
 268:11 317:2
 358:3,18

senior
 22:25 42:4
 43:4,5,6,8,19
 44:13 230:14
 347:4 349:7,
 17,19,21

sense
 14:22 94:7

sensor
 142:24

sentence
 124:22

138:25
 143:21
 220:23
 245:15 252:8
 253:16

separate
 101:23
 103:10,12
 111:4 112:2
 127:3 133:23
 171:25
 241:23 250:3,
 4 253:2
 258:20 260:8,
 12 273:9
 280:12
 326:14
 329:21,23

separately
 247:6 255:19,
 21

separation
 258:18

series
 277:15

serve
 346:22

served
 45:4

service
 103:13
 193:14 283:9
 315:9 338:22

services
 103:22
 150:17

set
 13:11 69:13
 70:17 139:20
 191:4 201:12

206:25
 280:25 281:7
 282:7,8
 326:15

sets
 89:22

settings
 282:7 283:7

setup
 191:3

severity
 58:23

shackle
 196:23

shades
 177:5

shape
 224:8,11,16,
 20

Sharif
 189:12 230:2,
 6,23 231:2
 247:21

sheet
 204:21 238:5
 270:20
 343:17,18

sheets
 236:6 238:12,
 15,17 343:15

shifted
 191:24

shimmy
 229:3

ship
 15:23 190:22
 195:2,11
 196:24

ship's
122:20

shipped
14:23 37:6

shipping
13:6 15:13
283:15 336:5

ships
13:21,23

shipyard
19:9 35:11
195:18

shipyard-
manned
190:14

shore
169:22,25

shoreside
295:12

short
181:21 336:2

shortage
336:9

shortened
260:19

shortening
260:17

shortly
36:19 220:16

shot
358:2

show
45:14 74:18
121:16
122:21 123:7
220:14 268:2
269:8 304:9

showed
282:7 328:6

shown
292:21 361:5

shows
122:22 123:3,
9 279:16
338:4

shy
13:18 14:3
15:25

sic
34:2 122:18

side
15:18 17:19
71:16,17,19
85:10 128:21
169:25
190:24 223:4
225:7 266:12
325:21 342:5
362:16

sides
95:3

sign
131:4 240:5
243:17

signal
27:7 236:14
303:14

signature
234:6 240:2

signed
30:8 72:18
209:20,25
210:11
211:10
217:14 228:8
239:25 240:3,

9,12,13
241:21,24
244:22 254:6
347:2

signs
109:15
308:14
334:17,19

similar
34:21 70:17
231:20
264:19
298:20
335:25

simple
89:10 164:4
270:20
321:13

simply
39:20

Simrad
277:12
320:14

Simrads
284:18

sir
11:12,22
13:22,25
23:20 25:9
26:16 29:17,
21 33:2,6
35:5 39:24
40:4 41:12
43:14,18
44:2,15 48:2,
5,10 53:2
54:2,21 60:21
70:10 74:8
76:4,9,21
79:4 80:8
82:4 84:8

85:8 87:10,19
94:15 95:9
97:13,16,19
98:6 99:2,4,
11,25 100:4,
8,18 101:3,
15,19 102:12
104:24
106:10,24
107:8,13
110:9,15
113:18
127:10,12,17
128:23
129:25 130:4
132:22
135:19
140:21 143:3
147:3 154:12
158:7,17
159:19
161:18
164:12 167:6,
16 169:5
170:23 173:6
176:14 181:5
182:8 184:4
185:16
186:23
187:12
188:11
190:18
194:25
197:11 198:4,
7,20,24
199:21
202:21 204:5
205:3,24
206:9 208:8,
12 209:2,16,
24 210:5,10,
13 211:14
215:7,13,24
216:9 217:5,

12,16,24
218:14,21,25
220:4 222:5
223:24
226:10,15,25
227:11,16
228:15,22
229:6,12
230:17,20
231:9,18
232:10,23
233:18 234:4,
9 235:5
236:11,23
237:12 238:8,
14,21 239:16,
22 241:12
243:2 244:20,
24 245:8,19
246:2,8,20
247:10,12,24
249:4 250:15,
17 252:10
253:6,20
256:17,22
258:6 259:25
260:11,23
261:6,16
262:8,20
263:8,21
265:14
266:23
267:11
269:13,25
271:13 272:8,
24 273:23
276:2,14,16
277:9,20
279:6 280:5
288:15,23
291:24 293:6
294:15 297:8
299:19
300:14,23

301:11,17
302:13 303:5
304:24
308:25 311:8
312:17
315:16 316:7,
13,20 317:8
321:19,25
323:20 324:7,
12 325:3,8,15
328:4,12
329:5 330:17
331:5 335:6
338:13 342:6,
11 343:19
344:18 346:3
347:22,25
348:13
349:11
350:22 351:7
353:15 354:7,
18 355:16
359:16 360:5,
9,12,16,20
361:4,9,23
362:9,17
363:8,14,20
364:6,15
365:11,19

**sire**
21:10

**site**
212:13
214:16

**sits**
130:6 144:12

**sitting**
323:8

**situation**
147:7,18
294:8 365:2

**situations**
146:8

**size**
70:5 354:11

**Skanska**
72:16 197:23
198:14 200:7,
10,12,25
201:6,9

**skipped**
98:20

**sleep**
46:25

**sleeping**
231:11

**slide**
231:21,24

**sliding**
219:22 220:3,
11,22,24
231:11

**slightly**
267:20
317:17
323:13

**slip**
204:20

**slow**
219:21
223:22 224:3
229:2 253:18

**slower**
364:21

**slowly**
199:6 262:3

**small**
14:25 17:16
31:22 37:10

179:5

**SMF**
177:9,13,14,
16,18 187:18,
20

**smokes**
126:8

**smoking**
124:24 126:8

**SMS**
27:12 138:17
141:2,5
145:13,20
147:11 148:4
160:5,11
165:23
182:19 183:8,
15 314:15
333:2 343:4,
6,14 344:2
346:25

**software**
274:7 275:22
362:19 363:5

**SOLAS**
95:17,19

**solid**
274:7,13
278:8 362:22

**Solutions**
102:18,20
103:11
158:14

**somebody's**
82:3 129:23
267:6 274:21
348:24

**Sons**
200:16

**sort**
9:13 88:21
110:2 118:18
130:10
136:23
176:15 177:7
184:15 198:3
207:8 214:21
225:19 232:6
235:20,21
238:4 259:19
260:10,16
272:17
273:10
325:10 343:2
344:7 346:2
347:4 348:23
349:3,5

**sorts**
345:16

**sound**
92:11

**sounds**
15:5 25:10
38:19,22
52:17 152:19
275:20
282:12
284:18
325:22
326:14
336:20
345:23

**South**
74:7 85:25
89:15 159:17
201:9 233:17

**southbound**
294:5 364:19

**southern**
122:2 134:24

135:3 148:22
154:18,22
155:19 156:5
234:11,20
281:20

**space**
253:10

**span**
224:15

**spare**
294:11 365:6

**spares**
284:4

**speak**
26:24 32:20
196:21
218:25
220:10 221:8,
21

**speaking**
92:15,17
223:19,20

**speaks**
145:23,24
169:19
171:23
186:17

**special**
19:15 66:14
72:5 117:9

**specific**
68:6 114:23
117:8,11
119:5 123:18
127:21 132:6
152:4 201:13
259:20 281:5
293:8 328:22
349:14 354:5

specifically
52:19 108:11
116:11
125:16
156:17
238:22 317:3
338:20
341:12

specificity
119:7

specifies
153:21

specimen
208:10
215:20

speculation
137:12 257:3

speed
84:3,6,14
156:12
197:15
202:22,25
253:14

spell
18:18 24:23
34:3,14 88:22
183:12 315:5

spelled
109:24

spelling
21:21 62:24
125:5

spells
152:6

spent
135:2

spill
180:6,9

spilled
280:3

spills
182:10

spoke
49:22 51:17
62:17 89:19
195:18
220:12
223:11
348:20

spoken
32:18 33:4

spot
35:11 104:19
109:2

spreadsheet
205:8

spring
280:15

squared
268:17

stamp
94:18 120:5
129:18 362:4

stamps
266:11
334:23

stand
13:8 109:17
365:14

standard
13:9,11
327:24

standards
13:9

standby
190:16

279:23 294:6
296:20 304:4
361:2 364:23

standing
30:19 107:20

stands
153:15 184:7
187:21
324:15

staple
209:5

stapled
214:21

stapler
209:6

starboard
69:14 71:11,
16 190:24

start
9:15 12:4
16:23 67:10
149:13 159:6
195:24 260:8
316:19

started
11:3 12:5
15:8,12 43:10
44:12 89:4
166:15,19,24
207:21
230:16
252:22

starting
158:16

starts
75:11 96:14
106:23 116:2
126:17
154:13,25

173:7 206:6
284:25

state
8:17 84:9
158:20
250:21 274:7,
13 278:8
359:8 362:22

stated
155:23
253:17 361:7,
15 366:3

statement
67:12,15,16,
24 81:9
136:23 137:4
138:11 139:3
209:18,23
210:2,15,17
211:4,7,9,19,
21 217:4,11,
18 218:23
219:11,19
220:8,19,21
221:7,8
222:25
223:23
225:13,15
228:12 231:4,
5,17 233:25
234:2,5,7,10
235:7 251:25
287:2 335:14
359:8,10,11

statements
65:6,9,13,15,
19,20 67:6,
17,21 68:16
93:2 180:15
209:11,14
211:16
216:14,17

218:12,15
219:9 225:20
227:24 228:5
230:23 231:2
232:7 233:21
235:4,13
245:20,21

Staten
37:13 92:10

states
15:3 47:12
146:24

station
110:14,16,20,
22,23 111:4,
9,10,16,17
253:7

stationary
356:3

stations
146:18

statute
155:13,14
186:15,16

stay
280:16

stayed
195:11

stays
188:21
280:14
329:10

STCW
13:4,15

steaming
197:10 294:8
365:2

steer
280:9 345:18

steered
117:9,12

steering
100:6 166:6
186:4,9 199:3
217:20,22
218:5,7,9,11
224:14
234:12,22
245:17
249:20
250:23
252:12
253:18,22
261:24
267:24 269:6
274:6 280:23
294:6,24
296:9,20
320:4 355:7
364:9,23

step
52:9

steps
184:9 281:5

stern
69:14,15
71:11,13
252:23
253:15
267:10,20
323:14

stevedoring
17:10

Stevens
85:15,16,18
86:3

stick
280:8

stock

270:14

stop
228:18 229:5,
14,15 307:3
345:12,25

stopped
299:2,12

storage
104:21

store
264:15,17

stored
264:19

straight
198:14

straighten
91:5

straps
196:8,20

street
9:24

strike
63:15 171:14
173:8,11
174:2,5,7
175:10
184:16 245:6

striking
356:3

struck
221:12,17

structure
242:17
256:24

stuck
221:12,17

stuff

14:25 88:8
273:14
283:15
357:10

STWC
13:8

subchapter
95:22 336:3

subject
8:25 237:15
299:5 360:18
361:7 364:12

subletter
100:10

submission
306:18

submit
41:24 77:3
144:16
184:11,15
192:21 243:5,
7 257:10
298:6 334:6

submitted
127:13 131:9
144:18
184:20 193:8,
20 194:2
214:7 225:22
240:16,24
241:23 242:5,
15,24 243:14
244:5,22
245:3,10
257:4,6
259:16 271:6,
7 291:11,15
294:13
334:13
336:21 342:8

submitting
105:14
213:21
229:21 232:5
254:25
347:13

subnumeral
173:5

subscribe
117:24

subscription
103:14,15,16

subsections
99:13,20

subsequent
143:22

substances
47:5

Suffice
97:5

sufficiently
345:7

suggested
249:10

summer
50:7

supervised
346:6

supplied
133:5 158:10

supplies
270:12

support
17:18 47:11
256:24

supporting
72:10

supposed
57:2 107:14
109:20
176:20 184:9
272:23
343:25 349:4

survey
104:10 198:2,
9,12 249:2,6
316:2,6
335:17

surveyed
249:12

surveyor
104:6 197:22
266:15

surveys
103:24,25
104:5 321:10

suspended
90:12 191:6

suspension
12:11 36:20
42:22 90:21
91:8

suspicious
47:23

sustained
294:12 365:8

swap
82:6 304:19
305:2 306:7

swapped
277:4

swear
8:13

swing
280:19

**switch**
199:3 245:17
249:19
250:22
252:11
253:18
261:24
279:23
280:22 281:6

**switching**
253:22

**sworn**
8:16 113:7

**sync**
118:21,24

**synced**
142:6

**synchronizati
on**
119:2

**syncing**
272:13

**system**
27:12 45:2
51:3,19 53:7,
15,22 56:8
76:18,23
77:2,11 81:21
82:17 87:8
88:5 93:24
95:12,15
96:12 97:6
101:5 102:7,
22 103:8,10,
11,19 105:2,
8,15,23
109:25
111:23 112:2
115:11
117:15,22
118:16 119:9,

14 120:21
127:25 132:8
133:4,24
134:6 137:21
138:19
145:19
146:16
147:14
148:14
158:10,12
163:21
166:10,14,18,
23 167:3,25
172:2,6 174:8
179:3 185:15
187:9 190:11
193:9 201:25
205:6 206:13
235:21 238:7
239:8 240:10
242:25
244:10
260:10 268:3,
24 274:6
277:12
278:25
280:25 281:9,
19 283:7
284:22
285:20
287:22,24
288:5,17
291:6 292:20
293:8 297:7
305:23
307:16
311:10
325:10,14
326:22 327:2
330:7 334:7
335:16
343:24
344:20 345:7
347:14,18

351:12
352:11,21
363:6 365:15

**systems**
27:7 135:15
156:2 278:2
287:10,22
331:17

---

**T**

**T-H-E-E-V-I-N-
E-T**
21:20

**T-W-O-M-E-Y**
23:3

**table**
96:11

**tabs**
238:10

**tag**
87:16 201:25
297:23

**tagging**
185:24
186:12

**tags**
87:20 88:4

**tail**
331:6

**takeaway**
137:10

**taking**
47:4 57:21
165:6 172:3
270:5

**talk**
41:25 46:15
54:22 348:12

358:2

**talked**
92:9 192:19

**talking**
10:21 24:16,
17 49:11 69:8
92:7 109:7,8,
10 170:16
200:19
294:22 298:8
304:25 353:9
354:25
358:15

**talks**
171:6

**tank**
195:10

**tanks**
195:8

**tap**
223:4

**tape**
181:19

**tapped**
223:7 225:7,
14 267:25

**tasked**
130:21

**tasks**
201:13

**TBS**
102:18
103:11,12,15,
16,18 104:3
105:13,20
106:5 133:5
158:10,14
310:22,24
312:10,15

313:8,15,25
314:13,18
315:7

**TBS/HELM**
311:18
312:14

**team**
17:5 50:18
64:18 80:2
120:10,12
273:16

**Teams**
246:11 247:5
251:2 252:19

**tech**
283:9

**technically**
192:6 275:13

**technician**
272:10 277:2
282:6 283:5
296:18 305:8
308:14
362:25

**technicians**
166:25
278:20
287:16 300:2,
6 304:8,13,19
305:5 306:6
348:6

**techs**
167:2

**telling**
31:4,5 225:3
231:25
318:15

**tells**
128:4 340:6

temperature
84:5

temporary
195:20 196:8,
19

ten
132:7 226:20,
24 355:23

term
48:25 49:7
91:5 196:14
224:17
286:18 287:2
298:25
305:13,16,20

termed
37:5

terminate
29:3,12

terminated
31:14 36:2,12
37:23

termination
29:16 30:23

terms
73:10 117:11
176:24
225:18
229:13
294:16 300:3
305:2

test
32:4 206:3,4
208:13
232:17,21
254:17 305:9

tested
254:20
272:18

testified
8:18 36:12
47:9 59:7
92:6 113:8
208:24
221:20

testify
45:7 113:23
251:8 352:8,
16

testimony
47:16 48:3
63:5 92:20
164:9 353:20

testing
81:24 82:6,8,
10 83:6
122:13
184:23,25
254:8 256:8
311:21
340:20
346:20

testings
311:24

text
26:25 32:14,
23 33:4 46:18

texted
32:16

texting
27:11

texts
338:21 339:3

Theevinet
21:20

thereabouts
274:2

thick

96:22,23,25

thicker
97:4

thing
54:7 70:4
99:14 100:19
107:19 110:2
118:18
123:16
130:10 139:2
154:16 198:3
228:21
234:17 235:3
260:10
262:11
288:25
341:13 343:3
346:2 349:5
353:2,3

things
83:2 114:25
146:9 160:15
163:24
182:25
280:12
289:25
298:13
303:18
309:21 311:4
312:18
325:11
331:25
340:17,25
341:9 352:21
357:24 358:9

thinks
59:5

third-party
102:23 313:9
314:14
335:18 336:4,

8

Thomas
19:13,19,21,
22 21:24
226:3 227:24

Thomasini
19:16

thought
51:13 196:3
212:20
231:12,21
245:18
249:20
250:23,25
318:22 341:2
350:9

thousands
139:2

thread
255:15 257:8

three-way
61:24

threshold
79:11

thresholds
28:13

throttle
252:23

thumbnail
70:5

ticket
14:18

tickets
77:3

tide
84:7 203:4

time
8:7 16:3,21

20:6,24 24:9,
17,21 26:5
28:15 32:9
33:24 35:13
40:14 44:6,8
45:5 48:13
50:3,22 55:4
57:7 58:10
63:22 68:21
69:4 78:2,20
79:18 80:12
83:10 84:23
86:12 108:14
110:24
111:20 112:7
113:4 114:5
118:16 120:5
126:4,8 132:6
135:2 140:3,
14 141:24
142:17
145:10,18
172:7 181:24
182:3 185:3
188:9 190:21
193:4 202:17
207:4 210:8
212:8 216:8
220:12
223:15,16
236:6,7
238:4,12,15,
17 244:16
250:10
251:22
257:16,19
258:15
262:17,21
266:11
292:23
293:10 294:7
297:24 302:4,
7 307:17
308:2 327:14,

17 328:22
330:23
334:14,23
337:17
338:24
339:16
345:17 349:2,
24 356:23
359:18
364:25 366:8,
10

**timeframe**
285:19 357:2

**timely**
260:4

**times**
130:2 194:15
290:4

**timing**
304:15
334:14

**tire**
191:3,5

**title**
22:8 23:17
93:25 127:4
314:5

**titled**
94:12 106:22
126:17,20
146:23 154:9
167:8 188:5
297:22

**today**
8:24 17:22
18:12 27:19
33:24,25
45:8,11,14
46:16,19,22
55:17 57:6

359:9

**Today's**
8:6

**told**
22:3 39:17
49:25 50:25
51:18 52:17
68:8 101:4
155:25
164:13,17,18
222:13
223:17
224:11 227:2
231:13
256:25
267:12
338:23
347:21

**Tom**
34:13,15

**tomorrow**
32:2

**tonnage**
42:18

**top**
22:11 23:22
27:5 29:23
37:9 39:14
77:13 79:25
82:19 96:16
100:24 101:9
103:7 104:9
105:19,24
106:9 110:5,
10 111:6
112:5 117:5
119:11 120:2
127:5 128:9
135:24 140:7
144:3 155:8
167:18 168:5

177:6 182:14,
22 184:2,14
185:6 187:6
189:9,11,13,
16 191:23
193:19,22
194:21
200:11
201:23
203:15,21
206:3,19
211:17
213:23
215:16
220:15 221:8
233:12
238:10 240:6
241:15 242:2
243:9 244:2
245:11 248:8
261:12
263:11 278:6
280:24
297:13,21
298:5 300:5
301:15
302:12
307:15
312:20
325:20
328:20 334:2
341:22
346:24

**total**
325:4

**touch**
234:13,23

**touched**
229:11

**tow**
14:25 107:21
136:17

140:19,24
202:22
203:13
267:17
294:18
322:25 323:7

**towing**
8:5 10:9,15,
18,21 11:20
12:23 17:4,13
18:8 19:8
23:9,11,24
24:12 25:5
28:6,18,24
29:3,13,20
31:22 35:4
38:24 40:24
41:3,8,14
43:10 64:13
72:19,25
78:12 82:22
85:15 86:3
88:13,21,25
89:2,12 91:8
95:12 101:5
102:21
108:24
109:12
128:15
141:17 144:4,
21 176:11
180:25 203:2
208:18,21
212:6 216:2
217:14 218:8,
19 227:18
231:7 235:7
312:24
335:16,17,22
336:6,10,17
337:6 342:17
349:15
351:24

353:11

**Towing's**
85:18

**track**
194:17
273:14
311:11
326:10 330:3
342:13

**tracking**
123:9 235:21
311:6 326:9

**tracks**
123:16

**trades**
10:17

**traffic**
150:16
299:13

**train**
109:20 312:8
315:18

**trained**
108:6 312:19
343:25
355:18 356:3

**trainee**
20:8

**training**
13:4,9,13,14
20:10,12
108:9,13,21,
23 109:2,14,
19,25 114:12,
15,24 140:22
147:8,14
165:18
187:15
304:18

308:20 309:23 310:7, 14 311:6,13, 16 312:4,13, 15,23,25 313:6,9,13, 15,23,25 314:2,6,11 315:19,22 343:21 347:6 354:5

**transcript**
54:14 68:24 250:13

**transfer**
341:14

**transit**
72:12 133:13 135:23 137:2, 9 138:2 139:10,12,19 140:18,25 148:18,22 156:2,3,8 281:9,19 329:3,17,18 332:25 347:15

**transited**
355:2

**transiting**
108:4 294:5 331:16 347:9 351:25 354:4, 17 355:10,15 364:19

**transitioned**
12:6 350:12

**transits**
99:24 124:3 133:21,25

160:16 161:17 329:22,24 351:17

**transpiring**
131:12

**transport**
201:7

**transportation**
11:24 14:8,21 15:13 135:5 247:8 255:23

**transported**
200:24

**Travelers**
341:19

**travels**
271:10

**treated**
345:9

**treating**
38:15 345:5

**trick**
49:10

**trip**
73:13

**true**
90:8 122:21 125:15 237:16 257:7 313:2

**truthful**
47:7

**TSMS**
95:12 100:25 101:4,14 102:4,7,19

103:4 104:4 106:4 109:24 126:20 127:3 159:21 186:19 335:16,19

**TSMS/HSP**
101:18 187:7

**tug**
14:17 34:22 51:2,18 53:15 54:23 56:3 57:18 58:23 59:13 64:23 66:2,4,12,21 86:21 90:2 95:20 102:17, 20 103:11 134:11,24 137:9 156:3 158:13,14 159:23 188:5 194:22 197:6 203:2 221:9 234:12,21,22 252:25 266:24 267:5, 12,15 269:18 270:10 271:14 294:18 299:13 315:9 323:4,7,8,10 346:21 352:25

**tug's**
223:2 225:4

**tugboat**
142:14 196:14

**tugmackenzie @carvercompanies.com.**
66:10

**tugs**
16:4 17:13,17 20:14 21:11 43:7 76:24 77:2 344:10

**turn**
100:20 110:7 122:18 124:14 126:16 132:20 133:10 141:8, 25 143:16 165:24 167:7 174:19 179:10,23 183:25 185:12 186:20 195:15 234:13,23 256:15 266:3 341:23

**turned**
29:9,15 199:2 261:23

**turns**
55:7

**TVIB**
335:23 336:14,24

**TVR**
143:24 144:2, 12,15

**TVRS**
144:20

**TWIC**
215:5

**two-page**
303:2

**two-thirds**
174:22

**Twomey**
23:3

**type**
67:19 81:14 93:23 151:22 255:5 268:17 298:5 309:17

**typed**
209:10 210:25 211:7, 9,16 216:13 219:16 222:25 227:23 228:8 230:22 233:20 268:19

**typed-up**
209:23 217:10,19 224:5,23 225:12,15 229:16 231:5, 15 234:2,7,18

**types**
178:25

**typewritten**
359:7,8

**typical**
197:15

**typically**
349:15

**typo**

321:13

**U**

ultimate
111:13 195:6
332:18

ultimately
156:6 195:12

uncle
15:22

undergoing
190:20

underneath
24:9,21 94:11
139:4 142:20
267:9 298:14

understand
21:4 38:17
42:5 47:6
48:25 51:7
53:25 54:4
58:22 59:6,25
67:23 79:15
88:10 90:19
97:9 106:13
108:18
119:23
122:14
125:17 136:9
159:10
160:21 163:8,
9,10 172:10
173:15
205:22
207:11 215:3
220:11
229:20
250:19
262:12
279:18

281:13
282:25 283:6
287:6 303:12
311:19 321:8
339:22

understandin
g
30:10 42:5
49:4,12 53:5,
14 63:17
162:15,20
265:12
287:16
317:10,12
352:17 363:4

understood
59:8 148:13
258:22
286:11

underway
197:6 198:4,
10 202:19,22
203:23
212:12 274:6
298:24

underwent
254:17

unintend
173:7

unintended
171:13,14
174:5,7
175:9,10
184:16 245:6

unique
111:10 125:9

uniquely
107:22
109:13

unit
168:14

United
15:3 47:11

unpack
52:2

unsafe
186:25

unusable
185:24
186:13

unusual
198:11

update
206:12

updated
39:18,20
274:6 345:2,3
362:19

updates
118:6,14,22,
23

updating
118:9 275:21

upgraded
27:20

upgrades
286:8

upper
146:21
217:23
228:18
252:25
274:24
275:15
277:23 284:8
317:7 320:6,
11,24

UPS
275:8,9

upstanding
42:13

urine
254:17

utilize
104:3 144:5
268:13
346:12

utilized
212:10
272:13

utilizes
321:12

utilizing
335:17

**V**

valid
42:17

Vane
11:19,20 12:2
13:16 135:5

varied
201:11

vendor
117:21
273:17

verbatim
170:22

verbiage
326:18

verification
208:13

verified
215:22

227:12

Vermont
314:23,24

versed
278:16

version
189:3 209:23
224:5,24
231:15
234:18
237:20 243:8
277:19
316:22

versus
173:22
182:18
258:12,19

vertical
151:21,25

vessel
35:10 39:16,
18 44:24 45:6
49:12 78:20
87:13 108:9
109:8 111:5,
10,11 114:5
115:16 117:7
119:3 122:4,
22 123:12,19,
22 125:4,6,
19,24 126:18,
20 127:4
132:6,21
133:7 136:20
143:25 144:4,
23 147:5,19,
24 148:2,7,19
150:16
152:22 160:7,
18,23 169:24
172:5,25

173:3 175:8,
14 176:2,11
186:3 190:19
191:21
197:15 212:8,
12 214:9,13
219:21 246:3
248:22,24
249:2,12,14,
16 259:8
265:2,23
276:23 277:3
280:9 303:23
309:20 312:3
315:20,21
316:2,15
318:16,19
321:11
327:25
332:19
335:15,18,20,
23 336:6,10,
12,14,17
337:6,7
343:4,11
344:13,17,24
349:10 354:5,
8,9

**vessel's**
148:17

**vessels**
20:19 21:5
44:21,23 45:3
87:14 110:23
114:18
141:17
144:21 165:9
289:8 310:9
313:10
331:24 336:8
353:11

**vetting**

20:8,16,18,19
21:5

**VHF**
143:8 272:12

**VHFS**
143:12
272:14

**video**
54:13 96:25
157:7,22,23
244:15 366:8

**view**
236:3,5
262:11

**views**
238:20

**Virginia**
9:3 47:24
154:10,18
158:19
198:22
234:20
246:19 272:4

**virtual**
357:5

**virtually**
333:16

**virtue**
13:13

**visibility**
83:20 114:6
331:21

**visible**
171:19
234:15,16
235:2

**visual**
124:13

**voice**
345:13

**voicemails**
338:21 339:3

**voyage**
36:21 73:24
102:15 149:2,
3 150:3,9,11,
18 152:5,7,8,
17,20,25
158:25 159:4,
11 160:24
321:16,20,23
322:10
325:18,19,23
326:3,5,10,
13,20 327:6
349:10

**VPS**
274:24 275:4,
6

**VTS**
161:7

---

**W**

---

**W-E-N**
201:19,20

**wait**
46:6 53:10
75:10 305:18
319:6

**waited**
223:22

**Waiting**
222:8

**walk**
57:15

**walked**
58:3

**wanted**
15:24 16:4
29:5 105:10
111:20 132:5
140:13 345:4

**Warlordy**
191:14

**watch**
13:10 57:4
107:17
109:17
114:16 115:5
125:10,12
126:14 130:3
147:19 153:3,
6 154:10
158:19 162:5
165:19 192:9
194:15
219:21
245:16 252:9
253:17
328:23 331:7
332:14 333:4
354:23
365:14

**water**
16:6,8 84:6
136:14
165:11 260:9

**weather**
83:15 161:2,6
165:10 324:3

**wee**
322:22

**week**
119:5 130:6
273:25 310:6,
14

**weekend**
49:20

**weekends**
50:18

**weekly**
118:22,24
119:4,8
192:12
311:12

**weeks**
199:4 200:19,
22 223:4
225:7 234:11,
21 261:25
267:6 290:2

**Weeks'**
200:25

**weigh**
327:4

**welders**
196:9

**welding**
195:9,19,21
196:6,10,17

**Wen**
201:12,17,20

**Werner**
74:22,23
75:14 301:22

**west**
56:9 69:17
122:23 123:9,
11

**western**
123:20 124:8,
9,12

**whatever's**
186:2

**whatnot**
292:23 327:5

Whatsapp
27:7

wheel
74:5 171:20

wheelhouse
55:12,25
66:23,25
69:16 115:17
144:13
146:20,21
217:23 218:3
224:7 228:18
229:10
231:13 246:6,
7 251:21
252:25
258:19,21
264:20
277:22 284:9
320:6,10,22,
24 321:21
344:23,25

wheelman
137:2,25

whistleblower
345:9

whoever's
153:4

whomever
13:11 120:13
345:13,17

width
122:21
134:10 323:3

William
22:21

winch
203:13

wind

84:3,5,6,14

window
58:15 59:9

winds
89:22

wire
202:23 203:2,
5 294:11,17,
18 365:7

wires
294:20

wished
32:11

wishing
32:24

Wisnowski
255:24

Withdrawn
221:2

witness'
32:5

word
12:15 49:5
81:14 129:5
220:5 221:12,
14 228:21
231:16
295:19

words
204:20
228:14
237:17 251:5,
6,8 283:4

work
11:6,17 13:16
14:7 20:13
21:11 28:17
35:21 38:11
40:23 44:7,20

89:9 132:10,
16 195:3,22
196:18,19,25
208:17 216:2
227:14 236:9
272:11,17
273:6 274:4
275:21,24
276:5 279:21
283:18
284:19
285:19
286:15
287:19,21,23
300:12
305:22
306:11,15
313:14
342:23
345:12,25
349:25 357:7
360:11
362:14
365:16

work/rest
236:7 238:6,
12

worked
11:7 13:17
14:8 29:13
41:13 47:10
208:21
227:18 238:5
286:3 288:5
305:17 363:5

working
17:4,8 22:20
24:9 31:19,20
35:17 40:5
44:12 50:5
72:17 166:15
185:21 186:9

197:23
207:21 216:7
230:16,18
233:13
274:25
275:16
349:25
350:15
365:16

works
102:24

world
352:25

worries
196:2

worry
233:6

write
116:7 264:20
268:16 269:5

write-up
88:15

write-ups
88:16,17

writing
357:10

written
27:6 68:2,13,
17 114:22
221:7 267:9
310:8,11
342:15

wrote
269:3,4
308:15

_____

Y

_____

yard

50:10

yea
12:14

year
12:20 115:22,
23 222:22
250:8 264:15
270:17
313:18

years
11:14 12:3
13:18 14:3
47:19 201:11
336:2

yellow
133:18
136:24
236:17

yellowish
177:7

yesterday
32:13,23

York
8:17 9:23
12:23,24
37:11 64:24
65:11 72:8
119:18
134:23
200:17
214:17
220:17
223:16
269:24
298:24

_____

Z

_____

Z-O
34:6,7

**BRIAN MOORE**

**April 28, 2025**

**Zoom**
246:11 247:5
248:2 251:2
357:6

DEPARTMENT OF HOMELAND SECURITY
U.S. Coast Guard

OMB No. 1625-0001
Exp. Date: 07/31/2022

# REPORT of MARINE CASUALTY, COMMERCIAL DIVING CASUALTY, or OCS-RELATED CASUALTY

## Section I - Reporting Vessel/Facility Information

| 1. Vessel or Facility Name | 2. Vessel Official Number or IMO Number | 3. Vessel Flag |
|---|---|---|
| MACKENZIE ROSE | 1098224 | USA |

| 4. Vessel Length | 5. Vessel Gross Tons | 6. Vessel Propulsion Type |
|---|---|---|
| 96  [x] Feet  [ ] Meters | 157 | DIESEL |

| 7. Vessel or Facility Type | 8. Vessel or Facility Service or Occupation |
|---|---|
| TOWING VESSEL | TOWING VESSEL |

| 9. FOR TOWING ONLY | 9a. Arrangement: [x] Pushing Ahead [ ] Towing Astern [ ] Towing Alongside | 9b. Number of Vessels Towed: Empty ___ Loaded 1 Total ___ | 9c. Maximum Size of Tow/Tow-Boat(s): Length 296 feet  Width 50 feet | 9d. Did one or more of the barges in the tow cause or sustain damage in the marine casualty? [ ] Yes  [x] No (If Yes complete and attach one or more CG-2692A forms to this report) |
|---|---|---|---|---|

## Section II - Reason for Submitting this Report (Check all that apply)

10. The above vessel was involved in a Marine Casualty consisting of (46 CFR 4.05-1 and 4.05-10):

[x] 1. Unintended grounding or an unintended strike of (allision with) a bridge

[ ] 2. Intended grounding or intended strike of a bridge that created a hazard to navigation, the environment or the safety of the vessel, or that meets any of the criteria in 3 through 8 below

[ ] 3. Loss of main propulsion, primary steering, or any associated component or control system that reduces the maneuverability of the vessel

[ ] 4. Occurrence materially and adversely affected the vessel's seaworthiness or fitness for service or route

[ ] 5. Loss of life

[ ] 6. Injury that requires professional medical treatment (treatment beyond first aid) and, if the person is engaged or employed on board a vessel in commercial service, that renders the individual unfit to perform his or her routine duties

[ ] 7. Occurrence causing property damage in excess of $75,000

[ ] 8. Occurrence involving significant harm to the environment

11. The above facility or vessel was involved in a Commercial Diving Casualty involving (46 CFR 197.484):

[ ] 1. Loss of life

[ ] 2. Diving-related injury to any person causing incapacitation for more than 72 hours

[ ] 3. Diving-related injury to any person requiring hospitalization for more than 24 hours

12. The above facility or vessel was involved in an OCS Facility Casualty Resulting in (33 CFR 146.30 and 146.35):

[ ] 1. Death

[ ] 2. Injury to 5 or more persons in a single incident

[ ] 3. Injury causing any person to be incapacitated for more than 72 hours

[ ] 4. OCS Facility only - Damage affecting the usefulness of primary lifesaving or firefighting equipment

[ ] 5. OCS Facility only - Damage to the facility exceeding $25,000 resulting from a collision by a vessel with the facility

[ ] 6. OCS Facility only - Damage to a floating OCS facility exceeding $25,000

EXHIBIT
tabbies
19
4/28/25

## Section III - Associated Parties Information (Fill all fields that apply)

| 13. Name of Owner | Telephone | 14. Name of Operator or Manager | Telephone |
|---|---|---|---|
| COEYMANS MARINE TOWING LLC | 518-355-6034 | COEYMANS MARINE TOWING LLC | 518-355-6034 |
| Address 2170 RIVER RD, COEYMANS, NY 12045 | Email address BMOORE@CARVER COMPANIES.COM | Address 2170 RIVER RD, COEYMANS, NY 12045 | Email address BMOORE@CARVERC OMPANIES.COM |

| 15. Name of Master or Person-In-Charge (Last, First, Middle) | Telephone | 16. Name of Agent (Last, First, Middle) | Telephone |
|---|---|---|---|
| CHRISTOPHER MILLER | 253-670-0769 | | |
| Address 601 4TH ST., NEWPORT, WA 99156 | Email address CHRIS.MILLERT UGZ@GMAIL.COM | Address | Email address |

| 17. Name of Dive Supervisor (Last, First, Middle) | Telephone | 18. Name of Pilot (Last, First, Middle) | Telephone |
|---|---|---|---|
| | | | |
| Address | Email address | Address | Email address |

## Section IV - Casualty Information

| 19. Date/Time (local) of Occurrence | 20. Location-Name of Body of Water or Waterway: Latitude: 36*48.6 | River Mile Marker: |
|---|---|---|
| 15 JUNE 2024 AT 1625 | SOUTHERN BRANCH, NORFOLK VA  Longitude: 076*17.4  OR | |

| 21. Property Damage Estimated Damage Cost(s) to: | Describe the Extent of Property Damage |
|---|---|
| Vessel: $ _____  Cargo: $ _____  Facility: $ _____  Other: $ _____ | NORTH & PBL RAILROAD BRIDGE WAS OFFSET FROM ITS FOUNDATION |

22. Status of Involved Persons (If there are 1 or more injured, dead or missing persons complete and attach one or more CG-2692C forms to this Report)

| Total Number of Persons: | On Board the Vessel: 5 | Injured: 0 | Dead: 0 | Missing: 0 |
|---|---|---|---|---|

CG-2692 (07/19)

CARVER 000111

Page 1 of 3

Section IV - Casualty Information (continued)

23. Was This Casualty a Serious Marine Incident (SMI) as Defined in 46 CFR 4.03-2?

[x] Yes   [ ] No   [ ] Not at this Time, But is Likely to Become an SMI   *(If Yes or Is Likely to Become an SMI complete/attach one or more CG-2692B forms to this report)*

24a. Is there any evidence of alcohol or drug use by or intoxication of individuals directly involved in the casualty?

[ ] Yes   [x] No   *(If Yes, identify those individuals for whom evidence has been obtained and specify the method to obtain such evidence in block 24c)*

24b. Did any individual directly involved in a casualty refuse to submit to, or cooperate in, the administration of a timely chemical test, when directed by a law enforcement officer or by the marine employer?

[ ] Yes   [x] No   *(If Yes, note the individual(s) who refused in block 24c)*

24c. Individuals with evidence of drug or alcohol use, evidence of intoxication, or who refused to submit/cooperate in a timely chemical test (*if more space is needed, continue in block 25c*)

24d. Is there evidence that alcohol use contributed to this casualty?

[ ] Yes   [x] No   *(If Yes, discuss in block 25b)*

25. Nature and Circumstance of the Casualty:

25a. Activity or Operation Being Conducted at the Time of the Casualty:

THE TOWING VESSEL MACKENZIE ROSE WAS PUSHING THE DECK BARGE WEEKS 281, AHEAD IN PUSH GEAR. THEY WERE OUTBOUND THE NORFOLK SOUTHERN BRANCH FOR SEA. THE OFFICER ON WATCH, JAMES MORRISSEY, WAS IN AUTOPILOT AND DIDNT SWITCH OVER TO NON FOLLOW UP HAND STEEERING BUT THOUGHT HE DID. THE VESSEL CONTINUED TO TRACK TO PORT AND BEFORE THE OOW WAS ABLE TO CORRECT IT AFTER SWITCHING TO NON FOLLOW UP, THE BOW OF THE BARGE MADE CONTACT WITH THE WESTERN SECTION OF BRIDGE.

25b. Description of the Casualty (casualty events and the conditions and actions that were believed to be causal factors as well as any hazards created as a result of the casualty. Attach additional sheets if necessary.):

THE OOW HAD FAILED TO PROPERLY SWITCH TO HAND STEERING AND ALSO GAVE MINIMAL ENGINE ORDERS AT FIRST IN ORDER TO PREVENT FURTHER HEADWAY OR COURSE CHANGE. THE OOW STATED THAT ONCE HE DID SWITCH TO HAND STEERING, HE GAVE A SLOW ASTERN AT FIRST AND THEN FULL ASTERN. ONCE CONTACT WAS MADE WITH THE BRIDGE STRUCTURE, THE VESSEL WAS BARELY MAKING HEADWAY AND BEGAN TO MAKE ASERTN WAY. THE OOW WAS BACKING INTO THE MAIN CHANNEL AND REGAINED CONTROL OF THE VESSEL.

25c. Any other comments, including with respect to use of or need for emergency response equipment:

| Section V - Person Making this Report | | |
|---|---|---|
| 24. Name *(PRINT) (Last, First, Middle)*<br>MOORE, BRIAN BERNT | 25. Signature  *Brian Moore*   Digitally signed by Brian Moore Date: 2024.06.26 08:40:49 -04'00' | 26. Date<br>06/25/2024 |
| 27. Title<br>GENERAL MANAGER | 28. Address<br>2170 RIVER RD, COEYMANS, NY 12045 | |
| 29. Telephone No.<br>845-594-4410 | 30. Email<br>BMOORE@CARVERCOMPANIES.COM | |

CARVER 000112

REPORT OF MARINE CASUALTY, COMMERCIAL DIVING CASUALTY, OR OCS-RELATED CASUALTY

An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a valid OMB control number. The Coast Guard estimates that the average burden for this report is 1 hour. You may submit any comments concerning the accuracy of this burden estimate or any suggestions for reducing the burden to: Commandant (CG-INV), U.S. Coast Guard Stop 7501, 2703 Martin Luther King Jr Ave SE, Washington, DC 20593-7501 or Office of Management and Budget, Paperwork Reduction Project (1625-0001), Washington, DC 20503.

### WHEN TO USE THIS FORM

1. This form satisfies the requirement for written reports of casualties and accidents found in the Code of Federal Regulations for vessels, commercial diving operations, and Outer Continental Shelf (OCS) facilities. Depending on the circumstances surrounding an incident, a written report may be required if it meets one or more of the conditions described in instructions 2 - 4.

2. VESSELS. If you are the owner, agent, master, operator, or person in charge of a vessel, other than a public vessel or an uninspected recreational or state-numbered vessel, you must submit a report if your vessel:

A. is involved in a marine casualty or accident that occurs upon the navigable waters of the United States, its territories or possessions and meets any of the criteria in block 10; or

B. is a United States vessel involved in a marine casualty or accident, wherever such casualty or accident occurs, that meets any of the criteria in block 10; or

C. is a foreign vessel engaged in OCS activities as defined in 33 CFR 140.10 and is involved in a marine casualty or accident that meets any of the criteria in block 10; or

D. is a foreign tank vessel operating in waters subject to the jurisdiction of the United States, including the Exclusive Economic Zone (EEZ), which involves significant harm to the environment or material damage affecting the seaworthiness or efficiency of the vessel.

3. DIVING.

A. Commercial Diving. If you are the master or person in charge of a vessel or facility from which a commercial diving operation is conducted: (1) at any deepwater port or the safety zone thereof as defined in 33 CFR Part 150; (2) from any artificial island, installation, or other device on the Outer Continental Shelf (OCS) and the waters adjacent thereto as defined in 33 CFR Part 147 or otherwise related to activities on the OCS; (3) from any vessel required to have a certificate of inspection issued by the Coast Guard, including mobile offshore drilling units, regardless of their geographic location; or (4) from any vessel connected with a deepwater port or within the deepwater port safety zone or from any vessel engaged in activities related to the OCS, you must submit a report if there is a diving casualty meeting the criteria in block 11, except if the diving operation is:

1. performed solely for marine scientific research and development purposes by educational institutions,

2. performed solely for research and development for the advancement of diving equipment and technology, or

3. performed solely for search and rescue or related public safety purposes by or under the control of a governmental agency.

B. All Other Diving. Any occurrence of injury or loss of life to any person while diving from a vessel subject to instruction 2 and using underwater breathing apparatus must be reported under instruction 2.

4. OUTER CONTINENTAL SHELF (OCS) FACILITIES. If you are the owner, operator, or person in charge of an OCS facility engaged in OCS activities as defined in 33 CFR 140.10, you must submit a report if your facility is involved in a casualty or accident that meets any of the criteria in block 12.

### COMPLETION OF THIS FORM

5. In accordance with 46 CFR §4.05-10, 46 CFR §197.486, and 33 CFR §146.35, this form shall be filled out as completely and accurately as possible. Please type or print clearly. Fill in all blanks that apply to the kind of accident that has occurred. If a block is not applicable, the abbreviation "NA" should be entered in that space. If the answer is unknown and cannot be obtained before the report has to be submitted (i.e. within 5 days of the accident), the abbreviation "UNK" should be entered in that block. If "NONE" is the correct response, enter it in the block.

6. Once completed, deliver, email, or fax this form within 5 days of the casualty to the Coast Guard Sector, Marine Safety Unit, or Activity nearest the location of the casualty or, if at sea, nearest the arrival port. https://www.uscg.mil/Units/Organization/

7. Tugs or towboats with tows under their control shall complete blocks 9a through 9d and, if one or more barges in their tow causes or sustains damage or meets any other reporting criteria, use the "Barge Addendum," CG-2692A to report information on the barge(s) involved.

8. If an incident involves multiple barges suffering or causing damage while moored or anchored (such as in a fleeting area), or breaking away from their moorage and causing or sustaining damage, enter the location of the moorage in Block 1 of the CG-2692 and complete the form except for blocks 2-8. Details for the barges will be entered on the CG-2692A. If a single barge is involved in a marine casualty while moored or anchored, it shall be documented as any other vessel using the CG-2692.

9. If the casualty meets the criteria for a serious marine incident as defined in 46 CFR §4.03, use the "Chemical Drug and Alcohol Testing Addendum," CG-2692B to report information on required drug and alcohol testing following a serious marine incident.

10. If one or more persons on the vessel or facility were injured, killed, or missing as a result of the casualty, use the "Personnel Casualty" Addendum, CG-2692C to report information on the extent of all personnel casualties.

11. For facilities and vessels engaged in OCS activities who are reporting a casualty in accordance with 33 CFR §146.35 or 33 CFR §146.303, use the "Involved Persons and Witnesses Addendum," CG-2692D to provide a list of all involved persons and witnesses to the casualty being reported. The CG-2692D may also be used to provide data on persons involved or witnessing a marine casualty or commercial diving casualty.

12. Block 20 - "Location": Always identify the body of water or waterway. Latitude and longitude to the nearest tenth of a minute should always be entered except in those rivers and waterways where a mile marker system is commonly used. In those cases, the mile number to the nearest tenth of a mile should be entered. If the latitude and longitude, or mile number, are unknown, reference to a known landmark or object (buoy, light, etc.) with distance and bearing to the object is permissible.

#### Privacy Act Notice
(CG-2692, CG-2692A, CG-2692B, CG-2692C and CG-2692D)

Authority: Title 46, United States Code (U.S.C.) §6301, Title 46, Code of Federal Regulations (CFR), Parts 4 and 197, and Title 33, CFR Part 146 authorizes the collection of this information. Specifically, 46 CFR §4.05-10 mandates that vessel owners, agents, masters, operators, or persons in charge file a written report of any marine casualty required to be reported under 46 CFR §4.05-1, 46 CFR §197.486 mandates that persons in charge of vessels or facilities file a report of any diving casualty required to be reported under 33 CFR §197.484, and 46 CFR §146.35 mandates that owners, operators, or persons in charge of an OCS facility or vessel engaged in OCS activities file a report of any OCS-related casualty required to be reported under 33 CFR §146.30. For marine casualties, diving casualties when the diving installation is on a vessel, and The written report must be provided on Form CG-2692 (Report of Marine Casualty, Commercial Diving Casualty, or OCS-Related Casualty) supplemented as necessary by appended Forms CG-2692A (Barge Addendum), CG-2692B (Chemical Drug and Alcohol Testing Addendum), CG-2692C (Personnel Casualty Addendum), and CG-2692D (Involved Persons and Witnesses Addendum). The forms may be used for diving casualties when the diving installation is on a facility or for OCS-related casualties that are not also marine casualties under 46 CFR Part 4.

Purpose: The Coast Guard uses this information in gathering facts to determine causes surrounding reportable marine casualties. This information assists in promoting the safety of life, property, and the protection of the marine environment through preventing the reoccurrence of accidents.

Routine Uses: Reportable marine casualty information is needed for Coast Guard investigations of vessel casualties involving injury, death, property damage, environmental damage and dangerous conditions and for preparation and submission of data reports mandated by Congress (see 46 U.S.C. 6301). Information gathered is also used to determine whether new or revised safety laws, regulations, and policies are necessary. Additionally, chemical testing information is needed to improve Coast Guard detection and reduction of drug use by mariners. The information contained on forms CG-2692, CG-2692A, CG-2692B, CG-2692C, and CG-2692D may be disclosed under the Freedom of Information Act (FOIA) in response to a written FOIA request.

Disclosure: Furnishing this information is mandatory per 46 CFR §4.05-10. Failure to furnish the requested information for occurrences that are reportable marine casualties, diving casualties, or OCS-related casualties may result in civil penalty sanctions as outlined in 33 CFR Part 1. Coast Guard credentialed mariners may be subject to administrative adjudication per 46 CFR Part 5 for reporting failures. Some of the casualty information collected on this form may be made available for public inspection, however, information collected is protected from use in civil litigation per 46 U.S.C. §6308. Personal privacy information will not be disclosed routinely. Social Security numbers are not mandated on this form.

CARVER 000113

DEPARTMENT OF HOMELAND SECURITY
U.S. Coast Guard

OMB No. 1625-0001
Exp. Date: 07/31/2022

## REPORT OF MANDATORY CHEMICAL TESTING FOLLOWING A SERIOUS MARINE INCIDENT INVOLVING VESSELS IN COMMERCIAL SERVICE

Note: This form shall be used to report data on persons directly involved in a serious marine incident involving a vessel in commercial service and the mandatory chemical drug and alcohol testing.

### Section I - Reporting Vessel Information - Casualty Date/Time

| 1. Vessel Name | 2. Vessel Official Number or IMO Number | 3. Date/Time *(local)* of Occurrence |
|---|---|---|
| MACKENZIE ROSE | 1098224 | 15 JUNE 2024 – 1630 |

### Section II - Reason for Submitting this Report *(Check all that apply)*

4. The above vessel is in commercial service and was involved in a Serious Marine Incident that resulted in *(46 CFR 4.03-2)*:

- [ ] One or more deaths
- [ ] An injury to a crewmember, passenger, or other person that requires professional medical treatment beyond first aid, and, in the case of a person employed on board a vessel in commercial service, which renders the individual unfit to perform routine vessel duties
- [ ] Damage to property in excess of $200,000
- [ ] Actual or constructive total loss of any vessel subject to inspection under 46 USC 3301
- [ ] Actual or constructive total loss of any self-propelled vessel, not subject to inspection under 46 USC 3301, of 100 gross tons or more
- [ ] A discharge of oil of 10,000 gallons or more into the navigable waters of the United States, as defined in 33 USC 1321
- [ ] A discharge of a reportable quantity of a hazardous substance into the navigable waters of the United States
- [ ] A release of a reportable quantity of a hazardous substance into the environment United States

### Section III - Personnel and Testing Information

5. Individuals Directly Involved in Serious Marine Incident    6. Drug and Alcohol Testing

| 5a. Name *(Last, First, Middle)* | 5b. USCG Credentialed? | 6a. Drug Test Urine Sample Provided Within 32 Hours? | 6b. Alcohol Test Specimen Provided within 2 Hours? | 6c. Type of Alcohol Test Specimen Provided | 6d. Alcohol Test Results |
|---|---|---|---|---|---|
| MILLER, CHRISTOPHER | [x] Yes [ ] No | [ ] Yes [x] No [ ] Refused | [ ] Yes [x] No [ ] Refused | [ ] Saliva [ ] Blood [ ] Breath | N/A |
| MORRISEY, JAMES | [x] Yes [ ] No | [ ] Yes [x] No [ ] Refused | [ ] Yes [x] No [ ] Refused | [ ] Saliva [ ] Blood [ ] Breath | N/A |
| McGRATH, JASON | [x] Yes [ ] No | [ ] Yes [x] No [ ] Refused | [ ] Yes [x] No [ ] Refused | [ ] Saliva [ ] Blood [ ] Breath | N/A |
| PORTER, SHARIF | [x] Yes [ ] No | [ ] Yes [x] No [ ] Refused | [ ] Yes [x] No [ ] Refused | [ ] Saliva [ ] Blood [ ] Breath | N/A |
| MORRISEY, JARKERIES | [x] Yes [ ] No | [ ] Yes [x] No [ ] Refused | [ ] Yes [x] No [ ] Refused | [ ] Saliva [ ] Blood [ ] Breath | N/A |
|  | [ ] Yes [ ] No | [ ] Yes [ ] No [ ] Refused | [ ] Yes [ ] No [ ] Refused | [ ] Saliva [ ] Blood [ ] Breath |  |
|  | [ ] Yes [ ] No | [ ] Yes [ ] No [ ] Refused | [ ] Yes [ ] No [ ] Refused | [ ] Saliva [ ] Blood [ ] Breath |  |
|  | [ ] Yes [ ] No | [ ] Yes [ ] No [ ] Refused | [ ] Yes [ ] No [ ] Refused | [ ] Saliva [ ] Blood [ ] Breath |  |
|  | [ ] Yes [ ] No | [ ] Yes [ ] No [ ] Refused | [ ] Yes [ ] No [ ] Refused | [ ] Saliva [ ] Blood [ ] Breath |  |
|  | [ ] Yes [ ] No | [ ] Yes [ ] No [ ] Refused | [ ] Yes [ ] No [ ] Refused | [ ] Saliva [ ] Blood [ ] Breath |  |

7. Explanation of why test samples were not collected within required timeframes or not at all and/or why testing was not conducted *(Required for each "No" checked in columns 6a or 6b)*

IN THE INCIDENT IN QUESTION FROM 15 JUNE 2024, THERE WAS NO EVIDENCE OF LOSS OF PROPULSION, LOSS OF STEERING OR DAMAGE TO THE VESSEL AND ITS BARGE IN TOW. A DRUG AND ALCOHOL TEST WOULD ONLY BE ADMINISTERED IF THE ABOVE INCIDENTS OCCURED.

| 8. SAMHSA Accredited Laboratory Conducting Chemical Drug Tests | 9. Laboratory or Individual Conducting Alcohol Tests |
|---|---|
| Name: N/A | Name: N/A |
| Address: N/A | Address: N/A |
| Telephone: N/A | Telephone: N/A |
| Email: N/A | Email: N/A |

### Section IV - Person Making this Report

| 10. Name *(PRINT) (Last, First, Middle)* | 11. Signature | 12. Date |
|---|---|---|
| BALDASSARE, LEONARD N | LEONARD N BALDASSARE  *Digitally signed by LEONARD N BALDASSARE Date: 2024.06.19 08:37:12 -04'00'* | 06/19/2024 |

| 13. Title | 14. Address |
|---|---|
| PORT CAPTAIN | 2581 RICHMOND TERRANCE, STATEN ISLAND, NY 10303 |

| 15. Telephone No. | 16. Email |
|---|---|
| 838-207-2960 | LBALDASSARE@CARVERCOMPANIES.COM |

CARVER 000114

CG-2692B (07/19)

Page 1 of 2

**INSTRUCTIONS FOR COMPLETION OF FORM CG-2692B**
*Report of Chemical Testing Following a Serious Marine Incident Involving a Commercial Vessel*

An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a valid OMB control number. The Coast Guard estimates that the average burden for this report is 5 hours. You may submit any comments concerning the accuracy of this burden estimate or any suggestions for reducing the burden to: Commandant (CG-INV), U.S. Coast Guard Stop 7501, 2703 Martin Luther King Jr Ave SE, Washington, DC 20593-7501 or Office of Management and Budget, Paperwork Reduction Project (1625-0001), Washington, DC 20503

### WHEN TO USE THIS FORM

1. This form, when submitted in conjunction with a CG-2692 or submitted alone, satisfies the requirement found in the Code of Federal Regulations for written reports of chemical drug and alcohol testing of individuals engaged or employed on board a commercial vessel who are identified as being directly involved in serious marine incidents consisting of one or more of the occurrences lists in block 4. Alcohol tests are to be conducted not later than 2 hours (unless there are safety concerns directly related to the casualty that need to be addressed by the individual(s)) and drug test specimens collected not later than 32 hours after a serious marine incident.

### INDIVIDUAL DIRECTLY INVOLVED IN A SERIOUS MARINE INCIDENT

2. The term "individual Directly Involved in a Serious Marine Incident" means an individual whose order, action, or failure to act is determined to be, or cannot be ruled out as, a causative factor in the events leading to or causing a serious marine incident.

### COMPLETION OF THIS FORM

3. In accordance with 46 CFR Subpart 4.06 this form shall be filled out as completely and accurately as possible. Please type or print clearly. Fill in all blanks that apply to the kind of accident that has occurred. If a block is not applicable, the abbreviation "NA" should be entered in that space. If the answer is unknown and cannot be obtained before the report has to be submitted (i.e. within 5 days of the accident), the abbreviation "UNK" should be entered in that block. If "NONE" is the correct response, enter it in the block.

4. If more than 10 individuals are directly involved in the Serious Marine Incident additional CG-2692Bs should be completed.

5. Once completed, deliver, email, or fax this form with a corresponding CG-2692 within 5 days of the casualty to the Coast Guard Sector, Marine Safety Unit, or Activity nearest the location of the casualty or, if at sea, nearest the arrival port. https://www.uscg.mil/Units/Organization

6. Upon receipt of a report of chemical test results. The marine employer shall submit a copy of the test results for each person listed in block 5a of this form to the Coast Guard Officer in Charge, Marine Inspection where the CG-2692B was submitted in accordance with 46 CFR §4.06-60(d).

7. Block 6d - Alcohol Test Result: When the alcohol test results are available, the alcohol concentration shall be expressed numerically in percent by weight (i.e. 0.04, 0.10, etc.); otherwise indicate positive for alcohol being present or negative for no alcohol present.

**NOTICE:** The information collected on this form is routinely available for public inspection. It is needed by the Coast Guard to carry out its responsibility to investigate marine casualties, to identify hazardous conditions or situations and to conduct statistical analysis. The information is used to determine whether new or revised safety initiatives are necessary for the protection of life or property in the marine environment.

CARVER 000115

DEPARTMENT OF HOMELAND SECURITY
U.S. Coast Guard

OMB No. 1625-0001
Exp. Date: 07/31/2022

## BARGE ADDENDUM

**Note:** This form shall be used to report data on barges causing or sustaining damage in the marine casualty described on form CG-2692. This form may only be used in addition to form CG-2692, never alone.

### Section I - Reporting Vessel/Facility Information - Casualty Date/Time

| 1. Towing Vessel Name | 2. Date/Time *(local)* of Occurrence |
|---|---|
| MACKENZIE ROSE | 15 JUNE 2024- 1620 |

### Section II - Barge(s) Causing or Sustaining Damage

| 3a. Barge Name | 3b. Barge Official Number | 3c. Barge Flag |
|---|---|---|
| WEEKS 281 | 1311242 | USA |

| 3d. Barge Length | 3e. Barge Gross Tons | 3f. Load Condition |
|---|---|---|
| 200 ☒ feet ☐ meters | 192 | ☒ Loaded ☐ Empty |

| 3g. Barge Class/Type | 3h. Barge Service or Occupation |
|---|---|
| OCEAN GOING DECK BARGE | DECK BARGE |

| 3i. Name of Barge Owner | 3j. Name of Barge Agent |
|---|---|
| WEEKS MARINE | WEEKS MARINE |

3k. Property Damage Estimated Damage Cost(s) to:
Barge: $ 0
Cargo: $ 0

Describe the Extent of Property Damage
DISPLACEMENT OF BELTLINE BRIDGE SUPPORT STRUCTURE

| 4a. Barge Name | 4b. Barge Official Number | 4c. Barge Flag |
|---|---|---|
| | | |

| 4d. Barge Length | 4e. Barge Gross Tons | 4f. Load Condition |
|---|---|---|
| ☐ feet ☐ meters | | ☐ Loaded ☐ Empty |

| 4g. Barge Class/Type | 4h. Barge Service or Occupation |
|---|---|
| | |

| 4i. Name of Barge Owner | 4j. Name of Barge Agent |
|---|---|
| | |

4k. Property Damage Estimated Damage Cost(s) to:
Barge: $
Cargo: $

Describe the Extent of Property Damage

| 5a. Barge Name | 5b. Barge Official Number | 5c. Barge Flag |
|---|---|---|
| | | |

| 5d. Barge Length | 5e. Barge Gross Tons | 5f. Load Condition |
|---|---|---|
| ☐ feet ☐ meters | | ☐ Loaded ☐ Empty |

| 5g. Barge Class/Type | 5h. Barge Service or Occupation |
|---|---|
| | |

| 5i. Name of Barge Owner | 5j. Name of Barge Agent |
|---|---|
| | |

5k. Property Damage Estimated Damage Cost(s) to:
Barge: $
Cargo: $

Describe the Extent of Property Damage

| 6a. Barge Name | 6b. Barge Official Number | 6c. Barge Flag |
|---|---|---|
| | | |

| 6d. Barge Length | 6e. Barge Gross Tons | 6f. Load Condition |
|---|---|---|
| ☐ feet ☐ meters | | ☐ Loaded ☐ Empty |

| 6g. Barge Class/Type | 6h. Barge Service or Occupation |
|---|---|
| | |

| 6i. Name of Barge Owner | 6j. Name of Barge Agent |
|---|---|
| | |

6k. Property Damage Estimated Damage Cost(s) to:
Barge: $
Cargo: $

Describe the Extent of Property Damage

CARVER 000116

An agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a valid OMB control number. The Coast Guard estimates that the average burden for this report is .5 hours. You may submit any comments concerning the accuracy of this burden estimate or any suggestions for reducing the burden to: Commandant (CG-INV), U.S. Coast Guard Stop 7501, 2703 Martin Luther King Jr Ave SE, Washington, DC 20593-7501 or Office of Management and Budget, Paperwork Reduction Project (1625-0001), Washington, DC 20503.

**WHEN TO USE THIS FORM**

1. This form, when submitted in conjunction with a CG-2692, satisfies the requirement for written reports of casualties and accidents found in the Code of Federal Regulations for vessels. Specifically, it provides information on one or more barges that cause or sustain damage as a result of their involvement in a reportable marine casualty. This form may only be used in addition to form CG-2692, never alone.

2. One or More Barges as Part of a Tow. This form shall be used to enter information on all barges that were part of the tow and that caused or sustained damage as a result of the marine casualty reported on the CG-2692.

3. Multiple Anchored or Moored Barges. This form shall be used to enter information on multiple barges that were moored or anchored (such as in a fleeting area) and either cause or sustained damage or broke away and caused or sustained damage during an incident that meets the criteria of a marine casualty required to be reported on a CG-2692.

4. This form should not be use if the incident involves only a single barge while moored or anchored. This type of incident shall be documented as any other vessel using the CG-2692.

**COMPLETION OF THIS FORM**

5. In accordance with 46 CFR §4.05-10 this form shall be filled out as completely and accurately as possible. Please type or print clearly. Fill in all blanks that apply to the kind of accident that has occurred. If a block is not applicable, the abbreviation "NA" should be entered in that space. If the answer is unknown and cannot be obtained before the report has to be submitted (i.e. within 5 days of the accident), the abbreviation "UNK" should be entered in that block. If "NONE" is the correct response, enter it in the block.

6. If more than 4 barges caused or sustained damage in the marine casualty additional CG-2692As should be completed necessary to enter the required information for all barges.

7. Once completed, deliver, email, or fax this form with a corresponding CG-2692 within 5 days of the casualty to the Coast Guard Sector, Marine Safety Unit, or Activity nearest the location of the casualty or, if at sea, nearest the arrival port. https://www.uscg.mil/Units/Organization/

**NOTICE:** The information collected on this form is routinely available for public inspection. It is needed by the Coast Guard to carry out its responsibility to investigate marine casualties, to identify hazardous conditions or situations and to conduct statistical analysis. The information is used to determine whether new or revised safety initiatives are necessary for the protection of life or property in the marine environment.

CARVER 000117