# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION IN ADMIRALTY


CIVIL ACTION NO. 2:24-CV-00490


In the Matter of COEYMANS MARINE TOWING, LLC

D/B/A CARVER MARINE TOWING as Owner and

Operator of M/T Mackenzie Rose, (IMO No. 8968765)

her cargo, engines, boilers, tackle, equipment, apparel, and

appurtenances, etc., *in rem,* ("M/T Mackenzie Rose"),

petitioning for Exoneration from or Limitation of Liability in

allision Norfolk and Portsmouth Belt Line Railroad Company

 Main Line Railroad Bridge ("the bridge") occurring June 15,

2024 in and about the Elizabeth River, Virginia.

---

REPORT OF FINDINGS AND OPINIONS OF

CAPTAIN SAM STEPHENSON, J.D.

June 8, 2025


499 THATCH PALM DRIVE

BOCA RATON, FLORIDA 33432

# TABLE OF CONTENTS

BACKGROUND…………………………………………………………………………….2

QUALIFICATIONS…………………………………………………………………………2

COMPENSATION………………………………………………………………………....5

TESTIMONY IN OTHER CASES………………………………….………………………5

LIST OF MATERIALS RELIED ON FOR THIS REPORT………………………..……7

ASSIGNMENT……………………………………………………………….…….…...12

BACKGROUND OF CASE………………………………………………....….….……12

SUMMARY OF OPINIONS…………………………………………………….…....…16

BASIS FOR OPINIONS………………………………………………………...………17

CONCLUSION ……………………………………………………………….…….…..34

TRIAL EXHIBITS…………………………………………..…………………………34

SUPPLEMENTATION OF OPINION………………………………………………..……..35

## I. BACKGROUND

My name is Captain Sam Stephenson. I am a Senior Harbor Pilot in Port Everglades, Florida. I have been a lead instructor and course developer at Resolve Maritime Academy in Fort Lauderdale, Florida for pilot and captain/officer courses. Prior to becoming a harbor pilot, I sailed as captain aboard ships of unlimited tonnage for approximately six years. I am a retired Commander of the United States Naval Reserve. In addition to my roles at Resolve Maritime Academy, I have taught at the Maritime Institute of Technology and Graduate Studies (MITAGS), Maritime Pilot Institute, and Texas A&M University at Galveston. I was Captain on the United States Training Ship Texas Clipper II. I was appointed to and served on the Navigation Safety Advisory Council, Department of Transportation, Washington, D.C., which is an internationally recognized body of maritime experts to advise the Secretary of Transportation via the Commandant of the US Coast Guard on maritime issues. I have been a maritime expert with regard to maritime issues since 1999.

I have been retained as an independent expert by counsel for defendant. I understand this case involves a tug pushing a barge which allided (came in contact) with a railroad bridge. I expect to testify at trial regarding the subject matter set forth in this report.

### i.    *Qualifications*

I am a licensed Master Mariner in the U.S. Merchant Marine (unlimited tonnage, any oceans), a Senior Port Everglades State Harbor Pilot, and a Port Everglades First Class Federal Pilot. I am also a retired Commander of the United States Naval Reserve, where I served from 1990-2011. I have a Bachelor of Science in Marine Transportation from Texas A&M (1989), a Master of Science in Marine Management from Maine Maritime Academy (1994), and a Doctor of Jurisprudence from the University of Miami School of Law (1996).

For the past 19 years, I have been a harbor pilot in the Port Everglades Pilot Association. In Port Everglades (Fort Lauderdale) and throughout the United States, pilots are responsible for the safe and efficient navigation of ships, tugs & barges, yachts, etc. entering and departing ports. Port Everglades is the busiest port in the State of Florida and the third busiest cruise ship port in the world. Port Everglades is a major petroleum port for the State of Florida, supplying approximately 35% of the petroleum to the State. Vessels calling on Port Everglades include passenger ships, oil tankers, barges, cargo ships, tugboats, ATB's, submarines, US Navy ships, yachts, ferries, etc. I have piloted over eight thousand vessels during this period. I served as President of the Florida Harbor Pilots Association from 2016 to 2020. From 2021-2023, I served as co-managing pilot for Port Everglades Pilot Association.

In addition to being a Port Everglades Harbor Pilot, I have been the lead instructor and course developer at Resolve Maritime Academy in Fort Lauderdale, Florida for the pilot courses. I taught federal & state licensed pilots, captains, and senior officers from major passenger ship companies the following courses: Bridge Resource Management, Navigation Rules (Inland & International), Bridge Resource Management – Pilots, Advanced Shiphandling, Emergency Shiphandling, Podded Propulsion Shiphandling, and Integrated Bridge Systems. In addition, I developed the following courses for state and federal pilots: Bridge Resource Management - Pilots, Podded Propulsion for Pilots, Advanced Shiphandling for Pilots, Emergency Shiphandling for Pilots, and Regulatory & Legal Issues of Piloting. In 2012, I was an adjunct instructor teaching at Maritime Professional Institute in Covington, Louisiana.

From 1990 until 2006, I sailed on various types of ships worldwide including passenger, ammunition, oil tankers, training, navy, etc., to upgrade my USCG license.

Upon graduating from the University of Miami School of Law in Miami, Fl. in 1996, I worked as a senior lecturer at Texas A&M at Galveston Maritime Academy. The Texas A&M Maritime Academy is one of six state maritime academy's in the United States with the mission to train officers for the United States Merchant Marine.  As a senior lecturer, I developed and taught the following classes: Navigational Rules (Inland & International), seamanship, marine orientation & lifesaving, and electronic navigation. In the electronic navigation course,  I taught the midshipmen about the use of autopilot. During this time, I was also chief mate aboard the United States Training Ship Texas Clipper II.  In port the ship was used as a floating laboratory for training and during the summer the ship would travel throughout the world to give hands-on training for the midshipmen to become officers in the US Merchant Marine and the US Navy. Upon graduating and passing the US Coast Guard license exam, the midshipmen were licensed as third officers in the United States Merchant Marine, giving them the license to sail on ships of unlimited tonnage such as oil tankers, container ships, passenger ships, tugs, etc. as officers.  The midshipmen also had the option of being commissioned as officers in the United States Navy. From 2001 to 2005, I was captain of the United States Training Ship Texas Clipper II, and Commandant of Cadets of the midshipmen.

From 2005 – 2006,  I was captain of the United States Naval Ship Sirius.  During this time, the ship was deployed to New Orleans for Operation Katrina Relief. I was awarded the United States Merchant Marine Medal - Outstanding Achievement Award from the US Maritime Administration for our service during Operation Katrina Relief.   In 2013, I was captain aboard the NOAA Research Ship Reuben Lasker.

Furthermore, I served in the United States Naval Reserve from 1990 until 2011, when I retired as a Commander.  I was involved in various military operations during my time in the Navy.

I expect to testify at trial regarding the subject matter set forth in this report.

My Resume is attached. *(See Exhibit 1)*

ii.      ***Compensation***

I believe I am well qualified to serve as an expert in this matter based on my education and work experience.

I am compensated for my services in this case as follows:

    • $475 for consulting work

    • $475 for deposition and trial testimony

My fee is not contingent on the outcome of this case or any of the opinions I provide below.

iii.     ***Testimony in Other Cases***

*I testified at trial in the following matters:*

- Natalia Ostensen, as Successor Trustee of the Olenicoff Residence Trust II, vs. Mendee Rock a/k/a Minde Rock and Lucas Zeke Williams a/k/a Lucas Williams., Circuit Court of the Seventeen Judicial Circuit In and For Broward County, Florida, 2024 (Vessel Allision with dock).

- Matthew J. Hersh and Joseph Carter vs. United States of America and Cavache Inc., United States District Court, Southern District of Florida, 2019 (Dredge Pipeline Allision, testified for plaintiff).

- Sunderland Marine Mutual Insurance Company, LTD. vs. Weeks Marine Construction Company, United States District Court – Middle East District of Florida, 2001 (Allision, testified for plaintiff).

- Tug Ralph E. Bouchard vs. American Endeavor, United States District Court, Southern District of Texas, 1999 (Collision, testified for plaintiff).

*I further testified at depositions in the following matters:*

- Drew Leeman vs. Indian Creek Village, Indian Creek Country Club Inc. Miami-Dade County, and Southeast Marine Construction, Inc., Florida Department of Financial Services, Florida Fish & Wildlife Commission, US Army Corps of Engineers, and Florida Inland Navigation District., In the Circuit Court for the Eleventh Judicial Circuit, In and For, Miami-Dade County, Florida, 2025  (Jet ski – allision).

- Candace Love vs. Osage Marine Services, Inc., In the Circuit Court of Saint Louis City, State of Missouri, 2024 (Crewmember - death).

- State of Florida vs. Mark Dominic Passero, In the Circuit Court of the Sixteenth Judicial Circuit in and for Monroe County, State of Florida Lower Keys Criminal Division, 2024 (Vessel collision - homicide, testified for defendant).

- In Re the Complaint and Petition of United Marine Offshore, LLC, Owner of the M/V Miss Julie, Her Engines, Tackle, ETC. In a Cause of Exoneration from or Limitation of Liability, In the United States District Court for the Southern District of Texas Corpus Christi Division, 2023 (Collision, testified for defendant).

- Moda Ingleside Oil Terminal, LLC vs. M/T Riverside, its Engines, Tackle, ETC., In Rem United States District Court for the Southern District of Texas Corpus Christi Division, 2022 (Allision, testified for defendant).

- John Ray vs. Greg Robertson, Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, 2022 (Personal Injury, testified for plaintiff).

- Eugene Nock and Jessica Nock, as parents and natural guardians of Lauren-Taylor Nock v. Riley Baugh, Circuit Court of the Twelfth Judicial Circuit In and For Sarasota County, 2023 (Personal Injury, testified for plaintiff).

- Marine Offshore LLC, Owner of the M/V Miss Julie, Her Engines, Tackle, Etc. in a cause of Exoneration from or Limitation of Liability. US District Court, Southern District of Texas, 2023 (Collision, testified for defendant).

- John Rae vs. Greg Robertson, Circuit Court of the 15th Judicial Circuit In and For Palm Beach County, Florida, 2022 (Personal Injury, testified for plaintiff).

- Moda Ingleside Oil Terminal, LLC vs. M/T Riverside, its engines, tackle, etc., in rem United States District Court – Southern District of Texas Corpus Christi Division, 2022 (Oil Tanker allision, testified for defendant).

- Jerry & Kevin Ellis vs. Tall Ships Charleston, LLC, American Sail Training, Association d/b/a Tall Ships American, and the Argentine Republic. United States District of South Carolina, 2022 (Gangway Injury, testified for the plaintiff).

- Robert Brown vs. GLF Construction Company. United States District Court - Eastern District of Louisiana, 2021 (Barge injury, testified for defendant).

## II. LIST OF MATERIALS RELIED ON FOR THIS REPORT

In forming my opinions contained in this report, I conducted a vessel inspection on July 28, 2025 aboard the Mackenzie Rose in New York. As a harbor pilot, I am routinely on tug and barges when piloting in Port Everglades and familiar with their operations. For this report, I also surveyed captains while aboard their vessels or on the phone. The following companies which operate tugs have one-man bridge operations aboard tugs when conditions permit: **McAllister, Bisso Towboat, Dann Marine Towing, OSG, Gulf Oceanic Marine, Moran, Shoreline**

**Sightseeing**. All of these companies listed above operate with USCG licensed masters aboard their vessels.

In addition, I talked with harbor pilots from the following pilot associations. US Harbor Pilots are licensed by the Coast Guard as well as the state, and are experts in ship handling and navigation. I surveyed pilots from Sandy Hook Pilot Association (New York), American Harbor & Docking Pilots Association (Philadelphia), St. Johns Bar Pilot Association (Jacksonville), Crescent River Pilots Association (Mississippi River), and Galveston Texas City Pilots (Galveston), Port Everglades Pilot Association (Fort Lauderdale) they as well navigate rivers and waterways using autopilot when conditions are appropriate.

I have relied on the documents listed below. I have also relied on my many decades of experience in the maritime sector and my education.

### *Documents Reviewed*

- Carver Marine's Fifth Supplemental Response to the Belt Line's First Request for Production of Documents and Things.

- Carver Marine Towing's Fifth Supplemental Response to Norfolk and Portsmouth Belt Line Railroad Company's Second Set of Requests for Production of Documents.

- Deposition of Jarkeis Morrisiey

- Deposition of Sharif Porter

- Deposition of Erik Walordy

- Deposition of Leonard Baldarasse

- Deposition of Brian Moore

- Deposition of Alex O'Rourke

- Deposition of Jason McGrath

- Deposition of Nicholas Laraway

- Expert Report – Robert Furborough

- Expert Report – Captain Nicholas Lewis

- Shoreside Incident Report

- Jim M Time Sheets

- Test Results – James Morrissey Preemployment

- Mackenzie Rose Electronic Chart System

- Text messages

- Photos

- Emails

- USCG recordings

- Work Rest Hours

- Masters Daily Report

- Masters Daily Vessel Report

- Log Book

- Text Messages

- Steering M&R

- Steering Related Near Miss

- Christopher Mile File

- Crew Matrix

- Jarkeis Jamal File

- Jason McGrath File

- Jimmy Morrisey File

- Jim M. Time Sheets

- US Coast Guard Forms (2692)

- TBS Produced Records

- Work Rest Hours

- T-Mobile Phone Records  - Morrissey

- Loss of Steering for Mack, Deck and Engine Rough Logs

- Ayers Vendor Tech Reports

- GMT Report Auto Pilot

- USCG Correspondence

- Meyerrose and Co., Inc. Survey with Photos

- 7.5 Navigation

- New Crew Orientation Check List

- Pier Damage Incident Report

- James Morrissey Training

- Health and Safety Plan

- Voyage Planning – Outside New York Harbor

- Voyage Planning

- Daily Rose Point Video produced in narrative form

- Distracted Operations

- Incident Reports

- Deckhand 2024

- Mate/Captain Relief 2024

- Bridge Allision

- Steering Failure 2024

- CMT Towing Safety Management System

- Witness Interviews Baldassare and J.Morrisey

- Mackenzie Rose manning

- Training Quizzes & Meetings

- Incident Report Event

- Mackenzie Rose COI

- Drills

- Standard Diary

- Photos of Bridge Area

- Preliminary Advice

- Daily Engine Logs

- Carver's Towing Safety Management System

- Simrad AP 70 Manual

- Drawing Showing Location of Vessel Strike

- Allision Event Surveillance Videos 1-8

- IMG 2206.mov

- IMG 2210.mov

- Clamant/Respondent Norfolk and Portsmouth Beltline Railroad Company's Expert Witness Identification.

- CFR's

- Photos  – taken during vessel inspection on July 28, 2025.

## III.  ASSIGNMENT

The towing vessel Mackenzie Rose was pushing the barge Weeks 281 outbound the Norfolk Southern Branch on the Elizabeth River headed to sea. The officer on watch was using autopilot while approaching the railroad bridge "and didn't switch over to non-follow up hand steering but thought he did"[1] as the vessel approached the railroad bridge. It is alleged the barge allided with the railroad bridge.

***In this case, I have been asked to opine on whether:***

1. The Mackenzie Rose was properly manned, the crew was licensed by the US Coast Guard, and in compliance with work/rest requirements of six hours on/six hours off.

2. The watch officer acting as look-out was appropriate under the prevailing conditions.

3.  Autopilot is prohibited for use while transiting a waterway with bridges.

4.  The evidence establishes that Mate Morrissey's initial statement the autopilot malfunctioned was false.

5. Mate Morrissey failed to engage the switch from Auto to NFU when he thought he did.

## IV. BACKGROUND OF CASE

*Weather*

Good Visibility, light wind, and ebb current at .58 knots (180 degrees). [2]

*Vessel Specifications*

Name: Mackenzie Rose and barge Weeks 281

---

[1] See e.g., USCG 2692 – June 25, 2024
[2] See, e.g., AyeTides: Chesapeake, Southern Branch current

Service: Towing vessel & barge

Overall Length Tug & barge: 300'

Beam: 55'

Draft: 14'

Vessel Flag: United States



Tug Mackenzie Rose



Mackenzie Rose and Barge Weeks 281 – June 15, 2024



North & PBL Railroad Bridge: The navigable channel between the bridge fenders is approximately 330' (Over one football field in length). (Photo Google Earth). Red circle indicates approximate location the barge incident with the railroad bridge.

**Incident:**

On June 15, 2024, James Morrissey, a licensed USCG master (captain) was the officer in charge of navigation aboard the Tug Mackenzie Rose pushing the barge *Weeks 281*. He was navigating from the upper wheelhouse of the Mackenzie Rose and had the autopilot engaged as he navigated outbound the Norfolk Southern Branch to sea. After transiting under the middle of the South Norfolk Jordan Bridge, the Mackenzie Rose tracked westward of the center span of the Norfolk and Portsmouth Belt Line Railroad Bridge (hereinafter "railroad bridge") at about 5.5 MPH. (See photo infra). Mate Morrissey was in autopilot and didn't switch over to hand steering but thought he did.[3] Approximately 1626 (4:26 PM) local time, the bow of the barge allided with the western section of the railroad bridge. See Photo – next page.

---

[3] USCG 2692 – June 25, 2024



**Yellow Line:**  Represents the track of the Mackenzie Rose & Weeks 281 with time stamp.[4]

**Blue Line:** Represents the projected track had the vessel continued on autopilot with no additional inputs.

**Red Line:** Represent what the track line should have looked like for the transit of the railroad bridge. It is customary to navigate through the center of the span of a bridge.

## V. SUMMARY OF OPINIONS

Within the bounds of reasonable operational maritime certainty, it is my opinion that:

---

[4] See, e.g., 15JUN2024 MACKENZIE ROSE ECS 1.mp4

1. The Mackenzie Rose was properly manned, the crew was licensed by the US Coast Guard, and in compliance with work/rest requirements of six hours on/six hours off.

2. The watch officer acting as look-out was appropriate under the prevailing conditions.

3.  Autopilot is not prohibited for use while transiting a waterway with bridges.

4.  The evidence clearly establishes that Mate Morrissey's initial statement the autopilot malfunctioned was false.

5. Mate Morrissey failed to engage the switch from Auto to NFU when he thought he had.  This failure by Mate Morrissey and his lack of situational awareness was the sole cause of the allision.


## VI. BASIS OF OPINIONS

***1. The Mackenzie Rose was properly manned, the crew was licensed by the US Coast Guard, and in compliance with work/rest requirements of six hours on/six hours off.***

The crew aboard the Mackenzie Rose worked 6 hours on and 6 hours off which is customary for tug/barge operations. The graph below shows the hours worked by each crewmember.  On 6/15/24, Mate Morrissey worked from 0000 (midnight) until 0600 (6:00 a.m.), and then on rest from 0600 (6:00 a.m.) until 12:00 (noon). He was back on watch from 12:00 (noon) until 1800 (6:00 p.m.)  The light blue color represents "rest," and the light beige represents "watch." See Infra.



The US Coast Guard Certificate of Inspection requires five crewmembers for the Mackenzie Rose. One master, one licensed mate, two able seamen, and one ordinary seaman. If the Mackenzie Rose had an additional lookout at all times when navigating, the crewmembers would be outside the mandated work/rest requirements of working no more than ten hours a day, unless an exceptional circumstance exist. It would be dangerous for the crew and more importantly in violation of 46 CFR 15.1111. The Mackenzie Rose was manned as required by of the Certificate of Inspection.

The Mackenzie Rose had not one, but two licensed US Coast Guard masters aboard. Captain Miller who was the captain for that voyage, and James Morrissey who was the acting mate. Carver Marine and Captain Miller had every right to delegate navigational responsibility of the Mackenzie Rose to Mate Morrissey, a licensed US Coast Guard Captain, and expect him to act prudently. It would by proper for a vessel such as the Mackenzie Rose to have the watch officer acting as look-out on June 15, 2024.

Applying my professional experience, knowledge, skill, training, and education, and after a thorough review and analysis of the facts and materials provided, it is my opinion to a reasonable degree of professional maritime certainty that Carver's vessel Mackenzie Rose was properly manned and fit for its intended voyage. Furthermore, the Mackenzie Rose was compliant with Coast Guard regulations and crew requirements set forth in the vessel's COI.

**2. The watch officer acting as look-out was appropriate under the prevailing conditions.**

33 CFR § 83.05 Look-out (Rule 5)

*Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.*

Rule 5, supra, requires every vessel to maintain a proper look-out.  The rule does not state how many look-outs a vessel must have, nor does it state where the look-outs are to be stationed, nor does it state when additional look-outs are required.  These decisions are left up to the discretion of the captain and watch officer.  For a look-out to be "proper," the officer of the watch must have enough information to make "a full appraisal of the situation and risk of collision."

The upper wheelhouse of the Mackenzie Rose where Mate Morrisey was standing watch on June 15th, 2024 had 360 degree visibility.  See photos next page – taken during the vessel inspection on July 28, 2025.



Upper Wheelhouse – 360° Visibility



View from Upper Wheelhouse

As a harbor pilot who is routinely on tugs and barges, it is customary for small vessels such as tugs/barges with 360 degree visibility to have one mate in the wheelhouse who is also the acting look-out (one-man bridge). Based upon my experience as a harbor pilot, in which I am routinely on tugs and barges and familiar with the operation, it is industry standard for companies such as Carver to operate with one-man bridge operations. Based on the findings of my survey of other tug and barge operations, in which I talked with captains and shoreside personnel, and my personal experience as a harbor pilot in Port Everglades, Carver's operation of a one-man bridge is customary in the marine industry. The following companies have one-man bridge operations aboard tugs when conditions permit: McAllister, Bisso Towboat, Dann Marine Towing, OSG, Gulf Oceanic Marine, Moran, Shoreline Sightseeing.

At the time of the incident, the weather was good and the skies were clear based on the surveillance video. Unless there is restricted visibility, heavy vessel traffic or operating in the proximity to danger, it is customary for a one-man bridge operation with the watch officer being the sole look-out. 46 CFR 140.630, infra, clearly states it is the duty of the master or watch officer to assess the situation and determine if the posting of an additional look-out is required. In addition, the statute infra, makes it clear the "master or mate (pilot)" can be the sole look-out – by stating *"A lookout in addition to the master or mate (pilot) should be added when necessary."*

46 CFR § 140.630 Lookout

*(a) Throughout the trip or voyage the master and officer in charge of the navigational watch must assess the requirement for a lookout, consistent with 33 CFR 83.05. A lookout in addition to the master or mate (pilot) should be added when necessary to:*

*(1) Maintain a state of vigilance with regard to any significant change in the operational environment;*

*(2) Assess the situation and the risk of collision/allision;*

*(3) Anticipate stranding and other dangers to navigation; and*

*(4) Detect any other potential hazards to safe navigation.*

*(b) In determining the requirement for a lookout, the officer in charge of the navigational watch must take full account of relevant factors including, but not limited to: state of weather, visibility, traffic density, proximity of dangers to navigation, and the attention necessary when navigating in areas of increased vessel traffic.*

The CFR supra, states "master and officer in charge of the navigational watch must assess the requirement for a lookout." The CFR makes it clear it is the responsibility of the master and officer in charge of the navigational watch to "assess the requirement for lookout," it is not the responsibility of the company (Carver) to determine when, where, or in what circumstances additional look-outs need to be posted.

Carver's *TSMS (Tug Safety Management System)* addresses "lookout" in two separate sections. First, section 7.16 states:

**Look-Out** – *Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision. From 33 CFR 83 Rule 5*

22

***Requirements for a Look-Out***

*In determining the requirement for a look-out, the person in charge of the navigational watch must take full account of the relevant factors including, but not limited to:*

- *State of the weather.*

- *Visibility.*

- *Traffic Density.*

- *Proximity of dangers to navigation.*

- *The attention necessary when navigating in areas of increased vessel traffic.*

- *Crew members medical certificate MUST state "Fit for Look-out Duty: Y"*

***Procedures***

*A look-out should be added when necessary to:*

- *Maintain a state of vigilance with regard to any significant change in the operational environment.*

- *Appraise the situation and the risk of collision/allision.*

- *Anticipate stranding and other dangers to navigation.*

- *Detect any potential hazards to safe navigation.*

*A look-out shall be added when entering any port channel or at any waterway intersection.*

*The look-out may remain in the wheelhouse if visibility, weather and traffic conditions permit.*

***One-Man Bridge Operations***

*"On vessels where there is an unobstructed all-around view provided at the steering station, as on certain pleasure craft, fishing boats, and towing vessels, or where there is no impairment of night vision or other impediment to keeping a proper look-out, the watch officer or helmsman may safely serve as the look-out. However, it is expected that this practice will only be followed after the\ situation has been carefully assessed on each occasion and it has been clearly established that it is prudent to do so. Full account shall be taken of the weather, conditions of visibility, traffic density, and the proximity to navigational hazards. It is not the intent of these rules to require additional personnel forward, if none is required to enhance safety."*

*Senate Report N.96-979,96th Congress, 2nd Session (1980 ) at 7-8[5]*

Additionally, Carver's Navigation Policy under Section 7.5 Navigation states:

*"It is the company's policy to be in strict compliance with US Coast Guard Navigation Rules regarding look-outs." Inland Navigation Rule #5 states: "every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."*

*The vessel operator shall appoint and instruct a qualified person to perform lookout duties in any situation deemed appropriate by the operator.*

---

[5] See e.g., 7.16 Look-Out – Carver TBS Helm Connect: Bates 000951

In any situation he/she deems appropriate, the vessel Captain on watch shall take precautions including, but not limited to, the following:

- Appointing a qualified person to perform look-out duties

- Instructing the look-out person as to his or her duties

- Setting up appropriate means of communication with the person acting as look-out.[6]

Carver's Look-out policy is consistent with 33 CFR § 83.05 Look-out (Rule 5) and 46 CFR § 140.630 Lookout. Carver's policy requires vessels to maintain a proper look-out at all times and leaves it to the discretion of the operator (watch officer) to determine if an additional look-out is appropriate.

Applying my professional experience, knowledge, skill, training, and education, and after a thorough review and analysis of the facts and materials provided, it is my opinion to a reasonable degree of operational maritime certainty that it is appropriate and customary under the prevailing conditions (good weather, clear visibility, low traffic)[7] for Mate Morrissey to be the watch officer and look-out aboard the Mackenzie Rose on June 15, 2024 prior to the incident. In addition, based on my experience as a harbor pilot being aboard tugs and barges on a routine basis, and surveying the captains of tug companies, it is industry standard for vessels such as the Mackenzie Rose to have one mate in the wheelhouse who is acting as lookout. Carver's operation manual, section on look-out, is consistent with the operations I observe aboard the tugs and barges in Port Everglades.

---

[6] See e.g., 7.5 Navigation – Carver TBS Helm Connect/; Bates 000918
[7] See e.g., Video of the Makenzie Rose and barge Week 281 just prior to incident.

### 3. Autopilot is not prohibited for use while transiting a waterway with bridges.

Mate Morrissey was navigating the Mackenzie Rose with the autopilot engaged prior to the incident with the bridge.   Using autopilot aboard small vessels such as tugs and barges while transiting inland waters is an accepted practice in the maritime industry among captains and pilots as confirmed by my personal experience as a pilot in Port Everglades and my survey. The primary reason autopilot is used in inland waters is because the autopilot does a better job of steering compared to a watch stander and steers a straighter course. Also, autopilots allow the watch officer to easily make course adjustments by pushing a button. The Code of Federal Regulations states the requirements for the use of autopilot aboard vessels. See infra.

*46 § 140.670 Use of auto pilot.*

*Except for __towing__ vessels in compliance with requirements in __33 CFR 164.13__(d), when an automatic pilot is used in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigational situations, the master must ensure that:*

*(a) It is possible to immediately establish manual control of the ship's steering;*

*(b) A competent person is ready at all times to take over steering control; and*

*(c) The changeover from automatic to manual steering and vice versa is made by, or under, the supervision of the officer in charge of the navigational watch.*

The exception being tank vessels carry hazardous material or oil are prohibited from using autopilot in inland waters  (33 CFR 164.13(d)). The barge *Weeks 281* which the Mackenzie Rose was pushing was not carrying hazardous material or oil, thus 33 CFR 164.13(d) is not applicable. The Mackenzie Rose fulfilled the requirements of 46 CFR 140.670 with regards to the use of autopilot as stated below.

1. The barge was not carrying hazardous material or oil during the transit on June 15th, 2024.

2. It was possible to immediately establish manual control of the ship's steering.

3. Mate Morrissey, a US Coast Guard licensed master, is considered a "competent person" by the US Coast Guard which issued his master's license. At the time, his license was active and unsuspended.

4. Mate Morrissey was the officer in charge of the navigational watch aboard the Mackenzie Rose and any change over in steering was made under his supervision.

In addition, Carver's Navigational Manual has a section, Use of Auto Pilot (if Equipped) which stated the following:

*When an automatic pilot is used in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigational situation, the master must ensure that:*

- *It is possible to immediately establish manual control of the ship's steering;*

- *A competent person is always ready to take over steering control; and*

- *The changeover from automatic to manual steering and vice versa is made by, or under, the supervision of the officer in charge of the navigation watch.*[8]

The Navigation instructions in Carver's navigation manual are consistent the requirements found in the Code of CFR's. Carver's navigational manual complied with the Code of Federal Regulations.  The officer of the watch was given instructions by Carver on the use of autopilot under various conditions.

As stated before, it is common to use autopilot aboard small vessels such as tug and barges in inland waters while navigating. While transiting a bridge, some watch standers may stay in

---

[8] See e.g., 7.5 Navigation – Bates 000817

autopilot while others may switch to hand steering, it is personal preference. The distance between the fenders of the Norfolk and Portsmouth Belt Line Railroad Bridge was approximately 330 feet (over one football field in length) and the beam of the tug & barge was approximately 55 feet in width. The opening of the bridge span between the fenders for navigation was over six times the beam of the Mackenzie Rose and barge which in my opinion is a wide span for navigation.

In Port Everglades, autopilot is used for ships, tugs & barges, and mega yachts, etc. while navigating in the channel. The largest ship we bring in Port Everglades in autopilot is over 1,000' in length. In addition to my own experience of navigating ships as a harbor pilot in inland waterways using autopilot, I surveyed pilots from New York, Philadelphia, Jacksonville, Mississippi River, and Galveston, they as well navigate rivers and/or waterways using autopilot when conditions are appropriate.

Applying my professional experience, knowledge, skill, training, and education, and after a thorough review and analysis of the facts and materials provided, it is my opinion to a reasonable degree of operational maritime certainty that it was acceptable for a vessel such as the Mackenzie Rose to be engaged in autopilot while transiting under the Norfolk Railroad bridge. In addition, Carver management provided guidance which complied with the CFR's on the use of autopilot for the watch officer, which is consistent with the findings of my survey of other pilots, and my own personal experience of using autopilot in navigational channels.

**4. The evidence clearly establishes that Mate Morrissey's initial statement the autopilot malfunctioned was false.**

Mate Morrissey failed to be truthful regarding the incident with the bridge. The evidence I have reviewed does not support his initial statement the autopilot malfunctioned. Instead, the

evidence establishes that Mate Morrissey did not disengage the autopilot as he believed he had. First, the incident report entry, infra, states "Mate James Morrissey reports the autopilot was not completely turned off."



More importantly the USCG 2692 form submitted on 06/25/24 states "The OOW had failed to properly switch to hand steering." See Infra.



Furthermore, in a text message from Captain Miller to Brian Moore on 6/28/2024 at 10:01:19 AM (UTC-4), the text message stated "his interview statement to the CG said it never went hard over and it was midships the entire time.[9] See infra.



CARVER ESI 001897

Thus, the fact that Mate Morrissey failed to properly disengage the autopilot is supported by the incident report entry, the USCG 2692 form, and the text message, supra. In my opinion, failure to properly disengage the autopilot by Mate Morrissey, a US Coast Guard licensed master, was the sole cause of the incident.

Furthermore, the incident report supra states, "able to correct and switch back over to hand steering" which means Mate Morrissey switched to hand steering prior to the incident. In addition, the USCG 2692 form submitted on 06/25/24 states: "The OOW stated that once he did switch to hand steering, he gave a slow astern bell at first and then a full astern bell." Consequently, in my opinion, based on the incident report entry and the USCG 2692 form, Mate Morrissey was able to and did switch to manual (hand) steering prior to the incident.

---

[9] See e.g., Carver ESI 001897

Each day, it is common for commercial vessels to log the status of operational equipment. On June 14, 2024, the Master's Daily Vessel Reporting (Tugs) – Mackenzie Rose under Daily Tests & Inspections  (33 CFR 164.80)  Section 2.1 Steering Test  showed the system "passed." The Navigation Equipment under Section 2.3 also "passed." This document was filled in at 10:41 am and electronically signed by Captain Chris Miller.[10] According to the log, which is an official document, the steering and navigational equipment was working properly.

On June 15, 2024, the Master's Daily Vessel Reporting (Tugs) – Mackenzie Rose under Daily Tests & Inspections   (33 CFR 164.80)   Section 2.1 Steering Test showed the system "passed." The Navigation Equipment under Section 2.3 also "passed."  This document was filled in at 23:55 (11:55 pm) which was within hours after the incident with the bridge, and electronically signed by Captain Chris Miller.[11]

Applying my professional experience, knowledge, skill, training, and education, and after a thorough review and analysis of the facts and materials provided, it is my opinion to a reasonable degree of operational maritime certainty that it has been established the autopilot worked properly on June 15th, 2024 just prior to the incident, based on the incident report entry, the USCG 2692 form, and the text message.  In fact, as set forth above, Mate Morrissey's conduct of failing to turn off the autopilot when he thought he did was the sole cause of the incident.

**5. Mate Morrissey failed to engage the switch from Auto to NFU when he thought he had.  This failure by Mate Morrissey and his lack of situational awareness was the sole cause of the allision.**

Switching from autopilot to hand steering is a two-step process, first the Standby (STBY)

---

[10] See e.g., Master's Daily Vessel Reporting (Tugs) – Mackenzie Rose Bates 000015
[11] See e.g., Master's Daily Vessel Reporting (Tugs) – Mackenzie Rose Bates 000021

button on the autopilot needs to be pressed, second steering needs to be switched from autopilot (auto) to NFU by engaging the switch. See photos infra.[12]



#1 – Press STBY (Standby)



#2 – Engage switch from Auto to NFU

---

[12] Photos taken during vessel inspection – July 28, 2025.



**Steer with NFU (Hand Steering)**

If either step is not completed (#1 & #2), the rudders will not react to the operator moving the control lever in hand steering (NFU).[13]

As set forth above, Mate Morrissey did not perform step number 2, engaging switch from Auto to NFU when he thought he did.

Applying my professional experience, knowledge, skill, training, and education, and after a thorough review and analysis of the facts and materials provided, it is my opinion to a reasonable degree of operational maritime certainty that it has been established that Mate Morrissey failed to engage the switch from Auto to NFU when he thought he did.  This is based on the incident report and USCG 2692. See Infra.



---

[13] See e.g., Non Follow Up Steering – Allows the operator using the control lever to turn the rudder to port (left) or starboard (right), once released rudder goes back to midships.

33

24d. Is there evidence that alcohol use contributed to this casualty?

[ ] Yes    [x] No    (If Yes, discuss in block 25b)

25. Nature and Circumstance of the Casualty:

25a. Activity or Operation Being Conducted at the Time of the Casualty:

THE TOWING VESSEL MACKENZIE ROSE WAS PUSHING THE DECK BARGE WEEKS 281, AHEAD IN PUSH GEAR. THEY WERE OUTBOUND THE NORFOLK SOUTHERN BRANCH FOR SEA. THE OFFICER ON WATCH, JAMES MORRISSEY, WAS IN AUTOPILOT AND DIDNT SWITCH OVER TO NON FOLLOW UP HAND STEERING BUT THOUGHT HE DID. THE VESSEL CONTINUED TO TRACK TO PORT AND BEFORE THE OOW WAS ABLE TO CORRECT IT AFTER SWITCHING TO NON FOLLOW UP, THE BOW OF THE BARGE MADE CONTACT WITH THE WESTERN SECTION OF BRIDGE.

25b. Description of the Casualty (casualty events and the conditions and actions that were believed to be causal factors as well as any hazards created as a result of the casualty. Attach additional sheets if necessary.):

THE OOW HAD FAILED TO PROPERLY SWITCH TO HAND STEERING AND ALSO GAVE MINIMAL ENGINE ORDERS AT FIRST IN ORDER TO PREVENT FURTHER HEADWAY OR COURSE CHANGE. THE OOW STATED THAT ONCE HE DID SWITCH TO HAND STEERING, HE GAVE A SLOW ASTERN AT FIRST AND THEN FULL ASTERN. ONCE CONTACT WAS MADE WITH THE BRIDGE STRUCTURE, THE VESSEL WAS BARELY MAKING HEADWAY AND BEGAN TO MAKE ASERTN WAY. THE OOW WAS BACKING INTO THE MAIN CHANNEL AND REGAINED CONTROL OF THE VESSEL.

This failure by Mate Morrissey to engage the switch from Auto to NFU and his lack of situational awareness was the sole cause of the incident.

## VII. CONCLUSION

 Within the bounds of reasonable operational maritime certainty, it is my opinion that:

1. The Mackenzie Rose was properly manned, the crew was licensed by the US Coast Guard, and in compliance with work/rest requirements of six hours on/six hours off.

2. The watch officer acting as look-out was appropriate under the prevailing conditions.

3.  Autopilot is not prohibited for use while transiting a waterway with bridges.

4.  The evidence clearly establishes that Mate Morrissey's initial statement the autopilot malfunctioned was false.

5. Mate Morrissey failed to engage the switch from Auto to NFU when he thought he had.  This failure by Mate Morrissey and his lack of situational awareness was the sole cause of the allision.

## VII. TRIAL EXHIBITS

I may rely on visual aids and demonstratives to demonstrate the bases of my opinions. Examples of such visual aids and demonstratives may include, for example, electronic charts, drawings, diagrams, pictures, exhibits,  diagrams, videos, and animated or computer-generated videos.

## VIII. SUPPLEMENTATION OF OPINIONS

I reserve the right to adjust or supplement my opinion after I have had the opportunity to review additional documents or other discovery that may be brought to my attention. I also reserve the right to adjust or supplement any analysis in light of any critiques or comments on my report and to offer additional opinions and evidence in reply to any opinions advanced.

I, Sam Stephenson, declare all statements and affirmations made herein of my knowledge are true and correct, and all statements made on information and belief are believed to be true and correct.

Dated: August 8, 2025

Captain Sam Stephenson, J.D.

### *Rebuttal - Report of Captain Nicholas J. Lewis*

I will address the following findings of Captain Lewis.

1. The unit made direct contact with the bridge, causing visible structural movement (as evidenced by surveillance video, which is contrary to crew statements of "no damage" or "minor impact."

2. The unit deviated outside the navigational channel without cause and continued forward at approximately 5.2 knots toward a fixed portion of the Norfolk and Portsmouth Belt Line Railroad Bridge.

35

3. The deck logbook entry was inaccurate and misleading, stating the Unit had maneuvered onto fendering and away from the Bridge when in fact it struck the fixed western structure directly.

4. The Officer of the Watch (Captain James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up Mode) in a confined navigational channel, resulting in loss of directional control.

5. The Company TSMS (Tug Safety Management System) lacked policy guidance prohibiting autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion.

6. The use of autopilot in a narrow inland waterway while approaching a fixed railroad bridge was in direct contradiction to established safe seamanship practices and warnings in the Simrad AP70MK2 Autopilot Manual.

7. Carver deprived the Norfolk and Portsmouth Belt Line Railroad Company protections afforded by the autopilot manufacturer which created unseaworthy conditions aboard the Mackenzie Rose and was a cause of the allision.

8. No lookout was posted in violation of 33 C.F.R. § 83.05 (Rule 5 – Look-out), a critical error during confined water navigation in daylight while pushing ahead a barge.

9.  The company TSMS (Tug Safety Management System) did not prohibit autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion.

10. Carver gave no official training to its operators with regard to how to safely transit a waterway when approaching a bridge, when a proper lookout should be posted, and had no restrictions on the use of autopilot.

11. The Coast Guard was not promptly notified of the allision, in violation of 45 C.F.R. . §4.05-1. This delayed official investigation and post-incident drug and alcohol testing. And created potentially dangerous conditions for the Norfolk and Portsmouth Belt Line Railroad Company and the public at large.

12. Post-incident accounts from multiple crew members were inconsistent, with discrepancies in timing, actions taken, and observations.

13. By not having the autopilot repaired and not restricting  the use of the autopilot, Carver management was a cause of the allision with the NPBL Bridge.

14. These failures – navigational, procedural, and managerial – singularly or in combination, created an unreasonably dangerous and unseaworthy conditions, that violated well established standards of safe marine practice, and were causes of this allision incident.

15. In my opinion, given the lack of training to the crew, the lack of policies and procedures regarding use of an autopilot or lookout during bridge transits, the known issues with the autopilot, and Captain Morrissey's prior allision, the Tug Mackenzie Rose was unseaworthy. Carver should not have allowed this tug to sail with this crew.

The following findings of Captain Lewis will be addressed, infra.

*1. The unit made direct contact with the bridge, causing visible structural movement (as evidenced by surveillance video, which is contrary to crew statements of "no damage" or "minor impact."*

I disagree with Captain Lewis's finding. The movement of the structure as depicted in the surveillance video does not affect the crews perception of the incident or what they reported afterwards. Crewmembers testified upon inspection of the barge which contacted the railroad bridge, showed minimal damage.  Additionally, I am not a structural engineer.

*2. The unit deviated outside the navigational channel without cause and continued forward at approximately 5.2 knots toward a fixed portion of the Norfolk and Portsmouth Belt Line Railroad Bridge.*

I disagree with the finding of Captain Lewis. The unit deviated outside the navigational channel due to the lack of situational awareness of Mate Morrissey.

*3. Captain Lewis asserts the deck logbook entry was inaccurate and misleading, stating the Unit had maneuvered onto fendering and away from the Bridge when in fact it struck the fixed western structure directly.*

38

The deck logbook entry was inaccurate and misleading because Mate Morrissey failed to be truthful regarding the incident with the bridge. The logbook entry did not state the barge allided with the western section of the bridge.

*4. Captain Lewis asserts the Officer of the Watch (Captain James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up Mode) in a confined navigational channel, resulting in loss of directional control.*

I agree with Captain Lewis's finding that Mate Morrissey failed to properly disengage the autopilot for two reasons. First, the incident report entry, infra, states "Mate James Morrissey reports the autopilot was not completely turned off."



Second, the USCG 2692 form submitted on 06/25/24 states "The OOW had failed to properly switch to hand steering." See Infra.

**24d. Is there evidence that alcohol use contributed to this casualty?**

☐ Yes    ☒ No    *(If Yes, discuss in block 25b)*

**25. Nature and Circumstance of the Casualty:**

**25a. Activity or Operation Being Conducted at the Time of the Casualty:**

THE TOWING VESSEL MACKENZIE ROSE WAS PUSHING THE DECK BARGE WEEKS 281, AHEAD IN PUSH GEAR. THEY WERE OUTBOUND THE NORFOLK SOUTHERN BRANCH FOR SEA. THE OFFICER ON WATCH, JAMES MORRISSEY, WAS IN AUTOPILOT AND DIDNT SWITCH OVER TO NON FOLLOW UP HAND STEERING BUT THOUGHT HE DID. THE VESSEL CONTINUED TO TRACK TO PORT AND BEFORE THE OOW WAS ABLE TO CORRECT IT AFTER SWITCHING TO NON FOLLOW UP, THE BOW OF THE BARGE MADE CONTACT WITH THE WESTERN SECTION OF BRIDGE.

**25b. Description of the Casualty (casualty events and the conditions and actions that were believed to be causal factors as well as any hazards created as a result of the casualty. Attach additional sheets if necessary.):**

THE OOW HAD FAILED TO PROPERLY SWITCH TO HAND STEERING AND ALSO GAVE MINIMAL ENGINE ORDERS AT FIRST IN ORDER TO PREVENT FURTHER HEADWAY OR COURSE CHANGE. THE OOW STATED THAT ONCE HE DID SWITCH TO HAND STEERING, HE GAVE A SLOW ASTERN AT FIRST AND THEN FULL ASTERN. ONCE CONTACT WAS MADE WITH THE BRIDGE STRUCTURE, THE VESSEL WAS BARELY MAKING HEADWAY AND BEGAN TO MAKE ASERTN WAY. THE OOW WAS BACKING INTO THE MAIN CHANNEL AND REGAINED CONTROL OF THE VESSEL.

Furthermore, in a text message from Captain Miller to Brian Moore on 6/28/2024 at 10:01:19 AM (UTC-4), the text message stated "his interview statement to the CG said it never went hard over and it was midships the entire time.[14] See infra.



CARVER ESI 001897

Captain Lewis's finding that Mate Morrissey failed to properly disengage the autopilot is supported by the incident report entry, the USCG 2692 form, and the text message. In my opinion, Mate Morrissey's failure to turn off the autopilot when he thought he did was a cause of the incident.

---

[14] See e.g., Carver ESI 001897

I disagree with Captain Lewis's finding "the autopilot did not switch to manual (hand) steering" for the following reasons. The incident report supra states, "able to correct and switch back over to hand steering" which means Mate Morrissey did switch to hand steering prior to the incident. Second, the USCG 2692 form submitted on 06/25/24 states: "The OOW stated that *once he did switch to hand steering*, he gave a slow astern bell at first and then a full astern bell"

In my opinion, based on the incident report entry and the USCG 2692 form, Mate Morrissey was able to and did switch to manual (hand) steering prior to the incident.

In addition, I respectfully disagree the allision occurred in a confined navigational channel. First, what defines a confined navigational channel is subjective, not objective and based not only on the width of the channel, but also the size of the vessel navigating the channel. For all practical purposes, every navigational channel is "confined." The maximum beam (width) of the Mackenzie Rose and barge Weeks 281 was 55 feet. The navigation opening between the bridge fenders was approximately 330' in width. The navigational opening between the fenders of the railroad bridge is over six (6) times the beam of the barge. Furthermore, before the railroad bridge the navigational channel was approximately 713' in width. Almost thirteen (13) times the beam (width) of the Mackenzie Rose and barge Weeks 281. See chart infra. The light blue line just above the magenta colored line is the measurement of the channel from the 18' depth curve on either side of the channel. The draft (vertical distance between waterline and lowest point on vessel's hull) of the Mackenzie Rose was14'. The measurement of the light blue line in the upper left hand corner of the screen below the latitude and longitude shows in feet the distance across the channel at that point is approximately 713 feet.[15]

---

[15] Measurement taken using GPSMAP Garmin 8616 multifunction display using Navionics chart.



In my opinion, a vessel with a beam of 55' navigating a channel with a width of approximately 713' (over two football fields wide) is not a confined channel. An example of a confined navigational channel is Port Everglades where the channel is 450' – 500' wide, and ships with a beam of 180' navigate the channel on a regular basis. In my opinion, the Mackenzie Rose was not navigating in a confined channel prior to the incident, nor was the channel between the fendering of the railroad bridge confined.

Based on my professional experience, education, and the information that I have reviewed and analyzed, I agree with Captain Lewis that Mate Morrissey failed to properly disengage the autopilot. However, I disagree with Captain Lewis's two additional findings: One, that Captain James Morrissey did not switch to manual (hand) steering, and two, the Mackenzie Rose and barge Weeks 281 were navigating in a confined channel at the time of the incident.

*5. Captain Lewis asserts the Company TSMS (Tug Safety Management System) lacked policy guidance prohibiting autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion.*

Captain Lewis's finding states the "Company TSMS lacked policy guidance prohibiting autopilot use in confined waterways or near critical infrastructure."  In my opinion his finding is flawed because there is no prohibition on using autopilot in confined waters or near critical infrastructure.  The CFR's set forth requirements for using autopilot aboard a vessel such as the Mackenzie Rose pushing barge Weeks 281.  The decision to use autopilot is left to the judgement of the vessel's captain and watch officer.  Autopilot is just another method to steer the vessel.

Carver's TSMS (Tug Safety Management System ) has a section - Use of Auto Pilot (if Equipped) which addresses the use of autopilot in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigation situation.  See infra.

*When an automatic pilot is used in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigational situation, the master must ensure that:*

- *It is possible to immediately establish manual control of the ship's steering;*

- *A competent person is always ready to take over steering control; and*

- *The changeover from automatic to manual steering and vice versa is made by, or under, the supervision of the officer in charge of the navigation watch.[16]*

Carver's TSMS (Tug Safety Management System) mirrors the requirements found in the Code of CFR's.  See infra.

***46 § 140.670 Use of auto pilot.***

---

[16] See e.g., 7.5 Navigation – Bates 000817

*Except for <u>towing</u> vessels in compliance with requirements in <u>33 CFR 164.13</u>(d), when an automatic pilot is used in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigational situations, the master must ensure that:*

*(a) It is possible to immediately establish manual control of the ship's steering;*

*(b) A competent person is ready at all times to take over steering control; and*

*(c) The changeover from automatic to manual steering and vice versa is made by, or under, the supervision of the officer in charge of the navigational watch.*

The Mackenzie Rose fulfilled the requirements of 46 CFR 140.670 with regards to the use of autopilot as stated below.

1. It was possible to immediately establish manual control of the ship's steering.

2. James Morrissey, a US Coast Guard licensed captain, is considered a "competent person" by the US Coast Guard which issued his captain's license.

3. James Morrissey, was the officer in charge of the navigational watch aboard the Mackenzie Rose, and any change over in steering would have been made under his supervision.

46 CFR 140.670 does not prohibit the use of autopilot for vessels such as the Mackenzie Rose/Weeks 281.

Based on my years of professional maritime experience as a harbor pilot in Port Everglades using autopilot in narrow channels, it is an accepted practice, and in my opinion, there would be no justification for Carver to prohibit the use of autopilot aboard their vessels while in inland waters.

*6. Captain Lewis asserts the use of autopilot in a narrow inland waterway while approaching a fixed railroad bridge was in direct contradiction to established safe seamanship practices and warnings in the Simrad AP70MK2 Autopilot Manual.*

In my opinion, the finding of Captain Lewis is a moot-point because Mate Morrissey thought he was in hand (manual) steering while approaching the railroad bridge. The incident entry, infra, states "Mate Morrissey reports the autopilot was not completely turned off he was able to correct and switch back over to hand steering and begin backing." See infra.



Second, the USCG 2692 form submitted on 06/25/24 states Mate Morrisey did switch to manual steering (hand steering). "*The OOW had failed to properly switch to hand steering ... The OOW stated that once he did switch to hand steering.* See infra.

45

25b.  Description of the Casualty (casualty events and the conditions and actions that were believed to be causal factors as well as any hazards created as a result of the casualty.  Attach additional sheets if necessary.):

```
THE OOW HAD FAILED TO PROPERLY SWITCH TO HAND STEERING AND ALSO GAVE MINIMAL ENGINE ORDERS AT
FIRST IN ORDER TO PREVENT FURTHER HEADWAY OR COURSE CHANGE.  THE OOW STATED THAT ONCE HE DID
SWITCH TO HAND STEERING, HE GAVE A SLOW ASTERN AT FIRST AND THEN FULL ASTERN.  ONCE CONTACT
WAS MADE WITH THE BRIDGE STRUCTURE, THE VESSEL WAS BARELY MAKING HEADWAY AND BEGAN TO MAKE
ASERTN WAY.  THE OOW WAS BACKING INTO THE MAIN CHANNEL AND REGAINED CONTROL OF THE VESSEL.
```

According to both the incident entry and the USCG 2692 form, Mate Morrissey did switch to manual (hand) steering.  Prior to incident with the railroad bridge, Mate Morrissey thought he was in hand steering but he wasn't because the autopilot wasn't completely turned off.

Based on my professional experience, education, and the information that I have reviewed and analyzed, it is my opinion that Mate Morrissey thought he was in hand steering prior to the incident when the autopilot was still engaged, and he did switch to hand steering prior to the incident.  P70MK2 Autopilot Manual warning is a moot-point because the Mackenzie Rose was not operating "in heavy traffic areas or in narrow waters."

*7. Captain Lewis asserts Carver deprived the Norfolk and Portsmouth Belt Line Railroad Company protections afforded by the autopilot manufacturer which created unseaworthy conditions aboard the Mackenzie Rose and was a cause of the allision.*

I do not understand what Captain Lewis's point is with regards to his finding. However, it is my understanding, the determination of unseaworthiness is to be determined by the trier of facts, and not by the expert.  Additionally, the evidence clearly establishes the incident occurred due to Mate Morrissey's lack of situational awareness.

*8. Captain Lewis asserts No lookout was posted in violation of 33 C.F.R. § 83.05 (Rule 5 – Look-out), a critical error during confined water navigation in daylight while pushing ahead a barge.*

I disagree with the finding of Captain Lewis that the Mackenzie Rose did not have a lookout. Aboard tugs and barges such as the Mackenzie Rose with 360-degree visibility from the wheelhouse, it is customary for a one-man bridge operation in which the watch officer is the look-out. At the time of the incident, the weather was good, the skies were clear and vessel traffic was light based on the surveillance video. Unless there is restricted visibility, heavy vessel traffic or operating in the proximity to danger, it is customary for a one-man bridge operation in which the watch officer is the look-out aboard small vessels including tugs and barges. 46 CFR 140.630, infra, clearly states **it is the duty of the master or watch officer to assess the situation and determine if the posting of an additional lookout is necessary.**

In addition, the statute infra, makes it clear the "master or mate (pilot)" can be the sole look-out – by stating *"A lookout in addition to the master or mate (pilot) should be added when necessary."* See infra.

46 CFR § 140.630 Lookout

*(a) Throughout the trip or voyage the master and officer in charge of the navigational watch must assess the requirement for a lookout, consistent with 33 CFR 83.05. <u>A lookout in addition to the master or mate (pilot) should be added when necessary</u> to:*

*(1) Maintain a state of vigilance with regard to any significant change in the operational environment;*

*(2) Assess the situation and the risk of collision/allision;*

*(3) Anticipate stranding and other dangers to navigation; and*

*(4) Detect any other potential hazards to safe navigation.*

*(b) In determining the requirement for a lookout, the officer in charge of the navigational watch must take full account of relevant factors including, but not limited to: state of weather, visibility, traffic density, proximity of dangers to navigation, and the attention necessary when navigating in areas of increased vessel traffic.*

A one-man bridge operation (mate on watch is also the look-out) would be customary on a vessel such as the Mackenzie Rose on June 15th, 2024 considering the wheelhouse has 360 degree visibility, the weather was good, the visibility was clear, and vessel traffic was light. There would have been no reason for Mate Morrissey to have an additional look-out posted that day.

Based on my professional experience, education, and the information that I have reviewed and analyzed, it is my opinion that a one man bridge operation with no additional look-out aboard the Mackenzie Rose would have been the industry standard on June 15, 2024 due to good weather, clear visibility and light vessel traffic. In addition, based on my experience as a harbor pilot being aboard tugs and barges on a routine basis, and surveying the captains of tug companies, it is industry standard for vessels such as the Mackenzie Rose to have one mate in the wheelhouse who is acting as lookout.

*9. Captain Lewis asserts the company TSMS (Tug Safety Management System) did not prohibit autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion.*

48

First, it is the discretion of the captain and the mate on watch to make decisions regarding navigation.  As a harbor pilot, it is my decision to be in hand steering or autopilot. Companies may give guidance, but navigation is ultimately left to the discretion of the pilot (when required), captain and the mate on watch.  Second, as stated in my opinion of Captain Lewis's findings #4, the Mackenzie Rose and barge Weeks 281 were not operating in a confined narrow channel at the time of the incident.  Third, there is no prohibition in the Code of Federal Regulations prohibiting the use of autopilot in confined waterways or near critical infrastructure.

The Code of Federal Regulations requires the master (captain), not the company to ensure that when autopilot is used it is possible to: immediately switch from autopilot to hand (manual) steering, a competent person is ready to take over at all times, this would be the officer of the watch (Mate Morrissey), and the switch over from autopilot to hand steering is made under the supervision of the officer in charge of the watch (Mate Morrissey). These are the requirements for vessels using autopilot in areas of high traffic density, conditions of restricted visibility, or any hazardous navigational situation. See infra.  None of the following conditions (high traffic density, conditions of restricted visibility, or any hazardous navigational situation) applied prior to the incident of barge Weeks 281 with the railroad bridge.

*46 § 140.670 Use of auto pilot.*

*Except for <u>towing</u> vessels in compliance with requirements in <u>33 CFR 164.13</u>(d), when an automatic pilot is used in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigational situations, the master must ensure that:*

*(a) It is possible to immediately establish manual control of the ship's steering;*

*(b) A competent person is ready at all times to take over steering control; and*

*(c) The changeover from automatic to manual steering and vice versa is made by, or under, the supervision of the officer in charge of the navigational watch.*

In addition, the company's *TSMS (Tug Safety Management System)* has a section on the use of Auto Pilot (if Equipped) which states the following.

*When an automatic pilot is used in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigational situation, the master must ensure that:*

- *It is possible to immediately establish manual control of the ship's steering;*
- *A competent person is always ready to take over steering control; and*
- *The changeover from automatic to manual steering and vice versa is made by, or under, the supervision of the officer in charge of the navigation watch.[17]*

The section in Carver's *TSMS (Tug Safety Management System)* mirror the requirements found in the CFR, and makes it clear it is the responsibility of the master to ensure the autopilot is used in compliance with federal regulations, which it was at the time of the incident.

Based on my professional experience, education, and the information that I have reviewed and analyzed, it is my opinion there would be no justification in prohibiting the use of autopilot so long as the operator complies with 46 CFR 140.670 – Use of auto pilot.

*10. Captain Lewis asserts Carver gave no official training to its operators with regard to how to safely transit a waterway when approaching a bridge, when a proper lookout should be posted, and had no restrictions on the use of autopilot.*

---

[17] See e.g., 7.5 Navigation – Bates 000817

I disagree with Captain Lewis's findings for the following reason. First a professional mariner such as Mate Morrissey, a captain licensed by the US Coast Guard, there is an expectation they are competent, and at that point in their career, they should not need training for bridge transits, when a look-out should be posted, and restrictions on autopilot usage. In my seagoing career, I have never heard of training to transit a bridge. Carver Marine hired US Coast Guard licensed masters (Captain Miller and Mate Morrissey) to operate the Mackenzie Rose. There is an expectation from companies like Carver that they should not have to train experienced masters on bridge transit, look-out, and the use of autopilot. Licensed captains and mates are expected to be competent, act prudently, and exercise good judgement. In my opinion, there is no reason a licensed master such as Mate Morrissey would need training on bridge transits, posting look-outs, and autopilot.

*11. Captain Lewis asserts the Coast Guard was not promptly notified of the allision, in violation of 45 C.F.R. . §4.05-1. This delayed official investigation and post-incident drug and alcohol testing. And created potentially dangerous conditions for the Norfolk and Portsmouth Belt Line Railroad Company and the public at large.*

At the time of the incident, Carver management was clearly misled on the extent of the damage caused by the incident. Management was led to believe the barge laid on the bridge fendering based on the evidence in the case. See texts infra.



The photo taken from the Mackenzie Rose and texted to management is misleading, the photo shows bridge fendering. See photo supra.







Based on the texts, Carver management was not aware of the damage to the bridge caused by the incident. Furthermore, the initial USCG 2692 form completed on 6/19/2024 by Carver had no information in the document showing damage to the railroad bridge. See infra.

| Section I - Reporting Vessel Information - Casualty Date/Time | | |
|---|---|---|
| 1. Vessel Name<br>MACKENZIE ROSE | 2. Vessel Official Number or IMO Number<br>1098224 | 3. Date/Time *(local)* of Occurrence<br>15 JUNE 2024 - 1630 |

| Section II - Reason for Submitting this Report *(Check all that apply)* |
|---|
| 4. The above vessel is in commercial service and was involved in a Serious Marine Incident that resulted in *(46 CFR 4.03-2):* |
| ☐ One or more deaths |
| ☐ An injury to a crewmember, passenger, or other person that requires professional medical treatment beyond first aid, and, in the case of a person employed on board a vessel in commercial service, which renders the individual unfit to perform routine vessel duties |
| ☐ Damage to property in excess of $200,000 |
| ☐ Actual or constructive total loss of any vessel subject to inspection under 46 USC 3301 |
| ☐ Actual or constructive total loss of any self-propelled vessel, not subject to inspection under 46 USC 3301, of 100 gross tons or more |
| ☐ A discharge of oil of 10,000 gallons or more into the navigable waters of the United States, as defined in 33 USC 1321 |
| ☐ A discharge of a reportable quantity of a hazardous substance into the navigable waters of the United States |
| ☐ A release of a reportable quantity of a hazardous substance into the environment United States |

| 7. Explanation of why test samples were not collected within required timeframes or not at all and/or why testing was not conducted *(Required for each "No" checked in columns 6a or 6b)* |
|---|
| IN THE INCIDENT IN QUESTION FROM 15 JUNE 2024, THERE WAS NO EVIDENCE OF LOSS OF PROPULSION, LOSS OF STEERING OR DAMAGE TO THE VESSEL AND ITS BARGE IN TOW. A DRUG AND ALCOHOL TEST WOULD ONLY BE ADMINISTERED IF THE ABOVE INCIDENTS OCCURED. |

| 8. SAMHSA Accredited Laboratory Conducting Chemical Drug Tests | 9. Laboratory or Individual Conducting Alcohol Tests |
|---|---|
| Name:   N/A | Name:   N/A |
| Address:  N/A | Address:  N/A |
| Telephone: N/A | Telephone: N/A |
| Email:    N/A | Email:    N/A |

| Section IV - Person Making this Report | | |
|---|---|---|
| 10. Name *(PRINT) (Last, First, Middle)*<br>BALDASSARE, LEONARD N | 11. Signature<br>LEONARD N BALDASSARE    Digitally signed by LEONARD N BALDASSARE<br>Date: 2024.06.19 08:37:42 -04'00' | 12. Date<br>06/19/2024 |
| 13. Title<br>PORT CAPTAIN | 14. Address<br>2581 RICHMOND TERRACE, STATEN ISLAND, NY 10303 | |

In my opinion, when the first USCG 2692 form was submitted on 6/19/24, management was still not aware of the extent of the damage to the bridge. None of the boxes were indicated for a serious marine incident. See Supra.  Another USCG 2692 Form was submitted on 6/25/24 after management was aware of damage to the bridge.

In my opinion and as supported by the evidence in this case, Carver management was misled by Mate Morrissey with regards to extent of damage caused by the incident.

*12. Post-incident accounts from multiple crew members were inconsistent, with discrepancies in timing, actions taken, and observations.*

Mate Morrissey failed to tell the truth about the incident.  He gave conflicting accounts of what happened to the crewmembers aboard the Mackenzie Rose.

*13. Captain Lewis asserts by not having the autopilot repaired and not restricting the use of the autopilot, Carver management was a cause of the allision with the NPBL Bridge.*

Mate Morrissey failed to be truthful regarding the incident with the railroad bridge.  The evidence I have reviewed does not support his initial statement that the autopilot malfunctioned.  Instead, the evidence establishes that Mate Morrissey did not disengage the autopilot as he believed he had.  First, the incident report entry, infra, states "Mate James Morrissey reports the autopilot was not completely turned off."



More importantly the USCG 2692 form submitted on 06/25/24 states "The OOW had failed to properly switch to hand steering." See Infra.

24d. Is there evidence that alcohol use contributed to this casualty?

☐ Yes  ☒ No  *(If Yes, discuss in block 25b)*

25. Nature and Circumstance of the Casualty:

25a. Activity or Operation Being Conducted at the Time of the Casualty:

THE TOWING VESSEL MACKENZIE ROSE WAS PUSHING THE DECK BARGE WEEKS 281, AHEAD IN PUSH GEAR. THEY WERE OUTBOUND THE NORFOLK SOUTHERN BRANCH FOR SEA. THE OFFICER ON WATCH, JAMES MORRISSEY, WAS IN AUTOPILOT AND DIDNT SWITCH OVER TO NON FOLLOW UP HAND STEERING BUT THOUGHT HE DID. THE VESSEL CONTINUED TO TRACK TO PORT AND BEFORE THE OOW WAS ABLE TO CORRECT IT AFTER SWITCHING TO NON FOLLOW UP, THE BOW OF THE BARGE MADE CONTACT WITH THE WESTERN SECTION OF BRIDGE.

25b. Description of the Casualty (casualty events and the conditions and actions that were believed to be causal factors as well as any hazards created as a result of the casualty. Attach additional sheets if necessary.):

THE OOW HAD FAILED TO PROPERLY SWITCH TO HAND STEERING AND ALSO GAVE MINIMAL ENGINE ORDERS AT FIRST IN ORDER TO PREVENT FURTHER HEADWAY OR COURSE CHANGE. THE OOW STATED THAT ONCE HE DID SWITCH TO HAND STEERING, HE GAVE A SLOW ASTERN AT FIRST AND THEN FULL ASTERN. ONCE CONTACT WAS MADE WITH THE BRIDGE STRUCTURE, THE VESSEL WAS BARELY MAKING HEADWAY AND BEGAN TO MAKE ASERTN WAY. THE OOW WAS BACKING INTO THE MAIN CHANNEL AND REGAINED CONTROL OF THE VESSEL.

Furthermore, in a text message from Captain Miller to Brian Moore on 6/28/2024 at 10:01:19 AM (UTC-4), the text message stated "his interview statement to the CG said it never went hard over and it was midships the entire time.[18] See infra.



From: +18455944410 Brian Moore
To: +15187084887 (owner)
I'll call you very shortly but his interview statement to CG said it never went hard over and it was midship the entire time.

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +15187084887 | | 6/28/2024 10:01:32 AM(UTC-4) | |

Status: Read

6/28/2024 10:01:19 AM(UTC-4)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x7A7CC9 (Table: message, handle; Size: 26599424 bytes)

CARVER ESI 001897

Thus, the fact that Mate Morrissey failed to properly disengage the autopilot is supported by the incident report entry, the USCG 2692 form, and the text message. In my opinion, situational awareness and failure to properly disengage the autopilot by Mate Morrissey, a US Coast Guard licensed master, was the sole cause of the incident.

---

[18] See e.g., Carver ESI 001897

Furthermore, the incident report supra states, "able to correct and switch back over to hand steering" which means Mate Morrissey switched to hand steering prior to the incident. In addition, the USCG 2692 form submitted on 06/25/24 states:  "The OOW stated that once he did switch to hand steering, he gave a slow astern bell at first and then a full astern bell."  Consequently, in my opinion, based on the incident report entry and the USCG 2692 form, Mate Morrissey was able to and did switch to manual (hand) steering prior to the incident.

Each day, it is common for commercial vessels to log the status of operational equipment. On June 14, 2024, the Master's Daily Vessel Reporting (Tugs) – Mackenzie Rose under Daily Tests & Inspections  (33 CFR 164.80)  Section 2.1 Steering Test  showed the system "passed." The Navigation Equipment under Section 2.3 also "passed."  This document was filled in at 10:41 am and electronically signed by Captain Chris Miller.[19] According to the log, which is an official document, the steering and navigational equipment was working properly.

On June 15, 2024, the Master's Daily Vessel Reporting (Tugs) – Mackenzie Rose under Daily Tests & Inspections  (33 CFR 164.80)  Section 2.1 Steering Test showed the system "passed."  The Navigation Equipment under Section 2.3 also "passed."  This document was filled in at 23:55 (11:55 pm) which was within hours after the incident with the bridge, and electronically signed by Captain Chris Miller.[20]

Based on my professional experience, education, and the information that I have reviewed and analyzed, it is my opinion it has been established the autopilot worked properly on June 15th, 2024 just prior to the incident.  In fact, as set forth above, Mate Morrissey failed to turn off the autopilot when he thought he did. This failure to engage the switch from Auto to NFU and his lack of situational awareness was the sole cause of the incident.

---

[19] See e.g., Master's Daily Vessel Reporting (Tugs) – Mackenzie Rose Bates 000015
[20] See e.g., Master's Daily Vessel Reporting (Tugs) – Mackenzie Rose Bates 000021

*14. Captain Lewis asserts these failures – navigational, procedural, and managerial – singularly or in combination, created an unreasonably dangerous and unseaworthy conditions, that violated well established standards of safe marine practice, and were causes of this allision incident.*

The finding of Captain Lewis, supra, states there were failures which created unreasonable dangerous and unseaworthy conditions that violated well established standards of safe marine practice and were the cause of the allision. However, he does not give any facts or rely on any authority to support his allegations that unreasonable dangerous and unseaworthy conditions existed.

Based on my professional experience, education, and the information that I have reviewed and analyzed, it is my opinion no unreasonable dangerous and no unseaworthy condition existed aboard the Mackenzie Rose on June 15, 2024. The cause of the incident was solely by Mate Morrissey. Furthermore, Captain Lewis in #4 of his finding states "The Officer of the Watch (Captain James Morrissey) failed to properly disengage the autopilot." I agree with Captain Lewis on this point, which in my opinion was a cause of the incident.

*15. Captain Lewis asserts in his opinion, given the lack of training to the crew, the lack of policies and procedures regarding use of an autopilot or lookout during bridge transits, the known issues with the autopilot, and Captain Morrissey's prior allision, the Tug Mackenzie Rose was unseaworthy. Carver should not have allowed this tug to sail with this crew.*

I disagree with the findings of Captain Lewis for the following reasons. See infra.

*A. Lack of training with crew*

Mate Morrissey held a master's license issued by the US Coast Guard. In order to become a licensed master by the US Coast Guard, he was required to attend numerous classes shoreside

and pass a rigorous Coast Guard exam. In addition, to qualify for the Coast Guard master's (captain) exam, Mate Morrissey would have had years of seagoing experience.

Aboard vessels, training is a continuous evolution, and according to Engineer Mcgrath, the crew did training aboard the Mackenzie Rose. See Infra.


*A.    I mean, you do get training on it, and you get occasional drills like what would happen if such and such happened, this and that, that are regularly that you have to have per Coast Guard, but to sit down and read the manual, no.*

*Q.    Like a man overboard drill?*

*A.    Oh yeah. Yeah, we do all of that.*

*Q.    All right. A fire drill?*

*A.    Fire drill, fuel -- if fuel goes into the -- fuel or oil goes into the water, what you would do, stuff like that.*

*Q.    Who provides that training or runs those drills?*

*A.    It would be the captain, or the port engineer, or the port -- sorry, the port captain or our captain.[21]*

It is customary for the captain and/or mate to run the drills and provide training to the crew aboard vessels.

Based on my professional experience, education, and the information that I have reviewed and analyzed, it is my opinion the crew was properly trained, and it is customary for companies such as Carver to have the captain and/or mate carry out the vessel training.

---

[21] See e.g., Deposition of Jason Mcgrath, Page 66, Lines 4-21.

B. T*he lack of policies and procedures regarding use of an autopilot or lookout during bridge transits.*

I disagree with the finding of Captain Lewis that Carver lacked policies for autopilot, lookout and bridge transits. Carver had policies and procedures in place regarding the use of autopilot, lookout, and bridge transits. See Infra.





## 7.16  LOOK OUT
Revision Date: July 1, 2021

**Look-Out** - Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision. *From 33 CFR 83 Rule 5*

### Requirements for a Look-out

In determining the requirement for a look-out, the person in charge of the navigational watch must take full account of the relevant factors including, but not limited to:
- State of the weather.
- Visibility.
- Traffic density.
- Proximity of dangers to navigation.
- The attention necessary when navigating in areas of increased vessel traffic.
- Crew members medical certificate MUST state "Fit for Look-out Duty: Y"

### Procedures

A look-out should be added when necessary to:
- Maintain a state of vigilance with regard to any significant change in the operational environment.
- Appraise the situation and the risk of collision/allision.
- Anticipate stranding and other dangers to navigation.
- Detect any potential hazards to safe navigation.

A look-out shall be added when entering any port channel or at any waterway intersection. The lookout may remain in the wheelhouse if visibility, weather and traffic conditions permit.

### One-Man Bridge Operations

"On vessels where there is an unobstructed all-around view provided at the steering station, as on certain pleasure craft, fishing boats, and towing vessels, or where there is no impairment of night vision or other impediment to keeping a proper look-out, the watch officer or helmsman may safely serve as the look-out. However, it is expected that this practice will only be followed after the\ situation has been carefully assessed on each occasion and it has been clearly established that it is prudent to do so. Full account shall be taken of the weather, conditions of visibility, traffic density, and proximity of navigational hazards. It is not the intent of these rules to require additional personnel forward, if none is required to enhance safety."

*Senate Report N. 96-979, 96th Congress, 2nd Session (1980) at 7–8*

46 CFR 140.630 / 33 CFR 83 Rule 5

CARVER TBS HELM CONNECT 000951



### 7.12  BRIDGE TRANSITS

Revision Date: July 1, 2021

**Before the Transit**

The captain responsible for the transit should determine the following before making an approach to the bridge:

- Visibility
- Air draft/vertical height of vessel and tow;
- Vertical clearance of the bridge at the time of transit;
- Direction and strength of current/tide and/or river conditions;
- Nearby traffic;
- Establish contact with the bridge tender to ascertain the time of the bridge lift or swing and other traffic at the bridge.
- That the beam/width of the vessel/tow combination and any assist/tag boats will be adequate to safely transit the bridge spans;
- Necessity of assigning a crew member with a radio to the head of the tow.
- Ascertain wind conditions at the bridge, especially with empty barges or barges with a large sail area and determine the effect of the wind well before arriving at the bridge.

The captain responsible for the transit should determine the proper vessel/tow configurations for the transit. If necessary, the watch officer will establish timely communication with the bridge tender to ascertain the bridge lift or swing time and any other traffic affecting the transit.

Under no circumstances shall the wheelman responsible for the transit make the bridge due to pressure or pride.

Based on my professional experience, education, training, and the information that I have reviewed and analyzed, it is my opinion Carver had very clear policies and procedures in place for bridge transits, autopilot usage and look-outs.

C. *Mate Morrissey's Prior Incident*

On 1/21/24 an incident involving Mate Morrissey occurred on the Cooper River in which the vessel he was operating landed on the corner of Pier K. The environmental conditions were as

follows: the wind was blowing 15-20 knots (17 – 23 MPH) with the current ebbing at 1.9 knots (2.2 MPH). Not ideal conditions for docking/undocking a vessel.  A piling was bent and some concrete was damaged.[22] Coast Guard Sector Charleston was notified verbally and a USCG Form 2692 (Incident Form) was completed.  When a 2692 Form is submitted, the Coast Guard may conduct an investigation into the incident which can result in a mariner's license being revoked, suspended, or administrative action taken against the license such as a warning or fine.  If the Coast Guard found probable cause against Mate Morrissey, it would be the responsibility of the Coast Guard to take action against his license.  No evidence has been presented to show the Coast Guard took any action against Mate Morrissey's license from the 1/21/24 incident.  Furthermore, the Coast Guard, by taking no action against his license, deemed Mate Morrissey to be a competent master.

Based on my professional experience, education, training, and the information that I have reviewed and analyzed, it is my opinion the Coast Guard deemed Mate Morrissey to be competent, and it is my opinion Carver had every right to expect Mate Morrissey to be a competent mate if the Coast Guard had deemed him to be a competent master.

*D. the Tug Mackenzie Rose was unseaworthy.*

I disagree with the finding of Captain Lewis the Tug Mackenzie Rose was unseaworthy. The Mackenzie Rose was properly manned, the crew was licensed by the US Coast Guard, and in compliance with work/rest requirements. The crew aboard the Mackenzie Rose worked 6 hours on and 6 hours off which is customary for tug/barge operations. The graph below shows the hours

---

[22] See e.g., Bates 000829-847 1-24-24 Pier damage.pdf

worked by each crewmember.  On 6/15/24, Mate Morrissey worked from 0000 (midnight) until 0600 (6:00 a.m.), and then on rest from 0600 (6:00 a.m.) until 12:00 (noon). He was back on watch from 12:00 (noon) until 1800 (6:00 p.m.)  The light blue color represents "rest," and the light beige represents "watch." See Infra.



In addition, the Mackenzie Rose was in compliance with the Code of Federal Regulations regarding look-out and the use of autopilot.

Based on my professional experience, education, training, and the information that I have reviewed and analyzed, it is my opinion Carver's vessel Mackenzie Rose was properly manned and fit for its intended voyage.

*E. Carver should not have allowed this tug to sail with this crew.*

I disagree with Captain Lewis's finding that Carver should not have allowed the tug to sail with this crew. The US Coast Guard determines the crew requirements for a vessel, these requirements are found in the Certificate of Inspection (COI) which is issued by the Coast Guard to each vessel. The Mackenzie Rose was fully compliant and manned with the requirements of the COI which required one master and one mate in addition to all other required crew.

The Mackenzie Rose had not one but two licensed US Coast Guard masters aboard. Captain Miller who was the captain for that voyage, and Mate Morrissey who was the acting mate. Carver Marine and Captain Miller had every right to delegate navigational responsibility of the Mackenzie Rose to a licensed US Coast Guard master (Mate Morrissey) and expect him to act prudently.

Based on my professional experience, education, and the information that I have reviewed and analyzed, it is my opinion that Captain Lewis has no basis for his opinion, that "Carver should not have allowed this tug to sail with this crew." The Mackenzie Rose was compliant with Coast Guard regulations and crew requirements set forth in the vessel's COI.

Dated: August 8, 2025

Captain Sam Stephenson, J.D.

**Rebuttal - Report on Simrad Autopilot Installed on Tug Mackenzie Rose – Robert Furborough**

Mr. Furborough's report opines on the autopilot aboard the Mackenzie Rose. However he fails to opine on evidence which does not support an autopilot malfunction. The evidence establishes that Mate Morrissey did not disengage the autopilot as he believed he had. First, the incident report entry, infra, states "Mate James Morrissey reports the autopilot was not completely turned off."



More importantly the USCG 2692 form submitted on 06/25/24 states "The OOW had failed to properly switch to hand steering." See Infra. Mr. Furborough failed to opine on the 2692 form which states the cause of the incident .

24d. Is there evidence that alcohol use contributed to this casualty?

☐ Yes ☒ No *(If Yes, discuss in block 25b)*

25. Nature and Circumstance of the Casualty:

25a. Activity or Operation Being Conducted at the Time of the Casualty:
THE TOWING VESSEL MACKENZIE ROSE WAS PUSHING THE DECK BARGE WEEKS 281, AHEAD IN PUSH GEAR. THEY WERE OUTBOUND THE NORFOLK SOUTHERN BRANCH FOR SEA. THE OFFICER ON WATCH, JAMES MORRISSEY, WAS IN AUTOPILOT AND DIDNT SWITCH OVER TO NON FOLLOW UP HAND STEEERING BUT THOUGHT HE DID. THE VESSEL CONTINUED TO TRACK TO PORT AND BEFORE THE OOW WAS ABLE TO CORRECT IT AFTER SWITCHING TO NON FOLLOW UP, THE BOW OF THE BARGE MADE CONTACT WITH THE WESTERN SECTION OF BRIDGE.

25b. Description of the Casualty (casualty events and the conditions and actions that were believed to be causal factors as well as any hazards created as a result of the casualty. Attach additional sheets if necessary.):
THE OOW HAD FAILED TO PROPERLY SWITCH TO HAND STEERING AND ALSO GAVE MINIMAL ENGINE ORDERS AT FIRST IN ORDER TO PREVENT FURTHER HEADWAY OR COURSE CHANGE. THE OOW STATED THAT ONCE HE DID SWITCH TO HAND STEERING, HE GAVE A SLOW ASTERN AT FIRST AND THEN FULL ASTERN. ONCE CONTACT WAS MADE WITH THE BRIDGE STRUCTURE, THE VESSEL WAS BARELY MAKING HEADWAY AND BEGAN TO MAKE ASERTN WAY. THE OOW WAS BACKING INTO THE MAIN CHANNEL AND REGAINED CONTROL OF THE VESSEL.

Furthermore, he did not carry out a vessel inspection to inspect the autopilot, and does not opine on the working condition of the autopilot on June 15, 2024.

Dated: August 8, 2025

Captain Sam Stephenson, J.D.