# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
----------------------------------------X
IN THE MATTER OF COEYMANS MARINE
TOWING, LLC D/B/A CARVER MARINE
TOWING AS OWNER AND OPERATOR OF M/T
MACKENZIE ROSE, (IMO NO. 8968765) HER
CARGO, ENGINES, BOILERS, TACKLE, EQUIPMENT,
APPAREL, AND APPURTENANCES, ETC., IN REM,
("M/T MACKENZIE ROSE"),

                              CIVIL ACTION
                              NO: 2:24-cv-00490-MSD-LRL

PETITIONING FOR EXONERATION FROM OR
LIMITATION OF LIABILITY IN ALLISION WITH
NORFOLK AND PORTSMOUTH BELT LINE RAILROAD
COMPANY MAIN LINE RAILROAD BRIDGE
(THE "BRIDGE") OCCURRING JUNE 15, 2024 IN
AND ABOUT THE ELIZABETH RIVER, VIRGINIA.

----------------------------------------X
                         June 17, 2025
                         10:08 a.m.


        AN IN PERSON VIDEOTAPED DEPOSITION of

Nicholas Laraway, taken by the respective

parties, pursuant to Order, before Larin

Kaywood, a Notary Public for and within the

State of New York.


JOB NO.: 114501

NICHOLAS LARAWAY

June 17, 2025

```
 1                A P P E A R A N C E S:

 2    CRENSHAW, WARE & MARTIN, P.L.C.
         Attorneys for Defendant Norfolk
 3       Portsmouth Belt Line Railroad Company
         150 W. Main Street Suite 1500
 4       Norfolk, Virginia 23510
      BY:  JIM CHAPMAN, ESQ.
 5    E-mail:  Jchapman@cwm-law.com

 6    CLYDE & CO US LLP
         Attorneys for Coeymans Marine Towing, LLC
 7       30 S. Wacker Drive, Suite 2600
         Chicago, IL 60606
 8    BY:  JAMES H. Rodgers, ESQ.
      E-mail:  James.rodgers@clydeco.us

 9

10    SINNOTT, NUCKOLS & LOGAN, PC
          Attorney for Evanston Insurance Company,
11    s/s/o Norfolk and Portsmouth Belt Line
      Railroad Company
12       13811 Village Mill Drive
         Midlothian, Virginia 23114
13    BY: MARK C. NANAVATI, ESQ.
          NICHOLAS J. LEWIS, ESQ.
14    E-mail:  Mnanavati@snllaw.com
               Cjones@snllaw.com

15

16    Also Present:  Josef Malik, Chief legal
      officer, Carver Companies.
17    Ryan.

18    Ingrid Contreras, The videographer

19

20

21

22
              *      *      *      *      *
23

24

25
```

NICHOLAS LARAWAY

June 17, 2025

```
 1                          INDEX

 2       EXAMINATION OF Nicholas Laraway

 3    EXAMINATION BY                                  PAGE
      MR. CHAPMAN                                     5
 4

 5                         EXHIBITS
 6              MARKED FOR IDENTIFICATION

 7    DESCRIPTION                                     PAGE

 8    Exhibit 1  - Deposition Notice                  7

 9    Exhibit 2  - 6/20/24 Laraway email re evidence  14
                   Preservation request ESI 0307 - 0311
10
      Exhibit 3  - 6/20/24 Laraway email FW:Accident  27
11                 Moore ESI 0191-0192

12    Exhibit 4  - 12/6/21 Marine Safety Consultants  33
                   To Dime Community Bank - Condition &
13                 Valuation Survey Report Dime 000231-237

14    Exhibit 5  - USCG General Index or Abstract of  39
                   Title Mary Gellaty/Mackenzie Rose
15                 NPBL0052 - 0053

16    Exhibit 6  - 12/27/21 Mi-Ro Ltr to Dime Community  43
                   Bank re: Desktop Opinion of Tugboat
17                 Mackenzie Rose

18    Exhibit 7  - Schedule of Vessels - Hull Effective  47
                   11/1/23 Carver 0673-0674
19
      Exhibit 8  - DLS Marine Survey &amp; Appraisal  49
20                 Carver 1929 - 1957

21    Exhibit 9  - Meyerrose 4/1/2025 Survey Produced by  57
                   Carver (need Bates #)
22
      Exhibit 10 - SMS 6.4 Drug &amp; Alcohol Policy  99
23                 TBS Helm Connect 0843 -0852

24    Exhibit 11 - 7/29/24 Feeney email FS: CMT-AMS  103
                   Drug Testing ESI 0201-0217
25
```

**NICHOLAS LARAWAY**

**June 17, 2025**

1    Exhibit 12 - 10/3/24 Morrissey termination letter    106

2    Exhibit 13 - SMS 8.8F Collision/Allision TBS    118
            Helm Connect 000996-997

3

4    Exhibit 14 - 7/3/24 Galioto email FW    122
            Photos to Moore
            ESI 0313 - 0319

5

6    Exhibit 15 - 6/16/24 Miller email with crew    126
            statements
            ESI 0038 - 0042

7

8    Exhibit 16 - 6/28/24 Miller email re:    135
            Incident report (not attached)
            ESI 0541

9

10   Exhibit 17 - 6/24/24 Miller email with Helm    136
            Log June 15 RR Accident
            ESI 0527 - 0531

11

12   Exhibit 18 - 6/24/24 Moore email re: Helm Logs    144
            Meeting Notes
            ESI 0532

13

14   Exhibit 19 - 7/19/24 Galioto email re:    147
            CMT Safety Info to Moore
            ESI 0020 - 0037

15

16   Exhibit 20 - 6/14/2024 The General Ship Repair    161
            Invoice TGSR 000009

17   Exhibit 21 - 6/9/25 Declaration of Josef Malik    164

18

19        NAME/DESCRIPTION (MCGRATH)

20

21   Exhibit 1 5/20/2024 Mackenzie Rose Daily
            Log TBS Helm Connect 000503-504

22

23

24

25

NICHOLAS LARAWAY

June 17, 2025

1    THE VIDEOGRAPHER:  This is the

2    beginning of Media Number 1 in the

3    deposition of Nicholas Laraway in the

4    matter of Coeymans Marine Towing,

5    LLP, d/b/a Carver Marine Towing, Inc.

6    Case number 224-cv-009 -- I'm sorry,

7    00490.

8        Today's date is Tuesday, June

9    17th, 2025, and the time on the

10    monitor is 10:08 a.m.

11        My name is Ingrid Contreras and

12    I'm the videographer.  The court

13    reporter is Larin Kaywood.  We are

14    here with First Legal.

15        Counsel, please introduce

16    yourself after which the court

17    reporter will swear in the witness.

18        MR. CHAPMAN:  James Chapman

19    with the law firm of Crenshaw, Ware &

20    Martin, on behalf of the plaintiff,

21    Norfolk and Portsmouth Belt Line

22    Railroad Company.

23        MR. RODGERS:  James Rodgers of

24    Clyde & Co, on behalf of Coeymans

25    Marine, d/b/a Carver Marine Towing.

NICHOLAS LARAWAY

June 17, 2025

```
 1              MR. MALIK:  Josef Malik, chief
 2         legal officer for Carver Companies.
 3    N I C H O L A S   L A R A W A Y, having
 4    first been duly sworn by a Notary Public
 5    for and within the State of New York, upon
 6    being examined, testified as follows:
 7              THE REPORTER:  Can I have your
 8         first and last name for the record,
 9         please?
10         THE WITNESS:  Nicholas Laraway.
11              THE REPORTER:  And your
12         address?
13         THE WITNESS:  104 Dutchman
14         Lane, Schenectady, New York 12303.
15              THE REPORTER:  Can you spell
16         Schenectady again?
17              THE WITNESS:
18         S-C-H-E-N-E-C-T-A-D-Y.
19              THE REPORTER:  And what is zip
20         code?
21         THE WITNESS:  12303.
22              THE REPORTER:  One second.
23    EXAMINATION BY
24    MR. CHAPMAN:
25         Q.   Good morning, Mr. Laraway.
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        A.    Good morning.
 2        Q.    You are here on behalf of the
 3  company to testify on a number of topics
 4  that were identified in the deposition
 5  notice.
 6              Is that your understanding?
 7        A.    Yes, sir.
 8        Q.    I take it you've seen the
 9  deposition notice?
10        A.    Yes, sir.
11              MR. CHAPMAN:  Can you mark that
12         as one, please?
13              THE REPORTER:  Already had it
14         on here, thank you.
15              (Whereupon, Exhibit 1 was
16         marked for identification.)
17        Q.    And that is the notice of the
18  deposition of Coeymans Marine Towing, d/b/a
19  Carver Marine Towing.
20              And attached as Exhibit A,
21  there's some definitions and a couple of
22  dozen topics.
23              See that?
24        A.    I do.
25        Q.    You've had a chance to review
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   it prior to the deposition?
 2        A.    I have.
 3        Q.    And it's your understanding
 4   that you've been designated to testify on
 5   those topics?
 6        A.    Yes.
 7        Q.    Right.  How long have you been
 8   employed by, I'll call it Carver, but I
 9   don't know whether it's Coeymans Marine
10   Towing, d/b/a as Carver or sort of what's
11   your role there?
12        A.    I've been employed with Carver
13   Companies in a number of roles since 2011.
14        Q.    Did you work anywhere else
15   before working for Carver?
16        A.    Prior to 2011, I had worked a
17   number of part-time jobs including working
18   for Carver and miscellaneous jobs during
19   the summers.
20              But I began my full-time
21   employment with Carver right out of school.
22        Q.    Are you connected via family to
23   the Carver organization?
24        A.    I am.
25        Q.    Can you tell us about that?
```

**NICHOLAS LARAWAY**

June 17, 2025

1         **A.      Carver Laraway, the founder and**
2     **chairman of the board is my uncle.**

3         Q.    So were you in college working
4     part-time?

5         **A.    Yes.**

6         Q.    Before you joined the
7     companying?

8         **A.    (Nodding.)**

9         Q.    When did you graduate?

10        **A.    2010.**

11        Q.    And what's your degree?

12        **A.    In economics and business.**

13        Q.    Do you hold any U.S. Coast
14    Guard licenses?

15        **A.    I do not.**

16        Q.    Have you ever sailed on any
17    vessel as a member of the crew?

18        **A.    I have not.**

19        Q.    I take it that you're a
20    salaried employee?

21        **A.    I am.**

22        Q.    What is your current title?

23        **A.    My current title is the**
24    **executive director of administration of**
25    **Carver Companies.**

## NICHOLAS LARAWAY

June 17, 2025

1      Q.    Who do you report to?

2      **A.    I report to the board of**

3    **directors.**

4      Q.    So one of the topics is kind of

5    the relationships of Carver Companies.

6            Can you tell us about that?

7      **A.    Certainly.  So Carver Companies**

8    **is a large diversified industrial**

9    **organization that does a number of -- it**

10   **works within a number of different**

11   **industries and a number of different**

12   **geographical locations.**

13           **We do construction, earth work**

14   **and infrastructure in New York and South**

15   **Carolina.  We have a deep water industrial**

16   **port at our Port of Coeymans facility in**

17   **Coeymans, New York just south of Albany.**

18           **Adjacent to that we have a 300**

19   **acre industrial park that facilitates the**

20   **movement of cargo to and from the Port of**

21   **Coeymans.  We have a number of ancillary**

22   **businesses in Upstate New York.**

23           **Certainly, we have the Coeymans**

24   **Marine Towing business now doing business**

25   **as Carver Marine Towing that operates on**

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   the East and occasionally the Gulf Coast of

 2   the U.S.

 3              We have a Marine steelworks

 4   division that supports the marine towing

 5   division and does shipyard type work for

 6   other customers.

 7              And then we have another deep

 8   water port in North Charleston, South

 9   Carolina.  We have stevedoring businesses

10   that support our ports and do work for

11   other industrial maritime companies.

12              We previously had a materials

13   business that we sold in August of 2020 to

14   Heidelberg Materials.  And we have a quarry

15   in Bayside, New Brunswick in Canada, and a

16   port that is adjacent to that that

17   facilitates the shipment of our stone from

18   our quarry to a number of locations on the

19   East and Gulf Coast.

20       Q.    That's quite a portfolio.

21              Thank you for sharing that.

22       A.    Yes, sir.

23       Q.    When did you get into the

24   marine towing business, or when did Carver

25   get into the marine towing business?
```

NICHOLAS LARAWAY

June 17, 2025

```
 1        A.    Carver Companies got into the

 2   marine towing business in 2014.

 3        Q.    Acquired another operator, or

 4   did you stand up your own fleet?

 5        A.    It was a partnership that was

 6   formed with another operator in the New

 7   York City market and acquired a push boat

 8   and a number of barges in the Gulf and

 9   relocated them to New York to begin

10   operations.

11        Q.    And who was your partner back

12   then?

13        A.    The partner was Roy White of

14   Greater New York Marine Towing.

15        Q.    Do you have any official role

16   titles, whether it's a manager, or

17   otherwise in, I'll call it Carver Marine

18   Towing because that's the d/b/a of, I

19   still -- I can never pronounce it.

20   Coeymans.

21        A.    Coeymans.

22        Q.    Coeymans Marine Towing.

23        A.    I have an official title within

24   Carver Companies, and support the

25   management of Coeymans Marine Towing, but
```

**NICHOLAS LARAWAY**

June 17, 2025

1    **no standalone specific title as part of**

2    **Coeymans or Carver Marine Towing.**

3         Q.    Okay.  Yeah.  You may be aware

4    that Mr. Moore told us that he was the

5    general manager.  I don't still know

6    whether that's an official title or whether

7    it's just sort of an operating role that he

8    has.

9              Is there a -- is Coeymans

10   Marine Towing a member managed LLC?

11        **A.    I don't recall specifically if**

12   **it's member managed.**

13        Q.    Okay.  But as an entity its

14   owned by the Carver Companies as part of

15   this holding entity that you described?

16        **A.    That is correct.**

17        Q.    Okay.  Do you know if there are

18   any officers of Carver Marine Towing?

19        **A.    Carver Laraway is the managing**

20   **member.**

21        Q.    That's your uncle?

22        **A.    Correct.**

23        Q.    And you may have said this, I

24   apologize, but Carver Companies is

25   privately owned?

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        A.     Correct.
 2        Q.     How did you first learn of the
 3    incident involving the Tug Mackenzie Rose
 4    alliding with the Norfolk and Portsmouth
 5    Belt Line Bridge in June of 2024?
 6        A.     I first became aware that it
 7    hit the bridge when I received an e-mail
 8    from what I recall was an attorney for the
 9    bridge with a letter that was addressed to
10    myself.
11               MR. CHAPMAN:  Can you mark that
12          as two, please?
13               (Whereupon, Exhibit 2 was
14           marked for identification.)
15        Q.     They were provided to us
16    recently a number of e-mails including this
17    one that's been marked as Exhibit 2.
18               Do you recognize it?
19        A.     Yes.
20        Q.     It appears that you're actually
21    forwarding it to somebody or others based
22    on the top header.
23               You see that?
24        A.     Yes.
25        Q.     But down underneath there's a
```

**NICHOLAS LARAWAY**

June 17, 2025

```
1   e-mail that was sent to you and Mr. Moore
2   on June 20th, 2024, with a letter attached
3   to it offered by me.
4           Do you see that?
5       A.    Yes, sir.
6       Q.    Okay.  That is the first time
7   you knew of anything involving the tug
8   alliding with the Belt Line Bridge?
9       A.    That's correct.
10      Q.    Okay.  At the top of this
11  e-mail, in the two line, it has a number of
12  names in quotation marks.  I'm not really
13  sure why that is, but just to kind of run
14  them down.  Brian Moore, the general
15  manager of Carver Marine Towing, correct?
16      A.    Correct.
17      Q.    What is CMT dispatch?
18      A.    That is a group e-mail for the
19  dispatchers of Carver Marine Towing.
20      Q.    So all of the dispatchers would
21  receive a copy if you send it to that
22  group?
23      A.    Yes.
24      Q.    Do you know how many
25  dispatchers there were at the time?
```

**NICHOLAS LARAWAY**

June 17, 2025

1        A.    I believe there were two.

2        Q.    Okay.  And the next name,

3   Leonard Baldassare, he no longer works for

4   Carver, but at the time he was the port

5   captain of Carver Marine Towing, correct?

6        **A.    That is correct.**

7        Q.    Who is Mark Pearson?

8        **A.    Mark Pearson is a captain that**

9   **has been with or who had been with Carver**

10  **Company since we formed the marine towing**

11  **division.  He was one of our senior**

12  **captains and...**

13       Q.    So he started from the very

14  beginning like in 2014?

15       **A.    Yep, he was our first captain.**

16       Q.    And is he still employed by the

17  company?

18       **A.    He recently retired.**

19       Q.    And then on the CCs it has

20  three -- what look like three e-mail

21  addresses.  I don't know what their

22  addresses are, but do you know who Anthony

23  is?

24       **A.    That is Antony Cardona, Jr.,**

25  **our attorney at the time.**

**NICHOLAS LARAWAY**

**June 17, 2025**

1          Q.    Does he still represent Carver?

2          **A.    Not on any specific matters at**

3     **the moment.**

4          Q.    Okay.  And who is Junior?

5          **A.    I believe those would go**

6     **together.**

7          Q.    They have --

8          **A.    Anthony Cardona, Jr.**

9          Q.    Okay.  So that's really one

10    e-mail recipient?

11         **A.    I believe so.**

12         Q.    Okay.  And who's Carlo?  Is it

13    Agneta?

14         **A.    Agneta.  He is our insurance**

15    **broker with Marshall & Sterling.**

16         Q.    So I didn't find any response

17    to this e-mail and what's been produced so

18    far, but do you recall receiving a response

19    from any of these individuals by e-mail?

20         **A.    I don't recall specifically.**

21         Q.    Did anybody call you about it?

22         **A.    Yes.**

23         Q.    Who?

24         **A.    Well, from what I recall, the**

25    **first phone call I received was from our**

**NICHOLAS LARAWAY**

June 17, 2025

1    attorney having read this letter with some

2    serious accusations.

3              MR. RODGERS:  Don't tell him

4       what your attorney said to you.

5       Q.    Yeah.  I'm not asking for

6    whatever your conversation was --

7       A.    Yes.

8       Q.    -- with your attorney, but I am

9    asking you about who else called you and

10   what conversations you had with them?

11      A.    And the other conversation I

12   recall was receiving a call from Brian

13   Moore.

14      Q.    And what did Mr. Moore tell

15   you?

16      A.    From what I recall, he was

17   aware that there was a incident with the

18   Mackenzie Rose that was referenced in the

19   letter.  And he talked through what he knew

20   at the time, and that they were

21   investigating what was going on.

22      Q.    Did he tell you whether he had

23   notified the Coast Guard?

24      A.    I don't recall.

25      Q.    Did he tell you whether he had

**NICHOLAS LARAWAY**

June 17, 2025

1    been contacted by the Coast Guard?

**2**        **A.    I don't recall.**

3        Q.    And did he tell you whether he

4    knew anyone else who'd been contacted by

5    the Coast Guard regarding the incident?

**6**        **A.    I don't recall.**

7        Q.    Do you have any memory of

8    responding to the e-mail that was sent to

9    you on my behalf on June 20th of 2024 as

10   indicated at 10:41 a.m. on that date in

11   Exhibit 2?

**12**       **A.    I did not directly respond to**

**13**   **that e-mail --**

14       Q.    Did you --

**15**       **A.    -- from what I can recall.**

16       Q.    Did you direct anyone else to?

**17**       **A.    I believe our attorney reached**

**18**   **out to begin correspondence.**

19       Q.    And who was your attorney?

**20**       **A.    Anthony Cardona, Jr.**

21       Q.    Is it your understanding that

22   Mr. Cardona reached out to me?

23            COUNSEL:  Hey, Jim, can you

24        identify for the record, what Bates

25        label that is?

**NICHOLAS LARAWAY**

**June 17, 2025**

1          MR. CHAPMAN:  Yeah, Carver

2      ESI000307.

**3      A.    I don't know specifically.**

4      Q.    Did you have any conversation

5  with your insurance broker, Mr. Agneta?

**6      A.    I eventually had conversations**

**7  with Mr. Agneta about it.  I don't recall**

**8  specifically when the first one was.**

9      Q.    Could have been on June 20th,

10  2024?

**11      A.    It certainly could have.**

12      Q.    When you received this e-mail

13  with the attached letter, it included this

14  photograph, didn't it?

**15      A.    It did.**

16      Q.    Did it appear to you that there

17  was something amiss with the bridge?

18          MR. RODGERS:  Objection to

19      form.

20          Can you rephrase that?

21          MR. CHAPMAN:  What's wrong with

22      the form?

23          MR. RODGERS:  You have to ask

24      him what he saw or what he sees.

25          MR. CHAPMAN:  I'm just

**NICHOLAS LARAWAY**

June 17, 2025

```
 1       asking --
 2             MR. RODGERS:  I object to the
 3       term "amiss."
 4       Q.   Did it appear --
 5             MR. RODGERS:  Can you rephrase
 6       it?
 7             MR. CHAPMAN:  Okay.
 8       Q.   Did it appear the bridge was
 9  out of the alignment from the picture
10  attached to the letter that was sent to you
11  on June 20th, 2024?
12             MR. RODGERS:  Just when he
13       looked at it then?
14             MR. CHAPMAN:  Yes.
15       A.   Yes.  It looked like it
16  possibly could have been out of alignment.
17       Q.   This letter specifically
18  requested that a Carver undertake to
19  preserve and retain various information.
20             Did you initiate any steps to
21  do that?
22             MR. RODGERS:  Objection to the
23       extent that it asks for legal advice
24       that he received, but you can answer
25       as to your understanding.
```

**NICHOLAS LARAWAY**

June 17, 2025

1      A.    My understanding was that that

2   was requested of us and that we were to do

3   that.

4      Q.    My question though was, did you

5   do anything to do that?

6      A.    When I spoke with Brian, I

7   asked him to make sure that he obtained

8   everything and compiled it for our attorney

9   because our attorney was taking lead on

10   correspondence moving forward.

11      Q.    And sitting here today, do you

12   know whether anything was ever done to

13   secure any of the mobile devices that were

14   utilized for communication between the tug

15   and either Mr. Baldassare and Mr. Moore on

16   June 15th, 2024?

17      A.    I believe Mr. Baldassare's

18   phone has been provided and that the tug

19   phone has as well.

20            I am not certain, but I believe

21   there were actions taken to follow the

22   request in the letter.

23      Q.    And provided to whom when you

24   say provided?

25            MR. RODGERS:   That's -- you're

**NICHOLAS LARAWAY**

June 17, 2025

```
 1          asking him about attorney-client
 2          communications dealing with this
 3          litigation.
 4               MR. CHAPMAN:  No.  I'm just
 5          asking about the physical devices.
 6          The phone on the tug and
 7          Mr. Baldassare's phone or any other
 8          phone that was involved in the
 9          communications that occurred on June
10          15th, 2024 between the tug and either
11          Mr. Moore or Mr. Baldassare.
```

**12      A.    I don't know the specific**
**13  actions that were taken by Brian to comply**
**14  with that.**

```
15      Q.    And this is what I'm asking is,
16  today you still don't know?
17               MR. CHAPMAN:  I'm not
18          asking --
19               MR. RODGERS:  By counsel we are
20          providing the records of
21          Mr. Baldassare's phone, and the tug
22          phone, and I think you know that.
23               That's what we've provided or
24          we had access to, so.
25               MR. CHAPMAN:  Actually I don't
```

## NICHOLAS LARAWAY

June 17, 2025

```
 1          know that, but I appreciate you
 2          telling me that.
 3                MR. RODGERS:  Well, it's in
 4          the -- it's in our response.
 5                MR. CHAPMAN:  We don't need to
 6          have a debate about it, but
 7          Mr. Malik's declaration says
 8          otherwise.  And --
 9                MR. RODGERS:  No.  Because it
10          wasn't -- we didn't -- we had to get
11          a vender to do that.
12                So I'm just giving you
13          the -- by counsel.  I'm not sure the
14          witness has any knowledge, but you
15          can tell him what you know.
16      A.    I don't have specific
17   knowledge.
18      Q.    About what's happened to the
19   phones?  Just so we're clear on what we're
20   talking about.
21                MR. RODGERS:  Personal
22          knowledge?
23                MR. CHAPMAN:  Yes.
24      A.    I don't have personal knowledge
25   of how that information was obtained and
```

**NICHOLAS LARAWAY**

June 17, 2025

```
1    provided to our insurance counsel.

2         Q.    Fair enough.  My question

3    though really relates to, you're the

4    corporate representative.

5         A.    Correct.

6         Q.    And I'm just trying to

7    understand from your perspective, being the

8    corporate representative, what does Carver

9    say or you say on their behalf about the

10   status of those two phones I have been

11   asking about.

12              They have been recovered?  They

13   have been secured?

14              MR. RODGERS:  Objection.

15         Counsel, he's already answered that.

16              Don't answer that.

17              MR. CHAPMAN:  You are not under

18         oath, Mr. Rodgers.

19              MR. RODGERS:  Don't -- well, I

20         don't know -- this is discovery we're

21         providing you as counsel, so he's

22         already answered.

23              Do you want to ask the same

24         question again?

25              Go ahead.
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        Q.    How about we have the court
 2   reporter read it back?
 3             MR. RODGERS:  And the corporate
 4         position is what counsel has provided
 5         in this discovery.  That's the
 6         corporate position.
 7             If you want to ask him his
 8         personal knowledge, he's here to
 9         answer that.
10             (Whereupon, the above record
11         was read back by the court reporter.)
12        A.    I personally was not involved
13   in the process to secure and provide the
14   phones to our counsel.
15        Q.    Is it your understanding though
16   that it has occurred?
17        A.    That is my understanding.
18        Q.    You mentioned earlier the
19   context of the company's businesses that
20   you engage in cargo handling operations.
21   Is that both South Carolina and your
22   facility in New York?
23        A.    Correct.
24        Q.    Is that all bulk cargo or do
25   you guys handle like containerized traffic
```

**NICHOLAS LARAWAY**

```
 1  or what?
 2       A.    It's predominantly bulk, but
 3  not exclusively.
 4       Q.    So some intermodal or not?
 5       A.    A bit of containers, some break
 6  bulk and variety of other things from time
 7  to time.
 8       Q.    Are either of the facilities
 9  rail served?
10       A.    The facility in Queens is not
11  rail served.  The facility in North
12  Charleston has a limited rail spur.
13       Q.    And what railroads serve that
14  facility in North Charleston?
15       A.    Palmetto Rail.
16       Q.    That's a short line is, isn't
17  it?
18       A.    I don't know.
19             MR. CHAPMAN:  Would you mark
20        that as three, please?
21             (Whereupon, Exhibit 3 was
22        marked for identification.)
23       Q.    Mr. Laraway, that appears to
24  be -- well, you've been handed Exhibit 3,
25  which appears to be another e-mail from you
```

NICHOLAS LARAWAY
June 17, 2025

1   this time only addressed to Brian Moore

2   also on June 20th of 2024.

3            Do you see that?

4       **A.     Mm-hmm.**

5       Q.    You need to say yes or no?

6       **A.     Yeah.**

7       Q.    Thank you.

8            MR. RODGERS:  Jim, do you mind

9        stating the Bates stamp just for the

10       record?

11           MR. CHAPMAN:  Sure.  It's

12       Carver ESI 000191.

13      Q.    Let me just start with, who is

14   Dan Albright?

15      **A.     Dan Albright is a salesman for**

16   **Carver Companies.**

17      Q.    And it appears that he

18   forwarded you something that was obtained

19   from CSX on June 18th of 2024.

20           See that?

21      **A.     I do.**

22      Q.    Did you read it at the time

23   that he forwarded it to you?

24      **A.     I don't recall having read it**

25   **at the time.**

## NICHOLAS LARAWAY

June 17, 2025

```
 1        Q.    Does he routinely forward you
 2   things of the nature like this?
 3        A.    Often.
 4        Q.    And when you say he is in
 5   sales, for which Carver entity?
 6        A.    He sells a lot of different
 7   services including property maintenance.
 8   He's sold port services, aggregate sales.
 9   At the time, construction work, emergency
10   response.
11        Q.    Is he still employed by Carver?
12        A.    He is.
13        Q.    Do you know whether he
14   forwarded this e-mail to anybody besides
15   you on June 18th, 2024?
16        A.    I don't know.
17        Q.    Did he call you after
18   forwarding it to you?
19        A.    Not that I recall.
20        Q.    Did you have any conversation
21   with him after he forwarded you this e-mail
22   regarding its substance?
23        A.    Not that I recall.
24        Q.    Is the railroad known as CSX a
25   customer of Carver?
```

**NICHOLAS LARAWAY**

June 17, 2025

1        A.    It is.

2        Q.    And what type of business does

3    Carver deal with CSX?

4        **A.    We have provided aggregate**

5    **materials and ballast to them at a number**

6    **of locations.  As I have mentioned before,**

7    **we provide emergency response for them.**

8            **CSX is Dan's largest client and**

9    **he services them all over the East Coast on**

10   **various projects from time to time, so he**

11   **is in frequent contact with CSX**

12   **representatives.**

13       Q.    When you say emergency

14   response, you mean, like, if they have a

15   derailment or something?

16       **A.    Historically, derailments,**

17   **washouts.  In New York, they have a lot of**

18   **issues related to snow and we've helped**

19   **them out with snowplowing and removal.  And**

20   **a lot of equipment rental.**

21       Q.    Is all of that relationship

22   with CSX in the New York area?

23       **A.    It is not.**

24       Q.    So it extends down into South

25   Carolina?

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        A.    It is in New England and in the
 2   southeast, South Carolina, Georgia.
 3        Q.    And you -- referring back to
 4   Exhibit 2 --
 5        A.    Mm-hmm.
 6        Q.    -- it appears that two days
 7   later you got the letter that my assistant
 8   sent to you on June 20th of 2024.
 9              Did you connect the dots at
10   that point that these were related?
11        A.    I certainly had questions as to
12   whether they were related, which is why I
13   remember sending that to Brian.
14        Q.    Okay.  Did you have any
15   conversation with Brian Moore afterwards
16   about this?
17        A.    I mean, on the 20th there was
18   ongoing conversations related to the
19   letter.
20              I don't recall if this specific
21   e-mail came up in those conversations.
22        Q.    Just to be clear, did you
23   actually talk to your lawyer, I forget his
24   name now, Anthony, Jr.  On -- I'm sorry
25   Anthony Cardona, Jr., on June 20th, 2024?
```

**NICHOLAS LARAWAY**

**June 17, 2025**

1        A.      Absolutely.

2        Q.      Okay.  Did you talk to Brian

3   Moore that day?

4        A.      Yes.

5        Q.      Did you talk to Leonard

6   Baldassare that day?

7        A.      I did not.  Not that I recall.

8        Q.      You -- well, do you recall

9   talking to anybody else that sort of worked

10  in the marine towing -- Carver Marine

11  Towing besides Mr. Moore on June 20th?

12       A.      Not specifically.

13       Q.      Did you talk to Dan Albright

14  that day, June 20th?

15       A.      Not that I recall.

16       Q.      How long has Carver owned the

17  Tug Mckenzie Rose?

18       A.      Since 2020.

19       Q.      How much did Carver pay for it

20  when it was acquired?

21       A.      I believe it was approximately

22  a million dollars.

23       Q.      One million?

24               THE REPORTER:  Yes?

25       A.      Yes, sorry.

**NICHOLAS LARAWAY**

June 17, 2025

1      Q.    And after acquiring it, did

2   Carver have any work done on it?

**3      A.    There has been work done on it**

**4   since we've acquired it, yes.**

5      Q.    Did it require, I don't know,

6   refurbishing or anything to make it

7   operational when you acquired it

**8      A.    Not that I recall.**

9      Q.    Who was it acquired from?

**10      A.    I believe it was Gellatly.  A**

**11   company with a name that included Gellatly.**

**12   I don't recall the specific entity.**

13            THE REPORTER:  Can you just

14       spell that?

**15            THE WITNESS:  Sure,**

**16       G-E-L-A-P-E-L-Y, Possibly.**

17            MR. RODGERS:  Jim, I think it's

18       on survey that we got.

19            MR. CHAPMAN:  Can you mark that

20       as -- we are on 4 now?

21            Thank you.

**22      A.    I was close.**

23            (Whereupon, Exhibit 4 was

24       marked for identification.)

25      Q.    You've been passed on Exhibit

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   4, which is the abstract of title for the
 2   vessel, which with we obtained from the
 3   Coast Guard National Vessel Documentation
 4   Center.
 5          And it appears to document that
 6   it was sold by Gellatly & Criscione
 7   Services Corp. to Carver Marine -- Coeymans
 8   Marine Towing, correct?
 9       A.    That is correct.
10       Q.    And that it appears that at the
11   time of the acquisition there was a
12   $2 million mortgage placed on the vessel?
13       A.    That appears to be correct.
14       Q.    Okay.  So you told us earlier
15   that you thought you'd paid a million
16   dollars for it, but there's a $2 million
17   mortgage.
18          Is -- can you explain the
19   difference?
20       A.    From what I recall, at the time
21   we purchased it and there was some equity
22   in the vessel and we had planned to do some
23   work in the future, so we were able to take
24   out a mortgage for more than we paid for.
25       Q.    So you paid the seller a
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   million dollars, but succeeded in putting a
 2   mortgage on it for $2 million; is that
 3   right?
 4        A.    That's correct.
 5        Q.    And who was that mortgage with?
 6        A.    BNB Bank.
 7        Q.    Is BNB Bank still in existence
 8   today?
 9        A.    They are not.  They were
10   acquired by another bank.
11        Q.    And do you know who they were
12   acquired by?
13        A.    Dime Bank.
14              MR. RODGERS:  His knowledge of
15         who acquired them, Jim, right?
16              Jim?
17              MR. CHAPMAN:  Yes.
18              MR. RODGERS:  His knowledge.
19              MR. CHAPMAN:  That's what he
20         said.  I know.
21              MR. RODGERS:  I know.  He
22         doesn't work for Dime Bank.
23              MR. CHAPMAN:  I get that.
24        Q.    And continuing with Exhibit 4,
25   it appears further on in 2022 that there
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1  was another mortgage placed on the vessel
 2  in the amount of $2,921,213.50, correct?
 3      A.    That is correct.
 4      Q.    Okay.  And for some reason that
 5  mortgage was terminated just 30 days later
 6  and it was reestablished -- actually it
 7  looks like the same mortgage was -- must
 8  have been recorded twice for some reason.
 9           MR. RODGERS:  So one -- one
10       says satisfaction.
11      Q.    Yeah.  Well, the final entry on
12  this abstract of title says that there is a
13  preferred ship mortgage in the amount of
14  $2,921,213.50 that was filed on March 13th
15  of 2022.
16           Do you see that?
17      A.    I do.
18      Q.    Okay.  With Dime -- and the
19  mortgage is Dime Community Bank.
20           So is there a mortgage in that
21  amount on the vessel today?
22      A.    There is a mortgage on the
23  vessel.  To my knowledge, there is a
24  mortgage on the vessel that had an original
25  amount of that.
```

**NICHOLAS LARAWAY**

**June 17, 2025**

1    Q.    It's been paid down some?

2    A.    **Of course, yes.**

3    Q.    Okay.  All right.

4          And do you know whether Dime

5    Community Bank had the vessel appraised

6    before they allowed a mortgage in that

7    amount?

8    A.    **I don't know specifically if**

9    **Dime had it appraised.**

10   Q.    So who on behalf of Carver

11   would've signed these loan documents?

12   A.    **Carver Laraway.**

13   Q.    Your uncle?

14   A.    **Yes.**

15   Q.    All right.  Would you have

16   reviewed them before he signed them?

17   A.    **Yes.**

18   Q.    Okay.  Were you involved in

19   some way in the, I'll call it refinancing,

20   to put an almost $3 million mortgage on it

21   in 2022?

22   A.    **I -- from what I recall, I was.**

23   Q.    And do you know whether there

24   was a loaned value requirement that Dime

25   Bank imposed in making this loan?

**NICHOLAS LARAWAY**

June 17, 2025

```
 1              Was there some limit on how
 2  much they would loan on the vessel based on
 3  its value?
 4       A.    I don't recall specifically.
 5       Q.    Have you ever seen an appraisal
 6  for more than that amount of money, 2.9
 7  million -- 2,921,213.50?
 8              MR. RODGERS:  You're talking
 9         about the appraisal --
10              MR. CHAPMAN:  Yeah, I'm asking
11         if he's -- yeah.
12              MR. RODGERS:  -- either a
13         survey or appraisal?
14              MR. CHAPMAN:  Either one, yeah.
15              MR. RODGERS:  Okay.
16       A.    I recall having seen surveys of
17  that vessel that were at a larger number
18  than that, yes.
19       Q.    Okay.  And what's the largest
20  number that you've seen it valued at based
21  on a survey?
22              MR. RODGERS:  Objection.  You
23         have the document and I ask that you
24         put it in front of him.
25              MR. CHAPMAN:  Well, I'm testing
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1          him memory first, Mr. Rodgers.
 2               MR. RODGERS:  All right.  You
 3          can test his memory.
 4               If you know.
 5          A.    The largest appraisal that I've
 6     seen is the 2025 appraisal that had a range
 7     that was over $4 million.  I don't recall
 8     the specific amount or range.
 9          Q.    Okay.
10               MR. CHAPMAN:  Can you mark that
11          as 5, please?
12               (Whereupon Exhibit 5 was marked
13          for identification.)
14          Q.    You've been passed Exhibit 5,
15     which is a condition and valuation survey
16     report addressed to Dime Community Bank on
17     the Tug Mackenzie Rose that's dated late
18     20 -- September 6th, 2021.
19               Do you see that?
20          A.    I do.
21          Q.    Okay.  Have you previously seen
22     that?
23               MR. RODGERS:  Just before you
24          answer.
25               Have you produced this?
```

NICHOLAS LARAWAY

June 17, 2025

```
 1              MR. CHAPMAN:  Yes.  And my
 2         apologies, this was printed before we
 3         actually responded to your discovery
 4         last week, so it didn't have the
 5         Bates Numbers on it, but it's Bates
 6         Number Dime 000231.  The documents we
 7         got pursuant to subpoena from Dime.
 8              MR. RODGERS:  That was produced
 9         to us?
10              MR. CHAPMAN:  Mm-hmm.  Yeah.
11         And the -- it ends in 237.  So it's
12         231 to 237.
13         Q.    Anyway, my question was, have
14    you seen this before?
15         A.    I may have at the time.
16         Q.    Okay.
17         A.    I don't specifically recall.
18         Q.    Yeah.  If you turn to the
19    second to last page, it's Page 6 of 7 of
20    the exhibit.  There at the bottom it says,
21    "Estimated fair market value, $4 million,"
22    right?
23         A.    That is correct.
24         Q.    And is that your memory that
25    you recall seeing or knowing of an
```

**NICHOLAS LARAWAY**

June 17, 2025

1  appraisal in that amount or was it higher?

**2**     **A.    Can you repeat the question?**

3     Q.    Yeah.  You had previously said

4  that you had seen another appraisal and you

5  recall that it was, I think your words were

6  more than four million, but that's what I'm

7  trying to find out.  Is this that

8  appraisal?

9              MR. RODGERS:  I think he's

10        talking about a recent one.

11              This is 2021, right?

12              MR. CHAPMAN:  Yeah.

**13**     **A.    I testified from what -- I**

**14  testified that the largest appraisal I**

**15  recall having seen was from 2025 and it had**

**16  a range on it.**

17     Q.    Okay.

18              MR. RODGERS:  And I believe you

19         have that from Meyerrose.

20     Q.    Okay.  So that's -- I'm curious

21  about that because was it your testimony

22  that that appraisal that you've seen from

23  2025 was for $4 million or more?

**24**     **A.    From what I recall, yes.**

25     Q.    Okay.  But you don't think it

**NICHOLAS LARAWAY**

June 17, 2025

```
 1  was from this appraisal from 2021 that's
 2  marked as Exhibit 5?
 3              MR. RODGERS:  Objection to
 4       form.  You can answer if you
 5       understand the question.
 6       A.    Correct.
 7       Q.    Okay.  If you look at the first
 8  page of Exhibit 5, it has the name of a
 9  person, or an e-mail for a person,
10  Jennifer, I don't know how it's pronounced,
11  deblasi@dime.com.
12              See that?
13       A.    I do.
14       Q.    Do you know who that person is?
15       A.    She is a member of the staff at
16  Dime that we've dealt with on a number of
17  transactions in the past.
18       Q.    Okay.  Was she previously with
19  BNB Bank?
20       A.    From what I recall, she was.
21       Q.    Okay.  And to your knowledge,
22  is she still employed by Dime?
23       A.    I'm not sure.
24              MR. RODGERS:  Just for the
25       record, the Exhibit 5 the -- it
```

**NICHOLAS LARAWAY**

```
 1          references itself as a survey, not as

 2          an appraisal.

 3                MR. CHAPMAN:  Yeah.

 4                MR. RODGERS:  Just to be

 5          accurate.

 6     Q.    Yes.  Page 1, it appears that

 7    the title is condition and valuation survey

 8    report.

 9                MR. RODGERS:  Thank you.

10                MR. CHAPMAN:  Can you mark that

11          as 6, please?

12                (Whereupon, Exhibit 6 was

13          marked for identification.)

14     Q.    This is also a letter -- excuse

15    me, a document that was obtained from Dime

16    Community Bank pursuant to subpoena and

17    it's -- although it doesn't have the number

18    on it, it is Dime000159.

19                And it appears to be some sort

20    of desk review of the other appraisal.

21                It appears to be a desk review

22    of somebody else or the other appraisal, to

23    which it refers.

24                Do you see that?

25     A.    I do.
```

**NICHOLAS LARAWAY**

June 17, 2025

```
1        Q.    It's addressed to Jennifer

2   Pepera.  Is that a different person than

3   Jennifer DeBlasi, if you know?

4        A.    I'm not sure.

5        Q.    Do you know the name Jennifer

6   Pepera at Dime Community Bank?

7        A.    It doesn't specifically ring a

8   bell.

9        Q.    Okay.  But this is a -- at

10  least a letter purporting to be a desktop

11  opinion of an appraisal of the -- excuse

12  me, of a survey of the Tug Mackenzie Rose,

13  correct?

14             MR. RODGERS:  Are you going to

15        ask him if he has seen it before --

16             MR. CHAPMAN:  No.  I'm just

17        asking him if that's what it appears

18        to be.

19             MR. RODGERS:  I prefer if you

20        ask him, Have you seen it before?

21             But...

22             MR. CHAPMAN:  How about if he

23        answers that question first and then

24        I'll ask him if he's seen it before?

25             MR. RODGERS:  It should be the
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        first question, Jim.  You know better
 2         than that.
 3        A.    Can I answer?
 4        Q.    Yeah, you can.
 5        A.    It appears to be.
 6        Q.    Okay.  And do you know whether
 7    you've seen it before?
 8        A.    I don't recall having seen this
 9    before.
10        Q.    Do you know how much insurance
11    coverage for loss of the Tug Mackenzie Rose
12    the company carries on it?
13            MR. RODGERS:  Back then, at the
14         time or now?
15        Q.    Well, at the time of the
16    allision with the Belt Line Bridge --
17        A.    I --
18        Q.    -- June of 2024.
19        A.    I do not specifically recall.
20        Q.    Okay.  Is there somebody else
21    in your organization who handles insurance
22    for Carver Marine Towing?
23        A.    Yes.
24        Q.    Who's that?
25        A.    It's currently being handled by
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   our financial controller.

 2        Q.    And who is that?

 3        A.    Her name is Melissa Jochum.

 4        Q.    Jochum or Yoakum?

 5        A.    J-O-C-H-U-M.

 6        Q.    Okay.

 7        A.    She handles the nuts and bolts

 8   of valuations, adding and subtracting

 9   equipment.

10             MR. RODGERS:  Just for the

11         record, Carver has produced the

12         information on the insurance

13         regarding them tug and company

14         pursuant to your demand, Jim, and the

15         further answer of this lawsuit.

16             MR. RYAN:  May I ask, is

17         Mr. Rodgers miced up, because I

18         don't -- it's very difficult to hear

19         the objections or whatever's being

20         said?

21             MR. RODGERS:  I'm very soft

22         spoken.

23             You get that?

24             MR. RYAN:  I heard the last

25         part, not the part before.
```

NICHOLAS LARAWAY

June 17, 2025

```
 1              MR. RODGERS:  I'll speak
 2        louder.
 3              Is this Ryan?
 4              MR. CHAPMAN:  Yeah.
 5              MR. RYAN:  Yes, thank you.
 6              MR. CHAPMAN:  Can you mark that
 7        as 7, please?
 8              Thank you.
 9              (Whereupon, Exhibit 7 was
10        marked for identification.)
11              MR. RODGERS:  Just for the
12        record, it's Carver00073 and 7 -- no
13        I'm sorry.
14              MR. CHAPMAN:  It's 673.
15              MR. RODGERS:  673 and 674.
16    Q.    Here is a copy for you.
17              Mr. Laraway, this was produced
18    by the company in discovery.  And I believe
19    it to be a schedule of vessels and
20    the -- including the mounts for which they
21    are insured.
22              And at the top of the second
23    page of this exhibit, it list the Mackenzie
24    Rose.  Do you see that very first line?
25    A.    I do.
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1      Q.    And it says that it's the
 2  amount insured/agreed, value is $3,070,000,
 3  correct?
 4      A.    That is correct.
 5      Q.    Do you understand why it is
 6  insured for that amount?
 7            MR. RODGERS:  In this document?
 8            MR. CHAPMAN:  No.
 9            MR. RODGERS:  In this document.
10      Q.    Not necessarily in this
11  document, but I'm just trying to understand
12  why the company is insured it in that
13  amount.
14            MR. RODGERS:  Just for the
15        record, it's -- I think it's dated
16        11/1/2023.
17            You can answer, if you know.
18      A.    The company generally insures
19  the vessel for -- the vessels for a minimum
20  of the fair market value, and when there's
21  a higher replacement value, we try and
22  insure them for more because if in the
23  event that we needed to utilize the
24  insurance, we would need to generally
25  replace it with something.
```

### NICHOLAS LARAWAY

June 17, 2025

1      Q.    And is it your understanding

2   that amount, that $3,070,000 is a valuation

3   that's been agreed to between Carver and

4   its insurance company, which appears to be

5   Travelers?

6            MR. RODGERS:  On that

7        date -- on the date of the document?

8      **A.    That is my general**

9   **understanding.**

10     Q.    Okay.  And that that would be

11  the agreed value for the life of this

12  particular policy, correct?

13     **A.    Subject to any change, but yes.**

14     Q.    Yeah.  Okay.

15           MR. RODGER:  Yeah.  This what

16       we produced.  It should say --

17           MR. CHAPMAN:  Where's the next

18       exhibit, please?

19           THE REPORTER:  That's the next

20       one.

21     Q.    I'm going to pass Exhibit 8,

22  Carver 001929 through 1917.

23           (Whereupon, Exhibit 8 was

24       marked for identification.)

25           MR. RODGERS:  Do you have one

**NICHOLAS LARAWAY**

**June 17, 2025**

1          for me?

2                    MR. CHAPMAN:  Sure.

3                    MR. RODGERS:  Or just take

4          yours.

5                    MR. CHAPMAN:  You ignore my

6          note.  He's already answered the

7          question, but this...

8                    MR. RODGERS:  Can I mark it or

9          you need it back?

10                    MR. CHAPMAN:  No, you can mark

11          it up.

12                    MR. RODGERS:  Just so you know,

13          I'll cross that out.

14                    MR. CHAPMAN:  Yeah.

15          Q.    This document was produced to

16    us by Carver, so I presume that it's in

17    Carvers files, correct?

**18          A.    Yes.**

19          Q.    Okay.  And it is a -- there's a

20    summary page on the front, but then on

21    page, the second page of this exhibit, it

22    says "Appraisal as of January 21, 2020 on

23    the Mary Gellatly."  Right?

**24          A.    That is correct.**

25          Q.    Okay.  So this presumably was

NICHOLAS LARAWAY

June 17, 2025

1   done before it was acquired.  And it was

2   done for the account of Carver according to

3   the certification there on Page 1930,

4   correct?

5        **A.    That is correct.**

6        Q.    Okay.  And the fair market

7   value opinion as of January 31, 2020 is

8   stated on the first page is $3,070,000,

9   correct?

10       **A.    That is correct.**

11       Q.    Okay.  That's not the

12   replacement cost, correct?

13       **A.    Correct.**

14       Q.    All right.  And to your

15   knowledge, has the vessel been

16   assured -- insured on an agreed value basis

17   for $3,070,000 going back to 2020, to your

18   knowledge?

19       **A.    I don't specifically know.**

20       Q.    Any reason to think that it

21   would be something different than that?

22            MR. RODGERS:  If you know.

23       Don't guess.

24       **A.    I don't specifically know.**

25       Q.    Okay.  And who in your

NICHOLAS LARAWAY

June 17, 2025

```
 1   organization would you expect to know?
 2        A.    I would've expected Brian Moore
 3   as the general manager, Melissa Jochum who
 4   could look that up, but she wouldn't have
 5   specific knowledge because she hasn't been
 6   here that whole time.
 7        Q.    Okay.  The way to test that is
 8   to actually go back and look at all
 9   those --
10        A.    Of course.
11        Q.    -- previous policies and see
12   what it's insured for, correct?
13        A.    Correct.
14        Q.    All right.  Has the amount of
15   insurance for the vessels been increased,
16   to your knowledge since the casualty, since
17   the allision?
18        A.    I believe that it has been
19   increased recently in 2025 after completion
20   of a shipyard that was done.
21        Q.    Okay.  Do you know what it is
22   now?
23        A.    I don't specifically know.
24        Q.    Is it over four million.
25             MR. RODGERS:  The insurance?
```

**NICHOLAS LARAWAY**

**June 17, 2025**

1          MR. CHAPMAN:  Yeah, the agreed

2      value.

3          MR. RODGERS:  Or the --

4          MR. CHAPMAN:  The agreed value.

5          MR. RODGERS:  Yeah.

6          MR. CHAPMAN:  Yeah.

7      **A.    I would believe so.**

8      Q.    Okay.  So you did mention that

9  there was a -- you thought a 2025 survey

10  that you've seen and it provides a

11  valuation that you think exceeds

12  $4 million.

13          And is it your understanding

14  that on that basis, it's been insured for

15  whatever that survey reported the fair

16  market value to be?

17          MR. RODGERS:  Objection to

18      form.  You can answer if you

19      understand the question.

20      **A.    That would be my understanding**

21  **of the process to increase the insurance**

22  **value, yes.**

23      Q.    Okay.  Is there any reason we

24  can't get a copy of that appraisal?

25          MR. RODGERS:  You have it, it's

**NICHOLAS LARAWAY**

June 17, 2025

```
 1          Meyerrose.
 2               MR. CHAPMAN:  Meyerrose did one
 3          in 2024 for your limitation actually.
 4               MR. RODGERS:  No, I believe
 5          they did one in 2025.
 6               MR. CHAPMAN:  Well, I --
 7               MR. RODGERS:  So --
 8               MR. CHAPMAN:  I'd need to see
 9          it.  Can you give me the Bates
10          Numbers?  We'll be happy to go look
11          it up.
12               MR. RODGERS:  Yeah.  Just give
13          us a second.  I'm talking to counsel.
14               One shows April 1st 20 -- yeah.
15          2025.  See if this dates -- no, there
16          isn't on this one.  Yeah, 001962.
17               MR. CHAPMAN:  What does it
18          start with though?
19               MR. RODGERS:  Carver.
20               MR. CHAPMAN:  Just says Carver?
21               MR. RODGERS:  What number?
22               MR. CHAPMAN:  Yeah.  Some of
23          your productions say Carver and some
24          have a long name.
25               MR. RODGERS:  This is what I
```

NICHOLAS LARAWAY

June 17, 2025

```
1          sent to you after I looked at
2          Meyerrose.  Remember we -- you
3          subpoenaed them.
4              MR. CHAPMAN:  Okay.
5              MR. RODGERS:  And then I -- we
6          did a privilege review copy and sent
7          it to you.
8              MR. CHAPMAN:  All right.  Did
9          you hold anything on the basis of
10         privilege?
11             MR. RODGERS:  On that?
12             MR. CHAPMAN:  Yeah.
13             MR. RODGERS:  No. No.
14             MR. CHAPMAN:  Carver, what is
15         it?  001963?
16             MR. RODGERS:  That's correct.
17             MR. CHAPMAN:  Okay.
18             MR. RODGERS:  Do you want to
19         take a break and --
20             MR. CHAPMAN:  Yeah, I'd like to
21         take a look at it.
22             MR. RODGERS:  -- it's passed an
23         hour, so I'll see if I have a copy in
24         my office.
25             MR. CHAPMAN:  Okay.
```

**NICHOLAS LARAWAY**

**June 17, 2025**

1              MR. RODGERS:  If not, I'll

2        print it out.

3              MR. CHAPMAN:  All right.

4              MR. RODGERS:  You guys, we have

5        coffee here.  This is also a coffee

6        room.

7              THE REPORTER:  Okay.

8              MR. RODGERS:  Opposing

9        counsel's not allowed to go in.

10              THE VIDEOGRAPHER:  We are going

11        off the record.  The time is 11:05

12        a.m.

13              Off the record.

14              (Whereupon, a short recess was

15        held at this time.)

16              THE VIDEOGRAPHER:  Beginning

17        Media Number 2.  We are back on the

18        record.  The time is 11:18 a.m.

19        Q.   We'll come back to the

20   appraisal in a little bit.  Here it is.

21              MR. RODGERS:  Copies in the

22        bottom.

23              MR. NANAVATI:  That's

24        there -- wait, which is the original?

25              MR. RODGERS:  Copies in the

**NICHOLAS LARAWAY**

June 17, 2025

```
1          bottom.
2               MR. NANAVATI:  Okay, good.
3               MR. RODGERS:  I guess that one
4          has -- it's -- yeah.  The ones to
5          mark, this one, Jim?
6               MR. CHAPMAN:  Yeah, what'll
7          that be?  9?
8               THE WITNESS:  This one was 8.
9               THE REPORTER:  8?
10              THE WITNESS:  Nope, this was 8.
11              MR. CHAPMAN:  Yeah.  That's 8,
12         so this would be 9.
13              THE REPORTER:  Thank you.
14         Marked.
15              (Whereupon, Exhibit 9 was
16         marked for identification.)
17    Q.   I didn't realize it was quite
18    such a thick document, but I think we're
19    looking at maybe the first 10 pages of this
20    thing and the rest of it is all
21    photographs.
22              But is this the survey that you
23    were recalling in your earlier testimony
24    that it was done in 2025 by Meyerrose and
25    Company?
```

**NICHOLAS LARAWAY**

**June 17, 2025**

1      A.      Yes.

2      Q.      And it appears that the

3   valuation set forth in this report marked

4   Exhibit 9, is four and a half to five

5   million dollars, if I am reading Page 9

6   correctly?

7      A.      That is correct.

8      Q.      And do you know how much

9   it -- the vessel's currently insured for

10  then?

11     A.      I don't know specifically.

12     Q.      Did you understand they went

13  up?

14     A.      Yes.

15     Q.      Got you.  So at the time of the

16  allision, what is Carver's understanding of

17  the value of the vessel, the Tug Mackenzie

18  Rose?

19     A.      Approximately two and a half

20  million dollars.

21     Q.      And what is that based upon?

22     A.      A survey that was done recently

23  after the allision.

24     Q.      And was that the survey by

25  Mr. Meyerrose?

NICHOLAS LARAWAY

June 17, 2025

1       A.      That is my understanding.

2       Q.      Okay.  Have you seen that

3    survey recently, Mr. Laraway?

4       A.      Yes.

5       Q.      Let me show you what was

6    previously marked in Mr. Moore's deposition

7    as Exhibit 33.

8       A.      Thank you.

9               MR. RODGERS:  Jim?

10              MR. CHAPMAN:  I do not have an

11        extra copy of it.  That's the

12        original from the previous

13        deposition.

14              MR. RODGERS:  Okay.  Yeah.

15        Good.  Let me have this.

16       Q.      Is that the survey you're

17    talking about?

18       A.      Yes, sir.

19       Q.      And the valuation is two and a

20    half million dollars?

21       A.      That's the high end of the

22    range, yes, sir.

23       Q.      Okay.  Other than that survey,

24    is there anything else on which Carver

25    bases its valuation of the Tug Mackenzie

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1  Rose as of the date of the allision in
 2  2024?
 3            MR. RODGERS:   Objection to
 4       form.  You can answer if you
 5       understand it.
 6       A.    Nothing specifically that I can
 7  bring to mind.
 8       Q.    Okay.  I mean, okay.
 9       A.     Industry experience.
10       Q.    I'm sorry?
11       A.    I said the industry experience
12  of our leaders.
13       Q.    Which includes yours?
14       A.    Which would include more
15  specifically Brian Moore as the general
16  manager and expert in the maritime field.
17       Q.    And has he ever told you that
18  he thought that as of the date of the
19  casualty, the vessel was worth something
20  betwee -- up to two and a half million
21  dollars?
22       A.    I don't recall having that
23  specific conversations with him.
24       Q.    All right.  Great.  Thank you.
25  I'll take that back.  Thank you.
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1              The vessel at -- Tug Mackenzie

 2    Rose, at the time of the of allision, was

 3    pushing a Weeks barge to a job site where

 4    some bridge components or things that were

 5    needed to construct a bridge would do; is

 6    that right?

 7         A.    It was pushing a Weeks barge to

 8    or from a job site, I don't know.

 9         Q.    Okay.

10         A.    In which direction.

11         Q.    And how much was Carver being

12    paid for making that transit?

13         A.    I don't know the specific

14    amount.

15         Q.    You don't?

16         A.    Not off the top of my head.

17         Q.    Carver would have been paid

18    something for --

19         A.    Absolutely.

20         Q.    -- delivering that cargo,

21    right?

22         A.    Yes.

23         Q.    And what job was it for?

24         A.    We were hired by -- my

25    understanding is that we were hired by
```

**NICHOLAS LARAWAY**

June 17, 2025

1   **Skanska on a one-off basis to move this**

2   **barge for a project they were participating**

3   **in.**

4      Q.    So this is not like a long-term

5   project where you were making lots of runs?

6   It was just once?

7      **A.    They contacted us on a one-off**

8   **basis to move it as they do from time to**

9   **time.**

10     Q.    And how much did they pay

11  Carver to do the job?

12     **A.    It was a lump some fee.  I do**

13  **not recall the specific amount.  I believe**

14  **it was in the documents we provided.**

15          MR. CHAPMAN:  Is that true?  Is

16       that -- Mr. Rodgers, is that a

17       document that's actually been

18       produced so far?

19          MR. RODGERS:  I know we were

20       looking for it.  I'm not sure if

21       we've produced it yet.

22     Q.    So just to be clear, if you can

23  take a look at Exhibit 1 really quick.

24          On the list of topics.

25     **A.    Mm-hmm.**

**NICHOLAS LARAWAY**

June 17, 2025

1      Q.    Topic Number 7 is freight

2    towage or higher received or owed for the

3    service of the vessel at the time of the

4    incident.

5        **A.    Yes.**

6        Q.    Right.  So I'm trying to

7    understand, what did you do to prepare

8    yourself to be able to testify on that

9    topic?

10            MR. RODGERS:  Objection.  Don't

11        testify as to what you've discussed

12        with your lawyers, me or any other

13        lawyer.

14            You may -- can I confer with

15        the witness?

16    Q.    Let me ask this --

17            MR. RODGERS:  It's to your

18        benefit.

19            MR. CHAPMAN:  Let me ask

20        this --

21            MR. RODGERS:  All right.  Go

22        ahead.

23    Q.    Did Carver invoice Skanska for

24    this job?

25        **A.    I believe so.**

NICHOLAS LARAWAY

June 17, 2025

1        Q.    Okay.  Did Skanska demand some
2    reduction, or some credit or discount --
3        **A.    Not that I'm aware of.**
4        Q.    -- that resulted in Carver not
5    getting paid?
6        **A.    Not that I'm aware of.**
7        Q.    Okay.  So to your knowledge,
8    Skanska paid whatever they were invoiced
9    for?
10       **A.    That is my understanding.**
11       Q.    Have you ever seen that
12   invoice?
13       **A.    I do not recall having seen the**
14   **specific invoice.**
15       Q.    Okay.  Did you talk to anybody
16   besides the lawyers about the amount of
17   that invoice?
18       **A.    I did.**
19       Q.    Okay, and what were you told?
20       **A.    I was told that we did the work**
21   **for Skanska.  They reached to us on a**
22   **one-off basis to move it and we charged**
23   **them lump sum.  I do not recall the amount,**
24   **that is the simple problem here.**
25       Q.    You think somebody did tell you

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   the amount, you just don't remember it?
 2       A.    Correct.
 3       Q.    Okay.  So is there some way to
 4   find that out?
 5             MR. RODGERS:  Yes.
 6       A.    Yes.
 7             MR. RODGERS:  I believe in our
 8         response.  We may have said we were
 9         still searching for that.  And that
10         would be the witness, I believe, has
11         been searching for it, no.  Maybe
12         not.
13       A.    I spoke to our salesmen about
14   the information, asked him to forward it
15   over.  We spoke about it over the phone, he
16   did not send it to me yet, but we spoke
17   about it.  That's how I have the knowledge
18   of the business arrangement.
19       Q.    Who was the salesman?
20       A.    Dylan Galm.
21       Q.    Well, let me just kind of ask a
22   little bit around that then.  Is there a
23   process to give a quote, this is what it's
24   going to cost or did they just call you up
25   and say hey, we need you to move this barge
```

**NICHOLAS LARAWAY**

**June 17, 2025**

1   for us.  Tell us what it's going to be or

2   send us an invoice when you're done?

3          **A.      The process generally includes**

4   **quoting from time to time, when it's, "Can**

5   **you do something for me?  Give me a number,**

6   **we do it," and we send an invoice and we**

7   **get paid for it.  So it could happen in**

8   **either scenario.**

9          Q.    Okay.  And do you know what

10  happened in this scenario with Skanska?

11         **A.      Dylan indicated with -- to me**

12  **when I spoke to him that there was a rate**

13  **sheet provided, a one off, and that we did**

14  **the work, we invoiced him for it and to his**

15  **knowledge, we were paid for it.  And I can**

16  **obtain that number for you during a break**

17  **if you'd like.**

18         Q.    Okay.

19                MR. RODGERS:  If not, we'll

20          leave a -- you could leave a space in

21          the record for that amount and we'll

22          get it to counsel.

23         **A.      _____**

24  **_____.**

25         Q.    So I want to ask you some

**NICHOLAS LARAWAY**

June 17, 2025

```
1   questions about topic number nine.  The
2   operation course and speed of the vessel on
3   the day of the incident.
4           Did you talk to anybody, not
5   the lawyers, but did you talk to anybody
6   besides the lawyers to educate yourself
7   about the operation course and speed of the
8   vessel on the date of the incident?
9           MR. RODGERS:  Subject to, I
10      believe our objection --
11   Q.   Yes.
12           MR. RODGERS:  -- in the written
13      objections, he can answer.
14   A.   I did not.
15   Q.   Okay.  Why not?
16           MR. RODGERS:  Objection to
17      form.
18   A.   I spoke with our attorneys, I
19   reviewed the information we provided and I
20   believe that Brian Moore and Lenny are the
21   appropriate people to testify as to those
22   items related to the actions of the tugboat
23   on that day.
24   Q.   So you are not in a position to
25   testify about that topic based on anything
```

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1   you've done to prepare for this deposition?
 2              MR. RODGERS:  He's relying on
 3         the testimony of Mr. Moore and
 4         Mr. Baldassare.
 5         Q.   Maybe I'm -- I apologize.
 6              MR. RODGERS:  As well as the
 7         documents produced to date.
 8         Q.   I may have misunderstood your
 9   answer.  You said that that information
10   would be in the hands of or in the minds of
11   or knowledge of Mr. Moore and
12   Mr. Baldassare?
13         A.   And what they have testified
14   to, and all of the information we have
15   provided today.
16         Q.   Okay.  And did you read their
17   testimony?
18         A.   I did not.
19         Q.   Did you read a summary of their
20   testimony?
21              MR. RODGERS:  Objection.
22         Attorney-client.  Don't answer that.
23         Q.   I'm not asking what's in the
24   summary --
25              MR. RODGERS:  Don't answer
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        that.
 2        Q.    I'm only asking whether you
 3   have read a summary of their testimony.
 4             MR. RODGERS:  Objection.  Does
 5        that include what the attorneys have
 6        provided?
 7             MR. CHAPMAN:  It might have.
 8        I'm not asking what the substance
 9        was.
10             MR. RODGERS:  Don't answer any.
11        No.  You're answering what we did to
12        prep him and that -- I mean, you're
13        asking what we did to prep him.
14             MR. CHAPMAN:  Well, are you
15        telling the witness not to answer,
16        Mr. Rodgers?
17             MR. RODGERS:  I think I
18        objected.
19        Q.    Okay.  I understand your
20   objection.  I'm just asking, did you read a
21   summary of what either Mr. Baldassare or
22   Mr. Moore testified to?
23             MR. RODGERS:  You can answer if
24        you read a summary.  Not what you
25        read.
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        A.    I did read summaries.

 2        Q.    And do you know who prepared

 3   the summaries?

 4              MR. RODGERS:  What was the -- I

 5         didn't hear you.

 6        Q.    I said do you know who prepared

 7   the summaries?

 8              MR. RODGERS:  Don't answer

 9         that.  I'm directing the witness not

10         to answer.

11        Q.    Well, I'm just trying to

12   understand.  Was it like ChatGPT that

13   prepared them or was it an actual human

14   being, if you know?

15              MR. RODGERS:  You're asking him

16         if it came from his attorneys or from

17         somebody else?

18              MR. CHAPMAN:  Well, it might

19         have come from his attorneys.

20              MR. RODGERS:  Well, why don't

21         you establish that so you're not

22         asking him privileged information?

23              MR. CHAPMAN:  Well, I started

24         by asking if he knew who had prepared

25         the summaries.
```

## NICHOLAS LARAWAY

June 17, 2025

```
 1             MR. RODGERS:  You're getting
 2         into attorney-client preparation.
 3         You can answer if your attorneys
 4         provided you, or somebody else.
 5         A.    It was provided by my
 6     attorneys.
 7         Q.    So --
 8             MR. RODGERS:  In preparation
 9         for this deposition?
10             THE WITNESS:  Yes.
11             MR. RODGERS:  I just want to
12         make that clear, Jim, that we -- that
13         he's prepared himself.
14         Q.    And do you -- what was the
15     speed of the vessel when it allided with
16     the Belt Line Bridge on June 15th, 2024?
17             MR. RODGERS:  Objection.  Asked
18         and answered.  You can answer it
19         again.
20         A.    I would rely on the testimony
21     of Brian and Lenny as well as the documents
22     we've provided in discovery.
23         Q.    Okay.  But what was the speed?
24     I can -- I hear you saying you're relying
25     on them.
```

NICHOLAS LARAWAY

June 17, 2025

```
 1        A.    I don't know off the top of my
 2   head.
 3        Q.    You don't?
 4        A.    I do not.
 5        Q.    What was the heading of the Tug
 6   Mackenzie Rose at the time that it allided
 7   with the Norfolk and Portsmouth Belt Line
 8   Bridge on June 15th, 2024?
 9             MR. RODGERS:  Objection.  Asked
10         and answered.  You can --
11        A.    I would repeat my prior answer.
12        Q.    How long ago did you review the
13   summaries that you've mentioned of the
14   testimony of Mr. Baldassare or Mr. Moore?
15             MR. RODGERS:  Objection.  I'm
16         directing the witness not to answer.
17         And I know what you are doing, Jim.
18         You are trying into get into
19         the -- to attorney-client work
20         process.
21        Q.    I'm --
22             MR. RODGERS:  Yeah, you are.
23         So don't answer that.  Maybe ask it a
24         different way.  I don't think there's
25         another way, but ask it and I'll let
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        him answer.
 2        Q.    At the time of the allision,
 3   what was Carver's procedure for reporting
 4   allisions?
 5        A.    The procedure was contained
 6   within the safety management system.
 7        Q.    Is that the section called the
 8   incident response, section 9.5?
 9        A.    I believe so, yes.
10        Q.    Let me pass over to you the
11   document that was marked as Exhibit 4
12   during Mr. Moore's deposition.  These are
13   sections of the safety management system
14   previously produced to us by Carver.  I
15   want to ask you some questions about them.
16             MR. RODGERS:  You don't have a
17        copy for me?
18             MR. CHAPMAN:  I don't.  I
19        brought the original and the copy
20        that I took.
21             MR. RODGERS:  It's all right.
22             MR. CHAPMAN:  From the deps.
23        But if you want to --
24             MR. RODGERS:  Well, let me go
25        through it quickly.
```

**NICHOLAS LARAWAY**

June 17, 2025

 1                   MR CHAPMAN:  You still have

 2            your copy back in your office?

 3                   MR. RODGERS:  I'd have to have

 4            like 50 documents in here.  It's

 5            okay.  I know what this is.

 6       Q.    So if you look towards the end

 7   of the document and I didn't have anything

 8   to do with numbering.  So these seem like

 9   they are not numbered in the right order,

10   but they follow the section numbers of the

11   safety management system.  You see that?

**12       A.    Okay.**

13       Q.    Based on the title page.  So

14   towards the end, you should see a page that

15   looks like this and --

**16       A.    What does it say on the bottom?**

**17   Carver number?**

18       Q.    It says Carver number 163.

19                   MR. RODGERS:  163?

20       Q.    Mm-hmm.  000163.

21                   MR. RODGERS:  You know, Jim,

22            let's take a break.  I'm going to

23            just see if -- I think I have a pile

24            of the exhibits we used that week and

25            that should be in it, right?

## NICHOLAS LARAWAY
**June 17, 2025**

```
 1              MR. CHAPMAN:  Yeah.  That's
 2         fine.  You want to go grab it?
 3              MR. RODGERS:  Two minutes.
 4         Yeah.
 5              THE VIDEOGRAPHER:  We are going
 6         off the record.  The time is 11:40
 7         a.m.
 8              THE VIDEOGRAPHER:  Beginning
 9         Media Number 3.  We are back on the
10         record.  The time is 11:50 a.m.
11         Q.    Mr. Laraway, do you have
12    Exhibit 4 from Mr. Moore's deposition in
13    front of you?
14         A.    I do.
15         Q.    And then we were referring to
16    the section labeled 9.5 accident/incident
17    reporting.
18         A.    I can take this apart, right?
19              MR. RODGERS:  Yes.
20         Q.    Starts at Carver 000163.  You
21    see that?
22         A.    I do.
23         Q.    Okay.  And it's clear this is
24    the safety management system requirements
25    around what needs to be done as far as an
```

**NICHOLAS LARAWAY**

June 17, 2025

1    incident or accident reporting procedure,

2    correct?

3         **A.    That is my understanding.**

4         Q.    Okay.  Have you reviewed this

5    before your testimony today?

6         **A.    I have in general reviewed it,**

7    **yes.**

8         Q.    So the two reporting

9    priorities, first is the master and that's

10   the master of the tug, or master of the

11   vessel, correct?

12        **A.    Yes.**

13        Q.    "We'll notify the office as

14   soon as practical after a marine casualty."

15   And second bullet, "The master will notify

16   the nearest USCG unit," which I take to

17   mean U.S. Coast Guard unit, "as soon as

18   practical after a marine casualty," right?

19        **A.    That's what that says, yes.**

20        Q.    Okay.  And that's Carver's

21   procedure; isn't it?

22        **A.    That is what that says, yes.**

23        Q.    All right.  And then it appears

24   to actually include the entire text of a

25   few sections of the code of federal

**NICHOLAS LARAWAY**

June 17, 2025

 1  regulations as part of the

 2  incident/accidents' reporting procedures,

 3  right?  It doesn't?

 **4**      A.    **I'm sorry.  No, he --**

 5       Q.    Oh, he took it away from you?

 **6**      A.    **Yes.**

 7            MR. RODGERS:  Yeah, I did.

 8        Just an objection to the extent

 9         you're asking him any kind of a legal

10         question or conclusion.

11       Q.    So --

12            MR. RODGERS:  Could you refer

13  to what you're saying when you say code of

14  federal regulation?  What you are pointing

15  to?

16       Q.    Yeah.  They're on Page 163

17  under the heading "Marine Casualty or

18  Incident."  It refers to 46 CFR 4.03-1,

19  correct?

**20**      A.    **Correct.**

21       Q.    All right.  And on the

22  following pages it prefers to further

23  sections of 46 CFR 4.03, 4.05?

**24**      A.    **That is correct.**

25       Q.    Yeah.  Okay.  So Carver's

**NICHOLAS LARAWAY**

June 17, 2025

```
 1  policy is to follow the code of federal
 2  regulations?
 3            MR. RODGERS:  Objection to
 4       form.
 5            You can answer if you
 6       understand the question.
 7       A.    Our policy is to follow these
 8  specific regulations.
 9       Q.    Okay.  So if you turn to Page
10  164, under the section, "Notice of Marine
11  Casualty 46 CFR 4.05-1," in Section A, it
12  says, "Immediately after addressing
13  resultant safety concerns, the owner,
14  agent, master operator or person in charge
15  shall notify the nearest Sector Office,
16  Marine Inspection Office or Coast Guard
17  Group Office whenever a vessel is involved
18  in a marine casualty consisting in," and
19  it's got a bunch of sub parts, right?
20       A.    It does.
21       Q.    So the first one is "Unintended
22  grounding or unintended strike of (allision
23  with) a bridge," correct?
24       A.    That's correct.
25       Q.    Okay.  To Carver's knowledge or
```

**NICHOLAS LARAWAY**

June 17, 2025

```
1   understanding, was the allision with the

2   Norfolk and Portsmouth Belt Line Bridge on

3   June 15th, 2024 unintended?

4            MR. RODGERS:  Just what he

5        understood at the time?  What they

6        understood at the time or now?

7        Q.    I'm asking him whether

8   he -- whether Carver believes that it was

9   unintended?

10           MR. RODGERS:  Okay.

11       A.    Yes.

12       Q.    Okay.  You don't have any

13  information to suggest that it was an

14  intended allision, correct?

15       A.    Correct.

16       Q.    Okay.  So in the context of

17  this reporting obligation, did Carver

18  immediately notify any of these Coast Guard

19  designated offices regarding the allision

20  with the Belt Line Bridge?

21       A.    Carver referring to myself and

22  the company, or Carver Marine Towing, or

23  anyone?

24       Q.    Okay.  Well, you are here on

25  behalf of Carver Marine Towing?
```

**NICHOLAS LARAWAY**

June 17, 2025

1      A.    Yes.

2      Q.    Or Coeymans doing business as

3   Carver Marine Towing, right?

4      A.    Yes.

5      Q.    So in that capacity, I am

6   asking, did Carver notify any of those

7   Coast Guard offices immediately after the

8   allision?

9      **A.    I'm not aware that they did.**

10      Q.    Okay.  And when is the first

11   time that Carver notified the Coast Guard

12   of the allision?

13      **A.    My understanding is that the**

14   **first correspondence with the Coast Guard**

15   **regarding this was days after it happened.**

16      Q.    And what is Carver's

17   understanding of the reasons why it did not

18   notify the Coast Guard immediately after

19   the allision?

20      **A.    My understanding from preparing**

21   **for this deposition is that the original**

22   **report provided to Lenny was that it was**

23   **strike between the barge and fendering and**

24   **not the bridge structure.  It was not until**

25   **days later that the fact that the bridge**

NICHOLAS LARAWAY

June 17, 2025

1  was struck came to light.

2      Q.    And who reported that

3  information to -- you called him Lenny,

4  that's Mr. Baldassare, right?

5      A.    Leonard.  Yep.

6      Q.    Who reported that information

7  to Mr. Baldassare?

8      A.    It was the captain or the mate,

9  I don't recall specifically.

10      Q.    The captain being Christopher

11  Miller?

12      A.    Yes.

13      Q.    Who's now deceased?

14      A.    Yes.

15      Q.    And the mate being James

16  Morrissey?

17      A.    Correct.

18      Q.    Who no longer works for the

19  company?

20      A.    Correct.

21      Q.    So is it Carver's assessment

22  that one or both of them conveyed false

23  information to Mr. Baldassare?

24          MR. RODGERS:  Objection to the

25      term false, but you can answer if you

**NICHOLAS LARAWAY**

June 17, 2025

```
 1          understand the question.
 2      A.    It is my understanding that
 3  incorrect information was provided to
 4  Lenny.
 5      Q.    By either Captain Miller or
 6  Captain Morrissey?
 7      A.    Correct.
 8      Q.    How did Carver then become
 9  aware that that information was incorrect?
10          MR. RODGERS:  Go ahead if you
11      know.
12      A.    I would have to rely on the
13  testimony of Lenny and Brian as to how they
14  become aware that the information was
15  correct.
16      Q.    Was it my letter that was
17  e-mailed to you on June 20th, 2024?
18          MR. RODGERS:  When the witness
19      had knowledge?
20      Q.    Yes.  Mm-hmm.
21      A.    That is when I first had
22  knowledge that there was a strike between
23  the barge and the bridge.
24      Q.    And did you come to learn that
25  either Mr. Baldassare and Mr. Moore knew of
```

## NICHOLAS LARAWAY

June 17, 2025

```
 1  the strike with the bridge?  With the
 2  bridge, not the fender system prior to the
 3  letter that I sent to you on June 20th,
 4  2024?
 5          MR. RODGERS:  Who were the
 6       employees you just mentioned?
 7       Q.    Moore and Baldassare.
 8       A.    That is my understanding.
 9       Q.    That they did know of it before
10  I sent the letter to you?
11          MR. RODGERS:  Objection.  No.
12       That's not what he's saying.
13          MR. CHAPMAN:  Maybe I
14       misunderstood.  That's what I'm
15       trying to tease out.
16          MR. RODGERS:  I think you're
17       mixing up not intentionally, but
18       he -- and the witness could be
19       getting mixed up what the captain and
20       Morrissey knew, and what Moore and
21       Baldassare knew.
22       Q.    That's what I'm trying to find
23  out.
24          MR. RODGERS:  Well, it's
25       getting mixed up because you asked
```

NICHOLAS LARAWAY

**June 17, 2025**

```
1           first the Captain Morrissey, but now
2           it's Baldassare, and I don't want him
3           confused.
4       Q.    I'm just trying to find out if
5   you became aware that Mr. Moore or
6   Mr. Baldassare knew that the original
7   information that was provided by either
8   Captain Morrissey or Captain Miller on the
9   date of the allision was incorrect at any
10  time before you received my letter on June
11  20th of 2024?
12      A.    I am not aware of when they
13  specifically learned that they had been
14  provided incorrect information about it
15  hitting the fendering, not the bridge.
16      Q.    But did you come to learn that
17  they knew of it before you did?
18          MR. RODGERS:  Objection.
19      Q.    That they knew of the incorrect
20  information before you did?
21          MR. RODGERS:  Objection to
22  form.  You're making a statement.  You are
23  asking if he knows that they knew
24  beforehand or are you telling him they knew
25  beforehand?  So my objection is to the
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   form.
 2            MR. CHAPMAN:  If you want to
 3   make a form objection, just make a form
 4   objection rather than continuing to --
 5            MR. RODGERS:  I mean, if you
 6        are not going to re-do the question,
 7        then I'll just tell him not to answer
 8        it.  So I'd ask that you redo the
 9        question in a proper form.
10            MR. CHAPMAN:  Okay.
11            MR. RODGERS:  So it's not to
12        confuse the witness.
13            MR. CHAPMAN:  So I'm not going
14        to re-ask the question.  Okay.  If
15        you want me to tell him not to
16        answer, that's your call.
17            MR. RODGERS:  I know you want
18        me to do that, but we'll see what
19        happens.  You want to repeat the
20        question?
21     A.    Can you repeat the question?
22            MR. CHAPMAN:  Sure.  Madam
23        Court Reporter, could you read it
24        back, please?
25            (Whereupon, the above record
```

NICHOLAS LARAWAY

June 17, 2025

```
 1        was read back by the court reporter.)
 2            MR. RODGERS:  Do you understand
 3         the question?
 4        A.    I understand the question.  I'm
 5   not sure as to those facts, you would have
 6   to rely on their testimony as to when they
 7   became aware.
 8        Q.    To Carver's understanding, did
 9   anyone contact the Norfolk and Portsmouth
10   Belt Line regarding the allision at any
11   time prior to my letter to you on June
12   20th, 2024?
13        A.    Not that I'm aware of.
14        Q.    As part of your
15   responsibilities with Carver, have you ever
16   had occasion to access the safety
17   management system for Carver Marine Towing?
18        A.    Access it?  I have never had
19   occasion to access it directly, no.
20        Q.    Okay.  You -- so never go to
21   look things up, or try to understand what's
22   in it or that's sort of thing --
23            MR. RODGERS:  Objection to
24         form.
25        Q.    -- in your role with Carver?
```

NICHOLAS LARAWAY

June 17, 2025

 1                    MR. RODGERS:  You can answer.

 2          Objection to form.

 3          A.    I have not been required to

 4    access it.  If I ever had any questions, I

 5    would ask it of the general managers.

 6          Q.    So any of the sections of the

 7    safety management system that you have

 8    reviewed have been in connection with

 9    attempting to prepare for this deposition,

10    right?

11          A.    Any of the sections that I have

12    reviewed recently have been in connection

13    with this deposition, correct?

14          Q.    All right.  So let me ask you

15    the, again referring to Exhibit 4.  And you

16    may want to put a paper clip back on that

17    just so it doesn't get all out of order?

18          A.    I can just -- I'll close it and

19    get back there if I need to.

20          Q.    Okay.  So there is a section

21    7.3 in Exhibit 4, which looks like a form

22    that you would fill out.

23                It starts at the --

24          A.    I can, yeah.

25          Q.    Bates Number at the bottom is

NICHOLAS LARAWAY

June 17, 2025

```
 1   Carver 000898.

 2            Have you reviewed that before

 3   today?

 4            MR. RODGERS:  Hasn't seen it

 5        before the deposition.

 6       Q.    Well, you can call it seen,

 7   yeah.  I'm just trying to find out if it

 8   was something that you looked at before

 9   today?

10            MR. RODGERS:  I prefer if you

11        ask him, has he seen it before today?

12       A.    I have seen the form.  I

13   haven't reviewed it --

14       Q.    Okay.

15       A.    -- in specific detail.

16       Q.    If you turn to the second page

17   of the form.  Page 899.  There is a

18   numbered section 1.13, "Lookout."  You see

19   that?

20       A.    Yes.

21       Q.    Okay.  It says, "It's

22   required."  Do you see the text required

23   over in the right-hand side?

24       A.    That's correct.

25       Q.    Okay.  Do you know the purpose
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   of requiring lookout information as part of
 2   this form?
 3            MR. RODGERS:   Objection to
 4        form.  He is not here as an expert.
 5        You can answer as to what he knows.
 6        A.    As to my personal knowledge, I
 7   do not know why.
 8        Q.    Okay.  This is a Carver form
 9   though?
10        A.    Correct.
11        Q.    Okay.  If you could turn to the
12   section beginning with 7.5 titled
13   "Navigation."  The Bates Number is Carver
14   000817.
15            Do you see the form -- excuse
16   me, the section?
17        A.    I do.
18        Q.    Okay.  It actually begins on
19   the prior page.  So it begins on 816.  But
20   I do want to ask you a question about 817.
21   In the middle of the page it says, "Use of
22   autopilot if equipped."  Do you see that?
23        A.    I do.
24        Q.    Was the Mackenzie Rose equipped
25   with an autopilot?
```

**NICHOLAS LARAWAY**

1        **A.      That is my understanding.**

2        Q.    Okay.  And as part of the

3   navigation section of the safety management

4   system, there's no company prohibition on

5   using the automatic pilot that's placed on

6   any of the operators of the vessels,

7   correct?

8              MR. RODGERS:  Objection.  If

9         you're asking him as an expert or as

10        mariner, he's already testified he's

11        not.  To the extent of your

12        knowledge, you can answer.

13       **A.      Can you repeat the question,**

14   **please?**

15       Q.    Yeah.  Could you read it back,

16   please?

17             (Whereupon, the above record

18        was read back by the court reporter.)

19             MR. RODGERS:  Same objection.

20             Jim, are you asking him what it

21        says or are you asking him what he

22        knows?

23             MR. CHAPMAN:  Well, I'm asking

24        him about the contents of the safety

25        management system and specifically

**NICHOLAS LARAWAY**

June 17, 2025

```
 1          focused on the company's policy
 2          regarding the use of autopilot.  And
 3          I just want to be sure that we
 4          understand it.
 5     Q.    And my question is, whether
 6  there is any company policy prohibiting the
 7  use of the autopilot?
 8     A.    I would rely on the depositions
 9  of Brian and Lenny to speak to the
10  specifics.  But based upon reading this,
11  there does not appear to be any prohibition
12  in writing in this document.
13     Q.    Are you aware of any
14  prohibition that is somehow not in writing?
15     A.    I'm not aware.
16     Q.    If you could turn to the
17  section titled 7.1, Bridge Transits.  The
18  Bates Number is Carver 000910.
19          This section appears to provide
20  instructions regarding bridge transits by
21  vessels, correct?
22     A.    That appears to be correct.
23     Q.    And right in the middle of the
24  page, it says, kind of in a call out,
25  yellow or orange-ish color.  "Under no
```

NICHOLAS LARAWAY

June 17, 2025

1    circumstances shall the wheelman

2    responsible for the transit make the bridge

3    due to pressure or pride."  What does that

4    mean?

5              MR. RODGERS:  Objection to

6         form.  You can answer if you

7         understand the question.

8         A.    I would rely on the depositions

9    of Brian and Lenny.  As to the specifics of

10   what that means, I would be making an

11   educated guess.

12        Q.    So you don't know?

13        A.    Not specifically.

14        Q.    And then right underneath it,

15   it has a heading called "Safety Briefing"?

16        A.    Correct.

17        Q.    Was there a safety briefing

18   before the transit of any of the bridges on

19   the Southern branch of the Elizabeth River?

20             MR. RODGERS:  Objection to

21        form.

22             MR. CHAPMAN:  Let me just

23        finish.

24             MR. RODGERS:  Sorry.

25        Q.    Prior to the allision on June

**NICHOLAS LARAWAY**

June 17, 2025

1    15th, 2024?

2        **A.    I would rely upon the documents**

3    **provided and the depositions of Brian Lenny**

4    **and all the crew members to answer that**

5    **question.  I'm not directly aware**

6    **personally.**

7        Q.    What training does Carver

8    provide to its employees regarding bridge

9    transits.

10       **A.    I would rely upon the**

11   **depositions of Brian and Lenny as to those**

12   **answers and all of the documents provided**

13   **in discovery.  I do not specifically know.**

14       Q.    Are you -- does Carver know of

15   any training that was specifically provided

16   to Captain Morrissey regarding bridge

17   transits?

18       **A.    I would answer the question the**

19   **same way I answered the prior one.**

20       Q.    Which is you don't know and

21   you'd rely on what other people had to say

22   about it?

23       **A.    Correct.**

24       Q.    If I'm correctly summarizing

25   your answer.

NICHOLAS LARAWAY

June 17, 2025

```
 1              MR. RODGERS:  Relying on
 2          specific testimony and the documents
 3          produced to date, not just anyone.
 4      Q.    What testing, if any, does
 5   Carver provide regarding the captain's
 6   knowledge and the capabilities regarding
 7   bridge transits?
 8              MR. RODGERS:  Objection.  The
 9          captain's not been -- not testified
10          and he is deceased and Mr. Morrissey
11          is scheduled for next week.  So the
12          witness cannot possibly know that.
13              MR. CHAPMAN:  So once again,
14          there you go off doing your best to
15          coach the witness into an answer,
16          Mr. Rodgers.
17              MR. RODGERS:  I'm not coaching.
18              MR. CHAPMAN:  And I just ask
19          that if you have a form objection,
20          just make it and then we'll proceed
21          with the witnesses knowledge.
22              MR. RODGERS:  You were asking
23          him about testimony that hasn't
24          happened and you know better than
25          anybody it hasn't happened.  So it's
```

NICHOLAS LARAWAY

June 17, 2025

1              an improper question.

2         Q.    Could you read the question

3     back?

4              (Whereupon, the above record

5     was read back by the court reporter.)

6              **THE WITNESS:  Can I answer?**

7              MR. RODGERS:  If you can

8         answer.

9         **A.    I would reiterate the same**

10    **statement as before.  We would have to rely**

11    **on the testimony of Brian, Lenny, the**

12    **captain which we can't have, the future**

13    **testimony of the mate and the documents**

14    **provided through discovery.  I do not**

15    **personally have any firsthand knowledge of**

16    **any training.**

17        Q.    Does Carver have records of the

18    training of its personnel at Carver Marine

19    Towing?

20        **A.    There -- can you repeat the**

21    **question?**

22        Q.    Does Carver maintain records of

23    the training that is provided to the people

24    that work for Carver Marine Towing?

25        **A.    I believe we do.**

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        Q.    And what's that belief based

 2   on?

 3        A.    Any sanction training that we

 4   provide or that someone is -- comes with is

 5   stored within their personnel files.

 6        Q.    Have you reviewed any such

 7   training records for Captain James

 8   Morrissey?

 9        A.    I specifically have not.

10        Q.    Do you know if they exist?

11        A.    Anything that exists has been

12   provided through the discovery that we have

13   conducted.  That I'm aware of.

14        Q.    So you don't know whether it

15   exists or not but if it does, you believe

16   it's been provided in discovery?

17        A.    Correct.

18        Q.    To Carver's knowledge, was a

19   lookout posted for the bridge transit of

20   the Norfolk and Portsmouth Belt Line Bridge

21   on June 15th, 2024?

22        A.    Not that I'm aware of.

23              MR. RODGERS:  You okay?

24              THE WITNESS:  Is now a good

25   time for a break or?
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1                  MR. RODGERS:  It's up to you.
 2    You're the witness.
 3         Q.    Do you need to take a break?
 4         A.    If we can, I'd just like to use
 5    the restroom real quick.
 6         Q.    Yeah.  Sure.
 7         A.    Are we done with this document?
 8         Q.    I think so, yeah.
 9         A.    Okay.
10                  THE VIDEOGRAPHER:  We are going
11    off the record.  The time is 12:18 p.m.
12                  Off the record.
13                  (Whereupon, a short recess was
14    held.)
15                  THE VIDEOGRAPHER:  Beginning
16    Media Number 4.  We are back on the record.
17    The time is 12:32 p.m.
18         Q.    Mr. Laraway, what training was
19    provided to the captains of the tugs
20    regarding the use of the autopilot on any
21    of the tugs that were equipped with it?
22         A.    I would rely on the testimony
23    of Brian and Lenny, any documents in
24    evidence and the future testimony of
25    Morrissey.  I'm not specifically aware
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   myself.
 2       Q.    And you haven't done anything
 3   to become aware?
 4       A.    I didn't hear you.
 5       Q.    And you haven't done anything
 6   to become aware?
 7           MR. RODGERS:  Objection.  He
 8        didn't say that.
 9           MR. CHAPMAN:  Well, he said he
10        was not specifically aware himself.
11        That's what I'm trying to understand.
12       Q.    You haven't done anything to
13   specifically become aware?
14           MR. RODGERS:  Objection.  You
15        can answer if you want.  If you
16        understand it.
17       A.    I understand the question.
18   I -- during my preposition, I did not
19   become aware of specific training related
20   to use of the autopilot.
21       Q.    So you would rely on, I think
22   you said Mr. Baldassare or Mr. Moore or
23   documents?
24       A.    Or documents or Morrissey,
25   testimony forthcoming.
```

NICHOLAS LARAWAY

**June 17, 2025**

```
 1              MR. CHAPMAN:  What exhibit are
 2   we up to?
 3              THE REPORTER:  I think 10.
 4              MR. CHAPMAN:  Okay.
 5              Will you mark that as 10,
 6   please.
 7              (Whereupon, Exhibit 10 was
 8   marked for identification.)
 9        Q.   Mr. Laraway, you've been handed
10   what's been marked as Exhibit 10, which is
11   Section 6.4 from the safety management
12   system.
13              Do you see that?
14        A.   Yes.
15        Q.   I just want to kind of start on
16   Page 1 there.  Basically, the use of
17   alcohol in connection with any sort of
18   vessel operations is prohibited by the
19   company, correct?
20        A.   Correct.
21        Q.   Okay.  If you turn to the third
22   page of this exhibit, for those of you who
23   are on the call, it's marked as Carver TBS
24   Helm CONNECT 00.  Starts at 843 and the
25   page I'm on now is 845.
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1                    Near the bottom it talks about

 2      testing.  You see that?

 3           A.    I do.

 4           Q.    And it says, "All employees and

 5      applicants are required to participate in

 6      prohibitive substance screenings for the

 7      following reasons."  And the first one is

 8      preemployment, A, B on the next page is

 9      random sampling and then C is

10      post-incident?

11                    Do you see that?

12           A.    I do.

13           Q.    "So any employee directly

14      involved in an accident, injury or incident

15      involving human error or any required

16      reporting by the U.S. Coast Guard will be

17      subjected to sampling to rule out the

18      involvement of prohibited substances,"

19      right?  Is that what it says?

20           A.    It is.

21           Q.    There wasn't any post-incident

22      alcohol testing of any of the members of

23      the crew following the allision of the

24      Mackenzie Rose with the Belt Line Bridge on

25      June 15th, 2024, correct?
```

NICHOLAS LARAWAY

June 17, 2025

 1              MR. RODGERS:  Just alcohol?

 2      Q.    Well, I'm asking about alcohol

 3   right now, but yeah, this refers to

 4   prohibited substances.

 5              MR. RODGERS:  Objection to

 6       form.  You can answer it.

 7      Q.    My first question was about

 8   alcohol.  There wasn't any alcohol testing,

 9   was there?

10      **A.    Not that I'm aware.**

11      Q.    Okay.  In section D, it says,

12   "Alcohol test kits are on board the vessel

13   to meet the two-hour alcohol testing

14   deadline."  Are there in fact alcohol test

15   kits on the vessel?

16      **A.    I would have to rely upon the**

17   **testimony of Brian and Lenny and the**

18   **documents provided in evidence.  I'm not**

19   **certain.**

20      Q.    Okay.  And then there's a

21   further drug testing deadline for

22   prohibited substances that has to be done

23   within 32 hours.

24              You see that?

25      **A.    I see that.**

NICHOLAS LARAWAY

June 17, 2025

1       Q.    And there wasn't any such drug

2   testing of any members of the crew of the

3   Mackenzie Rose within that period of time

4   following the allision with the Belt Line

5   Bridge, correct?

6       **A.    Not that I'm aware of.**

7            MR. RODGERS:  You said drug

8       testing?

9            MR. CHAPMAN:  I said drug

10      testing, yes.

11      Q.    In the aftermath of the

12  allision with the Belt Line Bridge on June

13  15th, 2024, did Carver change anything

14  related to its drug testing protocols or

15  policies?

16           MR. RODGERS:  Objection.

17      Foundation.  You can answer if you

18      know.

19      **A.    I'm unaware.**

20      Q.    Who is Thomas Feeney?

21      **A.    Tom Feeney is an operations**

22  **manager for Carver Marine Towing.**

23      Q.    Is he still employed by Carver?

24      **A.    He is.**

25      Q.    Since the allision with the

**NICHOLAS LARAWAY**

**June 17, 2025**

1    Belt Line Bridge in June of 2024, has

2    Carver hired a vendor to manage its drug

3    and alcohol testing?

4        **A.    The company may have.  I'm not**

5    **aware of any.  That doesn't mean it didn't**

6    **happen.  We've had relationships with**

7    **multiple drug testing vendors in the past.**

8    **I'm not sure if we're using the same one or**

9    **if it's switched.**

10            MR. CHAPMAN:  Can you mark that

11    as Exhibit 11, please?

12            (Whereupon, Exhibit 11 was

13        marked for identification.)

14        Q.    You've been passed a document

15    marked Exhibit 11 which appears to be an

16    e-mail from Thomas Feeney on July 29th,

17    2024 to Brian Moore, Leonard Baldassare and

18    Jason Galioto.  Do you see that?

19        **A.    I do.**

20        Q.    For those of you who are

21    attending remotely, the production number

22    is Carver ESI000201.  And it appears to be

23    an e-mail that has been forwarded by

24    Mr. Feeney to others in the Carver Marine

25    Towing end of the business about some sort

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   of drug testing consortium.  Do you see
 2   that?
 3        A.    I do see that.
 4        Q.    And the company that they were
 5   talking to was American Maritime Safety,
 6   Inc.?
 7        A.    That's what it appears to be.
 8        Q.    Okay.  Attached to this e-mail,
 9   apparently somebody forwarded it to
10   Mr. Feeney is a membership services
11   agreement?  Starting at --
12              MR. RODGERS:  Just on the
13         record, just an objection to the line
14         of questioning or remedial, but the
15         witness can answer to his knowledge.
16              And if just -- I'm going to
17         have that as standing objection.
18        Q.    Sure.  It be -- the page number
19   is 212.
20        A.    Okay.
21        Q.    Has Carver entered into this
22   agreement or an agreement like this with
23   AMS, America Maritime Safety?
24        A.    I am not aware if we have, or
25   have not.
```

NICHOLAS LARAWAY

June 17, 2025

1      Q.    Is there any other vendor of

2  these type of services that Carver has

3  entered into an agreement with?

4      **A.    What type of services?**

5      Q.    These drug testing services.

6      **A.    We have a standard vendor that**

7  **Carver Companies utilizes for**

8  **pre-employment, random and post-incident**

9  **drug and alcohol testing at a number of our**

10  **locations.**

11     Q.    Those -- are those shoreside

12  facilities?  When you say a number of those

13  locations, I'm just trying to understand

14  your answer.

15     **A.    My understanding is that that**

16  **vendor provides the service for our**

17  **shoreside locations and when requested for**

18  **our tug and fleet as well.**

19     Q.    And who is that vendor?

20     **A.    The companies name is Foro,**

21  **F-O-R-O.  I don't know much beyond that.**

22     Q.    Okay.  You didn't sign the

23  contract?

24     **A.    Not that I'm aware of.  Not**

25  **that I can recall.**

**NICHOLAS LARAWAY**

**June 17, 2025**

1      Q.    Okay.

2            MR. CHAPMAN:  Can you mark this

3    as 12, please?

4            (Whereupon, Exhibit 12 was

5         marked for identification.)

6      Q.    You've been passed Exhibit 11,

7    which appears to be a letter and

8    some -- oh, I'm sorry.  I apologize.

9            You've been passed Exhibit 12.

10   Thank you, Madam Court Reporter.

11           Mr. Laraway, you've been passed

12   Exhibit 12, a letter from Carver to

13   Mr. Morrissey, James Morrissey, with a

14   couple of details, pages detailing, I guess

15   some kind of internal processing related to

16   his termination.

17           Do you see that?

18     **A.    I do.**

19     Q.    Okay.  Was Captain Morrissey

20   disciplined in any way after the allision

21   with the Belt Line Bridge?

22     **A.    He was sus -- my understanding**

23   **is he was suspended pending the outcome of**

24   **multiple investigations.**

25     Q.    So how soon was he suspended

**NICHOLAS LARAWAY**

June 17, 2025

```
 1  after the allision?
 2       A.    For specifics, we would need to
 3  rely on the documents and evidence on the
 4  testimony of Brian and Lenny.  I would only
 5  be able to speak to what I recall.
 6       Q.    Yeah.  So there's a collection
 7  of documents from what I presume to be his
 8  personal -- personnel jacket, personnel
 9  file --
10       A.    Yes, sir.
11       Q.    -- that was produced.  I
12  couldn't find anything in there about him
13  being suspended.  I only find this
14  reference to a termination.  Is there a
15  status that would normally be entered in
16  the system that says the employee was
17  suspended?
18       A.    I don't operate within the HRIS
19  system.  I can't speak to -- if that is a
20  possible status or not.
21       Q.    When you say HRIS, what is that
22  an acronym for?
23       A.    HR Information System.
24       Q.    Human Resources Information
25  System?
```

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1        A.    Yes.
 2        Q.    So if you look on the second
 3   page of Exhibit 12, which looks like it's
 4   some sort of print out from that system; is
 5   that right?
 6        A.    That is correct.
 7        Q.    Okay.  So who is Sybil
 8   Linstead?
 9        A.    Sybil is one of our HR
10   generalists.
11        Q.    Still employed by the company?
12        A.    Yes.
13        Q.    And then a little further down,
14   under administrator termination, it says,
15   "Administered -- initiated for James
16   Morrissey, initiated by Thomas Marin."
17   Is -- am I pronouncing that correctly?
18        A.    You are.
19        Q.    And who is Mr. Marin?
20        A.    He is our chief HR officer,
21   CHRO.
22        Q.    Does he still work for the
23   company?
24        A.    He does not.
25        Q.    And do you recall about when he
```

**NICHOLAS LARAWAY**

June 17, 2025

```
1   left?
2        A.    About three or four months ago,
3   it was recent.
4        Q.    Did he take another position
5   somewhere else?
6        A.    He did.
7        Q.    And do you know where he went?
8        A.    Where Tom went.
9        Q.    Yeah.
10       A.    He is working for some service
11  provider of SUNY in the Albany area.  I
12  don't know the specific company but.
13       Q.    A service provider of SUNY, you
14  mean as and acronym for?
15       A.    State University of New York.
16  They provide services for -- as a
17  subcontractor or vendor of SUNY.
18       Q.    So on the second -- on the next
19  page of Exhibit 12.
20       A.    Mm-hmm.
21       Q.    It says -- it's a continuation,
22  I presume, of the printout from that
23  system.  It says, "Eligible for rehire."
24  Do you see that line?
25       A.    I do.
```

NICHOLAS LARAWAY

June 17, 2025

```
 1        Q.    No.  Why is he not eligible for
 2   rehire?
 3        A.    That would be a question to be
 4   answered by Brian or Tom.
 5        Q.    Did you personally, I'm asking
 6   you in your personal capacity, have any
 7   involvement in his termination?
 8        A.    Other than awareness that it
 9   was happening, I was not involved in the
10   process, no.
11        Q.    So what was the reason for his
12   termination?
13        A.    While under paid suspension
14   during the investigation, Brian or some
15   member of his team became aware that
16   Mr. Morrissey began employment for another
17   company.  And he didn't feel it appropriate
18   to continue to pay him as a suspended
19   mariner while he was working for someone
20   else.
21        Q.    So he was still on the payroll,
22   so to speak and getting paid even though he
23   wasn't working?
24        A.    Correct.  Paid suspension, is
25   my understanding.
```

NICHOLAS LARAWAY

June 17, 2025

```
1        Q.    And who did he go to work for
2   while he was still on your payroll?
3        A.    I don't know.
4        Q.    So the last entry on this page
5   says, "Notes."  There's nothing in the
6   before column but then in the submitted
7   column it says, "Ongoing Coast Guard
8   investigations.  See documents."
9        A.    That is what it says.
10       Q.    What documents are those?
11       A.    I don't have personal knowledge
12  as to what they are.  I would rely on the
13  testimony of Brian and the documents
14  submitted.
15       Q.    Did you review the records
16  produced to us regarding Mr. Morrissey?
17       A.    I generally reviewed hundreds
18  of documents.  I don't know specifically if
19  I reviewed those specific documents.
20       Q.    Yeah.  I'm just trying to
21  understand if there --
22       A.    Yeah.
23       Q.    Are there any?  It says, "See
24  documents."  Are there any other documents
25  that relate to Mr. Morrissey in these kind
```

**NICHOLAS LARAWAY**

June 17, 2025

1  of personnel file that I haven't seen,

2  right?

**3**       A.    Yes.

4        Q.    I realize you can't read my

5  mind.

**6**       A.    Yes.

7        Q.    But I'm just -- I didn't see

8  any and just trying to figure out what the

9  reference is to "see documents."

**10       A.    I can't attest -- I didn't**

**11  write this nor was I involved in the**

**12  execution of this.  So I can't.**

**13  Specifically somebody's buzzing.**

14        Q.    So would Sybil Linstead have

15  made all of these entries?

**16       A.    Based upon my understanding of**

**17  what is written here, it could have been**

**18  Sybil or it could have been Tom.**

**19            I don't know if this was a**

**20  printout that Sybil did and Tom filled the**

**21  whole thing out or if Tom did the whole**

**22  thing.  I'm not familiar enough with the**

**23  system to say which one of two of them.**

24        Q.    So we can go back to Page 1.

25  It says, the very first sentence, "In

NICHOLAS LARAWAY

June 17, 2025

```
1   accordance with New York, NY Labor Law," I
2   assume that means New York Labor Law,
3   "195(6), this letter is to provide written
4   notice that your employment with Carver
5   Companies terminated on 9/27/2024, right."
6   And then it further says, "Your last day
7   work was on about 9/27/2024."
8              If I understood your earlier
9   testimony, he didn't actually work that
10  day, he was just in a suspended status.
11       A.    That is my understanding.
12       Q.    He may have been working for
13  somebody else at the time?
14       A.    He may have.
15       Q.    Okay.  So was he an employee of
16  Carver Companies as it says in that first
17  line?
18       A.    He was an employee of Carver
19  Companies Payroll, that is correct, LLC.
20       Q.    So at the end -- well, let me
21  just kind of unpack that.  Carver -- I'm
22  sorry.  You said it's Carver Companies
23  Payroll, LLC?
24       A.    That is correct.
25       Q.    What is that?
```

NICHOLAS LARAWAY

June 17, 2025

1          A.    It is an entity of ours that

2     processes payroll for all our hourly and

3     day rate employees that work for various

4     Carver entities.

5          Q.    Not just Carver Marine Towing?

6          A.    No.

7          Q.    But doesn't handle salaried

8     personnel?

9          A.    Correct.

10         Q.    Okay.  It's signed or at least

11    has a signature block for Sybil Laraway.

12    Who is that?

13         A.    That is Sybil's maiden name.

14         Q.    Oh, this is Sybil Linstead?

15         A.    Yes.

16         Q.    They are one and the same?

17         A.    Yes.

18         Q.    Okay.  Are you related to her?

19         A.    She is my cousin.

20         Q.    There's a -- this has been

21    photocopied and provided to us in

22    discovery.  And it appears to have a pink

23    sticky note on it.

24               Do you see that?

25         A.    It does.

## NICHOLAS LARAWAY

June 17, 2025

1        Q.    Do you know whether there is
2    anything under that sticky note that we
3    can't see because it's covering it?
4        **A.    I don't specifically know that**
5    **there is nothing under there, but I do not**
6    **believe there is.**
7        Q.    Okay.  And what makes you think
8    that?
9        **A.    Based upon where her signature**
10   **block is, I wouldn't believe.  And knowing**
11   **how our signature blocks are set up, I**
12   **wouldn't believe there is anything to the**
13   **right of her e-mail signature block or**
14   **letter's signature block, whatever it is.**
15       Q.    Okay.  Was any action taken
16   against Captain Christopher Miller,
17   disciplinary or employment-wise, as a
18   result of the allision with the Belt Line
19   Bridge?
20       **A.    Not that I'm aware of.**
21       Q.    So he stayed on the payroll,
22   right?  And continued to work for Carver?
23       **A.    That's my understanding.**
24       Q.    Okay.  At least until he passed
25   away this year?

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        A.    Until he went out sick before
 2   he passed away.
 3        Q.    Okay.  So besides being
 4   suspended and I guess not performing duties
 5   at some point following the allision with
 6   the Belt Line Bridge, was there any other
 7   employment or disciplinary action taken
 8   against Mr. Morrissey up until the time he
 9   was terminated?
10        A.    My understanding is the
11   investigation internally and with the Coast
12   Guard remained ongoing, and that we were
13   waiting until there was a conclusion to
14   that before we took any further action.
15        Q.    So is it fair to say that if
16   hadn't been terminated because it turned
17   out for a period that he was working for
18   somebody else, he would still be in a
19   suspended status?
20             MR. RODGERS:  Objection to
21         form.  It calls for speculation.
22        Q.    Let me just finish -- pending
23   your receipt or whatever the Coast Guard's
24   investigation was?
25        A.    It was -- it certainly is
```

**NICHOLAS LARAWAY**

June 17, 2025

1    possible that that could be the case.

2         Q.    Who is Jason Galioto?

3         A.    He is an employee of Carver

4    Marine Towing.

5         Q.    And what's his position?

6         A.    He works in compliance and

7    safety predominantly.

8         Q.    Do you know when he was first

9    hired?

10        A.    He's been employed here since

11   prior to the incident but I don't recall

12   specifically when he was hired.

13        Q.    Okay.

14             MR. CHAPMAN:  So this is a

15   convenient time to take a break and grab

16   some lunch.

17             MR. RODGERS:  Yeah.

18             MR. CHAPMAN:  All right.

19             MR. RODGERS:  What time do you

20   want?

21             MR. CHAPMAN:  You want to come

22   back at 2:00?

23             THE VIDEOGRAPHER:  We are going

24   off the record.  The time is 12:58 p.m.

25             Off the record.

**NICHOLAS LARAWAY**

June 17, 2025

 1              (Whereupon, a short recess was
 2   held at this time.)
 3              THE VIDEOGRAPHER:  Beginning
 4   Media Number 5.  We are back on the record.
 5   The time is 2:06 p.m.
 6       Q.    Would you mark that as the next
 7   exhibit?
 8              THE REPORTER:  I believe 13.
 9              MR. CHAPMAN:  13, yeah.
10              (Whereupon, Exhibit 13 was
11   marked for identification.)
12       Q.    Mr. Laraway, this is another
13   section out of the Carver Safety
14   Management, number 8.8F, titled
15   "Collision/allision."
16              Do you see that?
17       **A.    I do.**
18       Q.    And the reference is Carver TBS
19   Helm CONNECT 00996 and 997.  It looks like
20   Page 1 covers collisions; is that correct?
21       **A.    That appears to be correct.**
22       Q.    And then Page 2 covers
23   allisions.  That is hidden fixed objects.
24   The first of which is, what to do if you
25   hit an aid to navigation, and the second,

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1   what to do if you hit a structure, correct?
 2        A.    That is correct.
 3        Q.    And so kind of like the
 4   incident reporting, number one for hitting
 5   a structure is to notify the company,
 6   correct?
 7        A.    Correct.
 8        Q.    Number two is to notify the
 9   appropriate person in charge.  It's got a
10   parenthetical, (The lock master, the bridge
11   tender, the doc master, et cetera.)  Do you
12   see that?
13        A.    I do.
14        Q.    You've already confirmed that
15   the company did not notify the bridge when
16   it happened, right?
17        A.    That is correct.
18        Q.    And then it says to notify the
19   U.S. Coast Guard if appropriate.  And we've
20   already seen that your 9.5 of the SMS says
21   if you hit -- unintended contact with a
22   bridge requires notifications to the Coast
23   Guard and that didn't happen, correct?
24        A.    Correct.
25        Q.    It says, "Document the damage
```

**NICHOLAS LARAWAY**

**June 17, 2025**

1    including photographs."  There's one

2    photograph that has been produced in

3    discovery and I'm still sort of chasing the

4    original native version of it.  But I want

5    to show you that one photograph, which was

6    marked as Exhibit 1 at Mr. Moore's

7    deposition.

8              Have you seen that photograph

9    before?

10         A.    I have.

11         Q.    Okay.  And did you see it

12   in -- I'll ask it in the first month after

13   the incident, after the allision?

14         A.    From what I can recall, yes.

15         Q.    Yeah.  And did somebody forward

16   that to you?

17         A.    I don't recall how I came upon

18   it.

19         Q.    Okay.  So it could have been

20   like an attachment to an e-mail?

21         A.    It could have.

22         Q.    It could have been somebody

23   texted it to you?

24         A.    It could have.

25         Q.    Yeah.  Somebody might have

## NICHOLAS LARAWAY

**June 17, 2025**

1　printed it out -- I'm sorry, this sounds

2　silly, but I'm just trying to understand

3　what the range of options are.

4　Somebody printed it and you saw it like in

5　the paper version that is right there?

**6**　　　**A.　　Certainly.**

7　　　Q.　　If you look at Exhibit 1 there,

8　it's a little grainy, it's not like super

9　clear.

10　　　　Have you ever seen one that is

11　not grainy like that?

**12**　　　**A.　　I don't recall if the one that**

**13**　**I saw was less grainy or of the same**

**14**　**quality.**

15　　　Q.　　The one you saw, you know, in

16　the month or so after the allision, did it

17　lead you to believe that there had been

18　some damage to the bridge itself?

**19**　　　**A.　　Knowing what I saw in the**

**20**　**letter you sent me and the nature of the**

**21**　**bridge and the photo, it lead me to believe**

**22**　**that that was correct.**

23　　　Q.　　Okay.  Do you know whether any

24　other photographs of the bridge were taken

25　by the tug?

NICHOLAS LARAWAY

June 17, 2025

1          A.    I would rely upon the testimony

2    of Brian and Lenny and documents produced,

3    and I'm personally I'm unaware of any

4    additional.

5          Q.    All right.  I'll take number

6    one back.  Thank you.

7          A.    You're welcome.

8          Q.    Can you mark that as 14,

9    please?

10               (Whereupon, Exhibit 14 was

11          marked for identification.)

12         Q.    You've been handed what's been

13   marked as Exhibit 14, which is an e-mail

14   produced in discovery.  It begins with

15   Carver ESI000313 and ends with 319.  And it

16   appears to be an e-mail sent by Jason

17   Galioto to Brian Moore on July 3rd, 2024.

18   Do you see that?

19         A.    That appears to be correct.

20         Q.    And he appears to be forwarding

21   e-mail received from the Tug Mackenzie

22   Rose, sent July 2nd, 2024.

23               Do you see that?

24   A.    Yes.

25         Q.    So who is able to use the

**NICHOLAS LARAWAY**

**June 17, 2025**

1  tugmackenzierose@carvercompanies.com e-mail

2  address to send things or to send e-mails?

3      **A.    I would rely on the testimony**

4  **of Brian and Lenny.  However, my**

5  **understanding is the captain and mate on**

6  **watch during any hitch have access to that**

7  **e-mail.**

8      Q.    Okay.  So does Carver know who

9  actually sent these photographs from that

10  Tug Mackenzie Rose e-mail address?

11      **A.    I would --**

12          MR. RODGERS:  He is talking

13      about, yeah, from the tug.

14      Q.    Yeah, from the tug.  It

15  says -- somebody's written, "Here are the

16  photos I took of the bridge and bow of the

17  barge June 15th after the allision with the

18  bridge."  But...

19      **A.    I mean, I can make an**

20  **assumption but it's not signed and this is**

21  **the first time I'm seeing this.**

22          MR. RODGERS:  Don't guess.

23      Q.    Oh, you haven't seen this

24  before?  Okay.

25          MR. RODGERS:  Don't guess.

**NICHOLAS LARAWAY**

June 17, 2025

1      A.      Yeah.

2      Q.      All right.  Okay.  And there

3  appear to be five digital images embedded

4  in the e-mail which says -- it's at

5  the -- on Page 2.  It says, "It's sent from

6  my iPhone."  Is the Tug's phone an iPhone?

7      A.      All company issued phones are

8  iPhones.

9      Q.      Okay.

10     A.      So that is a probability.

11     Q.      Okay.  And then the next five

12  pages are slightly larger images of the

13  ones that are embedded in the e-mail.

14  First of the bridge and then four of the

15  barge, correct?

16     A.      That appears to be correct,

17  yes.

18     Q.      All right.  So if we go back to

19  the first page and you see where it says

20  attachments.

21     A.      I do.

22     Q.      And it starts with IMG1731.JPG

23  and the iPhone protocol is, you know,

24  obviously given number to each photograph

25  as it's taken.

NICHOLAS LARAWAY

June 17, 2025

1          Do you know what photographs or
2    what's depicted in the photographs that
3    would have been numbered IMG1732 through
4    1737 are?
5          A.    I do not.
6          Q.    And do you know if they were
7    ever requested internally since there
8    appears to be a gap of a few photographs?
9          A.    I would rely on the testimony
10   of Brian, Lenny and the documents in
11   evidence, but I'm not personally familiar
12   with that request, if any.
13         Q.    Does the Tug Mackenzie Rose
14   have any other e-mail address that is
15   like -- is there is a
16   mackenzierose2@carvercompanies, or some
17   other kind of e-mail handle that is
18   considered a -- I'll call it a, you know,
19   tug or official e-mail address?
20         A.    I would rely on the testimony
21   of Brian and Lenny, but I'm not aware of
22   any other e-mail address personally.
23         Q.    In the aftermath of the
24   incident, you know, say in June or July of
25   2024, did you read any of the statements

**NICHOLAS LARAWAY**

June 17, 2025

1    that were submitted by the crew of the tug?

2        **A.    I did not personally at that**

3    **time, no.**

4        Q.    Did anybody inform you of their

5    contents?

6        **A.    Brian updated me generally as**

7    **to what was going on.  I would assume part**

8    **of that included updates related to the**

9    **statements.**

10       Q.    Did you understand that crew

11   statements had been taken or obtained in

12   some way?

13       **A.    Yes.**

14       Q.    Would you mark this as 15,

15   please?

16             (Whereupon, Exhibit 15 was

17   marked for identification.)

18       Q.    You've been handed what's been

19   marked as Exhibit 15, which is an e-mail

20   sent June 16th, 2024 to Leonard Baldassare

21   and Brian Moore.  And in the -- it says

22   it's sent from admin services but the

23   e-mail address appears to be

24   chris.miller63@hotmail.com.

25             You see that?

**NICHOLAS LARAWAY**

June 17, 2025

1      A.    I do.

2      Q.    Okay.  So Chris Miller is one

3   of the captains at Mackenzie Rose, right?

4      A.    Was.

5      Q.    Yes, correct.  Was.  So is

6   chrismiller63@hotmail.com considered like

7   an official or Carver Companies' e-mail

8   that he is sending this from?

9      A.    It is not.

10      Q.    All right.  There is no

11   prohibition against him doing that though?

12   He did it?

13      A.    He did.

14      Q.    All right.  Okay.  And did

15   either Brian Moore or Leonard Baldassare

16   share the content of these crew statements

17   with you in and about the time they

18   received them?

19      A.    No.  Not that I recall.

20      Q.    Okay.  I think you told us you

21   didn't find out that there had been an

22   incident until you received my letter on

23   the 20th, correct?

24      A.    That is correct.

25      Q.    Okay.  So if you could just

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   take a look at each of these statements
 2   with me?
 3        A.      Mm-hmm.
 4        Q.      The first one is the chief
 5   engineer, Mr. McGrath who says, "Was in my
 6   room, felt abrupt stop," right?
 7   And then the next one is from one of the
 8   deckhands, Sharif Porter, "I was in bed
 9   sleeping, I felt the boat sliding.  I
10   thought we popped the push gear."
11            And then the next one, the
12        other deckhand, Jarkeis Morrissey, in
13        the third sentence says, "I was in
14        the galley cleaning up and put away
15        the food when we hit something."
16        Right.
17            And then the last one
18        Christopher Miller, the captain who
19        says, "I, Christopher Miller, was in
20        my bed resting when I felt a bump."
21            If this information had been
22        shared with you when it came in, what
23        would it have lead you to do, if
24        anything?  Maybe nothing, but if
25        anything.
```

NICHOLAS LARAWAY

June 17, 2025

```
 1              MR. RODGERS:  Objection.  Calls
 2       for speculation.
 3              You can answer if you
 4       understand the question.
 5       A.    Understanding the question and
 6  knowing what -- if this information was
 7  provided to me along with the information
 8  that I am aware was shared with Lenny at
 9  the time that there was an issue with the
10  fendering or a tap as it said in this
11  e-mail, I would make sure that Brian and
12  Lenny conducted a full investigation to
13  confirm the facts.
14       Q.    And it wasn't until after
15  getting the letter from me that that
16  started?
17              MR. RODGERS:  Objection.  That
18       he did that or?
19              MR. CHAPMAN:  Yeah.  I'm just
20       asking.
21              MR. RODGERS:  Or that or Lenny
22       and Brian Moore doing an
23       investigation.  Those two different
24       things?
25              MR. CHAPMAN:  Yeah.
```

NICHOLAS LARAWAY

June 17, 2025

```
 1        A.    You're asking me when I did
 2   what I just described or when I became
 3   aware of it.  What is the question?
 4        Q.    The investigation.
 5        A.    Mm-hmm.
 6        Q.    Was there an investigation
 7   initiated before your receiving of my
 8   letter on June 20th?
 9             MR. RODGERS:  Objection of form
10        on the term investigation.
11             If you understand the question,
12         you can answer.
13        A.    I would rely specifically on
14   the testimony of Brian and Lenny and all
15   the documents provided through discovery.
16   But my understanding is that they were
17   reviewing what had happened.
18        Q.    Yeah.  Can you give us any more
19   detail on what you mean by reviewing what
20   happened?
21        A.    I cannot because I wasn't aware
22   of it at the time.
23        Q.    Just to be sure, you haven't
24   actually read their testimony, you've only
25   read --
```

NICHOLAS LARAWAY

June 17, 2025

```
 1              MR. RODGERS:  Objection.
 2         Objection.  You're getting into
 3         preparation.
 4              And by the way, just for the
 5         record, these statements, whatever
 6         they mean, are dated June 15th, and
 7         have a certain time on it.  So
 8         obviously there was some -- there
 9         were -- that the employees were being
10         asked by somebody to write down a
11         statement.  So when you say there was
12         no investigation, I take issue with
13         that.
14              MR. CHAPMAN:  Are you done with
15         your speaking objection?
16              MR. RODGERS:  Well, I'm, you
17         know, just straightening up the
18         record.
19    A.    Can you repeat the question?
20    Q.    I can't even remember the
21 question.
22    A.    Me either.
23              MR. RODGERS:  Me either.
24              MR. NANAVATI:  The question
25         was, did you actually read the
```

NICHOLAS LARAWAY

June 17, 2025

```
 1        transcript or just read a summary?
 2            MR. RODGERS:  Objection.  Don't
 3        answer that.
 4            MR. CHAPMAN:  So you're
 5        instructing the client --
 6            MR. NANAVATI:  You're saying
 7        that he can't answer what he did to
 8        prepare for a deposition --
 9            MR. RODGERS:  Who's this?
10        Who's speaking?
11            MR. NANAVATI:  Mark Nanavati.
12            MR. RODGERS:  Okay.  Well, you
13        can't do the tag team thing.  If you
14        want to ask questions on Evanston's
15        account, then you can do that when
16        Mr. Chapman is completed.
17            MR. NANAVATI:  I'm not asking
18        questions.  I'm challenging your
19        objections which are without merit.
20            MR. RODGERS:  Okay.  Well, good
21        for you but that's not going to
22        happen because we are not doing tag
23        team.
24            My objection is
25        you -- is -- and I'll repeat it,
```

NICHOLAS LARAWAY

June 17, 2025

```
 1          you're asking for attorney-client
 2          privilege information.  He's already
 3          answered that he read summaries.  Not
 4          you, Mark.  I'm talking to Jim.
 5      Q.    And all I'm trying to do is be
 6  clear.  The only thing you read was
 7  summaries.  You didn't actually read the
 8  testimony of either Baldassare or Moore,
 9  correct?
10          MR. RODGERS:  Objection.  He's
11          told you what he did.  He is not
12          going to tell you what he didn't do
13          and we are not going there.  So I'm
14          going to tell him not answer -- and
15          excuse me, I'm going to direct the
16          witness not to answer based on
17          attorney-client privilege and
18          preparation for this deposition.
19      Q.    Do you know what an incident
20  report is in the Helm CONNECT system?
21      A.    I understand the gist of what
22  it is.
23      Q.    Okay.  Tell us what you
24  understand it to be?
25      A.    An incident report is a
```

NICHOLAS LARAWAY

June 17, 2025

1    document filled out by crew when an

2    incident or near miss or other event

3    happens in the Helm CONNECT system which is

4    our SMS.

5        Q.    And are there any notifications

6    to management when an incident report is

7    filled out in the Helm CONNECT system?

8            MR. RODGERS:  I'm sorry, could

9        you repeat that?  I missed it.

10       Q.    I said -- I asked, are there

11   any notifications to management when an

12   incident report is filled out in the Helm

13   CONNECT system?

14       A.    Management meaning CMT

15   management or company management?

16       Q.    I don't know if there -- I

17   don't understand on how you distinguish

18   them.  I'm basically asking would like

19   Mr. Moore or Mr. Baldassare or somebody

20   else in the management of the towing

21   business get a notification?

22       A.    I would rely on the testimony

23   of Mr. Moore and Lenny as to whether or not

24   they receive notifications regarding

25   incident reports from Helm.  I do not

**NICHOLAS LARAWAY**

June 17, 2025

1    receive incident reports from Helm.

2        Q.    Yeah, no, I get that.  But I'm

3    just asking what your understanding is.

4    Are they supposed to get a report, not

5    whether they actually did?

6        **A.    I'm not certain how the**

7    **interworkings of Helm work as it relates to**

8    **incident reporting notification.**

9        Q.    Can we mark that as 16 now?

10            (Whereupon, Exhibit 16 was

11    marked for identification.)

12       Q.    You've been passed Exhibit 16,

13    which appears to be an e-mail on June 28th

14    from the Tug Mackenzie Rose to Brian Moore

15    with a subject line, "I've finished the

16    incident report 6,15/24."

17            Do you see that?

18       **A.    I do.**

19       Q.    I'll represent to you that

20    there is nothing attached to this e-mail in

21    the way it was produced to us which is

22    Carver ESI000541.

23            Have you ever seen an incident

24    report for the bridge allision?

25            MR. RODGERS:  Just could you be

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1          more specific because there's Coast
 2          Guard reports?  There's internal
 3          reports.
 4      Q.    I'm asking about -- that's a
 5   good question.  I'm asking about the
 6   incident report in the Helm CONNECT system
 7   for this bridge allision.
 8      A.    I don't specifically recall if
 9   that was something that I reviewed as part
10   of my preparation for this deposition, and
11   I don't recall having seen anything in the
12   months after the event.
13      Q.    Do you know if there is an
14   incident report in the Helm CONNECT system
15   for the bridge allision?
16      A.    I would rely on Brian and
17   Lenny's testimony and what we've submitted
18   through our discovery process.  I'm not
19   specifically aware if there is one
20   personally.
21      Q.    Can you mark that as 17,
22   please?
23          (Whereupon, Exhibit 17 was
24   marked for identification.)
25      Q.    Mr. Laraway, you've been handed
```

NICHOLAS LARAWAY

June 17, 2025

```
 1   a document marked as Exhibit 17, which
 2   appears to be an e-mail from the Tug
 3   Mackenzie Rose, on June 24th, 2024, to
 4   Brian Moore and Leonard Baldassare.  The
 5   subject of which is "Helm log, June 15, RR
 6   incident."
 7           Do you see that?
 8      A.   I do.
 9      Q.   This one actually references an
10   attachment and based on the way that it was
11   produced by Carver, I believe that the
12   following four pages are the attachment.
13   But it's marked Carver ESI000527 through
14   531.
15           And since it came from the Tug
16   Mackenzie Rose e-mail, there's -- is there
17   any way to determine who actually sent it?
18      A.   I'm not aware of how we could
19   determine the specific individual, no.
20      Q.   Okay.  If you look at the
21   attachment on the first page, 528.  On the
22   second line it says "Entry type incident."
23   And you can't read it all but it looks like
24   something was logged at 1630 hours on June
25   15th, 2024, by Christopher (Chris) at
```

**NICHOLAS LARAWAY**

June 17, 2025

1    Norfolk, Virginia with a description.  You

2    see that?

3        **A.    I see it.**

4        Q.    All right.  And the description

5    says, "Mate James Morrissey reports the

6    autopilot was not completely turned off as

7    he was able to correct and switch back over

8    to hand steering and began backing on the

9    Weeks 281 barge and maneuvered the barge

10   alongside fendering on the north and PBL RR

11   bridge.  Photo taken, proceeds slowly away

12   from bridge."

13            In the aftermath of the

14   allision, saying that month or so following

15   June 15th, did you learn that the autopilot

16   had been used while they were making this

17   wedge in the vicinity of the bridge?

18            MR. RODGERS:  Objection.

19       **A.    I do not recall when I became**

20   **aware of the use of autopilot as it related**

21   **to this incident.**

22       Q.    Okay.  Do you have an

23   understanding what he -- it is meant by the

24   autopilot was not completely turned off?

25       **A.    I would rely on the testimony**

NICHOLAS LARAWAY

June 17, 2025

 1   of Brian and Lenny and Mate Morrissey

 2   eventually and the documents we've

 3   provided, I don't.

 4        Q.    To your knowledge, is there

 5   some way that an autopilot can be somehow

 6   not completely turned off?

 7             MR. RODGERS:  Objection.  He's

 8        already testified he is not a

 9        mariner, and he's also not here as an

10        expert.

11             You can answer if you have an

12        answer.

13        A.    I'd rely on the testimony of

14   Brian, Lenny, and the mate, and the

15   documents in evidence.  I have no knowledge

16   of how an autopilot system works.

17        Q.    Do you know whether this

18   document that we are looking at right now,

19   this PDF printout that's attached to the

20   e-mail marked Exhibit 17, is in fact

21   incident report in the Helm CONNECT system

22   for the bridge allision?

23        A.    I do not know if it is in the

24   Helm CONNECT system.  I would rely on the

25   testimony of Brian, Lenny, and the

NICHOLAS LARAWAY

June 17, 2025

1    documents we've produced.

2        Q.    What is Carver's understanding

3    of the reason the tug and barge allided

4    with the bridge?

5            MR. RODGERS:    Just what is

6    Carver's understanding?

7            MR. CHAPMAN:    Yeah.

8            MR. RODGERS:    At that time or

9    now.

10        Q.    You can give me both?

11            MR. RODGERS:    No.    He can

12    testify as to what his understanding was at

13    the time he learned of it and what his

14    understanding is now, if you understand

15    that.

16            Why don't you ask him

17    separately, Jim, so we keep it simple?

18            MR. CHAPMAN:    So I don't think

19    I have to but I'll humor you, Mr. Rodgers.

20            MR. RODGERS:    Well, just to add

21        another objection.    It was asked and

22        answered about two hours ago, but

23        again, just split up the question.

24        It would be easier for the witness to

25        understand.

**NICHOLAS LARAWAY**

**June 17, 2025**

1      Q.    So question one, what is

2   Carver's understanding of the reason that

3   tug and barge allided with the bridge?

4      **A.    My understanding?**

5      Q.    No, Carver's.

6           MR. RODGERS:  Objection to the

7       form.  If you don't understand the

8       question, then you don't -- then

9       don't answer it.

10          **A.    Can you rephrase the question?**

11     Q.    I don't think so.  What is it

12   that you don't understand about the

13   question?

14          MR. RODGERS:  Objection.

15          Don't answer that.

16          Jim, what are you doing here?

17          MR. CHAPMAN:  I'm trying to

18   clarify for him.  You're the one that's

19   made the objection.

20          MR. RODGERS:  No.  No.  No.  He

21   and I have both asked you to split it up.

22   You're asking Carver.  You are not saying

23   then or now.  So I -- it's -- just rephrase

24   it or withdraw the question.

25     Q.    So I'm using present tense.

NICHOLAS LARAWAY

June 17, 2025

```
 1   What is Carver's understanding or the
 2   reason the tug and barge allided with the
 3   bridge?
 4                MR. RODGERS:  Object -- same
 5       objection.
 6                Do you understand the question.
 7       A.    I did.  The company's
 8   understanding of what happened when the tug
 9   allided with the bridge was that originally
10   Morrissey stated that he got in with the
11   fenders, later amended the story multiple
12   times.  Finally, during -- based on my
13   understanding, during conversations with
14   the Coast Guard, he stated that he got in
15   and hit the bridge while he was piloting
16   the vessel.
17       Q.    And did -- he was using the
18   autopilot to pilot the vessel?
19       A.    I would rely on other people's
20   testimony to that.  I'm not specifically
21   sure.
22                MR. RODGERS:  And objection to
23   the extent as the document speaks for
24   itself that you've shown the witness, which
25   is and in some kind of an incident log that
```

NICHOLAS LARAWAY

June 17, 2025

1    says, "Mate James Morrissey reports the

2    autopilot was not completely turned off.

3    He was able to correct and switch back over

4    to hand steering and began backing on the

5    Weeks 281 barge," et cetera, et cetera.

6            So that's the document in front

7    of him and you are asking him to guess at

8    something when the document says what it

9    says.

10    Q.    Is there anything else to add

11    to your answer?

12    **A.    I mean the Coast Guard**

13    **investigation has not been completed.  So**

14    **we have an understanding of what we believe**

15    **happened, but we do not have the final**

16    **incident report or investigative report**

17    **from the Coast Guard.**

18    Q.    There wasn't anybody else at

19    the Helm at the time of the allision other

20    than Captain James Morrissey, correct?

21    **A.    That is my understanding.**

22    Q.    Was there any damage to the tug

23    as a result of alliding with the bridge?

24    **A.    I would rely on the testimony**

25    **of Brian, Lenny, and the information in**

NICHOLAS LARAWAY

June 17, 2025

1    evidence.  But I'm aware -- unaware of any

2    damage to the tug as a result of the

3    allision to the bridge.

4        Q.    Was there any damage to the

5    barge as a result of alliding with the

6    bridge?

7        A.    I would repeat that answer as

8    it relates to the barge.  There was

9    potentially some superficial damage but no

10   noticeable damage that we were made aware

11   of previously or subsequently that I'm

12   aware of.

13       Q.    Did Weeks Marine make any claim

14   against the company on account of damage to

15   its barge?

16       A.    Not that I'm aware of.

17       Q.    Okay.  Can you mark that as 18,

18   please?

19            Thank you.

20            (Whereupon, Exhibit 18 was

21        marked for identification.)

22       Q.    Mr. Laraway, you've been handed

23   what's been marked as Exhibit 18, an e-mail

24   sent June 24th, 2024 from Brian Moore to a

25   number of people.

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1              You've told us who Thomas

 2   Feeney is, Lenny Baldassare, Jason Galioto.

 3   Who is Dylan Galm?

 4        A.    He's our salesman.

 5        Q.    You referred to him previously

 6   I think in another answer.

 7        A.    I did.

 8        Q.    And who is Melissa Kool?

 9        A.    She was the financial

10   controller for this business unit for a

11   brief period of time including the June of

12   last year.

13        Q.    Does she still work for the

14   company?

15        A.    She does, just not in that

16   role.

17        Q.    You've told us who the CMT

18   dispatch is.

19              In Mr. Moore's e-mail, the

20   second dark bullet, you see it there?  It

21   says, "In the past we were charging one way

22   and now we are charging each way from JC to

23   PN."

24              Did I read that correctly?

25        A.    You did read that correctly.
```

NICHOLAS LARAWAY

June 17, 2025

1      Q.    Do you know what JC or PN are?

**2      A.    I do not.**

3      Q.    And then it says, "Note light

4   tug in invoice."  Do you see that?

**5      A.    Yes.**

6      Q.    Does this somehow relate to

7   getting paid for work that Carver Marine

8   Towing is doing with its tugs?

**9      A.    I would rely on Brian's**

**10   testimony and the evidence that we have**

**11   provided.  I'm -- I would be guessing.**

12      Q.    So the second to last

13   bullet -- dark bullet that begins with

14   "Logs are awful."

15            There is two bullets underneath

16   it.  One says, "Resend the logs."  The

17   second one says, "Resend the logs standards

18   and show what needs to be entered."

19            Do you know what the log

20   standards are?

**21      A.    I personally do not.**

22      Q.    Do you have any information

23   about when they may have been sent

24   previously by, I guess, somebody, the crew?

**25      A.    I would rely on Brian's**

**NICHOLAS LARAWAY**

June 17, 2025

1   testimony and the evidence we provided or

2   the documents we've provided.

3             I don't know what they are to

4   surmise when they may have been previously

5   provided.

6        Q.   Okay.

7             MR. CHAPMAN:   Can you mark that

8        as 19, please?

9             THE REPORTER:   19 or --

10       Q.   I think we're on 19.

11            THE REPORTER:   19.

12       **A.   Okay.**

13            (Whereupon, Exhibit 19 was

14   marked for identification.)

15       Q.   Mr. Laraway, you've been handed

16   a document marked Exhibit 19, which is an

17   e-mail sent July 7 -- excuse me, July 19th,

18   2024 from Jason Galioto to Brian Moore,

19   with an attachment in the form of, it looks

20   like an Excel spreadsheet titled "Near

21   Miss-Incidents, JHA."

22            Do you see that?

23       **A.   I do.**

24       Q.   Okay.  There -- this begins

25   with Carver ESI000020, and with the -- what

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   I believe is the attachment, which is a

 2   printout of the spreadsheet.  It ends in

 3   Carver ESI000037.

 4           If you turn to the second page,

 5   which is the beginning of the spreadsheet.

 6           Have you ever seen this before?

 7       A.   Not that I recall.

 8       Q.   Okay.  On it, I just want to

 9   direct your attention to three entries on

10   Page 1.  There's one on February 28, one on

11   April 1st, and another one on May 3rd

12   involving the Mackenzie Rose.

13           You see those?

14       A.   I do.

15       Q.   First one says, "Equipment

16   issue" and the other two say, "Navigation

17   equipment."

18       A.   Yes.

19       Q.   It's a little hard to follow,

20   but it looks like the second page.  When

21   it's printed out is just sort of whatever

22   was in the next column.

23           If you were to look at it in an

24   Excel spreadsheet, I think it would kind of

25   all line up.  But the -- you don't have any
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   memory of seeing this spreadsheet at any
 2   time before today?
 3        A.    I mean, it may have been
 4   in -- it definitely was in all of the
 5   documents, but I don't recall having
 6   reviewed this.
 7        Q.    Okay.  If you look at the
 8   February 28 entry for the Mackenzie Rose,
 9   where it says, "Equipment issue," on the
10   following Page 22.
11            It says, "Autopilot failure
12   that if had gone overlooked may have
13   resulted in a navigation incident."
14            Do you see that?
15        A.    I see that.
16        Q.    And the one on April 1st for
17   the Mackenzie Rose, almost in about the
18   middle of the second page it says, "SAT
19   compass failed causing erratic inputs in
20   the autopilot texts sent to
21   nav -- investigate."
22            Do you see that?
23        A.    I see that.
24            MR. RODGERS:
25   Just -- objection.  Just the -- whether we
```

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1   produced it this way or whatever.
 2            MR, CHAPMAN:  It's the way it
 3       prints out.  I mean, I --
 4            MR. RODGERS:  Okay.
 5            MR. CHAPMAN:  -- well, I can't
 6       control that --
 7            MR. RODGERS:  It's not lined
 8       up, so we're just --
 9            MR. CHAPMAN:  I get it.  It's
10       not easy --
11            MR. RODGERS:  I just want to
12       make that --
13            MR. CHAPMAN:  We're navigating
14       our way through it.
15            MR. RODGERS:  Very good.
16       Q.   So here's my question.  Where
17   it says, "Text sent to investigate," what
18   was investigated?
19       A.   I mean, I would rely on the
20   testimony of Brian and Lenny and the other
21   members of the crew that had any knowledge
22   in the documents we produced.
23            I would have to make an
24   assumption based upon what I'm reading here
25   to say exactly what's on --
```

NICHOLAS LARAWAY

June 17, 2025

```
 1              MR. RODGERS:  Don't assume --
 2       A.      -- I'm not going to do that.
 3              MR. RODGERS:  Yeah, don't
 4        assume or guess.
 5       Q.    So that I'm -- so basically you
 6   don't know and you would depend on whatever
 7   others have said or what documents have
 8   been produced about it; is that fair?
 9       A.    Correct.
10              MR. RODGERS:  Objection.
11       Q.    All right, and then the --
12              MR. RODGERS:  Object.  I am not
13        done.
14              MR. CHAPMAN:  I apologize.  I
15        thought you were.
16              MR. RODGERS:  You have the
17        documents that relate to those texts
18        and you've questioned people on them.
19            So if you want to put those in
20        front of him, you can ask questions,
21        but this is -- you're -- this is not
22        specific and you're asking him to
23        guess --
24              MR. CHAPMAN:  Well --
25              MR. RODGERS:  -- but he's
```

NICHOLAS LARAWAY

June 17, 2025

1          answered, so just continue, please.

2          Q.    So the one on May 3rd, okay,

3     for the Mackenzie Rose, it says,

4     "Navigation equipment."

5               Do you see that?

6     **A.    Yes.**

7               MR. RODGERS:  Again, I'm going

8          to object, because this incident is

9          in Helm CONNECT and you have other

10         documents which are more specific.

11              Ask your question.

12         Q.    And it appears that the line

13    related to that on the following page says,

14    "Rudder went hard over," and so it says.

15              Do you have any information

16    about that?

17    **A.    I would have to rely on the**

18    **testimony of others, Brian and Lenny and**

19    **the crew and the documents produced.**

20         Q.    And do you know whether any

21    techs, technicians were charged with

22    investigating that one?

23    **A.    That one specifically, I would**

24    **rely on the testimony of Brian and Lenny,**

25    **the others and the documents we've**

**NICHOLAS LARAWAY**

June 17, 2025

1    produced.

2           I do not specifically have

3    knowledge as to what any techs may or may

4    not have investigated.

5       Q.    So back to Page 1 of Exhibit

6    19, the e-mail itself?

7       A.    Mm-hmm.

8       Q.    Under the caption or heading

9    called, "Incident reports."  It says that

10   there were so many in first quarter, so

11   many in second quarter and then year to

12   date.

13          And then right after that

14   there's a dated entry May 21, 2024.  It

15   says, "The Mackenzie Rose filed one for the

16   autopilot inducing a hard turn to port."

17          Do you see that?

18      A.    I do see that.

19      Q.    That one for some reason's not

20   listed on this spreadsheet that we're

21   looking at, Page 2.

22          But my question is, do you know

23   whether there was any investigation

24   regarding that report of the autopilot

25   inducing a hard turn to port?

NICHOLAS LARAWAY

June 17, 2025

```
 1              MR. RODGERS:  What date was
 2       that?
 3              MR. CHAPMAN:  May 21, 2024.
 4       A.    I would've to rely on the
 5  testimony of Brian and Lenny and the
 6  documents we've provided.
 7              I don't have any knowledge of
 8  any investigation.
 9       Q.    Okay.  And then the next entry
10  on Page 1 of Exhibit 19, it's dated
11  6/15/24.
12              It says Mackenzie Rose bridge
13  incident which as everyone knows is under
14  legal review.
15              Do you see that?
16       A.    I do.
17       Q.    Okay.  Was there any
18  investigation by technicians or otherwise
19  of the autopilot in the aftermath of -- or
20  the steering system, either one, in the
21  aftermath of --
22              MR. RODGERS:  Objection to
23       form.
24       Q.    -- the allision with the
25  bridge?
```

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1              MR. RODGERS:  You can answer.
 2      A.    I would have to rely on the
 3   testimony of Brian and Lenny and the
 4   documents provided.
 5              I do not -- I'm not
 6   specifically aware of any autopilot
 7   investigation.
 8      Q.    And did you do anything to
 9   determine that?  I mean --
10              MR. RODGERS:  Objection.
11      Q.    -- I hear what you've said you
12   would rely on others --
13              MR. CHAPMAN:  Let me finish
14      my -- -
15              MR. RODGERS:  No I --
16              MR. CHAPMAN:  No, let me finish
17      my question and you can object.
18              MR. RODGERS:  Okay, finish the
19      question.
20      Q.    My -- I heard what you said
21   that you would rely on the testimony of
22   Brian and Lenny and documents that have
23   been produced.
24              But I'm just asking, did you do
25   anything to specifically determine whether
```

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1   there was any effort to investigate the
 2   autopilot in the aftermath of the allision
 3   with the bridge?
 4              MR. RODGERS:  Objection.
 5         Immediately after the reporting to
 6         the Coast Guard, the Coast Guard
 7         conducted an investigation.
 8              They investigated every aspect
 9         of this, which you were aware of
10         because you were there at the
11         hearings or the interviews.  And
12         that's who did the investigation.
13              You are asking if they did
14         their own investigation when the
15         Coast Guard was investigating it?
16              MR. CHAPMAN:  That's exactly
17         what I'm asking.
18              MR. RODGERS:  At the same time?
19              MR. CHAPMAN:  That's exactly
20         what I'm asking.
21              MR. RODGERS:  Okay.
22     A.    And my answer would remain the
23   same.  Brian and Lenny were conducting the
24   investigation in conjunction with the Coast
25   Guard.
```

**NICHOLAS LARAWAY**

June 17, 2025

1          I would rely on their testimony

2     as to the process and results of the

3     investigation and the documents in

4     evidence.

5          I am not personally involved

6     with any investigation regarding the

7     autopilot.

8          Q.    So including whether there were

9     any technicians engaged to come and check

10    it out?

11         A.    Correct.

12         Q.    So if -- just continuing to

13    look at Exhibit 19, a little further down

14    beginning on Page 25, that is the Carver

15    ESI000025.

16         Do you have that?

17         A.    I do.

18         Q.    So that's a -- appears to be

19    another spreadsheet that's been printed out

20    and produced this way, but there's a

21    reference to May 21, 2024, Mackenzie Rose

22    in the navigation category.

23         And then if you turn to the

24    next page, where you think the spreadsheet

25    extends out, it says, "Autopilot put boat

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1   in hard left turn."
 2              Is that right?
 3        A.    I see that.
 4        Q.    And whether there was any
 5   investigation by technicians or otherwise
 6   of that, do you have any knowledge?
 7        A.    I would rely on the testimony
 8   of Brian and Lenny on that front.
 9              I do not have specific
10   firsthand knowledge as to if that specific
11   thing was reviewed --
12        Q.    Okay.
13        A.    -- without -- off the top of my
14   head.
15        Q.    Okay.  Let me pass over to you
16   what was marked as Exhibit 6 at Mr. Moore's
17   deposition.
18              MR. CHAPMAN:  I'm sorry, I
19         don't have one for you, Mr. Rodgers.
20        Q.    But I believe this is about
21   five days of daily logs for the Mackenzie
22   Rose, beginning three days before the
23   bridge allision, the day of the bridge
24   allision and then the day following,
25   essentially June 12th to June 16th, 2024.
```

NICHOLAS LARAWAY

June 17, 2025

```
 1              You see that?
 2      A.    I do.
 3      Q.    All right.  Have you seen these
 4  before today?
 5      A.    I may have seen them during my
 6  review and preparation for my deposition.
 7      Q.    All right.  So on June 12th,
 8  2024 the vessel was apparently at a
 9  shipyard in Baltimore standing by for
10  repairs.
11              You see that?
12      A.    That is what that says, yes.
13      Q.    Do you know the purpose of
14  those repairs?
15      A.    I would have to rely on the
16  testimony of Brian and Lenny.  I do
17  not -- and the crew.
18      Q.    So are you aware that the
19  vessel had taken the barge, the Weeks 281,
20  dropped it off and, the City of Chesapeake
21  on the Southern Branch of the Elizabeth
22  River, and then had gone up to Baltimore to
23  have some repairs, where it stayed for few
24  days before returning to the Norfolk to
25  pick up the barge?
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1              MR. RODGERS:  Are you telling

 2         him that or?

 3              MR. CHAPMAN:  No.  I'm just

 4         asking if he's aware of it.

 5         A.    I'm not specifically aware of

 6    that sequence.

 7         Q.    Okay.  Is there a different

 8    sequence that you're aware of or --

 9         A.    No.  I'm just not aware of the

10    specific days leading up to the incident.

11         Q.    Okay.  So I'm just interested

12    in what repairs, you know, were made to the

13    vessel.

14              So out of curiosity, we sent a

15    subpoena to the General Ship Repair

16    Corporation in Baltimore.

17              MR. RODGERS:  Did you produce

18         these to us?

19              MR. CHAPMAN:  Yep, mm-hmm.

20         Sure did.

21              And that's 21?

22              THE REPORTER:  I believe it is

23         20.

24              MR. CHAPMAN:  Okay.

25              MR. RODGERS:  Is that 20?
```

NICHOLAS LARAWAY

June 17, 2025

```
 1              MR. CHAPMAN:  20.

 2              (Whereupon, Exhibit 20 was

 3         marked for identification.)

 4      Q.    You've been handed Exhibit 20,

 5   which is a invoice that was produced

 6   pursuant to a subpoena by the General Ship

 7   Repair Corporation, dated June 14th, 2024,

 8   to Tug Mackenzie Rose and Carver Companies.

 9              Do you see that?

10      A.    I do.

11      Q.    And it says on it that there

12   two items that are being invoiced.  The

13   first is, "To prepare and weld to keeper

14   plate onto the port rudder post."

15              See that?

16      A.    I do.

17      Q.    Do you know what the reason or

18   the need for that repair was?

19      A.    I would rely on the testimony

20   of Brian, Lenny, the crew, and the

21   documents we have produced.

22              I personally don't even know

23   what a keeper plate is, so I cannot attest

24   to that.

25      Q.    Okay.  And then second -- the
```

NICHOLAS LARAWAY

June 17, 2025

```
 1   second item there is, "Provides straps to

 2   secure STBD," which I presume to be an

 3   abbreviation for starboard-side fender for

 4   transit.

 5           Do you know what the purpose of

 6   that repair was?

 7      A.   I would reiterate the same

 8   answer.  I would rely on the testimony of

 9   Brian, Lenny, the crew and the documents

10   we've provided.

11           I don't know why they would do

12   that.

13      Q.   And do you know any reason for

14   why these repairs would be done in

15   Baltimore?

16      A.   I would rely on the testimony

17   of Brian and Lenny.  I don't.

18      Q.   Can you hand me Exhibit 6 back

19   so I don't lose track of it, please?

20      A.   Yes, sir.

21      Q.   Thank you.

22           MR. CHAPMAN:  We've been going

23       a little bit over an hour.  Why don't

24       we take a short break and come back?

25           THE VIDEOGRAPHER:  We are going
```

**NICHOLAS LARAWAY**

 1          off the record.  The time is

 2          3:03 p.m.

 3                 (Whereupon, a short recess was

 4          taken.)

 5                 THE VIDEOGRAPHER:  Beginning

 6          Media Number 6.  We are back on the

 7          record.  The time is 3:17 p.m.

 8     Q.    Mr. Laraway, I have a few

 9  questions about the condition of the

10  vessel.

11                 It was equipped with what's

12  referred to as AIS, an automated kind of

13  tracking system; is that right?

14                 MR. RODGERS:  You're telling

15          him or asking him?

16                 MR. CHAPMAN:  I'm just -- well,

17          I'm asking him to confirm it because

18          I know that it was, but yeah.

19     **A.    That is my understanding.**

20     Q.    Okay.  So and is AIS or the

21  automated tracking system used on all of

22  the Carver vessels, to your knowledge?

23     **A.    I would have to rely on the**

24  **testimony of Brian or Lenny.  I don't know**

25  **specifically that it's on all of our**

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   vessels.
 2       Q.    Okay.  Have you ever seen any
 3   information that was extracted from the AIS
 4   system pertaining to the allision with the
 5   Belt Line's Bridge?
 6       A.    Not that I recall.
 7       Q.    Did the Mackenzie Rose have a
 8   working radar system at the time of the
 9   allision with the bridge?
10       A.    I would have to rely on the
11   testimony of Brian, Lenny, the other
12   members of the crew and the documents we've
13   produced.
14       Q.    So just to be clear, you don't
15   know and you presume that they do, right?
16           MR. RODGERS:  Objection to
17       form.
18       A.    Correct.
19           MR. CHAPMAN:  Could you mark
20       this as 21?
21       A.    Thank you.
22           (Whereupon, Exhibit 21 was
23   marked for identification.)
24       Q.    You've been handed a document
25   marked as Exhibit 21, which is a
```

NICHOLAS LARAWAY

June 17, 2025

1  declaration of Josef Malik.  Am I

2  pronouncing the last name correctly, sir?

3  Which is dated on June 9th, 2025, as

4  reflected on Page 3.

5            Do you see that?

6      **A.    Yes.**

7      Q.    All right, have you

8  previously --

9            MR. RODGERS:  Just to be clear,

10      this has to do with the documents we

11      produced?

12            MR. CHAPMAN:  Yeah, mm-hmm.

13            MR. RODGERS:  Okay.

14      Q.    Have you previously seen this?

15      **A.    I have.**

16            MR. RODGERS:  I didn't hear

17      that.

18            **THE WITNESS:  I have.**

19      Q.    Did you have any --

20            MR. RODGERS:  No, I didn't hear

21      the question.

22            MR. CHAPMAN:  I said, have you

23      previously seen this?

24            MR. RODGERS:  Okay.

25            MR. CHAPMAN:  That is before I

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1           just handed it to him, marked as

 2           Exhibit 21.

 3                   MR. RODGERS:  I understand

 4           that.

 5                   MR. CHAPMAN:  Okay.

 6                   MR. RODGERS:  I have some

 7           hearing loss --

 8                   MR. CHAPMAN:  Yeah.

 9                   MR. RODGERS:  -- in my ear from

10           too much gun --

11                   MR. CHAPMAN:  Yeah.

12                   MR. RODGERS:  -- Navy gunfire,

13           I should say.

14           Q.    Have you -- do you have any

15     involvement in preparing it?

16           A.    Preparing this document?

17           Q.    Correct.

18           A.    I did not.

19           Q.    At the time you saw it, had it

20     already been signed by Mr. Malik?

21           A.    Yes.

22           Q.    Did you participate in any way

23     in the searches that are described in

24     Mr. Malik's declaration?

25                   MR. RODGERS:  And what do you
```

**NICHOLAS LARAWAY**

**June 17, 2025**

1          mean participate?  In what capacity?

2              MR. CHAPMAN:  In any capacity.

3          I'm just -- that's my question.

4          Q.    Did you participate in any of

5     the searches that are described --

6              MR. RODGERS:  Other than

7              communication with his lawyers, us,

8              me?

9              MR. CHAPMAN:  Well, if the

10             witness doesn't understand the word

11             search, we'll sort that out too.

12         Q.    But I'm just asking if you

13    participated in any of the searches that

14    are described in Mr. Malik's declaration,

15    Exhibit 21.

**16         A.    Beyond providing access to my**

**17    data if requested, I don't recall having**

**18    specifically participated in searching for**

**19    any of this stuff.**

20         Q.    And what do you mean by

21    providing access to your data?

22             MR. RODGERS:  Just -- okay.  Go

23             ahead.

24             You are talking to -- is your

25             question about what his lawyers asked

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1        him to do?
 2              MR. CHAPMAN:  My question is
 3         what he meant by providing access to
 4         his data or what he referred to as
 5         his data.
 6              MR. RODGERS:  You can answer
 7         that.
 8      A.    I mean, we have numerous cases
 9   ongoing.  I've provided my cellphone.  I
10   don't know if that was something that
11   was -- without reading through this thing
12   entirely, I don't know if that's something
13   that's been searched in conjunction with
14   this case or if that other cases.  We have
15   three active lawsuits going on at the
16   moment.
17      Q.    Okay.  If you look at Page 4,
18   it's titled, "Addendum A, e-mail ESI
19   search."
20              Do you see that?
21      A.    Yep.
22      Q.    So it describes custodians, and
23   I don't see your name or your e-mail among
24   them.
25      A.    Okay.
```

NICHOLAS LARAWAY

June 17, 2025

```
 1        Q.    Right.  So does that in any way
 2  inform you about?
 3        A.    If that's the case then I did
 4  not participate in the search for this
 5  data.
 6        Q.    Okay.  If you -- again, on Page
 7  4 under custodians, the third bullet.
 8              MR. RODGERS:  Just -- I'm
 9        sorry, Jim, but I think this
10        affidavit or -- I'm sorry,
11        declaration is for all our efforts
12        and the addendum is just the e-mail
13        ESI search.
14              MR. CHAPMAN:  Yeah.  And that's
15        what I'm asking about right now.
16              MR. RODGERS:  Just that did you
17        understand that he was just asking
18        about that?
19              THE WITNESS:  I understand that
20        now.
21              MR. CHAPMAN:  Yep.
22              MR. RODGERS:  Now he
23        understands that Jim.
24              MR. CHAPMAN:  Okay.
25        Q.    So my question is, the third
```

## NICHOLAS LARAWAY

June 17, 2025

```
 1  bullet there on the custodian says,

 2  "Cmiller@carvercompanies.com."  It's got

 3  this parenthetical, (Captain Chris Miller,

 4  check.  This is correct Carver e-mail.)

 5          Do you know whether Captain

 6  Miller, at least while he was alive, had an

 7  e-mail address of

 8  cmiller@carvercompanies.com?

 9      A.    I personally do not know if

10  that is his e-mail or if that e-mail ever

11  existed.

12      Q.    Do you know of any, in the next

13  bullet it says, "Crew members with a Carver

14  e-mail address," but doesn't list anybody.

15          Do you know of any other crew

16  members that had Carver Company's e-mail

17  addresses on the Tug Mackenzie Rose?

18      A.    I personally am not aware of

19  any.

20          MR. CHAPMAN:  So I don't have

21      any further questions at this time.

22      And pass the witness to, you know,

23      others on the Zoom if they have any

24      questions or whether you need to do

25      any follow up.
```

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1              MR. NANAVATI:  I'm just -- this
 2         is Mark Nanavati.  Just a couple of
 3         questions.
 4  EXAMINATION
 5  BY MR. NANAVATI:
 6      Q.   And if I missed this I
 7  apologize and I am confident that Jim will
 8  object.
 9           But do you know whether or not
10  there was working radar on Mackenzie Rose
11  on the date of the allision?
12              MR. RODGERS:  Objection.  Asked
13         and answered, but you can answer.
14      A.   I would rely on the testimony
15  of Brian, Lenny, the crew, the documents
16  we've provided.
17           And as we summarized in the
18  end, I have no reason to believe there
19  wasn't, but I don't know firsthand.
20      Q.   Okay.  And when you are saying
21  that you're relying on the testimony of
22  Brian, Lenny, the crew, what other crew are
23  you relying on?
24      A.   For that answer specifically or
25  for all of the times I said that.
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1        Q.    Let's start with that answer
 2   specifically.
 3              MR. RODGERS:  Just for the
 4        record, Mark, is, when he states that
 5        he is relying on the crew's testimony
 6        to date, which you're aware of was
 7        testified, but we also have Jason
 8        McGrath tomorrow and potentially
 9        Morrissey on next week, and Captain
10        Miller unfortunately passed away.
11              That's what he's referring to,
12        but he can still answer the question
13        if --
14              MR. NANAVATI:  Well, I mean,
15        now that you've answered it for him.
16        Q.    Is Mr. Rodger's answer, your
17   answer?
18              MR. RODGERS:  Is that --
19        A.    Yes.
20              MR. RODGERS:  -- what I said,
21        correct?
22        A.    Correct.
23        Q.    Okay.  And when you're saying
24   documents produced in response to that
25   question, which documents are you referring
```

**NICHOLAS LARAWAY**

June 17, 2025

1   to?

2      **A.    I mean, there were thousands of**

3   **documents produced throughout the discovery**

4   **is my understanding.**

5           **I have reviewed many of them.**

6   **I can't speak to which ones specifically**

7   **would attest to the working condition of**

8   **the radar if any.**

9      Q.    So you're suggesting that we go

10   through the documents and pick ones out

11   that's responsive to the question and that

12   will be your answer?

13           MR. RODGERS:  Objection to

14      form.  Of course you just answered

15      your own question, yes.  You should

16      do your homework.

17      Q.    So you can't identify a single

18   document as you sit here today that would

19   answer the question regarding the status of

20   the radar on the date of the allision, can

21   you?

22      **A.    Not specifically, no.**

23      Q.    Okay.  I don't have any further

24   questions for you, sir.  I appreciate your

25   time.

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1        A.     Thank you.

 2               MR. RODGERS:  Anybody else?

 3               I need a few minutes with the

 4        witness and Mr. Malik and then we'll

 5        come back.

 6               But you're done for -- other

 7        than follow up to follow up.

 8               MR. CHAPMAN:  Yeah.

 9               MR. RODGERS:  Let's -- yeah.

10        All right.  It'll just be a couple

11        minutes.

12               THE VIDEOGRAPHER:  Okay.  We

13        are going off the record.  The time

14        is 3:29 p.m.

15               Off the record.

16               (Whereupon, a discussion was

17        held off the record.)

18               THE VIDEOGRAPHER:  Beginning

19        Media Number 7.  We are back on the

20        record.  The time is 3:20 -- 35 p.m.

21               MR. RODGERS:  Okay.  We have no

22        follow-up questions at this time.

23               Thank you, Jim.  Thank you,

24        Mark.

25               THE REPORTER:  And --
```

**NICHOLAS LARAWAY**

June 17, 2025

1        MR. RODGERS:  And thank you

2    Madam Reporter and Madam

3    Stenographer -- no, Madam

4    Videographer.

5        THE REPORTER:  And would you

6    like a copy of a rough and a copy of

7    the transcript?

8        MR. RODGERS:  No, just the

9    transcript.

10        THE REPORTER:  Okay.

11        Mark, copy of the transcript?

12        MR. NANAVATI:  Yes, please.

13        THE REPORTER:  And would you

14    like a rough draft as well?

15        MR. NANAVATI:  No, thank you.

16        THE REPORTER:  Okay, got it.

17    Thank you so much.

18        MR. RODGERS:  Are we closed?

19        MR. CHAPMAN:  Till tomorrow.

20        MR. RODGERS:  Okay.

21        THE VIDEOGRAPHER:  Okay.  This

22    is the end of the video deposition of

23    Nicholas Laraway.

24        The time is 3:36 p.m.  And we

25    are off the record.

NICHOLAS LARAWAY

June 17, 2025

```
 1                    (Thereupon, the examination

 2          was concluded at 3:36 P.M.

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1              A C K N O W L E D G M E N T

 2

 3

 4    STATE OF NEW YORK)

 5                          :ss

 6    COUNTY OF          )

 7         I, Nicholas Laraway, hereby certify

 8    that I have read the transcript of my

 9    testimony taken under oath on 06/17/2025;

10    that the transcript is a true, complete and

11    correct record of what was asked, answered

12    and said during this proceeding, and that

13    the answers on the record as given by me

14    are true and correct.

15                    _____

16                    Nicholas Laraway

17

18

19    Signed and subscribed to
      before me this _____ day
20    of _____, 2025

21
      _____
22         Notary Public

23

24

25
```

**NICHOLAS LARAWAY**

**June 17, 2025**

```
 1              C E R T I F I C A T E

 2   STATE OF NEW YORK)
                              :ss
 3   COUNTY OF SUFFOLK  )

 4        I, LARIN KAYWOOD, a Notary Public

 5   within and for the State of New York, do

 6   hereby certify:

 7        That the witness whose examination is

 8   hereinbefore set forth was duly sworn and

 9   that such an examination is a true record

10   of the testimony given by such a witness.

11        I further certify that I am not

12   related to any of these parties to this

13   action by blood or marriage, and that I am

14   not in any way interested in the outcome of

15   this matter.

16        IN WITNESS WHEREOF, I have hereunto

17   set my hand this 17th day of June, 2025.

18

19

20                    _____

21                         Larin Kaywood

22

23

24

25
```

**NICHOLAS LARAWAY**

June 17, 2025

```
 1   Errata Sheet

 2

 3   NAME OF CASE: IN THE MATTER OF COEYMANS MARINE TOWING

 4   DATE OF DEPOSITION: 06/17/2025

 5   NAME OF WITNESS: NICHOLAS LARAWAY

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                                _____
```

**NICHOLAS LARAWAY**

June 17, 2025

**$**

**$2**
34:12,16 35:2

**$2,921,213.50**
36:2,14

**$3**
37:20

**$3,070,000**
48:2 49:2
51:8,17

**$4**
39:7 40:21
41:23 53:12

**0**

**00**
99:24

**000163**
74:20 75:20

**000191**
28:12

**000231**
40:6

**000817**
89:14

**000898**
88:1

**000910**
91:18

**001929**
49:22

**001962**
54:16

**001963**
55:15

**00490**
5:7

**00996**
118:19

**1**

**1**
5:2 7:15 43:6
62:23 99:16
112:24
118:20 120:6
121:7 148:10
153:5 154:10

**1.13**
88:18

**10**
57:19 99:3,5,
7,10

**104**
6:13

**10:08**
5:10

**10:41**
19:10

**11**
103:11,12,15
106:6

**11/1/2023**
48:16

**11:05**
56:11

**11:18**
56:18

**11:40**
75:6

**11:50**
75:10

**12**
106:3,4,9,12
108:3 109:19

**12303**
6:14,21

**12:18**
97:11

**12:32**
97:17

**12:58**
117:24

**12th**
158:25 159:7

**13**
118:8,9,10

**13th**
36:14

**14**
122:8,10,13

**14th**
161:7

**15**
126:14,16,19
137:5

**15th**
22:16 23:10
71:16 72:8
79:3 93:1
96:21 100:25
102:13
123:17 131:6
137:25
138:15

**16**
135:9,10,12

**163**
74:18,19
77:16

**12**
106:3,4,9,12

**1630**
137:24

**164**
78:10

**16th**
126:20
158:25

**17**
136:21,23
137:1 139:20

**1737**
125:4

**17th**
5:9

**18**
144:17,20,23

**18th**
28:19 29:15

**19**
147:8,9,10,
11,13,16
153:6 154:10
157:13

**1917**
49:22

**1930**
51:3

**195(6)**
113:3

**19th**
147:17

**1st**
54:14 148:11
149:16

**2**

**2**

**14:13,17**
19:11 31:4
56:17 118:22
124:5 153:21

**2,921,213.50**
38:7

**2.9**
38:6

**20**
39:18 54:14
160:23,25
161:1,2,4

**2010**
9:10

**2011**
8:13,16

**2014**
12:2 16:14

**2020**
11:13 32:18
50:22 51:7,17

**2021**
39:18 41:11
42:1

**2022**
35:25 36:15
37:21

**2024**
14:5 15:2
19:9 20:10
21:11 22:16
23:10 28:2,19
29:15 31:8,25
45:18 54:3
60:2 71:16
72:8 79:3
82:17 83:4
84:11 86:12
93:1 96:21

**NICHOLAS LARAWAY**

June 17, 2025

100:25
102:13 103:1,
17 122:17,22
125:25
126:20 137:3,
25 144:24
147:18
153:14 154:3
157:21
158:25 159:8
161:7

**2025**
5:9 39:6
41:15,23
52:19 53:9
54:5,15 57:24
165:3

**20th**
15:2 19:9
20:9 21:11
28:2 31:8,17,
25 32:11,14
82:17 83:3
84:11 86:12
127:23 130:8

**21**
50:22 153:14
154:3 157:21
160:21
164:20,22,25
166:2 167:15

**212**
104:19

**22**
149:10

**224-cv-009**
5:6

**231**
40:12

**237**

40:11,12

**24th**
137:3 144:24

**25**
157:14

**28**
148:10 149:8

**281**
138:9 143:5
159:19

**28th**
135:13

**29th**
103:16

**2:00**
117:22

**2:06**
118:5

**2nd**
122:22

———————

**3**

**3**
27:21,24 75:9
165:4

**30**
36:5

**300**
10:18

**31**
51:7

**319**
122:15

**32**
101:23

**33**

59:7

**35**
174:20

**3:03**
163:2

**3:17**
163:7

**3:20**
174:20

**3:29**
174:14

**3:36**
175:24 176:2

**3rd**
122:17
148:11 152:2

———————

**4**

**4**
33:20,23 34:1
35:24 73:11
75:12 87:15,
21 97:16
168:17 169:7

**4.03**
77:23

**4.03-1**
77:18

**4.05**
77:23

**4.05-1**
78:11

**46**
77:18,23
78:11

———————

**5**

**5**
39:11,12,14
42:2,8,25
118:4

**50**
74:4

**528**
137:21

**531**
137:14

———————

**6**

**6**
40:19 43:11,
12 158:16
162:18 163:6

**6,15/24**
135:16

**6.4**
99:11

**6/15/24**
154:11

**673**
47:14,15

**674**
47:15

**6th**
39:18

———————

**7**

**7**
40:19 47:7,9,
12 63:1
147:17

174:19

**7.1**
91:17

**7.3**
87:21

**7.5**
89:12

———————

**8**

**8**
49:21,23
57:8,9,10,11

**8.8F**
118:14

**816**
89:19

**817**
89:20

**843**
99:24

**845**
99:25

**899**
88:17

———————

**9**

**9**
57:7,12,15
58:4,5

**9.5**
73:8 75:16
119:20

**9/27/2024**
113:5,7

**997**
118:19

June 17, 2025

**9th**
  165:3

**A**

**a.m.**
  5:10 19:10
  56:12,18
  75:7,10

**abbreviation**
  162:3

**abrupt**
  128:6

**Absolutely**
  32:1 61:19

**abstract**
  34:1 36:12

**access**
  23:24 86:16,
  18,19 87:4
  123:6 167:16,
  21 168:3

**accident**
  76:1 100:14

**accident/
incident**
  75:16

**accordance**
  113:1

**account**
  51:2 132:15
  144:14

**accurate**
  43:5

**accusations**
  18:2

**acquired**
  12:3,7 32:20

33:4,7,9
35:10,12,15
51:1

**acquiring**
  33:1

**acquisition**
  34:11

**acre**
  10:19

**acronym**
  107:22
  109:14

**action**
  115:15 116:7,
  14

**actions**
  22:21 23:13
  67:22

**active**
  168:15

**actual**
  70:13

**add**
  140:20
  143:10

**addendum**
  168:18
  169:12

**adding**
  46:8

**additional**
  122:4

**address**
  6:12 123:2,10
  125:14,19,22
  126:23 170:7,
  14

**addressed**
  14:9 28:1
  39:16 44:1

**addresses**
  16:21,22
  170:17

**addressing**
  78:12

**adjacent**
  10:18 11:16

**admin**
  126:22

**Administered**
  108:15

**administratio
n**
  9:24

**administrator**
  108:14

**advice**
  21:23

**affidavit**
  169:10

**aftermath**
  102:11
  125:23
  138:13
  154:19,21
  156:2

**agent**
  78:14

**aggregate**
  29:8 30:4

**Agneta**
  17:13,14
  20:5,7

**agreed**
  49:3,11 51:16

53:1,4

**agreement**
  104:11,22
  105:3

**ahead**
  25:25 63:22
  82:10 167:23

**aid**
  118:25

**AIS**
  163:12,20
  164:3

**Albany**
  10:17 109:11

**Albright**
  28:14,15
  32:13

**alcohol**
  99:17 100:22
  101:1,2,8,12,
  13,14 103:3
  105:9

**alignment**
  21:9,16

**alive**
  170:6

**allided**
  71:15 72:6
  140:3 141:3
  142:2,9

**alliding**
  14:4 15:8
  143:23 144:5

**allision**
  45:16 52:17
  58:16,23 60:1
  61:2 73:2
  78:22 79:1,
  14,19 80:8,

12,19 84:9
86:10 92:25
100:23 102:4,
12,25 106:20
107:1 115:18
116:5 120:13
121:16
123:17
135:24 136:7,
15 138:14
139:22
143:19 144:3
154:24 156:2
158:23,24
164:4,9
171:11
173:20

**allisions**
  73:4 118:23

**allowed**
  37:6 56:9

**alongside**
  138:10

**amended**
  142:11

**America**
  104:23

**American**
  104:5

**amiss**
  20:17 21:3

**amount**
  36:2,13,21,25
  37:7 38:6
  39:8 41:1
  48:2,6,13
  49:2 52:14
  61:14 62:13
  64:16,23 65:1
  66:21

**NICHOLAS LARAWAY**

June 17, 2025

**AMS**
104:23

**ancillary**
10:21

**answering**
69:11

**answers**
44:23 93:12

**Anthony**
16:22 17:8
19:20 31:24,
25

**Antony**
16:24

**apologies**
40:2

**apologize**
13:24 68:5
106:8 151:14
171:7

**apparently**
104:9 159:8

**appears**
14:20 27:23,
25 28:17 31:6
34:5,10,13
35:25 43:6,
19,21 44:17
45:5 49:4
58:2 76:23
91:19,22
103:15,22
104:7 106:7
114:22
118:21
122:16,19,20
124:16 125:8
126:23
135:13 137:2
152:12

157:18

**applicants**
100:5

**appraisal**
38:5,9,13
39:5,6 41:1,4,
8,14,22 42:1
43:2,20,22
44:11 50:22
53:24 56:20

**appraised**
37:5,9

**approximatel
y**
32:21 58:19

**April**
54:14 148:11
149:16

**area**
30:22 109:11

**arrangement**
65:18

**asks**
21:23

**aspect**
156:8

**assessment**
81:21

**assistant**
31:7

**assume**
113:2 126:7
151:1,4

**assumption**
123:20
150:24

**assured**
51:16

**attached**
7:20 15:2
20:13 21:10
104:8 135:20
139:19

**attachment**
120:20
137:10,12,21
147:19 148:1

**attachments**
124:20

**attempting**
87:9

**attending**
103:21

**attention**
148:9

**attest**
112:10
161:23 173:7

**attorney**
14:8 16:25
18:1,4,8
19:17,19
22:8,9

**attorney-
client**
23:1 68:22
71:2 72:19
133:1,17

**attorneys**
67:18 69:5
70:16,19
71:3,6

**August**
11:13

**automated**
163:12,21

**automatic**
90:5

**autopilot**
89:22,25
91:2,7 97:20
98:20 138:6,
15,20,24
139:5,16
142:18 143:2
149:11,20
153:16,24
154:19 155:6
156:2 157:7,
25

**aware**
13:3 14:6
18:17 64:3,6
80:9 82:9,14
84:5,12 86:7,
13 91:13,15
93:5 96:13,22
97:25 98:3,6,
10,13,19
101:10 102:6
103:5 104:24
105:24
110:15
115:20
125:21 129:8
130:3,21
136:19
137:18
138:20 144:1,
10,12,16
155:6 156:9
159:18 160:4,
5,8,9 170:18
172:6

**awareness**
110:8

**awful**
146:14

**B**

**back**
12:11 26:2,11
31:3 45:13
50:9 51:17
52:8 56:17,19
60:25 74:2
75:9 85:24
86:1 87:16,19
90:15,18
95:3,5 97:16
112:24
117:22 118:4
122:6 124:18
138:7 143:3
153:5 162:18,
24 163:6
174:5,19

**backing**
138:8 143:4

**Baldassare**
16:3 22:15
23:11 32:6
68:4,12 69:21
72:14 81:4,7,
23 82:25
83:7,21 84:2,
6 98:22
103:17
126:20
127:15 133:8
134:19 137:4
145:2

**Baldassare's**
22:17 23:7,21

**ballast**
30:5

**Baltimore**
159:9,22
160:16

162:15

**bank**
35:6,7,10,13,
22 36:19
37:5,25 39:16
42:19 43:16
44:6

**barge**
61:3,7 62:2
65:25 80:23
82:23 123:17
124:15 138:9
140:3 141:3
142:2 143:5
144:5,8,15
159:19,25

**barges**
12:8

**based**
14:21 38:2,20
58:21 67:25
74:13 91:10
96:1 112:16
115:9 133:16
137:10
142:12
150:24

**bases**
59:25

**basically**
99:16 134:18
151:5

**basis**
51:16 53:14
55:9 62:1,8
64:22

**Bates**
19:24 28:9
40:5 54:9
87:25 89:13

**91:18**

**Bayside**
11:15

**bed**
128:8,20

**began**
8:20 110:16
138:8 143:4

**begin**
12:9 19:18

**beginning**
5:2 16:14
56:16 75:8
89:12 97:15
118:3 148:5
157:14
158:22 163:5
174:18

**begins**
89:18,19
122:14
146:13
147:24

**behalf**
5:20,24 7:2
19:9 25:9
37:10 79:25

**belief**
96:1

**believes**
79:8

**bell**
44:8

**Belt**
5:21 14:5
15:8 45:16
71:16 72:7
79:2,20 86:10
96:20 100:24

102:4,12
103:1 106:21
115:18 116:6
164:5

**benefit**
63:18

**betwee**
60:20

**bit**
27:5 56:20
65:22 162:23

**block**
114:11
115:10,13,14

**blocks**
115:11

**BNB**
35:6,7 42:19

**board**
9:2 10:2
101:12

**boat**
12:7 128:9
157:25

**bolts**
46:7

**bottom**
40:20 56:22
57:1 74:16
87:25 100:1

**bow**
123:16

**branch**
92:19 159:21

**break**
27:5 55:19
66:16 74:22
96:25 97:3

117:15
162:24

**Brian**
15:14 18:12
22:6 23:13
28:1 31:13,15
32:2 52:2
60:15 67:20
71:21 82:13
91:9 92:9
93:3,11 95:11
97:23 101:17
103:17 107:4
110:4,14
111:13 122:2,
17 123:4
125:10,21
126:6,21
127:15
129:11,22
130:14
135:14
136:16 137:4
139:1,14,25
143:25
144:24
147:18
150:20
152:18,24
154:5 155:3,
22 156:23
158:8 159:16
161:20 162:9,
17 163:24
164:11
171:15,22

**Brian's**
146:9,25

**bridge**
14:5,7,9 15:8
20:17 21:8
45:16 61:4,5

71:16 72:8
78:23 79:2,20
80:24,25
82:23 83:1,2
84:15 91:17,
20 92:2 93:8,
16 94:7
96:19,20
100:24 102:5,
12 103:1
106:21
115:19 116:6
119:10,15,22
121:18,21,24
123:16,18
124:14
135:24 136:7,
15 138:11,12,
17 139:22
140:4 141:3
142:3,9,15
143:23 144:3,
6 154:12,25
156:3 158:23
164:5,9

**bridges**
92:18

**briefing**
92:15,17

**bring**
60:7

**broker**
17:15 20:5

**brought**
73:19

**Brunswick**
11:15

**bulk**
26:24 27:2,6

**bullet**

76:15 145:20
146:13 169:7
170:1,13

**bullets**
146:15

**bump**
128:20

**bunch**
78:19

**business**
9:12 10:24
11:13,24,25
12:2 30:2
65:18 80:2
103:25
134:21
145:10

**businesses**
10:22 11:9
26:19

**buzzing**
112:13

———————
**C**

**call**
8:8 12:17
17:21,25
18:12 29:17
37:19 65:24
85:16 88:6
91:24 99:23
125:18

**called**
18:9 73:7
81:3 92:15
153:9

**calls**
116:21 129:1

**Canada**
11:15

**capabilities**
94:6

**capacity**
80:5 110:6
167:1,2

**captain**
16:5,8,15
81:8,10 82:5,
6 83:19 84:1,
8 93:16 95:12
96:7 106:19
115:16 123:5
128:18
143:20 170:3,
5 172:9

**captain's**
94:5,9

**captains**
16:12 97:19
127:3

**caption**
153:8

**Cardona**
16:24 17:8
19:20,22
31:25

**cargo**
10:20 26:20,
24 61:20

**Carlo**
17:12

**Carolina**
10:15 11:9
26:21 30:25
31:2

**carries**
45:12

**Carver**
5:5,25 6:2
7:19 8:8,10,
12,15,18,21,
23 9:1,25
10:5,7,25
11:24 12:1,
17,24 13:2,
14,18,19,24
15:15,19
16:4,5,9 17:1
20:1 21:18
25:8 28:12,16
29:5,11,25
30:3 32:10,
16,19 33:2
34:7 37:10,12
45:22 46:11
49:3,22 50:16
51:2 54:19,
20,23 55:14
59:24 61:11,
17 62:11
63:23 64:4
73:14 74:17,
18 75:20
79:8,17,21,
22,25 80:3,6,
11 82:8
86:15,17,25
88:1 89:8,13
91:18 93:7,14
94:5 95:17,
18,22,24
99:23 102:13,
22,23 103:2,
22,24 104:21
105:2,7
106:12 113:4,
16,18,21,22
114:4,5
115:22 117:3
118:13,18
122:15 123:8

127:7 135:22
137:11,13
141:22 146:7
147:25 148:3
157:14 161:8
163:22 170:4,
13,16

**Carver's**
58:16 73:3
76:20 77:25
78:25 80:16
81:21 86:8
96:18 140:2,6
141:2,5 142:1

**Carver00073**
47:12

**Carvers**
50:17

**case**
5:6 117:1
168:14 169:3

**cases**
168:8,14

**casualty**
52:16 60:19
76:14,18
77:17 78:11,
18

**category**
157:22

**causing**
149:19

**CCS**
16:19

**cellphone**
168:9

**Center**
34:4

**certification**
51:3

**cetera**
119:11 143:5

**CFR**
77:18,23
78:11

**chairman**
9:2

**challenging**
132:18

**chance**
7:25

**change**
49:13 102:13

**Chapman**
5:18 6:24
7:11 14:11
20:1,21,25
21:7,14 23:4,
17,25 24:5,23
25:17 27:19
28:11 33:19
35:17,19,23
38:10,14,25
39:10 40:1,10
41:12 43:3,10
44:16,22
47:4,6,14
48:8 49:17
50:2,5,10,14
53:1,4,6 54:2,
6,8,17,20,22
55:4,8,12,14,
17,20,25 56:3
57:6,11 59:10
62:15 63:19
69:7,14
70:18,23
73:18,22 74:1
75:1 83:13

85:2,10,13,22
90:23 92:22
94:13,18 98:9
99:1,4 102:9
103:10 106:2
117:14,18,21
118:9 129:19,
25 131:14
132:4,16
140:7,18
141:17 147:7
150:2,5,9,13
151:14,24
154:3 155:13,
16 156:16,19
158:18 160:3,
19,24 161:1
162:22
163:16
164:19
165:12,22,25
166:5,8,11
167:2,9 168:2
169:14,21,24
170:20 174:8
175:19

**charge**
78:14 119:9

**charged**
64:22 152:21

**charging**
145:21,22

**Charleston**
11:8 27:12,14

**chasing**
120:3

**Chatgpt**
70:12

**check**
157:9 170:4

**Chesapeake**
159:20

**chief**
6:1 108:20
128:4

**Chris**
127:2 137:25
170:3

**chris.
miller63@
hotmail.com.**
126:24

**chrismiller63
@hotmail.
com**
127:6

**Christopher**
81:10 115:16
128:18,19
137:25

**CHRO**
108:21

**circumstance
s**
92:1

**City**
12:7 159:20

**claim**
144:13

**clarify**
141:18

**cleaning**
128:14

**clear**
24:19 31:22
62:22 71:12
75:23 121:9
133:6 164:14
165:9

**client**
30:8 132:5

**clip**
87:16

**close**
33:22 87:18

**closed**
175:18

**Clyde**
5:24

**cmiller@
carvercompa
nies.com**
170:8

**Cmiller@
carvercompa
nies.com.**
170:2

**CMT**
15:17 134:14
145:17

**coach**
94:15

**coaching**
94:17

**Coast**
9:13 11:1,19
18:23 19:1,5
30:9 34:3
76:17 78:16
79:18 80:7,
11,14,18
100:16 111:7
116:11,23
119:19,22
136:1 142:14
143:12,17
156:6,15,24

**code**

6:20 76:25
77:13 78:1

**Coeymans**
5:4,24 7:18
8:9 10:16,17,
21,23 12:20,
21,22,25
13:2,9 34:7
80:2

**coffee**
56:5

**collection**
107:6

**college**
9:3

**Collision/
allision**
118:15

**collisions**
118:20

**color**
91:25

**column**
111:6,7
148:22

**communicati
on**
22:14 167:7

**communicati
ons**
23:2,9

**Community**
36:19 37:5
39:16 43:16
44:6

**companies**
6:2 8:13 9:25
10:5,7 11:11
12:1,24

13:14,24
28:16 105:7,
20 113:5,16,
19,22 161:8

**Companies'**
127:7

**company**
5:22 7:3
16:10,17
33:11 45:12
46:13 47:18
48:12,18 49:4
57:25 79:22
81:19 90:4
91:6 99:19
103:4 104:4
108:11,23
109:12
110:17 119:5,
15 124:7
134:15
144:14
145:14

**company's**
26:19 91:1
142:7 170:16

**companying**
9:7

**compass**
149:19

**compiled**
22:8

**completed**
132:16
143:13

**completely**
138:6,24
139:6 143:2

**completion**
52:19

compliance
117:6

comply
23:13

components
61:4

concerns
78:13

concluded
176:2

conclusion
77:10 116:13

condition
39:15 43:7
163:9 173:7

conducted
96:13 129:12
156:7

conducting
156:23

confer
63:14

confident
171:7

confirm
129:13
163:17

confirmed
119:14

confuse
85:12

confused
84:3

conjunction
156:24
168:13

connect

31:9 99:24
118:19
133:20 134:3,
7,13 136:6,14
139:21,24
152:9

connected
8:22

connection
87:8,12 99:17

considered
125:18 127:6

consisting
78:18

consortium
104:1

construct
61:5

construction
10:13 29:9

contact
30:11 86:9
119:21

contacted
19:1,4 62:7

contained
73:5

containerized
26:25

containers
27:5

content
127:16

contents
90:24 126:5

context
26:19 79:16

continuation
109:21

continue
110:18 152:1

continued
115:22

continuing
35:24 85:4
157:12

contract
105:23

Contreras
5:11

control
150:6

controller
46:1 145:10

convenient
117:15

conversation
18:6,11 20:4
29:20 31:15

conversations
18:10 20:6
31:18,21
60:23 142:13

conveyed
81:22

Copies
56:21,25

copy
15:21 47:16
53:24 55:6,23
59:11 73:17,
19 74:2
175:6,11

Corp
34:7

corporate
25:4,8 26:3,6

Corporation
160:16 161:7

correct
13:16,22 14:1
15:9,15,16
16:5,6 25:5
26:23 34:8,9,
13 35:4 36:2,
3 40:23 42:6
44:13 48:3,4
49:12 50:17,
24 51:4,5,9,
10,12,13
52:12,13
55:16 58:7
65:2 76:2,11
77:19,20,24
78:23,24
79:14,15
81:17,20
82:7,15 87:13
88:24 89:10
90:7 91:21,22
92:16 93:23
96:17 99:19,
20 100:25
102:5 108:6
110:24
113:19,24
114:9 118:20,
21 119:1,2,6,
7,17,23,24
121:22
122:19
124:15,16
127:5,23,24
133:9 138:7
143:3,20

151:9 157:11
164:18
166:17 170:4
172:21,22

correctly
58:6 93:24
108:17
145:24,25
165:2

correspondence
19:18 22:10
80:14

cost
51:12 65:24

counsel
5:15 19:23
23:19 24:13
25:1,15,21
26:4,14 54:13
66:22

counsel's
56:9

couple
7:21 106:14
171:2 174:10

court
5:12,16 26:1,
11 85:23 86:1
90:18 95:5
106:10

cousin
114:19

coverage
45:11

covering
115:3

covers
118:20,22

credit
64:2

Crenshaw
5:19

crew
9:17 93:4
100:23 102:2
126:1,10
127:16 134:1
146:24
150:21
152:19
159:17
161:20 162:9
164:12
170:13,15
171:15,22

crew's
172:5

Criscione
34:6

cross
50:13

CSX
28:19 29:24
30:3,8,11,22

curiosity
160:14

curious
41:20

current
9:22,23

custodian
170:1

custodians
168:22 169:7

customer
29:25

customers
11:6

**D**

d/b/a
5:5,25 7:18
8:10 12:18

daily
158:21

damage
119:25
121:18
143:22 144:2,
4,9,10,14

Dan
28:14,15
32:13

Dan's
30:8

dark
145:20
146:13

data
167:17,21
168:4,5 169:5

date
5:8 19:10
49:7 60:1,18
67:8 68:7
84:9 94:3
153:12 154:1
171:11 172:6
173:20

dated
39:17 48:15
131:6 153:14
154:10 161:7
165:3

dates
54:15

day
32:3,6,14
67:3,23
113:6,10
114:3 158:23,
24

days
31:6 36:5
80:15,25
158:21,22
159:24
160:10

deadline
101:14,21

deal
30:3

dealing
23:2

dealt
42:16

debate
24:6

Deblasi
44:3

deblasi@
dime.com.
42:11

deceased
81:13 94:10

deckhand
128:12

deckhands
128:8

declaration
24:7 165:1
166:24

167:14
169:11

deep
10:15 11:7

definitions
7:21

degree
9:11

delivering
61:20

demand
46:14 64:1

depend
151:6

depicted
125:2

deposition
5:3 7:4,9,18
8:1 59:6,13
68:1 71:9
73:12 75:12
80:21 87:9,13
88:5 120:7
132:8 133:18
136:10
158:17 159:6
175:22

depositions
91:8 92:8
93:3,11

deps
73:22

derailment
30:15

derailments
30:16

describes
168:22

description
138:1,4

designated
8:4 79:19

desk
43:20,21

desktop
44:10

detail
88:15 130:19

detailing
106:14

details
106:14

determine
137:17,19
155:9,25

devices
22:13 23:5

difference
34:19

difficult
46:18

digital
124:3

Dime
35:13,22
36:18,19
37:4,9,24
39:16 40:6,7
42:16,22
43:15 44:6

Dime000159
43:18

direct
19:16 133:15
148:9

**NICHOLAS LARAWAY**

June 17, 2025

directing
70:9 72:16

direction
61:10

directly
19:12 86:19
93:5 100:13

director
9:24

directors
10:3

disciplinary
115:17 116:7

disciplined
106:20

discount
64:2

discovery
25:20 26:5
40:3 47:18
71:22 93:13
95:14 96:12,
16 114:22
120:3 122:14
130:15
136:18 173:3

discussed
63:11

discussion
174:16

dispatch
15:17 145:18

dispatchers
15:19,20,25

distinguish
134:17

diversified
10:8

division
11:4,5 16:11

doc
119:11

document
34:5 38:23
43:15 48:7,9,
11 49:7 50:15
57:18 62:17
73:11 74:7
91:12 97:7
103:14
119:25 134:1
137:1 139:18
142:23 143:6,
8 147:16
164:24
166:16
173:18

Documentatio
n
34:3

documents
37:11 40:6
62:14 68:7
71:21 74:4
93:2,12 94:2
95:13 97:23
98:23,24
101:18 107:3,
7 111:8,10,
13,18,19,24
112:9 122:2
125:10
130:15 139:2,
15 140:1
147:2 149:5
150:22 151:7,
17 152:10,19,
25 154:6
155:4,22
157:3 161:21

162:9 164:12
165:10
171:15
172:24,25
173:3,10

dollars
32:22 34:16
35:1 58:5,20
59:20 60:21

dots
31:9

dozen
7:22

draft
175:14

dropped
159:20

drug
101:21 102:1,
7,9,14 103:2,
7 104:1
105:5,9

due
92:3

duly
6:4

Dutchman
6:13

duties
116:4

Dylan
65:20 66:11
145:3

---

**E**

---

e-mail
14:7 15:1,11,
18 16:20

17:10,17,19
19:8,13 20:12
27:25 29:14,
21 31:21 42:9
103:16,23
104:8 115:13
120:20
122:13,16,21
123:1,7,10
124:4,13
125:14,17,19,
22 126:19,23
127:7 129:11
135:13,20
137:2,16
139:20
144:23
145:19
147:17 153:6
168:18,23
169:12 170:4,
7,10,14,16

e-mailed
82:17

e-mails
14:16 123:2

ear
166:9

earlier
26:18 34:14
57:23 113:8

earth
10:13

easier
140:24

East
11:1,19 30:9

easy
150:10

economics
9:12

educate
67:6

educated
92:11

effort
156:1

efforts
169:11

eligible
109:23 110:1

Elizabeth
92:19 159:21

embedded
124:3,13

emergency
29:9 30:7,13

employed
8:8,12 16:16
29:11 42:22
102:23
108:11
117:10

employee
9:20 100:13
107:16
113:15,18
117:3

employees
83:6 93:8
100:4 114:3
131:9

employment
8:21 110:16
113:4 116:7

employment-
wise

**NICHOLAS LARAWAY**

June 17, 2025

115:17

**end**
59:21 74:6,14
103:25
113:20
171:18
175:22

**ends**
40:11 122:15
148:2

**engage**
26:20

**engaged**
157:9

**engineer**
128:5

**England**
31:1

**entered**
104:21 105:3
107:15
146:18

**entire**
76:24

**entities**
114:4

**entity**
13:13,15 29:5
33:12 114:1

**entries**
112:15 148:9

**entry**
36:11 111:4
137:22 149:8
153:14 154:9

**equipment**
30:20 46:9
148:15,17

149:9 152:4

**equipped**
89:22,24
97:21 163:11

**equity**
34:21

**erratic**
149:19

**error**
100:15

**ESI**
28:12 168:18
169:13

**ESI000020**
147:25

**ESI000025**
157:15

**ESI000037**
148:3

**ESI000201**
103:22

**ESI000307**
20:2

**ESI000313**
122:15

**ESI000527**
137:13

**ESI000541**
135:22

**essentially**
158:25

**establish**
70:21

**Estimated**
40:21

**Evanston's**
132:14

**event**
48:23 134:2
136:12

**eventually**
20:6 139:2

**evidence**
97:24 101:18
107:3 125:11
139:15 144:1
146:10 147:1
157:4

**examination**
6:23 171:4
176:1

**examined**
6:6

**exceeds**
53:11

**Excel**
147:20
148:24

**exclusively**
27:3

**excuse**
43:14 44:11
89:15 133:15
147:17

**execution**
112:12

**executive**
9:24

**exhibit**
7:15,20
14:13,17
19:11 27:21,
24 31:4
33:23,25
35:24 39:12,
14 40:20

42:2,8,25
43:12 47:9,23
49:18,21,23
50:21 57:15
58:4 59:7
62:23 73:11
75:12 87:15,
21 99:1,7,10,
22 103:11,12,
15 106:4,6,9,
12 108:3
109:19 118:7,
10 120:6
121:7 122:10,
13 126:16,19
135:10,12
136:23 137:1
139:20
144:20,23
147:13,16
153:5 154:10
157:13
158:16 161:2,
4 162:18
164:22,25
166:2 167:15

**exhibits**
74:24

**exist**
96:10

**existed**
170:11

**existence**
35:7

**exists**
96:11,15

**expect**
52:1

**expected**
52:2

**experience**
60:9,11

**expert**
60:16 89:4
90:9 139:10

**explain**
34:18

**extends**
30:24 157:25

**extent**
21:23 77:8
90:11 142:23

**extra**
59:11

**extracted**
164:3

---

**F**

**F-O-R-O**
105:21

**facilitates**
10:19 11:17

**facilities**
27:8 105:12

**facility**
10:16 26:22
27:10,11,14

**fact**
80:25 101:14
139:20

**facts**
86:5 129:13

**failed**
149:19

**failure**
149:11

**NICHOLAS LARAWAY**

June 17, 2025

**fair**
25:2 40:21
48:20 51:6
53:15 116:15
151:8

**false**
81:22,25

**familiar**
112:22
125:11

**family**
8:22

**February**
148:10 149:8

**federal**
76:25 77:14
78:1

**fee**
62:12

**feel**
110:17

**Feeney**
102:20,21
103:16,24
104:10 145:2

**felt**
128:6,9,20

**fender**
83:2 162:3

**fendering**
80:23 84:15
129:10
138:10

**fenders**
142:11

**field**
60:16

**figure**
112:8

**file**
107:9 112:1

**filed**
36:14 153:15

**files**
50:17 96:5

**fill**
87:22

**filled**
112:20 134:1,
7,12

**final**
36:11 143:15

**Finally**
142:12

**financial**
46:1 145:9

**find**
17:16 41:7
65:4 83:22
84:4 88:7
107:12,13
127:21

**fine**
75:2

**finish**
92:23 116:22
155:13,16,18

**finished**
135:15

**firm**
5:19

**firsthand**
95:15 158:10
171:19

**fixed**
118:23

**fleet**
12:4 105:18

**focused**
91:1

**follow**
22:21 74:10
78:1,7 148:19
170:25 174:7

**follow-up**
174:22

**food**
128:15

**forget**
31:23

**form**
20:19,22 42:4
53:18 60:4
67:17 78:4
84:22 85:1,3,
9 86:24 87:2,
21 88:12,17
89:2,4,8,15
92:6,21 94:19
101:6 116:21
130:9 141:7
147:19
154:23
164:17
173:14

**formed**
12:6 16:10

**Foro**
105:20

**forthcoming**
98:25

**forward**
22:10 29:1

65:14 120:15

**forwarded**
28:18,23
29:14,21
103:23 104:9

**forwarding**
14:21 29:18
122:20

**Foundation**
102:17

**founder**
9:1

**freight**
63:1

**frequent**
30:11

**front**
38:24 50:20
75:13 143:6
151:20 158:8

**full**
129:12

**full-time**
8:20

**future**
34:23 95:12
97:24

---

**G**

**G-E-L-A-P-E-
L-Y**
33:16

**Galioto**
103:18 117:2
122:17 145:2
147:18

**galley**

128:14

**Galm**
65:20 145:3

**gap**
125:8

**gear**
128:10

**Gellatly**
33:10,11 34:6
50:23

**general**
13:5 15:14
49:8 52:3
60:15 76:6
87:5 160:15
161:6

**generalists**
108:10

**generally**
48:18,24 66:3
111:17 126:6

**geographical**
10:12

**Georgia**
31:2

**get all**
87:17

**gist**
133:21

**give**
54:9,12 65:23
66:5 130:18
140:10

**giving**
24:12

**good**
6:25 7:1 57:2
59:15 96:24

**NICHOLAS LARAWAY**

June 17, 2025

132:20 136:5
150:15

**grab**
75:2 117:15

**graduate**
9:9

**grainy**
121:8,11,13

**Great**
60:24

**Greater**
12:14

**grounding**
78:22

**group**
15:18,22
78:17

**Guard**
9:14 18:23
19:1,5 34:3
76:17 78:16
79:18 80:7,
11,14,18
100:16 111:7
116:12
119:19,23
136:2 142:14
143:12,17
156:6,15,25

**Guard's**
116:23

**guess**
51:23 57:3
92:11 106:14
116:4 123:22,
25 143:7
146:24 151:4,
23

**guessing**

146:11

**Gulf**
11:1,19 12:8

**gun**
166:10

**gunfire**
166:12

**guys**
26:25 56:4

---

**H**

**half**
58:4,19 59:20
60:20

**hand**
138:8 143:4
162:18

**handed**
27:24 99:9
122:12
126:18
136:25
144:22
147:15 161:4
164:24 166:1

**handle**
26:25 114:7
125:17

**handled**
45:25

**handles**
45:21 46:7

**handling**
26:20

**hands**
68:10

**happen**

66:7 103:6
119:23
132:22

**happened**
24:18 66:10
80:15 94:24,
25 119:16
130:17,20
142:8 143:15

**happening**
110:9

**happy**
54:10

**hard**
148:19
152:14
153:16,25
158:1

**head**
61:16 72:2
158:14

**header**
14:22

**heading**
72:5 77:17
92:15 153:8

**hear**
46:18 70:5
71:24 98:4
155:11
165:16,20

**heard**
46:24 155:20

**hearing**
166:7

**hearings**
156:11

**Heidelberg**
11:14

**held**
56:15 97:14
118:2 174:17

**Helm**
99:24 118:19
133:20 134:3,
7,12,25
135:1,7
136:6,14
137:5 139:21,
24 143:19
152:9

**helped**
30:18

**hey**
19:23 65:25

**hidden**
118:23

**high**
59:21

**higher**
41:1 48:21
63:2

**hired**
61:24,25
103:2 117:9,
12

**Historically**
30:16

**hit**
14:7 118:25
119:1,21
128:15
142:15

**hitch**
123:6

**hitting**
84:15 119:4

**hold**
9:13 55:9

**holding**
13:15

**homework**
173:16

**hour**
55:23 162:23

**hourly**
114:2

**hours**
101:23
137:24
140:22

**HR**
107:23 108:9,
20

**HRIS**
107:18,21

**human**
70:13 100:15
107:24

**humor**
140:19

**hundreds**
111:17

---

**I**

**identification**
7:16 14:14
27:22 33:24
39:13 43:13
47:10 49:24
57:16 99:8
103:13 106:5
118:11
122:11
126:17

135:11
136:24
144:21
147:14 161:3
164:23

**identified**
7:4

**identify**
19:24 173:17

**ignore**
50:5

**images**
124:3,12

**IMG1731.JPG**
124:22

**IMG1732**
125:3

**immediately**
78:12 79:18
80:7,18 156:5

**imposed**
37:25

**improper**
95:1

**incident**
14:3 18:17
19:5 63:4
67:3,8 73:8
76:1 77:18
100:14
117:11 119:4
120:13
125:24
127:22
133:19,25
134:2,6,12,25
135:1,8,16,23
136:6,14
137:6,22

138:21
139:21
142:25
143:16
149:13 152:8
153:9 154:13
160:10

**incident/
accidents'**
77:2

**include**
60:14 69:5
76:24

**included**
20:13 33:11
126:8

**includes**
60:13 66:3

**including**
8:17 14:16
29:7 47:20
120:1 145:11
157:8

**incorrect**
82:3,9 84:9,
14,19

**increase**
53:21

**increased**
52:15,19

**individual**
137:19

**individuals**
17:19

**inducing**
153:16,25

**industrial**
10:8,15,19
11:11

**industries**
10:11

**industry**
60:9,11

**inform**
126:4 169:2

**information**
21:19 24:25
46:12 65:14
67:19 68:9,14
70:22 79:13
81:3,6,23
82:3,9,14
84:7,14,20
89:1 107:23,
24 128:21
129:6,7 133:2
143:25
146:22
152:15 164:3

**infrastructure**
10:14

**Ingrid**
5:11

**initiate**
21:20

**initiated**
108:15,16
130:7

**injury**
100:14

**inputs**
149:19

**Inspection**
78:16

**instructing**
132:5

**instructions**
91:20

**insurance**
17:14 20:5
25:1 45:10,21
46:12 48:24
49:4 52:15,25
53:21

**insure**
48:22

**insured**
47:21 48:6,12
51:16 52:12
53:14 58:9

**insured/
agreed**
48:2

**insures**
48:18

**intended**
79:14

**intentionally**
83:17

**interested**
160:11

**intermodal**
27:4

**internal**
106:15 136:2

**internally**
116:11 125:7

**interviews**
156:11

**interworkings**
135:7

**introduce**
5:15

**investigate**
149:21
150:17 156:1

**investigated**
150:18 153:4
156:8

**investigating**
18:21 152:22
156:15

**investigation**
110:14
116:11,24
129:12,23
130:4,6,10
131:12
143:13
153:23 154:8,
18 155:7
156:7,12,14,
24 157:3,6
158:5

**investigations**
106:24 111:8

**investigative**
143:16

**invoice**
63:23 64:12,
14,17 66:2,6
146:4 161:5

**invoiced**
64:8 66:14
161:12

**involved**
23:8 26:12
37:18 78:17
100:14 110:9
112:11 157:5

**involvement**
100:18 110:7
166:15

**involving**
14:3 15:7

**NICHOLAS LARAWAY**

June 17, 2025

100:15
148:12

**iphone**
124:6,23

**iphones**
124:8

**issue**
129:9 131:12
148:16 149:9

**issued**
124:7

**issues**
30:18

**item**
162:1

**items**
67:22 161:12

---

**J**

**J-O-C-H-U-M**
46:5

**jacket**
107:8

**James**
5:18,23 81:15
96:7 106:13
108:15 138:5
143:1,20

**January**
50:22 51:7

**Jarkeis**
128:12

**Jason**
103:18 117:2
122:16 145:2
147:18 172:7

**JC**
145:22 146:1

**Jennifer**
42:10 44:1,3,
5

**JHA**
147:21

**Jim**
19:23 28:8
33:17 35:15,
16 45:1 46:14
57:5 59:9
71:12 72:17
74:21 90:20
133:4 140:17
141:16 169:9,
23 171:7
174:23

**job**
61:3,8,23
62:11 63:24

**jobs**
8:17,18

**Jochum**
46:3,4 52:3

**joined**
9:6

**Josef**
6:1 165:1

**Jr**
16:24 17:8
19:20 31:24,
25

**July**
103:16
122:17,22
125:24
147:17

**June**

5:8 14:5 15:2
19:9 20:9
21:11 22:16
23:9 28:2,19
29:15 31:8,25
32:11,14
45:18 71:16
72:8 79:3
82:17 83:3
84:10 86:11
92:25 96:21
100:25
102:12 103:1
123:17
125:24
126:20 130:8
131:6 135:13
137:3,5,24
138:15
144:24
145:11
158:25 159:7
161:7 165:3

**Junior**
17:4

---

**K**

**Kaywood**
5:13

**keeper**
161:13,23

**kind**
10:4 15:13
65:21 77:9
91:24 99:15
106:15
111:25
113:21 119:3
125:17
142:25
148:24

163:12

**kits**
101:12,15

**knew**
15:7 18:19
19:4 70:24
82:25 83:20,
21 84:6,17,
19,23,24

**knowing**
40:25 115:10
121:19 129:6

**knowledge**
24:14,17,22,
24 26:8
35:14,18
36:23 42:21
51:15,18
52:5,16 64:7
65:17 66:15
68:11 78:25
82:19,22 89:6
90:12 94:6,21
95:15 96:18
104:15
111:11 139:4,
15 150:21
153:3 154:7
158:6,10
163:22

**Kool**
145:8

---

**L**

**label**
19:25

**labeled**
75:16

**Labor**

113:1,2

**Lane**
6:14

**Laraway**
5:3 6:10,25
9:1 13:19
27:23 37:12
47:17 59:3
75:11 97:18
99:9 106:11
114:11
118:12
136:25
144:22
147:15 163:8
175:23

**large**
10:8

**larger**
38:17 124:12

**largest**
30:8 38:19
39:5 41:14

**Larin**
5:13

**late**
39:17

**law**
5:19 113:1,2

**lawsuit**
46:15

**lawsuits**
168:15

**lawyer**
31:23 63:13

**lawyers**
63:12 64:16
67:5,6 167:7,
25

**lead**
22:9 121:17,
21 128:23

**leaders**
60:12

**leading**
160:10

**learn**
14:2 82:24
84:16 138:15

**learned**
84:13 140:13

**leave**
66:20

**left**
109:1 158:1

**legal**
5:14 6:2
21:23 77:9
154:14

**Lenny**
67:20 71:21
80:22 81:3
82:4,13 91:9
92:9 93:3,11
95:11 97:23
101:17 107:4
122:2 123:4
125:10,21
129:8,12,21
130:14
134:23 139:1,
14,25 143:25
145:2 150:20
152:18,24
154:5 155:3,
22 156:23
158:8 159:16
161:20 162:9,
17 163:24

164:11
171:15,22

**Lenny's**
136:17

**Leonard**
16:3 32:5
81:5 103:17
126:20
127:15 137:4

**letter**
14:9 15:2
18:1,19 20:13
21:10,17
22:22 31:7,19
43:14 44:10
82:16 83:3,10
84:10 86:11
106:7,12
113:3 121:20
127:22
129:15 130:8

**letter's**
115:14

**licenses**
9:14

**life**
49:11

**light**
81:1 146:3

**limit**
38:1

**limitation**
54:3

**limited**
27:12

**Line's**
164:5

**lined**
150:7

**Linstead**
108:8 112:14
114:14

**list**
47:23 62:24
170:14

**listed**
153:20

**litigation**
23:3

**LLC**
13:10 113:19,
23

**LLP**
5:5

**loan**
37:11,25 38:2

**loaned**
37:24

**locations**
10:12 11:18
30:6 105:10,
13,17

**lock**
119:10

**log**
137:5 142:25
146:19

**logged**
137:24

**logs**
146:14,16,17
158:21

**long**
8:7 32:16
54:24 72:12

**long-term**
62:4

**longer**
16:3 81:18

**looked**
21:13,15 55:1
88:8

**lookout**
88:18 89:1
96:19

**lose**
162:19

**loss**
45:11 166:7

**lot**
29:6 30:17,20

**lots**
62:5

**louder**
47:2

**lump**
62:12 64:23

**lunch**
117:16

---

**M**

---

**Mackenzie**
14:3 18:18
39:17 44:12
45:11 47:23
58:17 59:25
61:1 72:6
89:24 100:24
102:3 122:21
123:10
125:13 127:3
135:14 137:3,
16 148:12
149:8,17
152:3 153:15
154:12

157:21
158:21 161:8
164:7 170:17
171:10

**mackenzieros
e2@
carvercompa
nies**
125:16

**Madam**
85:22 106:10
175:2,3

**made**
112:15
141:19
144:10
160:12

**maiden**
114:13

**maintain**
95:22

**maintenance**
29:7

**make**
22:7 33:6
71:12 85:3
92:2 94:20
123:19
129:11
144:13
150:12,23

**makes**
115:7

**making**
37:25 61:12
62:5 84:22
92:10 138:16

**Malik**
6:1 165:1

166:20 174:4

**Malik's**
24:7 166:24
167:14

**manage**
103:2

**managed**
13:10,12

**management**
12:25 73:6,13
74:11 75:24
86:17 87:7
90:3,25 99:11
118:14 134:6,
11,14,15,20

**manager**
12:16 13:5
15:15 52:3
60:16 102:22

**managers**
87:5

**managing**
13:19

**maneuvered**
138:9

**March**
36:14

**Marin**
108:16,19

**marine**
5:4,5,25 7:18,
19 8:9 10:24,
25 11:3,4,24,
25 12:2,14,
17,22,25
13:2,10,18
15:15,19
16:5,10 32:10
34:7,8 45:22

76:14,18
77:17 78:10,
16,18 79:22,
25 80:3 86:17
95:18,24
102:22
103:24 114:5
117:4 144:13
146:7

**mariner**
90:10 110:19
139:9

**maritime**
11:11 60:16
104:5,23

**mark**
7:11 14:11
16:7,8 27:19
33:19 39:10
43:10 47:6
50:8,10 57:5
99:5 103:10
106:2 118:6
122:8 126:14
132:11 133:4
135:9 136:21
144:17 147:7
164:19 171:2
172:4 174:24
175:11

**marked**
7:16 14:14,17
27:22 33:24
39:12 42:2
43:13 47:10
49:24 57:14,
16 58:3 59:6
73:11 99:8,
10,23 103:13,
15 106:5
118:11 120:6
122:11,13

126:17,19
135:11
136:24 137:1,
13 139:20
144:21,23
147:14,16
158:16 161:3
164:23,25
166:1

**market**
12:7 40:21
48:20 51:6
53:16

**marks**
15:12

**Marshall**
17:15

**Martin**
5:20

**Mary**
50:23

**master**
76:9,10,15
78:14 119:10,
11

**mate**
81:8,15 95:13
123:5 138:5
139:1,14
143:1

**materials**
11:12,14 30:5

**matter**
5:4

**matters**
17:2

**Mcgrath**
128:5 172:8

**Mckenzie**
32:17

**meaning**
134:14

**means**
92:10 113:2

**meant**
138:23 168:3

**Media**
5:2 56:17
75:9 97:16
118:4 163:6
174:19

**meet**
101:13

**Melissa**
46:3 52:3
145:8

**member**
9:17 13:10,
12,20 42:15
110:15

**members**
93:4 100:22
102:2 150:21
164:12
170:13,16

**membership**
104:10

**memory**
19:7 39:1,3
40:24 149:1

**mention**
53:8

**mentioned**
26:18 30:6
72:13 83:6

**merit**

132:19

**Meyerrose**
41:19 54:1,2
55:2 57:24
58:25

**miced**
46:17

**middle**
89:21 91:23
149:18

**Miller**
81:11 82:5
84:8 115:16
127:2 128:18,
19 170:3,6
172:10

**million**
32:22,23
34:12,15,16
35:1,2 37:20
38:7 39:7
40:21 41:6,23
52:24 53:12
58:5,20 59:20
60:20

**mind**
28:8 60:7
112:5

**minds**
68:10

**minimum**
48:19

**minutes**
75:3 174:3,11

**miscellaneous**
8:18

**Miss-
incidents**

147:21

missed
134:9 171:6

misunderstood
68:8 83:14

mixed
83:19,25

mixing
83:17

mm-hmm
28:4 31:5
40:10 62:25
74:20 82:20
109:20 128:3
130:5 153:7
160:19
165:12

mobile
22:13

moment
17:3 168:16

money
38:6

monitor
5:10

month
120:12
121:16
138:14

months
109:2 136:12

Moore
13:4 15:1,14
18:13,14
22:15 23:11
28:1 31:15
32:3,11 52:2
60:15 67:20

68:3,11 69:22
72:14 82:25
83:7,20 84:5
98:22 103:17
122:17
126:21
127:15
129:22 133:8
134:19,23
135:14 137:4
144:24
147:18

Moore's
59:6 73:12
75:12 120:6
145:19
158:16

morning
6:25 7:1

Morrissey
81:16 82:6
83:20 84:1,8
93:16 94:10
96:8 97:25
98:24 106:13,
19 108:16
110:16
111:16,25
116:8 128:12
138:5 139:1
142:10 143:1,
20 172:9

mortgage
34:12,17,24
35:2,5 36:1,5,
7,13,19,20,
22,24 37:6,20

mounts
47:20

move
62:1,8 64:22

65:25

movement
10:20

moving
22:10

multiple
103:7 106:24
142:11

_____

**N**

names
15:12

Nanavati
56:23 57:2
131:24 132:6,
11,17 171:1,
2,5 172:14
175:12,15

National
34:3

native
120:4

nature
29:2 121:20

nav
149:21

navigating
150:13

navigation
89:13 90:3
118:25
148:16
149:13 152:4
157:22

Navy
166:12

nearest

76:16 78:15

necessarily
48:10

needed
48:23 61:5

Nicholas
5:3 6:10
175:23

Nodding
9:8

Norfolk
5:21 14:4
72:7 79:2
86:9 96:20
138:1 159:24

north
11:8 27:11,14
138:10

Notary
6:4

note
50:6 114:23
115:2 146:3

Notes
111:5

notice
7:5,9,17
78:10 113:4

noticeable
144:10

notification
134:21 135:8

notifications
119:22 134:5,
11,24

notified
18:23 80:11

notify
76:13,15
78:15 79:18
80:6,18
119:5,8,15,18

number
5:2,6 7:3
8:13,17 10:9,
10,11,21
11:18 12:8
14:16 15:11
30:5 38:17,20
40:6 42:16
43:17 54:21
56:17 63:1
66:5,16 67:1
74:17,18 75:9
87:25 89:13
91:18 97:16
103:21
104:18 105:9,
12 118:4,14
119:4,8 122:5
124:24
144:25 163:6
174:19

numbered
74:9 88:18
125:3

numbering
74:8

numbers
40:5 54:10
74:10

numerous
168:8

nuts
46:7

NY
113:1

June 17, 2025

---

**O**

**oath**
25:18

**object**
21:2 142:4
151:12 152:8
155:17 171:8

**objected**
69:18

**objection**
20:18 21:22
25:14 38:22
42:3 53:17
60:3 63:10
67:10,16
68:21 69:4,20
71:17 72:9,15
77:8 78:3
81:24 83:11
84:18,21,25
85:3,4 86:23
87:2 89:3
90:8,19 92:5,
20 94:8,19
98:7,14 101:5
102:16
104:13,17
116:20 129:1,
17 130:9
131:1,2,15
132:2,24
133:10
138:18 139:7
140:21 141:6,
14,19 142:5,
22 149:25
151:10
154:22
155:10 156:4
164:16

171:12
173:13

**objections**
46:19 67:13
132:19

**objects**
118:23

**obligation**
79:17

**obtain**
66:16

**obtained**
22:7 24:25
28:18 34:2
43:15 126:11

**occasion**
86:16,19

**occasionally**
11:1

**occurred**
23:9 26:16

**offered**
15:3

**office**
55:24 74:2
76:13 78:15,
16,17

**officer**
6:2 108:20

**officers**
13:18

**offices**
79:19 80:7

**official**
12:15,23 13:6
125:19 127:7

**one-off**

62:1,7 64:22

**ongoing**
31:18 111:7
116:12 168:9

**operate**
107:18

**operates**
10:25

**operating**
13:7

**operation**
67:2,7

**operational**
33:7

**operations**
12:10 26:20
99:18 102:21

**operator**
12:3,6 78:14

**operators**
90:6

**opinion**
44:11 51:7

**Opposing**
56:8

**options**
121:3

**orange-ish**
91:25

**order**
74:9 87:17

**organization**
8:23 10:9
45:21 52:1

**original**
36:24 56:24
59:12 73:19

80:21 84:6
120:4

**originally**
142:9

**outcome**
106:23

**overlooked**
149:12

**owed**
63:2

**owned**
13:14,25
32:16

**owner**
78:13

---

**P**

**p.m.**
97:11,17
117:24 118:5
163:2,7
174:14,20
175:24 176:2

**pages**
57:19 77:22
106:14
124:12
137:12

**paid**
34:15,24,25
37:1 61:12,17
64:5,8 66:7,
15 110:13,22,
24 146:7

**Palmetto**
27:15

**paper**
87:16 121:5

**parenthetical**
119:10 170:3

**park**
10:19

**part**
13:1,14 46:25
77:1 86:14
89:1 90:2
126:7 136:9

**part-time**
8:17 9:4

**participate**
100:5 166:22
167:1,4 169:4

**participated**
167:13,18

**participating**
62:2

**partner**
12:11,13

**partnership**
12:5

**parts**
78:19

**pass**
49:21 73:10
158:15
170:22

**passed**
33:25 39:14
55:22 103:14
106:6,9,11
115:24 116:2
135:12
172:10

**past**
42:17 103:7
145:21

---

June 17, 2025

pay
  32:19 62:10
  110:18

payroll
  110:21 111:2
  113:19,23
  114:2 115:21

PBL
  138:10

PDF
  139:19

Pearson
  16:7,8

pending
  106:23
  116:22

people
  67:21 93:21
  95:23 144:25
  151:18

people's
  142:19

Pepera
  44:2,6

performing
  116:4

period
  102:3 116:17
  145:11

person
  42:9,14 44:2
  78:14 119:9

personal
  24:21,24 26:8
  89:6 107:8
  110:6 111:11

personally
  26:12 93:6

95:15 110:5
122:3 125:11,
22 126:2
136:20
146:21 157:5
161:22 170:9,
18

personnel
  95:18 96:5
  107:8 112:1
  114:8

perspective
  25:7

pertaining
  164:4

phone
  17:25 22:18,
  19 23:6,7,8,
  21,22 65:15
  124:6

phones
  24:19 25:10
  26:14 124:7

photo
  121:21
  138:11

photocopied
  114:21

photograph
  20:14 120:2,
  5,8 124:24

photographs
  57:21 120:1
  121:24 123:9
  125:1,2,8

photos
  123:16

physical
  23:5

pick
  159:25
  173:10

picture
  21:9

pile
  74:23

pilot
  90:5 142:18

piloting
  142:15

pink
  114:22

plaintiff
  5:20

planned
  34:22

plate
  161:14,23

PN
  145:23 146:1

point
  31:10 116:5

pointing
  77:14

policies
  52:11 102:15

policy
  49:12 78:1,7
  91:1,6

popped
  128:10

port
  10:16,20
  11:8,16 16:4
  29:8 153:16,
  25 161:14

Porter
  128:8

portfolio
  11:20

ports
  11:10

Portsmouth
  5:21 14:4
  72:7 79:2
  86:9 96:20

position
  26:4,6 67:24
  109:4 117:5

possibly
  21:16 33:16
  94:12

post
  161:14

post-incident
  100:10,21
  105:8

posted
  96:19

potentially
  144:9 172:8

practical
  76:14,18

pre-
employment
  105:8

predominantl
y
  27:2 117:7

preemployme
nt
  100:8

prefer
  44:19 88:10

preferred
  36:13

prefers
  77:22

prep
  69:12,13

preparation
  71:2,8 131:3
  133:18
  136:10 159:6

prepare
  63:7 68:1
  87:9 132:8
  161:13

prepared
  70:2,6,13,24
  71:13

preparing
  80:20 166:15,
  16

preposition
  98:18

present
  141:25

preserve
  21:19

pressure
  92:3

presume
  50:16 107:7
  109:22 162:2
  164:15

previous
  52:11 59:12

previously
  11:12 39:21
  41:3 42:18
  59:6 73:14

June 17, 2025

144:11 145:5
146:24 147:4
165:8,14,23

**pride**
92:3

**print**
56:2 108:4

**printed**
40:2 121:1,4
148:21
157:19

**printout**
109:22
112:20
139:19 148:2

**prints**
150:3

**prior**
8:1,16 72:11
83:2 86:11
89:19 92:25
93:19 117:11

**priorities**
76:9

**privately**
13:25

**privilege**
55:6,10
133:2,17

**privileged**
70:22

**probability**
124:10

**problem**
64:24

**procedure**
73:3,5 76:1,
21

**procedures**
77:2

**proceed**
94:20

**proceeds**
138:11

**process**
26:13 53:21
65:23 66:3
72:20 110:10
136:18 157:2

**processes**
114:2

**processing**
106:15

**produce**
160:17

**produced**
17:17 39:25
40:8 46:11
47:17 49:16
50:15 62:18,
21 68:7 73:14
94:3 107:11
111:16 120:2
122:2,14
135:21
137:11 140:1
150:1,22
151:8 152:19
153:1 155:23
157:20 161:5,
21 164:13
165:11
172:24 173:3

**production**
103:21

**productions**
54:23

**prohibited**
99:18 100:18
101:4,22

**prohibiting**
91:6

**prohibition**
90:4 91:11,14
127:11

**prohibitive**
100:6

**project**
62:2,5

**projects**
30:10

**pronounce**
12:19

**pronounced**
42:10

**pronouncing**
108:17 165:2

**proper**
85:9

**property**
29:7

**protocol**
124:23

**protocols**
102:14

**provide**
26:13 30:7
91:19 93:8
94:5 96:4
109:16 113:3

**provided**
14:15 22:18,
23,24 23:23
25:1 26:4
30:4 62:14

66:13 67:19
68:15 69:6
71:4,5,22
80:22 82:3
84:7,14 93:3,
12,15 95:14,
23 96:12,16
97:19 101:18
114:21 129:7
130:15 139:3
146:11 147:1,
2,5 154:6
155:4 162:10
168:9 171:16

**provider**
109:11,13

**providing**
23:20 25:21
167:16,21
168:3

**Public**
6:4

**purchased**
34:21

**purporting**
44:10

**purpose**
88:25 159:13
162:5

**pursuant**
40:7 43:16
46:14 161:6

**push**
12:7 128:10

**pushing**
61:3,7

**put**
37:20 38:24
87:16 128:14

151:19
157:25

**putting**
35:1

---

**Q**

**quality**
121:14

**quarry**
11:14,18

**quarter**
153:10,11

**Queens**
27:10

**question**
22:4 25:2,24
40:13 41:2
42:5 44:23
45:1 50:7
53:19 77:10
78:6 82:1
85:6,9,14,20,
21 86:3,4
89:20 90:13
91:5 92:7
93:5,18 95:1,
2,21 98:17
101:7 110:3
129:4,5
130:3,11
131:19,21,24
136:5 140:23
141:1,8,10,
13,24 142:6
150:16
152:11
153:22
155:17,19
165:21 167:3,
25 168:2

169:25
172:12,25
173:11,15,19

**questioned**
151:18

**questioning**
104:14

**questions**
31:11 67:1
73:15 87:4
132:14,18
151:20 163:9
170:21,24
171:3 173:24
174:22

**quick**
62:23 97:5

**quickly**
73:25

**quotation**
15:12

**quote**
65:23

**quoting**
66:4

---

**R**

**radar**
164:8 171:10
173:8,20

**rail**
27:9,11,12,15

**railroad**
5:22 29:24

**railroads**
27:13

**random**

100:9 105:8

**range**
39:6,8 41:16
59:22 121:3

**rate**
66:12 114:3

**re-ask**
85:14

**re-do**
85:6

**reached**
19:17,22
64:21

**read**
18:1 26:2,11
28:22,24
68:16,19
69:3,20,24,25
70:1 85:23
86:1 90:15,18
95:2,5 112:4
125:25
130:24,25
131:25 132:1
133:3,6,7
137:23
145:24,25

**reading**
58:5 91:10
150:24
168:11

**real**
97:5

**realize**
57:17 112:4

**reason**
36:4,8 51:20
53:23 110:11
140:3 141:2

142:2 161:17
162:13
171:18

**reason's**
153:19

**reasons**
80:17 100:7

**recall**
13:11 14:8
17:18,20,24
18:12,16,24
19:2,6,15
20:7 28:24
29:19,23
31:20 32:7,8,
15 33:8,12
34:20 37:22
38:4,16 39:7
40:17,25
41:5,15,24
42:20 45:8,19
60:22 62:13
64:13,23 81:9
105:25 107:5
108:25
117:11
120:14,17
121:12
127:19 136:8,
11 138:19
148:7 149:5
164:6 167:17

**recalling**
57:23

**receipt**
116:23

**receive**
15:21 134:24
135:1

**received**
14:7 17:25

20:12 21:24
63:2 84:10
122:21
127:18,22

**receiving**
17:18 18:12
130:7

**recent**
41:10 109:3

**recently**
14:16 16:18
52:19 58:22
59:3 87:12

**recess**
56:14 97:13
118:1 163:3

**recipient**
17:10

**recognize**
14:18

**record**
6:8 19:24
26:10 28:10
42:25 46:11
47:12 48:15
56:11,13,18
66:21 75:6,10
85:25 90:17
95:4 97:11,
12,16 104:13
117:24,25
118:4 131:5,
18 163:1,7
172:4 174:13,
15,17,20
175:25

**recorded**
36:8

**records**
23:20 95:17,

22 96:7
111:15

**recovered**
25:12

**redo**
85:8

**reduction**
64:2

**reestablished**
36:6

**refer**
77:12

**reference**
107:14 112:9
118:18
157:21

**referenced**
18:18

**references**
43:1 137:9

**referred**
145:5 163:12
168:4

**referring**
31:3 75:15
79:21 87:15
172:11,25

**refers**
43:23 77:18
101:3

**refinancing**
37:19

**reflected**
165:4

**refurbishing**
33:6

**regulation**

**NICHOLAS LARAWAY**

77:14

**regulations**
77:1 78:2,8

**rehire**
109:23 110:2

**reiterate**
95:9 162:7

**relate**
111:25 146:6
151:17

**related**
30:18 31:10,
12,18 67:22
98:19 102:14
106:15
114:18 126:8
138:20
152:13

**relates**
25:3 135:7
144:8

**relationship**
30:21

**relationships**
10:5 103:6

**relocated**
12:9

**rely**
71:20 82:12
86:6 91:8
92:8 93:2,10,
21 95:10
97:22 98:21
101:16 107:3
111:12 122:1
123:3 125:9,
20 130:13
134:22
136:16

138:25
139:13,24
142:19
143:24 146:9,
25 150:19
152:17,24
154:4 155:2,
12,21 157:1
158:7 159:15
161:19 162:8,
16 163:23
164:10
171:14

**relying**
68:2 71:24
94:1 171:21,
23 172:5

**remain**
156:22

**remained**
116:12

**remedial**
104:14

**remember**
31:13 55:2
65:1 131:20

**remotely**
103:21

**removal**
30:19

**rental**
30:20

**repair**
160:15 161:7,
18 162:6

**repairs**
159:10,14,23
160:12
162:14

**repeat**
41:2 72:11
85:19,21
90:13 95:20
131:19
132:25 134:9
144:7

**rephrase**
20:20 21:5
141:10,23

**replace**
48:25

**replacement**
48:21 51:12

**report**
10:1,2 39:16
43:8 58:3
80:22 133:20,
25 134:6,12
135:4,16,24
136:6,14
139:21
143:16
153:24

**reported**
53:15 81:2,6

**reporter**
5:13,17 6:7,
11,15,19,22
7:13 26:2,11
32:24 33:13
49:19 56:7
57:9,13 85:23
86:1 90:18
95:5 99:3
106:10 118:8
147:9,11
160:22
174:25 175:2,
5,10,13,16

**reporting**
73:3 75:17
76:1,8 77:2
79:17 100:16
119:4 135:8
156:5

**reports**
134:25 135:1
136:2,3 138:5
143:1 153:9

**represent**
17:1 135:19

**representativ
e**
25:4,8

**representativ
es**
30:12

**request**
22:22 125:12

**requested**
21:18 22:2
105:17 125:7
167:17

**require**
33:5

**required**
87:3 88:22
100:5,15

**requirement**
37:24

**requirements**
75:24

**requires**
119:22

**requiring**
89:1

**Resend**

146:16,17

**Resources**
107:24

**respond**
19:12

**responded**
40:3

**responding**
19:8

**response**
17:16,18 24:4
29:10 30:7,14
65:8 73:8
172:24

**responsibiliti
es**
86:15

**responsible**
92:2

**responsive**
173:11

**rest**
57:20

**resting**
128:20

**restroom**
97:5

**result**
115:18
143:23 144:2,
5

**resultant**
78:13

**resulted**
64:4 149:13

**results**
157:2

June 17, 2025

retain
21:19

retired
16:18

returning
159:24

review
7:25 43:20,21
55:6 72:12
111:15
154:14 159:6

reviewed
37:16 67:19
76:4,6 87:8,
12 88:2,13
96:6 111:17,
19 136:9
149:6 158:11
173:5

reviewing
130:17,19

right-hand
88:23

ring
44:7

River
92:19 159:22

RODGER
49:15

Rodger's
172:16

Rodgers
5:23 18:3
20:18,23
21:2,5,12,22
22:25 23:19
24:3,9,21
25:14,18,19
26:3 28:8

33:17 35:14,
18,21 36:9
38:8,12,15,22
39:1,2,23
40:8 41:9,18
42:3,24 43:4,
9 44:14,19,25
45:13 46:10,
17,21 47:1,
11,15 48:7,9,
14 49:6,25
50:3,8,12
51:22 52:25
53:3,5,17,25
54:4,7,12,19,
21,25 55:5,
11,13,16,18,
22 56:1,4,8,
21,25 57:3
59:9,14 60:3
62:16,19
63:10,17,21
65:5,7 66:19
67:9,12,16
68:2,6,21,25
69:4,10,16,
17,23 70:4,8,
15,20 71:1,8,
11,17 72:9,
15,22 73:16,
21,24 74:3,
19,21 75:3,19
77:7,12 78:3
79:4,10 81:24
82:10,18
83:5,11,16,24
84:18,21
85:5,11,17
86:2,23 87:1
88:4,10 89:3
90:8,19 92:5,
20,24 94:1,8,
16,17,22 95:7
96:23 97:1

98:7,14
101:1,5
102:7,16
104:12
116:20
117:17,19
123:12,22,25
129:1,17,21
130:9 131:1,
16,23 132:2,
9,12,20
133:10 134:8
135:25
138:18 139:7
140:5,8,11,
19,20 141:6,
14,20 142:4,
22 149:24
150:4,7,11,15
151:1,3,10,
12,16,25
152:7 154:1,
22 155:1,10,
15,18 156:4,
18,21 158:19
160:1,17,25
163:14
164:16 165:9,
13,16,20,24
166:3,6,9,12,
25 167:6,22
168:6 169:8,
16,22 171:12
172:3,18,20
173:13 174:2,
9,21 175:1,8,
18,20

role
8:11 12:15
13:7 86:25
145:16

roles
8:13

room
56:6 128:6

Rose
14:3 18:18
32:17 39:17
44:12 45:11
47:24 58:18
60:1 61:2
72:6 89:24
100:24 102:3
122:22
123:10
125:13 127:3
135:14 137:3,
16 148:12
149:8,17
152:3 153:15
154:12
157:21
158:22 161:8
164:7 170:17
171:10

rough
175:6,14

routinely
29:1

Roy
12:13

RR
137:5 138:10

rudder
152:14
161:14

rule
100:17

run
15:13

runs
62:5

Ryan
46:16,24
47:3,5

―――――――

S

S-C-H-E-N-E-
C-T-A-D-Y
6:18

safety
73:6,13 74:11
75:24 78:13
86:16 87:7
90:3,24
92:15,17
99:11 104:5,
23 117:7
118:13

sailed
9:16

salaried
9:20 114:7

sales
29:5,8

salesman
28:15 65:19
145:4

salesmen
65:13

sampling
100:9,17

sanction
96:3

SAT
149:18

satisfaction
36:10

scenario
66:8,10

June 17, 2025

schedule
47:19

scheduled
94:11

Schenectady
6:14,16

school
8:21

screenings
100:6

search
167:11
168:19 169:4,
13

searched
168:13

searches
166:23 167:5,
13

searching
65:9,11
167:18

section
73:7,8 74:10
75:16 78:10,
11 87:20
88:18 89:12,
16 90:3
91:17,19
99:11 101:11
118:13

sections
73:13 76:25
77:23 87:6,11

Sector
78:15

secure
22:13 26:13
162:2

secured
25:13

sees
20:24

seller
34:25

sells
29:6

send
15:21 65:16
66:2,6 123:2

sending
31:13 127:8

senior
16:11

sentence
112:25
128:13

separately
140:17

September
39:18

sequence
160:6,8

serve
27:13

served
27:9,11

service
63:3 105:16
109:10,13

services
29:7,8 30:9
34:7 104:10
105:2,4,5
109:16
126:22

set
58:3 115:11

share
127:16

shared
128:22 129:8

Sharif
128:8

sharing
11:21

sheet
66:13

ship
36:13 160:15
161:6

shipment
11:17

shipyard
11:5 52:20
159:9

shoreside
105:11,17

short
27:16 56:14
97:13 118:1
162:24 163:3

show
59:5 120:5
146:18

shown
142:24

shows
54:14

sick
116:1

side
88:23

sign
105:22

signature
114:11 115:9,
11,13,14

signed
37:11,16
114:10
123:20
166:20

silly
121:2

simple
64:24 140:17

single
173:17

sir
7:7,10 11:22
15:5 59:18,22
107:10
162:20 165:2
173:24

sit
173:18

site
61:3,8

sitting
22:11

Skanska
62:1 63:23
64:1,8,21
66:10

sleeping
128:9

sliding
128:9

slightly
124:12

slowly
138:11

SMS
119:20 134:4

snow
30:18

snowplowing
30:19

soft
46:21

sold
11:13 29:8
34:6

somebody's
112:13
123:15

sort
8:10 13:7
32:9 43:19
86:22 99:17
103:25 108:4
120:3 148:21
167:11

sounds
121:1

south
10:14,17 11:8
26:21 30:24
31:2

southeast
31:2

Southern
92:19 159:21

space
66:20

speak
47:1 91:9
107:5,19

110:22 173:6

**speaking**
131:15
132:10

**speaks**
142:23

**specific**
13:1 17:2
23:12 24:16
31:20 33:12
39:8 52:5
60:23 61:13
62:13 64:14
78:8 88:15
94:2 98:19
109:12
111:19 136:1
137:19
151:22
152:10 158:9,
10 160:10

**specifically**
13:11 17:20
20:3,8 21:17
32:12 37:8
38:4 40:17
44:7 45:19
51:19,24
52:23 58:11
60:6,15 81:9
84:13 90:25
92:13 93:13,
15 96:9 97:25
98:10,13
111:18
112:13 115:4
117:12
130:13 136:8,
19 142:20
152:23 153:2
155:6,25
160:5 163:25

167:18
171:24 172:2
173:6,22

**specifics**
91:10 92:9
107:2

**speculation**
116:21 129:2

**speed**
67:2,7 71:15,
23

**spell**
6:15 33:14

**split**
140:23
141:21

**spoke**
22:6 65:13,
15,16 66:12
67:18

**spoken**
46:22

**spreadsheet**
147:20 148:2,
5,24 149:1
153:20
157:19,24

**spur**
27:12

**staff**
42:15

**stamp**
28:9

**stand**
12:4

**standalone**
13:1

**standard**
105:6

**standards**
146:17,20

**standing**
104:17 159:9

**starboard-
side**
162:3

**start**
28:13 54:18
99:15 172:1

**started**
16:13 70:23
129:16

**Starting**
104:11

**starts**
75:20 87:23
99:24 124:22

**State**
6:5 109:15

**stated**
51:8 142:10,
14

**statement**
84:22 95:10
131:11

**statements**
125:25 126:9,
11 127:16
128:1 131:5

**states**
172:4

**stating**
28:9

**status**
25:10 107:15,

20 113:10
116:19
173:19

**stayed**
115:21
159:23

**STBD**
162:2

**steelworks**
11:3

**steering**
138:8 143:4
154:20

**Stenographer**
175:3

**steps**
21:20

**Sterling**
17:15

**stevedoring**
11:9

**sticky**
114:23 115:2

**stone**
11:17

**stop**
128:6

**stored**
96:5

**story**
142:11

**straightening**
131:17

**straps**
162:1

**strike**
78:22 80:23

82:22 83:1

**struck**
81:1

**structure**
80:24 119:1,5

**stuff**
167:19

**subcontracto
r**
109:17

**subject**
49:13 67:9
135:15 137:5

**subjected**
100:17

**submitted**
111:6,14
126:1 136:17

**subpoena**
40:7 43:16
160:15 161:6

**subpoenaed**
55:3

**subsequently**
144:11

**substance**
29:22 69:8
100:6

**substances**
100:18 101:4,
22

**subtracting**
46:8

**succeeded**
35:1

**suggest**
79:13

NICHOLAS LARAWAY

June 17, 2025

suggesting
173:9

sum
64:23

summaries
70:1,3,7,25
72:13 133:3,7

summarized
171:17

summarizing
93:24

summary
50:20 68:19,
24 69:3,21,24
132:1

summers
8:19

SUNY
109:11,13,17

super
121:8

superficial
144:9

support
11:10 12:24

supports
11:4

supposed
135:4

surmise
147:4

survey
33:18 38:13,
21 39:15
43:1,7 44:12
53:9,15 57:22
58:22,24
59:3,16,23

surveys
38:16

sus
106:22

suspended
106:23,25
107:13,17
110:18
113:10 116:4,
19

suspension
110:13,24

swear
5:17

switch
138:7 143:3

switched
103:9

sworn
6:4

Sybil
108:7,9
112:14,18,20
114:11,14

Sybil's
114:13

system
73:6,13 74:11
75:24 83:2
86:17 87:7
90:4,25 99:12
107:16,19,23,
25 108:4
109:23
112:23
133:20 134:3,
7,13 136:6,14
139:16,21,24
154:20

163:13,21
164:4,8

_____

T

tag
132:13,22

taking
22:9

talk
31:23 32:2,5,
13 64:15
67:4,5

talked
18:19

talking
24:20 32:9
38:8 41:10
54:13 59:17
104:5 123:12
133:4 167:24

talks
100:1

tap
129:10

TBS
99:23 118:18

team
110:15
132:13,23

tease
83:15

technicians
152:21
154:18 157:9
158:5

techs
152:21 153:3

telling
24:2 69:15
84:24 160:1
163:14

tender
119:11

tense
141:25

term
21:3 81:25
130:10

terminated
36:5 113:5
116:9,16

termination
106:16
107:14
108:14 110:7,
12

test
39:3 52:7
101:12,14

testified
6:6 41:13,14
68:13 69:22
90:10 94:9
139:8 172:7

testify
7:3 8:4 63:8,
11 67:21,25
140:12

testimony
41:21 57:23
68:3,17,20
69:3 71:20
72:14 76:5
82:13 86:6
94:2,23
95:11,13
97:22,24

98:25 101:17
107:4 111:13
113:9 122:1
123:3 125:9,
20 130:14,24
133:8 134:22
136:17
138:25
139:13,25
142:20
143:24
146:10 147:1
150:20
152:18,24
154:5 155:3,
21 157:1
158:7 159:16
161:19 162:8,
16 163:24
164:11
171:14,21
172:5

testing
38:25 94:4
100:2,22
101:8,13,21
102:2,8,10,14
103:3,7 104:1
105:5,9

text
76:24 88:22
150:17

texted
120:23

texts
149:20
151:17

thick
57:18

thing
57:20 86:22

112:21,22
132:13 133:6
158:11
168:11

**things**
27:6 29:2
61:4 86:21
123:2 129:24

**Thomas**
102:20
103:16
108:16 145:1

**thought**
34:15 53:9
60:18 128:10
151:15

**thousands**
173:2

**Till**
175:19

**time**
5:9 15:6,25
16:4,25 18:20
27:6,7 28:1,
22,25 29:9
30:10 34:11,
20 40:15
45:14,15 52:6
56:11,15,18
58:15 61:2
62:8,9 63:3
66:4 72:6
73:2 75:6,10
79:5,6 80:11
84:10 86:11
96:25 97:11,
17 102:3
113:13 116:8
117:15,19,24
118:2,5
123:21 126:3

127:17 129:9
130:22 131:7
140:8,13
143:19
145:11 149:2
156:18 163:1,
7 164:8
166:19
170:21
173:25
174:13,20,22
175:24

**times**
142:12
171:25

**title**
9:22,23 12:23
13:1,6 34:1
36:12 43:7
74:13

**titled**
89:12 91:17
118:14
147:20
168:18

**titles**
12:16

**today**
22:11 23:16
35:8 36:21
68:15 76:5
88:3,9,11
149:2 159:4
173:18

**Today's**
5:8

**told**
13:4 34:14
60:17 64:19,
20 127:20
133:11 145:1,

17

**Tom**
102:21 109:8
110:4 112:18,
20,21

**tomorrow**
172:8 175:19

**top**
14:22 15:10
47:22 61:16
72:1 158:13

**topic**
63:1,9 67:1,
25

**topics**
7:3,22 8:5
10:4 62:24

**towage**
63:2

**towing**
5:4,5,25 7:18,
19 8:10
10:24,25
11:4,24,25
12:2,14,18,
22,25 13:2,
10,18 15:15,
19 16:5,10
32:10,11 34:8
45:22 79:22,
25 80:3 86:17
95:19,24
102:22
103:25 114:5
117:4 134:20
146:8

**track**
162:19

**tracking**
163:13,21

**traffic**
26:25

**training**
93:7,15
95:16,18,23
96:3,7 97:18
98:19

**transactions**
42:17

**transcript**
132:1 175:7,
9,11

**transit**
61:12 92:2,18
96:19 162:4

**transits**
91:17,20
93:9,17 94:7

**Travelers**
49:5

**true**
62:15

**Tuesday**
5:8

**tug**
14:3 15:7
22:14,18
23:6,10,21
32:17 39:17
44:12 45:11
46:13 58:17
59:25 61:1
72:5 76:10
105:18
121:25
122:21
123:10,13,14
125:13,19
126:1 135:14
137:2,15

140:3 141:3
142:2,8
143:22 144:2
146:4 161:8
170:17

**Tug's**
124:6

**tugboat**
67:22

**tugmackenzie
rose@
carvercompa
nies.com**
123:1

**tugs**
97:19,21
146:8

**turn**
40:18 78:9
88:16 89:11
91:16 99:21
148:4 153:16,
25 157:23
158:1

**turned**
116:16 138:6,
24 139:6
143:2

**two-hour**
101:13

**type**
11:5 30:2
105:2,4
137:22

---

**U**

**U.S.**
9:13 11:2
76:17 100:16

**NICHOLAS LARAWAY**

June 17, 2025

119:19

**unaware**
102:19 122:3
144:1

**uncle**
9:2 13:21
37:13

**underneath**
14:25 92:14
146:15

**understand**
25:7 42:5
48:5,11 53:19
58:12 60:5
63:7 69:19
70:12 78:6
82:1 86:2,4,
21 91:4 92:7
98:11,16,17
105:13
111:21 121:2
126:10 129:4
130:11
133:21,24
134:17
140:14,25
141:7,12
142:6 166:3
167:10
169:17,19

**understanding**
7:6 8:3 19:21
21:25 22:1
26:15,17
49:1,9 53:13,
20 58:16 59:1
61:25 64:10
76:3 79:1
80:13,17,20
82:2 83:8

86:8 90:1
105:15
106:22
110:25
112:16
113:11
115:23
116:10 123:5
129:5 130:16
135:3 138:23
140:2,6,12,14
141:2,4
142:1,8,13
143:14,21
163:19 173:4

**understands**
169:23

**understood**
79:5,6 113:8

**undertake**
21:18

**unintended**
78:21,22
79:3,9 119:21

**unit**
76:16,17
145:10

**University**
109:15

**unpack**
113:21

**updated**
126:6

**updates**
126:8

**Upstate**
10:22

**USCG**
76:16

**utilize**
48:23

**utilized**
22:14

**utilizes**
105:7

_____

**V**

**valuation**
39:15 43:7
49:2 53:11
58:3 59:19,25

**valuations**
46:8

**valued**
38:20

**variety**
27:6

**vender**
24:11

**vendor**
103:2 105:1,
6,16,19
109:17

**vendors**
103:7

**version**
120:4 121:5

**vessel**
9:17 34:2,3,
12,22 36:1,
21,23,24 37:5
38:2,17 48:19
51:15 58:17
60:19 61:1
63:3 67:2,8
71:15 76:11
78:17 99:18

101:12,15
142:16,18
159:8,19
160:13
163:10

**vessel's**
58:9

**vessels**
47:19 48:19
52:15 90:6
91:21 163:22
164:1

**vicinity**
138:17

**video**
175:22

**Virginia**
138:1

_____

**W**

**wait**
56:24

**waiting**
116:13

**Ware**
5:19

**washouts**
30:17

**watch**
123:6

**water**
10:15 11:8

**wedge**
138:17

**week**
40:4 74:24
94:11 172:9

**Weeks**
61:3,7 138:9
143:5 144:13
159:19

**weld**
161:13

**what'll**
57:6

**whatever's**
46:19

**wheelman**
92:1

**White**
12:13

**who'd**
19:4

**withdraw**
141:24

**witnesses**
94:21

**word**
167:10

**words**
41:5

**work**
8:14 10:13
11:5,10 29:9
33:2,3 34:23
35:22 64:20
66:14 72:19
95:24 108:22
111:1 113:7,9
114:3 115:22
135:7 145:13
146:7

**worked**
8:16 32:9

**working**

**NICHOLAS LARAWAY**

June 17, 2025

8:15,17 9:3
109:10
110:19,23
113:12
116:17 164:8
171:10 173:7

**works**
10:10 16:3
81:18 117:6
139:16

**worth**
60:19

**would've**
37:11 52:2
154:4

**write**
112:11
131:10

**writing**
91:12,14

**written**
67:12 112:17
113:3 123:15

**wrong**
20:21

---

**Y**

---

**year**
115:25
145:12
153:11

**yellow**
91:25

**Yoakum**
46:4

**York**
6:5,14 10:14,
17,22 12:7,9,

14 26:22
30:17,22
109:15 113:1,
2

---

**Z**

---

**zip**
6:19

**Zoom**
170:23

| | |
|---|---|
| **Sent:** | 6/20/2024 9:49:02 AM |
| **From:** | Nick Laraway <nlaraway@carvercompanies.com> |
| **To:** | |
| | "Brian Moore" "CMT Dispatch" "Leonard Baldassare" "Mark Pearson" |
| **Cc:** | |
| | "Anthony" "Jr." "Carlo Agneta" |
| **Bcc:** | |
| **Importance:** | 3 (Normal) |
| **Subject:** | FW: Notice of Claim for Damage |
| **Attachments:** | image001.png , 20240620 Notice Letter to Carver.pdf , image003.png |

Is anyone aware of any of this?

**From:** Armond Joyner <ajoyner@cwm-law.com>
**Sent:** Thursday, June 20, 2024 10:41 AM
**To:** Nick Laraway <nlaraway@carvercompanies.com>
**Cc:** Brian Moore <bmoore@carvercompanies.com>; James Chapman <jchapman@cwm-law.com>; W. Ryan Snow <wrsnow@cwm-law.com>; Robert Bracknell <rbracknell@cwm-law.com>; Beth Powers <bpowers@cwm-law.com>
**Subject:** Notice of Claim for Damage

> You don't often get email from ajoyner@cwm-law.com. Learn why this is important          Good Morning,

Please see attached correspondence from Mr. Chapman.

Thank you,



**Armond Joyner**, Legal Assistant
**CRENSHAW, WARE & MARTIN, P.L.C.**
150 W. Main Street, Suite 1923 | Norfolk, VA 23510
**T** (757) 623-3000 | **F** (757) 623-5735 | www.cwm-law.com | ajoyner@cwm-law.com

This communication is intended only for the recipient(s) named above and may be privileged or confidential. If you are not the intended recipient, any disclosure, distribution or other use is prohibited. If you received this communication in error, please notify Crenshaw, Ware & Martin, P.L.C. at (757) 623-3000 or by return email to ajoyner@cwm-law.com.




CARVER ESI 000307



CARVER ESI 000308

LAW OFFICES
## CRENSHAW, WARE & MARTIN, P.L.C.
150 WEST MAIN STREET, SUITE 1923
NORFOLK, VIRGINIA 23510

TELEPHONE (757) 623-3000
FACSIMILE (757) 623-5735

June 20, 2024

JAMES L. CHAPMAN IV
EMAIL: jchapman@cwm-law.com
Also licensed in North Carolina

**VIA E-MAIL (nlaraway@carvercompanies.com) and REGULAR MAIL**

Mr. Nick Laraway
Chief Operating Officer
Carver Companies
2170 River Road
Coeymans, NY 12045

Re:    Notice of Claim for Damage
To the Owners and Operators of TUG MACKENZIE ROSE
Allision of M/T MACKENZIE ROSE with Main Line Bridge of Norfolk and
Portsmouth Belt Line Railroad Company
Date of Allision: June 15, 2024
Preservation of Evidence Demand

Dear Mr. Laraway:

This law firm represents Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line"). I write regarding damage caused by Tug Mackenzie Rose alliding with the Belt Line's main line bridge on Saturday June 15, 2024. The bridge spans the Southern Branch of the Elizabeth River from 36.81096 North Latitude/76.229215 West Longitude to 36.81234 North Latitude/76.28872 West Longitude.

AIS voyage data and video document the Tug pushing a deck barge northbound in the Southern Branch of the Elizabeth River when it struck the main line bridge, knocking it from its pier structure and causing substantial damage, as shown in the enclosed photograph.

The bridge remains out of service and the Belt Line is incurring continuing economic damage resulting from loss of use.

Carver Companies, or one of its operating entities owns and/or operates Tug Mackenzie Rose. The Belt Line demands adequate security for all damage caused by the Tug. Failing that, we will seek to have the vessel arrested as security for the loss. If you have not done so, we request you immediately notify the insurer of the Tug of the casualty and request them to contact us directly.

Because these matters could require legal action, Carver is requested to place an immediate litigation hold on all potentially relevant documents and information, including electronically stored information (ESI). The failure to do so may expose Carver to sanctions or legal liability.



CARVER ESI 000309

Mr. Nick Laraway
Chief Operating Officer, Carver Companies
June 20, 2024
Page 2

    Carver must preserve and retain, and not discard, shred, or delete, any documents and information relating to the Tug and the casualty, including logbooks (rough and smooth), AIS data, notes, communications (text, email, voicemail and messaging services), photographs, video and other data. This includes, without limitation, all hard copy and electronic files, computer hard drives, mobile devices, backup media, home computers and personal laptops if used to perform work on behalf of Carver, and personal accounts for work-related communications.

    Electronically stored information (ESI) will potentially be an important source of discovery or evidence. Carver must preserve all ESI related to the disputes and suspend the deletion, overwriting, or any other possible destruction of relevant electronic documents and data. Any automatic data destruction protocols must be suspended. Again, failure to do so could result in sanctions against Carver. These obligations apply to all relevant ESI, no matter when it was created. Carver has a continuing obligation to preserve all newly created ESI as well, not just ESI that was created before delivery of the contract termination and proposed debarment notices.

    The legal obligation to preserve information also extends to any data, documents or information within Carver's "control." If Carver works with third-party vendors or other entities that may have data, documents or information covered by this demand, please notify us immediately so that we may determine whether to inform these third parties of their preservation obligations.

    Please confirm receipt of this request and that Carver is undertaking to comply with it. Thank you for your prompt attention to this matter.

Sincerely yours,

James L. Chapman, IV

JLC/acj

Enclosure

cc:    Brian Moore, GM, Carver Marine Towing - bmoore@carvercompanies.com
       W. Ryan Snow, Esquire
       Norfolk and Portsmouth Belt Line Railroad Company



Mr. Nick Laraway
Chief Operating Officer, Carver Companies
June 20, 2024
Page 3

Enclosure





CARVER ESI 000311