# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

----------------------------------------X
IN THE MATTER OF COEYMANS MARINE
TOWING, LLC D/B/A CARVER MARINE
TOWING AS OWNER AND OPERATOR OF M/T
MACKENZIE ROSE, (IMO NO. 8968765) HER
CARGO, ENGINES, BOILERS, TACKLE, EQUIPMENT,
APPAREL, AND APPURTENANCES, ETC., IN REM,
("M/T MACKENZIE ROSE"),

                                        CIVIL ACTION NO:
                                        2:24-CV-00490

PETITIONING FOR EXONERATION FROM OR
LIMITATION OF LIABILITY IN ALLISION WITH
NORFOLK AND PORTSMOUTH BELT LINE RAILROAD
COMPANY MAIN LINE RAILROAD BRIDGE
(THE "BRIDGE") OCCURRING JUNE 15, 2024 IN
AND ABOUT THE ELIZABETH RIVER, VIRGINIA.

----------------------------------------X


                        April 29, 2025

                        10:18 a.m.

        AN IN PERSON VIDEOTAPED DEPOSITION of

of Leonard Baldassare, a Defendant herein,

taken by the respective parties, pursuant

to Order, before Larin Kaywood, a Notary

Public for and within the State of New

York.




JOB NO.: 112214

```
 1    A P P E A R A N C E S:

 2

 3         CRENSHAW, WARE & MARTIN, P.L.C.
              Attorneys for Defendant Norfolk
 4           Portsmouth Belt Line Railroad Company
             150 W. Main Street Suite 1500
 5           Norfolk, Virginia 23510
           BY:  JIM CHAPMAN, ESQ.
 6         E-mail:  Jchapman@cwm-law.com

 7         CLYDE & CO US LLP
              Attorneys for Coeymans Marine Towing, LLC
 8           30 S. Wacker Drive, Suite 2600
             Chicago, IL 60606
 9         BY:  JAMES H. RODGERS, ESQ.
              MICHAEL ROMAN, ESQ.
10         E-mail:  Michael.roman@clydeco.us
                    James.rodgers@clydeco.us
11
           SINNOT, NUCKOLS & LOGAN, P.C.
12            Counsel for Evanston Insurance Company,
              S/s/o Norfolk and Portsmouth Belt Line
13           Railroad Company
             13811 Village Mill Drive
14           Midlothian, Virginia 23114
           BY:  MARK C. NANAVATI, ESQ.
15            CHRISTOPHER JONES, ESQ.
           E-mail:  Mnanavati@snllaw.com
16                  Cjones@snllaw.com

17         BUTLER WEIHMULLER KATZ CRAIG, LLP
              Counsel for Evanston Insurance Company,
18            S/s/o Norfolk and Portsmouth Belt Line
             Railroad Company
19           11525 N. Community House Road
             Suite 300
20           Charlotte, North Carolina 28277
           BY:  ZACHARY M. JETT, ESQ.
21         E-mail:  Zjett@butler.legal

22

23    ALSO PRESENT:

24    Ingrid Contreras, the videographer

25    Connan Moss.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1                        INDEX

 2           EXAMINATION OF LEONARD BALDASSARE

 3

 4   EXAMINATION BY                              PAGE

 5   Mr. Chapman                             6, 218

 6   Mr. Rodgers                                209

 7

 8               - MARKED EXHIBITS -

 9   NUMBER      DESCRIPTION                   PAGE

10   Exhibit 1 - Bridge Photo 6/15/2024 244      82

11   Exhibit 2 - Barge Photos 6/15/2024 245 - 248   84

12   Exhibit 3 - 9.5 Incident Report - 1/22/2024   137
                 (SC pier damage)
13
     Exhibit 4 - Labelled Sections of SMS Produced   158
14                by Carver Listed on cover page

15   Exhibit 6 - Daily Logs 6/12/2024 - 6/16/2024   87
                 (Helm System)
16
     Exhibit 9 - Capt. Christopher Miller         96
17                Statements 6/15/2024

18

19           - PREVIOUSLY MARKED EXHIBITS -

20   Exhibit 15 - Deckhand Sharif Porter Statements
                   6/15/2024
21
     Exhibit 17 - Capt. James Morrissey Statements
22                 6/15/2024

23   Exhibit 19 - CG-2692 Report of Marine Casualty

24   Exhibit 21 - Helm Screenshot 6/15/2024

25   Exhibit 23 - Rough Deck Logs 6/12/2024 - 6/16/2024
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1           - PREVIOUSLY MARKED EXHIBITS (CONT.) -

 2    Exhibit 24 - Ayers Marine Electronics Records
                   4/2024 249 -
 3
      Exhibit 25 - GMT/Mackay Marine Invoices 2023 - 2024
 4
      Exhibit 26 - 9.2 Near Miss Report 5/6/2024
 5                 (approved) 41 - 42

 6    Exhibit 28 - 9.2 Near Miss Report 3/4/2024
                   (approved) 37 - 38
 7
      Exhibit 30 - 9.2 Near Miss Report 4/19/2024
 8                 (approved)

 9    Exhibit 32 - Morrissey Training Records 7/2/23 -
                   6/16/24
10
      Exhibit 34 - Voyage Plan 6/15/2024 890 - 897
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              *     *     *     *     *

 2              THE VIDEOGRAPHER:  This is the

 3         beginning of Media Number 1 in the

 4         deposition of Leonard Baldassare, in

 5         the matter of Coeymans Marine, d/b/a

 6         Carver Marine Towing.  Case number

 7         2:24-cv-00490.  Today's date is

 8         Tuesday, April 29th, 2025, and the

 9         time on the monitor is 10:22 a.m.

10              My name is Ingrid Contreras,

11         and I am the videographer.  The court

12         reporter is Larin -- my mistake,

13         Larin Kaywood.  We are here with

14         Rosenberg & Associates, Inc.  All

15         appearances are recorded.

16              The court reporter will now

17         swear in the witness:

18    L E O N A R D   B A L D A S S A R E, the

19    witness herein, having first been duly

20    sworn by the Notary Public, was examined

21    and testified as follows:

22              THE REPORTER:  Please state

23         your name for the record.

24              THE WITNESS:  Leonard

25         Baldassare.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              THE REPORTER:  And your
 2         address, please?
 3              THE ADDRESS:  88 Shore Road,
 4         Lindenhurst, New York 11757.
 5    EXAMINATION BY
 6    MR. CHAPMAN:
 7         Q.   Good morning, Mr. Baldassare.
 8         A.   Good morning.
 9         Q.   My name is Jim Chapman, I
10    represent Norfolk and Portsmouth Belt Line
11    Railroad Company.  We are taking your
12    deposition today in connection with a
13    lawsuit, a limitation proceeding that was
14    filed by your former employer, Carver, to
15    limit its liability resulting from the
16    damage to the Belt Lines bridge back in
17    June of 2024.
18              Do you understand that?
19         A.   Yes, sir.
20         Q.   Could you tell me your date of
21    birth?
22         A.   4/26/1993.
23         Q.   I want to get a little
24    background, you know, what your work
25    experience has been and that sort of thing.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
1                    Who'd you work for before you

2      went to work for Carver?

3           A.      Center Line logistics.

4           Q.      And how long were you at Center

5      Line?

6           A.      Four and a half years.

7           Q.      Doing what?

8           A.      Port Captain.

9           Q.      Did you sail at all while you

10     were Port Captain?  Did you have any sail

11     time?

12          A.      While I was at Center Line?

13          Q.      Yeah.

14          A.      No, but I sailed previously.

15          Q.      Okay.  So who'd you work for

16     right before Center Line?

17          A.      Buchanan Marine.

18          Q.      Did you sail for Buchanan?

19          A.      I did, yes.

20          Q.      Were you the master of one of

21     their vessels?

22          A.      No, I was a mate.

23          Q.      How long were you with

24     Buchanan?

25          A.      A year and half.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        Q.    Where did you sail out of with

 2   Buchanan?

 3        A.    Port Washington, New York.

 4        Q.    And prior to Buchanan, who were

 5   you with?

 6        A.    Vane Line Bunkering.

 7        Q.    How long with Vane Line?

 8        A.    Five years.

 9        Q.    All sailing?

10        A.    Yes.

11        Q.    Were you the master of any of

12   the towing vessels?

13        A.    No.

14        Q.    Mate?

15        A.    Mate.

16             THE REPORTER:  Just let him

17       finish his questions.

18             MR. CHAPMAN:  Okay, sure.

19             THE REPORTER:  Then give a

20       pause in between.

21             MR. CHAPMAN:  Sorry.

22             THE REPORTER:  Okay.

23        Q.    I should have said this at the

24   outset, but we'll try to exercise, kind of,

25   good radio discipline.  I'll -- let me
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    finish my question before you start your

2    answer, and I'll do my best to not

3    interrupt your answer.

4         **A.    Understood.**

5         Q.    Okay.  So before Vane Line, who

6    were you with?

7         **A.    I was at SUNY Maritime College.**

8         Q.    I'm sorry, SUNY Maritime?

9         **A.    Yes.**

10        Q.    What was your major?

11        **A.    Marine operations.**

12        Q.    When did you graduate?

13        **A.    2015, sorry.**

14        Q.    Four years?

15        **A.    Two years.**

16        Q.    Two years, okay.

17        **A.    Yes.**

18        Q.    Did you go somewhere else

19    before SUNY?

20        **A.    Yes, community college.**

21        Q.    Okay.  But you ended up with a

22    four year degree coming out of SUNY?

23        **A.    No, I did two --**

24        Q.    It's a two-year program?

25        **A.    Yes.**

**LEONARD BALDASSARE**

**April 29, 2025**

1        Q.    Okay.  So when were you

2    first -- when did you get your first

3    merchant marine document?

4        **A.    When I graduated from SUNY,**

5    **took my license exam and got my MMC, so I**

6    **think it was February of '14.**

7        Q.    Are you currently licensed?

8        **A.    Yes.**

9        Q.    What do you hold?

10       **A.    1600 Ton Mate New York Coastal.**

11       Q.    Any endorsement?

12       **A.    Yeah.  I have STCW, Radar**

13   **observer, Lifeboatman, Basic Safety, ECDIS.**

14       Q.    I'm not familiar with that one.

15   What'd you say?

16       **A.    ECDIS.**

17       Q.    ECDIS?

18       **A.    Yeah.**

19       Q.    It's an acronym for something?

20       **A.    Yeah, it's -- I don't know the**

21   **full --**

22       Q.    What does it really mean?

23       **A.    It's a form of like navigation.**

24       Q.    It's like a navigation

25   endorsement?

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.      Correct, Yes.
 2          Q.      To use some particular type of
 3    nav equipment?
 4          A.      An ECDIS machine.
 5          Q.      Okay.  And how do you spell
 6    that?
 7          A.      E-C-D-I-S.
 8          Q.      So has it been about four and a
 9    half years since you've actively sailed?
10          A.      Yeah, roughly.
11          Q.      Do you ever operate any of
12    Center Line's boats?
13          A.      No.
14          Q.      Do you ever operate any of
15    Carver's boats?
16          A.      No.
17          Q.      So when did you start with
18    Carver?
19          A.      January of 2024.
20          Q.      Did you work with Brian Moore
21    when you were at Vane Line?
22          A.      He -- we worked there at the
23    same time.  We never worked together
24    though.
25          Q.      Okay.  Did you work with Brian
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    Moore when you were at Center Line?
 2         A.    I did, yes.
 3         Q.    How long was he at Center Line
 4    while you were there.  Like how much
 5    overlap was there?
 6         A.    He was there the entire time I
 7    was there, but I believe he started about a
 8    year before I did.
 9         Q.    And he -- I know -- he told us
10    yesterday he left to go to Carver.
11         A.    Mm-hmm.
12         Q.    Did he invite you to come to
13    Carver after him, or how did you end up at
14    Carver?
15         A.    They were looking for a Port
16    Captain, and I had applied for the job.
17         Q.    He told us a little bit about
18    the way in which you applied for jobs at
19    Carver.
20               Did you go through the online
21    portal --
22         A.    No.
23         Q.     -- to get hired?
24         A.    No.
25         Q.    Who'd you -- did you contact
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    somebody about getting hired there?
 2         A.    I spoke to Tom Marron, the HR
 3    representative.
 4         Q.    Do you know how he spells his
 5    last name?
 6         A.    I do not.
 7         Q.    Did he run HR at the time?
 8         A.    I believe so, yes.
 9         Q.    What position were you hired
10    into at Carver?
11         A.    Port Captain.
12         Q.    So pretty much the same thing
13    you were doing, at least position wise at
14    Center Line?
15         A.    Correct.
16         Q.    How many vessels did Center
17    Line have that you sort of had Port Captain
18    responsibility?
19         A.    Between the tugs and the
20    barges, 40 roughly.
21         Q.    How many tugs?
22         A.    20.  About 20, I think.  I'd
23    have to go through all of them, but
24    I -- I'd say 20 is a fair number between
25    the offshore and inland division.
```

**LEONARD BALDASSARE**

**April 29, 2025**

 1          Q.    So fewer tugs to my -- the way

 2     Mr. Moore described it at Carver than at

 3     Center Line?

 **4**          **A.    You're saying?**

 5          Q.    Yeah.  Well, I'll just ask you

 6     this, how many tugs at Carver when you

 7     become Port Captain?

 **8**          **A.    Seven, I believe.**

 9          Q.    Okay.

 **10**          **A.    Yes.  It's a smaller outlet,**

 **11**     **correct.  Yeah.**

 12          Q.    Was it a pay raise to go to

 13     Carver?

 **14**          **A.    It was.**

 15          Q.    And compensation wise, was it a

 16     salaried position or an hourly position --

 **17**          **A.    Salaried.**

 18          Q.     -- going to Carver?

 **19**          **A.    Correct.**

 20          Q.    Had you been salaried at?

 21     Buchanan -- excuse me, at Center Line?

 **22**          **A.    Yes.**

 23          Q.    When did you leave Carver?

 **24**          **A.    January of 2025.**

 25          Q.    So about a year altogether at

**LEONARD BALDASSARE**

**April 29, 2025**

1    Carver?

**2        A.    Correct.**

3        Q.    Why'd you leave?

**4        A.    It was a mutual agreement.**

**5    They were looking for me to relocate up to**

**6    their port in Albany, and it just wasn't an**

**7    option for me at the time.**

8        Q.    You live on Long Island?

**9        A.    I do.**

10        Q.    When you were Port Captain for

11    Carver, did they allow you to like work

12    from home or did you work some place that

13    was close to where you lived?

**14        A.    I worked in the office in**

**15    Staten Island.**

16        Q.    What reason did they give for

17    wanting you to move to the Albany office?

**18        A.    I think they were just looking**

**19    for me to be more involved in the main**

**20    operation up at the port, but like I said,**

**21    I have a young child so it wasn't an option**

**22    for me to move.**

23        Q.    How old is your child?

**24        A.    She's 10 months.**

25        Q.    Okay.  So how long -- I should

LEONARD BALDASSARE

**April 29, 2025**

 1    ask you, who are you working for now?

 2         **A.    H&L Contracting.**

 3         Q.    And what is their business?

 4         **A.    Marine construction is the**

 5    **division that I work in.  I'm a project**

 6    **manager.  But they do various construction,**

 7    **but I'm in the marine sector of the**

 8    **company.**

 9         Q.    Are there any tugs that are

10    part of the marine construction --

11         **A.    Yes.**

12         Q.     -- division?

13         **A.    Yes, there are.**

14         Q.    Are they -- give me some idea,

15    relative size?

16         **A.    So we have one tug boat that's**

17    **1200 horse power, it has a COI, and then**

18    **the rest are all under 26 foot non-COI work**

19    **boats.**

20         Q.    How many altogether?

21         **A.    I think about 12.**

22         Q.    When you were Port Captain for

23    Carver, tell us what your duties were?

24         **A.    I was responsible for the**

25    **day-to-day operations of the tug fleet.  So**

**LEONARD BALDASSARE**

**April 29, 2025**

1    I would make sure the tugs were crewed, I

2    would make sure that safety equipment was

3    up to snuff.  Just basically be the liaison

4    between the boats and upper management.

5        Q.    Did you have any responsibility

6    for hiring crew personnel?

7        A.    I did not, no.  That all went

8    through HR.  I would sometimes sit in on

9    the interviews, but it would go through HR.

10        Q.    Did you have any responsibility

11    for testing people that were hired into

12    crew positions?

13        A.    No, I did not.

14        Q.    Did somebody else?

15        A.    Not to my knowledge, no.

16        Q.    Was there a training manager,

17    or somebody that was responsible for

18    training when you worked for Carver?

19        A.    No, not to my knowledge.

20        Q.    As a Port Captain, who did you

21    report to?

22        A.    Brian Moore.

23        Q.    Was there anybody else that

24    you, I don't know, thought of having to

25    report to in your mind, somebody else

**LEONARD BALDASSARE**

**April 29, 2025**

1    besides him that you also had to report to?

**2**       **A.    No.**

3        Q.    Did you ever deal with Nick

4    Laraway?

**5**       **A.    Yeah.  He was the -- he's like**

**6**   **Brian's boss, so -- but not directly, no.**

7        Q.    So you never had to meet with

8    him?

**9**       **A.    No.  I did, but I was -- like I**

**10**  **wouldn't report to Nick.  I would report**

**11**  **things to Brian.**

12       Q.    Okay.  Just as a for instance,

13   I'm going to get into some questioning

14   about the allision with the bridge, and how

15   that was reported and that sort of thing,

16   but did you ever have a conversation with

17   Nick Laraway about that incident?

**18**      **A.    I did not, no.**

19       Q.    From your perspective, was

20   Brian Moore the guy that ran Carver Marine

21   Towing?

**22**      **A.    Yes, he was the general**

**23**  **manager.**

24       Q.    What was the normal means of

25   communicating with Mr. Moore when you were

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    Port Captain?
 2         A.    Phone call.
 3         Q.    Did you ever e-mail him?
 4         A.    I did.
 5         Q.    Is there some distinction in
 6    your mind as to why you would e-mail him
 7    about some things or -- versus having a
 8    phone call with him about others?
 9         A.    No, just -- no.
10         Q.    Were you issued a phone by the
11    company --
12         A.    Yes.
13         Q.     -- in your role as Port
14    Captain?
15         A.    Yes, I was.
16         Q.    Do you still have that phone
17    today?
18         A.    I do not, no.
19         Q.    You were served with a subpoena
20    before the deposition?
21         A.    Yes, sir.
22         Q.    And I asked you to bring
23    whatever phone you had used or communicated
24    with back --
25         A.    Yes.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              MR. RODGERS:  Jim --
 2              MR. CHAPMAN:  Let me just
 3         finish the question.  Let me just
 4         finish the question.
 5              MR. RODGERS:  Finish it.
 6         Q.    The subpoena requested that you
 7    produce the phone that you had used on June
 8    15th, 2024, which was the date of the
 9    allision, right?
10              Do you still have that phone
11    today?
12              MR. RODGERS:  Just don't answer
13         it.  We're producing Mr. Baldassare
14         as a Carver witness, not pursuant to
15         the subpoena.  Any demand you could
16         make to Carver, and -- we'll deal
17         with it.  So he's not here now by
18         virtue of the subpoena, he's here now
19         as our witness as I talked to you
20         about, or e-mailed you about.
21         Q.    Yeah.  I'm just asking
22    whether -- you confirmed that you were
23    served with a subpoena, right?
24              MR. RODGERS:  You can --
25         A.    Yes.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1         Q.   Okay.  And the subpoena
 2    requested you to produce a phone if you
 3    still had it in your possession, correct?
 4         A.   Yes.
 5         Q.   Okay.  Do you still have that
 6    phone in your possession?
 7         A.   No.
 8         Q.   All right.
 9              MR. RODGERS:  Yeah, you can go
10         ahead.
11         A.   Okay.  Yeah.  No.  I don't have
12    the phone in my possession.
13         Q.   And that's because it was a
14    company phone and you turned it back into
15    the company when you left?
16         A.   That is correct.
17         Q.   Is that the only phone that you
18    used for communication on company business?
19         A.   Yes, it is.
20         Q.   So it sounds like when you were
21    working for Carver, you'd carry around two
22    phones.  You had a personal phone and the
23    company phone.
24              MR. RODGERS:  Objection to
25         form.
```

**LEONARD BALDASSARE**

**April 29, 2025**

1        Q.    Is that right?

**2        A.    Correct, yes.**

3        Q.    Did you use the company phone

4    to text -- send text messages on company

5    business?

**6        A.    Yes.**

7        Q.    Were you ever requested to

8    provide any text information or things that

9    were on that phone in connection with the

10   allision?

**11       A.    No.**

12       Q.    When you were Port Captain for

13   Carver, did you ever have to fire anybody?

**14       A.    No, I did not.**

15       Q.    Anybody you felt ought to have

16   been fired?

**17       A.    No.**

18       Q.    In your role as Port Captain,

19   if -- and I realize you didn't fire anybody

20   or think anybody should be fired, but did

21   you have the authority to recommend that

22   somebody be fired?

**23       A.    Yes, I did.**

24       Q.    Besides Port Captain, did you

25   hold any other position in the Cargo

**LEONARD BALDASSARE**

**April 29, 2025**

1    organization?

**2        A.    I did not, no.**

3        Q.    So you said that when you were

4    hired, there were seven tugs.  Were there

5    more than that when you left working for

6    cargo?

**7        A.    No.**

8        Q.    Still seven?

**9        A.    Yeah, I believe.  Caroline,**

**10   Pike, Otter, McKenzie Rose, Helen, Erin**

**11   Elizabeth, Daisy Mae, yeah, seven.**

12       Q.    Okay.

**13       A.    Yeah.  Sorry, I just --**

14       Q.    Those are all inspected

15   vessels?

**16       A.    Correct.  Yes, they are.**

17       Q.    Any uninspected vessels?

**18       A.    No.**

19       Q.    How long did it take you to

20   find a position with H&L Contracting?

**21       A.    Three weeks.**

22       Q.    Do you feel like you left

23   Carver on good terms?

**24       A.    To my knowledge, yes.**

25       Q.    Have you had any communications

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    with Brian Moore since you've left Carver?
 2         A.    No.
 3         Q.    So no texting, no conversation?
 4         A.    No.
 5         Q.    Did Carver or anyone at Carver
 6    provide a reference for you when you left
 7    the company?
 8         A.    For -- to -- for a new job,
 9    you're saying?
10         Q.    Yes.
11         A.    Oh, no.
12         Q.    And did you request one?
13         A.    No.
14         Q.    The -- did you have any
15    preexisting connection with anybody at H&L
16    Contracting before you went to go work for
17    them?
18         A.    No.
19         Q.    And was it like it's owned by a
20    cousin or something?
21         A.    No.
22         Q.    Okay.
23         A.    No, no.
24         Q.    There are three people that
25    are -- that were members of the crew of the
```

## LEONARD BALDASSARE

**April 29, 2025**

```
1    Mackenzie Rose when the allision occurred
2    that are no longer with the company, no
3    longer with Carver, Captain Miller, Captain
4    Morrissey and Engineer McGrath.  I want to
5    ask you, did Miller leave while you were
6    still employed by Carver?
7        A.    No.  He was still employed when
8    I left.
9        Q.    And was he still captain of the
10   Mackenzie Rose when you left?
11       A.    He was, but the Mackenzie Rose
12   was in the shipyard when I left.
13       Q.    So what was he doing if --
14       A.    He was home.  He wasn't
15   like -- he wasn't working at the time.
16       Q.    So to your knowledge, he was
17   still collecting a paycheck?
18       A.    No, he was not.
19       Q.    Okay.  So he was still on the
20   company rolls, but he wasn't receiving --
21       A.    Correct.  Because he was not
22   working because his boat was in the
23   shipyard.
24       Q.    So his position as captain,
25   that's not a salaried position.  It's if
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    you're working position hourly, or?
 2         A.    Correct.  It's a day rate.
 3         Q.    Day rate.
 4         A.    Yes.
 5         Q.    Okay.  Do you recall the last
 6    time you actually spoken to him?
 7         A.    No, I do not.
 8         Q.    Do you know how long the
 9    Mackenzie Rose had been in the yard?
10              MR. RODGERS:  If you know.
11         A.    Five months, I believe.  It was
12    still in the yard when I left and I'm not
13    sure when exactly it came out, but I would
14    say five months.  It was her annual dry
15    docking, so.
16         Q.    So an annual what?  For --
17         A.    COI.
18         Q.    Okay.  So she went into the
19    yard, you left -- you said you left in
20    January?
21         A.    Yes, sir.
22         Q.    And how long had it been in the
23    yard before that?
24         A.    A week or two maybe, it wasn't
25    very long.
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          Q.    And then you think -- maybe I

2    misunderstood.  I heard you say something

3    about five months, and I'm just trying to

4    understand.  It wasn't in the yard for five

5    months, or was it?

6          **A.    I don't know.  I'm assuming or**

7    **just remembering --**

8               MR. RODGERS:  Don't assume.

9               **THE WITNESS:  Okay.**

10              MR. RODGERS:  And don't guess.

11         **A.    So I don't know.  I don't know**

12   **how long it was in there.  When I left, it**

13   **was still in the shipyard.**

14         Q.    Okay.

15         **A.    I don't know when it came out.**

16         Q.    All right.  And it had gone

17   there -- gone in there a couple of weeks

18   before you left?

19         **A.    Correct.**

20         Q.    All right.  So did you leave

21   like January 1, January 30?  I'm just

22   trying to, kind of, put a timeframe on

23   this.

24         **A.    I think it was the end of**

25   **January.  I don't know the exact date.**

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Q.    Had that shipyard evolution for
 2    the COI been planned --
 3          A.    Yes.
 4          Q.     -- for some period of time?
 5          A.    Yes.
 6          Q.    And is that the port captain's
 7    responsibility, or does somebody else
 8    handle that?
 9          A.    That would be the engineering
10    department.
11          Q.    So is there a port engineer for
12    the company that handles that sort of
13    thing?
14          A.    There is, yes.
15          Q.    And when you were Port Captain,
16    who was the port engineer?
17          A.    Chris Nunamann.
18          Q.    Nunamann?
19          A.    Yes.  Don't ask me how to spell
20    it because I have no idea.
21          Q.    Okay.
22                THE REPORTER:  And it's COI,
23          the acronym, right?
24                THE WITNESS:  Yes ma'am?
25          Q.    And just for clarification of
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    record, COI stands for certificate of
 2    inspection, right?
 3         A.    Yes, that's correct.
 4         Q.    So let me ask about Captain
 5    Morrissey.  Did he leave the company while
 6    you were still port engineer -- excuse me,
 7    Port Captain?
 8              MR. RODGERS:  I think you said
 9         Moore.
10              MR. CHAPMAN:  I said Captain
11         Morrissey, I thought --
12              MR. RODGERS:  Miller.
13              MR. CHAPMAN:  Thought so.
14              MR. RODGERS:  Okay.
15              MR. CHAPMAN:  I mean, Captain
16         James Morrissey.
17              MR. RODGERS:  Oh, Morrissey.  I
18         though you said Moore.  Sorry.  My
19         hearing.
20         Q.    Did Captain James Morrissey
21    leave Carver before you did?
22         A.    I'm not sure.  I don't know.
23    As far as I knew, after this incident
24    happened, he was still an employee of the
25    company.  However, he was not working on
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1     any of the boats.
 2          Q.    So the -- once he brought this
 3     barge, or the -- once the Mackenzie Rose
 4     delivered this barge to the bridge
 5     construction location in New Jersey --
 6          A.    Mm-hmm.
 7          Q.     -- he didn't sail again for
 8     Carver?
 9          A.    To my knowledge, no.
10          Q.    Would you have like crew
11     assignment responsibility so that you would
12     actually know that?
13          A.    Yes.  But I believe he was
14     removed from the vessel by upper
15     management.  It was kind of above my pay
16     grade.
17          Q.    So you didn't make that
18     decision?
19          A.    I did not.  It was made by
20     upper management.
21          Q.    And when you say "upper
22     management," do you mean Mr. Moore?
23          A.    Correct.
24                MR. RODGERS:  I just want to
25            talk to the witness for a minute.
```

**LEONARD BALDASSARE**

**April 29, 2025**

 1          Are you okay with that, Jim.

 2               MR. CHAPMAN:  You know, I'm

 3          really not.

 4

 5               MR. RODGERS:  All right.  I'll

 6          do it in front of you.  Well, I can,

 7          but I don't want to waste a lot of

 8          time.  Off the record.

 9               (Whereupon, a discussion was

10          held off the record.)

11               **THE WITNESS:  This incident**

12          **happened, and then on June 24th, I**

13          **was out for eight weeks on paternity**

14          **leave.  So anything that --**

15               MR. RODGERS:  That's it.

16          That's what he need.

17               **THE WITNESS:  Okay.**

18               MR. RODGERS:  He can ask you

19          now what you remember and know.

20               **THE WITNESS:  Sure, understood.**

21          Q.   I'm sorry, eight weeks of

22     paternity leave?

23          **A.   Yes.**

24          Q.   While you were on paternity

25     leave, did anybody inform you that Captain

**LEONARD BALDASSARE**

**April 29, 2025**

1      Morrissey had been removed?

2          **A.    No.**

3          Q.    Did you have any communication

4      with anybody at the company during those

5      eight weeks that you were enjoying your

6      paternity leave?

7          **A.    In regards to this situation or**

8      **just in general?**

9          Q.    Just in general.

10         **A.    I did, yes.**

11         Q.    Okay.

12         **A.    Just congratulations, is --**

13         Q.    Well wishes?

14         **A.    Correct.**

15         Q.    Okay.  Anything

16     business-related?

17         **A.    No.**

18         Q.    So when you come back -- let's

19     see -- you said June 24th, right?

20         **A.    Yes.**

21         Q.    You came back late August of

22     2024?

23         **A.    Correct.**

24         Q.    And Captain Morrissey was not

25     sailing?

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.      Correct.
 2          Q.      Right.  And was that when you
 3     learned that he'd been removed from any
 4     operational position?
 5          A.      Yes.
 6          Q.      Was he doing anything else for
 7     the company?
 8          A.      I do not know.
 9          Q.      You didn't see him?
10          A.      I did not see him, no.
11          Q.      You didn't have any
12     communication with him?
13          A.      I did not.
14          Q.      Do you know whether he's still
15     being paid?
16          A.      I do not know.
17          Q.      And at any time before you left
18     Carver in January of 2025, did Captain
19     Morrissey ever come back?
20          A.      No.
21          Q.      Did you ever come to learn that
22     the reason Captain Morrissey was removed
23     was because of the incident involving the
24     allision with the Belt Line Bridge?
25                  MR. RODGERS:  Objection to
```

**LEONARD BALDASSARE**

**April 29, 2025**

1              form.  You can answer if you know.

2         **A.    I don't know.  I'm not sure.  I**

3    **was just -- I figured that that was the**

4    **reason why.**

5         Q.    You never asked?

6         **A.    I never asked.**

7         Q.    Would there be any other reason

8    that he would not --

9         **A.    No.**

10        Q.    -- come back?

11        **A.    No.  That's why I just figured**

12   **that that was the reason why.**

13        Q.    Do you have any idea what he's

14   doing today?

15        **A.    I do not.**

16        Q.    So let me turn to the Engineer

17   Jacob McGrath?

18        **A.    Jason.**

19        Q.    Jason, excuse me.  Thank you.

20   Jason McGrath.  Was he still employed by

21   the company when you left in January 2025?

22        **A.    He was not.**

23        Q.    Do you know when he left?

24        **A.    I do not.**

25        Q.    Did it have anything to do with

**LEONARD BALDASSARE**

**April 29, 2025**

1    the allision?

2         **A.    I do not know.**

3         Q.    Do you know whether he quit --

4         **A.    I do not know.**

5         Q.     -- or he was asked to leave?

6         **A.    I think whenever it happened I**

7    **was not -- I was out, so I don't know.**

8              MR. CHAPMAN:  I'm just going to

9         intervene for a second.  Are you able

10        to get all that down?  I know we're

11        kind of talking back and forth.

12             MR. RODGERS:  You got to wait

13        for him to finish his questions.

14             **THE WITNESS:  I know.  I'm**

15        **sorry.  I'll try to slow down.**

16             MR. CHAPMAN:  Yeah, you're

17        doing fine.

18             THE REPORTER:  I'm -- yeah.

19        Just give it a pause.

20             **THE WITNESS:  Okay.**

21             THE REPORTER:  I know you want

22        to answer.

23             **THE WITNESS:  Sorry.**

24             THE REPORTER:  It's okay.

25             **THE WITNESS:  I'm just not used**

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1         to --
 2              THE REPORTER:  I know.
 3              THE WITNESS: -- Stopping.
 4              THE REPORTER:  It's not usual
 5        conversation.
 6              MR. RODGERS:  -- from New York.
 7              THE WITNESS:  Yes.
 8              THE REPORTER:  Literally.
 9        Q.    Were you involved in hiring
10   Captain Morrissey?
11        A.    I was not.
12        Q.    Do you know who had that
13   responsibility?
14        A.    I do not know.  He was employed
15   when I was -- he was already there when I
16   came on board.
17        Q.    So you don't know when he was
18   hired before --
19        A.    I do not know.
20        Q.     -- before that?  Okay.
21   Did -- when you were Port Captain, was
22   there any process for evaluating the
23   capabilities of people that were currently
24   employed?  Like you'd go out and watch them
25   at work or review their daily logs or any
```

LEONARD BALDASSARE

**April 29, 2025**

```
 1    of that sort of thing?
 2         A.    Yes.  So the captains were
 3    responsible for evaluating their mates and
 4    deck hands, the port engineers would be
 5    responsibile for evaluating the engineers
 6    on the boats, and then myself or Brian
 7    would be responsibile for doing annual ride
 8    alongs with the captains to just kind of
 9    make sure that they were following policies
10    and procedures.
11         Q.    So how many ride alongs did you
12    do in the year that you worked for Carver?
13         A.    I would say at least five.
14         Q.    Was there anybody else that did
15    ride alongs?
16         A.    Brian Moore.
17         Q.    Okay.  And is a ride
18    along -- can you describe that for us?
19    Like, what do you mean by that?
20         A.    Sure.  Yeah.  So I would get on
21    the boat in the morning when I got in, say
22    they had a couple of jobs that they would
23    be doing, delivering barges, whatever it
24    may be.  I would go with them, I'd be in
25    the wheelhouse with the captain and I'd
```

LEONARD BALDASSARE

**April 29, 2025**

1    kind of just, you know, make sure that he

2    was operating the vessel safely.

3         Q.    And this is specific to the

4    master of the vessel, right?

5         A.    Yes, sir.

6         Q.    Okay.  Did you ever do anything

7    similar with the mates?

8         A.    No.  The mates would be

9    evaluated by the captains, and then if

10   there was any type of issues, then myself

11   or Brian would get involved and do our own

12   ride along and assessment.

13        Q.    Is there any form that would be

14   filled out in connection with those ride

15   along assessments?

16        A.    I believe so, yes.

17        Q.    Where would you enter that

18   data?  Where -- what form is it that you're

19   talking about?

20        A.    It would go into the Helm

21   CONNECT.

22        Q.    So there's some sort of

23   evaluation process?

24        A.    Yes, sir.

25        Q.    Okay.  So do the masters have

LEONARD BALDASSARE

**April 29, 2025**

```
1     to do that for the mates?
2          A.    They do, yes.
3          Q.    And how frequently do they have
4     to do that?
5          A.    It's annually.
6          Q.    And you said that the port
7     engineer was responsible for evaluating the
8     engineer assigned to each vessel?
9          A.    Correct.
10         Q.    Is that done also in some kind
11    of ride along, or?
12         A.    Yes.
13         Q.    Okay.  So would the ride along
14    ever take this bridge allision incident as
15    an example?  They started in Chesapeake,
16    Virginia with the barge that they had
17    picked up, and it took them basically two
18    days, maybe a little less, to get to the
19    job site where it was being delivered,
20    right?
21         A.    Mm-hmm.
22         Q.    Would you do a ride along on
23    that type of voyage or are you just talking
24    about going out like a small job in the
25    harbor, where you're out for two hours,
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    four hours, maybe the whole day?
 2         A.    It would mostly be local stuff.
 3    I wouldn't normally go for a multiple day
 4    voyage.
 5         Q.    So the -- you said about five
 6    that you could -- you had done in the year
 7    that you were there, they were all less
 8    than a full day?
 9         A.    No, it would be a full day.
10         Q.    Oh, they would be a full day?
11         A.    Yes, yes.
12         Q.    You spend the whole day on the
13    boat?
14         A.    Correct.
15         Q.    Drinking the coffee on the
16    boat?
17         A.    Doing what I got to do.
18         Q.    Okay.  But there would be a
19    form filled out for that -- a check ride or
20    ride along.
21         A.    Yes.
22         Q.    And there should be a similar
23    form filled out by the master for the mate
24    that they work with, right?
25         A.    Yes.
```

## LEONARD BALDASSARE

**April 29, 2025**

```
1         Q.    And the Mackenzie Rose is
2    actually -- it's kind of crewed by two
3    crews, right, because there is crew
4    changes?
5         A.    Yes, correct.
6         Q.    So there's really two masters
7    in the Mackenzie Rose?
8         A.    Yes.
9         Q.    Okay.  When Captain Miller was
10   the master, who was the other master that
11   worked kind of the other -- is it two week
12   on, two week off?
13        A.    Yes.
14        Q.    Who was the master that worked
15   the other two weeks?
16        A.    Captain Morrissey.
17        Q.    So Morrissey was actually a
18   captain of the vessel?
19        A.    In this instance, he was
20   working over, which a lot of times people
21   do for extra money if we need someone to
22   fill in.  So he was sailing in the capacity
23   of mate when this incident happened.
24        Q.    Oh, so he was one of the two
25   normal masters of the Mackenzie Rose?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.    Yes, sir.

 2          Q.    Okay.  And he

 3     just -- he -- Captain Miller was the other

 4     master?

 5          A.    Yes.

 6          Q.    All right.  So ordinarily, they

 7     wouldn't be on the same cycle?

 8          A.    No.  They would technically

 9     work opposite of each other.

10          Q.    Okay.  So did you ever do a

11     check ride with Captain Morrisey?

12          A.    I don't think I did, no.

13          Q.    Okay.  I mean, you were there

14     for a year, so --

15          A.    Yes.

16          Q.    -- somebody would've done one?

17          A.    Somebody would've done one.

18     But when this happened, I had only been

19     there for five months, so -- or six months,

20     whatever it was.

21          Q.    Okay.  And then you said you

22     didn't work after that --

23          A.    Correct.

24          Q.    -- right?  Okay.  But somebody

25     did one or you would expect there to --
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        A.    At some point, somebody prior
 2    to me being there would I -- would've done
 3    one.
 4        Q.    Okay.  Do you know what that
 5    form's called?
 6        A.    I do not recall what -- it's
 7    under in the Helm CONNECT.  I'm not sure.
 8             MR. RODGERS:  You're referring
 9         to the ride along form?
10             MR. CHAPMAN:  Yes.
11             MR. RODGERS:  Okay.
12        Q.    Or the annual review form,
13    whether it's called ride along, I don't
14    know.
15        A.    Yeah.  I'm not sure what it's
16    called in Helm.  I'm sorry.
17        Q.    And would there be a -- there'd
18    be -- is there one specific to the master
19    of the vessel and another one that's
20    specific to the evaluation of the mate on
21    the vessel, and another one that's specific
22    to the evaluation of the engineer on the
23    vessel?
24        A.    Yes.  It's separate forms for
25    each position.
```

## LEONARD BALDASSARE

**April 29, 2025**

```
 1        Q.   Okay.  Are there any other
 2   opportunities to evaluate someone's
 3   competence during the work that they're
 4   doing on a tug besides those annual reviews
 5   that you just mentioned?
 6        A.   I don't really understand what
 7   you're asking, I'm sorry.
 8        Q.   Yeah.  I'm trying -- well, you
 9   told us Captain Morrissey was one of the
10   two captains on the vessel.
11        A.   Right.
12        Q.   He was operating in the role of
13   being the mate for this particular two-week
14   assignment, right?
15        A.   Right.
16        Q.   I'm just -- and you explained
17   that there's an annual review process and a
18   form to be filled out?
19        A.   Mm-hmm.
20             THE REPORTER:  Yes?
21        A.   Yes.
22        Q.   So what I'm trying to
23   understand, is there any other time or
24   other opportunity other than annually where
25   any of those roles would actually be
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    formally evaluated?

**2**    A.    **Not formally, no.**

3    Q.    Okay.  Are there any other

4    forms to be filled out in Helm that involve

5    an evaluation of crew personnel?

**6**    A.    **No.**

7    Q.    Did you do anything to prepare

8    to testify today?

9        MR. RODGERS:  Other than

10        meeting with me.

11        MR. CHAPMAN:  Well -- okay.  We

12        can start there, but I'm just asking

13        in his mind whether he did anything

14        to prepare.

**15**    A.    **Just meeting with Jim.**

16    Q.    Okay.  Mr. Rodgers?

**17**    A.    **Mr. Rogers, sorry.**

18    Q.    All right.  And was that today?

**19**    A.    **It was this morning in your**

**20**    **office, and then previously last week --**

21    Q.    And other times?

**22**    A.    **Yeah, last week on the phone.**

23    Q.    Okay, okay.  I'm not going to

24    dive into what you guys talked about, but

25    did you do anything else in your mind to

## LEONARD BALDASSARE

**April 29, 2025**

```
 1    prepare for this testimony?
 2        A.    No.  Say a prayer this morning
 3    on the way in.
 4        Q.    Did you review any documents at
 5    all?
 6        A.    No.
 7        Q.    So just trying to understand,
 8    you seem very alert, but I want to make
 9    sure, did you sleep okay last night?
10        A.    Yes.
11        Q.    All right.  Are you taking any
12    medications or substances that would impair
13    your ability to understand my questions or
14    provide truthful answers?
15        A.    No.
16        Q.    Have you ever testified before?
17        A.    I have not, no.
18        Q.    Okay.  So this deposition is
19    the first time you've ever done
20    this -- ever done a deposition?
21        A.    Correct, yes.
22        Q.    All right.  But never testified
23    at trial, a hearing, anything like that?
24        A.    The -- one with the Coast Guard
25    about this -- the MTSB meeting with the
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1      Coast Guard, which I believe you were on
 2      also.
 3           Q.    That was a Zoom meeting --
 4           A.    Yes.
 5           Q.     -- right?
 6           A.    Correct.
 7           Q.    So -- and I honestly don't know
 8      whether the Coast Guard put you under oath.
 9           A.    They did.
10           Q.    But you provided some answers
11      to questions.
12           A.    Yes.
13           Q.    Any other occasions than
14      that --
15           A.    No.
16           Q.     -- where you've testified?
17           A.    No.
18           Q.    Do you understand the term
19      "allision?"
20           A.    Yes, sir.
21           Q.    And what it means for a vessel
22      to a elide with a -- to hit a fixed object,
23      right?
24           A.    Yes.
25           Q.    Tell us how you first learned
```

LEONARD BALDASSARE

**April 29, 2025**

```
 1    about the Mackenzie Rose eliding with the
 2    Belt Line Bridge on June 15th, 2024?
 3         A.    Captain Miller called me, told
 4    me that they were coming through the
 5    bridge, that Captain Morrissey got out of
 6    shape, and landed on the fendering inside
 7    of the bridge and slid through the bridge,
 8    and that there was no damage to the bridge
 9    or to the vessel or barge.
10         Q.    So when Captain Miller called
11    you, did you pick up right away, or did he
12    leave a message and you called him back?
13         A.    I believe I picked up right
14    away.
15         Q.    And what were you doing at the
16    time that he called?
17         A.    I don't remember.
18         Q.    So Saturday afternoon?
19         A.    Yes.
20         Q.    In the middle of June?
21         A.    Yes.
22         Q.    Do you know where you were?
23         A.    I was home.
24         Q.    How many conversations did you
25    have with Captain Miller?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.      That day?

 2          Q.      Yes, sir.

 3          A.      I don't really recall.

 4          Q.      More than one?

 5          A.      Yes.

 6          Q.      In the first phone conversation

 7     that you had with him, did he tell you that

 8     they had taken a photograph?

 9          A.      No, he did not.

10          Q.      Did you ask him to take a

11     photograph?

12          A.      I did.

13          Q.      In that first conversation?

14          A.      Yes.

15          Q.      All right.  Did you

16     subsequently receive a photograph?

17          A.      I did.

18          Q.      Was it more than one?

19          A.      I believe it was four or five.

20          Q.      And did you receive them all at

21     the same time, or did you receive them in

22     groups or --

23          A.      I think they came in all at

24     once.

25          Q.      All right.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        A.    Yeah.
 2        Q.    And what do you recall the
 3  photos being?
 4        A.    There was a few of the bridge,
 5  there was one of the barge, and then there
 6  was one of the tug.
 7        Q.    And when you had -- after you
 8  first spoke to Captain Miller, took his
 9  phone call and he told you this situation,
10  who did you contact?
11        A.    Brian Moore.
12        Q.    And did he pick up when you
13  called him?
14        A.    I think so, yeah.  I believe he
15  did.
16        Q.    What did you tell him?
17        A.    Told him that Captain Miller
18  just called me, that Captain Morrissey was
19  coming through the bridge, got out of
20  shape, landed on the fendering.  There was
21  no damage that anyone could see, and that
22  they were going to send me some photos and
23  then I would send him the photos once I got
24  them.
25        Q.    So when Captain Miller told you
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
1    that Captain Morrissey had gotten out of
2    shape, is that -- is it -- does "getting
3    out of shape" have some meaning that you
4    can explain for us?
5         A.    If you are going through this
6    opening, and you're lining up to come
7    through the center, and you start sliding a
8    little bit, that's getting out of shape.
9         Q.    So the vessel is drifting in
10   some way or --
11        A.    Well, there's --
12        Q.    -- steering in a way that you
13   don't intend it to?
14             MR. RODGERS:  Just for the
15          record, he's testifying as a fact
16          witness, not as an expert.
17             MR. CHAPMAN:  Yeah.  I'm just
18          asking him to explain.
19             MR. RODGERS:  Just putting it
20          on the record.
21             MR. CHAPMAN:  He said those
22          were Miller's words, and I'm --
23             MR. RODGERS:  No, he's
24          fine -- I'm fine with him testifying.
25          I just want to put that on the
```

## LEONARD BALDASSARE

**April 29, 2025**

1          record.  Just --

2          A.    Can you repeat what you just

3    asked, I'm sorry?

4          Q.    Yeah.  I'm just trying to

5    understand.  You took a paper clip -- a

6    couple of clips and used them, I assume as

7    the fenders of a bridge -- the channel

8    opening?

9          A.    It could be anything, buoys,

10   anything.

11         Q.    But getting out of shape to you

12   or what you understood Captain Miller to

13   say to you involved the vessel moving in

14   some direction that it wasn't intended to

15   move?

16         A.    Correct.

17         Q.    Okay.  And what causes a vessel

18   to get out of shape?

19         A.    Wind, current, tide, there

20   could be a few things of that nature.

21         Q.    In your first conversation with

22   Captain Miller, did you ask to talk to

23   Captain Morrissey?

24         A.    I did not.

25         Q.    Did Captain Miller tell you

**LEONARD BALDASSARE**

**April 29, 2025**

1    where on the vessel he was calling from?

**2**        A.    **When -- Captain Miller?**

3        Q.    Yeah.

**4**        A.    **Yeah.  He was calling from the**

**5**    **wheelhouse, he told me.**

6        Q.    And what I -- I've learned that

7    there's a phone that goes with the tug?

**8**        A.    **Yes.**

9        Q.    Maybe there's more than one,

10    but there's at least one phone, right?

**11**        A.    **There's one boat phone for the**

**12**    **vessel.**

13        Q.    Okay.  Call the boat phone,

14    right?

**15**        A.    **Yes.**

16        Q.    And when that phone shows up on

17    your phone, it says, "Tug Mackenzie Rose

18    calling -- "

**19**        A.    **Yes, sir.**

20        Q.    -- right?  So that's why you

21    know to pick it up.

**22**        A.    **Yes, sir.**

23        Q.    And would you expect the master

24    of the vessel to call you whenever there is

25    an incident that involves the vessel

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    contacting a fixed object?
 2         A.    Yes.
 3         Q.    So it says, "Tug Mackenzie
 4    Rose," and you assume that you're going to
 5    end up talking to the master on the vessel.
 6    It might be somebody else, but --
 7         A.    Yeah.
 8         Q.     -- your first inclination is,
 9    "It's the captain calling."
10         A.    Correct.
11         Q.    The master calling?
12
13
14         MR. RODGERS:  Objection to
15      form.  You can answer.
16         A.    Yes.
17         Q.    Okay.  Did you have calls from
18    any other of the Carver vessels that day?
19         A.    I don't recall.
20         Q.    The phone, was it like an
21    iPhone or was it an Android device?
22         A.    The boat phone?
23         Q.    No.  The phone that you were
24    assigned, I'm sorry.  Good clarification.
25         A.    It was an iPhone.
```

**LEONARD BALDASSARE**

**April 29, 2025**

1      Q.    All right.  And the phone on

2    the boat, do you know whether it's also an

3    iPhone?

**4**         **A.    It was also an iPhone.**

5            MR. RODGERS:  Just to clarify

6       for me, the boat phone was an iPhone.

**7**            **THE WITNESS:  Yes.**

8            MR. RODGERS:  Okay.

9      Q.    Okay.  So the phone itself, at

10   least for some period of time, would've a

11   log of when that call was placed to you and

12   the duration that you spoke to Captain

13   Miller, right?

**14**         **A.    I would think so.  I'm not a**

**15   phone expert, but yes.**

16     Q.    Well, you've got an iPhone

17   today?

**18**         **A.    I do.**

19     Q.    Okay.  Your personal phone is

20   an iPhone?

**21**         **A.    It is.**

22     Q.    Right.  And that's the way they

23   work?

**24**         **A.    Yes.**

25     Q.    Right.  So the next call, which

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    I assume was right away was to Brian Moore?
 2         A.    Yes, sir.
 3         Q.    And you've told us what you
 4    told him.
 5         A.    Yes.
 6         Q.    And you were waiting on photos?
 7         A.    Yes.
 8         Q.    How soon after you talked to
 9    Mr. Moore did those photos arrive?
10         A.    I don't really recall, but
11    within the hour.  It was fairly quick.
12         Q.    They were delivered to you how?
13         A.    Via text message.
14         Q.    From the boat phone?
15         A.    Yes, sir.
16         Q.    So the photos were taken with
17    the boat phone and then simply forwarded to
18    you?
19         A.    Yes.
20         Q.    Okay.  In the time that you
21    continued to work for Carver, did you ever
22    delete those photos from the company phone?
23         A.    I did not, no.
24         Q.    So at least when you left, they
25    should have still been on there?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1         A.    Yes.
 2         Q.    Was there any message that came
 3    with any of the photos that were sent to
 4    you from the boat phone?
 5         A.    I don't recall.
 6         Q.    Did you at any time while you
 7    were still employed by Carver, if there was
 8    a text message that came with those photos,
 9    ever delete them?
10         A.    No.
11         Q.    After you spoke to Mr. Moore,
12    did you call the boat back?
13         A.    I did.
14         Q.    And what did you tell them?
15         A.    I told them that Brian and I
16    were going to review the photos and discuss
17    the course of action.
18         Q.    So did you tell them to
19    standby?
20         A.    Yes.
21         Q.    And when -- you told us you got
22    the photos within the hour?
23         A.    Mm-hmm.
24         Q.    Is it your recollection that
25    you got photos of the bridge and the barge
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    within the hour?
 2         A.    Yes.
 3         Q.    All right.  And they came as a
 4    group or one at a time, do you recall?
 5         A.    I don't recall.
 6         Q.    But they all came at about the
 7    same time?
 8         A.    Yes.
 9         Q.    That's your memory, okay.  Then
10    once you got the photos, did you send them
11    to Brian?
12         A.    I did, yes.
13         Q.    And does he have a company
14    phone or did he have a company phone?
15         A.    I don't know, honestly.
16         Q.    You had his -- presumably had
17    his cell number in your contact, right?
18         A.    Yeah.  I think it was his work
19    phone, yeah.
20         Q.    Okay.
21         A.    Yeah.
22               MR. RODGERS:  Don't guess.
23               THE WITNESS:  Okay.
24         Q.    But --
25         A.    I don't know.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Q.    But you do know that you sent
 2    them to him?
 3          A.    I did, yes.
 4          Q.    Okay.  Did you include any text
 5    message when you sent them?
 6          A.    I don't recall.  I don't
 7    recall.
 8          Q.    The photos that you sent to him
 9    with your company phone, at any time before
10    you left Carver, did you ever delete those
11    text messages?
12          A.    No.
13          Q.    To Mr. Moore?
14          A.    No, I never deleted anything.
15          Q.    Okay.  In the seven months, six
16    months or so that you were still employed
17    by Carver before you left and turned your
18    phone back in, did you -- was that phone
19    ever replaced?
20          A.    No.
21          Q.    So same phone?
22          A.    Yes, sir.
23          Q.    From June 15th to when you gave
24    it back to him in January of 2025?
25          A.    Yes.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Q.    Now, I assume that you talked
 2     to Mr. Moore again after you sent him the
 3     photos?
 4          A.    Yes.
 5          Q.    Tell us about that
 6     conversation.
 7          A.    We discussed the photos --
 8              MR. RODGERS:  Just -- sorry to
 9          interrupt, Jim.  Are you talking
10          about on the phone, or just
11          some -- that day on the phone.
12              MR. CHAPMAN:  That day, yeah.
13              MR. RODGERS:  Okay, go ahead.
14          Q.    Focused -- still focused on
15     June 15th.
16          A.    Okay.  Yeah, sure.  Yeah.  We
17     spoke about the photos, we went over what
18     Captain Miller told us happened.  We didn't
19     observe any damage anywhere to our
20     knowledge, and we both agreed that it would
21     be okay for the vessel to proceed and that
22     we would discuss it further on Monday.
23          Q.    So in your conversation with
24     Mr. Moore after sending him the photos, was
25     there any discussion about the need to
```

LEONARD BALDASSARE

**April 29, 2025**

```
 1    report the incident to the Coast Guard?
 2         A.    No.  We both felt at the time
 3    that reporting it was not necessary because
 4    there was no damage or anything to report.
 5         Q.    But you did actively discuss
 6    whether it should be reported?
 7         A.    Yes.
 8         Q.    To the Coast Guard?
 9         A.    Yes.
10         Q.    Okay.  What about reporting it
11    to the Bridge, to the Belt Line Bridge, was
12    that discussed?
13         A.    No.
14         Q.    Just the possibility of
15    reporting to the Coast Guard?
16         A.    Yes, sir.
17         Q.    Did either of you -- did you
18    contact the Coast Guard that day?
19         A.    Not that day, no.
20         Q.    So after you talked to
21    Mr. Moore, did you call the boat back?
22         A.    Yes.
23         Q.    And who did you speak with?
24         A.    Captain Miller again.
25         Q.    So then one more phone
```

LEONARD BALDASSARE

**April 29, 2025**

1    conversation, it sounds like the third

2    conversation you would've had with the boat

3    on the afternoon of June 15th, 2024 about

4    the allision?

5         **A.    Yes.**

6         Q.    All right.  And what did you

7    tell -- or what did you and Captain Miller

8    talk about?

9         **A.    I told him that Brian and I had**

10   **discussed it.  There was no damage to the**

11   **tug, there was no damage to the barge.**

12   **They told us from what they could see that**

13   **there was no damage to the bridge, so we**

14   **agreed that it would be okay to proceed.**

15        Q.    And the photo of the bridge

16   that they sent you did not indicate -- or

17   you didn't think that there was any damage

18   to the Railroad Bridge?

19        **A.    Correct.**

20        Q.    In any of -- you told us that

21   you didn't talk to Captain Morrissey in the

22   first conversation, but in any of the

23   conversations that you had with the

24   boat -- I'll call it, on June 15th, did you

25   talk to anybody other than Captain Miller?

**LEONARD BALDASSARE**

**April 29, 2025**

1          **A.    No.**

2          Q.    Besides Mr. Moore, did you

3     speak -- and the -- and Captain Miller, did

4     you speak with anybody else with Carver

5     about the allision on June 15th, 2024?

6          **A.    I did not, no.**

7          Q.    So the last phone call or the

8     third phone call you had with Captain

9     Miller, you indicated that it was okay to

10    leave and to come on up with the barge to

11    destination, right?

12         **A.    Yes.**

13         Q.    Do you know where the tug and

14    barge were located when you gave them that

15    go ahead?

16         **A.    I do not recall.**

17         Q.    Do you know how long they stood

18    by the bridge before getting underway?

19         **A.    I don't know.**

20         Q.    To your knowledge, was anyone

21    instructed to notify the Coast Guard about

22    the allision on June 15th, 2024?

23         **A.    No.**

24

25

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              MR. RODGERS:  Is your last
 2         question notified the Coast Guard on
 3         the -- on June 15th?  Is that what
 4         your question was?
 5              MR. CHAPMAN:  I think so.  Let
 6         me to read it back.
 7              MR. RODGERS:  You understood he
 8         was talking about the day of the
 9         collision.
10         THE WITNESS:  He was asking if
11         we contacted on the day.
12              MR. RODGERS:  On the day of
13         the --
14         THE WITNESS:  Yeah, we -- yeah.
15         Right.  No, we did not, no.
16              MR. RODGERS:  Yeah.
17         Q.   And my question was whether
18    anybody was instructed -- whether you
19    contacted them or not, was anybody, to your
20    knowledge, instructed to contact the Coast
21    Guard about the allision on June 15th,
22    2024?
23         A.   No, not to my knowledge.
24         Q.   So when did anybody on behalf
25    of Carver first notify the Coast Guard of
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    the allision?
 2         A.    Monday.
 3         Q.    Monday, June 17th?
 4         A.    Yes, sir.
 5         Q.    Okay.  And was that because
 6    Carver contacted the Coast Guard, or was it
 7    because the Coast Guard contacted Carver?
 8         A.    We contacted the Coast Guard.
 9         Q.    Okay.
10         A.    Sector Norfolk, I believe it
11    was.
12         Q.    All right.  And who made that
13    contact?
14         A.    I did.
15         Q.    Who'd you talk to?
16         A.    Lieutenant Palumbo.
17         Q.    So you called Sector Norfolk
18    for what reason?
19         A.    To report the allision with the
20    bridge.
21         Q.    And did you, sort of, when you
22    made that call, did you ask to speak to her
23    personally or did you -- how did that go
24    down?
25         A.    She just happened to answer the
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    phone for the investigations number.
 2         Q.    That's who you called, was
 3    investigations?
 4         A.    Yes.  That's who you call to
 5    report.
 6         Q.    To your knowledge, had the
 7    Coast Guard contacted or attempted to
 8    contact Harbor before you called Coast
 9    Guard office in Norfolk to let --
10         A.    To my knowledge, no.
11         Q.    What caused you to contact the
12    Coast Guard on June 17th?
13         A.    Brian Moore reached out to me
14    in the morning and said that we need to
15    call the Coast Guard to report the
16    allision.
17         Q.    And did he tell you how he had
18    come to that conclusion?
19         A.    He did not, no.
20         Q.    He just told you to do it?
21         A.    Yes.
22         Q.    Where were you physically
23    working on Monday, June 17th?
24         A.    In the office in Staten Island.
25         Q.    And did you use your cell phone
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    to call?

2        **A.    I used my company cell phone to**

3    **make the phone call.**

4        Q.    Okay.  Thank you for that

5    clarification.  What time did you make that

6    call?

7        **A.    I don't recall.  Sometime in**

8    **the morning, maybe around 9:00 or 10:00.**

9        Q.    Did Brian Moore call you to

10   tell you to make that phone call?

11       **A.    Yes, he did.**

12       Q.    Did he send any e-mail or text

13   about making that phone call?

14       **A.    No.**

15       Q.    Okay.  When he called you, was

16   there any discussion of why he had reached

17   the conclusion or what his reasons for

18   wanting you to call the Coast Guard were?

19       **A.    No, there was not.  He just**

20   **gave me the order to do it.**

21       Q.    So how long was that

22   conversation?

23       **A.    Few minutes.**

24       Q.    And when you talked to

25   Lieutenant Palumbo that day, what did you

**LEONARD BALDASSARE**

**April 29, 2025**

1    tell her?

2        A.    I told her that on Saturday, we

3    were coming through the bridge, we had

4    touched up on the fendering and that I was

5    going to be reporting it.  She then

6    instructed me to fill out the Coast Guard

7    2692, which I did that day.

8        Q.    On the 17th?

9        A.    Yes, sir.

10        Q.    And did you send a Coast Guard

11    2692 to the Coast Guard on June 17th?

12        A.    I sent it to Brian for review,

13    and I believe he was the one that sent it.

14        Q.    And did he copy you on the

15    submission to the Coast Guard?

16        A.    I believe so.

17        Q.    So to your memory, was it

18    e-mailed to the Coast Guard?

19        A.    Yes.  Usually -- yes.  That's

20    how it's sent to them.  It's e-mailed.

21        Q.    All right.  So there'd be some

22    e-mail reflecting that transmission?

23        A.    Should be, yes.

24        Q.    And you think Mr. Moore did it?

25        A.    Yes.

**LEONARD BALDASSARE**

**April 29, 2025**

1          Q.    You didn't?

**2          A.    I did not, no.**

3          Q.    What was your e-mail address

4    when you were employed by Carver?

5              MR. RODGERS:  Your work

6         address, right?

7              MR. CHAPMAN:  Yeah.

**8          A.    lbaldassare@carvercompanies.com**

**9    .**

10         Q.    At any time before you left

11    Carver, do you recall deleting any e-mails

12    that pertained to the allision with the

13    Norfolk Portsmouth Belt Line Bridge?

**14         A.    No.**

15         Q.    You know in Outlook you can set

16    up little folders to put e-mails that you

17    want to keep.  Did you have a folder for

18    the allision or for this incident in your

19    e-mail?

**20         A.    I did not, no.**

21         Q.    So it would just be in your

22    general inbox or outbox?

**23         A.    Yes.**

24         Q.    Now, in connection with

25    contacting the Coast Guard, did you also

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    contact the Belt Line about the allision?
 2        A.    No.
 3        Q.    Why not?
 4        A.    I was not --
 5
 6
 7             MR. RODGERS:  Objection to
 8         form.  You can answer if you --
 9        A.    I was not obstructed
10    to -- instructed to, sorry.
11        Q.    So did it occur to you that the
12    Belt Line should be contacted or notified?
13        A.    No.
14        Q.    In the initial conversation you
15    had with Mr. Moore, when he told you to
16    contact the Coast Guard and notify them of
17    the allision, did it come up that the Belt
18    Line should be contacted or there's no
19    reason to contact the Belt Line, anything
20    about contacting the Belt Line?
21             MR. RODGERS:  Objection to
22         form.  You can answer if you know.
23        A.    No.  Nothing came up in our
24    conversation about contacting the Belt
25    Line.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        Q.    Yeah.  So just to be clear, you

 2    didn't suggest to Mr. Moore, "Hey, boss,

 3    should I also contact the railroad in that

 4    conversation?"  Right?

 5        A.    No.

 6        Q.    And likewise, he didn't say,

 7    "Hey, I want you to call the Coast Guard

 8    and also call the Belt Line?"

 9        A.    No, he did not say that.

10        Q.    Okay.  So Mr. Moore told us

11    that you and he then investigated the

12    allision, right?

13        A.    Mm-hmm.

14            MR. RODGERS:  Objection to

15        form.

16        Q.    Does that comport with your

17    recollection?  Do you agree that both of

18    you were involved in investigating the

19    allision?

20        A.    Yes.  I was up until I was out

21    10 days after on paternity leave.

22        Q.    So tell us what you did after

23    June 15th.  It sounds like maybe it was

24    after June 17th, I don't know, but what you

25    did after June 15th to investigate this
```

LEONARD BALDASSARE

**April 29, 2025**

1    allision with the Belt Line Bridge?

2        A.    When the boat got to the yard

3    after this voyage, I went on the boat and

4    spoke to the crew about what happened, and

5    they all told me the same story that they

6    had told me on the phone.

7        Q.    Which was?

8        A.    That when they were coming

9    through the bridge, Captain Morrissey had

10   got out of shape.  He landed on the

11   fendering inside the bridge and slipped

12   through on the fendering, and that there

13   was no visible damage.

14       Q.    And you say, "All of the crew,"

15   you -- did you talk to all five members of

16   the crew?

17       A.    Yes.

18       Q.    So just kind of run down,

19   Captain Miller, Captain Morrissey?

20       A.    Yes.

21       Q.    Engineer McGrath?

22       A.    Yes.

23       Q.    And both deck hands?

24       A.    Yes.

25       Q.    One's named Morrissey, and the

## LEONARD BALDASSARE

**April 29, 2025**

```
1    other one is named Porter?
2         A.    Yes.
3         Q.    Right?  You spoke to all of
4    them?
5         A.    Yes.
6         Q.    Did they provide you any
7    written statements?
8         A.    They did, yes.
9         Q.    And the written statements that
10   they provided, were -- did you take them up
11   while you were there on the boat?
12        A.    No.  I informed them that we
13   needed to get statements from everybody
14   explaining to their knowledge what happened
15   and that they were need -- they needed to
16   send them to myself and Brian.
17        Q.    Okay.  Had you received any
18   written statements from the boat before you
19   went aboard the vessel and interviewed the
20   crew members?
21        A.    No.
22        Q.    Did they prepare written
23   statements for you while you were on the
24   boat?
25        A.    No.
```

## LEONARD BALDASSARE

**April 29, 2025**

```
 1        Q.    So when did you receive written
 2    statements from any member of the crew?
 3            MR. RODGERS:  Objection to
 4        form.  You can answer.
 5        A.    I don't recall exactly when
 6    they sent everything to me, but I had
 7    requested it, you know, when I was on the
 8    boat on that day.
 9        Q.    So did you talk to the crew
10    members before you called the Coast Guard
11    on June 17th?
12        A.    No, it was after.
13        Q.    And did you talk to the crew
14    members the same day you talked to the
15    Coast Guard?
16        A.    I believe it was that Monday,
17    yes.
18        Q.    But it would've been after
19    talking to Lieutenant Palumbo --
20        A.    Yes.
21        Q.    -- that you interviewed the
22    crew members?
23        A.    Yes.
24        Q.    When you went down to the
25    vessel, did you inspect it to see whether
```

LEONARD BALDASSARE

**April 29, 2025**

1    there was any damage to it?

2        **A.    Yes.  Myself and Engineer**

3    **McGrath walked down the engine room, up**

4    **into the forward hold just to make sure**

5    **that there was no damage, and we did not**

6    **see any damage on the vessel.**

7        Q.    That's the tugboat?

8        **A.    Yes, sir.**

9        Q.    Right.  Did you inspect the

10   barge at all?

11       **A.    I did not inspect the barge,**

12   **no.**

13       Q.    When you boarded the vessel,

14   was the barge still made up to it?

15       **A.    No.**

16       Q.    Had the barge already been

17   delivered to the job site?

18       **A.    Yes.**

19       Q.    So the Tug Mackenzie Rose

20   arrived at the dock where you boarded it in

21   what they call "a light boat condition?"

22       **A.    Yes, sir.**

23       Q.    Didn't have any barge, right?

24       **A.    No barge, just the tug.**

25       Q.    And what dock did you go to to

**LEONARD BALDASSARE**

**April 29, 2025**

1    board the vessel?

2        **A.    It was our yard in Staten**

3    **Island where our office is.**

4        Q.    And the job site where the

5    barge had been delivered was how far away?

6        **A.    I'm not sure.  It was a few**

7    **miles.  It wasn't like right there.**

8        Q.    It was over New Jersey?

9        **A.    Yes.**

10       Q.    Did you make any effort to

11   inspect the barge?

12       **A.    No.  It was not my privy to do**

13   **the inspection on the barge, that was going**

14   **to be handled by other parties.**

15       Q.    So did the Coast Guard -- well,

16   let me back up.

17             You got written statements from

18   the crew, did they prepare them themselves?

19       **A.    Yes.**

20       Q.    They did?

21       **A.    Yes.**

22       Q.    And when you received the

23   written statements, were they typed up on

24   company letter head or were they

25   handwritten, or what?

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        A.    No, they were handwritten.

 2        Q.    Who gave them to you?

 3        A.    I think Captain Miller gave

 4   them to me, if I remember correctly.

 5        Q.    Did he give you the original

 6   handwritten statements?

 7        A.    I don't recall.  I think he did

 8   hand them to me, but I don't recall.

 9        Q.    Is it possible that they were

10   scanned and e-mail to you?

11        A.    Possibly.

12

13

14        MR. RODGERS:  Don't guess.

15        A.    Possibly.

16        Q.    Does the Tug Mackenzie Rose

17   have the capability of scanning a document?

18        A.    Yes.

19        Q.    Were the statements that you

20   received from the crew, they would've been,

21   I guess, one written statement for each

22   member of the crew, right?

23        A.    Yes.

24        Q.    Did you ever receive any type

25   of typed-up statement from members of the
```

**LEONARD BALDASSARE**

**April 29, 2025**

1  crew?

**2      A.    No.**

3      Q.    Did you ever speak with any

4  member of the crew about the allision with

5  the bridge after that initial meeting that

6  you had to interview them?

**7      A.    No.  Like I said, I went out a**

**8  few days later on paternity leave, so it**

**9  was just that one instance.**

10      Q.    When you went aboard the vessel

11  to interview them, where did the interviews

12  take place?

**13      A.    I interviewed Captain Miller**

**14  and Morrissey in the wheel house, and the**

**15  rest of the crew in the galley.**

16      Q.    And when you interviewed them,

17  were both Miller and Morrissey with you in

18  the wheelhouse when you talked to them?

**19      A.    No, I separated them.**

20      Q.    All right.  Same question about

21  the other crew members, were they all

22  together in the gallery when you talked to

23  them?

**24      A.    I spoke to both deckhands**

**25  together in the galley, and I spoke to the**

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1       engineer alone in the galley.
 2            Q.    Is there anything that would
 3       help you nail down the actual date and time
 4       if possible when you conducted these
 5       interviews aboard the vessel?
 6            A.    No.
 7            Q.    You just believe that it was
 8       sometime later the day that you initially
 9       contacted the Coast Guard, correct?
10            A.    Yes.
11            Q.    How soon after those interviews
12       did you receive the written statements that
13       you described?
14            A.    Like I said before, I don't
15       really remember.  I think it might have
16       been the next day, but I'm not 100 percent
17       sure.
18            Q.    At any time before you went out
19       on paternity leave, did you talk to Nick
20       Laraway about the allision?
21            A.    No.
22            Q.    Did you talk to anyone
23       internally at Carver about the allision
24       besides Mr. Moore, or the five members of
25       the crew of the Tug Mackenzie Rose?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          A.      No, I did not.

2          Q.      Was there a written report of

3     your investigation prepared?

4          A.      Did I -- me, personally?

5          Q.      Yes.

6          A.      No.

7          Q.      You mentioned filing out a

8     2692.  Do you consider that a written

9     report?

10              MR. RODGERS:  Objection to

11          form.  You can answer his question if

12           you understand it.

13          A.      Yes.

14          Q.      Okay.  So there's at least a

15    2692 that you filled out as a result of

16    your investigation, right?

17          A.      Yes.

18          Q.      And you -- your memory is that

19    you sent that 2692 to Mr. Moore and then he

20    sent it to the Coast Guard?

21          A.      Yes.

22          Q.      Right.  Not you, correct?

23          A.      No, I did not.  He did.

24          Q.      All right.  Was there any

25    report that was filled out or completed in

**LEONARD BALDASSARE**

**April 29, 2025**

```
1    the Helm system about this incident about

2    the allision?

3         A.    I did not personally fill

4    anything out, no.

5         Q.    Would you expect there to be a

6    form that gets filled out about an incident

7    like this in the Helm system?

8         A.    I'm not really sure.

9         Q.    Have you seen reports from the

10   Helm system about the incidents involving

11   vessels?

12        A.    Not in my time at Carver, no.

13        Q.    You have access to the Helm

14   system?

15        A.    Yes.

16        Q.    So you've got login credentials

17   as Mr. Baldassare -- Leonard Baldassare,

18   correct?

19        A.    Yes.

20        Q.    Is there anything you can't

21   view in the Helm system?

22             MR. RODGERS:  Meaning

23         Mr. Baldassare?

24             MR. CHAPMAN:  Yeah.

25        A.    I'm sure there are.  There's
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    different like categories based on

2    department.  So like I don't know if I was

3    able to access like all the engineering

4    stuff because I technically wouldn't really

5    need it, but I'm sure there are, yes.

6        Q.    Okay.  Let me pass over to you

7    what's been marked as Exhibit 1 for these

8    depositions.  That's just a print of a

9    photograph that was provided to us in the

10   discovery process.  I realize it's a little

11   grainy.

12           (Whereupon, Exhibit 1 was

13   marked for identification.)

14           Have you seen that before?

15       A.    Yes.

16       Q.    Okay.  And the image that

17   you've seen before wasn't as grainy?

18       A.    It was not, no.

19       Q.    Okay.  You could see it clearly

20   on your phone, I take it?

21       A.    Yes.

22       Q.    And tell us what that is then?

23       A.    This is the bridge, and this is

24   the fendering inside of the bridge.

25       Q.    Can you tell what vantage point

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    that photograph was taken from?
 2         A.    I'm not sure.  I don't know.
 3         Q.    And -- but this was one of the
 4    photos that was sent to you on June 15th?
 5         A.    Yes.
 6         Q.    From the tug?
 7         A.    Yes.
 8         Q.    All right.  Do you see any
 9    damage to the bridge in that photo?
10         A.    I do not, no.
11         Q.    Can you hand that to me just
12    for one second?
13         A.    Sure.  There you go.
14         Q.    Actually, you can keep it in
15    front of you.
16         A.    Are you sure?
17         Q.    Yeah.  Once we get a good image
18    of this, I may need to ask you some more
19    questions in the future.  But what I want
20    to know now is looking at this at the very
21    top of the photograph, does it appear that
22    the bridge is offset from the pier to you?
23              MR. RODGERS:  Objection.
24              MR. CHAPMAN:  I'm just asking
25         what he sees.
```

LEONARD BALDASSARE

**April 29, 2025**

1          A.    I've never seen this bridge in

2     person, so I really can't answer what it is

3     or isn't supposed to look like.

4          Q.    Okay.  And you can put that on

5     the side or -- yeah, we'll just put it

6     right here.

7          A.    Sure.

8          Q.    So let me pass you what's been

9     marked as Exhibit 2.

10               (Whereupon, Exhibit 2 was

11     marked for identification.)

12          A.    Sure.

13          Q.    So four more photos.

14               Are those the copies of the

15     photos of the barge that you received by

16     text?

17          A.    Yes, they are.

18          Q.    Okay.  Again, they're a little

19     grainy, but I assume that whatever you were

20     able to see on your phone was clearer than

21     this?

22          A.    Yes, it was.

23          Q.    And what were

24     you -- what -- did you ask them to provide

25     pictures of the barge?

**LEONARD BALDASSARE**

**April 29, 2025**

```
1          A.     I did, yes.
2          Q.     All right.  And were these
3    pictures sufficient to satisfy you that
4    there was no damage to the barge?
5          A.     Yes, there were.
6          Q.     Did you tell them specifically
7    what areas of the barge to take picture of?
8          A.     No.
9          Q.     These photos all appear to
10   depict the forward end, the raked end of
11   the barge --
12         A.     Yes.
13         Q.      -- in some fashion, correct?
14         A.     Yes, sir.
15         Q.     There's no photos of the stern
16   of the barge?
17         A.     No, there are not.
18         Q.     And there's one photo where you
19   can sort of see the port side of the barge?
20         A.     This last one?
21         Q.     Yeah, Number 248 in the
22   exhibit.
23         A.     Yeah, I got it.
24         Q.     But there's nothing of the
25   starboard side?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        A.    No.
 2        Q.    Okay.  And it looks like this
 3   barge is equipped with a rub system
 4   consisting of tires hanging over the side,
 5   right?
 6        A.    Yes.
 7        Q.    Did Captain Miller or any
 8   member of the crew indicate which side of
 9   the barge contacted the fender system when
10   you interviewed them?
11        A.    They did not.
12        Q.    Did they say whether -- was
13   there any information provided to you by
14   the crew as to which side of the bridge
15   they contacted?
16        A.    No, not specifically.  I would
17   assume that it was this --
18
19
20             MR. RODGERS:  Don't guess.
21         Tell him what you no.
22        A.    No, they did not.  They did
23   not.
24        Q.    Okay.
25        A.    They sent me this photo.
```

**LEONARD BALDASSARE**

**April 29, 2025**

1         Q.    That's Exhibit 1?

**2         A.    Correct.**

3         Q.    All right.  But you don't know

4    whether that's in east side, west side,

5    north side or south side, right?

**6         A.    I do not know.  I just know**

**7    from what the photo --**

8         Q.    Okay.

**9         A.     -- that they sent me.**

10        Q.    Okay.  Let me pass you Exhibit

11   6, which was produced to us in discovery.

12             Does that appear to be a

13   collection of daily logs from the Mackenzie

14   Rose beginning June 12th, 2024?

15             (Whereupon, Exhibit 6 was

16   marked for identification.)

**17        A.    Yes.**

18        Q.    And this is printed out from

19   the Helm system, correct?

**20        A.    Yes.**

21        Q.    Right.  So if you turn to the

22   June 15th, '24, daily log, these -- it has

23   numbers at the bottom of the page, it says,

24   "Carver phone number?"

**25        A.    Yeah.**

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1         Q.    You're looking for 56.

 2         A.    56?

 3         Q.    Yeah.

 4         A.    Got it.

 5         Q.    Got it.  Okay.  So at the

 6    bottom of the page -- so we know that the

 7    accident was on June 15th --

 8         A.    Yes.

 9         Q.    2024.  This appears to be the

10    daily log for that, right?

11         A.    Mm-hmm.

12         Q.    Would've been completed by the

13    master or the mate, or both of them, right?

14         A.    Yes.

15         Q.    So at 16:30, it says there's an

16    incident.  It says, "Mate James Morrissey

17    reports the autopilot was not completely

18    turned off.  He was able to correct and

19    switch back over to hand steering and begin

20    backing on the weeks 281 barge and

21    maneuvering the barge alongside fendering

22    on the northend P-B-L-R-R Bridge, photo

23    taken, proceed slowly away from bridge."

24              I read that correctly?

25         A.    Yes.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Q.    So in any of your conversations
 2    with Captain Miller or the interviews of
 3    the crew on the -- whatever day it was, was
 4    there any mention of the autopilot somehow
 5    being involved in this casualty?
 6          A.    No, there was not.
 7          Q.    Nobody said that?
 8          A.    Nobody said that to me.
 9          Q.    Did you ever ask --
10          A.    I did not.
11          Q.     -- whether they were on
12    autopilot or not?
13          A.    No.
14          Q.    In making bridge transits,
15    would you expect them to not to be in
16    autopilot?
17          MR. RODGERS:  Objection to
18       form.  You can answer.
19          A.    Say that again, I'm sorry.
20          Q.    I'm just --
21          MR. RODGERS:  He's not here as
22       an expert, but he can answer as to
23       his knowledge.
24          A.    No.  There would be no reason
25    for them to be in autopilot when
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    **approaching the bridge.**

2         Q.    You would expect them not to be

3    on autopilot?

4         **A.    Correct, they should be**

5    **hand-steering.**

6         Q.    Okay.  We can put that back in

7    the pile here, sir.

8              MR. RODGERS:  Do you need water

9         or coffee?

10             **THE WITNESS:  No, I'm okay.**

11             MR. RODGERS:  You're okay?

12             **THE WITNESS:  Yeah.**

13             MR. CHAPMAN:  Are we okay time

14        wise?

15             THE REPORTER:  Five minutes.

16             MR. CHAPMAN:  We got five

17        minutes?  Why don't we just go ahead

18        and take a break.  I'll regroup and

19        try to --

20             MR. RODGERS:  Sure.

21             MR. CHAPMAN:  Okay.

22             THE REPORTER:  Yes?

23             MR. RODGERS:  Yeah, we're

24        ready.  We don't need to regroup.

25        Let's go off the record.

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1                THE VIDEOGRAPHER:  We are going
 2           off the record, the time is 11:44
 3           a.m.
 4                Off the record.
 5                (Whereupon, a short recess was
 6           taken.)
 7                THE VIDEOGRAPHER:  Beginning
 8           Media Number 2.
 9                We are back on the record, the
10           time is 12:02 p.m.
11           Q.    All right.  I tried to get a
12      little organized here.
13           A.    Sure.
14           Q.    I'm going to give you five
15      exhibits that I believe are the written
16      statements you talked about.
17           A.    Okay.
18           Q.    And they're stapled together
19      with some typed-up versions of the
20      statements as well.  But I want you to just
21      focus on Page 1 of each of these
22      exhibits --
23           A.    Yes, sir.
24           Q.     -- to confirm this for me.
25      But it is Exhibits 9, 11, 13, 15, and 17.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              THE VIDEOGRAPHER:  Let me
 2         apologize.  Counsel, please, your
 3         microphone.
 4              MR. CHAPMAN:  Did you hear that
 5         okay or not?  Is it on the record?
 6              THE VIDEOGRAPHER:  Yes, but I
 7          hear the noise.
 8              MR. CHAPMAN.  Apologies.
 9         Q.    So the first one is signed to
10    Captain Chris Miller, Number 9.  Is that
11    the written statement that you received
12    from Captain Miller?
13         A.    Yes.
14         Q.    All right.  And then moving on
15    to 11, that first page.  Is that the
16    written statement you received from
17    deckhand Jacques Bass Morrissey?
18         A.    Yes.
19         Q.    And then the next one, Exhibit
20    13, the first page, is that the witness
21    statement you received from Engineer Jason
22    McGrath?
23         A.    Yes.
24         Q.    And then Exhibit 15, the first
25    page is that the written --
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.    Wait, this says Exhibit 17.
 2          Q.    I'm sorry, it should -- didn't
 3    I have 15 now?
 4          A.    Oh, yeah.  I only have four.
 5    You said --
 6          Q.    -- might be one.  You got 15?
 7          A.    Sorry.  Yes, I got 15.
 8          Q.    Okay, good.
 9          A.    Sorry about that.
10          Q.    So 15, the first page, is that
11    the statement you received from deckhand
12    Sharif Porter?
13          A.    Yes.
14          Q.    All right.  And then the last
15    one, which is Exhibit 17.  It's not signed,
16    but is that the witness statement that you
17    received from Captain Morrissey?
18          A.    I'm not sure if this is
19    handwriting, but it could be his, yeah.
20              MR. RODGERS:  Jim, when
21          you -- you're talking about the first
22          page --
23              MR. CHAPMAN:  Just the first
24          page.
25              MR. RODGERS:  -- of the
```

LEONARD BALDASSARE

**April 29, 2025**

```
 1            exhibit, right.
 2                 MR. CHAPMAN:  Yeah.
 3                 MR. RODGERS:  Okay.
 4                 MR. CHAPMAN:  Yeah.
 5            Q.    Yes.  So just -- it says,
 6       "Outbound Norfolk Southern branch with
 7       weeks 281."  That's the barge that the
 8       Mackenzie Rose was pushing at the time,
 9       right?
10            A.    Correct, yes.
11            Q.    Okay.  And it talks about
12       touching on the bridge, no damage to barge,
13       and no visible damage to bridge.
14            A.    Mm-hmm.
15            Q.    So if we have accounted for the
16       other four statements that do have names on
17       them, does this -- does that in any way
18       refresh your recollection that this is the
19       one you received from Captain Morrissey?
20            A.    Yes.
21            Q.    Okay.  And just to be clear,
22       the written statements are -- the first
23       page of each of the exhibits are the only
24       statements that you received during the
25       course of your investigation?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          A.     Yes.

2          Q.     Right?  Okay.  So I do want to

3      ask you a question or two about some of the

4      other documents that are attached within

5      these exhibits.

6          A.     Okay.

7          Q.     So if we start with Number 9,

8      the one from Captain Miller?

9          A.     Mm-hmm.

10         Q.     There's a -- I'll call it a

11     typed-up version of his statement, right?

12         A.     Yes.

13         Q.     During the course of your

14     investigation, did you ever see this

15     statement?

16         A.     No.

17         Q.     Did -- you didn't request it

18     then--

19         A.     No.

20         Q.      -- from Captain Miller?

21              Do you know if anybody else

22     requested a typed-up version of this

23     statement?

24         A.     I don't know.

25         Q.     Okay.  And then the third page

**LEONARD BALDASSARE**

**April 29, 2025**

```
1    of Exhibit 9, which is numbered Carver

2    000049, looks like it's on some kind of

3    Carver Marine Towing letterhead?

4              (Whereupon, Exhibit 9 was

5    marked for identification.)

6         A.    Yes.

7         Q.    Right.  Did you ever receive

8    this as part of your investigation?

9         A.    No, I did not.

10        Q.    Okay.  And before you went out

11   on paternity leave, had this ever showed up

12   to your knowledge?

13        A.    No.  Not to my knowledge, no.

14        Q.    Okay.  Do you have any

15   understanding of who may have requested or

16   solicited either of these two typed

17   statements from Captain Miller?

18        A.    I do not know who would have.

19        Q.    All right.  So all of these

20   other statements are similarly

21   done -- these exhibits are similarly done.

22   If you look at them you'll see the

23   deckhands, the engineer?

24        A.    Yes.

25        Q.    They all --
```

**LEONARD BALDASSARE**

**April 29, 2025**

 1        **A.     The same format.**

 2        Q.     There's a typed-up version and

 3   then there's a -- something on the company

 4   type letterhead?

 5        **A.     Right.**

 6        Q.     Okay.  And you've never seen

 7   those at any point during your

 8   investigation?

 9        **A.     No, I have not.**

10        Q.     And the one for Captain

11   Morrissey does not have that, kind of, last

12   page with the letterhead typed-up

13   statement?

14        **A.     Right.**

15        Q.     Right.  Okay.  But the other

16   four do?

17        **A.     Correct.**

18        Q.     Yep.  At any time before you

19   left Carver, did you ever see those

20   typed-up versions of any of these

21   statements?

22        **A.     No, I have not.**

23        Q.     Anybody ever tell you or lead

24   you to believe that there were type-up

25   versions of those statements?

**LEONARD BALDASSARE**

**April 29, 2025**

1       A.      No.

2            Q.     Before today, have you see

3       them?

4                   MR. RODGERS:   Other than with

5         his attorney?

6                   MR. CHAPMAN:   Yeah.

7            **A.      Just with my attorney.**

8            Q.     Okay.  And that's been recent?

9            **A.      Yes.**

10           Q.     Okay.  Any explanation to your

11      knowledge, you know, within your knowledge

12      as to why there are typed-up versions in

13      addition to the handwritten ones?

14           **A.      No.**

15           Q.     And just looking at the

16      handwritten ones in each of these five

17      exhibits, does that refresh your

18      recollection whether you were given like

19      the original version -- the original, you

20      know, written out version versus them being

21      e-mailed to you, or photocopied and

22      delivered to you?

23           **A.      They might have been like**

24      **handed to me.**

25           Q.     Okay.  And then it looks like

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    on some of sort of small notepad.
 2         A.    Yes.
 3         Q.    Do you remember the color of
 4    the paper?
 5         A.    I do not.
 6         Q.    Okay.  Do you know or recall
 7    whether these statements -- the handwritten
 8    statements, had already been prepared
 9    before you interviewed the crew?
10         A.    The -- when they got back to
11    New York harbor?
12         Q.    Yes.
13         A.    No.  This wasn't -- these
14    weren't -- no.  This was after I had
15    already spoken to everyone.
16         Q.    Let me pass to you Exhibit 19,
17    Captain -- or Mr. Baldassare, which I
18    believe is the compilation of the 2692
19    filled with the United States Coast Guard?
20         A.    Yes.
21         Q.    If you look at the first page
22    there -- excuse me -- the second page, the
23    bottom of the second page, it has a
24    signature on it as to who completed it or
25    signed it --
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
1           A.      Right.
2           Q.      -- and sent it out.  And it's
3   signed by Mr. Moore, correct?
4           A.      Correct.
5           Q.      Not you.  Did you ever sign
6   it --
7               MR. RODGERS:  I'm sorry.  Do
8           you mean the electronic signature, or
9           is it --
10              MR. CHAPMAN:  Yeah.  It's got a
11          digital signature on there.
12          Q.      You see the digital signature?
13          A.      Yes.
14          Q.      And what's -- might as well
15  read it.  What's the date and time?
16          A.      For the digital?
17          Q.      Yes.
18          A.      June 26, 2024, 08:48.
19          Q.      Okay.  Do you recall ever
20  signing a 2692 that was submitted to the
21  Coast Guard in connection with this
22  investigation?
23          A.      No.  I was out on paternity
24  leave when this was submitted.
25          Q.      Yeah.  But my question is,
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    before you went out on paternity leave, did

2    you ever sign a 2692 that was submitted to

3    the Coast Guard?

4         **A.    I filled out the 2692 that we**

5    **discussed earlier that I sent to Brian,**

6    **that he was going to be reviewing and**

7    **sending to the Coast Guard.**

8         Q.    So the original 2692 that you

9    sent to Mr. Moore, what did it say it

10   happened to the bridge?

11        **A.    Exactly what the vessel told me**

12   **when they called me on Saturday that they**

13   **had gotten out of shape coming through,**

14   **that they landed on the fendering inside of**

15   **the bridge, slid along the fendering and**

16   **that there was no visible damage.**

17        Q.    And do you know whether

18   Mr. Moore every submitted that to the Coast

19   Guard?

20        **A.    I do not know.**

21        Q.    If you look on Page 1, and

22   Block 10 of this exhibit?

23        **A.    You said Block 10?**

24        Q.    Block 10.

25        **A.    Yep.**

**LEONARD BALDASSARE**

**April 29, 2025**

```
1           Q.    It says, "The above vessel was
2      involved in a marine casualty consisting
3      in -- " and there's a bunch of things you
4      could check off.
5           A.    Yep.
6           Q.    The first one is checked,
7      right?
8           A.    Yes, sir.
9           Q.    "Unintended grounding or an
10     unintended strike of (allision with) a
11     bridge," right?
12          A.    Yes.
13          Q.    The draft or form that you
14     filled out and sent to Mr. Moore, was that
15     box checked?
16          A.    I don't recall.
17          Q.    And if you look down in Block
18     20, titled -- under Section 4, casualty
19     information?
20          A.    Got it.
21          Q.    It says, "Describe the extent
22     of property damage."
23          A.    Mm-hmm.
24          Q.    And it says, "Northend TBL
25     Railroad Bridge was offset from its
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    foundation."

2              Did it say that in the draft

3    that you sent to Mr. Moore?

**4**         A.    No.

5         Q.    What did it say?

**6**         **A.    I don't recall, but it didn't**

**7**    **say that.**

8         Q.    Okay.  If you turn to the next

9    page of Exhibit 19, which is Carver

10   0000112, it's like the next page of the

11   2692.

**12**        **A.    Yep.**

13        Q.    Under Block 25 --

**14**        **A.    Yep.**

15        Q.    -- A, under, "Activity or

16   operation being conducted at the time of

17   the casualty," it describes -- I mean, I'll

18   just read it.  "The towing vessel Mackenzie

19   Rose was pushing the deck barge weeks 281

20   ahead and push gear.  They were outbound at

21   the Norfolk Southern branch for sea.  The

22   officer on watch, James Morrissey, was in

23   autopilot and didn't switch over to non

24   follow up hand steering, but thought he

25   did.  The vessel continued to track the

LEONARD BALDASSARE

**April 29, 2025**

```
1    port and made -- and before the officer,
2    they -- " excuse me.  "Before the OOW was
3    able to correct it after switching to non
4    follow up, the bow of the barge made
5    contact with the Western section of the
6    bridge."  The draft that you sent to
7    Mr. Moore, did it include that statement?
8         A.    No.  Because that's not the
9    information that I was given.
10        Q.    Okay.  What do you recall it
11   saying?
12        A.    Exactly what I said before.  As
13   they were coming through the bridge, they
14   got out of shape, landed on the fendering,
15   and slid through the bridge, and that there
16   was no physical damage to the bridge,
17   vessel or barge.
18        Q.    So during the course of your
19   investigation before you went on paternity
20   leave, did you ever learn that this is in
21   fact what happened as described in Block
22   25A of this exhibit?
23        A.    No.
24        Q.    Never learned that?
25        A.    No.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        Q.    When was the first time you
 2   learned that this is the report that was
 3   submitted to the Coast Guard?
 4
 5
 6             MR. RODGERS:  Other than with
 7        me.
 8        Q.    Well --
 9        A.    Just this morning with
10   Jim -- with Mr. Rodgers.
11             MR. RODGERS:  You don't
12        want -- need to tell him what we
13        discussed.
14        Q.    That -- so prior to you meeting
15   with the attorney for Carver today, you did
16   not know that this was the report that was
17   submitted to the Coast Guard in connection
18   with allision with the bridge?
19        A.    Correct, I did not know.
20        Q.    Okay.  So if you go to the next
21   page.
22        A.    Yep.
23        Q.    There's some instructions about
24   completing the form in about the middle of
25   the page.  You'll see Number 6?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    A.    Yep.

2    Q.    "Once completed, deliver e-mail

3    or fax this form within five days of the

4    casualty to the Coast Guard sector Marine

5    safety unit, or activity nearest the

6    location of the casualty, or if at sea,

7    nearest the arrival port."  Then

8    there's -- looks like there's a -- some

9    portal in the cloud that you could log

10    into.

11    A.    Yep.

12    Q.    This form is not signed by

13    Mr. Moore until digitally on June 26th,

14    2024?

15    A.    Correct.

16    Q.    So that's like 11 days post

17    casualty, right?

18    A.    Yes.

19    Q.    Okay.  Do you know if any form

20    2692 was submitted to the Coast Guard

21    within the five-day requirement?

22    A.    I do not know.

23    Q.    So if you turn to the next

24    page.  This is Carver 0000114, and it's the

25    form 2692B regarding mandatory drug

**LEONARD BALDASSARE**

1    testing?

**2**        A.    Yep.

3        Q.    Right.  Generally, any time

4    there is a marine casualty, marine incident

5    like this, the crew is supposed to be

6    tested for drugs and alcohol, right?

**7**        A.    Yes.

8        Q.    Okay.  And there's a -- the

9    Coast Guard's laid out pretty narrow time

10    limits for getting that done, right?

**11**        A.    Yes.

12        Q.    So this report is basically

13    saying that there was no drug testing,

14    there was no alcohol testing,

15    post-incident, right?

**16**        A.    Correct.

17            MR. RODGERS:  Just for the

18        record, it says within 32 hours.

19        Q.    So in Block 7, it says, "In the

20    incident in question from June 15th, 2024,

21    there was no evidence of loss of

22    propulsion, loss of steering or damage to

23    the vessel and its barge, and a drug and

24    alcohol test would only be administered if

25    the above incidents occurred."

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1                    Leaving aside whether that's a
 2    correct interpretation or regulation, okay,
 3    I'm not really worried about that, did you
 4    draft that?
 5         A.    I believe so, yes.
 6         Q.    Okay.  And I ask because it
 7    appears to be signed by you digitally,
 8    right?
 9         A.    Yes.
10         Q.    Now, would a 2692B be submitted
11    without the 2692 form --
12         A.    No.
13         Q.    -- or would they go hand and
14    hand?
15         A.    They all get submitted
16    together.
17         Q.    Okay.  So your digital
18    signature on here is dated June 19th, 2024?
19         A.    Yes.
20         Q.    Right?  So does that in any way
21    refresh your recollection that you signed a
22    2692 form that was submitted on June 19th,
23    2024 to the Coast Guard?
24         A.    No.
25         Q.    And you --
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          A.      I filled out the 2692 on the

2     17th and sent it to Brian for review --

3          Q.      Okay.

4          A.         -- and submission.

5          Q.      All right.  But it appears that

6     you filed this 2692B out on the 19th,

7     right?

8          A.      Yes.

9          Q.      And who would've been

10    responsible for then submitting it to the

11    Coast Guard?

12         A.      Brian.

13         Q.      But you don't believe that you

14    signed the 2692 form, correct?

15              MR. RODGERS:  Objection to

16         form.  I'm not sure he testified to

17         that.

18         A.      I'm not really sure what you're

19    asking me.  Are you asking me about the

20    first part of this?

21         Q.      Yeah.

22         A.      Yeah.  This is -- I

23    didn't -- this is all Brian, this not me.

24         Q.      Yeah.  No.  I get the 2692

25    that's in this exhibit.

**LEONARD BALDASSARE**

**April 29, 2025**

1        A.      Okay.

2        Q.      What I'm trying to find out is

3    whether you have any memory of actually

4    signing the 2692 form that was submitted to

5    the Coast Guard that would've accompanied

6    this 2692B form that's in Exhibit 19?

7        **A.      Yes.  I filled it out on the**

8    **17th, sent it to Brian for his review and**

9    **submission.  What he did with it from**

10   **there, I don't know.**

11       Q.      So how was it that then you

12   came to fill out the 2692B on June 19th?

13       **A.      I don't know.**

14       Q.      Did you send it after you

15   signed it to Mr. Moore?

16       **A.      On the 17th.**

17       Q.      Well, we can agree that you

18   didn't sign this on the 17th of June.  That

19   is the 2692B, right?

20       **A.      Yeah.**

21       Q.      Okay.  Well, all I'm trying to

22   find out is after you signed it, the 2692B,

23   on June 19th, did you then send it to

24   Mr. Moore?

25       **A.      Yes.**

**LEONARD BALDASSARE**

**April 29, 2025**

1    Q.    Okay.  And you did not file the

2    2692B with the Coast Guard?

**3       A.    No.**

4    Q.    Okay.  The last part of this

5    form in Exhibit 19 is the 2692A?

**6       A.    Mm-hmm.**

7    Q.    Which is a barge addendum for a

8    report under 2692, and it is numbered

9    Carver 00016.  You see that?

**10      A.    Yep.**

11   Q.    It doesn't say who filled it

12   out.  There's no place on this form where

13   you add a name of somebody completing this

14   form.  Do you recall whether you completed

15   this form, the barge addendum?

**16      A.    I do not recall.**

17   Q.    It -- in Block 3K, or at least

18   the description, the property damage next

19   to it, it says, "Displacement of Belt Line

20   bridge support structure."  You see that?

**21      A.    Yes.**

22   Q.    Is that something you would've

23   drafted?

**24      A.    No.**

25   Q.    And you are pretty certain of

**LEONARD BALDASSARE**

**April 29, 2025**

1     that?  I just -- how is it that you --

2

3

4              MR. RODGERS:  Objection to

5        form.

6         Q.    How is it that you know that

7     you didn't draft it?

8              MR. RODGERS:  You can answer

9         that.

10        Q.    Yeah.

11              MR. RODGERS:  If you know.

12        **A.    Because the information**

13     **provided to me during the time when this**

14     **was filled out, never was this statement**

15     **told me to from anyone about the support**

16     **structure issue.**

17        Q.    You went out on paternity leave

18     on the 26th --

19        **A.    No.**

20        Q.     -- of June?

21        **A.    The 24th.**

22        Q.    24th of June?

23        **A.    Yes.**

24        Q.    Okay.  I'm sorry.  We learned

25     from Mr. Moore that somebody from the

**LEONARD BALDASSARE**

**April 29, 2025**

```
1      National Transportation Safety Board and

2      from Coast Guard interviewed crew members

3      on the Mackenzie Rose on June 25th --

4                  MR. RODGERS:  Objection to

5           form.

6           Q.     -- of 2024.  I know that was

7      after you left on paternity leave.  But did

8      you have any assistance or role in setting

9      up those interviews?

10          A.     No.

11          Q.     Do you know who handled that?

12          A.     I do not know.

13

14

15                 MR. RODGERS:  This for me.

16                 THE WITNESS:  I'm good.  Thank

17          you.

18          Q.     As part of your

19     responsibilities as Port Captain when you

20     were working for Carver, did you ever run

21     reports, I'll say in the Helm system to

22     look at specific things or to, kind of,

23     figure out what was going on?

24          A.     No, not daily.  If there was an

25     incident or issue or something then, yeah,
```

**LEONARD BALDASSARE**

**April 29, 2025**

1  I would -- I could pull something up.  But

2  it wasn't part of my daily tasks to run

3  reports.

4       Q.    Got you.  Was it in any way in

5  your responsibility to like, I don't know,

6  review the daily logs that were submitted

7  by the vessel or that sort of thing?  Maybe

8  weekly task, monthly task, anything like

9  that?

10      A.    Only if there was an issue with

11  something on the boat for billing purposes.

12      Q.    So it was all incident --

13      A.    Correct.

14      Q.     -- specific?

15      A.    Correct.

16      Q.    Okay.  Was there anybody at

17  Carver Marine Towing when you were the Port

18  Captain that had specific responsibility

19  for training of new hires?  A person like a

20  training manager or training director, that

21  sort of thing?

22      A.    No, not to my knowledge.

23          MR. RODGERS:  You're talking

24       about the crew or generally?

25          MR. CHAPMAN:  Well, that's a

**LEONARD BALDASSARE**

**April 29, 2025**

1          great question.

2              MR. RODGERS:  Don't adopt my

3          questions.

4              MR. CHAPMAN:  No, no.

5      Q.    So there's seven tugs, right?

6      **A.    Yes, sir.**

7      Q.    Seven inspected vessels, maybe

8  some uninspected vessels.  How many people

9  work for Carver Marine Towing when you were

10 a Port Captain before you -- you know, at

11 about the time you -- well, mid June of

12 2024?

13 **A.    That would be -- if you want to**

14 **include the dispatchers, eight people.**

15 Q.    Okay.  And you don't think of

16 the crew members as being within that

17 universe?

18 **A.    Oh, I thought you were just**

19 **talking shore side.  If you want to include**

20 **all the crew members --**

21 Q.    Yeah.

22 **A.      -- figure 10 guys per boat, so**

23 **that's 70 people.**

24 Q.    Okay.

25 **A.    Plus the shore side staff, so**

**LEONARD BALDASSARE**

**April 29, 2025**

1    75 to 80 people.

2         Q.    Okay.  And among the shore side

3    folks, nobody was like the training manager

4    or training director?

5         A.    No.

6         Q.    Among the -- I don't know what

7    you call them, the crews, there wasn't

8    anybody that like had the title of being

9    training director?

10        A.    No.

11        Q.    Okay.  Among the shore side

12   personnel, was there anybody that had the

13   assigned responsibility of being the safety

14   manager?

15        A.    Yes.

16        Q.    And who was that?

17             THE WITNESS:  It's okay to --

18             MR. RODGERS:  Yeah.

19        A.    Yeah.  Jason (indiscernible)

20   was the HSQE advisor.

21        Q.    What does HSQE stand for?

22        A.    Health Safety Environmental

23   something.  He was the safety and

24   compliance officer.

25        Q.    And when -- was he hired after

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    you started working there?
 2         A.    He was, yes.
 3         Q.    And how -- just in relationship
 4    to the allision, how long before the
 5    allision with the Belt Line bridge was he
 6    hired?
 7         A.    A month or two.
 8         Q.    Was he hired for that specific
 9    role?
10         A.    No.
11         Q.    What was he hired for?
12         A.    Originally as a dispatcher.
13         Q.    So when did he become
14    the -- you called it the H --
15         A.    Health and safety officer.
16         Q.    Health and safety officer.
17         A.    Yeah.
18         Q.    When did he take on that
19    responsibility?  Before or after the
20    allision?
21         A.    I believe it was right before,
22    but I don't -- I can't give you an exact
23    timeline.
24         Q.    Was he still with Carver when
25    you left?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.    Yes.

 2          Q.    Was he still in the same role?

 3          A.    Yes.

 4          Q.    Let me show you Exhibit 21 that

 5     was produced to us by Carver.  And at the

 6     top -- I don't know who added this, it

 7     says, "Screenshot from Helm event."  You

 8     see that?

 9          A.    Yeah.

10          Q.    When you go to the Helm system

11     and you look up an incident -- maybe you

12     got to put in the date, time, I don't know,

13     but is this the view that you would get of

14     an incident?

15          A.    I think it would show up a

16     little differently on mine, so I don't

17     know.  I -- mine was a little bit of a

18     different view.

19          Q.    Okay.  This language here, I

20     believe is shown on Exhibit 21 is identical

21     to the statement that appears in Exhibit 6,

22     on page Carver 000056 regarding the

23     incident.  I just want to pass you Exhibit

24     6.

25          A.    Yeah, right here at 16:30?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          Q.    Yeah.

**2          A.    Yep.**

3          Q.    It says -- I believe they're

4     word for word?

5               MR. RODGERS:  What's your -- do

6          you have a question?

7          Q.    Yeah.  The question is, are

8     they word for word?  Is there any

9     difference between the two

**10         A.    No, it's word for word.**

11         Q.    Okay.  So the daily log,

12    Exhibit 6, for June 15th, would've been

13    completed on June 15th, correct?

**14         A.    Correct.**

15         Q.    All right.  And then it

16    would've been available to view in the Helm

17    system as an incident that occurred on that

18    date, right?

**19         A.    Yes.**

20         Q.    Okay.  So at least at some

21    point on June 15th, somebody, Captain

22    Miller or Captain Morrissey, entered a note

23    about the incident at 16:30 hours involving

24    the bridge in which they described the use

25    of the autopilot, right?

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        A.     Correct.

 2        Q.     But you didn't know about that

 3    when you conducted your investigation?

 4        A.     No, I did not.

 5        Q.     Did you ever go look in the

 6    Helm system to see what they had entered

 7    about the incident?

 8        A.     No.  Am I able to ask Jim a

 9    question, like -- no?

10        Q.     Yeah.  So here's the deal.

11    When we're doing depositions, it's just

12    like we are testifying at trial.

13        A.     Sure.

14        Q.     You're testifying in trial.  So

15    you wouldn't turn to a lawyer in trial and

16    say, "Hey, I need to ask a question."

17    Judge wouldn't let you do that.

18        A.     Right.

19        Q.     Okay.  If you want to do it on

20    a break --

21        A.     Okay.

22        Q.     -- I can't stop you guys from

23    talking.

24        A.     Understood.

25        Q.     But --
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.    Okay.
 2          Q.    -- if you need a
 3    clarification, you're welcome to ask me
 4    too.
 5          A.    Okay.
 6          Q.    And I'll do my best.  If
 7    there's something about a question I'm
 8    not -- you don't understand, I'm happy to
 9    try to help you sort that out.
10          A.    No, it's fine.
11          Q.    Okay.
12                MR. RODGERS:  And you can talk
13           to me whenever you need to, but not
14           really about the testimony.
15                THE WITNESS:  Okay.
16                MR. RODGERS:  But if you need
17           to clarify something, tell
18           Mr. Chapman.
19                THE WITNESS:  Well, the only
20           thing that I wanted to clarify was
21           that in regards to the logs, these
22           are -- they're able to go back in and
23           edit these after the fact.
24          Q.    Oh, is that right?
25          A.    Correct.
```

**LEONARD BALDASSARE**

**April 29, 2025**

1      Q.    Okay.  So is there an audit

2    trail that would tell you when something is

3    changed?

**4**      **A.    No.**

5      Q.    Or what was changed?

**6**      **A.    No.**

7      Q.    So even though the daily log

8    has been completed, it's not really final?

**9**      **A.    It's not final until they close**

**10**   **it out for the day.  So they can leave it**

**11**   **open for a few hours, and then go back and**

**12**   **change or edit if they make a mistake on**

**13**   **something.  It's mostly -- it's there so**

**14**   **that if they say, "Oh, we picked up the**

**15**   **weeks 282, but it was really the weeks**

**16**   **281," they can go back and make the**

**17**   **correction.**

18      Q.    Like they could do that a week

19    later?

**20**      **A.    No.  Once they submit it for**

**21**   **the day, then that's it.**

22      Q.    So it's -- at the end of the

23    day, it's closed?

**24**      **A.    Correct.**

25      Q.    And I'll call it, sort of,

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    inalterable --
 2         A.    Yes.
 3         Q.     -- at that point?
 4         A.    Yes.  Until they submit it and
 5    close it out for the day, it's
 6    still -- they can still edit it.
 7         Q.    So looking at Exhibit 6 again
 8    for June 15th on Page 56 of this exhibit,
 9    are you able to tell when they closed that
10    out?
11         A.    No.
12         Q.    Is there another record,
13    another document that would show you when
14    the master's daily report was closed out?
15         A.    No.
16         Q.    Let me pass over to you Exhibit
17    36.  That was produced to us in this case,
18    and appears to be -- well, is it -- is some
19    kind of form titled "7.3 master's daily
20    vessel reporting?"
21         A.    Yes.
22         Q.    For the Mackenzie Rose, right?
23         A.    Yes, sir.
24         Q.    Right?  So this is also a form
25    in the Helm system?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          **A.     Yes.**

2          Q.     And is this the report that

3    then is some how connected to the report

4    that you have there in Exhibit 6?  Are they

5    related to each other?

6          **A.     No, this is a separate form.**

7          Q.     Okay.

8          **A.     This is the master's daily form**

9    **that they fill out every day.**

10         Q.     All right.  And if you look at

11   the page for June 15th, check -- is -- they

12   have numbers at the bottom, Carver 000019?

13         **A.     Got it.**

14         Q.     Right.  This report says it was

15   filled out by Captain Chris Miller on June

16   15th, 2024 at 23:55 hours?

17         **A.     Yes.**

18         Q.     So he's the master of the

19   vessel, that would've been just before he

20   went off watch?

21         **A.     Yes.**

22         Q.     Right?

23         **A.     Yes.**

24         Q.     Okay.  So he fills out this

25   report and submits it, and once it's

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    submitted on -- at this time 23:55 hours,

 2    is it like done for the day?

 3         A.    Yes.

 4         Q.    You can't go back in and change

 5    it?

 6         A.    No.

 7         Q.    All right.  And then the report

 8    that's in Exhibit 6 is more like a logbook,

 9    right?

10         A.    Yes.

11         Q.    And likewise, once it's

12    submitted, whenever that happens, before

13    the end of the day, it's done.  You can't

14    amend it?

15         A.    Yes, sir.

16         Q.    Right.  Okay.  So there's also

17    a rough deck log kept on the boat, right?

18         A.    Yes.

19         Q.    It's a journal, covers the

20    whole year, right?

21         A.    Yes.

22         Q.    Carver puts those on the boat

23    or provides them for the boat?

24         A.    No.

25         Q.    You don't think so?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1        A.    No.

2        Q.    Why?

3        A.    I've never been instructed to

4    provide one or put one on the boat for any

5    reason at all.  That's what the Helm system

6    is for.

7        Q.    So in your experience, you've

8    never filled out a rough log?

9        A.    Not working at Carver

10   companies, no.

11       Q.    At Buchanan?

12       A.    Yes.

13       Q.    Vane?

14       A.    No.

15       Q.    Center Line?  Actually, you

16   didn't have a sailing role at Center Line.

17       A.    I wasn't sailing there,

18   correct.

19       Q.    But there's a rough log on the

20   Mackenzie Rose, right?

21       A.    Yes.

22       Q.    So let me pass you Exhibit 23.

23            MR. RODGERS:  Are you okay?

24            THE WITNESS:  Yeah, yeah, I'm

25       fine.

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        Q.   So as part of your
 2   investigation into this allision, did you
 3   ever review the rough log that was on the
 4   boat?
 5        A.   No.
 6        Q.   Did you ever request a copy of
 7   the rough log?
 8        A.   No.
 9        Q.   Did you even know there was a
10   rough log?
11        A.   No.
12        Q.   If you would look at -- this is
13   in Exhibit 23, the page covering Saturday,
14   June 15th of 2024?
15        A.   Yes, got it.
16        Q.   Okay.  It says, "At 16:30, a
17   co-captain reports steering went hard over
18   and he was backing in, we tapped the
19   northend P-B-L-R-R Bridge."  Did I read
20   that correctly?
21        A.   Yes.
22        Q.   Okay.  Do you recognize that
23   handwriting?
24        A.   No.
25        Q.   So you don't know whether it's
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    Captain Morrissey or Captain Miller?

**2**        A.    I do not know.

3        Q.    All right.  Did anybody ever

4    say to you during the course of any

5    interview that they had actually tapped the

6    bridge?

**7**        A.    No.

8        Q.    Only the fender?

**9**        A.    Yes, sir.

10        Q.    Did you have any responsibility

11    as Port Captain for making sure that

12    repairs were effected to any of the tugs

13    that you oversaw?

**14**        A.    Not usually.  In certain

**15**    instances I would assist the engineering

**16**    team, but it would be handled by

**17**    engineering.

18        Q.    Were you aware of any

19    complaints involving either the steering

20    system or the autopilot system on the

21    Mackenzie Rose while you were Port Captain

22    at any time before the allision with the

23    bridge?

**24**        A.    No.  Nothing was told to me

**25**    from the vessel that there was any issues.

**LEONARD BALDASSARE**

**April 29, 2025**

1      Q.    Okay.  So if there were

2    some -- I'll call it problem or concern

3    with navigation, the autopilot system, that

4    sort of thing, how would the crew get that

5    addressed or resolved, or at least

6    inspected?

7         **A.    They would reach out to the**

8    **port engineer who would then set up either**

9    **a technician, go out to the vessel to make**

10   **a repair or talk to the engineer and see if**

11   **it's something that the engineer feels**

12   **comfortable repairing himself, depending on**

13   **the extent of the issue.**

14        Q.    Okay.  Do you know what a "near

15   miss report" is?

16        **A.    Yes.**

17        Q.    Is that a form that you fill

18   out in the Helm system?

19        **A.    Me personally, or the vessels?**

20        Q.    Well, in Carver Marine Towing

21   generally, is that a form that can be

22   filled out in the Helm system?

23        **A.    Yes.  But not by shore side**

24   **personnel.  Just by the vessels.**

25        Q.    So it's not a form that you

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1   would even have access to?
 2        A.    No.
 3        Q.    If there's one that's submitted
 4   by a vessel, are you able to see it?
 5        A.    No.  Usually, it goes directly
 6   to Brian because he was the one that would
 7   have to approve the near misses.
 8        Q.    So there's an approval process
 9   when there's a near miss?
10        A.    Correct.
11        Q.    And what is -- what's involved
12   in that?
13        A.    I do not know.  I was not an
14   approver.
15        Q.    So you wouldn't even be
16   informed of a near miss?
17        A.    Unless there was a incident,
18   normally not.
19        Q.    So as originally reported to
20   you, where apparently everybody that you
21   interviewed said, "All we did was brush up
22   against the fender system on the
23   bridge -- "
24             MR. RODGERS:  Objection to
25        form.  I'm not sure that's his
```

**LEONARD BALDASSARE**

**April 29, 2025**

1              testimony.  You said "everyone."

2              Q.    You can correct me if I

3      misstated, okay?

4              **A.    Okay.**

5              Q.    But based on that, would you

6      have considered that to be a near miss,

7      requiring a near miss report in your Helm

8      system?

9              MR. RODGERS:  Objection to

10          form.  If you understand it, you can

11          answer.

12          **A.    I'm not really sure what you're**

13      **asking.  Are you asking if the incident**

14      **that was reported to me on Saturday the**

15      **15th, would be considered a near miss?**

16          Q.    Sure.

17          **A.    In my personnel opinion?**

18          Q.    Yes.

19          **A.    I'm not an expert in near**

20      **misses, but --**

21              MR. RODGERS:  Well, don't --

22          **A.    No, I'm not really --**

23              MR. RODGERS:  Stop, stop.

24          Don't -- you're not here to give your

25          opinion, okay.

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1                  THE WITNESS:  Okay.
 2          A.    Then no.
 3          Q.    It wouldn't be reported as a
 4    near miss or you just don't have an
 5    opinion?
 6          A.    I don't have an opinion on it.
 7          Q.    Okay.  It was -- in your -- why
 8    did the boat -- why did Captain Miller
 9    contact you on the afternoon of June 15th,
10    2024?
11
12
13          MR. RODGERS:  Objection to
14           form.  You can answer if you
15           understand it.
16          A.    You would have to ask Captain
17    Miller why he felt it necessary to call me.
18          Q.    So you were the Port Captain,
19    and he reported that they had touched the
20    fender system, right?
21          A.    Yes.
22          Q.    Who else would he report it to,
23    if not you?
24          A.    Brian Moore.
25          Q.    Is there some clear kind of
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    reporting chain that he should call Moore
 2    first and then you, or call you and if he
 3    doesn't reach you, then call Moore?
 4         A.    It would be me first.
 5         Q.    All right.  So do you know
 6    whether he spoke at all to Brian Moore that
 7    day?
 8         A.    I do not know.
 9         Q.    I want to ask you about a
10    couple of sets of invoices or billing
11    records that were provided to us by Carver
12    that came from GMT McCay and Ayers Marine
13    Electronics, which are labeled Exhibit 24
14    and 25.
15         A.    Okay.  You got an extra one
16    there?
17         Q.    All right, thank you.  So 24 is
18    from Ayers Marine Electric?
19         A.    Yep.
20         Q.    And 25 is from GMT McCay,
21    right?
22         A.    Yes.
23         Q.    Would those, I'll say, come
24    across to -- your desk or come to your
25    attention?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          A.    I can't speak to this one
2     because I wasn't even employed at the time.
3          Q.    That's the GMT McCay?
4          A.    Yes, sir.
5          Q.    And you're talking about
6     something from 2023?
7          A.    Correct.
8          Q.    Okay.
9          A.    So I wasn't employed, so I
10    can't speak to anything on that.
11         Q.    And one second before we go on,
12    but Exhibit 25, the GMT McCay, is three
13    pages.  So the second page is from March of
14    2024?
15         A.    Yes.
16         Q.    All right.  And so, that's my
17    question is, would that have come to your
18    attention in --
19              MR. RODGERS:  The invoice.
20         Q.    Yeah.  The record from McCay?
21         A.    No.  This would go to our
22    accounts payable department.
23         Q.    Okay.  So -- but in the
24    ordinary course, you wouldn't be involved
25    in that at all?

**LEONARD BALDASSARE**

**April 29, 2025**

 1      **A.      No.**

 2      Q.      Right.  Do you have any memory

 3   of seeing that or knowing it was some work

 4   being done on the Mackenzie Rose in that

 5   timeframe?

 6      **A.      No, not this one.**

 7      Q.      Okay.  So let's look at the

 8   Ayers Marine Electric, that is Exhibit 24.

 9      **A.      Yep.**

10      Q.      Would that have come to your

11   attention in some way or across your desk,

12   so to speak, in connection with your role

13   as Port Captain in 2024?

14      **A.      No.  Once again, this would go**

15   **to accounts payable.  However, I was the**

16   **one that was instructed to set up the**

17   **technicians to come down and work on the**

18   **autopilot for the boat.**

19      Q.      Okay.  So you didn't have that

20   role with the GMT McCay work in March of

21   2024?

22      **A.      No.**

23      Q.      But you did with Ayers?

24      **A.      Yes, sir.**

25      Q.      In -- and that was in April of

**LEONARD BALDASSARE**

**April 29, 2025**

1    2024?

2       A.    Yes, sir.

3       Q.    And they came out twice?

4       A.    Yes.

5       Q.    Right.  And to your knowledge,

6    what work was required on the autopilot

7    system?

8       A.    I'm not sure exactly what was

9    required.  I know what they did was replace

10   the actual unit itself.  They ran some new

11   wires and they have fixed everything into

12   the GPS system on the boat.

13      Q.    In April of 2024?

14      A.    Yes.

15      Q.    Do you know what 11problems

16   they were experiencing with the autopilot

17   system?

18      A.    I do not know exactly.  I was

19   just instructed from the engineering team

20   to please assist in setting up a technician

21   to come out there.

22      Q.    So when did you start with

23   Carver in 2024?  And I know you told us

24   January, but what was your start date?

25      A.    It was sometime in mid January.

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1       I don't know the exact date.
 2           Q.    Okay.  Shortly after you
 3       arrived, if it was mid January, did you
 4       become aware that Captain Morrissey, while
 5       piloting the Mackenzie Rose down in
 6       Charleston Harbor, hit a pier?
 7           A.    No.
 8           Q.    You didn't know that?
 9           A.    No.
10           Q.    Would that type of thing be
11       reported to you as a Port Captain or not?
12           A.    It would be normally, yes.
13           Q.    Okay.  Let me pass to you
14       Exhibit 3.
15                 (Whereupon, Exhibit 3 was
16       marked for identification.)
17           A.    Okay.
18           Q.    This was produced to us by
19       Carver, and at the top it says it's 9.5
20       incident report event pertaining to the
21       Mackenzie Rose.  It looks like somebody
22       filled it out on January 22nd of 2024.  Do
23       you see that?
24           A.    Yeah.  I feel like -- do you
25       know what day of the week this was?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
1      Because I feel like this happened or this
2      was right before I started.
3           Q.    Okay.
4           A.    This date.
5           Q.    Do you know who Brandon Kuster
6      is?
7           A.    I do.
8           Q.    Who is he or what role did he
9      have at --
10          A.    He was a mate at Carver
11     Companies, he still works there --
12          Q.    He's still --
13          A.     -- to my knowledge.
14          Q.    He's still employed at Carver?
15          A.    Yes.
16          Q.    Okay.  At least he was when you
17     left?
18          A.    Correct.
19          Q.    This Helm -- this report from
20     Helm is some type of form that has to be
21     filled out when there's an incident --
22          A.    Yes.
23          Q.     -- right?  Whether it was for
24     the Mackenzie Rose or not, were there any
25     other 9.5 incident reports that were filled
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    out for any of the vessels while you were
 2    employed by Carver?
 3         A.    Not to my knowledge.
 4         Q.    And you don't think you've ever
 5    seen this one?
 6         A.    This one I've never seen, no.
 7         Q.    Okay.  Was a 9.5 incident
 8    report like Exhibit 3, like the one marked
 9    as Exhibit 3, ever started for the allision
10    with the Belt Line Bridge?
11         A.    I do not know.
12         Q.    Did you ever open such a form
13    and input any data --
14         A.    No.
15         Q.     -- to support that?  Do you
16    know if any of the -- either the master or
17    the mate did?
18         A.    You would have to ask them, I
19    don't know.
20         Q.    Can this report be filled out
21    by anybody other than the master or the
22    mate?
23         A.    I do not know if -- I don't
24    know.  I'm not sure.
25         Q.    Okay.
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          A.    Yeah.  I'm not sure if -- I

2    would say probably not, but I don't know

3    for sure.

4          Q.    After you started working for

5    Carver, did you ever hear or come to learn

6    that Captain Morrissey, while piloting the

7    Mackenzie Rose, had hit a pier in

8    Charleston, South Carolina?

9          A.    No.

10          Q.    While you were employed by

11    Carver, was Captain Morrissey ever

12    disciplined or reprimanded or anything to

13    your knowledge?

14          A.    Not to my knowledge, and not by

15    me.

16          Q.    Have you had to discipline or

17    reprimand anybody during your employment by

18    Carver?

19               MR. RODGERS:  You can --

20          A.    Yes.

21          Q.    Okay.

22          A.    I have, yeah.

23          Q.    Crew members?

24          A.    Correct.

25          Q.    All right.  Anybody who was in

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    the role of master of a tug?
 2         A.    No.  No.
 3         Q.    Mate?
 4         A.    Yes.
 5         Q.    And more than once?
 6         A.    Yeah.  Not the same individual,
 7    but on a few separate occasions, a few
 8    mates needed to, you know, shape up.
 9         Q.    And what are the types of
10    things that you would've to counsel them
11    about?
12         A.    Just being more prudent with
13    filling out logs, doing inspections.
14    Their -- just overall, you know, the way
15    they conduct themselves on the boat.
16         Q.    Anything operational?
17         A.    No.  No.
18         Q.    What about deck hands?
19         A.    Yes.
20         Q.    Counseling involved by you or
21    delivered by you?
22         A.    Yes.
23         Q.    All right.  And again, same
24    question, what's the nature of that
25    counseling?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          A.    Don't be lazy, listen to the

2    captain, do your duties that you're

3    assigned for your watch.  Yeah, that's

4    pretty much it.

5          Q.    Is there a record kept of that

6    counseling?

7          A.    No.  No.  It's more just me

8    coming saying, "Hey, listen.  I spoke to

9    Captain whoever, he's not really thrilled

10   with the way things have been working out.

11   This is me telling you, you know, you need

12   to be better, try harder."

13                Things of that nature.

14         Q.    But it's not like there's

15   something that gets documented in their

16   personnel file?

17         A.    No.  Unless it was a -- like a

18   major thing, then if they were like written

19   up or something like that, then it would be

20   documented.

21         Q.    When you say, "written up," is

22   there a form in Helm for doing that?

23         A.    No, HR has the write-up forms.

24         Q.    Can you access the HR system

25   for those?

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.    No.  I would have to reach out
 2     to HR directly and let them know we're
 3     going to be writing this person up for X, Y
 4     and Z, and then they would send the form
 5     over.
 6          Q.    To your knowledge, was Captain
 7     Morrissey ever written up --
 8          A.    Not to my knowledge.
 9          Q.     -- in process?
10          A.    Not to my knowledge and not by
11     me.
12          Q.    Were there occasions while you
13     were employed by Carver as Port Captain
14     that you did reach out to HR and initiated
15     that you -- write-up process on anybody you
16     were counseling?
17          A.    Yes, one time.
18          Q.    One time.  And what position
19     did that person hold?
20          A.    Deck hand.
21          Q.    On the Mackenzie Rose?
22          A.    No.
23          Q.    Did you ever do a check ride
24     with Captain Morrissey?
25          A.    No.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Q.    Captain Miller?

 2          A.    I don't believe so, no.

 3          Q.    We can put those over here.

 4          A.    Oh, sure.   There you go.

 5          Q.    Mr. Baldassare, I'm going to

 6     pass to you what has been marked as

 7     Exhibits 26, 28, and 30.   Those documents

 8     were produced to us in this case, and they

 9     appear to be separate near miss reports --

10          A.    Okay.

11          Q.      -- involving the Mackenzie

12     Rose.

13                MR. RODGERS:   Separate reports

14        or separate incidents.

15                MR. CHAPMAN:   Well, Okay.

16          Separate reports of separate

17          incidents, how about that?

18          Q.    It's only Exhibit 28 that has

19     the Helm sort of logo on it with some other

20     data about when it was filled out, who it

21     was filled out by.

22          A.    Right.

23          Q.    You see that?

24          A.    Yes.

25          Q.    But exhibits 26 and 30 contain
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
1    the form response items for separate
2    incidents.  Do you see that?
3         A.    Mm-hmm.
4         Q.    Okay.
5         A.    Yes.
6         Q.    These all were received at some
7    point by Mr. Moore?
8         A.    Yes.
9         Q.    Do you see that in Block 2.2?
10        A.    Yes.
11        Q.    On separate dates.  Looks like
12   Exhibit 26 was in May of 2024, Exhibit 28
13   was in March of 2024 and Exhibit 30 was in
14   April of 2024, right?
15        A.    Yes.
16        Q.    Were you ever aware of any of
17   these near misses --
18        A.    No.
19        Q.     -- that were reported?
20        A.    No, I was not.  As I stated
21   earlier, these -- when these were
22   submitted, they went directly to Brian as
23   he was the approver of the near misses.
24        Q.    In 2024, March, April and May,
25   do you know whether Mr. Moore had a valid
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1      Merchant Mariners Document?
 2          A.    Did he have one?
 3          Q.    Yeah.
 4               MR. RODGERS:  I didn't hear it.
 5          Q.    I'm asking if you know whether
 6      in March, April and May of 2024, Mr. Moore
 7      had a valid Merchant Mariners document?
 8               MR. RODGERS:  I didn't hear,
 9          Merchant Marine, what.
10               MR. CHAPMAN:  Merchant Mariners
11          document.  Did he have a valid --
12               MR. RODGERS:  A license.
13               MR. CHAPMAN:  Yep, mm-hmm.
14          A.    I don't know.  I would -- I
15      don't know, I --
16               MR. RODGERS:  Don't assume
17          anything.
18          A.    Yeah, no.  I don't know.
19          Q.    Okay.  Had you ever sailed with
20      Mr. Moore?
21          A.    No.
22          Q.    So when you worked together in
23      the past, they weren't in the sailing
24      roles?
25          A.    Separate vessels.  He was a
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    captain, I was sailing as a mate on a

2    different vessel.

3        Q.    Okay.  Did he ever inform you

4    of these near miss reports?

5        A.    No, he did not.

6        Q.    Okay.  I'm going to pass you

7    Exhibit 32.

8        A.    Sure.

9            MR. RODGERS:  Thank you.

10        Q.    This was produced to us by

11   Carver and it consists of several pages

12   beginning with Carver 00851 through 00885.

13            And it appears to relate

14   exclusively to James D. Morrissey.  Do you

15   know what this report is of?

16        A.    I have no idea.  I have never

17   seen this before.

18        Q.    Okay.  Do you see on -- just

19   looking at the first couple of pages, it

20   looks like it's tracking either training or

21   participation in drills, that sort of

22   thing?

23        A.    Yeah.  Participating in

24   drill -- yeah, weekly task, participating

25   in drill.

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        Q.    Okay.
 2        A.    Yeah.
 3        Q.    Are there -- I don't know what
 4   to call them, modules, like a video you
 5   would watch or a training document that you
 6   would review or quiz, you know, written
 7   quiz that you would fill out that were
 8   associated with any of these?
 9        A.    Not to my knowledge.  No, not
10   to my knowledge.
11        Q.    Okay.  I am thinking that now's
12   a good time to get lunch and then --
13              MR. RODGERS:  Oh, you're not
14        done.
15              I'm kidding.
16              MR. CHAPMAN:  Come back in 45
17        minutes.
18              MR. RODGERS:  Yeah, 45 works.
19              MR. CHAPMAN:  Okay.
20              MR. RODGERS:  Is that okay with
21        your team.
22              MR. CHAPMAN:  Yes.
23              THE VIDEOGRAPHER:  We are going
24        off the record.  The time is 1:06
25        p.m.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1                   Off the record.
 2                   (Whereupon, a short recess was
 3            taken.)
 4                   THE VIDEOGRAPHER:  Beginning
 5            Media Number 3.  We are back on the
 6             record.  The time is 1:59 p.m.
 7            Q.    Mr. Baldassare, I'm going to
 8      pass over to you Exhibit 34.  You can give
 9      me 32, 33.
10            A.    32, yeah.
11            Q.    Great.  Thanks.  That's a
12      document that was provided by Carver.  It
13      appears to be a report of the voyage plan
14      out of the Helm system?
15            A.    Yep, yes.
16            Q.    At the top it says, "7.9 voyage
17      plan-outside New York Harbor for the
18      Mackenzie Rose."
19            A.    Right.
20            Q.    On June 15th, 2024?
21            A.    Yep.
22            Q.    The time is, I guess that's
23      midnight, right?
24            A.    Yes.
25            Q.    It says it was filled out by
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    you?

2         A.    It does say that, yes.

3         Q.    Okay.  Was it filled out by

4    you?

5         A.    It was not.  So sometimes what

6    happens when the -- whoever is filling out

7    the log or the voyage plan, there's a drop

8    down for who it's filled out by and it's

9    alphabetical.  And a lot of times since my

10   name is BA, it's usually at the top.

11              So instead of dropping down and

12   correct -- picking whoever is filling it

13   out, sometimes they would just leave my

14   name without even realizing it.  That's why

15   it says deleted.

16        Q.    Have you ever filled out a

17   voyage plan --

18        A.    No.

19        Q.     -- in section 7.9?

20        A.    No.

21        Q.    Never?

22        A.    Never.

23        Q.    Okay.  Is there any way to know

24   who filled this out then?

25        A.    I don't think so.  No, I don't

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1      think so.
 2           Q.    So in Section 2 it describes
 3      the crew members?
 4           A.    Yes.
 5           Q.    Master, mate, engineer and two
 6      deck hands, right?
 7           A.    Yes.
 8           Q.    And it's got their names?
 9           A.    Yes.
10           Q.    So after the Master Christopher
11      Miller, says deleted.
12           A.    Yep.
13           Q.    What does deleted mean?
14           A.    I do not know.
15           Q.    And I get -- the same questions
16      around the mate and the engineer, where it
17      says, "The mate is James Morrissey and the
18      engineer, Jason McGrath."  It says,
19      "Inactive" after theirs?
20           A.    Right.  I see that.  I don't
21      know what -- why it would say that.
22           Q.    Okay.  Do you know why it says,
23      "Deleted" for you?
24           A.    Like I said earlier, if they
25      put the wrong name they have to go back and
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    put the correct name.

2         Q.    And we just don't have that

3    version of whatever the correct name would

4    be?

5         A.    Correct.

6         Q.    All right.  Once this plan is

7    filed can it be amended -- modified?

8         A.    I don't believe so.

9         Q.    So they couldn't change who it

10   was filled out by?

11        A.    No.  They would have to delete

12   it and create a new one.

13        Q.    When you create a voyage plan

14   it says, you know, date filed and then the

15   time, are those drop downs as well --

16        A.    Yeah.

17        Q.       -- or is that autopopulated?

18        A.    No.  This all drop downs except

19   for the external number and the tags,

20   everything else is a drop down.

21        Q.    Even the time -- the date and

22   time?

23        A.    Yes.

24        Q.    Okay.  Did you ever see this in

25   connection with your investigation of the

**LEONARD BALDASSARE**

**April 29, 2025**

1    allision with the bridge?

**2        A.    No, I did not.**

3        Q.    It lives in the Helm system

4    though, so if you had looked for it, you

5    could have accessed it?

**6        A.    Correct.**

7        Q.    In Section 1.2, under voyage

8    planning, it references a Rose Point voyage

9    plan to be attached to the form.  Have you

10   ever seen a Rose Point voyage plan attached

11   to one of these forms?

**12       A.    Yes.**

13       Q.    And how do you create that?

**14       A.    It would be on the Rose Point**

**15   system on the boat.  They would go in,**

**16   create a voyage plan and then they can**

**17   print it out.**

18       Q.    So when you create a Rose Point

19   voyage plan, you put in where you start and

20   where you're going?

**21       A.    Correct.  With all your way**

**22   points along the way, security check-ins,**

**23   traffic check-ins, things of that nature.**

24       Q.    So you actually have to what,

25   like drop pins or something, for those in

**LEONARD BALDASSARE**

**April 29, 2025**

1    the plan?

2         **A.    Yeah, essentially, yes.**

3         Q.    And when you then create the

4    plan, so that you can attach it, is it like

5    one click in the Rose Point application to

6    do that?

7         **A.    I don't understand your**

8    **question.**

9         Q.    Well, I'm just trying to

10    understand.  It goes on to describe, it

11    says, "Save the voyage plan to your

12    computer, then click on the paper clip,

13    either at the top of the form or the one on

14    the right side."

15              Is that to create the voyage

16    plan, or is that to attach it to this Helm

17    system?

18         **A.    That's to attach the voyage**

19    **plan to the Helm voyage plan -- the Rose**

20    **Point voyage plan to the Helm voyage plan.**

21         Q.    And is the Rose Point voyage

22    plan like a PDF or what type of file is it?

23         **A.    I'm not sure what kind of form**

24    **it comes in, I believe it is a PDF, but I'm**

25    **not 100 percent sure.**

**LEONARD BALDASSARE**

**April 29, 2025**

```
1           Q.    Did you ever secure the Rose
2    Point voyage plan from anyone in the crew
3    of the McKenzie Rose for the voyage they
4    were on when they elided with the bridge?
5           A.    No, I did not.
6           Q.    Did you ask them to provide it?
7           A.    No, I did not.
8           Q.    Why not?
9
10
11           MR. RODGERS:  Objection to
12        form.  You can answer if you have an
13        answer.
14           A.    I don't really have an answer.
15    I just didn't request it.
16           Q.    I assume that the voyage plan
17    did not include eliding with the bridge?
18           A.    No.
19           Q.    Would the voyage plan indicate
20    the ranges where the vessel was going to be
21    on autopilot?
22           A.    No.  No.
23           Q.    Does the Rose Point system
24    track when the vessel is or is not on
25    autopilot?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1     **A.     That, I do not know.**

2          Q.    Under Section 5.

3     **A.     Yep.**

4          Q.    There is a number of risk

5     assessment questions.  And then in Section

6     6 there is a reference to 9.4 GAR model

7     risk assessment.  Do you see that?

8     **A.     Yes.**

9          Q.    It looks like GAR stands for,

10    Green Amber Red?

11    **A.     Yes.**

12         Q.    Correct?

13    **A.     Correct.**

14         Q.    Are you familiar with that risk

15    assessment system?

16    **A.     No.**

17         Q.    Is there something that

18    the -- whoever filled out this form has

19    access to, to kind of walk them through the

20    assignment of risk scores in Section 6?

21              MR. RODGERS:  Objection.

22         Foundation.

23              MR. CHAPMAN:  Well, he can only

24         answer if he knows, Mr. Rodgers.

25              MR. RODGERS:  He said he

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              doesn't fill out these things.
 2                   MR. CHAPMAN:  That doesn't make
 3              any difference.  It's a question of
 4              whether he knows --
 5                   MR. RODGERS:  But now you're
 6              asking him --
 7                   MR. CHAPMAN: -- if there's some
 8              reference.
 9                   MR. RODGERS:  But now you're
10              asking him what somebody who fills it
11              out whether they -- how -- excuse me,
12              how they fill it out.
13                   But you can answer if you know,
14              Lenny.
15         A.    I don't know.  I don't know.  I
16    don't fill these out regularly, so.
17         Q.    Are you familiar at all with
18    the GAR model risk assessment --
19         A.    No.
20         Q.     -- process?
21         A.    No.
22         Q.    Do you know what the reference
23    to 9.4 is, in Section 6?
24         A.    It's right here, GAR model risk
25    assessment.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        Q.    Yeah.  Do you know what that
 2    reference is, it's 9.4 to some other
 3    document or system?
 4        A.    Oh, I don't know.
 5             MR. CHAPMAN:  That was mine.
 6         That was mine.  That was mine.
 7             MR. RODGERS:  Sorry.
 8             MR. CHAPMAN:  It's all right.
 9             MR. RODGERS:  Jesus, I'm losing
10        it.  I thought I heard a little
11         voice.
12        Q.    Mr. Baldassare, let me pass you
13    now, Exhibit 4, which we learned yesterday
14    from Mr. Moore our selected sections from
15    the safety management system?
16             (Whereupon, Exhibit 4 was
17    marked for identification.)
18        A.    Mm-hmm.
19             MR. RODGERS:  Objection to
20         form.
21        Q.    If -- let's just start with
22    page -- they're numbered at the bottom,
23    Carver 0000148?
24        A.    This first page here?
25        Q.    Yeah.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.     Yep.

 2          Q.     It says at the top, "5.1

 3     Master's responsibility and authority?"

 4          A.     Mm-hmm.

 5          Q.     Do you know what the safety

 6     management system is that Carver has for

 7     marine operations?

 8          A.     Yes.

 9          Q.     And is it available in

10     electronic version?

11          A.     Yes, it's in Helm.

12          Q.     It's actually in the Helm

13     system?

14          A.     Yes.  They can access it via

15     Helm.

16          Q.     Do you know -- is it like a PDF

17     document in Helm or is it a -- an

18     electronic document that just has a bunch

19     of sections in it?

20          A.     It's -- you could access it

21     both ways.  You can access it

22     electronically in the helm system and then

23     you can also download the entire thing as a

24     PDF.

25          Q.     Okay.  Is there a hard copy
```

LEONARD BALDASSARE

**April 29, 2025**

```
 1    that's printed out somewhere at Carver
 2    Marine?
 3         A.    Not to my knowledge.
 4         Q.    You never had a hard copy?
 5         A.    No, just the electronic.
 6         Q.    Okay.  So you don't know how
 7    thick the hard copy would be if it was
 8    printed out?
 9         A.    No.  I admit -- I would assume
10    it's killing a lot of trees.
11         Q.    Okay.  You had access to the
12    safety management system though while you
13    were Port Captain, right?
14         A.    Yes, sir.
15         Q.    And did you ever use it to look
16    things up or check on things?
17         A.    Yes.
18         Q.    Does it have like an index or
19    is it -- do you know?
20         A.    You could search it.  You could
21    do like Control S and a little tab would
22    come up and you can search for just like
23    keywords.  So if you're looking for health
24    and safety, you could just type in, "Health
25    and safety" and it would bring you to all
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    the sections that include health and
 2    safety.
 3         Q.    And then you could just kind of
 4    scroll through the document looking at
 5    them?
 6         A.    Yes.
 7         Q.    Do you know whether it has like
 8    a table of contents?
 9         A.    I believe it does, but I'm not
10    100 percent sure.  But I'm -- I believe it
11    does, yes.
12         Q.    Did -- was there a safety
13    management system in place at Center Line?
14         A.    Yes.
15         Q.    That you had access to?
16         A.    Yes.
17         Q.    And at Vain Brothers?
18         A.    Yes.
19         Q.    That you had access to?
20         A.    Yes.
21         Q.    What about -- it was at
22    Buchanan that you worked at?
23         A.    Yes.
24         Q.    Did they have one too?
25         A.    They did, yes.
```

**LEONARD BALDASSARE**

**April 29, 2025**

 1          Q.    Was it electronic?

 2          **A.    Yes.**

 3          Q.    So it suffices to say that

 4     you've used the safety management system at

 5     not just Carver, but previous employers?

 6          **A.    Yes.  They're all -- they all**

 7     **vary based on the company, but yes.**

 8          Q.    Does your new company have a

 9     safety management system?

10          **A.    It does, yes.**

11          Q.    So this starts at 5.1 and these

12     are the only sections that were produced to

13     us, okay?

14          **A.    Okay.**

15          Q.    But in terms of the overall

16     numbering scheme, if you see on Page 1 or

17     the first page of the exhibit where the

18     exhibit sticker is, would there be sections

19     that come before 5.1?

20          **A.    I'm not sure.  I would have to**

21     **pull the whole thing up, but I don't know.**

22          Q.    And would there be sections

23     that come after 9.5?

24          **A.    Again, I don't know.  I don't**

25     **have it memorized.**

**LEONARD BALDASSARE**

**April 29, 2025**

1    Q.    The only way to really know is

2    to look at the document, right?

**3    A.    Yes.**

4    Q.    Okay.  Do you know what the

5    source of the safety management system is

6    that Carver used, like who they bought it

7    from or rented it from?

**8    A.    I do not know.**

9    Q.    If you turn to the very end of

10   this exhibit, the last four pages, the

11   first of which begins with the number

12   Carver 000886?

**13   A.    Yeah.  With the TBS logo at the**

**14   top?**

15   Q.    Yeah.

**16   A.    Yep.**

17   Q.    Are you familiar with the

18   company that's referred to as TBS?

**19   A.    Yes.**

20   Q.    What do you know about them?

**21   A.    They're a third-party auditor**

**22   that -- they manage the Helm system and**

**23   they manage like the documentation for all**

**24   the boats, and kind of just make sure that**

**25   you're staying in compliance with**

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    everything.  But they are their own
 2    separate entity.
 3         Q.   Do you know where they're
 4    headquartered?
 5         A.   I believe in Louisiana.
 6         Q.   Okay.  There's an address on
 7    here that says, "Daphne, Alabama."  Could
 8    that be it?
 9         A.   Could be, but I don't know.
10    I've never been to the headquarters.
11         Q.   Okay.
12         A.   We've only dealt with the TBS
13    employees that are in New York.
14         Q.   And who are they?
15         A.   Collin Bryant.
16         Q.   Collin Bryant --
17         A.   Yes.
18         Q.    -- with a T?
19         A.   Yes.
20         Q.   All right.
21         A.   And that's it.  Just him.
22    Sorry.
23         Q.   Just him?
24         A.   Yes.
25         Q.   Is he in Staten Island, New
```

LEONARD BALDASSARE

**April 29, 2025**

1    York City?

2         A.    I think he's all over the

3    place.  I don't know what his day to day

4    is, but I know he covers New York.

5         Q.    And is he the sales guy or is

6    he the troubleshooting guy with the -- this

7    product?

8         A.    No.  He's -- he comes out and

9    like does the audits and make sure that

10   everything is staying in compliance.

11        Q.    All right.  At your new

12   employer, HNL --

13        A.    Yes.

14        Q.     -- do you also use TBS?

15        A.    No.

16        Q.    Is there another third party

17   provider or do you guys have your own --

18        A.    It's all internal.

19        Q.    One you guys -- that the

20   company developed itself?

21        A.    Yes.  Excuse me.

22        Q.    Is there anything that you know

23   of within the safety management system

24   that's some how very unique to Carver as

25   opposed to kind of a generic safety

**LEONARD BALDASSARE**

**April 29, 2025**

1    management system?

**2**        **A.    No, not to my knowledge.**

3        Q.    Have you ever requested changes

4    to the safety management system while you

5    were employed by Carver?

**6**        **A.    No.**

7        Q.    Do you know if there's a

8    process for doing that?

**9**        **A.    I believe there is, yes.**

10        Q.    Do you know of any changes that

11    were made to the safety management system

12    while you were employed by Carver?

**13**        **A.    Not to my knowledge.**

14        Q.    If you can turn to -- all these

15    pages are numbered at the bottom.

**16**        **A.    Yes.**

17        Q.    I confess they're not

18    necessarily consecutive page numbering, but

19    it looks like it's the third page into this

20    exhibit.  At the top it starts with the

21    word, "The 6.12 deckhand."  Page 150.

**22**        **A.    Yes, I got it.**

23        Q.    Okay.  Under the operational

24    section towards the bottom of the page --

**25**        **A.    Mm-hmm.**

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Q.      -- the fourth bullet says that
 2     "One of the deckhands responsibility is to
 3     assist the master/mate in making bridges."
 4     How does the deckhand assist the master or
 5     mate in making bridges?
 6
 7
 8              MR. RODGERS:  Objection to
 9          form.  You can answer if you know.
10          A.    It would just be them going out
11     to be on the look out if required or
12     needed.  But it would be at the master of
13     mates discretion if they thought one was
14     needed.
15          Q.    So then the next bullet down
16     says, "Standing lookout or riding ahead of
17     the tow as a lookout."
18          A.    Yeah.
19          Q.    Right?
20          A.    Essentially the same thing.
21          Q.    Do the deckhands get any
22     training on how to perform those duties?
23          A.    No, not to my knowledge.
24          Q.    Do the masters or mates get any
25     training on the process of assigning
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
1    lookouts or the circumstances under which a
2    lookout should be assigned?
3         A.    No.  Like I said, it would be
4    at their own discretion if there was fog or
5    rain or lack of visibility.
6         Q.    And so if you can turn to the
7    Section 7.12 on bridge transits.
8         A.    Okay.
9         Q.    And it's towards the end.
10        A.    Shifts 7.12?
11        Q.    Yes, 7.12 for bridge transits.
12             MR. RODGERS:  Which page is
13          that.
14        Q.    It's got a big yellow bar
15    across the middle of it.  The page number
16    is 910.
17
18
19             MR. RODGERS:  910.  Okay.  Is
20          that near the end or somewhere else.
21             MR. CHAPMAN:  It's closer to
22          the end than the beginning.
23             MR. RODGERS:  Thank you.
24        A.    Okay, I'm here.
25        Q.    So bridge transits have their
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
1    own section in the safety management
2    system, right?
3        A.    Yes.
4        Q.    And is that because they create
5    hazardous navigation situations or at least
6    potentially do?
7        A.    Yes.
8        Q.    So right in the middle of that
9    page there is this kind of yellow or
10   orange-ish call out in larger font that
11   says, "Under no circumstances shall the
12   wheelman responsible for the transit make
13   the bridge due to pressure or pride."  Do
14   you know what that is warning the master or
15   the mate of?  Like what does that statement
16   mean to them?
17       A.    It means that if you're not
18   comfortable transiting through a bridge for
19   any circumstance, then do not do so.
20       Q.    Is there a reason that it's
21   like popped out important or highlighted in
22   this fashion?
23       A.    I'm not sure.
24       Q.    If you look at above
25   that -- the section titled "Before The
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    Transit?"
 2         A.    Yes.
 3         Q.    The second to last bullet says,
 4    "Necessity of assigning a crew member with
 5    a radio to the head of the tow."  Right?
 6         A.    Yes.
 7         Q.    So if a look out was assigned
 8    to the head of the tow, it would have to be
 9    at the front end of the barge, right?
10         A.    Correct.
11         Q.    That's what that means?
12         A.    Yes, the valve of the barge.
13         Q.    Which is -- this barge is 200
14    feet.  So it's at least 200 feet away from
15    the wheelhouse.
16         A.    Correct.
17         Q.    The wheel house sits a little
18    back from the bow of the tub, correct?
19         A.    Yes.
20         Q.    The only way to communicate
21    then is with a handheld radio?
22         A.    Yes.
23         Q.    Between the two?
24         A.    Yes.
25         Q.    And what would you expect the
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    lookout that's assigned to a circumstance
 2    like that to be on the lookout for?
 3             MR. RODGERS:  Objection to the
 4        extent he's not here as an expert,
 5        and he wasn't the master of that
 6        particular tug at the time.
 7             So are you asking his opinion?
 8             MR. CHAPMAN:  Well, I didn't
 9        finish because I was going to ask
10        when transiting a bridge.  I mean,
11        this -- the question only relates to
12        putting up post and lookout for a
13        bridge transit, okay, which -- you
14        know, which is contemplated by this
15        bullet.
16    A.    Okay.
17    Q.    I'm trying to understand then
18    what is the look out in that circumstance
19    as expected to look out for?
20             MR. RODGERS:  Objection -- same
21        objection.  He's not here as an
22        expert.  And he wasn't on the
23        Mackenzie Rose.  You're asking his
24        opinion, so if have you an --
25             THE WITNESS:  I can give my
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          opinion on it.
 2                  MR. RODGERS:  All right.  I
 3          don't want you to give your opinion.
 4                  THE WITNESS:  Okay.  All right.
 5          Then I won't answer it.
 6          Q.   If you feel that it's an
 7     opinion, you should still give it.  And you
 8     can qualify it and say that it's your
 9     opinion.
10                  MR. RODGERS:  Objection.
11          A.   I'm just going to go with --
12                  MR. RODGERS:  Don't instruct
13           the witness.
14          A.   -- what James is telling me to
15     do.
16          Q.   So are you going to answer the
17     question?
18          A.   No.
19          Q.   So you're refusing to answer
20     the question?
21                  MR. RODGERS:  No.  He's not
22           refusing, he's listening to his
23           attorney.
24                  MR. CHAPMAN:  So you're --
25                  MR. RODGERS:  What are you
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          doing, Jim?  He's listening to me.

2                    MR. CHAPMAN:  You're

3          instructing him not to answer then?

4                    MR. RODGERS:  Yeah.  If it's an

5          opinion.  He's not here as an expert

6          and he wasn't on the Mackenzie Rose.

7                    MR. CHAPMAN:  I'm asking about

8          the companies safety management

9          system, and what the companies

10         expectations are or were around that

11         language, what is the look out

12         supposed to be looking out for during

13         a bridge transit.

14

15

16                   MR. RODGERS:  If you have an

17         answer to that as to what the

18         company's expectation is that you

19         know of, you can answer.

20         **A.     Okay.  It would be to make sure**

21    **that the vessel as they are transiting**

22    **through the bridge is doing so safely so**

23    **that there's clearance port and star bird**

24    **overhead, and to make sure that there is no**

25    **traffic or anything like that, that -- you**

**LEONARD BALDASSARE**

**April 29, 2025**

1    know, the -- that's also my -- that's my

2    opinion.  To make sure there's no traffic,

3    just to ensure the safety going through the

4    bridge.

5        Q.    And then down under the last

6    section titled -- call -- titled "During

7    The Transit."  The third bullet says, "To

8    post lookouts as necessary on the tow."

9    Who's that an instruction to?

10        A.    That would be to either the

11    master or the mate who's over on watch.

12        Q.    Is there a place on any of the

13    reporting forms where you record whether a

14    lookout was posted?

15        A.    Not to my knowledge.

16        Q.    Do you still hold an active

17    license?

18        A.    Yes.

19        Q.    All right.  When does it

20    expire?

21        A.    '27, I think.  I just renewed

22    it recently.

23        Q.    Okay.  Have you ever transited

24    the Southern branch of the Elizabeth River?

25        A.    No.

**LEONARD BALDASSARE**

**April 29, 2025**

1      Q.    So you're not familiar how the
2   bridges are set up or laid out in that
3   navigational area?
4      **A.    No, I'm not.**
5      Q.    They would be marked on a
6   chart, correct?
7      **A.    They would be, yes.**
8      Q.    The Section 7.12 in the middle,
9   right under that section that's highlighted
10  it's titled "Safety Briefing."
11     **A.    Yes.**
12     Q.    It says that, "As with any
13  operation, the captain responsible for
14  transit should brief the crew and the crew
15  of any assist/tag boats on the plan
16  transit."  That does -- that's not
17  mandatory is it, just say "should be?"
18     **A.    Is what, mandatory assist**
19  **boats?**
20     Q.    No.  The safety briefing.  It
21  says, "Should brief the crew."  That's not
22  mandatory, is it?
23     **A.    No.**
24     Q.    Is there any reason why it's
25  not mandatory?

**LEONARD BALDASSARE**

**April 29, 2025**

1        A.      I don't know.

2        Q.      Do you think it's a good Marine

3    practice to have a safety briefing before

4    transiting bridges?

5              MR. RODGERS:  Objection.  Don't

6          answer that.  I'm directing the

7          witness not to answer.

8        Q.      If you could turn to the

9    Section 7.9 K titled "Safety Management

10   Form."  And it starts at Page 194.  It

11   looks like this.  It has a little blue bar

12   at the bottom with the number of pages in

13   it.  It says it's -- first page says, "1 of

14   6 pages."  It's probably about halfway

15   through that document.

16             MR. RODGERS:  What was the

17         Bates Number?

18             MR. CHAPMAN:  194.

19             MR. RODGERS:  194.

20             MR. CHAPMAN:  Yes.

21       A.      7.9 K, right?

22       Q.      Yeah.

23       A.      Yeah, I got it.

24       Q.      Yeah.  So this is apparently a

25   section of the safety management plan that

## LEONARD BALDASSARE

**April 29, 2025**

```
 1    actually covers a segment of, I'll call it
 2    the Intercostal waterway, but basically
 3    Norfolk and Virginia and the southern
 4    branch of the Elizabeth River, correct?
 5         A.    Yes.
 6         Q.    And it's got a few bridges that
 7    are identified in it and some general notes
 8    on the last couple of pages, right?  Do you
 9    see that?
10         A.    Yes.
11         Q.    So the first bridge that's
12    identified in this section is the Norfolk
13    and Portsmouth Belt Line Railroad Bridge,
14    correct?
15         A.    Correct.
16         Q.    Is this document one that
17    should be consulted before transiting
18    bridges or before transiting this bridge?
19         A.    Yes.
20         Q.    And do you know whether there
21    were any of the bridges that were transited
22    when they got underway on this voyage
23    before they arrived at the Norfolk and
24    Portsmouth Belt Line Railroad Bridge?
25         A.    Was there any other bridges?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Q.    Yeah.
 2          A.    Oh, I don't know.
 3          Q.    Yeah.  And you didn't ask the
 4    crew whether there were other bridges that
 5    they had made?
 6          A.    No.
 7          Q.    Okay.  Did you consult this
 8    section of the safety management system as
 9    part of your investigation?
10          A.    No.
11          Q.    If you could turn to Section
12    7.16 on lookouts.  The number of that page
13    is Carver 000155, but it's -- it is towards
14    the end of the collection of sections --
15          A.    Oh, because it's not in order,
16    right?
17          Q.    Yeah.
18          A.    Okay.  So zero -- what is it,
19    155?
20          Q.    Yeah.  It's just one page, it
21    looks like this.
22          A.    Got it.
23          Q.    So this is the section of the
24    safety management system on the lookouts,
25    correct?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          A.     Yes, correct.

2          Q.     In the first part under

3    requirements for a look out it -- there's a

4    half a dozen bullets of things that should

5    be considered as relevant factors in

6    deciding whether they're supposed to

7    lookout, correct?

8          A.     Correct.

9          Q.     Okay.  Weather visibility,

10   traffic density and then it says,

11   "Proximity of dangers to navigation."  What

12   are dangers to navigation --

13

14

15              MR. RODGERS:  Objection to

16       form.

17        Q.      -- that would require the

18   posting of a lookout?

19              MR. RODGERS:  Objection to

20       form.  He's not here as an expert.

21        A.     Yeah.  I'm not sure what they

22   would qualify as proximity to dangerous

23   allegation.

24        Q.     Would a bridge transit?

25              MR. RODGERS:  Objection to

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          form.
 2          A.    I'm not sure.  Again, I'm
 3      not -- I didn't write this, so I don't
 4      know.
 5          Q.    This is intended as guidance
 6      though to the master or mate on watch
 7      regarding considerations for posting a
 8      lookout though, right?
 9          A.    Yes.
10          Q.    Okay.  So that's my question
11      is, whether you wrote it or not, is a
12      bridge a danger to navigation?
13              MR. RODGERS:  Objection.  He's
14          not here as an expert.  And you're
15          supposed to premise the questions not
16          as an expert.  You haven't done that
17          all day, okay?  So I'm going to tell
18          him not to answer.  I'm going to
19          direct him not to answer anything
20          that asks for his opinion.
21              MR. CHAPMAN:  You're
22          instructing the witness not to answer
23          the question?
24
25
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              MR. RODGERS:  Yes, I am.  I
 2         just said that.
 3         Q.    And then under procedures, it
 4    says, "A look out should be added when
 5    necessary to."  And the second bullet is,
 6    "To apprise the situation and the risk of
 7    collision/ allision," right?
 8         A.    Yes.
 9         Q.    So the tug while pushing the
10    barge elided with the bridge, right?
11         A.    Yeah.
12              MR. RODGERS:  Can you repeat
13         that?
14              MR. CHAPMAN:  I said --
15              MR. RODGERS:  Hold on, let me
16         go to this.
17              MR. CHAPMAN:  I said, the tug,
18         Mackenzie Rose --
19              MR. RODGERS:  I said, "Can you
20         repeat this?  "Are you going to
21         repeat it.
22              MR. CHAPMAN:  I am.
23              MR. RODGERS:  Okay.
24              MR. CHAPMAN:  The tug Mackenzie
25         Rose while pushing the Weeks 281 on
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1           June 15th, 2024 elided with the
 2       bridge.
 3              MR. RODGERS:  To his knowledge?
 4       To his knowledge.
 5              MR. CHAPMAN:  Well --
 6              MR. RODGERS:  He's a fact
 7       witness.
 8              MR. CHAPMAN:  Exactly, and I'm
 9       asking him, did it?
10              MR. RODGERS:  To his
11       knowledge --
12              MR. CHAPMAN:  Did it?
13              MR. RODGERS: -- you're asking
14        him for a legal conclusion.
15              MR. CHAPMAN:  No.
16              MR. RODGERS:  Yeah, you are.
17       Q.    At any time while you were
18    employed by Carver, did you learn that the
19    tug boat while pushing the weeks 281 elided
20    with the Norfolk and Portland Belt Line
21    Bridge on June 15th, 2024?
22              MR. RODGERS:  You can answer
23        that.
24       A.    Yes.
25       Q.    So back to --
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1               THE REPORTER:  Can you just
 2          speak a little louder?  Sorry.
 3          Q.    Back to the safety management
 4     system 7.16 on lookout under procedures.
 5     It says, "A lookout should be added when
 6     necessary to."
 7               And then I'm looking at the
 8     second bullet, "Apprise the situation and
 9     the risk of collision/elision."  See that?
10          A.    Yeah, I see it.
11          Q.    So a lookout could have been
12     posted to arise -- to appraise of the risk
13     of an allision with the bridge, correct?
14               MR. RODGERS:  Objection.  Don't
15          answer that.  Directing the witness
16          not to answer that question as it's
17          calling for expert testimony.
18          Q.    The last part of that section
19     on procedure says, "A lookout shall be
20     added when entering any port channel, or
21     any waterway intersection."  What is meant
22     by a port channel -- when entering a port
23     channel, or anyway waterway intersection?
24     What does that mean?
25
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              MR. RODGERS:  Objection.  It
 2         calls for expert testimony and
 3         interpretation of a statute.
 4         Just -- I'm going to direct the
 5         witness not to answer.
 6         Q.    Are you aware of any statute
 7    that governs the posting of a lookout when
 8    entering a port channel, or a waterway
 9    intersection?
10              MR. RODGERS:  Objection.  You
11         can answer if you're aware or not
12         aware.
13         A.    No, I'm not aware.
14         Q.    So as far as you know, there's
15    not a statute that would require posting a
16    lookout in either of those
17    circumstances --
18              MR. RODGERS:  Objection.
19         Q.     -- correct?
20              MR. RODGERS:  Mischaracterizes
21         testimony.
22         Q.    If I mischaracterize it, you
23    can correct me.
24         A.    Can you repeat the question,
25    I'm not sure what you're asking me?
```

LEONARD BALDASSARE

**April 29, 2025**

1          Q.    Yeah.   I -- what I said was, so

2    there's not a regulation or law that you're

3    aware of that mandates posting a lookout

4    when entering a port channel, or when

5    entering a waterway intersection?

6          **A.    Oh, no, not to my knowledge.**

7          Q.    Okay.   If you could turn to

8    Section 9.5, which is after 7.12, got a

9    sort of big orange call out at the top?

10         **A.    Yep.**

11         Q.    Starting on Page 163.   In that

12   call out titled "Reporting Priorities"

13   there's two things that the master is

14   obligated to do.   First, "To notify the

15   office as soon as practical after a marine

16   casualty," right?

17         **A.    Yes.**

18         Q.    And in the circumstance of this

19   allision, Captain Miller called you after

20   they reportedly made contact with the

21   fender system, right?

22         **A.    Yes.**

23         Q.    Okay.   And then second, it

24   says, "The master will notify the nearest

25   Coast Guard unit as soon as practical after

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    a marine casualty."
 2                 To your knowledge, during the
 3    course of your investigation, Captain
 4    Miller never contacted the Coast Guard, did
 5    he?
 6         A.    No, not to my knowledge.
 7         Q.    Regarding the allision?
 8         A.    Right.
 9         Q.    Did you ever tell Captain
10    Miller that you were contacting the Coast
11    Guard?
12         A.    No.
13         Q.    Did you ever tell him that
14    Brian Moore was contacting the Coast Guard?
15         A.    No.
16         Q.    Did you ever tell him that it
17    was okay to leave -- because you had
18    contacted the Coast Guard?
19         A.    No, I did not.
20         Q.    Did you ever say to him in
21    words or substance that you had contacted
22    the Coast Guard and that they had said it
23    was okay to leave?
24         A.    No, I did not.
25         Q.    In your safety management
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    system regarding accident and incident
 2    reporting, the system recites regulations
 3    out of 46 CFR.  Do you see that?
 4        A.    Yes.
 5        Q.    And if you go to the next page,
 6    about two thirds on the way down, there is
 7    a heading called "Notice of Marine Casualty
 8    46 CFR 4.05-1?"
 9        A.    Yes.
10        Q.    Okay.  In Section A -- I'm
11    going to focus on Section A and Subsection
12    1.  So just follow along with me.
13        A.    Okay.
14        Q.    Section A says, "Immediately
15    after addressing the result and safety
16    concerns, the owner, agent, master,
17    operator or person in charge shall notify
18    the nearest sector office, Marine
19    Inspection Office or Coast Guard Group
20    office whenever a vessel is involved in a
21    Marine casualty, consisting in Subsection
22    1.
23            An unintended grounding for an
24    unintended strike of forensic "allision"
25    with a bridge?"  Did I read that correctly?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          A.      Yes.

2          Q.      Okay.  So is there any

3  circumstance in the context of this

4  regulation that you know of where you don't

5  have to report an unintended allision with

6  the bridge --

7              MR. RODGERS:  Objection.

8          Q.       -- immediately to the Coast

9  Guard?

10             MR. RODGERS:  Objection to the

11          term "allision with the bridge."

12          It's not consistent with his

13          testimony as to what he knew.

14          **A.      As far as I knew they landed on**

15  **the fenders inside of the bridge.**

16          Q.      And that's not an allision?

17          **A.      That's not an allision.**

18          Q.      Contact with affixed object is

19  not an allision?

20             MR. RODGERS:  He didn't say

21          that.

22          **A.      That's not what I'm saying,**

23  **just saying they --**

24          Q.      What are you saying then?

25          **A.       -- they slid through the**

**LEONARD BALDASSARE**

**April 29, 2025**

 1    fenders.

 2         Q.    Without contacting them?

 3         **A.    From what they told me.**

 4         Q.    They did not contact the

 5    fender?

 6         **A.    They told me that they slid**

 7    **through the fendering system.**

 8         Q.    So does that mean they

 9    contacted the fender?

10         **A.    I don't know.  I wasn't there.**

11         Q.    Well, you were having a

12    conversation with Captain Miller at

13    the -- literally the point in time when

14    this happened, right?

15         **A.    Yes.**

16         Q.    And when he said to you that

17    they slid through the fenders, what did you

18    understand that to mean?  That they had

19    contacted it or not contacted it?

20         **A.    I'm not sure because he didn't**

21    **really specify.**

22         Q.    You didn't think it was your

23    obligation to be certain what had actually

24    happened in the conversation you had with

25    him?

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1                  MR. RODGERS:  Objection to
 2      form.
 3           A.    In the moment no.  We were just
 4      trying to figure exactly what happened.
 5           Q.    And when did you learn that
 6      they said they had actually contacted the
 7      fender system of that bridge?
 8           A.    I don't really recall the exact
 9      day and time.
10           Q.    But it wasn't on June 15th of
11      2024 is what you're saying?
12           A.    No.  Not that they had struck
13      the bridge, no.
14           Q.    Okay.  So is it your
15      perspective that Captain Miller lied to
16      you?
17                  MR. RODGERS:  Objection to
18        form.
19           A.    What'd you say?  I don't -- I'm
20      not going to call him a liar.  I'm just
21      going off of what he told me.
22           Q.    Have you seen a photograph of
23      the actual damage to the bridge?
24           A.    No.
25           Q.    Never?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          **A.      Never.**

2          Q.      The only photograph you've seen

3    of the bridge is the one that was texted to

4    you within the hour after Captain Miller

5    first reported it to you?

6          **A.      Yes.**

7          Q.      And no others?

8          **A.      No, no others.**

9          Q.      If you could turn to Page 166.

10

11

12               MR. RODGERS:  Carver 166.

13               MR. CHAPMAN:  Yeah.

14          Q.      That's in Exhibit 4.  It's

15    a -- looks like a flow chart of some

16    sort --

17          **A.      Sure.**

18          Q.       -- related to accident or

19    incident reporting?

20          **A.      Yes.**

21          Q.      Did you consult this at all

22    when you were investigating the allision

23    with the bridge?

24          **A.      No.**

25          Q.      Why not?

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              MR. RODGERS:  Objection to
 2         form.  You can answer if --
 3         A.    I didn't think that it was
 4    necessary to reference this.
 5         Q.    Did you even know of it's
 6    existence?
 7         A.    Yes.
 8         Q.    But you didn't think that it
 9    was required to review it or follow it?
10              MR. RODGERS:  Objection to
11          form.
12         A.    Yes.
13         Q.    Just so I'm clear what your
14    answer means, you mean -- you're saying
15    what I stated was correct?
16         A.    Correct.
17         Q.    Near the top of the flow chart
18    in kind of a light green color it says,
19    "File SMF 9.2 near miss report?"
20         A.    Yes.
21         Q.    Do you know what SMF stands
22    for?
23         A.    I do not.
24         Q.    Could it be safety management
25    form?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              MR. RODGERS:  Objection to
 2         form.  You can answer if you
 3         understand.
 4         A.    It could be, yes.
 5              MR. RODGERS:  But don't guess.
 6         Q.    And then at the bottom in red,
 7    the mandate is kind of at the bottom of the
 8    flow chart, to fill to out an SMF 9.5
 9    incident report, correct?
10         A.    Yes.
11         Q.    Okay.  And to your knowledge
12    was an SMF 9.5 incident report prepared for
13    the incident involving the allision with
14    the Belt Line Bridge?
15         A.    I do not know if one was.
16         Q.    If you could turn to Page 168.
17    Do you see the red box on that flow chart
18    it says, "Designated person assumes
19    position as emergency response coordinator
20    for life of incident?"
21         A.    Yes.
22         Q.    Who is Carver's designated
23    person in the safety management system?
24
25
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              MR. RODGERS:  At that time.
 2              MR. CHAPMAN:  Yeah.
 3         A.    I believe it was Brian Moore.
 4         Q.    Were there any alternates?
 5         A.    I don't know, I would have to
 6    go back and look.  I don't recall.
 7         Q.    And is that contained somewhere
 8    in the safety management system, that
 9    designation?
10         A.    Yes.
11         Q.    And if you turn to Page 169.
12    This is another flow chart on -- it appears
13    to relate to filling out the Coast Guard
14    form 2692, correct?
15         A.    Correct.
16         Q.    And it says, "A vessel accident
17    must be reported if it occurs upon the
18    Naval waters of the United States.  It's
19    territories or possessions or wherever an
20    accident involves a U.S. vessel, wherever
21    the accident may occur.  And the accident
22    must also involve one or more of the
23    following."
24              And the very first item
25    under -- on this flow chart, Number 1, is
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
1      "An unintended grounding or an unintended
2      strike of "allision with" the bridge."
3         A.    Yes.
4         Q.    If you had learned that the tug
5      while pushing the barge 281 had damaged the
6      bridge, that has hit it in a way that
7      damaged it, it hit the bridge, would you
8      agree that a 2692 would need to be filled
9      with the Coast Guard?
10             MR. RODGERS:  Objection.  Calls
11          for speculation.  You can answer if
12           you can.
13        A.    Yes.
14        Q.    You agree?
15        A.    Yes.
16        Q.    And at the bottom there's a
17     heading called "Drug and Alcohol Testing?"
18        A.    Yep.
19        Q.    It says, "Any serious marine
20     incident will require drug and alcohol
21     testing of all individuals directly
22     involved."
23             You signed a form that there
24     had been no drug and alcohol testing for
25     this allision, correct?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1      A.      Correct.

2           Q.    And presumably that was

3      submitted to the Coast Guard?

4           A.      Yes.

5           Q.    Okay.  And then it says here

6      right after that C Section 6.  Do you know

7      what Section 6 is?

8           A.      Assuming it's Section 6 in the

9      SMS or safety management system.

10          Q.    Okay.  When you were employed

11     by Carver as Port Captain, do you know

12     whether new crew personnel were given any

13     specific training on transiting bridges

14     with narrow channels?

15          A.      To my knowledge, no.

16          Q.    As part of people, you know,

17     taking on a new -- a crew position, getting

18     hired for a crew position on one of your

19     tugs while you were at harbor, did the

20     company provide any, I don't know, deckhand

21     manual, master's manual, some book that

22     had, you know, instructions regarding

23     navigation, or bridge transit, or vessel

24     safety, that sort of thing?

25          A.      Just what was in the SMS that

**LEONARD BALDASSARE**

**April 29, 2025**

1     everyone had access too on the vessel.

2          Q.     So nothing else though?

3          A.     To my knowledge, no.

4          Q.     And the SMS, how do you access

5     that on the Mackenzie Rose?

6          A.     Like I said earlier, you would

7     go onto the boat computer, go into Helm and

8     then there would be a section to access the

9     SMS electronically and also again, download

10    the whole PDF, if you wanted to.

11         Q.     Okay.  And do you know if

12    there's a copy of the SMS that is aboard

13    the Mackenzie Rose that is a, you know,

14    hard copy?

15         A.     Just the electronic ones.

16         Q.     And that laptop, is it located

17    in the wheelhouse?

18         A.     Yes.

19         Q.     But anybody can log into it and

20    look at the SMS?

21         A.     Yes.

22         Q.     Do you know while you were, you

23    know, Port Captain for Carver, whether

24    there was any ongoing training or guidance

25    on how to safely transit bridges with

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    barges?
 2         A.    To my knowledge, I don't know
 3    of any, no.
 4         Q.    Was there any ongoing training
 5    that was focused specifically on lookout
 6    duties or the circumstances under which
 7    somebody should be posted as a lookout to
 8    the head end of the barge?
 9         A.    To my knowledge, no.  There
10    was --
11         Q.    Is the only guidance or
12    operating procedure, if I can call it that,
13    regarding the transiting of bridges
14    contained in Section 7.12 of the safety
15    management system --
16              MR. RODGERS:  To his knowledge.
17              MR. CHAPMAN:  Yeah, to his
18       knowledge.
19         A.    To my knowledge, yes.
20         Q.    It's not like there's a book
21    sitting on the shelf somewhere at the
22    company's office that says "How to safely
23    transit bridges?"
24         A.    No.
25         Q.    Okay.  Is there any specific
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    training provided to the crew about the

2    proper use of an autopilot system on the

3    company's vessels?

4        **A.    No.  Anything related to the**

5    **autopilot would be referenced in the safety**

6    **management system.**

7        Q.    So there maybe a section on the

8    autopilot system, it's just -- we don't

9    have it as part of that collection --

10       **A.    Correct.**

11       Q.     -- in Exhibit 4, right?

12       **A.    Correct.**

13       Q.    How are masters, or mates, you

14   know, the officer of the watch, expected to

15   know how to appropriately use the autopilot

16   system?

17           MR. RODGERS:  Sorry,

18        could -- let me just read that from

19        the computer.

20           I'm going to object as to form.

21        You can answer if you understand it

22        or know it.

23       **A.    It's -- I don't really know how**

24   **to answer it.**

25       Q.    How did you learn how to use an

LEONARD BALDASSARE

**April 29, 2025**

```
 1    autopilot system, let's start there?
 2         A.    From sailing, experience, I was
 3    shown by a captain.  I was -- before I
 4    became a full -- like a cut loose mate, I
 5    was a training mate.  So I sailed as an
 6    extra wheelhouse personnel for six months.
 7    Kind of learned all the operating systems.
 8         Q.    On-the-job training?
 9         A.    Correct.
10         Q.    Are there any manuals regarding
11    the use of the autopilot system?
12         A.    Yes.  There's manuals on board
13    the vessel.
14         Q.    Have you actually seen the
15    manual for the autopilot system on the
16    McKenzie Rose when you were employed by
17    Carver?
18         A.    Yes, I have.  When the new
19    system was installed, the manual was left
20    on board for anyone to reference on the
21    boat.
22         Q.    And that would've been by
23    whoever the technician was that installed
24    it?
25         A.    Correct.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Q.    Was there any training for that
 2     new system that was specifically provided
 3     to your knowledge?
 4          A.    To my knowledge, no.
 5          Q.    So the manual served as kind of
 6     a reference if they want to look something
 7     up or need to look something up?
 8          A.    Yes.
 9
10
11          MR. RODGERS:  Objection to
12           form.  You can answer.
13          A.    Yes.
14          Q.    Did -- have you ever reviewed
15     that autopilot manual for the new
16     autopilots that were installed on the
17     Mackenzie Rose while you were with Carver?
18          A.    No.
19          MR. RODGERS:  Do you want some
20           coffee, Jim?  There's new coffee.
21          MR. CHAPMAN:  Did they bring
22           some?
23          MR. RODGERS:  Yeah, they did.
24          MR. CHAPMAN:  Yeah.  Could we
25           just take a five-minute break?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
1              MR. RODGERS:  Yeah.
2              MR. CHAPMAN:  Would be okay?
3              MR. RODGERS:  Yeah, no, that's
4         good.
5              MR. CHAPMAN:  Okay.
6              MR. RODGERS:  I thought you saw
7         the guy come in.
8              MR. CHAPMAN:  No.
9              THE VIDEOGRAPHER:  We are going
10         off the record.  The time is
11         2:56 p.m.
12              (Whereupon, a short recess was
13         taken.)
14              THE VIDEOGRAPHER:  Beginning
15         Media Number 4.  We are back on the
16         record.  The time is 3:03 p.m.
17         Q.   Mr. Baldassare, during the
18     course of your investigation between the
19     statements that you received and the
20     interviews you conducted of the crew, did
21     you learn that the captain was the only one
22     who was working as a lookout at the time of
23     the allision?
24         A.   Yes.
25              MR. RODGERS:  You mean
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Morrissey?
 2               MR. CHAPMAN:  Yeah, Captain
 3          Morrissey.
 4
 5               MR. RODGERS:  Well, he was
 6          at -- okay.
 7          Q.    He was the officer on the
 8     watch, right?
 9          A.    Yes.
10          Q.    Yeah.  And that's because the
11     other deckhand that was on duty at the time
12     was --
13               MR. RODGERS:  Objection.
14          Q.     -- down in the galley, right?
15               MR. RODGERS:  No.  Objection.
16           That's not the testimony in this
17           case.
18          Q.    I'm just asking what you
19     learned in the investigation?
20          A.    I'm not sure where the other
21     deckhand was at the time.
22          Q.    Well, was there more than one
23     pair of eyes keeping an eye out on the
24     transit of the vessel?
25               MR. RODGERS:  Objection.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1        Q.    On the boat, at the time of the

 2   allision?

 3              MR. RODGERS:  You can answer.

 4        A.    It was Captain Morrissey who

 5   was on watch, yeah.

 6        Q.    Yeah.  So he was on watch.

 7   What I'm asking is whether there was a

 8   second person that was providing any kind

 9   of lookout with respect to the transit at

10   the time of the allision?

11              MR. RODGERS:  As far as he

12         knows from his investigation.

13              MR. CHAPMAN:  Yeah, exactly.

14        A.    As far as I know, no.

15        Q.    And as far as you know, when

16   you were employed by Carver, there was no

17   requirement by Carver that more than one

18   person served as the lookout when

19   transiting bridges, correct?

20

21              MR. RODGERS:  Objection.  He's

22         not here as an expert.  You can

23         answer if you understand the

24         question.

25        A.    To my knowledge, no, there was
```

**LEONARD BALDASSARE**

**April 29, 2025**

1    **no policy or requirement.**

2        Q.    Are you aware of any best

3    practices in the towing industry that would

4    require posting a lookout at the head end

5    of the barge during a bridge transit?

6           MR. RODGERS:  Could you define

7       best practices.

8           MR. CHAPMAN:  I'm just asking

9       him.

10         MR. RODGERS:  That's a kind of

11      a corporate term.  But if you

12      understand it, you can go ahead.

13    **A.    Yes.**

14        Q.    And are you aware of any best

15    practices in the towing industry that

16    recommend disengaging the autopilot when

17    transiting near a fixed object like a

18    bridge?

19         MR. RODGERS:  Objection to

20      form.  He's not here as an expert.

21       You can answer as to what you

22      know.

23    **A.    Yes, I'm aware.**

24    Q.    And there are?

25    **A.    There are, yes.**

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1            Q.    Can an autopilot system make
 2     course corrections?
 3                   MR. RODGERS:  Objection.  He's
 4              not here as an expert on autopilot
 5              systems.
 6            A.    Yeah, I don't --
 7
 8                   MR. RODGERS:  You can as to
 9              your knowledge.
10            A.    To my knowledge, I'm not sure.
11     I'm not a -- I don't -- I'm not sure.
12            Q.    Is there any autopilot system
13     that you've ever used that's capable of
14     making its own course corrections?
15                   MR. RODGERS:  Objection to
16              form.  You can answer as to your
17              knowledge.
18            A.    No.  It would -- you would set
19     the course that you wanted and it would
20     hold that course.
21            Q.    It would endeavor to stay on
22     that course?
23            A.    Correct.
24            Q.    Okay.  But if you want to
25     change it, it has to be done manually?
```

**LEONARD BALDASSARE**

**April 29, 2025**

1          A.    Yes.

2          Q.    As part of the -- your

3    investigation, did you ever determine

4    whether the radar was in use on the vessel

5    at the time of the allision?

6          **A.    Yes, the radar was in use.**

7          Q.    And would a radar indicate a

8    fixed object like a bridge?

9          **A.    Yes.**

10         Q.    I figured the answer was yes.

11               MR. CHAPMAN:  Sorry, made you

12          choke there Mr. Rodgers.

13         **A.    Yes, it would.  I didn't know**

14   **if it was a trick question.**

15         Q.    Okay.  The radars on the

16   Mackenzie Rose, did they provide any

17   warning associated with the approach to a

18   fixed object?

19         **A.    They would have to set their**

20   **own CPA if they wanted to be alerted.**

21         Q.    Like how far out?

22         **A.    Correct.**

23         Q.    What does CTA stand for?

24         **A.    CPA?**

25         Q.    CPA.

**LEONARD BALDASSARE**

**April 29, 2025**

1        **A.    Closest point of approach.**

2        Q.    Okay.  And did you find out

3    during your investigation what had been set

4    as the closest point of approach for the

5    radars for some notification?

6        **A.    I did not.**

7        Q.    Do you know whether there was

8    any CPA that was set?

9        **A.    I do not.  They do not tell me.**

10   **I know the radar was operational from what**

11   **they told me.**

12           THE REPORTER:  And you said

13        CPA, right?

14        **THE WITNESS:  Yes.**

15           MR. CHAPMAN:  I don't think I

16        have any further questions at this

17        time.  Based on what the judge said

18        though I'm reserving my rights with

19        respect to anything you guys

20        produce --

21           MR. RODGERS:  Yeah.

22           MR. CHAPMAN: -- as ordered last

23        week.

24           MR. RODGERS:  I just ask that

25        we -- if possible we do it -- if any

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              follow up with this witness, we do by
 2              Zoom or here in New York with me
 3              representing him if you want to do it
 4              from Norfolk --
 5         Q.    We will do our best to
 6    accommodate that.  Okay.  I mean that, I
 7    don't know how it'll work out, but I don't
 8    want to make it difficult, you know.  And
 9    we may not need to re-depose you, okay, to
10    ask you more questions.  But if we do,
11    we'll make those arrangements.
12              THE REPORTER:  And Counsel, do
13         you want this expedited and/or, I
14         know you wanted a rough, but do you
15         want it expedited as well for the
16         final --
17              MR. RODGERS:  No.  But I have a
18         couple of questions.
19              MR. CHAPMAN:  Yeah.
20    EXAMINATION BY
21    MR. RODGERS:
22         Q.    So Mr. Baldassare, training of
23    the crew on any particular tug boat is done
24    by the captain, right?
25         A.    Yes, sir.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Q.    Or the captain is supervising
 2    training, correct?
 3          A.    Yes.
 4          Q.    And that would include any
 5    training for lookouts, correct?
 6          A.    Yes, sir.
 7          Q.    And it's the captain of the tug
 8    when they're on the way that makes the sole
 9    decision to have a lookout?
10          A.    Yes.
11          Q.    Okay.  And any instructions
12    that lookout or a particular watch that the
13    lookout is standing, would that generally
14    come from the captain?
15          A.    Yes.
16          Q.    To your knowledge?
17          A.    To my knowledge, yes.
18          Q.    Okay, and your experience?
19          A.    Yes, sir.
20          Q.    Okay.  Now, if you could go
21    to -- well, before you go to anything, I
22    got a few questions.
23                In your investigation, did you
24    determine which bridge Mate Morrissey was
25    on at the time of the incident?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.      What bridge on the vessel?

 2          Q.      Yeah.

 3          A.      I don't -- was not -- no.  I

 4     did not know.  I would've -- I don't know.

 5          Q.      You don't know --

 6          A.      No.

 7          Q.      -- whether he was on the

 8     steering bridge or the lower bridge, the

 9     main bridge?

10          A.      I believe he was on the -- he

11     should have been in the upper wheelhouse.

12          Q.      Okay.  And if -- is -- have you

13     ever been to the upper wheelhouse on that

14     vessel?

15          A.      Yes.

16          Q.      The McKenzie Rose is --

17                  THE REPORTER:  Just give him a

18           minute to finish.

19                  THE WITNESS:  Sorry.

20          Q.      And from that steering bridge,

21     upper wheelhouse the mate on watch can see

22     past the barge configured as it was

23     that -- on the day of the incident,

24     correct?

25                  MR. CHAPMAN:  Object to the
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          form.
 2          A.    Yes.
 3          Q.    It's above the barge, correct?
 4          A.    Yes, yes.
 5          Q.    So is his view unobstructed --
 6                MR. CHAPMAN:  Object to the
 7          form.
 8          A.    Yes.
 9          Q.    -- as to what you understand
10    the load was?
11          A.    As to what I understand, yes.
12          Q.    And if he looks to the
13    starboard side, is it generally
14    unobstructed?
15                MR. CHAPMAN:  Object to the
16          form.
17          A.    Yes.
18          Q.    How about the portside?
19                MR. CHAPMAN:  Same objection.
20          A.    Yes.
21          Q.    And how about a Stern?
22                MR. CHAPMAN:  Same objection.
23          A.    Yes.
24          Q.    If he turns around, obviously?
25          A.    Yes.
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          Q.    Okay.  Could you go to --
 2                THE REPORTER:  Okay.  You guys
 3          have to slow down tremendously for
 4          me.
 5                MR. RODGERS:  I'm sorry.
 6                THE REPORTER:  Just slow down a
 7          little bit.
 8                MR. RODGERS:  You're from New
 9          York.
10                THE REPORTER:  I don't care, I
11          can't write --
12                MR. RODGERS:  Okay, sorry.
13          Apologies.
14                THE REPORTER:  I can't write
15          his testimony --
16                MR. RODGERS:  All right, I'm
17          sorry.  Did you get it all?
18                THE REPORTER:  I did actually,
19          but not the point --
20                MR. RODGERS:  All right.
21                THE REPORTER:  Slow down a
22          little bit.  You can read the
23          realtime, I have it.
24                MR. RODGERS:  I don't think
25          it's going to go well down in Eastern
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              District, Virginia if I'm questioning

 2              anybody.

 3                    THE REPORTER:  It'll be a lot

 4              slower.

 5                    MR. RODGERS:  I'm going to have

 6              to do a training session.

 7              Q.    Could you look at Carver 155,

 8       which was the lookout, Section 7.16?

 9              A.    Yes.

10                    MR. CHAPMAN:  We're on the SMS

11              Exhibit 4.

12                    MR. RODGERS:  Sorry, thank you.

13              Q.    We're in the SMS Exhibit 4,

14       Bates Stamp Number Carver 155.

15                    Just hold that thought, I need

16       to check something.  Sorry, I just need two

17       minutes some -- before I -- just -- oh,

18       there they are.

19                    Okay.  If you could go back to

20       Exhibit 4, Carver 155.  Could you read into

21       the record under "One man bridge

22       operations?"

23              A.    Sure.  "One man bridge

24       operations.  On vessels where there is an

25       unobstructed all around view provided at
```

LEONARD BALDASSARE

**April 29, 2025**

1     the steering station, as on certain

2     pleasure crafts, fishing boats and towing

3     vessels or where there is no impairment of

4     night vision or other impediment to keeping

5     a proper look out, the watch officer or

6     helmsmen may safely serve as the lookout.

7              However, it is expected that

8     this practice will only be followed after

9     the situation has been carefully assessed

10    on each occasion and it has been clearly

11    established that it is prudent to do so.

12             Full account shall be taken of

13    the weather, conditions of visibility,

14    traffic density, and proximity of

15    navigational hazards.  It is not the intent

16    of these rules to require additional

17    personnel forward if none is required to

18    enhance safety."

19        Q.    Thank you.  Now, if a -- in

20    your experience and understanding of

21    lookouts as you -- in the context of being

22    questioned by Mr. Chapman, is it the

23    captain's decision to decide whether

24    lookout is to require to enhanced safety?

25             MR. CHAPMAN:  Object to the

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1         form.
 2         A.    Yes, it is his decision.
 3         Q.    Okay.  And I'm not going to ask
 4    you any opinion questions.  I'm just going
 5    to want you to verify.  This is in Section
 6    7.16 under the "lookout" section of
 7    Carver's SMS book, right?
 8         A.    Yes, that is correct.
 9         Q.    Okay, what you just read?
10         A.    Yes.
11         Q.    Okay.  Sorry I lost my list.  I
12    remember, okay.  I don't need the list.
13              Carver 169, can you find that?
14    I'm not sure where that is.  I think it was
15    near the end of those --
16         A.    Yeah, I got it.
17         Q.     -- those charts.
18         A.    Yep.
19         Q.    I'm glad you got it.  Okay.  Is
20    that in Exhibit 4?
21         A.    Yes.
22         Q.    Okay, thank you.
23              All right.  Do you remember
24    talking about this flow chart in Section
25    915 of the SMS with Mr. Chapman?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          A.     Yes, I remember.

 2          Q.     Okay.  So I just want to go

 3     over a few things, or maybe just one thing.

 4     If you go to one, it says, "An unintended

 5     grounding or an unintended strike of

 6     "allision with" a bridge," correct?

 7          A.     Yes.

 8          Q.     Now, on June 15th, 2024 when

 9     you received a call from Captain Miller,

10     did he tell you he had hit the bridge?

11          A.     No.

12          Q.     At any time during that day,

13     June 15th, did you find out he had hit the

14     bridge?

15          A.     No.

16          Q.     And was it your understanding

17     that he had slid by the fendering system?

18          A.     Yes.

19          Q.     That's what he told you?

20          A.     Yes, that is what he told me.

21          Q.     Okay.  So just from reviewing

22     this and your knowledge of this flow chart,

23     is it your understanding that based on what

24     Captain Miller told you this reporting

25     requirement was not required on June 15th
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
1    with the knowledge you had?
2         A.    That is correct, with the
3    knowledge of the situation that I was told.
4         Q.    Okay.  I have no further
5    questions.  Thank you.
6              MR. CHAPMAN:  I have a couple
7          of follows up.  Thank you.  MR.
8          RODGERS:  How did I guess.
9    EXAMINATION BY
10   MR. CHAPMAN:
11        Q.    So you got Exhibit 4 there?
12        A.    Yes.
13        Q.    I got a follow up on Page 155,
14   which is the lookout rule?
15        A.    One second.
16        Q.    7.16, lookout.  You got that
17   there?
18        A.    Yes, sir.
19        Q.    You read that very last section
20   called "One man bridge operations," right?
21        A.    I did, yes.
22        Q.    And it looks like it's quoted
23   language from some other source, right?
24        A.    Yes.
25        Q.    And did Carver intentionally
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    include this in it's safety management

 2    system or was it something that was

 3    included by the folks that sell the safety

 4    management system this TBS outlet, if you

 5    know?

 6              MR. RODGERS:  Objection to

 7         form.

 8         Q.    If you know.

 9         A.    I do not know.

10         Q.    Okay.  In any of that language

11    that you read regarding one man bridge

12    operations, did it talk about transiting

13    bridges?

14         A.    No.

15         Q.    Okay.  Did it talk about narrow

16    channels?

17         A.    No, it did not.

18         Q.    Now, if you could turn to Page

19    169, Section 9.5 of this accident and

20    incident reporting?

21         A.    Got it.

22         Q.    Section --

23              MR. RODGERS:  Somebody there.

24              MR. CHAPMAN:  Is somebody

25         asking a question or they just didn't
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          put themselves on mute?
 2               MR. RODGERS:  Cannon Moss.
 3          It's your client.
 4               THE REPORTER:  Mr. Cannon?
 5               MR. RODGERS:  I think it's
 6          Mr. Moss.  Is it Moss?
 7               THE REPORTER:  Yes.
 8               MR. CHAPMAN:  Mr. Moss, were
 9          you asking a question or did you just
10          forget to mute yourself?  Looks like
11          he's on mute now.  Okay.
12          Q.   So we're on Page 169 in Exhibit
13     4?
14          A.   Yes, sir.
15          Q.   And Mr. Rodgers asked you a
16     question related to whether this was
17     something that needed to be reported,
18     right?  And based on what you learned
19     during your conversations with Captain
20     Miller, on June 15th, right?
21          A.   Yes, he did.
22          Q.   And I think the word was or the
23     term that was used was slide by, which you
24     understood to mean they had made no contact
25     with the bridge or fender system, correct?
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              MR. RODGERS:  Objection to
 2         form.  You can answer if you
 3         understand his question.
 4         A.    Yes, correct.
 5         Q.    That's what you believe?
 6         A.    To what I -- to what they told
 7    me, yes.
 8         Q.    Got it.  So have you ever had
 9    another tug crew contact you to inform you
10    that they had slid by a fender system while
11    you were Port Captain at Carver?
12         A.    No.
13         Q.    So if all they did was slide by
14    the fender system, was there any reason for
15    them to call you about it that afternoon?
16              MR. RODGERS:  Objection to
17         form.  You can answer if you --
18         A.    You would have to ask --
19              MR. RODGERS:  Don't guess.
20         A.    You would've to ask Captain
21    Miller his reasoning.  I'm not sure, I just
22    answered the phone when they called.
23         Q.    If all they did was slide by as
24    reported to you, would there be any reason
25    for you to ask them to take some photos and
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1    send them to you?
 2               MR. RODGERS:  Objection to
 3         form.  You can answer if you have an
 4         answer.
 5         A.    Yes.  Just so I can make sure
 6    that there was no damage and that they
 7    weren't lying to me about anything.
 8         Q.    So they called you to tell you
 9    that they had slid by and hadn't made any
10    contact with the bridge out of the blue on
11    a Saturday afternoon?
12               MR. RODGERS:  Objection to
13         form.
14         Q.    Okay.  On a Saturday afternoon.
15    And you wanted to check whether they were
16    lying to you, so you had them take some
17    photos and send them to you.  Is that your
18    testimony?
19               MR. RODGERS:  Objection to
20         form.  You can answer if you want to
21         extrapolate on that.
22         A.    I'd rather not answer.
23         Q.    Are you going to refuse to
24    answer?
25         A.    Yes.
```

**LEONARD BALDASSARE**

```
1        Q.    No further questions.

2              MR. RODGERS:  I think I'm done.

3              MR. CHAPMAN:  Yeah, thank you.

4              MR. RODGERS:  Thank you, Mr.

5        Baldassare.

6              THE WITNESS:  Thank you.

7              MR. RODGERS:  Thanks for coming

8        in.

9              THE WITNESS:  No problem.

10             MR. RODGERS:  Are we done with

11       the witness?

12             MR. CHAPMAN:  Yeah.  I'm sorry

13       it was a little tense.

14             THE VIDEOGRAPHER:  One second.

15       This is the end of the video

16       deposition of Leonard Baldassare.

17       The time is 3:24 p.m.

18             MR. NANAVATI:  Ms. Court

19       reporter, I would like a copy of that

20       proceeding.

21             (Time noted:  3:26 p.m.)

22

23

24

25
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1              A C K N O W L E D G M E N T

 2

 3

 4     STATE OF NEW YORK)

 5                            :ss

 6     COUNTY OF          )

 7          I, LEONARD BALDASSARE, hereby certify

 8     that I have read the transcript of my

 9     testimony taken under oath on 04/29/2025;

10     that the transcript is a true, complete and

11     correct record of what was asked, answered

12     and said during this proceeding, and that

13     the answers on the record as given by me

14     are true and correct.

15

16          _____

                LEONARD BALDASSARE
17

18

19     Signed and subscribed to
       before me this _____ day
20     of _____, 2025

21

22     _____
            Notary Public
23

24

25
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1          C E R T I F I C A T E

 2

 3    STATE OF NEW YORK)

 4                              :ss

 5    COUNTY OF SUFFOLK  )

 6

 7          I, LARIN KAYWOOD, a Notary Public

 8    within and for the State of New York, do

 9    hereby certify:

10          That the witness whose examination is

11    hereinbefore set forth was duly sworn and

12    that such an examination is a true record

13    of the testimony given by such a witness.

14          I further certify that I am not

15    related to any of these parties to this

16    action by blood or marriage, and that I am

17    not in any way interested in the outcome of

18    this matter.

19          IN WITNESS WHEREOF, I have hereunto

20    set my hand this 29th day of April, 2025.

21

22

23

24    _____

25          Larin Kaywood
```

**LEONARD BALDASSARE**

**April 29, 2025**

```
 1   Errata Sheet

 2

 3   NAME OF CASE: IN THE MATTER OF COEYMANS MARINE TOWING, LLC

 4   DATE OF DEPOSITION: 04/29/2025

 5   NAME OF WITNESS: LEONARD BALDASSARE

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                          _____
```

LEONARD BALDASSARE

April 29, 2025

---

**Exhibits**

**Exhibit 1**
3:10 82:7,12
87:1

**Exhibit 2**
3:11 84:9,10

**Exhibit 3**
3:12 137:14,
15 139:8,9

**Exhibit 4**
3:13 158:13,
16 191:14
199:11
214:11,13,20
216:20
218:11
220:12,13

**Exhibit 6**
3:15 87:10,
11,15 118:21,
23,24 119:12
123:7 124:4
125:8

**Exhibit 9**
3:16 96:1,4

**Exhibit 15**
3:20 92:24

**Exhibit 17**
3:21 93:1,15

**Exhibit 19**
3:23 99:16
103:9 110:6
111:5

**Exhibit 21**
3:24 118:4,20

**Exhibit 23**
3:25 126:22
127:13

**Exhibit 24**
4:2 133:13
135:8

**Exhibit 25**
4:3 134:12

**Exhibit 26**
4:4 145:12

**Exhibit 28**
4:6 144:18
145:12

**Exhibit 30**
4:7 145:13

**Exhibit 32**
4:9 147:7

**Exhibit 34**
4:10 149:8

---

**0**

**0000112**
103:10

**0000114**
106:24

**0000148**
158:23

**000019**
124:12

**000049**
96:2

**000056**
118:22

**000155**
178:13

**00016**
111:9

**000886**
163:12

**00851**
147:12

**00885**
147:12

**08:48**
100:18

---

**1**

**1**
5:3 27:21
82:7,12 87:1
91:21 101:21
162:16
176:13
187:12,22
194:25

**1.2**
153:7

**10**
15:24 71:21
101:22,23,24
115:22

**100**
79:16 154:25
161:10

**10:00**
67:8

**10:22**
5:9

**11**
91:25 92:15
106:16

**11757**
6:4

**11:44**
91:2

**11problems**
136:15

**12**
16:21

**1200**
16:17

**12:02**
91:10

**12th**
87:14

**13**
91:25 92:20

**14**
10:6

**15**
91:25 92:24
93:3,6,7,10

**150**
166:21

**155**
178:19 214:7,
14,20 218:13

**15th**
20:8 48:2
59:23 60:15
62:3,24 63:5,
22 64:3,21
71:23,25 83:4
87:22 88:7
107:20
119:12,13,21
123:8 124:11,
16 127:14
131:15 132:9
149:20 182:1,
21 190:10
217:8,13,25
220:20

**1600**
10:10

**163**

**185:11**

**166**
191:9,12

**168**
193:16

**169**
194:11
216:13
219:19
220:12

**16:30**
88:15 118:25
119:23
127:16

**17**
91:25 93:1,15

**17th**
65:3 66:12,23
68:8,11 71:24
74:11 109:2
110:8,16,18

**19**
99:16 103:9
110:6 111:5

**194**
176:10,18,19

**19th**
108:18,22
109:6 110:12,
23

**1:06**
148:24

**1:59**
149:6

---

**2**

**2**
84:9,10 91:8

---

**LEONARD BALDASSARE**

April 29, 2025

151:2

**2.2**
145:9

**20**
13:22,24
102:18

**200**
170:13,14

**2015**
9:13

**2023**
134:6

**2024**
6:17 11:19
20:8 32:22
48:2 62:3
63:5,22 64:22
87:14 88:9
100:18
106:14
107:20
108:18,23
113:6 115:12
124:16
127:14
132:10
134:14
135:13,21
136:1,13,23
137:22
145:12,13,14,
24 146:6
149:20 182:1,
21 190:11
217:8

**2025**
5:8 14:24
33:18 34:21
59:24

**21**

118:4,20

**22nd**
137:22

**23**
126:22
127:13

**23:55**
124:16 125:1

**24**
87:22 133:13,
17 135:8

**248**
85:21

**24th**
31:12 32:19
112:21,22

**25**
103:13
133:14,20
134:12

**25A**
104:22

**25th**
113:3

**26**
16:18 100:18
144:7,25
145:12

**2692**
68:7,11 80:8,
15,19 99:18
100:20 101:2,
4,8 103:11
106:20
108:11,22
109:1,14,24
110:4 111:8
194:14 195:8

**2692A**
111:5

**2692B**
106:25
108:10 109:6
110:6,12,19,
22 111:2

**26th**
106:13
112:18

**27**
174:21

**28**
144:7,18
145:12

**281**
88:20 94:7
103:19
122:16
181:25
182:19 195:5

**282**
122:15

**29th**
5:8

**2:24-cv-00490**
5:7

**2:56**
202:11

_____

**3**

**3**
137:14,15
139:8,9 149:5

**30**
27:21 144:7,
25 145:13

**32**
107:18 147:7
149:9,10

**33**
149:9

**34**
149:8

**36**
123:17

**3:03**
202:16

**3:24**
223:17

**3:26**
223:21

**3K**
111:17

_____

**4**

**4**
102:18
158:13,16
191:14
199:11
202:15
214:11,13,20
216:20
218:11
220:13

**4.05-1**
187:8

**4/26/1993**
6:22

**40**
13:20

**45**
148:16,18

**46**
187:3,8

_____

**5**

**5**
156:2

**5.1**
159:2 162:11,
19

**56**
88:1,2 123:8

_____

**6**

**6**
87:11,15
105:25
118:21,24
119:12 123:7
124:4 125:8
156:6,20
157:23
176:14 196:6,
7,8

**6.12**
166:21

_____

**7**

**7**
107:19

**7.12**
168:7,10,11
175:8 185:8
198:14

**7.16**
178:12 183:4
214:8 216:6
218:16

**LEONARD BALDASSARE**

April 29, 2025

**7.3**
123:19

**7.9**
149:16
150:19 176:9,
21

**70**
115:23

**75**
116:1

**8**

**80**
116:1

**88**
6:3

**9**

**9**
91:25 92:10
95:7 96:1,4

**9.2**
192:19

**9.4**
156:6 157:23
158:2

**9.5**
137:19
138:25 139:7
162:23 185:8
193:8,12
219:19

**910**
168:16,19

**915**
216:25

**9:00**
67:8

**A**

**a.m.**
5:9 91:3

**ability**
46:13

**aboard**
73:19 78:10
79:5 197:12

**access**
81:13 82:3
130:1 142:24
156:19
159:14,20,21
160:11
161:15,19
197:1,4,8

**accessed**
153:5

**accident**
88:7 187:1
191:18
194:16,20,21
219:19

**accommodate**
209:6

**accompanied**
110:5

**account**
215:12

**accounted**
94:15

**accounts**
134:22
135:15

**acronym**
10:19 28:23

**action**
57:17

**active**
174:16

**actively**
11:9 61:5

**activity**
103:15 106:5

**actual**
79:3 136:10
190:23

**add**
111:13

**added**
118:6 181:4
183:5,20

**addendum**
111:7,15

**addition**
98:13

**additional**
215:16

**address**
6:2,3 69:3,6
164:6

**addressed**
129:5

**addressing**
187:15

**administered**
107:24

**admit**
160:9

**adopt**
115:2

**advisor**
116:20

**affixed**
188:18

**afternoon**
48:18 62:3
132:9 221:15
222:11,14

**agent**
187:16

**agree**
71:17 110:17
195:8,14

**agreed**
60:20 62:14

**agreement**
15:4

**ahead**
21:10 60:13
63:15 90:17
103:20
167:16
205:12

**Alabama**
164:7

**Albany**
15:6,17

**alcohol**
107:6,14,24
195:17,20,24

**alert**
46:8

**alerted**
207:20

**allegation**
179:23

**allision**
18:14 20:9

22:10 25:1
33:24 35:1
39:14 47:19
62:4 63:5,22
64:21 65:1,19
66:16 69:12,
18 70:1,17
71:12,19 72:1
78:4 79:20,23
81:2 102:10
105:18 117:4,
5,20 127:2
128:22 139:9
153:1 181:7
183:13
185:19 186:7
187:24 188:5,
11,16,17,19
191:22
193:13 195:2,
25 202:23
204:2,10
207:5 217:6

**alongs**
37:8,11,15

**alongside**
88:21

**alphabetical**
150:9

**alternates**
194:4

**altogether**
14:25 16:20

**Amber**
156:10

**amend**
125:14

**amended**
152:7

**LEONARD BALDASSARE**

April 29, 2025

and/or
  209:13

Android
  54:21

annual
  26:14,16 37:7
  43:12 44:4,17

annually
  39:5 44:24

answers
  46:14 47:10

Apologies
  92:8 213:13

apologize
  92:2

apparently
  130:20
  176:24

appearances
  5:15

appears
  88:9 108:7
  109:5 118:21
  123:18
  147:13
  149:13
  194:12

application
  154:5

applied
  12:16,18

appraise
  183:12

apprise
  181:6 183:8

approach
  207:17 208:1,
  4

approaching
  90:1

appropriately
  199:15

approval
  130:8

approve
  130:7

approver
  130:14
  145:23

April
  5:8 135:25
  136:13
  145:14,24
  146:6

area
  175:3

areas
  85:7

arise
  183:12

arrangements
  209:11

arrival
  106:7

arrive
  56:9

arrived
  75:20 137:3
  177:23

asks
  180:20

assessed
  215:9

assessment
  38:12 156:5,

7,15 157:18,
25

assessments
  38:15

assigned
  39:8 54:24
  116:13 142:3
  168:2 170:7
  171:1

assigning
  167:25 170:4

assignment
  30:11 44:14
  156:20

assist
  128:15
  136:20 167:3,
  4 175:18

assist/tag
  175:15

assistance
  113:8

Associates
  5:14

assume
  27:8 52:6
  54:4 56:1
  60:1 84:19
  86:17 146:16
  155:16 160:9

assumes
  193:18

assuming
  27:6 196:8

attach
  154:4,16,18

attached
  95:4 153:9,10

attempted
  66:7

attention
  133:25
  134:18
  135:11

attorney
  98:5,7 105:15
  172:23

audit
  122:1

auditor
  163:21

audits
  165:9

August
  32:21

authority
  22:21 159:3

autopilot
  88:17 89:4,
  12,16,25 90:3
  103:23
  119:25
  128:20 129:3
  135:18 136:6,
  16 155:21,25
  199:2,5,8,15
  200:1,11,15
  201:15
  205:16 206:1,
  4,12

autopilots
  201:16

autopopulate
d
  152:17

aware
  128:18 137:4

145:16 184:6,
11,12,13
185:3 205:2,
14,23

Ayers
  133:12,18
  135:8,23

———

**B**

BA
  150:10

back
  6:16 19:24
  21:14 32:18,
  21 33:19
  34:10 35:11
  48:12 57:12
  59:18,24
  61:21 64:6
  76:16 88:19
  90:6 91:9
  99:10 121:22
  122:11,16
  125:4 148:16
  149:5 151:25
  170:18
  182:25 183:3
  194:6 202:15
  214:19

background
  6:24

backing
  88:20 127:18

Baldassare
  5:4,25 6:7
  20:13 81:17,
  23 99:17
  144:5 149:7
  158:12
  202:17

209:22 223:5,
16

**bar**
168:14
176:11

**barge**
30:3,4 39:16
48:9 50:5
57:25 62:11
63:10,14
75:10,11,14,
16,23,24
76:5,11,13
84:15,25
85:4,7,11,16,
19 86:3,9
88:20,21
94:7,12
103:19 104:4,
17 107:23
111:7,15
170:9,12,13
181:10 195:5
198:8 205:5
211:22 212:3

**barges**
13:20 37:23
198:1

**based**
82:1 131:5
162:7 208:17
217:23
220:18

**Basic**
10:13

**basically**
17:3 39:17
107:12 177:2

**Bass**
92:17

**Bates**
176:17
214:14

**begin**
88:19

**beginning**
5:3 87:14
91:7 147:12
149:4 168:22
202:14

**begins**
163:11

**behalf**
64:24

**Belt**
6:10,16 33:24
48:2 61:11
69:13 70:1,
12,17,19,20,
24 71:8 72:1
111:19 117:5
139:10
177:13,24
182:20
193:14

**big**
168:14 185:9

**billing**
114:11
133:10

**bird**
173:23

**birth**
6:21

**bit**
12:17 51:8
118:17 213:7,
22

**Block**

101:22,23,24
102:17
103:13
104:21
107:19
111:17 145:9

**blue**
176:11
222:10

**board**
36:16 76:1
113:1 200:12,
20

**boarded**
75:13,20

**boat**
16:16 25:22
37:21 40:13,
16 53:11,13
54:22 55:2,6
56:14,17
57:4,12 61:21
62:2,24 72:2,
3 73:11,18,24
74:8 75:21
114:11
115:22
125:17,22,23
126:4 127:4
132:8 135:18
136:12
141:15
153:15
182:19 197:7
200:21 204:1
209:23

**boats**
11:12,15
16:19 17:4
30:1 37:6
163:24

175:15,19
215:2

**book**
196:21
198:20 216:7

**boss**
18:6 71:2

**bottom**
87:23 88:6
99:23 124:12
158:22
166:15,24
176:12 193:6,
7 195:16

**bought**
163:6

**bow**
104:4 170:18

**box**
102:15
193:17

**branch**
94:6 103:21
174:24 177:4

**Brandon**
138:5

**break**
90:18 120:20
201:25

**Brian**
11:20,25
17:22 18:11,
20 24:1 37:6,
16 38:11
50:11 56:1
57:15 58:11
62:9 66:13
67:9 68:12
73:16 101:5

109:2,12,23
110:8 130:6
132:24 133:6
145:22
186:14 194:3

**Brian's**
18:6

**bridge**
6:16 18:14
30:4 33:24
39:14 48:2,5,
7,8 50:4,19
52:7 57:25
61:11 62:13,
15,18 63:18
65:20 68:3
69:13 72:1,9,
11 78:5
82:23,24
83:9,22 84:1
86:14 88:22,
23 89:14 90:1
94:12,13
101:10,15
102:11,25
104:6,13,15,
16 105:18
111:20 117:5
119:24
127:19 128:6,
23 130:23
139:10 153:1
155:4,17
168:7,11,25
169:13,18
171:10,13
173:13,22
174:4 177:11,
13,18,24
179:24
180:12
181:10 182:2,
21 183:13

187:25 188:6,
11,15 190:7,
13,23 191:3,
23 193:14
195:2,6,7
196:23 205:5,
18 207:8
210:24 211:1,
8,9,20
214:21,23
217:6,10,14
218:20
219:11
220:25
222:10

**bridges**
167:3,5 175:2
176:4 177:6,
18,21,25
178:4 196:13
197:25
198:13,23
204:19
219:13

**briefing**
175:10,20
176:3

**bring**
19:22 160:25
201:21

**Brothers**
161:17

**brought**
30:2

**brush**
130:21

**Bryant**
164:15,16

**Buchanan**
7:17,18,24

8:2,4 14:21
126:11
161:22

**bullet**
167:1,15
170:3 171:15
174:7 181:5
183:8

**bullets**
179:4

**bunch**
102:3 159:18

**Bunkering**
8:6

**buoys**
52:9

**business**
16:3 21:18
22:5

**business-related**
32:16

---

**C**

**call**
19:2,8 50:9
53:13,24
55:11,25
57:12 61:21
62:24 63:7,8
65:22 66:4,15
67:1,3,6,9,10,
13,18 71:7,8
75:21 95:10
116:7 122:25
129:2 132:17
133:1,2,3
148:4 169:10
174:6 177:1

185:9,12
190:20
198:12 217:9
221:15

**called**
43:5,13,16
48:3,10,12,16
50:13,18
65:17 66:2,8
67:15 74:10
101:12
117:14
185:19 187:7
195:17
218:20
221:22 222:8

**calling**
53:1,4,18
54:9,11
183:17

**calls**
54:17 184:2
195:10

**Cannon**
220:2,4

**capabilities**
36:23

**capability**
77:17

**capable**
206:13

**capacity**
41:22

**captain**
7:8,10 12:16
13:11,17 14:7
15:10 16:22
17:20 19:1,14
22:12,18,24
25:3,9,24

28:15 29:4,7,
10,15,20
31:25 32:24
33:18,22
36:10,21
37:25 41:9,
16,18 42:3,11
44:9 48:3,5,
10,25 50:8,
17,18,25 51:1
52:12,22,23,
25 53:2 54:9
55:12 60:18
61:24 62:7,
21,25 63:3,8
72:9,19 77:3
78:13 86:7
89:2 92:10,12
93:17 94:19
95:8,20 96:17
97:10 99:17
113:19
114:18
115:10
119:21,22
124:15 128:1,
11,21 132:8,
16,18 135:13
137:4,11
140:6,11
142:2,9
143:6,13,24
144:1 147:1
160:13
175:13
185:19 186:3,
9 189:12
190:15 191:4
196:11
197:23 200:3
202:21 203:2
204:4 209:24
210:1,7,14
217:9,24

220:19
221:11,20

**captain's**
28:6 215:23

**captains**
37:2,8 38:9
44:10

**care**
213:10

**carefully**
215:9

**cargo**
22:25 23:6

**Carolina**
140:8

**Caroline**
23:9

**carry**
21:21

**Carver**
5:6 6:14 7:2
11:18 12:10,
13,14,19
13:10 14:2,6,
13,18,23
15:1,11 16:23
17:18 18:20
20:14,16
21:21 22:13
23:23 24:1,5
25:3,6 29:21
30:8 33:18
37:12 54:18
56:21 57:7
59:10,17 63:4
64:25 65:6,7
69:4,11 79:23
81:12 87:24
96:1,3 97:19
103:9 105:15

106:24 111:9
113:20
114:17 115:9
117:24 118:5,
22 124:12
125:22 126:9
129:20
133:11
136:23
137:19
138:10,14
139:2 140:5,
11,18 143:13
147:11,12
149:12
158:23 159:6
160:1 162:5
163:6,12
165:24 166:5,
12 178:13
182:18
191:12
196:11
197:23
200:17
201:17
204:16,17
214:7,14,20
216:13
218:25
221:11

**Carver's**
11:15 193:22
216:7

**case**
5:6 123:17
144:8 203:17

**casualty**
89:5 102:2,18
103:17 106:4,
6,17 107:4
185:16 186:1

187:7,21

**categories**
82:1

**caused**
66:11

**cell**
58:17 66:25
67:2

**center**
7:3,4,12,16
11:12 12:1,3
13:14,16
14:3,21 51:7
126:15,16
161:13

**certificate**
29:1

**CFR**
187:3,8

**chain**
133:1

**change**
122:12 125:4
152:9 206:25

**changed**
122:3,5

**channel**
52:7 183:20,
22,23 184:8
185:4

**channels**
196:14
219:16

**Chapman**
6:6,9 8:18,21
20:2 29:10,
13,15 31:2
35:8,16 43:10
45:11 51:17,

21 60:12 64:5
69:7 81:24
83:24 90:13,
16,21 92:4,8
93:23 94:2,4
98:6 100:10
114:25 115:4
121:18
144:15
146:10,13
148:16,19,22
156:23 157:2,
7 158:5,8
168:21 171:8
172:24 173:2,
7 176:18,20
180:21
181:14,17,22,
24 182:5,8,
12,15 191:13
194:2 198:17
201:21,24
202:2,5,8
203:2 204:13
205:8 207:11
208:15,22
209:19
211:25 212:6,
15,19,22
214:10
215:22,25
216:25 218:6,
10 219:24
220:8 223:3,
12

**charge**
187:17

**Charleston**
137:6 140:8

**chart**
175:6 191:15
192:17 193:8,

17 194:12,25
216:24
217:22

**charts**
216:17

**check**
40:19 42:11
102:4 124:11
143:23
160:16
214:16
222:15

**check-ins**
153:22,23

**checked**
102:6,15

**Chesapeake**
39:15

**child**
15:21,23

**choke**
207:12

**Chris**
28:17 92:10
124:15

**Christopher**
151:10

**circumstance**
169:19 171:1,
18 185:18
188:3

**circumstance
s**
168:1 169:11
184:17 198:6

**City**
165:1

**clarification**

28:25 54:24
67:5 121:3

**clarify**
55:5 121:17,
20

**clear**
71:1 94:21
132:25
192:13

**clearance**
173:23

**clearer**
84:20

**click**
154:5,12

**client**
220:3

**clip**
52:5 154:12

**clips**
52:6

**close**
15:13 122:9
123:5

**closed**
122:23 123:9,
14

**closer**
168:21

**closest**
208:1,4

**cloud**
106:9

**co-captain**
127:17

**Coast**
46:24 47:1,8

61:1,8,15,18
63:21 64:2,
20,25 65:6,7,
8 66:7,8,12,
15 67:18
68:6,10,11,
15,18 69:25
70:16 71:7
74:10,15
76:15 79:9
80:20 99:19
100:21 101:3,
7,18 105:3,17
106:4,20
107:9 108:23
109:11 110:5
111:2 113:2
185:25 186:4,
10,14,18,22
187:19 188:8
194:13 195:9
196:3

**Coastal**
10:10

**Coeymans**
5:5

**coffee**
40:15 90:9
201:20

**COI**
16:17 26:17
28:2,22 29:1

**collecting**
25:17

**collection**
87:13 178:14
199:9

**college**
9:7,20

**Collin**

164:15,16

**collision**
64:9 181:7

**collision/
elision**
183:9

**color**
99:3 192:18

**comfortable**
129:12
169:18

**communicate**
170:20

**communicate
d**
19:23

**communicati
ng**
18:25

**communicati
on**
21:18 32:3
33:12

**communicati
ons**
23:25

**community**
9:20

**companies**
126:10
138:11 173:8,
9

**company**
6:11 16:8
19:11 21:14,
15,18,23
22:3,4 24:7
25:2,20 28:12
29:5,25 32:4

33:7 34:21
56:22 58:13,
14 59:9 67:2
76:24 97:3
162:7,8
163:18
165:20
196:20

**company's**
173:18
198:22 199:3

**compensatio
n**
14:15

**competence**
44:3

**compilation**
99:18

**complaints**
128:19

**completed**
80:25 88:12
99:24 106:2
111:14
119:13 122:8

**completely**
88:17

**completing**
105:24
111:13

**compliance**
116:24
163:25
165:10

**comport**
71:16

**computer**
154:12 197:7
199:19

**concern**
129:2

**concerns**
187:16

**conclusion**
66:18 67:17
182:14

**condition**
75:21

**conditions**
215:13

**conduct**
141:15

**conducted**
79:4 103:16
120:3 202:20

**confess**
166:17

**configured**
211:22

**confirm**
91:24

**confirmed**
20:22

**congratulatio
ns**
32:12

**CONNECT**
38:21 43:7

**connected**
124:3

**connection**
6:12 22:9
24:15 38:14
69:24 100:21
105:17
135:12
152:25

**consecutive**
166:18

**consideration
s**
180:7

**considered**
131:6,15
179:5

**consistent**
188:12

**consisting**
86:4 102:2
187:21

**consists**
147:11

**construction**
16:4,6,10
30:5

**consult**
178:7 191:21

**consulted**
177:17

**contact**
12:25 50:10
58:17 61:18
64:20 65:13
66:8,11 70:1,
16,19 71:3
104:5 132:9
185:20
188:18 189:4
220:24 221:9
222:10

**contacted**
64:11,19
65:6,7,8 66:7
70:12,18 79:9
86:9,15
186:4,18,21

189:9,19
190:6

contacting
54:1 69:25
70:20,24
186:10,14
189:2

contained
194:7 198:14

contemplated
171:14

contents
161:8

context
188:3 215:21

continued
56:21 103:25

Contracting
16:2 23:20
24:16

Contreras
5:10

Control
160:21

conversation
18:16 24:3
36:5 49:6,13
52:21 60:6,23
62:1,2,22
67:22 70:14,
24 71:4
189:12,24

conversations
48:24 62:23
89:1 220:19

coordinator
193:19

copies
84:14

copy
68:14 127:6
159:25 160:4,
7 197:12,14
223:19

corporate
205:11

correct
11:1 13:15
14:11,19 15:2
21:3,16 22:2
23:16 25:21
26:2 27:19
29:3 30:23
32:14,23 33:1
39:9 40:14
41:5 42:23
46:21 47:6
52:16 54:10
62:19 79:9
80:22 81:18
85:13 87:2,19
88:18 90:4
94:10 97:17
100:3,4 104:3
105:19
106:15
107:16 108:2
109:14
114:13,15
119:13,14
120:1 121:25
122:24
126:18
130:10 131:2
134:7 138:18
140:24
150:12 152:1,
3,5 153:6,21
156:12,13

170:10,16,18
175:6 177:4,
14,15 178:25
179:1,7,8
183:13
184:19,23
192:15,16
193:9 194:14,
15 195:25
196:1 199:10,
12 200:9,25
204:19
206:23
207:22 210:2,
5 211:24
212:3 216:8
217:6 218:2
220:25 221:4

correction
122:17

corrections
206:2,14

correctly
77:4 88:24
127:20
187:25

counsel
92:2 141:10
209:12

counseling
141:20,25
142:6 143:16

couple
27:17 37:22
52:6 133:10
147:19 177:8
209:18 218:6

court
5:11,16
223:18

cousin
24:20

covering
127:13

covers
125:19 165:4
177:1

CPA
207:20,24,25
208:8,13

crafts
215:2

create
152:12,13
153:13,16,18
154:3,15
169:4

credentials
81:16

crew
17:6,12 24:25
30:10 41:3
45:5 72:4,14,
16 73:20
74:2,9,13,22
76:18 77:20,
22 78:1,4,15,
21 79:25
86:8,14 89:3
99:9 107:5
113:2 114:24
115:16,20
129:4 140:23
151:3 155:2
170:4 175:14,
21 178:4
196:12,17,18
199:1 202:20
209:23 221:9

crewed

17:1 41:2

crews
41:3 116:7

CTA
207:23

current
52:19

cut
200:4

cycle
42:7

_____

D

d/b/a
5:5

daily
36:25 87:13,
22 88:10
113:24 114:2,
6 119:11
122:7 123:14,
19 124:8

Daisy
23:11

damage
6:16 48:8
50:21 60:19
61:4 62:10,
11,13,17
72:13 75:1,5,
6 83:9 85:4
94:12,13
101:16
102:22
104:16
107:22
111:18
190:23 222:6

damaged
195:5,7

danger
180:12

dangerous
179:22

dangers
179:11,12

Daphne
164:7

data
38:18 139:13
144:20

date
5:7 6:20 20:8
27:25 79:3
100:15
118:12
119:18
136:24 137:1
138:4 152:14,
21

dated
108:18

dates
145:11

day
26:2,3 40:1,3,
8,9,10,12
49:1 54:18
60:11,12
61:18,19
64:8,11,12
67:25 68:7
74:8,14 79:8,
16 89:3
122:10,21,23
123:5 124:9
125:2,13
133:7 137:25

165:3 180:17
190:9 211:23
217:12

day-to-day
16:25

days
39:18 71:21
78:8 106:3,16

deal
18:3 20:16
120:10

dealt
164:12

decide
215:23

deciding
179:6

decision
30:18 210:9
215:23 216:2

deck
37:4 72:23
103:19
125:17
141:18
143:20 151:6

deckhand
92:17 93:11
166:21 167:4
196:20
203:11,21

deckhands
78:24 96:23
167:2,21

define
205:6

degree
9:22

delete
56:22 57:9
59:10 152:11

deleted
59:14 150:15
151:11,13,23

deleting
69:11

deliver
106:2

delivered
30:4 39:19
56:12 75:17
76:5 98:22
141:21

delivering
37:23

demand
20:15

density
179:10
215:14

department
28:10 82:2
134:22

depending
129:12

depict
85:10

deposition
5:4 6:12
19:20 46:18,
20 223:16

depositions
82:8 120:11

describe
37:18 102:21
154:10

describes
103:17 151:2

description
111:18

designated
193:18,22

designation
194:9

desk
133:24
135:11

destination
63:11

determine
207:3 210:24

developed
165:20

device
54:21

difference
119:9 157:3

differently
118:16

difficult
209:8

digital
100:11,12,16
108:17

digitally
106:13 108:7

direct
180:19 184:4

directing
176:6 183:15

direction
52:14

directly
18:6 130:5
143:2 145:22
195:21

director
114:20 116:4,
9

discipline
8:25 140:16

disciplined
140:12

discovery
82:10 87:11

discretion
167:13 168:4

discuss
57:16 60:22
61:5

discussed
60:7 61:12
62:10 101:5
105:13

discussion
31:9 60:25
67:16

disengaging
205:16

dispatcher
117:12

dispatchers
115:14

Displacement
111:19

distinction
19:5

District
214:1

dive
45:24

division
13:25 16:5,12

dock
75:20,25

docking
26:15

document
10:3 77:17
123:13 146:1,
7,11 148:5
149:12 158:3
159:17,18
161:4 163:2
176:15
177:16

documentation
163:23

documented
142:15,20

documents
46:4 95:4
144:7

download
159:23 197:9

downs
152:15,18

dozen
179:4

draft
102:13 103:2
104:6 108:4
112:7

drafted
111:23

drifting

51:9

drill
147:24,25

drills
147:21

Drinking
40:15

drop
150:7 152:15,
18,20 153:25

dropping
150:11

drug
106:25
107:13,23
195:17,20,24

drugs
107:6

dry
26:14

due
169:13

duly
5:19

duration
55:12

duties
16:23 142:2
167:22 198:6

duty
203:11

**E**

E-C-D-I-S
11:7

e-mail

19:3,6 67:12
68:22 69:3,19
77:10 106:2

e-mailed
20:20 68:18,
20 98:21

e-mails
69:11,16

earlier
101:5 145:21
151:24 197:6

east
87:4

Eastern
213:25

ECDIS
10:13,16,17
11:4

edit
121:23
122:12 123:6

effected
128:12

effort
76:10

Electric
133:18 135:8

electronic
100:8 159:10,
18 160:5
162:1 197:15

electronically
159:22 197:9

Electronics
133:13

elide
47:22

elided
155:4 181:10
182:1,19

eliding
48:1 155:17

Elizabeth
23:11 174:24
177:4

emergency
193:19

employed
25:6,7 34:20
36:14,24 57:7
59:16 69:4
134:2,9
138:14 139:2
140:10
143:13 166:5,
12 182:18
196:10
200:16
204:16

employee
29:24

employees
164:13

employer
6:14 165:12

employers
162:5

employment
140:17

end
12:13 27:24
54:5 85:10
122:22
125:13 163:9
168:9,20,22
170:9 178:14

elided
198:8 205:4
216:15
223:15

endeavor
206:21

ended
9:21

endorsement
10:11,25

engine
75:3

engineer
25:4 28:11,16
29:6 34:16
39:7,8 43:22
72:21 75:2
79:1 92:21
96:23 129:8,
10,11 151:5,
16,18

engineering
28:9 82:3
128:15,17
136:19

engineers
37:4,5

enhance
215:18

enhanced
215:24

enjoying
32:5

ensure
174:3

enter
38:17

entered
119:22 120:6

entering
183:20,22
184:8 185:4,5

entire
12:6 159:23

entity
164:2

Environmental
116:22

equipment
11:3 17:2

equipped
86:3

Erin
23:10

essentially
154:2 167:20

established
215:11

evaluate
44:2

evaluated
38:9 45:1

evaluating
36:22 37:3,5
39:7

evaluation
38:23 43:20,
22 45:5

event
118:7 137:20

evidence
107:21

evolution
28:1

exact

27:25 117:22
137:1 190:8

exam
10:5

EXAMINATIO
N
6:5 209:20
218:9

examined
5:20

exclusively
147:14

excuse
14:21 29:6
34:19 99:22
104:2 157:11
165:21

exercise
8:24

exhibit
82:7,12 84:9,
10 85:22
87:1,10,15
92:19,24
93:1,15 94:1
96:1,4 99:16
101:22 103:9
104:22
109:25 110:6
111:5 118:4,
20,21,23
119:12 123:7,
8,16 124:4
125:8 126:22
127:13
133:13
134:12 135:8
137:14,15
139:8,9
144:18
145:12,13

147:7 149:8
158:13,16
162:17,18
163:10
166:20
191:14
199:11
214:11,13,20
216:20
218:11
220:12

exhibits
91:15,22,25
94:23 95:5
96:21 98:17
144:7,25

existence
192:6

expect
42:25 53:23
81:5 89:15
90:2 170:25

expectation
173:18

expectations
173:10

expected
171:19
199:14 215:7

expedited
209:13,15

experience
6:25 126:7
200:2 210:18
215:20

experiencing
136:16

expert
51:16 55:15

89:22 131:19
171:4,22
173:5 179:20
180:14,16
183:17 184:2
204:22
205:20 206:4

expire
174:20

explain
51:4,18

explained
44:16

explaining
73:14

explanation
98:10

extent
102:21
129:13 171:4

external
152:19

extra
41:21 133:15
200:6

extrapolate
222:21

eye
203:23

eyes
203:23

**F**

fact
51:15 104:21
121:23 182:6

factors

179:5

fair
13:24

fairly
56:11

familiar
10:14 156:14
157:17
163:17 175:1

fashion
85:13 169:22

fax
106:3

February
10:6

feel
23:22 137:24
138:1 172:6

feels
129:11

feet
170:14

felt
22:15 61:2
132:17

fender
86:9 128:8
130:22
132:20
185:21 189:5,
9 190:7
220:25
221:10,14

fendering
48:6 50:20
68:4 72:11,12
82:24 88:21
101:14,15
104:14 189:7

217:17

**fenders**
52:7 188:15
189:1,17

**fewer**
14:1

**figure**
113:23
115:22 190:4

**figured**
34:3,11
207:10

**file**
111:1 142:16
154:22
192:19

**filed**
6:14 109:6
152:7,14

**filing**
80:7

**fill**
41:22 68:6
81:3 110:12
124:9 129:17
148:7 157:1,
12,16 193:8

**filled**
38:14 40:19,
23 44:18 45:4
80:15,25 81:6
99:19 101:4
102:14 109:1
110:7 111:11
112:14
124:15 126:8
129:22
137:22
138:21,25
139:20

144:20,21
149:25 150:3,
8,16,24
152:10
156:18 195:8

**filling**
141:13 150:6,
12 194:13

**fills**
124:24
157:10

**final**
122:8,9
209:16

**find**
23:20 110:2,
22 208:2
216:13
217:13

**fine**
35:17 51:24
121:10
126:25

**finish**
8:17 9:1 20:3,
4,5 35:13
171:9 211:18

**fire**
22:13,19

**fired**
22:16,20,22

**fishing**
215:2

**five-day**
106:21

**five-minute**
201:25

**fixed**
47:22 54:1

136:11
205:17 207:8,
18

**fleet**
16:25

**flow**
191:15
192:17 193:8,
17 194:12,25
216:24
217:22

**focus**
91:21 187:11

**focused**
60:14 198:5

**fog**
168:4

**folder**
69:17

**folders**
69:16

**folks**
116:3 219:3

**follow**
103:24 104:4
187:12 192:9
209:1 218:13

**font**
169:10

**foot**
16:18

**forensic**
187:24

**forget**
220:10

**form**
10:23 21:25
34:1 38:13,18

40:19,23
43:9,12 44:18
54:15 70:8,22
71:15 74:4
80:11 81:6
89:18 102:13
105:24 106:3,
12,19,25
108:11,22
109:14,16
110:4,6
111:5,12,14,
15 112:5
113:5 123:19,
24 124:6,8
129:17,21,25
130:25
131:10
132:14
138:20
139:12
142:22 143:4
145:1 153:9
154:13,23
155:12
156:18
158:20 167:9
176:10
179:16,20
180:1 190:2,
18 192:2,11,
25 193:2
194:14
195:23
199:20
201:12
205:20
206:16 212:1,
7,16 216:1
219:7 221:2,
17 222:3,13,
20

**form's**

43:5

**formally**
45:1,2

**format**
97:1

**forms**
43:24 45:4
142:23
153:11
174:13

**forward**
75:4 85:10
215:17

**forwarded**
56:17

**foundation**
103:1 156:22

**fourth**
167:1

**frequently**
39:3

**front**
31:6 83:15
170:9

**full**
10:21 40:8,9,
10 200:4
215:12

**future**
83:19

---

**G**

**gallery**
78:22

**galley**
78:15,25 79:1
203:14

**LEONARD BALDASSARE**

April 29, 2025

**GAR**
156:6,9
157:18,24

**gave**
59:23 63:14
67:20 77:2,3

**gear**
103:20

**general**
18:22 32:8,9
69:22 177:7

**generally**
107:3 114:24
129:21
210:13
212:13

**generic**
165:25

**get all**
35:10

**give**
8:19 15:16
16:14 35:19
77:5 91:14
117:22
131:24 149:8
171:25 172:3,
7 211:17

**glad**
216:19

**GMT**
133:12,20
134:3,12
135:20

**good**
6:7,8 8:25
23:23 54:24
83:17 93:8
113:16

148:12 176:2
202:4

**governs**
184:7

**GPS**
136:12

**grade**
30:16

**graduate**
9:12

**graduated**
10:4

**grainy**
82:11,17
84:19

**great**
115:1 149:11

**green**
156:10
192:18

**grounding**
102:9 187:23
195:1 217:5

**group**
58:4 187:19

**groups**
49:22

**Guard**
46:24 47:1,8
61:1,8,15,18
63:21 64:2,
21,25 65:6,7,
8 66:7,9,12,
15 67:18
68:6,10,11,
15,18 69:25
70:16 71:7
74:10,15
76:15 79:9

80:20 99:19
100:21 101:3,
7,19 105:3,17
106:4,20
108:23
109:11 110:5
111:2 113:2
185:25 186:4,
11,14,18,22
187:19 188:9
194:13 195:9
196:3

**Guard's**
107:9

**guess**
27:10 58:22
77:14,21
86:20 149:22
193:5 218:8
221:19

**guidance**
180:5 197:24
198:11

**guy**
18:20 165:5,6
202:7

**guys**
45:24 115:22
120:22
165:17,19
208:19 213:2

_____

**H**

_____

**H&I**
16:2 23:20
24:15

**half**
7:6,25 11:9
179:4

**halfway**
176:14

**hand**
77:8 83:11
88:19 103:24
108:13,14
143:20

**hand-steering**
90:5

**handed**
98:24

**handheld**
170:21

**handle**
28:8

**handled**
76:14 113:11
128:16

**handles**
28:12

**hands**
37:4 72:23
141:18 151:6

**handwriting**
93:19 127:23

**handwritten**
76:25 77:1,6
98:13,16 99:7

**hanging**
86:4

**happened**
29:24 31:12
35:6 41:23
42:18 60:18
65:25 72:4
73:14 101:10
104:21 138:1
189:14,24
190:4

**happy**
121:8

**harbor**
39:25 66:8
99:11 137:6
149:17
196:19

**hard**
127:17
159:25 160:4,
7 197:14

**harder**
142:12

**hazardous**
169:5

**hazards**
215:15

**head**
76:24 170:5,8
198:8 205:4

**heading**
187:7 195:17

**headquartere
d**
164:4

**headquarters**
164:10

**health**
116:22
117:15,16
160:23,24
161:1

**hear**
92:4,7 140:5
146:4,8

**heard**
27:2 158:10

**hearing**

29:19 46:23

**held**
31:10

**Helen**
23:10

**helm**
38:20 43:7,16
45:4 81:1,7,
10,13,21
87:19 113:21
118:7,10
119:16 120:6
123:25 126:5
129:18,22
131:7 138:19,
20 142:22
144:19
149:14 153:3
154:16,19,20
159:11,12,15,
17,22 163:22
197:7

**helmsmen**
215:6

**Hey**
71:2,7 120:16
142:8

**highlighted**
169:21 175:9

**hired**
12:23 13:1,9
17:11 23:4
36:18 116:25
117:6,8,11
196:18

**hires**
114:19

**hiring**
17:6 36:9

**hit**
47:22 137:6
140:7 195:6,7
217:10,13

**HNL**
165:12

**hold**
10:9 22:25
75:4 143:19
174:16
181:15
206:20
214:15

**home**
15:12 25:14
48:23

**honestly**
47:7 58:15

**horse**
16:17

**hour**
56:11 57:22
58:1 191:4

**hourly**
14:16 26:1

**hours**
39:25 40:1
107:18
119:23
122:11
124:16 125:1

**house**
78:14 170:17

**HR**
13:2,7 17:8,9
142:23,24
143:2,14

**HSQE**
116:20,21

**I**

**idea**
16:14 28:20
34:13 147:16

**identical**
118:20

**identification**
82:13 84:11
87:16 96:5
137:16
158:17

**identified**
177:7,12

**image**
82:16 83:17

**immediately**
187:14 188:8

**impair**
46:12

**impairment**
215:3

**impediment**
215:4

**important**
169:21

**Inactive**
151:19

**inalterable**
123:1

**inbox**
69:22

**incident**
18:17 29:23
31:11 33:23
39:14 41:23
53:25 61:1

69:18 81:1,6
88:16 107:4,
20 113:25
114:12
118:11,14,23
119:17,23
120:7 130:17
131:13
137:20
138:21,25
139:7 187:1
191:19 193:9,
12,13,20
195:20
210:25
211:23
219:20

**incidents**
81:10 107:25
144:14,17
145:2

**inclination**
54:8

**include**
59:4 104:7
115:14,19
155:17 161:1
210:4 219:1

**included**
219:3

**index**
160:18

**indiscernible**
116:19

**individual**
141:6

**individuals**
195:21

**industry**
205:3,15

**inform**
31:25 147:3
221:9

**information**
22:8 86:13
102:19 104:9
112:12

**informed**
73:12 130:16

**Ingrid**
5:10

**initial**
70:14 78:5

**initially**
79:8

**initiated**
143:14

**inland**
13:25

**input**
139:13

**inside**
48:6 72:11
82:24 101:14
188:15

**inspect**
74:25 75:9,11
76:11

**inspected**
23:14 115:7
129:6

**inspection**
29:2 76:13
187:19

**inspections**
141:13

**installed**
200:19,23

201:16

instance
18:12 41:19
78:9

instances
128:15

instruct
172:12

instructed
63:21 64:18,
20 68:6 70:10
126:3 135:16
136:19

instructing
173:3 180:22

instruction
174:9

instructions
105:23
196:22
210:11

intend
51:13

intended
52:14 180:5

intent
215:15

intentionally
218:25

Intercostal
177:2

internal
165:18

internally
79:23

interpretation
108:2 184:3

interrupt
9:3 60:9

intersection
183:21,23
184:9 185:5

intervene
35:9

interview
78:6,11 128:5

interviewed
73:19 74:21
78:13,16
86:10 99:9
113:2 130:21

interviews
17:9 78:11
79:5,11 89:2
113:9 202:20

investigate
71:25

investigated
71:11

investigating
71:18 191:22

investigation
80:3,16 94:25
95:14 96:8
97:8 100:22
104:19 120:3
127:2 152:25
178:9 186:3
202:18
203:19
204:12 207:3
208:3 210:23

investigation
s
66:1,3

invite

12:12

invoice
134:19

invoices
133:10

involve
45:4 194:22

involved
15:19 36:9
38:11 52:13
71:18 89:5
102:2 130:11
134:24
141:20
187:20
195:22

involves
53:25 194:20

involving
33:23 81:10
119:23
128:19
144:11
193:13

iphone
54:21,25
55:3,4,6,16,
20

Island
15:8,15 66:24
76:3 164:25

issue
112:16
113:25
114:10
129:13

issued
19:10

issues

38:10 128:25

item
194:24

items
145:1

_____

J

Jacob
34:17

Jacques
92:17

James
29:16,20
88:16 103:22
147:14
151:17
172:14

January
11:19 14:24
26:20 27:21,
25 33:18
34:21 59:24
136:24,25
137:3,22

Jason
34:18,19,20
92:21 116:19
151:18

Jersey
30:5 76:8

Jesus
158:9

Jim
6:9 20:1 31:1
45:15 60:9
93:20 105:10
120:8 173:1
201:20

job
12:16 24:8
39:19,24
75:17 76:4

jobs
12:18 37:22

journal
125:19

judge
120:17
208:17

June
6:17 20:7
31:12 32:19
48:2,20 59:23
60:15 62:3,24
63:5,22 64:3,
21 65:3
66:12,23
68:11 71:23,
24,25 74:11
83:4 87:14,22
88:7 100:18
106:13
107:20
108:18,22
110:12,18,23
112:20,22
113:3 115:11
119:12,13,21
123:8 124:11,
15 127:14
132:9 149:20
182:1,21
190:10 217:8,
13,25 220:20

_____

K

Kaywood
5:13

**keeping**
203:23 215:4

**keywords**
160:23

**kidding**
148:15

**killing**
160:10

**kind**
8:24 27:22
30:15 35:11
37:8 38:1
39:10 41:2,11
72:18 96:2
97:11 113:22
123:19
132:25
154:23
156:19 161:3
163:24
165:25 169:9
192:18 193:7
200:7 201:5
204:8 205:10

**knew**
29:23 188:13,
14

**knowing**
135:3

**knowledge**
17:15,19
23:24 25:16
30:9 60:20
63:20 64:20,
23 66:6,10
73:14 89:23
96:12,13
98:11 114:22
136:5 138:13
139:3 140:13,
14 143:6,8,10

148:9,10
160:3 166:2,
13 167:23
174:15 182:3,
4,11 185:6
186:2,6
193:11
196:15 197:3
198:2,9,16,
18,19 201:3,4
204:25 206:9,
10,17 210:16,
17 217:22
218:1,3

**Kuster**
138:5

---

**L**

**labeled**
133:13

**lack**
168:5

**laid**
107:9 175:2

**landed**
48:6 50:20
72:10 101:14
104:14
188:14

**language**
118:19
173:11
218:23
219:10

**laptop**
197:16

**Laraway**
18:4,17 79:20

**larger**

169:10

**Larin**
5:12,13

**late**
32:21

**law**
185:2

**lawsuit**
6:13

**lawyer**
120:15

**lazy**
142:1

**lbaldassare@
carvercompa
nies.com**
69:8

**lead**
97:23

**learn**
33:21 104:20
140:5 182:18
190:5 199:25
202:21

**learned**
33:3 47:25
53:6 104:24
105:2 112:24
158:13 195:4
200:7 203:19
220:18

**leave**
14:23 15:3
25:5 27:20
29:5,21
31:14,22,25
32:6 35:5
48:12 63:10
71:21 78:8

79:19 96:11
100:24 101:1
104:20
112:17 113:7
122:10
150:13
186:17,23

**Leaving**
108:1

**left**
12:10 21:15
23:5,22 24:1,
6 25:8,10,12
26:12,19
27:12,18
33:17 34:21,
23 56:24
59:10,17
69:10 97:19
113:7 117:25
138:17
200:19

**legal**
182:14

**Lenny**
157:14

**Leonard**
5:4,24 81:17
223:16

**letter**
76:24

**letterhead**
96:3 97:4,12

**liability**
6:15

**liaison**
17:3

**liar**
190:20

**license**
10:5 146:12
174:17

**licensed**
10:7

**lied**
190:15

**Lieutenant**
65:16 67:25
74:19

**life**
193:20

**Lifeboatman**
10:13

**light**
75:21 192:18

**likewise**
71:6 125:11

**limit**
6:15

**limitation**
6:13

**limits**
107:10

**Lindenhurst**
6:4

**Line's**
11:12

**Lines**
6:16

**lining**
51:6

**list**
216:11,12

**listen**
142:1,8

listening
172:22 173:1

literally
36:8 189:13

live
15:8

lived
15:13

lives
153:3

load
212:10

local
40:2

located
63:14 197:16

location
30:5 106:6

log
55:11 87:22
88:10 106:9
119:11 122:7
125:17 126:8,
19 127:3,7,10
150:7 197:19

logbook
125:8

login
81:16

logistics
7:3

logo
144:19
163:13

logs
36:25 87:13
114:6 121:21
141:13

long
7:4,23 8:7
12:3 15:8,25
23:19 26:8,
22,25 27:12
63:17 67:21
117:4

longer
25:2,3

looked
153:4

lookout
167:16,17
168:2 171:1,
2,12 174:14
179:7,18
180:8 183:4,
5,11,19
184:7,16
185:3 198:5,7
202:22 204:9,
18 205:4
210:9,12,13
214:8 215:6,
24 216:6
218:14,16

lookouts
168:1 174:8
178:12,24
210:5 215:21

loose
200:4

losing
158:9

loss
107:21,22

lost
216:11

lot
31:7 41:20

150:9 160:10
214:3

louder
183:2

Louisiana
164:5

lower
211:8

lunch
148:12

lying
222:7,16

_____

**M**

machine
11:4

Mackenzie
25:1,10,11
26:9 30:3
41:1,7,25
48:1 53:17
54:3 75:19
77:16 79:25
87:13 94:8
103:18 113:3
123:22
126:20
128:21 135:4
137:5,21
138:24 140:7
143:21
144:11
149:18
171:23 173:6
181:18,24
197:5,13
201:17
207:16

made

30:19 65:12,
22 75:14
104:1,4
166:11 178:5
185:20
207:11
220:24 222:9

Mae
23:11

main
15:19 211:9

major
9:10 142:18

make
17:1,2 20:16
30:17 37:9
38:1 46:8
67:3,5,10
75:4 76:10
122:12,16
129:9 157:2
163:24 165:9
169:12
173:20,24
174:2 206:1
209:8,11
222:5

makes
210:8

making
67:13 89:14
128:11 167:3,
5 206:14

man
214:21,23
218:20
219:11

manage
163:22,23

management
17:4 30:15,
20,22 158:15
159:6 160:12
161:13 162:4,
9 163:5
165:23 166:1,
4,11 169:1
173:8 176:9,
25 178:8,24
183:3 186:25
192:24
193:23 194:8
196:9 198:15
199:6 219:1,4

manager
16:6 17:16
18:23 114:20
116:3,14

mandate
193:7

mandates
185:3

mandatory
106:25
175:17,18,22,
25

maneuvering
88:21

manual
196:21
200:15,19
201:5,15

manually
206:25

manuals
200:10,12

March
134:13
135:20

145:13,24
146:6

**marine**
5:5,6 7:17
9:11 10:3
16:4,7,10
18:20 96:3
102:2 106:4
107:4 114:17
115:9 129:20
133:12,18
135:8 146:9
159:7 160:2
176:2 185:15
186:1 187:7,
18,21 195:19

**Mariners**
146:1,7,10

**Maritime**
9:7,8

**marked**
82:7,13 84:9,
11 87:16 96:5
137:16 139:8
144:6 158:17
175:5

**Marron**
13:2

**master**
7:20 8:11
38:4 40:23
41:10,14 42:4
43:18 53:23
54:5,11 88:13
124:18
139:16,21
141:1 151:5,
10 167:4,12
169:14 171:5
174:11 180:6
185:13,24

187:16

**master's**
123:14,19
124:8 159:3
196:21

**master/mate**
167:3

**masters**
38:25 41:6,25
167:24
199:13

**mate**
7:22 8:14,15
10:10 40:23
41:23 43:20
44:13 88:13,
16 138:10
139:17,22
141:3 147:1
151:5,16,17
167:5 169:15
174:11 180:6
200:4,5
210:24
211:21

**mates**
37:3 38:7,8
39:1 141:8
167:13,24
199:13

**matter**
5:5

**Mccay**
133:12,20
134:3,12,20
135:20

**Mcgrath**
25:4 34:17,20
72:21 75:3
92:22 151:18

**Mckenzie**
23:10 155:3
200:16
211:16

**meaning**
51:3 81:22

**means**
18:24 47:21
169:17
170:11
192:14

**meant**
183:21

**Media**
5:3 91:8
149:5 202:15

**medications**
46:12

**meet**
18:7

**meeting**
45:10,15
46:25 47:3
78:5 105:14

**member**
74:2 77:22
78:4 86:8
170:4

**members**
24:25 72:15
73:20 74:10,
14,22 77:25
78:21 79:24
113:2 115:16,
20 140:23
151:3

**memorized**
162:25

**memory**

58:9 68:17
80:18 110:3
135:2

**mention**
89:4

**mentioned**
44:5 80:7

**merchant**
10:3 146:1,7,
9,10

**message**
48:12 56:13
57:2,8 59:5

**messages**
22:4 59:11

**microphone**
92:3

**mid**
115:11
136:25 137:3

**middle**
48:20 105:24
168:15 169:8
175:8

**midnight**
149:23

**miles**
76:7

**Miller**
25:3,5 29:12
41:9 42:3
48:3,10,25
50:8,17,25
52:12,22,25
53:2 55:13
60:18 61:24
62:7,25 63:3,
9 72:19 77:3
78:13,17 86:7

89:2 92:10,12
95:8,20 96:17
119:22
124:15 128:1
132:8,17
144:1 151:11
185:19 186:4,
10 189:12
190:15 191:4
217:9,24
220:20
221:21

**Miller's**
51:22

**mind**
17:25 19:6
45:13,25

**mine**
118:16,17
158:5,6

**minute**
30:25 211:18

**minutes**
67:23 90:15,
17 148:17
214:17

**mischaracteri
ze**
184:22

**Mischaracteri
zes**
184:20

**misses**
130:7 131:20
145:17,23

**misstated**
131:3

**mistake**
5:12 122:12

**misunderstood**
27:2

**mm-hmm**
12:11 30:6
39:21 44:19
57:23 71:13
88:11 94:14
95:9 102:23
111:6 145:3
146:13
158:18 159:4
166:25

**MMC**
10:5

**model**
156:6 157:18,
24

**modified**
152:7

**modules**
148:4

**moment**
190:3

**Monday**
60:22 65:2,3
66:23 74:16

**money**
41:21

**monitor**
5:9

**month**
117:7

**monthly**
114:8

**months**
15:24 26:11,
14 27:3,5
42:19 59:15,

16 200:6

**Moore**
11:20 12:1
14:2 17:22
18:20,25 24:1
29:9,18 30:22
37:16 50:11
56:1,9 57:11
59:13 60:2,24
61:21 63:2
66:13 67:9
68:24 70:15
71:2,10 79:24
80:19 100:3
101:9,18
102:14 103:3
104:7 106:13
110:15,24
112:25
132:24 133:1,
3,6 145:7,25
146:6,20
158:14
186:14 194:3

**morning**
6:7,8 37:21
45:19 46:2
66:14 67:8
105:9

**Morrisey**
42:11

**Morrissey**
25:4 29:5,11,
16,17,20
32:1,24
33:19,22
36:10 41:16,
17 44:9 48:5
50:18 51:1
52:23 62:21
72:9,19,25
78:14,17

88:16 92:17
93:17 94:19
97:11 103:22
119:22 128:1
137:4 140:6,
11 143:7,24
147:14
151:17 203:1,
3 204:4
210:24

**Moss**
220:2,6,8

**move**
15:17,22
52:15

**moving**
52:13 92:14

**MTSB**
46:25

**multiple**
40:3

**mute**
220:1,10,11

**mutual**
15:4

———————

**N**

**nail**
79:3

**named**
72:25 73:1

**names**
94:16 151:8

**NANAVATI**
223:18

**narrow**
107:9 196:14
219:15

**National**
113:1

**nature**
52:20 141:24
142:13
153:23

**nav**
11:3

**Naval**
194:18

**navigation**
10:23,24
129:3 169:5
179:11,12
180:12
196:23

**navigational**
175:3 215:15

**nearest**
106:5,7
185:24
187:18

**necessarily**
166:18

**Necessity**
170:4

**needed**
73:13,15
141:8 167:12,
14 220:17

**Nick**
18:3,10,17
79:19

**night**
46:9 215:4

**noise**
92:7

**non-coi**

16:18

**Norfolk**
6:10 65:10,17
66:9 69:13
94:6 103:21
177:3,12,23
182:20 209:4

**normal**
18:24 41:25

**north**
87:5

**northend**
88:22 102:24
127:19

**Notary**
5:20

**note**
119:22

**noted**
223:21

**notepad**
99:1

**notes**
177:7

**Notice**
187:7

**notification**
208:5

**notified**
64:2 70:12

**notify**
63:21 64:25
70:16 185:14,
24 187:17

**now's**
148:11

**number**

5:3,6 13:24
58:17 66:1
85:21 87:24
91:8 92:10
95:7 105:25
149:5 152:19
156:4 163:11
168:15
176:12,17
178:12
194:25
202:15
214:14

**numbered**
96:1 111:8
158:22
166:15

**numbering**
162:16
166:18

**numbers**
87:23 124:12

**Nunamann**
28:17,18

---

**O**

**oath**
47:8

**object**
47:22 54:1
188:18
199:20
205:17 207:8,
18 211:25
212:6,15
215:25

**objection**
21:24 33:25
54:14 70:7,21
71:14 74:3

80:10 83:23
89:17 109:15
112:4 113:4
130:24 131:9
132:13
155:11
156:21
158:19 167:8
171:3,20,21
172:10 176:5
179:15,19,25
180:13
183:14 184:1,
10,18 188:7,
10 190:1,17
192:1,10
193:1 195:10
201:11
203:13,15,25
204:21
205:19 206:3,
15 212:19,22
219:6 221:1,
16 222:2,12,
19

**obligated**
185:14

**obligation**
189:23

**observe**
60:19

**observer**
10:13

**obstructed**
70:9

**occasion**
215:10

**occasions**
47:13 141:7
143:12

**occur**
70:11 194:21

**occurred**
25:1 107:25
119:17

**occurs**
194:17

**office**
15:14,17
45:20 66:9,24
76:3 185:15
187:18,19,20
198:22

**officer**
103:22 104:1
116:24
117:15,16
199:14 203:7
215:5

**offset**
83:22 102:25

**offshore**
13:25

**On-the-job**
200:8

**One's**
72:25

**ongoing**
197:24 198:4

**online**
12:20

**OOW**
104:2

**open**
122:11
139:12

**opening**
51:6 52:8

**operate**
11:11,14

**operating**
38:2 44:12
198:12 200:7

**operation**
15:20 103:16
175:13

**operational**
33:4 141:16
166:23
208:10

**operations**
9:11 16:25
159:7 214:22,
24 218:20
219:12

**operator**
187:17

**opinion**
131:17,25
132:5,6
171:7,24
172:1,3,7,9
173:5 174:2
180:20 216:4

**opportunities**
44:2

**opportunity**
44:24

**opposed**
165:25

**opposite**
42:9

**option**
15:7,21

**orange**
185:9

**orange-ish**
169:10

**order**
67:20 178:15

**ordered**
208:22

**ordinarily**
42:6

**ordinary**
134:24

**organization**
23:1

**organized**
91:12

**original**
77:5 98:19
101:8

**originally**
117:12
130:19

**Otter**
23:10

**outbound**
94:6 103:20

**outbox**
69:22

**outlet**
14:10 219:4

**Outlook**
69:15

**outset**
8:24

**overhead**
173:24

**overlap**
12:5

oversaw
128:13

owned
24:19

owner
187:16

**P**

P-B-L-R-R
88:22 127:19

p.m.
91:10 148:25
149:6 202:11,
16 223:17,21

pages
134:13
147:11,19
163:10
166:15
176:12,14
177:8

paid
33:15

pair
203:23

Palumbo
65:16 67:25
74:19

paper
52:5 99:4
154:12

part
16:10 96:8
109:20 111:4
113:18 114:2
127:1 178:9
179:2 183:18
196:16 199:9
207:2

participating
147:23,24

participation
147:21

parties
76:14

party
165:16

pass
82:6 84:8
87:10 99:16
118:23
123:16
126:22
137:13 144:6
147:6 149:8
158:12

past
146:23
211:22

paternity
31:13,22,24
32:6 71:21
78:8 79:19
96:11 100:23
101:1 104:19
112:17 113:7

pause
8:20 35:19

pay
14:12 30:15

payable
134:22
135:15

paycheck
25:17

PDF
154:22,24
159:16,24

197:10

people
17:11 24:24
36:23 41:20
115:8,14,23
116:1 196:16

percent
79:16 154:25
161:10

perform
167:22

period
28:4 55:10

person
84:2 114:19
143:3,19
187:17
193:18,23
204:8,18

personal
21:22 55:19

personally
65:23 80:4
81:3 129:19

personnel
17:6 45:5
116:12
129:24
131:17
142:16
196:12 200:6
215:17

perspective
18:19 190:15

pertained
69:12

pertaining
137:20

phone
19:2,8,10,16,
23 20:7,10
21:2,6,12,14,
17,22,23
22:3,9 45:22
49:6 50:9
53:7,10,11,
13,16,17
54:20,22,23
55:1,6,9,15,
19 56:14,17,
22 57:4
58:14,19
59:9,18,21
60:10,11
61:25 63:7,8
66:1,25 67:2,
3,10,13 72:6
82:20 84:20
87:24 221:22

phones
21:22

photo
62:15 83:9
85:18 86:25
87:7 88:22

photocopied
98:21

photograph
49:8,11,16
82:9 83:1,21
190:22 191:2

photos
50:3,22,23
56:6,9,16,22
57:3,8,16,22,
25 58:10 59:8
60:3,7,17,24
83:4 84:13,15
85:9,15

221:25
222:17

physical
104:16

physically
66:22

pick
48:11 50:12
53:21

picked
39:17 48:13
122:14

picking
150:12

picture
85:7

pictures
84:25 85:3

pier
83:22 137:6
140:7

Pike
23:10

pile
90:7

piloting
137:5 140:6

pins
153:25

place
15:12 78:12
111:12
161:13 165:3
174:12

plan
149:13 150:7,
17 152:6,13
153:9,10,16,

19 154:1,4,
11,16,19,20,
22 155:2,16,
19 175:15
176:25

**plan-outside**
149:17

**planned**
28:2

**planning**
153:8

**pleasure**
215:2

**point**
43:1 82:25
97:7 119:21
123:3 145:7
153:8,10,14,
18 154:5,20,
21 155:2,23
189:13 208:1,
4 213:19

**points**
153:22

**policies**
37:9

**policy**
205:1

**popped**
169:21

**port**
7:8,10 8:3
12:15 13:11,
17 14:7 15:6,
10,20 16:22
17:20 19:1,13
22:12,18,24
28:6,11,15,16
29:6,7 36:21

37:4 39:6
85:19 104:1
106:7 113:19
114:17
115:10
128:11,21
129:8 132:18
135:13
137:11
143:13
160:13
173:23
183:20,22
184:8 185:4
196:11
197:23
221:11

**portal**
12:21 106:9

**Porter**
73:1 93:12

**Portland**
182:20

**portside**
212:18

**Portsmouth**
6:10 69:13
177:13,24

**position**
13:9,13 14:16
22:25 23:20
25:24,25 26:1
33:4 43:25
143:18
193:19
196:17,18

**positions**
17:12

**possession**
21:3,6,12

**possessions**
194:19

**possibility**
61:14

**Possibly**
77:11,15

**post**
106:16
171:12 174:8

**post-incident**
107:15

**posted**
174:14
183:12 198:7

**posting**
179:18 180:7
184:7,15
185:3 205:4

**potentially**
169:6

**power**
16:17

**practical**
185:15,25

**practice**
176:3 215:8

**practices**
205:3,7,15

**prayer**
46:2

**preexisting**
24:15

**premise**
180:15

**prepare**
45:7,14 46:1
73:22 76:18

**prepared**
80:3 99:8
193:12

**pressure**
169:13

**pretty**
13:12 107:9
111:25 142:4

**previous**
162:5

**previously**
7:14 45:20

**pride**
169:13

**print**
82:8 153:17

**printed**
87:18 160:1,8

**prior**
8:4 43:1
105:14

**Priorities**
185:12

**privy**
76:12

**problem**
129:2 223:9

**procedure**
183:19
198:12

**procedures**
37:10 181:3
183:4

**proceed**
60:21 62:14
88:23

**proceeding**

6:13 223:20

**process**
36:22 38:23
44:17 82:10
130:8 143:9,
15 157:20
166:8 167:25

**produce**
20:7 21:2
208:20

**produced**
87:11 118:5
123:17
137:18 144:8
147:10
162:12

**producing**
20:13

**product**
165:7

**program**
9:24

**project**
16:5

**proper**
199:2 215:5

**property**
102:22
111:18

**propulsion**
107:22

**provide**
22:8 24:6
46:14 73:6
84:24 126:4
155:6 196:20
207:16

**provided**
47:10 73:10

82:9 86:13
112:13
133:11
149:12 199:1
201:2 214:25

**provider**
165:17

**providing**
204:8

**proximity**
179:11,22
215:14

**prudent**
141:12
215:11

**Public**
5:20

**pull**
114:1 162:21

**purposes**
114:11

**pursuant**
20:14

**push**
103:20

**pushing**
94:8 103:19
181:9,25
182:19 195:5

**put**
27:22 47:8
51:25 69:16
84:4,5 90:6
118:12 126:4
144:3 151:25
152:1 153:19
220:1

**puts**
125:22

**putting**
51:19 171:12

---

**Q**

**qualify**
172:8 179:22

**question**
9:1 20:3,4
64:2,4,17
78:20 80:11
95:3 100:25
107:20 115:1
119:6,7
120:9,16
121:7 134:17
141:24 154:8
157:3 171:11
172:17,20
180:10,23
183:16
184:24
204:24
207:14
219:25 220:9,
16 221:3

**questioned**
215:22

**questioning**
18:13 214:1

**questions**
8:17 35:13
46:13 47:11
83:19 115:3
151:15 156:5
180:15
208:16
209:10,18
210:22 216:4
218:5 223:1

**quick**

56:11

**quit**
35:3

**quiz**
148:6,7

**quoted**
218:22

---

**R**

**radar**
10:12 207:4,
6,7 208:10

**radars**
207:15 208:5

**radio**
8:25 170:5,21

**railroad**
6:11 62:18
71:3 102:25
177:13,24

**rain**
168:5

**raise**
14:12

**raked**
85:10

**ran**
18:20 136:10

**ranges**
155:20

**rate**
26:2,3

**re-depose**
209:9

**reach**
129:7 133:3

143:1,14

**reached**
66:13 67:16

**read**
64:6 88:24
100:15
103:18
127:19
187:25
199:18
213:22
214:20 216:9
218:19
219:11

**ready**
90:24

**realize**
22:19 82:10

**realizing**
150:14

**realtime**
213:23

**reason**
15:16 33:22
34:4,7,12
65:18 70:19
89:24 126:5
169:20
175:24
221:14,24

**reasoning**
221:21

**reasons**
67:17

**recall**
26:5 43:6
49:3 50:2
54:19 56:10
57:5 58:4,5

59:6,7 63:16
67:7 69:11
74:5 77:7,8
99:6 100:19
102:16 103:6
104:10
111:14,16
190:8 194:6

**receive**
49:16,20,21
74:1 77:24
79:12 96:7

**received**
73:17 76:22
77:20 84:15
92:11,16,21
93:11,17
94:19,24
145:6 202:19
217:9

**receiving**
25:20

**recent**
98:8

**recently**
174:22

**recess**
91:5 149:2
202:12

**recites**
187:2

**recognize**
127:22

**recollection**
57:24 71:17
94:18 98:18
108:21

**recommend**
22:21 205:16

**record**
5:23 29:1
31:8,10
51:15,20 52:1
90:25 91:2,4,
9 92:5 107:18
123:12
134:20 142:5
148:24 149:1,
6 174:13
202:10,16
214:21

**recorded**
5:15

**records**
133:11

**red**
156:10 193:6,
17

**reference**
24:6 156:6
157:8,22
158:2 192:4
200:20 201:6

**referenced**
199:5

**references**
153:8

**referred**
163:18

**referring**
43:8

**reflecting**
68:22

**refresh**
94:18 98:17
108:21

**refuse**
222:23

**refusing**
172:19,22

**regroup**
90:18,24

**regularly**
157:16

**regulation**
108:2 185:2
188:4

**regulations**
187:2

**relate**
147:13
194:13

**related**
124:5 191:18
199:4 220:16

**relates**
171:11

**relationship**
117:3

**relative**
16:15

**relevant**
179:5

**relocate**
15:5

**remember**
31:19 48:17
77:4 79:15
99:3 216:12,
23 217:1

**remembering**
27:7

**removed**
30:14 32:1
33:3,22

**renewed**
174:21

**rented**
163:7

**repair**
129:10

**repairing**
129:12

**repairs**
128:12

**repeat**
52:2 181:12,
20,21 184:24

**replace**
136:9

**replaced**
59:19

**report**
17:21,25
18:1,10 61:1,
4 65:19 66:5,
15 80:2,9,25
105:2,16
107:12 111:8
123:14 124:2,
3,14,25 125:7
129:15 131:7
132:22
137:20
138:19 139:8,
20 147:15
149:13 188:5
192:19 193:9,
12

**reported**
18:15 61:6
130:19
131:14 132:3,
19 137:11
145:19 191:5

194:17
220:17
221:24

**reportedly**
185:20

**reporter**
5:12,16,22
6:1 8:16,19,
22 28:22
35:18,21,24
36:2,4,8
44:20 90:15,
22 183:1
208:12
209:12
211:17 213:2,
6,10,14,18,21
214:3 220:4,7
223:19

**reporting**
61:3,10,15
68:5 123:20
133:1 174:13
185:12 187:2
191:19
217:24
219:20

**reports**
81:9 88:17
113:21 114:3
127:17
138:25 144:9,
13,16 147:4

**represent**
6:10

**representativ
e**
13:3

**representing**
209:3

**reprimand**
140:17

**reprimanded**
140:12

**request**
24:12 95:17
127:6 155:15

**requested**
20:6 21:2
22:7 74:7
95:22 96:15
166:3

**require**
179:17
184:15
195:20 205:4
215:16,24

**required**
136:6,9
167:11 192:9
215:17
217:25

**requirement**
106:21
204:17 205:1
217:25

**requirements**
179:3

**requiring**
131:7

**reserving**
208:18

**resolved**
129:5

**respect**
204:9 208:19

**response**
145:1 193:19

responsibile
37:5,7

responsibiliti
es
113:19

responsibility
13:18 17:5,10
28:7 30:11
36:13 114:5,
18 116:13
117:19
128:10 159:3
167:2

responsible
16:24 17:17
37:3 39:7
109:10
169:12
175:13

rest
16:18 78:15

result
80:15 187:15

resulting
6:15

review
36:25 43:12
44:17 46:4
57:16 68:12
109:2 110:8
114:6 127:3
148:6 192:9

reviewed
201:14

reviewing
101:6 217:21

reviews
44:4

ride

37:7,11,15,17
38:12,14
39:11,13,22
40:19,20
42:11 43:9,13
143:23

riding
167:16

rights
208:18

risk
156:4,7,14,20
157:18,24
181:6 183:9,
12

River
174:24 177:4

Road
6:3

Rodgers
20:1,5,12,24
21:9,24 26:10
27:8,10 29:8,
12,14,17
30:24 31:5,
15,18 33:25
35:12 36:6
43:8,11 45:9,
16 51:14,19,
23 54:14
55:5,8 58:22
60:8,13 64:1,
7,12,16 69:5
70:7,21 71:14
74:3 77:14
80:10 81:22
83:23 86:20
89:17,21
90:8,11,20,23
93:20,25 94:3
98:4 100:7

105:6,10,11
107:17
109:15 112:4,
8,11 113:4,15
114:23 115:2
116:18 119:5
121:12,16
126:23
130:24 131:9,
21,23 132:13
134:19
140:19
144:13 146:4,
8,12,16 147:9
148:13,18,20
155:11
156:21,24,25
157:5,9
158:7,9,19
167:8 168:12,
19,23 171:3,
20 172:2,10,
12,21,25
173:4,16
176:5,16,19
179:15,19,25
180:13 181:1,
12,15,19,23
182:3,6,10,
13,16,22
183:14 184:1,
10,18,20
188:7,10,20
190:1,17
191:12 192:1,
10 193:1,5
194:1 195:10
198:16
199:17
201:11,19,23
202:1,3,6,25
203:5,13,15,
25 204:3,11,
21 205:6,10,

19 206:3,8,15
207:12
208:21,24
209:17,21
213:5,8,12,
16,20,24
214:5,12
218:8 219:6,
23 220:2,5,15
221:1,16,19
222:2,12,19
223:2,4,7,10

Rogers
45:17

role
19:13 22:18
44:12 113:8
117:9 118:2
126:16
135:12,20
138:8 141:1

roles
44:25 146:24

rolls
25:20

room
75:3

Rose
23:10 25:1,
10,11 26:9
30:3 41:1,7,
25 48:1 53:17
54:4 75:19
77:16 79:25
87:14 94:8
103:19 113:3
123:22
126:20
128:21 135:4
137:5,21
138:24 140:7

143:21
144:12
149:18 153:8,
10,14,18
154:5,19,21
155:1,3,23
171:23 173:6
181:18,25
197:5,13
200:16
201:17
207:16
211:16

Rosenberg
5:14

rough
125:17 126:8,
19 127:3,7,10
209:14

roughly
11:10 13:20

rub
86:3

rule
218:14

rules
215:16

run
13:7 72:18
113:20 114:2

_____

S

safely
38:2 173:22
197:25
198:22 215:6

safety
10:13 17:2
106:5 113:1

LEONARD BALDASSARE

April 29, 2025

116:13,22,23
117:15,16
158:15 159:5
160:12,24,25
161:2,12
162:4,9 163:5
165:23,25
166:4,11
169:1 173:8
174:3 175:10,
20 176:3,9,25
178:8,24
183:3 186:25
187:15
192:24
193:23 194:8
196:9,24
198:14 199:5
215:18,24
219:1,3

**sail**
7:9,10,18 8:1
30:7

**sailed**
7:14 11:9
146:19 200:5

**sailing**
8:9 32:25
41:22 126:16,
17 146:23
147:1 200:2

**salaried**
14:16,17,20
25:25

**sales**
165:5

**satisfy**
85:3

**Saturday**
48:18 68:2
101:12

127:13
131:14
222:11,14

**Save**
154:11

**scanned**
77:10

**scanning**
77:17

**scheme**
162:16

**scores**
156:20

**Screenshot**
118:7

**scroll**
161:4

**sea**
103:21 106:6

**search**
160:20,22

**section**
102:18 104:5
150:19 151:2
153:7 156:2,
5,20 157:23
166:24 168:7
169:1,25
174:6 175:8,9
176:9,25
177:12 178:8,
11,23 183:18
185:8 187:10,
11,14 196:6,
7,8 197:8
198:14 199:7
214:8 216:5,
6,24 218:19
219:19,22

**sections**
158:14
159:19 161:1
162:12,18,22
178:14

**sector**
16:7 65:10,17
106:4 187:18

**secure**
155:1

**security**
153:22

**sees**
83:25

**segment**
177:1

**selected**
158:14

**sell**
219:3

**send**
22:4 50:22,23
58:10 67:12
68:10 73:16
110:14,23
143:4 222:1,
17

**sending**
60:24 101:7

**separate**
43:24 124:6
141:7 144:9,
13,14,16
145:1,11
146:25 164:2

**separated**
78:19

**serve**
215:6

**served**
19:19 20:23
201:5 204:18

**session**
214:6

**set**
69:15 129:8
135:16 175:2
206:18
207:19 208:3,
8

**sets**
133:10

**setting**
113:8 136:20

**shape**
48:6 50:20
51:2,3,8
52:11,18
72:10 101:13
104:14 141:8

**Sharif**
93:12

**shelf**
198:21

**Shifts**
168:10

**shipyard**
25:12,23
27:13 28:1

**shore**
6:3 115:19,25
116:2,11
129:23

**short**
91:5 149:2
202:12

**Shortly**
137:2

**show**
118:4,15
123:13

**showed**
96:11

**shown**
118:20 200:3

**shows**
53:16

**side**
84:5 85:19,25
86:4,8,14
87:4,5
115:19,25
116:2,11
129:23
154:14
212:13

**sign**
100:5 101:2
110:18

**signature**
99:24 100:8,
11,12 108:18

**signed**
92:9 93:15
99:25 100:3
106:12 108:7,
21 109:14
110:15,22
195:23

**signing**
100:20 110:4

**similar**
38:7 40:22

**similarly**
96:20,21

**simply**
56:17

sir
6:19 19:21
26:21 38:5,24
42:1 47:20
49:2 53:19,22
56:2,15 59:22
61:16 65:4
68:9 75:8,22
85:14 90:7
91:23 102:8
115:6 123:23
125:15 128:9
134:4 135:24
136:2 160:14
209:25 210:6,
19 218:18
220:14

sit
17:8

site
39:19 75:17
76:4

sits
170:17

sitting
198:21

situation
32:7 50:9
181:6 183:8
215:9 218:3

situations
169:5

size
16:15

sleep
46:9

slid
48:7 101:15
104:15
188:25 189:6,

17 217:17
221:10 222:9

slide
220:23
221:13,23

sliding
51:7

slipped
72:11

slow
35:15 213:3,
6,21

slower
214:4

slowly
88:23

small
39:24 99:1

smaller
14:10

SMF
192:19,21
193:8,12

SMS
196:9,25
197:4,9,12,20
214:10,13
216:7,25

snuff
17:3

sole
210:8

solicited
96:16

someone's
44:2

sort

6:25 13:17
18:15 28:12
37:1 38:22
65:21 85:19
99:1 114:7,21
121:9 122:25
129:4 144:19
147:21 185:9
191:16
196:24

sounds
21:20 62:1
71:23

source
163:5 218:23

south
87:5 140:8

southern
94:6 103:21
174:24 177:3

speak
61:23 63:3,4
65:22 78:3
134:1,10
135:12 183:2

specific
38:3 43:18,
20,21 113:22
114:14,18
117:8 196:13
198:25

specifically
85:6 86:16
198:5 201:2

speculation
195:11

spell
11:5 28:19

spells

13:4

spend
40:12

spoke
13:2 50:8
55:12 57:11
60:17 72:4
73:3 78:24,25
133:6 142:8

spoken
26:6 99:15

staff
115:25

Stamp
214:14

stand
116:21
207:23

standby
57:19

standing
167:16
210:13

stands
29:1 156:9
192:21

stapled
91:18

star
173:23

starboard
85:25 212:13

start
9:1 11:17
45:12 51:7
95:7 136:22,
24 153:19
158:21 200:1

started
12:7 39:15
117:1 138:2
139:9 140:4

Starting
185:11

starts
162:11
166:20
176:10

state
5:22

stated
145:20
192:15

statement
77:21,25
92:11,16,21
93:11,16
95:11,15,23
97:13 104:7
112:14
118:21
169:15

statements
73:7,9,13,18,
23 74:2
76:17,23
77:6,19 79:12
91:16,20
94:16,22,24
96:17,20
97:21,25
99:7,8 202:19

Staten
15:15 66:24
76:2 164:25

States
99:19 194:18

station
  215:1

statute
  184:3,6,15

stay
  206:21

staying
  163:25
  165:10

STCW
  10:12

steering
  51:12 88:19
  103:24
  107:22
  127:17
  128:19 211:8,
  20 215:1

stern
  85:15 212:21

sticker
  162:18

stood
  63:17

stop
  120:22
  131:23

Stopping
  36:3

story
  72:5

strike
  102:10
  187:24 195:2
  217:5

struck
  190:12

structure
  111:20
  112:16

stuff
  40:2 82:4

submission
  68:15 109:4
  110:9

submit
  122:20 123:4

submits
  124:25

submitted
  100:20,24
  101:2,18
  105:3,17
  106:20
  108:10,15,22
  110:4 114:6
  125:1,12
  130:3 145:22
  196:3

submitting
  109:10

subpoena
  19:19 20:6,
  15,18,23 21:1

Subsection
  187:11,21

subsequently
  49:16

substance
  186:21

substances
  46:12

suffices
  162:3

sufficient

85:3

suggest
  71:2

SUNY
  9:7,8,19,22
  10:4

supervising
  210:1

support
  111:20
  112:15
  139:15

supposed
  84:3 107:5
  173:12 179:6
  180:15

swear
  5:17

switch
  88:19 103:23

switching
  104:3

sworn
  5:20

system
  81:1,7,10,14,
  21 86:3,9
  87:19 113:21
  118:10
  119:17 120:6
  123:25 126:5
  128:20 129:3,
  18,22 130:22
  131:8 132:20
  136:7,12,17
  142:24
  149:14 153:3,
  15 154:17
  155:23

156:15 158:3,
  15 159:6,13,
  22 160:12
  161:13 162:4,
  9 163:5,22
  165:23 166:1,
  4,11 169:2
  173:9 178:8,
  24 183:4
  185:21 187:1,
  2 189:7 190:7
  193:23 194:8
  196:9 198:15
  199:2,6,8,16
  200:1,11,15,
  19 201:2
  206:1,12
  217:17 219:2,
  4 220:25
  221:10,14

systems
  200:7 206:5

_____

T

tab
  160:21

table
  161:8

tags
  152:19

taking
  6:11 46:11
  196:17

talk
  30:25 52:22
  62:8,21,25
  65:15 72:15
  74:9,13
  79:19,22
  121:12

129:10
  219:12,15

talked
  20:19 45:24
  56:8 60:1
  61:20 67:24
  74:14 78:18,
  22 91:16

talking
  35:11 38:19
  39:23 54:5
  60:9 64:8
  74:19 93:21
  114:23
  115:19
  120:23 134:5
  216:24

talks
  94:11

tapped
  127:18 128:5

task
  114:8 147:24

tasks
  114:2

TBL
  102:24

TBS
  163:13,18
  164:12
  165:14 219:4

team
  128:16
  136:19
  148:21

technically
  42:8 82:4

technician
  129:9 136:20

200:23

technicians
135:17

telling
142:11
172:14

tense
223:13

term
47:18 188:11
205:11
220:23

terms
23:23 162:15

territories
194:19

test
107:24

tested
107:6

testified
5:21 46:16,22
47:16 109:16

testify
45:8

testifying
51:15,24
120:12,14

testimony
46:1 121:14
131:1 183:17
184:2,21
188:13
203:16
213:15
222:18

testing
17:11 107:1,

13,14 195:17,
21,24

text
22:4,8 56:13
57:8 59:4,11
67:12 84:16

texted
191:3

texting
24:3

then--
95:18

there'd
43:17 68:21

thick
160:7

thing
6:25 13:12
18:15 28:13
37:1 114:7,21
121:20 129:4
137:10
142:18
147:22
159:23
162:21
167:20
196:24 217:3

things
18:11 19:7
22:8 52:20
102:3 113:22
141:10
142:10,13
153:23 157:1
160:16 179:4
185:13 217:3

thinking
148:11

third-party
163:21

thirds
187:6

thought
17:24 29:11,
13 103:24
115:18
158:10
167:13 202:6
214:15

thrilled
142:9

tide
52:19

time
5:9 7:11
11:23 12:6
13:7 15:7
25:15 26:6
28:4 31:8
33:17 44:23
46:19 48:16
49:21 55:10
56:20 57:6
58:4,7 59:9
61:2 67:5
69:10 79:3,18
81:12 90:13
91:2,10 94:8
97:18 100:15
103:16 105:1
107:3,9
112:13
115:11
118:12 125:1
128:22 134:2
143:17,18
148:12,24
149:6,22
152:15,21,22

171:6 182:17
189:13 190:9
194:1 202:10,
16,22 203:11,
21 204:1,10
207:5 208:17
210:25
217:12
223:17,21

timeframe
27:22 135:5

timeline
117:23

times
41:20 45:21
150:9

tires
86:4

title
116:8

titled
102:18
123:19
169:25 174:6
175:10 176:9
185:12

today
6:12 19:17
20:11 34:14
45:8,18 55:17
98:2 105:15

Today's
5:7

told
12:9,17 44:9
48:3 50:9,17,
25 53:5 56:3,
4 57:15,21
60:18 62:9,
12,20 66:20

68:2 70:15
71:10 72:5,6
101:11
112:15
128:24
136:23 189:3,
6 190:21
208:11
217:19,20,24
218:3 221:6

Tom
13:2

Ton
10:10

top
83:21 118:6
137:19
149:16
150:10
154:13 159:2
163:14
166:20 185:9
192:17

touched
68:4 132:19

touching
94:12

tow
167:17 170:5,
8 174:8

towing
5:6 8:12
18:21 96:3
103:18
114:17 115:9
129:20 205:3,
15 215:2

track
103:25
155:24

tracking
147:20

traffic
153:23
173:25 174:2
179:10
215:14

trail
122:2

training
17:16,18
114:19,20
116:3,4,9
147:20 148:5
167:22,25
196:13
197:24 198:4
199:1 200:5,8
201:1 209:22
210:2,5 214:6

transit
169:12 170:1
171:13
173:13 174:7
175:14,16
179:24
196:23
197:25
198:23
203:24 204:9
205:5

transited
174:23
177:21

transiting
169:18
171:10
173:21 176:4
177:17,18
196:13
198:13

204:19
205:17
219:12

transits
89:14 168:7,
11,25

transmission
68:22

Transportatio
n
113:1

trees
160:10

tremendously
213:3

trial
46:23 120:12,
14,15

trick
207:14

troubleshooti
ng
165:6

truthful
46:14

tub
170:18

Tuesday
5:8

tug
16:16,25 44:4
50:6 53:7,17
54:3 62:11
63:13 75:19,
24 77:16
79:25 83:6
141:1 171:6
181:9,17,24
182:19 195:4

209:23 210:7
221:9

tugboat
75:7

tugs
13:19,21
14:1,6 16:9
17:1 23:4
115:5 128:12
196:19

turn
34:16 87:21
103:8 106:23
120:15 163:9
166:14 168:6
176:8 178:11
185:7 191:9
193:16
194:11
219:18

turned
21:14 59:17
88:18

turns
212:24

two-week
44:13

two-year
9:24

type
11:2 38:10
39:23 77:24
97:4 137:10
138:20
154:22
160:24

type-up
97:24

typed

76:23 96:16

typed-up
77:25 91:19
95:11,22
97:2,12,20
98:12

types
141:9

___

U

U.S.
194:20

understand
6:18 27:4
44:6,23 46:7,
13 47:18 52:5
80:12 121:8
131:10
132:15 154:7,
10 171:17
189:18 193:3
199:21
204:23
205:12 212:9,
11 221:3

understandin
g
96:15 215:20
217:16,23

understood
9:4 31:20
52:12 64:7
120:24
220:24

underway
63:18 177:22

uninspected
23:17 115:8

unintended

102:9,10
187:23,24
188:5 195:1
217:4,5

unique
165:24

unit
106:5 136:10
185:25

United
99:19 194:18

universe
115:17

unobstructed
212:5,14
214:25

upper
17:4 30:14,
20,21 211:11,
13,21

usual
36:4

___

V

Vain
161:17

valid
145:25 146:7,
11

valve
170:12

Vane
8:6,7 9:5
11:21 126:13

vantage
82:25

vary

162:7

**verify**
216:5

**version**
95:11,22 97:2
98:19,20
152:3 159:10

**versions**
91:19 97:20,
25 98:12

**versus**
19:7 98:20

**vessel**
30:14 38:2,4
39:8 41:18
43:19,21,23
44:10 47:21
48:9 51:9
52:13,17
53:1,12,24,25
54:5 60:21
73:19 74:25
75:6,13 76:1
78:10 79:5
101:11 102:1
103:18,25
104:17
107:23 114:7
123:20
124:19
128:25 129:9
130:4 147:2
155:20,24
173:21
187:20
194:16,20
196:23 197:1
200:13
203:24 207:4
211:1,14

**vessels**

7:21 8:12
13:16 23:15,
17 54:18
81:11 115:7,8
129:19,24
139:1 146:25
199:3 214:24
215:3

**video**
148:4 223:15

**view**
81:21 118:13,
18 119:16
212:5 214:25

**Virginia**
39:16 177:3
214:1

**virtue**
20:18

**visibility**
168:5 179:9
215:13

**visible**
72:13 94:13
101:16

**vision**
215:4

**voice**
158:11

**voyage**
39:23 40:4
72:3 149:13,
16 150:7,17
152:13 153:7,
8,10,16,19
154:11,15,18,
19,20,21
155:2,3,16,19
177:22

## W

**wait**
35:12 93:1

**waiting**
56:6

**walk**
156:19

**walked**
75:3

**wanted**
121:20
197:10
206:19
207:20
209:14
222:15

**wanting**
15:17 67:18

**warning**
169:14
207:17

**Washington**
8:3

**waste**
31:7

**watch**
36:24 103:22
124:20 142:3
148:5 174:11
180:6 199:14
203:8 204:5,6
210:12
211:21 215:5

**water**
90:8

**waters**
194:18

**waterway**
177:2 183:21,
23 184:8
185:5

**ways**
159:21

**weather**
179:9 215:13

**week**
26:24 41:11,
12 45:20,22
122:18
137:25
208:23

**weekly**
114:8 147:24

**weeks**
23:21 27:17
31:13,21 32:5
41:15 88:20
94:7 103:19
122:15
181:25
182:19

**west**
87:4

**Western**
104:5

**What'd**
10:15 190:19

**wheel**
78:14 170:17

**wheelhouse**
37:25 53:5
78:18 170:15
197:17 200:6
211:11,13,21

**wheelman**
169:12

**who'd**
7:1,15 12:25
65:15

**Why'd**
15:3

**Wind**
52:19

**wires**
136:11

**wise**
13:13 14:15
90:14

**wishes**
32:13

**word**
119:4,8,10
166:21
220:22

**words**
51:22 186:21

**work**
6:24 7:1,2,15
11:20,25
15:11,12
16:5,18 24:16
36:25 40:24
42:9,22 44:3
55:23 56:21
58:18 69:5
115:9 135:3,
17,20 136:6
209:7

**worked**
11:22,23
15:14 17:18
37:12 41:11,
14 146:22
161:22

**working**

**LEONARD BALDASSARE**

**April 29, 2025**

16:1 21:21
23:5 25:15,22
26:1 29:25
41:20 66:23
113:20 117:1
126:9 140:4
142:10
202:22

**works**
138:11
148:18

**worried**
108:3

**would've**
42:16,17 43:2
55:10 62:2
74:18 77:20
88:12 109:9
110:5 111:22
119:12,16
124:19
141:10
200:22 211:4
221:20

**write**
180:3 213:11,
14

**write-up**
142:23
143:15

**writing**
143:3

**written**
73:7,9,18,22
74:1 76:17,23
77:21 79:12
80:2,8 91:15
92:11,16,25
94:22 98:20
142:18,21
143:7 148:6

**wrong**
151:25

**wrote**
180:11

---

**Y**

---

**yard**
26:9,12,19,23
27:4 72:2
76:2

**year**
7:25 9:22
12:8 14:25
37:12 40:6
42:14 125:20

**years**
7:6 8:8 9:14,
15,16 11:9

**yellow**
168:14 169:9

**yesterday**
12:10 158:13

**York**
6:4 8:3 10:10
36:6 99:11
149:17
164:13 165:1,
4 209:2 213:9

**young**
15:21

---

**Z**

---

**Zoom**
47:3 209:2