# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC d/b/a CARVER MARINE TOWING, as Owner and Operator of the *M/T Mackenzie Rose*, (IMO No. 8968765), *et al.* | Civil Action No. 2:24-cv-00490-MSD LRL |

**PETITIONER'S BRIEF IN SUPPORT OF *DAUBERT* MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF ZANE SADIK, PE**

Petitioner, Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver"), for its Brief in Support of Its Motion to Exclude Testimony and Opinions of Zane Sadik, PE ("Mr. Sadik"), states as follows:

**I.      The measure of damages in maritime allision actions in this District.**

For over sixty (60) years, Courts in the Fourth Circuit have measured damages in maritime allision cases as the "reasonable costs of repairs with proper consideration being given to actual depreciation of the facility at the time of its damages." *Seaboard A.L.R. Co. v. Marine Industries, Inc.*, 237 F. Supp. 10, 12 (D.S.C. 1964). That rule is founded upon the premises that "it violates reason to find that a responsible party should be obligated to replace in a new condition that which was depreciated at the time he became responsible." *Id.* (quoting *Atkins v. Alabama Drydock and Shipbuilding Co.*, 195 F.Supp. 944, 945 (S.D. Ala) (citing *The Baltimore*, 75 U.S. (8 Wall.) 377, 385 (1869). Courts thus apply depreciation where new materials are used to repair damaged members by calculating the life expectancy of the infrastructure and amount of depreciation at the time of damage, then reduce the costs of repair by the percentage of depreciation. In *Seaboard*, by example, the Court found:

> New pilings and timbers were used in repairing libelant's bridge, thus it is assumed that the repaired portion of the structure now has

1

> a life expectancy 50% Longer than such portion had at time of collisions. If this be true, and unless depreciation is allowed for labor and materials, libelant now has a portion of its bridge with a useful life twice as long as it had prior to damage by respondent, without any cost to it. If 15% depreciation is allowed only as to cost of the new materials used in repair, libelant will be in the favored position of having the useful life of such portion of its bridge doubled upon expenditure of $ 1,219.00. Equity and fairness should require libelant to pay for one-half of the total repair cost to such damaged portion of its bridge, if its useful life is doubled as a result of the repairs. Otherwise, libelant will be making a profit as a result of the accident, at the unjust expense of respondent.

237 F. Supp. 10 at 14. Notably, depreciation is "allowed against the entire costs of repairs, without distinction between applied to both the costs of materials and costs of labor." *Id.*

This District has applied the *Seaboard* rule of law in a case involving the same Main Line Bridge at issue in the case at bar. In *Norfolk and Portsmouth Belt Line Railroad Company v. M/V Marlin*, the west fendering system of the Bridge was damaged in an allision by a vessel, the *M/V Marlin*, resulting in $570,000 in total damages. Upon consideration of photographs, testimony, and other evidence as to the condition of the Bridge, the Court found "[i]t is clear … that prior to the allision the west fendering system was heavily deteriorated," but not "worthless," and that the fendering system was 65% depreciated. 2009 U.S. Dist. LEXIS 104327, *37-38 (E.D. Va. 2009). "Accordingly, Belt Line [was] entitled to recover thirty-five percent (35%) of the depreciable costs of reconstruction." *Id.* Notably, *Marlin* was decided by the Court sitting in admiralty, under its "authority to make equitable decisions, considering all of the facts and circumstances of the individual case." *Id.*, *32.

## II.  Mr. Sadik's Credentials and Opinions.

Mr. Sadik is a professional engineer who intends to testify for Claimant Evanston Insurance Company as to the reasonableness of the repairs to the Bridge resulting from the allision. Mr. Sadik's scope of engagement was limited to performing a replacement cost valuation ("RCV") and

2

actual cash valuation ("ACV") for a "full bridge replacement." **Exhibit 1**, Tr. 21:5-10. For his RCV methodology, Mr. Sadik compared the costs of a purportedly similar bridge in Alabama that cost $167 Million to build in today's dollars and then applied a 66% depreciation reduction that was based on a 100-year life expectancy of the bridge to arrive at an "ACV" of $57 Million. **Ex. 2**, Report at 7-8. Mr. Sadik describes this process as providing a "rough order of magnitude," which is more for "planning purposes. It's not an in-depth, granular, detailed estimate, which will take a lot more time, money, effort, and resources." **Ex. 1**, Tr. 15:24-16:3. On that methodology, Mr. Sadik concluded that the $11 Million in repairs were reasonable, since they were less than the $159 Million RCV and $57 Million depreciated ACV of the Bridge. **Ex. 2**, 7-8.

Mr. Sadik did not run any type of depreciation evaluation for only the damaged sections of the Bridge:

> Q. Okay. At any time, did you perform a depreciation evaluation of just the sections of the bridge that were damaged, which I think you in this paragraph estimate was about 350 feet?
>
> A. **No. So the depreciation was done on the replacement. Again, it's not typical to do depreciation on repairs. And in the I would say, I don't know, roughly 100 or so cases I've been involved in with costs, I've never seen anyone depreciate a repair. I have – I have yet to see that.**
>
> Q. Did you run any individualized depreciation analysis as to the components of the bridge that were replaced after the allision, meaning those parts that had new steel members or, you know, kind of replaced in full?
>
> A. **No, because they were repairs and they were integral and absolutely necessary for the bridge to be put back in service. Those spot repairs, if you will, did not extend the overall lifespan or useful life of the structure.**

**Ex. 1**, Tr. 74-75. Mr. Sadik admits, however, that he did not actually determine the useful service life of the bridge at any time:

> Q. Okay. Did you perform any type of testing at all or run any type of calculations to determine what the useful service life of the bridge was before the allision as compared to after the incident?
>
> A. No.
> [objection]
> A. No. That was outside my scope.

*Id.*, Tr. 65:6. Nonetheless, Mr. Sadik opines that "it would be unreasonable to say that a repaired bridge that was hit and repaired with similar materials is a betterment over the same bridge which was never hit or damaged by a vessel." *Id.* 65:19-66:10. Mr. Sadik ultimately bases his opinion on betterment on "common sense" and that he "cannot imagine a buyer wanting to pay additional money because something was hit. Fundamentally, that does not make sense." *Id.* 66:11-35. Despite this, Mr. Sadik admits that the repairs included replacing damaged 66-year-old steel with new, "stronger" steel that was not available when the Main Line Bridge was constructed. *Id.* 67:13-18; 62:25-63:11. Though he admits the replacement steel is stronger, Mr. Sadik did not run any type of evaluation of whether it has increased the load capacity or fatigue resistance of the Bridge, or whether the new replacement steel was more corrosive resistant than the 66-year-old carbon steel. **Ex. 1**, Tr. 65:1-9; 63:12-16.

### III.   Argument.

#### A. Mr. Sadik's RCV and ACV opinions are unreliable and irrelevant.

Mr. Sadik's methodology of valuing sections of the bridge that were not damaged renders the methodology flawed and irrelevant and his opinions should be excluded. There is no basis in the law of damages to include undamaged portions of the Bridge in the valuation or consideration of whether the repair costs were reasonable. In *M/V Marlin*, for example, neither party attempted to argue that the costs of repairs for the fendering system should include the *entire* cost or valuation of the Main Line Bridge. Rather, the valuation opinions and the Court's consideration were limited

4

to only the fendering system and the components that were used to replace it.  The *M/V Marlin* decision was rooted in the principles of the reported *Seaboard* decision, under which the Court "assumed that the *repaired portion* had a life expectancy 50% long than such *portion* had at time of collisions … and unless depreciated, the libelant now [had] a portion of its bridge with a useful life twice as long as it had prior to damage…" 237 F.Supp. at 14.  The same rule applies in this case—that is, the only relevant sections of the bridge and applicable depreciation to them are Spans 4, 3 and 2 that were actually damaged in the allision.  The other sections – which includes the expensive lift portion of the bridge – are irrelevant to the valuation and consideration of damages because they were not damaged as a result of the allision. Mr. Sadik's methodology of valuing the entire bridge is thus flawed and unreliable and should be excluded.

Moreover, Mr. Sadik admits his RCV calculations are simply a "rough order of magnitude" and that he did not apply the type of rigorous evaluation to determine what the actual replacement cost or actual cash valuation of the Bridge. According to Mr. Sadik, this would have included meeting with the Coast Guard, U.S. Navy to understand what constraints would be and "starting an entirely new bridge design." **Ex. 1**, 16-17.  Such an evaluation would have taken additional resources and Mr. Sadik concedes there is no way to determine which method is more reliable "until we go through that exercise." *Id.*, Tr. 17:8-19.  Mr. Sadik, instead, simply compared an Alabama bridge that he was familiar with, which he admits was markedly different than the Main Line Bridge that he compared it to.  *Id.*, Tr. 13-14.  This renders Mr. Sadik's opinions speculative and unfounded and thus they should be excluded.

### B. Mr. Sadik's opinions as to life expectancy and betterment are unfounded, speculative, and unreliable.

Throughout his report, Mr. Sadik makes several broad opinions that parrot the case law on measuring damages under admiralty law such as the "repair was done like in kind to the extent

5

possible and was not an upgrade or betterment." **Ex. 2** at p. 10 (#8); see also *id.* at p. 8 ("the repair was not a betterment"). In deposition, Mr. Sadik attempted to shoehorn in opinions on life expectancy that are nowhere to be found in his report, including that railroad bridges "do potentially have an indefinite lifespan." **Ex. 1**, Tr. 53:24-54:17. Despite these pronouncements, Mr. Sadik admits he bases his "betterment" opinions on "common sense" and his belief as to what a buyer of the Bridge may look for during a sale process. Mr. Sadik's common sense and personal beliefs are not a reliable methodology under *Daubert*, and he admits that he never ran any type of calculations or applied a scientific methodology to determine whether the Bridge had, for example, a greater fatigue resistance or load capacity before or after the allision. *Gen. Elec. Co. v. Joiner*, 522 U.S. 135, 146, 118 S. Ct. 512, 239 L.Ed. 2d 508 (1997) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Absent those types of analyses, Mr. Sadik's opinions on betterment and life expectancy of the Bridge are speculative, unfounded, and unreliable and thus they should be excluded from evidence in this case.

**IV. Conclusion.**

Mr. Sadik was retained by Evanston during the claims process to evaluate the proofs submitted by the Belt Line in connection with its claim for insurance benefits. Mr. Sadik applied methodologies for RCV and ACV valuations that are sometimes used by insurers, but which have no basis in the *Seaboard* rule of law for maritime property damages case. That measure of damages is replacement cost minus depreciation, including both materials and labor, for the repairs made to the damaged portions of the bridge. As set forth above, Mr. Sadik testified that he did not run this a depreciation evaluation for the actual damaged portions of the bridge. Since a crucial component of the *Seaboard* formula is depreciation of the alleged repairs, Mr. Sadik's calculations are wholly

irrelevant to determining the damages claimed in this case. Consequently, Mr. Sadik's report and opinions must be excluded. Moreover, Mr. Sadik's opinions on betterment and life expectancy of the Bridge are admittedly based on his own speculation and beliefs as to what constitutes "common sense." *Daubert* demands much more from purported experts. Mr. Sadik's opinions should therefore be excluded from evidence in this matter.

WHEREFORE, Petitioner Coeymans Marine Towing, LLC respectfully requests that the Court grant its Motion to Exclude Testimony and Opinions of Zane Sadik, PE and enter an Order barring Claimants from eliciting or offering Zane Sadik's testimony and opinions into evidence at any stage of this litigation, and for all other relief in favor of Petitioner as the Court deems just and proper.

Respectfully submitted,

Dated: September 3, 2025

**CLYDE & CO US LLP**

By: /s/ Harold L. Cohen
Harold L. Cohen (VSB No.:98148)
1221 Brickell Avenue, Suite 1600
Miami, FL 33131
Tel: 305-446-2646
Fax: 305-441-2374
Email: harry.cohen@clydeco.us;

James H. Rodgers*
Clyde & Co US LLP
45 Lexington Avenue, 16th Floor
New York, NY 10174
Phone: (212) 702-6771
Email: james.rodgers@clydeco.us

Michael J. Roman*
Dawn L. Johnson
Siobhan M. Murphy*
Clyde & Co US LLP

7

30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email: michael.roman@clydeco.us
dawn.johnson@clydeco.us
Siobhan.murphy@clydeco.us

Rachel Werner*
One North Central Avenue, Suite 1030
Pheonix, Arizona 85004
Phone: 480-746-4556
Email: rachel.werner@clydeco.us
*pro hac vice

## **CERTIFICATE OF SERVICE**

  I hereby certify that on September 3, 2025, a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will serve all counsel of record by electronic mail as follows:

Mark C. Nanavati, Esq. (VSB No.: 38709)
G. Christopher Jones, Jr., Esq. (VSB No.: 82260)
SINNOT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)
(804) 893-3862 (Jones)
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com
*Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

Zachary M. Jett, Esq. (VSB #93285)
BUTLER WEIHMULLER KATZ, et al
11525 North Community House Road
Suite 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

                */s/ Harold L. Cohen*