IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al.* | Civil Action No. 2:24-cv-00490-MSD-LRL |

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY AND EVANSTON INSURANCE COMPANY'S JOINT RESPONSE IN OPPOSITION TO PETITIONER'S MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF CAPTAIN <u>NICHOLAS J. LEWIS</u>**

COMES NOW Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") and Evanston Insurance Company ("Evanston"), by counsel, and respectfully provides this Joint Response in Opposition to Petitioner's Motion to Exclude the Testimony and Opinions of Captain Nichoal J. Lewis (Capt. Lewis) filed on August 29, 2025, and states as follows:

**FACTUAL BACKGROUND**

<u>Carver Hits a Stationary Bridge</u>

This is a hit and run bridge allision case. On June 15, 2024, the tug M/T MACKENZIE ROSE ("Tug"), owned and operated by Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver") from New York, struck the Belt Line's Main Line Railroad Bridge that spans the Southern Branch of the Elizabeth River between Chesapeake and Portsmouth, Virginia. The Tug, pushing a 200-foot loaded barge, hit the Portsmouth side of the bridge—far outside the navigable channel and well behind the fender system—with such force that it shoved the steel superstructure nearly 7 feet. Incredibly, the superstructure did not collapse but ended up suspended in midair, resting precariously on 3 of its 4 legs. The impact so severely damaged the superstructure and warped the steel rail that it rendered the bridge unusable until repaired.



*Above: View of approach from South to North*

After catastrophically damaging the bridge, the operators of the Tug backed up, navigated the tug and barge into the channel, through the bridge opening, and departed for New York without a word to the Belt Line, the U.S. Coast Guard, or any other authority. To date, total repair costs exceed $15.9 million.



*Above: Moment of Impact Captured on Surveillance Video*

Under the "Oregon Rule" of general maritime law, when a moving vessel allides with a stationary object like a bridge, the vessel is presumed at fault. *See The Oregon,* 158 U.S. 186

(1895); *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 795 (5th Cir. 1977); *United States v. Norfolk-Berkley Bridge Corp.,* 29 F.2d 115, 125 (E.D. Va. 1928). The Oregon Rule unquestionably applies here.

Nevertheless, through this action, having ignored one federal law that requires immediate reporting of allisions for public safety, Carver seeks to reap the benefit of another federal law to limit its liability to the value of the offending Tug, allegedly $2.5 million. *See* 46 C.F.R. § 4.05-1 (reporting requirement) and 46 U.S.C. § 30523 (claims subject to limitation). In opposition to the limitation action and in support of Belt Line and Evanston's claims against Carver, they jointly designated, among others, Capt. Lewis to offer opinions as to duty and causation. Capt. Lewis is a marine industry expert with over thirty years of experience in the marine industry, with twenty five years experience as US Coast Guard licensed mariner primarily operating tug boats. His Rule 26(a)(2) report is attached as Ex. 1.

*Captain Nicholas Lewis' Opinions*

1. The unit made direct contact with the bridge, causing visible structural movement (as evidenced by surveillance video), which is contrary to crew statements of "no damage" or "minor impact."

2. The unit deviated outside the navigational channel without cause and continued forward at approximately 5.2 knots towards a fixed portion of the Norfolk and Portsmouth Belt Line Railroad bridge.

3. The deck logbook entry was inaccurate and misleading, stating the unit had maneuvered onto fendering and away from the bridge when in fact it struck the fixed western structure directly.

4. The Officer of the Watch (Captain James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode) in a confined navigational channel, resulting in loss of directional control.

5. The company TSMS (Tug Safety Management System) lacked policy guidance prohibiting autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion.

6. The use of autopilot in a narrow inland waterway while approaching a fixed railroad bridge was in direct contradiction to established safe seamanship practices and warnings in the Simrad AP70MK2 Autopilot Manual.

7. Carver deprived the Norfolk and Portsmouth Beltline Railroad Company of protections afforded by the autopilot manufacturer, which created unseaworthy conditions aboard the McKenzie Rose and was a cause of the allision.

8. No lookout was posted in violation of 33 C.F.R. §83.05 (Rule 5 Look-Out), a critical error during confined water navigation and daylight while pushing ahead a barge.

9. The company TSMS (Tug Safety Management System) did not prohibit autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operate or discretion.

10. Carver gave no official training to its operators with regard to how to safely transit a waterway when approaching a bridge, when a proper lookout should be posted, and had no restrictions on the use of autopilot.

11. The Coast Guard was not promptly notified of the allision in violation of 46 C.F.R. §4.05-1. This delayed official investigation and post-incident drug and alcohol testing, and created potentially dangerous conditions for the Norfolk and Portsmouth Beltline Railroad Company and the public at large.

12. Post incident accounts from multiple crew members were inconsistent, with discrepancies and timing, actions taken, and observations.

13. By not having the autopilot repaired and not restricting the use of the autopilot, Carver management was a cause of the allision with the NPBL bridge.

14. These failures - navigational, procedural, and managerial - singularly or in combination, created an unreasonably dangerous and unseaworthy condition that violated well established standards of safe marine practice, and were causes of this allision incident.

15. In my opinion, given the lack of training to the crew, the lack of policies and procedures regarding the use of an autopilot or lookout during bridge transits, the known issues with the autopilot, and Captain Morrissey's prior allision, the Tug Mackenzie Rose was unseaworthy. Carver should not have allowed this Tug to sail with this crew.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, the Court acts as a gatekeeper "to verify that expert testimony is based on sufficient facts or data." *E.E.O.C. v. Freeman,* 778 F.3d 463, 472 (4th Cir. 2015) (Agee, J., concurring) (citing Fed. R. Evid. 702). The expert testimony must be shown to be

"not only relevant, but reliable." *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579, 589 (1993). "Because 'expert witnesses have the potential to be both powerful and quite misleading,' it is crucial that the district court conduct a careful analysis into the reliability of the expert's proposed opinions." *United States v. Fultz,* 591 Fed. App'x 226, 227 (4th Cir. 2015) (quoting *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001).

The trial court must ensure that the testimony (1) "will help the trier of fact to understand the evidence or to determine a fact in issue,"; (2) "is based on sufficient factors or data"; (3) "is the product of reliable principles and methods,"; and (4) "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," *Daubert,* 509 U.S. at 592–93, and whether the expert has "faithfully appl[ied] the methodology to the facts." *Roche v. Lincoln Prop. Co.,* 175 Fed. App'x 597, 602 (4th Cir. 2006). Additionally, the Court must evaluate any proposed expert testimony under Federal Rule of Evidence 403.

Factors to be considered in assessing the reliability of technical or scientific evidence include "whether a theory or technique…can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," the "known or potential rate of error," the "existence and maintenance of standards controlling the technique's operations," and whether the theory or technique has garnered "general acceptance." *Daubert,* 509 U.S. at 593–94. Courts have also considered whether the "expert developed his opinions expressly for the purposes of testifying" or through research conducted independent of litigation." *See Wehling v. Sandoz Pharm. Corp.,* 162 F.3d 1158 at *3 (4th Cir. 1998); *Daubert v. Merrell Dow Pharm. Inc.,* 113 F.3d 1311, 1317 (9th Cir. 1995) (on remand). The *Daubert* factors are not exhaustive and illustrate the

5

type of factors "that will bear on the inquiry." *United States v. Hassan,* 742 F.3d 104, 130 (4th Cir. 2014).

The proponent of the expert testimony carries the burden to establish the admissibility of the testimony by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001); Fed. R. Evid. 702 (noting witness is qualified if the proponent demonstrates "it is more likely than not that" that Rule 702's factors are met). The Fourth Circuit has held that "Rule 702 excludes expert testimony on matters within the common knowledge of [the trier of fact]". *Persinger v. Norfolk & W. R. Co.,* 920 F.2d 1185, 1188 (4th Cir. 1990); *Scott v. Sears, Roebuck, & Co.,* 789 F.2d 1052, 1055 (4th Cir. 1986) (noting by negative implication that "Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of (the trier of fact) because such testimony, almost by definition, can be of no assistance"); Fed. R. Evid. 702 (requiring that an admissible expert opinion be based upon "scientific, technical, or other specialized knowledge"). The admission of "common sense" expert testimony is dangerous because "the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." *Scott,* 789 F.2d at 1055.

## ARGUMENT

The opinions of Capt. Lewis are admissible because they are based on sufficient facts/data and are the product of a reliable application of specialized knowledge and principles involved in marine operations. There is no analytical gap between the data and the conclusions reached. Proper navigational, procedural, and managerial considerations incumbent upon a tug owner and its crew are not typically within the common knowledge of the trier of fact. Thus, testimony from an expert witness with specialized knowledge of tug and barge operations is necessary to assist the trier of fact to understand the evidence and to determine facts at issue in this matter.

Carver designated marine industry expert Captain Sam Stephenson to offer opinions on duty and causation, as well as to rebut the opinions offered by Capt. Lewis. The result is a "battle of the experts" who disagree on the facts of the case and the application of the facts to applicable industry standards. However, "questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility of the witness' assessment, not its admissibility." *See Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (internal quotations omitted); *Rappuhn v. Primal Vantage Co.*, No. 23-10050, 2024 WL 2930448, at *4 (11th Cir. June 11, 2024) ("[C]rediting one expert over another ... misapplies *Daubert* and intrudes on the province of the jury."). Capt. Lewis should be allowed to testify to his Opinions No. 1-15 as outlined in Ex. 1. The trier of fact may then give the appropriate weight and credibility of Capt. Lewis' assessment.

## I. CAPT. LEWIS'S OPINIONS NOs. 5, 6, 7, 9, & 10 ARE RELIABLE AND RELEVANT

Carver seeks to exclude Capt. Lewis' Opinion Nos. 5, 6, 7, 9 & 10 "because he fails to actually identify the standard of care for which he opines" and "does not cite to any rule, regulation, publication or other authority" in reaching his conclusions. This is inaccurate. Capt. Lewis' report outlines the basis of his opinions, including the documents reviewed:

(1) Simrad AP70MK2 Auto Pilot Manual;

(2) 33 CFR §83.05 US Inland Rules of the Road – Rule 5 Look-Out;

(3) 46 C.F. R. §4.05-1 Notice of Marine Casualty;

(4) Carver's Tug Safety Management System (TSMS); and,

(5) Discovery documentation and sworn deposition testimony in this matter.

These rules, regulations, publications, and discovery documents allow Capt. Lewis to form opinions based on his education, training, background and specialized knowledge gained after

more than thirty years of experience in the marine industry, twenty-five of which was as a US Coast Guard licensed Captain, primarily operating tugboats. When supported by competent and reliable evidence (such as federal law, Petitioner's internal policies, verified discovery responses and sworn testimony), the opinions are reliable.

Opinion Nos. 5, 6, 7, 9, and 10 are derived from a review of Carver's TSMS and the Simrad autopilot manual. The plain language of the Simrad manual prohibits autopilot use "in heavy traffic areas or in narrow waters" yet Carver's TSMS placed no restrictions on the use of autopilot at any time, including in narrow waterway, high traffic areas, confined spaces, or when transiting bridges. (Ex. 1 at p. 6). As a tug Captain with over twenty-five years of experience, Capt. Lewis opined upon industry practices and the industry standard among tug companies was to provide instructions to tug captains on the appropriate use of an autopilot, including restrictions on such use. Capt. Lewis applied his background, training, experience, and specialized knowledge during his review of Carver's TSMS and autopilot manual in rendering his opinion.

Carver further moves this Court to exclude Opinion Nos. 5, 6, 7, 9, and 10 because Capt. Lewis operated, among other vessels, tug and oil barges. This is a red herring argued to deflect away from Carver's managerial shortcomings by focusing on a nuance of Capt. Lewis' experience. Opinion Nos. 5, 6, 7, 9 and 10 focus (either in whole or in part) on Carver's lack of institutional prohibition on the use of autopilot in confined waterways or when transiting a bridge despite the manufacturer's warning prohibiting autopilot use. These opinions are not limited to tug and oil barges, but rather a reflection of Capt. Lewis' background, training, experience, and specialized knowledge gained while operating tugboats as a licensed mariner, including light tugs (that is, a tug without a barge). As Capt. Lewis noted in his deposition, "Anywhere I ran a tugboat, you always ran a light tugboat." (Dep. of Lewis at 140:8-9) This is because a tug is without a barge

8

between pick up and drop off, necessitating navigation of narrow channels and transitioning bridges. Capt. Lewis should be permitted to testify as to Opinion Nos. 5, 6, 7, 9 and 10 because they are not limited to tug and oil barge operation, but rather marine industry standard on operational and managerial procedure related to the use of an autopilot.

Finally, Carver seeks to exclude Capt. Lewis' Opinion Nos. 5, 6, 7, 9, and 10 by alleging these opinions are speculative. Carver purports that Capt. Lewis assumes that if Carver (1) had policies in place to restrict the use of autopilot and (2) trained Mate Morrissey, then the allision would not have occurred. Carver misses the point. While Carver seeks to blame Mate Morrissey exclusively for navigational error, Carver ignores the autopilot owner's manual warning and marine industry standards that lead the parties to the position they are in today – that is, a dispute over Carver's privity and knowledge of the Tug's seaworthiness prior to the hit and run allision. Capt. Lewis' Opinion Nos. 5, 6, 7, 9, and 10 highlighted the deficiencies in Carver's own policies and procedures, and underscore Carver's ignorance of the autopilot owner's manual. If Carver had policies in place to restrict the use of the autopilot and properly trained the Tug's crew, the hit and run allision might be considered a pure navigational error. However, in the absence such policies and training, Carver willfully ignored both the autopilot's manual and industry standards – neither of which are speculative. Capt. Lewis' Opinion Nos. 5, 6, 7, 9, and 10 are relevant to assist the trier of fact because they are based on Carver's own inadequate policies, the autopilot manual, and marine industry standards.

For the foregoing reasons, Capt. Lewis should be permitted to offer Opinion Nos. 5, 6, 7, 9, & 10 at trial.

## II. OPINION #8 SHOULD BE ADMISSIBLE BECAUSE IT IS RELIABLE, HEPFUL, RELEVANT AND A SPECIALIZED OPINION

Capt. Lewis' opinion that Carver failed to keep a proper lookout is based on his education, training, background and specialized knowledge as a licensed captain on tug and barge ocean-going units. They were not developed solely for the purpose of testifying. His opinion is reliable because it is not limited to his experience exclusively with oil barges. While the parties disagree as to whether or not a lookout is necessary, Capt. Lewis should be permitted to testify regarding his experience and knowledge based on his 25+ year career as a licensed U.S. Coast Guard Master of Steam and Motor vessels of up to 1600 gross tons upon oceans, and a 3rd Mate of Steam and Motor vessels of unlimited tonnage. Specifically, Capt. Lewis testified:

```
20    Q.    With regards to tugs pushing or towing an oil
21    barge, to your knowledge is there a separate regulation
22    or law regarding lookouts?

23    A.   No.  But the rule five lookout rule is just a
24    minimum.  I mean, we've always had a lookout, you know.
25    It was irregardless whether it was an oil barge or a scow
 1    or whatever, I would always have a lookout at hand in the
 2    wheelhouse with me, if possible, underway in a river, in
 3    a river transit, daylight or nighttime.
```
(Lewis Tr. at 55:20 – 56:3).

Capt. Lewis' experience as to the use of a lookout as a Captain on a Light Tug (a tug without a barge) or when pushing a scow (large flatbottom boat with square ends, typically used for transporting non-hazardous freight) is relevant and reliable, and is not limited to his experience with tugs pushing oil barges. His testimony addresses Carver's knowledge and privity of unseaworthiness, as Carver abdicated to Mate Morrissey complete discretion on the use of a lookout. Establishing Morrissey failed to keep a proper lookout prior to the allision underscores Carver's knowledge and privity of the Tug's unseaworthiness because Carver neither required a lookout nor trained Morrissy on proper procedure for a lookout when transiting a bridge in a confined waterway. Carver's designated marine expert Capt. Stephenson intends to opine Carver

kept a proper lookout prior to the hit and run allision. Given the disagreement among designated marine experts, the trier of fact should give the appropriate weight and credibility to the proffered testimony.

Finally, Carver argues expert testimony on the use of a lookout should be excluded because it is common sense. The marine industry is highly specialized, requiring US Coast Guard licensure to operate tugs, and often involves a career at sea. For these reasons, this Court permits testimony by designated expert witnesses on the requirements to post a proper lookout. *In Matter of Complaint of Vulcan Materials Co.*, 674 F. Supp.2d 756 (E.D. Virginia, Norfolk Division 2009). For the foregoing reasons, Capt. Lewis should be permitted to offer Opinion No. 8 at trial.

### III.  OPINIONS 1, 2, 3, 11, AND 12 ARE RELEVANT AND PROPER EXPERT TESTIMONY

Opinions 1, 2, 3 and 12 go to the very matter at issue in the limitation action: whether Carver had knowledge and privity of the unseaworthiness of the vessel prior to or at the time of the allision. Specifically, these opinions form the basis to assert the crew was not properly trained by Carver rendering the tug unseaworthy prior to the allision. The question of seaworthiness "is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport". *The Southwark*, 191 U.S. 1, 9 (1903); *Bank Line v. Porter*, 25 F.2d 843 (4 Cir.), cert. denied, 278 U.S. 623, 49 S.Ct. 25, 73 L.Ed. 544 (1928). Claimants' position is the Tug was not seaworthy because Carver's lack of training of the Tug's crew on proper approach to the Belt Line Bridge (i.e. allowing the use of the autopilot despite owner's manual warning and two prior unresolved near misses due to autopilot failure) and the failure to properly report the allision both internally and in accord with Federal Law all render the Tug unseaworthy.[1]

---

[1] "On May 3, 2024, the autopilot took a hard left while the tug weas towing a barge at sea turning the Tug back towards the barge. The Tug barely missed colliding with the barge. On May 21, 2024,

Carver's crew made direct contact with the bridge, causing obvious structural damage (which Carver denies), and the crew reported "no damage" despite causing the bridge's superstructure to move seven feet off its support. The existence of the navigation channel, deviation outside the same (which Carver denies), and the speed at the time of the allision all require specialized knowledge from an expert to assist the trier of fact. Furthermore, the import of proper deck logbook entries and the effect of improper entries (which Carver denies) require specialized knowledge. Carver denies the facts above, thereby requiring expert testimony to establish Claimants' position as to duty and liability, as well as rebut Carver's claim that it lacked privity and knowledge.

Opinion 11 addresses Federal Law (46 C.F.R. §4.05-1), its application to vessel seaworthiness, and the impacts of violating the regulation. Expert witness testimony is necessary to assist the Court with the applicable regulation at issue, its purpose, and potential ramifications if violated. Carver incorrectly argues their "post-incident reporting has no relevancy to determine the cause of the allision, or the issues of privity and knowledge." On the contrary, post-incident reporting as under 46 C.F.R. §4.05-1 is required to allow the Coast Guard to immediately begin its investigation into the condition of the vessel, the autopilot, the steering system, or other factors that led to the reportable casualty, including mandatory drug and alcohol testing of the crew, which could reveal the cause of the allision[2]. Said differently, the failure to report (as directed by Carver management in a blatant coverup) prevented the immediate determination of the cause of the allision, which inferentially supports Claimants' contention that Carver had pre-allision knowledge

---

the autopilot once again had a hard over rudder incident and headed the Tug into heavy seas." Lewis' Report, p.11.

[2] As more fully briefed in Claimants' Joint Memorandum in Support of Claimants' Motion for Summary Judgment (DE 91), Carver directed the crew to proceed away from the allision without reporting the allision to the Coast Guard pursuant to 46 C.F.R. §4.05-1.

12

and privity that the Tug was not seaworthy. Because no report was made to the Coast Guard, the immediate investigation was not possible, thereby making the failure to report a central issue in determining the Tug's seaworthiness prior to the allision. Nothing about Carver's failure to report the allision to the Coast Guard is unfounded, inflammatory, or improper, as suggested by Carver. Carver's failure to report is factual. The impact and consequence of Carver's violation of 46 C.F.R §4.05-1 may be explained by a marine industry expert to assist the trier of fact in determining the seaworthiness of the Tug prior to the allision.

For the foregoing reasons, Capt. Lewis should be permitted to offer Opinion Nos. 1, 2, 3, 11, and 12 at trial.

## IV. OPINION 13, 14, AND 15 ARE RELIABLE, NOT SPECULATIVE, WELL FOUNDED AND SHOULD BE ADMITTED

Carver seeks to exclude Capt. Lewis' Opinion No. 13 because Carver now claims there was no "hard-over event" prior to the June 15, 2024, hit and run allision. Capt. Lewis' Opinion No. 13 reads: "By not having the autopilot repaired and not restricting the use of the autopilot, Carver management was a cause of the allusion with the NPBL bridge." Carver ignores the language of the opinion, as there is no mention of a "hard-over event" in Opinion 13.

The May 3, 2024, and again on May 21, 2024, reports of autopilot failures aboard the Tug were reported to Carver management by tug personnel. These are briefed in Claimants' Joint Memorandum in Support of Claimants' Motion for Summary Judgment (DE 91).[3] There is no

---

[3] 48. On May 3, 2024, just 6 weeks before the Allision, Captain Miller, as confirmed by Mate Erik Walordy, filed a "near miss report" in Carver's HELM system records describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "the steering went into standby and the rudder came hard over without alarm." *See* Exhibit Y (05/03/24 Near Miss Report); Exhibit DD (Walordy Dep. 24:18-26:19).

49. On May 21, 2024, 3½ weeks before the Allision, Captain Milled filed an incident report in Carver's HELM system records describing an incident with the M/T MACKENZIE ROSE wherein

13

dispute a "near-miss report" was filed on May 3, 2024 and a serious incident report was filed on May 21, 2024. Both attributed the steering problems to autopilot failure. There is also no dispute that Carver did not undertake to have any repair or inspection performed to the autopilot prior to the June 15, 2024 allision. As noted above, the autopilot's manual does not permit the use of the autopilot in "heavy traffic areas or in narrow waters." This Court should permit Capt. Lewis to evaluate these facts based on his background, training, and specialized knowledge as a Licensed US Coast Guard licensed Captain with 25+ years of operating experience, and to render an opinion based on his expertise. Opinion No. 13 that the autopilot was not repaired after two reported incidents in May 2024 and that Carver did not restrict the use of the autopilot is supported by the undisputed facts. Based on these facts, Capt. Lewis should be allowed to testify that Carver management was a cause of the allision with the NPBL bridge.

Opinion Nos. 14 and 15 are Capt. Lewis' ultimate opinions he intends to offer based on his background, education, training, and specialized knowledge gained after more than thirty years in the marine industry. The opinions are supported by the facts in this case and are intended to assist the trier of fact in evaluating the evidence in this case. Opinion Nos. 14, and 15 are well founded, supported by evidence established during discovery, and based on Capt. Lewis' career as a US Coast Guard licensed Captain. When supported by competent and reliable evidence, the opinions are reliable. Capt. Lewis' ultimate Opinion Nos. 14 and 15 are reliable, relevant, and should be admitted at trial.

For the foregoing reasons, Capt. Lewis should be permitted to offer Opinion Nos. 13, 14, and 15 at trial.

---

the steering went unexpectedly hard left when the tug was in autopilot. *See* Exhibit Z (05/21/24 Incident Report).
(DE 91 at p. 16).

14

## CONCLUSION

Capt. Lewis intends to offer opinions Nos. 1-15 outlined in Ex. 1 based on his knowledge of marine industry standards and his background, education, training, and specialized knowledge developed over his 25+ career as US Coast Guard licensed Captain operating tugboats. Capt. Lewis authored Ex. 1 based on reliable industry standards applicable to marine navigational, procedural, and managerial operations. He applied those standards to the facts gathered during discovery and his knowledge of commercial tugboat operations. Carver challenges Capt. Lewis' reliance on certain facts and argues that the opinions of its experts provide a more reliable account of the cause of the allision. Carver further alleges of Capt. Lewis' knowledge of accepted maritime industry standards is irrelevant because Capt. Lewis often operated a tug pushing an oil barge. These bases are insufficient to support the exclusion of expert testimony, and are more appropriate to be addressed during cross-examination.

WHEREFORE, Belt Line and Evanston respectfully request the Court deny Petitioner's Motion to Exclude the Testimony and Opinions of Captain Nicholas J. Lewis.

This 12th day of September 2025.

/s/*Zachary M. Jett*
Zachary M. Jett, Esq. (VSB # 93285)
BUTLER WEIHMULLER KATZ CRAIG LLP
11525 N. Community House Road, Suite 300
Charlotte, North Carolina 28277
Telephone: (704) 543-2321
Facsimile: (704) 543-2324
Email: zjett@butler.legal

Mark C. Nanavati, Esq. (VSB # 38709)
G. Christopher Jones, Jr., Esq. (VSB # 82260)
SINNOTT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
Telephone: (804) 893-3866 (Nanavati)
Telephone: (804) 893-3864 (Jones)
Facsimile: (804) 378-2610
mnanavati@snllaw.com
cjones@snllaw.com

*Attorneys for Evanston Insurance Company*


/s/*James L. Chapman IV*
James L. Chapman, IV, Esq.
W. Ryan Snow, Esq.
Mackenzie R. Pensyl, Esq.
Crenshaw, Ware & Martin, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com

*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of September 2025 a true and correct copy of the forgoing *Norfolk and Portsmouth Beltline Railroad Company and Evanston Insurance Company's Joint Response in Opposition to Petitioner's Motion to Exclude Testimony and Opinions of Captain Nicholas J. Lewis* has been filed through the Court's CM/ECF electronic filing system, which will automatically delivery electronic notification of the same to the following counsel of record:

Harold L. Cohen, Esq.
Clyde & Co US LLP
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
Harry.Cohen@Clydeco.us

Michael J. Roman, Esq.
Dawn L. Johnson, Esq.
Siobhan Murphy, Esq.
Clyde & Co US LLP
30 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606
Michael.Roman@clydeco.us
Dawn.Johnson@clydeco.us
Siobhan.murphy@clydeco.us

*Attorneys for Coeymans Marine Towing, LLC
d/b/a Carver Marine Towing*

James H. Rodgers, Esq.
Clyde & Co US LLP
405 Lexington Avenue
New York, New York 10174
James.Rodgers@clydeco.us

Rachel Werner, Esq.
One North Central Avenue, Suite 1030
Phoenix, Arizona 85004
Rachel.Werner@clydeco.us

*Attorneys for Coeymans Marine Towing, LLC
d/b/a Carver Marine Towing*

I further certify that on this 12th day of September 2025 a true and correct copy of the forgoing *Norfolk and Portsmouth Beltline Railroad Company and Evanston Insurance Company's Joint Response in Opposition to Petitioner's Motion to Exclude Testimony and Opinions of Captain Nicholas J. Lewis* has been served upon the following by electronic mail and by placing a copy in the United Stated Mail, postage pre-paid, to:

James Morrissey
4723 Baywood Drive
Lynn Haven, Florida 32444
jdmorrissey15@gmail.com
*Pro Se* Defendant

                                                      /s/Zachary M. Jett
                                                     Zachary M. Jett, Esq.