# CAPTAIN'S REPORT

### of the

# TUG MACKENZIE ROSE INCIDENT

*In the Matter of COEYMANS MARINE TOWING, LLC d/b/a CARVER MARINE TOWING as Owner and Operator of M/T ·MACKENZIE ROSE, (IMO No. 8968765), her cargo, engines, boilers, tackle, equipment, apparel, and appurtenances, etc., IN REM, ("M/T MACKENZIE ROSE"), petitioning for exoneration from or limitation of liability in allision with Norfolk and Portsmouth Belt Line Railroad Company Main Line Railroad Bridge (the "Bridge") occurring June 15, 2024 in and about the Elizabeth River, Virginia.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA: NORFOLK DIVISION**
**Case No. 2:24-cv-00490**

**RFI File No. 25FE0014**

Prepared By:

**CAPTAIN NICHOLAS J. LEWIS**

**July 2, 2025**

┌─────────────────┐
│   **EXHIBIT**   │
│      **A**      │
└─────────────────┘



**TUG MACKENZIE ROSE INCIDENT**

<u>CAPTAIN'S REPORT</u>                                                                                    <u>July 2, 2025</u>

**A.   INTRODUCTION**

On June 15, 2024, the Tug Mackenzie Rose, pushing ahead the deck barge Weeks 281, was transiting northbound on the Elizabeth River, Southern Branch, Virginia. During the transit, the tug/barge allided with the Norfolk and Portsmouth Belt Line Railroad Company Main Line Railroad Bridge. The Bridge was damaged as a result of the allision.

The purpose of my investigation was to determine if the actions/inactions of the Captain aboard the Tug Mackenzie Rose and the owners of the tug, Coeymans Marine Towing, LLC and Carver Marine Towing, LLC (hereinafter "Coeymans," "Carver"), created unreasonably dangerous conditions that caused the allision with the Bridge.

My investigation into this matter and the preparation of this report was performed at the request of Mark C. Nanavati, Esq. of Sinnott, Nuckols & Logan, P.C., 13811 Village Mill Drive, Midlothian, Virginia 23114.

**B.   QUALIFICATIONS**

I am a graduate of the State University of New York, Maritime College at Fort Schuyler, with a Bachelor of Science degree in Marine Transportation.

I have more than 30 years in the marine industry, both at sea and ashore. I am a retired licensed U.S. Coast Guard Master of Steam and Motor vessels of not more than 1600 gross tons upon oceans and a 3rd Mate of Steam and Motor vessels of any gross tons upon oceans. I have been a Captain for more than 25 years on tug and barge ocean-going units. I also worked as a 3rd Mate aboard ocean-going tankers.

As the Captain of the vessel, I was responsible for the overall operation of the vessel, including the safe navigation, and mooring of the vessel, compliance with all safety policies and procedures; including vessel security and ensuring that all vessel maintenance schedules were up to date. I was responsible for all aspects of the operation: budget planning, purchasing of stores, spare parts, safety equipment, electronics, fuel, as well as crews' payroll and overtime.

As Captain and Mate aboard ocean tankers and tanker barges, I was responsible for developing critical vessel onboard procedures and protocols to comply with company policies. This included writing procedures for oil and cargo transfers as well as an operation manual for all tasks done aboard the vessel. I was also responsible for all vessel inspections, audits, onboard injury investigations and analysis.

My CV outlining my complete education, experience and training is attached separately.



1

### TUG MACKENZIE ROSE INCIDENT

The approach taken for the analysis of this investigation is based on reliable scientific reasoning and methodology which is accepted by the scientific community. All my statements, findings, analysis, and opinions contained herein are stated within a reasonable degree of professional certainty. They are based on my education and over 30 years of experience in the marine industry and are subject to change if additional information becomes available.

<u>Testimony as an Expert</u>

A document listing each of the occasions on which I have given expert testimony in the past 4 years is attached separately.

<u>Exhibits</u>

I reviewed and may use the following materials as exhibits to illustrate testimony: all references and documents cited in this report or listed as Materials Available for Review.

**C.  AVAILABLE INFORMATION**

1. Complaint for Exoneration from or Limitation of Liability (Filed 8/08/2024).
2. Answer of Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company, to the Petition for Exoneration from or Limitation of Liability (Filed 12/05/2024).
3. Claim of Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company (Filed 12/05/2024).
4. Carver Rule 26(a)(1) Initial Disclosures
5. Coeymans' Initial Production (000253-000705)
6. NPBL Initial Production (000001-000211)
7. US Coast Guard Form 2692,
8. Rosepoint and Logbook Data
9. Master's Daily Reports
10. Near Miss, Incident Reports and JSA's (Carver ESI 000020-000037)
11. Responses & Objections to #101618597v4 Plaintiff's First Set of Discovery Requests – Page 2
12. Carver's First Supplemental Answers to Belt Line's First Set of Interrogatories
13. Carver Marine's Third Supplemental Response to the Belt Line's First Requests for Production of Documents and Things
14. Norfolk - Carver Production for Third Supplemental Response to RFPs
15. NPBL's First Supplemental Responses to Coeymans' Requests for Production
16. NPBL Supplemental Production
17. Response to Norfolk and Portsmouth Belt Line Railroad Company's Second Set of Requests for Production of Documents
18. Response to First Requests for Production of Documents and Things
19. Answers to Norfolk and Portsmouth Belt Line Railroad Company's First Set of Interrogatories



2

**TUG MACKENZIE ROSE INCIDENT**

20. NPBL000201-2024-06-15, Allision Event Surveillance Vidéo 1
21. Norfolk and Portsmouth Belt Line Railroad Company's Responses to Petitioner's Second Requests for Production of documents
22. Brian Moore Deposition and exhibits, April 28, 2025.
23. Leonard Baldassare Deposition and Exhibits, April 29, 2025.
24. Jarkeis Jamal Bass Morrissey Deposition, April 30, 2025.
25. Sharif Porter Deposition, April 30, 2025.
26. Carver/Nicholas Laraway Deposition and Exhibits, June 17, 2025
27. Jason McGrath Deposition and Exhibits, June 18, 2025

**D.  DESCRIPTION OF THE INCIDENT**

On June 15, 2024, Captain Morrissey (Morrissey) was steering the Tug Mackenzie Rose (Tug) on autopilot without a designated lookout while transiting north on the Southern Branch of the Elizabeth River, Virginia. The Tug was pushing ahead a 200-foot unmanned deck barge, Weeks 281 (Barge), owned by Weeks Marine.

The Tug/Barge (Unit) was in the channel heading for the center of the Norfolk and Portsmouth Belt Line Railroad Company Main Line Railroad Bridge (Bridge). The Bridge was in the up position to allow for clear passage to any marine traffic on the River. As the Unit was approaching the Bridge, it veered hard to port (left), causing the Unit to go out of the channel towards the west side of the Bridge. At that location, the Bridge is a fixed structure just a few feet above the River with no lift for the Unit to clear underneath the Bridge.

The speed of the Unit was approximately 5.2 knots as the Unit approached the Bridge. The video: NPBL000201-2024-06-15, Allision Event Surveillance Video 1 shows the Barge hitting the Bridge after which the structure can be seen rocking hard back and forth. After the allision with the Bridge, Morrissey backed the Tug full astern, maneuvering the Unit all the way back into the channel and then proceeded to go ahead and pass under the open Bridge.

The Captain on watch, steering the Tug, James Morrissey's statement of the incident follows:

> *June 15, 16:59: Statement that happened approximately 16:30 with the Nort and PBL RR Bridge.*
>
> *I, James Morrissey, was operating outbound in Norfolk VA southern branch of the Elizabeth river with the barge weeks 281. The Tug experienced a steering malfunction causing the tug and barge to turn to port and touchup on the bridge before it could be corrected. No Damage to the barge and no visible damage to the bridge.*
> *Captain James Morrissey.*



3

**TUG MACKENZIE ROSE INCIDENT**

I anticipated more would be learned from his deposition on that was noticed for June 24, 2025, but he failed to appear to testify. Captain Morrissey, in command of the Unit, completely disregarded all safe practices of good seamanship and navigation. He negligently[1] and recklessly[2] deviated outside the navigational channel, and without cause proceeded ahead at a speed of approximately 5.2 knots until the Unit allided with the western side of the fixed portion of the Bridge.

**E.    BACKGROUND**

The Norfolk and Portsmouth Belt Line Railroad Company is the owner of the Bridge, which crosses the southern branch of the Elizabeth River between the cities of Chesapeake and Portsmouth, Virginia. The bridge is a single-track railroad vertical lift bridge and remains in an open position such that vessel traffic may pass underneath it, except when lowered to allow trains to pass.

See 33 C.F.R. § 117.997:

> **117.997 Atlantic Intracoastal Waterway, South Branch of the Elizabeth River to the Albermarle and Chesapeake Canal.**
>
> (a) The draw of the Belt Line Railroad Bridge, mile 2.6, in Portsmouth and Chesapeake will operate as follows:
>> (1) The bridge will be left in the open position at all times and will only be lowered for the passage of trains and to perform periodic maintenance authorized in accordance with subpart A of this part:
>>
>> (4) When the bridge closes for any reason, the controller will announce 30 minutes in advance, 15 minutes in advance, and immediately preceding the actual lowering, over marine channel 13, that the Belt Line Railroad Bridge is closing for river traffic. In each of these three announcements, the bridge/train controller will request all concerned river traffic to please acknowledge on marine channel 13.

---

[1] Negligent: a. marked by or given to neglect especially habitually or culpably; b. failing to exercise the care expected of a reasonably prudent person in like circumstances. (Merriam-Webster.com Dictionary, s.v. "negligent," accessed July 2, 2025. https://www.merriam-webster.com/dictionary/negligent

[1] Reckless: marked by lack of proper caution : careless of consequences. (Merriam-Webster.com Dictionary, s.v. "reckless," accessed July 2, 2025. https://www.merriam-webster.com/dictionary/reckless



4

**TUG MACKENZIE ROSE INCIDENT**

**Tug Mackenzie Rose Crew Matrix on June 15, 2024:**

    Captain Christopher Lee Miller

    Captain/Mate James Dominick Morrissey

    Deckhand Sharif Porter

    Deckhand Jarkeis Jamal Bass Morrissey

    Engineer Jason McGrath

**June 15, 2024, Mackenzie Rose logbook entry**

> *Incident - Norfolk, VA - Mate James Morrissey reports the auto pilot was not completely turned off he was able to correct and switch back over to hand steering and begin backing on the Weeks 281 Barge and maneuvered the barge alongside fendering on the North and PBL RR Bridge, photo taken. proceed slowly away from bridge.*

This entry omits any information that the Unit plowed directly into the Bridge. The point of impact was on the west side of the fendering, outside the channel. The video shows the Tug moving ahead at over 5 knots when the barge hit the structure of the Bridge, where the west side trestle was located. It also shows the trestle rocking back and forth, several times, after the impact. Due to the allision, the railroad tracks were shifted out of alignment. This caused the Bridge to be shut down to all train traffic in either direction.

## F.   ANALYSIS

Based on my training and experience and the documents reviewed, crew statements, vessel logs, USCG 2692 form, and applicable regulations, it is my expert opinion that several navigational, procedural, and managerial failures contributed to and caused the subject hit and run allision.

The Officer of the Watch (OOW), Captain James Morrissey, was using autopilot when he should have been manual steering. This error directly resulted in the tug and barge veering to port, outside the safe channel, leading to the allision with the bridge.

When operating a tug/barge unit in a narrow channel it is imperative to use good seamanship and to operate in a safe and prudent manner. The OOW should be controlling the rudder with manual steering, not autopilot. The Coeyman's Tug Safety Management System (TSMS) does not prohibit the use of the autopilot in restricted conditions such as bridges or busy waterways like the Southern Branch.



**TUG MACKENZIE ROSE INCIDENT**

Carver's General Manager, Brian Moore confirmed under oath that there was no policy restriction on autopilot use in the Elizabeth River. This represents a significant lapse in safety oversight by vessel management. B. Moore Deposition: 281: 17-23:

17· · · · · · · · There was no prohibition -- Carver

18· ·didn't prohibit the captain from using the auto pilot

19· ·system in the transit that he was making, you know,

20· ·down the southern branch of the Elizabeth River

21· ·before the allision?

**22· · · · ·A.· · · No. It's up to the captain's discretion**

**23· ·to make that judgment call.**

**The Coeyman's Tug Safety Management System (TSMS) documentation had no explicit policy, specific prohibition or procedural control for autopilot use near bridges or in confined waters. This lack of procedural guidance allowed the captain to rely on personal discretion, contrary to industry best practices and standards.**

In addition, the use of autopilot in confined inland waterways, particularly when approaching a fixed structure such as a railroad bridge, violates best practices and specific warnings found in the Simrad AP70MK2 Autopilot Manual Chapter 2: (The Autopilot used in the upper wheelhouse on the Tug Mackenzie Rose at the time of the allision.)

**Basic operation**
**Safe operation with the autopilot**

Warning: An autopilot is a useful navigational aid, but DOES NOT replace
a human navigator.
Warning: Ensure the autopilot has been installed correctly, commissioned
and calibrated before use.
Do not use automatic steering when:
  • **In heavy traffic areas or in narrow waters**
  • In poor visibility or extreme sea conditions
  • When in areas where use of an autopilot is prohibited by law
When using an autopilot:
  • **Do not leave the helm unattended**
  • Do not place any magnetic material or equipment near the heading sensor used by the autopilot system
  • Verify at regular intervals the course and position of the vessel
  • **Always switch the autopilot to standby and reduce speed in due time to avoid hazardous Situations.**
  • **Verify at regular intervals the course and position of the vessel.**



6

### TUG MACKENZIE ROSE INCIDENT

This shows a complete lack of prudent management on Carver's part in operating a vessel safely in a close quarters/narrow channel situation. Carver deprived the Norfolk and Portsmouth Belt Line Railroad Company protections afforded by the autopilot manufacturer which created unseaworthy conditions aboard the Mackenzie Rose and was a cause of the allision.

Industry practice and standards, as well as my own experience as a tugboat captain with three different tugboat companies, Sun Transport, Maritans, and Exxon Shipping Co/SeaRiver Maritime, prohibits navigating a vessel using autopilot in any narrow river, channel, or when transiting a bridge.

Prudent seamanship also dictated that a lookout should have been used for the transit when approaching the Bridge, even in daylight.

33CFR-83.05 - US Inland Rules of the Road: Rule 5 Look-out states:

> **"Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."**

**Key Points of Rule 5:**

• Every vessel must maintain a look-out at all times.
• Look-out must use sight, hearing, and all available means (radar, AIS, etc.).
• The purpose is to assess the situation fully and identify risks of collision.
• The quality and method of the look-out must be appropriate to the prevailing circumstances and conditions.

In this case, there was no dedicated lookout assigned while navigating in a confined waterway near a fixed structure, which violates the above rule. The failure to assign a dedicated lookout constitutes a breach of the Inland Rules of the Road and contributed materially to the allision with the Bridge.  Based on the information at hand including the limited Daily Masters Reports produced by Carver, Carver did not provide proper supervision, training, management, or oversight regarding decisions related to the posting of a lookout.

Carver contributed and caused this hit and run allision by their lack of training, oversight, and/or management with regards to the transiting of a Bridge, the use of a proper lookout, and allowing a vessel operator to use his/her discretion to steer the vessel on autopilot through a Bridge.

Carver GM B. Moore testified that he didn't know of anyone that was in charge of training the crews aboard Carver's vessels. B. Moore Deposition: 108:22-24, 109: 2, 12-21:

    108
    22· · · · ·Q.· · ·So there isn't anybody that you know of



### TUG MACKENZIE ROSE INCIDENT

23· ·that has training responsibility at Carver Marine
24· ·Towing?
109
·2·· · · ·A.· · ·Not directly assigned a training spot. *DH*
12·· · · ·Q.· · ·At Carver Marine Towing, is there
13· ·somebody that uniquely has the responsibility for
14· ·training new hires?
15·· · · ·A.· · ·The master or mate, whoever that signs
16· ·them off in within Helm as -- and appropriate to
17· ·stand watch.
18·· · · ·Q.· · ·And does the master or mate that has
19· ·that responsibility also receive training in what
20· ·they're supposed to train the deckhands in?
21·· · · ·A.· · ·I don't know.

Carver had no designated safety officer for the fleet to oversee all crew training and new hire training before the allision. It was not until after the subject allision that Mr. Jason Galioto was designated as the marine safety and compliance person to handle vetting for the fleet. (He had been hired as a logistics coordinator trainee (Dispatcher) and it is unknown what his experience or expertise is.) He worked directly for the Carver GM, B. Moore.

**Notification of the USCG is mandatory after a marine casualty as stated in 46 C.F.R. § 4.05-1:**

**4.05-1 Notice of marine casualty.**

(a) Immediately after the addressing of resultant safety concerns, the owner, agent, master, operator, or person in charge, shall notify the nearest Sector Office, Marine Inspection Office or Coast Guard Group Office whenever a vessel is involved in a marine casualty consisting in—

(1) An unintended grounding, or *an unintended strike of (allision with) a bridge;*

46 CFR 4.05.1 mandates immediate notification of a marine casualty. In this case, the allision with the Bridge was not promptly reported to the Coast Guard, delaying investigation and post-incident drug and alcohol testing.

Despite crew claims of minimal impact, photographs, and video of bridge structure movement document otherwise. Variance in post-incident reports and a lack of timely Coast Guard notification further undermine the reliability of the crew's account and created potentially life-threatening conditions for the Norfolk and Portsmouth Belt Line Railroad Company and the public at large.

This is a direct result of lack of training on reporting and an over-reliance by Carver on requiring the crew to report first to the company any incidents, allowing the company to maintain control over what is reported to the Coast Guard and when it is reported, if at all.  Though the photograph taken by a crew member with the camera on the Tug is grainy, it shows that the bridge structure was completely shifted out of alignment at the time the Tug was passing through the channel under the bridge. For Carver to



**TUG MACKENZIE ROSE INCIDENT**

have received this photograph and not immediately inform the Coast Guard of the allision in compliance with reporting and drug and alcohol testing requirements, was irresponsible and contrary to its reporting obligations under the CFR and its own SMS.

On June 15, 2024, after the allision with the Bridge at 1630, all five of the crew members hand wrote a statement about what they were doing when the allision occurred and what had happened. Captain Miller and CE Mcgrath were the only ones with a signature. (Carver 000047, 000095, 000079, 000086, 000071).

On June 15, 2024, at 1659 a typewritten report was also completed for each crew member. All stated essentially the same information on the written report except for Captain Miller's. His was the same adding that a photo was taken showing no visible damage to the bridge. (Carver 000048, 000094, 000083, 000085, 000070).

There is a third statement typed on Carver Marine Towing Stationary, RE: Incident Report, for all of the Tug crew except Captain Morrissey. There is no date of when these reports were typed. The statements do have the date, June 15, 2024, and time of incident: 1630 listed.

All 4 of the statements from the crew are different from their written and typed reports. There is no more mention of feeling a bump, (Miller), or of the boat coming to an abrupt stop, (McGrath), or feeling the boat hit something, (Ja. Morrissey), or noticed we had landed against the fenders, (Porter). (Carver 000049,000082, 000084, 000072).

 CE McGrath, referring to the Carver Statement in his Deposition states the following:

      12     Q.   All right.  But you don't
      13   remember either signing that, or?
      14     A.   I don't even remember seeing
      15   this, to tell you the truth.
      16     Q.   And it sounds like based on
      17   what you just described that it's not
      18   accurate in terms of your own memory?
      19     A.   No, sir.

In my opinion, the statements were procured by Carver to justify its failure to immediately report the allision to the Coast Guard as required by CFR 4.05.1.

**Carver's Failure to Discipline or Train James Morrissey**

On January 21, 2024, Captain Morrissey was at the helm of the Tug Mackenzie Rose, made up to a barge, on the Cooper River in Charleston, South Carolina. At 0835 while docking at Pier K the barge allided with the northside corner of Pier K. The result of the allision was a piling was bent in and the concrete behind



**TUG MACKENZIE ROSE INCIDENT**

the piling was damaged as well as damage to the barge. A US Coast Guard form 2692 was filled out and submitted to the local USCG station. According to the Carver G.M Brian Moore deposition: 89: 14-17

14· · · · ·Q.· · ·Was Captain Morrissey disciplined for
15· ·damaging the South Carolina Port Authority dock in
16· ·January of 2024?
**17· · · · ·A.· · ·For that incident, no.**

Concerning the June 15, 2024, allision, according to the Carver GM Brian Moore deposition: 90: 9 - 25

·9· · · · ·Q.· · ·To your knowledge, has Captain Morrissey
10· ·ever been disciplined for the incident -- the
11· ·allision with the Belt Line Bridge in 2024?
**12· · · · ·A.· · ·He was suspended with pay pending that**
**13· ·investigation.**
14· · · · ·Q.· · ·But was he disciplined?
15· · · · · · · ·MR. RODGERS:· Objection to form.
**16· · · · ·A.· · ·A disciplinary form?· No.**
17· · · · ·Q.· · ·I'm sorry?
18· · · · · · · ·MR. RODGERS:· Asked and answered is my
19· · · · ·objection, but you can answer if you understand
20· · · · ·his question.
**21· · · · ·A.· · ·To me, the suspension was the**
**22· ·disciplinary.**
23· · · · ·Q.· · ·So he still collected full -- collect
24· ·full pay while he was on admin leave, right?
**25· · · · ·A.· · ·Yes.**

**Captain Morrissey had an allision on January 21, 2024, with the tug Mackenzie Rose, while docking a barge, and did over $75,000 worth of damage to a pier and barge. Carver Marine Towing management took no disciplinary action against Morrissey at that time.**

**On June 15, 2024, Captain Morrissey, with the Tug Mackenzie Rose and the barge Weeks 281 had an allision with the Bridge, on the outside of the channel where the bridge was fixed. Carver Marine Towing's discipline was to suspend Morrissey, indefinitely with full pay.**

**Carver management is irresponsible and deficient when it comes to the safe operation of the fleet and safety of the crews aboard its vessels. By not disciplining Morrissey in the first allision and then suspending him with full pay in the second allision, Carver showed no initiative to ensure that the fleet operates in a safe and proper manner.**



### TUG MACKENZIE ROSE INCIDENT

Carver Marine knew, or should have known, there had been a problem with the autopilot on the Tug Mackenzie Rose. In May 2024 there were 2 autopilot rudder failures and near misses. On May 3, 2024, the autopilot took a hard left while the tug was towing a barge at sea turning the Tug back towards the barge. The Tug barely missed colliding with the barge. On May 21, 2024, the autopilot once again had a hard over rudder incident and headed the Tug into heavy seas.

The Tug had been having autopilot issues since the beginning of 2024, with numerous near miss incidents. Carver had Ayers and GMT make repairs to the autopilot in March and April of 2024, when the Tug experienced autopilot failures. After both incidents in May, Carver failed to have a technician inspect, check, and/or repair the autopilot after either incident in May.  See e.g., Carver Marine's 30(b)(6) June 17, 2025 Deposition (pp 151-154) and Brian Moore's April 28, 2025 Deposition (pp 275-276).

If Carver Marine was a conscientious, reliable, and safe operator of the Tug, they would have had the autopilot inspected and serviced. Knowing the Tug was having autopilot issues, Carver should have prohibited the use of the autopilot until it was repaired or replaced. **By not having the autopilot repaired and not restricting the use of the autopilot, Carver management was a cause of the allision with the NPBL Bridge.**

These failures — navigational, procedural, and managerial — collectively created an unreasonably dangerous situation and an unsafe working environment, directly contributing to the incident.



**The Norfolk and Portsmouth Belt Line Railroad Company Main Line Railroad Bridge (NPBL Bridge) is in an open position.**



**TUG MACKENZIE ROSE INCIDENT**




**NPBL Bridge damage on June 15, 2024**

**G.  FINDINGS**

Within the bounds of reasonable professional certainty, and subject to change if additional information becomes available, it is my opinion that:

1.  The unit made direct contact with the bridge, causing visible structural movement (as evidenced by surveillance video), which is contrary to crew statements of "no damage" or "minor impact."

2.  The unit deviated outside the navigational channel without cause and continued forward at approximately 5.2 knots toward a fixed portion of the Norfolk and Portsmouth Belt Line Railroad Bridge.

3.  The deck logbook entry was inaccurate and misleading, stating the Unit had maneuvered onto fendering and away from the Bridge when in fact it struck the fixed western structure directly.

4.  The Officer of the Watch (Captain James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode) in a confined navigational channel, resulting in loss of directional control.

5.  The company TSMS (Tug Safety Management System) lacked policy guidance prohibiting autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion.



**TUG MACKENZIE ROSE INCIDENT**

6.  The use of autopilot in a narrow inland waterway while approaching a fixed railroad bridge was in direct contradiction to established safe seamanship practices and warnings in the Simrad AP70MK2 Autopilot Manual.

7.  Carver deprived the Norfolk and Portsmouth Belt Line Railroad Company protections afforded by the autopilot manufacturer which created unseaworthy conditions aboard the Mackenzie Rose and was a cause of the allision.

8.  No lookout was posted in violation of 33 C.F.R. § 83.05 (Rule 5 – Look-out), a critical error during confined water navigation in daylight while pushing ahead a barge.

9.  The company TSMS (Tug Safety Management System) did not prohibit autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion.

10. Carver gave no official training to its operators with regard to how to safely transit a waterway when approaching a bridge, when a proper lookout should be posted, and had no restrictions on the use of the autopilot.

11. The Coast Guard was not promptly notified of the allision, in violation of 46 C.F.R. § 4.05-1. This delayed official investigation and post-incident drug and alcohol testing. and created potentially dangerous conditions for the Norfolk and Portsmouth Belt Line Railroad Company and the public at large.

12. Post-incident accounts from multiple crew members were inconsistent, with discrepancies in timing, actions taken, and observations.

13. By not having the autopilot repaired and not restricting the use of the autopilot, Carver management was a cause of the allision with the NPBL Bridge.

14. These failures - navigational, procedural, and managerial – singularly or in combination, created an unreasonably dangerous and unseaworthy conditions, that violated well established standards of safe marine practice, and were causes of this allision incident.

15. In my opinion, given the lack of training to the crew, the lack of policies and procedures regarding use of an autopilot or lookout during bridge transits, the known issues with the autopilot, and Captain Morrissey's prior allision, the Tug Mackenzie Rose was unseaworthy. Carver should not have allowed this Tug to sail with this crew.

*Nicholas J. Lewis*

Captain Nicholas J. Lewis
Marine Expert



**Captain Nicholas J. Lewis**
History of Expert Testimony

<u>Date</u>                    <u>Case Name & Description</u>

05/2/19            <u>Daniel Pacelli v. Vane Line Bunkering, Inc. et. al</u>
                   2:17-cv-04337
                   New Jersey District Court
                   *Deposition*

9/24/20            <u>Specialist and Other Vessel Owner Limitation Actions</u> <u>(Tappan Zee Constructors v.</u>
                   <u>Weeks Marine)</u>
                   16-CV-4643
                   United States District Court Southern District of New York
                   *Deposition*

11/06/20           <u>Steven Trollinger v. Space Exploration Technologies Corp. d/b/a SpaceX</u>
                   Case Reference No. 1460005892 (BC716065)
                   Superior Court of the State of California, County of Los Angeles
                   Via Zoom Meeting, Melbourne, FL
                   *Deposition*

12/20/23           <u>Martina Garza, Oziel Martinez, Jr. (Minor A.G.) and Estate of Oziel Martinez v. Great</u>
                   <u>Lakes Dredge & Dock Co., LLC</u>
                   District Court, 152nd Judicial District, Harris County, TX
                   Cause No. 2021-26789
                   Via Zoom Meeting, Melbourne, FL
                   *Deposition*

2/06/2024          <u>Zachary Latiolais v. Seabulk Towing, Inc.</u>
                   Circuit Court of the Eleventh Judicial Circuit, Miami-Dade County, FL
                   Case No. 2019-030942-CA-01, Section CA25
                   Via Zoom Meeting, Melbourne, FL
                   *Deposition*



**THE EXPERTS**
# Robson Forensic

July 2, 2025

Mark C. Nanavati, Esq.
Sinnott, Nuckols & Logan, PC
13811 Village Mill Drive
Midlothian, VA  23114
Phone:  (804) 378-7600
Email:   mnanavati@snllaw.com

**Re:   Belt Line and Evanston Ins. Co. v. Coeymans Marine Towing, LLC, et al.**
      **RFI File No. 25FE0014**

Dear Attorney Nanavati:

Our fee schedule for Captain Nicholas J. Lewis is as follows and applies to all work including preparation, file review, research, analysis, inspections, meetings/phone conferences, reports, depositions, travel, and trial.

Services provided to you will be invoiced at $535.00 per hour. If travel is required, we will invoice you at full rate from Melbourne, FL.

Out-of-pocket expenses will be passed along with a 12% carrying charge. This includes travel costs (mileage, airfare, airport service, accommodations, meals, auto rental, etc.), photocopies, outside lab/testing, data collection/verification and demonstrative aids. You are also responsible for any applicable equipment charges and lab service fees.
Invoices are due upon receipt.  After 30 days, balances will accrue 1.5% interest per month. All rates are subject to change.

If you have any questions regarding this matter, please do not hesitate to contact us.

/ll
Cc: Zach Jett <zjett@butler.legal>

**THE EXPERTS**
# Robson Forensic

CAPTAIN NICHOLAS J. LEWIS
Marine Expert

## PROFESSIONAL EXPERIENCE

2009 to present

**Robson Forensic, Inc**.
*Associate*
Provide technical investigations, analysis, reports, and testimony towards the resolution of commercial and personal injury litigation involving marine matters and failure analysis.

1981 to 2006

**Seariver Maritime, Inc. and Seariver Maritime Vessels**
S/R AMERICAN PROGRESS – Tanker                                    2004-2006
Bridge Watch stander and managed all aspects of the vessels navigation.  Directed vessel mooring operations and was in charge of loading and discharging all cargoes and ballast while on duty.  Was also the Safety Officer aboard in charge of inspecting all safety equipment and the coordinator for all monthly safety meetings. Ports of Call included: Alaska, California, Washington, Singapore, Japan, Panama Canal Zone and numerous Ports along the Gulf and Atlantic Coasts.

S/R EVERETT/ Barge S/R NEW YORK
ATB (Articulating Tug and Barge)                                    2001-2004
*Lead Captain* in converting the unit from Mobil Oil to Exxon / Seariver Maritime ownership and operations.  Developed critical vessel onboard procedures and protocols to conform to Seariver's company policies.  This included writing procedures for all oil and cargo transfers as well as an operation manual for all tasks aboard the vessel.

Ensured that all Solas, USCG, IMO, ISO/ISM, and OIMS (Operation Integrity Management System - Exxon's Company Policy) were complied with at all times.  Also ensured that all vessel Documents and Certificates were in compliance and up to date.  Conducted and/or assisted the USCG, American Bureau of Shipping (ABS) and Company representatives in all vessel Inspections and Audits.

Worked with the Chief Engineer, Chief Mate and all crew members on a daily basis to set up proper maintenance schedules, review safety policies and procedures, and ensure the vessel was operated in a safe and seaworthy manner.

Ensured all the proper drills and inspections were carried out and conducted on a weekly, quarterly, or yearly basis, as required.

Oversaw the safe navigation of the vessel.  Ensured that all Voyage plans, Publications, Charts and Corrections were up to date and that all electronic navigational equipment and communications gear was in good working order (including Radars, ARPA, GPS, AIS, GMDSS and VHFs).

**THE EXPERTS**
# Robson Forensic

## CAPTAIN NICHOLAS J. LEWIS
### Marine Expert

Worked with all officers and crew in budget planning, preparation and stewardship. This included all requisition stores, spare parts, fuel, food (no cook aboard), port expenses, main office costs, payroll and overtime.

Assimilated several Ocean Fleet (Tankers) and Mississippi River Fleet (Tugs/Barges) employees into a very successful crew aboard the ATB.  During my watch there were no injuries, spills, damages or commercial non-conformities.

S/R CALIFORNIA, S/R GOLDEN STATE, S/R CARQUINEZ
Ocean and Harbor Tugs                                                          1993-2003
*Captained* all 3 Tugs in San Francisco.  Duties included tanker escort from /to sea/port, docking/undocking vessels within the Bay Area (Redwood City south to Sacramento north). Also Towed a bulk barge from San Francisco to Anchorage, Alaska, reloaded barge in Nikiski, AK. And discharged barge in Portland, Oregon.

FLEET SUPERVISOR (Port Captain)                                              1992
Worked on a Temporary Shore Assignment (TSA) as the *Fleet Supervisor* for the Exxon Coastal Division in Bayway, New Jersey.

Complete operational responsibility for the Coastal Fleet including:
- The daily operations of all the Harbor Tugs and Coastal Tugs/ Barges operating in New York Harbor, along the Atlantic Coast (From Maine to Virginia), Gulf of Mexico and San Francisco Bay.
- Supervised Exxon's Tanker Docking Master and all 3rd party Pilots and Tugs in New York Harbor.
- The Emergency Response on scene Supervisor.
- Organizing and supervising the Fleet Seminars on Occupational Health and Safety.
- Supervising all vessel/terminal screening (marine vetting) for the Exxon domestic and foreign flag trade.
- Personnel Administration and Supervision of division employees in the Division.
- Initiating new policies and procedures to assist all Captains in stewarding vessel budgets, operations and crews.

EXXON MAINE / barge EXXON BAYWAY
EXXON GOLDEN STATE / barge EXXON #503                                        1987-1992
*Chief Mate and Captain* (1988) aboard the Exxon Maine/ barge Exxon Bayway. *Captain* (1989-1992) the Exxon Golden State / Exxon Barge # 503. Operated in the Gulf of Mexico MGO trade. Responsible for the overall safe operation of the Tug/Barge unit, including all cargo transfers.

**THE EXPERTS**
# Robson Forensic

CAPTAIN NICHOLAS J. LEWIS
Marine Expert

EXXON GARDEN STATE/ EXXON Barge #501                                    1986
*Lead Captain* in the tug/barge unit vessel transfer from Poling Bros Inc. in New York Harbor to Exxon Shipping Company – East Coast Branch.
Responsible for developing all new procedures aboard to conform to Exxon policies and supervising the re-rigging of the unit to operate more efficiently and safely.

EXXON DELAWARE VALLEY, EXXON EMPIRE STATE
EXXON GARDEN STATE, EXXON MAINE,
EXXON CRYSTAL RIVER – Coastal and Harbor Tugs                          1981-1986
*Chief Mate and Relief Captain* aboard all the above Exxon East Coast Tugs operating in New York Harbor and along the Atlantic Coast from Maine to Virginia. Operations consisted of docking/undocking Ships, Shifting lightering barges from anchorage to docks, and delivering barges to ports along the East Coast carrying clean oil products.

1980 to    **Interstate Towing Co. (SONAT)**, Philadelphia, Pa.
1981       *Chief Mate*
           Chief Mate aboard the Tug Clipper towing the Barges Ocean 155 or Ocean 250 from Philadelphia, Pennsylvania to New York Harbor and Boston, Massachusetts.

1974 to    **Sun Transport, Inc.  (Sunoco),** Marcus Hook, Pa.
1980       *Captain*                                                   1977-1980
           Became the youngest Chief Mate in Sun's history to be promoted to Captain aboard the Tug New England Sun / Barge Albany Sun.  Transported clean oil products from New York Harbor to ports along the East Coast from Maine to Puerto Rico.

           *Chief Mate*                                                1975-1977
           Chief Mate aboard the Tugs New England Sun, Newark Sun, Chesapeake Sun and the Motor Barge Toledo Sun transporting clean oil products from Newark, New Jersey to ports along Atlantic Coast and north to Bangor, Maine, including the Hudson River to Albany, New York.

           *Third Mate*                                                1974-1975
           Third Mate aboard the Coastal Tankers Texas Sun and New Jersey Sun, operating from Marcus Hook, Pennsylvania to Texas and Puerto Rico.

1973 to    **F.W. Hartmann and Co.**
1974       *Boarding Agent*
           Boarding Agent for Atlantica Lines, Hansa Lines, and Black Star Lines. Overall agent for all their vessels when they arrived in New York Harbor. Responsibilities included all manifests, bill of ladings, entering and clearing the vessels with the U.S. Customs service. Also worked with the Department of Agriculture and Immigration to ensure vessel were in compliance with all rules and regulations.

# THE EXPERTS
# Robson Forensic

## CAPTAIN NICHOLAS J. LEWIS
## Marine Expert

**PROFESSIONAL CREDENTIALS**

Master of United States Steam or Motor vessels of not more than 1600 Gross Tons upon Oceans. (Issue # 9)

Third Mate Steam and Motor Vessels of any Gross Tons upon Oceans

First Class Pilot of any Gross Tons upon the Waters of New York Harbor from Bayway, New Jersey to Eastern Long Island Sound, including the Hudson River

Radar Observer (Unlimited), U.S.C.G. Approved

GMDSS Radio Operator License

Standards of Training, Certification and Watchkeeping for Seafarers (STCW)

Escort Tug Master – State of California

**EDUCATION**

B.S. Marine Transportation, State University of New York Maritime College, Fort Schuyler, The Bronx, New York, 1973

*Additional Training, Courses, and Seminars:*
GMDSS Operator Training program
Personal Survival Techniques Course
Personal Safety and Social Responsibility Course
Basic First Aid / CPR Course
Basic and Advanced Marine Firefighting Course
ARPA / Bridge Resource Management Course
Confined Space Awareness Course
Electronic Chart Display and Information System (ECDIS) training program
Dangerous Liquids Cargo Course
Advanced Shiphandling for Masters
Shiphandling with Tractor Tugs
Tractor Tug Boathandling
Tug Emergency Preparedness Training Course
Breathe Alcohol Testing Course
Specimen Collection Course

**PROFESSIONAL MEMBERSHIPS**

Board Member and past President of the First Lieutenant Michael L. Lewis Jr. Memorial Fund, which provides scholarships to deserving, upstanding, American citizens attending College, 1970-2016

President of the Men's Auxiliary, VFW Post 8191, 2007-2013
Oversee the membership and assist the Post Commander in carrying out the mission of the Post and the Veterans of Foreign Wars of the United States.

Member of VFW Post 4643, 2013 to 2017