**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765) her cargo, engines, boilers, tackle, equipment, apparel, and appurtenances, etc., *in rem*, ("M/T MACKENZIE ROSE"), petitioning for Exoneration from or Limitation of Liability in allision with Belt Line Main Line Railroad Bridge (the "Bridge") occurring June 15, 2024 in and about the Elizabeth River, Virginia.

**Civil Action No: 2:24-cv-00490**

**PETITIONER'S RESPONSE IN OPPOSITION TO TO CLAIMANTS' MOTION FOR SUMMARY JUDGMENT**

Now comes the Petitioner in Limitation, Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver"), by and through its undersigned counsel, and for its Response in opposition to the summary judgment motion of Claimants, Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") and Evanston Insurance Company (Evanston") states as follows:

**INTRODUCTION**

This matter arises from an allision between a barge being pushed by Carver's M/V MACKENZIE ROSE. After the allision, the Belt Line submitted a claim for insurance coverage to Evanston and then repaired and improved its bridge, even "replacing" components of the bridge that did not exist prior to the allision. They now seek summary judgment that the damage from that allision exceeded $15,000,000, which is contrary to the evidence, even without applying depreciation. They also seek judgment defeating Carver's limitation action, which is, again, contrary to the evidence in this case. As noted in Carver's motion for summary judgment on limitations, there is no genuine dispute of fact that the allision was caused by an error of Carver's

Mate on duty and was not caused by any unseaworthiness of the M/V MACKENZIE ROSE. On the evidence, and for the reasons set forth in this brief, the motion of Belt Line and Evanston must be denied.

**RESPONSE AS TO DISPUTED MATERIAL FACTS (L.R. 56(B))**

Claimants' motion is grounded on a statement of 'undisputed' material fact, which often includes argumentative inferences from facts, as if they were facts, themselves. The disputed facts and inferences are addressed below, on a paragraph-by-paragraph basis.

2. On June 15, 2024, at approximately 4:26 p.m. EST, Carver's tug, the M/T MACKENZIE ROSE, pushing the loaded barge WEEKS 281, allided with the Bridge (the "Allision"). See ECF 1, p. 2.

**RESPONSE:** The bow of the barge, not the tug, allided with the bridge. **See Doc. 99, Carver's Memorandum of Law in Support of its Motion for Summary Judgment at Statement of Facts filed 9/2/25** (hereinafter cited as "**Carver's SUMF**"), ¶ 2 at Ex. 2, revised 2692 form dated 6/25/24.

7. At approximately 4:36 pm EST on June 15, 2024, Carver's Port Captain in New York, Leonard Baldassare, texted Carver's General Manager in New York, Brian Moore, confirming that the tug allided with the Bridge. See Exhibit F at CARVER 187 (texts between Baldassare and Moore).

**RESPONSE:** As noted, the bow of the barge, allided with the bridge. See Response to Claimants' Undisp. Facts No. 2, *supra*.

9. At the time of the Allision, Carver's Port Captain, Mr. Baldassare, was a management level employee in charge of all operations of Carver's tug fleet, including serving as a liaison to Carver's upper-level management. See Exhibit H (Baldassare Dep. 16:22-17:4).

**RESPONSE:** Mr. Baldassare testified that he was in charge of "day-to-day" operations at the Carver facility on Staten Island, not "all operations." See Claimants' Ex. H, *supra.*

14. To date, the Allision has caused $15,542.871.55 in damages not including interest, costs, attorneys' fees and punitive damages. See Exhibit A (Moss Declaration).

**RESPONSE:** This is a significant substantive dispute based on multiple admissions of Belt Line as evaluated by Carver's experts, W.N. Marianos and Charlie Cunningham, R.L. Banks & Associates, Incorporated. Belt Line's damages claim of $15,542,871.55 is greatly overstated. R.L. Banks's opinion to a reasonable degree of professional economic and engineering certainty is that total damages incurred by Claimant Belt Line after applying depreciation and removing inappropriate charges are $2,972,767. **Carver Exhibit 21,[1] Claimants' Expert Report of W. N. Marianos and Charlie Cunningham R.L. Banks Joint Report dated Aug. 8, 2025.**

The Belt Line has inflated its claim in numerous ways. The Belt Line has included unrelated or unreasonable costs as part of its damages claim. By example, it includes a $17,000 invoice to "replace" electrical conduit under the bridge after the allision but also admits in there was no conduit under the bridge prior to the allision. **Carver Exhibit 22, Belt Line's Responses to Carver's First Requests for Admission, served 8/15/25; Carver Exhibit 23, Belt Line's Costs Spreadsheet.** As another example, the Belt Line includes approximately $900,000 of "labor charges" that are fictitious and derived by applying an "additive rate" upwards of 185% to their own labor charges. Carver Ex. 23, *supra*. The Belt Line has also included charges to replace the entire deck and rail system on Spans 2, 3, and 4 of the Bridge despite the fact that only several ties and a portion of the rails were damaged in the allision. Carver Ex. 23; **Carver Group Exhibit 24,**

---

[1]This exhibit, Carver Exhibit 21 as well as the exhibits following, continues the numbering of exhibits referenced in Doc. 99, Petitioner's Memorandum of Law in Support of Motion for Summary Judgment.

**Belt Line's Rail Tie Invoices.** The result of including these fictitious and unrelated costs as part of their damages prayer is an inflated claim and the Belt Line's misrepresentation of what is actually at stake in this lawsuit.

21. Despite the Port Captain's statement to the tug crew, no one at Carver notified the U.S. Coast Guard of the Allision on June 15, 2024. *See* Exhibit M (Carver Rule 30(b)(6) Dep. 76:8-80:15). Carver's Rule 30(b)(6) designee confirmed in his deposition that Carver did not notify the U.S. Coast Guard and first communicated with them "days after it happened." *Id.* (images omitted)

**RESPONSE:** The facts asserted in Paragraph 21 are incomplete and therefore incorrect. Based on their discussions with Capt. Miller and photos which showed no visible damage to the tug, barge, or bridge, Mr. Moore and Mr. Baldassare did not believe that this was a reportable incident under 46 CFR 4.05-1. See Carver's SUMF ¶¶ 14 -16. Mr. Baldassare testified that he contacted the Coast Guard two days after the allision on June 17, 2024, at Mr. Moore's direction. Carver SUMF ¶ 21 at Ex. 10, Baldessare Dep. 64:24-66:16.

On June 20, 2024, Mr. Baldassare submitted the CG-2692 form to the Coast Guard based on the details reported by Capt. Miller. Carver SUMF ¶ 22. Consistent with the federal regulations at 46 CFR 4.05-10(a) which require that the owner, agent, master, operator, or person in charge, shall within five days, file a written report of any marine casualty required to be reported under 4.05-1, the form was timely filed within five days of the event. Carver subsequently filed an amended CG-2692, on June 25, 2025, once it learned that the original report to it was incorrect.

27. Text messages produced by Carver between Carver's Port Captain, Mr. Baldasare and Carver's General Manager, Mr. Moore, indicate that Carver's tug captain had intended to

notify the US Coast Guard of the Allision. Exhibit F. (texts between Baldassare and Moore) (images omitted).

**RESPONSE:** See Carver's Response to Claimants' Undisp. Facts No. 21, *supra*. Exhibit F is eighteen pages of text messages, some of which relate to the MACKENZIE ROSE, including a discussion of whether to contact the Coast Guard, and whether such notice would be appropriate given the indication of lack of damage.

28. Instead of notifying the U.S. Coast Guard on June 15, 2024, text messages produced by Carver between Mr. Baldassare and Mr. Moore indicated that Carver's management misled the tug captain into leaving the scene and that Mr. Baldassare "yelled at" him for wanting to report the incident.

**RESPONSE**: See Carver's Responses to Claimants' Undisp. Facts Nos. 14, 21, and 27, *supra*.

30. Carver did not test the crew of the tug for drug and alcohol use on the day of the Allision, and because Carver did not report the incident to the U.S. Coast Guard, no one else did either. See Exhibit M. (Carver Rule 30(b)(6) Dep. 101.7-10; 101:20-102:6). (images omitted)

RESPONSE: See Claimants' Response to Undisp. Facts No. 21, *supra*.

31. The M/T MACKENZIE ROSE has video cameras in the lower wheelhouse and at the stern, yet Carver has never produced data or videos from any such cameras despite being requested to do so in the Belt Line's Requests for Production Nos. 9, 14, and 15. See Exhibit R (photos of the tug on 8/19/25) Exhibit S (Belt Line's First RFPs).

**RESPONSE**: The above improperly assumes that equipment observed on the tug in August 2025 was present and operation on the date of the allision. Carver has fully responded to the Belt Line's First RFP. See Claimants' Ex. S. Nick Laraway testified that the tug was overhauled

in 2025, which included cameras installed. See, e.g. Carver Ex. 6, Deposition of Carver (Nick Laraway), June 17, 2015, p. 52:18-20. Moreover, Requests for Production nos. 9, 14, and 15 from the First Request for Production did not seek videos taken well after the subject allision. Claimants' Ex. S.

32. Carver's General Manager, Mr. Moore, disposed of his cell phone that he used on June 15, 2024, and Carver has never produced texts or ESI from that phone despite being requested to do so by the Belt Line and ordered to do so by this Court. See Exhibit G (Moore Dep. 27:15-21); Exhibit S (Belt Line's First RFPs); ECF 50 (Order requiring response to RFP 34).

**RESPONSE**: The above statement is based, in part, on an improper inference and, in part, on a false statement. In addition, the above statement mischaracterizes the information requested during discovery. Plaintiff's First Request for Production no. 34 seeks "communications pertaining to the incident to or from you, the Vessel's officers or crewmembers, or any government entity, including but not limited to the United States Coast Guard on or after June 15, 2024." "You" is defined as "Carver Marine Towing, Inc.", its management, employees, agents, and counsel, and the person answering these Interrogatories." Carver produced all company email as defined, which included Brian Moore's email account as well as cell phone communications from Lenny Baldassare and the cell phone issued to the tug, the two recipients who had company cell phones. This notably included Mr. Moore's texts produced in this case. See **Carver** Exhibit **25, Carver's Seventh Supplemental Response to the Belt Line's First Request for Production of Documents and Things, served 7/11/2025.** Since May 2025, Claimants' follow up requests preliminary to the Court Order referenced by Claimants, above, specifically asked for "Mr. Moore's "work cell phone." See **Carver Exhibit 26, May 5, 2025 Letter from Belt Line to Counsel re Deposition Documents.** Claimants infer or imply that Mr. Moore's personal cell

phone has been destroyed, but they have never issued a subpoena to Mr. Moore for his personal cell phone text messages.

33. Carver performed "maintenance" work on the tug on June 18, 2024, just days after the Allision, before the Belt Line, Evanston, or the U.S. Coast Guard could inspect it. See Exhibit U at CARVER HELM CONNECT 549-550 (Daily Log Entry 06/18/24).

**RESPONSE**: Claimants' Argument on this point, at p. 29, cites to Claimants' Undisp. Facts ¶ 36, which addresses the width to the bridge in making an assertion that Carver spoliated evidence, although this Paragraph 33 appears to be the support for that sentence. Notwithstanding the error, this assertion that Carver regularly maintains its vessels does not support an inference that the maintenance was pertinent to this case. The testimony has been that the tug was not damaged when the barge allided with the bridge. Claimants' Ex. H (Baldassare Dep. p. 62:6-14. In addition, if the inference that Claimants ask this Court to make were about something on the tug, the evidence is that this accident was caused by Mate Morrissey's navigational error, not some defect of the tug. See Carver's Response and citations to ¶¶ 40-49 of Claimants' SUMF, i*nfra*.

34. At all times relevant, the Bridge was and is a published hazard to navigation in 33 CFR 117.997.

**RESPONSE**: 33 CFR 117.997(a) does not state that "the Bridge was and is a published hazard."

35. Carver's Port Captain, Mr. Baldassare, confirmed that bridges are considered hazards to navigation. See Exhibit H (Baldassare Dep. 169:4-7).

**REPONSE**: Mr. Baldassare testified that bridge transits can *potentially* create hazardous navigations systems. *See* Claimants' Ex. H (Baldassare Dep. 169:6) (emphasis added).

38. The daily log for the M/T MACKENZIE ROSE for June 15, 2024, states that James Morrissey did not turn off the autopilot until he began backing away from the Bridge. *Id*.

**REPONSE**: The log states that Mate Morrissey switched from autopilot back to hand steering *and then* began backing the barge. *See* Claimants' SUMF ¶ 38, *supra* (stating "Morrisey…. Was able to correct and switch back over to hand steering and begin backing the Weeks 281 Barge and maneuvered the barge….").

39. On June 15, 2024, Carver's General Manager, Mr. Moore, asked Carver's Port Captain, Mr. Baldassare, to "see how we can resolve the steering issue" in reference to the Allsion. *See* Exhibit F (texts between Baldassare and Moore).

**REPONSE**: The subject discussion is irrelevant. Mr. Baldassare and Mr. Moore's initial concern that there was a steering issue was in error. This was superseded by later events that revealed that the allision was due to Mate Morrissey's navigational error, not a steering failure. *See* Doc. 99, Carver's SUMF ¶¶ 14 -16.

40. On July 2, 2024, two weeks after the Allision, an engineer on board the M/T MACKENZIE ROSE noted error codes on the autopilot and reported this error to Carver via test message.

**RESPONSE**. The above statement misconstrues the cited conversation and asks the court to make an unsupported inference that there was a defect in the autopilot that caused the subject Allision. The exchange of text messages included in Exhibit L reflects only that the autopilot needed to be re-set on July 2, 2024, and that re-setting the autopilot, resolved all concerns. See Claimants' Exhibit F ("Shut off the auto pilot, shut off the power supply to the unit, and it should find itself as per Todd." … "OK" … "10-4 Its all working again. Both stations."). The autopilot was functional between the allision and July 2, 2024. The evidence is that the autopilot was

operative on the date of the allision. See Carver's SUMF ¶¶ 24-25. *See, e.g.*, Doc. 99, SUMF ¶¶ 14 -16. *See also* Carver's SUMF 6, at Ex. 4, Report and Findings of Captain Sam Stephenson ("Mate Morrisey failed to engage the switch from Auto to NFU when he thought he had. This failure by Mate Morrissey and his lack of situational awareness was the sole cause of the allision."). See also Carver's SUMF ¶¶ 41- 49 (Allegations in original that Carver was checking/testing the autopilot, and, as set forth above, the autopilot was found to be operational).

Paragraphs 41. through 49. titled by Claimants as "Carver knew of problems with the autopilot before the Allision."

**RESPONSE**: Each of the particulars discussed in the above paragraphs is submitted as if it were evidence of a defect in the autopilot causing the allision. The undisputed evidence is that Mate Morrissey failed to be truthful regarding the incident with the railroad bridge. Carver's SUMF ¶¶ 24-25. Instead, the evidence establishes that Mate Morrissey did not disengage the autopilot as he believed he had. Doc. 99, Carver's SUMF ¶¶ 24-25 at Ex. 2, Revised 2692 Form dated 6/25/24; See Carver's SUMF ¶4, Ex. 6, Stephenson Report, pp. 55- 56. Conversely, the evidence does not support that the autopilot malfunctioned. *See* Carver's SUMF ¶ 4, Stephenson Report, pp. 55- 57 (addressing Capt. Lewis' claim, *inter alia*, that autopilot was not repaired). Likewise, the evidence, including that provided by Claimants' maritime expert Nicholas J. Lewis, agrees that navigational error caused the bridge strike, specifically that "[t]he Officer on Watch (James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode) in a confirmed navigational channel, resulting in loss of directional control." Carver's SUMF ¶ 27 at Ex. 19, Lewis Report at 12; Ex. 20, Lewis Dep. 40:1-24).

The evidence is that the autopilot worked properly on June 14, 2024 the day before the incident, and on June 15, 2024, the date of the incident. See, e.g., See Carvers SUMF ¶ 4, Ex. 6,

Stephenson Report, pp. 55- 57. The vessel's official logs of June 14, 2024 signed by Capt. Chris Miller show that the autopilot at Section 2.1 ("Steering Test") was working properly. **Carver's Exhibit 27, June 14, 2024, Master's Daily Vessel Reporting (tugs) - CARVER 000013-18.** Section 2.3 shows that the Navigation Equipment passed. *Id*. The vessel's official logs of June 15, 2024 signed by Capt. Chris Miller show that the autopilot at Section 2.1 ("Steering Test") was working properly as was the Navigation Equipment under Section 2.3. **Carver's Exhibit 28, June 15, 2024, Master's Daily Vessel Reporting (tugs) - CARVER 000019-23.**

50. The Operator manual for the Simrad auto pilot system on the M/T MACKENZIE ROSE on June 15, 2024, prohibits use of automatic steering "in heavy traffic areas or in narrow waters" and requires users to "always switch the autopilot to standby and reduce speed in due time to avoid hazardous situations. See Exhibit EE at CARVER 01999 (Simrad manual excerpt).

**RESPONSE:** This section of the Elizabeth River was a channel with a width of approximately 713' (over two football fields wide) and is not a confined or narrow channel. Or narrow waters." See **Exhibit 29, Sam Stephenson Deposition, pp. 137:13 – 138:11.** *See also* Carver's SUMF ¶ 4, Ex. 6, Stephenson Report, at pp. 41-42; 46.

53. Notwithstanding the Simrad manual and the many problems with the auto pilot that had not been fixed, Carer did not prohibit use of the autopilot on the M/T MACKENZIE ROSE before the Allision. See Exhibit G (Moore Dep. 281-8-23); Exhibit M. (Carver Rule 30(b)96) Dep. 91:5-12; 57.

**RESPONSE:** Carver disputes that (1) the Simrad manual prohibits use of auto pilot; and (2) that there were problems with the autopilot on the M/T MACKENZIE ROSE. As to (1), the Simrad P70MK2 Autopilot Manual warning does not apply because Mate Morrissey thought he was in hand steering prior to the allision when the autopilot was still engaged, and he switched to

hand steering prior to the incident. See Carver SUMF 23-25, at Ex. 2 , Revised 2692 form dated 6/25/24. See also Carver's SUMF ¶ 4, Ex. 6, Stephenson Report, at pp. 45-46. The P70MK2 Auto Pilot Manual warning is a moot point because the MACKENZIE ROSE was not operating in heavy traffic areas or narrow waters." *Id.* There were no problems with the MACKENZIE ROSE at the time of the allision, as the allision was caused by operator navigational error. See Carver's Response to Claimants' Undisp. Facts Nos. 41-49, *supra*.

54. Notwithstanding the Simrad manual and Mr. Baldassare's testimony, Carver's Safety Management System ("SMS") contains no restriction on the use of autopilot in heavy traffic areas, narrow waters, or near hazards to navigation. See Exhibit G. (Moore Dep. 281-17-23; Exhibit K (SMS excerpts) Exhibit M (Carver Rule 30(b)(6) dep. 91-5:12).

**RESPONSE**: Carver disputes that Mr. Baldassare characterized the subject bridge was a "hazard." The characterization of Mr. Baldassare's testimony is incorrect. Mr. Baldassare testified that bridge transits *can potentially* create hazardous navigations systems. See Claimants' Exhibit H (Baldassare Dep. 169:4-7). Carver disputes that the MACKENZIE ROSE was operating in heavy traffic or narrow waters. See Carver's SUMF ¶ 4, Ex. 6, Stephenson Report, at pp. 45-46.

56. James Morrissey received no training from Carver on transiting bridges before operating the tug on the day of the Allsion. See Exhibit FF (records of Morrissey's training.

**RESPONSE:** Carver disputes the assumption implicit in this statement that Carver had a duty to train Mr. Morrissey as to how to transit a bridge. Mr. Morrissey held a Coast Guard Masters License which authorized him to operate inspected vessels and passenger vessels within 200 tons. Doc. 99, Carver's SUMF at ¶ 5. A captain is in charge of the vessel and commonly does the training for the crew members. **Carver Exhibit 30, James Morrissey Merchant Mariner Credential CARVER 000091-000093;** Carver Ex. 29 Sam Stephenson Dep., 40:12 – 41:21.

57. James Morrissey Received no training from Carver on the use of auto pilot before operating the tug on the day of the Allision. See Exhibit FF (records of Morrissey's training).

**RESPONSE.** Carver disputes the improper inference and assumption implicit in this statement that Carver had a duty to train Mr. Morrissey how to use autopilot. See Response to No. 56, supra. Further responding, if there are any questions regarding the operation of the autopilot, the captain would consult the manual pertaining to autopilot operation on the vessel. Carver Ex. 29, Sam Stephenson Dep., 40:12 – 41:21; 65:5-66:1.; Carver Exhibit, Ex. 10, Baldassare Dep. 199:25-200:1-9. Carver had a manual governing autopilot on the vessel. *Id*. at 41:15-21.

59. After the January 2024 allision, James Morrissey was not disciplined by Carver or required to go through any additional training. See Exhibit G (Moore Dep. 88:6-89:16).

**RESPONSE.** The statement above, used by Claimants to support their claim that Mr. Morrissey was not a competent captain, is an improper inference as Claimants provide incomplete testimony from Mr. Moore regarding the event. Mr. Moore testified that following this January 21, 2024 incident, Carver did not discipline Mr. Morrissey as the incident resulted from "winds and currents" rather than operator error. See Carver SUMF at Ex. 1, Moore Deposition. See also **Carver Exhibit 31, James Morrissey Witness Statement 1.21.24** CARVER TBS HELM CONNECT 003732. The incident was properly reported by Carver to the Coast Guard, and the Coast Guard conducted no investigation or nor did it issue any violations to Carver or to Mate Morrissey. **Carver Exhibit 32, 9.5 Incident Report – Event, 1/22/2024** at CARVER 0000829-CARVER 0000847 (Sections 19.11-19.13).

In further Response to Claimants' motion, Carver adopts its Statement of Facts as set forth in its Motion for Summary judgment, Doc. 99. (Referenced herein as "Carver's SUMF").

## STANDARD OF REVIEW

Summary Judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). In this regard, the moving party bears the burden of "informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The record is reviewed resolving credibility issues or weight of the evidence in favor of the non-movant. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008); *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). Likewise, any inferences from the evidence to be drawn are those "most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

## ARGUMENT

This matter is before the Court on Carver's timely Petition for relief under the Limitation Act, 46 U.S.C. § 30529(a) (the "Act"). The Act serves to "encourage investment in the ship-building industry by protecting owners from excessive liability for claims related to their vessels." *In re Pac. Maritime Freight, Inc.*, 316 F. Supp. 3d at 1217 (*citing Lewis*, 531 U.S. at 446, 121 S.Ct. 993); accord *In re Star & Crescent Boat Co., Inc.*, 519 F. Supp. 3d 752, 757 (S.D. Cal. 2021). "A limitation of liability action is a proceeding in admiralty for vessel owners that permits them to limit their liability (if any) to their interest in the vessel and its freight, provided that the loss was incurred without their privity or knowledge." *In re Complaint of Ross Island Sand & Gravel*, 226 F.3d 1015, 1017 (9th Cir. 2000). The procedure applicable to a limitations claim requires

Claimants to prove what negligent acts or omissions caused the casualty with the burden then shifting to the owner to prove lack of privity or knowledge of the cause of the casualty. *In re Marine Sports, Inc*, 840 F.Supp 46, 1994 AMC 1678 (D.Md. 1993) (emphasis added); *Empresas Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir.1983).

Claimants Belt Line and Evanston now seek Summary judgment attempting to establish, as a matter of law, that Carver was negligent in some way other than the Mate 'doing something wrong. Their goal is to deny Carver the limitation and further seek judgment that their damages claims are proven on the evidence. They detour into an 'unclean hands' argument, as well. Each of the Claimants' arguments should be denied.

On the facts of this case, a competent and qualified Mate who was at the helm of the MACKENZIE ROSE made error of navigation. "[I]f the vessel's negligence or unseaworthiness is the proximate cause of the claimant's loss, the plaintiff-in-limitation must prove it had no privity or knowledge of the unseaworthy conditions or negligent acts." *Trico Marine Assets Inc. v. Diamond B Marine Servs. Inc*., 332 F.3d 779, 789–90 (5th Cir. 2003) (citations omitted). "[A] shipowner has privity if he personally participated in the negligent conduct or brought about the unseaworthy condition." *Id.* Given the above, Carver is entitled to limitation where it hired a competent Mate whose actions were operator error, as is conceded by Claimants' own expert.

## I. Claimants Have Failed to Prove Any Causative Negligence Other than a Mere Mistake by the Mate.

### A. The Allision Was Due to an Error by Mate Morrisey.

There is no dispute that Carver's tug was pushing the barge at the time of the allision. It occurred on a clear day in good weather. Carver's SUMF ¶ 4. The tug maintained an American Bureau of Shipping International Load line certificate. Carver's SUMF ¶ 11. James Morrisey, the Mate on Watch, was a United States Coast Guard licensed Master, stationed in the upper

wheelhouse, with an unobstructed all-round view. Carver's SUMF ¶¶ 5-6. Morrisey had no disciplinary history at Carver. Carver's SUMF ¶ 19. These facts defeat any argument that Carver's crew as improperly trained and credentialed.

While Mate Morrissey initially described the allision as due to a steering malfunction, he retracted that statement when he was required to testify during the Coast Guard's investigation. Carver's SUMF ¶¶ 25-26. Claimants' own Captain Lewis, a licensed mariner on tankers hauling oil or other hazardous material, offered one pertinent observation, that the cause of the subject loss was that: "Officer of the Watch … failed to properly disengage the autopilot and did not switch to manual steering … in a confined navigational channel, resulting in loss of directional control." Carver's SUMF ¶ 27.

None of the crew claimed that the tug's autopilot was involved in the incident. Carver's SUMF ¶20. Mate Morrisey testified to the United States Coast Guard that the incident occurred because he failed to properly switch from autopilot to hand steering. Carver's SUMF ¶ 25.[2]

**B. Claimants' Suggestions of Other Negligence as to which they can Argue Privity are Not Well Founded.**

Claimants attempt to throw as much rhetorical spaghetti at the wall as they can, in an effort to persuade the court that they have proven some other causative negligence as to which there is arguable privity.

First, Claimants assert that that *if* the autopilot malfunctioned before the accident, there was privity even though their own expert opines that the causative error was the Mate's mistake, not some problem with the autopilot. They base this assertion on two reports produced by Carver

[2] Like Claimants, Carver reserves its right to submit he formal documents from the USCG investigation.

in discovery, and described by them in their statement of facts at ¶¶48-49. Notably, the pertinent testimony by Captain Lewis recognizes that there was no "hard over event" on June 15, 2024:

Q: So I'm not talking about speculation. What you have in front of you thus far without talking to Morrissey and none us have except for Mr. Chapman who was at this hearing and knows what he said, but I wasn't. I hadn't been hired yet. But based on what you've been given, which are the 2692 and other documents and the Rose Point data, there's no indication that the vessel went hard over; correct?

[Objection]

A. **Correct.**

Q. So there's no indication, no evidence that you've been able to review that the incident in May with the autopilot, that same exact incident hard over occurred on June 15, 2024; correct?

[Objection]

A. Correct. …

**Ex. 1**, Tr. at 123:4-21 (Emphasis added). A party cannot prove a causative mechanical failure based on speculation. There is "too great an analytical gap" and the Claimant's assertions should be disregarded. *GE v. Joiner*, 522 U.S. 136, 146 (1997).

Next, Claimants assert that the autopilot system should not have been used in what it now characterizes as 'heavy traffic', 'narrow waters', or 'hazardous situations'. In an effort to recharacterize the river as 'narrow' or the bridge as 'hazardous' Claimants cite 33 CFR 117.997(a) which governs the Belt Line's operation of the subject bridge (without ever referencing it as hazardous), then misquotes Mr. Baldassare as if he testified that the subject bridge was in narrow waters or was hazardous – which he did not. In fact, it is common to use autopilot in inland waters. Further, the opening of the bridge span between the fenders for navigation was over six times the beam of the Mackenzie Rose and barge, this is not a case where the transit was narrow. On these facts, it was acceptable for a vessel such as the Mackenzie Rose to have engaged its autopilot while

transiting toward the Norfolk Railroad bridge. *See* Carver's SUMF, ¶ 6, Capt. Stephenson Report at pp. 31-34. Even claimant's Captain Lewis concedes that no law prohibited Mate Morrissey from using autopilot to transit on the Elizabeth River on June 15, 2024 because the *M/V Mackenzie Rose* was not hauling oil or hazardous material. (Doc. 92), Petitioner's Brief in Support of Daubert Motion to Exclude Testimony of Captain Nicholas J. Lewis, filed 8/29/25 at Ex. 1, Lewis Dep., 49:16-50:7; (Doc. 97) Petitioner's Brief in Support of Daubert Motion to Exclude Testimony and Opinions of John Poulson filed 9/2/25.

Claimants next assert that the Captain and Mate Morrissey, the Officer on Watch were not competent. Relevant factors for this include (1) whether the captain is properly licensed; (2) whether the captain has a satisfactory safety record; (3) whether the captain is familiar with the vessel and the waters on which it travels; and (4) whether the captain is adequately trained. *In re Sea Wolf Marine Towing & Transp., Inc.*, 2007 U.S. Dist. LEXIS 82565; 2008 AMC 131 (SDNY 2007). As noted above, the record establishes that Mate Morrissey was, in fact, properly trained. He made a "navigational error," which, *de jure*, is not sufficient to create privity or knowledge of an owner.

Claimants discuss the fact that Mate Morrissey was the one man on watch at the time of the accident. Yet, there is no genuine issue in dispute that Carver's SMS, section 7.16 permitted one-man bridge operations. Carver'S SUMF ¶ 13. Claimants ask this court to draw an inference that Mate Morrissey was untrained because he struck a pier while operating the MACKENZIE ROSE in January 2004. The actual testimony about that incident, however, was that the accident was not due to mishandling the tug. Rather, the incident resulted from "winds and currents". See Carver SUMF at Ex. 1, Moore Deposition; see also **Carver Exhibit 30, James Morrissey Witness Statement** CARVER TBS HELM CONNECT 003732. Importantly, the incident was properly

reported by Carver to the Coast Guard, and the Coast Guard conducted no investigation or nor did it issue any violations to Carver or to Mate Morrissey. Carver Ex. 32, 9.5 Incident Report – Event, 1/22/2024 (Sections 19.11-19.13).

### II. Claimants Mis-apply the Limitation of Liability Act in their Argument on Supposed 'Unclean Hands'.

Under the Limitation Act, as implemented by Rule F (Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure), the determination of whether a shipowner may limit liability involves a two-step analysis: (1) a determination of what acts of negligence caused the casualty and; (2) whether the shipowner had "privity or knowledge" of the acts *which caused the allision*. This procedure requires the claimant to prove what negligent acts or omissions caused the casualty with the burden then shifting to the owner to prove lack of privity or knowledge of the cause of the casualty. *Empresas Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir. 1983).

Evidence of post-incident or remedial actions taken by Carver after the incident, including any issue of reporting to the Coast Guard, is irrelevant to a determination by the Court of the necessary privity or knowledge to be imputed to Carver. In an effort to create the requisite pre-incident privity, the Belt Line argues, incorrectly, that facts related to what Carver knew or did after the incident supports a claim of pre-incident privity.[3] Not only is this mis-applying the

[3] Federal statutes are meant to be interpreted as written. Nothing in the statute suggests that the Petitioner seeking to limit its liability must do more than comply with subsection (b) of the statute. In addition, this is not a remarkable case warranting creating of a new maritime doctrine of unclean hands in a limitations action. Lawsuits seeking Exoneration or Limitation of Liability actions have long been available on a well-established basis. That jurisprudence flies in the face of Claimants' effort to make an unclean hands argument.

statutory and case law, but it would also improperly expand the scope of the statute, create "new law," and violate Carver's rights and protections codified in the Limitation Act.

Notwithstanding misplaced and unprecedented application of unclean hands law, the undisputed facts are that immediately following the June 15, 2024 incident, based on the testimony that the Company did not know that *the bridge* had been damaged, as it believed that the barge had hit the wood fendering system located at the opening of the bridge. See Doc. 99, Carver's Memorandum of Law in Support of Motion for Summary Judgment, SUMF ¶¶ 15-16 at Ex. 10, Baldassare Dep. 217:2 – 218:3. *See id*. SUMF, ¶ 23. Based on the undisputed testimony of Leonard Baldassare, the Carver Port Captain stationed in Staten Island, New York, that on June 15, 2024, the Company had no knowledge that the bridge had been damaged as it was reported and it believed that the barge had hit the fendering.

> Q: Now, on June 15, 2024 when you received a call from Captain Miller did he tell you he had hit the bridge?
> **A. No.**
> Q. At any time during that day, June 15, did you find out he had hit the bridge?
> **A. No.**
> Q. And was it your understanding that he had slid by the fendering system?
> **A. Yes.**
> Q. That's what he told you?
> **A. Yes, that is what he told me.**

*Id*.

WHEREFORE, for the foregoing reasons, Carver respectfully requests that the Court deny Claimants' Motion for Summary Judgment and grant summary judgment in its favor that Carver is entitled to limit its liability, as that an admitted navigational error cannot be imputed to Carver as the vessel owner, and there, Carver had o privity of knowledge as to this navigational error made by a duly-qualified pilot.

Dated: September 15, 2025

CLYDE & CO US LLP

By: /s/ Harold L. Cohen

Harold L. Cohen (VSB No.:98148)
1221 Brickell Avenue, Suite 1600
Miami, FL 33131
Tel: 305-446-2646
Fax: 305-441-2374
Email: harry.cohen@clydeco.us;

James H. Rodgers*
Clyde & Co US LLP
45 Lexington Avenue, 16th Floor
New York, NY 10174
Phone: (212) 702-6771
Email: james.rodgers@clydeco.us

Michael J. Roman*
Dawn L. Johnson
Siobhan M. Murphy*
Clyde & Co US LLP
30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email: michael.roman@clydeco.us
dawn.johnson@clydeco.us
Siobhan.murphy@clydeco.us

Rachel Werner*
One North Central Avenue, Suite 1030
Pheonix, Arizona 85004
Phone: 480-746-4556
Email: rachel.werner@clydeco.us
**pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2025, a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will serve all counsel of record by electronic mail as follows:

Mark C. Nanavati, Esq. (VSB No.: 38709)
G. Christopher Jones, Jr., Esq. (VSB No.: 82260)
SINNOT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)
(804) 893-3862 (Jones)
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com
*Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

Zachary M. Jett, Esq. (VSB #93285)
BUTLER WEIHMULLER KATZ, et al
11525 North Community House Road
Suite 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

*/s/ Harold L. Cohen*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765) her cargo, engines, boilers, tackle, equipment, apparel, and appurtenances, etc., *in rem*, ("M/T MACKENZIE ROSE"), petitioning for Exoneration from or Limitation of Liability in allision with Belt Line Main Line Railroad Bridge (the "Bridge") occurring June 15, 2024 in and about the Elizabeth River, Virginia.

**Civil Action No: 2:24-cv-00490**

**INDEX OF EXHIBITS cited in**
**CARVER'S MOTION FOR SUMMARY JUDGMENT and in**
**CARVER'S RESPONSE IN OPPOSITION TO CLAIMANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**
**Re: <u>Norfolk and Portsmouth Belt Line Railroad Co. v. Carver Marine Towing, et al.</u>**
**Civil Action No. 2:24-cv-00490**

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| EXHIBIT 1 | Brian Moore Deposition 4/28/25 with Exhibit 19 |
| EXHIBIT 2 | Revised 2692 form dated 6/25/24, CARVER 000111-000112 |
| EXHIBIT 3 | Capt. Chris Miller handwritten statement, CARVER 000047 |
| EXHIBIT 4 | Report and Findings of Captain Sam Stephenson, J.D. |
| GROUP EXHIBIT 5 | Statement of Chris Miller, Carver 000049; Sharif Porter Dep., 22:13-23:22; Jarkeis Morrissey Deposition 20:19-21:10; Jason McGrath Dep., 30:15-31:22 |
| EXHIBIT 6 | Nick Laraway Deposition 6/17/25 |
| EXHIBIT 7 | ABS Survey, 9/2/2021, ABS–0089-0095 |
| GROUP EXHIBIT 8 | COI CARVER 001728-001731, Daily Log 6/15/24 listing crew, CARVER 000056-000057 |
| EXHIBIT 9 | 7.16 Look Out, CARVER 000155 |
| EXHIBIT 10 | Leonard Baldassare Deposition 04/29/25 |
| EXHIBIT 11 | James Morrissey Handwritten Statement, CARVER 000094 |

| | |
|---|---|
| EXHIBIT 12 | Answer to Interrogatory No. 4 of Carver Marine Towing's Fifth Supplemental Response to Norfolk Belt Line's Second Set of Requests for Production of Documents with Affidavit of Josef Malk in Support |
| EXHIBIT 13 | Initial 2692-B form 6/16/24, CARVER 00114-117 |
| EXHIBIT 14 | Email from Lenny to Lt. Palomba with 2692 form, CARVER ESI 001274-001275 |
| GROUP EXHIBIT 15 | Revised Statement of Chris Miller at CARVER 49; Revised Statement of Jarkeis Morrisey at CARVER 000072; Revised Statement of Sharif Porter at CARVER 000084; and Revised Statement of Jason McGrath at CARVER 000082 |
| EXHIBIT 16 | Tug cell text, CARVER ESI 001897 |
| EXHIBIT 17 | CARVER ESI 000523 (screen shot of incident) |
| EXHIBIT 18 | 6/15/24 Daily Log, CARVER 000056 |
| EXHIBIT 19 | Capt. Nicholas J. Lewis Report |
| EXHIBIT 20 | Capt. Nicholas J. Lewis Deposition, 40:1-24 |
| EXHIBIT 21 | Claimants' Expert Report of W. N. Marianos and Charlie Cunningham R.L. Banks Joint Report dated Aug. 8, 2025. |
| EXHIBIT 22 | Belt Line's Responses to Carver's First Requests for Admission, served 8/15/25 |
| EXHIBT 23 | Belt Line's Costs Spreadsheet |
| EXHIBIT 24 | Belt Line's Rail Tie Invoices |
| EXHIBIT 25 | Carver's Seventh Supplemental Response to the Belt Line's First Request for Production of Documents and Things served 7/11/2025 |
| EXHIBIT 26 | May 5, 2025 Letter from Belt Line to Counsel re Deposition Documents |
| EXHIBIT 27 | June 14, 2024, Master's Daily Vessel Reporting (tugs) - CARVER 000013-18 |
| EXHIBIT 28 | June 15, 2024, Master's Daily Vessel Reporting (tugs) - CARVER 000019-23 |
| EXHIBIT 29 | Capt. Sam Stephenson Deposition |
| EXHIBIT 30 | James Morrissey Merchant Mariner Credential CARVER 000091-000093 |
| EXHIBIT 31 | James Morrissey Witness Statement, CARVER TBS HELM CONNECT 003732 |
| EXHIBIT 32 | 9.5 Incident Report – Event, 1/22/2024 at CARVER 0000829-CARVER 0000847 |