# Exhibit 29

```
               IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                        Norfolk Division
                         In Admiralty

        ----------------------------X
        In the Matter of COEYMANS    :
        MARINE TOWING, LLC D/B/A      :
        CARVER MARINE TOWING as       :
        Owner and Operator of M/T     :
        Mackenzie Rose, (IMO No.      :
        8968765) her cargo, engines, :
        cargo, engines, boilers,      :
        tackle, equipment, apparel,   :
        and appurtenances, etc., in   :    Civil Action No.:
        rem, ("M/T MACKENZIE ROSE"),  :    2:24-cv-00490
        petitioning for Exoneration   :
        from or Limitation of         :
        Liability in allision with    :
        Norfolk and Portsmouth Belt   :
        Line Railroad Company Main    :
        Line Railroad Bridge (the     :
        "Bridge") occurring June 15,  :
        2024 in and about the         :
        Elizabeth River, Virginia.    :
        ----------------------------X
```

                               Monday, August 11, 2025

        Job No. 117090

        Remote Videotaped Deposition of:

                CAPTAIN SAMUEL STEPHENSON, J.D.,

        called for examination, pursuant to the amended

        notice of deposition, held remotely and commencing

        at 10:33 a.m. when all were present on behalf of

        the respective parties:

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

---

**Page 2**

```
1      -  A P P E A R A N C E S  -

2

3    On Behalf of the Plaintiff:

4        JAMES H. RODGERS, ESQUIRE

5        MICHAEL ROMAN, ESQUIRE

6            CLYDE & CO US, LLP

7            405 Lexington Avenue

8            New York, New York  10174

9            (212) 702-6771

10           james.rodgers@clydeco.us

11

12   On Behalf of the Defendant:

13       JAMES L. CHAPMAN, IV, ESQUIRE

14           CRENSHAW, WARE & MARTIN, P.L.C.

15           150 West Main Street

16           Suite 1500

17           Norfolk, Virginia  23510

18           (757) 623-3000

19           jchapman@cwm-law.com

20

21              (CONTINUES ON PAGE 3)

22
```

**Page 4**

```
1      -  I N D E X  -

2

3    EXAMINATION OF CAPTAIN SAMUEL STEPHENSON    PAGE

4        by Mr. Nanavati........................  6

5        by Mr. Chapman.........................158

6        by Mr. Rodgers.........................193

7

8

9

10

11        -  MARKED EXHIBITS  -

12   PLAINTIFF'S EXHIBITS                        PAGE

13    1   Expert Disclosure...................... 21

14

15           (EXHIBIT RETAINED BY COUNSEL)

16

17

18

19

20

21

22
```

**Page 3**

```
1      -  A P P E A R A N C E S  -

2

3    On Behalf of the Defendant:

4        MARK C NANAVATI, ESQUIRE

5            SINNOT, NUCKOLS & LOGAN, P.C.

6            13811 Village Mill Drive

7            Midlothian, Virginia 23114

8            804-893-3866

9            mnanavati@snllaw.com

10

11   On Behalf of the Defendant:

12       ON BEHALF OF THE DEFENDANT:

13       ZACHARY M. JETT, ESQUIRE

14           BUTLER WEIHMULLER KATZ CRAIG LLP

15           11525 N. Community House Rd, Suite 300

16           Charlotte, North Carolina 28277

17           704-543-2321

18           zjett@butler.legal

19

20

21

22
```

**Page 5**

```
1       P R O C E E D I N G S

2            THE VIDEOGRAPHER:  Counselors,

3    gentlemen, witness, we're now going on the record.

4            Good morning, this is the deposition of

5    Captain Sam Stephenson in the matter of Coyemans

6    Marine Towing LLC, et al, Civil Action Number

7    2:24-CV-00490.  This deposition is being held via

8    remote method.  The date is August 11, 2025, the

9    time is 10:33 a.m.

10           I am Rob Chang, the videographer, on

11   behalf of First Legal Deposition, located in Los

12   Angeles, California.  This deposition is being

13   videoed at all times unless specified to go off the

14   video record.

15           Would all attorneys present please

16   identify yourself, beginning with the noticing

17   attorney.

18           MR. NANAVATI:  My name is Mark

19   Nanavati, and I represent Evanston Insurance.

20           MR. CHAPMAN:  James Chapman, I

21   represent Norfolk and Portsmouth Beltline Railroad

22   Company.
```

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

1    MR. JETT:  Zachary Jett, I represent
2  Evanston Insurance Company.
3    MR. RODGERS:  James Rogers of Clyde &
4  Co., we represent Coyemans Marine Towing d/b/a
5  Carver Marine Towing, as well as the Tug, Mackenzie
6  Rose, and the witness.
7    MR. ROMAN:  Michael Roman, also with
8  Clyde, for the same parties as Mr. Rodgers.
9    THE VIDEOGRAPHER:  Thank you.  Will the
10  court reporter please swear in the witness?
11    THE COURT REPORTER:  Mr. Stephenson,
12  can I get you to raise your right hand, please?
13  WHEREUPON,
14    CAPTAIN SAMUEL STEPHENSON, J.D.,
15  called as a witness, and after first being duly
16  sworn, was examined and testified as follows:
17    **THE WITNESS:  I do.**
18    THE COURT REPORTER:  Thank you.
19    EXAMINATION
20    BY MR. NANAVATI:
21    Q:    Can you state your full name on the
22  record for me, please?

1    **A:    Samuel S. Stephenson.**
2    Q:    Mr. Stephenson, my name is Mark
3  Nanavati, and as I mentioned just a few minutes
4  ago, I represent Evanston Insurance Company in this
5  litigation.  I'm going to take your deposition
6  today.  You may get some questions from the
7  Beltline as well.
8    What do you prefer to be called?
9    **A:    You can call me Sam, or Captain Sam, or**
10  **Captain Stephenson.**
11    Q:    Okay, I'll call you Sam.  If that
12  doesn't offend you, it will be a little bit easier
13  on the record.  And Sam, I assume based on what
14  I've seen, you've been to depositions before, so
15  you have a general idea of how this goes, correct?
16    **A:    Yes.**
17    Q:    All right.  The only thing I'll say is,
18  and I don't know if you've been to a remote
19  deposition before, but sometimes these remote
20  depositions, it can be a little bit more difficult
21  for me to follow your answers or you to follow my
22  questions because we've got this AV interface

1  between us.
2    So, if you're not 100% sure you heard
3  me, or you're not 100% sure you knew what I'm
4  getting at or understand my question, please stop
5  me and let me repeat or rephrase, so we're sure
6  we're on the same page.  It won't be helpful to
7  either one of us if a month from now we're reading
8  a transcript, and I think you're giving me an
9  answer to a question that's different than the
10  question you thought you were answering, okay?
11    **A:    Yes.**
12    Q:    Okay?  And just like a regular
13  deposition, verbal responses are necessary, so that
14  the court reporter can type down an answer without
15  trying to interpret your movements.
16    **A:    Yes.**
17    Q:    Okay.
18    **A:    Who retained you?**
19    Q:    Clyde.
20    **A:    Okay.  And who at Clyde was your**
21  **point of contact?**
22    **A:    Jim Rodgers.**

1    Q:    Okay.  And had you worked for Clyde
2  before?
3    **A:    I did one other case with Clyde.**
4    Q:    And was that also with Mr. Rodgers?
5    **A:    To my knowledge, he was involved in it.**
6    Q:    Okay.  And do you recall, is that case
7  on your list, or is that a case where you did not
8  provide testimony?
9    **A:    I did not provide testimony.**
10    Q:    Okay, what was the nature of that case?
11    **A:    It was a man overboard case in which a**
12  **person died.**
13    Q:    Okay.  And we've obviously been
14  provided with your 26A2 disclosure which has your
15  bio in it and list of cases where you testified
16  previously.
17    Without me going through it, that bio
18  is accurate as of today, generally speaking?
19    **A:    Yes.**
20    Q:    And the list of cases that you provided
21  -- where you provided either testimony by way of a
22  deposition or trial, that's accurate as of today?

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 10

1    A:    Yes.

2    Q:    Okay.  I noticed in your bio that you

3  have a J.D.?

4    A:    Yes.

5    Q:    Did you ever practice as a lawyer?

6    A:    No, I did not.

7    Q:    Okay, are you licensed to practice?

8    A:    No.

9    Q:    Okay.  And outside of the cases that

10  you've identified in your report where you provided

11  testimony, can you give me just a general idea of

12  how many cases you do a year as a consultant where

13  you may or may not provide testimony?

14    A:    It varies.  Some years I'll do more

15  than others, but I'd say possibly five a year.

16    Q:    Okay.  And for how long have you been

17  averaging approximately five a year?

18    A:    About 25 years.

19    Q:    Okay.  And I see that you obviously

20  have other vocations outside of serving as a

21  consultant.

22          How does your work week or work month

Page 11

1  divide up between non-consulting work and legal

2  consulting work, just by way of percentages?

3          Again, roughly.

4    A:    The legal work is very small compared

5  to my work schedule.  I'm a harbor pilot, so we

6  work an unusual schedule.  I work 28 days on, 28

7  days off.

8    Q:    Okay, so when you're working 28 days

9  on, you're almost exclusively working as a harbor

10  pilot, I'm assuming, and then the other 28 days you

11  have time to do the consulting work?

12    A:    Correct.  But it just varies.

13    Q:    I got you.  I got you.  Okay.

14          Again, I've been able to look at the

15  list of cases you've provided where you were called

16  upon to provide transcribed testimony, but can you

17  give me a sense of the work that you've done over

18  these last 25 years?  If you can, what percentage

19  of them involved allisions versus some other

20  casualty event?

21    A:    I'd say possibly 10 involved allisions

22  approximately.

Page 12

1    Q:    Okay.  And of that 10, do you have a

2  rough idea of how many involved allisions with a

3  bridge?

4    A:    None of them did.

5    Q:    Okay, so this is the first case that

6  you had where a vessel allided with a bridge?

7    A:    Yes.

8    Q:    Okay.  And the 10 cases that you had

9  that involved allisions, generally, how many of

10  those cases involved allegations relating to the

11  use of autopilot?

12    A:    This is the first one.

13    Q:    Okay.  And of the 10 cases you

14  previously worked on that involved allisions, how

15  many of those involved allegations related to the

16  proper use of a lookout?

17    A:    This is the first one.

18    Q:    Okay.  And of those 10 cases that you

19  --

20    A:    I take that back.  Several have

21  involved a lookout.

22    Q:    Okay.  Like three or four or something

Page 13

1  like that out of the 10?

2    A:    I would have to look.  I don't have

3  that in front of me.

4    Q:    Okay.  And in those several cases, do

5  you recall whether or not you were providing an

6  opinion that the lookout that was in place was

7  satisfactory or unsatisfactory?

8    A:    Yes.

9    Q:    Which side of that were you on?

10    A:    I was on the defense side.

11    Q:    So, whatever the lookout situation was

12  in those vessels was appropriate given the

13  circumstances?

14    A:    I was more on the side of the lookout

15  on the other vessel was not appropriate.

16    Q:    Okay.  Got you.

17          So, were those allisions, or were those

18  collisions?

19    A:    It was an allision.

20    Q:    Okay.  And the opinions that you

21  provided regarding the lookout not being

22  appropriate on the other vessel, was it a

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 14

1  circumstance where it was a single -- where the
2  captain was operating as a lookout, or was it one
3  where there was a posted lookout?  Give me an idea
4  of what type of lookout issues you were dealing
5  with.
6      **A:    The vessel was at anchor.**
7      Q:    Okay.  And what was the lookout
8  situation with the vessel that was at anchor that
9  you were opining on?
10     **A:    There was one mate on the bridge, and**
11 **he was not looking out the window.**
12     Q:    Okay.  And where was he looking?
13     **A:    He was on his computer.**
14     Q:    Okay.  Got it.
15         The approximately 10 allision matters
16 you've been involved in before this one, did any of
17 those other allisions involve an allegation that a
18 vessel had left the scene of the allision without
19 properly reporting the allision to the authority
20 with jurisdiction?
21         MR. RODGERS:  Objection to the form.
22 You can answer it.

Page 15

1      **A:    No.**
2      Q:    Okay.  As it relates to prior cases
3  you've been involved in or in litigation, do you
4  know whether or not any opinions that you've
5  provided or intended to provide at trial were
6  either excluded in whole or in part by a court?
7      **A:    None of my opinions have been excluded.**
8      Q:    Okay.  Now, I looked on your website.
9  You've got a long list of areas of expertise, many
10 of which are relevant to this case and some of
11 which are not.
12         And I'll just go through these with
13 you, and you can tell me whether or not you've been
14 qualified as an expert in any federal court on
15 these particular areas of expertise.  The first
16 topic or subject that you had on your website was
17 navigation rules.
18         Have you qualified as an expert to
19 testify regarding navigation rules?
20     **A:    Yes.**
21     Q:    Okay.  And it'll be the same question
22 for each of these, so I'm just going to move it

Page 16

1  along a little bit.
2         Piloting and navigation?
3      **A:    Yes.**
4      Q:    Okay.
5         Pleasure vessel safety?
6      **A:    Yes.**
7      Q:    Gangways and accommodation ladders?
8      **A:    Yes.**
9      Q:    Harbor and port design?
10     **A:    No.**
11     Q:    Okay.  Tug and barge operations?
12     **A:    No.**
13     Q:    Okay, shipboard safety?
14     **A:    Yes.**
15     Q:    Life-saving equipment?
16     **A:    Yes.**
17     Q:    Okay, ship handling?
18     **A:    Yes.**
19     Q:    Collisions?
20     **A:    Yes.**
21     Q:    Seamanship?
22     **A:    Yes.**

Page 17

1      Q:    Fire --
2      **A:    Some of these go together.**
3      Q:    I'm sorry, say it again.  I'm sorry,
4  you broke up.
5      **A:    Some of these go together.  When you're**
6  **talking about lookout and rules of the road, those**
7  **go together.**
8      Q:    Okay.  And I'm just reading -- I just
9  cut this list right off your website, so if they
10 need to go together, just let me know that.  But
11 they were separated on your website.
12         Firefighting?
13     **A:    Yes.**
14     Q:    Narrow channels?
15     **A:    No.  That would be navigation, though,**
16 **and rules of the road.**
17     Q:    Okay.  But specifically, again, on your
18 website, you've got an area of expertise called
19 narrow channels, and you don't recall a prior case
20 where you've been designated as an expert and
21 allowed to testify on that subject in federal
22 court.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 18

1          Is that correct?
2     A:    Correct.
3     Q:    Okay, line handling?
4     A:    Yes.
5     Q:    Okay, groundings?
6     A:    Yes.
7     Q:    Okay.  And then the last one,
8  allisions, which we've already talked about,
9  correct?
10    A:    Yes.
11    Q:    Okay.  There's a couple things when I
12  was reading your report that I think may be
13  relevant to this case that I did not see on your
14  list of topics.
15          And let me ask you this, do you hold
16  yourself out as an expert in the manufacture of
17  autopilots?
18    A:    No.
19    Q:    Okay, do you hold yourself out as an
20  expert in the servicing of autopilot systems?
21    A:    No.
22    Q:    Okay, do you hold yourself out as an

Page 19

1  expert in the installation of autopilot systems?
2     A:    No.
3     Q:    Okay.  And do you hold yourself out as
4  an expert in the maintenance of autopilot systems?
5     A:    No.
6     Q:    Okay.  There was also some opinions in
7  here regarding the credibility of Captain
8  Morrissey.
9          Do you hold yourself out as a human
10  factors expert?
11    A:    No.
12    Q:    Okay.  And do you hold yourself out as
13  an expert in witness credibility?
14    A:    No.
15    Q:    Okay.
16          When you've been operating a vessel,
17  have you ever transited a bridge yourself in
18  autopilot?
19    A:    Yes.
20    Q:    Okay.  And where was that?
21    A:    17th Street Bridge in Fort Lauderdale.
22    Q:    Okay, any other bridges?

Page 20

1     A:    As a pilot or as a captain?
2     Q:    Well, as a pilot or a captain.
3     A:    Numerous bridges.  Are you talking
4  autopilot?
5     Q:    Yes, sir.
6     A:    We do -- in Port Everglades, we use
7  autopilot going through the 17th Street Bridge.
8     Q:    Okay, is there any other bridge that
9  you've either piloted or captained where you've
10  transited the bridge while in autopilot?
11    A:    Not to my knowledge.
12    Q:    Okay.  And outside of the 17th Street
13  Bridge, can you give me a sense of how many bridge
14  transits you've made as either a captain or a
15  pilot?
16    A:    I couldn't tell you.
17    Q:    Thousands?
18    A:    No, not thousands.
19    Q:    Hundreds?
20    A:    I wouldn't even say hundreds.
21    Q:    Okay, less than a hundred?
22    A:    You're asking me a question I really

Page 21

1  can't opine on.
2     Q:    Okay.
3     A:    I've been at sea for 40-some years.
4     Q:    Okay.  All right.  We received a
5  report -- I don't know if that was to me or not.
6  Sorry.  If it's me, I don't think so.
7          We received a report from Carver, and
8  I'm just going to refer to the entirety, entity,
9  you know, Coyemans and the vessel as Carver.
10          Is that okay by you?
11    A:    Yes.
12    Q:    Okay.  We received an expert disclosure
13  on Friday from Carver that contained a report that
14  you authored.  And the report itself has been
15  marked as Exhibit 1 to this deposition.
16          (WHEREUPON, EXHIBIT 1 WAS IDENTIFIED
17  AND MARKED FOR THE RECORD.)
18          BY MR. NANAVATI:
19    Q:    Do you have a copy of that report
20  handy?
21    A:    Yes, I do.
22    Q:    Okay.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 22

```
1              Can you pull that up just for a moment?
2     A:     Sure.  There we go.
3     Q:     Yes.  Yeah, I just want to make sure
4  you can see it.
5              Like I said, I've marked the report as
6  Exhibit 1, and I'll get into some questions I have
7  in a report in a moment, but I just want to be sure
8  that we're on the same page.
9              This report is called Report of
10  Findings and Opinions of Captain Sam Stephenson,
11  J.D., and it's dated June 8th of 2025.
12             Do you see that?
13     A:     Yes.
14     Q:     Okay.  And is this the report that you
15  prepared in this particular matter?
16     A:     Yes.
17     Q:     Okay.  And it looks to me like outside
18  of your CV, the report that I have is a total of 67
19  pages.
20             Is that what you have as well?
21     A:     Yes.
22     Q:     Okay.  And this report that we have in
```

Page 23

```
1  front of us that's been marked as Exhibit 1, does
2  this contain all the opinions that either you've
3  been asked to, or you intend to provide at the
4  trial of this matter, if it goes to trial?
5     A:     Yes.
6     Q:     Okay.  And similar question, this
7  report contains what I would call a basis for those
8  opinions, meaning documents you've reviewed or
9  facts that you've considered.
10             Does this report contain the entirety
11  of the basis for the opinions that are contained in
12  Exhibit 1?
13     A:     Yes.
14     Q:     Okay, have you spoken directly with any
15  employees of Carver?
16     A:     Yes.
17     Q:     Okay.  And who have you spoken with?
18     A:     I talked with the captain on -- I did
19  the vessel inspection.
20     Q:     Which captain?
21     A:     I don't recall the captain's name.
22     Q:     Okay.
```

Page 24

```
1     A:     I talked with the captain and the port
2  captain, when I did the vessel inspection.
3     Q:     Okay.  And do you recall who the port
4  captain was at that time?
5     A:     No.
6     Q:     Okay, have you spoken with any of the
7  crew that was aboard the Mackenzie Rose on June
8  15th of 2024?
9     A:     Just the captain, the port captain.
10     Q:     Okay, were they on the Mackenzie Rose
11  on June 14th of 2024?
12     A:     The captain wasn't, the port captain,
13  no.  Neither one.
14     Q:     Okay, did you say the captain was not,
15  or was?
16             I'm sorry, I had trouble hearing you.
17     A:     Was not.
18     Q:     Okay, so you have not spoken with any
19  of the crew that were aboard the Mackenzie Rose on
20  June 15th of 2024, correct?
21     A:     Yes.
22     Q:     Okay, have you asked to speak with any
```

Page 25

```
1  of the crew that were on board the Mackenzie Rose
2  on June 15th of 2024?
3     A:     No.
4     Q:     Okay, has anybody offered to you to
5  speak with any of the crew that were on board the
6  Mackenzie Rose on June 15th of 2024?
7             MR. RODGERS:  Objection, privileged.
8             MR. NANAVATI:  Outside of counsel, has
9  anybody offered for you to interview or speak with
10  the crew that were on board the Mackenzie Rose of
11  June 15th of 2024?
12             MR. RODGERS:  You can answer other than
13  your attorney or the Carver's attorney.
14     A:     No.
15     Q:     As it relates to the crew that was
16  aboard the Mackenzie Rose on June 15th of 2024,
17  what investigation, if any, have any of you done
18  into their individual backgrounds and training as
19  it relates to serving as a crew member on the tug?
20     A:     I reviewed the documents Carver has
21  with regards to their employment.
22     Q:     Okay.  And outside of their HR files,
```

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 26

1  have you reviewed any other information regarding
2  any one of these individuals' background or
3  training as it relates to being a crew member on a
4  tug like the Mackenzie Rose?
5              MR. RODGERS:  Objection to form.
6      **A:**      **No.**
7              **One thing I would like to just make**
8  **clear, Mark, is I made a typo on one page.  I'd**
9  **like to bring that up now before we get more into**
10 **the report.**
11     Q:     Yeah.  Yeah.
12             What is it?
13     **A:**      **It's on page 18.  And in the first**
14 **paragraph, middle -- in the middle, it says, "Would**
15 **be outside the mandated work rest requirements of**
16 **working no more than 10 hours a day."**
17     Q:     Right.
18     **A:**      **That should have been 14 hours a day.**
19     Q:     I'm sorry, how many hours?
20     **A:**      **14.**
21     Q:     Okay.  Got it.  Thank you.
22             And as it relates to your work as a --

Page 27

1  as a consultant, or your -- even your work as a
2  pilot or a captain, have you written any articles
3  or published any articles or books or anything
4  related to navigation of a tugboat, autopilot,
5  lookouts, anything like that?
6      **A:**      **No.**
7      Q:     Okay.  All right.  So, let me ask you a
8  little bit about the allision that brings us all
9  here today.
10             First, are you aware that there was an
11 allision?
12             Sorry, go ahead.
13     **A:**      **Let's back up.  When you say, Have I**
14 **authored anything?  I've wrote courses.  I wrote a**
15 **rules of the road course for Resolve Maritime**
16 **Academy.**
17     Q:     Okay.  And is that --
18     **A:**      **I don't know if I'd call that authored,**
19 **but it was rules course.**
20             **Also, when I taught at the Texas**
21 **Maritime Academy, part of Texas A&M, I taught the**
22 **navigation rules of the road course.  And again, I**

Page 28

1  **wrote that course also.**
2      Q:     Okay.  And is that information
3  available on your website, do you know?
4      **A:**      **No.**
5      Q:     Okay.  All right.
6              Is that information available, do you
7  know, on either one of them -- from either one of
8  those educational institutions?
9      **A:**      **From Resolve, possibly.  I don't know**
10 **at this point.**
11     Q:     Okay, was there anything in the rules
12 course that would, and again, if you don't
13 remember, that's fine, but it would bear directly
14 on the big issues in this case, lookout, autopilot,
15 transiting bridges?
16     **A:**      **Lookout, yes.**
17     Q:     Okay.
18             Now, let me ask you just a few quick
19 general questions about your understanding of what
20 kind of brings us here today.  You're aware that
21 there was an allision between the Mackenzie Rose
22 and or at least a barge it was pushing and the -- a

Page 29

1  bridge owned by Norfolk Southern on June 15th of
2  2024?
3      **A:**      **Yes.**
4      Q:     Okay.  And what is your understanding
5  of where the barge that was being pushed by the
6  Mackenzie Rose allided with the bridge?
7      **A:**      **It's my understanding it was west.  It**
8  **was the west side of the bridge, just west of the**
9  **fendering system.**
10     Q:     Okay.  And based on your understanding
11 of the allision, was there anything that the
12 Beltline did, the owner of the bridge, to cause or
13 contribute to the allision?
14     **A:**      **To my knowledge?  No.**
15     Q:     Okay.  And to your knowledge, was the
16 bridge -- was the bridge up at the time of the
17 allision?
18     **A:**      **Yes.**
19             MR. RODGERS:  Objection.  Can you
20 explain what you mean by up?
21     Q:     Do you understand what I'm saying?
22 There's a railroad track that goes across and it

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 30

1    can either be up or down?
2        A:    Yes.
3        Q:    Okay.  And you understand that it was
4    up when the allision occurred?
5        A:    Yes.
6        Q:    Okay, do you know whether or not any
7    member of the Mackenzie Rose crew conducted a
8    navigational assessment prior to the allision?
9        A:    No.
10       Q:    Okay, is that -- but you would agree
11   with me that navigational assessments are required
12   to be performed by the Coast Guard, correct?
13       A:    They're not required.
14       Q:    They're not required?  Okay.
15       A:    No.
16       Q:    Is it good practice to conduct a
17   navigational assessment before a vessel like the
18   Mackenzie Rose starts a trip like this one?
19             MR. RODGERS:  Objection, it's vague.
20   Can you go ahead and define what you mean, Mark?
21             MR. NANAVATI:  Go ahead and answer the
22   question.

Page 31

1             MR. RODGERS:  Can you define what you
2    mean?
3        Q:    Do you know what a navigational
4    assessment is?
5        A:    You're talking a risk assessment?
6        Q:    Yeah.
7              Do you understand what I'm asking?
8        A:    You're talking like a GAR assessment?
9        Q:    Yeah.
10       A:    Yes.
11       Q:    Okay.  And I think what you said is you
12   do not know whether or not one was performed prior
13   to this particular voyage, correct?
14       A:    Yes.
15       Q:    And I think what you said is they're
16   not required.
17             Is that right?
18       A:    Yes.
19       Q:    Okay, do you believe it's good practice
20   to conduct one?
21       A:    Not if you're doing a route on a
22   regular basis.  In my opinion, there's no reason

Page 32

1    for it.
2        Q:    And do you know whether or not the
3    Mackenzie Rose had been on this route on a regular
4    basis prior to this allision?
5        A:    No, I don't.
6        Q:    Okay, do you know what training or
7    requirements Carver has as it relates to conducting
8    these particular assessments prior to a voyage?
9        A:    No.
10       Q:    Okay.
11             As it relates to the allision, what
12   speed do you understand the Mackenzie Rose was
13   operating at when it allided with the bridge?
14       A:    I don't know what speed it was
15   operating at when it allided with the bridge.
16       Q:    Okay, do you have an understanding or
17   opinion as to what speed the Mackenzie Rose was
18   operating at as it approached the bridge?
19       A:    Approximately 5.5 knots.
20       Q:    Okay.  And have you seen any documents
21   or an interview with a witness or any other
22   information that would suggest that that speed

Page 33

1    altered in some way as the allision occurred?
2        A:    Yes.
3        Q:    Okay.  And tell me what you saw.
4        A:    Reading the 2692 form before the vessel
5    or the barge allided with the bridge, Mate
6    Morrissey at first put the engines at stern.  At
7    some point he put the engines full of stern.
8        Q:    Okay.  And do you know whether that was
9    before or after the allision?
10       A:    Based on the document, it was before
11   the allision.
12       Q:    Okay, does it say in that document that
13   the engines were put in full of stern before the
14   allision?
15       A:    Let me read it so we're clear.
16       Q:    Please, please.
17             MR. RODGERS:  Do you want to put it in
18   front of him, Mark?  Do you have exhibits?
19             MR. NANAVATI:  He has it in front of
20   him.
21             MR. RODGERS:  Well, going forward, can
22   you put the document in front of him?

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 34

1	MR. NANAVATI: It's in his report.
2	A:	Okay. This is from the 2692 form. The
3	officer of the watch stated that once he did switch
4	to hand steering, he gave a slow of stern at first
5	and then a full of stern.
6	Q:	Okay. And is there any indication that
7	that was either before or after the allision?
8	A:	In my opinion, it was before the
9	allision.
10	Q:	Okay. But my question is, is there
11	anything in that document that says that this
12	occurred either before or after the allision?
13	A:	It says, "Once contact was made with
14	the bridge structure, the vessel was barely making
15	headway."
16	Q:	Okay.
17	A:	So, if once contact was made, in my
18	opinion, they had slowed down before the allision.
19	Q:	Okay, but you would agree with me that
20	outside of that, there's nothing in the report that
21	indicates that the full of stern was either before
22	or after allision?

Page 35

1	A:	I would have to look. I think there
2	was a -- Morrissey had a comment that he started
3	backing before.
4	Q:	Okay have you seen the video of the
5	allision?
6	A:	Yes.
7	Q:	Did you see any evidence from the video
8	that the Mackenzie Rose was full of stern prior to
9	the allision?
10	A:	I wouldn't be able to tell from that
11	video. It would be a little hard. You're talking
12	about the watch.
13	Q:	Okay, have you seen anything on the
14	electronic data that was produced from the
15	Mackenzie Rose that would suggest that the speed of
16	the Mackenzie Rose had either slowed or gone into
17	almost reverse prior to the allision?
18	A:	If I recall, on the Rose Point data, it
19	was slowing down somewhat right before the
20	allision.
21	Q:	Okay. And do you have a recollection
22	of when you say somewhat, how much it slowed prior

Page 36

1	to the allision?
2	A:	I don't recall that.
3	Q:	Okay, as the vessel was approaching the
4	bridge, do you have an understanding of what its
5	heading was?
6	A:	It was heading directly towards -- what
7	do you mean by heading, the course it was on?
8	Q:	Yes.
9	A:	No, I don't.
10	Q:	Okay. And as it relates to what
11	general direction was going on, as it relates to
12	the bridge, as it was approaching the bridge, was
13	it heading towards the bridge, or was it heading
14	towards the channel between the two bridge piles?
15	A:	The vessel was slowly meandering
16	westward of the middle of the bridge.
17	Q:	Okay. And do you have an opinion as to
18	why the vessel was slowly meandering westwards
19	towards the physical structure itself?
20	A:	Can you repeat that?
21	Q:	Yeah, do you know why it was slowly
22	meandering to the left?

Page 37

1	A:	Do I know why? No, I wasn't there.
2	Q:	Okay, do you have an opinion as to why
3	it was meandering to the left, based on your review
4	of the information that's listed in your 26A2
5	disclosure?
6	A:	Yes.
7	Q:	Okay, what is that?
8	A:	Loss of situational awareness.
9	Q:	Okay. And how does that interplay with
10	the vessel being an autopilot?
11	A:	The Mate Morrissey, in my opinion, was
12	not paying attention.
13	Q:	Okay. And was the autopilot
14	functioning properly when it was allowing the
15	vessel to drift to the left into the bridge?
16	A:	From all the evidence I have reviewed,
17	yes.
18	Q:	Okay, so what was it about the
19	autopilot that had it set on a course, or not on a
20	course, but allowed it to meander to the left?
21	MR. RODGERS: Objection to form, you
22	can answer if you understand it.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 38

1        THE WITNESS:  Can you repeat the
2   question?
3            MR. NANAVATI:  Yeah.
4        Q:    Was the vessel in autopilot as it
5   approached the bridge?
6        A:   At some point, yes.
7        Q:    Okay.  And how far away from the bridge
8   was it when the autopilot was disengaged, in your
9   opinion?
10       A:    I don't know.  I wasn't there.
11       Q:    Okay.  And was the vessel meandering to
12  the left for some period of time before the
13  allision?
14       A:    Yes.
15       Q:    Okay.  And was the vessel meandering to
16  the left some period of time while it was in
17  autopilot, in your opinion?
18       A:    Yes.
19       Q:    Okay.  And can you explain to me why
20  the vessel was meandering to the left while it was
21  in autopilot?
22       A:    Why it was meandering to the left in

Page 39

1   autopilot?
2        Q:    Yes.
3        A:    Because in my opinion, Morrissey was
4   not paying attention.  He had a lack of situational
5   awareness, and that's the reason it was meandering
6   to the west in autopilot.
7        Q:    Okay.  And how did his lack of
8   situational awareness play into the vessel
9   meandering to the left while it was in autopilot?
10       A:    Because he wasn't paying attention.
11       Q:    And what was causing the vessel to
12  meander to the left while it was in autopilot?
13       A:    You're talking the course input?
14       Q:    Okay, so your opinion is that when the
15  course input was put in, it was put in improperly?
16       A:    I wasn't there, so I can't tell you.
17  But if that's the course it was on, it was
18  meandering to the west, it would be a course input.
19       Q:    Okay, but do you have an opinion one
20  way or the other as to whether or not the course
21  input was the cause of the meandering, or something
22  else?

Page 40

1        A:    I'd say it's lack of situational
2   awareness.
3        Q:    I know you said that, but something's
4   causing this vessel to move to the left, correct?
5   Could be the course input.  Presumably it could be
6   other things, correct?
7        A:    My opinion was course input by Mate
8   Morrissey.
9        Q:    Okay.  And do you know what course Mate
10  Morrissey inputted into the autopilot system?
11       A:    No, I don't.
12       Q:    Okay, have you seen any documents or
13  any interviews of any witnesses or any other
14  information that would indicate what course Mate
15  Morrissey put into the autopilot system?
16       A:    No.
17       Q:    All right, and do you know what
18  training Carver provided Mate Morrissey as it
19  relates to course input on this particular
20  autopilot system?
21       A:    No, but I'll say it's common not to
22  train a captain.  A captain is the one who normally

Page 41

1   does the training for the crew members.  And when
2   you receive a -- when you get the autopilot, if you
3   have a question, look at the manual.
4        Q:    Okay.  And do you know whether or not
5   -- so, my question is this though, do you know
6   whether or not Carver provided any instruction to
7   Mate Morrissey, Captain Miller, or any other member
8   of the crew of the Mackenzie Rose regarding the use
9   and operation of the Simrad autopilot system that
10  was installed several months before this allision?
11       A:    No, but that's up to the captain.  The
12  captain is in charge of the vessel, and he is the
13  one who should be reading the manual if he has any
14  questions.
15       Q:    Okay.  And do you know whether he read
16  the manual?
17       A:    No.
18       Q:    Okay, do you know whether he was
19  provided the manual?
20       A:    When I went on board, there was a
21  manual aboard the vessel.
22       Q:    Okay, do you know whether or not that

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

**Page 42**

1 same manual was aboard the vessel on June 15th of
2 2024?
3    **A:    I wasn't there.  No.**
4    Q:    Okay.
5         MR. RODGERS:  Mark, just by counsel, I
6 see the captain's here and he's not a party.  So
7 again, could you please ask him to leave, Captain
8 Lewis?
9         MR. NANAVATI:  I believe he's an
10 expert, can sit in on other depositions, and he's
11 been permitted to sit in other depositions in this
12 case.
13         MR. RODGERS:  I don't believe he can.
14         MR. NANAVATI:  So, what do you want to
15 do about that?
16         I think I'm pretty clear that he's
17 allowed to sit in and listen as an expert witness.
18         MR. RODGERS:  Give me a case or give me
19 a -- give me something.
20         MR. NANAVATI:  Well, I mean, if you
21 want to go, we'll have to -- I'm not -- if you
22 wanted to have legal research on this, we'll have

**Page 43**

1 to go off the record for a bit, do the research and
2 have a back and forth on it, or you can note your
3 objection, and we can move on.
4         MR. RODGERS:  Yeah.  No, let's -- let's
5 just get this -- let's do it, the first option.
6         MR. NANAVATI:  What was that?
7         MR. RODGERS:  Let's find out whether he
8 can be here or not before we continue.
9         MR. NANAVATI:  Okie doke.  Let's go off
10 the record.
11         MR. RODGERS:  Take a break.  I don't
12 know how long it'll take you.  Is 15 minutes okay?
13         MR. NANAVATI:  Should be fine.
14         MR. RODGERS:  Okay.
15    **THE WITNESS:  15 minutes?**
16         MR. RODGERS:  Yeah, 15 minutes.
17         THE VIDEOGRAPHER:  Counselor, we're
18 going off the record.  The time is 11:08.
19         One moment, please.
20         (WHEREUPON, A BRIEF RECESS WAS TAKEN.)
21         THE VIDEOGRAPHER:  Counselors,
22 gentlemen, witness, we're now going back on the

**Page 44**

1 record.  The time is 11:23.
2         Please proceed.
3         MR. NANAVATI:  Oh, is Jim back?
4 Rodgers?
5         MR. RODGERS:  I'm back.
6         MR. NANAVATI:  Okay.  All right.
7         Mr. Lorman, can you just remind me what
8 the last question and answer was, please?  I've
9 lost my track.
10         MR. RODGERS:  Can we get to the issue
11 about --
12         MR. NANAVATI:  Oh yeah, sorry.  I
13 didn't -- yeah.  Did you -- did you have something
14 to the contrary?
15         MR. RODGERS:  It's not allowed.  You've
16 got something that allows it, then -- I thought --
17 what have you been doing for 10 minutes?
18         MR. NANAVATI:  I sent you an email like
19 10 minutes ago with a case from the fourth circuit
20 saying that it's allowed.
21         MR. RODGERS:  Well, would have helped
22 if you told me.

**Page 45**

1         MR. NANAVATI:  You want to read it, and
2 we'll go back -- go off the record, so you can read
3 it, and we can come back on the record.  That's
4 fine by me.  I don't spend any time getting an
5 argument over things, but I think that the -- what
6 we've cited is clear, and I indicated if you guys
7 --
8         MR. RODGERS:  Let me read it and --
9         MR. NANAVATI:  Okay --
10         MR. RODGERS:  And we'll go from there.
11         MR. NANAVATI:  Okay.  Let's go back off
12 the record for like five minutes, and then we can
13 come back on.  Thank you.
14         THE VIDEOGRAPHER:  Counselors, we're
15 going off the record.  The time is 11:24.
16         (WHEREUPON, A BRIEF RECESS WAS TAKEN.)
17         THE VIDEOGRAPHER:  Counselors,
18 gentlemen, witness, we're going back on the record.
19 The time is 11:39.
20         Please proceed.
21         MR. RODGERS:  Yeah.  So, Mark, I'm --
22 I'm objecting.  We'll go forward.

## CAPTAIN SAMUEL STEPHENSON, J.D.

**August 11, 2025**

Page 46

1    I'm objecting, one, you didn't provide
2  a fourth circuit case.
3    Two, as you stated, you had, I believe,
4  two, I have not consented to any experts, and in
5  the future going forward, while Mike is an
6  important part of the team, he doesn't speak when
7  it comes to substantive issues.
8    And third, the only person that, from
9  what I understand, was at an engineer's deposition
10  was the consulting engineer or consulting expert,
11  it was not a testifying expert.
12    Be that as it may with that, I object
13  to Captain Lewis being here, but we'll go forward
14  with that objection on the record.
15    MR. NANAVATI:  Sounds good.  Appreciate
16  it.
17    Mr. Lorman, can you just remind me what
18  the last question and answer was, please?
19    (WHEREUPON, THE COURT REPORTER READ
20  BACK THE REQUESTED TRANSCRIPT QUESTION.)
21    BY MR. NANAVATI:
22    Q:    Sam, do you have any understanding, or

Page 47

1  have you learned anything regarding when the
2  autopilot that was in place on June 15th, 2024, was
3  installed in the Mackenzie Rose?
4    **A:    I recall it -- not when I was there,**
5  **no, but reading the documents, yes.**
6    Q:    Okay.  And when was it installed?
7    **A:    I recall it was in November of '23.**
8    Q:    Okay.  And do you recall seeing
9  anything in the materials that provided to you
10  regarding any alleged or claimed issues with the
11  autopilot's functionality between November of 2023
12  -- November, when it was installed, and June 15th
13  of 2024, when this allision occurred?
14    **A:    Yes.**
15    Q:    Okay.  And what incidents do you recall
16  seeing or reading about?
17    **A:    It's an issue with the auto -- not the**
18  **autopilot, was with the, I think, the satellite**
19  **were disconnected and the vessel when the autopilot**
20  **went into standby mode, like it should.**
21    Q:    Okay, do you recall anything else
22  occurring, or any other complaints regarding the

Page 48

1  autopilot's performance between its installation
2  date and this allision in June of 2024?
3    **A:    I recall there was one, but in my**
4  **opinion, it was irrelevant because at the time the**
5  **autopilot was working properly.**
6    Q:    At the time of the allision, or at the
7  time that this complaint was made?
8    **A:    At the time of the allision based on**
9  **the information that I've reviewed.**
10    Q:    Okay, so let me ask, go back.  You said
11  there was another incident that you reviewed or
12  another complaint regarding the autopilot's
13  performance that you reviewed, what was that, and
14  when did that occur?
15    SSI don't recall.
16    MR. RODGERS:  Objection.  If you're
17  going to ask him about a specific document, please
18  put it in front of him.
19    MR. NANAVATI:  I'm not.
20    MR. RODGERS:  Can't guess as to what
21  incident you're talking about.
22    Q:    Well, you -- you just mentioned to me

Page 49

1  that you -- there was a satellite connectivity
2  issue, correct?
3    **A:    Yes.**
4    Q:    And then, you mentioned there was
5  another autopilot issue that you recalled learning
6  about during your investigation in this matter,
7  correct?
8    **A:    Yes.**
9    Q:    What was the other one that you recall
10  either learning about or reading about?
11    MR. RODGERS:  Same objection.  You can
12  -- you can answer, if you recall.
13    **A:    It was after the event on June 15,**
14  **2024.**
15    Q:    Okay, do you recall, other than the
16  satellite connectivity issue, have you been
17  provided any documents or any information at all
18  regarding any other complaints regarding the
19  performance of the autopilot between the date that
20  it was installed and June 15th of 2024?
21    MR. RODGERS:  Objection.  The documents
22  are listed.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 50

```
 1          And again, counsel, I ask that you put
 2   documents in front of the witness instead of asking
 3   him to guess, you know, what the 2000 documents he
 4   looked at.
 5          MR. NANAVATI:  So, I'm going to ask the
 6   question, again.
 7          MR. RODGERS:  You can -- if you can
 8   remember, Captain, what you reviewed.  If you
 9   can't, and you need a document, please ask the
10   question that the attorney questioning you.
11          MR. NANAVATI:  And I just going to -- 
12   I'm going to say this one time, Mr. Rodgers, these
13   speaking objections that you make consistently
14   throughout every deposition in order to coach
15   witnesses how to answer questions is wholly
16   inappropriate under the Rules of Federal Procedure.
17   And if you continue in this case, and it makes it
18   impossible to take this deposition, because you
19   answer for every witness how you want them to
20   answer by way of an objection, we will need to stop
21   this and bring this back in front of the court,
22   because it's not -- it's not appropriate.
```

Page 51

```
 1          You can make an objection to form.  You
 2   can make an objection that doesn't suggest an
 3   answer, but you continue to make objections in
 4   every deposition where you try to tell witnesses
 5   how to answer or respond to a question.  And it's
 6   wholly inappropriate.
 7          MR. RODGERS:  All right.  Mark, you
 8   want -- you want to go there?  Because you lied to
 9   the court in your papers and said there were 144
10   speaking objections in your paper -- in your papers
11   against the company, and yet you listed only 11.
12   So, what you think is a speaking objection, you
13   better be clear on it, and you better be precise,
14   because so far in your papers, in your reply brief,
15   you or Jim Chapman, whoever's responsible for those
16   papers, lied to the court when you said 144
17   speaking objections, and then the annex only has
18   11.
19          MR. NANAVATI:  The 11 are you -- the 11
20   are you obstructing witnesses not to answer.  It
21   may be appropriate for you to read something.
22          MR. RODGERS:  But if you want to lie to
```

Page 52

```
 1   the court this time, we're going to -- we're going
 2   to go right back to the lie you already did, and
 3   we'll bring it up at oral argument.
 4          MR. NANAVATI:  You can suggest to the
 5   court that there's a --
 6          (SIMULTANEOUS SPEAKING.)
 7          MR. RODGERS:  The witness --
 8          MR. NANAVATI:  Please, make an
 9   objection, and let's move on.
10          MR. RODGERS:  Put on a document in
11   front of him and stop this game.
12          MR. NANAVATI:  It's not -- I'm not
13   asking -- I'm not asking about it.  I'm not asking
14   about a document.
15          MR. RODGERS:  It's not a speaking
16   objection to ask you to put a document in front of
17   the witness.  And it's not a speaking objection for
18   me to direct the witness on that issue.  And you
19   know it as well as I do.
20          It's not coaching the witness on
21   anything substantive.  And you obviously agree
22   because in your papers, after threatening us with
```

Page 53

```
 1   140, 144 speaking objections, you actually only
 2   moved on 11, because there were no 140 speaking
 3   objections.  So, that I want on the record, if
 4   you're going to go back to the court and
 5   misrepresent, whatever you're going to
 6   misrepresent, I want that on the record.
 7          MR. NANAVATI:  Are you done?
 8          MR. RODGERS:  No, are you done?  Are
 9   you trying --
10          MR. NANAVATI:  I need to ask a
11   question.  Are you done?
12          MR. RODGERS:  Just please move forward.
13          BY MR. NANAVATI:
14      Q:   You mentioned another, and I asked you,
15   were you made aware of either verbally or through
16   any kind of document, of any other issues with the
17   autopilot from the date that it was installed until
18   June 15th of 2024, other than the satellite
19   connectivity issue?
20          MR. RODGERS:  Same objection.  Answer
21   if you can, Captain.
22      A:   Yeah, it would help refresh my memory
```

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 54

1   if you could put it up on the screen.

2       Q:   I'm not saying there are.  I'm not

3   saying there are or they're not.  I'm asking you

4   whether or not, as the expert witness in this case,

5   opining on the functionality of the autopilot

6   issue, you were made aware in any format, could

7   have been a phone call, could have been a document,

8   could have been smoke signals.

9       Were you made aware of any other

10  complaints regarding the functionality of the

11  autopilot system between the date it was installed

12  on June 15th of 2024, other than the connectivity

13  issue that you described?

14      MR. RODGERS:  Objection.

15      A:   I recall the conductivity issue.

16      Q:   Anything else?

17      A:   No.

18      Q:   Okay.

19      A:   To be honest, I wasn't paying attention

20  to that because that really isn't an issue in this

21  case, in my opinion.

22      Q:   As it relates to the lookout on the

Page 55

1   Mackenzie Rose on the date of the allision, June

2   15th of 2024, who do you believe was the lookout

3   when the allision occurred?

4       A:   Mate Morrison.

5       Q:   Okay.  And why do you believe that?

6       A:   On a vessel which has 360-degree

7   visibility, it is common to have on a small vessel

8   like the Mackenzie Rose, the watch officer as the

9   acting lookout, that is standard procedure.

10      Q:   And is it standard procedure when the

11  watch officer operates as the acting lookout to

12  reference the watch operator as the lookout in the

13  daily reports?

14      A:   I'm confused by what you're saying.

15      Q:   Yeah.  When reports are made, the

16  captain makes reports every day regarding the

17  vessel, and there's a spot on there to identify a

18  lookout, should the watch officer be identified as

19  a lookout if they're serving as the lookout?

20      A:   I'm a little -- could you put it up on

21  the screen?  I'm a little confused by what you're

22  saying there.

Page 56

1       Q:   Okay, let me ask you a little bit

2   differently.  So, I'm not going to do your job for

3   you.

4       Have you seen any documents at all that

5   identified Mate Morrissey as the lookout on the

6   date of the allision?

7       A:   No, nor would you expect to.

8       Q:   Okay.

9       A:   I wouldn't be expecting.

10      Q:   And have you -- have you talked to

11  anybody or seen any testimony or any photos that

12  shows Mate Morrissey in the -- in the upper

13  wheelhouse in the minutes preceding the allision?

14      A:   Have I seen photos of him up in the

15  upper wheelhouse?

16      Q:   Yes.  Have you seen any, either

17  deposition testimony or statements made by any of

18  the crew, that they saw Mate Morrissey in the upper

19  wheelhouse in the minutes preceding the allision?

20      A:   Preceding the allision, no.  After the

21  allision, yes.

22      Q:   Okay.  And do you have any

Page 57

1   understanding at all based on the materials that

2   you've reviewed as to whether or not the bridge

3   that the Mackenzie Rose and Ortsbarge allided with

4   was damaged?

5       A:   Can you repeat that?

6       Q:   Yeah, do you know whether or not the

7   bridge was damaged by the allision?

8       A:   Based on the information I have

9   reviewed, I saw the video of the -- the

10  surveillance video.

11      Q:   And what did that tell you?

12      A:   Contact was made with the bridge.

13      Q:   Okay, did you see the bridge or the

14  tracks change their position, meaning they were

15  bent or damaged in some way?

16      A:   I saw a photo of it, yes.

17      Q:   Okay, have you been provided with any

18  text from any employees at Carver where they

19  indicated that they were going to tell Captain

20  Miller that they had reported this allision to the

21  Coast Guard, so he would leave the scene?

22      A:   Yes.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 58

1     Q:    Okay.  And do you have an understanding
2  as to why that instruction was given to Captain
3  Miller?
4              MR. RODGERS:  Objection to form.
5        A:    No, I wasn't there.
6        Q:    Okay, you would agree with me that
7  there's no evidence that anybody from Carver
8  notified the Coast Guard of the allision on June
9  15th of 2024, correct?
10             MR. RODGERS:  Objection to form, asks
11  for a legal conclusion.
12       A:    So, you're saying did anyone on
13  November 15th, contact Carver?
14       Q:    No.
15             Are you aware of anything in your
16  review of the materials that are listed in your
17  2682 disclosure, have you seen any information that
18  suggests that Carver did in fact report this
19  allision to the Coast Guard on June 15th of 2024,
20  as they represented to the captain of the Mackenzie
21  Rose?
22       A:    No.

Page 59

1     Q:    Okay.  And if in fact either Carver or
2  the vessel had reported the allision to the Coast
3  Guard, would the Coast Guard have responded to the
4  scene of the allision and boarded the vessel?
5              MR. RODGERS:  Objection to form.  You
6  can answer if you understand.
7        A:    I can't answer that question because if
8  a vessel lays on the fendering of a bridge, when
9  it's, let's say a barge lays on the fendering of
10  the bridge and there's no damage to it, visible
11  damage, the company or the captain is not required
12  to report it.
13       Q:    I understand, but that's not what
14  happened here, correct?
15             MR. RODGERS:  Objection.
16       A:    That's correct.  That was management's
17  understanding.
18       Q:    Okay, but management also misled the
19  crew in telling them that they had reported it to
20  the Coast Guard, so that they could go on, correct?
21             MR. RODGERS:  Objection to form.  What
22  do you mean by that?

Page 60

1     Q:    Correct?
2        A:    Can you repeat that?
3        Q:    Yeah.
4              So you understand that Captain Miller
5  wanted to report this matter to the Coast Guard,
6  correct?
7        A:    Yes.
8        Q:    And you understand that management at
9  Carver told him they had reported it to the Coast
10  Guard to get him to leave, correct?
11             MR. RODGERS:  Objection.  Vague,
12  ambiguous.
13       A:    I don't know why they said that to him.
14  I wasn't there.
15       Q:    But they did say it, correct?  You've
16  seen those texts?
17             MR. RODGERS:  Asked and answered.
18       A:    Yes.
19       Q:    And that was not true, correct?
20       A:    Yes.
21       Q:    Okay.
22             Do you know whether or not any drug or

Page 61

1  alcohol tests were administered to any members of
2  the Mackenzie Rose crew within 24 hours of the
3  allision?
4        A:    Based on the information I've reviewed,
5  no.
6        Q:    Okay.  And is it -- after an allision
7  like this, we know what actually happened, is it
8  required by the Coast Guard to have crew members
9  tested for alcohol and drugs within 24 hours of an
10  allision?
11       A:    Management would have to make that
12  decision, generally.  And based on the information
13  they were given, the vessel slid on the fendering,
14  and if there's no damage, you're not required to do
15  that.
16       Q:    Okay, they also got a picture from the
17  vessel showing the bent railroad track, correct?
18       A:    I saw the picture of the fendering from
19  the vessel, and that's what I would have focused on
20  based on the text also.
21       Q:    Did they get it -- did -- you're not
22  answering my question.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 62

1    Did the -- did a vessel text a picture
2  of the bridge damage to the Carver management?
3    **A:    They texted a picture of the bridge.  I**
4  **can't tell you if that specified the damage or not.**
5  **I'm not looking at the picture.  I would not have**
6  **seen it myself.**
7    Q:    Okay, you looked at the picture and you
8  couldn't see the tracks had a curve in them?
9    MR. RODGERS:  Objection.
10   **A:    Not really --**
11   Q:    Okay --
12   **A:    -- because I'm not an expert in that**
13  **field.**
14   Q:    Okay, what is a safety management
15  system?
16   **A:    It's a management system a lot of**
17  **companies have with regards to manuals and**
18  **practices.**
19   Q:    Is it industry standard for a company
20  like Carver to have a safety management system?
21   **A:    Yes.**
22   Q:    Is it required by law?

Page 63

1    **A:    No.**
2    Q:    Okay.
3    MR. RODGERS:  Is this a good time for a
4  break?  I think, including the 15 minutes, I think
5  it's been about an hour, Mark.
6    MR. NANAVATI:  Yeah, that's fine by me.
7  Can we make it kind of short?  I'm trying not to
8  keep Captain Sam here all day, if possible.
9    MR. RODGERS:  But you're having fun.
10   MR. NANAVATI:  Yeah.
11   MR. RODGERS:  All right.  How about --
12  is 10 minutes fine?
13   MR. NANAVATI:  Whatever everybody
14  needs.  I don't want anybody to be uncomfortable,
15  but yeah.
16   MR. RODGERS:  Ten all right?
17   MR. NANAVATI:  You okay with that, Sam?
18   **THE WITNESS:  Yeah, that's good.**
19  **Thanks.**
20   MR. NANAVATI:  All right.  Okay.
21  Thanks.
22   THE VIDEOGRAPHER:  Counselors, we're

Page 64

1  going off the record.  The time is 11:55.
2    (WHEREUPON, A BRIEF RECESS WAS TAKEN.)
3    THE VIDEOGRAPHER:  Counselors,
4  gentlemen witness, we're going back on the record.
5  The time is 12:12.
6    Please proceed.
7    BY MR. NANAVATI:
8    Q:    Sam, back on, gonna try to get through
9  a little bit more of this, and then we'll get to
10  your report.
11   As it relates to any training that's
12  provided -- that was provided to the members of the
13  Mackenzie Rose crew, based on your view of the
14  information listed in your 26A2 disclosure, have
15  you seen any training that was provided by Carver
16  Management itself to the crew of the Mackenzie
17  Rose?
18   **A:    Yeah, I read the training where they**
19  **have the training manuals and the training they do,**
20  **yes.**
21   Q:    Okay.  And when -- what type of
22  training did the management provide the crew

Page 65

1  members, and when did they provide?
2    **A:    They -- it was on an ongoing basis, the**
3  **training, and also the training is very various on**
4  **various activities on board the vessels.**
5    Q:    Okay, did you see any evidence of any
6  training given by the management at Carver to the
7  crew of the Mackenzie Rose related to the use of
8  autopilot?
9    MR. RODGERS:  Objection to form.
10   **A:    That's something I have never heard of**
11  **doing training for is a use of autopilot.  That's**
12  **not something that's done in the industry.  When**
13  **you get aboard a vessel, that is the captain who**
14  **will train himself, it's a new unit.  That's not**
15  **something the company would do.**
16   Q:    Okay, so my question is, you did not
17  see that here regardless of whether or not it
18  should or shouldn't be done, correct?
19   MR. RODGERS:  Objection asked and
20  answered.
21   **A:    Like I said, that training is done on**
22  **board the vessel by the captain, not the company,**

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 66

1  nor would it be expected to be done by the company.
2      Q:     Did you see any training done by --
3  given by management to the crew of the Mackenzie
4  Rose related to lookouts?
5      A:     Lookout training, again, is something
6  that would be expected that is done by the training
7  academies the mates go to, they have to go through
8  different training schools.  And also, that is done
9  on the vessel.  Again, that's something I've never
10 heard of with regards to shoreside training.
11 That's not something that's done.  That is done on
12 the vessel, and it's on the job training lookout.
13     Q:     Okay, how about reporting allisions,
14 any training provided by Carver to the crew of the
15 Mackenzie Rose regarding Coast Guard regulations
16 related to reporting allisions?
17     A:     They had requirements for reporting
18 allisions.  Yes.
19     Q:     Okay.  And what were their
20 requirements?
21     A:     If you can put -- if you can put the
22 document up, that would help greatly, but they have

Page 67

1  a document with regards to reporting allisions.
2      Q:     Okay.  And that's in what, where did
3  you see that, what group of documents?
4      A:     I recall as a safety management system.
5      Q:     Okay.  Was there any -- did you see
6  anything in the safety management system or any
7  other training materials that suggested that Carver
8  provided any training to the crew of the Mackenzie
9  Rose regarding navigational assessments or
10 navigational risk assessments?
11         MR. RODGERS:  Objection foundation.
12 You can answer.
13     A:     Again, that is something that is done
14 by the captain on board the vessel.  That would be
15 standard for that to be an onboard activity that
16 the captain would conduct.
17     Q:     Okay, you indicated you saw some
18 information regarding the training provided by
19 Carver management to the crew, what subjects did
20 you see training occur on?
21     A:     There were numerous subjects.
22     Q:     Can you give me a couple of examples?

Page 68

1      A:     I recall man overboard.  There are
2  quite a few different subjects, allision, numerous
3  subjects on that.
4      Q:     Okay.  And generally speaking with
5  allisions, do you recall what the training related
6  to?
7         (SIMULTANEOUS SPEAKING.)
8         BY MR. NANAVATI:
9      Q:     Okay.  Have you seen any testimony
10 through depositions of any Carver management where
11 they indicated that it was inappropriate to use
12 autopilot when transiting a bridge, like in this
13 particular case?
14     A:     That would not be expected because
15 again, it is not prohibited by the code of federal
16 regulations.  And in Port Everglades, we do, and I
17 talked to pilots throughout the country, have it
18 listed, and they use autopilot as well.
19     Q:     Okay, but my question was, when you
20 were -- when you reviewed the deposition
21 transcripts of the Carver management --
22         MR. RODGERS:  Hold on.  He wasn't

Page 69

1  finished answering.
2      Q:     Sorry, go ahead.
3      A:     Okay, in inland waters, and it is a
4  procedure that is done on board vessels.  And when
5  I'm talking about vessels, I'm talking ships,
6  tugging barges, yachts.  They do use autopilot in
7  inland waters.
8      Q:     All right, so my question was, have you
9  read any deposition testimony from any Carver
10 management where they testified that it was
11 inappropriate to use autopilot in a circumstance
12 like the one that brings us here today?
13     A:     I don't recall the words inappropriate.
14 No.
15     Q:     Okay, how about shouldn't have used, or
16 anything similar to that?
17         MR. RODGERS:  Objection to form.
18     A:     If I recall, there was a document where
19 it was discussed, but I don't recall the details of
20 the discussion in the deposition.
21     Q:     Okay, you indicated you'd interviewed
22 folks about the use of autopilot and navigational

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 70

1    channels, similar to the one at issue.
2            Have you talked to any pilots or
3    captains that have transited the bridge that was
4    allided with in this particular case?
5        **A:    That bridge?  No.  Because again, it's**
6    **a very specific area, and it's a -- but the bridge**
7    **is -- it's a 300-foot opening, and that is not a**
8    **narrow opening at all.  That would be an opening**
9    **for a vessel to go under.**
10       Q:    I just want to be sure I understood.
11           Have you spoken with any captains or
12   pilots that have transited the bridge that's a
13   subject of this litigation?
14       **A:    That specific bridge?  I have not.**
15       Q:    Okay.  And have you ever transited that
16   bridge as a captain or a pilot?
17       **A:    To my knowledge, no.**
18       Q:    Okay.
19           This particular autopilot was
20   manufactured by a company called Simrad, correct?
21       **A:    Yes.**
22       Q:    Okay.  And you would agree with me that

Page 71

1    the Simrad owner's manual has some warnings related
2    to the use of autopilot in certain circumstances,
3    correct?
4        **A:    I read what they have in their manual.**
5    **Yes.**
6        Q:    Okay.  And are there autopilots that
7    are manufactured by Simrad or other manufacturers
8    that do not have similar warnings and limitations
9    on the use of their autopilot?
10       **A:    I haven't reviewed other manuals**
11   **recently.**
12       Q:    Okay.
13           THE COURT REPORTER:  Quick court
14   reporter clarification.
15           You were saying allision, right?  Like
16   A-L-L-I-S-I-O-N, like colliding with something
17   stationary?
18           MR. NANAVATI:  You got it.
19           THE COURT REPORTER:  Okay, cool.  Just
20   wanted to make sure.  It's not a term I'm super
21   familiar with.
22           MR. NANAVATI:  Yeah, no, no.  I

Page 72

1    appreciate you asking.  If anything else pops, you
2    know, ask please.
3        Q:    Do you have any understanding as to the
4    last time that the autopilot that was in use on
5    June 15th of 2024, was either maintained or
6    inspected by any type of third-party technical
7    entity, you know, an electronics retailer -- excuse
8    me, electronic maintenance entity or electronics
9    repair entity?
10           MR. RODGERS:  Objection to form.
11       **A:    The information I have reviewed.**
12       Q:    I'm sorry.  I didn't catch the answer.
13   I apologize, I couldn't hear you.
14       **A:    The information that I reviewed.**
15       Q:    Okay.  And so when was the last time
16   that this autopilot, prior to June 15th of 2024,
17   was either serviced or inspected?
18           MR. RODGERS:  Objection foundation, you
19   can answer if you remember.
20       **A:    I don't recall the dates.  I would have**
21   **to look at the documents.**
22       Q:    Okay, was each member of the -- the

Page 73

1    Mackenzie Rose crew on June 15th of 2024
2    credentialed?
3        **A:    Based on the information I have**
4    **reviewed.  Yes.**
5        Q:    Okay, in your experience as a pilot and
6    or a captain, have you ever had a circumstance
7    where the autopilot on your vessel malfunctioned
8    for some reason?
9        **A:    No.**
10       Q:    Okay, in your experience as a pilot and
11   or a captain, have you ever been involved in an
12   allision with a bridge?
13       **A:    No.**
14       Q:    Okay.  All right.  I want to ask you
15   some questions about Exhibit 1, which is your
16   report that we talked about earlier, okay?
17           Do you have that handy in front of you
18   still?
19       **A:    Yes.**
20       Q:    Okay, so the very first thing I want to
21   ask you is the reports dated June 8th.  And just so
22   I understand, is June 8th the date that the initial

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 74

1  section was prepared, and then the rebuttal to
2  Lewis was prepared on the later date?
3      **A:    It was all prepared together.**
4      Q:    Okay, so is June 8th the correct date
5  for this report?
6      **A:    Friday.  Yes.**
7      MR. RODGERS:  No, he's asking you about
8  the month.
9      **A:    Month?**
10     Q:    This report's dated June 8th.
11     **A:    That is the wrong date.**
12     Q:    Okay, that's what I was asking.  So,
13  the entire report was prepared at one time.
14         And would it be, obviously, in July --
15  or August, actually, I'm sorry, August 8th?
16         Is that correct?
17     **A:    Yes, correct.**
18     Q:    Okay.
19         Can you turn to page five of your
20  report, please?  And section double little I, it's
21  got your hourly rates for this particular matter,
22  do you see that?

Page 75

1      **A:    Yes.**
2      Q:    Do you have any idea of how much time
3  you have in this matter to date, either in hours or
4  dollars?
5         What's that?  I'm sorry.
6      **A:    Approximately 80 hours or so.  I**
7  **haven't looked recently.**
8      Q:    Okay.  If you turn to page nine,
9  please.
10         About halfway down in this list of
11  documents, there's something called USCG
12  Recordings, do you see that?
13     **A:    Yes.**
14     Q:    What are the recordings of?
15     **A:    It's the information which I reviewed**
16  **from the Coast Guard.**
17     Q:    I'm sorry, say that again.
18     **A:    The information which I reviewed from**
19  **the Coast Guard.**
20     Q:    And what is that information?
21     **A:    Could really be anything with regards**
22  **to the Coast Guard information I reviewed.**

Page 76

1      Q:    But when you say recordings, is this
2  like a recording of some audio of an interview, or
3  a -- I don't know what recordings means.
4      **A:    No, no.**
5      Q:    So, the word recordings, should that
6  say records?
7      **A:    Or records, excuse me.  Yes.**
8      Q:    Okay.  Okay.  All right.
9         **A couple down, it says, Text messages.**
10        **Do you see that?**
11     **A:    Yes.**
12     Q:    Do you recall which text messages you
13  reviewed?  And I don't mean that you identify each
14  one, just like either between in timeframes,
15  basically.
16     **A:    I would have to look at the documents.**
17     Q:    Do you have those handy?
18     **A:    No, I don't.**
19     Q:    Okay.
20         Do you have -- as we sit here today, do
21  you have any recollection of what text messages you
22  reviewed?

Page 77

1      MR. RODGERS:  Objection.
2      **A:    Yes, they're in the report.**
3      Q:    Okay, so the ones that are, you have
4  screenshotted in the report?
5      **A:    Yes.**
6      Q:    Okay.
7         Can you turn to page 10 for me, please?
8  It's kind of the top third.  It says, Loss of
9  steering for mac deck and engine rough logs.
10        Do you see that?
11     **A:    Yes.**
12     Q:    What does that refer to?
13     **A:    I think the -- talking about the**
14  **incident with regards to the records which they had**
15  **of the incident.**
16     Q:    The one that we're here for today, the
17  June 15th, 2024, allision?
18     **A:    Yes.**
19     Q:    Okay.
20         Do you recall any other loss of
21  steering for mac deck and engine log documents
22  other than those related to the allision we're here

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 78

1 for today?

2    **A:    The information which I reviewed, and**
3 **we discussed earlier.**

4    Q:    The satellite connectivity issue?

5    **A:    Yes.  That was in the documents, which**
6 **we discussed earlier.**

7    Q:    Okay, can you turn to the next page 11,
8 please?  The second line says, "Steering failure
9 2024."

10        Is that referring to this allision, or
11 something else?

12    **A:    No, that would be the documents we**
13 **discussed before when they lost the steering due to**
14 **the satellite issue.**

15    Q:    Got it.

16        And in response to that particular
17 situation, what, if anything, was done to identify
18 and correct the satellite connectivity issue to
19 your knowledge?

20        MR. RODGERS:  Objection, foundation,
21 you can answer.

22    **A:    I would want to review the documents.**

Page 79

1 Again, there were so many documents in this case.
2 I want to refresh my memory on that.

3    Q:    As we sit here today, do you recall
4 anything in particular that was done by Carver in
5 response to the satellite connectivity issue?

6        MR. RODGERS:  Same objection.

7    **A:    I would have to look at the documents.**

8    Q:    Okay, so is the answer that without
9 looking at some documents, you don't have a
10 recollection as to what, if anything, was done by
11 Carver in response to the satellite connectivity
12 issue?

13        MR. RODGERS:  Objection.  Objection.
14 Objection.  Don't answer.  Objection.  He's already
15 told you he needs the document.

16        For the record, counsel is not putting
17 the documents in front of the witness.

18        MR. NANAVATI:  I'm not -- excuse me,
19 Jim.  Let me try to ask you a different way.

20    Q:    Putting documents aside, do you have
21 any recollection in your brain of what Carver did,
22 if anything, in response to the satellite

Page 80

1 connectivity issue with its autopilot?

2        MR. RODGERS:  Objection, form, you can
3 answer if you understand.

4    **A:    I would have to review the documents.**

5    Q:    Okay.  A couple of down says, "Witness
6 interviews, Baldessari and J. Morrissey."

7        Do you see that?

8    **A:    Yes.**

9    Q:    What are these witness interviews?  Who
10 took these interviews?

11        If you -- I'm trying to make sure I
12 have the interviews.  I don't know what this refers
13 to.

14    **A:    I don't know who took those interviews.**
15 **I wasn't there.**

16    Q:    Are they written, are they transcribed,
17 are they recorded?  Can you give me some sense of
18 what these are?

19    **A:    If I recall, they were typed.**

20    Q:    Typed, okay.

21    **A:    You have to look at the document.**

22    Q:    And when it's J. Morrissey, which

Page 81

1 Morrissey are we referring to?

2    **A:    Both gave interviews.**

3    Q:    And when you list here, the witness
4 interviews, Baldessari and J. Morrissey, are you
5 referring to both Morrisseys, or one or the other?

6    **A:    It would be both.**

7    Q:    Okay.  And then there's -- you have an
8 interview of Baldessari that you've reviewed?

9    **A:    Yes.**

10    Q:    Okay.  About halfway down, there's
11 something called Preliminary Advice.

12        Do you see that?

13    **A:    Yes.**

14    Q:    What is that?

15    **A:    I don't recall.**

16    Q:    Okay.

17    **A:    There were so many documents I went**
18 **through, and I think there were 1800 pages, and I**
19 **went through and what I reviewed, I put down here.**

20    Q:    Yeah, and I'm not, you know, look, I
21 mean, every witness remembers some things and don't
22 remember others.  I just didn't recognize what that

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 82

1   was.
2           And if you knew, I was going to try to
3   find out.
4           Can you turn to page 12, please?
5           I just want to make sure I'm clear on
6   this.  The last sentence of the assignment
7   paragraph, which is Roman numeral three.
8           Do you see that?
9       A:   Page 12?
10      Q:   Yeah.
11      A:   Okay, I'm on page 12.
12      Q:   Okay.  And do you see the assignment
13  paragraph?  It's Roman numeral three?
14      A:   Assignment, Roman numeral three?
15      Q:   Right at the top of page 12?
16      A:   Yes.
17      Q:   Okay.  And the last sentence says, "It
18  is alleged the barge allided with the railroad
19  bridge."
20          You agree that it actually did allide
21  with the railroad bridge, correct?
22      A:   That is what is alleged.  Yes.

Page 83

1       Q:   And do you have any reason to dispute
2   the allegation that there was an allision?
3           MR. RODGERS:  Objection.  And I'd state
4   the exact before you continue with another
5   question.
6           MR. NANAVATI:  I'd do what?
7           MR. RODGERS:  Allision is a legal term
8   of art, in this case.  You're asking the witness
9   for a legal term of art.  Why don't you just ask
10  him what he understands had happened.
11          MR. NANAVATI:  I don't believe allision
12  is a legal term of art.  I believe it means --
13          MR. RODGERS:  It's the third way you're
14  trying to get everybody to agree there was an
15  allision.  But I'm objecting for that reason.  You
16  can answer it, Captain, what your understanding is.
17      Q:   Do you know what the word allision
18  means, Captain?
19      A:   Yes.
20      Q:   What does it mean to you?
21      A:   A vessel makes contact with a fixed
22  object.

Page 84

1       Q:   And did that happen here?
2       A:   That's allegedly what happened.
3       Q:   Do you have any reason to believe that
4   didn't happen?
5       A:   I'm just going by -- like I said,
6   that's allegedly what happened.
7       Q:   I know, and what I'm asking you is, do
8   you have any information to suggest that there was
9   no contact between the barge that the Mackenzie
10  Rose was pushing and the bridge?
11      A:   I wasn't there at the time.
12      Q:   So, you don't even know if there was an
13  allision?
14      A:   I'm saying that's allegedly what
15  happened.  I was not there.
16      Q:   Do you have an opinion one way or the
17  other whether or not an allision occurred on June
18  15, 2024, between the barge being pushed by the
19  Mackenzie Rose and the bridge owned by the
20  Beltline?
21          MR. RODGERS:  Objection.
22      A:   Yes.

Page 85

1       Q:   Okay.  And what is your opinion?
2       A:   Contact was made.
3       Q:   Okay.  A little bit further down, it
4   says, in this case, I've been asked to opine on
5   whether there's five kind of bullet points.
6           Do you see that?
7       A:   Yes.
8       Q:   Okay.  And the third one says,
9   Autopilot -- again, I'm not saying that this is
10  your opinion, but you've been asked to opine on
11  this.
12          Autopilot is prohibited for use while
13  transiting a waterway with bridges.
14          Do you see that section?
15      A:   Yes.
16      Q:   Okay, is that different than autopilot
17  is prohibited for use while transiting a bridge?
18          MR. RODGERS:  Objection to form.
19      A:   There is no difference.
20      Q:   Okay.
21          All right, can you go to page 15 for
22  me, please?

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 86

1        So, this paragraph is entitled,
2  Incident.
3        Do you see that?
4    A:    Yes.
5    Q:    Okay.  The third line says He, and I
6  think that's -- you mean, Mate Morrissey, was
7  navigating from the upper wheelhouse of the
8  Mackenzie Rose and had the autopilot engaged as he
9  navigated outbound the Norfolk Southern Branch to
10  sea.
11        Do you see that?
12    A:    Yes.
13    Q:    And I just want to go back to something
14  we talked about before.
15        It indicates here that he was in the
16  upper wheelhouse.  I think you answered this
17  before, but is there any evidence that he was
18  actually in the upper wheelhouse prior to the
19  allision?
20    A:    **Based on the information I received,**
21  **yes, because that's where the crew went after the**
22  **allision to talk with Mate Morrissey, was the upper**

Page 87

1  wheelhouse.
2    Q:    Right.  But before the allision, have
3  you seen any statements from anybody that indicate
4  they saw him in the upper wheelhouse?
5    A:    **Again, it's based on the information,**
6  **which I just told you.  It was right after the**
7  **allision, literally right after that, they went up**
8  **to the upper wheelhouse, and he was up in the upper**
9  **wheelhouse navigating, and that's where you'd**
10  **expect someone to navigate a vessel from.**
11    Q:    Okay.
12        Outside of that, any other information
13  you base that statement on?
14    A:    **On the crew's depositions.**
15    Q:    And in the crew's depositions, did any
16  of them indicate that they'd seen Mate Morrissey in
17  the wheelhouse prior to the allision?
18    A:    **He was the one navigating the vessel by**
19  **himself, so he would be the only one in the**
20  **wheelhouse at the time.**
21    Q:    Okay.  And he has not been deposed,
22  correct?

Page 88

1    A:    To my knowledge, yes.
2    Q:    Okay.  And you have not spoken to him,
3  correct?
4    A:    No.
5    Q:    Okay, that is correct?
6    A:    Correct.
7    Q:    Okay.  I think I asked you about the
8  other things in here.
9        All right, turn to page 16 for me,
10  please.  You've got a picture on page 16.  It has,
11  I guess, three colored lines.
12        Do you see that?
13    A:    Yes.
14    Q:    Okay.  And will you describe what the
15  yellow line means?
16    A:    **The yellow line is the track the**
17  **Mackenzie Rose was on as it transited from the**
18  **South Norfolk Jordan Bridge to the Railroad Bridge,**
19  **based on the Rose Point.**
20    Q:    Okay.  And the blue line?
21    A:    **That is the course the vessel would**
22  **have continued on.**

Page 89

1    Q:    What if that had not happened?
2    A:    **I don't know, but I'm saying that's**
3  **just a trajectory the vessel would have continued**
4  **on.**
5    Q:    Oh, you mean if it had stayed on the
6  same trajectory as the yellow line, that's the
7  yellow line extended, basically?
8    A:    Yes, correct.
9    Q:    Okay.  And the blue line, the yellow
10  line extended, looks like it transits the bridge
11  on, I guess, the far-left side of the channel.
12        Is that correct?
13    A:    On the westward side.
14    Q:    Yeah.  And then, the red line is?
15    A:    Red line is what would be expected for
16  a vessel to transit.  It's going through the center
17  of the bridge opening.
18    Q:    And as we sit here today, do you have
19  any understanding as to what happened on that
20  yellow line?
21        It's the third blue dot where the
22  yellow line and the blue line diverge from each

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 90

1  other.

2      A:    The only -- what I have is the

3  information that I've reviewed.

4      Q:    And what does that tell you as to what

5  happened at that third blue dot?

6      A:    I wasn't there.

7      Q:    Okay, do you have an opinion as to what

8  more likely than not happened at that third blue

9  dot?

10      A:    I was not aboard the vessel at that

11  time.

12      Q:    Okay, I get that you're not a fact

13  witness.  I absolutely understand that you were not

14  a member of the crew, but you've been called in to

15  get some opinions regarding this allision.

16      So, I'm trying to ask, do you have an

17  opinion as to what happened at that third blue dot

18  to cause the Mackenzie Rose to veer to the left?

19      A:    I don't know.  Like I said, I wasn't

20  there, and I would have to be there to have an

21  opinion on that.

22      Q:    Okay.  And as it relates to the blue

Page 91

1  line, which is the yellow line extended, as I

2  understand what you said here is that that's not

3  really an ideal track to use to transit the bridge,

4  even if it had gone straight.  It looks like you

5  believe the red line is the more appropriate track?

6      MR. RODGERS:    Objection form, you can

7  answer.

8      Q:    Is that what you're saying?

9      A:    The red line would be the appropriate

10  track for a vessel to follow to go underneath the

11  bridge.

12      Q:    Okay.  And do you have any

13  understanding or opinion as to what happened at the

14  first dot that got the Mackenzie Rose heading to

15  the west rather than the center of the bridge at

16  issue?

17      A:    Again, I wasn't on board.

18      Q:    Okay.

19      And similarly, you do not have an

20  opinion in that regard?

21      A:    Again, I wasn't on board the vessel.

22      Q:    Yeah, go ahead.  Sorry.

Page 92

1      A:    From the track, there was a lack of

2  situational awareness.

3      Q:    Okay.  And do you know what caused that

4  lack of situational awareness?

5      A:    No, I wasn't there.

6      Q:    Okay.  All right.  If you turn to page

7  17, please.

8      A:    Okay.

9      Q:    This looks like it relates to your

10  first opinion, which is that the Mackenzie Rose

11  relates to Mackenzie Rose's manning at the time of

12  the allision.

13      Do you see that?

14      A:    Yes.

15      Q:    Okay, with respect to the particular

16  crew that was aboard the Mackenzie Rose, do you

17  know whether or not any of the crew were involved

18  in any prior near misses, collisions, or allisions

19  that predate the June 15, 2024, allision that

20  brings us here today?

21      A:    Mate Morrissey had an incident.

22      Q:    Okay.  And when was that?

Page 93

1      A:    I don't recall the exact date.  I'd

2  have to look at the document.

3      Q:    Okay.  And do you have a general

4  recollection of what the incident was?

5      A:    Yes.

6      Q:    And what was that?

7      A:    He landed on a pier, which does happen.

8  If I recall, the current was running strong, and it

9  was pretty windy, and that does happen for a vessel

10  to land on the edge of a pier, either on departure

11  or arrival.

12      Q:    Okay, have you seen any investigation

13  into that incident by Carver to determine what the

14  cause of that particular incident was and whether

15  or not Mate Morrissey either did everything

16  correctly or incorrectly or something in between?

17      A:    I have to read the evidence or the

18  information which was given to me.

19      Q:    Okay.  And so my question is, I haven't

20  seen this, so I can't show you this, but have you

21  seen any type of investigation by Carver into that

22  incident so that they can make a determination as

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

---

Page 94

1  to what caused that particular incident?

2  Q:    I've seen the information.

3  MR. RODGERS:  Objection to form, can

4  you define investigation?

5  MR. NANAVATI:  You can answer.

6  MR. RODGERS:  Okay, don't define it.

7  Go ahead.  Answer it.

8  **A:    I have seen the information Carver had**

9  **in the report regarding the incident.**

10  Q:    Okay.  And outside of that report, have

11  you seen, for instance, witness interviews done by

12  Carver and the crew?

13  **A:    With regards to Mate Morrissey's making**

14  **contact?**

15  Q:    Yes, sir.

16  **A:    No.  I've seen the Coast Guard 2692.**

17  Q:    Okay.  And outside of that, you haven't

18  seen any other information related to an

19  investigation by Carver into the cause of that

20  particular incident, correct?

21  **A:    Yes, because, again, if it's a small**

22  **incident like that, normally there won't be an**

Page 95

1  investigation.

2  Q:    Do you have any understanding as to

3  whether or not the Coast Guard has completed its

4  investigation into that incident?

5  MR. RODGERS:  Objection to form,

6  foundation.  You can answer.

7  **A:    Just based on the information I have**

8  **reviewed.**

9  Q:    And what -- so what is -- that they

10  have completed, or they have not completed?

11  MR. RODGERS:  Objection to form,

12  foundation.

13  **A:    It's a 2692 form which was submitted to**

14  **the Coast Guard, and that's what I reviewed.**

15  Q:    Okay.  And do you know one way or the

16  other whether or not the Coast Guard's

17  investigation into that incident is ongoing?

18  MR. RODGERS:  Objection, foundation.

19  You can answer.

20  **A:    I can't answer that question.  I don't**

21  **have that information.**

22  Q:    Okay.  Turn to page 19, please.

Page 96

1  This relates to the lookout issue.

2  Do you see that, section two?

3  **A:    Yes.**

4  Q:    Okay.  And as I gleaned it in this

5  matter, you're of the opinion that the watch

6  officer in this case was Mate Morrissey, was an

7  appropriate lookout given the circumstances of the

8  allision?

9  **A:    That's customary based on industry**

10  **standards.**

11  Q:    But I mean, is that your opinion in

12  this case?

13  **A:    That he was the lookout?**

14  Q:    And that -- yes, number one and number

15  two, that that was appropriate given the

16  circumstances of this situation?

17  **A:    Yes.**

18  Q:    Okay.

19  Under what circumstances, in your view,

20  is it appropriate to have somebody else -- somebody

21  other than, for instance, in this case, Mate

22  Morrissey, operate as the lookout?

Page 97

1  **A:    So, you're talking about having a**

2  **second lookout?**

3  Q:    Yes.

4  **A:    Normally, that will be done if it's a**

5  **vessel that's in restricted visibility.  If the**

6  **vessel has a very high bow, like I'm talking a**

7  **ship, to have a lookout on the bow because there's**

8  **a line-of-sight issue there, you cannot see vessels**

9  **right underneath the bow.  If a vessel is in waters**

10  **which, say, are not marked on the chart, such as a**

11  **shoaling, you may have a lookout up there.  And**

12  **then it's also specified in the -- if there's**

13  **hazards to navigation, any real dangers to**

14  **navigation, anything like that, there will be a**

15  **second lookout.**

16  **But when you're navigating on a vessel**

17  **like the Mackenzie Rose, which has an upper**

18  **wheelhouse, 360-degree visibility, it is not**

19  **standard to have a second lookout, nor is the**

20  **vessel manned for a second lookout.  It would have**

21  **to be additional people on board to have a second**

22  **lookout, in this case, for the bridges which are**

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 98

1  going under, stay within the rest work
2  requirements.
3      Q:    Just on that kind of a question,
4  Jarkeis Morrissey, was he not available to serve as
5  a lookout if needed?
6      A:    He's there on standby, but it's not
7  customary to have someone looking out when it's not
8  necessary.  In my opinion, the weather was very
9  good.  The visibility was clear.  There was low
10  vessel traffic.  There would be no reason at all to
11  have an additional lookout at that point because,
12  to get down to it, Morrissey, where he was on the
13  bridge of the vessel, in the upper wheelhouse, was
14  able to make a full appraisal of the situation.  It
15  wasn't like he had restricted visibility or
16  anything.
17      Q:    So, the second part, you indicated
18  nobody was available to be a second lookout,
19  consistent with Coast Guard regulations regarding
20  hours.  I just want to be clear, Jarkeis Morrissey
21  was available if needed, correct?
22      A:    Yes.  What I'm saying is, if you had an

Page 99

1  additional lookout when the vessel is navigating at
2  all times, it would have to have more crew members
3  on board.  If you had a two-man watch, it's called.
4      Q:    As it relates to the ability to see
5  clearly from the upper wheelhouse, have you
6  inspected that particular vessel when it has a
7  barge made up in front of it to see what that view
8  looks like from the wheelhouse across the bow of
9  the barge?
10      A:    I looked at the photos -- or the video
11  on the day of the incident, and the visibility, in
12  my opinion, was very good, and he would definitely
13  have seen a bridge.  He would have definitely seen
14  a bridge up there from the upper wheelhouse.  It
15  would be very hard to miss a railroad bridge.
16      Q:    But my question is a little bit
17  different.
18          Have you inspected that particular tug
19  when it's made up with a barge, like the Weeks?
20      A:    I inspected the tug.  I was not there
21  when there was a barge made up, but my opinion
22  would make no difference because looking at the

Page 100

1  surveillance on the day of the incident, there
2  would be no issue with visibility, and the mate on
3  watch, which is Morrissey, would be able to make a
4  full appraisal of the situation.
5      Q:    Have you seen any photos from the
6  wheelhouse showing the visibility from the
7  wheelhouse with a barge like the Weeks made up on
8  the tug?
9      A:    From the wheelhouse?
10      Q:    Yes, sir.
11      A:    In my opinion, I saw photos from the
12  surveillance camera, and it would make no
13  difference.  I'm on ships all the time.  I can tell
14  you the visibility was excellent up there,
15  especially if you're looking to go through a
16  bridge.
17          It's not like we're looking for a small
18  railboat.  This is a bridge.  This will definitely
19  stick out on a wheelhouse like that, and even a
20  small boat on that bridge is so high up, and he had
21  excellent visibility, in my opinion.
22          There's no reason for an additional

Page 101

1  lookout.
2      Q:    I understand your opinion, but I'm
3  right out to ask you about the bases.
4          Have you seen any photos taken from the
5  wheelhouse out over the Mackenzie Rose when it's
6  made up with a barge like it was on June 15, 2024?
7      A:    No, sir.
8      Q:    Okay.
9          THE COURT REPORTER:  Court reporter
10  clarification, were you saying Weeks?
11          MR. NANAVATI:  Yeah.  I think it's
12  W-E-E-K-S.
13          THE COURT REPORTER:  Okay.  And one
14  more as well.  Can you spell -- I think you said
15  the name Jarkeis?
16          MR. NANAVATI:  Yeah, I might get this
17  wrong, but I think it's J-A-R-K-E-I-S.
18          THE COURT REPORTER:  Thank you.
19          BY MR. NANAVATI:
20      Q:    All right.  Do you consider a bridge
21  like the bridge that was at issue here to be an
22  obstruction to navigation?

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 102

1      A:    No.

2      Q:    Okay.  And do you consider a bridge

3  like the bridge at issue here to be a danger to

4  navigation?

5      A:    No, it's marked on the chart.  There's

6  no danger to navigation.

7      Q:    Okay, do you consider a bridge like the

8  one at issue here to be a potential hazard to safe

9  navigation?

10     A:    No.

11     Q:    Okay.

12          In this particular matter, the bridge

13  did, in fact, turn out to be an obstruction to the

14  Mackenzie Rose's navigation, correct?

15          MR. RODGERS:  Objection, you can answer

16  if you understand.

17     A:    I would disagree with that.

18     Q:    So, the bridge did not stop the

19  Mackenzie Rose from navigating along the path that

20  it was on?

21          MR. RODGERS:  Objection, harassment,

22  you can answer.

Page 103

1      A:    I don't think you can call the bridge

2  an obstruction.  In my opinion, it's not an

3  obstruction.  It's a fixture.

4      Q:    Okay, you indicated that there was not

5  a lot of vessel traffic in the area of the

6  Mackenzie Rose on the date of this allision.

7          What do you base that upon?

8      A:    It's based on the surveillance video.

9      Q:    Okay, anything else?

10          If I recall, the Rose Point showed no

11  traffic either.

12     Q:    Okay, anything else that you recall?

13     A:    No.

14     Q:    Okay.

15          As it relates to the use of a lookout

16  on page 22 of your report, you indicate that the

17  CFRs are consistent with, in essence, your opinion

18  that it's not required, but for certain

19  circumstances.

20          Do you see that?

21          MR. RODGERS:  Objection.

22     A:    Yes.

Page 104

1      Q:    Okay, does the CFR regulate the crew,

2  and in this case, Mate Morrissey, or does it

3  regulate the owner of the vessel, in this case,

4  Carver?

5          MR. RODGERS:  Objection to form.

6          THE WITNESS:  I'm a little confused.

7  Could you repeat the question?

8          MR. NANAVATI:  Yeah.

9      Q:    Is the CFR applicable in this

10  particular incident to Mate Morrissey and the crew,

11  or does the CFR control the acts and omissions of

12  the owner of the vessel as well?

13     A:    If we read the CFR, it says, Throughout

14  the trip or voyage, a master and officer in charge

15  of navigation watch must assess requirement for a

16  lookout.  That decision is left up to the master

17  and the officer of the watch.

18     Q:    Okay, is there anything in the CFRs

19  that prevents the owner of a vessel or the operator

20  of a vessel from setting its own rules, safety

21  guidance for its crew based on its crew, its

22  vessel, and its navigation systems?

Page 105

1          MR. RODGERS:  Objection to form.

2      A:    I'm trying to understand what you're

3  saying.

4          I think you're saying, who would be in

5  charge of setting up the lookout?  And it's very

6  clear in the CFR that is the master and the officer

7  in charge of the navigational watch.

8      Q:    My question is a little bit different

9  than that.

10          Is there anything in the CFR that

11  prevents the owner or operator of a vessel from

12  setting safety guidelines that are, in essence,

13  more stringent than the CFR based on its particular

14  knowledge of its vessel, its crew, and the

15  equipment on the vessel?

16          MR. RODGERS:  Objection asked and

17  answered.

18     A:    I think I answered it.

19          The CFR is very clear that it's not the

20  company which makes these decisions.  It is the

21  master and the officers in charge of the watch.

22     Q:    And so, that's an answer, but not to my

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 106

1  question.
2          My question is, is there anything in
3  the CFR that prohibits the owner or the operator of
4  the vessel from setting forth or making safety
5  guidelines that are more stringent than the CFR
6  based on its particular knowledge of its vessel,
7  the equipment on its vessel, and its crew?
8          MR. RODGERS:  Same objection.
9      A:    The company could do what it likes, but
10  it is customary and industry standard for a vessel
11  like the Mackenzie Rose to have one lookout while
12  navigating in inland waters.  That's standard
13  procedure.  It's customary.
14          I've been on thousands of vessels, and
15  these are the customs and procedures of the
16  vessels.
17      Q:    But there's nothing in the CFR to
18  prohibit a company from saying on our vessel, we
19  always want to have a second lookout?
20          MR. RODGERS:  Objection to form.
21      A:    That would be up to the company.
22      Q:    And similarly, as it relates to

Page 107

1  autopilot, there's nothing to prevent a company
2  from saying on our vessel, given the type of
3  autopilot that we have on that vessel, you cannot
4  use autopilot in narrow waterways, for instance?
5          MR. RODGERS:  Objection to form.
6      A:    In my opinion, that makes no sense
7  because, one, it's not prohibited by the CFRs.
8  Two, it is a practice where autopilot is used on
9  inland waters, so I don't know why a company would
10  do that.  It doesn't make sense.
11          They put that piece of equipment on the
12  vessel for a reason.  Why would you then prohibit
13  it from being used in inland waters?
14      Q:    Well, presumably, if you bought an
15  autopilot system where the manufacturer said, don't
16  use this autopilot under certain circumstances, it
17  may be something you would tell your crew, don't
18  use autopilot under these circumstances, even if
19  otherwise permitted under the CFR.  I think that's
20  -- if you're asking me, that's the answer.
21          MR. RODGERS:  Is that a question?
22          MR. NANAVATI:  No, he asked me a

Page 108

1  question.  I answered it for him.
2      Q:    Can you turn to page 23, please?
3          So, this is under procedures on page
4  23.  Do you see that?
5      A:    Yes.
6      Q:    Okay.  Let's go back here one second.
7  You've reviewed the master's daily
8  reports and master's daily vessel reports, correct?
9      A:    Yes.
10      Q:    In the reports that predate June 15,
11  2024, is the lookout section ever completed on any
12  of those reports?
13      A:    I would have to look at the report.  I
14  don't recall.
15      Q:    Okay, should the lookout section be
16  completed on those reports?
17      A:    I don't know what the criteria are for
18  doing those reports.
19      Q:    Okay.  And do you know what the purpose
20  of the reports are generally?
21      A:    For a log?
22      Q:    Yes.

Page 109

1      A:    It's a history of the vessel.
2      Q:    Okay.  And do the logs in this for
3  Carver go to Carver to review?
4      A:    To my knowledge, yes.
5      Q:    Okay.  And should Carver review the
6  logs to ensure safe operation of its vessels?
7          MR. RODGERS:  Objection, be more
8  precise on Carver.
9      A:    What do you mean by Carver?
10      Q:    The management at Carver, whoever's
11  responsible for vessel operation and safety, when
12  they review the logs, is there a reason to review
13  the logs?
14      A:    I can't answer that question.  I don't
15  work for Carver.
16      Q:    Okay, in your experience as a captain
17  and a pilot, what happens to the logs that are
18  prepared, where do they go?
19      A:    The logs, they stay on the vessel, and
20  they're put into a room, kept for X number of
21  years, and then they're discarded.
22      Q:    Even electronic logs, are they

## CAPTAIN SAMUEL STEPHENSON, J.D.

Page 110

1 similarly just kept on the vessel, or are they
2 accessible to the operator?
3     **A:     That's how we did it.  It was kept on**
4 **the vessel.**
5     Q:     Okay, have you captained a ship or
6 piloted a ship where the logs are electronic?
7     **A:     Piloted a ship, yes.**
8     Q:     Okay.  And in those circumstances, are
9 you aware of what happens to the electronic logs
10 and or who has accessibility to them?
11     **A:     I don't pay attention to that, no.**
12     Q:     Okay.
13          In this particular opinion, too, you've
14 got a lookout should be added when necessary, too,
15 and you've got a couple bullet points below it.
16          Do you see that?
17     **A:     Yes.**
18     Q:     Okay, as it relates to maintaining a
19 state of vigilance or appraising the situation for
20 the risk of allision or detecting any potential
21 hazards, do you know whether or not that was done
22 on the Mackenzie Rose before the start of this

Page 111

1 particular voyage?
2     **A:     Can you repeat that?**
3     Q:     Yeah.  These particular bullet points
4 you have here, which would suggest the need for a
5 second lookout in certain circumstances, do you
6 know whether or not that assessment was done by
7 anybody on the Mackenzie Rose prior to the voyage
8 at issue?
9     **A:     That's not something you do before you**
10 **leave the dock.  A lookout is when a vessel leaves**
11 **the dock, at the time you leave the dock, and it**
12 **can be beautiful weather, and 10 minutes later,**
13 **there may be fog.  At that point, you'll post an**
14 **additional lookout.**
15          **But assessment, when you're on the**
16 **vessel, it's very dynamic, so the conditions are**
17 **changing on a regular basis.  So, if a lookout**
18 **needs to be posted, a lookout is added, but it's**
19 **not something that's done before the voyage saying,**
20 **we're going to have a lookout here, we're going to**
21 **have a lookout there.  It's done as needed on a**
22 **vessel.**

Page 112

1     Q:     Okay.  And if, for instance, the
2 captain, or in this case, Mate Morrissey, was not
3 in the wheelhouse or was doing something other than
4 looking out and maintaining a state of vigilance,
5 would that be a time when you call upon a second
6 lookout?
7          MR. RODGERS:  Objection foundation.
8     **A:     So, I'm a little confused by the**
9 **question.**
10          **So, you're saying Mate Morrissey is the**
11 **lookout?**
12     Q:     Yeah.  For some reason, you indicated
13 he was not maintaining situational awareness.  So
14 presumably, he probably wasn't looking out and ran
15 right into the side of a bridge.
16          Those are circumstances that would
17 require a second lookout, correct?
18          MR. RODGERS:  Objection.
19     **A:     First, he was able to, if you go back**
20 **to the definition of lookout, let's go right back**
21 **there.  From up where he was on the upper**
22 **wheelhouse of the vessel, he had 360-degree**

Page 113

1 **visibility.  He was able to make a full appraisal**
2 **of the situation and of the risk of collision.  He**
3 **was able to do that up there.  There's no question**
4 **in my mind he could not.**
5          **My opinion, he was able to look around.**
6 **The wheelhouse is very high on that vessel, the**
7 **upper wheelhouse.  He could definitely see a**
8 **bridge.  And from there, he could make a full**
9 **appraisal of the situation.  Another lookout is**
10 **added when, I'll say, the mate on watch in an upper**
11 **wheelhouse like that cannot make a full appraisal**
12 **of the situation.**
13     Q:     I'm just reading your report.  It says
14 a lookout should be added when necessary to
15 maintain a state of vigilance.
16          Do you see that?
17     **A:     Yes.**
18     Q:     If Mate Morrissey was not able to
19 maintain situational awareness for whatever reason,
20 should a second lookout have been added?
21     **A:     It's expected that a captain -- Mate**
22 **Morrissey has his captain's license, a captain over**

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 114

1   three and a half years, that he would maintain a
2   state of vigilance.  That is expected when you have
3   someone on watch.  And that's why he's been
4   licensed by the U.S. Coast Guard.  You're putting
5   him on watch up there.  He's been certified by the
6   Coast Guard that he will be the mate on watch, and
7   he can make decisions on his own.  So, that would
8   be up to him to decide if he needed another lookout
9   or not.  That's up to the mate and the captain.
10      Q:    Okay, do you have an opinion as to
11  whether or not Mate Morrissey maintained a state of
12  vigilance as he approached the Beltline Bridge at
13  issue in this matter?
14      A:    I wasn't on the bridge.  I don't know
15  what Mate Morrissey was thinking at the time.
16      Q:    Okay.  Turn to page 24, please.  I'm
17  sorry.  I moved that a little bit further.  I
18  already asked you that.  26, please.
19          This is the use of autopilot section.
20          I think I've already asked you this,
21  but there's nothing in the CFR that would prohibit
22  Carver from telling its crew not to use the

Page 115

1   autopilot in narrow waters, correct?
2           MR. RODGERS:  Objection to form,
3   foundation.
4       A:    That decision is left up to the
5   captain.  It's very clear in the CFRs that decision
6   is left up to the captain.
7       Q:    Is there anything in the CFR that would
8   prevent an owner from telling a captain of one of
9   its vessels that it does not permit the use of
10  autopilot in narrow waters or while transiting
11  bridges?
12      A:    Is there anything in the CFR that
13  prohibits it?  The CFRs don't tell companies what
14  they can do, and they can't do in this situation.
15      Q:    Right.  So, Carver, if they'd wanted
16  to, I'm not saying they did, but Carver, if they'd
17  wanted to, could tell its crews that Carver's
18  company policy is no autopilot in narrow waters,
19  for instance.
20          MR. RODGERS:  Objection to form.
21      A:    In my opinion, that would make no
22  sense.  Carver put an autopilot on for a reason,

Page 116

1   the autopilot holds a better course than a human
2   helmsman steering the vessel.  And I don't
3   understand why they would do that when they're
4   putting the equipment on, and it's standard
5   customary procedure aboard vessels to use
6   autopilot.  I don't understand that.
7       Q:    Yeah, go ahead.  Sorry, I didn't mean
8   to cut you off.
9       A:    But in this situation, talking about
10  autopilot, that would be up to the company.
11      Q:    Okay, so if a company had some
12  understanding, some particular limitations on the
13  equipment on its vessels, they could take that into
14  consideration in creating their own autopilot rules
15  and regulations, fair?
16          MR. RODGERS:  Objection foundation.
17      A:    Yes, but again, if you look at the
18  CFRs, it's very clear that it's up to the master
19  with regards to the requirements for autopilot, to
20  use autopilot or not.  And you can use the
21  autopilot in areas of high traffic density,
22  conditions of restrictive visibility or any other

Page 117

1   hazardous situation so long as they comply with the
2   CFRs.
3           And that's up to the captain to make
4   sure the vessel is complying with the CFRs.
5       Q:    Okay, if you turn to page 28 for me,
6   please.
7           It indicates that the distance between
8   the fenders of the Norfolk and Portsmouth Beltline
9   Railroad Bridge was approximately 330 feet.
10          Do you see that?
11      A:    Yes.
12      Q:    Where did you get that measurement?
13      A:    It's from Google Earth, and also the
14  Garmin Navionics Unit.  It was the same measurement
15  between the two.
16
17      Q:    Okay, bottom of page 28.  It says, "The
18  evidence clearly establishes that Mate Morrissey's
19  initial statement that the autopilot malfunction
20  was false."
21          You see that?
22      A:    Yes.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

---

Page 118

1    Q:    And it looks like that's, and correct
2    me if I'm wrong, but that's based on inconsistent
3    or different statements made by Mate Morrissey
4    after the initial statement was made.
5         Is that correct?
6    **A:    Well, it's based on the incident**
7    **report. It's based on the USCG 2692 form, and also**
8    **the text message.**
9    Q:    Okay, do you know who completed the USG
10   2692?
11   **A:    No, I do not recall. I'd have to --**
12        MR. RODGERS:  He only has a screenshot
13   of the relevant language, Mark.
14   Q:    Do you have any reason to believe Mate
15   Morrissey completed and filed the CG 2692?
16        MR. RODGERS:  You could put it in front
17   of him, and he would see who filled it out, Mark,
18   as opposed to --
19        **THE WITNESS:  Let me pull it up.  I**
20   **have it in here.**
21        MR. NANAVATI:  Please.
22        MR. RODGERS:  Really, Mark, you're not

Page 119

1    going to put it in front of him?
2        MR. NANAVATI:  Not my job to answer
3    questions for him, Jim.
4        MR. RODGERS:  It is your job to put a
5    document in front of him that's a complete
6    document, especially when you're asking about a
7    part that's not in his report.  But whatever, I
8    object to this entire line of questioning.
9        Just after this question, Mark, can we
10   take a break then?  I'm not sure how much you have,
11   but I think it's been an hour.
12        MR. NANAVATI:  If you don't mind, we
13   just get to this one section, so I don't lose my
14   train of thought, and then take the break.
15        MR. RODGERS:  That's fine.
16        MR. NANAVATI:  Okay, thank you.
17        MR. RODGERS:  Five-minute one.
18        MR. NANAVATI:  Yeah, that's about
19   right.
20        MR. RODGERS:  To use the restroom.
21        **THE WITNESS:  I have the report in**
22   **front of me.**

Page 120

1        BY MR. NANAVATI:
2    Q:    Okay.  And can you tell me who
3    submitted that report?
4    **A:    The first 2692 was by Brian Moore.**
5    Q:    Okay.  And is that the one that you're
6    relying on in this particular section regarding the
7    inconsistencies of the reports by Mate Morrissey?
8    **A:    Well, two of them were submitted.  Let**
9    **me back up there.  The first one was submitted by**
10   **Leonard Baldessari.**
11   Q:    Okay.  And then the other one you said
12   was Brian Moore?
13   **A:    Yes.**
14   Q:    Okay.  And then you also referenced the
15   text message, which I think you have cut and pasted
16   on page 30 of your report?
17   **A:    Yes.**
18   Q:    Okay.  And you indicate that's a text
19   message from Captain Miller to Brian Moore related
20   to, I guess, Morrissey's interview with the Coast
21   Guard?
22   **A:    It says on there, so I'm not going to**

Page 121

1    **-- I don't know who exactly did that text message.**
2    Q:    Okay, but you got in here in several
3    places that it's a message.  If you look at your
4    paragraph there and it's in other places that this
5    was a message from the vessel to Moore, correct?
6    **A:    Yes.**
7    Q:    But if you look at the text message
8    itself, it's from Brian Moore to somebody, correct?
9    **A:    Correct.**
10   Q:    Okay, so this isn't a text message from
11   Captain Miller or the vessel regarding what
12   happened, right?
13        MR. RODGERS:  Objection, the document
14   speaks for itself.
15   **A:    Yes, that was afterwards.**
16   Q:    Okay, have you seen any statement from
17   Captain -- from Mate Morrissey, other than the
18   original one, that indicated there was a
19   malfunction in the autopilot that's attributed --
20   that's directly from him rather than somebody else
21   saying what he said.
22        MR. RODGERS:  Objection to the form.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 122

1      A:      With regards to the crew statements,
2   Mate Morrissey was telling different stories pretty
3   much to every crew member.  One of them, he
4   mentioned the vessel went, he had a steering issue,
5   but then he had a different statement, he told some
6   of the crew everything was fine.
7          His statement was very, very
8   inconsistent.
9      Q:   Okay.  Well, my question is, you've
10  seen a direct statement attributed to Mate
11  Morrissey where he indicates there was an autopilot
12  issue, correct?
13          MR. RODGERS:  Objection, what do you
14  mean by direct?
15          MR. NANANVATI:  That Morrissey authored.
16          MR. RODGERS:  You know, Mark, if you
17  didn't do your homework, I can't help you, but he's
18  not going to answer something without a document in
19  front of him, and a witness should not be the one
20  getting the documents.  If you have a statement
21  that you're specifically referring to, please put
22  it in front of the witness.

Page 123

1          MR. NANANVATI:  Okay.
2          MR. RODGERS:  You're defining something
3   when there were multiple statements from every crew
4   member, and you're asking the witness to guess.
5          MR. NANANVATI:  Okay.
6          MR. RODGERS:  So, I'm going to ask you
7   to please put the document up on the screen.
8          MR. NANANVATI:  I appreciate the advice
9   on how to handle a deposition, but I think I got
10  it.  It's nice of you though.
11     Q:   Let me look -- refer you to your
12  report, and we'll talk about the ones that you
13  actually rely on.
14          Page 29 of your report, there's a
15  statement at the top.  Do you see it in incident --
16  entry type incident, you've got it cut and paste.
17     A:   Yes.
18     Q:   That was logged by according to this,
19  Chris, somebody, presumably Chris Miller.
20          Do you see that?
21     A:   It's been logged by Christopher.
22     Q:   Okay.  And then you've got the USCG

Page 124

1   2692 form below that, correct?
2      A:      That's correct.  Yes.
3      Q:      And that was similarly logged by
4   somebody other than Mate Morrissey, correct?
5      A:      That was done by --
6      Q:      Either Baldessari or Moore, correct?
7      A:      No, it was done by Moore, Brian Moore.
8      Q:      Okay.  Yeah.
9          And then, you've got a text message
10  that you attribute to being an inconsistency for
11  Mate Morrissey, but that was authored by Brian
12  Moore as well, correct?
13     A:      It's from Brian Moore.
14     Q:      Okay.  And then if you look down
15  towards the bottom of page 30, you've got a
16  statement that says Mate Morrissey was able to, and
17  did switch from manual, parentheses, end
18  parentheses, out hand steering prior to the
19  incident.
20          Do you see that?
21     A:      Yeah, that's based on the evidence
22  above.

Page 125

1      Q:      Yeah, do you have an opinion as to how
2   far away the barge was from the bridge when this
3   particular effort took place?
4      A:      I don't know.  I wasn't there.
5      Q:      Okay.  Look on page 31, you've got a
6   first paragraph, section 2.1 steering test showed
7   system passed.  And then, it also has a navigation
8   equipment under 2.3 also passed.
9          Do you see that?
10     A:      I do.
11     Q:      Do you have any understanding of what
12  the testing protocols and procedures were on the
13  Mackenzie Rose to test the functionality of either
14  the steering or the navigation equipment?
15     A:      It's customary aboard vessels when
16  you're doing the steering test, they'll check the
17  NFU, the auto.  You'll go through the different
18  steering systems to make sure that the steering
19  works properly.
20          And then, for the navigation systems,
21  you're looking at the radar, the nav lights.  It's
22  just a standard procedure.  It's pretty customary,

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 126

1   it's more or less the same on every vessel.
2       Q:    Do you know if that's what happened on
3   the Mackenzie Rose on June 14, 2024?
4               MR. RODGERS:   Other than what he sees
5   in the document?
6               MR. NANAVATI:   I'm asking if he knows
7   what the actual testing protocol procedure was on
8   the Mackenzie Rose as it relates to steering and
9   navigation.   Sam was kind enough to give me a
10  general understanding of what's common in the
11  industry.   And I'm trying to figure out if that's
12  what happened on the Mackenzie Rose.
13              MR. RODGERS:   Other than what's in the
14  document where it memorializes something.
15              Is that what you're saying?
16              MR. NANAVATI:   Yeah.
17      Q:    It says, "Showed steering test, showed
18  system passed."   Trying to understand what the
19  actual test was.
20      **A:    I wasn't there on the Mackenzie Rose on**
21  **that date.**
22      Q:    Okay.   And would that be the same

Page 127

1   answer for the tests that are referred in the
2   second paragraph on June 15th, 2024?
3       **A:    Again, I wasn't there.**
4       Q:    Okay, so you don't have an
5   understanding or opinion as to what the actual
6   tests that were performed on the Mackenzie Rose on
7   the 14th and 15th were, correct?
8       **A:    Again, I was not there.   I can just**
9   **tell you the industry standard.**
10      Q:    Okay.   All right; that's the end of
11  that section.
12              So, if you want to take the 10 minutes
13  or whatever you need, that's a good time.
14              MR. RODGERS:   If you're going to go a
15  couple hours, then --
16              MR. NANAVATI:   I don't think I'm going
17  to go a couple hours.   What I'd like to do is just
18  finish up mine.   And if I have to run, let Jim
19  finish up with his cross because I've got to take
20  my daughter to Clemson this afternoon.
21              I got an eight-hour drive ahead of me.
22  So, I'd like to finish up and then cut out if I

Page 128

1   need to.
2               MR. RODGERS:   So, this is not a joint
3   expert?
4               MR. NANAVATI:   This is your expert.   I
5   think each party can ask questions if they like.
6               MR. RODGERS:   Yeah.   I mean, you're not
7   jointly doing this then?
8               MR. NANAVATI:   Well, hopefully, I'll
9   get 90% of it.   But just like some of the other
10  witnesses, I had to follow up to Jim.
11              MR. RODGERS:   Anybody else that's going
12  to be asking questions?
13              MR. NANAVATI:   No.
14              MR. RODGERS:   Jim?
15              MR. NANAVATI:   No, because we got two
16  parties, two lawyers.
17              MR. RODGERS:   Well, allegedly.   Okay.
18              MR. NANAVATI:   Okay.
19              MR. RODGERS:   That'll be more obvious
20  later on in the case that there's two parties.
21              MR. NANAVATI:   Ten?
22              MR. RODGERS:   Well, it depends if Jim's

Page 129

1   going to go all afternoon because the man has to
2   eat.
3               MR. NANAVATI:   Yeah.   Jim?
4               MR. CHAPMAN:   Hard to say at this
5   point, but based on what I've heard so far, I can't
6   imagine that my questions will take probably more
7   than 30 or 45 minutes.
8               MR. RODGERS:   All right.   So, why don't
9   we take 20 minutes, Captain, is that okay?
10              **THE WITNESS:   That's fine.**
11              MR. NANAVATI:   I mean, whatever you
12  need.   If you're hungry and you're feeling bad,
13  let's take whatever you need.
14              MR. RODGERS:   Yeah.   Okay, 10 minutes
15  is fine.
16              MR. CHAPMAN:   All right.   Thank you.
17  So, we're off for 20 minutes?
18              MR. RODGERS:   Yeah, let's just say
19  quarter till two and make it even.
20              MR. NANAVATI:   Okay, see you all then.
21              THE VIDEOGRAPHER:   Counselors, we're
22  going off the record.   The time is 1:17.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 130

1          (WHEREUPON, A BRIEF RECESS WAS TAKEN.)
2          THE VIDEOGRAPHER:  Counselors,
3   gentlemen, witness, we're going back on the record.
4   The time is 1:48.
5          Please proceed.
6          BY MR. NANAVATI:
7      Q:     All right, Sam I'm going to try to move
8   it along because I think a lot of the stuff in the
9   rebuttal, we probably addressed when the -- in the
10  -- your original opinion.  So, I'm going to be kind
11  of hopping pages and hopefully skipping a bunch.
12         So, in particular, given that if
13  something seems out of context, it doesn't make
14  sense, make sure you yell at me, all right?
15     **A:     Will do.**
16     Q:     Okay.  And go to page 38, please.
17         If you look at it says, "The following
18  finding to Captain Lewis will be addressed infra."
19         Do you see that?
20     **A:     Yes.**
21     Q:     And it says, "The unit made direct
22  contact with the bridge causing visible structural

Page 131

1   movement as evidenced by the surveillance video,
2   which is contrary to crew statements of no damage
3   or minor impact."
4          Do you see that?
5      **A:     I do.**
6      Q:     Okay.  And it generally says you
7   disagree with Captain Lewis's finding, but I just
8   want to clarify a few things.
9          You do agree there was direct contact
10  with the bridge, correct?
11     **A:     There was contact with the barge and**
12  **the bridge.**
13     Q:     Yes, and that you could see movement at
14  least on the surveillance video, correct?
15     **A:     Yeah, which would be definitely**
16  **different from what the crew saw from, I'll say the**
17  **vantage point up top, that would be a totally**
18  **different view from the vessel versus what their**
19  **surveillance video.**
20     Q:     No, I understand.  But by looking at
21  the surveillance video, you could see the movement
22  of the, of the bridge, correct?

Page 132

1          MR. RODGERS:  Objection.
2      **A:     You'll see it moving a little.  Yes.**
3      Q:     Okay.  And then number two, you've got
4   the unit deviated outside.  Oh, sorry.  Let me go
5   back and ask you one other thing about that video.
6          When you looked at the --
7          MR. RODGERS:  Can I finish my
8   objection, are you not hearing me?
9          MR. NANAVATI:  No, I'm sorry.  I didn't
10  hear you.  Go ahead.
11         MR. RODGERS:  I had an objection with
12  your question and the way it was formed, but he's
13  already answered it, so go ahead.
14     Q:     On the surveillance video, did you
15  notice the black diesel smoke coming out of the --
16  out of the tugboat after the allision?
17     **A:     There was smoke.**
18     Q:     Do you remember seeing that happen
19  after the allision occurred?
20     **A:     No, I do not recall that after, but**
21  **again, a situation like that, it depends when they**
22  **start backing the engines and everything, when**

Page 133

1   **you're going to have a smoke like that.  You can**
2   **put the engines as stern and it depends because**
3   **nowadays the ships operate on very clean fuel, so**
4   **you won't have near the smoke you used to when you**
5   **first start backing the engines, depending on the**
6   **type of fuel they're using.**
7      Q:     Okay.  And do you have any
8   understanding of what type of fuel they were using
9   or what type of motor this particular vessel had as
10  it relates to clean diesel operations?
11     **A:     That I do not.**
12     Q:     Okay.  Next one down, number two.  It
13  sounds like there's no disagreement that the unit
14  deviated outside the navigational channel.
15         The issue you have is related to
16  whether or not -- what the cause of that deviation
17  was, correct?
18     **A:     Yeah.  In my opinion the reason it**
19  **deviated out of the channel was because of lack of**
20  **situational awareness of maybe what was the**
21  **navigator on the vessel at the time.**
22     Q:     All right.  We've asked you about --

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

---

Page 134

1  I've asked you about the autopilot disengagement.
2  On page 40, just to be sure that we got this
3  straight, there's a -- in the middle, kind of top
4  third, it says further more to text message.
5          Do you see that?
6      **A:    Yes.**
7      Q:    That should be flipped, right?  It
8  should be Brian Moore to Captain Miller?
9          MR. RODGERS:  Sam, what is your
10 question again?
11     Q:    He's got the text message going from
12 Captain Miller to Brian Moore.
13         And when I'm looking at the text
14 message, it looks like it's from Brian Moore to
15 Captain Miller.
16     **A:    It is.**
17     Q:    Okay.  And then it says something in
18 here.  The text itself says, I'll call you very
19 shortly, but his interview statement to CG said it
20 never went hard over and was midship the entire
21 time.
22         When it says it went hard over, it was

---

Page 135

1  midship the entire time, what do you take that to
2  mean?
3      **A:    Hard over, in maritime terms means that**
4  **the rudders went hard left or hard right, which is**
5  **fully hard left or hard right.  And midships is**
6  **where the rudder stays midships.**
7      Q:    Okay.  And based on your review of the
8  -- going back, you did that -- remember that chart
9  you did with the yellow, blue and red line on it?
10     **A:    Yes.**
11     Q:    Okay, do you believe that the rudder
12 stayed based on that state midship?
13     **A:    Do I believe it stayed midships?**
14     Q:    Yes, sir.
15     **A:    That's a question's really hard to**
16 **answer because the current was very strong at that**
17 **point.  The current running approximately 1.9 knots**
18 **ebbing, if I recall.  So, the current would be**
19 **pushing the vessel towards the bridge.**
20     Q:    Okay.
21     **A:    So, you can have a considerable amount**
22 **of different variations and how a vessel will act**

---

Page 136

1  **with a current like that when you start backing**
2  **engines.  If you have a slight angle at all, the**
3  **current will a lot of times take the stern of the**
4  **vessel in that situation further to the right and**
5  **the bow to the left.**
6      Q:    Okay, do you have an, as we sit here
7  today and I'm not suggesting what it should be, but
8  do you have an opinion whether or not it was
9  midship the entire time or whether or not there was
10 any change in the rudder?
11     **A:    I did not see the rudder angle**
12 **indicator, but based on the evidence, the vessel's**
13 **rudder did not go hard over.  If it had gone hard**
14 **over, the vessel would had a much more say severe**
15 **turn to port, especially considering it had the up**
16 **current on the stern there, which would really**
17 **pushed around if it had gone hard over.**
18     Q:    Can you say whether or not it went over
19 to the left at all rather than hard over, or do you
20 have an opinion on that?
21     **A:    I don't have an opinion.**
22     Q:    Okay.

---

Page 137

1      **A:    Again, it's based on the current, which**
2  **have considerable impact on how a vessel handles**
3  **once it hits a vessel, the current.**
4      Q:    Okay, got it.
5          I think I -- I'm looking at page 41
6  just to take, so you keep up with me, but I think
7  we've already talked about switching and where that
8  happened.  It looks like the third paragraph on
9  page 41 starts with, "In addition, I respectfully
10 disagree."
11         Do you see that?
12     **A:    Yes.**
13     Q:    So, I assume you disagree with the
14 description of this area is confined, not a
15 navigation.  I mean, I assume you agree it's a
16 navigational channel, correct?
17     **A:    Yeah.  What I said was for all**
18 **practical purposes, every channel is a confined**
19 **channel, and this is for all practical purposes,**
20 **like any other channel.  But when you start looking**
21 **at, it's not really as a confined, is it narrow?**
22 **That's based on not only the channel, but the size**

---

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 138

1   vessel that's operating in the channel.

2          Now, if we have, let's say 1,100-foot

3   ship going down this channel, yet, let's say a

4   hundred -- a 200 -- another 200 -- some of them,

5   180-foot beam.  Yes, that would be a confined

6   channel.  My opinion, this vessel with the beam of

7   50 feet and the channel that's over 700 feet, in my

8   opinion, is not a confined channel, nor is it where

9   you have a 300-foot opening to go to a bridge and

10  the beams only 55 feet.  My opinion, that is not

11  confined.

12      Q:    Is there any industry standard that

13  you're aware of that defines that term confined?

14      A:    No.  It's a very, I'll say, subjective

15  opinion.

16      Q:    Okay.

17          In your subjective opinion, is there a

18  particular ratio that you look at the width of the

19  vessel versus the width of the channel to determine

20  whether it's confined, you know, one to three or

21  one to eight, or is there any particular ratio that

22  you look to, to say this is a confined or a narrow

Page 139

1   channel versus something else?

2       A:    My opinion is around one to four.

3       Q:    Okay.

4       A:    That's my opinion.

5       A:    Yeah.

6          And do you know if there's anything

7   from the Coast Guard or any commentary from any

8   learned source that would suggest one to four is

9   the appropriate ratio, or is it really truly

10  subjective?

11      A:    No, there is no, I'll say true -- it's

12  very subjective.  And again, it's based not only on

13  the channel, but the beam of the vessel.

14      Q:    Okay.

15      A:    Again, this was a very small vessel.

16      Q:    The next page, on page 42.  So, in this

17  Port Everglade channel that we've obviously talked

18  about several times, the channel width is 450 to

19  500 feet, and you call it a confined navigational

20  channel.  I'm assuming that's not based on the

21  width of the channel, but the beam of the vessels

22  that you particularly operate.

Page 140

1          Is that correct?

2       A:    Correct.  Yes.  If it's a tug and barge

3   or a small vessel, then it's not confined in my

4   opinion.  No.

5       Q:    Okay.  And what types of vessels with

6   180-foot beam are you typically navigating through

7   the Port Everglades channel -- or that, what's the

8   name of the bridge that we talked about?

9       A:    We can't get 180-foot beam through the

10  bridge that we take the mega yachts through, which

11  are worth literally some of them over a hundred

12  million dollars.  And the beam on that bridge is

13  120, the width between the fenders is 125 feet.

14      Q:    Okay, so when you referred to before

15  taking vessels on autopilot through that particular

16  bridge, they would not be vessels of this size, the

17  180-foot beam vessels, correct?

18      A:    No, a 180-foot beam vessel would not

19  fit through a 125-foot opening.

20      Q:    Yeah, what type of vessels do you take

21  through that particular bridge that you use

22  autopilot on when --

Page 141

1       A:    We take the mega yachts, which can be

2   worth well in excess of a hundred million dollars.

3       Q:    Okay, what's the beam on them?

4       A:    120?  You're going to have 60-, 70-foot

5   beam.

6       Q:    Okay.

7       A:    They're good-sized vessels.

8       Q:    And you take those through an autopilot

9   regularly?

10      A:    I have, yes.

11      Q:    I know you have, but is that the -- is

12  that the norm, or is that the exception?

13      A:    It's up to the captain how they want to

14  do it.  Like we have some ships coming in autopilot

15  and I'm happy to do it.  One of the ships we do an

16  autopilot is over a 1,000-foot-long cruise ship,

17  and we'll go through the currents and Port

18  Everglades in autopilot on that, and it's not an

19  issue.

20      Q:    Do you use autopilot?  Is it the

21  exception or is it the norm when you're operating a

22  vessel that size through that type of channel?

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 142

1      A:    We don't do it on a regular basis, but
2  we're happy to do it.  All the pilots will do it on
3  the vessel.
4      Q:    Okay.  All right.
5            So, if it's up to you, you hand steer?
6      A:    It depends on the vessel.  We have tug
7  and barges, which come in an autopilot, and that's
8  fine.
9      Q:    But what you were talking before, these
10  very large -- these large beam vessels, unless
11  you're directed -- I think you said, unless you're
12  directed to use autopilot, you typically use hand
13  steering?
14     A:    What are you talking about, where?
15     Q:    I think you said that sometimes people
16  come in on autopilot and ask you to use autopilot
17  and you'll do it.
18     A:    And that's fine.  Yes.
19     Q:    Yeah, but if it's up to you without
20  direction from the vessels, do you choose
21  autopilot, or do you choose hand steering?
22     A:    Oh, it all depends on the situations

Page 143

1  because we have -- it's one of the busiest ports,
2  I'll say not Port Everglades, it's not only ship
3  wise, but small boat traffic, so any given voyage,
4  we can have literally hundreds of small boats
5  coming out, but that's a situation which it is most
6  of the time.  It's going to be enhanced steering.
7      Q:    Gotcha.  Okay.  All right.
8            I think we talked about the CFRs on
9  autopilot.  If you go to page 45, please, number
10  six?
11     A:    Okay.
12     Q:    It talks about the Simrad AP70 MK2
13  autopilot manual.
14     A:    Yes.
15     Q:    You've reviewed that, correct?
16     A:    Yes.
17     Q:    And you would agree with me that it has
18  restrictions on the use of autopilot in narrow
19  waters or heavy traffic areas?
20     A:    My opinion, that does not apply in this
21  situation.  This was not a narrow channel.  There
22  was very little traffic on the waterway based on

Page 144

1  the surveillance video.
2      Q:    No, I got it.  But you would agree with
3  me that the manual does say, do not use automatic
4  steering when in heavy traffic areas or in narrow
5  waters?
6      A:    Yeah, my opinion doesn't apply in this
7  situation, but that's what it says.
8      Q:    Okay.  If you turn to page 51, please,
9  this relates to the notification to the Coast Guard
10  of the illusion.
11           Do you see that?
12           It's towards the bottom of page 51, I
13  think it's your number 11.
14     A:    Yes.
15     Q:    Okay.
16           Captain Lewis -- you were opining on
17  Captain Lewis asserting that the Coast Guard was
18  not promptly notified of the allision, a violation
19  of 45 CFR section 405-1.
20           Do you see that?
21     A:    I do.
22     Q:    Okay, do you agree with me that the

Page 145

1  Coast Guard was not promptly notified of the
2  allision as required by 45 CFR section 4.05-1?
3      A:    Based on the information at the time,
4  Carver's management did not know the damage of the
5  bridge.  The damage of the bridge, they were told,
6  if you look at the documents, that the vessel more
7  or less laid on the fenders, slid through the
8  fenders, and if there's no damage at all, which
9  they were told, there is no reason to report it to
10  the Coast Guard.
11     Q:    They were provided photos of the barge,
12  correct?  The front of the barge, looking for
13  damage?
14     A:    Yes.
15     Q:    And why would they be asking for and
16  receiving photos of the front of the barge if they
17  thought that it was just a sideswipe?
18     MR. RODGERS:  Objection to form.  You
19  can answer if you understand the question.
20     A:    So, you're saying they're looking at
21  the photos of the front of the barge?
22     Q:    They requested and received photos of

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 146

1  the front of the barge.
2      A:      Why were they asking for those?
3      Q:      If it was a sideswipe, wouldn't they
4  want pictures of the side?
5      A:      I can only see in the evidence that
6  I've reviewed, and what they talked about was that
7  it was a sideswipe.
8      Q:      Right, and the other thing that they
9  were told is that Captain Miller wanted to report
10 this to the Coast Guard before he left, correct?
11     A:      That's what the report said.  And
12 again, if it's going to be reported, you will not
13 report laying up on the fenders or something like
14 that.  And I don't know Captain Miller, but maybe
15 he was very cautious about it.
16             And if you touch something, he'll
17 definitely, if he may want to report it, I don't
18 know.  But that is not the standard for reporting.
19 The standard for reporting is that you'll report
20 going under a bridge if you damage something, if
21 there's no damage, there's no reason to report it
22 to the Coast Guard.

Page 147

1      Q:      Okay.  And Carver Management,
2  Baldessari, or Moore reported to the vessel that
3  not that they didn't need to report it.
4             They told them that they had reported
5  it, and they could leave, correct?
6             MR. RODGERS:  Objection.
7      A:      They were told the vessel laid upon the
8  fendering, slid through on the fendering on the
9  port side.  If that were the case, the company is
10 not required to report it.  Now, if it was such an
11 issue, Captain Miller could have reported it if
12 that's how he felt.
13             But he left that up to -- he could have
14 done it.  And the company did not report it, not
15 thinking they had to report it.  So, they probably
16 wanted to get the bargeman, I don't know.  But they
17 did not feel at that time there was any damage from
18 all the information I've reviewed.  They thought
19 there was no damage at all.  And in that case,
20 there's no requirement to report it.
21             If you look past when Captain Morrissey
22 had an incident a few months prior, that was

Page 148

1  reported to the Coast Guard on the 2692 form and
2  everything else.  So, I don't think it's that they
3  didn't want to report it, it was they did not feel
4  it was necessary for it to be reported.
5      Q:      Was the earlier incident with Mate
6  Morrissey witnessed by somebody other than folks on
7  the Mackenzie Rose?
8      A:      From what I read, people on the shore
9  side saw it.
10     Q:      Okay.  And with respect to this
11 particular situation that we're here for, the June
12 15, 2024, allision, you would agree with me that it
13 was whoever it was, you know, Moore or Baldessari
14 told the vessel, not that it didn't need to be
15 reported, they told the vessel they had reported it
16 to the Coast Guard, and the Coast Guard said they
17 could leave, correct?
18     A:      To keep the vessel going.
19     Q:      Yeah, and that was not true, correct?
20     A:      But they were not told the truth either
21 as to the damage done by the bridge.
22     Q:      Well, in any event, my question isn't

Page 149

1  whether or not they were -- the crew lied to the
2  management, that's apparently the case.  It's also
3  probably the case of management lied to the crew,
4  correct?
5             MR. RODGERS:  Objection to the form.
6      A:      Yeah, the crew definitely was not
7  truthful with regards to management.  There's no
8  question about that.
9      Q:      And how about management, were they
10 truthful to the crew when they told them they
11 reported it to the Coast Guard so they could leave?
12     A:      I think what happened was that they
13 wanted -- they did not think there was any damage
14 to the bridge when you read all the evidence and
15 they thought, okay, there's no damage to the
16 bridge, we want to keep the vessel going.  So,
17 we'll tell them that we'll report it, and they --
18     Q:      They told them that they had reported
19 it, correct?
20     A:      I don't recall.  I'd have to look at
21 that document again.
22     Q:      Well, let's -- all right, let's see if

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 150

1  we can just share a screen.  I'll show you this one
2  because this one I think is important.
3          Can you see my screen?
4      **A:    Yes.**
5      Q:    Okay.  I can tell Chris, presumably
6  that's Chris Miller, the captain, I notified them,
7  and they will do an investigation and to keep going
8  just to shut him up.
9          Do you see that?
10     **A:    I do, but in my opinion, this is**
11  **irrelevant.  This is all after the fact of the**
12  **incident.**
13     Q:    It's on June 15th of 2024, correct?
14     **A:    Yeah, and it was after the incident**
15  **occurred.**
16     Q:    Right, and if they had not made that
17  misrepresentation to Chris Miller, presumably he
18  would have reported it.
19          The Coast Guard could have boarded the
20  vessel and done drug and alcohol testing, correct?
21          MR. RODGERS:  Objection.
22     **A:    Yeah, it would be up to the captain.  I**

Page 151

1  can't speak for the captain on this one.
2      Q:    Okay, regardless of whether you think
3  it's relevant or not, that statement is not true,
4  correct?
5          MR. RODGERS:  Objection.
6      **A:    You're talking with regards to the**
7  **reporting?**
8      Q:    Yes.
9      **A:    That's what this statement said.**
10     Q:    And is that, that is not true, correct?
11          MR. RODGERS:  Objection, you're
12  harassing the witness.  Asked and answered.
13     Q:    Is it true, or false?
14          MR. RODGERS:  Asked and answered.
15     **A:    I've already answered the question.**
16     Q:    What was the answer?
17     **A:    I told you before.**
18          MR. RODGERS:  Objection.  Mark, you're
19  harassing the witness.  He's asked -- answered it
20  twice.
21          MR. NANAVATI:  He said six times that
22  the crew lied to management.  He will not say

Page 152

1  whether or not this statement, that they notified
2  the Coast Guard, and that Coast Guard will do an
3  investigation, so that Chris Miller will keep going
4  just to shut him up, is a true or false statement.
5          MR. RODGERS:  Asked and answered.
6  Objection.  Asked and answered.
7          You can answer it a third time,
8  Captain.
9      **A:    Yeah, I already answered it.**
10     Q:    What was the answer?
11     **A:    I said that --**
12          MR. RODGERS:  Counselor, can you have
13  it read to him?  Counselor, can you have it read to
14  him?
15     **A:    What the text says.**
16     Q:    I know I can read the text.
17          Is the statement in the text true or
18  false?
19          MR. RODGERS:  Asked and answered.
20     **A:    What statement in the text?**
21     Q:    That they notified the Coast Guard of
22  the allision on June 15, 2024.

Page 153

1      **A:    At that point they had not.**
2      Q:    Okay, thank you.
3          Can you go to page 54, please.  Number
4  12, it says, "Post-incident accounts from multiple
5  crew members were inconsistent."
6          Do you see that section?
7      **A:    I do.**
8      Q:    And in response, you indicated Mate
9  Morrisey failed to tell the truth about the
10  incident.
11          Do you see that?
12     **A:    That's correct.  He did fail to tell**
13  **the truth about the incident.**
14     Q:    Did you review any other crew
15  statements?
16     **A:    Can you repeat that?**
17     Q:    Yeah, did you review any crew
18  statements other than Mate Morrisey's?
19     **A:    Yes.**
20     Q:    Do you have an opinion as to whether or
21  not any of the other crew statements were
22  inaccurate?

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 154

1    A:    I did not write the statements for the
2  crew members.  I don't know -- I was not there when
3  the statements were written, but at my opinion
4  being on vessels, I would say, no, they are
5  accurate.
6          What I have, the evidence I have seen
7  and the documents I have reviewed, I have no reason
8  not to believe they would not be accurate.
9    Q:    Okay.  Can you turn to page 63, please?
10 Kind of middle of the page.
11         It says, Furthermore, the Coast Guard,
12 by taking no action against his license, deemed
13 Mate Morrissey to be a competent master.
14         Do you see that?
15    A:    Yes.
16    Q:    Are you aware of any Coast Guard
17 regulation or publication that indicates if action
18 is not taken, that's deemed to be a finding by the
19 Coast Guard that somebody is a competent master or
20 competent at anything?
21    A:    No, my opinion, if the Coast Guard does
22 not take action on someone's license after an

Page 155

1  incident, they're deeming him to be competent,
2  they're allowing him to have his license.  Part of
3  it, when you get, receive the captain's license,
4  you're expected to be competent.  If you are not
5  competent, the Coast Guard, and you have an
6  incident, the Coast Guard will take action against
7  the license.
8    Q:    Okay, so my question is, are you aware
9  of any Coast Guard regulations or other
10 publications that indicates a lack of action
11 equates to a finding of competency?
12    A:    Coast Guard publications?
13    Q:    Let's start there, Coast Guard
14 publications?
15    A:    To my knowledge no, but the thing is
16 that if the Coast Guard -- if you have an incident
17 on a ship, the Coast Guard takes that very
18 seriously on board a vessel.  They'll do an
19 investigation.  Generally, they'll do an
20 investigation, and if they find an issue with the
21 person who's operating the vessel, they will take
22 action against the license.  If they don't take

Page 156

1  action against the license, in my opinion, they
2  deem that person to be competent.
3    Q:    And how long is the typical Coast Guard
4  investigation?  How does it take them to usually
5  complete an investigation?
6    A:    That I cannot tell you.
7    Q:    Okay.  And so you don't have any idea
8  whether or not the January 21, 2024, incidents
9  investigation is completed, correct?
10         MR. RODGERS:  Objection, foundation.
11         MR. NANAVATI:  Yeah, I agree.
12    Q:    Do you have any foundation to determine
13 that the Coast Guard has not -- has decided not to
14 take action against Mate Morrissey?
15         MR. RODGERS:  There's no investigation
16 by the Coast Guard and you know it, Mark.  So,
17 there's no foundation for this question.
18         If I have to follow it up, I will, but
19 you're just throwing out stuff that's not true.
20         MR. NANAVATI:  I don't know that, I'm
21 asking.
22    Q:    Does he have information to suggest the

Page 157

1  investigation is completed?
2          MR. RODGERS:  Foundation, again.
3    A:    Based on my experience, if there's an
4  issue with a crew member on board a vessel, which
5  had an incident, the Coast Guard will take action
6  relatively quickly.
7    Q:    Okay.  And did Carver do anything after
8  the January 21, 2024, incident as relates to Mate
9  Morrissey?
10         MR. RODGERS:  Asked and answered,
11 objection, asked and answered like two hours ago.
12 Go ahead, Captain.
13    A:    What I reviewed was in the documents,
14 and I think we talked about this already, what
15 Carver did, they did their -- they have a form
16 which they filled out with regards to the
17 investigation, and that was completed by Carver
18 after the incident with Mate Morrissey.
19    Q:    Okay.  And did Carver do anything as it
20 relates to Mate Morrissey after the June 15, 2024,
21 allision?
22         MR. RODGERS:  Objection to form.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 158

1    A:    I would have to review the documents
2  again.  There's over 1,800 documents, so I don't
3  remember every document to be honest.
4             MR. NANAVATI:  That's fine.
5             All right.  I don't think I have any
6  further questions for you, sir.  Please answer any
7  questions Mr. Chapman may have, and I'll probably
8  bow out here shortly.
9             MR. RODGERS:  Captain Stephenson,
10  Mr. Chapman represents Norfolk and Portsmouth Belt
11  Railroad.
12                   EXAMINATION
13             BY MR. CHAPMAN:
14    Q:    Good afternoon, Sam.  My name's Jim
15  Chapman.  I introduced myself much earlier in this
16  deposition.  Mr. Rogers is correct; I do represent
17  Norfolk and Portsmouth Beltline Railroad.
18             How are you this afternoon?
19    A:    Good.
20    Q:    Good.  I do have some questions that
21  I'm just trying to get a little better
22  understanding on, there's been, you know, some

Page 159

1  focus on this particular bridge, I think in Fort
2  Lauderdale, you call it the 17th Street Bridge?
3    A:    Yes.
4    Q:    And I just want to make sure I know
5  which one we're talking about.
6             And while you were, while we were on a
7  break, I, you know, looked it up on the internet
8  and I think I know what it is, but I just want to
9  understand, it looks to me like it's a bridge
10  that's used by automobile traffic, is that right?
11    A:    Yes.
12    Q:    And it's a bascule bridge in its
13  operation, correct?
14    A:    Yes.
15    Q:    And just so we're clear on that, it
16  basically opens like this from either side,
17  correct?
18    A:    That is correct.
19    Q:    Do you know how long that bridge has
20  been there in its current configuration?
21    A:    There was one there before it was
22  replaced.  I can't tell you the date.

Page 160

1    Q:    I think you said that the channel
2  opening fender to fender was 125 feet.
3             Is that right?
4    A:    Yes.
5    Q:    And I understand your occupation is you
6  are a harbor pilot in that particular port, right?
7    A:    That's correct.
8    Q:    Are you licensed as a harbor pilot
9  there?
10    A:    Yes.
11    Q:    And did you have to undergo any special
12  training to become licensed as a harbor pilot in
13  that location?
14    A:    Before -- well, I was captain for six
15  years on ships.  And then, after I was captain, I
16  became a harbor pilot.  I went through another
17  three years of training, just under three years of
18  training to be a harbor pilot, which at the time, I
19  think I did 3,000 transits in three years.
20    Q:    All in Port Everglades?
21    A:    Yes, a pilot is very specific to a
22  port.

Page 161

1    Q:    Gotcha.  So, it was like an
2  apprenticeship almost is the way I think of it.
3             Is that fair?
4    A:    Correct.
5    Q:    Yeah.  So, in your role as a Harbor
6  pilot, I think you said, no, we don't take really
7  big boats through that opening because it's just
8  not wide enough, and that predominantly the boats
9  that you're taking through there when you're
10  working as a Harbor pilot would be mega yachts, or
11  what's referred to as mega yachts?
12             It might have a beam of 60 or 70 feet?
13    A:    Approximately.
14    Q:    Okay, those mega yachts, are they
15  typically equipped with bow thrusters?
16    A:    Yes.
17    Q:    Or court nozzles?  I don't know how you
18  think of it, but bow thrusters and twin main
19  engines?
20    A:    Yes.
21    Q:    Okay.  And when you said that the crew
22  of the vessel would want to go through those on

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 162

1  autopilot, you would, I don't know, agree to that
2  or, you know, think that that was okay, correct?
3      **A:    I leave it up to the captain.**
4      Q:    And is that because the harbor pilot is
5  only in kind of an advisory role when you're aboard
6  one of those vessels?
7      MR. RODGERS:  Objection.
8      **A:    When we're aboard the vessel, if it's a**
9  **foreign flag vessel, we are mandated by law, if**
10  **it's a US flag vessel from one US port to another**
11  **port, we're still mandated by law to be on board,**
12  **and we are not an advisor unless the captain has**
13  **the trips required.**
14      Q:    I'm sorry, I missed that.
15          Captain has the what?
16      **A:    Required trips.  So, if it's a Navy**
17  **vessel -- if it's a Navy vessel or public vessel,**
18  **then we are an advisor, otherwise we have as**
19  **control of the con or conduct of the vessel.**
20      Q:    Okay.  And when you say have control of
21  the con, you would actually operate the controls in
22  that circumstance where you're considered to be the

Page 163

1  captain on the vessel, is that right?
2      **A:    No, we're not considered to be the**
3  **captain.  We're not part of the ship's crew.  We're**
4  **a pilot and we are there to take navigational**
5  **control of the vessel.**
6          **So, on the ship, say five miles out at**
7  **sea, we get on board the boat.  We have small**
8  **boats, which take us out there and we climb on**
9  **board.  The captain gives us; it's called**
10  **navigational control of the vessel.  So, I'm in**
11  **control of the navigation of the vessel.  I do not**
12  **touch the throttles or anything else.  I give the**
13  **commands.**
14      Q:    And in these mega yachts that you
15  describe, what is the, I don't know, is there a
16  typical crew size, a usual crew size?
17      **A:    It's all over the place.**
18      Q:    So, would you expect these mega yachts
19  would have a master of the vessel and somebody that
20  operates in the role of chief mate?
21      **A:    They may, it really varies on the**
22  **yacht.**

Page 164

1      Q:    Okay, when you're, I guess, coming into
2  or leaving the Port Everglades in your role as a
3  harbor pilot, then you're not technically at the
4  control, somebody else is actually operating the
5  steering or the, the propulsion, that sort of
6  thing, is that right?
7      **A:    That's correct.  We give the orders.**
8      Q:    Okay.  And do you have any
9  responsibility for filling out a log?
10      **A:    As a pilot?  No.  As a captain, yes.**
11      Q:    Okay, so when you're operating as a, as
12  a harbor pilot, somebody else handles the log
13  entries during whatever time you have on the
14  vessel?
15      **A:    Yes, unless we tell them to put an**
16  **entry in the log for whatever reason it may be.**
17      Q:    And during your kind of 28 days on, 28
18  days off, if you could kind of give us a general
19  description of like, how many transits would you be
20  making or how many times would you be serving as
21  the harbor pilot in a 28 day on period?
22      **A:    It really varies a lot based on the**

Page 165

1  month.  We have a peak season, and we have low
2  season traffic.  So, there's quite a variation.
3      Q:    So, in your very busiest month, what
4  would it be like?
5      **A:    Probably around 70 transits, somewhere**
6  **there.  It could be more lately; it's been very**
7  **busy.**
8      Q:    So, at least a couple of days during a
9  busy season, it sounds like?
10      **A:    Excuse me?**
11      Q:    At least a couple of them a day during
12  the busy season?
13      **A:    And that's pretty much every day we**
14  **have a couple of them.  Yes.**
15      Q:    Okay, how many people in the Harbor
16  Pilots Association there for Port Everglades?
17      **A:    We have 15 pilots and four deputies.**
18      Q:    And is a deputy, somebody that's like a
19  junior harbor pilot?
20      **A:    They're not a pilot yet.  They're**
21  **undergoing training.**
22      Q:    Okay, kind of like the program you went

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 166

1  through?

2      A:      Correct.

3      Q:      Okay, so when you are performing harbor

4  pilot duties, you would only operate the vessel or

5  allow the vessel to be operated on autopilot if the

6  request came from the master of the vessel?

7      A:      Or if the vessel's already in harbor

8  pilot.  A lot of times we just keep it in harbor

9  pilot when we're going in the channel or out the

10  channel.

11      Q:      So, when a vessel is coming in from the

12  sea, where do you board it as a harbor pilot?

13      A:      It depends on the size vessel.  It

14  could be one mile from the sea buoy, close to five

15  miles offshore.

16      Q:      I'm sorry, where is the sea buoy at

17  Port Everglades?

18      A:      It's about a mile and a half out.

19      Q:      Okay.  And so if I understood your

20  answer, then you could board it as close as the sea

21  buoy, but as far out as about five miles from the

22  sea buoy, is that right?

Page 167

1      A:      Half a mile east of the sea buoy,

2  usually to five miles offshore.

3      Q:      And does the Harbor Pilots Association

4  operate some pilot vessels to get you to and from

5  the ship that you're going to be piloting?

6      A:      Yes.

7      Q:      Do you ever operate those?

8      A:      If the driver has to relieve himself,

9  I'll take the helm.

10      Q:      Okay, but not as your normal course of

11  duty?

12      A:      No, not at all.

13      Q:      Okay, have you ever operated any vessel

14  inside the sea buoy for the Port of Hampton Roads?

15      A:      Yes.

16      Q:      And tell us about the circumstances in

17  which you've done that, please.

18      A:      I was captain on the U.S. training

19  ship, Texas Clipper II, and we're going up the

20  James River.  And also, as captain on the Reuben

21  Lasker, and we were going, like I said, I don't

22  recall if it was Elizabeth River where, but we went

Page 168

1  somewhere up there.

2      Q:      So, just so I understand, is it two

3  ships, each of which made one voyage inside the sea

4  buoy for Hampton Roads?

5      A:      And also, I worked with the Navy pilots

6  in Virginia and Norfolk.

7      Q:      Tell us about that work.

8      A:      I was riding with the harbor pilots up

9  there for the Navy work.  That's a little different

10  than a state Harbor Pilot.  There are several

11  harbor pilots.

12          But I spent my Navy duty doing work

13  with them at the Navy base.

14      Q:      When you say the Navy base, can you

15  tell us what you mean by the Navy base?

16      A:      Navy base in Norfolk where the ships

17  dock.

18      Q:      Okay, so is that what is referred to as

19  the Naval Operations Base, NOB for short?

20      A:      It may be.  I'm going back years.  I

21  don't recall what they called it back then.

22      Q:      Okay, that was going to be kind of a

Page 169

1  follow-up question is when you made these transits.

2  I read in your resume that you're a retired Naval

3  Reserve officer.

4          So, this must have been during some

5  kind of temporary active-duty work that you were

6  involved in.

7          Is that right?

8      A:      Correct.  That was my one-year

9  active-duty work.  Yes.

10          Well, I went and did my work for one

11  year up there for my calendar year.

12      Q:      What calendar year was that?

13      A:      I don't recall.

14      Q:      Before 1990?

15      A:      No, it was after that.

16      Q:      Before 2000?

17      A:      I can't recall.  I know it was after

18  1990.

19      Q:      And the two transits that you told us

20  about, one on the training ship, and I honestly

21  don't remember the other ship you described, you

22  gave us a name, but when were those transits made?

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 170

1    A:    One was made approximately, I'd say --
2  I'd have to look, I don't recall exactly.  It's
3  been quite a few years.
4    Q:    Just give us your best estimate.
5    A:    This is a guess.  I'd say around 2013,
6  maybe.  But it would have been a long time.
7    Q:    And have you ever transited a vessel in
8  the southern branch of the Elizabeth River?
9    A:    To my knowledge, like I said, I don't
10  recall we went up somewhere there.  All I recall
11  was there was a shipyard.  It was one of those
12  rivers when we went past the Navy base.
13          And so, all I recall, it was a
14  brand-new ship, and I was hired to bring it out for
15  sea trials as captain.
16    Q:    And you recall that it was, you said, a
17  brand-new ship?
18    A:    Yes, Reuben Lasker.
19    Q:    Do you still have your report there?
20    A:    Yes.
21    Q:    I think it's been marked as Exhibit 1,
22  but you were asked some questions, I think it was

Page 171

1  on page 42, there in about the middle of the page,
2  talking about what's a confined channel, what's
3  not.  I think you said there's no industry
4  standard, but you did offer up what I understood to
5  be some type of ratio.  And I just want to make
6  sure I understand what is in that ratio.  You use
7  the figures of a ratio of one to four.
8          And so, what are the two figures in
9  that ratio?
10          And if you said it, I apologize.  I
11  just didn't hear it, and I'm just trying to
12  understand that.
13    A:    Talking about, again, this is very
14  subjective, and that would be the channel width to
15  the beam of the vessel.
16    Q:    So, the channel width is the one, and
17  the beam of the vessel is the four, or is it the
18  width?
19    A:    Yes, the channel width would be the
20  four, and the beam would be the one.  And also,
21  it's not just -- there's so many variations.  You
22  have to look at the weather conditions, everything

Page 172

1  else.  There's some -- like I said, this is very
2  subjective.  There's a lot of variations to this.
3          Is there a heavy wind?  Is the vessel
4  crabbing in the wind?  When you're crabbing, the
5  vessel is not going straight in the channel.  The
6  vessel will have an angle.  So, it's a dynamic
7  environment on the water, and this all has to be
8  taken into account when you're doing these
9  calculations.
10    Q:    Okay, I appreciate that explanation.  I
11  just wanted to understand what was the one and what
12  was the four, but the one is the width of the
13  channel, and the four is the width of the vessel in
14  a general sense?
15    A:    The one is the beam of the vessel.
16    Q:    I apologize.  Thank you.
17    A:    And four is the width of the channel,
18  and that's, again, it's subjective.
19    Q:    Okay.  Great.
20          I wanted to also ask you some questions
21  about a couple of things that appear in this
22  section of your report called Documents Review, it

Page 173

1  looks like it starts on page eight.
2          On page nine, Mr. Nanavati asked you
3  about the bullet point that's in about the middle
4  that says, USCG Recordings, and I know you
5  ultimately said that what you meant there was USCG
6  records, which I think were described as
7  information that was received from the Coast Guard,
8  and I just want to understand what information was
9  received from the Coast Guard that you reviewed?
10    A:    From the Coast Guard?  I'm talking
11  about like the 2692 report.
12    Q:    Okay, do you have any memory that there
13  was anything other than the 2692 reports from the
14  Coast Guard that you reviewed that would fit within
15  that USCG records entry?
16    A:    At this point, there's, I think, close
17  to 1,800 pages of documents.  That's what I recall.
18    Q:    Yeah, no, I get that.  I'm just trying
19  to understand whether, I don't know, somehow Carver
20  was able to obtain information from the Coast Guard
21  that you considered, and I've heard you say the
22  2692 reports, but like, I don't know what there

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 174

1   would be from the Coast Guard, a copy of their
2   investigation, their final report, anything like
3   that?
4       A:     No, no.
5       Q:     Okay, as far as I know, they're still
6   doing their investigation.  And if somebody else
7   knows differently, I'm very keen to find that out,
8   but that's not something that you reviewed?
9       A:     No.
10      Q:     Okay.  On page 10, there's a bullet
11  entry.  One, two, three, the sixth one down, it
12  says T-Mobile Phone Records, Morrissey.
13             What is that?
14      A:     I think I reviewed his phone records to
15  see if he was texting or anything.
16      Q:     Okay.  And did you find any indication
17  that he was?
18      A:     No.
19      Q:     How did you know they were T-Mobile
20  Phone Records?
21      A:     Again, there's close to 1,800
22  documents, and I recall looking at them, and if I

Page 175

1   recall, it had T-Mobile on the document.
2       Q:     Okay, did you actually see text
3   messages in those records?
4       A:     They're just a phone record itself, the
5   calls made.
6       Q:     Okay.  And then on page 11, the fourth
7   entry there, witness interviews, Baldessari and J.
8   Morrissey.  And I know you were asked some
9   questions about this already, but as witness
10  interviews, was there like a, I don't know, a
11  question, and then and answer type format?
12      A:     No, not to my knowledge, no.  It was
13  their statements, if you will, the interview
14  statements.
15      Q:     So, who interviewed them?
16      A:     Should have probably put statements,
17  not interviews.  They would have the depositions,
18  but that's obviously different.
19      Q:     Okay, so your recollection is what
20  you're referring to there, some type of statement
21  that Mr. Baldessari and the two Morrisseys made?
22      A:     Yes.  Again, there's 1,800 pages of

Page 176

1   documents, so yeah.
2       Q:     Do you recall whether they were
3   handwritten or typed?
4       A:     If I recall, these two were typed.
5       Q:     Were they signed?
6       A:     I don't recall.
7       Q:     Sam, I'm going to try to share my
8   screen here.
9              Can you see a handwritten statement on
10  your screen?
11      A:     Yes.
12      Q:     Okay.  This was marked as Exhibit 17 in
13  Mr. Moore's deposition.  I know you've referred to
14  having read the depositions of several people,
15  including Mr. Moore.
16             Did you receive the exhibits with the
17  deposition transcripts, or just the deposition
18  testimony?
19      A:     I received the exhibits.
20      Q:     Do you recall seeing this exhibit?
21      A:     I have seen that, yes.  I don't recall
22  if it was an exhibit or if I saw it when it was not

Page 177

1   an exhibit.  I don't recall that.
2       Q:     Okay.  And so when you refer on page 11
3   to, it says, Witness interviews, Baldessari and J.
4   Morrissey, is this one of the documents that you're
5   referring to?
6       A:     No.
7       Q:     It's not.  Okay.  Let me go to the next
8   page of this exhibit and ask you, is this one of
9   the documents that you're referring to in that
10  fourth bullet on page 11?
11      A:     Like I said, there were 1,800 pages and
12  that may have been one of them.
13      Q:     I'm just trying to understand kind of
14  what you had access to.  That's all.
15      A:     I have read that, yes.  That's your
16  question.  Yes, I have reviewed that.
17      Q:     Okay.  And is it your understanding
18  that this is Captain Morrissey's statement post
19  that incident?
20      A:     That's what it has, Captain James
21  Morrissey, at the bottom.
22      Q:     Okay, so in the context of the bullet

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

---

Page 178

1  number four on page 11, is this what you're
2  referring to or do you think there's something else
3  that constitutes whatever J. Morrissey may have
4  said about the incident?
5      A:     **That was one of the statements I was**
6  **referring to.**
7          MR. RODGERS:  Are you marking that,
8  Jim?
9          MR. CHAPMAN:  It's been previously
10 marked as Exhibit 17 to Mr. Morris's deposition on
11 April 28th.  I don't see any purpose in marking it,
12 but we will provide a copy to the court reporter so
13 that it can be included in this transcript.
14         MR. RODGERS:  Can you just keep it
15 available for follow-up?
16         MR. CHAPMAN:  Sure.
17         MR. RODGERS:  Can you just keep it
18 available?
19         MR. CHAPMAN:  Yes.  I'm sorry if you
20 didn't hear me, but I said yes, sure.
21         I would like to take a brief recess.  I
22 think we've been going close to an hour anyway.

---

Page 179

1  So, why don't we take a 10-minute recess just to
2  see if you have any additional questions, Sam, and
3  then we can go back on the record, and if not,
4  Mr. Rogers has any questions he can ask them.
5          THE VIDEOGRAPHER:  Counselors, we're
6  going off the record.  The time is 2:43.
7          (WHEREUPON, A BRIEF RECESS WAS TAKEN.)
8          THE VIDEOGRAPHER:  Counselors,
9  gentlemen, witness, we're going back on the record.
10 The time is 2:58.
11         Please proceed.
12         BY MR. CHAPMAN:
13     Q:     Sam, if you could take a look at your
14 report, again, Exhibit 1.  I want to ask you about
15 the kind of the final piece of it, starting on page
16 65 at the bottom where it says, Rebuttal report on
17 Simrad autopilot installed on the Tug Mackenzie
18 Rose.
19     A:     **Yes, I see that.**
20     Q:     There's a couple of pages with some
21 images in it right after it, and just the very last
22 thing it says, the last sentence says, Furthermore,

---

Page 180

1  he did not carry out a vessel inspection to inspect
2  the autopilot.
3          And as I understand it, you were able
4  to go aboard the vessel sometime in the last couple
5  of weeks, correct?
6      A:     **I went aboard the vessel, yes, for an**
7  **inspection.**
8      Q:     Yeah, and you looked at the autopilot,
9  right?
10     A:     **Yes.**
11     Q:     I think there's a couple of photos in
12 your report, at least showing what it looks like in
13 the upper wheelhouse, correct?
14     A:     **I put some photos in from the upper**
15 **wheelhouse.  That's correct.**
16     Q:     Yeah, so what did you learn from your
17 inspection of the autopilot that bears on your
18 opinions in this case?
19     A:     **Went over the changeover procedures**
20 **from autopilot to the NFU steering.**
21     Q:     To see that you could do that?
22     A:     **So, I make sure I understood the proper**

---

Page 181

1  **procedure for doing it, and also to determine the**
2  **visibility up on the upper wheelhouse for the**
3  **barge, even though you could, just looking at the**
4  **photos, you could tell the visibility was very good**
5  **from up there, and it was.**
6      Q:     Yeah, okay.
7          So, I want to just understand in terms
8  of the inspection of the autopilot, was the vessel
9  underway when you inspected the autopilot?
10     A:     **The vessel was at the dock.**
11     Q:     Okay, so were you able to operate the
12 autopilot system while it was underway?
13     A:     **I did not go underway on the vessel.**
14     Q:     Okay, so you took those photos of the
15 autopilot system in the upper wheelhouse, right?
16     A:     **That's correct.  Yeah, I took those**
17 **photos, yes.**
18     Q:     And did you do anything else as part of
19 the inspection of the autopilot?
20     A:     **I looked at the autopilots, and I went**
21 **through looking at some of the different screens on**
22 **the autopilot, and that was about it.**

---

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 182

1    Q:    So, you turned the autopilot on, or
2    somebody turned it on?

3        A:    Yeah.

4    Q:    And when you say you went through the
5    screens, different screens on the autopilot, can
6    you tell us what you looked at?

7        A:    Yeah, I was going, the mates were
8    explaining to me, excuse me, the port captain and
9    the captain were explaining to me the various ways
10   the autopilot works.

11   Q:    So, you got some information directly
12   from them about the operation of the autopilot, is
13   that right?

14       A:    Yes.

15   Q:    Have you ever used a Simrad system?

16       A:    You're asking me a question I don't
17   know.  I can't answer that.  I have been on, like I
18   said, thousands of ships and vessels, tugboats, in
19   and out of Port Everglades.

20            I don't know what system they have.
21   It's not something I normally look at.

22   Q:    Gotcha.  It's just something you just

Page 183

1    wouldn't normally pay attention to, other than it
2    has an autopilot system?

3        A:    Correct.

4    Q:    Okay, anything else you learned from
5    the inspection of the autopilot, did you have
6    anything?

7        A:    They had the manuals.  I went through
8    the manuals.  They showed me where the manual was
9    down in the lower wheelhouse.

10            I looked at the autopilot in the lower
11   wheelhouse, which was the same as the autopilot in
12   the upper wheelhouse.

13   Q:    Is the only one that you turned on and
14   kind of went through those screens the one that was
15   in the upper wheelhouse?

16       A:    Yes.

17   Q:    Did you ask for a photocopy of the
18   Simrad manual?

19       A:    Not a photocopy, no, but I have a copy
20   here.

21   Q:    Okay, you obtained a copy of it in
22   connection with your work in this matter?

Page 184

1        A:    Yes, that's correct.  It was sent to
2    me.

3    Q:    Okay.  I saw it was listed as one of
4    the items that you had reviewed, right?

5        A:    Yes.

6    Q:    So, if I understand the response you
7    had to Mr. Furborough's opinion about the autopilot
8    on the Mackenzie Rose, number one, you point out
9    that there is some indication from this record,
10   this screen shot, that Morrisey has presumably
11   reported to Captain Miller that the autopilot was
12   not completely turned off, is that correct?

13       A:    Yeah, it says right here, Mate James
14   Morrisey reports autopilot was not completely
15   turned off.  He was able to correct and switch back
16   over to hand steering.

17   Q:    And then a second, there's a reference
18   to a 2692 form that was submitted on June 25th,
19   2024, that says the OOW had failed to properly
20   switch to hand steering, correct?

21       A:    Yes, that's correct.

22   Q:    Okay.

Page 185

1        A:    And that would be James Morrissey.

2    Q:    All right, and those are the only
3    things that you point to in rebuttal to
4    Mr. Furborough's opinion, correct?

5        A:    Yes.  In addition, in this one, yes.

6    Q:    On page 21 of your report, it's in the
7    very first paragraph, it talks about findings of a
8    survey of other tug and barge operators in which
9    you talked with captains and shoreside personnel,
10   as well as your own experience as a harbor pilot in
11   Port Everglades.  And the last sentence looks like
12   it referenced to several companies.

13            And I just want to understand, did you
14   talk to an individual that you understood to be
15   employed by each of those companies?

16       A:    Yes.

17   Q:    Did you talk to them?

18       A:    It was either a captain on the vessel
19   or shoreside personnel.

20   Q:    Okay.  And were any of them captains on
21   vessels that operate in the Port of Hampton Roads?

22       A:    That I cannot tell you.  These vessels,

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 186

1  a lot of them go up and down the East Coast.  And
2  the companies like Moran, I think you'll find that
3  up there, they are not local companies, but they're
4  more East Coast companies, which go from one port
5  to another on the US East Coast.
6      Q:    Gotcha.
7            Did you talk to a guy named Ken Flowers
8  with Moran?
9      A:    It's possible.
10     Q:    Do you have a list of the people that
11 you actually spoke with at each of these companies?
12     A:    I know some of them.  The captains, I
13 don't know.  Overall, no, I don't.  It was just
14 when I'm on board the ships with the captain.
15           When we get on the ships coming in, you
16 see, it's a one-man watch on the bridge, and it's
17 the same thing outbound and working with the tugs.
18 We go up there, it's a one-man watch on the bridges
19 of when the tugs are on port.  It doesn't matter.
20           They have one person.  And when you
21 look at the setup on the upper wheelhouse of these
22 tugs, if they have an upper wheelhouse, it is so

Page 187

1  small up there.  There's one chair for the, I'll
2  say the navigator or the officer on watch.  And
3  they may have a small stool or something up there
4  for a pilot when he's on board.
5      Q:    I just want to kind of understand this.
6  I was under the impression that the listing of
7  these companies were folks that you had reached out
8  to, to interview or survey, as you say you did.
9            Am I not understanding that correctly?
10     A:    That's correct.  I talked to some of
11 the tugboat captains, and also some of the
12 companies there, yes, where I asked them, do you
13 have a one-man watch on board these vessels?
14     Q:    This was outreach that you made to
15 somebody at each of these companies to ask them
16 that question?
17     A:    Correct, yes.
18     Q:    Did you have a set of questions that
19 you asked each company?
20     A:    No, it was more when I was on board the
21 ship, when I'm bringing it into the channel or
22 outbound, I'll just start asking questions and talk

Page 188

1  to them.  It's normally, the inbound is close to an
2  hour and a half.  Voyage outbound might be 40, 50
3  minutes.
4            So, I was talking to the captains on
5  board the vessel.  And then, I know what their
6  standard operating procedures are also, because I'm
7  on board, the tug and barge is coming into Port
8  Everglades on a regular basis.  It's standard for
9  us to be on them.
10     Q:    So, McAllister and Moran, both are in
11 the tugboat business, right?
12     A:    Yes.
13     Q:    And I presume by its name, Bisseau is
14 also in the tugboat business, right?
15     A:    Yes.
16     Q:    Is the same true of Dan Marine?
17     A:    Yes.
18     Q:    And OSG?
19     A:    Yes.
20     Q:    Is that an acronym for a company name?
21     A:    Overseas Shipholding Group.
22     Q:    Okay.

Page 189

1      A:    They have the tugs, the large tugs,
2  they're called ATBs, but they're articulated tug
3  barges.
4      Q:    All right, and then you list Gulf
5  Oceanic Marine?
6      A:    Yes.
7      Q:    Was it a tug operator?
8      A:    Yes.
9      Q:    And then last, Shoreline Sightseeing?
10     A:    Yes.  That was from -- I was just in
11 Chicago last week and there was a tugboat pushing a
12 barge around with several hundred people.  It was a
13 pretty good-sized tugboat.
14           And I talked to one of their captains
15 and asked if that, and that place went through
16 bridges, you know, how many bridges within a
17 two-hour tour.  And there was a lot of small boat
18 traffic.  And I talked to the captain there and
19 asked, is this a four-man bridge operation?
20           He goes, yes, it is.  That's what the
21 Coast Guard, the COI requires.  It's a one-man
22 bridge operation.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

Page 190

1   Q:   Does the COI for the Mackenzie Rose
2   specify that it's a one-man bridge operation?
3   **A:   You will not find that on the COI.  It**
4   **will not specify.**
5   Q:   Got it.  So, all of these interviews,
6   it sounds like while you were working as a Port
7   Everglades Harbor pilot and had access to talk to
8   somebody about their operations, or in this other
9   instance up in Chicago, you happened to be on a
10   vessel and had the opportunity to make inquiry
11   about their operations.
12      Is that fair?
13   **A:   That's correct, and I also talked to**
14   **Moran Towing.**
15   Q:   So, you actually reached out to Moran?
16   **A:   Yes.**
17   Q:   Who did you talk to at Moran?
18   **A:   I don't recall.**
19   Q:   Did you record your answers anywhere or
20   the subject of your interviews with these folks?
21   **A:   No, because like I said, I'm on these**
22   **vessels on a regular basis to tug embargoes.  I**

Page 191

1   already know what their procedures are coming into
2   the ports.  And no, I did not because each time I
3   asked, they gave me the same answer.
4   **It's a one-man bridge operation.  And**
5   **that's what I've observed for close to 19 years**
6   **now, so I didn't see any reason to record anything.**
7   Q:   On page 28 of your report, the second
8   full paragraph says, In Port Everglades autopilot
9   is used for ships, tugs, and barges, and mega
10   yachts, et cetera.  And at the end of that
11   paragraph, it says I surveyed pilots from New York,
12   Philadelphia, Jacksonville, Mississippi River, and
13   Galveston.
14      Is that separate and apart from the
15   interviews you had that you just told us about
16   relative to the one-man bridge operations?
17   **A:   Yes.**
18   Q:   Okay, so when did you do this survey?
19   **A:   I called the pilots on the phone maybe**
20   **a month ago.  I don't recall exactly.**
21   Q:   So, this was contacting the pilot's
22   associations in each of those ports?

Page 192

1   **A:   Yes.**
2   Q:   I'm sorry.
3   **A:   And talking to a pilot.**
4   Q:   And do you have a record that you kept
5   of the conversations in that survey?
6   **A:   No, I know the pilots individually.  I**
7   **just called them up.**
8   **I know them through the American Pilot**
9   **Association.**
10   Q:   All right, did you talk to anyone in
11   Norfolk?
12   **A:   No.**
13   Q:   Do you know any pilots in Norfolk?
14   **A:   No, I tried to.  I was looking for**
15   **that, some pilots I would know, and there were none**
16   **that I knew in Norfolk.**
17      MR. CHAPMAN:  I don't have any further
18   questions for you.  Thanks for your patience.  I
19   don't know if Mr. Rogers has any follow-up, but
20   we'll stand by.
21      MR. RODGERS:  I do.
22

Page 193

1      EXAMINATION
2      BY MR. RODGERS:
3   Q:   Good afternoon, Captain.
4   **A:   Good afternoon.**
5   Q:   You may recall earlier you were asked
6   by counsel about repairs done prior to the incident
7   to the autopilot.
8      Do you remember that?
9   **A:   Yes.**
10   Q:   And do you remember being given
11   invoices to review from a company called Ayres,
12   A-Y-E-R-S?
13   **A:   I remember reviewing the invoices, yes.**
14   Q:   Do you remember that they had come on
15   board sometime in April of 2024?
16   **A:   I recall the invoices from Ayers doing**
17   **the repair on the autopilot.  I do recall that,**
18   **yes.**
19   Q:   Okay, so you reviewed all the
20   information that both parties have regarding the
21   history of the repairs, correct?
22   **A:   That is correct, yes.**

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 194

1          MR. CHAPMAN:  Object to form.

2     Q:     And you also reviewed all the logs with

3 any issue with steering, correct?

4     **A:     Yes, I did.**

5     Q:     Now, ultimately you concluded that it

6 was not the autopilot itself mechanically, it was

7 something that Mr. Morrissey had done, correct?

8     **A:     Yes, it was.**

9          MR. CHAPMAN:  Excuse me.  Let me just

10 note my objection to the form.

11     Q:     You were asked about the January 2024

12 incident with the pier, correct?

13     **A:     Yes, I was.**

14     Q:     Based on those documents, based on what

15 you had, Carver had reported it to the Coast Guard,

16 correct?

17     **A:     Yes, they filled out a 2692 form.**

18     Q:     And based on what you reviewed, there

19 were no documents memorializing any kind of

20 investigation by the Coast Guard, correct?  On what

21 you reviewed, is that correct?

22     **A:     From the evidence where the documents I**

Page 195

1 **reviewed, they did the 2692 form, and no action had**

2 **been taken on his license.**

3     Q:     Okay.  You were asked about your

4 experience.

5          Currently, not currently, but the last

6 19 years, you've been piloting tugs and barges,

7 correct?

8     **A:     Yes.**

9     Q:     And do you know how many, approximately

10 how many times you've done that?

11     **A:     No.  I guess, it's probably -- it's a**

12 **real rough estimate.  It's probably 400, 500, 600,**

13 **somewhere there.**

14     Q:     Okay.

15          You're very familiar with tugs and

16 barges coming into port, correct?

17     **A:     Yes, I am in Port Everglades.  Yes.**

18     Q:     Jim, do you mind bringing up the

19 Exhibit 17 that you showed them?

20          MR. CHAPMAN:  Yeah, let me pull it up.

21          Do you see it?

22          MR. RODGERS:  Yes.

Page 196

1     Q:     Captain Stephenson, do you see that?

2     **A:     Yes.**

3     Q:     It doesn't have a name on who wrote it,

4 correct?

5     **A:     Correct.**

6     Q:     That is consistent with the initial

7 story, correct, that came from Mr. Morrissey, the

8 one he told Captain Miller, is that correct?

9          MR. CHAPMAN:  Objection to the form.

10     **A:     Yes.  Based on the information I have**

11 **viewed, yes.**

12     Q:     And is it your understanding that that

13 set of facts is what was initially relayed to

14 Carver from Captain Miller?

15          MR. CHAPMAN:  Objection to the form.

16     **A:     Yes.**

17     Q:     And Captain Miller, from your review of

18 all the records, he did not witness the incident,

19 correct?

20     **A:     No.  He was, according to his**

21 **deposition, he was down below.**

22     Q:     And the other crew members did not

Page 197

1 witness the incident, correct?

2     **A:     Correct.  They were down below also.**

3     Q:     Is it fair to say that the only person

4 who witnessed the incident was Mate Morrissey?

5          MR. CHAPMAN:  Objection to the form.

6     **A:     Based on the documents I have reviewed,**

7 **yes.**

8     Q:     And from what you've reviewed, did Mate

9 Morrissey eventually make a statement at an

10 interview or a hearing before the Coast Guard?

11     **A:     From what I have reviewed, the**

12 **statement would be -- well, we have the 2692 form,**

13 **and then we have the text message.**

14     Q:     Okay.  But you understand -- just what

15 is your understanding --

16          You understand that ultimately Mate

17 Morrissey was interviewed by the Coast Guard,

18 correct?

19     **A:     Yes.  Based on the text message.**

20     Q:     And is it your understanding that the

21 amended 2692 of June 25, 2024, reflected that

22 testimony or interview?

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 198

1           MR. CHAPMAN:  Objection to the form.
2     A:    Yes.
3     Q:    And that was a different story than
4   what he had told Captain Miller to your
5   understanding, correct?
6           MR. CHAPMAN:  Objection to the form.
7     A:    **The story was completely different on**
8   **the second 2692 form.**
9     Q:    Now, you also, you understand that this
10  office has subpoenaed the Coast Guard for that
11  transcript, correct?
12    A:    Yes.
13    Q:    And also, that this office has
14  subpoenaed the NTSB for that transcript, correct?
15    A:    Yes.
16    Q:    Are you holding your -- well, scratch
17  that.
18          Do you weigh -- excuse me, do you
19  reserve the right to amend this report once you see
20  the transcript?
21    A:    Yes.
22    Q:    Jim, do you have the actual 2692?

Page 199

1           MR. CHAPMAN:  I don't have it available
2   immediately.
3           MR. RODGERS:  Oh, sorry.  It's in his
4   report.  I apologize.  I knew I saw it.
5           MR. CHAPMAN:  Are we done with this?
6           MR. RODGERS:  Yeah, yeah.
7     Q:    If you look at the screenshot that you
8   put on page 34 of your report.
9     A:    **Okay.**
10    Q:    Do you understand that to be part of
11  the amended 2692?
12    A:    **Yes.  That's the second 2692.**
13    Q:    And do you understand that was
14  submitted by Carver on June 25th, 2024.
15          Is that correct?
16    A:    **That is correct.**
17    Q:    And that's 10 days after the incident,
18  correct?
19    A:    **Yes.**
20    Q:    You can find the text messages that we
21  were referring to in your report.  Do you have
22  those on the page?

Page 200

1     A:    **I didn't understand that.**
2     Q:    The text messages that you referred to
3   in the report, do you know what page they were on?
4           I think I found them.
5     A:    **Page 40?**
6     Q:    Okay, 40?
7     A:    **On page 52 and 53.**
8     Q:    Well, getting away from those, is the
9   2692, the amended one, is that consistent -- those
10  facts consistent with the facts that you relied on
11  for your conclusions?
12          MR. CHAPMAN:  Object to the form.
13    A:    **Yes.**
14    Q:    Okay, could you go to your conclusions
15  on page 34?  Can you just read one through five?
16    A:    **My conclusions, within the bounds of**
17  **reasonable operation maritime certainty, it is my**
18  **opinion that one, the Mackenzie Rose was properly**
19  **manned, the crew is licensed by the US Coast Guard**
20  **in compliance with work rest requirements of six**
21  **hours on, six hours off.**
22          **Two, the watch officer acting as looked**

Page 201

1   **at was appropriate under the prevailing conditions.**
2           **Three, autopilot is not prohibited for**
3   **use while transiting a waterway with bridges.**
4           **Four, the evidence clearly establishes**
5   **that Mate Morrissey's initial statement the**
6   **autopilot malfunctioned was false.**
7           **Five, Mate Morrissey failed to engage**
8   **the switch from auto to NFU when he thought he did.**
9   **This failure by Mate Morrissey and his lack of**
10  **situational awareness was the sole cause of the**
11  **allision.**
12    Q:    Thank you.  Just getting to, just want
13  to make sure we're clear.
14          You inspected the tug on July 28, 2025,
15  correct?
16    A:    **I would have to check the data on that,**
17  **but yes, I did inspect the tug.**
18    Q:    Was Captain Lewis at the inspection?
19    A:    **No, he was not.  It was July 28, 2025.**
20  **Yes.**
21    Q:    Say what?
22    A:    **The date was July 28th, 2025.**

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 202

1    Q:    Okay.  And you inspected it in New
2  York, correct?
3    **A:    Yes.**
4    Q:    And Captain Lewis was not there?
5    **A:    He was not there.**
6    Q:    Now, I want you to read on page 17, you
7  were talking to Mr. Chapman about your survey, and
8  that was your own personal conversations with
9  employees or representatives of certain tug
10  companies, correct?
11    **A:    Yes.**
12    Q:    And could you read the tug companies
13  that you asked about one man bridge operations?
14    **A:    Yes, page -- what page did you have**
15  **that on?**
16    Q:    Seven and then leading into eight,
17  mostly seven.
18    **A:    Yeah, the tug companies which I**
19  **contacted with regards to one man bridge operations**
20  **was McAllister Tugs, ESO Towing, Tow Boat, Dan**
21  **Marine Towing, OSG, Gulf Oceanic Marine, Moran,**
22  **Shoreline Sighting.**

Page 203

1    Q:    Okay.  And that, what you call survey
2  was in -- that was in addition to the CFR and the
3  SMS of Carver that allows one man bridge operations
4  depending on certain conditions, correct?
5         MR. CHAPMAN:  Object to the form.
6    **A:    Yeah, that's correct.  And that's**
7  **customary in the industry just to have a one-man**
8  **bridge on a tug and barge.**
9    Q:    In your review of -- you reviewed
10  Captain Lewis's report?
11    **A:    Yes.**
12    Q:    In your review of his report, did he do
13  any kind of a similar survey?
14    **A:    Based on what I have reviewed, no, he**
15  **did not.**
16    Q:    Okay.  And then based on the, on the
17  CFR and, and the SMS, the tugs and barges can
18  navigate rivers and water, waterways using
19  autopilots when conditions are appropriate.
20         Is that one of your conclusions?
21         MR. CHAPMAN:  Object to the form.
22    **A:    Yeah.**

Page 204

1    Q:    And you then conducted a survey of
2  pilot associations, correct?
3    **A:    Yes.**
4    Q:    Okay.  That was in addition to what
5  your assessment is on what can be done and what
6  cannot be done, correct?
7    **A:    Correct.  And also, based on my**
8  **personal experience.**
9    Q:    Okay, could you just go to page eight
10  and tell us which associations that you surveyed
11  for this case?
12    **A:    Sandy Hook Pilot Association, New York,**
13  **American Harbor and Docking Pilot Association,**
14  **Philadelphia, St.  John's Bar Pilot Association,**
15  **Jacksonville, Crescent River Pilot Association,**
16  **Mississippi River, Galveston Pilots, Galveston and**
17  **Port Everglades Pilot Association, Fort Lauderdale.**
18    Q:    And the documents reviewed, did that
19  include, to your knowledge, transcripts of the
20  depositions taken in this case?
21    **A:    Yes.**
22    Q:    Other than the damage depositions,

Page 205

1  correct?  Like the engineers dealing with the
2  damaged bridge, right, you didn't look at that?
3    **A:    No, I did not.**
4    Q:    And did the reading the depositions of
5  Jarkeis, Morrissey, Sharif Porter, Eric Warlordy,
6  Leonard Baldessari, Brian Moore, Alex O'Rourke,
7  Jason McGrath, Nicholas Larraway, did those -- did
8  reading those transcripts -- was that part of how
9  you arrived at your conclusions?
10    **A:    Yes.**
11    Q:    And then, you were provided with the
12  vessels, logs that were made a part of this
13  lawsuit, correct?
14    **A:    Yes.**
15    Q:    Were those logs part of educating you
16  as to the facts in this case, so you could make
17  conclusions?
18    **A:    Yes.**
19    Q:    And you also looked at various
20  third-party repair invoices to the autopilot prior
21  to the incident, correct?
22    **A:    Yes, that's correct.**

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

Page 206

1    Q:    Just for the record, again, the two
2    what appear to be typos, you've already testified,
3    the front page is June 8th, that's a typo, it's
4    supposed to be August 8th?
5    **A:    Yes, that was a typo I made.**
6    Q:    And that's the date of your report,
7    correct?
8    **A:    Yes.**
9    Q:    And if you go to page 35, that's the
10   date of your signature, correct?
11   **A:    That's correct, yes.**
12   Q:    August 8, 2025, right?
13   **A:    Yes.**
14   Q:    And you also changed the typo, I don't
15   know what page, but you changed, you had put in 10
16   hours, you meant 14?
17   **A:    That was page 18.  I had 10, and the**
18   **correct number was 14 hours a day.**
19   Q:    And if you could go to page 21 and 22,
20   where you have a CFR 46, CFR 140.630, look out, do
21   you see that?
22   **A:    I do.**

Page 207

1    Q:    And did you base your opinions at least
2    in part with that CFR provision?
3    **A:    Yes.**
4    Q:    And then, if you go to page 22, the
5    safety management system, section 7.16, which I
6    think leads into page 23, do you see that?
7    **A:    Yes, I do.**
8    Q:    Are your conclusions based in part by
9    that TSMS provision regarding look out?
10   **A:    Yes.**
11   Q:    And if you go to page 24, the one-man
12   bridge operations, is that a quote from the TSMS of
13   what we call SMS of Carver?
14   **A:    That is correct, yes.**
15   Q:    And to your -- is that based on a CFR
16   provision to your knowledge?
17          MR. CHAPMAN:  Object to the form.
18   **A:    To my knowledge, no.**
19   Q:    And where is that -- what is that based
20   on?
21   **A:    It was in the Carver's manual and says**
22   **Senate report end period 96-979, 96 Congress,**

Page 208

1    second session 1980 at 7-8.
2    Q:    Okay.
3          In part, did your conclusions rely on
4    that section?
5    **A:    Yes.**
6    Q:    And page 25, you cite 33 CFR 83.05 look
7    out rule five.
8          Do you see that?
9    **A:    Yes.**
10   Q:    And 46 CFR section 140.630 look out,
11   correct?
12   **A:    Yes.**
13   Q:    Is it -- was Carver's policy consistent
14   with those regulations?
15          MR. CHAPMAN:  Object to the form.
16   Q:    You can answer.
17   **A:    Yes, they were consistent, very**
18   **consistent with the regulations.**
19   Q:    And was a review of those regulations
20   and Carver's operations from what materials you
21   were given?  Did form at least in part the basis of
22   your conclusions?

Page 209

1    **A:    Yes, those are my conclusions, yes.**
2    Q:    And if you go to 26, you cited 46
3    section 140.670 of the CFR use of autopilot.
4    **A:    Yes.**
5    Q:    And are your conclusions based in part
6    by a review of that CFR provision?
7    **A:    A review of the CFR positions, the CFR,**
8    **and also the way the barge was manned by Mate**
9    **Morrissey who had all the proper credentials for**
10   **using the autopilot.**
11   Q:    Thank you.
12          Now, in page 28, where you say, I
13   surveyed pilots.  Is that just -- is that a repeat
14   of what you earlier had written?
15   **A:    It is a repeat, yes.  Just it's being**
16   **reiterated a second time there, pilots, which were**
17   **surveyed.**
18          MR. RODGERS:  Okay.  I have no further
19   questions.  No further follow-up questions.
20          Thank you, Captain, for your help and
21   your, your assistance at this deposition.  I don't
22   know if there's follow-up from counsel or not.

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

---

**Page 210**

1          Are we done?

2          THE VIDEOGRAPHER:  Madam [sic] court

3    reporter, do you have anything to add for the

4    record?

5          THE COURT REPORTER:  No.

6          THE VIDEOGRAPHER:  Counselors, does

7    anybody want the video sync to their transcript?

8          Any of the counselors?

9          MR. RODGERS:  Go ahead.

10          THE VIDEOGRAPHER:  If not, we'll just

11   archive it.

12          MR. RODGERS:  I do need a rough draft

13   if I can get one.

14          THE COURT REPORTER:  Sure.  Yeah, I can

15   do a rough draft for you.  How quickly do you need

16   that; ASAP?

17          MR. RODGERS:  Tonight but tomorrow

18   might do.

19          THE COURT REPORTER:  Okay.  And does

20   anybody else want a copy of this?

21          MR. CHAPMAN:  I mean, we're ordering a

22   copy.  Yes.

---

**Page 211**

1          MR. RODGERS:  Same.  Yeah, we're

2    ordering a regular copy, and then the rough draft

3    as well.

4          THE COURT REPORTER:  Okay.

5          MR. RODGERS:  Are we done?

6          THE VIDEOGRAPHER:  Counselors, we're

7    going off the record.  The time is 3:41.

8          (WHEREUPON, THE DEPOSITION WAS

9    CONCLUDED AT 3:41 P.M.)

10          (SIGNATURE NOT WAIVED.)

11          (EXHIBITS RETAINED.)

12

13

14

15

16

17

18

19

20

21

22

---

**Page 212**

1      -  CERTIFICATE OF NOTARY  -

2

3          I, GARRETT LORMAN, Notary Public,

4    before whom the foregoing testimony was taken, do

5    hereby certify that the witness was duly sworn by

6    me; that said testimony is a true record of the

7    testimony given by said witness; that I am neither

8    counsel for, related to, nor employed by any of the

9    parties to this action, nor financially or

10   otherwise interested in the outcome of the action;

11   and that the testimony was reduced to typewriting

12   by me or under my direction.

13          This certification is expressly

14   withdrawn upon the disassembly or photocopying of

15   the foregoing transcript, including exhibits,

16   unless disassembly or photocopying is done under

17   the auspices of Olender Reporting, Inc*, and the

18   signature and original seal is attached thereto.

19   Dated: 08/25/2025

20   _____

                              *Garrett Lorman*

21          GARRETT LORMAN, Notary Public

22

---

**Page 213**

1              Errata Sheet

2    NAME OF CASE:     In the Matter of Coeymans Marine Towing, LLC

3    DATE OF DEPOSITION: 08/11/2025

4    NAME OF WITNESS:   Captain Samuel Stephenson, J.D.

5    Reason Codes:  1. To clarify the record.

6                   2. To conform to the facts.

7                   3. To correct transcription errors.

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24          _____

25          CAPTAIN SAMUEL STEPHENSON, J.D.

---

**CAPTAIN SAMUEL STEPHENSON, J.D.**

**August 11, 2025**

**Page 214**

```
1                    Errata Sheet
2    NAME OF CASE:      In the Matter of Coeymans Marine Towing, LLC
3    DATE OF DEPOSITION: 08/11/2025
4    NAME OF WITNESS:   Captain Samuel Stephenson, J.D.
5    Reason Codes:  1. To clarify the record.
6                   2. To conform to the facts.
7                   3. To correct transcription errors.
8    Page _____ Line _____ Reason _____
9    From _____ to _____
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
24                      _____
25                      CAPTAIN SAMUEL STEPHENSON, J.D.
```

**Page 215**

```
1    STATE OF _____)
2                             ) ss.
3    COUNTY OF _____)
4
5         I, CAPTAIN SAMUEL STEPHENSON, J.D., declare under penalty of
6    perjury that I have read the foregoing transcript, and
7    I have made any corrections, additions, or deletions
8    that I was desirous of making; that the foregoing is a
9    true and correct transcript of my testimony contained
10   therein.
11        EXECUTED this _____ day of _____,
12   20_____, at _____, _____.
                  (City)              (State)
13
14
15
16
17        _____
18             CAPTAIN SAMUEL STEPHENSON, J.D.
19
20
21
22
23
24
25
```

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

**1**

**1**
21:15,16 22:6
23:1,12 73:15
170:21 179:14

**1,000-foot-long**
141:16

**1,100-foot**
138:2

**1,800**
158:2 173:17
174:21 175:22
177:11

**1.9**
135:17

**10**
11:21 12:1,8,
13,18 13:1
14:15 26:16
44:17,19
63:12 77:7
111:12 127:12
129:14 174:10
199:17
206:15,17

**10-minute**
179:1

**100%**
8:2,3

**10:33**
5:9

**11**
5:8 51:11,18,
19 53:2 78:7
144:13 175:6
177:2,10
178:1

**11:08**
43:18

**11:23**
44:1

**11:24**
45:15

**11:39**
45:19

**11:55**
64:1

**12**
82:4,9,11,15
153:4

**120**
140:13 141:4

**125**
140:13 160:2

**125-foot**
140:19

**12:12**
64:5

**14**
26:18,20
126:3 206:16,
18

**140**
53:1,2

**140.630**
206:20 208:10

**140.670**
209:3

**144**
51:9,16 53:1

**14th**
24:11 127:7

**15**
43:12,15,16

**49:13 63:4**
84:18 85:21
92:19 101:6
108:10 148:12
152:22 157:20
165:17

**15th**
24:8,20 25:2,
6,11,16 29:1
42:1 47:2,12
49:20 53:18
54:12 55:2
58:9,13,19
72:5,16 73:1
77:17 127:2,7
150:13

**16**
88:9,10

**17**
92:7 176:12
178:10 195:19
202:6

**17th**
19:21 20:7,12
159:2

**18**
26:13 206:17

**180-foot**
138:5 140:6,9,
17,18

**1800**
81:18

**19**
95:22 191:5
195:6

**1980**
208:1

**1990**
169:14,18

**1:17**
129:22

**1:48**
130:4

**2**

**2.1**
125:6

**2.3**
125:8

**20**
129:9,17

**200**
138:4

**2000**
50:3 169:16

**2013**
170:5

**2023**
47:11

**2024**
24:8,11,20
25:2,6,11,16
29:2 42:2
47:2,13 48:2
49:14,20
53:18 54:12
55:2 58:9,19
72:5,16 73:1
77:17 78:9
84:18 92:19
101:6 108:11
126:3 127:2
148:12 150:13
152:22 156:8
157:8,20
184:19 193:15
194:11 197:21
199:14

**2025**
5:8 22:11
201:14,19,22
206:12

**21**
156:8 157:8
185:6 206:19

**22**
103:16 206:19
207:4

**23**
47:7 108:2,4
207:6

**24**
61:2,9 114:16
207:11

**25**
10:18 11:18
197:21 208:6

**25th**
184:18 199:14

**26**
114:18 209:2

**2682**
58:17

**2692**
33:4 34:2
94:16 95:13
118:7,10,15
120:4 124:1
148:1 173:11,
13,22 184:18
194:17 195:1
197:12,21
198:8,22
199:11,12
200:9

**26A2**
9:14 37:4

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

64:14

**28**
11:6,8,10
117:5,17
164:17,21
191:7 201:14,
19 209:12

**28th**
178:11 201:22

**29**
123:14

**2:24-CV-00490**
5:7

**2:43**
179:6

**2:58**
179:10

---

**3**

---

**3,000**
160:19

**30**
120:16 124:15
129:7

**300-foot**
70:7 138:9

**31**
125:5

**33**
208:6

**330**
117:9

**34**
199:8 200:15

**35**
206:9

**360-degree**
55:6 97:18
112:22

**38**
130:16

**3:41**
211:7,9

---

**4**

---

**4.05-1**
145:2

**40**
134:2 188:2
200:5,6

**40-some**
21:3

**400**
195:12

**405-1**
144:19

**41**
137:5,9

**42**
139:16 171:1

**45**
129:7 143:9
144:19 145:2

**450**
139:18

**46**
206:20 208:10
209:2

---

**5**

---

**5.5**
32:19

**50**
138:7 188:2

**500**
139:19 195:12

**51**
144:8,12

**52**
200:7

**53**
200:7

**54**
153:3

**55**
138:10

---

**6**

---

**60**
161:12

**60-**
141:4

**600**
195:12

**63**
154:9

**65**
179:16

**67**
22:18

---

**7**

---

**7-8**
208:1

**7.16**
207:5

**70**
161:12 165:5

**70-foot**
141:4

**700**
138:7

---

**8**

---

**8**
206:12

**80**
75:6

**83.05**
208:6

**8th**
22:11 73:21,
22 74:4,10,15
206:3,4

---

**9**

---

**90%**
128:9

**96**
207:22

**96-979**
207:22

---

**A**

---

**A&m**
27:21

**A-L-L-I-S-I-O-N**
71:16

**A-Y-E-R-S**
193:12

**a.m.**
5:9

**ability**
99:4

**able**
11:14 35:10
98:14 100:3
112:19 113:1,
3,5,18 124:16
173:20 180:3
181:11 184:15

**aboard**
24:7,19 25:16
41:21 42:1
65:13 90:10
92:16 116:5
125:15 162:5,
8 180:4,6

**absolutely**
90:13

**academies**
66:7

**Academy**
27:16,21

**access**
177:14 190:7

**accessibility**
110:10

**accessible**
110:2

**accommodatio
n**
16:7

**according**
123:18 196:20

**account**
172:8

**accounts**
153:4

**accurate**
9:18,22 154:5,
8

**acronym**
188:20

**act**
135:22

**acting**
55:9,11
200:22

**action**
5:6 154:12,17,
22 155:6,10,
22 156:1,14
157:5 195:1

**active-duty**
169:5,9

**activities**
65:4

**activity**
67:15

**acts**
104:11

**actual**
126:7,19
127:5 198:22

**actually**
53:1 61:7
74:15 82:20
86:18 123:13
162:21 164:4
175:2 186:11
190:15

**add**
210:3

**added**
110:14 111:18
113:10,14,20

**addition**
137:9 185:5
203:2 204:4

**additional**
97:21 98:11
99:1 100:22
111:14 179:2

**addressed**
130:9,18

**administered**
61:1

**advice**
81:11 123:8

**advisor**
162:12,18

**advisory**
162:5

**after**
6:15 33:9
34:7,12,22
49:13 52:22
56:20 61:6
86:21 87:6,7
118:4 119:9
132:16,19,20
150:11,14
154:22 157:7,
18,20 160:15
169:15,17
179:21 199:17

**afternoon**
127:20 129:1
158:14,18
193:3,4

**afterwards**
121:15

**against**
51:11 154:12
155:6,22
156:1,14

**agree**
30:10 34:19

**52:21 58:6**
70:22 82:20
83:14 131:9
137:15 143:17
144:2,22
148:12 156:11
162:1

**ahead**
27:12 30:20,
21 69:2 91:22
94:7 116:7
127:21
132:10,13
157:12 210:9

**alcohol**
61:1,9 150:20

**Alex**
205:6

**allegation**
14:17 83:2

**allegations**
12:10,15

**alleged**
47:10 82:18,
22

**allegedly**
84:2,6,14
128:17

**allide**
82:20

**allided**
12:6 29:6
32:13,15 33:5
57:3 70:4
82:18

**allision**
13:19 14:15,
18,19 27:8,11
28:21 29:11,

**13,17 30:4,8**
32:4,11 33:1,
9,11,14 34:7,
9,12,18,22
35:5,9,17,20
36:1 38:13
41:10 47:13
48:2,6,8 55:1,
3 56:6,13,19,
20,21 57:7,20
58:8,19 59:2,4
61:3,6,10 68:2
71:15 73:12
77:17,22
78:10 83:2,7,
11,15,17
84:13,17
86:19,22 87:2,
7,17 90:15
92:12,19 96:8
103:6 110:20
132:16,19
144:18 145:2
148:12 152:22
157:21 201:11

**allisions**
11:19,21 12:2,
9,14 13:17
14:17 18:8
66:13,16,18
67:1 68:5
92:18

**allow**
166:5

**allowed**
17:21 37:20
42:17 44:15,
20

**allowing**
37:14 155:2

**allows**

**44:16 203:3**

**altered**
33:1

**ambiguous**
60:12

**amend**
198:19

**amended**
197:21 199:11
200:9

**American**
192:8 204:13

**amount**
135:21

**anchor**
14:6,8

**Angeles**
5:12

**angle**
136:2,11
172:6

**annex**
51:17

**answer**
8:9,14 14:22
25:12 30:21
37:22 44:8
46:18 49:12
50:15,19,20
51:3,5,20
53:20 59:6,7
67:12 72:12,
19 78:21 79:8,
14 80:3 83:16
91:7 94:5,7
95:6,19,20
102:15,22
105:22 107:20
109:14 119:2

122:18 127:1
135:16 145:19
151:16 152:7,
10 158:6
166:20 175:11
182:17 191:3
208:16

**answered**
60:17 65:20
86:16 105:17,
18 108:1
132:13
151:12,14,15,
19 152:5,6,9,
19 157:10,11

**answering**
8:10 61:22
69:1

**answers**
7:21 190:19

**anybody**
25:4,9 56:11
58:7 63:14
87:3 111:7
128:11 210:7,
20

**anyone**
58:12 192:10

**anything**
27:3,5,14
28:11 29:11
34:11 35:13
47:1,9,21
52:21 54:16
58:15 67:6
69:16 72:1
75:21 78:17
79:4,10,22
97:14 98:16
103:9,12
104:18 105:10

106:2 115:7,
12 139:6
154:20 157:7,
19 163:12
173:13 174:2,
15 181:18
183:4,6 191:6
210:3

**AP70**
143:12

**apologize**
72:13 171:10
172:16 199:4

**apparently**
149:2

**appear**
172:21 206:2

**applicable**
104:9

**apply**
143:20 144:6

**appraisal**
98:14 100:4
113:1,9,11

**appraising**
110:19

**apprenticeship**
161:2

**approached**
32:18 38:5
114:12

**approaching**
36:3,12

**approximately**
10:17 11:22
14:15 32:19
75:6 117:9
135:17 161:13
170:1 195:9

**April**
178:11 193:15

**archive**
210:11

**area**
17:18 70:6
103:5 137:14

**areas**
15:9,15
116:21 143:19
144:4

**argument**
45:5 52:3

**arrival**
93:11

**arrived**
205:9

**art**
83:8,9,12

**articles**
27:2,3

**articulated**
189:2

**ASAP**
210:16

**ask**
18:15 27:7
28:18 42:7
48:10,17 50:1,
5,9 52:16
53:10 56:1
72:2 73:14,21
79:19 83:9
90:16 101:3
123:6 128:5
132:5 142:16
172:20 177:8
179:4,14
183:17 187:15

**asked**
23:3 24:22
53:14 60:17
65:19 85:4,10
88:7 105:16
107:22
114:18,20
133:22 134:1
151:12,14,19
152:5,6,19
157:10,11
170:22 173:2
175:8 187:12,
19 189:15,19
191:3 193:5
194:11 195:3
202:13

**asking**
20:22 31:7
50:2 52:13
54:3 72:1
74:7,12 83:8
84:7 107:20
119:6 123:4
126:6 128:12
145:15 146:2
156:21 182:16
187:22

**asks**
58:10

**asserting**
144:17

**assess**
104:15

**assessment**
30:8,17 31:4,
5,8 111:6,15
204:5

**assessments**
30:11 32:8
67:9,10

**assignment**
82:6,12,14

**assistance**
209:21

**Association**
165:16 167:3
192:9 204:12,
13,14,15,17

**associations**
191:22 204:2,
10

**assume**
7:13 137:13,
15

**assuming**
11:10 139:20

**ATBS**
189:2

**attention**
37:12 39:4,10
54:19 110:11
183:1

**attorney**
5:17 25:13
50:10

**attorneys**
5:15

**attribute**
124:10

**attributed**
121:19 122:10

**audio**
76:2

**August**
5:8 74:15
206:4,12

**authored**
21:14 27:14,

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

18 122:15
124:11

**authority**
14:19

**auto**
47:17 125:17
201:8

**automatic**
144:3

**automobile**
159:10

**autopilot**
12:11 18:20
19:1,4,18
20:4,7,10 27:4
28:14 37:10,
13,19 38:4,8,
17,21 39:1,6,
9,12 40:10,15,
20 41:2,9
47:2,18,19
48:5 49:5,19
53:17 54:5,11
65:8,11 68:12,
18 69:6,11,22
70:19 71:2,9
72:4,16 73:7
80:1 85:9,12,
16 86:8 107:1,
3,4,8,15,16,18
114:19 115:1,
10,18,22
116:1,6,10,14,
19,20,21
117:19 121:19
122:11 134:1
140:15,22
141:8,14,16,
18,20 142:7,
12,16,21
143:9,13,18

162:1 166:5
179:17 180:2,
8,17,20 181:8,
9,12,15,19,22
182:1,5,10,12
183:2,5,10,11
184:7,11,14
191:8 193:7,
17 194:6
201:2,6
205:20 209:3,
10

**autopilot's**
47:11 48:1,12

**autopilots**
18:17 71:6
181:20 203:19

**AV**
7:22

**averaging**
10:17

**aware**
27:10 28:20
53:15 54:6,9
58:15 110:9
138:13 154:16
155:8

**awareness**
37:8 39:5,8
40:2 92:2,4
112:13 113:19
133:20 201:10

**Ayers**
193:16

**Ayres**
193:11

———————
**B**
———————

**back**

12:20 27:13
43:2,22 44:3,5
45:2,3,11,13,
18 46:20
48:10 50:21
52:2 53:4
64:4,8 86:13
108:6 112:19,
20 120:9
130:3 132:5
135:8 168:20,
21 179:3,9
184:15

**background**
26:2

**backgrounds**
25:18

**backing**
35:3 132:22
133:5 136:1

**bad**
129:12

**Baldessari**
80:6 81:4,8
120:10 124:6
147:2 148:13
175:7,21
177:3 205:6

**Bar**
204:14

**barely**
34:14

**barge**
16:11 28:22
29:5 33:5 59:9
82:18 84:9,18
99:7,9,19,21
100:7 101:6
125:2 131:11
140:2 145:11,

12,16,21
146:1 181:3
185:8 188:7
189:12 203:8
209:8

**bargeman**
147:16

**barges**
69:6 142:7
189:3 191:9
195:6,16
203:17

**bascule**
159:12

**base**
87:13 103:7
168:13,14,15,
16,19 170:12
207:1

**based**
7:13 29:10
33:10 37:3
48:8 57:1,8
61:4,12,20
64:13 73:3
86:20 87:5
88:19 95:7
96:9 103:8
104:21 105:13
106:6 118:2,6,
7 124:21
129:5 135:7,
12 136:12
137:1,22
139:12,20
143:22 145:3
157:3 164:22
194:14,18
196:10 197:6,
19 203:14,16
204:7 207:8,

15,19 209:5

**bases**
101:3

**basically**
76:15 89:7
159:16

**basis**
23:7,11 31:22
32:4 65:2
111:17 142:1
188:8 190:22
208:21

**beam**
138:5,6
139:13,21
140:6,9,12,17,
18 141:3,5
142:10 161:12
171:15,17,20
172:15

**beams**
138:10

**bear**
28:13

**bears**
180:17

**beautiful**
111:12

**became**
160:16

**before**
7:14,19 9:2
14:16 26:9
30:17 33:4,9,
10,13 34:7,8,
12,18,21 35:3,
19 38:12
41:10 43:8
78:13 83:4

Case 2:24-cv-00490-MSD-LRL    Document 109-9    Filed 09/15/25    Page 62 of 96
PageID# 3741
CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

86:14,17 87:2
110:22 111:9,
19 140:14
142:9 146:10
151:17 159:21
160:14
169:14,16
197:10

**beginning**
5:16

**behalf**
5:11

**believe**
31:19 42:9,13
46:3 55:2,5
83:11,12 84:3
91:5 118:14
135:11,13
154:8

**below**
110:15 124:1
196:21 197:2

**Belt**
158:10

**Beltline**
5:21 7:7 29:12
84:20 114:12
117:8 158:17

**bent**
57:15 61:17

**best**
170:4

**better**
51:13 116:1
158:21

**between**
8:1 11:1 28:21
36:14 47:11
48:1 49:19

54:11 76:14
84:9,18 93:16
117:7,15
140:13

**big**
28:14 161:7

**bio**
9:15,17 10:2

**Bisseau**
188:13

**bit**
7:12,20 16:1
27:8 43:1 56:1
64:9 85:3
99:16 105:8
114:17

**black**
132:15

**blue**
88:20 89:9,21,
22 90:5,8,17,
22 135:9

**board**
25:1,5,10
41:20 65:4,22
67:14 69:4
91:17,21
97:21 99:3
155:18 157:4
162:11 163:7,
9 166:12,20
186:14 187:4,
13,20 188:5,7
193:15

**boarded**
59:4 150:19

**boat**
100:20 143:3
163:7 189:17
202:20

**boats**
143:4 161:7,8
163:8

**books**
27:3

**both**
81:2,5,6
188:10 193:20

**bottom**
117:17 124:15
144:12 177:21
179:16

**bought**
107:14

**bounds**
200:16

**bow**
97:6,7,9 99:8
136:5 158:8
161:15,18

**brain**
79:21

**branch**
86:9 170:8

**brand-new**
170:14,17

**break**
43:11 63:4
119:10,14
159:7

**Brian**
120:4,12,19
121:8 124:7,
11,13 134:8,
12,14 205:6

**bridge**
12:3,6 14:10
19:17,21 20:7,
8,10,13 29:1,

6,8,12,16
32:13,15,18
33:5 34:14
36:4,12,13,14,
16 37:15 38:5,
7 57:2,7,12,13
59:8,10 62:2,3
68:12 70:3,5,
6,12,14,16
73:12 82:19,
21 84:10,19
85:17 88:18
89:10,17 91:3,
11,15 98:13
99:13,14,15
100:16,18,20
101:20,21
102:2,3,7,12,
18 103:1
112:15 113:8
114:12,14
117:9 125:2
130:22
131:10,12,22
135:19 138:9
140:8,10,12,
16,21 145:5
146:20 148:21
149:14,16
159:1,2,9,12,
19 186:16
189:19,22
190:2 191:4,
16 202:13,19
203:3,8 205:2
207:12

**bridges**
19:22 20:3
28:15 85:13
97:22 115:11
186:18 189:16
201:3

**bring**
26:9 50:21
52:3 170:14

**bringing**
187:21 195:18

**brings**
27:8 28:20
69:12 92:20

**broke**
17:4

**bullet**
85:5 110:15
111:3 173:3
174:10
177:10,22

**bunch**
130:11

**buoy**
166:14,16,21,
22 167:1,14
168:4

**busiest**
143:1 165:3

**business**
188:11,14

**busy**
165:7,9,12

**C**

**calculations**
172:9

**calendar**
169:11,12

**California**
5:12

**call**
7:9,11 23:7

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

27:18 54:7
103:1 112:5
134:18 139:19
159:2 203:1
207:13

**called**
6:15 7:8 11:15
17:18 22:9
70:20 75:11
81:11 90:14
99:3 163:9
168:21 172:22
189:2 191:19
192:7 193:11

**calls**
175:5

**camera**
100:12

**can**
6:12,21 7:9,20
8:14 10:11
11:16,18
14:22 15:13
20:13 22:1,4
25:12 29:19
30:1,20 31:1
33:21 36:20
37:22 38:1,19
42:10,13 43:2,
3,8 44:7,10
45:2,3,12
46:17 49:11,
12 50:7 51:1,2
52:4 53:21
57:5 59:6 60:2
63:7 66:21
67:12,22
72:19 74:19
77:7 78:7,21
80:2,17 82:4
83:16 85:21
91:6 93:22

94:3,5 95:6,19
100:13 101:14
102:15,22
103:1 108:2
111:2,12
114:7 115:14
116:20 119:9
120:2 127:8
128:5 132:7
133:1 135:21
136:18 141:1
143:4 145:19
146:5 150:1,3,
5 152:7,12,13,
16 153:3,16
154:9 168:14
176:9 178:13,
14,17 179:3,4
182:5 199:20
200:15 203:17
204:5 208:16
210:13,14

**can't**
21:1 39:16
48:20 50:9
59:7 62:4
93:20 95:20
109:14 115:14
122:17 129:5
140:9 151:1
159:22 169:17
182:17

**cannot**
97:8 107:3
113:11 156:6
185:22 204:6

**captain**
5:5 6:14 7:9,
10 14:2 19:7
20:1,2,14
22:10 23:18,
20 24:1,2,4,9,

12,14 27:2
40:22 41:7,11,
12 42:7 46:13
50:8 53:21
55:16 57:19
58:2,20 59:11
60:4 63:8
65:13,22
67:14,16
70:16 73:6,11
83:16,18
109:16 112:2
113:21,22
114:9 115:5,6,
8 117:3
120:19
121:11,17
129:9 130:18
131:7 134:8,
12,15 141:13
144:16,17
146:9,14
147:11,21
150:6,22
151:1 152:8
157:12 158:9
160:14,15
162:3,12,15
163:1,3,9
164:10
167:18,20
170:15
177:18,20
182:8,9
184:11 185:18
186:14 189:18
193:3 196:1,8,
14,17 198:4
201:18 202:4
203:10 209:20

**captain's**
23:21 42:6
113:22 155:3

**captained**
20:9 110:5

**captains**
70:3,11 185:9,
20 186:12
187:11 188:4
189:14

**carry**
180:1

**Carver**
6:5 21:7,9,13
23:15 25:20
32:7 40:18
41:6 57:18
58:7,13,18
59:1 60:9
62:2,20 64:15
65:6 66:14
67:7,19 68:10,
21 69:9 79:4,
11,21 93:13,
21 94:8,12,19
104:4 109:3,5,
8,9,10,15
114:22
115:15,16,22
147:1 157:7,
15,17,19
173:19 194:15
196:14 199:14
203:3 207:13

**Carver's**
25:13 115:17
145:4 207:21
208:13,20

**case**
9:3,6,7,10,11
12:5 15:10
17:19 18:13
28:14 42:12,
18 44:19 46:2

50:17 54:4,21
68:13 70:4
79:1 83:8 85:4
96:6,12,21
97:22 104:2,3
112:2 128:20
147:9,19
149:2,3
180:18
204:11,20
205:16

**cases**
9:15,20 10:9,
12 11:15 12:8,
10,13,18 13:4
15:2

**casualty**
11:20

**catch**
72:12

**caused**
92:3 94:1

**causing**
39:11 40:4
130:22

**cautious**
146:15

**center**
89:16 91:15

**certain**
71:2 103:18
107:16 111:5
202:9 203:4

**certainty**
200:17

**certified**
114:5

**cetera**
191:10

CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

**CFR**
104:1,9,11,13
105:6,10,13,
19 106:3,5,17
107:19 114:21
115:7,12
144:19 145:2
203:2,17
206:20 207:2,
15 208:6,10
209:3,6,7

**CFRS**
103:17 104:18
107:7 115:5,
13 116:18
117:2,4 143:8

**CG**
118:15 134:19

**chair**
187:1

**Chang**
5:10

**change**
57:14 136:10

**changed**
206:14,15

**changeover**
180:19

**changing**
111:17

**channel**
36:14 89:11
133:14,19
137:16,18,19,
20,22 138:1,3,
6,7,8,19
139:1,13,17,
18,20,21
140:7 141:22
143:21 160:1

166:9,10
171:2,14,16,
19 172:5,13,
17 187:21

**channels**
17:14,19 70:1

**Chapman**
5:20 51:15
129:4,16
158:7,10,13,
15 178:9,16,
19 179:12
192:17 194:1,
9 195:20
196:9,15
197:5 198:1,6
199:1,5
200:12 202:7
203:5,21
207:17 208:15
210:21

**charge**
41:12 104:14
105:5,7,21

**chart**
97:10 102:5
135:8

**check**
125:16 201:16

**Chicago**
189:11 190:9

**chief**
163:20

**choose**
142:20,21

**Chris**
123:19 150:5,
6,17 152:3

**Christopher**

123:21

**circuit**
44:19 46:2

**circumstance**
14:1 69:11
73:6 162:22

**circumstances**
13:13 71:2
96:7,16,19
103:19
107:16,18
110:8 111:5
112:16 167:16

**cite**
208:6

**cited**
45:6 209:2

**Civil**
5:6

**claimed**
47:10

**clarification**
71:14 101:10

**clarify**
131:8

**clean**
133:3,10

**clear**
26:8 33:15
42:16 45:6
51:13 82:5
98:9,20 105:6,
19 115:5
116:18 159:15
201:13

**clearly**
99:5 117:18
201:4

**Clemson**
127:20

**climb**
163:8

**Clipper**
167:19

**close**
166:14,20
173:16 174:21
178:22 188:1
191:5

**Clyde**
6:3,8 8:19,20
9:1,3

**coach**
50:14

**coaching**
52:20

**Coast**
30:12 57:21
58:8,19 59:2,
3,20 60:5,9
61:8 66:15
75:16,19,22
94:16 95:3,14,
16 98:19
114:4,6
120:20 139:7
144:9,17
145:1,10
146:10,22
148:1,16
149:11 150:19
152:2,21
154:11,16,19,
21 155:5,6,9,
12,13,16,17
156:3,13,16
157:5 173:7,9,
10,14,20
174:1 186:1,4,

5 189:21
194:15,20
197:10,17
198:10 200:19

**code**
68:15

**COI**
189:21 190:1,
3

**colliding**
71:16

**collision**
113:2

**collisions**
13:18 16:19
92:18

**colored**
88:11

**commands**
163:13

**comment**
35:2

**commentary**
139:7

**common**
40:21 55:7
126:10

**companies**
62:17 115:13
185:12,15
186:2,3,4,11
187:7,12,15
202:10,12,18

**company**
5:22 6:2 7:4
51:11 59:11
62:19 65:15,
22 66:1 70:20
105:20 106:9,

18,21 107:1,9
115:18
116:10,11
147:9,14
187:19 188:20
193:11

**compared**
11:4

**competency**
155:11

**competent**
154:13,19,20
155:1,4,5
156:2

**complaint**
48:7,12

**complaints**
47:22 49:18
54:10

**complete**
119:5 156:5

**completed**
95:3,10
108:11,16
118:9,15
156:9 157:1,
17

**completely**
184:12,14
198:7

**compliance**
200:20

**comply**
117:1

**complying**
117:4

**computer**
14:13

**con**
162:19,21

**concluded**
194:5 211:9

**conclusion**
58:11

**conclusions**
200:11,14,16
203:20 205:9,
17 207:8
208:3,22
209:1,5

**conditions**
111:16 116:22
171:22 201:1
203:4,19

**conduct**
30:16 31:20
67:16 162:19

**conducted**
30:7 204:1

**conducting**
32:7

**conductivity**
54:15

**configuration**
159:20

**confined**
137:14,18,21
138:5,8,11,13,
20,22 139:19
140:3 171:2

**confused**
55:14,21
104:6 112:8

**Congress**
207:22

**connection**

183:22

**connectivity**
49:1,16 53:19
54:12 78:4,18
79:5,11 80:1

**consented**
46:4

**consider**
101:20 102:2,
7

**considerable**
135:21 137:2

**consideration**
116:14

**considered**
23:9 162:22
163:2 173:21

**considering**
136:15

**consistent**
98:19 103:17
196:6 200:9,
10 208:13,17,
18

**consistently**
50:13

**constitutes**
178:3

**consultant**
10:12,21 27:1

**consulting**
11:2,11 46:10

**contact**
8:21 34:13,17
57:12 58:13
83:21 84:9
85:2 94:14
130:22 131:9,

11

**contacted**
202:19

**contacting**
191:21

**contain**
23:2,10

**contained**
21:13 23:11

**contains**
23:7

**context**
130:13 177:22

**continue**
43:8 50:17
51:3 83:4

**continued**
88:22 89:3

**contrary**
44:14 131:2

**contribute**
29:13

**control**
104:11
162:19,20
163:5,10,11
164:4

**controls**
162:21

**conversations**
192:5 202:8

**cool**
71:19

**copy**
21:19 174:1
178:12
183:19,21

210:20,22
211:2

**correct**
7:15 11:12
18:1,2,9 24:20
30:12 31:13
40:4,6 49:2,7
58:9 59:14,16,
20 60:1,6,10,
15,19 61:17
65:18 70:20
71:3 74:4,16,
17 78:18
82:21 87:22
88:3,5,6 89:8,
12 94:20
98:21 102:14
108:8 112:17
115:1 118:1,5
121:5,8,9
122:12 124:1,
2,4,6,12 127:7
131:10,14,22
133:17 137:16
140:1,2,17
143:15 145:12
146:10 147:5
148:17,19
149:4,19
150:13,20
151:4,10
153:12 156:9
158:16
159:13,17,18
160:7 161:4
162:2 164:7
166:2 169:8
180:5,13,15
181:16 183:3
184:1,12,15,
20,21 185:4
187:10,17
190:13

August 11, 2025

193:21,22
194:3,7,12,16,
20,21 195:7,
16 196:4,5,7,
8,19 197:1,2,
18 198:5,11,
14 199:15,16,
18 201:15
202:2,10
203:4,6 204:2,
6,7 205:1,13,
21,22 206:7,
10,11,18
207:14 208:11

**correctly**
93:16 187:9

**could**
40:5 42:7
54:1,6,7,8
55:20 59:20
75:21 104:7
106:9 113:4,7,
8 115:17
116:13 118:16
131:13,21
147:5,11,13
148:17 149:11
150:19 164:18
165:6 166:14,
20 179:13
180:21 181:3,
4 200:14
202:12 204:9
205:16 206:19

**couldn't**
20:16 62:8
72:13

**counsel**
25:8 42:5 50:1
79:16 193:6
209:22

**Counselor**
43:17 152:12,
13

**counselors**
5:2 43:21
45:14,17
63:22 64:3
129:21 130:2
179:5,8 210:6,
8 211:6

**country**
68:17

**couple**
18:11 67:22
76:9 80:5
110:15
127:15,17
165:8,11,14
172:21 179:20
180:4,11

**courses**
27:14

**court**
6:10,11,18
8:14 15:6,14
17:22 46:19
50:21 51:9,16
52:1,5 53:4
71:13,19
101:9,13,18
161:17 178:12
210:2,5,14,19
211:4

**Coyemans**
5:5 6:4 21:9

**crabbing**
172:4

**creating**
116:14

**credentialed**
73:2

**credentials**
209:9

**credibility**
19:7,13

**Crescent**
204:15

**crew**
24:7,19 25:1,
5,10,15,19
26:3 30:7
41:1,8 56:18
59:19 61:2,8
64:13,16,22
65:7 66:3,14
67:8,19 73:1
86:21 90:14
92:16,17
94:12 99:2
104:1,10,21
105:14 106:7
107:17 114:22
122:1,3,6
123:3 131:2,
16 149:1,3,6,
10 151:22
153:5,14,17,
21 154:2
157:4 161:21
163:3,16
196:22 200:19

**crew's**
87:14,15

**crews**
115:17

**criteria**
108:17

**cross**
127:19

**cruise**
141:16

**current**
93:8 135:16,
17,18 136:1,3,
16 137:1,3
159:20

**currently**
195:5

**currents**
141:17

**curve**
62:8

**customary**
96:9 98:7
106:10,13
116:5 125:15,
22 203:7

**customs**
106:15

**cut**
17:9 116:8
120:15 123:16
127:22

**CV**
22:18

**D**

**d/b/a**
6:4

**daily**
55:13 108:7,8

**damage**
59:10,11
61:14 62:2,4
131:2 145:4,5,
8,13 146:20,
21 147:17,19

**148:21**
149:13,15
204:22

**damaged**
57:4,7,15
205:2

**Dan**
188:16 202:20

**danger**
102:3,6

**dangers**
97:13

**data**
35:14,18
201:16

**date**
5:8 48:2 49:19
53:17 54:11
55:1 56:6
73:22 74:2,4,
11 75:3 93:1
103:6 126:21
159:22 201:22
206:6,10

**dated**
22:11 73:21
74:10

**dates**
72:20

**daughter**
127:20

**day**
26:16,18
55:16 63:8
99:11 100:1
164:21
165:11,13
206:18

**days**

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

11:6,7,8,10
164:17,18
165:8 199:17

**dealing**
14:4 205:1

**decide**
114:8

**decided**
156:13

**decision**
61:12 104:16
115:4,5

**decisions**
105:20 114:7

**deck**
77:9,21

**deem**
156:2

**deemed**
154:12,18

**deeming**
155:1

**defense**
13:10

**define**
30:20 31:1
94:4,6

**defines**
138:13

**defining**
123:2

**definitely**
99:12,13
100:18 113:7
131:15 146:17
149:6

**definition**

112:20

**density**
116:21

**departure**
93:10

**depending**
133:5 203:4

**depends**
128:22 132:21
133:2 142:6,
22 166:13

**deposed**
87:21

**deposition**
5:4,7,11,12
7:5,19 8:13
9:22 21:15
46:9 50:14,18
51:4 56:17
68:20 69:9,20
123:9 158:16
176:13,17
178:10 196:21
209:21 211:8

**depositions**
7:14,20 42:10,
11 68:10
87:14,15
175:17 176:14
204:20,22
205:4

**deputies**
165:17

**deputy**
165:18

**describe**
88:14 163:15

**described**
54:13 169:21

173:6

**description**
137:14 164:19

**design**
16:9

**designated**
17:20

**details**
69:19

**detecting**
110:20

**determination**
93:22

**determine**
93:13 138:19
156:12 181:1

**deviated**
132:4 133:14,
19

**deviation**
133:16

**didn't**
44:13 46:1
72:12 81:22
84:4 116:7
122:17 132:9
147:3 148:3,
14 171:11
178:20 191:6
200:1 205:2

**died**
9:12

**diesel**
132:15 133:10

**difference**
85:19 99:22
100:13

**different**
8:9 66:8 68:2
79:19 85:16
99:17 105:8
118:3 122:2,5
125:17
131:16,18
135:22 168:9
175:18 181:21
182:5 198:3,7

**differently**
56:2 174:7

**difficult**
7:20

**direct**
52:18 122:10,
14 130:21
131:9

**directed**
142:11,12

**direction**
36:11 142:20

**directly**
23:14 28:13
36:6 121:20
182:11

**disagree**
102:17 131:7
137:10,13

**disagreement**
133:13

**discarded**
109:21

**disclosure**
9:14 21:12
37:5 58:17
64:14

**disconnected**
47:19

**discussed**
69:19 78:3,6,
13

**discussion**
69:20

**disengaged**
38:8

**disengagemen
t**
134:1

**dispute**
83:1

**distance**
117:7

**diverge**
89:22

**divide**
11:1

**do**
6:17 7:8 9:6
10:12,14
11:11 12:1
13:4 15:3
18:15,19,22
19:3,9,12 20:6
21:19,21
22:12 24:3
28:3,6 29:21
30:6 31:3,7,
12,19 32:2,6,
12,16 33:8,17,
18 35:21 36:4,
7,17,21 37:1,2
39:19 40:9,17
41:4,5,15,18,
22 42:14,15
43:1,5 46:22
47:8,15,21
49:15 52:19
55:2,5 56:2,22

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

57:6 58:1
59:22 60:22
61:14 64:19
65:15 68:5,16
69:6 71:8 72:3
73:17 74:22
75:2,12 76:10,
12,17,20
77:10,20 79:3,
20 80:7 81:12
82:8,12 83:1,
6,17 84:3,7,16
85:6,14 86:3,
11 88:12
89:18 90:7,16
91:12,19 92:3,
13,16 93:3
95:2,15 96:2
101:20 102:2,
7 103:7,20
106:9 107:10
108:4,19
109:2,9,18
110:16,21
111:5,9 113:3,
16 114:10
115:14 116:3
117:10 118:9,
11,14 122:13,
17 123:15,20
124:20 125:1,
9,10,11 126:2
127:17
130:15,19
131:4,5,9
132:18,20
133:7,11
134:5 135:1,
11,13 136:6,8,
19 137:11
139:6 140:20
141:14,15,20
142:1,2,17,20,
21 144:3,11,

20,21,22
150:7,9,10
152:2 153:6,7,
11,20 154:14
155:18,19
156:12 157:7,
19 158:16,20
159:19 163:11
164:8 166:12
167:7 170:19
173:12 176:2,
20 178:2
180:21 181:18
186:10 187:12
191:18 192:4,
13,21 193:8,
10,14,17
195:9,18,21
196:1 198:18,
22 199:10,13,
21 200:3
203:12
206:20,22
207:6,7 208:8
210:3,12,15,
18

**dock**
111:10,11
168:17 181:10

**Docking**
204:13

**document**
33:10,12,22
34:11 48:17
50:9 52:10,14,
16 53:16 54:7
66:22 67:1
69:18 79:15
80:21 93:2
119:5,6
121:13 122:18
123:7 126:5,

14 149:21
158:3 175:1

**documents**
23:8 25:20
32:20 40:12
47:5 49:17,21
50:2,3 56:4
67:3 72:21
75:11 76:16
77:21 78:5,12,
22 79:1,7,9,
17,20 80:4
81:17 122:20
145:6 154:7
157:13 158:1,
2 172:22
173:17 174:22
176:1 177:4,9
194:14,19,22
197:6 204:18

**does**
10:22 23:1,10
33:12 37:9
41:1 77:12
83:20 90:4
93:7,9 104:1,
2,11 115:9
143:20 144:3
154:21 156:4,
22 167:3
190:1 210:6,
19

**doesn't**
7:12 46:6 51:2
107:10 130:13
144:6 186:19
196:3

**doing**
31:21 44:17
65:11 108:18
112:3 125:16
128:7 168:12

172:8 174:6
181:1 193:16

**doke**
43:9

**dollars**
75:4 140:12
141:2

**don't**
7:18 13:2
17:19 21:5,6
23:21 27:18
28:9,12 32:5,
14 36:2,9
38:10 40:11
42:13 43:11
45:4 48:15
60:13 63:14
69:13,19
72:20 76:3,13,
18 79:9,14
80:12,14
81:15,21 83:9,
11 84:12 89:2
90:19 93:1
94:6 95:20
103:1 107:9,
15,17 108:14,
17 109:14
110:11 114:14
115:13 116:2,
6 119:12,13
121:1 125:4
127:4,16
129:8 136:21
142:1 146:14,
17 147:16
148:2 149:20
154:2 155:22
156:7,20
158:2,5 161:6,
17 162:1
163:15 167:21

168:21
169:13,21
170:2,9
173:19,22
175:10 176:6,
21 177:1
178:11 179:1
182:16,20
186:13 190:18
191:20
192:17,19
199:1 206:14
209:21

**done**
11:17 25:17
53:7,8,11
65:12,18,21
66:1,2,6,8,11
67:13 69:4
78:17 79:4,10
94:11 97:4
110:21 111:6,
19,21 124:5,7
147:14 148:21
150:20 167:17
193:6 194:7
195:10 199:5
204:5,6 210:1
211:5

**dot**
89:21 90:5,9,
17 91:14

**double**
74:20

**draft**
210:12,15
211:2

**drift**
37:15

**drive**
127:21

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

driver
167:8

drug
60:22 150:20

drugs
61:9

due
78:13

duly
6:15

duties
166:4

duty
167:11 168:12

dynamic
111:16 172:6

---

**E**

each
15:22 72:22
76:13 89:22
128:5 168:3
185:15 186:11
187:15,19
191:2,22

earlier
73:16 78:3,6
148:5 158:15
193:5 209:14

Earth
117:13

easier
7:12

east
167:1 186:1,4,
5

eat

129:2

ebbing
135:18

edge
93:10

educating
205:15

educational
28:8

effort
125:3

eight-hour
127:21

either
8:7 9:21 15:6
20:9,14 23:2
28:7 30:1
34:7,12,21
35:16 49:10
53:15 56:16
59:1 72:5,17
75:3 76:14
93:10,15
103:11 124:6
125:13 148:20
159:16 185:18

electronic
35:14 72:8
109:22 110:6,
9

electronics
72:7,8

Elizabeth
167:22 170:8

else
39:22 47:21
54:16 72:1
78:11 96:20
103:9,12

121:20 128:11
139:1 148:2
163:12 164:4,
12 172:1
174:6 178:2
181:18 183:4
210:20

email
44:18

embargoes
190:22

employed
185:15

employees
23:15 57:18
202:9

employment
25:21

end
124:17 127:10
191:10 207:22

engage
201:7

engaged
86:8

engine
77:9,21

engineer
46:10

engineer's
46:9

engineers
205:1

engines
33:6,7,13
132:22 133:2,
5 136:2
161:19

enhanced
143:6

enough
126:9 161:8

ensure
109:6

entire
74:13 119:8
134:20 135:1
136:9

entirety
21:8 23:10

entitled
86:1

entity
21:8 72:7,8,9

entries
164:13

entry
123:16 164:16
173:15 174:11
175:7

environment
172:7

equates
155:11

equipment
16:15 105:15
106:7 107:11
116:4,13
125:8,14

equipped
161:15

Eric
205:5

ESO
202:20

especially
100:15 119:6
136:15

essence
103:17 105:12

establishes
117:18 201:4

estimate
170:4 195:12

et al
5:6

Evanston
5:19 6:2 7:4

event
11:20 49:13
148:22

eventually
197:9

Everglade
139:17

Everglades
20:6 68:16
140:7 141:18
143:2 160:20
164:2 165:16
166:17 182:19
185:11 188:8
190:7 191:8
195:17 204:17

everybody
63:13 83:14

everything
93:15 122:6
132:22 148:2
171:22

evidence
35:7 37:16
58:7 65:5
86:17 93:17

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

117:18 124:21
136:12 146:5
149:14 154:6
194:22 201:4

**evidenced**
131:1

**exact**
83:4 93:1

**exactly**
121:1 170:2
191:20

**EXAMINATION**
6:19 158:12
193:1

**examined**
6:16

**examples**
67:22

**excellent**
100:14,21

**exception**
141:12,21

**excess**
141:2

**excluded**
15:6,7

**exclusively**
11:9

**excuse**
72:7 76:7
79:18 165:10
182:8 194:9
198:18

**exhibit**
21:15,16 22:6
23:1,12 73:15
170:21
176:12,20,22

177:1,8
178:10 179:14
195:19

**exhibits**
33:18 176:16,
19 211:11

**expect**
56:7 87:10
163:18

**expected**
66:1,6 68:14
89:15 113:21
114:2 155:4

**expecting**
56:9

**experience**
73:5,10
109:16 157:3
185:10 195:4
204:8

**expert**
15:14,18
17:20 18:16,
20 19:1,4,10,
13 21:12
42:10,17
46:10,11 54:4
62:12 128:3,4

**expertise**
15:9,15 17:18

**experts**
46:4

**explain**
29:20 38:19

**explaining**
182:8,9

**explanation**
172:10

**extended**
89:7,10 91:1

---

**F**

---

**fact**
58:18 59:1
90:12 102:13
150:11

**factors**
19:10

**facts**
23:9 196:13
200:10 205:16

**fail**
153:12

**failed**
153:9 184:19
201:7

**failure**
78:8 201:9

**fair**
116:15 161:3
190:12 197:3

**false**
117:20 151:13
152:4,18
201:6

**familiar**
71:21 195:15

**far-left**
89:11

**federal**
15:14 17:21
50:16 68:15

**feel**
147:17 148:3

**feeling**

129:12

**feet**
117:9 138:7,
10 139:19
140:13 160:2
161:12

**felt**
147:12

**fender**
160:2

**fendering**
29:9 59:8,9
61:13,18
147:8

**fenders**
117:8 140:13
145:7,8
146:13

**field**
62:13

**figure**
126:11

**figures**
171:7,8

**filed**
118:15

**files**
25:22

**filled**
118:17 157:16
194:17

**filling**
164:9

**final**
174:2 179:15

**find**
43:7 82:3
155:20 174:7,

16 186:2
190:3 199:20

**finding**
130:18 131:7
154:18 155:11

**findings**
22:10 185:7

**fine**
28:13 43:13
45:4 63:6,12
119:15 122:6
129:10,15
142:8,18
158:4

**finish**
127:18,19,22
132:7

**finished**
69:1

**Fire**
17:1

**Firefighting**
17:12

**first**
5:11 6:15
12:5,12,17
15:15 26:13
27:10 33:6
34:4 43:5
73:20 91:14
92:10 112:19
120:4,9 125:6
133:5 185:7

**fit**
140:19 173:14

**Five-minute**
119:17

**fixed**
83:21

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

fixture
103:3

flag
162:9,10

flipped
134:7

Flowers
186:7

focus
159:1

focused
61:19

fog
111:13

folks
69:22 148:6
187:7 190:20

follow
7:21 91:10
128:10 156:18

follow-up
169:1 178:15
192:19
209:19,22

following
130:17

foreign
162:9

form
14:21 26:5
33:4 34:2
37:21 51:1
58:4,10 59:5,
21 65:9 69:17
72:10 80:2
85:18 91:6
94:3 95:5,11,
13 104:5
105:1 106:20

107:5 115:2,
20 118:7
121:22 124:1
145:18 148:1
149:5 157:15,
22 184:18
194:1,10,17
195:1 196:9,
15 197:5,12
198:1,6,8
200:12 203:5,
21 207:17
208:15,21

format
54:6 175:11

formed
132:12

Fort
19:21 159:1
204:17

forward
33:21 45:22
46:5,13 53:12

found
200:4

foundation
67:11 72:18
78:20 95:6,12,
18 112:7
115:3 116:16
156:10,12,17
157:2

four-man
189:19

fourth
44:19 46:2
175:6 177:10

Friday
21:13 74:6

front
13:3 23:1
33:18,19,22
48:18 50:2,21
52:11,16
73:17 79:17
99:7 118:16
119:1,5,22
122:19,22
145:12,16,21
146:1 206:3

fuel
133:3,6,8

full
6:21 33:7,13
34:5,21 35:8
98:14 100:4
113:1,8,11
191:8

fully
135:5

fun
63:9

functionality
47:11 54:5,10
125:13

functioning
37:14

Furborough's
184:7 185:4

future
46:5

_____

**G**

_____

Galveston
191:13 204:16

game
52:11

Gangways
16:7

GAR
31:8

Garmin
117:14

gave
34:4 81:2
169:22 191:3

general
7:15 10:11
28:19 36:11
93:3 126:10
164:18 172:14

generally
9:18 12:9
61:12 68:4
108:20 131:6
155:19

gentlemen
5:3 43:22
45:18 64:4
130:3 179:9

get
6:12 7:6 22:6
26:9 41:2 43:5
44:10 60:10
61:21 64:8,9
65:13 83:14
90:12,15
98:12 101:16
117:12 119:13
128:9 140:9
147:16 155:3
158:21 163:7
167:4 173:18
186:15 210:13

getting
8:4 45:4
122:20 200:8

201:12

give
10:11 11:17
14:3 20:13
42:18,19
67:22 80:17
126:9 163:12
164:7,18
170:4

gives
163:9

giving
8:8

gleaned
96:4

go
5:13 15:12
17:2,5,7,10
22:2 27:12
30:20,21
42:21 43:1,9
45:2,10,11,22
46:13 48:10
51:8 52:2 53:4
59:20 66:7
69:2 70:9
85:21 86:13
91:10,22 94:7
100:15 108:6
109:3,18
112:19,20
116:7 125:17
127:14,17
129:1 130:16
132:4,10,13
136:13 138:9
141:17 143:9
153:3 157:12
161:22 177:7
179:3 180:4
181:13 186:1,

4,18 200:14
204:9 206:9,
19 207:4,11
209:2 210:9

**goes**
7:15 23:4
29:22 189:20

**going**
5:3 7:5 9:17
15:22 20:7
21:8 33:21
36:11 43:18,
22 45:15,18
46:5 48:17
50:5,11,12
52:1 53:4,5
56:2 57:19
64:1,4 82:2
84:5 89:16
98:1 111:20
119:1 120:22
122:18 123:6
127:14,16
128:11 129:1,
22 130:3,7,10
133:1 134:11
135:8 138:3
141:4 143:6
146:12,20
148:18 149:16
150:7 152:3
166:9 167:5,
19,21 168:20,
22 172:5
176:7 178:22
179:6,9 182:7
211:7

**gone**
35:16 91:4
136:13,17

**good**
5:4 30:16

31:19 46:15
63:3,18 98:9
99:12 127:13
158:14,19,20
181:4 193:3,4

**good-sized**
141:7 189:13

**Google**
117:13

**Gotcha**
143:7 161:1
182:22 186:6

**Great**
172:19

**greatly**
66:22

**groundings**
18:5

**group**
67:3 188:21

**Guard**
30:12 57:21
58:8,19 59:3,
20 60:5,10
61:8 66:15
75:16,19,22
94:16 95:3,14
98:19 114:4,6
120:21 139:7
144:9,17
145:1,10
146:10,22
148:1,16
149:11 150:19
152:2,21
154:11,16,19,
21 155:5,6,9,
12,13,16,17
156:3,13,16
157:5 173:7,9,

10,14,20
174:1 189:21
194:15,20
197:10,17
198:10 200:19

**Guard's**
95:16

**guess**
48:20 50:3
88:11 89:11
120:20 123:4
164:1 170:5
195:11

**guidance**
104:21

**guidelines**
105:12 106:5

**Gulf**
189:4 202:21

**guy**
186:7

**guys**
45:6

---

## H

**had**
9:1 12:6,8
14:18 15:16
24:16 32:3
34:18 35:2,16
37:19 39:4
46:3 57:20
59:2,19 60:9
62:8 66:17
73:6 77:14
83:10 86:8
89:1,5 91:4
92:21 94:8
98:15,22 99:3

100:20 112:22
116:11 122:4,
5 128:10
132:11 133:9
136:13,14,15,
17 147:4,15,
22 148:15
149:18 150:16
153:1 157:5
175:1 177:14
183:7 184:4,7,
19 187:7
190:7,10
191:15 193:14
194:7,15
195:1 198:4
206:15,17
209:9,14

**half**
114:1 166:18
167:1 188:2

**halfway**
75:10 81:10

**Hampton**
167:14 168:4
185:21

**hand**
6:12 34:4
124:18 142:5,
12,21 184:16,
20

**handle**
123:9

**handles**
137:2 164:12

**handling**
16:17 18:3

**handwritten**
176:3,9

**handy**
21:20 73:17
76:17

**happen**
84:1,4 93:7,9
132:18

**happened**
59:14 61:7
83:10 84:2,6,
15 89:1,19
90:5,8,17
91:13 121:12
126:2,12
137:8 149:12
190:9

**happens**
109:17 110:9

**happy**
141:15 142:2

**harassing**
151:12,19

**harassment**
102:21

**harbor**
11:5,9 16:9
160:6,8,12,16,
18 161:5,10
162:4 164:3,
12,21 165:15,
19 166:3,7,8,
12 167:3
168:8,10,11
185:10 190:7
204:13

**hard**
35:11 99:15
129:4 134:20,
22 135:3,4,5,
15 136:13,17,
19

Case 2:24-cv-00490-MSD-LRL    Document 109-9    Filed 09/15/25    Page 73 of 96
PageID# 3752
CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

**have**
7:15 10:3,16,
20 11:11 12:1,
20 13:2 15:7,
18 19:17
21:19 22:6,18,
20,22 23:14,
17 24:6,18,22
25:17 26:1,18
27:2,13 32:16,
20 33:18 35:1,
4,13,21 36:4,
17 37:2,16
39:19 40:12
41:3 42:21,22
43:2 44:13,17,
21 46:4,22
47:1 49:16
54:7,8 55:7
56:4,10,14,16,
22 57:8,17
58:1,17 59:3
61:8,11,19
62:5,17,20
64:14,19
65:10 66:7,22
68:9,17 69:8,
15 70:2,3,11,
12,14,15 71:4,
8 72:3,11,20
73:3,6,11,17
75:2,3 76:16,
17,20,21 77:3
79:7,9,20
80:4,12,21
81:7 83:1
84:3,8,16 87:2
88:2,22 89:3,
18 90:2,7,16,
20 91:12,19
93:2,3,12,17,
20 94:8,10
95:2,7,10,21
96:20 97:7,11,

19,20,21 98:7,
11 99:2,5,13,
18 100:5
101:4 106:11,
19 107:3
108:13 110:5
111:4,20,21
113:20 114:2,
10 118:11,14,
20 119:10,21
120:15 121:16
122:20 125:1,
11 127:4,18
133:1,4,7,15
135:21 136:2,
6,8,20,21
137:2 138:2,9
141:4,10,11,
14 142:6
143:1,4
147:11,13
149:20
150:18,19
152:12,13
153:20 154:6,
7 155:2,5,16
156:7,12,18,
22 157:15
158:1,5,7,20
160:11 161:12
162:18,20
163:7,19
164:8,13
165:1,14,17
167:13 169:4
170:2,6,7,19
171:22 172:6
173:12
175:16,17
176:21
177:12,15,16
178:3 179:2
182:15,17,20
183:5,19

186:10,20,22
187:3,13,18
189:1 192:4,
17 193:20
196:3,10
197:6,11,12,
13 198:22
199:1,21
201:16 202:14
203:7,14
206:20 209:18
210:3

**haven't**
71:10 75:7
93:19 94:17

**hazard**
102:8

**hazardous**
117:1

**hazards**
97:13 110:21

**he'll**
146:16

**heading**
36:5,6,7,13
91:14

**headway**
34:15

**hear**
72:13 132:10
171:11 178:20

**heard**
8:2 65:10
66:10 129:5
173:21

**hearing**
24:16 132:8
197:10

**heavy**

143:19 144:4
172:3

**held**
5:7

**helm**
167:9

**helmsman**
116:2

**help**
53:22 66:22
122:17 209:20

**helped**
44:21

**helpful**
8:6

**high**
97:6 100:20
113:6 116:21

**hired**
170:14

**history**
109:1 193:21

**hits**
137:3

**hold**
18:15,19,22
19:3,9,12
68:22

**holding**
198:16

**holds**
116:1

**homework**
122:17

**honest**
54:19 158:3

**honestly**

169:20

**Hook**
204:12

**hopping**
130:11

**hour**
63:5 119:11
178:22 188:2

**hourly**
74:21

**hours**
26:16,18,19
61:2,9 75:3,6
98:20 127:15,
17 157:11
200:21
206:16,18

**HR**
25:22

**human**
19:9 116:1

**hundred**
20:21 138:4
140:11 141:2
189:12

**hundreds**
20:19,20
143:4

**hungry**
129:12

---

**I**

---

**idea**
7:15 10:11
12:2 14:3 75:2
156:7

**ideal**
91:3

identified
10:10 21:16
55:18 56:5

identify
5:16 55:17
76:13 78:17

II
167:19

illusion
144:10

images
179:21

imagine
129:6

immediately
199:2

impact
131:3 137:2

important
46:6 150:2

impossible
50:18

impression
187:6

improperly
39:15

inaccurate
153:22

inappropriate
50:16 51:6
68:11 69:11,
13

inbound
188:1

incident
48:11,21
77:14,15 86:2

92:21 93:4,13,
14,22 94:1,9,
20,22 95:4,17
99:11 100:1
104:10 118:6
123:15,16
124:19 147:22
148:5 150:12,
14 153:10,13
155:1,6,16
157:5,8,18
177:19 178:4
193:6 194:12
196:18 197:1,
4 199:17
205:21

incidents
47:15 156:8

include
204:19

included
178:13

including
63:4 176:15

inconsistencie
s
120:7

inconsistency
124:10

inconsistent
118:2 122:8
153:5

incorrectly
93:16

indicate
40:14 87:3,16
103:16 120:18

indicated
45:6 57:19

67:17 68:11
69:21 98:17
103:4 112:12
121:18 153:8

indicates
34:21 86:15
117:7 122:11
154:17 155:10

indication
34:6 174:16
184:9

indicator
136:12

individual
25:18 185:14

individually
192:6

individuals'
26:2

industry
62:19 65:12
96:9 106:10
126:11 127:9
138:12 171:3
203:7

information
26:1 28:2,6
32:22 37:4
40:14 48:9
49:17 57:8
58:17 61:4,12
64:14 67:18
72:11,14 73:3
75:15,18,20,
22 78:2 84:8
86:20 87:5,12
90:3 93:18
94:2,8,18
95:7,21 145:3
147:18 156:22

173:7,8,20
182:11 193:20
196:10

infra
130:18

initial
73:22 117:19
118:4 196:6
201:5

initially
196:13

inland
69:3,7 106:12
107:9,13

input
39:13,15,18,
21 40:5,7,19

inputted
40:10

inquiry
190:10

inside
167:14 168:3

inspect
180:1 201:17

inspected
72:6,17 99:6,
18,20 181:9
201:14 202:1

inspection
23:19 24:2
180:1,7,17
181:8,19
183:5 201:18

installation
19:1 48:1

installed
41:10 47:3,6,

12 49:20
53:17 54:11
179:17

instance
94:11 96:21
107:4 112:1
115:19 190:9

instead
50:2

institutions
28:8

instruction
41:6 58:2

Insurance
5:19 6:2 7:4

intend
23:3

intended
15:5

interface
7:22

internet
159:7

interplay
37:9

interpret
8:15

interview
25:9 32:21
76:2 81:8
120:20 134:19
175:13 187:8
197:10,22

interviewed
69:21 175:15
197:17

interviews
40:13 80:6,9,

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

10,12,14 81:2,
4 94:11 175:7,
10,17 177:3
190:5,20
191:15

**introduced**
158:15

**investigation**
25:17 49:6
93:12,21 94:4,
19 95:1,4,17
150:7 152:3
155:19,20
156:4,5,9,15
157:1,17
174:2,6
194:20

**invoices**
193:11,13,16
205:20

**involve**
14:17

**involved**
9:5 11:19,21
12:2,9,10,14,
15,21 14:16
15:3 73:11
92:17 169:6

**irrelevant**
48:4 150:11

**isn't**
54:20 121:10
148:22

**issue**
44:10 47:17
49:2,5,16
52:18 53:19
54:6,13,15,20
70:1 78:4,14,
18 79:5,12

80:1 91:16
96:1 97:8
100:2 101:21
102:3,8 111:8
114:13 122:4,
12 133:15
141:19 147:11
155:20 157:4
194:3

**issues**
14:4 28:14
46:7 47:10
53:16

**items**
184:4

**J**

**J-A-R-K-E-I-S**
101:17

**J.D.**
6:14 10:3
22:11

**Jacksonville**
191:12 204:15

**James**
5:20 6:3
167:20 177:20
184:13 185:1

**January**
156:8 157:8
194:11

**Jarkeis**
98:4,20
101:15 205:5

**Jason**
205:7

**Jett**
6:1

**Jim**
8:22 44:3
51:15 79:19
119:3 127:18
128:10,14
129:3 158:14
178:8 195:18
198:22

**Jim's**
128:22

**job**
56:2 66:12
119:2,4

**John's**
204:14

**joint**
128:2

**jointly**
128:7

**Jordan**
88:18

**July**
74:14 201:14,
19,22

**June**
22:11 24:7,11,
20 25:2,6,11,
16 29:1 42:1
47:2,12 48:2
49:13,20
53:18 54:12
55:1 58:8,19
72:5,16 73:1,
21,22 74:4,10
77:17 84:17
92:19 101:6
108:10 126:3
127:2 148:11
150:13 152:22
157:20 184:18

197:21 199:14
206:3

**junior**
165:19

**jurisdiction**
14:20

**K**

**keen**
174:7

**Ken**
186:7

**kept**
109:20 110:1,
3 192:4

**kind**
28:20 53:16
63:7 77:8 85:5
98:3 126:9
130:10 134:3
154:10 162:5
164:17,18
165:22 168:22
169:5 177:13
179:15 183:14
187:5 194:19
203:13

**knew**
8:3 82:2
192:16 199:4

**knots**
32:19 135:17

**know**
7:18 15:4
17:10 21:5,9
27:18 28:3,7,9
30:6 31:3,12
32:2,6,14 33:8
36:21 37:1

38:10 40:3,9,
17 41:4,5,15,
18,22 43:12
50:3 52:19
57:6 60:13,22
61:7 72:2,7
76:3 80:12,14
81:20 83:17
84:7,12 89:2
90:19 92:3,17
95:15 107:9
108:17,19
110:21 111:6
114:14 118:9
121:1 122:16
125:4 126:2
138:20 139:6
141:11 145:4
146:14,18
147:16 148:13
152:16 154:2
156:16,20
158:22 159:4,
7,8,19 161:17
162:1,2
163:15 169:17
173:4,19,22
174:5,19
175:8,10
176:13
182:17,20
186:12,13
188:5 189:16
191:1 192:6,8,
13,15,19
195:9 200:3
206:15 209:22

**knowledge**
9:5 20:11
29:14,15
70:17 78:19
88:1 105:14
106:6 109:4

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

155:15 170:9
175:12 204:19
207:16,18

**knows**
126:6 174:7

**L**

**lack**
39:4,7 40:1
92:1,4 133:19
155:10 201:9

**ladders**
16:7

**laid**
145:7 147:7

**land**
93:10

**landed**
93:7

**language**
118:13

**large**
142:10 189:1

**Larraway**
205:7

**Lasker**
167:21 170:18

**last**
11:18 18:7
44:8 46:18
72:4,15 82:6,
17 179:21,22
180:4 185:11
189:9,11
195:5

**lately**
165:6

**later**
74:2 111:12
128:20

**Lauderdale**
19:21 159:2
204:17

**law**
62:22 162:9,
11

**lawsuit**
205:13

**lawyer**
10:5

**lawyers**
128:16

**laying**
146:13

**lays**
59:8,9

**leading**
202:16

**leads**
207:6

**learn**
180:16

**learned**
47:1 139:8
183:4

**learning**
49:5,10

**least**
28:22 131:14
165:8,11
180:12 207:1
208:21

**leave**
42:7 57:21
60:10 111:10,

11 147:5
148:17 149:11
162:3

**leaves**
111:10

**leaving**
164:2

**left**
14:18 36:22
37:3,15,20
38:12,16,20,
22 39:9,12
40:4 90:18
104:16 115:4,
6 135:4,5
136:5,19
146:10 147:13

**legal**
5:11 11:1,4
42:22 58:11
83:7,9,12

**Leonard**
120:10 205:6

**less**
20:21 126:1
145:7

**let**
8:5 17:10
18:15 27:7
28:18 33:15
45:8 48:10
56:1 79:19
118:19 120:8
123:11 127:18
132:4 177:7
194:9 195:20

**Lewis**
42:8 46:13
74:2 130:18
144:16,17

201:18 202:4

**Lewis's**
131:7 203:10

**license**
113:22
154:12,22
155:2,3,7,22
156:1 195:2

**licensed**
10:7 114:4
160:8,12
200:19

**lie**
51:22 52:2

**lied**
51:8,16 149:1,
3 151:22

**Life-saving**
16:15

**lights**
125:21

**like**
8:12 12:22
13:1 22:5,17
26:4,7,9 27:5
30:17,18 31:8
44:18 45:12
47:20 55:8
61:7 62:20
65:21 68:12
69:12 71:15,
16 76:2,14
84:5 89:10
90:19 91:4
92:9 94:22
97:6,14,17
98:15 99:8,19
100:7,17,19
101:6,21
102:3,7

106:11 113:11
118:1 127:17,
22 128:5,9
132:21 133:1,
13 134:14
136:1 137:8,
20 141:14
146:13 157:11
159:9,16
161:1 164:19
165:4,9,18,22
167:21 170:9
172:1 173:1,
11,22 174:2
175:10 177:11
178:21 180:12
182:17 185:11
186:2 190:6,
21 205:1

**likely**
90:8

**likes**
106:9

**limitations**
71:8 116:12

**line-of-sight**
97:8

**lines**
88:11

**list**
9:7,15,20
11:15 15:9
17:9 18:14
75:10 81:3
186:10 189:4

**listed**
37:4 49:22
51:11 58:16
64:14 68:18
184:3

CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

listen
42:17

listing
187:6

literally
87:7 140:11
143:4

litigation
7:5 15:3 70:13

LLC
5:6

local
186:3

located
5:11

location
160:13

log
77:21 108:21
164:9,12,16

logged
123:18,21
124:3

logs
77:9 109:2,6,
12,13,17,19,
22 110:6,9
194:2 205:12,
15

long
10:16 15:9
43:12 117:1
156:3 159:19
170:6

looked
15:8 50:4 62:7
75:7 99:10
132:6 159:7
180:8 181:20

182:6 183:10
200:22 205:19

lookout
12:16,21 13:6,
11,14,21 14:2,
3,4,7 17:6
28:14,16
54:22 55:2,9,
11,12,18,19
56:5 66:5,12
96:1,7,13,22
97:2,7,11,15,
19,20,22 98:5,
11,18 99:1
101:1 103:15
104:16 105:5
106:11,19
108:11,15
110:14 111:5,
10,14,17,18,
20,21 112:6,
11,17,20
113:9,14,20
114:8

lookouts
27:5 66:4

Lorman
44:7 46:17

Los
5:11

lose
119:13

loss
37:8 77:8,20

lost
44:9 78:13

lot
62:16 103:5
130:8 136:3
164:22 166:8

172:2 186:1
189:17

low
98:9 165:1

lower
183:9,10

_____

M

mac
77:9,21

Mackenzie
6:5 24:7,10,19
25:1,6,10,16
26:4 28:21
29:6 30:7,18
32:3,12,17
35:8,15,16
41:8 47:3
55:1,8 57:3
58:20 61:2
64:13,16 65:7
66:3,15 67:8
73:1 84:9,19
86:8 88:17
90:18 91:14
92:10,11,16
97:17 101:5
102:14,19
103:6 106:11
110:22 111:7
125:13 126:3,
8,12,20 127:6
148:7 179:17
184:8 190:1
200:18

Madam
210:2

made
20:14 26:8
34:13,17 48:7

53:15 54:6,9
55:15 56:17
57:12 85:2
99:7,19,21
100:7 101:6
118:3,4
130:21 150:16
168:3 169:1,
22 170:1
175:5,21
187:14 205:12
206:5

main
161:18

maintain
113:15,19
114:1

maintained
72:5 114:11

maintaining
110:18 112:4,
13

maintenance
19:4 72:8

make
22:3 26:7
50:13 51:1,2,3
52:8 61:11
63:7 71:20
80:11 82:5
93:22 98:14
99:22 100:3,
12 107:10
113:1,8,11
114:7 115:21
117:3 125:18
129:19
130:13,14
159:4 171:5
180:22 190:10
197:9 201:13

205:16

makes
50:17 55:16
83:21 105:20
107:6

making
34:14 94:13
106:4 164:20

malfunction
117:19 121:19

malfunctioned
73:7 201:6

man
9:11 68:1
129:1 202:13,
19 203:3

management
59:18 60:8
61:11 62:2,14,
16,20 64:16,
22 65:6 66:3
67:4,6,19
68:10,21
69:10 109:10
145:4 147:1
149:2,3,7,9
151:22 207:5

management's
59:16

mandated
26:15 162:9,
11

manned
97:20 200:19
209:8

manning
92:11

manual
41:3,13,16,19,

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

21 42:1 71:1,4
124:17 143:13
144:3 183:8,
18 207:21

**manuals**
62:17 64:19
71:10 183:7,8

**manufacture**
18:16

**manufactured**
70:20 71:7

**manufacturer**
107:15

**manufacturers**
71:7

**Marine**
5:6 6:4,5
188:16 189:5
202:21

**maritime**
27:15,21
135:3 200:17

**Mark**
5:18 7:2 26:8
30:20 33:18
42:5 45:21
51:7 63:5
118:13,17,22
119:9 122:16
151:18 156:16

**marked**
21:15,17 22:5
23:1 97:10
102:5 170:21
176:12 178:10

**marking**
178:7,11

**master**
104:14,16

105:6,21
116:18
154:13,19
163:19 166:6

**master's**
108:7,8

**mate**
14:10 33:5
37:11 40:7,9,
14,18 41:7
55:4 56:5,12,
18 86:6,22
87:16 92:21
93:15 94:13
96:6,21 100:2
104:2,10
112:2,10
113:10,18,21
114:6,9,11,15
117:18 118:3,
14 120:7
121:17 122:2,
10 124:4,11,
16 148:5
153:8,18
154:13 156:14
157:8,18,20
163:20 184:13
197:4,8,16
201:5,7,9
209:8

**materials**
47:9 57:1
58:16 67:7
208:20

**mates**
66:7 182:7

**matter**
5:5 22:15 23:4
49:6 60:5
74:21 75:3

96:5 102:12
114:13 183:22
186:19

**matters**
14:15

**may**
7:6 10:13
18:12 46:12
51:21 97:11
107:17 111:13
146:17 158:7
163:21 164:16
168:20 177:12
178:3 187:3
193:5

**maybe**
133:20 146:14
170:6 191:19

**Mcallister**
188:10 202:20

**Mcgrath**
205:7

**mean**
29:20 30:20
31:2 36:7
42:20 59:22
76:13 81:21
83:20 86:6
89:5 96:11
109:9 116:7
122:14 128:6
129:11 135:2
137:15 168:15
210:21

**meander**
37:20 39:12

**meandering**
36:15,18,22
37:3 38:11,15,
20,22 39:5,9,

18,21

**meaning**
23:8 57:14

**means**
76:3 83:12,18
88:15 135:3

**meant**
173:5 206:16

**measurement**
117:12,14

**mechanically**
194:6

**mega**
140:10 141:1
161:10,11,14
163:14,18
191:9

**member**
25:19 26:3
30:7 41:7
72:22 90:14
122:3 123:4
157:4

**members**
41:1 61:1,8
64:12 65:1
99:2 153:5
154:2 196:22

**memorializes**
126:14

**memorializing**
194:19

**memory**
53:22 79:2
173:12

**mentioned**
7:3 48:22 49:4
53:14 122:4

**message**
118:8 120:15,
19 121:1,3,5,
7,10 124:9
134:4,11,14
197:13,19

**messages**
76:9,12,21
175:3 199:20
200:2

**method**
5:8

**Michael**
6:7

**middle**
26:14 36:16
134:3 154:10
171:1 173:3

**midship**
134:20 135:1,
12 136:9

**midships**
135:5,6,13

**might**
101:16 161:12
188:2 210:18

**Mike**
46:5

**mile**
166:14,18
167:1

**miles**
163:6 166:15,
21 167:2

**Miller**
41:7 57:20
58:3 60:4
120:19 121:11
123:19 134:8,

CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

12,15 146:9,
14 147:11
150:6,17
152:3 184:11
196:8,14,17
198:4

**million**
140:12 141:2

**mind**
113:4 119:12
195:18

**mine**
127:18

**minor**
131:3

**minutes**
7:3 43:12,15,
16 44:17,19
45:12 56:13,
19 63:4,12
111:12 127:12
129:7,9,14,17
188:3

**misled**
59:18

**misrepresent**
53:5,6

**misrepresentat ion**
150:17

**missed**
162:14

**misses**
92:18

**Mississippi**
191:12 204:16

**MK2**
143:12

**mode**
47:20

**moment**
22:1,7 43:19

**month**
8:7 10:22
74:8,9 165:1,3
191:20

**months**
41:10 147:22

**Moore**
120:4,12,19
121:5,8 124:6,
7,12,13 134:8,
12,14 147:2
148:13 176:15
205:6

**Moore's**
176:13

**Moran**
186:2,8
188:10
190:14,15,17
202:21

**more**
7:20 10:14
13:14 26:9,16
64:9 90:8 91:5
99:2 101:14
105:13 106:5
109:7 126:1
128:19 129:6
134:4 136:14
145:6 165:6
186:4 187:20

**morning**
5:4

**Morris's**
178:10

**Morrisey**
153:9 184:10,
14

**Morrisey's**
153:18

**Morrison**
55:4

**Morrissey**
19:8 33:6 35:2
37:11 39:3
40:8,10,15,18
41:7 56:5,12,
18 80:6,22
81:1,4 86:6,22
87:16 92:21
93:15 96:6,22
98:4,12,20
100:3 104:2,
10 112:2,10
113:18,22
114:11,15
118:3,15
120:7 121:17
122:2,11,15
124:4,11,16
147:21 148:6
154:13 156:14
157:9,18,20
174:12 175:8
177:4,21
178:3 185:1
194:7 196:7
197:4,9,17
201:7,9 205:5
209:9

**Morrissey's**
94:13 117:18
120:20 177:18
201:5

**Morrisseys**
81:5 175:21

**most**
143:5

**mostly**
202:17

**motor**
133:9

**move**
15:22 40:4
43:3 52:9
53:12 130:7

**moved**
53:2 114:17

**movement**
131:1,13,21

**movements**
8:15

**moving**
132:2

**multiple**
123:3 153:4

**must**
104:15 169:4

**myself**
62:6 158:15

———

**N**

———

**name's**
158:14

**named**
186:7

**Nanavati**
5:18,19 6:20
7:3 21:18 25:8
30:21 33:19
34:1 38:3
42:9,14,20
43:6,9,13

**44:**3,6,12,18
45:1,9,11
46:15,21
48:19 50:5,11
51:19 52:4,8,
12 53:7,10,13
63:6,10,13,17,
20 64:7 68:8
71:18,22
79:18 83:6,11
94:5 101:11,
16,19 104:8
107:22 118:21
119:2,12,16,
18 120:1
122:15 123:1,
5,8 126:6,16
127:16 128:4,
8,13,15,18,21
129:3,11,20
130:6 132:9
151:21
156:11,20
158:4 173:2

**narrow**
17:14,19 70:8
107:4 115:1,
10,18 137:21
138:22
143:18,21
144:4

**nature**
9:10

**nav**
125:21

**Naval**
168:19 169:2

**navigate**
87:10 203:18

**navigated**
86:9

Case 2:24-cv-00490-MSD-LRL    Document 109-9    Filed 09/15/25    Page 80 of 96
PageID# 3759
CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

**navigating**
86:7 87:9,18
97:16 99:1
102:19 106:12
140:6

**navigation**
15:17,19 16:2
17:15 27:4,22
97:13,14
101:22 102:4,
6,9,14 104:15,
22 125:7,14,
20 126:9
137:15 163:11

**navigational**
30:8,11,17
31:3 67:9,10
69:22 105:7
133:14 137:16
139:19 163:4,
10

**navigator**
133:21 187:2

**Navionics**
117:14

**Navy**
162:16,17
168:5,9,12,13,
14,15,16
170:12

**needed**
98:5,21
111:21 114:8

**Neither**
24:13

**never**
65:10 66:9
134:20

**NFU**
125:17 180:20

201:8

**nice**
123:10

**Nicholas**
205:7

**no**
10:6,8 15:1
16:10,12
17:15 18:18,
21 19:2,5,11,
14 20:18 24:5,
13 25:3,14
26:6,16 27:6
28:4 29:14
30:9,15 31:22
32:5,9 36:9
37:1 40:11,16,
21 41:11,17
42:3 43:4 47:5
53:2,8 54:17
56:7,20 58:5,
7,14,22 59:10
61:5,14 63:1
69:14 70:5,17
71:22 73:9,13
74:7 76:4,18
78:12 84:9
85:19 88:4
92:5 94:16
98:10 99:22
100:2,12,22
101:7 102:1,5,
6,10 103:10,
13 107:6,22
110:11 113:3
115:18,21
118:11 124:7
128:13,15
131:2,20
132:9,20
133:13 138:14
139:11 140:4,

18 144:2
145:8,9
146:21
147:19,20
149:7,15
154:4,7,12,21
155:15
156:15,17
161:6 163:2
164:10 167:12
169:15 171:3
173:18 174:4,
9,18 175:12
177:6 183:19
186:13 187:20
190:21 191:2
192:6,12,14
194:19 195:1,
11 196:20
201:19 203:14
205:3 207:18
209:18,19
210:5

**NOB**
168:19

**nobody**
98:18

**non-consulting**
11:1

**none**
12:4 15:7
192:15

**Norfolk**
5:21 29:1 86:9
88:18 117:8
158:10,17
168:6,16
192:11,13,16

**norm**
141:12,21

**normal**
167:10

**normally**
40:22 94:22
97:4 182:21
183:1 188:1

**note**
43:2 194:10

**nothing**
34:20 106:17
107:1 114:21

**notice**
132:15

**noticed**
10:2

**noticing**
5:16

**notification**
144:9

**notified**
58:8 144:18
145:1 150:6
152:1,21

**November**
47:7,11,12
58:13

**nowadays**
133:3

**nozzles**
161:17

**NTSB**
198:14

**number**
5:6 96:14
109:20 132:3
133:12 143:9
144:13 153:3
178:1 184:8

206:18

**numeral**
82:7,13,14

**numerous**
20:3 67:21
68:2

---

**O**

**O'ROURKE**
205:6

**object**
46:12 83:22
119:8 194:1
200:12 203:5,
21 207:17
208:15

**objecting**
45:22 46:1
83:15

**objection**
14:21 25:7
26:5 29:19
30:19 37:21
43:3 46:14
48:16 49:11,
21 50:20 51:1,
2,12 52:9,16,
17 53:20
54:14 58:4,10
59:5,15,21
60:11 62:9
65:9,19 67:11
69:17 72:10,
18 77:1 78:20
79:6,13,14
80:2 83:3
84:21 85:18
91:6 94:3
95:5,11,18
102:15,21

CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

103:21 104:5
105:1,16
106:8,20
107:5 109:7
112:7,18
115:2,20
116:16
121:13,22
122:13 132:1,
8,11 145:18
147:6 149:5
150:21 151:5,
11,18 152:6
156:10
157:11,22
162:7 194:10
196:9,15
197:5 198:1,6

**objections**
50:13 51:3,10,
17 53:1,3

**observed**
191:5

**obstructing**
51:20

**obstruction**
101:22 102:13
103:2,3

**obtain**
173:20

**obtained**
183:21

**obvious**
128:19

**occupation**
160:5

**occur**
48:14 67:20

**occurred**

30:4 33:1
34:12 47:13
55:3 84:17
132:19 150:15

**occurring**
47:22

**Oceanic**
189:5 202:21

**off**
5:13 11:7 17:9
43:1,9,18
45:2,11,15
64:1 116:8
129:17,22
164:18 179:6
184:12,15
200:21 211:7

**offend**
7:12

**offer**
171:4

**offered**
25:4,9

**office**
198:10,13

**officer**
34:3 55:8,11,
18 96:6
104:14,17
105:6 169:3
187:2 200:22

**officers**
105:21

**offshore**
166:15 167:2

**Okie**
43:9

**omissions**
104:11

**onboard**
67:15

**one-man**
186:16,18
187:13 189:21
190:2 191:4,
16 203:7
207:11

**one-year**
169:8

**ongoing**
65:2 95:17

**only**
7:17 46:8
51:11,17 53:1
87:19 90:2
118:12 137:22
138:10 139:12
143:2 146:5
162:5 166:4
183:13 185:2
197:3

**OOW**
184:19

**opening**
70:7,8 89:17
138:9 140:19
160:2 161:7

**opens**
159:16

**operate**
96:22 133:3
139:22 162:21
166:4 167:4,7
181:11 185:21

**operated**
166:5 167:13

**operates**
55:11 163:20

**operating**
14:2 19:16
32:13,15,18
138:1 141:21
155:21 164:4,
11 188:6

**operation**
41:9 109:6,11
159:13 182:12
189:19,22
190:2 191:4
200:17

**operations**
16:11 133:10
168:19 190:8,
11 191:16
202:13,19
203:3 207:12
208:20

**operator**
55:12 104:19
105:11 106:3
110:2 189:7

**operators**
185:8

**opine**
21:1 85:4,10

**opining**
14:9 54:5
144:16

**opinion**
13:6 31:22
32:17 34:8,18
36:17 37:2,11
38:9,17 39:3,
14,19 40:7
48:4 54:21
84:16 85:1,10
90:7,17,21
91:13,20
92:10 96:5,11

98:8 99:12,21
100:11,21
101:2 103:2,
17 107:6
110:13 113:5
114:10 115:21
125:1 127:5
130:10 133:18
136:8,20,21
138:6,8,10,15,
17 139:2,4
140:4 143:20
144:6 150:10
153:20 154:3,
21 156:1
184:7 185:4
200:18

**opinions**
13:20 15:4,7
19:6 22:10
23:2,8,11
90:15 180:18
207:1

**opportunity**
190:10

**opposed**
118:18

**option**
43:5

**oral**
52:3

**order**
50:14

**ordering**
210:21 211:2

**orders**
164:7

**original**
121:18 130:10

CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

Ortsbarge
57:3

OSG
188:18 202:21

other
9:3 10:20
11:10,19
13:15,22
14:17 19:22
20:8 25:12
26:1 32:21
39:20 40:6,13
41:7 42:10,11
47:22 49:9,15,
18 53:16,18
54:9,12 67:7
71:7,10 77:20,
22 81:5 84:17
87:12 88:8
90:1 94:18
95:16 96:21
112:3 116:22
120:11 121:4,
17 124:4
126:4,13
128:9 132:5
137:20 146:8
148:6 153:14,
18,21 155:9
169:21 173:13
183:1 185:8
190:8 196:22
204:22

others
10:15 81:22

otherwise
107:19 162:18

outbound
86:9 186:17
187:22 188:2

outreach

187:14

Overall
186:13

overboard
9:11 68:1

Overseas
188:21

owned
29:1 84:19

owner
29:12 104:3,
12,19 105:11
106:3 115:8

owner's
71:1

**P**

P.M.
211:9

pages
22:19 81:18
130:11 173:17
175:22 177:11
179:20

paper
51:10

papers
51:9,10,14,16
52:22

paragraph
26:14 82:7,13
86:1 121:4
125:6 127:2
137:8 185:7
191:8,11

parentheses
124:17,18

part
15:6 27:21
46:6 98:17
119:7 155:2
163:3 181:18
199:10 205:8,
12,15 207:2,8
208:3,21
209:5

particular
15:15 22:15
31:13 32:8
40:19 68:13
70:4,19 74:21
78:16 79:4
92:15 93:14
94:1,20 99:6,
18 102:12
104:10 105:13
106:6 110:13
111:1,3
116:12 120:6
125:3 130:12
133:9 138:18,
21 140:15,21
148:11 159:1
160:6

particularly
139:22

parties
6:8 128:16,20
193:20

party
42:6 128:5

passed
125:7,8
126:18

past
147:21 170:12

paste
123:16

pasted
120:15

path
102:19

patience
192:18

pay
110:11 183:1

paying
37:12 39:4,10
54:19

peak
165:1

people
97:21 142:15
148:8 165:15
176:14 186:10
189:12

percentage
11:18

percentages
11:2

performance
48:1,13 49:19

performed
30:12 31:12
127:6

performing
166:3

period
38:12,16
164:21 207:22

permit
115:9

permitted
42:11 107:19

person

9:12 46:8
155:21 156:2
186:20 197:3

personal
202:8 204:8

personnel
185:9,19

Philadelphia
191:12 204:14

phone
54:7 174:12,
14,20 175:4
191:19

photo
57:16

photocopy
183:17,19

photos
56:11,14
99:10 100:5,
11 101:4
145:11,16,21,
22 180:11,14
181:4,14,17

physical
36:19

picture
61:16,18 62:1,
3,5,7 88:10

pictures
146:4

piece
107:11 179:15

pier
93:7,10
194:12

piles
36:14

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

pilot
11:5,10 20:1,
2,15 27:2
70:16 73:5,10
109:17 160:6,
8,12,16,18,21
161:6,10
162:4 163:4
164:3,10,12,
21 165:19,20
166:4,8,9,12
167:4 168:10
185:10 187:4
190:7 192:3,8
204:2,12,13,
14,15,17

pilot's
191:21

piloted
20:9 110:6,7

piloting
16:2 167:5
195:6

pilots
68:17 70:2,12
142:2 165:16,
17 167:3
168:5,8,11
191:11,19
192:6,13,15
204:16
209:13,16

place
13:6 47:2
125:3 163:17
189:15

places
121:3,4

play
39:8

Pleasure
16:5

point
8:20 28:10
33:7 35:18
38:6 88:19
98:11 103:10
111:13 129:5
131:17 135:17
153:1 173:3,
16 184:8
185:3

points
85:5 110:15
111:3

policy
115:18 208:13

pops
72:1

port
16:9 20:6
24:1,3,9,12
68:16 136:15
139:17 140:7
141:17 143:2
147:9 160:6,
20,22 162:10,
11 164:2
165:16 166:17
167:14 182:8,
19 185:11,21
186:4,19
188:7 190:6
191:8 195:16,
17 204:17

Porter
205:5

ports
143:1 191:2,
22

Portsmouth
5:21 117:8
158:10,17

position
57:14

positions
209:7

possible
63:8 186:9

possibly
10:15 11:21
28:9

post
111:13 177:18

Post-incident
153:4

posted
14:3 111:18

potential
102:8 110:20

practical
137:18,19

practice
10:5,7 30:16
31:19 107:8

practices
62:18

preceding
56:13,19,20

precise
51:13 109:8

predate
92:19 108:10

predominantly
161:8

prefer
7:8

Preliminary
81:11

prepared
22:15 74:1,2,
3,13 109:18

present
5:15

presumably
40:5 107:14
112:14 123:19
150:5,17
184:10

presume
188:13

pretty
42:16 93:9
122:2 125:22
165:13 189:13

prevailing
201:1

prevent
107:1 115:8

prevents
104:19 105:11

previously
9:16 12:14
178:9

prior
15:2 17:19
30:8 31:12
32:4,8 35:8,
17,22 72:16
86:18 87:17
92:18 111:7
124:18 147:22
193:6 205:20

privileged
25:7

probably
112:14 129:6
130:9 147:15
149:3 158:7
165:5 175:16
195:11,12

procedure
50:16 55:9,10
69:4 106:13
116:5 125:22
126:7 181:1

procedures
106:15 108:3
125:12 180:19
188:6 191:1

proceed
44:2 45:20
64:6 130:5
179:11

produced
35:14

program
165:22

prohibit
106:18 107:12
114:21

prohibited
68:15 85:12,
17 107:7
201:2

prohibits
106:3 115:13

promptly
144:18 145:1

proper
12:16 180:22
209:9

properly
14:19 37:14

Case 2:24-cv-00490-MSD-LRL    Document 109-9    Filed 09/15/25    Page 84 of 96
PageID# 3763
CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

48:5 125:19
184:19 200:18

**propulsion**
164:5

**protocol**
126:7

**protocols**
125:12

**provide**
9:8,9 10:13
11:16 15:5
23:3 46:1
64:22 65:1
178:12

**provided**
9:14,20,21
10:10 11:15
13:21 15:5
40:18 41:6,19
47:9 49:17
57:17 64:12,
15 66:14 67:8,
18 145:11
205:11

**providing**
13:5

**provision**
207:2,9,16
209:6

**public**
162:17

**publication**
154:17

**publications**
155:10,12,14

**published**
27:3

**pull**
22:1 118:19

195:20

**purpose**
108:19 178:11

**purposes**
137:18,19

**pushed**
29:5 84:18
136:17

**pushing**
28:22 84:10
135:19 189:11

**put**
33:6,7,13,17,
22 39:15
40:15 48:18
50:1 52:10,16
54:1 55:20
66:21 81:19
107:11 109:20
115:22 118:16
119:1,4
122:21 123:7
133:2 164:15
175:16 180:14
199:8 206:15

**putting**
79:16,20
114:4 116:4

**Q**

**qualified**
15:14,18

**quarter**
129:19

**question**
8:4,9,10 15:21
20:22 23:6
30:22 34:10
38:2 41:3,5

44:8 46:18,20
50:6,10 51:5
53:11 59:7
61:22 65:16
68:19 69:8
83:5 93:19
95:20 98:3
99:16 104:7
105:8 106:1,2
107:21 108:1
109:14 112:9
113:3 119:9
122:9 132:12
134:10 145:19
148:22 149:8
151:15 155:8
156:17 169:1
175:11 177:16
182:16 187:16

**question's**
135:15

**questioning**
50:10 119:8

**questions**
7:6,22 22:6
28:19 41:14
50:15 73:15
119:3 128:5,
12 129:6
158:6,7,20
170:22 172:20
175:9 179:2,4
187:18,22
192:18 209:19

**quick**
28:18 71:13

**quickly**
157:6 210:15

**quote**
207:12

**R**

**radar**
125:21

**railboat**
100:18

**railroad**
5:21 29:22
61:17 82:18,
21 88:18
99:15 117:9
158:11,17

**raise**
6:12

**ran**
112:14

**rates**
74:21

**rather**
91:15 121:20
136:19

**ratio**
138:18,21
139:9 171:5,6,
7,9

**reached**
187:7 190:15

**read**
33:15 41:15
45:1,2,8 46:19
51:21 64:18
69:9 71:4
93:17 104:13
148:8 149:14
152:13,16
169:2 176:14
177:15 200:15
202:6,12

**reading**
8:7 17:8 18:12
33:4 41:13
47:5,16 49:10
113:13 205:4,
8

**real**
97:13 195:12

**reason**
31:22 39:5
73:8 83:1,15
84:3 98:10
100:22 107:12
109:12 112:12
113:19 115:22
118:14 133:18
145:9 146:21
154:7 164:16
191:6

**reasonable**
200:17

**rebuttal**
74:1 130:9
179:16 185:3

**recall**
9:6 13:5 17:19
23:21 24:3
35:18 36:2
47:4,7,8,15,21
48:3,15 49:9,
12,15 54:15
67:4 68:1,5
69:13,18,19
72:20 76:12
77:20 79:3
80:19 81:15
93:1,8 103:10,
12 108:14
118:11 132:20
135:18 149:20
167:22 168:21

CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

169:13,17
170:2,10,13,
16 173:17
174:22 175:1
176:2,4,6,20,
21 177:1
190:18 191:20
193:5,16,17

**recalled**
49:5

**receive**
41:2 155:3
176:16

**received**
21:4,7,12
86:20 145:22
173:7,9
176:19

**receiving**
145:16

**recently**
71:11 75:7

**recess**
43:20 45:16
64:2 130:1
178:21 179:1,
7

**recognize**
81:22

**recollection**
35:21 76:21
79:10,21 93:4
175:19

**record**
5:3,14 6:22
7:13 21:17
43:1,10,18
44:1 45:2,3,
12,15,18
46:14 53:3,6

64:1,4 79:16
129:22 130:3
175:4 179:3,6,
9 184:9
190:19 191:6
192:4 206:1
210:4 211:7

**recorded**
80:17

**recording**
76:2

**recordings**
75:12,14 76:1,
3,5 173:4

**records**
76:6,7 77:14
173:6,15
174:12,14,20
175:3 196:18

**red**
89:14,15 91:5,
9 135:9

**refer**
21:8 77:12
123:11 177:2

**reference**
55:12 184:17

**referenced**
120:14 185:12

**referred**
127:1 140:14
161:11 168:18
176:13 200:2

**referring**
78:10 81:1,5
122:21 175:20
177:5,9 178:2,
6 199:21

**refers**

80:12

**reflected**
197:21

**refresh**
53:22 79:2

**regard**
91:20

**regarding**
13:21 15:19
19:7 26:1 41:8
47:1,10,22
48:12 49:18
54:10 55:16
66:15 67:9,18
90:15 94:9
98:19 120:6
121:11 193:20
207:9

**regardless**
65:17 151:2

**regular**
8:12 31:22
32:3 111:17
142:1 188:8
190:22 211:2

**regularly**
141:9

**regulate**
104:1,3

**regulation**
154:17

**regulations**
66:15 68:16
98:19 116:15
155:9 208:14,
18,19

**reiterated**
209:16

**related**
12:15 27:4
65:7 66:4,16
68:5 71:1
77:22 94:18
120:19 133:15

**relates**
15:2 25:15,19
26:3,22 32:7,
11 36:10,11
40:19 54:22
64:11 90:22
92:9,11 96:1
99:4 103:15
106:22 110:18
126:8 133:10
144:9 157:8,
20

**relating**
12:10

**relative**
191:16

**relayed**
196:13

**relevant**
15:10 18:13
118:13 151:3

**relied**
200:10

**relieve**
167:8

**rely**
123:13 208:3

**relying**
120:6

**remember**
28:13 50:8
72:19 81:22
132:18 135:8

158:3 169:21
193:8,10,13,
14

**remembers**
81:21

**remind**
44:7 46:17

**remote**
5:8 7:18,19

**repair**
72:9 193:17
205:20

**repairs**
193:6,21

**repeat**
8:5 36:20 38:1
57:5 60:2
104:7 111:2
153:16
209:13,15

**rephrase**
8:5

**replaced**
159:22

**reply**
51:14

**report**
10:10 18:12
21:5,7,13,14,
19 22:5,7,9,
14,18,22 23:7,
10 26:10 34:1,
20 58:18
59:12 60:5
64:10 73:16
74:5,13,20
77:2,4 94:9,10
103:16 108:13
113:13 118:7

Case 2:24-cv-00490-MSD-LRL    Document 109-9    Filed 09/15/25    Page 86 of 96
PageID# 3765
CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

119:7,21
120:3,16
123:12,14
145:9 146:9,
11,13,17,19,
21 147:3,10,
14,15,20
148:3 149:17
170:19 172:22
173:11 174:2
179:14,16
180:12 185:6
191:7 198:19
199:4,8,21
200:3 203:10,
12 206:6
207:22

**report's**
74:10

**reported**
57:20 59:2,19
60:9 146:12
147:2,4,11
148:1,4,15
149:11,18
150:18 184:11
194:15

**reporter**
6:10,11,18
8:14 46:19
71:13,14,19
101:9,13,18
178:12 210:3,
5,14,19 211:4

**reporting**
14:19 66:13,
16,17 67:1
146:18,19
151:7

**reports**
55:13,15,16

73:21 108:8,
10,12,16,18,
20 120:7
173:13,22
184:14

**represent**
5:19,21 6:1,4
7:4 158:16

**representative
s**
202:9

**represented**
58:20

**represents**
158:10

**request**
166:6

**requested**
46:20 145:22

**require**
112:17

**required**
30:11,13,14
31:16 59:11
61:8,14 62:22
103:18 145:2
147:10
162:13,16

**requirement**
104:15 147:20

**requirements**
26:15 32:7
66:17,20 98:2
116:19 200:20

**requires**
189:21

**research**
42:22 43:1

**reserve**
169:3 198:19

**Resolve**
27:15 28:9

**respect**
92:15 148:10

**respectfully**
137:9

**respond**
51:5

**responded**
59:3

**response**
78:16 79:5,11,
22 153:8
184:6

**responses**
8:13

**responsibility**
164:9

**responsible**
51:15 109:11

**rest**
26:15 98:1
200:20

**restricted**
97:5 98:15

**restrictions**
143:18

**restrictive**
116:22

**restroom**
119:20

**resume**
169:2

**retailer**
72:7

**retained**
8:18 211:11

**retired**
169:2

**Reuben**
167:20 170:18

**reverse**
35:17

**review**
37:3 58:16
78:22 80:4
109:3,5,12
135:7 153:14,
17 158:1
172:22 193:11
196:17 203:9,
12 208:19
209:6,7

**reviewed**
23:8 25:20
26:1 37:16
48:9,11,13
50:8 57:2,9
61:4 68:20
71:10 72:11,
14 73:4 75:15,
18,22 76:13,
22 78:2 81:8,
19 90:3 95:8,
14 108:7
143:15 146:6
147:18 154:7
157:13 173:9,
14 174:8,14
177:16 184:4
193:19 194:2,
18,21 195:1
197:6,8,11
203:9,14
204:18

**reviewing**

193:13

**riding**
168:8

**risk**
31:5 67:10
110:20 113:2

**River**
167:20,22
170:8 191:12
204:15,16

**rivers**
170:12 203:18

**road**
17:6,16 27:15,
22

**Roads**
167:14 168:4
185:21

**Rob**
5:10

**Rodgers**
6:3,8 8:22 9:4
14:21 25:7,12
26:5 29:19
30:19 31:1
33:17,21
37:21 42:5,13,
18 43:4,7,11,
14,16 44:4,5,
10,15,21 45:8,
10,21 48:16,
20 49:11,21
50:7,12 51:7,
22 52:7,10,15
53:8,12,20
54:14 58:4,10
59:5,15,21
60:11,17 62:9
63:3,9,11,16
65:9,19 67:11

Case 2:24-cv-00490-MSD-LRL    Document 109-9    Filed 09/15/25    Page 87 of 96
PageID# 3766
CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

**role**
161:5 162:5
163:20 164:2

**Roman**
6:7 82:7,13,14

**room**
109:20

**Rose**
6:6 24:7,10,19
25:1,6,10,16
26:4 28:21
29:6 30:7,18
32:3,12,17
35:8,15,16,18
41:8 47:3
55:1,8 57:3
58:21 61:2
64:13,17 65:7
66:4,15 67:9
73:1 84:10,19
86:8 88:17,19
90:18 91:14
92:10,16
97:17 101:5
102:19 103:6,
10 106:11
110:22 111:7
125:13 126:3,
8,12,20 127:6
148:7 179:18
184:8 190:1
200:18

**Rose's**
92:11 102:14

**rough**
12:2 77:9
195:12
210:12,15
211:2

**roughly**
11:3

**Rogers**
6:3 158:16
179:4 192:19

68:22 69:17
72:10,18 74:7
77:1 78:20
79:6,13 80:2
83:3,7,13
84:21 85:18
91:6 94:3,6
95:5,11,18
102:15,21
103:21 104:5
105:1,16
106:8,20
107:5,21
109:7 112:7,
18 115:2,20
116:16
118:12,16,22
119:4,15,17,
20 121:13,22
122:13,16
123:2,6 126:4,
13 127:14
128:2,6,11,14,
17,19,22
129:8,14,18
132:1,7,11
134:9 145:18
147:6 149:5
150:21 151:5,
11,14,18
152:5,12,19
156:10,15
157:2,10,22
158:9 162:7
178:7,14,17
192:21 193:2
195:22 199:3,
6 209:18
210:9,12,17
211:1,5

**route**
31:21 32:3

**rudder**
135:6,11
136:10,11,13

**rudders**
135:4

**rule**
208:7

**rules**
15:17,19 17:6,
16 27:15,19,
22 28:11
50:16 104:20
116:14

**run**
127:18

**running**
93:8 135:17

---

**S**

---

**safe**
102:8 109:6

**safety**
16:5,13 62:14,
20 67:4,6
104:20 105:12
106:4 109:11
207:5

**said**
22:5 31:11,15
40:3 48:10
51:9,16 60:13
65:21 84:5
90:19 91:2
101:14 107:15
120:11 121:21
134:19 137:17
142:11,15

**Sam**
5:5 7:9,11,13
22:10 46:22
63:8,17 64:8
126:9 130:7
134:9 158:14
176:7 179:2,
13

**Samuel**
6:14 7:1

**Sandy**
204:12

**satellite**
47:18 49:1,16
53:18 78:4,14,
18 79:5,11,22

**satisfactory**
13:7

**scene**
14:18 57:21
59:4

**schedule**
11:5,6

**schools**
66:8

**scratch**
198:16

**screen**
54:1 55:21

146:11 148:16
151:9,21
152:11 160:1
161:6,21
167:21 170:9,
16 171:3,10
172:1 173:5
177:11 178:4,
20 182:18
190:21

**screens**
181:21 182:5
183:14

**screenshot**
118:12 199:7

**screenshotted**
77:4

**sea**
21:3 86:10
163:7 166:12,
14,16,20,22
167:1,14
168:3 170:15

**Seamanship**
16:21

**season**
165:1,2,9,12

**section**
74:1,20 85:14
96:2 108:11,
15 114:19
119:13 120:6
125:6 127:11
144:19 145:2
153:6 172:22
207:5 208:4,
10 209:3

**sees**
126:4

**Senate**
207:22

**sense**
11:17 20:13
80:17 107:6,
10 115:22
130:14 172:14

123:7 150:1,3
176:8,10
184:10

sentence
82:6,17
179:22 185:11

separate
191:14

separated
17:11

serve
98:4

serviced
72:17

servicing
18:20

serving
10:20 25:19
55:19 164:20

session
208:1

set
37:19 187:18
196:13

setting
104:20 105:5,
12 106:4

setup
186:21

severe
136:14

share
150:1 176:7

Sharif
205:5

ship
16:17 97:7
110:5,6,7
138:3 141:16
143:2 155:17
163:6 167:5,

19 169:20,21
170:14,17
187:21

ship's
163:3

shipboard
16:13

Shipholding
188:21

ships
69:5 100:13
133:3 141:14,
15 160:15
168:3,16
182:18
186:14,15
191:9

shipyard
170:11

shoaling
97:11

shore
148:8

Shoreline
189:9 202:22

shoreside
66:10 185:9,
19

short
63:7 168:19

shortly
134:19 158:8

shot
184:10

should
26:18 41:13
43:13 47:20
55:18 65:18

76:5 108:15
109:5 110:14
113:14,20
122:19 134:7,
8 136:7
175:16

shouldn't
65:18 69:15

show
93:20 150:1

showed
103:10 125:6
126:17 183:8
195:19

showing
61:17 100:6
180:12

shows
56:12

shut
150:8 152:4

sic
210:2

side
13:9,10,14
29:8 89:11,13
112:15 146:4
147:9 148:9
159:16

sideswipe
145:17 146:3,
7

Sighting
202:22

Sightseeing
189:9

signals
54:8

signature
206:10 211:10

signed
176:5

similar
23:6 69:16
70:1 71:8
203:13

similarly
91:19 106:22
110:1 124:3

Simrad
41:9 70:20
71:1,7 143:12
179:17 182:15
183:18

SIMULTANEO
US
52:6 68:7

single
14:1

sir
20:5 94:15
100:10 101:7
135:14 158:6

sit
42:10,11,17
76:20 79:3
89:18 136:6

situation
13:11 14:8
78:17 96:16
98:14 100:4
110:19 113:2,
9,12 115:14
116:9 117:1
132:21 136:4
143:5,21
144:7 148:11

situational
37:8 39:4,8
40:1 92:2,4
112:13 113:19
133:20 201:10

situations
142:22

sixth
174:11

size
137:22 140:16
141:22 163:16
166:13

skipping
130:11

slid
61:13 145:7
147:8

slight
136:2

slow
34:4

slowed
34:18 35:16,
22

slowing
35:19

slowly
36:15,18,21

small
11:4 55:7
94:21 100:17,
20 139:15
140:3 143:3,4
163:7 187:1,3
189:17

smoke
54:8 132:15,
17 133:1,4

CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

**SMS**
203:3,17
207:13

**sole**
201:10

**some**
7:6 10:14
11:19 15:10
17:2,5 19:6
22:6 33:1,7
38:6,12,16
57:15 67:17
71:1 73:8,15
76:2 79:9
80:17 81:21
90:15 112:12
116:11,12
122:5 128:9
138:4 140:11
141:14
158:20,22
167:4 169:4
170:22 171:5
172:1,20
175:8,20
179:20 180:14
181:21 182:11
184:9 186:12
187:10,11
192:15

**somebody**
96:20 121:8,
20 123:19
124:4 148:6
154:19 163:19
164:4,12
165:18 174:6
182:2 187:15
190:8

**somehow**
173:19

**someone**
87:10 98:7
114:3

**someone's**
154:22

**something**
12:22 39:21
42:19 44:13,
16 51:21
65:10,12,15
66:5,9,11
67:13 71:16
75:11 78:11
81:11 86:13
93:16 107:17
111:9,19
112:3 122:18
123:2 126:14
130:13 134:17
139:1 146:13,
16,20 174:8
178:2 182:21,
22 187:3
194:7

**something's**
40:3

**sometime**
180:4 193:15

**sometimes**
7:19 142:15

**somewhat**
35:19,22

**somewhere**
165:5 168:1
170:10 195:13

**sort**
164:5

**sounds**
46:15 133:13
165:9 190:6

**source**
139:8

**South**
88:18

**southern**
29:1 86:9
170:8

**speak**
24:22 25:5,9
46:6 151:1

**speaking**
9:18 50:13
51:10,12,17
52:6,15,17
53:1,2 68:4,7

**speaks**
121:14

**special**
160:11

**specific**
48:17 70:6,14
160:21

**specifically**
17:17 122:21

**specified**
5:13 62:4
97:12

**specify**
190:2,4

**speed**
32:12,14,17,
22 35:15

**spell**
101:14

**spend**
45:4

**spent**
168:12

**spoke**
186:11

**spoken**
23:14,17 24:6,
18 70:11 88:2

**spot**
55:17

**SSI**
48:15

**St**
204:14

**stand**
192:20

**standard**
55:9,10 62:19
67:15 97:19
106:10,12
116:4 125:22
127:9 138:12
146:18,19
171:4 188:6,8

**standards**
96:10

**standby**
47:20 98:6

**start**
110:22 132:22
133:5 136:1
137:20 155:13
187:22

**started**
35:2

**starting**
179:15

**starts**
30:18 137:9
173:1

**state**

**stated**
34:3 46:3

**statement**
87:13 117:19
118:4 121:16
122:5,7,10,20
123:15 124:16
134:19 151:3,
9 152:1,4,17,
20 175:20
176:9 177:18
197:9,12
201:5

**statements**
56:17 87:3
118:3 122:1
123:3 131:2
153:15,18,21
154:1,3
175:13,14,16
178:5

**stationary**
71:17

**stay**
98:1 109:19

**stayed**
89:5 135:12,
13

**stays**
135:6

**steer**
142:5

**steering**
34:4 77:9,21
78:8,13 116:2

6:21 83:3
110:19 112:4
113:15 114:2,
11 135:12
168:10

August 11, 2025

122:4 124:18
125:6,14,16,
18 126:8,17
142:13,21
143:6 144:4
164:5 180:20
184:16,20
194:3

**Stephenson**
5:5 6:11,14
7:1,2,10 22:10
158:9 196:1

**stern**
33:6,7,13
34:4,5,21 35:8
133:2 136:3,
16

**stick**
100:19

**still**
73:18 162:11
170:19 174:5

**stool**
187:3

**stop**
8:4 50:20
52:11 102:18

**stories**
122:2

**story**
196:7 198:3,7

**straight**
91:4 134:3
172:5

**Street**
19:21 20:7,12
159:2

**stringent**
105:13 106:5

**strong**
93:8 135:16

**structural**
130:22

**structure**
34:14 36:19

**stuff**
130:8 156:19

**subject**
15:16 17:21
70:13 190:20

**subjective**
138:14,17
139:10,12
171:14 172:2,
18

**subjects**
67:19,21 68:2,
3

**submitted**
95:13 120:3,8,
9 184:18
199:14

**subpoenaed**
198:10,14

**substantive**
46:7 52:21

**suggest**
32:22 35:15
51:2 52:4 84:8
111:4 139:8
156:22

**suggested**
67:7

**suggesting**
136:7

**suggests**
58:18

**super**
71:20

**supposed**
206:4

**surveillance**
57:10 100:1,
12 103:8
131:1,14,19,
21 132:14
144:1

**survey**
185:8 187:8
191:18 192:5
202:7 203:1,
13 204:1

**surveyed**
191:11 204:10
209:13,17

**swear**
6:10

**switch**
34:3 124:17
184:15,20
201:8

**switching**
137:7

**sworn**
6:16

**sync**
210:7

**system**
29:9 40:10,15,
20 41:9 54:11
62:15,16,20
67:4,6 107:15
125:7 126:18
181:12,15
182:15,20
183:2 207:5

**systems**
18:20 19:1,4
104:22
125:18,20

---

**T**

**T-MOBILE**
174:12,19
175:1

**take**
7:5 12:20
43:11,12
50:18 116:13
119:10,14
127:12,19
129:6,9,13
135:1 136:3
137:6 140:10,
20 141:1,8
154:22 155:6,
21,22 156:4,
14 157:5
161:6 163:4,8
167:9 178:21
179:1,13

**taken**
43:20 45:16
64:2 101:4
130:1 154:18
172:8 179:7
195:2 204:20

**takes**
155:17

**taking**
140:15 154:12
161:9

**talk**
86:22 123:12
185:14,17
186:7 187:22

190:7,17
192:10

**talked**
18:8 23:18
24:1 56:10
68:17 70:2
73:16 86:14
137:7 139:17
140:8 143:8
146:6 157:14
185:9 187:10
189:14,18
190:13

**talking**
17:6 20:3
31:5,8 35:11
39:13 48:21
69:5 77:13
97:1,6 116:9
142:9,14
151:6 159:5
171:2,13
173:10 188:4
192:3 202:7

**talks**
143:12 185:7

**taught**
27:20,21

**team**
46:6

**technical**
72:6

**technically**
164:3

**telling**
59:19 114:22
115:8 122:2

**temporary**
169:5

CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

**Ten**
63:16 128:21

**term**
71:20 83:7,9,
12 138:13

**terms**
135:3 181:7

**test**
125:6,13,16
126:17,19

**tested**
61:9

**testified**
6:16 9:15
69:10 206:2

**testify**
15:19 17:21

**testifying**
46:11

**testimony**
9:8,9,21
10:11,13
11:16 56:11,
17 68:9 69:9
176:18 197:22

**testing**
125:12 126:7
150:20

**tests**
61:1 127:1,6

**Texas**
27:20,21
167:19

**text**
57:18 61:20
62:1 76:9,12,
21 118:8
120:15,18
121:1,7,10

124:9 134:4,
11,13,18
152:15,16,17,
20 175:2
197:13,19
199:20 200:2

**texted**
62:3

**texting**
174:15

**texts**
60:16

**That'll**
128:19

**thing**
7:17 26:7
73:20 132:5
146:8 155:15
164:6 179:22
186:17

**things**
18:11 40:6
45:5 81:21
88:8 131:8
172:21 185:3

**think**
8:8 18:12 21:6
31:11,15 35:1
42:16 45:5
47:18 51:12
63:4 77:13
81:18 86:6,16
88:7 101:11,
14,17 103:1
105:4,18
107:19 114:20
119:11 120:15
123:9 127:16
128:5 130:8
137:5,6
142:11,15

143:8 144:13
148:2 149:12,
13 150:2
151:2 157:14
158:5 159:1,8
160:1,19
161:2,6,18
162:2 170:21,
22 171:3
173:6,16
174:14 178:2,
22 180:11
186:2 200:4
207:6

**thinking**
114:15 147:15

**third-party**
72:6 205:20

**thought**
8:10 44:16
119:14 145:17
147:18 149:15
201:8

**thousands**
20:17,18
106:14 182:18

**threatening**
52:22

**throttles**
163:12

**throwing**
156:19

**thrusters**
161:15,18

**till**
129:19

**time**
5:9 11:11 24:4
29:16 38:12,

16 43:18 44:1
45:4,15,19
48:4,6,7,8
50:12 52:1
63:3 64:1,5
72:4,15 74:13
75:2 84:11
87:20 90:11
92:11 100:13
111:11 112:5
114:15 127:13
129:22 130:4
133:21 134:21
135:1 136:9
143:6 145:3
147:17 152:7
160:18 164:13
170:6 179:6,
10 191:2
209:16 211:7

**timeframes**
76:14

**times**
5:13 99:2
136:3 139:18
151:21 164:20
166:8 195:10

**today**
7:6 9:18,22
27:9 28:20
69:12 76:20
77:16 78:1
79:3 89:18
92:20 136:7

**told**
44:22 60:9
79:15 87:6
122:5 145:5,9
146:9 147:4,7
148:14,15,20
149:10,18
151:17 169:19

191:15 196:8
198:4

**tomorrow**
210:17

**Tonight**
210:17

**top**
77:8 82:15
123:15 131:17
134:3

**topic**
15:16

**topics**
18:14

**total**
22:18

**totally**
131:17

**touch**
146:16 163:12

**tour**
189:17

**Tow**
202:20

**Towing**
5:6 6:4,5
190:14
202:20,21

**track**
29:22 44:9
61:17 88:16
91:3,5,10 92:1

**tracks**
57:14 62:8

**traffic**
98:10 103:5,
11 116:21
143:3,19,22

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

144:4 159:10
165:2 189:18

**train**
40:22 65:14
119:14

**training**
25:18 26:3
32:6 40:18
41:1 64:11,15,
18,19,22 65:3,
6,11,21 66:2,
5,6,8,10,12,14
67:7,8,18,20
68:5 160:12,
17,18 165:21
167:18 169:20

**trajectory**
89:3,6

**transcribed**
11:16 80:16

**transcript**
8:8 46:20
178:13
198:11,14,20
210:7

**transcripts**
68:21 176:17
204:19 205:8

**transit**
89:16 91:3

**transited**
19:17 20:10
70:3,12,15
88:17 170:7

**transiting**
28:15 68:12
85:13,17
115:10 201:3

**transits**

20:14 89:10
160:19 164:19
165:5 169:1,
19,22

**trial**
9:22 15:5 23:4

**trials**
170:15

**tried**
192:14

**trip**
30:18 104:14

**trips**
162:13,16

**trouble**
24:16

**true**
60:19 139:11
148:19 151:3,
10,13 152:4,
17 156:19
188:16

**truth**
148:20 153:9,
13

**truthful**
149:7,10

**try**
51:4 64:8
79:19 82:2
130:7 176:7

**trying**
8:15 53:9 63:7
80:11 83:14
90:16 105:2
126:11,18
158:21 171:11
173:18 177:13

**TSMS**
207:9,12

**tug**
6:5 16:11
25:19 26:4
99:18,20
100:8 140:2
142:6 179:17
185:8 188:7
189:2,7
190:22
201:14,17
202:9,12,18
203:8

**tugboat**
27:4 132:16
187:11
188:11,14
189:11,13

**tugboats**
182:18

**tugging**
69:6

**tugs**
186:17,19,22
189:1 191:9
195:6,15
202:20 203:17

**turn**
74:19 75:8
77:7 78:7 82:4
88:9 92:6
95:22 102:13
108:2 114:16
117:5 136:15
144:8 154:9

**turned**
182:1,2
183:13
184:12,15

**twin**
161:18

**two-hour**
189:17

**two-man**
99:3

**type**
8:14 14:4
64:21 72:6
93:21 107:2
123:16 133:6,
8,9 140:20
141:22 171:5
175:11,20

**typed**
80:19,20
176:3,4

**types**
140:5

**typical**
156:3 163:16

**typically**
140:6 142:12
161:15

**typo**
26:8 206:3,5,
14

**typos**
206:2

---

**U**

**U.S.**
114:4 167:18

**ultimately**
173:5 194:5
197:16

**uncomfortable**
63:14

**undergo**
160:11

**undergoing**
165:21

**underneath**
91:10 97:9

**understand**
8:4 29:21 30:3
31:7 32:12
37:22 46:9
59:6,13 60:4,8
73:22 80:3
90:13 91:2
101:2 102:16
105:2 116:3,6
126:18 131:20
145:19 159:9
160:5 168:2
171:6,12
172:11 173:8,
19 177:13
180:3 181:7
184:6 185:13
187:5 197:14,
16 198:9
199:10,13
200:1

**understanding**
28:19 29:4,7,
10 32:16 36:4
46:22 57:1
58:1 59:17
72:3 83:16
89:19 91:13
95:2 116:12
125:11 126:10
127:5 133:8
158:22 177:17
187:9 196:12
197:15,20
198:5

Case 2:24-cv-00490-MSD-LRL    Document 109-9    Filed 09/15/25    Page 93 of 96
PageID# 3772
CAPTAIN SAMUEL STEPHENSON, J.D.

August 11, 2025

**understands**
83:10

**understood**
70:10 166:19
171:4 180:22
185:14

**underway**
181:9,12,13

**unit**
65:14 117:14
130:21 132:4
133:13

**unless**
5:13 142:10,
11 162:12
164:15

**unsatisfactory**
13:7

**until**
53:17

**unusual**
11:6

**upper**
56:12,15,18
86:7,16,18,22
87:4,8 97:17
98:13 99:5,14
112:21 113:7,
10 180:13,14
181:2,15
183:12,15
186:21,22

**USCG**
75:11 118:7
123:22 173:4,
5,15

**use**
12:11,16 20:6
41:8 65:7,11

68:11,18 69:6,
11,22 71:2,9
72:4 85:12,17
91:3 103:15
107:4,16,18
114:19,22
115:9 116:5,
20 119:20
140:21 141:20
142:12,16
143:18 144:3
171:6 201:3
209:3

**used**
69:15 107:8,
13 133:4
159:10 182:15
191:9

**USG**
118:9

**using**
133:6,8
203:18 209:10

**usual**
163:16

**usually**
156:4 167:2

— V —

**vague**
30:19 60:11

**vantage**
131:17

**variation**
165:2

**variations**
135:22 171:21
172:2

**varies**
10:14 11:12
163:21 164:22

**various**
65:3,4 182:9
205:19

**veer**
90:18

**verbal**
8:13

**verbally**
53:15

**versus**
11:19 131:18
138:19 139:1

**vessel**
12:6 13:15,22
14:6,8,18 16:5
19:16 21:9
23:19 24:2
30:17 33:4
34:14 36:3,15,
18 37:10,15
38:4,11,15,20
39:8,11 40:4
41:12,21 42:1
47:19 55:6,7,
17 59:2,4,8
61:13,17,19
62:1 65:13,22
66:9,12 67:14
70:9 73:7
83:21 87:10,
18 88:21 89:3,
16 90:10
91:10,21 93:9
97:5,6,9,16,20
98:10,13 99:1,
6 103:5 104:3,
12,19,20,22
105:11,14,15

106:4,6,7,10,
18 107:2,3,12
108:8 109:1,
11,19 110:1,4
111:10,16,22
112:22 113:6
116:2 117:4
121:5,11
122:4 126:1
131:18 133:9,
21 135:19,22
136:4,14
137:2,3 138:1,
6,19 139:13,
15 140:3,18
141:22 142:3,
6 145:6 147:2,
7 148:14,15,
18 149:16
150:20
155:18,21
157:4 161:22
162:8,9,10,17,
19 163:1,5,10,
11,19 164:14
166:4,5,6,11,
13 167:13
170:7 171:15,
17 172:3,5,6,
13,15 180:1,4,
6 181:8,10,13
185:18 188:5
190:10

**vessel's**
136:12 166:7

**vessels**
13:12 65:4
69:4,5 97:8
106:14,16
109:6 115:9
116:5,13
125:15 139:21
140:5,15,16,

17,20 141:7
142:10,20
154:4 162:6
167:4 182:18
185:21,22
187:13 190:22
205:12

**video**
5:14 35:4,7,11
57:9,10 99:10
103:8 131:1,
14,19,21
132:5,14
144:1 210:7

**videoed**
5:13

**view**
64:13 96:19
99:7 131:18

**viewed**
196:11

**vigilance**
110:19 112:4
113:15 114:2,
12

**violation**
144:18

**Virginia**
168:6

**visibility**
55:7 97:5,18
98:9,15 99:11
100:2,6,14,21
113:1 116:22
181:2,4

**visible**
59:10 130:22

**vocations**
10:20

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

**voyage**
31:13 32:8
104:14 111:1,
7,19 143:3
168:3 188:2

---

**W**

---

**W-E-E-K-S**
101:12

**WAIVED**
211:10

**want**
22:3,7 33:17
42:14,21 45:1
50:19 51:8,22
53:3,6 63:14
70:10 73:14,
20 78:22 79:2
82:5 86:13
98:20 106:19
127:12 131:8
141:13 146:4,
17 148:3
149:16 159:4,
8 161:22
171:5 173:8
179:14 181:7
185:13 187:5
201:12 202:6
210:7,20

**wanted**
42:22 60:5
71:20 115:15,
17 146:9
147:16 149:13
172:11,20

**Warlordy**
205:5

**warnings**
71:1,8

**wasn't**
24:12 37:1
38:10 39:10,
16 42:3 54:19
58:5 60:14
68:22 80:15
84:11 90:6,19
91:17,21 92:5
98:15 112:14
114:14 125:4
126:20 127:3

**watch**
34:3 35:12
55:8,11,12,18
96:5 99:3
100:3 104:15,
17 105:7,21
113:10 114:3,
5,6 186:16,18
187:2,13
200:22

**water**
172:7 203:18

**waters**
69:3,7 97:9
106:12 107:9,
13 115:1,10,
18 143:19
144:5

**waterway**
85:13 143:22
201:3

**waterways**
107:4 203:18

**ways**
182:9

**weather**
98:8 111:12
171:22

**website**

15:8,16 17:9,
11,18 28:3

**week**
10:22 189:11

**weeks**
99:19 100:7
101:10 180:5

**weigh**
198:18

**west**
29:7,8 39:6,18
91:15

**westward**
36:16 89:13

**westwards**
36:18

**wheelhouse**
56:13,15,19
86:7,16,18
87:1,4,8,9,17,
20 97:18
98:13 99:5,8,
14 100:6,7,9,
19 101:5
112:3,22
113:6,7,11
180:13,15
181:2,15
183:9,11,12,
15 186:21,22

**WHEREUPON**
6:13 21:16
43:20 45:16
46:19 64:2
130:1 179:7
211:8

**whether**
13:5 15:4,13
30:6 31:12
32:2 33:8

39:20 41:4,6,
15,18,22 43:7
54:4 57:2,6
60:22 65:17
84:17 85:5
92:17 93:14
95:3,16
110:21 111:6
114:11 133:16
136:8,9,18
138:20 149:1
151:2 152:1
153:20 156:8
173:19 176:2

**which**
9:11,14 13:9
15:10,11 18:8
23:20 55:6
73:15 75:15,
18 76:12
77:14 78:2,5
80:22 82:7
87:6 91:1
92:10 93:7,18
95:13 97:10,
17,22 100:3
105:20 111:4
120:15 131:2,
15 135:4
136:16 137:1
140:10 141:1
142:7 143:5
145:8 157:4,
16 159:5
160:18 163:8
167:17 168:3
173:6 183:11
185:8 186:4
202:18 204:10
207:5 209:16

**whoever's**
51:15 109:10

**wholly**
50:15 51:6

**wide**
161:8

**width**
138:18,19
139:18,21
140:13
171:14,16,18,
19 172:12,13,
17

**will**
6:9 7:12 50:20
65:14 88:14
97:4,14
100:18 114:6
129:6 130:15,
18 135:22
136:3 142:2
146:12 150:7
151:22 152:2,
3 155:6,21
156:18 157:5
172:6 175:13
178:12 190:3,
4

**wind**
172:3,4

**window**
14:11

**windy**
93:9

**wise**
143:3

**with**
5:16 6:7 9:3,4,
14 12:2,6
14:5,8,20
15:12 23:14,
17,18 24:1,6,

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

18,22 25:5,9,
21 29:6 30:11
32:13,15,21
33:5 34:13,19
37:9 44:19
46:12,14
47:10,17,18
52:22 53:16
57:3,12,17
58:6 62:17
63:17 66:10
67:1 68:4
70:4,11,22
71:16,21
73:12 75:21
77:14 80:1
82:18,21 83:4,
21 85:13
86:22 92:15
94:13 98:19
99:19 100:2,7
101:6 102:17
103:17 116:19
117:1,4
120:20 122:1
127:19 130:22
131:7,10,11
132:11 135:9
136:1 137:6,9,
13 138:6
140:5 143:17
144:2,22
148:5,10,12
149:7 151:6
155:20 157:4,
16,18 161:15
168:5,8,13
176:16 179:20
183:22 185:9
186:8,11,14,
17 189:12
190:20 194:2,
3,12 195:15
196:6 199:5

200:10,20
201:3 202:8,
19 205:1,11
207:2 208:14,
18

**within**
61:2,9 98:1
173:14 189:16
200:16

**without**
8:14 9:17
14:18 79:8
122:18 142:19

**witness**
5:3 6:6,10,15,
17 19:13
32:21 38:1
42:17 43:15,
22 45:18 50:2,
19 52:7,17,18,
20 54:4 63:18
64:4 79:17
80:5,9 81:3,21
83:8 90:13
94:11 104:6
118:19 119:21
122:19,22
123:4 129:10
130:3 151:12,
19 175:7,9
177:3 179:9
196:18 197:1

**witnessed**
148:6 197:4

**witnesses**
40:13 50:15
51:4,20
128:10

**won't**
8:6 94:22
133:4

**word**
76:5 83:17

**words**
69:13

**work**
10:22 11:1,2,
4,5,6,11,17
26:15,22 27:1
98:1 109:15
168:7,9,12
169:5,9,10
183:22 200:20

**worked**
9:1 12:14
168:5

**working**
11:8,9 26:16
48:5 161:10
186:17 190:6

**works**
125:19 182:10

**worth**
140:11 141:2

**would**
5:15 13:2
17:15 23:7
26:7,14 28:12,
13 30:10
32:22 34:19
35:1,11,15
39:18 40:14
44:21 53:22
56:7 57:21
58:6 59:3
61:11,19 62:5
65:15 66:1,6,
22 67:14,16
68:14 70:8,22
72:20 74:14
76:16 78:12,
22 79:7 80:4

81:6 87:19
88:21 89:3,15
90:20 91:9
97:20 98:10
99:2,12,13,15,
22 100:2,3,12
102:17 105:4
106:21 107:9,
12,17 108:13
111:4 112:5,
16 114:1,7,21
115:7,21
116:3,10
118:17 126:22
131:15,17
135:18
136:14,16
138:5 139:8
140:16,18
143:17 144:2
145:15 148:12
150:18,22
154:4,8 158:1
161:10,22
162:1,21
163:18,19
164:19,20
165:4 166:4
170:6 171:14,
19,20 173:14
174:1 175:17
178:21 185:1
192:15 197:12
201:16

**wouldn't**
20:20 35:10
56:9 146:3
183:1

**write**
154:1

**written**
27:2 80:16

154:3 209:14

**wrong**
74:11 101:17
118:2

**wrote**
27:14 28:1
196:3

---

**Y**

**yacht**
163:22

**yachts**
69:6 140:10
141:1 161:10,
11,14 163:14,
18 191:10

**year**
10:12,15,17
169:11,12

**years**
10:14,18
11:18 21:3
109:21 114:1
160:15,17,19
168:20 170:3
191:5 195:6

**yell**
130:14

**yellow**
88:15,16 89:6,
7,9,20,22 91:1
135:9

**York**
191:11 202:2
204:12

**you're**
8:2,3,8 11:8,9
17:5 20:22
28:20 31:5,8,

**CAPTAIN SAMUEL STEPHENSON, J.D.**

August 11, 2025

21 35:11
39:13 48:16,
21 53:4,5
55:14,21
58:12 61:14,
21 63:9 83:8,
13 90:12 91:8
96:5 97:1,16
100:15 105:2,
4 107:20
111:15 112:10
114:4 118:22
119:6 120:5
122:21 123:2,
4 125:16,21
126:15 127:14
128:6 129:12
133:1 138:13
141:4,21
142:11 145:20
151:6,11,18
155:4 156:19
161:9 162:5,
22 164:1,3,11
167:5 169:2
172:4,8
175:20 177:4,
9 178:1
182:16 195:15

**you've**
7:14,18 10:10
11:15,17
14:16 15:3,4,
9,13 17:18,20
19:16 20:9,14
23:2,8,9 44:15
57:2 60:15
81:8 85:10
88:10 90:14
108:7 110:13,
15 122:9
123:16,22
124:9,15

125:5 132:3
143:15 167:17
176:13 195:6,
10 197:8
206:2

**yourself**
5:16 18:16,19,
22 19:3,9,12,
17

---

**Z**

---

**Zachary**
6:1