**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**EVANSTON INSURANCE COMPANY'S RESPONSE IN OPPOSITION
TO PETITIONER'S MOTION TO EXCLUDE TESTIMONY AND OPINIONS
OF ZANE SADIK**

COMES NOW Evanston Insurance Company ("Evanston"), by counsel, and respectfully provides this Response in Opposition to Petitioner's Motion to Exclude the Testimony and Opinions of Zane Sadik filed on September 3, 2025, and states as follows:

**FACTUAL BACKGROUND**

*Carver Hits a Stationary Bridge*

This is a hit and run bridge allision case. On June 15, 2024, the tug M/T MACKENZIE ROSE ("Tug"), owned and operated by Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver") from New York, struck the Belt Line's Main Line Railroad Bridge ("Bridge") that spans the Southern Branch of the Elizabeth River between Chesapeake and Portsmouth, Virginia. The Tug, pushing a 200-foot loaded barge, hit the Portsmouth side of the bridge—far outside the navigable channel and well behind the fender system—with such force that it shoved the steel superstructure nearly 7 feet. Incredibly, the superstructure did not collapse but ended up suspended in midair, resting precariously on 3 of its 4 legs. The impact so severely damaged the superstructure and warped the steel rail that it rendered the bridge unusable until repaired.



*Above: View of approach from South to North*

After catastrophically damaging the bridge, the operators of the Tug backed up, navigated the tug and barge into the channel, through the bridge opening, and departed for New York without a word to the Belt Line, the U.S. Coast Guard, or any other authority. To date, total repair costs exceed $15.9 million.



*Above: Moment of Impact Captured on Surveillance Video*

Under the "Oregon Rule" of general maritime law, when a moving vessel allides with a stationary object like a bridge, the vessel is presumed at fault. *See The Oregon,* 158 U.S. 186

(1895); *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 795 (5th Cir. 1977); *United States v. Norfolk-Berkley Bridge Corp.,* 29 F.2d 115, 125 (E.D. Va. 1928). The Oregon Rule unquestionably applies here.

Nevertheless, through this action, having ignored one federal law that requires immediate reporting of allisions for public safety, Carver seeks to reap the benefit of another federal law to limit its liability to the value of the offending Tug, allegedly $2.5 million. *See* 46 C.F.R. § 4.05-1 (reporting requirement) and 46 U.S.C. § 30523 (claims subject to limitation).  In opposition to the limitation action and in support of Evanston's claims against Carver, Evanston designated Zane Sadik, P.E. to offer opinions as to valuation and reasonableness of repair costs paid by Evaston to its insured, Norfolk and Portsmouth Beltline Railroad Company ("NPBL"), as a result of the hit and run allision. Mr. Sadik is a professional engineer with an extensive background in the design, construction, and repair of railroad bridges. His Rule 26(a)(2) report is attached as Ex. 1.

*Zane Sadik's Opinions*

1.    A tug that allided with the bridge structure causing the property damage observed.

2.    The channel at the Elizabeth River bridge is approximately 300 ft wide and the vessel that allided with this bridge in question was over 200 feet from the center of the channel. (approximately 225').

3.    Moveable railroad bridges have a proven record of remaining in service for over 100 years.

4.    Railroad and other bridges planned life expectancies are 100 years +.

5.    To error on the conservative side and using a 100-year life expectancy from the 100–125-year range, this bridge in question had at least 34% or 34 years of its useful life remaining.

6.    The calculated RCV for this bridge, based on a similar lift bridge that is much smaller in height, and using the RS Means Cost index is $169 million in 2024 dollars. Using 34% of remaining useful life gives an ACV of approximately $57 million.

7.    If using the other calculated RCV of $162 million, the ACV would be approximately $55 million.

    a. These estimates are at the early stages of the project and are expected to range

from -25% to + 75%.

8.      The repair was done in like in kind to the extent possible and was not an upgrade or betterment.

9.      The repair costs paid by Evanston Insurance Company are fair, reasonable and necessary for this repair work directly resulting from the June 15th , 2024, hit and run allision.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, the Court acts as a gatekeeper "to verify that expert testimony is based on sufficient facts or data." *E.E.O.C. v. Freeman,* 778 F.3d 463, 472 (4th Cir. 2015) (Agee, J., concurring) (citing Fed. R. Evid. 702). The expert testimony must be shown to be "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579, 589 (1993). "Because 'expert witnesses have the potential to be both powerful and quite misleading,' it is crucial that the district court conduct a careful analysis into the reliability of the expert's proposed opinions." *United States v. Fultz,* 591 Fed. App'x 226, 227 (4th Cir. 2015) (quoting *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001).

The trial court must ensure that the testimony (1) "will help the trier of fact to understand the evidence or to determine a fact in issue,"; (2) "is based on sufficient factors or data"; (3) "is the product of reliable principles and methods,"; and (4) "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid," *Daubert,* 509 U.S. at 592–93, and whether the expert has "faithfully appl[ied] the methodology to the facts." *Roche v. Lincoln Prop. Co.,* 175 Fed. App'x 597, 602 (4th Cir. 2006). Additionally, the Court must evaluate any proposed expert testimony under Federal Rule of Evidence 403.

Factors to be considered in assessing the reliability of technical or scientific evidence include "whether a theory or technique…can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," the "known or potential rate of error," the "existence and maintenance of standards controlling the technique's operations," and whether the theory or technique has garnered "general acceptance." *Daubert,* 509 U.S. at 593–94. Courts have also considered whether the "expert developed his opinions expressly for the purposes of testifying" or through research conducted independent of litigation." *See Wehling v. Sandoz Pharm. Corp.,* 162 F.3d 1158 at 3 (4th Cir. 1998); *Daubert v. Merrell Dow Pharm. Inc.,* 113 F.3d 1311, 1317 (9th Cir. 1995) (on remand). The *Daubert* factors are not exhaustive and illustrate the type of factors "that will bear on the inquiry." *United States v. Hassan,* 742 F.3d 104, 130 (4th Cir. 2014).

The proponent of the expert testimony carries the burden to establish the admissibility of the testimony by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001); Fed. R. Evid. 702 (noting witness is qualified if the proponent demonstrates "it is more likely than not that" that Rule 702's factors are met). The Fourth Circuit has held that "Rule 702 excludes expert testimony on matters within the common knowledge of [the trier of fact]". *Persinger v. Norfolk & W. R. Co.,* 920 F.2d 1185, 1188 (4th Cir. 1990); *Scott v. Sears, Roebuck, & Co.,* 789 F.2d 1052, 1055 (4th Cir. 1986) (noting by negative implication that "Rule 702 makes inadmissible expert testimony as to a matter which obviously is within the common knowledge of (the trier of fact) because such testimony, almost by definition, can be of no assistance"); Fed. R. Evid. 702 (requiring that an admissible expert opinion be based upon "scientific, technical, or other specialized knowledge"). The admission of "common sense" expert

testimony is dangerous because "the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." *Scott,* 789 F.2d at 1055.

## ARGUMENT

The opinions of Mr. Sadik are admissible because they are based on sufficient facts and data. Mr. Sadik's opinions are the product of a reliable application of specialized knowledge and principles involved in the proper valuation of railroad bridge design, construction, and repair. There is no analytical gap between the data and the conclusions reached. Mr. Sadik applied his background, training, experience, and specialized knowledge during his review of this matter. Testimony from an expert witness with specialized knowledge of the proper valuation of railroad bridge design, construction, and repair is necessary to assist the trier of fact to understand the evidence and to determine facts at issue in this matter.

Carver designated R.L. Banks & Associates, a railroad consulting firm, to offer opinions on the valuation of the railroad bridge at issue, as well as to rebut the opinions offered by Mr. Sadik. The result is a "battle of the experts," who disagree on the facts of the case and the application of the facts to applicable industry standards. However, "questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility of the witness' assessment, not its admissibility." *See Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (internal quotations omitted); *Rappuhn v. Primal Vantage Co.*, No. 23-10050, 2024 WL 2930448, at 4 (11th Cir. June 11, 2024) ("[C]rediting one expert over another ... misapplies *Daubert* and intrudes on the province of the jury."). Mr. Sadik should be allowed to testify to his Opinions No. 1-9 as outlined in Ex. 1. The trier of fact may then give the appropriate weight and credibility of Mr. Sadik's assessment.

## I.    THE MEASURE OF DAMAGES IN MARTIME ALLSION ACTIONS IN THIS DISTRICT

As noted in Petitioner's Brief in Support of their *Daubert* Motion to Exclude the Testimony and Opinions of Zane Sadik (DE 103), this Court summarized the measure of damages in a maritime allision action in this district in *Norfolk and Portsmouth Belt Line Railroad Company v. M/V Marlin,* 2009 WL 3363983 (E.D. Va 2009):

> "The general rule for recovery of damages due to the negligence of others in admiralty cases is *restitutio in integrum;* the damaged party is entitled to be put in as good a position pecuniarily as he was in prior to the damage to his property occurring." *BP Exploration & Oil, Inc. v. Moran Mid–Atl. Corp.,* 147 F.Supp.2d 333, 337 (D.N.J.2001) (citing *The Baltimore,* 75 U.S. (8 Wall.) 377, 385–86, 19 L.Ed. 463 (1869); *Standard Oil Co. of N.J. v. S. Pac. Co.,* 268 U.S. 146, 155, 45 S.Ct. 465, 69 L.Ed. 890 (1925)); *(internal citations omitted).*  When the plaintiff suffers either an actual or constructive total loss, "the measure of damages is generally the market value of the property just before the loss (less the value of any salved equipment or materials)." *Pillsbury Co.,* 715 F.Supp. at 763 (citing *B & M Towing Co. v. Wittliff,* 258 F.2d 473, 475 (5th Cir.1958); *Orange Beach Water, Sewer & Fire Prot. Auth. v. M/V Alva,* 680 F.2d 1374, 1383 (11th Cir.1982)). When there is no established market for the damaged property, the court may consider other evidence to determine the value of the property, including replacement cost, depreciation, expert opinion, and the condition the structure was in prior to the damage. *See Orange Beach Water, Sewer & Fire Prot. Auth.,* 680 F.2d at 1383–84; Ultimately, "[t]he ascertainment of value ... is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." *Standard Oil Co. of N.J.,* 268 U.S. at 156.

> Although these principles for calculating damages are instructive, **a Court sitting in admiralty is a court of equity and has the authority to award what is fair and just in light of all the facts and circumstances of the case**. *See BP Exploration,* 147 F.Supp.2d at 341 ("[I]t is clear that a federal court sitting in admiralty is not tied to any strict rules of the common law, but has the authority to make equitable decisions, considering all of the facts and circumstances of the individual case."); *Gateway W. Ry. Co. v. Am. River Transp. Co.,* 887 F.Supp. 201, 202 (C.D.Ill.1995) ("[A] court sitting in admiralty is privileged to exercise flexibility and award what is fair."); *The David Pratt,* 7 F. Cas. 22, 24 (D.Me.1839) (No. 3597) ("A court of admiralty is ... a court of equity. Its hands are not tied up by the rigid and technical rules of the common law, but it administers justice upon the large and liberal principles of courts which exercise a general equity jurisdiction."). (Emphasis added).

Here, the Court is not limited to strict common law principles, and has the authority to award what is fair and just in light of all the facts and circumstances. The Bridge at issue is not a bridge subject to vehicle traffic. It is a railroad lift bridge for the exclusive use of NPBL and their customers. It is unique. This Court should consider evidence to determine the value of the property, including expert opinion(s) on the estimated replacement costs, the actual cash value of a full bridge replacement, and the reasonableness of the necessary costs to repair the structure following the hit and run allision. Mr. Sadik intends to offer such evidence at trial.

## II.    MR. SADIK'S CREDENTIALS AND OPINIONS

Mr. Sadik is qualified to offer opinions in this matter based on his background, training, experience, and specialized knowledge obtained through his extensive work in the railroad industry and as licensed structural forensic engineer. Mr. Sadik explained his scope of work as follows:

```
2· ·Q.· ·And what was the scope of your engagement in this
·3· ·case?

·4· ·A.· ·So I think it's mainly spelled out in my report,
·5· ·but the scope was to determine what caused or
·6· ·contributed to the damage of the bridge in question,
·7· ·which is owned and operated by Norfolk & Portsmouth Belt
·8· ·Line Railroad, and to provide a replacement cost value,
·9· ·RCV, and an actual cash value, ACV, estimate for a full
10· ·bridge replacement on the most conservative value
11· ·possible.
12· · · · Basically, the lowest possible amount given the
13· ·parameters of the project.· I was also tasked with
14· ·reviewing the invoices on the project and advised
15· ·Evanston Insurance Company during this involvement of
16· ·payments from the carrier to Norfolk & Portsmouth Belt
17· ·Line Railroad for items submitted up through $10
18· ·million, which I was told is the policy limits, and
19· ·whether they were reasonable, related, and necessary or
20· ·not.
```
(Ex. 2, Tr. 10)

Petitioner seeks to exclude Mr. Sadik, in part, because he did not "run any type of depreciation evaluation for only the damaged sections of the Bridge." (DE 103, p.3). This argument ignores the both the principles of equity and facts of the case. Mr. Sadik's scope did not include a "depreciation evaluation" because only a section of the Bridge was damaged, and it was able to be repaired.  Equity requires the measure of damages to be the cost of reasonable and necessary repairs to return the Bridge to its pre-allision condition. Mr. Sadik (as an independent third party retained on behalf of Evanston) reviewed invoices for the actual cost of repair as the expense were incurred and submitted to NPBL during the emergency repair of the Bridge.  Mr. Sadik determined the costs were reasonable and in accord with industry standard based on his background, training, experience, and specialized knowledge obtained through his extensive work in the railroad industry and as licensed structural forensic engineer.  (Ex. 2, Tr. 59:15-25). Evanston then issued payments to NPBL based on Mr. Sadik's evaluation of the actual cost of repairs.

The damages suffered as a result of the hit and run allision should not be reduced for any claimed depreciation or betterment as the repairs to the Bridge neither enhanced the value nor extended the service life of the structure. As Ms. Sadik noted in his deposition, the type of steel used in the repair is different from the original steel, though it is less expensive and commercially readily available, thus actually saving costs during the repair.  (Ex. 2, Tr. 62:12 - 63:11).  He further testified that, despite the repair, the Bridge is mis-aligned as a result of the allision. (Ex. 2, Tr. 63:17 -64:2). In Mr. Sadik's opinion, the repairs did not enhance the Bridge, or extend its useful life the steel is now mismatched, and the railroad track is not straight as it was prior to the allision. Courts sitting in equity in other circuits have routinely found depreciation is not applied in maritime allision matters where the stationary bridge is able to be repaired.  *See Or. by State Highway Comm'r v. Tug Go-Getter,* 468 F.2d 1270, 1274 (9th Cir. 1972); *J.W. Paxson Co. v. Bd.*

*of Chosen Freeholders,* 201 F. 656, 664 (3rd Cir. 1912); *Petition of M/V Elaine Jones,* 480 F.2d 11, 27 (5th Cir. 1973).

Mr. Sadik did not conduct a "depreciation evaluation" because it is not necessary or part of his scope of work. His scope included review of the cost of repair as they were incurred to ensure time and expense fell within the acceptable industry standard. His did so by utilizing his background, experience, training, and expertise as outlined on his CV. (Ex. 1, p. 13-15).

## III.    MR. SADIK'S OPINIONS AS TO REPLACEMENT COSTS (RCV) AND ACTUAL CASH VALUE (ACV) ARE RELIABLE AND RELEVANT.

Mr. Sadik's opinions as to RCV and ACV utilize accepted industry standards and are provided to assist the trier of fact in rendering an equitable remedy for the damage caused by Carver's hit and run allision. Ultimately, Mr. Sadik opines "the repair costs paid by Evanston Insurance Company are fair, reasonable and necessary for [the Bridge] repair work directly resulting from the June 15th, 2024, hit and run allision." (Ex. 1, p. 10). In order to make that determination, he evaluated the cost to replace the Bridge versus the cost to repair the Bridge. In doing so, he considered the generally accepted industry rates for materials in labor in constructing or repairing a railroad bridge. (Ex. 1, p. 7-9, Ex. 2, Tr. 68:1 – 73:3).

Petitioner references this Courts' finding in *M/V Marlin* as a basis for excluding Mr. Sadik. In *M/V Marlin*, the entire fendering system (intended to protect the Bridge) was destroyed during an allision, and could not be repaired. Since the entire fendering system was replaced with a completely new fendering system, this Court applied a depreciated value on the new fendering system in awarding damages. This incident is readily distinguished from *M/V Marlin*, as the instant matter involves repairs to the damaged Bridge, not a full replacement. If the entire bridge was replaced, rather than repaired, Petitioner's argument to depreciate the value of recoverable damages might be more persuasive. The reasonable and necessary costs to repair exceeded

Evanston's $10,000,000.00 policy limit. Evanston paid the full policy limit of $10,000,000.00 to NPBL as a result of the hit and run allision, and NPBL incurred nearly $6,000,000.00 in additional expenses to repair the Bridge. Mr. Sadik's independent evaluation of the cost of actual repairs, as well as the anticipated RCV and ACV, are supported by the evidence, applicable industry standards, and his background in the railroad design and construction industry. When supported by competent and reliable evidence, the opinions are reliable. Mr. Sadik's opinions as to RCV and ACV are reliable, relevant, and should be admitted at trial.

**IV.    MR. SADIK'S OPINIONS AS TO LIFE EXPECTANCY AND BETTERMENT ARE BASED ON HIS BACKGROUND, EDUCATION, AND TRAINING AND SHOUDLD BE ADMITTED AT TRIAL**

Mr. Sadik opined "the repair [to the Bridge] was done in like in kind to the extent possible and was not an upgrade or betterment." He explained "it was a steel bridge, and they used steel to repair the steel bridge." (Ex. 2, Tr. 62:9-11). Mr. Sadik testified the repairs "were integral and absolutely necessary for the bridge to be put back in service (…) (t)hose spot repairs, if you will, did not extend the overall lifespan or useful life of the structure." (Ex. 2., Tr. 75:10-14). These opinions are based on the methodology outlined in his Rule 26(a)(2) report, and draws from Mr. Sadik's career first in the railroad construction industry and then as a licensed professional engineer.

Mr. Sadik used a baseline of a "conservative" life span of 100-125 years when preparing his Rule 26(a)(2) report[1]. Subsequent to his report, Howard Sawnson of Hardesty & Hanover (the engineering firm who oversaw the emergency repairs to the Bridge) testified

---

[1] Petitioner argues "In deposition, Mr. Sadik attempted to shoehorn in opinions on life expectancy that are nowhere to be found in his report, including that railroad bridges 'do potentially have an indefinite lifespan'." (DE 103, p.6). This is inaccurate. Mr. Sadik's opinions nos. 3, 4, and 5 address life expectancy of railroad bridges. (Ex. 1, p. 9).

9· · · ·Q.· ·Do you have any opinion either
10· ·agreeing or disagreeing or another way, as to
11· ·whether the Main Line Bridge had an indefinite
12· ·useful service life if it had undergone routine
13· ·repair and maintenance?

14· · · ·A.· ·I agree it would have an indefinite
15· ·service life.

16· · · ·Q.· ·Okay.· And what makes you say that
17· ·you would agree with that statement?

18· · · ·A.· ·Because I have seen plenty of
19· ·railroad bridges that are 40, 50 years older
20· ·than the Belt Line bridge that are still in
21· ·good shape and in good service, and so just
22· ·sort of figuring out that this bridge is 40 to
23· ·50 years younger than that and maybe slightly
24· ·better construction than -- since those bridges
25· ·have an indefinite life, this bridge has a 40
1· ·or 50 years more indefinite life.

·2· · · ·Q.· ·And what is it -- what do you mean by
·3· ·indefinite?· How do you define that?

·4· · · ·A.· ·How I would define that is a -- it
·5· ·does not have a fixed service life, that the
·6· ·bridge will be able to be functional in the
·7· ·medium term, which I would say is approximately
·8· ·25, 50 years from now without any, you know,
·9· ·major issues.
(Ex. 3, Tr. 108:9 – 109:9).

Mr. Sadik reviewed Mr. Swanson's deposition transcript prior to his deposition. (Ex. 2, Tr.

39:2).  Mr. Sadik did not change any opinion offered in his Rule 26(a)(2) report. He testified Mr.

Swanson's opinion as to life expectancy supported his conservative estimate of 100-125 years.

(Ex. 2, Tr. 3:15-17).   When supported by competent and reliable evidence, the opinions are

reliable.  Mr. Sadik's opinions as to life expectancy and betterment are reliable, relevant, and

should be admitted at trial.

## CONCLUSION

Mr. Sadik intends to offer his opinions based on his knowledge of industry standards and his background, education, training, and specialized knowledge developed over his career in the railroad industry and as a licensed professional engineer.  He applied those standards to the facts gathered during discovery and his knowledge of commercial railroad design, construction, and repair.  Carver challenges Mr. Sadik's reliance on certain facts and argues that the opinions of its experts provide a more reliable account of valuation of damage caused by the hit and run allision.  Carver further alleges of Mr. Sadik's knowledge of accepted railroad construction industry standards are irrelevant because only a portion of the Bridge was repaired.  These bases are insufficient to support the exclusion of expert testimony and are more appropriate to be addressed during cross-examination.

WHEREFORE, Evanston respectfully requests the Court deny Petitioner's Motion to Exclude the Testimony and Opinions of Zane Sadik.

This 17th day of September 2025.

/s/Zachary M. Jett
Zachary M. Jett, Esq. (VSB # 93285)
BUTLER WEIHMULLER KATZ CRAIG LLP
11525 N. Community House Road, Suite 300
Charlotte, North Carolina 28277
Telephone: (704) 543-2321
Facsimile: (704) 543-2324
Email: zjett@butler.legal

Mark C. Nanavati, Esq. (VSB # 38709)
G. Christopher Jones, Jr., Esq. (VSB # 82260)
SINNOTT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
Telephone: (804) 893-3866 (Nanavati)
Telephone: (804) 893-3864 (Jones)
Facsimile: (804) 378-2610
mnanavati@snllaw.com
cjones@snllaw.com

*Attorneys for Evanston Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September 2025 a true and correct copy of the forgoing *Evanston Insurance Company's Joint Response in Opposition to Petitioner's Motion to Exclude Testimony and Opinions of Zane Sadik* has been filed through the Court's CM/ECF electronic filing system, which will automatically delivery electronic notification of the same to the following counsel of record:

Harold L. Cohen, Esq.
Clyde & Co US LLP
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
Harry.Cohen@Clydeco.us

Michael J. Roman, Esq.
Dawn L. Johnson, Esq.
Siobhan Murphy, Esq.
Clyde & Co US LLP
30 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606
Michael.Roman@clydeco.us
Dawn.Johnson@clydeco.us
Siobhan.murphy@clydeco.us

James H. Rodgers, Esq.
Clyde & Co US LLP
405 Lexington Avenue
New York, New York 10174
James.Rodgers@clydeco.us

*Attorneys for Coeymans Marine Towing, LLC
d/b/a Carver Marine Towing*

Rachel Werner, Esq.
One North Central Avenue, Suite 1030
Phoenix, Arizona 85004
Rachel.Werner@clydeco.us

*Attorneys for Coeymans Marine Towing, LLC
d/b/a Carver Marine Towing*

*James L. Chapman, IV, Esq.
W. Ryan Snow, Esq.
Mackenzie R. Pensyl, Esq.
Crenshaw, Ware & Martin, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia*
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com

*Attorneys for Norfolk and Portsmouth Belt
Line Railroad Company*

I further certify that on this 12th day of September 2025 a true and correct copy of the forgoing *Norfolk and Portsmouth Beltline Railroad Company and Evanston Insurance Company's Joint Response in Opposition to Petitioner's Motion to Exclude Testimony and Opinions of Captain Nicholas J. Lewis* has been served upon the following by electronic mail and by placing a copy in the United Stated Mail, postage pre-paid, to:

James Morrissey
4723 Baywood Drive
Lynn Haven, Florida 32444
jdmorrissey15@gmail.com
*Pro Se* Defendant

*/s/Zachary M. Jett*
Zachary M. Jett, Esq.