# EXHIBIT 2

**Page 1**

```
1         IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                  NORFOLK DIVISION
                   IN ADMIRALTY
3                                   .
4  IN THE MATTER OF              .
   COEYMANS MARINE TOWING, LLC .   Civil Action No.:
5  D/B/A CARVER MARINE TOWING .    2:24-cv-00490
   AS OWNER AND OPERATOR OF    .
6  M/T MACKENZIE ROSE (IMO NO. .
   8968765) HER CARGO,         .   Jacksonville, Florida
7  ENGINES, BOILERS, TACKLE,   .
   EQUIPMENT, APPAREL, AND      .
8  APPURTENANCES, ETC., IN     .   August 21, 2025
   REM, PETITIONING FOR         .
9  EXONERATION FROM OR          .
   LIMITATION OF LIABILITY IN  .   11:16 a.m.
10 ALLISION WITH NORFOLK AND    .
   PORTSMOUTH BELT LINE         .
11 RAILROAD COMPANY MAIN LINE   .
   RAILROAD BRIDGE OCCURRING    .
12 JUNE 15, 2024 IN AND ABOUT   .
   THE ELIZABETH RIVER,         .
13 VIRGINIA.                    .
   . . . . . . . . . . . . . . .
14
15
                   DEPOSITION OF
16
            ZANE SADIK, PE, CGC, DFE
17
             Taken by the Petitioner
18
19
               CONNIE CHEUNG, CER
20          Esquire Deposition Solutions
21
22
23
24 Proceedings recorded by a reporter using electronic
   sound recording; transcript produced by the reporter and
25 transcriber.
```

**Page 2**

```
1                APPEARANCES OF COUNSEL
2  On behalf of COEYMANS MARINE TOWING, LLC D/B/A CARVER
   MARINE TOWING:
3
      MICHAEL J. ROMAN, ESQ. (PRO HAC VICE)
4     CLYDE & CO US LLP
      30 South Wacker Drive
5     Suite 2600
      Chicago, Illinois 60606
6     312-635-6971
      michael.roman@clydeco.us
7
   On behalf of NORFOLK AND PORTSMOUTH BELT LINE RAILROAD
8  COMPANY:
9     W. RYAN SNOW, ESQ.
      CRENSHAW, WARE & MARTIN, P.L.C.
10    150 West Main Street
      Suite 1923
11    Norfolk, Virginia 23510
      757-623-3000
12    wrsnow@cwm-law.com
13 On behalf of EVANSTON INSURANCE COMPANY:
14    ZACHARY M. JETT, ESQ.
      BUTLER WEIHMULLER KATZ
15    11525 North Community House Road
      Suite 300
16    Charlotte, North Carolina 28277
      704-543-2321
17    zjett@butler.legal
18    AND
19    MARK C. NANAVATI, ESQ.
      SINNOTT, NUCKOLS & LOGAN, P.C.
20    13811 Village Mill Drive
      Midlothian, Virginia 23114
21    804-378-7600
      mnanavati@snllaw.com
22
23 Also present:
24    Cannon Moss
25
```

**Page 3**

```
1              INDEX TO EXAMINATION
2
3  EXAMINATION                              PAGE
4  Examination by Mr. Roman                  5
5
6              INDEX OF EXHIBITS
7  PETITIONER'S   DESCRIPTION               PAGE
8  Exhibit 1      Report                     23
9  Exhibit 2      Curriculum Vitae           23
10
11       (Exhibits 1 through 2 were retained.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1      THE REPORTER:  We are now on the record at
2  11:16 a.m., Eastern Standard Time, on August 21st, 2025,
3  to take the deposition of Zane Sadik in the case of --
4      MR. JETT:  Coeymans.
5      THE REPORTER:  -- in the matter of Coeymans
6  Marine Towing, LLC.
7      My name is Connie Cheung, notary public and
8  digital reporter on behalf of Esquire in the state of
9  Florida.  Pursuant to the general laws of the state of
10 Florida, I'll be capturing the verbatim record of
11 today's record using electronic audio equipment, a
12 computer, and specialized recording software, which is
13 not a form of stenography.
14      The witness is located in Jacksonville,
15 Florida and has confirmed his identity with a driver's
16 license issued by the state of Florida.
17      Will everyone in attendance please identify
18 yourselves for the record and state who you represent?
19      MR. JETT:  Zachary Jett.  I represent Evanston
20 Insurance Company and the witness.
21      MR. ROMAN:  Michael Roman for Petitioner,
22 Coeymans Marine Towing, LLC, and the vessel.
23      MR. SNOW:  Ryan Snow with Crenshaw, Ware &
24 Martin.  I represent Norfolk & Portsmouth Belt Line
25 Railroad Company.
```



Page 5

1    THE REPORTER:  Thank you, Counsel.
2    Absent any objection at this time, Counsel and
3    the witness agree to my in-person administration of the
4    oath to this witness and that the final transcript may
5    be used for all purposes allowed by the general laws of
6    the state of Florida.
7    Hearing no objection, this will constitute
8    agreement and stipulation of such.  I'll now swear in
9    the witness.
10    Mr. Sadik, if you'll please raise your hand.
11    Thank you.
12    ZANE SADIK, PE, CGC, DFE,
13    having first been duly sworn, testified as follows:
14    THE REPORTER:  Perfect.
15    Counsel, you may begin.
16    EXAMINATION
17    BY MR. ROMAN:
18    Q.  Good morning again, Mr. Sadik.  My name is Michael
19    Roman, one of the attorneys representing Coeymans Marine
20    Towing in this case.
21    Can you please state your name?
22    A.  Zane Sadik.
23    Q.  Great.  And you have been retained as an expert
24    witness in this matter on behalf of Evanston Insurance
25    Company through their counsel at Butler Weihmuller Katz

Page 6

1    & Craig, correct?
2    A.  Yes, I believe so.
3    Q.  And when were you first retained?
4    A.  I don't have those records readily available due to
5    internet issues, but I'm sure that Zach can get you that
6    information later if required.
7    Q.  Okay.  You were retained before the lawsuit was
8    filed last summer, right?  You were involved in the
9    claims process itself?
10    A.  Yes, I do believe so.
11    Q.  Okay.  So fair to say you were in on the case from
12    sort of the beginning?
13    A.  I don't know if I would say the -- the beginning,
14    not as soon as the bridge was struck, but sometime after
15    the allision occurred.
16    Q.  How many depositions have you given before?
17    A.  Over 30, including depositions, trials, and
18    arbitrations.
19    Q.  Okay.  Were all of those -- was all of that
20    testimony, whether it was trial or deposition,
21    arbitrations, provided in a capacity as an expert
22    witness?
23    A.  Yes.
24    Q.  And you're affiliated with YA Engineering Services,
25    LLC, correct?

Page 7

1    A.  Correct, Young and Associates.
2    Q.  Okay.  And what -- if I call that YA Engineering,
3    we on the same team, or how do you -- how do you usually
4    refer to it?  YAES?
5    A.  YA is fine.
6    Q.  Okay.  And what does YA do for their business?
7    A.  YA has various engineering and building consultant
8    services.  They get involved in various claims, whether
9    it's from an estimating perspective or possibly even a
10    cost to rebuild perspective.  And they also have a
11    forensic engineering division, which I and others are
12    in.  Some of those engineers may have a civil or
13    structural background.  Some may be biomechanical.  Then
14    there's also architecture and electrical engineering,
15    mechanical and various other engineering and design-
16    related trades.
17    Q.  Does YA primarily provide litigation support
18    services or does it also provide things like project
19    management where you're actually out on a -- on a
20    construction project?
21    A.  I guess it's not the best answer, but it -- it just
22    depends.  At times there -- I believe we have been
23    acquiring more companies as time goes on and there are
24    at times where we will be on a construction site
25    providing guidance.

Page 8

1    Q.  How long have you been with that YA?
2    A.  Since around the summer of 2023, just over two
3    years.
4    Q.  And how much of your work with YA has been for what
5    I'll call dispute work, whether it's arbitrations,
6    trials, et cetera, where you're consulting for
7    litigation support as opposed to other types of work
8    with the company?
9    A.  The vast majority, for sure.
10    Q.  Vast majority being for litigation support?
11    A.  That is correct.
12    Q.  To your understanding, were you retained by or are
13    you providing services for Norfolk & Portsmouth Belt
14    Line Railroad Company in this case, as well as Evanston
15    Insurance Company?
16    A.  Well, I wouldn't say I'm providing information or
17    testimony on anyone's behalf.  I would say that I was
18    hired by their counsel to look at the facts as a
19    forensic engineer and give them factual information.
20    Q.  And which Counsel are you referring to there?
21    A.  I don't know if that would be counsel for the
22    insurance carrier, Evanston Insurance Company.
23    Q.  Right.  So you were retained in this case initially
24    by Mr. Jett and his office for Evanston Insurance
25    Company, correct?



ZANE SADIK PE CGC DFE
COEYMANS MARINE TOWING

August 21, 2025
9–12

Page 9

1  A.  I do believe I was first involved through some
2  individual at Evanston Insurance Company, and then at
3  some point later, it was transitioned over to Butler.
4  Q.  Okay.  Got it.
5      So my question was whether if, at any time, you've
6  also been retained by Norfolk & Portsmouth Belt Line
7  Railroad Company, which is one of the other claimants in
8  this case, or are you only working for Evanston
9  Insurance Company?
10  A.  I believe I've only been hired through Evanston
11  Insurance Company and Butler.
12  Q.  Okay.  Have you had any discussions with anyone
13  from the Crenshaw, Ware & Martin law firm related to
14  this case?
15  A.  No.
16  Q.  Okay.  Have you had any discussions with anyone
17  from Norfolk & Portsmouth Belt Line Railroad Company
18  about the case?
19  A.  When we were on site, I know that I definitely met
20  with some individual from the railroad before we were
21  allowed access onto their property.
22  Q.  Okay.  But no, like, interviews with any folks from
23  the Belt Line or anything like that for preparing your
24  report and opinions where you sat down and asked them
25  questions about the repair work, that type of thing?

Page 10

1  A.  No, not to the best of my knowledge.
2  Q.  And what was the scope of your engagement in this
3  case?
4  A.  So I think it's mainly spelled out in my report,
5  but the scope was to determine what caused or
6  contributed to the damage of the bridge in question,
7  which is owned and operated by Norfolk & Portsmouth Belt
8  Line Railroad, and to provide a replacement cost value,
9  RCV, and an actual cash value, ACV, estimate for a full
10  bridge replacement on the most conservative value
11  possible.
12      Basically, the lowest possible amount given the
13  parameters of the project.  I was also tasked with
14  reviewing the invoices on the project and advised
15  Evanston Insurance Company during this involvement of
16  payments from the carrier to Norfolk & Portsmouth Belt
17  Line Railroad for items submitted up through $10
18  million, which I was told is the policy limits, and
19  whether they were reasonable, related, and necessary or
20  not.
21  Q.  And I should have probably started with this a
22  little bit ago, but can we call Norfolk & Portsmouth
23  Belt Line Railroad Company the Belt Line moving forward
24  so --
25  A.  Yes, that'll make it a lot easier.  Thank you.

Page 11

1  Q.  Fair enough.  Okay.  And one of your opinions --
2  we'll get into a little bit your report later, but one
3  of your opinions in this case is that the mainline
4  bridge that you were asked to look at had approximately
5  a 34-year life expectancy left at the time of the
6  allision in June of 2024, correct?
7  A.  No, that is not correct.
8  Q.  Okay.  How is that incorrect?
9  A.  So in this hypothetical as spelled out in the
10  conclusion, to err on the conservative side using a 100-
11  year life expectancy, which was the lowest possible life
12  expectancy that I could reasonably come up with given
13  all the research, training, knowledge, and documents
14  reviewed, using that hypothetical, this bridge would
15  have at an absolute minimum 34 years of useful life,
16  given that hypothetical situation.
17  Q.  Okay.  But that 34 years of useful life expectancy
18  is the figure that you used throughout your report in
19  making some of your calculations, correct?
20  A.  In regards to a possible replacement cost value and
21  actual cash given the lowest possible amount with
22  those parameters, yes.
23  Q.  And that 34 years of life expectancy was the figure
24  that you used in applying depreciation to several of
25  your figures in your report, correct?

Page 12

1      MR. JETT:  Object to the form.
2      THE WITNESS:  In regards to a full bridge
3  replacement and using a rough order of magnitude
4  estimate as spelled out in this report, yes.
5  BY MR. ROMAN:
6  Q.  Okay.  Now, were you ever asked to perform any type
7  of valuation for anything other than a full bridge
8  replacement?
9  A.  No, other than verifying costs submitted up through
10  $10 million were reasonable, related, and necessary.
11  Q.  Okay.  And I think you said you used the RCV method
12  as one way, correct?
13  A.  Yes.  There's both an RCV and ACV estimate given
14  the parameters and erring on the most conservative side
15  I felt possible.
16  Q.  Okay.  And just for the record, RCV is the
17  replacement cost value, right?
18  A.  Correct.
19  Q.  Okay.  How did you determine to use RCV in
20  performing your analysis and formulating your opinions
21  in this case?
22  A.  Well, it -- it was part of the scope to provide a
23  replacement cost and an actual cash value.
24  Q.  Okay.  And so that was a specific methodology that
25  you were asked to use by Evanston Insurance Company in



Page 13

1  formulating your opinions?
2  A.   The specific scope, as spelled out previously, was
3  to provide a replacement cost value and an actual cash
4  value for a full bridge replacement on the most
5  conservative value possible.
6  Q.   And so that would be yes, Evanston Insurance
7  Company asked you specifically to perform the RCV or
8  apply the RCV methodology in formulating your opinions?
9  A.   I don't know if it answers the question, but they
10  asked specifically for a replacement cost value and an
11  actual cash value on the most conservative value
12  possible.
13  Q.   Okay.  How many times over your career have you
14  performed an RCV calculation to value a piece of the
15  railroad infrastructure such as the mainline bridge?
16  A.   Well, I can't recall exactly specifically to
17  railroad bridges, but how many times have I been hired
18  and provided RCV and ACV values for various construction
19  related items, whether they were concrete, steel, or
20  other building materials, I would say a significant
21  number, somewhere between ten to 40.
22  Q.   Okay.  And how do you go about performing an RCV
23  evaluation of a structure?
24  A.   Well, in -- in this case, it was -- it was a rough
25  order of magnitude, just mainly for training purposes,

Page 14

1  but I think it's very well spelled out within the
2  report.  I found another bridge, which does not have
3  anywhere close to the same constraints as the bridge in
4  question, which is a bridge that I've physically been on
5  and been part of the automation process.
6     That bridge is Mobile River in Mobile, Alabama.  It
7  has approximately the same clear span of 300 feet.  And
8  that bridge was replaced in 2011 for a total project
9  cost of roughly $110 million.  Using that cost and the
10  RSMeans cost index of historical -- their historical
11  cost index, using the price index of July 2011, which
12  was 191.2, and then using the July 2024 cost of 294.8,
13  you get a ratio of roughly 1.5418.  And all this is on
14  Page 6 of my report.  And when you extrapolate that out,
15  that comes to a projected cost of 169 million.
16     And it's spelled out in my report, that doesn't
17  include various factors, and I do think it would be much
18  higher.  Those factors are the additional costs and
19  delays for any type of railroad traffic being rerouted
20  during this two-year period, how long the Coast Guard
21  would allow a channel outage, how long and when would
22  the U.S. Navy allow for a channel outage, the likely
23  increase in cost for steel and materials with current
24  tariffs and other global economic concerns, and the
25  costs associated with possible power lines and utility

Page 15

1  coordinations, of course, on top of being a heavily
2  populated area versus being in an unpopulated area.
3  Q.   Sure.  And we'll get into the specifics of your
4  report in a little bit, but what I'm asking is just
5  generally speaking, if you were to go provide an RCV
6  estimate for -- let's just say Evanston Insurance
7  Company hired you.  Excuse me.  I'm getting a call.  One
8  sec.  Well, strike that.  I'll start over.  My
9  apologies.
10     If you had been retained by Evanston Insurance
11  Company to go out and take a look at, say, a highway
12  bridge, and they wanted to know what the RCV estimate
13  was, just generally speaking, how would you go about
14  performing that methodology?
15  A.   I think in a very similar fashion, which would be
16  to find a somewhat similar bridge, similar size, and
17  then to give them a -- a rough -- ROM or an order --
18  rough order of magnitude estimate, which I've -- as I've
19  set out here, from various other publications, it's
20  typically minus 25 to plus 75 percent, and then on the
21  higher end is what they should be budgeting for that
22  project.
23  Q.   And what do you mean by rough order of magnitude?
24  A.   That's a -- again, it's a rough order of magnitude.
25  It's more for planning purposes.  It's not an in-depth,

Page 16

1  granular, detailed estimate, which will take a lot more
2  time, money, effort, and resources.
3  Q.   And where did you learn to perform that RCV
4  estimate in that manner that you just described?
5  A.   I believe there's some training within PMI.  I'm
6  also a -- a licensed project management professional.
7  But it is not uncommon for contractors, engineers,
8  and -- and other design professionals to use example
9  projects and an adjustment factor for historical
10  pricing.  That is basically exactly what we just went
11  over.
12  Q.   Can you recall when you first performed an RCV
13  estimate in that manner in your career?
14  A.   The exact timeline, I -- I cannot, but I would say
15  that would be dating back to my time at JMT, which would
16  be, I guess, a little bit over a decade ago.
17  Q.   Sure.  Is there a way to perform an RCV estimate
18  other than the way that you just described?
19  A.   Yes, absolutely.  But as -- as previously stated,
20  that would take more time, effort, and resources.
21  Q.   Okay.  Did Evanston Insurance Company limit the
22  amount of time or resources you could spend on this
23  case?
24  A.   I was not -- it was outside of my scope to do a
25  full bridge replacement, to meet with the Coast Guard,



ZANE SADIK PE CGC DFE
COEYMANS MARINE TOWING

August 21, 2025
17—20

Page 17

1  to meet with the U.S. Navy, understand what their
2  constraints were.  Those constraints are what will drive
3  the cost of this replacement.  That was completely
4  outside of my scope and I did not go through the
5  exercise of meeting with both the Coast Guard, the U.S.
6  Navy, and then starting an entirely new bridge design,
7  no.
8  Q.  Did you ever ask Evanston Insurance Company if you
9  could go perform those tasks and do that more in depth
10  analysis of the -- or for your RCV estimate?
11  A.  No.
12  Q.  Do you have an opinion as to which one is more
13  reliable, the one in which you use a comparator piece of
14  infrastructure that you performed in this case or the
15  more in depth RCV methodology where you actually go
16  perform the calculations?
17  A.  We really won't know until we go through that
18  exercise, but that was outside of the scope of my
19  retention in this case.
20  Q.  Now, talking about the -- you were also asked to
21  perform the ACV estimate, which is the actual cash value
22  estimate, correct?
23  A.  That is correct.
24  Q.  All right.  And how did you go about doing that?
25  A.  I went through various documents research along

Page 18

1  with movable bridges that I've physically been on and
2  been part of restoration and/or replacement projects and
3  came up with the lowest hypothetical lifespan of 100
4  years.  There are several movable bridges that are in
5  service today that are over 100 years and the goal
6  according to some railroad people and resources is as
7  high as 150-year service life is the target.  But the --
8  the true reality is, now with the outages of the Coast
9  Guard, it is more often than not preferred to just have
10  enhanced maintenance as these structures get older in
11  order to mitigate the need for a channel outage, which
12  may not be allowed by the Coast Guard, giving a possible
13  indefinite useful life.
14  Q.  Okay.  And when was the first time you performed an
15  ACV estimate in your career?
16  A.  I don't have that exact date readily available, but
17  I would think that would have been sometime around 2018
18  timeframe.
19  Q.  In that -- when you performed the ACV estimate in
20  that 2018 timeframe, is -- did you do it in the same
21  manner that you did in this case?
22  A.  In regards to first coming up with the replacement
23  cost value, looking at various lifespans and research to
24  come up with an expected life expectancy, and then
25  backing that out, yes.

Page 19

1  Q.  Are there other ways to perform an ACV estimate
2  than the one that you performed in this case?
3  A.  There may be, but the methodology that I'm familiar
4  with is to come up with the replacement cost and then to
5  take depreciation on various items given their expected
6  lifespan.
7  Q.  And how did you come to understand that there
8  should be some type of depreciation applied to the value
9  of the bridge in this case?
10      MR. JETT:  Object to the form.
11      You can answer, if you know.  Sorry.
12      THE WITNESS:  Yeah, no, it's okay.  I -- I
13  think -- believe there -- there's -- it's not in
14  contention that the bridge was not new and I was asked
15  to give a replacement cost and then to back out the
16  actual cash value given the age and the most
17  conservative value possible, which was the lowest
18  expected life expectancy of similar bridges.
19  BY MR. ROMAN:
20  Q.  Is it fair to say that, in your opinion as an
21  engineer, that when you're dealing with an older piece
22  of infrastructure such as a mainline bridge, that
23  typically some type of depreciation is applied to that
24  piece of infrastructure given its age, the deteriorated
25  state, et cetera?

Page 20

1  A.  No, not necessarily.
2  Q.  Okay.  What makes the -- what goes into determining
3  whether or not to apply depreciation to a piece of
4  infrastructure?
5      MR. JETT:  Do you -- do you mean generally or
6  for this bridge, Mike?
7  BY MR. ROMAN:
8  Q.  Well, I said not necessarily -- that depreciation
9  is not always applied to an older piece of
10  infrastructure, so I'm looking for scenarios in which it
11  is, in which it isn't.
12  A.  I don't know if this answers the question, but
13  in -- in my experience in -- being involved in -- in the
14  hundreds of cases where there is, you know, cost at a
15  question, whether it's replacement cost or actual cash
16  value, I have never seen anyone depreciate a repair,
17  especially actual costs that have been paid, only to
18  look at what that replacement is, and because it may be
19  able to be fixed, there is a depreciation on the full
20  replacement.  Whether the end party chooses to do a full
21  replacement or repair I guess is typically yet to be
22  seen.  However, in this specific case, the repair was
23  made and those receipts, I believe, have been provided
24  to all parties.
25  Q.  At any time of your review of the file and your



ZANE SADIK PE CGC DFE
COEYMANS MARINE TOWING

August 21, 2025
21–24

Page 21

1  work on the case, did you ask Evanston Insurance Company
2  whether they had performed any internal RCV estimates or
3  ACV estimates of the mainline bridge?
4  A.  Not that I can recall.
5  Q.  Did you review -- you reviewed the repair invoices
6  for the mainline bridge, the ones comprising of Hardesty
7  and Hanover and PCL and their various subcontractors,
8  correct?
9  A.  I believe up through the rough number of $11
10  million.
11  Q.  Okay.  And I think that's up through about February
12  10th, 2025; does that sound about right?
13  A.  Yeah, it was somewhere in the January to February
14  timeframe.
15  Q.  Okay.  Did you have access to any of the documents
16  that were contained within the evidence and insurance
17  company claim file for this loss?
18  A.  I don't really know how to -- to answer that other
19  than the -- the documents that I have been given, and I
20  think there was various backup to the various costs up
21  through that roughly $11 million mark.
22  Q.  Okay.  Did you see any documents in your review of
23  the file that indicated that Evanston Insurance Company
24  had placed a replacement cost value on the mainline
25  bridge at roughly $70 million?

Page 22

1          MR. JETT:  Object to the form.
2      You can answer, if you have it.
3          THE WITNESS:  No, I don't -- I don't think so.
4  I don't recall that.
5  BY MR. ROMAN:
6  Q.  Okay.  And did -- and just to ask, I don't know if
7  we got an answer.
8      Did you ask Evanston Insurance Company at all
9  throughout your work on the case whether there were
10  other evaluations of the RCV estimate or the ACV
11  estimate of the mainline bridge?
12  A.  No, I --
13          MR. JETT:  Objection.
14          THE WITNESS:  -- I don't believe so.
15      Sorry.  Go ahead.
16          MR. JETT:  No, I objected.
17      Go ahead.
18  BY MR. ROMAN:
19  Q.  If you had come to learn that there were RCV
20  estimates for the mainline bridge of $70 million, would
21  that change your evaluation in this case at all?
22          MR. JETT:  Objection.
23          THE WITNESS:  No, it would not.
24          MR. ROMAN:  Zach, we can enter the Report as
25  Exhibit 1.  And then the CV, as Exhibit 2.

Page 23

1          (Exhibits 1 to 2 were marked for
2  identification.)
3  BY MR. ROMAN:
4  Q.  I'm actually going to start with the CV if you have
5  that in front of you.
6  A.  Yes, I do.
7  Q.  All right.  And then I believe this was Appendix B
8  to your report.  That -- that's the CV that I'm looking
9  at.  Is that the one you have in front of you?
10  A.  I believe so.  I don't know if there's a -- a newer
11  one or not.  Does it say director of engineering on the
12  first page?
13  Q.  Yeah, here.
14  A.  I think --
15  Q.  I'll share my screen just to make sure we're on the
16  same page.
17  A.  Three pages in total.
18  Q.  Yeah.  You see that there?
19  A.  Yes, sir.
20  Q.  All right, is this an accurate and up-to-date
21  version of your CV?
22  A.  I believe so.
23  Q.  Anything that comes to mind that you -- is missing
24  or would add to this CV?
25  A.  I believe I'm waiting on a PE license in Missouri,

Page 24

1  but I don't think that necessarily has anything to do
2  with this case being in Virginia.
3  Q.  Okay.  And on those licenses, it looks like Page 3
4  to 4, it lists your various licenses starting in
5  alphabetical order from Alabama down to the Virgin
6  Islands, correct?
7  A.  Correct.
8  Q.  All right.  Any of those licenses ever been
9  suspended, revoked, or any disciplinary actions taken
10  against them?
11  A.  No, not to the best of my knowledge.
12  Q.  Okay.  And when were you first licensed in
13  Virginia?
14  A.  I believe it was in 2012.
15  Q.  What is the -- a board certified diplomat in
16  forensic engineering?
17  A.  So that is a qualification that -- that you can get
18  if you have some trial deposition experience, as well as
19  various continuing education.  You are -- have to be a
20  licensed engineer, and you also have to be a part of the
21  National Society of Professional Engineers.  At that
22  point, you can apply and obtain that certification,
23  depending on the Academy's approval or not.
24  Q.  And when did you first obtain that certification?
25  A.  I believe it was in 2024.  It could be 2023.  I --



Page 25

1  I just don't have -- sadly, the -- due to the internet
2  here, I don't -- don't have that in front of me. It's
3  in my deposition notebook that is in our job file.
4  Q.  Is that a certification that you obtained when you
5  began getting into expert work?
6  A.  Yes.  That is correct.
7  Q.  And what's the organization that issues that
8  accreditation?
9  A.  I believe it's the National Academy of Forensic
10  Engineering.
11  Q.  And then what about a certified general contractor?
12  If you could explain what that is, what -- how you
13  obtain that certification?
14  A.  Yeah.  So during my time as -- as an engineer, we'd
15  work hand in hand with construction.  A lot of
16  engineering may contain construction management or even
17  owner's representative services.  Specifically to this
18  project, I did a lot of that at the railroad, more
19  specifically with movable bridges as one of the heads of
20  the movable bridge initiative.
21      And if you have enough construction experience,
22  along with schooling and other qualifications, you can
23  qualify to sit for three tests, which I believe total
24  roughly 15 and a half hours.  If you get through all
25  those tests and have a decent credit rating, pass

Page 26

1  various other hurdles, then you can be called a
2  certified general contractor in the state of Florida.
3  There's various other levels.  That is also considered
4  an unlimited license in other states.
5  Q.  Are there continuing education requirements for
6  that certification?
7  A.  Yes.
8  Q.  All right.  And are those -- are some of the -- I
9  saw you included CLE certificates in one of the
10  appendices to your report.
11      Are some of those CLE certificates related to the
12  general contractor certification?
13  A.  Yes, along with various other continuing education
14  from my other licenses.
15  Q.  And have you maintained the certified general
16  contractor certification since you obtained it?
17  A.  Yes.  And I also qualify a construction company.
18  Q.  I'm sorry, do you -- say the last part again?
19  A.  I also qualify a construction company.
20  Q.  Okay.  If you -- what do you mean by that?
21  A.  So in order for a company to perform general
22  contracting related activities, similar to an
23  engineering firm performing engineering activities, they
24  typically have to have someone qualify that company in
25  order to perform that work in that state.

Page 27

1  Q.  All right.  It looks like you started your career
2  at Morabito Consultants, correct?
3  A.  Morabito.
4  Q.  Morabito?  My apologies.  That's the (inaudible)
5  accent coming out in me.
6  A.  No worries.  It's just Frankie, he got real mad
7  whenever someone mispronounced his name.
8  Q.  I'm sure.  And what did you do for Morabito back in
9  '07 to '08?
10  A.  It was full service structural engineering, so some
11  of that was everything from, I believe, a high-end
12  residential construction to multi-use facilities to --
13  one wild project was putting a helicopter pad on top of
14  an existing hospital.  I definitely remember that one.
15  Q.  Okay.  Did you perform any ACV/RCV estimates during
16  your time at Morabito?
17  A.  No.  I don't believe I was involved really with
18  cost estimating at -- at Morabito.
19  Q.  Okay.  And then how about for JMT, Inc.?  What did
20  you do there from '08 to '12?
21  A.  JMT was a -- a bigger operation.  They were full
22  service engineering as well as architectural, all in-
23  house.  And jobs performed there were similarly varied.
24  Some might have been pedestrian bridges.  Others were
25  on-calls with the city for various issues that would

Page 28

1  come up, whether someone ran into a building or
2  something broke and needed to be repaired, to wastewater
3  treatment plants, to -- I believe they -- they would get
4  some highway bridge work as well and several coastal and
5  port and harbor projects.
6  Q.  Did you perform any cost estimating at JMT?
7  A.  Yes.
8  Q.  How many projects?
9  A.  I -- I couldn't name the -- the projects off the
10  top of my head.  They -- they varied, but I would say
11  probably somewhere around, like, 30 to 40.
12  Q.  Okay.  And when you -- for those projects, I mean,
13  was it a situation where you were estimating what the
14  project was going to cost, or was it similar to what you
15  did in this case where you, you know, were valuing a
16  piece of infrastructure working backwards?
17  A.  It would be pricing out what a project would cost,
18  and then also dealing with possible value engineering or
19  unknown constraints that would come up due to project
20  limitations.
21  Q.  Did any of those project involve performing an RCV
22  or ACV valuation?
23  A.  Not -- not that I can recall at this time.
24  Q.  And it looks like from JMT, you went to CSX and
25  were there for almost ten years, right?  Or I guess



ZANE SADIK PE CGC DFE
COEYMANS MARINE TOWING

August 21, 2025
29—32

Page 29

1  five -- eight years or so?

2  A.  Yeah.  I believe I -- I think it was closer to
3  maybe, like, six to seven, but -- but yes, a little bit
4  less than that.  The better part of a decade.

5  Q.  All right.  And it looks like first, you were a
6  LEADS field manager from '12 to '14, then a Black Belt
7  from '14 to '15, an engineer from '15 to '18, and a
8  forensic engineer from '18 to '20?

9     Or I'm sorry, just stopping at the engineer, that's
10  what you did for CSX?

11  A.  Correct.

12  Q.  All right.  And what did you do as a LEADS field
13  manager for CSX?

14  A.  So they rebranded what was called freight claims,
15  so some of that work had to do with onboarding new
16  clients and helping them with how to load a rail car.
17  And a very large portion of it had to do with dealing
18  with claims and, in a way, being a first responder to
19  derailments.  My territory was one of the busiest areas,
20  I guess, for derailments because I had West Virginia
21  over to, I believe, Virginia, and up through, like, the
22  Philadelphia area, so there were a lot of derailments.

23     Some of those derailments obviously involved
24  bridges, whether those bridges were impacted to the
25  point of being repaired or being -- I don't want to say

Page 30

1  knocked over, but I guess I -- you don't have to say it.
2  And I don't know how to say it other than knocked --
3  knocked over or no longer standing.

4  Q.  Did that role, the LEADS field manager, involve
5  engineering work?

6  A.  At times, and it definitely involved real-time
7  decision making on regards to recovery efforts and,
8  at -- at times, rebuilding efforts.

9  Q.  Did you perform any RCV or ACV evaluations as
10  your -- in your time as a LEADS field manager?

11  A.  No.  Most of that was -- was in the field, decision
12  making with a phone call, and then you go.

13  Q.  And then how about a Black Belt for CSX?  What does
14  that position involve?

15  A.  That was within the process improvement group, so
16  you would learn Black Belt or Six Sigma process
17  methodology.  Then, you would get involved in various
18  projects within all aspects of the railroad and client
19  interfaces in order to take an issue, whatever that
20  issue may be, and put improvements around there for a
21  financial benefit for both the railroad and whatever
22  client, whether that was an internal or external client.

23  Q.  And what is the Six Sigma methodology?

24  A.  That's -- I guess it's very loaded, but it -- a
25  high level would be similar to what Lexus is coined as

Page 31

1  the pursuit to excellence.  It's just constant --

2  Q.  I'm sorry, a --

3  A.  Constant improvement or continuous improvement.

4  Q.  Was that -- was that an operations role, Black
5  Belt?  Like, an internal operations role?

6  A.  I don't know how to really answer that
7  specifically, but it -- it involved direct impacts to
8  operations, yes.

9  Q.  Okay.  And then an engineer for CSX, what does that
10  position involve?

11  A.  That was where I was brought into the design and
12  construction part of CSX.  This was directly after being
13  the main point of contact or main project manager for
14  the Casky project, which was the first railroad yard in,
15  I want to say four, but somewhere in the three to four-
16  decade range for CSX.

17     And I believe, due to my ability to get things
18  done, and in my opinion, you'd have to ask the -- the
19  executive team, they had placed me in this engineering
20  role.  There was a large initiative for these longer
21  trains and siding expansions, as well as a desire to
22  implement new technology and reliability to the movable
23  bridge program.

24  Q.  Okay.  And how many -- well, did you work on any
25  movable bridges in your role as an engineer with CSX?

Page 32

1  A.  Yes.

2  Q.  And how many?

3  A.  Over 20, I'd say, roughly over half of what was on
4  their network.  I want to say that I've been -- worked
5  on or physically observed and been in -- part of over
6  20.  I -- I could read what I had wrote down yesterday,
7  but I want to say it was around 25 or so.

8  Q.  And what type of work were you actually doing with,
9  you know, those 25 bridges, understanding it was
10  probably varied, but if you could give me kind of a
11  synopsis?

12  A.  I -- I guess it -- it really varied all over the
13  place.  Some of it was from a process perspective.  As
14  you go to automate these bridges, there was a desire to
15  enhance maintenance because now, you would no longer
16  have someone physically at the bridge.

17     So coming up with everything from the training
18  books on how to operate the bridge, to the -- the
19  maintenance instructions, to how the bridge is operated
20  in both local and remote, to being part of the process
21  of selecting the contractor and verifying and paying or
22  rejecting their invoices.

23  Q.  Did any of your work with CSX regarding those
24  movable railroad bridges involve determining the
25  estimated useful service life of any of the bridges?



ZANE SADIK PE CGC DFE                                    August 21, 2025
COEYMANS MARINE TOWING                                        33–36

Page 33

1   A.   I would not say, "estimated useful service life,"
2   but desired functionality now and in the future.  And
3   one specific one was the full replacement of a bridge
4   that was roughly over 100 years old.  However, that was
5   more so due to the automation initiative.  And given
6   that the cost of maintenance was increasing, there was a
7   business decision given that we were trying to automate
8   all the bridges on the Gulf Coast to do a full
9   replacement of that Bayou Sara Bridge.
10  Q.   And did any of your work for CSX on those bridges
11  involve performing an RCV or an ACV estimate of any of
12  the bridges?
13  A.   Yes.  I would say I was involved in the -- the RCV.
14  I don't think there was any ACV.  There was -- no one
15  had ran a large object similar to a boat into any of
16  those bridges, to the best of my knowledge.  There might
17  have been some issues with people capping fenders at
18  times.  However, there was no large object smashing in a
19  similar fashion as -- of a hit-and-run to any of those
20  bridges.
21  Q.   What was the name of that bridge that you
22  referenced where CSX decided to replace it because it
23  was at the end of its life of over 100 years old?
24       MR. JETT:  Object to the form.
25       THE WITNESS:  So I -- I do appreciate you

Page 34

1   adding something at the end of that, sir, but no, I -- I
2   did not say it was at the end of its useful life, but
3   that was -- that was a good -- that was a good slide-in.
4        That was Bayou Sara, and that is in the report.
5   BY MR. ROMAN:
6   Q.   And did you personally perform any type of RCV
7   estimate for that bridge for your work on the project?
8   A.   I was intimately involved in the replacement of
9   that project and the -- I believe there was a business
10  decision to minimize the outage as much as possible.  I
11  think we're able to rip that bridge out.  Maybe a world
12  record.  We'll have to Google it.  But have to be able
13  to rip the bridge out and put the new one in and run a
14  train inside of 36 hours and bringing it down to, I
15  think, a -- roughly, a -- a two-day timeframe instead of
16  a -- a week.
17       The additional cost, I -- I want to say, was -- it
18  was in the millions, but I can't remember what it was.
19  But to reduce the outage as much as possible, we, the
20  railroad, CSX, paid a couple extra million dollars to --
21  to get that done.
22  Q.   Okay.  And for performing those value -- or
23  evaluations on what those actual numbers were going to
24  be in order to make that business decision to replace
25  the bridge, were you personally involved in those

Page 35

1   calculations or evaluations at all?
2   A.   As I recall, it was a team effort.  We also heavily
3   relied on our specialty contractor, given all the
4   various constraints and automation that was involved in
5   that bridge, and I -- I believe that was HDR.
6   Q.   All right.  Then it looks like from CSX you moved
7   to CED Technologies as a forensic engineer from '18 to
8   '21, correct?
9   A.   Yes, it is correct.
10  Q.   All right.  And what did you do as a forensic
11  engineer for CED?
12  A.   It'd be a similar fashion to what I'm doing today.
13  It was to be involved as a forensic engineer, typically,
14  or more often than not, in regards to expert witness
15  testimony or issues that are either in or believed to
16  soon be in litigation.
17  Q.   And so is that -- you were doing some litigation
18  support work beginning in 2018 for CED?
19  A.   For CED, yes.  But I believe through my old boss,
20  Jeffrey Cerquetti (phonetic), we would get some of
21  these, what I would call litigation or forensic cases,
22  while at JMT.
23  Q.   Did any of your work for CED involve performing
24  ACV/RCV evaluations of any type of infrastructure?
25  A.   Yes.  In my time at -- at CED, there was definitely

Page 36

1   cost estimating involved, and I believe, at times, both
2   RCV and ACV estimates provided.
3   Q.   Okay.  Can you recall the names of any particular
4   projects or pieces of infrastructure in which you
5   performed those evaluations on?
6   A.   Not the exact projects, but there was a -- a
7   fatality case with a parking garage collapse.  There's
8   been various construction defects where I've been asked
9   to give cost estimates.
10  Q.   Were you working on the property damage side of
11  that claim?
12  A.   Well, the -- I believe the estimates were in
13  regards to fixing property.  I don't know if that would
14  answer your question.
15  Q.   Yeah, I was just trying to square -- I think you
16  said that it was a death claim or a death suit, but it
17  sounds to me like you were involved on estimating some
18  of the property that was damaged as part of that, that
19  led to the injury.
20       So I was just trying to get a sense of what role
21  you had in the claim?
22  A.   Yes.  That was rebuilding the structure, and there
23  might have been alleged issues with maintenance of the
24  structure prior to the work being done or the
25  constructability, the means, and methods that were --



ZANE SADIK PE CGC DFE                                    August 21, 2025
COEYMANS MARINE TOWING                                         37–40

Page 37

1  were used in the safe practices or lack thereof.
2  Q.  Okay.  And then from CED, you went to Charles
3  Taylor Engineering.
4      Did that -- is that the company that became YA
5  Engineering?
6  A.  No, no.  We -- the whole East Coast, we all left at
7  the same go.  That was -- that was interesting.
8  Q.  Okay.  So those are two separate companies, Charles
9  Taylor and YA?
10  A.  Yes, absolutely.  I left Charles Taylor to go to YA
11  due to just high level breach of contract.
12  Q.  Okay.  And then what did you do as a principal
13  forensic engineer for Charles Taylor?
14  A.  It -- it was very similar, if not the same, as the
15  work at CED.  However, Charles Taylor did get more
16  involved in design repair and even more so in
17  construction management services.  And at times, we
18  would also be asked to stamp or sign and seal drawings
19  in order for contractors to get a permit to rebuild, and
20  at times, watch or guide through the rebuild process.
21  Q.  Okay.  So you were actually doing some project
22  management or engineering services for Charles Taylor?
23  A.  Yes.  I mean, and there were -- there were some
24  at -- at CED, too.  At times when people were outside
25  their comfort zone, like re-leveling a house or

Page 38

1  something of that nature, we would also be on site and
2  let them know, you know, when we've either reached that
3  re-level point, or we can no longer move whatever the
4  structure is due to limitations of the project given all
5  parameters at that time.
6  Q.  All right.  Then why don't we take a quick break?
7  I think we've been going about an hour.  And then we'll
8  get into your report when we come back.
9      How's that sound?
10  A.  Okay.
11      THE REPORTER:  All right.  We are off the
12  record at 12:09.
13      (A recess was taken.)
14      THE REPORTER:  We are back on the record.
15  Q.  Zane, do you have your report in front of you,
16  which we'll mark as Exhibit 2 (sic)?
17  A.  Yes, sir.
18  Q.  All right.  Great.
19      Starting on Page 5, the document review, is this a
20  complete list of the documents that you reviewed in
21  formulating your report and opinions?
22  A.  Yes.  However, there has been additional
23  depositions that have been provided to me for review
24  prior to today.
25  Q.  Okay.  What depositions, if you can recall, have

Page 39

1  you reviewed since then?
2  A.  I believe Howard Swanson's.  I think it was taken
3  on June 25th of 2025.  Cannon Moss on June 4th of 2025.
4  And then there was a report, I believe it was authored
5  by Lee Lentz, dated July 2nd, 2025, a report by Kevin
6  Lugo, dated July 2nd, 2025, and then there was also
7  this -- I'm going to -- I know I'm going to kill it.
8  It's a very long name.  W.N. Marinos, and then Charlie
9  Cunningham, I believe they authored a report very
10  recently on August 8th of 2025.
11  Q.  Did your review of the deposition transcripts --
12  putting aside the expert reports that you mentioned, did
13  your review of the depositions change or modify any of
14  your opinions or findings that you had in your report?
15  A.  No.  I believe they further backed up my opinion
16  in the report.  It's very similar thoughts, conclusions to
17  what I have listed in my conclusions.
18  Q.  The last bullet point on Page 5, says, "PMI Guide
19  to the Project Management Body of Knowledge."  It looks
20  like, "PMBOK Trademark Seventh Edition."
21      What is that publication?
22  A.  So that's the PMBOK.  It's a book of knowledge, if
23  you will, on project management.  That whole Project
24  Management Institute and then project management
25  professional certification, which I hold, came out of

Page 40

1  the construction industry.  And within those teachings
2  and methodologies, it does talk to estimating.  It also
3  talks to scheduling and -- and various other things that
4  are involved within construction and construction
5  management.
6      And that is where I get the plus and minus 25
7  percent to 75 percent ROM.  That rough price range at
8  the level of which the estimate was that I performed is
9  detailed within that publication, and it is minus 25
10  percent to plus 75 percent.
11  Q.  Okay.  And then where in your -- can you point in
12  your report where that -- is that on Page 8, you're
13  referencing that range?  I think it's the top paragraph.
14      "This is a rough order of magnitude estimates,
15  so the actual cost could range from minus 25 percent to
16  plus 75 percent, as stated in the PMBOK Seventh
17  Edition"?
18  A.  Correct.  Making the potential cost for
19  replacement, you know, as high as roughly $300 million.
20  Q.  And how did you determine to apply that range to
21  your figures?
22  A.  Well, because that's where we are right now.
23  That's a -- that's a rough order of magnitude.  That is
24  not a -- we did not go through the exercise and time,
25  like we talked about earlier, to do a full bridge



ZANE SADIK PE CGC DFE
COEYMANS MARINE TOWING

August 21, 2025
41—44

Page 41

1  replacement, have a sit down meeting with the Coast
2  Guard, have a sit down meeting with the -- the Navy,
3  whoever's in charge there, and understand what their
4  constraints are and then cost all of those constraints
5  out, along with getting with suppliers, et cetera, to
6  have a better idea of what the cost will be now. And as
7  we all know, with the -- the new administration, that is
8  subject to change on a -- as much as weekly basis due to
9  tariffs going on or off.
10  Q.  And how did you determine to use the PMBOK Seventh
11  Edition as a resource to apply that range?
12  A.  Well, it's something I have training and experience
13  in. I've also taught project management to various
14  people at the railroad on CSX, a -- a portion of that,
15  the class that gets you ready to take the test, which is
16  a roughly six and a half hour test. And I believe that
17  is, at times, also considered an industry standard or
18  a -- a standard pricing range given where we were in
19  time or where this estimate is made from.
20      Typically, also considered a -- do we go after this
21  project or not? In the very early stages of a project,
22  do we -- do we have the funds to go after a set project
23  or not?
24  Q.  And are there other ranges, other than the 25
25  percent to -- or minus 25 percent to plus 75 percent, in

Page 42

1  the PMBOK Seventh Edition that you could apply to when
2  you're doing your evaluation?
3  A.  No, not where this estimate is, because we are
4  at that rough order magnitude stage. As you do get
5  drawings and go further along in the design process and
6  then unknowns become known, then yes, at that
7  percentage, would -- that range would come down.
8  Q.  Okay. Were there any other ranges for the -- for a
9  rough order of magnitude stage of the project other than
10  the one -- that minus 25 to plus 75 percent, or is it
11  that's what the range is for that particular stage of
12  the project?
13  A.  According to the PMI, yes.
14  Q.  Okay. And so it's the range diminishes as you go
15  farther along in the stage of the project? Do I have
16  that right?
17  A.  As more unknowns become known, yes.
18  Q.  Okay. All right. Now, the Mobile River is one of
19  the Mobile River Bridge is one of the comparators that
20  you used in performing your evaluation, right?
21  A.  Yes. It is a similar bridge with almost the exact
22  same channel span.
23  Q.  Okay. And how did you determine to use that as a
24  comparator?
25  A.  I -- I just did some research. It's also a bridge

Page 43

1  I'm familiar with and I had been physically on, and I
2  wanted to find a lift bridge that was at least somewhat
3  similar in channel width and was a lift or vertical lift
4  bridge. Trying to find one in the United States that
5  had a somewhat close timeframe to this incident, I know
6  this is roughly like ten years older, and this was the
7  closest one I could find. It is the -- according -- and
8  it's all in my report. But it is roughly the same exact
9  channel, clear width of 300 feet; however, the towers
10  here, I believe, are substantially shorter. And I think
11  that is all spelled out in the report.
12  Q.  Okay. How did you -- how did you do the research?
13  Was it internet research?
14  A.  I -- I guess it was a combination of also
15  physically been out to the bridge. The vertical
16  clearance is very different. But throughout the
17  research that was done, I guess it was just at a random
18  happen sake (sic). But the bridge that this replaced
19  was also not past its useful life, which is similar to
20  the original bridge here in question, before it was
21  replaced in the '50s. The -- both this bridge and the
22  bridge in question in the past were swing bridges. And
23  there was a -- a desire to have a much larger channel
24  clear span, and that's why they went from swing bridges
25  to lift bridges.

Page 44

1      Both share those exact characteristics. Both are
2  now lift bridges. The one in question is just
3  significantly taller. And the one in question is also
4  in a much more congested area with other limitations,
5  such as the Navy and being in a downtown environment.
6  Q.  And can you recall any particular websites,
7  articles, publications in particular that you relied
8  upon and found through your research on that -- on that
9  Mobile River Bridge?
10  A.  No. Other than my -- my time at CSX working on
11  automating that bridge, bringing that into a state of --
12  I want to say a state of repair, it's a fairly new
13  bridge, but being on there several times, I don't know
14  if I've physically been on that bridge 20 times. Being
15  involved with the drawings, being involved with the
16  integration with the signal system, and being involved
17  with the Movable Bridge Initiative, having that bridge
18  being fully remote from, I believe, it's cyber yard at
19  CSX, which is right around Three-Mile Bridge.
20  Q.  And on Page 6, it says, "According to a CSX
21  article." Do you see that part there?
22  A.  Yes.
23  Q.  And is that a CSX article relating to the Mobile
24  River Bridge?
25  A.  Yes, I believe so.



Page 45

1 Q.  Okay.  Do you know where you found that article or
2 do you still have a copy of it?
3 A.  Yeah, it -- it should be in my job file.  Again, I
4 don't have internet access here to -- due to the issues
5 here.  It -- it was on.  It keeps dropping off.  But
6 that -- that's an article that we can -- we can get you.
7 But again, it just simply talks to what we just talked
8 about, that this -- this bridge that existed previously
9 was a swing bridge and there was a desire for the -- the
10 various boat traffic to have a -- a wider navigation
11 span and that span could not get larger without a full
12 bridge replacement.
13 Q.  Has Mr. Jett or anyone from his office asked you to
14 provide any documents from your file such as that CSX
15 article that's in there?
16 A.  I -- I thought I -- I -- I'm not sure if we
17 provided our full job file on this or not file.  I -- I
18 know we typically do when asked.  I -- I can't recall if
19 it was -- it's a link or a share file was asked to be
20 given yet or -- or not, as I sit here today.
21 Q.  All right.  And then moving down on Page 6, says,
22 "In 2009, this bridge was estimated to cost
23 approximately 72 million."  That's referring to the
24 Mobile River Bridge, right?
25 A.  Correct.  Before any work started.  Yes.

Page 46

1 Q.  So that was the estimate, you know, from the
2 drawings and the project -- or before the project
3 started, right?
4 A.  Correct.  To the best of my knowledge and documents
5 researched.
6 Q.  Okay.  And it says, "YAES was informed this bridge
7 had a total cost of approximately 110 million when it
8 was finally complete and in service," correct?
9 A.  Correct.
10 Q.  And how did you go about finding out about that
11 $110 million figure?
12 A.  Well, I believe I still had access to some of this
13 information while I was at CSX on -- I also want to say
14 I also talked to some contacts at CSX to verify that
15 number.
16 Q.  All right.  Do you know -- can you recall the names
17 of any of those contacts at CSX?
18 A.  I -- I can't remember the exact person, but I -- I
19 want to say it was some of the people that were involved
20 on the Movable Bridge Initiative while I was at CSX.
21 Q.  And were those folks that you contacted
22 specifically in relation to your work on this case as
23 you were doing your report?
24 A.  Well, specific just to what that final cost was,
25 because it -- when I looked it up online, I was like, I

Page 47

1 know it -- I remember this being over $100 million.
2 That's too low.
3     And what I recall from those conversations, they
4 said, absolutely.  That's just what we -- that's what we
5 started with, but that is not what the project ended up
6 costing.
7 Q.  Yeah.  Yeah.  And I just mean, as you, you know,
8 sat down to do your evaluation, your report for
9 Evanston, you made those phone calls to figure out what
10 that 110 million was, you know, for this project?
11 A.  Yes, I believe so.
12 Q.  Did you review any of the kind of final invoices or
13 repair documents from the -- or I should say bill
14 documents from the Mobile River Bridge to confirm that
15 $110 million figure?
16 A.  Not of recent.  I do believe I had the ability to
17 that information while I was still working at CSX and
18 given that this was a mostly public-funded project, that
19 information may be available upon request.  But I -- I
20 don't know if that would all be something CSX is willing
21 to release or not.  We'd have -- we'd have to contact
22 them.
23 Q.  Okay.  Did you ask or find out any information
24 about how that $110 million broke down for the project?
25 A.  No.  No, I did not.

Page 48

1 Q.  Okay.  How long is the entire Mobile River Bridge?
2 A.  I don't have the complete clear span in front of
3 me.  However, it's obviously more than 300 feet.  If the
4 horizontal clearance that was verified, I believe, by
5 looking up the navigation channels, it's 300 feet.  So
6 it provides the same horizontal clearance as the bridge
7 in question of approximately 300 feet.
8 Q.  And that 300 feet is specifically for the lift
9 portion of the bridge, right?
10 A.  No, that's not correct.
11 Q.  Okay.  What's the 300 feet for?
12 A.  It's fender to fender, so it's the clearance, the
13 amount of width of water clearance that boats can travel
14 in between -- in between the fenders.
15 Q.  Okay.  And you say you don't recall, as you sit,
16 you know, what it is shore to shore, the length of the
17 bridge, right?
18 A.  Correct.  That -- that could be something that can
19 be looked up fairly quickly, but I -- I don't have that
20 information in front of me at this time.
21 Q.  Okay.  On a project to build a railroad bridge that
22 has a lift system like the Mobile River, is it more --
23 is it typical that the lift system in that portion of
24 the bridge itself would be the more expensive part of
25 the project?



Page 49

1  A.  I -- I guess it depends how you look at it.  It's
2  really the -- the whole movable portion, right?  It's
3  not just the -- the structure in the middle, but all of
4  the cables, machinery, you know, hydraulics, if they
5  exist, et cetera, and of course the towers.  And in this
6  instance, these towers are significantly smaller than
7  the towers of the bridge in question.
8  Q.  Did you make any determination as to what the
9  Mobile River Bridge cost to build on a span by span
10  basis?
11  A.  No.
12  Q.  Did you make any evaluation or determination of
13  what the value of the main line bridge would be on a
14  span by span basis?
15  A.  No.
16  Q.  Okay.  Is it fair to say that you just looked at
17  the Mobile River Bridge as a whole in comparison to the
18  Main Line bridge as a whole, and that's how you used it
19  as a comparator for your calculations?
20  A.  Yes.  To err on the most conservative side, again,
21  given those obvious constraints we talked about before
22  and the fact that for the horizontal clearance and the
23  towers, if you will, they are significantly smaller on
24  Mobile River versus the bridge in question.
25  Q.  All right.  And then you used the RSMeans price

Page 50

1  index to -- as part of your valuation calculations here,
2  correct?
3  A.  Yes.  Within the report, that is correct.
4  Q.  All right.  And if you could explain how the
5  RSMeans fits into your valuation and what those figures
6  mean on Page 6 of your report?
7  A.  Yeah.  So RSMeans I would consider as an industry
8  standard.  It puts out a what they call a historical
9  cost index to help look at what costs were on a project
10  at a given time in history versus another given time and
11  can -- it takes into account steel, concrete, et cetera.
12  And at -- at that time of July 2011, that price index is
13  191.2 and then in July of 2024, it is 294.8.
14  Q.  And it says that we use this ratio, we get 2024
15  compared to 2011 as 294.8 divided by 191.2 equals
16  1.5418.  What does that 1.5418 figure represent and how
17  does that factor into your calculations?
18  A.  That -- that represents roughly the multiplier
19  spelled out here to go from a project, a similar project
20  in 2011, to get a similar project in 2024, given this
21  historical cost reference.
22  Q.  And so if I'm reading correctly, it'd be -- based
23  on the RSMeans price index, it would've cost roughly
24  $169 million to build the Mobile River Bridge in 2024
25  dollars as it did in 2011 dollars?

Page 51

1  A.  Yes.
2  Q.  Okay.  Did you perform any of those types of
3  calculations for the Bayou Sara Bridge or the Three-Mile
4  Bridge or the Portland, Oregon, Steel Bridge that are
5  referenced on Page 7?
6  A.  I do believe when we were costing out various
7  movable bridge projects that historical pricing was
8  referenced at the beginning and possibly throughout the
9  various construction stages of that initiative.
10  Q.  Okay.  Well, I guess, what is the significance of
11  those three bridges, the Bayou Sara, Three-Mile Bridge,
12  and the Portland, Oregon, Steel Bridge, what are the
13  significance of those bridges to your report and your --
14  and opinions in this case?
15  A.  It just shows the age at that time.  The Bayou Sara
16  was a -- a full bridge replacement that I was a part of.
17  It had not reached the end of its useful life, but for
18  business decisions, it was decided to replace that
19  bridge.  The outage for that bridge with the Coast Guard
20  was not the -- the biggest heartburn or limiting factor
21  and the desire to remote all those bridges out there in
22  a cluster, if you will, was made.  So that was replaced
23  and at the time of replacement, it was over 100 years
24  old.
25      There was -- the same thing was looked at at Three-

Page 52

1  Mile, however, we just, I don't want to say upgraded.
2  It was upgraded from electronics perspective, but
3  additional structural work was done to -- to help
4  maintain that bridge.  And that bridge is in service
5  today.  It's over 100 years old.
6      And the Steel Bridge is a lift bridge in Portland,
7  Oregon.  It -- it's constantly being, I guess, upgraded,
8  if you will.  I believe it has high speed rail, car
9  traffic, passenger traffic, and rail traffic, and that
10  bridge is over 110 years old.
11      And going back through, you know, my -- my time at
12  CSX, there's various other movable bridges that are over
13  100 years old as well, including, but not limited to,
14  Chef Menteur in New Orleans, the Hillsborough River
15  Bridge in Tampa, Florida, St. Lucie Canal Bridge in
16  Indiantown, Florida, CR Draw Bridge in Nashville,
17  Tennessee, and there may be a few others.
18  Q.  Okay.  So is it fair to say that you're not
19  utilizing any of those three bridges referenced in your
20  report or the ones you just listed here for a comparator
21  for the actual cash value calculations or RCV
22  calculations, right?
23  A.  Yes.  Not for calculations.  I think it's just
24  to -- to show that there are several movable -- railroad
25  movable bridges that are over 100 years old and they are



ZANE SADIK PE CGC DFE                                         August 21, 2025
COEYMANS MARINE TOWING                                              53—56

Page 53

1  in service at this time.
2  Q.  Right.  So just confirming, you're -- you've only
3  done the -- or utilized the Mobile River Bridge as a
4  comparator for your ACV and RCV evaluations and no other
5  bridges, right?
6  A.  For the hypothetical cost, yes, given that it is a
7  vertical lift bridge with the same navigation clear
8  span.
9  Q.  Okay.  All right.  So the next section of your
10  report on Page 7, the Bridge Design Lifespan, if you
11  could, take me through the significance of this part of
12  your report?
13  A.  Yeah, it just further backs up the actual other
14  proof that was given prior, that bridges are not just
15  intended to live over 100 years old, but they are in
16  service now at over 100 years old.  And I think that one
17  or two of these might even have been in the report
18  referenced by Marinos (phonetic) and Cunningham.  I
19  think it was there.
20  Q.  Right.
21  A.  Their -- not issued.  Their paragraphs, I think, 30
22  and 31 come to mind.
23  Q.  And fair to say that you are not making any opinion
24  in this case that steel railroad bridges have an
25  indefinite lifespan, correct?

Page 54

1  A.  Well, with proper maintenance, they do potentially
2  have an indefinite lifespan.  My scope was to give the
3  RCV and ACV estimates for the full replacement on the
4  most conservative value possible.  And that most
5  conservative value I could come up with, given all this
6  research as well as these bridges that are in service
7  today, is 100 years.  They could potentially have an
8  indefinite lifespan, which is, I think, being shown by
9  this.  The best example here, that's a lift bridge, is a
10  steel bridge and in an -- in a new context that we are
11  in today where those navigation outages may not be
12  granted, you may be forced to do constant repairs,
13  maintenance upgrades in order to mitigate the need for a
14  full bridge replacement.
15  Q.  But the opinion that they can have, that -- that's
16  not listed anywhere in your report, correct, anything to
17  do with an indefinite lifespan?
18  A.  Correct.  That is not listed in this report.
19  However, the 100 years is based on the hypothetical,
20  trying to give the most conservative value possible,
21  i.e. the lowest possible amount, given the parameters of
22  this project.
23  Q.  And then it says -- it looks like the second
24  sentence on -- under Bridge Design Lifespan on Page 7,
25  "According to an article by the DOT, quote, 'The current

Page 55

1  goal of new construction is 100 years.'"
2      Do you know what the citation is to that DOT
3  article?
4  A.  Yes.  And I do believe that is in regards to car
5  and -- and truck traffic.  Maybe on the next break, I
6  can get help with this Wi-Fi because it shows I'm
7  connected, but I don't have -- I don't have access to my
8  job folder.
9  Q.  Well, do you want to take a quick break and see if
10  we can figure out because I do want to get the citations
11  to this because your counsel's objected to providing
12  anything in your file right now.  We got to get that
13  resolved by the court.  It's typically something we have
14  before your deposition, but if we could figure that out,
15  I do want to get these citations on the record.
16  A.  Okay.  Yeah, we take a quick break and maybe they
17  can help me out with this Wi-Fi issue.
18  Q.  Thanks.
19      THE REPORTER:  We are off the record.
20      (A recess was taken.)
21      THE REPORTER:  We are back on the record at
22  12:58.
23  BY MR. ROMAN:
24  Q.  All right, Mr. Sadik, so after -- during the break,
25  Counsel sent over two documents, PDF.  Looks like the

Page 56

1  first one is a printout from the DOT website from the
2  Public Roads, November-December 2006, Issue Number
3  Volume 70, Number 3 with a publication next to it.
4      Is that the DOT article you're referencing in the
5  second sentence of Page 7 on your report?
6  A.  Yes.
7  Q.  Okay.  And then similar question for the next
8  document.  It looks like it's a publication that was
9  found on researchgate.net titled, "Can 100-year-old
10  Steel Railroad Bridges Continue to Be Used in Service,"
11  from Anna Rokoski (phonetic), if I'm pronouncing that
12  correctly, from the Warsaw Institute University of
13  Technology.
14      Is that the article you're referencing in the third
15  sentence of Page 7 of your report?
16  A.  Correct.  And I believe it's also listed as Item
17  Number 30 or 31 in the Cunningham and Marinos report.
18  Q.  Okay.  And then there was also a link to it looks
19  like one of the investor pages of CSX's website, a link
20  regarding the Mobile River alterations.
21      Which article is that, is that the one that you
22  referred to in the previous section of your report?
23  A.  Yes, that is correct.
24  Q.  And I think that's the Page 6, "According to a CSX
25  article," and then it goes on.  Is that -- that's the



Page 57

1  article you're referring to?
2  A.  Yes, that is correct.
3  Q.  Okay.  All right.  Then on Page 7, moving down,
4  says, "Talks with design professionals, the Class I
5  railroad -- railroads and contractors both stated that
6  the current plan goal for movable river -- movable
7  bridges is a 100 to 150 year life expectancy."
8      Do you see that part there?
9  A.  Yes, sir.
10  Q.  And was that -- were those talks with design
11  professionals, were those conversations you had as part
12  of your work in this case, in your research into the
13  issues?
14  A.  I believe so.  They were just trying to get from a,
15  you know, basically a -- a third-party perspective of
16  what the current goal is from people actually involved
17  in doing the exact same work today.
18  Q.  And can you recall the names of any of those
19  professionals that you spoke with?
20  A.  The exact names, no, but I -- I do know I had talks
21  with people with inside of CSX as well as I believe some
22  design professionals at HDR.
23  Q.  Okay.  And what's HDR?
24  A.  HDR is a large design company.  I think they're --
25  it might be a Fortune 50 company.  They have a movable

Page 58

1  bridge department and HDR and their movable bridge
2  department was heavily involved with the automation
3  initiative at my time at CSX.
4  Q.  So fair to say, in addition to reviewing some of
5  the publications and articles, you did some market
6  research in other professionals who evaluate railroad
7  bridges, to get their thoughts based on their
8  experiences and training and education as to what they
9  would place -- what type of life expectancy they would
10  place on a movable bridge?
11  A.  Yes.  Yes, that's correct.
12  Q.  All right.  Moving on to Page 8, if you could, run
13  me through the calculations that are contained within
14  that first section on Page 8, down through the five
15  bullet points?
16  A.  And so I think we already talked about the rough
17  order of magnitude.  So it's showing that 169 would
18  be -- using the minus 25 and plus 75, that would be, you
19  know, roughly an approximate range of 127 million to
20  $296 million.
21      And then also to show there wasn't -- that there is
22  additional things that would make this more expensive,
23  the -- the cost index, using RSMeans, in 2024, there is
24  a Mobile, Alabama, overall for all construction.  It is
25  roughly 1 percent less on average than Norfolk,

Page 59

1  Virginia.
2      It also shows that, given the constraints, which I
3  think we talked earlier on the record, of that U.S. Navy
4  yard, which is a direct neighbor of this bridge, along
5  with the potential issues with the Coast Guard, given
6  that this is a very heavily traveled waterway in a city
7  environment, would make this specific bridge in
8  question, and in my opinion, significantly more
9  expensive.
10  Q.  Okay.  And then on the -- what's the second full
11  paragraph, this is the section where you apply the
12  depreciation to the figures that are referenced above
13  it, correct?
14  A.  Correct.
15  Q.  All right.  And I think you've already stated you
16  did not do any type of depreciation analysis on a span
17  by span basis or comparison for the bridge.  It was just
18  for the full cost of what it might take to replace the
19  bridge, correct?
20  A.  Yes.  It was the full cost to replace the bridge,
21  but also in reviewing invoices of the project, to advise
22  Evanston Insurance Company during their involvement of
23  payments from them to the Belt Line for items submitted
24  up and through $10 million were reasonable, related, and
25  necessary.

Page 60

1  Q.  Okay.  And can you recall what the breakdown of
2  that -- those $11 million in costs that your reviews
3  was?
4  A.  No.  But I believe those -- the documents, as we
5  talked about earlier, go through that either January,
6  February timeframe and significant backup was provided,
7  I believe, by PCL to justify all line items that were
8  included.
9  Q.  Okay.  Is it fair to say that you're not offering
10  any opinions on the reasonableness of charges that may
11  be submitted that are in excess of the $11 million in
12  invoices and other costs that you reviewed?
13  A.  Correct.  My involvement only came up -- the
14  documents I was provided was only up through that
15  roughly $11 million part.  The additional cost past
16  that, I -- I don't think I've been provided all of those
17  documents.
18  Q.  Okay.  Do you recall if you reviewed a spreadsheet
19  in this case that listed approximately $1.4 million in
20  labor charges from the Belt Line for things like
21  building an access road to the site and yardmasters who
22  worked around the time of the repairs, that type of
23  thing?
24  A.  Potentially.  I -- I don't recall exactly, but I
25  want to say that the access road I thought was in, like,



ZANE SADIK PE CGC DFE                                    August 21, 2025
COEYMANS MARINE TOWING                                   61–64

Page 61

1  a 30 to $50,000 range. I think that was a fairly small
2  item. But I do believe that if they were included up
3  through invoices in that January or February timeframe,
4  then -- then I would have reviewed them at some point,
5  yes.
6  Q.  Okay. Are you making any specific opinions on the
7  reasonableness of the labor charges that the Belt Line
8  has submitted as damages in this case?
9  A.  Well, other than, again, through that roughly 10 or
10 $11 million mark that from my review, they were
11 reasonable, related, and absolutely necessary.
12 Q.  Did you do any evaluation as to a category of
13 damages in the amounts of approximately $3 million that
14 I believe Mr. Lentz spoke about regarding a portion of
15 the project where costs increased because work was being
16 done on multiple shifts for a certain period of time?
17      MR. JETT: Object to the form.
18      You can answer, if you know.
19      THE WITNESS: So I -- I don't know, but again,
20 if that was included within the invoices up through that
21 roughly $11 million mark in that January, February
22 timeframe, then -- then yes, I do believe I've reviewed
23 them.
24 BY MR. ROMAN:
25 Q.  All right. The second to the last paragraph up

Page 62

1  from the bottom, the one that begins with, "This repair
2  was done like and kind to the extent possible." Do you
3  see that there?
4  A.  Yes, sir.
5  Q.  And what -- if you could, take me through your
6  methodology for making the determination that the repair
7  was done like and kind to the extent possible?
8  A.  So I -- I think it's pretty well spelled out here,
9  but from a, you know, pure layman's perspective, it was
10 a steel bridge and they used steel to repair the steel
11 bridge. High level, that -- that's --
12 Q.  Do you know what type --
13 A.  -- all of it.
14 Q.  Do you know what type of steel was used for the
15 replacement parts for the -- after the allision?
16 A.  Yeah. I believe it was readily available steel,
17 which is standard in the industry, grade 50.
18 Q.  Is that different than the steel that was used in
19 the original design and build of the bridge?
20 A.  It is. And that may have impacted the historical
21 value of the bridge, but that was outside of my scope to
22 see what type of value was lost due to it no longer
23 matching the historical nature that existed prior to the
24 hit-and-run allision.
25 Q.  Do you have any opinion as to whether the grade 50

Page 63

1  steel that was used in the -- after the allision is a
2  higher grade of steel than the type of steel that was
3  used in the original design and build of the bridge?
4  A.  It's the same steel that I would've used if I was
5  in charge of the repair operation. It's steel that's
6  readily available, and yes, that -- that steel is
7  stronger. But I do believe because it's readily
8  available, it's not only what should be used and what
9  was used, but it also may be cheaper than trying to get
10 special ordered A7 steel and whether that is currently
11 available or not.
12 Q.  Do you have any opinion as to whether that grade 50
13 steel is more corrosive-resistant than the type of steel
14 that was used in the original design and build of the
15 bridge?
16 A.  No. No, I do not have an opinion on that.
17 Q.  The last paragraph beginning with, "This repair was
18 not a betterment." Do you see that -- excuse me --
19 A.  Yes, I do.
20 Q.  -- part there. And how did you go about
21 determining or making your opinion that the repair was
22 not a betterment?
23 A.  Well, the repairs are not adding to the life
24 expectancy that existed prior to the bridge. I believe
25 we have in some various depos now that we've been given

Page 64

1  for review, the bridge is not as straight as it was
2  before and it's currently in a mismatched condition.
3      Again, it's maybe a totally different analogy, but
4  I know when someone hits my car and it's a red car, I'm
5  not taking a blue panel as a betterment. It's no longer
6  the same as it was prior to the accident.
7  Q.  Did you do anything else other than review the
8  deposition transcripts in formulating the opinion that
9  the repair was not a betterment?
10 A.  Correct. At the time of this report, I didn't have
11 those depositions. They just further backed this up.
12 And there is mismatched steel. I would agree if they
13 were to take off all approaches and all towers and
14 replace all metal with this brand new steel, that --
15 that could be looked at as a possible betterment.
16 However, the entire structure all the way down to the
17 load path, including the pier foundations were not
18 altered. I believe only damaged material was fixed and
19 a lot of damage and arguably liability, was accepted by
20 the belt line. I don't know if that is the right word,
21 but they -- they accepted risk in not replacing all
22 items that were damaged or impacted. They made a
23 decision to live with various areas of the existing
24 bridge and only fix things that would appear to be
25 absolutely necessary.



Page 65

1  Q.  Did you perform any type of testing on the bridge
2  the -- to, like, determine the -- what the live load
3  capacity was after the allision as compared to before
4  the allision?
5  A.  No.
6  Q.  Did you perform any testing to evaluate the fatigue
7  resistance on the bridge after the allision as compared
8  to before the allision?
9  A.  No.  That was outside of my scope.
10  Q.  Okay.  Did you perform any type of testing at all
11  or run any type of calculations to determine what the
12  useful service life of the bridge was before the
13  allision as compared to after the allision?
14  A.  No.
15      MR. SNOW:  Object to the form.
16      THE WITNESS:  No.  That was outside of my
17  scope.
18  BY MR. ROMAN:
19  Q.  And then it would -- moving on to, "It would be
20  unreasonable to say that a repaired bridge that was hit
21  and repaired with similar materials is a betterment over
22  the same bridge which was never hit or damaged by a
23  vessel."
24      Did I read that correctly?
25  A.  This repair was not a betterment.  A steel bridge

Page 66

1  was repaired with steel.  The original bridge was never
2  hit by a vessel.  It would be unreasonable to say that a
3  repaired bridge that was hit and repaired with similar
4  material is a betterment over the same bridge which was
5  never hit or damaged by a vessel.  It is reasonable to
6  say that this bridge would now be less valuable since it
7  was repaired after a hit-and-run allision in the event
8  of a sale.  And I guess in addition to that, what we
9  have from the depositions, it's no longer as straight as
10  it was prior to the hit-and-run allision.
11  Q.  And what did you do to make the determination that
12  it would be unreasonable to say that a repaired bridge
13  that was hit and repaired with similar materials is a
14  betterment over the same bridge which is never hit or
15  damaged by a vessel?
16  A.  I guess, other than -- than common sense, I know at
17  times, railroads or -- or any business owner may be
18  looking to sell property and now that it is hit, whether
19  it's a bridge or a car or a building, that has to be
20  disclosed.  And I cannot imagine a buyer wanting to pay
21  additional money because something was hit.
22  Fundamentally, that does not make sense.
23  Q.  And how about for this -- for the opinion that it
24  is reasonable to say that this bridge would now be less
25  valuable since it was repaired after a hit-and-run

Page 67

1  allision in the event of a sale; what did you do to make
2  that opinion?
3  A.  Well, that goes within my knowledge, training, and
4  working at a class 1 railroad.  But again, in the
5  general sense of you would now have to disclose that and
6  the buyer would be taking on that risk knowing that it
7  was hit and repaired, it was not replaced.  And it --
8  also, given the fact that people have stated on the
9  record, it's no longer as straight as it was before as
10  far as the track.  All of that information would have to
11  be disclosed, and those are not things that I believe
12  add value.
13  Q.  And we can agree that at least some of the steel
14  members on the mainline bridge were replaced after the
15  allision were actually replaced with that -- with that
16  A50 steel, correct?
17  A.  Yes, some of the damaged steel was replaced with
18  steel.  Yes.
19  Q.  Okay.  All right.  Let's go to Page 9.  And just to
20  roughly summarize the first paragraph, this is a
21  different methodology that you use to value,
22  potentially, the replacement cost, correct?
23  A.  Correct.  Based on linear footage estimation.
24  Yeah.
25  Q.  Okay.  And it says that you had -- you estimated

Page 68

1  that it could be replaced at roughly 20,000.  And I
2  take -- is that $20,000 per linear foot?
3  A.  Yes.  I -- I don't know.
4  Q.  (inaudible).
5  A.  I believe that's the approach, and then there's a
6  different cost for the -- the towers and movable
7  portion.
8  Q.  Right, right.  I just -- on the -- it's the third
9  line.  It says, "Roughly 20K per linear foot."  I just
10  want to make -- there's no dollar sign.
11      You're referring to $20,000 per linear foot, right?
12  A.  Yes, that is correct.
13  Q.  Okay.  And then how did you determine or come up
14  with that 20,000 per linear foot figure?
15  A.  I believe that's the rough rule of thumb estimating
16  that we were using it at my time at CSX.  And then go
17  into the next line, which I'm -- I'm sure you'll ask
18  for, that's what I believe it would be now with
19  inflation along with also, I want to say a conversation
20  with one or a few people over at HDR, who name escapes
21  me at this time.
22  Q.  Was that 20,000 per square foot figure based on
23  your time at CSX in 2012 or 2018, or somewhere in the
24  middle?
25  A.  I -- I can't recall at this time.



Page 69

1  Q.  Okay.  And then what did you do to apply inflation
2  to that 20,000 per linear square foot to come up with
3  the estimated 30,000 per linear foot calculation that
4  you used?
5  A.  I believe that was a -- a mix of looking up current
6  steel costs now, as well as what we just talked about
7  earlier, talking with individuals that are currently
8  involved in that process and in the design and
9  construction of movable bridges for railroads today.
10  Q.  Do you have any of those calculations noted
11  anywhere in your file?
12  A.  No.  This is a rough rule of thumb, but out of, I
13  guess random happen sake (sic), it happened to be within
14  just a few percentages of the exact cost that we got
15  from doing the other methodology, which to me, shows
16  that it is somewhat or reasonably accurate as far as
17  from a rough order of magnitude level.
18  Q.  And what is factoring into that price per linear
19  foot that you're using?  Cost of steel?  Is it cost of
20  labor?  Just, you know, what's actually going into that
21  figure?
22  A.  I think it's everything just based on historical
23  pricing
24  Q.  And what is the everything is what I'm trying to
25  find out?

Page 70

1  A.  The everything.  There is no bridge.  And then now,
2  the bridge is there and it's operational.  What was that
3  cost?
4  Q.  Okay.  And so that would be cost for engineering,
5  correct?
6  A.  I'm sorry, what was that, sir?
7  Q.  I said that would include cost for engineering,
8  right?
9  A.  Yes.
10  Q.  Cost for the actual labor itself for iron workers,
11  other laborers on the job, right?
12  A.  Yes, I believe so.  All-in cost.
13  Q.  And then cost for materials, including cost for
14  steel, correct?
15  A.  Correct.
16  Q.  And then cost for equipment, renting equipment,
17  whether you got to buy equipment and all the materials
18  that go into the -- into the job, right?
19  A.  Yes, that's correct.
20  Q.  All right.  And so if I'm understanding the figures
21  effectively, since your time at CSX in 2012 to 2018, the
22  cost of building a steel railroad bridge to 2024 roughly
23  went up one and a half to two times; is that correct?
24  A.  Yeah, I -- I'd say that's fairly accurate.
25  Q.  Did you reference any of the actual market prices

Page 71

1  of steel over that time in making the determination that
2  it would cost about 30 to 40,000 per linear square foot?
3  A.  No, other than this was a rule of thumb and it was
4  benchmarked with both design and other people that are
5  in charge of capital projects at CSX.
6  Q.  And how about any of the labor rates -- historical
7  cost of labor rates?  Did you reference any government
8  tables, anything of that figure in determining the
9  30,000 square -- per linear foot?
10  A.  No, not to the best of my knowledge.
11  Q.  All right.  And then you used the lower end of that
12  range, the 30,000 per linear foot, right?
13  A.  Yes.  Yeah.  The whole exercise was to get the
14  valuation as low as possible.
15  Q.  Okay.  And it says the approach section up to the
16  lift that was damaged is roughly 350 feet.
17       Do you recall which -- I guess, what -- how'd you
18  figure out that 350-feet figure?
19  A.  I can't recall if that's really from the drawings
20  or our drone.  I -- I do have various licenses, as we,
21  you know, broadly skipped over, but I did do a rough 2D
22  and 3D model of the area with the drone and then we took
23  measurements from that model.
24  Q.  And so fair to say that that 350 feet would be
25  from, like, span 4 over to span 3 and 2 that was

Page 72

1  damaged, right?
2  A.  If you had a picture to show me, I think that could
3  help.
4  Q.  Yeah.
5  A.  And then after this question, if that's okay, I'd
6  like to take a comfort break.
7  Q.  We can do it now, if that works.
8       THE WITNESS:  Okay.  Awesome.  Sorry, I drank
9  a lot of water.
10       MR. ROMAN:  No.  I hear you.
11       THE REPORTER:  We are off the record.
12       (A recess was taken.)
13       THE REPORTER:  All right.  We are back on the
14  record.
15  BY MR. ROMAN:
16  Q.  All right.  Mr. Sadik, if we could -- I think we're
17  at the top of Page 9 still.  Sentence, "The approach
18  section up to the lift was damaged -- was 350 feet."
19       We talked about that, correct?
20  A.  That's right.
21  Q.  And then it says, "The opposite side of the channel
22  where the other tower lands would also need to be
23  replaced."
24       Are you referring to -- well, I guess what --
25  what's -- which side of the channel are you referring to



Page 73

1  there?  It -- it's not the part that was damaged, right?
2  A.  Correct.  The opposite side because, again, this
3  exercise is for a full replacement.
4  Q.  Okay.  And so what made you determine that that
5  side would also need to be replaced if you were just
6  replacing the damaged section?
7       MR. JETT:  Object to the form.
8       You can answer, if you know.
9       THE WITNESS:  Yeah.  So again, remember this
10  was this exercise was for a full replacement, as stated
11  in the scope previously.
12  BY MR. ROMAN:
13  Q.  Okay.  And then so that approach section is 180
14  feet.  You're referring to the opposite side, the part
15  that was not damaged, correct?
16  A.  Correct.  All boat towers.  This estimate includes
17  boat towers.  So that 500 -- well, bear with me.  But
18  this estimate does include boat towers.
19  Q.  Okay.  And then so the next sentence, "This is
20  roughly 530 linear feet times $30,000 per foot equals
21  15.9 million," correct?
22  A.  Correct.
23  Q.  And then so what exactly is that $15.9 million
24  figure representing?
25  A.  I believe that's just the approach section.  And

Page 74

1  then later on, we talked to the movable section in the
2  towers and that's a cost per square foot, and then
3  that -- the total rough numbers come up to 162.2 million
4  in this calculation.
5  Q.  Okay.  And did you do any analysis of applying
6  depreciation to that $15.9 million section?
7  A.  Well, in this scenario, I believe within the
8  conclusions, which I believe we'll talk to later, it --
9  the entire bridge is then depreciated based on the
10  hypothetical 100-year life expectancy, as previously
11  stated.
12  Q.  Right.  But I -- I'm asking if you had applied the
13  depreciation just for that particular figure, basically
14  taking out the movable lift section of the bridge.
15  A.  So I believe that in the 162 number -- 162.2
16  million, that's the full replacement cost.  And then
17  later within the conclusions, I believe it's listed on
18  conclusion 7, the actual cash value would be roughly 55
19  million.
20  Q.  Okay.  At any time, did you perform a depreciation
21  evaluation of just the sections of the bridge that were
22  damaged, which I think you in this paragraph estimate
23  was about 350 feet?
24  A.  No.  So the depreciation was done on the
25  replacement.  Again, it's not typical to do depreciation

Page 75

1  on repairs.  And in the I would say, I don't know,
2  roughly 100 or so cases I've been involved in with
3  costs, I've never seen anyone depreciate a repair.  I
4  have -- I have yet to see that.
5  Q.  Did you run any individualized depreciation
6  analysis as to the components of the bridge that were
7  replaced after the allision, meaning those parts that
8  had new steel members or, you know, kind of replaced in
9  full?
10  A.  No, because they were repairs and they were
11  integral and absolutely necessary for the bridge to be
12  put back in service.  Those spot repairs, if you will,
13  did not extend the overall lifespan or useful life of
14  the structure.
15  Q.  All right.  And then the conclusion section of your
16  report, beginning with conclusion 1, "A tug that aligned
17  with the bridge structure causing the property damage
18  observed," and then moving on to -- through Number 9, is
19  that a complete and accurate summary of what your
20  anticipated and expected opinions are in this case?
21  A.  Yes, but -- but again, with the exception of going
22  to trial, this was all based on the hypothetical to get
23  the lowest cost.  And if asked, you know, can a -- is it
24  typical for movable bridges to last over 100 years?
25  Yes.  And could they potentially last 150 or even 200

Page 76

1  years or longer with proper and consistent maintenance?
2  Yes, that is correct.
3  Q.  And you said you had reviewed the report and
4  opinions of Mr. Lugo, correct?
5  A.  That is correct.
6  Q.  Do you have any opinions as to any of the
7  conclusions or findings that Mr. Lugo has offered in
8  this case?
9  A.  I want to say the reports of both Mr. Lugo and
10  Lentz, I -- I don't take any exception to -- to their
11  conclusions or opinions.
12  Q.  Okay.  And I think you added Mr. Lentz.  You don't
13  have any -- you don't take any exceptions to Mr. Lentz's
14  report and opinions as well?
15  A.  That is correct.
16  Q.  And then you said you reviewed the report of Mr.
17  Mariano and Mr. Cunningham, which I'll refer to as the
18  R.L. Banks report, if that's okay, the co-authored
19  report you recall?
20  A.  Yep, that's correct.
21  Q.  Okay.  Do you have any opinions as to the R.L.
22  Banks report and opinions?
23  A.  I think it's citing various presentations that are
24  not authoritative publications and that he does not
25  address any of my opinions in his report, which leads me



ZANE SADIK PE CGC DFE                                August 21, 2025
COEYMANS MARINE TOWING                                      77–80

Page 77

1  to believe that he is in general agreeance with the
2  opinions I have in my report.
3  Q.  What particular publications are you referring to
4  that you view as not authoritative?
5  A.  I believe the vast majority, and I think I -- I do
6  agree with his 30 and 31.  So to quote it directly,
7  "AREMA," who is really the governing body here, the
8  American Railway Engineering and Maintenance-of-Way
9  Association, "within their manual of the railroad
10  engineering, chapter 15 talks to service life and in its
11  guidelines, it does not state the estimated service life
12  of the steel bridge."  And then I believe that's number
13  30.
14        I want to say number 31 in his report is from
15  other AREMA committee members, which does talk to, I
16  believe, the average railroad bridge in service today
17  being over 100 years old.  And that life expectancy well
18  exceeds -- exceeds that with some bridges being 150
19  years or older at this time.
20  Q.  Any other opinions as to their report?
21  A.  No.  No, I -- no, I do not.
22  Q.  Do you have any opinions on any testimony or
23  opinions that Mr. Swanson -- Howard Swanson has offered
24  in his deposition testimony?
25  A.  No.  I don't take any objections to anything that

Page 78

1  I -- I read or heard within the Swanson or Moss
2  deposition.
3  Q.  And that would include Mr. Swanson's testimony that
4  he is not qualified to determine the expected useful
5  service life of a railroad bridge?
6  A.  I -- I did think that was interesting given how --
7  his history of -- of so much movables, but he chose not
8  to talk to the life expectancy.  I took it as this
9  specific bridge.  However, he's been on numerous bridges
10  and I -- I believe he said that he expected a possible
11  continuous useful life with proper maintenance.
12  Q.  Have you spoken to Mr. Swanson at all in connection
13  with this case?
14  A.  No, I have not.
15  Q.  How about Charlie Graning from PCL; have you spoken
16  to him at all?
17  A.  I think I might have spoke with -- I know I spoke
18  with some people on site with PCL.  I can't recall
19  exactly who I spoke with, but I -- I did speak with
20  someone while on site with PCL.
21  Q.  Yeah.  And when was your inspection of the bridge?
22  I think you had it listed in here, right?
23  A.  I believe it's in my report.  Bear with me.
24  Q.  Yeah.  I think July -- page 4, you visited the
25  property on July 29th, 2024, right?

Page 79

1  A.  That sounds correct.
2  Q.  And PCL was mobilized at that time, correct?
3  A.  Yeah.  PCL was there and I believe they also had
4  some subcontractors working on the bridge while we were
5  on site.
6  Q.  And you had access to those folks who were working
7  if you had any questions on the -- you needed answered?
8  A.  Yes.  I mean, they -- they were on site.  I -- I
9  think some of them were in the literal middle of working
10  on the bridge, but they -- they were on site while we
11  were there.
12  Q.  Yeah.  You weren't necessarily going to interrupt
13  anyone who was -- who was working, right?
14  A.  Yeah.  I don't believe I chose to interrupt anybody
15  that was doing actual steel work at that time.
16  Q.  What are your -- what rates are you charging for
17  your work on this case?
18  A.  That's a good billing question.  I -- I don't know
19  if I'm honoring my old rate or my current 2025 rate.  My
20  current rate as I sit here today is 420 an hour for
21  regular forensic services, and YA charges a 20 percent
22  additional fee for depositions and trials, which would
23  make my current rate at deposition in that trial roughly
24  $500 an hour.  However, my 2024 rate was 395, and then
25  there'd be a 20 percent additional fee on that.  So I

Page 80

1  think that would be closer to either 470 or 475 range.
2  Q.  And I take it for today's dep, you're higher --
3  you're charging the testimony rate, the higher one,
4  whether it's the 2024 or 2025 rate?
5  A.  Correct.  I just don't know if it's the 2024 or
6  2025.
7  Q.  Has anyone else from your firm worked on the case
8  with you?
9  A.  Yes.  Brian Long was there with me when we did the
10  site inspection.
11  Q.  What is Mr. Long's background?
12  A.  He's -- he has a big background in construction.  I
13  believe he's also -- at least he was.  He may still be a
14  licensed professional engineer as well.
15  Q.  Okay.  Do you know what rates Mister -- Mr. Long
16  would be charging?
17  A.  I -- I do not.  That's something we can definitely
18  get you, but I just don't have that information right
19  now.
20  Q.  Anyone else than Mr. Long who's worked on the file
21  with you?
22  A.  No.  I don't believe so.
23  Q.  Okay.  Do you know if your -- if YA has actually
24  invoiced Evanston to-date for your work on the case?
25  A.  I -- I don't know if we were directly invoicing to



Page 81

1  Evanston or to Butler.  It was Evanston at one point in
2  time and then it transferred to -- to Butler.  I -- I --
3  I'd have to get with our billing department to fully
4  answer that question.
5  Q.   Okay.  Have you ever worked with Mr. Jetter's (sic)
6  law firm before?
7  A.   I have not worked with Mr. Jett prior to this, no.
8  Q.   Okay.  And I think it's on your testimony list that
9  there was a couple Butler Weihmuller cases on there.
10  Have you worked with other attorneys from that firm?
11  A.   Yes, absolutely.
12  Q.   Okay.  How many times have you been engaged by a
13  client who was represented by the Butler Weihmuller
14  firm?
15  A.   Well, I -- I have no idea, but as far as all of the
16  cases that I have either gone to trial or a deposition,
17  those would be listed on my trial and deposition list.
18  Q.   Okay.  How many times have you been retained by
19  Evanston Insurance Company?
20  A.   Typically, we're not really hired directly by the
21  insurance company, at least I'm not in my work.  So I --
22  I think this is probably the only one, but I don't -- I
23  don't know that definitively.
24  Q.   How many -- how about any cases where you've been
25  returned by -- retained by a client who is insured by

Page 82

1  Evanston?
2  A.   I -- I would have no idea.  I would not be able to
3  answer that question.
4        MR. ROMAN:  All right.  I think that's all I
5  have for now.  Might have a couple follow-ups depending,
6  but appreciate it.  Good to meet you.  Thanks for your
7  time.
8        THE WITNESS:  Oh.  Thank you, Mr. Roman.  I
9  appreciate the time.
10        MR. JETT:  Mike, let's just take five really
11  quick.  Let me look at my notes and we'll be right back,
12  if that's all right.
13        MR. ROMAN:  Sounds good.
14        THE REPORTER:  We are off the record.
15        (A recess was taken.)
16        THE REPORTER:  We're back on the record.
17        Go ahead.
18        MR. JETT:  I don't have any questions for this
19  witness.  Thank you.
20        MR. SNOW:  This is Ryan Snow.  I don't have
21  any questions either.
22        MR. JETT:  All right.  I think we're all done.
23        THE REPORTER:  Perfect.
24        Did you want a transcript order, Counsel
25  Roman?

Page 83

1        MR. ROMAN:  Yeah.  I'll order E-Tran.  Can I
2  get a rough, too, in the next couple days?
3        THE REPORTER:  You want a rough as well?
4        MR. ROMAN:  Please.
5        THE REPORTER:  Did you want electronic, paper,
6  or both?
7        MR. ROMAN:  E-Tran only, please.
8        THE REPORTER:  Standard delivery okay?
9        MR. ROMAN:  What's standard, two weeks?
10        THE REPORTER:  Seven to ten business days.
11        MR. ROMAN:  If we could get it just by, like,
12  the 2nd --
13        THE REPORTER:  September 2nd?
14        MR. ROMAN:  -- if that works.
15        THE WITNESS:  And then I'd like to read and
16  sign, if that's an option.
17        MR. JETT:  Yeah.  You'll read and sign.
18        THE REPORTER:  Did you say September 2nd,
19  Counsel Roman?
20        MR. ROMAN:  Correct.  Yeah.
21        THE REPORTER:  Okay.  And then did you want a
22  copy, Counsel Jett?
23        MR. JETT:  Yes.  I'll take a copy when
24  available.  I don't need it expedited or anything.
25  Just --

Page 84

1        THE REPORTER:  Electronic as well?
2        MR. JETT:  Electronic, condensed only is fine.
3        THE REPORTER:  Okay.  And then, Counsel Snow?
4        MR. SNOW:  Yeah.  I'll take electronic,
5  regular.  I don't need expedited, just a copy.
6        THE REPORTER:  Okay, perfect.
7        We are off the record at 1:50.
8        (Deposition concluded at 1:50 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 85

```
 1                    CERTIFICATE OF OATH
 2
     STATE OF FLORIDA
 3
     COUNTY OF DUVAL
 4
 5              I, the undersigned authority, certify that
 6  Zane Sadik, PE, CGC, DFE personally appeared before me
 7  and was duly sworn on this 21st day of August, 2025.
 8
 9              WITNESS my hand and official seal this 25th
10  day of August, 2025.
11
12              Connie Cheung
13
     Connie Cheung
14
     Notary Commission No.:  HH 640436
15
     Commission Expires:  February 13, 2029
16
17
18
19
20
21
22
23
24
25
```

Page 86

```
 1                  CERTIFICATE OF REPORTER
 2
 3              I, CONNIE CHEUNG, a Digital Reporter and
 4  Notary Public in and for the State of Florida do hereby
 5  certify:
 6
 7              That the foregoing witness whose examination
 8  is hereinbefore set forth was duly sworn and that said
 9  testimony was accurately captured with annotations by me
10  during the proceeding.
11
12              I further certify that I am not related to any
13  of the parties to this action by blood or marriage and
14  that I am not interested in the outcome of this matter,
15  financial or otherwise.
16
17              IN WITNESS THEREOF, I have hereunto set my
18  hand this 25th day of August, 2025.
19              Connie Cheung
20
21  CONNIE CHEUNG
22  Florida Licensed Court Reporter No. HH 640436
23  Notary Commission Expires:  February 13, 2029
24
25
```

Page 87

```
 1                CERTIFICATE OF TRANSCRIPTIONIST
 2
 3              I, RAECHEL YOCUM, Legal Transcriptionist do
 4  hereby certify:
 5              That the foregoing is a complete and true
 6  transcription of the original digital audio recording of
 7  the testimony and proceedings captured in the above-
 8  entitled matter.  As the transcriptionist, I have
 9  reviewed and transcribed the entirety of the original
10  digital audio recording of the proceeding to ensure a
11  verbatim record to the best of my ability.
12              I further certify that I am neither attorney
13  for nor a relative or employee of any of the parties to
14  the action; further, that I am not a relative or
15  employee of any attorney employed by the parties hereto,
16  nor financially or otherwise interested in the outcome
17  of this matter.
18              IN WITNESS THEREOF, I have hereunto set my
19  hand this 25th day of August, 2025.
20
21              Raechel Yocum
22
23  RAECHEL YOCUM
24
25
```

Page 88

```
 1                  DEPOSITION ERRATA SHEET
 2
 3  Esquire Job No. J13278485
    In the Matter of:  COEYMANS MARINE TOWING, LLC D/B/A
 4  CARVER MARINE TOWING AS OWNER AND OPERATOR OF M/T
    MACKENZIE ROSE (IMO NO. 8968765) HER CARGO, ENGINES,
 5  BOILERS, TACKLE, EQUIPMENT, APPAREL, AND APPURTENANCES,
    ETC., IN REM, PETITIONING FOR EXONERATION FROM OR
 6  LIMITATION OF LIABILITY IN ALLISION WITH NORFOLK AND
    PORTSMOUTH BELT LINE RAILROAD COMPANY MAIN LINE RAILROAD
 7  BRIDGE OCCURRING JUNE 15, 2024 IN AND ABOUT THE
    ELIZABETH RIVER, VIRGINIA.
 8
 9
10             DECLARATION UNDER PENALTY OF PERJURY
11
12              I declare under penalty of perjury that I have
13  read the entire transcript of my deposition taken in the
14  above-captioned matter or the same has been read to me,
15  and the same is true and accurate, save and except for
16  changes and/or corrections, if any, as indicated by me
17  on the DEPOSITION ERRATA SHEET hereof, with the
18  understanding that I offer these changes as if still
19  under oath.
20
21      Signed on the _____ day of _____, _____.
22
23
24              _____
25              ZANE SADIK, PE, CGC, DFE
```



ZANE SADIK PE CGC DFE
COEYMANS MARINE TOWING

August 21, 2025
89–90

Page 89

```
1                    DEPOSITION ERRATA SHEET
2        Page No._____Line No._____Change to:_____
3        _____
4        Reason for change:_____
5        Page No._____Line No._____Change to:_____
6        _____
7        Reason for change:_____
8        Page No._____Line No._____Change to:_____
9        _____
10       Reason for change:_____
11       Page No._____Line No._____Change to:_____
12       _____
13       Reason for change:_____
14       Page No._____Line No._____Change to:_____
15       _____
16       Reason for change:_____
17       Page No._____Line No._____Change to:_____
18       _____
19       Reason for change:_____
20       Page No._____Line No._____Change to:_____
21       _____
22       Reason for change:_____
23
24       SIGNATURE:_____DATE:_____
25              ZANE SADIK, PE, CGC, DFE
```

Page 90

```
1                    DEPOSITION ERRATA SHEET
2        Page No._____Line No._____Change to:_____
3        _____
4        Reason for change:_____
5        Page No._____Line No._____Change to:_____
6        _____
7        Reason for change:_____
8        Page No._____Line No._____Change to:_____
9        _____
10       Reason for change:_____
11       Page No._____Line No._____Change to:_____
12       _____
13       Reason for change:_____
14       Page No._____Line No._____Change to:_____
15       _____
16       Reason for change:_____
17       Page No._____Line No._____Change to:_____
18       _____
19       Reason for change:_____
20       Page No._____Line No._____Change to:_____
21       _____
22       Reason for change:_____
23
24       SIGNATURE:_____DATE:_____
25              ZANE SADIK, PE, CGC, DFE
```

