IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | Civil Action No. 2:24-cv-00490-MSD-LRL |

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S
MEMORANDUM IN OPPOSITION TO CARVER'S
MOTION FOR SUMMARY JUDGMENT**

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line"), by counsel, pursuant to Fed. R. Civ. P. 56 and Local Rule 56, submits the following memorandum in opposition to the Motion for Summary Judgment filed by Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver").

**INTRODUCTION**

Carver's Motion relies on a narrative that does not align with the evidence. Carver centers its Motion on an argument that James Morrissey, the tug operator, was solely negligent because he switched to hand steering from autopilot too late before encountering the Belt Line's Bridge. No admissible evidence supports this theory. The logbooks say plainly that "steering went hard over," ECF 91, Ex. J (Rough Log 06/15/24), and the tug was in autopilot at all times until Mr. Morrissey began backing away from the Bridge after impact, ECF, Ex. I (Daily Log 06/15/24).

Yet even if Carver's theory were correct—that Mr. Morrissey left the tug in autopilot too long—it is a distinction without a difference. There is no reason that engaging the autopilot for any amount of time should have caused the vessel to strike a bridge. Only an underlying issue with

the autopilot system, as the undisputed facts establish, makes this a possibility. Accordingly, even under Carver's view of the facts, the cause of the Allision was not outside Carver's control but directly related to issues within its privity and knowledge.

For the reasons below, and all those set forth in the Belt Line's own Motion for Summary Judgment (ECF 90 & 91), Carver's privity and knowledge and its unclean hands prevent limitation of liability. The Belt Line therefore respectfully requests that this Court deny Carver's Motion for Summary Judgment.

## OBJECTION TO CARVER'S RELIANCE ON U.S. COAST GUARD INVESTIGATION

As a threshold matter, Carver's brief is replete with references to the U.S. Coast Guard investigation of this Allision that are forbidden from being used in any way in a civil action. In particular, Carver cites two versions of a CG-2692 incident form filled out by its own management employees in New York, Brian Moore and Leonard Baldasarre, who were not on the vessel. These are the same two employees who deliberately deceived the tug crew, falsely asserting that the Coast Guard had approved their departure without investigation. *See* ECF 70, pp. 3-5. Carver uses the forms to suggest that Mr. Morrissey was solely responsible for the allision because, according to Carver's incident description, he failed to switch off the autopilot soon enough.

As noted, this assertion does not advance Carver's position, even if true. Leaving the autopilot "on" should not take a tug straight into a bridge. And why the autopilot was acceptable for navigating the Jordan Bridge but not the Belt Line's Bridge is totally unexplained in Carver's brief. Carver's narrative thus leads to the same point that the Belt Line makes in its own Motion for Summary Judgment: the autopilot on the M/T MACKENZIE ROSE, having failed repeatedly in the past, never should have been allowed on the day of the Allision. *See* ECF 91, pp. 20-22 (NPBL Brief in Support of Summary Judgment).

Regardless, however, under 46 U.S.C. §§ 6301 and 6308, no part of the CG-2692 forms or Carver's narrative based on those forms can be used in this case. Section 6308(a) provides:

> Notwithstanding any other provision of law, no part of a report of a marine casualty investigation conducted under section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States.

This provision is expressly cited in the Privacy Act Notice on page 3 of the CG-2692 form:

> **Disclosure**: Furnishing this information is mandatory per 46 CFR § 4.05-10. . . . Some of the casualty information collected on this form may be made available for public inspection; however, *information collected is protected from use in civil litigation per 46 U.S.C. § 6308*. Personal privacy information will not be disclosed routinely. Social Security numbers are not mandated on this form.

ECF 99, Ex. 2 & 19 to Carver's Brief in Support of Summary Judgment (emphasis added).

Federal courts consistently enforce this prohibition. *See, e.g., In re Complaint of Cozy Cove Marina, Inc.*, 521 F. Supp. 2d 504, 506-07 (E.D. Va. 2007) (holding that 46 U.S.C § 6308 precludes use of U.S. Coast Guard accident reports as evidence in private civil litigation); *In re Eternity Shipping, Ltd.*, 444 F. Supp. 2d 347, 352 (D. Md. 2006) (same). The reason is straightforward: the government has a strong interest in protecting the integrity of its investigative process, yet the incident descriptions in CG-2692 forms can be manipulated to favor whoever fills them out. *Id*. If they were admissible in civil litigation, a company facing liability would have every incentive to describe an incident in a way that limits its exposure.

Because Carver's arguments depend entirely on its prohibited use of the CG-2692 forms, its Motion for Summary Judgment should be stricken or denied on this ground alone.

### **RESPONSES TO CARVER'S STATEMENT OF FACTS**

Most of Carver's stated facts do not materially advance its arguments and therefore do not require a response. The following statements are incomplete, inaccurate, and/or misleading:

3

10. Carver's General Manager, Brian Moore, was not present on the tug the day of the incident. (Ex.1, Moore Dep., 10:5-6; 29:18-21). He first learned of it when he received a call from Carver Port Captain, Leonard Baldassare, who told him that the tug made contact with the fendering of the bridge. (Ex.1, Moore Dep., 49:16-50:6).

**RESPONSE**: This is inaccurate. Mr. Moore was informed of the Allision through a text message from Mr. Baldassare at 4:36 p.m. EST on June 15, 2024, which stated: "MACKROSE rudder got stuck hard over and they hit the bridge as they were coming through it." ECF 91, Ex. F. The remaining messages in the text chain include more conversation about the Allision and an intentional decision not to report it to the Coast Guard as required by 46 C.F.R. 4.05-1.

15. Capt. Chris Miller reported the incident to Port Capt. Lenny Baldassare. Mr. Baldassare testified that when he spoke to Capt. Miller, he relayed the account of events provided by Mate Morrisey: that the vessel got "bent out of shape" and that he lost control of the vessel and slid into the bridge's fendering system. (Ex. 10, Baldassare Dep., 48:3-9). Mr. Baldassare received 4-5 photos of the tug, bridge, and barge, and understood from Capt. Miller (as told to him by Mate Morrissey and the crew members) that there was no visible damage to the tug, barge or bridge. (Ex. 10, Baldassare Dep., *supra*).

**RESPONSE**: This is inaccurate and misleading. Mr. Baldassare was aware of the Allision as evidenced by the text from him to Mr. Moore at 4:36 p.m. EST on June 15, 2024 quoted above. *See* ECF 91, Ex. F. A photograph of the Bridge after the Allision was sent to Mr. Baldassare by the tug's cell phone in which a serious deflection in the tracks on the Bridge is visible. *See* ECF 91, Ex. B. The text sent immediately after the photograph stated, "I can't tell anything from that," not that there was no damage to the Bridge. *Id*.

16. Mr. Baldassare relayed the information he received from Capt. Miller to Mr. Moore and they both agreed that since there was no observable damage in the photos that it would be okay for the vessel to proceed to New York (Ex. 10, Baldassare Dep., 50:7-24;60:16-22). Neither Mr. Moore nor Mr. Baldassare reported the incident to the United States Coast Guard because there was no visible damage to report and, as reported to them, the bridge <u>had not</u> been struck. (Ex. 10, Baldassare Dep., 60:1-61:4). At no time on June 15, 2024, did Mr. Baldassare nor Mr. Moore know that the barge made contact with the bridge, not just the bridge's fendering system. (Ex. 10, Baldassare Dep., 217:8-15; Ex. 1, Moore Dep., 53:5-19).

4

**RESPONSE**: This is incorrect and misleading. An allision occurs when a moving vessel strikes a stationary object such as a bridge. A vessel striking a bridge's fender is still an allision. *Norfolk S. Ry. v. Moran Towing Corp.*, 718 F. Supp. 2d 658, 660 (E.D. Va. 2010). Therefore, whether Carver believed the tug struck the truss of the Bridge or the fender, and regardless of visible damage, the Allision was still a reportable incident under 46 C.F.R. 4.05-1 (requiring immediate reporting to the Coast Guard of any "unintended strike of (allision with) a bridge"). Text messages between Mr. Moore and Mr. Baldassare also contradict Carver's statement that they did not report the incident because, "as reported to them, the bridge had not been struck," and, "[a]t no time on June 15, 2024, did Mr. Baldassare nor Mr. Moore know that the barge made contact with the bridge, not just the bridge's fendering system." Their texts at 4:36 p.m. EST on June 15, 2024 state explicitly that the tug hit the bridge: "MACKROSE rudder got stuck hard over and they **hit the bridge** as they were coming through it." *See* ECF 91, Ex. F.

19. Mate Morrissey had no disciplinary history at Carver prior to the subject incident. (Ex. 1, Moore Dep., 88:6 – 89:25; *see also, e.g.*, **Exhibit 12**, **Answer to Request No. 4 of Carver Marine Towing's Fifth Supplemental Response to Norfolk Belt Line's Second Set of Requests for Production of Documents and Affidavit of Josef Malk in Support**.)

**RESPONSE**: This is incomplete and misleading. A lack of disciplinary history is not equivalent to a lack of incidents involving Mr. Morrissey of which Carver had knowledge. In January 2024, just 5 months before the Allision, Mr. Morrissey struck a pier while operating the M/T MACKENZIE ROSE, causing over $75,000 in damages. *See* ECF 91, Ex. AA (01/22/24 Incident Report). After this incident, Carver did not discipline Mr. Morrissey or require additional training before permitting him to continue operating the tug.

20. None of the crew claimed that the autopilot was involved in the incident. (Ex. 10, Baldassare Dep., 89:1-8).

5

**RESPONSE**: This is incorrect. As shown below, the daily log for the M/T MACKENZIE ROSE for June 15, 2024, completed by the crew, states that Mr. Morrissey did not turn off the autopilot until he began backing away from the Bridge. *See* ECF 91, Ex. I.

| 16:30 | Incident - Norfolk, VA - Mate James Morrissey reports the auto pilot was not completely turned off he was able to correct and switch back over to hand steering and begin backing on the Weeks 281 Barge and maneuvered the barge alongside fendering on the North and PBL RR Bridge, photo taken. proceed slowly away from bridge. |
|---|---|

21. On Monday, June 17, 2024, Mr. Baldassare contacted the Coast Guard to report the bridge incident after Mr. Moore ordered him to do so. (Ex. 10, Baldassare Dep., 64:24-66:16).

**RESPONSE**: This is inaccurate. Carver did not contact the Coast Guard first; the Coast Guard contacted Carver after the Belt Line reported the Allision on June 17, 2024. *See* ECF 91, Ex. O (Moss Dep. 204:6-19). That same day, USCG Lt. Palomba contacted Carver to discuss the Allision that the Belt Line reported. *See* ECF 91, Ex. P (voicemail from USCG Lt. Palomba).

23. The Coast Guard requested a revised Form CG-2692 from Carver after receiving video footage of the barge making contact with the bridge, not just the bridge fendering system, as initially reported by Mate Morrissey to Captain Miller and the crew and learning that Mate Morrissey had initially lied about the auto pilot failure. (Ex. 1, Moore Dep., 241:9-244:17).

**RESPONSE**: This is inaccurate and misleading. There is no evidence that Mr. Morrissey "lied about the autopilot failure." Carver's CG-2692 form does not say so and any reference to it is prohibited. Mr. Morrissey twice evaded deposition, so he has not testified to the point either. *See, e.g.*, ECF 88 (Order granting sanctions for failure to appear at deposition).

26. Before the switch to hand steering took effect, the bow of the barge made contact with the western section of the bridge. (Ex. 2, 2692 form dated 6/25/24, CARVER 111-112; **Exhibit 16, Tug cell text,** CARVER ESI 1897; and **Exhibit 17** CARVER ESI 523 (**screen shot of incident**). In the tug's Bridge Log of June 15, 2024, Capt. Chris Miller stated:

Mate James Morrissey reports the autopilot was not completely turned off he was able to correct and switch back over to hand steering and begin backing on the Weeks 281 barge and maneuvered the barge alongside fendering on the North and PBL RR Bridge, photo taken. proceed slowly away from bridge.

(**Exhibit 18, 6/15/24 Daily Log**, CARVER 56; Ex. 17, CARVER ESI 523 (screen shot of incident with same text). Similarly, in a June 28, 2024 email from Capt. Miller to Brian more, Capt. Miller states:

> From: +18455944410 Brian Moore
> To: +15187084887 (owner)
>
> I'll call you very shortly but his interview statement to CG said it never went hard over and it was midship the entire time.
>
> Participant: +15187084887   Read: 6/28/2024 10:01:32 AM(UTC-4)
>
> Status: Read                 6/28/2024 10:01:19 AM(UTC-4)
>
> Source Info:
> iPhone/mobile/Library/SMS/sms.db : 0x7A7CC9 (Table: message, handle; Size: 26599424 bytes)
>
> CARVER ESI 001897

See (Ex. 16, CARVER ESI 1897). See also SUMF 6, *supra*, at Capt. Stephenson's report, p. 30 (discussing same).

**RESPONSE**: This is inaccurate and misleading. The above-depicted statement is not an "email from Capt. Miller to Brian more." It comes from text messages *from Mr. Moore to the M/T MACKENZIE ROSE cell phone*. ECF 91, Ex. L. Carver is also prohibited from citing the CG-2692 report submitted by Mr. Moore or Mr. Moore's purported summary of a Coast Guard interview in support of Fact No. 26.

27. Capt. Nicholas J. Lewis, Claimants' purported marine industry expert who intends to offer opinions on duty and causation of the allision, agrees that navigational error caused the bridge strike, specifically that "[t]he Officer on Watch (James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode) in a confined navigational channel, resulting in loss of directional control." **(Exhibit 19**, Lewis Report at 12; see also **Exhibit 20,** Lewis Dep, 40:1-24 ("Yeah. [Morrissey] did something wrong")).

**RESPONSE**: This is inaccurate and misleading. Captain Lewis is not a fact witness and did not purport to be one in his expert report or deposition. The statement that Mr. Morrissey could have "disengage[d] the autopilot" does not relieve Carver of responsibility for allowing use of the autopilot in the first place.

7

## STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

## ARGUMENT

**I.   Mr. Morrissey's alleged navigational error does not entitle Carver to limit its liability under the Act, even if the statement was accurate.**

Carver bears the "burden of establishing that the casualty occurred without the owner's privity and fault, *including pre-voyage unseaworthiness. . .*" *Crown Zellerbach v. Ingram Indus.*, 783 F.2d 1296, 1303 (5th Cir. 1986) (emphasis added). Its Motion seeks to shift blame onto Mr. Morrissey for a navigational error, but the argument fails under basic scrutiny. The alleged "navigational error" was proceeded by repeated unrepaired issues with the autopilot system and a prior incident with Mr. Morrissey himself, of which Carver was undisputedly aware. *See* ECF 91, pp. 13-14 and Exs. W, X, Y, Z, and AA (Incident and Near Miss Reports). There is simply no way that Carver can establish that operator error was the sole cause of the Allision.

What is more, as explained above, Carver's argument is a difference without a distinction. Carver asserts that Mr. Morrissey failed to "turn off the auto pilot in time sufficient to aver Allision with the bridge." *See* ECF 99, p. 2.[1] Yet even if this were the case, leaving autopilot engaged should

---

[1]   Carver's argument is based on the inadmissible CG-2692 report and should be stricken as noted above. *See* 46 U.S.C. §§ 6301 and 6308 and ECF 114 (NPBL First Motion in Limine).

8

not cause a vessel to strike a bridge. Such a result could only occur if there was an underlying issue with the autopilot system, which is precisely the case here. As described in detail in the Belt Line's own Motion for Summary Judgment, Carver was aware of these issues because incidents related to the autopilot were reported in Carver's business records before the Allision. In other words, even if Carver's narrative were accurate, it would not absolve Carver from fault.

Carver further argues is that it could not have had privity and knowledge of the condition leading to the Allision because, as owner, it was too far removed from the operations of the vessel on the day of the Allision. Carver relies on two cases in which courts found that one-time crew errors did not defeat a limitation action where no privity or knowledge of other issues existed. *See McAllister Towing of Va., Inc. v. United States*, 2012 U.S. Dist. LEXIS 47776 (E.D. Va. 2012) (involving negligent release of a tow wire); *see also In re Manhattan by Sail, Inc.,* 2018 U.S. Dist. LEXIS 157262 (S.D.N.Y. 2018) (involving mishandling of a ship's halyard line).

Carver attempts to liken its action, or rather inaction, to *McAllister* and *In re Manhattan*. But this case does not involve mishandling a ship sail or improper release of a wire with no other issues of privity and knowledge. Here, the undisputed facts show that Carver's systematic disregard for the seaworthiness of the M/T MACKENZIE ROSE and her crew, particularly with respect to the autopilot system, led directly to the Allision that caused millions of dollars in damage to the Belt Line's Bridge. *See* ECF 91, pp. 19-22.

The only other support Carver cites for this argument is a case from the Northern District of Illinois where the court permitted a shipowner's limitation of liability because the evidence failed to show privity or knowledge of a defect. *See Illinois Constructors Corp. v. Logan Transp.*, 715 F. Supp. 872 (N.D. Ill. 1989). However, in that case, the court found that 1) the vessel was seaworthy and there was no evidence of inadequate steering and 2) the shipowner provided a

competently trained crew. *Id*. at 886. For the reasons explained in the Belt Line's Motion for Summary Judgment, ECF 90 & 91, the same is not true here.

II. **Carver is not entitled to exoneration from or limitation of liability because it had privity and knowledge of the vessel's unseaworthiness.**

Carver's attempt to shift blame away from itself cannot change the fact that it undisputedly knew of the conditions that led to the Allision. Under 46 U.S.C. § 30523, to limit liability, a shipowner must prove that it lacked "privity or knowledge" of the negligence or fault that caused the Allision. *See* 46 U.S.C. § 30523(b); *see also Hellenic Lines, Ltd. v. Prudential Lines, Inc*., 730 F.2d 159, 166 (4th Cir. 1984). In other words, "[t]o obtain the benefit of the Act the owners must establish a right to it. That involves the always difficult—and oftentimes impossible—burden of establishing that the casualty occurred without the owner's privity and fault, *including pre-voyage unseaworthiness*. The books are filled with hundreds of cases denying limitation of liability." *Crown,* 783 F.2d at 1303 (emphasis added). A shipowner's privity or knowledge is not limited to action or inaction on the date of the incident, *Crown,* 783 F.2d at 1303, but can be shown if a vessel "by having either *insufficient equipment* or an *insufficiently competent and trained crew*." *SCF Waxler Marine, LLC v. Aris T M/V*, 24 F.4th 458, 472 (5th Cir. 2022) (citations omitted, emphasis added).

Because Carver had privity and knowledge of the conditions leading to the Allision, namely with the autopilot system and incompetent crew, it is not entitled to limit its liability under the Limitation Act. The Belt Line incorporates its Motion for Summary Judgment on this point and, without fully repeating its arguments, highlights four points that Carver cannot overcome.

A. **Carver cannot prove the seaworthiness of the M/T MACKENZIE ROSE.**

Carver's attempt to establish the seaworthiness of the M/T MACKENZIE ROSE at the time of the Allision fails to meet its "burden of establishing that the casualty occurred without

10

the owner's privity and fault, *including pre-voyage unseaworthiness*." *Crown*, 783 F.2d at 1303.

Carver first asserts that the M/T MACKENZIE ROSE had two licensed captains and five crew members on the date of the Allision and was therefore properly manned. However, just because Captain Miller and Mr. Morrissey were licensed masters of the vessel and the requisite number of crew members were aboard does not automatically render the crew competent. In fact, the undisputed facts demonstrate that Carver was aware of previous incidents as well as a lack of training for Mr. Morrissey before the Allision.

Carver also asserts that Mr. Morrissey was properly serving as a "lookout" at the same time he was operating the tug. But whether this is true (which the Belt Line does not concede) is immaterial to Carver's Motion for Summary Judgment because it does not overcome his lack of training and discipline as described below and in the Belt Line's own Motion.

### B. Carver knew of issues with the autopilot system on the M/T MACKENZIE ROSE before the Allision and failed to repair it or prohibit its use.

Carver's Motion also cannot overcome the significant undisputed evidence that the M/T MACKENZIE ROSE had a history of autopilot malfunctions, including two incidents reported just weeks before the Allision. This history is evidenced by Carver's internal business records demonstrating that Carver failed to properly repair the autopilot system or prohibit its use despite knowledge of the previous malfunctions.

The previous incidents are well documented. After numerous problems with the autopilot system on the tug, Carver had Ayers Marine repair the system in April 2024. Yet it is undisputed that problems persisted after these repairs. On May 3, 2024, just 6 weeks before the Allision, Carver's internal report describes a "near miss" of the M/T MACKENZIE ROSE and cites the reason as "steering went into standby and the rudder came hard over without alarm." *See* ECF 91, Ex. Y (05/03/24 Near Miss Report). On May 21, 2024, just 3½ weeks before the Allision, another

11

report describes a similar incident wherein the steering went unexpectedly left when the tug was in autopilot, remarkably like the turn the tug took on the approach to the Bridge here. *See* ECF 91, Ex. Z (05/21/24 Incident Report).

Despite its knowledge of these autopilot malfunctions in May 2024, Carver performed no work on the autopilot system between April 2024 and the Allision on June 15, 2024, nor did Carver prohibit use of the system until proper repairs could be made. *See* ECF 91, Ex. G (Moore Dep. 275:24-276:6) (confirming no work on autopilot after April 2024). It is undisputed that on June 15, 2024, while in autopilot, the M/T MACKENZIE ROSE, pushing a 200-foot loaded barge, veered left outside the navigable channel and hit the Bridge, a situation that should never have occurred had Carver properly repaired the autopilot system or prohibited its use.

### C. Carver knew the Simrad manual for the autopilot system prohibited autopilot use in "narrow waters" but failed to restrict its use in transiting the Bridge.

Carver also cannot limit its liability because it knew of written restrictions in the operator manual for the Simrad autopilot system installed on the M/T MACKENZIE ROSE—specifically a prohibition on the use of autopilot in "heavy traffic areas or in narrow waters" and a requirement that users "always switch the autopilot to standby and reduce speed in due time to avoid hazardous situations." ECF 91, Ex. EE (Simrad manual); *see also* 33 C.F.R. 117.997 (identifying Bridge in the Code of Federal Regulations). Carver's own Port Captain, Mr. Baldassare, expressly testified that autopilot should not have been used when approaching the Bridge in this case. ECF 91, Ex. H (Baldassare Dep. 89:14-90:5). Despite this knowledge, Carver failed to prohibit the crew from using the autopilot system in the approach on the day of the Allision.

Carver's argument that autopilot is not necessarily prohibited by federal law ignores this explicit prohibition in the Simrad manual, as well as Mr. Baldasarre's testimony on point. It also ignores the requirement of 46 C.F.R § 140.670 (autopilot regulation) that an autopilot system must

12

be manned by a "competent" operator "in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigational situations." It is indisputable that, at the time of the Allision, the Bridge was a published hazard to navigation in 33 C.F.R. 117.997.

Because Carver knew the Simrad manual prohibited use of autopilot in the situation here yet failed to prohibit its use in the approach to the Bridge, Carver cannot limit its liability.

### D. Carver failed to provide a competent crew for the M/T MACKENZIE ROSE.

Finally, Carver's failure to supply a competent and properly trained crew also led to the Allision. As the Fifth Circuit explained in *SCF Waxler Marine*, "[t]he privity or knowledge standard obliges the owner to select a competent master. It also requires the owner to *properly train the master and crew*." *SCF Waxler Marine*, 24 F.4th at 472.

The undisputed facts show that Carver did not train Mr. Morrissey on transiting bridges or use of the Simrad autopilot system installed on the tug before he operated the M/T MACKENZIE ROSE on June 15, 2024. *See* ECF 91, Ex. FF (records of Morrissey's training). Additionally, on January 22, 2024, as reported in Carver's business records, Mr. Morrissey struck a pier while operating the M/T MACKENZIE ROSE, but did not receive any discipline or additional training before the Allision. *See* ECF 91, Ex. AA (01/22/24 Incident Report). Carver's failure to properly train or discipline him renders the crew incompetent. *SCF Waxler Marine*, 24 F.4th at 472.

Each of the four points above individually precludes Carver from meeting its burden of proof. Combined, they establish undisputedly that Carver knew of and failed to prevent the conditions that led to the Allision. As a result, Carver is not entitled to limit its liability and its Motion for Summary Judgment should be denied.

## CONCLUSION

WHEREFORE, the Belt Line respectfully requests that this Court enter an order denying Carver's Motion for Summary Judgment, granting the Belt Line's Motion for Summary Judgment, and awarding the Belt Line all other just relief.

Dated: September 19, 2025

NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

By:    */s/ Mackenzie R. Pensyl*
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl, VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of September 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all registered counsel of record, and mailed to:

James Morrissey
4723 Baywood Drive
Lynnhaven, FL 32444

By:    */s/ Mackenzie R. Pensyl*
James L. Chapman, IV, VSB No. 21983
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510