IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | Civil Action No. 2:24-cv-00490-MSD-LRL |

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S
REPLY TO CARVER'S BRIEF IN OPPOSITION TO
THE BELT LINE'S MOTION FOR SUMMARY JUDGMENT**

Norfolk and Portsmouth Belt Line Railroad Company, by counsel, for its Reply to Carver's Brief in Opposition to the Belt Line's Motion for Summary Judgment, states as follows:[1]

## Introduction

Carver's Opposition Brief fails to overcome the Belt Line's motion. Two things stand out at the start. First, Carver does not dispute liability for the Belt Line's Claim under the Oregon Rule, which alone entitles the Belt Line to judgment on its Claim. Second, Carver mistakenly argues against the Belt Line's damages when the Belt Line does not seek summary judgment on damages. In its motion, the Belt Line asks this Court to "(1) dismiss Carver's Complaint for Exoneration from or Limitation of Liability; [and] (2) grant the Belt Line . . . judgment on [its] Claims against Carver *in an amount to be proven at trial*. . ." ECF 90, p. 1.

Carver spends the remainder of its brief attempting to limit liability, advancing the same invalid argument as in its own Motion for Summary Judgment: that the Allision was entirely the

---

[1] This reply brief is also submitted on behalf of Evanston Insurance Company to the extent Evanston remains in the case.

1

fault of the operator of the tug, James Morrissey, because he switched off autopilot too late before encountering the Belt Line Bridge. No admissible evidence supports this theory. The undisputed facts establish that the tug's "steering went hard over," ECF 91, Ex. J (Rough Log 06/15/24), and that the tug was in autopilot at all times until it began backing away from the Bridge after impact, ECF, Ex. I (Daily Log 06/15/24).

Yet even if Carver's theory were correct, it makes no difference. A competent operator leaving a properly functioning autopilot system "engaged" should not cause a tug to hit a bridge. Only an underlying issue with the autopilot makes this a possibility. Carver's alleged dispute, therefore, does not materially affect the outcome on summary judgment. Whether under the documented facts or Carver's modification of those facts, the cause of the Allision was not outside Carver's control but directly related to issues within its privity and knowledge.

Carver's other arguments are equally immaterial, as they fail to overcome the undisputed facts or raise genuine disputes. Instead, Carver focuses on disagreements with semantics, facts unrelated to the Belt Line's motion, alleged lack of context, and inferences Carver itself has made. Because the undisputed facts establish that the Belt Line's claim is valid, that Carver cannot meet its burden to show it lacked privity or knowledge of the conditions that caused the Allision, and that Carver comes to the Court with unclean hands, this Court should grant summary judgment for the Belt Line and allow the case to proceed to trial on damages with no limitation on liability.

### Objection to Carver's Reliance on U.S. Coast Guard Investigation

As with Carver's own Motion for Summary Judgment, its Opposition Brief relies heavily on parts of the U.S. Coast Guard investigation that are forbidden in a civil action. Specifically, Carver relies on two versions of a CG-2692 incident form filled out by its own management employees, Brian Moore and Leonard Baldasarre, who were not on the vessel. These are the same

two employees who deliberately deceived the tug crew, falsely asserting that the Coast Guard had approved their departure without investigation. *See* ECF 91, pp. 8-10 (NPBL Brief in Support of Summary Judgment). Carver uses the information on these forms to suggest that Mr. Morrissey was solely responsible for the allision.

As noted above, Carver's assertion does not advance its position, even if true. Leaving autopilot "on" should not take a tug into a bridge. And why the autopilot was acceptable for navigating the Jordan Bridge but had to be taken "off" for the Belt Line's Bridge is totally unexplained in Carver's brief. Carver's narrative thus leads to the same place as the Belt Line's motion: use of the autopilot on the M/T MACKENZIE ROSE, having failed repeatedly in the past, never should have been allowed on the day of the Allision. *See* ECF 91, pp. 20-22.

Regardless, however, under 46 U.S.C. §§ 6301 and 6308, no part of the CG-2692 forms or Carver's narrative based on those forms can be used in this case. Section 6308(a) provides:

> Notwithstanding any other provision of law, no part of a report of a marine casualty investigation conducted under section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States.

This provision is expressly cited in the Privacy Act Notice on page 3 of the CG-2692 form:

> **Disclosure**: Furnishing this information is mandatory per 46 CFR § 4.05-10. . . . Some of the casualty information collected on this form may be made available for public inspection; however, *information collected is protected from use in civil litigation per 46 U.S.C. § 6308*. Personal privacy information will not be disclosed routinely. Social Security numbers are not mandated on this form.

ECF 99, Ex. 2 & 19 (Carver's Brief in Support of Summary Judgment) (emphasis added).

Federal courts consistently enforce this prohibition. *See In re Complaint of Cozy Cove Marina, Inc.*, 521 F. Supp. 2d 504, 506-07 (E.D. Va. 2007) (holding 46 U.S.C. § 6308 precludes use of U.S. Coast Guard accident reports in civil litigation); *In re Eternity Shipping, Ltd.*, 444 F.

3

Supp. 2d 347, 352 (D. Md. 2006) (same).  The reason is to protect the government's strong interest in the integrity of the investigative process, since incident descriptions can be manipulated to favor whoever fills them out.  *Id*.  If they were admissible in private litigation, a company facing liability would have every incentive to describe an incident in a way that limits its exposure.

Because of the pervasiveness of Carver's reliance on the Coast Guard investigative process and CG-2692 forms, its Opposition Brief should be stricken.  Put simply, there is no plausible way to read Carver's brief or arguments without the prohibited references.

## Counterresponse to Material Facts

To the extent the Court does not strike Carver's Opposition Brief, the following counter-responses address Carver's alleged "disputes" with the Belt Line's undisputed facts.  None of Carver's contentions raises any genuine dispute of material fact.

### *Carver's responses to Undisputed Facts 2, 7, and 9 improperly equate differences in semantics with material factual disputes*

2. On June 15, 2024, at approximately 4:26 p.m. EST, Carver's tug, the M/T MACKENZIE ROSE, pushing the loaded barge WEEKS 281, allided with the Bridge (the "Allision"). *See* ECF 1, p. 2.

**COUNTERRESPONSE**:  Carver takes no issue with the substance of No. 2 and points only to a difference in semantics, stating that "[t]he bow of the barge, not the tug, allided with the bridge." ECF 109, p. 2.  The distinction is immaterial since the tug was pushing the barge.

7. At approximately 4:36 pm EST on June 15, 2024, Carver's Port Captain in New York, Leonard Baldassare, texted Carver's General Manager in New York, Brian Moore, confirming that the tug allided with the Bridge. *See* Exhibit F at CARVER 187 (texts between Baldassare and Moore).

**COUNTERRESPONSE**:  Carver also takes no issue with the substance of No. 7, simply reiterating that "the bow of the barge allided with the bridge." ECF 109, p. 2.

9. At the time of the Allision, Carver's Port Captain, Mr. Baldassare, was a management level employee in charge of all operations of Carver's tug fleet, including serving as a liaison to Carver's upper-level management. *See* Exhibit H (Baldassare Dep. 16:22-17:4).

**COUNTERRESPONSE**: Carver also takes no issue with the substance of No. 9 and instead points out only that Mr. Baldassare testified he was in charge of "day-to-day" operations rather than "all" operations. ECF 109, p. 2. Either way, he was a management level employee.

### *Carver's response to Undisputed Fact 14 is not relevant to the Belt Line's motion, as the Belt Line does not seek summary judgment on damages*

14. To date, the Allision has caused $15,542.871.55 in damages not including interest, costs, attorneys' fees and punitive damages. *See* Exhibit A (Moss Declaration).

**COUNTERRESPONSE**: After receiving the latest contractor invoice, the Belt Line's repair cost damages now total $15,922,877.46. Carver argues a "substantive dispute" regarding damages, ECF 109, p. 3, but the dispute is irrelevant to the Belt Line's motion because the Belt Line does not seek summary judgment on damages. *See* ECF 90, p. 1.

### *Carver's responses to Undisputed Facts 21, 27, 28, and 30 do not actually dispute any of the stated facts*

21. Despite the Port Captain's statement to the tug crew, no one at Carver notified the U.S. Coast Guard of the Allision on June 15, 2024. *See* Exhibit M (Carver Rule 30(b)(6) Dep. 76:8-80:15). Carver's Rule 30(b)(6) designee confirmed in his deposition that Carver did not notify the U.S. Coast Guard and first communicated with them "days after it happened." *Id.*

**COUNTERRESPONSE**: Carver argues that the facts in No. 21 are "incomplete and therefore incorrect," but cites no evidence to contest them. ECF 109, p. 4. Carver instead attempts to supply additional information, arguing that, based on "photos which showed no visible damage to the tug, barge, or bridge, Mr. Moore and Mr. Baldassare did not believe that this was a reportable incident under 46 CFR 4.05-1." But visible damage (even if the Court were to believe the photos showed none) is irrelevant to the reporting requirement; *any contact* must be reported immediately. *See* 46 C.F.R. 4.05-1(a)(1). Carver's argument does not alter the undisputed facts in No. 21.

5

27. Text messages produced by Carver between Carver's Port Captain, Mr. Baldasare and Carver's General Manager, Mr. Moore, indicate that Carver's tug captain had intended to notify the US Coast Guard of the Allision. *See* Exhibit F (texts between Baldassare and Moore).

**COUNTERRESPONSE**: Carver does not dispute the facts in No. 27 and cites only its response to No. 21, which does not address No. 27. ECF 109, pp. 4-5. The statements in No. 27 are correct and supported by the text messages in Carver's business records.

28. Instead of notifying the U.S. Coast Guard on June 15, 2024, text messages produced by Carver between Mr. Baldassare and Mr. Moore indicated that Carver's management misled the tug captain into leaving the scene and that Mr. Baldassare "yelled at" him for wanting to report the incident. *See* Exhibit F (texts between Baldassare and Moore).

**COUNTERRESPONSE**: Carver contests No. 28 by citing its responses to "Nos. 14, 21, and 27," ECF 109, p. 5, but none of those address the statements in No. 28. The statements in No. 28 are correct and supported by the text messages in Carver's business records.

30. Carver did not test the crew of the tug for drug and alcohol use on the day of the Allision, and because Carver did not report the incident to the U.S. Coast Guard, no one else did either. *See* Exhibit M (Carver Rule 30(b)(6) Dep. 101.7-10; 101:20-102:6).

**COUNTERRESPONSE**: Carver again cites its response to No. 21, which does not address No. 30. ECF 109, p. 5. The statements in No. 30 are correct and supported by the testimony of Carver's Rule 30(b)(6) designee.

***Carver's responses to Undisputed Facts 31-33, 40-50, 53-54, 56-57, and 59 fail to dispute the facts and, instead, take issue with alleged "assumptions" or "inferences"***

31. The M/T MACKENZIE ROSE has video cameras in the lower wheelhouse and at the stern, yet Carver has never produced data or videos from any such cameras despite being requested to do so in the Belt Line's Requests for Production Nos. 9, 14, and 15. *See* Exhibit R (photos of the tug on 8/19/25) and Exhibit S (Belt Line's First RFPs).

**COUNTERRESPONSE**: Carver argues that No. 31 "improperly assumes that equipment observed on the tug in August 2025 was present and operation [*sic*] on the date of the allision." ECF 109, p. 5. Carver cites an "overhaul" in 2025 in which it claims new cameras were installed,

6

but this says nothing about whether cameras existed in 2024.  The facts in No. 31 are correct that photos of the tug undisputedly show multiple cameras, and the Belt Line undisputedly requested all video data from the outset of the case, which Carver has never produced.

  32. Carver's General Manager, Mr. Moore, disposed of his cell phone that he used on June 15, 2024, and Carver has never produced texts or ESI from that phone despite being requested to do so by the Belt Line and ordered to do so by this Court.  *See* Exhibit G (Moore Dep. 27:15-21); Exhibit S (Belt Line's First RFPs); ECF 50 (Order requiring response to RFP 34).

  **COUNTERRESPONSE**:  Carver argues that No. 32 "is based, in part, on an improper inference and, in part, on a false statement.  In addition, [Carver argues,] the above statement mischaracterizes the information requested during discovery."  ECF 109, p. 6.  The Belt Line's request sought "communications pertaining to the incident to or from [Carver], the Vessel's officers or crewmembers, or any government entity."  *Id.*  Carver claims it "produced all company email as defined, which included Brian Moore's email account as well as cell phone communications from Lenny Baldassare and the cell phone issued to the tug, the two recipients who had company cell phones."  *Id.*  Notably absent from this list is any cell phone data belonging to Mr. Moore, just as stated in No. 32, and Mr. Moore was an employee of Carver when the Belt Line sent its request.  *See* ECF 91, n. 2, and Ex. T.

  33. Carver performed "maintenance" work on the tug on June 18, 2024, just days after the Allision, before the Belt Line, Evanston, or the U.S. Coast Guard could inspect it.  *See* Exhibit U at CARVER HELM CONNECT 549-550 (Daily Log Entry 06/18/24).

  **COUNTERRESPONSE**:  Carver responds by stating that, "th[e] assertion that Carver regularly maintains its vessels does not support an inference that the maintenance was pertinent to this case."  ECF 109, p. 7.  This statement does not dispute the facts set forth in No. 33, which are correctly supported by Carver's business records.

  39. On June 15, 2024, Carver's General Manager, Mr. Moore, asked Carver's Port Captain, Mr. Baldassare, to "see how we can resolve the steering issue" in reference to the Allision.  *See* Exhibit F (texts between Baldassare and Moore).

**COUNTERRESPONSE**: Carver does not dispute this fact, but argues that "[t]he subject discussion is irrelevant." ECF 109, p.8. According to Carver, "Mr. Baldassare and Mr. Moore's initial concern that there was a steering issue was in error. This was superseded by later events that revealed that the allision was due to Mate Morrissey's navigational error, not a steering failure." "Later events" appears to mean Messrs. Moore and Baldassare deciding to change their CG-2692 report to the Coast Guard to blame Mr. Morrissey instead of the autopilot, but that information is inadmissible. The steering issue is highly relevant, and the statement in No. 39 is correct based on the text messages in Carver's business records.

40.     On July 2, 2024, two weeks after the Allision, an engineer on board the M/T MACKENZIE ROSE noted error codes on the autopilot and reported this error to Carver via text message. *See* Exhibit L (text messages from tug phone to Moore).

**COUNTERRESPONSE**: Carver argues that No. 40 "misconstrues the cited conversation and asks the court to make an unsupported inference that there was a defect in the autopilot that caused the subject Allision." ECF 109, p. 8. Carver claims that, because there were other messages in the conversation, the statement in No. 40 somehow overlooks that the autopilot just "needed to be re-set on July 2, 2024, and that re-setting the autopilot resolved all concerns." *Id*. Nothing in this argument changes the undisputed fact stated in No. 40 that Carver's business records note error codes on the autopilot just two weeks after the Allision.

41-49.  Undisputed Facts 41 through 49 in the section titled, "Carver knew of problems with the autopilot before the Allision."

**COUNTERRESPONSE**: Carver attempts to contest this entire group of undisputed facts because they show repeated problems with the autopilot system, all causing it to turn unexpectedly, including multiple incidents in early 2024 and two in the weeks just before the Allision, after which Carver failed to repair the system or prohibit its use. Carver argues that, "[e]ach of the particulars

discussed in the above paragraphs is submitted as if it were evidence of a defect in the autopilot causing the allision." ECF 109, p. 9. But nothing in this response contests any of the undisputed facts asserted in Nos. 41-49 because all of them come directly from Carver's business records.

50. The operator manual for the Simrad autopilot system on the M/T MACKENZIE ROSE on June 15, 2024 prohibits use of automatic steering "in heavy traffic areas or in narrow waters" and requires users to "always switch the autopilot to standby and reduce speed in due time to avoid hazardous situations." *See* Exhibit EE at CARVER 001999 (Simrad manual excerpt).

**COUNTERRESPONSE**: Carver argues that the Elizabeth River in the area of the Belt Line's Bridge is not a confined or narrow channel, despite Carver's simultaneous argument that Mr. Morrissey should have turned off autopilot to transit it. *See* ECF 109, p. 10. These internally competing positions have no bearing on the factual statements in No. 50, which correctly reflect the contents of the operator manual of the Simrad autopilot system.

53. Notwithstanding the Simrad manual and the many problems with the autopilot that had not been fixed, Carver did not prohibit use of the autopilot on the [tug] before the Allision. *See* Exhibit G (Moore Dep. 281-8-23); Exhibit M (Carver Rule 30(b)(6) Dep. 91:5-12).

**COUNTERRESPONSE**: Carver disputes that "(1) the Simrad manual prohibits use of autopilot; and (2) that there were problems with the autopilot on the M/T MACKENZIE ROSE." ECF 109, p. 10. These are not accurate disputes for reasons already stated, but regardless, Carver does not dispute the material statement in No. 53 that, "Carver did not prohibit use of the autopilot on the M/T MACKENZIE ROSE before the Allision." *Id*.

54. Notwithstanding the Simrad manual and Mr. Baldassare's testimony, Carver's Safety Management System ("SMS") contains no restriction on the use of autopilot in heavy traffic areas, narrow waters, or near hazards to navigation. *See* Exhibit G (Moore Dep. 281-17-23); Exhibit K (SMS excerpts); Exhibit M (Carver Rule 30(b)(6) Dep. 91-5:12).

**COUNTERREPONSE**: Carver "disputes that Mr. Baldassare characterized the subject bridge was a 'hazard'." ECF 109, p. 11. No. 54 does not make this statement, but references Mr. Baldassare's testimony quoted previously in No. 52 (not challenged) where he stated that autopilot

9

should not have been used when transiting a bridge. *See* ECF 91, Ex. H (Baldassare Dep. 89:14-90:5). To the extent pertinent, Mr. Baldassare also testified that a bridge is a hazard to navigation in another part of his deposition cited in No. 35. *See id*. (Baldassare Dep. 169:4-7).

56. James Morrissey received no training from Carver on transiting bridges before operating the tug on the day of the Allsion. *See* Exhibit FF (records of Morrissey's training).

**COUNTERRESPONSE**: Carver disputes only "the assumption implicit in this statement that Carver had a duty to train Mr. Morrissey as to how to transit a bridge." ECF 109, p. 11. Its disagreement with an implicit "assumption," however, is not a dispute of the stated fact, which is correct based on Mr. Morrissey's training history in Carver's business records.

57. James Morrissey received no training from Carver on the use of auto pilot before operating the tug on the day of the Allision. *See* Exhibit FF (records of Morrissey's training).

**COUNTERRESPONSE**: Carver disputes only "the assumption implicit in this statement that Carver had a duty to train Mr. Morrissey how to use autopilot." ECF 109, p.12. Again, its disagreement with the alleged assumption is not a dispute of the stated fact, which is correct based on Mr. Morrissey's training history in Carver's business records.

59. After the January 2024 allision, James Morrissey was not disciplined by Carver or required to go through any additional training. *See* Exhibit G (Moore Dep. 88:6-89:16).

**COUNTERRESPONSE**: Carver argues that this statement "is an improper inference" because, in Carver's view, the incident in January 2024 resulted from "winds and currents." ECF 109, p.12. Carver cites Mr. Moore's deposition generally (without page or line) and the incident report from Mr. Morrissey's pier allision just six months before the Bridge allision. Yet whether Carver *thought* discipline or additional training was required does not change the accuracy of the statement in No. 59. Undisputedly, Carver did neither.

10

## Argument

**I.   Carver does not deny liability on the Belt Line's Claim.**

Under the "Oregon Rule" of general maritime law, when a moving vessel allides with a stationary object like a bridge, the vessel is presumed at fault. *See The Oregon*, 158 U.S. 186, 197 (1895). *Yarmouth Sea Prods. v. Scully*, 131 F.3d 389, 393 (4th Cir. 1997); *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977). The Belt Line argued in its motion that, based on the undisputed facts, Carver is at fault for the Allision and the damages that flow from it. ECF 91, p. 19. Carver did not respond to this argument. Therefore, Carver is deemed to have conceded the point and the Belt Line is entitled to judgment on liability on its Claim. *See, e.g., Hopeman Bros., Inc. v. Cont'l Cas. Co.*, 307 F. Supp. 3d 433, 454 (E.D. Va. 2018) ("Defendants have not responded to any of Plaintiff's arguments about the import of the grouping language. Therefore, the Court considers Defendants to have conceded Plaintiff's argument that the grouping language does not require the aggregation of claims in this case.").

**II.   The undisputed facts prevent Carver from meeting its burden of proof to limit liability.**

    **A.   Mr. Morrisey's alleged "navigational error," even if true, does not entitle Carver to limit liability.**

Carver carries the burden to show that it lacked "privity or knowledge" of the condition or negligence that caused the Allision. *See* 46 U.S.C. § 30523(b); *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 166 (4th Cir. 1984) ("a shipowner seeking limitation of liability bears the burden of proving that he was without privity or knowledge of the condition or negligence responsible for the collision."). It seeks to meet this burden by arguing that the sole cause of the Allision was Mr. Morrissey's "fail[ure] to properly switch from autopilot to hand steering." ECF 109, p. 15. This unfounded distinction, however, makes no material difference here.

11

Most importantly, the theory is unsupported. Carver pulls it entirely from the CG-2692 form filled out by its own management employees, who were not on the tug and actively deceived the tug crew into leaving the scene. Use of that form is prohibited in civil litigation. *See* 46 U.S.C. §§ 6301 and 6308; *In re Complaint of Cozy Cove Marina, Inc.*, 521 F. Supp. 2d at 506-07 (46 U.S.C. § 6308 precludes use of U.S. Coast Guard accident reports in civil litigation).

The undisputed contemporaneous facts establish that the tug's "steering went hard over," ECF 91, Ex. J (Rough Log 06/15/24), and that the tug was in autopilot at all times until it began backing away from the Bridge after impact, ECF, Ex. I (Daily Log 06/15/24).

Yet even if Carver could successfully create a factual dispute using its own CG-2692 form, the dispute is immaterial because it does not affect the outcome on summary judgment. Failing to turn off a properly functioning autopilot system should not cause a tug to veer left and hit a bridge. Carver offers no explanation for this obvious problem with its theory. It also offers no explanation for why autopilot was acceptable to navigate the Jordan Bridge, just a few hundred feet before the Belt Line Bridge, but not the Belt Line Bridge. And if this was the rule at Carver—that autopilot is acceptable for some bridges but not others—Carver offers no explanation for why it is not reflected anywhere in Carver's SMS or tug records, or why Carver never trained Mr. Morrissey on the nuances of such bridge transits, much less the Simrad autopilot system on this tug, before June 15, 2024. *See* ECF 91, pp. 15-16. There are simply no facts, undisputed or otherwise, to allow Carver to limit its liability by blaming the operator.

By contrast, the undisputed facts establish that (1) Carver allowed its operators on the M/T MACKENZIE ROSE to use autopilot on June 15, 2024, including in the area of the Belt Line's Bridge, (2) the M/T MACKENZIE ROSE, pushing a 200-foot loaded barge, was in autopilot as it approached the Bridge, (3) while in autopilot, the tug veered left outside the navigable and ran the

12

barge headlong into the Bridge, (4) the autopilot steering system on the tug had failed at least four times previously in 2024, (5) all four events involved the tug turning unexpectedly, (6) two of the events occurred in May 2024, just 6 weeks and 3½ weeks before the Allision, (7) Carver performed no repairs to the autopilot after April 2024, notwithstanding the May 2024 events, (8) Carver did not prohibit use of autopilot on the M/T MACKENZIE ROSE after April 2024, notwithstanding the May 2024 events, and (9) on July 2, 2024, two weeks after the Allision, an engineer on the M/T MACKENZIE ROSE noted error codes on the autopilot that would not clear until it was restarted. *See* ECF 91, pp. 2-3, 5, 12-15 (Undisputed Facts 1-6, 12-13, 37-49, 53-54) and Exs. W, X, Y, and Z (Incident and Near Miss Reports).

None of these facts can be denied. Carver undisputedly knew them because they come directly from the logbooks and reports in its own HELM system. *Id*. And all of them point to Carver's "privity or knowledge" of the conditions that caused the Allision. *See* 46 U.S.C. § 30523(b); *Hellenic Lines, Ltd*., 730 F.2d at 166. Under these circumstances, Carver cannot meet its burden to limit liability under the Limitation of Liability Act.

> **B.     Carver ignored its autopilot operating manual and supplied an incompetent crew for the M/T MACKENZIE ROSE on the date of the Allision.**

Other undisputed facts also independently foreclose Carver's ability to limit liability, most notably its decisions to (1) ignore the prohibitions in its own autopilot operating manual and (2) supply the M/T MACKENZIE ROSE with an incompetent crew on the date of the Allision. Carver attempts to offer reasons why the manual might not apply and why Carver's crew was competent, but Carver's arguments do not align with the undisputed facts.

The terms of the Simrad autopilot manual are detailed in the Belt Line's opening brief. They prohibit use of autopilot in heavy traffic areas, in narrow waters, or near hazards to navigation. *See* ECF 91, pp. 14-15. Carver argues that the Elizabeth River in the area of the Belt

13

Line Bridge is not a narrow channel, so the prohibition against autopilot does not apply. ECF 109, p. 10. But even if this were debatable, it does not address the separate prohibition against autopilot around hazards to navigation, and the Bridge is a documented hazard to navigation in the Code of Federal Regulations. *See* ECF 91, pp. 14-15, 21-22; *see also* 33 C.F.R. 117.997. Under the Simrad operating manual, Carver should have prohibited use of autopilot near the Bridge (and under the Jordan Bridge as well), but nothing in its SMS or any other Carver record does this. Had Carver followed the manual, Mr. Morrissey never would have been in autopilot in the first place.

The undisputed facts also show that Carver supplied an incompetent crew for the M/T MACKENZIE ROSE on the day of the Allision, particularly Mr. Morrissey as acting captain. *See* ECF 91, p. 22. Carver argues against this conclusion by pointing to a four-factor test to determine competence: (1) whether the captain is properly licensed; (2) whether the captain has a satisfactory safety record; (3) whether the captain is familiar with the vessel and the waters on which it travels; and (4) whether the captain is adequately trained. ECF 109, p. 17; *see also In re Sea Wolf Marine Towing & Transp.*, 2007 U.S. Dist. LEXIS 82565 (S.D.N.Y. 2007). Carver argues that Mr. Morrissey was never disciplined, so must have been competent. *Id*. Yet the facts show at least three things that overcome this argument: *first*, Carver knew Mr. Morrissey had previously struck a pier while operating the same tug, yet failed to discipline him or require additional training; *second*, Carver never trained Mr. Morrissey on the Simrad autopilot system for the tug before allowing him to use it on the day of the Allision; and *third*, Carver never trained Mr. Morrissey on proper procedures for transiting bridges, even though it now claims that some bridges (like the Jordan Bridge) can be transited in autopilot while others cannot. *See* ECF 91, p. 24. Based on Carver's own test, therefore, Mr. Morrissey satisfies only *one* factor and fails the other three.

14

### III. Carver is not entitled to relief under the Limitation of Liability Act due to its unclean hands.

Finally, Carver argues that the Belt Line's motion misapplies the equitable doctrine of unclean hands. *See* ECF 109, pp. 18-19. Carver does not meaningfully dispute the substantial facts underlying its unclean hands, nor can it since they come directly from text messages sent and received by Carver's own managerial employees in its business records. *See* ECF 91, pp. 6-10. Instead, it argues that the conduct underlying its unclean hands did not "cause" the Allision. *See* ECF 109, p. 18. Carver offers no statute or precedent for this proposition, pointing only to Admiralty Rule F and case law that places the burden on the vessel owner to prove lack of privity or knowledge of the "cause" of a casualty. ECF 109, p. 18 (citing *Empresas Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir. 1983)).

Carver's argument mixes up issues. There is no causal requirement for a court of equity to bar a party from obtaining relief due to unclean hands. To establish a defense of unclean hands, a defendant must show that the plaintiff's conduct (1) was willful and inequitable; (2) was directly related to the claim asserted; and (3) injured the defendant. *Harrods Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 679-80 (E.D. Va. 2001). All of these are laid out in the Belt Line's brief. The guiding principle "is the equitable maxim that he who comes into equity must come with clean hands." *Mas v. Coca-Cola Co.*, 163 F.2d 505, 509 (4th Cir. 1947).

A party's inequitable conduct is "directly related" to a claim where "there is a close nexus between [the] party's [inequitable] conduct and the transactions on which that party seeks relief." *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 810 (4th Cir. 2001); *see also Mas v. Coca-Cola Co.*, 163 F.2d 505, 508 (4th Cir. 1947). As the Fourth Circuit explained, "The doctrine of unclean hands prevents a plaintiff from obtaining equitable relief if the plaintiff has been guilty of any inequitable or wrongful conduct *with respect to the transaction or subject matter*

15

sued on." *WorldCom, Inc. v. Boyne*, 68 Fed. Appx. 447, 451 (4th Cir. 2003) (emphasis added, citations omitted); *Kennedy v. Dabbiere*, 545 F. Supp. 3d 269, 286 (E.D. Va. 2021) (same).

It is undisputed that Carver's evasion is directly related to the Allision for which it now seeks exoneration. Indeed, the text messages in the Belt Line's motion reveal that the entire aim of Carver's inequitable conduct was to *cover up* Carver's involvement in that Allision. *See* ECF 91, pp. 8-10. It is also beyond dispute that Carver's actions created incredible risks for the public and the Belt Line. And perhaps worst is that the concealment might have worked, thus encouraging similar conduct in the future, but for surveillance video identifying the tug. All this conduct is directly related to the Allision from which Carver now seeks relief.

Carver's only other argument against unclean hands is that it "had no knowledge the bridge had been damaged[.]" ECF 109, p. 19. This argument is not only false, but irrelevant under the reporting law. The undisputed facts show that a photograph of the Bridge after the Allision was sent to Mr. Baldassare by the tug's cell phone in which a serious deflection in the tracks is visible. *See* ECF 91, Ex. B. Yet even if no damage were visible, Carver still had a duty to report the incident to the Coast Guard before leaving the scene. *See* 46 C.F.R. 4.05-1 (requiring immediate reporting to the Coast Guard of any "unintended strike of (allision with) a bridge"). As such, Carver's argument that it had no knowledge of any damage is immaterial to its unclean hands, and Carver should be precluded from limiting its liability in this equitable proceeding.

## Conclusion

WHEREFORE, the Belt Line respectfully requests that this Court (1) dismiss Carver's Complaint for Exoneration from or Limitation of Liability; (2) grant the Belt Line judgment on its Claim against Carver in an amount to be proven at trial; and (3) award the Belt Line all other just and necessary relief.

Dated: September 22, 2025

        NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

By:    */s/ James L. Chapman, IV*
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl, VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

### CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all registered counsel of record, and mailed to:

James Morrissey
4723 Baywood Drive
Lynnhaven, FL 32444

By:    */s/ James L. Chapman, IV*
James L. Chapman, IV, VSB No. 21983
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*