IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/V MACKENZIE ROSE, (IMO No. 8968765) her cargo, engines, boilers, tackle, equipment, apparel, and appurtenances, etc., *in rem,* ("M/T MACKENZIE ROSE"), petitioning for Exoneration from or Limitation of Liability in allision with Belt Line Main Line Railroad Bridge (the "Bridge") occurring June 15, 2024 in and about the Elizabeth River, Virginia. | Civil Action No: 2:24-cv-00490 |

**PETITIONER'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGEMENT AND SUPPORTING MEMORANDUM OF LAW**

Petitioner, Coeymans Marine Towing LLC d/b/a Carver Marine Towing, by counsel, for its Reply in Support of Its Motion for Summary Judgement Lewis (Doc. 99), states as follows:

**I. INTRODUCTION**

The undisputed facts show that the sole causative negligent act was a navigational error by Mate Morrisey in failing to switch from autopilot to Non-Follow-Up mode (NFU) when he thought he had, which led to the bridge strike. The Belt Line has failed to meet its burden to show that the MACKENZIE ROSE was unseaworthy and that its unseaworthy condition at the time of the allision caused the bridge strike, or that the crew was not competent, or that under the pertinent law, Carver's Tug Safety Management System ("TSMS") and the Simrad Manual Carver should not have been operating the vessel in autopilot at the time of the allision. As a matter of law, where the undisputed facts show that the sole cause of the alleged negligent act is a navigational error, a vessel owner meets its burden of proof to show lack of privity, which, here, would entitle Carver to limit its liability pursuant to the Limitation of Liability Act, 46 U.S.C §30501 *et seq*. Based on the foregoing Reply in support of its Motion for Summary Judgment, Carver respectfully requests

1

that the Court grant its Motion for Summary Judgment, denying the Belt Line's Motion for Summary Judgment.

## II. REPLY TO BELT LINE'S RESPONSE AS TO MATERIAL FACTS

**CARVER'S SUMF No. 10.**

It appears that Belt Line does not dispute that Carver's General Manager, Brian Moore, was not present on the tug the day of the incident. (Ex.1, Moore Dep., 10:5-6; 29:18-21). Nor does it appear to dispute that Brian Moore first learned of the allision through a call from Carver Port Captain, Leonard Baldassare, who told him that the tug made contact with the fendering of the bridge. Rather, it adds references to a text message and related chain of text messages, which provided inaccurate information to Mr. Moore. There is no dispute that the initial description of the allision was incorrect.

**CARVER'S SUMF No. 15.**

The Belt Line does not appear to dispute that Capt. Chris Miller reported the incident to Port Capt. Lenny Baldassare. Nor does it appear to dispute Mr. Baldassare's cited testimony. Rather, it appears to argue that if Mr. Baldassare had focused on one particular photo he would have realized, after the fact, that there was damage to the bridge. It also notes that there is a text indicating that the photograph, in and of itself, was uninformative. There is no dispute that the initial belief that the bridge was undamaged was incorrect.

**CARVER'S SUMF No. 16.**

The Belt Line's Response addresses the legal definition of an allision and regulatory obligations as to reporting. then as to duties to make reports to the Coast Guard, neither of which is pertinent to the undisputed testimony cited. The Belt Line offers a quote from a text as to the

nature of the allision to suggest that Moore and Baldassare might have thought the barge made contact with the bridge, despite their explicit and clear testimony to the contrary.

### CARVER'S SUMF 19.

The Belt Line's Response admits that Mate Morrissey had no disciplinary history. It then ignores the evidence that another 'incident' involving Mr. Morrissey was due to wind and weather, and not due to any error by Mr. Morrisey. [Doc 109], Petitioner's Response in Opposition to Claimants' Motion for Summary Judgment SUMF ¶ 59, and evidence cited therein.

### CARVER'S SUMF 20.

The Belt Line cites evidence of an error by Mate Morrisey as if it were evidence that the autopilot malfunctioned. While Mate Morrissey's reports were not accurate, See Carver SUMF ¶¶ 23-26, there is no genuine dispute that this accident occurred due to the Mate's error.

### CARVER'S SUMF 21.

The Belt Line cites its own call to the Coast Guard as if that reporting somehow negated the fact that Mr. Baldassare called the Coast Guard on Monday, June 17, 2024, after Mr. Moore ordered him to do so. (Carver Ex. 10, Baldassare Dep., 64:24-66:16).

### CARVER'S SUMF 23.

The Belt Line implies, without citing any evidence, that Mate Morrissey's original description of events might have been truthful, and complains that Mate Morrissey has failed to appear for his deposition. Neither the implication nor the fact of Mr. Morrissey's failure to appear is evidentiary. This is addressed in further detail in this Reply at Section III, Argument, at Paragraphs A. and B.

**CARVER'S SUMF 26**.

The Belt Line comments that an exchanged wrongly described as an email was actually a text from Mr. Moore to the M/T MACKENZIE ROSE. This is correct. That fact does not alter the substance of the exchange. The Belt Line then asserts that Carver's own business record as to what occurred in the accident is inadmissible. That is addressed in detail in this Reply at Section III, Argument.

**CARVER'S SUMF 27**.

The Belt Line objects to reliance on its own expert's opinions in the case, based, apparently, on lack of personal knowledge. This response does not alter that it is undisputed that the allision was caused by Mate Morrissey's navigational error in failing to switch from autopilot to manual steering (Non-Follow Up mode) resulting in a loss of directional control. The Belt Line also asserts that the decision to allow the use of an autopilot on the river near the Bridge was negligence That legal conclusion is contrary to the law and facts and is separately addressed.

### III.  ARGUMENT

**A.  Based on all admissible evidence, Morrissey's navigational error was the sole proximate cause of the allision.**

The Belt Line mistakenly argues that the only evidence of Mate James Morrisey's operator error in failing to switch from autopilot and to NFU is "the CG-2692 Forms." Having advanced this false premise, the Belt Line argues that the 2692-B form and the CG-2692 forms that Carver submitted to the U.S. Coast Guard June 19, 2024 and June 25, 2024, respectively, are not admissible evidence. This argument is flawed for two reasons: (1) Carver's argument depends not only on the forms, but other significant uncontradicted evidence; and (2) the Coast Guard Forms executed by Carver and provided to the Coast Guard by Carver are admissible evidence.

4

At the outset, Carver contends that the forms are admissible evidence as a business records exception to hearsay under Fed. R. Evidence 803(6),[1] even if the conclusions to be drawn from the forms may not. The U.S. Coast Guard 2692 Forms are admissible as business records of Carver, consistent with other significant admissible evidence (including the sworn testimony of Carver General Manager Brian Moore and Carver 30(b)(6) representative Nick Laraway, tug Crew Member revised Statements, and the Tug's June 15, 2024 Bridge Log authored by Capt. Chris Miller and a June 28, 2025 Text Message from Brian Moore to the Tug cell phone) all of which evidence Mate Morrissey's navigational error in operation of the tug by failing to switch from autopilot to Non-Follow Up mode (NFU mode). *See, e.g.*, [Doc. 99], Petitioner's Memorandum of Law in Support of Motion for Summary Judgment at Statement of Uncontested Facts ("SUMF"), ¶ 24 (extensive testimony of Brian Moore); Carver SUMF ¶ 25 (testimony of Brian Moore and Nick Laraway; crew member revised statements of Capt. Chris Miller, engineer Jason McGrath, deckhand Jarkeis Morrissey, deckhand Sharif Porter ); Carver SUMF ¶ 26 (June 15, 2024 Bridge Log authored by Capt. Chris Miller stating that "the auto pilot was not completely turned off and he was able to correct and switch back over to hand steering and begin backing …" and June 28, 2024 screen shot of text message from Brian Moore to tug cell stating that "his interview statement to CG said it never went hard over and it was midship the entire time."). Importantly, Brian Moore testified that after he attended the Coast Guard interview with James Morrissey following the allision, Lieutenant Meghan Palomba, U.S. Coast Guard, who was also

---

[1] Carver will submit a bench brief on the issue of the admissibility of the U.S. Coast Guard 2692 forms under the business records exception of Fed. R. Evidence 803(6). It also anticipates presenting the actual testimony taken by the Coast guard, together with Mr. Morrissey's testimony, which has been compelled by this Court. Most recently, on September 18, 2024, The NTSB advised that it would release the interviews "in one to two weeks."

present at the interview, asked Mr. Moore to revise the 2692 Form to reflect the correct account of events, which was that "James Morrissey was in auto pilot and didn't switch over to follow up hand steering mode, but thought he did." See Carver SUMF24, at Ex. 1 Moore dep. 244:8-248:3). The Belt Line's own liability expert, Capt. Nicholas Lewis, opined that a navigational error caused the bridge strike, specifically that "[t]he Officer on Watch (James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode) in a confirmed navigational channel, resulting in loss of directional control." Carver SUMF ¶ 27. In fact, Mr. Lewis unequivocally testified that "Yeah, [Morrissey] did something wrong." See Carver SUMF ¶ 27 at Ex. 20, Lewis Dep.40:1-24. In short, the evidence as viewed by all parties is that Morrisey's navigational error caused the tug to push the barge into the bridge. The attack on admissibility of one set of documents generated by Carver does not change or contradict the evidence.

The Belt Line argues that the 2692 Forms authored and submitted by Carver will be subject to the rule cited in *In re Complaint of Cozy Cove Marina, Inc*., 521 F. Supp. 2d 504, 506-07 (E.D. Va. 2007). However, 46 U.S.C.§ 6308(a) does not have as broad of a scope as Counsel for the Belt Line believes. *In Guest v. Carnival Corp*., 917 F. Supp. 2d 1242, 1243-47 (S.D. Fla. 2012) the Court held that documents or other materials that *Defendant produced to the Coast Guard* in furtherance of the Coast Guard's investigation were not within the scope of 46 U.S.C. § 6308(a). Rather, Section § 6308(a) extends to the specific Coast Guard investigative report, and arguably, any other Coast Guard document produced in the course of its investigation that contains any findings of fact, opinion, or conclusions — not, however, a litigant's own documents. *Id*. *See also Goodwin v. Cockrell*, No. 4:13-CV-199-F, 2014 WL 6630105 (E.D. N.C.) (holding that written statement and diagram do not constitute "part of a report of a marine casualty investigation" within

6

the meaning of §6308.). Here, the 2692 Forms are Carver's own documents and are admissible as outside the scope of 46 U.S.C. § 6308(a).

In sum, even if the 2692 Forms were not admissible – and that is incorrect, as they are outside the scope of § 6308(a) - other significant, sworn testimony and admissible evidence supports Carver's argument that a navigational error caused the bridge strike, specifically that "[t]he Officer on Watch (James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode)." The Belt Line has failed to identify evidence to the contrary.

### B. The Belt Line's initial argument in Section I is premised on a mistake of both law and fact.

In Section I, of its Brief in Opposition, the Belt Line argues that "Mr. Morrissey's alleged navigational error does not entitle Carver to limit its liability under the Act, even if the statement were accurate." The Belt Line's argument is premised on several flawed factual assumptions, evidentiary arguments and legal assumptions, and is a red herring intended to distract from the main issue: that the Belt Line has no undisputed factual evidentiary support for their claim that a mechanical error with the autopilot – not operator error – was a cause of the allision.

First, as clearly set forth supra, the admissible factual evidence, both testimony and documentary, is that the bridge strike was caused solely due to operator navigational error. Mr. Moore, who was present at Mate Morrissey's hearing, testified that Morrissey admitted his navigational error in failing to disengage the autopilot and switch to NFU mode. Having not been able to oppose Carver's argument that Mate Morrissey's navigational error was the sole proximate of the incident, counsel for the Belt Line speculates that that "leaving the auto pilot engaged should not cause a vessel to strike a bridge."  Belt Line Opposition brief, pp. 8-9. Counsel further opines, without factual support for the claim, that "[s]uch a result could only occur if there was an

7

underlying issue with the autopilot system, which is precisely the case here." *Id*. Problematically, counsel's statement, unsupported by reference to either factual support that it was a mechanical error which caused the allision, is pure speculation. Moreover, the Fourth Circuit has recognized the Belt Line's legal fallacy, *supra*. "[T]he mere occurrence of an allision does not automatically impart liability to the vessel or her owner." *In re American Milling Co*., 270 F. Supp.2d 1068, 1087 (E.D. Mo. 2003).

  Second, the Belt Line argues in Section I of its Argument attempts to distinguish the import of case law which supports Carver's argument that a navigational error by a crew member as the sole cause of an incident cannot be impugned to the vessel owner as privity of knowledge of a dangerous condition. Like other jurisdictions, the Eastern District of Virginia has recognized the limited scope of control that an owner has over his agents, that is, where the owner is so far removed from the vessel that he cannot reasonably exert control over the captain or pilot's conduct, the pilot's navigational errors at sea are generally not within the privity of knowledge of the owner. *McAllister Towing of Virginia*, 2012 WL 143877 *23; *Complaint of Hellenic, Inc*. 2 52 F.3d 391, 396 (5th Cir. 2001). Both *McAlllister Towing* and *Illinois Constructors* are on point and as a matter of law.

  The Belt Line argues that *McAllister Towing* is not relevant to a determination of a finding as to owner's lack privity because the *McAllister Towing*'s crew's failure to lengthen a tow line was not the same error as that which Mate Morrissey committed. *McAllister Towing* does not draw any such distinction. This distinction ignores the Rule of Law which is: Navigational errors are generally not impugned to the owner. Moreover the Carver crew, like the *McAllister Towing* crew, were clearly competent, without any prior history of bridge strikes, and importantly, Capt. Morrissey, like the Captain in *McAllister Towing*, had no prior disciplinary history, and this "one-

8

time error" on the part of the Captain Morrissey does not warrant a denial of limitation of liability for Carver. *See McAllister Towing*, 2012 WL 143877 at *23-24.

Next, the Belt Line provides no reasoning for its argument that *Illinois Constructors* does not apply because the facts did not involve "inadequate steering" and that the owner provided a competent crew and ultimately found the vessel seaworthy. Contrary to the Belt Line's position, *Illinois Constructors* is on all fours factually with the instant action. In *Illinois Constructors*, the Court held that the vessel owner provided a seaworthy vessel with a competent crew, the captains were licensed pilots with many years of experience on the river, and on the subject vessel. 715 F. Supp. at 882-83. Moreover, in *Illinois Constructors*, like here, the Captain's navigational errors in misjudging the position of the vessel with respect to the bridge and responding inadequately to the grounding and force of downstream current, was not a navigational error of a pilot within the privity and knowledge of the vessel owner. *Id.* The same is true in the case at bar, as the undisputed evidence shows Mate Morrisey's navigational error in failing to switch the autopilot to Non-Follow-Up mode was not a navigational error within Carver's privilege and knowledge.

The Rule of Law of *Allister Towing* and *Illinois Constructors*, *supra*, applied here is clear: a vessel operator's navigational errors are generally not impugned to the vessel owner where the vessel owner has no privity of knowledge of the error made by an otherwise competent Captain and crew. As a matter of law, Carver cannot be charged with privity of knowledge of Mate Morrisey's admitted navigational error and is therefore entitled to limit liability under the Limitation of Liability Act.

**C.**    **The Belt Line has no evidentiary support for its argument in Section II. A. and B. that the MACKENZIE ROSE was unseaworthy at the time of the allision.**

The Limitation of Shipowners Liability Act, 46 USC § 30501, et seq. provides, at § 305051, that a vessel owner may limit its liability to the value of the vessel and its pending freight at the

9

end of the voyage on which the casualty occurs, if the fault causing the loss occurred without his "privity or knowledge." Under the Limitation Act, the determination of whether a shipowner may limit liability involves a two-step analysis: (1) a determination of what acts of negligence[2] caused the casualty and; (2) whether the shipowner had "privity or knowledge" of these acts. This procedure requires the claimant to prove what negligent acts or omissions caused the casualty with the burden then shifting to the owner to prove lack of privity or knowledge. *Empresas Lineas Maritimas Argentinas S.A. v. United States*, 730 F.2d 153, 155 (4th Cir.1983); *In re Marine Sports, Inc*, 840 F. Supp 46, 1994 AMC 1678 (D.Md. 1993).

　　Instead of meeting its burden to support its own argument with undisputed facts that the vessel was unseaworthy and that the vessel's unseaworthiness was a cause the allision, the Belt Line instead misstates the law and the burden of proof applicable here. The Belt Line argues that Carver cannot meet the initial "always difficult – and sometimes impossible – burden" of proving "the seaworthiness of the M/T MACKENZIE ROSE." Likewise in Paragraph A, the Belt Line argues that "Carver cannot prove the seaworthiness of the M/T MACKENZIE ROSE." The Belt Line is incorrect. As claimant, the Belt Line has the initial burden of proof to show that the vessel was unseaworthy, as the party seeking to recover damages must demonstrate the shipowner's liability for its loss, either by showing the unseaworthiness of the vessel or the negligence of the vessel's crew. *See Coryell v. Phipps,* 317 U.S. 406, 409, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943); *In re Brasea, Inc.*, 583 F.2d 36 5(5th Cir.1978) *In re BOWFIN M/V*, 339 F.3d 1137, 1138 (9th Cir.2003) (per curiam); *Hercules Carriers, Inc. v. Florida,* 768 F.2d 1558, 1563 (11th Cir.1985);

---

[2] The elements of a negligence claim in a limitation of liability proceeding under the Limitation of Liability Act are the same as the elements of negligence under common law: duty, breach of duty, causation, and damages. *In re Bald Head Island Transp. Inc*, 124 F. Supp. 3d 658, 671 (2015 (E.D. N.C 2015).

*Carr v. PM Fishing Corp*, 191 F.3d 1, 4 (1st Cir. 1999). Once the relevant unseaworthiness or negligence is established, the burden shifts to the vessel owner seeking to limit his liability; its burden is to prove that it did not have privity or knowledge of the condition or negligence that caused the accident. *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 813 F.2d 634, 638 (Cir. 1987); *McAllister Towing of Virginia*, 2012 WL 143877 *23, 2013 AMC 428 (E.D. Va. 2012).

Common law negligence principles apply in an admiralty suit alleging maritime tort. *McAllister Towing of Virginia*, 2012 WL 143877, *11. Liability in a maritime action requires a finding of "fault" that caused or contributed to the damage incurred.[3] *McAllister Towing of Virginia*, 2012 WL 143877 *23 2013 A.M.C. 428.* Belt Line's confusing argument in Section II, Paragraphs A and B, is premised on incorrectly shifting the burden of proof on Carver to show a seaworthy vessel, in an obvious effort to deflect that it cannot meet its own burden to show that the tug was unseaworthy. Although the Belt Line cites to two (2) unrelated events involving the vessel steering on May 3, 2024 and May 24, 2024, the Belt Line has no evidentiary support to support the factual claim that on the *date of the allision, June 15, 2024, there was anything wrong with the autopilot*.[4] Any attempt by the Belt Line to rely on Mate Morrissey's initial explanation for the incident has also been refuted as false. This "steering malfunction" or "autopilot malfunction" explanation has been debunked by Carver's undisputed evidence from Brian Moore, Nick Laraway, Crew members and testimony and conversations by text message with Brian Moore

---

[3] As in all negligence cases the claimant must establish that the action or omission was foreseeable. The Belt Line has failed to establish that Mat Morrissey's lapse in judgment was foreseeable.

[4] As Carver discusses in its Memorandum of Law in support of summary judgment, the tug's daily vessel logs from June 15, 2025 log the status of operational equipment, including the vessel navigation equipment which covers the tug's steering system. According to Carver's Master's Daily Vessel Reporting (Tugs), an official document electronically signed by Capt. Chris Miller, the steering and navigational equipment was working properly. See Carver SUMF 6, Ex. 4, Capt. Stephenson, Report, p. 31, and n.10-n.11.

and Capt. Miller, who all either stated or testified that that the allision was caused by Mate Morrissey's navigational error. *See, e.g.*, Paragraphs 23-25 of its Memorandum of Law in Support of its Motion for Summary Judgment and in Section A of this Brief on Reply, *supra*. None of the crew testified that the allision was caused by an autopilot or steering malfunction.

In sum, the Belt Line has no evidentiary support for its argument in Section II.A. and B. that the MACKENZIE ROSE was unseaworthy and that alleged fault caused or contributed to the damage. The Belt Line's motion for summary judgment on this issue should be denied.

**D.    Despite the Belt Line's argument to the contrary, autopilot is not prohibited for use while transiting a waterway with bridges.**

The Belt Line ignores that at the time of the incident, the autopilot did not cause the incident and asserts, instead, that the use of autopilot near the bridge was prohibited. The undisputed facts are that navigational operator error by Mate Morrissey in failing to switch to Non-Follow-Up mode or hand steering, caused the incident. Further, there is no such prohibition on the use of the autopilot.

The Belt Line ignores Carver's TSMS, which is consistent with the requirements governing the use of autopilot set forth in 46 CFR 140670. On the evidence, and as Captain Stephenson has opined, the Belt Line was in full compliance with both Carver's TMS, 7.5 Navigation. See Carver SUMF, ¶ 6, at Ex. 4, Capt. Stephenson Report at pp. 25-27. The opening of the bridge was not an area of narrow transit as posited by the Belt Line as the undisputed facts show that opening was six times the beam of tug and Barge. See Carver SUMF, ¶ 6, at Ex. 4, Capt. Stephenson Report at pp. 31-34. The video from the Belt Line's cameras do not show heavy traffic in the area. See Belt Line SUMF Exhibit D (video from Belt Line surveillance cameras); Exhibit E (video from industry surveillance camera). The undisputed facts also show that Mate Morrisey, the Officer on Watch, was a "competent person" standing watch ready to take over from automatic pilot to

12

manual steering, contrary to the belt Line's argument. On all accounts, contrary to the Belt Line's argument, Carver's conduct complies with the Simrad manual. Mr. Baldassare's hypothetical opinion under different circumstances suggested to him in his deposition is not consistent of Carver's actual duties and obligations of the time of the allision.

Despite the Belt Line's argument to the contrary, autopilot is not prohibited for use while transiting a waterway with bridges. The Belt Line's argument is factually and legally unsupported.

### E.   The Undisputed facts show that the Tug's crew was competent.

Relevant factors in determining the competency of a captain include: (1) whether the captain is properly licensed; (2) whether the captain has a satisfactory safety record; (3) whether the captain is familiar with the vessel and the waters on which it travels; and (4) whether the captain is adequately trained. *Sea Wolf Marine Towing & Transp., Inc*., 2007 U.S. Dist. LEXIS 82565; 2008 AMC 131 (S.D.N.Y. 2002). The record establishes that Mate Morrissey was, in fact, properly qualified and trained. The MACKENZIE ROSE was manned as required by the U.S. Coast Guard Certificate of Inspection. Carver SUMF at Ex. 4. James Morrisey, a U.S. Coast Guard Licensed Captain, is considered a "competent person" by the U.S. Coast Guard which issued his Captain's license. *Id.* Mate Morrissey had no disciplinary history at Carver, and the Belt Line has no contrary argument. Rather, the Belt Line makes the abstract argument without any situational facts that a pier strike in foul weather with Mate Morrissey on watch should have resulted in discipline. As this Court has noted, "the mere occurrence of an allision does not automatically impart liability to the vessel or her owner. Liability requires a finding of 'fault that caused or contributed to the damage occurred.'" *McAllister Towing*, 2012 WL 143870, *11, 2013 AMC 428, the river incident

13

where the Coast Guard, who was notified, declined to investigate, and declined to issue any violations to Carver, Morrissey, defeats the Belt Line's requisite burden of proof on this issue.

## CONCLUSION

For the reasons stated here and in its opening brief, Petitioner Coeymans Marine Towing LLC d/b/a Carver Marine Towing respectfully requests that the Court grant its Motion for Summary Judgment, denying the Belt Line's Motion for Summary Judgment, and awarding Carver all other just relief.

Respectfully submitted,

Dated: September 26, 2025    **CLYDE & CO US LLP**

By: /s/ *Harold L. Cohen*
Harold L. Cohen  (VSB No.:98148)
1221 Brickell Avenue, Suite 1600
Miami, FL  33131
Tel: 305-446-2646
Fax: 305-441-2374
Email: harry.cohen@clydeco.us;

James H. Rodgers*
Clyde & Co US LLP
45 Lexington Avenue, 16th Floor
New York, NY 10174
Phone: (212) 702-6771
Email: james.rodgers@clydeco.us

Michael J. Roman*
Dawn L. Johnson
Siobhan M. Murphy*
Clyde & Co US LLP
30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email: michael.roman@clydeco.us
dawn.johnson@clydeco.us
Siobhan.murphy@clydeco.us

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2025, a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will serve all counsel of record by electronic mail as follows:

Mark C. Nanavati, Esq. (VSB No.: 38709)
G. Christopher Jones, Jr., Esq. (VSB No.: 82260)
SINNOT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)
(804) 893-3862 (Jones)
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com
*Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

Zachary M. Jett, Esq. (VSB #93285)
BUTLER WEIHMULLER KATZ, et al
11525 North Community House Road
Suite 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

/s/ Harold L. Cohen