IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**MEMORANDUM IN SUPPORT OF NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S THIRD MOTION *IN LIMINE* TO PRECLUDE ALL EFFORTS TO DEPRECIATE REPAIR COSTS AND ALL TESTIMONY BY CARVER'S EXPERT WITNESSES AT R.L. BANKS & ASSOCIATES, INC.**

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line"), by counsel, submits this memorandum in support of its Third Motion *in Limine* to preclude all efforts to depreciate the Belt Line's repair costs for its Main Line Bridge (the "Bridge"), including testimony by Carver's expert witnesses at R.L. Banks & Associates, Inc., W. N. Marianos and Charlie Cunningham.[1]

**Introduction**

On June 15, 2024, the M/T MACKENZIE ROSE, owned and operated by Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver"), pushing a 200-foot loaded barge, allided with the Belt Line Bridge (the "Allision"), rendering it inoperable. As a result of the Allision, the Belt Line has incurred over $15,922,877 in repair costs. Carver's expert witnesses opine that these damages should be depreciated to $2,972,767, treating the situation as a replacement of the entire Bridge instead of a repair of one section. Not only does Carver's position lack a basis in both law and fact, but it contravenes public policy.

---

[1] This reply brief is also submitted on behalf of Evanston Insurance Company to the extent Evanston remains in the case.

1

The rule in admiralty when assessing damages after an allision is to make the injured party whole. *See Hewlett v. Barge Birtie*, 418 F.2d 654, 657 (4th Cir. 1969). To reduce recoverable repair costs in a situation where the injured party did not materially benefit from the repairs would leave the injured party in a worse position than prior to the allision. *See Petition of M/V Elaine Jones*, 480 F.2d 11, 27 (5th Cir. 1973). Thus, where repairs have not materially improved an injured party's position, the injured party is entitled to recover the full cost of the repairs. *See Oregon by State Highway Com. v. Tug Go-Getter*, 468 F.2d 1270, 1274 (9th Cir. 1972).

It is undisputed that the force of the Allision displaced the steel superstructure of the Bridge by nearly 7 feet, leaving the western truss balancing on 3 of its 4 legs. The engineering and construction work just to restabilize and reposition the superstructure was incredibly complex. It is also undisputed that the Belt Line was able to accomplish the repair work through highly qualified engineers at Hardesty & Hanover and railroad bridge contractors at PCL Civil Constructors by using existing contracts between those companies and Norfolk Southern, with pre-negotiated non-emergency rates. This alone saved a fortune in repair costs versus emergency pricing and mitigated economic losses by avoiding a lengthy procurement that would have left the Bridge disabled through the busy grain season.

There is no plausible argument that the Belt Line is in a better condition now than it was before the Allision. All testimony on this issue demonstrates that the repairs to the Bridge were conducted on integral parts of primarily just one span and did not extend the Bridge's useful life. In fact, the lead engineer on the repair project testified that, if anything, the Bridge is in a worse condition now because it could not be perfectly realigned. The experts that Carver relies on to establish depreciation ignore the case law, offer no analysis of integral components or actual betterment (because they never inspected the Bridge), and invent a "suggested service life" to

calculate that the Bridge was near collapse at the time of the Allision, contrary to reality and the requirements of Rule 702. For all these reasons, as explained below, the Belt Line's repair costs cannot be depreciated, and any related testimony is inadmissible.

## Legal Authority

The purpose of a motion *in limine* is "to exclude anticipated prejudicial evidence before the evidence is actually offered" and to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013).

Federal Rule of Evidence 702 allows a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. District courts are tasked to act as gatekeepers and exclude expert testimony from trial that is irrelevant or unreliable. *See* Fed. R. Evid. 104(a); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (discussing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593-94 (1993)). Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93. Under Federal Rule of Evidence 703, an expert's opinion is "admissible only if the expert has relied on information of a kind reasonably relied on by experts in the field." *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997); *see also* Fed. R. Evid. 703.

Federal Rule of Civil Procedure 26(a)(2)(B) provides that every expert disclosure must be accompanied by a report containing "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in

forming them[.]" Fed. R. Civ. P. 26(a)(2)(B). While Rule 26 does not explicitly prohibit joint expert reports, it does require such reports to "reveal the division of labor between the experts…[and] how they reached their separate opinions." *MS Amline Marine NV v. Delta Marine Idus. Inc.*, 348 F.R.D. 658, 677 (W.D. Wa. 2025).

## Argument

**I.      The Belt Line's repair costs cannot be depreciated.**

The rule for determining damages in an allision case is "restitutio in integrum," which involves restoring the injured party to the position occupied prior to the allision. *See Hewlett v. Barge Birtie*, 418 F.2d at 657. If repairs are physically and economically feasible, "then the reasonable cost of recovery, including repairs and an allowance for deprivation of use, is the measure" of damages. *Id*. at 658. As the Fourth Circuit stated, "[I]n admiralty, the cost of repairs is the equivalent of value-diminution. Damage less than total loss is compensated by reference to cost of repairs." *Id*. (internal quotations omitted). Where repairs are performed to an integral part of a structure and do not enhance or better the whole structure, no depreciation is required or permitted. *BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp.*, 147 F. Supp. 2d 333, 341 (D. N.J. 2001). Only where repair costs extend the useful life of a structure may recovery be reduced in accordance with the principles of depreciation and betterment. *Id*.

**a.  The repairs to the Belt Line Bridge were integral to the Bridge's structure.**

No depreciation is permitted where repairs are performed to an integral part of a structure. *BP Exploration & Oil, Inc.*, 147 F. Supp. 2d at 341; *see also Union Pac. R.R., Co. v. Heartland Barge Mgmt., L.L.C.*, 2006 U.S. Dist. LEXIS 75797 at *46 (S.D. Tx. 2006). An integral component is one that is essential to the structure's core function, and whose repair or replacement does not add substantial value to or extend the useful life of the entire structure. *Id*.; *see also Oregon by*

4

*State Highway Com.*, 468 F.2d at 1352. Howard Swanson, the Chief Engineer of Rail and Transit at Hardesty & Hanover, the firm responsible for the repair design, testified that the repairs to the Belt Line Bridge were integral to its structure: [2]

```
13       Q.   ... And those drawings coupled
14   with Exhibit 3, the emergency inspection
15   report, showed the components that would be
16   repaired or replaced as part of your design?
17       A.   Yes, sir.
18       Q.   To your knowledge were any of those
19   components that were part of your repair design
20   supposed to be imminently replaced anyway?
21       A.   None of them to our knowledge would
22   have been imminently replaced.
23       Q.   And were all of the components for
24   the repair in your design drawings integral to
25   the bridge structure?
 1       A.   Yes, except for that motor brake that
 2   we've talked about, the M drawings, that was
 3   not put on.
 4       Q.   Correct.  To your knowledge the motor
 5   brake has not been replaced?
 6       A.   Right.
```

Howard Swanson Dep., attached as **Exhibit A**, 177:13-178:6. The motor brake that "was not put on" is not part of the Belt Line's damages claim. Mr. Swanson provided the only fact testimony relating to this issue, and Carver has not offered any evidence or testimony to the contrary because the repairs were undisputedly integral to the structure.

### b.  The repairs to the Belt Line Bridge did not extend its useful life.

Depreciation is permitted only where repairs extend the useful life of an entire structure. *BP Exploration & Oil, Inc.*, 147 F. Supp. 2d at 341. Courts across the country have consistently upheld this principle. *See J.W. Paxson Co. v. Bd. of Chosen Freeholders*, 201 F. 656, 664 (3d Cir.

---

[2]  Mr. Swanson is a fact witness who has substantial education and experience in railroad bridge engineering. To the extent that he provides testimony that might be deemed to fall under Rule 702, the Belt Line has disclosed him as a non-specially retained expert in this case.

5

1912); *Petition of M/V Elaine Jones*, 480 F.2d 11, 27 (5th Cir. 1973); *Oregon by State Highway Com.*, 468 F.2d at 1274; *BP Exploration & Oil, Inc.*, 147 F. Supp. 2d at 341.

In *J.W. Paxson Co. v. Board of Chosen Freeholders*, for example, the Third Circuit held that, where a drawbridge owner was forced to incur the cost of a new, potentially more valuable bridge after its bridge was struck by a negligent tug, the owner was entitled to recover its full replacement costs. 201 F. 656, 664 (3d Cir. 1912). The court found that, because the old bridge had sufficed for the purposes of the owner, and the owner did not need a new bridge, "the [owner] was damaged by being compelled to procure a new structure in place of the old one, for the contract price of which it was obliged to pay." *Id.* at 663. The court concluded that it was immaterial whether the new bridge was potentially more valuable than the old. *Id.*

Similarly, in *Petition of M/V Elaine Jones*, the Fifth Circuit held that, where a bridge had a remaining useful life of an indefinite number of years, repair costs following an allision were not to be reduced for depreciation. 480 F.2d at 27. The court reasoned that, because "the repairs neither enhanced the value nor extended the life of [the bridge], reduction of recoverable repair costs by depreciation previously taken would leave [the injured party] in a significantly worse economic position than before the accident." *Id.* Thus, only the full repair cost would sufficiently replace the bridge's value commensurate with its pre-allision worth, making the injured party whole. *Id*.

In *Oregon by State Highway Commission v. Tug Go-Getter*, the Ninth Circuit likewise held that, where the bow of a barge struck the pier of a bridge, replacement of the pier could not be depreciated because it was integral to the bridge. The court found that:

> [I]t is of no significance that the pier could be separately repaired or even replaced (so could a single wall of a building). The repair or replacement adds nothing of substance to the over-all value of the structure of which it is an integral part and ***the life expectancy of the entire structure has not been extended***.

468 F.2d at 1274; *see also Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 506 (5th Cir. 1994) (finding that, where pipeline replaced after an allision was a small part of a much larger pipeline system, there should be no reduction for depreciation). As such, the court held that the bridge owner was entitled to recover its full repair costs.

Similarly, in *BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp.*, the district court in New Jersey held that, where a tugboat crashed through a portion of a dock, the replacement of segments of the dock's pipeline did not enhance the overall value of the dock facility. 147 F. Supp. 2d at 341. The court reasoned that, "[i]f the remaining segments of each pipeline give way, it will be of no consequence that one segment of the line was replaced more recently." *Id*. The court continued, "[W]hen the entire pipeline is eventually replaced, it is unlikely that these pieces of pipes would be left for replacement even further in the future and, if that were the course of action, any savings would be *de minimis*." *Id*. Therefore, the court declined to reduce the damages for depreciation of the updated pipeline segments.

Here, just like in the cases above, the Belt Line's Bridge was fully functional and did not need the repairs that the Allision required. *See* Swanson Dep., **Exhibit A**, 177:13-178:6. Like in *J.W. Paxson Co*., but for the Allision, the Bridge would have remained sufficient for the Belt Line's purposes. *J.W. Paxson*, 201 F. at 664. The Belt Line incurred the repair costs only because it was compelled to do so by Carver's negligence, not to enhance the overall structure.

Repairs to the damaged section of the Bridge also did not extend the service life of the Bridge. Mr. Swanson's testimony confirms that, like the bridge in *Petition of M/V Elaine Jones*, the Belt Line Bridge had an indefinite service life with ordinary maintenance:

```
 9     Q.   Do you have any opinion either
10   agreeing or disagreeing or another way, as to
11   whether the Main Line Bridge had an indefinite
12   useful service life if it had undergone routine
```

```
13   repair and maintenance?
14       A.   I agree it would have an indefinite
15   service life.
```

**Exhibit A**, 108:9-108:15.

It is undisputed that only one section of the Bridge was significantly repaired. Of the eight spans that comprise the Bridge, repairs focused almost exclusively on Span 4 that the barge struck.



Repair of a single section does not increase the life expectancy of an entire bridge. *See Oregon State Highway Commission*, 468 F.2d at 1274. As the court reasoned in *BP Exploration & Oil, Inc.*, if the remaining spans were to give way, it would be of no consequence that one span was more recently replaced. *See* 147 F. Supp. 2d at 341.

The testimony on this issue confirms the point, even with newer grade steel. Kevin M. Lugo, P.E., a licensed engineer and Senior Vice President of McDonough Bolyard Peck, Inc., who is an expert witness on bridge construction and repair costs, testified as much:

```
9    And what type of steel was used to replace
10   any of the components that needed to be replaced
11   after the allision?
12       A.   I'm going off memory, so don't hold me to
13   this.  But I want to say it was 792.  But don't hold
14   me to that.  But it was a different steel than what
15   was originally used on the project.
16       Q.   And was that originally used on the
17   project or do you mean the original?
18       A.   Original project.  Yes.  Sorry.  Yes.
19       Q.   The original design and build of the
```

```
20   bridge; right?
21        A.    Yes.  That's a special order now.  This
22   steel that was used on the bridge repairs is more
23   commercially available while the older steel would
24   have had to have been a custom order.  So we know
25   that that would be more expensive.  So we didn't,
 1   you know, calculate that because we know --
 2        Q.    The older type of steel, it would have
 3   been more expensive because it would have been a
 4   custom -- for custom project to fabricate it?
 5        A.    Yes.  And it's not only the -- it's not
 6   only the cost for the custom, but it's the time
 7   component as well.  And as you know, time is money.
 8   And that would have just impacted the overall
 9   duration of the repair process as well.
10        Q.    Is the steel that was used for the repair,
11   the 792, a stronger steel than the steel that was
12   used in the original design (indiscernible)?
13        A.    It's -- it's a better steel.  It's a newer
14   steel, stronger, more corrosion resistant.
15        Q.    Okay.
16        A.    It's also cheaper, so there's no reason
17   not to use it.
18        Q.    And the fact that it's more resistant to
19   corrosion, would that indicate that it has a longer
20   useful life than the steel that was used in the
21   original design and build?
22              MR. SNOW:  Object to form.
23        A.    I'm going to answer your question the way
24   I understand it.  Individually, yes.  Collectively,
25   no.
 1        Q.    (By Mr. Roman) And --
 2        A.    And for the entire structure, you have not
 3   extended the life of the entire structure
 4   necessarily by changing out some damaged pieces with
 5   some newer, better pieces.  You still have an entire
 6   structure; so it's not a betterment by any stretch
 7   of imagination.
```

Kevin M. Lugo Dep., attached as **Exhibit B**, 80:9-82:7.

Mr. Swanson's testimony also confirms that the repairs did not add value or betterment to the Bridge:

```
11        Q.    In your view is the condition of the
12   bridge as repaired as good as it was before the
13   allision ever happened?
14        A.    That's a hard professional question
15   to answer.  Our goal with repair plans were to
16   make the bridge as good as it was, you know,
```

9

```
17   we're repairing this to make it as good as it
18   was.  There just, where we ran into certain
19   things that we had trouble getting exactly back
20   into the right alignment as -- as was
21   originally -- or as originally designed so it
22   should have the same strength as what it did
23   originally.
24      However, there are probably some items
25   that are not as good in terms of how the bridge
1    is aligned than what it was when it was
2    originally built or before the allision. And
3    those are the -- well, anyways.
4       Q.   Well, what -- what parts are not in
5    as good a condition as they were before the
6    allision?
7       A.   Well, the -- to splice in the bottom
8    cord members, we -- there was one -- one splice
9    there to begin with as it was originally built.
10   And now to put in the piece that we put in,
11   there's now two splices there where that piece
12   is.  And the -- from what I can tell -- well, I
13   don't know for certain but my guess is that the
14   splice was a little bit better aligned than
15   what we were able to get two -- the single
16   splices built was better aligned than what we
17   were able to get the two splices aligned as
18   with the new -- with the repaired bridge.
19      Q.   And when you say the repaired bridge
20   is not aligned as well as pre-allision, what
21   part of the bridge are you talking about?
22      A.   The bottom cord, which is the bottom
23   structural piece along the -- from L1 prime to
24   L4 prime, and that should have been straight as
25   an arrow before the allision.  And there's
1    still some, even after the repairs, there's
2    still some deformation in it, some slightly out
3    of alignment there.
```

**Exhibit A**, 178:11-180:3.

Because the repairs to the Bridge were made to integral components of only one section and did not extend the useful life of the entire structure, the Belt Line's repair costs cannot and should not be depreciated. Any other outcome would leave the Belt Line considerably worse off than before the Allision through no fault of its own.

## II. The opinions expressed by the R.L. Banks experts are inadmissible and should be excluded.

### a. The R.L. Banks experts opine that the Belt Line's repair costs should be depreciated to $2,972,767.

In their Report, the R.L. Banks experts claim that the damages incurred by the Belt Line are overstated. *See* R.L. Banks Report, attached as **Exhibit C**, ¶ 20.[3] To come to this conclusion, they assume a hypothetical "suggested service life" for four components of the Bridge, with the truss floor and main members at 70 and 80 years respectively:

> **iv. Suggested Service Life for Depreciation**
>
> 35. Based on the documentation referenced above and on RLBA's professional experience, knowledge, training, skill and education and after a thorough review and analysis of the facts and materials provided, it is RLBA's opinion to a reasonably professional economic and engineering certainty that, the following service life estimates are used throughout this Report in depreciation calculations:
>    - Ties and Rail - 20 years;
>    - Mechanical and Electrical Components - 25 years;
>    - Truss Floor System - 70 years and
>    - Truss Main Members - 80 years.

*Id.* ¶ 35. The experts are careful not to actually *opine* to the service life of the Bridge, but instead state only that "the following service life estimates are used throughout this Report…" *Id*. Since the Bridge was built in 1958, the 70 and 80 year figures presumably mean that the Bridge was either 4 or 14 years away from total failure when the tug hit it.

The experts then claim that the Belt Line failed to account for the depreciated state of the Bridge, failed to account for a credit for scrap steel, and applied inappropriate labor charges. *Id.* ¶ 20. After factoring these alleged errors into their calculations, the R.L. Banks experts opine that the true cost of the Belt Line's repairs, after depreciation, is at most $2,972,767. *Id*. at p. 7.

---

[3] The R.L. Banks Report is authored by two people from separate companies, without any indication of which person holds which opinions. For reasons discussed *infra*, the Report violates Rule 26(a)(2)(B) and should be disallowed on that basis.

11

### b. The R.L. Banks experts disregard the law.

As a threshold matter, the R.L. Banks Report contradicts the law that depreciation is not permitted where repairs are integral and do not extend the useful life of a structure. *See supra*. In fact, nowhere in the Report do the experts opine that the repairs actually extended the useful service life of the Bridge. Without this opinion, their methodology skips a vital analytical step: they go straight to depreciating costs without a justification to do so. Nor do they rely on the testimony of another expert for this point, because Carver identified no such expert. On this basis alone, their testimony should be excluded.

### c. The R.L. Banks experts fail to reveal their division of labor or differentiate their opinions.

Their testimony should also be excluded because they fail to indicate which expert holds which opinions. Rule 26(a)(2)(B) provides that every expert disclosure must be accompanied by a report containing "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B). While Rule 26 does not explicitly prohibit joint expert reports, it does require such reports to "reveal the division of labor between the experts…[and] how they reached their separate opinions." *MS Amline Marine NV v. Delta Marine Idus. Inc.*, 348 F.R.D. 658, 677 (W.D. Wa. 2025) (internal quotations omitted). "[W]hen two experts work as a team and divide up the work, the report must reveal this division of labor to comply with Fed. R. Civ. P.26(a)(2)(B)." *Id*. Courts have consistently upheld this principle. *See Homesite Insurance Co. v. Norcold, Inc.*, 2025 U.S. Dist. LEXIS 1671 at *6-7 (Nv. Dist. 2025); *Late v. United Staets*, 2016 U.S. Dist. LEXIS 188179 at *2 (Pa. Mid. Dist. 2016); *Adams v. United States*, 2011 U.S. Dist. LEXIS 63775 at *12-13 (Id. Dist. 2011); *Univ. of Florida Research Fouund., Inc. v. Motorola Mobility LLC*, 2013 U.S. Dist. LEXIS 201302 at *26 (Fl. S.D. 2013).

The Fourth Circuit consistently emphasizes the importance of compliance with Rule 26(a)(2)(B). *See Saudi v. Northrop Grumman Corp.*, 427 F.3d 217, 278 (4th Cir. 2005); *Carr v. Deeds*, 453 F.3d 593, 604-605 (4th Cir. 2006). In *Carr v. Deeds*, for example, where a disclosure failed to provide an expert's qualifications alongside his opinion, the Fourth Circuit held that it was not an abuse of the district court's discretion to exclude the expert. The Court reasoned that:

> **Every litigant in federal court is plainly entitled under Rule 26(a)(2)(B) to be given the information spelled out therein, and none shoulder the burden to independently investigate and ferret out that information as best they can and at the expense of their client**…. The available penalty for failure to comply with Rule 26(a)(2)(B) is equally plain, and if a litigant refuses to comply with the requirements of the rule, he does so at his peril.

453 F.3d at 605 (emphasis added).

Here, the R.L. Banks Report was submitted by both Mr. Marianos and Mr. Cunningham. *See* **Exhibit C**. According to the Report, the two experts are not from the same company. *Id.*, ¶¶ 3-12. Nowhere in the Report do they distinguish their respective opinions, making it impossible for the Belt Line to meaningfully investigate each expert's methods or analysis. The Belt Line is not required to depose the witnesses to find out, and should not shoulder the burden of guessing as to the particulars of their Report under Rule 26(a)(2)(B). *See Carr v. Deeds*, 453 F.3d at 605. The Report violates Rule 26(a)(2)(B) on this ground, and the experts should be excluded.

### d. The R.L. Banks experts do not rely on sufficient facts or data to survive scrutiny under Rules 702 and 703.

To the extent the R.L. Banks experts are not excluded on the grounds above, they should be excluded because their opinions fail to comply with Federal Rules of Evidence 702 and 703. Under Rule 703, an expert's opinion is "admissible only if the expert has relied on information of a kind reasonably relied on by experts in the field." *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997); *see also United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013)

13

(finding that Rule 703 "permits an expert to testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions"); Fed. R. Evid. 703.

In *United States v. Tran Trong Cuong*, the Fourth Circuit declined to admit a medical expert's opinion where he relied upon another doctor's medical report in forming his opinion. 18 F.3d 1132, 1143 (4th Cir. 1994). The proponent for the expert argued that, under Rule 703, it was permissible for an expert to consult other experts, books, and reports. *Id.* The Court, however, found that "there [was] no indication that the medical report of [another doctor] was of a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the [relevant] subject." *Id.* As such, the Court reasoned, to admit the expert's opinion would subject the opposing party "to the testimony of a witness whom he may not cross-examine." *Id.* Therefore, the expert's opinion was deemed inadmissible under Rule 703.

Here, the R.L. Banks experts did not even visit, much less physically inspect, the Belt Line's Bridge to evaluate its useful life. Two other Carver experts did so, before and after the repairs were completed, but neither provided a report for Carver. *See* Right of Entry Agreements for Brian Lawn and Jeffrey Schroeder, attached as **Exhibit D**. The R.L. Banks experts also did not cite the testimony of Mr. Swanson that the expected service life of this particular Bridge is indefinite with regular maintenance. *See* **Exhibit A**, 108:9-108:15.

Instead, the experts rely on four publications to form their opinions regarding purported depreciation, only one of which possibly conforms with Rule 703. *See* **Exhibit C**. That one, Chapter 15 of the American Railway Engineering and Maintenance-of-Way Association *Manual for Railway Engineering*, is the only industry-wide publication cited by R.L. Banks. *See* **Exhibit C**, ¶ 30. Yet the R.L. Banks Report itself states that, "[w]hile Chapter 15 contains many

14

occurrences of 'service life' or 'life' in its guidelines, it *does not state* the estimated service life of a steel bridge." *Id*. (emphasis added).

Finding no support in the industry-wide publication, the R.L. Banks experts cite to "[a] 2019 research paper" that claims "more than 50% of a common type of steel railroad bridges [] are over 100 years old." **Exhibit C**, ¶ 31. The experts admit, however, that the structures studied in this paper differ from the Belt Line Bridge. *Id.* at ¶ 31. They then refer to the preface of a book by John Unsworth, a past chairman of AREMA Committee 15, where he states, without context, that 80 years is "estimated as the typical *design life* of a steel railway superstructure." *Id*. (emphasis added). Notably, he does not say "service life" or specify any particular kind of steel superstructure, and his estimate, if used to refer to service life, conflicts with the conclusion in the paper above that more than half of steel railroad bridges are over 100 years old.

Finally, the experts cite to a U.S. Army Corps of Engineers document, "Navigation Policy: Cost Apportionment of Bridge Alterations," which is a discontinued regulation from 1979 that "focused on movable bridges" in determining appropriate *cost apportionment* for replacing and altering bridges under the Truman-Hobbs Act. *Id*. at ¶ 32. The Army Corps of Engineers document does not contain any specific study of steel bridge service life and uses estimated figures solely for cost calculations. In a part not quoted by the R.L. Banks experts, the document expressly states that its "service life figures are not to be used arbitrarily, but as a basis for a fair judgment of the service life ***considering all other factors that pertain in any particular case***." 33 C.F.R. 277 (1979).[4] Here, the R.L. Banks experts did not consider any other factors related to the service life of the Belt Line Bridge because they never even inspected it.

---

[4] Guidance on bridge alteration cost apportionment is now found in 33 C.F.R. 116.50, *Apportionment of Costs under the Truman-Hobbs Act*, which contains no figures estimating useful service lives.

15

In the absence of actually inspecting the Bridge that they opine about, the information relied upon by the R.L. Banks experts is not the type permitted by Rule 703. *See* Fed. R. Evid. 703; *see also United States v. Tran Trong Cuong* 18 F.3d 1132, 1143 (4th Cir. 1994). All three documents, the research paper, the book, and the discontinued regulation, focus on generic bridges or bridges dissimilar to the Belt Line Bridge. To allow the experts to testify to "suggested" hypothetical numbers based only on this information would subject the Belt Line to purported expert testimony that fails to meet the standards of Rules 702 and 703.

> **e. The R.L. Banks experts incorrectly claim that the Belt Line failed to apply a credit for scrap steel and included inappropriate labor charges in its costs.**

In a single part of their Report not related to depreciation, the R.L. Banks experts also claim that the Belt Line failed to account for an alleged $41,897 credit for scrap steel when assessing repair costs. **Exhibit C**, ¶¶ 20, 67. This statement is incorrect for two reasons. First, the Belt Line's credit for scrap steel was only $1,467. *See* Belt Line Invoice 5524004-014, attached as **Exhibit E**, p. 2. Second, the credit was actually applied. *Id.*

In estimating a value of the scrap steel credit, the experts completely ignore costs incurred to abate the lead paint and dispose of the steel. *See* Kevin M. Lugo, P.E., Rebuttal Report, attached as **Exhibit F**. As Mr. Lugo confirms, "the scrap steel net value after lead abatement and handling was approximately $2,000. PCL confirmed that it credited that amount to [the Belt Line]." **Exhibit F**, p. 2. The invoice from PCL confirms as much:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ACCESS TRESSTLE | $ 17,717.40 | $ 17,717.40 | $ 0.01 | $ 0.01 | $ 0.02 | $ | - |
| PERMANENT MATERIALS | $ 1,172,827.89 | $ 1,237,861.73 | $ - | $ - | $ - | $ | 65,033.84 |
| CREDIT FOR STEEL SCRAP | $ - | $ (1,467.04) | $ - | $ - | $ - | $ | (1,467.04) |
| SUBTRADE | $ 4,065,614.21 | $ 4,132,020.69 | $ - | $ - | $ - | $ | 66,406.48 |
| STS | $ 507,373.97 | $ 642,389.29 | $ - | $ - | $ - | $ | 135,015.32 |
| FOG | $ - | $ - | $ - | $ - | $ - | $ | - |
| TRAVEL EXPENSE | $ 403,923.75 | $ 392,791.26 | $ - | $ - | $ - | $ | (11,132.49) |
| MATERIAL MARKUP 15% | $ 312,618.85 | $ 340,736.29 | $ - | $ - | $ - | $ | 28,117.44 |

**Exhibit E**, p. 2. As such, the R.L. Banks experts are mistaken in deducting $41,897 from the Belt Line's repair costs.

16

The R.L. Banks experts are similarly incorrect in claiming that the Belt Line applied inappropriate labor charges in calculating its costs. *See* **Exhibit C**, ¶¶ 20, 70. The experts identify three categories of labor charges that they say the Belt Line misapplied: (1) additive rates for employee overhead, (2) yardmaster wages, and (3) train and engine employee pay. *Id.*, ¶ 77.

With respect to additive rates, the experts claim that such costs "are incurred by the Belt Line whether the [Allision] occurred or not and are not appropriate in the context of a damages claim." **Exhibit C**, ¶ 70. However, these costs were not of a type that would be incurred anyway. As the evidence establishes, the costs relate to work coded specifically to this project for employees that would not necessarily have worked otherwise. *See* Cannon Moss Dep., attached as **Exhibit G**, 179:17-181:20; Lugo Rebuttal Report, **Exhibit F**, p. 3. They are for self-performed work where the Belt Line was able to avoid the higher cost of procuring a contractor, like construction of a service road and rerouting trains due to the inoperable Bridge. *Id*. And the additive rates are the same rates used by the Belt Line with the Commonwealth of Virginia and approved for other railroads (including the entire Norfolk Southern system) by the Georgia Department of Transportation. *Id*. As a matter of law, "[t]he cost of repairs performed internally by [an] injured party, ***including overhead***, are recoverable in a negligence action." *Freeport Sulphur Co. v. The S/S Hermosa*, 526 F.2d 300, 302 (5th Cir. 1976); *see also Baltimore & O. R. Co. v. Commercial Transport, Inc.*, 273 F.2d 447, 449 (7th Cir. 1960) ("The reasonable cost of the repairs made by plaintiff by its own employees is not limited to the dollar amount actually paid to the workman and material suppliers. Such a limitation would ignore the facts of business life.").

As to yardmaster pay, the experts concede that "[p]erhaps some of a yardmaster's time would be spent coordinating with NS and CSX under the temporary arrangement to move trains around the disabled [Bridge.]" **Exhibit C**, ¶ 75. They then go on to deduct the yardmaster's pay

17

in its entirety, without explanation or justification. *Id*. This contradicts the experts' own finding that such rates would be attributed to work resulting from the Allision.

Finally, in discussing train and engine employee pay, the experts claim that $4,774 of the charges were the result of "management decisions that should not be included in damages claims." **Exhibit C**, ¶ 74. However, the charges the experts refer to, such as "No 1st meal," "No 2nd Meal," and "Vacation," stem from decisions driven by union contracts, which the experts never analyzed. *See* Moss Dep., **Exhibit G**, 187:18-189:6. As such, the charges are appropriate, and the experts offer no legitimate basis to challenge them.

### f. Even if repair costs were depreciable in admiralty (they are not), the R.L. Banks experts fail to segregate out costs to reposition and realign the Bridge, which cannot possibly be depreciated.

Finally, even ignoring all the flaws above, the R.L. Banks experts fail Rule 702 scrutiny because they do not differentiate between material costs, labor costs associated with that material, and costs associated with salvaging and repositioning the Bridge (the vast bulk of the damages). Costs to *salvage* a structure following an allision—including costs to mobilize and demobilize, realign or reposition a structure, remove debris, and demolish damaged components—are unquestionably not depreciable. *Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 104327 at *38 (E.D. Va. 2009). This is because those costs would be required to remedy the problem regardless of any hypothetical betterment. Where such costs are reasonable, necessary, and proximately caused by an allision, they are recoverable in full. *Id*. at 33.[5]

---

[5] In the *Marlin* case, while awarding salvage costs in full, this Court allowed partial depreciation of the replacement costs for a bridge fendering system (coincidentally for this same Bridge) only because the **entire fender system was replaced**. 2009 U.S. Dist. LEXIS 104327 at *38. That allowance does not apply here, where only a single section was repaired. *See supra*.

18

This comports with the general rule in admiralty when assessing damages after an allision to make the injured party whole. *See Hewlett v. Barge Birtie*, 418 F.2d 654, 657 (4th Cir. 1969). To reduce recoverable costs associated with saving a structure and repositioning it to avoid collapse would leave the injured party in a worse position than prior to the allision. *See Petition of M/V Elaine Jones*, 480 F.2d 11, 27 (5th Cir. 1973). Here, the most significant portion of the Belt Line's repair costs was realigning and resetting the Bridge immediately after the Allision. Permanent repairs to the steel could not even begin until the foundation was sufficiently repositioned and steadied. Indeed, out of the total $15,922,877 in damages, "permanent material" costs in PCL's invoice summary total only $1,237,861. *See* **Exhibit E**, p. 2.

The R.L. Banks Report considers none of this. Having failed to account for the distinction between the different kinds of work and materials on the project, even if depreciation were permissible (it is not), the R.L. Banks experts cannot testify to it because their analysis is fatally incomplete.

## Conclusion

WHEREFORE, for all these reasons, the Belt Line respectfully requests that this Court enter an Order granting its Third Motion *in Limine* and precluding any evidence of, suggestion of, or reference to depreciation of the Belt Line's repair costs, including all testimony by Carver's expert witnesses at R.L. Banks & Associates, Inc., W. N. Marianos and Charlie Cunningham, and granting the Belt Line all other just relief.

Dated: October 3, 2025                                    NORFOLK AND PORTSMOUTH BELT
                                                          LINE RAILROAD COMPANY

                                                          By: _____*/s/ James L. Chapman, IV*_____
                                                          James L. Chapman, IV, VSB No. 21983
                                                          W. Ryan Snow, VSB No. 47423

19

        Mackenzie R. Pensyl, VSB No. 100012
Crenshaw, Ware & Martin, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of October 2025, a true copy of the foregoing was (i) electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all registered counsel of record, and (ii) mailed to:

James Morrissey
4723 Baywood Drive
Lynnhaven, FL 32444

By:    */s/ James L. Chapman, IV*
James L. Chapman, IV, VSB No. 21983
Crenshaw, Ware & Martin, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*