# Exhibit F



August 22, 2025

Crenshaw Ware & Martin, P.L.C.
150 W. Main Street
Suite 1923
Norfolk, VA 23510

Attention: Mr. Ryan Snow
Esquire

Reference: **MBP Expert Rebuttal Report of the R.L. Banks & Associates, Inc. Expert Report**
**Case No: 2.24-cv-00490-MSD-LRL**
**Main Line Railroad Bridge**

Dear Mr. Snow,

At your request, McDonough Bolyard Peck, Inc. ("MBP") independently reviewed and evaluated the opinions proffered in the R.L. Banks & Associates, Inc.'s report titled *Expert Report of W.N. Marianos and Charlie Cunnigham,* dated August 8, 2025 ("R.L. Banks Report"). This report sets forth the professional opinions of Kevin Lugo in rebuttal of the R.L. Banks Report related to topics and analysis in my July 2, 2025, Expert Report ("Expert Report").

**Review of the R.L. Banks Report**
Based on our review of the available contemporaneous records, deposition transcripts, interviews with the Main Line Railroad Bridge owner, the Norfolk Portsmouth Belt Line ("NPBL"), the designer, and the contractor team, and our analyses, I offer the following rebuttal response to the R.L. Banks Report.

1. **Structural Repairs to the Main Line Bridge**

The R.L. Banks Report, paragraphs 81 and 82, opines that the original Main Line Bridge A7 grade of steel was replaced with a newer, less corrosive, A709 grade 50 steel, which is not an in-kind replacement. It further opines that, because NPBL chose to use this newer, more readily available steel, NPBL received a betterment that would likely last longer than the original A7 grade steel.

While we do not dispute that Hardesty and Hanover chose a newer and more readily available A709 grade 50 steel, the repairs to the damaged bridge components are not a betterment and do not extend the lifespan of the bridge structure. For R.L. Banks to even present repairs to a damaged bridge structure as a betterment is improper. NPBL repaired only one bridge span out of eight, out of need, not want.

As discussed in my deposition, A709 grade 50 steel is more readily available than the original A7 bridge steel used on the Main Line Bridge. In the instance of A7 versus A709 grade 50 steel, A7 steel was widely used in bridge infrastructure until around 1967, when ASTM A7 was officially withdrawn. It has since been replaced by materials such as A709 steel. Today, A7 steel is used for castings, dies and molds, cutting tools, and specialized tools such as an anvil; not for bridge infrastructure projects.

As discussed in my deposition and supported above, the lack of readily available A7 steel has additional time-related cost implications for locating it, delivering it, and fabricating/modifying it for this specialty order steel on the existing Main Line Bridge. In my experience and through discussions with a steel supplier who works with more than 31 plants throughout the US, steel that is not readily available will take an additional eight weeks more than the typical four to six weeks for fabrication. In other words, to use original A7 steel, the NPBL would have had to wait longer and spend more money on this specialty and custom steel order, with no benefit to the project. R.L. Banks fails to present this narrative in its report.

Availability of similar materials impacts the cost of materials. If the supply of materials is plentiful and the demand is low, the price is competitive. Conversely, if the supply of materials is low and the demand is high, the price is higher. In the instance of new A7 bridge infrastructure steel, not only is the demand low and the availability is low, or non-existent, requiring a custom order, further extending the procurement time and duration of the Main Line Bridge repairs.

The R.L. Banks Report, paragraphs 83 and 84, states that the bridge construction was completed so the bridge could be operational by NPBL's busy season, which increased its costs. The increased costs were attributed to labor working overtime, double time, and a second shift, which the report says was done *"perhaps with the expectation that such costs could be passed on easily to another party."*

R.L. Banks does not appear to have made any adjustments to the damage calculations and instead speculates that an accelerated schedule may have increased the repair costs. This ignores NPBL's financial and operational benefits from the CSX trains delivering materials across the Main Line Bridge, which the allision ultimately affected. To the NPBL, the economic impact and damage caused by the Main Line Bridge not being operational were potentially immense. Further, to properly evaluate whether accelerating a schedule was truly more costly, other driving cost facts must be considered. The potential financial impact on NPBL due to the bridge not being operational must be considered, but also the additional costs related to a longer construction duration. For example, the labor costs by NPBL to reroute the trains, and the additional supervision and overhead costs by PCL due to a longer duration. Without considering those variables, at a minimum, it is speculative for R.L. Banks to state that the additional effort *"can be more costly and less productive"* without further discussion regarding the overall potential total cost impact.

2.  **Salvage Value**
The R.L. Banks Report, paragraphs 64, 65, 66, and 67, opines that 264,335 pounds of damaged leftover steel from PCL's bridge repairs would have a similar scrap value to the replacement steel. R.L. Bank quantified the salvage value at $41,897 based on values provided by an internet website for delivered steel.

Based on R.L. Banks' amount, $41,897 of the +$15.5 million in repair costs incurred by NPBL is 0.27% of the entire project repair costs, an insignificant sum. Nonetheless, R.L. Banks' assumptions are flawed because it assumed the damaged steel was similar to the new steel. As discussed in my August 14, 2025, deposition, the scrap steel net value after lead abatement and handling was approximately $2,000. PCL confirmed that it credited the amount to NPBL but did not provide a detailed line item for such a small amount. It is my opinion that R.L. Banks incorrectly concluded that a steel salvage value should have been credited for NPBL's damage.

### 3. Belt Line Labor

R.L. Banks, paragraphs 68 through 70, concludes that NPBL's labor and administrative markups, whether they are audited or not, are not allowable in the context of a damages claim. Specifically, R.L. Banks concludes that labor markups are not appropriate since NPBL would have incurred them whether there was an allision or not, because the personnel were already NPBL employees. Further, R.L. Banks opines that NPBL's 5% materials additive markup should not be included because the Main Line Bride repairs are not a "revenue-driven" project.

As discussed in my Expert Report and my deposition, NPBL uses approved, audited overhead rates for its hourly employees. For every hour a union hourly NPBL employee works, NPBL incurs overhead amounts, including insurance, benefits, building costs, equipment costs, etc., as part of the cost of that employee. These costs are not recouped within a customary 40-hour work week but are based on the costs from prior audits for the total average hours for NPBL employees. NPBL used particular cost codes for the work it performed on this repair project, so it is not correct to say that these employees were doing other work or would have worked 40 hours anyway. Essentially, for every hour an NPBL employee works, that individual employee attracts overhead that is a cost to NPBL. Also, all work by an NPBL employee related to the allision is separate from their regular duties for NPBL.

Additionally, NPBL's 5% additive markup for materials is not intended to generate revenue but is an appropriate administrative cost for acquiring the materials.

In conclusion, it is my opinion that NPBL's approved audited overhead and markups for labor and materials are reasonable and appropriate.

### 4. Cost to Repair Floorbeam 8 Crack & Counterweight Bridge Cable Lubrication

R.L. Banks, paragraph 86, takes issue with an estimate in my report of a simple repair by PCL to a crack at Floorbeam 8 at stringer 1 in the amount of no more than $300. R.L. Banks opines that my quantification is highly suspect and that the iron workers $90/hr. rate does not include a labor markup.

As discussed in my Expert Report and my deposition, PCL was working in the area of Floorbeam 8 and sent an iron worker to quickly drill a hole through the steel to stop the crack from continuing. MBP estimated the time it would take for an on-site iron worker to drill a hole using the labor and equipment rates plus markups included in PCL's invoices and Agreement. MBP also confirmed its estimate for the value of the work with PCL. Also, R.L. Banks' statement that the $90/hr. iron worker's hourly rate did not include a markup is incorrect. PCL's $90/hr. rate for an iron worker is a fully loaded rate, including labor burden. Using R.L. Banks' premise, a PCL ironworker base salary would be an exceptional $187,200 per annum (2080 hrs./year x $90/hr.).

R.L. Banks, paragraph 87, opines that some of the counterweight cable lubrication costs should be removed, or partially removed, from the NPBL's damage calculations because they had been identified in prior inspection bridge reports as needing attention.

I have discussed this both in my Expert Report and in my deposition. While I concur with R.L. Banks that the counterweight cables had been previously identified as needing lubrication, the issue is that the main lift bridge span had remained in the upright position for approximately six months as a result of

Mr. Snow
August 22, 2025
Page **4** of **4**

the damage to the bridge. This prevented the automatic lubrication from lubricating the cables. Because the lubrication was not occurring on a regular basis, the cables gathered significant dust and debris from the river and the surrounding industrial operation. As such, it is my opinion that NPBL is entitled to these costs.

MBP's review and analysis are ongoing, and the conclusions presented herein are based on information reviewed to date. Mr. Lugo's conclusions and professional opinions are offered with a reasonable degree of certainty and are based on his expertise, education, analysis, and experience in the construction industry. MBP may amend or change any opinions and conclusions presented herein as appropriate based on further information brought to its attention. The opinions expressed herein do not and should not be construed as providing legal conclusions.

Sincerely,

Kevin M. Lugo, PE (NC, SC), CCM
Senior Vice President