# Exhibit E

UNITED STATES OF AMERICA

NATIONAL TRANSPORTATION SAFETY BOARD

```
* * * * * * * * * * * * * * * * * *
Investigation of:           *
                            *
ALLISION OF M/T MACKENZIE ROSE     *
WITH THE BELT LINE BRIDGE ON THE   *   Accident No.: DCA24FM039
ELIZABETH RIVER IN VIRGINA         *
ON JUNE 15, 2024            *
                            *
* * * * * * * * * * * * * * * * * *
```

Interview of:  BRIAN MOORE, General Manager
               Carver Marine Towing


                         via videoconference


                         Thursday,
                         July 18, 2024

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

APPEARANCES:

LUKE WISNIEWSKI, Investigator
National Transportation Safety Board

██ ██████ ██████
United States Coast Guard

██ █████ ███
United States Coast Guard

██ ██████ ████
United States Coast Guard

JAMES RODGERS, ESQ.
Clyde & Co on behalf of Carver

DAWN JOHNSON, ESQ.
Clyde & Co on behalf of Carver

JAMES CHAPMAN, ESQ.
Crenshaw, Ware & Martin on behalf of
Norfolk and Portsmouth Belt Line Railroad

<u>I N D E X</u>

<u>ITEM</u>                                                                <u>PAGE</u>

Interview of Brian Moore:

      By ██ ███████                                           5

      By Mr. Wisniewski                                       8

      By Mr. Chapman                                          10

      By Mr. Gonzalez                                         10

      By ██ ███████                                           11

      By ██ █████                                             16

      By ██ █████                                             18

      By ██ ███████                                           19

      By ██ █████                                             24

      By Mr. Wisniewski                                       24

      By Mr. Rodgers                                          37

      By Mr. Chapman                                          38

      By Mr. Wisniewski                                       54

      By Mr. Chapman                                          57

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

4

I N T E R V I E W

(2:35 p.m.)

████ ██████ Good afternoon, everyone.  My name is ██ █████ ███████ I am with Coast Guard Sector Virginia Investigations.  Today is July 18th, the time is 14:35.  We are here to conduct an interview of Mr. Brian Moore in regards to the allision of the Tug *Mackenzie Rose* with the Belt Line Railroad Bridge on June 15th.

Mr. Moore, would you please introduce yourself and state that you consent to the recording of this interview.

MR. MOORE:  Hi, good afternoon.  My name is Brian Moore.  I do consent to the recording of this video.

████ ██████ Thank you, sir.  Could you spell your last name for the transcription?

MR. MOORE:  It's M-o-o-r-e.

████ ██████ Thank you.  My last name is ███████ ██████████ .

████ ████ Good afternoon.  Attending for the Coast Guard, ███ ███ ████ last name ██████ , Investigating Officer, Sector Virginia.

████ ████ Good afternoon.  I'm ███ ██████ ████ spelling, ██████ , with United States Coast Guard, Sector Virginia.

████ ██████ Over to the NTSB.

MR. WISNIEWSKI:  Good afternoon, Luke Wisniewski, W-i-s-n-i-e-w-s-k-i, with the National Transportation Safety

1  Board.

2         ████  ████████  Over to Carver.

3      MR. RODGERS:  Jim Rodgers for Carver and Mr. Moore, the

4  witness, in his capacity at Carver.  Last name is spelled,

5  R-o-d-g-e-r-s.

6         ████  ████████  And Ms. Johnson.

7      MS. JOHNSON:  Dawn Johnson for the same parties as identified

8  by Mr. Rodgers.

9         ████  ████████  And the Belt Line.

10     MR. CHAPMAN:  James Chapman, spelled, C-h-a-p-m-a-n, with the

11  law firm of Crenshaw, Ware & Martin representing Norfolk and

12  Portsmouth Belt Line Railroad Company.

13        ████  ████████  Thank you.  Mr. Gonzalez.

14     MR. GONZALEZ:  Richard Gonzalez with Gallo Vitucci Klar,

15  representing Captain Miller as party of interest.

16        ████  ████████  Okay. I will ask everyone who is not speaking to

17  turn their cameras off and keep muted just for the bandwidth of

18  everything here.  Thank you.

19                    INTERVIEW OF BRIAN MOORE

20     BY ██  ████████

21  Q.  Mr. Moore, would you please give us a quick introduction of

22  yourself and your history in the maritime field?

23  A.  Sure.  So it's actually Captain Brian Moore.  I am the

24  general manager of Coeymans Marine Towing, d/b/a is Carver Marine

25  Towing; you probably figured that out by now.  Came over here in

1   December of 2022.

2        My career path up to this point, started out on actually on

3   my 18th birthday when I went down to the Coast Guard Center, The

4   Battery, in New York City and obtained my Ordinary Seaman and took

5   the exam for basic, like, minimal captain's license, whatever I

6   can get.

7        A couple of months later I started shipping out with Casey

8   Transportation based here on Staten Island as an OS. I got my sea

9   time, advanced up to AB with them within a couple of years.  And

10  then also started training to upgrade my license to start

11  operating on their tugs, they provided some training for me.  So

12  on my 24th birthday, I was actually a chief mate -- chief mate,

13  running tugs and barges, running the Atlantic Coast, New York

14  Harbor, Hudson River, pretty much anywhere in between.

15       With Casey Transportation for about 10 years, actually, about

16  10 years, and then I went over to the Hudson River Pilots.  I

17  worked with them for almost two years and that kind of coincided

18  with the economic depressions, not depression, I'll call it down

19  fall.

20       With that, you know, you got paid by tonnage so I went from a

21  high-end chief mate spot down to the helmsman.  I couldn't really

22  make that work financially with my new wife and the house and

23  everything else so just due to the lack of work there, I went over

24  to Vane Brothers, based here in Brooklyn and Baltimore, as a

25  captain.  Sailed with them for five years.  Then Harley Marine

1  reached out to me, and I went over to them.  They wanted me to

2  come over as a port captain so initially I said no, let me sail

3  with you guys first.  Sailed with them for six months, helped them

4  get -- from the west coast to the east coast, a little bit more.

5       Sailed with them for eight months at sea and then came

6  shoreside as a port captain.  Shortly after that, senior port

7  captain overseeing -- vessels we had by that time.  But in March

8  of 2020, right around when Covid came around, February, I bumped

9  up to the director of Atlantic Operations for Centerline Logistics

10  which -- from Harley.  Oversaw 38 different assets, 280 crew

11  members and worked from Maine all the way down to the Gulf of

12  Mexico and the Caribbean.

13       While I was working there, Carver Companies reached out to

14  me, asked if I was interested in a job as general manager.  Came

15  out, interviewed with them.  It was a lot shorter commute for me

16  so I made the decision to come over to Carver Companies and here

17  I've been for the last year and a half, a little over a year and a

18  half, overseeing including, what, eight tug boats and 90 crew

19  members and 50 plus barge assets.

20  Q.  All right, thank you for that summary.  So are you currently

21  holding an MMC?

22  A.  It just expired.  I actually submitted it to it, but it's a

23  little backed up.

24  Q.  Okay. You have an application pending?

25  A.  Yeah, but I don't really sail anymore.  So I have -- time

8

1    Near Coastal Masters, Near Coastal Master of Towing and then a

2    Unlimited First Class Pilotage from New York Harbor up to Albany,

3    Hudson River.

4    Q.    Have you ever --

5    A.    And then I did --

6    Q.    I'm sorry, go ahead.

7    A.    Sorry.  I do have an AD (phonetic sp.) with STCW in Basic

8    Safety, all that.

9    Q.    Okay.  Have you ever sailed under your credential with

10   Carver?

11   A.    No.

12   ██  ████        Do you have any questions on background?

13   ██  ███    No questions.

14   ██  ████      Over to the NTSB with any background questions.

15        MR. WISNIEWSKI:

16   Q.    Yeah, this is Luke, NTSB.  Captain Moore, just want to go

17   through real quick the -- you indicated you had about five years

18   sailing as captain on tugs?

19   A.    Sailing as captain, it would have been probably closer to

20   eight, eight years as captain.

21   Q.    Okay, eight years.  So you said you were five years --

22   A.    Seven, seven as captain.

23   Q.    -- with Vane Brothers?

24   A.    Yeah, all with Vane Brothers and then with Harley.

25   Q.    Okay.  And then when you came over to Carver, your current

1  employer, in December, did you ride on board the tugs?  How'd you

2  get familiar with the eight vessels that you have?

3  A.   Yeah.  So my philosophy is one as you work in the management

4  in the office, is always to be run it like a ship, run it like a

5  tug boat, where you're very involved and everybody's kind of, it's

6  all hands on deck.

7       When I first came here, I did get on all the vessels just

8  ride them as extra, yeah, met with the crew members, the vessels,

9  you know, just kind of learning the operation.  Having spent 23 of

10 the 24 years in oil and gas for the most part so coming over here,

11 it's learning a different trade.

12 Q.   Understood.  You indicated the number of tugs, personnel, you

13 oversee.  I assume then you're also, do you have the Safety

14 Management System, the Helm CONNECT, is that your responsibility?

15 A.   I guess that, well, everything technically is my

16 responsibility.  But it goes through the rest of the team as well

17 too so every team member, every shoreside team member, has access

18 to the shoreside version of Helm.

19      MR. WISNIEWSKI:  That's all I have right now, thank you.

20      ███ ██████  Over to Carver with any background questions.

21      MR. RODGERS:  Yeah, we have no questions at this time.

22      ███ ██████   All right.  Over to the Belt Line.

23      MR. CHAPMAN: It's a little hard to hear on my system for some

24 reason.  I just want to make sure I heard things, a couple of

25 things correctly.

10

1      BY MR. CHAPMAN:

2  Q.   Did you say that you had a license issued by the Coast Guard,

3  or that you had actually sailed as a member of the Coast Guard?

4  A.    No, I'm licensed.  I never sailed with the Coast Guard.  I

5  went down to The Battery on my 18th birthday and got sworn in, you

6  know, pretty basic license and captain's license.

7  Q.    Okay.  And then did I hear that your license is currently

8  expired, you're working to get it renewed?

9  A.    Yeah, correct.

10  Q.   When did you apply for the renewal?

11  A.    I just recently sent it in.

12  Q.   Like in the last month?

13  A.    Yeah.

14  Q.   Thank you.

15  A.    In fact, yeah, I sent it -- month.

16  Q.   When would, when did it expire?

17  A.    It expired last year, but I don't sail so it's not a relevant

18  thing.

19      MR. CHAPMAN:  Thank you.  I don't have any other questions at

20  this time.

21      ███  ██████    All right.  Mr. Gonzalez, do you have anything?

22      BY MR. GONZALEZ:

23  Q.   Just a couple questions of Mr. Moore.  As the port captain,

24  are you responsible or do you oversee any of the training of the

25  crew members?

11

1  A.    So, actually, the general manager of --

2  Q.    You're the general manager?  Okay, sorry.

3  A.    That's fine.

4  Q.    Do you oversee any of the training of the crew members?

5  A.    No.

6  Q.    Do you, policy and procedures of the company, who sets those

7  policy and procedures for the company?

8      MR. RODGERS:  ███  ██████ I think it's gone beyond the scope

9  of background.

10     MR. GONZALEZ:  Okay.

11     BY MR. GONZALEZ:

12 Q.    Mr. Moore, do you have any responsibilities to setting any

13 policy and procedures for the company?

14     MR. RODGERS:  Lieutenant, I object.  It's beyond the scope of

15 your initial questioning.

16     ███  ██████    Yes.  We can get into that further, but can we

17 just stick to Mr. Moore's background now, sir, and we'll get into

18 the actual incident and can get into that.

19     MR. GONZALEZ:  Okay, no problem.  I'll follow up.  Thank you.

20     ███  █████   Thanks, Mr. Gonzalez.

21     MR. GONZALEZ:  No further questions.

22     ███  ██████   Sorry, computer's lagging on my end.

23     BY ███  ██████

24 Q.    Mr. Moore, so would you mind walking me through the events

25 that you remember from June 15th regarding the *Mackenzie Rose*?

12

A.    Yeah.  So I was home, actually working out in the yard,
various stuff throughout the house.

      I did not have my phone in my pocket or with me so after some
time, I went back in and checked the phone.  I could see that
there was a missed called from the *Mackenzie Rose*, a missed call
from Lenny and then a text message with what looked like the,
between the tug and *Mackenzie Rose* and work phone, and Lenny and
myself on it too.

      That's when I called Lenny to see what was going on, I see he
was already involved in it.  And it looked like, you know, by then
the photos were already there so we're just trying to figure out
what exactly happened.  And I didn't have the best cell phone
service where I was at, I know Lenny said he was working on that
one.

      That's where I kind of picked up on that one with, where, you
know, I kind of got thrown into it after the fact when it
happened.

      So it looked like the only threads, the *Mackenzie* called,
couldn't get ahold of me; they called Lenny, got ahold of Lenny,
informed him that while they were transiting out the southern
branch.  I know I wasn't on a call when it was reported they hit
the fendering but they said they hit the bridge, they -- the
fendering.  So I was okay, Lenny, let's see the photos.  Looking
at the photos, it was like no big deal because there was no damage
in that said photos to the barge or to the bridge itself.

13

1   Assuming it was the fendering obviously.

2        Said all right, like, let's carry this out and just, if

3   there's no damage, it should be fine for now and we'll figure it

4   out as needed.

5        And then Lenny was working with the team, sorry, the crew to

6   figure out what exactly was needed and how that vessel was

7   operating.

8        Then I said all right, everything's clear, we're good, you

9   can proceed north and we'll see where it goes from there, and

10  we'll handle it as needed on Monday.

11       Then I believe I was traveling on Tuesday.  I got a message

12  from you, Lieutenant.  I couldn't answer it so I forwarded it to

13  Lenny and said please call her immediately so they can figure out

14  what's going on.

15       And then that's where this whole thing transpired, you know,

16  the vessel being, saying the vessel hit the bridge versus the

17  actual fendering which we were under the assumption it was

18  fendering so that's kind of where we started the deep dive into

19  everything else as well too.

20  Q.   Okay. Thank you for that recollection.  Would you mind

21  giving me a few time stamps, to the best of your ability?  I know

22  it's not going to be down to the minute or anything, but just a

23  rough timeline from when you first looked at the phone.

24  A.   Yeah.  I was probably out in the yard from 13:00 to, I'm

25  going to say it was around 17:00 plus or minus.  I think there was

14

1    about a 30 to 40 minute gap of when the initial call, allision

2    came in to when I actually received my phone again to give --

3    Q.    I know you said you were coming in after the fact, so what

4    was the decision or the thoughts at the time that you entered the

5    conversation?

6    A.    It was at, since there was no damage and no visual and

7    everything was operating as is, that we would handle it.  We would

8    figure out what we needed to do, notify, you know, I think

9    everybody was under the assumption that it was a five-day window

10   to submit 2692 and everything else so then it wasn't until

11   obviously after the fact.

12   Q.    Okay.  How did the vessel relay the damage?  Have they, was

13   it to Lenny that they'd spoken to?

14   A.    Yeah.  So they texted the photos, those two photos that were

15   submitted under the wood piling, I guess, and the barge.  They

16   texted that and that was it, that's all the photos we've ever seen

17   of it.

18        So looking at it, 99.9 percent of the time when a vessel says

19   they've made contact with a bridge, it's always going to be the

20   fendering, obviously.

21        Looking at the initial photo that they sent from the port

22   bridge wing, I'm sorry, the port window, looking out that scope,

23   that's where we kind of looked at and said, okay, everything's

24   good, we didn't hit anything, it doesn't, no damage, no broken

25   timbers.  The barge looked okay besides the usual scuff marks that

1  we've seen the photos.  That's why I was, kind of assumed that

2  nothing was, obviously, as advanced as it was.

3  Q.   Was there any other specification from the vessel whether it

4  was bridge structure, bridge fendering?

5  A.   No.

6  Q.   Did you guys, so were there any calls to the Coast Guard or

7  any additional personnel at Carver regarding this incident?

8  A.   No, not from myself.  I think Lenny was going to work on that

9  one, but until, you know, it wasn't going to be until Monday since

10  there was no supposed damage and the crew said there was no damage

11  to, you know, they didn't see any damage so they figured there

12  wasn't any necessary need to call.

13  Q.   And do you have a rough time that you think the vessel was

14  cleared by either yourself or Mr. Baldassare to --

15  A.   I don't know off the top of my head.  It was a relatively

16  short amount of time later probably within the hour would be my

17  assumption.

18  Q.   Okay. Do you know who you were speaking to on the vessel,

19  either through the text or on the phone, who the main point of

20  contact was?

21  A.   I didn't say, no, it -- no.  Lenny talked to them so the, I

22  don't know who had the phone at that time and versus who had the

23  controls of the tug at the time.  So I knew it was mate watch so

24  knowing it would be Jimmy Morrissey on watch and doing it.  I

25  don't know who was sending the photos.

1  Q.    And did you guys order any drug or alcohol testing for the

2  crew to do?

3  A.    We did not.  One of the reasons we did not is 'cause,

4  obviously, we follow through with all policy and procedures for

5  that, but given the fact that we assumed there wasn't an incident

6  and there was no damage to anything, that it wasn't a reportable

7  incident so that's why we didn't follow through with the drug and

8  alcohol testing.

9      BY ██  ██████

10 Q.    Hi, Mr. Moore.  How many reportable marine casualties would

11 you say you've had or been a part of in your experience?

12 A.    Well, none sailing, thankfully.  Coming to shoreside -- so

13 not just with us, with all the companies I've sailed shoreside

14 with?

15 Q.    Okay, yeah.

16 A.    Yeah.  I understand the policies of, yeah, but -- other crew

17 members as well involved too.  I would say at least over 12.

18 Q.    In your experience with Carver, I guess, over the past year

19 and a half, have there been any casualities that required the

20 submission of 2692s?

21 A.    Yes, there has.  I don't know, I cannot tell you how many off

22 the top of my head but less than a handful.

23 Q.    And generally, who's responsible for submitting those within

24 the company?  I know a variety of people can submit them, but who

25 is generally responsible within Carver?

17

A.   It would either be myself or Port Captain Lenny, at the time,

or that's primary who it's going to be.  We also have prior to

this, well, prior to this, another compliance manager that would,

before her maternity leave, she would submit them as well.

Q.   And with regard to notification to the Coast Guard, is it

standard practice for either the port captain or yourself or

whoever kind of is in that shoreside supervisory role to handle

notifications to the Coast Guard?  When I say that, I mean the

immediate notification following the, a marine casualty.

A.   Right.  So in my career, it's always been pretty much gone

through the shoreside, the management, to handle everything is --

sail that's, you know, unless it's imminent danger where, I'm

going to use the VHF radio to notify the Coast Guard.  But from

what I've seen, it's always been the shoreside responsibility.

Q.   Was there any talk or discussion about post-casualty testing

following the discussion between yourself and Lenny and anyone

else or Monday or Tuesday?

A.   I don't recall, but I think by the time it -- no, I don't

recall of it because I think after that it was almost after the

five-day window and by the time, there was no talk, there was no

discussion I think.

█████  ████     I think that's all I have for now, sir.

MR. MOORE:  Okay.

█████  ████     Thank you, appreciate it.

MR. MOORE:  Very well.

1      ██  ████   This is ██ ████   I just got a few follow-up

2   questions with you, sir.

3      BY ██ ████

4   Q.   At what point did you learn that the gravity of this

5   situation has increased to more severe casualty than was initially

6   reported.  What was that day time frame?  Was it three days, four

7   days, five days after incident?

8   A.   It was after ██ █████ called and spoke to Lenny.  And then

9   that's when they were discussing, you said it wasn't the

10  fendering, it was the actual bridge.  So that's kind of when it

11  came to light of the severity of the -- three, three or four days

12  later, three days later.

13  Q.   Three days later after the incident?

14  A.   Yeah, I believe so.  Saturday, Sunday, Monday, Tuesday.  I

15  believe she called on Tuesday.

16  Q.   All right.  And with that, when you were originally notified

17  of the actual casualty itself, you mentioned that the bridge, I'm

18  sorry, the towing vessel was in communication with Lenny and also

19  yourself, did the vessel say that they hit the bridge, or did they

20  hit the fendering system in the text or phone calls when you were

21  looking at the photos?

22  A.   In the text, I don't think it said, I don't recall what it

23  said, if was a directly bridge or fendering.  I think it was just

24  assumed because it was always every, other tug runs always hit the

25  fendering.  So I think that's when the assumption was made.

19

1   Q.   Okay.  And I know you had mentioned earlier you said that

2   99.9 percent of the casualties involved allisions of bridges or

3   typically with the bridge fendering system, is that correct?

4   A.   Yes, sir.

5   Q.   Would it be fair to say that it was the assumption when you

6   were looking at the photographs to look at the fendering system

7   and not necessarily the over arching bridge itself or any other

8   areas?

9   A.   Yes, so it wouldn't --

10  Q.   So when you were looking at the images, you're looking at

11  that fendering?

12  A.   Correct.  We're looking, we looked at the overall assessment

13  of everything primarily concentrating on said fendering.

14       But even if you were to look at after the fact, you think,

15  knowing the knowledge you have after the fact what that bridge

16  probably looks like, you know, I don't know how the rail lines are

17  laid out or what they may be or if it's outside or inside so

18  without being a structural engineer, I don't know really know, but

19  from a maritime perspective, looking at it, everything else looked

20  like a normal bridge.

21       ██  ████    I have no further questions, appreciate it.

22       MR. MOORE:  Yes.

23       ██  ██████     All right.

24       BY  ██████████

25  Q.   This is ██  ██████  again.  I just tried to share my screen

1    with you.  Are you able to see that photo?

2    A.    Yes, perfect.

3    Q.    Is this the photo that was in discussion on that group text?

4    A.    Yes, ma'am.

5    Q.    Would you mind just talking me through what you were looking

6    at and thinking about with this one?

7    A.    Yeah.  So knowing they were outbound on the river, you know,

8    looking at it just knowing it's going from, let's say, south to

9    north on this.  So looking at the original photo, the fendering

10   system doesn't look to be attached to the bridge at all.  There's

11   no broken timber heads that we could see.  It looks like, even

12   though it is technically chopped off by one timber head there, but

13   looking at this original photo, everything looks free and clear of

14   any damage.

15   Q.    Okay.  Thank you.  Do you have oversight of the training of

16   the crews or does that delegated to another person at Carver?

17   A.    No, it's kind of a delegated to the rest of the team members

18   as well too so it's along the -- training.  If they do have

19   anything, they'll have initial onboarding that they'll do here at

20   HR.  But then it's not necessary, you know, training per se.

21        They do have initial onboarding training through Helm that

22   they'll go through where it, they'll work with the crews to go,

23   I'm sorry, not the crew, but the captain or mate or designated

24   person will walk them throughout the vessel, show them the basic

25   operating procedure of that particular vessel.

1      Every new vessel they do go on and then you sign a sheet and

2  go through all the safety gear, the basic, that vessel's standard

3  SOPs, how they're going to operate, what they're going to do, how

4  they set the lines.

5      Each vessel, each crew member is assigned a new vessel, they

6  get a new sign off sheet in Helm.

7  Q.   Okay.  Do you know if Helm does any sort of training for

8  identifying and the requirements for recording marine causalities

9  for the crew?

10 A.   There is a Master's Review every year that is done, that's

11 been done for as far as I can remember.  In that, our SMS, our

12 Safety Management System, at a push it's like 1,100 pages or so.

13 In theory, you can never memorize the SMS, you kind of just

14 utilize it as your tool for when something does come up.  The

15 crews are, the captains are the only ones that go through the SMS

16 like that to submit it.

17     And that Master's Review is only to submit changes that they

18 would like to see to said manual, like improvements or things that

19 they can identify that might need to change or help better the

20 company.

21 Q.   Thank you.  Were you aware of any sort of engine

22 functionality issues on the *Mackenzie Rose* prior to that incident

23 on June 15th?

24 A.   No, no gear tests and no engine issues prior that, on that.

25 Q.   Had you ever had any reports of malfunctioning equipment on

22

1   the *Mackenzie Rose* as the general manager?

2   A.   Yes, not the main engines.  So prior, I would say 2023-ish,

3   there was a couple of issues with autopilot where they said, I

4   don't know who submitted it, but undergoing, you know, going hard

5   over or not having the ability to engage it or whatever it may be

6   so we would submit, technicians sent, the port engineer or port

7   captains would technicians down from various, whatever region

8   they're in to go look at it.

9        And then I think it was in March or February, which I have to

10  look at the technician report, we kind of just said let's just

11  replace the whole system, put all new, brand-new equipment on

12  there.

13       So we had Aires Marine come in, go through the whole system,

14  replace, you know, and we've also replaced out GPSs, radios,

15  pretty much all new electronics, we put in there.  So that's been

16  the kind of ongoing process from last year into early this year.

17       I think February, March, all said new equipment was installed

18  on the *Mackenzie Rose*, with autopilot.

19  Q.   Have there been any electronics issues reported on the

20  *Mackenzie Rose* since the swap outs were made?

21  A.   No, not that I recall.  Everything was fully operational to

22  that point.  And still up until the point now.

23  Q.   So after the incidents on that Saturday, did you discuss

24  personally with the crew as to what happened or ask any of the

25  events that led up to the allision?

23

A.    Yeah, not on the, not on that day, due to the limited cell

phone service where I live.  After the fact when you called, I

spoke to, got to Lenny there, you know, he called me back as to

when I can get out of the meeting, that's when I called Captain

Morrissey, the Mate Alternate Watch Morrissey, and said hey, what

happened here, did it actually go hard over or was there a lapse

in judgment or what happened.

And that's when he informed me that he was having, he had

issues switching over from autopilot to hand steering, and he

thought it was in hand steering when he wasn't.  And that's

what's, and then he realized it was, you know, he went back,

switched back over.  And he says that, you know, he was already

fully engaged, full astern, and that he said they tapped the

bridge.  So not really admitting to if it's the fendering or the

bridge itself, the super structure, or whatever it may be, that

wasn't until after the fact.

I haven't talked to him on that one, you know, knowing the

fact that after they departed, Captain Miller retested the

autopilot, everything was fully functional.  He has had no issues

with it, the trip up the coast.  And even to this day, there was

no issues with the autopilot.

So knowing that, that assume that he just incorrectly

switched out of the autopilot into hand steering.  That's kind of

what led to some other issues.  Yes, sir?

▉  ▉▉▉    I had a quick question.

1      BY ██ ████████

2  Q.   You said it was tested afterwards by Captain Miller, the

3  autopilot functioning, was any technicians or contractors called

4  afterwards, after the incident, to complete surveys to kind of

5  rule out any kind of equipment failure or functionality?

6  A.   No, no technicians were called out, no.

7  Q.   Not even to this day, like just to rule that out as a

8  possible factor?

9  A.   No, I don't believe so.  I'll check with our -- port captains

10 but given the fact that Captain, sorry, Mate Morrissey said that

11 it was an operator error, that's why it was under the assumption

12 that it wasn't an autopilot failure since the autopilot went on

13 that it was a personnel issue not a machinery issue.

14      ██ ████████      Thank you, Mr. Moore.  Anything --

15      ██ █████   No questions.

16      ██ ████████      That's all we have from the Coast Guard at this

17 time.  We'll go over to Mr. Wisniewski with the NTSB.

18      BY MR. WISNIEWSKI:

19 Q.   Yes, Luke with NTSB, again.  Captain Moore, I'd just like to

20 go through, I guess, who did you speak to from the actual vessel

21 regarding contact with the fendering?

22 A.   On Tuesday, I spoke to Captain Morrissey, James Morrissey.

23 Q.   And that was on Tuesday?

24 A.   Yes.

25 Q.   And how about --

25

1  A.    Then I talked to Lenny.  I spoke to Lenny on Saturday.

2  Q.    You only spoke to Lenny on Saturday, you didn't speak to

3  Captain Miller?

4  A.    No, sir.  I can double check my call logs, but no, I did not

5  speak to the vessel itself.

6  Q.    All right.  And when you spoke to Lenny, is he the one that

7  forwarded you the pictures?  How did you get the --

8  A.    It was in that initial, I'm sorry, it was in that group text

9  with the vessel, myself and Lenny.

10 Q.    So it was a group text?

11 A.    Yes, sir.

12 Q.    You indicated that you were going to leave Lenny to follow up

13 with it.  How did you come to that determination that everything

14 was fine, there was no damage from what you said with the

15 fendering to move forward?  Did you instruct Lenny then to handle

16 it as far as the reporting?

17 A.    Yes, we looked at the photo, everything was still operating,

18 nobody had complaints.  So looked at the photos but pretty much

19 the judgment call was on -- saying that looking at, that there was

20 no damage to anything.  Because of my lack of service, cell phone

21 service, that Lenny just closest -- follow up through everything,

22 figure out what needs to be done.

23 Q.    And so can I just understand as far as the port captain is

24 the first one to call and then you're second?  How does this phone

25 tree go as far as causality reporting?

26

A.   We have a, our dispatch is technically a 24-hour, they're 24-
hours so anything that would come through would go through, you
know, they can call dispatch and always get somebody.  And then
the dispatchers would, if it was after hours or maybe they would
call somebody else.

     So a lot of times, the vessels will call port captain, port
engineer, whoever it may be directly, and that's how they
maintain, that's how it'll open up an incident, I guess, a call
for an incident.

Q.   As far as you're concerned, you empowered Lenny to make the
overall decision on whether this was to be reported or not 'cause
it sounds like you're hearing it now second hand.

A.   Right.  Yeah, no, you know, I kind of made the decision that
since there was damage to it, I was like, you know, told,
instructed Lenny to just figure it out, close the valve, get with
the vessel and whatever else needs to be done to make sure
everything's good.

Q.   Just trying to understand, when did you have the ability to
let's say review any AIS data on this or to follow up?  Was that
not until after ███ █████ called you?

A.   Yeah, correct.  It was after the fact, that's when they kind
of opened up Pandora's Box of things and that's when I was able to
pull up, we got on the vessel, pulled their Rose Point data and
everything else.  So we extracted that from the vessel, or copied
it, sorry, just copied it from the vessel.  And that's when we

1  reviewed everything and noticed there was no hard over turns on

2  the vessel, on the Rose Point data, it was more of a kind of

3  casual continuation of the turn, it's almost like a swing turn, a

4  casual swing, and monitoring the speed and everything as well.

5  Q.    And then we haven't been able to see that yet, and I know

6  your lawyers are looking to get that over to us.

7  A.    Yeah.  So I have, so we have, so unless, whoever said,

8  whoever's looking at it, if you ask everybody else, I sent it

9  over.  The initial files, but they're in Rose Point, the

10 operating, the electronic chart services of Rose Point, so unless

11 you have that, you can't view it, I guess.

12      What I did was, just today actually, I got a screenshot, I

13 screen grabbed it from my computer of files I sent it to counsel

14 to share right here shortly.

15 Q.    All right.  And then just regarding that review of it, and

16 then just asking you if you can recall, what was the speed?  Was

17 the speed with the turn as it was going to port?

18 A.    Without cross referencing, right now I'm going to say it was

19 doing between four, some reason it had listed in miles per hour,

20 but it said four and a half to five, five point two miles per

21 hour.  So roughly around the same in knots.

22      And then through the whole turn as they exited, so as he's

23 exiting a couple of bridges, he's slowing down in the beginning

24 once he had departed the dock, it looks like he was waiting for

25 one bridge to open, came through that around anywhere between

28

1  three and five knots and then it looks like he was up at, around

2  five knots for the exit.  And then he made the turn through the

3  Jordan Bridge, I believe it is, to the south of it.

4      Then you see it slow down just before it's, you'll see the

5  speed drop off just before it, the Belt Line Bridge.

6  Q.   Yeah, we look forward to looking at that, looking at the

7  track line and reviewing that data so appreciate that.

8  A.   Yes, sir.

9  Q.   I wanted to follow up with the Simrad, the autopilot.

10  Captain Morrissey, Captain James Morrissey who was the mate so let

11  me just make that clear, Mate James Morrissey, at the time, he

12  indicated to us that the Simrad, it tripped off and it went,

13  veered to port.

14      I'm listening to you now tell us that he indicated that it

15  was an operator error on his port (verbatim), but he was saying it

16  was tripped off. Just --

17  A.   Right.

18  Q.   -- want to understand that difference 'cause when we

19  interviewed him, it was a little bit different than what he

20  indicated.

21  A.   So with that --

22      MR. RODGERS:  If I can -- hold on, Brian.

23      MR. MOORE:  Yeah.

24      MR. RODGERS:  I have a little issue with the characterization

25  of that interview 'cause I don't yet have the transcript,

1  Mr. Wisniewski.

2      MR. WISNIEWSKI:  Understood, yeah.

3      MR. RODGERS:  I know Brian was there, but it's not in front

4  of him now.  I will by counsel say Brian sent me today, I think he

5  had sent it to me earlier but I couldn't find it, the Rose

6  Point --

7      MR. WISNIEWSKI:  Data, yeah.

8      MR. RODGERS:  -- data, the images, and I've been, I wanted to

9  review it before I sent it over, but if you think that you need it

10 for Brian's interview today, I can send it to you over now.

11     It is, the original data is still being retained by the

12 company.  Brian's put it in a format so people that can't read

13 Rose Point can pull it up and look at it.

14     So if you and ███   ████ want me to send it to you now, I

15 will.  But, of course, anything Brian says is fine too, it was

16 just his review of that screen.  He wasn't there, obviously.

17     MR. WISNIEWSKI:  Yes.

18     MR. RODGERS:  If you think it's helpful --

19     MR. WISNIEWSKI:  Yeah, we want the RAW data, and it's going

20 to be in a file format of an hour-long segment, and their folders.

21 Yes, and so I have licensed Rose Point data that I will share with

22 the Coast Guard and do the same thing as far as taking screenshots

23 and videos of it through Snagit.

24     But right now, it's just trying to understand a little bit of

25 the disconnect that, I guess, we're hearing right now.  Yes, the

1  transcript hasn't been given so I was just trying to understand

2  the disconnect here 'cause even I listened to both, the captain

3  indicated that they hit the bridge, and the Mate James Morrissey,

4  and now I'm only hearing that like the fendering was contacted.

5       MR. RODGERS: Right --

6       MR. WISNIEWSKI:  And that was also clear with what Mr. Lenny

7  indicated as well.  That's for --

8       MR. MOORE:  Sorry.  I don't receive any phone call for that

9  so I don't know what was verbally said to anybody other than that.

10      And the fact that we initially interviewed Jimmy, James

11 Morrissey, on the phone while I was traveling then I second

12 interviewed him with our HR and another senior captain, I believe

13 it was on that Friday, it was still the same week.  And that's

14 when he also said, and probably those two other people, that it

15 never, it didn't go hard over, it was an operating switch over

16 policy.

17      I also had in James Morrissey's statements, without

18 transcripts here obviously, but in the initial first hour, he did

19 say it went hard, it went over, but then by the hour marker so he

20 did say that the rudder was midship, he was left of the channel,

21 center of the channel, and everything else and that he was not

22 hand steering like he assumed he was.

23      Like I said, I don't have the transcript, but that's what I

24 remember from the --

25      MR. WISNIEWSKI:  Understood.  No, thanks for clarifying that.

31

 1      BY MR. WISNIEWSKI:

 2  Q.   My follow-up question as far as the crew statements, we were

 3  told that on the evening of the incident, crew statements were

 4  taken by the crew.

 5  A.   Yeah, they wrote it down.  Lenny had them compile something.

 6  I think it was like in chicken scratch form on a piece of paper

 7  that they were going to, well, I believe that should have been

 8  sent over.  I think it was sent over to the first counsel before

 9  we had to switch over for the conflict of interest.

10      MR. WISNIEWSKI:  And where are we at on those crew

11  statements, counsel?

12      MR. RODGERS:  Say that again?

13      MR. WISNIEWSKI:  Where are we at on receiving the crew

14  initial statements?  They made two statements, they told us during

15  our initial interviews on board?

16      MR. RODGERS:  You don't have those?

17      MR. WISNIEWSKI:  I do not, no.

18      MR. RODGERS:  I've seen very short statements in our

19  materials so I'll get them to you.

20      MR. WISNIEWSKI:  ████ ██████ --

21      MR. RODGERS:  Are you telling me, when you say two

22  statements, are you talking about the crew or did you say two

23  statements?

24      MR. WISNIEWSKI:  The crew indicated they wrote statements the

25  night of the incident and then they went and followed up and did

1   more of a formal sit down written statements.  So each crew

2   member, from what it was relayed to us during the interviews,

3   there was two written statements by all crew members.  Is that

4   correct?

5       MR. RODGERS:  I don't know, if it's correct, but we'll give

6   you what we have.

7       MR. WISNIEWSKI:  Okay.

8       ███   ████     And this ██   █████    just confirming that we, to

9   my knowledge, have not received those additional statements that

10  Mr. Wisniewski's referencing.

11      MR. RODGERS:  Okay.  Also, you mentioned you had the right

12  equipment for the Rose Point so if we send you the original data

13  that Brian can get because I can't read it unless he sends it to

14  me in some other way.

15      But you're saying you can get the original data and then you

16  can see the schematic up on the screen?

17      MR. WISNIEWSKI:  Absolutely, and the biggest thing, and I put

18  on the request over the ██   █████    is take a screen shot of the

19  settings that was on *Mackenzie Rose* and then we can actually see

20  exactly how it was laid out in that upper bridge.

21      MR. MOORE:  Okay.  So do you want the app which I didn't get

22  that part which I'm sure they didn't change it, so you want how

23  the chart displays with the speed, the time --

24      MR. WISNIEWSKI:  Correct, it will have the settings, yeah, so

25  it will lay everything out.

1      MR. RODGERS:  Can I snip it that from, can I have the vessel

2 either snip it and then email it over?

3      MR. WISNIEWSKI:  You can snip it to settings, yes, and then I

4 would incorporate the settings into Rose Point so we could see

5 exactly what the mate, captain, had up on the upper wheelhouse.

6      MR. MOORE:  Yeah, I can definitely do that.  That's easy.

7      MR. WISNIEWSKI:  That would be great.  I'll stop with the

8 Rose Point questions and track line.  But would like to just

9 follow up on that bridge photo.  ███  ████████  if you could bring

10 that back up again.  If not, I can share my screen.

11      ███  ████████      I can definitely bring it back up, just a

12 moment.

13      MR. WISNIEWSKI:  And that was the Bridge Photo 1 JPEG.

14      ███  ████████      Are you seeing the screen with the photo up?

15      MR. WISNIEWSKI:  Yes, thank you.

16      BY MR. WISNIEWSKI:

17 Q.   You had indicated right, the pilings that are not visible,

18 right, you couldn't view it there, but from the pilings on the

19 fendering, you didn't see any damage.  But I want to just talk a

20 little bit about the, I know you're not a bridge expert, but as

21 far as the lower chord of the trusses, that looked all normal to

22 you, that didn't --

23 A.   Sorry.  What do you mean lower chord of the trusses, like the

24 steel?

25 Q.   Yes.  Maybe I should share my screen and then that way I can

34

1   put my cursor over it.  Let me take control.  Can you see my

2   photo, the same image?

3   A.    Yeah.

4   Q.    Is it big enough there?  I can blow it up.

5   A.    Yeah, that's fine.

6   Q.    But, yeah, you're saying here, on the fendering, on the left-

7   hand side of that bank that they were passing, no damage here.

8   But what I'm interested in this lower chord here, there was no

9   discussion, nothing from the crew or Lenny to you?

10  A.    No, nothing from the crew or Lenny.  I don't think that was

11  ever relayed to what was actually hit or struck.  But looking at

12  that photo, like I said, if you are in the industry, I've seen

13  other rail lines where they'll have elevated railroad tracks and

14  it kind of looks like in the top end up there where it does come

15  up, I don't know anything about it.

16      But that might come up to a step rail, I guess, or whatever

17  you want to call it and then -- down.

18  Q.    Right here, you're saying?

19  A.    Yes, sir.  It's all, you know, but looking at it, there's no

20  mangled mess, there's no hanging eye beams or structures where it

21  would raise immediate concern.  You won't believe that a barge

22  struck a bridge.  It's going to do more than just kind of inset, I

23  guess, it looks inset the whole thing's straight and even.

24      So that's why, not knowing looking at it, that's kind of why

25  the decision was made.

35

1  Q.   So this was a discussion that you had with Lenny, you were

2  saying?

3  A.   No.  I looked at the photo of it, I think everybody looked at

4  the photo and said, you know, there's no damage, there's no visual

5  damage here.  So nobody would have, I assume that that whole

6  section which we now know is offset was actually the piece struck.

7  Q.   Got it.  And so that discussion, or that group text, was

8  between Lenny, yourself and the *Mackenzie Rose*?

9  A.   Yes, correct.  So when I spoke with Lenny on the phone --

10 Q.   Cell phone?

11 A.   Yeah, I spoke to Lenny on the phone looking at it, looking at

12 the photo, and we kind of looked at it together on the phone

13 saying that, you know, there's nothing here, but I don't know if

14 Lenny spoke to the vessel as well too.

15      But even the vessel, I think the crew said that they didn't

16 believe there was any damage either.  But I don't really recall

17 that one.  But they think that's, you know, who said what or

18 whatever it was.  Everybody was assuming that there was no damage.

19 Q.   All right.  And I assume, well, I don't really want to assume

20 anything, but as far as preserving all those texts, that group

21 text chat along with any other chat discussions, texts that you

22 had with Lenny --

23 A.   Yes, Lenny.

24 Q.   -- that you've already saved.

25 A.   Yeah, nothing's ever been deleted.

36

1  Q.   We'll reach out and ask for that as well.  I'll add to the

2  list.  Let me continue on then with -- I'll stop sharing.

3       We'll go back to just the general training on board for these

4  type of marine causalities in relation to that 46 C.F.R, the

5  marine casualty reporting.  Are you familiar with where that's at

6  in Helm CONNECT?

7  A.   In Helm CONNECT or in the SMS, I would have to reference it,

8  but I do know it's in there.  I don't know exactly where without

9  having to search for it.

10 Q.   Yeah, so we're still waiting on those documentations too.

11      MR. WISNIEWSKI:  Is there any update, Mr. Rodgers, on counsel

12 for the SMS procedures for marine reporting?

13      MR. RODGERS:   Yeah, we're still gathering, but we're on it.

14 We're getting stuff and as we get it, we're going to probably do a

15 rolling production to you to get the stuff sooner than later that

16 we do get.

17      MR. WISNIEWSKI:  We would ask that, yeah, there's no more

18 delays with it.  We're just trying to move this thing along and as

19 we do these interviews, it would be more productive for us to have

20 this information so we appreciate it.

21      MR. RODGERS:  Will do.

22      MR. WISNIEWSKI:  And then, I guess that's all I have for

23 right now.  Yeah, that's all.  I'll pass it over to everyone else.

24 Thank you, appreciate it.

25      MR. MOORE:  Yes, sir.

1      MR. WISNIEWSKI:  Captain Moore, thank you.

2      ███ ████████  Thank you, Mr. Wisniewski.  Over to Mr. Rodgers,

3  if you have anything.

4      BY MR. RODGERS:

5  Q.   Just quickly, Brian.  Your understanding of what

6  Mr. Morrissey ultimately did is based on you attending his

7  interview with the Coast Guard and the NTSB, correct?

8  A.   The interview and then the two phone conversations.  One was

9  just by myself in a car with him or talked to him over the phone

10 part.  And then the second one was with our HR manager and senior

11 captain, as well.

12 Q.   Okay.  Is it your understanding that you were talking, and,

13 again, we don't have the transcript, it's your understanding that

14 any modification or change in the story by Mr. Morrissey was

15 something that he stated in the interview with the Coast Guard?

16 A.   Yeah.  From what I recall during that first initial one it

17 was.  The second interview round is when, you know, in the

18 beginning of that he said that it was, you know, I don't recall

19 exactly what it was, it was hard over or it went off on him.  But

20 by, within an hour later when we kind of came back around, it was

21 noted that he was left of center, trying to go over, around some

22 fishing vessels that didn't show up on any videos that we've seen.

23      That he was left of center and he thought it was hand

24 steering when he was still in autopilot.  So by the time he

25 realized it to go switch back over that, it wasn't that way.  But

38

1  that's kind of what I recall from that interview.

2      MR. RODGERS:  Thank you.  By counsel, I just want to make

3  sure that in reviewing this that we, that the investigators go

4  back and look at Mr. Morrissey's testimony rather than Mr. Moore's

5  recollection of it since I don't have that in front of me.

6      BY MR. RODGERS:

7  Q.  Mr. Moore, Brian, this is your recollection of what he

8  testified in front of all the people that are here today, correct?

9  A.  Yes, sir.

10     MR. RODGERS:  Thank you.  I have no further questions.

11     ███    ███       Thank you, Mr. Rodgers.  And over to the Belt

12  Line, if there are any questions.

13     MR. CHAPMAN:  Yes.  Thank you.

14     BY MR. CHAPMAN:

15  Q.  Mr. Moore, was there more than one photo of that bridge that

16  was sent from the tug?

17  A.  There is one photo of the bridge and then four photos of the

18  barge.

19  Q.  Was it reported to you by anybody that the barge had

20  contacted the bridge, or that the boat had contacted it?

21  A.  No, it would be impossible for the tug 'cause they weren't

22  towing or alongside so it would have been assumed that it was the

23  barge, unless they were --

24  Q.  Just so I understand what you just said, you said it would be

25  impossible because the tug was alongside the barge?

39

1  A.    No.  I said it would impossible 'cause they, it would be

2  impossible for it not to be the barge 'cause they were pushing

3  astern.  They weren't towing or alongside which, in that case,

4  might happen when a tug would hit a bridge.

5  Q.    Was it your understanding that the barge had hit the fender,

6  or that the tug had hit the fender?  I'm just trying to understand

7  that.

8  A.    No, I understand.  I was trying -- this it would be the barge

9  that would hit the bridge.

10 Q.    And so the photos of the barge, did they depict any damage

11 that suggested or was consistent with contact from the fender?

12 A.    No, sir.  There was no consistent, the photos of the barge

13 would lead to no, everybody would believe there is no damage,

14 initial strike of anything alongside or on the bow, or whatever it

15 was 'cause in the photos you could see the bridles, you could see

16 where the scrap marks are on the bridles and everything else.

17       But due to the fact that it's apparently a clean and painted

18 barge on the topside of the deck as well as the hull and the lock,

19 the stem head lock, whatever you want to call it.  So everything

20 looked completely normal, fresh, clean, besides the scrap marks

21 where you'd see from normal tug operations.

22 Q.    And did you receive those photos of the barge at the same

23 time as the photo of the bridge?

24 A.    I believe so.  I don't know when the photos would have come

25 in, what time I picked up the phone and looked at them.  I believe

1    they're all there but relatively close to, maybe time, but I don't

2    recall.

3    Q.    And did they, were they in the same group text that you

4    mentioned earlier?

5    A.    Yes.

6    Q.    And your recollection is there were four of them?

7    A.    I believe so, yeah.  I believe there's four photos of said

8    barge and then one of the bridge.  I will double check, but there

9    might be three, maybe four total, but I would have to double

10   check.  The only --

11   Q.    So I'm just -- go ahead.  I apologize about that.

12   A.    No, it's all right.  And only one of the actual physical

13   bridge itself.

14       MR. CHAPMAN:  I'm at a loss.  I don't have a copy of any of

15   those photos.  I would ask, Mr. Wisniewski, do you have copies of

16   them?

17       MR. WISNIEWSKI:  Yes, I do have copies; I received them from

18   the Coast Guard.  Coast Guard's the lead investigative agency so

19   they're in charge of all document control and distribution to

20   their parties-in-interest.  So I'll defer --

21       MR. CHAPMAN:  I'm just interested in -- go ahead.

22       MR. WISNIEWSKI:  I'll defer to ███ ██████

23       ███ ████████  Thanks, Mr. Wisniewski.  Mr. Chapman, you can

24   come review the photos over at the office, but we will not be

25   sending those out to the parties-in-interest.

1        MR. CHAPMAN:  Is there any reason why they haven't been shown

2    to this witness?

3        ████  ███████  The photo that we were interested mainly was the

4    bridge on that one so we chose to share the other one.  And from

5    what I'm looking at, there really was nothing to, nothing

6    significant to show on those barge photos.  You're welcome to come

7    over to the office and view those if you'd like though.

8        BY MR. CHAPMAN:

9    Q.   Mr. Moore, what angle were those photos taken from?  Was

10   somebody on top of the barge that is walking around the deck

11   taking them, or were they taken from the wheelhouse, or some other

12   location or vantage point on the tug?  Do you recall?

13   A.   I believe --

14       MR. RODGERS:  Wait, Brian.  Lieutenant, I think it's beyond

15   the scope.

16       ████  ███████  So this is --

17       MR. RODGERS:  It's just --

18       ████  ███████  I should have offered to the parties-in-interest

19   to give them more opportunity to come view.  Mr. Chapman, I will

20   invite you over to come look at them.

21       If we could move on from the barge photos in this instance.

22       MR. CHAPMAN:  Yeah, so my challenge is you've come to some

23   conclusion based on your expertise that there's nothing to be seen

24   in these barge photos.  But I have no basis for drawing that same

25   conclusion without seeing them.  I just want to ask the witness

1  what is depicted in them, in the photos of the barge?  I mean, it

2  seems to me --

3  ████ ████    Mr. Chapman, I --

4      MR. CHAPMAN:  -- what happened and part of what --

5      MR. RODGERS:  I think he's answered that.

6      MR. CHAPMAN:  Excuse me.  It's part of what happened and it's

7  part of what's been reported to the company, but why is it not

8  pertinent to your investigation?

9      MR. RODGERS:  Well, it's just --

10     ████ ████    Mr. Chapman, we've done our review of that and

11 I'll remind you the role of the party-in-interest is to support

12 the investigation, and we appreciate you taking part in these

13 investigations and these interviews.  But we are not looking at

14 that specific item right now.  I'm going to ask that you just

15 direct the questions to a new topic.

16     BY MR. CHAPMAN:

17 Q.   So, Mr. Moore, when you talked to Mr. Morrissey on Tuesday,

18 post casualty, I thought I heard you say there was somebody else

19 on the call with you.  Is that correct?

20 A.   No, sir, never said that.

21 Q.   Just you, okay.  Maybe it was the Friday meeting that

22 somebody else was there?

23 A.   Yes, sir.  I believe it was Thursday or Friday, I have to

24 double check.  But yes, it was Tom Aaron our senior HR chief, HR

25 manager, I guess you want to call him; and then our, and

43

1   Mark Pearson, he was our, one of our senior, actually, our senior

2   captain, still working, but a senior captain, as an additional

3   person.

4   Q.    Okay.  Thank you.

5   A.    Yeah.

6   Q.    Did you receive copies of the statements from the crew

7   members that were apparently taken on Saturday night of the, the

8   evening of the casualty?

9   A.    I have the hard copies that were in my file.

10  Q.    I was just wondering if anybody had sent them to you before

11  you received those hard copies?

12  A.    I believe the crew sent them.  I think they literally just

13  wrote them down on a note pad and sent the photos to Lenny and

14  that's when they said this isn't going to work, we need a real

15  statement.  So that's what Lenny was working with them to get a

16  real statement.

17  Q.    So only Lenny received those?

18  A.    I received them after the fact, yes, when we got the new,

19  Jason, well, our safety team and the rest of the team sent over

20  everything so I do have, I got that submitted to me as well as the

21  secondary.

22  Q.    I'm really interested in understanding what you received on

23  Saturday, right.  We've talked about some photos --

24  A.    Oh, Saturday, I --

25  Q.    -- you get some text messages, right?

44

1   A.   I did not receive the, I don't recall receiving the

2   statements on Saturday.

3   Q.   I think you said that you only talked to Lenny on Saturday,

4   the day of the casualty?

5   A.   We texted and talked after the fact, yes.

6   Q.   But did you talk to any member of the crew on Saturday?

7   A.   No.  No, sir.

8   Q.   Did you text with any member of the crew on Saturday other

9   than that group text that you mentioned?

10  A.   No, and I will double check that, I don't even think I texted

11  to that group text either.

12  Q.   So it was all incoming texts to you, not responding?

13  A.   Yes, I believe so, yeah.

14  Q.   All right.  Was there any conversation then between you and

15  Lenny about the need for drug and alcohol testing?

16  A.   No, not right off, not off the initial because, like I said,

17  it was looking at the photos and with everybody saying there

18  really wasn't any damage, that we assumed it wasn't a reportable

19  incident, a marine, whatever -- side, yeah, it wasn't a reportable

20  incident to the Coast Guard.

21  Q.   Just so I'm clear, is it your understanding that the only

22  incidents that are reportable that involve vessels and bridges are

23  those that result in damage?

24  A.   No.

25       MR. RODGERS:  Lieutenant, he's going beyond the scope and

1  he's going beyond what this is, the questions.

2  ████████      That would be more in a Part 5 investigation so

3  I'll ask, new question on that one, Mr. Chapman.

4  MR. CHAPMAN:  You guys asked whether there was any reporting.

5  It seems to me that his understanding of whether the reporting is

6  required is relevant to the investigation.

7  MR. RODGERS:  I have an issue him asking the witness this

8  line of question.

9  ████████      I believe that we covered the marine casualty

10  reporting requirements on that, Mr. Chapman.  If there are any

11  questions that aren't directly asking for Mr. Moore's

12  understanding of the requirement on that as that would likely go

13  more towards a Part 5 Investigation.  We're not trying to play

14  Gotcha here or anything like that.

15  MR. CHAPMAN:  Well, okay. My understanding is he doesn't hold

16  a license.

17  MR. RODGERS:  Objection.

18  MR. MOORE:  My license has nothing to do with this or I don't

19  see --

20  MR. RODGERS:  Brian.  You don't have to answer that, and you

21  don't have to respond to that.

22  MR. CHAPMAN:  I don't --

23  ████████      Mr. Chapman, I'm going to ask that you just move

24  to a new topic here.

25  BY MR. CHAPMAN:

46

1  Q.   So you were talking about the vessel speed that you saw in

2  whatever recorder was available to you all, and I think you said

3  it was somewhere between four and a half and five point two miles

4  per hour.  Did I get that down correctly?

5  A.   I don't recall what I said.

6      MR. RODGERS:  Well, don't guess, Brian.  If you don't have

7  any personal --

8      MR. MOORE:  Right.  Without it in front of me, I don't recall

9  exactly what it was.

10     BY MR. CHAPMAN:

11 Q.   Well, what I'm interested in is you said that the, you saw

12 the speed drop off, or you could see the speed drop off based on

13 whatever you were looking at --

14 A.   Yes.

15 Q.   -- and I'm trying to understand, what did you see it drop off

16 to?

17     MR. RODGERS:  Objection.  Lieutenant, and I apologize that we

18 haven't gotten you that tracking video, but he's asking him a

19 question about looking at a video.  He has no personal knowledge

20 about the speed.

21     ███  ████   Mr. Moore could answer that if he wants, if he

22 saw that, that screenshot, it's not saying that that is

23 100 percent fact of what was on there.  He's stating to the best

24 of his knowledge and recollection.

25     MR. MOORE:  Right.  I don't know without it in front me, I

1  don't know what it dropped off to, what the end result number was.

2      BY MR. CHAPMAN:

3  Q.   Could you tell on the track where it dropped off, that is,

4  the position of the vessel?

5  A.   At least with the view that I have, it doesn't show, it just

6  shows a dot for the vessel.  It's not like an overlay of said

7  vessel that you would type in your parameters of 400 feet by 65 so

8  it doesn't show that.  It literally just shows a dot.

9  Q.   You answered some questions about the, apparently there were

10  some problems with the autopilot, I think you said late 2023, and

11  that the autopilot, I want to understand this, was swapped out.

12  Is that correct?

13  A.   Yeah, correct.  We replaced the full operating system for the

14  autopilot.

15  Q.   Did an outside contractor handle that?

16  A.   Yes, correct.

17  Q.   When you say it was swapped out or replaced, is it your

18  understanding that it was new equipment that was installed?

19  A.   Yes, it was new equipment.

20  Q.   And does Carver have any policy regarding the use of

21  autopilot in restricted waters say where there's a bridge opening

22  of the -- of the vessel?

23  A.   I --

24      MR. RODGERS:  Brian.  Lieutenant, I think it's beyond the

25  scope.

48

1    ▮ ▮▮▮▮▮▮    Mr. Rodgers, I think that would be within a, a

2    fair question to ask a general manager of a boat company.  If he's

3    comfortable answering the question.

4        MR. MOORE:  Yeah.  I can't reference it right now, but there

5    is policies and procedures for autopilot usage in our SMS.

6        BY MR. CHAPMAN:

7    Q.    It's in the SMS?

8    A.    Correct.

9    Q.    Is that available to ship's personnel?

10   A.    Yes, that's available to, yeah, it's available to all

11   officers, available to all the crews directly.  It's in their

12   straight Helm documents so anybody that's logging into Helm can

13   see it and pull it up.

14   Q.    Do you know from your own personal knowledge whether the use

15   of the autopilot is permitted under company policy in the

16   circumstances under which Mr. Morrissey was operating the vessel?

17   A.    I --

18       MR. RODGERS: Wait, Brian.  Lieutenant, same objection.  He's

19   getting into areas that are outside the scope.

20       ▮ ▮▮▮▮▮    Mr. Rodgers, I think that understanding the

21   parameters of the use of autopilot is perfectly within the scope.

22       MR. RODGERS:  Well, he's getting argumentative with the

23   witness.  It's not a deposition.

24       ▮ ▮▮▮▮▮▮    It's not a deposition.  I think I have said

25   this, and I'll reiterate it again, Mr. Moore, if you're not

1  comfortable answering any of these questions, you do not have to.

2      MR. MOORE:  That's fine, I appreciate it.  I would have to

3  reference, I have not, like I said, I think the SMS is 1,100 pages

4  long or so, I would have to reference it to exactly what it says.

5  I do believe they've requested it so Mr. Rodgers and counsel

6  submitted it as needed.  But there is references.

7      MR. CHAPMAN:  Fair enough.  I don't have any further

8  questions at this time, Mr. Moore, thank you.

9      MR. MOORE:  Okay, very well.

10     ███  ██████  Thank you, Mr. Chapman.  Over to Mr. Gonzalez.

11     MR. GONZALEZ: I just had a couple questions, not that many.

12     BY MR. GONZALEZ:

13  Q.  Just wanted to follow up on this SMS manual, guidance manual.

14  Is this a printed copy, or is this something electronically that's

15  available on board the vessel?

16  A.  This is an electronic document, controlled electronic

17  document inside of the Helm Operating System.

18  Q.  It's available at the vessel, is that what you're saying?

19  A.  Yes.

20  Q.  At the beginning when you started to talk about how you were,

21  became aware of the incident, you said that you got a missed call

22  and then a text.  Is that correct on it?

23  A.  I got a missed call, yeah, so when I initially picked up the

24  phone, I could see a missed call from *Mackenzie Rose*, a missed

25  call from Lenny Baldassare then the group text regarding

50

1    everything.

2    Q.    Did either of these calls leave a voice mail?

3    A.    I don't know.  I have to double check.  This is my one and

4    only phone so it's a personal phone/work phone so I have a lot of

5    voice mails that are still on it.

6    Q.    That's fine.  I'll ask the Coast Guard if they would follow

7    up, if the calls were saved over, and to obtain a copy of any

8    important voice mail that was left on regarding these two missed

9    calls.  But you did say that you saved the group text?

10   A.    Yeah, nothing has been deleted so this --

11   Q.    Now, you mentioned the Master Review that was conducted,

12   that's conducted every year.  Do you know who conducts this Master

13   Review?

14   A.    I believe it's an auto populated option in Helm.  I don't

15   exactly, I don't know the exact, I know when I did it, it was done

16   at the end of the year and you're supposed to review the SMS as a

17   master.

18   Q.    Good.  You answered my next question which is how often is it

19   done, end of the year is what you say.

20        Now, a question, this is building upon the interview that we

21   had with the port captain and what you mentioned the computer that

22   is available for the port captain to use that has the Rose or

23   something like that.  And I got to ask you specifically policies

24   and procedures about it, just going to ask you, does the company

25   have written policies and procedures about the use of that

51

1  computer by the port captain?

2  A.    You telling, the vessel's computer or his --

3  Q.    No.

4  A.    -- laptop?

5  Q.    His laptop, the laptop for the port captain.

6  A.    I don't believe there's a, that's our one and only computer

7  so we're all issued our own laptops.  But there was no, I don't, I

8  cannot tell you if there's any policy or procedure saying like,

9  you know, when you need to work and when you can't work, and

10 work/rest hours and everything else.

11 Q.    Okay. So as far as you know, there's no policy and procedures

12 about what sort of equipment the port captain needs to have while

13 he's port captain?

14     MR. RODGERS:  Wait.  Lieutenant, I have an issue with that.

15 It's a very broad question and it's also a statement within a

16 question.

17     MR. GONZALEZ:  My question is specific as to whether the port

18 captain is required to have this computer -- asking him directly

19 whether the port captain was required to have this computer on the

20 day of the accident.  I'm asking whether the company has policies

21 and procedures as to whether the port captain is required to have

22 this equipment which will come into bearing as to whether the port

23 captain, while exercising his duties on the date of the accident

24 or any other accident, will be able to evaluate any casualty in

25 order to determine to whether it is reportable to the Coast Guard

52

1   or not.

2      MR. RODGERS:  Now you're arguing the case, in all due

3   respect, Richard.  Lieutenant, he's arguing whatever he wants to

4   argue. I really don't --

5      MR. GONZALEZ:  No, I'm not arguing, it's just only -- the

6   reason of my question.

7      █████ █████  Mr. Rodgers, Mr. Gonzalez, the purpose of this

8   interview, and this is an interview, now we're not having an

9   argument here, is to determine causal factors and hopefully help

10   prevent situations like this in the future.

11      So please keep your questions, and I say questions,

12   seriously, to that subject.

13      MR. RODGERS:  I don't understand, who's talking?

14      █████ █████  This is █████ █████ with the Coast Guard.

15      MR. RODGERS:  Yeah, I understand, but he's explaining

16   something as to some open-end issue that he wants to argue at a

17   later time or something that's helpful for his client, which I

18   understand.  But if we're going to go that route, then I'll be

19   making arguments here on behalf of my client, and that's not what

20   this is for.

21      MR. GONZALEZ:  Mr. Rodgers, I'm not arguing that.  I'm just

22   asking, you said that it's outside the scope and I'm explaining to

23   you why I believe it was within the scope.  I'll rephrase it.

24      BY MR. GONZALEZ:

25   Q.  Mr. Moore, does the company have any policy and procedures

53

1  regarding the use of the laptop by the port captain?

2  A.  Well, I don't think that his laptop caused the incident so I

3  would have to review company policy and procedures and follow back

4  up with you.

5  Q.  So you're not sure?

6  A.  Yeah.

7  MR. GONZALEZ:  Thank you.  Oh, and one more point of it.

8  Mr. Rodgers, the Coast Guard's requested copy of the crew's

9  statements of it.  As representative of Captain Miller, we're

10  going to, we're requesting a copy of any statement that he

11  provided to the company.

12  ███  ██████    Mr. Gonzalez.

13  MR. GONZALEZ:  I'm not telling you, you can't give it to the

14  company, but you can, we're requesting a copy of the statement.

15  ███  ██████    We can talk off line, Mr. Gonzalez, for any

16  other requests, but let's get back to the interview.

17  MR. GONZALEZ:  No, Lieutenant, I was not requesting this from

18  you, I was requesting it from Mr. Rodgers.

19  ███  ██████    Oh, and I understand, Mr. Gonzalez, but for the

20  purposes of this transcription, this video, I'm just going to ask

21  that any sort of outside evidence stuff, we'll discuss at a later

22  time outside of this.

23  Do you have any further questions, Mr. Gonzalez, for

24  Mr. Moore?

25  MR. GONZALEZ:  No, nothing else.

54

1          ███  ████████          Okay. Thank you.  And we have no other questions

2    on the side of the Coast Guard.  I will go back over to the NTSB

3    with Mr. Wisniewski for any follow-up questions.

4          BY MR. WISNIEWSKI:

5    Q.   Yes, this is Luke, NTSB, again.  Captain Moore, I just wanted

6    to follow up with you again with the Simrad autopilot.  From what

7    we learned being on board that it was installed in March of 2024,

8    and so you indicated that Carver Marine, yourself or the port

9    captain, no one has looked a document post incident any error

10   messages, alarms, anything that would have come in.  Do you have

11   any type of service report indicating --

12   A.   We requested --

13   Q.   -- any issues?  If you look through the history of the

14   Simrad, right, was there anything that came up?

15   A.   We did ask over the phone, we asked the installer if there

16   was a log that would show when the autopilot kick on and off and

17   he said there wasn't.  But I didn't directly reach out to Simrad

18   itself.

19   Q.   Okay.  And then with the Simrad autopilot, you know, it's an

20   AP70 Mk2 so I would assume that the install in March would have

21   been the last upgrade of --

22         UNIDENTIFIED SPEAKER:  Firmware.

23         BY MR. WISNIEWSKI:

24   Q.   -- the firmware, yeah, the software on board, the version?

25   A.   I would believe so 'cause I don't, unless, me personally, I

55

1  never had an autopilot firmware updated so it would have to been

2  the most updated version because it was a new system.

3  Q.   All right.  And then I guess the last one for me is going

4  back to the AIS, the Rose Point, electronic chart navigation data

5  that we were referring to.  Do you know when the last time the

6  electronic charts were updated on that?

7  A.   I double checked, they were within less than a week.  I would

8  have to check the chart log but they, because they had cell phone

9  service often that I know for a fact that they update very often.

10 Q.   So less than a week.  And I would ask, you know, I'll add

11 that to my list of requests, but if you can take a screenshot of

12 that for us, that would be great too.

13 A.   Sure.

14     MR. WISNIEWSKI:  That's all I have, thank you.

15     MR. MOORE:  You're welcome.

16     ████  ████  Thank you, Mr. Wisniewski.  Mr. Rodgers, do you

17 have anything?

18     MR. RODGERS:  Not of the witness, but I just want to, while

19 the witness is in front of us, make sure that we get to the

20 priority of things that you and Mr. Wisniewski needs.

21     You want the original Rose Point data, right?

22     ████  ████  Yes, sir.  They want the, it'll come in hour

23 blocks.

24     MR. RODGERS:  You know what that means, Brian, and what

25 you're --

56

1      MR. MOORE:  Yeah, that's part of the ones that you couldn't

2 open so you should have that.  If not, I can resend it to the

3 Coast Guard.

4      MR. WISNIEWSKI:  Correct.  They're one-hour CEVDR files.

5      MR. MOORE:  That's -- 15:00, 16:00 --

6      MR. WISNIEWSKI:  That's in the email to you.

7      MR. MOORE:  Yeah, I have 15:00, 16:00 and 17:00.

8      MR. WISNIEWSKI:  Great, thank you.

9      ███  ███   Yes.

10     MR. RODGERS:  Just so you both understand, he had sent that

11 to me.  I just don't have the equipment where I can pull it up and

12 see it and so we were going through that.  And, finally, he sent

13 me a kind of idiot proof version which I was able to watch.  Okay,

14 that'll be on our priority list.

15     SMS materials, I want to make sure Brian understands what you

16 both need and so we can put that in the priority.  Are you talking

17 about the manuals, things like that?

18     MR. WISNIEWSKI:  Correct.  we can continue this after this

19 interview.

20     MR. RODGERS:  I know, but I want to make sure Brian's here

21 because he's the one who's gathering this stuff, and I want to

22 make sure he hears from you.  I mean, you guys talk amongst

23 yourselves sometimes, it might be Greek to me.

24     Do you know what they're looking for, Brian?

25     MR. MOORE:  Yes, yes I do. I think I referenced ██ Palomba's

57

1   initial request so whatever was on that one, I believe, it was

2   extracted and sent over in PDF form.

3          ███ ████████   Thank you, Mr. Moore, on that.  And Mr. Rodgers,

4   I'm going to ask, can we, us four, myself, Mr. Wisniewski,

5   Mr. Moore and yourself jump on a call hereafter this interview for

6   the sake of everyone else's time.

7          MR. RODGERS:  Yes, that would be fine, thank you.

8          MR. WISNIEWSKI:  Thank you.

9          ███ ████████   Thank you.  All right.  Over to Mr. Chapman with

10  the Belt Line.  Do you have anything, sir?

11         MR. CHAPMAN:  Yes, thank you.

12         BY MR. CHAPMAN:

13  Q.   Just an enquiry to follow up Mr. Wisniewski's question about

14  this Simrad and its installation in March of this year.

15       I think you said you talked to the installer over the phone

16  to try to find out whether you could get a log of errors or

17  defaults or something like that out of it.  Is that right?

18  A.   Yes.

19  Q.   Did you have that call, or was it somebody else and you just

20  never --

21  A.   It was another port captain, another port captain we have as

22  well.

23  Q.   Is that, that's not Mr. Baldassare?

24  A.   No.  It's actually, technically his title is a marine

25  operations manager, Thomas Feeney, but he called up, but he

1  wasn't, he just started here not long ago.

2  Q.   And what is your knowledge of when the call was made, or when

3  that information was learned?  I'm just to put it in relationship

4  to when you may have to talked to Mr. Morrissey or that sort of

5  thing.

6  A.   It was after the fact.  It was just a call that we had to try

7  to gather more data on this for everybody so it was after the

8  fact.

9  Q.   Like more than a week after the casualty?

10  A.   Yeah, correct, yes.

11  Q.   Do you have any information as to who the installer was?

12  A.   It was in March, we had the marine technician reports.  We

13  have them, I'm going to send them over to, ███ was asking for that

14  one as well too so, yeah, any technician reports we've had.

15       MR. CHAPMAN:  Thank you, Mr. Moore.

16       MR. MOORE:  You're welcome.

17       MR. CHAPMAN:  I don't have any further questions.

18       ███        Thank you, Mr. Chapman.  Anything from

19  Mr. Gonzalez?

20       MR. GONZALEZ:  No, nothing for me, thank you.

21       ███        Thank you, sir.  All right, Mr. Moore, we've

22  asked you a lot of questions and I greatly appreciate you

23  answering them so thoroughly.

24       Do you have any questions for us at this time, or have any

25  other information you'd like to share about the incident?

59

1      MR. MOORE:  No, I have no questions.  No problem answering

2  any questions.  I can stand along watch if needed.  No, I'm good

3  for whatever you guys have anytime and any needs, I'm here.

4      ████  ████      Thank you, Mr. Moore.  And I will now be

5  stopping the recording.  Today is July 18th.

6      MR. RODGERS:  Lieutenant, before you stop, I didn't identify

7  our law firm.  James Rodgers and Dawn Johnson.  We're from Clyde &

8  Co, and we represent Carver and Coeymans as well, but Carver for

9  the purposes of this interview and the witness, Brian Moore, as an

10  employee of Carver.

11      ████  ████      Thank you, Mr. Rodgers, for the clarification.

12      I will now be stopping the recording.  Today is July 18th,

13  2024.  The time is 3:57 p.m.

14      (Whereupon, at 3:57 p.m., the interview was concluded.)

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

This is to certify that the attached proceeding before the

NATIONAL TRANSPORTATION SAFETY BOARD

IN THE MATTER OF:        ALLISION OF M/T *MACKENZIE ROSE* WITH
                         THE BELT LINE BRIDGE ON THE
                         ELIZABETH RIVER IN VIRGINIA,
                         ON JUNE 15, 2024
                         Interview of Brian Moore

ACCIDENT NO.:            DCA24FM039

PLACE:                   via videoconference

DATE:                    July 18, 2024

was held according to the record, and that this is the original,

complete, true and accurate transcript which has been transcribed

to the best of my skill and ability.


                                    _____
                                    Christina H. Neilson
                                    Transcriber