# Exhibit F

                    UNITED STATES OF AMERICA

            NATIONAL TRANSPORTATION SAFETY BOARD

    * * * * * * * * * * * * * * * * *
    Investigation of:                *
                                     *
    ALLISION OF M/T *MACKENZIE ROSE*  *
    WITH THE BELT LINE BRIDGE ON THE *    Accident No.: DCA24FM039
    ELIZABETH RIVER IN VIRGINA       *
    ON JUNE 15, 2024                 *
                                     *
    * * * * * * * * * * * * * * * * *

    Interview of:  LEONARD BALDASSARE, Port Captain
                   Carver Marine Towing




                          via videoconference

                          Wednesday,
                          July 3, 2024












                    FREE STATE REPORTING, INC.
                    Court Reporting  Transcription
                       D.C. Area 301-261-1902
                     Balt. & Annap. 410-974-0947

APPEARANCES:

LUKE WISNIEWSKI, Investigator
National Transportation Safety Board

██ ██ ████
United States Coast Guard

██ ███ ███
United States Coast Guard

██ ██ ████
United States Coast Guard

██ █████ ████
United States Coast Guard

BRIAN MOORE
Carver Marine Towing

JAMES RODGERS, ESQ.
Clyde & Co on behalf of Carver

DAWN JOHNSON, ESQ.
Clyde & Co on behalf of Carver

JAMES CHAPMAN, ESQ.
Crenshaw, Ware & Martin on behalf of
Norfolk and Portsmouth Belt Line Railroad

ROBERT GRAY BRACKNELL, ESQ.
Crenshaw, Ware & Martin on behalf of
Norfolk and Portsmouth Belt Line Railroad

CANNON MOSS
Norfolk and Portsmouth Belt Line Railroad

<u>I N D E X</u>

| ITEM | PAGE |
|---|---|

Interview of Leonard Baldassare:

| By ██ ████████ | 6 |
|---|---|
| By Mr. Wisniewski | 7 |
| By Mr. Chapman | 8 |
| By Mr. Gonzalez | 9 |
| By ██ ████████ | 10 |
| By ██ ████ | 14 |
| By ██ ████ | 15 |
| By Mr. Wisniewski | 16 |
| By Mr. Rodgers | 21 |
| By Mr. Chapman | 22 |
| By Mr. Gonzalez | 33 |
| By Mr. Wisniewski | 36 |
| By Mr. Chapman | 38 |
| By Mr. Gonzalez | 40 |
| By ██ ████████ | 41 |
| By Mr. Rodgers | 43 |
| By Mr. Gonzalez | 43 |

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

4

1                    <u>I N T E R V I E W</u>

2                                                    (9:39 a.m.)

3       ███ ███████     Good morning, everyone.  This is ██  █████

4  ██████   with Coast Guard Sector Virginia Investigations.  We are

5  here today to record the interview of Mr. Leonard Baldassare in

6  relation to the allision of the Towing Vessel *Mackenzie Rose* with

7  the Belt Line Bridge that occurred on June 15th, 2024.  Today's

8  date is July 3rd, time is 09:39.

9       Mr. Baldassare, could you please introduce yourself.

10      MR. BALDASSARE:  Leonard Baldassare, Port Captain, Carver

11  Marine Towing.  Spelling of my name, L-e-o-n-a-r-d,

12  B-a-l-d-a-s-s-a-r-e.

13      ███ ███████     Thank you, sir.  I said, my name is ██  █████

14  ██████   ██████████ .

15      And Mr. Baldassare, could you confirm that you consent to the

16  recording of this interview?

17      MR. BALDASSARE:  Yes, I consent.

18      ███ ███████     Thank you, sir.

19      ███ █████ ██  ███ █████    with Sector Virginia Investigations,

20  last name, ██████ .

21      ███ █████ ██  ███ █████     with Sector Virginia Investigations,

22  last name's spelling, ███████ .

23      ███  ROSE:  ███  Rose with Sector Virginia Investigations, last

24  name, ██████ .

25      ███ ███████     Over to the NTSB.

5

1          MR. WISNIEWSKI:  Good morning, Luke Wisniewski with the

2    National Transportation Safety Board, W-i-s-n-i-e-w-s-k-i.

3          ███████████  Thank you, sir.  Over to Carver.

4          MR. RODGERS:  James Rodgers of Clyde & Co, last name,

5    R-o-d-g-e-r-s, for Carver.

6          MS. JOHNSON:  Dawn Johnson, also of Clyde & Co for Carver,

7    J-o-h-n-s-o-n.

8          MR. MOORE:  Brian Moore, Carver Marine Towing, Carver

9    Companies, M-o-o-r-e.

10         ███████████  Over to the Belt Line?

11         MR. CHAPMAN:  Yes.  James Chapman with the law firm of

12    Crenshaw, Ware & Martin representing Norfolk and Portsmouth Belt

13    Line Railroad Company.

14         MR. BRACKNELL:  Hi, Robert Gray Bracknell, B-r-a-c-k-n-e-l-l,

15    also with Crenshaw, Ware & Martin.

16         MR. MOSS:  Cannon Moss, Norfolk and Portsmouth Belt Line

17    Railroad, M-o-s-s.

18         ███████████  Mr. Gonzalez?

19         MR. GONZALEZ:  Richard Gonzalez, G-o-n-z-a-l-e-z, with Gallo

20    Vitucci Klar and representing Captain Miller.

21         ███████████  Okay. Is there anyone else online that has not

22    been introduced?

23         All right.  At this time to save bandwidth, I'm going to ask

24    that only the people asking the questioning and Mr. Baldassare

25    turn on their video so if everyone else can turn it off, and

6

1    Mr. Baldassare, if you could turn it on.  Thank you, sir.

2                    INTERVIEW OF LEONARD BALDASSARE

3        BY ███ ████████

4    Q.   Mr. Baldassare, would you just give us a quick introduction

5    of yourself, name, where you live?

6    A.   Leonard Baldassare.  Like I said before, Port Captain for

7    Carver Marine Towing, based out of our Staten Island Office.  I

8    reside on Long Island, Suffolk County.

9    Q.   Could you give me a brief history on your maritime career?

10   A.   Sure.  Graduate of SUNY Maritime College in the Bronx, New

11   York.  Sailed with various tug companies in New York Harbor, Vane

12   Brothers, Buchanan Marine, transitioned to a shoreside role with

13   Centerline Logistics and now working with Carver Marine Towing as

14   of January of 2024.

15   Q.   All right, thank you, sir.  About how many years of sea time

16   do you have as an operator?

17   A.   Seven years roughly.

18   Q.   And are you, do you hold a Merchant Mariner credential?

19   A.   I do, yes.

20   Q.   What are they endorsements on that?

21   A.   1600 Ton Mate, Near Coastal, Radar, ECDIS, STCW, Advanced

22   Firefighting, Basic, you know, the usual stuff.

23   Q.   Okay.  And how long have you held the 1600 Ton portion?

24   A.   Since 2013, I believe.  I graduated -- yeah, 2013.

25   Q.   So, you graduated with that endorsement?

7

1   A.   Correct, yes.  I received it through maritime college.

2   Q.   All right.  You said you were employed with Carver, I'm

3   sorry, was that January of this year?

4   A.   Correct, yes.

5   Q.   Was holding a credential a condition of the employment for

6   the port captain position?

7   A.   I believe so, yes.

8   Q.   Have you ever operated under the credential for Carver?

9   A.   No.

10  Q.   Okay. What does your role as port captain involve for Carver

11  Marine Towing?

12  A.   Overseeing day-to-day operations of the tug fleet, crewing,

13  crew changes, hiring of employees, supply-chain logistics.  What

14  else.  Any inspections that are due internal and external, I

15  usually try to be involved in that stuff.  I think that's about it

16  for the day-to-day, big-picture stuff.

17  Q.   Thank you, Mr. Baldassare.

18       ██████████    I'm going to go around for any other questions

19  on background and employment history.  Over to the NTSB.

20       BY MR. WISNIEWSKI:

21  Q.   Good morning, Luke with NTSB.  Just wanted to follow with a

22  couple of those.

23       So, you've been with Carver Marine Towing since 2024 and you

24  said January timeframe?

25  A.   Correct.

8

1   Q.   Do you, have you sailed on any of the vessels, any of the

2   tugs, tows?

3   A.   No.

4   Q.   And then just with the, you said as port captain, so your

5   involved with inspections.  How about as far as maintenance, do

6   you get involved with items that come up for that, you know,

7   reoccurring issues or maintenance that would be booked in?

8   A.   If the engineering team needs any assistance with anything,

9   I'll help them.  But I'm not an engineer so I don't get involved

10  with any maintenance.

11       MR. WISNIEWSKI:  That's all I have.  Thank you.

12       ███████████  All right, over to Carver.

13       MR. RODGERS:  I have no questions so far.

14       ███████████  Any additional --

15       MR. RODGERS:  Sorry, I had my mic off.  No questions at this

16  time.

17       ███████████  Okay, thank you.  Belt Line then.

18       BY MR. CHAPMAN:

19  Q.   Good morning, Mr. Baldassare.  My enquiry's really around

20  what role you have in any sort of on-water incident management or

21  incident reporting as far as your responsibility as the port

22  captain.

23  A.   In what regard as far as am I the one making the reporting?

24  Q.   Yes.  You were asked about what your job responsibilities

25  entailed, and I'm trying to understand if they include any

9

1    involvement in incident management, incident reporting.

2    A.    It would depend on the extent of the incident.

3    Q.    Can you give us a for instance or example?

4    A.    I'm not sure at this moment.

5    Q.    Do the, did the towing captains, the tug captains or the

6    leadership on the tug have direct access to you?

7    A.    Yes.

8    Q.    So, they've got your cell phone, or they can reach you any

9    time of day or night?

10   A.    Correct.

11   Q.    Is that something that is part of your job responsibility?

12   A.    Yes.

13   Q.    Just so I'm clear then, does that include the reporting of

14   on-water incidents or incident management?

15   A.    Yes.

16        MR. CHAPMAN:   Thank you.   I don't have any other questions

17   right now.

18        ███████    All right.   Over to Mr. Gonzalez?

19        BY MR. GONZALEZ:

20   Q.    Good morning, Mr. Baldassare.

21   A.    Good morning.

22   Q.    Who is your supervisor at Carver?

23   A.    Brian Moore.

24   Q.    Do you supervisor anybody directly at Carver?

25   A.    The crews report to me, the crews on all the vessels.

10

1  Q.    The vessels, the vessel crews?

2  A.    Correct, yeah.

3  Q.    You were asked a minute ago regarding incident reporting.

4  When you started work at Carver, were you, did you go through any

5  training regarding your job?

6  A.    Like, for my job personally?

7  Q.    Yes.

8  A.    Yes.  I worked with Brian for a few weeks.  When I first

9  started, we kind of, he introduced me to everyone, we went through

10  all the systems and things of that nature, yes.

11  Q.    Did that include written policies and procedures for the

12  company?

13  A.    Yes.

14  Q.    You have access to all those written policies and procedures?

15  A.    I do, yes.

16  Q.    Thank you.

17  A.    No problem.

18         MR. GONZALEZ:  No questions at this time, thank you.

19         BY █  ████████

20  Q.    Mr. Baldassare, how many vessels do you oversee with Carver?

21  A.    I believe it's eight total vessels we have.

22  Q.    Okay.  Is that all the vessels for the fleet?

23  A.    Yes.

24  Q.    Are you the only port captain?

25  A.    Yes.

11

1  Q.   All right, thank you, sir.   To the best of your recollection,

2  totally understanding that we are almost through three weeks out

3  from it, but can you just go through your remembering of the

4  actions on June 15th and notifications from the *Mackenzie Rose*?

5  A.   Sure.   I was, I received a phone call from the Tug *Mackenzie*

6  *Rose* Saturday afternoon, I believe around 16:30, if I remember

7  correctly.

8       They told me that they were coming through the bridge and

9  that they needed to land on the fendering, they had gotten out of

10  shape.   They informed me that there was no damage to the bridge,

11  to the barge or to the boat, but that they just wanted to let me

12  know that they had landed on the fendering going through the

13  bridge.

14  Q.   Okay.   Did you ask any follow-up questions of the crew?

15  A.   Yeah.   I asked them if there was any damage.   I said, you

16  know, do you have any photos, anything like that.   They told, they

17  sent me some photos.   They informed me that there was no damage,

18  nothing visible at least from their end.

19       At that moment, I had no reason to question their integrity

20  of the situation, and no reason to think that they were lying to

21  me.

22  Q.   Did they say why they laid up on the fendering system?

23  A.   Yeah.   I believe from the conversation I had, if I remember

24  correctly, they were switching over to the hand steering.   And for

25  some reason, they didn't properly follow the procedure to put it

12

1   into hand steering.

2   Q.   Was this a report you'd received from the *Mackenzie Rose* or

3   other vessels previously that that hand steering had been an

4   issue?

5   A.   No.

6   Q.   You mentioned photos.  Were those sent to your personal cell

7   phone or a work cell phone?

8   A.   No, I believe they were sent to my work cell phone, yeah.

9   Q.   What's the number for that work cell phone?

10  A.   Hang on a second.  ████████████.

11  Q.   I'm sorry, could you say that one more time?

12  A.   ████████████.

13  Q.   Okay. Thank you, sir.  So, you talked to the vessel at this

14  point, would you continue the day's events after you've had that,

15  it sounds like, initial conversation with them?

16  A.   I'm sorry, can you repeat that.

17  Q.   Would you continue with the further interactions you had with

18  the vessel after these initials reports and photos sent back and

19  forth?

20  A.   Oh.  Sure.  We discussed the, like I said the, I guess the

21  situation of them laying up on the fendering, that there was no

22  damage, they sent me the photos and then we proceeded on with our

23  voyage.

24  Q.   Did you tell them that they were good to go at that point

25  after the report?

13

1  A.    Yeah, to my understanding, like I said, there was no damage,

2  there was no reason in that moment for me to think that it was a

3  reportable event.  Going through bridge and touching the fendering

4  to maneuver through safely is not an uncommon practice in our

5  industry.

6  Q.    And how many photos did the vessel send you?

7  A.    I believe it was two; one of the fender and one of the barge.

8  Q.    Did you notice any damage in those photos?

9  A.    I did not.  They only thing that I saw on the barge was your

10  standard, up on the bow where the tow bridle is, just some paint

11  scrapes which is, like I said, it's a pretty common thing to have

12  some paint scrapes.  It's not anything major.

13  Q.    What's Carver's internal policy for reporting marine

14  casualties?

15  A.    I'd have to go into our SMS and look.  I don't have it off

16  the top of my head.

17  Q.    Have you had other vessels report marine casualties to you?

18  A.    In this, at Carver?

19  Q.    Yes, at Carver.

20  A.    Knock on wood, no.  I have not.

21  Q.    Are you aware of the marine casualty reporting requirements?

22  A.    Yes.

23  Q.    So, it sounds like this was an unintentional allision with

24  the bridge.  Are you aware that that's one of the reporting

25  requirements to the Coast Guard?

14

1  A.    I am not.

2  Q.    Did the, did you discuss with the crew about reporting it to

3  the Coast Guard or to the railroad bridge itself that the allision

4  had happened?

5  A.    No. Because, like I said, to our knowledge, there was no

6  damage to be reported.  It was just a touch up on the fendering

7  going through the bridge.

8  Q.    And what did you tell, do you remember almost exactly what

9  you said to the crew when you told them to continue on?

10 A.    That we were going to discuss it internally and make a

11 decision on who and how it was going to be handled and reported.

12 Q.    Did you have any follow-up conversations with the vessel

13 later that day?

14 A.    I don't believe so. I don't remember off the top of my head.

15 Q.    Did you discuss any drug or alcohol testing with the master?

16 A.    I did not because, like I said, I didn't think it was a

17 situation where any drug or alcohol testing needed to be

18 conducted.

19        ███ ███████  Any questions?

20        BY ██ █████

21 Q.    Yes.  Mr. Baldassare, thanks for taking the time.  ███ ████

22 ████ here.

23        How much time elapsed from when they allided with the bridge

24 and when they contacted you, and then how much time between when

25 they contacted you and when they elected to continue the voyage?

15

1  A.   I do not know the first part of that question.  I'm not sure

2  the exact timeline of when the contact with the bridge happened

3  and then they made the phone call to me.

4       I believe, for the second part of that question, I would say

5  roughly 45 minutes to an hour from, if I'm remember correctly.

6  Q.   Okay, thanks.  And then what was the original plan of voyage

7  for the vessel and the barge?

8  A.   They were sailing up to New York Harbor.

9  Q.   And where was the barge bound for, do you know?

10 A.   I believe it was going to one of our moorings in New York

11 Harbor to stand by.  I think it was supposed to be offloaded with

12 some bridge components or some sort of components that were on the

13 barge were to be offloaded sometime later in the week.

14 Q.   Okay.  Was, I understand that the barge traded the cargo

15 with, to another, I'm sorry, the tug traded the cargo to another

16 tug when they got closer to New York?

17 A.   Uh-huh.

18 Q.   Was that the original plan?

19 A.   Yes.

20       ▮  ▮▮▮▮  That's all I got.  Any questions from Mr. ▮▮▮▮

21       BY ▮ ▮▮▮▮

22 Q.   Yes, this is ▮ ▮▮▮▮  I just got one more follow-up question

23 with you.

24       You said that during the switching to hand control and they

25 drifted off course, they intended or was it an unintentional

16

```
 1  allision with that bridge?  Can you just clarify that?  Yeah, they
 2  went --
 3  A.    I'm not sure.
 4  Q.    Okay. Did they intend to, I guess, touch the bridge and then
 5  reposition, or was that communicated with you?
 6  A.    In that situation from the way that it was described to me,
 7  from what I was told by them, it was their intention to reach it,
 8  to land on the bridge, to regain the proper angle or however you
 9  want to look at it to continue through the bridge, yes.
10      Which goes back to why there was no damage or anything while
11  we, it wasn't, why we didn't see that in the moment as something
12  that should have been reported.
13      ████   ███   No further questions on that.
14      ████ ████████   All right.  Over to the NTSB.
15      BY MR. WISNIEWSKI:
16  Q.    Yes, Luke NTSB.  I just wanted to go through, you indicated
17  there was a we discussion.  Who were you talking to on board the
18  vessel?
19  A.    The captain.
20  Q.    The captain?
21  A.    Yeah.
22  Q.    Was that Mr., can you say his last name for us?  Who was
23  that?
24  A.    That was Captain Chris Miller.
25  Q.    Chris Miller, okay.  And then, so you guys discussed, I've
```

17

1  heard now a couple of times, touch the bridge, touch the

2  fendering, can you describe --

3  A.    I didn't say touch the bridge, I said touch the fendering.

4  Q.    Yeah, okay.

5  A.    That was what was relayed to me.

6  Q.    All right.  Where at in the fendering do you recall they told

7  you they touched?

8  A.    They sent me a photo of some wooden fendering on the bridge

9  which is what they indicated they landed on.

10  Q.    Let's see if I can share, if you can see the picture.  I

11  think we received one picture, it's Bridge Photo Number 1.  Let me

12  know when you see it.

13  A.    I can't see anything.  Yeah, now I could see it.  Yeah,

14  that's the photo they sent to me and the wood pile, or the wood

15  pier, fendering there, however you want to call it, is what they

16  told me they landed on.

17  Q.    So you're saying this fendering system here, they landed

18  somewhere on here?

19  A.    Correct.  Yes, that's what was indicated to me.

20  Q.    The lower portion of the fendering that's kind of arched --

21  A.    Correct.

22  Q.    -- protecting the -- okay.  Did they, they didn't indicate at

23  all that they, anywhere within here?

24  A.    No.

25  Q.    No?  Okay.

18

1  A.    No.

2  Q.    And when you saw this picture, did anything look off to you,

3  or how long, you know, did you have a discussion with the captain

4  when you saw this picture?

5  A.    Yeah, I asked him, you know, where did you guys touch up.

6  They told me that they landed on the fendering of the bridge and

7  slid through the bridge.  Like I said, I asked them if there was

8  any damage to that fendering or the barge or the tug, and they

9  told me no.

10 Q.    And you said they again so I just want to try to be specific.

11 Who were you talking to?

12 A.    The crew, the captain on the boat, on the vessel.

13 Q.    Okay. The captain was relaying the information from the mate,

14 or just he was --

15 A.    I'm not sure.  I don't, I'm not sure who he was relaying it

16 from.  I was just going off of what he was telling me.

17 Q.    'Cause, yeah, I'm looking at this picture, and I see a fairly

18 good-sized indentation here, damage to the lower portion right in

19 this area where you can see --

20 A.    I'm not familiar with what the bridge looked like so I don't

21 know.

22 Q.    Fair enough.  And as far as did you inform anyone -- I'll

23 stop sharing that photo, that was Bridge Photo 1.  Did you inform

24 your supervisor, Mr. Brian Moore, of any discussion that you had

25 with the crew and the vessel?

19

1    A.    Yes.

2    Q.    What'd you relay up to him?

3    A.    Exactly what the crew told me, that they had landed on the

4    fendering, there was no damage to the fendering, to the barge or

5    to the boat.

6    Q.    During that discussion, was there any discussion of reaching

7    out to that bridge to let them know that you, that the vessel made

8    contact, to alert the --

9    A.    There was not, no.

10   Q.    Did you know at the time what bridge was in contact, what

11   railroad bridge that was?

12   A.    Yes, the vessel informed me when they called me for the

13   initial call.

14   Q.    And can you, did you remember what it was, or did --

15   A.    No, it was three weeks ago.  I'm not sure.

16   Q.    All right.  What I'm just curious is, if they did make

17   contact, I'm just curious if anyone in your discussions, either

18   with Mr. Moore or your yourself say, hey, should we reach out to

19   the Belt Line Bridge, their contact number, let them know we did

20   make contact?

21   A.    Like I said, we assumed that going, slide through the

22   fendering and no damage.  We didn't really see a reason at the

23   time to make any initial phone calls, at that time, just from what

24   we were being told.

25   Q.    There was no call made to the local Coast Guard, captain of

20

1  the port?

2  A.    No.

3  Q.    And then you said there was, so you had the bridge photo,

4  what other photos were taken that you reviewed.  You said that --

5  A.    Just one photo of the bow of the barge where the towing

6  bridle was.

7  Q.    Where the towing bridle was, okay.

8  A.    Yeah.

9  Q.    Then just, who sent you those photos?  I think you indicated

10  who.

11  A.    I think the boat sent them to me, they sent them from the

12  boat phone --

13  Q.    To the boat phone?

14  A.    -- to my work phone?

15  Q.    Okay.

16  A.    Yes.

17  Q.    And can you recall how many there were, how many photos?

18  A.    Two.  I believe two, two or three.

19  Q.    Two or three, okay.  Can you just elaborate a little bit on

20  the discussion you had with your supervisor, Brian Moore, about

21  the incident?

22  A.    Like I said to you a couple of minutes ago, just what the

23  crew had told me, that they had made contact with the fendering

24  coming through the bridge, no damage to the barge, boat or bridge.

25  Q.    All right.  And so it stopped there, that was it, informed

21

1   and nothing else was said or done, correct?

2   A.   Correct.

3        MR. WISNIEWSKI:  That's all I have at this time, thank you.

4        ████████  ████████    Okay.  Over to Carver.

5        BY MR. RODGERS:

6   Q.   Yeah, hi.  Can you hear me?

7   A.   Yes.

8   Q.   Hi, Mr. Baldassare.  I just have a couple follow-up

9   questions.

10       At the time that the captain called you initially, from the

11  time he called you to the time you got off the phone, is it fair

12  to say that you understood that the tug and barge had not directly

13  hit the bridge?

14  A.   Yes.

15  Q.   Okay.  Was it your understanding that it, that the tug and

16  barge, or the barge directly, that the fleet, the unit, had hit or

17  struck the fender?

18  A.   Yes.

19  Q.   Then went through under the bridge and got through safely?

20  A.   Yes.

21  Q.   The photo that was just shown to you by the gentleman from

22  the NTSB, that shows a fender, right?

23  A.   Correct.

24  Q.   Was that, did you see that at the time you were talking to

25  the captain?

22

1  A.   Did I see the fender?

2  Q.   Yes, the picture.

3  A.   Yes, that was the picture they sent me, yes.

4  Q.   Okay.  And is it fair to say in that photo, it doesn't appear

5  to be any damage to the fender?

6  A.   Correct.

7  Q.   To your knowledge, at that time, the tug and barge had not

8  hit the bridge, it had touched the fender, no damage to the

9  fender, and then the tug and barge went through under the bridge,

10  correct?

11  A.   Yes, sir, that's correct, yes.

12      MR. RODGERS:  Okay.  That's all I have for now, thank you.

13      ███████  Over to the Belt Line.

14      BY MR. CHAPMAN:

15  Q.   Hi, again.  You think there were two or three photos that

16  Captain Miller sent you?

17  A.   Yes.

18  Q.   Did you receive photos from anybody besides Captain Miller?

19  A.   No.

20  Q.   And they all came to your cell phone?

21  A.   My work cell phone, yes.

22  Q.   He called you initially on your work cell phone?

23  A.   I believe -- yes, he did.

24  Q.   And did you answer, or did he leave a voicemail?

25  A.   No, I answered.

23

1  Q.   And how soon after you initially talked to him did he send

2  you that picture that we just saw, that the NTSB Investigator

3  showed us?

4  A.   I don't know.  I'd have to go back through my messages and

5  look and line up the times.  I don't want to speak out of term.

6  Q.   You still have all that information on your work cell phone?

7  A.   Yes.

8  Q.   And at least the record of when the call, initial call came

9  in?

10 A.   Everything's still there.

11 Q.   Do you know if he called you from a work cell phone that was

12 assigned to him by Carver?

13 A.   I believe he called me from his personal cell phone, if I

14 remember correctly.  But then I think the photos were sent from

15 the tug's, the boat phone.

16 Q.   So there's a work cell phone or a boat cell phone, as you

17 call it, assigned to the tug?

18 A.   Yes.

19 Q.   Does it stay in the wheelhouse?

20 A.   Yes.

21 Q.   And are those photos still on your work cell phone?

22 A.   I believe so, yes.  I haven't deleted them.

23 Q.   Has anybody asked you to provide them to anyone else?

24 A.   From who?  I know --

25 Q.   The photos that you have on your cell phone, have you

24

1  forwarded them or sent them to anybody else?

2  A.    Yes.  We've sent them internally just, obviously, as this

3  whole thing is going on, to assess the situation.

4  Q.    Did you send them to Mr. Moore?

5  A.    Can I, or did I?

6  Q.    Did you?

7  A.    Yes.

8  Q.    And did you send them during the sort of exchange of

9  information that you were having with him in the immediate

10  aftermath of the report?

11  A.    I believe so, yes.

12  Q.    Did you send him all of the photos that you received from the

13  tug?

14  A.    Yes.

15  Q.    Did you have any conversation about the photos with Mr. Moore

16  as the two of you were either looking at them or having

17  conversation about this incident?

18  A.    Yes.

19  Q.    Was it ever discussed that the bridge looked like it was not

20  in straight alignment?

21  A.    No, 'cause as I said earlier, we were told that the vessel or

22  the barge landed on the wooden fendering not anywhere, not made

23  contact with the bridge or anything like that.

24  Q.    So you were only looking at the wooden fendering portion of

25  that photo?  Is that what you're saying?

25

1  A.  Correct, yes.

2  Q.  And you didn't look at any other part of the bridge --

3  A.  I had no reason to.

4  Q.  I think you said there was a photo of the barge?

5  A.  Yes.

6  Q.  Where was that taken from?  What was the angle or perspective

7  from which it was taken?

8  A.  I believe the tug took it, once they were putting the barge

9  on the tow wire, they kind of got like a side angle of the barge.

10  Q.  If you remember, how long after the initial photograph was

11  received did you receive this photo of the barge?

12  A.  A couple of minutes maybe.  It wasn't long after.

13  Q.  Was it sent as a separate text message to your work phone, or

14  did you --

15  A.  No, I think both photos were sent at the same time.  I'd have

16  to go back and look, but I believe both were sent, either at the

17  same time or within a few minutes of each other.

18  Q.  So, the photo of the barge, was it taken from the perspective

19  of the, taken from the wheelhouse of the tug, like that photo of

20  the fender?

21  A.  I don't know exactly where it was.  I'm not sure where they

22  took it from.

23  Q.  And when you say it depicted the towing bridle, I take that

24  to be set up on the bow of the barge, is that correct?

25  A.  Yes, the towing bridles on the bow of the barge, yeah.

26

1   Q.    The photos of the entire bow of the barge?

2   A.    No, it was from the, I guess it would be the port corner

3   around to like the side of the barge.

4   Q.    And I apologize for asking all these questions, but I haven't

5   seen a single one of these photos.  That photo that the NTSB

6   Investigator put up just a few minutes ago is the first photo I've

7   ever seen that was sent.  I'm sorry if it seems like I'm asking a

8   bunch of dumb questions.  I'm just trying to understand what you

9   were seeing and how that might have influenced your decision

10  directly, that's all.

11  A.    Sure.

12  Q.    So, the photo was essentially of the bow of the barge.  Does

13  that barge have a rake?

14  A.    It does, yes.

15  Q.    Okay. Could you see any part of the rake, or you were only

16  sort of looking at the bow, at the head log area?

17  A.    I was looking kind of that, like half of the bow down the

18  side of the barge.  And I guess the angle of it was from, they

19  were taking it, obviously, from the tug so the boat is a little

20  bit higher.  So it was kind of like looking down the barge.

21  Q.    And I apologize, I think you said that it was along the

22  portside of the barge?

23  A.    I believe so, yeah.

24  Q.    Okay. From the angle from which it was taken, did it appear

25  that the tug then was positioned somewhere along the portside or

27

1  at least in a position to have a clear view of the portside of the

2  barge?

3  A.    When they took the photo?

4  Q.    Yes.

5  A.    I don't believe so, no, 'cause like I said, I think it was

6  when they were putting the barge on the wire to continue towing it

7  so it wasn't the greatest angle.

8  Q.    The photo that we saw of the bridge fendering, the bridge,

9  just a few minutes ago, obviously, daytime, daylight, it might

10 even have some kind of time stamp data in it, do you know when the

11 photo of the barge that was sent to you, just visually, is it

12 still broad daylight?

13 A.    Yes.

14 Q.    Is it later in the day?

15 A.    No, it's day, to my knowledge, you know, I'm not a

16 photographer, it was daytime.

17 Q.    You thought there, I don't want to put words in your mouth,

18 but you said there two or three photos.  I'm just trying to

19 understand.  If there was a third photo, what did it depict?

20 A.    I don't know.  I don't think there was, there might have not

21 been a third.  It was three weeks ago.  I have a five-day-old baby

22 at home so I'm not really running on a lot of sleep right now.

23 Q.    Gotcha.

24 A.    But, yeah, I'm thinking that I'm probably, yeah, it was

25 probably just the two photos.  I'd have to go back into my

28

1    conversation with them and look.  But I think it was just the

2    fender and then the bow, or, you know, the barge one.

3    Q.    You said that there was some paint scrapes in the barge

4    photo?

5    A.    Yes.

6    Q.    Where do you recall the paint scrapes appearing?

7    A.    Just your standard, like along the side and top of the barge

8    where the tow bridle would slide when they're making up on the

9    wire.

10   Q.    Were they deep gouges of paint being scrapped?

11   A.    No, absolutely not, no.

12   Q.    Generally, what condition of the barge, I mean, had it

13   recently painted, did it have a lot of rust on it?  Can you give

14   us some indication of what kind of condition overall the barge was

15   in?

16   A.    The barge was in decent condition.  It had, like I said, your

17   standard scrapes of paint and stuff like that just from the nature

18   of this work and, you know, the tow bridle and stuff like that.

19   Q.    And was the photo sent to you with any sort of messaging or

20   conversation that this, these scrapes that were shown or that

21   appeared in that photo, were somehow caused as a result of laying

22   up against the fendering system?

23   A.    No, it was not indicated to me, no.

24   Q.    Did you ask any questions about where did the paint scrapes

25   come from?

29

1  A.   No.  I just knew that, or I just figured that it was from the

2  towing bridle, just the way that everything lined up in the photo.

3  Q.   You assumed that the paint scrapping had been caused by the

4  handling of the bridle or positioning of the bridle, is that

5  right?

6  A.   Yeah, or just your standard wear and tear.

7       MR. RODGERS:  ███  ███████

8       ███  ███████       Yes, is that Mr. Rodgers?

9       MR. RODGERS:  Yeah.  I just feel that Mr. Chapman's getting

10 into speculation and also things that the witness doesn't have any

11 personal knowledge.  And it's not a deposition, and his client has

12 sued Carver already.  I understand he's entitled to be here, but

13 from my observation, I think he's going beyond the scope of this

14 particular interview.

15      ███  ███████       I do think we've asked a good amount of

16 questions on the photos.  I will say, Mr. Chapman, do you have one

17 or two more questions that you could ask about this and then we

18 move on to another topic?

19      MR. CHAPMAN:  Yeah, actually, I have -- I think I've

20 exhausted the questioning around the photo, and the photo

21 obviously will speak for itself once we have an opportunity to

22 take a look at it.

23      BY MR. CHAPMAN:

24 Q.   I'm going to thank you for trying to explain that,

25 Mr. Baldassare.

30

1      Were all of your conversations with the tug with

2  Captain Miller?

3  A.   Yes, I believe so.  To my knowledge, yes.  Like I said, it

4  was a couple of weeks ago now.

5  Q.   Do you know who was at the helm when they reported having

6  laid up against the fendering system?

7  A.   I do, yes.

8  Q.   Who?

9  A.   Am I allowed to discuss that, or is that a separate topic

10 here?

11 Q.   I guess the question is really, did Captain Miller tell you

12 who was at the helm when they laid up against the fendering?

13 A.   Yes.

14 Q.   And who did he tell you?

15 A.   James Morrissey.

16 Q.   And did he tell you that he had taken over the control of the

17 tug from Captain Morrissey?

18 A.   He did indicate that he had relieved him after they had gone

19 through the bridge, yes.

20 Q.   When you, as I understand it, after that initial call with

21 Captain Miller, you called Brian Moore?

22 A.   Yes.

23 Q.   Immediately?

24 A.   Within a few minutes, yes.

25 Q.   Did he pick up, or did you have to leave a voicemail?

31

1  A.    No, he picked up the phone.

2  Q.    I know you've told us that you basically reported to him

3  exactly what the vessel had told you.  Was there any discussion at

4  that point with Mr. Moore about contacting the Coast Guard?

5  A.    I don't remember.

6  Q.    So there might have been?

7  A.    I don't remember.

8  Q.    How many phone calls did you have with Captain Miller before

9  they were given, I'll say, instructions or directions that they

10 could continue with the voyage?

11 A.    I'd have to go back into my call log and look.  I don't have

12 an actual number.

13 Q.    Did you deal with any other of the towing vessels or the

14 vessels over which you have sort of port captain responsibility at

15 any time from Captain Miller's initial call to you on June 15th

16 about laying up against the fendering, and what you take to be

17 his, the last call you had with him which was to allow them to

18 proceed or instruct them to proceed with their, continue with the

19 voyage?

20 A.    Did I have any other conversations with any of our other

21 vessels, you're asking me?

22 Q.    Yeah.

23 A.    In that --

24 Q.    I'm just trying to figure out if was there anything else --

25 A.    That day?

32

1  Q.   I'm trying to figure out whether there was anything else that

2  you were dealing with or going, might have been going on in

3  connection with some other vessel that you have responsibility for

4  besides this incident with the *Mackenzie Rose* on the afternoon of

5  June 15th?

6  A.   I don't believe so.  I'd have to go back and look, but I

7  don't think there was anything else going on that day, no.  It was

8  a Saturday.

9  Q.   You mentioned earlier that it's not an uncommon practice to

10 lay up against a fendering system when going through the draw of a

11 bridge.  Can you explain that a little bit, what you meant by not

12 an uncommon practice?

13 A.   I don't really know how you want me to explain it.

14 Q.   Well, why do you think it's not an uncommon practice?

15     MR. RODGERS:  Again, Lieutenant, he's not here as an expert

16 witness or even a corporate witness.  He's here as a factual

17 witness.  I think it's, I think Mr. Chapman is going beyond the

18 scope.

19     ████ ████████  Mr. Baldassare's answered that portion so I'm

20 going to ask that we keep the questions directly to the incident

21 we're talking about.  Moving forward, if you still have questions,

22 Mr. Chapman.

23     MR. CHAPMAN:  Let me just respond to that.  We're trying to

24 understand around this incident, management and the fact that my

25 client was not contacted in any way about what happened.  And he

33

1   has offered --

2   ▇▇▇▇▇▇  So, Mr. Chapman, while that is, I'll say, even

3   like a tertiary portion of this but right now, we are trying to

4   figure out exactly what happened as far as the allision with the

5   bridge.

6       Anything beyond that, that's not the focus of this interview

7   right now.  We're here in the name of marine safety, figure out

8   what happened and why.

9       BY MR. CHAPMAN:

10  Q.  Did you relay to Mr. Moore the identity of the bridge that

11  had been reported?

12  A.  Did I let him know which bridge?

13  Q.  Yes.

14  A.  Yes.

15      MR. CHAPMAN:  I don't have any further questions then at this

16  time.

17      ▇▇▇▇▇▇  All right.  Mr. Gonzalez, do you have anything?

18      MR. GONZALEZ:  Yes.

19      BY MR. GONZALEZ:

20  Q.  Mr. Baldassare, who assigns the captains on the tugs?  Is

21  that your responsibility?

22  A.  Yeah, I mean, since January but a lot of them had been

23  assigned prior to me being here.

24  Q.  On this particular voyage, were Captain Miller and the

25  Mate Morrissey assigned by you or they were already assigned?

34

1  A.   No, they were already assigned to that vessel before I

2  started.

3  Q.   Okay. You discussed, you mentioned that after Captain Miller

4  had reported the incident to you of it, you said, we were going to

5  discuss it internally regarding further reporting.  Is that

6  discussing you and Mr. Moore?

7  A.   Yes.

8  Q.   That was a conversation that Captain Miller had nothing to

9  do, correct?

10  A.   Correct.

11  Q.   To your knowledge, the vessel has an AIS?

12  A.   Yes.

13  Q.   And it has GPS as well?

14  A.   Yes.

15  Q.   At your office, is that known?  Can you guys access that

16  information live?

17  A.   No.  I can't, no.

18  Q.   Who can?

19  A.   If anybody has Rose Point, they can access that, I believe.

20  Q.   I got a couple of questions regarding the reporting

21  requirements of it.

22      It's being, you said that you're familiar with the company

23  policy regarding reporting marine causalities.  Is it the

24  company's policy for a casualty of the vessel that occurs, even

25  it's a touching of the fendering, to be reported to the company or

35

1  to be reported directly to the Coast Guard?

2  A.    To be reported to the company.

3  Q.    The company policy is for them afterwards, the company

4  reports it to the Coast Guard, or does the company tell the

5  captain to report it to the Coast Guard?

6  A.    I would have to go and look.  I don't have the policy

7  verbatim in front of me.

8  Q.    Is it company's policy for the vessel to provide the 2692, or

9  is it the company to complete it and send it to the Coast Guard?

10  A.    I would have to look at the exact verbiage of the policy.

11  Q.    How accessible is this policy when you're working?

12  A.    For me personally?

13  Q.    Yes.

14  A.    I just have to go into my Helm system and pull up the policy.

15  Q.    Assuming that when Captain Miller called and reported the

16  casualty, you would be able to immediately access the company

17  policy regarding reporting procedures, correct?

18  A.    Yes.

19  Q.    Okay. Since you've been there since January 'til now, how

20  many times have vessels reported that they have laid upon

21  fendering on bridges?

22  A.    This was the first one.

23  Q.    This was the first time, okay.

24      MR. GONZALEZ:  Okay, I have no further questions at this

25  time, thank you.

36

1           ████████████    All right, thank you, Mr. Gonzalez.  Okay.

2  Nothing, no other questions from the Coast Guard here.  I'm going

3  to go back over to the NTSB for any follow-up questions.

4           MR. WISNIEWSKI:  Great, thank you.  This is Luke, NTSB.  To

5  give more reference to that photo, it's a bridge photo, it was

6  Number 1, JPG.  I can give you the time stamp as well.  It was

7  taken on June 15th, 2024 at 4:31 p.m.  The program name was 175.1,

8  and it was taken from an iPhone SE, (3rd generation) phone.

9           BY MR. WISNIEWSKI:

10  Q.   I'd like to go through and just follow up, you indicated

11  that, yeah, if you have Rose Point, you can review it, did you or

12  anyone review that track line of the, traveling north on June 15th

13  around --

14  A.   I personally did not.  I don't know if anybody else did.

15  Q.   But that wasn't brought up, right?  You said that's not

16  available to you right away, that's only available from the track

17  line from the boat.  It's not automatically sent ashore?

18  A.   It's not automatically sent ashore, correct.

19  Q.   All right.  And then you indicated that your incident

20  reporting procedures are on Helm CONNECT so do you have a stand-

21  alone laptop?  How do you access it, Helm CONNECT?

22  A.   I have the company-issued laptop that I can access.

23  Q.   And during your discussion with Mr. Moore, did you access

24  that Helm CONNECT at all?

25  A.   I did not, it was a Saturday.  I did not have my laptop next

37

1   to me.

2   Q.   Okay, thank you.  We also, you know, we talked with

3   Captain Miller and talked about your conversations back and forth

4   with them.  Can you recall if Captain Miller told you how that

5   they were a slow bell, awaiting your decision, awaiting your

6   discussion with management on how to proceed?  Can you go through

7   that?

8   A.   Yes, he did tell me that.

9   Q.   He did?

10  A.   Yeah.

11  Q.   Can you go through that with us, all of it?  And I guess the

12  question I'm looking for, the discussion, was there any discussion

13  about drug testing at that time?

14  A.   No, there was not.

15  Q.   Even from the captain?

16  A.   Even from the captain, there was not, no.

17  Q.   So even from the captain's eyes, he didn't bring it up to

18  you, elevate it to you like, hey, we should pull over?

19  A.   No.

20  Q.   Do you recall him --

21  A.   No, he just --

22  Q.   Go ahead.

23  A.   He just went on a, they just sent on a slow bell to, you

24  know, until we assessed the situation.  But he did not bring up to

25  me anything in regards to drug testing or anything like that.

38

1  Q.   So in your mind the level of severity wasn't there, you felt

2  it was just the fendering?

3  A.   Correct, yes.

4       MR. WISNIEWSKI:  I think that's all I have right now, thank

5  you.

6       ████████    All right, thanks, Mr. Wisniewski.  Anything

7  additional from Carver?

8       MR. RODGERS:  Nothing additional.

9       ████████    Anything from the Belt Line?

10      MR. CHAPMAN:  Yes.  Thank you, ██  ████████

11      BY MR. CHAPMAN:

12 Q.   You mentioned that it was a Saturday and you didn't have

13 access to your laptop.  Where were you when the call from

14 Captain Miller came about --

15 A.   I don't see why that's relevant to this situation.  I had my

16 work phone, I was able to answer it.

17      ████████     Mr. Baldassare, you don't have to answer any

18 questions you don't want to.  I just should have said that from

19 the beginning.

20      BY MR. CHAPMAN:

21 Q.   Well, I'm interested, Mr. Baldassare, whether maybe you were

22 at some place that might have been not conducive to dealing

23 directly with this such as attending a ballgame or out partying

24 with friends.  That's all I'm trying to find out is what you were

25 doing or where you were.

39

1          ████████        Mr. Chapman, we're not here to talk about his

2    personal activities on that Saturday.

3          ████████        I think Mr. Baldassare answered --

4          MR. CHAPMAN:   ████████     it could make a difference in terms

5    of why this incident wasn't reported to the Coast Guard and could

6    bear on the overall safety of towing operations.  So, it does bear

7    on your investigation, ma'am.

8          MR. RODGERS:  Mr. Chapman, he has extensively answered that

9    question on what he was doing.  He answered his phone on the first

10   call.  I think we've established that he was attending to his

11   duties as required.

12         BY MR. CHAPMAN:

13   Q.   Did you ever say in words or substance to Captain Miller that

14   you had contacted the Coast Guard?

15   A.   Did I contact the Coast Guard?

16   Q.   No, did you ever say to Captain Miller in either words or

17   substance that you had contacted the Coast Guard?

18   A.   No, I told Captain Miller that we would discuss if we needed

19   to.

20         MR. CHAPMAN:  I don't have any further questions then.  Thank

21   you, sir.

22         ████████        Thank you, Mr. Chapman.  Anything from

23   Mr. Gonzalez?

24         MR. GONZALEZ:  Yes, just a minute.

25         ████████        And Mr. Baldassare, I think we are ending or

40

1   coming near the end of the interview, but if you do need to take a

2   break or anything, please let me know.

3           MR. BALDASSARE:  No, I'm good.

4           ██  ████████   Okay.  Thank you, sir.

5       BY MR. GONZALEZ:

6   Q.   Mr. Baldassare, just one question in here.  You mentioned

7   that you did not have the laptop with you?

8   A.   Yeah.

9   Q.   Is that, why didn't you have the laptop with you if you were

10  on watch?

11  A.   I wasn't on watch.

12  Q.   You weren't on watch, not on watch?

13  A.   When you're saying on watch, what are you implying here?

14  Q.   Regarding having the responsibly to answer the phone calls

15  when an incident occurs, that could be reportable to the

16  U.S. Coast Guard of it, and to be able to assess the situation on

17  it.  Did you, was that your role on that Saturday?

18  A.   I'm not sure what you're asking me, honestly.

19  Q.   On that Saturday, were you acting as port captain for the

20  company?

21  A.   Yes.

22  Q.   On that Saturday, why did you not have the laptop with you?

23  A.   'Cause I was not home.

24  Q.   You were not home.  The laptop is kept at home?

25          ██  ████████   Mr. Gonzalez, I'm going to --

41

1        MR. BALDASSARE:  This is ridiculous.

2        ███████    Do you have any unrelated questions on that,

3   Mr. Gonzalez?

4        BY MR. GONZALEZ:

5   Q.   How many days had you been working prior to the Saturday of

6   it, work/rest issues?  How many days in a row before that Saturday

7   had you been working?

8        MR. RODGERS:  Lieutenant, I don't think this is within the

9   scope of what's been asked him.

10       MR. GONZALEZ:  Is it within the scope of establishing the

11  work/rest pattern of Mr. Baldassare on this particular day?

12       ███████    Mr. Gonzalez, I'm going to, I'll take over this

13  line of questioning here.

14       BY ███████

15  Q.   Mr. Baldassare, what's your typical expectations as far as

16  being on call and days in the office, that sort of thing?

17  A.   My office days are Monday through Friday, you know, seven, I

18  get in at 07 'til 15:00.

19       And then my phone is always on if there's ever an emergency

20  or anything like that, the guys know that they can call my work

21  cell phone and I'll answer it and if there's anything that they

22  need, I'll be at their disposal.

23       But as far as why I didn't have my laptop with me on a

24  Saturday afternoon, I believe I'm entitled to a personal life.

25  Q.   So you're truly 24/7 cell phone response, is what I'm

42

1  hearing.  Do you ever alternate with another port captain, or are

2  you strictly in charge making calls?

3  A.   Well, I mean, there's multiple personnel, shoreside personnel

4  that the boats can call.  It just depends on who they decide to

5  call.  I can't really dictate if they call me or don't call me for

6  certain situations.  It's kind of just --

7  Q.   Do you know --

8  A.   Go ahead, sorry.

9  Q.   I'm sorry, I did not mean to cut you off, I apologize.

10  A.   Oh, you're okay.  No, I was just going to say --

11  Q.   I was going to --

12  A.   -- that I don't, I can't make a decision for them on who they

13  call for, and what circumstances.

14  Q.   Do you know if there's a company policy on who they should be

15  calling?

16  A.   I'm not sure.  I would have to go in and look.

17  Q.   If they weren't calling you, who else would they be calling

18  at the office?

19  A.   They could call Brian, they could call the port engineer,

20  they could call dispatch, they can call any of the port mechanics

21  or anything like that.

22  Q.   Are there any weekends where you do have your phone off and

23  you're inaccessible?

24  A.   Just right now that I'm on paternity leave.

25         ███  ██████      Thank you, sir.  I will throw it back out to

43

1  anyone else if they have any specific questions for

2  Mr. Baldassare.

3       MR. RODGERS:  Yeah, just a call from Carver.

4       BY MR. RODGERS:

5  Q.   Mr. Baldassare, you called Brian Moore on the day of the

6  incident?

7  A.   Yes.

8  Q.   You discussed the situation with Mr. Moore, right?

9  A.   Yes, sir.

10 Q.   Between the two of you and the information that you had at

11 that time, you and Mr. Moore made a decision on one, whether it

12 needed to be reported and, two, if the tug and barge could

13 continue, correct?

14 A.   Correct, yes, sir.

15 Q.   And that was made in conjunction with Mr. Moore?

16 A.   Correct.

17      MR. RODGERS:  Okay, thank you.  I have no further questions.

18      ███████    Thank you, Mr. Baldassare, for taking the time

19 today and for everyone for joining --

20      MR. GONZALEZ:  Lieutenant?

21      ███████    Yes, sir.

22      MR. GONZALEZ:  I have one follow-up question on it that I

23 don't think I heard them discuss.

24      BY MR. GONZALEZ:

25 Q.   How did you and Brian Moore assess the situation on it?  The

44

1    only, by the report, did they tell you to, and the picture of it,

2    or did you do anything else to assess the situation, there was no

3    damage and that's not reportable to the Coast Guard?

4    A.    I discussed this already multiple times.

5         MR. CHAPMAN:  That's correct, he did, Mr. Gonzalez.

6         MR. GONZALEZ:  Okay, thank you.

7         ███  ████████    We'll make sure the transcript gets passed out

8    to everyone for reviewing those for anything that was missed.

9         Mr. Baldassare, thank you for taking the time this morning,

10   and thank you to everyone on the line for joining us in.  I know

11   we're before the holiday weekend here.

12        We've asked you a lot of questions.  Do you have any

13   additional details that you would like to share, any more info

14   regarding this incident?

15        MR. BALDASSARE:  No, I'm good.  I just hope I was able to

16   give you guys the information you needed.  I tried to answer

17   everything to the best of my knowledge as it was presented to me

18   in the situation.

19        ███  ████████    We appreciate it.  And do you have any follow-up

20   questions for us?

21        MR. BALDASSARE:  No, thank you.

22        ███  ████████    Okay. And if we do have additional questions in

23   the future, is it okay that we reach out to you for any

24   clarification?

25        MR. BALDASSARE:  Sure.

45

1       ███ ███████        All right.  I will now be stopping the
2   recording.   Today is July 3rd, time is 10:38.
3       (Whereupon, at 10:38 a.m., the interview was concluded.)

CERTIFICATE

This is to certify that the attached proceeding before the

NATIONAL TRANSPORTATION SAFETY BOARD

IN THE MATTER OF:        ALLISION OF M/T *MACKENZIE ROSE* WITH
                         THE BELT LINE BRIDGE ON THE
                         ELIZABETH RIVER IN VIRGINIA,
                         ON JUNE 15, 2024
                         Interview of Leonard Baldassare

ACCIDENT NO.:            DCA24FM039

PLACE:                   via videoconference

DATE:                    July 3, 2024

was held according to the record, and that this is the original,

complete, true and accurate transcript which has been transcribed

to the best of my skill and ability.


                              _____
                              Christina H. Neilson
                              Transcriber


FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947