**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/V Mackenzie Rose, (IMO No. 8968765) her cargo, engines, boilers, tackle, equipment, apparel, and appurtenances, etc., *in rem*, ("M/T MACKENZIE ROSE"), petitioning for Exoneration from or Limitation of Liability in allision with Belt Line Main Line Railroad Bridge (the "Bridge") occurring June 15, 2024 in and about the Elizabeth River, Virginia. | Civil Action No: 2:24-cv-00490- |

**CARVER'S MEMORANDUM IN OPPOSITION TO THE
BELT LINE'S SECOND MOTION IN LIMINE**

Petitioner, Coeymans Marine Towing LLC d/b/a Carver Marine Towing ("Carver"), by counsel, for its Memorandum in Opposition to the Belt Line's Second Motion *In Limine* to exclude the credibility opinion testimony of Capt. Sam Stephenson, Carver's Marine expert, "along with any reference by him to a U.S. Coast Guard form or any other Coast Guard investigative process" at trial states as follows:

### I. INTRODUCTION

The Belt Line asks this Court exclude from the forthcoming bench trial the credibility opinion testimony of Capt. Stephenson, "along with any reference by him to a U.S. Coast Guard 2692 form or any other Coast Guard investigative process" from admissibility at trial pursuant to 46 U.S.C. § 6308(a).[1] Belt Line seeks to preclude Capt. Stephenson (1) from testifying as to the

---

[1] As this Court may be aware, on September 26, 2025, the NTSB released the transcript of Capt. James Morrissey's interview conducted June 26, 2024, along with the other crew members and Carver General Manager Brian Moore and Port Captain Leonard Baldassare, all taken shortly after the allision by United State Coast Guard, NTSB, and counsel for the parties.[1] On October 7, 2025, Carver filed the transcripts as exhibits to its Memorandum in Opposition [ECF 139] to the Belt Line's First Motion *in Limine* which seeks to exclude from admissibility at the upcoming

1

truthfulness of Mate James Morrissey's initial and later factual accounts of how the incident occurred and (2) to preclude Capt. Stephenson from referencing any Coast Guard 2692 Form or any other Coast Guard investigative process.

The Belt Line's arguments are flawed in several respects. In its Second Motion *in Limine*, the Belt Line does not dispute that Capt. Sam Stephenson is eminently qualified to opine on the liability issues. Rather, since the underlying evidence — namely the CG 2692 Forms and the newly-released transcripts of the Carver crew and employee interviews — is properly admissible for the reasons set forth in Carver's Opposition to the Belt Line's First Motion *in Limine* [ECF 139], it therefore follows that Capt. Stephenson may rely on that that evidence to opine as to the cause of the allision.

Notwithstanding, even if the CG 2692 Forms and transcripts are inadmissible, under Federal Rule of Evidence 703, Capt. Stephenson may rely on that evidence—regardless of its independent admissibility—at trial and the Court here, as the trier of fact, may countenance his testimony, including his opinion as to the credibility of Carver's initial account of the allision submitted to the Coast Guard on June 19, 2024 in its CG 2692 Form. In a bench trial, as the Supreme Court has held, the Federal Rules place no restriction on the revelation of such information to the fact finder. When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose. *Williams v. Illinois*, 567 U.S. 50, 69 (2012) (plurality opinion) (emphasis in original) (*abrogated on other grounds* by *Smith v.*

---

bench trial the Coast Guard 2692 forms and all Coast Guard materials, regardless of whether released by NTSB. In response to the Belt Line's present motion, at the outset, Carver incorporates by reference its argument in its Opposition brief [ECF 139] that the Coast Guard documents, including the 2692 Forms and transcripts are admissible on multiple, independent grounds.

*Arizona*, 144 S. Ct. 1785 (2024)). Capt. Stephenson may testify, for example, that Mate Morrissey's transcript is evidence that the cause of the allision was caused solely by a navigational error. At a bench trial, there is minimal risk that this Court will misuse inadmissible information on which experts rely.

## II. STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if" the following conditions are satisfied:

> (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 thus establishes "a district court's gatekeeping responsibility to 'ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.' " *Nease v. Ford Motor Company*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). District Courts enjoy "broad latitude" to consider whatever factors prove applicable given "the unique circumstances of the expert testimony involved." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). The Rule 702 inquiry necessarily proves "flexible," focusing on the expert's "principles and methodology" rather than the conclusions that he draws. *Id.*

Additionally, while Rule 702 governs the admissibility of expert testimony generally, Federal Rule of Evidence 703 prescribes the court's "relatively narrow inquiry" into an expert's reliance on otherwise inadmissible information. Fed. R. Evid. 703. Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703. Rule 703 thus controls only "whether an expert reasonably relied upon inadmissible information in forming [his] opinions." *Clancy v. United Healthcare Insurance Company*, 2022 WL 22758943, *2-3 (E.D. Va. 2022) (citing *Goodrich v. John Crane, Inc.*, 2018 WL 4677773, at *19 (E.D. Va. Sept. 28, 2018)).

While Federal Rules of Evidence 702 and 703 apply equally to bench trials as to jury trials, "[t]he gatekeeping function of the court is relaxed where a bench trial is to be conducted ... because the court is better equipped than a jury to weigh the probative value of expert evidence." *Clancy,* 2022 WL 2275 WL 22758943, *3; *Williams v. Illinois*, 567 U.S. 50, 69 (2012) (plurality opinion) (emphasis in original) (*abrogated on other grounds* by *Smith v. Arizona*, 144 S. Ct. 1785 (2024)). Since the "'gatekeeper doctrine was designed to protect juries [it] is largely irrelevant in the context of a bench trial.' The concerns regarding expert evidence cited by *Daubert* and its progeny, particularly an expert's power to persuade and potentially mislead a jury are greatly diminished in a bench trial where the judge acts as both gatekeeper and factfinder. *See, e.g.*, *In re Randolph Hospital*, 2024 WL 380701, *3 (M.D.N.C. 2024) *(citing United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013) (quoting *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005)) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

## III.
## ADDITIONAL EVIDENCE RELEASED BY NTSB – TRANSCRIPTS INTERVIEWS OF CARVER CREW AND PERSONNEL

In its Second Motion *in Limine* [ECF 124, including Exhibits A through H], the Belt Line seeks to exclude "the credibility opinion testimony of Sam Stephenson, J.D. along with any reference by him to a U.S. Coast Guard 2692 form or any other Coast Guard investigative process." The Belt Line's Motion seeks to exclude portions of Stephenson's Report at pp. 17, 28, 29, 30, 34, 55, and deposition testimony at the following pages: p. 19:6-14; pp. 117:17 – 118:8; pp. 123:22 – 124:13; and p. 201:4-6.

Since the Belt Line's Second Motion *in Limine* was filed, the Coast Guard has released transcripts of interviews of the following Carver crew and personnel:

Mate James Morrissey – operator of tug at time of allision [ECF 139-1]
Sharif Porter – Carver crew member and deckhand [ECF 139-2]
Jargues Bass Morrissey– Carver crew member and deckhand [ECF 139 -3]
Jason McGrath – Carver crew member and tug engineer [ECF 139-4]
Brian Moore – Carver General Manager [ECF 139-5]
Leonard Baldassare – Carver Port Captain [ECF 139-6]

*See, e.g*., Carver's Memorandum in Opposition to Belt Line's First Motion *in Limine* to Preclude Coast Guard Investigative materials and CG-2692 Forms at Trial [ECF 139]. All were questioned by several members of the Coast Guard, NTSB, Belt Line's counsel and Carver's prior counsel, with representatives from the Belt Line present. This interview of Mate Morrissey's account of the events is consistent with that provided in the 2692 Form submitted by Carver to the Coast Guard on June 25, 2024 [ECF115-3]. Capt. Stephenson will testify that neither the transcript of the interviews of any of the Carver personnel or crew, including the transcript of Mate Morrissey's interview on June 26, 2024 changes his written opinion provided in this lawsuit or his deposition testimony, attached to the Belt Line's Second Motion *in Limine* as Exhibits B and H,

respectively.  See **Affidavit of Sam Stephenson dated October 20, 2025**, attached hereto as **Exhibit 1**.  In Capt. Stephenson's affidavit, he states, inter alia:

> 5. I have reviewed each of the transcripts referenced above, and my conclusions and opinions remain the same as set forth in my June 8, 2025 written report and my August 11, 2025 deposition.

Exhibit 1, ¶ 5.

## IV.  ARGUMENT

**A.    In its Second Motion *in Limine*, the Belt Line misrepresents the evidence upon which Sam Stephenson relies.**

Capt. Stephenson relied on multiple sources of data in formulating his opinion, including importantly, but not limited to, the time-stamped track of the Mackenzie Rose and Weeks 281 as depicted on June 15, 2024 in the "Daily Rose Point video produced in narrative form," not only the short list of data described by the Belt Line in its Second Motion *in Limine* as Exhibits B through G.[2]  See Exhibit B, Stephenson Report, pp. 7-11, Second Motion *in Limine* [ECF 123, 124] ("II.  LIST OF MATERIAL S RELIED ON FOR THIS REPORT").  Capt. Stephenson describes track taken by the tug and barge in his written opinion:

> On June 15, 2024, James Morrissey, a licensed USCG master (captain) was the officer in charge of avigation aboard the tug Mackenzie Rose pushing the barge Weeks 281. He was navigating from the upper wheelhouse of the Mackenize Rose and had the autopilot engaged as he navigated outbound the Norfolk Southern Branch to sea. After transiting under the middle of the South Norfolk Jordan bridge, the Mackenzie Rose tracked westward of the center span of the Norfolk and Portsmouth Belt Line Railroad Bridge (hereinafter "railroad bridge") at about 5.5

---

[2]

| Exhibit | Evidence Listed In NPBL's Second Motion *in Limine* |
|---|---|
| Ex. B | USCG 2692 submitted 6/25/24 |
| Ex. C | Capt. Miller's handwritten "Statement CARVER 47 |
| Ex. D | Mate Morrissey handwritten Statement |
| Ex. E | Log Entry at 4:30 |
| Ex. F | Brian Moore text message |
| Ex. G | Incident Report |

>MPH. (See photo infra). Mate Morrissey was in autopilot and didn't switch over to hand steering but thought he did. Approximately 1626 (4:26 PM) local time, the bow of the barge allided with the western section of the railroad bridge. See Photo- next page.

*See* Belt Line's Second Motion *in Limine*, Exhibit B, Stephenson Report, p. 15-16, Second Motion *in Limine* [ECF 123, 124]. A digital video of June 15, 2024 was produced to all counsel. *Id.*, (*citing* 15JUN2024 MACKENZIE ROSE ECS 1.MP4). The track of the tug and barge despited in the Rosepoint mp4 shows that on June 15, 2024, prior to the allision, the vessel did not go "hard over." The Rosepoint data is technical documentary evidence of the GPS navigational tracking and unequivocal evidence of the vessel's track. Importantly, the Belt Line does not dispute the credibility of the Rosepoint narrative mp4, and counsel failed to advise the Court that the vessel did not go "hard over. The Belt Line's expert, Captain Lewis, agreed that the Rosepoint data is the evidence in the case:

```
 7     Q.  You would agree that the evidence in the case
 8  regarding the track is the Rose Point evidence; correct?
 9     A.  That's one of them, yes.
10     Q.  Well, that's the main evidence; correct?  It's
11  not like your opinion and your drawing, it's not Captain
12  Stephenson's drawing, right, it's the Rose Point chart?
13     A.  It's the Rose Point --
14     Q.  Right.
15     A.  It's the Rose Point video.
16     Q.  That's the actual evidence in the case;
17  correct?
18     A.  Yes, that I received.
19     Q.  Based on that, your testimony earlier today,
20  based on that was that there -- there does not appear to
21  be any hard left turn; correct?
22     A.  Yes.
```

*See* "Petitioner's Memorandum of Law in Support of Motion for Summary Judgment," [ECF 99], at SUMF 27, p. 15 at Exhibit 20, Lewis Dep. p. 157:7-22.

Capt. Lewis' testified that the Rosepoint <u>data does</u> not show that the vessel went "hard over":

```
13    Q.  And did you also review the Rose Point data,
14  you know, the computer track?
15    A.  Yes.
16    Q.  And would you agree that it does not on its
17  face show the track going hard left at all, it shows a
18  gradual movement to the left; correct?
19    A.  Correct.
20    Q.  So if as a tug captain and as an expert
21  reviewing that, would you agree supports his later story
22  as opposed to his first story which was the rudder went
23  hard left?
24    A.  Yes.
```

*See* "Petitioner's Memorandum of Law in Support of Motion for Summary Judgment," [ECF 99], at SUMF 27, p. 15 at Exhibit 20, Lewis Dep. p.40:13-24..

Simply put, counsel misrepresented the actual <u>facts</u> to this Court, and, instead, simply put, instead has created a red herring by adopting Mate Morrissey's initial statement, which has been unequivocally established to be a self-serving, flagrant lie. Instead, the Belt Line disputes the credibility and admissibility of not only the Coast Guard forms, but text messages on June 15, 2024 between Carver's Brian Moore and the tug cell as "out of court written statements." The Belt Line again, conveniently forgets the length, and considerable cost, that Carver went to in obtaining text messages that the Belt Line and Evanston doggedly pursued throughout the litigation.

Where the Federal Rule of Evidence 703 is implicated in light of hearsay concerns, Court have reasoned that "the appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events." *See, e.g., Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013). As with the text messages, Carver persistently pursued

transcripts from the USCG and NTSB of official interviews of crew members, including Mate Morrissey, who has declined to appear in this lawsuit despite this Court's Order for him to do so.[3] The NTSB at Carver's request released the transcript on September 26, 2025.  Capt. Stephenson will testify that none of the transcripts of the interviews of any of the Carver personnel or crew, including the transcript of Mate Morrissey's interview on June 26, 2024, changes his written opinion provided in this lawsuit or his deposition testimony  Capt. Stephen's opinion and deposition transcript are attached to the Belt Line's Second Motion *in Limine* as Exhibits B and H, respectively.  Rather, Capt. Stephenson's opinion, which relies on multiple sources of data, does not depend on "credibility" evidence as argued by the Belt Line's counsel.

Accordingly, Belt Line's counsel <u>knew</u> no later than June 26, 2024, a date prior to Belt Line filing its claim, that Morrissey's initial written account of the events, as stated in Captain Miller's and Mate Morrissey's initial written statements, were incorrect, yet, counsel continued and continues to, ask this Court to rely on those false statements in lieu of the correct and extensive and varied factual evidence relied on by Capt. Stephenson.  Additionally,  the arguments set forth

---

[3] Carver has diligently pursued the transcripts of interviews of its crew and personnel from both the Coast Guard and NTBS.  On July 15, 2025 Carver issued a Touhy letter/subpoena to the USCG requesting transcripts, video, and audio recordings of interviews conducted during the investigation. On July 16, 2025 Carver issued a FOIA to the USCG requesting transcripts, video, and audio recordings of interviews conducted during the investigation. On July 23, 2025, the USCG denied the Touhy request and subpoena. The Coast Guard cited DHS Touhy regulations (6 C.F.R. §§ 5.41–5.49) and 46 U.S.C. § 6308, which protects marine casualty investigation materials from discovery in civil litigation. Until the recent release of the statements, the Coast Guard stated that the requested materials are part of an open investigation led by the NTSB and advised Carver to direct the request to the NTSB.

Similarly, on March 24, 2025, Carver issued a FOIA request to the  NTSB, followed by a document subpoena on April 10, 2025 for the transcripts and other materials.  The NTSB declined, as the investigation was ongoing.  On August 14, 2025 we sent a letter to the Office of the General Counsel at the NTSB and withdrew the subpoena, we also requested the NTSB produce the transcripts, as at that time, the lawsuit was set for trial on October 21, 2025. The NTSB thereafter released the transcripts on September 26, 2025.

in the Belt Line brief run counter to the testimony not only of Capt. Stephenson, but the Belt Line's own expert Capt. Lewis, opined as Finding No. 4, that the allision was caused by the operator's navigational error and that the rudder did not go "hard over." *See* "Petitioner's Memorandum of Law in Support of Motion for Summary Judgment," [ECF 99], at SUMF 27, p. 15 at Exhibit 19, Lewis Report at 12 ("the Officer on Watch (Captain James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode) in a confined navigational channel resulting in loss of directional control.")

In sum, Carver does not need to rely on "credibility" of any evidence, as Mr. Morrissey's initial statement that the rudder went "hard over" is patently false, as relied on by both counsel and their experts.

**B.     Under Federal Rule of Evidence 703, Capt. Stephenson may rely on all of the evidence before him, without restriction, and the Court in this bench trial will weigh the probative value of expert evidence.**

Federal Rule of Evidence 703 explicitly states that experts may rely on inadmissible evidence in forming their opinions and may disclose that inadmissible evidence to a jury. However, in a *bench trial*, as is here, as the Supreme Court has held, the Federal Rules place no restriction on the revelation of such information to the fact finder. As the Supreme Court reasoned in *Williams v. Illinois*:

> In bench trials, however, both the Illinois and the Federal Rules place no restriction on the revelation of such information to the factfinder. When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose. As we have noted, "[i]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." *Harris v. Rivera,* 454 U.S. 339, 346, 102 S.Ct. 460, 70 L.Ed.2d 530 (1981) *(per curiam)*. There is a "well-established presumption" that "*the judge [has] adhered to basic rules of procedure,*" when the judge is acting as a factfinder. *Id.,* at 346–347, 102 S.Ct. 460 (emphasis added). See also *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1078, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (Rehnquist, C.J., dissenting).. When the judge sits as the trier of fact, it is

10

> presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose.

*567* U.S. 50, 69-70 (2012) (plurality opinion) (emphasis in original) (abrogated on other grounds by *Smith v. Arizona*, 144 S. Ct. 1785 (2024)) (citations omitted).

The data submitted to and released in connection with the Coast Guard and NTSB investigation unequivocally is of the type that an expert in marine operations would rely. Capt. Stephenson testified that the Coast Guard conducts investigations of incidents involving vessels. *See* Petitioner's Response in Opposition to Claimants' Motion for Summary Judgment [ECF 109] at Exhibit 29, pp. 155:1 – 156:2 (Capt. Stephenson deposition) ("if you have an incident on a ship, the Coast Guard takes that very seriously on board a vessel. They'll do an investigation . . and if they find an issue with the person who's operating the vessel, they will take action against the license. If they take action against the license, in my opinion, they deem that person to be competent.").

At the outset, it is Carver's position that the 2692 Forms and transcripts are admissible on the bases provided in its brief in Opposition to the Belt Line's First Motion *in Limine* [ECF 139].

Capt. Stephenson reasonably relied upon the Rosepoint video of June 15, 2024, but also the Coast Guard forms, Mate Morrissey and Capt. Miller's handwritten Statements, as well as the transcripts of interviews taken by the Coast Guard, including that of Mate Morrissey. Carver submitted that data to the Coast Guard as part of its response to the Coast Guard's request during the investigation. That data, including the interviews, are the factual evidence which the Coast Guard itself will consider in its investigation as to liability for the bridge allision. Notwithstanding their admissibility, based on the above, Capt. Stephenson's reliance on all of the materials,

11

including the 2692 forms submitted as part of or in relation to the Coast Guard investigation is clearly reasonable.

Moreover, to date, James Morrissey, the vessel operator, a ship's officer and the sole witness to the allision, has consistently refused to provide testimony in the lawsuit, including appear in the lawsuit and appear for his deposition after being ordered by this Court to do so [ECF 88, 8/20/25 Order re ECF 62 Motion for Sanctions]. In addition, Capt. Miller is now deceased and died before his testimony could be taken in the instant litigation. Prior to the recent release of the Coast Guard transcripts, Capt. Stephenson preliminary relied in part on the 2692 Forms, which was the best evidence available to him as to the events leading up the allision as reported by Carver to the Coast Guard on June 19, 2024, and then as revised on June 25, 2024 after Lt. Palomba, USCG, asked the Carver General Manager to revise it based on interviews by the NTSB and Coast Guard on board the vessel. See "Petitioner's Memorandum of Law in Support of its Motion for Summary Judgment" [ECF 99], SUMF ¶ 24. It was reasonable for Capt. Stephenson to rely on Capt. Miller's statement, given that Capt. Miller is deceased. It was, and is, reasonable for Capt. Stephenson to rely on Mate Morrissey's own factual account — as memorialized in the revised 2692 Form and the newly-released transcript of his interview — as providing the best account of factual events involving the allision as he has refused to appear in this lawsuit and has refused to appear for his deposition, despite this Court's Order to do so. Under Rule 703, the Court in this lawsuit will determine whether Capt. Stephenson's inferences to be taken from the interviews (such as credibility of one version of the events over another), were in fact, reasonable.

The Belt Line appears to rely on *United States v. Cecil*, 836 F.2d 1431 (4th Cir. 1988) for the proposition that the best judge of credibility is the judge or jury. The Belt Line does not address, however, the distinction in that the instant lawsuit is a bench trial, which is different than

12

a jury trial in that in "bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." *See Williams*, 567 U.S. at 69-70. Rule 703 of the Federal Rules of Evidence, the Court will make the determination of whether Capt. Stephenson reasonably relied on the evidence and transcript interview. The Court will accord Capt. Stephenson's opinions, and the inferences he has taken from the evidence, including the forms and transcripts, its due weight. Moreover, the Coast Guard interviews were conducted in conjunction with the NTSB, and counsel for the Belt Line attended the hearing and was invited to question Mr. Morrissey and counsel did so. Indeed, all parties' experts have relied on the Coast Guard 2692 Forms in rendering their respective opinions. The Belt Line's own expert, Capt. Lewis, relied on the 2692 Forms in rendering his opinion. *See* Petitioner's Response in Opposition to Claimants' Motion for Summary Judgment at Exhibit 19 [ECF 109] (Capt. Nicholas J. Lewis Report). ("based on my training and experience and the documents reviewed, crew statements, vessel logs, USCG 2692 form and applicable regulations it is my expert opinion that several navigational, procedural and managerial failure to and caused the subject hit and run allision.") (emphasis added). opinions. Prior to the release of the Coast Guard transcripts, Capt. Stephenson preliminarily relied on the best evidence available to him, which included the 2692 Forms.

    In its second argument, the Belt Line seeks to invoke 46 U.S.C. § 6308 as barring this Court from considering Coast Guard evidence relied upon by its expert. Carver adopts its legal position taken in its brief in Opposition to the Belt Line's First Motion *in Limine* [ECF 139], that the 2692 Forms and transcripts and other documents submitted to the USCG are admissible on the basis provided in therein, and that ruling on any evidence not yet released by the NTSB is premature.

    To the extent that the Belt Line is arguing that Section 6308 abrogates Federal Rule of Evidence 703, the Belt Line provides no legal support for that argument.

13

## **CONCLUSION**

For the foregoing reasons, Carver requests that the Court:

(1)     Deny the Belt Line's Motion *in Limine* No.2; and

(2)     Defer ruling on the admissibility as of any expert testimony which would rely potentially other records to be released by the NTSB until such time as the records are offered into evidence, and

(3)     Award Carver all other just relief.

|  |  |
|---|---|
| Dated: October 21, 2025 | Respectfully submitted,<br>**CLYDE & CO US LLP**<br><br>By: /s/ *Harold L. Cohen*<br>Harold L. Cohen  (VSB No.:98148)<br>1221 Brickell Avenue, Suite 1600<br>Miami, FL  33131<br>Tel: 305-446-2646<br>Fax: 305-441-2374<br>Email: harry.cohen@clydeco.us;<br><br>James H. Rodgers*<br>Clyde & Co US LLP<br>45 Lexington Avenue, 16th Floor<br>New York, NY 10174<br>Phone: (212) 702-6771<br>Email: james.rodgers@clydeco.us<br><br>Michael J. Roman*<br>Dawn L. Johnson<br>Siobhan M. Murphy*<br>Clyde & Co US LLP<br>30 South Wacker Drive, Suite 2600<br>Chicago, IL 60606<br>Phone: (312) 635-7000<br>Email: michael.roman@clydeco.us<br>            dawn.johnson@clydeco.us<br>            Siobhan.murphy@clydeco.us |

**CERTIFICATE OF SERVICE**

        I hereby certify that on October 21, 2025, a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will serve all counsel of record by electronic mail as follows:

| | |
|---|---|
| Mark C. Nanavati, Esq. (VSB No.: 38709)<br>G. Christopher Jones, Jr., Esq. (VSB No.: 82260)<br>SINNOT, NUCKOLS & LOGAN, P.C.<br>13811 Village Mill Drive<br>Midlothian, Virginia 23114<br>(804) 893-3866 (Nanavati)<br>(804) 893-3862 (Jones)<br>(804) 378-2610 (Facsimile)<br>mnanavati@snllaw.com<br>cjones@snllaw.com<br>*Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company* | Zachary M. Jett, Esq. (VSB #93285)<br>BUTLER WEIHMULLER KATZ, et al<br>11525 North Community House Road<br>Suite 300<br>Charlotte, North Carolina 28277<br>(704) 543-2321 (Telephone)<br>(704) 543-2324 (Facsimile)<br>zjett@butler.legal<br>*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company* |

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

                              */s/ Harold L. Cohen*

15