**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION**

---

In the Matter of COEYMANS MARINE
TOWING, LLC d/b/a CARVER MARINE
TOWING, as Owner and Operator of the *M/T
Mackenzie Rose*, (IMO No. 8968765), *et al.*

**Civil Action No. 2:24-cv-00490-MSD LRL**

---

**PETITIONER'S BRIEF IN OPPOSITION TO BELT LINE'S
MOTION *IN LIMINE* #3 TO PRECLUDE DEPRECIATION OF REPAIR COSTS
AND BAR EXPERT R.L. BANKS & ASSOCIATES, INC.**

Petitioner, Coeymans Marine Towing LLC d/b/a Carver Marine Towing ("Carver"), for its

Brief in Opposition to Claimant Norfolk and Portsmouth Belt Line Railroad Company's ("Belt

Line") Motion *in Limine* #3 to Preclude All Efforts to Depreciate Repair Costs and Bar Testimony

By Carver's Expert R.L. Banks & Associates, Inc. (ECF 134-135), states as follows:

**I.  Introduction.**

The Belt Line has declined to offer a competing expert opinion on depreciation of repair

costs or the value of its 66-year-old Main Line Bridge ("Bridge") at the time of the allision.  This

risky strategy follows Belt Line's judgment to insure the Bridge for only $10 Million and its

involvement in *In re M/V Marlin*, where this Court found Belt Line did not "seriously contest[] the

validity of using replacement cost depreciated as the appropriate measure of damages" for repairs

to part of the very same Bridge.[1]  In a footnote on page 17, Belt Line attempts to distinguish its

precedent by claiming replacement cost depreciated was appropriate in *Marlin* "only because the

***entire fendering system was replaced***," whereas here "only a single section was ***repaired***." ECF

135 at fn. 2 (first emphasis original, second supplied).

---

[1] *Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, Civil Action No. 2:08cv134, 2009 U.S. Dist. LEXIS 104327, at *21 (E.D. Va. Oct. 9, 2009)

Belt Line's buried argument misconstrues its own case. To start, only one side of the Bridge's fendering system was damaged in *Marlin* like the one section at issue here. More importantly, Belt Line and the vessel owner in *Marlin* stipulated that the fendering system was a constructive total loss, which the Court noted "is generally a term of art referring to damaged property where 'the cost of repairs … exceed the precasualty value of the property.'"[2] That contrasts with an "actual total loss," where "the property is damaged beyond physical repair" and thus requires entire replacement. Both forms of total loss differ from a "partial loss," when the costs of repairs do not exceed the precasualty value and an "owner is entitled to recover the reasonable cost of repairs necessary to restore it to its pre-damage condition."[3] The inquiry is not, as Belt Line suggests, whether a full replacement or repair occurred but, rather, how much the work costs relative to the value of the property.

Belt Line does not claim it sustained a partial loss on June 15, 2024 or seriously dispute that the repair costs exceeded the precasualty value of Span 4 of the Bridge. Thus, in a case of constructive total loss, as here, there is no genuine disagreement that replacement costs depreciated is the proper measure of damages. Rather than offer a different methodology for damages, Belt Line instead seeks cover of an exception to the "new for old" rule that precludes depreciation if repairs to an integral component of the property do not enhance its value or extend its useful life. No Court within the Fourth Circuit has adopted this exception. The measure of damages utilized in *Marlin*—replacement cost depreciated—is the rule of law in the Eastern District of Virginia and applies in this case. Plaintiff's motion should be denied on that basis alone.

---

[2] *Id.* at fn. 4.
[3] *F.C. Wheat Mar. Corp. v. United States*, 712 F. Supp. 2d 471, 473 (E.D. Va. 2010).

Even if the Court adopts the integral component exception as a matter of law, Belt Line's motion must still be denied.  The questions of whether Span 4 is an integral component, whether the repairs enhanced the value of the Bridge, and if the repairs extended its useful life are issues of fact to be decided on the evidence at trial.  Belt Line's brief offers conclusory testimony from its experts, Howard Swanson P.E. and Lee Lentz, P.E., that Span 4 is an "integral component," but neither offer any actual opinion on the value of the bridge or its useful service life at any time. Moreover, Belt Line completely ignores that *their own experts* concede that the new Span 4 has "newer steel," which is "stronger, more corrosion resistant" and thus constitutes an improvement over the 66-year-old original steel in other parts of the Bridge. The Court should only determine these issues after considering a full evidentiary record, and decline Belt Line's attempt to bar depreciation based only on its experts' conclusions.

Finally, Belt Line has not established that R.L. Banks' Report is inadmissible.  Mr. Cunningham and Mr. Marianos jointly opined to the issues discussed in the Report and thus complied with Rule 26.  Belt Line's other criticisms of the Report center on its claim that R.L. Banks did not inspect the Bridge (which is entirely inaccurate)[4] and bear only on the weight of the opinions and not admissibility. Belt Line's motion should be denied in full, with prejudice.

## II.   Statement of Fact

### A.  Howard Swanson P.E. admits he is not qualified to opine on life expectancy of the Bridge and has not actually rendered an opinion on the issue.

Belt Line has provided selective excerpts of Mr. Swanson's deposition that do not provide the full context or meaning of his testimony.  First, Mr. Swanson unequivocally concedes he is unqualified to render an opinion on useful life expectancy of the Bridge:

---

[4] For reasons unknown to Carver, Belt Line chose not to depose either Mr. Marianos or Mr. Cunningham despite Carver's offer to make its experts available for oral discovery.

Q. And if you were asked to determine the expected useful service life of a steel railroad bridge, how would you go about doing that?

[Objection]

**A. First, you know, whenever you do any sort of -- you know, work of that sort of stuff, you go back to what kind of guidance the -- like AREMA provides. And to my knowledge there's no guidance in AREMA with regard to that. There may be guidance elsewhere with regard to that but I'm not familiar with those -- those sources. And so I don't know exactly how I'd go about that, probably do a literature search first. But I haven't been asked to do that, so I wouldn't say I'm qualified to do that.**

Q. And just to be sure, you have not been asked to determine what the expected useful service life of the Main Line Bridge is or was at any time, correct?

**A. That is correct.**

Q. And you do not feel that you would be qualified to do so?

**A. That is correct.**

Q. What type of engineer in your opinion or I guess -- strike that. What type of professional in your opinion would be qualified to make that type of determination?

[objection]

**A. It would be likely a structural engineer that has worked more in that area than I have.**

**Exhibit 1,** Swanson Tr. 102:11-103:21. Belt Line further represents that Mr. Swanson agrees the

Bridge had an "indefinite service life" (ECF 135, pp. 7-8), however it only provides a snippet of

Mr. Swanson's actual testimony. Mr. Swanson, in reality, admitted he did not ground this statement

on any methodology and he confusingly defines "indefinite" as meaning "25, 50 years":

Q: Okay. And what makes you say that you would agree with that testimony?

**A. Because I have seen plenty of railroad bridges that are 40, 50 years older than the Belt Line bridge that are still in good shape and in good service, and so just sort of figuring out that this bridge is 40 to 50 years younger than that and maybe slightly better construction than – since those bridges have an indefinite service life, this bridge has a 40 or 50 years more indefinite life.**

Q. And what is it – what do you mean by indefinite? How do you define that?

A. **How I would define that is a – it does not have a fixed service life, that the bridge will be able to be functional in the medium, which I would say is approximately 25, 50 years from now without any, you know, major issues.**

Q. And what methodology do you use to make that opinion?

A. **Well, that's sort of your – your question there is kind of a contradiction in terms.  That's an opinion so it does not have a methodology behind it.**

Q. Okay. What methodology would you use to make that determination, that the Main Line railroad bridge has an indefinite service life?

A. **As I said before, I would have to study the topic.  It's not something that I've been – have a lot of knowledge in about exactly what the service life is.  It's just, I've looked at a lot of railroad bridges and it's an opinion, not a hard engineering fact.**

*Id.*, Tr. 108:16-109:15.

**B. Belt Line's hired experts also do not offer any reliable opinion on life expectancy of the Bridge.**

Similar to Mr. Swanson, Belt Line's retained experts admit they have never opined on the life expectancy of a steel railroad bridge and are unqualified to do so. Kevin Lugo, PE testified that he "can't just throw a number on it" and if he were asked to make an opinion, he would put together a team in which Mr. Lugo's role would be on the "constructor maintenance side of the ledger," while other structural engineers would evaluate the life expectancy issue:

Q. And have you ever performed any type of analysis on that issue?

A. **Which issue? I just want to be clear.**

Q. Yeah. Determining the expected useful service life of a steel railroad bridge.

A. **I have not.**

5

Q. If someone asked you to make a determination of what the expected useful service life of a steel railroad bridge in terms of, you know, years of expected life, how would you go about doing that if you were asked?

**A. I would – well, I would – I would put together a team to do that. And it would be a team of engineers, structural engineers, constructors, and evaluate what the maintenance has been on the structure. But I mean, ultimately the useful life of a – of a structure depends on whether – how long – whether it's been maintained; so first thing you would do is check the maintenance on it. But if it's been maintained, then you can assume that that life expectancy is indefinite until you stop maintaining it or choose to replace it for whatever reason you choose it to replace it for; so it's really not that – it's just not that simple. You can't just throw a number on it.**

Q. And what would your role on that team be that you would put together?

**A. I would be on the constructor maintenance side of the ledger.**

Q. And then what would the role of the other team members?

**A. A structural engineer evaluating the life expectancy or the condition of the steel members. So you're already in a building. You're already in a structure that's being constructed. It's already in life.**

**Exhibit 2**, Lugo Tr. 24:24-26:11.

Belt Line's other expert, Lee Lentz P.E., readily admits he made no opening opinion on the life expectancy issue:

Q. Correct me if I'm wrong, but as I understand it, you are not offering any opinions on what the expected useful service life of the Main Line Bridge is or was at any time, correct?

**A. Correct.**

**Exhibit 3**, Lentz Tr. 19:23-20:2. In his rebuttal report, Mr. Lentz relies on the testimony of the unqualified Mr. Swanson to state that "[t]he repairs completed as necessary to bring the Main Line bridge back into service after the allision did not extend the service life of the bridge." **Exhibit 4**, Lentz Rebuttal Report at 1. Mr. Lentz's rebuttal report notably does not mention any methodology

used to make this statement, which squares with his deposition testimony that he's never done such

analysis and would, instead, rely upon a different structural engineer to evaluate that issue.

### C. There is ample evidence besides expert opinion on life expectancy that Belt Line improved and enhanced the value of the Bridge during repair work.

Belt Line made several decisions after the allision to proceed with additional work on the

Bridge that resulted in improvements and enhanced its value.   By example, Belt Line's President,

Cannon Moss, made a business decision to do a complete rail and tie replacement of the west

section of the Bridge since this project was scheduled to proceed in 2027 anyhow:

> We're going to be removing most of the rail and large sections of ties to fix the bridge.  We had planned to re-deck and re-rail the MLB in 2027. It would make sense to do this on the west side of the bridge now, since we're going through the effort of pulling everything off. I'm getting pricing for new rail and a complete tie replacement on the west section of the bridge.  Whatever insurance doesn't cover can be run under one of our grants from the state.

**Exhibit 5** (Moss to Board 7-8-24).  Belt Line admits this project was completed after the allision,

as planned by Mr. Moss.  See **Exhibit 6** (RFA #28).  Belt Line also added electrical conduit to the

Bridge, which it admits was not in place prior to the Allision.  *Id.*, #30.  Belt Line also had its

engineers from Hardesty & Hanover design plans for a new motor brake and other electrical

components that were not damaged in the allision.[5] **Ex. 1**, Swanson Tr. 93:14-24.  Belt Line had

its contractors repair preexisting cracks in the steel members, which its experts admit were

unrelated to the Allision.  **Ex. 7** (Lugo Report).  Belt Line also lubricated the ropes of its

counterweight system, which was work its engineers had recommended during a June 4-5, 2024

inspection because the "counterweight ropes were observed to have inadequate lubrication, surface

---

[5]     Belt Line represents in its brief that these charges "are not included in its claim," however the charges are included in H&H's invoices that Belt Line has been tendered as proof of its damages. See **Ex. 1,** Swanson Tr. 89-90. It is not Carver's burden to disprove Belt Line's damages or guess at which line items in invoices are not actually part of its claim.

corrosion, and abrasive crown wear" and were "nearing the end of their useful life." **Ex. 8** (Draft Mechanical Inspection Report).[6] Belt Line's hired experts now claim that the ropes needed to be lubricated because the lift system was not used for a couple months following the allision.

These improvements are in addition to the irrefutable fact that Span 4 of the Bridge is now built with modern, freshly fabricated steel, which Belt Line's own expert characterizes as "newer steel, stronger, more corrosion resistant." **Ex. 2**, Lugo Tr. 81:13-14.  Mr. Swanson agrees the Belt Line's new steel is "stronger" and "has less impurities, sort of is a[n] improvement in steel making since the 1950s when this was originally constructed." **Ex. 1**, Tr. 79:6-11. The cumulative effect of this additional work is straightforward: Belt Line now has a newly rebuilt Span 4 of its Bridge, with better, stronger steel and a completely new rail and tie system (that will last another 20+ years) plus improvements to the lift system, which was in a decrepit condition just prior to the Allision.

### III.    Legal Standards.

#### A.  Measure of damages under maritime law.

As this Court stated in *Marlin*, "[w]hen the plaintiff suffers either an actual or constructive total loss, 'the measure of damages is generally the market value of the property just before the loss (less the value of any salved equipment or materials).'" 2009 U.S. Dist. LEXIS, 105327 *30-31 (citing *Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F.Supp. 738, 763 (E.D. La. 1989). "When there is no established market for the damaged property, the court may consider other evidence to determine the value of the property, including replacement cost, depreciation, expert opinion, and the condition the structure was in prior to the damage." *Id.* at *31 (citation omitted).

---

[6]    Belt Line has claimed the Mechanical Inspection Report, which it produced in discovery and Hardesty & Hanover authenticated in deposition, is not an admissible business record because they labeled it a "draft."

Ultimately, "[t]he ascertainment of value . . . is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." *Id.*

"Although these principles for calculating damages are instructive, a Court sitting in admiralty is a court of equity and has the authority to award what is fair and just in light of all the facts and circumstances of the case." *Id.* (citing *BP Expl. & Oil, Inc. v. Moran Mid-Atlantic Corp.*, 147 F. Supp. 2d 333, 337 (D.N.J. 2001) ("[I]t is clear that a federal court sitting in admiralty is not tied to any strict rules of the common law, but has the authority to make equitable decisions, considering all of the facts and circumstances of the individual case."); *Gateway W. Ry. Co. v. Am. River Transp. Co.,* 887 F. Supp. 201, 202 (C.D. Ill. 1995) ("[A] court sitting in admiralty is privileged to exercise flexibility and award what is fair."); *The David Pratt*, 7 F. Cas. 22, 24, F. Cas. No. 3597 (D. Me. 1839) (No. 3597) ("A court of admiralty is . . . a court of equity. Its hands are not tied up by the rigid and technical rules of the common law, but it administers justice upon the large and liberal principles of courts which exercise a general equity jurisdiction."

### B.  Expert admissibility.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *United States v. Wilson*, 484 F.3d 267, 274-75 (4th Cir. 2007). Under the Rule:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Stated otherwise, expert testimony is admissible "if it concerns (1) scientific, technical, or other specialized knowledge that will (2) aid the jury or other trier of fact to understand or resolve a fact at issue." *Westberry v. Gislavad Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999). The first prong requires the court to examine "whether the reasoning or methodology underlying the expert's proffered opinion is reliable" and the second prong asks the court to analyze "whether the opinion is relevant to the facts at issue." *Id*.; see also *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ("[T]he Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). "The proponent of the testimony must establish its admissibility by a preponderance of proof." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

## IV.    Argument

### A.  Replacement costs depreciated is the appropriate measure of damages and rule of law in this District.

Belt Line's brief focuses on precedent from other jurisdictions and fails to mention that this Court, sitting in admiralty, is not tied to any rigid rule for determining damages. The method used by the Court in *Marlin*, however, has been the chosen method in the Fourth Circuit dating back to the reported *Seaboard A.L.R. Co. v. Marine Industries, Inc.* case in 1964. See 237 F.Supp. 10, 13-14 (finding that "[c]ourts have generally allowed depreciation in awarding damages for injury to wharfs, bridges, and similar installations" and "court has not found nor been cited a single case involving damages to a wharf or bridge in which the court has refused to make an allowance for depreciation"). This measure has been used regardless of whether there is a full replacement or repair of the structure at issue or whether it is a total or partial loss. In *Seaboard*, for example, the District Court explained:

> Unquestionably libelant is entitled to have its bridge restored to its same condition prior to the subject collisions insofar as reasonably possible. To do more or less would be inequitable and unjust to either libelant or respondent. Since the bridge was not a total loss and has no readily determinable fair market value, the usual measure of damages, being the difference in fair market value immediately prior to collisions and its value immediately after, cannot be applied in practicality by the court. Thus, the ends of justice demand that the measure of damages must necessarily be predicated upon reasonable cost of repairs with proper consideration being given to actual depreciation of the facility at time of its damage.

237 F. Supp. at 12.  The *Seaboard* Court further reasoned:

> New pilings and timbers were used in repairing libelant's bridge, thus it is assumed that the repaired portion of the structure now has a life expectancy 50% Longer than such portion had at time of collisions. If this be true, and unless depreciation is allowed for labor and materials, libelant now has a portion of its bridge with a useful life twice as long as it had prior to damage by respondent, without any cost to it. If 15% Depreciation is allowed only as to cost of the new materials used in repair, libelant will be in the favored position of having the useful life of such portion of its bridge doubled upon expenditure of $ 1,219.00. Equity and fairness should require libelant to pay for one-half of the total repair cost to such damaged portion of its bridge, if its useful life is doubled as a result of the repairs. Otherwise, libelant will be making a profit as a result of the accident, at the unjust expense of respondent.

*Id.* at 14.  The *Seaboard* analysis squares with the case at bar.  As a result of the Allision, Belt Line has benefitted from a rebuilt portion of its 66-year-old Bridge—Span 4—that was constructed with brand new steel that is stronger and more resistant to corrosion that the original steel.  This new section of Bridge also has a new rail and tie system which, by Belt Line's own admission, was scheduled to be replaced in 2027 anyhow.  On this evidence, the Court, like *Seaboard*, can assume that Span 4, with its new steel and new rail and tie system, has a longer useful life than the other sections of the 66-year-old bridge.

Importantly, these are all factual issues that the Court should decide on the evidence at trial rather than on a pretrial evidentiary motion.  In *Marlin*, for example, the Court applied the same

measure of damages as *Seaboard* only after hearing expert testimony and reviewing documentary evidence as to the pre-allision condition and value of the Bridge. *Marlin*, 2009 U.S. Dist. LEXIS 104327, at *34 ("The evidence presented to the Court includes the personal observations of Austin, Kirby, and Rodgers, as well as numerous photographs depicting the nature and quality of the piles"). The Court found "of particular interest" photographs showing "substantial necking" of the pilings, "spalling of the concrete caisson," "broken piles that show substantial deterioration," and "close-ups of the remaining dolphins, showing severe wasting." *Id.* at *36-37. On this evidence, "it was clear to the Court that prior to the allision, the west tendering system was heavily deteriorated," thus the Court "infer[red] from the evidence that the west tendering system was 65% depreciated" and reduced Belt Line's damages accordingly. *Id.* at *38.

Trial in this case will include similar evidence of the deteriorated state of Belt Line's Bridge before Span 4 was reconstructed. By example, the January 2024 Inspection Report for the Bridge indicates there was "section loss," "pack rust," "missing rivets," "worn rivet heads," and "cracks" in some of 66-year-old steel that has now been replaced with new, stronger steel. See **Exhibit 9** (January 2024 Inspection Report at NPBL2182-84). The same report noted a "Priority 2" issue that "the counterweight channel guide is wearing heavily on the left side," which was partially replaced after the Allision. **Ex. 1**, Swanson Tr. 55-56. The Court should only make a determination of the condition and value of the Bridge after reviewing a full evidentiary record, including documentary evidence like that discussed above. This is the precedent set by *Seaboard* and *Marlin*, and nothing about this case warrants straying from established rule of law in this District. Plaintiff's motion should be denied.

**B. The "integral component" exception does not apply in this case.**

Belt Line cites *BP Exploration & Oil, Inc.* for the proposition that "[w]here repairs are performed to an integral part of a structure and do not enhance or better the whole structure, no depreciation is required or permitted." ECF 135 at 4. This broad statement misconstrues when the rule applies. The *BP Exploration & Oil, Inc.* Court explained that the exception only applies "where destruction does not result in a total loss, actual or constructive, and where repairs are not actually made in-kind." 147 F.Supp.2d 333, 341. The only reasonable proof Belt Line has produced in discovery as to the value of the Bridge is the amount of insurance it placed on it – $10 Million – which is less than the claimed cost of repairs. The case at hand thus involves the constructive total loss of Span 4 of the Bridge, which differs from the partial loss at issue in *BP Exploration* and the line of cases cited by Belt Line as to the integral component exception. On this basis alone, the Court should disregard the integral component exception, which only arguably applies in cases involving partial losses.

**C. Even if the "integral component exception" applies, the evidence shows the repairs enhanced the value of the Bridge and extended its life.**

The Belt Line's brief ignores that the integral component exception does not apply if the repairs "enhanced the value" of the Bridge **or** extended its life expectancy**.** See *Freeport Sulphur Co. v. The S/S Hermosa*, 368 F.Supp. 952, 955 (5th Cir. 1973) ("The question then is what amount of damages will return the plaintiff to the economic position it was in before the collision. This entails inquiry into whether the value of the dock has been enhanced beyond its pre-collision value, or whether its life has been extended"). Belt Line focuses on whether the repairs extended the useful life of the Bridge without addressing how the repairs impacted the value.

As discussed above, it is undisputed that Belt Line chose to make several improvements to its Bridge during repairs, notably including a complete rail and tie replacement and adding things

13

like electrical conduit to its electrical system.  Moreover, several of its component parts were replaced that were identified as needing repair prior to the allision, including the counterweight guides that were significantly deteriorating from Belt Line's lack of maintenance in the years before the allision.  There can be little argument that brand new rails and ties, which are expected to last another 20 years, do not enhance the value of the Bridge or extend its useful life.  While Belt Line relies on its own experts' conclusions that the life was not extended, it completely ignores whether the repairs added financial or other value to the Bridge.

Importantly, Belt Line seeks a ruling on a legal issue that is buttressed only by their own experts' conclusory opinions.  The issue of depreciation, value of the Bridge, and recovery of damages, however, involves fact intensive inquiries to be decided by the Court on a full evidentiary record.  See *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146, 156 (1925) ("The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts").  Belt Line's motion fails to include any factual evidence relating to the condition of its Bridge prior to the Allision or details on the work done afterwards.  As outlined above, there are sufficient unrelated repair costs and improvements baked into Belt Line's claim, in additional to factual evidence on the condition and value of the Bridge that must be considered in full before the Court makes a determination as to whether and how much depreciation applies in this case.   These are all issues of fact to be decided by the Court at trial based on the evidence and Belt Line's motion should be denied.

**D.  The R.L. Banks report and opinions are admissible and reliable.**

    **i.**      **R.L. Banks applied the methodology this Court utilized in *Marlin*.**

For its foremost argument to bar Carver's experts, Belt Line claims R.L. Banks "contradicts the law that depreciation is not permitted where repairs are integral and do not extend the useful life of a structure." ECF 135 at 12. As discussed above, this is not the law in this District and, indeed, R.L. Banks utilized the replacement costs depreciated methodology utilized by the Court in *Marlin*. Contrary to Belt Line's assertion, R.L. Banks' methodology tracks that used by admiralty Courts and Belt Line's arguments should be disregarded.

### ii.    Mr. Cunningham and Mr. Marianos each express the opinions stated in the Report.

Belt Line next attacks R.L. Banks by arguing they failed to comply with Rule 26(a)(2)(B), which, according to Belt Line, requires joint reports to "reveal the division of labor between the experts … [and] how they reached their separate opinions." ECF 135 at 12. This entirely ignores the Report itself, which clearly states that Mr. Marianos and Mr. Cunningham offer the "collective opinions" stated in the Report. ECF 135, Ex. C at ¶13. Thus each of the experts offer the opinions in the Report; there are no "separate opinions" to delineate. Nothing is impermissible about this strategy. Indeed, in a case Belt Line cites, *MS Amlin Marine NV v. Delta Marine Indust. Inc.*, the Court noted that "co-authored reports make sense when both experts 'reviewed the same materials, and, working together, came to the same opinions.'" 348 F.R.D. 658, 677 (W.D. Wash. 2025). That is the situation here and thus the Report complies with Rule 26(a)(2)(B).

### iii.    R.L. Banks relied upon sufficient facts and data.

Belt Line chose not to depose either Mr. Marianos or Mr. Cunningham and now moves to exclude their testimony because "the R.L. Banks experts did not even visit, much less physically inspect, the Belt Line's Bridge to evaluate its life." ECF 135. That is simply inaccurate, as clearly outlined in the Report. See ECF 135, Ex. C at ¶17 ("**In addition, Mr. Marianos conducted a site visit of the bridge July 15, 2025**"); see also *id.*, Report at Ex. C (showing "Select Photos of Site

15

Visit"). Belt Line's motion is clearly unfounded as a result of its decision to forego deposing R.L. Banks or clarify its miscomprehension of the Report. The motion should be denied on these grounds alone. See ECF 135 at p. 16 (Belt Line requesting exclusion because "in the absence of actually inspecting the Bridge that they opine about, the information relied upon by R.L. Banks experts is not the type permitted by Rule 703").

Putting this aside, Belt Line takes issue with R.L. Banks' reliance on Army Corps of Engineers guidance that sets forth service life figures of the component parts of steel railroad bridges. The Bridge at issue here is a Truman-Hobbs Act Bridge and the Corps guidance relied upon by R.L. Banks was used to assist in cost apportionment under the Act. As Belt Line notes, the regulation specifically say they are not to be used "arbitrarily, but as a basis for fair judgment of the service life *considering all other factors that pertain in any particular case*." ECF 135 (citing 33 C.F.R. 277 (1979)).

Belt Line's only contention is that R.L. Banks did not consider other facts "because they never inspected" the Bridge. As stated above, this is wrong and represents Belt Line's failure to comprehend the written report. Moreover, courts sitting in admiralty have found that Truman-Hobbs Act publications like those R.L. Banks utilized are "useful as guidance in the difficult task of calculating the expected life span and rate of depreciation of an integral part of a bridge, especially considering the extensive amount of data collected by Congress before its enactment." *State v Taira Lynn Marine Ltd. No. 7 LLC*, 244 So. 3d 859 (La. App. 5 Cir 2018). That is what R.L. Banks did here – utilized U.S. Army Corps publications as guidance in determining and estimating the expected useful life of Belt Line's 66-year-old Bridge as one input in the methodology this Court used in *Marlin*. Belt Line does not seriously say U.S. Army Corps of Engineer guidance is unreliable but, rather, only takes issue with R.L Banks utilizing it without

also inspecting the Bridge. ECF 135 at p. 15 ("R.L. Banks experts did not consider any other factors related to the service life of the Belt Line Bridge because they never even inspected it").

As for the other three (3) publications, Belt Line concedes one is relied upon across the industry (AREMA *Manual for Railway Engineering*). Belt Line's issues with the other two (a 2019 study and book excerpt authored by AREMA's former Chairman) are that the publications discuss different types of bridges and the "design life" rather than "expected useful service life."[7]  These are not reasons the bar R.L. Banks' opinions and, if anything, simply go the weight of the opinions. See *Bresler v. Wilmington Tr. Co.*, No. PJM 09 2957, 2015 U.S. Dist. LEXIS 36625, at *11 (D. Md. Mar. 24, 2015), *aff'd* 855 F.3d 178, 202 (4th Cir. 2017) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility ….") (citation omitted)).

Belt Line's claim that R.L. Banks relied on insufficient data is founded upon their errant belief that R.L. Banks did not physically inspect the bridge or consider other factors besides publications listed in the report.  This is simply wrong, and Belt Line's motion should be denied.

        **iv.**    **Belt Line attempts to flip their burden of proving damages onto R.L. Banks**.

Belt Line next contends that R.L. Banks' opinion should be barred because they did not differentiate between materials costs, labor costs, and other claimed non-depreciable costs.  This argument is belied by a number of statements in the Report, but, namely Table 3 where R.L. Banks clearly separates out various costs on a component-by-component basis:

---

[7] "Design life" is another way to say "expected useful life" of a structure, both of which differ from the "actual service life." Here, R.L. Banks offers opinions as to the expected useful service life of the Bridge.

Table 5 – Depreciated Total of Damages, Construction Invoices

| Group | Damages Amount | % of Useful Life Remaining | Depreciated Total |
|---|---|---|---|
| Ties and Rail | $224,446 | 13% | $29,178 |
| Mechanical/Electrical Components | $468,030 | 74% | $346,342 |
| Truss Floor System | $2,100,013 | 5% | $105,001 |
| Truss Main Members | $3,212,248 | 17% | $546,082 |
| *Classified Sub-total* | *$5,780,291* | | *$997,425* |
| Unclassified | $7,524,646 | 17% | $1,279,190 |
| **TOTALS** | **$13,529,383** | | **$2,305,793** |

ECF 135, Ex. C at ¶55.

Notwithstanding this, Norfolk is the party seeking damages [and] bears the burden of proof to show the amount, as well as the fact, of damages." *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1088 (5th Cir. 1982). Here, as noted by R.L. Banks in its report, Belt Line has taken a "top line" approach at establishing damages by providing invoices that only contain bulk categories of damages without delineating what work was done during which month and on which part of the project. It is not Carver's or its expert's burden to parse through Norfolk's invoices and disprove the damages for which they bear the burden to prove. *Id.* ("We know of no rule shifting this burden to the defendant every time a plaintiff succeeds in introducing into evidence some figure denominated 'the costs of repairs'"). "Indeed, it has explicitly been held that when a defendant shows that the figure claimed by the plaintiff includes non-compensable improvements, the plaintiff must prove the amount of such improvements, *i.e.*, the amount by which the original figure must be decreased." Belt Line has also clearly included nonrecoverable costs for work done on the Bridge that are unrelated to Bridge—for example, Belt Line's new rails and ties, electrical conduit, lubrication on the lift system. Thus under prevailing law, Belt Line is the one who must go back through its own invoices, identify the improvements, and calculate those charges—not R.L. Banks.

18

Moreover, any issue Belt Line has with R.L Banks' conclusion that all of Belt Line's damages are depreciable simply affects the weight of their opinion, not admissibility. For purposes of *Dabuert*, "courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Bresler v. Wilimington Tr. Co*., 855 F.2d 178, 195 (4th Cir. 2017). "If the methodology is reliable, further criticisms of the expert's testimony will go to its weight, not its admissibility." *Acosta v. Vinoskey*, 310 F. Supp. 3d 662, 667 (W.D. Va. 2018). Here, R.L. Banks applied the same methodology this Court used in *Marlin*, a case that involved depreciation of the same Belt Line Bridge at issue in this case. Belt Line does not take any issue with the actual methodology, thus all of Belt Line's gripes about R.L. Banks's Report can be addressed through cross examination at trial.

**V.    Conclusion**.

Belt Line's motion attempts to preclude application of the replacement costs depreciated measure of damages to this case despite the fact that this Court utilized the methodology in a similar allision case involving the same Bridge at issue here. Belt Line relies nearly exclusively on out-of-circuit case law for its argument that depreciation should not apply here, and goes so far as to argue, in the District Court, that "public policy" warrants deviation from the rule stated in *In re Marlin* and *Seaboard*. This Court should decline Belt Line's overture to do so. Moreover, Belt Line's motion relies on conclusory statements from its own experts regarding life expectancy and value of the bridge, which are critical issues of fact to be decided on the evidentiary record after a full trial. Importantly, as set forth above, Belt Line's purported "experts" have testified that, in fact, they are not experts on life expectancy or the value of the Bridge. Belt Line's request to preclude depreciation in this matter should be denied.

Belt Line also has not established that R.L. Banks' Report or the joint opinions of Mr. Cunningham and Mr. Marianos are inadmissible. R.L. Banks' methodology tracks this Court's methodology used in *Marlin* like many other admiralty courts across the country. Belt Line's remaining complaints of R.L. Banks' Report bear on the weight, if anything, rather than admissibility. Belt Line's motion should be denied in full, with prejudice.

WHEREFORE, Petitioner Coeymans Marine Towing LLC d/b/a Carver Marine Towing respectfully requests that the Court deny Belt Line's Motion *in Limine* #3 (ECF 135) in full, with prejudice, and award Petitioner all other relief as the Court deems just and proper.

Respectfully submitted,

Dated: October 24, 2025

**COEYMANS MARINE TOWING, LLC**

By:    /s/ Harold L. Cohen
Harold L. Cohen  (VSB No.:98148)
1221 Brickell Avenue, Suite 1600
Miami, FL  33131
Tel: 305-446-2646
Fax: 305-441-2374
Email: harry.cohen@clydeco.us;

James H. Rodgers*
Clyde & Co US LLP
45 Lexington Avenue, 16th Floor
New York, NY 10174
Phone: (212) 702-6771
Email: james.rodgers@clydeco.us

Michael J. Roman*
Dawn L. Johnson
Siobhan M. Murphy*
Clyde & Co US LLP
30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email: michael.roman@clydeco.us
dawn.johnson@clydeco.us

Siobhan.murphy@clydeco.us

Rachel Werner*
One North Central Avenue, Suite 1030
Pheonix, Arizona 85004
Phone: 480-746-4556
Email: rachel.werner@clydeco.us
*pro hac vice

Counsel for Petitioner

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on October 24, 2025, he caused to be filed a true and correct copy of the foregoing document using the Court's CM/ECF system, which will serve all counsel of record by electronic mail as follows:

Mark C. Nanavati, Esq. (VSB No.: 38709)
G. Christopher Jones, Jr., Esq. (VSB No.: 82260)
SINNOT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)
(804) 893-3862 (Jones)
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com
*Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

Zachary M. Jett, Esq. (VSB #93285)
BUTLER WEIHMULLER KATZ, et al
11525 North Community House Road
 Suite 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

*/s/ Harold L. Cohen*