# Exhibit 1

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
 2                   Norfolk Division
                     In Admiralty
 3

 4
    In the Matter of COEYMANS    )
 5  MARINE TOWING, LLC D/B/A     )
    CARVER MARINE TOWING as      )
 6  Owner and Operator of M/T    )
    Mackenzie Rose,              )
 7  (IMO No. 8968765) her cargo, )
    engines, boilers, tackle,    )
 8  equipment, apparel, and      )
    appurtenances, etc., in rem, )
 9  petitioning for Exoneration  )
    from or Limitation of        )
10  Liability in allision with   )
    Norfolk and Portsmouth Belt  ) CIVIL ACTION FILE
11  Line Railroad Company Main   ) NO.: 2:24-cv-00490
    Line Railroad Bridge         )
12  occurring June 15, 2024 in   )
    and about the Elizabeth      )
13  River, Virginia.            )
14

15

                  DEPOSITION OF
16                HOWARD SWANSON
            WEDNESDAY, JUNE 25, 2025
17                10:00 A.M.
18            CLYDE & CO US, LLP
         271 17TH ST. NW, STE. 1720
19             ATLANTA, GA 30363
20

21

22

23

24

25
```

## Page 2

```
 1  APPEARANCES OF COUNSEL:

 2

    Attorneys For Coeymans Marine Towing, LLC d/b/a
 3  Carver Marine Towing:
 4      MICHAEL J. ROMAN, Esq.
        Clyde & Co US LLP
 5      30 S. Wacker Drive, Ste. 2600
        Chicago, IL 60606
 6      Tel: (312) 635-6971
        Fax: (312) 635-6950
 7      Michael.roman@clydeco.us
        Dawn.johnson@clydeco.us
 8
 9  Attorneys for Norfolk and Portsmouth Belt Line
    Railroad Company:
10
        W. RYAN SNOW, Esq.
11      Crenshaw, Ware & Martin, P.L.C.
        150 W. Main Street, Suite 1923
12      Norfolk, Virginia 23510
        Telephone (757) 623-3000
13      Facsimile: (757) 623-5735
        Jchapman@cwm-law.com
14      Wrsnow@cwm-law.com
15
    Counsel for Evanston Insurance Company a/s/o
16  Norfolk and Portsmouth Belt Line Railroad Company:
17      (Appearance via Zoom)
        KENNETH F. HARDT, Esq.
18       Sinnot, Nuckols & Logan, P.C.
        13811 Village Mill Drive
19      Midlothian, Virginia 23114
        Mnanavati@snllaw.com
20      Cjones@snllaw.com
21

22

23

24

25
```

## Page 3

```
 1  APPEARANCES OF COUNSEL (CONT.)
 2  Counsel for Evanston Insurance Company, a/s/o
    Norfolk and Portsmouth Belt Line Railroad Company:
 3
        (Appearance via Zoom)
 4      ZACHARY M. JETT, Esq.
        Butler Weihmuller Katz, et al
 5      11525 North Community House Road
        Suite 300
 6      Charlotte, North Carolina 28277
        (704) 543-2321 (Telephone)
 7      (704) 543-2324 (Facsimile)
        Zjett@butler.legal
 8
 9      Also Present:  Cannon Moss
        Elizabeth Jefferson, summer associate
10

11

                     *   *   *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
 1  INDEX TO EXAMINATION
 2  Examination                        Page No.
 3  By Mr. Roman......................    5
    By Mr. Snow.......................  168
 4  By Mr. Roman......................  180
 5
 6            INDEX TO EXHIBITS
 7  Exhibit No.                        Page No.
 8  Swanson Exhibit 1.........................   8
       Subpoena for deposition
 9
    Swanson Exhibit 2........................   38
10     Email with attached proposal for
       Belt Line RR vertical lift bridge
11     inspection
12  Swanson Exhibit 3........................   67
       Elizabeth River bridge emergency
13     inspection report
14  Swanson Exhibit 4........................   82
       Elizabeth River bridge contract plans
15
    Swanson Exhibit 5........................  106
16     Request from Cannon Moss
17  Swanson Exhibit 6........................  116
       H&H letter to Adam Reeder 8-1-24
18
    Swanson Exhibit 7........................  137
19     Mechanical inspection report
20  Swanson Exhibit 8........................  157
       Email with attached fee estimate
21     for depositions
22  Swanson Exhibit 9........................  162
       Expert witness identification
23

24
                     *   *   *
25
```



Page 5

1      P R O C E E D I N G S
2
3          HOWARD SWANSON,
4  being first duly sworn, was examined and testified
5  as follows:
6          EXAMINATION
7  BY MR. ROMAN:
8      Q.  Good morning.  Again, I'm Michael
9  Roman, one of the attorneys who is representing
10  the petitioner, Coeymans Marine Towing, LLC in
11  this matter.  I appreciate you coming down for
12  the deposition.
13      Can you please state your name?
14      A.  Howard Carl Swanson.
15      Q.  Have you ever been deposed before?
16      A.  Yes, sir.
17      Q.  How many times?
18      A.  Three times I believe.
19      Q.  What was your involvement in the
20  lawsuits that you were deposed in?
21      A.  Let's see here.  One time -- and
22  these past three times were when I was working
23  with Norfolk Southern.  The first time I
24  believe it was that there was a contractor's
25  employee that got injured on a Norfolk Southern

Page 6

1  project.  I was at that time assistant division
2  engineer of bridges in Decatur, Illinois, and
3  it was one of the repair projects we were
4  doing.  And it was a contractor's employee that
5  got injured on the project and there was a
6  question about if Norfolk Southern's flag
7  person on the project properly guarded this
8  employee from injury.
9      Second time was a grade crossing incident
10  where a contractor -- outside contractor doing
11  a bridge replacement, an overhead bridge
12  replacement or new bridge -- new overhead
13  bridge had a cement truck, got hit by a train
14  at a crossing.  I really did not have any
15  involvement in that project prior to that, but
16  my name got in the email chain after the
17  project about who knew what.  And so I was
18  deposed because of that.
19      And the third project, when I was a -- I
20  can't remember if it was when I was assistant
21  chief engineer or assistant -- or engineer
22  structures for northern region.  There was a
23  bridge in Columbus, Ohio over the Scioto River
24  and the City of Columbus decided to rework
25  their riverfront.  And the -- it appeared that

Page 7

1  that reworking of the riverfront ended up
2  changing the channel of the river and caused
3  settlement on the bridge foundations.
4      Q.  Okay.  Sounds like two injury
5  lawsuits and then one relating to the potential
6  damage or -- that was done by the bridge
7  installation.  Fair enough?
8      A.  Well, the last one, it was the -- the
9  bridge was there already.  It wasn't -- there
10  was damage to the bridge caused by changing of
11  the river.
12      Q.  Right.  In any of those three
13  lawsuits were you designated by Norfolk
14  Southern as an expert?
15      A.  No.
16      Q.  Okay.  All right.  Just to back up,
17  I'm sure since you've been down this road
18  before, you understand the ground rules.  But
19  just so we have a good clean record, when I'm
20  asking questions if you just wait until I
21  finish, and then when you're responding I'll
22  try to return that same courtesy.  That way we
23  don't have crosstalk and Steve, the court
24  reporter, can take down everything we say.
25  Fair?

Page 8

1      A.  That's fair.
2      Q.  All right.  Second, it's not supposed
3  to be a marathon contest.  If you need a break
4  at any time let me or Ryan know.  Just ask that
5  if there's a question pending that you answer
6  the question and then we can take a break.  Is
7  that fair?
8      A.  Okay.
9      Q.  Then if I ask something -- I'm sure
10  at some point I'll ask something that you don't
11  understand, particularly we're going to be
12  speaking a little bit your language today as an
13  engineer.  So if there's something that you
14  don't understand or there's a certain
15  vernacular that you might use and you're not
16  sure what I'm asking, just let me know.  I'll
17  be happy to try to rephrase, but want to make
18  sure you and I are on the same page as to what
19  we're asking and what you're responding to.  Is
20  that fair?
21      A.  Works for me.
22      Q.  All right.  Great.  I just want to
23  enter the dep notice as Exhibit 1.
24          (Swanson Exhibit 1 marked
25          for identification by the court reporter).



Page 9

BY MR. ROMAN:
2    Q.   And I apologize, called it a notice,
3  but Ryan, it will be the subpoena itself.  And
4  Mr. Swanson, if you could take a look at what
5  we've marked as Exhibit 1.  Just let me know
6  when you've had a chance to review it.
7    A.   (Witness reviews document).
8         (Off-the-record discussion).
9         THE WITNESS:  Okay, I've reviewed
10  it.
11  BY MR. ROMAN:
12    Q.   And you recognize this document?
13    A.   Yes, sir.
14    Q.   And could you describe it for me?
15    A.   It's a subpoena to testify at this
16  deposition and production of some documents.
17    Q.   Okay.  And if we go to that document
18  request as Exhibit A to the subpoena, if you
19  could flip there, please.  Before we got on
20  record you handed me a thumb drive.
21    A.   Yes, sir.
22    Q.   Is that correct?  Is that thumb drive
23  the response to the document requests here that
24  we see on Exhibit 1?
25    A.   Yes, sir.

Page 10

Q.   Okay.  What did you do to gather
2  those documents and information that's
3  requested here?
4    A.   There are sort of three different
5  areas I gathered documents in.  Hardesty &
6  Hanover for a project has a virtual drive
7  for -- that contains all of our projects.  I
8  copied over the contents of that virtual drive.
9    I do keep sort of working copies of
10  documents for a project on my work computer.  I
11  copied over that file.  And then I searched
12  through my text messages, emails, and Teams
13  messages, internal messages for this project,
14  and tried to get all those that were related to
15  this project.
16    Q.   Did anyone assist you in that
17  process?
18    A.   No, sir.
19    Q.   Okay.  You mentioned Hardesty &
20  Hanover.  Are you currently employed by
21  Hardesty?
22    A.   Yes, sir.
23    Q.   And what is your current job title
24  with Hardesty?
25    A.   Chief engineer, passenger rail and

Page 11

transit.
2    Q.   How long have you been with -- well,
3  let me back up.  If I call it Hardesty today,
4  we're on the same page, we're talking about
5  Hardesty & Hanover?
6    A.   Yeah, or H&H is fine.
7    Q.   H&H.  How long have you been with
8  H&H?
9    A.   Five years.
10    Q.   About 2019, somewhere in there?
11    A.   Yeah.  Well, and it's two years prior
12  to that I worked -- had my own engineering firm
13  that worked exclusively for H&H.  So --
14    Q.   What's the name of that engineering
15  firm?
16    A.   HC Swanson Engineering, LLC.
17    Q.   And you had -- HC Swanson, LLC had
18  some type of arrangement where it was working
19  exclusively for H&H?
20    A.   Correct.
21    Q.   For the document gathering, did
22  anyone from the Belt Line assist or consult in
23  any way with your process for producing the
24  documents?
25    A.   No, sir.

Page 12

Q.   And that would be same with anyone
2  from the Crenshaw, Mr. Snow's law firm?  No one
3  assisted you with that process?
4    A.   No, sir.
5    Q.   All right.  Could you describe your
6  educational history for me?
7    A.   Well, the -- after sort of standard
8  high school, I attended Purdue University from
9  1982 to 1986 and graduated with a bachelor of
10  science in engineering.  I have a master's in
11  business administration from Emory University,
12  and there's been numerous continuing
13  education since then.
14    Q.   I'm an Indiana Hoosier, so don't hold
15  that against me today.
16    Are you a licensed engineer?
17    A.   Yes, sir.
18    Q.   Okay.  How many states are you
19  licensed in?
20    A.   Excuse me.  We keep this on our
21  business card, so I can try and make sure I
22  don't forget --
23    Q.   We like to have accuracy, sir.
24    A.   Yeah.  (Reviews business card).  14
25  states as a professional engineer.



Page 13

1    Q.   Okay.  When did you first obtain
2  licensure as an engineer?
3    A.   I believe in 1993 in Georgia.
4    Q.   Have you maintained that Georgia
5  license since '93?
6    A.   Yes, sir.
7    Q.   Have any of your licenses in any
8  states ever been revoked, put under suspension,
9  any type of disciplinary action?
10    A.   No, sir.
11    Q.   Are you a licensed engineer in the
12  state of Virginia?
13    A.   Yes, sir.
14    Q.   And when did you obtain that license?
15    A.   It was in 2024.
16    Q.   What is the process to obtain
17  licensure in Virginia?
18    A.   It is a -- and hopefully I get the
19  right legal phrase, it's a comity process.
20  Basically I had to send in a request for
21  licensure and some background documents.  And
22  there wasn't any specific requirements above
23  the licensing I already had.
24    Q.   I think sometimes we might call that
25  reciprocity.  Is it a situation where you were

Page 14

1  licensed in one state and Virginia sort of
2  honored that license as long as you put in the
3  proper paperwork?
4    A.   It works out that way, but if
5  you -- and I'm not going to get anywhere close
6  to saying anything with legality on this, but
7  there's something in the laws that say
8  something that it's not reciprocity, it's
9  comity I believe.  And I don't know for certain
10  what the specific legal definition for that is.
11    Q.   Fair enough.  Did you have to take
12  any type of exam or testing, anything like
13  that?
14    A.   No, sir.
15    Q.   All right.  Did you obtain the
16  Virginia license specifically to do work
17  related to the bridge that we're here to talk
18  about?
19    A.   Yes, sir.
20    Q.   All right.  Do you recall what month?
21    A.   No, I don't recall exactly what
22  month.
23    Q.   And we'll probably talk about a
24  couple of bridges today.  But as I understand
25  it the bridge that was involved in the allision

Page 15

1  generally referred to as the Main Line Bridge.
2  Just if I say Main Line Bridge or the MLB are
3  we on the same page that that's the one we're
4  talking about?
5    A.   Yeah.
6    Q.   Where did you work after graduating
7  Purdue with your -- I'm sorry, Emory after you
8  obtained your master's?
9    A.   Well, I obtained my master's at
10  night, so I was working for Norfolk Southern.
11  I -- right after Purdue I hired on with Norfolk
12  Southern and originally was working as a
13  management trainee out of Bluefield, West
14  Virginia.
15    Q.   How long were you in that management
16  trainee program?
17    A.   Eight months I believe.
18    Q.   What is involved in that management
19  trainee program?
20    A.   I was a management trainee in the
21  bridges and structures department, so I
22  basically worked with the repair gangs that the
23  railroad had in the coal fields of West
24  Virginia, and somewhat supervised their work.
25  And it was just basically a training process to

Page 16

1  sort of learn bridge work and how construction
2  work happened in the field.
3    Q.   Where did you go next after
4  completing the management training program?
5    A.   I was transferred here to Atlanta as
6  a assistant engineer of structures.
7    Q.   And what are the duties and
8  responsibilities of that position?
9    A.   It was designing repairs and
10  replacements for railroad bridges.
11    Q.   Were you assigned to a specific area?
12    A.   At that time I was assigned to the
13  eastern region, which included Virginia, North
14  Carolina, South Carolina, Georgia, little bit
15  of Florida.
16    Q.   Did you have any projects in that
17  position where you were overseeing as the
18  engineer repair work to any of the Norfolk
19  Southern bridges?
20    A.   Yeah, there were quite a few that I
21  had during that period.
22    Q.   Were any of those bridges a lift
23  bridge similar to the one like the MLB bridge?
24    A.   When I -- and for -- I was here in
25  Atlanta for 20 years.  And so during that



Page 17

1  period I worked for -- in the eastern region,
2  western region and northern region.  When I was
3  with the western region, had some repair work
4  to the drawbridge at Decatur, Alabama and
5  Jackson, Mississippi which are both vertical
6  lift bridges.
7      Northern region had I believe some repair
8  work to the Calumet River bridge just outside
9  of Chicago.  You see it from the skyway.  And
10  that's also a vertical lift bridge.
11      Q.  How long were you in that position
12  for?
13      A.  I was an assistant engineer for 20
14  years.
15      Q.  Who did you -- well, when you first
16  started who were you reporting to?
17      A.  Robert Hugh Hyder.
18      Q.  What was Robert's title?
19      A.  Engineer of structures.
20      Q.  And that was for Norfolk Southern?
21      A.  Yes.
22      Q.  Was he your direct superior?
23      A.  Yes, sir.
24      Q.  Did you have anyone reporting
25  directly to you?

Page 18

1      A.  No, sir.
2      Q.  All right.  How long was Robert your
3  superior for?
4      A.  I can't remember.  I want to say it
5  was like for eight or nine years in that time
6  period.
7      Q.  Were you located in the same area for
8  all those 20 years in Atlanta?
9      A.  Yes.
10      Q.  Did you oversee that same -- or were
11  you assigned to that same territory that we
12  were discussing the entire 20 years?
13      A.  No, I -- I was for part of that
14  period part of the western region and I worked
15  for Willie Benton at that time.  And that's
16  when I did the work on the bridges at Decatur,
17  Alabama and Jackson, Mississippi.
18      And then for the last say three or four
19  years or five years I worked for -- on the
20  northern region which is a former Conrail.  And
21  I worked for Tom Heinrich, and that's when I
22  worked on the Calumet River bridge.
23      Q.  Did you hold any other positions with
24  Norfolk Southern other than the assistant
25  engineer role?

Page 19

1      A.  I was a assistant division engineer
2  of bridges on the Illinois division for a
3  little bit over five years.
4      Q.  And when was that?
5      A.  That was 2007 through 2013.
6      Q.  Where were you located then?
7      A.  Decatur, Illinois.
8      Q.  And what's the difference between
9  assistant division engineer and just an
10  assistant engineer?
11      A.  Assistant division engineer is
12  responsible for the maintenance of all the
13  bridges, the division that they are assigned
14  to.  So when I was ADE out of -- or assistant
15  division engineer out of Decatur, I had -- had
16  maintenance responsibilities in addition to a
17  whole bunch of other bridges of the vertical
18  lift bridges at Valley City, Illinois and
19  Hannibal, Missouri.
20      Q.  Okay.  The MLB bridge as I understand
21  it is owned by Norfolk & Portsmouth Belt Line
22  Railroad Company.  Is that your understanding?
23      A.  (Witness nods head affirmatively).
24      Q.  If I call it the Belt Line are we on
25  the same page, that's the company I'm talking

Page 20

1  about?
2      A.  Yes, sir.
3      Q.  What is your understanding of the
4  relationship between Norfolk Southern and the
5  Belt Line?
6      A.  My understanding is that the Belt
7  Line is a subsidiary of Norfolk Southern.
8      Q.  In your time working for Norfolk
9  Southern, did you ever work on any bridges that
10  were owned by the Belt Line including the MLB?
11      A.  Never worked on any of them.
12      Q.  Did you ever work with anyone from
13  Belt Line in your roles with Norfolk Southern?
14      A.  In the 2000s or 1999, 2000, somewhere
15  around that time period, Norfolk Southern had a
16  program that they decided to work on creating
17  remote operation of some of their drawbridges.
18  The Belt Line had successfully turned this
19  bridge, the Main Line Bridge, into a remote
20  operated bridge.  And during that time period
21  we -- we looked at various bridges, one bridge
22  on the Florida East Coast Railroad down in
23  Miami.
24      Anyways, the Belt Line bridge, Main Line
25  Bridge, was one of the bridges we looked at.



Page 21

1  So it was like probably three or four hours
2  with the Belt Line employee.
3      Q.  Were you involved in any capacity
4  with the modification of the MLB to a remote --
5  you said it was a remote?
6      A.  Yes.
7      Q.  Were you involved at all in that
8  project?
9      A.  No, no, it was looking at the project
10  after it was completed to see how this stuff
11  works.
12      Q.  And who from the Belt Line did you
13  meet with during that three or four-hour
14  meeting?
15      A.  I have no idea.
16      Q.  Fair to say you were sort of
17  consulting with them just to get their industry
18  knowledge and what they did on the project,
19  that type of thing?
20      A.  Yes, sir.
21      Q.  All right.  Any other kind of
22  encounters or involvement working with the Main
23  Line Bridge prior to 2024?
24      A.  Well, the -- in 2023, we were
25  contacted -- I can't remember if we contacted

Page 22

1  or the Belt Line contacted us, about doing a
2  mechanical and electrical inspection of the
3  bridge.  So that -- the actual inspection that
4  happened in 2024 started in 2023.
5      Q.  Okay.  Let's go back.  So you were
6  the assistant division engineer roughly about
7  '07 to '13 for Norfolk Southern?
8      A.  (Witness nods head affirmatively).
9      Q.  Where did you go next after that
10  position?
11      A.  I was a assistant division engineer
12  of bridges on the Virginia division, which was
13  out of Roanoke, Virginia and included Norfolk.
14      Q.  As assistant division engineer, were
15  you responsible for overseeing Norfolk
16  Southern's railroad bridges?
17      A.  Yes, sir.
18      Q.  Does Norfolk Southern have a -- did
19  they have a bridge management program at that
20  time?
21      A.  Yes, sir.
22      Q.  Were you designated as the program
23  manager under that program?  Let's strike that.
24      Were you designated in any capacity as
25  someone who was responsible for implementing

Page 23

1  that bridge management program?
2      A.  Yes.  We -- I was designated as a
3  bridge engineer, bridge inspector and bridge
4  supervisor at that time.
5      Q.  Do you know who the bridge program
6  manager was at that time when you were
7  designated as those roles?
8      A.  The -- can you explain that a little
9  bit more?
10      Q.  Sure.  My understanding of the
11  various roles in a bridge program manager
12  includes the three that you said and also
13  includes a bridge program manager, the BPM, who
14  is sort of overall responsible for
15  implementation of the bridge management
16  program.
17      And I'm just seeing if you recall who was
18  that person during the time that you worked for
19  Norfolk Southern and were listed as the, I
20  think you said the engineer or the supervisor
21  and the inspector?
22      A.  Yeah, I -- and it's been a while
23  since I've looked at that part of the FRA
24  requirements, but I don't exactly remember that
25  title being designated under the FRA

Page 24

1  requirements.  That would have fallen under the
2  chief engineer of bridges likely, who was James
3  M. Carter, Jr. at that time.
4      Q.  And during the time that you were
5  with Norfolk Southern, did Norfolk Southern
6  maintain a bridge management program that was
7  separate from the bridge management program
8  that was maintained by the Belt Line?
9      A.  Yes, sir.
10      Q.  Did you at any time -- were you at
11  any time designated in any role under the Belt
12  Line's bridge management program?
13      A.  No, sir.
14      Q.  Okay.  And when you were over the --
15  you said it was the Virginia division?
16      A.  (Witness nods head affirmatively).
17      Q.  Did you have any role in overseeing
18  operations on the Main Line Bridge, repairs on
19  the Main Line Bridge?
20      A.  No, sir.
21      Q.  Okay.  All right.  Where did you go
22  next after the assistant division role in
23  Virginia?
24      A.  Engineer of structures for northern
25  region, so after Tom Heinrich retired I



Page 25

1  basically took his spot.
2      Q.  And what's the difference in the --
3  those two positions?
4      A.  Well, as the assistant engineer
5  you're doing the design work.  As the engineer
6  of structures you're supervising the folks
7  doing the design work, programming work, making
8  sure that everything's in compliance.  There
9  was a bridge inspection audit process that we
10 were involved with too.
11     Q.  How long were you in that position?
12     A.  I want to say two or three years, and
13 then I moved into the assistant chief engineer
14 role.
15     Q.  How long were you the assistant
16 division engineer for the Virginia region?
17     A.  One year.
18     Q.  That was about 2013 to 2014?
19     A.  Right.
20     Q.  And then the next role was '14 to
21 about '16 or '17?
22     A.  Right.
23     Q.  And I think you said there was one
24 more position with Norfolk Southern?
25     A.  Assistant chief engineer of bridges.

Page 26

1      Q.  And where were you located for that
2  role?
3      A.  Here in Atlanta, and the engineer of
4  structures role was here in Atlanta also.
5      Q.  As the assistant chief engineer were
6  you overseeing a specific territory?
7      A.  No, I had the responsibility for the
8  entire railroad.
9      Q.  Okay.  Would you have responsibility
10 then for overseeing all of the railroad
11 bridges?
12     A.  Pretty much so.
13     Q.  How many during that time railroad
14 bridges were on Norfolk Southern's tracks?
15     A.  I can't give you a good estimate
16 right now.  I don't remember.
17     Q.  Okay.  In that assistant chief
18 engineer role did you have any responsibility
19 for overseeing the Main Line Bridge?
20     A.  No, sir.
21     Q.  Okay.  And then was it after the
22 assistant chief engineer role that you went out
23 on your own?
24     A.  Yes, sir.
25     Q.  And what prompted that decision?

Page 27

1      A.  We had completed a couple of large
2  projects and it didn't look like there were any
3  more large projects in the pipeline.  And I
4  wanted to continue doing large projects so...
5      Q.  We being Norfolk Southern had
6  completed a bunch of large projects?
7      A.  Yes.
8      Q.  And when you were with the company
9  and there was a repair project that needed to
10 be done on a Norfolk Southern railroad bridge
11 did they have the capability to do that
12 in-house or would they usually contract out?
13     A.  What portion of that repair project?
14     Q.  Well, I guess is there a certain type
15 of project that they would have capacity to do
16 in-house versus out?  Just trying to get a
17 sense of how often Norfolk Southern used to use
18 contractors?
19     A.  Over my time with Norfolk Southern,
20 the maintenance forces sort of decreased and
21 probably by the time I left Norfolk Southern
22 about 50 percent of the -- maybe 50 percent or
23 more of the work was contracted out to -- the
24 repair work was contracted -- the actual repair
25 work was contracted out.

Page 28

1      Q.  And when you were with Norfolk
2  Southern, did you ever retain Hardesty &
3  Hanover to do any repair work?
4      A.  Never retained Hardesty & Hanover to
5  do repair work.  They were involved with a
6  remote drawbridge project in Alabama but not
7  for repair work.
8      Q.  How about just any work performed on
9  any railroad bridge, did you ever retain
10 Hardesty & Hanover?
11     A.  No.
12     Q.  Okay.
13     A.  The major projects that were
14 previously done that I mentioned, one of them
15 was designed by Modjeski and Masters, which is
16 a direct competitor with H&H.  And I had
17 approved invoices for over a million dollars
18 with M and M and I decided I wanted to leave
19 the railroad.  And so I wanted to go to a firm
20 that was like M and M so -- but I didn't want
21 to have any conflict of interest, so I ended up
22 with Hardesty & Hanover.
23     Q.  When was that project?
24     A.  Let's see, it was the Genesee Arch
25 Bridge at Portageville, and I want to say we



Page 29

1  did construction from 2016 through 2018.
2      Q.   When you started your LLC right after
3  you left Norfolk Southern, how did you get
4  connected with Hardesty & Hanover for that
5  exclusive arrangement I think you said?
6      A.   The AREMA has technical committees
7  and I'm on the steel technical committee.  And
8  I talked to another member of the committee who
9  is -- well, Paul Skelton, who's one of the
10  principals at H&H.
11      Q.   And just for those of us that don't
12  live and breathe this, what is AREMA?
13      A.   American Railroad Engineering and
14  Maintenance-of-Way Association.
15      Q.   And what is your understanding of
16  what that organization does?
17      A.   It develops technical specifications
18  for various railroad engineering situations,
19  let's put it that way.
20      Q.   How long have you -- you said you
21  were on a committee?
22      A.   (Witness nods head affirmatively).
23      Q.   How long have you been involved with
24  AREMA?
25      A.   AREMA was formed in, I'm going to get

Page 30

1  this date probably wrong, around 1999, '95,
2  2000, somewhere in there, and it was a merger
3  of previous engineering organizations.  One of
4  them was the American Railroad Engineering
5  Association and I've been a member of AR -- was
6  a member of ARE since 1984.
7      Q.   Did you have any involvement in
8  developing the rules and specifications that
9  AREMA publishes?
10      A.   Yes.
11      Q.   What involvement did you have in
12  that?
13      A.   As a member of a technical committee,
14  well, AREMA is all volunteer organization.  As
15  a member of a technical committee, you can make
16  a proposal to change one part of the
17  specification.  Once that -- and there are
18  subcommittees that are responsible for
19  individual parts or sections of the manual from
20  there.
21      And so once that subcommittee approves a
22  change to the manual, then it goes to the full
23  committee for vote.  And then if it succeeds
24  then it is incorporated into the manual.
25      I had, prior to my involvement with the

Page 31

1  steel committee, I was involved with the
2  seismic committee and most of the changes that
3  I've made to the manual were in the seismic
4  area.
5      Q.   And what is the seismic area?  What
6  are you referring to there?
7      A.   Basically it is ensuring that
8  railroad structures, being that they are
9  bridges or anything else, are able to survive
10  an earthquake, and that survival term is kind
11  of a term of art in terms of is it going to be
12  able to -- is it just going to stand up after
13  an earthquake, are we going to be able to run
14  trains on it afterwards and the sort.
15      Q.   And so it was through your
16  involvement with AREMA that you got connected
17  with H&H?
18      A.   Yes, sir.
19      Q.   All right.  I think you said you had
20  that LLC for about two years?
21      A.   Yes, sir.
22      Q.   What was the arrangement you had with
23  H&H or the LLC had with H&H to do work
24  exclusively for them?
25      A.   Basically it was a hourly rate and an

Page 32

1  agreement for them to pay for attendance at
2  certain conferences.
3      Q.   Did you have speaking engagements,
4  anything like that at those conferences?
5      A.   No, sir.
6      Q.   Did you actually do any engineering
7  work under that arrangement for H&H?
8      A.   Oh, yes, yeah.
9      Q.   How many projects were you involved
10  with through your work for the LLC in
11  arrangement with H&H during those two years?
12      A.   I don't remember, but it was probably
13  at least a dozen.
14      Q.   Were you the lead engineer overseeing
15  any of those projects during that time?
16      A.   There was one project that I was.
17      Q.   Okay.  Were any of those projects for
18  Norfolk Southern?
19      A.   No, sir.
20      Q.   How about for the Belt Line?
21      A.   No, sir.
22      Q.   Can you recall any of the projects or
23  what -- well, strike that.
24      Were the projects related to any railroad
25  bridges?



Page 33

1    A.   Yes, they were all related to
2   railroad bridges.
3    Q.   Any similar to the Main Line Bridge
4   like with a lift system?
5    A.   No, sir.
6    Q.   And then at some point you started
7   with H&H, correct?
8    A.   Yes.
9    Q.   And what prompted your transfer to
10   H&H as a full-time employee?
11    A.   Well, and this sort of has to go with
12   the LLC, and since I had 32 years with Norfolk
13   Southern, I was under railroad retirement.
14   Under railroad retirement, there are certain
15   benefits that you lose if you go to work for a
16   private employer.  But if you are employed --
17   self-employed, you can retain those benefits.
18    And the main benefit was a survivor
19   benefit for my wife that was -- and so we
20   looked at the costs that we were paying for
21   healthcare and looked at the cost of creating a
22   life insurance policy for me that would
23   basically have the same result as the survivor
24   benefit for my wife, and determined it was
25   cheaper for me to go to work for H&H and get

Page 34

1   the healthcare and put money into life
2   insurance to take into account that survivor
3   benefit.
4    Q.   Gotcha, okay.  What does H&H do?
5   What is their primary business?
6    A.   Our primary business is -- well, our
7   primary business is engineering services.
8   Historically, H&H has been very involved in the
9   movable bridge business.  JA Waddell, who was
10   basically the founder of the H&H, invented the
11   first vertical lift bridge in Chicago.
12    Q.   What do you mean by moveable bridge?
13    A.   There are three types of movable
14   bridges that are sort of familiar to people.
15   Let's call it a swing bridge, which is a bridge
16   that pivots in the middle to allow ships to
17   pass through.  You have bascule bridges which
18   are hinged at one end to allow ships to pass
19   through.  And then you have a vertical lift
20   bridge like this bridge which the whole bridge
21   raises up.
22    Q.   And the Main Line you said is the
23   vertical lift?
24    A.   Correct.
25    Q.   Does H&H provide any litigation

Page 35

1   support services?
2    A.   Please define that term.
3    Q.   Sure, if a law firm calls H&H and
4   says we're looking for an expert witness to
5   opine on XYZ in litigation, is that a service
6   that H&H will provide?
7    A.   I think we do on a very limited
8   basis.  Generally we shy away from that.  I'm
9   not certain if we have ever done that, but it
10   is not sort of our bread and butter.
11    Q.   Have you ever provided any expert
12   witnessing services?
13    A.   No, sir.
14    Q.   Remind me again what your title is
15   with H&H?
16    A.   Chief engineer, passenger rail and
17   transit.
18    Q.   Was that your title when you started
19   with the company?
20    A.   No, my title was I believe senior
21   project manager.
22    Q.   I take it your position now would
23   have been considered an elevation from senior
24   project manager?
25    A.   Yes, sir.

Page 36

1    Q.   Okay.  Who did you report to as a
2   senior PM?
3    A.   I reported to -- well, H&H doesn't
4   have direct structure as well as some companies
5   do.  Railroads have very militaristic style of
6   organization chart which I was kind of
7   surprised with H&H.
8    But I somewhat reported to Paul Skelton
9   when I started out as a senior project
10   manager -- or no.  No, no, no.  I actually
11   reported to Brett Farmer, and Brett was the --
12   I don't remember what Brett's official title
13   was but it was something in accordance with
14   head of the freight rail group.
15    Q.   Did you have any direct reports as a
16   senior PM?
17    A.   No, sir.
18    Q.   How long were you titled as the
19   senior PM or a senior PM?
20    A.   For about three and a half -- or for
21   about four years.  I've only been a chief
22   engineer of passenger and transit for about a
23   year.
24    Q.   So you were a senior PM for at least
25   the beginning portion of the work that was done





Page 37

1   on the Main Line Bridge?
2     A.  Yes.
3     Q.  How does H&H compensate you as a
4   senior PM?  Generally what's the structure?
5     A.  The structure is I get compensated an
6   hourly rate and then there's a benefits
7   package.
8     Q.  Are you 1099 or W-2?
9     A.  W-2.
10
22    Q.  And in terms of what goes into your
23  pocket, is it just your hourly rate?
24    A.  Just my hourly rate.
25    Q.  So if H&H bills you out for let's say

Page 38

1   300 for one client and 400 for the other
2   client, do you see any benefit from that
3   hundred dollar increase --
4     A.  No, sir.
5     Q.  -- into your pocket?  Okay.
6     I think earlier you said at some point you
7   were contacted in 2023 regarding a project on
8   the Main Line Bridge?
9     A.  Yes, sir.
10    Q.  All right.  I'm going to mark as 2.
11        (Swanson Exhibit 2 marked
12        for identification by the court reporter).
13    MR. SNOW:  Can you tell me what
14  that is?
15        MR. ROMAN:  I think it's that top
16  one, and I printed these without the Bates,
17  these were the raw --
18        MR. SNOW:  Maybe, Mr. Swanson,
19  can you read the date of the document you're
20  looking at?
21        THE WITNESS:  December 9th, 2023,
22  10:19 a.m.  It's from Amanda Gary.
23  BY MR. ROMAN:
24    Q.  Amanda Gary is who printed that.
25    A.  Okay.

Page 39

1     Q.  I believe it is an email thread
2   between yourself and Cannon Moss, if you look
3   at that.
4     A.  Right.
5        MR. SNOW:  Can we go off the
6   record for just a moment?
7        MR. ROMAN:  Sure.
8        (Off-the-record discussion).
9        (Brief recess).
10  BY MR. ROMAN:
11    Q.  Mr. Swanson, we have marked as
12  Exhibit 2 a set of documents.  If you could
13  review them and let me know when you're ready
14  to go.
15    A.  (Witness reviews document).
16    Q.  While Mr. Swanson is reviewing that,
17  just for the record, Exhibit 2 is an email and
18  then an attachment to the email.  The email has
19  been produced, marked as NPBL 007822.  I don't
20  believe a Bates marked copy of the attachment,
21  which is a letter dated December 8th, 2023 on
22  Hardesty & Hanover letterhead to Mr. Adam
23  Reeder, I don't believe that's been Bates
24  marked, but that's what Exhibit 2 consists of.
25        MR. SNOW:  This is a letter

Page 40

1   that's attached to the email?
2        MR. ROMAN:  Correct.
3        THE WITNESS:  I'm finished
4   reading it.
5   BY MR. ROMAN:
6     Q.  And do you recognize these documents?
7     A.  Yes, sir.
8     Q.  Could you describe what they are?
9     A.  It is a proposal to diagnose problems
10  with the guide rail system for the Elizabeth
11  River bridge of the Belt Line.
12    Q.  And the first document email dated
13  Saturday, December 9th, 2023, 10:19:12 a.m.
14  from yourself to Mr. Reeder, correct?
15    A.  Yes.
16    Q.  All right.  At the time you sent this
17  email had you done any type of inspection or
18  review of the bridge?
19    A.  No, sir.
20    Q.  Okay.  And then the proposal which is
21  the attachment to the email, is this something
22  that you drafted?
23    A.  I drafted it.  There was likely
24  some -- or definitely there was some internal
25  editing with regard to it, but yeah, that's my



Page 41

1  letter.
2      Q.  Okay.  And how did you get involved
3  with the -- with this or what prompted you to
4  provide the proposal?
5      A.  I don't remember exactly how we got
6  connected up with the Belt Line to begin with
7  in terms of them indicating that they had a
8  problem with their bridge.  It may have been
9  just a cold call by Travis Kimmins, I can't
10  remember.
11      Q.  And what was your understanding of
12  what the problem was with the bridge?
13      A.  My understanding was that they were
14  having problems with the counterweight not
15  hanging exactly vertical and that caused it to
16  ride up against the guide rails.  Those are
17  rails that guide the counterweight.
18      Q.  And do you recall how you obtained
19  that information?
20      A.  Talking with Adam Reeder prior to
21  this letter.
22      Q.  Had you ever worked with Mr. Reeder
23  in the past?
24      A.  Not to my knowledge.
25      Q.  So the information that there was an

Page 42

1  issue with the counterweight that was pressing
2  up against the guide rails would have come from
3  Mr. Reeder to the best of your recollection?
4      A.  Best of my recollection.
5      Q.  Okay.  If we go to the attachment,
6  the letter dated December 8th, 2023, project
7  understanding header, do you see that there?
8      A.  Yes, sir.
9      Q.  It says the main counterweight for
10  the Belt Line vertical lift bridge over the
11  Elizabeth River in Norfolk, Virginia has been
12  riding against the guide rails.  This issue has
13  been gradually getting worse.  H&H has been
14  requested to inspect the bridge to identify the
15  cause of the issue.
16      Did I read that correctly?
17      A.  That is correct.
18      Q.  What is meant by the issue had been
19  gradually getting worse?
20      A.  My understanding was that it was --
21  that the connector or the -- the guide portion
22  that rides on the guide rails was getting
23  closer to the guide rails and they had to
24  lubricate it more to allow it to operate
25  properly.

Page 43

1      Q.  Could that riding against the guide
2  rails impact the structural integrity of that
3  portion of the bridge?
4          MR. SNOW:  Object to form.
5          THE WITNESS:  Can you please
6  define structural integrity?
7  BY MR. ROMAN:
8      Q.  Well, what are some of the impacts
9  that could result from this issue of the
10  counterweight riding against the guide rails?
11      A.  It could cause the counterweight to
12  kind of get stuck in there and cause more
13  friction than what the motors that operate the
14  bridge can overcome.
15      Q.  Could it increase strain on the
16  motors?
17      A.  Yes, it could.
18      Q.  Could it increase strain on the guide
19  rails themselves?
20      A.  Yes, it could.
21      Q.  And backing up, if you could explain
22  just generally what the -- how the lift system
23  portion of the bridge kind of works?
24      A.  Okay.  The vertical lift bridges work
25  with a -- you have a very large weight for the

Page 44

1  span and to make it so that the amount -- you
2  know, you require a very large system to just
3  directly lift that span up and down.
4      So to counterbalance that there are
5  counterweights that are attached to -- or
6  there's great big pulleys on the top that are
7  known as sheaves that counterweight ropes or
8  folks would call them cable, wire rope cables
9  but they are known as counterweight ropes,
10  attach from the span over these sheaves onto
11  the counterweights, and the system is designed
12  so the -- it takes less mechanical effort to
13  raise and lower the bridge.
14      And to keep the counterweights from
15  blowing back and forth in the wind and causing
16  all sorts of problems, there are guide rails to
17  hold the counterweights basically in a vertical
18  plane as they go up and down.
19      Q.  There's a reference on the attachment
20  that one of the scope of H&H's project is to
21  perform an inspection of the counterweights,
22  right?
23      A.  Yes, sir.
24      Q.  When did that inspection occur?
25      A.  I don't recall the exact date, but it



Page 45

1  was about a week or so before the allision.
2     Q.  So in early June 2024?
3     A.  Yes.
4     Q.  Did you perform that inspection?
5     A.  No, sir.
6     Q.  Who did?
7     A.  Travis Kimmins and Kevin Ciampi
8  performed the inspection.
9     Q.  And both of those gentlemen are
10  employees of Hardesty & Hanover?
11    A.  Yes, sir.
12    Q.  And what is, if you know,
13  Mr. Kimmins' background?
14    A.  Mr. Kimmins is a mechanical engineer,
15  but I don't really have a thorough background
16  for him.
17    Q.  And remind me the other individual
18  you mentioned?
19    A.  Kevin Ciampi, that's C-I-A-M-P-I.  He
20  is also a mechanical engineer.
21    Q.  Okay.  Do you know if either of those
22  gentlemen are structural engineers?
23    A.  Neither are structural engineers.
24    Q.  Did you discuss the inspection that
25  those two individuals performed with them?

Page 46

1     A.  Yes, I've discussed it, discussed the
2  inspection and the report with them.
3     Q.  The letter that was attached to what
4  we've marked as Exhibit 2, you signed that
5  proposal, right?
6     A.  Yes, sir.
7     Q.  What was your involvement in the
8  project that resulted from the proposal and the
9  acceptance of the proposal?
10    A.  The -- my part of it was basically
11  sort of managing the relationship with the
12  railroad.
13    Q.  Who was the lead from H&H who was
14  overseeing the actual provision of services for
15  this project?
16    A.  Can you define exactly what you mean
17  by provision of services?
18    Q.  Sure.  Well, if we look at the
19  proposal under the scope of work, first it says
20  perform power calculations to determine the
21  ideal balance condition with considerations to
22  the capabilities of the current machinery,
23  snow/ice loads and brake capacity.  Do you see
24  that part?
25    A.  Yeah.

Page 47

1     Q.  So who was responsible from H&H for
2  doing that portion of the project?
3     A.  Kevin Ciampi.
4     Q.  Okay.  Do you know if Mr. Ciampi
5  performed those calculations before or after
6  conducting the inspection or during I guess I
7  should say?
8     A.  After the inspection.
9     Q.  Okay.  And then number two under the
10  proposed scope it says to perform an in-depth
11  inspection of the mechanical systems to
12  identify the source of the counterweight issues
13  plus identify any other items that could cause
14  future operating issues.
15    Was it Mr. Kimmins and Mr. Ciampi who
16  performed that inspection?
17    A.  Yeah, Kimmins and Ciampi performed
18  that inspection.
19    Q.  Anyone else to your knowledge from
20  H&H?
21    A.  I'm not certain, they may have had a
22  junior with them.
23    Q.  And then third, it says perform
24  strain gauge balance testing, prepare balance
25  report at completion of testing with

Page 48

1  recommendations for balance adjustments.  Do
2  you see that part?
3     A.  Yes.
4     Q.  Do you know who was responsible from
5  H&H for performing that part of the project?
6     A.  I believe Kevin did that.
7     Q.  And then number four says confirm
8  that the bridge is properly driving into the
9  seats, and quote, winding up the machinery.
10  H&H will have our local senior electrical
11  engineer assist with the strain gauge testing
12  and while he will evaluate the seating wind up
13  and perform a cursory inspection of electrical
14  systems.  Do you see that part?
15    A.  Yeah, and I don't know who exactly
16  that senior, local senior electrical engineer
17  was.
18    Q.  Okay.  Do you know -- do you think he
19  would have been an H&H employee or --
20    A.  Yes.
21    Q.  Okay.  Does H&H have a base of
22  operations in the Norfolk, Virginia area?
23    A.  Yeah, we have Travis Kimmins is based
24  there.
25    Q.  And what is meant by properly driving



1  into the seats there?
2      A.  I will give a structural engineer's
3  viewpoint on that.  I'm not an expert on this
4  portion of work.  However, the systems for
5  vertical lift bridges are designed so that when
6  you're closing the bridge or even when you're
7  opening it, there is a sort of startup speed,
8  full speed for the movement, let's say you're
9  going down -- you're lowering the span, and
10  then a slower speed for when you're actually
11  landing down on the bearings.
12      So the -- and that's -- well, that's
13  driving into the seat so that the idea is you
14  want to make sure it firmly gets down in the
15  bearings but you're not running into the
16  bearings at full speed.
17      Q.  Okay.  And then how about the
18  reference to, quote, winding up the machinery?
19  Can you interpret that for us?
20      A.  I'm not exactly certain what I meant
21  by that.  I believe it has something to do with
22  that process of starting out slow, going full
23  speed in the main part of the lift and then
24  winding down or slowing down at the right time.
25      Q.  You said the inspection was performed

1  a few weeks before the June 15th allision,
2  right?
3      A.  Correct.
4      Q.  Do you recall when you first had a
5  discussion with either Mr. Kimmins or
6  Mr. Ciampi about that inspection?
7      A.  I believe it was -- well, it would
8  have been prior to this December 9th letter
9  because, you know, when we're lining up the
10  estimate for this work, you know, you talk to
11  the people who are going to be doing the work.
12  And so coming up with their estimated hours,
13  travel costs and all the rest of that, that
14  would have been prior to proposal letter.
15      Q.  The proposal letter is dated not
16  December -- well, the letter itself is December
17  8th, 2023.  Your transmittal email was December
18  9th, 2023, right?  The allision was about six
19  months later on June 15th, 2024.
20      And my question was when you -- if you
21  recall when you first discussed the inspection,
22  which I understand they performed in June 4th
23  and 5th of 2024, when you discussed the results
24  of that inspection with them?
25      A.  I believe it was a day or two after

1  the actual inspection.
2      Q.  What do you recall from that
3  discussion?
4      A.  It was, you know, sort of, you know,
5  did you have any problem finding the bridge,
6  did you have any problems getting track time to
7  get out on the bridge, you know, did you meet
8  with -- you know, did you have any problems
9  meeting with the railroad representatives, just
10  sort of a overall how did the inspection go
11  sort of thing.  I don't remember if we
12  discussed any technical details.
13      Q.  Okay.  And who was on that -- well,
14  was it a phone call, in-person meetings, Zoom,
15  do you recall?
16      A.  I don't recall.  I think it was a --
17  it probably was either a phone call or a Teams
18  meeting, not a official Teams meeting but just
19  a, you know, saw Travis was available and rung
20  him up on Teams.
21      Q.  And it was you and Travis on that
22  Teams call?
23      A.  Best of my understanding.
24      Q.  Can you recall if Mr. Ciampi or
25  anyone else was also on it?

1      A.  No, I can't recall.
2      Q.  Okay.  Did Mr. Kimmins discuss any of
3  his preliminary recommendations as to what type
4  of work might need to be performed to resolve
5  the issue with the counterweight?
6      A.  I don't -- I did have a conversation
7  with Travis with regard to that, but I cannot
8  remember if it was prior or after the allision.
9      Q.  And what did Mr. Kimmins say were his
10  preliminary recommendations?
11      A.  There's -- what we found, one of the
12  major problems was that the -- there's -- I
13  can't remember the exact number but let's say
14  there's 32 of these counterweight ropes that go
15  from the span to the counterweight, and that
16  they were not all equal tensioned, and that at
17  a minimum they would have to be equally
18  tensioned.
19      Q.  Did Mr. Kimmins say anything with
20  regard to whether work would need to be
21  performed on the guide rails themselves?
22      A.  I don't recall if he said so or not.
23      Q.  How about the mechanical portions,
24  the motor, the brake, did Mr. Kimmins discuss
25  those components at all?



Page 53

1    A.   I don't remember if he discussed them
2  at that time.
3    Q.   Do you know if Mr. Kimmins -- well,
4  strike that.
5    Do you know if there were any plans made
6  at any time to perform work on the brake system
7  of the Main Line Bridge?
8    A.   We -- somewhere in that time period
9  we realized that the motor brake, which is one
10  brake on the back side of the motor, was
11  undersized for holding the span in place when
12  the span was in a raised position.  Also,
13  undersized for holding the counterweight in
14  place when the span's in the lowered position.
15    Q.   And how did H&H determine that it was
16  undersized?
17    A.   That is out of my area of expertise.
18    Q.   Okay.  Do you know who would have
19  made that determination for H&H?
20    A.   I believe Travis did.
21    Q.   At any time were there plans
22  formulated to perform any repair work on the
23  counterweight itself?
24    A.   Can you please clarify that question?
25    Q.   Yeah, sure.  So maybe I'll call it

Page 54

1  the counterweight system, which you were just
2  describing, it going up and down and the guide
3  rails which as I understand it would be
4  distinct from the motor brake, right?
5    A.   (Witness nods head affirmatively.)
6    Q.   So if we take a look at that
7  counterweight, the guides, the spans, was there
8  ever -- were there any plans formulated to do
9  any type of work to that portion of the bridge
10  resulting from that June 4th and 5th
11  inspection?
12    A.   H&H obtained a contract from Belt
13  Line in the last two months to develop 30
14  percent plans to do work associated with
15  readjusting the counterweight or associated
16  with the counterweight ropes and getting the --
17  that system corrected.
18    Q.   Was there any work done on the ropes
19  at any time between June 15th and today?
20    A.   No, sir.
21    Q.   And then how about the counterweight
22  guide rails themselves?  Any work done on those
23  between June 15th and today?
24    A.   Yes, there was work done on those.
25    Q.   And that would be on the -- just to

Page 55

1  clarify the western portion of the bridge,
2  right?
3    A.   Correct.
4    Q.   What type of work can you recall
5  being performed on the counterweight guide
6  rails?
7    A.   The counterweight guide rails were
8  damaged in the allision and the
9  counterweight -- it appeared to have swung back
10  and forth quite a bit during the allision
11  because a portion of the concrete had gotten
12  knocked off the counterweight.
13    So as part of the repair work after the
14  allision to get this bridge back in service, we
15  had to put in new guide rails for like the
16  bottom 20, 25 feet of the guide rails.
17    Q.   And how long are the -- is the
18  complete guide rail?
19    A.   I want to say it's about 140 feet.
20  It's the full -- basically the full length of
21  the tower.
22    Q.   Okay.  And I think you said only 20
23  percent or 20 feet were replaced?
24    A.   It was the bottom portion, so it
25  was -- and I may -- it may be as much as 30

Page 56

1  feet, but it was not any more than just the
2  bottom portion where the counterweight was
3  located during the allision.
4    Q.   And when the lift is in the raised
5  position, where is the counterweight located?
6    A.   The counterweight is down near the
7  track level.
8    Q.   Okay.  And you say it was that bottom
9  portion of the counterweights that were
10  replaced after the allision?
11    A.   The counterweight guides.
12    Q.   Gotcha.  Did those portions of the
13  counterweight guides that were replaced, were
14  those also being ridden up against by the
15  counterweight guides prior to the allision
16  which was part of the problem that H&H was
17  looking into?
18    A.   Likely.
19    Q.   Okay.  And what makes you say likely?
20    A.   There was, when we put in the repair
21  pieces, they had to be milled down to account
22  for the wear that was in them compared to the
23  originals, bridge design.
24    Q.   Do you have any opinion as to whether
25  that portion that was replaced after the



Page 57
1  allision would have still needed to be replaced
2  because of those ongoing issues with the
3  counterweight?
4      A.   Yeah, well, once -- once the
5  counterweight is repaired, probably the guide
6  rails for the whole length of the tower will
7  need to be replaced and need to be replaced on
8  both the east and west set of guide rails.
9      Q.   For the western section, what are the
10  reasons that those are going to have to be
11  replaced?
12      A.   With the counterweight being
13  re-leveled, then the -- the tolerance can be
14  then closer and be better positioned there.
15      Q.   And you said that recently there's
16  been a proposal H&H submitted to the Belt
17  Line --
18      A.   (Witness nods head affirmatively).
19      Q.   -- to proceed with some of the work
20  on that counterweight and the guide system?
21      A.   Yes, sir.
22      Q.   Has any of that work commenced?
23      A.   A small amount of it.  Had one -- one
24  of our junior engineers starting to work on it.
25      Q.   And who is that junior engineer?

Page 58
1      A.   David Derks.
2      Q.   Like what type of work has he done so
3  far?
4      A.   The work is going to likely require
5  the replacement of the counterweight ropes.
6  They are nearing the end of their useful life,
7  and so the counterweight would then have to be
8  temporarily supported.  And so he is -- and
9  there's a system in place to temporarily
10  support the counterweights.  And he was
11  checking through that system and making sure
12  that if we needed to redesign something in
13  there, that would be available.
14      Q.   Has Mr. Derks been onsite to perform
15  any type of inspection of the bridge?
16      A.   Yes, but not associated with that.
17      Q.   What was his inspection for?
18      A.   After the allision, there was some
19  additional structural members -- one of the
20  stringers in the floor system, when they took
21  the ties off, there appeared to be more damage
22  there than we had noticed prior to removing the
23  ties and rail.  And David was available and so
24  we sent him out to do the inspection.
25      Q.   I want to pivot a little bit, so

Page 59
1  let's switch to the allision and the repairs.
2      A.   Okay.
3      Q.   My understanding I think is that at
4  some point someone from the Belt Line reached
5  out to H&H about the allision?
6      A.   Yes, sir.
7      Q.   Were you involved in those
8  preliminary discussions?
9      A.   Yes, sir.
10      Q.   All right.  And just tell me what you
11  can recall were the first thing that happened
12  after -- or being contacted by the Belt Line
13  with regard to the June 15th allision.
14      A.   To my knowledge and I don't know
15  exactly the relationship, but Charlie Graning
16  with PCL was contacted soon after the allision
17  by the Belt Line.  And Charlie Graning had
18  worked for me on the Virginia division when I
19  was ADE, and we kept in contact.  And Charlie
20  said, you know, Belt Line's got a heck of a
21  mess here, and so I believe I got ahold of
22  Cannon and said do you want our engineering
23  services with regard to this.
24      Q.   And you and Mr. Graning you said you
25  had worked together at Norfolk Southern?

Page 60
1      A.   Yes, sir.
2      Q.   Back when you were in the Virginia
3  division?
4      A.   Correct.
5      Q.   So how long have you known
6  Mr. Graning?
7      A.   Since, what was it, 2013 when I was
8  on the Virginia division.
9      Q.   What's Mr. Graning's background if
10  you know?
11      A.   He's a graduate engineer from North
12  Carolina State railroad -- or North Carolina
13  State University.  He has worked in the
14  railroad industry since then, either worked in
15  the railroad industry or worked for a
16  contractor doing railroad work since then.
17      Q.   And he's with PCL, correct?
18      A.   Correct.
19      Q.   Had you worked with Mr. Graning on
20  any projects while you were with H&H and he was
21  with PCL other than the one, the Main Line
22  Bridge project?
23      A.   Can you define worked on?
24      Q.   Sure.  So my -- well, am I correct
25  that H&H was the lead engineer for Belt Line



Page 61

1  with regard to the Main Line Bridge repair
2  project, right?
3      A.  Right.
4      Q.  Okay.  And PCL was the primary
5  contractor --
6      A.  Correct.
7      Q.  -- for the actual repairs?
8      Did you ever work on any other projects in
9  that similar type of relationship where H&H was
10  the lead engineer and PCL was the lead
11  contractor?
12      A.  Not exactly in that relationship.
13  Well, sort of.  There was a piece of work that
14  we were working on proposing that PCL was going
15  after that H&H was going to do some engineering
16  services for PCL.  So it -- we weren't in a
17  formal contractor/engineering firm relationship
18  but we were -- the two firms were talking about
19  this proposed work.
20      Q.  When you first spoke with Mr. Graning
21  about the Main Line Bridge allision, do you
22  know whether or not Mr. Graning had already
23  been out to the site and taken a look at it?
24      A.  Yeah, I think he had just been at the
25  site and sent me pictures.

Page 62

1      Q.  And then at some point you had a
2  discussion with Mr. Moss?
3      A.  Yeah, I -- it was either with
4  Mr. Moss or Mr. Reeder.
5      Q.  All right.  And what can you recall
6  about those discussions?
7      A.  We were -- we didn't know sort of the
8  extent of the -- what had gone on.  So I
9  basically said, you know, just so we get a
10  contracting arrangement, sent him a proposal to
11  just come up and look at the bridge for I think
12  it was initially for $10,000 or just so that we
13  had a not-to-exceed contract put into place.
14      Q.  So that $10,000 proposal which I
15  think you are correct that's what it was, was
16  sort of for your initial come up and take a
17  look at the bridge.  And obviously you were
18  going to follow up with a further proposal
19  after he had taken a look at it?
20      A.  Right.
21      Q.  All right.  And when did you perform
22  that inspection?
23      A.  I can't remember the exact dates but
24  it was with -- I believe it was -- I came up
25  and looked at it within -- the allision

Page 63

1  happened on Saturday and I believe I was up
2  onsite by that Wednesday or Thursday.
3      Q.  Did anyone else from H&H attend that
4  inspection with you?
5      A.  I'm not certain if Tim Noles was
6  there at the same time I was or not.
7      Q.  And what's Mr. Noles' position with
8  the company?
9      A.  I can't remember exactly Tim's title.
10  He's like a senior project engineer or I
11  believe he's also a principal, but I'm not
12  certain.
13      Q.  He's a licensed engineer?
14      A.  Yes, sir.
15      Q.  Who did you meet with -- well, who
16  else was present for that inspection?
17      A.  Other than -- I can't remember if
18  Charlie Graning was there at the same time and
19  it may have been Adam Reeder and Cannon may
20  have been there at the time.
21      Q.  How long did the inspection last?
22      A.  Well, I want to sort of clarify terms
23  there.
24      Q.  Sure.
25      A.  It was not truly an inspection, it

Page 64

1  was a just sort of a let's walk and do an
2  investigation to see sort of kind of scope
3  investigation as opposed to a inspection in
4  anybody's book, you know.
5      Q.  Okay.
6      A.  So -- but --
7      Q.  How about, what did -- what did you
8  do that day when you went out to the bridge?
9      A.  Went out, walked the length of the
10  western portion of the bridge, looked what the
11  sort of general ideas of what the damage was
12  and I believe at that time, if that was when
13  Tim was up there, we also came up with a quick
14  plan or quick ideas on how the bridge would
15  have to be supported to do the repairs.
16      Q.  What were those preliminary plans
17  that you formulated from that initial review of
18  the bridge?
19      A.  One, we came up with some ideas for
20  PCL to help stabilize the bridge.  The, what's
21  called the bottom lateral system, which is what
22  resists the -- or helps the bridge resist wind
23  forces, had been significantly damaged by the
24  allision, so we had them put in temporary
25  chains and tensioned between these points to be



1  able to resist wind forces if it occurred.
2      There was some locations we suggested them
3  putting in timber blocking to prevent -- there
4  was a portion of the bridge sort of hanging out
5  in the air, had timber blocking put in there to
6  provide some support for that area.
7      And I don't know if it -- at that time or
8  a little bit later -- oh, and I believe Travis
9  was there at the first -- first looking at the
10  bridge, since he was local.
11      But somewhere along that time he indicated
12  some concerns with the motor brake there and
13  had PCL somewhere in those first weeks put
14  timber blocking underneath the counterweight to
15  provide a stop if the brake failed.
16      Q.  And to your understanding was
17  Mr. Kimmins aware of that potential issue with
18  the motor brake in part from his prior
19  inspection of the bridge?
20      A.  Yes.
21      Q.  As I understand it there was, in that
22  kind of week or two following the allision,
23  after you had an opportunity to take a look at
24  the bridge, sit down, that there's sort of
25  several changes to the proposed plan.  Is that

1  fair to say?
2      A.  Yeah.
3      Q.  All right.  What was the sort of
4  first major change in the proposed plan to
5  repair the bridge after you were able to take
6  a -- sit down and take a look at everything
7  after performing that initial review?
8      A.  I don't know if -- I don't know if we
9  had a sort of change in plan at that time.  I
10  think originally PCL thought that they could do
11  a lot of the repair work using heat
12  straightening, and they had lined up a heat
13  straightening contractor or subcontractor.  But
14  that wasn't something that we had -- I don't
15  think we -- I mean, I know we hadn't produced
16  any plans or any official documents
17  recommending that.  So that was a change that
18  occurred but it wasn't necessarily a change in
19  our plans.
20      Q.  Okay.  Let's take a look --
21      A.  Can --
22      Q.  Sorry, go ahead?
23      A.  Can I use -- take a break.
24          MR. ROMAN:  Yeah, let's take a
25  break.          (Brief recess).

1          (Swanson Exhibit 3 marked
2          for identification by the court reporter).
3  BY MR. ROMAN:
4      Q.  I've marked as Exhibit 3 the
5  emergency inspection report which is Bates
6  marked NPBL 002304 to 2366.  If you could take
7  a look at that.
8      A.  Okay.
9      Q.  Are you familiar with this document?
10      A.  Yes, sir.
11      Q.  All right.  Fair to say this is the
12  inspection report that was -- H&H provided to
13  the Belt Line after the initial inspection that
14  you performed?
15      A.  After the review -- or the survey of
16  the bridge after the allision.
17      Q.  Okay.  Who actually authored this
18  document?
19      A.  It was a combination of Barry Keung
20  and Brian Sykes and they were the inspectors.
21  On here, the BK, that's -- on the second page,
22  that's Barry -- oh, TK is Travis Kimmins so
23  they both were involved in the creation of this
24  report.  And then Tim Noles and myself approved
25  it, that's the checked -- or I should say

1  checked.  And Keith Griesing who is KRG is the
2  person who approved this and he's chief
3  technical officer for the -- for H&H.
4      And although it shows Barry made this,
5  Brian Sykes was also involved in the
6  inspection, so he may have written portions of
7  this under Brian's super -- or Barry's
8  supervision.
9      Q.  Okay.  And so you said the initials
10  TN next to the checker, who is that?
11      A.  Tim Noles.
12      Q.  Tim Noles, okay.  And HCS is you,
13  correct?
14      A.  Correct.
15      Q.  All right.  What -- what's the
16  process at H&H for, you know, authoring,
17  reviewing and approving and ultimately
18  delivering this type of report to a client?
19      A.  A document gets -- or plans,
20  documents, anything going out to a client gets
21  produced by somebody, then there will be at
22  least one checker who goes through and either
23  highlights items in yellow for approved or
24  marks them in red and provides comments for
25  what is supposed to be changed.



Page 69

1    And then the reviewer will -- or the
2   person who originally created the document will
3   then go through and the items that are red
4   will -- I'm going to get my green and blue
5   mixed up, but anyways, the -- they will mark in
6   green any comments or saying -- or do a
7   checkmark in green to indicate that they agree
8   with that change, or will provide a written
9   explanation why they disagree with it.
10    And then there is a blue mark that is done
11   by the person who created the document to
12   indicate that it's been revised, the final
13   document.  And then the checker will go back
14   through and mark in orange the -- they will
15   compare the checked document to the new
16   modified document and mark in orange that all
17   the modifications have been made.
18    And if there's any disagreement, then that
19   orange check is, you know, not done and then it
20   goes back and forth and discussed.
21    Q.   And to your understanding was that
22   process followed with regard to the document
23   we've marked as Exhibit 3?
24    A.   Yes, to my knowledge.
25    Q.   Okay.

Page 70

1    A.   And I may have that blue and green
2   color mixed up, but it's -- that's the process.
3    Q.   Okay.  All right.  I want to go to --
4   I think it's page five of the report, NPBL
5   2308.
6    A.   Okay.
7    Q.   The third paragraph up from the
8   bottom starting with span guides were not
9   accessible during this inspection.  Visually it
10   was confirmed that the lift span southwest
11   upper and lower span guide was entirely out of
12   engagement with the SW span guide track.  Do
13   you see that there?
14    A.   Yes.
15    Q.   All right.  Why were those not, if
16   you can recall, accessible during the
17   inspection?
18    A.   Okay.  I don't -- and there's a --
19   one clarification here.  The span guides are
20   different from the counterweight guides as the
21   counterweight guides keep the counterweight
22   going vertically in this process and resist
23   wind on it.  The span guides do the same thing
24   and they are on the outside of the tower legs.
25    I don't know why we put the sentence that

Page 71

1   the span guides were not accessible during this
2   inspection, but there was some concern without
3   having all the false work underneath the span
4   for climbing up to the top of the tower.  So it
5   is likely that we were more indicating that the
6   span guides were not fully able to be inspected
7   for the whole vertical length.
8    The lift span, span guide, there's the --
9   there's the track that it runs in and the
10   actual guide itself.  And what this sentence,
11   the visually was confirmed that the lift span
12   southwest upper and lower span guides were
13   entirely out of engagement of the southwest
14   track, means that the track along the tower --
15   or the guide, what grabs onto the guide rail
16   itself was out of -- was not connected anymore.
17    Q.   Okay.  Do you know whether or not
18   there was some type of inspection to that
19   portion of the bridge?
20    A.   We did additional drone inspection of
21   the bridge after -- the week after the hands on
22   inspection, and part of the drone inspection
23   was to be able to go up and look at those upper
24   portions without putting anybody in risk in the
25   inspection.  So that was performed at that

Page 72

1   time.
2    Q.   Who was actually operating the drone
3   during that inspection?
4    A.   I'm not exactly certain the person
5   who was operating it.  We subcontracted that
6   work out to ARE, American Railroad Engineering
7   Corporation.  They have a drone inspection
8   capabilities.  We have limited capabilities
9   in-house.
10    The other key item with regard to doing
11   any drone inspection there is with the location
12   next to the Norfolk naval base -- or not naval
13   base, naval shipyard, and with the -- I want to
14   say Virginia Power, I may have that wrong, but
15   the power lines that are connected to the
16   bridge, it's a very sensitive difficult area to
17   do a drone inspection on.
18    So we -- we originally looked at a couple
19   of different contractors and then we were able
20   to get ARE to do the work.
21    Q.   Did H&H receive a copy of the footage
22   from ARE's inspection?
23    A.   Yes, and it is included on the -- in
24   the information that was on the jump drive.
25    Q.   You anticipated my question, good



Page 73

1    man.
2        A.   Well, those are huge files and they
3    were difficult to get copied over and had to
4    specially format the jump drive so I could do
5    that.  So --
6        Q.   Well, we appreciate your work.  All
7    right.
8        Going up to the -- I think it's two
9    paragraphs up it says:  In general the upper
10   framing of the truss of span four appears in
11   fair as-built condition.
12       Do you see that part there?
13       A.   Yes.
14       Q.   What does it mean fair as-built
15   condition?
16       A.   It would mean that it is in a
17   functional condition with sort of possibly
18   secondary issues.  There's, the coatings on
19   this bridge are not 100 percent and so that's
20   probably why it would get a fairer condition as
21   opposed to an excellent condition.
22       Q.   I'm sorry, you said the coatings?
23       A.   Yes, the paint.
24       Q.   Oh, the paint, okay.  So
25   C-O-A-T-I-N-G?

Page 74

1        A.   Yeah.
2        Q.   All right.  When it's referencing
3    fair as-built condition, is that referring to
4    the condition for notwithstanding the allision
5    or the after-the-fact condition?
6        A.   That is in -- after the allision
7    because that second sentence, the upper lateral
8    bracing of span four appears in fair condition
9    with one member showing evidence of buckling.
10   So that member that shows buckling is, you
11   know, out of the ordinary for the rest of the
12   repair work.
13       Q.   Okay.  So what I'm trying to
14   understand, was that portion of the bridge in
15   fair condition because of the allision or would
16   it have been in a -- would that have been the
17   condition regardless of whether the allision
18   had occurred?  Am I making sense?
19       A.   Yeah, it would have been probably in
20   fair condition without the allision.
21       Q.   Okay.  Did you make any assessment or
22   did Hardesty & Hanover make any assessment sort
23   of as to the overall condition of the span of
24   the bridge that had been impacted in the
25   allision?

Page 75

1        A.   No, we did not look at the overall
2    span.
3        Q.   And as I understand it sort of
4    reading the report, there was assessments made
5    to the various component members and their
6    condition that you were reviewing, right?
7        A.   (Witness nods head affirmatively).
8    Well, let me back up a little bit about the --
9    my previous statement.  It was a -- we looked
10   at the entire bridge and then sort of doing the
11   sorting of was this member damaged or not, once
12   we determined that that member wasn't damaged,
13   then we didn't do any assessment of it.
14       Q.   Gotcha.  Okay.  So if there is a
15   member that is assessed in a -- in this report
16   such as the -- what we see in this paragraph,
17   the upper framing of the truss of span four
18   appears in fair as-built condition, we can kind
19   of take that to mean that that was a member
20   that was damaged in the allision?
21       A.   The -- the member that was damaged in
22   the -- in that upper framing portion was the --
23   the upper lateral bracing in span four appears
24   to be in fair condition.  That's talking about
25   the general case.  And then with one member

Page 76

1    showing evidence of buckling.  That one member
2    showing evidence of buckling was what was
3    assumed to have been occurred through the
4    allision.
5        Q.   All right.  I want to go on to page
6    seven.  Could you take us through what the
7    figure 4 and figure 5 represent here?
8        A.   Okay.  Figure 5 -- or figure 4 is the
9    western pier which is pier number four.  Figure
10   5 is pier number 5 which is the eastern pier
11   for span number four.  And the blue squares
12   indicate where the bearings were to our
13   understanding prior to the allision, which is
14   the as-designed location.  And the red squares
15   indicate where these bearings were dislodged
16   to.
17       And the figure 5 indicates that the
18   bearing on the southwest corner was dislodged
19   six inches from the as-built location.  And
20   there were three anchor bolt -- well, it
21   doesn't show on there, but there were three
22   anchor bolts that were broken at that location.
23   And figure 4 shows the dislodged location of
24   the two bearings on the west end of the bridge.
25       Q.   Are these images that someone from



Page 77

1  H&H were to generate?
2    A.  Yes.
3    Q.  What type of software was used to
4  generate these?
5    A.  I believe that they used Bluebeam to
6  do this, but I am not exactly certain what they
7  used.
8    Q.  Moving on to the next page in the
9  series of photos, photo two, photo three, photo
10  four, and it goes on to photo 11 on page 13 of
11  the report.  To the best of your understanding
12  were these photos all taken by someone from
13  H&H?
14    A.  Yes.
15    Q.  And do you know who would have taken
16  them?
17    A.  I believe that the photos that have
18  dates on them and they may have been cropped
19  with some of the dates taken out, but the
20  photos with dates in them were taken by Brian
21  Sykes, and Barry Keung probably took the other
22  ones.
23    Q.  You personally didn't take any of
24  them, correct?
25    A.  Not the pictures in this report.

Page 78

1    Q.  Okay.  I want to take a look at
2  figure 6, if you could take us through and
3  interpret what that figure is representing?
4    A.  Figure -- you mean photo 6?
5    Q.  No, figure 6 on page 13, NPBL
6  002316 --
7    A.  Okay.
8    Q.  -- which has the -- some of the
9  member components in red, some of them in
10  black.  If you can just, you know, interpret
11  what that's representing there?
12    A.  Okay.  This represents the members
13  that we determined needed to be repaired or
14  replaced in red for the south truss due to
15  damage, due to the allision.
16    Q.  And these are all steel member
17  components, correct?
18    A.  That is correct.
19    Q.  What type of steel was in the
20  original bridge, Main Line Bridge, at the time
21  of the allision?
22    A.  I believe it was ASTM A7 steel.
23    Q.  And what is -- what does that
24  grade -- what is that grade?
25    A.  That's a low carbon structural steel.

Page 79

1    Q.  And what type of steel was used for
2  the replacement parts of those members?
3    A.  A709 grade 50.
4    Q.  What are the differences between
5  those grades if anything?
6    A.  The A709 is a -- I believe a cleaner
7  steel.  It has less impurities, sort of is a
8  improvement in steel making since the 1950s
9  when this was originally constructed.
10    Q.  Is it a stronger steel?
11    A.  Yes.
12    Q.  The next seven pages I believe on to
13  page 22 of the report -- I'm sorry, nine pages,
14  my math was wrong, which is NPBL 002325,
15  there's a series of photos again.  Did you take
16  any of those photos?
17    A.  No.  The two inspectors took the
18  pictures.
19    Q.  Okay.  And then looking at page 18 of
20  the report, NPBL 2321, figure 7, the north
21  truss damage location schematic, do you see
22  that there?
23    A.  Uh-huh.
24    Q.  If you could explain what this figure
25  is representing.

Page 80

1    A.  This figure shows the items that we
2  believe needed to be repaired or replaced due
3  to the allision, shown in red.
4    Q.  Okay.  Is there any way to determine
5  from looking at this photo which members in red
6  might have been able to be repaired versus
7  replaced?
8    A.  Not from this diagram.
9    Q.  Okay.  How about from any of the
10  other diagrams in the report, if you want to
11  thumb through them?
12    A.  (Witness complies.)
13      MR. SNOW:  I'm sorry, what
14  exactly are you looking for or asking him to
15  look for?
16  BY MR. ROMAN:
17    Q.  If there is any way to tell from the
18  various photos which members might have been
19  repaired or replaced, just from the initial
20  recommendation.
21    A.  Well, if you look at appendix 2.1, at
22  the top left of the -- it doesn't show what
23  page number it is, but if you start at the
24  first page of appendix 2.1 --
25      MR. SNOW:  You should see at the



Page 81

1  bottom a Bates label.  Do you see that in the
2  bottom right corner?
3         THE WITNESS:  Okay, it's 2354.
4  BY MR. ROMAN:
5     Q.   Okay.
6     A.   In the upper left-hand corner of the
7  spreadsheet shows repair.
8     Q.   Yep.
9     A.   If you go to the next page, 2355, it
10 shows replace.
11    Q.   Gotcha.  And fair to say this is what
12 the plan, preliminary plans were for the
13 project, right?
14    A.   (Witness nods head affirmatively).
15    Q.   I'm sorry, that was a yes?
16    A.   Yeah, this was -- this represented a
17 game plan for the preliminary -- for the
18 repairs for the project.
19    Q.   And fair to say there were some
20 modifications or changes to those plans as the
21 project went on?
22    A.   Yes.
23    Q.   I think one example you mentioned was
24 the floor system which actually started
25 removing some of the members to get a better

Page 82

1  look and there were additional -- either
2  additional pieces or some pieces that needed to
3  be replaced that you thought might have been
4  repaired or stuff like that?
5     A.   Right, or didn't -- didn't see damage
6  on the initial inspections and found damage.
7     Q.   Was there any type of document
8  prepared similar to the one that we're looking
9  at in appendix 2.1 showing ultimately what
10 exact -- what particular member components were
11 repaired, replaced, worked on, after the
12 project was done?
13    A.   Not a spreadsheet as this portion.
14 There's a final conformed set of plans which
15 indicate what was repaired or replaced.
16    Q.   Okay.
17         (Swanson Exhibit 4 marked
18         for identification by the court reporter).
19 BY MR. ROMAN:
20    Q.   Take a look at those.  We've marked
21 as Exhibit 4 a set of documents.  If you could
22 take a look at those, Mr. Swanson, please.
23    A.   (Witness reviews document).
24    Q.   And for the record, these are Bates
25 marked NPBL 003798 through 3854.

Page 83

1         MR. SNOW:  Exhibit 4?
2         MR. ROMAN:  Yes.
3  BY MR. ROMAN:
4     Q.   Ready?
5     A.   Yes, sir.
6     Q.   The document that we marked as
7  Exhibit 4, are these the conformed set of
8  drawings that you referenced?
9     A.   To the best of my ability to check it
10 is.
11    Q.   Okay.  And from what you've seen
12 these would represent sort of the actual plans
13 and the work that was done on the bridge?
14    A.   Yes.
15    Q.   All right.  And there's been some
16 submittals and some draft plans that have been
17 produced in discovery.  Fair to say that this
18 set that we're looking at would be the ones to
19 review for what actually was performed
20 ultimately?
21    A.   Yes, if it -- you know, just assuming
22 this is the final conformed set and there is a
23 copy of the final conformed set in the
24 documents that were provided.
25    Q.   Okay.  If we look at the -- it's the

Page 84

1  second page of the drawings, the NPBL 003799,
2  if you could sort of explain what this index is
3  representing?
4     A.   Okay.  The G -- the drawings on the G
5  are general plan drawings.  The -- or start
6  with G, they are general plan drawings,
7  basically providing notes and information to
8  the contractor over items that are -- reflect
9  the entire project.
10        The T drawings I believe are demolition
11 and other repair plans.  And then the S
12 drawings are the structural drawings.  And the
13 M drawings are mechanical drawings.
14    Q.   Okay.  Were the drawings that are
15 reflected in here, who actually authored those,
16 the drawings, or was it a team of people?
17    A.   It was a team of people that did
18 that.
19    Q.   Okay.  And if we go back to the
20 first, you're listed here as the engineer of
21 record, correct?
22    A.   That is correct.
23    Q.   And so would ultimately the drawings
24 and the plans that are reflected in this
25 document be signed off and approved by you?



Page 85

1    A.   Yes, sir.
2    Q.   Who all was involved in -- who all
3   was part of that team that was involved in
4   these drawings?
5    A.   Amanda Ruyack, R-U-C-A-C-K [sic], I
6   believe.  Barry Keung, Brian Sykes, David
7   Derks.  And we also had some engineering
8   support.  They didn't actually produce drawings
9   but they produced some engineering work that
10  went into this by Dave Marcic, Giacomo
11  Mauriello, and Jonathan Hewko.
12   Q.   Are all of those folks Hardesty &
13  Hanover employees?
14   A.   Yes, sir.
15   Q.   There's no subcontractors?
16   A.   No subcontractors.
17   Q.   And I know we're going to need this
18  spelling, Giacomo?
19   A.   No, Giacomo, what was the -- what was
20  the movie something -- anyways, he's Italian.
21  And actually H&H is an international company
22  and we draw from various offices, and he's
23  Italian and works out of our London office.
24   Q.   Okay.  So this was an international
25  team you had working on this thing?

Page 86

1    A.   Yeah, somewhat.
2    Q.   If we go back to the index, the NPBL
3   3799 -- well, actually strike that.  Let's go
4   to the next page.  I think it's the sheet
5   number two, NPBL 3800.  See the bottom, the
6   drawn by, checked by, designed by?
7    A.   Yep.
8    Q.   Could you take us through
9   interpreting what those boxes mean?
10   A.   Drawn by is Amanda Ruyack.  Barry
11  Keung checked it.  And Amanda did the design
12  work.  And this -- this page it doesn't matter
13  as much, but she did the design work and that
14  was checked by Barry.
15      The design -- you know, the design work
16  portion of it is the calculations that are not
17  really shown on here but are -- well, they are
18  shown and what's put on here, but that's a
19  separate package.  And then the drawn by is the
20  CAD work that's done to create these.
21   Q.   Okay.  And what generally is the
22  process for designing, drawing, coming up with
23  the plans and then reviewing for you internally
24  at H&H?
25   A.   Well, the -- you kind of come up with

Page 87

1   a plan of what you're -- and we definitely did
2   this for the -- this project.  We came up with
3   a game plan of what we were going to start
4   working on first in terms of the drawing
5   packages.
6       And the first item that we had to be
7   cognizant of was to get PCL enough information
8   so that they could get their engineering
9   subcontractor, McNary Bergeron, start designing
10  the temporary work.
11      And so on here it shows -- on the 3799 it
12  actually shows five packages there.  The first
13  package was created in the -- well, was the
14  first package that was sent out to the Belt
15  Line because actually our contract is with the
16  Belt Line.  We didn't send it directly to PCL,
17  but it sort of -- we sent it to the Belt Line
18  and then they sent it to PCL.  And that was to
19  get them starting to work on things they could
20  start working on.
21      And each of these packages came out like
22  two weeks, one after the other, then created a
23  full package when it was done.
24      So then we came up with details for them
25  to start supporting the bridge, that's the

Page 88

1   jacking plan.  And that gave the McNary
2   Bergeron the forces for them to design the
3   temporary bracing from -- we sort of had a
4   meeting of the minds about where the bridge
5   could be temporarily braced to do the repairs.
6       And then we started looking at doing
7   repairs or detailing out repairs that the PCL
8   could get an outside fabricator to start
9   fabricating the material to do the -- to
10  actually come up with the repair steel to be
11  put in.
12   Q.   What was McNary Bergeron's role?  You
13  said that they were the engineer for PCL?
14   A.   Yeah.  On 3802 it's shown as sheet --
15  structure one, sheet 21.
16   Q.   Uh-huh.
17   A.   You'll notice that there's temporary
18  piers marked on this drawing, and the -- where
19  it says like 50 kips, or a hundred kips.  A kip
20  is a thousand pounds in engineering parlance.
21      Anyways, the -- this was sort of directing
22  McNary Bergeron about where they should design
23  temporary work to support the bridge while the
24  repairs were being made, and to get this work
25  done in a cost -- or a time efficient manner



Page 89

1  McNary Bergeron designed all the temporary
2  works and H&H designed the permanent repairs.
3      Q.   So you -- H&H was working hand in
4  hand with McNary Bergeron throughout the
5  project?
6      A.   Yeah, it was a -- more of an arm's
7  length because we were not, you know, McNary
8  Bergeron was PCL's subcontractor.  So, you
9  know, things had to go through the right hands
10 to be correctly gone back and forth.  But yeah,
11 we -- we discussed things and had Teams calls
12 that, you know, had folks from all the
13 different parties on just to discuss things.
14     Q.   On average, how long -- how much work
15 goes into creating one of these sheets?  And
16 I'm sure it differs but --
17     A.   We generally figure -- and you know,
18 it depends on what type of project it is, but I
19 think we generally figure it takes between 80
20 and 70 -- 70 and 80 engineering hours to create
21 a sheet.
22     Q.   And obviously those hours will be
23 split up among the team?
24     A.   Right.
25     Q.   At different rates depending upon the

Page 90

1  seniority level?
2      A.   Yeah.
3      Q.   I want to go to the M drawings in
4  package five, the mechanical general notes.
5      A.   Okay.
6      Q.   What are these drawings reflecting?
7      A.   These drawings reflect a proposal to
8  replace the motor brake that was undersized.
9      Q.   And that was the undersized motor
10 brake that Mr. Kimmins identified during the
11 June 4th and 5th, 2024 inspection?
12     A.   That is true.
13     Q.   Do you know when the drawings for
14 this proposal were actually done, like what
15 month?
16     A.   No, I would -- I believe either in
17 July or August but I am not certain.
18     Q.   Is there any way to tell from any of
19 the drawings like what date they were actually
20 finalized?
21     A.   There's only a way to check on them
22 if there was a revision made and those
23 revisions are dated.
24     Q.   And would that be a -- like through
25 the submittal process?

Page 91

1      A.   It could be through the submittal
2  process or it could be the -- there could have
3  been something that was found in the field that
4  needed to be modified -- the plans needed to be
5  modified to field conditions.  We were kind of
6  handicapped on this project in that we did not
7  have the original steel fabrication drawings
8  for this bridge.
9      Q.   And do you know why you didn't have
10 them?
11     A.   I don't know why they -- the Belt
12 Line did not have them.  I don't know why they
13 didn't have them, but they didn't have them.
14     Q.   You said handicapped, does that mean
15 that more work had to go into the repair
16 project because you didn't have those original
17 drawings?
18     A.   A little bit more work on our end and
19 a little bit more communications to make sure
20 that like bolt spacing was the same location
21 where -- that were indicated in the original
22 design drawings.
23     Q.   And I saw some references in some of
24 emails that there were documentation issues
25 with the repairs that were done on the bridge

Page 92

1  over the years.  Do you recall those?
2          MR. SNOW:  Object to form.
3          THE WITNESS:  Can you be more
4  specific about what kind of repairs?
5  BY MR. ROMAN:
6      Q.   I can maybe grab the email later.  I
7  frankly don't have it at this point.  My
8  question was going to be whether -- and it's
9  not trying to be a memory test, we can grab the
10 email, but whether the referenced documentation
11 issued with the repair records would be
12 separate from those drawings that you just
13 referenced?
14         MR. SNOW:  Object to form.
15         THE WITNESS:  To my recollection
16 we did not run into any structural repairs that
17 were made in the past that we had to work
18 around.
19         MR. ROMAN:  All right.  Do you
20 want to take a little lunch break?
21         MR. SNOW:  That sounds great.
22         (Lunch recess).
23 BY MR. ROMAN:
24     Q.   Mr. Swanson, back to Exhibit 4.  With
25 regard to those -- that M package drawings, the



Page 93

1  mechanical plans that we were discussing, does
2  any of that work that's -- has any of the work
3  been actually done to implement the drawings?
4      A.   Not to my knowledge.  I've talked
5  with the -- Charlie Graning with PCL the other
6  day to see if the work had been done, and they
7  didn't do the work.  There's a possibility that
8  the Belt Line had it done by somebody else but
9  not to my knowledge.
10     Q.   And if that is the case, it would
11  have been using the drawings that are reflected
12  here?
13     A.   That's correct.
14     Q.   Okay.  Are any of the other drawings
15  that are reflected in the index, do any of
16  those drawings or any parts of the drawings
17  reflect planned work that is unrelated to the
18  allision of June 15, 2024?
19     A.   No, sir.  Everything was related to
20  that.
21     Q.   Except for the mechanical drawings as
22  we established were related to the June 4th and
23  5th inspection?
24     A.   Yeah.
25     Q.   So if we look at S022 and S023, the

Page 94

1  counterweight guide repairs?
2      A.   Yes.
3      Q.   Do any of those drawings reflect any
4  type of work that would have been planned or
5  prepared as a result of the June 4th or 5th
6  inspection that looked at some of those
7  counterweight guide issues?
8      A.   The -- let me get to the right
9  drawings there.  The repairs of tracks or guide
10  tracks that were damaged due to the allision.
11  Eventually when the counterweight work is
12  completed, these tracks probably will have to
13  be replaced again to better fit what the -- how
14  the counterweight is hanging.  But these were
15  just done as part of the allision repairs.
16  They had to be repaired because of the
17  allision.
18      And the repairs, the guide track work for
19  after the counterweight is completed, that
20  guide track work will likely be for a longer
21  taller extent of the pier -- or the column, or
22  the tower.
23     Q.   So I think you said the counterweight
24  guide rails will have to be likely replaced?
25     A.   Yes.

Page 95

1      Q.   And then I think you said the span
2  guides as well?
3      A.   No, I don't think the span guides
4  will have to be replaced on the permanent
5  repairs.  And also we did not replace span
6  guides just -- well, the bearing had to be
7  lifted up on the southeast corner so that we
8  could shift the bridge back into position.
9      To do that work we had to take off the
10  span guide to get another location to grab
11  ahold of the bridge to lift it up.  And as part
12  of that work then after that work was done, we
13  had to replace that portion of the span guide.
14      So it wasn't -- it wasn't that there was
15  directly any damage to the span guide there,
16  but it wasn't -- we weren't able to remove and
17  replace the span guide after we did the
18  shifting of the span.  So there is a new bottom
19  portion of the span guide there, but that was
20  just so that we could get the jacking
21  arrangement in to move the span back.
22      If you look at NPBL 003847, there's a
23  drawing in the upper left-hand corner showing
24  south tower leg shift.
25     Q.   Okay.

Page 96

1      A.   That beam that shows detail two there
2  had to be temporarily added on to be able to
3  get enough jacking capacity underneath the span
4  to lift the span without damaging the existing
5  span.  So to put that on there, we had to
6  remove the span guide and lower portion of that
7  south tower leg.
8      Q.   Back to the sheet two, which is the
9  notes for the plans and drawings.
10     A.   Okay.
11     Q.   Sorry, I'm going to have to strain
12  your eyes, but if we go to the structural steel
13  notes, job conforming to the following unless
14  otherwise noted.  And it looks like 1.1 through
15  1.6 --
16     A.   Uh-huh.
17     Q.   -- it's requiring that ASTM 8709
18  grade 50 steel that we talked about earlier,
19  correct?
20     A.   Correct.
21     Q.   How was it determined to use that
22  grade of steel in those particular components?
23     A.   That is a grade -- that is the
24  current common grade of steel that is
25  available.



1    Q.   Is that set by an AREMA standard, by
2   the railroad, I mean, how did --
3    A.   That is somewhat set by sort of the
4   whole entire structural steel industry, it's --
5   that is the common grade of steel that steel
6   mills now produce.  If we wanted to get A7
7   steel like what this bridge was originally
8   built for, we would have to get a special order
9   from the mill if that's even -- even available.
10    And there's also -- the A709 or A7, et
11   cetera, steel that that's all American steel
12   testing ASTM, American -- no, American --
13   anyways, it's the general structural or general
14   material testing that is sort of the gold
15   standard.  And there still is a A7 spec out
16   there, but it has changed quite a bit from what
17   was in -- when the steel -- or when this bridge
18   was originally constructed to what is being
19   rolled now.
20    So it's not like an industry -- well, it's
21   kind of the railroad industry, the highway
22   industry, everybody's gone to A709.
23    Q.   You said if you had to use the A7,
24   which was the original steel, that would have
25   to be specifically rolled for this project in

1   all likelihood?
2    A.   Yeah, I -- I've never attempted to
3   get the right -- get something of that sort.
4   So I don't know what the availability is, but
5   it's like that's just not -- not a normal
6   available item.
7    Q.   Are there any grades of steel between
8   like A7 and the A709 grade 50 that could have
9   been used for the replacement members?
10    A.   Not that is readily available.  There
11   may be some A36 steel that is still partially
12   available, A36 has 36,000 KSI yield strength.
13   The grade 50 has 50,000 KSI yield strength.
14    Q.   At any time did you make any
15   assessment of how long the existing steel on
16   the railroad bridge would have lasted just
17   prior to the allision?
18    A.   No.
19    Q.   And how about with the new steel that
20   was put in there?  Do you have any opinion on
21   how long that steel is expected to last?
22    MR. SNOW:  Object to form.
23    THE WITNESS:  Can you restate
24   that question?
25   BY MR. ROMAN:

1    Q.   Yeah, sure.  Generally speaking with
2   regard to the ASTM 709 grade 50 steel, what is
3   the expected useful life in your opinion of
4   that type of steel for a railroad bridge?
5    MR. SNOW:  Object to form.
6    THE WITNESS:  The -- I wouldn't
7   put an exact date on how long that steel would
8   last.
9   BY MR. ROMAN:
10    Q.   Would you expect that type of steel
11   to last longer than the A7 that was originally
12   used to build the Main Line Bridge?
13    MR. SNOW:  Object to form.
14    THE WITNESS:  That's not in the
15   consideration when using one material over the
16   other.
17   BY MR. ROMAN:
18    Q.   Yeah, I think just generally.  My
19   question was generally speaking as an engineer,
20   do you have any opinion whether the A709 grade
21   50 would last longer than the A7 that was built
22   or used in the 1950s?
23    A.   No, I don't have any opinion it would
24   last longer.
25    Q.   In your time working for Norfolk

1   Southern as an engineer who's worked on
2   railroad bridges, how many steel railroad
3   bridges have you worked on or been involved
4   with for a project?
5    A.   I don't keep track of that, but I
6   could easily say hundreds.
7    Q.   Have you ever been asked to by
8   anybody to determine the expected service life
9   of a railroad bridge?
10    A.   We did some studies at Norfolk
11   Southern to do some planning with regard to
12   that.
13    Q.   Were those studies published?
14    A.   No.
15    Q.   They were internal proprietary
16   Norfolk Southern studies?
17    A.   Right.
18    Q.   What did -- well, tell me about the
19   studies.  Were you determining like a
20   methodology to use to determine the useful life
21   or was it something where you were looking at
22   various bridges and actually determining what
23   the useful life was?
24    A.   We were sort of looking at the age
25   population of bridges and looking at kind of



Page 101

1 the capital replacement rate we would have to
2 do.
3    Q.  And what were the findings of that
4 study?
5    A.  That we were not replacing at a rate
6 that would -- well, the majority of the
7 railroad structures Norfolk Southern had were
8 built between -- steel railroad structures were
9 built between 1900 to 1920.  And so, and the
10 majority of those are still out there, so
11 assuming a -- we're well over, assuming a
12 hundred year life on there and getting towards
13 150 and likely it's going to have to be some of
14 structures are going to have a 200-year life.
15 So -- and most of the replacements were based
16 off of a need for higher load capacity as
17 opposed to this bridge is worn out.
18    Q.  And so meaning when the bridges were
19 built in the 1900 to 1920 timeframe they had a
20 lower load capacity than what might be needed
21 in the modern era?
22    A.  Some of them did, yes.
23    Q.  Okay.  Did that study or those
24 studies take a look at sort of what the average
25 or typical useful life of a steel railroad

Page 102

1 bridge would be that was built in that
2 timeframe?
3        MR. SNOW:  Object to form.
4        THE WITNESS:  We went in with
5 some assumptions but found out that the
6 assumption -- you know, as I said we weren't
7 replacing them fast enough.  So they were
8 getting -- we were getting much longer life out
9 of the bridges than we had expected.
10 BY MR. ROMAN:
11    Q.  And if you were asked to determine
12 the expected useful service life of a steel
13 railroad bridge, how would you go about doing
14 that?
15        MR. SNOW:  Object to form.
16        THE WITNESS:  First, you know,
17 whenever you do any sort of -- you know, work
18 of that sort of stuff, you go back to what kind
19 of guidance the -- like AREMA provides.  And to
20 my knowledge there's no guidance in AREMA with
21 regard to that.  There may be guidance
22 elsewhere with regard to that but I'm not
23 familiar with those -- those sources.
24    And so I don't know exactly how I'd go
25 about that, probably do a literature search

Page 103

1 first.  But I haven't been asked to do that, so
2 I wouldn't say I'm qualified to do that.
3 BY MR. ROMAN:
4    Q.  And just to be sure, you have not
5 been asked to determine what the expected
6 useful service life of the Main Line Bridge is
7 or was at any time, correct?
8    A.  That is correct.
9    Q.  And you do not feel that you would be
10 qualified to do so?
11    A.  That is correct.
12    Q.  What type of engineer in your opinion
13 or I guess -- strike that.
14    What type of professional in your opinion
15 would be qualified to make that type of
16 determination?
17        MR. SNOW:  Object to form.
18        THE WITNESS:  It would be likely
19 a structural engineer that has worked more in
20 that area than I have.
21 BY MR. ROMAN:
22    Q.  And are you differentiating then
23 between a structural engineer and a
24 professional engineer?
25    A.  That gets into a kind of two

Page 104

1 different areas.  A professional engineer at
2 least in the Virginia context is somebody who's
3 licensed by the state.  I happen to hold a
4 structural engineer license in the state of
5 Illinois and the state of Georgia which is
6 separate from my professional engineer's
7 license, but I'm more going to somebody who has
8 been trained in structural engineering.
9    Q.  Right, and Illinois --
10    A.  Education.
11    Q.  Illinois is one of the only states in
12 the country that differentiates between
13 structurals and professionals, right?
14    A.  There's about a half a dozen states.
15    Q.  So that was where my question was
16 going, I just wanted to -- do you view a
17 structural engineer at least as it pertains to
18 Virginia as someone who holds different
19 qualifications than a professional engineer?
20    A.  Now you're -- and I don't -- I don't
21 want to really get into some of the legal
22 issues -- or I may not completely understand
23 the legalities but it -- no matter what your
24 engineering training is, you can become a
25 professional engineer in the state of Virginia.



Page 105

1  And it's all, you know, if you're electrical
2  engineer, mechanical engineer, civil engineer,
3  structural engineer, that's all a -- you can be
4  licensed as a professional engineer.
5      And so there are folks who hold a
6  professional engineering in the state of
7  Virginia that have a structural engineering
8  background.  So it's -- you know, a subset of
9  the professional engineer.
10     Q.  What type of experience would you be
11  looking for in a professional that you would
12  view as qualified to make the determination of
13  a railroad -- steel railroad bridge's useful
14  expected service life?
15         MR. SNOW:  Object to form.
16         THE WITNESS:  I really haven't
17  thought about that.  I would have to sort of
18  look at what their past qualifications and what
19  they have done in the past, so I don't know.
20  BY MR. ROMAN:
21     Q.  Do you know if there's anyone within
22  Hardesty & Hanover who has made any
23  determinations or opined as to what the useful
24  expected service life of a steel railroad
25  bridge is?

Page 106

1      A.  I don't know of anybody specifically
2  in Hardesty & Hanover who have done that.
3  There is more research done in the highway area
4  and there may be folks who have done that work
5  with regard to highway bridges.
6      Q.  Have you ever done that type of
7  determination for a highway bridge?
8      A.  No, sir.
9      Q.  And as part of your involvement in
10  the work that was performed on the bridge after
11  the allision, you reviewed various drawings,
12  construction plans and other documents from the
13  original design and construction of the
14  railroad bridge, right, the Main Line Bridge?
15     A.  Yes, sir.
16     Q.  Is there anything that you reviewed,
17  is there anything in what you reviewed that
18  indicated what the useful expected service life
19  of the Main Line Bridge was at the time of
20  construction?
21     A.  No, sir.
22     Q.  Okay.
23         (Swanson Exhibit 5 marked
24         for identification by the court reporter).
25  BY MR. ROMAN:

Page 107

1      Q.  Mr. Swanson, we'll mark as Exhibit 5
2  a document that's been produced under the Bates
3  label NPBL 007988, and just take a minute to
4  look at it.  Let me know when you're ready.
5      A.  Uh-huh.
6      Q.  Do you recognize this?
7      A.  Yes, sir.
8      Q.  And could you describe it for us?
9      A.  It is a request from Cannon Moss
10  about a -- if I would have time for a meeting
11  or a quick call with the Belt Line's attorney
12  regarding the useful life of our bridge.  They
13  have a deposition tomorrow and I have a few
14  questions.
15     Q.  Did you ever respond to Mr. Moss by
16  email to this, to the best that you can recall?
17     A.  I don't remember if I -- I am pretty
18  certain I responded to Cannon one way or the
19  other to this, and I believe I indicated that I
20  did have ability to have a quick call.
21     Q.  And did you have a call?
22     A.  Best of my recollection, yes.
23     Q.  And who was all on that call?
24     A.  I believe Ryan was on that call and I
25  don't remember who else from his firm was on

Page 108

1  that call.
2      Q.  Okay.  What did you and Mr. Snow
3  discuss?
4      A.  I don't remember exactly what we
5  discussed, but my recollection is that my
6  answer was somewhat similar to your questioning
7  there in that it's hard to tell what the useful
8  life of an existing railroad bridge is.
9      Q.  Do you have any opinion either
10  agreeing or disagreeing or another way, as to
11  whether the Main Line Bridge had a indefinite
12  useful service life if it had undergone routine
13  repair and maintenance?
14     A.  I agree it would have an indefinite
15  service life.
16     Q.  Okay.  And what makes you say that
17  you would agree with that statement?
18     A.  Because I have seen plenty of
19  railroad bridges that are 40, 50 years older
20  than the Belt Line bridge that are still in
21  good shape and in good service, and so just
22  sort of figuring out that this bridge is 40 to
23  50 years younger than that and maybe slightly
24  better construction than -- since those bridges
25  have an indefinite life, this bridge has a 40



Page 109

1  or 50 years more indefinite life.
2      Q.  And what is it -- what do you mean by
3  indefinite?  How do you define that?
4      A.  How I would define that is a -- it
5  does not have a fixed service life, that the
6  bridge will be able to be functional in the
7  medium term, which I would say is approximately
8  25, 50 years from now without any, you know,
9  major issues.
10     Q.  And what methodology do you use to
11 make that opinion?
12     A.  Well, that's sort of your -- your
13 question there is kind of a contradiction in
14 terms.  That's an opinion so it does not have a
15 methodology behind it.
16     Q.  Okay.  What methodology would you use
17 to make that determination, that the Main Line
18 railroad bridge has an indefinite service life?
19     A.  As I said before, I would have to
20 study the topic.  It's not something that I
21 have been -- have a lot of knowledge in about
22 exactly what the service life is.  It's just,
23 I've looked at a lot of railroad bridges and
24 it's an opinion, not a hard engineering fact.
25     Q.  Do all of the railroad bridges that

Page 110

1  you've reviewed throughout your career have an
2  indefinite service life?
3      A.  Not all of them.  Not the ones that
4  we replaced.  The Genesee Arch bridge that I
5  indicated earlier, we were talking about
6  earlier, was built in 1873 included in part of
7  the construction a lot of wrought iron.  And
8  the bridge was having significant maintenance
9  problems and so we knew it didn't have an
10 indefinite service life and we ended up
11 replacing it.
12     Q.  The Main Line Bridge has a floor
13 system on it, correct?
14     A.  Correct.
15     Q.  And what -- how would you describe
16 what all goes into a floor system that -- like
17 the one that's on the Main Line Bridge?
18     A.  Well, the -- in engineering, the --
19 or structural engineering, one of the things
20 you do is you sort of follow the load path.  So
21 how to load goes from the track to the piers to
22 support it.  So the floor system is set up in
23 that you have timber ties, which is generally
24 not considered as part of the floor system.
25 And an underneath that there are steel beams

Page 111

1  called stringers, those are connected to -- and
2  those run parallel to the track directly
3  underneath the ties.  And then at intervals you
4  have floor beams that the stringers frame into
5  and the floor beams then carry the load from
6  the stringers to the truss on the outside and
7  the truss carries the load out to the bearings.
8      Q.  Are the rails and the ties part of
9  the floor system or are those separate?
10     A.  They are generally not considered
11 part of the floor system.
12     Q.  Okay.  What are the -- how do you
13 refer to the rail ties in the actual rails
14 themselves?  Is it like the deck?
15     A.  Yeah, the ties are generally referred
16 to as the deck.
17     Q.  How long would the deck last
18 typically on a steel railroad bridge like the
19 Main Line Bridge?
20         MR. SNOW:  Object to form.
21         THE WITNESS:  I'm not exactly
22 familiar with the conditions of the deck there.
23 There are, when I was in the role as a
24 assistant division engineer of bridges, there
25 were two ways that we determined if a bridge

Page 112

1  deck was ready to be replaced.  One was the
2  bridge mechanically couldn't hold the rails in
3  the right place or, two, the ties would rot
4  out.  And you could get various times of a life
5  of a deck depending on how much or -- how much
6  traffic or what kind of conditions were
7  involved in that.
8  BY MR. ROMAN:
9      Q.  Do you know when the deck on the Main
10 Line Bridge was installed prior to the one that
11 was in place prior to the allision?
12     A.  I have no knowledge.
13     Q.  Did you have any involvement in the
14 design plans for the deck that was implemented
15 on the bridge after the allision?
16     A.  I helped Adam Reeder with some of the
17 dimensions on the ties.
18     Q.  And the Main Line Bridge had a
19 walkway on it, correct?
20     A.  Correct.
21     Q.  Do you know why that walkway was
22 installed?
23     A.  No, sir.
24     Q.  Did you come across any documents or
25 have any discussions with anyone indicating



Page 113

1    that the walkway was installed in part to
2    offset the counter imbalance on the counter
3    guide weights?
4       A.   No, but I -- I don't see how those
5    two would be tied together.
6       Q.   Did you have any involvement in
7    installing the walkway on the Main Line Bridge?
8       A.   The --
9       Q.   Let me --
10      A.   I didn't have --
11      Q.   I was going to say let me strike.
12      Did you have any involvement in the
13   project to install the walkway that was on the
14   Main Line Bridge before the incident?
15      A.   No.
16      Q.   Okay.  And how about the walkway that
17   was replaced and installed after the allision?
18      A.   I can't recall that we had any
19   involvement in that.  We may have had some
20   minor involvement but I don't recall any
21   involvement.
22      Q.   Do you recall how many of the --
23   well, I guess do you have any opinion on what
24   the state or condition of the deck was just
25   prior to the allision?

Page 114

1       A.   I don't know.
2       Q.   Have you been asked to make any
3    opinion or determination on that?
4       A.   No, sir.
5       Q.   Have you had any other discussions
6    with Mr. Snow or anyone from his office other
7    than that one that we just talked about from
8    the April 28th email?
9       A.   We had a discussion on Monday just to
10   make sure we knew the right places to show up
11   and just sort of general overall since I hadn't
12   done a deposition for a while about what to
13   expect.
14      Q.   All right.  How long was that call on
15   Monday?
16      A.   I think it was an hour or two.
17      Q.   And what did -- what specifically --
18   was it Mr. Snow and you on the call?
19      A.   Correct.
20      Q.   And what specifically did you discuss
21   during that call?
22      A.   As I said, just sort of the mechanics
23   of getting here, making sure that I knew kind
24   of the rules of engagement for a deposition,
25   and making sure that I had everything that

Page 115

1    you'd subpoenaed on the jump drive.  And
2    Mr. Snow asked to have a copy of it too and so
3    I ran out and got another jump drive.
4       Q.   Did you discuss any documents?
5       A.   No.
6       Q.   Did you discuss any --
7       A.   Well, we discussed the subpoena
8    document as I said.
9       Q.   Sure.  I meant did he say hey, take a
10   look at these drawings and ask you questions
11   about it, like I'm doing, anything like that?
12      A.   No.
13      Q.   Did you discuss any of the testimony
14   of any of the other witnesses provided in the
15   case so far?
16      A.   No, sir.
17      Q.   Do you have any involvement in the
18   billing process at H&H?
19      A.   A Little bit.  I mean, sometimes
20   there's -- on the billing document there's a
21   set of like four or five -- or three or four
22   items saying what work was accomplished during
23   that billing period, and generally I'm the one
24   providing that information.
25      Q.   Meaning the actual hours worked for

Page 116

1    that particular...
2       A.   No, it's -- it's not regarding the
3    hours worked, it's regarding the work that was
4    accomplished.
5       Q.   Is there a separate billing
6    department at H&H?
7       A.   Yes.
8       Q.   All right.
9          (Swanson Exhibit 6 marked
10         for identification by the court reporter).
11   BY MR. ROMAN:
12      Q.   We're going to mark Exhibit 6.  These
13   are a series of invoices, Mr. Swanson.  I
14   organized them on my end.  The stack I'm going
15   to give you is not necessarily ordered, but
16   we're just going to run through them in
17   sequential order.
18         MR. ROMAN:  And we'll do this as
19   I guess a group 6 instead of -- so we'll call
20   out the Bates numbers and these have been
21   designated confidential under the protective
22   order.
23         MR. SNOW:  Okay.  Is there a way
24   to describe what that contains?  Does it run
25   through like 6003 to something else?



Page 117

1       MR. ROMAN:  So there are going to
2   be -- they are going to jump around, so let
3   me -- let's just do this for the record.
4       MR. SNOW:  Maybe you could say
5   the dates of the invoice packages.
6       MR. ROMAN:  Yeah, so group --
7   Swanson group Exhibit 6, the first document is
8   going to be an invoice dated July 12th, 2024,
9   Bates marked NPBL 2807 through 2821.
10      The next document in group 6 will be
11  August 1st, 2024 invoice Bates marked NPBL 6003
12  to 60065.
13      The next document in group 6 is a separate
14  invoice dated the 'same day, August 1st, 2024,
15  Bates marked NPBL 003054.
16      The next document in group 6 is an August
17  21st, 2024 invoice Bates marked NPBL 3205 to
18  3207.
19      The next document in group Exhibit 6 is a
20  September 19th, 2024 invoice Bates marked NPBL
21  6066 through 6136.
22      The next document in group 6 is October
23  29th, 2024 invoice Bates marked NPBL 6137
24  through 6197 -- I'm sorry, 6198.
25      The next document in group 6 is a November

Page 118

1   21st, 2024 invoice Bates marked NPBL 2545 to
2   2546.
3       The next document is a December 26th, 2024
4   invoice Bates marked NPBL 3537 through 3539.
5       The next is an October 29th, 2024 invoice
6   Bates NPBL 2547 through 2552.
7       Next is another invoice dated December 26,
8   2024 Bates marked 3534 --
9       MR. SNOW:  I don't have that.
10      MR. ROMAN:  -- through 3536.
11      MR. SNOW:  Do you have that one?
12      THE WITNESS:  Yeah, I --
13      MR. ROMAN:  We can go off for one
14  second.
15      (Off-the-record discussion).
16      MR. ROMAN:  So there's four more
17  documents to go in group 6.  The first one
18  actually starts with an email from Mr. Moss to
19  Lisa Hamaker and that runs from NPBL 5984
20  through 5996.  And if we look on the second
21  page of this document, NPBL 5985, it is an
22  invoice dated February 21st, 2025.
23      The next document in group 6 will be NPBL
24  6295 through 6298, an invoice dated February
25  1st, 2025.

Page 119

1       The next document is also an invoice -- or
2   an invoice is also dated February 21st, 2025.
3   That is Bates marked NPBL 5985 through 6002.
4       And finally, we have an invoice, the next
5   document is April 11th, 2025, Bates marked NPBL
6   6546 through 6555.
7   BY MR. ROMAN:
8       Q.  Mr. Swanson, I think you said you had
9   a correction to make?
10      A.  Yes.  On many of our clients we
11  provide information of what was done during
12  that period for the invoice.  Looking at these
13  invoices -- well, yeah, we do have a progress
14  report here.  So like I was thinking maybe some
15  of these were missing and they may be, some of
16  them missing a progress report.
17      But on document 2810 of the July 12th it
18  shows perform inspection, began analysis and
19  inspection findings.  That's a typical progress
20  report that I provide information for.
21      Q.  Okay.  And in terms of -- so let's
22  just take a look at that NPBL 2807, the front
23  page.  It looks like it's signed by Anna
24  Volynsky, CFO?
25      A.  Yeah.

Page 120

1       Q.  That's the cover letter.  Then we see
2   the invoice that goes on to page 2808, 2809,
3   and then behind it are detailed expense
4   reports.
5       But in terms of generating this actual
6   invoice, are you involved in generating that at
7   all or is that done by like the billing
8   department?
9       A.  That is done by the billing
10  department.
11      Q.  Are you generally familiar with the
12  process that H&H's billing department uses to
13  generate these invoices?
14      A.  In a sort of high level manner in
15  terms of I know that the -- we submit our time
16  and our expense reports through a computerized
17  system and then the accounting department in
18  New York comes up with a invoice that is
19  approved.  And as part of that invoice process
20  they ask us, you know, what we performed during
21  that time period.
22      And so that's sort of a high level of what
23  my understanding of the process is.
24      Q.  And how do you enter time into the
25  system at H&H?



Page 121

1    A.   Daily I can go in there and put in
2 how much hours I spent on each project and,
3 like the project number 6498.00, I'll enter
4 that into my time sheet and then put the time
5 in there.
6    Q.   And that 6498.00-01, is that like a
7 file number, internal file number at H&H?
8    A.   Yeah, the 6498 is an internal file
9 number.  00 is the number that was assigned for
10 the initial inspection, mechanical and
11 electrical inspection, and the dash 01
12 indicates this is the first invoice for that
13 work.
14    Q.   Okay.  The 6498, is that a reference
15 to the client or project?
16    A.   It can be either.  Typically, if we
17 have a project, a client that we have a
18 longstanding service contract with, it will be
19 the client.  If it's a client that we've got a
20 one-off project on or if it's an extremely
21 large project it will get a different number.
22    Q.   Okay.  And looking at the July 12th,
23 2024 invoice for $24,470, invoice number
24 6498.00-01, I think you said this invoice
25 relates to that guide rail and inspection that

Page 122

1 occurred on June 4th and 5th of 2021?
2    A.   Correct.
3    Q.   So that would be unrelated to the
4 allision of June 15th, 2024?
5    A.   That is correct.
6    Q.   So this amount should not be included
7 in the Belt Line's claim for repairs done as a
8 result of the allision, correct?
9    A.   That is correct.  And to clarify a
10 matter that I had not been able to answer
11 earlier, Jason Ambrose that is shown on this
12 invoice was the electrical engineer for that
13 inspection.
14    Q.   And you -- I guess you're referencing
15 the 2809, the professional personnel?
16    A.   Yes.
17    Q.   Okay.  See the titles there, looks
18 like engineer 4, engineer 6, next to those
19 gentlemen's names?
20    A.   Yeah.
21    Q.   How many levels of engineers are
22 there at H&H?
23    A.   I believe that there's nine levels
24 and it is a system that was created by the
25 American Society of Civil Engineers based on

Page 123

1 experience and responsibility.
2    Q.   And that would be, an engineer 1
3 would be the lowest ranking seniority?
4    A.   Yeah.
5    Q.   Engineer 9 would be the highest
6 ranking seniority?
7    A.   Right.
8    Q.   And I take it the hourly rates
9 associated with the various levels of engineers
10 increases as you go up 1 through 9?
11    A.   Yes, sir.
12    Q.   Okay.  Let's go to the next one which
13 starts at -- it's the August 1, 2024, NPBL
14 6003.
15    A.   Okay.
16    Q.   Here it looks like it's a different
17 invoice number.  It's 6498.01-01.  Do you see
18 that on the cover letter?
19    A.   Yes, sir.
20    Q.   And what is the significance in the
21 difference between this invoice file number and
22 the one that we were just looking at?
23    A.   If you look in the regarding part of
24 the letter, the third line is repair of vessel
25 collision.  And if you look at the July 12th

Page 124

1 that's guide rail inspection.  So the 01
2 projects are based on the vessel collision.
3    Q.   Is it fair to say that any invoice
4 with the reference number 6498.00 dash whatever
5 the invoice number is, that those are related
6 to the inspection project and are unrelated to
7 the repair of vessel?
8    A.   That's correct.
9    Q.   All right.  Let's go on to the next
10 page, NPBL 6004.  If you could take me through
11 this chart that we see and interpret what we're
12 looking at here.
13    A.   Okay.  Yeah, as we talked about
14 before, we had come up with a not-to-exceed
15 amount that we provided -- or not-to-exceed
16 estimate that we had provided to the Belt Line
17 for the inspection.  And that is where it says
18 contract amount, that 155,000, that is the
19 not-to-exceed amount.  The labor and expenses
20 there are what we had estimated for the labor
21 and expenses for that and for the ARE
22 corporation.  That is what our subcontracting
23 expenses were.
24    And as you can see on the remaining budget
25 there, we had exceeded that not-to-exceed



Page 125

1 amount. And about that same time I sent a
2 letter to Cannon saying, you know, we're
3 starting to work on the repairs, this is what
4 the total cost is going to be.
5 Q. And that line item for ARE Corp,
6 27,942.20, I think earlier you said that was
7 mainly for the drone inspection?
8 A. Yeah, that was what it was for.
9 Q. NPBL 6005.
10 A. Uh-huh.
11 Q. Do you know or can you interpret from
12 this page or anything else in the invoice what
13 these particular professionals did for this
14 invoice period?
15 A. Okay. As I said before, Jonathan
16 Hewko did some structural analysis for us.
17 Barry Keung was involved in the inspection.
18 Travis Kimmins somewhat was involved in the
19 inspection also. David Marcic was involved
20 with some of the analysis. Giacomo was also
21 involved with the analysis.
22 Steve Malczewski, he is a mechanical
23 engineer who is very, very familiar with
24 movable bridges. And at this stage of the game
25 we were calling in all the people that had --

Page 126

1 were kind of our movable bridge experts in the
2 company to make sure that we were moving
3 forward in the right plan. So that's why
4 Malczewski's time is there.
5 Tim Noles as I said before was out for one
6 of the inspections. He is also one of our high
7 level engineers.
8 Pete Rudy is our chief engineer of
9 structures and he is nominally over Amanda,
10 Brian and Barry. And so that's why his time
11 was in there.
12 Amanda was not out at the inspection, but
13 she developed things in-house in New York City
14 for this project.
15 Brian was -- did the inspection. I was
16 involved in the inspection and sort of overall
17 coordinating things. And Paul van Hagen is
18 Giacomo's supervisor, and I don't exactly
19 understand why both of them are shown under
20 engineer 1s. And quite frankly, I think you
21 guys got a good deal on that.
22 Q. Fair enough. Looking at the progress
23 report, if you could take us through and
24 interpret what work is reflected and invoiced
25 on this particular document.

Page 127

1 A. Okay. You know, first item we
2 responded to the vessel collision. As we've
3 talked about before, we talked with the
4 contractor to stabilize the existing structure.
5 We performed an inspection and determined the
6 amount of damage and started developing repair
7 plans.
8 We did meetings. We started developing
9 loading for the temporary conditions to figure
10 out how we're going to support the bridge. And
11 we provided reports and recommendations and
12 then we started designing repairs, so --
13 Q. As best as you can recall and by
14 reviewing this document, did the begin
15 designing the repairs involve any work on the
16 drawings for the mechanical components of the
17 lift bridge that we were talking about earlier?
18 A. No, it would not have.
19 Q. Okay. And I believe the next one
20 is --
21 A. That appears to be the same.
22 Q. Same one just incomplete it looks
23 like, right?
24 A. Yeah.
25 Q. Okay. All right. I think the next

Page 128

1 one I have is August 21st, 2024.
2 A. Okay.
3 Q. If we look at this one, this is the
4 invoice for 133,454. I don't see a progress
5 report on this one.
6 A. Yeah, I don't know how that happened.
7 Q. By looking at this invoice, does it
8 refresh your recollection or can you recall
9 what work H&H was performing during this
10 particular period?
11 A. We continued developing plans. I
12 don't know what else I can tell you with regard
13 to that.
14 Q. Would you need to review the progress
15 report to probably refresh your recollection?
16 A. Yeah, I -- I'd probably -- in the
17 drawings we showed the different packages,
18 packages one through 5, and those were on
19 consecutive dates. And so in the
20 documentation, I mean, there's definitely an
21 email going out when we released each package
22 and I can somewhat match those up between the
23 two.
24 Q. And just I think you were taking a
25 look at Exhibit 4 which are the drawings. And



Page 129

1  did you say that those went in sequential
2  order?
3      A.  Right.
4      Q.  So package 1, it went package 1, 2,
5  3, 4 and 5?
6      A.  Right, approximately let's say two
7  weeks between them.
8      Q.  Okay.  Generally if we take a look at
9  those emails with the submittals, when
10  you're -- and line those up we can probably
11  align with the amount of work?
12      A.  Yeah.
13      Q.  Is it fair to say that the designs,
14  the drawings was the lion's share of the work
15  that was going on for Hardesty & Hanover?
16      A.  Yes, I mean, and probably 60 percent
17  of -- well, after the inspection -- you know,
18  it varied over time, you know, when we did the
19  initial inspection that was a huge amount of
20  the time.  But by the time we were getting to
21  this invoice here, it was the design
22  calculations and the drawings.  And the design
23  calculations probably were 30 percent of the
24  time with the drawings remaining 70 percent.
25      Q.  Okay.  Looking at NPBL 6066, the

Page 130

1  document starting there, the September 19th,
2  2024 invoice for $92,722.51, looks like there
3  are detailed timesheets for the first few
4  pages.  The progress report is at page marked
5  NPBL 6074.  If you could review that and then
6  tell us the best of your recollection what work
7  was done in this period.
8      A.  We were still repairing -- still
9  providing repair, drawing packages, and getting
10  and talking with the contractor to make sure
11  things were lining up right.
12      Q.  Number four said continued structural
13  analysis of temporary conditions.  Is that some
14  of the work that you were discussing earlier
15  where you were doing with McNary Bergeron?
16      A.  Yeah.
17      Q.  Okay.  As best as you can tell from
18  this invoice we're looking at for the period
19  August 10th, 2024 through September 6th, 2024,
20  does any of the work relate to the drawings for
21  those mechanical components we were talking
22  about earlier?
23      A.  I'm not exactly certain.  That may be
24  tied to the time for Christine Sidorski but I'm
25  not certain about that.

Page 131

1      Q.  Next document is the October 29th
2  invoice I think, starting at NPBL 6137.
3  Progress report starts on 6141.  If you could
4  take us through what work H&H performed during
5  this period?
6      A.  Okay.  I think we were finishing up
7  the -- we did do some temporary design for the
8  shifting of the front tower leg.  I believe we
9  were finishing up that work at this time, and I
10  was going out, the travel that I had up to
11  Norfolk there, was going out and checking on
12  what the -- how the contractor was progressing
13  and making sure everything was working out
14  correctly.
15      Q.  Okay.
16      A.  That's that field support during key
17  repair activities.
18      Q.  As best as you can tell from
19  reviewing this invoice and your recollection,
20  does any of the work reflected in this period
21  relate to the drawings for the mechanical
22  components we were talking about earlier?
23      A.  The only person that I could see that
24  possibly would be involved in that would be
25  Travis Kimmins' hours there.  Other than that,

Page 132

1  I don't see that.
2      Q.  Okay.  Next invoice is November 21st,
3  2024, NPBL 2545.  This is an invoice for
4  $44,825.96.  I don't see a progress report on
5  this one, Mr. Swanson.  Can you tell what work
6  is reflected for this particular period?
7      A.  It is hard to tell without the
8  additional documentation.  I'm not going to
9  make any suppositions.
10      Q.  Okay.  Next one is the December 26,
11  2024.  I also don't see a progress report.  Can
12  you tell what work was reflected in this one?
13      A.  Yes.  And we -- we had some staff
14  onsite to help with getting the bridge started,
15  so you've got Jason Ambrose, Teddy, Alex Noble
16  and Bill Stickle, and they are -- that's a
17  group of both mechanical engineers and
18  electrical engineers.
19      And they were -- they are onsite when the
20  bridge was originally opened after the allision
21  to make sure that there wasn't anything that
22  was really messed up with the bridge in terms
23  of electrical load or if they foresee -- or saw
24  any mechanical problems.
25      The other thing is that we -- to start out



Page 133

1  with and caution, we had the bridge operated at
2  a slower speed to begin with.  And I believe
3  our folks helped the Belt Line get the bridge
4  to the point where it could operate at a slower
5  speed.
6      And I'm not -- let's see here.  Yeah,
7  there's -- and we had folks out helping with
8  the electrical and mechanical systems and
9  getting it -- the bridge going twice.
10     And so we -- our reimbursable expenses
11  don't necessarily fall in line with the same
12  time as the labor.  And so if you see Teddy
13  Kostadinov has only a half hour of professional
14  services in the November 2nd through November
15  29th, but he's got a whole bunch of expenses in
16  October.  His labor tied with that expenses
17  probably was with the previous invoice, and so
18  that's tied in there.
19     Q.  Okay.  I think the next one is
20  November 21st, 2024.  Can you take a look at
21  that and let me know if you can discern what
22  work H&H performed during this period?
23     A.  Wait a second.  Which one?  What's
24  the number?
25     Q.  It's 2545, NPBL 2545.  It's just a

Page 134

1  two-pager.
2      A.  Okay.
3      Q.  I don't know what happened with this
4  one.
5      A.  Well, that's the -- isn't that the --
6  yeah, we looked at NPBL 6137.
7          MR. SNOW:  I think we already did
8  2545.
9          THE WITNESS:  That's the same
10  invoice.
11  BY MR. ROMAN:
12     Q.  There was one duplicative in there.
13     A.  October 29th is my birthday so that
14  just -- the fact that you had two of them
15  there, that just caused me to --
16     Q.  So I'm looking at 2545 as the
17  November 21st, 2024 (indicating), just the two
18  pages.
19     A.  Oh, okay.
20     Q.  2547 is the duplicative.
21     A.  Yeah, I don't -- there's not enough
22  detail for me to be able to tell you what went
23  on here.
24     Q.  Okay.  And then NPBL 3534, the one
25  for a grand total of $882, would you agree that

Page 135

1  that is an invoice that relates to the guide
2  rail inspection noted by the 6498.00?
3      A.  Correct.
4      Q.  All right.  So we can -- Mr. Snow
5  thought I was joking off record, but we can
6  throw this one out, right, as unrelated to the
7  Main Line Bridge repairs from the collision?
8          MR. SNOW:  Does this invoice
9  relate to the mechanical inspection then?
10         THE WITNESS:  Right, the one
11  that -- the one that is -- well, there's two
12  that are December 26.  3534 and 3537, right?
13  BY MR. ROMAN:
14     Q.  Right, 3537 is for repair and vessel
15  collision.  That's $25,643.70, right?
16     A.  Right.  So --
17     Q.  Yeah, and then the --
18     A.  882 compared to 25,000, I mean I'd
19  rather take the 25,000.
20     Q.  Well, me too, but Mr. Snow and I will
21  have to work that out later.
22         MR. SNOW:  He's just trying to
23  clarify, so the question was whether the one
24  for 882 that says invoice number 6498.00-04, is
25  one for the mechanical inspection --

Page 136

1          THE WITNESS:  Correct.
2          MR. SNOW:  -- unrelated to the
3  allision, right?
4          THE WITNESS:  Right.
5          MR. ROMAN:  Thanks, counsel.
6  BY MR. ROMAN:
7      Q.  All right.  Next one, this is the one
8  that starts with the email on top, Bates marked
9  5984.  And then the cover letter for the
10  invoice starts on 5985.  And again, this is
11  February 21st, 2025.  And do you agree with me
12  that this one is related to the guide rail
13  inspection and is unrelated to the allision
14  repairs?
15     A.  That's correct.
16     Q.  Okay.  All right.  Then the next one
17  is also a February 21st, 2025 invoice Bates
18  marked NPBL 6295 in the amount of $6,176.  Can
19  you tell from looking at this invoice what work
20  was performed during this period which is
21  January 11, 2025 through February 7, 2025?
22     A.  Oh, it's on the 6298.  We provided
23  the final punch list to the contractor on
24  January 29th and there were some issues with
25  the counterweight guide supports that we helped



Page 137

1  the Belt Line with.
2     Q.  And the January 29th date that you
3  provided the final punch list, would that
4  reflect the date of the completion of the
5  project for H&H?
6     A.  Not necessarily.  Generally, after a
7  project like this we would go in and provide
8  a -- the final conformed set of plans with all
9  the documents there, make sure that the owner
10  had all the submittals and RFIs and basically
11  it's finishing up paperwork.
12        MR. ROMAN:  Okay.  Why don't we
13  take a little bit of a break.  How does that
14  sound?
15        THE WITNESS:  Okay, that sounds
16  good to me.
17         (Brief recess).
18         (Swanson Exhibit 7 marked
19         for identification by the court reporter.)
20  BY MR. ROMAN:
21     Q.  Mr. Swanson, I put Exhibit 7 in front
22  of you, but very quickly I think I missed two
23  on group 6.  Both February 21st, 2025 invoices.
24  The first one is NPBL 6295, $6,176.  Do you see
25  that one?

Page 138

1     A.  6295, yes.
2     Q.  Okay.  Can you discern from looking
3  at this one what work Hardesty & Hanover did --
4  I'm sorry, strike that.  We looked at this one.
5     I missed the other February 21st, 2025
6  invoice, the one starting NPBL 5985, $1,436.96.
7  Fair to say this one related to the guide rail
8  inspection?
9     A.  Yes, sir.
10     Q.  All right.  And is unrelated to the
11  allision repair?
12     A.  Correct.
13     Q.  Let's take a look at what we've
14  marked as Exhibit 7.  It's in front of you,
15  the --
16     A.  Okay.
17     Q.  Do you recognize this document?
18     A.  Yes.
19     Q.  Could you describe it?
20     A.  This is the mechanical inspection
21  report based on the mechanical inspection that
22  H&H performed.
23     Q.  Okay.  And we see at the top on page
24  115 of the document, NPBL 6813, the top in red,
25  draft submission for NPBL review, October 2024.

Page 139

1  Are there any reasons that this was submitted
2  in October as opposed to sooner after the June
3  4th/5th date?
4     A.  Other than there's a lot of draw
5  bridges that have a lot of issues that our
6  people seem to get busy with.
7     Q.  Okay.  Who actually authored this
8  document if you know?
9     A.  I am not certain exactly who authored
10  this and it likely was authored by a
11  combination of Kevin Ciampi and Travis Kimmins.
12     Q.  If we go on to page two and it looks
13  like we have paragraphs one through 11 there.
14  It says just prior to that, based on the
15  inspection findings H&H has the following
16  recommendations.  The first is they replace the
17  ten inch thruster brake with a nineteen inch
18  thruster brake.  The existing motor brake is
19  significantly undersized and has adjusted
20  well beyond its rate of torque.
21     Did I read that correctly?
22     A.  That's correct.
23     Q.  And we discussed that particular
24  project a bit today, correct?
25     A.  Correct.

Page 140

1     Q.  And part of that was H&H doing the
2  design repairs which are included in those
3  drawing sets that we discussed?
4     A.  Correct.
5     Q.  All right.  Then number two is
6  replace the counterweight ropes.  In the 1983
7  counterweight rope replacement, all of the
8  counterweight ropes were replaced but only two
9  tower sheaves were replaced.  Given the current
10  condition of the counterweight sheave grooves
11  and the limited hub material available to be
12  machined to recondition the sheave groups.  It
13  is recommended that all four counterweight
14  sheaves and trunnion shafts be replaced as part
15  of the work.  The rope should be replaced in
16  the next five years.  However, with the
17  contractor currently mobilized consideration
18  should be given to replacing the ropes in the
19  near term.  Care should be taken to specify
20  ropes of a similar weight/construction given
21  the lack of auxiliary counterweight/balance
22  chains.
23     Did I read that correctly?
24     A.  Yes, sir.
25     Q.  All right.  How was it determined



Page 141

1  that the ropes should be replaced in the next
2  five years?
3      A.   By the wear of the ropes, there's --
4  if you can refer to picture M3 which is on 6821
5  you can see flat spots on the -- the metal wire
6  ropes here.  You know, it says that there's
7  crown wear.  That means that the -- where it
8  should be rounded off on top that it's now
9  flattened out.
10      So that's the reason why they said that.
11      Q.   Moving down to number three it says
12  if the counterweight ropes and sheaves are not
13  replaced in the near term, perform ultrasonic
14  testing on all of the counterweight sheave
15  trunnion shafts.
16      Did I read that accurately?
17      A.   That is correct.
18      Q.   And would that be a repair to do in
19  the event that NPBL decided not to go forward
20  with the recommended plan to replace all the
21  ropes?
22      A.   Yes, or that would be if they
23  determined not to replace the shivs, the -- on
24  the NPBL 6816 which is the next page it shows
25  the tower shiv shaft.  The shiv where it shows

Page 142

1  one foot four -- well, the six inches one foot
2  four and the six inches, the big pulley or what
3  we call the shiv is mounted at that location.
4      The -- where it shows the half inch
5  radius, there is a possibility of cracking in
6  that location.  And so the ultrasonic testing
7  is a -- if they weren't going to replace it
8  right offhand they need to test that location
9  to make sure that there isn't any cracking
10  going on at that location.
11      Q.   Okay.  Fair to say four and five
12  discuss the lubrication on the counterweight
13  ropes a little bit what we discussed earlier?
14      A.   Right.
15      Q.   And then number six says consider
16  installation of an auxiliary counterweight or
17  balance chain to at least partially balance out
18  the uneven counterweight rope weight.  This
19  would reduce wear and tear on the machinery and
20  decrease the likelihood of future mechanical
21  failures similar to the ones previously
22  experienced, parentheses, bevel gear failures,
23  operating rope failures, et cetera.  If desired
24  H&H could evaluate the feasibility of auxiliary
25  counterweights and/or balance chains.

Page 143

1      Q.   Did I read that accurately?
2      A.   That is correct.
3      Q.   And what -- were there additional
4  failures that were -- to your knowledge that
5  are not specifically listed here in
6  parentheses?
7      A.   Not to my knowledge.
8      Q.   Okay.  Number eight, if the main
9  drive machinery gets rehabilitated in the
10  future, replace the asbestos hand break with a
11  modern thruster break.
12      Did I read that correctly?
13      A.   That's correct.
14      Q.   And what's the main drive machinery
15  that's referenced in this?
16      A.   That is the machinery that is used to
17  raise and lower the span.
18      Q.   Has H&H made any type of evaluation
19  of that machinery?
20      A.   Sort of offhanded, I shouldn't say
21  offhanded, but the -- we were talking about the
22  load testing of the machinery.  That would
23  provide indication there of problems with that
24  machinery.
25      Q.   Okay.  Have you had any discussions

Page 144

1  with the Belt Line about proceeding with
2  repairs or modification of that machinery?
3      A.   We have not talked with -- this is
4  sort of an either/or situation, the 30 percent
5  plans that we are working on developing for the
6  Belt Line currently should include, I believe
7  we're looking at doing the auxiliary
8  counterweighting which will reduce the load on
9  the machinery and therefore basically take care
10  of this problem.
11      Q.   Okay.  No firm plans to do it yet,
12  though, is that fair?
13      A.   The -- please define fair or --
14      Q.   I guess H&H hasn't been formally
15  retained to actually proceed with the project
16  yet?
17      A.   We have been retained to develop 30
18  percent plans.  There's some additional things
19  going on with the Belt Line that they more than
20  likely will develop -- or go for the 100
21  percent plans, but at this point they don't
22  want to proceed with that.
23      Q.   Fair enough.  Number 10, consider the
24  installation of a buffer hard stop to prevent
25  the span from being able to over-travel.



Page 145

1    Did I read that correctly?
2    A.   Yes.
3    Q.   What does that refer to?
4    A.   Well, we were talking about -- or we
5   put timber footing underneath the
6   counterweight to prevent it from going up
7   further if -- if the brakes failed.  This would
8   do the same thing with a hard stop to prevent
9   the span from moving farther than it was
10  supposed to.
11   Q.   Okay.  And then 11 is perform the M&E
12  inspection once the tower is realigned to
13  verify machinery/CTWT alignment and to confirm
14  the electrical systems are still functioning as
15  intended.
16   Did I read that accurately?
17   A.   Yeah, and the CTW is the abbreviation
18  for counterweight.
19   Q.   It says once the tower is realigned,
20  is that a reference to once the tower is
21  realigned from the allision?
22   A.   It appears that that may be one way
23  to read that.  I can also read that as once the
24  counterweight sheaves and counterweight
25  trunnions have been replaced, make sure that

Page 146

1   there's a final M&E inspection to make sure
2   everything is working correctly.
3    Q.   Okay.  To your understanding has any
4   such inspection occurred as we sit?
5    A.   I think these recommendations should
6   be read as sequentially.  So that would
7   basically say that after one through ten have
8   been performed or a version of one through ten
9   have been performed, that that's a -- let's
10  check and make sure everything is aligned
11  correctly after things are done.
12   Q.   Okay.  On to page four of the report,
13  NPBL 6816.  Second sentence under the
14  counterweighted ropes is the counterweight
15  ropes are nearing the end of their useful life.
16   Do you know whether or not anyone from H&H
17  has run any calculations as to what that useful
18  life was for the counterweight ropes?
19   A.   To my knowledge they have not run
20  exact determination of what the useful life is.
21   Q.   Do you know how H&H determined that
22  the ropes were nearing the end of their useful
23  life?
24   A.   Through that -- to my understanding
25  through that visual inspection just looking at

Page 147

1   them and seeing that they were worn.
2    Q.   Okay.  If we look at the photo on the
3   front of the report, 6813 is the Bates --
4    A.   Uh-huh.
5    Q.   -- do you know when that photograph
6   was taken?
7    A.   I do not know when that photograph
8   was taken, although I would assume that it was
9   taken during the inspection on June 4th and
10  5th.  And the reason -- well, no, I can't even
11  make sure that that is the June 4th or 5th
12  inspection because it appears to be facing
13  eastward and from the west tower.  And all the
14  work with regard to the allision would have
15  occurred behind where this person is standing.
16   So although we know it didn't happen right
17  after the allision because the span would have
18  been in the raised position.  And I don't think
19  that Travis went back out there or one of those
20  guys went back out there just to take this
21  picture after the bridge was back in service.
22   So just not knowing for certain when this
23  picture was taken, I would strongly suspect it
24  was taken during that June inspection.
25   Q.   And if we go to NPBL 6819 it's a

Page 148

1   photo M1, titled West Counterweight Hanging Out
2   At an Angle.  Do you see that?
3    A.   Yes.
4    Q.   Was this photograph taken as part of
5   the June 4th or 5th inspection?
6    A.   Yes, likely.
7    Q.   And we see it looks like there's two
8   arrows that are superimposed on the photograph
9   on the top side pointing to what looks to be a
10  gap.
11   A.   Uh-huh.
12   Q.   And then on the bottom right looks to
13  be where the counterweight is rubbing against
14  the guide rails.
15   A.   Yes.
16   Q.   And earlier we are talking about that
17  that counterweight was rubbing up against those
18  rails, right?
19   A.   Right.
20   Q.   Due to the imbalance.  Could that
21  rubbing when the lift system goes up and down,
22  could that impact the integrity of those
23  components that it's rubbing against?
24   A.   To a limited extent.
25   Q.   And what do you mean by limited



Page 149

1  extent?
2      A.  Those components are structural T
3  sections and so -- and the -- if you think
4  about a capital T, the portion that is rubbing
5  next to the counterweight is the vertical leg
6  of the T.  And so, you know, you will get wear
7  on what would be the bottom leg of that
8  vertical T.
9      And so if you -- I don't remember, the T
10  section is probably -- that vertical leg is
11  like three inches.  And if you lose a half inch
12  of that T section, yes, you are reducing the
13  structural capacity of that T section.  But
14  it's not like what you would have if you lost,
15  you know, the top bar of the T.
16      Q.  Just when you're referring to the T
17  section, can you point that out anywhere in the
18  photo?
19      A.  It's hard to see on the photo.  Can
20  we go back to --
21      Q.  You can go back to anything you want.
22      A.  -- Exhibit 4.  It is 3823.
23          MR. SNOW:  Which sheet is that?
24          THE WITNESS:  Sheet 42.  Okay.
25  In the bottom right-hand corner there's a item

Page 150

1  that is shown as blocked, WT 5 by 56.  That is
2  a T section, and we show that we had to remove
3  1.035 inches off that T section to have it fit.
4  You can see that the majority of the T section
5  is still in there too.
6      So that somewhat reduces the strength of
7  the T section but doesn't, you know, completely
8  reduce the capacity of that T.
9  BY MR. ROMAN:
10      Q.  Okay.  Photo M2 on the next page of
11  Exhibit 7, southwest inboard trunnion bearing
12  with significant scoring, do you know when this
13  photograph was taken?
14      A.  It should have been taken during that
15  June 4th and 5th inspection.
16      Q.  What is scoring?
17      A.  You see the -- the -- this should be
18  a mirror finish, and so the lines you see on
19  there are what's considered scoring, and if a
20  piece of grit or sand or something gets in
21  there or the lubricant breaks down, it will
22  score these vertical lines.
23      Just sort of to give you an orientation,
24  this is the end bearing of the shaft and the
25  shaft will rotate sort of going in and out of

Page 151

1  the page.  So this shows that there's -- that
2  this either would need to be polished or
3  re-machined to reduce friction.
4      Q.  Okay.  And then photo, we talked
5  about photo M3, but M4 which is on the NPBL
6  6822, looks like it's -- there's a notation
7  main counterweight sheave grooves measured with
8  a worn groove gauge, note the gap between the
9  gauge and the sheave groove indicates a worn
10  groove.
11      A.  Right.
12      Q.  Where is the worn groove?  Is it
13  where the arrow is?
14      A.  Yeah, that's where the arrow is.  And
15  this is like on the bottom side of that great
16  big pulley, the shiv, and the wire rope will --
17  when it's on the top side, the wire rope will
18  run in these grooves.
19      Q.  Okay.
20      A.  And so this indicates that there's
21  wear in that shiv.
22      Q.  M5 is related to the motor brake,
23  correct, and same with M6?
24      A.  Correct.
25      Q.  On the M8, picture taken from west

Page 152

1  tower adjacent to the lift span in the fully
2  raised position.  The safety line was too loose
3  to be safely used.  What is that safety -- I
4  mean how do you use that safety line?
5      A.  The -- my understanding is that's the
6  way to go from the -- I don't know exactly what
7  that is used to -- for personnel to go from one
8  location to the other, but it is a safety
9  concern for personnel moving about the bridge
10  doing the mechanical inspection.  So it is
11  something regarding mechanical inspection.
12  It's a something regarding safe movement for
13  like a tie-off point for folks doing mechanical
14  inspections.
15      Q.  And was the loose safety line, do you
16  know if it had any relation to the imbalance in
17  the counterweights?
18      A.  I don't think so.  I think a safety
19  line would be generally fixed from one point to
20  another, so you could put a fall protection
21  harness or something like that.  This is a
22  worker safety item.
23      Q.  Okay.
24          MR. ROMAN:  We can go off for one
25  second.



Page 153

1    (Off-the-record discussion).
2  BY MR. ROMAN:
3    Q.  Mr. Swanson, do you recall having an
4  email exchange with Mr. Moss from the Belt
5  Line, I think it was in the last month or two,
6  regarding the safe load capacity of the Main
7  Line Bridge?
8    A.  I may have, I don't -- don't
9  remember.  I know that I -- in the last couple
10  of months I saw the load ratings, but I don't
11  remember having a email correspondence with him
12  with regard to it.
13    Q.  Have you done any calculations or
14  been asked to perform any evaluation of what
15  the load capacities are for the Main Line
16  Bridge?
17    A.  No, sir.
18    Q.  Okay.  And I think you said you
19  had -- at some point you had seen a reference
20  to load capacities, correct?
21    A.  Yes.
22    Q.  And what was the context of you
23  reviewing those capacities?
24    A.  The -- I think there was some
25  question about how the load capacities were

Page 154

1  calculated or something with regard to them.
2    Q.  Do you have any understanding of what
3  the load capacities were on the Main Line
4  Bridge prior to the allision of June 15th,
5  2024?
6    A.  No.
7    Q.  How about as you sit here today, do
8  you have any understanding of what the current
9  load capacities are of the Main Line Bridge?
10    A.  I do not have a complete knowledge of
11  it.  I saw a spreadsheet produced by somebody
12  else of what the capacities are.
13    Q.  To your knowledge are the load
14  capacities different in any manner from today
15  as compared to the -- or prior to the allision?
16    A.  I doubt that they are different.
17  The -- what we replaced in the allision was all
18  basically one end of the bridge and so if --
19  and you know, your load capacity is based on
20  whatever the weakest member is, and we only
21  sort of replaced -- and the bridges in the
22  middle, east and west it is basically
23  symmetrical.  So we replaced stuff on the east
24  end of the bridge.  The stuff on the west end
25  of the bridge would still be the controlling

Page 155

1  load rating.
2    Q.  You're talking about the two ends
3  that are separated by the vertical lift
4  portion?
5    A.  No, if the -- on the plans, we
6  show -- the span itself, span four, you can --
7  east end and west end, I'm looking at 3844.
8  It's sheet 25A.  It's marked from the plans as
9  demolition at L3/U3 but it will work for this.
10    You can see that on the right-hand -- or
11  on my right hand that the numbers on the bottom
12  cord is shown as L0 through L4, and L is for
13  lower, U is for upper.  Anyways, and then on
14  this end, this is marked as L3 prime, L2 prime,
15  L1 prime, L0 prime.
16    And the reason why that is, is one,
17  engineers are lazy, but two, there is symmetry
18  between these members over here and these
19  members over here.  So even if we replaced
20  members over here that have a similar size as
21  members over here, these members over here will
22  still control.
23    Q.  Meaning the non-replaced members
24  would control because they might be of lower
25  capacity, right?

Page 156

1    A.  Right.
2    Q.  Okay.  So the load capacity is, if
3  I'm interpreting correctly, determined by what
4  the weakest member of the structure is?
5    A.  Right.
6    Q.  Okay.  Have you ever performed a
7  evaluation on any steel railroad bridge to
8  determine what the load capacity is?
9    A.  Yes, quite a few.  That was one of my
10  tasks at Norfolk Southern for the first 20
11  years of my career.
12    Q.  What methodology do you use to make
13  that determination?
14    A.  The -- well, let's see, how would I
15  explain it.  There's a rating process.
16  Basically you figure out the capacity of that
17  particular steel member using the structural
18  characteristics, the shape of it and also the
19  strength of the material.  And then you
20  determine loads in that member and somewhat,
21  you know, you -- you've got a total capacity of
22  the member.  And the part of that capacity has
23  to be taken up by just the strength that member
24  needs to support the bridge, you know, the
25  bridge itself just standing there, what we call



Page 157

1  dead load.
2      And then you subtract out the dead load
3  and some other loads to find out how much live
4  load capacity you have and you determine live
5  load capacity from there.
6      Q.  And you've not done any type of data
7  evaluation for the Main Line Bridge, correct?
8      A.  That is correct.
9      Q.  Has anybody asked you to do such an
10  evaluation?
11     A.  No, sir.
12     Q.  Do you plan on doing any evaluation
13  prior to trial?
14     A.  No, sir.
15     Q.  All right.  This will be 8.
16          (Swanson Exhibit 8 marked
17          for identification by the court reporter).
18  BY MR. ROMAN:
19     Q.  Have you looked at Exhibit 8?
20     A.  Yes, sir.
21     Q.  And do you recognize this?
22     A.  Yes, sir.
23     Q.  Could you describe it for us, please.
24     A.  It is an estimated cost for gathering
25  documentation and attending the depositions for

Page 158

1  as per the subpoena.
2      Q.  Is it fair to say this document,
3  you're memorializing a discussion with Mr. Moss
4  from the Belt Line in which the Belt Line has
5  agreed to compensate H&H for services provided
6  in relation to the deposition today?
7          MR. SNOW:  Object to form.
8          THE WITNESS:  These costs are for
9  gathering documents and travel to and from the
10  deposition.
11  BY MR. ROMAN:
12     Q.  And if we look at the third page it
13  looks like a spreadsheet.  Is this a
14  spreadsheet that you prepared?
15     A.  Yes, sir.
16     Q.  Okay.  And what do these figures on
17  the spreadsheet reflect?
18     A.  They reflect hours.
19     Q.  Okay.  So if we look at task one,
20  project management, eight total hours for a
21  total cost of 2112, what are those entries
22  reflecting?
23     A.  Just general costs for whatever
24  project management that would be associated
25  with getting the documents together, meetings

Page 159

1  or whatever with like Travis Kimmins who's the
2  other item on here -- other person on here.
3      Q.  How about the same for task two, the
4  quality management?
5      A.  The -- that was for hours to make
6  sure that the -- if we needed to, if our
7  document gathering was done in a quality
8  manner.
9      Q.  Task three, gathered documents, looks
10  like a total of 72 hours for a total cost of
11  18,624?
12     A.  Uh-huh.
13     Q.  This was an estimated -- this was an
14  estimate, correct?
15     A.  Correct.
16     Q.  Do you know how long it actually took
17  you to do the document gathering?
18     A.  I don't remember exactly.  It was
19  less than 40 hours.
20     Q.  And then the deposition, 16 hours for
21  the program manager, and the engineer five.  Is
22  that you?
23     A.  No, that's Travis.
24     Q.  So Travis for 32 hours and then total
25  hours, 48 for $12,288.  That is the estimate?

Page 160

1      A.  Yeah.
2      Q.  Okay.  Have you submitted any invoice
3  to the Belt Line yet for any costs that are
4  reflected in this estimate sheet that we're
5  looking at?
6      A.  No, we have not.
7      Q.  How many discussions have you had
8  with Mr. Moss regarding this lawsuit?
9      A.  We've had a few, I think maybe two or
10  three.  I don't remember exactly.
11     Q.  Have you had any discussions about
12  this lawsuit with anyone else from the Belt
13  Line besides Mr. Moss?
14     A.  No.
15     Q.  Best as you recall, when were those
16  two or three discussions you've had with
17  Mr. Moss?
18     A.  I want to say, I don't know exactly
19  the timeline but I think there was an offhand
20  mention soon after this lawsuit was brought
21  that there was going to be a lawsuit.  And then
22  when I received the deposition, talked to our
23  legal folks and basically said, you know, we've
24  got a -- try and capture our costs to gather
25  information, and talked to Cannon after that



Page 161

1  saying, you know, we're going to have costs
2  associated with this, you know, in this as --
3  as indicated in this email as per our
4  discussion.  And that was to make sure that we
5  were going to receive compensation for H&H's
6  costs associated with this.
7      Q.  Has Mr. Moss requested any particular
8  information from Hardesty & Hanover in relation
9  to the litigation?
10     A.  No, I can't think of anything related
11  to the investigation, or the -- the --
12     Q.  Earlier we were talking a little bit
13  about he had requested at some point to speak
14  with Mr. Snow and his firm about a question
15  they had before deposition, right?
16     A.  Yeah, I believe so.
17     Q.  Was there any other conversations
18  such as that one where Mr. Moss came to you and
19  said hey, we're looking into this issue for the
20  case or we need this piece of information or
21  anything like that where you were involved?
22     A.  Can't -- can't remember anything.
23     Q.  Has Mr. Moss asked you to provide any
24  opinions on any topics related to this
25  litigation?

Page 162

1      A.  I can't remember -- I can't remember
2  anything that he directly said was related to
3  this investigation or this lawsuit.
4          (Swanson Exhibit 9 marked
5          for identification by the court reporter).
6          THE WITNESS:  (Witness reviews
7  document).
8      Q.  Have you ever seen the document that
9  we've marked as Exhibit 9?
10     A.  No, sir.
11     Q.  And we see on -- looks like someone
12  didn't put page numbers on this, but on the
13  back side see it's dated June 4, 2025 signed by
14  Mr. W. Ryan Snow?
15     A.  Okay.
16     Q.  As far as you know, did you have any
17  discussions with either Mr. Moss, anyone from
18  the Belt Line or anyone from Mr. Snow's firm
19  regarding the information that is reflected in
20  the document marked as Exhibit 9?
21     A.  I had a discussion this morning with
22  Mr. Snow that I probably would be on this list.
23     Q.  Okay.  But no discussions to your
24  understanding before the document was prepared
25  and served on the parties in the case?

Page 163

1      A.  No.
2      Q.  No being correct?
3      A.  Correct, I --
4      Q.  Okay.  If we look down, looks like
5  it's subparagraph five or next to one, Howard
6  Swanson, PE, that's you?
7      A.  Yes.
8      Q.  Okay.  Occupation chief engineer,
9  rail and transit group and licensed
10  professional engineer with Hardesty & Hanover,
11  LLC?
12     A.  That's correct.
13     Q.  Is that accurate?
14     A.  Yeah.
15     Q.  It says field of expertise, railroad
16  bridge engineer, extensive experience on large
17  freight rail projects and bridge management in
18  compliance with the Federal Railway
19  Administration, may testify regarding movable
20  railroad bridges, the Main Line condition,
21  extent of damage, repair methodology, costs and
22  emergency repairs including rebuttal testimony
23  as appropriate.
24      Did I read that accurately?
25     A.  Yes, sir.

Page 164

1      Q.  All right.  Has anyone asked you to
2  provide any opinions with regard to the topics
3  that are listed in that subparagraph?
4      A.  Can you restate that question again?
5      Q.  Yeah.  So you see the part where it
6  says may testify regarding movable railroad
7  bridges, comma, the Main Line Bridge condition,
8  and then it goes on?
9      A.  (Witness nods head affirmatively).
10     Q.  Just so we're on the same page I
11  would consider movable railroad bridges as a
12  topic of your anticipated testimony.  Is that
13  fair?
14     A.  Right.
15     Q.  Has anyone asked you to provide any
16  opinions to a reasonable degree of engineering
17  certainty with regards to movable railroad
18  bridges?
19     A.  Well, I'd like to cut down that
20  statement a little bit more.  My daily work is
21  providing opinions about movable railroad
22  bridges, so nobody from the Belt Line or
23  Mr. Snow's firm has asked me to provide any
24  information with regard to that subject.
25     Q.  Okay.  And then the same question



Page 165

1  with the Main Line Bridge condition, has anyone
2  asked you to provide an opinion on any aspect
3  of the Main Line Bridge condition?
4     A.  No.
5     Q.  Has anyone asked you to provide an
6  opinion on the extent of damage, the topic that
7  we're referencing here in Exhibit 9?
8     A.  No.
9     Q.  Has anyone asked you to provide any
10  opinions on repair methodology?
11     A.  No.
12     Q.  Has anyone asked you to provide any
13  opinions on costs?
14     A.  No.  Now, I'd sort of kind of like to
15  back up a little bit with regard to repair
16  methodology and emergency repairs.
17     As we were doing this, we shared opinions
18  back and forth with regard to that during the
19  work.
20     Q.  Right.
21     A.  But not anything with regard to this
22  lawsuit or anything of that sort.
23     Q.  No situations for example where, you
24  know, Mr. Snow or someone else came to you and
25  said hey, can you let us know what you think

Page 166

1  about the repair methodology for the Main Line
2  Bridge if we go to do this or something like
3  that?
4     A.  No.
5     Q.  Has anyone asked you to provide any
6  opinions on the emergency repairs particularly
7  in relation to this lawsuit?
8     A.  No.
9     Q.  And how about rebuttal testimony, has
10  anyone asked you whether you will provide any
11  rebuttal testimony as appropriate?
12     A.  Nobody has asked me if I would.
13     Q.  Do you intend to author any reports
14  for this litigation?
15     A.  Not for this litigation.
16     Q.  Okay.
17     A.  Define reports for this litigation.
18     Q.  Any reports in your capacity as a
19  structural engineer containing opinions and
20  underlying facts in support of those opinions
21  and the methodology you used to come to those
22  opinions, any reports such as that?
23     A.  In our sort of professional
24  organizations we have conferences, et cetera.
25  I have prepared a paper with regard to --

Page 167

1  actually we have prepared two papers with
2  regard to this collision or allision and I'm
3  scheduled to present on it now.  If I'm not
4  supposed to present or if I need to pull the
5  papers, we will pull the papers.
6     Q.  I think I saw a reference in the
7  emails, at some point I think you spoke to a
8  conference, an AREMA conference.  Do I have
9  that right?
10     A.  We are planning to -- to AREMA
11  conference in September and scheduled for the
12  International Bridge Conference in July.
13     Q.  You say we, who do you mean by we?
14     A.  Charlie Graning and I are presenting
15  at the International Bridge Conference.  We're
16  planning to present at the International Bridge
17  Conference, and Brian Sykes and myself are
18  planning to present at AREMA.
19     Q.  And you said the AREMA is in
20  September?
21     A.  AREMA is in September.
22     Q.  When is the International Bridge
23  Conference?
24     A.  July.
25     Q.  So coming up soon?

Page 168

1     A.  Yeah.
2     Q.  You said you prepared papers related
3  to the bridge project?
4     A.  Right, there's a -- both these have
5  a -- well, a call for papers and then there's
6  a -- I can't remember, what do they call a
7  group of papers for a conference?  Anyways,
8  they provide a group of paper -- you know, you
9  submit a paper and then you present on that
10  paper.
11     Q.  Are those papers and presentation
12  materials included in the thumb drive that
13  you've given us earlier?
14     A.  Yes, sir.
15     MR. ROMAN:  All right.  I think
16  for now that's all I have.  I'm just for the
17  record going to keep the deposition open
18  subject to whatever -- I think your disclosures
19  are due on the second, Ryan.  In the event that
20  there are, you know, opinions or additional
21  materials that are disclosed on that date with
22  respect to Mr. Swanson, that we're going to
23  leave the deposition open for that.
24     MR. SNOW:  Yeah, I can confirm
25  that he's not going to author an expert report.



Page 169

1    MR. ROMAN:  Okay.
2    MR. SNOW:  Because he's not a
3   specially retained expert.  He's identified to
4   the extent that the testimony talks about is
5   considered something in the matter of expert
6   testimony and that's why this is captioned
7   non-specially retained expert.  So there will
8   not be an expert report.
9    MR. ROMAN:  I understood there
10  won't be a report.  But in the event, you know,
11  he gave us a disclosure with his opinion, we
12  want to retain our right to --
13    MR. SNOW:  Understood.
14  Understood.  You guys want to take a
15  five-minute break?  I've got some followup.
16    MR. ROMAN:  Yeah, yeah.
17    MR. SNOW:  We'll go off the
18  record.
19    (Brief recess).
20    EXAMINATION
21  BY MR. SNOW:
22    Q.   Mr. Swanson, we've obviously met
23  before.  My name is Ryan Snow.  I represent the
24  Norfolk & Portsmouth Belt Line Railroad Company
25  in this case.  I have a few followup questions.

Page 170

1   I'll try not to sound scattered, but I'll go
2   from point to point and see if we can clean up
3   a few things that were gaps in my notes.
4    First one, if you could look at Exhibit 9,
5   which is the expert witness identification for
6   the Belt Line that you talked about at the end.
7   Do you see that?
8    A.   Uh-huh.
9    Q.   And if you'll flip to number five,
10  the entry for you under non-specially retained
11  experts, did you find that?
12    A.   Yes.
13    Q.   You were asked a few questions about
14  the field of expertise and the topics you may
15  testify regarding, which included movable
16  railroad bridges, the Main Line Bridge
17  condition, extent of damage, repair
18  methodology, costs and emergency repairs.
19    If asked to testify about your work on the
20  Main Line Bridge are you qualified to talk
21  about each of those topics identified on this
22  document?
23    A.   Yes, sir.
24    Q.   Okay.  And that's based on your
25  background and your expertise and your

Page 171

1   education?
2    A.   Yes, sir.
3    Q.   You were also shown Exhibit 8, the
4   one right before that, about an email between
5   you and Cannon Moss, president of the Belt
6   Line, that had a spreadsheet attached to it
7   with an estimate from you of about $37,000.  Do
8   you recall that?
9    A.   Yes.
10    Q.   The Belt Line is not paying for your
11  time to testify today, correct?
12    A.   That is correct.
13    Q.   And they're not paying you for any
14  particular opinions in this case; is that
15  correct?
16    A.   That is correct.
17    Q.   In fact, notwithstanding what the
18  email might say, the Belt Line is compensating
19  you for your costs associated with gathering
20  documents to respond to a subpoena that Carver
21  issued, correct?
22    A.   Correct.
23    Q.   When you were hired for the repair
24  work after the June 15 allision, am I correct
25  in understanding that the rates used for

Page 172

1   Hardesty & Hanover on this project were
2   pre-negotiated rates with Norfolk Southern?
3    A.   That is correct.
4    Q.   And I understand that some companies
5   have emergency rates that might be higher than
6   their standard rates.  Were the pre-negotiated
7   rates that were used with the Belt Line for
8   this repair project pre-negotiated emergency
9   rates or pre-negotiated standard rates?
10    A.   Standard rates.
11    Q.   A lot of the invoicing that we looked
12  at in Exhibit 6 was marked confidential so that
13  those rates that you all used in this case
14  would not be made public.  Is that because
15  those rates are lower than H&H's market rates?
16    A.   They very well could be.  The
17  contract was a -- the contract with Norfolk
18  Southern is a three-year contract.  And if I
19  remember correctly the contract ends this year
20  and so our rates were getting to be, you know,
21  lower than what they were -- well, what happens
22  is you set your rates based on where you think
23  your salary range will be and for that
24  three-year period.  And so as you get closer to
25  the end of that rate, you know, period, you are



Page 173

1  actually lose -- or not making as much money at
2  the end of that contract as you would at the
3  beginning because, you know, your salaries keep
4  going up but your rates remain the same.
5     Also, the rates are for a -- like they
6  showed ASCE class 6 or class 7 or whatever.
7  Those rates are for everybody in the company
8  with that job -- ASCE job title.  So if you get
9  somebody who has more experience and is getting
10 paid a higher rate per hour for a project,
11 which we needed for this, you end up somewhat
12 not making as much profit because you've got a
13 fixed rate that you have used for an average
14 person in that job category and you've got the
15 more experienced folks in that job category
16 doing the work.  And so you're kind of getting
17 a squeeze there.
18    Q.  And that I take it would have worked
19 to the Belt Line's benefit in this situation?
20    A.  Yes, sir.
21 

Page 175

1     Q.  If you flip to the second page of
2  that, April 11th invoice package, it has the
3  summary for the billing period, March 8, 2025
4  through April 4, 2025.  Do you see that?
5     A.  Yes.
6     Q.  And there's a spreadsheet table there
7  that has a number of columns.  And one column
8  second to the left says contract amount and at
9  the bottom $665,000.  Is that the budgeted
10 amount for Hardesty's work on the repair
11 project?
12    A.  Yes, sir.
13    Q.  And then if you go to the right
14 there's another column called total to date.
15 And at the bottom there it says $534,477.87.
16    A.  Uh-huh.
17    Q.  What does that reflect?
18    A.  That reflects what was billed to
19 date.
20    Q.  And this is the last invoice in the
21 group.  Is this actually the final amount that
22 Hardesty is billing for this repair project?
23    A.  Likely.  There may be a very small
24 additional invoice, but my guess is this is the
25 last invoice with the time -- with, you know,

Page 176



1  what's been done to this project.
2     Q.  The final column says remaining
3  budget at the bottom it's a figure of
4  $130,522.13.  Does that mean that Hardesty
5  finished its work on this repair project
6  roughly $130,000 under what it had budgeted?
7     A.  Yes, sir.
8     Q.  There was some discussion about the
9  steel used on the repair project, and you said
10 that you all used ASTM A709 grade 50 steel in
11 the repair project, correct?
12    A.  That's correct.
13    Q.  And that's versus the ASTM A7 steel
14 that was originally used?
15    A.  That's correct.
16    Q.  And I believe you said to get the A7
17 steel you'd have to special order that because
18 it's not a commonly available steel nowadays?
19    A.  That's correct.
20    Q.  Did the fact that Hardesty and PCL
21 used the newer grade of steel, did that
22 increase the load capacity of the entire bridge
23 in any way?
24    A.  No, it probably did not.
25    Q.  Okay.  Did it make the whole bridge

21    Q.  Understood.  If you look at Exhibit 6
22 and we'll take for example the last invoice in
23 Exhibit 6, which is April 11, 2025.  It's Bates
24 labeled at the bottom NPBL 6546.
25    A.  Yes, sir.



ESQUIRE
DEPOSITION SOLUTIONS

Page 177

1  stronger in any way?
2      A.   Not -- not of any significant amount.
3      Q.   Okay.  We went through -- in addition
4  to the steel that got replaced we went through
5  the contract plan that Hardesty had prepared.
6  If you recall those you referred to them a
7  couple of times in Exhibit 4.  Do you remember
8  that?
9      A.   (Witness nods head affirmatively).
10      Q.   You have to say yes.
11      A.   Yes, sorry.  You can't hear my head
12  shaking.
13      Q.   Exactly.  And those drawings coupled
14  with Exhibit 3, the emergency inspection
15  report, showed the components that would be
16  repaired or replaced as part of your design?
17      A.   Yes, sir.
18      Q.   To your knowledge were any of those
19  components that were part of your repair design
20  supposed to be imminently replaced anyway?
21      A.   None of them to our knowledge would
22  have been imminently replaced.
23      Q.   And were all of the components for
24  the repair in your design drawings integral to
25  the bridge structure?

Page 178

1      A.   Yes, except for that motor brake that
2  we've talked about, the M drawings, that was
3  not put on.
4      Q.   Correct.  To your knowledge the motor
5  brake has not been replaced?
6      A.   Right.
7      Q.   As we sit here today I take it the
8  repair project is complete and trains are
9  running over the bridge?
10      A.   Yes, sir.
11      Q.   In your view is the condition of the
12  bridge as repaired as good as it was before the
13  allision ever happened?
14      A.   That's a hard professional question
15  to answer.  Our goal with repair plans were to
16  make the bridge as good as it was, you know,
17  we're repairing this to make it as good as it
18  was.  There just, where we ran into certain
19  things that we had trouble getting exactly back
20  into the right alignment as -- as was
21  originally -- or as originally designed so it
22  should have the same strength as what it did
23  originally.
24      However, there are probably some items
25  that are not as good in terms of how the bridge

Page 179

1  is aligned than what it was when it was
2  originally built or before the allision.  And
3  those are the -- well, anyways.
4      Q.   Well, what -- what parts are not in
5  as good a condition as they were before the
6  allision?
7      A.   Well, the -- to splice in the bottom
8  cord members, we -- there was one -- one splice
9  there to begin with as it was originally built.
10  And now to put in the piece that we put in,
11  there's now two splices there where that piece
12  is.  And the -- from what I can tell -- well, I
13  don't know for certain but my guess is that the
14  splice was a little bit better aligned than
15  what we were able to get two -- the single
16  splices built was better aligned than what we
17  were able to get the two splices aligned as
18  with the new -- with the repaired bridge.
19      Q.   And when you say the repaired bridge
20  is not aligned as well as pre-allision, what
21  part of the bridge are you talking about?
22      A.   The bottom cord, which is the bottom
23  structural piece along the -- from L1 prime to
24  L4 prime, and that should have been straight as
25  an arrow before the allision.  And there's

Page 180

1  still some, even after the repairs, there's
2  still some deformation in it, some slightly out
3  of alignment there.
4      Q.   Okay.  And to describe that, you're
5  referring to sheet 21 in the structural
6  drawings on Exhibits 4?
7      A.   Yeah, it would be 3802.
8          MR. ROMAN:  Sorry, you said L1
9  prime.  Could you just give the section again?
10          THE WITNESS:  It is L1 prime to
11  L4 prime, or L4 -- L1 prime to L4.
12  BY MR. SNOW:
13      Q.   This is probably my last question.
14  In the very beginning of the deposition you had
15  talked about NPBL as a subsidiary of NS.  Do
16  you actually know the Belt Line's corporate
17  structure?
18      A.   No, I do not know the Belt Line's
19  corporate structure.
20      Q.   And I take it you also don't know the
21  ownership structure of the Belt Line?
22      A.   No, I do not understand the ownership
23  structure.
24          MR. SNOW:  Give me one minute to
25  flip through, I think I'm finished.  Yeah,



Page 181

1  that's all I have.  Thank you, Mr. Swanson.
2      Mr. Jett, do you have any questions?
3          MR. JETT:  I think y'all have
4  covered it all, thank you.
5          MR. HARDT:  This is Ken Hardt.  I
6  don't have any questions either.
7          MR. ROMAN:  Couple of followups,
8  Mr. Swanson.
9          FURTHER EXAMINATION
10 BY MR. ROMAN:
11     Q.  You took a look at the bridge kind of
12 way back in your time with Norfolk Southern,
13 right?
14     A.  (Nods head).
15     Q.  Did you do any type of inspection on
16 the bridge, you know, in the six months before
17 the allision?
18     A.  No, sir.
19     Q.  And do you have any understanding of
20 what the condition of the bridge was in the
21 year before the allision based on your personal
22 observation of the bridge?
23     A.  No, sir.
24     Q.  Did you ever look at that section of
25 the bridge that you identified, the L1 prime to

Page 182

1  L4 prior to the allision?
2      A.  No, sir.
3      Q.  Do you have any understanding of
4  whether that section of the bridge was
5  perfectly aligned I think as you referenced
6  prior to the allision?
7      A.  No, sir.
8      Q.  Okay.  If the steel members of the
9  bridge that were not replaced as part of the
10 allision repairs, if the Belt Line wanted to
11 kind of re-haul the bridge and replace all
12 steel structures on the bridge as part of a
13 repair project, would you recommend that they
14 replace the new steel members that were
15 installed as part of the repairs from the
16 allision?
17         MR. SNOW:  Object to form.
18         THE WITNESS:  Can you restate
19 that question again?
20 BY MR. ROMAN:
21     Q.  Sure.  Let's say the Belt Line wants
22 to proceed with rehabbing the bridge in part
23 because the steel that's on it was the A7 grade
24 that was part of the original design in '58,
25 and they wanted to do that project in the next

Page 183

1  year, would you think it would make sense as an
2  engineer to replace the new steel structures,
3  members that had just been replaced as part of
4  the allision repairs?
5          MR. SNOW:  Object to form.
6          THE WITNESS:  The amount of steel
7  that would have to be replaced for -- to
8  replace the A7 steel in this would basically
9  amount to a total span replacement.  It's --
10 it's like the -- you know, if you're going to
11 do the temporary work that would be required to
12 replace the A7 steel in the structure, you
13 would have to have so much false work that it
14 almost would be easier to replace the whole
15 span.  But that would be something that you
16 would have to plan out and plan to replace the
17 tower also at the same time.
18     So it's a -- it's a theoretical question
19 but it's impractical to do.
20         MR. ROMAN:  Okay.  All right.
21 Subject to our holding it up subject to further
22 disclosure of opinions, I think that's all I
23 have.
24         MR. SNOW:  Okay.  He will read
25 and sign.

Page 184

1          THE COURT REPORTER:  Anybody on
2  Zoom want a copy of the deposition?
3          MR. JETT:  I'll take a condensed
4  transcript, please.
5          MR. HARDT:  I'll have my partner
6  make that determination.  It's his case and he
7  will let you know.
8          MR. SNOW:  I will take electronic
9  only, and if I can get a rough that would be
10 great.
11         MR. ROMAN:  I would like the same
12 order as Mr. Snow, E-tran only, please.
13     (Deposition concluded, 4:37 p.m.)



Page 185

```
1        E R R A T A   S H E E T
2
3       Pursuant to Rule 30(e) of the Federal Rules of
   Civil Procedure and/or the Official Code of Georgia
4  Annotated 9-11-30(e) any changes in form or
   substance which you desire to make to your
5  deposition testimony shall be entered upon the
   deposition with a statement of the reasons given for
6  making them.
7       To assist you in making any such corrections,
   please use the form below. If supplemental or
8  additional pages are necessary, please furnish same
   and attach them to this errata sheet.
9
                      - - -
10
11      I, the undersigned, HOWARD SWANSON,
   do hereby certify that I have read the foregoing
12  deposition and that to the best of my knowledge
   said deposition is true and accurate (with the
13  exception of the following corrections listed
   below).
14
15 Page_____ Line_____should read:_____
16 Reason for change:_____
17
18 Page_____ Line_____should read:_____
19 Reason for change:_____
20
21 Page_____ Line_____should read:_____
22 Reason for change:_____
23
24 Page_____ Line_____should read:_____
25 Reason for change:_____
```

Page 186

```
1  Page_____ Line_____should read:_____
2  Reason for change:_____
3
4  Page_____ Line_____should read:_____
5  Reason for change:_____
6
7  Page_____ Line_____should read:_____
8  Reason for change:_____
9
10 Page_____ Line_____should read:_____
11 Reason for change:_____
12
13 Page_____ Line_____should read:_____
14 Reason for change:_____
15
16 Page_____ Line_____should read:_____
17 Reason for change:_____
18                     _____
19 Signature
20 Sworn to and Subscribed before me
21 _____, Notary Public.
22 This_____day of _____, 2025.
23 My Commission Expires:                        STV
24
25
```

Page 187

```
1         C E R T I F I C A T E
2
3
4  G E O R G I A:
5  FULTON COUNTY:
6
7
8       I hereby certify that the
9  foregoing deposition was reported, as
10 stated in the caption, and the questions
11 and answers thereto were reduced to the
12 written page under my direction; that the
13 foregoing pages represent a true and
14 correct transcript of the evidence
15 given.  I further certify that I am not in
16 any way financially interested in the
17 result of said case.
18       Pursuant to Rules and Regulations
19 of the Board of Court Reporting of the
20 Judicial Council of Georgia, I make the
21 following disclosure:
22       I am a Georgia Certified Court
23 Reporter.  I am here as an independent
24 contractor for Huseby, Inc.
25
```

Page 188

```
1       I was contacted by the offices of
2  Huseby, Inc. to provide court
3  reporting services for this deposition.
4  I will not be taking this deposition under
5  any contract that is prohibited by O.C.G.A.
6  15-14-7 (a) or (b).
7       I have no written contract to
8  provide reporting services with any party
9  to the case, any counsel in the case, or
10 any reporter or reporting agency from whom
11 a referral might have been made to cover
12 this deposition.  I will charge my usual
13 and customary rates to all parties in the
14 case.
15    This, the 9th day of July, 2025.
16
17
   STEVE S. HUSEBY, CCR-B-1372
18 My Commission Expires
   November 20th, 2026.
19
20
21
22
23
24
25
```

