Exhibit 2

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

In Admiralty

In the Matter of COEYMANS

MARINE TOWING, LLC d/b/a          :

CARVER MARINE TOWING as           :

Owner and Operator of M/T         :

Mackenzie Rose (IMO No.           : Civil Action

8968765) her cargo,               : No.: 2:24-cv-00490

engineers, boilers, tackle        :

equipment apparel, and            :

appurtenances, etc., in           :

rem, petitioning for              :

Exoneration from or Liability     :

in allision with Norfolk and      :

Portsmouth Belt Line Railroad     :

Co. Main Line Railroad Bridge     :

occurring June 15, 2024, in and   :

about the Elizabeth River, VA     :

        Pursuant to Notice, the remote deposition

of KEVIN MARK LUGO, P.E., was taken on Thursday, the

14th day of August, 2025, commencing at 10:00 a.m.,

before Brian M. McDonald, a Court Reporter and

Notary Public.

**Page 2**

A P P E A R A N C E S :

ON BEHALF OF COEYMANS MARINE TOWING, LLC, d/b/a

CARVER MARINE TOWING:

        MICHAEL J. ROMAN, ESQUIRE

        Clyde & Co US LLP

        30 South Wacker Drive, Suite 2600

        Chicago, Illinois 60606

ON BEHALF OF NORFOLK AND PORTSMOUTH BELT LINE

RAILROAD COMPANY:

        W. RYAN SNOW, ESQUIRE

        Mackenzie R. Pensyl VSB No. 100012

        P.L.C. 150 West Main Street

        Suite 1923

        Norfolk, Virginia 23510

        wrsnow@cwm-law.com

ON BEHALF OF EVANSTON INSURANCE COMPANY a/s/o

NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY:

        MARK C. NANAVATI, ESQUIRE

        Sinnot, Nuckols & Logan, P.C.

        13811 Village Mill Drive

        Midlothian, Virginia 23114

        mnanavati@snllaw.com

ALSO PRESENT: MR. CANNON MOSS

**Page 3**

C O N T E N T S

WITNESS:   MR. KEVIN MARK LUGO, P.E.       PAGE NO.

    Examination by Mr. Roman............... 5

    Examination by Mr. Snow............... 86

    E X H I B I T S

EXHIBIT NO.    DESCRIPTION           PAGE NO.

No. 1   Curriculum vitae.................. 23

No. 2   Report............................ 28

No. 3   Document containing nine pages

        provided to Mr. Lugo produced

        June 6, 2025...................... 31

No. 4   Sample quantity validations

        (including Ex. 13 from report).... 77

**Page 4**

P R O C E E D I N G S

- - -

Whereupon,

    REPORTER: Good morning. Today's date is Thursday, August 14, 2025, and the time is 10 o'clock a.m. Eastern, and this is the deposition of kevin Lugo, P.E. taken in the matter of Coeymans Marine Towing, LLC d/b/a Carver Marine Towing, as Owner and Operator of M/T Mackenzie Rose (IMO No. 8968765) her cargo, engines, boilers, tackle, equipment, apparel, and appurtenances, etc. in rem, petitioning for Exoneration from or Limitation of Liability Belt Line Railroad Company Main Line Railroad Bridge occurring June 15, 2024, in and about the Elizabeth River, Virginia.

    This is before the United States District Court for the Eastern District of Virginia, Norfolk Division in Admiralty. Civil Action No. 2:24-cv-00490.

    My name is Brian McDonald. I'm a court reporter affiliated with Esquire Deposition Solutions.

    Counsel, for the record purpose, would you please state your name and whom you represent,



KEVIN M. LUGO P.E.                                                    June 15, 2024
MATTER OF COEYMANS MARINE TOWING                                          5–8

Page 5

1    beginning with Noticing attorney.
2        MR. ROMAN:  Michael Roman for petitioner
3    Coeymans Marine Towing LLC, the vessel.
4        MR. SNOW:  This is Ryan Snow.  Counsel for
5    Norfolk and Portsmouth Belt Line Railroad
6    Company.
7        MR. NANAVATI:  This is Mark Nanavati, here
8    for Evanston Insurance.
9            KEVIN MARK LUGO, P.E.,
10   a witness herein, being first duly sworn, was
11   examined and testified upon his oath as follows:
12           EXAMINATION
13   BY MR. ROMAN:
14       Q.   Good morning, Mr. Lugo.  I'm Michael
15   Roman, one of the attorneys for Coeymans Marine
16   Towing in this matter.  Thanks for coming in today.
17   Can you please state your name.
18       A.   Kevin Mark Lugo.
19       Q.   And you have been retained as an expert
20   witness in this case to offer some opinions and
21   testimony on behalf of Norfolk and Portsmouth Belt
22   Line Railroad Company; correct?
23       A.   Correct.
24       Q.   All right.  If I refer to Norfolk and
25   Portsmouth Belt Line Railroad Company as the Belt

Page 6

1    Line, are we on the same page as to the entity we're
2    talking about?
3        A.   We are.
4        Q.   Okay.  I know we'll talk about some things
5    relating to the Main Line Bridge.  If I call it the
6    Bridge or the Main Line Bridge, are we on the same
7    page that that's a bridge that I'm referring to
8    unless otherwise stated?
9        A.   We are.
10       Q.   When were you first retained in this
11   matter?
12       A.   I don't recall.  I would just -- let's
13   just estimate six months ago.
14       Q.   And you were retained by the Belt Line
15   Counsel or through the Belt Line Counsel at Crenshaw
16   Ware & Martin?
17       A.   That's correct.
18       Q.   Have you ever done any work with Crenshaw
19   Ware & Martin before?
20       A.   I have not.
21       Q.   How about for the Belt Line?
22       A.   I have not.
23       Q.   And how long have you been doing expert
24   witness work?
25       A.   Let's see, 20-plus years.

Page 7

1        Q.   And is that all of your expert witnessing
2    work?  Has that been with the MBP firm that you're
3    with today?
4        A.   Yes.
5        Q.   And what does MBP do?  What's their
6    business?
7        A.   Our business is construction management
8    and consulting from project inception, or even
9    programming, all the way through project closeout
10   and dispute resolution.
11       Q.   How much of your work with MBP is expert
12   work or dispute work as compared to the project
13   management work?
14       A.   It's pretty cyclical.  I usually have one
15   or two active projects ongoing.  Right now those are
16   actually completed; so my focus is dispute
17   resolution at the moment, corporate
18   responsibilities, some business development,
19   recruiting, that kind of thing.
20       Q.   Over the past five years, what's the
21   breakdown by percentage if you could give an
22   estimate between those two groups?
23       A.   I would estimate 30 percent of my time is
24   dispute resolution.  The other two would be
25   corporate related and project execution.

Page 8

1        Q.   What was the scope of engagement for your
2    work on the case that we're here to talk about
3    today?
4        A.   I was engaged to evaluate the cost
5    expended by the Belt Line for the repairs on the
6    Main Line Bridge.
7        Q.   Did your engagement include reviewing or
8    providing any opinions on a lost business income
9    claim that the Belt Line had initially asserted in
10   this case?
11       A.   No.
12       Q.   Good.  And we'll get into your reporting
13   in a little bit.  But do any of the opinions in your
14   report relate to any type of lost business claim or
15   in distinction from just reviewing the
16   reasonableness of the repairs?
17       A.   The report addresses the reasonableness of
18   the repairs.
19       Q.   How much are you charging per hour in this
20   case?
21       A.   380.
22       Q.   Is that 380 across the board for
23   testimony, document review, et cetera, or do you
24   have various rates?
25       A.   For this project we did not do split



KEVIN M. LUGO P.E.
MATTER OF COEYMANS MARINE TOWING

June 15, 2024
9–12

Page 9

1 rates.
2   Q.   How many hours did you estimate do you
3 have into the file as of today?
4   A.   I don't know.  I'd have to look them up
5 for you.
6   Q.   Do you know, is all the invoicing handled
7 by MBP?
8   A.   Yes.
9   Q.   Do you know whether or not any invoices
10 have been issued yet?
11   A.   Yes.  We would have invoiced likely
12 through July.
13   Q.   And do you not know how many invoices have
14 been issued?
15   A.   Not off the top of my head.
16   Q.   Has anyone else at MBP worked on the file
17 with you?
18   A.   Yes.
19   Q.   If you could take me through your team
20 that worked on the case with you?
21   A.   So me, Ladipo, it's N-I-Y-I.  Allen Shad,
22 George Kogi, Miranda Clerval, and Mahogan --
23 Muhammed Shafak.
24   Q.   I think I got it.  Is it Mr. Ladipo?  Is
25 that who the first one was?

Page 10

1   A.   Miss.
2   Q.   Miss.  And what is her background?
3   A.   She's a service line leader or manager for
4 our firm.  She has experience in estimating rail
5 large projects.  She has -- I don't want to mention
6 her on this deposition, but she has probably 35, 40
7 years experience, estimated.
8   Q.   And does Ms. Ladipo also bill out at the
9 380 an hour rate?
10   A.   She does not.
11   Q.   And what is her rate?
12   A.   I'd have to look that up for you.
13   Q.   What was Ms. Ladipo's role on the team as
14 you guys did the work for this case?
15   A.   So her role was focused on costs, assist
16 with some of the report writing, QC of the team and
17 performed a bridge replacement roughly of a
18 magnitude estimate.
19   Q.   And I think the next person, I heard a
20 Shad?
21   A.   Shad, S-H-A-D.
22   Q.   And what's his or her background?
23   A.   He's a cost estimator.
24   Q.   And do you know what his rate is on the
25 file?

Page 11

1   A.   I do not.
2   Q.   What was his role on the team for the work
3 in this case?
4   A.   Structural takeoffs.
5   Q.   I'm sorry.  You said structural takeoffs?
6   A.   Yes, sir.
7   Q.   Could you define what that means, please?
8   A.   Quantifying pieces of steel, how many
9 pieces of steel, in simple terms.
10   Q.   Any other role that he had on the file?
11   A.   That was his main role.
12   Q.   And then I think I had a Mr. or Ms. Kogi;
13 is that correct?
14   A.   Yep.  Yes.  George Kogi, K-O-G-I.
15   Q.   What's Mr. Kogi's background?
16   A.   He's an estimator and scheduler.
17   Q.   Do you know Mr. Kogi's work rate is on the
18 file?
19   A.   I do not.
20   Q.   And what was his role on the team doing
21 all this?
22   A.   His main role was reviewing inspection
23 reports.
24   Q.   Did Mr. Kogi put together any summaries or
25 evaluations of those invoices?

Page 12

1   A.   He did not evaluate the invoices.
2   Q.   I'm sorry.  What did he do, then, on the
3 file?
4   A.   He reviewed inspection reports of the main
5 line.
6   Q.   My apologies.
7        Did he put together any summaries or
8 evaluations of those reports?
9   A.   He would have summarized any repair
10 priorities for me.
11   Q.   Is that a situation where he would kind of
12 provide his summaries and the pertinent information
13 he took from those reports, and then you would rely
14 on those for ultimately what was ended up in your
15 report?
16   A.   No, he would provide a summary, and then I
17 would go and review the summary and the report as
18 well, and then I would come up with my opinion.
19   Q.   And then I think I had a Miranda.  That is
20 a first or last name?
21   A.   That's a first name.
22   Q.   What's Miranda's last name again?
23   A.   Clerval.  It's C-L-E-R-V-A-L.  And I'm
24 sorry if I'm looking towards the other screen, but
25 camera is over here and the big screen is over here.



KEVIN M. LUGO P.E.                                              June 15, 2024
MATTER OF COEYMANS MARINE TOWING                               13–16

Page 13

1    Q.   No worries.  I have a tendency to look
2    down or away too, so no worries.
3         And what was Miranda's -- what's Miranda's
4    background?
5    A.   Estimator.
6    Q.   What was her role on the team for the work
7    in this case?
8    A.   She did structural takeoffs and cross
9    validation.
10   Q.   Do you know what her rate is on the file?
11   A.   I do not.
12   Q.   Among those folks we just discussed, is
13   there a particular seniority among them?
14   A.   Yes.  It would start with me.  I've
15   supervised everybody responsible for their work
16   product.  And then Niyi Ladipo was responsible for
17   the team as well.  So that's the hierarchy, myself
18   and then Niyi.
19   Q.   As I understand it from reading your
20   report, you conducted interviews with Howard Swanson
21   as part of your review and formulating your
22   opinions; correct?
23   A.   That's correct.
24   Q.   When did you interview Mr. Swanson?
25   A.   I'd have to go back and see if I could get

Page 14

1    the exact date.  I've spoken with him multiple
2    times.  Mostly during the -- it would have been
3    during the creation of the expert report.  So let's
4    see.  We turned that in in July.  So a couple weeks
5    before the July 2nd report.
6    Q.   Okay.  Can you recall how many
7    conversations you had with him?
8    A.   Two or three.
9    Q.   Was anyone else present for the first
10   conversation that you had with him?
11   A.   Yes.
12   Q.   And who is that?
13   A.   It would have been myself, Niyi, and then
14   the attorneys from Crenshaw.
15   Q.   And for that first discussion, what was
16   your objective in interviewing Mr. Swanson?
17   A.   The objective and big picture would have
18   been to get his summary of the project, how it went,
19   what he did, what contractor he did, et cetera, et
20   cetera.
21   Q.   Okay.  At the time that you had that first
22   discussion, had you already conducted a review of
23   the inspection reports, the invoices from Hardesty &
24   Hanover, the invoices from PCL, and the notes that
25   PCL had put together from their weekly calls?

Page 15

1    A.   Yes.
2    Q.   Was there any information in particular
3    that you needed clarification on, just based off
4    that review of the documents I just mentioned that
5    you were intended to ask Mr. Swanson about in that
6    first discussion?
7    A.   Likely, but I don't recall specifically
8    what it was.  I would say if there's anything that
9    we relied upon, it would be in the report.
10   Q.   And what did Mr. Swanson describe to you
11   in that first discussion you had with him?
12   A.   Basically, how they were engaged, what
13   they did at the beginning of the project, how it
14   went through the project, how they interfaced with
15   PCL and the Belt Line.
16   Q.   And then how about that second
17   conversation you had with Mr. Swanson?  What was
18   your objective during that discussion?
19   A.   We probably had some follow-up questions
20   with him regarding to something specific we were
21   crafting in the report, which I don't recall at the
22   top of my head what that was.  That, again, would be
23   likely referenced in the report.
24   Q.   Did you take any notes during your phone
25   calls with Mr. Swanson?

Page 16

1    A.   I don't think so.
2    Q.   And I think you said there might have been
3    a third discussion with Howard, but you're not
4    certain as you said?
5    A.   I'm not certain.  I'd have to go back and
6    look at my email traffic or something to that
7    effect.
8    Q.   When you set up those interviews with Mr.
9    Swanson, were you corresponding directly with him,
10   or were you doing it through counsel?
11   A.   Through counsel.
12   Q.   And then I understand you also had an
13   interview with Charlie Graining; correct?
14   A.   That's correct.
15   Q.   And when did you and Mr. Graining speak?
16   A.   A week or two before the report was done.
17   Q.   Do you know if it was before or after your
18   first discussion with Mr. Swanson?
19   A.   I recall it to be after.
20   Q.   And what were your objectives in
21   interviewing Mr. Graining?
22   A.   I recall we wanted to ask about their
23   invoicing process and the cables on the
24   counterweight.  And there was -- wanted to know if
25   they had made any repairs to anything that was



Page 17

1  listed in the inspection reports.
2      Q.   What in particular about the invoicing
3  process did -- what were you asking for or about?
4      A.   Just their process for the contract, how
5  they were pulling it all together, that type of
6  Information.
7      Q.   Now, were there any particular invoices
8  or, you know, the substance of a particular invoice
9  that you were interested in discussing with Mr.
10 Graining?
11     A.   I don't recall that.
12     Q.   And then what information were you
13 interested in with regard to the cables on the
14 counterweight?
15     A.   We recognized that there was an inspection
16 report that had noted that the cables needed to be
17 greased; so we asked Mr. Graining about that, and he
18 explained why those cables needed to be greased.
19     Q.   What was Mr. Graining's explanation?
20     A.   And I recall this is also in the report.
21 He said that because the structure, the main span,
22 the lift part of the structure wasn't moving, that
23 the cables were not being greased.  And because of
24 the debris from the plant next door, the concrete
25 plant, all the debris coming up and down from the

Page 18

1  river required them to re-grease them.  They needed
2  to be greased.  That's --
3      Q.   And did you discuss --
4      A.   That's the summary.
5      Q.   Did you discuss with Mr. Graining how much
6  it costs to grease those cables in particular?
7      A.   No, because that was already in an
8  invoice.
9      Q.   Do you recall as you sit here what that
10 figure is?
11     A.   I do not.
12     Q.   Do you know which invoice it was in?
13     A.   No.  There's a lot of invoices.
14     Q.   How many times did you speak with Mr.
15 Graining?
16     A.   I spoke to him a week or two before the
17 expert report.
18     Q.   Just once or multiple times?
19     A.   Just once.
20     Q.   And do you recall how long your
21 conversation was?
22     A.   A half hour, hour maybe.
23     Q.   Was anyone else present for it?
24     A.   Niyi Ladipo, Ryan, and Mackenzie from
25 Crenshaw.

Page 19

1      Q.   Did you conduct any interviews with anyone
2  else other than Mr. Swanson and Mr. Graining?
3      A.   Sure.  I spoke with representatives from
4  the Belt Line.
5      Q.   Do you recall who those folks were?
6      A.   Cannon Moss, I believe his name was Adam
7  Reeder.  There was another gentleman, but I don't
8  recall his name.  You, because you were there.  I
9  think that covers it.
10     Q.   Was that one single interview with all the
11 folks in the Belt Line or separate interviews?
12     A.   I have spoken to the Belt Line
13 representatives multiple times.  That was one
14 instance, but I've spoken with Cannon multiple
15 times.
16     Q.   Do you recall when the first discussion
17 was with Mr. Moss?
18     A.   I don't.
19     Q.   What was your objective in speaking with
20 Mr. Moss?
21     A.   Well, Mr. Moss is the president of the
22 Belt Line, and he has intimate knowledge of most
23 everything related to the operations there; so if I
24 have any questions or I need any explanation about
25 anything related to that, I would reach out through

Page 20

1  counsel to him.
2      Q.   Is it fair to say that the folks at the
3  Belt Line were made available to you?  You know,
4  sort of, whenever you needed it throughout your work
5  on the case?
6      A.   Pretty much.  I mean, obviously we have to
7  work around schedules, but I was able to talk to
8  them whenever I needed.
9      Q.   Have you conducted an inspection or a site
10 visit at the bridge?
11     A.   I have.
12     Q.   And how many times?
13     A.   One time.
14     Q.   When was that?
15     A.   I'd have to look at my calendar.  But you
16 were there.  You had some inspection people there as
17 well.  I think Adam was with us, Ryan and Mackenzie.
18     Q.   Was that before or was that after all the
19 work had been performed?
20     A.   Yes.
21     Q.   And was it before or after you authored
22 your report?
23     A.   Before.
24     Q.   What were your observations of the bridge
25 based on that inspection?



Page 21

1  A.   That there had been repairs made to it.  I
2  looked at the repairs.
3  Q.   Did that inspection change or modify any
4  of your preliminary opinions that you had about the
5  work that was done on the bridge?
6  A.   It didn't change anything.  I was there to
7  observe what was done.
8  Q.   Are you offering any opinions in this case
9  as to what the condition of the bridge was prior to
10  the allision?
11  A.   No.
12  Q.   Are you offering any opinions as you sit
13  as to what the useful service life or life
14  expectancy of the bridge is or was at any time?
15  MR. SNOW:  Object to form.
16  A.   Can you ask that question again, please?
17  Q.   (By Mr. Roman) Sure.  Are you offering any
18  opinions as to what the expected useful service life
19  of the bridge is or was at any time as part of your
20  work in this case?
21  A.   Well, my understanding is --
22  MR. SNOW:  Object to form.
23  A.   -- the life -- useful life of a structure
24  is -- it's indefinite and as long as you maintain
25  it, or the cost becomes -- of maintaining the

Page 22

1  structure or any structure really is higher than
2  replacement, or some type of catastrophic failure to
3  it, you know, hurricane or hit something or iceberg
4  knocks it or whatever that might be, necessitating a
5  replacement.
6  Q.   (By Mr. Roman) And is it your opinion that
7  every railroad -- steel railroad bridge has an
8  indefinite life expectancy?
9  A.   If you maintain any structure, I wouldn't
10  even -- it doesn't even have to be a railroad bridge
11  but if you maintain anything, it'll last as long as
12  you maintain it.
13  Q.   And how did you go about making that
14  determination?
15  A.   I've been in construction for 30-plus
16  years.  And one, when we are in a position where we
17  have to decide whether to replace or renovate, renew
18  a structure, it really always comes down to does it
19  make sense to spend on them?
20  Is there a cost benefit to maintaining a
21  structure versus replacing a structure?
22  Q.   Did you review any literature,
23  publications standards, guidelines, any type of
24  documents such as that to make the determination
25  that infrastructure generally has an indefinite life

Page 23

1  expectancy?
2  A.   I'm basing it on my experience of building
3  and renovating structures of whatever kind they are,
4  and if you maintain something, it will last.
5  Q.   What did you do before you joined up with
6  MBP?
7  A.   I've been in the basic same industry, but
8  before I joined MBP, I worked for a little design
9  firm called Dewberry and Companies.
10  And before that, I worked at a company you
11  may not have heard of, but has been gobbled up four
12  or five times, (indiscernible) Engineering.  And
13  before that, I worked for the Department of Justice,
14  Federal Bureau of Prisons in the design and
15  construction branch.
16  Q.   And how many projects have you worked on
17  that involved a steel railroad bridge similar to the
18  one like the Main Line Bridge?
19  A.   I'd have to go look at my CV.  Do you want
20  to go there?
21  Q.   Do you have it in front of you?
22  A.   I did, because I anticipated you might
23  want to go through it.
24  (Whereupon, Deposition Exhibit
25  No. 1 was marked for

Page 24

1  identification)
2  Q.   (By Mr. Roman) That's fine.  We can mark
3  it as Exhibit 1.  If you need to reference it, feel
4  free.
5  A.   Yes.  Thank you.  I'd rather do it on
6  paper than on the screen.
7  Q.   I'm with you.
8  A.   There was a bridge.  There was a CSX
9  bridge across Western Lake Freeway.  That one comes
10  to mind.  I don't believe it was a steel structure,
11  it might have been a post and there was probably a
12  concrete girder.  Toll Road -- Dulles Toll Road.
13  I believe those are concrete girders; so
14  from just going through my CV, it looks like the
15  first one that I've really focused on has been the
16  Main Line for complete concrete -- I mean,
17  structural steel structure.
18  Q.   Have you ever in your work as a
19  construction manager or as an engineer been asked by
20  any type of company to make an assessment or an
21  evaluation of what the useful life expectancy of a
22  steel railroad bridge is?
23  A.   I have not.
24  Q.   And have you ever performed any type of
25  analysis on that issue?



KEVIN M. LUGO P.E.
MATTER OF COEYMANS MARINE TOWING

June 15, 2024
25–28

Page 25

1    A.   Which issue?  I just want to be clear.
2    Q.   Yeah.
3         Determining the expected useful service
4    life of a steel railroad bridge.
5    A.   I have not.
6    Q.   If someone asked you to make a
7    determination of what the expected useful service
8    life of a steel railroad bridge in terms of, you
9    know, years of expected life, how would you go about
10   doing that if you were asked?
11   A.   I would -- well, I would -- I would put
12   together a team to do that.  And it would be a team
13   of engineers, structural engineers, constructors,
14   and evaluate what the maintenance has been on the
15   structure.
16        But I mean, ultimately the useful life of
17   a -- of a structure depends on whether -- how long
18   -- whether it's been maintained; so first thing you
19   would do is check the maintenance on it.
20        But if it's been maintained, then you can
21   assume that that life expectancy is indefinite until
22   you stop maintaining it or choose to replace it for
23   whatever reason you choose it to replace it for; so
24   it's really not that -- it's just not that simple.
25   You can't just throw a number on it.

Page 26

1    Q.   And what would your role on that team be
2    that you would put together?
3    A.   I would be on the constructor maintenance
4    side of the ledger.
5    Q.   And then what would the role of the other
6    team members?
7    A.   A structural engineer evaluating the life
8    expectancy or the condition of the steel members.
9    So you're already in a building.  You're already in
10   a structure that's being constructed.  It's already
11   in life.
12   Q.   Fair to say, yeah, you would rely on the
13   other members of the team to do the actual
14   evaluation and determination of what the figure is
15   for an expected useful service life of the railroad
16   bridge?
17   A.   Well, I think we're talking in circles.
18   I'm saying that if it's been maintained, the useful
19   life is indefinite until somebody chooses to replace
20   it for whatever reason.
21        So this academic discussion isn't -- it
22   doesn't work for me.
23   Q.   As part of your work on this case, did you
24   do any evaluation or make any determination as to
25   whether the Main Line bridge had been properly

Page 27

1    maintained prior to the allision?
2    A.   So I did review the inspection reports and
3    the priority of the items that were identified and
4    considered that in our cost evaluation.
5         And, looked to us, MBP and me, that the
6    Main Line was properly monitoring the structure and
7    making repairs as needed.
8    Q.   Okay.
9         Was there anything that you or anyone on
10   your team at MBP identified from those inspection
11   reports that had not been -- that the repair had not
12   been done or not properly maintained prior to the
13   allision?
14   A.   I'd have to go back and look at the report
15   if there's anything specific.  There was one that
16   comes to mind that wasn't a has-to-be-repaired
17   priority, it was something to monitor.  And that was
18   a crack that PCL corrected or stopped during the
19   repair of the bridge.  And it was a pretty minor
20   cost impact to the overall cost to repair it.
21   Q.   Okay.  All right.
22   A.   Essentially, all they did was drill a hole
23   and stop a crack.
24   Q.   Anything else that comes to mind other
25   than that crack?

Page 28

1    A.   That was the one that comes to mind.  I
2    want to -- I recall it was a priority three and I'm
3    confident that it was covered in the report, expert
4    report.
5    Q.   All right.  Well, why don't we take a look
6    at your report.  Do you have a copy in front of you?
7    A.   I do.  I do.
8         (Whereupon, Deposition Exhibit
9         No. 2 was marked for
10        identification)
11        MR. ROMAN:  All right.  And we can mark
12   this as Exhibit 2.  I know you had about 13
13   exhibits with it.  Ryan and Mark, I think that
14   -- I was just going to mark the report itself
15   and maybe a couple of exhibits just -- just
16   because of the length; so Exhibit 2 would just
17   be the report itself.
18        MR. SNOW:  That's fine.
19        MR. NANAVATI:  Yeah.  No worries.
20        MR. SNOW:  Mike, that's the only piece
21   that I printed out, was the narrative.
22        MR. ROMAN:  Yeah.  You and I are on the
23   same page there.  You know, I saved a tree.
24   Q.   (By Mr. Roman) Starting on page 1.  If you
25   could describe the process, I guess, that you're



KEVIN M. LUGO P.E.
MATTER OF COEYMANS MARINE TOWING

June 15, 2024
29–32

Page 29

1  describing in your introduction section about how
2  you went about formulating your opinions?
3      A.   Well, the introduction is pretty high
4  level, but essentially we just independently
5  evaluated and provided our opinions on the
6  reasonableness of the cost to repair the Main Line.
7  And while we were doing -- I mean, to do that, we
8  reviewed the available project documentation that
9  was provided by counsel.
10       And I believe you have a copy of all the
11  records that we did receive.  But in categories, the
12  documentation include, and I'm reading on the second
13  paragraph now, the plans, the specs, the RFI, the
14  master agreements, inspection reports, emails,
15  invoices, the check-in reports that PCL prepared.
16       We characterized in this daily and weekly
17  reports, but they're titled check in reports.
18  There's a schedule, there's photographs, videos, I
19  read the depositions of, let's see, Mr. Moss, Mr.
20  Reeder, Mr. Swanson, and Mr. O'Brien from the Belt
21  Line and all the legal pleadings.  That is all.
22  Well, I'm not going to say all of them because there
23  might be some missing, but...
24       MR. ROMAN:  Ryan, I don't know if you
25   caught the most recent wave, but they were

Page 30

1   riveting stuff.
2       MR. SNOW:  I don't think so.
3      Q.   (By Mr. Roman) The bottom of the first
4  paragraph, it notes that the report sets forth the
5  preliminary findings, conclusions, and opinions of
6  -- of yourself.  And then the bottom paragraph notes
7  that the analysis is ongoing and the conclusions are
8  based on information review today and that MPB
9  reserves the right to amend or modify.
10       Have you made any changes or modifications
11  to any of the opinions that are expressed in the
12  report?
13      A.   I have not made any modifications to the
14  opinions at this stage.
15      Q.   Okay.
16      A.   Now, I will point out that there are still
17  some invoices trickling in from PCLI so if there's
18  anything like that that comes in, we would just
19  basically adjust the amount that's been invoiced for
20  the repairs to the Main Line and review the invoices
21  as they come in and see if it has an effect on our
22  overall opinion.
23       But ultimately, it appears that the price
24  isn't going down, it's going up, and we're going to
25  keep a tally on that as we go.

Page 31

1      Q.   When was the last time you received new
2  documents like those invoices, if you can recall?
3      A.   I understand there's one coming from PCL,
4  so I don't think we have it, but if we did, it would
5  be recent.
6       Admittedly, I was in a mediation yesterday
7  and so who knows if something came in because I
8  haven't looked at any of that stuff.
9      Q.   Do you have the document that was marked,
10  I think, documents provided to expert Lugo and
11  someone else in front of you?
12      A.   Is it -- is it like -- is it a legal
13  document, like something you would turn in?
14      Q.   I -- it has the case captured on it here.
15  I can pull it up.
16      A.   I have it.  I have it.
17      Q.   Yeah.  It's the -- has the case
18  captioning.  At the top it says, documents provided
19  to expert Lugo.
20      A.   I have that document.
21       (Whereupon, Deposition Exhibit
22       No. 3 was marked for
23       identification)
24       MR. ROMAN:  We'll mark that as Exhibit 3,
25   I think we're on.

Page 32

1      Q.   (By Mr. Roman) And I'm just going to share
2  my screen briefly just to make sure we're talking
3  about the same document, if that's okay.
4      A.   Well, I printed out three documents, the
5  report, my CV, and this.  But you can't read.  Never
6  mind.
7      Q.   Yeah.  I cannot -- can see my screen here?
8      A.   I have that document.
9      Q.   Okay.
10      A.   At least that first page.
11      Q.   And so that's what we will mark as Exhibit
12  3.  It's nine pages on my PDF.  You see the column
13  that says produced 6/6/2025.  Then it goes on --
14      A.   I do see that.  Yeah, I counted it up.  I
15  have nine.
16      Q.   Do you recall receiving any other
17  documents which it appears would have been after
18  July 1st, 2025, from counsel or the Belt Line or
19  anyone that are not listed on the -- on what we've
20  marked as Exhibit 3?
21      A.   Well, I can't confirm whether or not
22  they're in here or not, but I do have some request
23  for production documents that I received recently.
24      Q.   Did your review of those additional
25  documents change or modify anything that you have in



Page 33

1  your report?
2      A.   No.  I mean it -- just as a question.  So
3  it wouldn't have even -- I haven't done anything
4  with it if that's what you're asking.
5      Q.   Yeah.
6          And what is your understanding of the work
7  that will be reflected on the PCL's invoice that
8  you're expecting to receive soon?
9      A.   Well, just validate the costs in the
10 invoice.  If it -- if it --
11         MR. SNOW:  When it comes in.
12     Q.   (By Mr. Roman) Right.
13         What I'm asking is that, is it for, like,
14 work that PCL did that is going to be added to the
15 tally, or is it just going to be a document that's
16 explaining the existing work that you've already
17 reviewed?
18     A.   I understand, but this is just my
19 understanding that PCL hasn't completely submitted
20 all their invoices.  But I can't say that for sure
21 until I see what comes in, if something comes in.
22     Q.   And how did you find out about that
23 potential invoice that might be coming in?
24     A.   I would have been advised by Counsel that
25 there may be one coming in.

Page 34

1      Q.   Any anticipated invoices from Hardesty &
2  Hanover that you're aware of?
3      A.   Yes.  I understand that there may be two
4  revised invoices coming in.  And we'll evaluate
5  those as well.
6      Q.   And do you have any understanding of what
7  those revisions will consist of?
8      A.   I believe they may have mis-totaled two
9  invoices and they've made the corrections to them.
10 And there may be another one coming in that they
11 hadn't billed yet.  But again, I haven't -- I
12 haven't evaluated that yet; so I can't say for sure
13 what the change is exactly.
14     Q.   I want to move on to I think it's page 6
15 of your report, section 1.4, where you set forth
16 your conclusions and opinions.  Just let me know
17 when you are there.
18     A.   I'm there.  Sorry.  I put the mute on.  I
19 had to call.
20     Q.   Is what's listed on page 6 -- 6, is that a
21 fair and accurate summary of what your opinions are
22 in the case?
23     A.   It is.
24     Q.   Any other opinions to add to this?
25 They're not reflected here as you sit.

Page 35

1      A.   As I sit here today, I don't -- I cannot
2  think of something new.
3      Q.   Moving on to page 8, statement concerning
4  findings and opinion section 2.3.
5          First sentences is, the opinions expressed
6  herein are made within a reasonable degree of
7  certainty and based upon review and evaluation of
8  the project records made available to date.  What
9  degree of certainty or field are you holding those
10 opinions to?
11     A.   Can you ask that again?  I'm not sure I
12 understood you.
13     Q.   Yeah.  It says here, a reasonable degree
14 of certainty.  Is that in a particular field or area
15 of specialty that you hold the findings?
16     A.   Well, it's based on our review and
17 evaluation of the records and on my expertise,
18 education, analysis, observation, experience.
19     Q.   Are you holding any or all of your
20 opinions in this case to a reasonable degree of
21 certainty within the field of professional
22 engineering?
23         MR. SNOW:  Object to form.
24     A.   Yeah.  I am not -- can you ask that again
25 maybe a little differently?

Page 36

1      Q.   (By Mr. Roman) Sure.  So your first
2  opinion, which is back on page 6, is that the -- to
3  summarize generally that the repair costs are
4  reasonable; right?
5      A.   Correct.
6      Q.   Is that opinion offered and held to a
7  reasonable degree within the field of professional
8  engineering or some other area of specialty for
9  which you have a background and experience in?
10     A.   So my background is I'm a licensed
11 engineer and a certified construction manager.  I've
12 been doing estimating for a large portion of my
13 career, construction a large portion of my career,
14 evaluating invoices a large portion of my career.
15 Is based on that experience.
16     Q.   And is it your experience in one of those
17 fields versus the other, meaning engineering versus
18 the construction management, or is it a combination
19 of both?
20     A.   Well, that -- that's -- that's not a
21 simple answer.  My experience is based on all of
22 that; so I inherently rely on my training, my
23 experience to evaluate what I'm doing.  Does that
24 make any sense?
25     Q.   Yeah, I think so.  And then it would be



KEVIN M. LUGO P.E.                                                     June 15, 2024
MATTER OF COEYMANS MARINE TOWING                                          37—40

---

Page 37

1  the same question for your second opinion, the
2  emergency inspection engineering construction
3  service that is carried out by the Belt Line
4  contractors were appropriate and essential.  I mean,
5  do you hold that opinion to a reasonable degree of
6  certainty as was referenced on page 8?
7     A.   Yes.
8     Q.   And is that an opinion that's held to a
9  reasonable degree of certainty within the field of
10  engineering or within the field of construction
11  management or folks?
12          MR. SNOW:  Object to form.
13     A.   Can you ask that again, please?
14     Q.   (By Mr. Roman) Is your opinion number two
15  that's reflected on page 6 of your report held to a
16  reasonable degree of certainty within the field of
17  engineering or construction management?
18          MR. SNOW:  Object to form.
19     A.   Trying to answer your question here.  This
20  is definitely based on my expertise.  Based on our
21  analysis of the cost and the urgency of the Belt
22  Line to have that bridge open as soon as possible to
23  the upcoming, as the Belt Line characterizes it, the
24  very busy season starting sometime in October, they
25  needed to get that bridge open; so the most cost

Page 38

1  effective and efficient way to get it done would
2  have been to correct, to make the repairs the way
3  they made them.  So based on my experience, I
4  believe that they made the right decision and it was
5  appropriate.
6     Q.   (By Mr. Roman) For opinion 3 on page 6, is
7  that opinion held to a reasonable degree of
8  certainty within the field of engineering or
9  construction management?
10          MR. SNOW:  Object to form.
11     A.   Again, it's both in this instance again
12  because depending on which side of the ledger you're
13  on, the design side or the contractor side, you can
14  come up with this opinion based on the process it
15  takes to deliver a project using another delivery
16  method.
17     Q.   (By Mr. Roman) And then a similar question
18  for opinion 4 on page 6, is that opinion held to a
19  reasonable degree of certainty within the field of
20  engineering or construction management?
21          MR. SNOW:  Object to form.
22     A.   Both.
23     Q.   (By Mr. Roman) Both.  Okay.
24     A.   It can be either one or both.
25     Q.   All right.  Moving on to page 9, section

Page 39

1  3.1 titled "The Belt Line's Project Delivery
2  Method".  Just tell me when you're there.
3     A.   Page 9, 3.1?
4     Q.   Correct.  Yeah.
5     A.   I'm there.
6     Q.   It looks like the first sentence of that
7  paragraph, the Belt Line decision to utilize master
8  services agreements with N/S, I think that means
9  Norfolk Southern; correct?
10     A.   Correct.  Pretty sure I read it somewhere.
11     Q.   And it's your opinion that it would have
12  likely resulted in a reduction in the overall
13  project duration by at least eight to ten months;
14  correct?
15     A.   That's correct.
16     Q.   And how did you go about making that
17  opinion?
18     A.   Well, if you give me a second, I believe
19  on page 10, I actually explain how I arrived at that
20  conclusion.  You see --
21     Q.   Is that page -- the third paragraph of
22  page 10?
23     A.   Would be the second full paragraph on page
24  10, to be clear.
25     Q.   In that paragraph, reference is a

Page 40

1  traditional delivery method; right?
2     A.   Among others.
3     Q.   And what did you mean by traditional
4  delivery method?
5     A.   A traditional delivery method is what the
6  industry would term a design-bid-build.  You design
7  it, you build it, you construct it; so that entails
8  engaging a design firm, likely through an RFP,
9  request for proposal process, negotiating a
10  contract, and designing a design that is adequate
11  enough for a contractor to bid it, put the design
12  out for bid, allow the contractor time to evaluate
13  the design, prepare its bid, submit its bid, get
14  under contract, and start work.
15          And there's some variations of that
16  depending on the delivery method, but that's
17  essentially the process for the traditional
18  design-bid-build delivery method.
19     Q.   Are there other types of delivery methods
20  within the field of construction other than the
21  traditional delivery method referenced here?
22     A.   Sure.  The design-build method right after
23  the traditional law bid method.
24     Q.   Is there also --
25     A.   Well, sure.  We can go on and on for days



Page 41

1  on this, but the design-builds and other
2  methodology, construction manager at risk is another
3  methodology.
4       Q.   Is there a --
5       A.   (Indiscernible) design-bid-build.  Sorry.
6       Q.   Sorry.  I didn't mean to cut you off.  If
7  you're done -- I just want to know if you are done
8  with that.
9       A.   I was just going to say that there's more
10 out there.  For example, integrated design-build and
11 other methodology.
12      Q.   Are there any particular methods or method
13 for an emergency repair project that are standard
14 within the construction industry?
15      A.   Yeah.  Customarily, it's a type of
16 emergency procurement where the contractors and
17 designers are either already under contract or
18 immediately put under contract.  And it's not
19 through an advertisement type of qualifications
20 based and then bid-based scenario.
21      So, for example, in North Carolina there's
22 been some flooding and Western North Carolina lost a
23 lot of dams and roads.  And those were all done on
24 procurement methods almost identical to what the
25 Belt Line did, even with a combination of industry

Page 42

1  and internal forces.  Very similar, if not
2  identical.
3       Q.   How long typically would the bid and
4  design process take under the emergency procurement
5  method?
6       A.   It depends on what the emergency is.  The
7  more complex the emergency, the more time it takes
8  to do a design.  But in the emergency scenario, the
9  owner, the designers and the contractors are on
10 board and engaged almost immediately.
11      Q.   How many firms within the construction
12 industry would you estimate exist that provide
13 emergency repair services as part of their
14 offerings?
15      MR. SNOW:  Object to form.
16      A.   I wouldn't be able to quantify that.  It
17 would take us days to research that.
18      MR. SNOW:  That's a recent project.
19      A.   Yeah.  It's a -- it is a lot, but it also
20 depends on the emergency as well.
21      I mean, clearly building contractor would
22 do building emergencies and a heavy civil contractor
23 would maybe focus on heavy civil emergencies.  And
24 then there's contractors that don't touch it.
25      Q.   (By Mr. Roman) Is it fair to say that the

Page 43

1  construction market is pretty competitive, a lot of
2  firms competing for work to do projects?
3       MR. SNOW:  Object to form.
4       A.   It depends on the -- it depends on the
5  actual project.  There's so many variables there.
6  It could be a negotiated contract.  You could -- and
7  it depends on the delivery method as well.  Depends
8  on the owner's appetite.  What do they want?  So
9  there's really no -- it's not a simple answer.  And
10 it's really not much different than any other
11 industry.  Everybody has competition in their
12 industry.
13      Q.   (By Mr. Roman) How did you determine to
14 evaluate or, I guess, compare the timeline that it
15 took for the Main Line bridge work to be done to
16 compare it against the traditional delivery method
17 versus, say, comparing it against what the timeline
18 would have been under the emergency procurement
19 method?
20      A.   I'm not sure I understand your question.
21 Could you maybe phrase it a little differently,
22 please?
23      Q.   Sure.  So as I understand it, you know,
24 your opinion that says the work was done in an
25 efficient and timely manner.

Page 44

1       One of the bases for which you make that
2  opinion is that under this traditional delivery
3  method, it would have taken potentially eight to ten
4  months just for the contractor to begin work.
5  Right.  Which was the entire length of the project
6  that the Main Line took from start to finish to
7  repair it.  And you used that traditional delivery
8  method as a comparison as one of the bases for your
9  opinion that the Main Line was done efficiently;
10 right?
11      A.   I used the traditional delivery method as
12 one example, but the concept of using a more
13 traditional method where you might want to get
14 competitive bids would have had a large impact on
15 the time it would have taken to engage those
16 contractors.
17      Q.   Did you do an evaluation of what the
18 timeline would have been under the emergency
19 procurement method?
20      A.   No.  I didn't need to because they were
21 onboard immediately, within days of the incident.
22      Q.   But you didn't do a separate analysis of
23 what the timeline for the bid-design process might
24 have been for an emergency procurement method that
25 brought in other firms other than PCL, H&H; right?



Page 45

1      MR. SNOW:  Objective to form.
2      A.    That doesn't make any sense to me.  Can
3  you ask that question again?
4      Q.    (By Mr. Roman)  Yeah.  I just want to
5  confirm that you didn't do any type of evaluation of
6  what the difference in the time that it took to do
7  the repairs under the emergency procurement method,
8  if you had done an evaluation of -- under that
9  method for other firms other than H&H and PCL.  You
10  just looked at PCL and H&H and said that was a quick
11  timeline; right?
12      A.    Well, you just --
13      MR. SNOW:  Object to form.
14      A.    You just characterized -- your premise is
15  you've just turned an emergency procurement into
16  something different.
17          By virtue of your premise, you've extended
18  the project duration by adding in timeline for three
19  other firms to compete on a drawing or an emergency
20  work that hasn't been designed.  They're not going
21  to do it.  They can't.  They can't give you a
22  number.
23      Q.    (By Mr. Roman)  Yeah.  So that is to say
24  you wouldn't be able to provide that number; right?
25      MR. SNOW:  Objective to form.

Page 46

1      A.    Nobody can provide that number.
2      Q.    (By Mr. Roman)  But you were able to
3  provide the number by using the traditional delivery
4  method; correct?
5      A.    Okay.  You have to ask -- you have to -- I
6  -- I'm not understanding your question.  I
7  understood your question to be, what would be the
8  number for the three firms to be able to provide a
9  number?  What would that be?  I didn't understand
10  that you were asking, what's the timeline?  Is that
11  what you're asking me?
12      Q.    Yeah.  I mean, really at bottom, I'm
13  trying to determine how it made sense for you to
14  compare an emergency repair project that needed to
15  be done after the allision against a traditional
16  delivery method, which I think inherently means that
17  there doesn't need to be emergency repairs done.
18          I mean, that's what I'm trying to get at.
19  And just what's your explanation of why you used
20  this particular methodology for comparison in making
21  your opinions?
22      A.    I just used -- I didn't use that
23  methodology solely, I just used that one as an
24  example.
25          But as soon as you incorporate competitive

Page 47

1  bidding into an emergency situation, you've extended
2  the duration, because nobody can bid a job without a
3  design.  And if they do bid a job without a design,
4  nobody's going to accept the number because they
5  don't know what it is.  So the contractor is going
6  to cover their risk by adding a substantial amount
7  of contingency into their bid number.
8          So your example would be, you have $15
9  million, repair could have turned into a $30 million
10  bid.  It would have had to add time to the -- you
11  still would have had time because you have to design
12  something for them to bid; so you're inherently
13  pulled it out of an emergency situation.
14      Q.    Did you do any evaluation of whether the
15  rates being charged by Hardesty & Hanover were
16  reasonable?
17      A.    We looked at the rates, they didn't seem
18  unreasonable to us.  They had negotiated already.
19  So they were reasonable to Norfolk Southern.  Same
20  with PCL.
21      Q.    Did you do any analysis of what other
22  market rates were and compared them to the Hardesty
23  & Hanover negotiated rates with Norfolk and
24  Southern?
25      A.    Well, we -- I would have looked at those

Page 48

1  rates, and if they looked at a line from one of my
2  experiences, then with engineering rates and
3  construction-type rates, it would have red-flagged
4  it for me, and it did not.  We did the same thing at
5  MBP.  We do the same type of thing.  We have rates
6  that we use for master services agreements.
7      Q.    How did the Hardesty & Hanover rates
8  compare to the MBP rates for a similar type of work?
9      A.    I don't recall at the top of my head.  We
10  had multiple rate structures depending on whether
11  it's federal or municipality or a DoT or CPRA,
12  whoever it is.  We had different rates depending on
13  the project and who they are, the skill sets
14  required.
15      Q.    And do any evaluation of the rates that
16  PCL was charging for the work?
17      A.    Yeah, I looked at those rates as well.
18      Q.    And what process did you employ for making
19  the determination that PCL rates were reasonable?
20      A.    I run a calculation to determine what
21  their basic average salary rate is for an
22  individual.  That's how I do that.  And I can tell
23  based on my experience in the projects I've involved
24  in, whether or not that rate, what that equates to
25  for a yearly salary to determine whether it's



Page 49

1  reasonable or not.
2      Q.   And what is that calculation?
3      A.   It's the hourly rate times 2080, which is
4  inclusive of vacation and sick time.  That's your
5  normalized hours for the year for a person working
6  40 hours a week.
7      Q.   So you said 280?
8      A.   2080.  So if I take your -- if I take your
9  direct rate, Michael, and multiply it by 2080, I can
10  figure out how much you make a year, not including
11  all the overtime.  I know you work because you're an
12  attorney; so I just would get your base salary if
13  that's how you're compensated and determine how much
14  you make per year.
15      Q.   Okay.
16      A.   And then anything over that is an adder.
17      Q.   And did you run those calculations for
18  PCL's work on this case?
19      A.   Yeah, I would have spot-checked those.  I
20  probably used the calculator.  It is quicker.
21      Q.   And how did you determine what the
22  particular employee salary was?
23      A.   I just explained it.  I would just
24  basically run their direct rate times 2080 to
25  determine what they would generally be compensated

Page 50

1  for over a year.  Period.
2      Q.   Right.  So if an engineer is charging 100
3  bucks an hour, you're taking $100 an hour and you're
4  multiplying that by 2080; right?
5      A.   If it's their direct rate, yes.
6      Q.   You are distinguishing direct rate from
7  something else?
8      A.   Yes.
9      Q.   The two are separate?
10      A.   Yes.
11      Q.   And what are the rates, what other rate
12  would that be?
13      A.   Well, you have -- if you -- well, it
14  depends on the contract, but essentially on this
15  project, if you have a direct rate, that's how much
16  the individual is paid.  So what they get.  Anything
17  -- anything additional would be some type of
18  overhead markup or labor burden markup or in the
19  instance of this project, the Belt Line used audited
20  rates and they would use the direct rate times a
21  multiplier to get the cost for that individual.  And
22  they are two different things.  You cost -- Michael,
23  you cost more for your firm than how much they pay
24  you as an example.
25      Q.   Right.  And putting aside the Belt Line's

Page 51

1  labor rates and speaking about PCL, did you have
2  available to you what the direct rate was for the
3  PCL employee versus whatever that rate would be that
4  included the overhead in the markup?
5      A.   I don't recall.  I would have -- I don't
6  recall whether it was a direct or -- or a burden
7  rate, but if it was a burden rate, I would run a
8  calculation to pull the burden out and back it in.
9      Q.   And how about for Hardesty & Hanover?  Did
10  you have those different rates for performing your
11  calculations?
12      A.   I would -- again, same -- same process.
13  And I don't recall whether it's -- whether they were
14  fully burden rates or direct rates.  But either way,
15  the math is somewhat similar.  I would -- if it's a
16  fully burden rate, I back out what the overhead or
17  multiplier would be to determine whether or not what
18  their salary is or approximately would be, just to
19  see if it's reasonable.
20          Now, with the engineers, that's -- I can
21  also rely on my experience preparing these types of
22  rates for my own people and seeing where they land.
23      Q.   For the Hardesty & Hanover and PCL, did
24  you do those calculations on, like, in any type of,
25  like, worksheet or notes or anything like that?

Page 52

1      A.   No, I don't believe I did.  I believe I
2  used my calculator.
3      Q.   Okay.
4      A.   I know it's kind of counterintuitive for
5  an engineer to use his calculator once in a while,
6  but I do even though I do love spreadsheets.
7      Q.   Yeah.  I mean, I actually use a
8  calculator, that two plus two is, you know, no
9  judgment.
10          I just wanted -- so are those the
11  calculations for how you determine the results?  Are
12  they in the report at all?  It's not a trick
13  question.  I just want to make sure I didn't miss it
14  at all.  That's all.
15      A.   I don't believe I make reference to that
16  little exercise that I would have done.
17          I mean, ultimately these are negotiated
18  rates or agreed upon rates between the owner and the
19  design and contractor team.
20          And clearly, Norfolk Southern was
21  acceptable of the rates.  So -- and we didn't have
22  any issue with the rates.  So there was no sense --
23  there was no reason to make any adjustments.
24          And even from that, it was in the
25  emergency type situation and the Belt Line chose to



Page 53

1  use what was already negotiated for expediency.
2      Q.   Fair enough.  We've been going for a bit.
3  You want to take a break?
4      A.   I do appreciate that.
5      Q.   Yeah.  I don't know, maybe about seven or
6  ten.  Something like that.  That works?
7      A.   That works.
8          REPORTER:  Off the record.
9              (Recess taken)
10         REPORTER:  Back on the record.
11     Q.   (By Mr. Roman) I would go on to, I think
12  page 13 of your report, section for the analysis of
13  the Belt Line and the wedge (indiscernible).  Just
14  let me know when you're there.
15     A.   I'm there.  My apologies.
16     Q.   That's okay.  And then it is fair to say
17  you're finding here that that $15,517,166.85 was
18  reasonable for the repair costs?
19     A.   Yes.
20     Q.   Have you reviewed the report provided by
21  Lee Lentz, another expert in this case?
22     A.   I believe so.
23     Q.   In Mr. Lentz's report, one of the -- and
24  I'm summarizing that one of his opinions in
25  particular with regard to the 15 and a half and

Page 54

1  change of damages was that three million of the
2  damages resulted from increased labor to sort of
3  quicken up the work.
4          And again, I'm generally summarizing it.
5  But he offered the opinion that he specifically
6  agreed that the damages increased from 12 to about
7  $15 million because of that $3 million dollars of
8  expedited work, for lack of a better term.
9          Did you do any type of evaluation on a
10  similar figure like that $3 million of expedited
11  work in making your determination here?
12         MR. SNOW:  Object to form.
13     A.   I did not.
14     Q.   (By Mr. Roman) Was there anything that
15  jumped out to you in your review of any of the
16  documents in the case, including the PCL invoices or
17  the Hardesty & Hanover invoices where you noted that
18  there was an increase in the amount charged because
19  of the expedited work?
20     A.   I recall, but I'd have to go verify.  But
21  I recall that there was some overtime in the
22  invoicing.
23     Q.   And do you recall which kind of category
24  or which companies that overtime was for?
25     A.   Well, I know that the Belt Line had

Page 55

1  special projects.  So those were the -- those would
2  have been -- well, I don't know.
3          There would probably be some -- there was
4  overtime in there.  I believe PCL had something.  I
5  don't recall specifically on Hardesty.  I'd have to
6  go back and look.  But I'm not -- overtime on a --
7  from a contractor doesn't surprise me anyway.  It's
8  inherent in the business.
9      Q.   Are you offering any opinion specifically
10  as to that $3 million category of damages that Mr.
11  Lentz spoke about in his report?
12         MR. SNOW:  Objection.
13     A.   I have not been asked to do that yet or at
14  all.  And so right now I do not have an opinion on
15  it.  And we have to keep in the back of our minds
16  there's potential that more documents may come in,
17  which I will need to evaluate if they do come in.
18     Q.   (By Mr. Roman) All right.  Go onto section
19  4.1, the one titled "Methodology".
20     A.   I am there.
21     Q.   It is fair to say, this is the -- where
22  you outline the methodology that you use to come up
23  with the opinion that's reflected in the section
24  before it on page 13 about the reasonableness of
25  charges for costs, I should say?

Page 56

1      A.   Yes.  This generally covers the
2  methodology.
3      Q.   I think it starts right after the Exhibit
4  10 in bold, is that you're going to then perform the
5  quantity validation of PCL's installed quantities by
6  developing select independent quantity estimates
7  from the conformed plans and comparing these to the
8  quantities of the same materials that were purchased
9  by PCL for emergency repair work.  Do you see that
10  there?
11     A.   I am there.  Yes.
12     Q.   If you could explain what that process is
13  and in particular, what that quantity validation
14  methodology is that you use?
15     A.   So what we do is we perform our own
16  takeoffs and compare our takeoffs of material
17  quantities to what was installed in the field, if
18  that makes any sense to you.
19     Q.   I might need a little clarification on
20  what you mean by takeoff.
21     A.   Okay.  I'm (indiscernible) the following
22  question.  We survey how much material is being
23  replaced on the drawings and compare that to what
24  was installed in the field.
25     Q.   And is that typically a difference, then,



KEVIN M. LUGO P.E.                                         June 15, 2024
MATTER OF COEYMANS MARINE TOWING                          57—60

Page 57

1  between the takeoff and the quantities that were
2  done on the field?
3     A.   Essentially, that's what we're looking
4  for.  Any anomalies in a takeoff quantity to an
5  installed quantity.
6     Q.   And then if you could expound upon what
7  you meant by this, developing a select independent
8  quantity estimate from those drawings.
9     A.   So what that means is, is we may not have
10  validated every nut and bolt that was purchased, but
11  we would look for large items that have a large cost
12  impact and evaluate those items.
13     Q.   And what were your findings from that
14  analysis that you found?
15     A.   That the quantities that we determined
16  were in alignment with the quantities that PCL
17  included in their invoices.
18     Q.   And is that the process you use just isn't
19  related to the steel components on the bridge?
20     A.   Can you ask that again, please?
21     Q.   Yeah.  The process of performing the
22  quantity validation and then the independent
23  quantity estimates, is that the process you use just
24  for the steel parts that were replaced?
25     A.   We did do that on the steel, that is

Page 58

1  correct.
2     Q.   And then any other kind of, say,
3  categories of the repair work that you use that
4  process for?
5     A.   I believe there are some others, but in
6  section 4.211, we focused in the report on the steel
7  wide flange beams and the L-shaped angles.
8     Q.   And so looking at 4.211, it looks as you
9  said for selected components; right?
10     A.   Correct.
11     Q.   And then two of those selected components
12  would be the flange beams and then the L-shaped
13  angles; right?
14     A.   That is correct.  We --
15     Q.   Now --
16     A.   -- included the -- for the purposes of the
17  report, we included the higher cost steel wide
18  flange and L-shaped angles.
19     Q.   Did you do that process for any other
20  components that are not referenced in the report,
21  such as the flange beams and L-shaped angles?
22     A.   Yes.  But I don't recall specifically
23  which ones they were at this point, or as I sit here
24  today.  I'd have to go look.
25     Q.   And what would you look at if you were to

Page 59

1  go find that out?
2     A.   I'm an engineer.  We have spreadsheets.
3  It would be tabular --
4     Q.   Those are spreadsheets that are in your
5  file somewhere?
6     A.   Yes.
7     Q.   And why in particular did you focus in the
8  report on the steel wide flange beams and L-shaped
9  angles?
10     A.   Because these two components are items
11  that material costs are higher; so when you evaluate
12  a cost of a system, the ROI on reviewing the overall
13  cost is to focus on the very expensive high-dollar
14  items.
15     Q.   It's fair to say you gave more attention
16  to the higher-dollar components than the lower cost
17  ones?
18     A.   Yes, because they have the biggest impact
19  to the overall cost of the repairs.
20     Q.   The second bullet point under 4.211 on
21  page 16.
22     A.   Yes.
23     Q.   The one that starts with, (indiscernible)
24  PCL would use steel angles of a different size than
25  the design due to space limitations.  Can you recall

Page 60

1  which particular angles you're referencing there in
2  that bullet point?
3     A.   Not specifically.  No.  I'd have to go and
4  look.
5     Q.   At what would you look at if you had to
6  find that out?
7     A.   I would go back to our comparison of
8  installed versus quantity take off amounts and look
9  there.  And when we notice some of these instances,
10  there's three explanations.  Either -- four really
11  but we know one of them doesn't --isn't in play.
12  But what one would be the most takeoff, but we know
13  we did that correctly.  So that's not one of the
14  things it could be.
15        So it's either waste which most projects
16  materials, there's a certain amount of ways to get
17  programmed in, which isn't a bullet in here, but
18  it's programmed in because, you know, you're going
19  to cut something or you're going to have to buy a
20  little bit extra because you're going to need it.
21        So there's always a little bit of waste.
22  And then in the instance of this, we knew through
23  conversations with Mr. Swanson that they had to make
24  field adjustments, and so that there was additional
25  steel that needed to be ordered, whether it was a



KEVIN M. LUGO P.E.
MATTER OF COEYMANS MARINE TOWING

June 15, 2024
61–64

Page 61

1 connection or an L-shape or whatever the material
2 was to fit in the field because these pieces
3 couldn't be ordered in a supply chain because there
4 wasn't time to do that. They had to go order them
5 and make them work; so in the instance of those
6 situations, that's what they did.
7 And here, in the bullet you're referring
8 to, there's some space limitations. So they made
9 adjustments in the field and made the materials
10 work.
11 And I know Mr. Swanson was involved in
12 that intimately because he had probably some design
13 calculations that he needed to run to make sure they
14 worked, then it was acceptable.
15 Q. And in particular, that referenced that --
16 to the design, is that a reference to the original
17 design on the bridge or the original design that
18 Hardesty & Hanover or PCL put together for the
19 repair projects?
20 A. No, it's a reference to -- I will circle
21 back to where we were earlier today. But
22 essentially, if you had time to put this out and get
23 the steel into the steel fabricator's hands, they
24 can spend more time making sure that everything's
25 exactly per the design, and it should fit together

Page 62

1 like a glove.
2 Now, in the instance of this job, there
3 are bad pieces. They had to move the structure
4 over. Wasn't as simple as building something brand
5 new. There's always going to be something in the
6 field that you identify that you didn't expect. And
7 the instance of this one, they determined that there
8 was some space limitations that they had to adjust
9 to in the field.
10 It's like we say in the industry, if
11 you're building a new building it is a whole lot
12 easier than renovating one at times, because
13 sometimes you find things you didn't recognize were
14 there, which drives the cost sometimes.
15 Q. Yeah. I just wanted to clarify as to
16 whether that design is like the original design for
17 the bridge or the design is for the repairs. And as
18 I understand it, you get out in the field and
19 there's got to be some modifications based on what
20 you're seeing; right?
21 A. Right. This isn't --
22 Q. And --
23 A. This isn't a reference to anybody's design
24 error or any reference to the original design. This
25 is just a dynamic of when you're repairing something

Page 63

1 that has twisted steel, and they have to put it all
2 back together.
3 Well, something's going to come up. And
4 that's what this was and they made an adjustment and
5 moved on.
6 Q. Do you know how many adjustments there
7 were throughout the repair work process?
8 A. It is documented, but I don't know off the
9 top of my head what it is.
10 Q. And then the reference to the PCL quantity
11 validation, is that the same process that we just
12 talked about that you applied to the PCL portion of
13 the project?
14 A. Yeah. We're in the PCL section of the
15 report.
16 Q. And then moving on to page 17, what I
17 think is the third bullet point of that 4.211
18 subsection.
19 A. I am there.
20 Q. What is the reference -- yeah. What is
21 the reference to the fracture critical testing
22 there?
23 A. So, fracture critical testing is basically
24 a key point in the bridge where if it fails, it
25 fails that member, which is a catastrophic failure

Page 64

1 in that point; so they were doing testing and
2 realized they needed to make some angle section size
3 changes. And the angles had to be re-fabricated; so
4 this is just part of the process that occurred on
5 the project.
6 Q. And do you recall as you sit where those
7 particular connections were located on the bridge?
8 A. Not off the top of my head. But you can
9 see in the table below the variance that we
10 identified five percent and ten percent; so it
11 wasn't a drastic amount of change in the quantity,
12 but we thought it prudent to at least be able to
13 have an explanation of why there may be a variance.
14 Now, some people would argue that five and
15 ten percent is just waste, but we went a little bit
16 further to investigate.
17 Q. And what does that quantity variance
18 reflect there? Just how much was the difference
19 between the -- well, just if you could explain what
20 exactly the quantity variance means.
21 A. It's the difference between what we had
22 taken off for material quantity on the drawings
23 versus what was purchased by PCL.
24 Q. In the 4.212, it is fair to say this is
25 your discussion of the reasonableness of PCL's



Page 65

1  rates; correct?
2     A.  Correct.
3     Q.  Do you have anything to add as to how
4  you've made this determination other than what we
5  talked about, I think a little bit ago?
6     A.  No, I think this pretty much covers what
7  we talked about before.  I mean, we can't -- we --
8  we got to -- the one thing we got to keep in the
9  back of our mind is you have two sophisticated
10  parties negotiating a contract together; so we know
11  with confidence that the rates are going to be
12  acceptable, just from that high level perspective.
13     Q.  And then on page 18, the first full
14  paragraph, I think we talked about this a little bit
15  earlier, but that was the one crack that had been
16  identified in the inspection report that was
17  repaired as part of the process, or I should say as
18  part of the repair work after the allision rate?
19     A.  That is correct.  And so we performed our
20  own estimate of what it would take to make this
21  repair.  And then back to that conversation that we
22  had with Charlie Graining that we talked about
23  before, I validated that cost with him.
24        And he said, yes, we were already there,
25  it took no time to do it.  We had all the materials,

Page 66

1  went there, knocked it out.  Done.  So I'm pretty
2  comfortable with that number.
3     Q.  The estimation that you provided or ran
4  internally, is that the one that's referenced in the
5  last sentence of that paragraph starting with, from
6  our estimation?
7     A.  That's correct.
8     Q.  And then you ran those figures past Mr.
9  Graining after you had done those calculations, and
10  he said, yeah, that's about what it took PCL to do?
11     A.  Yes.
12     Q.  Sorry.  The next paragraph, fair to say,
13  you were discussing the lubrication; correct?
14     A.  Yes.  And we talked about this earlier,
15  too.
16     Q.  Yeah.  Do you have any opinion as to
17  whether the lubrication of the cables would have had
18  to been done regardless of whether the allision
19  occurred?
20     A.  So there was reference in one of the
21  inspection reports that they were going to need to
22  be done eventually, but it wasn't a high priority
23  from my recollection.
24        So yeah, eventually they were going to
25  have to do it.  I don't know when at this point when

Page 67

1  the Belt Line would have programmed that into their
2  budgeting.  But based on my conversations with Mr.
3  Graining, he said it had to be done because of the
4  circumstances of the main span not moving up and
5  down regularly, and we had to do it.  It wasn't
6  because it wasn't done before, but it was because it
7  had been sitting and not moving.
8     Q.  Do you know what time frame PCL performed
9  that lubricating work?
10     A.  I did at one point.  It would have had to
11  have been before October because they must have
12  raised -- when they raised the structure in October
13  manually, I would assume it was there, but I can
14  verify that exact date if you need me to sometime.
15     Q.  Yeah.  What would you do to verify it?
16     A.  I would -- there's two ways to do it.  I
17  would look in their check-ins documentation and I
18  would also go back to their invoicing and identify
19  it in there, if I could.
20     Q.  I think I asked this earlier.  My
21  apologies.  You don't recall as you sit here as to,
22  you know, how much work went into the cost of that
23  particular part of the project, lubricating the
24  ropes; right?
25     A.  That is correct.  I mean, I have a number

Page 68

1  in my head, but I'm afraid to say it because I'm not
2  sure it's right.  So I'm not going to say it, but I
3  can find out very quickly if I need to.
4     Q.  And what did you do, if anything, to come
5  to the opinion that the cost for that lubrication
6  was reasonable?
7     A.  We would have looked at the invoices and
8  reviewed that.  I don't recall that activity being a
9  very impactful cost activity to the project.
10     Q.  Did you take into account at all either by
11  like discounting that cost or find some type of
12  reduction given the fact that the lubrication would
13  have probably been done regardless of the allision?
14        MR. SNOW:  Object to form.
15     A.  I did not.  And the reason is because it
16  had to be done because the main span had been
17  sitting idle for a long time.  Long time being
18  relative.  But long enough that PCL had to go redo
19  them.  And that is from PCL.  And I have no
20  reason to not believe Mr. Graining's evaluation of
21  the situation.
22     Q.  (By Mr. Roman) All right.  Onto 4.22, fair
23  to say this is where you're discussing Hardesty &
24  Hanover's work on the project?
25     A.  Yes.



Page 69

1    Q.    And how did you go about making the
2    opinion that Hardesty & Hanover's charges were
3    reasonable?
4    A.    Well, in section 4.221, we reviewed the
5    man hours to complete the various scope of work in
6    comparison to the scope and context -- contents of
7    their July 3rd inspection report, the repair plans
8    and specs.
9         And I'll point out that I did run another
10   -- I didn't put this in the report, but I did run a
11   repair, like, an estimate of their design fees, and
12   they were pretty reasonable.
13        And I don't have the number in front of
14   me, but it was lower than you would have expected
15   for the work that they did in the time frame that
16   they did it.
17        And I also did that same type of analysis
18   on the cost of the repair to a cost of -- a rough
19   order of magnitude cost to replace the bridge.  And
20   that cost, I do remember, was anywhere from five to
21   eight percent to repair versus replace.
22   Q.    What do you mean by the five to eight
23   percent there?
24   A.    My apologies if I wasn't clear.  Five --
25   the cost to make the repair in my estimation was

Page 70

1    anywhere between five and eight percent of the cost
2    of replacing the entire structure; so let's say
3    hypothetically the structure was damaged so badly
4    that -- excuse me.  It couldn't be repaired for
5    whatever reason, and the decision was to replace it.
6    The replacement cost would have been anywhere -- off
7    the top of my head, anywhere from 180 million to
8    300'ish million.  And that's a rough order of
9    magnitude, because obviously I don't have a design
10   that I could actually run an estimate on to
11   calculate it.
12        But just based on other historical
13   structures being constructed, adjusting for changes
14   or variations in the type of how many tracks, for
15   example, or whether the substructure was replaced,
16   it'd be somewhere in that neighborhood; so I ran
17   that calculation as well.
18   Q.    And is that 180 to 300 million range, is
19   that for entire bridge or just the --
20   A.    Yes.  Yes.  Yes.  I mean, it was just an
21   exercise.  I did it mostly for curiosity, really,
22   what it would cost to replace that structure.  And
23   then I thought to myself that there's value in at
24   least understanding how much the percentage of
25   repair would have been as compared to a new one.

Page 71

1    And that's how I determined those percentages.
2    Q.    Okay.
3    A.    Did the same thing with the design fees.
4    That's why I went down this rabbit hole.
5    Q.    Did you do any evaluation of what the
6    estimate of replacement cost would have been just
7    for band 4 of the bridge?
8    A.    I did not.  And that's an interesting
9    question, and we'd end up back into our discussion
10   again about delivery methods and design and all
11   that; so that is one of the reasons why I didn't do
12   it, because you would have had to design the entire
13   section there from span 4 and figure out how to
14   place it in there.  And so you brought it into
15   design time frames and then getting a contractor
16   engaged.  I just don't think you could have.
17        You may have been able to do it on an
18   emergency process, but it would have been
19   challenging.  Plus, you would have had to stabilize
20   the existing structure a lot more than they did
21   because now you're taking a whole piece of the whole
22   structure, you're taking a piece out and replacing
23   it.
24        And so that's -- that might have been --
25   might not be actually doable, but if it would have

Page 72

1    been doable or if it is doable, now you're having to
2    figure out how to stabilize the main span, and I
3    think ultimately it would have cost a lot more.
4    Q.    It is fair to say you didn't do it for
5    span 1, 2, or 3 either, like, on an individual
6    span-by-span basis?
7    A.    That's correct.  But if you think about it
8    this way, Mike, when you replace an entire span, now
9    you're placing all the steel; so your material costs
10   are going to go way up.
11   Q.    And I think you said for that 180 to $300
12   million figure, you looked at some comparable
13   projects?
14   A.    Yes.  One in particular.  And I'm trying
15   to remember the name of it, designed by Hardesty &
16   Hanover, actually.  I know we're going to just wrap
17   the ten, I think.  It's in -- I think it's a Port
18   job.  Port Authority job in New Jersey-New York.  It
19   was just used as a basis to come up with a rough
20   order of magnitude as what we call in industry as a
21   range of what it could cost based on similar types
22   of projects.  Making adjustments as you can to come
23   up with a range of what it could cost.
24        Obviously, a full design is much easier to
25   do, but we don't have the benefit of that because



Page 73

1  nobody's designed that bridge yet to be replaced.
2      Q.    On a lift bridge like the Main Line
3  bridge, what's the most costly portion of the bridge
4  to build?  Just in general, if you were to do it
5  from ground up.
6      A.    I'd have to go back and look at our comp
7  because I don't recall specifically.  I mean, it's
8  all one big structure.  So to me it's all one piece.
9      Q.    All right.
10         I need a little assistance.  So that five
11  to eight percent that you referenced versus the
12  replacement costs, just by my napkin math, if we
13  take here that the Belt Line is claiming 15 and a
14  half million to repair it versus what you ran of 180
15  to 300 million for the replacement cost, I'm having
16  difficulty squaring with that five to eight percent
17  means if -- you're saying the cost of repair was
18  five to eight percent of the total replacement cost?
19     A.    Of a new bridge, yes.
20     Q.    Okay.
21     A.    Based on rough order of magnitude; so I
22  pulled out my calculator and ran 15 and a half
23  divided by 180 and I got 8.6 percent.  So that's
24  just a simple math exercise there.
25     Q.    Okay.  In evaluating Hardesty & Hanover's

Page 74

1  rates, did you do any type of comparison to other
2  market rates or anything of that nature?
3      A.    Yeah, we talked about that earlier.  That
4  was a discussion about labor burdens and markups and
5  how you calculate how much somebody makes versus
6  direct rates or fully loaded rates, and I have.
7      Q.    So that's the methodology you use for
8  that?
9      A.    That would be what we'd use.  And like I
10  mentioned earlier, let's not forget that two large
11  firms have negotiated a rate that's not even an
12  emergency rate.  It was just a general this is how
13  much we would charge you to do a job per hour.
14     Q.    Sorry.  There's 4.23, which is the review
15  of the Belt Line's labor invoices.
16     A.    Yes, I'm there.
17     Q.    And how did you go about determining that
18  these were reasonable and in particular the markup
19  based on the additive rates that are reflected in
20  the spreadsheets?
21     A.    Sure.  The additive rates are audited
22  rates that Norfolk Southern uses for its personnel,
23  and they've been accepted by VDoT, GDoT.  And I'm
24  experiencing this because we do the same thing.  We
25  have automated rates with GDoT, VDoT, and CDoT.  And

Page 75

1  it's the same process.
2         So when you have an hourly individual,
3  they have -- it's the cost to carry them.  It's what
4  they cost the Belt Line, it is not what you pay
5  them.  So these rates are audited and they're
6  allowed to have this markup on their rate.  And
7  that's the rate that cost the Belt Line to employ
8  them.
9      Q.    Did the train and engine employees from
10  the Belt Line, did they actually do any work to
11  repair the bridge after the allision, to your
12  understanding?
13     A.    My recollection was they were more focused
14  on rerouting trains and the maintenance of way
15  individuals did more of some of the access road, the
16  flagging, the moving of the structure up and down,
17  railroad flagging.  And just so you know, this is --
18  I've had numerous conversations with the Belt Line
19  about these individuals and what they were working
20  on.
21     Q.    And in any of those discussions that you
22  had with the Belt Line, was it relayed to you in any
23  way that's like the train and engine employees on
24  that first -- first row in table 5 that they were
25  actually out there doing work to repair the bridge,

Page 76

1  you know, side by side with PCL or anything of that
2  nature?
3      A.    So if you look on the paragraph right
4  below table 5, I explained what everybody on -- in
5  table 5 were doing.  So the classifications of the
6  train engineer employees are masters and the
7  maintenance of way employees.  Do you see that
8  there?
9      Q.    Yeah.
10     A.    So that's -- right in here is -- is the
11  explanation of what they did.  That's the first full
12  paragraph on page 21.
13     Q.    Anything else other than what's listed on
14  the page 21 to your understanding that those
15  categories of employees did?
16     A.    I mean, that's a fair description of what
17  they were working on.
18     Q.    And then 4.24, review of the access road
19  costs.  How did you go about coming to the opinion
20  that these costs were reasonable?
21     A.    Same process as we've talked about before.
22  Looked at what the hours were, how much the cost for
23  the work that was done, the materials, all that, and
24  determined that this is a reasonable cost.
25         And if you think about it, you have 30



Page 77

1   some thousand in materials just in costs.  So it's
2   not unreasonable.  You know that they spent the
3   money on the materials.
4       Q.   Okay.  All right.
5           Page 23, what methodology did you employ
6   for determining that these costs reflected on table
7   7 were reasonable?
8       A.   Same process as we've been talking about.
9   We looked at the invoices and looked at what they
10  were working on, the scope of their work, and
11  evaluated the cost and realized or determined that
12  they were reasonable.
13          And as you can see here, we clearly went
14  through to determine what each individual was doing
15  because we listed it on the bottom for the reader.
16          So you knew what Diamondbacks role was,
17  what they did before, what they did on the job.
18  Same with the electrical sub, the metalwork sub, the
19  rail sub, the (indiscernible) sub, et cetera.
20          (Whereupon, Deposition Exhibit.
21          No. 4 was marked for
22          identification)
23      Q.   (By Mr. Roman) I wanted to take a look at
24  what you marked as Exhibit 13, the sample quantity
25  validations, which we will mark.  I believe we are

Page 78

1   on Exhibit 4.  You have that part in front of you?
2       A.   I don't.  I can put it on my screen or you
3   can put it on your screen.
4       Q.   I have it -- I have it up.  I have it up.
5       A.   That works.
6       Q.   So I know we've talked about your process,
7   you know, generally.  But if you could maybe just
8   take me through and I'll let you pick the column,
9   whichever one you want to do.
10          But if you could using, you know, this
11  Exhibit 13 with the actual heard example and run
12  through how you work through methodology, if we
13  could do that.
14      A.   Sure.  So this is really similar to the
15  summary table in the report, but it just has a
16  little bit more granularity to it.
17          So essentially we have a material takeoff,
18  for example, W12 by 210 beams.  And we have a
19  quantity in the invoicing.  And we ran a variance
20  between our takeoff and the quantity.
21          And as you look through the variances,
22  there are different variances.  Wish it was in
23  Excel, we'd have a column.
24          But you can see there under comparison,
25  the differences in the quantity, some are higher,

Page 79

1   some are lower.  But ultimately it results in a five
2   percent difference in the material.
3           And then we have some comments there from
4   our takeoff and from the Infra-Metal -- yeah, thank
5   you, sir.  Infra-Metal metals, what they were for,
6   for example.
7       Q.   And so all three columns are comments that
8   would have been authored by someone at MBP?
9       A.   Yes.  That's coming right from either a
10  takeoff or from the order; so it should be for
11  example, the Infra-Metals order, it should say that
12  on there.
13      Q.   Okay.  And who actually prepared the
14  tables that are reflected here, if you recall?
15      A.   So it would have been a -- it's -- this is
16  a team effort.  I was involved in this table.  Niyi
17  Ladipo was involved in this table, and so was
18  Miranda Clerval.
19      Q.   And I think it was noted as this was a
20  sample.  What was marked as Exhibit 13.  Are there
21  additional tables in your files that are similar to
22  the ones on Exhibit 13?
23      A.   Yes.  For example, I ran across one this
24  morning that just had differences in poundage.  So
25  we went to the effort of looking at the weight of a

Page 80

1   section, if you will.
2       Q.   Okay.
3       A.   There it is.
4       Q.   These are the angle sections?
5       A.   Yeah.  Well, in this instance.  Yeah.
6   It's beams angle sections and all we did was we just
7   did it differently using poundage instead of
8   footage.
9       Q.   And what type of steel was used to replace
10  any of the components that needed to be replaced
11  after the allision?
12      A.   I'm going off memory, so don't hold me to
13  this.  But I want to say it was 792.  But don't hold
14  me to that.  But it was a different steel than what
15  was originally used on the project.
16      Q.   And was that originally used on the
17  project or do you mean the original?
18      A.   Original project.  Yes.  Sorry.  Yes.
19      Q.   The original design and build of the
20  bridge; right?
21      A.   Yes.  That's a special order now.  This
22  steel that was used on the bridge repairs is more
23  commercially available while the older steel would
24  have had to have been a custom order.  So we know
25  that that would be more expensive.  So we didn't,



Page 81

1  you know, calculate that because we know --
2      Q.   The older type of steel, it would have
3  been more expensive because it would have been a
4  custom -- for custom project to fabricate it?
5      A.   Yes.  And it's not only the -- it's not
6  only the cost for the custom, but it's the time
7  component as well.  And as you know, time is money.
8  And that would have just impacted the overall
9  duration of the repair process as well.
10     Q.   Is the steel that was used for the repair,
11  the 792, a stronger steel than the steel that was
12  used in the original design (indiscernible)?
13     A.   It's -- it's a better steel.  It's a newer
14  steel, stronger, more corrosion resistant.
15     Q.   Okay.
16     A.   It's also cheaper, so there's no reason
17  not to use it.
18     Q.   And the fact that it's more resistant to
19  corrosion, would that indicate that it has a longer
20  useful life than the steel that was used in the
21  original design and build?
22         MR. SNOW: Object to form.
23     A.   I'm going to answer your question the way
24  I understand it.  Individually, yes.  Collectively,
25  no.

Page 82

1      Q.   (By Mr. Roman) And --
2      A.   And for the entire structure, you have not
3  extended the life of the entire structure
4  necessarily by changing out some damaged pieces with
5  some newer, better pieces.  You still have an entire
6  structure; so it's not a betterment by any stretch
7  of imagination.
8      Q.   But you would agree that the newer steel
9  is going to corrode at a slower rate than the steel
10  that it was originally built with; right?
11         MR. SNOW: Object to form.
12     A.   The pieces will corrode less quickly than
13  the original.  The individual pieces, yes.  But it's
14  not -- you haven't -- there's no -- there's no
15  advantage to using anything else because while the
16  steel may be a better quality steel, it's also a
17  cheaper steel.  So that's -- all right.
18         I'm going to be full disclosure.  I'm a
19  car guy, so I like car guy analogies.  And my
20  analogy is I've run around in a 1957 Volkswagen, and
21  I've smashed the original fender that has less
22  quality steel.  And so am I going to go necessarily
23  go out and buy that old original fender?  Well,
24  maybe if I want to be a purist, but if I want a
25  newer fender that has better quality, that's

Page 83

1  cheaper, which it is, I might do that.  And that's
2  what somebody would do.  Does that make any sense?
3      Q.   It does.  And using your analogy, if in a
4  couple of years you wanted to redo the entire body
5  of the car, in all likelihood you're not going to
6  replace the new fender that you just put on a couple
7  of years back.  Right?  You're going to --
8      A.   Well, I said -- I didn't say just died.
9      Q.   Fair enough.  But reasonably speaking,
10  you're not going to replace that new part that you
11  just put in.  You're just going to replace the other
12  older parts; right?
13         MR. SNOW: Object to form.
14     A.   It doesn't work that way.  So if I'm
15  driving around in my '57 Volkswagen and I smashed
16  the fender into the mailbox, well, I'm going to
17  replace that fender.  If my entire car has -- just
18  needs a new paint job, I'm not going to replace
19  anything on it.  Just to paint it.
20     Q.   (By Mr. Roman) Have you reviewed the
21  report from YA Engineering in this case that was
22  offered by Mr. Zane Sadik, I believe his name is?
23     A.   Who -- who is he the expert for?  I mean,
24  if I may ask.
25     Q.   I just want to -- I just want

Page 84

1  (indiscernible) to his experts.
2      A.   No, I haven't seen that one.
3      Q.   You've not seen any?
4      A.   No, I have not seen that.
5      Q.   Would you agree or disagree with one of
6  Mr. Sadik's findings that steel railroad bridges
7  like the Main Line bridge, generally have a 100 to
8  125 year life expectancy?
9          MR. SNOW: Object to form.
10     A.   I haven't read his report.  I can't -- I
11  need to read his report to even potentially consider
12  answering that question.  I just don't have any
13  opinion on what he said.
14     Q.   (By Mr. Roman) Have you reviewed the
15  report of RL Banks & Associates that was co-authored
16  by Nick Mariano and Charlie Cunningham?
17     A.   I read it once.
18     Q.   Do you have any opinions as you sit here
19  as to anything that's been offered in that report?
20     A.   I do not have any opinions.  As I said, I
21  haven't been asked to provide any opinions on it,
22  and I just glanced at it.  I just hadn't spent
23  enough time even to formulate anything.
24     Q.   Are you familiar with RL Banks &
25  Associates at all?



KEVIN M. LUGO P.E.                                    June 15, 2024
MATTER OF COEYMANS MARINE TOWING                     85–88

Page 85

1    A.   With the exception.  The only thing I know
2  about them, a glance from the report is they seem to
3  focus on some consulting in the rail industry.  And
4  I thought it was interesting that they were in
5  Northern Virginia, which is where my home office is.
6  That's about all I know about them.  I really
7  haven't done much with -- I haven't done much of
8  anything in that report.
9    Q.   Are you familiar with them outside of
10  knowing that they're involved in this case at all?
11    A.   No.
12    Q.   Have you been asked by counsel for the
13  Belt Line in this case at any time to collect any
14  documents for production?
15    A.   No.
16    Q.   How about to provide any input on any
17  responses to discovery requests that have been
18  served in this case, like interrogatories or
19  requests for admissions, anything of that nature?
20    A.   I have not.
21       MR. ROMAN:  Why don't we take a few
22    minutes, probably getting close just to run
23    through my notes, if that works?
24       MR. SNOW:  Works, okay.
25       REPORTER:  Going off the record at

Page 86

1  approximately 12:20.
2       (Recess taken)
3       REPORTER:  We can go back on the record if
4    everybody's ready.
5    Q.   (By Mr. Roman) Are you ready, Kevin?
6    A.   I'm ready, sir.
7    Q.   Mr. Lugo, if Mr. Snow or one of his
8  colleagues over at Crenshaw Ware & Martin came to
9  you and said that they were in process of responding
10  to some requests for admission, which in their view
11  required expert testimony within your field and
12  needed some assistance in answering them, would you
13  be willing, ready and able to assist them?
14       MR. SNOW:  Object to form.
15    A.   Well, to answer your question to the best
16  of my ability, I haven't been asked.  If it's
17  something in my field of expertise and I'm asked, I
18  will be happy to help them.
19       MR. ROMAN:  All right.  Sorry.  I think
20    that's all I have for now.  Might have a couple
21    of follow-ups depending on other counsel, but
22    good to meet you and thanks for your time.
23       THE WITNESS:  Thanks, Mike.
24       MR. SNOW:  Mark, do you have anything?
25       MR. NANAVATI:  I have nothing.

Page 87

1       EXAMINATION
2  BY MR. SNOW:
3    Q.   I have just one topic, Mr. Lugo.
4  Obviously, I'm Ryan Snow.  I represent the Belt Line
5  and you know that.
6       A quick follow-up on the discussion you
7  had with Mr. Roman about reasonable degree of
8  certainty.  Do you recall that discussion?
9    A.   I do.
10    Q.   Your expert report that we marked Exhibit
11  2 shows your qualifications with your areas of
12  expertise; doesn't it?
13    A.   It does.
14    Q.   And your CV that was marked as Exhibit 1
15  also shows those areas of expertise; doesn't it?
16    A.   It does.
17    Q.   Are all of your opinions that you express
18  in your report and that you've given today in
19  testimony held to a reasonable degree of certainty
20  in those fields of expertise?
21    A.   Yes.
22       MR. SNOW:  That's all I have.  Thank you,
23    Mr. Lugo.
24       THE WITNESS:  Thank you.
25       MR. ROMAN:  Mark, I think you got nothing

Page 88

1  on that; right?
2       MR. NANAVATI:  Nothing.
3       MR. ROMAN:  I'm good.  Are you reserving
4  right?
5       MR. SNOW:  Yeah.  He'll read and sign.
6       REPORTER:  Great.  Thank you.
7       And this concludes the deposition at
8  12:30.
9       Mr. Roman, are you ordering a transcript?
10       MR. ROMAN:  Yeah.  E-Tran please.
11       Could I get a rough maybe in a couple of
12  days, if you got it.
13       REPORTER:  Sure.  Is Monday okay?
14       MR. ROMAN:  Yeah, it should be fine.
15       REPORTER:  And let's see what else we got
16  here.
17       MR. NANAVATI:  No, I don't need a copy.
18  Thank you.
19       REPORTER:  Okay.  No copy.  How about you,
20  Mr. Snow?
21       MR. SNOW:  Yeah, I will take a copy, but I
22  don't need it expedited or rough.
23       REPORTER:  Okay.
24       MR. SNOW:  Just regular.
25       REPORTER:  Regular copy.  Okay.



KEVIN M. LUGO P.E.
MATTER OF COEYMANS MARINE TOWING

June 15, 2024
89–92

---

**Page 89**

1  (Whereupon, the witness having
2  elected to read and sign,
3  the deposition concluded at
4  12:30 p.m.)
5        - - -

---

**Page 90**

1            CERTIFICATE OF DEPONENT

2

3        I hereby certify that I have read and

4  examined the foregoing transcript, and the same

5  is a true and accurate record of the testimony

6  given by me.

7

8        Any additions or corrections that I feel

9  are necessary, I will attach on a separate

10  sheet of paper to the original transcript.

11

12        _____

13            KEVIN M. LUGO, P.E.

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 91**

1            CERTIFICATION OF NOTARY

2  I, Brian M. McDonald, the officer before whom the

3  foregoing deposition was taken, do hereby certify

4  that the witness whose testimony appears in the

5  foregoing deposition was duly sworn by me; that the

6  testimony of said witness was taken by me

7  stenographically and thereafter reduced to

8  typewriting by me; that said deposition is a true

9  record of the testimony given by said witness; that

10  I am neither counsel for, related to or employed by

11  any of the parties to the action in which this

12  deposition is taken and further, that I am not a

13  relative or employee of any attorney or counsel

14  employed by the parties thereto, nor financially or

15  otherwise interested in the outcome of this action.

16        _____

17            Brian M. McDonald

18            Notary Public

19    My Commission Expires: February 15, 2029

20      Dated this 27th day of August 2025

21

22

23

24

25

---

**Page 92**

1  Reference No.: 13278480

2

3  Case:  MATTER OF COEYMANS MARINE TOWING

4      DECLARATION UNDER PENALTY OF PERJURY

5        I declare under penalty of perjury that

6  I have read the entire transcript of my Depo-
   sition taken in the captioned matter or the

7  same has been read to me, and the same is
   true and accurate, save and except for

8  changes and/or corrections, if any, as indi-
   cated by me on the DEPOSITION ERRATA SHEET
   hereof, with the understanding that I offer
   these changes as if still under oath.

10

11        _____

12            Kevin M. Lugo P.E.

13

14        NOTARIZATION OF CHANGES

15            (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)              Notary Public,

24

25  in and for the State of _____

---



Page 93

```
1    Reference No.: 13278480
     Case:  MATTER OF COEYMANS MARINE TOWING
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24
     SIGNATURE:_____DATE:_____
25   Kevin M. Lugo P.E.
```

Page 94

```
1    Reference No.: 13278480
     Case:  MATTER OF COEYMANS MARINE TOWING
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24
     SIGNATURE:_____DATE:_____
25   Kevin M. Lugo P.E.
```

