# Exhibit 3

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2               Norfolk Division
                  In Admiralty
 3               CIVIL ACTION
               NO: 2:24-cv-00490
 4
 5  In the Matter of COEYMANS    :
    MARINE TOWING, LLC D/B/A     :
 6  CARVER MARINE TOWING as Owner:
    and Operator of M/T Mackenzie:
 7  Rose (IMO No. 8968765) her   :
    cargo, engines, boilers,     :
 8  tackle, equipment, apparel,  :
    and appurtenances, etc., in  :
 9  rem, petitioning for         :
    Exoneration from or          :
10  Limitation of Liability in   :
    allision with Norfolk and    :
11  Portsmouth Belt Line Railroad:
    Company Main Line Railroad    :
12  Bridge occurring June 15,    :
    2024 in and about the        :
13  Elizabeth River, Virginia    :
                                 :
14
15            DEPOSITION VIA ZOOM OF
16              LEE R. LENTZ, P.E.
17           Tuesday, August 12, 2025
18                 10:00 a.m.
19   Witness location:  Mechanicsburg, Pennsylvania
20
21
22
23
24
25  Maureen Stewart, RPR and Notary Public (Remote)
```

## Page 2

```
 1  REMOTE APPEARANCES:
 2
    ATTORNEYS FOR COEYMANS MARINE TOWING, LLC d/b/a
 3  CARVER MARINE TOWING:
 4          CLYDE & CO US LLP
            BY:  MICHAEL J. ROMAN, ESQUIRE.
 5          30 S. Wacker Drive, Ste. 2600
            Chicago, IL 60606
 6          Michael.Roman@clydeco.us
 7
 8  ATTORNEYS FOR NORFOLK AND PORTSMOUTH BELT LINE
    RAILROAD COMPANY:
 9
            CRENSHAW, WARE & MARTIN, P.L.C.
10          BY:  W. RYAN SNOW, ESQUIRE
            150 W. Main Street, Suite 1923
11          Norfolk, Virginia 23510
            wrsnow@cwm-law.com
12
    COUNSEL FOR EVANSTON INSURANCE COMPANY A/S/O
13  NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY:
14  SINNOT, NUCKOLS & LOGAN, P.C.
            BY:  G. CHRISTOPHER JONES, JR., ESQUIRE
15          13811 Village Mill Drive
            Midlothian, Virginia 23114
16          Cjones@snllaw.com
17
18  ALSO PRESENT:
19          Cannon Moss (via Zoom)
20
21
22
23
24
25
```

## Page 3

```
 1               INDEX OF EXAMINATION
 2  WITNESS:  LEE R. LENTZ, P.E.
 3  EXAMINATION                          PAGE
 4   BY MR. ROMAN                       4, 100
 5   BY MR. SNOW                           96
 6
 7
 8
 9
10
11            INDEX TO EXHIBITS
12  MARKED          DESCRIPTION           PAGE
13  Exhibit 1       Lentz CV               29
14  Exhibit 2       Lentz Rprt.            29
15  Exhibit 3       Document List          29
16  Exhibit 4       Amended Notice of Dep. 89
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              * * *
 2        LEE R. LENTZ, P.E., having been duly
 3  remotely sworn, was examined and testified as
 4  follows:
 5              * * *
 6        EXAMINATION BY MR. ROMAN
 7              * * *
 8  BY MR. ROMAN:
 9     Q.  Good morning, Mr. Lentz.  Again, my name
10  is Michael Roman.  I am one of the attorneys who
11  represent the Petitioner, Coeymans Marine Towing,
12  LLC, in this matter and the vessel.  Could you
13  please state your name?
14     A.  Lee Lentz.
15     Q.  And it's my understanding you have been
16  retained by Norfolk and Portsmouth Belt Line
17  Railroad Company to provide some expert opinions in
18  this case?
19     A.  Correct, through CW&M.
20     Q.  And that's through the Belt Line's
21  counsel?
22     A.  Correct.
23     Q.  And if I refer to Norfolk and Portsmouth
24  Belt Line Railroad Company as the Belt Line, are we
25  on the same page; that that's the company I'm
```



LEE R. LENTZ P.E.
COEYMANS MARINE TOWING

August 12, 2025
5–8

Page 5

1  talking about?
2      A.  Yes.
3      Q.  Have you ever done expert witnessing work
4  before?
5      A.  No.
6      Q.  And you are affiliated with the firm,
7  Modjeski & Masters; correct?
8      A.  Correct.
9      Q.  And it looks like you have been there for
10  almost 25 years or so?
11      A.  1998, I started here, yes.
12      Q.  And what does Modjeski & Masters do?
13      A.  We are a consulting engineering firm that
14  provides engineering services for bridges.
15      Q.  What is your current role with the
16  company?
17      A.  My current role is Senior Project Manager
18  and Assistant director Of the Movable Bridge
19  Business Unit.
20      Q.  What was your position with the company
21  when you first started years ago?
22      A.  I guess we would call that engineer 1.
23      Q.  And then if you could, just briefly, take
24  me through your progression with Modjeski & Masters
25  over the years, you know, various positions and

Page 6

1  roles that you have held, that type of thing?
2      A.  Okay.  There is five, call it, staff
3  engineer positions, worked from E1 to E5.  Maybe the
4  key milestone there, E3 is when you get your
5  Professional Engineering license.  E5 is senior
6  engineer.
7      I am not sure when exactly -- E3 was
8  probably 2003.  I am not sure about E5, but went
9  into management in 2012.  So a project manager in
10  2012, Senior Project Manager 2019, and just this
11  year, the assistant director position, in 2025.
12      Q.  So that would be, recently, you were
13  promoted up to the director position, assistant
14  director position?
15      A.  Correct.
16      Q.  Generally, what does a project manager do
17  at Modjeski & Masters?
18      A.  They are primarily responsible in charge
19  of teams of engineers that perform engineering
20  service and they are the responsible reviewer for
21  deliverables.  They propose the work and estimate
22  it.  That's primarily the role.
23      Q.  And then what are the differences, if any,
24  between a Project Manager and a Senior Project
25  Manager?

Page 7

1      A.  Yeah, it's probably hard to differentiate.
2  The roles are very similar.  I think the project
3  size just expands in the senior project management
4  position.
5      Q.  So larger, maybe more complex projects
6  that you are overseeing as a senior PM as compared
7  to a regular PM?
8      A.  That's correct.
9      Q.  How many projects have you overseen in
10  either a PM or a senior PM role during your time at
11  Modjeski & Masters?
12      A.  Probably, over 100.  Probably, hundreds.
13  I am not sure.
14      Q.  And how many of those projects would be
15  for work on some type of a railroad asset such as a
16  steel railroad bridge?
17      A.  Our work encompasses, probably, 50 percent
18  railroad and 50 percent highway.  So I would say,
19  half.
20      Q.  And you said the other 50 percent was
21  highway?
22      A.  Yes.
23      Q.  Prior to your engagement by the folks at
24  Crenshaw, Ware & Martin for this case, had you ever
25  done any projects for the Belt Line before?

Page 8

1      A.  No, not to my knowledge.
2      Q.  How about for Norfolk Southern Railroad
3  Company?
4      A.  Yes, we have worked for Norfolk Southern.
5      Q.  How many projects have you done with
6  Norfolk Southern?
7      A.  Oh, boy, probably, I'm going to say,
8  dozens.  Two or three dozen projects over the years
9  with them.
10      Q.  And were all of those while you were
11  employed by Modjeski & Masters?
12      A.  Yes.
13      Q.  Did you -- well, you are a licensed
14  Professional Engineer; correct?
15      A.  Correct.
16      Q.  And when did you first obtain your
17  Professional Engineering license?
18      A.  2003.
19      Q.  When did you complete your education?
20      A.  In 1998?
21      Q.  And where did you go to school?
22      A.  Penn State University in Harrisburg,
23  Pennsylvania.
24      Q.  VIVI Line, huh?
25      A.  Yep.



LEE R. LENTZ P.E.
COEYMANS MARINE TOWING

August 12, 2025
9–12

1    Q.   Did you go there for undergrad -- well,
2  what are your degrees?
3    A.   My only degree is a Bachelor of Science in
4  mechanical engineering technology, Penn State.
5    Q.   And is that a four-year program?
6    A.   It actually is a two year -- back then, it
7  was a two-year junior/senior level program.  So I
8  went to a private school, Grove City College, for
9  two years under a regular BSME program and
10  transferred to Penn State Harrisburg for their MET
11  junior/senior program.
12    Q.   I am a couple of miles down the road from
13  Grove City as we sit, so I am familiar with it.
14    A.   I grew up out there, so that's how I
15  landed there.
16    Q.   And then what did you do between
17  graduating Penn State in '98 and joining Modjeski &
18  Masters?
19    A.   I started at Modjeski & Masters before I
20  graduated, so I didn't do anything between.
21    Q.   And so you have been there your entire
22  career?
23    A.   Correct.
24    Q.   For those two or three dozen projects that
25  you did for Norfolk Southern, I mean, where were

1  they located?  All over the country?  Specific
2  areas?  Can you give me some background on that?
3    A.   Yes.  They varied between, you know,
4  inspections to rehabilitation designs and
5  construction support during construction, some
6  testing, but, yeah, I remember one in Detroit, one
7  in Wilmington, Delaware, one down in Louisiana,
8  probably, some others in Michigan, some in Upstate
9  New York.  So kind of all over the country.
10  Virginia, yeah.
11    Q.   And when you say, inspections, what types
12  of inspections do you regularly perform through your
13  work with Modjeski?
14    A.   We will perform special inspections, such
15  as those that are needed after an emergency event
16  like a seismic event or flooding or an allision like
17  this particular case.  We will perform regular
18  interval inspections -- this is on the DOT and the
19  railroad side -- or troubleshooting inspections.
20  For movable bridges, there is a good bit of
21  troubleshooting that has to occur based on
22  bridge-operating behavior.
23    Q.   Have you ever performed any inspections on
24  the Main Line Bridge, the one that is involved in
25  the lawsuit we are here to talk about?

1    A.   I had not, and to my knowledge, Modjeski &
2  Masters has not.
3    Q.   Did you inspect the Main Line Bridge at
4  any time as part of your involvement as an expert in
5  this case?
6    A.   Yes, yes.
7    Q.   And when was that?
8    A.   Oh, boy, it was pretty recent.  I want to
9  say, it was August 5th, last week.
10    Q.   Was that your only inspection that you
11  performed on the Main Line Bridge?
12    A.   Yes.
13    Q.   Had you inspected the bridge before
14  formulating your opinions and report that was
15  disclosed?
16    A.   No.
17    Q.   Did your inspection of the bridge on
18  August 5th modify or change any of the opinions or
19  information that is contained in your report?
20    A.   No.
21    Q.   Who all was present for that inspection?
22    A.   Adam Reeder from the Belt Line and
23  Mackenzie Pensyl from CW&M and myself.
24    Q.   If you could, take me through your process
25  for the inspection, you know, how long it took, what

1  you did that day, on the 5th?
2    A.   Sure.  Yeah.  Let's see, I came in and met
3  at the Belt Line office there with Mackenzie and
4  Adam Reeder just to go over how we can go about
5  accessing the bridge, the property and actually rode
6  with Adam, so that we could just stay in his
7  vehicle, had a safety briefing on what protection we
8  would have out there.  And came up on the west side
9  near span four on the new access road as our access.
10  And I had a printout of the engineer's repair plans
11  with me and I just used those as my map to access
12  the repairs and see them firsthand, watched bridge
13  operation and watched train passage, probably, out
14  there for two to three hours and that was about it.
15    Q.   And the plans that you had, were those the
16  Hardesty & Hanover plans?
17    A.   Yes.
18    Q.   And did you have any plans from PCL?
19    A.   No.
20    Q.   And you saw the lift system in action, so
21  to speak, operating?
22    A.   Correct.
23    Q.   Do you know, was that a regularly
24  scheduled operation or was that something that the
25  Belt Line arranged for you to do for your



LEE R. LENTZ P.E.
COEYMANS MARINE TOWING

August 12, 2025
13–16

Page 13

1 inspection?
2    A.   It ended up being it needed lowering for a
3 train that just happened to work out while I was
4 there.  We were planning a special scheduled
5 operation for me, but that worked out.
6    Q.   And, again, the inspection that you did
7 last week is not changing any of your opinions that
8 you have offered in this case; right?
9    A.   Correct.
10    Q.   When were you first retained in this case?
11    A.   Oh, boy, my recollection, it probably
12 would have been the month of June this year.
13    Q.   Did Modjeski & Masters have any
14 involvement at all in any of the work that was done
15 on the Main Line Bridge prior, you know, separate
16 from your engagement as an expert in this case?
17    A.   No, not to my knowledge.
18    Q.   I think your report includes your rate
19 schedule, right -- which we will get into a little
20 bit later, the actual substance of the report.  But
21 the rates that are reflected in the report, are
22 those accurate and up-to-date rates that you are
23 charging for your expert work?
24    A.   Yes.
25    Q.   As you sit, do you have an estimate of how

Page 14

1 much time you have put into the file?
2    A.   Let's say, probably, 50 hours.
3    Q.   If you could breakdown that 50 hours, what
4 went into it between -- I saw that you reviewed some
5 information, some documents, obviously, drafted the
6 report, if you could break that down.
7    A.   I would probably say, 50 percent was
8 review of documents, 20 percent the report itself
9 and then, say, 10 percent was the site view and then
10 the rest would be, kind of, just revisiting things
11 in preparation for this, just so I had a little
12 better recall for today's deposition.
13    Q.   Is the engagement with the Belt Line
14 through their attorneys with Modjeski & Masters,
15 Inc. or are you doing it separately, as an
16 individual?
17    A.   No.  It's with Modjeski & Masters.
18    Q.   So that's the party or Modjeski & Masters
19 is the actual party to the agreement and then you
20 are doing the work under them?
21    A.   Correct.
22    Q.   As I understood it, as part of your review
23 of the file, you interviewed Howard Swanson and
24 Cannon Moss?
25    A.   Correct, virtually, Teams calls.

Page 15

1    Q.   And when was your interview with Mr. Moss?
2    A.   July 1st.
3    Q.   Was anyone else present for that
4 interview?
5    A.   Mackenzie Pensyl, myself and then I had an
6 electrical engineer and a mechanical engineer on
7 with me that were helping me with reviewing the
8 facts of the case and then Cannon.
9    Q.   Those two engineers you referenced, are
10 those your colleagues at Modjeski & Masters that are
11 working with you on the file?
12    A.   Correct.
13    Q.   And what are their names?
14    A.   Elizabeth Sample and Thien Pham.  Thien is
15 T-H-I-E-N and the last name P-H-A-M.
16    Q.   Has anyone else worked on the file with
17 you, other than Ms. Sample and Mr. Pham?
18    A.   There was a structural representative,
19 Michael Alestra, A-L-E-S-T-R-A.  And then --
20    Q.   What is --
21    A.   Go ahead.
22    Q.   I apologize if I cut you off.  Were you
23 finished?
24    A.   There were two other Project Managers I
25 had on, but I honestly don't know if they ended up

Page 16

1 having, you know, much time on it, but Richard
2 Jackson and Braden Brajkovich.  Brajkovich is
3 B-R-A-J-K-O-V-I-C-H.
4    Q.   What is Ms. Sample's background?
5    A.   She is a mechanical engineer, a senior
6 mechanical engineer here, at Modjeski & Masters.
7    Q.   Do you have a copy of your report in front
8 of you?
9    A.   Yes.
10    Q.   If you need to reference it at any time,
11 just let me know.  So is Ms. Sample -- I am looking
12 at the rate sheet, would she be the E5 title?
13    A.   That's correct.
14    Q.   And then how about Mr. Pham, what is his
15 background?
16    A.   He's an electrical engineer, a
17 Professional Engineer.  I believe he's an E4.
18    Q.   And then how about Mr. Jackson, what is
19 his background?
20    A.   He has a structural background.  He's vice
21 president, so he would be an E8.
22    Q.   And then I'm sorry, is it Ms. or Mr.
23 Brajkovich?
24    A.   Yes, Mr. Brajkovich.  Braden, he's an
25 electrical project manager, E6.



Page 17

1    Q.   So the 50 hours that you referenced
2  earlier, was that 50 hours that you, personally,
3  have put into the file or was that total for the
4  Modjeski & Masters?
5    A.   I think that would be close to what I have
6  put in.  I guess the rest of the team, if you added
7  them all up, it would probably be 50 to 100.  I
8  honestly am not sure.
9    Q.   And what were the, sort of, roles that
10  your team, the folks that we were just talking
11  about, had on the project for the file?  Who was
12  reviewing what or drafting; if you could break that
13  down?
14    A.   Sure.  I was supervising them, similar to
15  like a project that we would run on any other
16  project and put them on like a fact-finding mission.
17  I should have Betsy Reiner on there, too.  She's our
18  cost estimating engineer.  So Betsy Reiner,
19  R-E-I-N-E-R.  She's a structural engineer who
20  specializes in specifications and costs -- cost
21  estimating and she's an E5.  So that would have been
22  the team.
23    Q.   And do you have any involvement in the
24  billing process at Modjeski & Masters?  And what I
25  mean by billing process, I mean the actual, you

Page 18

1  know, generation of the bills and transmittal and
2  getting them paid or is that handled by a separate
3  department?
4    A.   The project managers do review prebills,
5  as they are called, which would be our direct
6  charges each month and then we give direction to our
7  accounting staff on any nuances having to do with
8  those prebills and whether or not they can go ahead
9  and bill on a monthly basis and then we typically
10  will review invoices sent to clients on a monthly
11  basis, but they are generated, primarily, by our
12  accounting group.
13    Q.   Do you know whether or not Modjeski &
14  Masters has issued any invoices for your work on
15  this project?
16    A.   I believe there would be just -- the first
17  one would probably be coming up soon and that would
18  be for billings through the end of July.
19    Q.   So as far as your understanding, the Belt
20  Line or counsel has not actually received an invoice
21  yet from Modjeski, but will soon?
22    A.   I think so, yes.
23    Q.   How long did that interview with Mr. Moss
24  last back on the 1st?
25    A.   I would have to estimate, probably, 40

Page 19

1  minutes.  A half hour, 40 minutes.
2    Q.   And what was your goal of that meeting
3  with Mr. Moss?  What types of information were you
4  looking for and questions you had, that type of
5  thing?
6    A.   It was mostly clarification questions to
7  get a better understanding on the Bridge Management
8  Program, some of the steps taken within that
9  program, especially, the ratings and when they
10  occurred and who did them.  And if there was
11  anything that we hadn't seen in terms of work since
12  the allision and the repairs that we should be
13  taking into account, especially, inspection, rating,
14  asked a lot about if the repair work had, like, a
15  known impact in terms of improvement on the rating
16  of the bridge.
17        We asked about all electrical repair
18  planning because that really was handled, kind of,
19  in a different way.  The repairs, from an electrical
20  standpoint, didn't necessarily show up on formal
21  engineering design drawings.  So we talked a lot
22  about that.
23    Q.   Correct me if I'm wrong, but as I
24  understand it, you are not offering any opinions on
25  what the expected useful service life of the Main

Page 20

1  Line Bridge is or was at any time; correct?
2    A.   Correct.
3    Q.   So the information that you were
4  requesting of Mr. Moss in relation to if there were
5  betterments or extensions of the service life of the
6  bridge, was that all just background for your
7  opinions that you are offering in this case?
8    A.   Yes.
9    Q.   For that category of information about
10  whether there was additional work that you either
11  done or planned to be done that you had not reviewed
12  in the documents, what did Mr. Moss report in that
13  regard?
14    A.   He clarified for us that what looked to be
15  they were on the verge of doing a brake replacement
16  for the span drive machinery had not occurred to
17  that -- at that time due to lead time issues and
18  then clarified that counterweight rope -- the main
19  counterweight wire ropes were not replaced, but may
20  be in a future project planned to be replaced.
21  Those were the two main items.
22    Q.   And then what did Mr. Moss report on for
23  the status of the bridge at that time?
24    A.   Yeah, I am sure we got into that.  It's my
25  understanding that everything was fully functional.



Page 21

1 At the time of our call, my understanding things
2 were fully functional, even the remote operations in
3 February of this year.
4    Q.   And when you had that discussion with Mr.
5 Moss, had you already completed or at least done a
6 substantial portion of your file review and had
7 looked at the invoices and the things that you
8 referenced in your report?
9    A.   Yes.  The report not complete, but it was,
10 kind of, like the final step before I completed the
11 report.
12    Q.   Was there any information that you
13 obtained during that interview with Mr. Moss that
14 changed any of your, kind of, analysis of those
15 documents that you had already reviewed?
16    A.   No.
17    Q.   And I think you also had an interview with
18 Mr. Howard Swanson; correct?
19    A.   That's correct.
20    Q.   And when did you speak with Mr. Swanson?
21    A.   June 30th.
22    Q.   So that would have been shortly before you
23 had the discussion with Mr. Moss?
24    A.   Correct.
25    Q.   And who was all present for that

Page 22

1 conversation?
2    A.   I do not have that listed.  I wouldn't
3 doubt it was a similar group, but I don't have it
4 listed.
5    Q.   Do you recall how long your discussion
6 with Mr. Swanson was?
7    A.   I think it was similar.  It was probably a
8 little longer than Mr. Moss, so I would guess more
9 like 45 minutes to an hour.
10    Q.   Had you read the transcript of Mr.
11 Swanson's deposition at the time that you had
12 interviewed with him?
13    A.   I don't recall.  I am guessing, yes, I did
14 and it was probably the preliminary version or the
15 version prior to finalization.  I am not sure what
16 it is called.
17    Q.   The rough transcript?
18    A.   Yes.
19    Q.   Was there any particular information that
20 was lacking from that deposition transcript that you
21 read that you had asked -- that you asked Mr.
22 Swanson about or, kind of, had on your note sheet to
23 follow-up with him in that discussion?
24    A.   From the deposition -- you know, most of
25 our follow-ups, I am not sure if they came generated

Page 23

1 from the deposition.  I think most of our follow-ups
2 came just from seeing their design repair plans and
3 then reviewing invoicing and all of the other
4 documents, just trying to fill in some areas of
5 question, but I don't know if it specifically had to
6 do with reviewing his deposition.
7    Q.   What were those areas of follow-up that
8 you went into the meeting with a goal of finding out
9 from Mr. Swanson?
10    A.   Most of them were pretty detailed
11 questions about the scope of repairs and how they
12 transpired and trying to better understand if an RFI
13 came in, what -- you know, what was precipitating
14 that for PCL and whether or not it was part of the
15 original planned work.  I have seen it in other
16 depositions, too, maybe, but examples were like they
17 had, had some drilling that had to be done in the
18 field and then that drill oil got on painted members
19 that were already out for the repair and damaged
20 that and they had to go fix the paint, like really
21 detailed things that we wanted to make sure, you
22 know, is there something here that was anyone's
23 fault in particular that would be unfairly
24 transferred onto someone else in terms of cost.  So
25 the paint thing was one.

Page 24

1       The crack-arrest hole they performed while
2 they were in one of the bays doing emergency repair
3 work; that was another RFI.  And we went through --
4 like we did with Mr. Moss, we went through some of
5 the, call it, repair descriptions that were on the
6 side that we never saw come to fruition and
7 reconfirmed, you know, did the brake work get done;
8 and if so, why was that part of the emergency
9 repairs, those kind of questions.  Did the
10 counterweight ropes get replaced; and if so, why is
11 that part of the emergency repairs.  And neither of
12 those were performed as part or the work.
13       So we were just trying to confirm if
14 anything came into the emergency repair work that
15 might not have been related to the allision, and we
16 could not find anything through our discussions or
17 through our review of the file.
18    Q.   Just so I am understanding correctly --
19 well, was there any work identified that was not
20 related to the allision on June 15th, 2024, based on
21 your discussion with Mr. Swanson?
22    A.   No.
23    Q.   And I think one of the areas you asked him
24 was to clarify, sort of, the process that the
25 repairs were done, the order?



LEE R. LENTZ P.E.
COEYMANS MARINE TOWING

August 12, 2025
25–28

Page 25

1    A.   Not necessarily.  It was just those things
2  that seemed to pop up, to us, outside of their
3  design plans, like, the damaged paint and the
4  crack-arrest hole.
5        I will go back and say the crack-arrest
6  hole, which we have seen other people discuss in the
7  file, was not part of the allision, but it was, you
8  know, like a couple hundred dollar repair that was
9  done.  They arrested a hole by -- arrested a crack
10  by drilling a hole at the end of it while they were
11  in a certain bay at span four.  So that would be one
12  thing that would not be part of the allision, but we
13  didn't get into sequence necessarily with Howard.
14  That was all pretty clear through the repair plan
15  layout.
16        We asked Howard, like Mr. Moss, about the
17  ratings and if it would have been likely that the
18  allision repairs would change the rating, and the
19  feedback we got, that it would not.  There's a bunch
20  of members still out there today that were not
21  things that were controlling elements, if you will,
22  of the rating.
23    Q.   Do you recall, as you sit, which members
24  those are?
25    A.   Span four has eight or ten floorbeams;

Page 26

1  those are the main beams that are transverse to the
2  span, and two of them were repaired.  The vast
3  majority of them were not.  And floorbeams are the
4  controlling element of the rating.
5    Q.   Was there any particular floorbeam that
6  was the controlling member?
7    A.   The rating summary, which I think the
8  latest one within the Bridge Management Program as
9  an appendix, just lists the style -- or not the
10  style -- the type of response that the floorbeams
11  have to make in bending and the floorbeams, in
12  general.  They don't specify, you know, any
13  individual floorbeam.  It just, in general, says
14  floorbeams, plural.
15        So it's likely that it's -- I don't know
16  exactly which ones would be controlling, but it's
17  multiple floorbeams.  It's likely that it is
18  multiple floorbeams and they are similar response,
19  similar detail, similar size.
20    Q.   In all of the work that you have done on
21  the file and in relation to the Main Line Bridge
22  through your file document review, discussions with
23  Mr. Moss and Mr. Swanson, have you received or come
24  across any information that indicates that there was
25  a particular floorbeam or set of floorbeams that

Page 27

1  were the controlling member for the rating at any
2  time?
3    A.   No.
4    Q.   So the best is that you are basing the
5  information on what is contained within the Bridge
6  Management Program?
7        MR. SNOW:  Object to form.
8        MR. ROMAN:  You can answer, Mr.
9  Lentz.  And if you need me to clarify, just let me
10  know.
11        THE WITNESS:  Maybe repeat and
12  rephrase.
13  BY MR. ROMAN:
14    Q.   I just want to make sure that I'm
15  understanding correctly that the rating indicates
16  that the controlling member was the floorbeam member
17  bending -- I'm sorry -- is that based off of, in
18  part, the information that is contained in the
19  Bridge Management Program?
20    A.   That's correct.
21    Q.   And then are you basing that on any other
22  information, like a document just somewhere in your
23  file, as well, or just the Bridge Management
24  Program?
25    A.   I think it's just the Bridge Management

Page 28

1  Program.
2    Q.   Are you offering any opinions on whether
3  span four of the Main Line Bridge was a total loss
4  after the allision?
5    A.   I am not sure I understand the question.
6    Q.   Well, I think it's in your report that you
7  noted that the bridge was rendered unusable as a
8  result of the allision; right?
9    A.   That is correct.
10    Q.   And I think we talked about that you are
11  not offering any opinion as to what the expected
12  useful service life of the bridge was either before
13  or after the allision; correct?
14    A.   Correct.
15        MR. SNOW:  Just to clarify on that,
16  Mike, he's not been asked to offer those opinions as
17  of today, but we still have rebuttal expert reports
18  on August 22nd, and so things could change.  I don't
19  want anything to be mislead by that question and
20  answer.
21        MR. ROMAN:  Hey, all I can do is
22  operate as of today, Ryan.  So whatever you have got
23  coming down the pipe, we'll deal with it then.
24  BY MR. ROMAN:
25    Q.   I guess, let me ask this:  Have you been



Page 29

1 asked or are you providing any opinions on the value
2 of the bridge, the monetary value of the bridge,
3 either before or after the allision of June 15th,
4 2024?
5     A.  Nothing beyond the last part of my report
6 where we discuss likely cost of construction on
7 replacement of a bridge of this type and size.
8     Q.  You have never been asked to take a look
9 at the documents and say that the value, the
10 financial value, of the bridge was X as of a certain
11 date; right?
12    A.  No.
13       MR. ROMAN:  I am going to -- Madam
14 Court Reporter, I think we're going to enter some
15 exhibits.  And Ryan and Chris, I think we'll do the
16 CV as Exhibit 1, we'll mark the report as Exhibit 2
17 and then the document list as Exhibit 3.
18       (Whereupon, documents were requested to be
19 marked as Exhibit 1, 2 and 3.)
20 BY MR. ROMAN:
21    Q.  And do you have those three documents in
22 front of you, Mr. Lentz?
23    A.  Just the report.
24    Q.  I can pull it up, too.  I prefer if we
25 could -- because I have it printed out.  If I need

Page 30

1 to share my screen, I can, but I would prefer if we
2 can --
3     A.  Yes, that would be great.
4     Q.  Can you see that?  That's a two-page
5 document that lists the summary of some of your
6 projects and background?
7     A.  Mm-hmm, yes.
8     Q.  Is this a document -- was this something
9 that you created for this project for your expert
10 work or was this an existing document that you had
11 handy around the time that you were engaged?
12    A.  The latter, it was an existing document.
13    Q.  Do you maintain, in the regular course of
14 business, a curriculum vitae or resume?
15    A.  I should be, but I don't necessarily do it
16 on a regular basis.  It is more based on when we're
17 going after a job, I guess, that's how I'll answer
18 that.
19    Q.  When did you create the document that
20 we're looking at?
21    A.  Let's see, this would have been -- it
22 appears as though, it's like a pursuit for something
23 in Louisiana, obviously.  It's within the last year
24 because it lists my years of service, 26 years.
25    Q.  And I take it, that this is not a complete

Page 31

1 list of the projects that you have worked on over
2 your career; correct?
3     A.  That's correct.
4     Q.  And how did you determine to include these
5 particular projects that are referenced on Exhibit
6 1?
7     A.  It was geared toward a particular pursuit
8 with a particular client, so it would have been
9 regionally focused.  Like, from a geographic
10 perspective, it would have been technically focused
11 from the type of work performed that would match
12 what they were advertising that we're competing for
13 and it would have been focused, basically, on
14 probably style of bridge, like, movable bridge style
15 as well.
16    Q.  And what was your involvement on the 4th
17 Street Bridge rehabilitation project?
18    A.  Curbing to grade, we would say.  That one
19 was a project where we were involved with scoping
20 from the beginning when it was an existing bridge
21 that we went out and inspected and scoped -- created
22 a scope for the DOT, listing what we think needed to
23 be replaced or repaired and I was part of the design
24 team that created the plans and specifications for
25 the repairs and then I was an inspector that came

Page 32

1 out on-site and observed construction and then in
2 the office reviewed contractor submittals, RFIs and
3 then witnessed testing in the shop and the field as
4 the work was completed to confirm it was performed
5 to the contract.
6     Q.  And then what about your involvement on
7 the Westlake Swing Bridge Rehab project for the UP?
8     A.  Managed that project in terms of the
9 mechanical portions.  So I had some other mechanical
10 engineers perform the work and then I would
11 coordinate with other groups, other offices, other
12 departments in the design process.  That one, I did
13 not get involved as much during construction.  It
14 was more on the front end when we were scoping the
15 job, investigating the best way to address their
16 issues.
17       They are close to the water there, so they
18 really had an initiative to raise equipment up above
19 certain flood stages and I was involved with
20 producing the contract documents that the contractor
21 ended up bidding on.  But then once it went to
22 construction, I don't believe I did much in terms of
23 construction monitoring on that one.
24    Q.  Are there any differences between a
25 rehabilitation project versus a repair project



Page 33

1 versus a modification project --
2    A.   Not --
3    Q.   -- on a railroad bridge?
4    A.   Rehab and rehabilitation are pretty
5 similar.  Sometimes, we might label something a
6 modification if it is changing -- there is a
7 significant change in the mode by which certain
8 systems operate.  If you go from, like, an
9 electromechanical drive to a hydraulic drive, for
10 example, that would be a modification from, like,
11 the original system on the bridge, but otherwise,
12 they are all updating and upgrade -- updating
13 existing bridges with new equipment.
14    Q.   And how old was the 4th Street Bridge that
15 you worked on?
16    A.   I believe that one was from the 1950s.
17    Q.   And in the second sentence in the box, it
18 says, this was a continuation of previous design
19 work orders in which M&M designed the necessary
20 rehabilitation to extend the structure of the life
21 by 40 years.  Were you involved in that aspect of
22 the project at all?
23    A.   No.  I think our office replaced the deck
24 elements.  The deck elements are a wearing element
25 in terms of how slippery it can get and also an open

Page 34

1 bridge deck is required usually on movable bridges
2 because of wind and ice effects -- not ice down
3 there so much, but wind.  So it is nice to have an
4 open deck as opposed to solid and those open bridge
5 decks, those typically wear out or start showing
6 signs of fatigues and requiring a lot of maintenance
7 and repair.  So I think that had to deal with
8 replacing the deck on the bridge.
9    Q.   And it was replacing the deck that, in
10 part, extended the life of that railroad bridge?
11    A.   Yeah.  It's like any element that you can
12 go in that's wearing out or showing signs of wearing
13 out, if you can replace it, it kind of gives you a
14 little restart.
15    Q.   And would that be true on a
16 member-by-member basis on a railroad bridge?
17         MR. SNOW:  Object to form.
18         THE WITNESS:  Maybe if you can just
19 say the whole question, maybe I can answer it
20 better.
21 BY MR. ROMAN:
22    Q.   Meaning if you -- yeah.  You know, if you
23 see a member that's wearing out, it has some wear
24 and tear like you referenced and then you replaced
25 that member with a new part, would that, generally

Page 35

1 speaking, extend the life of the structure after you
2 made that replacement?
3         MR. SNOW:  Object to form.
4         THE WITNESS:  Yeah, it's probably
5 hard to say.  There is an improvement on the
6 element-by-element basis, but it is hard to say what
7 you have done for the entire bridge when you are
8 just looking at one element.  I am not sure.
9 BY MR. ROMAN:
10    Q.   In your work with Modjeski & Masters, have
11 you ever worked on a project where you determined or
12 made an opinion about what the useful life
13 expectancy of a steel railroad bridge was?
14    A.   Maybe not in terms of a number, but I have
15 certainly been involved with, you know, taking logs,
16 so to speak, from railroad owners -- not all
17 maintain records or have records because they have
18 had different ownerships, but -- and get logs of
19 live load, which would be the trains, and apply
20 those and the cycles by which they have gone across
21 the bridge and then what can be -- I don't know if I
22 would call it common, but you can go and do testing,
23 which our company does and you can monitor a group
24 of members on a bridge cross section and have trains
25 go over it and you see the response of the members

Page 36

1 and that gets you a little beyond the theoretical in
2 the office analysis of a bridge and you might be
3 able to take a little more liberties in terms of,
4 oh, you know, we get a little more composite
5 response of the deck to the floorbeams to the
6 stringers, so we can tweak how the bridge rates and
7 especially considering what traffic it has had on it
8 over its life.  But, yeah, it's really not common or
9 commonplace or typical that you put a year -- years
10 on it, you know, like a life number.
11    Q.   And I think you might have just answered
12 it, but what is the process or processes that you
13 would use to make that determination of what the
14 useful service life of a railroad bridge is?
15         MR. SNOW:  Object to form.
16         THE WITNESS:  Again, the answer
17 probably -- the answer to the process or what spits
18 out at the end of the engineering analysis might not
19 be the years, but it could be a strengthening of a
20 certain member, so that the stress level comes down,
21 but the process is a combination of inspection and
22 testing with known loads going over the bridge and
23 then a model in the office that takes those loads
24 and analyzes the response of the bridge cross
25 section.  You know, it's taking basically a



Page 37

1 theoretical model and a rating analysis based on
2 guides specifications for our industry, but then
3 going ahead and doing some real-world testing to see
4 if there is any other benefits you could take ahold
5 of and improve things and it might highlight an area
6 that needs reinforcement to help the bridge respond
7 better and keep the stress ranges lower. So that's
8 what would be spit out.
9        It wouldn't necessarily be, like, okay,
10 now, you have X number of years.
11 BY MR. ROMAN:
12    Q.  And would reducing, or I should say,
13 increasing the stress capacity on a steel component,
14 generally, increase the useful service life of that
15 structure?
16        MR. SNOW:  Object to form.
17        THE WITNESS:  Not necessarily.  It's
18 on a very individual basis.  And you know, there's
19 all kinds of wearing elements, elements that would
20 be more likely to need repair more often.  It's just
21 a matter of maintenance and repair over a life of
22 the bridge until that just gets to the point where
23 it is so often and expensive, it doesn't make much
24 sense.
25

Page 38

1 BY MR. ROMAN:
2    Q.  Back to Exhibit 1, the specific reference
3 on the 4th Street project that Modjeski assisted in
4 extending the structure life by 40 years, do you
5 have any understanding of how that figure was
6 derived, the 40 years?
7    A.  Just thinking about it more as we talk, I
8 think that's typically an attempt by the engineering
9 community and the owners of these assets to try to
10 get themselves, like, to a reasonable agreed-to
11 scope of things.  So in hindsight, maybe it isn't
12 really great to have a number associated with these
13 repairs, but it does start -- you start
14 understanding in the extremities, if they all need
15 to get by for a year, you would only do so much
16 work.  If they want to get 200 years, you are
17 replacing maybe the whole bridge.  So you start,
18 kind of, moving the dial back and forth and then you
19 select a scope of work based on this concept of how
20 long they want to go before the next major
21 rehabilitation.
22        It doesn't have much to do with minor
23 repairs and normal routine maintenance, but major
24 repairs.  And on that bridge, it's a rolling lift,
25 so one of the highest maintenance interfaces is the

Page 39

1 curved tread that the whole bridge rolls on and the
2 flat track that receives the curved tread and they
3 had been -- there is like traction pin pulls in the
4 track and pockets in the tread and those areas have
5 been welded on and repaired for decades chasing, you
6 know, wear and cracks in those elements that support
7 the whole bridge, so that was another major
8 change-out that we did, replacing the lift treads
9 and track plates.
10        I am not sure if that answered your
11 question.
12 BY MR. ROMAN:
13    Q.  For the projects that are listed on
14 Exhibit 1, did any of those that are listed involve
15 you making a determination of what the useful
16 service life of any of the bridges were?
17    A.  No.  I am flipping to the second page, no.
18 No.
19    Q.  Is there anyone at Modjeski & Masters, to
20 your understanding or knowledge, that would perform,
21 or I should say, would make that determination or is
22 that something that you would do if you were asked
23 to do it on a project?
24        MR. SNOW:  Object to form.
25        THE WITNESS:  I don't -- yeah, I

Page 40

1 don't think that's something that we would do or
2 something that I would do, no.
3 BY MR. ROMAN:
4    Q.  Are there any other projects, experiences,
5 background that are not included in Exhibit 1 that
6 you would add to your qualifications and background?
7    A.  No.  I think this is a good
8 representative project base.
9    Q.  And then I know you have been a one-firm
10 man your entire career; right?
11    A.  Correct.
12    Q.  So Exhibit 1 is an accurate and up-to-date
13 summary of your background and experiences, at least
14 professionally speaking?
15    A.  Yes.
16    Q.  I'll call it your background, the middle
17 box, it says that you were the secretary for the
18 movable bridge industry's nonprofit agency, Heavy
19 Movable Structures, Inc.  What is that organization?
20    A.  It's an organization that has been around
21 since the '80s, I think, mid to late '80s.  We
22 basically organize a conference every two years.  So
23 it has, like, a Board of Directors and then, like,
24 my position would be part of the officer group.  We
25 meet once a month to make sure we are coordinating.



Page 41

1 The actual symposium, that's like the main activity
2 and gets 400 or 500 attendees every two years, so
3 that people can exhibit.  Either vendors or builders
4 or designers or owners can get together and see each
5 other, hear about projects, people write papers and
6 then present them there, and then we have a guest
7 speaker from a DOT or federal government or railroad
8 talk at one of our luncheons and we have some social
9 events.  But, yeah, it's mainly trying to plan each
10 two-year symposium.
11     Q.   And when you were a secretary, was that,
12 like, a board position that you held?
13     A.   I'm sorry, I didn't hear.  The what kind
14 of position?
15     Q.   Was that a board, like, were you on the
16 board of that?
17     A.   No.  It's a nonvoting renewed annual
18 position.  I think I started in 2014, and I have
19 been secretary since.
20     Q.   Is that an organization where you have to
21 be a member of it in order to get invited to the
22 conference or anyone can buy a ticket?
23     A.   Anyone can buy a ticket.  And then once
24 you buy a ticket and come, you are a member for
25 those two years.  So your membership is perpetuated

Page 42

1 by attending the conference.  You can also buy a
2 membership separate from your registration if you
3 are not making it to the conference.  But anybody
4 can become a member.
5     Q.   And have you ever had any speaking
6 engagements at any of the conferences that have been
7 put on by that organization?
8     A.   Yeah.  I have presented papers at least
9 twice.
10     Q.   And what were the topics?
11     A.   One of the topics was motor loads on
12 machinery, depending on the style of the electric
13 motor.  And the other one was a comparison of two
14 different vertical lift bridge types; one being like
15 the Main Line Bridge where cables are used to lift
16 it and all of your equipment is on the span -- the
17 span driver lift and they have a tower drive
18 vertical lift where all of your equipment is in each
19 tower.  So you have two sets of equipment lifting
20 the bridge instead of one.  I did that with -- each
21 one, I think I had a co-presenter.
22          I think those were the only two times I
23 presented there.  Since I started the secretary
24 role, I am so involved with the symposium that I
25 don't typically get to presenting anything.

Page 43

1     Q.   It looks like you are also the Chairman of
2 the Movable Bridges Subcommittee for AREMA?
3     A.   Yeah.  That ended -- that has a term
4 limit.  So I was on seven years, 2016 to 2023.  So
5 that has ended.  I am still a member of Committee
6 15, an active member, but I am not the Chairman of
7 Movable Bridge.
8     Q.   I think I missed it.  So there is two
9 separate committees that you served on?
10     A.   Let's see.  Committee 15 is the committee
11 and then Movable Bridge is a subcommittee of Steel
12 Structures Committee 15.  So I was the Chairman of
13 the Movable Bridge Subcommittee under AREMA
14 Committee 15.
15     Q.   And then what is Committee 15?  I mean,
16 generally, what are you --
17     A.   It's basically railroad bridge guide
18 specifications and it's made up of a certain
19 percentage of each interest, like, consulting
20 engineers, owners, constructors, fabricators.  We
21 meet three times a year.  It's all on a volunteer
22 basis, and work on updates to the guide
23 specifications for fabricating, designing and
24 building railroad bridges.
25     Q.   So your involvement on that committee, do

Page 44

1 you have a role in reviewing, approving and
2 ultimately publishing those AREMA specifications?
3     A.   Correct.
4     Q.   How long have you served on that
5 committee, or I guess, how many times, however --
6     A.   I think I started in '04, so over 20
7 years.
8     Q.   What particular specifications -- and if
9 it's a long list, I can understand -- have you been
10 involved in reviewing and ultimately publishing on
11 behalf of AREMA through your time with the
12 committee?
13     A.   Fabrication, materials, and movable
14 bridge.  We all are required to be on three
15 subcommittees.  Those are the three subcommittees I
16 am on.  But the entire general membership of
17 Committee 15 are responsible for reviewing and
18 voting on letter ballots that create changes to the
19 guide spec.
20     Q.   And do you serve on terms, like, two-year
21 terms or something like that, for that committee?
22     A.   Just when you are chair of a subcommittee,
23 then those are rolling three-year terms.  For some
24 reason, I was, kind of, midterm and had seven years.
25 It is usually a three-year term, then you can be



LEE R. LENTZ P.E.
COEYMANS MARINE TOWING

August 12, 2025
45–48

Page 45

1  approved for a second three-year term.  And if you
2  have something brewing that you are -- a really big
3  change that you are trying to lead, they'll extend
4  it a little bit, but it is typically six years, two
5  three-year terms as chair of a subcommittee.
6  Everything else there are no term limits for general
7  membership.
8      Q.   And who serves on the Movable Bridge
9  Subcommittee with you currently?
10     A.   There is probably 60 people and, like I
11  said, they are made up of all of the different
12  stakeholders in the industry, so owners, builders,
13  fabricators, designers.
14         Does that answer your question?
15     Q.   Yes.  I guess I was thinking it was more
16  like a four or five person committee, but 60 sounds
17  like a lot.
18         MR. ROMAN:  Why don't we take a quick
19  break.  We can go off the record.
20         (Whereupon, a break was taken.)
21  BY MR. ROMAN:
22     Q.   Mr. Lentz, I am going to get into your
23  report in a little bit, but first I want to take a
24  look at Exhibit 3, which is the document entitled,
25  Documents Provided to Expert Lugo and Lewis.  And I

Page 46

1  can bring that up if you want me to.
2      A.   Yeah, that would be good.
3      Q.   Can you see my screen there?
4      A.   Yes.
5      Q.   So first question, I don't see your name
6  listed at the top here, but did you receive these
7  documents as well as Mr. Lugo and Captain Lewis?
8      A.   Yes.
9      Q.   And it's a nine-page document.  Quite a
10  list of documents, I am scrolling through.  Are
11  there any documents or information, that are not
12  listed on this document we have marked as Exhibit 3,
13  that you reviewed as part of your work in this file?
14     A.   No.
15     Q.   So that would be an accurate and
16  up-to-date summary of the documents you have been
17  provided and had access to as part of your work on
18  the case?
19     A.   Yes.
20     Q.   Was there any information that you felt
21  you did not have that you called up and asked for or
22  that was missing in connection with your work in
23  this case?
24     A.   No.
25     Q.   We can put that aside.  I want to take

Page 47

1  look at your report we marked as Exhibit 2, and I
2  think you said you have a copy of that in front of
3  you?
4      A.   Yes.
5      Q.   If we start at the top, it looks -- do you
6  see, under the header marked general, there is four
7  categories or questions, I should say.  Is that a
8  fair and accurate summary of what defined the scope
9  of your engagement in the case, what you were asked
10  to do?
11     A.   Yes.
12     Q.   And I think it would be Page 2 of your
13  report, under the header, answers and analysis, the
14  first part, was the bridge properly maintained prior
15  to the allision; do you see that part there?
16     A.   Yes.
17     Q.   If you could please just take us through
18  your process for how you addressed this particular
19  question and how you formulated your opinions.
20     A.   Sure.  So as we started out the -- I
21  started out the report, framing the four questions
22  was, kind of, our scope so we could, kind of, stay
23  on task, the first of which was the evaluation of
24  proper maintenance, and the Bridge Management
25  Program is how the owner maintains their bridge.  It

Page 48

1  is something that -- and I forget the year -- it
2  came out as a requirement, but nonetheless, it is
3  present and accounted for through, I guess, now it
4  is Koppers Engineering has a lot of the
5  responsibilities in the Bridge Management Program
6  and they have had it, even prior to Koppers'
7  involvement, with ARE.
8          So we got a copy of that, went through the
9  document in terms of just confirming it has the
10  elements that we expect.  It has the credentials of
11  the parties that have responsible roles in there and
12  then they do have, kind of, AREMA guidance sketches,
13  so that everybody is on the same page.  If we find
14  this on this bridge, this is the type of element
15  labeling we would use, this is the type of
16  criticality we would follow and here is how we are
17  going to go about things, especially, like
18  inspections, how often, who is going to do them, who
19  do we report to in the event that we find something.
20         So that was my perspective in terms of the
21  management program being the majority of it and then
22  what falls out of that, like, the inspections and
23  confirming that the inspections are being performed.
24  They do a rating of the bridge.  So it is, kind of,
25  the management program, and then if it required



LEE R. LENTZ P.E.
COEYMANS MARINE TOWING

August 12, 2025
49—52

Page 49

1 something in the produced documents, are we seeing
2 these documents, like, inspection reports and who is
3 performing them and if there is a rating done or
4 not, so that's, kind of, like -- the majority of it
5 was Bridge Management Program review.
6      Q.   And in the bottom of the second paragraph
7 under that header, it says, based on deposition
8 testimony of Mr. Moss and records reviewed, the
9 railroad also properly maintains or repairs priority
10 items noted under guidance of its bridge engineers.
11          Did I read that correctly?
12     A.   Yes.
13     Q.   What -- I guess, if you could expand upon
14 that they, you know, did the correct or, I guess,
15 the priority items did the maintenance and repair
16 work; how do you make that determination as to what
17 should be done based off those inspection reports?
18     A.   I think the key is there is a chain of
19 command, so to speak.  So that as things are
20 observed and documented and reported on, the right
21 people are seeing it and evaluating it and
22 monitoring it.  So I think that sentence is
23 referencing part of the deposition where Mr. Moss
24 was asked about things found during inspection and
25 whether or not they were addressed and how they

Page 50

1 would go about addressing them and Mr. Moss
2 responded with, basically, who's out there seeing it
3 firsthand, their credentials and then his
4 involvement as, kind of, like the be-all end-all
5 decision-maker on action after those items were
6 found.  So that's the key, that there is some sort
7 of chain of command and someone is making decisions
8 and it is not something found that people aren't
9 aware of.
10     Q.   Was there anything that you noted in your
11 review of the documents for your work on the case
12 where there was a recommended repair project or
13 maintenance item that you noted should have been
14 done, but was not done prior to the 2024 allision?
15     A.   No, because, again, it's an evaluation,
16 case by case.  And to say something should have been
17 done by a certain time, I don't have anything on the
18 top of my mind that's on that list, no.
19     Q.   As part of your formulating your opinions
20 in response to the question one there, did you
21 review the draft October 2024 inspection report that
22 was done by Hardesty & Hanover?
23     A.   Yes.  Was that the mechanical electrical?
24     Q.   Correct.
25     A.   Yes.

Page 51

1      Q.   As we go onto the next page, and I think
2 it would be Page 3 of your report, there is a
3 specific reference to, according to the 2019
4 mechanical and electrical inspection, no emergency
5 repairs were identified for the mechanical or
6 electrical components; all recommended repairs were
7 categorized as maintenance repairs.  Do you see that
8 there?
9      A.   Yes.
10     Q.   Was there anything that you reviewed
11 within that 2024 mechanical inspection, that
12 Hardesty & Hanover did, that should have been done,
13 in your opinion, between 2019 and 2024?
14     A.   Not that I recall.  And I see, you know,
15 that is, kind of, a hole there.  I certainly
16 reviewed those more recent reports, but they just
17 weren't complete formal plan inspections, like,
18 which J&D's, in 2019, was a full and complete set.
19 So, yeah, I understand asking about that.  And, no,
20 nothing stands out that had to have been done before
21 the allision.
22     Q.   And what is it that you recall from the
23 2024 inspection report that were identified for
24 recommended repairs and the condition of the bridge,
25 generally?

Page 52

1      A.   As I recall, there was concerns about span
2 balance and the fact that this bridge opens so high
3 and it doesn't have what they call auxiliary
4 counterweight systems to account for all of that
5 lateral rope weight transferring to the
6 counterweight side when you raise the bridge and
7 transferring to the span side when you lower the
8 bridge.  The counterweight cables themselves, the
9 wire ropes exhibited wear, the sheave pulleys that
10 the ropes ride on, their grooves exhibited a good
11 bit of wear and then the brake up in the span drive
12 system.
13          Its support wasn't what they expected to
14 see when they got out there and its rating.  They
15 were concerned that it was being dialed up above the
16 scale on the side of the brake beyond its rating and
17 maybe not having enough guts for the braking of the
18 bridge.
19     Q.   Is it unusual for a bridge of the type
20 that the Main Line Bridge is to not have that
21 auxillary counterweight?
22          MR. SNOW:  Object to form.
23          THE WITNESS:  I am not sure if it's
24 unusual.  It certainly doesn't meet today's
25 guidance.  So I don't know when that came into



Page 53

1  vogue, those auxillary counterweights.  But it is
2  something that, above 70 feet it, it is
3  recommended now for vertical lifts.
4  BY MR. ROMAN:
5      Q.   And is that something that if you were
6  assisting with designing a movable lift bridge of a
7  similar type to the Main Line Bridge, by today's
8  standards, that it would have an auxillary
9  counterweight system?
10     A.   I would say, nine times out of ten.  You
11  could maybe make some other considerations.  The
12  owner may not want a whole other system.  You may
13  have to do some different motor size assumptions or
14  brake size assumptions, but nine times out of ten,
15  yes, there would be an auxiliary counterweight
16  system.
17     Q.   And why is it that you would include that
18  auxiliary counterweight system in a movable lift
19  bridge like that?
20     A.   Balance is key in any movable bridge.  So
21  if you don't have the auxiliary counterweight
22  system, there is such a large swing of balance from
23  fully seated to fully open, that you really can't
24  have any kind of reasonable target, I guess, of
25  balance because it varies so much.  So the bridge is

Page 54

1  going to have to go from very span heavy to very
2  counterweight heavy.  And auxiliary counterweights
3  level that line off, so you can shoot for a certain
4  balance and it is maintained no matter what position
5  the bridge is in.  So you would help distribute the
6  load amongst the machinery more evenly if you could
7  have an auxiliary counterweight system.
8      Q.   I think one of the notations in the
9  Hardesty & Hanover 2024 report was that the
10  counterweight was imbalanced prior to the allision;
11  right?
12     A.   I don't recall if they said it was
13  imbalanced.  I believe the string engaged.  So they
14  should have had a conclusion, but I don't recall.
15     Q.   Do you have any opinions on whether the
16  counterweight system is more balanced today, after
17  the repair work, than it was prior to the allision
18  in June of 2024?
19     A.   I don't.  I don't have any basis for that
20  to make an opinion on that.
21     Q.   Moving on to Subsection 2, which I think
22  is on Page 3, as the header, it asks, was the repair
23  methodology reasonable; do you see that there?
24     A.   Yes.
25     Q.   If you could take us through your process

Page 55

1  for addressing this question and how you came about
2  your opinions.
3      A.   Okay.  Probably, the thing that would
4  stand out most to us in our review was the repairs
5  calling out replacements in kind, so whether there
6  was an original drawing or field measurements that
7  were available or not, a call out could be used like
8  that so that the builder knows who will have access
9  to the bridge and to these joints to measure plates,
10  the plate thicknesses, the plate surface areas, the
11  bolt patterns.  They know that your intent as a
12  designer is just to replace that plate or member
13  with the same bolt pattern, the same thickness, the
14  same surface area.  So that we saw pretty -- that
15  was a pretty common call out in the design plans, so
16  that leads me to believe that the intent was
17  reasonable in that it was only just trying to
18  replace what was there in a similar size, type and
19  configuration.
20         We had a good focus on what loads the
21  member that was damaged is carrying, whether it's
22  live load, dead load, both, and whether those are
23  tension or compression and whether they needed to be
24  supported in a temporary fashion just to be able to
25  bring them back into a repaired state.  So that's a

Page 56

1  big consideration in terms of complexity and that
2  seemed to jibe with our experience as well.  It was
3  limited -- the temporary works were limited to where
4  it needed to be provided.
5          The last part was electrical and, again,
6  there weren't a lot of preplanned design plans, so
7  there was more invoice review, material invoicing
8  and the types of vendors that were involved, like,
9  the Fate controls people and Diamondback Signal, and
10  just reviewing that to just understand even what the
11  scope was there.
12         I think there was a first level of things
13  that had to be done on the west side.  And then once
14  the bridge was temporarily operational, there was
15  more to be done on the east side.  So there was a
16  little bit of that, that was part of our interview
17  process, too, with Mr. Moss and Mr. Swanson.  But
18  once we got the information we needed, found that it
19  certainly was reasonable that the impact caused the
20  electrical repairs to be necessitated and they were
21  done, kind of, like, in a minimalized way.
22         I did get a feel for that, too, at the
23  site visit.  They certainly were done in a
24  minimalized way, so very reasonable, I guess, is the
25  way we would label that in this setting.  So I think



LEE R. LENTZ P.E.                                           August 12, 2025
COEYMANS MARINE TOWING                                              57—60

Page 57

1  that's a summary.
2      Q.  Can you recall what particular components
3  of the electrical system were damaged in the
4  allision?
5      A.  I know the power rail, on the east side,
6  came to light later as bridge operability was
7  attempted.  And then on the west side, there was a
8  good bit of -- just how the conductors come in along
9  that span and then transition to the vertical lift
10  span, there was a lot of new run electrical there
11  and conduit underneath the span four.
12      Q.  Any other components that you can recall,
13  as you sit?
14      A.  I think that's what I can recall.
15      Q.  Do you recall what type of steel was used
16  in the original design and construction of the
17  bridge?
18      A.  I got this out of, I think, a deposition.
19  I think Howard's deposition calls it an ASTM number,
20  an A-7, I think.  I am not familiar with A-7.
21  That's probably, you know, the era of the bridge,
22  that was maybe the bridge steel spec.
23      Q.  It would have been an older steel type;
24  right?
25      A.  Yeah.

Page 58

1      Q.  And do you recall what type of grade of
2  steel was used for any of the steel components that
3  were required to be replaced?
4      A.  I don't know if it was exclusive to all,
5  but it seemed like the majority of it was ASTM A-709
6  grade 50 steel for the repairs.
7      Q.  And did you review, as part of your work,
8  the differences, if any, between the steel that was
9  original to the bridge and the steel type that was
10  used for the replacement parts?
11      A.  Not original.  I did a review of 709 and
12  the different grades just to make sure.  I saw
13  something in the documents about -- oh, I think it's
14  in the recent expert rebuttals, so to speak.  I saw
15  some things about corrosion resistance and
16  availability.  So this, kind of, was renewed
17  recently receiving some of the rebuttal reports.
18          But review up to this report version right
19  now, just looked at the different grades of 709.
20  And I am pretty familiar with 709 and then its
21  predecessor, 836.  A-7 was before my time and I
22  didn't spend much time reviewing that.
23      Q.  Do you have any opinion as to whether the
24  709 grade steel is of a higher grade than the A-7
25  steel that was original to the bridge?

Page 59

1      A.  I would assume it's higher grade.  That
2  era, your strength -- I don't know what A-7 exactly
3  its yield strength rating is as compared to 709 is
4  50,000 psi yield strength.  I am assuming it was
5  30,000 psi or 30/36 back then.  So that's definitely
6  a different grade.
7          I think the 709 is probably just -- that's
8  bridge steel.  That's what AWS welding code for
9  bridges recognizes.  It's just available and common
10  in today's realm of bridges.
11      Q.  And do you have any reason to disagree
12  with the opinion that the 709 grade of steel is more
13  resistant to corrosion than the A-7 grade of steel
14  that was original to the bridge?
15          MR. SNOW:  Object to form.
16          THE WITNESS:  Yeah, I can't agree or
17  disagree with it at this point.  That surprised me,
18  I guess, that comment, and there may be a way by
19  which I can look things up and understand that or
20  refute it.  But, yeah, at this point, I don't have
21  an opinion either way.
22  BY MR. ROMAN:
23      Q.  Fair to say, as you sit, it is not within
24  your background and experience, as you sit, to make
25  that opinion; it is something that you would have to

Page 60

1  do some digging on?
2          MR. SNOW:  Object to form.
3          THE WITNESS:  I think my experience
4  would be appropriate, yeah, once I am able to look
5  at a few documents.  That is pretty common,
6  evaluation of materials spec and what performance it
7  can provide, so I am comfortable doing it.  I just
8  haven't done it yet.
9  BY MR. ROMAN:
10      Q.  I guess to clarify my question, as you sit
11  today, you haven't done the work to make that
12  opinion, correct, but you feel that you would be
13  qualified to do so?
14      A.  Right, correct.
15      Q.  And what would you do if you were asked to
16  look in and give an opinion on that issue?
17      A.  I would go to the ASTM standards where
18  they list both the mechanical properties of these
19  different grades of materials and the chemical.  And
20  the chemical might, in this case, be more important
21  because there are weathering steels and, of course,
22  there is stainless steels.  So you start adding
23  alloys to gain corrosion resistance, so that's
24  probably where I will focus to see what might
25  provide better corrosion resistance from A-7 to



Page 61

1 A-709.
2     Q.   Would repainting steel on a regular basis
3 assist with corrosion resistance on the steel?
4     A.   Yes.
5     Q.   Do you recall or have any information as
6 to when the Main Line Bridge was repainted prior to
7 the allision?
8     A.   I don't recall if that was in the
9 documents.  Yeah, I don't have any information that
10 I know of.
11    Q.   Is there any type of standard within the
12 industry, based on your experience and background,
13 that you would recommend as a timeframe for when
14 steel on railroad bridges should be repainted?
15    A.   No.
16    Q.   But you went out and saw the bridge and
17 its state after the repair work; right?
18    A.   Right, correct.
19    Q.   Did it appear to you at all that there was
20 a difference in the coatings that were on certain
21 members of the bridge based on your observation?
22    A.   There was definitely -- actually, I asked
23 some questions of Mr. Reeder on-site about some of
24 rolled shape being there as opposed to, like,
25 built-up lattice member.  There were some

Page 62

1 differences even amongst unrepaired areas.
2          Repaired areas certainly had a coating
3 very local to where the repair was.  But most of the
4 bridge, it looked like it still had coating on it
5 and there were isolated areas of corrosion, but you
6 could see the repairs because they had a fresher
7 coating in a localized area.
8     Q.   Right.  And that's what I was getting at.
9 I mean, if you have gone and observed the bridge, it
10 is pretty easy to tell from the painting, the
11 coating, as to which are the newer members versus
12 the ones that were original; right?
13    A.   That's fair to say.
14    Q.   And for those members that have the fresh
15 coat of paint on them which were done as part of the
16 repair cost, do you have any opinion as to whether
17 those particular members are more resistant to
18 corrosion than the original, what I'll say, not
19 freshly painted components on the bridge?
20    A.   I still, I think, will reserve the right
21 to look through some things on that one because it
22 is surprising sometimes from old to new material
23 what you are going to get, even if there is
24 differences in coatings conditions.  So I don't
25 know.  I don't have an opinion on that right now.

Page 63

1     Q.   Did you identify any members or components
2 that were repaired or replaced on the bridge as part
3 of the work after the allision that had, like, a
4 thicker grade of steel, like, a plate that was
5 thicker than the one that was damaged, anything of
6 that nature?
7     A.   The only place, and it is not really a
8 one-to-one comparison, is the bearing shear keys
9 sheared off.  So there was actually external keeper
10 plates that are very thick.  So you are not really
11 comparing, like, a plate to a plate.
12         The areas where you are actually repairing
13 by adding plates, they looked similar, similar in
14 size or the same.
15    Q.   As part of your evaluation in formulating
16 your opinions for question two, did you look at the
17 work, sort of, in totality or did you look at it,
18 like, segment by segment, you know, what they did in
19 June, what they did in July, what they did in August
20 to determine whether the method that they used was
21 reasonable?
22    A.   I think it is kind of a combination.
23 Certainly, in totality.  And then as we get into
24 number three, this is part of that, too, we kind of
25 looked in detail on equipment used, methods because

Page 64

1 a lot of that built into, like, how the costs shook
2 out and whether those were reasonable.  So
3 definitely in totality, aggregate and then component
4 by component, repair by repair.  So a little bit of
5 both.
6     Q.   As you sit, can you recall or describe,
7 generally, what work was done in the June -- I'll
8 say, June 15th after the allision, to the end of the
9 month, June 30th, by the contractors that were out
10 there?
11    A.   Yeah, I question how much -- how accurate
12 I will be on this.  I can maybe make some
13 assumptions based on knowing the work that had to be
14 done right away, what was going on, certainly a lot
15 of mobilization and access work in terms of that
16 road coming in.  And then I know, as soon as H&H
17 could, they were trying to get loads to PCL so that
18 their temporary works engineer could start designing
19 the temporary works needs, like, the temporary
20 piers.  So a lot of like mobilization, access, of
21 course, design and planning, temporary works.  But
22 beyond that, I can't comment on actual productivity
23 on the site for that month.
24    Q.   I have a similar question for July.  Can
25 you recall, just generally, describe what type of



LEE R. LENTZ P.E.                                          August 12, 2025
COEYMANS MARINE TOWING                                        65–68

Page 65

1 work was going on during that month-long period?
2    A.   I cannot.  I apologize.
3    Q.   That's fine.
4        Same question for August, the August
5 timeframe?
6    A.   Yeah, I think I pretty much just would be
7 guessing on particulars until the end of October
8 when they actually could get the first lowering of
9 the bridge.
10    Q.   Okay.  So what is it about that October
11 timeframe that, you know, refreshes your
12 recollection to being able to identify what work was
13 being done?
14    A.   Yeah.  That was a major milestone in that
15 they were able to lower the bridge for the first
16 time.  And like I mentioned before, they were able
17 to uncover a little more in terms of issues on the
18 east side with electrical, but it was a major
19 milestone that things were coming into a decent
20 enough alignment for bridge operations.
21    Q.   And then once -- can you recall or
22 describe what work was being done in the November
23 timeframe, the November 1st to the end of the month?
24    A.   I would guess -- again, unfortunately, I
25 would be guessing in particular, but just because

Page 66

1 the first train -- you know, the first lowering and
2 the first train within those few weeks, that there
3 was a good bit of signals work, especially, on the
4 east side and electrical work going on with Fate
5 Technologies and Diamondback Signal.  That's about
6 all I can probably point to.
7    Q.   And then how about for the work that was
8 done between December and then into January?
9    A.   Probably, for that whole window from after
10 the first train in early November to February, I
11 would only cite the fact that there was a good bit
12 of effort going on, again -- well, for getting the
13 bridge back to remote operations, which is what it
14 was typically doing before the allision and that
15 involved a lot of coordination with signals and the
16 electrical control system vendor.  That's all I
17 could probably cite for that time period.
18    Q.   What is your understanding of when the
19 work was completed on the bridge after the allision?
20    A.   I just have in my mind mid-February of
21 this year as when remote operations were reinstated.
22 So I am thinking that was a major milestone, but I
23 am sure there was a bunch of demob that still had to
24 occur.  I am assuming there may even still be some
25 little things right now, but I am still not certain.

Page 67

1    Q.   And for any of those segments of work --
2 we, sort of, did it month by month, did you apply
3 any different process for a particular segment as
4 the one we discussed earlier for determining if the
5 methodology was reasonable or was there just the
6 same process for looking at the work as a whole?
7    A.   Yeah, I don't think we had different
8 methodology for different time periods of the
9 project, so the same methodology as a whole.
10    Q.   So that would be the same methodology that
11 you applied to some of the mechanical work, the same
12 methodology to some of the electrical work, and then
13 the same methodology for evaluating the structural
14 work; is that fair to say?
15    A.   The only difference being the electrical
16 didn't have much by way of the repair planning to
17 review from that direction.  But at the end of the
18 day, we were still reviewing invoices in detail and
19 figuring out what vendors were doing work and what
20 the materials were that were being solved.  So yeah,
21 that would be the only difference amongst those
22 three disciplines.
23    Q.   I think it's the second to last paragraph
24 under No. 2.  It says, the bridge owner may have
25 additional evidence or documentation to support the

Page 68

1 various electrical issues identified on the bridge.
2 Do you see that part there?
3    A.   Yes.
4    Q.   Did you ever receive any additional
5 information in regard to what you wrote there?
6    A.   I know when we got to speak with Mr. Moss,
7 a lot of this got tweaked because we did have some
8 questions on the electrical.  So, no, we have not
9 received anything in addition.
10    Q.   What made you make that notation in the
11 report that there may be additional information
12 regarding the electrical issues?
13    A.   Not having the repair plans that were
14 engineered to review and, kind of, reverse engineer
15 what we think a reasonable cost would be I think is
16 what initiated some of the questions we had for Mr.
17 Moss.  And then he, kind of, confirmed that, yeah,
18 things were being uncovered as they went and they
19 had -- you know, signals was a good part of it and
20 they are their own entity and they are going to
21 design-build basically their repairs, and I think a
22 lot of that was going on as well as with control
23 system integration and just power utility, which is
24 probably a railroad entity as well.
25        So I think talking to the right people you



LEE R. LENTZ P.E.                                                August 12, 2025
COEYMANS MARINE TOWING                                          69–72

Page 69

1  may get more information on what was done, how fast
2  and when, but I don't know that anybody is ever
3  going to get to the point where they have the
4  as-built, if you will, details of the electrical
5  work by linear foot and diameter of conduit and
6  number of conductors, so that might just hang out
7  there.  And in an emergency, especially, and in
8  these disciplines, signals, power and controls, they
9  are probably the first ones to be a little more
10  design-build in nature.
11     Q.  All right.  Let's move on to the third
12  section.  The question is, was the total cost
13  reasonable.  Do you see that there?
14     A.  Yes.
15     Q.  If you could, take me through your process
16  of how you addressed this issue and came to your
17  conclusions.
18     A.  Okay.  I, kind of, came at this in
19  multiple directions and when each method kept giving
20  us the same answer, that gave us the comfort to
21  confirm that the costs were indeed reasonable.  So
22  we did an independent cost estimate.
23        Now, it was a little reverse of what we
24  are used to.  We typically design a project like H&H
25  did on their plans and then we have our cost group

Page 70

1  take the plans, look at them, understand the
2  quantities in the plans and then create an
3  engineer's estimate of the work.  So that when
4  owners bid the work out, they have some sanity
5  check, from a designer, that the bids are
6  reasonable.
7        In this case, a lot of the work was kind
8  of coming together, I'll say, again as a
9  design-build nature because PCL was ramping up as
10  H&H was ramping up and H&H got ahead of them on some
11  things and other things, kind of, they had to agree
12  to go in parallel with one another.  So our
13  independent cost estimating had a combination of
14  understanding what H&H was communicating on their
15  repair plans, but then also a lot was left to the
16  builder to engineer and build and so we went to then
17  the invoicing to understand what equipment was used,
18  material quantities and then we used our own rates,
19  such as, from RSMeans for equipment and materials
20  and labor, and so we came at it from that direction,
21  did an independent estimate, and it certainly wasn't
22  every nut and bolt, so to speak.
23        Betsy estimated that she got through 85 to
24  90 percent of the work based on that approach and
25  then the documents that we had.  And so she handled

Page 71

1  it as if it was a normal job, not an emergency and
2  did an estimate.  And then I got in there,
3  understood that, and then compared it to other
4  similar projects, reviewed the rates that PCL and
5  H&H were charging to evaluate the reasonableness of
6  those and -- what else did we do -- yeah, and tried
7  to, you know, create a good understanding of what
8  this would look like if it was a normal project, a
9  normal schedule versus an emergency and tried to
10  recognize that as well as any complexity that had to
11  do with supporting the bridge which is in place
12  while installing load-carrying members.  So you have
13  to unload the member and reload it once it is
14  repaired.
15        Oh, and then the final thing was just a
16  good overarching look at, all right, well, what was
17  the engineering cost versus the construction cost
18  and that was another sanity check; these are good
19  ratios of one another, so to speak, based on our
20  experience and based on what costs typically occur
21  on normal and emergency service jobs.
22     Q.  Going back to the independent cost
23  estimate that you referenced, just so I have it
24  right, was that something where you looked at or
25  sort of came up with your own figures as if Modjeski

Page 72

1  & Masters was going to be putting in a bid for the
2  work and then compared it to what Hardesty & Hanover
3  and PCL were doing or was it kind of a mix of both?
4  I just want to make sure I understand it correctly.
5     A.  Right.  In terms of mix, it was a very
6  minor amount of mix.  We took the costs at face
7  value with some review.  I think it was like 1.4
8  million where it wasn't PCL charges, so there were
9  some other costs in there.  We called them other
10  that weren't PCL and they were, you know, a decently
11  small fraction of the total 15, 16 million.  So that
12  is the only portion we didn't, you know, step
13  through as if we were doing an engineer estimate for
14  an owner.  We just took that, reviewed those
15  invoices and the materials, made sure we understood
16  what that work was, like, the access road, for
17  example, the signals and the electrical work, I
18  think were wrapped up in that.  But the PCL items
19  call them, the steel repairs, the temporary works,
20  we did, yes, an engineer's estimate of those items.
21  I think there were 20 -- 20 or 22 items.  And it is
22  not like a bid.  It is quite different than that.  I
23  mean, engineer designers do estimate what these jobs
24  should cost, but they are not always perfect.  The
25  bidders end up making the price.



Page 73

1    Q.   And so that 1.4 that you referenced, that
2  was the bucket of charges that were, I think, the
3  Belt Line labor, the access road, is that category
4  of information, I think, that's outlined on the
5  damages spreadsheet?
6    A.   Yes, exactly.
7    Q.   And so for that category of the damages,
8  as I understood it, you did not conduct an
9  evaluation of those costs; right?
10    A.   We evaluated them, but we did not
11  independently estimate them, you know, as an
12  independent cost estimate.
13        When we rolled our final numbers together,
14  we just took those, I think it was 1.4 million, and
15  added them to our 14-point-so-many-million and came
16  up with our total number, something like that.
17    Q.   So you just took that particular category
18  at face value and added it onto the other parts that
19  you had --
20    A.   Yes.
21    Q.   So if we look at, I think it's the second
22  paragraph on -- the next time you do expert work,
23  Mr. Lentz, I will recommend putting page numbers on.
24    A.   Yes.
25    Q.   I think it's Page 4.

Page 74

1        MR. SNOW:  I think they are at the
2  top.
3        MR. ROMAN:  Oh, yeah.
4        THE WITNESS:  Oh, it snuck it in the
5  header.
6        MR. ROMAN:  That's on me.  Sorry.
7  BY MR. ROMAN:
8    Q.   It's the second paragraph there on Page 4
9  towards the bottom of that, there is that 17 million
10  figure.  It says, I also reviewed the costs for
11  construction labor, and then it goes on, and that
12  you arrive at my estimate that a reasonable cost for
13  repairs of this nature would be in excess of 17
14  million.  Do you see that part there?
15    A.   Mm-hmm.
16    Q.   How did you derive that $17 million figure
17  particularly?
18    A.   That was our independent evaluation, our
19  cost estimating of the PCL items plus the other 1.4
20  million category plus what we would have assumed
21  with no knowledge of what actually occurred.  The
22  engineering fees would be for the work and then add
23  that all together.
24    Q.   And then that engineering fee is the six
25  and a half percent that we see up above that in that

Page 75

1  same paragraph?
2    A.   The design engineering fee, yep.  That was
3  an average of the five to eight percent I had
4  referenced maybe in other spots.
5    Q.   And that range of five to eight percent of
6  the engineering fees, how did you derive that range?
7    A.   Just from internal data.  It certainly can
8  be more than that on really unique situations, but
9  that's internally what our experience has been.
10    Q.   And when you say, our, you are referring
11  to Modjeski & Masters?
12    A.   Modjeski & Masters, yes.
13    Q.   So fair to say that five to eight percent
14  range is the, sort of, standard range for fees that
15  Modjeski & Masters may charge clients in the
16  marketplace?
17    A.   Correct.
18    Q.   Did you do any other research as to what
19  other firms might charge or, you know, look at any
20  publications, studies, et cetera of what the general
21  fees, or I should say, fees may be in the
22  marketplace for engineers?
23    A.   No, only would cite we win some and we
24  lose some.  We are competing for this work all of
25  the time, so I guess that's where we would take it

Page 76

1  from.
2    Q.   And then the six and a half percent is,
3  what, the average of that range that you used?
4    A.   Correct.
5    Q.   Do you recall what the -- well, let me ask
6  this:  Hardesty & Hanover charged by the hour;
7  right?
8    A.   Yes.
9    Q.   Does Modjeski & Masters typically charge
10  clients for a similar type of project by the hour or
11  do they do it on a fee basis?
12    A.   By the hour.  It's very rare that it is
13  anything different.
14    Q.   So help me square how the fee basis comes
15  into how engineering firms charge for projects like
16  this?
17    A.   This is a ratio of what it costs to design
18  versus what it costs to build, so it was -- it's a
19  factor that usually holds pretty true, that owners
20  typically have different contracts, right.  Like,
21  the railroad would get funding and get a pot of
22  money ready to do the design and then we will
23  certainly estimate the cost of construction based on
24  that scope of design repairs and they will have a
25  separate contract with a contractor.  So I guess



LEE R. LENTZ P.E.                                                    August 12, 2025
COEYMANS MARINE TOWING                                              77—80

Page 77

1  that data ratio gives us that percentage.
2      I am not sure exactly what your question
3  is, I guess.
4      Q.   I think you answered it.
5      So that six and a half percent fee as a
6  total of the ultimate cost of the project, that's
7  sort of a marker within the industry, that you are
8  looking to be in that five to eight percent range as
9  a total cost to construction that equals out to
10  whatever hourly rate you are going to charge; is
11  that --
12      A.   Yes.  How many hours it will take to do
13  the design, yes, and what percentage --
14      Q.   If you are working on a $10 million
15  project and Modjeski & Masters is out there trying
16  to win the work, you are going to say, if we were
17  charging $1 million for engineering fees, we are
18  going to be above the range, it is probably not
19  going to be competitive; right?
20      A.   Exactly.
21      Q.   I just want to make sure I understood it
22  right.
23      A.   Yeah.
24      Q.   Down to the third paragraph from the
25  bottom, the one that starts, additionally, I note

Page 78

1  specific agreement with one phase of the project
2  where the costs increased from 12 to 15 due to the
3  speed of completion; do you see that part there?
4      A.   Yes.
5      Q.   How did you determine that there was a $3
6  million spread due to the speed at which the work
7  was done in your process?
8      A.   I should have noted it there, but it was a
9  particular email or meeting minutes, something where
10  I saw that literal jump, and I noted it here because
11  part of our evaluation of cost reasonableness was
12  the fact that this was emergency and that finishing
13  it as efficiently as possible would benefit all, and
14  this was a good example of it here where -- you
15  know, where time crunches do equal additional costs
16  and rightly so in this case, I think, in my opinion,
17  because, like I said, finishing it sooner reduces
18  costs for all.
19      So I think that was maybe an email.  And I
20  am not sure exactly where I saw it, but it was a
21  conversation and there was the impact and it just
22  further, like, supported my approach to how I
23  handled the costs -- the cost estimating from a
24  normal project to an emergency project.
25      Q.   Was that a topic of either of your

Page 79

1  interviews with Mr. Moss or Mr. Swanson?
2      A.   I believe so.  It was probably with Mr.
3  Moss just to, kind of, confirm, you know, the speed
4  by which things were being completed, staffing needs
5  around the clock versus, you know, single or double
6  shift work.  So I am sure that came up in our
7  discussion just to have a good understanding of how
8  the work was done.  And I remember comments to the
9  effect -- you know, it was kind of a little bit of a
10  roller coaster because, initially, you have got to
11  get everybody on board and then you realize, okay,
12  this is something that needs a little bit of
13  planning, so taylor back a little bit of the labor
14  for a little while and then you ramp back up
15  whenever you actually can get going on-site.
16      Q.   And what is your understanding of how
17  the -- or, I guess, what parts of the work resulted
18  in the $3 million increase?  I mean, was it the
19  extra crews, was it equipment costs, if you have any
20  understanding of, you know, kind of, the breakdown
21  of that $3 million?
22      A.   I don't.  My recollection is this was
23  primarily due to and impacts from PCL's work.  This
24  was specific to, you know, the primary general
25  contractor and their costs.

Page 80

1      Q.   And I know you referenced that there was
2  an email you think you reviewed referencing this.
3      Are there any documents, invoices, in
4  particular, that might be reflected on Exhibit 3 you
5  can recall, as you sit today, that you identified as
6  the bases for the $3 million increase, like, the
7  July bill or the October bill, you know, there was a
8  material increase in labor costs and that's part of
9  that $3 million, anything of that nature?
10      A.   It likely exists, but I cannot recall
11  right now.
12      Q.   You weren't asked to do any evaluation or
13  review of any type of lost business or impacts from,
14  like, the rerouting of trains or anything of that
15  sort; right?
16      A.   No.
17      MR. ROMAN:  Why don't we take another
18  quick break, if that works.
19      (Whereupon, a break was taken.)
20  BY MR. ROMAN:
21      Q.   Mr. Lentz, continuing on the third
22  section of your report, the bottom of Page 4, the
23  last paragraph is, reevaluate the rates that were
24  charged by Hardesty & Hanover and PCL; fair?
25      A.   Right.



LEE R. LENTZ P.E.                                                    August 12, 2025
COEYMANS MARINE TOWING                                                     81—84

---

Page 81

1   Q.   And how did you go about making these
2   opinions and conclusions?
3       A.   Hardesty is easiest.  I can see their -- I
4   got confidential documentation showing their
5   billable rates, which actually is their at-cost
6   rates with a multiplier, so I could do a direct
7   comparison to ours.  And ours are benchmarked across
8   the industries and different services on our
9   compensation committee every year, so that was easy
10  and direct.
11          PCL, something similar, just looking at
12  RSMeans data and what they have in their rates for
13  their different positions, was able to confirm that
14  they meet industry averages, I would say.  So
15  nothing jumped out, out of the norm, and I think it
16  is typical in our industry.  There isn't a lot of
17  flexibility.  Everyone is audited based on what they
18  can charge.
19          But in an emergency, you could run the
20  risk of those numbers creeping up.  But in this
21  case, they were able to use previous agreed-to rates
22  and agreements, so all reasonable.
23      Q.   And what is the RSMeans you are
24  referencing?
25      A.   It used to be a book.  Now, it's an online

Page 82

1   publication that gives out, I believe, annually,
2   what should be assumed as fair and average rates
3   based on geography and specialty and experience on
4   labor and equipment.
5       Q.   So as I understand it, you reviewed the
6   PCL and Hardesty rates, compared them against the
7   Modjeski rates and then also took a look at the
8   RSMeans' figures?
9       A.   Correct.
10      Q.   And you said, I think, Modjeski is,
11  generally, benchmarked against the industry from
12  year to year?
13      A.   Yes.  There's services we purchase and
14  those services house a bunch of people's rates like
15  ours, so that we can make sure we're trending and
16  keeping our people and all of that stuff.
17      Q.   What is it, if you know, that benchmarking
18  process that Modjeski uses?
19      A.   I have been on the compensation committee
20  several times.
21      Q.   And how do you guys go about determining
22  that benchmarking?
23      A.   We purchase one or more, I think no more
24  than two data sets, I would call it.  There are
25  organizations out that that's all they do.  They

Page 83

1   survey AE companies, architectural engineering
2   companies and then house it and crunch the data and
3   then provide it as a service for that purpose, for
4   people like us, to benchmark ourselves to make sure
5   that at each level of experience we feel like we are
6   fair and tracking with other competitors.
7       Q.   Moving on to the last portion of your
8   report, Section 4 starts, in my opinion, should the
9   bridge have been repaired or replaced; do you have
10  that in front of you?
11      A.   Yes.
12      Q.   If you could, take us through your process
13  of how you evaluated this issue.
14      A.   Basically, we could surmise based on the
15  repair planning and really the impact videos that
16  this was going to impact structural, at first blush,
17  the most, certainly, had some questions about
18  electrical, mechanical and just the bridge itself.
19  As we reviewed everything and got a better picture,
20  that, yes, indeed this bridge can be brought back
21  online for operability, it certainly made sense to
22  repair.  Just basically looking at it as a time to
23  completion was one way of looking at it, repairing
24  certainly was more reasonable in terms of the amount
25  of material that had to be procured and the amount

Page 84

1   of material that had to be installed.  So it
2   certainly would be quicker and in most cases then
3   that means less expensive to repair.
4          And just to, kind of, back all of that up,
5   looked at similar projects, movable bridge, trusses,
6   railroad and, kind of, I already had the feeling,
7   but offered one scenario here where we were talking
8   more of an order of magnitude increased costs to
9   replace as opposed to rehabilitate in this
10  circumstance on this type of bridge.
11          Then mechanical and electrical --
12  mechanical had little to no impact.  Electrical had
13  some, but with it primarily being structural.  And
14  if it were replaced, we would be tied into that
15  tower.  You know, the span is so complex with the
16  tower, too.  There would be such a big snowball
17  effect trying to replace that whole span that it
18  just did not make sense to me.
19      Q.   You might have anticipated my next
20  question.  So when you are doing the comparison
21  between the other project, including like the
22  Raritan Bridge, were you evaluating that as, like, a
23  total bridge replacement, which for the Main Line
24  would be the other span, the other half of the lift
25  system that was not damaged, or were you just



LEE R. LENTZ P.E.                                      August 12, 2025
COEYMANS MARINE TOWING                                           85—88

Page 85

1  focusing on spans one through four as part?
2      A.   The Raritan was an interesting reference
3  because it's only a superstructure, so that job does
4  not include piers, which are in-water elements, so
5  that conceivably could be what you would consider
6  the Main Line Bridge, just the steel above the pier
7  and up and replacement and then it was the full
8  crossing with, kind of, a modification that it is a
9  wider bridge.  But, yeah, it would be all -- I
10 forget how many spans, but it would be all, assuming
11 that you were going to replace everything above the
12 piers and from above it to abutment over the water.
13     Q.   And do you recall how long the Raritan
14 River Bridge is?
15     A.   I do not.  I don't recall.
16     Q.   And if I am interpreting it correctly,
17 with the cost comparison that you made to the
18 Raritan Bridge, you split the total costs 444,000
19 million in half and you used the 222 million figure
20 because the Main Line has one -- the one track and
21 the Raritan had two tracks; am I correct?
22     A.   Correct.  And that certainly will -- that
23 is a conservative low estimation because you
24 wouldn't just cut the bridge price in half because
25 you have two tracks.  It is one track instead of

Page 86

1  two.  Most of your major elements are still in
2  place.  And, yeah, it is narrower, but it's the
3  cheaper components that you are shrinking, so I
4  think that was a fair approach.
5      Q.   And did you do any evaluation on, like,
6  what it would have cost just to replace span four of
7  the Main Line Bridge at any time?
8      A.   No.
9      Q.   How about the same question for spans one,
10 two, or three, did you make any kind of independent
11 evaluation of what the replacement cost would be for
12 those particular spans?
13     A.   No.
14     Q.   And is it fair to say that since you
15 didn't do that evaluation, that you didn't compare,
16 on a span-by-span basis, to a similar type of
17 project like the Raritan River Bridge project;
18 right?
19     A.   That's fair.
20     Q.   The fourth paragraph down, the mechanical
21 and electrical systems were the least impacted
22 portions, therefore the repair was the most
23 appropriate path, did the Raritan Bridge have any
24 similar mechanical or electrical systems as the Main
25 Line Bridge?

Page 87

1      A.   Good question.  I believe that's a full
2  mechanical and electrical replacement.
3      Q.   And did you run any evaluations -- putting
4  aside comparing it to a project like the Raritan
5  River Bridge, did you run any calculations or
6  evaluations to what it would have cost to repair the
7  damaged portions of the bridge that resulted in the
8  allision as opposed to just replacing them in full?
9      A.   Well, replacement -- we certainly
10 evaluated other projects besides Raritan, but
11 nothing formally in writing or in a cost estimate.
12     Q.   Do you have any opinion on what I'll call
13 the full replacement cost would have been for spans
14 one, two and three and four of the Main Line Bridge
15 after the allision?
16     A.   I don't.
17     Q.   So then the statement of compensation on
18 the back part, we talked about that, those remain
19 the accurate and up-to-date rates that are being
20 charged in this matter for your work on the case?
21     A.   Correct.
22     Q.   And are all of the opinions that are
23 expressed in here held to a reasonable degree of
24 engineering certainty.
25     A.   Yes.

Page 88

1      Q.   And we see, on Page 6, the signature page,
2  and that's your signature; correct?
3      A.   Yes.
4      Q.   Did you have an opportunity to look at the
5  Notice of Deposition that we served in this case at
6  any time?
7      A.   Can you remind me which document that is?
8      Q.   Sure.  If you give me one moment.  Can you
9  see my screen there?
10     A.   Yes.
11     Q.   Have you seen this document before?
12     A.   Yes, I believe so.
13     Q.   Then do you see the rider part, that there
14 was a request for documents?  Did you have a chance
15 to review those at all prior to today?
16     A.   No.
17     Q.   Were you asked, at any time, to gather any
18 documents for production in the case, other than
19 what you exchanged with counsel as part of your
20 formulating opinions?
21     A.   No.
22     Q.   If we look at 22 and 23 -- starting with
23 22 --
24          MR. ROMAN:  And I will mark this as
25 Exhibit 4.  It will be the amended notice that was



Page 89

1 served on July 30th.
2        (Whereupon, a document was requested to be
3 marked as Exhibit 4.)
4 BY MR. ROMAN:
5     Q.  22 requests copies of any publications,
6 policies, rules, regulations, manuals, guidelines,
7 standards or documents known to the deponent that
8 state railroad bridges similar to the Belt Line's
9 Railroad Bridge have an indefinite life expectancy.
10 Do you see that part there?
11    A.  I see it.
12    Q.  Do you have an understanding of what an
13 indefinite life expectancy would mean in the context
14 of a steel railroad bridge?
15    A.  I am still working my way through the
16 statement here.
17       I am not sure what this No. 22 is getting
18 at, honestly.
19    Q.  Do you have an understanding what the
20 term, indefinite life expectancy, means for a steel
21 railroad bridge?
22    A.  I can -- yeah, I understand what that
23 phrase is trying to describe, yes.
24    Q.  How would you describe what that phrase
25 means?

Page 90

1     A.  It would mean that proper maintenance and
2 certain cycle frequency of repairs and
3 rehabilitation, you could perpetuate a life of a
4 bridge on an indefinite basis.
5     Q.  Are you aware of any publications,
6 documents, standards, anything, just as you sit,
7 that exist out there that discuss steel railroad
8 bridges as having an indefinite life expectancy?
9     A.  I am picturing manuals and guides that
10 attempt to extend the life expectancy of a bridge
11 and they may even go so far as to say indefinite,
12 but I am not certain.
13    Q.  Is it fair to say you can't recall, you
14 know, say, this study that was produced by X company
15 that specifically discusses this topic, right, as
16 you sit?
17    A.  That's correct.
18    Q.  Have you been asked at any time to provide
19 any input or information on responding to any
20 discovery that has been issued by any party in the
21 case?
22    A.  No.  I am not sure if the produced file
23 had any discovery in it, but just whatever was in
24 that list that you shared.
25    Q.  And no conversations with counsel to say,

Page 91

1 hey, we are looking into responding to
2 interrogatories or request for admission and could
3 use your guidance on engineering as to whether this
4 is something that we can accurately answer, you
5 haven't been asked to do anything like that;
6 correct?
7        MR. SNOW:  Object to form.
8        THE WITNESS:  No.
9 BY MR. ROMAN:
10    Q.  And no, being that, that was a correct
11 statement?
12    A.  Correct.
13    Q.  If you were asked to provide input for a
14 response that called for expert engineering
15 testimony, would you do it for Mr. Snow?
16       MR. SNOW:  Object to form.
17       THE WITNESS:  I am not exactly sure
18 what this request would be, so it is hard to answer
19 that.
20 BY MR. ROMAN:
21    Q.  How are your files maintained at Modjeski
22 & Masters?
23    A.  We have probably a combination, I guess,
24 at this point, of hardware and cloud-based server
25 storage.

Page 92

1     Q.  And this particular matter, do you have it
2 opened as a separate file number within your system?
3     A.  We maintain it as separate, yes.
4     Q.  Like, what is the matter's project name?
5 How do you refer to it internally?
6     A.  We have project number and project name,
7 yes.
8     Q.  So it's a standalone file for the expert
9 work that you are doing for CWM on the behalf of the
10 Belt Line?
11    A.  Correct.
12    Q.  And who all has access to the file?  Is it
13 anybody within Modjeski & Masters or is it limited
14 to, you know, a-need-to-know basis?
15    A.  Certain portions are locked out to
16 management.  Other portions are accessible by anyone
17 at Modjeski & Masters.
18    Q.  What cloud-based system do you guys use
19 for file management?
20    A.  I didn't mean like project-wide or
21 anything like that.  I just think our IT has
22 migrated certain things to a cloud-based
23 subscription.  So I don't have the answer to that.
24 I don't know what services they use.
25    Q.  Is there a particular, like, file



LEE R. LENTZ P.E.                                                              August 12, 2025
COEYMANS MARINE TOWING                                                                 93—96

Page 93
1  management software system that Modjeski uses?
2      A.   No, nope.  We are just in regular
3  Explorer, Windows Explorer.
4      Q.   So for, like, work on this file, it's
5  incumbent on whoever is working on the file to just
6  maintain their documents and notes and all of that
7  type of thing on their respective computers in
8  folders however they deem?
9      A.   Our standard practice is to keep
10  everything within that project folder on the server.
11      Q.   The server, is that like a proprietary
12  internal server to Modjeski & Masters or is there a
13  third-party service?
14      A.   It's owned, operated, maintained by
15  Modjeski & Masters on-site in our regular course.
16      Q.   Like, we use iManage.  You don't use
17  something like that; right?
18      A.   What's it called?
19      Q.   Our file management system is called
20  iManage.
21      A.   Not that I am aware of.
22      Q.   I don't know if you guys use a service
23  like that.  That's all.
24      A.   No.
25      Q.   Have you had a chance to take a look at

Page 94
1  the report and opinions of R.L. Banks & Associates
2  that was coauthored by Nick Marianos and Charlie
3  Cunningham?
4      A.   I received it and I did start looking at
5  it.  I haven't looked at the entire document.
6      Q.   Do you remember Mr. Marianos from his time
7  working at Modjeski & Masters?
8      A.   I do.  We overlapped.  I don't know how
9  much, but we definitely overlapped a little bit.  I
10  do remember him.
11      Q.   I think it was early in your career;
12  right?
13      A.   Yeah.  It would have been, yeah.
14      Q.   Do you have any opinions, as you sit
15  today, in regard to anything that was offered by
16  R.L. Banks & Associates in its report?
17          MR. SNOW:  Objection to form.
18          THE WITNESS:  No.  I am just
19  absorbing that.  I just started to absorb that, so I
20  don't have anything to share.
21  BY MR. ROMAN:
22      Q.   And fair to say that you are going to
23  continue on that process and review it?
24      A.   That's correct.
25      Q.   Have you reviewed the report of YA

Page 95
1  Engineering that was authored by a Mr. Sadik, who
2  was retained on behalf of Evanston Insurance
3  Company?
4      A.   No.
5      Q.   Do you know if you received a copy of that
6  report at any time?
7      A.   No.
8      Q.   Fair to say, you have not been asked to
9  provide any opinions to date in regard to any
10  opinions that Mr. Sadik has offered?
11      A.   That's correct.
12          MR. ROMAN:  All right, Mr. Lentz.  I
13  think that's all I have for right now.  I don't know
14  if other counsel has some, but I appreciate your
15  time good meeting you.
16          THE WITNESS:  Yeah, you too.  Thank
17  you.
18          MR. JONES:  No questions.
19          MR. SNOW:  I may have some, but why
20  don't we take a ten-minute break and then we can
21  come back and I'll see.
22          THE WITNESS:  Okay.
23          MR. ROMAN:  Sounds good.
24              * * *
25          EXAMINATION BY MR. SNOW

Page 96
1              * * *
2  BY MR. SNOW:
3      Q.   Mr. Lentz, I'm Ryan Snow.  I represent the
4  Belt Line, as you know.  I have a few follow-up
5  questions.
6          When Mr. Roman was asking you about the
7  repair methodology section of your report, he asked
8  you a number of questions about what work was done
9  month to month.  Do you recall that discussion?
10      A.   Yes.
11      Q.   And I think you testified by memory; is
12  that right?
13      A.   Yes.
14      Q.   If Mr. Roman had shown you documents from
15  that timeframe, you could have answered more
16  precisely; is that right?
17      A.   I am sure, yes.
18      Q.   And in coming to the conclusions and
19  opinions in your report, did you actually review the
20  documents to show what was done month to month on
21  the project?
22      A.   Yes.
23      Q.   The third part of your report addressed
24  reasonableness of the total costs and there was some
25  discussion with Mr. Roman and you about the



LEE R. LENTZ P.E.                                    August 12, 2025
COEYMANS MARINE TOWING                                        97–100

Page 97

1 ancillary costs. I think you called them other.
2    A. Other, yes.
3    Q. Do you remember that discussion?
4    A. Yes.
5    Q. You said you took the 1.4 million at face
6 value, I think. Did you still assess the
7 reasonableness of that number as part of your
8 opinion?
9    A. Yes, yes. We still reviewed and evaluated
10 and assessed reasonableness, evaluating invoices,
11 timecards, the summary of charges and definitely
12 assessed the reasonableness of those costs in
13 detail.
14    Q. And what was your conclusion about whether
15 the 1.4 million figure was reasonable?
16    A. We concluded -- I concluded that it is
17 reasonable costs.
18    Q. There was some more discussion about
19 engineering costs as a percentage of total project
20 costs and Modjeski & Masters charges at between five
21 and eight percent. Do you recall that discussion?
22    A. Yes.
23    Q. I think you said that those charges are
24 based on Modjeski & Masters competing for work with
25 other engineering companies in the industry; is that

Page 98

1 right?
2    A. Yes.
3    Q. So is it correct to say that Modjeski &
4 Masters fees in that five to eight percent range are
5 competitive with the rest of the market, to your
6 knowledge?
7    A. Yes.
8    Q. And I take it, that would be based on your
9 experience, not only generally at Modjeski &
10 Masters, but also on that subcommittee you serve on?
11    A. The compensation committee, yes.
12    Q. And the last part of your report about
13 repair versus replacement, Mr. Roman asked you
14 questions about whether you calculated a cost to
15 replace just certain spans like span four. Do you
16 remember that discussion?
17    A. Yes.
18    Q. And I think you said, no, you did not
19 calculate those costs. Did I note that correctly?
20    A. That's correct.
21    Q. Is replacing just span four something that
22 you would recommend doing in the first place?
23    A. No. With looking at that, the complexity
24 by which you would go about doing that doesn't make
25 any sense to even estimate its cost for replacement

Page 99

1 due to the fact it is interconnected with the
2 counterweight system, the lift span and the tower
3 and span are one in this case directly tied
4 together, so, no.
5    Q. Is that why you didn't calculate a cost
6 for just replacing a span?
7    A. I think, in hindsight, that's why.
8    Q. At the very beginning of your deposition,
9 you had a discussion with Mr. Roman about an
10 inspection of the Main Line Bridge where you
11 actually went out and saw the bridge on August 5th.
12 Do you recall that?
13    A. Yes.
14    Q. And Mr. Roman asked you if that site visit
15 to the bridge changed any of your opinions and I
16 believe you said, no. Do I have that correct?
17    A. Correct.
18    Q. My question is, even though it didn't
19 change your opinions, did the site visit support or
20 reinforce any of your opinions?
21    A. Yeah. It definitely supported my opinion
22 shared in my report and it even augmented it in
23 several cases where I could see adjacent or related
24 damage to the bridge from the allision event that
25 was not repaired. One case was the counterweight in

Page 100

1 the southwest corner near the guides had fresh
2 damage likely from the allision event that was not
3 repaired. And then there was a damaged portion of
4 the lower cord at span four on the impact side that
5 had some buckled lacing bars. I don't know whether
6 that is part of the event or a past issue, but
7 obviously, it was not repaired as part of the
8 repair. So it supported my opinion and augmented
9 it. That's fair to say.
10         MR. SNOW: I don't have any further
11 questions. Thank you, Mr. Lentz.
12         MR. ROMAN: Just a few follow-ups,
13 Mr. Lentz.
14          * * *
15         RE-EXAMINATION BY MR. ROMAN
16          * * *
17 BY MR. ROMAN:
18    Q. That $1.4 million bucket that you and your
19 counsel were discussing, how did you go about
20 evaluating the reasonableness of the additive rate
21 percentages that were used to escalate the labor
22 costs?
23    A. Labor and material.
24    Q. Do you recall the specific portion that
25 there was what I call an escalator of the additive



LEE R. LENTZ P.E.
COEYMANS MARINE TOWING

August 12, 2025
101–104

Page 101

1 rates that were based off of Norfolk Southern's
2 agreements with various data. Do you recall that
3 part?
4     A. Yes, the five percent on materials and
5 then the various markups on labor. The material --
6     Q. And when -- I apologize. I didn't mean to
7 cut you off.
8     A. The material markups is common. We see
9 that often. Sometimes, we're even able to markup,
10 like, direct expenses at that rate -- very rare from
11 the consulting engineer's perspective, but it is
12 very common on the builder side for materials. And
13 then, again, looking at the labor rates, very
14 similar to what we do, what H&H does and what PCL
15 does and the fact that they were pre-agreed to rates
16 that are used otherwise by railroads in Virginia,
17 that all added up for us.
18     MR. ROMAN: All right. I think
19 that's all I have. Anything on that, Mr. Snow?
20     MR. SNOW: No, sir. Anything from
21 you, Mr. Jones?
22     MR. JONES: Nothing here.
23     MR. ROMAN: Are you waiving
24 reserving?
25     MR. SNOW: He'll read and sign.

Page 102

1     MR. ROMAN: Maureen, I'll take a
2 copy. Etran is fine. And can I get a rough, like,
3 in the next day or two?
4     COURT REPORTER: Ryan, do you want a
5 copy -- well, you will get the read and sign.
6     MR. SNOW: Yes, but I don't need the
7 rough.
8     COURT REPORTER: Chris, do you want a
9 copy?
10     MR. JONES: Yes, please.
11     COURT REPORTER: Thank you.
12     (Whereupon, the deposition concluded at
13 approximately 1:10 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 103

1
2
3         C E R T I F I C A T I O N
4
5         I, Maureen Stewart, a Registered
6 Professional Reporter and Notary Public, within and
7 for the State of Pennsylvania, do hereby certify:
8         That LEE R. LENTZ, P.E., the witness whose
9 examination is hereinbefore set forth, was first
10 duly sworn by me and that this transcript of said
11 testimony is a true record of the testimony given by
12 said witness.
13         I further certify that I am not related to
14 any of the parties to this action by blood or
15 marriage, and that I am in no way interested in the
16 outcome of this matter.
17
18         IN WITNESS WHEREOF, I have hereunto set my
19 hand this 12th day of August, 2025.
20
21
22         _____
23         Maureen Stewart, RPR
          Notary Public
24
25

Page 104

1         DEPOSITION ERRATA SHEET
2
3 Our Assignment No. J13278479
4 Case Caption:    Norfolk and Portsmouth Belt Line
5 Bridge Allision
6
7
8         DECLARATION UNDER PENALTY OF PERJURY
9         I declare under penalty of perjury that I
10 have read the entire transcript of my Deposition
11 taken in the above-captioned matter or the same has
12 been read to me, and the same is true and accurate,
13 save and except for changed and/or corrections, if
14 any, as indicated by me on the DEPOSITION ERRATA
15 SHEET hereof, with the understanding that I offer
16 these changes as if still under oath.
17     Signed on the _____ day of
18 _____, 20_____,
19
20 _____
21 LEE R. LENTZ, P.E.
22
23
24
25

LEE R. LENTZ P.E.
COEYMANS MARINE TOWING

August 12, 2025
105–106

```
                                              Page 105
 1              DEPOSITION ERRATA SHEET
 2   Page No.____ Line No. _____ Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No.____ Line No. _____ Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No.____ Line No. _____ Change to:_____
 9   _____
10   Reason for change:_____
11   Page No.____ Line No. _____ Change to:_____
12   _____
13   Reason for change:_____
14   Page No.____ Line No. _____ Change to:_____
15   _____
16   Reason for change:_____
17   Page No.____ Line No. _____ Change to:_____
18   _____
19   Reason for change:_____
20   Page No.____ Line No. _____ Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____ DATE:_____
25          LEE R. LENTZ, P.E.
```

```
                                              Page 106
 1              DEPOSITION ERRATA SHEET
 2   Page No.____ Line No. _____ Change to:_____
 3   _____
 4   Reason for change:_____
 5   Page No.____ Line No. _____ Change to:_____
 6   _____
 7   Reason for change:_____
 8   Page No.____ Line No. _____ Change to:_____
 9   _____
10   Reason for change:_____
11   Page No.____ Line No. _____ Change to:_____
12   _____
13   Reason for change:_____
14   Page No.____ Line No. _____ Change to:_____
15   _____
16   Reason for change:_____
17   Page No.____ Line No. _____ Change to:_____
18   _____
19   Reason for change:_____
20   Page No.____ Line No. _____ Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____ DATE:_____
25          LEE R. LENTZ, P.E.
```

