# Exhibit 7

CONFIDENTIAL



# Expert Report

## Norfolk and Portsmouth Belt Line Railroad Company

### v.

## Coeymans Marine Towing, LLC D/B/A Carver Marine Towing

## Case No: 2.24-cv-00490-MSD-LRL

## Concerning

## Main Line Railroad Bridge

## Elizabeth River, Virginia

**Submitted to:**
**Crenshaw, Ware & Martin, P.L.C.**
W. Ryan Snow, Esq.

July 2, 2025

Kevin M. Lugo, PE, CCM
Senior Vice President

McDonough Bolyard Peck, Inc.
2600 Park Tower Drive, Suite 801
Vienna, VA 22180

CONFIDENTIAL

## TABLE OF CONTENTS

1   SUMMARY.................................................................................................................1
  1.1   Introduction ......................................................................................................1
  1.2   Project Background..........................................................................................2
      1.2.1   The Belt Line Main Line Railroad Bridge.................................................2
      1.2.2   Belt Line's Emergency Repair Design and Construction Contractors....................4
  1.3   The Dispute .....................................................................................................5
  1.4   MBP's Conclusions and Opinions..................................................................6
2   QUALIFICATIONS...................................................................................................7
  2.1   MBP General Description and Services.........................................................7
  2.2   Qualifications of Kevin M. Lugo, PE, CCM....................................................7
  2.3   Statement Concerning Findings and Opinions..............................................8
3   MBP'S REVIEW AND ANALYSIS OF BELT LINE'S EMERGENCY REPAIR PLAN AND
   PROCESS ...............................................................................................................9
  3.1   Belt Line's Project Delivery Method................................................................9
  3.2   The Main Line Bridge Repair Plan ...............................................................11
4   MBP'S ANALYSIS OF BELT LINE'S ALLEGED DAMAGES .....................................13
  4.1   MBP's Methodology........................................................................................14
  4.2   Analysis of Belt Line's Alleged Direct Costs................................................14
      4.2.1   Review of PCL's Invoices.........................................................................15
          4.2.1.1   PCL Quantity Validation................................................................16
          4.2.1.2   Review of PCL's Labor, Material, and Equipment Rates ....................17
      4.2.2   Review of H&H's Invoices........................................................................19
          4.2.2.1   H&H Labor Efforts Validation ...............................................19
          4.2.2.2   Review of H&H's Labor and Material Rates ........................20
      4.2.3   Review of Belt Line's Labor Invoices ......................................................20
      4.2.4   Review of Belt Line's Access Road Costs ...............................................21
      4.2.5   Review of Belt Line's Other Emergency Repair Costs ...........................22
5   EXHIBIT LIST ..........................................................................................................i

CONFIDENTIAL

# 1    SUMMARY

## 1.1    Introduction

Crenshaw, Ware & Martin, P.L.C., counsel for Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") engaged Kevin M. Lugo, PE, CCM, and McDonough Bolyard Peck, Inc. ("MBP") to independently evaluate and provide professional opinions regarding the reasonableness of costs incurred by Belt Line during emergency repairs of its Main Line Railroad Bridge *"that spans the Southern Branch of Elizabeth River, between Chesapeake and Portsmouth, Virginia[1]"* (the "Project"). The professional opinions developed and expressed herein are based on review of the pleadings, the contemporaneous project records, and the results of independent analyses. This report sets forth the preliminary findings, conclusions, and opinions of Kevin M. Lugo, PE, CCM. Any references to opinions of MBP are the opinions of Mr. Lugo.

While performing its assignment, MBP reviewed available project documentation including Plans, Specifications, Requests for Information ("RFI"), contract agreements, bridge inspection reports, emails, invoices, daily reports, weekly reports, project schedule, payment applications, photographs, videos, depositions, and legal pleadings. The general documentation listed above is not intended to be all-inclusive and was obtained through Counsel. MBP also interviewed personnel with the Belt Line, Hardesty and Hanover, Inc. ("H&H"), and PCL Civil Constructors, Inc.. ("PCL").

MBP's review and analysis of the Project is ongoing, and the conclusions presented herein are based on information reviewed to date. MBP may amend or change any opinions and conclusions presented herein as appropriate based on further information brought to its attention.

---

[1] March 31, 2025, Norfolk and Portsmouth Belt Line Railroad Company's Brief in Support of its Motion to Compel.

CONFIDENTIAL

## 1.2    Project Background

### 1.2.1    The Belt Line Main Line Railroad Bridge

The Belt Line Main Line Railroad Bridge ("Main Line Bridge" or "the Bridge") spans the Southern branch of the Elizabeth River between Chesapeake and Portsmouth, Virginia.

From the West (Portsmouth) end towards the center, the Main Line Bridge consists of a West approach, three spans, and the Span 4 truss. To the east of the Span 4 truss span is the center span, which mechanically lifts vertically, followed by two East truss spans (Span 6 and 7), Span 8, and the East approach at the Chesapeake (South Norfolk) end. To the left of the figure is the West, and to the right is the East. Span 4 is the area where the allision occurred, and it rests on Piers 4 and 5. A general elevation of the bridge is shown below in Figure 1: General Elevation of the Main Line Bridge. The Bridge is also identified by Sections 1 to 6 in some of the Inspection and Maintenance Reports, and those have been illustrated in Figure 1: General Elevation of the Main Line Bridge.



**Figure 1: General Elevation of the Main Line Bridge**

The Bridge is regularly inspected and maintained in accordance with Belt Line's Bridge Management Program. **[Exhibit 1]**

On June 15, 2024, the tug M/T MACKENZIE ROSE ("the tug"), owned and operated by Carver Marine Towing of New York ("Carver"), struck the Main Line Bridge. The tug was pushing a 200-foot loaded barge when it hit the Portsmouth side of the Bridge, outside of the navigable

CONFIDENTIAL

channel and behind the fender system. The impact, which was on Span 4, was so severe that the tug knocked the superstructure almost seven feet off the pier substructure, left one of the four legs resting midair, and warped the track rail in such a way that the structure was rendered unusable until repaired. See Figure 2: Main Line Bridge Superstructure Knocked Off Substructure - Looking East as follows.



**Figure 2: Main Line Bridge Superstructure Knocked Off Substructure - Looking East**

Span 4 is also identified in the Bridge Inspection Reports as the SBER-2 or SBER Section 2. Figure 3: Elevation of the South Truss at the MacKenzie Rose Tug Strike Location, Looking North, shows a photograph identifying the location of the allision of the South Truss span. It is MBP's understanding that the tug and its load left the scene without notifying the U.S. Coast Guard or any other authority.

CONFIDENTIAL



**Figure 3: Elevation of the South Truss at the MacKenzie Rose Tug Strike Location, Looking North**

By June 18, 2024[2], Belt Line had engaged H&H as the emergency repair engineer and PCL as its emergency repair contractor to put the bridge back in service. H&H and PCL were on-site on June 18, 2024.[3] As quickly as October 30, 2024, the Bridge was successfully lowered and raised since the allision, but additional work was required to make it fully operational, including repairing the entire electrical and signal system that remotely operated the lifting and lowering of the Bridge. The first train crossed the Bridge on November 6, 2024, partially resuming Belt Line's service to its customers. By February 13, 2025, the Bridge was able to be lifted remotely at 100% speed using full automation, and on or about March 7, 2025, PCL began demobilizing from the project site.

### 1.2.2    Belt Line's Emergency Repair Design and Construction Contractors

Within days of the allision, Belt Line's President and General Manager, Cannon Moss, contacted Norfolk Southern Railway Company's ("N/S")[4] Chief Bridge Engineer for assistance in identifying potential engineers and constructors experienced in the type of construction and

---

[2] Page 81 of Cannon Moss's June 4, 2024, deposition transcript.
[3] Page 98 of Cannon Moss's June 4, 2024, deposition transcript.
[4] Norfolk Southern is the majority stockholder in Belt Line. Page 19 of Cannon Moss's June 4, 2025, deposition.

CONFIDENTIAL

repairs needed to put the Bridge back into service. Belt Line was informed that N/S held Master Service Agreements with engineers and contractors, with negotiated rates but not emergency rates, and that the Belt Line could utilize those agreements to engage an engineer and contractor to complete the work. Based on N/S's experience, H&H and PCL were identified as a qualified engineer and contractor, respectively, to perform the work. Belt Line subsequently selected them.

Belt Line also contacted PCL on June 17, 2024, regarding the incident and was on-site on June 18, 2024[5].

Belt Line engaged H&H on June 18, 2024, to prepare an emergency repair plan under pre-negotiated rates using its existing December 28, 2018, N/S Master Service Agreement. **[Exhibit 2]** Similarly, PCL started repairs on June 18, 2024, using its existing November 3, 2020, N/S Master Service Agreement. **[Exhibit 3]** PCL also received an addendum (Appendix B) describing the services to be performed and negotiated rates for labor and equipment, signed on September 14, 2024. **[Exhibit 4]**

### 1.3    The Dispute

On August 8, 2024, Carver filed a Complaint For Exoneration from or Limitation of Liability to the United States Eastern District of Virginia: Norfolk Division as a result of the M/T MACKENZIE ROSE's allision with the Belt Line's Main Line Bridge that occurred on June 15, 2024. **[Exhibit 5]** On December 5, 2024, Belt Line responded to the August 8, 2024, Carver Complaint with its answer and affirmative defenses. **[Exhibit 6]** On December 5, 2024, Belt Line also filed a Claim stating that the M/T MACKENZIE ROSE negligently struck the Main Line Bridge, failed to notify Belt Line, the United States Coast Guard, or any other authority of the damage to the Bridge with damages likely in excess of $12 million not including economic losses associated with months of diverted traffic. **[Exhibit 7]** As of the date of this report, Belt Line's

---

[5] Interview with Charlie Graning of PCL

claimed costs resulting from the Tug's impact on the bridge structure total $15,517,166.85.

**[Exhibit 8]**

### 1.4    MBP's Conclusions and Opinions

Mr. Lugo's conclusions and opinions are offered with a reasonable degree of certainty and are based on his expertise, education, analysis, and experience in the construction industry. As described below, it is Mr. Lugo's opinion that:

1. Belt Line's claimed costs to repair the Main Line Bridge are reasonable at $15,517,166.85, including inspection, design, and construction costs as well as its supporting costs to complete the work. The repairs made to the Bridge were directly caused by the tug allision, not from pre-existing conditions.

2. The emergency inspection, engineering, and construction services carried out by Belt Line's contractors were appropriate and essential.

3. Belt Line's use of existing Master Service Agreements with H&H and PCL allowed for rapid mobilization, avoiding delays of up to eight (8) to ten (10) months that would have occurred under traditional procurement methods.

4. Belt Line's project delivery approach was efficient and cost-effective, minimizing disruption to freight operations. The decision to bypass traditional bidding processes was justified given the emergency nature of the repairs.

## 2   QUALIFICATIONS

### 2.1   MBP General Description and Services

MBP is a consulting firm that provides services to clients in the areas of program management, construction management, and the analysis and resolution of disputes arising from construction performance. The experience of the firm's professionals, in multiple disciplines of both the engineering and performance aspects of construction, is the basis for MBP's services that include program and project management, contract administration, critical path method ("CPM") scheduling, cost estimating, value engineering, constructability review, commissioning, risk management, earned value management, and construction engineering and quality control/assurance inspection. MBP's services in dispute resolution include claim analysis, delay, impact, inefficiency and damages analyses, standard of care, litigation support, and expert testimony. MBP is perennially recognized by Engineering News-Record (ENR) as a Top 100 Construction Management-for-Fee firm and a Top 50 Program Management firm.

### 2.2   Qualifications of Kevin M. Lugo, PE, CCM

Mr. Lugo has over 30 years of varied engineering and management experience on construction projects for owners, designers, and contractors. He has experience providing construction and program management services on behalf of owners and contractors performing cost estimating, CPM scheduling, constructability reviews, resident engineering and inspection, contract administration, and project closeout. Mr. Lugo has over 20 years of experience performing post-construction analysis of project cost and schedule impact to assist in the resolution of disputes and has provided testimony at mediation, arbitration, and court proceedings.

Mr. Lugo is a licensed Professional Engineer in North Carolina and South Carolina. He is an active member of the Construction Management Association of America ("CMAA") and has served as an officer and a board member for its North Carolina Chapter. He is also recognized as a Certified Construction Manager through CMAA.

Mr. Lugo's CV, including his qualifications, publications, and expert testimony history, is attached to this report as an exhibit. **[Exhibit 9]** For this assignment, MBP's billable hourly rate for Mr. Lugo is $380.00 per hour.

### 2.3    Statement Concerning Findings and Opinions

Opinions expressed herein are made with a reasonable degree of certainty and based upon the review and evaluation of the project records made available to date. Mr. Lugo's's opinions are based on technical expertise, education, analysis, observations, and experience and experience. The opinions expressed herein do not and should not be construed as providing legal conclusions.

The opinions expressed herein are subject to change, refinement, and supplementation should additional information that has a material bearing on the findings and opinions expressed in this report be brought to our attention and made available for review and analysis. MBP reserves the right to amend and/or supplement this report as necessary to address new or recently provided information.

## 3   MBP'S REVIEW AND ANALYSIS OF BELT LINE'S EMERGENCY REPAIR PLAN AND PROCESS

Mr. Lugo reviewed the contemporaneous project record, considered the extenuating circumstances surrounding M/T MACKENZIE ROSE's allision with the Main Line Bridge, and Belt Line's engagement with H&H, PCL, and the use of its forces and other outside vendors. It is Mr. Lugo's opinion that Belt Line proceeded with the most efficient, cost-effective, and timely bridge repair plan to minimize the impact on its customers and return the Bridge into operation. Had Belt Line proceeded with other customary project delivery methods, such as the traditional design, bid, build, or design-build method, the procurement process alone would have extended the project anywhere from an estimated six (6) to eight (8) months.

### 3.1   Belt Line's Project Delivery Method

Belt Line's decision to utilize Master Service Agreements that N/S had negotiated with qualified engineers and contractors to perform work likely resulted in a reduction in the overall project duration by at least eight (8) to ten (10) months. This is because Belt Line was able to nimbly engage professionals to begin on the Project almost immediately after the M/T MACKENZIE ROSE's allision event with the Main Line Bridge. N/S held Master Service Agreements with both H&H and PCL. The N/S Master Service Agreement with H&H became effective on December 28, 2018, and included three appendices: Appendix A (The General Terms and Conditions), Appendix B (General Scope of Work), and Appendix C (Contractor's Proposal and Hourly Rate Schedule). The Master Service Agreement scope of services was for H&H to furnish all reports, plans, specifications, and any other documents required by Appendix B.

The N/S Master Service Agreement with PCL was an Hourly-Volume Based Contract. The Master Service Agreement became effective on November 3, 2020, and included labor and equipment rates that were to remain effective for at least two (2) years. PCL was contracted to furnish all materials, goods, or services as required in Appendix B. This Agreement included two appendices: Appendix A (The General Terms and Conditions) and Appendix B (PCL Proposal to N/S, dated October 16, 2020). On September 14, 2024, PCL signed an Appendix B for the

emergency repairs on the Main Line Bridge, which contained negotiated labor and equipment rates. The General Terms and Conditions in Appendix A covered the materials, overhead, and other markups.

Because Belt Line was able to utilize these negotiated master agreements, it avoided sole-source procurement with unknown design and construction firms that would have utilized higher "emergency rates" to quickly mobilize and execute the work. Emergency rates generally apply when a company prioritizes an emergency over its existing projects. This often necessitates greater involvement from upper management and senior staff, additional logistical and administrative support, and increased craft labor to address the urgent needs and operational disruptions.

Additionally, Belt Line avoided a lengthy procurement process. For Belt Line to pursue a traditional low bid, design-build, or Construction Manager at Risk delivery/contracting methods it would have had to advertise through the use of a Request for Proposal ("RFP") for whatever method was chosen. For example, for a traditional delivery method, the process for preparing an RFP and advertising, allowing engineers adequate time to respond, selecting the engineer, and then conducting contract negotiations would customarily take anywhere from three (3) to four (4) months. Once the engineer is under contract, the engineer would then need to prepare a design adequate for a contractor to reasonably bid the work, which could take up to 2 months in an emergency scenario. Belt Line would then need to repeat the three (3) to four (4) month procurement process to engage the contractor. The entire process could take anywhere from eight (8) to ten (10) months just for the contractor to begin work. It is MBP's opinion that Belt Line chose the expeditious project and cost-effective delivery method.

Based on this analysis, it is Mr. Lugo's opinion that the Belt Line chose an expeditious and cost-effective delivery method. Additionally, Belt Line bypassed a lengthy procurement process. Using traditional methods like low bid, design-build, or Construction Manager at Risk would have required a lengthy RFP process.

### 3.2    The Main Line Bridge Repair Plan

Following the June 15, 2024, incident, H&H was promptly contacted by the Belt Line regarding the allision and mobilized to the site on June 18, 2024, to begin inspecting the condition of the Bridge, and by July 3, 2024, had prepared an inspection report of the condition of the Main Line Bridge after the allision. **[Exhibit 10]** The inspection report summarized that the impact was roughly at the L2 node of the South Truss in the westerly direction of Span 4 and the lower portion of the West tower. The H&H inspection report then detailed the extent of damage and provided a list of repair and replacement recommendations.

By June 18, 2024, PCL had mobilized to the project site and began initial emergency repairs identified by H&H. Ultimately, on July 3, 2024, H&H proposed a top-down construction plan because the upper section of the bridge was in better alignment (straighter) than the lower sections of the truss[6]. While H&H was designing the repair plan, it provided PCL work plans to design the temporary falsework while H&H completed the repair design. During the process, H&H provided PCL with six (6) design packages, so it could proceed with the work.

During the repair effort, H&H and PCL worked together to establish the most efficient work plan and sequence to open the bridge as quickly as possible.[7] Since the allision, the Bridge was successfully lowered and raised by October 30, 2024. By November 6, 2024, the first train crossed the Bridge. By February 13, 2025, the Bridge could be lifted remotely at 100% speed using full automation. On or about March 7, 2025, PCL began demobilizing from the site.

Even though the Belt Line was in an emergency bridge repair situation, it was able to capitalize on existing N/S Master Service Agreements with both H&H and PCL. This allowed:

- H&H and PCL to start work on the emergency repairs almost immediately after the allision;

- Belt Line to avoid a lengthy procurement process, thereby saving valuable time;

- Belt Line to capitalize on the existing negotiated rates for H&H and PCL, which, in MBP's opinion, benefited the Belt Line with cost and schedule savings to the Project;

---

[6] Interview with Howard Swanson of H&H.
[7] Interview with Charlie Graning of PCL.

CONFIDENTIAL

- H&H and PCL to quickly collaborate during the design and construction process, resulting in efficiencies to the project sequencing as well as cost and schedule savings.[8]

---

[8] Interview with Charlie Graning of PCL.

## 4    MBP'S ANALYSIS OF BELT LINE'S ALLEGED DAMAGES

Belt Line asserts entitlement for emergency inspection, engineering services, and construction repairs in the amount of $15,517,166.85. This includes direct costs of $14,768,247.48 plus additive costs of $743,355.98. The additive costs are comprised of the Belt Line's overhead markups for its own labor used to support the emergency repair efforts, based on approved overhead rates by the Federal Highway Administration ("FHA") and the Georgia Department of Transportation ("GDOT")[9], and a 5% markup on materials. Based on the analysis below, it is Mr. Lugo's opinion that Belt Line's claim in the amount of $15,517,166.85 is reasonable and that the costs were necessarily incurred to bring the Bridge back into service. See Table 1: Belt Line's Costs for Emergency Repairs for a summary of Belt Line's alleged damages. Belt Line's detailed repair costs are included as an exhibit. **[Exhibit 8]**

Table 1: Belt Line's Costs for Emergency Repairs

| Name of Offsetting Account | Costs | Additive Rate | Additive Costs | Total |
|---|---|---|---|---|
| PCL CIVIL CONSTRUCTORS INC | $13,529,383.88 | | | $13,529,383.88 |
| HARDESTY & HANOVER LLC | $543,980.87 | | | $543,980.87 |
| Train and Engine Employees | $128,121.81 | 185.01% | $237,038.16 | $365,159.97 |
| Yardmasters | $191,259.85 | 185.01% | $353,849.85 | $545,109.70 |
| Maintenance of Way employees | $47,502.57 | 272.34% | $129,368.49 | $176,871.05 |
| Construction of access road to site: Labor | $7,918.12 | 272.34% | $21,564.21 | $29,482.33 |
| Construction of access road to site: Material | $10,444.69 | 5.00% | $522.23 | $10,966.92 |
| Construction of access road to site: Material | $20,260.94 | 5.00% | $1,013.05 | $21,273.99 |
| Other Costs Incurred | $289,375.15 | | | $294,938.14 |
| **Subtotal Amount** | **$14,768,247.88** | | **$743,355.98** | **$15,517,166.85** |

---

[9] Typically, the process to establish overhead rates with a state Department of Transportation ("DOT") is to submit audited overhead rates for DOT approval. For example, MBP has submitted its audited overhead rates to the Virginia, North Carolina, and Georgia DOT. All three states have accepted the same overhead rates. Mr. Moss confirmed in deposition that the rates used by Belt Line have been accepted by Virginia authorities.

### 4.1    MBP's Methodology

Mr. Lugo reviewed the July 3, 2024, Bridge Inspection Report, H&H's conformed set of bridge repair drawings and specifications[10] dated November 19, 2024, the PCL daily and weekly reports, and other contemporaneous project records to understand the scope of repairs on the Project. **[Exhibit 10]** Mr. Lugo then performed a quantity validation of PCL's installed quantities by developing select independent quantity estimates from the conformed plans and comparing these to the quantities of the same materials that were purchased by PCL for the emergency repair work. He also evaluated whether the rates charged by both H&H and PCL were the same rates that were agreed upon in H&H and PCL's Master Service Agreements with N/S[11]. **[Exhibit 11]**

Finally, Mr. Lugo reviewed whether any pending maintenance work from the January 24, 2024, Annual Bridge Inspection Report, plus prior inspection reports, and the H&H mechanical inspection conducted on June 4 and 5, 2024, with an October 2024 draft report date to determine if work was included, or excluded, specifically any Priority 1 or 2 repairs[12], dated prior to the June 15, 2024, incident, in the repair work by PCL or Belt Line during the emergency repair process. **[Exhibit 12]**

### 4.2    Analysis of Belt Line's Alleged Direct Costs

In the following Subsections of this report, Mr. Lugo provides his conclusions and opinions of the alleged damages incurred by Belt Line due to the allision by M/T MACKENZIE ROSE with the Main Line Bridge over the Elizabeth River.

---

[10] Conformed Drawings and Specifications are a final set of construction drawings that include all the iterations and changes made to the design.

[11] I have evaluated the amount of each invoice and underlying information produced by H&H and PCL in reaching my conclusions in this report. To the extent any supporting information is not provided with any invoice, I have evaluated the total amount of each invoice for reasonableness given my knowledge and understanding of the overall work performed.

[12] Bridge Management Program, 2023, Page 7, Defect Levels/Condition Codes, Priority Rating definitions.

### 4.2.1  Review of PCL's Invoices

Mr. Lugo reviewed PCL's invoices for the emergency repairs of the various scopes of work on the Bridge from June 22, 2024, to May 31, 2025, in the amount of $13,529,383.88. For the purposes of this report, Mr. Lugo conducted a review of all the PCL invoices, quantity validation of a sample of materials across all PCL invoices, and a detailed analysis of PCL's largest invoice, October 31, 2024, in the amount of $4,581,044.35.[13]

It is Mr. Lugo's opinion that the Belt Line's claim for costs reflected in the PCL invoices is reasonable in the amount of $13,529,383.88, as described in the conformed bridge repair plans. Belt Line's expenditures to PCL to make the emergency repairs to the Main Line Bridge are summarized in Table 2: PCL Costs Incurred by Belt Line for Emergency Repairs as follows:

---

[13] The October 31, 2024, invoice and backup information. Bates Numbers NPBL006302 through NPBL006545

Table 2: PCL Costs Incurred by Belt Line for Emergency Repairs

| Document Date | Name of Offsetting Account | Costs |
|---|---|---|
| June-24 | PCL CIVIL CONSTRUCTORS INC | $271,780.34 |
| June-24 | PCL CIVIL CONSTRUCTORS INC | $29,217.28 |
| July-24 | PCL CIVIL CONSTRUCTORS INC | $1,150,040.45 |
| August-24 | PCL CIVIL CONSTRUCTORS INC | $1,200,865.67 |
| September-24 | PCL CIVIL CONSTRUCTORS INC | $1,184,763.10 |
| October-24 | PCL CIVIL CONSTRUCTORS INC | $4,581,044.35 |
| November-24 | PCL CIVIL CONSTRUCTORS INC | $783,075.66 |
| December-24 | PCL CIVIL CONSTRUCTORS INC | $1,074,252.56 |
| January-25 | PCL CIVIL CONSTRUCTORS INC | $1,632,440.06 |
| February-25 | PCL CIVIL CONSTRUCTORS INC | $719,259.08 |
| March-25 | PCL CIVIL CONSTRUCTORS INC | $480,846.87 |
| April-25 | PCL CIVIL CONSTRUCTORS INC | $345,137.46 |
| May-25 | PCL CIVIL CONSTRUCTORS INC | $76,661.00 |
| | **Subtotal Amount** | **$13,529,383.88** |

### 4.2.1.1 PCL Quantity Validation

MBP performed an independent material quantity validation by preparing quantity estimates for selected components, including higher-cost Steel Wide Flange Beams and L-shaped angles of the emergency repair plans, and comparing the results to the quantities included within all the PCL invoices. **[Exhibit 13]** MBP's material quantity comparison indicates minimal variance between its material take-off and PCL's invoice quantities for the following reasons:

- PCL purchased steel in stock lengths from Infra-Metals, had them shipped to the fabricator's yard for cutting to length[14].

- There were instances where PCL had to use steel angles of a different size than designed due to space limitations affecting the bolt installation, requiring additional purchases of steel.[15]

---

[14] Interview with Howard Swanson of H&H
[15] Interview with Howard Swanson of H&H

- PCL had to modify some of the steel connections to pass fracture-critical testing. In this situation, the issue was resolved by H&H changing the angle section sizes on the drawings. PCL refabricated the angles using already purchased material to the revised sizes, where possible.[16]

In summary, MBP's length variance for the wide flange beams is 5%, while that for the angles is 10%. See Table 3: Summary Quantity Validation for Steel Wide Flange Beams and Angles for the summary results of our analysis.

Table 3: Summary Quantity Validation for Steel Wide Flange Beams and Angles

| W Beams and Angle Sections | | | | | | |
|---|---|---|---|---|---|---|
| MBP Takeoff | | | Infra-Metals Invoiced Quantities | | Quantity Variance (LF) | Quantity Variance (%) |
| Total Wide Flange Beam Length | 583 | LF | Total Wide Flange Beam Length | 615 | LF | 32 | 5% |
| Total Angle Length | 509 | LF | Total Angle Length | 560 | LF | 51 | 10% |

As a result of the analysis, it is Mr. Lugo's opinion that the sampled PCL quantities are reasonable as compared to the quantity takeoffs, and any variances are due to the reasons described above.

### 4.2.1.2   Review of PCL's Labor, Material, and Equipment Rates

Mr. Lugo verified that PCL's labor and equipment rates in the invoices align with the negotiated rates in PCL's Appendix 2 Addendum. Due to the unsafe and unusable state of the Bridge, the work was completed on an hourly-volume basis, with records documenting all material purchases, equipment rental, and labor, supervision, and management. Additionally, PCL produced daily and weekly reports of progress for the emergency repair work during the course of the Project, identifying the work performed each day and week, which is expected of an hourly-volume type delivery method.[17] **[Exhibit 10]**

Mr. Lugo reviewed the January 24, 2024, Bridge Inspection report and cross-checked this with the Belt Line's 2018 - 2024 Repair Invoices (NPBL000999 - 1305)[18] to determine if any Bridge Inspection Report repair recommendations in Span 4, classified as a Priority 2, and noted

---

[16] Interview with Howard Swanson of H&H
[17] PCL Daily and Weekly Reports, Bates Number NPBL002408 to 2531
[18] Document containing Belt Line's bridge repairs, titled 2018-2024 Repair Invoices (NPBL000999 – 1305)

as "Repair: Floorbeam 8 web at stringer 1 outbound top angle area", were completed prior to the June 15, 2024, incident. No high-priority recommendations appeared to be outstanding that were included in the post-allision repairs.

There was another recommendation in the January 24, 2024, Bridge Inspection report, classified as a Priority 3, and noted as "Monitor: Floorbeam 8 crack at stringer 1 on inboard side for additional cracking past termination hole". Mr. Lugo did not identify any Bridge Repair invoices describing this item as completed prior to the allision. PCL identified a crack in Floorbeam 8, during the emergency repairs, identified during prior Annual Bridge Inspections, and drilled a hole in the steel section to stop the crack[19]. From our estimation, this activity is likely to have taken no more than two hours for a PCL Ironworker at $90/hour with a Drill at $20/hour plus 15% material markup, or $226, and no more than $300 in total. An insignificant cost on this $15 plus million repair project.

While mechanical issues related to the counterweight had been identified before the allision, the single PCL invoice for lubrication of the counterweight cables was related to the emergency repairs. During the emergency repairs, the cables that hold the Bridge's counterweight used during the lifting process gathered significant dust and dirt over several months from the river and surrounding industrial operations due to a lack of use. The automatic lubrication system lubricates the cables while the bridge moves up and down. Because the lubrication system was not regularly lubricating the ropes, as in the past, PCL had to lubricate them before the Bridge could be lifted on a regular basis. As a result, it was necessary for PCL to lubricate the counterweights cables in order to get the Bridge to work as designed.[20]

---

[19] Interview with Charlie Graning of PCL
[20] Interview with Charlie Graning of PCL

#### 4.2.2    Review of H&H's Invoices

H&H's invoices for the work done on the emergency repairs are listed below in Table 4: H&H Invoices Incurred by Belt Line for Emergency Repairs. These invoices cover H&H's emergency inspection and design services.

Table 4: H&H Invoices Incurred by Belt Line for Emergency Repairs

| Document Date | Name of Offsetting Account | Costs |
|---|---|---|
| June-24 | HARDESTY & HANOVER LLC | $169,657.97 |
| July-24 | HARDESTY & HANOVER LLC | $133,454.00 |
| August-24 | HARDESTY & HANOVER LLC | $92,722.51 |
| September-24 | HARDESTY & HANOVER LLC | $50,985.41 |
| October-24 | HARDESTY & HANOVER LLC | $44,825.96 |
| November-24 | HARDESTY & HANOVER LLC | $25,643.70 |
| December-24 | HARDESTY & HANOVER LLC | $5,425.03 |
| January-25 | HARDESTY & HANOVER LLC | $6,176.00 |
| February-25 | HARDESTY & HANOVER LLC | $4,707.79 |
| March-25 | HARDESTY & HANOVER LLC | $879.50 |
| April/May 2025 | HARDESTY & HANOVER LLC | $660.00 |
| Jun-Aug 2024 | HARDESTY & HANOVER LLC | $4,055.00 |
| August-24 | HARDESTY & HANOVER LLC | $4,788.00 |
| | Subtotal Amount | $543,980.87 |

Mr. Lugo reviewed H&H's invoices for the professional services rendered with respect to the June 15, 2024, incident and ensuing emergency repairs of the various scopes of work on the Bridge from June 18, 2024, to May 31, 2025, in the amount of $543,980.87. For the purposes of this report, MBP presents the results of our review of all the H&H invoices, including labor rates and duration validation.

It is Mr. Lugo's opinion that the Belt Line's claim for H&H's costs for the inspection and design services of $543,980.87 is reasonable.

#### 4.2.2.1    H&H Labor Efforts Validation

Mr. Lugo reviewed H&H's manhours to complete various scopes of work in comparison to the scope and contents of the July 3, 2024, inspection report, and the emergency repair plans and specifications. Documents reviewed include H&H invoice progress reports, hours

reports, and accompanying time records. Activities in the progress reports were compared to the invoiced hours. H&H's effort included field support to the construction crews as repair activities progressed and during the repairs of the Bridge counterweight guides.

It is Mr. Lugo's opinion that H&H's labor effort was reasonable for the work performed on behalf of the Belt Line.

### 4.2.2.2    Review of H&H's Labor Rates and Expenses

Mr. Lugo reviewed H&H's invoiced labor rates and compared them to its negotiated rates in Attachment B to the CY23-CY25_3997 Executed Change Order No. 1[21] to its December 28, 2018, N/S Master Services Agreement. H&H's invoice labor rates in its invoices are aligned with its negotiated rates. The H&H invoices also included timesheets in support of the hours expended and documentation in support of the invoiced expenses.

Based on the analyses, it is Mr. Lugo's opinion that Belt Line's claim for H&H's inspection and engineering services for $543,980.87 is reasonable.

### 4.2.3    Review of Belt Line's Labor Invoices

Belt Line provided crews, supervision, and management staff from June 22, 2024, to March 11, 2025, in support of the emergency damage inspections and repairs to the Bridge and for railroad train traffic operations that were previously performed by CSX Transportation ("CSX") prior to rerouting of trains to Peterburg, Virginia.

It is Mr. Lugo's opinion that the Belt Line invoices are supportable and reasonable in the amount of $1,087,140.72 ($266,884.23 in direct labor costs plus audited overhead rate markups in the amount of $720,256.49), as shown in Table 5: Belt Line Costs Incurred Due to Emergency Repairs below. The additive overhead markups are 185.01% for Transportation (Train & Engine) and Yardmasters, and 272.34% for Maintenance of Way Employees as approved from the FHA and GDOT accepted overhead rates for N/S. **[Exhibit 14]** These rates

---

[21] CY23-CY25_3997 Executed Change Order No. 1 is Confidential and not included as an exhibit.

are in line with anticipated rates and, based on deposition testimony of Mr. Moss, have been accepted in Virginia in the past.

**Table 5: Belt Line Costs Incurred Due to Emergency Repairs**

| Document Date | Name of Offsetting Account | Costs | Additive Rate | Additive Cost | Total |
|---|---|---|---|---|---|
| Jun 24 to Feb 25 | Train and Engine Employees | $128,121.81 | 185.01% | $237,038.16 | $365,159.97 |
| Jun 24 to Feb 25 | Yardmasters | $191,259.85 | 185.01% | $353,849.85 | $545,109.70 |
| Oct 24 to Mar 25 | Maintenance of Way employees | $47,502.57 | 272.34% | $129,368.49 | $176,871.05 |
| | | $366,884.23 | Subtotal Amount | $720,256.49 | $1,087,140.72 |

The Belt Line was required to utilize Yardmasters and Train and Engine Employees because it was forced to reroute the trains to Petersburg, Virginia, before arriving at the Belt Line because the Main Line bridge was not operational. Yardmasters and Train and Engine Employees were responsible for the train traffic to the Belt Line, which was normally handled by CSX Transportation ("CSX"). Belt Line Yardmaster and Train Engine Employees crew costs after November 6, 2024, the date the Bridge was able to be lifted with manual controls, were handling CSX train traffic that came in overnight. The Bridge could only be lifted during daylight hours due to safety concerns, including engaging the bridge span safety locks and only lifting the bridge during daylight hours to maintain marine traffic safety at night[22]. Maintenance of Way Employees were responsible for operating the Main Line Bridge lift manually and railroad flagging operations, including during the repair operations.

### 4.2.4    Review of Belt Line's Access Road Costs

In support of the emergency repairs, Belt Line constructed an access road to the site to facilitate emergency repairs. Belt Line's labor costs of $7,918.12 include a 272.34% overhead markup for Maintenance of Way & Structures and Communications & Signals, per the 2022 Federal Highway Administration and Georgia Department of Transportation accepted additive rates for N/S. This resulted in a total labor cost of $29,482.33, including overhead and material costs of $30,705.63 ($10,444.69 + $20,260.94) plus 5%. The total cost for constructing the

---

[22] The Main Line Bridge raised and lowered at a reduced speed until the remote control system was fully operational. This is a safety concern during nightline hours to marine traffic.

access road was $61,723.24 as shown in Table 6: Access Road Construction Costs Incurred Due to Emergency Repairs.

**Table 6: Access Road Construction Costs Incurred Due to Emergency Repairs**

| Name of Offsetting Account | Costs | Additive Rate | Additive Costs | Total |
|---|---|---|---|---|
| Construction of access road to site | $7,918.12 | 272.34% | $21,564.21 | $29,482.33 |
| | $10,444.69 | 5.00% | $522.23 | $10,966.92 |
| | $20,260.94 | 5.00% | $1,013.05 | $21,273.99 |
| | **$38,623.75** | **Subtotal Amount** | **$23,099.49** | **$61,723.24** |

Based on our review, it is Mr. Lugo's opinion that Belt Line is entitled to compensation for the access road costs, in the amount of $61,723.24.

### 4.2.5   Review of Belt Line's Other Emergency Repair Costs

In support of the emergency repairs, Belt Line incurred other repair costs in addition to the costs associated with H&H, PCL, and construction of support labor and the access road, as shown in Table 7: Other Emergency Repair Costs. Having reviewed these costs, it is Mr. Lugo's opinion that the amounts are reasonable and that the costs appear to have been necessarily incurred to bring the Bridge back into service.

**Table 7: Other Emergency Repair Costs**

| Document Date | Name of Offsetting Account | Costs | Additive Rate | Additive Costs | Total |
|---|---|---|---|---|---|
| November | DIAMONDBACK SIGNAL | $6,761.02 | | | $6,761.02 |
| December | DIAMONDBACK SIGNAL | $14,018.60 | | | $14,018.60 |
| January | DIAMONDBACK SIGNAL | $2,813.40 | | | $2,813.40 |
| February | DIAMONDBACK SIGNAL | $2,742.12 | | | $2,742.12 |
| | | | | | |
| 1/31/2025 | DOREY ELECTRIC | $17,714.00 | | | $17,714.00 |
| | | | | | |
| 9/6/2024 | EASTERN METAL WORKS LLC | $1,323.00 | | | $1,323.00 |
| 11/10/2024 | EASTERN METAL WORKS LLC | $1,587.60 | | | $1,587.60 |
| 12/1/2024 | EASTERN METAL WORKS LLC | $7,814.20 | | | $7,814.20 |
| 1/15/2025 | EASTERN METAL WORKS LLC | $9,757.91 | | | $9,757.91 |
| 2/18/2025 | EASTERN METAL WORKS LLC | $13,990.76 | | | $13,990.76 |
| | | | | | |
| 8/26/2024 | Cliff's Rail | $21,539.70 | 5.00% | $1,076.99 | $22,616.69 |
| | | | | | |
| 9/5/2024 | STELLA JONES CORPORATION | $81,550.64 | 5.00% | $4,077.53 | $85,628.17 |
| | | | | | |
| 11/21/2024 | Burnet & Sons, Inc. | $96,592.80 | | | $96,592.80 |
| | | | | | |
| 5/12/2025 | Custom Panel & Controls, LLC | $3,000.00 | | | $3,000.00 |
| | | | | | |
| | Metro Wire & Cable Corp. | $8,169.40 | 5.00% | $408.47 | $8,577.87 |
| | | | | | |
| | **Subtotal Amount** | **$289,375.15** | | **$5,562.99** | **$294,938.14** |

Belt Line's subcontractors and vendors provided the following services:

- Diamondback Signal: Normally responsible for the Belt Line's signal maintenance. During the emergency repairs it repaired the communication cables for the remote lift operation.

- Dorey Electrical: Installed a new electrical conduit under the Bridge damaged by the allision.

- Eastern Metal Works: Normally responsible for routine maintenance on the Bridge. During the emergency repairs, Eastern Metal Works assisted with raising or lowering the Bridge or assisting the contractor(s) with the Bridge because of their extensive knowledge of the Main Line Bridge.

- Cliff's Rail: Provided replacement rail material.

- Stella Jones Corporation: Provided replacement bridge tie material.

- Burnet & Sons, Inc.: Contractor that installed railroad ties and rail.

- Custom Panel & Controls, LLC: Assisted Diamondback when it was reconnecting the communication cables to the remote system bridge lift controller system.

CONFIDENTIAL

- Metro Wire & Cable Corporation: Provided replacement communication cable materials.

## 5    EXHIBIT LIST

1    Bridge Maintenance Program dated December 13, 2023

2    H&H Master Services Agreement for H&H, dated December 28, 2018

3    PCL Master Services Agreement, dated November 3, 2020

4    PCL Appendix B, dated September 14, 2024

5    August 8, 2024, Carver Complaint

6    Belt Line's December 5, 2024, Response to Carver's Complaint

7    Belt Line's December 5, 2024, Claim

8    Belt Line's July 1, 2025, Compilation of Damages

9    Curriculum Vitae for Kevin M. Lugo

10    July 3, 2024, H&H Emergency Inspection Report dated July 3, 2024, H&H's conformed set of bridge repair drawings and specifications dated November 19, 2024, the PCL daily and weekly reports

11    Review of the Summary of Belt Line Expenses

12    January 2021 Annual Bridge Inspection Report and the Draft H&H Mechanical Inspection Report

13    Sample Quantity Validation

14    FHA and GDOT OH Approved Audited Overhead Rates



August 22, 2025


Crenshaw Ware & Martin, P.L.C.
150 W. Main Street
Suite 1923
Norfolk, VA 23510

Attention:  Mr. Ryan Snow
            Esquire

Reference:  **MBP Expert Rebuttal Report of the R.L. Banks & Associates, Inc. Expert Report**
            **Case No: 2.24-cv-00490-MSD-LRL**
            **Main Line Railroad Bridge**

Dear Mr. Snow,

At your request, McDonough Bolyard Peck, Inc. ("MBP") independently reviewed and evaluated the opinions proffered in the R.L. Banks & Associates, Inc.'s report titled *Expert Report of W.N. Marianos and Charlie Cunningham,* dated August 8, 2025 ("R.L. Banks Report"). This report sets forth the professional opinions of Kevin Lugo in rebuttal of the R.L. Banks Report related to topics and analysis in my July 2, 2025, Expert Report ("Expert Report").

**Review of the R.L. Banks Report**
Based on our review of the available contemporaneous records, deposition transcripts, interviews with the Main Line Railroad Bridge owner, the Norfolk Portsmouth Belt Line ("NPBL"), the designer, and the contractor team, and our analyses, I offer the following rebuttal response to the R.L. Banks Report.

**1.   Structural Repairs to the Main Line Bridge**
The R.L. Banks Report, paragraphs 81 and 82, opines that the original Main Line Bridge A7 grade of steel was replaced with a newer, less corrosive, A709 grade 50 steel, which is not an in-kind replacement. It further opines that, because NPBL chose to use this newer, more readily available steel, NPBL received a betterment that would likely last longer than the original A7 grade steel.

While we do not dispute that Hardesty and Hanover chose a newer and more readily available A709 grade 50 steel, the repairs to the damaged bridge components are not a betterment and do not extend the lifespan of the bridge structure. For R.L. Banks to even present repairs to a damaged bridge structure as a betterment is improper. NPBL repaired only one bridge span out of eight, out of need, not want.

As discussed in my deposition, A709 grade 50 steel is more readily available than the original A7 bridge steel used on the Main Line Bridge. In the instance of A7 versus A709 grade 50 steel, A7 steel was widely used in bridge infrastructure until around 1967, when ASTM A7 was officially withdrawn. It has since been replaced by materials such as A709 steel. Today, A7 steel is used for castings, dies and molds, cutting tools, and specialized tools such as an anvil; not for bridge infrastructure projects.

As discussed in my deposition and supported above, the lack of readily available A7 steel has additional time-related cost implications for locating it, delivering it, and fabricating/modifying it for this specialty order steel on the existing Main Line Bridge. In my experience and through discussions with a steel supplier who works with more than 31 plants throughout the US, steel that is not readily available will take an additional eight weeks more than the typical four to six weeks for fabrication. In other words, to use original A7 steel, the NPBL would have had to wait longer and spend more money on this specialty and custom steel order, with no benefit to the project. R.L. Banks fails to present this narrative in its report.

Availability of similar materials impacts the cost of materials. If the supply of materials is plentiful and the demand is low, the price is competitive. Conversely, if the supply of materials is low and the demand is high, the price is higher. In the instance of new A7 bridge infrastructure steel, not only is the demand low and the availability is low, or non-existent, requiring a custom order, further extending the procurement time and duration of the Main Line Bridge repairs.

The R.L. Banks Report, paragraphs 83 and 84, states that the bridge construction was completed so the bridge could be operational by NPBL's busy season, which increased its costs. The increased costs were attributed to labor working overtime, double time, and a second shift, which the report says was done *"perhaps with the expectation that such costs could be passed on easily to another party."*

R.L. Banks does not appear to have made any adjustments to the damage calculations and instead speculates that an accelerated schedule may have increased the repair costs. This ignores NPBL's financial and operational benefits from the CSX trains delivering materials across the Main Line Bridge, which the allision ultimately affected. To the NPBL, the economic impact and damage caused by the Main Line Bridge not being operational were potentially immense. Further, to properly evaluate whether accelerating a schedule was truly more costly, other driving cost facts must be considered. The potential financial impact on NPBL due to the bridge not being operational must be considered, but also the additional costs related to a longer construction duration. For example, the labor costs by NPBL to reroute the trains, and the additional supervision and overhead costs by PCL due to a longer duration. Without considering those variables, at a minimum, it is speculative for R.L. Banks to state that the additional effort *"can be more costly and less productive"* without further discussion regarding the overall potential total cost impact.

**2. Salvage Value**

The R.L. Banks Report, paragraphs 64, 65, 66, and 67, opines that 264,335 pounds of damaged leftover steel from PCL's bridge repairs would have a similar scrap value to the replacement steel. R.L. Bank quantified the salvage value at $41,897 based on values provided by an internet website for delivered steel.

Based on R.L. Banks' amount, $41,897 of the +$15.5 million in repair costs incurred by NPBL is 0.27% of the entire project repair costs, an insignificant sum. Nonetheless, R.L. Banks' assumptions are flawed because it assumed the damaged steel was similar to the new steel. As discussed in my August 14, 2025, deposition, the scrap steel net value after lead abatement and handling was approximately $2,000. PCL confirmed that it credited the amount to NPBL but did not provide a detailed line item for such a small amount. It is my opinion that R.L. Banks incorrectly concluded that a steel salvage value should have been credited for NPBL's damage.

### 3.   Belt Line Labor

R.L. Banks, paragraphs 68 through 70, concludes that NPBL's labor and administrative markups, whether they are audited or not, are not allowable in the context of a damages claim. Specifically, R.L. Banks concludes that labor markups are not appropriate since NPBL would have incurred them whether there was an allision or not, because the personnel were already NPBL employees. Further, R.L. Banks opines that NPBL's 5% materials additive markup should not be included because the Main Line Bride repairs are not a "revenue-driven" project.

As discussed in my Expert Report and my deposition, NPBL uses approved, audited overhead rates for its hourly employees. For every hour a union hourly NPBL employee works, NPBL incurs overhead amounts, including insurance, benefits, building costs, equipment costs, etc., as part of the cost of that employee. These costs are not recouped within a customary 40-hour work week but are based on the costs from prior audits for the total average hours for NPBL employees. NPBL used particular cost codes for the work it performed on this repair project, so it is not correct to say that these employees were doing other work or would have worked 40 hours anyway. Essentially, for every hour an NPBL employee works, that individual employee attracts overhead that is a cost to NPBL. Also, all work by an NPBL employee related to the allision is separate from their regular duties for NPBL.

Additionally, NPBL's 5% additive markup for materials is not intended to generate revenue but is an appropriate administrative cost for acquiring the materials.

In conclusion, it is my opinion that NPBL's approved audited overhead and markups for labor and materials are reasonable and appropriate.

### 4.   Cost to Repair Floorbeam 8 Crack & Counterweight Bridge Cable Lubrication

R.L. Banks, paragraph 86, takes issue with an estimate in my report of a simple repair by PCL to a crack at Floorbeam 8 at stringer 1 in the amount of no more than $300. R.L. Banks opines that my quantification is highly suspect and that the iron workers $90/hr. rate does not include a labor markup.

As discussed in my Expert Report and my deposition, PCL was working in the area of Floorbeam 8 and sent an iron worker to quickly drill a hole through the steel to stop the crack from continuing. MBP estimated the time it would take for an on-site iron worker to drill a hole using the labor and equipment rates plus markups included in PCL's invoices and Agreement. MBP also confirmed its estimate for the value of the work with PCL. Also, R.L. Banks' statement that the $90/hr. iron worker's hourly rate did not include a markup is incorrect. PCL's $90/hr. rate for an iron worker is a fully loaded rate, including labor burden. Using R.L. Banks' premise, a PCL ironworker base salary would be an exceptional $187,200 per annum (2080 hrs./year x $90/hr.).

R.L. Banks, paragraph 87, opines that some of the counterweight cable lubrication costs should be removed, or partially removed, from the NPBL's damage calculations because they had been identified in prior inspection bridge reports as needing attention.

I have discussed this both in my Expert Report and in my deposition. While I concur with R.L. Banks that the counterweight cables had been previously identified as needing lubrication, the issue is that the main lift bridge span had remained in the upright position for approximately six months as a result of

Mr. Snow
August 22, 2025
Page **4** of **4**

the damage to the bridge. This prevented the automatic lubrication from lubricating the cables. Because the lubrication was not occurring on a regular basis, the cables gathered significant dust and debris from the river and the surrounding industrial operation. As such, it is my opinion that NPBL is entitled to these costs.

MBP's review and analysis are ongoing, and the conclusions presented herein are based on information reviewed to date. Mr. Lugo's conclusions and professional opinions are offered with a reasonable degree of certainty and are based on his expertise, education, analysis, and experience in the construction industry. MBP may amend or change any opinions and conclusions presented herein as appropriate based on further information brought to its attention. The opinions expressed herein do not and should not be construed as providing legal conclusions.

Sincerely,

Kevin M. Lugo, PE (NC, SC), CCM
Senior Vice President