**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S
OBJECTION TO THE MAGISTRATE JUDGE'S DENIAL
OF ITS MOTION FOR RELIEF UNDER RULES 30 AND 37**

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line"), by counsel, pursuant to Federal Rule of Civil Procedure 72, for its objection to the Magistrate Judge's Report and Recommendation ("Magistrate Judge's Report") recommending denying the Belt Line's Motion for Relief under Federal Rules of Civil Procedure 30 and 37 against Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver"), states as follows:[1]

**Introduction**

The Magistrate Judge's Report is difficult to reconcile with the facts. Over the course of five depositions of Carver's witnesses in New York, Carver's *pro hac vice* counsel made a total of **144** speaking objections (that is, beyond the form of the question) and instructed witnesses not to answer **13** times without a privilege. In addition, Carver produced a corporate designee under Rule 30(b)(6) who repeatedly answered (or non-answered) questions by pointing only to all testimony of other witnesses and all documents in the case. These obstructions thoroughly blocked the Belt

---

[1]    The Belt Line incorporates its previous Motion, Brief, Reply, and exhibits as if set forth herein. *See* ECF 69, 70, and 80.

Line's effort to develop key facts, consistent with a lengthy pattern of other obstruction.  Yet if the Magistrate Judge's recommendation stands, Carver will face no repercussions for its conduct.

No call to the Court could have cured the designee's remarkable lack of preparation. Nor would new depositions remedy the inquiries obstructed by objections, since new depositions would only reward Carver by allowing it to re-prepare witnesses for now-known lines of questioning. Endeavors at collaborative solutions with opposing counsel also proved futile, although deposition transcripts, correspondence, and meet and confer efforts reveal the Belt Line's attempts.

Faced with undeniable obstruction, the Belt Line filed a Motion as Rule 30 permits.  *See* ECF 69.  With its Motion, the Belt Line submitted a detailed chart of the factual inquiries that were obstructed.  *See* **Exhibit A** (ECF 69-1).  The Belt Line also provided correspondence showing its attempts to resolve Carver's deposition conduct.  *See* July 3, 2025 Email, attached as **Exhibit B** (ECF 69-2); July 3-4, 2025 Emails, attached as **Exhibit C** (ECF 69-3); July 3-11, 2025 Emails, attached as **Exhibit D** (ECF 69-4); July 10, 2025 Letter, attached as **Exhibit E** (ECF 69-5).

In its Brief in Support of its Motion, the Belt Line provided specific examples of improper conduct by Carver, together with pasted excerpts of deposition transcripts from the five depositions at issue, all incorporated herein.  *See* ECF 70.  The Belt Line attached multiple background documents, including a deficiency letter to which Carver responded by threatening sanctions, attached as **Exhibit F** (ECF 70-1), a past Order from another case in which Carver's General Manager, Brian Moore, was cited for spoiling evidence (the same person who failed to produce text messages here), attached as **Exhibit G** (ECF 70-2), an email with *partial* production of text messages ordered to be produced, attached as **Exhibit H** (ECF 70-3), a request to inspect the M/T MACKENZIE ROSE, attached as **Exhibit I** (ECF 70-4), and the Belt Line's Notice of 30(b)(6) Deposition, attached as **Exhibit J** (ECF 70-6).  The Belt Line also provided excerpts of the

deposition transcripts demonstrating Carver's speaking objections and instructions not to answer. *See* Nicholas Laraway Dep., attached as **Exhibit K** (ECF 70-7); Leonard Baldassare Dep., attached as **Exhibit L** (ECF 70-8); Brian Moore Dep., attached as **Exhibit M** (ECF 70-9); Jarkeis Morrissey Dep., attached as **Exhibit N** (ECF 70-10); Sharif Porter Dep., attached as **Exhibit O**.[2]

The Belt Line requested that Carver's limitation action be dismissed and that the obstructed facts be deemed admitted, just like a Request for Admission that is wrongly denied or obstructed under Rule 36. (To be clear, the Belt Line did not ask that all of Carver's defenses be dismissed, only its ability to limit liability.) By Order entered on August 29, 2025, this Court directed the Magistrate Judge to "conduct hearings, including evidentiary hearings, if necessary, and to submit… proposed findings of fact, if applicable, and recommendations for the disposition by the United States District Judge of this motion." ECF 95, p.1.

The Magistrate Judge's Report recommends denying the Belt Line's Motion in its entirety. ECF 136, p. 9. In fact, the Report begins by admonishing the Belt Line for filing the Motion: "In this limitation action, the parties are embroiled in yet another dispute they felt compelled to bring before the Court,[3] this time over [the Belt Line's] Motion for Relief Under Rules 30 and 37 ("Motion for Relief") and memorandum in support." ECF 136, p. 1. The Report footnotes three other motions, all unrelated. ECF 42 was a Motion to Compel that the Belt Line filed because Carver did not respond to discovery. This Court granted it entirely, save for one request. *See* ECF 50. ECF 62 was a motion against a *pro se* party (not Carver) who failed to appear for his deposition

---

[2]    The Belt Line mistakenly attached a second copy of Leonard Baldassare's Deposition as Exhibit K to its Motion, instead of Sharif Porter's Deposition. The proper deposition is attached here as Exhibit O.

[3]    [Footnote from original:] "*See* ECF Nos. 42, 62, 67. After the instant motion was brought, another such motion for a protective order was filed [by Carver]. *See* ECF No. 71."

after the parties flew to Florida to take it.  And ECF 67 was a joint motion to compel inspection of the tug that hit the Bridge.

The Report does not cite any of the 144 speaking objections or 13 instructions not to answer in its Findings of Fact.  No hearing occurred.  The Report ultimately concludes that the Belt Line's Motion "reflects a misuse of discovery" by "ask[ing] the Court to grant severe sanctions without first exhausting less drastic measures."  ECF 136, p. 8.  Respectfully, as explained below, that conclusion is inconsistent with the record, and lesser remedies would not adequately cure the prejudice to the Belt Line here.

## Legal Authority

Where a Magistrate Judge issues a Report and Recommendation under Rule 72(b), a party may serve and file with the clerk of court specific objections to the Magistrate Judge's findings and recommendations within 14 days of receiving the Report and Recommendation.  *See* Fed. R. Civ. P. 72(b)(2).  The United States District Judge shall make a *de novo* determination of those portions of the Report and Recommendation or specific findings or recommendations to which objection is made.  *See* Fed. R. Civ. P. 72(b)(3).  "The district judge may accept, reject, or modify, in whole or in part, the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1); *Arnold v. Huntington Ingalls Inc.*, 2025 U.S. Dist. LEXIS 129679, at *4-5 (E.D. Va. 2025).

## Argument

"District courts are allowed broad discretion in resolving discovery disputes." *Humanscale Corp. v. CompX Int'l, Inc.*, 2009 U.S. Dist. LEXIS 120197, at *5-6 (E.D. Va. 2009).  Regarding depositions in particular, Rule 30 provides that, where a person "***impedes, delays, or frustrates the fair examination of [a] deponent***[,]" the court may impose an appropriate sanction.  Fed. R. Civ.

P. 30(d)(2). In the context of a Rule 30(b)(6) deposition, this Court has held that, "sanctions may be properly imposed against a corporation when its 30(b)(6) designee is unknowledgeable of relevant facts and it fails to designate an available, knowledgeable, and readily identifiable witness because such an 'appearance is, for all practical purposes, no appearance at all.'" *Humanscale*, 2009 U.S. Dist. LEXIS 120197, at *5-6 (citation omitted). This Court has further held (and the Fourth Circuit has affirmed) that, where a party "abuses the process at a level that is utterly inconsistent with the orderly administration of justice and undermines the integrity of the process[,]" more serious sanctions are appropriate, including dismissal. *See Projects Mgmt. v. Dyncorp Int'l LLC*, 734 F.3d 366, 373 (4th Cir. 2013).

### I.      Response to Magistrate Judge's Findings of Fact

The Magistrate Judge's Report makes three findings of fact. ECF 136, p. 4. The Belt Line's responses are as follows:

1.      The Belt Line does not dispute the Magistrate Judge's finding that the Belt Line conducted five depositions that it contends were interfered with by Carver's attorney's conduct, or that the alleged obstructions took the form of improper speaking objections, instructions not to answer, and, in the case of the witness examined under Rule 30(b)(6), references to records and other discovery in lieu of substantive answers.

2.      The Belt Line does not dispute the Magistrate Judge's finding that the Belt Line attached portions of each of the five depositions where objections or instructions not to answer were asserted, and where the 30(b)(6) witness responded to a question by referring to records or other testimony. The Belt Line also does not dispute the Magistrate Judge's finding that the Belt Line asks this Court for relief in the form of dismissal of Carver's limitation action and a finding of certain facts that the Belt Line claims it was prevented from establishing.

3.      The Belt Line does not dispute the Magistrate Judge's finding that the parties did not provide the complete transcripts of the depositions, but rather excerpts of those portions pertinent to their arguments.  The Belt Line disputes the Magistrate Judge's conclusion that this approach, which is standard practice, "depriv[ed] the Court of any context to evaluate the impediments to discovery the Belt Line contends Carver created by its actions."  ECF 136, p. 4. The Belt Line would have promptly provided any transcripts the Court requested.

**II.      Response to the Magistrate Judge's Conclusions of Law and Recommendation**

The Belt Line disputes the Magistrate Judge's recommendation contained in the sections of his Report titled Conclusions of Law and Recommendation.  In particular, the Belt Line did not fail to pursue cooperative remedies (it pursued them multiple times); lesser remedies suggested by the Magistrate Judge would not have adequately cured the obstructions; and the Belt Line should not be penalized for providing excerpts of testimony relevant to its arguments instead of burdening the Court with full transcripts of depositions.

**a.    Attempts at cooperative remedies by the Belt Line were either shut down by Carver or proven futile by Carver's counsel.**

The Magistrate Judge's Report concludes that the Belt Line failed to pursue cooperative remedies regarding Carver's deposition conduct "before seeking the ultimate sanction of claim dismissal[.]"  ECF 136, p. 6.  In particular, the Report states that "the Belt Line could have requested the Court's intervention during depositions, held a meet and confer with opposing counsel to resolve any disagreement regarding counsel's deposition conduct, or held an informal conference with the Court prior to filing a motion to compel."  *Id.*  Respectfully, the Magistrate Judge's conclusions are incorrect.

6

### i. No call to the Court would have cured Carver's corporate designee's lack of preparation.

This Court has held that, "sanctions may be property imposed against a corporation when its 30(b)(6) designee is unknowledgeable of relevant facts…because such an 'appearance is, for all practical purposes, no appearance at all.'" *Humanscale*, 2009 U.S. Dist. LEXIS 120197, at *5-6 (citation omitted).  Here, Carver's corporate designee, Nicholas Laraway, lacked knowledge regarding almost every topic on which he was designated to testify, save for a limited number of financial questions related to his job.  Carver designated Mr. Laraway on all noticed topics:

```
17        Q.    And that is the notice of the
18   deposition of Coeymans Marine Towing, d/b/a
19   Carver Marine Towing.
20             And attached as Exhibit A,
21   there's some definitions and a couple of
22   dozen topics.
23             See that?
24        A.    I do.
25        Q.    You've had a chance to review
1    it prior to the deposition?
2         A.    I have.
3         Q.    And it's your understanding
4    that you've been designated to testify on
5    those topics?
6         A.    Yes.
```

**Exhibit K**, pp. 42-43 (ECF 70-7).

Mr. Laraway was wholly unprepared to discuss the vast majority.  Instead, he defaulted repeatedly to one of two answers: either denying personal knowledge (an improper avoidance tactic in a corporate deposition) or referring for his answer to all documents produced in the case and the testimony of all other Carver witnesses.  An example from the end of the deposition illustrates this repeated practice:

```
5    BY MR. NANAVATI:
6         Q.    And if I missed this I
7    apologize and I am confident that Jim [Rodgers]
8    will object.
9              But do you know whether or not
10   there was working radar on Mackenzie Rose
11   on the date of the allision?
12             MR. RODGERS:  Objection.  Asked
13          and answered, but you can answer.
14        A.    I would rely on the testimony
```

```
15    of Brian, Lenny, the crew, the documents
16    we've provided.
17           And as we summarized in the
18    end, I have no reason to believe there
19    wasn't, but I don't know firsthand.
20       Q.    Okay.  And when you are saying
21    that you're relying on the testimony of
22    Brian, Lenny, the crew, what other crew are
23    you relying on?
24       A.    For that answer specifically or
25    for all of the times I said that.
 1       Q.    Let's start with that answer
 2    specifically.
 3           MR. RODGERS:  Just for the
 4        record, Mark, is, when he states that
 5        he is relying on the crew's testimony
 6        to date, which you're aware of was
 7        testified, but we also have Jason
 8        McGrath tomorrow and potentially
 9        Morrissey on next week, and Captain
10        Miller unfortunately passed away.
11           That's what he's referring to,
12        but he can still answer the question
13        if --
14           MR. NANAVATI:  Well, I mean,
15        now that you've answered it for him.
16       Q.    Is Mr. Rodger's answer, your
17    answer?
18           MR. RODGERS:  Is that --
19       A.    Yes.
20           MR. RODGERS:  -- what I said,
21        correct?
22       A.    Correct.
23       Q.    Okay.  And when you're saying
24    documents produced in response to that
25    question, which documents are you referring

 1    to?
 2       A.    I mean, there were thousands of
 3    documents produced throughout the discovery
 4    is my understanding.
 5           I have reviewed many of them.
 6    I can't speak to which ones specifically
 7    would attest to the working condition of
 8    the radar if any.
 9       Q.    So you're suggesting that we go
10    through the documents and pick ones out
11    that's responsive to the question and that
12    will be your answer?
13           MR. RODGERS:  Objection to
14        form.  Of course you just answered
15        your own question, yes.  You should
16        do your homework.
17       Q.    So you can't identify a single
18    document as you sit here today that would
19    answer the question regarding the status of
20    the radar on the date of the allision, can
21    you?
22       A.    Not specifically, no.
```

**Exhibit K**, pp. 44-46 (ECF 70-7).

The Belt Line's counsel flew to New York to take this deposition after multiple discussions with Carver's counsel about the topics of inquiry. Despite that effort and the preparation that went into taking the deposition, Mr. Laraway's lack of preparation fundamentally stymied the Belt Line's investigation of Carver's privity and knowledge. A party that lists specific topics of inquiry for a Rule 30(b)(6) witness, like the Belt Line did here (**Exhibit J** (ECF 70-6)), should not be consistently told to scour the testimony of all other witnesses and all documents in the case to find an answer. A phone call to the Court could not have cured that deficient preparation. The meet and confer efforts that happened even before the deposition occurred did not help either.

### ii.   The Belt Line's efforts to collaborate and confer with Carver's counsel prior to seeking Rule 30 sanctions were shut down.

The Magistrate Judge's Report also states that the Belt Line "could have … held a meet and confer with opposing counsel to resolve any disagreement regarding counsel's deposition conduct," prior to seeking Rule 30 sanctions. ECF 136, p.6. However, the record reflects that the Belt Line did just that, to no avail.

Examples from Mr. Baldassare's deposition illustrate the Belt Line's efforts to resolve Carver's obstruction as it occurred, even on basic topics like whether the tug and barge hit the Bridge. Mr. Baldassare was Carver's Port Captain on June 15, 2024, the date of the allision, and communicated with the crew immediately after the incident.

```
 9          Q.    So the tug while pushing the
10      barge elided with the bridge, right?
11          A.    Yeah.
12              MR. RODGERS:  Can you repeat
13       that?
14              MR. CHAPMAN:  I said --
15              MR. RODGERS:  Hold on, let me
16       go to this.
17              MR. CHAPMAN:  I said, the tug,
18       Mackenzie Rose --
19              MR. RODGERS:  I said, "Can you
20       repeat this?  "Are you going to
21       repeat it.
22              MR. CHAPMAN:  I am.
23              MR. RODGERS:  Okay.
24              MR. CHAPMAN:  The tug Mackenzie
```

```
25              Rose while pushing the Weeks 281 on
1               June 15th, 2024 elided with the
2               bridge.
3                   MR. RODGERS:  To his knowledge?
4               To his knowledge.
5                   MR. CHAPMAN:  Well --
6                   MR. RODGERS:  He's a fact
7               witness.
8                   MR. CHAPMAN:  Exactly, and I'm
9               asking him, did it?
10                  MR. RODGERS:  To his
11              knowledge --
12                  MR. CHAPMAN:  Did it?
13                  MR. RODGERS: -- you're asking
14              him for a legal conclusion.
15                  MR. CHAPMAN:  No.
16                  MR. RODGERS:  Yeah, you are.
17          Q.    At any time while you were
18      employed by Carver, did you learn that the
19      tug boat while pushing the weeks 281 elided
20      with the Norfolk and Portland Belt Line
21      Bridge on June 15th, 2024?
22                  MR. RODGERS:  You can answer
23              that.
24          A.    Yes.
```

**Exhibit L**, p. 13-14 (ECF 70-8).

On July 3, 2025, after five depositions filled with repeated obstructions, counsel for the Belt Line sent a letter to Carver's counsel seeking a meet and confer regarding Carver's conduct. *See* **Exhibit A** (ECF 69-2).  The parties met and conferred on July 8, 2025, where Carver's counsel agreed to propose a solution to the obstructions.  *See* **Exhibit B** (ECF 69-3).  Instead of doing so, Carver sent a letter on July 10, 2025, wherein Carver's counsel claimed that no solution was required because the obstructions were acceptable deposition practice:

> [The Belt Line's] letter claims that we, as Carver's counsel, have engaged in 'obstructionist tactics' with some unstated prejudice to [the Belt Line's] clients. Those claims are unfounded and not supported by the record. We believe [the Belt Line's] letter mischaracterizes Carver's conduct, the actions of Carver's counsel, and the substance of the testimony provided by Carver's 30(b)(6) witness. The [contained] discussion identifies specific inaccuracies in your characterization of this conduct and testimony.

**Exhibit E** (ECF 69-5).

The Magistrate Judge's Report, despite containing one paragraph that finds Carver not "blameless," ECF 136, p. 8, effectively condones Carver's view of deposition practice. In fact, if

the recommendation stands, Carver will have successfully blocked inquiries into material facts (with 144 speaking objections and 13 instructions not to answer) with no ramifications.

### iii.   Any motion to compel new depositions would be futile in this case.

The only remaining remedy proposed in the Magistrate Judge's Report is a motion to compel new depositions. The Belt Line intentionally did not seek this relief, as it is not an adequate remedy for the pattern of obstruction here. *See* ECF 70, p. 8. As noted above, a new deposition only gives the obstructing party a better chance to prepare its witnesses, except this time for known lines of questioning after witnesses and counsel can strategize an approach. In a multi-million-dollar case, even if the obstructing party is required to pay the other side's fees, that relatively minimal cost is well worth the delay and second bite at the apple that the obstruction affords, particularly if more meaningful sanctions are off the table.

The Belt Line's view on this is consistent with this Court's view in other cases. In *E.I. du Pont de Nemours v. Kolon Industries*, for example, this Court held that answers crafted after-the-fact with "helpful suggestions of lawyers" fundamentally undermine the discovery process:

> One of the main purposes of the discovery rules, and the deposition rules in particular, ***is to elicit the facts before the trial and to memorialize witness testimony before*** the recollection of events fade or '***it has been altered by… helpful suggestions of lawyers***…. ***Those purposes are disserved by allowing deponents to 'answer questions* [*at a deposition*] *with no thought at all' and later to craft answers that better serve the deponent's cause. Indeed, <u>to allow such conduct makes a mockery of the serious and important role that depositions play in the litigation process</u>***."

277 F.R.D. 286, 297 (E.D. Va. 2011) (emphasis added).

Just the opposite of the policy articulated above, the Magistrate Judge's Report identifies the Belt Line's Motion, not Carver's conduct, as a "misuse of discovery" for seeking that the facts obstructed by Carver should be deemed admitted, and that Carver should be precluded from limiting its liability when it repeatedly blocked inquiries that would establish its privity and

knowledge.  Yet these remedies are narrowly and directly tailored to the exact harms that Carver

caused—far more so than a second deposition.  And they are in line with the same kind of remedy

under Rule 36 where a Request for Admission is improperly obstructed or denied.  *See* Fed. R.

Civ. P. 36.

If only one instance of obstruction existed here, the "appropriate" remedy under Rule 30

might be different.  But the exhibits attached to the Belt Line's original Motion and reproduced

here show a markedly different scenario, with a repeated use of improper objections and

instructions that cannot be cured with the lesser remedies suggested by the Magistrate Judge.

### b.  The Belt Line properly supported its Motion and Brief with excerpts from the transcripts related to its arguments.

The Magistrate Judge's Report lastly states that, because the Belt Line provided only

excerpts of the transcripts of the depositions at issue rather than the transcripts in their entirety, it

"deprived the Court of the full context necessary to evaluate the Belt Line's claims of misconduct."

ECF 136, p. 7.  Therefore, the Report concludes, "the Belt Line has not demonstrated prejudice

resulting from Carver's deposition conduct[.]" *Id.* at p. 8.

In full candor, the Belt Line did not appreciate that the Court would want all 1,104 pages

of the deposition transcripts, including portions unrelated to the Motion.  Indeed, the Belt Line

provided not only the relevant transcript sections, but also a chart connecting them to the factual

inquiries that Carver obstructed.  *See* **Exhibit A** (ECF 69-1).  It excerpted the transcripts for

efficiency for the Court, not to conceal any text.  Carver likewise did so, presumably for the same

reason.  Nevertheless, the Report states that "[i]t is certainly not the Court's obligation or

inclination to hunt through the voluminous docket in this case to find out if there could be other

evidence germane to the issues in dispute that might be found elsewhere."  ECF 136, p. 5, FN 3.

To the extent this Court on review desires the full transcripts, the Belt Line will certainly file them in the record.

Contrary to the Magistrate Judge's conclusion that the Belt Line failed to show prejudice by excerpting transcripts, the exhibits that the Belt Line attached to its Motion amply demonstrate the prejudice caused by Carver and include all the relevant portions cited in the Motion. These obstructions, including 144 speaking objections, 13 instructions not to answer without a privilege, and a completely unprepared corporate witness, thoroughly impeded the Belt Line's ability to develop facts to defeat Carver's limitation effort. The full list of those facts was included in **Appendix A** to the Motion (ECF 69-1) and is reproduced here as **Exhibit A**).

The unfortunate outcome of the Magistrate Judge's Report, if adopted by this Court, is that Carver will have been rewarded for its conduct, if not encouraged. With all respect to the Magistrate Judge, the Belt Line is not the wrongdoer here. It did not encourage Carver's conduct. It did not invite the obstructions. It is the victim of well-documented improper tactics, all designed to block development of essential facts. Yet the Magistrate Judge's report reads otherwise. There is precedent at stake for proper deposition practice in this District. For all the reasons above and in the Belt Line's Motion and Brief, this Court should decline to follow the Magistrate Judge's recommendation and award the Belt Line the relief sought in its Motion.

## Conclusion

WHEREFORE, the Belt Line respectfully asks this Court to enter an Order:

1.    *Dismissing* Carver's Limitation Complaint and allowing this action to proceed on the claims by the Belt Line without a limitation on recovery;

2.    *Deeming* the facts underlying the obstructed testimony admitted against Carver for purposes of this action as detailed in **Appendix A**;

3.      *Deeming* all text messages produced by Carver after the depositions of its witnesses (and after the Court's deadline for production) admissible against Carver for purposes of summary judgment or trial; and

4.      *Granting* the Belt Line all other just relief, including its attorneys' fees associated with its Motion.

Dated:  October 24, 2025

NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY


By:      */s/ W. Ryan Snow*
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl, VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

14

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of October 2025, a true copy of the foregoing was (i) electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all registered counsel of record, and (ii) mailed to:

James Morrissey
4723 Baywood Drive
Lynnhaven, FL 32444

By:      */s/ W. Ryan Snow*
     W. Ryan Snow, VSB No. 47423
     CRENSHAW, WARE & MARTIN, P.L.C.
     150 W. Main Street, Suite 1923 Norfolk,
     Virginia 23510
     Telephone: (757) 623-3000
     Facsimile: (757) 623-5735
     wrsnow@cwm-law.com
     *Counsel for Norfolk and Portsmouth Belt*
     *Line Railroad Company*