# Exhibit L

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

----------------------------------------X
IN THE MATTER OF COEYMANS MARINE
TOWING, LLC D/B/A CARVER MARINE
TOWING AS OWNER AND OPERATOR OF M/T
MACKENZIE ROSE, (IMO NO. 8968765) HER
CARGO, ENGINES, BOILERS, TACKLE, EQUIPMENT,
APPAREL, AND APPURTENANCES, ETC., IN REM,
("M/T MACKENZIE ROSE"),

                                       CIVIL ACTION NO:
                                       2:24-CV-00490

PETITIONING FOR EXONERATION FROM OR
LIMITATION OF LIABILITY IN ALLISION WITH
NORFOLK AND PORTSMOUTH BELT LINE RAILROAD
COMPANY MAIN LINE RAILROAD BRIDGE
(THE "BRIDGE") OCCURRING JUNE 15, 2024 IN
AND ABOUT THE ELIZABETH RIVER, VIRGINIA.

----------------------------------------X

                     April 29, 2025

                     10:18 a.m.

       AN IN PERSON VIDEOTAPED DEPOSITION of

of Leonard Baldassare, a Defendant herein,

taken by the respective parties, pursuant

to Order, before Larin Kaywood, a Notary

Public for and within the State of New

York.

JOB NO.: 112214

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**EXHIBIT H**

**Deposition of Leonard Baldassare – April 29, 2025**

| Page | Line | Extract |
|---|---|---|
| 19 - 20 | 19 - 20 | 19    Q.   You were served with a subpoena<br>20   before the deposition?<br>21    A.   Yes, sir.<br>22    Q.   And I asked you to bring<br>23   whatever phone you had used or communicated<br>24   with back --<br>25    A.   Yes.<br><br>19<br><br><br>1       MR. RODGERS:  Jim --<br>2       MR. CHAPMAN:  Let me just<br>3   finish the question.  Let me just<br>4   finish the question.<br>5       MR. RODGERS:  Finish it.<br>6    Q.   The subpoena requested that you<br>7   produce the phone that you had used on June<br>8   15th, 2024, which was the date of the<br>9   allision, right?<br>10       Do you still have that phone<br>11   today?<br>12       MR. RODGERS:  Just don't answer<br>13   it.  We're producing Mr. Baldassare<br>14   as a Carver witness, not pursuant to<br>15   the subpoena.  Any demand you could<br>16   make to Carver, and -- we'll deal<br>17   with it.  So he's not here now by |

| | | |
|---|---|---|
| | | 18     virtue of the subpoena, he's here now<br>19     as our witness as I talked to you<br>20     about, or e-mailed you about. |
| 27 | 1 - 15 | 1       Q.   And then you think -- maybe I<br>2     misunderstood.  I heard you say something<br>3     about five months, and I'm just trying to<br>4     understand.  It wasn't in the yard for five<br>5     months, or was it?<br>6       A.   I don't know.  I'm assuming or<br>7     just remembering --<br>8          MR. RODGERS:  Don't assume.<br>9          THE WITNESS:  Okay.<br>10         MR. RODGERS:  And don't guess.<br>11       A.   So I don't know.  I don't know<br>12     how long it was in there.  When I left, it<br>13     was still in the shipyard.<br>14       Q.   Okay.<br>15       A.   I don't know when it came out. |
| 30-31 | 21 - 20 | 21       Q.   And when you say "upper<br>22     management," do you mean Mr. Moore?<br>23       A.   Correct.<br>24         MR. RODGERS:  I just want to<br>25       talk to the witness for a minute.<br><br>30<br><br>1       Are you okay with that, Jim.<br>2          MR. CHAPMAN:  You know, I'm<br>3     really not.<br>4<br>5          MR. RODGERS:  All right.  I'll<br>6     do it in front of you.  Well, I can,<br>7     but I don't want to waste a lot of<br>8     time.  Off the record.<br>9         (Whereupon, a discussion was<br>10     held off the record.)<br>11         THE WITNESS:  This incident<br>12     happened, and then on June 24th, I<br>13     was out for eight weeks on paternity<br>14     leave.  So anything that --<br>15         MR. RODGERS:  That's it.<br>16     That's what he need.<br>17         THE WITNESS:  Okay.<br>18         MR. RODGERS:  He can ask you |

| | | |
|---|---|---|
| | | 19    now what you remember and know.<br>20      THE WITNESS:  Sure, understood. |
| 33 - 34 | 21 - 4 | 21    Q.   Did you ever come to learn that<br>22    the reason Captain Morrissey was removed<br>23    was because of the incident involving the<br>24    allision with the Belt Line Bridge?<br>25      MR. RODGERS:  Objection to<br><br>33<br><br><br>1    form.  You can answer if you know.<br>2    A.   I don't know.  I'm not sure.  I<br>3    was just -- I figured that that was the<br>4    reason why. |
| 45 | 7 - 15 | 7    Q.   Did you do anything to prepare<br>8    to testify today?<br>9      MR. RODGERS:  Other than<br>10    meeting with me.<br>11      MR. CHAPMAN:  Well -- okay.  We<br>12    can start there, but I'm just asking<br>13    in his mind whether he did anything<br>14    to prepare.<br>15    A.   Just meeting with Jim. |
| 58 | 16 - 25 | 16    Q.   You had his -- presumably had<br>17    his cell number in your contact, right?<br>18    A.   Yeah.  I think it was his work<br>19    phone, yeah.<br>20    Q.   Okay.<br>21    A.   Yeah.<br>22      MR. RODGERS:  Don't guess.<br>23      THE WITNESS:  Okay.<br>24    Q.   But --<br>25    A.   I don't know. |
| 69-70 | 24 - 10 | 24    Q.   Now, in connection with<br>25    contacting the Coast Guard, did you also<br><br>69<br><br><br>1    contact the Belt Line about the allision? |

| | | |
|---|---|---|
| | | 2     A.   No.<br>3     Q.   Why not?<br>4     A.   I was not --<br>5<br>6<br>7          MR. RODGERS:  Objection to<br>8     form.  You can answer if you --<br>9     A.   I was not obstructed<br>10   to -- instructed to, sorry. |
| 70 | 11 - 25 | 11     Q.   So did it occur to you that the<br>12   Belt Line should be contacted or notified?<br>13     A.   No.<br>14     Q.   In the initial conversation you<br>15   had with Mr. Moore, when he told you to<br>16   contact the Coast Guard and notify them of<br>17   the allision, did it come up that the Belt<br>18   Line should be contacted or there's no<br>19   reason to contact the Belt Line, anything<br>20   about contacting the Belt Line?<br>21          MR. RODGERS:  Objection to<br>22     form.  You can answer if you know.<br>23     A.   No.  Nothing came up in our<br>24   conversation about contacting the Belt<br>25   Line. |
| 74 | 1 - 8 | 1     Q.   So when did you receive written<br>2   statements from any member of the crew?<br>3          MR. RODGERS:  Objection to<br>4     form.  You can answer.<br>5     A.   I don't recall exactly when<br>6   they sent everything to me, but I had<br>7   requested it, you know, when I was on the<br>8   boat on that day. |
| 77 | 9 - 15 | 9     Q.   Is it possible that they were<br>10   scanned and e-mail to you?<br>11     A.   Possibly.<br>12<br>13<br>14          MR. RODGERS:  Don't guess.<br>15     A.   Possibly. |
| 80 | 7 - 13 | 7     Q.   You mentioned filing out a<br>8   2692.  Do you consider that a written<br>9   report?<br>10          MR. RODGERS:  Objection to |

|   |   |   |
|---|---|---|
|   |   | 11    form.  You can answer his question if<br>12    you understand it.<br>13    A.  Yes. |
| 86 | 12 - 23 | 12    Q.  Did they say whether -- was<br>13  there any information provided to you by<br>14  the crew as to which side of the bridge<br>15  they contacted?<br>16    A.  No, not specifically.  I would<br>17  assume that it was this --<br>18<br>19<br>20        MR. RODGERS:  Don't guess.<br>21    Tell him what you no.<br>22    A.  No, they did not.  They did<br>23  not. |
| 89 - 90 | 14 - 5 | 14    Q.  In making bridge transits,<br>15  would you expect them to not to be in<br>16  autopilot?<br>17        MR. RODGERS:  Objection to<br>18    form.  You can answer.<br>19    A.  Say that again, I'm sorry.<br>20    Q.  I'm just --<br>21        MR. RODGERS:  He's not here as<br>22    an expert, but he can answer as to<br>23    his knowledge.<br>24    A.  No.  There would be no reason<br>25  for them to be in autopilot when<br><br>89<br><br><br>1  approaching the bridge.<br>2    Q.  You would expect them not to be<br>3  on autopilot?<br>4    A.  Correct, they should be<br>5  hand-steering. |
| 108 - 109 | 20 - 20 | 20    Q.  Right?  So does that in any way<br>21  refresh your recollection that you signed a<br>22  2692 form that was submitted on June 19th,<br>23  2024 to the Coast Guard?<br>24    A.  No.<br>25    Q.  And you --<br><br>108 |

| | | |
|---|---|---|
| | | 1    A.   I filled out the 2692 on the<br>2   17th and sent it to Brian for review --<br>3    Q.   Okay.<br>4    A.    -- and submission.<br>5    Q.   All right.  But it appears that<br>6   you filed this 2692B out on the 19th,<br>7   right?<br>8    A.   Yes.<br>9    Q.   And who would've been<br>10   responsible for then submitting it to the<br>11   Coast Guard?<br>12    A.   Brian.<br>13    Q.   But you don't believe that you<br>14   signed the 2692 form, correct?<br>15       MR. RODGERS:  Objection to<br>16    form.  I'm not sure he testified to<br>17    that.<br>18    A.   I'm not really sure what you're<br>19   asking me.  Are you asking me about the<br>20   first part of this? |
| 111 - 112 | 22 - 16 | 22    Q.   Is that something you would've<br>23   drafted?<br>24    A.   No.<br>25    Q.   And you are pretty certain of<br><br>111<br><br><br>1   that?  I just -- how is it that you --<br>2<br>3<br>4       MR. RODGERS:  Objection to<br>5    form.<br>6    Q.   How is it that you know that<br>7   you didn't draft it?<br>8       MR. RODGERS:  You can answer<br>9    that.<br><br>10    Q.   Yeah.<br>11       MR. RODGERS:  If you know.<br>12    A.   Because the information<br>13   provided to me during the time when this<br>14   was filled out, never was this statement |

| | | |
|---|---|---|
| | | 15   told me to from anyone about the support<br>16   structure issue. |
| 130 - 131 | 15 - 4 | 15      Q.   So you wouldn't even be<br>16   informed of a near miss?<br>17      A.   Unless there was a incident,<br>18   normally not.<br>19      Q.   So as originally reported to<br>20   you, where apparently everybody that you<br>21   interviewed said, "All we did was brush up<br>22   against the fender system on the<br>23   bridge -- "<br>24        MR. RODGERS:  Objection to<br>25      form.  I'm not sure that's his<br><br>130<br><br><br>1      testimony.  You said "everyone."<br>2      Q.   You can correct me if I<br>3   misstated, okay?<br>4      A.   Okay. |
| 131 - 132 | 5 - 6 | 5      Q.   But based on that, would you<br>6   have considered that to be a near miss,<br>7   requiring a near miss report in your Helm<br>8   system?<br>9        MR. RODGERS:  Objection to<br>10      form.  If you understand it, you can<br>11      answer.<br>12      A.   I'm not really sure what you're<br>13   asking.  Are you asking if the incident<br>14   that was reported to me on Saturday the<br>15   15th, would be considered a near miss?<br>16      Q.   Sure.<br>17      A.   In my personnel opinion?<br>18      Q.   Yes.<br>19      A.   I'm not an expert in near<br>20   misses, but --<br>21        MR. RODGERS:  Well, don't --<br>22      A.   No, I'm not really --<br>23        MR. RODGERS:  Stop, stop.<br>24      Don't -- you're not here to give your<br>25      opinion, okay.<br><br>131 |

| | | |
|---|---|---|
| | | 1          THE WITNESS:  Okay.<br>2     A.   Then no.<br>3     Q.   It wouldn't be reported as a<br>4    near miss or you just don't have an<br>5    opinion?<br>6     A.   I don't have an opinion on it. |
| 132 | 7 - 17 | 7     Q.   Okay.  It was -- in your -- why<br>8    did the boat -- why did Captain Miller<br>9    contact you on the afternoon of June 15th,<br>10    2024?<br>11<br>12<br>13          MR. RODGERS:  Objection to<br>14      form.  You can answer if you<br>15      understand it.<br>16     A.   You would have to ask Captain<br>17    Miller why he felt it necessary to call me. |
| 146 | 5 - 18 | 5     Q.   I'm asking if you know whether<br>6    in March, April and May of 2024, Mr. Moore<br>7    had a valid Merchant Mariners document?<br>8          MR. RODGERS:  I didn't hear,<br>9        Merchant Marine, what.<br>10          MR. CHAPMAN:  Merchant Mariners<br>11        document.  Did he have a valid --<br>12          MR. RODGERS:  A license.<br>13          MR. CHAPMAN:  Yep, mm-hmm.<br>14     A.   I don't know.  I would -- I<br>15    don't know, I --<br>16          MR. RODGERS:  Don't assume<br>17        anything.<br>18     A.   Yeah, no.  I don't know. |
| 155 | 1 - 15 | 1     Q.   Did you ever secure the Rose<br>2    Point voyage plan from anyone in the crew<br>3    of the McKenzie Rose for the voyage they<br>4    were on when they elided with the bridge?<br>5     A.   No, I did not.<br>6     Q.   Did you ask them to provide it?<br>7     A.   No, I did not.<br>8     Q.   Why not?<br>9<br>10<br>11          MR. RODGERS:  Objection to<br>12        form.  You can answer if you have an |

| | | |
|---|---|---|
| | | 13    answer.<br>14    A.   I don't really have an answer.<br>15  I just didn't request it. |
| 156 - 157 | 17 - 16 | 17    Q.   Is there something that<br>18  the -- whoever filled out this form has<br>19  access to, to kind of walk them through the<br>20  assignment of risk scores in Section 6?<br>21      MR. RODGERS:  Objection.<br>22    Foundation.<br>23      MR. CHAPMAN:  Well, he can only<br>24    answer if he knows, Mr. Rodgers.<br>25      MR. RODGERS:  He said he<br><br>156<br><br><br>1    doesn't fill out these things.<br>2      MR. CHAPMAN:  That doesn't make<br>3    any difference.  It's a question of<br>4    whether he knows --<br>5      MR. RODGERS:  But now you're<br>6    asking him --<br>7      MR. CHAPMAN:  -- if there's some<br>8    reference.<br>9      MR. RODGERS:  But now you're<br>10    asking him what somebody who fills it<br>11    out whether they -- how -- excuse me,<br>12    how they fill it out.<br>13      But you can answer if you know,<br>14    Lenny.<br>15    A.   I don't know.  I don't know.  I<br>16  don't fill these out regularly, so. |
| 170 - 171 | 25 - 16 | 25    Q.   And what would you expect the<br><br>170<br><br><br>1    lookout that's assigned to a circumstance<br>2    like that to be on the lookout for?<br>3      MR. RODGERS:  Objection to the<br>4    extent he's not here as an expert,<br>5    and he wasn't the master of that<br>6    particular tug at the time.<br>7      So are you asking his opinion?<br>8      MR. CHAPMAN:  Well, I didn't |

| | | |
|---|---|---|
| | | 9      finish because I was going to ask<br>10      when transiting a bridge.  I mean,<br>11      this -- the question only relates to<br>12      putting up post and lookout for a<br>13      bridge transit, okay, which -- you<br>14      know, which is contemplated by this<br>15      bullet.<br>16      A.   Okay. |
| 171 - 172 | 17 - 5 | 17      Q.   I'm trying to understand then<br>18      what is the look out in that circumstance<br>19      as expected to look out for?<br>20          MR. RODGERS:  Objection -- same<br>21      objection.  He's not here as an<br>22      expert.  And he wasn't on the<br>23      Mackenzie Rose.  You're asking his<br>24      opinion, so if have you an --<br>25          THE WITNESS:  I can give my<br><br>171<br><br><br>1      opinion on it.<br>2          MR. RODGERS:  All right.  I<br>3      don't want you to give your opinion.<br>4          THE WITNESS:  Okay.  All right.<br>5      Then I won't answer it. |
| 172 - 173 | 6 - 6 | 6      Q.   If you feel that it's an<br>7      opinion, you should still give it.  And you<br>8      can qualify it and say that it's your<br>9      opinion.<br>10          MR. RODGERS:  Objection.<br>11      A.   I'm just going to go with --<br>12          MR. RODGERS:  Don't instruct<br>13      the witness.<br>14      A.   -- what James is telling me to<br>15      do.<br>16      Q.   So are you going to answer the<br>17      question?<br>18      A.   No.<br>19      Q.   So you're refusing to answer<br>20      the question?<br>21          MR. RODGERS:  No.  He's not<br>22      refusing, he's listening to his<br>23      attorney.<br>24          MR. CHAPMAN:  So you're -- |

| | | |
|---|---|---|
| | | 25        MR. RODGERS:  What are you<br><br>172<br><br><br>1      doing, Jim?  He's listening to me.<br>2          MR. CHAPMAN:  You're<br>3      instructing him not to answer then?<br>4          MR. RODGERS:  Yeah.  If it's an<br>5      opinion.  He's not here as an expert<br>6      and he wasn't on the Mackenzie Rose. |
| 176 | 2 - 7 | 2      Q.   Do you think it's a good Marine<br>3      practice to have a safety briefing before<br>4      transiting bridges?<br>5          MR. RODGERS:  Objection.  Don't<br>6      answer that.  I'm directing the<br>7      witness not to answer. |
| 178 - 180 | 11 - 9 | 11      Q.   If you could turn to Section<br>12      7.16 on lookouts.  The number of that page<br>13      is Carver 000155, but it's -- it is towards<br>14      the end of the collection of sections --<br>15      A.   Oh, because it's not in order,<br>16      right?<br>17      Q.   Yeah.<br>18      A.   Okay.  So zero -- what is it,<br>19      155?<br>20      Q.   Yeah.  It's just one page, it<br>21      looks like this.<br>22      A.   Got it.<br>23      Q.   So this is the section of the<br>24      safety management system on the lookouts,<br>25      correct?<br><br>179<br><br><br>1      A.   Yes, correct.<br>2      Q.   In the first part under<br>3      requirements for a look out it -- there's a<br>4      half a dozen bullets of things that should<br>5      be considered as relevant factors in<br>6      deciding whether they're supposed to<br>7      lookout, correct?<br>8      A.   Correct.<br>9      Q.   Okay.  Weather visibility,<br>10      traffic density and then it says, |

| | | |
|---|---|---|
| | | 11   "Proximity of dangers to navigation."  What<br>12   are dangers to navigation -- <br>13<br>14<br>15          MR. RODGERS:  Objection to<br>16      form.<br><br>17      Q.    -- that would require the<br>18   posting of a lookout?<br>19          MR. RODGERS:  Objection to<br>20      form.  He's not here as an expert.<br>21      A.   Yeah.  I'm not sure what they<br>22   would qualify as proximity to dangerous<br>23   allegation.<br>24      Q.   Would a bridge transit?<br>25          MR. RODGERS:  Objection to<br><br>180<br><br><br>1      form.<br>2      A.   I'm not sure.  Again, I'm<br>3   not -- I didn't write this, so I don't<br>4   know.<br>5          Q.    This is intended as guidance<br>6   though to the master or mate on watch<br>7   regarding considerations for posting a<br>8   lookout though, right?<br>9      A.   Yes. |
| 180 - 181 | 10 - 2 | 10      Q.   Okay.  So that's my question<br>11   is, whether you wrote it or not, is a<br>12   bridge a danger to navigation?<br>13          MR. RODGERS:  Objection.  He's<br>14      not here as an expert.  And you're<br>15      supposed to premise the questions not<br>16      as an expert.  You haven't done that<br>17      all day, okay?  So I'm going to tell<br>18      him not to answer.  I'm going to<br>19      direct him not to answer anything<br>20      that asks for his opinion.<br>21          MR. CHAPMAN:  You're<br>22      instructing the witness not to answer<br>23      the question?<br>24<br>25<br><br>180 |

| | | |
|---|---|---|
| | | 1      MR. RODGERS:  Yes, I am.  I<br>2    just said that. |
| 181 - 182 | 9 - 24 | 9    Q.   So the tug while pushing the<br>10   barge elided with the bridge, right?<br>11    A.   Yeah.<br>12      MR. RODGERS:  Can you repeat<br>13   that?<br>14      MR. CHAPMAN:  I said --<br>15      MR. RODGERS:  Hold on, let me<br>16   go to this.<br>17      MR. CHAPMAN:  I said, the tug,<br>18   Mackenzie Rose --<br>19      MR. RODGERS:  I said, "Can you<br>20   repeat this?  "Are you going to<br>21   repeat it.<br>22      MR. CHAPMAN:  I am.<br>23      MR. RODGERS:  Okay.<br>24      MR. CHAPMAN:  The tug Mackenzie<br>25   Rose while pushing the Weeks 281 on<br><br>181<br><br><br>1    June 15th, 2024 elided with the<br>2   bridge.<br>3      MR. RODGERS:  To his knowledge?<br>4   To his knowledge.<br>5      MR. CHAPMAN:  Well --<br>6      MR. RODGERS:  He's a fact<br>7   witness.<br>8      MR. CHAPMAN:  Exactly, and I'm<br>9   asking him, did it?<br>10      MR. RODGERS:  To his<br>11   knowledge --<br>12      MR. CHAPMAN:  Did it?<br>13      MR. RODGERS: -- you're asking<br>14   him for a legal conclusion.<br>15      MR. CHAPMAN:  No.<br>16      MR. RODGERS:  Yeah, you are.<br>17    Q.   At any time while you were<br>18   employed by Carver, did you learn that the<br>19   tug boat while pushing the weeks 281 elided<br>20   with the Norfolk and Portland Belt Line<br>21   Bridge on June 15th, 2024? |

| | | |
|---|---|---|
| | | 22    MR. RODGERS:  You can answer<br>23    that.<br>24    A.  Yes. |
| 183 - 184 | 11 - 17 | 11    Q.  So a lookout could have been<br>12  posted to arise -- to appraise of the risk<br>13  of an allision with the bridge, correct?<br>14    MR. RODGERS:  Objection.  Don't<br>15    answer that.  Directing the witness<br>16    not to answer that question as it's<br>17    calling for expert testimony. |
| 183 - 184 | 18 - 5 | 18    Q.  The last part of that section<br>19  on procedure says, "A lookout shall be<br>20  added when entering any port channel, or<br>21  any waterway intersection."  What is meant<br>22  by a port channel -- when entering a port<br>23  channel, or anyway waterway intersection?<br>24  What does that mean?<br>25<br><br>183<br><br><br>1    MR. RODGERS:  Objection.  It<br>2    calls for expert testimony and<br>3    interpretation of a statute.<br>4    Just -- I'm going to direct the<br>5    witness not to answer. |
| 184 | 6 - 13 | 6    Q.  Are you aware of any statute<br>7  that governs the posting of a lookout when<br>8  entering a port channel, or a waterway<br>9  intersection?<br>10    MR. RODGERS:  Objection.  You<br>11    can answer if you're aware or not<br>12    aware.<br>13    A.  No, I'm not aware. |
| 188 | 2 - 15 | 2    Q.  Okay.  So is there any<br>3  circumstance in the context of this<br>4  regulation that you know of where you don't<br>5  have to report an unintended allision with<br>6  the bridge --<br>7    MR. RODGERS:  Objection.<br>8    Q.  -- immediately to the Coast<br>9  Guard?<br>10    MR. RODGERS:  Objection to the |

| | | |
|---|---|---|
| | | 11      term "allision with the bridge." <br> 12      It's not consistent with his <br> 13      testimony as to what he knew. <br> 14      A.   As far as I knew they landed on <br> 15   the fenders inside of the bridge. |
| 191 - 192 | 21 - 7 | 21      Q.   Did you consult this at all <br> 22   when you were investigating the allision <br> 23   with the bridge? <br> 24      A.   No. <br> 25      Q.   Why not? <br><br> 191 <br><br> 1         MR. RODGERS:  Objection to <br> 2      form.  You can answer if -- <br> 3      A.   I didn't think that it was <br> 4   necessary to reference this. <br> 5         Q.   Did you even know of it's <br> 6   existence? <br> 7      A.   Yes. |
| 192 - 193 | 21 - 5 | 21      Q.   Do you know what SMF stands <br> 22   for? <br> 23      A.   I do not. <br> 24      Q.   Could it be safety management <br> 25   form? <br><br> 192 <br><br> 1         MR. RODGERS:  Objection to <br> 2      form.  You can answer if you <br> 3      understand. <br> 4      A.   It could be, yes. <br> 5         MR. RODGERS:  But don't guess. |
| 195 | 4 - 15 | 4      Q.   If you had learned that the tug <br> 5   while pushing the barge 281 had damaged the <br> 6   bridge, that has hit it in a way that <br> 7   damaged it, it hit the bridge, would you <br> 8   agree that a 2692 would need to be filled <br> 9   with the Coast Guard? <br> 10         MR. RODGERS:  Objection.  Calls <br> 11      for speculation.  You can answer if <br> 12      you can. |

| | | |
|---|---|---|
| | | 13    A.  Yes.<br>14    Q.  You agree?<br>15    A.  Yes. |
| 199 | 13 - 24 | 13    Q.  How are masters, or mates, you<br>14  know, the officer of the watch, expected to<br>15  know how to appropriately use the autopilot<br>16  system?<br>17      MR. RODGERS:  Sorry,<br>18  could -- let me just read that from<br>19  the computer.<br>20      I'm going to object as to form.<br>21  You can answer if you understand it<br>22  or know it.<br>23    A.  It's -- I don't really know how<br>24  to answer it. |
| 203 | 7 - 21 | 7    Q.  He was the officer on the<br>8  watch, right?<br>9    A.  Yes.<br>10    Q.  Yeah.  And that's because the<br>11  other deckhand that was on duty at the time<br>12  was --<br>13      MR. RODGERS:  Objection.<br>14    Q.  -- down in the galley, right?<br>15      MR. RODGERS:  No.  Objection.<br>16  That's not the testimony in this<br>17  case.<br><br>18    Q.  I'm just asking what you<br>19  learned in the investigation?<br>20    A.  I'm not sure where the other<br>21  deckhand was at the time. |
| 204 - 205 | 6 - 1 | 6    Q.  Yeah.  So he was on watch.<br>7  What I'm asking is whether there was a<br>8  second person that was providing any kind<br>9  of lookout with respect to the transit at<br>10  the time of the allision?<br>11      MR. RODGERS:  As far as he<br>12  knows from his investigation.<br>13      MR. CHAPMAN:  Yeah, exactly.<br>14    A.  As far as I know, no.<br>15    Q.  And as far as you know, when<br>16  you were employed by Carver, there was no<br>17  requirement by Carver that more than one<br>18  person served as the lookout when |

| | | |
|---|---|---|
| | | 19    transiting bridges, correct?<br>20<br>21         MR. RODGERS:  Objection.  He's<br>22    not here as an expert.  You can<br>23    answer if you understand the<br>24    question.<br>25    A.   To my knowledge, no, there was<br><br>204<br><br><br>1    no policy or requirement. |
| 205 | 2 - 23 | 2    Q.   Are you aware of any best<br>3    practices in the towing industry that would<br>4    require posting a lookout at the head end<br>5    of the barge during a bridge transit?<br>6         MR. RODGERS:  Could you define<br>7    best practices.<br>8         MR. CHAPMAN:  I'm just asking<br>9    him.<br>10         MR. RODGERS:  That's a kind of<br>11    a corporate term.  But if you<br>12    understand it, you can go ahead.<br>13    A.   Yes.<br>14    Q.   And are you aware of any best<br>15    practices in the towing industry that<br>16    recommend disengaging the autopilot when<br>17    transiting near a fixed object like a<br>18    bridge?<br>19         MR. RODGERS:  Objection to<br>20    form.  He's not here as an expert.<br>21         You can answer as to what you<br>22    know.<br>23    A.   Yes, I'm aware. |
| 206 | 1 - 11 | 1    Q.   Can an autopilot system make<br>2    course corrections?<br>3         MR. RODGERS:  Objection.  He's<br>4    not here as an expert on autopilot<br>5    systems.<br>6    A.   Yeah, I don't --<br>7<br>8         MR. RODGERS:  You can as to<br>9    your knowledge.<br>10    A.   To my knowledge, I'm not sure.<br>11    I'm not a -- I don't -- I'm not sure. |

| | | |
|---|---|---|
| 206 | 12 - 20 | 12    Q.   Is there any autopilot system<br>13   that you've ever used that's capable of<br>14   making its own course corrections?<br>15        MR. RODGERS:  Objection to<br>16      form.  You can answer as to your<br>17      knowledge.<br>18      A.   No.  It would -- you would set<br>19   the course that you wanted and it would<br>20   hold that course. |
| 220 - 221 | 22 - 4 | 22    Q.   And I think the word was or the<br>23   term that was used was slide by, which you<br>24   understood to mean they had made no contact<br>25   with the bridge or fender system, correct?<br><br>220<br><br>1        MR. RODGERS:  Objection to<br>2      form.  You can answer if you<br>3      understand his question.<br>4      A.   Yes, correct. |
| 221 | 13 - 22 | 13    Q.   So if all they did was slide by<br>14   the fender system, was there any reason for<br>15   them to call you about it that afternoon?<br>16        MR. RODGERS:  Objection to<br>17      form.  You can answer if you --<br>18      A.   You would have to ask --<br>19        MR. RODGERS:  Don't guess.<br>20      A.   You would've to ask Captain<br>21   Miller his reasoning.  I'm not sure, I just<br>22   answered the phone when they called. |
| 221 - 222 | 23 - 7 | 23    Q.   If all they did was slide by as<br>24   reported to you, would there be any reason<br>25   for you to ask them to take some photos and<br><br>221<br><br>1   send them to you?<br>2        MR. RODGERS:  Objection to<br>3      form.  You can answer if you have an<br>4        answer. |

| | | |
|---|---|---|
| | | 5      A.   Yes.  Just so I can make sure<br>6    that there was no damage and that they<br>7    weren't lying to me about anything. |
| 222 | 14 - 25 | 14      Q.   Okay.  On a Saturday afternoon.<br>15    And you wanted to check whether they were<br>16    lying to you, so you had them take some<br>17    photos and send them to you.  Is that your<br>18    testimony?<br>19          MR. RODGERS:  Objection to<br>20      form.  You can answer if you want to<br>21      extrapolate on that.<br>22      A.   I'd rather not answer.<br>23      Q.   Are you going to refuse to<br>24    answer?<br>25      A.   Yes. |