Exhibit M

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division In Admiralty
CIVIL ACTION NO.   2:24-cv-00490
- - - - - - - - - - - - - - - - - - - - - - - - - - -

In the Matter of COEYMANS MARINE TOWING, LLC d/b/a
CARVER MARINE TOWING as Owner and Operator of M/T
MACKENZIE ROSE, (IMO No. 8968765), her cargo,
engines, boilers, tackle, equipment, apparel, and
appurtenances, etc., IN REM, ("M/T MACKENZIE ROSE"),
petitioning for Exoneration from or Limitation of
Liability in allision with Norfolk and Portsmouth

Belt Line Railroad Company Main Line Railroad Bridge
(the "Bridge") occurring June 15, 2024 in and about
the Elizabeth River, Virginia.

- - - - - - - - - - - - - - - - - - - - - - - - - - -




        TRANSCRIPT of the stenographic notes of the

videotaped deposition of Brian Moore in the

above-entitled matter, as taken by and before

LORRAINE B. ABATE, a Certified Shorthand Reporter and

Notary Public of the State of New York, and

Registered Professional Reporter, held at the offices

of Clyde & Co., 405 Lexington Avenue, New York, New

York, on April 28, 2025, commencing at 10:44 a.m.,

pursuant to Notice.



Job No. 112213

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**EXHIBIT I**

**Deposition of Brian Moore – April 28, 2025**

| Page | Line | Extract |
|---|---|---|
| 29 - 30 | 12 - 9 | 12  Q.   Have you had to terminate anybody who<br>13  worked for Carver Marine Towing?<br>14  A.   I have, yes.<br>15  Q.   And have you ever been turned down on a<br>16  termination recommendation?<br>17  A.   No, sir.<br>18  Q.   Do you hold any other positions inside<br>19  the Carver organization besides general manager of<br>20  Carver Marine Towing?<br>21  A.   No, sir.<br>22  Q.   When did Mr. Baldassare leave Carver?<br>23  A.   I don't recall off the top of my head.<br>24  Three months ago.  That is an estimate.<br>25  Q.  Do you know why he left?<br><br>29<br><br><br>1          Moore - April 28, 2025<br>2  (DIR)<br>3      MR. RODGERS:  Don't answer that.  That<br>4  is -- I'm directing Mr. Moore not to answer.<br>5      And by way of counsel, you can put in a<br>6  demand and we'll take it under advisement.<br>7  Concerned about employment law here and also<br>8  potential agreements that may have been signed,<br>9  for Mr. Baldassare's sake. |
| 34 - 35 | 6 - 14 | 6  Q.   Okay.  Do you know when Miller left<br>7  Carver?<br>8  A.   I would have to reference it, but it was |

| | | |
|---|---|---|
| | | 9  close to October or November of 2024.  He didn't<br>10  leave Carver then.  He was -- the -- his vessel was<br>11  going into shipyard, so we didn't have an extra spot<br>12  for him, so he was just off for an extended period of<br>13  time.  And come to find out on Friday, I heard that<br>14  he passed away.<br>15      Q.    So Captain Miller passed away?<br>16      A.    In the end of March.<br>17          He was working with HR for some<br>18  long-term disability that I didn't really have<br>19  reference to or idea abouts, but I just heard --<br>20  discovered that on Friday.<br>21      Q.    But he did not work for the company<br>22  since about October or November of 2024?<br>23      A.    I would have to reference.  He might<br>24  have filled in some days here and there, but I don't<br>25  recall.<br><br>35<br><br>1          Moore - April 28, 2025<br>2      Q.    Was he ever terminated from employment<br>3  by Carver?<br>4      A.    I don't know.<br>5      Q.    Do you know if he was ever asked to<br>6  resign?<br>7      A.    No.<br>8          MR. RODGERS:  I'm going to, again,<br>9      direct him not to answer on --<br>10          MR. CHAPMAN:  About Miller?<br>11          MR. RODGERS:  Yeah, but Miller wasn't<br>12      terminated.  He just testified that he was on<br>13      leave, and then he passed away, which we just<br>14      found out as well. |
| 49 - 51 | 22 - 9 | 22      Q.    What time do you recall calling him<br>23  back?<br>24      A.    Mid-afternoon.  I don't remember.<br>25      Q.    And he told you that the crew of the<br><br>50<br><br>1          Moore - April 28, 2025<br>2  tug -- somebody in the crew of the tug had reported<br>3  that they had contacted the fendering system of the<br>4  bridge?<br>5          MR. RODGERS:  Objection to form.<br>6          You can answer.<br>7          Do you understand his question?<br>8      Q.    If I -- just so I'm clear, if I'm --<br>9      A.    Yeah.  They --<br>10          MR. RODGERS:  Just hold off. |

|  |  | 11    Q.    I just want to respond to his objection.<br>12        If I've misstated what you said<br>13  previously, then feel free to correct me.  I thought<br>14  that's what you said.<br>15        A.    Sure.  Can you repeat the question,<br>16  then.<br>17        Q.    Yeah.  When you spoke to Mr. Baldassare,<br>18  he told you that someone in the crew of the tug had<br>19  reported that they had contacted the fendering system<br>20  of the Belt Line Bridge; is that right?<br>21        A.    Yes.  He didn't mention a name, he just<br>22  said the MACKENZIE ROSE, as a general.<br>23        Q.    And did you have any conversation with<br>24  him about that, any discussion, any -- like here's<br>25  what we need to do next, or can you get some more<br><br>51<br><br>1            Moore - April 28, 2025<br>2  information?  I'm just trying to unpack that.<br>3        A.    It was more of a find out what happened.<br>4  You know, I think I requested them get photos, see<br>5  what happened.<br>6        It -- when you receive that kind of<br>7  phone call, it's initially gather all the facts you<br>8  can, what happened, is everything okay, and then take<br>9  it step by step after that. |
|---|---|---|
| 56 - 59 | 11 - 8 | 11    Q.    So in the second conversation, I'll call<br>12  it, that you had with Mr. Baldassare, what did you<br>13  learn about what had happened?<br>14        A.    That there was no damage to the<br>15  fendering, and on initial walk of the barge, there<br>16  was no damage noted.  So that was probably what came<br>17  in -- came by way of the second phone call.<br>18        Q.    Do you know if the crew of the tug made<br>19  any inspection of the bridge to determine whether<br>20  there was any damage to it?<br>21        A.    Besides taking that one photo as they<br>22  passed through.<br>23        Q.    That's all they did --<br>24        A.    Well --<br>25        Q.    -- as far as you know?<br><br>57<br><br>1            Moore - April 28, 2025<br>2        A.    As far as I know.<br>3        Q.    Nobody got off the boat and walked the<br>4  bridge or came up alongside of the bridge, other than<br>5  in that one photo?<br>6        A.    I don't believe so. |

7          MR. RODGERS:  Well, don't guess.
8     Q.   So --
9     A.   So -- correction.  Yes, I don't know.
10     Q.   At any time, did it occur to you that
11   the Coast Guard needed to be contacted?
12          MR. RODGERS:  Objection to form.
13          You can answer.
14     A.   It would have been within that five-day
15   window of a bridge allision with fendering.
16     Q.   And not before?  Coast Guard needed --
17   did -- you're saying you -- it did not occur to you
18   that the Coast Guard should be contacted immediately
19   because of the allision?
20     A.   Well, given that it was reported that it
21   was just a fendering and there was no damage to the
22   fendering or the barge, I wouldn't understand the
23   severity of what the tug did or didn't do.
24     Q.   Yeah, I hear what you're saying, but do
25   you know what the regulatory requirement is?

58

1          Moore - April 28, 2025
2          MR. RODGERS:  Objection.  It's a --
3   you're asking about the law or what he knows?
4          MR. CHAPMAN:  I'm just -- again, I'm
5   asking him what he knows or what he thinks
6   regarding -- I'm trying to understand what --
7          MR. RODGERS:  Well, he just testified
8   that it -- he understood there was a five-day
9   window.
10          MR. CHAPMAN:  I'll back up.  I'll back
11    up.

12     Q.   Was the Coast Guard notified on
13   June 15th, 2024, that the tug had allided with the
14   bridge?
15     A.   I don't know.
16     Q.   Who would know?
17     A.   Lenny Baldassare.
18     Q.   Did he ever tell you that he had
19   notified the Coast Guard?
20     A.   I don't recall that, either.
21     Q.   So my question, then, is did you do
22   anything to confirm whether the Coast Guard had been
23   notified on June 15th, 2024, of the allision?
24          MR. RODGERS:  Objection to form.
25          You can answer if you understand it.

59

| | | |
|---|---|---|
| | | 1    Moore - April 28, 2025 |
| | | 2    A.    So say it -- repeat the question, |
| | | 3    please. |
| | | 4    MR. CHAPMAN:  I'll do it this way. |
| | | 5    Madam court reporter, would you read my |
| | | 6    question back to Mr. Moore. |
| | | 7    (The record was read.) |
| | | 8    A.    No. |
| 62 - 63 | 5 - 11 | 5    Q.    So it's your testimony that she |
| | | 6    contacted Mr. Baldassare, and then within 48 hours of |
| | | 7    that initial contact from the Coast Guard, then the |
| | | 8    Coast Guard was notified? |
| | | 9    A.    No.  Incorrect. |
| | | 10    Q.    I misunderstood, then. |
| | | 11    A.    Correct. |
| | | 12    So it was within 48 hours of the |
| | | 13    incident, I believe, is when Lieutenant contacted |
| | | 14    Lenny informing him that the MACKENZIE ROSE did |
| | | 15    strike the bridge. |
| | | 16    MR. RODGERS:  Just for the record, is |
| | | 17    that your understanding? |
| | | 18    MR. MOORE:  Yes. |
| | | 19    Q.    Okay.  And you think that was within |
| | | 20    48 hours of the allision? |
| | | 21    A.    I believe so, yes. |
| | | 22    Q.    And then at no time before that had |
| | | 23    Carver or anybody on behalf of Carver informed the |
| | | 24    Coast Guard of the allision; is that right? |
| | | 25    MR. RODGERS:  Objection to form. |
| | | |
| | | 63 |
| | | 1    Moore - April 28, 2025 |
| | | 2    You can answer what you know. |
| | | 3    A.    No. |
| | | 4    Q.    I'm not sure that answered my question |
| | | 5    the way you intended, but -- |
| | | 6    A.    Okay.  Pause -- repeat the question. |
| | | 7    Q.    Yeah. |
| | | 8    MR. CHAPMAN:  Could you read that back |
| | | 9    for us, please. |
| | | 10    (The record was read.) |
| | | 11    A.    Correct. |
| 66 - 68 | 11 - 18 | 11    Q.    Did everybody -- every member of the |
| | | 12    crew provide a statement, to your knowledge? |
| | | 13    A.    To my knowledge. |
| | | 14    Q.    And did they provide more than one |
| | | 15    statement or did they only provide one statement? |
| | | 16    A.    They provided a handwritten statement, |
| | | 17    and usually handwritten statements are illegible and |
| | | 18    not clear, and that we would ask them to retype it |
| | | 19    up.  Lenny would have had them type it up. |

| | | |
|---|---|---|
| | | 20    Q.    And what was the purpose of getting<br>21    statements?<br>22        MR. RODGERS:  Objection to form.<br>23        You can answer it if you understand it.<br>24    A.    Just with any incident, a statement<br>25    should be provided.<br><br>67<br><br>1        Moore - April 28, 2025<br>2    Q.    Was there any written report prepared of<br>3    the investigation?<br>4    A.    There was --<br>5        MR. RODGERS:  Objection.  Can you be<br>6    more specific.<br>7        MR. CHAPMAN:  I don't know that I can.<br>8    I'm just asking.  He's told -- he's --<br>9        MR. RODGERS:  By who?  By Carver or by<br>10    him, by anybody?<br>11        MR. CHAPMAN:  Fair.  That's a fair<br>12    inquiry.<br>13    Q.    Was there ever a written report of the<br>14    investigation prepared by Carver?<br>15    A.    Of the investigation, no.<br>16    Q.    So there were statements obtained, but<br>17    no written report prepared?<br>18    A.    Correct. |
| 87 - 88 | 6 - 3 | 6    Q.    Do employees ever get, I'll say,<br>7    reprimanded or disciplined in any way from messing<br>8    stuff up?<br>9        MR. RODGERS:  Objection to form.<br>10        You can answer if you understand it.<br>11    A.    Within Carver companies?<br>12    Q.    Yeah, I'll rephrase.<br>13        Do employees of Carver Marine Towing<br>14    ever get disciplined for damaging property?<br>15    A.    There's a formal write-up within Carver<br>16    companies.  I don't recall of any formal write-ups.<br>17    It would go through HR for write-ups and discipline<br>18    actions.<br>19    Q.    So would somebody from HR be completely<br>20    responsible for that or would there be somebody at<br>21    the towing company that had to initiate it or sort of<br>22    spell out what the issue was?<br>23    A.    Correct.  It would be -- it would go<br>24    through us for that.  It would be -- I say us; that's<br>25    Carver Marine Towing.  But it could go through<br><br>88<br><br>1        Moore - April 28, 2025 |

| | | |
|---|---|---|
| | | 2  somebody at Carver Marine Towing to initiate the |
| | | 3  disciplinary action. |
| 89 - 90 | 9 - 13 | 9      Q.    To your knowledge, has Captain Morrissey |
| | | 10  ever been disciplined for the incident -- the |
| | | 11  allision with the Belt Line Bridge in 2024? |
| | | 12      A.    He was suspended with pay pending that |
| | | 13  investigation. |
| | | 14      Q.    But was he disciplined? |
| | | 15          MR. RODGERS:  Objection to form. |
| | | 16      A.    A disciplinary form?  No. |
| | | 17      Q.    I'm sorry? |
| | | 18          MR. RODGERS:  Asked and answered is my |
| | | 19      objection, but you can answer if you understand |
| | | 20      his question. |
| | | 21      A.      To me, the suspension was the |
| | | 22  disciplinary. |
| | | 23      Q.    So he still collected full -- collect |
| | | 24  full pay while he was on admin leave, right? |
| | | 25      A.    Yes. |
| | | |
| | | 90 |
| | | |
| | | 1          Moore - April 28, 2025 |
| | | 2      Q.    Was there any counseling? |
| | | 3          MR. RODGERS:  I'm just -- sorry.  Jim, |
| | | 4      you call it admin leave.  I don't know if that's |
| | | 5      his term, but maybe you can straighten it out. |
| | | 6      A.    Correct.  So he wasn't on admin leave. |
| | | 7  He didn't have any day-to-day operations with Carver |
| | | 8  Marine Towing during his suspension. |
| | | 9      Q.    So he just didn't come into the office, |
| | | 10  but he received his full pay? |
| | | 11      A.    Yes. |
| | | 12      Q.    And how long did that go on? |
| | | 13      A.    I don't recall.  Multiple months. |
| 107 | 6 - 21 | 6      Q.    So how are deckhands trained in their |
| | | 7  responsibility regarding assisting the master or mate |
| | | 8  in making bridges? |
| | | 9      A.    They have their own training for vessel |
| | | 10  orientation and initial on hire, but I could not -- |
| | | 11  not to my knowledge, I don't know about specifically |
| | | 12  for passage to bridges or locks or... |
| | | 13      Q.    Who is responsible for training new |
| | | 14  hires at Carver in -- from the time you've been |
| | | 15  there, and maybe it's changed, but just going back to |
| | | 16  since you've been there? |
| | | 17          MR. RODGERS:  Objection to form. |
| | | 18          You can answer if you know -- understand |
| | | 19      the question. |
| | | 20      A.    I'm not sure who would be responsible |
| | | 21  for training. |

| 108 -<br>109 | 3 - 6 | 3     Q.     There's no one that has that role?<br>4   That's my question.  No one has --<br>5          MR. RODGERS:  Object --<br>6   Q.     No one has -- let me --<br>7          MR. RODGERS:  You're talking about on<br>8   the vessel or are you talking about in the<br>9   company?<br>10          MR. CHAPMAN:  I'm talking about in --<br>11          MR. RODGERS:  It's confusing.<br><br>12     Q.     At Carver Marine Towing, is there<br>13   somebody that uniquely has the responsibility for<br>14   training new hires?<br>15     A.     The master or mate, whoever that signs<br>16   them off in within Helm as -- and appropriate to<br>17   stand watch.<br>18     Q.     And does the master or mate that has<br>19   that responsibility also receive training in what<br>20   they're supposed to train the deckhands in?<br>21     A.     I don't know.<br>22     Q.     Is --<br>23          MR. RODGERS:  Don't guess.<br><br>24     Q.     Is it spelled out anywhere in this TSMS<br>25   system what training is required or how it's to be<br><br>109<br><br>1          Moore - April 28, 2025<br>2   conducted, that sort of thing?<br>3     A.     I would have to reference it.<br>4     Q.     You don't know?<br>5     A.     No, not off the top of my head.  I would<br>6   have to reference that. |
| 112 -<br>113 | 10 - 6 | 10     Q.     All right.  Thank you.<br>11          We were looking at Exhibit 4, and we<br>12   were on the Section 6.13 on page 153.<br>13     A.     Okay.<br>14     Q.     Let's see.  They're all bullets, but it<br>15   looks like eight bullets down, it says the -- for the<br>16   mate, captain/relief captain, his responsibilities<br>17   are to act as a lookout and oversee lookouts --<br>18     A.     Yes, sir.<br>19     Q.     -- right?<br>20          So what does it mean to oversee<br>21   lookouts?<br>22          MR. RODGERS:  Same objection.  He's not<br>23   here as an expert, but he'll testify as to his<br>24   knowledge.<br>25          Go ahead. |

| | | |
|---|---|---|
| | | 113<br><br>1          Moore - April 28, 2025<br>2    A.   I would say when to call out a lookout,<br>3  if I'm putting myself in the captain's hat on here.<br>4    Q.   Have you ever assigned a lookout at any<br>5  time while you were operating a vessel?<br>6    A.   I have, in restricted visibility. |
| 119 -<br>122 | 25 - 25 | 25    Q.   As part of your investigation, did you<br><br>120<br><br>1          Moore - April 28, 2025<br>2  review the Rose Point data once it was downloaded?<br>3    A.   I did.<br>4    Q.   And what did you observe relative to<br>5  the --<br>6        MR. RODGERS:  Objection to form.<br>7        You can answer if you remember.<br>8        MR. CHAPMAN:  Well, let me finish my<br>9    question.<br>10        MR. RODGERS:  Sure.<br><br>11    Q.   What did you observe relative to the<br>12  allision with the bridge from the Rose Point data?<br>13        MR. RODGERS:  Well, you know, just don't<br>14    answer yet.<br>15        MR. MOORE:  Sure.<br>16        MR. RODGERS:  I'd prefer you show him<br>17    the Rose Point data.<br>18        MR. CHAPMAN:  I don't have it.  Okay?<br>19    You guys haven't --<br>20        MR. RODGERS:  How can you not have it?<br>21        MR. CHAPMAN:  Because you haven't<br>22    produced it.<br>23        MR. RODGERS:  We've produced it.<br>24        MR. CHAPMAN:  I have -- no, you didn't.<br>25    I have the Rose Point data that runs all the way<br><br>121<br><br>1          Moore - April 28, 2025<br>2    up to about the Gilmerton reach in the southern<br>3    branch of the Elizabeth River, and that's the<br>4    last data.  It never gets the vessel up to the<br>5    bridge.<br>6        So I'm just asking this witness what did<br>7    he see.<br>8    A.   I would have to --<br>9        MR. RODGERS:  Go ahead.  Yeah, if you<br>10    remember what you saw, go ahead. |

| | | |
|---|---|---|
| | | 11    A.    It'd be better off to reference it<br>12  again.<br>13    Q.    I'm just testing your memory of what --<br>14    A.    Yeah, which I -- I understand.<br>15    Q.    What do you remember?<br>16    A.    It was -- I remember him coming around<br>17  and not having any -- any hard course changes and<br>18  kind of just gradualently [sic] constant radius turn<br>19  right into it.  But it doesn't overlay the length of<br>20  the barge.  It's not like a ship's overlay.  It<br>21  doesn't show you like true length, width.  It just<br>22  shows you the icon for the vessel.<br>23    Q.    Hitting the west pier of the bridge?<br>24    MR. RODGERS:  Objection.<br>25    A.    Into the area --<br><br>122<br><br><br>1         Moore - April 28, 2025<br>2         MR. RODGERS:  Objection.  You're asking<br>3  him if the Rose Point shows the hit?<br>4    A.    It doesn't --<br>5         MR. RODGERS:  Whatever you remember<br>6  or -- you can answer.<br>7    A.    Right.  It doesn't clearly show the<br>8  icon.<br>9    Q.    It shows it tracking towards the west<br>10  pier of the bridge?<br>11    A.    Close to the west pier where the --<br>12    Q.    And can you see the vessel then<br>13  reversing and kind of backing away from the bridge?<br>14    MR. RODGERS:  On the Rose Point?<br>15    MR. CHAPMAN:  On the Rose Point, yes.<br>16    A.    Yes.  It -- it tracks the whole thing,<br>17  every minute.<br>18    Q.    But my question is very specific.<br>19         Can you see on the Rose Point the vessel<br>20  backing away from the western pier of the bridge?<br>21    MR. RODGERS:  On the Rose Point?<br>22    A.    Yeah, you could see the vessel backing<br>23  away from the cluster of the bridge.  It's -- it's<br>24  not like it's definitive, but yes, it does back away<br>25  after it. |
| 132 -<br>133 | 10 - 23 | 10    Q.    Can you turn to Section 7.12.  It is<br>11  Carver Bates numbered 910.<br>12    A.    What section was that again?<br>13    Q.    It's called Bridge Transit, 7.12.  It is<br>14  towards the end of that document.<br>15    A.    And the Bates number was?<br>16    Q.    910. |

| | | |
|---|---|---|
| | | 17        It looks like this.  There's a big<br>18  yellow bar in the middle of it.<br>19     A.    Okay.<br>20     Q.    Found it?<br>21     A.    Bridge Transits.  Yeah.<br>22     Q.    So I don't know what 7.10 or 7.11 say,<br>23  but what's the reason for having a separate section<br>24  in the safety management system regarding bridge<br>25  transits?<br><br>133<br><br>1            Moore - April 28, 2025<br>2        MR. RODGERS:  Objection to form.<br>3        You can answer if you know.<br>4     A.    I don't know.<br>5     Q.    Is it because they're a hazardous<br>6  navigational system?<br>7        MR. RODGERS:  Objection.<br>8     A.    No.<br>9     Q.    So would you agree with me that every<br>10  bridge has a certain width that you've got to pass<br>11  the -- whatever you're -- whether it's your tug or<br>12  you're pushing a barge through --<br>13     A.    Correct.<br>14     Q.    -- right?<br>15        So it's a restricted channel?<br>16        MR. RODGERS:  Objection.  He's not here<br>17  as an expert.<br>18        You can answer as to your knowledge.<br>19     A.    I wouldn't say it's a restricted<br>20  channel.<br>21     Q.    You would not?<br>22     A.    No.  It's an everyday navigational<br>23  channel, especially in Norfolk or New York. |
| 135 | 5 - 14 | 5     Q.    Was there any bridge planning that you<br>6  know of or that you learned of during your<br>7  investigation?<br>8        MR. RODGERS:  Objection to form.<br>9        You can answer if you understand the<br>10  question.<br>11     A.    They would have made radio contact with<br>12  the bridge operators that are in the close --<br>13  enclosed conditions.  Other than that, it's a fairly<br>14  open channel of water. |
| 135 - 137 | 22 - 17 | 22     Q.    Right in the middle of that page,<br>23  there's this kind of highlighted statement, sort of<br>24  yellow or orange in color.<br>25        It says Under no circumstances shall the<br><br>136 |

|  |  | 1              Moore - April 28, 2025<br>2   wheelman responsible for the transit make the bridge<br>3   due to pressure or pride.<br>4              What is the purpose of that statement?<br>5              MR. RODGERS:  Objection to form.<br>6              You can answer.<br>7      A.   I don't know.<br>8      Q.   Well, if you were the operator of the<br>9   tug and read that before you made a bridge transit,<br>10   what would be your takeaway?<br>11             MR. RODGERS:  Objection.  It calls for<br>12       speculation and opinion.<br>13      A.     Well, I don't know how to answer that<br>14   one.<br>15      Q.   I'm sorry?<br>16      A.   I don't know how to answer that one.<br>17      Q.     Well, so you're the general manager of<br>18   Carver.<br>19      A.   Yes.<br>20      Q.     And you expect your employees to follow<br>21   what's in this safety management system, right?<br>22      A.     Correct.<br>23      Q.     So what is your expectation about what<br>24   they're going to do when it says Under no<br>25   circumstances, shall the wheelman responsible for the<br><br>137<br><br>1              Moore - April 28, 2025<br>2   transit make the bridge due to pressure or pride?<br>3             MR. RODGERS:  Objection to form.<br>4      A.   The -- I'm --<br>5             MR. RODGERS:  Don't guess.<br>6             MR. MOORE:  Yep.<br>7             MR. RODGERS:  Whatever you know.  Tell<br>8       him what you know.<br>9      A.   I don't know.<br>10      Q.   You don't know?<br>11      A.   I don't know what this statement would<br>12   lean to.<br>13      Q.   Not even an inkling?<br>14             MR. RODGERS:  Objection.  He's -- you're<br>15       harassing Mr. Moore, Jim.<br>16      A.   I didn't build -- I didn't make this<br>17   SMS, so it was here prior to me, so I'm not sure. |
| 144 -<br>145 | 7 - 6 | 7      Q.     Okay.  Then the next section says Use of<br>8   auto pilot, (if equipped)?<br>9      A.   Yep.<br>10      Q.     So is there any time that an auto<br>11   pilot -- that auto pilot use is prohibited by the |

| | | |
|---|---|---|
| | | 12  company?<br>13       MR. RODGERS:  I'm sorry.  By the SMS or<br>14       some other group?<br>15       MR. CHAPMAN:  I'm just asking about<br>16       Section 7.5 on navigation.  It says use of auto<br>17       pilot (if equipped).<br><br>18      Q.    Is there any time that the company<br>19  prohibits the use of the auto pilot system?<br>20      A.    I would have to reference the SMS again.<br>21      Q.    You would agree with me that this<br>22  section doesn't prohibit it, though; is that right?<br>23       MR. RODGERS:  Objection.  Speaks for<br>24       itself.  Document speaks for itself.  You can<br>25       answer, if you read it and look at it.<br><br>145<br><br>1            Moore - April 28, 2025<br>2      A.    Right, I don't see anything in here that<br>3  says that.<br>4      Q.   I'm sorry.  What was your answer?<br>5      A.    Oh.  So I don't see anything that says<br>6   that. |
| 159 -<br>160 | 15 - 13 | 15      Q.    Well, what other things would you think<br>16  are important besides bridge transits --<br>17       MR. RODGERS:  Objection --<br><br>18      Q.    -- relative to the safety of vessel<br>19  operations?<br>20       MR. RODGERS:  Objection to form.  You<br>21       can answer if you understand the question.<br>22      A.    To me, also drills, compliance of the<br>23  vessel to ensure that it's safe and sea-worthy.<br>24      Q.    Yeah.  I'm more focused on the voyage<br>25  itself, like what other --<br><br>160<br><br>1            Moore - April 28, 2025<br>2      A.    Weather.<br>3      Q.    -- call them hazards, obstructions,<br>4  whatever you want to call them, right?<br>5      A.    Yeah, that would be noted on the chart<br>6  itself.  But weather planning, anything that might<br>7  occur in VTS manuals.  So there's a lot of -- in this<br>8  industry, there's a lot of hazards that -- if you<br>9  look at them, that you take in your daily -- you take<br>10  in your daily operations when you're providing a safe<br>11  navigation. |

| | | |
|---|---|---|
| | | 12    Q.    So bridges are just one of them?<br>13    A.    Correct. |
| 160 -<br>161 | 19 - 23 | 19    Q.    And the very next page is Section 7.16<br>20  on Lookouts, which is Carver 000155.<br>21        Do you have that there?<br>22    A.    Yes.<br>23    Q.    Under the second section there, it says<br>24  Requirements for a Lookout.<br>25    A.    Yes.<br><br>161<br><br>1        Moore - April 28, 2025<br>2    Q.    It's got six bullets to consider.  In --<br>3  I'm just reading this.  In determining the<br>4  requirement for a lookout, the person in charge of |
| 162 -<br>164 | | 5  the navigation watch must take full account of the<br>6  relevant factors including, but not limited to, and<br>7  then there's six bullets.<br>8        And I want to ask you about the fourth<br>9  one there, which is Proximity of dangers to<br>10  navigation.<br>11    A.    Okay.<br>12    Q.    So what is a danger to navigation?<br>13        MR. RODGERS:  Objection.  He's not here<br>14  as an expert witness.<br>15        Are you asking him his understanding?<br>16        MR. CHAPMAN:  Well, I'm just asking him<br>17  as the general manager of the company, what's a<br>18  danger to navigation in their line of business?<br>19        MR. RODGERS:  Objection.<br>20        You can answer as to your understanding,<br>21  if you have any.<br>22    A.    Anything that is a risk to people,<br>23  property or environment. |
| | 1 - 12 | 162<br><br>1        Moore - April 28, 2025<br>2    A.    It's part of their regular navigation<br>3  that they incur every day.<br>4    Q.    But they present a danger to navigation,<br>5  don't they?<br>6        MR. RODGERS:  Objection, argumentative.<br>7        Objection.<br>8        You can answer if you understand.<br>9    A.    I don't understand.<br>10    Q.    You don't understand a bridge as being a<br>11  danger to navigation?<br>12        MR. RODGERS:  Objection, argumentative.<br>13        You're harassing Mr. Moore now. |

14       A.    I don't know how to answer that one.
15    (DIR)
16            MR. RODGERS:  Objection.  No -- just
17    don't answer.
18            You're asking his opinion.  He's not
19    here as an expert.
20       Q.    This is Carver's safety management
21    system, correct?
22       A.    Correct.
23       Q.    Okay.  And under this section on
24    Requirements for Lookout, one of the things to
25    consider is the proximity of dangers to navigation.

163

1                 Moore - April 28, 2025
2    Yes?
3       A.    Yes.
4       Q.    My question is really simple.
5            Is a bridge a danger to navigation?
6            MR. RODGERS:  Objection.  He's not here
7    as an expert.  He's here in his capacity at
8    Carver.
9            You're asking him expert testimony, and
10    you're being argumentative.
11            MR. CHAPMAN:  I'm just trying to get an
12    answer, sir.
13            MR. RODGERS:  Well, I already told him
14    not to answer, if it's going to be an opinion.
15            MR. CHAPMAN:  So is -- are you
16    instructing --
17            MR. RODGERS:  He's already told you he
18    doesn't -- he told you he doesn't have an
19    answer, then you're argumentative.  So he's
20    answered the question.
21            MR. CHAPMAN:  Are you instructing the
22    witness not to answer the question?
23            MR. RODGERS:  I already did, and he
24    already answered the question, so I think it's
25    moot.

164

1                 Moore - April 28, 2025
2            MR. CHAPMAN:  Well, I disagree.  He has
3    not answered the question.
4       A.    Well, I think if you look at all the
5    factors into this, but not limited to, like it says,
6    that you're taking all of this into your daily
7    prudent navigational assessment of something; that
8    you're going to look at everything as a danger.  It's

| | | |
|---|---|---|
| | | 9  including recreational vessels, including the<br>10  weather, including whatever it may be, from A to B,<br>11  and as long as it's part of on the water, then<br>12  everything is is to be looked at independently. |
| 169 | 2 - 19 | 2      Q.    It says The master may designate the<br>3  reporting to another person on the crew if it is not<br>4  practical for him/her to make the reports.<br>5          It doesn't say that the master may<br>6  designate the reporting to another person not in the<br>7  crew, correct?<br>8      A.    It does not say that.<br>9      Q.    Okay.  So was the master of the<br>10  MACKENZIE ROSE the first person to notify<br>11  Mr. Baldassare?<br>12      A.    That, I don't know.<br>13      Q.    It is fair to say the master never<br>14  notified the Coast Guard of the allision with the<br>15  bridge, correct?<br>16          MR. RODGERS:  Objection.  You're talking<br>17      about on the day of?<br>18          MR. CHAPMAN:  On the day of.<br>19      A.    Not to my knowledge. |
| 170 -<br>172 | 9 - 24 | 9      Q.    So under, it looks like, paragraph No. 4<br>10  on that page, towards the bottom, it says Any<br>11  incident described below (from 46 CFR 4.05-1(a).<br>12  That's a mouthful.<br>13          But the very first one is An unintended<br>14  grounding, or an unintended strike of a bridge,<br>15  right?<br>16          You see that?<br>17      A.    Yes.<br>18      Q.    So this is not based on whether there<br>19  was any visible damage, observable damage or like<br>20  wheel damage, it's just if there is an allision, it<br>21  has to be reported, right?<br>22          MR. RODGERS:  Objection.  The document<br>23      speaks for itself.<br><br>24      Q.    Correct?<br>25      A.    With a bridge separate from a fendering<br><br>171<br><br>1          Moore - April 28, 2025<br>2  system.<br>3      Q.    Just so I'm clear, you're taking the<br>4  position that because it was only reported to you or<br>5  to Mr. Baldassare that the vessel allided with the<br>6  fendering system, that it wasn't required to report<br>7  that to the Coast Guard at that instant in time?<br>8          MR. RODGERS:  Objection to form.  You're |

|  |  | 9    asking for his opinion or what he did? |
|  |  | 10          MR. CHAPMAN:  I'm asking to understand |
|  |  | 11   why the Coast Guard wasn't contacted -- |
|  |  | 12          MR. RODGERS:  Okay.  Coast Guard -- |
|  |  | 13          MR. CHAPMAN:  -- in the context of this |
|  |  | 14   regulation and -- |
|  |  | 15          MR. RODGERS:  You don't know if the |
|  |  | 16   Coast Guard was contacted or not because you |
|  |  | 17   haven't deposed everybody.  So you know, if you |
|  |  | 18   want to argue with him, you're assuming a fact |
|  |  | 19   not into evidence yet, as to who and when |
|  |  | 20   Lieutenant Palomba was either called or who she |
|  |  | 21   called, which has not been established yet by |
|  |  | 22   actual knowledge. |
|  |  | 23      A.    But also on here it just says Allision |
|  |  | 24   of a bridge that creates a hazard to navigation, the |
|  |  | 25   environment or safety of the vessel -- creates a |
|  |  | |
|  |  | 172 |
|  |  | |
|  |  | 1            Moore - April 28, 2025 |
|  |  | 2   hazard to navigation -- a hazard to navigation, the |
|  |  | 3   equipment or the safety of the vessel or that meets |
|  |  | 4   any creditation of paragraphs (a)(3) through 8. |
|  |  | 5      Q.    So you're reading at subnumeral iis? |
|  |  | 6      A.    Yes, sir. |
|  |  | 7      Q.    And it starts with An unintend -- excuse |
|  |  | 8   me, An intended grounding or an intended strike of a |
|  |  | 9   bridge.  Right? |
|  |  | 10          Are you saying that Captain Morrissey |
|  |  | 11   intended to strike the Belt Line Bridge? |
|  |  | 12          MR. RODGERS:  Objection.  Argumentative. |
|  |  | 13   He's not here as an expert. |
|  |  | 14          MR. CHAPMAN:  Well, he's the one who |
|  |  | 15   read it to me.  I'm just trying to understand -- |
|  |  | 16          MR. RODGERS:  All right.  Well, it's -- |
|  |  | 17          MR. CHAPMAN:  -- the reasons for that. |
|  |  | 18          MR. RODGERS:  He's not here as an |
|  |  | 19   expert.  He's here as a fact witness.  Please |
|  |  | 20   ask him what he knows. |
|  |  | 21      A.    Right.  So I was just reading this.  So |
|  |  | 22   by reading the first section of i versus iis. |
|  |  | 23          So it would have to be looked into |
|  |  | 24   further. |
| 172 -
173 | 25 - 18 | 25      Q.    Do you have any information that Captain |
|  |  | |
|  |  | 173 |
|  |  | |
|  |  | 1            Moore - April 28, 2025 |
|  |  | 2   Morrissey intended to strike the bridge? |
|  |  | 3      A.    No. |

| | | |
|---|---|---|
| | | 4    Q.    So your investigation informs you that<br>5  it was an unintended strike of the bridge?<br>6    A.    Yes.<br>7    Q.    And as an unintended strike of the<br>8  bridge, your safety management system obligates you<br>9  to follow the Code of Federal Regulations to<br>10  immediately notify the Coast Guard, doesn't it?<br>11        MR. RODGERS:  Objection.  There's no<br>12    evidence that the company did not notify the<br>13    Coast Guard.<br>14    A.    I didn't notify the Coast Guard.<br>15    Q.    Did anybody on behalf of Carver notify<br>16  the Coast Guard?<br>17        MR. RODGERS:  If you know.  Don't guess.<br>18    A.    I don't know. |
| 184 -<br>185 | 12 - 19 | 12    Q.    If you could turn to the next page,<br>13  Carver 000886.  This is the first of four pages that<br>14  are somehow related to the health and safety plan<br>15  within the safety management system, right?<br>16    A.    Yes, sir.<br>17    Q.    Under No. 6 on the left-hand column, it<br>18  refers to a section of the Code of Federal<br>19  Regulations, and then it says there's a requirement.<br>20        And it says that All machinery and<br>21  equipment that is not in proper working order,<br>22  (including missing or malfunctioning guards or safety<br>23  devices), must be removed, made safe through marking,<br>24  tagging or covering, or otherwise made unusable.<br>25        This doesn't appear to distinguish<br><br>185<br><br>1        Moore - April 28, 2025<br>2  like -- I assume that it relates to whatever's on the<br>3  vessel, but is there any definition of equipment that<br>4  excludes navigational equipment or steering<br>5  equipment?<br>6    A.    Not to my knowledge.  We would have to<br>7  look into that further.<br>8    Q.    So if there was something that was not<br>9  in proper working order in the nature of the steering<br>10  equipment or the navigation equipment, there would be<br>11  a requirement to either remove it, make it safe<br>12  through marking, tagging or covering or otherwise<br>13  making it unusable?<br>14        MR. RODGERS:  Objection.  It's citing a<br>15    CFR statute, and he's not here to opine on the<br>16    CFR statute or section.  And you're just reading<br>17    from this, so the document speaks for itself.<br>18    A.    I would have -- I would have to look<br>19  into the health and safety within the TSMS. |

| 206 | 11 - 23 | 11    Q.    And I'm trying to understand.<br>12        Do you have paper files on any of your<br>13    employees with Carver?<br>14        MR. RODGERS:  Objection to form.<br>15        You can answer if you --<br>16    A.    No, I do not.<br>17    Q.    Okay.  Have you ever, as an employee of<br>18    Carver?<br>19    A.    No, I have not.<br>20    Q.    I mean, it's not like you've gotten<br>21    any -- gotten rid of them since you started working<br>22    for Carver?<br>23    A.    No, absolutely not. |
|---|---|---|
| 210 - 212 | 15 - 9 | 15    Q.    Do you know of anybody who prepared<br>16    either of the typed statements for them?<br>17    A.    I do not know off the top of my head.<br>18    I've only -- no, I do not know.<br>19    Q.    So if the -- if the middle statement,<br>20    I'll call it, page 48, was prepared at June -- on<br>21    June 15th at 1659, the handwritten statement would<br>22    have been prepared before that?<br>23    A.    Most likely, yes.<br>24    Q.    All right.  And do you know whether the<br>25    final one in this exhibit, page 49, was actually<br><br>211<br><br>1        Moore - April 28, 2025<br>2    prepared on 15 June 2024 or it just references the<br>3    allision on June 15, 2024?<br>4    A.    That, I don't know either.<br>5    Q.    Would Captain Miller have access to<br>6    Carver Marine Towing letterhead?<br>7    A.    They have all -- over the course of<br>8    time, every vessel has seen the letterheads come<br>9    through.  They've -- there's no official letterhead,<br>10    but they've all been utilized before another.<br>11    Q.    So if these were all prepared on 15 June<br>12    2024, the vessel was still underway to the bridge job<br>13    site, right?<br>14    A.    Correct.<br>15    Q.    And so would it --<br>16        MR. RODGERS:  Just objection.  I don't<br>17    think the first one is dated.<br>18        MR. CHAPMAN:  You're correct.  It's not.<br>19    Has no date on it.<br>20        MR. RODGERS:  Oh, I thought you said --<br>21        MR. CHAPMAN:  Right.  No.<br>22        MR. RODGERS:  -- they were all --<br>23        MR. CHAPMAN:  No.  I just -- if they all<br>24    pertain to the allision with the bridge and |

| | | |
|---|---|---|
| | | 25      they -- the first one could not have been<br><br>212<br><br><br>1              Moore - April 28, 2025<br>2      prepared before sometime on June 15th.<br>3            MR. RODGERS:  No.  I'm just saying your<br>4      question was so these were all prepared on 15<br>5      June 2024.<br>6            MR. CHAPMAN:  Yeah, yeah.  That's what I<br>7      said.<br>8      Q.    If they were, right --<br>9            MR. RODGERS:  Okay. |
| 227 - 229 | 23 - 24 | 23      Q.    Okay.  And then on the last page, which<br>24   is on the Carver Marine letterhead, a little more<br>25   detail.  Says he was in his room completing engine<br><br>228<br><br><br>1              Moore - April 28, 2025<br>2   room paperwork, he felt the boat slow down, and<br>3   shimmy.<br>4          Now, that's different than saying an<br>5   abrupt stop, correct?<br>6      A.    Yes, sir.<br>7      Q.    And he said that it had landed on the<br>8   bridge fendering, he went down to the engine room to<br>9   make sure there were no issues, and then he went to<br>10   the wheelhouse, and the mate informed him he had<br>11   touched up on the bridge fendering.  Right?<br>12      A.    Yes, sir.<br>13      Q.    So it's a little out of order in terms<br>14   of what he did when, after feeling the abrupt stop,<br>15   but it mentions nothing about the abrupt stop in the<br>16   typed-up Carver Marine letterhead report, page 82,<br>17   correct?<br>18      A.    Correct.<br>19      Q.    And did you make any effort to try to<br>20   understand that discrepancy during the course of your<br>21   investigation before submitting the 2692?<br>22            MR. RODGERS:  Objection to form.<br>23      Foundation.<br>24      A.    No. |
| 249 - 250 | 18 - 19 | 18      Q.    So this is what I'm trying to<br>19   understand.  If Morrissey wasn't interviewed that day<br>20   and you didn't attend Morrissey's interview, how is<br>21   it that you knew to state that Morrissey was in auto<br>22   pilot and didn't switch over to non-followup hand<br>23   steering but thought he did?<br>24            MR. RODGERS:  Objection.  And just to be |

| | | |
|---|---|---|
| | | 25     clear, I thought he said Morrissey was |
| | | 250 |
| | | 1         Moore - April 28, 2025 |
| | | 2     interviewed by Teams or Zoom -- |
| | | 3         MR. MOORE:  Yeah. |
| | | 4         MR. RODGERS:  -- that day. |
| | | 5         MR. CHAPMAN:  Well, don't put words in |
| | | 6     his mouth, okay?  Don't put words in his mouth. |
| | | 7         MR. RODGERS:  No, it's what I heard him |
| | | 8     testify to.  You're putting words into his |
| | | 9     mouth. |
| | | 10         MR. MOORE:  Right.  So -- |
| | | 11         MR. RODGERS:  You're saying he wasn't |
| | | 12     interviewed.  He said he was.  Can we clear it |
| | | 13     up one way or the other. |
| | | 14     A.     The clarification is I don't remember |
| | | 15     exactly who was where during that.  It was obviously |
| | | 16     a long day of that, too.  So I don't remember exactly |
| | | 17     when James was interviewed for that, but I definitely |
| | | 18     remember hearing that from Captain Miller and/or |
| | | 19     James, but I would have to reference that one. |
| 253 - 254 | 5 - 15 | 5     Q.     So on the 2692-B that was completed by |
| | | 6     Mr. Baldassare, it looks like signed by him on |
| | | 7     June 19th, this is the report of the mandatory |
| | | 8     chemical testing -- |
| | | 9     A.     Yes. |
| | | 10     Q.     -- following a serious marine incident, |
| | | 11     right? |
| | | 12         And this reflects that all five members |
| | | 13     of the crew held Coast Guard credentials, right -- |
| | | 14     A.     Yes. |
| | | 15     Q.     -- in Section 3, block 5? |
| | | 16         And then in block 6, no one was -- no |
| | | 17     one underwent a drug test urine sampling within |
| | | 18     32 hours of the incident, correct? |
| | | 19     A.     Correct. |
| | | 20     Q.     And no one was tested for alcohol within |
| | | 21     two hours of the incident, correct? |
| | | 22     A.     Correct. |
| | | 23     Q.     And in block 7, did Mr. Baldassare |
| | | 24     review what he reported in that section before |
| | | 25     submitting this report to the Coast Guard? |
| | | 254 |
| | | 1         Moore - April 28, 2025 |
| | | 2     A.     I would believe so. |
| | | 3         MR. RODGERS:  Don't guess. |
| | | 4     A.     No.  So then no, I didn't -- I didn't |

| | | |
|---|---|---|
| | | 5   type this up or review it, so I don't know what he<br>6   would have done.<br>7        Q.    You're saying he didn't run it by you,<br>8   though?<br>9            MR. RODGERS:  Objection.  I don't think<br>10      he said that.<br><br>11      Q.    Well, if he did, you can correct me.<br>12   I'm sorry.  I --<br>13      A.    No, it's right.  I don't recall him<br>14   running this by me for this one, because I believe it<br>15   was all in that same Coast Guard e-mail thread. |
| 278 -<br>280 | 20 - 23 | 20      Q.    Okay.  So this one is dated March 5th<br>21   of '24, and it looks like it was for some work on<br>22   March 2nd of '24.  A complaint about the auto pilot<br>23   switch to standby intermittently, right?<br>24      A.    Yes.<br>25      Q.    And then it says they couldn't repeat<br><br>279<br><br>1            Moore - April 28, 2025<br>2   the problem, but noticed that some lever, the FU-80<br>3   FFU lever, had liquid spilled damage.<br>4        Right?<br>5      A.    Yes, sir.<br>6      Q.    Do you know what the FU-80 FFU lever is?<br>7      A.    I do.  It's a full followup lever that<br>8   looks like a little joy stick on your console that<br>9   you would use to steer the vessel.<br>10      Q.    So is that related to the non-followup?<br>11      A.    The non-followup and full followup are<br>12   two separate, independent things.<br>13            Full followup is when you adjust, the<br>14   lever stays in that rudder angle.<br>15            Non-followup has a spring return where<br>16   you click it and it comes right back and it will stay<br>17   in that rudder.<br>18            So full followup, if you hold it, it<br>19   will keep going; it will swing with you.<br>20            Non-followup always returns to center,<br>21   but will hold the rudder.<br>22      Q.    So if you want to switch over to manual<br>23   steering, do you have to be a non-followup?<br>24      A.    I don't know off the top of my head how<br>25   that system was set up.<br><br>280<br><br>1            Moore - April 28, 2025<br>2      Q.    Like every boat's different? |

| | | |
|---|---|---|
| | | 3    A.    You -- I would have to look at it,<br>4  honestly.  It would be -- it would be auto pilot to<br>5  full followup, and there's specific steps.  You just<br>6  switch this off and switch that, but I don't know how<br>7  this one's set up.<br>8    Q.    But there was no prohibition against the<br>9  captain using the auto pilot system for the transit<br>10  that they were making before they allided with the<br>11  bridge, right?<br>12      MR. RODGERS:  Objection to form.<br>13      You can answer if you understand the<br>14  question.<br>15    A.    Repeat the question.<br>16    Q.    Yeah.<br>17      There was no prohibition -- Carver<br>18  didn't prohibit the captain from using the auto pilot<br>19  system in the transit that he was making, you know,<br>20  down the southern branch of the Elizabeth River<br>21  before the allision?<br>22    A.    No.  It's up to the captain's discretion<br>23  to make that judgment call. |
| 281 -<br>282 | 20 - 7 | 20    A.    There's no other way to not.<br>21    Q.    Well, that's what I figured --<br>22    A.    Yeah.<br>23    Q.    -- you know.<br>24      Your lawyer's objecting.  I'm just<br>25  trying to understand.<br><br>282<br><br>1      Moore - April 28, 2025<br>2    A.    Right.  But I'm not --<br>3      MR. RODGERS:  No.  You're just putting<br>4  words into this mouth.  That's all.<br>5    A.    But I'm not a technician, so I don't<br>6  really understand what the high response rate and the<br>7  gain counter-rudder settings are for that system. |
| 282 -<br>283 | 21 - 13 | 21    Q.    What's a rudder angle indicator tell<br>22  you?<br>23    A.    What's -- where the position -- where<br>24  the rudder position is.<br>25    Q.    And why are four of them required on the<br><br>283<br><br>1      Moore - April 28, 2025<br>2  MACKENZIE ROSE?<br>3    A.    I do not know that as well, if it's --<br>4  some are spares or they just replaced a couple.<br>5      MR. RODGERS:  Don't guess.<br>6    A.    Oh, yeah.  I don't know, actually. |

| | | |
|---|---|---|
| | | 7     Q.    I mean, you would expect there to be<br>8   two, right?  One for upper house and one for the<br>9   wheelhouse?<br>10          MR. RODGERS:  Objection to form.<br>11          You can answer.<br>12     A.    Yeah, there are -- what -- each<br>13   concentration has a rudder angle indicator. |
| 285 -<br>286 | 10 - 8 | 10     Q.    Okay.  I'm not trying to argue with you,<br>11   but I understood that Mackay replaced them in late<br>12   2023 --<br>13          MR. RODGERS:  Objection.<br>14     Q.    -- and that Mackay and Ayers then did<br>15   some more work on them in 2024.  Mackay in March of<br>16   2024, and Ayers twice in April of 2024, and that's<br>17   when --<br>18          MR. RODGERS:  Objection to the term<br>19      replaced.<br>20          MR. CHAPMAN:  Let me just finish.<br>21     Q.    -- and that's what those invoices that<br>22   we've been looking at as Exhibits 24 and 25 tell us;<br>23   is that right?<br>24          MR. RODGERS:  Objection.  That -- you're<br>25      not asking a question, you're making a<br><br>286<br><br><br>1          Moore - April 28, 2025<br>2      statement, and I object to the term replaced in<br>3      that context.  So why don't you reword it,<br>4      maybe.<br>5          MR. CHAPMAN:  That was a long one.<br>6     Q.    Do you understand my question?<br>7     A.    If you can repeat it.<br>8          MR. RODGERS:  You want to read it over. |
| 294 -<br>296 | 9 - 24 | 9     Q.    That's where I'm reading.<br>10          So on Exhibit 26, the second page under<br>11   Section 2.3, it says Lessons learned.  Employee who<br>12   is approving this near miss shoreside should also<br>13   complete the Lessons Learned Form 9.7 in correlation<br>14   to the near miss.<br>15          So in Section 2.3, do you know whether<br>16   the lessons learned created is a required field that<br>17   has to be completed?<br>18     A.    It is not a required field.<br>19     Q.    Okay.  So you've added the word no there<br>20   to it, right?<br>21     A.    Correction.  I don't know exactly right<br>22   now if it's a required field or not.  It could be.<br>23     Q.    But even if it is a required field, you<br>24   checked the box no? |

| | | |
|---|---|---|
| | | 25    A.    Correct. |
| | | 295 |
| | | 1              Moore - April 28, 2025 |
| | | 2    Q.    Okay.  So there was no lesson learned as |
| | | 3  a result of what Captain Miller was reporting? |
| | | 4    A.    No, because I would have had Lenny or |
| | | 5  somebody else call and find out from it before I |
| | | 6  finally approved it.  So I don't recall if it was him |
| | | 7  just entering near misses, because we encouraged near |
| | | 8  misses with all the crews.  So I don't know if that's |
| | | 9  an accurate one or if it was the steering pump or if |
| | | 10  it was this or that.  Like it just is him entering |
| | | 11  all these logs in before and after.  I don't know if |
| | | 12  it was an accurate near miss or not. |
| | | 13    Q.    Is there any documentation of your |
| | | 14  contact with Mr. Baldassare related to this near miss |
| | | 15  report? |
| | | 16    A.    No. |
| | | 17    Q.    And is there any indication that any |
| | | 18  electronic technician or other technician went out to |
| | | 19  check out what the captain was reporting about the |
| | | 20  steering going into standby, rudder coming hard over |
| | | 21  without alarm? |
| | | 22          MR. RODGERS:  Objection, foundation. |
| | | 23          You can answer if you know. |
| | | 24    A.    Not that I know of. |
| 296 - 297 | 5 - 9 | 5    Q.    So this appears to be an -- Exhibit 28 |
| | | 6  appears to be another near miss report from the Helm |
| | | 7  system, right? |
| | | 8    A.    Yes, sir. |
| | | 9    Q.    And if you could compare this to |
| | | 10  Exhibit 26. |
| | | 11    A.    Okay. |
| | | 12    Q.    And so it looks like there's some |
| | | 13  heading information at the top of Exhibit 28 that |
| | | 14  should be available on Exhibit 26, but it's just not |
| | | 15  there, right? |
| | | 16          MR. RODGERS:  Objection.  I think |
| | | 17      there's two different dates of the incidents. |
| | | 18          MR. CHAPMAN:  Yeah, I agree.  There are |
| | | 19      two different dates. |
| | | 20    Q.    The question I'm asking, though, is |
| | | 21  Exhibit 28 has a -- some information at the top |
| | | 22  titled 9.2 Near Miss Report.  It's got some external |
| | | 23  number, a tag that it's clearly related to the |
| | | 24  MACKENZIE ROSE, who completed it, and the time it was |
| | | 25  completed, right? |

| | | |
|---|---|---|
| | | 297 |
| | | 1          Moore - April 28, 2025 |
| | | 2     A.    Yes. |
| | | 3     Q.    Okay.  Is there any reason why the |
| | | 4  document now marked as Exhibit 26 wouldn't have the |
| | | 5  same type of information at the top of it? |
| | | 6     A.    I don't know.  I didn't submit these.  I |
| | | 7  don't know where this one came from. |
| | | 8     Q.    You're talking about 26? |
| | | 9     A.    Correct.  Correction. |
| 302 | 2 - 24 | 2     Q.    This is a two-page exhibit marked Carver |
| | | 3  000039 and 40 and appears to be another near miss |
| | | 4  report, correct? |
| | | 5     A.    Yes, sir. |
| | | 6     Q.    That was -- appears to have been |
| | | 7  received and approved by you on April 19th, 2024? |
| | | 8     A.    Yes. |
| | | 9     Q.    And it references the loss of satellite |
| | | 10  compass? |
| | | 11     A.    Yes. |
| | | 12     Q.    What do you understand that to mean? |
| | | 13  Did it like fall overboard or -- |
| | | 14     A.    I would -- it could be loss of a signal |
| | | 15  from a satellite compass. |
| | | 16     Q.    Okay.  Or that it failed, it went bad or |
| | | 17  something like that? |
| | | 18     A.    Yeah, it could be multiple things. |
| | | 19     Q.    Is that important in navigation? |
| | | 20     A.    It -- |
| | | 21          MR. RODGERS:  Objection.  He's not here |
| | | 22     as an expert. |
| | | 23     A.    You can still navigate the vessel |
| | | 24  without a satellite compass. |
| 304 - 305 | 11 - 2 | 11     Q.    So we know Mackay replaced the auto |
| | | 12  pilots in late 2023, right? |
| | | 13          MR. RODGERS:  Objection to the term |
| | | 14     replaced. |
| | | 15     A.    They -- |
| | | 16          MR. RODGERS:  That's your term, not -- |
| | | 17     A.    -- they worked on.  They worked on. |
| | | 18          MR. RODGERS:  Wait until my objection's |
| | | 19     finished.  Sorry. |
| | | 20          That's your term, Jim, not his term.  So |
| | | 21     can you correct your -- go ahead. |
| | | 22     A.    Mackay did work on the auto pilot |
| | | 23  system. |
| | | 24     Q.    Okay.  They put in two new AP70s to |
| | | 25  replace the two AP50s, right? |
| | | 305 |

| | | |
|---|---|---|
| | | 1          Moore - April 28, 2025<br>2    A.    Yes. |
| 306 -<br>307 | 3 - 16 | 3     Q.    -- on Exhibit 31 -- well, let me stop.<br>4       So Exhibit 31 is the daily log for<br>5   April 1, 2024 of the MACKENZIE ROSE, correct?<br>6    A.    Yes.<br>7     Q.    Consisting of three pages, Carver 0000<br>8   27 to 29, right?<br>9    A.    Yes.<br>10     Q.    And on the first page at 9:34 a.m., it<br>11   says Near Miss Report, correct?<br>12    A.    It does.<br>13     Q.    And I don't know how you would correlate<br>14   these together. Maybe if we had the information at<br>15   the top of the exhibit marked 30 from the Helm<br>16   system, we would know whether it's the same date and<br>17   time on the Near Miss Report. But these were<br>18   produced to me and represented that somehow they were<br>19   related.<br>20      MR. RODGERS: Objection.<br>21     Q.    So that's what I'm trying --<br>22      MR. RODGERS: Objection to what they --<br>23   what we represented to you.<br>24      MR. CHAPMAN: Okay. Well, if I'm not<br>25   correct, then you can correct me.<br><br>307<br><br>1          Moore - April 28, 2025<br>2      MR. RODGERS: I guess if we have time<br>3    to.<br>4     Q.    If, in fact, this entry on April 1 in<br>5   the daily log of a near miss report is, in fact, the<br>6   one that is being approved on April 19th by you, it<br>7   could well be that the Ayers Marine people came in<br>8   and looked at this on April 3rd, April 4th,<br>9   April 10th, April 11th, right?<br>10    A.    It's possible.<br>11     Q.    Okay. So that's -- is that what you're<br>12   referring to in Section 2.5 of Exhibit 30?<br>13     A.    I don't know exactly, but once Ayers,<br>14   the technician, signs off on it, I would have then<br>15   gone in later and approved it and wrote that as a<br>16   note in there. |
| 316 -<br>318 | 4 - 15 | 4     Q.    If you go to page 810.<br>5    A.    Okay.<br>6     Q.    The photo in the lower left is labeled<br>7   Upper Pilot House.<br>8    A.    Yes, sir. |

9     Q.    So I think it's everybody's
10   understanding that's where Captain Morrissey was when
11   the allision occurred?
12       A.    That's my understanding, yes.
13       Q.    Just looking at that photo, can you tell
14   which of them is the auto pilot -- which device
15   arrayed in this picture is the auto pilot?
16       A.    It would be the one to the far right of
17   the screen, slightly above the fire extinguisher.
18       Q.    Okay.  If I gave you a pen, could you
19   circle it for us on this exhibit?
20       A.    Sure.
21       Q.    And then I'm going to ask you to put
22   your initials next to it and date it so that anybody
23   that looks at it later will know who did that.  Okay?
24       A.    Well, then, no, I won't.
25       Q.    Well, you have to.

317

1              Moore - April 28, 2025
2       A.    Well --
3              MR. RODGERS:  He doesn't have to.
4       A.    No, because I'm not familiar with it,
5   so...
6              MR. RODGERS:  Then don't do it.
7       Q.    I'm just asking you -- I'm not asking
8   you to say absolutely for certain that's what it is.
9   It's just the --
10       A.    Then --
11       Q.    -- what you believe --
12       A.    No.
13       Q.    -- it to be.
14       A.    Not doing it.
15       Q.    So you're telling us --
16       A.    You can come aboard the vessel and look
17   at it again or question Jason Meyerrose on it.
18       Q.    Yeah.  So I don't want to argue with you
19   about it, but I've been asking to board the vessel
20   for a couple of months now, okay?
21       A.    That's --
22              MR. RODGERS:  I thought we had a date
23   for it.
24       A.    That's not me.
25              MR. CHAPMAN:  No, we don't have a date.

318

1              Moore - April 28, 2025
2       Q.    All right.  So just to be clear, you
3   can't reliably pick out which of those devices that

| | | |
|---|---|---|
| | | 4   are seen in a photograph --<br>5       MR. RODGERS:  Objection.  Objection.<br>6   Wait.  He just said he's not going to do it in<br>7   the manner you asked him.  He's not the captain,<br>8   and he's not here as an expert.  And you will<br>9   get your inspection --<br>10       MR. CHAPMAN:  Great.<br>11       MR. RODGERS:  -- as you know.<br>12       And we'll get ours of the bridge, right?<br>13       MR. CHAPMAN:  Offered this Friday, if<br>14   you want to come look at it, okay?  It's<br>15   available. |
| 322 -<br>323 | 21 - 23 | 21   Q.   Okay.  There's an indication that there<br>22   was a predeparture safety meeting conducted in block<br>23   5.5?<br>24   A.   Yes.  Yep.<br>25   Q.   And a prearrival safety meeting?<br><br>323<br><br>1       Moore - April 28, 2025<br>2   A.   Yes.<br>3   Q.   And that a weather forecast was<br>4   obtained, right?<br>5   A.   Yes.<br>6   Q.   And I guess reviewed, right?  Correct?<br>7   A.   Yes, sir.<br>8   Q.   Okay.  So then on Section 6, it's called<br>9   a 9.4 GAR risk assessment -- model risk assessment.<br>10   I think we saw something earlier that referenced<br>11   that, and you didn't know what GAR meant?<br>12   A.   Yes, sir.<br>13   Q.   Does this give you any more information<br>14   about what a GAR is?<br>15   A.   No.  I still don't know what GAR stands<br>16   for.<br>17   Q.   Could it be green, amber, red?<br>18       MR. RODGERS:  Objection.<br>19       You can answer if it refreshes your<br>20   recollection.  Don't guess.<br>21   A.   Looking at 6.1, it does say GAR model<br>22   and then parentheses green, amber, red.<br>23       So yes, that refreshes it. |
| 336 -<br>340 | 23 - 15 | 23   Q.   Mr. Moore, you've been handed<br>24   Exhibit 39 --<br>25   A.   Correct.<br><br>337<br><br>1       Moore - April 28, 2025<br>2   Q.   -- to the deposition, which is a letter |

3    that I sent to Mr. Nick Laraway dated June 20, 2024,
4    and it shows a copy to you on page 2.
5        A.    Okay.
6        Q.    So is that your e-mail at Carver?
7        A.    Yes.
8        Q.    So do you recall receiving this letter?
9        A.    I don't recall it, but I've seen it.
10       Q.    It was asking you to preserve -- asking
11   Mr. Laraway to preserve information that might
12   otherwise be lost, right?
13       A.    Yes, sir.
14       Q.    Okay.  Did you do anything in response
15   to it to preserve any of the requested information?
16       A.    I did not do anything in particular.
17       Q.    Do you know whether Mr. Laraway did?
18       A.    No, I don't know what Mr. Laraway did,
19   either.
20       Q.    And it specifically requests around
21   preserving texts, e-mails, voicemails and messaging
22   service communications.
23            You told us that the phone that you had
24   at the time you since replaced --
25       A.    Yes.

338

1            Moore - April 28, 2025
2        Q.    -- right?
3            So were the texts, e-mails, voicemails,
4    or other messages on that device preserved before you
5    got rid of it?
6        A.    It would still be a cloud-based backup
7    for the iCloud, which is an iPhone.  So I'm not sure.
8    I -- correction.
9            MR. RODGERS:  Just --
10       A.    Let me --
11           MR. RODGERS:  -- hold on, hold on, hold
12   on.
13           Is there a reason this was sent to
14   Mr. Laraway and not Carver's attorneys?
15           MR. CHAPMAN:  Yeah.  I wasn't aware that
16   they had counsel at the time.
17           MR. RODGERS:  Well, I don't -- I don't
18   want him to discuss anything that has to do with
19   what they did to preserve.  That's not
20   appropriate.
21           MR. CHAPMAN:  I'm --
22           MR. RODGERS:  I understand the letter.
23           MR. CHAPMAN:  -- I'm entitled to ask him
24   what he did.
25           MR. RODGERS:  No.  You're entitled to

339

1           Moore - April 28, 2025
2    demand this, and we then produce, and -- you
3    know, you're not entitled to do this, because it
4    actually impedes on what his former lawyer asked
5    him to do or we asked him to do.  And that's
6    attorney-client privilege, until the court tells
7    us otherwise.
8           MR. CHAPMAN:  So --
9           MR. RODGERS:  We're not here to have a
10   hearing on preservation.  It's not fair to the
11   witness, and I don't think it's appropriate, to
12   be honest.  So I'm not going to have him answer
13   whether he or Carver actually complied with your
14   letter.  You're not his attorney, and you sent
15   it directly to a party, and whether or not you
16   knew who the attorney was is beside the point.
17   If you find out later that there's been things
18   that weren't preserved, then you make your
19   motion.
20          MR. CHAPMAN:  And I'm testing right now
21   what was preserved.
22          MR. RODGERS:  Well, I'm going to tell
23   him not to answer to anything that has to do
24   with this letter.  You've asked him if he
25   preserved things during this deposition, and he

340

1           Moore - April 28, 2025
2     answered you whether he thought they had it or
3    whatever, but not to this letter.  This is
4    not -- this is not appropriate.
5           MR. CHAPMAN:  Are you done?
6           MR. RODGERS:  Not really, but you can
7    go.
8       Q.    So you said that you had preserved
9    things in the cloud.  Is that your Apple iCloud
10   account?
11      A.    Yeah.  I -- so I didn't -- I didn't
12   specifically back it up to there, but I would -- I'd
13   not say assume, because it's bad thing, but when you
14   transfer it over, it would be done through AT&T or
15   whoever.

| 350 - 352 | 15 - 2 | 15   Q.   Okay.  Has the company ever disciplined<br>16   anyone for failing to comply with your safety<br>17   procedures related to bridge transits? |

|   |   |   |
|---|---|---|
|   |   | 18    A.    Not that I'm aware of.<br>19    Q.    What about lookout postings?<br>20    A.    Not that I'm aware of.<br>21    Q.    What about use of the auto pilot?<br>22    A.    Also, not that I'm aware of.<br>23    Q.    Are you aware of any best practices in<br>24    the towing industry that recommend disengaging auto<br>25    pilots when transiting near fixed objects like<br><br>351<br>1             Moore - April 28, 2025<br>2    bridges?<br>3    A.    No, I'm not.<br>4    Q.    What's the purpose of having an auto<br>5    pilot on the MACKENZIE ROSE?<br>6            MR. RODGERS:  Objection.  He's not an<br>7    expert.<br>8            You can testify if you know.<br>9    A.    I honestly don't know the purpose of it,<br>10    besides holding course.<br>11    Q.    Can an auto pilot system adjust for<br>12    changes in either river current or the drift of the<br>13    barge or make course corrections on its own?<br>14    A.    I --<br>15            MR. RODGERS:  He's not -- again, he's<br>16    not here as an expert, but he can testify as to<br>17    his own understanding.<br>18    A.    I don't know.  I've not come across<br>19    that.<br>20    Q.    I'm sorry.  You've not come across an<br>21    auto pilot system that can do any of those things?<br>22    A.    That can course --<br>23    Q.    Correct.<br>24    A.    -- can change course on your own?  No.<br>25    We -- in the tug and barge world, that's not a common<br><br>352<br><br>1             Moore - April 28, 2025<br>2    thing. |
| 353 -<br>354 | 19 - 24 | 19    Q.    Is it consistent with good seamanship to<br>20    rely on an auto pilot while approaching a bridge?<br>21            MR. RODGERS:  Objection.  He's not here<br>22    as an expert witness.<br>23    A.    It's up to the offshore and the watch<br>24    and their judgment. |
| 354 -<br>355 | 18 -<br>21 | 18    Q.    Would you expect a properly trained crew<br>19    to avoid hitting a bridge or alliding a bridge?<br>20            MR. RODGERS:  Objection.  Objection.<br>21            It's 7:40 at night, and now you're just |

22  fishing.  You're repeating the same question
23  about auto pilot, which would be fine at ten
24  o'clock in the morning, but I still have some
25  questions.

355

1          Moore - April 28, 2025
2     Q.    So my question was would you expect a
3   properly trained crew to avoid striking a stationary
4   object like a bridge?
5   (DIR)
6          MR. RODGERS:  Objection.  That's
7   harassing Mr. Moore.
8          Don't answer that.
9   A.   I've --
10         MR. RODGERS:  I said don't --
11  A.    Yeah, I would -- I --
12         MR. RODGERS:  Don't answer that.  That
13  means don't answer that.  Nothing.
14         MR. CHAPMAN:  So your --
15         MR. RODGERS:  Directing Mr. Moore not
16  to answer.
17         MR. CHAPMAN:  So your instruction is not
18  to answer?
19         MR. RODGERS:  I'm directing Mr. Moore,
20  yes, not to answer whether it's good policy to
21  hit a bridge.