IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | Civil Action No. 2:24-cv-00490-MSD-LRL |

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S REPLY IN SUPPORT OF ITS MOTION *IN LIMINE* TO PRECLUDE DEPRECIATION OF REPAIR COSTS AND ALL TESTIMONY OF R.L. BANKS & ASSOCIATES, INC.**

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line"), by counsel, for its Reply to Carver's Opposition to the Belt Line's Third Motion *in Limine* to preclude depreciation of repair costs, including all testimony of Carver's expert witnesses at R.L. Banks & Associates, Inc., states as follows:

**Introduction**

Carver's experts opine that the Belt Line's $15,922,877 in damages should be depreciated to $2,972,767, despite decades of case law to the contrary. Carver argues that its approach is proper because the Belt Line suffered a "constructive total loss" of Span 4 of its Bridge, thus triggering a depreciation analysis that would not otherwise apply. This argument has no basis in law or fact, as it incorrectly treats Span 4 as an independent, standalone feature of the Bridge instead of an integral part of it. If adopted, Carver's argument would leave the Belt Line in a far worse position than pre-allision for an incident that the Belt Line did not cause and could not have predicted.

The rule for determining damages in the case of an allision is "restitutio in integrum," which requires restoring the injured party to the position occupied prior to the allision. *See Hewlett v. Barge Birtie*, 418 F.2d 654, 657 (4th Cir. 1969). Where repairs are performed to an integral part

of a structure and do not enhance or better the structure, depreciation is not permitted, as the injured party did not materially benefit from the repairs. *BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp.*, 147 F. Supp. 2d 333, 341 (D. N.J. 2001). To hold otherwise would leave the injured party in a worse position than prior to the allision. *See Petition of M/V Elaine Jones*, 480 F.2d 11, 27 (5th Cir. 1973). At the same time, an injured party has a duty to mitigate and is not required to engage in economic waste when making repairs. *See In re National Shipping Co. of Saudi Arabia,* 2000 U.S. Dist. LEXIS at *7 (E.D. Va. 2000).

Despite conceding that this Court "is not tied to any rigid rule for determining damages[,]" *see* ECF 148, p. 10, Carver urges the Court to ignore this established body of case law and, instead, determine the Belt Line's damages by asking only whether it suffered a total or partial loss. ECF 148, p. 2. According to Carver, repair costs must be depreciated anytime a party suffers a "total loss." *Id*. (citing *F. C. Wheat Mar. Corp. v. United States*, 712 F. Supp. 2d 471, 473 (E.D. Va. 2010) (evaluating whether yacht was "constructive total loss" after being struck by government vessel). By contrast, where an injured party suffers a "partial loss," *i.e.*, where repair costs are less than the pre-casualty value of the structure, an owner may, without depreciation, "recover the reasonable cost of repairs necessary to restore it to its pre-damage condition." *Id*. As explained below, this case law is not altogether different from the allision law above, since a "total loss" occurs only when an entire structure must be replaced, not just integral parts, or when the cost of repair exceeds the value of the structure. Here, the entire Bridge was not replaced, and repair costs certainly did not exceed the value of the Bridge, so even under Carver's theory, depreciation does not apply.

Because depreciation does not apply, the experts that Carver relies on to establish it should not be permitted to testify. They ignore the case law, offer no analysis of integral components or actual betterment, and treat the situation as a replacement of the entire Bridge rather than a repair

2

of one section, contrary to reality. They also fail to reveal their division of labor or differentiate their opinions and rely on inapplicable publications in violation of Rules 702 and 703.

For all these reasons, as explained below, the Belt Line's repair costs cannot be depreciated and any related testimony is inadmissible.

## Argument

I.     **The Belt Line's repair costs cannot be depreciated.**

   A.     **The repairs to the Belt Line Bridge were integral to the structure and did not add value to it or extend its useful life.**

The rule in admiralty when assessing damages after an allision is to make the injured party whole. *See Hewlett v. Barge Birtie*, 418 F.2d 654, 657 (4th Cir. 1969). To reduce recoverable repair costs in a situation where the injured party did not materially benefit from the repairs would leave the injured party in a worse position than prior to the allision. *See Petition of M/V Elaine Jones*, 480 F.2d 11, 27 (5th Cir. 1973). Thus, where repairs are performed to an integral part of a structure and do not enhance or better the whole structure, depreciation is not permitted, as the injured party's position has not been materially improved. *BP Exploration & Oil, Inc. v. Moran Mid-Atlantic Corp.*, 147 F. Supp. 2d 333, 341 (D. N.J. 2001). Courts across the country have upheld this principle. *See J.W. Paxson Co. v. Bd. of Chosen Freeholders*, 201 F. 656, 664 (3d Cir. 1912); *Petition of M/V Elaine Jones*, 480 F.2d at 27; *Oregon by State Highway Com.*, 468 F.2d 1270, 1274 (9th Cir. 1972); *BP Exploration & Oil, Inc.*, 147 F. Supp. 2d at 341.

Carver argues that because no court within the Fourth Circuit has expressly adopted this principle, this Court should reject it. ECF 148, p. 2. Carver insists instead that this Court should follow *Seaboard A. L. R. Co. v. Marine Industries, Inc.*, a 1964 case in which the Eastern District of South Carolina held that, where "[a] bridge was not a total loss and ha[d] no readily determinable fair market value … the measure of damages must necessarily be predicated upon reasonable cost

3

of repairs with proper consideration being given to actual depreciation of the facility at the time of its damage." 237 F. Supp. 10, 12 (E.D. S.C. 1964). Carver argues that *Seaboard* requires this Court to depreciate the Belt Line's costs regardless of whether they related to integral parts and even if they did not extend the life of the Bridge. *See* ECF 148, p.10.

In *Seaboard*, however, the court was not dealing with integral components of a bridge structure, but an independent, standalone "dolphin and timbers protecting libelant's railroad." *Id*., 237 F. Supp. at 10. In support of depreciation, the court noted that the parties had *stipulated* that, "prior to the two accidents the piling and timbers damaged had depreciated to the extent of fifty (50%) percent." *Id*. at 11. The court also cited cases in which other courts addressing standalone objects likewise applied depreciation. *Id*. at 13 (citing *General American Transp. Corp. v. Tug Patricia Chotin*, 120 F. Supp. 246, 249 (E.D. La. 1954) (standalone "pile cluster"); *Jemison v. Dredge Duplex*, 163 F. Supp. 947, 949 (S.D. Ala. 1958) (standalone "wharf"); *Patterson Terminals, Inc. v. S.S. Johannes Frans*, 209 F. Supp. 705, 710 (E.D. Pa. 1962) (standalone "dolphin")).

The court did not address the situation here, where all testimony confirms that the damage occurred to integral parts of the Bridge structure, and the repairs did not extend the Bridge's useful life. *See* ECF 135, pp. 4-10. Indeed, the *Seaboard* court predicated its decision on the fact that it "ha[d] not found nor been cited a single case involving damages to a wharf or bridge in which the court has refused to make an allowance for depreciation, where such question was considered[,]" *id.* at 13, a quote Carver cites in its brief. *See* ECF 148, p. 10. To the extent the court's statement refers to damage to non-integral, standalone structures, it is a fair statement of the law. But to the extent Carver seeks to expand the statement to integral components of a larger structure, Carver's effort is incorrect. Both before and after *Seaboard*, admiralty courts in allision cases have permitted depreciation *only where* repairs are conducted to non-integral parts *and* add to the overall

4

structure's value or useful life. *See J.W. Paxson Co.*, 201 F. at 664 (3d Cir. 1912); *Petition of M/V Elaine Jones*, 480 F.2d at 27 (5th Cir. 1973); *Oregon by State Highway Com.*, 468 F.2d at 1274 (9th Cir. 1972); *BP Exploration & Oil, Inc.*, 147 F. Supp. 2d at 341 (D. N.J. 2001). There is no policy reason to hold otherwise, and Carver does not even attempt to offer one.

    **B.**    **Carver cannot create a "total loss" by ignoring the entirety of the Bridge structure.**

Even if the Court were to accept Carver's "total loss" versus "partial loss" dichotomy, the Belt Line's repair costs would still not be depreciable because the entire Bridge did not get replaced. That fact, which is indisputable, should end the analysis. Carver nonetheless attempts to convert this case into a "total loss" by convincing the Court that the damage to Span 4, even though only one of eight integrated spans, was a "total loss" in and of itself. To do so, Carver argues that the Court must determine "how much the [repair] work costs relative to the value of the property." ECF 148, p. 2. Carver does not specify the "property" to which it refers, but alternates between comparing the $16 million in repair costs against (i) the value of Span 4 alone, whatever that might be, and (ii) the $10 million amount of partial coverage in the Belt Line's insurance policy. Neither makes sense, and Carver offers no meaningful support for either option.

Instead, Carver points to *Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, which involved an allision with a fender system protecting the same Bridge, to suggest that this Court can evaluate Span 4 without reference to the rest of the Bridge. *See* 2009 U.S. Dist. LEXIS 104327 *1 (E.D. Va. 2009). The fender system at issue in *M/V Marlin*, however, was a standalone structure (just like a pile cluster, wharf, or mooring dolphin) and the damages to it were so severe that the Belt Line had to replace it *entirely*. *Id.* at 36. As this Court noted, "the west [f]endering system was devastated by the M/V MARLIN and needed to be replaced. ***Because the system works as a unit, Belt Line had to replace the <u>entire</u> [f]endering system and could not just replace its***

5

*components*." *Id.* (emphasis added). Because there was a total loss of a standalone system, and because the evidence established that the pre-allision value of the system was substantially less than the cost of repairs, the Belt Line's repair costs were depreciated. *Id.* at 38.

Here, unlike in *M/V Marlin*, the Belt Line repaired only one integral span of its Bridge, not the entire structure, meaning depreciation does not apply. *See F. C. Wheat*, 712 F. Supp. 2d at 473. Span 4 is not a standalone structure, and Carver provides no evidence at all of the pre-allision "value" of Span 4. Instead, Carver attempts only to supply a value for the Bridge itself:

> The only reasonable proof Belt Line has produced in discovery as to **the value of the Bridge** is the amount of insurance it placed on it—$10 Million—**which is less than the claimed cost of repairs**. The case at hand thus involves the constructive total loss of Span 4 of the Bridge[.]

ECF 148, p. 13.

Yet even if a comparison were warranted, the $10 million figure Carver cites is the amount of partial <u>coverage</u> for the Bridge under the Belt Line's insurance policy; it is not evidence of the "value of the Bridge," much less Span 4. Lee Lentz, the Senior Project Manager at Manager at Modjeski and Masters, Inc., testified that the cost to replace the Bridge would be at least $222 million, as supported by analysis in his report, far greater than the $16 million in repairs. *See* Lee Lentz Dep. 83:7-86:4, attached as **Exhibit A**; Lee Lentz Expert Report, p. 5, attached as **Exhibit B**.

Carver's fallback argument does not work either. Carver attempts to shift the burden to the Belt Line to show a partial loss, even though Carver bears the burden of establishing depreciation, if any. *See* ECF 148, p. 2 ("Belt Line does not claim it sustained a partial loss on June 15, 2024 or seriously dispute that the repair costs exceeded the precasualty value of Span 4 of the Bridge."). In *M/V Marlin*, this Court held that, "[w]here, as here, the tortfeasor[] assert[s] that the [precasualty] value is less than the cost of repairs, **they have the burden to establish that fact**."

6

*Norfolk & Portsmouth R.R. Co.*, 2009 U.S. Dist. LEXIS 104327 at *37 (emphasis added). Carver also claims that "[t]he Belt Line's motion fails to include any factual evidence relating to the condition of its Bridge prior to the Allision or details on the work done afterwards." ECF 148, p. 14. Yet this evidence is already established in the record. The Belt Line's Declaration of Cannon Moss attached to its Summary Judgment Motion does exactly this. *See* ECF 91-1 (describing significant harm to the Bridge, authenticating photographs and videos, and quantifying damages). For all these reasons, Carver cannot show that the Belt Line suffered a "total constructive loss" or that its repair costs may be depreciated.

      C.    **Since the Bridge has no ready market, Carver cannot show that repairs to integral components somehow "added value" to the Bridge without extending its useful life.**

Lastly, Carver argues that depreciation should apply even if Span 4 is integral to the Bridge because certain specific repairs "added value" to the structure—namely, new steel on some parts of Span 4, new rails and ties on the Bridge surface, new electrical conduit around the wiring, and lubrication of the Bridge's cables. The only one for which Carver identifies an amount is the rails and ties at $224,446. *See* ECF 148, p. 18. To put all the figures in context, out of the total $15,922,877 in damages, "permanent material" costs in PCL's invoice summary total only $1,237,861 (PCL is the contractor that repaired the Bridge). *See* ECF 135-5, p. 2.

| | | | | | | |
|---|---|---|---|---|---|---|
| ACCESS TRESSTLE | $ 17,717.40 | $ 17,717.40 | $ 0.01 | $ 0.01 | $ 0.02 | $ - |
| PERMANENT MATERIALS | $ 1,172,827.89 | $ 1,237,861.73 | $ - | $ - | $ - | $ 65,033.84 |
| CREDIT FOR STEEL SCRAP | $ - | $ (1,467.04) | $ - | $ - | $ - | $ (1,467.04) |
| SUBTRADE | $ 4,065,614.21 | $ 4,132,020.69 | $ - | $ - | $ - | $ 66,406.48 |
| STS | $ 507,373.97 | $ 642,389.29 | $ - | $ - | $ - | $ 135,015.32 |
| FOG | $ - | $ - | $ - | $ - | $ - | $ - |
| TRAVEL EXPENSE | $ 403,923.75 | $ 392,791.26 | $ - | $ - | $ - | $ (11,132.49) |
| MATERIAL MARKUP 15% | $ 312,618.85 | $ 340,736.29 | $ - | $ - | $ - | $ 28,117.44 |

With regard to the steel, Carver does not contend that the new steel extended the useful life of the Bridge as a whole, even though it argues that the newer steel *may be* less corrosive. The only support Carver offers for this argument is a preliminary characterization of the steel by Kevin Lugo, a licensed engineer and the Senior Vice President of McDonough Bolyard Peck, offered at

7

a deposition taken <u>before</u> Mr. Lugo investigated the steel and provided his rebuttal report. *See* ECF 148, p. 8 ("[The] Belt Line's own expert characterizes [the steel] as 'newer steel, stronger, more corrosion resistant.'"). Even in that deposition, however, Mr. Lugo made clear that the steel on Span 4 did not extend the life of the Bridge. *See* ECF 135, pp. 8-9. Mr. Lugo further confirmed this in his rebuttal report, concluding that the new grade steel did not extend the Bridge's useful life and that obtaining the old grade steel would have actually been more expensive for the Belt Line:

> The R.L. Banks Report, paragraphs 81 and 82, opines that the original Main Line Bridge A7 grade of steel was replaced with a newer, less corrosive, A709 grade 50 steel, which is not an in-kind replacement. It further opines that, because NPBL chose to use this newer, more readily available steel, NPBL received a betterment that would likely last longer than the original A7 grade steel.
>
> ***While we do not dispute that Hardesty and Hanover chose a newer and more readily available A709 grade 50 steel, the repairs to the damaged bridge components are not a betterment and do not extend the lifespan of the bridge structure…. NPBL repaired only one bridge span out of eight, out of need, not want***.
>
> ***As discussed in my deposition, A709 grade 50 steel is more readily available than the original A7 bridge steel used on the Main Line Bridge. In the instance of A7 versus A709 grade 50 steel, A7 steel was widely used in bridge infrastructure until around 1967, when ASTM A7 was officially withdrawn. It has since been replaced by materials such as A709 steel.*** Today, A7 steel is used for castings, dies and molds, cutting tools, and specialized tools such as an anvil; not for bridge infrastructure projects.

Kevin M. Lugo's Rebuttal Report, attached as **Exhibit C** (emphasis added). Mr. Lugo also explained that procuring the older steel would have added serious time and costs to the project for no benefit:

> As discussed in my deposition and supported above, the lack of readily available A7 steel has additional time-related cost implications for locating it, delivering it, and fabricating/modifying it for this specialty order steel on the existing Main Line Bridge. In my experience and through discussions with a

8

> steel supplier who works with more than 31 plants throughout the US, steel that is not readily available will take an additional eight weeks more than the typical four to six weeks for fabrication. ***In other words, to use original A7 steel, the NPBL would have had to wait longer and spend more money on this specialty and custom steel order, with no benefit to the project. R.L. Banks fails to present this narrative in its report.***

**Exhibit C** (emphasis added).

Mr. Lentz, another expert, also confirmed in his rebuttal report that the new grade steel is no different from the old steel in terms of corrosion:

> 81: The reference to in-kind replacement in my first report refers to the vast majority of the repairs matching geometry, number of fasteners, thickness, weight, surface area and the use of the most readily available material. Many other design and availability concerns had to be considered on a case by case basis. In none of the details was there an attempt to provide an unnecessary betterment. The approach by the designer and builder resulted in the most reasonable cost and delivery time. ***A7 steel standard was only active within ASTM Specifications between 1901 and 1966. Replicating this steel would have been a special run of the mill with high cost, long delivery time, and large minimum order quantity. The steel specification used in the repair, ASTM A709, has been the standard material for the bridge industry for over 25 years. The grade chosen for repairs was Grade 50, and again, is the most common and readily available and cost-effective steel in use today for bridges. Regardless, a lower grade specification would likely have resulted in grade 50 product as specifications are the minimum required criteria. Today's quality, process, and knowledge makes it difficult to produce lower grades, especially when there is no reason to do so.***

Lee Lentz Rebuttal Report, attached as **Exhibit D**, p.2 (emphasis added). Mr. Lentz specifically rejected Carver's unsupported corrosion theory:

> 82: The same errors in the RLBAI report relate to paragraph 82. The standard grade of ASTM A709 steel today is 50. This results in a material that is the most cost effective for the repairs. ***ASTM A36 and ASTM A709 Grade 50 have the same copper amount and neither steel includes Chromium, both of which impact a material's ability to provide corrosion resistance. ASTM A709 has a weathering steel grade (50W) which was not selected for the repair work. The weathering steel A709 Grade 50W does list Chromium in the chemical properties. I do not distinguish corrosion resistance levels of A7, A36 and A709 grade 50***.

**Exhibit D**, p.2 (emphasis added).

9

With respect to rails and ties, Carver is simply incorrect in arguing that they added value. ECF 148, p. 14. Carver offers no suggestion as to what this "added value" may be and, instead, relies only on incorrect allegations of an extended useful life to demonstrate it:

> There can be little argument that brand new rails and ties, ***which are expected to last another 20 years***, do not enhance the value of the Bridge or extend its useful life. While Belt Line relies on its own experts' conclusions that life was not extended, it completely ignores whether the repairs added financial or other value to the Bridge.

ECF 148, p. 14 (emphasis added). Testimony by the Belt Line's President, Cannon Moss, confirms that this work was required as a result of the Allision, not to better the Bridge:

```
10      Q.      What was the condition of those rails
11   and ties after the tug hit the bridge?
12      A.      Well, the rail -- rail was severely
13   damaged, and the ties were also damaged as well.
14      Q.      So were you able to use the rail and
15   ties on the mainline bridge after the allision?
16      A.      With the rail being in that condition
17   you would not reuse it just from a liability
18   standpoint.  You can -- you don't know what has
19   happened to it, and then the ties were all damaged,
20   so you wouldn't -- you don't pull off ties and
21   put them back in.  It's kind of like taking a nail
22   out of a wall and putting the nail back in the hole.
23   It's going to be loose.  It's going to be -- you've
24   got to put a plug in there, and then that just adds --
25   speeds up the deterioration of the bridge tie, and so
1    you're not going to put back old.  You're going to put
2    back new.
3       Q.      Does that mean you were required to
4    replace the rails and ties as a result of the
5    allision?
6       A.      Yes.
```

Cannon Moss Dep. 199:10-200:6 (emphasis added), attached as **Exhibit E**.

Mr. Moss' testimony also undercuts Carver's claim that the Belt Line had "scheduled" a complete rail and tie replacement of the west section of the Bridge in 2027 regardless of the Allision. Mr. Moss actually stated that the rails and ties were just one of many considerations in a proposed five-year capital plan for the railroad, not a required replacement, and were not even budgeted, much less scheduled:

10

```
10        A.   No.
11        Q.   Okay.  I take it that plan of redeck
12   and rerail the bridge in 2027 had been formulated
13   prior to June 15, 2024, correct?
14        A.   Correct.
15        Q.   All right.  So when did that plan
16   formulate?
17        A.   I can't recall exactly when it was
18   formulated.
19        Q.   Was it within a year before the June
20   15th, 2024 allision?
21        A.   It might have been part of our six-year
22   plan that we had for maintenance.
23        Q.   All right.  And what is that six-year
24   plan?
25        A.   Six-year plan for maintenance for the
1    railroad.
2         Q.   Okay.  Do you have a plan every six
3    years or was that like a specific plan for the next
4    six years?
5         A.   We have a five-year capital plan that
6    keeps evolving every year.
7         Q.   As of July 8th, 2024, at what point
8    were you in the current six-year plan?
9         A.   Maybe I did a bad job of describing
10   it.  I have a five-year capital plan that gets updated
11   every year for five years.
12        Q.   Okay.  So there is a five-year capital
13   plan in place today?
14        A.   Correct.
15        Q.   All right.  And there was a five-year
16   plan in place on June -- July 8th of 2024?
17        A.   Correct.
18        Q.   Had you determined who was going to
19   be doing the redecking and rerailing in 2027 as
20   of July 8, 2024?
21        A.   No.
22        Q.   Okay.  Do you recall how it was
23   determined that that's when you were going to
24   so the redecking and rerailing?
25        A.   It was a gap in our five-year plan
1    where we had funds to do it, but it could have
2    been moved and pushed back to another date.  It
3    wasn't set in stone.
```

**Exhibit E**, 121:25-125:3 (emphasis added).

The electrical conduit was also required solely because of the Allision and did nothing to add value to the Bridge. The Belt Line acknowledges that the conduit did not exist prior to the Allision. Prior to the Allision, the wiring on Span 4 ran down a long cable attached to the Bridge. That cable was damaged in the Allision, and instead of replacing it, PCL elected to put the wiring in conduit. The result is ultimately a "wash," since PCL did not need to replace the cable, but even

11

if this conduit was hypothetically not "necessary," the cost was only $17,714 of the total $15,922,877. *See* NPBL005974, attached as **Exhibit F**.

Carver is also incorrect about the lubrication, and it offers no actual evidence to support its argument. Carver claims that lubricating the cables that lift the center span of the Bridge was either gratuitous or already planned, but the evidence is just the opposite. The cables had to be lubricated for safety before the Bridge was reopened because they had sat unused for weeks as a result of the Allision. Mr. Lugo confirmed this in his testimony:

```
16      Q.     Yeah.  Do you have any opinion as to
17   whether the lubrication of the cables would have had
18   to been done regardless of whether the allision
19   occurred?
20      A.     So there was reference in one of the
21   inspection reports that they were going to need to
22   be done eventually, but it wasn't a high priority
23   from my recollection.
24             So yeah, eventually they were going to
25   have to do it.  I don't know when at this point when
1    the Belt Line would have programmed that into their
2    budgeting.  But based on my conversations with Mr.
3    Graining, he said it had to be done because of the
4    circumstances of the main span not moving up and
5    down regularly, and we had to do it.  It wasn't
6    because it wasn't done before, but it was because it
7    had been sitting and not moving.
```

Kevin Lugo Dep. 66:12-67:9 (emphasis added), attached as **Exhibit G**.

Given the foregoing, Carver is simply wrong about specific betterments arising ont of The replacement of the Bridge's steel, rail and ties, electrical conduit, and lubrication of the cables. All were done solely in response to the Allision, and none added any quantifiable value to the Bridge or extended its useful life.

**II.    The opinions expressed by the R.L. Banks experts are inadmissible and should be excluded.**

**A.    Because depreciation does not apply, any testimony of the R.L. Banks experts is irrelevant and inadmissible.**

Carver argues that, because the R.L. Banks experts "utilized the replacement costs depreciated method utilized by this Court in [*M/T*] *Marlin*[,]" their methodology is correct.

12

However, as discussed above, *M/T Marlin* involved a constructive total loss, whereas here, the Belt Line suffered only a partial loss of an integral part of its Bridge. As such, the methodology employed in *M/T Marlin* does not apply. And as noted in the Belt Line's Memorandum, nowhere do the R.L. Banks experts actually opine that the repairs extended the useful life of the Bridge (or even Span 4), so they are missing critical analytical steps even if their methodology was proper.

  **B. The R.L. Banks experts fail to reveal their division of labor or differentiate their opinions.**

In addition to applying an improper methodology, the experts fail to reveal their division of labor as required by Rule 26(a)(2)(B). While Rule 26 does not prohibit joint reports, it does require that, "when two experts work as a team and divide up the work, the report must reveal this division of labor[.]" *Homesite Insurance Co. v. Norcold, Inc.*, 2025 U.S. Dist. LEXIS 1671 at *6-7 (D. Nev. 2025); *Late v. United States*, 2016 U.S. Dist. LEXIS 188179 at *2 (M.D. Pa. 2016); *Adams v. United States*, 2011 U.S. Dist. LEXIS 63775 at *12-13 (D. Id. 2011); *Univ. of Florida Research Found. v. Motorola Mobility LLC*, 2013 U.S. Dist. LEXIS 201302 at *26 (S.D. Fl. 2013).

Carver argues that, because Mr. Marianos and Mr. Cunningham each offer the opinions in the report, there are no "separate opinions" to delineate. ECF 148, p. 15. To support this argument, Carver refers to a case that the Belt Line cited in its Motion, *MS Amline Marine NV v. Delta Marine Idus. Inc.*, where the court noted that "co-authored reports make sense when both experts 'reviewed the same materials, and, working together, came to the same opinions.'" 348 F.R.D. 658, 677 (W.D. Wa. 2025) (internal quotations omitted). However, Carver ignores the sentence immediately following that statement, in which the court held: "***Joint expert reports, however, fail to meet disclosure requirements when they do not "reveal the division of labor between the . . . experts, [or] how they reached their separate opinions***.*" Id.* Here, Mr. Marianos and Mr. Cunningham fail to distinguish their respective opinions, and their testimony should be excluded.

13

### C. The R.L. Banks experts do not rely on sufficient facts or data to survive scrutiny under Rules 702 and 703.

The R.L. Banks experts also fail to rely on sufficient facts or data. Under Rule 703, an expert's opinion is "admissible only if the expert has relied on information of a kind reasonably relied on by experts in the field." *Redman v. John D. Brush & Co.*, 111 F.3d 1174, 1179 (4th Cir. 1997); *see also United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013) (finding that Rule 703 "permits an expert to testify to opinions based on inadmissible evidence, including hearsay, if experts in the field reasonably rely on such evidence in forming their opinions").

The information relied on by the R.L. Banks experts is not permitted by Rule 703. *See* ECF 135, pp. 13-16. The experts rely on four publications to form their opinions regarding service life of the Bridge, none of which provide an estimated service life of a steel bridge of similar kind. *Id.* In fact, Carver does not contest that these publications fail to provide such information; rather, Carver contends that it was proper for the experts to use these publications because they did so *in conjunction with* their "inspection" of the Bridge. *See* ECF 148, p. 15-17. The problem with this argument is that the experts did not actually inspect the Bridge.

Carver did not request an inspection for either expert and the Belt Line has no record of one, even though Carver's other experts signed required Right of Entry forms. *See* Fed. R. Civ. P. 34(a)(2); *see also* ECF 135-4. In fact, a careful reading of the R.L. Banks report reveals that only one expert observed the Bridge from a distance. The report states that, "Mr. Marianos conducted a *site visit* of the [B]ridge July 15, 2025." ECF 135-3 at ¶ 17. Based on the four photographs attached to the report (taken from the vantage point of a boat passing by), the "site visit" was apparently an unsanctioned "viewing" of the Bridge, not a physical inspection.

In the absence of any meaningful inspection, the R.L. Banks experts support their "suggested" hypothetical service life figures solely with the four inapplicable and inconsistent

14

publications. As explained in the Belt Line's original Memorandum, this falls well short of the requirements of Rules 702 and 703. ECF 135, pp. 13-16.

      **D.    Carver fails to dispute that the R.L. Banks experts do not segregate out costs to reposition and realign the Bridge, which cannot be depreciated.**

To compound these errors, even if depreciation were allowed for the repair work (it is not), the experts also do not differentiate between costs associated with the repairs (which Carver claims are depreciable) and costs associated with initially salvaging and repositioning the Bridge (which undisputedly are not depreciable). Costs to *salvage* a structure following an allision—including costs to mobilize and demobilize, realign or reposition a structure, remove debris, and demolish damaged components—are not depreciable as a matter of law. *See Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 104327 at *38 (E.D. Va. 2009). This is because those costs would be required to remedy the problem regardless of any hypothetical betterment. Even under Carver's "total loss" theory, they are recoverable in full. *Id*. at 33.

Yet Carver does not contest (because it cannot) that its experts fail to account for this distinction and instead depreciate everything. Carver argues that "[i]t is not Carver's or its expert[s'] burden to parse through [the Belt Line's] invoices and disprove the damages for which [the Belt Line] bear[s] the burden to prove." ECF 148, p. 18. Carver, however, is the party advancing experts to depreciate the Belt Line's repair costs, so Carver alone bears the burden of supporting that defense. *See supra*, Section I(B). Because the R.L. Banks experts fail to account for non-depreciable costs in their calculations, their analysis is fatally incomplete.

## Conclusion

WHEREFORE, for the reasons set forth above, the Belt Line respectfully requests that this Court enter an Order granting its Third Motion *in Limine* and precluding any evidence of, suggestion of, or reference to depreciation of the Belt Line's repair costs, including all testimony

15

by Carver's expert witnesses at R.L. Banks & Associates, Inc., W. N. Marianos and Charlie Cunningham, and granting the Belt Line all other just relief..

Dated: <u>November 3, 2025</u>

NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

By:    <u>*/s/ James L. Chapman, IV*</u>
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl, VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November 2025, a true copy of the foregoing was (i) electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all registered counsel of record, and (ii) mailed to:

James Morrissey
4723 Baywood Drive
Lynnhaven, FL 32444

By:    <u>*/s/ James L. Chapman, IV*</u>
James L. Chapman, IV, VSB No. 21983
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

16