![Modjeski and Masters logo]

Colorado | Florida | Illinois | Louisiana | Michigan | Missouri | New Jersey | New York | North Carolina | Pennsylvania | Texas | Washington, DC | West Virginia

## MEMORANDUM

DATE: 7/2/2025

TO: W. Ryan Snow, Esquire – CW&M

FROM: Lee Lentz, P.E.

RE: Norfolk and Portsmouth Belt Line Bridge Allision Review       PN 250235

### General:

Modjeski and Masters, Inc. (MM) has been engaged to review and comment on the reasonableness of emergency response, repair, and costs resulting from the above referenced bridge vessel impact in June 2024. MM also reviewed the Railroad's Bridge Maintenance Program and related engineering reports to provide comment on the appropriateness of the Railroad's bridge maintenance practices. In particular, MM was asked to address four questions from a movable bridge inspection and design/bridge engineer perspective:

1. Was the bridge properly maintained prior to the allision?
2. Was the repair methodology reasonable?
3. Was the total cost reasonable?
4. In our opinion, should the bridge have been repaired or replaced?

I am the expert witness for this work. My answers and analysis follow.

### Background:

I am a licensed Professional Engineer in eleven states and have over 27 years of Movable Bridge Engineering experience. I am a Senior Project Manager and Assistant Director of Movable Bridges at MM. I joined MM in 1998. My experience includes Freight Railroad Bridge projects dealing with inspection, testing, and design. My experience on movable bridges includes over 230 inspections, 100 designs, 40 strain gage balance tests, and 20 emergency response projects. I am the past Chairman of the Movable Bridges Subcommittee for AREMA Committee 15 Steel Structures. I am also the Secretary for the movable bridge industry's non-profit agency, Heavy Movable Structures, Inc. I had one publication in the last ten years which was in Civil Engineering's July/August 2020 Issue entitled Smart Bridges. I have not participated in a deposition or provided expert witness testimony for a trial in the last four years.



100 STERLING PARKWAY, SUITE 302         717.790.9565         www.modjeski.com
**MECHANICSBURG, PA** 17050                888.663.5375         mechanicsburg@modjeski.com

I have reviewed the information identified in the attached production log. I have also interviewed Cannon Moss, President of the Railroad, and Howard Swanson, P.E., lead engineer on the repair project, regarding the background and repairs.

The general facts are established. On June 15, 2024, the tug M/T MACKENZIE ROSE, pushing a 200-foot loaded barge, hit the western span (Span 4) of the Railroad's main line bridge outside the navigable channel. This strike caused significant damage, rendering the bridge unusable for rail traffic. The Railroad engaged Hardesty & Hanover (H&H) and PCL Civil Constructors, Inc. (PCL) to design and execute repairs to the bridge. Both engagements were under pre-negotiated contracts.

The Bridge is a 385 foot vertical lift bridge that spans the Southern branch of the Elizabeth River.

The repairs were accomplished over approximately seven months. To date, the total cost of the repairs is $15,517,166.85. For the design engineering in particular, H&H internally budgeted $665,000, but completed work at a cost of $534,000 or approximately $130,000 under budget. The bridge is now operational.

Based on records available, before the damage, the bridge appears to have been inspected and maintained regularly as described below. Deposition testimony and the Railroad's Bridge Management Program indicate that the current bridge engineer for the Railroad is Koppers Railroad Structures, Inc., a reputable company in the railroad engineering field.

**Answers and Analysis:**

1.      **Was the bridge properly maintained prior to the allision?**

The bridge falls under a written Railroad Bridge Management Program as required by the FRA. Inspection, maintenance, and engineer rating are all part of the program based on CFR Title 49 Part 237, and the guidance of AREMA and the FRA. Based on my review of the Bridge Management Program and the deposition testimony of Mr. Moss, the program includes appropriate and regular monitoring, evaluation, and documentation by qualified personnel.

The Railroad properly relies on professional bridge engineers for its inspections, as noted above. It was also noted that the Railroad inspects this bridge on a more frequent basis (annually) than the minimum required by the FRA (every 540 days). Based on deposition testimony of Mr. Moss and records reviewed, the Railroad also properly maintains or repairs priority items noted under guidance of its bridge engineers.

I understand that a bridge rating was performed both in 2016 and in 2023. The most recent 2023 rating considered the current condition at that time and indicated the bridge rated for a Normal loading at E80/E71, and Maximum loading at E119/E105, for 10mph and 25mph speeds respectively. The bridge rated for E60 (286,000 lb standard freight car) without restriction. The rating indicates the controlling member was "floorbeam bending".

According to the 2019 Mechanical and Electrical inspection, no emergency repairs were identified for the mechanical or electrical components; all recommended repairs were categorized as maintenance repairs. The bridge mechanical and electrical is in working condition according to references to the 2019 inspection report.

Given all the foregoing, it is my opinion that the bridge was properly maintained prior to the allision.

**2.      Was the repair methodology reasonable?**

Emergency repairs to the damaged structural members were designed according to standard industry practice. The design of the permanent repairs, support loadings and other performance criteria for realignment were designed and developed by H&H while the means and methods of realigning the truss and the design and installation of the temporary supports were designed by PCL and their engineer. By handling the means and methods, the contractor gains greater control over scheduling, quality, and resource allocation, which streamlines operations and reduces delays, which was critical to restoring routine train operations. This type of project delivery is standard industry practice for emergency repairs.

The emergency structural repairs were specified to replace components in kind while meeting current design practice and material availability. Where possible, alternative methods such as heat straightening were employed to salvage existing components. Repairs were limited to replacing damaged members or to sufficiently splice replaced sections, or to allow for temporary supports to facilitate the realignment of the structure.  For example, the truss span and tower required an alternate load path to be established via temporary piers/columns to allow for the removal of the damaged members.

The focus of the electrical repairs was on replacing the damaged components to restore the bridge to service. The bridge owner may have additional evidence or documentation to support the various electrical issues identified on the bridge. This includes replacement of navigation lights, the cable reel, and the extension work on the cable reel platform.

Given all the foregoing, it is my opinion that the repair methodology was reasonable.

**3.      Was the total cost reasonable?**

For complex projects such as freight rail truss bridge and movable bridge design it is not uncommon for engineering fees to be between 5% and 8% of the construction cost. Here, the engineering fee was only 4% of the PCL cost, and the engineering cost finished 19% under the initial estimated budget.

W. Ryan Snow, Esquire – CW&M                      - 4 -                                       7/2/2025

The factors involved in a constrained project of this type are complex. They involve sequence and staging of tasks, large scale equipment, advanced or accelerated material procurement, temporary works to support dead loads which have singular permanent load paths, and temporary access improvements. All work is over water and much of the work is from the water. Critical alignment criteria need to be met for railroad operations and movable bridge operations safety and reliability.

Based on these factors and the constrained time frame for the emergency repairs to be completed to allow railroad traffic to resume, and given my experience with emergency repairs to similar bridges in the past, it is my opinion that the emergency repairs in this situation should have reasonably been expected to cost in excess of the actual costs incurred by the Railroad. I reviewed both repair types and locations of work done on the bridge but with an average engineering fee of 6.5% of construction, which is typical in the industry. I also reviewed the costs for construction labor, equipment and temporary and permanent materials from other similar projects and industry available equipment usage rates, labor rates, and material costs to arrive at my estimate that a reasonable cost for repairs of this nature would be in excess of $17M. As a result, I conclude that the Railroad's actual total costs of $15,517,166.85 are reasonable.

I further conclude that the Railroad's total costs are reasonable because I conclude that the components of the $15,517,166.85 were reasonable and necessary for the repair work to be successful. As noted, the repair design required complex permanent repairs, support loadings, and realignment of the trusses, all of which had to be performed with precision to ensure that the bridge could successfully function. I have reviewed in detail the components of the Railroad's costs in the invoices, work reports, plans, RFIs, and drawings that were required for the repairs and find them to be reasonable.

Additionally, I note specific agreement with one phase of the project where the costs increased from $12M to $15M due to the speed of completion. In order to reduce outage time the builder must consider premium time, extra crews and equipment, and some inefficiency and increase of risk when producing more progress in less calendar time. Compressing the repair schedule as much as practical is also appropriate as time is of the essence for freight rail bridges. They must maintain rail traffic over them as well as marine traffic under them. There are financial impacts for all stakeholders when operations are disrupted.

It is my understanding that the Engineer and Contractor each had standing agreements including labor and equipment rates prior to the emergency work, which the Railroad was able to use. This is common in the freight rail industry and keeps the contracting streamlined from year to year at pre-negotiated rates. It also serves to keep competitive pricing negotiations on the front end of all assignments received for the next 2 to 5 years as agreed to in the contract.

Given the foregoing, it is my opinion that the total cost was reasonable.



W. Ryan Snow, Esquire – CW&M                    - 5 -                                 7/2/2025

**4. In my opinion, should the bridge have been repaired or replaced?**

Structurally, replacement of the bridge would be an order of magnitude more expensive than the actual repair costs.  The lead time to design, procure material, fabricate and erect the new structure would have a duration measured in years instead of the timeline which the completed emergency repairs achieved in 7 months.

A comparable recent project was the Raritan River Bridge in New Jersey, which was bid in late 2024.  Low bid was roughly $444M, which included the costs for the flanking spans, tower spans, and lift span superstructures.  Substructures and trackwork were not included in the contract. Raritan River Bridge has a similar span configuration with flanking spans and a similar length of lift span to NPBL but holds two tracks instead of one.  A conservatively low estimation made by halving the $444M cost to compensate for one track instead of two results in $222M.

Even replacing the South Tower in-kind in its entirety and reusing substructure units would require removal and float-out/float-in of the lift span.  I would not expect an in-kind replacement of the South Tower to be less expensive than the emergency repairs that were actually performed.  Additionally, a full-scale or partial replacement would require a much longer outage, which can create significant losses for the marine and rail stakeholders.

The mechanical and electrical systems were the least impacted portions of the incident, therefore repair was the most appropriate path.

Given all the foregoing, it is my opinion that the bridge should have been repaired and not replaced.

**Statement of Compensation:**

I am being compensated as a Senior Project Manager according to the below rate table.  Other individuals at MM are compensated based upon their employee classification.

| ASCE Title | Description | Hourly Rate |
| --- | --- | --- |
| E8 | Vice President | $455.00 |
| E7 | Senior Project Manager | $402.50 |
| E6 | Project Manager | $315.00 |
| E5 | Senior Mechanical Engineer and Deputy PM | $245.00 |
| E3 - E4 | Lead Mechanical Engineer | $192.50 |
| E1 - E2 | Mechanical Engineer | $175.00 |
| T2-T3 | Mechanical Cad Technician | $175.00 |



W. Ryan Snow, Esquire – CW&M　　　　　　　　- 6 -　　　　　　　　7/2/2025

_____
Lee Lentz. P.E
Senior Project Manager & Assistant Director of Movable Bridges

Modjeski & Masters, Inc.
100 Sterling Parkway, Suite 302
Mechanicsburg, PA 17050