**MODJESKI and MASTERS**

Colorado | Florida | Illinois | Louisiana | Michigan | Missouri | New Jersey | New York | North Carolina | Pennsylvania | Texas | Washington, DC | West Virginia

## MEMORANDUM

DATE:   8/22/2025

TO:     W. Ryan Snow, Esquire – CW&M

FROM:   Lee Lentz, P.E.

RE:     Norfolk and Portsmouth Belt Line Bridge Allision Review       PN  250235
        Rebuttal Report

---

Please see below for my rebuttal with respect to the noted paragraphs in the report by R.L. Banks and Associates, Incorporated (RLBAI) dated August 8, 2025.

General Rebuttal:

At the outset, it is not clear which person is expressing which opinions in the RLBAI report. They appear to have different qualifications.

The discussion of service life in the RLBAI report is inaccurate. The repairs completed as necessary to bring the Main Line bridge back into service after the allision did not extend the service life of the bridge.  The bridge service life remained the same or was slightly reduced. A good example is the fact that perfect realignment was not achieved for Span 4 but acceptable alignment was achieved. This is stated in the deposition of Howard Swanson.  In addition, it should be noted that no work was performed on spans 1, 2, 3, 5, 6 and 7.  Span 6 is a mirrored replica of Span 4, which was impacted and repaired under this emergency, and Span 6 did not change.

Several documents referred to or relied upon by RLBAI are neither published treatises nor industry authorities.  These include conference presentations such as those referenced from the Heavy Movable Structures, Inc. and International Association of Bridge and Structural Engineer symposiums. The U.S. Army Corps of Engineers excerpt appears to deal with only cost apportionment using hypothetical years of service.

Specific Rebuttal:

Several specific paragraphs in the RLBAI report are also inaccurate.

80:  RLBAI takes issue with certain points about the Bridge Management Program but does not actually dispute that the bridge was properly maintained. In evaluating the appropriateness of



EXHIBIT D

100 STERLING PARKWAY, SUITE 302      717.790.9565      www.modjeski.com
**MECHANICSBURG, PA** 17050            888.663.5375      mechanicsburg@modjeski.com

maintenance of a bridge, the primary inquiry is whether repair items are detected, reported, and go through an evaluation for repair by the Railroad Bridge Engineer (RBE). This happened in all cases with the bridge. All priority repair items appear to be completed with the exception of the replacement of the motor brake and counterweight wire ropes. Both outstanding items are long lead items and it would be reasonable for the RBE to deem them to be addressed in a longer period of time. The 30 items in the 2019 Mechanical and Electric Inspection Report were not priority items for repair, as RLBAI concedes.

81: The reference to in-kind replacement in my first report refers to the vast majority of the repairs matching geometry, number of fasteners, thickness, weight, surface area and the use of the most readily available material. Many other design and availability concerns had to be considered on a case by case basis. In none of the details was there an attempt to provide an unnecessary betterment. The approach by the designer and builder resulted in the most reasonable cost and delivery time. A7 steel standard was only active within ASTM Specifications between 1901 and 1966. Replicating this steel would have been a special run of the mill with high cost, long delivery time, and large minimum order quantity. The steel specification used in the repair, ASTM A709, has been the standard material for the bridge industry for over 25 years. The grade chosen for repairs was Grade 50, and again, is the most common and readily available and cost-effective steel in use today for bridges. Regardless, a lower grade specification would likely have resulted in grade 50 product as specifications are the minimum required criteria. Today's quality, process, and knowledge makes it difficult to produce lower grades, especially when there is no reason to do so.

The designer utilized replace-in-kind analyses and not loading criteria to match what was existing. The methodology was to utilize one material and confirm it was meeting or exceeding the needs of the damaged member. This is a proper and acceptable practice for an emergency repair of this nature.

82: The same errors in the RLBAI report relate to paragraph 82. The standard grade of ASTM A709 steel today is 50. This results in a material that is the most cost effective for the repairs. ASTM A36 and ASTM A709 Grade 50 have the same copper amount and neither steel includes Chromium, both of which impact a material's ability to provide corrosion resistance.

ASTM A709 has a weathering steel grade (50W) which was not selected for the repair work. The weathering steel A709 Grade 50W does list Chromium in the chemical properties. I do not distinguish corrosion resistance levels of A7, A36 and A709 grade 50. The original A7 steel was painted and appears to be in relatively good condition in terms of corrosion. The new repairs were painted with a standard Norfolk Southern RR 3 coat system to specify a familiar approach for the installer and quickly achieve approval by all parties.

83: The RLBAI report mistakenly argues that my original report analyzed reasonableness of costs from only one perspective. Costs were analyzed through several different methods. The ratio of typical engineering fee to construction costs of non-emergency work was only one of several methods to evaluate the reasonableness of costs. Individual invoices were also reviewed for each major work item in order to create an independent construction cost estimate.



W. Ryan Snow, Esquire – CW&M     - 3 -     8/22/2025

Engineering and Contractor wage rates, material costs and equipment rates were also reviewed and compared with industry benchmarks. It would be improper not to include additives (loaded rates) for wages of employees and workers. This is standard practice and it maintains accurate actual costs to companies audited by the federal government.

For clarity, below are two clarifications and updates to my expert witness report dated July 2, 2025:
1. Page 2, paragraph 3: vertical lift bridge length should be 384 feet not 175 feet.
2. Page 5, paragraph 2: second sentence should be replaced with "Low bid was roughly 444M, which included the costs for superstructure only made up of two 188 foot long flanking span trussess, two towers, and one 376 foot long vertical lift span truss."

_____
Lee R. Lentz. P.E
Senior Project Manager & Assistant Director of Movable Bridges

Modjeski & Masters, Inc.
100 Sterling Parkway, Suite 302
Mechanicsburg, PA 17050