IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
---------------------------------------X
IN THE MATTER OF COEYMANS MARINE
TOWING, LLC D/B/A CARVER MARINE
TOWING AS OWNER AND OPERATOR OF M/T
MACKENZIE ROSE, (IMO NO. 8968765) HER
CARGO, ENGINES, BOILERS, TACKLE, EQUIPMENT,
APPAREL, AND APPURTENANCES, ETC., IN REM,
("M/T MACKENZIE ROSE"),

                       CIVIL ACTION NO:
                       2:24-CV-00490

PETITIONING FOR EXONERATION FROM OR
LIMITATION OF LIABILITY IN ALLISION WITH
NORFOLK AND PORTSMOUTH BELT LINE RAILROAD
COMPANY MAIN LINE RAILROAD BRIDGE
(THE "BRIDGE") OCCURRING JUNE 15, 2024 IN
AND ABOUT THE ELIZABETH RIVER, VIRGINIA.
---------------------------------------X


                     September 18, 2025

                     10:18 a.m.


             AN IN PERSON VIDEOTAPED

DEPOSITION of JASON GALIOTO, taken by the

Respective parties, pursuant to Order, held

at the offices of Clyde & Co., at 405

Lexington Avenue, New York, before MELISSA

HARBORD, a Notary Public for and within the

State of New York.



JOB NO.: 119022

**JASON GALIOTO**

September 18, 2025

```
 1

 2    A P P E A R A N C E S:

 3

 4    CRENSHAW, WARE & MARTIN, P.L.C.

 5    Attorneys for Defendant

 6    Norfolk Portsmouth Belt Line

 7    Railroad Company

 8    150 W. Main Street Suite 1500

 9    Norfolk, Virginia 23510

10    BY:· JIM CHAPMAN, ESQ.

11    E-mail:· Jchapman@cwm-law.com

12

13

14    CLYDE & CO US LLP

15    Attorneys for Coeymans Marine Towing, LLC

16    30 S. Wacker Drive, Suite 2600

17    Chicago, IL 60606

18    BY: MICHAEL ROMAN, ESQ.

19    E-mail: Michael.Roman@clydeco.us

20    BY: JAMES H. RODGERS, ESQ.

21    E-mail: James.rodgers@clydeco.us

22

23

24

25
```

**JASON GALIOTO**

**September 18, 2025**

```
 1
 2     A P P E A R A N C E S:
 3     SINNOTT, NUCKOLS & LOGAN, PC
 4     Attorney for Evanston Insurance Company,
 5     S/s/o Norfolk and Portsmouth Belt Line
 6     Railroad Company
 7     13811 Village Mill Drive
 8     Midlothian, Virginia 23114
 9     BY: MARK C. NANAVATI, ESQ.
10     E-mail: Mnanavati@snllaw.com
11     Cjones@snllaw.com
12
13     BUTLER WEIHMULLER KATZ, ET AL
14     Attorney for Evanston Insurance Company,
15     S/s/o Norfolk and Portsmouth Belt Line
16     Railroad Company
17     11525 North Community House Road, Suite 300
18     Charlotte, North Carolina 28277
19     BY: ZACHARY JETT, ESQ.
20     E-mail: Zjett@butler.legal
21
22     Also Present: Cannon Moss
23
24     Nicholas Stanziola, The videographer
25
```

JASON GALIOTO

September 18, 2025

1

2        Lexington Avenue, New York, New York.

3        The Court Reporter is Melissa

4        Harbord.  The Video Specialist is

5        Nicholas Stanziola.  Both are from

6        First Legal Depositions.

7            Counsel will state their

8        appearances and then the witness will

9        then be sworn.

10           MR. CHAPMAN:  Dave Chapman on

11       behalf of Norfolk and Portsmouth Belt

12       Line Railroad Company.

13           MR. NANAVATI:  Mark Nanavati

14       here for Evanston Insurance Company.

15           MR. JETT:  Zachary Jett for

16       Evanston Insurance Company.

17           MR. ROMAN:  Michael Roman for

18       the Coeymans Marine Towing and the

19       witness.

20  J A S O N   G A L I O T O, called as a

21  witness, having been first duly sworn by a

22  Notary Public of the State of New York, was

23  examined and testified as follows:

24           THE REPORTER:  Please state

25       your full name for the record.

September 18, 2025

1

2          **THE WITNESS:  Jason Andrew**

3          **Galioto.**

4          THE REPORTER:  Please state

5          your work address for the record.

6          **THE WITNESS:  2581 Richmond**

7          **Terrace, Staten Island, New York**

8          **10303.**

9     EXAMINATION BY

10    MR. CHAPMAN:

11         Q.   Good morning, Mr. Galioto.  My

12    name is Jim Chapman.  As you heard, I

13    represent the Norfolk and Portsmouth Belt

14    Line.

15         We have not met before but we

16    are going to try to proceed expeditiously

17    with your deposition today.

18         You have already stated your

19    full name.  Could you tell us your current

20    job title, please, with Carver Marine

21    Towing?

22         **A.   Current title is "Compliance**

23    **Logistics Supervisor."**

24         Q.   When did you begin your

25    employment with Carver Marine Towing?

**JASON GALIOTO**

**September 18, 2025**

```
 1
 2        A.     April 1st of 2024.
 3        Q.     What was the first position
 4   that you were hired into?
 5        A.     I was essentially a Logistics
 6   Coordinator, which is a Dispatcher.
 7        Q.     Do you have the same title
 8   today or did I misunderstand that, or is it
 9   a dual role?
10        A.     It is -- first, I was the
11   Logistics Coordinator.  Now I am
12   "Compliance and Logistics Supervisor" is
13   the current title.
14        Q.     All right.  Have you held any
15   other positions while you have been
16   employed by Carver Marine Towing?
17        A.     No.
18        Q.     What are the current
19   responsibilities that you have as the
20   Compliance and Logistics Coordinator?
21        A.     At this current time I am in
22   charge of our Compliance Program, which is
23   managing the Subchapter M Program, U.S.
24   Coast Guard, safety and compliance with the
25   ABS rules and regulations.
```

**JASON GALIOTO**

September 18, 2025

```
1
2    Unlimited Tonnage.
3         Q.    How long did you hold the Third
4    Mate's Unlimited?
5         A.    About ten years.
6         Q.    All right.  When did it lapse?
7         A.    I want to say 2010 when I
8    elected to put it into incontinuity.
9         Q.    I have not heard that term
10   before.  Can you tell me what you mean by
11   "incontinuity?"
12        A.    It is basically freezing your
13   documents so I still maintain them.  If I
14   wanted to pull them out and activate them
15   again, I would have to take STCW, the whole
16   gamut of classes:  Radar, Observer,
17   Firefighting, Security, so on and so forth
18   in order to fully activate the license.
19        Q.    But your sea time, I take it,
20   is preserved in some ways so you do not
21   have to get any more days?
22        A.    That is correct.
23        Q.    Who do you report to at Carver
24   Marine Towing?  Like who is your boss?
25        A.    Currently at the moment, Matt
```

**JASON GALIOTO**

**September 18, 2025**

1

2    Hoffman.

3        Q.    What is his title?

4        A.    "Interim General Manager."

5        Q.    Did he take over after Mr.

6    Moore left?

7        A.    Yes.

8        Q.    Did he have a role at Carver

9    Marine Towing before he was placed in the

10   Interim General Manager role?

11       A.    Yes.

12       Q.    What was that?

13       A.    To be quite honest, I am not

14   one hundred percent certain.  He was in a

15   different division.

16       Q.    So he was not with Carver

17   Marine?

18       A.    That is correct.

19       Q.    Do you know what division he

20   was with?

21       A.    No, I do not.

22       Q.    When did Mr. Moore leave?  When

23   I say "Mr. Moore," "Brian Moore."

24            When did Brian Moore leave

25   Carver?

JASON GALIOTO

September 18, 2025

1

2          A.      I believe it was early May of

3      '25.

4          Q.      Was he terminated?

5          A.      I don't know the specifics of

6      his leaving.

7          Q.      Before he left, is that who you

8      reported to?

9          A.      Yes, sir.

10         Q.      He never shared with you why he

11     was leaving?

12         A.      No, sir.

13         Q.      Did he ever share with you that

14     he was leaving?

15         A.      No, sir.

16         Q.      Have you ever asked anybody --

17         A.      No, sir.

18         Q.      -- the circumstances under

19     which he left?

20         A.      No, sir.

21         Q.      So tell us a little bit more

22     about how you go about your role of

23     insuring compliance with company safety

24     policies in the role that you are in?

25         A.      I will periodically review

**JASON GALIOTO**

**September 18, 2025**

1
2    not aware of anything off the top of my
3    head.
4         Q.    You have a background in Marine
5    Engineering and obviously, training and
6    experience related to the Third Mate's
7    License; right?
8         A.    Not really Engineering.
9         Q.    You were on the deck side?
10        A.    That is correct.
11        Q.    Do you know if there has been
12   any change in the Safety Management System
13   regarding the forms or processes for
14   reporting either steering or autopilot
15   problems with the vessels since the
16   allision in 2024?
17        A.    No changes.
18        Q.    Is there a process for
19   communicating to the vessels or crew, any
20   changes that are made to the SMS, like some
21   kind of bulletin or some kind of
22   announcement or training that they get?
23        A.    Formally, no.  But if I am --
24   when and if I am aware of a change, I will
25   at least, you know, send an e-mail to them

**JASON GALIOTO**

**September 18, 2025**

1
2    **and make them aware.**
3         Q.    Each boat has its own e-mail
4    handle, e-mail account?
5         **A.    Yes, yes.**
6         Q.    And who on the boats, the tugs,
7    to your understanding, has access to that
8    e-mail account?
9         **A.    Anyone on the crew can access**
10   **the computer, but generally speaking, the**
11   **Master may, and/or Chief Engineer will**
12   **handle the communications to and from**
13   **electronically.**
14        Q.    Got it.  Do you know what the
15   process is for submitting a Serious Injury
16   Report in the Safety Management System?
17        **A.    Yes.**
18        Q.    Who fills them out to submit?
19        **A.    There is an Incident Report**
20   **that is completed by the crew or the Master**
21   **or the Mate.**
22        Q.    All right.  Is that done
23   through that Helm Connect System?
24        **A.    Yes.**
25        Q.    When it is filled out, who in

**JASON GALIOTO**

**September 18, 2025**

1

2    the company's management receives them?

3         **A.    The designated person on shore.**

4         Q.    And does the Safety Management

5    System spell out who the designated person

6    on shore is?

7         **A.    Yes.**

8         Q.    At the time of the allision in

9    June of 2024, who was the designated person

10   ashore for Carver Marine Towing?

11        **A.    Mr. Moore.**

12        Q.    Sorry.  Who?

13        **A.    Mr. Moore.**

14        Q.    Was there any assistant

15   designated person or deputy designated

16   person, or was it only Mr. Moore?

17        **A.    At the time it was just Brian.**

18        Q.    Has that changed since the

19   allision in 2024?

20        **A.    Yes.**

21        Q.    Is there more than one person

22   that is the designated person now?

23        **A.    Yes.**

24        Q.    Are you one of them?

25        **A.    Yes.**

**JASON GALIOTO**

**September 18, 2025**

1

2          Q.     Who are the others?

3          A.     I am the primary.  The

4     secondary is Thomas Feeney.

5          Q.     What is Mr. Feeney's role?

6          A.     Project Manager and Fleet

7     Engineer or Port Engineer.

8          Q.     In this system, how is the

9     designated person informed of the fact that

10     a Serious Incident Report has been

11     submitted?

12          A.     If there is an Incident Report

13     submitted, it goes into Helm and it shows

14     in a box so that we -- it is in the

15     Incident Report and I take the accident,

16     you know, as required with that.  If it's a

17     reportable incident, then, obviously, we

18     are going to know about it and then we'll

19     take the appropriate action at that point;

20     whether that be a notification to external

21     parties or what have you.

22          Q.     When you say, "it's a box," you

23     mean like an inbox, like an e-mail inbox or

24     what?

25          A.     On the left-hand side of the

**JASON GALIOTO**

September 18, 2025

 1
 2    screen, under deep -- in my profile, there
 3    is a box under "Compliance" which says
 4    "Forms," and I click that box.  Any of the
 5    forms that are related to me that require
 6    sign-off, I view them and see them there.
 7        Q.    Does a Serious Incident Report
 8    require some sign-off?
 9        A.    **Absolutely.**
10        Q.    Do you check -- I don't know --
11    check this box every day?
12        A.    **First thing I do every morning.**
13        Q.    Is it the last thing that you
14    do before you go home, too?
15        A.    **Generally speaking, yes.**
16        Q.    Is there any e-mail alert that
17    you get regarding the submission of one of
18    these reports?
19        A.    **No.**
20        Q.    So it is just in this Helm
21    Connect System?
22        A.    **Yes.**
23        Q.    Do you stay logged into it all
24    day?
25        A.    **Generally, yes.**

**JASON GALIOTO**

September 18, 2025

1

2          Q.    Is there some pop-up

3    notification that you get on your screen if

4    there is a new report?

5          **A.    No.**

6          Q.    So you actually have to open

7    this "box," you called it, to see what's

8    there; right?

9          **A.    Correct.  There is a process in**

10   **place for notifications.  So if something**

11   **was to occur at this period, at this point**

12   **in time, I would be aware of it.**

13         Q.    You mean you would get some

14   kind of notification?

15         **A.    I would, in all likelihood, get**

16   **a verbal.**

17         Q.    Does that like come to your

18   phone or what?

19         **A.    I would probably get a phone**

20   **call from somebody.**

21         Q.    Okay.

22         **A.    But that is at this point in**

23   **time.  I'm sorry.**

24         Q.    So that is a change in the way

25   that the company handles these things now.

**JASON GALIOTO**

**September 18, 2025**

1

2    You are supposed to get a phone call, too?

3        **A.    Again, I can't speak for back**

4    **then, but now that is how we do it.  That**

5    **is how I do it.**

6        Q.    So if somebody fills out a

7    Serious Incident Report, they are required

8    also to call the designated person?

9        **A.    Yes.**

10       Q.    Just so I am clear on this, you

11   are saying that you do not know how it was

12   handled before then, before the allision?

13       **A.    At the time of the allision, I**

14   **was transitioning into the role, so how**

15   **things actually occurred, you know, I was**

16   **essentially training at the time.**

17               MR. CHAPMAN:  Understood.  So I

18           want to share my screen again and

19           show you what we'll mark as

20           "Exhibit 2" to your deposition.

21               (Whereupon, a document was

22           marked as Exhibit 2 for

23           identification as of this date by the

24           Reporter.)

25       Q.    Can you see the screen now with

**JASON GALIOTO**

**September 18, 2025**

1
2    the "9.5 Incident Report-Event?"
3         A.    I can see it.  I really can't
4    read it, but I am familiar with the form.
5         Q.    This was a document that was
6    provided to us in discovery and you will
7    see at the bottom, it's got numbers
8    beginning with the word, "Carver" and the
9    first page of this document is 002041.  It
10   is nine pages in all.
11             I will just scroll to the end
12   to get that number into the record: "Carver
13   002049."  Do you see that?
14        A.    Yes.
15        Q.    Okay.  Have you seen this form
16   before?
17        A.    I am familiar with the form.  I
18   can't read what is on it.
19        Q.    Let me blow it up for you.  Can
20   you see it any better?
21        A.    Just have to lean over.  Yes, I
22   could see it.
23        Q.    You have seen this before?
24        A.    Yes.
25        Q.    All right.  I just want to ask

**JASON GALIOTO**

**September 18, 2025**

1

2  you what you know about the very first part

3  of it, but it looks like there is a --

4  well, this is out of the Helm System;

5  correct?

6      **A.    Correct.**

7      Q.    And it has an external number,

8  FRM002836.  Do you know what that is?

9      **A.    I believe that is your -- that**

10 **is the Helm reference number.**

11     Q.    Does each new Incident Report

12 get a different number?

13     **A.    To be honest, I don't know.**

14     Q.    All right.  And this appears to

15 -- it says the asset is the Mackenzie Rose.

16 Does that mean it is from the tug Mackenzie

17 Rose?

18     **A.    Yes.**

19     Q.    And it says it was filled by a

20 "Christopher, (Chris) L. Miller (deleted)."

21         Do you see that?

22     **A.    Yes.**

23     Q.    That would have been

24 Christopher Miller, the Captain of the

25 Mackenzie Rose; is that right?

**JASON GALIOTO**

**September 18, 2025**

1

2          A.    He was a crew member, yes.  One

3     of the Captains.

4          Q.    It has a date and time and that

5     blocked call filled?

6          A.    Okay.  Yes.

7          Q.    Is that right?

8          A.    Yes.

9          Q.    Do you know why it says,

10    "Deleted" after his name?

11          A.    Oh, I would have to confirm

12    with TBS.  I believe Mr. Miller was no

13    longer with Carver Marine Towing and

14    ultimately passed away, as I understand.

15    So when somebody is no longer with us, it

16    becomes -- you know, I think that is to

17    signify that his name is deleted from the

18    system.

19          Q.    Okay.  So whenever this form

20    was printed, he was already gone from the

21    Carver system?

22          A.    Perhaps.

23          Q.    Do you know what he died of?

24          A.    I don't know.

25          Q.    So this form is nine pages

**JASON GALIOTO**

**September 18, 2025**

1

2    long.  There are some of these fields as

3    you go down the form response items that

4    are completed -- the first of which is in

5    Row 2.1, "Date of Incident:  5/24/2024";

6    correct?

7        A.    Yes.

8        Q.    And at the time of the

9    incident, the next row is "0008 hours,"

10   which I take to mean eight minutes after

11   Midnight?

12       A.    Yes.

13       Q.    Is that your understanding?

14       A.    Yes.

15       Q.    And then it looks like if we go

16   back to the top, that the form was actually

17   filled out maybe two or three hours later

18   at 0200 and 59 hours?

19       **A.    That is what it looks like,**

20   **yes.**

21       Q.    And this form describes who was

22   the Master in Row 3.2, that would have been

23   James Morrisey.  That is shown as

24   "inactive."  Do you see that?

25       A.    Yes, I do.

**JASON GALIOTO**

**September 18, 2025**

1

2          Q.    Do you know what the "inactive"

3    means?

4          **A.    He -- I believe when somebody**

5    **is on the books but not, you know, fully**

6    **working -- you know, it could be for an**

7    **injury or something to that effect, it gets**

8    **listed as an "inactive."  Whereas if you**

9    **are off the books, then it's a deletion.**

10          Q.    I want to ask you here in Row

11    3.3, it says:  "When did he or she become

12    aware of the incident?"

13                It says -- it looks like "ten

14    minutes after Midnight."

15                But it says, "3/21/24," which

16    is likes two months earlier than this form.

17    Do you know the reason for that?

18          **A.    I do not know.  I am not even**

19    **aware -- I don't remember this particular**

20    **incident and I was not there.  I cannot**

21    **speak for who generated the form.**

22          Q.    Do you know whether this is a

23    "fill in the blank form," somebody has to

24    actually enter that date?

25          **A.    Yes, you do.**

**JASON GALIOTO**

**September 18, 2025**

1

2      Q.    All right.  So he could have

3   been fat fingered and somebody hit "3"

4   instead of "5."

5            MR. ROMAN:  Object to form.

6        You could answer, Jason.

7      **A.    Sorry.  About that.  Yes, that**

8   **is conceivable, yes.**

9      Q.    And then in Section 4.4, that

10   row -- um, it says -- well, let me scroll

11   back up.

12            In 4.1:  "Vessel was involved

13   in a marine casualty consisting of," or

14   "consisting in," and then it says, "Check

15   all boxes that apply."

16            Then it looks like the one box

17   that is checked in Section 4 is -- in Row

18   4.4:

19            "Loss of main propulsion

20   primary steering or any associated

21   component or control system that reduces

22   the maneuverability of the vessel."

23            And it has the word, "Done,"

24   typed into that.  Do you see that?

25      **A.    Yes, I do.**

**JASON GALIOTO**

**September 18, 2025**

1

2          Q.    Is "Done," I don't know, just a

3     selection in the form from some kind of

4     drop-down menu, or do you know?

5          **A.    It -- it -- I do not believe**

6     **it's a drop-down.  I believe he had to**

7     **enter that manually and again, I cannot**

8     **speak for the Master and Brian who would**

9     **have approved this, what that means.**

10          Q.    Okay.  In Section 5 somebody

11     has filled out some items around the

12     weather and lighting conditions --

13          **A.    Correct.**

14          Q.    -- visibility, air temp, those

15     sorts of things.

16                In Section 6, you know, things

17     about the crew.

18                Apparently nobody was hurt as a

19     result of this incident; correct?

20          **A.    I would agree, yes.**

21          Q.    Yep.  And continuing down,

22     "Treatment" is not filled out because, I

23     presume, there is no medical treatment

24     involved.

25                And then finally, we get to

**JASON GALIOTO**

September 18, 2025

1

2    Section 9, titled, "Casualty Information."

3                    9.1 is:  "Was this a serious

4    marine incident as defined in 46CFR

5    4.03-2?"

6                    Somebody has typed in "Yes" in

7    completing this form.

8                    Do you know whether that is a

9    drop-down or somebody has to actually type

10   that in?

11       **A.    I believe you have to type it**

12   **in.  I do not think there was a drop-down.**

13       Q.    Okay.  Do you know if there is

14   today?

15       **A.    Again, I would have to**

16   **reference it.  Today it's a separate form**

17   **that has been shortened.**

18       Q.    It's a different form today?

19       **A.    Yes.**

20       Q.    I am sorry, you said it has

21   been shortened?

22       **A.    Yes.**

23       Q.    Do you know how many pages it

24   is today?

25       **A.    I think it is two.**

**JASON GALIOTO**

**September 18, 2025**

1

2      Q.    Sorry.  You said something.  I

3   missed what it was?

4      **A.    I believe it is two.**

5      Q.    All right.  And in Section 9.2,

6   it says:

7           "Is there evidence that alcohol

8   or drug use by or intoxication of

9   individuals directly involved in the

10  casualty?"

11          And the answer is "No."

12          In completing a serious Marine

13  Incident Report or something that is a

14  Serious Marine Incident as defined by that

15  CFR section, would alcohol and drug

16  screening of the crew be required?

17          MR. ROMAN:  Object to form.  If

18      you know that, you could answer.  If

19      you know, Jason.

20      **A.    Drug and alcohol testing would**

21  **be conducted, depending on the type of**

22  **serious marine casualty -- depending on the**

23  **kind of serious marine casualty.**

24      Q.    And then in Section 9.4, it

25  says:

**JASON GALIOTO**

**September 18, 2025**

```
1
2               "Did any individual directly
3       involved in the casualty refuse to submit
4       to or cooperate in the administration of a
5       timely chemical test when directed by a law
6       enforcement officer or by the marine
7       employer?"
8               And the answer is "No" there;
9       correct?
10          A.    That is what it appears to be,
11      yes.
12          Q.    Do you know whether any drug
13      testing or alcohol testing was done related
14      to this Serious Incident Report?
15          A.    As I stated earlier, this
16      incident occurred very early while I was
17      transitioning my other role into this.  So
18      I really do not have any knowledge of this
19      one.
20          Q.    Okay.  So continuing down in
21      Section 10, then, it says -- the title is
22      "Nature and Circumstance of the Casualty."
23              There is three rows.  10.1,
24      "Activity of operation being conducted at
25      the time of the casualty."  It says:  "SB
```

**JASON GALIOTO**

**September 18, 2025**

1
2  and autopilot."
3              Is "SB" an acronym for
4  something in Carver Marine's Towing world?
5      **A.    I did not write this.  I -- I**
6  **-- I cannot attest to what he meant.**
7      Q.    By "SB?"
8      **A.    Correct.  It hypothetically, it**
9  **could mean "southbound in autopilot."  I**
10 **could not attest to that as I was not**
11 **there.**
12     Q.    Is there anything else that
13 would make sense to you besides "southbound
14 in autopilot?"
15             MR. ROMAN:  Object to form.  We
16        do not need you to speculate, Jason.
17             **THE WITNESS:  Okay.**
18             MR. ROMAN:  You could answer,
19        if you know.
20     **A.    I don't know.  As I stated,**
21 **it's a hypothetical.**
22     Q.    Then in Section 10.2,
23 "Description of the Casualty (casualty
24 events and conditions)," and I don't know
25 whether that's "actions" "that were

1
2    believed to be casual factors as well as
3    any hazard created as a result of the
4    casualty."
5              Then it says, "steering went
6    hard left."  Do you see that?
7        **A.    Yes, I do.**
8        Q.    Do you have any deeper
9    understanding of what happened with the
10   steering when it went hard left?
11             MR. ROMAN:  Object to form.
12         Foundation.  You could answer, Jason.
13       **A.    No.  Again, I cannot speak for**
14   **it.  I do not know anything about this is**
15   **incident.  I was not involved with it.  To**
16   **me, it is just as it reads, something**
17   **occurred and the rudder went hard over.**
18       Q.    I appreciate that.  In the new
19   form is it spelled out the same way?  Are
20   they still captioning that same type of
21   information?
22       **A.    In the current form we have**
23   **right now, it is similar, but a lot of**
24   **these different boxes -- Field 7, 8, 9, 10,**
25   **those are all gone.  It is more of a user**

**JASON GALIOTO**

**September 18, 2025**

1

2    friendly easier form to generate where it

3    allows the person making the form to

4    generate a good detailed description of

5    what occurred.

6        Q.    So it is easier to use?

7        A.    Absolutely.

8        Q.    All right.  You get more

9    information that way?

10        A.    Um, depending on who is doing

11    it, yes.

12        Q.    Okay.  Is there any training

13    how to complete this form?

14        A.    No.

15        Q.    When I say, "this form," that

16    would include the current form that you are

17    using as well.  I apologize if that was

18    unclear.

19        A.    No.  There is no formal

20    training.  It is rather self-explanatory.

21    If, in today's world, if I have a crew

22    member generating a report like this, I

23    will walk him through the process as well

24    so he's -- you know, I will get what I want

25    out of it.

**JASON GALIOTO**

**September 18, 2025**

1

2    Q.    Okay.  So they might actually

3    go back in, edit it and add more

4    information to it at your request?

5         MR. ROMAN:  Object to form.

6      Misstates.

7    Q.    If I misstated again, I'm not

8    trying to put words in your mouth.  I am

9    trying to understand your answer.

10        MR. ROMAN:  It was far afield

11      from anything he said.  I think you

12      know that.

13        Jason, if you understand the

14      question, you could answer.

**15    A.    If I have a crew member**

**16    generating the form and I -- I -- a lot of**

**17    the times I'd be on the phone with the**

**18    person or you know, before it goes through**

**19    officially -- you know, I work with the**

**20    person to get him through the process.**

**21    Leave it at that.**

22    Q.    Thank you for that

23    clarification.

24        Then it has a Section 11:

25    "Items related to the incident."  Nothing

**JASON GALIOTO**

**September 18, 2025**

1

2    is filled out there.

3             12.  "Damaged property."

4    Nothing is filled out there.

**5             A notification in Section 13.**

**6    Um, it has been filled out, a few of those**

**7    rows.**

**8             13.1:  "Was the USCG verbally**

**9    notified?"**

**10           Answer:  "No."**

**11           Is "USCG" an acronym for the**

**12    "U.S. Coast Guard?"**

**13      A.    Yes, it is.**

14      Q.    And then 13.2 says:  "Was a

15    2692 completed?"

16           Was that a reference to a Coast

17    Guard form, a 2692?

**18      A.    Yes, that is.**

19      Q.    Then in Section 14:  "Witness

20    to the incident."

21           Nothing is filled out there.

22           Section 15:  "Injured person."

23    Nothing is filled out there.

24           Section 16:  "Person making

25    this report."  Um, it does say in 16.2 that

**JASON GALIOTO**

**September 18, 2025**

1

2    Christopher (Chris) L. Miller, (deleted),

3    is listed there.

4             Do you know whether that is

5    from a drop-down menu?

6        **A.    Again, my answer is the same as**

7    **previously.  I don't recall but I think you**

8    **had to write it in.**

9        Q.    Okay.  Then, um, Section 17:

10    "A spill, if applicable."  The form has got

11    answers to this 17.1, 17.2, 17.3, all

12    negative about spilling anything into the

13    water.

14             I take it that that is to track

15    oil or other hazardous substances that

16    might be released into the water from the

17    vessel; is that right?

18        **A.    Yes, that is correct.**

19        Q.    Then Section 18:  "Exposure

20    Report, if applicable."

21             Those are all negative.

22    Nothing is filled out for those.

23             Finally, Section 19:  "On

24    designated person approval."

25        **A.    Yes.**

**JASON GALIOTO**

**September 18, 2025**

1

2          Q.    This is the part of the form
3     where whoever is the designated person has
4     to weigh in on some approval; right?
5          **A.    Correct.**
6          Q.    There's several rows associated
7     with that.  I don't know that I could get
8     them all on the screen together, but it
9     shows -- first row, "Date received."
10    Second row:  "Time received," and those are
11    blank; right?
12         **A.    In this form, yes.**
13         Q.    Yeah.  And is that something
14    that the designated person would actually
15    fill out, the date it came in and the time
16    it came in?
17         **A.    I can't speak for Mr. Moore**
18    **because this was under his command, but for**
19    **me, if I am doing this, yes.**
20         Q.    Okay.  In the Row Number 19
21    where it says:  "Designated person
22    approval," it says:  "Declined on 6/24 of
23    2025 at 15:03."
24              That is more than a year after
25    this form.

**JASON GALIOTO**

September 18, 2025

1

2              Do you know who declined this,

3    Mr. Galioto?

4         **A.    That's a good question.**

5         Q.    Would it be listed on this

6    form?

7         **A.    It is an old form so that, I**

8    **don't know.**

9         Q.    None of these blocks under

10   Section 19 are filled out in any way other

11   than that first one in the line Numbered 19

12   where it says it was declined.

13              Then you get to the end, and

14   there is a section called, "Notes."  Do you

15   see that?

16        **A.    I am looking.  Oh --**

17        Q.    Do you see that?

18        **A.    Yes, I see that.**

19        Q.    The text notes says:

20              "Form has sit in this inbox for

21   months with the prior DPA"; correct?

22        **A.    Yes.**

23        Q.    And it says it is posted by

24   you; correct?

25        **A.    Okay.  Yes.**

**JASON GALIOTO**

September 18, 2025

1

2          Q.    Right?  Did you type this in,

3     "Form has sit in this inbox for months with

4     the prior DPA?"

5          **A.    I must have done it.  I might**

6     **have -- when I took on the DPA role and I**

7     **received more rights within the system, it**

8     **is possible that the form might have been**

9     **sitting there and with it being so old and**

10    **already dated by over, approximately, a**

11    **year, I might have -- I might have -- it**

12    **looks like I deleted it.  It's a**

13    **possibility.  I probably went in there and**

14    **deleted it, being it was an old incident**

15    **that was over a year.**

16         Q.    Yeah.  So, it says that was

17    posted on 06/24/2025 at 15:03, which

18    matches what it says up here on the

19    declined line, "A team."  Do you see that?

20         **A.    Yes.**

21         Q.    So it has been sitting in there

22    for over a year.

23              When did you become the

24    designated person?

25         **A.    Shortly after -- after Brian**

**JASON GALIOTO**

**September 18, 2025**

1

2  was gone, which I want to say called out

3  again mid-May -- mid-May or three quarters

4  of the way through the month of May.

5      Q.    Sometime in the month of May of

6  2025; correct?

7      A.    Yes.

8      Q.    So, perhaps a month or so

9  earlier, you had been appointed the

10  designated person following his departure?

11      A.    Correct.

12      Q.    Then in June you what,

13  discovered this form or saw this form in

14  that inbox, or that box in Helm and

15  declined it?

16      A.    Correct.

17      Q.    Do you know when it was

18  declined?  Is that a drop-down?  You either

19  accept or decline?

20      A.    I think it automatically tracks

21  that date so you do not have to type that.

22      Q.    Okay.  So going back down to

23  the Note Section then, the last column, has

24  what appears to be a thumbs down icon.  Do

25  you see that?

**JASON GALIOTO**

**September 18, 2025**

1

**2**          A.    Yes.

3          Q.    Is that an option in this Helm

4    system when you are reviewing that form?

**5**          A.    Yes.

6          Q.    Is there a thumbs up or thumbs

7    down icon?  Any other icons that you could

8    select from?

**9**          A.    It is "approve" or

**10**    "disapprove."

11          Q.    Okay.  So the thumbs down is

12    you disapprove?

**13**          A.    Disapprove.

14          Q.    That is what you submitted;

15    correct?

**16**          A.    Yes.

17               MR. ROMAN:  Object to form.

18               MR. CHAPMAN:  I know you

19          objected, Mr. Roman.  Was there an

20          answer following the objection

21          because I did not hear it?

22               MR. ROMAN:  You can answer

23          Jason, if you know.

**24**          A.    No.  That is correct.  It was

**25**    an "approve" and "disapprove" button and a

**JASON GALIOTO**

**September 18, 2025**

1
2    **disapproval trigger, that downward thumb**
3    **like that.**
4         Q.    Okay.  So, whether it is
5    approved or disapproved, does it then go
6    somewhere else in the Helm System when that
7    occurs?
8         A.    **It is recorded within the**
9    **system.**
10        Q.    All right.
11        A.    **The history.**
12        Q.    It will not get recorded to the
13   history of the system until it is either
14   approved or disapproved?
15        A.    **Correct.  It will live in the**
16   **quote, unquote, "inbox" until you do**
17   **something with it.**
18        Q.    Do you have any understanding
19   of why Mr. Moore did not address this
20   Serious Incident Report?
21        A.    **I cannot speak for him.  That I**
22   **don't know.**
23        Q.    Have you spoken to him at all
24   since he left the company?
25        A.    **No.**

**JASON GALIOTO**

**September 18, 2025**

1

2      Q.    Have you texted with him at all

3   since he left the company?

4      **A.    No.**

5            MR. CHAPMAN:  We'll mark that

6       as "Exhibit 2" to the deposition.

7      Q.    Mr. Galioto, do you know

8   whether the Mackenzie Rose is equipped with

9   a shaft brake?

10     **A.    I don't know.**

11     Q.    Do you know what a "shaft

12  brake" is on a towing vessel?

13     **A.    Yes, I do.**

14     Q.    Do you know if the Mackenzie

15  Rose is equipped with an external camera

16  above the wheelhouse that faces forward?

17     **A.    Can you repeat -- an external**

18  **what?**

19     Q.    Camera.  A camera?

20     **A.    At the time of the incident**

21  **there was no camera.  Post-incident today,**

22  **yes.**

23     Q.    To your understanding, when was

24  the camera installed?

25     **A.    Oh, sometime after January of**