UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

In the Matter of COEYMANS MARINE TOWING, LLC,
d/b/a CARVER MARINE TOWING AS OWNER AND
OPERATOR OF M/T MACKENZIE ROSE, (IMO No. 8968765),
Her Cargo, Engines, Boilers, Tackle, Equipment, Apparel, and App,

Case No.: 2:24cv490

NORFOLK AND PORTSMOUTH BELT LINE
RAILROAD COMPANY,

    Consolidated Plaintiff/Claimant,

v.

JAMES MORRISEY,

    Defendant.

## ORDER

This is an admiralty limitation action arising from an allision that occurred on June 15, 2024, when a barge being pushed by the tug *MACKENZIE ROSE* ("the tug") struck the Norfolk and Portsmouth Belt Line Railroad Company's Main Line Bridge. The tug was owned and operated by Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver"), who filed the underlying action to limit its liability for the allision. Carver alleges that the allision resulted from a navigational error by Mate James Morrissey and that the tug was seaworthy at the time of the incident. Claimant Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") disputes Carver's entitlement to a limitation of its liability, placing at issue the circumstances surrounding the tug's navigation and Carver's responsibility for events leading to the allision.

Presently before the Court is Carver's Motion to Exclude Testimony and Opinions of John S. Poulson and an accompanying memorandum in support. ECF Nos. 96–97. Therein, Carver seeks to exclude Poulson's valuation opinions on the grounds that they are unreliable. Belt Line filed a memorandum in opposition. ECF No. 111. No reply was filed, and the time to do so has expired.

Accordingly, the Motion to Exclude is fully briefed and ripe for disposition. For the reasons explained below, the Motion, ECF No. 96, is **GRANTED**.

## I. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under Rule 702, a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent of the expert must demonstrate it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also United States v. Wilson*, 484 F.3d 267, 274–75 (4th Cir. 2007). Accordingly, the Court is tasked with "a special gatekeeping obligation on the trial judge to ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (cleaned up).

The *reliability* of expert testimony is a "flexible inquiry" that requires the Court to ensure an expert's opinion is "based on scientific, technical, or other specialized *knowledge* and not on

belief or speculation." *Id.* (emphasis in original) (quotation omitted). Trial courts have "broad latitude" to determine "reasonable measure of reliability in a particular case," which can "depend on[] the nature of the issue, the expert's particular expertise, and the subject of [the expert's] testimony." *Id.* (alteration in original) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). The *relevancy* of expert testimony depends on whether the opinion "has a valid scientific connection to the pertinent inquiry" to "ensure that the expert helps the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (internal quotations and citation omitted). Ultimately, if an opinion is not relevant to a fact at issue, it must be excluded. *Id.*

While some experts may proffer "[p]urely scientific testimony . . . characterized by its falsifiability or refutability, or testability," other experts may proffer testimony based on their experience, which does not "rely on anything like the scientific method." *Wilson*, 484 F.3d at 274. In those instances, it is a function of the Court's gatekeeping role to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (quoting *Kumho Tire Co.*, 526 U.S. at 152). Thus, an experiential expert must still "explain how [his] experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *Wilson*, 484 F.3d at 274 (citation and quotation omitted).

As emphasized by the Fourth Circuit, in cases where expert testimony is challenged on relevance or reliability grounds, the district court's gatekeeping function is "indispensable" and "cannot be overstated." *Id.* at 283–84. However, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg.,*

3

*Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013) (per curiam) (unpublished)). "Indeed, *Daubert* itself stressed the importance of the 'conventional devices' of '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' (rather than wholesale exclusion by the trial judge) as 'the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

## II. ANALYSIS

Belt Line proffers John Poulson as its valuation expert, who estimates the market value of the tug as of the date of the allision at four million dollars. ECF No. 97, attach. 2 at 12. Poulson has over fifty years of global marine engineering, surveying, and consulting experience, with twenty-five years spent working in senior management roles. *Id.* at 6. Poulson's work includes overseeing and analyzing technical and financial aspects of major repairs to vessels, including vessel pre-purchase, condition and valuation surveys, capital investment estimates, major repair analysis, and forensic casualty investigations. *Id.* Poulson holds a Master of Science in Maritime Studies, a UK DOT Class One Marine Engineer Competency Certificate, a National Diploma in Marine Engineering, Chartered Engineer and Chartered Marine Engineer status from the UK Engineering Council, and active membership as a Fellow of the Institute of Marine Engineering, Science and Technology. *Id.* at 6–7.

Poulson's expert report provides his valuation of the tug as of the date of the allision as well as his estimated replacement cost. *See id.* at 11–12. Poulson provides three different estimations of the tug's value under three separate approaches: the Comparable Sales Approach, which produced an estimated value of four million dollars; the Replacement Cost Approach, which produced an estimated replacement cost of $4.2 million; and the Generated Income Approach,

which produced an estimated value of $4.4 million. *Id.* at 11. Based on his application of all three approaches, Poulson concludes that the estimated market value of the tug as of the date of the allision was four million dollars. *Id.* at 12. Poulson also states that he disagrees with the estimated value produced by Carver's valuation expert, Jason Meyerrose, and that the Meyerrose expert report on the tug's valuation "does not elaborate on the methodology applied to the provision of the values rendered."[1] *Id.*

Carver's Motion seeks to exclude Poulson's valuation opinions first on the ground that Poulson's comparable sales methodology is flawed and his valuation is therefore unreliable. ECF No. 97 at 4. Carver argues that Poulson did not employ the comparable sales method that is widely accepted under admiralty law and *Daubert* principles. *Id.* at 4–5. Under governing law, valuations must be made based on the fair market value—the price a willing seller is prepared to accept and the price a willing buyer is prepared to offer when both are fully apprised of the circumstances—unless such sales information is not available. *Id.* at 5 (citing *United States v. Cartwright*, 411 U.S. 546, 551 (1973)). Rather than using the actual sale prices of comparables, Poulson used "only seller's offer prices of similar vessels." *Id.* Carver maintains that because offer prices do not determine a vessel's fair market value under the generally employed standard, Poulson's opinions and four-million-dollar valuation of the tug should be excluded. *Id.*

Carver further challenges Poulson's other methodologies as unreliable because they are based on his flawed comparable sales methodology. *Id.* Carver argues that because Poulson's four-million-dollar valuation is unreliable due to his flawed methodology, any "confirmatory" opinions using Poulson's other stated methodologies are inherently unreliable, as well. *Id.* Carver maintains that Poulson's alternative methodologies are also inappropriately utilized in his report,

---

[1] Meyerrose's expert report is the subject of Belt Line's motion in limine, ECF No. 137.

as those methodologies are "only utilized in admiralty actions where the comparable sales methodology cannot reliably be used due to insufficient market data." *Id.* at 6. Because Poulson has not shown that there was insufficient market data for him to employ the "genuine" comparable sales methodology, his reliance on these speculative alternative methods only compounds his methodological error and warrants exclusion of his opinions. *Id.*

Belt Line argues in response that Poulson's valuations are admissible because they are based on the same types of data and methodologies routinely relied upon by experts in his field. ECF No. 11 at 2–3. According to Belt Line, precise pricing information is difficult to obtain because there is "no public database" with precise sale prices for boats. *Id.* at 3. As a result, experts are forced to rely on sellers' offer figures, which are publicly available and which provide a "close approximation of the fair market value of vessels." *Id.* In this market reality, Belt Line argues, Poulson's comparable sales valuation reflects accepted industry custom rather than methodological defects. *Id.* Belt Line further contends that, even if the Court were to find some deficiency in Poulson's fair-market-value analysis, his alternative methodologies provide independent, reliable bases for his opinions, such that any alleged flaws go to weight rather than admissibility. *Id.* at 4.

The Court finds that Poulson's methodology for valuing the tug is not reliable because it failed to properly apply the governing fair market value standard. Under *Standard Oil Co. of New Jersey v. Southern Pacific Co.*, 268 U.S. 146 (1925)—later applied in *F.C. Wheat Maritime Corp. v. United States*, 663 F.3d 714 (4th Cir. 2011)—fair market value must be used to value a vessel unless the information required for such a valuation is unavailable (that is, the price a willing buy would pay and a willing seller would accept). Critically, fair market value involves the sale price, *not* the asking price, of a vessel. Here, Poulson relied only on the asking price rather than the

6

actual sales price in valuing the tug's fair market value. Poulson's decision not to rely on the sales price departs from the governing legal standard behind vessel valuations and undermines the reliability of his opinions.

Importantly, the actual sales price *was* available to Poulson on a source which he admitted he was familiar with but did not seek out. During his deposition, Poulson acknowledged that such information existed but that he had not visited those publications that provided final sale prices, despite recognizing its relevance. *See* ECF No. 97, attach. 3 at 44:5–45:6 (answering at one point, "I've not gone there," when asked if there were publications that provided sales price information). As Carver correctly notes, where fair market value data is available but ignored, an expert may not bypass the required valuation method and substitute alternative approaches. *See* ECF No. 97 at 6. The fact that actual sales price information was available to Poulson from a source he was familiar with compounds the unreliability of his methodology. The Court concludes that his valuation opinions must therefore be excluded.

### III. CONCLUSION

For the reasons explained above, Carver's Motion to Exclude Testimony and Opinions of Robert Furborough, ECF No. 96, is **GRANTED**.

The Clerk is **DIRECTED** to forward a copy of this Order to all counsel of record.

It is so **ORDERED**.

_____
Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
February 6, 2026