UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

In the Matter of COEYMANS MARINE TOWING, LLC,
*d/b/a* CARVER MARINE TOWING AS OWNER AND
OPERATOR OF M/T MACKENZIE ROSE, (IMO No. 8968765),
Her Cargo, Engines, Boilers, Tackle, Equipment, Apparel, and App,

Case No.: 2:24cv490

NORFOLK AND PORTSMOUTH BELT LINE
RAILROAD COMPANY,

    Consolidated Plaintiff/Claimant,

v.

JAMES MORRISEY,

    Defendant.

## ORDER

This is an admiralty limitation action arising from an allision that occurred on June 15, 2024, when a barge being pushed by the tug *MACKENZIE ROSE* ("the tug") struck the Norfolk and Portsmouth Belt Line Railroad Company's Main Line Bridge. The tug was owned and operated by Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver"), who filed the underlying action to limit its liability for the allision. Carver alleges that the allision resulted from a navigational error by Mate James Morrissey and that the tug was seaworthy at the time of the incident. Claimant Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") disputes Carver's entitlement to a limitation of its liability, placing at issue the circumstances surrounding the tug's navigation and Carver's responsibility for events leading to the allision.

Presently before the Court is Belt Line's Fourth Motion in Limine to Exclude Testimony and Opinions of Jason R. Meyerrose and an accompanying memorandum in support. ECF Nos. 137–38. Therein, Belt Line seeks to exclude Meyerrose's valuation opinion on the grounds that it is unreliable. Carver filed a memorandum in opposition, ECF No. 156, and Belt Line filed its reply, ECF No. 163.

Accordingly, the Motion in Limine is fully briefed and ripe for disposition. For the reasons explained below, the Motion, ECF No. 137, is **GRANTED**.

## I. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under Rule 702, a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent of the expert must demonstrate it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also United States v. Wilson*, 484 F.3d 267, 274–75 (4th Cir. 2007). Accordingly, the Court is tasked with "a special gatekeeping obligation on the trial judge to ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (cleaned up).

The *reliability* of expert testimony is a "flexible inquiry" that requires the Court to ensure an expert's opinion is "based on scientific, technical, or other specialized *knowledge* and not on

2

belief or speculation." *Id.* (emphasis in original) (quotation omitted). Trial courts have "broad latitude" to determine "reasonable measure of reliability in a particular case," which can "depend on[] the nature of the issue, the expert's particular expertise, and the subject of [the expert's] testimony." *Id.* (alteration in original) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). The *relevancy* of expert testimony depends on whether the opinion "has a valid scientific connection to the pertinent inquiry" to "ensure that the expert helps the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (internal quotations and citation omitted). Ultimately, if an opinion is not relevant to a fact at issue, it must be excluded. *Id.*

While some experts may proffer "[p]urely scientific testimony . . . characterized by its falsifiability or refutability, or testability," other experts may proffer testimony based on their experience, which does not "rely on anything like the scientific method." *Wilson*, 484 F.3d at 274. In those instances, it is a function of the Court's gatekeeping role to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (quoting *Kumho Tire Co.*, 526 U.S. at 152). Thus, an experiential expert must still "explain how [his] experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *Wilson*, 484 F.3d at 274 (citation and quotation omitted).

As emphasized by the Fourth Circuit, in cases where expert testimony is challenged on relevance or reliability grounds, the district court's gatekeeping function is "indispensable" and "cannot be overstated." *Id.* at 283–84. However, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg.,*

3

*Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013) (per curiam) (unpublished)). "Indeed, *Daubert* itself stressed the importance of the 'conventional devices' of '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' (rather than wholesale exclusion by the trial judge) as 'the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

## II. ANALYSIS

Carver proffers Jason R. Meyerrose as its valuation expert, who estimates the value of the tug as of the date of the allision at $2.25 to $2.5 million. ECF No. 138, attach. 1 at 9. Meyerrose has over twenty years of experience in marine surveying, beginning as an apprentice marine surveyor and most recently as Principal Marine Surveyor, majority owner, and President of MEYERROSE AND CO., INC. ECF No. 163, attach. 2, at 1. Meyerrose specializes in on/off hire and trip-in-tow inspection surveys, condition and valuation surveys, and appraisal and sale/purchase inspection surveys. *Id.* Meyerrose holds a Bachelor of Arts in Business Administration and is ABYC certified in Marine Accidents/Collision Investigation. *Id.* at 2.

On June 25, 2024, ten days after the allision, Meyerrose surveyed the tug and subsequently issued an expert report on July 7, 2024, setting forth his valuation of the tug as of the date of the allision as well as its estimated replacement value. ECF No. 138, attach. 1 at 9. The report describes various aspects of the tug factoring into Meyerrose's valuation, such as its particulars, equipment, accommodations, machinery and systems, and overall condition. *Id.* at 3–9. Meyerrose concludes that, based on a "general examination of the subject vessel and machinery while afloat," the tug is in "satisfactory condition for operation, as well as for intended tug services." *Id.* at 9. He also concludes with his estimations of the tug's current fair market value

($2.25 to $2.5 million) and replacement value ($9 million), as well as a recommendation to "[m]aintain the necessary safety, life saving and fire-fighting gear and equipment, with up to date tags and servicing at all times." *Id.*

On July 29, 2024, Meyerrose completed an Affidavit of Valuation providing his fair market valuation of the tug. ECF No. 3, attach. 1. In the Affidavit, Meyerrose concluded that the tug's "maximum fair market value" as of the date of the allision was $2.5 million. *Id.* at 7. A year later, on August 28, 2025, Meyerrose provided a rebuttal report to the opinions of Belt Line's valuation expert, John Poulson. *See* ECF No. 138, attach. 2. In this rebuttal report, Meyerrose explained how he arrived at his initial valuation, noting that, as of the date of the allision, the tug's value was $2.5 million based on the "last true sales price of the vessel," Meyerrose's 2018 survey valuing the tug at $3 million, Meyerrose's review done for the survey in 2024, websites containing comparable vessel sale values, and Meyerrose's company's "knowledge and experience in the industry." *Id.* at 4.

Belt Line's Motion seeks to exclude Meyerrose's valuations on two grounds. First, Belt Line argues that Meyerrose provided no methodology as to how he arrived at the estimated current value ($2.25 to $2.5 million), in violation of Federal Rule of Civil procedure 26(a)(2)(B). ECF No. 138 at 2–3. Belt Line argues that Meyerrose was required to use the fair market value approach when determining the tug's value, and that other methods are available where the market value is not ascertainable. *Id.* at 3. However, Meyerrose did not use any accepted method of valuation as he provided neither "the basis and reasons for his valuation opinion" nor "any data he may have considered" in his report, such as any "testing, supporting literature, [or] peer reviewed publication." *Id.* at 3–4. Belt Line maintains that because Meyerrose failed to disclose which

5

valuation method he used, his opinion is "impossible for the Belt Line to evaluate" and should therefore be excluded as unreliable under Rule 702. *Id.* at 5.

Second, Belt Line argues that Meyerrose's rebuttal report—provided a year later—does not cure the deficiencies in his original report. *Id.* at 6. Belt Line further argues that the rebuttal report should be excluded as untimely because it was submitted one month after the Rule 26(a)(2)(B) disclosure deadline. *Id.* According to Belt Line, the rebuttal report remains insufficient under Federal Rule of Evidence 702 because it still does not explain the methodology Meyerrose used to arrive at his valuations. *Id.* Rather than addressing that deficiency, the rebuttal report relies on information that was available but omitted at the time of his original disclosure, which warrants its exclusion. *Id.* at 7.

In response, Carver argues that Meyerrose's expert opinion is admissible because his Affidavit of Valuation[1] and initial and rebuttal reports comply with both Federal Rule of Civil Procedure 26(a)(2)(B) and Federal Rule of Evidence 702. ECF No. 156 at 1–2. Carver notes that Meyerrose's Affidavit of Valuation—overlooked by Belt Line—was filed on August 8, 2024, to establish the bond for the limitation action, and that it was expressly referenced in Carver's Rule 26 disclosures served on June 5, 2025. *Id.* at 2–3. Carver further asserts that it produced Meyerrose's entire file as part of its disclosures, which contained "supporting data" underlying his opinions. *Id.* at 3 n.2, 6. According to Carver, the rebuttal report directly addressed Poulson and "elaborated on the basis for Mr. Meyerrose's fair market value method of valuation." *Id.* at 4.

---

[1] The affidavit avers Meyerrose did a fair market value assessment. ECF No. 3, attach. 1 at 7 ("After examining the vessel, I compared it to the fair market value for vessels of similar size and characteristics, in order to determine the fair market value of the M/T MACKENZIE ROSE."). However, Meyerrose's rebuttal report filed one year later seems to indicate that no fair market value assessment was possible because the tug was one-of-a-kind. *See* ECF No. 138, attach. 2 at 4 ("Overall item 6 is mostly filler material, assumes showing comparisons when IN FACT there is no other vessel comparable to the one off built 'MACKENZIE ROSE.'" (capitalization in original)).

6

Carver further argues that Meyerrose's expert testimony is grounded in his specialized industry knowledge developed over many years as well as relevant data from surveying comparable vessels, including the number of surveys he has performed. *Id.* at 10. Finally, Carver argues that even if any submissions were untimely, exclusion is unwarranted because Belt Line chose not to depose Meyerrose and has not suffered any resulting prejudice. *Id.* at 11–12.

In its reply, Belt Line rebuts Carver's claims that Meyerrose used a fair market value methodology and that no comparable sales were available for valuation, assertions Carver relied on to justify Meyerrose's valuation based on specialized industry knowledge. ECF No. 163 at 1–2. Belt Line argues that these claims are not only contradictory but that Meyerrose's rebuttal report does not constitute a real disclosure at all. *Id.* at 2. Belt Line asserts that Meyerrose's Affidavit of Valuation included a valuation range without citing any basis for the number or data considered to reach it. *Id.* at 7. Belt Line further argues that the "file" Meyerrose apparently relied on and Carver produced is simply Meyerrose's rebuttal report. *Id.* at 5. Thus, Belt Line argues, the affidavit, report, and rebuttal report are not a "single report" as required by Federal Rule of Civil Procedure 26(a)(2)(B). *Id.* at 6. Even if Carver's "piecemeal approach" to their Rule 26 disclosures was permissible, Belt Line argues, they still do not disclose Meyerrose's methodologies and data as required. *Id.* Because of these deficiencies, Belt Line argues Meyerrose's opinion should be excluded as unreliable under Rule 702.

Meyerrose's methodology for valuing the tug is not reliable because it failed to properly apply the governing fair market value standard. Under *Standard Oil Co. of New Jersey v. Southern Pacific Co.*, 268 U.S. 146 (1925)—later applied in *F.C. Wheat Maritime Corp. v. United States*, 663 F.3d 714 (4th Cir. 2011)—fair market value must be used to value a vessel unless the information required for such a valuation is unavailable. Belt Line is therefore correct that an

expert who claims to rely on fair market value must explain how that value was determined and what market data supports it. Here, Meyerrose's opinions are internally inconsistent: in his 2024 Affidavit of Valuation, Meyerrose stated that he used a fair market value approach, ECF No. 3, attach. 1 at 7, yet one year later in his rebuttal report, he asserted that the tug was unique—a "one off"—and that fair market value could therefore not be analyzed, ECF No. 138, attach. 2 at 4. Additionally, Carver asserts that Meyerrose relied on his industry knowledge, yet nothing in his report reflects what he relied on or how he reached his specific valuation. This shift is particularly problematic given that Belt Line's valuation expert, John Poulson, stated that comparable sales figures existed, despite choosing not to analyze them. *See* ECF No. 97, attach. 3 at 44:5–45:6 (acknowledging that actual sales price information was available from a source he was familiar with).

Carver's argument that Meyerrose's valuation is admissible because it is grounded in his industry experience does not cure these deficiencies. Rule 702 requires more than a conclusory assertion of expertise: it requires a reliable methodology and a clear application of that methodology to the facts. Here, Meyerrose's reliance on unspecified "industry knowledge," without identifying relevant data sources or analytical steps, provides no basis for the Court to assess reliability. Because Meyerrose's valuation opinion lacks a discernible methodology, it is unreliable under Rule 702. In light of this, the Court need not reach Belt Line's alternative arguments regarding the timeliness of the disclosures or the propriety of multiple expert submissions under Rule 26.

### III. CONCLUSION

For the reasons explained above, Belt Line's Fourth Motion in Limine to Exclude Testimony and Opinions of Jason R. Meyerrose, ECF No. 137, is **GRANTED**.

The Clerk is **DIRECTED** to forward a copy of this Order to all counsel of record.

It is so **ORDERED**.

                                                                            Lawrence R. Leonard  
                                                                            United States Magistrate Judge

Norfolk, Virginia  
February 6, 2026