UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

In the Matter of COEYMANS MARINE TOWING, LLC,
*d/b/a* CARVER MARINE TOWING AS OWNER AND
OPERATOR OF M/T MACKENZIE ROSE, (IMO No. 8968765),
Her Cargo, Engines, Boilers, Tackle, Equipment, Apparel, and App,

Case No.: 2:24cv490

NORFOLK AND PORTSMOUTH BELT LINE
RAILROAD COMPANY,

      Consolidated Plaintiff/Claimant,

v.

JAMES MORRISEY,

      Defendant.

## ORDER

This is an admiralty limitation action arising from an allision that occurred on June 15, 2024, when a barge being pushed by the M/T Mackenzie Rose ("the tug") struck the Norfolk and Portsmouth Belt Line Railroad Company's Main Line Bridge. The tug was owned and operated by Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver"), who filed the underlying action to limit its liability for the allision. Carver alleges that the allision resulted from a navigational error by Mate Morrissey and that the tug was seaworthy at the time of the incident. Claimant Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") disputes Carver's entitlement to a limitation of its liability, placing at issue the circumstances surrounding the tug's navigation and Carver's responsibility for events leading to the allision.

Presently before the Court is Carver's Motion to Exclude Testimony and Opinions of Captain Nicholas J. Lewis and an accompanying memorandum in support. ECF Nos. 92–93. Therein, Carver seeks to exclude fourteen of Lewis's fifteen opinions[1] on the grounds that they are unreliable or irrelevant. Belt Line filed a memorandum in opposition, ECF No. 105, and Carver filed its reply, ECF No. 118.

Accordingly, the Motion to Exclude is fully briefed and ripe for disposition. For the reasons explained below, the Motion, ECF No. 92, is **GRANTED IN PART** and **DENIED IN PART**.

## I. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under Rule 702, a witness may be qualified as an expert by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The proponent of the expert must demonstrate it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also United States v. Wilson*, 484 F.3d 267, 274–75 (4th Cir. 2007). Accordingly, the Court is tasked with "a special gatekeeping obligation on the trial judge to ensure

---

[1] Carver does not object to Opinion 4, which faults Mate Morrissey for the allision due to his navigational error. *See* ECF No. 93, attach. 2 at 13 ("4. The Officer of the Watch (Captain James Morrissey) failed to properly disengage the autopilot and did not switch to manual steering (Non-Follow-Up mode) in a confined navigational channel, resulting in loss of directional control.").

that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (cleaned up).

The *reliability* of expert testimony is a "flexible inquiry" that requires the Court to ensure an expert's opinion is "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id.* (emphasis in original) (quotation omitted). Trial courts have "broad latitude" to determine "reasonable measure of reliability in a particular case," which can "depend on[] the nature of the issue, the expert's particular expertise, and the subject of [the expert's] testimony." *Id.* (alteration in original) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). The *relevancy* of expert testimony depends on whether the opinion "has a valid scientific connection to the pertinent inquiry" to "ensure that the expert helps the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (internal quotations and citation omitted). Ultimately, if an opinion is not relevant to a fact at issue, it must be excluded. *Id.*

While some experts may proffer "[p]urely scientific testimony . . . characterized by its falsifiability or refutability, or testability," other experts may proffer testimony based on their experience, which does not "rely on anything like the scientific method." *Wilson*, 484 F.3d at 274. In those instances, it is a function of the Court's gatekeeping role to "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001) (quoting *Kumho Tire Co.*, 526 U.S. at 152). Thus, an experiential expert must still "explain how [his] experience leads to the conclusion reached, why his experience is a sufficient basis for the opinion, and how his experience is reliably applied to the facts." *Wilson*, 484 F.3d at 274 (citation and quotation omitted).

3

As emphasized by the Fourth Circuit, in cases where expert testimony is challenged on relevance or reliability grounds, the district court's gatekeeping function is "indispensable" and "cannot be overstated." *Id.* at 283–84. However, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 631 (4th Cir. 2018) (quoting *United States v. Stanley*, 533 F. App'x 325, 327 (4th Cir. 2013) (per curiam) (unpublished)). "Indeed, *Daubert* itself stressed the importance of the 'conventional devices' of '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' (rather than wholesale exclusion by the trial judge) as 'the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 596).

## II. ANALYSIS

Belt Line proffers Captain Nicholas J. Lewis as a maritime expert to "determine if the actions/inactions of the Captain aboard the Tug Mackenzie Rose and the owners of the tug, [Carver], created unreasonably dangerous conditions that caused the allision with the Bridge." ECF No. 93, attach. 2 at 2. Furborough is a retired, licensed U.S. Coast Guard Master of Steam and Motor Vessels and has been a Captain for over twenty-five years on "tug and barge ocean-going units." *Id.* As a Captain, Lewis is experienced in the "safe navigation" of vessels, ensuring "vessel maintenance schedules" are up to date, and various other aspects of operating a vessel. *Id.*

Lewis's expert report provides fifteen opinions regarding the "several navigational, procedural, and managerial failures" that led to the June 15, 2024, allision. *Id.* at 6; *see id.* at 13–14. Carver's Motion seeks to exclude fourteen opinions on reliability and relevancy grounds. The Court addresses the opinions below.

### A. Opinions 5–7, 9, & 10

Lewis's fifth, sixth, seventh, ninth, and tenth opinions address proscriptions against using autopilot on inland waterways and Carver's lack of such proscriptions in its policies:

> 5. The company TSMS (Tug Safety Management System) lacked policy guidance prohibiting autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion.
>
> 6. The use of autopilot in a narrow inland waterway while approaching a fixed railroad bridge was in direct contradiction to established safe seamanship practices and warnings in the Simrad AP70MK2 Autopilot Manual.
>
> 7. Carver deprived the Norfolk and Portsmouth Belt Line Railroad Company protections afforded by the autopilot manufacturer which created unseaworthy conditions aboard the Mackenzie Rose and was a cause of the allision.
>
> [. . .]
>
> 9. The company TSMS (Tug Safety Management System) did not prohibit autopilot use in confined waterways or near critical infrastructure, leaving the decision entirely to operator discretion.
>
> 10. Carver gave no official training to its operators with regard to how to safely transit a waterway when approaching a bridge, when a proper lookout should be posted, and had no restrictions on the use of autopilot.

ECF No. 93, attach. 2 at 13–14. Carver argues that government or industry standards regarding the subject at issue are not applicable in this circumstance and, as a result, Lewis's opinions rest on his ipse dixit. ECF No. 93 at 7–8. According to Carver, because there is no controlling government or industry standard applicable to these circumstances, Lewis lacks a proper foundation for his conclusions and his opinions are therefore unreliable and irrelevant. *Id.* at 9.

In response, Belt Line argues that Lewis's opinions are sufficiently reliable because they are based on multiple sources, including the Simrad autopilot manual, the Code of Federal Regulations, documents on Carver's Tug Safety Management System, discovery documents, and Lewis's own industry experience. ECF No. 105 at 7–8. Belt Line further argues that Carver

improperly construes Lewis's experience too narrowly, and that Lewis clearly applied his background, training, experience, and specialized knowledge during his review of these documents and in rendering his opinions. *Id.* at 8–9. Belt Line also argues that Lewis's opinions are not speculative but rather relevant to Carver's privity and knowledge of the tug's seaworthiness given that his opinions highlight "deficiencies in Carver's own policies and procedures." *Id.* at 9.

In its reply, Carver maintains that the Code of Federal Regulations does not apply to the circumstances of the allision, that the autopilot manual does not establish an industry standard, and that Carver's internal policies comply with the relevant regulatory requirements. ECF No. 118 at 1–2. Carver therefore reiterates its position that these opinions are based solely on a manufacturer's manual and Lewis's ipse dixit, thereby rendering them unreliable and irrelevant. *Id.* at 2.

Here, Carver too narrowly construes Lewis's experience and expertise in arguing that his opinions are unreliable. Lewis is entitled to rely on applicable regulations and the autopilot manufacturer's manual to explain why the autopilot should never have been used under the circumstances presented here and why Carver was responsible for failing to provide proper training and instruction to its crew. These sources collectively provide a reliable basis for Lewis's conclusions regarding crew competence and tug operation.

In essence, Lewis opines that, given the governing regulations, internal rules, and the clear limitations set forth in the autopilot manual, Carver should have had a policy prohibiting the use of autopilot on a narrow inland waterway. That opinion does not reflect speculation or an impermissible legal conclusion but rather an application of industry standards and manufacturer guidance to the facts of this case. From that premise, Lewis concludes that Carver's failure to

maintain such a policy resulted in inadequate crew training on safe navigation practices, a deficiency that contributed to the allision.

However, Lewis's seventh opinion differs from the others by invoking an impermissible legal conclusion: that Carver's conduct "created unseaworthy conditions aboard the Mackenzie Rose." Here, Lewis uses a term that carries a specialized legal meaning under general maritime law and directly addresses an ultimate legal issue reserved for the trier of fact. For the reasons stated *infra* in the Court's discussion of impermissible legal conclusions in Lewis's fourteenth and fifteenth opinions, Lewis's seventh opinion is inadmissible to the extent it characterizes the vessel's condition as "unseaworthy."

Accordingly, Lewis's fifth, sixth, ninth, and tenth opinions satisfy the requirements of Rule 702 and are admissible. Lewis's seventh opinion is excluded for the reasons explained *infra*.

### B. Opinion 8

Carver next challenges Lewis's eighth opinion as unreliable, unhelpful, irrelevant, and a common-sense opinion. ECF No. 93 at 9. In his eighth opinion, Lewis concludes that "[n]o lookout was posted in violation of 33 C.F.R. § 83.05 (Rule 5 – Look-out), a critical error during confined water navigation in daylight while pushing ahead a barge." ECF No. 93, attach. 2 at 14. Carver argues that this opinion is unreliable because Lewis relied on a section of the Code of Federal Regulations that is silent on "posting" a lookout and instead is only applicable to oil tankers. ECF No. 93 at 9. Carver also contends that the fact that failure to maintain a proper lookout—specifically, Mate Morrissey's failure to keep a lookout before striking the Bridge—does not bear on Carver's liability in an action brought under the Limitation Act. *Id.* at 9–10. Carver concludes that because expert testimony is not necessary to determine whether Mate

Morrissey failed to keep a proper lookout, Lewis's eighth opinion is irrelevant for the fact finder. *Id.* at 10.

In response, Belt Line argues that Lewis's opinion that Carver failed to keep a proper lookout is relevant and is the proper subject of expert testimony. ECF No. 105 at 10. Belt Line contends that not only is Lewis's opinion reliable because he bases it on his "education, training, background, and specialized knowledge as a licensed captain on tug and barge ocean-going units" but it is also relevant in addressing Carver's knowledge and privity of unseaworthiness because Carver "abdicated to Mate Morrissey complete discretion on the use of a lookout." *Id.* at 10. Belt Line refutes that Lewis's opinion is common-sense, as Lewis relies on his "highly specialized" expertise as a licensed tug captain to opine on the requirements for posting a proper lookout. *Id.* at 11.

In its reply, Carver contends that the fact finder does not need Lewis's common-sense opinion to determine if Mate Morrissey failed to keep a proper lookout, and that Lewis relies on an oil tanker regulation that is inapplicable to the circumstances here. ECF No. 118 at 4.

While Belt Line does not rebut Carver's argument that the regulation Lewis relies on (Rule 5) pertains to oil tankers, Lewis can nonetheless rely on his broad experience operating tugs to opine that a lookout should be posted whenever traversing narrow waterways and bridges. As Lewis described during his deposition, "the rule five lookout rule is just a minimum." ECF No. 93, attach. 1 at 55:23–55:24. Lewis's opinion is therefore not a common-sense observation but rather a judgment based on his specialized maritime experience and industry practice regarding safe navigation in narrow inland waterways. Lewis's testimony is relevant in assisting the fact finder in understanding when a proper lookout is required and how Carver's failure to provide one bears on its liability. Accordingly, Lewis's eighth opinion is admissible.

8

### C. Opinions 1–3, 11, & 12

Lewis's first, second, third, eleventh, and twelfth opinions address the facts of the accident and inconsistent post-accident reporting:

> 1. The unit made direct contact with the bridge, causing visible structural movement (as evidenced by surveillance video), which is contrary to crew statements of "no damage" or "minor impact."
>
> 2. The unit deviated outside the navigational channel without cause and continued forward at approximately 5.2 knots toward a fixed portion of the Norfolk and Portsmouth Belt Line Railroad Bridge.
>
> 3. The deck logbook entry was inaccurate and misleading, stating the Unit had maneuvered onto fendering and away from the Bridge when in fact it struck the fixed western structure directly.
>
> [. . .]
>
> 11. The Coast Guard was not promptly notified of the allision, in violation of 46 C.F.R. § 4.05-1. This delayed official investigation and post-incident drug and alcohol testing. [sic] and created potentially dangerous conditions for the Norfolk and Portsmouth Belt Line Railroad Company and the public at large.
>
> 12. Post-incident accounts from multiple crew members were inconsistent, with discrepancies in timing, actions taken, and observations.

ECF No. 93, attach. 2 at 13–14. Carver argues that these opinions are irrelevant because they are merely Lewis's commentary on and observations of the factual record, which the fact finder can do on its own. ECF No. 93 at 11. Carver specifically argues that Lewis's first, second, third, and eleventh opinions should be excluded because they allege that Carver's crew made "misleading" and "inaccurate" statements that "created potentially dangerous conditions," thereby providing improper and inflammatory commentary rather than relevant expert testimony. *Id.* Furthermore, Carver argues that Lewis's twelfth opinion—addressing Carver's allegedly "inconsistent" post-incident reporting—is irrelevant to determining the cause of the allision or issues of privity and knowledge and should thus be excluded on that basis. *Id.*

9

In response, Belt Line argues that Lewis's first, second, third, and twelfth opinions address whether Carver had knowledge and privity of the tug's unseaworthiness prior to or at the time of the allision, a key issue in a case brought as a limitation action. ECF No. 105 at 11. Specifically, Belt Line argues that these opinions are relevant because they provide the basis for finding that the tug's crew was not properly trained and that, thus, the tug was unseaworthy. *Id.* Belt Line also argues that Lewis's eleventh opinion should not be excluded because it relies on Lewis's marine industry expertise to explain 46 C.F.R. § 4.05-1 and how Carver's failure to report the allision prevented an immediate Coast Guard investigation, thereby bearing directly on the tug's seaworthiness and Carver's privity and knowledge. *Id.* at 12–13.

In its reply, Carver asserts that Lewis's opinions are ipse dixit and that commentary on facts surrounding the allision—such as the tug's speed and whether it deviated from the navigational channel—is unnecessary to determining the factual issues in this case. ECF No. 118 at 3. Instead, Carver asserts that Lewis's commentary does not add anything new because Carver has produced Rose Point navigational data showing the tug's speed and direction on the day of the allision. *Id.*

Here, Lewis does not merely recite evidence but instead synthesizes navigational data, records, regulatory requirements, and crew statements to conclude that the crew was not properly trained and that, thus, Carver management was a cause of the allision. This analysis is precisely the role of an expert witness and is beyond the common knowledge of a lay juror: by emphasizing facts that support his conclusions, Lewis offers expert insight that can assist jurors instead of supplanting their opinions. Accordingly, Lewis's first, second, third, eleventh, and twelfth opinions are admissible.

### D. Opinions 13–15

The final opinions that Carver challenges are opinions thirteen, fourteen, and fifteen. These opinions address Carver's failures to repair the tug's autopilot and prohibit its use on inland waters, and how these failures created an unseaworthy condition such that Carver should never have permitted the tug to sail:

> 13. By not having the autopilot repaired and not restricting the use of the autopilot, Carver management was a cause of the allision with the NPBL Bridge.
>
> 14. These failures – navigational, procedural, and managerial – singularly or in combination, created an unreasonably dangerous and unseaworthy conditions, that violated well established standards of safe marine practice, and were causes of this allision incident.
>
> 15. In my opinion, given the lack of training to the crew, the lack of policies and procedures regarding use of an autopilot or lookout during bridge transits, the known issues with the autopilot, and Captain Morrissey's prior allision, the Tug Mackenzie Rose was unseaworthy. Carver should not have allowed this Tug to sail with this crew.

ECF No. 93, attach. 2 at 14. Carver argues that these opinions are too speculative and conclusory to be admissible. ECF No. 93 at 11. Specifically, Lewis's thirteenth opinion is unsupported speculation because Lewis admitted there was no autopilot "hard over" event on the day of the allision that contributed to the allision and no facts suggesting autopilot failure. *Id.* Carver also contends that Lewis's fourteenth and fifteenth opinions amount to "conclusory summarizations" and should be excluded with his thirteenth opinion. *Id.* at 12.

In response, Belt Line argues that Lewis's opinions are firmly supported by the facts he cited previously. ECF No. 105 at 13–14. Belt Line contends that Lewis identifies specific failures—Carver's failure to repair the autopilot, its failure to maintain a policy prohibiting autopilot use on inland waters despite two unrepaired failures in the preceding month, and its failure to require a lookout under the circumstances—and explains, based on his maritime

11

expertise, how these deficiencies rendered the vessel unseaworthy. *Id.* at 14. Belt Line concludes that because these opinions synthesize established facts and apply Lewis's expertise, they are reliable and not speculative ultimate opinions. *Id.*

In its reply, Carver maintains that there is no evidence that a defective autopilot caused the tug to veer hard left and strike the bridge, rendering Lewis's opinions unsupported speculation. ECF No. 118 at 5. Carver further argues that the "ultimate opinions" that Lewis intends to offer fail for the same reasons as the underlying opinions (Opinions 1–3 and 5–12), namely that they are unsupported by admissible standards or evidence and therefore should be excluded. *Id.*

While Federal Rule of Evidence 704 permits expert testimony that embraces an ultimate issue of fact, it does not allow an expert to apply law to facts to reach an ultimate legal conclusion. *See United States v. Melvin*, 508 F. App'x 209, 211 (4th Cir. 2013). Courts determine whether expert testimony crosses this line by examining whether the opinion "tracks the language of the legal principle at issue" and whether the terms used have a "separate, distinct and specialized meaning in the law." *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) (internal quotation omitted) (quoting *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985)). If so, the testimony constitutes a legal conclusion and must be excluded.

Here, Lewis's fourteenth and fifteenth opinions track the precise legal standard at issue in this case: whether the tug was seaworthy. Under maritime law, "seaworthiness" is a term of art with a specialized legal meaning, namely whether a vessel is reasonably fit for its intended use. *See Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549 (1960). Lewis not only describes unsafe conditions or operational deficiencies, but he goes a step further and expressly concludes that those conditions rendered the tug "unseaworthy." Opinions concluding the tug's seaworthiness directly answer the ultimate legal question the fact finder must decide. Accordingly, Lewis may not testify

that the tug was unseaworthy or that Carver's conduct created an unseaworthy condition. Such testimony constitutes an impermissible legal conclusion and risks usurping the fact finder's role in coming to those conclusions itself. *See Newill v. Campbell Transp. Co.*, 2015 WL 222332, No. 2:12-cv-1344, at *2 (W.D. Pa. Jan. 14, 2015) (excluding expert testimony that a vessel was seaworthy because it "crosses the line into an impermissible legal conclusion"); *Shawler v. Ergon Asphalt & Emulsions, Inc.*, 2016 WL 1019121, Civil Action No. 15-2599, at *11 n.42 (E.D. La. Mar. 15, 2016) (noting that an expert opinion on the seaworthiness of the vessel was inadmissible in part because it constituted a legal conclusion); *President of India By and Through Director of India Supply Mission v. W. Coast Steamship Co.*, 213 F. Supp. 352, 357 (excluding expert testimony on a vessel's seaworthiness for "touch[ing] on the very issue to be decided by the Court").

This ruling does not preclude Lewis from testifying about factual matters or Carver's practices that are relevant to seaworthiness. He may describe the condition of the autopilot, the absence of Carver's policies or crew training, customary safety practices, and how those factors affect vessel operations. With carefully worded questions that avoid reciting the governing legal standard, such testimony may assist the fact finder without constituting legal conclusions. *See Newill*, 2015 WL 222332, at *2 ("The Court notes, however, that information on the issue of seaworthiness could be elicited from Smith at trial through carefully worded questions that do not mimic the relevant legal principles and, thus, do not call for legal conclusions.").

For these reasons, Lewis's fourteenth and fifteenth opinions are excluded to the extent they opine that the tug was unseaworthy or that Carver's conduct rendered it unseaworthy but otherwise are admissible.

## III. CONCLUSION

For the reasons explained above, Carver's Motion to Exclude Testimony and Opinions of Captain Nicholas J. Lewis, ECF No. 92, is **GRANTED IN PART** and **DENIED IN PART**.

The Clerk is **DIRECTED** to forward a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/ Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
February 6, 2026