## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**
**In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

## FINAL PRETRIAL ORDER

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line"), Evanston Insurance Company ("Evanston"), and Coeymans Marine Towing, LLC D/B/A Carver Marine Towing ("Carver") submit the following proposed Final Pretrial Order pursuant to the Court's Order (ECF 128), the Federal Rules of Civil Procedure, and the Local Rules of this Court. The Parties have stipulated as to various matters identified herein, and have identified the following exhibits, witnesses, factual contentions, and triable issues.

It is thus ORDERED as follows:

### I.    STIPULATION OF UNDISPUTED FACTS

1.    This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure for claimed property damage resulting from an allision to the Belt Line's Main Line Bridge ("Bridge") on the Southern Branch of the Elizabeth River. This Court has original jurisdiction over this matter under its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and federal question jurisdiction pursuant to 28 U.S.C § 1331. Venue is proper in this district and division under 28 U.S.C. § 1391.

2.    The Belt Line is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Chesapeake, Virginia. The

1

Belt Line is a terminal switching railroad serving the cities of Norfolk, Portsmouth, and Chesapeake, Virginia.

3.      The Belt Line is the owner of the Main Line Railroad Bridge that spans the Southern Branch of the Elizabeth River between Chesapeake and Portsmouth, Virginia. The Bridge is a 385-foot-long steel vertical lift bridge with a clearance of 300 feet between the fenders.

4.      Carver is a limited liability company organized under the laws of New York with its principal place of business in Albany, New York. Carver owns and operates a fleet of inland and offshore tugs and barges and provides towing services on the East Coast of the United States. On June 15, 2024, Carver owned and operated the tug M/T MACKENZIE ROSE.

5.      The M/T MACKENZIE ROSE (IMO No. 8968765) is a United States-flagged twin-screw tugboat built in 2000, measuring approximately 101 feet in length, 39 feet in beam, and 343 gross tons, with a draft of about 16 feet. It is powered by two Alco 12-251E diesel engines rated at approximately 4,500 horsepower, with auxiliary power from three Caterpillar 3304-driven generators.

6.      The Main Line Bridge was first permitted by Act of Congress in 1897, with a permit issued by the Secretary of War. Following hearings under the Truman–Hobbs Act of June 21, 1940, 33 U.S.C. §§ 511–524, the original swing bridge was determined to be an unreasonable obstruction to navigation, and the Secretary of the Army issued a new permit on October 6, 1947. The current Main Line Bridge was constructed between 1956 and 1958 as a steel vertical lift bridge carrying the Belt Line's main line across the Southern Branch of the Elizabeth River.

7.    At approximately 16:25 hours on June 15, 2024, the barge WEEKS 281 being pushed by the M/T MACKENZIE ROSE allided with the western truss on the Portsmouth side of the Bridge, outside the navigable channel, while the Bridge was in the raised stationary position (the "Allision").

8.    On June 15, 2024, the M/T MACKENZIE ROSE traveled northbound under the Jordan Bridge, turned to port, and proceeded outside the fender into the western truss of the Belt Line's Bridge as depicted below.

 

06/15/24 16:24 Tug transiting Jordan Bridge   06/15/24 16:26 Tug hitting Belt Line Bridge

9.    Video surveillance footage shows the M/T MACKENZIE ROSE pushing the WEEKS 281 into the western truss of the Bridge, then backing up, adjusting course, and maneuvering through the Bridge opening.

10.    On June 15, 2024, the M/T MACKENZIE ROSE crew included Captain Christopher Miller, Mate James Morrissey, Engineer Jason McGrath, Deckhand Sharif Porter, and Deckhand Jarkeis Morrissey.

11.    Captain James Miller, a U.S Coast Guard licensed Master, was the Captain aboard M/T MACKENZIE ROSE on June 15, 2024.

12.    At the time of the Allision, James Morrissey was the operator of the tug.

3

13.     Carver's SMS requires that, in the event of an allision, the master of the tug or the crew in the wheelhouse must "a) Notify the Company; [and] b) Notify the Coast Guard."

14.     The Belt Line reported the Allision to the U.S. Coast Guard on June 17, 2024.

15.     That same day, June 17, 2024, the U.S. Coast Guard contacted Carver about the Allision.

16.     The Allision caused damage to the Bridge.

## II.    LEGAL CONTENTIONS

### A. The Belt Line's Legal Contentions

40.     On June 15, 2024, the barge WEEKS 281 being pushed by the M/T MACKENZIE ROSE, allided with the Belt Line's Main Line Bridge, a stationary object.

41.     The negligence of the crew of the M/T MACKENZIE ROSE caused the Allision.

42.     The unseaworthiness of the M/T MACKENZIE ROSE caused the Allision.

43.     Carver knew or should have known prior to the Allision that there was a problem with the auto pilot of the M/T MACKENZIE ROSE that at times resulted in loss of steering and control.

44.     Despite repeated reports of loss of steering when using the auto pilot of the M/T MACKENZIE ROSE, Carver failed to investigate its condition or undertake repairs prior to the Allision.

45.     Carver failed to prohibit use of the auto pilot by the crew of the M/T MACKENZIE ROSE during operations in narrow waters, during bridge transits, or in defective condition.

46.     Carver failed to properly train the crew on the M/T MACKENZIE ROSE.

4

47.    Carver failed to provide a competent crew for the M/T MACKENZIE ROSE.

48.    Carver's management falsely told the crew that the U.S. Coast Guard had been informed of the Allision.

49.    Carver failed to notify the U.S. Coast Guard and/or the Belt Line of the Allision before departing as required by 46 C.F.R. § 4.05-1.

50.    The Belt Line suffered $15,922.877.46 in damages as a result of the Allision.

51.    Carver is not entitled to limit its liability to the value of the M/T MACKENZIE Rose and her pending freight on June 15, 2024.

52.    Carver failed to preserve evidence related to the Allision as requested in the Belt Line's June 20, 2024 Preservation Demand Letter, including failure to conduct post-incident drug and alcohol testing of the M/T MACKENZIE ROSE's crew and failure to retain ESI stored on the cell phone of Carver's general manager at the time of the Allision.

53.    Carver's reckless conduct warrants an award of punitive damages.

54.    Carver is not entitled to a settlement credit for any sums paid to Evanston.

**B. Carver's Legal Contentions**

1.    By virtue of its contract with Evanston, The Belt Line transferred all of its rights of recovery against Carver to Evanston, to the extent of Evanston's payment of $10,000,000.

2.    Consequently, Evanston held and has compromised the claim for up to $10,000,000.00 (The "Transferred Claim"), while the Belt Line holds and could potentially recover its excess damages, beginning at $10,000,000.01 (the "Retained Claim").

3.    The Belt Line has not carried its burden to prove it suffered any damages within the Retained Claim.

4.    If, however, Belt Line had proven damages within the Retained Claim, Carver's liability for those damages would be capped at the value of the subject Vessel because:

    a.    The Belt Line cannot prove any causative negligent act other than a navigational error by Mate Morrissey;

    b.    Carver has established its lack of privity of knowledge in regard to that navigational error;

Further,

    c.    If there were some other provable causative negligent act, Carver has established lack of privity of knowledge as to whatever that might be.

6.    There is no evidence that the autopilot, steering, or mechanical systems on the M/T MACKENZIE ROSE malfunctioned at any time on June 15, 2024.

7.    There is no evidence that Carver's crew was either improperly trained or not competent.

8.    The Belt Line cannot prove any causative negligent act other than a navigational error by Mate Morrissey.

9.    In the event that the Belt line can prove some other causative negligent act, which Carver denies, Carver can establish lack of knowledge.

10.    The sole causative negligent act was a navigational error by Mr. Morrissey and Carver can establish lack of privity as to any other alleged causative negligent act so there is no dispute as to the value of the vessel and its cargo. That amount is Carver's maximum exposure in this case.

11.    The evidence is that Belt Line's total damages in tort after depreciation were substantially less than the recovery it made in contract from Evanston ($10 million). The Belt Line's recovery here is $0.00.

12.     Carver can establish entitlement to limitation of liability, so the Belt Line cannot recover, as the value of the tug is substantially less than the $1 Million that the Belt Line recovered from Evanston.

13.     The value of the M/T MACKENZIE ROSE just prior to and after the Allision was approximately $2.5 Million.

14.     All damages provable by Belt Line are less than $10,000,000 and therefore within the transferred claim which has been compromised and released.

15.     Belt Line cannot recover any additive rates for the claimed labor charges.

16.     The claimed labor charges are unrelated to the repairs at issue and relate to the loss of business claim that the Belt Line has waived or forfeited.

17.     Belt Line's claimed damages include non-recoverable costs that are unrelated to the Allision.

18     There is no reckless, outrageous or other conduct that warrants a claim of punitive damages.

## III.     EXHIBITS

1.     The Parties have segregated the documents, summaries, and other exhibits that may be offered into evidence at trial into four exhibit lists.  A joint list of agreed exhibits will be submitted to the Court at the Final Pretrial Conference as **Exhibit A.**  The Belt Line's Exhibit List with Petitioner's objections thereto is attached as **Exhibit B.** Carver's Exhibit List with the Belt Line's objections thereto is attached as **Exhibit C.** Unless otherwise ordered, the Parties agree to deliver to the Court three copies of their respective exhibits, sequentially numbered with tabs in binders, one day before trial.

The parties resolved many objections prior to the FPTC. Those left unresolved were ruled on by the Court, and those exhibits and rulings are listed in the charts behind Exhibits B and C.

7

2.      The Parties have discussed their objections and will continue their efforts to narrow and resolve the objections to each other's proposed exhibits. The Parties reserve their rights to make and pursue objections to individual exhibits based on rulings on any pretrial motions. The Parties also agree to reserve the right to require a foundation for the admission of any exhibit and to object on hearsay grounds at trial.

3.      The Parties agree that any documents identified on the exhibit lists attached hereto that were produced from a Party's own files shall be deemed authentic unless specifically objected to on that basis by another Party. The Parties shall work together to identify any exhibits that remain subject to any specific authenticity objections. This provision shall not be deemed to resolve any hearsay objections or other aspects of foundation objections for exhibits.

4.      The Parties agree that to the extent an exhibit is excluded from one Party's exhibit list, it may be admissible for impeachment or cross-examination purposes. The Parties agree that inclusion of an exhibit on a Party's list shall not be deemed a waiver of the Party's right to object to the exhibit, given that exhibit lists have been prepared before rulings on pending summary judgment and other motions are final, and may be included protectively on the exhibit list.

5.      The Parties agree that documents, summaries, and other exhibits listed on the exhibit lists to which no objection has been specified at trial may be introduced into evidence by any Party; provided, however, all exhibits shall be introduced into evidence on the record at trial, either in the course of testimony about the exhibit at trial, either live or by deposition, or, if a joint exhibit, by offer on the record for admission.

6.      The exhibit lists set forth the Parties' exhibits for their respective cases-in-chief; the exhibit lists do not include potential cross-examination or impeachment exhibits that may or

may not be introduced into evidence.  The Parties reserve the right to offer such potential exhibits for purposes of cross-examination or impeachment.

## IV.    WITNESSES

The Parties adopt and incorporate by reference their objections to proposed witness testimony, whether by deposition or live, to the extent that testimony is the subject of any Party's motion in limine or *Daubert* motion.

For those witnesses expected to testify by deposition, attached as **Exhibit D** are tables indicating the page and line numbers designating each witnesses' testimony, objections lodged by the Parties, and counter-designations of the testimony.

*See Note @ p.7, Section III.1.*

### A.    The Belt Line's Witnesses

The Belt Line expects to call the following witnesses at trial:

| Name of Witness | Live/By Deposition | Objections |
|---|---|---|
| Cannon Moss | Live | |
| William O'Brien | Live | |
| Adam Reeder | Live | |
| Charlie Graning | Live | |
| Howard Swanson | Live | |
| Captain Nicholas Lewis | Live | *See* Motion in Limine And Order (ECF 173) |
| Robert Furborough | Live | *See* Motion in Limine and Order (ECF 170) |
| Lee Lentz | Live | |
| Kevin Lugo | Live | |
| Brian Moore | Deposition | See Exhibit D to Order |
| Leonard Baldassare | Deposition | See Exhibit D to Order |
| Jason Galioto | Deposition | See Exhibit D to Order |
| Nicholas Laraway- 30(b)(6) | Deposition | See Exhibit D to Order |
| Josef Malik | Deposition | See Exhibit D to Order |

The Belt Line may call the following witnesses at trial:

| Name of Witness | Live/By Deposition | Objections |
|---|---|---|
| Nathan Rose | Live | |

| Name of Witness | Live/By Deposition | Objections |
|---|---|---|
| Jim Holtje | Live | (1) Cumulative FRE 403 |
| Eric Walordy | Deposition | |
| Jarkeries Morrissey | Deposition | |
| Jason McGrath | Deposition | |
| Sharif Porter | Deposition | |
| Alex O' Rourke | Deposition | |

**B.    Carver's Witnesses**

Carver expects to call the following witnesses at trial:

| Name of Witness | Live/By Deposition | Objections |
|---|---|---|
| Carver Rule 30(b)(6) Representative | Live | The Belt Line objects to an unidentified witness. This is not a proper witness disclosure under Rule 26(a)(3). |
| Nicholas Laraway | Live | |
| Josef Malik | Live | |
| Jason McGrath | Live (unconfirmed);[1] | |
| Leonard Baldassare | Live (unconfirmed); | |
| Brian Moore | Live (unconfirmed) | |
| Jarkeis Morrissey | Live | |
| Sharif Porter | Live | |
| Captain Stephenson | Live | Fed. R. Evid. 702/703; Fed R. Evid. 403; *See* Motion in Limine and Order (ECF 174) |
| Nick Marianos | Live | Fed. R. Evid. 702/703; Fed R. Evid. 403; *See* Motion in Limine and Order (ECF 175) |
| Charlie Cunningham | Live | Fed. R. Evid. 702/703; Fed R. Evid. 403; *See* Motion in Limine and Order (ECF 175) |

Carver may call the following witnesses at trial:

---

[1] Jason McGrath and James Morrissey are no longer in the control of Carver.

| Name of Witness | Live/By Deposition | Objections |
|---|---|---|
| James Morrissey | Live (unconfirmed) | Mr. Morrissey has consistently evaded deposition despite this Court's Order (ECF 88) to appear. Any testimony from Mr. Morrissey at trial procured by Carver would surprise and prejudice the Belt Line. |
| Howard Swanson | Deposition | The Belt Line objects to use of deposition testimony to the extent the witness appears at trial. The Belt Line also objects to any testimony elicited as a basis to depreciate the cost of repairs. *See* Fed. R. Civ. P. 401 & 403; *see* ECF 175. |
| Jason Galioto | Live | |
| Eric Walordy | Live | |
| Alex O'Rourke | Live | |
| Cannon Moss | Live | |
| William O'Brien | Live | |
| Adam Reeder | Live | |
| Nathan Rose | Live | |
| Charlie Graning | Live | |
| Jim Holtje | Live | |

The Parties agree that all witnesses identified as witnesses whom they "will call" to testify "live" will in fact appear at trial, barring illness or other unforeseen circumstances beyond the witness's control. In the event that a witness so identified does not appear at trial, and that witness's deposition testimony has not been previously introduced by an opposing Party at trial, an opposing Party may offer any otherwise-admissible deposition testimony by that witness, regardless of whether the Party seeking to offer such testimony previously designated it. The Parties each reserve the right to call any witness listed on another Party's witness list, and expressly reserve the right to call witnesses not listed for rebuttal or

11

impeachment; provided, however, that while the Parties will work cooperatively, nothing herein shall be deemed to require a Party to produce a "live" witness at a time requested by another Party.

## V.    FACTUAL CONTENTIONS

The Belt Line's Factual Contentions are attached as **Exhibit E**. Carver's Factual Contentions are attached as **Exhibit F**. The Parties agree that these lists are not exhaustive and may be supplemented, and that the absence of a factual contention shall not constitute waiver and shall not preclude the admission of relevant evidence at trial.

## VI.    TRIABLE ISSUES

### A.    The Belt Line's Triable Issues

1.    Whether Carver has overcome the presumption that it was at fault for the Allision.

2.    Whether the tug M/T MACKENZIE ROSE was negligent in alliding with the Belt Line bridge on June 15, 2024.

3.    Whether Carver has met its burden to show that it lacked privity or knowledge of the condition or events giving rise to the Allision.

4.    Whether Carver is entitled to limit its liability to the value of the M/T MACKENZIE ROSE and her pending freight on June 15, 2024.

5.    If so, the value of the tug M/T MACKENZIE ROSE, on June 15, 2024.

6.    The amount of damages suffered by the Belt Line resulting from the allision.

7.    The amount of prejudgment interest awarded on those damages.

8.    Whether punitive damages should be awarded against Carver.

9.    If so, the amount of punitive damages awarded against Carver.

12

10.    Whether Carver is entitled to a settlement credit for any sums paid to Evanston.

11.    If so, the amount of such credit.

**B.    Carver's Triable Issues**

The key issues to be tried in Carver's lawsuit to Limit Liability pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.* are:

1.    Whether the Belt Line can prove any causative negligent act other than a navigational error by Mate Morrissey.

2.    If the Belt Line can prove some other causative negligent act, then whether Carver can establish lack of privity of knowledge.

3.    If the sole causative negligent act is a navigational error by Mr. Morrisey, or if Carver can establish lack of privity as to any other alleged causative negligent act, then there is a dispute as to the value of the vessel and its cargo. That amount would serve as Carver's maximum exposure in this case.

4.    Carver submits that the evidence is that the Belt Line's total damages in tort after depreciation were substantially less than the recovery it made in contract from Evanston ($ 10 million). If so, the Belt Line's recovery here should be $0.00.

5.    If Carver establishes entitlement to limitation of liability, then the Belt Line would not be entitled to recover, as the value of the tug is substantially less than the $10 Million that Belt Line recovered from Evanston.

6.    If it is determined that Norfolk is entitled to recovery, which Carver disputes, whether Norfolk has the right to $10,000,000 in claimed damages under its contract with Evanston any party is entitled to a reduction or set off of the award after final judgment.

ENTERED:  2-12-26

Lawrence R Leonard
United States Magistrate Judge

**Seen and Agreed:**

Mark C. Nanavati, Esq. (VSB No.: 38709)
G. Christopher Jones, Jr., Esq. (VSB No.: 82260)
SINNOT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
Telephone: (804) 893-3866 (Nanavati)
(804) 893-3862 (Jones)
Facsimile: (804) 378-2610
mnanavati@snllaw.com
cjones@snllaw.com
*Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

Zachary M. Jett, Esq. (VSB #93285)
BUTLER WEIHMULLER KATZ, et al
11525 North Community House Road
Suite 300
Charlotte, North Carolina 28277
Telephone: (704) 543-2321
Facsimile: (704) 543-2324
zjett@butler.legal
*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

James L. Chapman, IV, (VSB No. 21983)
W. Ryan Snow, (VSB No. 47423)
Mackenzie R. Pensyl (VSB No. 100012)
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

Harold L. Cohen (VSB No.:98148)
CLYDE & CO US LLP
1221 Brickell Avenue, Suite 1600
Miami, FL 33131
Telephone: (305) 446-2646
Facsimile: (305) 441-2374
harry.cohen@clydeco.us

James H. Rodgers, *Pro Hac Vice*
Clyde & Co US LLP
45 Lexington Avenue, 16th Floor
New York, NY 10174
Telephone: (212) 702-6771
james.rodgers@clydeco.us
*Counsel for Coeymans Marine Towing LLC d/b/a Carver Marine Towing*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | Civil Action No. 2:24-cv-00490-MSD-LRL |

**EXHIBIT A**

**JOINT EXHIBIT LIST**

| Joint Exhibit No. | Description | Bates Begin | Bates End | Alternate Description |
|---|---|---|---|---|
| J1. | 2024-07-03 Galioto email with Photos to Moore | CARVER ESI 000313 | CARVER ESI 000319 | |
| J2. | 2024-01-21 Incident Report | CARVER TBS HELM CONNECT 000171 | | |
| J3. | 2024-01-22 Incident Report | CARVER 000829 | CARVER 000847 | |
| J4. | 2024-02-28 Near Miss Report | CARVER TBS HELM CONNECT 000163 | CARVER TBS HELM CONNECT 000164 | *Corrected Bates numbers |
| J5. | 2024-03-04 Near Miss Report | CARVER 000037 | CARVER 000038 | **Moore Depo Exhibit 28 Also Produced as: 9.2 Near Miss Report Carver TBS Helm Connect 000163** |

| Joint Exhibit No. | Description | Bates Begin | Bates End | Alternate Description |
|---|---|---|---|---|
| J6. | 2024-04-19 Near Miss Report | CARVER 000039 | CARVER 000040 | |
| J7. | 2024-05-03 Near Miss Report | CARVER TBS HELM CONNECT 000167 | | |
| J8. | 2024-05-06 Near Miss Report | CARVER 000041 | CARVER 000042 | |
| J9. | 2024-05-21 Incident Report | CARVER 002041 | CARVER 002049 | |
| J10. | 2024-02-28 Daily Log Near Miss Entry | CARVER 000025 | CARVER 000026 | |
| J11. | 2024-04-01 Daily Log Near Miss Entry | CARVER 000027 | CARVER 000029 | |
| J12. | 2024-04-10 to 2024-04-11 Daily Logs | TBS HELM CONNECT 000437 | TBS HELM CONNECT 000440 | |
| J13. | 2024-05-03 Daily Log Near Miss Entry | CARVER 000030 | CARVER 000032 | |
| J14. | 2024-05-20 to 2024-05-21 Daily Logs | TBS HELM CONNECT 000503 | TBS HELM CONNECT 000506 | |
| J15. | 2024-06-12 to 2024-06-16 Daily Logs | CARVER 000051 | CARVER 000059 | |

| Joint Exhibit No. | Description | Bates Begin | Bates End | Alternate Description |
|---|---|---|---|---|
| J16. | 2024-06-15 Helm Daily Log | CARVER 000056 | | |
| J17. | 2025-06-18 Helm Daily Log | CARVER TBS HELM CONNECT 000549 | | |
| J18. | 2024-06-11 to 2025-06-12 Daily Logs | TBS HELM CONNECT 000538 | TBS HELM CONNECT 000539 | |
| J19. | 2024-06-15 Helm Screenshot | CARVER 000200 | | |
| J20. | Master's Daily Report Form (Helm system) | CARVER 000898 | CARVER 000906 | |
| J21. | 2024-06-12 to 2024-06-16 Master's Daily Report Logs | CARVER 000001 | CARVER 000024 | |
| J22. | 2024-06-15 Master's Daily Report Log | CARVER 000156 | CARVER 000160 | |
| J23. | 2024-06-12 to 2024-06-16 Spreadsheet of Log Entries | CARVER 000060 | CARVER 000066 | |
| J24. | 2024-06-11 to 2024-06-20 Master's Daily Vessel Logs | CARVER TBS HELM CONNECT 000001 | CARVER TBS HELM CONNECT 000088 | |
| J25. | 2024-06-15 Crew Matrix | CARVER 000050 | | |

3

| Joint Exhibit No. | Description | Bates Begin | Bates End | Alternate Description |
|---|---|---|---|---|
| J26. | Captain Miller Employment Records | CARVER 000043 | CARVER 000046 | |
| J27. | 2024-06-15 Captain Miller Statements | CARVER 000047 | CARVER 000049 | |
| J28. | Deckhand Jarkeis Morrissey Employment Records | CARVER 000067 | CARVER 000069 | |
| J29. | 2024-06-15 Deckhand Jarkeis Morrissey Statements | CARVER 000070 | CARVER 000072 | |
| J30. | Engineer Jason McGrath Employment Records | CARVER 000078, 000080 | CARVER 000081 | |
| J31. | 2024-06-15 Engineer Jason McGrath Statements | CARVER 000079, 000082 | CARVER 000083 | |
| J32. | Deckhand Sharif Porter Employment Records | CARVER 000087 | | |
| J33. | 2024-06-15 Deckhand Sharif Porter Statements | CARVER 000084 | CARVER 000086 | |
| J34. | James Morrissey Employment Records | CARVER 000088 | CARVER 000093 | |
| J35. | 2024-06-15 James Morrissey Statements | CARVER 000094 | CARVER 000095 | |

| Joint Exhibit No. | Description | Bates Begin | Bates End | Alternate Description |
|---|---|---|---|---|
| J36. | 2023-07-02 to 2024-06-16 Morrissey Training Records | CARVER 000851 | CARVER 000885 | |
| J37. | Crew Hours Worked Report | CARVER 000096 and CARVER 000229 | CARVER 000110 and CARVER 000232 | |
| J38. | 2024-06-16 Miller email with Crew Statements | CARVER ESI 000038 | CARVER ESI 000042 | |
| J39. | 2024-02-20 Engine Log | CARVER ESI 001292 | CARVER ESI 001295 | |
| J40. | 2024-06-12 to 2024-06-16 Engine Logs (Helm system) | CARVER 000118 | CARVER 000147 | |
| J41. | 2024-06-12 to 2024-06-12 Rough Engine Logs | CARVER 000234 | CARVER 000238 | |
| J42. | 2024-06-12 to 2024-06-16 Rough Deck Logs | CARVER 000239 | CARVER 000243 | |
| J43. | 2024-06-15 Rough Log Entry | CARVER 001898 | | |
| J44. | 2024-06-24 Miller email with Helm Log | CARVER ESI 000527 | CARVER ESI 000531 | |
| J45. | Ayers Marine Electronics Records | CARVER 000249 | CARVER 000250 | |

| Joint Exhibit No. | Description | Bates Begin | Bates End | Alternate Description |
|---|---|---|---|---|
| J46. | GMT/Mackay Marine Invoices 2023 – 2024 | CARVER 000251 | CARVER 000252 and 000821 | |
| J47. | Voyage Plan 2024-06-15 | CARVER 000890 | CARVER 000897 | |
| J48. | DLS Marine Survey & Appraisal | CARVER 001929 | CARVER 001957 | |
| J49. | USCG – Abstract of Title | NPBL 000052 | NPBL 000053 | |
| J50. | Certificate of Inspection 2021-05-19 | CARVER 000792 | CARVER 000794 | |
| J51. | Schedule of Vessels – Hull Effective 2023-11-01 | CARVER 000673 | CARVER 000674 | |
| J52. | Simrad Operator Manual | CARVER 001989 | CARVER 002040 | |
| J53. | Coeysman SMS | CARVER TBS HELM CONNECT 000732 | CARVER TBS HELM CONNECT 001078 | |
| J54. | 2024-06-28 Miller email re: incident report | CARVER ESI 000541 | | |
| J55. | 2024-07-19 Galioto email re: CMT Safety Info | CARVER ESI 000020 | CARVER ESI 000037 | |

| Joint Exhibit No. | Description | Bates Begin | Bates End | Alternate Description |
|---|---|---|---|---|
| J56. | 2024-06-14 The General Ship Repair Invoice | TGSR 000009 | | |
| J57. | 2025-06-09 Declaration of Josef Malik | | | |
| J58. | 2025-08-13 Letter to Carver | | | |
| J59. | Elizabeth River Bridge Emergency Inspection Report | NPBL 002304 | NPBL 002354 | |
| J60. | Elizabeth River Bridge Contract Plans | NPBL 003798 | NPBL 003854 | |
| J61. | Bridge Inspection Reports 2016-2024 | NPBL 001306; NPBL 003540 | NPBL 002216; NPBL 003717 | |
| J62. | Bridge Management Program 2021 | NPBL 006601 | NPBL 006667 | |
| J63. | Bridge Management Program 2023 | NPBL 006678 | NPBL 006812 | |
| J64. | Texts between Baldassare and Moore | CARVER ESI 001868 | CARVER ESI 001884 | |
| J65. | Texts between Baldassare and Tug | CARVER ESI 001888 | CARVER ESI 001901 | |

| Joint Exhibit No. | Description | Bates Begin | Bates End | Alternate Description |
|---|---|---|---|---|
| J66. | 2024-10-03 Morrissey Termination Letter | CARVER 001146 | CARVER 001148 | |
| J67. | 2024-06-24 Moore email re: Helm Logs Meeting Notes | CARVER ESI 000532 | | |
| J68. | 2024-06-20 Laraway email re Evidence Preservation | CARVER ESI 000307 | CARVER ESI 000311 | |
| J69. | 2021-12-27 Marine Safety Consultants to Dime Community Bank – Condition & Valuation Survey Report | DIME 000231 | DIME 000237 | |
| J70. | 2021-12-27 Mi-Ro letter to Dime Community Bank with Desktop Opinion for M/T Mackenzie Rose | DIME000210 | | |
| J71. | 2024-07-29 Feeney email re: CMT-AMS Drug Testing | CARVER ESI 000201 | CARVER ESI 000217 | |
| J72. | 2024-06-20 Laraway email re: Accident to Moore | CARVER ESI 000191 | CARVER ESI 000192 | |
| J73. | 2025-09-03 Damages Spreadsheet with Tabs | NPBL008221 Excel Spreadsheet with Tabs | | |

8

| Joint Exhibit No. | Description | Bates Begin | Bates End | Alternate Description |
|---|---|---|---|---|
| J74. | Invoices Supporting NPBL Damages Spreadsheet (see bates numbers and all invoices produced in response to Carver RFP No. 5) *<br><br>* The Belt Line reserves the right to present invoices through summaries in accordance with FRE 1006 | *CONFIDENTIAL NPBL 000198 002216-2573 **002545-2642** **002755-3539** 005870-5965 005966-5983 **005984-6545** **006546-6600** **006601-6667** **006823-6833** **006838-6940** **008032-8035** 008037 **008164-8175** **008177-8220** | | |
| J75. | NPBL M&W Expenses | NPBL000198 | | |
| J76. | NPBL T&E Expenses | NPBL 000199 | | |
| J77. | NPBL Mainline Bridge Repair Expenses | NPBL 000200 | | |
| J78. | Video from Belt Line surveillance cameras | NPBL000207 | | |
| J79. | Video from industry surveillance camera | NPBL000201 | | |

| Joint Exhibit No. | Description | Bates Begin | Bates End | Alternate Description |
|---|---|---|---|---|
| J80. | | | | |
| J81. | | | | |
| J82. | | | | |
| J83. | | | | |
| J84. | | | | |
| J85. | | | | |
| J86. | | | | |
| J87. | | | | |
| J88. | | | | |
| J89. | | | | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**EXHIBIT B**

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY EXHIBIT LIST**

| Exhibit Number | Description | Bates Begin | Bates End | Carver Objections |
|---|---|---|---|---|
| 1 | Moved to Joint Exhibit List | | | |
| 2 | Moved to Joint Exhibit List | | | |
| 3 | Rose Point video | | | |
| 4 | 2024-06-17 Voicemail from USCG Lt. Palomba | CARVER ESI 001885 | | |
| 5 | Photos of Damage | Various bates numbers, including NPBL 000016, 000090, 000093 | | |
| 6 | 2024-06-15 Bridge Photo | CARVER 000244 | | |
| 7 | Photos of Tug | Various bates numbers | | |
| 8 | 2024-06-15 Barge Photos | CARVER 000245 | CARVER 000248 | |
| 9 | Moved to Joint Exhibit List | | | |
| 10 | Moved to Joint Exhibit List | | | |
| 11 | Moved to Joint Exhibit List | | | |

| Exhibit Number | Description | Bates Begin | Bates End | Carver Objections |
|---|---|---|---|---|
| 12 | Moved to Joint Exhibit List | | | |
| 13 | Moved to Joint Exhibit List | | | |
| 14 | Moved to Joint Exhibit List | | | |
| 15 | Moved to Joint Exhibit List | | | |
| 16 | Moved to Joint Exhibit List | | | |
| 17 | Moved to Joint Exhibit List | | | |
| 18 | Moved to Joint Exhibit List | | | |
| 19 | Moved to Joint Exhibit List | | | |
| 20 | Moved to Joint Exhibit List | | | |
| 21 | Moved to Joint Exhibit List | | | |
| 22 | Moved to Joint Exhibit List | | | |
| 23 | Moved to Joint Exhibit List | | | |
| 24 | Moved to Joint Exhibit List | | | |
| 25 | Moved to Joint Exhibit List | | | |
| 26 | Moved to Joint Exhibit List | | | |
| 27 | Moved to Joint Exhibit List | | | |
| 28 | Moved to Joint Exhibit List | | | |
| 29 | Moved to Joint Exhibit List | | | |
| 30 | Moved to Joint Exhibit List | | | |
| 31 | Moved to Joint Exhibit List | | | |
| 32 | Moved to Joint Exhibit List | | | |
| 33 | Moved to Joint Exhibit List | | | |
| 34 | Moved to Joint Exhibit List | | | |
| 35 | Moved to Joint Exhibit List | | | |
| 36 | Moved to Joint Exhibit List | | | |
| 37 | Moved to Joint Exhibit List | | | |
| 38 | Moved to Joint Exhibit List | | | |
| 39 | Moved to Joint Exhibit List | | | |
| 40 | Moved to Joint Exhibit List | | | |
| 41 | Moved to Joint Exhibit List | | | |
| 42 | Moved to Joint Exhibit List | | | |

| Exhibit Number | Description | Bates Begin | Bates End | Carver Objections |
|---|---|---|---|---|
| 43 | Moved to Joint Exhibit List | | | |
| 44 | Moved to Joint Exhibit List | | | |
| 45 | Moved to Joint Exhibit List | | | |
| 46 | Moved to Joint Exhibit List | | | |
| 47 | Moved to Joint Exhibit List | | | |
| 48 | Moved to Joint Exhibit List | | | |
| 49 | Moved to Joint Exhibit List | | | |
| 50 | Moved to Joint Exhibit List | | | |
| 51 | Moved to Joint Exhibit List | | | ECF 137 |
| 52 | Moved to Joint Exhibit List | | | |
| 53 | Moved to Joint Exhibit List | | | |
| 54 | Moved to Joint Exhibit List | | | |
| 55 | Moved to Joint Exhibit List | | | |
| 56 | Moved to Joint Exhibit List | | | |
| 57 | Moved to Joint Exhibit List | | | |
| 58 | Moved to Joint Exhibit List | | | |
| 59 | Moved to Joint Exhibit List | | | |
| 60 | Removed from Exhibit List pursuant to ECF 172 | | | ECF 172 |
| 61 | Moved to Joint Exhibit List | | | |
| 62 | Moved to Joint Exhibit List | | | |
| 63 | Moved to Joint Exhibit List | | | |
| 64 | Moved to Joint Exhibit List | | | |
| 65 | 2024-06-20 Evidence Preservation Letter to Carver | | | (1) Relevancy FRE 401/402 (2) Prejudicial, Confusing, Waste FRE 403 |
| 66 | Moved to Joint Exhibit List | | | |
| 67 | Moved to Joint Exhibit List | | | |
| 68 | Moved to Joint Exhibit List | | | |
| 69 | Moved to Joint Exhibit List | | | |
| 70 | Moved to Joint Exhibit List | | | |

| Exhibit Number | Description | Bates Begin | Bates End | Carver Objections |
|---|---|---|---|---|
| 71 | Moved to Joint Exhibit List | | | |
| 72 | Moved to Joint Exhibit List | | | |
| 73 | Moved to Joint Exhibit List | | | |
| 74 | Moved to Joint Exhibit List | | | |
| 75 | Moved to Joint Exhibit List | | | |
| 76 | Moved to Joint Exhibit List | | | |
| 77 | Moved to Joint Exhibit List | | | |
| 78 | Moved to Joint Exhibit List | | | |
| 79 | Robert Furborough Expert Report | | | (1) FRE 701, 702, *Daubert* - ECF 100 |
| 80 | Robert Furborough CV | | | (1) FRE 701, 702, *Daubert* - ECF 100 |
| 81 | Robert Furborough Expert Rebuttal Report | | | (1) FRE 701, 702, *Daubert* - ECF 100 |
| 82 | Lee Lentz Expert Report | | | |
| 83 | Lee Lentz CV | | | |
| 84 | Lee Lentz Rebuttal Report | | | |
| 85 | Captain Lewis Expert Report | | | (1) FRE 701, 702, *Daubert* - ECF 92 |
| 86 | Captain Lewis CV | | | (1) FRE 701, 702, *Daubert* - ECF 92 |
| 87 | Kevin Lugo Expert Report | | | |
| 88 | Keving Lugo CV | | | |
| 89 | Kevin Lugo Rebuttal Report | | | |
| 90 | 2018-12-28 H&H Master Services Agreement | *CONFIDENTIAL **NPBL 02755** | **NPBL 002767** | |
| 91 | 2020-11-03 PCL Master Services Agreement | *CONFIDENTIAL **NPBL 002768** | **NPBL 002781** | |
| 92 | 2024-09-14 PCL Appendix B | *CONFIDENTIAL **NPBL 003245** | **NPBL 003247** | |
| 93 | MBP Compilation of NPBL Damages (updated) | | | |
| 94 | PCL Daily and Weekly Reports | NPBL 002408 | NPBL 002531 | |
| 95 | MBP Summary of NPBL Expenses | Lugo exhibits | | |

| Exhibit Number | Description | Bates Begin | Bates End | Carver Objections |
|---|---|---|---|---|
| 96 | MBP Sample Quantity Validation | Lugo exhibits | | |
| 97 | FHA and GDOT Approved Audited Overhead Rates | | | (1) Relevancy FRE 401/402<br>(2) Foundation / Authentication FRE 901 |
| 98 | John Poulson Expert Report | | | (1) FRE 701, 702, *Daubert* – ECF 96 |
| 99 | John Poulson CV | | | |
| 100 | John Poulson Rebuttal Report | | | (1) FRE 701, 702, *Daubert* – ECF 96 |
| 101 | 2023-12-09 Email Proposal for Belt Line RR Vertical Lift Bridge Inspection | | | |
| 102 | Moved to Joint Exhibit List | | | |
| 103 | Moved to Joint Exhibit List | | | |
| 104 | 2024-08-01 H&H Letter to Adam Reeder | *CONFIDENTIAL **NPBL 003054** | **NPBL 005996** | |
| 105 | Moved to Joint Exhibit List | | | |
| 106 | Moved to Joint Exhibit List | | | |
| 107 | Bridge Damage Photos | NPBL 000001-<br>NPBL 000016-<br>NPBL 000057-<br>NPBL 000128- | NPBL 000013;<br>NPBL 000046;<br>NPBL 000086;<br>NPBL 000197. | |
| 108 | H&H Emergency Repairs - Proposed Repair Methodology | NPBL 000014 | NPBL 000015 | |
| 109 | USCG Certificate of Documentation | NPBL 000047 | NPBL 000053 | |
| 110 | Mainline Bridge Drawings | NPBL 000054 | NPBL 000056 | |
| 111 | AIS: Marine Tug & Traffic Data | NPBL 000087 | NPBL 000088 | |
| 112 | Tug Photos | NPBL 000089; | NPBL 000091 | |
| 113 | Bridge Photos | NPBL 000090, 000092-0094 | | |

| Exhibit Number | Description | Bates Begin | Bates End | Carver Objections |
|---|---|---|---|---|
| 114 | NPBL Emergency Repairs Lidar Scan Overlays | NPBL 000095 | NPBL 000106 | |
| 115 | NPBL Contract Plans and Drawings | NPBL 000107 | NPBL 000116 | |
| 116 | 2024-07-24 NPBL Procedure for Repairing Damage to Approach Span | NPBL 000117 | NPBL 000121 | |
| 117 | PCL Construction NPBL Emergency Repairs | NPBL 000122 | NPBL 000127 | |
| 118 | Moved to Joint Exhibit List | | | |
| 119 | Moved to Joint Exhibit List | | | |
| 120 | Moved to Joint Exhibit List | | | |
| 121 | Allision Event Surveillance Videos | NPBL 000201 | NPBL 000212 | |
| 122 | PCL Time-Lapse Video of Construction Project | NPBL 002754 (YouTube) | | |
| 123 | Moved to Joint Exhibit List | | | |
| 124 | Moved to Joint Exhibit List | | | |
| 125 | Moved to Joint Exhibit List | | | |
| 126 | Jordan Bridge Video | NPBL 006677 | | |
| 127 | Carver's Responses to Request for Admission | | | |
| 128 | Carver's Answers to Interrogatories | | | |
| 129 | PCL Construction Documents | Various bates numbers | | |
| 130 | H&H Design Documents | Various bates numbers | | |
| 131 | Poulson Inspection Photos | Galioto deposition exhibit 3 and others | | |

| Exhibit Number | Description | Bates Begin | Bates End | Carver Objections |
|---|---|---|---|---|
| 132 | 2025-06-06 Presentation Emergency Repairs NPBL | Hardesty & Hanover Production | | (1) Rule 26(a)(2)(C) – scope and failure to disclose (2) FRE 702 / 703 unreliable (3) FRE 1006 improper summary (4) FRE 801 / 802 hearsay (5) FRE 401 / 402 scope and relevancy |

**WITNESSES**

## Carver's Unresolved Objections to NPBL Exhibits and Witnesses

| Witness | Expect/May | Objection | Notes |
|---|---|---|---|
| Travis Kimmins | May | (1) Cumulative FRE 403 of other experts on reasonableness of charges | Removed from Witness list *Resolved* |

Objections not on this list have been resolved by the parties

**EXHIBITS**

| Exhibit Number | Description | Reference | Objection | Notes |
|---|---|---|---|---|
| 72 | Captain Sam Stephenson Rebuttal Report | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). | *See Order at ECF 174* Sustained |
| 73 | Expert Report of RL Banks & Associates, Inc. co-authored by Nick Marianos and Charlie Cunningham | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). | Sustained *See Order at ECF 175* |
| 102 | Brian Moore Deposition taken 04/28/25 with Exhibit 19 | | Not an exhibit; no page or line designations to allow Belt Line to assess testimony; Exhibit 19 is an inadmissible USCG document. | Sustained (testimony at trial decision by District Judge) *See Order at ECF 169* No deposition designations from Carver |
| 106 | Nick Laraway Deposition taken 06/17/25 | | Not an exhibit; no page or line designations to allow Belt Line to assess testimony. | Sustained (witness will testify) No deposition designations from Carver |
| 107 | Leonard Baldassare Deposition taken 04/29/25 | | Not an exhibit; no page or line designations to allow Belt Line to assess testimony. | Sustained (witness will testify) No deposition designations from Carver |
| 108 | Nicholas J. Lewis Deposition, 40:1-24 and - sustained 99:1-100:24 - overruled | | Not an exhibit; the Belt Line expects to present Captain Lewis as indicated in its 26(a)(3) disclosures. | *See Order at ECF 173* Page 40 relates to USCG 2692 statements excluded at ECF 169 |
| 109 | Capt. Sam Stephenson Deposition | | Not an exhibit; *see* Belt Line's Second Motion in Limine | Sustained *See Order at ECF 174* |

2

| # | Description | | Ruling |
|---|---|---|---|
| | | ECF123; no page or line designations to allow Belt Line to assess testimony. | |
| 115 | Documents received in response to subpoena issued to Virginia Department of Rail & Public Transportation | This disclosure is unclear; the Belt Line has not received such documents. | *Sustained* Collateral source rule Relevance Never disclosed |
| 117 | Deposition of Cannon Moss taken on June 4, 2025 | This disclosure fails to specify if it is using a transcript, video, or designations | *For impeachment purposes only* No deposition designations from Carver |
| 125 | Deposition Transcript of John C. Poulson | Not an exhibit; no page or line designations to allow Belt Line to assess testimony; the Belt Line expects to present Mr. Poulson as indicated in its 26(a)(3) disclosures. | *For impeachment only if court reverses MIL Order* See Order at ECF 171 No deposition designations from Carver |
| 126 | Deposition Transcript of Capt. Nicholas J. Lewis | Not an exhibit; no page or line designations to allow Belt Line to assess testimony; the Belt Line expects to present Captain Lewis as indicated in its 26(a)(3) disclosures. | *For impeachment only* See Order at ECF 173 No deposition designations from Carver (except previous) |
| 127 | Deposition Transcript of Robert Furborough | Not an exhibit; no page or line designations to allow Belt Line to assess testimony; the Belt Line expects to present Mr. Furborough as indicated in its 26(a)(3) disclosures. | *For impeachment only* See Order at ECF 170 No deposition designations from Carver |
| 128 | Each and every Exhibit introduced and/or identified and/or marked at the depositions taken by the Belt Line and Evanston (including | The disclosure fails to identify specific deposition exhibits to which the Belt Line might have an objection. This is not a proper disclosure under 26(a)(3). | *Reserved (without identification on exhibit list, it cannot be used, unless proponent can establish basis for admission, such as impeachment)* |

(DPRT FOIA 0001- et seq — appears in column for #115 row)

3

| | | |
|---|---|---|
| but not limited to Claimants' Exhibits 1-39) | | |
| 129 | Each and every Exhibit introduced and/or identified and/or marked at the depositions taken by Carver Marine | The disclosure fails to identify specific deposition exhibits to which the Belt Line might have an objection. This is not a proper disclosure under 26(a)(3). | Same as 128 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al.* | Civil Action No. 2:24-cv-00490-MSD-LRL |

**EXHIBIT C**
**Carver's Exhibit List**

Carver's trial exhibits with the Belt Line's objections are as follows:

| Exhibit Number | Description | Reference | Objection |
|---|---|---|---|
| 1 | Texts between Baldassare and Tug | CARVER ESI 001888-1901 | |
| 2 | 2024-07-03 Galioto email with Photos to Moore | CARVER ESI 000313 - 0319 | |
| 3 | 2024-01-21 Incident Report | CARVER TBS HELM CONNECT 000171 - 0181 | |
| 4 | 2024-01-22 Incident Report | CARVER 000829- 0847 | |
| 5 | 2024-02-28 Near Miss Report | CARVER 000037 | |
| 6 | 2024-03-04 Near Miss Report | CARVER 000037 - 0038 | |
| 7 | 2024-04-19 Near Miss Report | CARVER 000039 - 0040 | |
| 8 | 2024-05-03 Near Miss Report | CARVER TBS HELM CONNECT 000167 - 0168 | |

| 9 | 2024-05-06 Near Miss Report | CARVER 000041-0042 | |
| 10 | 2024-05-21 Incident Report | CARVER 002041- 2049 | |
| 11 | 2024-02-28 Daily Log Near Miss Entry | CARVER 000025- 0026 | |
| 12 | 2024-04-01 Daily Log Near Miss Entry | CARVER 000027-0029 | |
| 13 | 2024-04-10 to 2024-04-11 Daily Logs | TBS HELM CONNECT 000437- 0440 | |
| 14 | 2024-05-03 Daily Log Near Miss Entry | CARVER 000030- 0032 | |
| 15 | 2024-05-20 to 2024-05-21 Daily Logs | TBS HELM CONNECT 000503-0506 | |
| 16 | 2024-06-12 to 2024-06-16 Daily Logs | CARVER 000051 - 0059 | |
| 17 | 2024-06-15 Helm Daily Log | CARVER 000056 - 0057 | |
| 18 | 2025-06-18 Helm Daily Log | CARVER TBS HELM CONNECT 000549 - 0550 | |
| 19 | 2024-06-11 to 2025-06-12 Daily Logs | TBS HELM CONNECT 000538-0539 | |
| 20 | 2024-06-15 Helm Screenshot | CARVER 000200 | |
| 21 | Master's Daily Report Form (Helm system) | CARVER 000898- 0906 | |
| 22 | 2024-06-12 to 2024-06-16 Master's Daily Report Logs | CARVER 000001- 0024 | |
| 23 | 2024-06-15 Master's Daily Report Log | CARVER 000156- 0160 | |
| 24 | 2024-06-12 to 2024-06-16 Spreadsheet of Log Entries | CARVER 000060 - 0066 | |
| 25 | 2024-06-11 to 2024-06-20 Master's Daily Vessel Logs | CARVER TBS HELM CONNECT 000001- 0088 | |
| 26 | 2024-06-15 Crew Matrix | CARVER 000050 | |

| 27 | Captain Miller Employment Records | CARVER 000044- 0046, and 0043 | |
| 28 | 2024-06-15 Captain Miller Statements | CARVER 000047- 0049 | |
| 29 | Deckhand Jarkeis Morrissey Employment Records | CARVER 000067 - 0069 | |
| 30 | 2024-06-15 Deckhand Jarkeis Morrissey Statements | CARVER 000070-0072 | |
| 31 | Engineer Jason McGrath Employment Records | CARVER 000078, 000080- 0081 | |
| 32 | 2024-06-15 Engineer Jason McGrath Statements | CARVER 000079, 000083, and 000082 | |
| 33 | Deckhand Sharif Porter Employment Records | CARVER 000087 | |
| 34 | 2024-06-15 Deckhand Sharif Porter Statements | CARVER 000086, 0085, 0084 | |
| 35 | James Morrissey Employment Records | CARVER 000091-0093, 0088 | Incomplete. |
| 36 | 2024-06-15 James Morrissey Statements | CARVER 000094- 0095 | |
| 37 | 2023-07-02 to 2024-06-16 Morrissey Training Records | CARVER 000851- 0885 | |
| 38 | 2024-10-03 Morrissey Termination Letter | CARVER 001146- 1148 | |
| 39 | Crew Hours Worked Report | CARVER 000096 – 0110, 0229 - 0232 | |
| 40 | 2024-06-16 Miller email with Crew Statements | CARVER ESI 000038 - 0042 | |
| 41 | 2024-02-20 Engine Log | CARVER ESI 001292-1295 | |
| 42 | 2024-06-12 to 2024-06-16 Engine Logs (Helm system) | CARVER 000118- 0147 | |
| 43 | 2024-06-12 to 2024-06-12 Rough Engine Logs | CARVER 000234 - 0238 | |
| 44 | 2024-06-12 to 2024-06-16 Rough Deck Logs | CARVER 000239- 0243 | |
| 45 | 2024-06-15 Rough Log Entry | CARVER 001898 | |

| 46 | 2024-06-24 Moore email re: Helm Logs Meeting Notes | CARVER ESI 000532 | |
|----|----|----|----|
| 47 | 2024-06-24 Miller email with Helm Log | CARVER ESI 000527 - 0531 | |
| 48 | Ayers Marine Electronics Records | CARVER 000249- 0250 | |
| 49 | GMT/Mackay Marine Invoices 2023 – 2024 | CARVER 000251- 0252, 0821 | |
| 50 | Meyerrose 2025-04-01 Survey | CARVER 001963-1985 | |
| 51 | Meyerrose 2025-07-07 Survey **[Actually 2024]** | CARVER 000796- 0815 | *See* Fed. R. Evid. 702, 703, and 802; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993); Belt Line's Motion *in Limine* related to Meyerrose survey. |
| 52 | Voyage Plan 2024-06-15 | CARVER 000890- 0897 | |
| 53 | DLS Marine Survey & Appraisal | CARVER 001929 - 1957 | |
| 54 | USCG – Abstract of Title | NPBL 000052 - 0053 | |
| 55 | Certificate of Inspection 2021-05-19 | CARVER 000792 - 0794 | |
| 56 | 2024-06-20 Evidence Preservation Letter to Carver | | |
| 57 | 2024-06-20 Laraway email re Evidence Preservation | CARVER ESI 000307 - 0311 | |
| 58 | 2021-12-27 Marine Safety Consultants to Dime Community Bank – Condition & Valuation Survey Report | DIME 000231-237 | |
| 59 | 2021-12-27 Mi-Ro letter to Dime Community Bank with Desktop Opinion for M/T Mackenzie Rose | | |
| 60 | Schedule of Vessels – Hull Effective 2023-11-01 | CARVER 000673- 0674 | |
| 61 | Simrad Operator Manual | CARVER 001989- 2040 | |

| 62 | Coeysman SMS | CARVER TBS HELM CONNECT 000732-1078 | |
| 63 | 2024-07-29 Feeney email re: CMT-AMS Drug Testing | CARVER ESI 000201-0217 | |
| 64 | 2024-06-20 Laraway email re: Accident to Moore | CARVER ESI 000191 - 0192 | |
| 65 | 2024-06-28 Miller email re: incident report | CARVER ESI 000541 | |
| 66 | 2024-07-19 Galioto email re: CMT Safety Info | CARVER ESI 000020 - 0037 | |
| 67 | 2024-06-14 The General Ship Repair Invoice | TGSR 000009 | |
| 68 | 2025-06-09 Declaration of Josef Malik | | |
| 69 | 2025-08-13 Letter to Carver | | |
| 70 | Captain Sam Stephenson Expert Report | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). |
| 71 | Captain Sam Stephenson CV | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). |
| 72 | Captain Sam Stephenson Rebuttal Report | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). |
| 73 | Expert Report of RL Banks & Associates, Inc. co-authored by Nick Marianos and Charlie Cunningham | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). |
| 74 | Charlie Cunningham CV | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). |
| 75 | Nick Marianos CV | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). |

| 76 | Jason R. Meyerrose Expert Report | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). |
|---|---|---|---|
| 77 | Jason R. Meyerrose Rebuttal Expert Report | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). |
| 78 | Jason R. Meyerrose CV | | Fed. R. Evid. 702, 703, 802, and 901; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993). |
| 79 | Elizabeth River Bridge Emergency Inspection Report | NPBL 002304-2354 | |
| 80 | Elizabeth River Bridge Contract Plans | NPBL 003798-3854 | |
| 81 | Hardesty & Hanover October 2024 Draft of Report of Mechanical Inspection | | The Belt Line objects on grounds that this is a draft report and therefore not a business record; *see also* Fed. R. Evid. 802. |
| 82 | Bridge Inspection Reports 2016-2024 | NPBL001306-2216; 03540-3717 | |
| 83 | Bridge Management Programs 2021 and 2023 | NPBL 006601-6667; NPBL 6678-6812 | |
| 84 | Belt Line's Answers to Carver's Interrogatories | | |
| 85 | Belt Line's Responses to Carver's First Set of Requests for Admissions | | |
| 86 | Belt Line's Responses to Carver's Second Set of Requests for Admissions | | |

| 87 | Carver's Seventh Supplemental Response to the Belt Line's First Request for Production of Documents and Things served 7/11/2025 | | |
|---|---|---|---|
| 88 | (Initial) 2692 U.S. Coast Guard form dated 6/16/24 | CARVER 000114-000117 | See the Belt Line's First Motion in Limine (ECF 114). |
| 89 | Email from Lenny Baldassare to Lt. Palomba with 2692 form | CARVER ESI 001274-001275 | See the Belt Line's First Motion in Limine (ECF 114). |
| 90 | Revised 2692 U.S. Coast Guard form dated 6/25/24 | CARVER 000111-000112 | See the Belt Line's First Motion in Limine (ECF 114). |
| 91 | ABS Survey, 9/21/2021, ABS 0089-ABS 0095 | ABS 0089-ABS 0095 | |
| 92 | Certificate of Inspection | CARVER 001728-001731 | |
| 93 | Tug Cell text – (Brian Moore cell to tug cell) 6/28/24 at 10:01:31 | CARVER ESI 001897 | |
| 94 | James Morrissey Witness Statement | CARVER TBS HELM CONNECT 003732 | No such bates labeled document. The Belt Line will consider objections if an actual statement is identified. |
| 95 | 9.5 Incident Report – Event, 1/22/2024 | CARVER 0000829-CARVER 0000847 | |
| 96 | Carver Notice of Claim for Damage, June 20, 2024 | | |
| 97 | ABS Survey 9/02/21 | ABS 0089-0095 | |

| 98 | 7.16 Look Out | CARVER 000155 | |
|---|---|---|---|
| 99 | Screenshot of incident | CARVER ESI 000523 | |
| 100 | Capt. Nicholas J. Lewis Report | | Foundation, hearsay. |
| 101 | Answer to Interrogatory No. 4 of Carver Marine Towing's Fifth Supplemental Response to Norfolk Belt Line's Second Set of Requests for Production of Documents with Affidavit of Josef Malk in Support | | Foundation, hearsay. |
| 102 | Brian Moore Deposition taken 4/28/25 with Exhibit 19 | | Not an exhibit; no page or line designations to allow Belt Line to assess testimony; Exhibit 19 is an inadmissible USCG document. |
| 103 | Sharif Porter Deposition, 22:13-23:22 | | Not an exhibit. |
| 104 | Jarkeis Morrissey Deposition 20:19-21:10 | | Not an exhibit. |
| 105 | Jason McGrath Dep., 30:15-31:22; 66:4-21 | | Not an exhibit. |
| 106 | Nick Laraway Deposition taken 6/17/25 | | Not an exhibit; no page or line designations to allow Belt Line to assess testimony. |

| 107 | Leonard Baldassare Deposition taken 04/29/25 | | Not an exhibit; no page or line designations to allow Belt Line to assess testimony. |
|---|---|---|---|
| 108 | Nicholas J. Lewis Deposition, 40:1-24 and 99:1-100:24 | | Not an exhibit; the Belt Line expects to present Captain Lewis as indicated in its 26(a)(3) disclosures. |
| 109 | Capt. Sam Stephenson Deposition | | Not an exhibit; *see* Belt Line's Second Motion in Limine ECF123; no page or line designations to allow Belt Line to assess testimony. |
| 110 | Belt Line's Costs Spreadsheet | | No objection provided this refers to the most updated version of the cost spreadsheet in the Belt Line's exhibit list. |
| 111 | Belt Line's Rail Tie Invoices | | This disclosure is unclear; the Belt Line will assess if the specific invoices are designated. |
| 112 | May 5, 2025 Letter from Belt Line to Counsel re Deposition Documents | | |
| 113 | Video from Belt Line's Camera | NPBL 000207 | |
| 114 | Video from industry surveillance camera | NPBL 000201 | |
| 115 | Documents received in response to subpoena issued to Virginia Department of Rail & Public Transportation | DPRT FOIA 0001- *et seq* | This disclosure is unclear; the Belt Line has not received such documents. |
| 116 | Declaration of Cannon Moss with Exhibit 1 (NPBL 0000160 and Exhibit 2 | | This disclosure is unclear; incorrect bates number. |
| 117 | Deposition of Cannon Moss taken on June 4, 2025 | | This disclosure fails to specify if it is using a transcript, video, or designations |

| | | | |
|---|---|---|---|
| 118 | Carver Rule 30(b)(6) Representative Deposition (91:5-12; 57) | | This disclosure is improper as a trial exhibit as it is a deposition designation. |
| 119 | Belt Line's First RFPs | | |
| 120 | ECF 50 – Order requiring response to RFP 34 | | The Court has overruled Carver's objections regarding Request for Production 34. |
| 121 | Photos taken during inspection of the subject vessel 7/28/25 | | The disclosure fails to identify specific photos to which the Belt Line might have an objection. This is not a proper disclosure under 26(a)(3). |
| 122 | Mackenzie Rose Electronic Chart System 1500 LTZ | CARVER 000904, 0943 | This disclosure is unclear; incorrect bates number. |
| 123 | TMS 7.5 Navigation (Revision date: 7/01/20212) | CARVER 000816- 0820 | This disclosure is unclear; incorrect bates number. |
| 124 | Lenny Baldassare texts | CARVER ESI 001868-1884 | |
| 125 | Deposition Transcript of John C. Poulson | | Not an exhibit; no page or line designations to allow Belt Line to assess testimony; the Belt Line expects to present Mr. Poulson as indicated in its 26(a)(3) disclosures. |
| 126 | Deposition Transcript of Capt. Nicholas J. Lewis | | Not an exhibit; no page or line designations to allow Belt Line to assess testimony; the Belt Line expects to present Captain Lewis as indicated in its 26(a)(3) disclosures. |
| 127 | Deposition Transcript of Robert Furborough | | Not an exhibit; no page or line designations to allow Belt Line to assess testimony; the Belt Line expects to present Mr. Furborough as indicated in its |

| | | | |
|---|---|---|---|
| | | | 26(a)(3) disclosures. |
| 128 | Each and every Exhibit introduced and/or identified and/or marked at the depositions taken by the Belt Line and Evanston (including but not limited to Claimants' Exhibits 1-39) | | The disclosure fails to identify specific deposition exhibits to which the Belt Line might have an objection. This is not a proper disclosure under 26(a)(3). |
| 129 | Each and every Exhibit introduced and/or identified and/or marked at the depositions taken by Carver Marine | | The disclosure fails to identify specific deposition exhibits to which the Belt Line might have an objection. This is not a proper disclosure under 26(a)(3). |

## NPBL Unresolved Objections to Carver Exhibits & Witnesses

**WITNESSES**

| Witness | Expect/May | Objection | Notes |
|---|---|---|---|
| James Morrissey | May | Mr. Morrissey has evaded depositions despite this Court's Order (ECF 88) to appear. Any testimony from him at trial procured by Carver would surprise and prejudice the Belt Line. | Reserved (If witness makes contact Carver is required to immediately notify Belt Line, and Belt Line may file emergency motion for relief?) |

Objections not on this list have been resolved by the parties

# EXHIBITS

## Belt Line Expect to Offer

| Exhibit | Description: | Reference: | Objections: | Notes: |
|---|---|---|---|---|
| 9 | Texts between Baldassare and Moore | CARVER ESI 001868-1884 | (1) Relevancy FRE 401/402<br>(2) Prejudicial, Confusing, Waste FRE 403<br>(3) Cumulative FRE 403<br>(4) Post-Remedial | J64 *Overruled* |
| 10 | Texts between Baldassare and Tug | CARVER ESI 001888-1901 | (1) Relevancy FRE 401/402<br>(2) Prejudicial, Confusing, Waste FRE 403<br>(3) Cumulative FRE 403<br>(4) Post-Remedial | J65 *Overruled* |
| 105 | 2025-09-03 Damages Spreadsheet with Tabs | NPBL008221<br>Excel Spreadsheet with Tabs | (1) Foundation FRE 901<br>(2) Hearsay<br>(3) Relevancy 401/402<br>(4) Untimely FRCP 37 / 26 | J73 *Overruled* |

## Belt Line May Offer

| Exhibit #: | Description: | Reference: | Objections: | |
|---|---|---|---|---|
| 47 | 2024-10-03 Morrissey Termination Letter | CARVER 001146-1148 | (1) Relevancy FRE 401/402<br>(2) Prejudicial, Confusing, Waste FRE 403 | J66 *Overruled* |
| 55 | 2024-06-24 Moore email re: Helm Logs Meeting Notes | CARVER ESI 000532 | (1) Relevancy FRE 401/402<br>(2) Prejudicial, Confusing, Waste FRE 403<br>(3) Post Remedial | J67 *Overruled* |

| 66 | 2024-06-20 Laraway email re Evidence Preservation | CARVER ESI 000307 - 0311 | (1) Relevancy FRE 401/402<br>(2) Prejudicial, Confusing, Waste FRE 403 | J68 | Overruled |
| 72 | 2024-07-29 Feeney email re: CMT-AMS Drug Testing | CARVER ESI 000201-0217 | (1) Relevancy FRE 401/402<br>(2) Prejudicial, Confusing, Waste FRE 403<br>(3) Post remedial | J71 | Overruled |
| 73 | 2024-06-20 Laraway email re: Accident to Moore | CARVER ESI 000191 - 0192 | (1) Relevancy FRE 401/402<br>(2) Prejudicial, Confusing, Waste FRE 403<br>(3) Post remedial | J72 | Overruled |
| 132 | 2025-06-06 Presentation Emergency Repairs NPBL | Hardesty & Hanover Production | (1) Rule 26(a)(2)(C) –scope and failure to disclose<br>(2) FRE 702 / 703 unreliable<br>(3) FRE 1006 improper summary<br>(4) FRE 801 / 802 hearsay<br>(5) FRE 401 / 402 scope and relevancy | Produced by Mr. Swanson on thumb drive brought to deposition on June 25, 2025 | Overruled |

3

# EXHIBIT D

This section will be supplemented upon submission of the parties' deposition designations

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

|  |  |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al.* | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**EXHIBIT E**
**The Belt Line's Factual Contentions**

*Carver Marine Towing*

1.      Petitioner Coeymans Marine Towing does business as Carver Marine Towing.

2.      Carver Marine Towing is part of a large diversified industrial organization known as Carver Companies with operations in a number of different industries including construction, earth work, infrastructure, and deep water industrial work (30(b)(6) Dep. 10:7-19).

3.      Carver Marine Towing operates a fleet of eight tug boats as well as two smaller fleeting tugs (Moore Dep. 17:3-24).

*Carver hits the Bridge*

4.      The Belt Line is the owner of the Main Line Railroad Bridge that spans the Southern Branch of the Elizabeth River between Chesapeake and Portsmouth, Virginia. The total length of the Bridge is approximately 2,050 feet, with the lift span measuring approximately 385 feet and providing a horizontal clearance of 300 feet. When closed, the bridge has a vertical clearance of approximately 6 feet, and when raised, approximately 142 feet. The lift span is counterweight-balanced and operated by wire ropes and sheaves.

1

5.    The Bridge is identified in the Code of Federal Regulations at 33 C.F.R. § 117.997.  By regulation, it remains raised except when a train is crossing.

6.    On June 15, 2024, at approximately 4:26 p.m. EST, Carver's tug, the M/T MACKENZIE ROSE, pushing the loaded barge WEEKS 281, allided with the Bridge (the "Allision").  *See* ECF 1, p. 2.

7.    The barge being pushed by the M/T MACKENZIE ROSE struck the western truss on the Portsmouth side of the Bridge, outside the navigable channel, while the Bridge was in the raised stationary position.  *See* **NPBL Ex. 5**.

8.    The impact of the Allision significantly displaced the steel superstructure of the Bridge, moving it nearly 7 feet and leaving the western truss balancing on 3 of its 4 legs. *See* **NPBL Ex. 5.**



9.    Rose Point navigation data produced by Carver for the M/T MACKENZIE ROSE on June 15, 2024 shows the tug traveling northbound under the Jordan Bridge, turning to port, and proceeding toward the western truss of the Belt Line's Bridge as depicted below. *See* **NPBL Ex. 3**.



06/15/24 16:24 Tug transiting Jordan Bridge     06/15/24 16:26 Tug hitting Belt Line Bridge

10.    Video surveillance footage shows the M/T MACKENZIE ROSE pushing the WEEKS 281 into the western truss of the Bridge, then backing up, adjusting course, and maneuvering through the Bridge opening. *See* **J78** (video from Belt Line surveillance cameras); **J79** (video from industry surveillance camera).

11.    At approximately 4:36 p.m. EST on June 15, 2024, Carver's Port Captain in New York, Leonard Baldassare, texted Carver's General Manager in New York, Brian Moore, confirming that the tug allided with the Bridge. *See* **J64** (texts between Baldassare and Moore).



12.    At the time of the Allision, Carver's General Manager, Mr. Moore, was a management level employee in charge of all day-to-day operations at Carver, including regulatory compliance as stated in his deposition below. *See* **Exhibit D p.81** (Moore Dep. 17:3-12).

3

```
 3        A.     Sure.  I oversee the day-to-day
 4   operations of Carver Marine Towing, working with my
 5   team that I have here in place to ensure that the
 6   daily activities are done, that the regulations and
 7   policies are complied with, that customer and
 8   business development is grown, and then also working
 9   interdepartmentally with the other divisions from the
10   ports to other stevedoring to ensure that
11   everything's done safely and efficiently throughout
12   day-to-day operations.
```

13.    At the time of the Allision, Carver's Port Captain, Mr. Baldassare, was a management level employee in charge of all operations of Carver's tug fleet, including serving as a liaison to Carver's upper-level management. *See* **Exhibit D p.148** (Baldassare Dep. 16:22-17:4).

```
22        Q.     When you were Port Captain for
23   Carver, tell us what your duties were?
24        A.     I was responsible for the
25   day-to-day operations of the tug fleet.  So
 1   I would make sure the tugs were crewed, I
 2   would make sure that safety equipment was
 3   up to snuff.  Just basically be the liaison
 4   between the boats and upper management.
```

14.    On June 15, 2024, the M/T MACKENZIE ROSE crew included Captain Christopher Miller, Mate James Morrissey, Engineer Jason McGrath, Deckhand Sharif Porter, and Deckhand Jarkeis Morrissey. *See* **J16** (Daily Log 06/15/24).

15.    At the time of the Allision, James Morrissey was the operator of the tug. *See* **J16** (Daily Log 06/15/24).  Mr. Morrissey also served as Co-Captain of the tug while Captain Miller was off duty, as was the case at the time of the Allision. *Id.*

16.    The rough logbook (paper log) for the M/T MACKENZIE ROSE in Carver's vessel records shows an incident at 4:30 p.m. EST on June 15, 2024 wherein the "Co Captain"

4

(James Morrissey) reported that the "steering went hard over" and "we tapped the North & PBL RR Bridge." *See* **J43** (Rough Log Entry 06/15/24).

| | |
|---|---|
| 16:30 | Co Captain Reports steering went Hard over and he was backing and we Tapped the North & PBL RR Bridge |

17.    The electronic logbook entry for the M/T MACKENZIE ROSE in Carver's fleet management software system (the HELM system) shows an incident at 4:30 p.m. EST on June 15, 2024 wherein James Morrissey reported that the tug maneuvered alongside the fendering of the Bridge. *See* **J16** (Daily Log 06/15/24).

18.    To date, the Allision has caused $15,922,877.46 in damages to the Belt Line, not including interest, costs, attorneys' fees, and punitive damages.

*Carver leaves the scene without notifying anyone*

19.    46 C.F.R. 4.05-1 requires that "the owner, agent, master, operator, or person in charge, shall notify the nearest Sector Office, Marine Inspection Office or Coast Guard Group Office whenever a vessel is involved in a marine casualty consisting in … (a) An unintended grounding, or an unintended strike of (allision with) a bridge."

20.    Carver has a Safety Management System ("SMS") that sets forth Carver's policies for the operation of its vessels as required by 46 C.F.R. 138.205. *See* **J53** (SMS excerpts).

21.    Carver's SMS requires that, in the event of an allision, the master of the tug or the crew in the wheelhouse must "a) Notify the Company; [and] b) Notify the Coast Guard." *See* **J53** at CARVER HELM CONNECT 000996 (SMS excerpts).

22.    Approximately one hour after the Allision, at 5:24 and 5:28 p.m. EST on June 15, 2024, Carver's Port Captain, Mr. Baldassare, notified the crew on the tug that the U.S.

Coast Guard had allowed the vessel to leave Norfolk and continue to New York. *See* **J65** (texts between Baldassare and tug phone).

23.    The texts from Mr. Baldassare to the tug cell phone are shown below as produced by Carver. *See* **J65** (texts between Baldassare and tug phone); see also **Exhibit D p.347-349** (Malik Dep. 58:10-59:17, 65:3-12) authenticating text messages.





24.    The tug crew followed the Port Captain's instructions to continue to New York harbor as shown in the rough log entry for June 15, 2024 below. *See* **J43** (Rough Log Entry 06/15/24).



25.    Despite the Port Captain's statement to the tug crew, no one at Carver notified the U.S. Coast Guard of the Allision on June 15, 2024.  *See* **Exhibit D p.242-244**(Carver Rule 30(b)(6) Dep. 76:8-80:15).  Carver's Rule 30(b)(6) designee confirmed in his deposition that Carver did not notify the U.S. Coast Guard of the Allision and did not communicate with them until "days after it happened."  *Id.*

```
5          Q.     So in that capacity, I am
6     asking, did Carver notify any of those
7     Coast Guard offices immediately after the
8     allision?
9          A.     I'm not aware that they did.
10         Q.     Okay.  And when is the first
11    time that Carver notified the Coast Guard
12    of the allision?
13         A.     My understanding is that the
14    first correspondence with the Coast Guard
15    regarding this was days after it happened.
```

26.    No one at Carver notified the Belt Line of the Allision on June 15, 2024, or at any time thereafter.  *See* **Exhibit D p.110-111** (Moore Dep. 170:13-19, 175:21-24); *see also* **Exhibit D p.244-245** (Carver 30(b)(6) Dep. 80:5-15).

27.    Two days after the Allision, on June 17, 2024, the Belt Line's operations manager, Nathan Rose, and Vice President of Operations, William O'Brien, discovered that the Bridge had been struck and was not operational.

28.    The Belt Line reported the Allision to the U.S. Coast Guard on June 17, 2024.

29.    That same day, June 17, 2024, the U.S. Coast Guard contacted Carver about the Allision. *See* **NPBL Ex. 4** (Voicemail from USCG Lt. Palomba).

30.    On June 20, 2024, counsel for the Belt Line sent a letter to Carver regarding the damage caused by the Allision and demanding that Carver preserve all documents, information, and ESI related to the incident. *See* **NPBL Ex. 65** (Preservation Letter).

<center>*Carver attempts to cover up the events*</center>

31.    Text messages produced by Carver between Carver's Port Captain, Mr. Baldassare, and Carver's General Manager, Mr. Moore, document that Carver's tug captain (Christopher Miller) had intended to notify the U.S. Coast Guard of the Allision. *See* **J64** (texts between Baldassare and Moore).





From: +18455944410 Brian Moore
To: +18382072960 +18382072960 (owner)

Ugh, was it a hard hit or did he lay up alongside it to go through?  Kinda like Newtown creek style.  Slow things down and lay alongside the fenders to safely pass through.

The last thing Baltimore wants is a bridge investigation.  If its a hard hit, then I can guarantee CG and TVIB will be all over their asses

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +18382072960 +18382072960 | | 6/15/2024 5:14:13 PM(UTC-4) | |

Status: Read

6/15/2024 5:10:16 PM(UTC-4)

32.      Instead of notifying the U.S. Coast Guard or the Belt Line on June 15, 2024, text messages produced by Carver between Mr. Baldassare and Mr. Moore document that Carver's management misled the tug captain into leaving the scene and that Mr. Baldassare "yelled at" him for wanting to report the incident.  *See* **J64** (texts between Baldassare and Moore); *see also* **Exhibit D p. 342-347** (Malik Dep. 42:1-45:24, 54:14-24).



From: +18382072960 +18382072960 (owner)
To: +18455944410 Brian Moore

I can tell Chris I notified them and they will do an investigation and to keep going just to shut him up

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +18455944410 Brian Moore | 6/15/2024 5:15:22 PM(UTC-4) | | |

Status: Sent

6/15/2024 5:15:22 PM(UTC-4)



From: +18455944410 Brian Moore
To: +18382072960 +18382072960 (owner)

Okay, CG will issue out an 835 for the rudder.  There is zero chance we can replicate the issue on the rudder so it won't be sailing any where for a while.

Did the rudder actually get stuck or just ship handling?

It's also a 250' barge that's hired out from weeks.

See how we can resolve the steering issue or they make it ship handing issue.

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +18382072960 +18382072960 | | 6/15/2024 5:17:58 PM(UTC-4) | |

Status: Read

6/15/2024 5:17:45 PM(UTC-4)



From: +18382072960 +18382072960 (owner)
To: +18455944410 Brian Moore

Yeah I already yelled at Chris

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +18455944410 Brian Moore | 6/15/2024 5:21:31 PM(UTC-4) | | |

Status: Sent

6/15/2024 5:21:30 PM(UTC-4)



From: +18382072960 +18382072960 (owner)
To: +18455944410 Brian Moore

Taken care of.

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +18455944410 Brian Moore | 6/15/2024 5:29:21 PM(UTC-4) | | |

Status: Sent

6/15/2024 5:29:21 PM(UTC-4)



From: +18382072960 +18382072960 (owner)
To: +18455944410 Brian Moore

As far as not reporting it I guess we just chalk it up to no damage and not thinking it was a reportable incident?

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +18455944410 Brian Moore | 6/18/2024 2:19:51 PM(UTC-4) | | |

Status: Sent

6/18/2024 2:19:50 PM(UTC-4)

10

33.     Carver's SMS requires drug and alcohol testing immediately after all serious marine incidents in accordance with 33 C.F.R. 95.  *See* **J53** at CARVER HELM CONNECT 000844 (SMS excerpts).

34.     Under 46 C.F.R. 4.03-2(a), a serious marine incident includes any bridge allision and any marine casualty with property damage in excess of $200,000.

35.     Carver did not test the crew of the tug for drug and alcohol use on the day of the Allision, and because Carver did not report the incident to the U.S. Coast Guard, no one else did either.  *See* **Exhibit G** (Carver Rule 30(b)(6) Dep. 101:7-10 **p.256**; 101:20-102:6 **257**).

```
7        Q.    My first question was about
8    alcohol.  There wasn't any alcohol testing,
9    was there?
10        A.    Not that I'm aware.
1        Q.    And there wasn't any such drug
2    testing of any members of the crew of the
3    Mackenzie Rose within that period of time
4    following the allision with the Belt Line
5    Bridge, correct?
6        A.    Not that I'm aware of.
```

36.     Carver's General Manager, Mr. Moore, disposed of his cell phone that he used on June 15, 2024, and Carver has never produced texts or ESI from that phone despite being requested to do so by the Belt Line and ordered to do so by this Court.  *See* **Exhibit D p.82** (Moore Dep. 27:15-21); **Exhibit S** (Belt Line's First RFPs); ECF 50 (Order requiring response to RFP 34).[1]

---

[1]     Mr. Moore is no longer employed by Carver but was employed by Carver at the time of the evidence preservation letter sent to Carver on June 20, 2024 and throughout most of this case.  *See* **NPBL Ex. 65**.

```
17        A.    It's my personal cell phone.
18        Q.    Do you still have the same cell phone
19   from June of 2024 that you have today?
20        A.    No.  It's been upgraded to different
21   iPhones, just through the family plan.
```

37.    Carver performed "maintenance" work on the tug on June 18, 2024, just days after the Allision, before the Belt Line, Evanston, or the U.S. Coast Guard could inspect it.  *See* **J17** at CARVER HELM CONNECT 000549-550 (Daily Log Entry 06/18/24).

# Daily Log
## Mackenzie Rose
06/18/2024

**Helm**

### Logs

| Log Time | Description |
|---|---|
| 05:00 | Standby for Orders - CMT Staten Island, NY (Greyship) - STANDING BY FOR ORDERS |
| 07:30 | Other - CMT Staten Island, NY (Greyship) - I had a meeting with Brian Moore and Lenny B about tug issues. |
| 09:00 | Other - CMT Staten Island, NY (Greyship) - LOADING SUPPLIES AND DOING MAINTANANCE ON THE TUG. |

*The Bridge is a published hazard to navigation in a narrow channel*

38.    At all times relevant, the Bridge was and is a published hazard to navigation in 33 C.F.R. 117.997.

39.    Carver's Port Captain, Mr. Baldassare, confirmed that bridges are considered hazards to navigation.  *See* **Exhibit D p.177** (Baldassare Dep. 169:4-7).

40.    The width of the Bridge opening between the fenders constitutes a narrow channel.

*Carver was using autopilot at the time of the Allision*

41.    Carver was operating the tug in autopilot at the time of the Allision.  *See* **J16** (Daily Log from 06/15/24).

42.     The daily log for the M/T MACKENZIE ROSE for June 15, 2024 states that James Morrissey did not turn off the autopilot until he began backing away from the Bridge. *Id.*

| 16:30 | Incident - Norfolk, VA - Mate James Morrissey reports the auto pilot was not completely turned off he was able to correct and switch back over to hand steering and begin backing on the Weeks 281 Barge and maneuvered the barge alongside fendering on the North and PBL RR Bridge, photo taken. proceed slowly away from bridge. |
|---|---|

43.     On June 15, 2024, Carver's General Manager, Mr. Moore, asked Carver's Port Captain, Mr. Baldassare, to "see how we can resolve the steering issue" in reference to the Allision. *See* **J64** (texts between Baldassare and Moore); *see also* **Exhibit D p.339- 346** (Malik Dep. 31:11-17, 39:13-20, 40:10-42:12, 54:14-24).

44.     On July 2, 2024, two weeks after the Allision, an engineer on board the M/T MACKENZIE ROSE noted error codes on the autopilot and reported this error to Carver via text message. *See* **J65** (text messages from tug phone to Moore).

*Carver knew of steering problems with the autopilot before the Allision*

45.     Before the Allision, the M/T MACKENZIE ROSE had a history of issues with its autopilot system. *See* **J2, J4, J6, J9, and J10** (Incident and Near Miss Reports).

46.     Carver replaced at least part of the autopilot system in November of 2023 after reported issues with the system. *See* **J46** (Mackay Marine Invoice); **Exhibit D p.109** (Moore Dep. 166:22-167:3).

47.     On February 28, 2024, Captain Miller filed a "near miss report" in Carver's HELM system records describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "AUTO PILOT STOPPED TUG TOOK A HARD LEFT INTO OTHERN (*sic*) TRAFFIC LANE." *See* **J4** (02/28/24 Near Miss Report); **Exhibit D p. 135** (Moore Dep. 298:21-301:11).

13

48.    On March 2, 2024, Mackay Marine performed work for Carver on the autopilot system on the M/T MACKENZIE ROSE after Carver complained of issues with the system. *See* **J46** (Mackay Marine Invoice); **Exhibit D p. 129** (Moore Dep. 276:17-277:5).

49.    On April 1, 2024, after the work by Mackay Marine, Captain Miller filed another "near miss report" in Carver's HELM system records describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "autopilot to go into standby and hard right to heavy seas." *See* **J11** (04/01/24 Near Miss Report); **Exhibit D p. 137-139** (Moore Dep. 303:2-8, 308:4-10).

50.    On April 3-5 and 10-11, 2024, Ayers Marine Electronics performed work for Carver on the autopilot system on the M/T MACKENZIE ROSE. *See* **J45** (Ayers Marine Invoice); **Exhibit D p. 127** (Moore Dep. 271:22-272:15).

51.    Carver's General Manager, Mr. Moore, testified that no further work was done to the autopilot system on the tug after April 2024. *See* **Exhibit D p.129** (Moore Dep. 275:24-276:6).

52.    On May 3, 2024, just 6 weeks before the Allision, Captain Miller, as confirmed by Mate Erik Walordy, filed a "near miss report" in Carver's HELM system records describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "the steering went into standby and the rudder came hard over without alarm." *See* **J7** (05/03/24 Near Miss Report); **Exhibit D p.7** (Walordy Dep. 24:18-26:19).

53.    On May 21, 2024, 3½ weeks before the Allision, Captain Miller filed an incident report in Carver's HELM system records describing an incident with the M/T MACKENZIE ROSE wherein the steering went unexpectedly hard left when the tug was in autopilot. *See* **J9** (05/21/24 Incident Report).

14

54.    Carver's current Compliance and Logistics Supervisor, Jason Galioto, confirmed that Carver's management received the May 21, 2024 Incident Report, but that it sat in Mr. Moore's electronic inbox unopened for months beyond the date of the Allision. *See* **Exhibit D p. 206-207** (Galioto Dep. 76:17-80:22).

*Carver did not restrict use of autopilot despite multiple reasons to do so*

55.    The operator manual for the Simrad autopilot system on the M/T MACKENZIE ROSE on June 15, 2024 prohibits use of automatic steering "in heavy traffic areas or in narrow waters" and requires users to "always switch the autopilot to standby and reduce speed in due time to avoid hazardous situations." *See* **J52** at CARVER 001999 (Simrad manual excerpt).

Do not use automatic steering when:
- In heavy traffic areas or in narrow waters
- In poor visibility or extreme sea conditions
- When in areas where use of an autopilot is prohibited by law

When using an autopilot:
- Do not leave the helm unattended
- Do not place any magnetic material or equipment near the heading sensor used by the autopilot system
- Verify at regular intervals the course and position of the vessel
- Always switch the autopilot to standby and reduce speed in due time to avoid hazardous situations

56.    Carver possessed the Simrad autopilot manual for the tug as part of its vessel records produced in this case. *See* **J52** (Simrad manual with CARVER bates stamp).

57.    Carver's Port Captain, Mr. Baldassare, testified that autopilot should not have been used when the tug was approaching the Bridge. *See* **Exhibit D p.164** (Baldassare Dep. 89:14-90:5).

```
14          Q.    In making bridge transits,
15    would you expect them to not to be in
16    autopilot?
24          A.    No.   There would be no reason
25    for them to be in autopilot when
```

15

```
1        approaching the bridge.
2            Q.    You would expect them not to be
3        on autopilot?
4            A.    Correct, they should be
5        hand-steering.
```

58.    Notwithstanding the Simrad manual and the many problems with the autopilot that had not been repaired, Carver did not prohibit use of the autopilot on the M/T MACKENZIE ROSE before the Allision. *See* **Exhibit D** (Moore Dep. 281:8-23); **Exhibit M** (Carver Rule 30(b)(6) Dep. 91:5-12).

59.    Notwithstanding the Simrad manual and Mr. Baldassare's testimony, Carver's SMS contains no restriction on the use of autopilot in heavy traffic areas, narrow waters, or near hazards to navigation. *See* **Exhibit D p.131** (Moore Dep. 281:17-23); **J53** (SMS excerpts); **Exhibit D p.252-253** (Carver Rule 30(b)(6) Dep. 91:5-12).

*Carver supplied an incompetent crew on the day of the Allision*

60.    Carver's SMS contains various training modules for operation of Carver's vessels, but does not contain any training module for transiting bridges. *See* **J53** (SMS excerpts).

61.    James Morrissey received no training from Carver on transiting bridges before operating the tug on the day of the Allision. *See* **J36** (records of Morrissey's training).

62.    James Morrissey received no training from Carver on the use of autopilot before operating the tug on the day of the Allision. *See* **J36** (records of Morrissey's training).

63.    In January 2024, 5 months before the Allision, James Morrissey struck a pier while operating the M/T MACKENZIE ROSE, causing over $75,000 in damages. *See* **J3** (01/22/24 Incident Report).

64.    After the January 2024 allision, James Morrissey was not disciplined by Carver or required undergo any additional or remedial training. *See* **Exhibit D p. 93** (Moore Dep. 88:6-89:16).

*The Belt Line has incurred nearly $16 million in costs to repair the Bridge*

65.    The Belt Line utilized Norfolk Southern Railway Company's Master Service Agreements to engage Hardesty & Hanover ("H&H") and PCL Civil Constructors ("PCL") to repair the Bridge.

66.    The Norfolk Southern Master Service Agreements contained negotiated rates as opposed to emergency rates which reduced the cost of the repair work.

67.    PCL was on-site by June 18, 2024, the day after the Belt Line discovered the damage caused by the Allision.

68.    The repairs performed by H&H and PCL, and their subcontractors, totaled $15,107,595.50 in direct repair costs and $815,281.95 in additive costs.

69.    The additive costs are comprised of the Belt Line's overhead and authorized markups for labor during the emergency repairs.

70.    These markups were approved by the Federal Highway Administration and the Georgia Department of Transportation. *See* **NPBL Ex. 97**.

71.    The costs of repairing the Main Line Bridge are reasonable and directly caused by the Allision.

72.    The current amount of costs incurred by the Belt Line is $15,922,877.46. *See* **J73**(Updated Cost Spreadsheet NPBL008221).

73.    The Court should award $15,922,877.46 in punitive damages against Carver for its reckless conduct (and post-incident fraud). *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513 (2008) (allowing a 1:1 ration of punitive to compensatory damages).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division
### In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

## EXHIBIT F

## CARVER'S FACTUAL CONTENTIONS

**EXHIBIT F TO PRETRIAL MEMORANDUM**

**CARVER'S FACTUAL STIPULATIONS AND TRIABLE ISSUES**

1.      This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure for claimed property damaged resulting from an allision to the Main Line Bridge on the Southern Branch of the Elizabeth River. This Court has original jurisdiction over this matter under its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and federal question jurisdiction pursuant to 28 U.S.C § 1331. Venue is proper in this district and division under 28 U.S.C. § 1391.

**Parties**

2.      Claimant Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business located in Chesapeake, Virginia. The Belt Line is a terminal switching railroad serving the cities of Norfolk, Portsmouth and Chesapeake, Virginia. The Belt Line is the owner of its Main Line Bridge over the Southern Branch of the Elizabeth River connecting the Cities of Chesapeake and Portsmouth.

3.      Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("CMT") is a limited liability organized under the laws of New York with its principal place of business located in Albany, New York. CMT owns and operates a fleet of inland and offshore tug and barges and provides towing services on the East Coast of the United States. On June 15, 2024, CMT owned and operated the tug M/T Mackenzie Rose.

4.      The M/T MACKENZIE ROSE (IMO No. 8968765) is a United States-flagged twin-screw tugboat built in 2000, measuring approximately 101 feet in length, 39 feet in beam,

1

and 343 gross tons, with a draft of about 16 feet. It is powered by two Alco 12-251E diesel engines rated at approximately 4,500 horsepower, with auxiliary power from three Caterpillar 3304-driven generators.

5.      James Morrissey is an individual who currently resides in Florida. He was formerly employed by CMT as a Captain. Mr. Morrissey holds a valid U.S. Coast Guard Merchant Mariner Credential (Serial No. 000611973, issued December 2021 expiring December 13, 2026) qualifying him as an Able Seafarer-Unlimited, Master of Towing Vessels on Near Coastal Waters and Western Rivers, and Master of Self-Propelled Vessels under 1,600 GRT on Near Coastal Waters. His endorsements include Radar Observer (Unlimited), Lifeboat Operator (limited), and multiple Standards of Training, Certification and Watchkeeping for Seafarers endorsements, including Advanced Firefighting, Basic Training, Officer in Charge of a Navigational Watch (limited), and Proficiency in Survival Craft (limited). He also maintains a valid U.S. Coast Guard Medical Certificate through November 23, 2026.

<p align="center">**The Main Line Bridge**</p>

6.      The Belt Line Railroad Bridge ("Main Line Bridge") was first permitted by Act of Congress in 1897, with a permit issued by the Secretary of War. Following hearings under the Truman–Hobbs Act of June 21, 1940, 33 U.S.C. §§ 511–524, the original bridge was determined to be an unreasonable obstruction to navigation, and the Secretary of the Army issued a new permit on October 6, 1947. The current Main Line Bridge was constructed between 1956 and 1958 as a steel vertical lift bridge carrying the Norfolk & Portsmouth Belt Line Railroad's main line across the Southern Branch of the Elizabeth River in Chesapeake, Virginia.

7.      The structure consists of four fixed approach spans and a central lift span supported by towers on each riverbank. The total length of the bridge is approximately 2,050 feet, with the

<p align="center">2</p>

lift span measuring approximately 385 feet and providing a horizontal clearance of 300 feet. When closed, the bridge has a vertical clearance of approximately 6 feet, and when raised, approximately 142 feet. The lift span is counterweight-balanced and operated by wire ropes and sheaves, allowing a raised vertical clearance of about 150 feet.

8.      The bridge was originally fabricated primarily using ASTM A7 carbon steel. Structural connections are primarily riveted, with gusset plates used at critical truss panel points. The design reflects mid-twentieth century railroad bridge engineering standards, including trusses, floor beams, stringers, and gusset plates that require periodic inspection and maintenance.

9.      By federal regulation, the bridge remains raised except when a train is crossing. The bridge is not manned by a tender. Instead, an off-bridge control station monitors the draw by video and monitors VHF Channels 13 and 16. Thirty minutes and fifteen minutes before any train crossing, the control station broadcasts a warning message on Channel 13 to advise approaching vessel traffic.

10.     On January 24, 2024, Koppers Railroad Structures Inc. ("Koppers") conducted an annual inspection of the Main Line Bridge.  Koppers found that Span 1 of the bridge exhibit web corrosion at all intermediate stiffener bottom 10" locations; top cover plates had minor pitting; and heavy pack rust and debris on the top gusset plates that indicated 25-30% section loss.

11.     Koppers also found that the floor systems on Spans 1 and 2 exhibited section loss, pack rust, and cracks in several steel members.

12.     On June 4-5, 2024, Hardesty & Hanover ("H&H"), a New York-based engineering firm, conducted a mechanical inspection of the Main Line Bridge. The inspection noted that the west counterweight was skewed due to uneven rope stretch, while the east counterweight showed minimal skew. Balance testing confirmed the span was as well-adjusted as possible, but the

3

absence of auxiliary counterweights or balance chains was described as unusual given the bridge's lift height.

13.    H&H also noted fatigue concerns in the counterweight trunnion shafts, including scoring and inadequate lubrication. The west tower auto-lubrication system was found non-functional, and lubrication of both trunnions and counterweight ropes was found inadequate.  The counterweight ropes showed corrosion, inadequate lubrication, and abrasive crown wear, and were described as nearing the end of their useful life. The counterweight sheave grooves were worn beyond acceptable tolerance to accommodate new ropes, raising concerns about poor load sharing between ropes.

14.    The report further found that the existing 10-inch thruster brake was undersized and adjusted beyond its rated torque, with missing supports and asbestos brake pads still in use. Poor brake pad contact was observed. Access to the machinery was also noted to be hazardous, requiring climbing nearly 200 feet of ladders with insufficient safety lines.

<div align="center"><b>The Allision on June 15, 2024</b></div>

15.    On June 15, 2024, the M/T MACKENZIE ROSE was transiting the Southern Branch of the Elizabeth River and was pushing the Weeks 281 barge laden with non-hazardous cargo per Carver's contract with Skanska.

16.    Captain James Miller, a U.S Coast Guard licensed Master, was the Captain aboard M/T MACKENZIE ROSE on June 15, 2024. James Morrisey was the Mate aboard the vessel.  The crew were Jarkeis Morrissey, Sharif Porter, and engineer Jason McGrath.

17.    At approximately 16:25 hours on June 15, 2024, the barge portion of the configured tug/barge allided with the Bridge.

<div align="center">4</div>

18.     At the time of the allision, James Morrissey was the Officer on Watch and in control of navigating the M/T MACKENZIE ROSE.  He was situated in the upper wheelhouse of the tug. There was a 360 view from the upper wheelhouse with a clear line of sight across the front of the barge.

19.     The weather conditions at the time of the allision were clear with good visibility (up to 10 miles).  The tide was about 21' with no "chop." There was insignificant vessel traffic on the Elizabeth River near the Main Line Bridge.

20.     Mate Morrissey was not under the influence of drugs or alcohol at or before the time of the allision.

21.     Mate Morrissey was operating the Mackenzie Rose using its Simrad AP70 autopilot system just prior to the allision.

22.     Mate Morrissey initially reported to Captain Miller that the allision was caused by the rudder going hard over to port just before striking the bridge.  This statement was untrue, as discovered by Carver's management once they conducted an investigation after the allision.

23.     During his U.S. Coast Guard investigation interview, Mr. Morrissey corrected his version of events and stated that he was transiting in autopilot and did not switch over to "non follow up" hand steering but thought he did.  He further stated that once he did switch to hand steering, he gave a slow astern at first and then full astern shortly prior to impact but nonetheless struck the bridge with the barge.

24.     There is no evidence that the autopilot, steering, or mechanical systems on the M/T MACKENZIE ROSE malfunctioned at any time on June 15, 2024.

25.     The most reliable evidence of the course and speed of the M/T *MACKENZIE ROSE* on June 15, 2024 is the Rose Point navigational data produced by Carver in discovery.

5

26.     The value of the M/T *MACKENZIE ROSE* just prior to and after the allision was approximately $2.5 Million.

**Carver's Factual Contentions for Trial**

**B.      The factual contentions of Carver in addition to Paragraphs 1 through 26 of the Stipulation above, are as follows:**

1.      This trial is about whether the Belt Line can defeat Carver's entitlement to limit its liability under the Limitation of Liability Act, 46 U.S.C. §30501 *et seq.*. and the amount of Belt Line's recoverable damages, if any. Belt Line contends, primarily, that Carver's vessel was unseaworthy on June 15, 2024 because Mate James Morrissey was not properly trained in how and when to use autopilot on the Elizabeth River near railroad infrastructure; the autopilot system on board the M/T *MACKENZIE ROSE* (an Simrad AP70) was defective or malfunctioned; Mate Morrissey failed to post a lookout and failed to keep a proper lookout; and that Carver's management had privity and knowledge of these issues.

2.      Carver contends that there is no evidence to support any of Belt Line's theories of liability. There is no evidence that the autopilot, steering, mechanical, or equipment on the vessel malfunctioned or was defective on the date of the incident. Carver regularly and properly maintained the M/T *MACKENZIE ROSE* and its various mechanical systems. This included replacing and maintaining the autopilot and steering systems in the months leading to the allision through reputable service venders in the maritime industry. The autopilot and steering systems functioned properly on the date of the incident.

3.      Moreover, Mate Morrissey, Captain Chris Miller, and the crew aboard the M/T *MACKENZIE ROSE* were licensed, experienced mariners and were competent in all respects on June 15, 2024. Carver neither knew nor should it have known of any incompetencies to suggest

6

that Mate Morrissey may errantly strike a bridge while in command of the M/T *MACKENZIE ROSE.*

4.      The weather conditions on June 15, 2024 were clear with good visibility (10 miles in either direction).  Mate Morrissey was Officer on Watch operating the M/T MACKENZIE ROSE prior to and at the time of the allision.  Captain Chris Miller and the crew were not on watch and were in their racks sleeping or otherwise below deck.  Mate Morrissey was situated in the Upper Wheelhouse of the M/T MACKENZIE ROSE which provided a sufficient lookout to observe and avoid striking the Main Line Bridge.

5.      Capt. Sam Stephenson will testify consistent with his written report of June 8, 2025 and within the bounds of reasonable operational maritime certainty,  that (1) The MACKENZIE ROSE was properly manned on June 15, 2024, the crew was licensed by the U.S. Coast Guard, and in compliance with work/rest requirements of six hours on/six hours off; (2) The watch officer acting as look-out was appropriate under the prevailing conditions on June 15, 2024; (3) Autopilot is not prohibited for use while transiting a waterway with bridges; (4) The evidence clearly establishes that Mate Morrissey's initial statement that the autopilot malfunctioned was false; and (5) Mate Morrissey failed to engage the switch from Auto to NFU when he thought he had and therefore, this failure by Mate Morrissey and his lack of situational awareness was the sole cause of the allision.

6.      Mate Morrissey was properly using autopilot as he transited the Elizabeth River but errantly failed to switch to Non-Follow Up and manually control the vessel as the vessel approached the Main Line Bridge.  Mate Morrissey's navigational error was the sole cause of the allision.

7

7.    The allision resulted in property damage to the Main Line Bridge and there were no injuries to any person.

8.    Belt Line contends that its damages for repairing the bridge total $15,992,887.46. These damages are overstated and include unrelated or unreasonable costs, including: costs for replacing rails and ties that were not damaged in the allision; adding improvements to the bridge like conduit for electrical wiring, mechanical system components, and refurbishing the lift system and its components, among other things; time and expenses for labor that relate to a lost income claim that Belt Line has conceded; and added "surcharges" on top of Belt Line's own labor expenses that are not recoverable.

9.    Additionally, Belt Line's damages do not account for depreciation and the deteriorated condition of the bridge.  The bridge was built in 1958, was 66 years old at the time of the allision and was nearing the end of its useful life.  Carver has retained R&L Banks & Associates, LLC, a firm that specializes in valuing railroad infrastructure, who will opine that the Belt Line's recoverable damages, at most, total $2,972,767 when accounting for depreciation that is allowed by law.  A summary of R&L Banks' valuation opinion is as follows:

*Table 1 – Summary of RLBA Damages Reductions Applied to* **Belt Line's Claim**

| Category | Subtotals | | Depreciated Value | | Totals | |
|---|---|---|---|---|---|---|
| Total Damages Claimed by Belt Line | | | | | $ | 15,542,872 |
| Ties and Rail | $ | 224,446 | | | | |
| PCL Classified Damages | $ | 5,780,290 | | | | |
| PCL Unclassified Damages | $ | 7,524,646 | | | | |
| Construction Total Damages | $ | 13,529,383 | | | | |
| Depreciated Value | | | $ | 2,343,949 | | |
| Depreciation Reduction | | | | | $ | (11,185,434) |
| H&H Classified Damages | $ | 262,471 | | | | |
| H&H Unclassfied Damages | $ | 252,178 | | | | |
| H&H Total Damages | $ | 514,649 | | | | |
| Depreciated Value | | | $ | 88,166 | | |
| Depreciation Reduction | | | | | $ | (426,483) |
| Total Depreciation of Belt Line's Claim | | | | | $ | (11,611,917) |
| Total Damages less Depreciation | | | | | $ | 3,930,954 |
| Scrap Steel Credit | | | | | $ | (41,897) |
| Belt Line Labor Damages | $ | 1,087,141 | | | | |
| Labor Charges removed | $ | 916,291 | | | | |
| Labor Reduction | | | | | $ | (916,291) |
| TOTAL Damages | | | | | $ | 2,972,767 |

9

9.     In the event that Carver is entitled to limit its liability under the Limitation of Liability Act, 46 U.S.C. §§ 30501 through 30512, and all laws supplementary thereto, Jason R. Meyerrose will testify the value of the subject vessel at the time of the loss, the M/T MACKENZIE ROSE, has a maximum value of approximately $2,500,000.00.

10.    By virtue of its contract with Evanston, the Belt Line transferred its rights of recovery against Carver to Evanston to the extent of Evanston's payment that was $10 Million. The Policy provides as follows:

## I.    TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

**If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after the loss to impair them …**

Evston Policy, Commerical Property Conditions, Form 00 90 07 88, p. 2 of 2.

### Carver's Triable Issues

### B. Carver's Triable Issues

The key issues to be tried in Carver's lawsuit to Limit Liability pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.* are:

1. Whether the Belt Line can prove any causative negligent act other than a navigational error by Mate Morrissey.

2. If the Belt Line can prove some other causative negligent act, then whether Carver can establish lack of privity of knowledge.

3. If the sole causative negligent act is a navigational error by Mate Morrisey, or if Carver can establish lack of privity as to any other alleged causative negligent act, then there

is a dispute as to the value of the vessel and its cargo. That amount would serve as Carver's maximum exposure in this case.

4. Notably, the Belt Line's actual damages are disputed. Carver submits that the evidence is that the Belt Line's total damages in tort after depreciation were substantially less than the recovery it made in contract from Evanston ($ 10 million). If so, the Belt Line's recovery here should be $0.00.

5. If Carver establishes entitlement to limitation of liability, then the Belt Line would not be entitled to recover, as the value of the tug is substantially less than the $10 Million that Belt Line recovered from Evanston.