**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty**

In the Matter of COEYMANS MARINE
TOWING, LLC D/B/A CARVER MARINE
TOWING as Owner and Operator of M/T
Mackenzie Rose, (IMO No. 8968765), *et al*.

Civil Action No. 2:24-cv-00490-MSD-LRL

**CARVER'S OBJECTION TO THE MAGISTRATE JUDGE'S
<u>ORDER OVERRULING CARVER'S OBJECTIONS TO NPBL'S EXHIBIT 105</u>**

Pursuant to Fed. R. Civ. P. 72 and 28 U.S.C. § 636(b)(1), Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver") respectfully objects to the Magistrate Judge's order overruling Carver's relevancy, foundation, hearsay, and Rules 26 and 37 objections to Belt Line's trial Exhibit 105. ECF 178 at p. 49.

**I.  Carver's Objections to Belt Line's Exhibit 105.**

Belt Line's Exhibit 105 is an "Excel Spreadsheet with Tabs" that purportedly summarizes Belt Line's alleged damages. **Exhibit A**.[1] Belt Line produced it on September 3, 2025 but several versions of the spreadsheet have been produced over the course of discovery, with Belt Line removing or adding claimed damages with each new iteration.[2] The original spreadsheet was created by Belt Line's President for submission to Evanston in connection with Belt Line's proof of loss for its insurance claim. The final version—Exhibit 105—tallies Belt Line's claimed

---

[1] The spreadsheet marked as Exhibit 105 contains separate sheets showing underlying labor costs and is approximately 86 pages when converted to PDF. Carver provides the first sheet of the spreadsheet for brevity here, which contains the summary line items and information at issue.

[2] For example, for much of the litigation Belt Line included several Hardesty & Hanover invoices amounting to about $40,000 for work on the bridge that predated the allision. Belt Line dropped those damages after Carver deposed the Hardesty & Hanover engineer, who confirmed the damages were unrelated to the incident.

1

damages at $15,922,877.46. Of that amount, $815,281.95 comes from an "additive rate"—ranging from 5% to 272%—that Belt Line tacked on to labor and material costs relating to rerouting trains during bridge repairs or construction of an access road for its contractors. See **Exhibit A**. Another $277,773.60 is derived from contractor invoices disclosed for the first time on September 3, 2025—well after the close of discovery on July 29, 2025. *Id.* at Row 48 (PCL Invoice 5524004-014 for $274,285.60) and Row 60 (Wesco Invoice 193469 for $3,488.81).

In total, the spreadsheet includes at least $1,093,055.55 in claimed damages that were either untimely disclosed or irrelevant to the claimed repairs as a matter of law. Carver's relevancy and Rule 37/26 objections are directed to these entries on Exhibit 105. Carver's foundation and hearsay objections are directed at Exhibit 105 generally to the extent Belt Line intends to offer the spreadsheet itself as evidence of damages, which includes the "notes" authored by Belt Line's President describing third party contractors' work. The spreadsheet was clearly prepared for litigation and only includes unfounded "top line" costs and not the underlying records establishing what damages, if any, Belt Line may have sustained from the allision. The Magistrate Judge's order allowing Exhibit 105 is contrary to law and Carver respectfully requests it be vacated and its objections to Exhibit 105 be sustained.

**II. Background and Relevant Discovery History.**

**A. Belt Line's Untimely Disclosure of $277,773.60 in Claimed Damages.**

Fact discovery closed for Belt Line on July 29, 2025. ECF 56. On July 29, 2025, Belt Line served its Seventh Supplemental Responses to Carver's First RFPs, which included an "Updated Costs Spreadsheet" Bates-marked NPBL 008176. **Exhibit B** (Supplemental Responses); **Exhibit**

2

**C** (NPBL01876).[3] On September 3, 2025, Belt Line served its Eighth Supplemental Responses to Carver's RFPs, which included what is now marked as Exhibit 105 for trial—the "Updated Cost Spreadsheet" Bates-marked NPBL 008221. **Ex. A** (NPBL 008221)**; Exhibit F** (Supplemental Responses)**.** This version of the spreadsheet and document production included two invoices—PCL #5524004-014 for $274,285.60 and Wesco #193469 for $3,488.00—that had never been disclosed during discovery. **Ex. A.**

### B. Belt Line's Additive Rate on Its Direct Labor Costs.

Both spreadsheets produced on July 29, 2025 and September 3, 2025 contain "additive rates" on top of direct labor costs that range from 185% to 245%. See **Exs. A, C**. The spreadsheet also adds a 5% additive rate to certain materials Belt Line ordered. See *id.* (e.g., Burnett & Sons Invoices). Belt Line's President, Cannon Moss, explained in deposition that Belt Line uses the additive rates on top of material and labor charges when Belt Line performs construction projects for state governments to account for overhead and other costs. **Exhibit D,** Moss Dep. at 180-185. They are derived from the Georgia Department of Transportation, which approved Norfolk Southern to use them for its government projects. *Id.* at 181, 184.

### III. Legal Standard.

A district judge may modify or set aside a magistrate judge's non-dispositive order if it "is clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). A court's "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Bruce v. Hartford*, 21 F. Supp. 3d 590, 593-94 (E.D. Va. 2014) (citing *United States v. United States Gypsum Co*, 333

---

[3] The spreadsheet marked as NPBL01876 contains separate sheets showing underlying labor costs and is approximately 85 pages when converted to PDF. Carver provides the first sheet for brevity here, which contains the summary line items and information at issue.

U.S. 364, 395, 68 S. Ct. 525 (1948)). An order is contrary to law if it "fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Convisser v. Exxon Mobil Corp.*, Civil Action No. 3:24-cv-00072, 2025 U.S. Dist. LEXIS 21630, at *4-6 (W.D. Va. Feb. 6, 2025). For questions of law "there is no practical difference between review under Rule 72(a)'s contrary to law standard and [a] *de novo* standard." *Id.* at 594.

### IV. Argument.

#### A. The late-disclosed claimed damages should be excluded.

Rule 37(c)(1) provides that a party who fails to disclose information required by Rule 26(a) or 26(e) is not allowed to use that information unless the failure was substantially justified or harmless. *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595 (4th Cir. 2003). Here, there is no dispute that the two invoices and information regarding claimed damages amounts—PCL #5524004-014 for $274,285.60 and Wesco #193469 for $3,488.00—were disclosed on September 3, 2025 after the close of discovery. Belt Line's late disclosure is presumptively sanctionable because it foreclosed Carver from taking discovery on the invoices, including reasonableness, causation, and whether the work duplicates other claimed items. Nor is there any justification for Belt Line's late disclosure. The work on the bridge was finished at least 5 months before the September 3, 2025 disclosure, and Belt Line had no issues in receiving timely monthly invoices from the contractors who performed the work. If there was any consideration that PCL was delaying providing an invoice, Belt Line could have and should have pressed them to provide it prior to discovery close on July 29, 2025. The late disclosure is clear cut and prejudices Carver by forcing it to defend damages that it never knew about during the discovery window. The Magistrate Judge's order overruling the objections is contrary to Rule 37 and Rule

4

26 and should be overturned. Belt Line's objections should be sustained and the $$277,773.60 in claimed damages relating to the two invoices should be barred from trial.

### B. The Additive Rates should be excluded because they are unsupported internal markup untethered to Belt Line's actual costs or any damage to the bridge.

The additive rates are clearly unrelated to any actual damage done to the bridge and do not reflect any real costs incurred by the Belt Line while rerouting trains. Belt Line's Vice President of Operations, Bill O'Brien, confirmed in deposition that Belt Line did not hire any extra crews to reroute trains but, rather, its crews simply worked more hours rerouting trains during the repair work. **Exhibit E**, O'Brien Tr. at 72. Overhead costs per employee—*e.g.*, health insurance premiums, administrative costs, office support—etc. do not increase simply because an employee works more hours. To the extent that some benefits contributions increased (if hours-based) increase, the additive rates employed by Belt Line do not actually reflect the same and thus there is no causal link to any actual costs borne by Belt Line. Moreover, Belt Line's President, Cannon Moss, testified that Belt Line, in fact, uses Norfolk Southern's payroll department to process employee compensation. **Ex. D**, Moss Tr. at 181. To the extent such costs actually increased, it would appear those were born by Norfolk Southern who is not a party to this litigation and does not have any type of claim against Carver.

Indeed, other federal courts have rejected railroads' attempts to inflate their damages by adding these additive rates to labor charges for rerouting trains and maintenance of way. In *In re Matteson Marine Services*, a railroad includes a 269.3% and 245.5% "additive rate" on top of crew labor costs stemming from rerouting trains after an allision to a bridge owned by the railroad, which the Court found was "patently unreasonable". *In re Matteson Marine Serv.*, No. 08-cv-4023, 2011 U.S. Dist. LEXIS 75168, at *58 (C.D. Ill. July 13, 2011). The *Matteson* court similarly rejected the railroad's argument that such rates were "industry standard," reasoning "the fact that

5

BNSF charges itself and other companies overhead rates similar to those proposed here is an unconvincing reason to find that such rates reflect a portion of the cost of the accident." *In re Matteson Marine Serv.*, No. 4:08-cv-4023-SLD-JAG, 2012 U.S. Dist. LEXIS 186688, at *18 (C.D. Ill. Sep. 28, 2012).

Here, Belt Line has declined to offer any proposed overhead rate that is actually tied to any incremental cost increase that it sustained as a result of the allision. It simply cherry-picked a patently unreasonable rate that its parent company charges to state governments and added to the claimed damages it requests from Carvers. These additive rates are irrelevant and untethered to any actual damage from the allision and should be rejected. The Magistrate Judge's order overruling Belt Line's objections and permitting Belt Line to introduce the additive rates are part of its damages computation effectively authorizes Belt line to pursue inflated and clearly irrelevant damages. This evidence should be barred now from trial. The Magistrate Judge's order should be overturned, and Carver's objections should be sustained.

V. **Conclusion and Prayer for Relief**.

For the foregoing reasons, Petitioner respectfully requests that the Court sustain this Objection, set aside the challenged portions of the Magistrate Judge's Order, and enter an order:

1. Excluding Belt Line's additive-rate multipliers from its damages computation and proof;
2. Excluding the late-disclosed contractor invoices (PCL #5524004-014 for $274,285.60 and Wesco #193469 for $3,488.00) and corresponding damages amounts listed in Exhibit 105 under Rule 37(c)(1); and
3. All other relief as the Court deems just and proper**.**

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: February 27, 2026 | **CLYDE & CO US LLP** |
|  | By: /s/ Matthew J. Obiala |

James H. Rodgers*
Clyde & Co US LLP
2 Grand Central Tower
140 E 45th Street, Suite 26A
New York, New York 10017
Phone: (212) 702-6771
Email: james.rodgers@clydeco.us

Michael J. Roman*
Matthew J. Obiala (VSB 100626)
Siobhan M. Murphy*
Clyde & Co US LLP
30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email: michael.roman@clydeco.us
       matt.obiala@clydeco.us
       dawn.johnson@clydeco.us
       Siobhan.murphy@clydeco.us

## **CERTIFICATE OF SERVICE**

  I hereby certify that on February 27, 2026, a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will serve all counsel of record by electronic mail as follows:

Mark C. Nanavati, Esq. (VSB No.: 38709)
G. Christopher Jones, Jr., Esq. (VSB No.: 82260)
SINNOT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 893-3866 (Nanavati)
(804) 893-3862 (Jones)
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
cjones@snllaw.com
*Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

Zachary M. Jett, Esq. (VSB #93285)
BUTLER WEIHMULLER KATZ, et al
11525 North Community House Road
Suite 300
Charlotte, North Carolina 28277
(704) 543-2321 (Telephone)
(704) 543-2324 (Facsimile)
zjett@butler.legal
*Counsel for Evanston Insurance Company, a/s/o Norfolk and Portsmouth Belt Line Railroad Company*

            */s/ Matthew J. Obiala*