# Exhibit D

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     Norfolk Division

 4                      In Admiralty

 5

 6   In The Matter of COEYMANS      )
     MARINE TOWING, LLC D/B/A       )
 7   CARVER MARINE TOWING as Owner  )   CIVIL ACTION NO.
     and Operator OF M/T MACKENZIE  )   2:24-cv-00490
 8   ROSE (IMO NO. 8968765) her     )
     cargo, engines, boilers,       )
 9   tackle, equipment, apparel,    )
     and appurtenances, etc. in     )
10   rem, petitioning for           )
     Exoneration from or Limitation )
11   of Liability in allision with  )
     Norfolk and Portsmouth Belt    )
12   Line Railroad Company Main     )
     Line Railroad Bridge           )
13   occurring June 15, 2024 in     )
     and about the Elizabeth River, )
14   Virginia.                      )

15

16            DEPOSITION UPON ORAL EXAMINATION

17                   OF CANNON MOSS

18           TAKEN ON BEHALF OF THE PETITIONER

19

20                   Norfolk, Virginia

21                     June 4, 2025

22

23

24

25
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

| | Page 2 |
|---|---|
| 1 | Appearances: |
| 2 | CLYDE & CO US, LLP |
| 3 | By:  MICHAEL J. ROMAN, ESQUIRE |
| 4 | 30 S. Wacker Drive, Suite 2600 |
| 5 | Chicago, Illinois  60606 |
| 6 | michael.roman@clydeco.us |
| 7 | Counsel for Petitioner |
| 8 | |
| 9 | CRENSHAW, WARE & MARTIN, PLC |
| 10 | By:  W. RYAN SNOW, ESQUIRE |
| 11 | MACKENZIE R. PENSYL, ESQUIRE |
| 12 | 150 West Main Street, Suite 1923 |
| 13 | Norfolk, Virginia  23510 |
| 14 | wrsnow@cwm-law.com |
| 15 | mpensyl@cwm-law.com |
| 16 | Counsel for Norfolk and Portsmouth Belt |
| 17 | Line Railroad Company |
| 18 | |
| 19 | BUTLER, WEIHMULLER, KATZ, CRAIG, LLP |
| 20 | BY:  ZACHARY M. JETT, ESQUIRE (Via Zoom) |
| 21 | 11525 North Community House Road, |
| 22 | Suite 300 |
| 23 | Charlotte, North Carolina  28277 |
| 24 | zjett@butler.legal |
| 25 | Counsel for Evanston Insurance Company |

| | Page 3 |
|---|---|
| 1 | Appearances (Cont'd: |
| 2 | |
| 3 | SINNOT, NUCKOLS & LOGAN, P.C. |
| 4 | By:  G. CHRISTOPHER JONES, ESQUIRE (Via |
| 5 | Zoom) |
| 6 | 13811 Village Mill Drive |
| 7 | Midlothian, Virginia  23114 |
| 8 | cjones@snllaw.com |
| 9 | Counsel for Evanston Insurance Company |

| | Page 4 |
|---|---|
| 1 | I N D E X |
| 2 | -   -   - |
| 3 | WITNESS                                          PAGE |
| 4 | CANNON MOSS |
| 5 | Examination by Mr. Roman                           6 |
| 6 | Examination by Mr. Snow                          197 |
| 7 | Examination by Mr. Roman                         204 |
| 8 | Examination by Mr. Jett                          206 |
| 9 | Examination by Mr. Roman                         208 |
| 10 | |
| 11 | EXHIBITS |
| 12 | No.   Description                               Page |
| 13 | 1    Second Supplemental Rule 26(a)(1)           NA |
| 14 | Initial Disclosures of Norfolk & |
| 15 | Portsmouth Belt Line Railroad Company |
| 16 | 2    6-18-24 E-mail from Cannon Moss to          85 |
| 17 | NPBL Board (Bates Number NPBL002644 |
| 18 | through NPBL002753 |
| 19 | 3    NPBL External Calls (Bates Number          152 |
| 20 | NPBL002408 through NPBL002531 |
| 21 | 4    Bridge Maintenance Program (Bates Number    47 |
| 22 | NPBL006678 through NPBL006812 |
| 23 | 5    Financial document                          NA |
| 24 | 6    Financial document                          NA |
| 25 | |

| | Page 5 |
|---|---|
| 1 | EXHIBITS (Cont'd) |
| 2 | No.   Description                               Page |
| 3 | 7    Annual inspection report (Bates number     155 |
| 4 | NPBL002173 through NPBL002213) |
| 5 | 8    Emergency inspection report                165 |
| 6 | (Bates number NPBL002304 through |
| 7 | NPBL00236 |
| 8 | 9    Mechanical inspection report (Bates        169 |
| 9 | number NPBL006813 through NPBL006827 |
| 10 | 10   Financial document                         177 |
| 11 | 11   Second supplemental Rule 26(a)(1)          190 |
| 12 | Initial Disclosures of Norfolk & |
| 13 | Portsmouth Belt Line Railroad Company |
| 14 | 12   Norfolk & Portsmouth Belt Line Railroad    190 |
| 15 | Company's Second Supplemental Answers to |
| 16 | Petitioner's First Interrogatories |

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025

Page 6

```
 1              Deposition upon oral examination of CANNON
 2  MOSS, taken on behalf of the Petitioner, before
 3  Tracy B. Marinelli, RPR, a Notary Public for the
 4  Commonwealth of Virginia at Large, taken pursuant to
 5  Notice, commencing at 10:00 a.m. at the offices of
 6  Crenshaw, Ware & Martin, 150 W. Main Street, Suite
 7  1923, Norfolk, Virginia.
 8
 9              CANNON MOSS, was sworn and deposed on
10  behalf of the Petitioner and testified as follows:
11
12              EXAMINATION
13  BY MR. ROMAN:
14      Q.    Good morning, Mr. Moss.  Thanks again for
15  being here.
16            Would you please state your name for the
17  record?
18      A.    Cannon Moss.
19      Q.    And have you ever been deposed before?
20      A.    Yes.
21      Q.    How many times?
22      A.    Twice, I think.
23      Q.    When was the last one?
24      A.    It was an injury case.
25      Q.    When was it?
```

Page 7

```
 1      A.    Two or three years ago.
 2      Q.    Well, I'm sure Mr. Snow and Ms. Pensyl
 3  have given you the ground rules, but just so we have
 4  a good clean record and make sure we don't talk over
 5  each other today, while I'm asking a question, let
 6  me finish, and when you're responding, I'll return
 7  that same courtesy, and that way the court reporter
 8  can take down everything we say without crossover.  Is
 9  that fair?
10      A.    Yes.
11      Q.    Second, if I ask something that you
12  don't understand or a poor question you don't
13  think you can answer, just let me know.  I'll be
14  happy to try to rephrase, but if you do answer
15  a question, I will take that to mean that you
16  can fairly answer it and understood it.  Is that
17  fair?
18      A.    Yes.
19      Q.    Great.
20            Just let me know if you need
21  a break at any time.  It might be a little while,
22  but it's not supposed to be a marathon contest.
23  My only request is if we have a question pending
24  to answer that question first and then just let Ryan
25  or me know you need to take a break and we'll go
```

Page 8

```
 1  from there, all right?
 2      A.    Okay.
 3      Q.    Are you on any medications or substances
 4  that would affect your ability to testify truthfully
 5  today?
 6      A.    No.
 7      Q.    Those two depositions that you previously
 8  took, were they in relation to your work for Norfolk
 9  and Portsmouth Belt Line Railroad?
10      A.    Yes.
11      Q.    Okay.  How do you refer to Norfolk and
12  Portsmouth Belt Line Railroad Company?
13      A.    How do I refer to them?
14      Q.    Yeah.  Do you have a shorthand name for
15  it?
16      A.    We call it the Belt Line or NPBL.
17      Q.    I'll try to go with the Belt Line.
18  I think that's what your counsel has been doing,
19  and we might get into Norfolk Southern a little bit,
20  but I just want to be clear that we're speaking
21  about the same company that's involved in the lawsuit.
22  Is that fair?
23      A.    Yeah.
24      Q.    All right.  When did you start with the
25  Belt Line?
```

Page 9

```
 1      A.    2011.
 2      Q.    And what was your job back in 2011?
 3      A.    President and general manager.
 4      Q.    Have you held those positions since 2011?
 5      A.    Yes.
 6      Q.    No gaps or anything like that since then?
 7      A.    No.
 8      Q.    Where did you go to school?
 9      A.    For college or --
10      Q.    High school.
11      A.    Collegiate in Richmond.
12      Q.    Where did you go to college?
13      A.    I went to the Virginia Military Institute
14  and I did a year at the University of Montana.
15      Q.    Which came first?
16      A.    I went to the Virginia Military Institute
17  and I went to Montana for a year and then went back to
18  VMI.
19      Q.    And when did you graduate from VMI?
20      A.    2001.
21      Q.    What did you obtain a degree in?
22      A.    Psychology.
23      Q.    Any other secondary or post college
24  education?
25      A.    Yes.
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 10

1   Q.   What did you do?
2   A.   I have an MBA from Liberty.
3   Q.   When did you obtain that MBA?
4   A.   That would have been in 2012.
5   Q.   And so that was after you started as
6   president?
7   A.   Correct.
8   Q.   What type of program was that?
9   A.   Online.
10   Q.   And what did you do for work after
11   graduating VMI?
12   A.   I was hired by Norfolk Southern.
13   Q.   What did you do for Norfolk Southern?
14   A.   I was a management trainee.
15   Q.   And what does that mean?
16   A.   I was a management trainee in their
17   transportation department.
18   Q.   Is that a specific program that they
19   have for like a set time period?
20   A.   Yes.
21   Q.   How long was that program?
22   A.   About a year.
23   Q.   And what did you do as a management
24   trainee during that year?
25   A.   I trained on various aspects of

Page 11

1   the transportation side of Norfolk Southern.
2   Q.   And you say transportation side.  What
3   other areas are there within Norfolk Southern?
4   A.   They're -- they have everything.
5   They're a Fortune 300 company so...
6   Q.   Did you do any training in the Management
7   Trainee Program?
8   A.   Yes.
9   Q.   What did that consist of?
10   A.   I went to conductor school.  I went
11   to engineering school.  I did a maintenance-of-way
12   training class and then shadowed various supervisors.
13   Q.   Where were you located for that
14   Management Trainee Program?
15   A.   Knoxville, Tennessee.
16   Q.   The conductor, engineering and
17   maintenance-of-way training, was that a classroom
18   training or shadowing or both?
19   A.   Classroom.  It was mostly classroom.
20   Q.   Who was your instructor?
21   A.   I have no clue.
22   Q.   How many other people were in the
23   Management Trainee Program with you at the time?
24   A.   I think there were seven of us.
25   Q.   Is that a competitive position to

Page 12

1   obtain?
2   A.   I'd like to think so, but....
3   Q.   Did any of -- your training in the
4   Management Trainee Program, was any of it specific
5   to railroad bridges?
6   A.   No.
7   Q.   And what did you do after -- did you
8   graduate from the Management Trainee Program?  How
9   does that work?
10   A.   Yeah.  I got promoted and I became an
11   assistant trainmaster.
12   Q.   And was that with Norfolk Southern?
13   A.   Correct.
14   Q.   Where were you assistant trainmaster?
15   A.   Knoxville, Tennessee.  Excuse me, Fort
16   Wayne, Indiana.
17   Q.   And what year was that?
18   A.   That would have been 2002.
19   Q.   And what are the responsibilities and
20   duties of an assistant trainmaster?
21   A.   We were responsible for the conductors
22   and the engineers and the T&E personnel and then
23   the yard operations at the yard and surrounding
24   territories.
25   Q.   And how long were you in that position?

Page 13

1   A.   About a year and-a-half.
2   Q.   All in Fort Wayne?
3   A.   Correct.
4   Q.   Is there a -- did you work in a
5   particular yard?
6   A.   Yes.
7   Q.   And what was that?
8   A.   I can't remember the name of it.
9   Q.   Is it still there?  Do you know?
10   A.   It's still there.
11   Q.   Who did you report to as the assistant
12   trainmaster back in Fort Wayne?
13   A.   The superintendent.
14   Q.   And what was his or her name?
15   A.   David Odell.
16   Q.   Do you know if Mr. Odell is still with
17   the company?
18   A.   He is not with the company.
19   Q.   Did anyone report to you as the assistant
20   trainmaster?
21   A.   I did not have any direct management
22   reports, but I was responsible for all the union
23   folks on my shift though.
24   Q.   And when you say responsible, I mean,
25   were you managing their day-to-day work, or what do

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 14

1  you mean by that?
2  A.    You were responsible for making sure
3  they were following the rules, making sure that
4  they were doing what they needed to do.  I worked
5  with the yardmaster on logistics, where -- what
6  trains needed to go out, yard switching, planning
7  like that, stuff like that.
8  Q.    Did any of your responsibilities as
9  an assistant trainmaster relate specifically to
10 railroad bridges, switching rail -- rail lines or
11 anything of that nature?
12          MR. SNOW:  Object to form.
13          THE WITNESS:  What do you mean switching
14 rail lines?
15          MR. ROMAN:  Well, strike that.
16 BY MR. ROMAN:
17 Q.    Did any of your responsibilities relate
18 specifically to railroad bridges?
19 A.    No.
20 Q.    And where did you go from your assistant
21 trainmaster position?
22 A.    I became a trainmaster in Chicago.
23 Q.    What yard?
24 A.    Calumet.
25 Q.    And that was for Norfolk Southern?

Page 15

1  A.    Yeah.
2  Q.    And what year, about, was that?
3  A.    That would have been 2003.
4  Q.    And I take it that was a promotion?
5  A.    Yeah.
6  Q.    Who did you report to at Calumet?
7  A.    I mean, I reported to four different
8  terminal superintendents when I was there, so which
9  one do you want?
10 Q.    And what are the primary duties and
11 responsibilities of a trainmaster?
12 A.    The same thing as an assistant
13 trainmaster basically.
14 Q.    So still responsible for the conductors,
15 engineers, maintenance-of-way crews?
16 A.    Correct.  Of course, they had some bridge
17 tenders in Chicago.
18 Q.    Sorry, bridge tenders?
19 A.    Bridge tenders, guys operating the
20 bridge.
21 Q.    And you oversaw them?
22 A.    Correct.
23 Q.    How many people did you oversee as the
24 trainmaster in Chicago?
25 A.    I mean, on any given shift in Chicago

Page 16

1  you probably had a hundred people working.
2  Q.    Were those all Norfolk Southern
3  employees or were there also contractors?
4  A.    All Norfolk Southern employees.
5  Q.    And what was your next position after
6  the trainmaster role?
7  A.    I did -- I was a manager of business
8  development in Norfolk Southern's ports in the
9  international department.
10 Q.    And what did that job entail?
11 A.    It involved dealing with some of the
12 various ports Norfolk Southern served, developing
13 business, that sort of thing.
14 Q.    Where was that?  Where were you located?
15 A.    Norfolk, Virginia.
16 Q.    And did you ever see any particular
17 port or -- were you involved with developing
18 business for any particular port?
19 A.    Sure, Port of Virginia, Port of Morehead
20 City, Port of Mobile, Port of New Orleans and then
21 the Lincoln River port.
22 Q.    And when did you start that role?
23 A.    2006.
24 Q.    So you were a trainmaster for about three
25 years then?

Page 17

1  A.    Correct.
2  Q.    And was that a promotion to the business
3  development role?
4  A.    It was a -- it was a lateral move,
5  but I didn't work 16-hour days anymore, so yes, it
6  was a promotion.
7  Q.    Was it a salary position?
8  A.    Yes.
9  Q.    And was the trainmaster position salary?
10 A.    Yes.
11 Q.    Would you consider the business
12 development role more of a corporate position?
13 A.    Yes.
14 Q.    Who did you report to in your business
15 development role?
16 A.    Renee Palin and Steve Evans.
17 Q.    And what were their job titles?
18 A.    Renee was a senior business development
19 manager.  Steve Evans was an AVP.
20 Q.    And they were all in the same territory?
21 A.    What do you mean?
22 Q.    The ports that you mentioned, port of
23 Virginia, were they responsibile for that territory,
24 developing business in those -- those particular
25 ports?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 18

1    A.    Renee had all the other ports that I
2  didn't.
3    Q.    Did you have any direct reports in that
4  role?
5    A.    No.
6    Q.    How long were you in that position?
7    A.    Five years.
8    Q.    And what was -- and that's when you
9  were -- then moved over as president of the Belt Line?
10    A.    Correct.
11    Q.    And how did that -- would you consider
12  that a promotion?
13    A.    Yes.
14    Q.    And how did you get that job?
15    A.    They offered it to me.
16    Q.    Was it something you applied for?
17    A.    No.
18    Q.    And what are your primary day-to-day
19  responsibilities as president of the Belt Line?
20  I guess we can qualify it, back in 2011 when you
21  started.
22    A.    It's the same as today, but it's a
23  35-person small business, so every aspect of it.
24    Q.    What is the relationship, if any,
25  between the Belt Line and Norfolk Southern?

Page 19

1    A.    Norfolk Southern is the majority
2  stockholder.
3    Q.    Would the Belt Line be considered a
4  subsidiary of Norfolk Southern?
5    MR. SNOW:  Object to form.
6    THE WITNESS:  We operate as an
7  independent company.
8  BY MR. ROMAN:
9    Q.    And you said it's a 35-person company.
10  Is that today?
11    A.    That is today.
12    Q.    Okay.  What is the primary business of
13  the Belt Line?
14    A.    I don't understand.  What do you mean?
15    Q.    How would you describe what your company
16  does on a day to day?
17    A.    We're a terminal switching railroad.
18    Q.    And what is a terminal switching
19  railroad?
20    A.    We are the last mile and first mile
21  basically of any freight that serves our customers.
22    Q.    How many miles of track does the Belt
23  Line own?
24    A.    We own 34 miles of track.
25    Q.    Where is that track located?

Page 20

1    A.    Here in Hampton Roads or in the cities
2  of Chesapeake and Portsmouth.
3    Q.    All around the area -- in the Virginia
4  area, nothing outside of the state?
5    A.    Yes, all of the Hampton Roads area,
6  South Side.
7    Q.    And I take it the Belt Line owned the
8  track on the railroad bridge that we're here to talk
9  about today?
10    A.    Yes.
11    Q.    And when did the Belt Line obtain that
12  track, acquire it?
13    A.    We've been around since 1897, so 1897.
14    Q.    And that bridge we're going to talk
15  about, what do you call the bridge?
16    A.    It's our mainline bridge.
17    Q.    Have you always referred it as the
18  mainline bridge?
19    A.    Yeah.
20    Q.    Is that your preference, for me to refer
21  to it as the mainline bridge today?
22    A.    Sure.
23    Q.    Okay.  How many other bridges does the
24  Belt Line own?
25    A.    We have six more.

Page 21

1    Q.    And those are all within the Hampton
2  Roads area?
3    A.    Correct.
4    Q.    And do any of your day-to-day
5  responsibilities relate specifically to overseeing
6  the operation of the mainline bridge?
7    A.    I mean, I oversee all the supervisors
8  that are there, yes.
9    Q.    And who are those supervisors?
10    A.    Bill O'Brien, Adam Reeder, Nathan Rose,
11  Jonathan -- sorry, Jonathan Beale.
12    Q.    And just so we're clear, was -- were
13  those individuals the supervisors back in June of
14  2024?
15    A.    Yes.
16    Q.    And are they still the supervisors today?
17    A.    Yeah.
18    Q.    And what -- is that a specific job
19  title, supervisors, or you referring to that
20  generally as supervisors?
21    A.    Generally.  I mean, Bill O'Brien is
22  our vice-president.  Adam Reeder is our
23  superintendant, and the other two are operations
24  supervisors.
25    Q.    And what are Bill O'Brien's day-to-day

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 22

1  responsibilities as VP?
2      A.     He manages maintenance-of-way and also
3  the transportation department.
4      Q.     And then how about Adam Reeder, what
5  are his day-to-day responsibilities and duties?
6      A.     He also manages the maintenance-of-way
7  and transportation department.
8      Q.     And does Adam report to Bill?
9      A.     Correct.
10     Q.     And Nathan Rose was the other individual
11 you mentioned?
12     A.     Correct.
13     Q.     And what is his title?
14     A.     Operations supervisor.
15     Q.     And what does an operations supervisor
16 do?
17     A.     He manages the day-to-day operations of
18 the transportation department.
19     Q.     Do any of those individuals oversee
20 anyone who are not Belt Line employees on a day to
21 day, such as contractors?
22     A.     Yes.
23     Q.     Does Belt Line utilize contractors
24 for its business operations regularly?
25     A.     What do you mean business operations?

Page 23

1      Q.     Sure.  So the 35 people you mentioned,
2  I mean, who are those 35 people?  What types of --
3  they're full-time employees of Belt Line.  What types
4  of roles do they have generally?
5      A.     Sure.  On the non agreement side there
6  is a comptroller, corporate secretary and a treasurer,
7  and then on the agreement side we have T&E employees,
8  train engine employees, conductors, engineers and then
9  maintenance-of-way employees, track supervisors, track
10 inspectors.
11     Q.     Okay.  So for those track inspectors,
12 track supervisors, the conductors, the folks who are
13 actually working on the line, those are all full-time
14 Belt Line employees?
15     A.     Correct.
16     Q.     Do -- does the Belt Line utilize any
17 independent contractors for those positions, referring
18 to the positions that are actually working directly on
19 the line?
20     A.     I mean, I still don't understand --
21 yes, we hire contractors to work on the track.
22     Q.     Okay.  Which specific contractors?
23     A.     For what?
24     Q.     What do you mean by work on the track?
25     A.     Well, when we do projects, we hire --

Page 24

1  when we do big projects, we hire contractors for
2  big track projects.  We have contractors that work
3  on the bridge, that maintain the bridge.  We have
4  contractors that clean our building.  We have
5  contractors that, you know, mow the grass.  We have
6  contractors that weld stuff for us.
7      Q.     Fair to say like work as in, you know,
8  repair, modifications, that type of thing,
9  inspections?
10     A.     Yes.
11     Q.     Do you utilize any independent
12 contractors as train conductors?
13     A.     No.
14     Q.     Do you utilize any independent
15 contractors as switch operators?
16     A.     No.
17     Q.     So all those types of positions would
18 be in-house Belt Line employees?
19     A.     They're union positions.
20     Q.     How many employees does Mr. -- does
21 Nathan oversee?
22     A.     Well, we have 21 union employees.
23     Q.     I'm sorry, I missed the --
24     A.     Yeah, 21 train and engine employees,
25 including yardmasters.

Page 25

1      Q.     And are those employees like assigned
2  specific portions of the track?
3      A.     We have specific jobs.
4      Q.     Okay.  Is there any specific job or
5  position that would be specific to the portion
6  of the track that the mainline bridge is on?
7      A.     I don't understand your question.
8      Q.     Sure.  I mean, the mainline bridge is
9  a lift bridge, right?
10     A.     Correct.
11     Q.     Okay.  How does the lift go up and
12 down?
13     A.     Sure.  It's remotely operated, and
14 so, yes, we have a union employee that will remotely
15 operate the bridge, and the supervisor will also
16 remotely operate the bridge.
17     Q.     Who was the employee responsible for
18 remotely operating the bridge back in June of
19 2024?
20            MR. SNOW:  Object to form.
21            THE WITNESS:  That's a whole month.
22 BY MR. ROMAN:
23     Q.     Sure.  Who was responsible for overseeing
24 the lifting of the bridge back in June of 2024?  Were
25 there multiple employees who would do that?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 26

1    A.    Multiple employees.
2    Q.    Okay.  How many?
3    A.    I have 21 T&E employees and four
4 supervisors, so it could have been any one of them.
5    Q.    So any 21 of those -- strike that.  There
6 were 21 people who may have some type responsibility
7 lifting the bridge at any given time during June of
8 2024?
9    A.    Correct.
10    Q.    Do those 21 employees also at times
11 oversee the operation of the other railroad bridges,
12 those other six bridges?
13    A.    Those others are fixed bridges.
14    Q.    Is the mainline bridge the only lift
15 bridge that Belt Line owns?
16    A.    Yes.
17    Q.    And, sorry, just so I have it right,
18 Nathan is the primary supervisor over those 21
19 employees?
20    A.    No.  That's Jonathan -- Jonathan Beale.
21    Q.    And what is his job title?
22    A.    Operations supervisor.
23    Q.    Okay.  Do you know who was on shift
24 on June 15th, 2024 for whatever position would have
25 been overseeing the lift of the bridge, lifting of

Page 27

1 the bridge?
2    A.    What -- what day was June -- I would
3 need to see a calendar.  I can't -- is that Monday
4 or is that Saturday when the bridge was hit?
5    Q.    I believe it was a Saturday.
6    A.    Sure.  We weren't working on Saturday,
7 so there is nobody in the office.
8    Q.    Does the mainline bridge have
9 capabilities to -- on June 15th, 2024 to lift
10 up or down without someone manually overseeing
11 it?
12    A.    No.
13    Q.    At the time did it always -- did
14 the mainline bridge always require an individual
15 to manually control it to lift up and down?
16    MR. SNOW:  Object to form.
17    THE WITNESS:  Yes.  When you say
18 manually, what do you mean?
19 BY MR. ROMAN:
20    Q.    Well, I mean, how does the -- why
21 don't you explain how the lift actually goes up and
22 down?
23    A.    Well, there are a couple of different
24 ways it can go up and down.  There is the remote
25 operation where we have an employee sitting in

Page 28

1 the office who can remotely lift and lower the
2 bridge, and you can walk out to the bridge and you
3 can make it go up and down from the bridge or you
4 can climb the bridge and operate it from the bridge
5 house.
6    Q.    And for that first one, the remote
7 operation, where does that employee sit to control
8 that?
9    A.    In our office.
10    Q.    And where is that office located?
11    A.    1340 Truxton Street.
12    Q.    Okay.  Is there a specific job position
13 for that specific task?
14    A.    Yes, utility man.
15    Q.    The utility man?
16    A.    Utility man.
17    Q.    Do you know who the utility man was
18 during the week leading up to June 15th, 2024, who was
19 working?
20    A.    Not offhand, no.
21    Q.    Do you know who the utility man was on
22 the Monday after June 15th, 2024?
23    A.    No, I don't.
24    Q.    How many utility men or women worked at
25 Belt Line in June -- June of 2024?

Page 29

1    A.    We had 21.  Any one of our employees,
2 I think, based on their seniority could hold a utility
3 job.
4    Q.    Okay.  Do some folks hold that utility
5 man position and other positions?
6    A.    Correct.
7    Q.    And then the second way you said was
8 manually doing it on the bridge.
9    A.    Correct.
10    Q.    And how many folks would have the
11 capability at Belt Line to perform that task?
12    A.    Five.
13    Q.    Why can only -- does that require
14 like a specific training or set of skills to do the
15 bridge lift manually?
16    A.    Yes.
17    Q.    And what type of training does that
18 require?
19    A.    It's a different operation so typically
20 supervisors are the ones that operate it from the
21 ground, but some of our maintenance-of-way folks are
22 actually trained in that.  I guess it's not five,
23 actually six folks.
24    Q.    Do you know the names of the folks who
25 would have had the skill set and capabilities in

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 30

1  June of 2024 to lift the bridge in that manner?
2      A.    Yes.
3      Q.    And what are their names?
4      A.    It would Bill O'Brien, Adam Reeder,
5  Jonathan Beale, Nathan Rose, Val and Dixon, from our
6  maintenance-of-way shop, and myself.
7      Q.    Do you know when the last time the
8  bridge was lifted prior to June 15th, 2024?
9      A.    Not specifically.  I need to see the
10 log sheet, but I'm pretty sure it was either the
11 Friday or the Thursday before.  I would need to see
12 the log sheet.
13     Q.    And how often generally was the bridge
14 lifted in a given month?
15     A.    Well, it's actually lowered because
16 it's always in the up position, and it depends on the
17 month.
18     Q.    I've seen references that October 1st
19 starts the Belt Line busy season.  Does that ring a
20 bell to you?
21     A.    That's correct.
22     Q.    All right.  And what is the busy season
23 for the Belt Line?
24     A.    Export soybeans.
25     Q.    Okay.  How long does that busy season

Page 31

1  last?
2      A.    It depends on the soybean -- export
3  soybean market, but typically it can start anywhere
4  from mid September to March, but I've seen it last
5  longer than March.
6      Q.    If it's not busy season for that -- for
7  the soy transport, is it normal season?
8      A.    Yes.
9      Q.    What's the difference in average train
10 traffic over the mainline bridge during busy season
11 as compared to the normal season?
12     A.    Our traffic will -- it will increase
13 five times as much traffic as we're used to.
14     Q.    On June 15th, 2024, was that the busy
15 season or sort of normal season?
16     A.    That was during our, yeah, normal season,
17 slow season, however you want to say it.
18     Q.    And then for busy season, how many
19 times on average is the bridge lowered and lifted in
20 a given month?
21     A.    I would be guessing, but 90, a hundred
22 times in a given month.
23     Q.    Is that -- of those 90 or a hundred
24 times, is it typically lowered and lifted using
25 the remote system or the manual way?

Page 32

1      A.    Actually, I'm sorry, it would actually
2  probably be more like 180 times, 90 each particular
3  way.
4      Q.    So 90 down, 90 up or a hundred down, a
5  hundred up?
6      A.    Ninety down -- yeah, 90 trains coming
7  across it, 90 trains going back over it.
8      Q.    Well, let me ask you this, when you --
9  when the bridge is lowered for a train to go through
10 and say there is not another train coming for two
11 hours, would you lift it up immediately or would it
12 stay down?
13     A.    The bridge is always in the up position
14 until we're running train traffic.
15     Q.    So lowered for effectively the
16 shortest amount of time required to allow the train
17 to go through?
18     A.    Correct.  It's actually part of the Coast
19 Guard regulations.
20     Q.    All right.  And then how many --
21 what's like kind of the average split between how
22 it's -- using the remote system or the manual
23 system?
24     A.    The majority is remote.
25          MR. SNOW:  I don't know what time period

Page 33

1  you're talking about here.
2          MR. ROMAN:  Let's go in 2024.  Well,
3  let me ask this, has the train traffic varied over
4  the last ten years during busy season at all?
5          THE WITNESS:  Yes.
6  BY MR. ROMAN:
7      Q.    Has it gone up or down?
8      A.    It's gone up.
9      Q.    Meaning the Belt Line is doing more
10 business, running more trains across the track?
11     A.    Correct.
12     Q.    All right.  Was there any specific
13 contract, business relationship that caused it to
14 go up?
15     A.    Mostly -- Perdue is our largest
16 customer.  They did some things to modernize their
17 plant so they could handle larger unit trains, so
18 the unit train size increased.  We've gotten some
19 other new business.
20     Q.    In the year 2024 on average how
21 many times is the bridge lowered or lifted using
22 the manual system as compared to the remote
23 system?
24     A.    I have no idea.
25     Q.    Does the Belt Line maintain a record

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 34

1  that would show that type of data?
2      A.    We keep records of when the bridge is
3  remotely lowered.
4      Q.    And what are those records called?
5      A.    The log records.
6      Q.    I'm sorry?
7      A.    Just the log.
8      Q.    Are those handwritten?
9      A.    They're handwritten by the operator.
10     Q.    And so that's going to be the utility man
11 who is working at the time?
12     A.    Utility man or a supervisor.
13     Q.    And are those logs maintained and stored
14 by the Belt Line?
15     A.    For how long?
16     Q.    Well, does the Belt Line have a retention
17 policy for those particular logs that it retains for a
18 certain amount of time?
19     A.    We'll typically keep them for a year.
20     Q.    And then is that the normal retention
21 period, one year?
22     A.    For what?
23     Q.    For those particular logs.
24     A.    Yes.
25     Q.    Are they destroyed after one year?

Page 35

1      A.    Probably.  I'm not sure.
2      Q.    Who is responsible for storing and
3  retaining those logs?  Do you have like a records
4  department?
5      A.    No.
6      Q.    Is there a policy and procedural manual
7  at Belt Line for record retention?
8      A.    Yeah.
9      Q.    What is that called?
10     A.    I believe it's called our record
11 retention policy.
12     Q.    Is that in paper format or electronically
13 stored?
14     A.    I believe it's electronically stored.
15     Q.    Do you know if that policy has either
16 a policy or procedure or some type of writing specific
17 to those logs that we talked about?
18     A.    I do not know offhand.
19     Q.    What are the reasons that the bridge
20 could be lifted using the automated system versus
21 the manual?  I mean, what dictates how you do it?
22     A.    You mean lowered?
23     Q.    Yes.
24     A.    Primarily we use the remote system to
25 lower it.  If we can't see, if visibility is bad

Page 36

1  on the cameras or if they're out or for some
2  reason, then we'll have a supervisor go out and
3  manually operate it from the tower.
4      Q.    Do you have a preference to do it the
5  automated way?
6      A.    Yes.
7      Q.    Is there any difference in cost?
8      A.    No.
9      Q.    Is there any difference in the speed at
10 which it goes up or down?
11     A.    No.
12     Q.    Is there a difference --
13     A.    Yes.  Actually it's slower to bring it
14 down manually.
15     Q.    Slower?
16     A.    Not -- let me back up.  The bridge
17 operates at the same speed, but when you bring it
18 down manually you have to walk into the bridge house
19 and click all of the signals and click all the
20 span locks so it takes a little bit more time.
21     Q.    Where is that mechanical house -- is
22 mechanical house what you call it?
23     A.    The bridge house.
24     Q.    The bridge house, where is that located?
25     A.    In the middle of the bridge.

Page 37

1      Q.    On the part that lifts up and down?
2      A.    Correct.
3      Q.    And how do you access that if it's in the
4  raised position?
5      A.    You climb up.
6      Q.    Pretty far climb, right?
7      A.    It is.
8      Q.    How many folks at the Belt Line are
9  qualified to make that climb?
10     A.    One.
11     Q.    So if the bridge is raised and you have
12 to do it manually, that one person has to climb up
13 the bridge and access the bridge opening?
14     A.    Correct.
15     Q.    And who is that person?
16     A.    Adam Reeder.
17     Q.    I take it Mr. Reeder probably prefers
18 that it operates automatically?
19     A.    Yeah.
20     Q.    Are there different mechanical systems
21 that are utilized depending on whether it's raised
22 and lowered using the remote system or mechanical or
23 manual system?
24     A.    No.
25     Q.    In June of 2024, as of that date when

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 38

1  was the mechanical system installed that was in
2  place in June of 2024 that caused the -- strike
3  that.  When was the mechanical system installed
4  that was utilized in June of 2024 to raise or lower
5  the bridge?
6       A.    Which one?
7       Q.    Well, I guess let me ask this, was
8  the mechanical system that was used to raise and
9  lower the bridge part of its original design?
10            MR. SNOW:  Object to form.
11            THE WITNESS:  The backup -- the
12  backup diesel motor is part of the original design.
13  BY MR. ROMAN:
14       Q.    Okay.  And what was the other part?
15       A.    We have an electric -- electric motor
16  with a variable speed drive that was installed in
17  2012, 2012 or 2013.
18       Q.    And who installed that in 2012 or 2013?
19       A.    I believe the company is called EHM.
20       Q.    And why was that particular part
21  installed?
22       A.    Sorry, back that up.  The GC was
23  Dorey Electric.  The motor -- the motor came from
24  EHM.
25       Q.    Well, let me ask you this, can you

Page 39

1  describe generally what the mechanical system was
2  that was utilized to raise and lower the bridge in
3  June of 2024?
4       A.    I still don't quite understand like
5  what --
6       Q.    Well, you said there was an electric
7  motor --
8       A.    Correct.
9       Q.    -- that was installed in 2012.
10       A.    Yes.
11       Q.    But then there was the original part,
12  correct?
13       A.    Sure.  So in June of -- the
14  electric motor is what we always use.  Only when
15  the electric motor isn't working do we use the
16  diesel backup.
17       Q.    And the diesel backup is the one that
18  you referenced that was part of the original?
19       A.    Correct.
20       Q.    Had the -- had the diesel engine ever
21  been replaced?
22       A.    Not to my knowledge.
23       Q.    Had it ever been repaired?
24       A.    Not to my knowledge.  I have no specific
25  knowledge of it.

Page 40

1       Q.    Was there an electric motor in the
2  bridge at any time before 2012 or 2013?
3       A.    Yes.
4       Q.    Was that a different electric motor than
5  what was there in June of 2024?
6       A.    Yes.
7       Q.    Okay.  So in 2012 or 2013 it was a
8  full replacement of the electric motor?
9       A.    Yes.
10       Q.    Okay.  Was there any other -- well,
11  would you consider that a big project that was done in
12  2012 or 2013?
13       A.    Yes.
14       Q.    How much did it cost?
15       A.    About a million and-a-half dollars.
16       Q.    And was that all related to the lift
17  system or was there other work that went on in the
18  bridge at that time?
19       A.    It was all related to replacing the
20  motor.
21       Q.    I'm sorry, replacing --
22       A.    It was all -- it was all replacing the
23  motor.
24       Q.    Okay.  Dorey Electric did the work,
25  right?

Page 41

1       A.    They were the GC, yes.
2       Q.    Okay.  Was there anyone who did an
3  inspection prior to that?
4       A.    Yes.
5       Q.    And who was that?
6       A.    Engineering firm called Stafford &
7  Bandlow, I believe.
8       Q.    Do you know when that inspection took
9  place?
10       A.    Just prior to the replacement.  They're
11  the ones that came up with the design and helped
12  oversee the install.
13       Q.    And what was the reason that that
14  project -- that the Belt Line did that project?
15       A.    It increased the reliability of the
16  motor.
17       Q.    Is that electric motor still in the
18  bridge today?
19       A.    The one we replaced?
20       Q.    The one that was installed in 2012 or
21  2013.
22       A.    Yes.
23       Q.    When was the bridge originally built?
24       A.    I believe -- I believe it was 1956.
25       Q.    Okay.  And some of the documents I

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 42

1  received, there was an original bridge that was
2  built like in the late 1800s, right?
3       A.    Correct.
4       Q.    Okay.  So when we talk about the mainline
5  bridge, do you consider there a new bridge that was
6  built in 1956?
7       A.    It was a new bridge built in 1956.
8       Q.    So they tore down the one built in
9  the late 1800s and built the mainline bridge?
10      A.    Yes.  The one from the 1800s was a
11 center span twist bridge.
12      Q.    Right, and I think it was deemed an
13 unreasonable obstruction to traffic, right?
14      A.    Yeah.  It was in the middle of a
15 channel.
16      Q.    How did you learn about the bridge?
17            MR. SNOW:  Object to form.
18            THE WITNESS:  I don't understand what you
19 mean.
20 BY MR. ROMAN:
21      Q.    I mean, when you became president, did
22 you go through any training about bridges?  I mean,
23 did you talk with engineers?  I mean, how did you
24 become knowledgeable about the bridge?
25      A.    Just working with it.

Page 43

1       Q.    How many projects have there been
2  on the bridge during your time as president to
3  either repair or modify the bridge?
4       A.    Define project.
5       Q.    Work performed on the bridge.
6       A.    We perform a lot of work on the
7  bridge.  It's constantly being maintained.  We're
8  constantly updating the cameras, communication
9  systems, replace the motor, replace operating cables.
10      Q.    When was the last time you replaced
11 the operating cables prior to June of 2024?
12      A.    I can't recall.
13      Q.    How long -- aside from the work that
14 was done after June of 2024, had you ever overseen
15 any work done on the actual rails?
16      A.    Yes.
17      Q.    How often was it replaced?
18      A.    Rails?
19      Q.    Yes.
20      A.    They haven't been replaced.
21      Q.    When you say they haven't been replaced,
22 you mean before June of 2024?
23      A.    They're the original rail that was with
24 the bridge.  We don't typically replace rail all that
25 often.

Page 44

1       Q.    And how about the ties?
2       A.    We put some ties in it.  I can't --
3  I can't remember how long ago, but I know we replaced
4  a couple ties.
5       Q.    Were there any other steel members
6  that were replaced at any time prior to June of
7  2024?
8            MR. SNOW:  Object to form.
9            THE WITNESS:  No steel members were
10 replaced.
11 BY MR. ROMAN:
12      Q.    How about repaired?
13      A.    I believe we've done some repairs on
14 the steel members.  I can't recall exactly what,
15 but I know when we have our bridge inspection if
16 they find something we typically try to -- if they
17 deem that we need to replace it immediately, we'll fix
18 it.
19      Q.    Is it standard practice for the Belt
20 Line to make the recommended repairs that are
21 identified in the annual inspection?
22            MR. SNOW:  Object to the form.
23            THE WITNESS:  It depends on the priority.
24 BY MR. ROMAN:
25      Q.    And what priority level does it take for

Page 45

1  repairs being done in short order?
2       A.    A priority one.
3       Q.    And what -- when you say priority one,
4  what does that mean?
5       A.    That means that they've -- the engineers
6  or our bridge inspectors have found something that
7  is critical and that needs to be replaced immediately.
8       Q.    And critical, would that suggest that it
9  affects the structural integrity?
10            MR. SNOW:  Object to form.
11            THE WITNESS:  Yes.
12 BY MR. ROMAN:
13      Q.    How many priority levels are there?
14      A.    There are five.
15      Q.    And one being the highest priority?
16      A.    Correct.
17      Q.    Five being the lowest?
18      A.    Yeah.
19      Q.    Would it be standard practice for
20 the Belt Line to make the recommended repairs if
21 they were priority two repairs?
22      A.    It depends.
23      Q.    Okay.  What does it depend on?
24      A.    It depends on conversations with
25 the bridge inspectors, the criticalness of the

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 46

```
1   repair.
2        Q.      And what is the difference between
3   a priority one and a priority two recommended
4   repair?
5        A.      Priority one is something you need
6   to take care of right away.
7        Q.      How about priority two?
8        A.      Priority two is something that they
9   found that needs to be either monitored or repaired
10  relatively soon.
11       Q.      Is there a standard -- guideline or
12  standard for the time that a priority two repair
13  should be made?
14       A.      There is not a standard time.
15       Q.      Okay.  And then how about for priority
16  three?
17       A.      There is not a standard.
18       Q.      And what is the difference between
19  a priority two and priority three recommended repair?
20       A.      The inspector deems it not as critical
21  but something to look at.
22       Q.      And how about a priority four?
23       A.      Something to keep an eye on.
24       Q.      And then priority five?
25       A.      Something they notice, I believe.  I
```

Page 47

```
1   mean, I'm just -- I'm going -- you know, I'm going off
2   memory.
3        Q.      Yeah, I hear you.
4                You want to take a quick break?  Is that
5   all right with you?
6        A.      Sure.
7                (Recess.)
8                (Carver Exhibit Number 4 was marked.)
9   BY MR. ROMAN:
10       Q.      All right.  We've marked this as Exhibit
11  3.  Have you ever seen this document before?
12       A.      Yes.
13       Q.      Would you describe it for us?
14       A.      It is our Bridge Management Program.
15               MR. SNOW:  Before we get too far, are you
16  marking this as Exhibit 3, behind Tab 4?
17               MR. ROMAN:  Thank you.  Exhibit 4,
18  correction.  Thank you, Ryan.  We'll mark this
19  as Exhibit 4, the Bridge Management Program.
20  BY MR. ROMAN:
21       Q.      Can you describe, what is the Bridge
22  Management Program?
23       A.      Sure.  It is an FRA required program
24  on how you plan to inspect your bridges.
25       Q.      And we see on page one, where it says
```

Page 48

```
1   Bates labeled NPBL6678 that there are specific
2   objectives there.  Do you see that?
3        A.      Yes.
4        Q.      And the first, set roles and
5   responsibilities for all persons involved in the
6   safe management of railroad bridges, do you see that?
7        A.      Yes.
8        Q.      And to develop and maintain an accurate
9   inventory of railroad bridges, do you see that?
10       A.      Yes.
11       Q.      And establish a program for the
12  inspection and evaluation of railroad bridges.  Did I
13  read that correctly?
14       A.      Yes.
15       Q.      And to determine the safe load capacity
16  of railroad bridges.  Did I read that correctly?
17       A.      Yes.
18       Q.      And to budget and program work in order
19  of relative priorities, based on seriousness of
20  condition and operating parameters.  Did I read that
21  correctly?
22       A.      Yes.
23       Q.      All right.  If you turn to the next
24  page, NPBL6679, you see there are three underlined
25  capitalized terms there, the Bridge Program Manager,
```

Page 49

```
1   the Railroad Bridge Engineer and then the Railroad
2   Bridge Inspector?
3        A.      Yeah.
4        Q.      Okay.  Is it fair to say you are listed
5   here as the bridge program manager?
6        A.      Yes.
7        Q.      And what does it mean to be the bridge
8   program manager?
9        A.      It means that I am responsible for the
10  bridge program.
11       Q.      Would those responsibilities include
12  overseeing inspections and repair work done to the
13  bridge?
14       A.      Correct.
15       Q.      And hiring a railroad bridge engineer
16  to inspect the bridge, correct?
17       A.      Correct.
18       Q.      And oversee their work on the bridge?
19       A.      Correct.
20       Q.      Who was the railroad bridge engineer
21  during the year 2024?
22       A.      We had -- Koppers was our railroad bridge
23  engineer.
24       Q.      Okay.  Had the railroad bridge engineer
25  changed over the last ten years at all?
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 50

```
 1      A.     Yes.
 2      Q.     And who was the railroad bridge
 3 engineer prior to -- just prior to Koppers?
 4      A.     A company called ARE.
 5      Q.     Do you know what that stands for?
 6      A.     I think it's American Rail Engineers, but
 7 I'm guessing.
 8      Q.     Do you know how long ARE was the RBE?
 9      A.     A couple of years, but not specifically.
10      Q.     Do you know who the RBE was prior to
11 ARE?
12      A.     It was a company called -- I think it's
13 called Osmose.  They got gobbled up by Koppers.
14      Q.     Osmose?
15      A.     Osmose, I think is the name.
16      Q.     Do you know how long Osmose was the --
17      A.     I guess let me back up.  Are you talking
18 specifically about the mainline bridge or are you
19 talking about all the bridges?
20      Q.     Well, are there different RBEs, depending
21 on the bridge?
22      A.     So the Bridge Maintenance Program has
23 only been around for a couple of years.  This is
24 an FRA required program that came out -- I can't
25 remember the year, but...
```

Page 51

```
 1      Q.     Do you know when that regulation took
 2 effect?
 3      A.     I can't remember the year.
 4      Q.     We had at least one other version.
 5 I think it was 2013 or 2014.  Does that sound
 6 right?
 7      A.     Sounds about right, yeah.
 8      Q.     Do you know if there has been any other
 9 Bridge Management Programs other than the 2013, 2014
10 version and then the one we're looking at?
11      A.     There has not been an FRA-specific
12 program.
13      Q.     Okay.  Was there a non FRA --
14 FRA-specific program?
15      A.     Not officially, no.
16      Q.     Was there a policy or procedural manual,
17 some type of document like that, that Belt Line
18 utilized for maintaining and inspecting the bridges
19 previously?
20      A.     No.
21      Q.     Did it have any internal guidelines,
22 policies, anything of that sort for maintaining
23 and inspecting its bridges prior to the federally
24 regulated program?
25      A.     Nothing official, no.
```

Page 52

```
 1      Q.     Was there anything unofficial?
 2      A.     Yeah.  We inspected the bridges every
 3 year and we inspected the mainline bridge every two
 4 or three years, I believe.
 5      Q.     And why the difference between every
 6 year for the other bridges and every two or three
 7 years for the mainline bridge?
 8      A.     I don't know why they did that before I
 9 got there.
10      Q.     Are there multiple -- in the year 2024
11 were there multiple RBEs under the bridge program?
12      A.     I know we contacted with Koppers, so they
13 were considered our bridge engineers.
14      Q.     And did they do the 2024 annual
15 inspection?
16      A.     Yes.
17      Q.     Did they do any other inspections
18 prior to June 15th, 2024 in the year 2024?
19      A.     I don't -- I don't understand.
20      Q.     Did they do any other inspections than
21 the annual inspection in 2024?
22      A.     I mean, I don't -- sorry.  They did --
23 explain -- one more time.
24      Q.     Yeah.  It's not -- I'm not trying to ask
25 a trick question.  I believe Koppers did an annual
```

Page 53

```
 1 inspection in like June of 2024.  Does that sound
 2 right?
 3      A.     Yes.  Well they did it prior to that,
 4 but yeah.
 5      Q.     I might have said June.  Did I say
 6 January or June?
 7      A.     I think you said June, but they did it in
 8 January.
 9      Q.     Sorry.  So just to clarify, Koppers did
10 an annual inspection of the mainline bridge in around
11 January, 2024, correct?
12      A.     Correct.
13      Q.     All right.  Did they do any other
14 inspections between January and June of 2024?
15      A.     No.
16      Q.     Hardesty & Hanover did an inspection on
17 June 4th, June 5th, 2024, correct?
18      A.     Correct.
19      Q.     All right.  Why was Hardesty & Hanover
20 used instead of Koppers for that inspection?
21      A.     It was a mechanical inspection.
22      Q.     Okay.  Does Koppers not do mechanical
23 inspections?
24      A.     They do not.
25      Q.     And how long is the -- or how often
```

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 54

1   is a mechanical inspection performed on the bridge?
2       A.    We do one about every five years.
3       Q.    Is that mechanical inspection regulated
4   by the code that requires the Bridge Management
5   Program?
6       A.    It is not.
7       Q.    To your knowledge is there -- are there
8   any regulations that require mechanical inspections on
9   any specific schedule?
10      A.    Not that I'm aware of.
11      Q.    Back to 6679, were there any Belt Line
12  employees who were considered an RBE under the
13  program?
14      A.    No.
15      Q.    And then how about the railroad
16  bridge inspector, who was that in 2024?
17      A.    It would have been Adam Reeder or Val
18  Rapp.
19      Q.    What was the second name?
20      A.    Val Rapp.
21      Q.    Is that a Belt Line employee?
22      A.    Yes.  I don't know if they're
23  specifically designated or not, but they're the
24  ones that inspect the bridges.
25      Q.    Are you looking for --

Page 55

1       A.    I was looking for the personnel.  This
2   thing is super thick.  I'll eventually find it.
3             I don't see that it's designated
4   RBI, but Val Rapp is our track inspector.  He
5   regularly inspects the track over the bridges.  Adam
6   Reeder -- Adam Reeder is the other qualified track
7   inspector.
8       Q.    And this document I believe is dated
9   in -- December 13th, 2023.  Do you see that on page
10  one?
11      A.    Yeah.
12      Q.    Did the RBI change at all from December
13  of 2023 to June of 2024?
14      A.    It shouldn't have.
15      Q.    Take a look at 6711, the Bates number.
16  I think that might be what you're looking for.
17      A.    Yeah, the inspectors.
18      Q.    So it looks like NPBL6711 through 6713
19  are labeled "Designation of Individuals With Bridge
20  Engineering, Inspection and Supervision
21  Qualifications."  Do you see that?
22      A.    That is correct.
23      Q.    All right.  Would this be the list
24  of designated individuals for the various roles
25  and responsibilities under the program that was

Page 56

1   applicable in the year 2024?
2       A.    Yes.
3       Q.    Moving on to the next page, the railroad
4   bridge supervisor, should that -- would that person
5   also be listed on this page that we just referenced?
6       A.    Well, I think this is different.  This
7   is the -- the page you just referenced is an
8   inspector.  Isn't that what it says?
9       Q.    Strike that.
10            Who was the RBS, the railroad bridge
11  supervisor, in June of 2024?
12      A.    It would have been me and Adam Reeder.
13      Q.    And how long has Adam Reeder been with
14  the company?
15      A.    Fifteen years.
16      Q.    Do you know if he has always been
17  designated as the railroad bridge supervisor
18  for as long as this program has been in place?
19      A.    Yes.
20      Q.    If you would, take a look at NPBL00681.
21  It's page four of Exhibit 4.  Do you see that bullet
22  point indented paragraph there with the underline,
23  Steel and Concrete Railroad Bridge?
24      A.    Yes.
25      Q.    Is the mainline bridge considered a

Page 57

1   steel and concrete railroad bridge such that this
2   portion of the program applies to it?
3       A.    Yes.
4       Q.    So we see there it says, detailed
5   inspections of steel and concrete railroad bridges
6   are to be performed at five-year intervals as
7   authorized by the railroad.  Did I read that
8   accurately?
9       A.    That is correct.
10      Q.    And what is the difference between
11  a detailed inspection and the annual inspections that
12  occur every year?
13      A.    I mean, annual inspections are -- are
14  detailed.  I mean --
15      Q.    Okay.  Well, I think we can agree that --
16  look down at the next paragraph, the Reevaluation
17  (Annual) Inspection.  Do you see that part there?
18      A.    Uh-huh.
19      Q.    Those obviously have to occur once every
20  year, right?
21      A.    Well, it's actually once every --
22            MR. SNOW:  Object to the form.
23            THE WITNESS:  -- 540 days.
24  BY MR. ROMAN:
25      Q.    Okay.  But that's not five years,

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 58

1  correct?

2      A.    Correct.

3      Q.    All right.  Is there a difference,

4  if any, between inspections that occur every 540

5  days versus the ones that are required to be done

6  every five years?

7      A.    Well, I would assume the Koppers' one

8  would be a little more detailed.  We haven't had one

9  done by Koppers yet so I'm not sure.

10     Q.    Who does the reevaluation (annual) --

11 strike that.  Who did the reevaluation (annual)

12 inspection that occurred prior to June 15, 2024,

13 whenever that last one was?

14     A.    Koppers.

15     Q.    Okay.  And then you're saying that

16 Koppers has not done the detailed inspection that's

17 required of the -- that's referenced in the paragraph

18 above that, the re-evaluation (annual) inspection,

19 right?

20     A.    Not to my knowledge, unless -- unless

21 their first one was considered detailed, but I

22 don't think so.  You would have to ask them.  I'm

23 guessing.

24           MR. SNOW:  Don't guess.

25           THE WITNESS:  Yeah, I'm not going to

Page 59

1  guess.

2  BY MR. ROMAN:

3      Q.    Is it fair to say you're not aware

4  as you sit here the differences between the

5  detailed inspections and the -- that occur every

6  five years and the reevaluation inspections that occur

7  every 540 days?

8      A.    My perspective is that I hire Koppers

9  to run my bridge inspection program, and I listen

10 to what they tell me to do.  So if you show me the

11 initial inspection from 2023, if it says that it

12 was a detailed one, then that was a detailed one,

13 but --

14     Q.    Do you know if Koppers charges

15 different amounts for the detailed inspection versus

16 the reevaluation inspection?

17     A.    I would have to look at the invoicing and

18 see.  I don't recall.

19     Q.    Do you know if any of the railroad

20 bridge engineers over the last ten years have charged

21 different amounts for the detailed inspection versus

22 the reevaluation inspection?

23     A.    I don't recall.

24     Q.    Is it fair to say you would defer to

25 Koppers for the answer to the question of what is

Page 60

1  the difference between the two?

2      A.    Correct.

3      Q.    On that paragraph on NPBL6681, on

4  the detailed inspection it says the inspection shall

5  identify any scour, as well as bridges that appear to

6  be susceptible to scour.  What is scour?

7      A.    It's buildup -- from what I understand,

8  it's buildup around the -- it's buildup either

9  around the -- the parts that go in the water, the

10 pilings that go in the water.

11     Q.    And then for the detailed inspection,

12 the narrative descriptions on the high-priority

13 conditions will include, as appropriate, percentage

14 of section loss, widths and lengths of cracks,

15 dimensions of spalls, etcetera to provide the BPM

16 and RBE sufficient detail to accurately review

17 and interpret the conditions that are noted.  Did I

18 read that correctly?

19     A.    Yes.

20     Q.    And what does percentage of section loss

21 mean?

22     A.    I would defer to my bridge engineers,

23 but basically how much is missing from a bridge.

24     Q.    Can there be section loss on wood

25 bridges?

Page 61

1           MR. SNOW:  Object to form.

2           THE WITNESS:  It depends on what part

3  of the bridge you're referring to.

4  BY MR. ROMAN:

5      Q.    Well, section loss is usually applicable

6  to steel, correct?

7      A.    Correct.

8      Q.    Okay.  So would the narrative description

9  of percentage of section loss be intended to provide

10 you with details to decide whether there was enough

11 section loss of steel that required repairs?

12           MR. SNOW:  Object to form.

13           THE WITNESS:  You're asking me if -- can

14 you repeat it one or time?

15 BY MR. ROMAN:

16     Q.    Well, as I read that sentence that

17 we just did, one of the things the railroad bridge

18 engineer should do is provide a narrative description

19 of the percentage of section loss, quote, to provide

20 the BPM -- that's you -- sufficient detail to

21 accurately review and interpret the conditions that

22 are noted.  Is that fair?

23     A.    Yes.

24     Q.    Okay.  And so I'm asking what is

25 your understanding of what percentage of section

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 62

```
 1   loss means when you read the narrative description
 2   of your engineers?
 3        A.   Well, the percentage of how much is lost,
 4   and then they determine -- the engineers determine if
 5   that's within the acceptable range or not.
 6        Q.   And then one of the other ones is
 7   dimensions of spalls.  What is spalls?  What are
 8   spalls?
 9        A.   I'm not sure.
10        Q.   Have you ever asked your engineer what
11   spalls are?
12        A.   I probably have.
13        Q.   Do you recall if you've ever read any
14   inspection reports that noted spalling?
15        A.   I can't remember.
16        Q.   All right.  We're going to go to 6803.
17   I take that back.  6710, if you could go there.
18        A.   All right.
19        Q.   You see the column to the line named --
20   I just want to confirm that the bridge that was
21   struck on June 15th, 2024 is the mainline that's
22   referenced there.
23        A.   Yes.
24        Q.   The next column, the bridge number, SBER,
25   is that the bridge ID reference?
```

Page 63

```
 1        A.   Yes.
 2        Q.   What is that fourth column over that
 3   starts MP#?
 4        A.   That's the milepost number.
 5        Q.   Okay.  And it looks like it's zero
 6   for all of those.  Is that perhaps missing information
 7   there?
 8        A.   Well, no.  We don't have mileposts.
 9        Q.   Okay.  Why are there multiple SBER
10   IDs or inspections of the bridge referenced in the
11   mainline bridge?
12        A.   Sure.  They -- they don't look it as
13   a whole bridge.  They look at each individual section.
14        Q.   And so there is six section of bridge,
15   right?
16        A.   I think it's showing eight.
17        Q.   Or eight sections, right?
18        A.   Yes.
19        Q.   And so would each section of that be
20   considered its own bridge?
21             MR. SNOW:  Object to form.
22             THE WITNESS:  You would have to ask the
23   inspector that question.
24   BY MR. ROMAN:
25        Q.   Okay.  Can you identify on this chart
```

Page 64

```
 1   which two -- or which IDs were impacted by the
 2   allision on June 15th, 2024?
 3        A.   Not from this one because they're not
 4   numbered.
 5        Q.   I think there is another one with the
 6   numbering in here.
 7        A.   Correct.
 8        Q.   Do you know where that page is?  I
 9   thought I -- I think it's 6783.
10        A.   Yes.  The part that got hit was SBER2.
11   See where it says truss (tower span.)
12        Q.   Yeah.  I'm sorry, were you done
13   answering?
14        A.   Yeah.
15        Q.   Okay.  Were any of the other sections
16   or spans impacted, other than the one that got
17   hit?
18        A.   SBER1 was affected because the rail was
19   all damaged on top of it.
20        Q.   Is it fair to say that the majority
21   of damage was done to the SBER2 portion of the
22   bridge?
23        A.   Yes.
24        Q.   Moving over to the columns at the top,
25   you see where it says "Steel" there?
```

Page 65

```
 1        A.   Yes.
 2        Q.   Then there is four boxes within the --
 3   that column labeled "Steel."  Do you see those?
 4        A.   Yes.
 5        Q.   And the first one is controlling bridge
 6   "E" rating (normal level), ten miles per hour/25 miles
 7   per hour.  Do you see that there?
 8        A.   Yes.
 9        Q.   If we go down to the cell that is for
10   SBER2, it looks like it says E80/E71.  Do you see
11   that?
12        A.   Yes.
13        Q.   And what do those numbers mean -- or
14   letters and numbers mean?
15        A.   Those are the Copper ratings.
16        Q.   And what is a Copper rating?
17        A.   It tells you how much weight the bridge
18   can support.
19        Q.   Would that also be considered a load
20   capacity?
21        A.   I'm not an engineer.  I'm not qualified
22   to answer that.
23        Q.   And then if we move over to the next
24   cell, E119/E105, do you see that there?
25        A.   Yes.
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 66

1    Q.    And if you go to the top it looks like
2    it's associated with controlling bridge "E" rating
3    (maximum level), ten miles per hour/25 miles per hour.
4    Do you see that?
5    A.    Yes.
6    Q.    Do you know what the difference between
7    those two Cooper ratings are?
8    A.    One is if the train traveling is at ten
9    miles hour and one is if it's traveling at 25 miles an
10   hour.
11   Q.    I meant the difference between the
12   E80/E71 and the E119/E105 Cooper ratings.
13   A.    I would be -- I would be guessing so
14   I'm not going to -- a qualified engineer would have
15   to answer that.
16   Q.    The next box over, it says -- on the
17   part that's labeled "Steel" on the top, third one over
18   says 100 percent repaired (normal level), ten miles
19   per hour/25 miles per hour.  Do you see that?
20   A.    Yes.
21   Q.    And if we go to the cell associated
22   with SBER2, it looks like the Cooper rating for
23   that is E85/E75.  Do you see that?
24   A.    Yes.
25   Q.    Do you know what that Cooper rating

Page 67

1    means as it relates to the 100 percent repaired
2    box?
3         MR. SNOW:  Object to form.
4         THE WITNESS:  You would need to ask a
5    qualified engineer that.
6    BY MR. ROMAN:
7    Q.    Do you know the difference between an
8    E80/E71 Cooper rating is and an E85/E75 Cooper rating
9    is?
10   A.    Sorry.  One more time.
11   Q.    Do you know what the difference between
12   an E80/E71 Cooper rating and an E85/E75 Cooper rating
13   is?
14        MR. SNOW:  Object to form.
15        THE WITNESS:  I would assume that
16   means that the E85 could support more weight,
17   but I don't know.  I'm not really qualified to answer
18   that.
19   BY MR. ROMAN:
20   Q.    Do you know what the Cooper rating
21   of the SBER2 section of the bridge was when it was
22   built?
23   A.    I do not know.
24   Q.    Do you know if there is any documents
25   that exist that have the Cooper rating listed at

Page 68

1    the time of the construction for SBER2?
2    A.    I do not know.
3    Q.    Do you know what the 100 percent
4    repaired (normal level), ten miles per hour/25 miles
5    per hour means?
6    A.    I do not know.  I'm not a qualified
7    engineer.
8    Q.    Can you explain the differences between
9    those four boxes under the "Steel" column, what those
10   are signifying?
11        MR. SNOW:  Object to form.
12        THE WITNESS:  I can tell you that
13   they're talking about the load rating between
14   going ten miles an hour and 25 miles an hour, and
15   it helps the engineers determine if it's rated for
16   286,000 pounds or not, which is the standard weight
17   that the railroad bases everything off of.
18   BY MR. ROMAN:
19   Q.    But we would have to ask Koppers or
20   another qualified engineer for how to interpret those
21   boxes?
22   A.    That would be wise.
23   Q.    Have you ever asked Koppers how to
24   interpret those?
25   A.    I have.

Page 69

1    Q.    And do you recall what they said?
2    A.    I do, but it's -- again, I'm not
3    a qualified engineer so me repeating it, I would
4    probably get it wrong.
5    Q.    When did you have that discussion
6    with them?
7    A.    I mean, I had it with ARE when they
8    first did these bridge ratings several years ago.
9    Q.    Do you recall what the bridge ratings
10   were that ARE calculated back then?
11   A.    I do not recall, but the bridge is
12   rated for 286,000 pounds.
13   Q.    Have you ever had a similar conversation
14   with Koppers?
15   A.    I'm sorry.  What was the question?
16   Q.    About what the Cooper ratings were for
17   the bridge, how to interpret them.
18   A.    What I know is that the bridge is rated
19   for 286,000 pounds.
20   Q.    And that was told to you by the
21   engineers?
22   A.    Correct.  I think it's even on this form
23   we're looking at.
24   Q.    Where is it?
25   A.    It's right there on the column that

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

**Page 70**

1  says 286,000 consist allowable, yes or no, and it
2  says yes.
3      Q.    And how does that 263k (sic) translate to
4  the Cooper rating, if you know?
5          MR. SNOW:  Object to from.
6          THE WITNESS:  You mean 286?
7          THE ROMAN:  Yeah.
8          THE WITNESS:  I'm not a qualified
9  engineer.  I can't tell you.
10 BY MR. ROMAN:
11     Q.    Anything to do with those Cooper ratings
12 or how to interpret them you would defer to your
13 railroad bridge engineer?
14     A.    Correct.
15     Q.    Is one of your responsibilities
16 as the railroad program manager to determine
17 if trains are too heavy to cross the track, to cross
18 the railroad bridge?
19     A.    Yes.
20     Q.    Okay.  And how do you make those
21 determinations?
22     A.    Well, it says right here 286,000k
23 consist allowable, yes or no.  So if it says yes,
24 that means it can handle any rail traffic that's out
25 there.

**Page 71**

1      Q.    Is that the maximum -- is 263,000
2  (sic) the maximum weight that it can carry?
3          MR. SNOW:  Object to form.
4          THE WITNESS:  No.  Well --
5  BY MR. ROMAN:
6      Q.    Do you ever recall a time where a
7  train was trying to come across the mainline bridge
8  and was too heavy for what it was rated for?
9      A.    No.
10     Q.    So there has never been a time since
11 you've been president of Belt Line where you had
12 to stop a train from coming across because it was
13 too heavy?
14     A.    No.
15     Q.    That's never happened, correct?
16     A.    Correct.
17     Q.    Going back to the first page, one
18 of the objectives was to determine the safe load
19 capacity.  Do you know what that is for the mainline
20 bridge?
21     A.    286,000 pounds.
22     Q.    Is "safe load capacity" a term that you
23 had heard before?
24     A.    Yes.
25     Q.    How did you first hear it?

**Page 72**

1      A.    Because some bridges aren't rated for
2  286,000.
3      Q.    Is it fair to say that anything under
4  286,000 it would be safe to carry across the mainline
5  bridge?
6          MR. SNOW:  Object to form.
7          THE WITNESS:  I don't understand the
8  question.
9  BY MR. ROMAN:
10     Q.    I think you said that the safe load
11 capacity was 286,000 pounds, right?
12         MR. SNOW:  Object to form.
13         THE WITNESS:  Well, the bridge is rated
14 for 286,000 pounds.  What the bridge can actually
15 hold is based on those Cooper ratings, but all
16 railroad traffic is -- the standardized weight is
17 286,000 pounds.
18 BY MR. ROMAN:
19     Q.    How did you first hear about the allision
20 on June 15th, 2024?
21     A.    I received a phone call.
22     Q.    From who?
23     A.    Bill O'Brien.
24     Q.    And when was that?
25     A.    I'm sorry.  What date did you give?

**Page 73**

1      Q.    I just asked when you heard about the
2  allision.
3      A.    You said -- what date did you use?
4      Q.    I don't think I did.  I honestly can't
5  remember.  That's all.
6          MR. SNOW:  Is there something you need to
7  clarify?
8          THE WITNESS:  Well, I wasn't half paying
9  attention.  I just didn't -- want to make sure you
10 didn't say like June -- like Saturday.
11         MR. ROMAN:  No, no.  I don't -- that's
12 where we're going to get.
13         THE WITNESS:  I want to make sure that,
14 you know, you didn't think about it I heard it on
15 Saturday or Sunday or something.
16 BY MR. ROMAN:
17     Q.    All right.  So Bill gave you a call
18 and that's how you heard about the allision, right?
19     A.    Correct.
20     Q.    Okay.  Do you recall when Bill called
21 you?
22     A.    It was sometime in the evening.
23     Q.    Sometime in the evening?
24     A.    Evening, yeah.
25     Q.    Do you recall which day?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

| Page 74 |
|---|

1    A.    It was Monday.
2    Q.    And as best as you can recall, what did
3  Bill say?
4    A.    He said that our bridge had been struck
5  and he was heading in to take a look at it.
6    Q.    Did Bill say how he found out about
7  it?
8    A.    Yes.  Nathan Rose told him.
9    Q.    And did Bill say when Nathan heard about
10  it?
11    A.    Probably -- he probably said Nathan heard
12  about it that evening.
13    Q.    And did Bill say how Nathan heard about
14  it?
15    A.    Yes.
16    Q.    And what do -- what do you recall Bill
17  saying?
18    A.    Nathan got a phone call or was called
19  on the radio by an inbound train that the bridge was
20  messed up.
21    Q.    And who was operating that inbound train?
22    A.    CSX crew, I believe.
23    Q.    Who was the utility man on duty on
24  Monday, which I think is June 17th, 2024?
25    A.    I do not recall.

| Page 75 |
|---|

1    Q.    Okay.  Were Bill and Nathan and you-all
2  working on Monday, the 17th?
3    A.    Yes.
4    Q.    Was the CSX train the first to attempt
5  to cross the mainline bridge that Monday, the 17th?
6    A.    Yes.
7    Q.    Okay.  And what did you do after you had
8  heard -- received a phone call from Bill?
9    A.    I received a picture of it from Nathan
10  or from Bill, and I called Crofton Diving to come out
11  and take a look at it and make sure it wasn't going to
12  fall over.
13    Q.    And who is Crofton?
14    A.    They're a local company that do rigging
15  and marine construction.
16    Q.    How did Nathan -- you said he sent
17  you a photo.  Was that by text, by E-mail?
18    A.    I believe it was text.
19    Q.    How long was it until Crofton came out?
20    A.    They came out that evening.
21    Q.    Were you on site when Crofton was there?
22    A.    No.
23    Q.    Do you know who was?
24    A.    Bill and Nathan.
25    Q.    What, if anything, did Crofton do that

| Page 76 |
|---|

1  evening?
2    A.    They didn't do -- there was nothing
3  they really could do.
4    Q.    Did they inspect it?
5    A.    They didn't really -- they drove around.
6  I believe they said if it hadn't fallen over yet it
7  probably wasn't going to fall over tonight, something
8  along those lines.
9    Q.    Did they give you an estimate of
10  when they thought it might fall over if it was going
11  to?
12    A.    No.
13    Q.    What did -- did Crofton ever do any work
14  on the bridge?
15    A.    Yes.
16    Q.    Okay.  What did they do?
17    A.    They were a sub of PCL.
18    Q.    Okay.  When, if you know, was Crofton
19  retained as a sub of PCL?
20    A.    I do not know.
21    Q.    Okay.  Did Crofton perform any work
22  on the bridge, you know, from Monday, June 17th,
23  in the evening, like in the next, you know, two or
24  three days after that?
25    A.    No.

| Page 77 |
|---|

1    Q.    At some point Hardesty & Hanover was
2  hired as the engineer to oversee the repair work,
3  right?
4    A.    Correct.
5    Q.    Okay.  How did you determine to go with
6  Hardesty & Hanover?
7    A.    I reached out to Norfolk Southern's
8  chief engineer, chief bridge engineer, asking her
9  opinion on what to do.  She suggested some
10  engineering firms and some contractors to call,
11  and H&H was already one of them, and since H&H
12  was already doing the mechanical inspection on the
13  bridge it just seemed relevant to hire them.
14    Q.    And who is that chief engineer?
15    A.    Ruth -- I can't remember her last name.
16    Q.    I hope I don't get you in trouble.
17    A.    You might.  I can look it up real quick
18  if you really want it.
19    Q.    That's okay.
20    A.    All right.
21    Q.    Ruth, the engineer chief from Norfolk
22  Southern?
23    A.    That's it.
24    Ruth Brown.  There you go.
25    Q.    Did you have any internal meetings

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 78

1  on June 18th about the allision incident?
2      A.    Yes.
3      Q.    Okay.  Do you know when you reached
4  out to Ruth, first reached out to Ruth about hiring
5  Hardesty?
6      A.    I can't remember if it was that evening
7  or the following morning.
8      Q.    Okay.  Who was involved in the decision
9  to go with Hardesty & Hanover for the repairs?
10      A.    I was.
11      Q.    Anyone else that you ran it by?
12      A.    No.
13      Q.    When did you formally retain Hardesty?
14      A.    It was Monday or Tuesday.  I can't
15  remember.
16      Q.    Pretty quickly?
17      A.    Very quickly.
18      Q.    Very quickly, all right.
19            When was your first meeting, and when
20  I say meeting, phone call, Zoom meeting or whatever,
21  with Hardesty & Hanover about proceeding with repairs
22  on the bridge?
23      A.    I can't recall an exact date, but it was
24  shortly thereafter.
25      Q.    Is there anyone in particular that you

Page 79

1  reached out to at Hardesty?
2      A.    Howard.
3      Q.    That's Howard Swanson?
4      A.    Yes.
5      Q.    Had you known Mr. Swanson before?
6      A.    No, but he had worked with Norfolk
7  Southern for several years and it was recommended
8  to reach out to him at Hardesty.
9      Q.    And do you know what Howard did at
10  Norfolk Southern?
11      A.    I believe he was a division engineer,
12  division bridge engineer.
13      Q.    Do you know how long he was with Norfolk
14  Southern?
15      A.    He was there 20-plus years.
16      Q.    Did Howard Swanson have any involvement
17  in the inspection of the mechanical system that went
18  forward on June 4th and 5th?
19      A.    That went forward or that were performed?
20      Q.    Well, that were performed.
21      A.    I don't -- I don't know.  I know Travis
22  was the lead inspector for H&H on that.
23      Q.    And that's Travis Kimmins?
24      A.    Yeah.
25      Q.    Did you retain -- when I say you, I

Page 80

1  mean did you make the decision to retain Hardesty
2  & Hanover for the June 4th and 5th inspection?
3      A.    Yes.
4      Q.    Anyone else involved in that decision?
5      A.    No.
6      Q.    Do you recall who you reached out to at
7  Hardesty about that inspection?
8      A.    I do not.
9      Q.    Then I see references that -- is it
10  fair to say one of the reasons you went with Hardesty
11  was that Norfolk Southern had a pro rata agreement
12  or some type of prior arrangement with them?
13      A.    They did.
14      Q.    Okay.  Was there any process for -- did
15  you send out any request for bids, proposals, anything
16  like that?
17      A.    No.  The bridge was destroyed and we
18  were shut down so I didn't even have time to bid it
19  out.
20      Q.    Who -- you can't recall when you
21  first talked to Hardesty & Hanover about it?
22      A.    I cannot recall exactly when.
23      Q.    Okay.  Was it within the first week
24  after the allision?
25      A.    It was probably within the first day.

Page 81

1      Q.    All right.  Do you recall who was
2  in that meeting or involved in that discussion?
3      A.    I do not recall.
4      Q.    Do you recall anyone in particular
5  at Hardesty & Hanover being on any meeting in that
6  first week to discuss the repairs?
7      A.    Yeah, Howard.
8      Q.    And was Howard the lead engineer
9  overseeing the project for Hardesty?
10      A.    Yes.
11      Q.    Was anyone else from the Belt
12  Line on those phone calls or meetings?
13      A.    No.
14      Q.    Did Howard ever come out to inspect the
15  bridge?
16      A.    Yes.
17      Q.    Do you recall when that was?
18      A.    I think he came out within a couple days.
19      Q.    Were you present for his inspection of
20  the bridge?
21      A.    Yes.
22      Q.    Do you know when it occurred?
23      A.    I do not.
24      Q.    Best estimate, was it within three or
25  four days?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 82

1      A.     Correct.
2      Q.     Who else was present for that?
3      A.     I believe at that point we had retained
4  PCL as our contractor.
5      Q.     Was PCL retained by Belt Line or was
6  that -- were they retained by Hardesty & Hanover?
7      A.     They were retained by the Belt Line.
8      Q.     Had you worked with PCL before?
9      A.     No.
10     Q.     How did you determine to go with them?
11     A.     I was given some contractors Ruth
12 recommended, and she recommended PCL, and so I called
13 them.
14     Q.     Do you recall who you reached out to?
15     A.     Yeah, Charlie, Charlie Graning.
16     Q.     And was he the lead for PCL on the
17 project?
18     A.     He was.
19     Q.     And what is Charlie's background, if you
20 know?
21     A.     He also worked for Norfolk Southern in
22 their bridge department.  He worked for FEC Railroad,
23 and I think he worked for another bridge contractor.
24     Q.     Was he an engineer?
25     A.     I believe so, yes.

Page 83

1      Q.     Were Charlie and Howard your main
2  points of contact for Hardesty and PCL throughout
3  the project?
4      A.     Yes.
5      Q.     Do you recall speaking with anyone
6  else at Hardesty or PCL besides those two kind of
7  as your regular points of contact?
8      A.     Not as a regular point of contact, no.
9      Q.     Was Charlie -- strike that.  Was anyone
10 from the Belt Line present for the first inspection
11 that Howard did?
12     A.     I don't recall.
13     Q.     Did Howard make any written findings from
14 that inspection?
15     A.     I don't recall.
16     Q.     Did you guys discuss it, the inspection,
17 afterwards?
18     A.     Yes.
19     Q.     And what did you two talk about?
20     A.     I don't recall exactly what we talked
21 about.
22     Q.     Do you recall anything about the
23 conversation?
24     A.     Yeah.  It -- they deemed it a nine
25 out of ten, as the worst bridge strike they had

Page 84

1  probably seen.  Howard gave me an estimate of what
2  he thought it might cost, and I asked Charlie if
3  he could make it significantly lower, and then I
4  remember telling them how we needed to get it put
5  back in service hopefully before October 1st.
6      Q.     What was that initial estimate that
7  Howard provided?
8      A.     $15,000,000.
9      Q.     And I take it that was kind of napkin
10 math, just on the spot?
11     A.     That was him just looking at it, and
12 I was appalled that that number was so high.
13     Q.     And then what did Charlie say whenever
14 you asked him if there was anything he could do
15 anything to lower it?
16     A.     I mean, Charlie gave me an estimate
17 that was still pretty high, but I mean, we were
18 just -- we were standing there staring at a bridge,
19 spitballing numbers.
20     Q.     What was Charlie's or PCL's initial
21 estimate just when you guys were standing there?
22     A.     I can't recall.
23     Q.     But it was lower than $15,000,000?
24     A.     Oh, yeah, it was.
25     Q.     Did Howard make any comments or say

Page 85

1  anything about what he thought was going to be
2  sort of the bulk of repairs that would eat up the
3  cost?
4      A.     Not at that time.
5      Q.     Did he have anyone else from Hardesty
6  & Hanover with him?
7      A.     I can't remember if Travis joined him
8  or not.
9      Q.     All right.  Let's take a look at --
10            MR. SNOW:  Do you want to take a break?
11 We've been going about an hour.
12            MR. ROMAN:  Yeah.  We have been going
13 about an hour.  Do you want to --
14            MR. SNOW:  It's up to you.
15            THE WITNESS:  I don't care, whatever.
16            MR. ROMAN:  I mean, I am going to start
17 going through the E-mails so now might be a good time
18 for a break.
19            MR. SNOW:  Yeah, why don't we take a
20 break then?
21            (Recess.)
22            (Carver Exhibit Number 2 was marked.)
23 BY MR. ROMAN:
24     Q.     We're going to take a look at what
25 we've marked as Exhibit 2, which starts at Bates stamp

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 86

1  NPBL2644 and it goes through 2753. Do you have that
2  in front of you?
3      A.    2644?
4      Q.    Yes.
5      A.    Yes.
6      Q.    All right. Do you recognize this?
7      A.    Yes.
8      Q.    Can you describe what it is for us?
9      A.    It's the E-mail that I sent my Board at
10  six a.m. on Tuesday after we discovered that the
11  bridge had been hit.
12     Q.    And this is an E-mail that you sent from
13  your company E-mail? I know it's not shown there. I
14  think there is other versions.
15     A.    Probably.
16     Q.    It's addressed to the NPBL Board,
17  correct?
18     A.    Yes.
19     Q.    All right. Who are these individuals
20  that we see in the "to" line, Jason Zampi, Angie
21  Williams, Ed Boyle, Joshua Lafferty and David Hoffman?
22     A.    Our Board members made up -- Jason
23  Zampi is the CFO of NS. Angie Williams is the CAO
24  of CSX. Ed Boyle is the VP of engineering for NS.
25  Josh Lafferty is the AVP of NOC, I believe now, and

Page 87

1  David Hoffman is an attorney with CSX.
2      Q.    And Mr. Hoffman is separately a Board
3  member of NPBL?
4      A.    Correct.
5      Q.    He's not just there in his capacity as a
6  lawyer, right?
7      A.    Correct.
8      Q.    And then under "cc," I know who Mr.
9  Chapman and Mr. Snow are. Who is Rachael Sears?
10     A.    She is our comptroller, corporate
11  secretary.
12     Q.    Mr. Chapman and Mr. Snow, were they --
13  I guess why were they copied on this E-mail?
14     A.    Well, they're our general counsel so
15  I copy them in any correspondence to the Board.
16     Q.    So they're general counsel for NPBL?
17     A.    Correct.
18     Q.    All right. First paragraph down it says,
19  we had a marine rigging and engineering company come
20  out to make sure the structure was safe in its current
21  state. Do you see that there?
22     A.    Yes.
23     Q.    And is that company the Crofton company
24  that we talked about a couple minutes ago?
25     A.    Yes.

Page 88

1      Q.    All right. The next sentence, I've
2  attached a photo of the damage. If you go to
3  the next, I don't know, 15 or 20 pages -- and
4  this is just how they were produced, one of the
5  things I want to do is figure out which photos were
6  attached to these E-mails that we're going to go
7  through. Does that make sense?
8      A.    Sure.
9      Q.    Do you recall as you sit here which
10  photos you were attaching to this particular E-mail,
11  the June 18th one?
12     A.    No, I cannot.
13     Q.    If you can maybe take a look at
14  the next I think it's about 20 to 25 pages of
15  photos and see if any of those refresh your
16  recollection of what might be attached to this June
17  18th E-mail.
18     A.    Yeah. There is one picture of the
19  bridge at night. That would have been probably the
20  only one I -- well, I can't recall. None of these
21  is a photo of the bridge at night.
22     Q.    Okay. Did you take that photo?
23     A.    No, that was the one that was text to
24  me, I believe.
25     Q.    The one from, I think, Adam Reeder?

Page 89

1      A.    No. It would have been from Nathan
2  Rose.
3      Q.    Moving down to the sixth bullet point,
4  along those same lines, I've sent a note to Ruth
5  Brown with NS. I'm assuming that means Norfolk
6  Southern.
7      A.    Yes.
8      Q.    Is that the communication that we
9  talked about a little while ago?
10     A.    Yes.
11     Q.    Okay. How did you send Ruth that note
12  that's referenced here?
13     A.    I can't remember. I don't know if
14  I sent it via Teams or text. I can't remember.
15     Q.    Is -- the Norfolk Southern and NPBL
16  Team systems, are they connected, like you can message
17  them?
18     A.    Yeah.
19     Q.    And then the next bullet point down
20  says, we've also reached out to Koppers, our bridge
21  engineers for the mainline bridge. Do you see that?
22     A.    Yes.
23     Q.    And does that refresh your recollection
24  at all as to whether you did in fact communicate
25  with Koppers in the aftermath of the allision?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 90

1    A.    Yes.
2        Q.    Okay.  Can you recall as you sit here
3    what that communication was?
4        A.    I cannot.
5        Q.    Do you know whether you reached out
6    by phone call, by E-mail, by text?
7        A.    I can't recall.
8        Q.    Do you know why you were reaching out
9    to Koppers?
10       A.    They're our bridge engineers.
11       Q.    Did you consider Koppers for doing any of
12   the repair work on the bridge?
13       A.    No.
14       Q.    Is there any standard or regulation
15   that requires you to inform Koppers of the -- of the
16   incident?
17           MR. SNOW:  Object to form.
18           THE WITNESS:  There is reference in
19   the Bridge Maintenance Program.  I don't know if --
20   it's not a requirement to inform them.  I don't know
21   actually.
22   BY MR. ROMAN:
23       Q.    All right.  The last line, I will
24   provide an update at our four p.m. meeting.  Was
25   that a meeting specific to the allision or was

Page 91

1    that a meeting that had already been on the
2    calendar?
3        A.    That was a meeting that had already
4    been on the calendar.
5        Q.    Go to the next E-mail.  I believe it
6    starts at 2679.  Are you there?
7        A.    Yeah.
8        Q.    It looks like this particular E-mail
9    continues on to NPBL2680.  Do you see that?
10       A.    Yeah.
11       Q.    And is this another E-mail that you
12   sent from your E-mail to the NPBL Board?
13       A.    Yes.
14       Q.    Same first question, do you see the
15   two attachments that are referenced at the top
16   there, the ML bridge drawings markup and the NPBL
17   bridge photos?
18       A.    Yes.
19       Q.    Okay.  Can you identify -- I think
20   it's going to be in the prior 20 pages -- what
21   those two attachments are to that E-mail?
22       A.    Without specifically seeing the
23   attachments, I can't.  This is just a sketch
24   of the bridge, but it's got no markings on it so
25   I don't think I would have sent that.  I know I

Page 92

1    wouldn't have sent that.
2            The next are a series of photos.
3    Without dates on them, I -- they were probably
4    taken right after.  I remember the one of the foot,
5    and I think that's Adam's foot.
6        Q.    What Bates label are you looking at, sir?
7        A.    NPBL2649.
8        Q.    Do you know who took this photo?
9        A.    I do not.
10       Q.    Why don't we just do this, let's go on
11   to the next one, 2650.  Do you know who took this
12   photo?
13       A.    The one that -- the one that -- whoever
14   took this one took the first one.  I believe it was
15   Adam or Bill that took these.
16       Q.    Someone from --
17       A.    From our company.
18       Q.    From the Belt Line?
19       A.    Yes.
20       Q.    2651, the next page, do you know who took
21   this one?
22       A.    I have no idea.
23       Q.    2652, do you know who took that one?
24       A.    I do not know.
25       Q.    Same for 2653?

Page 93

1        A.    I do not know.
2        Q.    2654?
3        A.    I do not know.
4        Q.    Why don't we do this, if you could
5    take a look at 2655 through 2678, thumb through
6    those and just let me know if you can identify
7    any photo that you know, you know, who took it.
8        A.    I don't know who took them.  I would
9    suspect it was probably Koppers, but I don't know
10   if -- they came out on the boat came out, but I don't
11   know who took them.
12       Q.    Do you recall how -- I know we talked
13   about the one from Nathan that you received.  Can
14   you recall as you sit here how you received any
15   other photos after the June 15th allision?
16       A.    I do not recall.
17       Q.    All right.  Back to 2679, the June
18   20th E-mail, can you first just describe here
19   what it is you're reporting on?
20       A.    On this just the initial findings
21   of what was damaged on the bridge and just an
22   update to the Board on where we stood with
23   everything.
24       Q.    Does this refresh your recollection
25   as to whether or not that you already had an initial

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 94

1  meeting with Hardesty & Hanover and PCL about their
2  findings from the incident?
3      A.    Yes, that is correct.
4      Q.    Okay.  Is that the meeting that we
5  discussed a little while ago where Howard Swanson
6  was there, Charlie Graning?
7      A.    Yes.
8      Q.    The second sentence, our approach will
9  be a -- calculated, incremental and sequenced
10 because of the nature of the damage.  Did I read that
11 correctly?
12     A.    Yes.
13     Q.    As of June 20th when you sent this
14 E-mail, had Hardesty & Hanover and PCL developed
15 any type of plan for the repairs of the bridge?
16     A.    No.
17     Q.    Did -- as of that date did the --
18 did Belt Line approve any type of plan or work
19 to the done on the bridge at that time?
20     A.    Well, when PCL and H&H first came
21 out, there was the idea of -- they had a plan
22 to maybe put it back in place, which was to lift
23 it up and shift it over, so they were working on
24 that.  That was the initial first pass game plan.
25 That was later deemed too dangerous by the engineers

Page 95

1  after they had some time to review it, and so
2  they changed tactics after that.
3      Q.    Can you recall if they had sort of
4  calculated that initial plan as of June 20th by
5  referencing this E-mail?
6      A.    Define calculated.
7      Q.    Come up with it.  Had they -- had they --
8  well, let me ask you this, had they relayed that that
9  was their initial thought as to how they were going
10 to go about performing the work as of June 20th?
11     A.    Yes.
12     Q.    They had?
13     A.    Yes.  That was -- that was in discussion.
14     Q.    And then what's the third or fourth
15 paragraph starts with, first is a buckling of one
16 of the support beams that supports the main tower
17 and then goes on, and then second is the base of
18 main support beam for the tower section and then goes
19 on.  Do you see those two paragraphs?
20     A.    Yes.
21     Q.    Are those issues that you're discussing
22 referencing what was that initial plan to lift up and
23 twist back the bridge?
24     A.    I don't understand -- I guess I don't
25 understand your question.

Page 96

1      Q.    Well, let me ask you this, why were
2  those the two major areas of the concern that you
3  referenced in that second paragraph at that time?
4      A.    Because those were the two major areas
5  of concern.
6      Q.    Okay.  And that plan -- that initial
7  plan that H&H and PCL came up with, at that point
8  did they think that plan was going to address these
9  two areas of concern?
10     MR. SNOW:  Object to form.
11     THE WITNESS:  I don't know -- I
12 still don't -- can you rephrase the question?  It
13 doesn't --
14     MR. ROMAN:  Yeah.
15     THE WITNESS:  By picking it up and
16 shifting it over it was not going to fix the
17 problem.
18 BY MR. ROMAN:
19     Q.    Okay.  Well, you said at some point it
20 was being -- the initial plan was too unsafe to
21 proceed with, right?
22     A.    Correct.
23     Q.    Okay.  Do you know when that was
24 determined?
25     A.    I don't know exactly when that was

Page 97

1  determined.
2      Q.    Okay.  At this point, on June 20th,
3  had the Belt Line made efforts to reroute their
4  trains that couldn't go over the bridge?
5      A.    Well, yes.  We say it in the update.
6      Q.    And that's the agreement that you had
7  with CSX?
8      A.    It was between NS and CSX, and we
9  already received our first CSX train.
10     Q.    All right.  And what -- generally could
11 you describe what that agreement was?
12     A.    Sure.  CSX was going to consider
13 bringing their -- bringing their trains through
14 their Portsmouth sub to us.  They were going to
15 hand off a train in Petersburg to NS and have an NS
16 crew bring it into NS's Portlock yard and then have
17 us go pick it up from the Portlock yard.
18     Q.    Is that the -- is that the plan that --
19 strike that.  Is that how trains accessed the yards
20 throughout the duration of the repair work?
21     A.    Yes.
22     Q.    Okay.  Was there any other plan or
23 accommodations made to continue moving the freight?
24     A.    Yes.
25     Q.    What were those?

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 98

1    A.    Perdue had to shift a significant
2    amount of their trains to interchange at -- in
3    Wheeling, West Virginia to NS so they would run
4    on the network a little more fluidly.
5    Q.    And when did Perdue first start doing
6    that, if you recall?
7    A.    I can't recall an exact date.
8    Q.    On to 2680, it looks like the first
9    bullet point under "Moving Forward," today we'll
10   add supports to the buckled support beam and try
11   to slide the bridge back into position.  Do you see
12   that?
13   A.    Yes.
14   Q.    Who would be performing that work?
15   A.    PCL.
16   Q.    Okay.  It wouldn't have been Crofton?
17   A.    It could have been.  I don't know who
18   PCL sublet at that time.
19   Q.    And so as of June 20th the contractor
20   had already mobilized in proceeding with some type
21   of work?
22   A.    Correct.  It was an emergency repair.
23   Q.    All right.  2681, do you recognize that
24   document?
25   A.    Yes.

Page 99

1    Q.    Could you describe it for us?
2    A.    It was H&H's proposed repair sequence.
3    Q.    Was that the proposed repair sequence
4    that I think we were just referring to as the initial
5    plan?
6    A.    I don't believe so.
7    Q.    Okay.  So this would have been a
8    proposed repair plan that came after that initial
9    plan where they were going to lift up the bridge and
10   put it back into place?
11   A.    Correct.
12   Q.    Okay.  Do you know when this document was
13   created?
14   A.    I do not.
15   Q.    Okay.  And we see Hardesty & Hanover, LLC
16   at the top, right?
17   A.    That's correct.
18   Q.    Is this a document that Hardesty &
19   Hanover prepared?
20   A.    Yes, it is.
21   Q.    Do you recall when you received this
22   document?
23   A.    I do not.
24   Q.    Could you describe the differences
25   between the initial plan and then the repair

Page 100

1    methodology that we see referenced here in 2681?
2    A.    Yes.
3    Q.    And what are those differences or
4    modifications?
5    A.    One was basically going to lift the
6    bridge up and slide it over back in place, and
7    this plan talks about building a temporary piling
8    to support the bridge and try and move it over that
9    way.
10   Q.    What did the contractor do, if
11   anything, between formulating the initial plan
12   and then formulating this proposed repair methodology
13   that caused them to think the initial plan was going
14   to be too unsafe to proceed with?
15   MR. SNOW:  Object to form, calls for
16   speculation.
17   THE WITNESS:  I'm not -- I'm not really
18   sure what they -- they did.
19   BY MR. ROMAN:
20   Q.    Well, was anyone else involved in
21   overseeing the engineers', Hardesty & Hanover and
22   PCL's, work on the bridge except for yourself?
23   A.    Yes, it was just me.
24   Q.    Okay.  Did they have to obtain your
25   approval to proceed with work on the bridge?

Page 101

1    A.    Yes, they did.
2    Q.    How often in a given week after June
3    15th, 2024 did you speak with someone from Hardesty
4    & Hanover about the repairs?
5    A.    Multiple times a day.
6    Q.    Okay.  How about with PCL?
7    A.    Multiple times a day.
8    Q.    All right.  Fair to say that this
9    was the top of your workload for a little while?
10   A.    Yeah.  The bridge strike consumed
11   the entire company for like eight months.
12   Q.    And so can you recall in any of
13   those discussions being informed how PCL or Hardesty
14   & Hanover determined that the initial plan that
15   they formulated was too unsafe to proceed with?
16   A.    If I recall, the engineers at H&H
17   had time to review it and they deemed it to be
18   unsafe.
19   Q.    And was that -- well, strike that.
20   It wasn't like they were in the middle of performing
21   that work and stopped the work, it was more that
22   they went back to their office and reviewed the
23   plans and then decided against that initial plan?
24   A.    Correct.
25   Q.    Okay.  Do you know -- they issued an

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 102

1  emergency inspection report around July 3rd, I
2  think, right?
3      A.    Yes.
4      Q.    Okay.  Do you know if Hardesty &
5  Hanover had decided against proceeding with that
6  initial plan by the time they issued that emergency
7  inspection report?
8      A.    Yes.
9      Q.    Yes, they had?
10     A.    Yes.
11     Q.    So they had decided against proceeding
12 with the initial plan at some point between June 18th
13 and July 3rd; is that fair?
14     A.    Yes.
15     Q.    And do you recall when you heard about
16 that?
17     A.    The change in methodology?
18     Q.    Yes.
19     A.    Probably shortly -- probably around June
20 20th or 21st.
21     Q.    Did you ever communicate by E-mail
22 with Hardesty & Hanover about their repair plans
23 and methodologies?
24     A.    Seeing we were all standing out there
25 on site, probably not.

Page 103

1      Q.    Did you give verbal or written approval
2  to proceed with work on the bridge?
3      A.    I believe I gave written permission.
4  I wrote -- I know I wrote PCL and H&H confirmation
5  that they would be doing it.
6      Q.    And who would you have E-mailed at H&H
7  about that?
8      A.    Howard.
9      Q.    Swanson?
10     A.    Yeah.
11     Q.    Would PCL -- someone from PCL typically
12 be copied on those E-mails with Hardesty & Hanover?
13     A.    I can't -- they could be.  I can't
14 remember.
15     Q.    Did you typically E-mail Hardesty &
16 Hanover and PCL separately?
17     A.    Sometimes.
18     Q.    Okay.  Was there sort of a core group
19 of individuals with Hardesty & Hanover and PCL that
20 you would E-mail about for updates of work, approval
21 of work, that type of thing?
22     A.    It would be Howard and Charlie.
23     Q.    So the three of you were sort of the
24 core group of decision makers for what work was going
25 to be done?

Page 104

1      A.    Decision makers for approving the work
2  or --
3      Q.    Well, Howard Swanson being the decision
4  maker for Hardesty & Hanover, saying here is what our
5  recommendations are, right?
6      A.    Correct.
7      Q.    Charlie from PCL being the decision maker
8  for saying yes, we can execute and do the actual work,
9  right?
10     A.    Correct.
11     Q.    And then you, yourself, as the
12 president who was authorizing work, deciding to
13 adopt the recommendations and approve PCL proceeding
14 with the work, right?
15     A.    That's correct.
16     Q.    All right.  So the three of you were the
17 decision makers?
18     A.    Sure, if that's how you describe it.
19     Q.    Did Hardesty & Hanover give you like
20 an initial budget for the proposed repair methodology
21 that we see here at NPBL2681?
22     A.    Yeah.  I believe I had -- they had
23 given me something.  I don't recall exactly what it
24 was.
25     Q.    And what -- how did they give you that

Page 105

1  budget?
2      A.    I can't remember if I got an E-mail or
3  they just told me.
4      Q.    In your 14 years with -- 15, whatever
5  it was, with the Belt Line, would you typically
6  proceed with a $15,000,000 project without seeing
7  the writing -- the numbers in writing?
8           MR. SNOW:  Object to form.
9           THE WITNESS:  Well, in the 15 years
10 I've been on the Belt Line railroad we haven't had
11 our railroad cut in half by a barge striking the
12 bridge and preventing 67 percent of our traffic
13 from crossing, so for an emergency repair, yes,
14 we proceed to get it back in service.
15 BY MR. ROMAN:
16     Q.    How about that 1.3 million dollar
17 project back in 2013 with the mechanical system,
18 did you receive a written budget for that one?
19     A.    We put it out to bid, yes, but that
20 was not an emergency repair.
21     Q.    What is your level of authority for
22 approving expenditures for the Belt Line?
23     A.    I can approve whatever needs to be
24 approved.
25     Q.    Okay.  Could you approve a hundred

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 106

1  million dollar expenditure on a railroad bridge
2  without consulting the Board or anyone else?
3      A.    It depends if it's capital item or
4  not, but --
5      Q.    Who -- would Howard have been the
6  person from H&H to send their budget for the --
7  this methodology?
8      A.    Yes.
9      Q.    And would Charlie have been the
10  person from PCL to send their budget for the
11  proposed work?
12      A.    Yes.
13      Q.    Did either of them have like assistants
14  who were looped in on these E-mails?
15      A.    They might have.  I don't recall.
16      Q.    Okay.  As you sit here can you
17  recall ever seeing a written budget from either
18  H&H or PCL for the work that they proposed on the
19  bridge for this methodology that we're looking at?
20      A.    Yes.
21      Q.    All right.  And where do you recall
22  seeing that?
23      A.    I believe Charlie sent me one.
24      Q.    Okay.  So definitely PCL you can recall,
25  right?

Page 107

1      A.    Correct.
2      Q.    And how about Hardesty & Hanover?
3      A.    They gave me a budget for the engineering
4  work, I believe, at some point.
5      Q.    And the one from PCL, was that like an
6  Excel spreadsheet?
7      A.    I don't recall.  I believe it was just
8  an E-mail.
9      Q.    And how about Hardesty & Hanover, do
10  you recall the format that that was provided to you
11  in?
12      A.    I do not.
13      Q.    As of like June 20th, 2024 had Hardesty
14  & Hanover had any existing projects that they were
15  doing for the Belt Line?
16      A.    They were doing a mechanical inspection.
17      Q.    And that was an open -- what would be
18  considered open at the time?
19      A.    Correct.
20      Q.    How about PCL, were they doing any
21  work on any other projects for the Belt Line at that
22  time?
23      A.    No.
24      Q.    Did you have a -- did the Belt Line
25  have a -- execute an agreement for the work on

Page 108

1  the bridge related to the allision with Hardesty
2  & Hanover?
3      A.    We were piggybacking on the existing
4  service agreement they had with NS.
5      Q.    Okay.  But there wasn't a separate
6  writing on -- specifically between Belt Line and
7  Hardesty & Hanover regarding the work?
8      A.    No.
9      Q.    Okay.  What about PCL?
10      A.    We were operating under an existing
11  service agreement they had with Norfolk Southern.
12      Q.    And that was an existing agreement
13  between PCL and Norfolk Southern?
14      A.    Correct.
15      Q.    Are there any E-mails or communications,
16  anything in writing, confirming that the terms of
17  those agreements with PCL and H&H and Norfolk
18  Southern would apply to the Belt Line?
19      A.    I believe -- I believe PCL wrote an
20  E-mail saying that they were going to be operating
21  under the NS service agreement, and I can't remember
22  what -- if I wrote H&H or Howard wrote me.  I can't
23  remember.
24      Q.    Do you recall when that E-mail came
25  through?

Page 109

1      A.    No.
2      Q.    Do you know if it was before or
3  after the proposed repair methodology at 2681
4  was generated?
5      A.    I do not recall.
6      Q.    Did you ever receive a budget from
7  H&H about that initial plan that we discussed?
8      A.    I did not.
9      Q.    So the budget you received from H&H
10  only related to this proposed repair methodology?
11      A.    Correct.
12      Q.    And then how about from PCL, did
13  they give you one for the initial plan?
14      A.    The initial plan was deemed dangerous
15  three days after they decided to do it, so no.
16      Q.    All right.  So you didn't get one in
17  those three days, right?
18      A.    Correct.
19      Q.    All right.  The next page, 2682, does
20  this look like it could be one of those attachments
21  we were looking for earlier, the drawing of the
22  bridge?
23      A.    I believe this was attached to the
24  write-up that they sent.
25      Q.    Okay.  So 2682 goes with 2681?

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 110

1    A.    I would believe so, yes.  I believe
2  so.
3    Q.    Okay.  All right.  Moving on to 2683,
4  again, do you recognize -- excuse me.  Do you
5  recognize this document?
6    A.    Yes.
7    Q.    And what is it?
8    A.    It's an update for the Board.
9    Q.    And that's an update that you sent via
10 E-mail?
11   A.    Correct.
12   Q.    And it's Friday, June 21st at about 12:41
13 p.m., correct?
14   A.    Correct.
15   Q.    All right.  It starts out -- it says,
16 the original plan to move the bridge has changed.
17 Very simply, said new plan is to first build support
18 pilings; two, install temporary supports for the
19 damaged areas; three, chop up the bridge and realign
20 it; four, install permanent supports, fix all damaged
21 track; is that correct?
22   A.    That's correct.
23   Q.    All right.  And that's that second plan
24 that went with that proposed repair methodology that
25 we were just looking at?

Page 111

1    A.    Yes.
2    Q.    At the top, the attachment, Norfolk
3  & Portsmouth Belt Line bridge emergency repair
4  methodology, is that the document that we were just
5  looking at on 2681 to 2682?
6    A.    I would assume it is.
7    Q.    All right.  Moving on to 2685, the
8  third paragraph, we will have our in-depth inspection
9  of the damage completed by Friday.  Do you see that?
10   A.    Where is that?
11   Q.    I'm on 2685.
12   A.    I can't see it.
13         Yes.
14   Q.    Who was performing that inspection?
15   A.    H&H.
16   Q.    Okay.  Is that the inspection that
17 resulted in the July 3rd emergency inspection report?
18   A.    I believe so.
19   Q.    Do you have any reason to believe there
20 is any other report or document summarizing findings
21 from this inspection that's referenced in 2685
22 other than the emergency inspection report of July
23 3rd?
24   A.    I believe it's just that one report.
25   Q.    All right.  Moving on to 2687, do you

Page 112

1  recognize this document?
2    A.    It's an E-mail.
3    Q.    Okay.  And this is an E-mail that you
4  sent?
5    A.    Yes.
6    Q.    And it's another E-mail to the Belt Line
7  Board, correct?
8    A.    Yes.
9    Q.    And this would have been transmitted
10 from your company E-mail?
11   A.    Yes.
12   Q.    It's dated Monday, July 8th.  Our
13 engineers (Hardesty & Hanover) have completed their
14 inspection and provided our contractor (PCL) with a
15 list of temporary and permanent repairs as well as
16 the sequence of those repairs.  Do you see that, the
17 first sentence, first paragraph?
18   A.    Okay, yeah, I got you.
19   Q.    Was that the inspection that resulted
20 in the July 3rd emergency inspection report?
21   A.    I believe so.
22   Q.    All right.  It says that Hardesty &
23 Hanover provided PCL with a list of temporary and
24 permanent repairs.  Is there a document that's
25 separate from the emergency inspection report of

Page 113

1  July 3rd that lists out those proposed temporary
2  and permanent repairs?
3    A.    I believe so, but I can't remember.
4    Q.    Okay.  What makes you think that there
5  is a separate document?
6    A.    Well, I wrote it in here, so I think
7  I read one.  I don't know.  It was -- there was so
8  much going back and forth at this time, I -- I really
9  can't remember.
10   Q.    Is it possible that Hardesty & Hanover
11 E-mailed sort of a punch list to PCL with those
12 temporary and permanent repairs in addition to
13 generating the emergency inspection report?
14         MR. SNOW:  Object to form, calls for
15 speculation.
16         THE WITNESS:  I'm not sure.
17 BY MR. ROMAN:
18   Q.    All right.  The first bullet point
19 says, we have two of the three temporary spans in
20 place.  Did I read that correctly?
21   A.    Yes.
22   Q.    All right.  Who performed that work?
23   A.    Sub of PCL.
24   Q.    Do you know which sub?
25   A.    Probably Crofton.

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 114

```
 1        Q.    Did PCL have authority to retain subs
 2   at their discretion?
 3        A.    Yes.  They're the general contractor for
 4   the project.
 5        Q.    It didn't require Belt Line approval?
 6   Just so we're clear, I take you mean subcontractor
 7   when you say sub?
 8        A.    Yes.
 9        Q.    All right.  Did PCL typically inform
10   you or the Belt Line that they were going to
11   retain a subcontractor before they -- before doing
12   so?
13        A.    No.
14        Q.    The second bullet point, PCL and
15   their engineers are finalizing design -- I think
16   it should probably say of the final span that will
17   end up supporting the main tower structure.  We'll
18   hopefully have that built by mid next week.  Did I
19   read that correctly?
20        A.    Yes.
21        Q.    Okay.  Are the engineers that are
22   listed there different than Hardesty & Hanover --
23   I'm sorry, referenced there different than Hardesty
24   & Hanover?
25        A.    Yes.
```

Page 115

```
 1        Q.    Okay.  Who were those engineers?
 2        A.    They were engineers hired by PCL.
 3        Q.    Are they in-house at PCL or would that
 4   be another subcontractor?
 5        A.    I'm not sure.
 6        Q.    Are you aware as you sit here as to
 7   any subcontractor that PCL hired for engineering
 8   services?
 9        A.    I mean, they had -- they had engineers.
10   I can't recall if they were contractors or in-house.
11        Q.    Okay.
12        A.    Actually they were -- yeah, they were
13   contractors.
14        Q.    Can you recall who they were?
15        A.    No, I can't.
16        Q.    All right.  H&H is continuing to work
17   on the design work for the permanent structures.  Did
18   I read that correctly?
19        A.    That's correct.
20        Q.    All right.  At this point, July 8th,
21   had H&H provided any drawings or design drawings
22   for any work to be performed on the bridge, as best
23   as you can recall?
24        A.    Well, H&H's role during the construction
25   phase was to oversee the designs from PCL's engineers
```

Page 116

```
 1   for the temporary structures.
 2        Q.    So PCL's engineers would be the ones
 3   that would come up with those designs?
 4        A.    That is correct.
 5        Q.    All right.  And then Hardesty & Hanover
 6   reviewed and approved them?
 7        A.    That is correct.
 8        Q.    Did you have any role in approving them
 9   after Hardesty & Hanover made their recommendations?
10        A.    Yes.  H&H would send me the plans.
11        Q.    And that would I take it come along with
12   some type of note that they are recommending it as is
13   or had modifications, right?
14        A.    Correct.
15        Q.    Can you recall if you ever rejected
16   one of Hardesty & Hanover's recommendations?
17        A.    No.
18        Q.    No, you can't recall or no, you did not?
19        A.    No, I did not.
20        Q.    All right.  The fourth bullet point,
21   we have an updated method where we will plan to
22   replace the damaged sections with permanent
23   structures, then realign the bridge, which should
24   be more efficient and provide a better work product
25   once completed.  Did I read that correctly?
```

Page 117

```
 1        A.    Correct.
 2        Q.    All right.  And that's an E-mail that
 3   you sent to the Board on July 8th, 2024 at 2:37
 4   p.m.?
 5        A.    That is correct.
 6        Q.    Okay.  And what is that updated method?
 7        A.    I can't recall specifically, but I
 8   believe we had changed around so -- well, I can't
 9   recall specifically.
10        Q.    But that would, I think, be at
11   least another method in addition to the initial
12   plan and then that repair methodology that we talked
13   about, right?
14        A.    Correct.
15        Q.    All right.  And it says that it
16   would be more efficient, provide a better product
17   once completed.  Is the better product referenced
18   in that communication the mainline railroad bridge?
19        A.    Yes.
20        Q.    Okay.  So as early as July 8, 2024
21   Belt Line had reason to believe that they were going
22   to have a better bridge after the work was done than
23   the one that was there before, correct?
24        MR. SNOW:  Object to the form.
25        THE WITNESS:  That is not correct.
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 118

BY MR. ROMAN:

2    Q.    Well, what did you mean by better
3  product?
4    A.    That means the bridge would be a little
5  bit straighter.
6    Q.    So straighter than the old one, right?
7    MR. SNOW:  Object to form.
8    THE WITNESS:  That is incorrect.
9  BY MR. ROMAN:
10    Q.    How is it incorrect?
11    A.    Because the old bridge was straight.
12    Q.    Okay.  So what were you comparing the
13  better product to in that sentence?
14    A.    As it was described to me, the
15  previous method they had thought about, by
16  doing it this way, once it's done it would be
17  a better fix for the bridge, not a better bridge
18  overall because the bridge is still crooked, and
19  the life of the bridge has already been diminished
20  because of the crookedness so it didn't provide a
21  better bridge but a better end product than the
22  previous design.
23    Q.    Okay.  And what did you mean by more
24  efficient?
25    A.    Because the original -- or the one

Page 119

1  prior to this was to put in temporary structures
2  and then remove them and then put in permanent ones,
3  and by doing it this way they skipped that step, so
4  it would be more efficient, hopefully cheaper and
5  quicker.
6    Q.    All right.  It says, PCL is working on
7  getting an estimated timeline and budget now that
8  they have a complete list of repairs.  Did I read that
9  correctly?
10    A.    That is correct.
11    Q.    Is that an additional budget than the
12  one that they had provided to you that we just
13  discussed?
14    A.    I don't recall exactly when they
15  provided me the budget we discussed.
16    Q.    Well, would that be -- the one that's
17  referenced on 2687, is that a second budget or is
18  that the budget that we were talking about?
19    A.    The one on 2687 says I was waiting on
20  a budget.  I don't think I said I got a budget.  I can
21  go back and look if you want me to.  2687?
22    Q.    Yes.
23    A.    I'm on 2687.
24    Q.    The fifth bullet point down on this,
25  PCL is working on getting me an estimated timeline

Page 120

1  and budget now that they have complete list of
2  repairs.
3    A.    That's correct.
4    Q.    So is that budget, as best as you
5  can recall, and by referencing this E-mail, is
6  that budget the one that we were just discussing or
7  do you think that that's a second budget that was
8  going to be updated, based on what you're looking at
9  now?
10    A.    I believe it was the original budget.
11  There is an E-mail from Charlie to me giving me
12  that budget.  If you want to show me that, that has
13  the correct date.
14    Q.    I don't have it.  That's why I'm asking
15  a lot of questions about it, unless you did provide
16  it.
17    MR. SNOW:  I don't know sitting here.
18  I don't even know if you asked for it, but we can
19  look.
20    MR. ROMAN:  Yeah.  I'm just trying to
21  focus in.  I'm not -- not asking you about documents I
22  know about, trust me.
23  BY MR. ROMAN:
24    Q.    All right.  The next paragraph,
25  we're going to be removing most of the rail and

Page 121

1  large sections of ties to fix the bridge.  We had
2  planned to redeck and rerail the MLB in 2027.  It
3  would make sense to do this on the west side of
4  the bridge now since we're going through the effort
5  of pulling everything off.  I'm getting pricing for
6  new rail and a complete tie replacement on the west
7  section of the bridge.  Whatever insurance doesn't
8  cover can be run under one of our grants from the
9  state.  Did I read that correctly?
10    A.    That is correct.
11    Q.    All right.  The second sentence, when
12  you say redeck, what did you -- what does redecking
13  the mainline bridge entail?
14    A.    Putting new cross ties down.
15    Q.    Okay.  Does that include putting new
16  rails down as well?
17    A.    That's rerailing.
18    Q.    Okay.  So redeck is simply the ties?
19    A.    Correct.
20    Q.    Do you know when the ties that were
21  on the bridge in June, 2024 were installed?
22    A.    I do not.
23    Q.    Okay.  How about the rails?
24    A.    I do not.
25    Q.    When did this plan to redeck and rerail

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 122

1  the -- when did you come up with the plan to redeck
2  and rerail the bridge?
3      A.    From when?
4      Q.    Well, so you planned to do it in 2027,
5  right?
6      A.    That was one -- that was one of our
7  considerations, yes.
8      Q.    Okay.  Had you started budgeting for that
9  project?
10     A.    No.
11     Q.    Okay.  I take it that plan of redeck
12 and rerail the bridge in 2027 had been formulated
13 prior to June 15, 2024, correct?
14     A.    Correct.
15     Q.    All right.  So when did that plan
16 formulate?
17     A.    I can't recall exactly when it was
18 formulated.
19     Q.    Was it within a year before the June
20 15th, 2024 allision?
21     A.    It might have been part of our six-year
22 plan that we had for maintenance.
23     Q.    All right.  And what is that six-year
24 plan?
25     A.    Six-year plan for maintenance for the

Page 123

1  railroad.
2      Q.    Okay.  Do you have a plan every six
3  years or was that like a specific plan for the next
4  six years?
5      A.    We have a five-year capital plan that
6  keeps evolving every year.
7      Q.    As of July 8th, 2024, at what point
8  were you in the current six-year plan?
9      A.    Maybe I did a bad job of describing
10 it.  I have a five-year capital plan that gets updated
11 every year for five years.
12     Q.    Okay.  So there is a five-year capital
13 plan in place today?
14     A.    Correct.
15     Q.    All right.  And there was a five-year
16 plan in place on June -- July 8th of 2024?
17     A.    Correct.
18     Q.    Had you determined who was going to
19 be doing the redecking and rerailing in 2027 as
20 of July 8, 2024?
21     A.    No.
22     Q.    Okay.  Do you recall how it was
23 determined that that's when you were going to
24 so the redecking and rerailing?
25     A.    It was a gap in our five-year plan

Page 124

1  where we had funds to do it, but it could have
2  been moved and pushed back to another date.  It
3  wasn't set in stone.
4      Q.    And where did those funds come from?
5      A.    We get grant money from the Department
6  of Rail & Public Transportation.
7      Q.    In July -- as of July 8, 2024 how
8  many existing grants had been issued to the Belt
9  Line for work on the -- that would include the
10 mainline bridge?
11     A.    I don't understand the question.
12 For --
13     Q.    Well, you said you get grants from the
14 state, right?
15     A.    Correct.
16     Q.    All right.  How many grants did you have
17 as of July 8, 2024?
18     MR. SNOW:  Object to form.
19     THE WITNESS:  I can't recall.  We had --
20 we had several.
21 BY MR. ROMAN:
22     Q.    Were all of the grants able to be used
23 towards improving the mainline bridge?
24     A.    No.
25     Q.    What departments, governmental entities,

Page 125

1  issued the grants?
2      A.    VDOT, Virginia Department of
3  Transportation.
4      Q.    Okay.  Anyone else?
5      A.    No.
6      Q.    And that's a State department?
7      A.    Correct.
8      Q.    No federal grants?
9      A.    No.  Federal grants for the bridge?
10     Q.    Correct.
11     A.    No.
12     Q.    And I'm really only concerned about
13 grants that you would be able to use for the mainline
14 bridge.
15     A.    Right.
16     Q.    So that's the only one?
17     A.    Correct.
18     Q.    Do you recall when that grant was --
19 when you received that grant?
20     A.    I can't recall.  Maybe 2022.
21     Q.    Do you know how much it was for?
22     A.    I can't recall specifically, but
23 it was probably a total of around 1 point -- one
24 and-a-half million dollars of the total project cost.
25 The grant was worth 70 percent of the total project

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 126

1    cost.  We were responsible for 30 percent of it.
2        Q.    Does VDOT have requirements as to how
3    the money can be used?
4        A.    They don't have requirements, no.  Well,
5    yes, they do.
6        Q.    Or I guess I should say restrictions on
7    how the money could be used.
8        A.    Yes.
9        Q.    All right.  And what could the grant
10   money from VDOT be used on by the Belt Line?
11       A.    Whatever we needed to upgrade the bridge
12   as long as we outlined it in the notice of proceeding
13   per the request for funds.
14       Q.    Could you use the VDOT money for repair
15   work?
16       A.    You have to use the VDOT money for
17   upgrades.
18       Q.    All right.  And so 2687, the
19   redeck and rerailing plan for 2027, did you
20   plan to use the VDOT grant money for that
21   project?
22       A.    We were considering it.
23       Q.    So that would be considered an
24   improvement?
25       A.    Define improvement.  I mean --

Page 127

1        Q.    Or upgrade I think your words were.
2        A.    Well, when you take an old cross
3    tie out and you put a new cross tie in, I guess that's
4    improvement.
5        Q.    Did you plan to redeck and rerail the
6    entire bridge, all eight sections?
7        A.    If we had the funds we were considering
8    it.
9        Q.    Okay.  Do you still have a copy of
10   your five-year plan that was in existence on July 8,
11   2024?
12       A.    Yeah, probably.
13       Q.    What other types of projects on the
14   mainline bridge, if any, are referenced in that
15   five-year capital plan?
16       A.    I don't recall.
17       Q.    Can you recall as you sit here any
18   other projects that were planned or in consideration
19   on the mainline bridge as of July 8, 2024?
20       A.    Yes.  We were in the process of
21   upgrading our PCL system, the remote control system.
22       Q.    And what is that?  Can you describe that
23   a little bit for me?
24       A.    Yeah.  It's the program that makes the
25   bridge go up and down.

Page 128

1        Q.    Is that the mechanical system that
2    was being inspected by Hardesty & Hanover back on June
3    4th?
4        A.    No.  It was basically the computer that
5    controls it, the mechanics and stuff.
6        Q.    When did the -- you begin considering to
7    upgrade that PCL system?
8        A.    We didn't upgrade the system.  We just
9    reprogrammed it, and that was in the works for six
10   months prior.  We were actually going to install it
11   in June, but the bridge got smashed and was out of
12   service for eight months.
13       Q.    Okay.  And where -- where is that
14   computer system located in the bridge house?  Does it
15   connect to like any servers or anything outside the
16   bridge house?
17       A.    It's not servers.  It's a PCL system,
18   so it just -- it connects to the other PCL system
19   that's in the bridge house, so it's what allows it to
20   be remotely operated.
21       Q.    Who was doing that work?
22       A.    Beach Panel.
23       Q.    And you say it had been in process for
24   about six months prior?
25       A.    Correct.

Page 129

1        Q.    And what is the name, Beach Panel?
2        A.    Beach Panel, yeah.
3        Q.    Are they local or out of town?
4        A.    They're local.
5        Q.    Did their work on the PCL system
6    impact the operations on the bridge?
7        A.    No.
8        Q.    What had they done in that six months,
9    what type of work?
10       A.    They had just wrote the program.
11       Q.    All right.  So they just wrote the
12   software part of it?
13       A.    Correct.
14       Q.    They didn't do any hard wiring or
15   anything?
16       A.    Correct.
17       Q.    Was that all offsite?
18       A.    Correct.
19       MR. ROMAN:  Why don't we take a little
20   break, if that works?
21       THE WITNESS:  Sure.
22       (Recess.)
23   BY MR. ROMAN:
24       Q.    Do you know how much was left of
25   the 1.5 million dollar grant as of July of 2024?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 130

```
1         A.    I can't recall.
2         Q.    Can you recall any projects that
3   you had expended the funds from that 1.5 million
4   dollar grant?
5         A.    Yes.  We had used it to reprogram
6   the bridge, or were in the process of using it,
7   and we were in the process of using it to pay for
8   the engineering work for our -- for the mechanical
9   inspection.
10        Q.    And that's the -- Hardesty & Hanover?
11        A.    Correct.
12        Q.    And what's the -- do you have to
13  get approval on a project-by-project basis to use
14  the funds?
15        A.    Yes.
16        Q.    And who do you communicate with to get
17  that approval?
18        A.    The rail program manager at the
19  Department of Rail & Public Transportation.
20        Q.    Do you know who that was in the year
21  2024?
22        A.    Yes, Linda Balderson.
23        Q.    And how about for 2023?
24        A.    Linda Balderson.
25        Q.    2022?
```

Page 131

```
1         A.    Linda Balderson.
2         Q.    Do you know Linda?
3         A.    Yes.
4         Q.    What is the approval process?
5         A.    You determine what you were going to
6   fix and then you submit a scope letter to them and
7   they approve it and you get your notice to proceed and
8   you're off and running.
9         Q.    And you say it was a 70/30 split on the
10  funding?
11        A.    Correct.
12        Q.    How was -- or how did VDOT provide
13  the money?  Is it after the fact, before?
14        A.    It's after the fact.
15        Q.    Okay.  So The Belt Line will cover
16  the cost initially and then be reimbursed; is that
17  true?
18        A.    Correct.
19        Q.    And then 2687 references one of our
20  grants from the state.  Can you recall there being
21  another grant, other than the 1.5 million dollar
22  one we've been discussing?
23        A.    Yes.  We have several.
24        Q.    Okay.  How many more?
25        A.    I don't recall offhand, but we have
```

Page 132

```
1   several.
2         Q.    Do you know a rough estimate of the
3   total dollar figure in grant money that the Belt
4   Line had received as of July, 2024 for railroad
5   bridge projects?
6               MR. SNOW:  Object to the form.
7               THE WITNESS:  Railroad bridge projects?
8               MR. ROMAN:  Or that could be used on
9   railroad bridge projects.
10              THE WITNESS:  I don't recall offhand.
11  BY MR. ROMAN:
12        Q.    Is Linda the person that you would
13  transact with for all of the grants that VDOT issued?
14        A.    For the Rail Preservation Fund, yes.
15        Q.    Are there other programs that VDOT has
16  that -- under which the Belt Line has received
17  grants, other than the Rail Preservation Program?
18        A.    Yes.
19        Q.    Were there any -- what are those
20  programs?
21        A.    The Freight Program.
22        Q.    And what is the difference between
23  the Freight Program and the Rail Preservation
24  Program?
25        A.    The Rail Preservation Program is
```

Page 133

```
1   specifically for short line railroads to maintain
2   their railroads in a state of good repair.  The
3   Freight Grant Program is to increase capacity.  Anyone
4   can apply for that.
5         Q.    And what are the requirements for using
6   grant money from the Freight Program?
7         A.    You submit an application and it gets --
8   I don't know how to answer your question.
9         Q.    It was a bad question.
10              What -- I mean, how do you qualify for --
11  under the Freight Program?  What type of project would
12  that be for?
13        A.    Any project that increased capacity under
14  Rail Network of Virginia.
15        Q.    So would that like include building new
16  rail lines?
17        A.    Correct.
18        Q.    As of July, 2024 had the Belt Line
19  used any grant money from the Freight Program for
20  a project on the mainline bridge in the last five
21  years?
22        A.    No.  In fact, we weren't even awarded
23  the freight grant until after July.  Yeah, after
24  July 1st.
25        Q.    And then the 2013 project on the
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 134

1  mechanical system, was that funded with grant
2  money?
3      A.      No.
4      Q.      That was -- how -- that was just Belt
5  Line money?
6      A.      Yes.
7      Q.      Did you have any discussions with Linda
8  about the allision?
9      A.      Yes.
10     Q.      Do you remember how many?
11     A.      I don't recall.
12     Q.      What can you recall discussing with
13  Linda?
14     A.      Asking if we could use our grant money
15  to help with some of the engineering work that was
16  involved in fixing our bridge.
17     Q.      And what did Linda say?
18     A.      Yes.
19     Q.      So some -- if I understand the program,
20  some of that engineering work would have been for
21  upgrades on the bridge in order to qualify for that
22  grant money, right?
23     A.      Well, it's not upgrades.  It's repairs.
24     Q.      Could the Belt Line use the grant money
25  to perform repairs that are identified in an annual

Page 135

1  inspection?
2      A.      Yes.
3      Q.      Have you ever done so in the past?
4      A.      What?
5      Q.      Have you had that happen in the past?
6      A.      Yes.
7      Q.      How many times?
8      A.      Several.
9      Q.      In 2024, prior to June -- well,
10  let's expand it from January 1st, 2013 through
11  June 14th, 2024.  Had the Belt Line done any repair
12  work on the bridge for issues that were identified
13  in any annual inspection?
14     A.      Yes.
15     Q.      Okay.  And what was that work?
16     A.      I can't recall offhand exactly what
17  it was.
18     Q.      Okay.  How would you go about finding out
19  what that work was?
20     A.      We would probably have to go dig
21  in our file to see if there was an AFE attached
22  to it or if we had a project build-out for it.
23     Q.      Can you recall if any of that work
24  that was done was funded by the VDOT grant money?
25     A.      I can't recall.

Page 136

1      Q.      Do you know what areas of the bridge
2  that work was done between January 1, 2013 and June
3  14th, 2024?
4      A.      I can't recall right now.
5      Q.      Back to NPBL2687, the fourth paragraph
6  down starts out, after the collision, the
7  counterweight of the bridge shifted and caused
8  some damage to the cables and guard rails on the
9  west side.  The cables were replaced in 1983.  It
10  is a big deal to retention the cables so when we do
11  that we should consider replacing all 48 cables.  Did
12  I read that accurately?
13     A.      That is correct.
14     Q.      Okay.  And that's from your E-mail to
15  the Board on July 8th, 2024?
16     A.      Yes.
17     Q.      Okay.  The first part of that says
18  after the collision, which I've been educated it's
19  an allision.  Is that what you were referring to
20  there?
21     A.      Yeah, when the tugboat smashed into
22  our bridge, correct.
23     Q.      I would have called it collision at that
24  time too.
25              So when did that shift in the

Page 137

1  counterweight happen, if you can recall?
2      A.      Have you watched the videos?
3      Q.      That's what I'm trying to --
4      A.      I would assume you have.  You can see
5  the thing moving around so that's what I'm assuming.
6  There were chunks of concrete sitting on the deck
7  of the railroad bridge after it got hit that
8  weren't there before, so I'm assuming that it
9  smashed in -- once the tugboat ran into it at full
10  speed, I'm sure it jarred the counterweight that
11  was hanging down like a pendulum and smashed into
12  the side.
13     Q.      So you when you say after the collision,
14  you mean like in the immediate aftermath of it?
15     A.      Yeah.
16     Q.      Okay.  It wasn't say five days after
17  that?
18     A.      No.
19     Q.      Okay.  That's what I was asking.
20     A.      It was probably poorly worded.
21     Q.      Sometimes we're a stickler for the
22  details.
23              All right.  And it says it caused some
24  damage to the cables and the guide rails on the west
25  side, right?

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 138

1    A.    Correct.
2        Q.    Okay.  Do you know how many of the cables
3  were impacted by the tug allision?
4    A.    I do not.
5        Q.    Was it less than the 48 cables that
6  are referenced there, or fewer I should say?
7    A.    I do not know.
8        Q.    How did you determine that the cables
9  were replaced in 1983?
10    A.    There is some plans that showed them
11  being replaced in 1983.
12        Q.    Okay.  Had they been -- to the best
13  of your knowledge, the cables on the west side,
14  had they been replaced or repaired at any time
15  between 1983 and June of 2024?
16    A.    Not that I know of.
17        Q.    Had there been any plans to replace
18  the cables or consideration of replacing the cables
19  in the future as of July 8, 2024?
20    A.    No.
21        Q.    Had you as of July 8, 2024 discussed
22  with Hardesty & Hanover, and I'm assuming it would
23  be Travis Kimmins, about any of their preliminary
24  findings from the June 4th and 5th inspection that
25  occurred?

Page 139

1    A.    Back to the last question, the date
2  you were talking about, you were talking about --
3  were there any discussions on the cable prior to
4  this July 8 E-mail or prior to when the bridge got
5  struck?
6        Q.    Prior to the July 8th E-mail.
7    A.    I'm sure of it because I wrote it in the
8  E-mail.
9        Q.    Yeah.  Now you confused me.  I don't
10  remember the last thing.  Had there been any
11  discussions about replacing the cables in the future
12  prior to the allision on June 15th, 2024?
13    A.    There probably had been discussions on
14  it.
15        Q.    Okay.  And the cables were something
16  that Hardesty & Hanover were taking a look at as
17  part of that June 4th and 5th inspection, right?
18    A.    Correct.
19        Q.    Okay.  Prior to June 15th, 2024 had
20  you had any discussions with H&H that you can recall
21  in which you discussed proceeding with or considering
22  replacing the cables?
23    A.    July 8th or June 8th?
24        Q.    June 15th.
25    A.    June 15th, no, we did not have any

Page 140

1  discussion.
2        Q.    Did you have any discussions with
3  Hardesty & Hanover about their inspection on June
4  4th and 5th, before June 15th, 2024?
5    A.    I don't recall, but I don't -- nothing
6  in-depth.
7        Q.    Did you attend the inspection with them?
8    A.    I did not.
9        Q.    Did anyone from the Belt Line?
10    A.    It would have been Adam Reeder.
11        Q.    And I think you said earlier you think
12  it was Travis Kimmins that would be --
13    A.    Yeah.
14        Q.    Are you aware of anyone else attending
15  or possibly attending that June 4th and 5th inspection
16  other than Adam and Travis?
17    A.    I do not, no.
18        Q.    Same paragraph on NPBL2687, you said,
19  there is a six-month lead time for cables.  However,
20  the engineers believe we can operate the bridge with
21  the weight out of tension for a short amount of time.
22  Whatever insurance doesn't cover can be run under
23  our MLB grant from the state.  Did I read that
24  correctly?
25    A.    That is correct.

Page 141

1        Q.    Why is there a six-month lead time
2  for the cables, if you know?
3    A.    I think it's actually a year.  Because
4  they're very big.
5        Q.    All right.  And the 48 cables there,
6  can you describe sort of how those -- generally
7  how those 48 cables fit into the bridge?  Is there
8  like 24 on the west side and 24 on the east side?
9  How long are they?  Are they used, you know --
10    A.    Well, it's 24 on the east side.
11        Q.    And where are they located on the east
12  side?
13    A.    They hold the counterweight.
14        Q.    Okay.  And I think you said you can't
15  recall which particular cables were damaged from
16  the allision, right?
17    A.    Correct.
18        Q.    Do you know anyone who might have that
19  information?
20    A.    Probably not, but I don't understand why
21  you want to know it.
22        Q.    Well, were all 48 cables eventually
23  replaced?
24    A.    No.
25        Q.    How many were replaced?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 142

1      A.      None.
2      Q.      Were any repaired?
3      A.      No.
4      Q.      Was any work done whatsoever to the
5  cables?
6      A.      No.
7      Q.      Were you paid for -- you submitted
8  1.5 million as a line item to your insurer for --
9  related to cables, right, as part of your claim?
10             MR. SNOW:  Object to form.
11             THE WITNESS:  I don't believe so.
12  BY MR. ROMAN:
13     Q.      Go to NPBL2690.  In the paragraph that
14  begins here is the breakdown of costs, there is a line
15  item for 1.5 million for cable replacement.  Do you
16  see that?
17     A.      Yeah.
18     Q.      Okay.  So as of July 12th, 2024, the
19  date of this E-mail, the Belt Line was considering
20  as part of the cost of the work on the bridge that
21  there was going to be 1.5 million dollars for cable
22  replacement, right?
23     A.      Correct.
24     Q.      Did that -- did that cost ever -- did
25  you ever expend that 1.5 million for cable

Page 143

1  replacement?
2      A.      No.
3      Q.      And how was it determined that there
4  would be no work done on the cables?
5      A.      Because it's like replacing a 50-year-old
6  roof for hail damage.  I mean, we're not trying to
7  steal from the insurance company.  I mean, we
8  could -- we could have charged -- we couldn't charge.
9  They could have charged us an astronomical amount of
10  money to put the cable -- put the counterweight back
11  up and retention everything, but that would have
12  been a waste of money because we still needed to
13  replace the cables, but, you know, the cable was
14  probably stretched out a little, but it's not -- you
15  can't justify making the insurance company pay for
16  that.
17     Q.      Yeah, understood.  Insurance aside --
18     A.      It's not part of the claim at all.
19     Q.      What do you claim is --
20     A.      I just got another state grant to replace
21  the cables in the near future so.....
22     Q.      As we sit here there has been no work
23  done to the cables?
24     A.      The cables have not been replaced on
25  that bridge, nor has it been retensioned, which it

Page 144

1  probably should.
2      Q.      All I'm asking is, at what
3  point was it decided there would not be any work
4  done to the cables from June 15th, 2024 to as we
5  sit here?
6      A.      I can't remember exactly when.
7      Q.      All right.  On 2690 it says, I finally
8  received an ROM from PCL regarding a timeline and
9  estimated cost.  Do you see that?
10     A.      Correct.
11     Q.      What is an ROM?
12     A.      Rough order of magnitude.
13     Q.      And what does that document look like?
14     A.      It was an E-mail to me from Charlie.
15     Q.      Okay.  Do you know what the Belt Line's
16  retention -- the policy is for retaining E-mails
17  through the company servers?
18     A.      I do not know.  It's whatever Norfolk
19  Southern's is.
20     Q.      And it says an estimated cost.  Is that
21  separate and apart from the budget that was referenced
22  in the E-mails we discussed?
23     A.      I mean, that was the budget.
24     Q.      Okay.  So it's all just one and the same
25  budget?

Page 145

1      A.      Yeah.  He wrote me an E-mail and
2  told me what he thought it was going to cost.
3      Q.      All right.  I want to skip up to 2737.
4  Are you there?
5      A.      Uh-huh.
6      Q.      Okay.  This is an E-mail dated October
7  30th at about 7:10 p.m. from you to the Board,
8  correct?
9      A.      Correct.
10     Q.      All right.  And it says, this afternoon
11  we successfully lowered and raised the bridge for
12  the first time since the damage occurred.  The
13  redecking and rail installation are progressing as
14  planned, and we expect to resume train traffic on
15  11-4, as previously reported.  While there are still
16  a few outstanding items to complete, we'll soon be
17  able to handle traffic, allowing Norfolk Southern to
18  discontinue the CSX diversion trains.  PCL is now
19  scheduled to demobilize by the end of December.  Did I
20  read that accurately?
21     A.      That is correct.
22     Q.      All right.  As of this date what was
23  the -- what were the outstanding items to complete for
24  the work on the bridge?
25     A.      Well, the bridge still had a significant

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 146

1  amount of work that needed to be done in order for
2  it to operate as normal.  All we were able to do
3  is straighten it back up, redeck it and slowly begin
4  to move trains.
5      Q.     And that's why I'm just trying to get
6  a timeline, some sense of what particularly needed
7  to be done from that point forward, if you can
8  recall.
9      A.     I can't recall specifically.  I do
10 know that the signal system was still messed up.
11 We operated it manually on that diesel engine
12 for a month or two, and then we were able to --
13 or a month, and then whenever -- whenever we were
14 able to get the electrical back in that motor, it
15 had to operate at jog speed, a slow speed, from the
16 ground because the counterweight guides and rail
17 guides were not installed.  I know they had to put
18 in the walkway or something and then a bunch of other
19 odds and ends.
20     Q.     And then as of that date at least the
21 schedule was that PCL would be demobilized by the
22 end of December.  Does that mean they would be done
23 with their work?
24     A.     That's what we thought, yes.
25     Q.     Were there any inspections on the --

Page 147

1  done on the lift part of the bridge after it was
2  lowered for the first time since the allision?
3      A.     I believe so, yes.
4      Q.     And who would have performed those
5  inspections?
6      A.     It would have been H&H.
7      Q.     Do you recall having any discussions
8  with H&H, that, hey, once the lift section gets
9  lowered we need to take a look at it and make sure
10 that there wasn't any damage to it or anything along
11 those lines?
12     A.     I don't recall, but I mean, there was
13 damage to it, so I'm sure we had that discussion.
14     Q.     Do you recall at any time after
15 October 30th finding out about additional damage
16 that was done to the lift part of the bridge that
17 could not be, you know, observed before it had been
18 lowered?
19     A.     Yes.
20     Q.     And what was that?
21     A.     When the bridge was hit, it swayed
22 in such a way that it had broke the power rails
23 that have the power that run all the way up to
24 the bridge so they had to be replaced.
25     Q.     When you say power rails, is that run

Page 148

1  with electricity?
2      A.     Correct.
3      Q.     Are those different than the guide rails?
4      A.     Yeah.  Power rails and guide rails
5  just allow the bridge to go up and down, or the
6  guide rails are structural.  The power rails feed
7  the power to the bridge.
8      Q.     Were any of the electrical components
9  damaged -- found to be damaged after those
10 inspections?
11     A.     Yes.
12     Q.     And what parts?
13     A.     The entire electrical and signal system
14 that ran from the Portsmouth side to the bridge had
15 been hit, falling into the river.  I think it was
16 cut in half, and then the power rails, I can't --
17 I know we had some electricians troubleshooting
18 it because we couldn't quite figure it out.  I
19 mean, the bridge had sat still for four months, so
20 we had some issues when we fired it back up.  I can't
21 recall exactly what they were.
22     Q.     And I think the lowering and raising
23 of the bridge referenced on 2737 was in a manual
24 way.
25     A.     Correct.

Page 149

1      Q.     And who -- who climbed up to the
2  bridge house to do that?
3      A.     We used Adam Reeder and our bridge
4  contractor from Eastern Metal Works.
5      Q.     Did PCL or Hardesty & Hanover or Belt
6  Line retain any additional contractors after October
7  30th for work to be performed on areas that had been
8  identified as being damaged that they didn't know
9  about before?
10     A.     Yes.
11     Q.     And who were those contractors?
12     A.     I don't know specifically who they were.
13     Q.     Okay.  Do you know what specialty they
14 were in or what type of work they would have been
15 performing?
16     A.     One was electrical and one was --
17 I believe one was a greaser.  I don't know the
18 best way to describe it.  They had to grease the
19 cables.
20     Q.     Moving on to 2753, are you there?
21     A.     Yes.
22     Q.     This is an E-mail dated February 14th,
23 2025 from you to the Board, correct?
24     A.     Correct.
25     Q.     All right.  It says, yesterday we

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 150

1  successfully restored the bridge's operating speed
2  to 100 percent.  While full automation has been
3  reinstated, we are still troubleshooting one final
4  connection issue before transitioning the bridge
5  back to remote operation.  Did I read that accurately?
6       A.     That's correct.
7       Q.     Do you recall what work went on
8  between October 30th and February 14th in order
9  to get the bridge back into the condition that's
10 referenced here on 2753?
11      A.     I know we replaced placed the cable
12 rails -- I mean, excuse me, the power rails.  They
13 were doing work with the guide rails.  I can't
14 remember specifically what was the last holdup
15 before we could make it operate at full speed.  I
16 think it was a guide rail, and then there were just
17 various odds and ends that they needed to take care
18 of.
19      Q.     And, if you can recall, what was the
20 final connection issue that needed to be resolved
21 that's referenced there?
22      A.     I can't -- I can't recall.
23      Q.     The second paragraph, the remaining
24 work includes reinstalling a damaged walkway and
25 ladder.  Additionally, cable cleaning and greasing

Page 151

1  are ongoing.  PCL plans to complete demobilization
2  by March 7th.  Did I read that accurately?
3       A.     That is correct.
4       Q.     Okay.  When did PCL actually demobilize,
5  if you recall?
6       A.     I can't recall exactly.
7       Q.     And the cleaning and greasing on the
8  cables, those were on the old cables?
9       A.     Yes.
10      Q.     The walkway and the ladder, was the
11 entire west side of the walkway replaced or just
12 the parts on the span two?
13      A.     Just the parts on span two.
14      Q.     What is the ladder that's referenced
15 there, where was that located?
16      A.     On the west side.
17      Q.     The ladder going --
18      A.     Up on the bridge, to climb the bridge.
19      Q.     So Reeder was using a damaged ladder to
20 get up there on October --
21      A.     No.  He was climbing up from the other
22 side.
23             MR. ROMAN:  All right.  We can go off the
24 record for a second.
25             (There was an off-the-record discussion.)

Page 152

1             MR. SNOW:  We'll stipulate that the
2  E-mails Cannon Moss sent to the Board were E-mails
3  that came from him to the Board.
4             (Carver Exhibit Number 3 was marked.)
5  BY MR. ROMAN:
6       Q.     All right.  Exhibit 3 starts on 2408.
7  The first page says NPBL Externals Calls, and that's
8  Bates -- Bates -- Exhibit 3 Bates will be labeled
9  2408 to 2531.  Just let me know when you're ready.
10      A.     Sure.
11      Q.     Could you describe what this set of
12 documents is that we're looking at, marked as Exhibit
13 3?
14      A.     Sure.  That's PCL's meeting notes from
15 the weekly conference call that we had.
16      Q.     And so these are based on -- are not
17 notes that are from Belt Line personnel?
18      A.     Correct.
19      Q.     And how did you obtain these -- these
20 printouts?
21      A.     I asked Charlie for a copy.
22      Q.     Did you ask Charlie as part of the
23 litigation or would you receive copies of these
24 throughout the work?
25      A.     I was receiving copies of these

Page 153

1  throughout the work, but I asked him as part of the
2  litigation.
3       Q.     All right.  2410, if you could go there.
4  Charlie Graning, he was the lead from PCL, right?
5       A.     Correct.
6       Q.     Who is Brandon Hinson?
7       A.     Someone that works for PCL.
8       Q.     Okay.  Do you know their title by chance?
9       A.     No.
10      Q.     Stephen Shortridge?
11      A.     Someone that works for PCL.
12      Q.     How about Andrew Cestaro?
13      A.     Another guy that works for PCL.
14      Q.     Bill O'Brien, he's VP of operations for
15 Belt Line, right?
16      A.     Yes.
17      Q.     Jeremy McDaniel, who is that?
18      A.     I believe he was -- I don't know.
19 I don't know if he is with PCL or H&H.
20      Q.     Okay.  Cannon Moss is you, right?
21      A.     Yes.
22      Q.     And Howard Swanson is from H&H, right?
23      A.     Yes.
24      Q.     All right.  Do you recall being on this
25 meeting on July 15th, 2024?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 154

1    A.    Sure.  I have a little checkmark next
2  to my name so I guess I was there.
3        Q.    Well, I asked you if you recalled, but --
4    A.    I don't recall, but yeah.
5        Q.    Anything that you can recall about this
6  meeting that's not referenced on here?
7    A.    No.
8        Q.    You see the bottom there, confirm if
9  eccentricity is acceptable for the lateral loads going
10 into P-Node per MBJ E-mail on 7-14.
11   A.    Uh-huh.
12       Q.    Do you see that part?
13   A.    Yes.
14       Q.    Who or what is MBJ?
15   A.    I have no idea.
16       Q.    Okay.  And would that be a reference --
17 do you know who actually authored these notes?
18   A.    Charlie did.
19       Q.    Charlie authored them?
20   A.    Uh-huh.
21       Q.    Would that presumably be a reference
22 to whatever MBJ E-mail is to Charlie?
23             MR. SNOW:  Object to form, calls for
24 speculation.
25             THE WITNESS:  I have no idea.

Page 155

1  BY MR. ROMAN:
2        Q.    But it's not an E-mail you recall
3  discussing, correct?
4    A.    Correct.
5        Q.    All right.  Are any of the notes in here
6  authored by you?
7    A.    No.
8        Q.    So these would all be notes that PCL
9  authored in some capacity?
10   A.    Correct, meeting minutes from the
11 daily conference calls we had on the progress of
12 the bridge.  Well, actually let me back up that.
13 I guess -- I guess they're notes, but it's also
14 items that need to get completed or that are in
15 progress.
16       Q.    Is -- the checkmark on the meeting
17 attendees, is that typically a pretty reliable
18 indicator on who was actually on these meetings?
19             MR. SNOW:  Object to form.
20             THE WITNESS:  I did not -- these aren't
21 my documents, so I'm not sure.
22             MR. ROMAN.  Fair enough.
23             All right.  We can put that one aside.
24             If we can turn to Exhibit 7.
25             (Carver Exhibit Number 7 was marked.)

Page 156

1  BY MR. ROMAN:
2        Q.    Turn to page NPBL002174, what we've
3  marked as Exhibit 7.
4             MR. SNOW:  Say that again.
5             MR. ROMAN:  2174.
6  BY MR. ROMAN:
7        Q.    First, Cannon, do you recognize this
8  document that we've marked as Exhibit 4?
9    A.    Yes.
10       Q.    And can you describe what it is for us?
11   A.    It's the inspection report from Koppers.
12       Q.    And for what year?
13   A.    2024.
14       Q.    That second page, 2174, when it says
15 Section 1 at the top, what part of the bridge is this
16 referring to?
17   A.    The first section that you cross from
18 the Portsmouth side.
19       Q.    Was this section damaged at all in the
20 allision of June 15, 2024?
21   A.    No.  The damaged section was SBER2.
22       Q.    Okay.
23   A.    Structurally I don't think this was
24 damaged, but it messed up the walkway that was here.
25       Q.    The walkway?

Page 157

1    A.    Yeah.
2        Q.    When was that walkway installed?
3    A.    I can't remember.  2015.  It was
4  pretty -- it was pretty brand new.
5        Q.    It was not originally on the bridge,
6  correct?
7    A.    No.
8        Q.    Do you know who installed it?
9    A.    I think it was -- I can't remember
10 the contractor.  Norfolk -- I can't remember the
11 contractor.
12       Q.    2182 I believe is the beginning of the
13 Section 2 inspection.
14             On to 2183, is this the finding notes
15 here?
16   A.    All right.
17       Q.    Under Concrete Pier 1, minor 1/8th inch
18 crack extending out from both DPG bearings.  Did I
19 read that correctly?
20   A.    Which -- which page are you?
21       Q.    I'm sorry, 2183.  That's the Bates label.
22   A.    I got you.  Okay.  All right.
23       Q.    What does this reference, if you know,
24 the DPG bearings there?
25   A.    I'm not sure.

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 158

1    Q.    Was that concrete pier damaged at all
2  in the allision on June 15th, 2024?
3    A.    No, it was not.
4    Q.    And then --
5    A.    Well, I take that back.  It was
6  damaged, but it was not hit.  I mean, when the --
7  when the tower section was twisted, it ripped the
8  bolts in half, so I'm sure it was damaged on the
9  top.
10   Q.    It says the truss bearings are rocked
11 north.  Do you know what that means?
12   A.    I do not.
13   Q.    Did you ever have any discussion with
14 Koppers about what that means?
15   A.    I probably did.
16   Q.    Okay.  Do you know if any work was
17 done to those truss bearings between the time
18 this inspection report was generated and the
19 allision?
20   A.    No, because the bridge was hit, what, two
21 months after this -- we got the document so we didn't
22 get enough time to do anything.
23   Q.    So the inspection occurred on January
24 24th, 2024, but you didn't get it until April?
25   A.    We got it on 3-11-2024.

Page 159

1    Q.    That was the date printed on the bottom?
2    A.    Correct.
3    Q.    And if you go to the Floor System, what
4  all comprised the floor system on the bridge?
5    A.    I would -- I'm not a bridge engineer so
6  I would do a terrible job explaining.  That's why I
7  hired Koppers.
8    Q.    Do you know if the floor system includes
9  the deck?
10   A.    It does not.
11   Q.    Okay.  Is the floor system the steel
12 underneath the deck?
13   A.    It is.
14   Q.    Okay.  And it goes between the two
15 stringers?
16   A.    Correct.
17   Q.    Is the floor system entirely made out of
18 steel?
19   A.    Yes.
20   Q.    Okay.  And we see next to there floor
21 beam 0 web has section loss with pinholes below
22 stringer 1 connection angle.  Did I read that
23 correctly?
24   A.    Yes.
25   Q.    Do you know how much section loss it had

Page 160

1  in that floor beam?
2    A.    I do not.
3    Q.    Did you ever have a discussion with
4  Koppers about that?
5    A.    It was never a priority one or two, so
6  no.
7    Q.    But it was a Belt Line priority three,
8  I think, at the bottom, right?
9    A.    Uh-huh.
10   Q.    And it says floor beam -- moving down,
11 floor beam 8 web has a 12-inch crack below top flange
12 angle coming out from stinger 1 on outboard side.  Did
13 I read that correctly?
14   A.    That is correct.
15   Q.    Was that crack ever repaired?
16   A.    It has been, but it -- no, because it
17 was -- we were actually monitoring it.  It was an
18 old crack that has been there for a long time.  So
19 it's a priority two because they pointed it out.  If
20 you can go back and look at our ARE inspections, they
21 didn't -- they didn't mention it, but it was never
22 fixed.
23   Q.    Does that crack still exist today?  Do
24 you know?
25   A.    I do not -- I think the crack is there,

Page 161

1  but they stopped it.
2    Q.    And then floor beam 8 web is cracked
3  below top flange angle coming out from stringer 1
4  on the inboard side, has a termination hole drilled.
5  Did I read that correctly?
6    A.    Yes.
7    Q.    And did any repairs get made to that
8  crack?
9    A.    The termination hole.
10   Q.    Down on the Diagonals, it says both
11 trusses U7-L8 has pack rust built up at L8 connection.
12 Did I read that correctly?
13   A.    That is correct.
14   Q.    And what is pack rust?
15   A.    I'm not sure.  You would probably
16 want to discuss it with the bridge engineer.
17   Q.    Okay.  Do you have any understanding of
18 what pack rust is?
19   A.    Probably buildup of rust for a
20 seven-year-old bridge.
21   Q.    Do you know how you remedy and repair
22 pack rust?
23   A.    I believe you get rid of it and then
24 you paint it with some sort of a sealer.
25   Q.    On Tower, tower gusset plates, seven on

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 162

1   both sides, has approximately six missing rivets.  Did
2   I read that correctly?
3       A.      That's correct.
4       Q.      Did any of those rivets get replaced
5   prior to the allision?
6       A.      I do not recall.
7       Q.      And then the next one down,
8   counterweight channel guide is wearing heavily on
9   left side.  Counterweight is not sitting plumb in
10  the tower.  Did I read that correctly?
11      A.      That is correct.
12      Q.      And is that one of the issues that
13  H&H was looking at in the June 4th and 5th
14  inspection?
15      A.      I believe so.
16      Q.      What prompted further inspection and
17  consideration of resolving that issue with the
18  counterweight channel guide?
19      A.      It wasn't -- we -- I think, like I
20  said before, we do a mechanical inspection every
21  five years or so.  It was not specific to that one
22  issue.  What was recommended, as you see, survey
23  piers and monitor structure for any movement.
24  We surveyed the piers for two years every quarter
25  I believe and it didn't move.  Now we're doing it

Page 163

1   every six months.
2       Q.      And who did those quarterly surveys?
3       A.      I cannot remember the name of the
4   company.
5       Q.      But it's an outside contractor?
6       A.      Correct.
7       Q.      And would there be a log of that work
8   somewhere in Belt Line's records?
9       A.      Yeah.  I believe we provided it to you.
10  I provided it to them.
11      Q.      On NPBL2185 through 86, those photos, did
12  you take any of those?
13      A.      No.  That's all part of the bridge
14  inspection.
15      Q.      2188, it appears to me, correct me
16  if I'm wrong, that these are kind of a relisting
17  of some of the identified issues that we just
18  discussed.
19      A.      Correct.
20      Q.      All right.  Were any of those -- was
21  any work done -- on any of these identified issues
22  done between when you received this inspection report
23  and the allision?
24      A.      No.
25      Q.      On to 2189, I think it is, the tie

Page 164

1   count, 146, is that how many ties there are on
2   this particular section of the bridge?
3       A.      Where are you looking?
4       Q.      2189.
5       A.      Possibly, yeah.
6       Q.      And then it says, tie count, 146, okay,
7   (seven exceptions), right?
8       A.      Correct.
9       Q.      Do you know which seven of those were
10  the exceptions?
11      A.      I do not.
12      Q.      All right.  Moving on to 2190, Section 3
13  of the SBER, and take a look at 2191 onto 92, if you
14  could for me.
15      A.      All right.
16      Q.      And my question is going to be, does
17  any of the components here that are referenced have
18  any relation at all to the allision and the work
19  that was done afterwards?
20      A.      No.  I mean, the only thing would be
21  tightening the loose bolts because we had to take
22  the Connolly joints off.
23      Q.      But that's all from Section 3, right?
24      A.      Yeah, not bad for a seven-year-old
25  bridge.

Page 165

1       Q.      All right.  All right.  Let's go to
2   Exhibit 8.
3               (Carver Exhibit Number 8 was marked.)
4   BY MR. ROMAN:
5       Q.      Do you recognize this document?
6       A.      I do, but before we get into anymore
7   questions, can I get a bathroom break to use the
8   restroom real quick?
9               MR. ROMAN:  Absolutely.
10              (Recess.)
11  BY MR. ROMAN:
12      Q.      All right.  Go to Exhibit 8 here.  Take
13  a look.  I want to go to Appendix 2.1.  I apologize,
14  Appendix 1 first.  It starts on NPBL2344.  Let me know
15  when you're ready.
16      A.      All right.
17      Q.      Were there any -- besides the drawings
18  and the submittals that -- that we have, was there
19  anything that Hardesty & Hanover prepared similar
20  to Appendix 1 throughout the course of their work
21  that identified exactly what was repaired or
22  replaced?
23      A.      No.  This is it.
24      Q.      Okay.  As far as you know is this a
25  fairly accurate summary of what actually was

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 166

1  identified as damaged in the allision?
2      A.    Yes, as far as I know.
3      Q.    You haven't seen any other similar
4  drawings with additional or different pieces that
5  were damaged?
6      A.    I might have because once they found
7  stuff they would send stuff over, but I can't
8  recall.  These were in July.
9      Q.    Yeah, yeah.
10     A.    So we found stuff later on that we
11 couldn't see.
12     Q.    Can you recall anything in particular
13 that was found during the course of the work that
14 wouldn't have been listed here?
15     A.    Yeah, like the power rails that I
16 described.
17     Q.    Okay.
18     A.    I can't recall.  The engineers would
19 be a better source of information than I would.  I
20 can't recall of the top of my head.
21     Q.    Similar question for Appendix 2.1,
22 which would you agree is a listing of particular
23 components of the bridge that they anticipated being
24 repaired?
25     A.    Sure, when they did their first

Page 167

1  inspection in July.
2      Q.    Was there any type of document that
3  you've seen like after the fact for example, of
4  hey, this is ultimately what was replaced, similar
5  to the one we're looking at here?
6      A.    No.  I do not recall.
7      Q.    Let me go to the last section, 2343.
8      A.    All right.
9      Q.    Did you have any discussions about
10 this portion of the inspection report with anyone
11 from Hardesty & Hanover after you received it?
12     A.    Yes.  I mean, I -- yes.
13     Q.    Was any of the work that was proposed
14 here or I guess considered here in bullet points
15 one, two, three and four, was any of that included
16 in that repair methodology document that we
17 discussed sometime ago that I think came in around
18 June 20th?
19         MR. SNOW:  Object to form.
20         THE WITNESS:  Well, I mean, these
21 were the -- yeah.  I mean, I know they replaced
22 the counterweight guides and guide rails because
23 they were damaged.  I mean, this isn't the mechanical
24 inspection.  This is the emergency inspection that
25 had some mechanical repairs that they saw that were

Page 168

1  either damaged or not.  I mean, it talks about the
2  counterweights being -- the counterweight ropes
3  being jacked and retentioned, but they also recommend
4  replacing, you know, the counter -- the ropes, which
5  we didn't do.
6  BY MR. ROMAN:
7      Q.    Are the ropes different from the cables?
8      A.    Those are the same thing.
9      Q.    Okay.  And just so I -- none of those
10 were replaced, right?
11     A.    Correct.
12     Q.    Okay.
13     A.    Because if we would have jacked up -- I
14 mean, just to get the weight off the counterweights
15 to retention the wires would have basically involved
16 building temporary structures again to lift the
17 counterweights off to give enough slack.  If you're
18 going to go through the cost of doing that, you
19 might as well replace the cables, and there is a
20 six month to two-year lead time on the cables.
21     Q.    All right.  And I'm sure I asked,
22 but do you know when in the timeline of work that
23 that decision was made, to not replace them?
24     A.    Well, yeah.  I don't recall exactly
25 when, but we were going to have the bridge in

Page 169

1  operation prior to six to twelve months, you
2  know, six to, you know, a year-and-a-half out.
3      Q.    All right.  Let's go on to the next
4  exhibit.  This is going to be Exhibit 9, I believe.
5      A.    Exhibit 9, okay.
6         (Carver Exhibit Number 9 was marked.)
7  BY MR. ROMAN:
8      Q.    And Exhibit 9, for the record, is
9  NPBL6183 through 6827.
10     A.    Yeah.
11     Q.    Let me know when you're ready.
12     A.    I'm ready.
13     Q.    All right.  Do you recognize this
14 document?
15     A.    Yes.
16     Q.    What is it?
17     A.    It is a draft of the mechanical
18 inspection we were having performed on the bridge.
19     Q.    And when -- when did you receive a copy
20 of this document?
21     A.    Sometime in October, 2024.  I can't --
22 I can't recall exactly when.  I haven't even
23 received the final copy of it.
24     Q.    Do you know if there is any other draft
25 versions of it out there?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 170

1    A.    Not that I've seen.
2    Q.    And are you expecting to get a final
3  version of it?
4    A.    Yes.
5    Q.    Okay.  Have you had discussions
6  with Hardesty & Hanover about receiving the final
7  version?
8    A.    Yes.
9    Q.    When did you discuss that with them?
10   A.    Last time I spoke to Howard, probably
11  a couple weeks ago maybe.
12   Q.    Did he discuss what might be in the
13  final version of it?
14   A.    No.
15   Q.    Why is he issuing a final version, if
16  you know?
17   A.    Well, this is a draft submission so....
18   Q.    Did he say anything -- did he
19  anticipate making any modifications or additions
20  to the final version of what's in the draft?
21   A.    I do not know.
22   Q.    Even though it says it was submitted
23  in October of 2024, this relates to the June 4th
24  and 5th inspection that H&H performed, correct?
25   A.    Correct.

Page 171

1    Q.    All right.  Did Howard say when he
2  actually drafted this document?
3    A.    I believe Travis drafted it.  I do not
4  recall.
5    Q.    I was going to correct myself.  Do you
6  know who actually drafted this?
7    A.    I don't know who typed it, but I would
8  assume it's Travis.
9    Q.    Okay.  Did -- did Travis say when he
10  drafted it?
11   A.    No.
12   Q.    Had you asked for a report at any
13  time prior to October, 2024?
14   A.    I can't recall.  I mean, we were
15  trying to put the bridge back together so that
16  was our sole focus.
17   Q.    All right.  Go to 6814.  Reading from
18  the top, this report summarizes Hardesty & Hanover's
19  (H&H) field notes and observations from a mechanical
20  inspection performed on 6-4-24 through 6-5-2024,
21  prior to the barge impact causing extensive damage
22  to the bridge, as well as findings to date for the
23  mechanical systems post-barge impact.  Did I read
24  that correctly?
25   A.    Yes.

Page 172

1    Q.    The primary goal of the initial
2  inspection was to determine the source of hard
3  contact between the guides and guide rails for
4  the west tower counterweight.  Did I read that
5  correctly?
6    A.    That's correct.
7    Q.    All right.  And as part of this
8  inspection, H&H performed balance testing and
9  inspected the main drive machinery.  Did I read
10  that correctly?
11   A.    Yes.
12   Q.    Have you seen any other documents
13  with the testing results that are not contained
14  within what we've marked as Exhibit 9?
15   A.    I don't believe so.
16   Q.    All right.  Moving down, it says,
17  based on the inspection findings, H&H has the
18  following recommendations:  Replace the existing
19  10-inch thruster brake with a 19-inch thruster brake.
20  The existing motor brake is significantly undersized
21  and has been adjusted well beyond its rated torque.
22  Did I read that correctly?
23   A.    Yes.
24   Q.    All right.  Did the Belt Line do that
25  replacement, proceed with making that replacement?

Page 173

1    A.    No.
2    Q.    Okay.  And why not?
3    A.    We haven't had a chance to.  It's
4  $164,000.  That's the quote that I got to put a
5  new brake on so....
6    Q.    And when did you receive that quote?
7    A.    During PCL's construction.  That's just
8  a quote from PCL.
9    Q.    Okay.  And when was it?
10   A.    I can't remember exactly when I
11  received it.
12   Q.    Number two, replace the counterweight
13  ropes.  In the 1983 counterweight rope replacement,
14  all of the counterweight ropes were replaced, but
15  only two tower sheaves were replaced.
16          The ropes -- moving down, the ropes
17  should be replaced in the next five years.  However,
18  with the contractor currently mobilized, consideration
19  should be given to replacing the ropes in the near
20  term.  Do you see that?
21   A.    Yes.
22   Q.    All right.  Is it fair to say that
23  since the ropes have not been replaced that that
24  decision was made at some point after receiving
25  this October 30, 2024 report and today?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 174

1     A.    Yeah.
2     Q.    Okay.  Based on your discussions
3  with Hardesty & Hanover, are they still recommending
4  to make those replacements to the ropes?
5     A.    Yes.
6     Q.    All right.  Did Hardesty & Hanover
7  do any work to the mechanical system since the
8  allision?
9     A.    No.
10    Q.    Okay.  Do you have any plans for them
11 to do it in the future?
12    A.    They'll be the engineers behind it.
13 They don't actually do the work.
14    Q.    Did PCL do any of the work on the
15 mechanical system since the allision?
16    A.    No.
17    Q.    Are there any plans currently for them to
18 do so?
19    A.    Not them, but we have plans to, yes,
20 make repairs on the system, on the mechanical
21 system.  Well, not repairs but -- yeah, repairs, I
22 guess.
23    Q.    Has any of the work that is recommended
24 here on 6814, has Belt Line proceeded with any --
25 making any of these recommendations -- or doing

Page 175

1  any of the work for the recommended work?
2     A.    No.  The Belt Line has not, no, not
3  yet, kind of ran out of money.
4     Q.    All right.  Moving on to 6815, it
5  says, the west counterweight is currently skewed
6  due to uneven rope stretch between sheaves, see
7  Photo M1.  As far as you understand it, was that
8  what the current state of it was as of the date
9  of the inspection on June 4th and 5th?
10    A.    I don't know.  I mean, I don't know.
11    Q.    Okay.  Moving to 6816, down at the
12 counterweight sheaves, was there any work done to
13 the counterweight sheaves after the allision in any
14 capacity?
15    A.    No.
16    Q.    And how about the -- moving on to
17 6817, the brakes, was there any work done to the
18 brakes in any capacity after the allision?
19    A.    No.
20    Q.    Okay.  And then the same thing with
21 the access, was there any work done to the access
22 parts of the bridge in any capacity after the
23 allision?
24    A.    No.
25    Q.    As best as you can tell from reviewing

Page 176

1  the recommended -- recommendations on this report,
2  was any work done on any of the components of the
3  bridge that are included in the recommended repairs,
4  was any work done after the allision to any of those
5  components in any capacity?
6          MR. SNOW:  Object to form.
7          MR. ROMAN:  I can -- I can try to
8  rephrase.
9          MR. SNOW:  Do you understand what
10 he's --
11         THE WITNESS:  I think I understand
12 what you're asking, but it's a terrible question.
13 Sorry.
14         MR. ROMAN:  I won't argue with that.  Do
15 you want me to rephrase it?
16         THE WITNESS:  Yeah, that'd be cool.
17 BY MR. ROMAN:
18    Q.    Are any of the components involved in
19 the recommended repairs components that were repaired
20 or replaced as part of the work that was done after
21 the allision?
22    A.    I don't -- I still don't -- sorry.
23 One more time.  So are you trying to ask --
24 well, what are you trying to ask?
25    Q.    Yeah.  So you didn't do any work on the

Page 177

1  counterweight ropes, right?
2     A.    Correct.
3     Q.    And you didn't do any on the
4  counterweight sheaves, right?
5     A.    Correct.
6     Q.    Or the brakes or the access, right?
7     A.    Correct.
8     Q.    There is a couple other components
9  within those broad categories of which Hardesty
10 & Hanover were recommending be repaired, right?
11    A.    Correct.
12    Q.    Any of those components that we did
13 not specifically identify, was any -- was any
14 work done to those after the allision in any
15 capacity?
16    A.    No, no.
17         MR. ROMAN:  All right.  Let's go off the
18 record.
19         (There was an off-the-record discussion.)
20 BY MR. ROMAN:
21    Q.    All right.  We are going to mark this as
22 Exhibit 10.  Do you recognize this document?
23    A.    Yes.
24         (Carver Exhibit Number 10 was marked.)
25 BY MR. ROMAN:

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 178

```
 1      Q.   Can you describe it for us, please?
 2      A.   It's a spreadsheet of damages I put
 3 together for the insurance company.
 4      Q.   Okay.  And you created this document?
 5      A.   Yes.
 6      Q.   All right.  We see the reason column on
 7 the far right side?
 8      A.   Correct.
 9      Q.   And did you author those notes?
10      A.   Yes.
11      Q.   And what was the purpose of those notes?
12      A.   To give context to the invoices.
13      Q.   Is this an accurate and up-to-date
14 summarization of the damages that the Belt Line is
15 claiming from Carver?
16      A.   I believe so.
17      Q.   Is there anything that's jumping out
18 to you that should be on this document that's not
19 on this document?
20      A.   I don't believe so.  Yeah, I don't
21 believe so.  Sorry.  I think this is up to date.
22 I'm pretty sure it's up to date.
23           MR. SNOW:  Just so we're clear, this
24 reflects the repair cost part of the damages.  It
25 doesn't include interest, those other components
```

Page 179

```
 1 that --
 2           MR. ROMAN:  Fair enough.
 3           THE WITNESS:  And I think we're expecting
 4 another invoice from PCL.
 5 BY MR. ROMAN:
 6      Q.   Okay.  That's what I was wondering.
 7 I was going to ask.  So you are expecting that
 8 there might be additional invoices from the
 9 contractors?
10      A.   Correct.
11      Q.   Okay.  How many are you expecting?
12      A.   I would expect one more from PCL and one
13 more from H&H probably.
14      Q.   Okay.  Do you know what timeframe that
15 would be for?
16      A.   I'm not sure.  I'm not sure.
17      Q.   All right.  The top line, the
18 construction of the road access, do you see those line
19 items?
20      A.   Yes.
21      Q.   Okay.  What was that road for?
22      A.   It was for access to the site where PCL
23 staged all of the work.
24      Q.   Is that road still in existence today?
25      A.   It is.
```

Page 180

```
 1      Q.   And is that a road that the Belt Line
 2 continues to use?
 3      A.   No.
 4      Q.   Okay.  Are there any plans to destroy
 5 the road or is it just going to exist?
 6      A.   It's just going to exist.
 7      Q.   Has it been utilized at all since --
 8 since the allision?
 9      A.   Only for you to come out and inspect the
10 bridge.
11      Q.   All right.  Do you see line for the
12 additive rate next to it?
13      A.   Yes.
14      Q.   Could you explain what those figures are
15 for me?
16      A.   Sure.  That's an additive rate that we
17 add to labor and material.  We do it for our state
18 projects and we do it for any work we do for other
19 customers, I guess.
20      Q.   And what do you mean by other customers?
21      A.   We recently replaced the road crossing
22 that was damaged for a customer at the end of our
23 line, and we did the rail work for it and they paid
24 for it.  We tacked on an additive rate to their
25 invoice.
```

Page 181

```
 1      Q.   Okay.  And how did you determine that
 2 272.34 percent additive rate that we see on the
 3 first line there?
 4      A.   Sure.  We used Norfolk Southern's
 5 additive rates.  We have the same union that
 6 they have.  In fact, we use their payroll department
 7 to pay all our folks, and so they had some additives
 8 that were recently -- well, two years ago -- audited
 9 by the Georgia Department of Transportation, and so
10 we used those numbers.  They've been accepted by the
11 Department of Rail & Public Transportation, so when
12 we submit invoices for these grants we used these
13 numbers.
14      Q.   You said that's from the Georgia
15 Secretary of State is who you said?
16      A.   That's from Norfolk Southern.  They
17 submitted it to the Georgia Department of
18 Transportation.  Well, they didn't submit it.  The
19 Georgia Department of Transportation I guess audited
20 them and approved that, so we used those rates.
21      Q.   And then how did you determine the five
22 percent additive rate that's below that?
23      A.   Came off the same approved additive rate
24 that the labor forces have.
25      Q.   Are the additive rates typically used
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 182

1    when doing work for governments?
2         A.    Yes.
3         Q.    Okay.  Do you ever add the additive
4    rate when you were performing work for just a regular
5    client?
6         A.    Yes.
7         Q.    How many times have you done it in the
8    last five years?
9         A.    We don't do a lot of work for other
10   clients, like you said, so maybe a handful of
11   times.
12        Q.    And then one of the three line items
13   under there says 10,000 -- the -- I'm sorry, the
14   labor cost, can you identify which one of those from
15   the back spreadsheets go with it?
16        A.    Sure.
17              It would be the one that starts with the
18   F series.  It says "Object" in the front column.
19        Q.    F series?
20        A.    Yes, F-09015.  Look at the last
21   spreadsheet.
22        Q.    Oh, the last stapled sheet?
23        A.    Uh-huh.
24        Q.    And if you could just explain, how --
25   like how did you pair those two together?

Page 183

1         A.    Sure.  So the F series is a project
2    number assigned for the maintenance-of-way projects,
3    so we take all of their -- whatever pay -- whatever
4    is on their timesheets, we assign it to that project
5    number.  Then we'll get with NS's payroll and have
6    them run the payroll for that project number.
7         Q.    And so that F-09015 is an internal
8    project number for the Belt Line?
9         A.    Correct.
10        Q.    And then what -- what is the five
11   percent additive rate for the -- what I'm interpreting
12   to be materials for the construction?
13        A.    It's just a five percent additive rate
14   for handling the material.
15        Q.    So would that be in addition to the
16   272.34 for the actual labor?
17        A.    Well, the labor was like $7,900.  The
18   272 percent is an approved labor rate because
19   obviously labor has a lot more stuff on it, and the
20   five percent is on the $10,000 that is material
21   additive.
22        Q.    Yeah.  I guess I'm looking for clarity
23   on the five percent, why that differs from the
24   272.34 percent.
25        A.    272 -- 272.34 percent would include

Page 184

1    things like their benefits, equipment potentially
2    used.  It's just a built-in additive rate, so the
3    labor rate is going to be higher than the material
4    rate.
5         Q.    All right.  And then what is the five
6    percent rate down at the bottom for the rail line
7    item?
8         A.    Just the same material additive rate.
9         Q.    And where did you source that one from?
10        A.    That came off that same audited additive
11   rate that was submitted to the Georgia Department of
12   Transportation by NS.
13        Q.    Okay.  Have you ever been -- has
14   Norfolk ever been approved for an additive rate by
15   any governmental entity in Virginia?
16        A.    Norfolk Southern?
17        Q.    Yeah.
18        A.    Maybe when they were headquartered here,
19   but I don't know.
20        Q.    Are there additive rates that have
21   been approved by other governmental entities outside
22   of Georgia?
23        A.    I do not know, but that's the supporting
24   documentation Norfolk Southern provided.
25        Q.    No, no, I understand.  I'm just trying

Page 185

1    to determine how the Georgia rates relate.
2              And then what about the 185 percent
3    additive rate for the train and engine employees?
4         A.    Yeah, that's the additive rate for a
5    train and engine employee.
6         Q.    So there are different additive rates,
7    depending on the type of work that is being done?
8         A.    Yeah.
9         Q.    And then so I take it the yardmasters
10   have the same additive rate as train and engine
11   employees?
12        A.    Yeah.
13        Q.    All right.  And so if I'm reading
14   this correctly, the cost column would be the
15   hard numbers of what you paid out in terms of
16   labor rate?
17        A.    Yes.
18        Q.    $7,918.12 for construction --
19   construction of access road to site, that's
20   the raw figure for wages that were paid to the
21   Belt Line employees who constructed the road;
22   right?
23        A.    Correct.
24        Q.    And then the additive rate adds on,
25   as we just discussed, to bring up your tally to

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 186

1  $29,482?

2      A.    Correct, because that rate doesn't

3  include things like the machinery that we use or the

4  benefits.

5      Q.    All right.  And then if we go to

6  the second, I think, stapled spreadsheet --

7      A.    This one?

8      Q.    That's the one.

9      A.    Okay.

10     Q.    The left-hand column, is that the

11 employee's ID number?

12     A.    Yes.

13     Q.    Okay.  Full name, which has been

14 redacted, I take it is their name, right?

15     A.    Yes.

16     Q.    What does the Local DT column mean?

17     A.    Duty time or duty date.

18     Q.    So that's the date that the work was

19 actually performed that they were on the job for?

20     A.    I believe so.

21     Q.    What does the next column mean?

22     A.    This is the duty assignment district,

23 so our guys use a mainframe system to log all

24 their -- all their hours, and so NP, Norfolk

25 Portsmouth, the duty assignment.  BL, Belt Line,

Page 187

1  is our sub district because we're -- Norfolk

2  Southern would be different, but we have NPBL and

3  then the assigned duty.  That NN number is the job,

4  so it's actually NN, and then if it's a 90 or 75,

5  that's that YS number.  So like this would be -- for

6  example, we call it -- the first one would be NN

7  90, would be the name of the job, and then the duty --

8  crew duty ID, the S1 is the switchman.  The FO is the

9  foreman, and EN is engineer.

10     Q.    So the duty_ASGN_craft, is that shorthand

11 for their job position?

12     A.    Yes.

13     Q.    Train, what's that column?

14     A.    Like I said, the NN90, that's the job.

15     Q.    How about the 10001 code?

16     A.    I believe that's a call center.

17     Q.    And then how about COT_CD?

18     A.    That is the code for whatever -- like

19 ST is for straight time.  RC is reduced crew.  C5

20 is conductor cert, so they put in these different

21 codes in order to get paid.

22     Q.    Okay.

23     A.    Each one is assigned a different dollar

24 amount.  That separates -- it's based on if they're

25 a new employee or they've been there longer than,

Page 188

1  I think, three years, and yes, they make a lot of

2  money.

3      Q.    So straight time is just a regular rate,

4  right?

5      A.    Yes.  They get paid a basic eight-hour

6  day if they work one hour or if they work seven hours

7  and 59 minutes.

8      Q.    So looking at employee 1030704, the

9  top line, am I to read that he got -- or he or she

10 got $240.67 of straight time on June 22nd, 2024 and

11 then also got an additional $15 of reduced crew time

12 on the same day?

13     A.    Yes.

14     Q.    And we could do that going down the

15 list and, you know, associate by employee ID and

16 date how much they got paid that particular

17 day?

18     A.    Correct.

19     Q.    All right.

20     A.    So just to -- just to tell you, you

21 didn't ask, but like when they have N1, like that

22 says no first meal.  So if they run lunch, they get

23 money for running lunch.

24          The student engineer allowance, so

25 if that engineer had a student engineer with them,

Page 189

1  they get paid $20 an hour, so that's what those

2  are.

3          If you're a conductor and you're

4  conductor certified, you get five bucks.  If an

5  engineer is certified, they get an extra five

6  bucks.

7      Q.    All right.  Is there any -- is this the

8  next big stapled one?

9      A.    That's for the yardmasters.

10     Q.    Okay.

11     A.    Basically the same thing.

12     Q.    And all of these if we tally them up

13 would square to the totals on the front page,

14 right?

15     A.    Correct.

16     Q.    All right.  Were you at the Belt Line

17 in 2009?

18     A.    No.

19     Q.    And I think you were at Norfolk Southern

20 at that time?

21     A.    Right.

22     Q.    Are you aware of an allision of the

23 bridge in like 2007 I think it was?

24     A.    No.

25     Q.    Or a lawsuit involving an allision

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 190

1  of the bridge around that timeframe, 2007 to 2009?
2      A.    No.
3            MR. ROMAN:  Why don't we take a break?
4  I want to go through my notes, but I think we're
5  getting pretty close.
6            MR. SNOW:  Okay.  That works.
7            (Recess.)
8            MR. ROMAN:  Mark these.
9            (Carver Exhibits Number 11 and 12 were
10  marked.)
11  BY MR. ROMAN:
12      Q.    Just a couple of more questions on
13  Exhibit 10, the spreadsheet, damages spreadsheet.
14  Have all of the invoices that are summarized here
15  that total $14,370,238.38 on the one column and then
16  $15,119.157.35 after you add the additive rates, have
17  all of those been paid to date?
18      A.    Yes.  Well, yes, I believe so.  Some
19  of the -- some of the PCL ones still might be
20  outstanding.
21      Q.    Can you identify any in particular that
22  you believe are outstanding?
23      A.    It would probably be just that last one.
24      Q.    That's $480,846.87?
25      A.    Yes.  It's getting paid this month, I

Page 191

1  believe.
2      Q.    And what was the source of funds for
3  payment of the invoices?
4      A.    We used all our cash and then we used
5  the insurance money, and then we -- we burned through
6  all the grants we had to try to save cash.
7      Q.    And so when you say out of cash, that's
8  just Belt Line's money from its normal operating
9  accounts?
10      A.    Correct.
11      Q.    And as I understand it the -- Evanston
12  Insurance Company paid out $10,000,000 under their
13  policy, correct?
14      A.    Correct.
15      Q.    And all of that was applied toward
16  payment of these costs?
17      A.    Correct.
18      Q.    How much of the $15,119,157.35 was paid
19  by grant funds?
20      A.    I'm not sure the exact amount.
21      Q.    Do you have an estimate?
22      A.    No, I would have to go back and see what
23  we had to do.
24      Q.    All right.  Looking at Exhibit 11, I
25  just want to confirm that -- on page eight of Exhibit

Page 192

1  11, you see the bolded header, the 5-20-2025
2  Supplemental Disclosure, and then the breakdown
3  there?
4      A.    Yes.
5      Q.    The three line items for construction
6  of access road, crew work and maintenance-of-way crew
7  time during repairs, are those included in the
8  $15,119,157.35 that we see above it?
9      A.    Yes, I think.  I'd have to pull the
10  spreadsheet to make sure it's all adding up at
11  the bottom here, but --
12      Q.    Yeah, the spreadsheet tallies up the
13  $15,119,157.35.  Do you agree?
14      A.    Yes.  Well, actually if you look at
15  it, you've got punitive damages of $350,000, and if
16  you add that to the fifteen million one nineteen,
17  that's where that total comes from.  I don't think
18  it's including that 38- and 365- and 176-.
19      Q.    Then I think as we discussed a little
20  bit earlier, there may be an additional invoice or
21  two coming from at least PCL, right?
22      A.    Yes, and H&H.
23      Q.    And H&H, okay.
24            Is there any actual work to be performed
25  in the future on the bridge --

Page 193

1      A.    Not from --
2      Q.    -- that would be related or that
3  the Belt Line would expect to claim as part of the
4  lawsuit?
5      A.    Well, define work.
6      Q.    All right.  So you're getting some
7  invoices from PCL and H&H, right?
8      A.    Correct.
9      Q.    Okay.  And that's for work they've
10  already performed, correct?
11      A.    Could be, but you've also subpoenaed
12  all of them to come testify so they're going to
13  send me a bill for their time, so I expect -- in
14  fact, H&H has already given me an estimate of what
15  they think it's going to cost you to talk to Howard
16  and their folks, so I plan to include that in these
17  damages.
18      Q.    Okay.  Are those the invoices that
19  you're expecting that we just discussed or would that
20  be in addition?
21      A.    I think the PCL one that might come,
22  that might be a catchall for work that was done, but I
23  haven't seen it yet.
24      Q.    Okay.  Are the -- is the repair work
25  relating to the allision of the bridge complete as of

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

---

Page 194

```
 1   today?
 2       A.    Yes.
 3       Q.    Okay.  So there is no scheduled work
 4   to be performed in the future that is related to
 5   the allision of June 15, 2024, correct?
 6       A.    No, I take that back.  It's not
 7   completed.  I apologize.  They have to -- when we
 8   put the bridge back together -- back in service,
 9   we only put half the railings and ties in because
10   we were trying to run trains, so we would just finish up
11   that portion.
12       Q.    When do you expect that work to be
13   performed?
14       A.    Hopefully in the next month.
15       Q.    Okay.  And is PCL going to do that?
16       A.    No.
17       Q.    Do you know which contractor is going to
18   do that?
19       A.    Sure.  It will be Burnett & Sons.
20       Q.    Okay.  Do you have an estimate of what
21   that will cost?
22       A.    Probably $50,000.
23       Q.    And that's for bridge and -- I'm sorry,
24   ties and rails?
25       A.    Bridge ties and rails, yes.
```

Page 195

```
 1       Q.    When did PCL demobilize?
 2       A.    I can't remember the exact date.
 3       Q.    All right.  Take a look at Exhibit 12.
 4   Do you recognize this document?
 5       A.    Yes.
 6       Q.    And what is it?
 7       A.    It's the -- I guess the answers for the
 8   first interrogatories that you-all sent.
 9       Q.    Okay.  If we go back to the back page, do
10   you see the declaration there?
11       A.    Yes.
12       Q.    Is that your signature?
13       A.    It is.
14       Q.    All right.  And you executed that
15   understanding you were verifying the accuracy of
16   the answers contained in this document?
17       A.    Yes.
18       Q.    Number four, the one that requests
19   to identify and state the load capacities of the
20   Belt Line's Railroad Bridge, do you see that?
21       A.    Yes.
22       Q.    And we discussed some of that back
23   when we were reviewing the Bridge Management Program.
24   Do you recall that?
25       A.    Yeah.
```

Page 196

```
 1       Q.    As you sit here, are there any other
 2   documents than that Bridge Management Program and
 3   the one that -- the 1962 drawings of the bridge that
 4   were referenced that might show what the load capacity
 5   was as of the date of construction?
 6       A.    As of the date of construction?
 7       Q.    Yes.
 8       A.    Not that I can find.
 9       Q.    Now I want to go down to number eight,
10   which states identify and state the useful service
11   life of the Belt Line's Railroad Bridge as of the
12   date of the incident.  Do you see that there?
13       A.    Yes.
14       Q.    And then the answer, subject to and
15   without waiving any objection, the Belt Line believes
16   the useful service life of the Railroad Bridge was
17   indefinite with ordinary maintenance as of the date
18   of the incident.  Did I read that accurately?
19       A.    That's correct.
20       Q.    And how did you determine that the
21   useful life of it was going to be indefinite?
22       A.    Well, if you maintain it properly, I
23   don't see how it's not.
24       Q.    Did you consult with any engineers,
25   any contractors or anyone in particular for
```

Page 197

```
 1   formulating that answer?
 2       A.    Yes.
 3       Q.    And who was that?
 4       A.    I talked to Howard about it.
 5       Q.    And what did Howard say?
 6       A.    No one can give you a good timeline.
 7   If you maintain your bridge, it should last for as
 8   long as it can last.  They don't just stop working
 9   at a certain time.
10       Q.    Anyone else that you consulted with other
11   than Howard?
12       A.    Not that I can recall.  I might have -- I
13   might have asked Charlie, but I can't recall the exact
14   conversation.
15           MR. ROMAN:  All right.  I think that is
16   all I have for now.
17           MR. SNOW:  I have a few follow-up
18   questions, but before I go, I want to make sure
19   that the folks from Evanston get a chance to, so
20   I'll turn it over to Mr. Jett.
21           MR. JETT:  I don't have any questions for
22   the witness.  Thank you.
23
24               EXAMINATION
25   BY MR. SNOW:
```

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 198

```
 1       Q.    I do have a few follow-up questions,
 2  Mr. Moss.  You talked about contracting with
 3  Hardesty & Hanover and PCL, and you said you
 4  piggybacked, I think was the phrase you used,
 5  off of a Norfolk Southern contract.  Do you
 6  recall that?
 7       A.    Yes.
 8       Q.    Does piggybacking mean that you used
 9  preexisting rates in the Norfolk Southern contract?
10       A.    Yes.
11       Q.    And is it your understanding that
12  those rates were negotiated in some fashion by
13  Norfolk Southern?
14       A.    Yes.  They negotiated with H&H
15  and PCL long before this happened, so they had
16  prenegotiated rates and a service contract already
17  in place.
18       Q.    Okay.  And is it your understanding
19  that those negotiated rates were lower than rates
20  you could have gotten from another company for
21  emergency-type repairs?
22       A.    I would like to think so.
23       Q.    There was an exhibit where you referenced
24  a document labeled NPBL2687, Exhibit 2, I believe.
25  Can you turn to that?  That's Exhibit 2, NPBL2687.
```

Page 199

```
 1  Tell me when you get to it.
 2       A.    All right.
 3       Q.    This is an update you gave to the
 4  NPBL Board on July 8th, 2024; is that correct?
 5       A.    Yes.
 6       Q.    Okay.  And one of the topics you
 7  were asked about was the rail and ties on the
 8  mainline bridge.  Do you recall that discussion?
 9       A.    Yes.
10       Q.    What was the condition of those rails
11  and ties after the tug hit the bridge?
12       A.    Well, the rail -- rail was severely
13  damaged, and the ties were also damaged as well.
14       Q.    So were you able to use the rail and
15  ties on the mainline bridge after the allision?
16       A.    With the rail being in that condition
17  you would not reuse it just from a liability
18  standpoint.  You can -- you don't know what has
19  happened to it, and then the ties were all damaged,
20  so you wouldn't -- you don't pull off ties and
21  put them back in.  It's kind of like taking a nail
22  out of a wall and putting the nail back in the hole.
23  It's going to be loose.  It's going to be -- you've
24  got to put a plug in there, and then that just adds --
25  speeds up the deterioration of the bridge tie, and so
```

Page 200

```
 1  you're not going to put back old.  You're going to put
 2  back new.
 3       Q.    Does that mean you were required to
 4  replace the rails and ties as a result of the
 5  allision?
 6       A.    Yes.
 7       Q.    And there was some discussion about
 8  potential grant money for work on the mainline
 9  bridge.  Was there any guaranteed grant for rail or
10  tie work?
11       A.    No.
12       Q.    In fact, I think your testimony regarding
13  the grant work was that you ended up using some or
14  all of the grant money you had for part of the repair
15  work after the allision; is that right?
16       A.    That's correct.
17       Q.    If you didn't have to use that
18  grant money for this repair, would you have had
19  it available for other projects the Belt Line
20  needed to do?
21       A.    Yes.  So we would have definitely
22  used it to fix the brake and replace the cables before
23  replacing the rails and cross ties.  That would have
24  been done.  In fact, we got another grant from the
25  state to replace the cables, so it's still less money
```

Page 201

```
 1  than we probably need, so it would have been nice to
 2  have the grant money that I had to burn through for
 3  this.
 4       Q.    When you were talking about the damages
 5  spreadsheet, do you recall about a discussion about
 6  additive rates?
 7       A.    Yes.
 8       Q.    And I think you said you pulled the
 9  additive rates from additive rates that had been
10  approved for Norfolk Southern by at least the
11  Georgia Department of Transportation.  Do you
12  recall that?
13       A.    Yes.
14       Q.    Has the Belt Line used those same
15  additive rate percentages for any kind of projects
16  in Virginia?
17       A.    Yes.  We've used them in other
18  grants that we've used, and we've used them and
19  Linda Balderson has approved them, so they're our
20  current additive rates.
21       Q.    So you have used those additive
22  rates for projects that were approved by Linda
23  Balderson?
24       A.    Yes.
25       Q.    And Linda Balderson is with the
```

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Page 202

1  Virginia Department of Rail & Public Transportation?
2      A.    Correct.
3      Q.    I think you -- you also mentioned that
4  you used those additive rates for a project for a
5  local customer recently; is that right?
6      A.    Yes, one of our -- not really a customer,
7  but they damaged a crossing that they're responsible
8  for, so we put in the rail and paid the asphalt
9  company and used the additive rates.
10     Q.    And the customer paid -- or the industry
11 paid those rates?
12     A.    Yes.
13     Q.    That was a private company?
14     A.    Yes.
15     Q.    And I know we talked about the Georgia
16 Department of Transportation approving the rates
17 for Norfolk Southern.  I assume that's because
18 Norfolk Southern is based in Atlanta now.
19     A.    I would assume so.
20     Q.    To your understanding does Norfolk
21 Southern use those same additive rates throughout its
22 entire system?
23     A.    I'm not a hundred percent sure.  I
24 don't know, but I would assume so.  Otherwise
25 they would have given us additive rates for

Page 203

1  Virginia because they do a bunch of projects here
2  in Virginia as well.
3      Q.    All right.  After all of the repairs
4  were finished, in your view is the bridge in as
5  good a condition as it was before this allision
6  happened?
7      A.     It is not in as good a condition
8  because it's not the way it was.  It's not
9  perfectly straight so -- it's still got a little
10 kink in it.
11     Q.    What do you mean by that?
12     A.    It's not -- still has got a little --
13 from what the engineers have told me, a little
14 bend.  While I'm not an engineer and I wouldn't
15 think it's a big deal, they've told me that it
16 actually was going to shorten the service life --
17 life of the bridge because of that misalignment.
18 While it's all got new steel on it, because of
19 that, the whole -- it's shortening the life of the
20 whole bridge itself.
21     Q.    What part is misaligned?
22     A.    The new part that they put.  They
23 couldn't get it back a hundred percent straight,
24 which apparently is a bigger deal than I thought
25 it was.

Page 204

1      Q.    You talked about communication after
2  the allision on June 15, 2024, people you talked
3  to, people who talked to you.  Do you recall that
4  discussion?
5      A.    Yes.
6      Q.    Did anyone from Carver contact you
7  to tell you that they had struck the mainline
8  bridge?
9      A.    No.  We didn't get a phone call
10 from Carver or the Coast Guard.  We're the ones
11 that notified the Coast Guard on Monday that it
12 had been struck, and the only reason that we knew
13 it was Carver, because it hit and took off to New
14 York, is they have AIS data tracking on their
15 tugboat, so it's a publicly available website -- I
16 guess you can pay for it too -- so I went on --
17 Monday night when we found out and I was able to
18 pull the history and see the AIS data for the
19 MACKENZIE ROSE, it hit and took off.
20          MR. SNOW:  Those are all the questions I
21 have.
22
23               EXAMINATION
24 BY MR. ROMAN:
25     Q.    With that discussion with the engineers

Page 205

1  about the current condition of the bridge, who
2  specifically was that with?
3      A.    That would be Howard.
4      Q.    Okay.  When did that discussion occur?
5      A.    A couple of times.  Him and -- him
6  and Charlie made the -- made the same comment.
7      Q.    Okay.  When was the last time that Howard
8  said that, if you can recall?
9      A.    I can't recall exactly.  Like I said,
10 I didn't think -- I didn't think, being a psychology
11 major, that it was a big deal, but apparently to
12 bridge engineers it's a big deal when it doesn't
13 go back like it should.
14     Q.    Did Howard give any reasons why he
15 thought that it shortened the lifespan in particular,
16 other than misalignment?
17     A.    I mean, from what I understand is that
18 misalignment can -- it's just not -- I guess over
19 time -- I'm not -- I don't know.  I'm not an engineer.
20 I can't speak to it, but from what I understand it's
21 a big deal when it's not perfectly straight.
22     Q.    And then that -- on the additive
23 rates, was that a -- I think you said that the
24 customer had damaged some portion of the rail
25 system that they were responsible for.

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

Page 206

1    A.    Yeah.  They had a Lowboy hit a
2  rail crossing and knock it out of alignment.
3    Q.    And did they request that the Belt Line
4  perform the work or --
5    A.    No.  Our crossing agreement with them
6  requires them to repair the damage.
7    Q.    Requires the customer to --
8    A.    Yeah.  We have -- we have a crossing
9  agreement with them, and as part of that crossing
10  agreement -- they're not actually a customer of
11  ours.  They're just -- they have to fix the broken
12  rail.
13    Q.    Does that crossing agreement reference
14  anything about the additive rates?
15    A.    No.
16    MR. ROMAN:  That's all I have for him.
17    MR. SNOW:  Okay.
18    MR. JETT:  I just have a few very
19  briefly, if you don't mind.
20    MR. SNOW:  Sure.
21
22    EXAMINATION
23  BY MR. JETT:
24    Q.    Mr. Moss, my name is Zachary Jett.  I
25  represent the intervening plaintiffs in this matter,

Page 207

1  Evanston Insurance Company.  I just have a few quick
2  questions for you about the insurance claim itself,
3  okay?
4    A.    All right.
5    Q.    All right.  Were you the point person
6  in charge of -- on behalf of the Belt Line to make
7  the insurance claim to Evanston Insurance Company?
8    A.    Yes.
9    Q.    All right.  And so you worked directly
10  with Evanston throughout the adjustment process; is
11  that accurate?
12    A.    Yes.
13    Q.    Did you review all of the expenses
14  or invoices before you submitted them to Evanston
15  Insurance Company?
16    A.    Yes.
17    Q.    Were they all related to repairs as
18  a result of damage caused by the allision event
19  that we've been talking about today?
20    A.    Yes.
21    Q.    All right.  You didn't submit any
22  invoices to Evanston Insurance Company that were
23  not related to the repairs necessitated by the
24  allision event; is that right?
25    A.    Correct.

Page 208

1    Q.    And how much did Evanston Insurance
2  Company reimburse the Belt Line as a result of
3  the damages incurred by the allision event?
4    A.    $10,000,000.
5    Q.    And was that the extent of your policy
6  limits with Evanston?
7    A.    Yes.
8    Q.    Did the Belt Line incur expenses
9  in excess of the $10,000,000 policy limit?
10    A.    Yes.
11    Q.    Was the bridge upgraded in any way as
12  a result of the repairs?
13    A.    No.  The bridge was just put back for
14  normal service.
15    MR. JETT:  Thank you very much, Mr. Moss.
16  Those are my questions.
17
18    EXAMINATION
19  BY MR. ROMAN:
20    Q.    On the insurance claim, did the --
21  did the Belt Line pay its $250,000 deductible?
22    A.    Yes.  From my understanding we went
23  above -- far exceeded the $10,000,000, and so
24  yes.
25    Q.    No, no, I understand that, but was --

Page 209

1  did you receive $9,750,000 from Evanston or --
2    A.    No.  We received $10,000,000.
3    MR. ROMAN:  All right.  That's all.
4    MR. SNOW:  I have no other questions.
5  He'll read and sign.
6    MR. JETT:  I'll just take an electronic
7  PDF condensed, please.
8    MR. ROMAN:  We'll also take a copy.
9  E-Tran is fine.
10    (The deposition was concluded at 4:10
11  p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**

---

**Page 210**

```
 1
 2
 3
 4   June 13, 2025
 5
 6   Crenshaw, Ware & Martin, PLC
 7   W. Ryan Snow, Esq.
 8   150 West Main Street, Suite 1923
 9   Norfolk, Virginia  23510
10
11
12
     IN RE:  COEYMANS MARINE TOWING, LLC
13
     Dear Mr. Snow,
14   Please have the witness read and sign the transcript
     and execute the errata pages before a notary public.
15   Once executed, the executed pages should be returned
     to:
16             Clyde & Co US, LLP
               Michael J. Roman, Esquire
17             30 S. Wacker Street, Suite 2600
               Chicago, Illinois  60606
18
     The timeline is 30 days in which to have the
19   transcript read and signed.  If the transcript is not
     read and signed within 30 days, it is deemed signed
20   and may then be used as though signed.
21   Thank you for your prompt attention to this matter.
     Tracy B. Marinelli, RPR
22
23
     cc: Michael J. Roman, Esq.
24       Zachary M. Jett, Esq.
25
```

**Page 212**

```
 1   COMMONWEALTH OF VIRGINIA AT LARGE: To wit:
 2
 3
 4             Subscribed and sworn to me before
 5   this _____ day of _____, 2025.
 6
 7
 8
 9
10
11
12                      _____
13                      Notary Public
14
15   MY COMMISSION EXPIRES:
16   _____
17
18
19
20
21
22
23
24
25
```

**Page 211**

```
 1             I, CANNON MOSS, do hereby certify
 2   that I have read the foregoing transcript of my
 3   testimony and further certify that said transcript,
 4   with the corrections noted below, is a true and
 5   accurate transcript of said testimony.
 6
 7             Dated at _____ this _____ day of
 8   _____, 2025.
 9
10             ERRATA SHEET
11   PAGE   LINE   CORRECTION        REASON FOR CHANGE
12
13   ____  ____   _____    _____
14   ____  ____   _____    _____
15   ____  ____   _____    _____
16   ____  ____   _____    _____
17   ____  ____   _____    _____
18   ____  ____   _____    _____
19   ____  ____   _____    _____
20   ____  ____   _____    _____
21   ____  ____   _____    _____
22   ____  ____   _____    _____
23
24                  _____
25             CANNON MOSS
```

**Page 213**

```
 1   COMMONWEALTH OF VIRGINIA AT LARGE: To wit:
 2             I, Tracy B. Marinelli, RPR, Notary
 3   Public for the Commonwealth of Virginia at Large,
 4   of qualification in the Circuit Court of the City
 5   of Chesapeake, and whose commission expires July 31,
 6   2026, do hereby certify that the within named
 7   deponent, CANNON MOSS, appeared before me at Norfolk,
 8   Virginia, as hereinbefore set forth, and after being
 9   first duly sworn by me, was thereupon examined upon
10   his oath by counsel for the parties; that his
11   examination was recorded in Stenotype by me and
12   reduced to computer printout under my direction; and
13   that the foregoing constitutes a true, accurate and
14   complete transcript of such proceeding.
15             I further certify that I am not related
16   to nor otherwise associated with any counsel or party
17   to this proceeding, nor otherwise interested in the
18   event thereof.
19             Given under my hand this 13th day of
20   June, 2025 at Norfolk, Virginia.
21
22
23             Tracy B. Marinelli, RPR
24             Notary Registration No. 212131
25
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: $10,000..17th

| Exhibits | $ |
|---|---|

MossC 1    4:13

MossC 2    4:16
  85:22,25
  198:24,25

MossC 3    4:19
  47:10,11,16
  152:4,6,8,
  12,13

MossC 4    4:21
  47:8,17,19
  56:21 156:8

MossC 5    4:23

MossC 6    4:24

MossC 7    5:3
  155:24,25
  156:3

MossC 8    5:5
  165:2,3,12

MossC 9    5:8
  169:4,5,6,8
  172:14

MossC 10    5:10
  177:22,24
  190:13

MossC 11    5:11
  191:24,25
  192:1

MossC 12    5:14
  195:3

$10,000    183:20

$10,000,000
  191:12
  208:4,9,23
  209:2

$14,370,238.38
  190:15

$15    188:11

$15,000,000
  84:8,23
  105:6

$15,119,157.35
  191:18
  192:8,13

$15,119.157.35
  190:16

$164,000    173:4

$20    189:1

$240.67    188:10

$250,000
  208:21

$29,482    186:1

$350,000
  192:15

$480,846.87
  190:24

$50,000    194:22

$7,900    183:17

$7,918.12
  185:18

$9,750,000
  209:1

— 0 —

0    159:21

— 1 —

1    125:23
  136:2 156:15
  157:17
  159:22
  160:12 161:3
  165:14,20

1.3    105:16

1.5    129:25
  130:3 131:21
  142:8,15,21,
  25

1/8th    157:17

10    177:22,24
  190:13

10,000    182:13

10-inch    172:19

100    66:18
  67:1 68:3
  150:2

10001    187:15

1030704    188:8

10:00    6:5

11    190:9
  191:24 192:1

11-4    145:15

12    190:9
  195:3

12-inch    160:11

12:41    110:12

12th    142:18

1340    28:11

13th    55:9

14    105:4

146    164:1,6

14th    135:11
  136:3 149:22
  150:8

15    58:12 88:3
  105:4,9
  122:13
  156:20 194:5
  204:2

150    6:6

15th    26:24
  27:9 28:18,
  22 30:8
  31:14 52:18
  62:21 64:2
  72:20 93:15
  101:3 122:20
  139:12,19,
  24,25 140:4
  144:4 153:25
  158:2

16-hour    17:5

176-    192:18

17th    74:24
  75:2,5 76:22

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**Cannon Moss on 06/04/2025**                    Index: 180..2644

**180**  32:2

**1800s**  42:2,9,
  10

**185**  185:2

**1897**  20:13

**18th**  78:1
  88:11,17
  102:12

**19-inch**  172:19

**1923**  6:7

**1956**  41:24
  42:6,7

**1962**  196:3

**1983**  136:9
  138:9,11,15
  173:13

**1st**  30:18
  84:5 133:24
  135:10

─────────
**2**
─────────

**2**  85:22,25
  157:13
  198:24,25

**2.1**  165:13
  166:21

**20**  88:3,14
  91:20

**20-plus**  79:15

**2001**  9:20

**2002**  12:18

**2003**  15:3

**2006**  16:23

**2007**  189:23
  190:1

**2009**  189:17
  190:1

**2011**  9:1,2,4
  18:20

**2012**  10:4
  38:17,18
  39:9 40:2,7,
  12 41:20

**2013**  38:17,18
  40:2,7,12
  41:21 51:5,9
  105:17
  133:25
  135:10 136:2

**2014**  51:5,9

**2015**  157:3

**2022**  125:20
  130:25

**2023**  55:9,13
  59:11 130:23

**2024**  21:14
  25:19,24
  26:8,24 27:9
  28:18,22,25
  30:1,8 31:14
  33:2,20
  37:25 38:2,4
  39:3 40:5
  43:11,14,22
  44:7 49:21

**52**:10,14,18,
  21 53:1,11,
  14,17 54:16
  55:13 56:1,
  11 58:12
  62:21 64:2
  72:20 74:24
  101:3 107:13
  117:3,20
  121:21
  122:13,20
  123:7,16,20
  124:7,17
  127:11,19
  129:25
  130:21 132:4
  133:18
  135:9,11
  136:3,15
  138:15,19,21
  139:12,19
  140:4 142:18
  144:4 153:25
  156:13,20
  158:2,24
  169:21
  170:23
  171:13
  173:25
  188:10 194:5
  199:4 204:2

**2025**  149:23

**2027**  121:2
  122:4,12
  123:19
  126:19

**20th**  93:18

**94**:13 95:4,
  10 97:2
  98:19 102:20
  107:13
  167:18

**21**  24:22,24
  26:3,5,6,10,
  18 29:1

**2174**  156:5,14

**2182**  157:12

**2183**  157:14,
  21

**2188**  163:15

**2189**  163:25
  164:4

**2190**  164:12

**2191**  164:13

**21st**  102:20
  110:12

**22nd**  188:10

**2343**  167:7

**24**  141:8,10

**2408**  152:6,9

**2410**  153:3

**24th**  158:24

**25**  66:9 68:14
  88:14

**2531**  152:9

**263,000**  71:1

**263k**  70:3

**2644**  86:3

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: 2650..7th

**2650**  92:11

**2651**  92:20

**2652**  92:23

**2653**  92:25

**2654**  93:2

**2655**  93:5

**2678**  93:5

**2679**  91:6
  93:17

**2680**  98:8

**2681**  98:23
  100:1 109:3,
  25 111:5

**2682**  109:19,
  25 111:5

**2683**  110:3

**2685**  111:7,
  11,21

**2687**  111:25
  119:17,19,
  21,23 126:18
  131:19

**2690**  144:7

**272**  183:18,25

**272.34**  181:2
  183:16,24,25

**2737**  145:3
  148:23

**2753**  86:1
  149:20
  150:10

**286**  70:6

**286,000**  68:16
  69:12,19
  70:1 71:21
  72:2,4,11,
  14,17

**286,000k**  70:22

**2:37**  117:3

—————————

**3**

**3**  47:11,16
  152:4,6,8,13
  164:12,23

**3-11-2024**
  158:25

**30**  126:1
  173:25

**300**  11:5

**30th**  145:7
  147:15 149:7
  150:8

**34**  19:24

**35**  23:1,2

**35-person**
  18:23 19:9

**365-**  192:18

**38-**  192:18

**3rd**  102:1,13
  111:17,23
  112:20 113:1

—————————

**4**

**4**  47:8,16,17,
  19 56:21
  156:8

**48**  136:11
  138:5 141:5,
  7,22

**4:10**  209:10

**4th**  53:17
  79:18 80:2
  128:3 138:24
  139:17
  140:4,15
  162:13
  170:23 175:9

—————————

**5**

**5-20-2025**
  192:1

**50-year-old**
  143:5

**540**  57:23
  58:4 59:7

**59**  188:7

**5th**  53:17
  79:18 80:2
  138:24
  139:17
  140:4,15
  162:13
  170:24 175:9

—————————

**6**

**6-4-24**  171:20

**6-5-2024**
  171:20

**6679**  54:11

**67**  105:12

**6710**  62:17

**6711**  55:15

**6713**  55:18

**6783**  64:9

**6803**  62:16

**6814**  171:17
  174:24

**6815**  175:4

**6816**  175:11

**6817**  175:17

**6827**  169:9

—————————

**7**

**7**  155:24,25
  156:3

**7-14**  154:10

**70**  125:25

**70/30**  131:9

**75**  187:4

**7:10**  145:7

**7th**  151:2

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                                    Index: 8..agreements

**8**

**8** 117:20
123:20
124:7,17
127:10,19
138:19,21
139:4 160:11
161:2 165:2,
3,12

**86** 163:11

**8th** 112:12
115:20 117:3
123:7,16
136:15
139:6,23
199:4

**9**

**9** 169:4,5,6,8
172:14

**90** 31:21,23
32:2,4,6,7
187:4,7

**92** 164:13

**A**

**a.m.** 6:5
86:10

**ability** 8:4

**Absolutely**
165:9

**acceptable**

62:5 154:9

**accepted**
181:10

**access** 37:3,13
175:21 177:6
179:18,22
185:19 192:6

**accessed** 97:19

**accommodations**
97:23

**accounts** 191:9

**accuracy**
195:15

**accurate** 48:8
165:25
178:13
207:11

**accurately**
57:8 60:16
61:21 136:12
145:20 150:5
151:2 196:18

**acquire** 20:12

**actual** 43:15
104:8 183:16
192:24

**Adam** 21:10,22
22:4,8 30:4
37:16 54:17
55:5,6
56:12,13
88:25 92:15
140:10,16
149:3

**Adam's** 92:5

**add** 98:10
180:17 182:3
190:16
192:16

**adding** 192:10

**addition**
113:12
117:11
183:15
193:20

**additional**
119:11
147:15 149:6
166:4 179:8
188:11
192:20

**Additionally**
150:25

**additions**
170:19

**additive**
180:12,16,24
181:2,5,22,
23,25 182:3
183:11,13,21
184:2,8,10,
14,20 185:3,
4,6,10,24
190:16
201:6,9,15,
20,21 202:4,
9,21,25
205:22
206:14

**additives**
181:7

**address** 96:8

**addressed**
86:16

**adds** 185:24
199:24

**adjusted**
172:21

**adjustment**
207:10

**adopt** 104:13

**AFE** 135:21

**affect** 8:4

**affected** 64:18

**affects** 45:9

**aftermath**
89:25 137:14

**afternoon**
145:10

**agree** 57:15
166:22
192:13

**agreement**
23:5,7 80:11
97:6,11
107:25
108:4,11,12,
21 206:5,9,
10,13

**agreements**
108:17

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                                    Index: AIS..assume

AIS   204:14,18

alignment
  206:2

allision   64:2
  72:19 73:2,
  18 78:1
  80:24 89:25
  90:25 93:15
  108:1 122:20
  134:8 136:19
  138:3 139:12
  141:16 147:2
  156:20
  158:2,19
  162:5 163:23
  164:18 166:1
  174:8,15
  175:13,18,23
  176:4,21
  177:14 180:8
  189:22,25
  193:25 194:5
  199:15
  200:5,15
  203:5 204:2
  207:18,24
  208:3

allowable
  70:1,23

allowance
  188:24

allowing
  145:17

American   50:6

amount   32:16
  34:18 98:2

140:21 143:9
146:1 187:24
191:20

amounts   59:15,
  21

and-a-half
  13:1 40:15
  125:24

Andrew   153:12

Angie   86:20,
  23

angle   159:22
  160:12 161:3

annual   44:21
  52:14,21,25
  53:10 57:11,
  13,17 58:10,
  11,18 134:25
  135:13

answering
  64:13

answers   195:7,
  16

anticipate
  170:19

anticipated
  166:23

anymore   17:5
  165:6

apologize
  165:13 194:7

appalled   84:12

apparently

203:24
205:11

appears   163:15

Appendix
  165:13,14,20
  166:21

applicable
  56:1 61:5

application
  133:7

applied   18:16
  191:15

applies   57:2

apply   108:18
  133:4

approach   94:8

approval
  100:25
  103:1,20
  114:5
  130:13,17
  131:4

approve   94:18
  104:13
  105:23,25
  131:7

approved
  105:24 116:6
  181:20,23
  183:18
  184:14,21
  201:10,19,22

approving
  104:1 105:22

116:8 202:16

approximately
  162:1

April   158:24

area   20:3,4,5
  21:2

areas   11:3
  96:2,4,9
  110:19 136:1
  149:7

argue   176:14

arrangement
  80:12

aspect   18:23

aspects   10:25

asphalt   202:8

assign   183:4

assigned   25:1
  183:2 187:3,
  23

assignment
  186:22,25

assistant
  12:11,14,20
  13:11,19
  14:9,20
  15:12

assistants
  106:13

associate
  188:15

assume   58:7

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: assuming..bearings

67:15 111:6
137:4 171:8
202:17,19,24

assuming  89:5
137:5,8
138:22

astronomical
143:9

Atlanta  202:18

attached  88:2,
6,16 109:23
135:21

attaching
88:10

attachment
111:2

attachments
91:15,21,23
109:20

attempt  75:4

attend  140:7

attendees
155:17

attending
140:14,15

attention  73:9

attorney  87:1

audited  181:8,
19 184:10

author  178:9

authored
154:17,19

155:6,9

authority
105:21 114:1

authorized
57:7

authorizing
104:12

automated
35:20 36:5

automatically
37:18

automation
150:2

average  31:9,
19 32:21
33:20

AVP  17:19
86:25

awarded  133:22

aware  54:10
59:3 115:6
140:14
189:22

_____

B

_____

back  9:2,17
13:12 18:20
21:13 25:18,
24 32:7
36:16 38:22
50:17 54:11
62:17 69:10
71:17 84:5
93:17 94:22

95:23 98:11
99:10 100:6
101:22
105:14,17
113:8 119:21
124:2 128:2
136:5 139:1
143:10
146:3,14
148:20
150:5,9
155:12 158:5
160:20
171:15
182:15
191:22
194:6,8
195:9,22
199:21,22
200:1,2
203:23
205:13
208:13

background
82:19

backup  38:11,
12 39:16,17

bad  35:25
123:9 133:9
164:24

balance  172:8

Balderson
130:22,24
131:1
201:19,23,25

Bandlow  41:7

barge  105:11
171:21

base  95:17

based  29:2
48:19 72:15
120:8 152:16
172:17 174:2
187:24
202:18

bases  68:17

basic  188:5

basically
15:13 19:21
60:23 100:5
128:4 168:15
189:11

basis  130:13

Bates  48:1
55:15 85:25
92:6 152:8
157:21

bathroom  165:7

Beach  128:22
129:1,2

Beale  21:11
26:20 30:5

beam  95:18
98:10 159:21
160:1,10,11
161:2

beams  95:16

bearings
157:18,24

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.

Cannon Moss on 06/04/2025                                    Index: begin..bridge

158:10,17

**begin**  128:6
  146:3

**beginning**
  157:12

**begins**  142:14

**behalf**  6:2,10
  207:6

**believes**
  196:15

**bell**  30:20

**Belt**  8:9,12,
  16,17,25
  18:9,19,25
  19:3,13,22
  20:7,11,24
  22:20,23
  23:3,14,16
  24:18 26:15
  28:25 29:11
  30:19,23
  33:9,25
  34:14,16
  35:7 37:8
  41:14 44:19
  45:20 51:17
  54:11,21
  71:11 81:11
  82:5,7 83:10
  92:18 94:18
  97:3 105:5,
  10,22
  107:15,21,24
  108:6,18
  111:3 112:6

114:5,10
117:21 124:8
126:10
131:15
132:3,16
133:18
134:4,24
135:11 140:9
142:19
144:15 149:5
152:17
153:15 160:7
163:8 172:24
174:24 175:2
178:14 180:1
183:8 185:21
186:25
189:16 191:8
193:3 195:20
196:11,15
200:19
201:14 206:3
207:6 208:2,
8,21

**bend**  203:14

**benefits**  184:1
  186:4

**bid**  80:18
  105:19

**bids**  80:15

**big**  24:1,2
  40:11 136:10
  141:4 189:8
  203:15
  205:11,12,21

**bigger**  203:24

**bill**  21:10,
  21,25 22:8
  30:4 72:23
  73:17,20
  74:3,6,9,13,
  16 75:1,8,
  10,24 92:15
  153:14
  193:13

**bit**  8:19
  36:20 118:5
  127:23
  192:20

**BL**  186:25

**Board**  86:9,
  16,22 87:2,
  15 91:12
  93:22 106:2
  110:8 112:7
  117:3 136:15
  145:7 149:23
  152:2,3
  199:4

**boat**  93:10

**bolded**  192:1

**bolts**  158:8
  164:21

**bottom**  154:8
  159:1 160:8
  184:6 192:11

**box**  66:16
  67:2

**boxes**  65:2
  68:9,21

**Boyle**  86:21,
  24

**BPM**  60:15
  61:20

**brake**  172:19,
  20 173:5
  200:22

**brakes**  175:17,
  18 177:6

**brand**  157:4

**Brandon**  153:6

**break**  7:21,25
  47:4 85:10,
  18,20 129:20
  165:7 190:3

**breakdown**
  142:14 192:2

**bridge**  15:16,
  18,19,20
  20:8,14,15,
  16,18,21
  21:6 24:3
  25:6,8,9,15,
  16,18,24
  26:7,14,15,
  25 27:1,4,8,
  14 28:2,3,4
  29:8,15
  30:1,8,13
  31:10,19
  32:9,13
  33:21 34:2
  35:19 36:16,
  18,23,24,25
  37:11,13

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: bridge's..build-out

38:5,9 39:2
40:2,18
41:18,23
42:1,5,7,9,
11,16,24
43:2,3,5,7,
24 44:15
45:6,25
47:14,19,21
48:25 49:1,
2,5,7,10,13,
15,16,18,20,
22,24 50:2,
18,21,22
51:9 52:3,7,
11,13 53:10
54:1,4,16
55:19 56:4,
10,17,23,25
57:1 59:9,20
60:22,23
61:3,17
62:20,24,25
63:10,11,13,
14,20 64:22
65:5,17 66:2
67:21 69:8,
9,11,17,18
70:13,18
71:7,20
72:5,13,14
74:4,19 75:5
76:14,22
77:8,13
78:22 79:12
80:17 81:15,
20 82:22,23
83:25 84:18

86:11 88:19,
21 89:20,21
90:10,12,19
91:16,17,24
93:21 94:15,
19 95:23
97:4 98:11
99:9 100:6,
8,22,25
101:10 103:2
105:12
106:1,19
108:1 109:22
110:16,19
111:3 115:22
116:23
117:18,22
118:4,11,17,
18,19,21
121:1,4,7,
13,21 122:2,
12 124:10,23
125:9,14
126:11
127:6,14,19,
25 128:11,
14,16,19
129:6 130:6
132:5,7,9
133:20
134:16,21
135:12
136:1,7,22
137:7 139:4
140:20 141:7
142:20
143:25
145:11,24,25

147:1,16,21,
24 148:5,7,
14,19,23
149:2,3
150:4,9
151:18
155:12
156:15 157:5
158:20
159:4,5
161:16,20
163:13
164:2,25
166:23
168:25
169:18
171:15,22
175:22 176:3
180:10
189:23 190:1
192:25
193:25
194:8,23,25
195:20,23
196:2,3,11,
16 197:7
199:8,11,15,
25 200:9
203:4,17,20
204:8 205:1,
12 208:11,13

**bridge's** 150:1

**bridges** 12:5
14:10,18
20:23 26:11,
12,13 42:22
47:24 48:6,

9,12,16
50:19 51:18,
23 52:2,6
54:24 55:5
57:5 60:5,25
72:1

**briefly** 206:19

**bring** 36:13,
17 97:16
185:25

**bringing** 97:13

**broad** 177:9

**broke** 147:22

**broken** 206:11

**Brown** 77:24
89:5

**buckled** 98:10

**buckling** 95:15

**bucks** 189:4,6

**budget** 48:18
104:20
105:1,18
106:6,10,17
107:3 109:6,
9 119:7,11,
15,17,18,20
120:1,4,6,7,
10,12
144:21,23,25

**budgeting**
122:8

**build** 110:17

**build-out**

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
**Cannon Moss on 06/04/2025**                    Index: building..certified

```
 135:22

building  24:4
  100:7 133:15
  168:16

buildup  60:7,8
  161:19

built  41:23
  42:2,6,7,8,9
  67:22 114:18
  161:11

built-in  184:2

bulk  85:2

bullet  56:21
  89:3,19 98:9
  113:18
  114:14
  116:20
  119:24
  167:14

bunch  146:18
  203:1

burn  201:2

burned  191:5

Burnett  194:19

business  16:7,
  13,18 17:2,
  11,14,18,24
  18:23 19:12
  22:24,25
  33:10,13,19

busy  30:19,
  22,25 31:6,
  10,14,18
  33:4
```

```
         C

C5  187:19

cable  139:3
  142:15,21,25
  143:10,13
  150:11,25

cables  43:9,11
  136:8,9,10,
  11 137:24
  138:2,5,8,
  13,18
  139:11,15,22
  140:19
  141:2,5,7,
  15,22 142:5,
  9 143:4,13,
  21,23,24
  144:4 149:19
  151:8 168:7,
  19,20
  200:22,25

calculated
  69:10 94:9
  95:4,6

calendar  27:3
  91:2,4

call  8:16
  20:15 36:22
  72:21 73:17
  74:18 75:8
  77:10 78:20
  90:6 152:15
  187:6,16
  204:9
```

```
called  34:4
  35:9,10
  38:19 41:6
  50:4,12,13
  73:20 74:18
  75:10 82:12
  136:23

calls  81:12
  100:15
  113:14 152:7
  154:23
  155:11

Calumet  14:24
  15:6

cameras  36:1
  43:8

Cannon  6:1,9,
  18 152:2
  153:20 156:7

CAO  86:23

capabilities
  27:9 29:25

capability
  29:11

capacities
  195:19

capacity  48:15
  65:20 71:19,
  22 72:11
  87:5 133:3,
  13 155:9
  175:14,18,22
  176:5 177:15
  196:4
```

```
capital  106:3
  123:5,10,12
  127:15

capitalized
  48:25

care  46:6
  85:15 150:17

carry  71:2
  72:4

carver  47:8
  85:22 152:4
  155:25 165:3
  169:6 177:24
  178:15 190:9
  204:6,10,13

case  6:24

cash  191:4,6,
  7

catchall
  193:22

categories
  177:9

caused  33:13
  38:2 100:13
  136:7 137:23
  207:18

causing  171:21

cell  65:9,24
  66:21

center  42:11
  187:16

cert  187:20

certified
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: Cestaro..comparing

189:4,5

Cestaro  153:12

CFO  86:23

chance  153:8
173:3 197:19

change  55:12
102:17

changed  49:25
95:2 110:16
117:8

channel  42:15
162:8,18

Chapman  87:9,
12

charge  143:8
207:6

charged  59:20
143:8,9

charges  59:14

Charlie  82:15
83:1,9 84:2,
13,16 94:6
103:22 104:7
106:9,23
120:11
144:14
152:21,22
153:4
154:18,19,22
197:13 205:6

Charlie's
82:19 84:20

chart  63:25

cheaper  119:4

checkmark
154:1 155:16

Chesapeake
20:2

Chicago  14:22
15:17,24,25

chief  77:8,
14,21

chop  110:19

chunks  137:6

cities  20:1

City  16:20

claim  142:9
143:18,19
193:3 207:2,
7 208:20

claiming
178:15

clarify  53:9
73:7

clarity  183:22

class  11:12

classroom
11:17,19

clean  7:4
24:4

cleaning
150:25 151:7

clear  8:20
21:12 114:6
178:23

click  36:19

client  182:5

clients  182:10

climb  28:4
37:5,6,9,12
151:18

climbed  149:1

climbing
151:21

close  190:5

clue  11:21

Coast  32:18
204:10,11

code  54:4
187:15,18

codes  187:21

college  9:9,
12,23

Collegiate
9:11

collision
136:6,18,23
137:13

column  62:19,
24 63:2 65:3
68:9 69:25
178:6 182:18
185:14
186:10,16,21
187:13
190:15

columns  64:24

commencing  6:5

comment  205:6

comments  84:25

Commonwealth
6:4

communicate
89:24 102:21
130:16

communication
43:8 89:8
90:3 117:18
204:1

communications
108:15

company  8:12,
21 11:5
13:17,18
19:7,9,15
38:15 50:4,
12 56:14
75:14 86:13
87:19,23
92:17 101:11
112:10
143:7,15
144:17 163:4
178:3 191:12
198:20
202:9,13
207:1,7,15,
22 208:2

compared  31:11
33:22

comparing
118:12

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025          Index: competitive..contractors

competitive
11:25

complete 119:8
120:1 121:6
145:16,23
151:1 193:25

completed
111:9 112:13
116:25
117:17
155:14 194:7

components
148:8 164:17
166:23
176:2,5,18,
19 177:8,12
178:25

comprised
159:4

comptroller
23:6 87:10

computer
128:4,14

concern 96:2,
5,9

concerned
125:12

concluded
209:10

concrete 56:23
57:1,5 137:6
157:17 158:1

condensed
209:7

condition
48:20 150:9
199:10,16
203:5,7
205:1

conditions
60:13,17
61:21

conductor
11:10,16
187:20
189:3,4

conductors
12:21 15:14
23:8,12
24:12

conference
152:15
155:11

confirm 62:20
154:8 191:25

confirmation
103:4

confirming
108:16

confused 139:9

connect 128:15

connected
89:16

connection
150:4,20
159:22
161:11

connects
128:18

Connolly
164:22

consideration
127:18
138:18
162:17
173:18

considerations
122:7

considered
19:3 52:13
54:12 56:25
58:21 63:20
65:19 107:18
126:23
167:14

consist 11:9
70:1,23

constantly
43:7,8

constructed
185:21

construction
68:1 75:15
115:24 173:7
179:18
183:12
185:18,19
192:5 196:5,
6

consult 196:24

consulted

197:10

consulting
106:2

consumed
101:10

contact 83:2,
7,8 172:3
204:6

contacted
52:12

contained
172:13
195:16

contest 7:22

context 178:12

continue 97:23

continues 91:9
180:2

continuing
115:16

contract 33:13
198:5,9,16

contracting
198:2

contractor
82:4,23
98:19 100:10
112:14 114:3
149:4
157:10,11
163:5 173:18
194:17

contractors

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                           Index: control..cost

16:3 22:21,
23 23:17,21,
22 24:1,2,4,
5,6,12,15
77:10 82:11
115:10,13
149:6,11
179:9 196:25

control   27:15
28:7 127:21

controlling
65:5 66:2

controls   128:5

conversation
69:13 83:23
197:14

conversations
45:24

cool   176:16

Cooper   66:7,
12,22,25
67:8,12,20,
25 69:16
70:4,11
72:15

copied   87:13
103:12

copies   152:23,
25

Copper   65:15,
16

copy   87:15
127:9 152:21
169:19,23

209:8

core   103:18,
24

corporate
17:12 23:6
87:10

correct   10:7
12:13 13:3
15:16,22
17:1 18:10
21:3 22:9,12
23:15 25:10
26:9 29:6,9
30:21 32:18
33:11 37:2,
14 39:8,12,
19 42:3
45:16 49:14,
16,17,19
53:11,12,17,
18 55:22
57:9 58:1,2
60:2 61:6,7
64:7 69:22
70:14 71:15,
16 73:19
77:4 82:1
86:17 87:4,
7,17 94:3
96:22 98:22
99:11,17
101:24
104:6,10,15
107:1,19
108:14
109:11,18
110:11,13,

14,21,22
112:7 115:19
116:4,7,14
117:1,5,14,
23,25 119:10
120:3,13
121:10,19
122:13,14
123:14,17
124:15
125:7,10,17
128:25
129:13,16,18
130:11
131:11,18
133:17
136:13,22
138:1 139:18
140:25
141:17
142:23
144:10
145:8,9,21
148:2,25
149:23,24
150:6 151:3
152:18 153:5
155:3,4,10
157:6 159:2,
16 160:14
161:13
162:3,11
163:6,15,19
164:8 168:11
170:24,25
171:5 172:6
177:2,5,7,11
178:8 179:10

183:9 185:23
186:2 188:18
189:15
191:10,13,
14,17 193:8,
10 194:5
196:19 199:4
200:16 202:2
207:25

correction
47:18

correctly
48:13,16,21
60:18 94:11
113:20
114:19
115:18
116:25 119:9
121:9 140:24
157:19
159:23
160:13
161:5,12
162:2,10
171:24
172:5,10,22
185:14

correspondence
87:15

cost   36:7
40:14 84:2
85:3 125:24
126:1 131:16
142:20,24
144:9,20
145:2 168:18
178:24

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                                    Index: costs..date

182:14
185:14
193:15
194:21

**costs** 142:14
191:16

**COT_CD** 187:17

**counsel** 8:18
87:14,16

**count** 164:1,6

**counter** 168:4

**counterweight**
136:7 137:1,
10 141:13
143:10
146:16
162:8,9,18
167:22 168:2
172:4
173:12,13,14
175:5,12,13
177:1,4

**counterweights**
168:2,14,17

**couple** 27:23
44:4 50:9,23
81:18 87:24
170:11 177:8
190:12 205:5

**court** 7:7

**courtesy** 7:7

**cover** 121:8
131:15
140:22

**crack** 157:18
160:11,15,
18,23,25
161:8

**cracked** 161:2

**cracks** 60:14

**created** 99:13
178:4

**Crenshaw** 6:6

**crew** 74:22
97:16 187:8,
19 188:11
192:6

**crews** 15:15

**critical** 45:7,
8 46:20

**criticalness**
45:25

**Crofton** 75:10,
13,19,21,25
76:13,18,21
87:23 98:16
113:25

**crooked** 118:18

**crookedness**
118:20

**cross** 70:17
75:5 121:14
127:2,3
156:17
200:23

**crossing**
105:13

180:21 202:7
206:2,5,8,9,
13

**crossover** 7:8

**CSX** 74:22
75:4 86:24
87:1 97:7,8,
9,12 145:18

**current** 87:20
123:8 175:8
201:20 205:1

**customer** 33:16
180:22
202:5,6,10
205:24
206:7,10

**customers**
19:21
180:19,20

**cut** 105:11
148:16

---

**D**

---

**daily** 155:11

**damage** 64:21
88:2 94:10
111:9 136:8
137:24 143:6
145:12
147:10,13,15
171:21 206:6
207:18

**damaged** 64:19
93:21

110:19,20
116:22
141:15 148:9
149:8 150:24
151:19
156:19,21,24
158:1,6,8
166:1,5
167:23 168:1
180:22
199:13,19
202:7 205:24

**damages** 178:2,
14,24 190:13
192:15
193:17 201:4
208:3

**dangerous**
94:25 109:14

**data** 34:1
204:14,18

**date** 37:25
72:25 73:3
78:23 94:17
98:7 120:13
124:2 139:1
142:19
145:22
146:20 159:1
171:22 175:8
178:21,22
186:17,18
188:16
190:17 195:2
196:5,6,12,
17

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                                    Index: dated..determine

dated   55:8
  112:12 145:6
  149:22

dates   92:3

David   13:15
  86:21 87:1

day   19:16
  22:20,21
  27:2 73:25
  80:25 101:5,
  7 188:6,12,
  17

day-to-day
  13:25 18:18
  21:4,25
  22:5,17

days   17:5
  57:23 58:5
  59:7 76:24
  81:18,25
  109:15,17
  137:16

deal   136:10
  203:15,24
  205:11,12,21

dealing   16:11

December   55:9,
  12 145:19
  146:22

decide   61:10

decided   101:23
  102:5,11
  109:15 144:3

deciding

104:12

decision   78:8
  80:1,4
  103:24
  104:1,3,7,17
  168:23
  173:24

deck   137:6
  159:9,12

declaration
  195:10

deductible
  208:21

deem   44:17

deemed   42:12
  83:24 94:25
  101:17
  109:14

deems   46:20

defer   59:24
  60:22 70:12

define   43:4
  95:6 126:25
  193:5

degree   9:21

demobilization
  151:1

demobilize
  145:19 151:4
  195:1

demobilized
  146:21

department

10:17 16:9
  22:3,7,18
  35:4 82:22
  124:5 125:2,
  6 130:19
  181:6,9,11,
  17,19 184:11
  201:11
  202:1,16

departments
  124:25

depend   45:23

depending
  37:21 50:20
  185:7

depends   30:16
  31:2 44:23
  45:22,24
  61:2 106:3

deposed   6:9,19

deposition   6:1
  209:10

depositions
  8:7

describe   19:15
  39:1 47:13,
  21 86:8
  93:18 97:11
  99:1,24
  104:18
  127:22 141:6
  149:18
  152:11
  156:10 178:1

describing

123:9

description
  61:8,18 62:1

descriptions
  60:12

design   38:9,12
  41:11 114:15
  115:17,21
  118:22

designated
  54:23 55:3,
  24 56:17

Designation
  55:19

designs   115:25
  116:3

destroy   180:4

destroyed
  34:25 80:17

detail   60:16
  61:20

detailed   57:4,
  11,14 58:8,
  16,21 59:5,
  12,15,21
  60:4,11

details   61:10
  137:22

deterioration
  199:25

determinations
  70:21

determine

48:15 62:4
68:15 70:16
71:18 77:5
82:10 131:5
138:8 172:2
181:1,21
185:1 196:20

**determined**
96:24 97:1
101:14
123:18,23
143:3

**develop**  48:8

**developed**
94:14

**developing**
16:12,17
17:24

**development**
16:8 17:3,
12,15,18

**Diagonals**
161:10

**dictates**  35:21

**diesel**  38:12
39:16,17,20
146:11

**difference**
31:9 36:7,9,
12 46:2,18
52:5 57:10
58:3 60:1
66:6,11
67:7,11
132:22

**differences**
59:4 68:8
99:24 100:3

**differs**  183:23

**dig**  135:20

**dimensions**
60:15 62:7

**diminished**
118:19

**direct**  13:21
18:3

**directly**  23:18
207:9

**Disclosure**
192:2

**discontinue**
145:18

**discovered**
86:10

**discretion**
114:2

**discuss**  81:6
83:16 161:16
170:9,12

**discussed**  94:5
109:7
119:13,15
138:21
139:21
144:22
163:18
167:17
185:25
192:19

193:19
195:22

**discussing**
95:21 120:6
131:22
134:12 155:3

**discussion**
69:5 81:2
95:13 140:1
147:13
151:25
158:13 160:3
177:19 199:8
200:7 201:5
204:4,25
205:4

**discussions**
101:13 134:7
139:3,11,13,
20 140:2
147:7 167:9
170:5 174:2

**district**
186:22 187:1

**diversion**
145:18

**Diving**  75:10

**division**
79:11,12

**Dixon**  30:5

**document**  47:11
51:17 55:8
98:24 99:12,
18,22 110:5
111:4,20

112:1,24
113:5 144:13
156:8 158:21
165:5 167:2,
16 169:14,20
171:2 177:22
178:4,18,19
195:4,16
198:24

**documentation**
184:24

**documents**
41:25 67:24
120:21
152:12
155:21
172:12 196:2

**dollar**  105:16
106:1 129:25
130:4 131:21
132:3 187:23

**dollars**  40:15
125:24
142:21

**Dorey**  38:23
40:24

**DPG**  157:18,24

**draft**  169:17,
24 170:17,20

**drafted**  171:2,
3,6,10

**drawing**  109:21

**drawings**  91:16
115:21

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                                    Index: drilled..ends

165:17  166:4
196:3

drilled   161:4

drive   38:16
172:9

drove   76:5

DT   186:16

due   175:6

duration   97:20

duties   12:20
15:10  22:5

duty   74:23
186:17,22,25
187:3,7,8

duty_asgn_craft
187:10

─────────────
        E
─────────────

E-MAIL   75:17
86:9,12,13
87:13  88:10,
17  90:6
91:5,8,11,
12,21  93:18
94:14  95:5
102:21
103:15,20
105:2  107:8
108:20,24
110:10
112:2,3,6,10
117:2  120:5,
11  136:14
139:4,6,8

142:19
144:14
145:1,6
149:22
154:10,22
155:2

E-MAILED   103:6
113:11

E-MAILS   85:17
88:6  103:12
106:14
108:15
144:16,22
152:2

E-TRAN   209:9

E119/e105
65:24  66:12

E80/e71   65:10
66:12  67:8,
12

E85   67:16

E85/e75   66:23
67:8,12

earlier   109:21
140:11
192:20

early   117:20

east   141:8,
10,11

Eastern   149:4

eat   85:2

eccentricity
154:9

Ed   86:21,24

educated
136:18

education   9:24

effect   51:2

effectively
32:15

efficient
116:24
117:16
118:24  119:4

effort   121:4

efforts   97:3

EHM   38:19,24

eight-hour
188:5

electric
38:15,23
39:6,14,15
40:1,4,8,24
41:17

electrical
146:14
148:8,13
149:16

electricians
148:17

electricity
148:1

electronic
209:6

electronically
35:12,14

emergency
98:22  102:1,
6  105:13,20
111:3,17,22
112:20,25
113:13
167:24

emergency-type
198:21

employee
25:14,17
27:25  28:7
54:21  185:5
187:25
188:8,15

employee's
186:11

employees
16:3,4  22:20
23:3,7,8,9,
14  24:18,20,
22,24  25:1,
25  26:1,3,
10,19  29:1
54:12  185:3,
11,21

EN   187:9

end   114:17
118:21
145:19
146:22
180:22

ended   200:13

ends   146:19
150:17

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                    Index: engine..expand

engine   23:8
  24:24 39:20
  146:11
  185:3,5,10

engineer   49:1,
  15,20,23,24
  50:3 61:18
  62:10 65:21
  66:14 67:5
  68:7,20 69:3
  70:9,13
  77:2,8,14,21
  79:11,12
  81:8 82:24
  159:5 161:16
  187:9
  188:24,25
  189:5 203:14
  205:19

engineering
  11:11,16
  41:6 55:20
  77:10 86:24
  87:19 107:3
  115:7 130:8
  134:15,20

engineers
  12:22 15:15
  23:8 42:23
  45:5 50:6
  52:13 59:20
  60:22 62:2,4
  68:15 69:21
  89:21 90:10
  94:25 101:16
  112:13
  114:15,21

115:1,2,9,25
  116:2 140:20
  166:18
  174:12
  196:24
  203:13
  204:25
  205:12

engineers'
  100:21

entail   16:10
  121:13

entire   101:11
  127:6 148:13
  151:11
  202:22

entities
  124:25
  184:21

entity   184:15

equipment
  184:1

establish
  48:11

estimate   76:9
  81:24 84:1,
  6,16,21
  132:2 191:21
  193:14
  194:20

estimated
  119:7,25
  144:9,20

etcetera   60:15

evaluation
  48:12

Evans   17:16,
  19

Evanston
  191:11
  197:19
  207:1,7,10,
  14,22 208:1,
  6 209:1

evening   73:22,
  23,24 74:12
  75:20 76:1,
  23 78:6

event   207:18,
  24 208:3

eventually
  55:2 141:22

evolving   123:6

exact   78:23
  98:7 191:20
  195:2 197:13

examination
  6:1,12
  197:24
  204:23
  206:22
  208:18

exceeded
  208:23

Excel   107:6

exceptions
  164:7,10

excess   208:9

excuse   12:15
  110:4 150:12

execute   104:8
  107:25

executed
  195:14

exhibit   47:8,
  10,16,17,19
  56:21 85:22,
  25 152:4,6,
  8,12 155:24,
  25 156:3,8
  165:2,3,12
  169:4,5,6,8
  172:14
  177:22,24
  190:13
  191:24,25
  195:3
  198:23,24,25

Exhibits   190:9

exist   67:25
  160:23
  180:5,6

existence
  127:10
  179:24

existing
  107:14
  108:3,10,12
  124:8
  172:18,20

expand   135:10

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                                    Index: expect..follow-up

expect  145:14
  179:12
  193:3,13
  194:12

expecting
  170:2 179:3,
  7,11 193:19

expend  142:25

expended  130:3

expenditure
  106:1

expenditures
  105:22

expenses
  207:13 208:8

explain  27:21
  52:23 68:8
  180:14
  182:24

explaining
  159:6

export  30:24
  31:2

extending
  157:18

extensive
  171:21

extent  208:5

Externals
  152:7

extra  189:5

eye  46:23

---

**F**

---

F-09015  182:20
  183:7

fact  89:24
  131:13,14
  133:22 167:3
  181:6 193:14
  200:12,24

fair  7:9,17
  8:22 24:7
  49:4 59:3,24
  61:22 64:20
  72:3 80:10
  101:8 102:13
  155:22
  173:22 179:2

fairly  7:16
  165:25

fall  75:12
  76:7,10

fallen  76:6

falling  148:15

fashion  198:12

February
  149:22 150:8

FEC  82:22

federal  125:8,
  9

federally
  51:23

feed  148:6

fewer  138:6

field  171:19

fifteen  56:15
  192:16

figure  88:5
  132:3 148:18
  185:20

figures  180:14

file  135:21

final  114:16
  150:3,20
  169:23
  170:2,6,13,
  15,20

finalizing
  114:15

finally  144:7

find  44:16
  55:2 196:8

finding  135:18
  147:15
  157:14

findings  83:13
  93:20 94:2
  111:20
  138:24
  171:22
  172:17

fine  209:9

finish  7:6
  194:10

finished  203:4

fired  148:20

firm  41:6

firms  77:10

fit  141:7

five-year  57:6
  123:5,10,12,
  15,25
  127:10,15

fix  44:17
  96:16 110:20
  118:17 121:1
  131:6 200:22
  206:11

fixed  26:13
  160:22

fixing  134:16

flange  160:11
  161:3

floor  159:3,
  4,8,11,17,20
  160:1,10,11
  161:2

fluidly  98:4

FO  187:8

focus  120:21
  171:16

folks  13:23
  23:12 29:4,
  10,21,23,24
  37:8 181:7
  193:16
  197:19

follow-up
  197:17 198:1

foot   92:4,5

forces   181:24

foreman   187:9

form   14:12
  19:5 25:20
  27:16 38:10
  42:17 44:8,
  22 45:10
  57:22 61:1,
  12 63:21
  67:3,14
  68:11 69:22
  71:3 72:6,12
  90:17 96:10
  100:15 105:8
  113:14
  117:24 118:7
  124:18 132:6
  142:10
  154:23
  155:19
  167:19 176:6

formally   78:13

format   35:12
  107:10

formulate
  122:16

formulated
  101:15
  122:12,18

formulating
  100:11,12
  197:1

Fort   12:15
  13:2,12

Fortune   11:5

forward   79:18,
  19 98:9
  146:7

found   45:6
  46:9 74:6
  148:9 166:6,
  10,13 204:17

fourth   63:2
  95:14 116:20
  136:5

FRA   47:23
  50:24 51:13

FRA-SPECIFIC
  51:11,14

freight   19:21
  97:23
  132:21,23
  133:3,6,11,
  19,23

Friday   30:11
  110:12 111:9

front   86:2
  182:18
  189:13

full   40:8
  137:9 150:2,
  15 186:13

full-time
  23:3,13

Fund   132:14

funded   134:1
  135:24

funding   131:10

funds   124:1,4
  126:13 127:7
  130:3,14
  191:2,19

future   138:19
  139:11
  143:21
  174:11
  192:25 194:4

_____

G
_____

game   94:24

gap   123:25

gaps   9:6

gave   73:17
  84:1,16
  103:3 107:3
  199:3

GC   38:22 41:1

general   9:3
  87:14,16
  114:3

generally
  21:20,21
  23:4 30:13
  39:1 97:10
  141:6

generated
  109:4 158:18

generating
  113:13

Georgia   181:9,

14,17,19
  184:11,22
  185:1 201:11
  202:15

give   72:25
  76:9 103:1
  104:19,25
  109:13
  168:17
  178:12 197:6
  205:14

giving   120:11

goal   172:1

gobbled   50:13

good   6:14 7:4
  85:17 133:2
  197:6 203:5,
  7

governmental
  124:25
  184:15,21

governments
  182:1

graduate   9:19
  12:8

graduating
  10:11

Graning   82:15
  94:6 153:4

grant   124:5
  125:18,19,25
  126:9,20
  129:25 130:4
  131:21 132:3

133:3,6,19,
23 134:1,14,
22,24 135:24
140:23
143:20
191:19
200:8,9,13,
14,18,24
201:2

grants  121:8
124:8,13,16,
22 125:1,8,
9,13 131:20
132:13,17
181:12 191:6
201:18

grass  24:5

grease  149:18

greaser  149:17

greasing
150:25 151:7

Great  7:19

ground  7:3
29:21 146:16

group  103:18,
24

guaranteed
200:9

guard  32:19
136:8
204:10,11

guess  18:20
29:22 38:7
50:17 58:24

59:1 87:13
95:24 126:6
127:3 154:2
155:13
167:14
174:22
180:19
181:19
183:22 195:7
204:16
205:18

guessing  31:21
50:7 58:23
66:13

guide  137:24
148:3,4,6
150:13,16
162:8,18
167:22 172:3

guideline
46:11

guidelines
51:21

guides  146:16,
17 167:22
172:3

gusset  161:25

guy  153:13

guys  15:19
83:16 84:21
186:23

———————————
H
———————————

H&h  77:11

79:22 94:20
96:7 101:16
103:4,6
106:6,18
108:17,22
109:7,9
111:15
115:16,21
116:10
139:20
147:6,8
153:19,22
162:13
170:24
171:19
172:8,17
179:13
192:22,23
193:7,14
198:14

H&h's  99:2
115:24

hail  143:6

half  73:8
105:11
148:16 158:8
194:9

Hampton  20:1,5
21:1

hand  97:15

handful  182:10

handle  33:17
70:24 145:17

handling
183:14

handwritten
34:8,9

hanging  137:11

Hanover  53:16,
19 77:1,6
78:9,21
80:2,21 81:5
82:6 85:6
94:1,14
99:15,19
100:21
101:4,14
102:5,22
103:12,16,19
104:4,19
107:2,9,14
108:2,7
112:13,23
113:10
114:22,24
116:5,9
128:2 130:10
138:22
139:16 140:3
149:5 165:19
167:11 170:6
174:3,6
177:10 198:3

Hanover's
116:16
171:18

happen  135:5
137:1

happened  71:15
198:15
199:19 203:6

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                    Index: happy..identify

happy  7:14

hard  129:14
  172:2 185:15

hardesty
  53:16,19
  77:1,6 78:5,
  9,13,21
  79:1,8 80:1,
  7,10,21
  81:5,9 82:6
  83:2,6 85:5
  94:1,14
  99:15,18
  100:21
  101:3,13
  102:4,22
  103:12,15,19
  104:4,19
  107:2,9,13
  108:1,7
  112:13,22
  113:10
  114:22,23
  116:5,9,16
  128:2 130:10
  138:22
  139:16 140:3
  149:5 165:19
  167:11 170:6
  171:18
  174:3,6
  177:9 198:3

He'll  209:5

head  166:20

header  192:1

heading  74:5

headquartered
  184:18

hear  47:3
  71:25 72:19

heard  71:23
  73:1,14,18
  74:9,11,13
  75:8 102:15

heavily  162:8

heavy  70:17
  71:8,13

held  9:4

helped  41:11

helps  68:15

hey  147:8
  167:4

high  9:10
  84:12,17

high-priority
  60:12

higher  184:3

highest  45:15

Hinson  153:6

hire  23:21,25
  24:1 59:8
  77:13

hired  10:12
  77:2 115:2,7
  159:7

hiring  49:15
  78:4

history  204:18

hit  27:4
  64:10,17
  86:11 137:7
  147:21
  148:15
  158:6,20
  199:11
  204:13,19
  206:1

Hoffman  86:21
  87:1,2

hold  29:2,4
  72:15 141:13

holdup  150:14

hole  161:4,9
  199:22

honestly  73:4

hope  77:16

hour  65:7
  66:3,9,10,19
  68:5,14
  85:11,13
  188:6 189:1

hour/25  65:6
  66:3,19 68:4

hours  32:11
  186:24 188:6

house  28:5
  36:18,21,22,
  23,24
  128:14,16,19
  149:2

Howard  79:2,3,
  9,16 81:7,8,

14 83:1,11,
13 84:1,7,25
94:5 103:8,
22 104:3
106:5 108:22
153:22
170:10 171:1
193:15
197:4,5,11
205:3,7,14

hundred  16:1
  31:21,23
  32:4,5
  105:25
  202:23
  203:23

_____

          I

ID  62:25
  186:11 187:8
  188:15

idea  33:24
  92:22 94:21
  154:15,25

identified
  44:21 134:25
  135:12 149:8
  163:17,21
  165:21 166:1

identify  60:5
  63:25 91:19
  93:6 177:13
  182:14
  190:21
  195:19
  196:10

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                    Index: IDS..inspections

IDS   63:10
  64:1

immediately
  32:11 44:17
  45:7

impact   129:6
  171:21,23

impacted   64:1,
  16 138:3

improvement
  126:24,25
  127:4

improving
  124:23

in-depth   111:8
  140:6

in-house   24:18
  115:3,10

inboard   161:4

inbound   74:19,
  21

inch   157:17

incident   78:1
  90:16 94:2
  196:12,18

include   49:11
  60:13 121:15
  124:9 133:15
  178:25
  183:25 186:3
  193:16

included
  167:15 176:3

192:7

includes
  150:24 159:8

including
  24:25 192:18

incorrect
  118:8,10

increase   31:12
  133:3

increased
  33:18 41:15
  133:13

incremental
  94:9

incur   208:8

incurred   208:3

indefinite
  196:17,21

indented   56:22

independent
  19:7 23:17
  24:11,14

Indiana   12:16

indicator
  155:18

individual
  22:10 27:14
  63:13

individuals
  21:13 22:19
  55:19,24
  86:19 103:19

industry
  202:10

inform   90:15,
  20 114:9

information
  63:6 141:19
  166:19

informed
  101:13

initial   59:11
  84:6,20
  93:20,25
  94:24 95:4,
  9,22 96:6,20
  99:4,8,25
  100:11,13
  101:14,23
  102:6,12
  104:20
  109:7,13,14
  117:11 172:1

initially
  131:16

injury   6:24

inspect   47:24
  49:16 54:24
  76:4 81:14
  180:9

inspected
  52:2,3 128:2
  172:9

inspecting
  51:18,23

inspection

41:3,8
44:15,21
48:12 52:15,
21 53:1,10,
16,20,21
54:1,3 55:20
57:11,17
58:12,16,18
59:9,11,15,
16,21,22
60:4,11
62:14 77:12
79:17 80:2,7
81:19 83:10,
14,16 102:1,
7 107:16
111:8,14,16,
17,21,22
112:14,19,
20,25 113:13
130:9 135:1,
13 138:24
139:17
140:3,7,15
156:11
157:13
158:18,23
162:14,16,20
163:14,22
167:1,10,24
169:18
170:24
171:20
172:2,8,17
175:9

inspections
24:9 49:12
52:17,20

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                    Index: inspector..Josh

53:14,23
54:8  57:5,
11,13  58:4
59:5,6  63:10
146:25  147:5
148:10
160:20

inspector
46:20  49:2
54:16  55:4,7
56:8  63:23
79:22

inspectors
23:10,11
45:6,25
55:17

inspects  55:5

install  41:12
110:18,20
128:10

installation
145:13

installed
38:1,3,16,
18,21  39:9
41:20  121:21
146:17
157:2,8

Institute
9:13,16

instructor
11:20

insurance
121:7  140:22
143:7,15,17

178:3  191:5,
12  207:1,2,
7,15,22
208:1,20

insurer  142:8

integrity  45:9

intended  61:9

interchange
98:2

interest
178:25

internal  51:21
77:25  183:7

international
16:9

interpret
60:17  61:21
68:20,24
69:17  70:12

interpreting
183:11

interrogatories
195:8

intervals  57:6

intervening
206:25

inventory  48:9

invoice  179:4
180:25
192:20

invoices
178:12  179:8
181:12

190:14  191:3
193:7,18
207:14,22

invoicing
59:17

involved  8:21
16:11,17
48:5  78:8
80:4  81:2
100:20
134:16
168:15
176:18

involvement
79:16

involving
189:25

issue  150:4,
20  162:17,22

issued  101:25
102:6  124:8
125:1  132:13

issues  95:21
135:12
148:20
162:12
163:17,21

issuing  170:15

item  106:3
142:8,15
184:7

items  145:16,
23  155:14
179:19

182:12  192:5

_____

J

jacked  168:3,
13

January  53:6,
8,11,14
135:10  136:2
158:23

jarred  137:10

Jason  86:20,
22

Jeremy  153:17

Jett  197:20,
21  206:18,
23,24  208:15
209:6

job  9:2  16:10
17:17  18:14
21:18  25:4
26:21  28:12
29:3  123:9
159:6  186:19
187:3,7,11,
14

jobs  25:3

jog  146:15

joined  85:7

joints  164:22

Jonathan  21:11
26:20  30:5

Josh  86:25

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025

Joshua 86:21

July 102:1,13
  111:17,22
  112:12,20
  113:1 115:20
  117:3,20
  123:7,16,20
  124:7,17
  127:10,19
  129:25 132:4
  133:18,23,24
  136:15
  138:19,21
  139:4,6,23
  142:18
  153:25 166:8
  167:1 199:4

jumping 178:17

June 21:13
  25:18,24
  26:7,24
  27:2,9
  28:18,22,25
  30:1,8 31:14
  37:25 38:2,4
  39:3,13 40:5
  43:11,14,22
  44:6 52:18
  53:1,5,6,7,
  14,17 55:13
  56:11 58:12
  62:21 64:2
  72:20 73:10
  74:24 76:22
  78:1 79:18
  80:2 88:11,
  16 93:15,17

94:13 95:4,
  10 97:2
  98:19 101:2
  102:12,19
  107:13
  110:12
  121:21
  122:13,19
  123:16
  128:2,11
  135:9,11
  136:2
  138:15,24
  139:12,17,
  19,23,24,25
  140:3,4,15
  144:4 156:20
  158:2 162:13
  167:18
  170:23 175:9
  188:10 194:5
  204:2

justify 143:15

K

Kimmins 79:23
  138:23
  140:12

kind 32:21
  83:6 84:9
  163:16 175:3
  199:21
  201:15

kink 203:10

knew 204:12

knock 206:2

knowledge
  39:22,24,25
  54:7 58:20
  138:13

knowledgeable
  42:24

Knoxville
  11:15 12:15

Koppers 49:22
  50:3,13
  52:12,25
  53:9,20,22
  58:9,14,16
  59:8,14,25
  68:19,23
  69:14 89:20,
  25 90:9,11,
  15 93:9
  156:11
  158:14 159:7
  160:4

Koppers' 58:7

L

L8 161:11

label 92:6
  157:21

labeled 48:1
  55:19 65:3
  66:17 152:8
  198:24

labor 180:17
  181:24

182:14
  183:16,17,
  18,19 184:3
  185:16

ladder 150:25
  151:10,14,
  17,19

Lafferty
  86:21,25

large 6:4
  121:1

larger 33:17

largest 33:15

late 42:2,9

lateral 17:4
  154:9

lawsuit 8:21
  189:25 193:4

lawyer 87:6

lead 79:22
  81:8 82:16
  140:19 141:1
  153:4 168:20

leading 28:18

learn 42:16

left 129:24
  162:9

left-hand
  186:10

lengths 60:14

letter 131:6

letters 65:14

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                                    Index: level..made

**level**  44:25
  65:6 66:3,18
  68:4 105:21

**levels**  45:13

**liability**
  199:17

**Liberty**  10:2

**life**  118:19
  196:11,16,21
  203:16,17,19

**lifespan**
  205:15

**lift**  25:9,11
  26:14,25
  27:9,15,21
  28:1 29:15
  30:1 32:11
  40:16 94:22
  95:22 99:9
  100:5 147:1,
  8,16 168:16

**lifted**  30:8,14
  31:19,24
  33:21 35:20

**lifting**  25:24
  26:7,25

**lifts**  37:1

**limit**  208:9

**limits**  208:6

**Lincoln**  16:21

**Linda**  130:22,
  24 131:1,2
  132:12

  134:7,13,17
  201:19,22,25

**Line's**  144:15
  163:8 191:8
  195:20
  196:11

**lines**  14:10,
  14 76:8 89:4
  133:16
  147:11

**list**  55:23
  112:15,23
  113:11 119:8
  120:1 188:15

**listed**  49:4
  56:5 67:25
  114:22
  166:14

**listen**  59:9

**listing**  166:22

**lists**  113:1

**litigation**
  152:23 153:2

**LLC**  99:15

**load**  48:15
  65:19 68:13
  71:18,22
  72:10 195:19
  196:4

**loads**  154:9

**local**  75:14
  129:3,4
  186:16 202:5

**located**  11:13
  16:14 19:25
  28:10 36:24
  128:14
  141:11
  151:15

**locks**  36:20

**log**  30:10,12
  34:5,7 163:7
  186:23

**logistics**  14:5

**logs**  34:13,
  17,23 35:3,
  17

**long**  10:21
  12:25 18:6
  30:25 34:15
  43:13 44:3
  50:8,16
  53:25 56:13,
  18 75:19
  79:13 126:12
  141:9 160:18
  197:8 198:15

**longer**  31:5
  187:25

**looped**  106:14

**loose**  164:21
  199:23

**loss**  60:14,
  20,24 61:5,
  9,11,19 62:1
  159:21,25

**lost**  62:3

**lot**  43:6
  120:15 182:9
  183:19 188:1

**Lowboy**  206:1

**lower**  28:1
  35:25 38:4,9
  39:2 84:3,
  15,23 198:19

**lowered**  30:15
  31:19,24
  32:9,15
  33:21 34:3
  35:22 37:22
  145:11
  147:2,9,18

**lowering**
  148:22

**lowest**  45:17

**lunch**  188:22,
  23

_____

          **M**

**M1**  175:7

**machinery**
  172:9 186:3

**MACKENZIE**
  204:19

**made**  46:13
  86:22 97:3,
  23 116:9
  159:17 161:7
  168:23
  173:24 205:6

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: magnitude..meal

magnitude
  144:12

main  6:6 83:1
  95:16,18
  114:17 172:9

mainframe
  186:23

mainline
  20:16,18,21
  21:6 25:6,8
  26:14 27:8,
  14 31:10
  42:4,9 50:18
  52:3,7 53:10
  56:25 62:21
  63:11 71:7,
  19 72:4 75:5
  89:21 117:18
  121:13
  124:10,23
  125:13
  127:14,19
  133:20
  199:8,15
  200:8 204:7

maintain  24:3
  33:25 48:8
  133:1 196:22
  197:7

maintained
  34:13 43:7

maintaining
  51:18,22

maintenance
  50:22 90:19
  122:22,25

196:17

maintenance-of-
way  11:11,17
  15:15 22:2,6
  23:9 29:21
  30:6 183:2
  192:6

major  96:2,4
  205:11

majority  19:1
  32:24 64:20

make  7:4 28:3
  37:9 44:20
  45:20 70:20
  73:9,13
  75:11 80:1
  83:13 84:3,
  25 87:20
  88:7 121:3
  147:9 150:15
  174:4,20
  188:1 192:10
  197:18 207:6

maker  104:4,7

makers  103:24
  104:1,17

makes  113:4
  127:24

making  14:2,3
  143:15
  170:19
  172:25
  174:25

man  28:14,15,
  16,17,21

29:5 34:10,
  12 74:23

management
  10:14,16,23
  11:6,14,23
  12:4,8 13:21
  47:14,19,22
  48:6 51:9
  54:4 195:23
  196:2

manager  9:3
  16:7 17:19
  48:25 49:5,8
  70:16 130:18

manages  22:2,
  6,17

managing  13:25

manner  30:1

manual  31:25
  32:22 33:22
  35:6,21
  37:23 51:16
  148:23

manually
  27:10,15,18
  29:8,15
  36:3,14,18
  37:12 146:11

marathon  7:22

March  31:4,5
  151:2

marine  75:15
  87:19

Marinelli  6:3

mark  47:18
  177:21 190:8

marked  47:8,10
  85:22,25
  152:4,12
  155:25
  156:3,8
  165:3 169:6
  172:14
  177:24
  190:10

market  31:3

marking  47:16

markings  91:24

markup  91:16

Martin  6:6

material
  180:17
  183:14,20
  184:3,8

materials
  183:12

math  84:10

matter  206:25

maximum  66:3
  71:1,2

MBA  10:2,3

MBJ  154:10,
  14,22

Mcdaniel
  153:17

meal  188:22

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                                    Index: Meaning..month

Meaning  33:9

means  45:5
 49:9 62:1
 67:1,16 68:5
 70:24 89:5
 118:4
 158:11,14

meant  66:11

mechanical
 36:21,22
 37:20,22
 38:1,3,8
 39:1 53:21,
 22 54:1,3,8
 77:12 79:17
 105:17
 107:16 128:1
 130:8 134:1
 162:20
 167:23,25
 169:17
 171:19,23
 174:7,15,20

mechanics
 128:5

medications
 8:3

meeting  78:19,
 20 81:2,5
 90:24,25
 91:1,3 94:1,
 4 152:14
 153:25 154:6
 155:10,16

meetings  77:25
 81:12 155:18

member  87:3

members  44:5,
 9,14 86:22

memory  47:2

men  28:24

mention  160:21

mentioned
 17:22 22:11
 23:1 202:3

message  89:16

messed  74:20
 146:10
 156:24

Metal  149:4

method  116:21
 117:6,11
 118:15

methodologies
 102:23

methodology
 100:1,12
 102:17
 104:20
 106:7,19
 109:3,10
 110:24 111:4
 117:12
 167:16

mid  31:4
 114:18

middle  36:25
 42:14 101:20

mile  19:20

milepost  63:4

mileposts  63:8

miles  19:22,
 24 65:6
 66:3,9,18,19
 68:4,14

Military  9:13,
 16

million  40:15
 105:16 106:1
 125:24
 129:25 130:3
 131:21
 142:8,15,21,
 25 192:16

mind  206:19

minor  157:17

minutes  87:24
 155:10 188:7

misaligned
 203:21

misalignment
 203:17
 205:16,18

missed  24:23

missing  60:23
 63:6 162:1

ML  91:16

MLB  121:2
 140:23

Mobile  16:20

mobilized
 98:20 173:18

modernize
 33:16

modifications
 24:8 100:4
 116:13
 170:19

modify  43:3

Monday  27:3
 28:22 74:1,
 24 75:2,5
 76:22 78:14
 112:12
 204:11,17

money  124:5
 126:3,7,10,
 14,16,20
 131:13 132:3
 133:6,19
 134:2,5,14,
 22,24 135:24
 143:10,12
 175:3 188:2,
 23 191:5,8
 200:8,14,18,
 25 201:2

monitor  162:23

monitored  46:9

monitoring
 160:17

Montana  9:14,
 17

month  25:21
 30:14,17
 31:20,22
 146:12,13

Case 2:24-cv-00490-MSD-LRL    Document 193-4    Filed 02/27/26    Page 83 of 104
PageID# 6164
IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                                    Index: months..NP

168:20
190:25
194:14

months  101:11
128:10,12,24
129:8 148:19
158:21 163:1
169:1

Morehead  16:19

morning  6:14
78:7

Moss  6:2,9,
14,18 152:2
153:20 198:2
206:24
208:15

motor  38:12,
15,23 39:7,
14,15 40:1,
4,8,20,23
41:16,17
43:9 146:14
172:20

move  17:4
65:23 100:8
110:16 146:4
162:25

moved  18:9
124:2

movement
162:23

moving  56:3
64:24 89:3
97:23 98:9
110:3 111:7,

25 137:5
149:20
160:10
164:12
172:16
173:16
175:4,11,16

mow  24:5

MP#  63:3

multiple  25:25
26:1 52:10,
11 63:9
101:5,7

_____

**N**
_____

N1  188:21

nail  199:21,
22

named  62:19

names  29:24
30:3

napkin  84:9

narrative
60:12 61:8,
18 62:1

Nathan  21:10
22:10 24:21
26:18 30:5
74:8,9,11,
13,18 75:1,
9,16,24 89:1
93:13

nature  14:11
94:10

necessitated
207:23

needed  14:4,6
84:4 126:11
143:12
146:1,6
150:17,20
200:20

negotiated
198:12,14,19

network  98:4
133:14

nice  201:1

night  88:19,
21 204:17

nineteen
192:16

Ninety  32:6

NN  187:3,4,6

NN90  187:14

NOC  86:25

Norfolk  6:7
8:8,11,19
10:12,13
11:1,3 12:12
14:25 16:2,
4,8,12,15
18:25 19:1,4
77:7,21
79:6,10,13
80:11 82:21
89:5,15
108:11,13,17
111:2 144:18

145:17
157:10
181:4,16
184:14,16,24
186:24 187:1
189:19
198:5,9,13
201:10
202:17,18,20

normal  31:7,
11,15,16
34:20 65:6
66:18 68:4
146:2 191:8
208:14

north  158:11

Notary  6:3

note  89:4,11
116:12

noted  60:17
61:22 62:14

notes  152:14,
17 154:17
155:5,8,13
157:14
171:19
178:9,11
190:4

notice  6:5
46:25 126:12
131:7

notified
204:11

NP  186:24

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: NPBL..opening

NPBL   8:16
  86:16 87:3,
  16 89:15
  91:12,16
  152:7 187:2
  199:4

NPBL002174
  156:2

NPBL00681
  56:20

NPBL2185
  163:11

NPBL2344
  165:14

NPBL2644   86:1

NPBL2649   92:7

NPBL2680   91:9

NPBL2681
  104:21

NPBL2687   136:5
  140:18
  198:24,25

NPBL2690
  142:13

NPBL6183   169:9

NPBL6678   48:1

NPBL6679   48:24

NPBL6681   60:3

NPBL6711   55:18

NS   86:23,24
  89:5 97:8,15
  98:3 108:4,

21 184:12

NS's   97:16
  183:5

number   47:8
  55:15 62:24
  63:4 84:12
  85:22 152:4
  155:25 165:3
  169:6 173:12
  177:24
  183:2,5,6,8
  186:11
  187:3,5
  190:9 195:18
  196:9

numbered   64:4

numbering   64:6

numbers   65:13,
  14 84:19
  105:7
  181:10,13
  185:15

─────────────

O

─────────────

O'BRIEN   21:10,
  21 30:4
  72:23 153:14

O'Brien's
  21:25

Object   14:12
  19:5 25:20
  27:16 38:10
  42:17 44:8,
  22 45:10
  57:22 61:1,

12 63:21
  67:3,14
  68:11 70:5
  71:3 72:6,12
  90:17 96:10
  100:15 105:8
  113:14
  117:24 118:7
  124:18 132:6
  142:10
  154:23
  155:19
  167:19 176:6
  182:18

objection
  196:15

objectives
  48:2 71:18

observations
  171:19

observed
  147:17

obstruction
  42:13

obtain   9:21
  10:3 12:1
  20:11 100:24
  152:19

occur   57:12,
  19 58:4
  59:5,6 205:4

occurred   58:12
  81:22 138:25
  145:12
  158:23

October   30:18
  84:5 145:6
  147:15 149:6
  150:8 151:20
  169:21
  170:23
  171:13
  173:25

odds   146:19
  150:17

Odell   13:15,
  16

off-the-record
  151:25
  177:19

offered   18:15

offhand   28:20
  35:18 131:25
  132:10
  135:16

office   27:7
  28:1,9,10
  101:22

offices   6:5

official   51:25

officially
  51:15

offsite   129:17

ongoing   151:1

Online   10:9

open   107:17,
  18

opening   37:13

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                                    Index: operate..past

operate 19:6
  25:15,16
  28:4 29:20
  36:3 140:20
  146:2,15
  150:15

operated 25:13
  128:20
  146:11

operates 36:17
  37:18

operating
  15:19 25:18
  43:9,11
  48:20 74:21
  108:10,20
  150:1 191:8

operation 21:6
  26:11 27:25
  28:7 29:19
  150:5 169:1

operations
  12:23 21:23
  22:14,15,17,
  24,25 26:22
  129:6 153:14

operator 34:9

operators
  24:15

opinion 77:9

oral 6:1

order 45:1
  48:18 134:21
  144:12 146:1

150:8 187:21

ordinary
  196:17

original 38:9,
  12 39:11,18
  42:1 43:23
  110:16
  118:25
  120:10

originally
  41:23 157:5

Orleans 16:20

Osmose 50:13,
  14,15,16

outboard
  160:12

outlined
  126:12

outstanding
  145:16,23
  190:20,22

oversaw 15:21

oversee 15:23
  21:7 22:19
  24:21 26:11
  41:12 49:18
  77:2 115:25

overseeing
  21:5 25:23
  26:25 27:10
  49:12 81:9
  100:21

overseen 43:14

owned 20:7

owns 26:15

─────────────
─────────────
        P
─────────────

P-NODE 154:10

p.m. 90:24
  110:13 117:4
  145:7 209:11

pack 161:11,
  14,18,22

pages 88:3,14
  91:20

paid 142:7
  180:23
  185:15,20
  187:21
  188:5,16
  189:1
  190:17,25
  191:12,18
  202:8,10,11

paint 161:24

pair 182:25

Palin 17:16

Panel 128:22
  129:1,2

paper 35:12

paragraph
  56:22 57:16
  58:17 60:3
  87:18 95:15
  96:3 111:8
  112:17

120:24 136:5
  140:18
  142:13
  150:23

paragraphs
  95:19

parameters
  48:20

part 32:18
  37:1 38:9,
  12,14,20
  39:11,18
  57:17 61:2
  64:10 66:17
  122:21
  129:12
  136:17
  139:17
  142:9,20
  143:18
  147:1,16
  152:22 153:1
  154:12
  156:15
  163:13 172:7
  176:20
  178:24 193:3
  200:14
  203:21,22
  206:9

parts 60:9
  148:12
  151:12,13
  175:22

pass 94:24

past 135:3,5

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                                    Index: pay..pier

**pay**   130:7
143:15 181:7
183:3 204:16
208:21

**paying**   73:8

**payment**   191:3,
16

**payroll**   181:6
183:5,6

**PCL**   76:17,19
82:4,5,8,12,
16 83:2,6
94:1,14,20
96:7 98:15,
18 101:6,13
103:4,11,16,
19 104:7,13
106:10,18,24
107:5,20
108:9,13,17,
19 109:12
112:14,23
113:11,23
114:1,9,14
115:2,3,7
119:6,25
127:21
128:7,17,18
129:5 144:8
145:18
146:21 149:5
151:1,4
153:4,7,11,
13,19 155:8
173:8 174:14
179:4,12,22
190:19

192:21
193:7,21
194:15 195:1
198:3,15

**PCL's**   84:20
100:22
115:25 116:2
152:14 173:7

**PDF**   209:7

**pending**   7:23

**pendulum**
137:11

**Pensyl**   7:2

**people**   11:22
15:23 16:1
23:1,2 26:6
204:2,3

**percent**   66:18
67:1 68:3
105:12
125:25 126:1
150:2 181:2,
22 183:11,
13,18,20,23,
24,25 184:6
185:2 202:23
203:23

**percentage**
60:13,20
61:9,19,25
62:3

**percentages**
201:15

**Perdue**   33:15

98:1,5

**perfectly**
203:9 205:21

**perform**   29:11
43:6 76:21
134:25 206:4

**performed**   43:5
54:1 57:6
79:19,20
113:22
115:22 147:4
149:7 169:18
170:24
171:20 172:8
186:19
192:24
193:10
194:4,13

**performing**
95:10 98:14
101:20
111:14
149:15 182:4

**period**   10:19
32:25 34:21

**permanent**
110:20
112:15,24
113:2,12
115:17
116:22 119:2

**permission**
103:3

**person**   37:12,
15 56:4

106:6,10
132:12 207:5

**personnel**
12:22 55:1
152:17

**persons**   48:5

**perspective**
59:8

**Petersburg**
97:15

**Petitioner**
6:2,10

**phase**   115:25

**phone**   72:21
74:18 75:8
78:20 81:12
90:6 204:9

**photo**   75:17
88:2,21,22
92:8,12 93:7
175:7

**photos**   88:5,
10,15 91:17
92:2 93:15
163:11

**phrase**   198:4

**pick**   97:17

**picking**   96:15

**picture**   75:9
88:18

**pieces**   166:4

**pier**   157:17
158:1

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: piers..preference

piers    162:23,
  24

piggybacked
  198:4

piggybacking
  108:3 198:8

piling   100:7

pilings   60:10
  110:18

pinholes
  159:21

place   38:2
  41:9 56:18
  94:22 99:10
  100:6 113:20
  123:13,16
  198:17

plaintiffs
  206:25

plan   47:24
  94:15,18,21,
  24 95:4,22
  96:6,7,8,20
  97:18,22
  99:5,8,9,25
  100:7,11,13
  101:14,23
  102:6,12
  109:7,13,14
  110:16,17,23
  116:21
  117:12
  121:25
  122:1,11,15,
  22,24,25

123:2,3,5,8,
  10,13,16,25
  126:19,20
  127:5,10,15
  193:16

planned   121:2
  122:4 127:18
  145:14

planning   14:6

plans   101:23
  102:22
  116:10
  138:10,17
  151:1
  174:10,17,19
  180:4

plant   33:17

plates   161:25

plug   199:24

plumb   162:9

point   56:22
  77:1 82:3
  83:8 89:3,19
  96:7,19 97:2
  98:9 102:12
  107:4 113:18
  114:14
  115:20
  116:20
  119:24 123:7
  125:23 144:3
  146:7 173:24
  207:5

pointed   160:19

points   83:2,7
  167:14

policies   51:22

policy   34:17
  35:6,11,15,
  16 51:16
  144:16
  191:13
  208:5,9

poor   7:12

poorly   137:20

port   16:17,
  18,19,20,21
  17:22

portion   25:5
  57:2 64:21
  167:10
  194:11
  205:24

portions   25:2

Portlock
  97:16,17

ports   16:8,12
  17:22,25
  18:1

Portsmouth
  8:9,12 20:2
  97:14 111:3
  148:14
  156:18
  186:25

position   11:25
  12:25 14:21
  16:5 17:7,9,

12 18:6 25:5
  26:24 28:12
  29:5 30:16
  32:13 37:4
  98:11 187:11

positions   9:4
  23:17,18
  24:17,19
  29:5

possibly
  140:15 164:5

post   9:23

post-barge
  171:23

potential
  200:8

potentially
  184:1

pounds   68:16
  69:12,19
  71:21 72:11,
  14,17

power   147:22,
  23,25 148:4,
  6,7,16
  150:12
  166:15

practice   44:19
  45:19

preexisting
  198:9

preference
  20:20 36:4

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                                        Index: prefers..promotion

prefers   37:17

preliminary
  138:23

prenegotiated
  198:16

prepared   99:19
  165:19

present   81:19
  82:2 83:10

Preservation
  132:14,17,
  23,25

president   9:3
  10:6 18:9,19
  42:21 43:2
  71:11 104:12

pretty   30:10
  37:6 78:16
  84:17 155:17
  157:4 178:22
  190:5

preventing
  105:12

previous
  118:15,22

previously   8:7
  51:19 145:15

pricing   121:5

Primarily
  35:24

primary   15:10
  18:18 19:12
  26:18 172:1

printed   159:1

printouts
  152:20

prior   30:8
  41:3,10
  43:11 44:6
  50:3,10
  51:23 52:18
  53:3 58:12
  80:12 91:20
  119:1 122:13
  128:10,24
  135:9 139:3,
  4,6,12,19
  162:5 169:1
  171:13,21

priorities
  48:19

priority
  44:23,25
  45:2,3,13,
  15,21 46:3,
  5,7,8,12,15,
  19,22,24
  160:5,7,19

private   202:13

pro   80:11

problem   96:17

procedural
  35:6 51:16

procedure
  35:16

proceed   96:21
  100:14,25

101:15 103:2
  105:6,14
  131:7 172:25

proceeded
  174:24

proceeding
  78:21 98:20
  102:5,11
  104:13
  126:12
  139:21

process   80:14
  127:20
  128:23
  130:6,7
  131:4 207:10

produced   88:4

product   116:24
  117:16,17
  118:3,13,21

program   10:8,
  18,21 11:7,
  14,23 12:4,8
  47:14,19,22,
  23 48:11,18,
  25 49:5,8,10
  50:22,24
  51:12,14,24
  52:11 54:5,
  13 55:25
  56:18 57:2
  59:9 70:16
  90:19 127:24
  129:10
  130:18
  132:17,21,

23,24,25
  133:3,6,11,
  19 134:19
  195:23 196:2

programs   51:9
  132:15,20

progress
  155:11,15

progressing
  145:13

project   40:11
  41:14 43:4
  81:9 82:17
  83:3 105:6,
  17 114:4
  122:9
  125:24,25
  126:21
  133:11,13,
  20,25 135:22
  183:1,4,6,8
  202:4

project-by-
project   130:13

projects   23:25
  24:1,2 43:1
  107:14,21
  127:13,18
  130:2 132:5,
  7,9 180:18
  183:2 200:19
  201:15,22
  203:1

promoted   12:10

promotion   15:4

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**

Cannon Moss on 06/04/2025                    Index: prompted..railroad

17:2,6 18:12

**prompted**
162:16

**properly**
196:22

**proposals**
80:15

**proposed** 99:2,
3,8 100:12
104:20
106:11,18
109:3,10
110:24 113:1
167:13

**provide** 60:15
61:9,18,19
90:24 116:24
117:16
118:20
120:15
131:12

**provided** 84:7
107:10
112:14,23
115:21
119:12,15
163:9,10
184:24

**psychology**
9:22 205:10

**Public** 6:3
124:6 130:19
181:11 202:1

**publicly**
204:15

**pull** 192:9
199:20
204:18

**pulled** 201:8

**pulling** 121:5

**punch** 113:11

**punitive**
192:15

**purpose** 178:11

**pursuant** 6:4

**pushed** 124:2

**put** 44:2 84:4
94:22 99:10
105:19
119:1,2
127:3 143:10
146:17
155:23
171:15 173:4
178:2 187:20
194:8,9
199:21,24
200:1 202:8
203:22
208:13

**putting**
121:14,15
199:22

——————————

Q

——————————

**Qualifications**
55:21

**qualified** 37:9
55:6 65:21

66:14 67:5,
17 68:6,20
69:3 70:8

**qualify** 18:20
133:10
134:21

**quarter** 162:24

**quarterly**
163:2

**question** 7:5,
12,15,23,24
25:7 52:25
59:25 63:23
69:15 72:8
91:14 95:25
96:12 124:11
133:8,9
139:1 164:16
166:21
176:12

**questions**
120:15 165:7
190:12
197:18,21
198:1 204:20
207:2 208:16
209:4

**quick** 47:4
77:17 165:8
207:1

**quicker** 119:5

**quickly** 78:16,
17,18

**quote** 61:19
173:4,6,8

——————————

R

——————————

**Rachael** 87:9

**radio** 74:19

**rail** 14:10,14
43:23,24
50:6 64:18
70:24 120:25
121:6 124:6
130:18,19
132:14,17,
23,25
133:14,16
145:13
146:16
150:16
180:23
181:11 184:6
199:7,12,14,
16 200:9
202:1,8
205:24
206:2,12

**railings** 194:9

**railroad** 8:9,
12 12:5
14:10,18
19:17,19
20:8 26:11
48:6,9,12,16
49:1,15,20,
22,24 50:2
54:15 56:3,
10,17,23
57:1,5,7
59:19 61:17

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                    Index: railroads..recall

68:17 70:13,
16,18 72:16
82:22
105:10,11
106:1 117:18
123:1 132:4,
7,9 137:7
195:20
196:11,16

**railroads**
133:1,2

**rails** 43:15,
18 121:16,23
136:8 137:24
147:22,25
148:3,4,6,16
150:12,13
166:15
167:22 172:3
194:24,25
199:10
200:4,23

**raise** 38:4,8
39:2

**raised** 37:4,
11,21 145:11

**raising** 148:22

**ran** 78:11
137:9 148:14
175:3

**range** 62:5

**Rapp** 54:18,20
55:4

**rata** 80:11

**rate** 180:12,
16,24 181:2,
22,23 182:4
183:11,13,18
184:2,3,4,6,
8,11,14
185:3,4,10,
16,24 186:2
188:3 201:15

**rated** 68:15
69:12,18
71:8 72:1,13
172:21

**rates** 181:5,
20,25 184:20
185:1,6
190:16
198:9,12,16,
19 201:6,9,
20,22 202:4,
9,11,16,21,
25 205:23
206:14

**rating** 65:6,16
66:2,22,25
67:8,12,20,
25 68:13
70:4

**ratings** 65:15
66:7,12
69:8,9,16
70:11 72:15

**raw** 185:20

**RBE** 50:8,10
54:12 60:16

**RBES** 50:20
52:11

**RBI** 55:4,12

**RBS** 56:10

**RC** 187:19

**re-evaluation**
58:18

**reach** 79:8

**reached** 77:7
78:3,4 79:1
80:6 82:14
89:20 90:5

**reaching** 90:8

**read** 48:13,
16,20 57:7
60:18 61:16
62:1,13
94:10 113:7,
20 114:19
115:18
116:25 119:8
121:9 136:12
140:23
145:20 150:5
151:2 157:19
159:22
160:13
161:5,12
162:2,10
171:23
172:4,9,22
188:9 196:18
209:5

**reading** 171:17
185:13

**ready** 152:9
165:15
169:11,12

**real** 77:17
165:8

**realign** 110:19
116:23

**reason** 36:2
41:13 111:19
117:21 178:6
204:12

**reasons** 35:19
80:10 205:14

**recall** 43:12
44:14 59:18,
23 62:13
69:1,9,11
71:6 73:20,
25 74:2,16,
25 78:23
80:6,20,22
81:1,3,4,17
82:14 83:5,
12,15,20,22
84:22 88:9,
20 90:2,7
93:12,14,16
95:3 98:6,7
99:21
101:12,16
102:15
104:23
106:15,17,
21,24 107:7,
10 108:24
109:5

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                    Index: recalled..references

115:10,14,23
116:15,18
117:7,9
119:14 120:5
122:17
123:22
124:19
125:18,20,22
127:16,17
130:1,2
131:20,25
132:10
134:11,12
135:16,23,25
136:4 137:1
139:20 140:5
141:15
146:8,9
147:7,12,14
148:21
150:7,19,22
151:5,6
153:24
154:4,5
155:2 162:6
166:8,12,18,
20 167:6
168:24
169:22
171:4,14
195:24
197:12,13
198:6 199:8
201:5,12
204:3 205:8,
9

**recalled**   154:3

**receive**   105:18
109:6 152:23
169:19 173:6
209:1

**received**   42:1
72:21 75:8,9
93:13,14
97:9 99:21
109:9 125:19
132:4,16
144:8 163:22
167:11
169:23
173:11 209:2

**receiving**
152:25 170:6
173:24

**recently**
180:21 181:8
202:5

**Recess**   47:7
85:21 129:22
165:10 190:7

**recognize**   86:6
98:23 110:4,
5 112:1
156:7 165:5
169:13
177:22 195:4

**recollection**
88:16 89:23
93:24

**recommend**
168:3

**recommendations**

104:5,13
116:9,16
172:18
174:25 176:1

**recommended**
44:20 45:20
46:3,19 79:7
82:12 162:22
174:23 175:1
176:1,3,19

**recommending**
116:12 174:3
177:10

**record**   6:17
7:4 33:25
35:7,10
151:24 169:8
177:18

**records**   34:2,
4,5 35:3
163:8

**redacted**
186:14

**redeck**   121:2,
12,18,25
122:1,11
126:19 127:5
146:3

**redecking**
121:12
123:19,24
145:13

**reduced**   187:19
188:11

**Reeder**   21:10,

22 22:4 30:4
37:16,17
54:17 55:6
56:12,13
88:25 140:10
149:3 151:19

**reevaluation**
57:16 58:10,
11 59:6,16,
22

**refer**   8:11,13
20:20

**reference**
62:25 90:18
154:16,21
157:23
206:13

**referenced**
39:18 56:5,7
58:17 62:22
63:10 89:12
91:15 96:3
100:1 111:21
114:23
117:17
119:17
127:14 138:6
144:21
148:23
150:10,21
151:14 154:6
164:17 196:4
198:23

**references**
30:18 80:9
131:19

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                                    Index: referencing..repeat

**referencing**
  95:5,22
  120:5

**referred**  20:17

**referring**
  21:19 23:17
  61:3 99:4
  136:19
  156:16

**reflects**
  178:24

**refresh**  88:15
  89:23 93:24

**regular**  83:7,8
  182:4 188:3

**regularly**
  22:24 55:5

**regulated**
  51:24 54:3

**regulation**
  51:1 90:14

**regulations**
  32:19 54:8

**reimburse**
  208:2

**reimbursed**
  131:16

**reinstalling**
  150:24

**reinstated**
  150:3

**rejected**
  116:15

**relate**  14:9,17
  21:5 185:1

**related**  40:16,
  19 108:1
  109:10 142:9
  193:2 194:4
  207:17,23

**relates**  67:1
  170:23

**relating**
  193:25

**relation**  8:8
  164:18

**relationship**
  18:24 33:13

**relative**  48:19

**relayed**  95:8

**relevant**  77:13

**reliability**
  41:15

**reliable**
  155:17

**relisting**
  163:16

**remaining**
  150:23

**remedy**  161:21

**remember**  13:8
  44:3 50:25
  51:3 62:15
  73:5 77:15
  78:6,15 84:4
  85:7 89:13,

14 92:4
  103:14 105:2
  108:21,23
  113:3,9
  134:10
  139:10 144:6
  150:14
  157:3,9,10
  163:3 173:10
  195:2

**remote**  27:24
  28:6 31:25
  32:22,24
  33:22 35:24
  37:22 127:21
  150:5

**remotely**
  25:13,14,16,
  18 28:1 34:3
  128:20

**remove**  119:2

**removing**
  120:25

**Renee**  17:16,
  18 18:1

**repair**  24:8
  43:3 46:1,4,
  12,19 49:12
  77:2 90:12
  97:20 98:22
  99:2,3,8,25
  100:12
  102:22
  104:20
  105:13,20
  109:3,10

110:24 111:3
  117:12
  126:14 133:2
  135:11
  161:21
  167:16
  178:24
  193:24
  200:14,18
  206:6

**repaired**  39:23
  44:12 46:9
  66:18 67:1
  68:4 138:14
  142:2 160:15
  165:21
  166:24
  176:19
  177:10

**repairs**  44:13,
  20 45:1,20,
  21 61:11
  78:9,21 81:6
  85:2 94:15
  101:4
  112:15,16,24
  113:2,12
  119:8 120:2
  134:23,25
  161:7 167:25
  174:20,21
  176:3,19
  192:7 198:21
  203:3
  207:17,23
  208:12

**repeat**  61:14

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: repeating..retain

repeating  69:3

rephrase  7:14
  96:12 176:8,
  15

replace  43:9,
  24 44:17
  116:22
  138:17
  143:13,20
  168:19,23
  172:18
  173:12
  200:4,22,25

replaced  39:21
  41:19 43:10,
  17,20,21
  44:3,6,10
  45:7 136:9
  138:9,11,14
  141:23,25
  143:24
  147:24
  150:11
  151:11 162:4
  165:22
  167:4,21
  168:10
  173:14,15,
  17,23 176:20
  180:21

replacement
  40:8 41:10
  121:6
  142:15,22
  143:1 172:25
  173:13

replacements
  174:4

replacing
  40:19,21,22
  136:11
  138:18
  139:11,22
  143:5 168:4
  173:19
  200:23

report  13:11,
  19 15:6
  17:14 22:8
  102:1,7
  111:17,20,
  22,24
  112:20,25
  113:13
  156:11
  158:18
  163:22
  167:10
  171:12,18
  173:25 176:1

reported  15:7
  145:15

reporter  7:7

reporting
  93:19

reports  13:22
  18:3 62:14

represent
  206:25

reprogram
  130:5

reprogrammed
  128:9

request  7:23
  80:15 126:13
  206:3

requests
  195:18

require  27:14
  29:13,18
  54:8 114:5

required  32:16
  47:23 50:24
  58:5,17
  61:11 200:3

requirement
  90:20

requirements
  126:2,4
  133:5

requires  54:4
  90:15 206:6,
  7

rerail  121:2,
  25 122:2,12
  127:5

rerailing
  121:17
  123:19,24
  126:19

reroute  97:3

resolved
  150:20

resolving
  162:17

responding  7:6

responsibile
  17:23

responsibilities
  12:19 14:8,
  17 15:11
  18:19 21:5
  22:1,5 48:5
  49:11 55:25
  70:15

responsibility
  26:6

responsible
  12:21 13:22,
  24 14:2
  15:14 25:17,
  23 35:2 49:9
  126:1 202:7
  205:25

restored  150:1

restrictions
  126:6

restroom  165:8

result  200:4
  207:18
  208:2,12

resulted
  111:17
  112:19

results  172:13

resume  145:14

retain  78:13
  79:25 80:1
  114:1,11

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                                Index: retained..save

149:6

**retained** 76:19
82:3,5,6,7

**retaining** 35:3
144:16

**retains** 34:17

**retensioned**
143:25

**retention**
34:16,20
35:7,11
136:10
143:11
144:16
168:15

**retentioned**
168:3

**return** 7:6

**reuse** 199:17

**review** 60:16
61:21 95:1
101:17
207:13

**reviewed**
101:22 116:6

**reviewing**
175:25
195:23

**Richmond** 9:11

**rid** 161:23

**rigging** 75:14
87:19

**ring** 30:19

**ripped** 158:7

**river** 16:21
148:15

**rivets** 162:1,4

**road** 179:18,
21,24 180:1,
5,21 185:19,
21 192:6

**Roads** 20:1,5
21:2

**rocked** 158:10

**role** 16:6,22
17:3,12,15
18:4 115:24
116:8

**roles** 23:4
48:4 55:24

**ROM** 144:8,11

**ROMAN** 6:13
14:15,16
19:8 25:22
27:19 33:2,6
38:13 42:20
44:11,24
45:12 47:9,
17,20 57:24
59:2 61:4,15
63:24 67:6,
19 68:18
70:7,10 71:5
72:9,18
73:11,16
85:12,16,23

90:22 96:14,
18 100:19
105:15
113:17
118:1,9
120:20,23
124:21
129:19,23
132:8,11
142:12
151:23 152:5
155:1,22
156:1,5,6
165:4,9,11
168:6 169:7
176:7,14,17
177:17,20,25
179:2,5
190:3,8,11
197:15
204:24
206:16
208:19
209:3,8

**roof** 143:6

**rope** 173:13
175:6

**ropes** 168:2,
4,7 173:13,
14,16,19,23
174:4 177:1

**Rose** 21:10
22:10 30:5
74:8 89:2
204:19

**rough** 132:2

144:12

**RPR** 6:3

**rules** 7:3
14:3

**run** 59:9 98:3
121:8 140:22
147:23,25
183:6 188:22
194:10

**running** 32:14
33:10 131:8
188:23

**rust** 161:11,
14,18,19,22

**Ruth** 77:15,
21,24 78:4
82:11 89:4,
11

**Ryan** 7:24
47:18

———

S

**S1** 187:8

**safe** 48:6,15
71:18,22
72:4,10
87:20

**salary** 17:7,9

**sat** 148:19

**Saturday** 27:4,
5,6 73:10,15

**save** 191:6

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                                    Index: SBER..side

SBER   62:24
  63:9 164:13

SBER1   64:18

SBER2   64:10,
  21 65:10
  66:22 67:21
  68:1 156:21

schedule   54:9
  146:21

scheduled
  145:19 194:3

school   9:8,10
  11:10,11

scope   131:6

scour   60:5,6

sealer   161:24

Sears   87:9

season   30:19,
  22,25 31:6,
  7,10,11,15,
  16,17,18
  33:4

secondary   9:23

secretary   23:6
  87:11 181:15

section   60:14,
  20,24 61:5,
  9,11,19,25
  63:13,14,19
  67:21 95:18
  121:7 147:8
  156:15,17,
  19,21 157:13

158:7
  159:21,25
  164:2,12,23
  167:7

sections   63:17
  64:15 116:22
  121:1 127:6

send   80:15
  89:11 106:6,
  10 116:10
  166:7 193:13

senior   17:18

seniority   29:2

sense   88:7
  121:3 146:6

sentence   61:16
  88:1 94:8
  112:17
  118:13
  121:11

separate   108:5
  112:25 113:5
  144:21

separately
  87:2 103:16

separates
  187:24

September   31:4

sequence   99:2,
  3 112:16

sequenced   94:9

series   92:2
  182:18,19

183:1

seriousness
  48:19

served   16:12

servers
  128:15,17
  144:17

serves   19:21

service   84:5
  105:14
  108:4,11,21
  128:12 194:8
  196:10,16
  198:16
  203:16
  208:14

services   115:8

set   10:19
  29:14,25
  48:4 124:3
  152:11

seven-year-old
  161:20
  164:24

severely
  199:12

shadowed   11:12

shadowing
  11:18

sheaves   173:15
  175:6,12,13
  177:4

sheet   30:10,

12 182:22

shift   13:23
  15:25 26:23
  94:23 98:1
  136:25

shifted   136:7

shifting   96:16

shop   30:6

short   45:1
  133:1 140:21

shorten   203:16

shortened
  205:15

shortening
  203:19

shortest   32:16

shorthand   8:14
  187:10

shortly   78:24
  102:19

Shortridge
  153:10

show   34:1
  59:10 120:12
  196:4

showed   138:10

showing   63:16

shown   86:13

shut   80:18

sic   70:3 71:2

side   11:1,2

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                              Index: sides..soy

20:6 23:5,7
121:3 136:9
137:12,25
138:13
141:8,10,12
148:14
151:11,16,22
156:18
160:12 161:4
162:9 178:7

**sides** 162:1

**sign** 209:5

**signal** 146:10
148:13

**signals** 36:19

**signature**
195:12

**significant**
98:1 145:25

**significantly**
84:3 172:20

**signifying**
68:10

**similar** 69:13
165:19
166:3,21
167:4

**simply** 110:17
121:18

**sir** 92:6

**sit** 28:7 59:4
88:9 90:2
93:14 106:16
115:6 127:17

143:22 144:5
196:1

**site** 75:21
102:25
179:22
185:19

**sitting** 27:25
120:17 137:6
162:9

**six-month**
140:19 141:1

**six-year**
122:21,23,25
123:8

**sixth** 89:3

**size** 33:18

**sketch** 91:23

**skewed** 175:5

**skill** 29:25

**skills** 29:14

**skip** 145:3

**skipped** 119:3

**slack** 168:17

**slide** 98:11
100:6

**slow** 31:17
146:15

**slower** 36:13,
15

**slowly** 146:3

**small** 18:23

**smashed** 128:11
136:21
137:9,11

**Snow** 7:2
14:12 19:5
25:20 27:16
32:25 38:10
42:17 44:8,
22 45:10
47:15 57:22
58:24 61:1,
12 63:21
67:3,14
68:11 70:5
71:3 72:6,12
73:6 85:10,
14,19 87:9,
12 90:17
96:10 100:15
105:8 113:14
117:24 118:7
120:17
124:18 132:6
142:10 152:1
154:23
155:19 156:4
167:19
176:6,9
178:23 190:6
197:17,25
204:20
206:17,20
209:4

**software**
129:12

**sole** 171:16

**Sons** 194:19

**sort** 16:13
31:15 51:22
85:2 95:3
103:18,23
113:11 141:6
161:24

**sound** 51:5
53:1

**Sounds** 51:7

**source** 166:19
172:2 184:9
191:2

**South** 20:6

**Southern** 8:19
10:12,13
11:1,3 12:12
14:25 16:2,
4,12 18:25
19:1,4 77:22
79:7,10,14
80:11 82:21
89:6,15
108:11,13,18
145:17
181:16
184:16,24
187:2 189:19
198:5,9,13
201:10
202:17,18,21

**Southern's**
16:8 77:7
144:19 181:4

**soy** 31:7

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: soybean..straight

soybean   31:2,3

soybeans   30:24

spalling   62:14

spalls   60:15
  62:7,8,11

span   36:20
  42:11 64:11
  114:16
  151:12,13

spans   64:16
  113:19

speak   101:3
  205:20

speaking   8:20
  83:5

specialty
  149:13

specific   10:18
  12:4 21:18
  23:22 25:2,
  3,4,5 28:12,
  13 29:14
  33:12 35:16
  39:24 48:1
  54:9 90:25
  123:3 162:21

specifically
  14:9,18 21:5
  30:9 50:9,18
  54:23 91:22
  108:6 117:7,
  9 125:22
  133:1 146:9
  149:12

150:14
  177:13 205:2

speculation
  100:16
  113:15
  154:24

speed   36:9,17
  38:16 137:10
  146:15
  150:1,15

speeds   199:25

spitballing
  84:19

split   32:21
  131:9

spoke   170:10

spot   84:10

spreadsheet
  107:6 178:2
  182:21 186:6
  190:13
  192:10,12
  201:5

spreadsheets
  182:15

square   189:13

ST   187:19

Stafford   41:6

staged   179:23

stamp   85:25

standard   44:19
  45:19 46:11,
  12,14,17

68:16 90:14

standardized
  72:16

standing
  84:18,21
  102:24

standpoint
  199:18

stands   50:5

stapled   182:22
  186:6 189:8

staring   84:18

start   8:24
  16:22 31:3
  85:16 98:5

started   10:5
  18:21 122:8

starts   30:19
  63:3 85:25
  91:6 95:15
  110:15 136:6
  152:6 165:14
  182:17

state   6:16
  20:4 87:21
  121:9 124:14
  125:6 131:20
  133:2 140:23
  143:20 175:8
  180:17
  181:15
  195:19
  196:10
  200:25

states   196:10

stay   32:12

steal   143:7

steel   44:5,9,
  14 56:23
  57:1,5 61:6,
  11 64:25
  65:3 66:17
  68:9 159:11,
  18 203:18

step   119:3

Stephen   153:10

Steve   17:16,
  19

stickler
  137:21

stinger   160:12

stipulate
  152:1

stockholder
  19:2

stone   124:3

stood   93:22

stop   71:12
  197:8

stopped   101:21
  161:1

stored   34:13
  35:13,14

storing   35:2

straight
  118:11

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: straighten..Swanson

187:19
188:3,10
203:9,23
205:21

**straighten**
146:3

**straighter**
118:5,6

**Street** 6:6
28:11

**stretch** 175:6

**stretched**
143:14

**strike** 14:15
26:5 38:2
56:9 58:11
83:9,25
97:19
101:10,19

**striking**
105:11

**stringer**
159:22 161:3

**stringers**
159:15

**struck** 62:21
74:4 139:5
204:7,12

**structural**
45:9 148:6

**Structurally**
156:23

**structure**

87:20 114:17
162:23

**structures**
115:17
116:1,23
119:1 168:16

**student**
188:24,25

**stuff** 14:7
24:6 128:5
166:7,10
183:19

**subcontractor**
114:6,11
115:4,7

**subject** 196:14

**sublet** 98:18

**submission**
170:17

**submit** 131:6
133:7
181:12,18
207:21

**submittals**
165:18

**submitted**
142:7 170:22
181:17
184:11
207:14

**subpoenaed**
193:11

**subs** 114:1

**subsidiary**
19:4

**substances** 8:3

**successfully**
145:11 150:1

**sufficient**
60:16 61:20

**suggest** 45:8

**suggested** 77:9

**Suite** 6:6

**summarization**
178:14

**summarized**
190:14

**summarizes**
171:18

**summarizing**
111:20

**summary** 165:25

**Sunday** 73:15

**super** 55:2

**superintendant**
21:23

**superintendent**
13:13

**superintendents**
15:8

**Supervision**
55:20

**supervisor**
22:14,15
25:15 26:18,

22 34:12
36:2 56:4,
11,17

**supervisors**
11:12 21:7,
9,13,16,19,
20,24 23:9,
12 26:4
29:20

**Supplemental**
192:2

**support** 65:18
67:16 95:16,
18 98:10
100:8 110:17

**supporting**
114:17
184:23

**supports** 95:16
98:10
110:18,20

**supposed** 7:22

**surrounding**
12:23

**survey** 162:22

**surveyed**
162:24

**surveys** 163:2

**susceptible**
60:6

**suspect** 93:9

**Swanson** 79:3,
5,16 94:5

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                    Index: swayed..thruster

103:9 104:3
153:22

swayed  147:21

switch  24:15

switching
  14:6,10,13
  19:17,18

switchman
  187:8

sworn  6:9

system  31:25
  32:22,23
  33:22,23
  35:20,24
  37:22,23
  38:1,3,8
  39:1 40:17
  79:17 105:17
  127:21
  128:1,7,8,
  14,17,18
  129:5 134:1
  146:10
  148:13
  159:3,4,8,
  11,17 174:7,
  15,20,21
  186:23
  202:22
  205:25

systems  37:20
  43:9 89:16
  171:23

— T —

T&e  12:22
  23:7 26:3

Tab  47:16

tacked  180:24

tactics  95:2

takes  36:20

taking  139:16
  199:21

talk  7:4
  20:8,14
  42:4,23
  83:19 193:15

talked  35:17
  80:21 83:20
  87:24 89:9
  93:12 117:12
  197:4 198:2
  202:15
  204:1,2,3

talking  33:1
  50:17,19
  68:13 119:18
  139:2 201:4
  207:19

talks  100:7
  168:1

tallies  192:12

tally  185:25
  189:12

task  28:13
  29:11

Team  89:16

Teams  89:14

telling  84:4

tells  65:17

temporary
  100:7 110:18
  112:15,23
  113:1,12,19
  116:1 119:1
  168:16

ten  33:4
  49:25 59:20
  65:6 66:3,8,
  18 68:4,14
  83:25

tenders  15:17,
  18,19

Tennessee
  11:15 12:15

tension  140:21

term  71:22
  173:20

terminal  15:8
  19:17,18

termination
  161:4,9

terms  48:25
  108:16
  185:15

terrible  159:6
  176:12

territories
  12:24

territory
  17:20,23

testified  6:10

testify  8:4
  193:12

testimony
  200:12

testing  172:8,
  13

text  75:17,18
  88:23 89:14
  90:6

that'd  176:16

thick  55:2

thing  15:12
  16:13 24:8
  55:2 103:21
  137:5 139:10
  164:20 168:8
  175:20
  189:11

things  33:16
  61:17 88:5
  184:1 186:3

thought  64:9
  76:10 84:2
  85:1 95:9
  118:15 145:2
  146:24
  203:24
  205:15

thruster
  172:19

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                          Index: thumb..training

thumb  93:5

Thursday  30:11

tie  121:6
  127:3 163:25
  164:6 199:25
  200:10

ties  44:1,2,4
  121:1,14,18,
  20 164:1
  194:9,24,25
  199:7,11,13,
  15,19,20
  200:4,23

tightening
  164:21

time  7:21
  10:19 11:23
  26:7 27:13
  30:7 32:16,
  25 34:11,18
  36:20 40:2,
  18 43:2,10
  44:6 46:12,
  14 52:23
  61:14 67:10
  68:1 71:6,10
  80:18 85:4,
  17 94:19
  95:1 96:3
  98:18 101:17
  102:6
  107:18,22
  113:8 136:24
  138:14
  140:19,21
  141:1 145:12

147:2,14
158:17,22
160:18
168:20
170:10
171:13
176:23
186:17
187:19
188:3,10,11
189:20 192:7
193:13 197:9
205:7,19

timeframe
  179:14 190:1

timeline
  119:7,25
  144:8 146:6
  168:22 197:6

times  6:21
  26:10 31:13,
  19,22,24
  32:2 33:21
  101:5,7
  135:7 182:7,
  11 205:5

timesheets
  183:4

title  21:19
  22:13 26:21
  153:8

titles  17:17

today  7:5 8:5
  18:22 19:10,
  11 20:9,21
  21:16 41:18

98:9 123:13
160:23
173:25
179:24 194:1
207:19

told  69:20
  74:8 105:3
  145:2
  203:13,15

tonight  76:7

top  64:19,24
  66:1,17
  91:15 99:16
  101:9 111:2
  156:15 158:9
  160:11 161:3
  166:20
  171:18
  179:17 188:9

topics  199:6

tore  42:8

torque  172:21

total  125:23,
  24,25 132:3
  190:15
  192:17

totals  189:13

tower  36:3
  64:11 95:16,
  18 114:17
  158:7 161:25
  162:10 172:4
  173:15

town  129:3

track  19:22,
  24,25 20:8,
  12 23:9,11,
  12,21,24
  24:2 25:2,6
  33:10 55:4,
  5,6 70:17
  110:21

tracking
  204:14

Tracy  6:3

traffic  31:10,
  12,13 32:14
  33:3 42:13
  70:24 72:16
  105:12
  145:14,17

train  23:8
  24:12,24
  31:9 32:9,
  10,14,16
  33:3,18 66:8
  71:7,12
  74:19,21
  75:4 97:9,15
  145:14
  185:3,5,10
  187:13

trained  10:25
  29:22

trainee  10:14,
  16,24 11:7,
  14,23 12:4,8

training  11:6,
  12,17,18
  12:3 29:14,

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
Cannon Moss on 06/04/2025                    Index: trainmaster..unofficial

17 42:22

**trainmaster**
12:11,14,20
13:12,20
14:9,21,22
15:11,13,24
16:6,24 17:9

**trains**  14:6
32:6,7
33:10,17
70:17 97:4,
13,19 98:2
145:18 146:4
194:10

**transact**
132:13

**transitioning**
150:4

**translate**  70:3

**transmitted**
112:9

**transport**  31:7

**transportation**
10:17 11:1,2
22:3,7,18
124:6 125:3
130:19
181:9,11,18,
19 184:12
201:11
202:1,16

**traveling**
66:8,9

**Travis**  79:21,

23 85:7
138:23
140:12,16
171:3,8,9

**treasurer**  23:6

**trick**  52:25

**trouble**  77:16

**troubleshooting**
148:17 150:3

**true**  131:17

**truss**  64:11
158:10,17

**trusses**  161:11

**trust**  120:22

**truthfully**  8:4

**Truxton**  28:11

**Tuesday**  78:14
86:10

**tug**  138:3
199:11

**tugboat**  136:21
137:9 204:15

**turn**  48:23
155:24 156:2
197:20
198:25

**twelve**  169:1

**twist**  42:11
95:23

**twisted**  158:7

**two-year**
168:20

**type**  10:8
24:8 26:6
29:17 34:1
35:16 51:17
80:12 94:15,
18 98:20
103:21
116:12 129:9
133:11
149:14 167:2
185:7

**typed**  171:7

**types**  23:2,3
24:17 127:13

**typically**
29:19 31:3,
24 34:19
43:24 44:16
103:11,15
105:5 114:9
155:17
181:25

―――――――――

**U**

―――――――――

**U7-18**  161:11

**Uh-huh**  57:18
145:5
154:11,20
160:9 182:23

**ultimately**
167:4

**underline**
56:22

**underlined**
48:24

**underneath**
159:12

**undersized**
172:20

**understand**
7:12 19:14
23:20 25:7
39:4 42:18
52:19 60:7
72:7 95:24,
25 124:11
134:19
141:20 175:7
176:9,11
184:25
191:11
205:17,20
208:25

**understanding**
61:25 161:17
195:15
198:11,18
202:20
208:22

**understood**
7:16 143:17

**uneven**  175:6

**union**  13:22
24:19,22
25:14 181:5

**unit**  33:17,18

**University**
9:14

**unofficial**
52:1

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025          Index: unreasonable..wondering

**unreasonable**
42:13

**unsafe** 96:20
100:14
101:15,18

**up-to-date**
178:13

**update** 90:24
93:22 97:5
110:8,9
199:3

**updated** 116:21
117:6 120:8
123:10

**updates** 103:20

**updating** 43:8

**upgrade** 126:11
127:1 128:7,
8

**upgraded**
208:11

**upgrades**
126:17
134:21,23

**upgrading**
127:21

**utility** 28:14,
15,16,17,21,
24 29:2,4
34:10,12
74:23

**utilize** 22:23
23:16 24:11,
14

**utilized** 37:21
38:4 39:2
51:18 180:7

———————

**v**

———————

**Val** 30:5
54:17,20
55:4

**variable** 38:16

**varied** 33:3

**VDOT** 125:2
126:2,10,14,
16,20 131:12
132:13,15
135:24

**verbal** 103:1

**verifying**
195:15

**version** 51:4,
10 170:3,7,
13,15,20

**versions** 86:14
169:25

**versus** 35:20
58:5 59:15,
21

**vice-president**
21:22

**videos** 137:2

**view** 203:4

**Virginia** 6:4,7
9:13,16
16:15,19

17:23 20:3
98:3 125:2
133:14
184:15
201:16 202:1
203:1,2

**visibility**
35:25

**VMI** 9:18,19
10:11

**VP** 22:1 86:24
153:14

———————

**w**

———————

**wages** 185:20

**waiting** 119:19

**waiving** 196:15

**walk** 28:2
36:18

**walkway** 146:18
150:24
151:10,11
156:24,25
157:2

**wall** 199:22

**Ware** 6:6

**waste** 143:12

**watched** 137:2

**water** 60:9,10

**Wayne** 12:16
13:2,12

**ways** 27:24

**wearing** 162:8

**web** 159:21
160:11 161:2

**website** 204:15

**week** 28:18
80:23 81:6
101:2 114:18

**weekly** 152:15

**weeks** 170:11

**weight** 65:17
67:16 68:16
71:2 72:16
140:21
168:14

**weld** 24:6

**west** 98:3
121:3,6
136:9 137:24
138:13 141:8
151:11,16
172:4 175:5

**whatsoever**
142:4

**Wheeling** 98:3

**widths** 60:14

**Williams**
86:21,23

**wires** 168:15

**wiring** 129:14

**wise** 68:22

**women** 28:24

**wondering**

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
Cannon Moss on 06/04/2025                      Index: wood..YS

179:6

**wood**  60:24

**worded**  137:20

**words**  127:1

**work**  8:8
10:10 12:9
13:4,25 17:5
23:21,24
24:2,7
40:17,24
43:5,6,13,15
48:18 49:12,
18 76:13,21
77:2 90:12
94:18 95:10
97:20 98:14,
21 100:22,25
101:21
103:2,20,21,
24 104:1,8,
12,14
106:11,18
107:4,21,25
108:7 113:22
115:16,17,22
116:24
117:22 124:9
126:15
128:21
129:5,9
130:8
134:15,20
135:12,15,
19,23 136:2
142:4,20
143:4,22
144:3 145:24

146:1,23
149:7,14
150:7,13,24
152:24 153:1
158:16
163:7,21
164:18
165:20
166:13
167:13
168:22
174:7,13,14,
23 175:1,12,
17,21 176:2,
4,20,25
177:14
179:23
180:18,23
182:1,4,9
185:7 186:18
188:6 192:6,
24 193:5,9,
22,24 194:3,
12 200:8,10,
13,15 206:4

**worked**  14:4
28:24 79:6
82:8,21,22,
23 207:9

**working**  16:1
23:13,18
27:6 28:19
34:11 39:15
42:25 75:2
94:23 119:6,
25 197:8

**workload**  101:9

**works**  128:9
129:20 149:4
153:7,11,13
190:6

**worst**  83:25

**worth**  125:25

**write-up**
109:24

**writing**  35:16
105:7 108:6,
16

**written**  83:13
103:1,3
105:18
106:17

**wrong**  69:4
163:16

**wrote**  103:4
108:19,22
113:6
129:10,11
139:7 145:1

_____

Y

_____

**yard**  12:23
13:5 14:6,23
97:16,17

**yardmaster**
14:5

**yardmasters**
24:25 185:9
189:9

**yards**  97:19

**year**  9:14,17
10:22,24
12:17 13:1
15:2 33:20
34:19,21,25
49:21 50:25
51:3 52:3,6,
10,18 56:1
57:12,20
122:19
123:6,11
130:20 141:3
156:12

**year-and-a-half**
169:2

**years**  7:1
16:25 18:7
33:4 49:25
50:9,23
52:4,7 54:2
56:15 57:25
58:6 59:6,20
69:8 79:7,15
105:4,9
123:3,4,11
133:21
162:21,24
173:17 181:8
182:8 188:1

**yesterday**
149:25

**York**  204:14

**you-all**  75:1
195:8

**YS**  187:5

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**

| Z |
|---|

**Zachary**  206:24

**Zampi**  86:20,
 23

**Zoom**  78:20