# Exhibit E

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    Norfolk Division
                      In Admiralty
 3

 4   In the Matter of COEYMANS MARINE    )
     TOWING, LLC, d/b/a CARVER MARINE    )
 5   TOWING, as Owner and Operator of    )
     M/T Mackenzie Rose (IMO No. 8968765))
 6   her cargo, engines, boilers, tackle )
     equipment, apparel, and             ) Civil Action
 7   appurtenances, etc., in rem,        ) No. 2:24-
     petitioning for Exoneration from or ) cv-00490
 8   Limitation of Liability in allision )
     with Norfolk and Portsmouth Belt    )
 9   Line Railroad Company Main Line     )
     Railroad Bridge occurring June 15,  )
10   2024, in and about the Elizabeth    )
     River, Virginia.                    )
11

12

13

14

15            DEPOSITION UPON ORAL EXAMINATION OF

16                    WILLIAM O'BRIEN

17        TAKEN ON BEHALF OF THE PETITIONER

18                   NORFOLK, VIRGINIA

19               Thursday, June 5, 2025

20

21

22

23

24

25
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 2

```
1    Appearances:
2
3        CLYDE & CO US LLP
         BY: MICHAEL J. ROMAN, ESQUIRE
4        30 S. Wacker Drive, Suite 2600
         Chicago, Illinois 60606
5        Michael.roman@clydeco.us
         Counsel for Petitioner
6
7        CRENSHAW, WARE & MARTIN, P.L.C.
         BY: W. RYAN SNOW, ESQUIRE
8        MACKENZIE R. PENSYL, ESQUIRE
         150 West Main Street, Suite 1923
9        Norfolk, Virginia 23510
         Wrsnow@cwm-law.com
10       Mpensyl@cwm-law.com
         Counsel for Norfolk and Portsmouth Belt Line
11       Railroad Company
12
         SINNOT, NUCKOLS & LOGAN, PC
13       BY: MARK C. NANAVATI, ESQUIRE (Via Zoom)
         13811 Village Mill Drive
14       Midlothian, Virginia 23114
         Mnanavati@snllaw.com
15       Counsel for Evanston Insurance Company
16
         BUTLER WEIHMULLER KATZ CRAIG, LLP
17       BY: ZACHARY M. JETT, ESQUIRE (Via Zoom)
         11525 North Community House Road, Suite 300
18       Charlotte, North Carolina 28277
         Zjett@butler.legal
19       Counsel for Evanston Insurance Company
20
21   Also Present:  Cannon Moss
22
23
24
25
```

Page 3

```
1               I N D E X
2
3    DEPONENT                              PAGE
4    WILLIAM O'BRIEN
5        Examination by Mr. Roman            4
6        Examination by Mr. Snow            84
7
8
9
10
11
12            E X H I B I T S
13   NO.        DESCRIPTION               PAGE
14   (Exhibits 1-12 previously marked.)
15   (Exhibits 1-12 to be attached to Mr. Moss's
         deposition only.)
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1              Deposition upon oral examination of
2    WILLIAM O'BRIEN, taken on behalf of the
3    Petitioner, before Heidi D. Quimby, Registered
4    Merit Reporter, a Notary for the Commonwealth of
5    Virginia at large, taken pursuant to Notice,
6    commencing at 10:00 a.m., on Thursday, June 5,
7    2025, at Crenshaw, Ware & Martin, P.L.C., 150 W.
8    Main Street, Suite 1923, Norfolk, Virginia; and
9    this in accordance with the Rules of the Supreme
10   Court of Virginia, 1950, as amended.
11
12              WILLIAM O'BRIEN was sworn and deposed on
13   behalf of the Petitioner as follows:
14
15                     EXAMINATION
16   BY MR. ROMAN:
17       Q.  Good morning again.
18           I am Michael Roman, one of the attorneys
19   that represents the Petitioner, Coeymans Marine
20   Towing, LLC.  Thanks a lot for coming in today.
21           Can you please state your name for the
22   record?
23       A.  William O Brien.
24       Q.  All right.
25           And have you ever given a deposition
```

Page 5

```
1    before?
2        A.  Yes.
3        Q.  All right.
4            How many times?
5        A.  Twice.
6        Q.  All right.
7            When was the last one?
8        A.  A couple of years ago.
9        Q.  All right.
10           Well, just to be sure -- your counsel has
11   probably gone over some of the ground rules -- but
12   just so we have a good, clean record, if I am
13   asking a question, I'll just ask you to let me
14   finish it so we don't talk over each other.  When
15   you are responding, I'll return that same
16   courtesy.  Hopefully, that way, the court reporter
17   can take down what we are saying.  If we are
18   cross-talking, sometimes it is difficult for her
19   to do so; is that fair?
20       A.  Yes, sir.
21       Q.  All right.
22           And I'm sure I'll ask poor questions at
23   some time today.  If I ask something you can't
24   understand, you don't know what I'm asking, just
25   let me know.  I'll be happy to try to rephase if I
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 6

1  can.  But if you do answer my question, I'll take
2  that to mean that you did understand it and can
3  fairly answer it; is that fair?
4      A.  Yes.
5      Q.  Just let me know if you need to take a
6  break, or let Mr. Snow know if you need to take a
7  break at any time.  It is not a marathon contest.
8  But if I have a question pending, I just ask that
9  you answer that question and let us know you need
10  a break for whatever reason, and we will do so.
11  Fair?
12      A.  Yes, I understand.
13      Q.  Are you on any medications or substances
14  today that would affect your ability to testify
15  truthfully?
16      A.  No, sir.
17      Q.  Okay.
18          Who do you work for?
19      A.  Norfolk and Portsmouth Belt Line Railroad
20  Company.
21      Q.  I -- if I refer to that as the "Belt
22  Line" today, are we on the same page, talking
23  about that company?
24      A.  Yes, sir.
25      Q.  How long have you been with the Belt

Page 7

1  Line?
2      A.  Fifteen years.
3      Q.  What was your first position with the
4  company?
5      A.  Superintendent.
6      Q.  And that would have been about 2002?
7      A.  No.
8      Q.  2010?
9      A.  Yeah, November 2010 until 2016.
10      Q.  And where was that first job that you had
11  with -- where were you located?
12      A.  Here in Chesapeake.
13      Q.  Okay.
14          And what are the responsibilities and
15  duties of the superintendent?
16      A.  The overall operation of trains and
17  maintenance of the track conditions.
18      Q.  And how long did you work in that
19  superintendent role?
20      A.  Until -- I believe it was 2016.
21      Q.  And who did you report to as
22  superintendent?
23      A.  At first it was David Stenson, and then
24  to Cannon Moss.
25      Q.  And what was Mr. Stenson's job title at

Page 8

1  that time?
2      A.  President, general manager.
3      Q.  And then you reported to Mr. Moss when he
4  succeeded?
5      A.  That is correct.
6      Q.  Did you have any direct reports as
7  superintendent?
8      A.  Yes.  Adam Reeder, track master.
9      Q.  And then I think you said you took on a
10  new position in 2016?
11      A.  Correct.
12      Q.  And what position was that?
13      A.  Vice president of operations.
14      Q.  Okay.
15          And is that the role that you're
16  currently in?
17      A.  Yes, sir.
18      Q.  All right.
19          Did you have -- held any other positions
20  at the company besides VP of operations since that
21  time?
22      A.  No, sir.
23      Q.  And describe, if you could, for me what
24  you do as a VP of operations.
25      A.  I manage the operations of the rail

Page 9

1  crews, safety of the operations, deal with
2  customers.  I had, you know, my hands in a lot of
3  places.
4      Q.  Okay.
5          And who do you currently report to?
6      A.  Still report to Cannon Moss.
7      Q.  So you have always reported to Mr. Moss
8  in your role as VP of operations?
9      A.  Yes.
10      Q.  All right.
11          And how many people report to you
12  directly today?
13      A.  Directly, superintendent, and he has two
14  reports that report to him.
15      Q.  And then who is the superintendent?
16      A.  Adam Reeder.
17      Q.  Okay.
18          Was Mr. Reeder the superintendent in June
19  of 2024?
20      A.  Yes.
21      Q.  Okay.
22          And when did Mr. Reeder start as
23  superintendent, if you can recall?
24      A.  I believe it was 2017 or 2018.  I'm not a
25  hundred percent sure.

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 10

1    Q.  Okay.
2        And you said Mr. Reeder today has two
3    direct reports himself?
4    A.  Yes.
5    Q.  And who are they?
6    A.  That is Nathan Rose and Jonathan Biel.
7    Q.  What is Mr. Rose's job position?
8    A.  Both Rose and Biel got the same job.
9    They are operation --
10   Q.  I'm sorry.
11       Operations --
12   A.  -- operation managers.
13   Q.  Okay.
14       What did you do for work before starting
15   with the Belt Line?
16   A.  I worked for the Norfolk Southern
17   Railroad.
18   Q.  And when did you start work with Norfolk
19   Southern?
20   A.  September of 1992.
21   Q.  What did you do for Norfolk Southern when
22   you started in '92?
23   A.  I was a brakeman.
24   Q.  What is a "brakeman"?
25   A.  On the train, you have a three positions.

Page 11

1    Used to have three positions.  You have an
2    engineer, a conductor and a brakeman.  Brakeman
3    would report basically to the conductor.
4    Q.  Okay.
5        That is a position where you are actually
6    on the train itself?
7    A.  Yes.
8    Q.  How long were you brakeman?
9    A.  About two years.
10   Q.  Okay.
11       And then I take it you took another
12   position with Norfolk Southern?
13   A.  Correct.  Promoted to conductor.
14   Q.  All right.
15       And the conductor runs the trains, right?
16   A.  Engineer runs the trains.  The conductor
17   is in charge.
18   Q.  Got it.
19       How long were you a conductor?
20   A.  Once conductor, you are always conductor.
21   Q.  Okay.
22       How long did you work in a job position
23   as a conductor?
24   A.  At least -- about 10 years.  I was also
25   engineer at that time also.

Page 12

1    Q.  What is your educational background?
2    A.  High school diploma.
3    Q.  Okay.
4        When you -- what year did you graduate?
5    A.  1988.
6    Q.  Did you hold any jobs between high school
7    and when you started with Norfolk Southern?
8    A.  United States Marine Corps.
9    Q.  Okay.
10       So you were in the Corps for four years?
11   A.  Yes, sir.
12   Q.  Honorable discharge?
13   A.  Yes, sir.
14   Q.  What did you -- what type of training did
15   you do for the Corps?
16   A.  The job title was "ammunition
17   technician."  Sort of logistics and storage for
18   ammunition and missiles.
19   Q.  And when you started as a brakeman with
20   Norfolk Southern, did you undergo training?
21   A.  Yes.
22   Q.  And what type of training was that?
23   A.  On-the-job training, classroom training.
24   Q.  What were the topics of the classroom
25   training?

Page 13

1    A.  Safety.
2    Q.  And how about on-the-job?  Any
3    difference?
4    A.  Yeah, applying the rules.
5    Q.  And did you undergo additional training
6    when you were promoted to a conductor role?
7    A.  There is always constant training through
8    your railroad career, so...
9    Q.  But nothing like a, you know, week-long
10   classroom session to -- like at the time you
11   started as a conductor, anything like that?
12   A.  No.  But to get promoted to a conductor,
13   you had to pass a rules test.
14   Q.  Okay.
15       Do you hold any certifications or any
16   licenses?
17   A.  Conductor certification.
18   Q.  And what is the process to obtain a
19   conductor certification?
20   A.  Knowledge of the rules and being able to
21   apply them.
22   Q.  And is that when you took that rules
23   test, in order to become a conductor?
24   A.  It is every -- every three years you have
25   to renew that certification.

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025

Page 14

1    Q.  And what organization issues that
2  certification?
3    A.  The railroad itself.
4    Q.  Okay.
5    So it was through Norfolk Southern?
6    A.  Through Norfolk Southern.
7    Q.  Nothing like a separate accrediting body
8  or anything like that?
9    A.  No.
10    I also hold an engineer's certification.
11 Also same process.
12    Q.  When it comes to your engineer
13 certification, first, when did you obtain that?
14    A.  About 1994.
15    Q.  Okay.
16    And then what is the process for
17 obtaining an engineer's certification?
18    A.  Going through Norfolk Southern Training
19 school in McDonough, Georgia, and on-the-job
20 training.
21    Q.  And when did you attend that training?
22    A.  I believe 1997, '98.
23    Q.  And I think that was when you were
24 working as a conductor?
25    A.  Correct.

Page 15

1    Q.  How long was that training?
2    A.  It was three months of classroom at
3  school, and then I believe six to eight months
4  hands-on.
5    Q.  Okay.
6    Was that -- during that first three
7  months, were you also working or was that --
8    A.  Straight training.
9    Q.  Straight training.  Okay.
10    You said it was down in Georgia?
11    A.  Right.
12    Q.  What topics did you guys learn, or was
13 that the actual substance of the training itself?
14    A.  You know, basic functions of the
15 locomotive, how to operate the locomotive signals,
16 train operations.
17    Q.  Did any of the training relate
18 specifically to railroad bridges?
19    A.  No.
20    Q.  Okay.
21    Six to eight months on-the-job training
22 after that?
23    A.  Yes.
24    Q.  Okay.
25    And then did you obtain the certification

Page 16

1  after the classroom training or after the
2  on-the-job training?
3    A.  After the on-the-job training.
4    Q.  Okay.
5    And I think you said you also worked as
6  an engineer?
7    A.  Correct.
8    Q.  Did you hold the engineer position at the
9  same time you held the conductor position?
10    A.  Right.  We worked as an extra.  You could
11 be called to go and fill different positions in
12 different roles.
13    Q.  During that time frame, where were you
14 located?
15    A.  I was living in Crewe, Virginia.
16    Q.  Crewe, Virginia.
17    Any other positions with Norfolk
18 Southern?
19    A.  Yes.
20    Q.  What was it after you were conductor?
21    A.  I was assistant trainmaster on the --
22 it's called the "Georgia northern territory."
23    Q.  What does an assistant trainmaster do?
24    A.  You assist the trainmaster on managing
25 the train crews and operations of the territory.

Page 17

1    Q.  And what does the trainmaster do?
2    A.  Ensures that the train crews work by the
3  rules.  You -- you have rule checks you have to
4  do, customer meetings you do, assist with payroll,
5  claims, multiple things managing the territory.
6    Q.  Okay.
7    And I'm sorry.  I know you told me, but
8  what was the territory that you --
9    A.  It was between -- it was between Atlanta
10 and Chattanooga, Tennessee.
11    Q.  And where were you based out of when you
12 worked as an assistant trainmaster?
13    A.  Rome, Georgia.
14    Q.  And how long did you work as an assistant
15 trainmaster?
16    A.  Somewhere between 18 months and two
17 years.
18    Q.  Can you recall those years, about the
19 time frame?
20    A.  I believe 2000 to 2002.
21    Q.  And then what position did you hold after
22 that?
23    A.  I was a trainmaster on the Savannah
24 district.  That is territory between Savannah and
25 Macon, Georgia.

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 18

```
1     Q.  Were you in a union ever?
2     A.  When I was conductor and engineer.
3     Q.  What union was that?
4     A.  That would be the UTU back then, United
5  Transportation Union.
6     Q.  And then once you were elevated to
7  assistant trainmaster, is that a non-union
8  position?
9     A.  Yes, sir.
10    Q.  Okay.
11        Did the union provide any separate
12 training other than what you went through with
13 Norfolk Southern?
14    A.  Not that I recall.
15    Q.  Okay.  All right.
16        What -- what role did you hold next after
17 the trainmaster position?
18    A.  Assistant superintendent in the
19 Atlanta --
20    Q.  Okay.
21        And what did that job entail?
22    A.  It all entails assisting the terminal
23 superintendent in running the operation of the
24 Atlanta terminal, managing the crews and the
25 trains' customers.
```

Page 19

```
1     Q.  What year did you hold those -- that --
2  what years or year did you hold that position?
3     A.  I believe -- I believe it was 2006 to
4  2009.  I don't remember.
5     Q.  Okay.
6        And are we up to your time at the Belt
7  Line yet?
8     A.  No, sir.
9     Q.  All right.
10        What else have we got?
11    A.  So I've got one more year as trainmaster
12 in Birmingham, between Birmingham and Columbus,
13 Georgia, with the same responsibilities as
14 training train crews.
15    Q.  Where were you based out of that year?
16    A.  Columbus, Georgia, I think, for a year.
17    Q.  Then how about the position after
18 trainmaster?
19    A.  That would be the coming to the Belt
20 Line.
21    Q.  Okay.  Norfolk.  All right.
22        We'll be talking a little bit about the
23 main line bridge.  I just want to confirm.  I know
24 the Belt Line has several bridges.  If we refer to
25 that today, we are talking about the main line
```

Page 20

```
1  bridge over the southern branch of the Elizabeth
2  River?
3     A.  Yes, sir.
4     Q.  Are you familiar with the bridge?
5     A.  Yes, sir.
6     Q.  All right.
7        And did you ever have any type of
8  training, any specific, you know, education about
9  the bridge itself?
10    A.  I got basic knowledge of how to operate
11 the bridge.
12    Q.  Is that through -- how did you obtain
13 that knowledge?
14    A.  Basically learned it from Adam's
15 supervisor that was here prior to my route.  Adam
16 Reeder.  He was here before me.
17    Q.  Okay.
18        So he showed you the ropes, I guess, on
19 how to operate the bridge?
20    A.  How to operate the bridge, yes, sir.
21    Q.  In your roles prior to the Belt Line, did
22 you deal with the railroad bridges and systems?
23    A.  No.
24    Q.  Okay.
25        So the -- your experiences in dealing
```

Page 21

```
1  with bridges like the main line bridge all came
2  after the time that you started with Belt Line?
3     A.  Yes.
4     Q.  Was there any type of specific training
5  when you started with the Belt Line on how to
6  operate the bridge, or did it just come throughout
7  the years?
8     A.  Like I said, Adam trained me when I got
9  here on how to operate the train.
10    Q.  What did that training consist of?
11    A.  Physically operating the bridges.
12 There's two ways of operating:  One is an
13 automated system, and then the other way is
14 manually updating the bridge from the bridge
15 itself.
16    Q.  And do you operate the bridge today, you
17 know, raise it and lower it using those two
18 methods?
19    A.  I can.
20    Q.  Okay.
21    A.  If needed.  It's been a while since I had
22 to do it.
23    Q.  That is what I was getting at.
24        You're qualified to do so?
25    A.  Yes.  If needed, I can do it.
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 22

1      Q.  And how long was it from the time you
2  started with the Belt Line to when you could --
3  you were qualified to operate the bridge sort of
4  on your own?
5      A.  Well, within a week.
6      Q.  Were you working the week of June 17th,
7  2024?
8      A.  That is the week of the incident?
9      Q.  It was.  The incident was June 15th,
10  2024, which I understand was a Saturday.
11      A.  Okay.
12          So, yes.
13      Q.  We are on the same page?
14      A.  Yes, sir.  I wanted to make sure.
15      Q.  I guess, were you working on June 15,
16  2024?
17      A.  That weekend?  That was a Saturday?
18      Q.  Yeah.
19      A.  I was on duty.
20      Q.  Okay.
21          Were you --
22      A.  I take it back.  I apologize.  I have a
23  supervisor that was on duty.  If something
24  happened, he would call and notify me.
25      Q.  Okay.

Page 23

1          And who was that supervisor?
2      A.  I believe it was Nathan Rose.
3      Q.  Okay.
4          And, as best as you can recall, Mr. Rose
5  was on duty that Saturday?
6      A.  He was responsible, but we didn't work
7  any train crews that day, so we had no operations.
8  So, to be clear, he is on duty in case something
9  goes on, somebody needs to reach out to him, needs
10  some help.
11      Q.  Just -- when you say you "didn't work any
12  train crews," can you expand on what that means?
13      A.  So our normal operations during that time
14  of the year, Monday through Friday, trains come in
15  and out during that time frame.  We have train
16  crews working to handle customers.
17      Q.  Okay.
18      A.  On the weekends, no customer service is
19  needed, no trains coming in, so we don't work
20  anybody that is physically at the railroad.
21      Q.  And are those train crews employees of
22  the Belt Line?
23      A.  The MPB train crews.  There is also CSX
24  train crews, which belongs to them.
25      Q.  When you said Mr. Rose was on duty that

Page 24

1  Saturday, was he physically -- was he supposed to
2  physically be at the offices, or is that like an
3  on-call situation?
4      A.  It is an on-call, as needed.
5      Q.  Okay.
6          Was anyone else on call that weekend?
7      A.  No, I don't believe so.
8      Q.  Okay.
9          And then were you on duty that following
10  Monday, June 17, 2024?
11      A.  Yes.
12      Q.  All right.
13          And I take it your -- are your normal
14  work hours -- work schedule Monday through Friday?
15      A.  For the most part, yes, sir.
16      Q.  Okay.
17          How did you hear that there was an
18  incident involving the bridge that weekend?
19      A.  It was somewhere around 7:00 p.m.-ish.  I
20  received a phone call from Nate Rose, who was the
21  supervisor working second shift at the Belt Line.
22      Q.  And that is 7:00 p.m. on Monday, June
23  17th?
24      A.  Yeah, estimated 7:00 p.m.
25      Q.  Okay.

Page 25

1          Had there been any train scheduled to
2  cross over the bridge on June 17th?
3      A.  That evening.
4      Q.  Okay.
5          And if you can recall, what train or
6  company was the train --
7      A.  It was a CSX train, the L253.
8      Q.  Okay.
9          What is an "L253"?
10      A.  That is just a train symbol.  It is a
11  train that comes out of Rocky Mount, North
12  Carolina, to us.
13      Q.  Okay.
14          Now, do you have -- how do you receive
15  information about the trains that are crossing?  I
16  mean, when do you receive that information?  I
17  mean, like a week in advance?  Is it a set
18  schedule?
19      A.  So the L253 train is a
20  regularly-scheduled train that comes -- the
21  schedule fluctuates throughout the year, but it is
22  normally a five-day train that comes to us five
23  days a week and we send it back five days a week.
24      Q.  All right.
25          If you can recall, how long had that L253

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 26

1  been on that schedule prior to June 17th, 2024?
2      A.  I can't recall that.
3      Q.  Okay.  All right.
4          So you said at some point, around 7:00
5  p.m., Mr. Rose reached out to you?
6      A.  Yes.
7      Q.  All right.
8          How did he reach out to you?
9      A.  I can't remember if he texted me first,
10  tried to call me.  I seen one and responded back
11  to him.
12      Q.  You said it was second shift, correct?
13      A.  Right.  Second shift begins at that time.
14  I want to say 3:00 p.m.
15      Q.  And then what is first shift?
16      A.  I think -- I believe at that time, first
17  shift was at 6:30 a.m.
18      Q.  So 6:30 to about 3:00 is first shift?
19      A.  Yes.
20      Q.  Second is -- how long does second shift
21  go to?
22      A.  You know, 3:00 to 11:00.
23      Q.  And then is there a third shift?
24      A.  No, sir.
25      Q.  All right.

Page 27

1          During that second shift on June 17th,
2  2024, who was more responsible for overseeing the
3  operation of the raising and lifting of the bridge
4  for when that train would come through?
5      A.  That would have been Nate Rose.
6      Q.  Where would he have been, you know,
7  physically located to oversee that raising and
8  lowering?
9      A.  He would have been in the bridge house,
10  in the bridge room.  It is a room inside of our
11  office that has the controls for the bridge.
12      Q.  Would anyone else be in there with him?
13      A.  No.
14      Q.  And would that have been scheduled to be
15  an automated lowering of the bridge?
16      A.  Yes.  Yes.
17      Q.  And if I recall correctly from yesterday,
18  the preference is to use the automated system,
19  correct?
20      A.  Yes.
21      Q.  That is a more efficient way to raise and
22  lower the bridge?
23      A.  Yes.
24      Q.  All right.
25          When the bridge is actually being raised

Page 28

1  and lowered, is -- what is Nathan doing or the
2  person on shift that -- you know, are they pushing
3  buttons?  How is it actually operating?
4      A.  So the train crew will call via radio and
5  give us a 30-minute heads-up that they will be
6  approaching the bridge.  So the bridge operator,
7  Nathan, would have gone into the bridge room and
8  he would have got on Channel 13, made the
9  announcement that the Belt Line Bridge would be
10  lowering in approximately 30 minutes.  He would do
11  a follow-up in 15 minutes, and then he would do a
12  last call just prior to lowering the bridge.
13          But he sees -- we have camera systems
14  that monitor all of the directions of the river,
15  the bridge, Portsmouth and Chesapeake side.  He
16  monitors the cameras.  When he sees the bridge as
17  -- excuse me, when he sees the train that has come
18  to the bridge has stopped, he would hit the button
19  inside the control room that gives permission.  He
20  would relay that to the conductor on the train,
21  and the conductor would get off the train after
22  receiving permission and hit the start button on
23  the other side of the bridge.
24          Once all of that happens, the bridge will
25  start coming down, and his response will be then

Page 29

1  to monitor the river to make sure no river traffic
2  is coming as the bridge is coming down.
3      Q.  And is that process consistent for each
4  time the bridge is supposed to be lowered and
5  raised?
6      A.  Yes.
7      Q.  So someone is actually physically in the
8  bridge room walking and overseeing?
9      A.  When we are running automation, yes, sir.
10      Q.  Okay.  All right.
11          I think you said you can't recall whether
12  it was text or by phone or how Mr. Rose reached
13  out to you.
14      A.  The initial -- but I -- I do remember
15  calling him.  Like I think I missed a call and saw
16  a text, so I called him.
17      Q.  Okay.
18          And what can you recall about that
19  initial discussion?
20      A.  He just said that something struck our
21  bridge, that the track got a terrible kink in it.
22  And I basically told him -- you know, I asked him
23  where the train was at, and he said it was at
24  Portsmouth.  It is at the stop signal.  I said,
25  "I'm on my way."

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 30

1    Q.  Okay.
2        And where were you at that time when
3    he --
4    A.  I was at home.
5    Q.  Okay.
6        Did Mr. Rose say how he had found out
7    about the damage to the bridge?
8    A.  Yes.
9    Q.  And what did he say about that?
10   A.  He said when he went into the bridge
11   room, he noticed that he didn't have any
12   communication with the bridge itself.
13   Q.  Okay.
14   A.  So he knew he couldn't operate it from
15   the bridge house.  So he proceeded out to the
16   bridge to take a look to see what was going on.
17   Q.  Okay.
18       When you -- he did not have
19   communication.  Was that -- I mean, could you
20   describe exactly what that means?
21   A.  So you have -- what is the word I'm
22   thinking of -- wireless communication that feeds
23   the camera system and also the lowering of the
24   bridge, all of the information.  So when he had no
25   communication, there is no video, and the screen

Page 31

1    on the -- on the monitor -- the start of the
2    bridge has -- we call them "little triangles."
3    When they have it on the triangles, you can't
4    operate it.
5    Q.  So sort of almost like an error message
6    is up on the screen?
7    A.  Yes.
8    Q.  Had anyone been scheduled to work or be
9    in the bridge room on the day before the 16th?  I
10   think it would have been a Sunday.
11   A.  No.
12   Q.  Okay.
13       And is it -- well, how often -- I don't
14   know -- in your experience with the Belt Line, do
15   trains come through on the weekends?
16   MR. SNOW:  Object to form.
17   BY MR. ROMAN:
18   Q.  Over the main line bridge.
19   A.  Repeat that one more time.
20   Q.  So I think you said normal operations are
21   Monday through Friday, right?
22   A.  For that time of year.
23   Q.  For that time of year.
24       I mean, how often -- generally, is there
25   a need for Belt Line employees to be on shift on

Page 32

1    the weekend to operate the main line bridge for
2    trains to pass through?
3    A.  So, in general, from mid-September
4    through May, we pretty much run a seven-day-a-week
5    operation.
6    Q.  And I think we talked a little bit about
7    that yesterday.  That is considered the busy
8    season for --
9    A.  Yeah, that is our grain season.
10   Q.  And for the busy season -- which I
11   understand fluctuates sometimes, depending on the
12   market conditions?
13   A.  Yes.
14   Q.  Okay.
15       -- you said the trains are running seven
16   days a week?
17   A.  Yes.
18   Q.  All right.
19       And during busy season, on average, in
20   your experience, how many trains would pass
21   through the main line bridge in a given week?
22   A.  Given week, anywhere from 10 to 15.
23   Q.  So that would be 10 to 15 -- 10 to 15 up
24   and down on the bridge?
25   A.  Per week?

Page 33

1    Q.  Yeah.
2    A.  No.  It is -- it is trains -- 10, 15 --
3    about 15 times a month -- a week, excuse me --
4    that the bridge will go --
5    Q.  Be raised and lowered, right, like in
6    one --
7    A.  Right.
8    Q.  Okay.
9        And then what's the variance in any -- in
10   a given week for non-busy season, how many trains
11   would pass through on the main line bridge?
12   A.  Eight to ten.
13   Q.  Okay.
14       So roughly half?  About that?
15   MR. SNOW:  You are still talking about --
16   MR. ROMAN:  Right.  In a given week.
17   THE WITNESS:  Yeah.
18   BY MR. ROMAN:
19   Q.  I think I asked Cannon Moss yesterday, so
20   I don't know why I changed it up, but all right.
21       So after Mr. Rose had contacted you, you
22   guys had that initial discussion, you said you
23   went down to the bridge room?
24   A.  Yes.
25   Q.  Did you guys go to the bridge itself?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 34

1   A.  We went to the bridge itself, yeah.
2   Q.  Was Mr. Rose there?
3   A.  Yes.
4   Q.  All right.
5       Anyone else present?
6   A.  Not when I got there, no.
7   Q.  Okay.
8       And was it light outside still?
9   A.  It was.  It was dusk.  It was about 8:00
10  p.m.
11  Q.  And what did you -- what did you do?
12  What did you see?  If you can, describe what
13  happened when you got on-site there.
14  A.  I arrived on what we call the "Portsmouth
15  side" of the bridge.  That is where the CSX train
16  was sitting at the signal.  I arrived to that
17  side, and when I looked at the bridge, I could see
18  there was a definite kink in the rail.
19  Q.  And did you speak with anyone who was on
20  the CSX train?
21  A.  I did not.
22  Q.  Did you see anyone have a conversation
23  with them?
24  A.  I didn't.
25  Q.  And when you observed -- I think you said

Page 35

1   a "kink" in the bridge -- I mean, where were you
2   located when you saw that?
3   A.  I was standing at the Portsmouth side,
4   right there on the track looking straight ahead.
5   Q.  Fair to say it was -- you know, you could
6   observe it pretty easily?
7   A.  Yes.
8   Q.  All right.
9       Did you take any photos?
10  A.  I don't recall.
11  Q.  Okay.
12      Did you observe Mr. Rose taking any
13  photographs?
14  A.  I believe we were talking.
15  Q.  Okay.
16      Can you recall anything particular about
17  what you guys discussed?
18  A.  Just sort of baffled about how much out
19  of alignment, you know, and what could have caused
20  it.
21  Q.  Did you go -- did you walk out under the
22  bridge or anything?
23  A.  Just a little bit, until I saw one of the
24  -- one of the legs where it shifted about six feet
25  off of the base, and so I backed off from that

Page 36

1   point.
2   Q.  All right.
3       What happened after you and Mr. Rose sort
4   of had your initial observation of the bridge?
5   A.  I believe my next phone call was to
6   Cannon Moss, and I had instructed Nate to call the
7   Coast Guard and the Tug Association.
8   Q.  What's the Tug Association?
9   A.  For the tugboats that operate in the
10  area.  I guess they were in charge.  I don't know.
11  Q.  Okay.
12      What can you recall about what you and
13  Mr. Moss spoke about?
14  A.  I told him that something -- our bridge
15  -- that I have taken the bridge out of service, we
16  cannot use it, and I was concerned about the
17  bridge falling over.  I told him we need somebody
18  with more of an education than myself out there at
19  the bridge to come take a look at it.
20  Q.  And what did Mr. Moss say, if you can
21  recall?
22  A.  He was going to call somebody to come get
23  out there and take a look.  And I told him -- I
24  think I was going back to the office to review the
25  cameras to see if I could see anything.

Page 37

1   Q.  Sorry.
2       Did you reach out to the Tug Association?
3   A.  No.
4       Nate.
5   Q.  Okay.
6       And you instructed Nate to --
7   A.  Right.
8   Q.  And then there was a third that you asked
9   Nate to reach out to?  Right?
10  A.  I'm sorry?
11  Q.  Was there another entity or individual
12  that Nathan was going to reach out to?
13  A.  The Coast Guard and the Tug Association.
14  Q.  Do you have any understanding as to
15  whether Mr. Rose did, in fact, reach out to the
16  Coast Guard?
17  A.  When I was standing there, he contacted
18  them, yes.
19  Q.  Was that on June 17th, 2024, while you
20  guys were standing there, to your understanding?
21  A.  I don't know if it was -- I think it was
22  when we got back to the office, I believe.
23  Q.  But it would have been sometime, to your
24  understanding, on the evening of June 17th, 2024?
25  A.  Yes.  Yes.

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 38

```
1     Q.  All right.
2         And then how about, do you have any
3  understanding whether Mr. Rose made contact with
4  someone from the Tug Association?
5     A.  I believe he did.  He may.  He didn't say
6  he didn't get ahold of anybody.
7     Q.  You go back to the bridge room, right?
8     A.  Yes, sir.
9     Q.  All right.
10        And did you -- were you able to take a
11 look at the cameras?
12    A.  Not in the bridge room.  Went back to the
13 superintendent's office.  He has the main
14 recording system for the cameras.
15    Q.  And are there actual surveillance cameras
16 on the bridge itself?
17    A.  Yes.
18    Q.  How many are there?
19    A.  One, two, three, four, five, six -- I
20 believe it's seven.
21    Q.  And that was seven at the time in that
22 June 15th to June 17th time frame?
23    A.  Yes.
24    Q.  Were all of those cameras in working
25 order?
```

Page 39

```
1     A.  Prior --
2     Q.  Yeah.
3         Prior to June 15th, 2024.
4     A.  Yes.
5     Q.  Okay.
6         And then those connect back to a systems
7  room back in the superintendent's office?
8     A.  Yes.
9     Q.  Do you know, do they record 24/7?
10    A.  Yes.
11    Q.  All right.
12        Do you know how long the recordings are
13 retained for?
14    A.  No.  I don't know exactly.
15    Q.  Okay.  All right.
16        So what happened when you got back to the
17 superintendent's office that evening on the 17th?
18    A.  I reviewed the film, and the -- one of
19 the cameras, the -- one of them was not showing
20 any video at all.  So I started backing up the
21 tape, trying to find a window to see when -- if I
22 can see if something hit the bridge.
23        This probably took a good hour of
24 reviewing.  And as I got back to Saturday, at some
25 point I fast-forwarded it back and I saw the
```

Page 40

```
1  "camera view" click on.  So I sort of narrowed my
2  search down until I saw that view go out, and
3  that's when I got the view of the tug.
4     Q.  How many of the cameras -- well, did you
5  review footage from all seven cameras?
6     A.  Well, a couple of them were relevant
7  because of the view.  But the ones of the bridge
8  that you can see, I would, so like three of them.
9     Q.  And those three have some type of view of
10 that west side of the main line bridge?
11    A.  Yeah.  They had some view of the area,
12 yes.
13    Q.  Yeah.
14        And I guess, more specifically, the area
15 that was impacted?
16    A.  Yes.
17    Q.  All right.
18        Was Mr. Rose back in the office with you
19 at that time?
20    A.  Yes.
21    Q.  All right.
22        Anyone else present?
23    A.  Not at that time, no.
24    Q.  Did Mr. Rose assist you in reviewing the
25 surveillance footage?
```

Page 41

```
1     A.  He was present, yes.
2     Q.  He was there.  Okay.
3         How long did it take for you guys to
4  identify the time frame of the -- on the camera's
5  footage that you were reviewing?
6     A.  Within an hour.
7     Q.  Had Mr. Rose spoken with the U.S. Coast
8  Guard, to your understanding, by the time you had
9  found the time frame?
10    A.  I believe so.
11    Q.  Okay.
12        Were you in the room with him when he was
13 speaking to the Coast Guard at all?
14    A.  No.
15    Q.  Do you have any understanding of what
16 Mr. Rose and the Coast Guard discussed?
17    A.  Not exactly.
18    Q.  Okay.
19        And how about with the -- do you have any
20 understanding of what Mr. Rose's discussions were
21 with anyone at the Tug Association?
22    A.  No, sir.
23    Q.  And then after you had identified the
24 sort of subject time frame on the footage, what
25 happened next?
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 42

1    A.  I believe I called Mr. Moss, and he -- I
2  believe I told him that I got the date and time,
3  and he was looking -- I believe it is called the
4  "AIS system" on the computer -- and he was
5  reviewing that.  So I gave him an estimated date
6  and time.  He was able to match that on the AIS
7  system.
8    Q.  And the AIS system is, to your
9  understanding, that tracking system for vessels,
10  maritime traffic?
11    A.  From what I understand, yes.
12    Q.  Okay.
13        And to your understanding, Mr. Moss was
14  the one who looked up in the system and identified
15  the vessel?
16    A.  Yes.
17    Q.  All right.
18        And was that that evening of June 17th?
19    A.  Yes.
20    Q.  Okay.
21        How long were you and Mr. Rose in the
22  office that evening?
23    A.  I can't remember.  It was, you know, sort
24  of late.
25    Q.  All right.

Page 43

1        What happened after you guys sort of
2  identified that and relayed the information to
3  Mr. Moss?  Did you do anything else with regard to
4  the incident that evening on the 17th?
5    A.  We did have some -- I can't remember the
6  company -- but somebody came to look at the
7  bridge, because I was concerned about the bridge.
8  They were an inspection company.  But they came
9  out there to look at it to put my mind at ease
10  that it would not topple over.
11    Q.  That was that evening?
12    A.  Yes.  That was at some point between 8:00
13  and 2:00 in the morning.
14    Q.  And were you present for -- strike that.
15        To your understanding, were those some
16  type of engineers or someone with a background in
17  the --
18    A.  They had background in -- I don't believe
19  they were engineers.
20    Q.  Okay.
21        Did anybody -- did they inspect or take a
22  look at the bridge that evening?
23    A.  They took a look at it, yes.
24    Q.  Were you present for that?
25    A.  Yes.

Page 44

1    Q.  Was anyone else present?
2    A.  Nate could have been there, but I'm not a
3  hundred percent sure.
4    Q.  Okay.
5        What, if anything, can you recall about
6  what those folks said about the bridge after they
7  had observed it?
8    A.  They said they've never seen nothing like
9  it.
10    Q.  Did they say anything about, you know,
11  whether it was going to fall over that evening or
12  anything like that?
13    A.  They felt like, because of the current
14  weather conditions and all, it wouldn t affect it.
15  But they felt that it would be all right, so we
16  got somebody out there the next morning.
17    Q.  Okay.
18        If you can recall, how long was that --
19  were you guys out -- actually out on the bridge
20  with those folks?
21    A.  Maybe 45 minutes.
22    Q.  Okay.
23        Were they viewing it just from land or
24  out on the boats?
25    A.  No.  Just from land.

Page 45

1    Q.  Okay.
2        Do you recall how many people from that
3  company were out there?
4    A.  Two.
5    Q.  Any chance you recall their names?
6    A.  No.
7    Q.  Did you ever see any written report or
8  findings from those two folks --
9    A.  No.
10    Q.  -- based on their observations that
11  evening?
12    A.  No.
13    Q.  All right.
14        So, after that, did you go home for the
15  evening?
16    A.  I think so.
17    Q.  Okay.  All right.
18        Did anything happen the next day on June
19  18th?
20        MR. SNOW:  Object to form.
21        You can answer if you understand the
22  question.
23        THE WITNESS:  Yeah.
24  BY MR. ROMAN:
25    Q.  Were you on duty on June 18th, 2024?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 46

1    A.  Yes.
2    Q.  Did you go out to the bridge at all on
3  June 18, 2024?
4    A.  Probably.  I don't remember.
5    Q.  I don't want you to guess.  If you can
6  recall.  That's all.
7    A.  Okay.  I can't recall.
8    Q.  All right.
9         Were you on -- did you have any
10  discussions with the Coast Guard in the days after
11  June 17th, 2024, about the bridge incident?
12    A.  I can't recall.
13    Q.  Okay.
14         It is a little bit of a broad question,
15  but, at that point, June 18 going forward, what
16  was sort of your involvement with the work that
17  was going to be done on the bridge to repair it?
18  You know, overseeing any contractors, anything
19  like that?
20    A.  My attention turned to running the
21  operation of the trains.
22    Q.  Okay.
23         And what specifically did you do on June
24  18th with regard to the operations?  I assume you
25  had to make some arrangements to reroute train

Page 47

1  traffic, that type of thing?
2    A.  That's correct.  Worked with both Norfolk
3  Southern, CSX, to come up with a plan to get
4  traffic moving.
5    Q.  Did you have a primary point of contact
6  to make up those arrangements?
7    A.  Yes.
8    Q.  And who was that?
9    A.  Jay Traywick.
10    Q.  "Traywick," you said?
11    A.  Traywick.
12    Q.  Yes.
13         And what is Mr. Traywick's job position,
14  if you know?
15    A.  He is the division superintendent.
16    Q.  Did you have discussions with
17  Mr. Traywick on Tuesday the 18th?
18    A.  Most likely I did.
19    Q.  Okay.
20         And you said you were also working with
21  CSX?
22    A.  Yes.
23    Q.  Did you have a primary point of contact
24  with CSX for that rerouting of the trains?
25    A.  Yes.

Page 48

1    Q.  And who was that?
2    A.  Robert Brown.
3    Q.  And what is Mr. Brown -- what was
4  Mr. Brown's position with CSX at that time, if you
5  know?
6    A.  Division superintendant.
7    Q.  And, generally, what did you and
8  Mr. Traywick and Mr. Brown come up with in terms
9  of a plan for continuing operations in light of
10  the incident?
11    A.  That CSX would reroute their traffic that
12  normally would come from Richmond and Rocky Mount
13  to Portsmouth, Virginia, that they would reroute
14  it all to go to Petersburg, Virginia; from
15  Petersburg, Virginia, Norfolk Southern had access
16  to their yard, and they would pick up the train
17  from Norfolk; Norfolk Southern would pick up the
18  trains from CSX and bring them into Norfolk.  And
19  from there, we would be able to reach over to
20  Norfolk Southern and get them through there.
21    Q.  How long did it take to sort of finalize
22  that plan?
23    A.  I don't recall.
24    Q.  Okay.
25         Any estimate whether it was like, you

Page 49

1  know, two days after, a week, month?
2    A.  Within a couple of days.
3    Q.  Okay.
4         Was anyone else, other than yourself,
5  Mr. Traywick and Mr. Brown, involved in making
6  that decision on how to reroute the trains?
7    A.  For the Belt Line, I made the decision
8  for them.  I can't -- I don't know.  I'm sure they
9  had people they would report to.
10    Q.  So you made the call.
11         Was it -- you know, did you consult with
12  anyone else at the Belt Line?
13    A.  Probably with our team.
14    Q.  And who would you consider your team
15  then?
16    A.  I would discuss it with Cannon and Adam
17  and Nate and Jonathan.
18    Q.  Okay.
19         So, as I understand it, kind of after
20  that initial response the evening of the 17th and
21  then getting the folks out to take a look from the
22  engineering perspective, you diverted back to the
23  operations side and moved forward?
24    A.  Yes.
25    Q.  Did you have any involvement in

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025

Page 50

1  overseeing any of the contractors who actually
2  were performing the repair work on the bridge over
3  the next, you know, six to eight months?
4      A.  No, sir.
5      Q.  Okay.
6          Did you have any involvement in deciding
7  who was actually going to be performing that work?
8      A.  No, sir.
9      Q.  You see that binder in front of you?
10     A.  Yes.
11     Q.  Take a look at it.
12         You see the tab that says "Exhibit 4"
13 there?
14     A.  Yes.
15     Q.  If you can turn to that.
16     A.  Okay.
17     Q.  Mr. O'Brien, this is the document we
18 marked as Exhibit 4.  It is Bates-labeled
19 MPBL006678 through 6812.
20         If you want to thumb through it and take
21 a minute to familiarize yourself, and just let me
22 know when you are ready.
23     A.  Okay.
24     Q.  Have you -- do you recognize this
25 document?

Page 51

1      A.  Yes.
2      Q.  And if you can, describe for us what it
3  is, to your understanding.
4      A.  It is our bridge management program.
5      Q.  All right.
6          What is a "bridge management program," to
7  your understanding?
8      A.  Guidelines from the F.R.A. on how to
9  manage a bridge.
10     Q.  And do you have any involvement in the
11 bridge management program for the Belt Line?
12     A.  Not really.
13     Q.  When did you first see this document, if
14 you can recall?
15     A.  We have always had bridge management.
16     Q.  Correct?
17         When did you first learn or come to
18 understand that there were regulations to have a
19 bridge management program for a company like the
20 Belt Line?
21     A.  Well, management programs are always from
22 the F.R.A., so we have one for drug and alcohol,
23 we have bridge management, you know?  So I knew --
24 you know, we have programs.
25     Q.  Okay.

Page 52

1      Q.  If we take a look on page 1 of Exhibit 4,
2  which is the Bates 6678, that second paragraph,
3  "Specific objectives are to" -- do you see that
4  paragraph?
5      A.  Yes.
6      Q.  First, it says, "Rules and
7  responsibilities for all the persons involved in
8  the safe management of railroad bridges."
9          Did I read that accurately?
10     A.  Yes.
11     Q.  To your understanding, are you any one of
12 those persons who are involved in the safety
13 management of the railroad bridges?
14     A.  Am I in this policy?
15     Q.  Yeah.
16     A.  Not -- I'm not named in the policy.
17     Q.  Okay.  Just want to go to the next page.
18         "The bridge program manager," that
19 section, you see that there?
20     A.  Yes, sir.
21     Q.  You see down where it says V.P.M. for the
22 railroad is Cannon Moss?  Do you see that there?
23     A.  Yes, sir.
24     Q.  Have you ever acted as the V.P.M. for the
25 Belt Line in any capacity?

Page 53

1      A.  No, sir.
2      Q.  All right.
3          And how about the next paragraph,
4  "Railroad bridge engineer."  Do you see that
5  paragraph?
6      A.  Uh-huh.
7      Q.  All right.
8          And I -- I apologize if I asked you
9  before, but you don't hold any engineering degrees
10 or anything, correct?
11     A.  No, sir.
12     Q.  Fair to say you never acted as a railroad
13 engineer under the management program that we are
14 looking at?
15     A.  That is correct.
16     Q.  Correct?
17     A.  Correct.
18     Q.  And then how about the "Railroad bridge
19 inspector" paragraph down there.  Do you see that?
20     A.  Yes, sir.
21     Q.  Have you ever acted as the R.B.I. under
22 the bridge management program for the Belt Line?
23     A.  No, sir.
24     Q.  Okay.
25         Under the next page, MPBL6680 -- just let

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 54

1  me know when you are there.
2      A.  Yes, sir.
3      Q.  See the top paragraph?  It starts, "The
4  railroad bridge supervisor."
5      A.  Yes, sir.
6      Q.  Have you ever been a designated railroad
7  bridge supervisor under this plan --
8      A.  No, sir.
9      Q.  -- for the Belt Line?
10         Okay.
11         Do you know who was at that time on or
12 about June of 2024?
13     A.  No, sir.
14     Q.  Give me one second.  I have to find this.
15     MR. ROMAN:  You don't remember what the
16 Bates number with --
17     MS. PENSYL:  No.
18     6711?
19     MR. ROMAN:  No.  I'm just looking for the
20 identification of all of the bridges.
21     MR. SNOW:  6710.
22     MR. ROMAN:  Yeah, the one with the SB --
23     MS. PENSYL:  Yeah, 6710.
24     MR. ROMAN:  We can go off real quick.
25         (Discussion held off the record.)

Page 55

1  BY MR. ROMAN:
2      Q.  If you can take the Bates label there,
3  MPBL006783.
4      A.  6783?
5      Q.  Correct.
6         It is in blue font at the bottom there.
7      A.  6783.  All right.
8      Q.  I know this is a really tiny font, but if
9  you can --
10     A.  It is not happening.
11     Q.  It is not happening?  Okay.
12     A.  Yeah.
13     Q.  Do you have any understanding -- if we go
14 -- you see the top of the box there, the one that
15 says "steel, timber" above the -- those columns
16 above the --
17     A.  No, sir.  I can't read that.
18     Q.  You can't read any of that?
19     A.  No, sir.
20     Q.  Okay.
21         Well, let me ask this:  Do you know what
22 a "Cooper rating" is?
23     A.  No.
24     Q.  Do you have any understanding of how the
25 load capacity of the main line railroad bridge is

Page 56

1  determined?
2      A.  No.
3      Q.  You ever talk with any engineers who have
4  discussed a Cooper rating with you?
5      A.  No, sir.
6      Q.  Ever discussed Cooper rating with
7  Mr. Moss?
8      A.  No, sir.
9      Q.  Ever discussed Cooper ratings with
10 Mr. Rose?
11     A.  No, sir.
12     Q.  Okay.
13         How long was the plan that we discussed
14 about rerouting the trains in place for?
15     A.  November.  I'm guesstimating.
16     Q.  That is November 2024?
17     A.  If I recall correctly.
18     Q.  In between June -- well, fair to say
19 when you said it was a couple of days after June
20 17th, did that -- that that plan was implemented?
21     A.  Two or three days.
22     Q.  So within that time frame, mid-to-late
23 June 2024 through November 2024, did the plan for
24 rerouting trains change at all?
25     A.  No, sir.

Page 57

1      Q.  So it was all that initial plan, how
2  you --
3      A.  Right.  That is correct.
4      Q.  -- how you all went about it?
5         All right.
6         And did the -- were trains able to go
7  over the main line bridge beginning sometime in
8  November 2024?
9      A.  I believe that was correct.
10     Q.  And how did you come to find out that the
11 bridge could be used again around that time?
12     A.  I believe Mr. Moss would have told me.
13     Q.  Okay.
14         During that June -- mid-to-late June to
15 November time frame, were you receiving any type
16 of updates on the progress of the work that was
17 being done to the bridge?
18     A.  I was part of an e-mail.
19     Q.  Okay.
20         And what -- was it like an ongoing e-mail
21 chain?
22     A.  I believe so.
23     Q.  Okay.
24         And can you recall who else was on that
25 e-mail thread?

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025

Page 58

1    A. No, sir, because I didn't pay much
2  attention to it. It was over my head.
3    Q. Okay.
4       When you say over your head, what types
5  of topics were on that e-mail thread?
6    A. Just talking about how they were going to
7  make repairs and timelines. And, like I said, I
8  concerned myself with the operation.
9    Q. Fair to say you were looped in but it
10 wasn't something that you were directly --
11   A. Absolutely.
12   Q. All right.
13      Were you present when the bridge was
14 first lowered again after the incident, which I
15 believe was sometime in late October?
16   A. No, sir.
17   Q. And you said you think it was Mr. Moss
18 who informed you that some type of operations
19 could resume over the bridge?
20   A. It would have been either him or Adam,
21 one of the two.
22   Q. And what -- if you can describe, how were
23 the operations when they initially began the first
24 time after the date of -- the November 2024 time
25 frame? Was it for normal operation?

Page 59

1    A. No, sir. It had to be manual.
2    Q. Okay.
3       And how did -- if you can describe the
4  manual process for lowering and raising the
5  bridge.
6    A. That would have been done -- I believe
7  the first time they had to climb the bridge and
8  run it. But, like I said, I wasn't there when
9  they started doing that.
10   Q. Okay.
11      Do you know how long the bridge was
12 manually operated before it could resume
13 operations through the automated method?
14   A. I can't recall at all.
15   Q. Did you ever manually operate the bridge
16 at any time after that November --
17   A. No, sir.
18   Q. Do you know how much train traffic went
19 over the bridge while it was being manually
20 operated?
21   A. No, sir.
22      MR. ROMAN: You want to take a quick
23 break, if that works?
24      MR. SNOW: Okay. Sure.
25      (Recess taken.)

Page 60

1  BY MR. ROMAN:
2    Q. Mr. O Brien, if you could please turn to
3  that binder tabbed "Exhibit 2."
4       All right.
5       So Exhibit 2 is series of documents,
6  Bates MPBL 2644 through MPBL2753. If you can
7  thumb through them.
8       My first question is going to be if you
9  have ever seen these documents before.
10   A. These are -- just the first couple pages
11 of documents?
12   Q. Well, it is not a trick question, but a
13 lot of these are e-mails that we went over. I
14 just want to confirm that you didn't authorize any
15 of these e-mails before or seen them before.
16   A. Is this including these photos too?
17   Q. Why don't we do this. Take a look at the
18 actual e-mails. Just thumb through them, and I'll
19 take a look at the photos with you as well.
20      MR. SNOW: I believe this exhibit
21 contains e-mails and then attachments. That is
22 probably why you are seeing these things. But
23 what he is asking is for you to look through the
24 various e-mails --
25      THE WITNESS: Oh. Okay.

Page 61

1      MR. SNOW: So you can determine if those
2  are familiar.
3       Is that fair?
4      MR. ROMAN: Correct. Thank you, counsel.
5      THE WITNESS: Okay.
6  BY MR. ROMAN:
7    Q. All right.
8       You had a chance to look at Exhibit 2?
9    A. Yes.
10   Q. All right.
11      Fair to say that you were not the author
12 of any of those e-mail communications?
13   A. Yes, sir.
14   Q. Did you also --
15      MR. SNOW: When you say "yes," you mean,
16 "yes," you were not one of the authors?
17      THE WITNESS: Yes. I was not one of the
18 authors, yes.
19 BY MR. ROMAN:
20   Q. Just wanted to make sure the transcript
21 is going to read -- we knew what you meant, but
22 sometimes it doesn't come out that way on paper.
23   A. All right.
24   Q. Did you also have a chance to look at the
25 photographs themselves that are contained in

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 62

1  Exhibit 2?
2      A.  Not really, no.
3      Q.  Okay.
4          I think the first one starts on MPBL2649,
5  which might be a little bit tiny there, but it is
6  the one with the tape measure there.
7      A.  Yes, I see it.
8      Q.  Did you take this photo?
9      A.  No.
10     Q.  Do you know or have any understanding of
11  who did take this photo?
12     A.  No.  I don't recall.
13     Q.  Okay.
14          And if you could maybe take another
15  minute.  I think the photos after that one run
16  through MPBL2678.  And if you can run through
17  them, just let me know if any of the photos on
18  Exhibit 2 in that Bates range are photos that you
19  yourself took.
20     A.  You said through 258?  Is that what you
21  said?
22     Q.  I think 78.
23     A.  78?
24     Q.  78.
25     A.  Okay.

Page 63

1      Q.  I know there is a quite a few of them.
2          MR. ROMAN:  Go off for one second.
3          (Discussion held off the record.)
4  BY MR. ROMAN:
5      Q.  Did you take a look at all of those
6  photos?
7      A.  Yes.
8      Q.  Any of them ones that you took?
9      A.  I don't recall.
10     Q.  Okay.
11          Did you recognize any one of those photos
12  in particular, like you have seen it before today?
13     A.  I believe these first couple.
14     Q.  Okay.
15          And you -- if you can just shout out the
16  Bates labels on them.
17     A.  I don't see the label on this first one,
18  or I can't read it, the very first photo.
19     Q.  Tape measure.
20          That is 2649?
21     A.  Correct.
22          And then the second one with the bolt, I
23  recall seeing that picture.
24     Q.  Do you recall when you first saw that
25  photo?

Page 64

1      A.  No, sir.
2      Q.  So just those two?
3      A.  That's all I can recall.
4      Q.  Okay.
5          And I believe the next series of photos
6  starts at 2720 in Exhibit 2.  And the -- just
7  three in there.  That's a little batch.  Take a
8  look at those and let me know if those are ones
9  that you took.
10     A.  What is the first photo?  I can't read
11  the numbers.
12          What is the first photo you are looking
13  for?
14          MR. SNOW:  It looks like this.
15  BY MR. ROMAN:
16     Q.  It has a yellow bucket on it.
17     A.  2720.  Okay.
18          I'm not familiar with these photos.
19     Q.  And then I think there is just one more
20  about six or seven pages later.  It is this one.
21  Familiar with that photo at all?
22     A.  I don't recall.
23     Q.  All right.
24          If you can move on to the next tab.  It
25  is Exhibit 3.  And this is a series of documents

Page 65

1  Bates-labeled MPBL2408 to -2531.  And hopefully
2  this will speed things up a little bit.
3          Mr. O Brien, if you can take a look at
4  2410.  It's like the third page in.  You see the
5  top series of names:  Charlie Graning, Brandon
6  Hensen, William O'Brien, and then it goes on.
7      A.  Yes.
8      Q.  "William O'Brien," is that you there?
9      A.  Yes.
10     Q.  All right.
11          I will represent hopefully that the
12  documents in Exhibit 3 are a series of notes that
13  I understand were prepared by folks at PCL
14  throughout the repair-work process.
15          Do you have any recollection of actually
16  being on the meetings which were, I guess, every
17  week or every few days with PCL?
18     A.  I was on, maybe for the first week after
19  the incident, on a couple of calls listening in.
20     Q.  Okay.
21     A.  But after that, I didn't participate.
22     Q.  And could you recall, your best estimate,
23  as to how many meetings you attended?
24     A.  No.
25     Q.  Okay.

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025

Page 66

1      But is it at least one?
2      A.  Talking about one of these phone
3  meetings?
4      Q.  Yeah.
5      A.  Yeah.  At least one.
6      Q.  And can you recall anything that was
7  discussed on that particular meeting?
8      A.  It was the beginning phases of the
9  planning.
10     Q.  Do you recall all who were at that
11 meeting?
12     A.  No.
13     Q.  I think you said you sort of listened in
14 but didn't participate too much?
15     A.  No, sir.
16     Q.  Meaning you did not participate directly?
17     A.  Most likely no.
18     Q.  None of the engineers asked for your
19 opinion?
20     A.  They didn't ask for my professional
21 opinion, no, sir.
22     Q.  Didn't provide any input on the plan
23 itself or what the actual repairs to be made would
24 be?
25     A.  No.

Page 67

1      Q.  Just for the record, that is correct,
2  meaning, you did not?
3      A.  I did not, yes.
4      Q.  Okay.  Thanks.  All right.
5      If we can go to -- I think it is Exhibit
6  7.  Exhibit 7 is a document Bates-labeled MPBL2173
7  through -2213.  Take a look at it.
8      My first question is, have you ever seen
9  this document before?
10     A.  Okay.
11     Q.  Have you ever seen this document before?
12     A.  I may have.
13     Q.  Okay.
14     In your time with the Belt Line, have you
15 had any direct involvement with the inspections of
16 the bridge -- main line bridge?
17     A.  No.
18     Q.  Okay.
19     Do you know who would be involved in sort
20 of overseeing the annual inspections?
21     A.  Well, that would be the bridge engineers.
22     Q.  Have you ever been on-site at main line
23 bridge when the engineers are conducting their
24 inspections?
25     A.  No.

Page 68

1      Q.  Okay.
2      Fair to say you would defer all questions
3  about the condition of the bridge to the engineers
4  or other folks who were involved in that process?
5      A.  Yes.
6      Q.  Okay.  All right.
7      Moving on to Exhibit 8.  Have you ever
8  seen this one before?
9      A.  I believe I have.
10     Q.  Okay.
11     When do you recall first seeing this
12 document?
13     A.  I don't know exactly when.
14     Q.  Okay.
15     And what is your understanding of what
16 this document is?
17     A.  Inspection report.
18     Q.  Okay.
19     Did you have any involvement in authoring
20 this document?
21     A.  No, sir.
22     Q.  All right.
23     Did you have any involvement in approving
24 any of the recommended repairs or work to be
25 performed that are outlined in this document?

Page 69

1      A.  No, sir.
2      Q.  Okay.
3      The next tab is not marked, but that is
4  what we -- it is Exhibit 10, which is
5  Bates-labeled MPBL6813 through 6827?
6      MR. SNOW:  I think that is Exhibit 9.
7      MR. ROMAN:  Exhibit 9.  Thank you.  My
8  apologies.
9  BY MR. ROMAN:
10     Q.  So just to clarify, Exhibit 9, as counsel
11 corrected me, is MPBL6813 -6827.
12     Have you ever seen this document before,
13 Mr. O Brien?
14     A.  I may have seen it.
15     Q.  Can you recall when you first saw it?
16     A.  No, sir.
17     Q.  All right.
18     Did you have any involvement in the
19 inspection of the mechanical systems that
20 proceeded on or about June 4 to 5, 2024?
21     A.  No, sir.
22     Q.  Okay.
23     Are you aware, as you sit here, whether
24 or not an inspection of the mechanical systems did
25 proceed in that time frame?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 70

```
1         A.  I'm not aware.
2              MR. ROMAN:  This is 10, correct?  Does he
3    have the -- the big spreadsheet there?
4    BY MR. ROMAN:
5         Q.  Mr. O Brien, if you can take a look at
6    that one.  Can you make that one out?
7         A.  I can.  Almost.
8         Q.  Have you ever seen this document before?
9         A.  No, sir.
10        Q.  Okay.
11             Fair to say you did not have any
12   involvement in drafting or preparing this
13   document?
14        A.  Correct.
15        Q.  All right.
16             Did you have any involvement in approving
17   for payment the invoices related to the work that
18   was done on the main line bridge after the
19   allision?
20        A.  No.
21        Q.  Okay.
22             If we can take a look at Exhibit 10.  You
23   see the column that has the added-up rate there?
24        A.  Yes.
25        Q.  Do you have any understanding of what
```

Page 71

```
1    those figures that we see, the 272.34 percent, 5
2    percent, and then down a few more lines, do you
3    have any understanding what those figures are?
4         A.  I don't have enough understanding to
5    explain it.
6         Q.  Okay.
7              Did you oversee, or have any involvement
8    overseeing, any of the Belt Line employees who
9    performed the work constructing the road that was
10   built after the allision?
11        A.  Did I oversee it?
12        Q.  Yeah.
13        A.  No, sir.
14        Q.  Did you ever oversee any Belt Line
15   employees or any contractors who performed any
16   type of work in or around the main line bridge
17   after the allision?
18        A.  Not that I recall.
19        Q.  You got the disclosures?  I think it is
20   Exhibit 11.
21             Take a look at that document, if you
22   could, Mr. O Brien.  Just let me know when you
23   have had a chance to review it.
24        A.  Okay.
25        Q.  Do you recognize this document?
```

Page 72

```
1         A.  No.
2         Q.  Okay.
3              If we can go to page 2.  You see the
4    "William O Brien" listed in subsection B there?
5         A.  Yes.
6         Q.  Fair to say that that is you?
7         A.  Yes.
8         Q.  All right.
9              It says, "Mr. O Brien has information
10   related to the facts alleged in the Belt Line's
11   claim, including operational issues and expenses
12   arising from the allision."
13             Did I read that correctly?
14        A.  Yes.
15        Q.  Fair to say we discussed some of the
16   operational issues that the Belt Line underwent
17   after the allision?
18        A.  Yes.
19        Q.  Okay.
20             We talked about the rerouting of the
21   train using the method that you came up with, the
22   CSX and Norfolk Southern, right?
23        A.  Yes.
24        Q.  Anything else you can think of in terms
25   of the operational issues that you may speak about
```

Page 73

```
1    at trial?
2              MR. SNOW:  Object to form.
3              THE WITNESS:  Can you repeat that,
4    please?
5    BY MR. ROMAN:
6         Q.  Sure.  Let me rephrase.
7              If you can, describe, best as you can
8    recall as you sit here, all of the operational
9    issues that Belt Line underwent after the allision
10   through the time that the bridge was finally
11   repaired.
12        A.  With the rerouting of the trains, which
13   costs additional crews, I had to work in an
14   agreement with the union to help assist us.
15        Q.  I think we -- correct me if I'm wrong --
16   but the rerouting of the trains, the one plan you
17   came up with, with CSX and Norfolk Southern,
18   existed throughout the time until the bridge could
19   be used again?
20        A.  Uh-huh.
21        Q.  And what about the renegotiation or
22   negotiation with the union?  Can you tell me about
23   that?
24        A.  So we have a standing contract with the
25   union of when we are allowed, in certain time
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 74

```
 1   windows, to be able to call train crews to work.
 2   With the detour in effect, we basically had to
 3   have availability to accrue within the two and
 4   half hours.  So our normal operation -- regular
 5   trains would show up, let's say, 6:59 in the
 6   morning and 3:59 in the afternoon to fill a
 7   vacancy for first shift.  I have to know by 7:00
 8   p.m. the day before.  That is the first shift.
 9   And then I need to know by 1:00 p.m. that
10   afternoon to fill second shift.
11          What the union allowed me to do was, when
12   we received a phone call saying there was a train
13   coming into Norfolk for us, I had to get a
14   two-hour call, and I was able to contact the local
15   chairman.  He would call to his employees and have
16   them come to work and report whatever time we
17   needed them to come to work.
18       Q.  And who was that chairman that you
19   interacted with?
20       A.  It is Ronnie Hobbs, H-O-B-B-S.
21       Q.  And when did you first discuss modifying
22   that process with Mr. Hobbs?
23       A.  This all was within the first week of
24   discussions of planning and trying to come up with
25   the best idea.
```

Page 75

```
 1       Q.  And did that require additional crew as
 2   compared to what the normal operations would be?
 3       A.  Yes.
 4       Q.  Do you have an estimate of how many
 5   additional crew members or folks who you had to
 6   put on duty throughout the time that the bridge
 7   was not able to be used in its normal operation?
 8       A.  I can't recall off the top of my head.
 9       Q.  Did that result in any of the crew
10   working like additional hours, overtime, that type
11   of thing?
12       A.  Sure, yes.
13       Q.  Do you have any estimates as to how many
14   overtime hours were -- Belt Line paid throughout
15   that time period?
16       A.  Not off the top of my head, I don't.
17       Q.  Okay.
18          Did Belt Line have to hire any additional
19   crew?
20       A.  No.
21       Q.  So just be additional hours worked?
22       A.  Yes.
23       Q.  All right.
24          Do you have any estimate, in a given
25   week, from the time period of the allision to when
```

Page 76

```
 1   the bridge got resumed to normal service, how many
 2   additional hours worked Belt Line paid as compared
 3   to the normal operations?
 4       A.  No, I don't.
 5       Q.  How would you go about finding out that
 6   information?
 7       A.  I believe we tracked every extra job that
 8   we used for that specific --
 9       Q.  Was anyone else besides you and Mr. Hobbs
10   involved in that discussion with the modified
11   procedures?
12       A.  I'm sure Mr. Reeder was involved too.
13       Q.  Okay.
14          Anyone else that you can think of besides
15   the three of you?
16       A.  As far as making the decision on it, no.
17       Q.  Okay.
18          Did you use a particular crew for those
19   additional hours, or was it just whoever Mr. Hobbs
20   was going to send to you?
21       A.  It is based off availability, if we have
22   extra people -- people waiting to call into work.
23   And if that didn't -- if we didn't have that, then
24   it would go to somebody that was -- you know,
25   prior shift may have worked.
```

Page 77

```
 1       Q.  Okay.
 2          And do you have an estimate for about how
 3   long that modified procedure was in place for?
 4       A.  Until we began operating over the bridge
 5   again.
 6       Q.  Okay.
 7          I think there are a couple of dates or
 8   markers, if you will, of when the bridge got back
 9   in service.  I think first it was like October
10   30th when it could go slower over the bridge,
11   trains could move slower over the bridge and then
12   eventually increase until more normal operations;
13   is that fair?
14       A.  That's fair.
15       Q.  Okay.
16          Was the modified procedure you were
17   talking about, getting additional crew, was that
18   -- did that stop on that October -- around that
19   October 30th date when the first train passed, or
20   was that sometime later in the future when the
21   bridge resumed more normal operations?
22       A.  I can't recall.  It stopped once we
23   received all of the CSX trains, so there could
24   have been some lingering out there.  I just can't
25   remember.
```

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 78

1    Q. And when you say "all of the CSX trains,"
2    that -- meaning when the CSX traffic resumed
3    normally?
4        A. That's correct.
5    Q. Okay.
6        Back to Exhibit 11. It says, "and the
7    expenses arising from the allision." Do you see
8    that there?
9        A. Yes.
10   Q. If you could just describe generally what
11   expenses Belt Line incurred resulting from the
12   allision.
13       A. The expense of operating specific crew to
14   handle the traffic.
15   Q. Okay.
16       And I think, as you sit, you can't
17   pinpoint an estimated figure, correct?
18       A. No, sir.
19   Q. Okay.
20       But, best of your understanding, there is
21   a -- either in the human resource system or some
22   type of record, that the Belt Line has that?
23       A. Yes.
24   Q. Do you know whether the belt line
25   maintains any records that track where -- the

Page 79

1    train traffic that goes through or over the Belt
2    Line, the main line bridge, in a given year?
3        A. Specifically tracks? No. The bridge
4    traffic? No, sir.
5    Q. Okay.
6        How about any records that track the
7    volume of freight that is carried over the main
8    line bridge? Are you aware of any records of that
9    sort?
10       A. No, sir.
11   Q. Okay.
12       If you can take a look at Exhibit 12.
13       A. Okay.
14   Q. Have you ever seen this document before?
15       A. I don't believe so.
16   Q. Okay.
17       To the best of your understanding, did
18   you have any involvement in providing any
19   information that is contained within the document?
20       A. I'm not sure.
21   Q. Okay.
22       Can you recall any conversations with
23   anyone at the Belt Line that said, hey, we have to
24   answer some things for the litigation, and then
25   asking you any type of information -- for any type

Page 80

1    of information?
2        A. Anybody at the Belt Line asked me?
3    Q. Yeah.
4        I don't want to know what Mr. Snow or Ms.
5    Pensyl may have asked you.
6        A. No. I don't recall that.
7    Q. Okay.
8        Is this the first time you've seen this
9    document today?
10       A. I believe so.
11   Q. Okay. All right.
12       MR. ROMAN: Why don't you give me five or
13   ten to go through my notes?
14       MR. SNOW: Sure.
15       (Recess taken.)
16   BY MR. ROMAN:
17   Q. Back on.
18       Mr. O'Brien, we are not going to mark it,
19   but did you have a chance to take a look at those
20   documents that are in front of you?
21       A. Yes.
22   Q. All right.
23       And, just for the record, they are
24   documents Bates-labeled MPBL6828 to -6833.
25       Mr. O Brien, that is the document that

Page 81

1    has the H&H emblem at the top. Do you see that
2    there?
3        A. Yes.
4    Q. Have you ever seen any invoices like this
5    before?
6        A. No.
7    Q. Fair to say you did not have any
8    involvement in paying these invoices like the one
9    we are looking at?
10       A. Correct.
11   Q. And then moving onto the second tab,
12   which is MPBL6838 through -6888, have you ever
13   seen these documents before today?
14       A. No.
15   Q. All right.
16       Fair to say you did not have any
17   involvement in making payments towards these
18   invoices or approving any of the work that was
19   done that is reflected in these invoices?
20       A. That is correct.
21   Q. All right.
22       Then that would be the same answer for
23   the third tab in that binder we are looking at,
24   the MPBL6889 through -6940?
25       A. That is correct.

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

Page 82

1   Q.  All right.
2       Did you have any involvement in the 2013
3   project on the bridge that related to its
4   mechanical systems?
5       A.  2013.  Yeah.  I can't recall off of the
6   top of my head.
7       Q.  Do you have any involvement in Belt
8   Line's application for grants that come from the
9   State of Virginia for work that may be done on any
10  of their bridges?
11      A.  No.
12      Q.  Okay.
13      Are you aware of whether or not the Belt
14  Line has been issued any grants for funds that may
15  be applied towards work that is done on the main
16  line bridge?
17      A.  I'm aware we put in the State for
18  funding.
19      Q.  Okay.
20      Just, generally, what is your
21  understanding of any grants that main line has
22  been issued for work on the bridge?
23      MR. SNOW:  Object to form.
24      THE WITNESS:  I'm not aware exactly of
25  what grants.

Page 83

1   BY MR. ROMAN:
2       Q.  Again, you did not have any involvement
3   in applying for that grant?
4       A.  No, sir.
5       Q.  All right.
6       Do you have any understanding of when the
7   bridge was built?
8       A.  I believe 1956.
9       Q.  Okay.
10      In your time with the Belt Line, have you
11  ever overseen any work that has been done on the
12  bridge?
13      A.  No.
14      Q.  Okay.
15      Do you have any involvement in creating
16  or consulting on any plans to do work on the main
17  line bridge, like in the future?
18      A.  I sat in on discussions.
19      Q.  Okay.
20      Have you sat in on any discussions in the
21  past year in which there were plans to do work on
22  the bridge that were unrelated to the repair work
23  that went on because of the allision?
24      A.  I don't recall.
25      Q.  As best as -- can you recall hearing

Page 84

1   about any intended -- any work that the Belt Line
2   intends to do on the main line bridge within the
3   next five years?
4       A.  I don't recall.
5       Q.  All right.
6       MR. ROMAN:  Mr. O Brien, thank you for
7   your time.  I think that is all I have for now.
8       THE WITNESS:  Yes.
9       MR. JETT:  I don't have any questions.
10  Thank you.
11      MR. SNOW:  I just have a few follow-up
12  questions, Mr. O Brien.
13
14          EXAMINATION
15  BY MR. SNOW:
16      Q.  You provided some testimony about a
17  number of trains a week that cross the bridge --
18  main line bridge in the grain season and the
19  summer season.  Do you recall that testimony?
20      A.  Yes.
21      Q.  And I believe you testified that during
22  the grain season or busy season, it was maybe up
23  to 15 times a week.  I'm trying to get to a number
24  of trains that cross the bridge on a monthly
25  basis, that we have that figure.

Page 85

1       A.  Okay.
2       So there are two times of the year.  So I
3   have to break it down this way:  Our grain season,
4   which mainly runs from -- we will say September
5   30th through May, we will average anywhere from 70
6   to 90 trains per month.
7       Q.  Okay.
8       How many in the summer season?
9       A.  In the summer season, it's reduced, 50 to
10  60 per month.
11      Q.  And am I correct that when a train is not
12  transiting the main line bridge, the movable lift
13  span on the bridge is in the raised position?
14      A.  Correct.
15      Q.  And it is only lowered to allow the train
16  to cross?
17      A.  That is correct.  Or lowered for
18  maintenance.
19      Q.  Sure.
20      You talked about discovery of damage
21  after the allision the evening of June 17th.  Do
22  you recall that discussion?
23      A.  Yes, sir.
24      Q.  Did anyone from the tugboat company call
25  you to tell you that they had hit the bridge?

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
**William O'Brien on 06/05/2025**

---

**Page 86**

```
1        A.  No, sir.
2        Q.  To your knowledge, did anyone from the
3   tugboat company call anyone at Belt Line to tell
4   them they had hit the bridge?
5        A.  Not that I'm aware of.
6            MR. SNOW:  Those are the only questions
7   that I have.
8            MR. ROMAN:  I don't have any follow up.
9            (Deposition concluded at 12:10 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 88**

```
1            COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
2
3            Subscribed and sworn to before me this
    _____ day of _____, 2025.
4
5
            _____
6                Notary Public
7
            My Commission Expires:
8            _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 87**

```
1            I, WILLIAM O'BRIEN, do hereby certify that
    I have read the foregoing transcript of my
2   testimony and further certify that said
    transcript, with the corrections noted below, is a
3   true and accurate transcript of said testimony.
4
            Dated at _____ this ____ day of ____
5   2025.
6                    ERRATA SHEET
7   PAGE      LINE      CORRECTION      REASON FOR CHANGE
8   ____      ____      _____      _____
            ____      ____      _____      _____
9   ____      ____      _____      _____
            ____      ____      _____      _____
10  ____      ____      _____      _____
            ____      ____      _____      _____
11  ____      ____      _____      _____
            ____      ____      _____      _____
12  ____      ____      _____      _____
            ____      ____      _____      _____
13  ____      ____      _____      _____
            ____      ____      _____      _____
14  ____      ____      _____      _____
            ____      ____      _____      _____
                                _____
15                              WILLIAM O'BRIEN
16
17
18
19
20
21
22
23
24
25
```

**Page 89**

```
1            COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
2            I, Heidi D. Quimby, RMR-CCR, Notary
3   Public for the Commonwealth of Virginia at Large,
4   of qualification in the Circuit Court of the City
5   of Newport News, Virginia, and whose commission
6   expires October 31, 2025, do hereby certify that
7   the within named deponent, WILLIAM O'BRIEN,
8   appeared before me at Norfolk, Virginia, as
9   hereinbefore set forth, and after being first duly
10  sworn by me, was thereupon examined upon his oath
11  by counsel for the parties; that his examination
12  was recorded in Stenotype by me and reduced to
13  computer printout under my direction; and that the
14  foregoing constitutes a true, accurate and
15  complete transcript of such proceeding.
16           I further certify that I am not related
17  to nor otherwise associated with any counsel or
18  party to this proceeding, nor otherwise interested
19  in the event thereof.  Given under my hand and
20  notarial seal this 12th day of June 2025, at
21  Newport News, Virginia.
22
23           Heidi D. Quimby, RMR-CCR
24           Notary Registration No. 7207260
25
```

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025                                    Index: -2213..78

**-**

**-2213**  67:7

**-2531**  65:1

**-6827**  69:11

**-6833**  80:24

**-6888**  81:12

**-6940**  81:24

**1**

**1**  52:1

**10**  11:24
  32:22,23
  33:2 69:4
  70:2,22

**10:00**  4:6

**11**  71:20 78:6

**11:00**  26:22

**12**  79:12

**12:10**  86:9

**13**  28:8

**15**  22:15
  28:11 32:22,
  23 33:2,3
  84:23

**150**  4:7

**15th**  22:9
  38:22 39:3

**16th**  31:9

**17**  24:10

**17th**  22:6
  24:23 25:2
  26:1 27:1
  37:19,24
  38:22 39:17
  42:18 43:4
  46:11 49:20
  56:20 85:21

**18**  17:16
  46:3,15

**18th**  45:19,25
  46:24 47:17

**1923**  4:8

**1950**  4:10

**1956**  83:8

**1988**  12:5

**1992**  10:20

**1994**  14:14

**1997**  14:22

**1:00**  74:9

**2**

**2**  60:3,5 61:8
  62:1,18 64:6
  72:3

**2000**  17:20

**2002**  7:6
  17:20

**2006**  19:3

**2009**  19:4

**2010**  7:8,9

**2013**  82:2,5

**2016**  7:9,20
  8:10

**2017**  9:24

**2018**  9:24

**2024**  9:19
  22:7,10,16
  24:10 26:1
  27:2 37:19,
  24 39:3
  45:25 46:3,
  11 54:12
  56:16,23
  57:8 58:24
  69:20

**2025**  4:7

**24/7**  39:9

**2410**  65:4

**258**  62:20

**2644**  60:6

**2649**  63:20

**272.34**  71:1

**2720**  64:6,17

**2:00**  43:13

**3**

**3**  64:25 65:12

**30**  28:10

**30-minute**  28:5

**30th**  77:10,19
  85:5

**3:00**  26:14,
  18,22

**3:59**  74:6

**4**

**4**  50:12,18
  52:1 69:20

**45**  44:21

**5**

**5**  4:6 69:20
  71:1

**50**  85:9

**6**

**60**  85:10

**6678**  52:2

**6710**  54:21,23

**6711**  54:18

**6783**  55:4,7

**6812**  50:19

**6827**  69:5

**6:30**  26:17,18

**6:59**  74:5

**7**

**7**  67:6

**70**  85:5

**78**  62:22,23,
  24

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025                    Index: 7:00..automated

**7:00**  24:19,
22,24 26:4
74:7

---
### 8
---

**8**  68:7

**8:00**  34:9
43:12

---
### 9
---

**9**  69:6,7,10

**90**  85:6

**92**  10:22

**98**  14:22

---
### A
---

**a.m.**  4:6
26:17

**ability**  6:14

**Absolutely**
58:11

**access**  48:15

**accordance**  4:9

**accrediting**
14:7

**accrue**  74:3

**accurately**
52:9

**acted**  52:24
53:12,21

**actual**  15:13
38:15 60:18
66:23

**Adam**  8:8 9:16
20:15 21:8
49:16 58:20

**Adam's**  20:14

**added-up**  70:23

**additional**
13:5 73:13
75:1,5,10,
18,21 76:2,
19 77:17

**advance**  25:17

**affect**  6:14
44:14

**afternoon**
74:6,10

**agreement**
73:14

**ahead**  35:4

**ahold**  38:6

**AIS**  42:4,6,8

**alcohol**  51:22

**alignment**
35:19

**alleged**  72:10

**allision**  70:19
71:10,17
72:12,17
73:9 75:25
78:7,12
83:23 85:21

**allowed**  73:25
74:11

**amended**  4:10

**ammunition**
12:16,18

**announcement**
28:9

**annual**  67:20

**apologies**  69:8

**apologize**
22:22 53:8

**application**
82:8

**applied**  82:15

**apply**  13:21

**applying**  13:4
83:3

**approaching**
28:6

**approving**
68:23 70:16
81:18

**approximately**
28:10

**area**  36:10
40:11,14

**arising**  72:12
78:7

**arrangements**
46:25 47:6

**arrived**  34:14,
16

**assist**  16:24
17:4 40:24
73:14

**assistant**
16:21,23
17:12,14
18:7,18

**assisting**
18:22

**Association**
36:7,8 37:2,
13 38:4
41:21

**assume**  46:24

**Atlanta**  17:9
18:19,24

**attachments**
60:21

**attend**  14:21

**attended**  65:23

**attention**
46:20 58:2

**attorneys**  4:18

**author**  61:11

**authoring**
68:19

**authorize**
60:14

**authors**  61:16,
18

**automated**
21:13 27:15,
18 59:13

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025                    Index: automation..bridge

**automation**
  29:9

**availability**
  74:3 76:21

**average**  32:19
  85:5

**aware**  69:23
  70:1 79:8
  82:13,17,24
  86:5

━━━━━━━━━━━━━
            **B**
━━━━━━━━━━━━━

**back**  18:4
  22:22 25:23
  26:10 36:24
  37:22 38:7,
  12 39:6,7,
  16,24,25
  40:18 49:22
  77:8 78:6
  80:17

**backed**  35:25

**background**
  12:1 43:16,
  18

**backing**  39:20

**baffled**  35:18

**base**  35:25

**based**  17:11
  19:15 45:10
  76:21

**basic**  15:14
  20:10

**basically**  11:3
  20:14 29:22
  74:2

**basis**  84:25

**batch**  64:7

**Bates**  52:2
  54:16 55:2
  60:6 62:18
  63:16

**Bates-labeled**
  50:18 65:1
  67:6 69:5
  80:24

**began**  58:23
  77:4

**beginning**  57:7
  66:8

**begins**  26:13

**behalf**  4:2,13

**belongs**  23:24

**belt**  6:19,21,
  25 10:15
  19:6,19,24
  20:21 21:2,5
  22:2 23:22
  24:21 28:9
  31:14,25
  49:7,12
  51:11,20
  52:25 53:22
  54:9 67:14
  71:8,14
  72:10,16
  73:9 75:14,

18 76:2
  78:11,22,24
  79:1,23 80:2
  82:7,13
  83:10 84:1
  86:3

**Biel**  10:6,8

**big**  70:3

**binder**  50:9
  60:3 81:23

**Birmingham**
  19:12

**bit**  19:22
  32:6 35:23
  46:14 62:5
  65:2

**blue**  55:6

**boats**  44:24

**body**  14:7

**bolt**  63:22

**bottom**  55:6

**box**  55:14

**brakeman**
  10:23,24
  11:2,8 12:19

**branch**  20:1

**Brandon**  65:5

**break**  6:6,7,
  10 59:23
  85:3

**bridge**  19:23
  20:1,4,9,11,

19,20 21:1,
  6,14,16 22:3
  24:18 25:2
  27:3,9,10,
  11,15,22,25
  28:6,7,9,12,
  15,16,18,23,
  24 29:2,4,8,
  21 30:7,10,
  12,15,16,24
  31:2,9,18
  32:1,21,24
  33:4,11,23,
  25 34:1,15,
  17 35:1,22
  36:4,14,15,
  17,19 38:7,
  12,16 39:22
  40:7,10
  43:7,22
  44:6,19
  46:2,11,17
  50:2 51:4,6,
  9,11,15,19,
  23 52:18
  53:4,18,22
  54:4,7 55:25
  57:7,11,17
  58:13,19
  59:5,7,11,
  15,19 67:16,
  21,23 68:3
  70:18 71:16
  73:10,18
  75:6 76:1
  77:4,8,10,
  11,21 79:2,
  3,8 82:3,16,

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
William O'Brien on 06/05/2025                          Index: bridges..conditions

22 83:7,12,
17,22 84:2,
17,18,24
85:12,13,25
86:4

**bridges**  15:18
19:24 20:22
21:1,11
52:8,13
54:20 82:10

**Brien**  4:23
60:2 65:3
69:13 70:5
71:22 72:4,9
80:25 84:6,
12

**bring**  48:18

**broad**  46:14

**Brown**  48:2,3,
8 49:5

**Brown's**  48:4

**bucket**  64:16

**built**  71:10
83:7

**busy**  32:7,10,
19 84:22

**button**  28:18,
22

**buttons**  28:3

————————
          **C**
————————

**call**  22:24
24:6,20

26:10 28:4,
12 29:15
31:2 34:14
36:5,6,22
49:10 74:1,
12,14,15
76:22 85:24
86:3

**called**  16:11,
22 29:16
42:1,3

**calling**  29:15

**calls**  65:19

**camera**  28:13
30:23 40:1

**camera's**  41:4

**cameras**  28:16
36:25 38:11,
14,15,24
39:19 40:4,5

**Cannon**  7:24
9:6 33:19
36:6 49:16
52:22

**capacity**  52:25
55:25

**career**  13:8

**Carolina**  25:12

**carried**  79:7

**case**  23:8

**caused**  35:19

**certification**
13:17,19,25

14:2,10,13,
17 15:25

**certifications**
13:15

**chain**  57:21

**chairman**
74:15,18

**chance**  45:5
61:8,24
71:23 80:19

**change**  56:24

**changed**  33:20

**Channel**  28:8

**charge**  11:17
36:10

**Charlie**  65:5

**Chattanooga**
17:10

**checks**  17:3

**Chesapeake**
7:12 28:15

**claim**  72:11

**claims**  17:5

**clarify**  69:10

**classroom**
12:23,24
13:10 15:2
16:1

**clean**  5:12

**clear**  23:8

**click**  40:1

**climb**  59:7

**Coast**  36:7
37:13,16
41:7,13,16
46:10

**Coeymans**  4:19

**Columbus**
19:12,16

**column**  70:23

**columns**  55:15

**commencing**  4:6

**Commonwealth**
4:4

**communication**
30:12,19,22,
25

**communications**
61:12

**company**  6:20,
23 7:4 8:20
25:6 43:6,8
45:3 51:19
85:24 86:3

**compared**  75:2
76:2

**computer**  42:4

**concerned**
36:16 43:7
58:8

**concluded**  86:9

**condition**  68:3

**conditions**

7:17 32:12
44:14

**conducting**
67:23

**conductor**
11:2,3,13,
15,16,19,20,
23 13:6,11,
12,17,19,23
14:24 16:9,
20 18:2
28:20,21

**confirm** 19:23
60:14

**connect** 39:6

**considered**
32:7

**consist** 21:10

**consistent**
29:3

**constant** 13:7

**constructing**
71:9

**consult** 49:11

**consulting**
83:16

**contact** 38:3
47:5,23
74:14

**contacted**
33:21 37:17

**contained**
61:25 79:19

**contest** 6:7

**continuing**
48:9

**contract** 73:24

**contractors**
46:18 50:1
71:15

**control** 28:19

**controls** 27:11

**conversation**
34:22

**conversations**
79:22

**Cooper** 55:22
56:4,6,9

**Corps** 12:8,
10,15

**correct** 8:5,11
11:13 14:25
16:7 26:12
27:19 47:2
53:10,15,16,
17 55:5
57:3,9 61:4
63:21 67:1
70:2,14
73:15 78:4,
17 81:10,20,
25 85:11,14,
17

**corrected**
69:11

**correctly**
27:17 56:17

72:13

**costs** 73:13

**counsel** 5:10
61:4 69:10

**couple** 5:8
40:6 49:2
56:19 60:10
63:13 65:19
77:7

**court** 4:10
5:16

**courtesy** 5:16

**creating** 83:15

**Crenshaw** 4:7

**crew** 28:4
75:1,5,9,19
76:18 77:17
78:13

**Crewe** 16:15,
16

**crews** 9:1
16:25 17:2
18:24 19:14
23:7,12,16,
21,23,24
73:13 74:1

**cross** 25:2
84:17,24
85:16

**cross-talking**
5:18

**crossing** 25:15

**CSX** 23:23

25:7 34:15,
20 47:3,21,
24 48:4,11,
18 72:22
73:17 77:23
78:1,2

**current** 44:13

**customer** 17:4
23:18

**customers** 9:2
18:25 23:16

---

**D**

**damage** 30:7
85:20

**date** 42:2,5
58:24 77:19

**dates** 77:7

**David** 7:23

**day** 23:7 31:9
45:18 74:8

**days** 25:23
32:16 46:10
49:1,2
56:19,21
65:17

**deal** 9:1
20:22

**dealing** 20:25

**deciding** 50:6

**decision** 49:6,
7 76:16

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025                                    Index: defer..evening

defer  68:2

definite  34:18

degrees  53:9

depending
 32:11

deposed  4:12

deposition
 4:1,25 86:9

describe  8:23
 30:20 34:12
 51:2 58:22
 59:3 73:7
 78:10

designated
 54:6

determine  61:1

determined
 56:1

detour  74:2

difference
 13:3

difficult  5:18

diploma  12:2

direct  8:6
 10:3 67:15

directions
 28:14

directly  9:12,
 13 58:10
 66:16

discharge
 12:12

disclosures
 71:19

discovery
 85:20

discuss  49:16
 74:21

discussed
 35:17 41:16
 56:4,6,9,13
 66:7 72:15

discussion
 29:19 33:22
 54:25 63:3
 76:10 85:22

discussions
 41:20 46:10
 47:16 74:24
 83:18,20

district  17:24

diverted  49:22

division  47:15
 48:6

document
 50:17,25
 51:13 67:6,
 9,11 68:12,
 16,20,25
 69:12 70:8,
 13 71:21,25
 79:14,19
 80:9,25

documents
 60:5,9,11
 64:25 65:12

80:20,24
 81:13

drafting  70:12

drug  51:22

dusk  34:9

duties  7:15

duty  22:19,23
 23:5,8,25
 24:9 45:25
 75:6

_____

E
_____

e-mail  57:18,
 20,25 58:5
 61:12

e-mails  60:13,
 15,18,21,24

ease  43:9

easily  35:6

education  20:8
 36:18

educational
 12:1

effect  74:2

efficient
 27:21

elevated  18:6

Elizabeth  20:1

emblem  81:1

employees
 23:21 31:25

71:8,15
 74:15

engineer  11:2,
 16,25 14:12
 16:6,8 18:2
 53:4,13

engineer's
 14:10,17

engineering
 49:22 53:9

engineers
 43:16,19
 56:3 66:18
 67:21,23
 68:3

Ensures  17:2

entail  18:21

entails  18:22

entity  37:11

error  31:5

estimate  48:25
 65:22 75:4,
 24 77:2

estimated
 24:24 42:5
 78:17

estimates
 75:13

evening  25:3
 37:24 39:17
 42:18,22
 43:4,11,22
 44:11 45:11,

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
William O'Brien on 06/05/2025                    Index: eventually..Graning

15 49:20
85:21

**eventually**
77:12

**examination**
4:1,15 84:14

**excuse** 28:17
33:3

**exhibit** 50:12,
18 52:1
60:3,5,20
61:8 62:1,18
64:6,25
65:12 67:5,6
68:7 69:4,6,
7,10 70:22
71:20 78:6
79:12

**existed** 73:18

**expand** 23:12

**expense** 78:13

**expenses** 72:11
78:7,11

**experience**
31:14 32:20

**experiences**
20:25

**explain** 71:5

**extra** 16:10
76:7,22

---

**F**

**F.R.A.** 51:8,22

**fact** 37:15

**facts** 72:10

**fair** 5:19
6:3,11 35:5
53:12 56:18
58:9 61:3,11
68:2 70:11
72:6,15
77:13,14
81:7,16

**fairly** 6:3

**fall** 44:11

**falling** 36:17

**familiar** 20:4
61:2 64:18,
21

**familiarize**
50:21

**fast-forwarded**
39:25

**feeds** 30:22

**feet** 35:24

**felt** 44:13,15

**Fifteen** 7:2

**figure** 78:17
84:25

**figures** 71:1,3

**fill** 16:11
74:6,10

**film** 39:18

**finalize** 48:21

**finally** 73:10

**find** 39:21
54:14 57:10

**finding** 76:5

**findings** 45:8

**finish** 5:14

**five-day** 25:22

**fluctuates**
25:21 32:11

**folks** 44:6,20
45:8 49:21
65:13 68:4
75:5

**follow** 86:8

**follow-up**
28:11 84:11

**font** 55:6,8

**footage** 40:5,
25 41:5,24

**form** 31:16
45:20 73:2
82:23

**forward** 46:15
49:23

**found** 30:6
41:9

**frame** 16:13
17:19 23:15
38:22 41:4,
9,24 56:22
57:15 58:25
69:25

**freight** 79:7

**Friday** 23:14
24:14 31:21

**front** 50:9
80:20

**functions**
15:14

**funding** 82:18

**funds** 82:14

**future** 77:20
83:17

---

**G**

**gave** 42:5

**general** 8:2
32:3

**generally**
31:24 48:7
78:10 82:20

**Georgia** 14:19
15:10 16:22
17:13,25
19:13,16

**give** 28:5
54:14 80:12

**good** 4:17
5:12 39:23

**graduate** 12:4

**grain** 32:9
84:18,22
85:3

**Graning** 65:5

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025                    Index: grant..intends

grant  83:3

grants  82:8,
  14,21,25

ground  5:11

Guard  36:7
  37:13,16
  41:8,13,16
  46:10

guess  20:18
  22:15 36:10
  40:14 46:5
  65:16

guesstimating
  56:15

Guidelines
  51:8

guys  15:12
  33:22,25
  35:17 37:20
  41:3 43:1
  44:19

                    H

H&h  81:1

H-O-B-B-S
  74:20

half  33:14
  74:4

handle  23:16
  78:14

hands  9:2

hands-on  15:4

happen  45:18

happened  22:24
  34:13 36:3
  39:16 41:25
  43:1

happening
  55:10,11

happy  5:25

head  58:2,4
  75:8,16 82:6

heads-up  28:5

hear  24:17

hearing  83:25

Heidi  4:3

held  8:19
  16:9 54:25
  63:3

Hensen  65:6

hey  79:23

high  12:2,6

hire  75:18

hit  28:18,22
  39:22 85:25
  86:4

Hobbs  74:20,
  22 76:9,19

hold  12:6
  13:15 14:10
  16:8 17:21
  18:16 19:1,2
  53:9

home  30:4

45:14

Honorable
  12:12

hour  39:23
  41:6

hours  24:14
  74:4 75:10,
  14,21 76:2,
  19

house  27:9
  30:15

human  78:21

hundred  9:25
  44:3

                    I

idea  74:25

identification
  54:20

identified
  41:23 42:14
  43:2

identify  41:4

impacted  40:15

implemented
  56:20

incident  22:8,
  9 24:18 43:4
  46:11 48:10
  58:14 65:19

including
  60:16 72:11

increase  77:12

incurred  78:11

individual
  37:11

information
  25:15,16
  30:24 43:2
  72:9 76:6
  79:19,25
  80:1

informed  58:18

initial  29:14,
  19 33:22
  36:4 49:20
  57:1

initially
  58:23

input  66:22

inside  27:10
  28:19

inspect  43:21

inspection
  43:8 68:17
  69:19,24

inspections
  67:15,20,24

inspector
  53:19

instructed
  36:6 37:6

intended  84:1

intends  84:2

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025                                Index: interacted..made

**interacted**
74:19

**invoices**  70:17
81:4, 8, 18, 19

**involved**  49:5
52:7, 12
67:19  68:4
76:10, 12

**involvement**
46:16  49:25
50:6  51:10
67:15  68:19,
23  69:18
70:12, 16
71:7  79:18
81:8, 17
82:2, 7  83:2,
15

**involving**
24:18

**issued**  82:14,
22

**issues**  14:1
72:11, 16, 25
73:9

———————

**J**

**Jay**  47:9

**JETT**  84:9

**job**  7:10, 25
10:7, 8  11:22
12:16  18:21
47:13  76:7

**jobs**  12:6

**Jonathan**  10:6
49:17

**June**  4:6  9:18
22:6, 9, 15
24:10, 22
25:2  26:1
27:1  37:19,
24  38:22
39:3  42:18
45:18, 25
46:3, 11, 15,
23  54:12
56:18, 19, 23
57:14  69:20
85:21

———————

**K**

**kind**  49:19

**kink**  29:21
34:18  35:1

**knew**  30:14
51:23  61:21

**knowledge**
13:20  20:10,
13  86:2

———————

**L**

**L253**  25:7, 9,
19, 25

**label**  55:2
63:17

**labels**  63:16

**land**  44:23, 25

**large**  4:5

**late**  42:24
58:15

**learn**  15:12
51:17

**learned**  20:14

**legs**  35:24

**licenses**  13:16

**lift**  85:12

**lifting**  27:3

**light**  34:8
48:9

**Line's**  72:10
82:8

**lines**  71:2

**lingering**
77:24

**listed**  72:4

**listened**  66:13

**listening**
65:19

**litigation**
79:24

**living**  16:15

**LLC**  4:20

**load**  55:25

**local**  74:14

**located**  7:11
16:14  27:7
35:2

**locomotive**
15:15

**logistics**
12:17

**long**  6:25
7:18  11:8,
19, 22  15:1
17:14  22:1
25:25  26:20
39:12  41:3
42:21  44:18
48:21  56:13
59:11  77:3

**looked**  34:17
42:14

**looped**  58:9

**lot**  4:20  9:2
60:13

**lower**  21:17
27:22

**lowered**  28:1
29:4  33:5
58:14  85:15,
17

**lowering**  27:8,
15  28:10, 12
30:23  59:4

———————

**M**

**Macon**  17:25

**made**  28:8
38:3  49:7, 10
66:23

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
William O'Brien on 06/05/2025          Index: main..MPBL2649

| | | | |
|---|---|---|---|
| **main** 4:8 19:23,25 21:1 31:18 32:1,21 33:11 38:13 40:10 55:25 57:7 67:16, 22 70:18 71:16 79:2,7 82:15,21 83:16 84:2, 18 85:12 | **manual** 59:1,4 **manually** 21:14 59:12,15,19 **marathon** 6:7 **Marine** 4:19 12:8 **maritime** 42:10 **mark** 80:18 **marked** 50:18 69:3 | **meetings** 17:4 65:16,23 66:3 **members** 75:5 **Merit** 4:4 **message** 31:5 **method** 59:13 72:21 **methods** 21:18 **Michael** 4:18 | **month** 33:3 49:1 85:6,10 **monthly** 84:24 **months** 15:2,3, 7,21 17:16 50:3 **morning** 4:17 43:13 44:16 74:6 **Moss** 7:24 8:3 9:6,7 33:19 |
| **maintains** 78:25 | **markers** 77:8 **market** 32:12 | **mid-september** 32:3 | 36:6,13,20 42:1,13 43:3 52:22 56:7 57:12 58:17 |
| **maintenance** 7:17 85:18 | **Martin** 4:7 **master** 8:8 | **mid-to-late** 56:22 57:14 | **Mount** 25:11 48:12 |
| **make** 22:14 29:1 46:25 47:6 58:7 61:20 70:6 | **match** 42:6 **Mcdonough** 14:19 | **mind** 43:9 **minute** 50:21 62:15 | **movable** 85:12 **move** 64:24 77:11 |
| **making** 49:5 76:16 81:17 | **meaning** 66:16 67:2 78:2 | **minutes** 28:10, 11 44:21 | **moved** 49:23 **moving** 47:4 |
| **manage** 8:25 51:9 | **means** 23:12 30:20 | **missed** 29:15 **missiles** 12:18 | 68:7 81:11 **MPB** 23:23 |
| **management** 51:4,6,11, 15,19,21,23 52:8,13 53:13,22 | **meant** 61:21 **measure** 62:6 63:19 **mechanical** 69:19,24 | **modified** 76:10 77:3,16 **modifying** 74:21 **Monday** 23:14 | **MPBL** 60:6 **MPBL006678** 50:19 **MPBL006783** 55:3 |
| **manager** 8:2 52:18 | 82:4 **medications** 6:13 | 24:10,14,22 31:21 **monitor** 28:14 | **MPBL2173** 67:6 **MPBL2408** 65:1 |
| **managers** 10:12 **managing** 16:24 17:5 18:24 | **meeting** 66:7, 11 | 29:1 31:1 **monitors** 28:16 | **MPBL2649** 62:4 |

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025         Index: MPBL2678..opinion

MPBL2678    62:16

MPBL2753    60:6

MPBL6680    53:25

MPBL6813    69:5,
   11

MPBL6828    80:24

MPBL6838    81:12

MPBL6889    81:24

multiple    17:5

———————

**N**

named    52:16

names    45:5
   65:5

narrowed    40:1

Nate    24:20
   27:5 36:6
   37:4,6,9
   44:2 49:17

Nathan    10:6
   23:2 28:1,7
   37:12

needed    21:21,
   25 23:19
   24:4 74:17

negotiation
   73:22

non-busy    33:10

non-union    18:7

Norfolk    4:8
   6:19 10:16,

18,21 11:12
   12:7,20
   14:5,6,18
   16:17 18:13
   19:21 47:2
   48:15,17,18,
   20 72:22
   73:17 74:13

normal    23:13
   24:13 31:20
   58:25 74:4
   75:2,7 76:1,
   3 77:12,21

North    25:11

northern    16:22

Notary    4:4

notes    65:12
   80:13

Notice    4:5

noticed    30:11

notify    22:24

November    7:9
   56:15,16,23
   57:8,15
   58:24 59:16

number    54:16
   84:17,23

numbers    64:11

———————

**O**

O'BRIEN    4:2,12
   50:17 65:6,8
   80:18

Object    31:16
   45:20 73:2
   82:23

objectives
   52:3

observation
   36:4

observations
   45:10

observe    35:6,
   12

observed    34:25
   44:7

obtain    13:18
   14:13 15:25
   20:12

obtaining
   14:17

October    58:15
   77:9,18,19

office    27:11
   36:24 37:22
   38:13 39:7,
   17 40:18
   42:22

offices    24:2

on-call    24:3,4

on-site    34:13
   67:22

on-the-job
   12:23 13:2
   14:19 15:21
   16:2,3

ongoing    57:20

operate    15:15
   20:10,19,20
   21:6,9,16
   22:3 30:14
   31:4 32:1
   36:9 59:15

operated
   59:12,20

operating
   21:11,12
   28:3 77:4
   78:13

operation    7:16
   10:9,12
   18:23 27:3
   32:5 46:21
   58:8,25 74:4
   75:7

operational
   72:11,16,25
   73:8

operations
   8:13,20,24,
   25 9:1,8
   10:11 15:16
   16:25 23:7,
   13 31:20
   46:24 48:9
   49:23 58:18,
   23 59:13
   75:2 76:3
   77:12,21

operator    28:6

opinion    66:19,

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025                    Index: oral..positions

21

**oral** 4:1

**order** 13:23
38:25

**organization**
14:1

**outlined** 68:25

**oversee** 27:7
71:7,11,14

**overseeing**
27:2 29:8
46:18 50:1
67:20 71:8

**overseen** 83:11

**overtime**
75:10,14

———————————

**P**

**P.L.C.** 4:7

**p.m.** 24:22,24
26:5,14
34:10 74:8,9
86:9

**p.m.-ish.**
24:19

**pages** 60:10
64:20

**paid** 75:14
76:2

**paper** 61:22

**paragraph**
52:2,4 53:3,

5,19 54:3

**part** 24:15
57:18

**participate**
65:21 66:14,
16

**pass** 13:13
32:2,20
33:11

**passed** 77:19

**past** 83:21

**pay** 58:1

**paying** 81:8

**payment** 70:17

**payments** 81:17

**payroll** 17:4

**PCL** 65:13,17

**pending** 6:8

**Pensyl** 54:17,
23 80:5

**people** 9:11
45:2 49:9
76:22

**percent** 9:25
44:3 71:1,2

**performed**
68:25 71:9,
15

**performing**
50:2,7

**period** 75:15,
25

**permission**
28:19,22

**person** 28:2

**persons** 52:7,
12

**perspective**
49:22

**Petersburg**
48:14,15

**Petitioner**
4:3,13,19

**phases** 66:8

**phone** 24:20
29:12 36:5
66:2 74:12

**photo** 62:8,11
63:18,25
64:10,12,21

**photographs**
35:13 61:25

**photos** 35:9
60:16,19
62:15,17,18
63:6,11
64:5,18

**physically**
21:11 23:20
24:1,2 27:7
29:7

**pick** 48:16,17

**picture** 63:23

**pinpoint** 78:17

**place** 56:14
77:3

**places** 9:3

**plan** 47:3
48:9,22 54:7
56:13,20,23
57:1 66:22
73:16

**planning** 66:9
74:24

**plans** 83:16,
21

**point** 26:4
36:1 39:25
43:12 46:15
47:5,23

**policy** 52:14,
16

**poor** 5:22

**Portsmouth**
6:19 28:15
29:24 34:14
35:3 48:13

**position** 7:3
8:10,12 10:7
11:5,12,22
16:8,9 17:21
18:8,17
19:2,17
47:13 48:4
85:13

**positions** 8:19
10:25 11:1
16:11,17

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025          Index: preference..receiving

preference
  27:18

prepared   65:13

preparing
  70:12

present   34:5
  40:22 41:1
  43:14,24
  44:1 58:13

president   8:2,
  13

pretty   32:4
  35:6

primary   47:5,
  23

prior   20:15,
  21 26:1
  28:12 39:1,3
  76:25

procedure
  77:3,16

procedures
  76:11

proceed   69:25

proceeded
  30:15 69:20

process   13:18
  14:11,16
  29:3 59:4
  65:14 68:4
  74:22

professional
  66:20

program   51:4,
  6,11,19
  52:18 53:13,
  22

programs
  51:21,24

progress   57:16

project   82:3

promoted   11:13
  13:6,12

provide   18:11
  66:22

provided   84:16

providing
  79:18

pursuant   4:5

pushing   28:2

put   43:9 75:6
  82:17

─────────────

          Q
─────────────

qualified
  21:24 22:3

question   5:13
  6:1,8,9
  45:22 46:14
  60:8,12 67:8

questions   5:22
  68:2 84:9,12
  86:6

quick   54:24
  59:22

Quimby   4:3

─────────────

          R
─────────────

R.B.I.   53:21

radio   28:4

rail   8:25
  34:18

railroad   6:19
  10:17 13:8
  14:3 15:18
  20:22 23:20
  52:8,13,22
  53:4,12,18
  54:4,6 55:25

raise   21:17
  27:21

raised   27:25
  29:5 33:5
  85:13

raising   27:3,7
  59:4

range   62:18

rate   70:23

rating   55:22
  56:4,6

ratings   56:9

reach   23:9
  26:8 37:2,9,
  12,15 48:19

reached   26:5
  29:12

read   52:9

55:17,18
61:21 63:18
64:10 72:13

ready   50:22

real   54:24

reason   6:10

recall   9:23
  17:18 18:14
  23:4 25:5,25
  26:2 27:17
  29:11,18
  35:10,16
  36:12,21
  44:5,18
  45:2,5 46:6,
  7,12 48:23
  51:14 56:17
  57:24 59:14
  62:12 63:9,
  23,24 64:3,
  22 65:22
  66:6,10
  68:11 69:15
  71:18 73:8
  75:8 77:22
  79:22 80:6
  82:5 83:24,
  25 84:4,19
  85:22

receive   25:14,
  16

received   24:20
  74:12 77:23

receiving
  28:22 57:15

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
William O'Brien on 06/05/2025                    Index: recess..Roman

| | | | |
|---|---|---|---|
| **recess** 59:25 80:15 | **regularly-scheduled** 25:20 | 11:3 45:7 49:9 68:17 74:16 | **result** 75:9 |
| **recognize** 50:24 63:11 71:25 | **regulations** 51:18 | **reported** 8:3 9:7 | **resulting** 78:11 |
| **recollection** 65:15 | **relate** 15:17 | **reporter** 4:4 5:16 | **resume** 58:19 59:12 |
| **recommended** 68:24 | **related** 70:17 72:10 82:3 | **reports** 8:6 9:14 10:3 | **resumed** 76:1 77:21 78:2 |
| **record** 4:22 5:12 39:9 54:25 63:3 67:1 78:22 80:23 | **relay** 28:20 **relayed** 43:2 **relevant** 40:6 **remember** 19:4 26:9 29:14 42:23 43:5 46:4 54:15 77:25 | **represent** 65:11 **represents** 4:19 **require** 75:1 **reroute** 46:25 48:11,13 49:6 | **retained** 39:13 **return** 5:15 **review** 36:24 40:5 71:23 **reviewed** 39:18 **reviewing** 39:24 40:24 41:5 42:5 |
| **recording** 38:14 | | | **Richmond** 48:12 |
| **recordings** 39:12 | **renegotiation** 73:21 | **rerouting** 47:24 56:14, 24 72:20 73:12,16 | **river** 20:2 28:14 29:1 |
| **records** 78:25 79:6,8 | **renew** 13:25 | | **road** 71:9 |
| **reduced** 85:9 | **repair** 46:17 50:2 83:22 | **resource** 78:21 | **Robert** 48:2 |
| **Reeder** 8:8 9:16,18,22 10:2 20:16 76:12 | **repair-work** 65:14 | **responded** 26:10 | **Rocky** 25:11 48:12 |
| **refer** 6:21 19:24 | **repaired** 73:11 **repairs** 58:7 66:23 68:24 | **responding** 5:15 **response** 28:25 49:20 | **role** 7:19 8:15 9:8 13:6 18:16 **roles** 16:12 20:21 |
| **reflected** 81:19 | **repeat** 31:19 73:3 | **responsibilities** 7:14 19:13 52:7 | **Roman** 4:16,18 31:17 33:16, 18 45:24 54:15,19,22, 24 55:1 |
| **regard** 43:3 46:24 | **rephase** 5:25 **rephrase** 73:6 | **responsible** 23:6 27:2 | |
| **Registered** 4:3 **regular** 74:4 | **report** 7:21 9:5,6,11,14 | | |

59:22 60:1
61:4,6,19
63:2,4 64:15
69:7,9 70:2,
4 73:5
80:12,16
83:1 84:6
86:8

Rome   17:13

Ronnie   74:20

room   27:10
28:7,19 29:8
30:11 31:9
33:23 38:7,
12 39:7
41:12

ropes   20:18

Rose   10:6,8
23:2,4,25
24:20 26:5
27:5 29:12
30:6 33:21
34:2 35:12
36:3 37:15
38:3 40:18,
24 41:7,16
42:21 56:10

Rose's   10:7
41:20

roughly   33:14

route   20:15

rule   17:3

rules   4:9
5:11 13:4,

13,20,22
17:3 52:6

run   32:4 59:8
62:15,16

running   18:23
29:9 32:15
46:20

runs   11:15,16
85:4

_____

**S**

safe   52:8

safety   9:1
13:1 52:12

sat   83:18,20

Saturday
22:10,17
23:5 24:1
39:24

Savannah
17:23,24

SB   54:22

schedule   24:14
25:18,21
26:1

scheduled   25:1
27:14 31:8

school   12:2,6
14:19 15:3

screen   30:25
31:6

search   40:2

season   32:8,9,
10,19 33:10
84:18,19,22
85:3,8,9

section   52:19

sees   28:13,
16,17

send   25:23
76:20

separate   14:7
18:11

September
10:20 85:4

series   60:5
64:5,25
65:5,12

service   23:18
36:15 76:1
77:9

session   13:10

set   25:17

seven-day-a-week
32:4

shift   24:21
26:12,13,15,
17,18,20,23
27:1 28:2
31:25 74:7,
8,10 76:25

shifted   35:24

shout   63:15

show   74:5

showed   20:18

showing   39:19

side   28:15,23
34:15,17
35:3 40:10
49:23

signal   29:24
34:16

signals   15:15

sir   5:20
6:16,24
8:17,22
12:11,13
18:9 19:8
20:3,5,20
22:14 24:15
26:24 29:9
38:8 41:22
50:4,8
52:20,23
53:1,11,20,
23 54:2,5,8,
13 55:17,19
56:5,8,11,25
58:1,16
59:1,17,21
61:13 64:1
66:15,21
68:21 69:1,
16,21 70:9
71:13 78:18
79:4,10 83:4
85:23 86:1

sit   69:23
73:8 78:16

IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.
William O'Brien on 06/05/2025                    Index: sitting..talking

sitting   34:16

situation   24:3

slower   77:10,
 11

Snow   6:6
 31:16 33:15
 45:20 54:21
 59:24 60:20
 61:1,15
 64:14 69:6
 73:2 80:4,14
 82:23 84:11,
 15 86:6

sort   12:17
 22:3 31:5
 35:18 36:3
 40:1 41:24
 42:23 43:1
 46:16 48:21
 66:13 67:19
 79:9

southern
 10:16,19,21
 11:12 12:7,
 20 14:5,6,18
 16:18 18:13
 20:1 47:3
 48:15,17,20
 72:22 73:17

span   85:13

speak   34:19
 72:25

speaking   41:13

specific   20:8
 21:4 52:3

76:8 78:13

specifically
 15:18 40:14
 46:23 79:3

speed   65:2

spoke   36:13

spoken   41:7

spreadsheet
 70:3

standing   35:3
 37:17,20
 73:24

start   9:22
 10:18 28:22,
 25 31:1

started   10:22
 12:7,19
 13:11 21:2,5
 22:2 39:20
 59:9

starting   10:14

starts   54:3
 62:4 64:6

state   4:21
 82:9,17

States   12:8

steel   55:15

Stenson   7:23

Stenson's   7:25

stop   29:24
 77:18

stopped   28:18

77:22

storage   12:17

straight   15:8,
 9 35:4

Street   4:8

strike   43:14

struck   29:20

subject   41:24

subsection
 72:4

substance
 15:13

substances
 6:13

succeeded   8:4

Suite   4:8

summer   84:19
 85:8,9

Sunday   31:10

superintendant
 48:6

superintendent
 7:5,15,19,22
 8:7 9:13,15,
 18,23 18:18,
 23 47:15

superintendent's
 38:13 39:7,
 17

supervisor
 20:15 22:23
 23:1 24:21

54:4,7

supposed   24:1
 29:4

Supreme   4:9

surveillance
 38:15 40:25

sworn   4:12

symbol   25:10

system   21:13
 27:18 30:23
 38:14 42:4,
 7,8,9,14
 78:21

systems   20:22
 28:13 39:6
 69:19,24
 82:4

───────────

T

tab   50:12
 64:24 69:3
 81:11,23

tabbed   60:3

taking   35:12

talk   5:14
 56:3

talked   32:6
 72:20 85:20

talking   6:22
 19:22,25
 33:15 35:14
 58:6 66:2
 77:17

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
William O'Brien on 06/05/2025                                Index: tape..trains

tape   39:21
  62:6 63:19

team   49:13,14

technician
  12:17

ten   33:12
  80:13

Tennessee
  17:10

terminal
  18:22,24

terms   48:8
  72:24

terrible   29:21

territory
  16:22,25
  17:5,8,24

test   13:13,23

testified
  84:21

testify   6:14

testimony
  84:16,19

text   29:12,16

texted   26:9

thing   47:1
  75:11

things   17:5
  60:22 65:2
  79:24

thinking   30:22

thread   57:25
  58:5

thumb   50:20
  60:7,18

Thursday   4:6

timber   55:15

time   5:23 6:7
  8:1,21 11:25
  13:10 16:9,
  13 17:19
  19:6 21:2
  22:1 23:13,
  15 26:13,16
  29:4 30:2
  31:19,22,23
  38:21,22
  40:19,23
  41:4,8,9,24
  42:2,6 48:4
  54:11 56:22
  57:11,15
  58:24 59:7,
  16 67:14
  69:25 73:10,
  18,25 74:16
  75:6,15,25
  80:8 83:10
  84:7

timelines   58:7

times   5:4
  33:3 84:23
  85:2

tiny   55:8
  62:5

title   7:25

12:16

today   4:20
  5:23 6:14,22
  9:12 10:2
  19:25 21:16
  63:12 80:9
  81:13

told   17:7
  29:22 36:14,
  17,23 42:2
  57:12

top   54:3
  55:14 65:5
  75:8,16 81:1
  82:6

topics   12:24
  15:12 58:5

topple   43:10

Towing   4:20

track   7:17
  8:8 29:21
  35:4 78:25
  79:6

tracked   76:7

tracking   42:9

tracks   79:3

traffic   29:1
  42:10 47:1,4
  48:11 59:18
  78:2,14
  79:1,4

train   10:25
  11:6 15:16
  16:25 17:2

19:14 21:9
  23:7,12,15,
  21,23,24
  25:1,5,6,7,
  10,11,19,20,
  22 27:4
  28:4,17,20,
  21 29:23
  34:15,20
  46:25 48:16
  59:18 72:21
  74:1,12
  77:19 79:1
  85:11,15

trained   21:8

training
  12:14,20,22,
  23,25 13:5,7
  14:18,20,21
  15:1,8,9,13,
  17,21 16:1,
  2,3 18:12
  19:14 20:8
  21:4,10

trainmaster
  16:21,23,24
  17:1,12,15,
  23 18:7,17
  19:11,18

trains   7:16
  11:15,16
  23:14,19
  25:15 31:15
  32:2,15,20
  33:2,10
  46:21 47:24
  48:18 49:6

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
William O'Brien on 06/05/2025                    Index: trains'..windows

56:14,24
57:6 73:12,
16 74:5
77:11,23
78:1 84:17,
24 85:6

**trains'**  18:25

**transcript**
61:20

**transiting**
85:12

**Transportation**
18:5

**Traywick**  47:9,
10,11,17
48:8 49:5

**Traywick's**
47:13

**trial**  73:1

**triangles**
31:2,3

**trick**  60:12

**truthfully**
6:15

**Tuesday**  47:17

**tug**  36:7,8
37:2,13 38:4
40:3 41:21

**tugboat**  85:24
86:3

**tugboats**  36:9

**turn**  50:15
60:2

**turned**  46:20

**two-hour**  74:14

**type**  12:14,22
20:7 21:4
40:9 43:16
47:1 57:15
58:18 71:16
75:10 78:22
79:25

**types**  58:4

---

**U**

**U.S.**  41:7

**Uh-huh**  53:6
73:20

**undergo**  12:20
13:5

**understand**
5:24 6:2,12
22:10 32:11
42:11 45:21
49:19 51:18
65:13

**understanding**
37:14,20,24
38:3 41:8,
15,20 42:9,
13 43:15
51:3,7 52:11
55:13,24
62:10 68:15
70:25 71:3,4
78:20 79:17
82:21 83:6

**underwent**
72:16 73:9

**union**  18:1,3,
5,11 73:14,
22,25 74:11

**United**  12:8
18:4

**unrelated**
83:22

**updates**  57:16

**updating**  21:14

**UTU**  18:4

---

**V**

**V.P.M.**  52:21,
24

**vacancy**  74:7

**variance**  33:9

**vessel**  42:15

**vessels**  42:9

**Vice**  8:13

**video**  30:25
39:20

**view**  40:1,2,
3,7,9,11

**viewing**  44:23

**Virginia**  4:5,
8,10 16:15,
16 48:13,14,
15 82:9

**volume**  79:7

**VP**  8:20,24
9:8

---

**W**

**waiting**  76:22

**walk**  35:21

**walking**  29:8

**wanted**  22:14
61:20

**Ware**  4:7

**ways**  21:12

**weather**  44:14

**week**  22:5,6,8
25:17,23
32:16,21,22,
25 33:3,10,
16 49:1
65:17,18
74:23 75:25
84:17,23

**week-long**  13:9

**weekend**  22:17
24:6,18 32:1

**weekends**  23:18
31:15

**west**  40:10

**William**  4:2,
12,23 65:6,8
72:4

**window**  39:21

**windows**  74:1

**IN THE MATTER OF COEYMANS MARINE TOWING, LLC., ET AL.**
William O'Brien on 06/05/2025                    Index: wireless..yesterday

**wireless**  30:22

**word**  30:21

**work**  6:18
  7:18 10:14,
  18 11:22
  17:2,14
  23:6,11,19
  24:14 31:8
  46:16 50:2,7
  57:16 68:24
  70:17 71:9,
  16 73:13
  74:1,16,17
  76:22 81:18
  82:9,15,22
  83:11,16,21,
  22 84:1

**worked**  10:16
  16:5,10
  17:12 47:2
  75:21 76:2,
  25

**working**  14:24
  15:7 22:6,15
  23:16 24:21
  38:24 47:20
  75:10

**works**  59:23

**wouldn**  44:14

**written**  45:7

**wrong**  73:15

---
**Y**
---

**yard**  48:16

**year**  12:4
  19:1,2,11,
  15,16 23:14
  25:21 31:22,
  23 79:2
  83:21 85:2

**years**  5:8 7:2
  11:9,24
  12:10 13:24
  17:17,18
  19:2 21:7
  84:3

**yellow**  64:16

**yesterday**
  27:17 32:7
  33:19