UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

In the Matter of COEYMANS
MARINE TOWING, LLC, d/b/a
CARVER MARINE TOWING AS OWNER                    Civil No. 2:24cv490
AND OPERATOR OF M/T MACKENZIE
ROSE (IMO No. 8968765), etc.

OPINION AND ORDER

Pending before the Court in this admiralty case are cross-motions for summary judgment filed by Claimant Norfolk and Portsmouth Belt Line Railroad Company ("the Belt Line"), ECF No. 90, and Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver"), ECF No. 98; a "motion for relief" under Rules 30 and 37 filed by the Belt Line, ECF No. 69; and a joint motion to dismiss filed by Carver and Claimant Evanston Insurance Company ("Evanston"),[1] ECF No. 132.

Because the parties' contentions are adequately presented in their filings, the Court finds that a hearing is unnecessary. Fed. R. Civ. P. 78; Local Civ. R. 7(J). For the following reasons, Evanston and Carver's joint motion to dismiss, ECF No. 132, is **CONDITIONALLY GRANTED**. The Belt Line's motion for relief, ECF No. 69, is **DENIED**. The Belt Line's motion for summary judgment, ECF No. 90, is **GRANTED in part** and **DENIED in part**, and Carver's motion for summary judgment, ECF No. 98, is **DENIED**.

---

[1] Evanston also joined the Belt Line's motions for relief and for summary judgment, ECF Nos. 69, 90, before moving to dismiss its claim.

## I. BACKGROUND

This case arises in admiralty from an allision between the M/T MACKENZIE ROSE, a tugboat owned and operated by Carver, and the Main Line Railroad Bridge ("the Bridge"), owned by the Belt Line and located on the Southern Branch of the Elizabeth River, between Chesapeake and Portsmouth, Virginia.

On the afternoon of June 15, 2024, the M/T MACKENZIE ROSE, under the operation of James Morrissey, was pushing a barge known as WEEKS 281 northbound on the Southern Branch. At approximately 16:24, the tug and barge transited beneath the Jordan Bridge, which carries motorists over the waterway just south of the Belt Line's Bridge. Less than two minutes later, WEEKS 281, still being pushed by the M/T MACKENZIE ROSE, "allided with the western truss on the Portsmouth side of the Bridge, outside the navigable channel, while the Bridge was in the raised stationary position." ECF No. 178, at 3. After this allision, the tug "back[ed] up, adjust[ed] course," "maneuver[ed] through the Bridge opening," and continued north without reporting the allision to the Belt Line or the United States Coast Guard. Id.

On June 25, 2024, the Belt Line brought suit in admiralty, seeking to recover its damages resulting from the allision. No. 2:24cv407, ECF No. 1. According to the Belt Line, those damages total nearly $16 million. ECF No. 178, at 5. On August 8, 2024, Carver filed its Complaint for Exoneration from or Limitation of

Liability.  ECF No. 1.  Carver maintains that, by statute, its liability must be limited to "the value of the vessel and its cargo," and contends that the value of the tug "was approximately $2.5 million."  ECF No. 178, at 6-7.  Both the Belt Line and its insurer, Evanston (from which the Belt Line received $10 million in insurance proceeds, ECF No. 159, at 5), filed claims in Carver's limitation action.  ECF Nos. 20, 22, 24-25.  By an order issued December 20, 2024, the Court consolidated the Belt Line's complaint seeking damages and Carver's limitation action.  ECF No. 30.  A bench trial was scheduled and discovery commenced.  ECF No. 32.

In April and June 2025, the Belt Line deposed several of Carver's witnesses.  On July 16, 2025, based on the conduct of Carver's counsel during these depositions, the Belt Line and Evanston filed a motion for relief, seeking, among other sanctions, the dismissal of Carver's limitation action.  ECF Nos. 69-70.  On August 27, 2025, the Belt Line and Evanston jointly moved for summary judgment.  ECF No. 90.  Carver filed its own cross-motion for summary judgment on September 2, 2025.  ECF No. 98.

Soon thereafter, on September 19, 2025, Carver and Evanston gave notice of a settlement between them.  ECF No. 116.  Evanston, joined by Carver, later filed a motion to dismiss Evanston's claim with prejudice, based on their $5 million compromise of that claim.  ECF Nos. 132-33, 159.  The Court begins with this most recent motion, by which Evanston seeks dismissal from the suit.

## II. JOINT MOTION TO DISMISS WITH PREJUDICE

Evanston and Carver seek dismissal of Evanston's claim, ECF No. 22, and intervening complaint, No. 2:24cv407, ECF No. 5-1, pursuant to Federal Rule of Civil Procedure 41(a)(2).  ECF Nos. 132, 133.  Evanston and Carver initially purported to stipulate such dismissal without the Court's approval pursuant to Rule 41(a)(1)(A).  ECF No. 125.  However, as the Belt Line observed, ECF No. 130, and as Evanston and Carver now concede, ECF No. 133 ¶ 4, that effort was inconsistent with the requirements of Rule 41.  Because Evanston "fail[ed] to act before the Rule's 'point of no return'" in seeking stipulated dismissal, "dismissal must be sought under Rule 41(a)(2)," which requires the Court's approval.  Marex Titanic, Inc. v. Wrecked & Abandoned Vessel, 2 F.3d 544, 546 (4th Cir. 1993) (citation omitted).

### A. Rule 41(a)(2) Dismissal Standard

Under Rule 41(a)(2), "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."  Fed. R. Civ. P. 41(a)(2).  In exercising its discretion over such motions, "a district court should consider . . . (1) the opposing party's effort and expense in preparing for trial; (2) excessive delay or lack of diligence on the part of the movant; (3) insufficient explanation of the need for a dismissal; and (4) the present stage of the litigation, i.e., whether a motion for summary judgment is pending," along with "any

4

other relevant factors . . . depending on the circumstances of the case." Gross v. Spies, 133 F.3d 914, 1998 WL 8006, at *5 (4th Cir. 1998) (unpublished table decision) (citations omitted).

In "empower[ing] district courts to exercise discretion over voluntary dismissals," Rule 41(a)(2) does not focus exclusively on protecting "the interests of defendants." GO Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 177 (4th Cir. 2007) (discussing Davis v. USX Corp., 819 F.2d 1270, 1273 (4th Cir. 1987)). A district court may exercise its Rule 41(a)(2) discretion to avert "prejudice to co-plaintiffs," In re FEMA Trailer Formaldahyde Prods. Liab. Litig., 628 F.3d 157, 163 (5th Cir. 2010), third-party intervenors, ITV Direct, Inc. v. Healthy Sols., LLC, 445 F.3d 66, 70 (1st Cir. 2006), or "other parties to the litigation," Cnty. of Santa Fe v. Pub. Serv. Co. of New Mexico, 311 F.3d 1031, 1049 (10th Cir. 2002).

As expressly contemplated by Rule 41(a)(2), the Court may condition a dismissal "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). Where a district court is inclined to impose conditions on dismissal, the movant — if it objects to such conditions — may elect instead "to proceed to judgment on the merits." Andes v. Versant Corp., 788 F.2d 1033, 1037 (4th Cir. 1986); Marlow v. Winston & Strawn, 19 F.3d 300, 304 (7th Cir. 1994) (gathering cases demonstrating that "the 'terms and conditions' clause of Rule 41(a)(2) grants [a] plaintiff the option of

withdrawing his motion if the district court's conditions are too onerous").

## B. Analysis

In opposing Evanston and Carver's Rule 41(a)(2) motion, the Belt Line contends that dismissal with prejudice of Evanston's claim "would significantly prejudice [the Belt Line's] potential recovery" in light of two legal principles relevant to Evanston's subrogation rights: the collateral-source rule and the made-whole doctrine.  ECF No. 149, at 2.

### 1. The Collateral-Source Rule

"The collateral-source rule bars a tortfeasor from reducing his liability by the amount plaintiff recovers from independent sources" and "disallow[s] evidence of insurance or other collateral payments that may influence a fact finder" in the determination of damages.  Deperrodil v. Bozovic Marine, Inc., 842 F.3d 352, 358 (5th Cir. 2016); Rayfield v. Lawrence, 253 F.2d 209, 213 (4th Cir. 1958) ("It is well settled in most jurisdictions including Virginia where this accident occurred, that an injured person may recover in full from a wrongdoer regardless of any compensation he may receive from a collateral source.").  The rule applies in admiralty cases "both in its substantive and evidentiary roles."  Higgs v. Costa Crociere S.P.A. Co., 969 F.3d 1295, 1311 (11th Cir. 2020); Caudill v. Victory Carriers, Inc., 149 F. Supp. 11, 17 n.2 (E.D. Va. 1957) (citing Sainsbury v. Pennsylvania

Greyhound Lines, 183 F.2d 548, 550 (4th Cir. 1950)) (recognizing collateral source rule in admiralty).[2]

    "[U]nder the collateral source rule a payment from a source independent of, or unrelated to, the tortfeasor does not reduce his liability to the injured party even if the result is to afford the injured party double compensation." Yost v. Am. Overseas Marine Corp., 798 F. Supp. 313, 319 (E.D. Va. 1992) (citing Restatement (Second) of Torts § 920A cmt. b); see also W. Towboat Co. v. Vigor Marine, LLC, 566 F. Supp. 3d 1095, 1099 (W.D. Wash. 2021) (explaining that "partial reimbursement by [a claimant's] insurers poses no procedural limitation . . . on [a claimant's] ability to recover the full amount of damages" from a tortfeasor). The rule thus ensures that tortfeasors "bear[] the costs of their own conduct," Davis v. Odeco, Inc., 18 F.3d 1237, 1243 n.21 (5th Cir. 1994) (citations omitted), "allow[ing] the injured party, rather than the tortfeasor, the windfall created by a collateral source payment," Yost, 798 F. Supp. at 319. That said, the likelihood of the injured party securing such a windfall is diminished by the collateral-source rule's "interplay" with the doctrine of subrogation. Glob. Int'l Marine, Inc. v. US United

---

[2] See also The Atlas, 93 U.S. 302, 310 (1876) ("[W]hat the plaintiff recovers under his policy of insurance is . . . a payment under a contract independent of the claim against the wrong-doer."); Thomas J. Schoenbaum, Admiralty and Maritime Law § 5:10, at 344-45 (7th ed. 2025).

Ocean Servs., LLC, No. 09cv6233, 2011 WL 2550624, at *13 (E.D. La. June 27, 2011) (Fallon, J.).

### 2. Subrogation And The Made-Whole Doctrine

In general, an "insurer, on paying to the insured the amount of the loss on the property insured, is subrogated in a corresponding amount to the insured's right of action against" the tortfeasor.   Ward v. Allied Van Lines, Inc., 231 F.3d 135, 140 (4th Cir. 2000) (quoting Gill v. Rollins Protective Servs. Co., 773 F.2d 592, 598 (4th Cir. 1985), amended on denial of reh'g, 788 F.2d 1042 (4th Cir. 1986)); The Atlas, 93 U.S. 302, 311 (1876) ("[I]nsurers, if they pay first, are entitled to be subrogated to the rights of the insured.").   Such subrogation may arise "by agreement between the insurer and the insured," or in equity "by operation of law, upon the payment of the loss."   Ward, 231 F.3d at 140.   Relatedly, rather than recovering directly from the tortfeasor pursuant to subrogation, an insurer may "seek reimbursement from its insured when the insured" receives payment from the tortfeasor.   Id.; see also Dominion Res., Inc. v. Alstom Power, Inc., 297 Va. 262, 273, 825 S.E.2d 752, 757 (2019) (explaining that there will be "no double recovery" where "the plaintiff pursues the claim against the defendant and repays the collateral source; or the collateral source, after reimbursing the plaintiff, obtains subrogation from the defendant").

Federal maritime law recognizes insurers' entitlement to subrogation.  See Aetna Ins. Co. v. United Fruit Co., 304 U.S. 430, 438 (1938); The Potomac, 105 U.S. 630, 634 (1881).  So, too, does Virginia law.[3]  Erie Ins. Exch. v. Alba, 298 Va. 673, 679, 842 S.E.2d 195, 198 (2020) ("Virginia has long been committed to a liberal application of the principle of subrogation." (citation omitted)); Gill, 773 F.2d at 598 ("The right to subrogation has long been generally favored in Virginia.").

Here, the Belt Line does not dispute that Evanston has some kind of "subrogation rights," ECF No. 149, at 7, for which the insurance contract between the Belt Line and Evanston appears explicitly to provide, see ECF No. 159-1, at 25, 35.[4]  Instead, the Belt Line objects to Evanston's effort "to enforce its subrogation rights by settling out of this case before its insured . . . has fully recovered its losses," in violation (so

---

[3] If a rule of law "has not been judicially established as part of the body of federal admiralty law," it must be "determined by state law."  Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 316 (1955).  Other courts have concluded that admiralty law lacks precise rules of subrogation (including, in particular, the made-whole doctrine) and have thus applied state law instead.  See Glob. Int'l Marine, Inc., 2011 WL 2550624, at *8; Tampa Port Auth. v. M/V DUCHESS, 65 F. Supp. 2d 1299, 1300 n.2 (M.D. Fla. 1997).  To the extent federal admiralty law does govern, it does not appear to diverge materially from Virginia law, to which all parties have cited.  See Aetna, 304 U.S. at 438.

[4] Evanston and Carver attached the insurance contract as Exhibit 1 to their reply in support of their joint motion to dismiss.  See ECF No. 159-1.  The Belt Line did not seek leave to file a surreply or otherwise object to the Court's consideration of the contract.  Cf. Pippin v. Burlington Res. Oil & Gas Co., 440 F.3d 1186, 1192 (10th Cir. 2006) (explaining that a district court may rely on "new materials . . . in a reply brief" if the nonmovant has "more than enough time to request time to file a surreply, but d[oes] not" (citations omitted)).

the Belt Line contends) of the made-whole doctrine.  ECF No. 149, at 7 (emphasis added).

Under the made-whole doctrine, "no paramount right of subrogation arises until the insured has received full satisfaction." White v. Nationwide Mut. Ins. Co., 361 F.2d 785, 787 (4th Cir. 1966) (applying Virginia law).  Put differently, until the injured party has been "made whole," an insurer's "right of subrogation cannot be enforced," for there "can be no interference with [the injured party's] rights or his securities which might, even by bare possibility, prejudice or embarrass him in any way in the collection of the residue of his claim."  Id. (quoting Obici v. Furcron, 160 Va. 351, 362, 168 S.E. 340, 344 (1933)); see also Aetna, 304 U.S. at 438 ("[T]he insurer is entitled to subrogation only after the insured is appropriately indemnified.").

The made-whole doctrine is not universally observed.  For instance, under New York law, "an insurer who has paid the policy limits possesses the derivative and limited rights of the insured and may proceed directly against the negligent third party to recoup the amount paid . . . even though the insured's losses are not fully covered by the proceeds of the policy." Winkelmann v. Excelsior Ins. Co., 85 N.Y.2d 577, 582, 650 N.E.2d 841, 844 (1995); see also Chandler v. State Farm Mut. Auto. Ins. Co., 598 F.3d 1115, 1120 (9th Cir. 2010) (relying on Winkelmann in a case under

California law); cf. Orlando v. Liburd, 353 Conn. 845, 862 n.6, 348 A.3d 430, 442 n.6 (2026) (describing Winkelmann as "wholly inconsistent with the ma[d]e whole doctrine").

However, the Supreme Court has "suggested that the 'made whole' rule is applicable in the context of marine insurance." Glob. Int'l Marine, Inc., 2011 WL 2550624, at *7-8 (emphasis added) (citing Aetna, 304 U.S. at 438). The made-whole doctrine is also "alive and well in the Commonwealth" of Virginia, as another judge of this Court recently recognized in a decision on which all three parties before this Court rely.[5] Sustainable Sea Prods. Int'l, LLC v. Am. Empire Surplus Lines Ins. Co., No. 3:21cv697, 2022 WL 3573247, at *7-8 (E.D. Va. Aug. 19, 2022); see also Schwarz & Schwarz of Virginia, L.L.C. v. Certain Underwriters at Lloyd's London, No. 6:07cv42, 2009 WL 2882034, at *10-11 (W.D. Va. Aug. 31, 2009), report and recommendation adopted, 677 F. Supp. 2d 890 (W.D. Va. 2009) (recognizing the made-whole doctrine as both "Virginia law" and "the majority rule").

### 3. The Belt Line-Evanston Insurance Contract

Rather than challenge the made-whole doctrine's status as the default rule in this case, Evanston and Carver maintain that the Belt Line and Evanston "contracted around" it. ECF No. 159, at

---

[5] The parties all rely on Virginia law concerning the made-whole doctrine, which reliance appears consistent with Wilbur Boat. See supra note 3. That said, even "if federal maritime law were to apply" to this issue in lieu of state law, "the Court would adopt the same subrogation rules" outlined herein. Glob. Int'l Marine, Inc., 2011 WL 2550624, at *17 n.8.

7.   Contracting parties may indeed "opt out of the make whole doctrine through clear contractual language." PRC, Inc. v. O'Bryan, 47 Va. Cir. 81, 1998 WL 972277, at *3 (1998); Sustainable Sea Prods., 2022 WL 3573247, at *8; see also In re Paris, 211 F.3d 1265, 2000 WL 384036, at *3 (4th Cir. 2000) (unpublished table decision) (declining to apply the doctrine to a contract that "contain[ed] a clear provision contrary to" it).

In determining whether there has been a "clear" contractual override of the made-whole doctrine, some courts have required that "the insurer's priority be set forth in a sufficiently explicit manner in the policy." Glob. Int'l Marine, Inc., 2011 WL 2550624, at *7.  That was the approach taken in Sustainable Sea Products, in which another judge of this court concluded that the parties had not "opt[ed] out of the made whole doctrine because" the insurance contract included only a "boilerplate" subrogation clause.  2022 WL 3573247, at *8 (citing Fireman's Fund Ins. Co. v. TD Banknorth Ins. Agency Inc., 644 F.3d 166, 169-70 (2d Cir. 2011)).  Citing Sustainable Sea Products, Evanston and Carver assert that the Belt Line-Evanston subrogation clauses are not boilerplate and establish both "a pro rata basis of recovery" and "a right to recovery," thereby overriding the made-whole doctrine. ECF No. 159, at 8.

Two subrogation clauses in the operative insurance contract are at issue.  Evanston and Carver first refer to a clause entitled

"TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US," which contains the following language:

> If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them.

ECF No. 159-1, at 35. This clause mirrors verbatim that which was deemed in Sustainable Sea Products to be too "boilerplate" to "preclude application of the made whole doctrine." 2022 WL 3573247, at *8. The Court sees no reason to construe it otherwise.

The other subrogation clause in the Belt Line-Evanston contract reads, in relevant part, as follows:

> In the event of any payment under this policy, this company shall be subrogated to the extent of such payment to all the Insured's rights of recovery therefore [sic]. The Insured shall execute all paper required and shall do anything that may be necessary at the expense of the Insurer to secure such right. The Insurer will act in concert with all other interests concerned, i.e., the Insured and any other company(ies) participating in any loss, in the exercise of such rights of recovery. As a result of subrogation, or other efforts, if any amount is recovered, the net amount recovered shall be divided between the interests concerned in the proportion of their respective interests. Necessary expenses shall be divided between the interests concerned in proportion of their respective recoveries. If there should be no recovery, the expense of proceedings shall be borne proportionately by the interests instituting the proceedings.

ECF No. 159-1, at 25.

In construing the plain language of this provision, the Court first observes the instant provision's requirement that Evanston

13

"act in concert with . . . the Insured . . . in the exercise of such rights of recovery." Id. This language, when read alone, arguably casts some doubt on Evanston's asserted prerogative to enforce subrogation to its benefit while the Belt Line still seeks to recover through litigation against Carver.[6]

The Court also notes that this second provision of the Belt Line-Evanston contract at issue in this case does not clearly confer upon the insurer first "priority" to all funds recovered. Sustainable Sea Prods., 2022 WL 3573247, at *8 (quoting Copeland Oaks v. Haupt, 209 F.3d 811, 813 (6th Cir. 2000)). Thus, this provision does not contract around the made-whole doctrine in the same manner as the subrogation clause that was before the Fourth Circuit in Paris, which provided that "any amounts recovered . . . w[ould] be applied first to reimburse the [subrogee]." Paris, 2000 WL 384036, at *1 (emphasis added).

However, Paris did not purport to narrowly limit the manner in which parties might displace the default made-whole doctrine in favor of an alternative arrangement of their choosing. Id. at *3. The question is whether the "plain language and literal meaning" of the subrogation clause, "read in context," indicates that the parties made such a choice. Id. at *2-3.

---

[6] In a sworn declaration, an adjuster with Carver's primary insurer states that Carver was "informed by Evanston and [a private mediator] that Evanston had permission [from the Belt Line] to negotiate a separate settlement with [Carver's] Insurers." ECF No. 160, at 6. The Belt Line has not responded to this contention, and the Court bases no part of its ruling thereon.

The sole Virginia precedent squarely addressing this issue suggests "that a reference in a subrogation clause that the insurer is subrogated to 'any' or 'all' rights of recovery overrides" the made-whole doctrine. PRC, Inc. v. O'Bryan, 47 Va. Cir. 81, 1998 WL 972277, at *3 (citing Fields v. Farmers Ins. Co., 18 F.3d 831, 835-36 (10th Cir. 1994) (applying Oklahoma law)).  The provision here includes such a reference, establishing Evanston's subrogation "to the extent of [its] payment [under the policy] to all the Insured's rights of recovery," and providing for the division among "the interests" of "any amount" recovered.  ECF No. 159-1, at 25 (emphasis added).

Furthermore, the present clause provides that "if any amount is recovered, the net amount recovered shall be divided between the interests concerned in the proportion of their respective interests." Id.  Were the made-whole doctrine expected to apply, this pro rata arrangement — the "proportion[al]" "divi[sion]," id., of recovery — would be incongruous.  See Ergon - St. James, Inc. v. PRIVOCEAN M/V, No. 15cv1121, 2018 WL 5077852, at *3-4 (E.D. La. Oct. 18, 2018) ("seriously question[ing] whether the 'made whole' doctrine" applied to a subrogation clause containing similar language).

These considerations suggest on balance that the Belt Line and Evanston indeed contracted around the default made-whole doctrine.  As such, the Court will not apply that doctrine to bar

Evanston from settling its subrogation rights with Carver while the Belt Line continues to seek damages from Carver,[7] especially in light of "the policy of this Court to encourage the settlement of disputes." Coleson v. Inspector Gen. of Dep't of Def., 721 F. Supp. 763, 769 (E.D. Va. 1989). Accordingly, the joint motion of Evanston and Carver to dismiss Evanston's claim is **CONDITIONALLY GRANTED**. ECF No. 132.

### C. "Proper" Terms Of Rule 41(a)(2) Dismissal

The question remains, however, on which terms (if any) to condition the dismissal of Evanston's claim in light of the foregoing analysis. As an alternative to denying dismissal, the Belt Line asks the Court to impose two conditions pursuant to its Rule 41(a)(2) authority. First, the Belt Line would have the Court prohibit Carver "from using or in any way introducing evidence of insurance proceeds from Evanston as a setoff to the Belt Line's $16 million claim." ECF No. 149, at 8. Second, the Belt Line seeks to have "the settlement payment to Evanston . . . held in abeyance and released only after the Belt Line has been made whole." Id.

---

[7] A Rule 41(a)(2) motion is "[t]ypically" granted absent a showing of "substantial prejudice." Teck Gen. P'ship v. Crown Cent. Petroleum Corp., 28 F. Supp. 2d 989, 991 (E.D. Va. 1998). The Belt Line has not demonstrated that such prejudice will result from dismissal, at least under the terms set forth below. Thus, even if the made-whole doctrine were applicable, the Court would still be inclined to permit dismissal on such terms.

The first requested condition sounds in the aforementioned collateral-source rule, to which "the subrogation rights of the collateral source payor" necessarily relate. Dominion Res., 297 Va. at 273-74, 825 S.E.2d at 757 (citations omitted) (discussing the "case by case analysis" that the collateral-source rule requires). As discussed, the rule has both "substantive and evidentiary roles." Higgs, 969 F.3d at 1311.

Here, the evidentiary aspect of the rule is not in dispute; Evanston and Carver concede that the "Belt Line may still put on evidence of its damages at trial" without reference to any insurance proceeds or settlement amount. ECF No. 159, at 5-6; compare id. at 5 ("Carver will not be permitted to introduce evidence of Belt Line's property insurance at trial."), with ECF No. 149, at 4 ("[T]he Belt Line is entitled to prove the full $16 million [of damages it claims].") . As the Belt Line rightly notes, any attempt to restrict the evidence that the Belt Line may adduce based on its receipt of insurance proceeds from Evanston "would raise a host of problems of proof at trial." ECF No. 149, at 4. To avoid these pitfalls, the Belt Line will be permitted to prove the full amount of damages it claims.

As to the "substantive" application of the collateral-source rule, Evanston and Carver maintain that the Belt Line's damages award will be subject to "offset . . . once a judgment is rendered." ECF No. 159, at 6. Evanston and Carver seem to

17

envision an offset of $10 million, equal to the entirety of the portion of the Belt Line's claim to which Evanston was subrogated, which would effectively reduce the Belt Line's maximum recovery from Carver to approximately $6 million. The Belt Line, meanwhile, appears to argue that it "would be entitled to $16 million from Carver, less the [$5 million] settlement amount" Carver paid Evanston. ECF No. 149, at 2 (emphasis added).

At this juncture, and in light of the limited briefing thus far directed to the question and the other related issues still to be determined at trial, the Court does not consider a dispositive ruling on the appropriate offset to be necessary to ruling on the joint motion to dismiss. However, the Court considers it "proper" to condition the dismissal of Evanston's claim on Evanston's consent not to seek recovery or reimbursement from the Belt Line of any portion of any damages the Belt Line is ultimately awarded. Evanston has pressed its motion to dismiss on the grounds that it has "elected to compromise" the entire $10 million subrogated claim. ECF No. 159, at 3. The Court will grant the motion only on the condition that Evanston, having "b[ought] [its] peace" by settling with Carver, id., abstain from further litigating that claim against either Carver or the Belt Line. See, e.g., N. Am. Hotels, Ltd. v. Home Indem. Co., 112 F.R.D. 25, 28 (E.D. Pa. 1986) ("[T]o ensure that there is no subsequent litigation, the [movant's] agreement to be bound by any judgment of this court

will be a condition of its dismissal."); Gap, Inc. v. Stone Int'l Trading, Inc., 169 F.R.D. 584, 593 (S.D.N.Y. 1997) (granting Rule 41(a)(2) dismissal conditioned "upon [the movant's] execution of a covenant not to sue defendants in the future"), aff'd, 125 F.3d 845 (2d Cir. 1997); 9 Wright & Miller's Fed. Prac. & Proc. § 2366 (4th ed. 2025) (explaining that a court "may condition dismissal on the plaintiff's agreement not to bring a subsequent action, assert certain claims in another lawsuit, or make certain payments in a subsequent case."); cf. Samsung Elecs. Co. v. Rambus, Inc., 440 F. Supp. 2d 495, 509 (E.D. Va. 2006) ("In exercising [Rule 41(a)(2)] discretion, district courts can impose terms and conditions . . . [that] materially alter the legal relationship between the parties.").  The Belt Line may continue to pursue its entire damages claim, with the Belt Line's recovery from Carver subject to the appropriate offset later determined.

With respect to the Belt Line's second requested condition, that the settlement payment be held in abeyance pending the Belt Line's own recovery, Carver has submitted that, already, the "settlement funds have been paid in full and are being held in trust by counsel for Evanston." ECF No. 160, at 1.  Carver has elsewhere assured the Court that its applicable liability insurance coverage is sufficient to fund both the settlement and the Belt Line's full damages claim.  See ECF No. 159, at 7. Notwithstanding this latter representation, the Court considers it

proper, as a condition of the dismissal of Evanston's claim, that counsel for Evanston retain in trust (in an interest-bearing account, if Evanston so elects) the settlement funds already paid pending Carver's full satisfaction of any damages award Carver is ultimately determined to owe to the Belt Line.

Finally, the Court will condition the dismissal of Evanston's claim on the Court's "'retention of jurisdiction' over the settlement contract." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381-82 (1994).

In sum, the joint motion to dismiss with prejudice, ECF No. 132, is **CONDITIONALLY GRANTED**, pursuant to Rule 41(a)(2), on the following terms:

(1)    Evanston consents not to seek recovery or reimbursement from the Belt Line of any portion of any damages ultimately awarded in this case.

(2)    Counsel for Evanston retains in trust the settlement funds already paid pending Carver's full satisfaction of any damages award Carver is ultimately determined to owe to the Belt Line.

(3)    The Court retains jurisdiction over the settlement contract between Evanston and Carver.

Evanston shall give notice within **SEVEN (7) days** of the issuance of this Opinion and Order if, rather than accept the foregoing conditions, it wishes instead "to proceed to judgment on

the merits." <u>Andes</u>, 788 F.2d at 1037.  If the Court receives no such notice, Evanston's claim, ECF No. 22, and intervening complaint, No. 2:24cv407, ECF No. 5-1, shall on these aforesaid conditions be **DISMISSED WITH PREJUDICE.**

### III. MOTION FOR RELIEF

The Belt Line[8] accuses Carver of engaging in "extensive obstructive conduct" during a series of depositions of Carver's witnesses.  ECF No. 69, at 1-2.  Based on this alleged misconduct, the Belt Line seeks relief pursuant to "Rules 30(d), (g), and 37, together with this Court's inherent authority."  <u>Id.</u> at 2.  In particular, the Belt Line asks the Court to dismiss Carver's limitation complaint, deem certain facts admitted against Carver, deem "all text messages produced by Carver after the depositions of its witnesses . . . admissible against Carver," and award attorney's fees.  <u>Id.</u>

Once the Belt Line's motion for relief had been fully briefed, <u>see</u> ECF No. 75 (Carver's opposition); ECF No. 79 (the Belt Line's reply), it was referred to Magistrate Judge Leonard, ECF No. 95. In his Report and Recommendation ("R&R"), the Magistrate Judge noted that the Belt Line had failed to "exhaust[] less drastic measures" before "ask[ing] the Court to grant severe sanctions." ECF No. 136, at 8.  The Belt Line also failed, he concluded, to

---

[8] Evanston also joined this motion before moving to dismiss.  <u>Supra</u> note 1.

"carr[y] its burden to demonstrate harm or prejudice sufficient to justify the specific relief sought." Id. at 7. Accordingly, the R&R recommends that the Belt Line's motion be denied. Id. at 8. The Belt Line filed objections, ECF No. 150, which Carver opposed, ECF No. 161.

### A. Legal Standards

#### 1. Review Of A Magistrate Judge's R&R

The Court "must determine de novo any part of" a Magistrate Judge's recommended disposition to which a party has timely filed a specific written objection. Fed. R. Civ. P. 72(b)(3); accord 28 U.S.C. § 636(b)(1)(B). "To trigger de novo review" of a given issue, "an objecting party 'must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" Elijah v. Dunbar, 66 F.4th 454, 460 (4th Cir. 2023) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)). Apart from such objections, a district court reviews a Magistrate Judge's recommendation "for clear error only."[9] Id. (citing Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005)). Upon review, the Court "may accept,

---

[9] Because the Magistrate Judge did not impose any dispositive sanction, it may be that no part of the recommendation is subject to de novo review. See Alpha Omega Servs. v. Dyncorp Int'l, LLC, No. 1:13cv809, 2014 WL 1401800, at *6 (E.D. Va. Apr. 9, 2014); Asterbadi v. Leitess, No. 1:04CV286, 2005 WL 2009276, at *3 (E.D. Va. Aug. 22, 2005); Giganti v. Gen-X Strategies, Inc., 222 F.R.D. 299, 304 n.9 (E.D. Va. 2004). Nevertheless, the Court applies the more thorough de novo standard in evaluating the objections raised here.

reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

### 2. Sanctions

The Belt Line primarily relies on Rule 30(d), pursuant to which "[t]he court may impose an appropriate sanction — including the reasonable expenses and attorney's fees incurred by any party — on a person who impedes, delays, or frustrates the fair examination of [a] deponent." Fed. R. Civ. P. 30(d)(2); see also Fed. R. Civ. P. 30(c) (governing objections during depositions). The Belt Line also suggests Carver's Rule 30(b)(6) designee was so unprepared that he effectively "fail[ed] to appear at all," violating Rule 30(g). ECF No. 70, at 17, 22; ECF No. 80, at 3-5.

As noted, the most significant sanction the Belt Line seeks is the dismissal of Carver's limitation complaint. ECF No. 69, at 2. Though a district court has "inherent power to dismiss a case based on the wrongdoing of a party," the exercise of such power is only appropriate "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." Projects Mgmt. Co. v. Dyncorp Int'l LLC, 734 F.3d 366, 373-74 (4th Cir. 2013) (quoting United States v. Shaffer Equip. Co., 11 F.3d 450, 461-63 (4th Cir.1993)).

"Before exercising" this power, the Court must consider "(1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney . . . ; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions . . . ; and (6) the public interest." Id. Similar considerations apply to courts' discretion to impose dismissal or default judgment pursuant to Rule 37. See Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc., 872 F.2d 88, 92 (4th Cir. 1989) (requiring "four-part test" where "the district court's desire to enforce its discovery orders" confronts "the party's rights to . . . a fair day in court": "(1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary . . . ; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions" (citing Wilson v. Volkswagen of America, Inc., 561 F.2d 494, 503-04 (4th Cir. 1977))); Mey v. Phillips, 71 F.4th 203, 215 (4th Cir. 2023) (similar).

Given that a sanction of dismissal "ends a case without resolving the underlying legal and factual disputes," the Fourth Circuit has "encouraged trial courts initially to consider" less severe sanctions. Brown v. Elliott, 876 F.3d 637, 646 (4th Cir. 2017) (quoting Hathcock v. Navistar Int'l Transp. Corp., 53 F.3d

36, 41 (4th Cir. 1995)).  For example, a court might "direct[]
that . . . designated facts be taken as established for purposes
of the action, as the prevailing party claims," or "prohibit[] the
disobedient party from supporting or opposing designated claims or
defenses, or from introducing designated matters in evidence."
Fed. R. Civ. P. 37(b)(2)(A).

### B. Analysis

### 1. Findings of Fact

The Magistrate Judge's findings of fact are largely
undisputed.  The Belt Line objects only to the finding that the
submission of <u>excerpts</u> of deposition transcripts, rather than
complete transcripts, "depriv[ed] the Court of any context to
evaluate the impediments to discovery the Belt Line contends Carver
created by its actions."  ECF No. 150, at 6 (quoting ECF No. 136,
at 4).  The Belt Line argues that, had the Magistrate Judge
requested complete transcripts, the Belt Line "would have promptly
provided" them.  <u>Id.</u>

This objection and proposed solution do not precisely address
the problem.  To the undersigned's understanding, the Magistrate
Judge took issue not with the omission of the complete transcripts
<u>per se</u> but rather with the inadequacy of the Belt Line's showing
of prejudice based on the excerpts it submitted.  If additional
portions of the transcripts revealed prejudice, it was the Belt
Line's burden to identify them and elucidate their import, not

merely to "provide[]" the entire transcripts without elaboration, id., since, as the Magistrate Judge correctly observed, the Court is not obligated "to hunt" for "other evidence" that the movant itself has failed to adduce. ECF No. 136, at 4-5 n.3. If instead the Belt Line could find no further evidence of prejudice in the transcripts, simply filing them in full would not have improved the Belt Line's position.

That the Belt Line relied on excerpts of transcripts to support its motion, and that an excerpt, by definition, excludes certain context, can hardly be disputed. To the extent the Belt Line objects to these observations in the R&R, the Belt Line's objection is overruled. That said, the true target of this objection appears to be the Magistrate Judge's conclusion that the Belt Line's showing of prejudice using such excerpts was insufficient to warrant the sanctions the Belt Line requests. Id. at 8. It is to this and the Magistrate Judge's other conclusions of law to which the Court now turns.

## 2. Conclusions of Law

The Belt Line raises three specific objections to the Magistrate Judge's recommended conclusions of law. ECF No. 150, at 6. In particular, the Belt Line argues that it "did not fail to pursue cooperative remedies," that "lesser remedies . . . would not have adequately cured the obstructions," and that it "should not be penalized for providing excerpts of testimony relevant to

26

its argument instead of burdening the Court with full transcripts of depositions." Id.

### (a) "Cooperative" and "Lesser" Remedies

The first two of these three objections, concerning the pursuit of cooperative remedies and the inadequacy of lesser remedies, are closely related, so the Court addresses them together, as the Belt Line does in raising them.

To begin, the Belt Line observes that a "phone call to the Court" during the deposition of Carver's corporate designee, Nicholas Laraway, "could not have cured [his] deficient preparation." Id. at 7. True, a mid-deposition call to the Court could not have improved Mr. Laraway's preparation or knowledge. But it conceivably could have limited Mr. Laraway's reliance on "referring for his answer to all documents produced in the case and the testimony of all other Carver witnesses," a tactic which forms a substantial part of the basis of the Belt Line's motion. Id. Furthermore, by placing such a call, the Belt Line might have, with the Court's assistance, facilitated a deposition of a second, better-prepared designee. Cf. ECF No. 136, at 6 ("Perhaps the Belt Line could have simply moved to compel deposition responses they believe were inadequate.").

For that matter, the Belt Line might have attempted to arrange a new Rule 30(b)(6) deposition, or new depositions of any other witnesses, by conferring with Carver. The Belt Line rejects this

prospect, noting that "meet and confer efforts . . . before the deposition" were unavailing. ECF No. 150, at 9. But given that the Belt Line does not suggest it knew of Mr. Laraway's deficient preparation or counsel's deposition defense strategy prior to the deposition, pre-deposition conferences appear to have limited relevance.

The Belt Line also argues that it _did_ seek to meet and confer with Carver to resolve this dispute after the depositions, without success. _Id._ at 10. However, in the letter proposing such a conference, the Belt Line stated (as it maintains here) that "re-deposition of the witnesses would be an insufficient remedy," demanding instead the outright dismissal of Carver's limitation action, which the Belt Line described as the "only feasible remedy." ECF No. 69-2, at 1.

This maximalist position does not seem to have been calculated to achieve any cooperative resolution. As the Magistrate Judge noted, "[w]hen discovery disputes arise, parties are expected to address them . . . with the purpose of reducing conflict — not escalating it." ECF No. 136, at 7. Regardless, even assuming the Belt Line took this position in good faith, it is undermined by _Humanscale_, the case from which the Belt Line appears to derive its theory of constructive failure-to-appear by a 30(b)(6) designee. There, the court's remedy for the nonmovant's failure to designate adequately knowledgeable deponents was a "direction"

from the court that the nonmovant "make available 30(b)(6) designees . . . prepared to answer questions on the subject matters" at issue for <u>new depositions</u>. <u>Humanscale Corp. v. CompX Int'l, Inc.</u>, No. 3:09cv86, 2009 WL 5091648, at *5 (E.D. Va. Dec. 24, 2009). Similarly, in <u>Resolution Trust</u> (quoted by the <u>Humanscale</u> court), the deposing party moved for sanctions after two 30(b)(6) designees lacked relevant knowledge. <u>Resol. Tr. Corp. v. S. Union Co.</u>, 985 F.2d 196, 196-97 (5th Cir. 1993). The dispute was resolved by a <u>new deposition</u> of a sufficiently knowledgeable corporate witness, plus a sanctions award of fees and costs. <u>Id.</u> at 197-98.

The Belt Line posits that new depositions here would be "futile," since "a new deposition only gives the obstructing party a better chance to prepare its witnesses, except this time for known lines of questioning." ECF No. 150, at 11. The Belt Line fails to explain why this supposed futility did not concern the courts in <u>Humanscale</u> and <u>Resolution Trust</u>. Nor does it resolve the obvious tension between this argument and the Belt Line's justifiable insistence that Carver's Rule 30(b)(6) designee ought to have been prepared for the "specific topics of inquiry" that the Belt Line provided to Carver prior to that designee's first deposition.[10] ECF No. 150, at 9; <u>see, e.g.</u>, <u>NewMarket Corp. v.</u>

---

[10] Of course, this specific contradiction does not apply with equal force to the Belt Line's concerns with respect to deponents not designated pursuant to Rule 30(b)(6), for whom similar lists presumably were not furnished.

Innospec Inc., No. 3:10cv503, 2011 WL 1306008, at *6 (E.D. Va. Apr. 1, 2011) (ordering a party to "produce an adequately prepared and knowledgeable corporate designee" for further deposition regarding topics in relation to which the party's initial designee had already been deposed); Projects Mgmt., 734 F.3d at 371 (recounting district court's initial order of "additional depositions" in lieu of dismissal). Though a witness may well be more prepared at a second deposition, the Court cannot find that additional preparation of witnesses would have so vitiated any new depositions' value as to render them "futile," especially where the Belt Line could have brought any inconsistencies between a witness's responses (or non-responses) at the two depositions to the factfinder's attention.[11]

In discussing the Belt Line's failure to pursue cooperative or lesser remedies, the Magistrate Judge did not "condone[] Carver's view of deposition practice" or paint the Belt Line as "the wrongdoer," as the Belt Line suggests. ECF No. 150, at 10, 13. On the contrary, the Magistrate Judge emphasized that he did not "countenance improper attorney behavior during depositions and thus" did not consider Carver "blameless." ECF No. 136, at 8. In

---

[11] The Belt Line cites E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., to demonstrate the risk of testimony being "altered by" the "helpful suggestions of lawyers." 277 F.R.D. 286, 297 (E.D. Va. 2011) (citation omitted); ECF No. 150, at 11. But that case addressed substantive "post-deposition revision" via written errata sheets, not subsequent live testimony at new depositions. Kolon, 277 F.R.D. at 297.

weighing these considerations, he instead sought to determine "whether the Belt Line ha[d] carried its burden to demonstrate harm or prejudice sufficient to justify the specific relief sought." Id. at 7.

This inquiry sounds in the aforementioned Wilson factors. 561 F.2d at 503-04. For instance, where a cooperative remedy is initially pursued, recalcitrance on the part of the nonmovant may bespeak bad faith. In contrast, a plausible inference of bad faith is less likely to arise from the initial alleged misconduct alone. Similarly, a court may doubt the degree of prejudice suffered by a movant who both delays the filing of a motion for sanctions and fails to meaningfully pursue any reconciliatory efforts in the interim. Likewise, a court may hesitate to deem less drastic sanctions ineffective when, though time permitted otherwise, such sanctions were not pursued. See Harden v. Siegelbaum, No. 09cv3166, 2011 WL 1322521, at *3 (D. Md. Apr. 1, 2011) (explaining that, where movants "never requested . . . a lesser sanction," the court could only "speculat[e]" whether "a less drastic sanction would have been effective"). Like the Magistrate Judge, this Court concludes, upon de novo review, that these considerations weigh against the Belt Line's motion for relief.

### (b) Reliance on Deposition Excerpts

With its third and final specific objection to the Magistrate Judge's conclusions of law, the Belt Line argues that it "should not be penalized for providing excerpts of testimony relevant to its argument instead of burdening the Court with full transcripts of depositions." ECF No. 150, at 6.

As this Court has already explained, in concluding that the Belt Line failed to "demonstrate harm or prejudice sufficient to justify the specific relief sought," ECF No. 136, at 7, the Magistrate Judge did not "penalize[]" the Belt Line for declining to file "all 1,104 pages of the deposition transcripts." ECF No. 150, at 12. The deficiency, as the Magistrate Judge noted, was not in sheer page count but in "evidence germane to the issues" that the Belt Line brought to his attention. ECF No. 136, at 5 n.3.

Having reviewed the excerpts on which the Belt Line relied, this Court reaches the same conclusion. To be sure, the Belt Line has identified numerous interventions by Carver's counsel which appear from the record not to have wholly complied with the dictates of Rule 30(c)(2). However, the Belt Line simply has not demonstrated "prejudice as a result." Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc., 872 F.2d 88, 93 (4th Cir. 1989). The "materiality" of the obstructed responses is largely unexplained, as are the ways in which Carver's improper deposition conduct has

actually harmed the Belt Line's ability to "prove its case." Id.
In neither respect does the record clearly speak for itself.[12]

"The rules of discovery 'are designed to prevent prejudice
due to inadequate trial preparation rather than simply punish
obduracy.'" Wilson, 561 F.2d at 505 n.23 (citation omitted).
Even in objecting to the Magistrate Judge's ruling, rather than
demonstrating prejudice, the Belt Line seems to take it as given
that Carver's conduct "thoroughly impeded the Belt Line's ability
to develop facts to defeat Carver's limitation effort." ECF No.
150, at 13.   The undersigned, like the Magistrate Judge, is
unpersuaded.  Certainly, on this record, the "harsh sanction" of
dismissal is unjustified.  Mey, 71 F.4th at 215 (citation
omitted).  And while Carver's good faith at the depositions is
somewhat doubtful, and the desirability of deterring similar
conduct substantial, the Belt Line's limited showing of prejudice
and failure to first seek less drastic remedies are dispositive.

---

[12] To take just one example, the Belt Line claims that its questions to Brian
Moore and Leonard Baldassare concerning "[w]hether a bridge is a danger to
navigation" were so impermissibly obstructed that the Court should deem
Carver to have admitted as much.  ECF No. 69-1, at 1.  But in the excerpt
of Mr. Moore's deposition that the Belt Line cites in support of this claim,
Mr. Moore states that "if you look at all the factors into this, but not
limited to, like it says, that you're taking all of this into your daily
prudent navigational assessment of something; that you're going to look at
everything as a danger."  ECF No. 70-9, at 16 (emphasis added).   Mr.
Baldassare, for his part, stated in response to another question his view
that "when approaching [a] bridge," a crew "should be hand-steering," not
using autopilot.  ECF No. 70-8, at 6.  It is not apparent how, if at all,
being left with these answers has hampered the Belt Line's case relative to
whatever response would have been given absent the obstructions, especially
considering the Belt Line's ability to marshal expert witnesses' testimony.

The Court declines to exercise its discretion to impose sanctions at this time.[13]   The Belt Line's objections are **OVERRULED** and the motion for relief is **DENIED**.

## IV. CROSS-MOTIONS FOR SUMMARY JUDGMENT

In its motion for summary judgment, the Belt Line seeks a favorable judgment on its affirmative claim "in an amount to be proven at trial,"[14] as well as the dismissal of Carver's limitation-of-liability complaint.   ECF No. 90, at 1.   Carver, meanwhile, seeks a judgment that it is "entitled to limit its liability," with the limitation likewise "to be proven at trial."   ECF No. 98, at 1.   After articulating the legal standard which governs summary-judgment motions, the Court will consider each motion in turn.

### A. Summary Judgment Standard

Rule 56(a) provides that a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The "mere existence of

---

[13] This ruling does not conclusively determine any question of evidentiary admissibility.   Nor does it preclude any future exercise of the Court's "inherent power to assess attorney's fees."   Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991) (citation omitted); Moench v. Marquette Transportation Co. Gulf-Inland, L.L.C., 838 F.3d 586, 594-97 (5th Cir. 2016) (admiralty).

[14] In opposing the Belt Line's motion, Carver states that the Belt Line "seek[s] summary judgment that the damage . . . exceeded $15,000,000."   ECF No. 109, at 1.   That is incorrect.   The Belt Line's motion (like Carver's) expressly reserves the issue of quantum for trial.   See ECF No. 90, at 1. Accordingly, the Court does not address that issue here.

some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable [factfinder] could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012).

Although the initial burden on summary judgment falls on the moving party, once a movant properly presents evidence supporting summary judgment, the nonmoving party may not rely on the "mere pleadings," but instead must set forth "specific facts" in the form of exhibits and sworn statements illustrating a "genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986) (citations omitted). The Court is not to weigh evidence or make credibility determinations at the summary judgment phase, but must evaluate the evidence only to the extent necessary to determine whether there is "sufficient disagreement to require submission to a [factfinder] or whether [the evidence] is so one-sided that one party must prevail as a matter of law." McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (quoting Liberty Lobby, 477 U.S. at 251-52). In making its determination, "the district court must 'view the evidence "in the light most

favorable to the"' nonmoving party." <u>Jacobs v. N.C. Admin. Off.</u>
<u>of the Cts.</u>, 780 F.3d 562, 568 (4th Cir. 2015) (citation omitted).

When faced with cross-motions for summary judgment, the Court
must "consider each motion separately on its own merits to
determine whether either of the parties deserves judgment as a
matter of law." <u>Defenders of Wildlife v. N.C. Dep't of Transp.</u>,
762 F.3d 374, 392 (4th Cir. 2014) (quoting <u>Bacon v. City of</u>
<u>Richmond, Va.</u>, 475 F.3d 633, 638 (4th Cir. 2007)). In doing so,
the Court must "resolve all factual disputes and any competing,
rational inferences in the light most favorable to the party
opposing that motion." <u>Id.</u> (quoting <u>Rossignol v. Voorhaar</u>, 316
F.3d 516, 523 (4th Cir. 2003)).

### B. The Belt Line's Motion For Summary Judgment[15]

#### 1. The Belt Line Is Entitled To Summary Judgment As To Liability

The Belt Line first argues it is entitled to judgment as a
matter of law because "Carver cannot overcome the presumption of
fault under the Oregon Rule." ECF No. 91, at 19. The "venerable
rule of admiralty jurisprudence" that the Belt Line here invokes,
and which <u>The Oregon</u>, 158 U.S. 186 (1895), is taken to embody, is
"that a moving vessel is presumed to be at fault in a collision

---

[15] After briefing was completed, the Belt Line moved to supplement the record
with "two exhibits containing relevant portions" of two depositions. ECF
No. 165, at 1. Carver opposed this supplementation. ECF No. 166. Seeing
no prejudice or undue delay, the Court in its discretion **GRANTS** the motion.
ECF No. 164. However, the supplemental material does not alter the Court's
disposition of the Belt Line's summary judgment motion.

with a stationary visible object." <u>Yarmouth Sea Prods. Ltd. v.</u> <u>Scully</u>, 131 F.3d 389, 393 (4th Cir. 1997); <u>N.D. Shipping, S.A. v.</u> <u>ZAGORA M/V</u>, No. 06cv10734, 2009 WL 1606877, at *5 (E.D. La. June 5, 2009) ("[T]he <u>Oregon</u> rule, which provides that a moving vessel that allides with a stationary object is deemed to be presumptively at fault for the allision[,] . . . derives from 'the common-sense observation that moving vessels do not usually collide with stationary objects unless the [moving] vessel is mishandled.'" (citations omitted)).  When the presumption applies, it "suffices to make out a prima facie case of negligence against the vessel," shifting the "burden of disproof of fault by the moving vessel" onto "all parties participating in the management" thereof.  <u>Woods</u> <u>v. U.S., Dep't of Transp.</u>, 681 F.2d 988, 990 (5th Cir. 1982).

It is undisputed that the M/T MACKENZIE ROSE, a "moving vessel" owned and operated by Carver, allided with the Bridge, which was "a stationary visible object," at around 4:25 p.m. on June 15, 2024.[16]  <u>Yarmouth</u>, 131 F.3d at 393; <u>see</u> ECF No. 91, at 4; ECF No. 109, at 2.  The <u>Oregon</u> rule thus applies, establishing "a presumed breach on the part of the alliding vessel," and therefore on the part of Carver as its owner and operator.  <u>In re Mid-S.</u> <u>Towing Co.</u>, 418 F.3d 526, 532 (5th Cir. 2005).  Furthermore, while

---

[16] To be precise, it was the barge that the M/T MACKENZIE ROSE was pushing, not the M/T MACKENZIE ROSE itself, which struck the bridge.  ECF No. 121, at 4; ECF No. 109, at 2.  However, as the Belt Line notes, this "distinction is immaterial," ECF No. 121, at 4; "barges in tow are considered as being under the control of the tug."  <u>The Quickstep</u>, 76 U.S. 665, 670-71 (1869).

the Oregon rule does not itself answer "the question of causation," id., the undisputed facts clearly do.

Far from carrying its "burden of disproof" as to its presumed breach, Woods, 681 F.2d at 990, Carver effectively concedes both breach and causation by mounting no genuine response to the Belt Line's arguments pertaining thereto.[17] Hopeman Bros., Inc. v. Cont'l Cas. Co., 307 F. Supp. 3d 433, 454 (E.D. Va. 2018) ("consider[ing] Defendants to have conceded Plaintiff's argument" where "Defendants ha[d] not responded to" it).

Instead, Carver insists that the allision at issue "was due to an error by" its crew, which Carver considers the sole "causative negligence" in this case. ECF No. 109, at 14; ECF No. 99, at 22. Carver also argues that the Belt Line "has inflated its claim" for damages — not that the allision caused no damages at all. ECF No. 109, at 3. While these disputes are material to the issues of limitation and quantum, even "resolv[ing]" them "in the light most favorable to" Carver, Defenders of Wildlife, 762 F.3d at 392, the facts point inexorably to a judgment in the Belt Line's favor. Summary judgment is **GRANTED** in the Belt Line's favor as to liability. ECF No. 90.

---

[17] Carver claims it does not "conced[e] negligence." ECF No. 99, at 19. Regardless, breach and causation follow from Carver's own factual account.

## 2. Genuine Disputes of Material Fact Remain Regarding Carver's Entitlement to Limitation of Liability

The Belt Line also seeks summary judgment denying Carver relief under the Limitation of Liability Act. ECF No. 91, at 21; 46 U.S.C. § 30523. Under this statute, "the owner of a vessel" may "limit [its] liability for losses . . . to the value of [its] interest in the vessel and her freight if the owner can show that the cause of the collision was not within [its] privity or knowledge." Hellenic Lines, Ltd. v. Prudential Lines, Inc., 730 F.2d 159, 166 (4th Cir. 1984). To obtain limitation of liability, the shipowner "bears the burden of proving that he was without privity or knowledge of the condition or negligence responsible for the [a]llision." Id.

Both "[p]rivity" and "knowledge" depend "on the facts of particular cases." Coryell v. Phipps, 317 U.S. 406, 411 (1943). Furthermore, the question of privity or knowledge is preceded by a similarly fact-bound inquiry: "[I]n order to grant or deny limitation," the Court must first "find what acts of negligence caused the accident." Joia v. Jo-Ja Serv. Corp., 817 F.2d 908, 912 (1st Cir. 1987). Only then can the Court "determine whether the vessel owner had knowledge or privity of those acts." Id.; accord Complaint of Christiansen Marine, Inc., No. 2:95cv896, 1996 WL 616188, at *8 (E.D. Va. Apr. 11, 1996).

In this case, although there remains no genuine dispute of material fact regarding Carver's liability for the allision, the same cannot be said with respect to the precise "condition or negligen[t]" act, Hellenic Lines, 730 F.2d at 166, to which that allision is properly attributed.  The Belt Line primarily contends that the allision was caused by a malfunctioning autopilot system.  See ECF No. 91, at 22-23.  Carver disputes this characterization, arguing instead that the allision was the result of a crewmember's navigational error after he "failed to properly switch from autopilot to hand steering."  ECF No. 109, at 15.[18]

The Belt Line argues that this "dispute is immaterial" and suggests that, even on Carver's account, the autopilot must have malfunctioned, since "[f]ailing to turn off a properly functioning autopilot system should not cause a tug to veer left and hit a bridge."  ECF No. 121, at 12.  This argument certainly has intuitive appeal, but the Belt Line does not muster concrete evidentiary support for it, and it does not clearly follow from

---

[18] The Belt Line has objected to Carver's reliance on "references to the U.S. Coast Guard investigation" of the allision.  ECF No. 120, at 2; ECF No. 121, at 3.  According to the Belt Line, Carver may not rely "on two versions of a CG-2692 incident form filled out by its own management employees," ECF No. 121, at 2, because a federal statute prohibits the admission as evidence of any "part of a report of a marine casualty investigation conducted" by the Coast Guard, ECF No. 121, at 3 (quoting 46 U.S.C. § 6308(a)).  The Magistrate Judge granted the Belt Line's Motion in Limine to this effect.  ECF Nos. 114, 169.  The Court will address the issue, which is not dispositive of either party's summary judgment motion, when it resolves Carver's objection to that ruling.  ECF No. 190.

the record viewed "in the light most favorable to" Carver. Defenders of Wildlife, 762 F.3d at 392.

To be sure, even accepting that the allision was caused by the operator error Carver posits, the Court doubts whether Carver will succeed in "proving that [it] was without privity or knowledge of" such error.   Hellenic Lines, 730 F.2d at 166; see, e.g., Christiansen Marine, 1996 WL 616188, at *9 (observing that a "lack of training or physical ability" that renders a crew "not fit for their ordinary duties . . . can constitute unseaworthiness").

However, the Court is constrained not to reach the privity-or-knowledge question without first resolving the anterior dispute over which act or acts of negligence caused the allision. Christiansen Marine, 1996 WL 616188, at *8.  The Court cannot do so on the record before it, which reveals a "genuine dispute as to [this] material fact."  Fed. R. Civ. P. 56(a).

The Court is also unpersuaded at this time by the Belt Line's argument that, in addition to Carver's privity and knowledge of the cause of the allision, its "unclean hands also prevent it from" limiting its liability.  ECF No. 91, at 25.  The Belt Line concedes that it has "found no reported precedent directly on point."  Id. Given that the text of the limitation-of-liability statute does not articulate such an exception, this Court declines at this juncture to pioneer its creation.  United States v. Rodgers, 461 U.S. 677, 701 (1983) ("No exception of th[is] sort . . . appears

41

on the face of the statute, and we decline to frustrate the policy of the statute by reading such an exception into it."). Accordingly, the Belt Line's motion for summary judgment is **DENIED** with respect to the limitation of Carver's liability.  ECF No. 90.

### C. Carver's Motion For Summary Judgment

In its own motion for summary judgment, Carver asks the Court to hold that "Carver is entitled to limit its liability in an amount to be proven at trial."  ECF No. 98, at 1.  The Court has "consider[ed] [this] motion separately on its own merits," and in doing so "resolv[ed] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing" it, the Belt Line.  Defenders of Wildlife, 762 F.3d at 392 (citations omitted).  As the Court has already explained, genuine disputes remain regarding facts material to Carver's asserted entitlement to liability limitation.  Fed. R. Civ. P. 56(a).  Accordingly, for reasons akin to those set forth in the Court's preceding analysis, Carver's cross-motion for summary judgment must be **DENIED**.  ECF No. 98.

### V. CONCLUSION

For the reasons set forth above, Evanston and Carver's joint motion to dismiss, ECF No. 132, is **CONDITIONALLY GRANTED**.  The Belt Line's Motion for Relief, ECF No. 69, is **DENIED**.  The Belt Line's motion for summary judgment, ECF No. 90, is **GRANTED in part** and **DENIED in part**, and Carver's motion for summary judgment, ECF

42

No. 98, is **DENIED**.    The case shall proceed on the issues of limitation and quantum.[19]

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____ /s/ Mark S. Davis
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
February 27 , 2026

---

[19] In a prior Order, ECF No. 140, the Court reserved ruling on Carver's motion for a court-ordered mediation or settlement conference, ECF No. 131. The parties previously participated in private mediation and are certainly encouraged to continue to seek an agreed resolution.  However, particularly in light of the Belt Line's opposition, ECF No. 143, the Court does not consider it "appropriate" to mandate settlement negotiations at this time. See Local. Civ. R. 83.6(G).  Accordingly, Carver's motion, ECF No. 131, is in this remaining respect **DENIED**.