# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division
### In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

## NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line"), by counsel, submits the following proposed findings of fact and conclusions of law pursuant to the Supplemental Rule 16(b) Scheduling Order (ECF 128). Based on controlling law and the evidentiary record, the Belt Line requests entry of judgment in its favor against Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver") in the full amount of the damages described below.

## Proposed Findings of Fact

### *Parties, Tug, and Bridge*

1.      This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure for property damage resulting from an allision with the Belt Line's Main Line Bridge ("Bridge") on the Southern Branch of the Elizabeth River. This Court has original jurisdiction under its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 and federal question jurisdiction pursuant to 28 U.S.C § 1331. Venue is proper in this district and division under 28 U.S.C. § 1391. *See* FPO STIP 1 (ECF 178).[1]

---

[1]      Reference is to the Final Pretrial Order ("FPO") Stipulations of Fact ("STIP") at ECF 178.

2.      The Belt Line is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Chesapeake, Virginia.  The Belt Line is a terminal switching railroad serving the cities of Norfolk, Portsmouth, and Chesapeake, Virginia.  It owns the Bridge.  *See* FPO STIP 2, 3 (ECF 178).

3.      The Bridge is a 385-foot-long steel vertical lift bridge with a clearance of 300 feet between the fenders.  It was first permitted by Act of Congress in 1897.  By the 1940s, the original swing bridge required replacement and the Secretary of the Army issued a new permit in 1947. The current Bridge was constructed between 1956 and 1958 and carries the Belt Line's main line railroad tracks across the Southern Branch of the Elizabeth River between Chesapeake and Portsmouth, Virginia.  *See* FPO STIP 3, 6 (ECF 178).

4.      Carver is a limited liability company organized under the laws of New York with its principal place of business in Albany, New York. Carver owns and operates a fleet of inland and offshore tugs and barges and provides towing services on the East Coast of the United States. On June 15, 2024, Carver owned and operated the tug M/T MACKENZIE ROSE.  *See* FPO STIP 4 (ECF 178).

5.      The M/T MACKENZIE ROSE (IMO No. 8968765) is a United States-flagged twin-screw tugboat built in 2000, measuring approximately 101 feet in length, 39 feet in beam, and 343 gross tons, with a draft of about 16 feet. It is powered by two Alco 12-251E diesel engines rated at approximately 4,500 horsepower, with auxiliary power from three Caterpillar 3304-driven generators.  *See* FPO STIP 5 (ECF 178).

*Allision on June 15, 2024*

6.      On June 15, 2024, the M/T MACKENZIE ROSE, pushing the barge WEEKS 281, traveled northbound up the Southern Branch of the Elizabeth River and under the Jordan Bridge

that connects vehicular traffic between Chesapeake and Portsmouth, Virginia.  After the tug passed

under the Jordan Bridge and began to approach the Belt Line's Bridge, it turned suddenly to port

and proceeded outside the fender toward the Bridge's western truss as depicted below.  *See* FPO

STIP 8 (ECF 178).



| 06/15/24 16:24 Tug transiting Jordan Bridge | 06/15/24 16:26 Tug approaching Belt Line Bridge |

     7.     At approximately 4:25 p.m. EST on June 15, 2024, the barge WEEKS 281, being

pushed by the M/T MACKENZIE ROSE, allided with the western truss on the Portsmouth side of

the Bridge, outside the navigable channel, while the Bridge was in the raised stationary position

(the "Allision").  *See* FPO STIP 7 (ECF 178).

     8.     Video surveillance footage shows the M/T MACKENZIE ROSE pushing the

WEEKS 281 into the western truss of the Bridge, then backing up, adjusting course, and

maneuvering through the Bridge opening.  *See* FPO STIP 9 (ECF 178).

     9.     On June 15, 2024, the M/T MACKENZIE ROSE crew included Captain

Christopher Miller, Mate James Morrissey, Engineer Jason McGrath, Deckhand Sharif Porter, and

Deckhand Jarkeis Morrissey.  *See* FPO STIP 10 (ECF 178).  At the time of the Allision, Mate

Morrissey was operating the tug.  *See* FPO STIP 12 (ECF 178).

     10.    The rough logbook (paper log) for the M/T MACKENZIE ROSE in Carver's vessel

records shows an incident at 4:30 p.m. EST on June 15, 2024 wherein the "Co Captain" (James

Morrissey) reported that the "steering went hard over" and "we tapped the North & PBL RR Bridge." *See* J.43 CARVER 001898 (Rough Log Entry 06/15/24).



*Carver Fails to Notify the U.S. Coast Guard or the Belt Line*

11.    Carver's Safety Management System ("SMS") requires that, in the event of an allision, the master of the tug or the crew in the wheelhouse must "a) Notify the Company; [and] b) Notify the Coast Guard." FPO STIP 13 (ECF 178).[2]

12.    Federal law also requires that, in the event of an allision, the owner, agent, master, operator, or person in charge of the vessel must notify the nearest Coast Guard Sector Office, Marine Inspection Office, or Coast Guard Group Office immediately after addressing any safety concerns.  *See* 46 CFR 4.05-1(a)(1).

13.    Carver did not notify the U.S. Coast Guard of the Allision on June 15, 2024, or even the day after.  In designated deposition testimony, Carver's Rule 30(b)(6) witness confirmed that Carver first communicated with the U.S. Coast Guard about the Allision "days after it happened."  Carver Rule 30(b)(6) Dep. 76:8-80:15.

14.    Carver also did not notify the Belt Line of the Allision on June 15, 2024, or any time thereafter.  *See* Moore Dep. 170:13-19, 175:21-24.

15.    The Belt Line reported the Allision to the U.S. Coast Guard on June 17, 2024.  *See* FPO STIP 14 (ECF 178).  That same day, the U.S. Coast Guard contacted Carver about the Allision.  *See* FPO STIP 15 (ECF 178).

---

[2]    A Safety Management System sets forth an owner's policies for the operation of its vessels as required by 46 C.F.R. 138.205.

4

16.     It is undisputed that the Allision caused damage to the Bridge.  *See* FPO STIP 16 (ECF 178).   The impact moved the steel superstructure nearly 7 feet, left the western truss balancing on 3 of its 4 legs, and rendered the Bridge inoperable.  *See* NPBL.5 (photos).

17.     Damages to the Belt Line from the Allision total $15,922,877, not including interest, costs, or punitive damages.  *See* J.73 (damages spreadsheet) and J.74 (invoices).

*Carver Attempts to Hide its Involvement*

18.     Text messages sent by Carver employees after the Allision reveal that Carver's management intentionally sought to cover up Carver's role in the Allision.

19.     At approximately 4:36 p.m. EST on June 15, 2024, Carver's Port Captain in New York, Leonard Baldassare, texted Carver's General Manager in New York, Brian Moore, confirming that the tug allided with the Bridge.  *See* J.64 CARVER 001871.

20.     At the time of the Allision, Mr. Moore was a management-level employee in charge of all day-to-day operations at Carver, including regulatory compliance.  *See* Moore Dep. 17:3-12.

21.     At the time of the Allision, Mr. Baldassare was a management-level employee in charge of all operations of Carver's tug fleet.  *See* Baldassare Dep. 16:22-17:4.

22.     Approximately one hour after the Allision, at 5:24 and 5:28 p.m. EST on June 15, 2024, even though no one at Carver had notified the U.S. Coast Guard of the Allision, Mr. Baldassare told the tug crew that the U.S. Coast Guard had allowed the vessel to leave Norfolk and continue to New York.  *See* J.65 CARVER ESI 001889-90 (texts).

23.     The tug crew then followed Mr. Baldassare's instructions and left the scene.  *See* J.43 CARVER 001898 (Rough Log Entry 06/15/24).

24.     Text messages between Mr. Baldassare and Mr. Moore indicate that Carver's tug captain, Christopher Miller, intended to notify the U.S. Coast Guard of the Allision, but that Mr. Baldassare "yelled at" him for wanting to do so.  *See* J.64 CARVER 001872-1877 (texts).



*Carver's Cover-Up Conceals Evidence*

25.     Carver's SMS requires drug and alcohol testing immediately after all serious marine incidents in accordance with 33 C.F.R. 95.  *See* J.53 CARVER HELM CONNECT 000844 (SMS excerpts).  Under 46 C.F.R. 4.03-2(a), a serious marine incident includes any bridge allision and any marine casualty with property damage in excess of $200,000.

26.     Carver did not test the crew of the tug for drug and alcohol use on the day of the Allision, and because Carver did not report the incident to the U.S. Coast Guard, no one else did either.  *See* Carver Rule 30(b)(6) Dep. 101:7-10, 101:20-102:6.

27.     Carver also performed "maintenance" work on the tug on June 18, 2024, just days after the Allision, before the Belt Line, Evanston, or the U.S. Coast Guard could inspect it.  *See* J.17 CARVER HELM CONNECT 000549-550 (Daily Log Entry 06/18/24).

28.     On June 20, 2024, counsel for the Belt Line sent an evidence preservation letter to Carver about the Allision and demanded that Carver preserve all documents, information, and ESI. *See* NPBL.65 (letter) and J.68 (email acknowledgement).  The letter was addressed to Carver's managing agent, Nicholas Laraway, and copied to Mr. Moore.  *Id*.

6

29.      Mr. Moore testified he received the preservation letter but "did not do anything in particular" about it.  *See* Moore Dep. at 337:23-338:16.  When the Belt Line's counsel followed up with him to explore what happened with his cell phone, Carver's counsel instructed him not to answer.  *Id*. at 339:9-341:15.  Carver's Rule 30(b)(6) representative, Mr. Laraway, confirmed in his deposition two months later that he received the letter and assigned the task of preserving evidence to Mr. Moore.  *See* Carver Rule 30(b)(6) Dep. at 14:2-15:9 and 21:17-22:10.

30.      Notwithstanding the preservation letter, Mr. Moore disposed of his cell phone that he used on June 15, 2024, and Carver has never produced texts or ESI from that phone despite being ordered to do so.  *See* Moore Dep. 27:15-21; Malik Dep. 29:6-30:24; ECF 50 (Order requiring response to Belt Line's RFP 34).[3]

*The Autopilot Steering System on the Tug Caused the Allision*

31.      Evidence described below, including contemporaneous records and documentation of multiple previous incidents, establishes that a failure of the autopilot steering system on the M/T MACKENZIE ROSE caused the Allision.  Carver's effort to shift blame to its crewmember does not alter that conclusion.

32.      Contemporaneous records from June 15, 2024 show that Carver was operating the tug in autopilot at the time of the Allision.  *See* J.43 CARVER 001898 (Daily Log from 06/15/24). In particular, the daily log for the M/T MACKENZIE ROSE on June 15, 2024 states that Mate Morrissey did not turn off the autopilot until he began backing away from the Bridge.  *See* J.43 CARVER 001898 (Daily Log from 06/15/24).

---

[3]      Mr. Moore is no longer employed by Carver but was employed by Carver throughout much of this case. According to Carver's General Counsel, Josef Malik, Mr. Moore was terminated for cause in 2025.  *See* Malik Dep., 14:17-15:11.  Jason Galioto, Carver's Compliance Logistics Supervisor, testified he took over Designated Person duties when Mr. Moore left Carver in April or May 2025.  *See* Galioto Dep., 77:23-78:7.

| 16:30 | Incident - Norfolk, VA - Mate James Morrissey reports the auto pilot was not completely turned off he was able to correct and switch back over to hand steering and begin backing on the Weeks 281 Barge and maneuvered the barge alongside fendering on the North and PBL RR Bridge, photo taken. proceed slowly away from bridge. |
|---|---|

33.     Contemporaneous text messages from Carver also confirm that a "steering issue" occurred while the tug was in autopilot.  On June 15, 2024 at 5:17 p.m. EST, Carver's General Manager, Mr. Moore, directed Carver's Port Captain, Mr. Baldassare, to "see how we can resolve the steering issue" in reference to the Allision "or they make it [a] ship hand[l]ing issue."  J.64 CARVER 001874 (texts).

34.     At least four incident reports in 2024 from before the Allision, described below, also suggest that steering issues with the autopilot system caused the Allision, including two incidents in May 2024 that went unresolved just weeks before June 15, 2024.  *See* J.5, J.6, J.7, and J.9 (incident reports).

35.     Carver does not dispute that the tug was in autopilot, but claims that "the allision was the result of a crewmember's navigational error after he failed to properly switch from autopilot to hand steering."  ECF 194 at 40 (Summ. Jdgmt. Op.).  This version of events finds no support in the evidence.[4]  Yet even if the Court were to accept Carver's theory, the autopilot system still caused the Allision.  Carver offers no evidence to explain why a properly functioning autopilot system, when left "on," should cause a tug to veer left and hit a bridge.

*Carver Knew of Problems with the Autopilot before the Allision*

36.     Before the Allision, the M/T MACKENZIE ROSE had a history of issues with its autopilot system.  *See* J.5, J.6, J.7, and J.9 (incident reports).

---

[4]     As indicated in the Court's Summary Judgment Opinion, Carver's view of events depends on inadmissible CG-2692 forms that its own management filled out.  *See* ECF 194 at 40.

37.   Carver replaced at least part of it in November 2023 after reported issues with the system.  *See* J.46 CARVER 000251 (Mackay Marine Invoice); Moore Dep. 166:22-167:3.

38.   After that work, on February 28, 2024, Captain Miller filed a "near miss report" in Carver's HELM system describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "AUTO PILOT STOPPED TUG TOOK A HARD LEFT INTO OTHERN TRAFFIC LANE." J.5 CARVER 000037 (02/28/24 Near Miss Report); Moore Dep. 298:21-301:11.

39.   On March 2, 2024, Mackay Marine performed more work on the autopilot system on the tug after Carver complained of additional issues.  *See* J.46 CARVER 000252 (Mackay Marine Invoice); Moore Dep. 276:17-277:5.

40.   On April 1, 2024, Captain Miller filed another "near miss report" in Carver's HELM system describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "autopilot to go into standby and hard right to heavy seas."  *See* J.6 CARVER 000039 (04/01/24 Near Miss Report); Moore Dep. 303:2-8, 308:4-10.

41.   On April 3-5 and 10-11, 2024, Ayers Marine Electronics performed work on the autopilot system on the M/T MACKENZIE ROSE.  *See* J.45 CARVER 000249 (Ayers Marine Invoice); Moore Dep. 271:22-272:15.  This was the last work on the autopilot before the Allision on June 15, 2024. *See* Moore Dep. 275:24-276:6

*Carver Fails to Repair the Autopilot after Two Incidents in May 2024*

42.   On May 3, 2024, just 6 weeks before the Allision, Captain Miller, as confirmed by Mate Walordy, filed a "near miss report" in Carver's HELM system describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "the steering went into standby and the rudder came hard over without alarm."  *See* J.7 CARVER HELM CONNECT 000167 (05/03/24 Near Miss Report); Walordy Dep. 24:18-26:19.

9

43.     On May 21, 2024, 3½ weeks before the Allision, Captain Miller filed another report in Carver's HELM system describing an incident with the M/T MACKENZIE ROSE wherein the steering went unexpectedly hard left when the tug was in autopilot.  *See* J.9 CARVER 002041 (05/21/24 Incident Report).

44.     Carver's General Manager, Mr. Moore, confirmed that no work was done to the autopilot system after either report.  *See* Moore Dep. 275:24-276:6.

45.     Carver's Compliance Logistics Supervisor, Mr. Galioto, testified that the May 21, 2024 Incident Report sat in Mr. Moore's electronic inbox unopened for more than a year after the date of the Allision on June 15, 2024.  *See* Galioto Dep. 58:17-80:25.

*Carver Fails to Prohibit Autopilot after the Incidents in May 2024*

46.     Notwithstanding the unresolved issues with the autopilot in May 2024, Carver did not prohibit use of the autopilot on the M/T MACKENZIE ROSE before the Allision.  *See* Moore Dep. 281:8-23; Carver Rule 30(b)(6) Dep. 91:5-12.

47.     Carver also did not prohibit use of the autopilot in the area of the Bridge despite requirements to do so in its own operator manual.  *See* J.52 CARVER 001999.

48.     The operator manual for the Simrad autopilot system that was on the M/T MACKENZIE ROSE on June 15, 2024 prohibits use of automatic steering "in heavy traffic areas or in narrow waters" and requires users to "always switch the autopilot to standby and reduce speed in due time to avoid hazardous situations."  *See* J.52 CARVER 001999 (excerpt).

49.     At all times relevant, the Bridge was and is a published hazard to navigation in 33 C.F.R. 117.997.

50.     Carver's Port Captain, Mr. Baldassare, confirmed that bridges are considered hazards to navigation, *see* Baldassare Dep. 169:4-7, and that autopilot should not have been used when the tug was approaching the Bridge.  *Id*. at 89:14-90:5.

51.    Despite the Simrad manual and Mr. Baldassare's statement, Carver's SMS contains no restriction on the use of autopilot in heavy traffic areas, narrow waters, or near hazards to navigation.  *See* Moore Dep. 281:17-23; J.52 and J.53 (SMS excerpts); Carver Rule 30(b)(6) Dep. 91:5-12.

*Carver Supplies an Incompetent Crew on the Day of the Allision*

52.    Carver's SMS contains various training modules for operation of Carver's vessels but does not contain any training module for transiting bridges.  *See* J.53 (SMS excerpts).

53.    Mate Morrissey received no training from Carver on transiting bridges before operating the tug on the day of the Allision.  *See* J.36 (records of Morrissey's training).

54.    Mate Morrissey received no training from Carver on the use of autopilot before operating the tug on the day of the Allision.  *See* J.36 (records of Morrissey's training).

55.    In January 2024, just 5 months before the Allision, Mate Morrissey struck a pier while operating the M/T MACKENZIE ROSE, causing over $75,000 in damages.  *See* J.3 CARVER 00082-0847 (01/22/24 Incident Report).

56.    After the January 2024 allision, Mate Morrissey was not disciplined by Carver or required to undergo remedial training.  *See* Moore Dep. 88:6-89:16.

*The Belt Line Incurs nearly $16 Million in Costs to Repair the Bridge*

57.    Damage to the Bridge from the Allision was substantial.

58.    Immediately after learning of the damage, the Belt Line engaged Hardesty & Hanover ("H&H"), a bridge engineering firm, and PCL Civil Constructors ("PCL"), a bridge construction firm, to repair the Bridge.

59.    By virtue of the Belt Line's relationship with Norfolk Southern Railway Company (one of its owners), the Belt Line was able to access existing Norfolk Southern Master Service Agreements with H&H and PCL.  *See* NPBL.90 (H&H) and NPBL.91 (PCL).

11

60.     The Norfolk Southern Master Service Agreements mitigated downtime and economic harm by eliminating the need for a lengthy procurement.  They also significantly reduced overall costs because they contained fixed pre-negotiated rates, not higher emergency rates.  *Id.*

61.     PCL was on-site by June 18, 2024, the day after the Belt Line discovered the damage caused by the Allision.  H&H began design work for a repair shortly thereafter.

62.     The Belt Line was also able to mitigate costs by performing some of the work with its own forces, including construction of an access road and rerouting trains.  For this work, the Belt Line included overhead rates depending on the trades involved, at standard levels used with the Virginia Department of Rail and Public Transportation.  *See* J.73 (damages spreadsheet).  The same rates are approved for use throughout the Norfolk Southern system.  *See* NPBL.97 (FHA and GDOT Approved Audited Overhead Rates).

63.     Because of the pace of the project, the Belt Line was able to reopen the Bridge for limited service in time for the busy grain season, avoiding potentially severe economic losses for its industry customers.

64.     The Bridge returned to low-capacity reduced-speed service, with manual as opposed to remote operation of the electronic systems, on November 6, 2024.

65.     The Bridge returned to full-speed service, still with manual as opposed to remote operation of the electronic systems, on February 14, 2025.  It returned to full-speed service with remote operation by the end of March 2025.

66.     The total cost of repairs to the Bridge, including work by H&H, PCL, other vendors and subcontractors, and the Belt Line's own forces, is $15,922,877, not including interest, costs, or punitive damages.  *See* J.73 (damages spreadsheet) and J.74 (invoices).  All are reasonable and were directly caused by the Allision.

*Interest, Costs, and Punitive Damages*

67.    Prejudgment and post-judgment interest is warranted on the Belt Line's damages as of the date of the Allision at the rate of 4% per annum.  This is the rate charged on a $4,000,000 loan the Belt Line secured from its owners to pay for part of the repairs.

68.    Costs are also warranted for the Belt Line to full extent provided by law, to be determined upon the Belt Line's submission of a Bill of Costs.

69.    Punitive damages are also warranted for the Belt Line based on Carver's conduct. This conduct includes:

(a)    Carver's attempt to cover up its involvement in the Allision;

(b)    Carver's failure to report the Allision to the U.S. Coast Guard, thereby endangering the public and precluding an immediate and fulsome investigation at the scene;

(c)    Carver's failure to report the incident to the Belt Line, thereby putting lives, property, and rail operations at risk;

(d)    Carver's deception of its crew and direction for them to leave the scene without reporting the incident;

(e)    Carver's verbal reprimand of its tug captain for desiring to provide the required notice to the U.S. Coast Guard;

(f)    Carver's spoliation of evidence, including

i.   drug and alcohol testing of the crew,

ii.   ESI from its General Manager's cell phone, and

iii.   the condition of its autopilot immediately after the Allision;

13

(g)    Carver's performance of "maintenance" on the tug before notifying the U.S. Coast Guard or the Belt Line;

(h)    Carver's failure to repair the tug's autopilot system after multiple incidents in May 2024;

(i)    Carver's failure to open a May 21, 2024 autopilot incident report until June 25, 2025, more than a year later;

(j)    Carver's failure to properly train its crew; and

(k)    Carver's failure to discipline or provide remedial training to Mate Morrissey after a previous allision in 2024.

70.    The Belt Line seeks punitive damages equal to the amount of its compensatory damages consistent with *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513 (2008) (allowing 1:1 ratio of punitive to compensatory damages).

71.    The Belt Line reserves the right to supplement these Findings of Fact as appropriate based on evidence developed at trial.

## Conclusions of Law

*Carver is Liable to the Belt Line for $15,922,827*

1.    Under this Court's Local Admiralty Rule (f), "Where the vessel interests seeking statutory limitation of liability [here, Carver] have raised the statutory defense by way of answer or complaint, the plaintiff in the former or the damage claimant in the latter [here, the Belt Line], shall proceed with its proof first, as is normal at civil trials."

2.    Carver filed its Limitation Complaint on August 8, 2024.  *See* ECF 1.

3.    The Belt Line timely filed its Claim on December 5, 2024.  *See* ECF 25.  To succeed on its Claim, the Belt Line must establish both liability and damages.

4.      For the reasons set forth in the Court's Summary Judgment Opinion, the Belt Line has established liability.  *See* ECF 194 at 38 ("Summary judgment is GRANTED in the Belt Line's favor as to liability.").

5.      By stipulation, the Belt Line has also established that Carver caused the Belt Line damages.  *See* FPO STIP 16 ("The Allision caused damage to the Bridge.").

6.      The Belt Line has also established the amount of its damages at $15,922,877, not including interest, costs, or punitive damages.  J.73 (damages spreadsheet) and J.74 (invoices).[5]

7.      Because the Belt Line has established liability and damages on its Claim, including quantum, unless Carver is able to limit liability under 46 U.S.C. § 30523, the Belt Line is entitled to judgment against Carver in the amount of $15,922,877, plus pre- and post-judgment interest at 4% per annum from June 15, 2024 until paid, plus all costs allowed by law (to be established in a Bill of Costs), plus punitive damages in an amount to be determined after trial.

*Carver Cannot Limit its Liability under 46 U.S.C. § 30523*

8.      Under 46 U.S.C. § 30523, the owner of a vessel may "limit [its] liability for losses . . . to the value of [its] interest in the vessel and her freight if the owner can show that the cause of the collision was not within [its] privity or knowledge."  ECF 194 at 39 (quoting *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 166 (4th Cir. 1984)).  To obtain limitation of liability, the shipowner "bears the burden of proving that he was without privity or knowledge of the condition or negligence responsible for the [a]llision."  *Id.*

---

[5]      Carver sought to depreciate the Belt Line's damages from $15,922,877 to $2,972,767, treating the situation as a replacement of the entire Bridge instead of a repair of one section.  *See* ECF 148.  In response to a Motion in Limine filed by the Belt Line (ECF 134), the Magistrate Judge correctly precluded that effort as contrary to law.  *See* ECF 175.

9.      The question of privity or knowledge is preceded by a fact-bound inquiry:  "[I]n order to grant or deny limitation," the Court must first "find what acts of negligence caused the accident."  ECF 194 at 39 (quoting *Joia v. Jo-Ja Serv. Corp.*, 817 F.2d 908, 912 (1st Cir. 1987)). "Only then can the Court determine whether the vessel owner had knowledge or privity of those acts."  *Id*.

10.     Here, contemporaneous Carver records in the form of the June 15, 2024 Daily Log (J.43) (showing the tug was in autopilot at the time of the Allision) and text messages between Carver's management (J.64) (describing a "steering issue" in reference to the Allision) show that a problem with the autopilot steering system on the tug caused the vessel to veer left and push the barge into the Bridge.

11.     Other Carver records also support this conclusion, including four incident reports in 2024 related to steering issues with the autopilot system.  These include a February 28, 2024 report filed by Captain Miller (J.5), an April 1, 2024 report filed by Captain Miller (J.6), a May 3, 2024 filed by Captain Miller (J.7), and a May 21, 2024 report filed by Captain Miller (J.9).

12.     Carver knew about these reports because they were logged in Carver's internal HELM system records.  *See* J.5, J.6, J.7, and J.9 (with CARVER bates labels).

13.     Testimony indicates that Carver took no action to repair the problems with the autopilot steering system indicated in the May 3, 2024 and May 21, 2024 reports.  *See* Moore Dep. 275:24-276:6 (no repairs after April 2024).  In fact, the May 21, 2024 report sat unopened in Carver's General Manager's inbox for more than a year.  *See* Galioto Dep. 58:17-80:25.

14.     Carver also took no steps to prohibit use of the autopilot system until repairs could be made.  *See* Moore Dep. 281:8-23; Carver Rule 30(b)(6) Dep. 91:5-12.

15.     Carver also failed to heed its own Simrad operator manual for the autopilot system, which prohibits automatic steering "in heavy traffic areas or in narrow waters."  *See* J.52 CARVER 001999 (excerpt).  This is true even though Mr. Baldassare testified that autopilot should not have been used when the tug was approaching the Bridge.  *See* Baldassare Dep. 89:14-90:5.

16.     Carver also failed to preserve critical evidence.  The Fourth Circuit has held that, in addressing spoliation, an adverse inference may be drawn when a party "knew the evidence was relevant to some issue at trial" and the party's "willful conduct resulted in its loss or destruction." *Buckley v. Mukasey*, 538 F.3d 306, 322 (4th Cir. 2008) (quoting *Vodusek v. Bayliner Marine Corp*., 71 F.3d 148, 156 (4th Cir. 1995) (rejecting "bad faith" standard for spoliation of evidence)).[6]  By failing to notify the U.S. Coast Guard, Carver evaded the obligation to conduct drug and alcohol testing or have its tug inspected at the scene.  By failing to secure ESI from Mr. Moore's phone, Carver thwarted access to evidence bearing on what it knew or did before and after the Allision.  By performing "maintenance" on the tug on June 18, 2024, Carver destroyed any evidence of the actual problems with the autopilot before the U.S. Coast Guard or the Belt Line could inspect it.  Consistent with other evidence in this case, these facts support an inference that Carver had privity or knowledge of the condition that caused the Allision.

17.     Because the evidence establishes that Carver knew of the condition that caused the Allision but took no action to resolve it or otherwise prevent its use, Carver cannot meet its burden under 46 U.S.C. § 30523 to "show that the cause of the collision was not within [its] privity or

---

[6]     The Federal Rules of Civil Procedure have since been amended to require that, for electronically stored information, an adverse inference may be made only if a party failed to preserve evidence "with the intent to deprive another party of the information's use in the litigation."  Fed. R. Civ. P. 37(e)(2)(B); *see also Doe v. Charlotte Mecklenburg Bd. of Educ*., 2024 U.S. App. LEXIS 18645 at *24 n.14 (4th Cir. 2024).

knowledge." ECF 194 at 39 (quoting *Hellenic Lines*, 730 F.2d at 166). As a result, Carver cannot limit its liability or otherwise obtain exoneration under 46 U.S.C. § 30523.[7]

*Prejudgment Interest*

18.    "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 828 (4th Cir. 1992) (quoting *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986)). "Prejudgment interest is routinely granted by the courts in maritime cases." *Chisholm v. UHP Projects*, 30 F. Supp. 2d 928, 931 (E.D. Va. 1998). Particularly with respect to property damage, there is "a general rule that prejudgment interest should be awarded in maritime collision cases, subject to a limited exception for 'peculiar' or 'exceptional' circumstances." *Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 104327 at *40 (E.D. Va. 2009) (quoting *City of Milwaukee v. Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995)).

19.    A trial court's broad discretion "over awards of prejudgment interest extends to its determinations of when interest begins." *Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 104327 at *43 (E.D. Va. 2009) (quoting *Indep. Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 25 (2d Cir. 1982). "Prejudgment interest is typically awarded from the date of the loss." *Id.* (citing *Wilkerson v. Ingalls Shipbuilding, Inc.*, 125 F.3d 904, 907 (5th Cir. 1997) ("[A]dmiralty courts generally have awarded prejudgment interest accruing from the time the damage was incurred."); *In re Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1335 (7th Cir. 1992); *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 493 (5th Cir. 1986) ("[P]rejudgment interest on repair costs runs from the date of the accident even though the

---

[7]    Because no limitation is available under 46 U.S.C. § 30523, the Court need not decide the value of the vessel. Valuation is contested and, at this point, Carver does not have an expert witness on valuation for trial. *See* ECF 172.

owner does not pay these costs until some later date."); *Complaint of M/V Vulcan*, 553 F.2d 489, 490 (5th Cir. 1977) ("[I]n admiralty cases the award of prejudgment interest from the date of loss is the rule rather than the exception."); *City of Chi. v. M/V Morgan*, 248 F. Supp. 2d 759, 779 (N.D. Ill. 2003) ("Prejudgment interest on a monetary award for an admiralty tort is calculated from the allision date to the judgment date."); *Ark. River Co. v. United States*, 947 F. Supp. 941, 953 (N.D. Miss. 1996) ("[P]rejudgment interest accru[es] from the date of the allision.").

20.     In this case, prejudgment interest is warranted commencing June 15, 2024 for the reasons and in the amount set forth in the factual findings above.

*Punitive Damages*

21.     "Punitive damages are available under the general maritime law in cases of property damage." *Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 61538 at *9 (E.D. Va. 2009) (citing *Furka v. Great Lakes Dredge & Dock Co., Inc*., 755 F.2d 1085, 1091 (4th Cir. 1985) and *Protectus Alpha Nav. Co. v. Northern Pacific Grain Growers, Inc*., 767 F.2d 1379, 1385 (9th Cir. 1985)).

22.     "Regardless of the alternative rationales over the years, the consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct." *Exxon*, 554 U.S. at 492.

23.     To establish a case for punitive damages, a party must show that "a defendant's conduct is 'outrageous' owing to 'gross negligence,' 'willful, wanton, and reckless indifference for the rights of others,' or behavior even more deplorable." *Norfolk & Portsmouth Belt Line R.R. Co.*, 2009 U.S. Dist. LEXIS 61538 at *9 (quoting *Exxon*, 554 U.S. at 493). In *Exxon*, the Supreme Court approved a "punitive-to-compensatory ratio of 1:1," which is the same ratio the Belt Line seeks here. *Exxon*, 554 U.S. at 515.

24.     For the reasons set forth in the factual findings above, the Belt Line has established that it is entitled to punitive damages against Carver in an amount to be determined after trial, recognizing that the Belt Line seeks a punitive-to-compensatory ratio of 1:1.

*Carver's Offset for Settlement with Evanston*

25.     This Court has already held that "the Belt Line will be permitted to prove the full amount of damages it claims" at trial, or $15,922,877.  *See* ECF 194 at 17.  This Court has also placed conditions on approval of the settlement between Evanston and Carver.  *Id*. at 19-20.

26.     Under the collateral source rule, Evanston's insurance payments to the Belt Line have no bearing on the Belt Line's damages.  *See* ECF 194 at 6-7 (explaining rule).  Consistent with that rule, Evanston's payments should be equally irrelevant to any offset for Carver.  *Id*.  To hold otherwise would effectively reward Carver, the tortfeasor, for the Belt Line's decision to procure and pay for liability insurance.  As this Court explained, "[U]nder the collateral source rule a payment from a source independent of, or unrelated to, the tortfeasor does not reduce his liability to the injured party even if the result is to afford the injured party double compensation."  ECF 194 at 7 (quoting *Yost v. Am. Overseas Marine Corp*., 798 F. Supp. 313, 319 (E.D. Va. 1992)); *see also W. Towboat Co. v. Vigor Marine, LLC*, 566 F. Supp. 3d 1095, 1099 (W.D. Wash. 2021) (explaining that "partial reimbursement by [a claimant's] insurers poses no procedural limitation . . . on [a claimant's] ability to recover the full amount of damages from a tortfeasor)).

27.     This analysis strongly suggests that the maximum offset to which Carver may be entitled is $5,000,000, the amount it paid Evanston, regardless of the amount Evanston paid the Belt Line.  Nevertheless, the Belt Line reserves the right to more fully brief this issue, which it believes is consistent with the Court's Summary Judgment Opinion deferring any ruling until after

trial. *See* ECF 194 at 19 ("The Belt Line may continue to pursue its entire damages claim, with the Belt Line's recovery from Carver subject to the appropriate offset later determined.").

28.    The Belt Line reserves the right to supplement these Conclusions of Law as appropriate based on evidence developed at trial.

## <u>Conclusion</u>

WHEREFORE, for the foregoing reasons, the Belt Line respectfully requests that this Court grant judgment in the Belt Line's favor against Carver for the full amount of damages set forth herein, together with all other just relief.

Dated:  March 3, 2026

NORFOLK AND PORTSMOUTH BELT
LINE RAILROAD COMPANY


By: _____*/s/ W. Ryan Snow*_____
    James L. Chapman, IV, VSB No. 21983
    W. Ryan Snow, VSB No. 47423
    Mackenzie R. Pensyl, VSB No. 100012
    CRENSHAW, WARE & MARTIN, P.L.C.
    150 W. Main Street, Suite 1923
    Norfolk, Virginia 23510
    Telephone: (757) 623-3000
    Facsimile: (757) 623-5735
    jchapman@cwm-law.com
    wrsnow@cwm-law.com
    mpensyl@cwm-law.com
    *Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of March 2026, a true copy of the foregoing was (i) electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all registered counsel of record, and (ii) mailed to:

James Morrissey
4723 Baywood Drive
Lynnhaven, FL 32444

By: _____/s/ W. Ryan Snow_____
W. Ryan Snow, VSB No. 47423
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
wrsnow@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*