IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/V Mackenzie Rose, (IMO No. 8968765), *et al*. | Civil Action No: 2:24-cv-00490-MDS-LRL |

### CARVER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Petitioner, COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING ("Carver"), as owner and operator of M/T MACKENZIE ROSE, submits its Proposed Findings of Fact and Conclusions of Law per the Court's Supplemental Rule 16(b) Scheduling Order as follows:

### Carver's Factual Stipulations

1. This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure for claimed property damaged resulting from an allision to the Main Line Bridge on the Southern Branch of the Elizabeth River. This Court has original jurisdiction over this matter under its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and federal question jurisdiction pursuant to 28 U.S.C § 1331. Venue is proper in this district and division under 28 U.S.C. § 1391.

### Parties

2. Claimant Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") is a corporation organized and existing under the laws of the Commonwealth of Virginia with its

principal place of business located in Chesapeake, Virginia. The Belt Line is a terminal switching railroad serving the cities of Norfolk, Portsmouth and Chesapeake, Virginia. The Belt Line is the owner of its Main Line Bridge over the Southern Branch of the Elizabeth River connecting the Cities of Chesapeake and Portsmouth.

3. Petitioner Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("CMT") is a limited liability organized under the laws of New York with its principal place of business located in Albany, New York. CMT owns and operates a fleet of inland and offshore tug and barges and provides towing services on the East Coast of the United States. On June 15, 2024, CMT owned and operated the tug M/T Mackenzie Rose.

4. The M/T MACKENZIE ROSE (IMO No. 8968765) is a United States-flagged twin-screw tugboat built in 2000, measuring approximately 101 feet in length, 39 feet in beam, and 343 gross tons, with a draft of about 16 feet. It is powered by two Alco 12-251E diesel engines rated at approximately 4,500 horsepower, with auxiliary power from three Caterpillar 3304-driven generators.

5. James Morrissey is an individual who currently resides in Florida. He was formerly employed by CMT as a Captain. Mr. Morrissey holds a valid U.S. Coast Guard Merchant Mariner Credential (Serial No. 000611973, issued December 2021 expiring December 13, 2026) qualifying him as an Able Seafarer-Unlimited, Master of Towing Vessels on Near Coastal Waters and Western Rivers, and Master of Self-Propelled Vessels under 1,600 GRT on Near Coastal Waters. His endorsements include Radar Observer (Unlimited), Lifeboat Operator (limited), and multiple Standards of Training, Certification and Watchkeeping for Seafarers endorsements, including Advanced Firefighting, Basic Training, Officer in Charge of a Navigational Watch (limited), and

Proficiency in Survival Craft (limited). He also maintains a valid U.S. Coast Guard Medical Certificate through November 23, 2026.

## The Main Line Bridge

6. The Belt Line Railroad Bridge ("Main Line Bridge") was first permitted by Act of Congress in 1897, with a permit issued by the Secretary of War. Following hearings under the Truman–Hobbs Act of June 21, 1940, 33 U.S.C. §§ 511–524, the original bridge was determined to be an unreasonable obstruction to navigation, and the Secretary of the Army issued a new permit on October 6, 1947. The current Main Line Bridge was constructed between 1956 and 1958 as a steel vertical lift bridge carrying the Norfolk & Portsmouth Belt Line Railroad's main line across the Southern Branch of the Elizabeth River in Chesapeake, Virginia.

7. The structure consists of four fixed approach spans and a central lift span supported by towers on each riverbank. The total length of the bridge is approximately 2,050 feet, with the lift span measuring approximately 385 feet and providing a horizontal clearance of 300 feet. When closed, the bridge has a vertical clearance of approximately 6 feet, and when raised, approximately 142 feet. The lift span is counterweight-balanced and operated by wire ropes and sheaves, allowing a raised vertical clearance of about 150 feet.

8. The bridge was originally fabricated primarily using ASTM A7 carbon steel. Structural connections are primarily riveted, with gusset plates used at critical truss panel points. The design reflects mid-twentieth century railroad bridge engineering standards, including trusses, floor beams, stringers, and gusset plates that require periodic inspection and maintenance.

9. By federal regulation, the bridge remains raised except when a train is crossing. The bridge is not manned by a tender. Instead, an off-bridge control station monitors the draw by video and monitors VHF Channels 13 and 16. Thirty minutes and fifteen minutes before any train

crossing, the control station broadcasts a warning message on Channel 13 to advise approaching vessel traffic.

10. On January 24, 2024, Koppers Railroad Structures Inc. ("Koppers") conducted an annual inspection of the Main Line Bridge. Koppers found that Span 1 of the bridge exhibit web corrosion at all intermediate stiffener bottom 10" locations; top cover plates had minor pitting; and heavy pack rust and debris on the top gusset plates that indicated 25-30% section loss.

11. Koppers also found that the floor systems on Spans 1 and 2 exhibited section loss, pack rust, and cracks in several steel members.

12. On June 4-5, 2024, Hardesty & Hanover ("H&H"), a New York-based engineering firm, conducted a mechanical inspection of the Main Line Bridge. The inspection noted that the west counterweight was skewed due to uneven rope stretch, while the east counterweight showed minimal skew. Balance testing confirmed the span was as well-adjusted as possible, but the absence of auxiliary counterweights or balance chains was described as unusual given the bridge's lift height.

13. H&H also noted fatigue concerns in the counterweight trunnion shafts, including scoring and inadequate lubrication. The west tower auto-lubrication system was found non-functional, and lubrication of both trunnions and counterweight ropes was found inadequate. The counterweight ropes showed corrosion, inadequate lubrication, and abrasive crown wear, and were described as nearing the end of their useful life. The counterweight sheave grooves were worn beyond acceptable tolerance to accommodate new ropes, raising concerns about poor load sharing between ropes.

14. The report further found that the existing 10-inch thruster brake was undersized and adjusted beyond its rated torque, with missing supports and asbestos brake pads still in use. Poor

brake pad contact was observed. Access to the machinery was also noted to be hazardous, requiring climbing nearly 200 feet of ladders with insufficient safety lines.

### The Allision on June 15, 2024

15. On June 15, 2024, the M/T MACKENZIE ROSE was transiting the Southern Branch of the Elizabeth River and was pushing the Weeks 281 barge laden with non-hazardous cargo per Carver's contract with Skanska.

16. Captain James Miller, a U.S Coast Guard licensed Master, was the Captain aboard M/T MACKENZIE ROSE on June 15, 2024. James Morrisey was the Mate aboard the vessel. The crew were Jarkeis Morrissey, Sharif Porter, and engineer Jason McGrath.

17. At approximately 16:25 hours on June 15, 2024, the barge portion of the configurated tug/barge allided with the Bridge.

18. At the time of the allision, James Morrissey was the Officer on Watch and in control of navigating the M/T MACKENZIE ROSE. He was situated in the upper wheelhouse of the tug. There was a 360 view from the upper wheelhouse with a clear line of sight across the front of the barge.

19. The weather conditions at the time of the allision were clear with good visibility (up to 10 miles). The tide was about 21' with no "chop." There was insignificant vessel traffic on the Elizabeth River near the Main Line Bridge.

20. Mate Morrissey was not under the influence of drugs or alcohol at or before the time of the allision.

21. Mate Morrissey was operating the Mackenzie Rose using its Simrad AP70 autopilot system just prior to the allision.

5

22. Mate Morrissey initially reported to Captain Miller that the allision was caused by the rudder going hard over to port just before striking the bridge. This statement was untrue, as discovered by Carver's management once they conducted an investigation after the allision.

23. During his U.S. Coast Guard investigation interview, Mr. Morrissey corrected his version of events and stated that he was transiting in autopilot and did not switch over to "non follow up" hand steering but thought he did. He further stated that once he did switch to hand steering, he gave a slow astern at first and then full astern shortly prior to impact but nonetheless struck the bridge with the barge.

24. There is no evidence that the autopilot, steering, or mechanical systems on the M/T MACKENZIE ROSE malfunctioned at any time on June 15, 2024.

25. The most reliable evidence of the course and speed of the M/T *MACKENZIE ROSE* on June 15, 2024 is the Rose Point navigational data produced by Carver in discovery.

26. The value of the M/T *MACKENZIE ROSE* just prior to and after the allision was approximately $2.5 Million.

### Carver's Factual Contentions for Trial

**The factual contentions of Carver in addition to Paragraphs 1 through 26 of the Stipulation above, are as follows:**

1. This trial is about whether the Belt Line can defeat Carver's entitlement to limit its liability under the Limitation of Liability Act, 46 U.S.C. §30501 *et seq.*. and the amount of Belt Line's recoverable damages, if any. Belt Line contends, primarily, that Carver's vessel was unseaworthy on June 15, 2024 because Mate James Morrissey was not properly trained in how and when to use autopilot on the Elizabeth River near railroad infrastructure; the autopilot system on board the M/T *MACKENZIE ROSE* (an Simrad AP70) was defective or malfunctioned; Mate

Morrissey failed to post a lookout and failed to keep a proper lookout; and that Carver's management had privity and knowledge of these issues.

2. Carver contends that there is no evidence to support any of Belt Line's theories of liability. There is no evidence that the autopilot, steering, mechanical, or equipment on the vessel malfunctioned or was defective on the date of the incident. Carver regularly and properly maintained the M/T *MACKENZIE ROSE* and its various mechanical systems. This included replacing and maintaining the autopilot and steering systems in the months leading to the allision through reputable service venders in the maritime industry. The autopilot and steering systems functioned properly on the date of the incident.

3. Moreover, Mate Morrissey, Captain Chris Miller, and the crew aboard the M/T *MACKENZIE ROSE* were licensed, experienced mariners and were competent in all respects on June 15, 2024. Carver neither knew nor should it have known of any incompetencies to suggest that Mate Morrissey may errantly strike a bridge while in command of the M/T *MACKENZIE ROSE*.

4. The weather conditions on June 15, 2024 were clear with good visibility (10 miles in either direction). Mate Morrissey was Officer on Watch operating the M/T MACKENZIE ROSE prior to and at the time of the allision. Captain Chris Miller and the crew were not on watch and were in their racks sleeping or otherwise below deck. Mate Morrissey was situated in the Upper Wheelhouse of the M/T MACKENZIE ROSE which provided a sufficient lookout to observe and avoid striking the Main Line Bridge.

5. Capt. Sam Stephenson will testify consistent with his written report of June 8, 2025 and within the bounds of reasonable operational maritime certainty, that (1) The MACKENZIE ROSE was properly manned on June 15, 2024, the crew was licensed by the U.S. Coast Guard,

and in compliance with work/rest requirements of six hours on/six hours off; (2) The watch officer acting as look-out was appropriate under the prevailing conditions on June 15, 2024; (3) Autopilot is not prohibited for use while transiting a waterway with bridges; (4) The evidence clearly establishes that Mate Morrissey's initial statement that the autopilot malfunctioned was false; and (5) Mate Morrissey failed to engage the switch from Auto to NFU when he thought he had and therefore, this failure by Mate Morrissey and his lack of situational awareness was the sole cause of the allision.

6. Mate Morrissey was properly using autopilot as he transited the Elizabeth River but errantly failed to switch to Non-Follow Up and manually control the vessel as the vessel approached the Main Line Bridge. Mate Morrissey's navigational error was the sole cause of the allision.

7. The allision resulted in property damage to the Main Line Bridge and there were no injuries to any person.

8. Belt Line contends that its damages for repairing the bridge total $15,992,887.46. These damages are overstated and include unrelated or unreasonable costs, including: costs for replacing rails and ties that were not damaged in the allision; adding improvements to the bridge like conduit for electrical wiring, mechanical system components, and refurbishing the lift system and its components, among other things; time and expenses for labor that relate to a lost income claim that Belt Line has conceded; and added "surcharges" on top of Belt Line's own labor expenses that are not recoverable.

9. Additionally, Belt Line's damages do not account for depreciation and the deteriorated condition of the bridge. The bridge was built in 1958, was 66 years old at the time of the allision and was nearing the end of its useful life. Carver has retained R&L Banks &

Associates, LLC, a firm that specializes in valuing railroad infrastructure, who will opine that the Belt Line's recoverable damages, at most, total $2,972,767 when accounting for depreciation that is allowed by law. A summary of R&L Banks' valuation opinion is as follows:

Table 1 – Summary of RLBA Damages Reductions Applied to **Belt Line's Claim**

| Category | Subtotals | Depreciated Value | Totals |
|---|---|---|---|
| Total Damages Claimed by Belt Line | | | $ 15,542,872 |
| Ties and Rail | $ 224,446 | | |
| PCL Classified Damages | $ 5,780,290 | | |
| PCL Unclassified Damages | $ 7,524,646 | | |
| Construction Total Damages | $ 13,529,383 | | |
| Depreciated Value | | $ 2,343,949 | |
| Depreciation Reduction | | | $ (11,185,434) |
| H&H Classified Damages | $ 262,471 | | |
| H&H Unclassfied Damages | $ 252,178 | | |
| H&H Total Damages | $ 514,649 | | |
| Depreciated Value | | $ 88,166 | |
| Depreciation Reduction | | | $ (426,483) |
| Total Depreciation of Belt Line's Claim | | | $ (11,611,917) |
| Total Damages less Depreciation | | | $ 3,930,954 |
| Scrap Steel Credit | | | $ (41,897) |
| Belt Line Labor Damages | $ 1,087,141 | | |
| Labor Charges removed | $ 916,291 | | |
| Labor Reduction | | | $ (916,291) |
| TOTAL Damages | | | $ 2,972,767 |

9. In the event that Carver is entitled to limit its liability under the Limitation of Liability Act, 46 U.S.C. §§ 30501 through 30512, and all laws supplementary thereto, Jason R. Meyerrose will testify the value of the subject vessel at the time of the loss, the M/T MACKENZIE ROSE, has a maximum value of approximately $2,500,000.00.

10. By virtue of its contract with Evanston, the Belt Line transferred its rights of recovery against Carver to Evanston to the extent of Evanston's payment that was $10 Million. The Policy provides as follows:

> I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US
>
> If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after the loss to impair them …

Evston Policy, Commerical Property Conditions, Form 00 90 07 88, p. 2 of 2.

**Carver's Proposed Conclusions of law**

In its lawsuit to Limit Liability pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq*. Carver contends that:

1. The Belt Line cannot prove any causative negligent act other than a navigational error by Mate Morrissey.

2. The Belt Line cannot prove some other causative negligent act, and Carver can establish lack of privity of knowledge.

3. The sole causative negligent act is a navigational error by Mate Morrisey. In the alternative, Carver can establish lack of privity as to any other alleged causative negligent act, such that there is a dispute as to the value of the vessel and its cargo. That amount would serve as Carver's maximum exposure in this case.

4. Notably, the Belt Line's actual damages are disputed.  Carver submits that the evidence is that the Belt Line's total damages in tort after depreciation were substantially less than the recovery it made in contract from Evanston ($ 10 million). If so, the Belt Line's recovery here should be $0.00.

5. Carver can establish entitlement to limitation of liability, and as a result, the Belt Line would not be entitled to recover, as the value of the tug is substantially less than the $10 Million that Belt Line recovered from Evanston.

6. If it is determined that Norfolk is entitled to recovery, which Carver disputes, whether Norfolk has the right to $10,000,000 in claimed damages under its contract with Evanston any party is entitled to a reduction or set off of the award after final judgement.

Dated:  March 3, 2026

Respectfully submitted,

**CLYDE & CO US LLP**

/s/ *Matthew J. Obiala*
Matthew J. Obiala  (VSB No. 100626)
30 S. Wacker Drive, Suite 2600
Chicago, IL 60606
T:  (312) 635-7000
E:  Matt.Obiala@clydeco.us


James H. Rodgers*
Clyde & Co US LLP
45 Lexington Avenue, 16th Floor
New York, NY 10174
Phone: (212) 702-6771
Email: james.rodgers@clydeco.us

Michael J. Roman*  
Dawn L. Johnson  
Siobhan M. Murphy*  
Clyde & Co US LLP  
30 South Wacker Drive, Suite 2600  
Chicago, IL 60606  
Phone: (312) 635-7000  
Email: michael.roman@clydeco.us  
dawn.johnson@clydeco.us  
Siobhan.murphy@clydeco.us

*pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2026, a true and correct copy of the foregoing document was filed using the Court's CM/ECF system, which will serve all counsel of record by electronic mail as follows:

| | |
|---|---|
| Mark C. Nanavati, Esq. (VSB No.: 38709) | Zachary M. Jett, Esq. (VSB No.: 93285) |
| G. Christopher Jones, Jr., Esq. (VSB No.: 82260) | BUTLER WEIHMULLER KATZ, et al |
| SINNOT, NUCKOLS & LOGAN, P.C. | 11525 North Community House Road |
| 13811 Village Mill Drive | Suite 300 |
| Midlothian, Virginia 23114 | Charlotte, North Carolina 28277 |
| (804) 893-3866 (Nanavati) | (704) 543-2321 (Telephone) |
| (804) 893-3862 (Jones) | (704) 543-2324 (Facsimile) |
| (804) 378-2610 (Facsimile) | zjett@butler.legal |
| mnanavati@snllaw.com | *Counsel for Evanston Insurance Company,* |
| cjones@snllaw.com | *a/s/o Norfolk and Portsmouth Belt Line* |
| *Counsel for Evanston Insurance Company a/s/o Norfolk and Portsmouth Belt Line Railroad Company* | *Railroad Company* |

James L. Chapman, IV, VSB No. 21983  
W. Ryan Snow, VSB No. 47423  
Mackenzie R. Pensyl VSB No. 100012  
CRENSHAW, WARE & MARTIN, P.L.C.  
150 W. Main Street, Suite 1923  
Norfolk, Virginia 23510  
Telephone (757) 623-3000  
Facsimile: (757) 623-5735

jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Attorneys for Norfolk and Portsmouth Belt Line Railroad Company*

/s/ Matthew J. Obiala