# IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

IN ADMIRALTY

CIVIL ACTION NO. 2:24-CV-00490

Expert Report of Captain Sam Stephenson

June 8, 2025

# Expert: Captain Sam Stephenson

- Senior Harbor Pilot, Port Everglades (Ft. Lauderdale) Florida for approximately 20 years

- Captain of vessels with unlimited tonnage for six years

- Federal and state license for piloting

- US Coast Guard Master Mariner (unlimited tonnage)

- B.S., Marine Transportation Texas A&M (1989); Masters, Maine Maritime Academy

- Lead instructor and course developer at Resolve Maritime Academy in Ft. Lauderdale, Florida

- Senior Lecturer, Texas A&M, Maritime Academy

- Ret. Commander, United States Naval Reserve, 1990-2011

# Case Background

- Petitioner: Coeymans Marine Towing, LLC d/b/a Carver Marine Towing

- Vessel: MT Mackenzie Rose (IMO No. 8968765)

- Incident: Allision with Norfolk & Portsmouth Belt Line Railroad Bridge

- Date: June 15, 2024



Tug Mackenzie Rose

# Vessel Specifications

- Name: Mackenzie Rose & barge Weeks 281

- Service: Towing vessel/barge

- Overall Length: 300 feet

- Beam: 55 feet

- Draft: 14 feet

- Flag: United States

# Incident Overview

- Location: Elizabeth River, Virginia

- Weather: Good visibility, light wind, ebb current 0.58 knots

- Time: Approximately 4:26 PM local time

- Bridge height is 142 feet

- Vessel Configuration: Tug pushing barge Weeks 281



Mackenzie Rose and Barge Weeks 281 – June 15, 2024

# Summary of Incident

On June 15, 2024, James Morrissey, a licensed USCG master (captain) was the officer in charge of navigation aboard the Tug Mackenzie Rose pushing the barge *Weeks 281*. He was navigating from the upper wheelhouse of the Mackenzie Rose and had the autopilot engaged as he navigated outbound the Norfolk Southern Branch to sea.  After transiting under the middle of the South Norfolk Jordan Bridge, the Mackenzie Rose tracked westward of the center span of the Norfolk and Portsmouth Belt Line Railroad Bridge (hereinafter "railroad bridge") at about 5.5 MPH. (See photo infra). Mate Morrissey was in autopilot and didn't switch over to hand steering but thought he did.[3]  Approximately 1626 (4:26 PM) local time, the bow of the barge allided with the western section of the railroad bridge. See Photo – next page.



North & PBL Railroad Bridge: The navigable channel between the bridge fenders is approximately 330' (Over one football field in length). (Photo Google Earth). Red circle indicates approximate location the barge incident with the railroad bridge.

## III. ASSIGNMENT

The towing vessel Mackenzie Rose was pushing the barge Weeks 281 outbound the Norfolk Southern Branch on the Elizabeth River headed to sea. The officer on watch was using autopilot while approaching the railroad bridge "and didn't switch over to non-follow up hand steering but thought he did"[1] as the vessel approached the railroad bridge. It is alleged the barge allided with the railroad bridge.

*In this case, I have been asked to opine on whether:*

1. The Mackenzie Rose was properly manned, the crew was licensed by the US Coast Guard, and in compliance with work/rest requirements of six hours on/six hours off.

2. The watch officer acting as look-out was appropriate under the prevailing conditions.

3. Autopilot is prohibited for use while transiting a waterway with bridges.

4. The evidence establishes that Mate Morrissey's initial statement the autopilot malfunctioned was false.

5. Mate Morrissey failed to engage the switch from Auto to NFU when he thought he did.

## Materials Reviewed

- Carver Marine's Fifth Supplemental Response to the Belt Line's First Request for Production of Documents and Things.

- Carver Marine Towing's Fifth Supplemental Response to Norfolk and Portsmouth Belt Line Railroad Company's Second Set of Requests for Production of Documents.

- Deposition of Jarkeis Morrisiey

- Deposition of Sharif Porter

- Deposition of Erik Walordy

- Deposition of Leonard Baldarasse

- Deposition of Brian Moore

- Deposition of Alex O'Rourke

- Deposition of Jason McGrath
- Deposition of Nicholas Laraway
- Expert Report – Robert Furborough
- Expert Report – Captain Nicholas Lewis
- Shoreside Incident Report
- Jim M Time Sheets
- Test Results – James Morrissey Preemployment
- Mackenzie Rose Electronic Chart System
- Text messages
- Photos
- Emails
- USCG recordings
- Work Rest Hours
- Masters Daily Report
- Masters Daily Vessel Report
- Log Book
- Text Messages
- Steering M&R
- Steering Related Near Miss
- Christopher Mile File
- Crew Matrix
- Jarkeis Jamal File
- Jason McGrath File

- Jimmy Morrisey File
- Jim M. Time Sheets
- US Coast Guard Forms (2692)
- TBS Produced Records
- Work Rest Hours
- T-Mobile Phone Records  - Morrissey
- Loss of Steering for Mack, Deck and Engine Rough Logs
- Ayers Vendor Tech Reports
- GMT Report Auto Pilot
- USCG Correspondence
- Meyerrose and Co., Inc. Survey with Photos
- 7.5 Navigation
- New Crew Orientation Check List
- Pier Damage Incident Report
- James Morrissey Training
- Health and Safety Plan
- Voyage Planning – Outside New York Harbor
- Voyage Planning
- Daily Rose Point Video produced in narrative form
- Distracted Operations
- Incident Reports
- Deckhand 2024
- Mate/Captain Relief 2024

- Bridge Allision
- Steering Failure 2024
- CMT Towing Safety Management System
- Witness Interviews Baldassare and J.Morrisey
- Mackenzie Rose manning
- Training Quizzes & Meetings
- Incident Report Event
- Mackenzie Rose COI
- Drills
- Standard Diary
- Photos of Bridge Area
- Preliminary Advice
- Daily Engine Logs
- Carver's Towing Safety Management System
- Simrad AP 70 Manual
- Drawing Showing Location of Vessel Strike
- Allision Event Surveillance Videos 1-8
- IMG 2206.mov
- IMG 2210.mov
- Clamant/Respondent Norfolk and Portsmouth Beltline Railroad Company's Expert Witness Identification.
- CFR's
- Photos  – taken during vessel inspection on July 28, 2025.

## Additional Materials reviewed:

1.  Transcripts of crew members on the Mackenzie Rose on 6/15/24:  James Morrissey, Jason McGrath, Sharif Porter, Jarques  Morrissey, Brian Moore, Lenny Baldassare
2.  Trial Testimony – 3.13.26 Vol 4 Afternoon – Testimony Lewis, Furborough
3.  Orders and filed documents (ECF 123, 147, 151, 169, 174, 190, 202, 207)
4.  Stephenson Dep.  Transcript (taken 8/11/25)
5.  Belt Line/Evanston's Joint Production of Expert Witness Rebuttal Report of Capt. Nichol Lewis 8/22/25

# Summary of Opinions

Within the Bounds of Reasonable Operational Maritime Certainty

# Opinion 1: Proper Manning

The Mackenzie Rose was properly manned, the 5-member crew was licensed by the US Coast Guard, and in compliance with work-rest requirements of six hours on/six hours off.

- US Coast Guard Certificate of Inspection required 5 crew members:

    Captain Christopher Miller

    Mate James "Jimmy" Morrissey

    Engineer Jason McGrath

    Deckhand Jarkeis Morrissey

    Deckhand Sharif Porter

- Vessel had two licensed USCG masters aboard

- No dispute that the Crew complied with 46 CFR 15.1111 work-rest requirements

# Work-Rest Compliance

Mate Morrissey's June 15, 2024 Schedule:

- 0000-0600: On watch

- 0600-1200: Rest

- 1200-1800: On watch (incident occurred during this watch)

Conclusion:  No dispute that the Crew complied with 46 CFR 15.1111 work-rest requirements.

It is customary on tugs and barges to work six hours on, six hours off.



## 7.1   WATCH STANDING & HOURS OF WORK
Revision Date: July 1, 2021

**Watch Standing**
1. One Master/Captain on transits of 12 hours or less.
2. One Master/Captain and one Mate/Pilot on transits greater than 12 hours.
3. Deckhand to maintain maximum of 12 hour shifts in conjunction with wheelhouse.
4. Except in an emergency, at least one qualified wheelhouse person and one additional crewmember should always be on duty while the vessel is underway.

**Hours of Work**
1. An individual licensed to operate a towing vessel may not work for more than 12 hours in a consecutive 24-hour period except in an emergency (46 USC 8104).
2. All other crewmembers on a towing vessel should be permitted to work no more than 15 hours in any 24-hour period or more than 42 hours in a 72-hour period, except in an emergency.
3. Except in an emergency, at least one qualified wheelhouse person and one additional crewmember should always be on duty while the vessel is underway.

# Opinion 2: Lookout Appropriate

The watch officer acting as lookout was appropriate under the prevailing conditions.

- Upper wheelhouse had 360-degree visibility

- Good weather, clear visibility, low traffic

- One-man bridge operation is industry standard

- Consistent with 33 CFR 83.05 (Look-out [Rule 5])

- and 46 CFR 140.630 (duty of watch officer to assess if more than one look out required)



Upper Wheelhouse – 360° Visibility

# Regulatory Compliance

- 33 CFR 83.05 - Lookout requirements met

33 CFR § 83.05 Look-out (Rule 5)

*Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.*

# Carver's TSMS 7.16 - Look-Out:

**Look-Out** – *Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision. From 33 CFR 83 Rule 5*

**Requirements for a Look-Out**

*In determining the requirement for a look-out, the person in charge of the navigational watch must take full account of the relevant factors including, but not limited to:*

- *State of the weather.*

- *Visibility.*

- *Traffic Density.*

- *Proximity of dangers to navigation.*

- *The attention necessary when navigating in areas of increased vessel traffic.*

- *Crew members medical certificate MUST state "Fit for Look-out Duty: Y"*

## TSMS 7.16 - continued

*Procedures*

*A look-out should be added when necessary to:*

- *Maintain a state of vigilance with regard to any significant change in the operational environment.*

- *Appraise the situation and the risk of collision/allision.*

- *Anticipate stranding and other dangers to navigation.*

- *Detect any potential hazards to safe navigation.*

*A look-out shall be added when entering any port channel or at any waterway intersection.*

*The look-out may remain in the wheelhouse if visibility, weather and traffic conditions permit.*

# Carver TSMS 7.16 consistent with all CFR requirements

**One-Man Bridge Operations**

"*On vessels where there is an unobstructed all-around view provided at the steering station, as on certain pleasure craft, fishing boats, and towing vessels, or where there is no impairment of night vision or other impediment to keeping a proper look-out, the watch officer or helmsman may safely serve as the look-out. However, it is expected that this practice will only be followed after the\ situation has been carefully assessed on each occasion and it has been clearly established that it is prudent to do so. Full account shall be taken of the weather, conditions of visibility, traffic density, and the proximity to navigational hazards. It is not the intent of these rules to require additional personnel forward, if none is required to enhance safety.*"

*Senate Report N.96-979,96th Congress, 2nd Session (1980 ) at 7-8[5]*

# 46 CFR 140.630 - Lookout assessment proper

## § 140.630 Lookout.

**(a)** Throughout the trip or voyage the master and officer in charge of the navigational watch must assess the requirement for a lookout, consistent with 33 CFR 83.05. A lookout in addition to the master or mate (pilot) should be added when necessary to:

   **(1)** Maintain a state of vigilance with regard to any significant change in the operational environment;

   **(2)** Assess the situation and the risk of collision/allision;

   **(3)** Anticipate stranding and other dangers to navigation; and

   **(4)** Detect any other potential hazards to safe navigation.

**(b)** In determining the requirement for a lookout, the officer in charge of the navigational watch must take full account of relevant factors including, but not limited to: state of weather, visibility, traffic density, proximity of dangers to navigation, and the attention necessary when navigating in areas of increased vessel traffic.

# Industry Standards: One-Man Bridge

Companies with one-man bridge operations:

- McAllister, Bisso Towboat, Dann Marine Towing

- OSG, Gulf Oceanic Marine, Moran

- Shoreline Sightseeing

# Opinion 3: Autopilot Not Prohibited

Autopilot is not prohibited for use while transiting a waterway with bridges.

- Vessel complied with 46 CFR 140.670 (Use of auto pilot) requirements
- Accepted practice in maritime industry
- Bridge span opening was 330 feet (6× vessel beam)
- Carver's navigation manual complied with CFRs

# 46 CFR 140.670 - Autopilot use compliant

**46 § 140.670 Use of auto pilot.**

Except for <u>towing</u> vessels in compliance with requirements in <u>33 CFR 164.13</u>(d), when an automatic pilot is used in areas of high traffic density, conditions of restricted visibility, or any other hazardous navigational situations, the master must ensure that:

**(a)** It is possible to immediately establish manual control of the ship's steering;

**(b)** A competent person is ready at all times to take over steering control; and

**(c)** The changeover from automatic to manual steering and vice versa is made by, or under, the supervision of the officer in charge of the navigational watch.

## Mate Morrissey testified at hearing before the USCG and NTSB:

Q.    Okay.  And the autopilot, is it a, like a heading full type, I think might be the right term, or is it a course follow?  How does it operate?

A.    It's on a satellite compass, no Gyro on the boat.  It's a Sperry unit.

Q.    So, I guess, I'm just going to ask this.  If you put it on autopilot, will it follow a projected track, or will it just maintain the current track?

A.    It'll correct itself to whatever heading you have on it.  It will follow up -- go ahead.

Q.    Okay.  And just ballpark, I know it's was two weeks ago and you're not exactly sure, but about how far from the incident site, so the Belt Line Railroad Bridge, in terms of minutes were you, before you -- the autopilot?



Mackenzie Rose and Barge Weeks 281 – June 15, 2024



View from Upper Wheelhouse

# Bridge Clearance Analysis

- Railroad bridge navigable channel: 330 feet between fenders

- Vessel beam: 55 feet

- Bridge height is 142 feet

- Clearance ratio: 6:1 (6× vessel beam)

- Channel width before bridge: 713 feet (13× vessel beam)

## 46 §140.670   9USE OF AUTO PILOT

**In areas of high traffic density, conditions of restricted visibility or any other hazardous navigational situation, the master must ensure that:**

a)  It is possible to establish manual control of ship's steering;

b)  a competent person is ready at all times to take over steering control; and

c)   the changeover from automatic to manual steering and vice versa is made by, or under, the supervision of the officer in charge of the  navigational watch.

# Opinion 4: The Autopilot did not malfunction

- Incident report: "autopilot was not completely turned off"

- USCG Form 2692: "OOW failed to properly switch to hand steering"

- Daily vessel logs show steering system passed tests

The incident report entry states that "Mate Morrissey reports the autopilot was not completely turned off."



## USCG 2692 on 6/25/24

States that "The OOW had failed to properly switch to hand steering."

24d. Is there evidence that alcohol use contributed to this casualty?

☐ Yes   ☒ No   (If Yes, discuss in block 25b)

25. Nature and Circumstance of the Casualty:

25a. Activity or Operation Being Conducted at the Time of the Casualty:

THE TOWING VESSEL MACKENZIE ROSE WAS PUSHING THE DECK BARGE WEEKS 281, AHEAD IN PUSH GEAR. THEY WERE OUTBOUND THE NORFOLK SOUTHERN BRANCH FOR SEA. THE OFFICER ON WATCH, JAMES MORRISSEY, WAS IN AUTOPILOT AND DIDNT SWITCH OVER TO NON FOLLOW UP HAND STEEERING BUT THOUGHT HE DID. THE VESSEL CONTINUED TO TRACK TO PORT AND BEFORE THE OOW WAS ABLE TO CORRECT IT AFTER SWITCHING TO NON FOLLOW UP, THE BOW OF THE BARGE MADE CONTACT WITH THE WESTERN SECTION OF BRIDGE.

25b. Description of the Casualty (casualty events and the conditions and actions that were believed to be causal factors as well as any hazards created as a result of the casualty. Attach additional sheets if necessary.):

THE OOW HAD FAILED TO PROPERLY SWITCH TO HAND STEERING AND ALSO GAVE MINIMAL ENGINE ORDERS AT FIRST IN ORDER TO PREVENT FURTHER HEADWAY OR COURSE CHANGE. THE OOW STATED THAT ONCE HE DID SWITCH TO HAND STEERING, HE GAVE A SLOW ASTERN AT FIRST AND THEN FULL ASTERN. ONCE CONTACT WAS MADE WITH THE BRIDGE STRUCTURE, THE VESSEL WAS BARELY MAKING HEADWAY AND BEGAN TO MAKE ASERTN WAY. THE OOW WAS BACKING INTO THE MAIN CHANNEL AND REGAINED CONTROL OF THE VESSEL.

# Text message from Brian Moore to Captain Miller

On 6/28/2024 that "his interview statement to the CG said it never went hard over and it was  midships the entire time."



CARVER ESI 001897

# Opinion 5: Sole Cause of Allision

Mate Morrissey failed to engage the switch from Auto to NFU when he thought he had. This failure and his lack of situational awareness was the sole cause of the allision.

- Two-step process not completed

- Failed to engage Auto to NFU switch (Step 2)

- Rudders did not respond to control lever



#1 – Press STBY (Standby)



#2 – Engage switch from Auto to NFU



Steer with NFU (Hand Steering)

# Autopilot Disengagement Process

Two-step process required:

- Step 1: Press STBY (Standby) button

- Step 2: Engage switch from Auto to NFU

Mate Morrissey completed Step 1 but failed to complete Step 2.

# Incident Report

Incident report entry states:

*"Mate James Morrissey reports the autopilot was not completely turned off... able to correct and switch back over to hand steering"*

# USCG Form 2692

USCG Form 2692 (June 25, 2024) states:

*"The OOW had failed to properly switch to hand steering."*

*"Once he did switch to hand steering, he gave a slow astern bell at first and then a full astern bell."*

# Carver's Responsible Actions

- Coast Guard notified and USCG Form 2692 filed

- Daily equipment tests performed and documented (June 14 & 15)

- Comprehensive TSMS compliant with all CFR requirements

- Mate Morrissey immediately switched to hand steering and reversed engines

# Carver Safety Management System

- Written policies on lookout requirements (Section 7.16)

- Written policies on autopilot use (Section 7.5)

- Policies mirror CFR requirements exactly

- Regular crew training and drills conducted

# Conclusion

Mate Morrissey's failure to engage the switch from Auto to NFU and his lack of situational awareness was the sole cause of the allision.

# Captain Sam Stephenson

Senior Harbor Pilot

Port Everglades, Florida

499 Thatch Palm Drive, Boca Raton, Florida 33432