**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

In the Matter of COEYMANS MARINE
TOWING, LLC D/B/A CARVER MARINE
TOWING as Owner and Operator of M/V
MACKENZIE ROSE, (IMO No. 8968765), *et al.*

**Civil Action No: 2:24-cv-00490-MSD-LRL**

## CARVER'S POST-TRIAL BRIEF

Petitioner, Coeymans Marine Towing LLC d/b/a Carver Marine Towing ("Carver"), by counsel, pursuant to the Court's direction following the conclusion of the bench trial and based on the trial evidence, respectfully submits this post-trial brief[1] in support of Carver's limitation of liability to the value of the *Mackenzie Rose* (the "Vessel"), plus freight, as follows:

### STATEMENT OF THE ISSUES

There are four overarching issues for ruling after the bench trial: (1) whether Carver has carried its burden on its petition under the Limitation of Liability Act as to each act of negligence established by Belt Line, (2) if not, whether Belt Line has proven damages resulting from the allision and, if so, the amount;  (3) whether Belt Line owns $10 Million of its claimed damages; and (4) whether punitive damages are appropriate in this property damage case.

The sole negligence at issue here was that of Mate Morrissey. He failed to engage manual steering and left the vessel in "neutral".  Carver has carried its burden to prove lack of privity regarding that navigational error. As a result, the claimants' damages are capped at their *pro rata*

---

[1] This brief is supported by Carver's Proposed Findings of Fact and Conclusions of Law, ECF No. 204, as supplemented and updated with findings during trial, filed concurrently on this date.

share of the proven value of the vessel. Further, the Belt Line does not hold Evanston's claim; it transferred that claim to Evanston prior to this litigation. Then Carver properly settled with Evanston. Next, the provable damages should be entirely held by Evanston, based on depreciation. Recognizing that the Court may not apply depreciation, the damages sought by the Belt Line are inflated.  Finally, this is not a case in which punitive damages are appropriate. On the evidence, Carver crewed the *Mackenzie Rose* with Coast Guard qualified mariners, consistent with the Certificate of Inspection on the Vessel. It regularly had the vessel maintained, and could not have known that Mate Morrissey failed to engage manual steering when he did.

## ARGUMENT

### I.    Carver is Entitled to Limitation of Liability.

The Limitation of Liability Act permits a vessel owner to limit its liability "to the value of [its] interest in the vessel and her freight if the owner can show that the cause of the collision was not within [its] privity or knowledge." *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 166 (4th Cir. 1984); 46 U.S.C. § 30523. The Court's prior Opinion and Order recognized that "the question of privity or knowledge is preceded by a similarly fact-bound inquiry: '[I]n order to grant or deny limitation,' the Court must first 'find what acts of negligence caused the accident.' Only then can the Court 'determine whether the vessel owner had knowledge or privity of those acts.'" ECF No. 194 at 39 (quoting *Joia v. Jo-Ja Serv. Corp.*, 817 F.2d 908, 912 (1st Cir. 1987)).

The Act does not define "privity or knowledge," rather this is an enquiry based on the facts of an individual case. *Gibboney v. Wright*, 517 F.2d 1054, 1057 (5th Cir. 1975). A shipowner "has privity if he personally participated in the negligent conduct or brought about the unseaworthy condition." *Trico Marine Assets, Inc. v. Diamond B Marine Serv., Inc.*, 332 F.3d 779, 789 (5th Cir. 2003). "[T]he knowledge of a seagoing vessel's master at the commencement of the voyage is

2

imputed to the vessel's owner." *Id.*, at 790. However, "a master's navigational errors at sea are generally not attributable to the owner. When the owner is so far removed from the vessel that he can exert no control over the master's conduct, he should not be held to the master's negligence. In such cases, the owner may rely on the master's skill and expertise." *In re Hellenic,* 252 F.d 391, 396 (5th Cir. 2001)*, see also Matter of Krisie Leigh Enterprises, Inc.,* 72 F.3d 479, 482 (5th Cir., 1996) (an employee's "negligence at sea, without more, is not enough to deny limitation," because the owner "may rely on the navigational expertise of a competent ship's master").

The trial record compels two findings. First, the sole cause of the allision was the in-the-moment navigational error of Mate James Morrissey—specifically, his failure to maintain situational awareness and correctly switch from autopilot to hand steering as the Mackenzie Rose approached the Bridge. Mate Morrissey's navigational error is the sole cause of the allision regardless of whether the Court credits his testimony that the AP70 system "tripped" without an audible alarm. The experts' all testified that visual alarms and displays in the wheelhouse would have indicated that the autopilot was in "standby" mode, regardless. Further, an experienced mariner like Mate Morrissey should have noticed the vessel drifting to port without rudder control long before the bridge strike. In short: audible alarm or not, Mate Morrissey's failure to engage manual steering was the sole cause of the allision.

Second, Carver had no privity or knowledge of this navigational error. Mate Morrissey was a U.S. Coast-guard mariner with thirty years of experience on the water and had not displayed any incompetency known to Carver's management. Importantly, Mate Morrisey was a fully licensed Master and on other voyages captained the tug on behalf of Carver. There is no dispute that the Mackenzie Rose was properly manned in accordance with its Certificate of Inspection, which called for only one Officer on Watch and one Deckhand on duty in the conditions present on the

3

day of the allision. Carver's management had no reason to foresee Mate Morrissey's in-the-moment navigational error and thus it is entitled to Limitation.

    **A.**    **The Evidence Establishes That the Sole Cause of the Allision Was Mate Morrissey's Navigational Error.**

Belt Line began this trial by advancing a multi-pronged theory of causation for the allision: (1) the autopilot malfunctioned, causing the rudder to go "hard over" to port into the Bridge; (2) Carver failed to post a second lookout in violation of Inland Rule 5; (3) Carver failed to prohibit use of the autopilot in "narrow waters"; and (4) Carver failed to train Mate Morrissey on the prohibition of autopilot in narrow waters. Each of these theories has been disproved—in substantial part by Belt Line's own witnesses—during its case-in-chief.

    **1.  The Autopilot Did Not Malfunction.**

The centerpiece of Belt Line's pre-trial causation theory was that the autopilot system malfunctioned by causing a "hard over" rudder to port event which pushed the Mackenzie Rose into the western truss of the Bridge. That theory collapsed at trial, necessitating Belt Line to revise its argument to say that the autopilot silently "tripped" into standby mode and that this caused Morrissey to switch into hand steering in time to avoid the Bridge. See Tr. 688-89; *cf.* ECF 91 at PageID 1737 ("The operational history of the autopilot system … is replete with malfunctions, *each causing the system to turn without reason* (sometimes without an alarm)"). Belt Line's autopilot expert was unequivocal on cross-examination about the alleged malfunctioning:

Q. Just want to clarify: You are not offering any opinion that the autopilot system malfunctioned on the date of the incident, correct?

A. No.

Q. Meaning correct, that you don't have an opinion, right?

A. I don't, no.

Tr. 664. Mr. Furborough further conceded that "there was no hard over event that occurred on the date of the allision that caused the bridge strike." Tr. 665. His only substantive opinion regarding Carver's alleged duty to take the autopilot out of service was expressly tethered to the possibility of a hard-over event, which he ruled out: "That's obvious from the record there was hard over [in May]" but on the date of allision, "from the evidence I've seen, no, there wasn't." Tr. 665.

Capt. Lewis, Belt Line's marine expert, whose experience was focused on the operation of oil barges, reached the same conclusion. He confirmed—and has never retracted—that Morrissey's failure to complete the switchover from autopilot to hand steering "is one of the causes of the incident." Tr. 534. Capt. Lewis did not offer any opinion that the alleged tripping into standby was a cause of the allision.

Lewis also conceded that the Rose Point tracking data *does not* establish that the autopilot was engaged at all when the vessel began drifting to port. Asked directly by the Court whether Rose Point captured autopilot status, Lewis agreed: "it doesn't"; "[d]oesn't show it, no." Tr. 531–32. The blue projected-course line he relied on "is not necessarily an autopilot course that was set." Tr. 531. Thus, from the Rose Point data, "we can't tell . . . whether the autopilot was on or not" when the vessel moved to port. Tr. 532. As Furborough further confirmed, even if the autopilot had automatically "gone to standby," the vessel "would maintain its course" on a straight heading and "wouldn't automatically start turning unless there was an influence on the vessel or the rudder to put it into a turn." Tr. 667.

Capt. Lewis also confirmed on cross examination that the May 2024 autopilot incidents— Belt Line marshaled extensively as support for an "unbroken chain of evidence" on causation, Tr. 690—involving "hard over" events that were "completely different circumstance[s]" from "the incident that happened on June 15th." Tr. 537-38. This is fatal to any causal chain tying the May

5

events to the June allision: the alleged prior malfunction (hard-over to port) was not what occurred on June 15. Mr. Furborough acknowledged as much, conceding that his opinion that Carver should have taken the autopilot out of service opinion was premised on the risk of another hard over event occurring, which did not happen on the day of the allision. Tr. 665.

Belt Line's own experts unequivocally testified that no "hard event" event occurred on June 15, 2024, and, more broadly, that the autopilot system did not "malfunction" before the allision. There is also no evidence that the autopilot, itself, caused the vessel to move to port towards the western section of the Bridge. As Capt. Lewis stated, the point of the vessel's track when it began veering was "left of where he should have been"—a failure of navigation, not of the system. Tr. 539.

Capt. Stephenson also testified the autopilot did not malfunction; the autopilot did not cause the rudder to go hard-over. Tr. 539:17 – 541:6. The Belt Line has not established that the autopilot caused the incident. As a result, there was no condition relating to the autopilot system that could have been known to Carver for purposes of resolving the Limitation of Liability issue.

### 2. Use of the Autopilot was Permissible on the Evidence.

Belt Line's theory that Carver's failure to prohibit autopilot use on the Elizabeth River contributed to the allision was likewise disproved by Belt Line's own case. Capt. Lewis, whose thirty-three years of maritime experience was confined almost entirely to oil-barge operations, acknowledged that the prohibitions he cited apply only to oil or hazardous-materials barges: "[W]e are not allowed to use autopilot" "[i]n inland waters, close-quarter situations"—but "for non-oil or non-hazardous barges, autopilot is not prohibited under the law." Tr. 533. The *Weeks 281* was not an oil barge, and the Mackenzie Rose's voyage on the Elizabeth River was not governed by the oil-barge prohibition on which Capt. Lewis's industry standards opinion relied.

Carver's expert, Capt. Stephenson confirmed that the use of autopilot was not prohibited while a tug like the Mackenzie Rose was transiting a waterway with bridges. Tr. 963:11 – 966:19, 532:15-23, 545:22–546:4, 549:15-18. Further evidence established that Carver's Safety Management System, J.E. 53, tracked the regulatory requirements for non-hazardous barge operations. While Capt. Lewis opined that the Simrad AP70 manual cautioned against use in "heavy traffic areas or narrow waters," Tr. 514, that is at most a manufacturer's advisory—not a prohibition—and does not establish that Carver permitting the Captain or Mate on duty to decide whether to use an autopilot somehow violated a legal standard or otherwise caused the allision. No witness identified any regulation, statute, or industry standard that barred autopilot use by a non-oil tug on the river. Belt Line's autopilot policy theory is therefore unmoored from any actionable duty and Carver's policy of not prohibiting autopilot use was not a cause of the allision.

### 3. Carver's Captain, Mate and Crew were Properly Trained.

The Belt Line's theory that Mate Morrisey was not properly trained and that, as a consequence, the Mackenzie Rose was unseaworthy is not supported by the record. The record proves, instead, that the vessel was properly manned, Tr. 599:7-15 pursuant to the USCG-issued Certificate of Inspection Ex. J50, 937:25 – 938:13, 942:11 – 943:14, the crew properly licensed and the crew was also in compliance with the hours of work-rest rules in accordance with the Code of Federal Regulations, including Mate Morrisey.  Tr. 938:14 – 939:7, 939:12 – 941:11. At all material times, Mate Morrisey was and has been licensed for about 30 years with a 1600 Ton Master in the Intercoastal license and around 15 years with a Master of Towing license, both issued by the Coast Guard. Ex. J80 at 6:24 –7:14, Tr. 952:14-22. The crew was also duly licensed. Tr. 737:24 – 738:20 (McGrath); Tr. 757:2-20 (Porter); Tr. 901:5-25 (O'Rourke)) The evidence reflects that Carver trained their crew members by "on-the-job training." The crew acknowledged they

were so trained, (*e.g.*, J84 6:16 – 8:5), and this is standard in the industry due to its dynamic environment. Tr. 962:9-13, 962:18 – 963:10.

Based on this record and on his maritime experience, Carver's expert, Capt. Stephenson, testified that the Mackenzie Rose was properly manned on June 15, 2024, pursuant to the Certificate of Inspection of the U.S. Coast Guard; the crew was licensed by the U.S. Coast Guard and  was also in compliance with work/rest requirements of six hours on/six hours off. Tr. 599:7-15, Ex. J50, Tr. 937:25 – 938:13, 938:14 – 939:7, 939:12 – 941:11, 942:11 – 943:14.

The evidence does not support the idea that classroom training is necessary for a properly licensed and experienced mariner to be considered qualified. Further, there is also no evidence that Mate Morrissey, a veteran sailor with about thirty (30) years of experience, was incompetent. Belt Line proffered evidence that Mate Morrisey was involved in a January 2024 incident where a vessel touched up to dock pilings, but Capt. Lewis confirmed this was an unserious incident. As he testified, the Coast Guard "did not do an investigation," did not discipline or suspend Morrissey, and would have investigated "[i]f they [had] thought his conduct had been a problem." Tr. 599–600. Belt Line's theory that additional training on bridge transits or prohibiting use of autopilot (which would be contrary to law) would have prevented the allision is speculative and untied to the record evidence that Mate Morrissey, like the crew aboard the Mackenzie Rose, was competent and properly trained.

### 4. Carver Did Not Violate Inland Rule 5 and Failure to Post a Second Lookout Was Not A Cause of the Allision.

Belt Line's final causation theory is Carver violated Inland Rule 5, which provides that "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05. By its terms, Rule 5 is

calibrated to the conditions at hand, such that decisions regarding look-out are properly vested in the Mate on duty. The Rule does not prescribe a specific number of lookouts, where they should be posted, or how lookouts should be positioned on the vessel. Courts have rejected attempts to convert Rule 5 into a rigid specification. *Anthony v. Int'l Paper Co.*, 289 F.2d 574, 580 (4th Cir. 1961) ("it is generally held that an arbitrary rule cannot be applied to every case and that the question of the sufficiency of the lookout in any instance is one of fact to be realistically resolved under the attendant circumstances, bearing in mind that the performance of lookout duty is an inexorable requirement of prudent navigation").

Belt Line's contention that circumstances dictated an additional lookout besides Mate Morrissey in the upper wheelhouse is unsupported on the record and under prevailing law. Cases that hold additional lookouts are typically used in cases typically involve fog, darkness, congested traffic, or a watch stander who was not watching at all. *See, e.g., In re Vulcan Constr. Materials, LLC*, 427 F. Supp. 3d 694, 711-13 (E.D. Va. 2019) (Rule 5 violation where OOW was distracted and conditions required heightened attention); *Esso Standard Oil Co. v. Oil Screw Tug Maluco I*, 332 F.2d 211, 213 (4th Cir. 1964) (forward bow lookout on a 256-foot oil tanker during a night voyage in narrow channel where officer at helm was "dazzled" by other vessel's searchlight and "confusion" caused by red and green background lights along the channel); *cf. C.G. Willis, Inc. v. The Spica*, 6 F.3d 193, 198 (4th Cir. 1993) (no "special lookout" needed in addition to helmsman under Rule 5 because the helmsman could see the other vessel and thus there was "no basis on which the Court could find that an additional lookout on the [vessel] would have prevented the collision"). Even a record of *sudden* fog in a rural waterway has been held insufficient for Rule 5 summary judgment. *In re Complaint of Jackson Creek Marine, LLC*, 2026 U.S. Dist. LEXIS

9

78013, at *6 (E.D. Va. Jan. 30, 2026) (Hanes, J.) (denying summary judgment on Rule 5 theory despite fog "com[ing] from nowhere").

Here, conditions of the Elizabeth River on June 15, 2024 were benign and as risk-free as a commercial transit could be. Capt. Lewis conceded each relevant fact: conditions were "perfect weather" (Tr. 564); visibility was "perfect" (Tr. 564); there was no heavy traffic density (Tr. 564); there was no excessive wind (Tr. 549); it was not poor visibility (Tr. 548); and the Mackenzie Rose and *Weeks 281* "had safely transited underneath three bridges that day." Tr. 564. There is no dispute Mate Morrissey "was acting as his own lookout" from the upper wheelhouse (Tr. 563). He "had an unobstructed view all around" (Tr. 563). He was at "the highest bridge of the ship" (Tr. 563); and his position as his own look-out was "permitted" under Carver's Safety Management System. Tr. 563. These admissions foreclose any argument that Mate Morrissey was not positioned to see the Bridge, which was a fixed, visible, and raised overhead structure directly ahead.

This conclusion is also well supported by the testimony of Capt. Stephenson. Stephenson explained that Mate Morrissey acting as look-out was appropriate under the prevailing conditions on June 15, 2024 Tr. 962:9-13, 962:18 – 963:10, 939:12-10, 941:9-11, Ex. J53 at CARVER TBS HELM CONNECT 000951, Tr. 520:21-24, 944:16-18, 941:9 – 942:10, 944:23 – 945:15, *see also* 46 CFR 140.630, 33 CFR 83 Rule 5, 562:10 – 566:13, 951:7 – 952:13, 952:23 – 955:4. This was pursuant to the one-man-bridge rule; The regulations place the obligation to assess the requirements for a lookout on the master and the officer in charge of navigation. Tr.952:23 – 954:10 – which is to say that under these conditions, no additional lookout was required by Rule 5 and Belt Line's attempt to impose such a requirement is unsupported. Further, and more importantly, the decision to post a second lookout rested upon Mate Morrissey at all relevant times.

Capt. Lewis conceded that whether or not Mate Morrissey decided to do so has no impact on Carver management's privity or knowledge of the issue:

> Q.   And the judgment to use a lookout is either the captain or the mate on watch, correct?
>
> A.   Correct.
>
> Q.   It's not Nick Laraway from Carver up in Albany, New York, correct?
>
> A.   Correct.

Tr. 568-69. This concession is dispositive of any Rule 5 theory that seeks to impose a duty on Carver — rather than Mate Morrissey — to deploy a second look-out. Nor is there any dispute that Carver trained its mariners to post the appropriate lookout for Rule 5 and that the Captain or Mate on watch conducted this on-the-job training. Tr. 568. Capt. Lewis acknowledge directly: "I didn't say there was no training for lookouts." Tr. 568.

At bottom, Belt Line's theory on posting an additional lookout, and Capt. Lewis' supporting opinion, is based on a custom and practice in the oil tanker industry that is not relevant to the case at hand. Capt. Lewis acknowledge as much. Tr. 553-54 ("[I]n my standard industry, we always had a second lookout in narrow waters and confined waters."); see also Tr. 568 (Capt. Lewis's career was spent "in the oil barge industry for the majority of [his] experience"). He also conceded that the text of Rule 5 does not require his preferred approach:

> "And the rules of the road are only minimal requirement. There is nothing says you can't have two, three, four people up there. A lookout is not a bad thing, in my opinion. It's a safety precaution."

Tr. 568. June 15, 2024 was a perfect day for sailing and nothing would have prevented Mate Morrissey from observing the Bridge ahead had he been engaging in the situational awareness of his surroundings. There is no evidence that failure to post a second look out was the cause of the allision and, even if so, such a decision was Mate Morrissey's to make without any knowledge or

11

privity on the part of Carver. Thus, if Mate Morrissey's navigational error might be attributed to his decision not to post a second look out, that was his sole decision, and his sole negligence.

### 5.   Mate Morrissey's Navigational Error was the Sole Cause of the Allision.

Belt Line's own expert concedes the autopilot system did not "malfunction" on the date of the allision; there was no law prohibiting autopilot use on the river; conditions were "perfect" for sailing and Mate Morrissey was acting as his own lookout with an unobstructed 360-degree view of the surroundings. Further, the Mackenzie Rose was manned according to its Certificate of Inspection (COI) with licensed and experienced crew, who were trained on-the-job at the discretion of the Mate or Captain on watch. Stripped of the autopilot-malfunction theory, the autopilot-use theory, the Rule 5 theory, and the training theory, Belt Line's case reduces to a single undisputed proposition: Mate Morrissey was operating the Mackenzie Rose when the barge struck the Bridge, and the strike would not have occurred absent his navigational error.

The evidence is that the vessel was heading to port as it passed beneath the prior bridge, Tr. 667 (Furborough). A prudent officer of the watch had the option to disengage the autopilot and go to hand steering. Morrissey thought he had activated hand steering but did not do so until it was too late. Most importantly, Belt Line's own maritime expert, Capt. Lewis, only offered that this failure to switch to NFU mode was "a cause" of the allision and did not offer any other opinion related to the autopilot or steering systems. Capt. Stephenson's testimony made clear that Mate Morrissey failed to engage the switch to NFU when he thought he had; thus Capt. Stephenson concluded that this failure by Mate Morrissey and his lack of situational awareness was the sole cause of the allision. Tr. 991:1-10, 992:12-996:2, 589:7-19. The Court in questioning Capt. Stephenson asked whether, Mate Morrisey "had experienced a tripping, he was far enough away

from the bridge that he could have corrected it?" Capt. Stephenson's answer based on his navigational experience was a categorical "Yes." Tr. 986:2-6.

Moreover, Mate Morrisey's testified at the USCG and the National Transportation Safety Board ("NTSB") interview, that he turned off the autopilot "minutes" from the bridge, Ex. J80 19:15-23. This would have given Mate Morrissey at 5 knots over 300 yards to maneuver. For this reason, Capt. Stephenson testified that Mate Morrissey would have had more than enough time to correct his course and safely maneuver the vessel through the bridge opening, if he had correctly engaged the manual steering. Tr. 971:12-13, 971:18 – 972:22. Capt. Lewis agreed that this was enough time for Morrissey to correct his course. Tr. 600:24 – 601:2, 601:15-22, 605:1-20.

Carver acknowledged this framework at the close of Belt Line's case. In its Rule 52(c) motion, Carver asked the Court to find that "the sole causative—sole cause of the allision is Mate Morrissey's navigational error. Whether that was a failure of situational awareness, failure—lack of paying attention . . . I think what has been established is that it had nothing to do with the mechanics of the boat, the autopilot system, and certainly not the steering, and there was no hard-over event." Tr. 684. The evidence at trial is unchanged. The Court should find as fact and matter of law that the sole cause of the allision was Mate Morrissey's in-the-moment navigational error.

### B.    Carver Lacked Privity or Knowledge of Mate Morrissey's Navigational Error and Other Purported Cause of the Allision.

The Limitation of Liability Act "allows the owner of a vessel to limit his liability for losses resulting from a collision to the value of his interest in the vessel and her freight if the owner can show that the cause of the collision was not within his privity or knowledge." *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 813 F.2d 634, 638 (4th Cir. 1987). "Privity and knowledge, as used in this statute, have been construed to indicate that a shipowner knew or should have known that a certain condition existed." *Id.* "When a corporation owns the vessel, the test is whether culpable

13

participation or neglect of duty can be attributed to an officer, managing agent, supervisor, or other high-level employee of the corporation." *In re Bald Head Island Transp., Inc.,* 124 F. Supp. 3d 658, 663–64 (E.D.N.C. 2015) (quoting *Carr v. PMS Fishing Corp.,* 191 F.3d 1, 4 (1st Cir.1999)). "[U]nless 'privity' or 'knowledge' are to become empty words" an owner "who selects competent men [. . . .] and who is not on notice as to the existence of any defect cannot be denied the benefit of limitation." *Coryell v. Phipps*, 317 U.S. 406, 412 (1943). "A shipowner seeking limitation of liability bears the burden of proving that he was without knowledge of the condition or negligence responsible for the collision." *Hellenic Lines, Ltd.*, 813 F.2d at 638.

"Where the acts of negligence result not from any lack of competence on the part of the crew, but rather are merely 'mistakes of navigation,' the shipowner is not precluded from the limitation of liability." *Id.*; see also *Mac Towing, Inc. v. American Commercial Lines*, 670 F.2d 543, 548 (5th Cir. 1982) ("Ordinarily, errors in navigation or other negligence by master or crew are not attributable to (the shipowner) for limitation purposes").

This case fits the navigational error bill. The evidence is Mate Morrissey failed to properly disengage the autopilot and switch to hand steering in time to navigate the Mackenzie Rose through the Bridge opening. There is no expert testimony that an alarm did not sound or that a "trip" into standby mode caused Mate Morrissey to strike the bridge. Thus, the alarm tripping issue is irrelevant. See *Omega Protein v. Samson Contour Energy E&P LLC*, 548 F.3d 361, 373 (5th Cir. 2008) ("because defective navigational aids played no role in the allision, they are irrelevant to whether Omega may limit liability"). The established record is that Mate Morrissey and the Mackenzie Rose were on a heading toward the western section of the Bridge as it came through the last bridge transited, and that the course never materially deviated at any time prior to the allision. Mate Morrissey's conceded before the Coast Guard that by the time he realized he was in

14

standby mode and failed to switch to NFU mode, it was too late. That is black letter navigational error and poor situational awareness, the fault of which is Mate Morrissey's that is outside the privity and knowledge of Carver.

The circumstances are similar to *Omega Protein*, a case in which the *F/V Gulf Shore* piloted by a twenty-year licensed mariner allided with stationary oil platform that had no navigational lights on a calm, clear night voyage in the Gulf of Mexico. 548 F.3d at 366. The *Gulf Shore* was equipped with "various navigational aids," including autopilot and a radar system "equipped with an anti-collision alarm, which emits a sound when an obstacle enters a field specified by the operator." *Id.* at 365. The vessel owner had not trained the master as to use of these navigational aids, he had not read the radar's manual and was unaware of the alarm's capabilities. After a bench trial, the Court found that the owner was entitled to limit its liability, even though the master violated Rule 5 and failed to keep a proper lookout, mainly because he turned on the wheelhouse light which created a "mirror effect" that diminished his night vision and "prevented [the master] from seeing the radar display" near the helm. *Id.* at 366-67. There was also "substantial testimony" that the master "did not make effective use of his radar" while underway. *Id.* at 367.

On these facts, the Fifth Circuit affirmed the district court's finding that the vessel owner was entitled to limit its liability under the Act. In so holding, the court found that the employee "committed navigational error by failing to look at his radar and Pinpoint system" and reasoned that "merely because better use of navigational aids might have helped prevent the allision does not compel a finding that [the master] was an incompetent master or that *Gulf Shore* was unseaworthy." *Id.* at 374. It also found irrelevant the fact that the vessel owner did not "have a protocol in placed dictating when features such as the anti-collision alarm were to be used" in part because the "'privity or knowledge' standard does not require a vessel owner to take every possible

15

precaution; it only obliges the owner to select a competent master and remedy deficiencies which he can discover through reasonable diligence." *Id.*

Mate Morrissey's conduct here is similar. He had discretion as to acting as lookout, was aware he was approaching the Bridge ahead, switched autopilot off for the transit, but failed to engage manual steering. It was his failure to engage fully – to have situational awareness while approaching the Bridge that caused the allision. The alleged alarm tripping is irrelevant to the limitation issue, as Mate Morrissey had visual warnings in the wheelhouse and could see that the vessel was in "neutral" well before he struck the Bridge. As in *Omega Protein*, Mate Morrissey's operator's failure to effectively utilize the navigational aids at his disposal does not turn his error into unseaworthiness. Regardless, Carver management never had privity or knowledge of Mate Morrissey's in-the-moment decision to use autopilot or proceed on a one-man watch without a second lookout. Mate Morrissey was a U.S. Coast Guard licensed, competent Captain whose errors of navigation caused the allision. Carver is thus entitled to limit its liability accordingly.

C.    **Carver's Liability Is Limited by Statute to the Post-Casualty Value of the Vessel ($3 million).**

A vessel owner who establishes that a casualty occurred due to negligence outside its privity or knowledge may "limit its liability to the value of the vessel and the pending freight." *In re Complaint of Rover Dolphin Tours, LLC*, 603 F.Supp. 3d 286, 289 (E.D. Va. 2022) (quotations omitted). "[T]he fund against which the claimants must make their claim is equal to the value of the ship *after* the voyage on which the incident occurred *Pickle v. Char Lee Seafood, Inc.*, 174 F.3d 444, 449 (4th Cir. 1999) (emphasis original).

Here, the Mackenzie Rose was acquired by Carver in or about March 2020 (Ex. J49), for $1 million. Tr. 711:15-17. After improvements to the Vessel, Carver financed the total – purchase price and improvements – with Bridgehampton National Bank a.k.a., BNB Bank, which was later

16

acquired by Dime Bank. Ex. J49, Tr. 711:22 – 714:11. Dime Bank hired surveyors Marine Safety Consultants, Inc. ("Marine Safety Consultants"), who in December 2021, valued the Vessel at $4 million. Ex. J69 at DIME000236, Tr. 714:12-17. The Vessel was insured for just over $3 million. Tr. 714:21 – 715:13.

In accordance with the Court's ruling on the motions in limine, neither party submitted valuation evidence using the tried-and-true "comparable sales methodology." *See* ECF No. 208 at 13-14. In such circumstances, the Court looks at the totality of circumstances has flexibility on how to determine valuation. See *Standard Oil Co. v. Southern Pacific Co.*, 268 U.S. 146, 155-56 (1925) ("Where there is no market value, such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to . . . . It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts."). The purchase price, insured value, income generation, repair costs, "cost-plus-depreciation," and surveys are all datapoints that the Court may consider in valuing a vessel and her freight. See *In re Manhattan By Sail, Inc.*, 436 F. Supp. 3d 803, 808-09 (S.D. N.Y.)

Carver submits the value of the Mackenzie Rose just after the allision is the insured value, $3 Million. Regardless, any valuation over $3.5M would ignore the full evidence and overvalue the $4 Million survey done by Dime Bank in December 2021 and the $3M agreed-upon insured value for the 2024 policy period. Carver thus requests that the Court find in its favor on its Limitation of Liability Act claim, order that claimants' recovery be limited to its *pro rata* share of the value of the Mackenzie Rose after the allision on June 15, 2024, and find that the value of the vessel and freight was $3 million.

The original purpose of the Limitation of Liability Act was "to encourage the development of American merchant shipping." *Lake Tankers Corp. v. Henn*, 354 U.S 147, 150 (1957). When a shipowner faces potential liability in excess of the value of the vessel, the district court is empowered both to enjoin other suits against the owner and to notify all potential claimants to file their claims in the admiralty court. *See* Fed.R.Civ.P. Supplemental Rule F(4). The Court then administers the action "with the view of giving to ship-owners the full benefit of the immunities intended to be secured by it" as otherwise the purpose of the Act will be defeated. <u>Matter of Texaco, Inc.</u>, 847 F. Supp. 457, 461 (E.D. La. 1994) (quoting *Providence & New York S.S. Co. v. Hill Mfg. Co.,* 109 U.S. 578, 594–95 (1883)).

Further, and as the Fourth Circuit and Supreme Court have recognized, the *concursus* serves, in part, to "ensure that all claimants, not just a favored few, will come in on an equal footing to obtain a *pro rata* share of their damages." *Matter of Grace Ocean Priv. Ltd*., 765 F. Supp. 3d 461, 469–70 (D. Md. 2025) (citations omitted, ultimately quoting *Cushing*, 347 U.S. at 417, 74 S.Ct. 608). Thus, the proceeding is to "provide a marshalling of assets [and]the distribution pro rata of an inadequate fund among claimants, none of whom can be paid in full." *In re Moran Transp. Corp.*, 185 F.2d 386, 389 (2d Cir., 1950), *cert. denied* 340 U.S. 953. In this case, Evanston and the Belt Line stepped forward as claimants.

This Court's determination of proven damages will establish both the value of Evanston's claim after limitations and the value of Belt Line's claim. The Court will also determine the value of the fund and distribute that fund based on a *pro rata* analysis. That has been held to be inconsistent with the *pro rata* approach taken in Rule F8. *See In re Libel of Kristie Leigh Enters., Inc.,* 168 F.3d 206, 209 (5th Cir. 1999) (Rejecting an argument to reduce the fund 'dollar for dollar' based on settlements); *Laughlin v. Falcon Operators, Inc.*, 2001 WL 476059 (Declining to reduce

18

the fund until liability has been determined). Thus, Carver does not claim a dollar-for-dollar reduction of the limitation fund based on the amount of its settlement and payment to Evanston. Instead, each claimant should be allocated its *pro rata* share for purposes of the establishment of the Belt Line's claim.

With the limitation fund at $3M, it will be divided *pro rata* between Evanston's proven claim and that of the Belt Line's proven claim. Based on the infirmities of Belt Line's damages proof, the total damages would likely be in the area of $12.5M, disregarding the application of depreciation. Thus, for the sake of argument, the court might allocate $10M to Evanston and $2.5M to Belt Line. With these assumptions, the Belt Line's apportioned share of the fund would be 20% of the fund.  On the other hand, because Belt Line's claim should be subject to depreciation, as detailed at trial, *See* Carver's proposed findings of fact and the table contained therein, at ¶ 36, then Belt Line was made whole through insurance and Evanston therefore holds the entire claim, which is in the amount of $2,972,767.

II.       **Belt Line's Claimed Damages Are Overstated, and Depreciation Should Apply.**

The Belt Line bears the burden of proving its damages. "[D]amages are not presumed, nor may they be based on speculation, but they must be proven, and [Belt Line] bears the burden of proof to show the amount, as well as the fact of damages." *Filkins v. McAllister Bros, Inc.*, 695 F. Supp. 845, 854 (E.D. Va. 1988) (citing *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1088 (5th Cir. 1982)). Damages must be calculated with "reasonable certainty." *See, e.g., Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1157 (5th Cir. 1990), *abrogated on other grounds*, CITGO *Asphalt Refining v. Frescati Shipping Co. Ltd.*, 589 U.S. 340 (2020).

Where the claimant fails to carry that burden as to any particular category or line item, the claim for that item must fail.

19

The governing admiralty rule is *restitutio in integrum*—the injured party is to be placed "in the same position, so far as money can do it, as he would have been, had the damage not been inflicted." *The Baltimore*, 75 U.S. (8 Wall.) 377, 385 (1869). That principle has two corollaries critical here. First, the tortfeasor is not liable for pre-existing conditions, deferred maintenance the owner would have incurred anyway, or improvements that leave the structure better than before. *See Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304–05 (5th Cir. 1976) (reducing repair recovery by "percentage of useful life extension"), *overruled on other grounds*, *Culver v. Slater Boat Co.*, 722 F.2d 114 (1982). Second, costs that the owner would have incurred "but for" the casualty are not recoverable—whether captured through direct labor, additive rates, or otherwise. *In re Matteson Marine Serv.*, No. 08-cv-4023, 2011 U.S. Dist. LEXIS 75168, at 58 (C.D. Ill. July 13, 2011). Much of the Belt Line's $15,914,034 claim fails both tests.

Applying these principles to the trial record, the claim is substantially overstated.

### A. Belt Line's "Additive Rates" Are Not Recoverable.

Belt Line stacks approximately $815,000 in "additive rates" to its claimed labor charges in amounts that vary from 5% (materials) to 185% (for Train & Engine employees) to 279% (for Maintenance of Way employees). These "additive rates" should be disallowed in their entirety for the following reasons.

### 1. The Additive Rates Are Fixed Costs That Would Have Been Incurred Regardless of the Allision.

To recover overhead charges, Belt Line must show that the claimed overhead "bear a reasonable relationship to the maintenance work and the train crews" that resulted in work done because of the allision. *In re Matteson Marine Serv.*, No. 4:08-cv-4023-SLD-JAG, 2012 U.S. Dist. LEXIS 186688, at *18 (C.D. Ill. Sep. 28, 2012). Belt Line has failed to show that the additive rates are anything but fixed costs that would have been incurred regardless of the allision.

As explained by Cannon Moss, the claimed additive rates cover things like administrative overhead, Belt Line's supplies, "the lights being on," insurance, and other costs per employee. Tr. Vol. 1-A at 105–10. Carver's economics expert, Charlie Cunningham of R.L. Banks, explained that the additive rates are, economically, fixed costs: "In my experience, additive rates are fixed costs. And from an economic damages perspective, if you think about it from a but for position…if the bridge had not been hit, would those costs have still been incurred by the railroad? If the answer is yes, as fixed cost or such costs would be, then they're not appropriate to be charged as economic damages." Tr. Vol. 6 at 773. Cunningham then walked through the typical components, including HR, execute, payroll, and other administrative overhead costs." Tr. at 788. Those are textbook fixed costs. The Belt Line's claimed additive rates included these fixed costs, as Moss identified, which do not change as a result of the allision. They are, therefore, disconnected from Carver's conduct and non-recoverable and should be disregarded.

### 2. Cannon Moss admitted he does not know how the additive rates are calculated and cannot tie them to any Belt Line cost.

Mr. Moss was the Belt Line's sponsoring witness on the damages spreadsheet. He repeatedly admitted he did not know what went into the rates, cannot replicate the calculation, has no per-employee overhead figure for the Belt Line, and instead simply adopted Norfolk Southern's rates—rates approved by the Georgia DOT based on a Norfolk Southern audit, not a Belt Line audit:

> Q. So my question was for Belt Line's accounting purposes what the real overhead cost per employee that Belt Line puts on its books. Do you know what that figure is?
>
> A. The overall total cost or a percentage?
>
> Q. A per employee overhead.
>
> A. No.

Tr. Vol. 1-B at 129–30. Asked how Norfolk Southern itself calculates the rate, Mr. Moss testified: "I can't tell you down to the penny because how they calculate it is proprietary so they won't even tell me how they actually calculate it." Tr. Vol. 1-B at 129.

That admission is fatal. *Filkins* requires proof "of the amount, as well as the fact of damages." 695 F. Supp. at 854. Belt Line cannot satisfy its burden with a number borrowed, by reference, from a different company, whose calculation Moss affirmatively concedes he cannot explain and which was never disclosed to him. "Proprietary" is not an admissible substitute for proof. Moss's concession that he has no idea of the rates included in Belt Line's claim is evidence that they do not reflect any actual cost incurred by Belt Line because of the allision. The $815,000 in additive rates should be disregarded.

### 3.    The Georgia DOT approval relied upon by Belt Line is irrelevant.

Belt Line's primary response is that the Federal Highway Administration and Georgia DOT have approved these rates for use on federally funded grant projects. Tr. Vol. 1-A at 106–07. That approval—for Norfolk Southern, not Belt Line—was given in a different regulatory context for a different purpose. Federal and state grant agencies routinely approve overhead recovery on grant-funded infrastructure projects as part of a negotiated reimbursement framework where both sides understand that the grantee will recover a pre-negotiated overhead figure in lieu of auditing the grantee's actual books. That regulatory convenience does not establish that the rates reflect actual incremental cost, and it does not bind a federal court applying general maritime damages law.

The *Matteson Marine* court addressed—and rejected—precisely this argument. An "[approved] additive rate[]…does not reflect actual costs incurred because of property damage." 2012 U.S. Dist. LEXIS 18688, at 28. The same result is required here. At most, Belt Line is entitled to recover the incremental, variable overhead actually caused by the allision, for which it has

offered no proof and no calculation. Cunningham's unrebutted testimony is that the variable component—if any—is small relative to the additive, and Belt Line had every opportunity to prove otherwise and did not. Tr. Vol. 6 at 787–88. Accordingly, the $815,000 in additive rates should be stricken in its entirety.

### B. Belt Line's labor charges are speculative and not recoverable.

Aside from the additive rates, the Belt Line claims approximately $402,753.95 in direct self-performed labor for (1) train & engine employees ($128,121.81), (2) yardmasters ($191,259.85), (3) maintenance-of-way employees ($47,502.57), and (4) utilitymen ($35,869.73). This $402,753.95 is also unrecoverable as Belt Line has failed to prove the labor charges were incurred because of the allision.

Cannon Moss admitted that the labor spreadsheet includes time for work unrelated to the allision:

> Q. We can agree at least some portion of the labor costs that are shown on this particular sheet relate to regular work that is unrelated to the allision?
>
> A. Correct.

Tr. Vol. 1-B at 123. Moss further confirmed that the Belt Line "treated it like a billable project": if an employee billed any time to the bridge project on a given day, "you're going to include them in the amount you're billing." Tr. Vol. 1-B at 123. Thus, he readily admitted that all hours worked for a single day are lumped into Joint Exhibit 73A if that employee billed a minute of time to the allision project. Moss could not identify how much of the yardmaster time on the spreadsheet reflects normal-shift work versus incremental rerouting work, and testified no separate record exists: "I don't believe so." Tr. Vol. 1-B at 120. That is a straightforward failure of proof under *Filkins*. Belt Line bears the burden to establish the *incremental* cost caused by the allision.

23

The law does not permit Belt Line to "black board" its entire payroll costs for several months and flip the burden to *disprove* what may or may not have been incurred because of the allision.

The $191,259.85 in yardmaster time, particularly, must be excluded as unrelated and unrecoverable. Moss confirmed that Belt Line typically has "one yardmaster assigned to the whole railroad," with seven yardmasters working for the company at any given time. Tr. Vol. 1-B at 119, 122. "One yardmaster controls the entire railroad," regardless of how many trains pass through. Tr. Vol. 1-B at 119. He further confirmed that Belt Line did not hire a "specific yardmaster" for the rerouting work post-allision and had no way of identifying on JE73A any additional hours worked because of the rerouting work. *Id.* The $190K in yardmaster time is clearly all regular labor that would have been incurred regardless of the allision and should be excluded.

Cunningham's analysis squarely addresses the point:

> If the bridge had not been hit, a yardmaster would still be on duty. They would still be managing trains. Adding one more train to that does not make it an economic damages claim. If they had to go into overtime, then that hour of overtime would be applicable. If you had to hire another yardmaster to handle it, that would be economic damages. But just because a yardmaster that's on duty that would have been on duty before the bridge was hit and is now on duty after the bridge was hit and handles a detoured train or two, that's not an economic damages claim.

Tr. Vol. 6 at 775. Belt Line's rebuttal on redirect—"if Carver had to outsource…that work, the yardmaster's time be charged to the project." Tr. Vol. 1-B at 144—is an apples-to-oranges argument that confuses the law and evidentiary record. The question is not what an outsourced yardmaster would have cost; the question is what incremental cost the Belt Line actually incurred. Since the existing yardmaster's salary was sunk and the Belt Line hired no additional yardmasters, that incremental cost is (at most) the overtime premium, not the full wage. Belt Line here has failed to prove either and thus the entire labor charges must be deemed unrecoverable.

24

### C.  $396,867 of untimely disclosed and speculative damages should be excluded.

As briefed in pre-trial motions, Belt Line included an untimely disclosed invoice for $274,285.60 from PCL (Invoice #5524004-014) and other labor charges in its damages calculations. Carver maintains its objections that this should be excluded as untimely disclosed and for other reasons set forth in motions before trial.

In addition, $396,867.61 should be reduced from Belt Line's top line $15,914,034.46 damages figure as unsupported and speculative.  Notably, Belt Line chose not to enter contractor invoices themselves into evidence and instead relied upon JE73A as a Rule 1006 summary of its purported evidence. The record is clear that Belt Line's own experts have no idea what this difference relates to. As Lee Lentz testified, he simply looked at this spreadsheet and determined an extra $400,000 was fair and reasonable:

> Q. Did you review anything other than that update cost spreadsheet in coming to your new opinion on the additional $400,000?
>
> A. No.
>
> Q. You didn't review the underlying invoices for those charges?
>
> A. I don't think that I re-reviewed any invoices, no.
>
> Q. So effectively just a line item on a spreadsheet is what you've found is your additional $400,000 —
>
> A. The update spreadsheet, yes.

Tr. Vol. 2-B at 390. Belt Line's other expert, Lugo, employed the same methodology:

> Q. What did you do, if anything, between the close of discovery and today when you testified that the new amount at that the Belt Line is claiming is also fair and reasonable?
>
> A. So we reviewed the spreadsheet and any back-up documentation that we would have received.
>
> Q. What back-up documentation in particular?
>
> A. I don't recall. I'd have to go back and look.

Tr. Vol. 2-B at 437-38. Belt Line's presentation of this extra $396,867.81 in damages is wholly unsupported and admittedly only supported by speculative, unfounded opinion of its experts. This amount should be disregarded.

### D.  The $17,000 electrical conduit is a betterment and unrecoverable.

Moss confirmed that Belt Line added electrical conduit to the Bridge that was not there before the allision. This is reflected on row 12 of the Joint Exhibit 73A and is clearly unrelated to the allision and should be excluded from any damages. See Tr. Vol. 1-B at 130, 133-34.

### E.  PCL's invoices are unreasonable and include extracontractual charges.

The PCL invoices account for approximately $13.8 million of the claim. Embedded in that figure are four categories of charges that either duplicate costs already captured in the agreed rates, lack any foundation in the governing contract, or were conceded by PCL's own project lead, Charlie Graning, to rest on speculation. Together they account for approximately $1.15 million in overstatement, independent of the additive-rate, labor, and betterment issues addressed above.

### 1.    The $138,000 "insurance" line item is a double charge.

PCL's Invoice No. 4 includes a $138,000 line item described as "insurance," which Mr. Graning confirmed on cross is a "one-percent adder" applied to the overall cost of the job and intended to "capture general liability and builder's risk." Tr. Vol. 2-A at 289. The problem is that insurance is already captured elsewhere. Mr. Graning testified that under the governing Master Services Agreement, insurance "is the contractor's burden"—that is, PCL's responsibility Tr. Vol. 2-A at 287. Further, the labor rates set forth in Appendix B of the MSA are "fully burdened." Tr. Vol. 2-A at 287. Asked to define "fully burdened," Mr. Graning testified:

> A fully burdened rate is basically the things that go with the individual in terms of **their insurance**, their 401(k)s, the things that come with them in terms of standard tools, PVE, things of that nature.

Tr. Vol. 2-A at 287–88 (emphasis added). The fully burdened rate, by PCL's own definition, *already includes* insurance. The 1% adder is a second charge for the same thing.

Compounding the duplication, Mr. Graning conceded he could not say whether PCL had *also* separately billed insurance premiums to Belt Line beyond the 1% adder: "I'm not aware of that. **I'm not the finance and risk guy.**" Tr. Vol. 2-A at 287. The project lead with signature authority over the invoices did not know what PCL even billed. Under *Filkins*, Belt Line bears the burden of proving damages with reasonable certainty. 695 F. Supp. at 854. A charge that is duplicative of a cost component already embedded in the agreed rate fails that burden on its face. The $138,000 insurance line item should be deducted in full.

**2.      The 15% material markup ($343,736) and 15% sub-trade markup ($619,863) are extracontractual unreasonable charges and must be excluded.**

Graning confirmed that the original Norfolk Southern Master Services Agreement (Belt Line Exhibit 91, dated November 3, 2020) governs the work, and that the rate sheet applicable to the post-allision repairs is the updated Appendix B at Belt Line Exhibit 92. Tr. Vol. 2-A at 269–70. He further conceded that those governing contracts do not provide any basis to include 15% markups for these items:

> Q. Appendix B…if you can identify where on Appendix B it says that the PCL can charge a 15 percent markup for materials, please let us know.
>
> A. Initial review, looking at this, I'm not — I don't see it expressly stated. But I will state that we would not have done the work if we did not have the ability to mark it up 15 percent.

Tr. Vol. 2-A at 312 (emphasis added). As for the sub-trade markup:

> Q. There is no term on Appendix B that provides for PCL to add a 15 percent markup on sub-trade that's listed in the document, correct?
>
> A. I do not see it on this document.

*Id.* These charges are thus clearly extracontractual and unreasonable. Belt Line agreed to pay the fully burdened rates in Appendix B. It did not agree to pay an additional 15% on materials or sub-

27

trade. The $963,599 should be deducted. Carver cannot be held to pay for overhead and additive rate markups that Belt Line itself did not contract for.

Over and above the contractual issues, Graning confirmed the 15% markups are "stacked" and thus include markup upon markup:

> Q. Are there any invoices that you have reviewed that included — from a subcontractor that included materials that applied the 15-percent markup and then also included the 15-percent markup when they were submitted to the Belt Line for payment?
>
> A. If I may clarify the question? You're asking is there a stacked 15-percent markup from the subcontractor or the vendor back to us?
>
> Q. Correct.
>
> A. And then we stack back to the railroad?
>
> Q. Correct.
>
> A. Yes, it is standard in terms of contract materials we provided.

Tr. Vol. 2-A at 313. The arithmetic is straightforward: a $100 subcontractor material cost becomes $115 on the subcontractor's invoice to PCL, which becomes $132.25 on PCL's invoice to Belt Line.

This is an independent reason to disallow both 15% markup categories. Even if the Court were to find *some* contractual basis for one level of markup (which Mr. Graning could not locate), the stacking of the two markups is unreasonable. Belt Line cannot recover the same 15% twice. At an absolute minimum, the sub-trade markup of $619,863 must be reduced to account for the markup already embedded in the subcontractors' invoices.

**3. Costs to repair the power rail on the east side of the Bridge must be reduced as speculative.**

Graning estimated that the work to repair the power rails on the undamaged east side of the Bridge was $100,000 or less. Tr. Vol. 2-A at 300. Graning conceded that relating this damage to the allision is entirely speculative:

> Q. Just to confirm, you're not sure the reason that the power rail was not working after the allision, right?
>
> A. I am — I'm sticking with the statement that it's my understanding they had power delivery before we got there, and that as a result of, after we got there they didn't have power when we needed it in order to move the span, that it was directly related to the allision.
>
> Q. And that would be speculating based on those assumptions, correct?
>
> A. Yes, sir.

Tr. Vol. 2-A at 302-03. The entire $100,000 plus 15% markup for a total of $115,000 must be excluded as unrelated and speculative damages.

## F.  Accounting for Depreciation, Belt Line's total recoverable damages are $2.9M.

The Court has ruled on Belt Line's motion *in limine* that, under *Hewlett v. Barge Bertie*, 418 F.2d 654, 657 (4th Cir. 1969), "a tortfeasor…in order to even consider proof of depreciation, has the burden to show that the value is less than the cost of repairs" Tr. Vol. 6 at 717, and has expressed that depreciation is an "uphill battle" given that what was replaced was not an entire span but discrete components. Carver has preserved its position on this issue, reincorporates its prior briefing and arguments on the issue, and includes two additional points for the record.

First, Belt Line's pre-allision valuation of the Main Line Bridge—as evidenced by its own property insurance limit of $10,000,000—is less than its claimed repair cost of $15,914,034. Tr. Vol. 1-B at 136. Mr. Moss's explanation that the $10M figure was "based on what we think repair costs could be" for a truss-by-truss replacement, Tr. Vol. 1-B at 137, is an admission that Belt

29

Line's own foreseeable damage valuation is $10M, not $16M. That is itself a factual predicate supporting Carver's depreciation theory, which is unrebutted by Belt Line. The bridge was thus a total loss and thus depreciation should apply.

Second, this Court is not tied to any rigid rules for determining damages. As discussed at trial, nothing prevents this Court from applying a component-by-component depreciation as RL Banks did. The rails and ties (~$276K) are the clearest and best example. These were slated to be replaced in 2027, and Moss admitted to the Board that Belt Line went ahead and replaced them while the repairs were ongoing. Tr. Vol. 1-B at 133–34. The rails and ties clearly have a distinct "service life" of other components on the Bridge, as is true of the truss members, mechanical systems (including lubrication etc.). Thus, at a minimum, the Court can apply depreciation to the rails/ties, new truss members, and find a reasonable depreciation rate to account for the clearly stronger, better steel that was used on the alleged integral component of the Bridge.

**III.    Belt Line's Total Recovery Must Be Reduced by $10 Million Because It Contractually Assigned It to Its Insurer.**

This Court reserved for post-trial resolution "the appropriate offset" against any damages award recovered by Belt Line from Carver. ECF No. 194 at 18. The "offset" issue reduces to a clean question of whether Belt Line owns $10 Million of its claim. Pursuant to the policy it held with its insurer, Evanston, the answer is that Evanston clearly owned the $10M claim. Belt Line only retained ownership of the amount in excess of $10,000,000 which, as stated above, is a live issue.

In short, the first $10,000,000 was transferred to Evanston the moment Evanston paid under the policy. Evanston then compromised that transferred claim with Carver for $5,000,000, extinguishing it. Belt Line cannot now pursue Carver for the $10,000,000 that does not belong to it; Belt Line only holds a claim for any excess damages. Three propositions, each established by

30

controlling or persuasive authority, compel this result. First**,** upon Evanston's payment, ownership of the $10,000,000 claim transferred to Evanston by operation of the policy. Second**,** because the Court has already held the Belt Line-Evanston policy contracted around the made-whole doctrine, ECF No. 194 at 15-16, that transfer was unconditional and immediate—not postponed until Belt Line was fully compensated. Third**,** Evanston's subsequent settlement with Carver satisfied the transferred $10,000,000 claim, regardless of the terms of the settlement.

The Evanston policy contains three independent clauses—each triggered upon Evanston's payment—that operate to transfer Belt Line's recovery rights against third-party tortfeasors to Evanston. The trial record confirms the triggering event: Moss testified that "[t]he Belt Line received the full limits of its $10 million from Evanston for the repairs." Tr. 137:6-8; *see also* Tr. 138:12-13 ("We received 10 million."); Tr. 139:13-14 (confirming "10 million of that came from the Evanston policy").

The first transfer clause is Section 16(B) of the Rail Property Manuscript, which provides:

> In the event of any payment under this policy, this company shall be subrogated to the extent of such payment to all the Insured's rights of recovery therefore. The Insured shall execute all paper required and shall do anything that may be necessary at the expense of the Insurer to secure such right.

ECF No. 159-1 at 25, PageID# 5416 (emphases added). The operative verb is mandatory and present-tense ("shall be subrogated"), and the scope is comprehensive ("all the Insured's rights of recovery"). The clause transfers recovery rights wholesale upon payment; it does not merely authorize Evanston to later seek reimbursement from Belt Line.

The Commercial Inland Marine Conditions contain an even more explicit transfer clause, Section J, titled "Transfer Of Rights Of Recovery Against Others To Us":

> If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us

31

to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them.

ECF No. 159-1 at 32, PageID# 5423 (emphases added). The Commercial Property Conditions contain an identical Section I. *Id.* at 35, PageID# 5426. The operative language—"those rights *are transferred*"—is unambiguous. This is express contractual assignment upon payment.

This Court has already construed these provisions. At summary judgment, the Court held that this very policy language "contracted around" the default made-whole doctrine, displacing any requirement that Belt Line first be fully compensated before Evanston's rights could be enforced. ECF No. 194 at 15-16. That holding is law of the case. It carries a necessary consequence: the transfer was unconditional. If Belt Line need not be made whole before Evanston's rights vest, then the transfer of rights occurs on payment—which is exactly when the policy says it occurs. *See* ECF No. 159-1 at 25, PageID# 5416 ("In the event of any payment").

Accordingly, Belt Line does not hold $10 Million of the claimed damages – Evanston has owned that claim throughout this case. This is not a collateral source issue; it turns on Belt Line's contract with Evanston and Evanston's right to pursue collection of its $10,000,000 payment. It turns on the fact that Evanston properly exercised its right to compromise the claim. Accordingly, Belt Line's damages evidence, to the extent that the Court accepts that evidence, first proves up Evanston's $10,000,000 claim, and only then establishes Belt Line's own claim.

IV.    **Punitive Damages are not appropriate.**

Belt Line, based on what can only be characterized as a conspiracy theory, seeks punitive damages matching compensatory damages. However, the evidence does not support the Belt Line's theory, and the burden of proof has not been met in accordance with the law and punitive damages precedent in admiralty. Punitive damages under maritime law are limited to cases where "a defendant's conduct is 'outrageous' owing to 'gross negligence,' 'willful, wanton, and reckless

32

indifference for the rights of others,' or behavior even more deplorable." *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2621, 171 L. Ed. 2d 570 (2008). Exxon, of course, was grounded in pre-voyage conduct with a master who was known to be impaired.  Regardless, Belt Line asserts: (1) that Carver knowingly sent the Mackenzie Rose into the June 15, 2024 transit in conscious disregard of a known steering/autopilot system danger; (2) Carver failed to properly train its U.S. Coast Guard-licensed mariners; and (3) Carver management orchestrated a post-allision cover-up, suppressing reporting, and evading investigation.

As stated in the limitation of liability section, *supra,* pillars (1) and (2) fail. Even were the Court to find that there was an issue with the autopilot and that Carver had privity of knowledge of those issues, which Carver denies, the evidence does not support any finding that Carver's conduct was malicious or engaged in some grand conspiracy.

Virginia, follows this approach. "Critically, the Supreme Court of Virginia has clarified that 'the difference between ordinary negligence and gross negligence is one of degree,' whereas the difference between 'any form of negligence and ... willful and wanton conduct ... is a matter of kind." *Byers v. City of Richmond*, 746 F. Supp. 3d 275, 336–37 (E.D. Va. 2024) (quoting *Green v. Ingram*, 269 Va. 281, 292, 608 S.E.2d 917 (2005); *Infant C. v. Boy Scouts of Am., Inc.*, 239 Va. 572, 582, 391 S.E.2d 322 (1990)).

Negligence "'conveys the idea of heedlessness, inattention, [or] inadvertence,' whereas willful and wanton conduct 'convey[s] the idea of purpose or design, actual or constructive.' *Id*. (quoting *Boward v. Leftwich*, 197 Va. 227, 231, 89 S.E.2d 32 (1955)). Critically, "willful and wanton conduct—i.e., willful and wanton negligence—is distinguishable from *intentional* misconduct: 'An actor guilty of intentional misconduct must intend to cause harm to another ....

33

An actor guilty of willful and wanton conduct intends his act, but not the resulting harm.'" *Id.* (quoting *Green*, 269 Va. at 292, 608 S.E.2d 917.) That is a case of mere negligence.

    **1. The Belt Line Failed to Meet its Burden of Proof as to Multiple Acts of Negligence and as to Punitive Damages.**

Mate Morrisey's navigational error was the sole cause of the allision. Carver never acted in such egregious, wanton manner or with malice to be penalized with punitive damages. If anything, the evidence supports, Carver's conduct was to the contrary.

    **a. The evidentiary record on maintenance history is inconsistent with a theory that Carver knowingly ignored some proven causative defect in the vessel's condition.**

The June 14, 2024, invoice from The General Ship Repair confirms the Vessel was at a shipyard in Baltimore for pier-side repairs immediately before the casualty. The invoice reflects work to "prepare and weld the keeper plate onto the port rudder post" and to provide straps to secure the starboard-side fender for transit. Ex. J56. Crew testimony likewise tied the Baltimore stop to welding and fendering issues; McGrath testified that the vessel was waiting on welding work and then obtained ratchet straps to hold the fendering in place until it could be fully fixed at home. McGrath Dep. Designation 60:10 –62:6.

The April 2024 Ayers invoices strengthen that same point. One Ayers work order reflects that the technician tested and checked all autopilot connections, found an autopilot backbone issue, added N2K components, and set vessel parameters on the satellite compass to improve stability. Ex. J45 at CARVER 000249. A second Ayers work order dated April 10-11, 2024 states that the technician diagnosed the complaint that the rudder went hard over underway, checked the steering system, updated software in the autopilot, replaced solid-state relays with mechanical ones, corrected a data-output plug issue, changed CAN-bus termination, and installed a UPS battery backup on the autopilot. Ex. J45 at CARVER 000250. Baldassare's testimony is consistent with

this: when asked what work was required on the autopilot system in April 2024, he testified that they replaced the actual unit itself, ran some new wires, and fixed everything into the GPS system on the boat. Baldassare Dep. Designation 136:5 – 137:1. That evidence defeats the caricature that Carver knowingly sent the vessel out with no maintenance attention or in deliberate indifference to obvious deficiencies. The same is true of the record showing that Ayers and Mackay performed work on the autopilot system in the March-April 2024 timeframe and that Moore testified he was unaware of further complaints after that work. Moore Dep. Designation 285:17 – 286:9.

The Belt Line has not offered testimony from any source that the vessel veered hard to port, resulting in the bridge strike. In fact, as agreed by Capt. Lewis after his analysis of the documents there does not appear that the rudder ever went hard over. Tr. 536:24-537:24. Punitive damages cannot rest on a theory of conscious corporate inaction when the record shows repeated maintenance efforts, vendor troubleshooting, shipyard work immediately before the voyage, and no proof that management subjectively understood the June 15, 2024 transit would probably result in an allision and nevertheless sent the vessel anyway. Even less so, the evidence supports that Carver intended for the allision to occur as the standard for punitive calls for.

**b. The Belt Line's evidence establishes Carver had written safety, training, reporting and maintenance procedures and required its mariners to comply with USCG licensing requirements.**

Belt Line has emphasized testimony that there was no separate classroom-style bridge-transit training and no company-wide autopilot-specific training that certain witnesses could identify. However, there is no dispute that Carver maintained an SMS as required by the Code of Federal Regulations or that Mate Morrissey was a duly licensed mariner by the USCG. Belt Line's own evidence shows Carver was not operating without written procedures, standards, or risk controls. The SMS – which was electronically available on the vessel for all crew, Baldassare Dep.

35

Designation 196:10-197:21, – contains sections addressing, *inter alia,* new-crew orientation and training of personnel, including navigation safety training and lookout duties, Ex. J53A at CARVER TBS HELM CONNECT 000839-41; drug and alcohol testing, including post-accident testing and serious marine incident protocols, *id*. at 000843-48, 001026; bridge-transit, navigation, lookout, and pilothouse resource management provisions, *id*. at 000734, 000951-52; collision/allision response procedures, *id.* at 000996-97; accident and incident reporting priorities and USCG notification requirements, *id.* at 001020-26; and maintenance procedures for vessel systems and equipment, *id.* at 000735, 001055-56. Belt Line may argue that these documented standards were inadequate, but "the standard for gross negligence [in Virginia] is one of indifference, not inadequacy, a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016), *See also Smith v. Wellpath LLC*, No. 2:20CV77, 2020 WL 13926025, at *11 (E.D. Va. Aug. 12, 2020). If the defendant exercised some degree of diligence or care, however, a gross negligence claim must fail as a matter of law. *Elliott*, 791 S.E.2d at 732-33.

Punitive damages require more than proof that a policy could have been better executed. The existence of a formal SMS addressing the very subjects Belt Line says Carver ignored - reporting, lookout, bridge transits, risk assessment, drug and alcohol testing, and maintenance - is fundamentally inconsistent with Belt Line's effort to paint Carver as a company acting with wholesale corporate indifference to marine safety.

**c. Belt Line's insinuation that Mate Morrisey may have been intoxicated is rank speculation.**

Belt Line highlighted the lack of post-incident drug and alcohol testing. The SMS and Baldassare's designation confirm that such testing should have been performed if the event qualified as a serious marine incident. Ex. J53A at CARVER TBS HELM CONNECT 000843-48,

001026; Baldassare Dep. Designation 195:16-196:4. The absence of testing is not affirmative proof that any crew member was intoxicated, impaired, or distracted, and even less so that Carver's management acted maliciously or wantonly before the casualty occurred.

On the contrary, Moore testified that, in his investigation, he did not learn that Morrissey was distracted in any way and did not obtain cell-phone evidence showing he was using a phone at the time of the allision. Moore Dep. Designation 125:21-126:5. Punitive damages cannot be inferred from what later testing might have shown. Without evidence of actual intoxication, actual distraction, or comparable aggravating facts, Belt Line is left with a failure-to-test argument that is simply an effort to ground a punitive claim on rank speculation and unsupported inference.

**d.  The evidence does not support a punitive damage claim.**

Belt Line's theory that Carver engaged in a grand conspiracy to cover-up the allision and suppress an investigation is unsupported by its own evidence. At best, the June 15, 2024 text chain between Moore and Baldassare, when read in conjunction with the initial incident reports, establish that the vessel crew provided inconsistent information to Carver's management employees. Importantly, Moore and Baldassare reviewed photographs of the bridge and did not observe any visual damage. Ex. J1 at CARVER ESI 001888-1889. Those observations from Carver's shoreside management employees were consistent with the immediate reports from vessel crew stating the fendering system was struck and they could not see damage to the bridge. Baldassare Dep. Designation 60:1-4, 60:23 – 61:4, 62:6-14, ECF No. 207-2 at 6. Far from attempting to conceal the incident, Baldassare specifically instructed the crew to provide written statements and document the incident in the vessel's reporting system.

The record clearly establishes that Mate Morrissey – the only true witness to the allision – initially provided an inaccurate version of events. There is also no dispute that Carver's

management complied with the USCG & NTSB joint investigation, conducted their own investigation, and corrected the company's records upon learning of Mate Morrissey's misrepresentation. The text communications and initial crew statements may tend to show mistaken judgment in the immediate aftermath of the allision, but it does not prove the sort of malicious, deceitful, or outrageous conduct necessary for punitive damages. Moreover, all of this conduct is post-incident. The record is clear that the cause of the allision was Mate Morrissey's poor situational awareness and navigational error. Tr. 991:1-10, 992:12-996:2. The initial response and belated reporting to the Coast Guard has no bearing on whether Carver had the pre-incident state of mind sufficient to punish it with a punitive damages award.

### 2. *Exxon* is markedly distinguishable from the evidence in this case.

The Belt Line patterns its punitive theory on *Exxon* case and seeks a 1:1 compensatory-to-punitive award totaling over $30 Million in a property damage case to a 70-year-old bridge. In *Exxon*, the U.S. Supreme Court evaluated punitive damages in a case involving an unprecedented oil spill caused by a vessel under the command of a captain with a known history of alcohol abuse who was highly intoxicated operating the vessel. *Exxon*, 554 U.S. at 476-78. The spill resulted in catastrophic pollution, environmental issues, natural habitat destruction, extensive business losses, disruption to the broader community, and clean-up efforts totaling over $2.1 billion. *Id.* at 479. Even against this backdrop, the Court case was one "without intentional or malicious conduct, and without behavior driven primarily by desire for gain" evaluating the punitive damages component of the case. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513, 128 S. Ct. 2605, 2633 (2008).

The contrast is telling. This case involves no death, no pollution, no evidence of intoxication, no evidence of actual distraction, no proof of an intentional allision, and no suggestion that Carver or its managers courted the risk for financial gain. There is also

contemporaneous evidence of pre-voyage repairs, ongoing written safety procedures, and a June 15 text record inconsistent with Belt Line's broadest "lie to the crew" theme. Whatever else the Court may find, this is not a case with the "earmarks of exceptional blameworthiness" described in Exxon. *Exxon* at 513. Carver should be granted judgment on the issue of punitive damages.

**CONCLUSION**

Carver seeks a limitation of its liability as owner of the Mackenzie Rose. Two Claimants filed to recover their shares of damages to the bridge. Under the *Oregon* rule, negligence of Carver has been established. Under the Limitations Act, a claimant must establish negligence or unseaworthiness, and the burden then shifts to the owner of the vessel to prove that the negligence or unseaworthy condition was not within its privity or knowledge. *Matter of Louisiana Swamp Tours, L.L.C.,* No. CV 04-2786, 2006 WL 8462869, at *4 (E.D. La. Mar. 21, 2006).

Here, Belt Line failed to establish any equipment malfunction or any other unseaworthy condition attributable to Carver and that proximately caused this allision. Rather, the evidence is that Mate Morrisey was in control of the Mackenzie Rose on a clear day, in a clear waterway where he had the discretion to choose to use or not to use the autopilot, and where he had the discretion to choose whether to have a second look-out. He was Coast Guard certified and experienced. On this particular day, Mate Morrissey turned off the autopilot but admittedly failed to switch to manual steering, which error was the sole cause of the allision. Carver has, in turn, proven that it was not in privity with those decisions and actions. Those decisions and actions were made in the moment—that is, they were solely navigational errors by the duly licensed Mate on watch.

Thus, Carver is entitled to a limitation of its liability. Carver has proven a reasonable value of the vessel of $3,000,000, and no more than $3,500,000. Regardless, of what number the Court finds appropriate as to the limitation fund, the next step is to allocate the fund, pursuant to the

39

concursus. The *pro-rata* share available to Belt Line is expected to be on the order of 20% of the fund, based on the anticipated ratio of Belt Line's damages to the total established claims.

Finally, Belt Line has not proven the factual and legal basis for punitive damages. The evidence is that Carver regularly maintained its vessel. When problems were reported to it, third party vendors were tasked to evaluate, repair, and replace systems. It maintained a qualified crew, consistent with the COI, and had appropriate policies and procedures in place. Belt Line asks this Court to find that Carver should be penalized for believing reports that the Bridge was unharmed – that the allision was with the wooden fendering system, but that is not evidence of the level of conscious disregard that would ever warrant any award of punitive damages. Finally, at trial, the Belt Line sought to tie-in arguments as to sanctions – which is a motion that this Court properly denied and, respectfully, should not be reconsidered. If, however, there were any issue, the Declaration of Josef Malik, Esq. clearly obviates any assertion that Carver somehow failed to produce its evidence.

WHEREFORE, Carver respectfully prays that this Court enter an order and judgment finding that Carver is entitled to a statutory limitation of its liability, assign the Belt Line its *pro rata* share of that fund, and deny Belt Line's claim and prayer for relief for punitive damages, as the same is unwarranted.

Dated:  April 24, 2026

Respectfully submitted,
**CLYDE & CO US LLP**

/s/ *Matthew J. Obiala*
Matthew J. Obiala  (VSB No. 100626)
30 S. Wacker Drive, Suite 2600
Chicago, IL 60606
T:  (312) 635-7000
E:  Matt.Obiala@clydeco.us

40

James H. Rodgers*
Clyde & Co US LLP
45 Lexington Avenue, 16th Floor
New York, NY 10174
Phone: (212) 702-6771
Email: james.rodgers@clydeco.us

Michael J. Roman*
Dawn L. Johnson
Siobhan M. Murphy*
Clyde & Co US LLP
30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email: michael.roman@clydeco.us
dawn.johnson@clydeco.us
Siobhan.murphy@clydeco.us

*pro hac vice

41

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing was filed electronically on this 24th day of April 2026, which will send notification of such filing to those attorneys of record registered on the CM/ECF system.


*/s/Matthew Obiala*