**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**
**In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/V MACKENZIE ROSE, (IMO No. 8968765), *et al.* | **Civil Action No: 2:24-cv-00490-MDS-LRL** |

**CARVER'S POST-HEARING PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Petitioner, Coeymans Marine Towing LLC d/b/a Carver Marine Towing ("Carver"), as owner and operator of the *Mackenzie Rose* (the "Vessel") respectfully submits its Post-Hearing Proposed Findings of Fact and Conclusions of Law pursuant to the Court's direction following the conclusion of all evidence submitted at the bench trial, and following closing arguments, as follows:

**PROPOSED FINDINGS OF FACT**

**The Parties**

1.     Carver is a limited liability company organized under the law of New York with its principal place of business in Albany, New York. Carver owns and operates a fleet of inland and offshore tugs and barges and provides towing services on the East Coast of the United States. On June 15, 2024, Carver owned and operated the tug *Mackenzie Rose*. ECF No. 178 ¶ 4.

2.     Claimant Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") is a corporation organized and existing under the law of the Commonwealth of Virginia with its principal place of business in Virginia. The Belt Line is a terminal switching railroad serving the cities of Norfolk, Portsmouth and Chesapeake, Virginia. ECF No. 178 ¶ 2. The Belt Line is the

1

owner of the Main Line Bridge. The Main Line Bridge spans the Southern Branch of the Elizabeth River connecting the cities of Chesapeake and Portsmouth, Virginia. Tr., 45; ECF No. 178 ¶ 3.

3.    The *Mackenzie Rose* allided with the Main Line Bridge on June 15, 2024.

4.    James D. Morrissey is an individual who currently resides in Florida. At the time of the allision he was employed by Carver. Mr. Morrissey holds a valid U.S. Coast Guard Merchant Mariner Credential (Document No. USA000611973, issued on December 13, 2021 expiring December 13, 2026) qualifying him as a Master of vessels under 3,000 GT limited to near coastal voyages; Officer in charge of navigational watch on vessels (limited); Able Seafarer, Deck; and Rating forming part of a navigational watch. His endorsements include Master of Self-Propelled Vessels under 1,600 GRT on Near Coastal Waters; Master of Towing Vessels on Near Coastal Waters and Western Rivers; Radar Observer (unlimited); Able Seaman (unlimited); Lifeboatman (limited), and multiple Standards of Training, Certification and Watchkeeping for Seafarers endorsements, including Advanced Firefighting, Basic Training, and Proficiency in Survival Craft (limited). Ex. J34 at CARVER000091-CARVER000093. He also maintains a U.S. Coast Guard Medical Certificate valid through November 23, 2026. *Id.*, Tr. 938; 952:14-18.

### The Subject Vessel and its Crew

5.    The *Mackenzie Rose* (IMO No. 8968765) had a value of three million dollars at the time of the allision. Ex. J49, Tr. 711:15-17, 711:22 – 714:11, Ex. J69 at DIME000236, Tr. 714:12-17, 714:21 – 715:13.

6.    The *Mackenzie Rose* is a United States-flagged twin-screw tugboat built in 2000, measuring approximately 101 feet in length, 39 feet in beam, and 343 gross tons, with a draft of about 16 feet. It is powered by two Alco 12-251E diesel engines rated at approximately 4,500

horsepower, with auxiliary power from three Caterpillar 3304-driven generators. ECF No. 178 ¶ 5.

7.      The *Mackenzie Rose* was regularly maintained. Its autopilot and steering systems were replaced in the months leading to the allision through reputable service venders in the maritime industry. Ex. J45, J46 and J56, Ex. J80 at 12:9-18, 25:19-24, Tr. 584:21-585:13. The autopilot and steering systems functioned properly on the date of the incident. Tr. 536:24-537:24.

8.      The crew of the *Mackenzie Rose* consisted of Captain Christopher Lee Miller, a U.S. Coast Guard licensed Master, ECF No. 178 ¶ 11, James Morrisey, the First Mate onboard the vessel, deck hands Jarkeis Morrissey, Sharif Porter, and engineer Jason McGrath. ECF No. 178 ¶ 10.

9.      Like Captain Miller, Mate Morrissey was a licensed captain. Tr. 577 3:15. The crew aboard the *Mackenzie Rose* were all licensed, experienced mariners and were competent in all respects on June 15, 2024. Tr. 563:8-10; Tr. 599:7-15, Ex. J50,  Tr. 937:25 – 938:13, 942:11 – 943:14, 938:14 – 939:7, 939:12 – 941:11, Ex. J80 at 6:24 –7:14, Tr. 952:14-22, 737:24 – 738:20, 757:2-20, Ex. J28, Ex. J84 at 6:9-25, Tr. 901:5-25, J84 6:16 – 8:5, Tr. 962:9-13, 962:18 – 963:10. The Belt Line's Captain Lewis testified that the Coast Guard license says that the mariners are qualified to perform their jobs. Tr. 560:6-19. He knew of no higher standard than that licensure. Further, he acknowledged that per the Coast Guard standards, Mate Morrisey was more than qualified to take the watch on the day of the allision. Tr. 577:11-15.

10.     The Belt Line's Captain Lewis described the process of obtaining a Coast Guard license, which required both training and qualifying through testing for each level of licensure. Tr. 558-559.

11.    Carver had no reason to believe that Mate Morrissey would have struck a bridge while in command of the *Mackenzie Rose* on a sunny and calm day on a navigable river. Baldassare Dep. Designation 47:25 – 48:9, 50:7-11, 50:16-24, ECF No. 207-2 at 4-5, Tr. 716:7 – 717:5, Ex. J01 at CARVER ESI 001888 – 001889.

## The Main Line Bridge

12.    The Main Line Bridge was first permitted in 1897. Following hearings under the Truman–Hobbs Act of June 21, 1940, 33 U.S.C. §§ 511–524, the original bridge was determined to be an unreasonable obstruction to navigation, and the Secretary of the Army issued a new permit on October 6, 1947. The current Main Line Bridge was constructed between 1956 and 1958 as a steel vertical lift bridge. ECF No. 178 ¶ 5.

13.    The structure consists of four fixed approach spans and a central lift span supported by towers on each riverbank. The towers hold up the sides of the bridge as it is raised or lowered. 61:23-24. The total length of the bridge is approximately 2,050 feet, and providing a horizontal clearance of 300 feet between the supports for the bridge when the span is raised to allow ships to transit.  Tr. 1043:11-24.[1] When lowered for freight trains to cross the river, the bridge has a vertical clearance of approximately 6 feet, and when raised, approximately 142 feet, leaving ample vertical clearance for shipping. The lift span is counterweight-balanced and operated by wire ropes and sheaves, allowing the lift span to be raised so that ships can proceed.

14.    Even considering the width of the barge, there was approximately 250 feet of clearance for the *Mackenzie Rose* to pass under the Main Line Bridge.  Tr. 552:18-25.

---

[1]Captain Stephenson measured that distance as 337 feet, but acknowledged that the NOAA chart says  300 feet.  His testimony was that the difference of 37 feet does not change his opinions in this matter.

15.    The bridge was originally fabricated primarily using ASTM A7 carbon steel. Tr. 385:7-9 Structural connections were primarily riveted, with gusset plates used at critical truss panel points. Tr. 185:1-9 This design reflects mid-twentieth century railroad bridge engineering standards, including trusses, floor beams, stringers, and gusset plates that require periodic inspection and maintenance.

16.    Belt Line designated Koppers Railroad Structures Inc. ("Koppers") to conduct regular inspections of the Main Line Bridge. Tr. 367:24 - 368:6. In 2024, prior to the allision, Koppers found that Span 1 of the bridge exhibit web corrosion at all intermediate stiffener bottom 10" locations; top cover plates had minor pitting; and heavy pack rust and debris on the top gusset plates that indicated 25-30% section loss. Koppers also found that the floor systems on Spans 1 and 2 exhibited section loss, pack rust, and cracks in several steel members.

17.    On June 4-5, 2024, Hardesty & Hanover ("H&H"), a New York-based engineering firm, conducted a mechanical inspection of the Main Line Bridge. Tr. 201:21-25 The inspection noted that the west counterweight was skewed due to uneven rope stretch, while the east counterweight showed minimal skew. Balance testing confirmed the span was as well-adjusted as possible, but the absence of auxiliary counterweights or balance chains was described as unusual given the bridge's lift height. Ex. D81 at NPBL006815.

18.    H&H also noted fatigue concerns in the counterweight trunnion shafts, including scoring and inadequate lubrication. The west tower auto-lubrication system was found non-functional, and lubrication of both trunnions and counterweight ropes was found inadequate. The counterweight ropes showed corrosion, inadequate lubrication, and abrasive crown wear, and were described as nearing the end of their useful life. The counterweight sheave grooves were worn

beyond acceptable tolerance to accommodate new ropes, raising concerns about poor load sharing between ropes. Tr. 201:21 – 203:23, Ex. D81 at NPBL006815 – 006816.

19. The report further found that the existing 10-inch thruster brake was undersized and adjusted beyond its rated torque, with missing supports and asbestos brake pads still in use. Poor brake pad contact was observed. Access to the machinery was also noted to be hazardous, requiring climbing nearly 200 feet of ladders with insufficient safety lines. Ex. 81 at NPBL006.

20. At the time of the allision, and at all relevant times, the Main Line Bridge was in a raised position. This is required by federal regulation; the bridge remains raised except when a train is crossing. The bridge is not manned by a tender. Instead, an off-bridge control station monitors the draw by video and monitors VHF Channels 13. Thirty minutes and fifteen minutes before any train crossing, the control station broadcasts a warning message on Channel 13 to advise approaching vessel traffic. 33 CFR 117.997(a)(1)-(11), Tr. 37:1 – 39:12. Because of this requirement, there was no risk that any train would move onto the bridge without Belt Line first confirming that it was safe to do so.

**The Allision**

21. On June 15, 2024, the *Mackenzie Rose* was transiting the Southern Branch of the Elizabeth River and was pushing the WEEKS 281 barge laden with non-hazardous cargo under Carver's contract with Skanska. The weather conditions at the time of the allision were sunny and clear with good visibility, light wind, the ebb current was approximately 0.6 knots There was insignificant vessel traffic on the Elizabeth River near the Main Line Bridge. Tr. 934:12-16, 547:24 – 548:1, 548:21 – 549:23. There was very little small-vessel traffic prior to the allision. Tr. 934:12-16, 547:24 – 548:1, 548:21 – 549:23.

6

22.     Mate Morrissey was Officer on Watch prior to and at the time of the allision. Tr. 537:23. Captain Chris Miller and most of the crew were not on watch and were in their racks sleeping or otherwise below deck.

23.     Mate Morrissey was situated in the Upper Wheelhouse of the *Mackenzie Rose* which provided a sufficient lookout to observe and avoid striking the Main Line Bridge. Tr. 563 – 565:8, Tr. 943:15 – 944:9, 745:17-22. The decision as to whether or not to use an additional lookout was properly Mate Morrissey's – it was not a Carver corporate decision. Tr. 568:21-569:5.

24.     Mate Morrissey was using the Simrad AP70 autopilot system prior to the allision. Tr. 512:5-8, 640:14-642:25, 937:1 -12. It was not the opinion of the Belt Line's electronics expert that the autopilot malfunctioned to cause the allision.  Tr. 664:19-24. Captain Lewis conceded that there was no evidence of an autopilot malfunction. Tr. 537-38.

25.     Mate Morrisey had a 360° view from the upper wheelhouse with a clear line of sight across the front of the barge. Tr. 943:15 – 944:9; Tr. 954:14-21. This part of the vessel, its wheelhouse, is "very narrow", such that the officer of the watch can maintain situational awareness with easy access to the controls. Tr. 1045:21 – 1046:24.

26.     The course and speed of the *Mackenzie Rose* on June 15, 2024 is established by the Rose Point navigational data produced by Carver in discovery. Tr. 498:19 – 499:9, Ex. B3.

27.     The parties agree that the allision was unintended. Tr. 526:14. In addition, it is not disputed that the allision was not caused by the rudder going hard over.  Tr. 536:24 – 537:2; Tr. 665: 8-19. Such an event would have caused the vessel to change course drastically. Tr. 537:7-10. That would have been a "completely different circumstance" from the events of the allision. Tr. 537:24. The autopilot, steering and mechanical systems on the *Mackenzie Rose* were well maintained and functioned properly on June 15, 2024. Tr. 536:24-537:24, 584:21-585:13.

28.    The Belt Line's Captain Lewis acknowledged that conditions on the river were such that the use of autopilot was permissible, just as the decision for Mate Morrisey to act as watch was permissible.  This is true even if the river were considered a confined waterway, as Lewis acknowledged that the decision as to whether to use autopilot in that area was operator discretion. Tr. 558:5-19. Tr. 532:21-23; 545:22-546:4.

29.    However, for the sake of maneuverability, the operator may turn the autopilot off, and then turn on hand steering. Tr. 522:10-16. Per Belt Line's own expert the process of turning the autopilot off and engaging manual steering is a simple process. Tr. 541:25-542:9.: "That's not hard. And it's the same step you have to do all the time." Tr. 542:8-9.

30.    Mate Morrissey thought that he had switched over to non follow up ("NFU") or hand steering as he approached the bridge. Unfortunately, he had switched off the auto-pilot without switching on manual steering.  During this time, the vessel was essentially in "neutral" and had no steering.  Tr. 589:7-19; Ex. J80 at 27:3-22. Once Mate Morrisey failed to engage the NFU – the manual steering - he had no ability to steer from that point forward. Tr. 542:14-543:13.

31.    Mate Morrisey testified to the Coast Guard that his effort to steer the tug started minutes before the allision. Tr. 602-03. He later realized his error and then correctly switched to manual steering just before striking the bridge.  Tr. 605:16-19. Using the most conservative estimate based on Mate Morrissey's testimony - that the original error occurred at least two minutes before the allision - that would have meant that Morrissey had over 330 yards to properly maneuver the barge & tug under the bridge. Tr.602-03. Unfortunately, as set forth above, because of this navigational error, the tug and barge had no steering during this crucial two or more minutes.

32.    The Belt Line has suggested that the autopilot tripped off – but if that were the case there would be visual indications to the Mate that would advise him of that fact.  Tr. 667:14-

8

17. Significantly, the Belt Line's expert, Mr. Furborough conceded that there were visual warnings that the vessel was not in gear; to him, this is a critical point. *Id.*

33.    However, as the evidence is clear that Mate Morrissey had already made the decision to switch to hand steering well before the approach to the bridge, whether or not he heard an alarm or should have seen the visual warnings is moot.  The allision occurred solely because Mate Morrissey failed to properly switch to hand steering after turning off the autopilot.

34.    While the Belt Line has offered innuendo regarding Mate Morrissey's health, it has provided no evidence that Mate Morrissey was in poor health or was somehow impaired at the time of the allision.

35.    At the time of the allision, Captain Miller was off duty. The record shows that, after the fact, he thought that the tug hit the fendering to the bridge, not the bridge. Tr. 534:10-535:13. The purpose of the fendering was to protect the Mail Line Bridge, itself.  Tr. 573:12-17. Some of the deckhands thought they were sliding along the fendering. Tr. 536:14-20.  After the accident, the crew understood that they had touched the fender, not the bridge. Tr. 571:15-23.

36.    After the accident, the crew of the *Mackenzie Rose* sent photographs to Carver, showing that the Main Line Bridge appeared to be undamaged.  As noted above, they believed that they had hit the fendering of the bridge, not the bridge.  This is confirmed by text message from Carver asserting that the bridge was not damaged. Tr. 1048- 1055, Jt. Ex. 64.

37.    Mate Morrissey told Captain Miller that the allision was caused by the rudder going hard over to port just before striking the bridge. This statement was incorrect, as discovered by Carver's management once they conducted an investigation after the allision. As is discussed in detail above, the evidence on the record, including testimony by Belt Line's Captain Nicholas

9

Lewis and a review of tracking data establishes there was no hard over event on the incident date. Tr. 536:24-537:24.

38.    Capt. Sam Stephenson testified based on his review of the evidence in this case, including extensive photographs and navigation data, and to a reasonable degree of operational maritime certainty, that:

(1)    The *Mackenzie Rose* was properly manned on June 15, 2024, pursuant to the Certificate of Inspection of the U.S. Coast Guard; the crew was licensed by the U.S. Coast Guard; it was also in compliance with work/rest requirements of six hours on/six hours off.  Tr. 599:7-15, Ex. J50, Tr. 937:25 – 938:13, 938:14 – 939:7, 939:12 – 941:11, 942:11 – 943:14;

(2)    Mate Morrissey acting as look-out was appropriate under the prevailing conditions on June 15, 2024 Tr. 962:9-13, 962:18 – 963:10, 939:12-10, 941:9-11, Ex. J53 at CARVER TBS HELM CONNECT 000951, Tr. 520:21-24, 944:16-18, 941:9 – 942:10, 944:23 – 945:15, *see also* 46 CFR 140.630, 33 CFR 83 Rule 5, 562:10 – 566:13, 951:7 – 952:13, 952:23 – 955:4. This was pursuant to the one-man-bridge rule; The regulations place the obligation to assess the requirements for a lookout on the master and the officer in charge of navigation. Tr.952:23 – 954:10;

(3)    Autopilot is not prohibited from use while transiting a waterway with bridges. Tr. 963:11 – 966:19, 532:15-23, 545:22 – 546:4, 549:15-18;

(4)    The evidence clearly establishes that Mate Morrissey's initial statement that the autopilot malfunctioned by causing the rudder to go hard-over was incorrect. Tr. 539:17 – 541:6; and

(5)    Mate Morrissey failed to engage the switch from Auto to NFU when he thought he had and this failure by Mate Morrissey and his lack of situational awareness was the sole cause of the allision. Tr. 991:1-10, 992:12-996:2, 589:7-19.

39.    In sum, Mate Morrissey was properly using autopilot as he transited the Elizabeth River but errantly failed to switch to Non-Follow Up and manually control the vessel as the vessel approached the Main Line Bridge. Mate Morrissey's navigational error including lack of situational awareness was the sole cause of the allision. Tr. 991:1-10, 992:12-996:2, 589:7-19.

## Damages

40.    The allision resulted only in property damage to the Main Line Bridge.  No people were injured.  Candidly, the Belt Line's Cannon Moss testified this was not a disaster. Tr. 67:23-25. As a result of the impact, the Bridge was initially stuck in the up position.  Belt Line could not bring the span down until about November 5th. Tr. 63:7-8, 12-16. The bridge was back in full operation in March of 2025. Tr. 84:23-85:1.

41.    Belt Line contends that its damages for repairing the bridge total $15,914,034. Belt Line received $10,000,000 toward that number from its insurer, Evanston.  Tr. 137:6-8, Tr. 138:11-13.

42.    Belt Line's damages claims are overstated. They include unrelated or unreasonable costs, including: costs for replacing rails and ties that were not damaged in the allision; adding improvements to the bridge like conduit for electrical wiring Tr. 133:14-17, mechanical system components, and refurbishing the lift system and its components, among other things; time and expenses for "regular work that is unrelated to the allision", Tr. 123:1-4, vacation time, 123:5-18, labor claims that relate to a lost income, a claim that Belt Line has

conceded; and added "surcharges" on top of Belt Line's own labor expenses that are not recoverable Tr. 106:25 – 107:23, Tr. 772:9-14, 772:24 – 773:25.

43.        Additionally, Belt Line's damages do not account for depreciation and the deteriorated condition of the bridge. The bridge was built in 1958, was 66 years old at the time of the allision and was nearing the end of its useful life. Carver has retained R&L Banks & Associates, LLC, a firm that specializes in valuing railroad infrastructure, opined that the Belt Line's recoverable damages, at most, total $2,972,767 when accounting for depreciation that is allowed by law. A summary of R&L Banks' valuation opinion is as follows:

*Table 1 – Summary of RLBA Damages Reductions Applied to* **Belt Line's Claim**

| Category | | Subtotals | | Depreciated Value | | Totals |
|---|---|---|---|---|---|---|
| Total Damages Claimed by Belt Line | | | | | $ | 15,542,872 |
| Ties and Rail | $ | 224,446 | | | | |
| PCL Classified Damages | $ | 5,780,290 | | | | |
| PCL Unclassified Damages | $ | 7,524,646 | | | | |
| Construction Total Damages | $ | 13,529,383 | | | | |
| Depreciated Value | | | $ | 2,343,949 | | |
| Depreciation Reduction | | | | | $ | (11,185,434) |
| H&H Classified Damages | $ | 262,471 | | | | |
| H&H Unclassfied Damages | $ | 252,178 | | | | |
| H&H Total Damages | $ | 514,649 | | | | |
| Depreciated Value | | | $ | 88,166 | | |
| Depreciation Reduction | | | | | $ | (426,483) |
| Total Depreciation of Belt Line's Claim | | | | | $ | (11,611,917) |
| **Total Damages less Depreciation** | | | | | $ | 3,930,954 |
| Scrap Steel Credit | | | | | $ | (41,897) |
| Belt Line Labor Damages | $ | 1,087,141 | | | | |
| Labor Charges removed | $ | 916,291 | | | | |
| Labor Reduction | | | | | $ | (916,291) |
| **TOTAL Damages** | | | | | $ | 2,972,767 |

44.        Further, even if the evidence of depreciation were not considered, any award of damages must further be reduced by this Court sitting in admiralty, including the following reductions:

(a)        a reduction from the  $441,253.38 in labor costs submitted by the Belt Line. Carver respectfully submits that, if any, the Belt Line labor damages should total $170,849.95, without regard to the "voluntary" reductions the Belt Line had subtracted during trial.

(b)        Similarly, costs unrelated to the repairs totaling $75,891.62, must be excluded from the Belt Line's damages – $3,000 for the corroded gusset/girder plate on the other side of the bridge, plus $14,000 for the mechanical brake drawing by H&H identified in its inspection before the allision and included in the repairs damages, plus the yardmasters' vacation days in at least $58,891.62.

(c)        In addition, the cost of lubrication of the counterweight ropes that are used to raise the bridge must be for the account of the Belt Line, as it was duly proved at trial that a mechanical inspection before the allision by H&H recommended replacing these ropes as they were nearing the end of their useful life, and as conceded by the Belt Line at trial. Consequently, the damages should be further reduced in $28,228.20, excluding labor. The same is the case with the and rails and ties in the amount of $224,000 should be reduced from the damages given their imminent replacement in the year 2027.

(d)        Even more so, invoices that pre-date the allision contained in the Belt Line's damages must be omitted. These total $146,710.33.

(e)        A credit for scrap metal applies to Carver in the amount of $41,897.

(f)      Finally, a reduction in the amount of $17,000 for new conduits that did not exist prior to the allision.

45.      Given the above, even before considering the limitation action, the damages sought by Belt Line are excessive.  Further, as discussed below, Belt Line does not hold the claim for the first $10,000,000 spent to repair the bridge.

**The Insurance Proceeds**

46.      The Belt Line had property insurance coverage from Evanston Insurance Company in the amount of $10 million, which was paid in full toward repair of the Bridge through a policy issued by Evanston. Tr. 135:23 – 136:19.

47.      By virtue of its contract with Evanston, the Belt Line transferred its rights of recovery against Carver to Evanston to the extent of the $10 Million payment. The Policy provides as follows:

I.      TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after the loss to impair them …

Evanston Policy, Commercial Property Conditions, Form 00 90 07 88, p. 2 of 2.

48.      Evanston paid full limits to the Belt Line. As such, the claim for the entire $10 million then transferred to Evanston under the policy. Tr. 137:6-8 Evanston, thus holds the claim for the complete amount it paid under the policy.

49.      On September 19, 2025, Evanston settled with Carver in regard to Evanston's claims, paying $5,000,000 to resolve that claim. ECF No. 116

14

**Punitive Damages**

50.     The Belt Line has asked this Court to find that Carver, corporate demonstrated such disregard of safety that the Court should award it punitive damages on a 1:1 ratio. This is primarily based on alleged post-casualty actions of Carver and its counsel.

51.     The Belt Line previously argued that Carver should be denied its limitation action as a sanction for post-casualty actions of Carver – which included complaints that Carver should have contacted it in regard to the allision and various arguments regarding preservation of evidence. The evidence includes a detailed sworn declaration of Carver, by its General Counsel, Josef Malik. This uncontroverted testimony establishes Carver's substantial efforts to provide discovery to the Belt Line.  The motion for sanction has been denied in its entirety.

52.     The evidence submitted by the parties reflects that this accident occurred because Mr. Morrissey did not realize that he had no steering at a time when he could have avoided the bridge. He was at the controls, had the discretion as to when to use the auto-pilot, when to turn it off, and whether to have a second crewmember as lookout.  Those decisions were not those of Carver owners nor its corporate management.

53.     The evidence shows (1) The *Mackenzie Rose* was properly manned on June 15, 2024, the crew was licensed by the U.S. Coast Guard, and in compliance with work/rest requirements of six hours on/six hours off Tr. 599:7-15, Ex. J50, Tr. 937:25 – 938:13, 938:14 – 939:7, 939:12 – 941:11, 942:11 – 943:14; (2) The watch officer acting as look-out was appropriate under the prevailing conditions on June 15, 2024 Tr. 962:9-13, 962:18 – 963:10, 939:12-10, 941:9-11, Ex. J53 at CARVER TBS HELM CONNECT 000951, Tr. 520:21-24, 944:16-18, 941:9 – 942:10, 944:23 – 945:15, *see also* 46 CFR 140.630, 33 CFR 83 Rule 5, 562:10 – 566:13, 951:7 – 952:13, 952:23 – 955:4; (3) Autopilot is not prohibited for use while transiting a waterway with

bridges Tr. 963:11 – 966:19, 532:15-23, 545:22 – 546:4, 549:15-18; (4) The evidence clearly establishes that Mate Morrissey's initial statement that the autopilot malfunctioned was false Tr. 539:17 – 541:6; and (5) Mate Morrissey failed to engage the switch from Auto to NFU when he thought he had and therefore, this failure by Mate Morrissey and his lack of situational awareness was the sole cause of the allision. Tr. 991:1-10, 992:12-996:2, 589:7-19

54. Carver's former employees' conduct in the immediate aftermath of the allision also does not support a punitive damages claim. That post-allision conduct did not cause any damage to the Belt Line. Further, Carver's General Manager and Port Captain reviewed and assessed the situation based on the information and photographs provided by the crew, which they believed at the time indicated that the bridge was undamaged, as were the tug-and-barge.

55. Carver complied with the United States Coast Guard and National Transportation Safety Board investigation and conducted their own investigation.

56. Mate Morrisey's initial version was later diligently corrected by Carver upon learning Mate Morrisey's misrepresentation following its own investigation, and complying with the USCG & NTSB joint investigation. After such investigation, it is uncontested that the Vessel allided with the bridge Tr. 576:13-17, and reported such allision to the USCG. Tr. 986:13 – 988:15. In its lawsuit to Limit Liability pursuant to the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq*.

Carver respectfully submits that this Court should reach the following conclusions of law, for the reasons set forth in more detail in its Post-Trial brief:

1. On the evidence in this case, Mate Morrissey's navigational error was the sole proximate cause of the subject allision.

2. On the evidence in this case, Carver has established that it lacked privity of knowledge as to Mate Morrissey's navigational error.

3. As a result of the finding that Carver lacked privity of knowledge to the navigational error by Mate Morrissey, Carver is entitled to limit its liability to the value of the vessel and its cargo after the accident.

4. While the Belt Line's actual damages are disputed. Carver submits that the evidence is that the Belt Line's total damages in tort, after depreciation, were substantially less than the recovery it made in contract from Evanston ($ 10 million). Since the claim for up to $10,000,000 was transferred from Belt Line to Evanston, prior to this suit, the Belt Line's recovery here should be $0.00.

5. If the court were to set aside depreciation, the Belt Line's claim for damages was substantially overstated. In that event, the evidence supports Evanston's claim for $10,000,000 and the Belt Line's claim for $2,500,000. Thus, Belt Line's claim for a *pro rata* share of the limitations fund is for 20% of the fund, as determined by the Court.

6. Further, this is not a case in which punitive damages are warranted. The evidence shows that Carver regularly maintained the *Mackenzie Rose*, and that it properly crewed the vessel. The negligence of Mate Morrissey was ordinary negligence while the vessel was at sea – and was not within the privity or knowledge of Carver.

Dated:  April 24, 2026

Respectfully submitted,
**CLYDE & CO US LLP**

/s/ *Matthew J. Obiala*
Matthew J. Obiala  (VSB No. 100626)
30 S. Wacker Drive, Suite 2600
Chicago, IL 60606

17

T:  (312) 635-7000
E:  Matt.Obiala@clydeco.us

James H. Rodgers*
Clyde & Co US LLP
45 Lexington Avenue, 16th Floor
New York, NY 10174
Phone: (212) 702-6771
Email: james.rodgers@clydeco.us

Michael J. Roman*
Dawn L. Johnson
Siobhan M. Murphy*
Clyde & Co US LLP
30 South Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: (312) 635-7000
Email: michael.roman@clydeco.us
dawn.johnson@clydeco.us
Siobhan.murphy@clydeco.us

*pro hac vice

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing was filed electronically on this 24th day of April 2026, which will send notification of such filing to those attorneys of record registered on the CM/ECF system.

*/s/Matthew Obiala*