**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S
AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line"), by counsel, submits these amended proposed findings of fact and conclusions of law to conform to the evidence at trial.

**Proposed Opinion and Order**

Based on controlling law and the evidentiary record, it is ORDERED that judgment is entered in favor of the Belt Line against Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver") in amount of $15,838,142 for compensatory damages, $15,838,142 for punitive damages, interest on the total amount at 4% per annum from June 15, 2024 until paid, and all costs allowed by law, subject to a credit of $5,000,000 that Carver paid to Evanston Insurance Company ("Evanston"). Accordingly, the Clerk shall enter judgment for the Belt Line against Carver as follows, plus additional interest in the amount of $3,660 daily from April 24, 2026 forward:

| | |
|---|---:|
| Compensatory Damages | $15,838,142 |
| Punitive Damages | $15,838,142 |
| Interest at 4% from June 15, 2024 | $2,394,658 |
| Costs | TBD |
| Preliminary Judgment Amount | **$34,070,942** |
| Credit to Carver | ($5,000,000) |
| Final Judgment Amount | **$29,070,942** |

The Court's findings of fact and conclusions of law are as follows:

**Proposed Findings of Fact**

*Parties, Tug, and Bridge*

1. This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure for property damage resulting from an allision with the Belt Line's Main Line Bridge ("Bridge") on the Southern Branch of the Elizabeth River. This Court has original jurisdiction under its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 and federal question jurisdiction pursuant to 28 U.S.C § 1331. Venue is proper in this district and division under 28 U.S.C. § 1391. *See* FPO STIP 1 (ECF 178).[1]

2. The Belt Line is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Chesapeake, Virginia. The Belt Line is a terminal switching railroad serving the cities of Norfolk, Portsmouth, and Chesapeake, Virginia. It owns the Bridge. *See* FPO STIP 2, 3 (ECF 178).

3. The Bridge is a 385-foot-long steel vertical lift bridge with a clearance of 300 feet between the fenders. It was first permitted by Act of Congress in 1897. By the 1940s, the original swing bridge required replacement and the Secretary of the Army issued a new permit in 1947. The current Bridge was constructed between 1956 and 1958 and carries the Belt Line's main line railroad tracks across the Southern Branch of the Elizabeth River between Chesapeake and Portsmouth, Virginia. *See* FPO STIP 3, 6 (ECF 178).

4. Carver is a limited liability company organized under the laws of New York with its principal place of business in Albany, New York. Carver owns and operates a fleet of inland and offshore tugs and barges and provides towing services on the East Coast of the United States.

---

[1] Reference is to the Final Pretrial Order ("FPO") Stipulations of Fact ("STIP") at ECF 178.

On June 15, 2024, Carver owned and operated the tug M/T MACKENZIE ROSE. *See* FPO STIP 4 (ECF 178).

5.       The M/T MACKENZIE ROSE (IMO No. 8968765) is a United States-flagged twin-screw tugboat built in 2000, measuring approximately 101 feet in length, 39 feet in beam, and 343 gross tons, with a draft of about 16 feet. It is powered by two Alco 12-251E diesel engines rated at approximately 4,500 horsepower, with auxiliary power from three Caterpillar 3304-driven generators. *See* FPO STIP 5 (ECF 178).

*Allision on June 15, 2024*

6.       On June 15, 2024, the M/T MACKENZIE ROSE, pushing the barge WEEKS 281, traveled northbound up the Southern Branch of the Elizabeth River and under the Jordan Bridge that connects vehicular traffic between Chesapeake and Portsmouth, Virginia.  After the tug passed under the Jordan Bridge and began to approach the Belt Line's Bridge, it turned suddenly to port and proceeded outside the fender toward the Bridge's western truss as depicted below.  *See* FPO STIP 8 (ECF 178).



06/15/24 16:24 Tug transiting Jordan Bridge          06/15/24 16:26 Tug approaching Belt Line Bridge

7.       At approximately 4:25 p.m. EST on June 15, 2024, the barge WEEKS 281, being pushed by the M/T MACKENZIE ROSE, allided with the western truss on the Portsmouth side of

3

the Bridge, outside the navigable channel, while the Bridge was in the raised stationary position

(the "Allision").  *See* FPO STIP 7 (ECF 178).

8.    Video surveillance footage shows the M/T MACKENZIE ROSE pushing the WEEKS 281 into the western truss of the Bridge, then backing up, adjusting course, and maneuvering through the Bridge opening.  *See* FPO STIP 9 (ECF 178).

9.    On June 15, 2024, the M/T MACKENZIE ROSE crew included Captain Christopher Miller, Mate James Morrissey, Engineer Jason McGrath, Deckhand Sharif Porter, and Deckhand Jarkeis Morrissey.  *See* FPO STIP 10 (ECF 178).  At the time of the Allision, Mate Morrissey was operating the tug.  *See* FPO STIP 12 (ECF 178).

10.    The rough logbook (paper log) for the M/T MACKENZIE ROSE in Carver's vessel records shows an incident at 4:30 p.m. EST on June 15, 2024 wherein the "Co Captain" (James Morrissey) reported that the "steering went hard over" and "we tapped the North & PBL RR Bridge." *See* J.43 CARVER 001898 (Rough Log Entry 06/15/24).

> 16:30    Co Captain Reports steering went Hard over and he was Backing and we tapped The North & PBL RR Bridge

*Carver Fails to Notify the U.S. Coast Guard or the Belt Line*

11.    Carver's Safety Management System ("SMS") requires that, in the event of an allision, the master of the tug or the crew in the wheelhouse must "a) Notify the Company; [and] b) Notify the Coast Guard."  FPO STIP 13 (ECF 178).[2]

12.    Federal law also requires that, in the event of an allision, the owner, agent, master, operator, or person in charge of the vessel must notify the nearest Coast Guard Sector Office,

---

[2]    A Safety Management System sets forth an owner's policies for the operation of its vessels as required by 46 C.F.R. 138.205.

Marine Inspection Office, or Coast Guard Group Office immediately after addressing any safety concerns.  *See* 46 CFR 4.05-1(a)(1).

13.     Carver failed to notify the U.S. Coast Guard of the Allision on June 15, 2024, or even the day after.  Carver's Rule 30(b)(6) witness confirmed that Carver first communicated with the U.S. Coast Guard about the Allision "days after it happened."  Carver Rule 30(b)(6) Dep. 76:8-80:15.

14.     Carver also did not notify the Belt Line of the Allision on June 15, 2024, or any time thereafter.  *See* Moore Dep. 170:13-19, 175:21-24.

15.     The Belt Line reported the Allision to the U.S. Coast Guard on June 17, 2024.  *See* FPO STIP 14 (ECF 178).  That same day, the U.S. Coast Guard contacted Carver about the Allision. *See* FPO STIP 15 (ECF 178).

16.     It is undisputed that the Allision caused damage to the Bridge.  *See* FPO STIP 16 (ECF 178).  The impact moved the steel superstructure nearly 7 feet, left the western truss balancing on 3 of its 4 legs, and rendered the Bridge inoperable.  *See* NPBL.5 (photos).

17.     Damages to the Belt Line from the Allision total $15,838,142, not including interest, costs, or punitive damages.  *See* J.73A (damages spreadsheet) and J.74 (invoices).

*Carver Attempts to Hide its Involvement*

18.     Text messages sent by Carver employees after the Allision reveal that Carver's management intentionally sought to cover up Carver's role in the Allision.

19.     At approximately 4:36 p.m. EST on June 15, 2024, Carver's Port Captain in New York, Leonard Baldassare, texted Carver's General Manager in New York, Brian Moore, confirming that the tug allided with the Bridge.  *See* J.64 CARVER 001871.

5

20.    At the time of the Allision, Mr. Moore was a management-level employee in charge of all day-to-day operations at Carver, including regulatory compliance.  *See* Moore Dep. 17:3-12.

21.    At the time of the Allision, Mr. Baldassare was a management-level employee in charge of all operations of Carver's tug fleet.  *See* Baldassare Dep. 16:22-17:4.

22.    Approximately one hour after the Allision, at 5:24 and 5:28 p.m. EST on June 15, 2024, even though no one at Carver had notified the U.S. Coast Guard of the Allision, Mr. Baldassare told the tug crew that the U.S. Coast Guard had allowed the vessel to leave Norfolk and continue to New York.  *See* J.65 CARVER ESI 001889-90 (texts).

23.    The tug crew then followed Mr. Baldassare's instructions and left the scene.  *See* J.43 CARVER 001898 (Rough Log Entry 06/15/24).

24.    Text messages between Mr. Baldassare and Mr. Moore show that Carver's tug captain, Christopher Miller, intended to notify the U.S. Coast Guard of the Allision, but that Mr. Baldassare "yelled at" him for wanting to do so.  *See* J.64 CARVER 001872-1877 (texts).



*Carver's Cover-Up Conceals Evidence*

25.    Carver's SMS requires drug and alcohol testing immediately after all serious marine incidents in accordance with 33 C.F.R. 95.  *See* J.53 CARVER HELM CONNECT 000844 (SMS excerpts).  Under 46 C.F.R. 4.03-2(a), a serious marine incident includes any bridge allision and any marine casualty with property damage in excess of $200,000.

26.     Carver did not test the crew of the tug for drug and alcohol use on the day of the Allision, and because Carver did not report the incident to the U.S. Coast Guard, no one else did either.  *See* Carver Rule 30(b)(6) Dep. 101:7-10, 101:20-102:6.

27.     Carver also performed "maintenance" work on the tug on June 18, 2024, just days after the Allision, before the Belt Line, Evanston, or the U.S. Coast Guard could inspect it.  *See* J.17 CARVER HELM CONNECT 000549-550 (Daily Log Entry 06/18/24).

28.     On June 20, 2024, counsel for the Belt Line sent an evidence preservation letter to Carver about the Allision and demanded that Carver preserve all documents, information, and ESI. *See* NPBL.65 (letter) and J.68 (email acknowledgement).  The letter was addressed to Carver's managing agent, Nicholas Laraway, and copied to Mr. Moore.  *Id*.

29.     Mr. Moore testified he received the preservation letter but "did not do anything in particular" about it.  *See* Moore Dep. at 337:23-338:16. When the Belt Line's counsel followed up with him to explore what happened with his cell phone, Carver's counsel instructed him not to answer.  *Id*. at 339:9-341:15.  Carver's Rule 30(b)(6) representative, Mr. Laraway, confirmed in his deposition two months later that he received the letter and assigned the task of preserving evidence to Mr. Moore.  *See* Carver Rule 30(b)(6) Dep. at 14:2-15:9 and 21:17-22:10 and Trial Vol. 5 at 716:7-717:20, 722:4-723:13 and 726:15-272:2.

30.     Notwithstanding the preservation letter, Mr. Moore disposed of his cell phone that he used on June 15, 2024, and Carver has never produced texts or ESI from that phone despite being ordered to do so.  *See* Moore Dep. 27:15-21; Malik Dep. 29:6-30:24; ECF 50 (Order requiring response to Belt Line's RFP 34).[3]

---

[3]     Mr. Moore is no longer employed by Carver but was employed by Carver throughout much of this case.  According to Carver's General Counsel, Josef Malik, Mr. Moore was terminated for cause in 2025.  *See* Malik Dep., 14:17-15:11.  Jason Galioto, Carver's Compliance Logistics

31.     Evidence also established that Carver "overhauled" the tug in 2025 after litigation began but before an inspection occurred.  *See* NPBL.65 (litigation hold letter in June 2024); Trial Vol. 5 at 720:19-721:14 (Laraway testimony) (describing an "overhaul" of the tug in early 2025); Carver.50 (Meyerrose Survey from March 2025 identifying "extensive maintenance and repair" in 2025 before the survey); ECF 67 at 1 (citing tug inspection scheduled for May 2025).

*The Autopilot Steering System on the Tug Caused the Allision*

32.     Evidence described below, including contemporaneous records and documentation of multiple previous incidents, establishes that a failure of the autopilot steering system on the M/T MACKENZIE ROSE caused the Allision.  Carver did not present compelling evidence of Mate Morrissey's fault sufficient to overcome this conclusion.

33.     Mate Morrissey's testimony to Coast Guard investigators directly established cause and states the autopilot "tripped" on the approach to the Bridge, switched to standby without alarm, and would not switch back before impact with the Bridge. *See* J.80 at 11.

34.     Additionally, contemporaneous records from June 15, 2024 show that Carver was operating the tug in autopilot at the time of the Allision.  *See* J.43 CARVER 001898 (Daily Log from 06/15/24).  In particular, the daily log for the M/T MACKENZIE ROSE on June 15, 2024 states that Mate Morrissey did not turn off the autopilot until he began backing away from the Bridge.  *See* J.43 CARVER 001898 (Daily Log from 06/15/24).

| 16:30 | Incident - Norfolk, VA - Mate James Morrissey reports the auto pilot was not completely turned off he was able to correct and switch back over to hand steering and begin backing on the Weeks 281 Barge and maneuvered the barge alongside fendering on the North and PBL RR Bridge, photo taken. proceed slowly away from bridge. |
| --- | --- |

---

Supervisor, testified he took over Designated Person duties when Mr. Moore left Carver in April or May 2025. *See* Galioto Dep., 77:23-78:7.

35. Contemporaneous text messages from Carver also confirm that a "steering issue" occurred while the tug was in autopilot. On June 15, 2024 at 5:17 p.m. EST, Carver's General Manager, Mr. Moore, directed Carver's Port Captain, Mr. Baldassare, to "see how we can resolve the steering issue" in reference to the Allision "or they make it [a] ship hand[l]ing issue." J.64 CARVER 001874 (texts).

36. At least four incident reports in 2024 from before the Allision, establish that steering issues with the autopilot system caused the Allision, including two incidents in May 2024 that went unresolved just weeks before June 15, 2024. *See* J.5, J.6, J.7, and J.9 (incident reports).

37. Carver did not dispute that the tug was in autopilot at trial, but claimed that "the allision was the result of a crewmember's navigational error after he failed to properly switch from autopilot to hand steering." ECF 194 at 40 (Summ. Jdgmt. Op.). This version of events finds no support in the evidence.[4] Yet even if the Court were to accept Carver's theory, the autopilot system still caused the Allision.

38. The Belt Line's maritime expert, Captain Nicholas Lewis, opined that a properly functioning autopilot should not have caused the tug to veer to one side or the other. *See* Trial Vol. 4A at 525:23-529:2.

39. Carver offered no evidence to explain why a properly functioning autopilot system, when left "on," should cause a tug to veer left and hit a bridge.

*Carver Failed to Prove that it Lacked Privity or Knowledge*

40. Carver failed to prove at trial that it lacked privity or knowledge of the condition that caused the Allision.

---

[4] As indicated in the Court's Summary Judgment Opinion, Carver's view of events depends on inadmissible CG-2692 forms that its own management filled out. *See* ECF 194 at 40.

41.     The Belt Line established that the issue with the autopilot steering on the M/T MACKENZIE ROSE was a condition that caused the Allision. *See supra* ¶¶ 31-38; *See also infra* ¶¶ 43-69.

42.     The Belt Line established, as set forth above in Paragraphs 31 through 60, that Carver knew, or should have known, of the autopilot steering issue with the M/T MACKENZIE ROSE and of the deficient training of its employees.

43.     Because Carver failed to establish that it lacked privity or knowledge of the autopilot steering issue on the M/T MACKENZIE ROSE, Carver is not entitled to limit its liability.

*Carver Knew of Problems with the Autopilot before the Allision*

44.     Before the Allision, the M/T MACKENZIE ROSE had a history of issues with its autopilot steering system.  *See* J.5, J.6, J.7, and J.9 (incident reports).

45.     Carver replaced at least part of it in November 2023 after reported issues with the system.  *See* J.46 CARVER 000251 (Mackay Marine Invoice); Moore Dep. 166:22-167:3.

46.     After that work, on February 28, 2024, Captain Miller filed a "near miss report" in Carver's HELM system describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "AUTO PILOT STOPPED TUG TOOK A HARD LEFT INTO OTHERN TRAFFIC LANE."  J.5 CARVER 000037 (02/28/24 Near Miss Report); Moore Dep. 298:21-301:11.

47.     On March 2, 2024, Mackay Marine performed more work on the autopilot system on the tug after Carver complained of additional issues.  *See* J.46 CARVER 000252 (Mackay Marine Invoice); Moore Dep. 276:17-277:5.

48.     On April 1, 2024, Captain Miller filed another "near miss report" in Carver's HELM system describing a near miss of the M/T MACKENZIE ROSE and citing the reason as

10

"autopilot to go into standby and hard right to heavy seas." *See* J.6 CARVER 000039 (04/01/24 Near Miss Report); Moore Dep. 303:2-8, 308:4-10.

49.     On April 3-5 and 10-11, 2024, Ayers Marine Electronics performed work on the autopilot system on the M/T MACKENZIE ROSE. *See* J.45 CARVER 000249 (Ayers Marine Invoice); Moore Dep. 271:22-272:15. This was the last work on the autopilot before the Allision on June 15, 2024. *See* Moore Dep. 275:24-276:6; *see also* Trial Vol. 4B at 660:16-663:6 and 665:22-666:1 (Furborough testimony).

*Carver Fails to Repair the Autopilot after Two Incidents in May 2024*

50.     On May 3, 2024, just 6 weeks before the Allision, Captain Miller, as confirmed by Mate Walordy, filed a "near miss report" in Carver's HELM system describing a near miss of the M/T MACKENZIE ROSE and citing the reason as "the steering went into standby and the rudder came hard over without alarm." *See* J.7 CARVER HELM CONNECT 000167 (05/03/24 Near Miss Report); Walordy Dep. 24:18-26:19.

51.     On May 21, 2024, 3½ weeks before the Allision, Captain Miller filed another report in Carver's HELM system describing an incident with the M/T MACKENZIE ROSE wherein the steering went unexpectedly hard left when the tug was in autopilot. *See* J.9 CARVER 002041 (05/21/24 Incident Report).

52.     Carver's General Manager, Mr. Moore, confirmed that no work was done to the autopilot system after either report. *See* Moore Dep. 275:24-276:6.

53.     Carver's Compliance Logistics Supervisor, Mr. Galioto, testified that the May 21, 2024 Incident Report sat in Mr. Moore's electronic inbox unopened for more than a year after the date of the Allision on June 15, 2024. *See* Galioto Dep. 58:17-80:25.

54.     The Belt Line's maritime expert, Captain Lewis, opined that there was no evidence Carver attempted to investigate or repair the autopilot steering after the May incidents. *See* Trial Vol. 4A at 515:2-8.

55.     The Belt Line's autopilot expert, Robert Furborough, confirmed that the issues with the autopilot steering system were never resolved before June 15, 2024. See Trial Vol. 4B at 660:16-663:6 and 665:22-666:1.

56.     Carver failed to present any evidence of work done to the autopilot steering system after the May incidents reported in the internal HELM system.

*Carver Fails to Prohibit Autopilot after the Incidents in May 2024*

57.     Notwithstanding the unresolved issues with the autopilot in May 2024, Carver did not prohibit use of the autopilot on the M/T MACKENZIE ROSE before the Allision.  *See* Moore Dep. 281:8-23; Carver Rule 30(b)(6) Dep. 91:5-12.

58.     Carver also did not prohibit use of the autopilot around the Bridge despite requirements to do so in its own operator manual.  *See* J.52 CARVER 001999; *see also* Trial Vol. 4A at 529:1-7 (Captain Lewis' testimony).

59.     The operator manual for the Simrad autopilot system that was on the M/T MACKENZIE ROSE on June 15, 2024 prohibits use of automatic steering "in heavy traffic areas or in narrow waters" and requires users to "always switch the autopilot to standby and reduce speed in due time to avoid hazardous situations."  *See* J.52 CARVER 001999 (excerpt).

60.     At all times relevant, the Bridge was and is a published hazard to navigation in 33 C.F.R. 117.997.

61.     Carver's Port Captain, Mr. Baldassare, confirmed that bridges are considered hazards to navigation, *see* Baldassare Dep. 169:4-7, and that autopilot should not have been used when the tug was approaching the Bridge.  *Id*. at 89:14-90:5.

62.     Despite the Simrad manual and Mr. Baldassare's statement, Carver's SMS contains no restriction on the use of autopilot in heavy traffic areas, narrow waters, or near hazards to navigation.  *See* Moore Dep. 281:17-23; J.52 and J.53 (SMS excerpts); Carver Rule 30(b)(6) Dep. 91:5-12.

63.     Mr. Furborough, the Belt Line's autopilot expert, also confirmed that the autopilot was never taken out of service before the June 15, 2024 incident. *See* Trial Vol. 4B at 663:7-16.

*Carver Supplies an Incompetent Crew on the Day of the Allision*

64.     Carver's SMS contains various training modules for operation of Carver's vessels but does not contain any training module for transiting bridges or on the use of autopilot.  *See* J.53 (SMS excerpts).

65.     Carver did not train Mate Morrissey on transiting bridges before operating the tug on the day of the Allision.  *See* J.36 (records of Morrissey's training).

66.     Carver did not train Mate Morrissey on the use of autopilot before operating the tug on the day of the Allision.  *See* J.36 (records of Morrissey's training).

67.     In January 2024, just 5 months before the Allision, Mate Morrissey struck a pier while operating the M/T MACKENZIE ROSE, causing over $75,000 in damages.  *See* J.3 CARVER 00082-0847 (01/22/24 Incident Report).

68.     After the January 2024 allision, Mate Morrissey was not disciplined by Carver or required to undergo remedial training.  *See* Moore Dep. 88:6-89:16.

13

69.     Carver did not dispute this lack of training at trial. Carver's maritime expert, Captain Stephenson did not dispute that Carver did not formally train its employees on use of the autopilot steering system or transiting bridges. At best, Captain Stephenson assumed all employees were trained on the job. *See* Trial Vol. 7A at 963:2-10.

70.     The Belt Line's maritime expert, Captain Lewis, testified that the lack of training provided by Carver was a contributing factor to the Allision. *See* Trial Vol. 4A at 524:15-525:1.

*The Belt Line Incurs nearly $16 Million in Costs to Repair the Bridge*

71.     Damage to the Bridge from the Allision was substantial.

72.     Immediately after learning of the damage, the Belt Line engaged Hardesty & Hanover ("H&H"), a bridge engineering firm, and PCL Civil Constructors ("PCL"), a bridge construction firm, to repair the Bridge.

73.     By virtue of the Belt Line's relationship with Norfolk Southern Railway Company (one of its owners), the Belt Line was able to access existing Norfolk Southern Master Service Agreements with H&H and PCL.  *See* NPBL.90 (H&H) and NPBL.91 (PCL).

74.     The Norfolk Southern Master Service Agreements mitigated downtime and economic harm by eliminating the need for a lengthy procurement.  They also significantly reduced overall costs because they contained fixed pre-negotiated rates, not higher emergency rates.  *Id.*

75.     PCL was on-site by June 18, 2024, the day after the Belt Line discovered the damage caused by the Allision.  H&H began design work for a repair shortly thereafter.

76.     The Belt Line was also able to mitigate costs by performing some of the work with its own forces, including construction of an access road and rerouting trains.  For this work, the Belt Line included additive rates depending on the trades involved, at standard levels used with the Virginia Department of Rail and Public Transportation.  *See* J.73 (damages spreadsheet).  The

same rates are approved for use throughout the Norfolk Southern system.  *See* NPBL.97 (FHA and GDOT Approved Audited Overhead Rates).

77.     Because of the pace of the project, the Belt Line was able to reopen the Bridge for limited service in time for the busy grain season, avoiding potentially severe economic losses for its industry customers.

78.     The Bridge returned to low-capacity reduced-speed service, with manual as opposed to remote operation of the electronic systems, on November 6, 2024.

79.     The Bridge returned to full-speed service, still with manual as opposed to remote operation of the electronic systems, on February 14, 2025.  It returned to full-speed service with remote operation by the end of March 2025.

80.     The total cost of repairs to the Bridge, including work by H&H, PCL, other vendors and subcontractors, and the Belt Line's own forces, is $15,838,142[5] not including interest, costs, or punitive damages.  *See* J.73A and Trial Vol. 1A at 111:20-112:7 (Moss testimony).  All are reasonable and were directly caused by the Allision.

81.     The Belt Line's total cost of repairs was comprised of both direct costs and self-performed costs. J. 73A.

*Direct Costs*

82.     For the direct costs, the Belt Line presented testimony of Mr. Moss as to what each cost represents and why it was incurred.  *See* Trial Vol. 1A at 89:3-112:18.

---

[5]     The Belt Line's claim in the Proposed Findings of Fact and Conclusions of Law as filed on March 3, 2026 included a compensatory damages amount of $15,922,877; however, the Belt Line voluntarily reduced its demand at trial as described below.

83.     The Belt Line also presented Mr. Swanson from H&H, the design engineer on the project, who testified in detail about the complexity of the repairs, the construction process from start to finish, and the engineering costs required. *See* Trial Vol. 1B, 153:14-199.

84.     Mr. Graning from PCL, the construction company that performed the work, also testified to the stabilization and repair process, the P-Node framework required to ensure the Bridge did not collapse, the extremely high risk involved with each step, and the costs of the work. *See* Trial Vol. 1B at 212:2-220:20; 225:23-228:12 and Trial Vol 2A at 232:16-249:9; 250:10-256:18; 259:23-260:20; 261:9-263:1.

85.     Both Mr. Swanson and Mr. Graning, with more than 50 years of combined experience, described this project as one of the most complex of their careers. *See* Trial Vol. 1B at 198:19-199:3 and Trial Vol. 2A at 262:16-263:1.

86.     Therefore, the Belt Line proved $15,838,142 in compensatory damages at trial—the amount required to restore it to the position it occupied before the Allision with a properly functioning Bridge. *See* J.73A and Trial Vol. 1A at 111:20-112:7 (Moss testimony).

*The Belt Line's costs for repairs to the Bridge are reasonable*

87.     The Belt Line also supported its damages claim with expert witnesses testimony from two highly qualified industry experts, Lee Lentz, P.E., and Kevin Lugo, P.E. *See* Trial Vol. 2B at 365:13-20 and 408:22 – 409:3. Mr. Lentz analyzed the damages from the standpoint of a railroad design engineer expert; Mr. Lugo analyzed the damages from the standpoint of a construction cost and process expert. Both evaluated each aspect of the costs incurred using multiple approaches, including sophisticated time and materials modeling, and both arrived independently at the same conclusion: that the total damages claimed by the Belt Line are not only

reasonable, but less than expected. *See* Trial Vol. 2B at 378:2-379:12; 381:2-383:12; and 387:7-389:9 (Lentz testimony) and 413:10-414:14 and 415:12-425:16 (Lugo testimony)

88. Mr. Lentz opined that total cost of repairs was reasonable and confirmed that the updated costs of repairs as of the date of testimony was likewise reasonable. *See* Trial Vol. 2B at 381:2-7.

89. Mr. Lentz also testified that he performed an independent cost analysis and suggested reasonable costs closer to $17,000,000. *See* Trial Vol. 2B at 381:7-10; 394:5-23; and 401:24-402:9.

90. Mr. Lentz testified that in his opinion, a cost of $14,000 for an engineering drawing should be removed from the total costs as unrelated to the Allision. *See* Trial Vol. 2B at 380:6-22.

91. Mr. Lentz also testified that repair of a corroded gussett plate addressed in Mr. Swanson's testimony should be removed from the total costs as unrelated to the Allision. He valued the work to this gussett plate at $2,000. See Trial Vol. 2B at 379:13-380:5.

92. The Belt Line submitted a revised damages summary at Joint Exhibit 73A removing both the engineering drawing and gussett plate costs. *See* Trial Vol. 2B at 380:23-381:7.

93. Mr. Lentz also opined that repairs were appropriate as opposed to a replacement as the likely replacement cost for the Bridge would be at least $222,000,000 based on the comparable example of a recent project for the Raritan River Bridge in New Jersey. *See* Trial Vol. 2B at 399:7-400:8 (Lentz testimony).

94. Mr. Lugo, a construction cost analyst, testified and opined that the repair process implemented by the engineers hired by the Belt Line were reasonable. *See* Trial Vol. 2B at 412:25-413:14.

95.    Mr. Lugo also confirmed the reasonableness of the self-performed costs and additive rates applied to self-performed work. *See* Trial Vol. 2B at 420:3-18; 422:4-8; and 425:5-16.

96.    Mr. Lugo also opined that the the total costs claimed by the Belt Line at trial were reasonable. *See* Trial Vol. 2B at 427:19-25.

97.    Mr. Lugo opined that, after hearing tesitmony at trial, certain costs for a gussett plate and an engineering drawing were unrelated to the Allision and should be removed from the total costs. Mr. Lugo opined that the cost of both the gussett plate and engineering drawing totaled $17,000. *See* Trial Vol. 2B at 426:6-427:16.

98.    Mr. Lugo also testified that the total costs incurred by the Belt Line for yardmaster pay should be reduced by $58,891 to account for vacation time mistakenly included in the spreadsheet. *See* Trial Vol. 2B at 420:16-421:21.

99.    As noted above, the Belt Line removed the costs of the gussett plate, engineering drawing, and yardmaster vacation days from the total costs and submitted a revised Joint Exhibit 73A reflecting the same.

100.    After the voluntary adjustments based on the expert's testimony descibed above, the Belt Line's total compensatory damages are $15,838,142. *See* J. 73A.

*No Basis for Depreciation*

101.    Carver failed to establish a basis to depreciate the Belt Line's direct costs.

102.    The evidence established that the Allision did not result in a total loss of either the entire Bridge or of Span 4. Mr. Moss' testimony confirms that the Bridge was operational after repairs and not a total loss. *See* Trial Vol. 1A at 79:11-14.

103. Mr. Swanson and Mr. Lentz both testified that the damage caused by the Allision was to Span 4 of the Bridge, which is one part of eight connected spans and an integral part of the Bridge. *See* Trial Vol. 1B at 195:21-196:1 and Vol 2B at 383:25-384:5 (Swanson, Lentz testimony that Span 4 is integral to Bridge); NPBL.132 Slides 26, 35, 43, and 48 (photos and diagrams showing portions of Span 4 repaired).

104. Carver's engineering expert, Mr. Marianos, confirmed that Span 4 was an integral part of the Bridge. *See* Trial Vol. 6 at 813:17 – 814:12 and at 848:2-8.

105. Additionally, Mr. Swanson, Mr. Graning, and Mr. Lentz confirmed that the repairs required after the Allision did not enhance the value of the Bridge as a whole. *See* Trial Vol. 1B at 197:1-13, Vol. 2A at 256:2-262:9, and Vol. 2B at 383:25-384:14. Specifically, Mr. Graning testified that the repairs to Span 4 of the Bridge did not extend the useful service life of the Bridge or increase its load capacity. *See* Trial Vol. 2A at 256:2-262:9.

106. Mr. Graning further testified that a substantial portion of the repair cost to the Bridge was "salvage" or to save the Bridge from falling by implementing a framing structure and rotating bent warped steel back into place. *See* Trial Vol. 1A at 237:2-239:22.

107. Carver failed to present any evidence that the Belt Line's costs could be individually depreciated on a component-by-component basis. Carver's expert, Mr. Marianos, testified that he did not calculate a specific useful life for rails and ties used on the Bridge and did not know the date which they were installed. *See* Trial Vol. 6 at 858:11-23.

108. Mr. Swanson and Mr. Moss also testified that the re-lubrication done on the counterweight ropes after repairs was not a part of routine maintenance, but rather was a necessary requirement of the Allision as a result of the ropes sitting dormant for months and accumulating

19

concrete dust. *See* Trial Vol. 1B at 148:8-23 (Moss Testimony) and 190:22-191:21 (Swanson Testimony).

109.    The Belt Line's superintendent, Adam Reeder, testified that the power rails on the East side of the Bridge were damaged as a result of the Allision and required repair. *See* Trial Vol. 2B at 334:13-339:4 (Reeder testimony) and Vol. 1B at 62:11-63:1.

110.    Mr. Swanson additionally confirmed that none of the maintenance items as called for in the pre-Allision mechanical inspection of the Bridge conducted by Hardesty & Hanover were performed as part of the repair. *See* Trial Vol. 1B at 191:25-192:11.

111.    Despite Carver's assertions that the Belt Line's component costs should be diminished, the evidence presented at trial contradicts that assertion.

*Self-Performed Work*

112.    The evidence established that self-performed work was necessary to (1) construct an access road to the site; (2) reroute train traffic as a result of the Bridge closure; and (3) operate the Bridge manually when remote electronics did not function.  *See* Trial Vol. 1A at 95:16-96:19; 98:1-104:2.

113.    For this self-performed work, the Belt Line identified specific employees, crews, and payroll costs required as a result of the allision.  *See* J.73A; *see also* Trial Vol. 1A at 100:17-101:25 (Moss testimony).

114.    The Belt Line also presented evidence from Adam Reeder, its Superintendent, to describe the rerouting process in detail.  *See* Trial Vol. 2B at 329:13-334:12.  Mr. Reeder testified that CSX traffic accounts for 60% of the Belt Line's total rail volume, and that 100% of the CSX rail traffic had to be rerouted, with additional interruptions to the Belt Line's Norfolk Southern traffic.  *See* Trial Vol. 2B at 329:16-24.

115.    Mr. Reeder explained how the CSX trains, all of which would normally cross the Bridge, had to be rerouted through Petersburg, Virginia, then back to Hampton Roads on Norfolk Southern lines, with the Belt Line then marshalling them through an intensly complex series of limited rail slots and opearating windows.  *See* Trial Vol. 2B at 329:25-333:10.  Absent the allision, all of those trains would have been simply dropped off in the Belt Line's yard after crossing the Bridge.  *See* Trial Vol. 2B at 331:22-332:10.

116.    Mr. Reeder and Mr. Moss both confirmed that the rerouting was only possible because the Belt Line's union labor agreed to 2-hour call times instead of 12-hour call times, working almost constantly from June 15, 2024 onward to handle to onslaught of diverted rail traffic.  *See* Trial Vol 1A at 67:7-18 and Vol. 2B at 331:3-21.

117.    Mr. Moss further confirmed that *all* of this work, from Train and Engine employees to Maintenance of Way employees to Yardmasters, would have had to be outsourced at higher cost if not self-performed by the Belt Line.  *See* Trial Vol. 1A at 86:1-7.  And he explained that none of the other employees, particularly Train and Engine employees, can work without a Yardmaster, so outsourcing that position would have required a full Yardmaster shift every day, even if the Yardmaster performed other work as well.  *See* Trial Vol. 1A at 102:23-103:25.

118.    The Belt Line, however, did not charge Yardmaster time every day as it could have, or even a flat 60% of all Yardmaster time to reflect the volume of its rerouted traffic; it charged only those days when its Train and Engine employees or Maintenance of Way employees required additional shifts because of the allision.  *See* Trial Vol. 1B at 143:20-145:11(Moss testimony).

119.    The Belt Line's expert, Mr. Lugo, confirmed that the costs of the self-performed work were reasonable. *See* Trial Vol. 2B at 422:4-423:8 (Lugo testimony).

120.   Carver failed to establish a basis to deduct the Belt Line's costs for self-performed work.

121.   Carver's damages expert, Mr. Cunningham, did not dispute that the self-performed costs were for activities necessary as a result of the Allision. *See* Trial Vol. 6 at 880:20-882:22. In fact, he admitted that he did no analysis of actual costs of the Belt Line and attempted to exclude all of the Belt Line's additive rates without any research. *See* Trial Vol. 6 at 886:18-888:15.

*Additive Rates*

122.   The Belt Line also included railroad "additive rates" based on the trades involved or materials required, at levels used previously with the Virginia Department of Rail and Public Transportation.  *See* J.73A (damages spreadsheet).

123.   Mr. Moss confirmed that additive rates in the railroad context include more than ordinary overhead.  *See* Trial Vol. 1A at 105:6-11.  As he explained, they encompass union benefits, railroad insurance, equipment, vehicles, internal tools and supplies, administrative costs, and management personell, in addition to ordinary overhead expenses.  *See* Trial Vol. 1A at 107:4-23.

124.   Mr. Moss further explained that, unlike PCL, for example, which charged separately for Mr. Graning's time, the Belt Line did not charge for time spent by Mr. Moss, Mr. Reeder, or Bill O'Brien (Belt Line's Vice President of Operations), even though they spent months addressing the chaos created by the allision.  *See* Trial Vol. 1A at 109:7-110:19.  Mr. Moss also confirmed that, because of the additive rates, the Belt Line did not separately charge for equipment; vehicles; supplies; tools; materials on-hand; any kind of "management" or "administrative" fee; or any other overhead costs.  *See* Trial Vol. 1A at 109:7-21.

125.   Mr. Moss also testified that the same rates the Belt Line uses in Virginia are approved for use throughout the entire Norfolk Southern system, as authorized by both the Federal

Highway Administration and Georgia Department of Transporation.  *See* Trial Vol. 1A at 104:5-106:19; *see also* NPBL.97A (FHA and GDOT Approved Audited Overhead Rates).  He testified that the Belt Line's overhead is consistent with Norfolk Southern's, if not higher due to the Belt Line's inability to scale costs, because the Belt Line's employees are part of the same union, the Belt Line pays the same insurance and benefits, the Belt Line uses the same kinds of equipment and vehicles, and the Belt Line uses the same back-office administration across information technology, payroll, and accounting systems, paying Norfolk Southern monthly for that service. *See* Trial Vol. 1A at 105:6-19; Trial Vol. 1A at 108:10-109:6; Trial Vol. 1B at 131:5-132:25; Trial Vol. 1B at 145:21-146:14.

126.    Both the Belt Line's damages experts, Mr. Lentz and Mr. Lugo, confirmed the reasonableness of the additive rates for self-performed work including the rationale that the costs are real expense to an injured party and would be lost without the additive rates. *See* Trial Vol. 2B at 388:21-389:9 (Lentz testimony) and Trial Vol. 2B at 420:3-18 and 422:4-8-425:5-16 (Lugo testimony).

### *Interest and Costs*

127.    The Belt Line also established that it was required to take out a $4,000,000 loan as a result of the Allision at 4% interest, warranting prejudgment interest at 4% per annum from the date of the Allision.  *See* ECF 210 at 4.

128.    Prejudgment and post-judgment interest is warranted on the Belt Line's damages as of the date of the Allision at the rate of 4% per annum.

129.    Costs are also warranted for the Belt Line to the full extent provided by law, to be determined upon the Belt Line's submission of a Bill of Costs.

*Punitive Damages*

130.     In addition to compensatory damages, the Belt Line also established that punitive damages are warranted.  The purpose of punitive damages is "to punish the tortfeasor and to deter him and others from similar extreme conduct."  *Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 61538 at *1 (E.D. Va. 2009).  "Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct."  *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 409 (2009).  For more than a century, the "general rule that punitive damages were available at common law [has] extended to claims arising under federal maritime law."  *Id*. (citing *Lake Shore & Michigan Southern R. Co. v. Prentice*, 147 U.S. 101, 108 (1893)).  "The lower federal courts followed suit, finding that punitive damages were available in maritime actions for tortious acts of a particularly egregious nature."  *Id*. (collecting cases).

131.     Here, the Belt Line supplied ample evidence of egregious conduct as described below—so egregious as to put lives and property at risk with reckless disregard for the consequences.  This began with Carver's total disregard of two separate autopilot failures in May 2024 (J.7 and J.9), just weeks before the allision, and an unresolved maintenance issue over autopilot "intermittently" switching to standby (J.46), then continued immediately after the allision when Carver lied to its crew so they would flee the scene without an investigation (J.64, J.65).

132.     The egregious conduct is established in an unbroken line of evidence from February 28, 2024 to June 15, 2024, all of which should have alerted Carver to either (1) properly repair the autopilot system once and for all, or (2) prohibit its use.  Carver did neither.  The line of evidence is detailed below:

24

| J.4 & J.5 | February 28, 2024 | "**Autopilot stopped** tug took a hard left" |
| J.6 & J.11 | April 1, 2024 | "Satellite compass failed" / "**Auto pilot [went] into standby**" |
| J.46 | April 4, 2024 | GMT Mackay investigates "complaint of **autopilot switch to stby intermittently**, could not repeat the problem" |
| J.7 & J.8 | May 3, 2024 | "**Steering went into standby** and the rudder came over without alarm" |
| J.9 | May 21, 2024 | "**SB in auto pilot** / steering went hard left" |
| J.80 | June 15, 2024 | "As I was steering on autopilot, when I got close to the bridge in question, ... **I had lost steering and the autopilot had tripped without an alarm**."  "Started to head over towards the bridge, **I started to turn on autopilot, and I was unable to turn it**." |

133.    Punitive damages are also warranted based on Carver's conduct as shown at trial. This conduct includes:

a)    Carver's General Manager and Port Captain deceiving the tug crew into fleeing the scene without notifying the Belt Line or Coast Guard, thereby preventing an immediate investigation and exposing the public to significant danger (J.64, J.65);

b)    Carver's Port Captain yelling at the tug captain for wanting to report the incident to the Coast Guard as required by law (J.64 CARVER 001872-1877 (texts));

c)    Carver performing unspecified "maintenance" on the tug before investigators could inspect it (J.17 CARVER HELM CONNECT 000549-550);

25

d)      Carver "overhauling" the tug in 2025 after litigation began but before inspection occurred (NPBL.65 (litigation hold letter in June 2024); Trial Vol. 5 at 720:19-721:14 (Laraway testimony) (describing "overhaul" in early 2025); Carver.50 (Meyerrose Survey identifying "extensive maintenance and repair" before March 2025); ECF 67 at 1 (citing tug inspection scheduled for May 2025));

e)      Carver failing to preserve other key evidence, like the General Manager's cell phone used to communicate about the Allision (Moore Dep. 27:15-21; Malik Dep. 29:6-30:24; ECF 50 (Order requiring response to Belt Line's RFP 34));

f)      Carver ignoring two separate autopilot failures on May 3 and May 21, 2024, just 6 weeks and 3½ weeks before the Allision (J.7, J.8, J.9);

g)      Carver's General Manager not even opening the May 21, 2024 report for more than a year (Galioto Depo. Des. at 75:20-77:15);

h)      Carver ignoring an unresolved issue with the autopilot "intermittently" switching to standby in a GMT Mackay work order from March 5, 2024 (J.46; Trial Vol. 4B at 660:16-666:1 (Furborough testimony));

i)      Carver failing to prohibit use of autopilot despite the two incidents on May 3 and 21, 2024 (J.7, J.8, J.9), the unresolved standby issue from March 5, 2024 (J.46), and two other autopilot incidents on February 28, 2024 and April 1, 2024 (J.4, J.5, J.6, J.11);

j)      Carver ignoring its own autopilot Operator Manual that prohibited use of autopilot in narrow waters (J.52 at CARVER 001999);

k)      Carver failing to train its crew on use of autopilot or bridge transits, including lookouts, despite the risk of catastrophic damage from not doing so (J.36 (records of

26

Morrissey's training); Trial Vol. 5 at 772:18-21 (Jar. Morrissey testimony) and Vol. 6 at 909:22-910:4 (O'Rourke testimony)); and

l)    Carver failing to remedially train or discipline Mate Morrissey after an allision less than 5 months earlier (Moore Dep. 88:6-89:16).

134.    Carver's own witnesses supported Carver's company culture of indifference and each testified that they checked on the mate after they felt the impact of the Allision, but simply went back to what they were doing before. *See* Trial Vol. 5 at 758:17-21 and 759:22-760:12 (Porter testimony) and 768:16-772:4 (Jar. Morrissey testimony).

135.    The evidence established that Carver Marine Towing generated approximately $34,000,000 to $35,000,000 in 2024 and $30,000,000 in 2025, while its parent company generated approximately $200,000,000. *See* Trial Vol. 5 at 731:6-18 (Laraway testimony).

136.    The Belt Line has established that punitive damages equal to the amount of its compensatory damages are warranted.

*Carver is Not Entitled to Offset over the Amount it Paid to Evanston*

137.    On September 19, 2025, Carver filed a Notice of Settlement indicating it has reached a settlement with Evanston in this matter. *See* ECF 116.

138.    In its settlement, Carver paid Evanston $5,000,000 in exchange for Evanston's release of claims against Carver.

139.    The Belt Line's insurance agreement with Evanston contains a subrogation clause that states:

I.    TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment.  That person or organization must do everything necessary to secure our rights and must do nothing after the loss to impair them.  …

ECF 159-1 at 35 (Commercial Property Conditions, Form CP 00 90 07 88).

140.   Carver's contention that it is entitled to a credit of $10,000,000 based on the insurance agreement to which it was not a party is unsupported. ECF 178 at 5.

141.   Carver has not established a credit against any judgment greater than the $5,000,000 it paid to Evanston.

## **Conclusions of Law**

*Carver is Liable to the Belt Line for $15,838,142 in Compensatory Damages*

1.   Under this Court's Local Admiralty Rule (f), "Where the vessel interests seeking statutory limitation of liability [here, Carver] have raised the statutory defense by way of answer or complaint, the plaintiff in the former or the damage claimant in the latter [here, the Belt Line], shall proceed with its proof first, as is normal at civil trials."

2.   Carver filed its Limitation Complaint on August 8, 2024.  *See* ECF 1.

3.   The Belt Line timely filed its Claim on December 5, 2024.  *See* ECF 25.  To succeed on its Claim, the Belt Line must establish liability, causation, and damages.

4.   For the reasons set forth in the Court's Summary Judgment Opinion, the Belt Line established liability.  *See* ECF 194 at 38 ("Summary judgment is GRANTED in the Belt Line's favor as to liability.").

5.   By stipulation, the Belt Line also established that Carver caused the Belt Line damages.  *See* FPO STIP 16 ("The Allision caused damage to the Bridge.").

6.   The Belt Line also established the amount of its compensatory damages at $15,838,142, not including interest or costs.  J.73A (damages spreadsheet).

*The Belt Line Proved the Cause of the Allision and Carver Cannot Limit its Liability under 46 U.S.C. § 30523*

7.      Under 46 U.S.C. § 30523, the owner of a vessel may "limit [its] liability for losses . . . to the value of [its] interest in the vessel and her freight if the owner can show that the cause of the collision was not within [its] privity or knowledge." ECF 194 at 39 (quoting *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 166 (4th Cir. 1984)). To obtain limitation of liability, the shipowner "bears the burden of proving that he was without privity or knowledge of the condition or negligence responsible for the [a]llision." *Id.*

8.      The question of privity or knowledge is preceded by a fact-bound inquiry: "[I]n order to grant or deny limitation," the Court must first "find what acts of negligence caused the accident." ECF 194 at 39 (quoting *Joia v. Jo-Ja Serv. Corp.*, 817 F.2d 908, 912 (1st Cir. 1987)). "Only then can the Court determine whether the vessel owner had knowledge or privity of those acts." *Id.*

9.      Here, the trial evidence showed that the Allision was caused by (i) Carver's failure to address a known problem with the autopilot steering system on the tug, and (ii) Carver's inadequate training of its crew, particularly Mate Morrissey.

10.     The autopilot problem was established by testimony of Mate Morrissey to Coast Guard investigators, stating that the autopilot "tripped" on the approach to the Bridge, switched to standby without alarm, and would not switch back before impact. See J.80 at 11.

11.     Contemporaneous Carver records in the form of the June 15, 2024 Daily Log (J.43) (showing the tug was in autopilot at the time of the Allision) and text messages between Carver's management (J.64) (describing a "steering issue" in reference to the Allision) also show that a problem with the autopilot steering system on the tug caused the vessel to veer left and push the barge into the Bridge.

29

12.    Other Carver records also support this conclusion, including four incident reports in 2024 related to steering issues with the autopilot system.  These include a February 28, 2024 report filed by Captain Miller (J.5), an April 1, 2024 report filed by Captain Miller (J.6), a May 3, 2024 filed by Captain Miller (J.7), and a May 21, 2024 report filed by Captain Miller (J.9).

13.    Carver knew about these reports because they were logged in Carver's internal HELM system records.  *See* J.5, J.6, J.7, and J.9 (with CARVER bates labels).

14.    Testimony indicates that Carver took no action to repair the problems with the autopilot steering system indicated in the May 3, 2024 and May 21, 2024 reports.  *See* Moore Dep. 275:24-276:6 (no repairs after April 2024).  In fact, the May 21, 2024 report sat unopened in Carver's General Manager's inbox for more than a year.  *See* Galioto Dep. 58:17-80:25.

15.    Carver also took no steps to prohibit use of the autopilot system until repairs could be made.  *See* Moore Dep. 281:8-23; Carver Rule 30(b)(6) Dep. 91:5-12; *see* Trial Vol. 4A at 515:2-8 (Lewis testimony) and Vol. 4B at 660:16-666:1 (Furborough testimony).

16.    Carver also failed to heed its own Simrad operator manual for the autopilot system, which prohibits automatic steering "in heavy traffic areas or in narrow waters."  *See* J.52 CARVER 001999 (excerpt).  This is true even though Mr. Baldassare testified that autopilot should not have been used when the tug was approaching the Bridge.  *See* Baldassare Dep. 89:14-90:5.

17.    Carver also failed to properly train its crew on how to use the autopilot or how to transit bridges, including proper lookouts for such transits. This was uncontested by Carver.

18.    Carver also failed to preserve critical evidence.  The Fourth Circuit has held that, in addressing spoliation, an adverse inference may be drawn when a party "knew the evidence was relevant to some issue at trial" and the party's "willful conduct resulted in its loss or destruction." *Buckley v. Mukasey*, 538 F.3d 306, 322 (4th Cir. 2008) (quoting *Vodusek v. Bayliner Marine Corp.*,

30

71 F.3d 148, 156 (4th Cir. 1995) (rejecting "bad faith" standard for spoliation of evidence)).[6]  By failing to notify the U.S. Coast Guard, Carver evaded the obligation to conduct drug and alcohol testing or have its tug inspected at the scene.  By failing to secure ESI from Mr. Moore's phone, Carver thwarted access to evidence bearing on what it knew or did before and after the Allision.  By performing "maintenance" on the tug on June 18, 2024, Carver destroyed any evidence of the actual problems with the autopilot before the U.S. Coast Guard or the Belt Line could inspect it.  By "overhauling" the tug in 2025 before an inspection, Carver similarly prevented investigation of potentially relevant information.  Consistent with other evidence in this case, these facts support an inference that Carver had privity or knowledge of the condition that caused the Allision.

19.    Because the evidence establishes that Carver knew of the condition that caused the Allision but took no action to resolve it or otherwise prevent its use, Carver cannot meet its burden under 46 U.S.C. § 30523 to "show that the cause of the collision was not within [its] privity or knowledge."  ECF 194 at 39 (quoting *Hellenic Lines*, 730 F.2d at 166).  As a result, Carver cannot limit its liability or otherwise obtain exoneration under 46 U.S.C. § 30523.[7]

*Depreciation*

20.    Carver failed to establish any basis for depreciating the Belt Line's repair costs.

21.    This Court has held "the rule regarding depreciation explained and adopted in *BP Expl. & Oil, Inc, v. Moran Mid-Atl. Corp*., 147 F. Supp. 2d 333, 341 (D. N.J. 2001), ought likewise to apply in the instant case.  Notably, as the Magistrate Judge observed, . . . this rule coheres with

---

[6]    The Federal Rules of Civil Procedure have since been amended to require that, for electronically stored information, an adverse inference may be made only if a party failed to preserve evidence "with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2)(B); *see also Doe v. Charlotte Mecklenburg Bd. of Educ*., 2024 U.S. App. LEXIS 18645 at *24 n.14 (4th Cir. 2024).

[7]    Because no limitation is available under 46 U.S.C. § 30523 (see below), the Court need not decide the value of the vessel.  Carver also presented no valuation expert at trial.

that applied in *Norfolk & Portsmouth Belt Line R. Co. V. M/V MARLIN*, No. 2:08cvl34, 2009 WL 3363983, at \*9 (E.D. Va. Oct. 9, 2009)."  ECF 208 at 4.

22.     This rule is "in the case of an allision where the destruction does not result in a total loss, actual or constructive, the damage is to an integral part of the [whole] facility, and the repairs will not enhance the value of the [whole] facility, there is to be no depreciation for the individual pieces." Id. (citing *BP Expl.*, 147 F. Supp. 2d at 341).  "Only '[t]o the extent that the damage is to a non-integral or separate part of the facility' should depreciation apply."  *Id.* (citing citing *Hewlett*, 418 F.2d at 657).

23.      The Belt Line established that the damage caused by the Allision was to an intergral part of the Bridge, not a total loss of Span 4 or the Bridge itself, and the repairs did nto enhance the value of the Bridge as a whole.

24.     Because the evidence establishes that the criteria for depreciation are not met, Carver is not entitled to depreciate the Belt Line's repair costs.

*Additive Rates*

25.     The Belt Line established that the additive rates incorporated into its damages are reasonable and proper under the circumstances.

26.     As a matter of law, "[c]ost of repairs performed internally by [an] injured party, *including overhead*, are recoverable in a negligence action."  *Freeport Sulphur Co. v. The S/S Hermosa*, 526 F.2d 300, 302 (5th Cir. 1976) (emphasis added, collecting cases).

27.     This Court previously held that, "Such costs may be recoverable." ECF 210 at 6 (citing *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 304 (5th Cir. 1976) ("The cost of repairs performed internally by the injured party, including overhead, are recoverable in a negligence action.")); *see also United States v. Capital Sand Co.*, 466 F.3d 655, 659-60 (8th Cir.

32

2006) (holding that a party "may recover overhead charges that are justified by a reasonable relationship to the repair work.").

28.     Even in the single case cited by Carver to oppose additive rates, the Court awarded the rates; it merely reduced them to 100%.  *See In re Matteson Marine Serv*., 2012 U.S. Dist. LEXIS 186688, at *18-19 (C.D. Ill. 2012).

29.     Here, the Belt Line established that the additive rates were reasonable and real costs expenses to it as the injured party as set forth in the findings of fact above.

30.     Because the Belt Line has established liability and damages on its Claim, including quantum, unless Carver is able to limit liability under 46 U.S.C. § 30523, the Belt Line is entitled to judgment against Carver in the amount of $15,838,142, plus pre- and post-judgment interest at 4% per annum from June 15, 2024 until paid, plus all costs allowed by law (to be established in a Bill of Costs), plus punitive damages in an amount to be determined after trial.

*Punitive Damages*

31.     "Punitive damages are available under the general maritime law in cases of property damage." *Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 61538 at *9 (E.D. Va. 2009) (citing *Furka v. Great Lakes Dredge & Dock Co., Inc*., 755 F.2d 1085, 1091 (4th Cir. 1985) and *Protectus Alpha Nav. Co. v. Northern Pacific Grain Growers, Inc*., 767 F.2d 1379, 1385 (9th Cir. 1985)).

32.     "Regardless of the alternative rationales over the years, the consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct." *Exxon*, 554 U.S. at 492.

33.     To establish a case for punitive damages, a party must show that "a defendant's conduct is 'outrageous' owing to 'gross negligence,' 'willful, wanton, and reckless indifference for

the rights of others,' or behavior even more deplorable." *Norfolk & Portsmouth Belt Line R.R. Co.*, 2009 U.S. Dist. LEXIS 61538 at *9 (quoting *Exxon*, 554 U.S. at 493). In *Exxon*, the Supreme Court approved a "punitive-to-compensatory ratio of 1:1," which is the same ratio the Belt Line seeks here. *Exxon*, 554 U.S. at 515.

29.   The Belt Line seeks punitive damages equal to the amount of its compensatory damages consistent with *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513 (2008) (allowing 1:1 ratio of punitive to compensatory damages).

30.   Courts have awarded punitive damages based on even egregious acts after-the-fact, like covering up negligence, spoiling evidence, or leaving the scene. *See Armada Supply, Inc.*, 613 F. Supp. at 1469-71 and 639 F. Supp. at 1163.

31.   Courts in other contexts have similarly justified punitive damage awards based on post-incident misconduct. *See Okosi v. Roby*, 715 F. Supp. 3d 166, 177 (D. Mass. 2024) ("punitive damage awards may be justified not only by defendant's actions on the date in question but also by their subsequent behavior"); *Gracia v. Sigmatron Int'l, Inc.*, 842 F.3d 1010, 1025 (7th Cir. 2016) ("One of the purposes of punitive damages is to limit the defendant's ability to profit from its wrongful conduct by escaping detection."); *Davis v. Rennie*, 264 F.3d 86, 115-16 (1st Cir. 2001) (upholding punitive damages based on defendants' attempts to conceal assault of a mental patient by falsifying post-incident report, filing groundless complaint against security officer who arrested one of the defendants, and testifying deceptively at trial); *Romano v. U'Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) (upholding punitive damages based in part on defendant's post-incident statement that he would "deny all of the alleged comments that he made [about terminating Romano] because of her sex in the event of a discrimination suit").

34

32.     For the reasons set forth in the factual findings above, the Belt Line established grounds for punitive damages against Carver at a ratio of 1:1 with compensatory damages.

*Interest*

33.     Under federal law, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961.  This applies to compensatory and punitive damages.  See *Vandevender v. Blue Ridge of Raleigh, LLC*, 756 F. Appx 230, 233 (4th Cir. 2018) (applying federal rate under 28 U.S.C. § 1961(a) to calculate interest on punitive damages award); *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992) ("[T]he plain language of the statute authorizes post-judgment interest on punitive damages, which are a part of the 'money judgment.'"); *Bank South Leasing, Inc. v. Williams*, 778 F.2d 704, 706 (11th Cir. 1985) (holding that the plaintiff was "entitled to post-judgment interest on the entire award, including the punitive damages, from the date of the original judgment"); *United States v. Michael Schiavone & Sons, Inc.*, 450 F.2d 875, 876 (1st Cir. 1971) (holding that final judgment in its entirety, including punitive damages, was "entitled to post-judgment interest under the mandatory terms of 28 U.S.C. § 1961").

34.     "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic."  *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 828 (4th Cir. 1992) (quoting *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986)).  "Prejudgment interest is routinely granted by the courts in maritime cases."  *Chisholm v. UHP Projects*, 30 F. Supp. 2d 928, 931 (E.D. Va. 1998).  Particularly with respect to property damage, there is "a general rule that prejudgment interest should be awarded in maritime collision cases, subject to a limited exception for 'peculiar' or 'exceptional' circumstances."

*Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 104327 at *40 (E.D. Va. 2009) (quoting *City of Milwaukee v. Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995)).

35.    A trial court's broad discretion "over awards of prejudgment interest extends to its determinations of when interest begins." *Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 104327 at *43 (E.D. Va. 2009) (quoting *Indep. Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 25 (2d Cir. 1982). "Prejudgment interest is typically awarded from the date of the loss." *Id.* (citing *Wilkerson v. Ingalls Shipbuilding, Inc.*, 125 F.3d 904, 907 (5th Cir. 1997) ("[A]dmiralty courts generally have awarded prejudgment interest accruing from the time the damage was incurred."); *In re Oil Spill by Amoco Cadiz*, 954 F.2d 1279, 1335 (7th Cir. 1992); *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 493 (5th Cir. 1986) ("[P]rejudgment interest on repair costs runs from the date of the accident even though the owner does not pay these costs until some later date."); *Complaint of M/V Vulcan*, 553 F.2d 489, 490 (5th Cir. 1977) ("[I]n admiralty cases the award of prejudgment interest from the date of loss is the rule rather than the exception."); *City of Chi. v. M/V Morgan*, 248 F. Supp. 2d 759, 779 (N.D. Ill. 2003) ("Prejudgment interest on a monetary award for an admiralty tort is calculated from the allision date to the judgment date."); *Ark. River Co. v. United States*, 947 F. Supp. 941, 953 (N.D. Miss. 1996) ("[P]rejudgment interest accru[es] from the date of the allision.").

36.    The Belt Line proved its entitlement to 4% prejudgment interest from June 15, 2024 until paid.

37.    The Belt Line is entitled to interest on the full amount of its famages before any credit to Carver.

*Carver's Offset for Settlement with Evanston*

36.    This Court has already held that "the Belt Line will be permitted to prove the full amount of damages it claims" at trial, or $15,838,142.  *See* ECF 194 at 17.  This Court also placed conditions on approval of the settlement between Evanston and Carver.  *Id*. at 19-20.

37.    Carver's contention that it should be entitled to a $10,000,000 credit against any judgment is based on an incorrect assumption that Carver can take advantage of the subrogation clause in the Belt Line's insurance agreement. ECF 178 at 5.

38.    Carver is not a party to the Belt Line's insurance contract with Evanston or a third-party beneficiary of any term in that contract.

39.    Under Virginia law, "In order to proceed on the third-party beneficiary contract theory, the party claiming the benefit must show that the parties to a contract 'clearly and definitely intended' to confer a benefit upon him."  *Copenhaver v. Rogers*, 238 Va. 361, 367 (1989); see also *Thorsen v. Richmond SPCA*, 292 Va. 257, 269 (2016).

40.    Carver presented no evidence that all parties to the insurance agreement intended Carver to benefit from its terms and the Belt Line explicitly objected to Carver's attempt to take advantage of the insurance contract in response to Carver's notice of settlement. *See* ECF 149.

41.    Under the collateral source rule, Evanston's insurance payments to the Belt Line have no bearing on the Belt Line's damages.  *See* ECF 194 at 6-7 (explaining rule).  Consistent with that rule, Evanston's payments are equally irrelevant to any offset for Carver.  *Id*.  As this Court explained, "[U]nder the collateral source rule a payment from a source independent of, or unrelated to, the tortfeasor does not reduce his liability to the injured party even if the result is to afford the injured party double compensation." ECF 194 at 7 (quoting *Yost v. Am. Overseas Marine Corp.*, 798 F. Supp. 313, 319 (E.D. Va. 1992)); *see also W. Towboat Co. v. Vigor Marine, LLC*, 566

F. Supp. 3d 1095, 1099 (W.D. Wash. 2021) (explaining that "partial reimbursement by [a claimant's] insurers poses no procedural limitation . . . on [a claimant's] ability to recover the full amount of damages from a tortfeasor)).

42.     For the reasons set forth herein, the Belt Line has established that Carver is not entitled to a setoff of more than $5,000,000, the amount it paid Evanston, regardless of the amount Evanston paid the Belt Line.

**Conclusion**

WHEREFORE, the Belt Line respectfully asks this Court to enter judgment in the Belt Line's favor against Carver as follows, with immediate execution thereon, and grant the Belt Line all other just relief:

| | |
|---|---|
| Compensatory Damages | $15,838,142 |
| Punitive Damages | $15,838,142 |
| Interest at 4% from June 15, 2024 | $2,394,658 |
| Costs | TBD |
| Preliminary Judgment Amount | **$34,070,942** |
| Credit to Carver | ($5,000,000) |
| Final Judgment Amount | **$29,070,942** |

Dated:  April 24, 2026                NORFOLK AND PORTSMOUTH BELT
                                      LINE RAILROAD COMPANY


                                      By: _____/s/ W. Ryan Snow_____
                                          James L. Chapman, IV, VSB No. 21983
                                          W. Ryan Snow, VSB No. 47423
                                          Mackenzie R. Pensyl, VSB No. 100012
                                          CRENSHAW, WARE & MARTIN, P.L.C.
                                          150 W. Main Street, Suite 1923
                                          Norfolk, Virginia 23510
                                          Telephone: (757) 623-3000
                                          Facsimile: (757) 623-5735
                                          jchapman@cwm-law.com
                                          wrsnow@cwm-law.com

mpensyl@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt
Line Railroad Company*


## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of April 2026, a true copy of the foregoing was (i) electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all registered counsel of record, and (ii) mailed to:

James Morrissey
4723 Baywood Drive
Lynnhaven, FL 32444


By: _____/s/ W. Ryan Snow_____
W. Ryan Snow, VSB No. 47423
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
wrsnow@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt
Line Railroad Company*