**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division
In Admiralty**

| | |
|---|---|
| In the Matter of COEYMANS MARINE TOWING, LLC D/B/A CARVER MARINE TOWING as Owner and Operator of M/T Mackenzie Rose, (IMO No. 8968765), *et al*. | **Civil Action No. 2:24-cv-00490-MSD-LRL** |

**NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY'S
<u>POST-TRIAL BRIEF</u>**

Norfolk and Portsmouth Belt Line Railroad Company ("Belt Line") respectfully requests entry of judgment in its favor against Coeymans Marine Towing, LLC d/b/a Carver Marine Towing ("Carver") for compensatory damages of $15,838,142, punitive damages of $15,838,142, interest on the total amount at 4% per annum from June 15, 2024 until paid, and all costs allowed by law, subject to a credit of $5,000,000 that Carver paid to Evanston Insurance Company ("Evanston").

James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl, VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt
Line Railroad Company*

**Table of Contents**

Trial Summary…………………………………….…………………………………………… 3

Evidence and Argument…………………………………………………………………… 6

    I.      The Belt Line proved its Claim………………………...……………………………… 6

    II.     The Belt Line proved the cause of the Allision……………………………..……… 6

    III.    Carver failed to prove that it lacked privity or knowledge of the condition that caused the Allision………………………………………….…………………10

    IV.    The Belt Line proved quantum of its compensatory damages……….……………...... 12

        A.     Carver owes $15,838,142 in compensatory damages plus interest……………12

        B.     The Belt Line's damages cannot be depreciated………………………………14

        C.     The Belt Line's damages cannot be diminished by component costs…………16

        D.     The Belt Line proved its self-performed costs and additive rates…………...... 18

        E.     The pace of the repair project mitigated damages…………………………. 24

    V.     The Belt Line proved grounds for punitive damages……………………………… 25

    VI.    The Belt Line is entitled to interest on the full amount of its damages………..…..... 30

    VII.   Carver is not entitled to a credit greater than the $5,000,000 it paid to Evanston……. 31

Conclusion……………………………………………………………………………..……….35

**Trial Summary**

It is undisputed that Carver's tug M/T MACKENZIE ROSE damaged the Belt Line's Main Line Bridge when it pushed a loaded barge into the western truss on June 15, 2024 ("Allision"). This Court granted the Belt Line judgment on liability under Rule 56. *See* ECF 194 at 38 ("Summary judgment is GRANTED in the Belt Line's favor as to liability."). By stipulation in the Final Pretrial Order, Carver admitted that it caused the Belt Line damages. *See* ECF 178 at 4, Stip. 16 ("The Allision caused damage to the Bridge."). As a result, the Belt Line established its *prima facia* Claim before trial even began.

At trial, the Belt Line proved two conditions that caused the Allision, both within Carver's privity and knowledge—(i) Carver's failure to address a known problem with the autopilot steering system on the tug, and (ii) Carver's inadequate training of its crew. All evidence on point, including testimony of operator James Morrissey to Coast Guard investigators, indicates that the tug's autopilot "tripped" on the approach to the Bridge, switching to standby without alarm, and would not switch back. Whether Mate Morrissey did not know how to switch it back (a training issue) or the system did not react (an autopilot issue) is immaterial; either way, the condition that caused the Allision falls squarely on Carver's management. The evidence also established Carver's failure to train its crew on the autopilot system or bridge transits, including lookouts for such transits.

By contrast, despite having brought this limitation action, Carver utterly failed to prove that it lacked privity or knowledge of these conditions. Carver did not contest the tug's multiple previous autopilot failures, including two in May 2024 with no repairs. Carver also did not contest an unresolved maintenance issue with the autopilot "intermittently" switching to standby. And Carver did not offer any evidence to contest Mate Morrissey's testimony in his Coast Guard investigation that the autopilot "tripped" without alarm and would not respond. Likewise, Carver offered no

3

evidence to rebut its lack of training on autopilot or bridge transits.  Even its maritime expert said nothing on the subject.  And Carver's own version of events in its revised USCG-2692 form—that Mate Morrissey turned off the autopilot himself—was revealed to be a fiction created after-the-fact by Carver's own management in its duplicitous cover-up efforts.

The Belt Line proved compensatory damages of $15,838,142.  *See* J.73 and J.73A.  Four witnesses—Cannon Moss (Belt Line President), Howard Swanson (project lead at Hardesty & Hanover), Charlie Graning (project lead at PCL Civil Constructors), and Adam Reeder (Belt Line Superintendent)—described the severe damage to the Bridge, necessary repairs, and impacts to operations.  Both Mr. Swanson and Mr. Graning described the repair project as one of the most complex of their careers.  The Belt Line then supported its evidence through testimony of two expert witnesses, Lee Lentz, P.E. (a railroad design engineer) and Kevin Lugo, P.E. (a construction cost analyst), who confirmed the reasonableness of the damages claimed.

By contrast, Carver failed to prove depreciation or any other deductions to the Belt Line's damages (aside from what the Belt Line voluntarily removed).  The undisputed evidence established that Span 4 is integral to the Bridge; that it was not fully replaced; and that repairs did not extend the useful life of the Bridge or otherwise improve its load capacity.  Even Carver's expert witnesses did not say otherwise.  Nor did they offer any other testimony that would diminish the Belt Line's damages, other than *ipse dixit* testimony about overhead that contradicts settled jurisprudence.

The Belt Line also showed that punitive damages are necessary to punish and deter Carver's conduct.  "Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct."  *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 409 (2009).  The purpose is "to punish the tortfeasor and to deter him and others from similar extreme conduct."  *Norfolk & Port. Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 61538 at *1 (E.D. Va. 2009).  Courts have

4

held that even post-incident acts, like covering up negligence, spoiling evidence, or leaving the scene, can support punitive damages. *See Armada Supply, Inc. v. S/T Agios Nikolas*, 613 F. Supp. 1459, 1469-71 (S.D.N.Y 1985) and 639 F. Supp. 1161, 1163 (S.D.N.Y. 1986) (relying on evidence of defendant's spoliation of cargo samples and post-delivery misconduct, including deliberately evading U.S. jurisdiction, to award punitive damages in cargo contamination case).

The Belt Line showed ample evidence of such conduct, manifested in Carver's near total disregard for the consequences of its acts or omissions to life and property. This included Carver deceiving its crew into fleeing the scene without notifying the Belt Line or Coast Guard, thereby preventing an immediate investigation and exposing the public to significant danger; ignoring two separate autopilot failures in May 2024 (not even opening one report) after multiple previous incidents; failing to prohibit use of autopilot despite the previous incidents and an unresolved issue with the system "intermittently" switching to standby; ignoring the autopilot Operator Manual that prohibited use in narrow waters; failing to train its crew on use of autopilot or bridge transits; failing to remedially train or discipline Mate Morrissey, despite a previous allision; performing unspecified "maintenance" on the tug before investigators could inspect it; "overhauling" the tug in 2025 before inspection despite pending litigation; and failing to preserve other key evidence, like the cell phone used by its General Manager to communicate about the Allision.

Finally, Carver cannot establish a credit greater than the $5,000,000 it paid to Evanston. Carver is not a third-party beneficiary of the Belt Line's insurance contract. As a result, under the collateral source rule, Evanston's insurance payments to the Belt Line have no bearing on the amount of Carver's liability to the Belt Line. *See* ECF 194 at 6-7 (explaining rule). As a condition of settlement, Evanston agreed it has no claim against the Belt Line for any more than $5,000,000. *See* ECF 194 at 20 ("Evanston consents not to seek recovery or reimbursement from the Belt Line of any

5

portion of any damages ultimately awarded in this case."). Carver's credit is therefore limited to that amount. To allow any greater offset would only reward Carver, the tortfeasor, for the Belt Line's decision to procure and pay for liability insurance.

All this means that the Belt Line is entitled to judgment on its Claim; that Carver should be punished for its outrageous conduct; that interest should run from June 15, 2024; that Carver cannot limit its liability under 46 U.S.C. § 30523; and that Carver is not entitled to a credit of more than $5,000,000. These points are discussed in detail below with citations to the trial record.

## Evidence and Argument

### I.    The Belt Line proved its Claim.

For the reasons above, the Belt Line proved its Claim. *See* ECF 194 at 38 (granting judgment on liability) and ECF 178 at 4 (stipulating causation and damage). Carver contested the Belt Line's Claim at trial in a motion for judgment on partial findings under Rule 52(c), which this Court correctly denied. *See* Trial Vol. 5 at 699:14-18.

### II.    The Belt Line proved the cause of the Allision.

The Belt Line also proved the cause of the Allision to extent necessary to overcome Carver's limitation effort under 46 U.S.C. § 30523. Under 46 U.S.C. § 30523, the owner of a vessel may "limit [its] liability for losses . . . to the value of [its] interest in the vessel and her freight if the owner can show that the cause of the collision was not within [its] privity or knowledge." ECF 194 at 39 (quoting *Hellenic Lines, Ltd. v. Prudential Lines, Inc.*, 730 F.2d 159, 166 (4th Cir. 1984)). To obtain limitation of liability, the shipowner "bears the burden of proving that he was without privity or knowledge of the condition or negligence responsible for the [a]llision." *Id*.

The question of privity or knowledge is preceded by a fact-bound inquiry: "[I]n order to grant or deny limitation," the Court must first "find what acts of negligence caused the accident."

6

ECF 194 at 39 (quoting *Joia v. Jo-Ja Serv. Corp.*, 817 F.2d 908, 912 (1st Cir. 1987)). "Only then can the Court determine whether the vessel owner had knowledge or privity of those acts." *Id.* [1]

Under the "Oregon Rule" of general maritime law, when a moving vessel allides with a stationary object like a bridge, the vessel is presumed at fault. *See The Oregon*, 158 U.S. 186, 197 (1895); *Yarmouth Sea Prods. v. Scully*, 131 F.3d 389, 393 (4th Cir. 1997); *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977). This presumption "suffices to make out a prima facie case of negligence against the vessel." *Woods v. U.S. Dept. Of Trans.*, 681 F.2d 988, 990 (5th Cir. 1982). What is more, "[t]his presumption applies to the operator as well as the vessel and to all parties participating in the management of the vessel at the time of the contact." *Id.*; *see also Merrill Trust Co. v. Bradford*, 507 F.2d 467, 471 (1st Cir. 1974).

The Oregon Rule applies here. Yet even absent that rule, Carver owed the Belt Line a legal duty to "approach the bridge with reasonable skill and care to avoid injuring it, having in mind the difficulty and peril occasioned by the bridge itself." *United States v. Norfolk-Berkley Bridge Corp.*, 29 F.2d 115, 125 (E.D. Va. 1928). As the Fifth Circuit observed almost 50 years ago, "Such

---

[1]    The Belt Line is not required to prove the condition that caused the Allision with precision. In an allision case, negligence is presumed under the Oregon Rule. *See The Oregon*, 158 U.S. 186, 197 (1895); *Yarmouth Sea Prods. v. Scully*, 131 F.3d 389, 393 (4th Cir. 1997). And in admiralty cases generally, negligence requires proof only of "proximate cause and injury by a preponderance of the evidence." *Gauthreaux v. United States*, 712 F. Supp. 2d 458, 464-65 (E.D. Va. 2010) (citing *Murray v. United States*, 215 F.3d 460, 463 (4th Cir. 2000)). Nevertheless, to the extent any greater precision is warranted, Carver effectively precluded it by fleeing the scene and spoliating evidence. Under spoliation law, this Court can infer from Carver's conduct that an immediate investigation would have shown that the autopilot caused the Allision consistent with previous failures and reported incidents in Carver's records. *See United States v. Johnson*, 996 F.3d 200, 217 (4th Cir. 2021) (explaining that an adverse inference may be drawn against a party whose conduct resulted in the loss or destruction of evidence); *Kettler Int'l, Inc. v. Starbucks Corp.*, 81 F. Supp. 3d 495, 500 (E.D. Va. 2015) (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001)) (holding that the duty to preserve evidence "extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation").

accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way." *Bunge Corp.*, 558 F.2d at 795.

Inadequate training also supports a finding of negligence in maritime cases. As this Court held, "[a] condition of the crew, either through lack of training or physical ability" that "renders them not fit for their ordinary duties . . . can constitute unseaworthiness." *Complaint of Christiansen Marine, Inc.*, 1996 U.S. Dist. LEXIS 10920, at *26 (E.D. Va. 1996); *see also* ECF 194 at 41 ("To be sure, even accepting that the allision was caused by the operator error Carver posits, the Court doubts whether Carver will succeed in 'proving that [it] was without privity or knowledge of' such error.") (quoting *Hellenic Lines*, 730 F.2d at 166, and citing *Christiansen*, *supra*).

Here, the trial evidence showed that the Allision was caused by (i) Carver's failure to address a known problem with the autopilot steering system on the tug, and (ii) Carver's inadequate training of its crew, particularly Mate Morrissey. Each is discussed below.

*Problem with the Autopilot*

The autopilot problem was established directly by testimony of the operator, Mate Morrissey, to Coast Guard investigators, stating that the autopilot "tripped" on approach to the Bridge, switched to standby without alarm, and would not switch back before impact. *See* J.80 at 11.

It was also supported by evidence from Carver's own records showing repeated problems with the autopilot system in 2024, culminating in two reported failures on May 3 and May 21, 2024, just weeks before the Allision. *See* J.7, J.8, J9. Carver did nothing about either one, and did not even open the May 21 report for more than a year. *See* Galioto Depo. Des. at 75:20-77:15.

The evidence also showed a repair invoice on March 5, 2024 that identified a complaint with the autopilot "intermittently" switching to standby—the same error Mate Morrissey described to the Coast Guard. *See* J.46. The Belt Line's maritime expert, Captain Nicholas Lewis, and autopilot

expert, Robert Furborough, confirmed that this issue was never resolved before June 15, 2024, nor was the autopilot taken out of service. *See* Trial Vol. 4A at 515:2-8 (Lewis testimony) and Vol. 4B at 660:16-666:1 (Furborough testimony). Captain Lewis also testified that a properly functioning autopilot should not cause a tug to veer to one side or the other. *Id*. at 525:23-529:2.

The principal autopilot issues are identified in the chart below.[2]

| | | | |
|---|---|---|---|
| J.4 & J.5 | February 28, 2024 | Near Miss Report | "**Autopilot stopped** tug took a hard left" |
| J.46 | March 5, 2024 | Work Order | GMT Mackay investigates "complaint of **autopilot switch to stby intermittently,** could not repeat the problem" |
| J.6 & J.11 | April 1, 2024 | Near Miss Report | "Satellite compass failed" / "**Auto pilot [went] into standby**" |
| J.7 & J.8 | May 3, 2024 | Near Miss Report | "**Steering went into standby** and the rudder came over without alarm" |
| J.9 | May 21, 2024 | Incident Report | "**SB in auto pilot** / steering went hard left" |
| J.80 | June 15, 2024 | USCG Testimony | "As I was steering on autopilot, when I got close to the bridge in question, … **I had lost steering and the autopilot had tripped without an alarm.**" "Started to head over towards the bridge, **I started to turn on autopilot, and I was unable to turn it.**" (p.11) |

*Failure to Train the Crew*

The Belt Line also showed that Carver failed to train its crew—particularly its operators—on either autopilot or bridge transits, including proper lookouts for such transits. This lack of training

---

[2]     The Belt Line presented a modified version of this chart at trial in response to Carver's Rule 52 motion. *See* Trial Vol. 5 at 687:23-688:3.

was uncontested at trial. No Carver witness, including Carver's maritime expert, Captain Sam Stephenson, disputed that Carver did not formally train its employees on how to use the autopilot or proper procedures for bridge transits. No Carver document contained any such training protocol, either. At best, Captain Stephenson assumed that all of Carver's employees were trained "on the job," with no guidance about how to do the job and no process or testing to ensure it happened. *See* Trial Vol. 7A at 963:2-10 (Stephenson testimony).

Even if "on the job" training occurred, however, reliance on such training here was markedly insufficient because Carver's own witnesses offered inconsistent views on the proper use of autopilot when transiting a bridge. *Compare, e.g.,* Moore Depo. Des. at 281:8-23 (testifying that use of autopilot is not prohibited) *with* Baldassare Depo. Des. at 89:14-90:5 (testifying that "when approaching [a] bridge," an operator "should be hand-steering," not using autopilot).

And the deficiency in Carver's training was amplified with Mate Morrissey. The evidence showed that on January 22, 2024, just months before the Allision here, Mate Morrissey caused a different allision while operating the same tug in Charleston, South Carolina. *See* Moore Dep. 88:6-89:16. Yet in response, Carver did not discipline him in any way or provide remedial training of any kind. *See* Moore Dep. 88:6-89:16. It let him continue operating the tug without consequence.

III.    **Carver failed to prove that it lacked privity or knowledge of the condition that caused the Allision.**

Against this backdrop, Carver wholly failed to prove that it lacked privity or knowledge of the conditions that caused the Allision. The evidence at trial overwhelmingly established that Carver knew or should have known of the autopilot problems because they were reported and recorded in its own electronic records. *See supra*. The evidence also overwhelmingly established that Carver knew or should have known of its deficient training because Carver's own records and witnesses confirmed that the training did not exist. *See supra*. By contrast, other companies routinely provide

10

such training.  *See* Trial Vol. 5 at 773:7-19 (Jar. Morrissey testimony).  Carver's conduct, including fleeing the scene and performing work on the tug, also allows this Court to infer fault even if the evidence did not already establish it.  *See Vodusek v. Bayliner Marine Corp*., 71 F.3d 148, 156 (4th Cir. 1995) ("[W]hen a [party's] intentional conduct contributes to the loss or destruction of evidence, the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct," including "unfavorable inferences").[3]

Carver's unclean hands also prevent it from limiting liability, even ignoring its lack of proof above.  As explained in the Belt Line's Memorandum in Support of Summary Judgment (ECF 91), the Limitation Act is rooted in equitable principles, so only those parties who come to the Court with clean hands can access the extraordinary relief it affords.  *See* 46 U.S.C. § 30523.  The question here is whether Carver, having violated one federal law that requires reporting of allisions for public safety, can reap the benefit of another federal law to limit its liability.  *See* 46 C.F.R. 4.05-1(a) and 46 U.S.C. § 30523.  For the reasons in the Belt Line's Memorandum, incorporated herein, Carver's unclean hands prevent it from doing so.  *See* ECF 91 at 23-29.

Because Carver "bears the burden of proving that [it] was without privity or knowledge of the condition or negligence responsible for the [a]llision," ECF 194 at 39, and because it failed to do so at trial, Carver cannot limit its liablity.

---

[3]     Part of the holding in *Vodusek* was superseded by an amendment to Rule 37, but the principle that a court can "draw unfavorable inferences against the party responsible for the loss or destruction of the original evidence" remains valid. *Vodusek*, 71 F.3d at 156.  Under the current version of Rule 37, for electronically stored information, an adverse inference instruction may be given only if the party failed to preserve the evidence "with the intent to deprive another party of the information's use in the litigation. . ." Fed. R. Civ. P. 37(e)(2)(B); *see also Doe v. Charlotte Mecklenburg Bd. of Educ.*, 2024 U.S. App. LEXIS 18645, at *24 n.14 (4th Cir. 2024).

IV.     **The Belt Line proved quantum of its compensatory damages.**

    A.     **Carver owes $15,838,142 in compensatory damages plus interest.**

The Fourth Circuit has "held that 'restitutio in integrum'—that is, restoration of the injured party to the position it occupied before the wrong—is the 'precept in fixing damages.'" *F.C. Wheat Mar. Corp. v. United States*, 663 F.3d 714, 721 (4th Cir. 2011) (citing *Hewlett v. Barge Bertie*, 418 F.2d 654, 657 (4th Cir. 1969)).  It has also held that, "When, as here, the tortfeasors assert that the value is less than the cost of repairs, *they have the burden* to establish that fact." *Hewlett*, 418 F.2d at 657 (emphasis added).  In *Hewlett*, where a defendant did not establish value less than the cost of repairs, the Fourth Circuit held that, "The respondents have failed to do so.  Consequently, the case stands on the proof of the repair cost, and the libelant is entitled to a decree in that amount." *Id*.

Here, the Belt Line proved $15,838,142 in compensatory damages—the amount required to restore it to the position it occupied before the Allision with a properly functioning Bridge. *See* J.73A and Trial Vol. 1A at 111:20-112:7 (Moss testimony). [4]  This was comprised of both direct costs and self-performed costs as reflected in Joint Exhibits 73 and 73A.  The Belt Line also established that it had to borrow $4,000,000 to cover its cash needs as a result of the Allision, warranting interest at 4% per annum from the date of the Allision until paid. *See* Trial Vol. 1A at 110:20-112:16 (Moss testimony); *see also* ECF 210 at 4 (discussing prejudgment interest). [5]

---

[4]     This reflects three voluntary adjustments by the Belt Line to conform to the trial testimony: (1) a deduction of $3,000 for a corroded gusset plate, (2) a deduction of $14,000 for a mechanical brake design, and (3) a deduction of $58,891 for yardmaster vacation days. *See* J.73A.

[5]     In admiralty cases, an award of prejudgment interest is the rule, not the exception, and runs from the date of the allision. *See* ECF 210 at 4.  As this Court explained, "'[T]he weight of authority' holds 'that prejudgment interest should start to accrue from the date of the loss, *i.e.*, the date of the allision.'" *Id*. at n.2 (citing *Norfolk & Ports. Belt Line R. Co. v. M/V MARLIN*, No. 2:08cvl34, 2009 A.M.C. 2465, 2009 WL 3363983, at *14 (E.D. Va. Oct. 9, 2009) and *Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 493 (5th Cir. 1986) ("[T]his circuit has consistently held that prejudgment interest on repair costs runs from the date of the accident even though the owner does not pay these costs until some later date.")).

Before trial, Carver raised the same defense as in *Hewlett*. At trial, however, Carver offered no evidence that the value of the Bridge, or even Span 4, was less than the cost of repairs. The only evidence on this point came from the Belt Line's expert witness, Mr. Lentz, who opined that the likely replacement cost for the Bridge would be at least $222,000,000 based on his analysis and a closely comparable example of a recent project for the Raritan River Bridge in New Jersey. *See* Trial Vol. 2B at 399:7-400:8 (Lentz testimony).

Carver offered no rebuttal. It showed only that the Belt Line procured liability insurance up to $10,000,000, but nothing established this as a valuation of any kind. *See* Trial Vol. 1B at 136:12-16 (Moss testimony). Liability coverage reflects contractual risk allocation, not value. *See, e.g., Toler v. State Farm Mut. Ins. Co.*, 25 F. App'x 141, 143 (4th Cir. 2001) (in evaluating the "value of the object of the litigation" for diversity jurisdiction, holding that, "[a] court should not, however, automatically equate the value of [a party's] claims with the policy limits of the coverage."); *Lombard v. Rohrbaugh*, 551 S.E.2d 349, 356 (Va. 2001) (stating "general principle that evidence as to whether a defendant did or did not carry liability insurance is generally irrelevant and inadmissible in a trial to address issues of negligence, causation, *and damages*.") (emphasis added); *State Farm Mut. Ins. Co. v. Earl*, 33 N.E.3d 337, 342 (Ind. 2015) (explaining that, "just as possessing insurance is not probative of fault, the coverage limit is not probative of the actual damages suffered. . .").

Consistent with this law, Mr. Moss testified that the Belt Line's liability policy reflected only his best estimate of exposure in the event of a property damage claim, not the value of the Bridge. *See* Trial Vol. 1B at 136:20-137:4. Because Carver offered no evidence that the value of the Bridge was less than the repair costs (it was not), like in *Hewlett*, this "case stands on the proof of the repair cost, and the [Belt Line] is entitled to a decree in that amount." *Hewlett*, 418 F.2d at 657.

**B.      The Belt Line's damages cannot be depreciated.**

Carver also failed to prove depreciation.  This Court explained the law on depreciation in a previous ruling:  "In this Court's view, sitting in admiralty as a court of equity, the rule regarding depreciation explained and adopted in *BP Expl. & Oil, Inc, v. Moran Mid-Atl. Corp.*, 147 F. Supp. 2d 333, 341 (D. N.J. 2001), ought likewise to apply in the instant case.  Notably, as the Magistrate Judge observed, . . . this rule coheres with that applied in *Norfolk & Portsmouth Belt Line R. Co. V. M/V MARLIN*, No. 2:08cvl34, 2009 WL 3363983, at *9 (E.D. Va. Oct. 9, 2009)."  ECF 208 at 4.

The rule is this:  "[I]n the case of an allision 'where the destruction does not result in a total loss, actual or constructive,' 'the damage is to an integral part of the [whole] facility,' and 'the repairs will not enhance the value of the [whole] facility, there is to be no depreciation for the individual pieces.'"  ECF 208 at 4 (quoting *BP Expl.*, 147 F. Supp. 2d at 341).  "Only '[t]o the extent that the damage is to a non-integral or separate part of the facility' should depreciation apply."  *Id*. (citing *Hewlett*, 418 F.2d at 657 ("If she is not a complete loss . . . then the reasonable cost of recovery, including repairs and an allowance for deprivation of use, is the measure."); *Oregon v. Tug Go-Getter*, 468 F.2d 1270, 1274 (9th Cir. 1972) (rejecting depreciation where "repair or replacement adds nothing of substance to the over-all value of the structure of which it is an integral part and the life expectancy of the entire structure has not been extended"); *J. W. Paxson Co. v. Bd. of Chosen Freeholders*, 201 F. 656, 663 (3d Cir. 1912) ("The plaintiff did not need a new span.  The old one was sufficient, and the county was damaged by being compelled to incur the cost of a new one.")).

Here, the evidence at trial met none of the criteria for depreciation.  It showed that:

(1)      the Allision did not result in a "total loss" of either the whole Bridge or Span 4;

(2)      the damage caused by the Allision was to an integral part of the Bridge, particularly Span 4, one of eight interconnected spans; and

(3)      the repairs did not enhance the value of the Bridge or extend its life.

*See*, *e.g.*, Trial Vol. 1A at 79:11-14 (Moss testimony that Bridge is operational after repairs); Vol. 1B at 195:21-196:1 and Vol. 2B at 383:25-384:5 (Swanson, Lentz testimony that Span 4 is integral to Bridge); NPBL.132 Slides 26, 35, 43, and 48 (photos and diagrams showing portions of Span 4 repaired); Trial Vol. 1B at 197:1-13, Vol. 2A at 256:2-262:9, and Vol. 2B 383:25-384:14 (Swanson, Graning, Lentz testimony that repairs did not extend useful life or increase load capacity).

Carver's own engineering expert also confirmed that Span 4 is integral to the Bridge. *See* Trial Vol. 6 at 813:17-814:12 and 848:2-8 (Marianos testimony). And both of Carver's damages experts were specifically asked if they calculated a useful life for this Bridge, much less any extension. Both admitted they did not. *See* Trial Vol. 6 at 848:9-850:3 and 880:1-19 (Marianos, Cunningham testimony). By contrast, Mr. Swanson, the Engineer of Record for the project, testified that nothing done to the Bridge extended its useful life, and, despite repairs, portions of it are not as well-aligned as before the Allision. *See* Trial Vol. 1B at 196:2-197:13. Mr. Graning, the construction manager at PCL, also testified that some aspects of the repair work, while functional, may require more work in the future. *See* Trial Vol. 2A at 261:9-16.

The Belt Line also showed that a substantial portion of the repair cost was in the nature of "salvage"—that is, saving the Bridge from collapse by bracing it with a frame structure and rotating the damaged section back into place before steel repairs could be made. *See* Trial Vol. 1A at 237:2-239:22 (Graning testimony). Costs to salvage a structure after an allision—including costs to mobilize and demobilize, realign or reposition, remove debris, and demolish damaged components—are not depreciable as a matter of law. *See Norfolk & Ports. Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 104327 at *38 (E.D. Va. 2009). Carver offered no breakdown to differentiate salvage work from non-salvage work, so failed to prove quantum of depreciation even if it were available (it is not).

15

C.       **The Belt Line's damages cannot be dimished by component costs.**

Carver also cannot diminish or depreciate the Belt Line's damages by challenging component costs that were required to bring the Bridge back into operation.  Carver attempted to do so at trial with at least three components:  rail and ties, conduit for electrical wire, and re-lubrication of the counterweight cables due to lack of automatic greasing during six months of non-use.  None of this should be deducted from the Belt Line's claim, since doing so would leave the Belt Line in a worse position than before the Allision through no fault of its own.

Under the Fourth Circuit precedent above, damages are designed to put the injured party in "the position it occupied before the wrong. . ."  *F.C. Wheat Mar. Corp.*, 663 F.3d at 721 (citing *Hewlett*, 418 F.2d at 657).  Courts have applied this rule to reject compenent depreciation for bridge repairs in similar contexts, including the Third Circuit in *J. W. Paxson*, 201 F. at 663 (quoted above; rejecting depreciation of component repair costs in bridge damage case); the Fifth Circuit in *Petition of M/V Elaine Jones*, 480 F.2d 11, 27 (5th Cir. 1973) (rejecting depreciation of repair costs in bridge damage case and explaining that, because "repairs neither enhanced the value nor extended the life of [the bridge], reduction of recoverable repair costs by depreciation previously taken would leave [the injured party] in a significantly worse economic position than before the accident"); and the Ninth Circuit in *Tug Go-Getter*, 468 F.2d at 1274 (quoted above; rejecting depreciation of repair costs in bridge damage case).  As in those cases, but for the Allision, the Bridge here was sufficient and fully operational.  The Belt Line incurred repair costs for the identified components only because it was compelled to do so by Carver's reckless conduct.

The case law above is also consistent with legal scholarship on the subject.  As this Court observed at the end of trial, legal scholars point to strong policy reasons for *not* deducting costs on a component-by-component basis, since the result will inevitably reward the tortfeasor at the expense

16

of the injured party.  As Professors Ed Cheng and Ehud Guttel explained in the law review article cited by the Court (also citing *J. W. Paxon*):

> In other words, full compensation (and corrective justice) requires replacement in these cases *without any kind of deduction for unrequested benefits or any limit based on the depreciated value of the damaged object*.  Does the plaintiff end up with something better and thus receive something of a windfall?  Perhaps.  But as the Third Circuit suggests, as between the innocent plaintiff and the negligent defendant, the defendant shoulders the burden of any slippage.

78 Vanderbilt Law Review 1577, 1592 (2025) (emphasis added). [6]

Even without these policy considerations, however, the Belt Line's damages still should not be diminished because Carver did not *prove* any betterment.  The Bridge cannot function as a railroad bridge without operable rails and ties.  Carver's expert admitted he did not calculate a specific useful life for the rails and ties on this Bridge, nor did he know when they were installed.  *See* Trial Vol. 6 at 858:11-23 (Marianos testimony).  And Mr. Moss refuted Carver's theory that they were to be replaced as early as 2027, explaining that rails and ties appeared only as a line item placeholder in a capital budget, but the Belt Line had no imminent need or plan to replace them.  *See* Trial Vol. 1B at 133:18-134:19 (Moss testimony).

Likewise with electrical conduit, Carver established only that some wiring "underneath" the Bridge did not have conduit before the Allision.  *See* Trial Vol. 1B at 130:20-24 (Moss testimony).  But a difference does not automatically equal a betterment.  Carver did not establish an actual betterment through testimony of any witness, even if repairs could be discounted component-by-component. Modern electrical code mandates conduit for wire over water.  *See, e.g.,* Nat. Elec. Code

---

[6]    Consistent with the case law and legal scholarship, the settlement between Carver and Evanston also prevents Carver from diminishing the Belt Line's damages.  The settlement agreement does not specify which dollars or damages were settled.  Nevertheless, as the admitted tortfeasor, Carver should not be allowed to reduce the Belt Line's damages at trial after discounting them already in settlement with Evanston.

Art. 300.9 (Wet Locations Above Grade).  As in *J. W. Paxson*, the Belt Line did not ask for new conduit; the conduit was required to repair the Bridge after Carver damaged it.

The same is true of the re-lubrication.  Carver's expert witness attempted to carve out this cost on a theory that lubrication is required periodically anyway.  *See* Trial Vol. 6 at 832:12-25 (Marianos testimony).  But both Mr. Moss and Mr. Swanson, who were involved in the project, testified that the one-time lubrication was not routine; rather, it was required specifically because of this project, where cables for the counterweight were not greased automatically by the gear mechanisms during normal use and instead sat dormant for months exposed to accumulating concrete dust.  *See* Trial Vol. 1B at 148:8-23 and 190:22-191:20 (Moss, Swanson testimony).  As above, the Belt Line did not want or need the re-lubrication expense.

The trial testimony also confirmed that none of the maintenance items called for in a pre-Allision mechanical inspection by Hardesty & Hanover were performed as part of this repair, even though it would have been cost-effective to do so.  *See* Trial Vol. 1B at 191:25-192:11 and 197:14-198:5 (Swanson testimony); Vol 2B at 146:19-147:18 (Moss testimony).  In sum, no piecemeal deductions are warranted.[7]

**D.     The Belt Line proved its self-performed costs and additive rates.**

Carver also failed to establish a basis to exclude damages for work performed by the Belt Line.  *See* J.73 and J.73A.  The evidence established that these costs were necessary to (1) construct an access road to the site; (2) manage the train traffic that was rerouted as a result of the Bridge closure; and (3) operate the Bridge manually before remote electronics were fully functional.  *See* Trial Vol. 1A at 85:16-25, 86:1-7, 79:11-80:18, and Vol. 1B at 146:15-147:18 (Moss testimony).

---

[7]     Carver also cross-examined Mr. Reeder about power rails on the east side of the Bridge, but all testimony from the witnesses involved—both Mr. Reeder and Mr. Graning—confirmed that the power rails were damaged as a result of the Allision.  *See* Trial Vol. 2B at 334:13-339:4 (Reeder testimony) and Vol. 1B at 62:11-63:1 (Graning testimony).

As a matter of law, "[c]ost of repairs performed internally by [an] injured party, *including overhead*, are recoverable in a negligence action." *Freeport Sulphur Co. v. The S/S Hermosa*, 526 F.2d 300, 302 (5th Cir. 1976) (emphasis added, collecting cases). "The reasonable cost of the repairs made by [a] plaintiff by its own employees is not limited to the dollar amount actually paid to the workman and material suppliers. Such a limitation would ignore the facts of business life." *Baltimore & O. R. Co. v. Comm. Transp., Inc.*, 273 F.2d 447, 449 (7th Cir. 1960). As the Sixth Circuit explained in allowing overhead for repairs after a steamer struck a coal unloader: "We find no reversible error in the inclusion of overhead in the costs allowed plaintiff for repair and demolition of the equipment and parts of the dock, track, etc., damaged in the accident. The figure used is that applied to all of plaintiff's government contracts. The record shows that the repair and demolition would have cost much more if an outside concern had performed the service at a profit." *Ford Motor Co. v. Bradley Transp. Co.*, 174 F.2d 192, 194 (6th Cir. 1949).

### *Constructing an Access Road*

Here, the access road was required to get construction vehicles and equipment to the site. *See* Trial Vol. 1B at 85:16-25 (Moss testimony). Carver did not contest this at trial. Belt Line Maintentance of Way crews constructed the road with Belt Line tools, equipment, and vehicles. *Id*. They tracked their efforts with a code that was recorded in the Belt Line's damages spreadsheet, with payroll information pulled from the Belt Line's payroll records maintained by Norfolk Southern. *Id*. at Vol. 1A 100:17-101:25; *see also* J.73 (spreadsheet with supporting data). If the Belt Line had not constructed the road, another contractor would have had to do so at greater expense. *Id*. at 86:1-7.

### *Managing and Handling Rerouted Trains*

Testimony also established that the Allision required substantial rerouting of trains. *See* Trial Vol 1A at 79:11- 80:20 (Moss testimony) and Vol. 2B at 329:13-334:12 (Reeder testimony). Absent

19

the Allision, CSX would have brought its trains over the Bridge and directly into the Belt Line's Berkley Yard in South Norfolk. *See* Trial Vol. 2B at 331:22-333:10 (Reeder testimony). After the Allision, all CSX traffic over the Bridge had to be rerouted through Petersburg, Virginia, transferred onto Norfolk Southern track, then coordinated with Norfolk Southern and brought back to Hampton Roads at Norfolk Southern's Portlock Yard in Chesapeake. *Id.* at 329:25-333:10. There, under guidance from the Belt Line's Yardmasters, Belt Line Train & Engine crews picked up the trains and brought them to Berkley Yard for switching. *Id.* Since railyards have limited tracks, every train had to be handled immediately to make room for the next one. *Id.* And because the rerouted CSX traffic created congestion for Norfolk Southern too, the crews had to be constantly available for both railroads to handle the rerouted trains. *Id.* at 332:11-24. They were able to do so only because their union agreed to a special two-hour call window. *Id.* at 330:8-331:21.

The rerouted traffic represented 60% of the Belt Line's total rail traffic. *See* Trial Vol. 1A at 36:1-9 (Moss testimony) and Vol. 2B at 329:13-24 (Reeder testimony). And the total logistical impact was much greater because of the impact on Norfolk Southern. *Id.* at 329:25-333:11. All of it had to be handled by the Belt Line's Train & Engine crews, and all Train & Engine crews require a Yardmaster. *See* Trial Vol. 1A at 102:23-103:25 (Moss testimony). All the necessary Train & Engine crews were tracked contemporaneously in the Belt Line's damages spreadsheet. *Id.* at 100:21-102:22; *see also* J.73. And each time a Train & Engine crew was required, the Belt Line also contemporaneously included the required Yardmaster. *Id.* at 102:20-22 and Vol 1B at 144:8-145:11. This lasted for months. *See* Trial Vol. 2B at 333:24-334:12 (Reeder testimony).

On cross-examination, Carver challenged the Yardmaster costs on grounds that the Belt Line used its Yardmasters for other operations, yet no testimony justified discounting or eliminating the cost. *See* Trial Vol. 1B at 124:13-128:21 (Moss testimony). Mr. Moss testified that Train & Engine

20

and Yardmaster time was included only when crews were required for rerouted trains. *Id.* at 122:6-25. And Carver did not contest the need to manage rerouted trains. *See* Trial Vol. 6 at 881:1-10 and 885:19-886:10 (Cunningham testimony). Carver also did not contest the testimony that every Train & Engine crew requires a Yardmaster, meaning the Belt Line could not avoid the cost, and that such employees work in shifts, not by task. *See* Trial Vol. 1B at 120:5-122:25 (Moss testimony). Nor did Carver contest the testimony that, during six months of downtime, nearly every facet of the Belt Line was impacted by the inoperable Bridge. *See* Trial Vol. 329:13-334:12 (Reeder testimony). And multiple witnesses confirmed that, absent the Belt Line using its own Yardmasters, the cost would have had to be outsourced at greater expense. *See* Trial Vol. 1A at 103:12-104:2 (Moss testimony), Vol. 2B at 394:5-395:6 (Lentz testimony), and Vol. 2B at 421:22-423:5 (Lugo testimony). All these facts justify inclusion of the full cost of the Yardmaster time. *See, e.g., Freeport*, 526 F.2d at 302 (holding that, "[c]ost of repairs performed internally by [an] injured party, including overhead, are recoverable in a negligence action."); *Ford Motor Co.*, 174 F.2d at 194 (allowing in-house costs where "[t]he record shows that the repair and demolition would have cost much more if an outside concern had performed the service at a profit.").

### *Manually Operating the Bridge*

Testimony also established that when the Bridge was first able to be raised and lowered again on November 5, 2024 (almost five months after impact), special Maintenance of Way crews were required to operate it on site because it could not be operated remotely like before the Allision. *See* Trial Vol. 1A at 79:11-80:20 (Moss testimony). Remote operation was not achieved until March 2025. *Id.* at 84:19-85:5. Again, Carver did not contest the need for this work. And as before, Belt Line crews coded their work, which was contemporaneously included in the Belt Line's damages spreadsheet. *Id.* at 145:7-11; *see also* J.73.

21

*Railroad Additive Rates*

To capture the entire cost of this self-performed work, including overhead, the Belt Line also incorporated "additive rates" into its damages spreadsheet. *See* J.73A; *see also* Trial Vol. 1A at 104:5-105:5 (Moss testimony). Additive rates capture the total cost to a railroad of the work its employees perform. *Id.* at 109:22-110:9. They are customary in the railroad industry and have been approved by the Virginia Department of Rail and Public Transportation for work performed by the Belt Line for at least "the last 14 years." *Id*. at 130:25-132:7.

Importantly here, additive rates for railroads account for more than ordinary overhead; they encompass all costs associated with self-performed work, including employee benefits, management time, equipment, tools, vehicles, insurance, and adminstrative costs. *See* Trial Vol. 1A at 107:4-23 and 108:14-109:6 (Moss testimony). For this reason, unlike construction contractors with separate line items for each of these costs, the Belt Line's damages spreadsheet includes no line items for Cannon Moss, Bill O'Brien, or Adam Reeder (all of whom were involved in the project), Belt Line equipment, Belt Line tools, Belt Line vehicles, or Belt Line insurance. *See* Trial Vol. 1A at 109:7-21 (Moss testimony). PCL's final invoice, by contrast, contains multiple entries for project management personnel, equipment, tools, vehicles, and insurance. *See* NPBL.129 at 2.

The additive rates also differ based on trades involved or materials handled, since some operations are more expensive than others. *See* J.73A. In addition to having been approved in Virginia, the rates in the Belt Line's damages spreadsheet are the same as those used by Norfolk Southern, as approved by both the Federal Highway Administration and Georgia Department of Transportation. *See* Trial Vol. 1A at 104:17-105:19 and Vol.1B at 131:19-132:7 (Moss testimony); NPBL.97A (approvals). Mr. Moss testified that the Belt Line uses these rates because the two railroads have nearly identical cost structures for all the factors that influence the rates: their

22

employees are in the same trades, their employees are in the same unions, their employees have the same benefits, both railroads use the same kinds of equipment, tools, and vehicles, and their back office administration (payroll, IT, human resources) is identical because the Belt Line pays Norfolk Southern for that service. *Id*. at 107:4-23 and Vol. 1B at 131:5-133:1. The only difference, if any, is that the Belt Line's administrative overhead is potentially *higher* than Norfolk Southern's because the Belt Line is less able to scale and spread costs. *Id*. at 132:20-25 and 148:1-7.

Both of the Belt Line's damages experts, Mr. Lentz and Mr. Lugo, confirmed the rationale behind including additive rates for self-performed work—that is, that the costs are real expenses incurred by an injured party and would be lost without the additives. *See* Trial Vol. 2B at 387:7-389:9 (Lentz testimony) and Vol. 2B at 422:4-425:16 (Lugo testimony). Both also opined that the rates were reasonable based on the work required. *See* Trial Vol. 2B at 365:22-378:20 and 381:2-10 (Lentz testimony) and Vol. 2B at 413:10-416:8 (Lugo testimony). And multiple witnesses confirmed that the work would have been more expensive if outsourced, like in the Sixth Circuit case above. *See Ford Motor Co*., 174 F.2d at 194; *see also* Trial Vol. 1B at 148:1-7 (Moss testimony), Vol. 2B at 375:5-383:12 (Lentz testimony), Vol. 2B at 413:10-14 and 422:4-425:16 (Lugo testimony), and Vol. 6 at 884:14-886:10 (Cunningham testimony).

Carver's damages expert, Charles Cunningham, did not dispute that these activities were necessary. *See* Trial Vol. 6 at 881:1-10 and 885:19-886:10 (Cunningham testimony). He disputed only the Belt Line's ability to include fixed overhead, using a "but for" standard that finds no support in the case law. In Mr. Cunningham's view, if the Belt Line would have paid its employees benefits with or without the Allision, the Belt Line cannot charge those costs to Carver. *Id*. at 886:11-888:4. This is the opposite of what the law says. In *Freeport*, for example, the Fifth Circuit rejected exactly that argument when made about in-house engineers after a dock allision. *See Freeport*, 526 F.2d at

303.  The reason is that allowing recovery of fixed overhead implicitly reflects missed opportunities for other profitable work by the same employees.  As the Court explained:

> [Defendant] Pansuiza argues, therefore, that the [in-house] engineering work was performed without any additional expense or overhead.  We reject this argument as being wholly based on speculation.  It is at least as plausible that there were other Freeport projects that would have been worked on by Freeport's internal engineers, but were not of such an emergency nature that they required the immediate employment of the outside firm.

*Id*.

Of course, even if Mr. Cunningham's overhead theory were correct (it is not), he excluded *all* of the Belt Line's additive rates in his opinion, regardless whether costs were fixed or not.  *Id*. at 888:5-890:15.  He performed no analysis of the Belt Line's actual costs or the parallels with Norfolk Southern's costs, nor did he evaluate any components of the additive rates.  *Id*.  He also admitted that he did not research the law on overhead before expressing his opinions.  *Id*. at 886:21-888:15.  Put simply, his analysis should be rejected as not methodologically sound, not quantifiable, and not in line with the law.  *See* Fed. R. Evi. 702.

### E.       The pace of the repair project mitigated damages.

Finally, Carver failed to establish that the Belt Line's damages should be reduced because of the pace of the project.  The evidence established that the pace of the project allowed the Bridge to open, at least with manual operation, in time for much of the Belt Line's grain season, thereby avoiding millions of dollars in additional economic damages as a result of the Allision.  *See* Trial Vol. 1A at 77:10-79:7 (Moss testimony).  As Mr. Moss testified, the likely economic losses if the Bridge did not open would have required adding a "zero" to the damages figure.  *Id*. at 78:21-22 ("Oh, it would have been—we would have probably had another zero on it.").  He further described the impacts to CSX, Norfolk Southern, and industry customers if trains could not cross the Bridge

through grain season. *Id*. at 78:21-79:7. None of Carver's evidence countered this obvious mitigation effort by the Belt Line and its contractors.

For all these reasons, the Belt Line properly established compensatory damages of $15,838,142, plus interest at 4% per annum from June 15, 2024 until paid.

## V.     The Belt Line proved grounds for punitive damages.

In addition to compensatory damages, the Belt Line also established grounds for punitive damages. The purpose of punitive damages is "to punish the tortfeasor and to deter him and others from similar extreme conduct." *Norfolk & Portsmouth Belt Line R.R. Co. v. M/V Marlin*, 2009 U.S. Dist. LEXIS 61538 at *1 (E.D. Va. 2009). "Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct." *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 409 (2009). For more than a century, the "general rule that punitive damages were available at common law [has] extended to claims arising under federal maritime law." *Id*. (citing *Lake Shore & Michigan Southern R. Co. v. Prentice*, 147 U.S. 101, 108 (1893)). "The lower federal courts followed suit, finding that punitive damages were available in maritime actions for tortious acts of a particularly egregious nature." *Id*. (collecting cases).

Courts have awarded punitive damages based on even egregious acts after-the-fact, like covering up negligence, spoiling evidence, or leaving the scene. *See Armada Supply, Inc*., 613 F. Supp. at 1469-71 and 639 F. Supp. at 1163. In *Armada Supply*, for example, in a series of two opinions, the Southern District of New York relied on evidence of post-delivery misconduct to award $250,000 in punitive damages in a contaminated cargo case. The defendants had shipped a cargo of oil for Armada Supply from Rio de Janeiro to New York. 613 F. Supp. at 1462. Upon delivery, however, inspections revealed that the oil no longer met specifications: the quantity was insufficient, the bottom sediment was too high, and the oil had been contaminated with seawater. *Id*.

25

Armada Supply's insurers obtained a warrant for the vessel's arrest, but before it could be executed, the vessel fled U.S. jurisdiction. *Id.* Over the next few weeks, the vessel remained outside U.S. jurisdiction while its owners demanded payment. *Id.* at 1464. When the vessel returned to New York in January 1983, investigators discovered an illegal connection between the vessel's oil and bunker systems, concluding that oil had been siphoned off and replaced with water while outside U.S. jurisdiction. *Id.* After finding the defendants liable for the cargo shortage and contamination, *id.* at 1469, the Court held that their conduct, particularly tampering with the sealed cargo samples pre-delivery and fleeing U.S. jurisdiction post-delivery, justified an award of punitive damages. *Id.* at 1470-71; *see also* 639 F. Supp. at 1165.[8]

Other courts have similarly justified punitive damages based on post-incident misconduct. *See Okosi v. Roby*, 715 F. Supp. 3d 166, 177 (D. Mass. 2024) ("punitive damage awards may be justified not only by defendant's actions on the date in question but also by their subsequent behavior"); *Gracia v. Sigmatron*, 842 F.3d 1010, 1025 (7th Cir. 2016) ("One of the purposes of punitive damages is to limit the defendant's ability to profit from its wrongful conduct by escaping detection."); *Davis v. Rennie*, 264 F.3d 86, 115-16 (1st Cir. 2001) (upholding punitive damages based on defendants' attempts to conceal assault by falsifying post-incident report, filing groundless complaint against security officer who arrested one of the defendants, and testifying deceptively at trial); *Romano v. U'Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) (upholding punitive damages based in part on defendant's post-incident statement that he would "deny all of the alleged comments that he made [about terminating plaintiff] because of her sex in the event of a discrimination suit").

---

[8]    In the Court's initial opinion, the Court held that punitive damages were warranted but did not award them because of uncertainty about authority under the Carriage of Goods by Sea Act. *See* 613 F. Supp. at 1471. After post-trial briefs, the Court concluded that COGSA does not prohibit punitive damages and awarded $250,000. *See* 639 F. Supp. at 1165.

Here, the Belt Line supplied ample evidence of wanton, willful, and outrageous conduct, all centered around a company culture at Carver of near total disregard for the consequences of its acts or omissions to life and property.  This included, among other things,

(i)     Carver's General Manager and Port Captain deceiving the tug crew into fleeing the scene without notifying the Belt Line or Coast Guard, thereby preventing an immediate investigation and exposing the public to significant danger (J.64, J.65);

(ii)    Carver's Port Captain yelling at the tug captain for wanting to report the incident to the Coast Guard as required by law (J.64 CARVER 001872-1877 (texts));

(iii)   Carver performing unspecified "maintenance" on the tug before investigators could inspect it (J.17 CARVER HELM CONNECT 000549-550);

(iv)    Carver "overhauling" the tug in 2025 after litigation began but before inspection occurred (NPBL.65 (litigation hold letter in June 2024); Trial Vol. 5 at 720:19-721:14 (Laraway testimony) (describing "overhaul" in early 2025); Carver.50 (Meyerrose Survey identifying "extensive maintenance and repair" before March 2025); ECF 67 at 1 (citing tug inspection scheduled for May 2025));

(v)     Carver failing to preserve other key evidence, like the General Manager's cell phone used to communicate about the Allision (Moore Dep. 27:15-21; Malik Dep. 29:6-30:24; ECF 50 (Order requiring response to Belt Line's RFP 34));

(vi)    Carver ignoring two separate autopilot failures on May 3 and May 21, 2024, just 6 weeks and 3½ weeks before the Allision (J.7, J.8, J.9);

(vii)   Carver's General Manager not even opening the May 21, 2024 report for more than a year (Galioto Depo. Des. at 75:20-77:15);

(viii)   Carver ignoring an unresolved issue with the autopilot "intermittently" switching to standby in a GMT Mackay work order from March 5, 2024 (J.46; Trial Vol. 4B at 660:16-666:1 (Furborough testimony));

(ix)   Carver failing to prohibit use of autopilot despite the two incidents on May 3 and 21, 2024 (J.7, J.8, J.9), the unresolved standby issue from March 5, 2024 (J.46), and two other autopilot incidents on February 28, 2024 and April 1, 2024 (J.4, J.5, J.6, J.11);

(x)   Carver ignoring its own autopilot Operator Manual that prohibited use of autopilot in narrow waters (J.52 at CARVER 001999);

(xi)   Carver failing to train its crew on use of autopilot or bridge transits, including lookouts, despite the risk of catastrophic damage from not doing so (J.36 (records of Morrissey's training); Trial Vol. 5 at 772:18-21 (Jar. Morrissey testimony) and Vol. 6 at 909:22-910:4 (O'Rourke testimony)); and

(xii)   Carver failing to remedially train or discipline Mate Morrissey after an allision less than 5 months earlier (Moore Dep. 88:6-89:16).

Even Carver's own witnesses revealed a company culture of near total indifference. Almost every crewmember testified that he checked on the mate after impact, then simply went back to bed or finished previous duties. *See* Trial Vol. 5 at 758:17-760:12 (Porter testimony), 768:16-772:4 (Jar. Morrissey testimony), 743:19-746:9 (McGrath testimony). One was so shaken by the Allision that he awoke from the middle of his sleep, but upon arriving in the upper wheelhouse, did not even look out the window to see what happened. *Id.* at 760:6-7 (Porter testimony). And the five crewmembers produced only *one* photo of the Bridge after impact, taken from the side between the fenders as they left the scene. *See* NPBL.6. Two crewmembers ultimately got out of the tug and checked the *front*

28

*of the barge* for damage, but not a single crewmember got out of the tug to check the Bridge. *See* Trial Vol. 5 at 742:20-743:4 (McGrath testimony).

Carver's management did not require anything more, either, despite Carver's duty to report the event for public safety. *See* 46 C.F.R. 4.05-1(a)(1). Because of the severe risk to the public of *any* damage to a bridge, all bridge allisions, even those that do not result in visible damage, must be reported immediately. *Id.* Yet Carver's management and crew conducted no investigation at all to determine what happened to the Bridge, nor did they report the contact to allow the Coast Guard or the Belt Line to do so, all while the public continued to use the waterway under the structure.

These facts underscore the need for punitive damages. The evidence established that Carver operates a "fleet" of tugs up and down the East Coast, together with 14 or 15 related companies, all governed by the same management in New York and subject to the same company culture. *See* Trial Vol. 5 at 731:1-21 (Laraway testimony). Carver Marine Towing, operating within this culture, generated approximately $34,000,000 to $35,000,000 in 2024 and $30,000,000 in 2025, while the parent company generated approximately $200,000,000 in 2025. *Id.* Without punitive damages, Carver will suffer no consequences for its outrageous conduct, increasing the likelihood that it will do the same thing in the future: flee a scene to cover up its involvement, stymie an immediate investigation, and fabricate an after-the-fact explanation to avoid liability. Indeed, a combination of AIS data and surveillance video here is the *only* reason the Belt Line even learned Carver was involved. *See* Trial Vol. 1A at 56:13-22 (Moss testimony).

The United States Supreme Court has allowed a 1:1 ratio of punitive to compensatory damges. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513 (2008). The egregious nature of Carver's total disregard for life and property, despite the high risk of catastrophic outcomes, alone warrants punitive damages in that amount. When coupled with Carver's post-incident attempt to

cover up its negligence by fleeing the scene, lying to its crew, yelling at its tug captain for trying to report the incident, performing "maintenance" before an investigation, and spoiling critical evidence after a litigation hold letter, a 1:1 ratio of punitive to compensatory damages is required to sufficiently punish and deter this type of conduct and serve as a warning to others.

**VI.    The Belt Line is entitled to interest on the full amount of its damages.**

Finally, the Belt Line should be awarded interest on the full amount of its damages before any credit to Carver.  Under federal law, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961.  This applies to both compensatory and punitive damages.  *See Vandevender v. Blue Ridge of Raleigh, LLC*, 756 F. Appx 230, 233 (4th Cir. 2018) (applying federal rate under 28 U.S.C. § 1961(a) to calculate interest on punitive damages award); *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992) ("[T]he plain language of the statute authorizes post-judgment interest on punitive damages, which are a part of the 'money judgment.'"); *Bank South Leasing, Inc. v. Williams*, 778 F.2d 704, 706 (11th Cir. 1985) (holding that the plaintiff was "entitled to post-judgment interest on the entire award, including the punitive damages, from the date of the original judgment"); *United States v. Michael Schiavone & Sons, Inc.*, 450 F.2d 875, 876 (1st Cir. 1971) (holding that final judgment in its entirety, including punitive damages, was "entitled to post-judgment interest under the mandatory terms of 28 U.S.C. § 1961").

The collateral source rule prevents any credit to Carver before interest applies.  Under that rule, "partial reimbursement by [a claimant's] insurers poses no procedural limitation . . . on [a claimant's] ability to recover the full amount of damages" from a tortfeasor.  *See Vigor Marine, LLC*, 566 F. Supp. 3d at 1099 (cited at ECF 194 at 7).  Consequently, Carver's credit of $5,000,000 (or any other amount the Court determines) can apply only after the total judgment is determined, including interest.  This is consistent with the reality that the $5,000,000 settlement payment has been held in an account that could be earning interest itself.  *See* ECF 194 at 20.

30

**VII.    Carver is not entitled to a credit greater than the $5,000,000 it paid to Evanston.**

Lastly, Carver cannot establish a credit against any judgment greater than the $5,000,000 it paid to Evanston because Carver is not a third-party beneficiary of the Belt Line's insurance contract. Under Virginia law, "In order to proceed on the third-party beneficiary contract theory, the party claiming the benefit must show that the parties to a contract 'clearly and definitely intended' to confer a benefit upon him." *Copenhaver v. Rogers*, 238 Va. 361, 367 (1989); *see also Thorsen v. Richmond SPCA*, 292 Va. 257, 269 (2016). "The essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his portion of the bargain." *Copenhaver*, 238 Va. at 367. The rule is the same under maritime law: "Under both maritime and Virginia law, a party claiming to be a third-party beneficiary of a contract must demonstrate that the contracting parties intended to confer a benefit upon that party." *Pridemore v. Hryniewich*, 98 Va. Cir. 113, 118 (Norfolk 2018) (citing *Maersk Line Ltd. v. CARE*, 271 F. Supp. 2d 818, 825 (E.D. Va. 2003) (applying maritime law) and *Thorsen*, 292 Va. at 269 (applying Virginia law)). "Although the third party need not be named in the contract, the intention must be that the benefit be direct, rather than incidental. *Pridemore*, 98 Va. Cir. at 118 (citing *Kelley v. Griffin*, 252 Va. 26, 29 (1996)).

Where a tortfeasor is not a third-party beneficiary to a contract, the collateral source rule bars that tortfeasor from benefitting from payments made under the contract. In ruling on the Belt Line's Motion for Summary Judgment, this Court explained the collateral source rule as follows:

> The collateral-source rule bars a tortfeasor from reducing his liability by the amount plaintiff recovers from independent sources and "disallow[s] evidence of insurance or other collateral payments that may influence a fact finder" in the determination of damages.

ECF 194 at 6 (quoting *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 358 (5th Cir. 2016)); *see also Rayfield v. Lawrence*, 253 F.2d 209, 213 (4th Cir. 1958) ("It is well settled in most jurisdictions

31

including Virginia . . . that an injured person may recover in full from a wrongdoer regardless of any compensation he may receive from a collateral source."). The rule applies in admiralty cases "both in its substantive and evidentiary roles." ECF 194 at 6 (citing *Higgs v. Costa Crociere S.P.A.*, 969 F.3d 1295, 1311 (11th Cir. 2020); *Caudill v. Victory Carriers, Inc.*, 149 F. Supp. 11, 17 n.2 (E.D. Va. 1957); *Sainsbury v. Penn. Greyhound Lines*, 183 F.2d 548, 550 (4th Cir. 1950)).

The Court further noted that, "[U]nder the collateral source rule a payment from a source independent of, or unrelated to, the tortfeasor does not reduce his liability to the injured party even if the result is to afford the injured party double compensation." ECF 194 at 7 (quoting *Yost v. Am. Overseas Marine Corp.*, 798 F. Supp. 313, 319 (E.D. Va. 1992)); *see also W. Towboat Co. v. Vigor Marine, LLC*, 566 F. Supp. 3d 1095, 1099 (W.D. Wash. 2021) (explaining "partial reimbursement by [a claimant's] insurers poses no procedural limitation . . . on [a claimant's] ability to recover the full amount of damages" from a tortfeasor). "The rule thus ensures that tortfeasors 'bear[] the costs of their own conduct,' *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 n.21 (5th Cir. 1994) (citations omitted), 'allow[ing] the injured party, rather than the tortfeasor, the windfall created by a collateral source payment,' *Yost*, 798 F. Supp. at 319." ECF 194 at 7.

Here, Carver seeks a $10,000,000 credit based on a mistaken assumption that Carver can take advantage of the terms of a subrogation clause in the Belt Line's insurance agreement with Evanston. Specifically, Carver contends that:

> 1. By virtue of its contract with Evanston, the Belt Line transferred all of its rights of recovery against Carver to Evanston, to the extent of Evanston's payment of $10,000,000 [; and]
>
> 2. Consequently, Evanston held and has compromised the claim for up to $10,000,000.00 (the "Transferred Claim"), while the Belt Line holds and could potentially recover its excess damages, beginning at $10,000,000.01 (the "Retained Claim").

*See* ECF 178 at 5 (Carver's Legal Contentions). The provision to which Carver refers states:

32

I.    TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

> If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment.  That person or organization must do everything necessary to secure our rights and must do nothing after the loss to impair them.  …

ECF 159-1 at 35 (Commercial Property Conditions, Form CP 00 90 07 88).

This provision, however, is part of a contractual arrangement solely between Evanston and the Belt Line, to be enforced by either or both of them (or not) as they see fit.  *See, e.g., The Atlas*, 93 U.S. 302, 310 (1876) ("[W]hat the plaintiff recovers under his policy of insurance is . . . a payment under a contract independent of the claim against the wrong-doer.").  Carver is not a third-party beneficiary of the provision or any other term in the Belt Line's insurance contract.  It can no more enforce the term than any other stranger to the agreement.[9]

Carver presented no evidence at trial or otherwise that all parties to the Belt Line's insurance contract intended Carver to benefit from its terms.  In fact, the Belt Line objected to Carver's attempt to take advantage of the insurance contract in response to Carver's notice of settlement, removing any argument of reliance as well.  *See* ECF 149 (Belt Line Objection to Joint Motion to Dismiss).  Consequently, Carver is not a third-party beneficiary of the contract and cannot enforce the the subrogation term upon which its $10,000,000 credit argument relies.

In the absence of the contract term, the proper analysis here involves a straightforward application of the collateral source rule.  The collateral source rule means Evanston's insurance payments have no bearing on the amount of Carver's liability to the Belt Line.  *See Yost*, 798 F. Supp.

---

[9]    The contractual term is paralleled by a statute in Virginia, which also provides rights only as between and insured and its insurer, not third parties.  *See* Va. Code § 38.2-207 ("Except for contracts or plans subject to § 38.2-3405 or § 38.2-2209, when any insurer pays an insured under a contract of insurance which provides that the insurer becomes subrogated to the rights of the insured against any other party the insurer may enforce the legal liability of the other party. This action may be brought in its own name or in the name of the insured or the insured's personal representative.").

at 319; *see also Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 389 (4th Cir. 2010) ("The collateral source rule holds that 'compensation from a collateral source should be disregarded in assessing tort damages.'").  If the "transfer" clause in the Belt Line's insurance contract could alter this result for a non-party like Carver, the collateral source rule would lose all purpose.  Nearly every insurance contract contains a similar clause, so the tortfeasor in every insured case would simply point to the "transfer" of the claim as grounds not to pay.

Carver's entitlement to a credit of $5,000,000 is solely a reflection of its informed decision to pay that sum to Evanston.  The only reason the payment can be treated as a credit is because it prevents Evanston from seeking recoupment from the Belt Line.  This is confirmed by the conditions imposed by this Court on the settlement.  In allowing Evanston's dismissal, this Court required that "Evanston consents *not to seek recovery or reimbursement from the Belt Line of any portion of any damages ultimately awarded in this case*."  ECF 194 at 20 (emphasis added).

To be sure, the Belt Line recognizes that Carver has postured this as a windfall.  But that risk was always known to Carver if it did not settle with *both* parties to the insurance contract, as was the law on third-party beneficiaries and collateral source payments.  It is no different from the outcome if Evanston had never entered the case.  In that situation, Carver would be liable for all the Belt Line's damages and the collateral source rule would prevent Carver from pointing to the Belt Line's insurance contract to escape that result.  Whether Evanston decided to enforce its subrogation rights would be up to Evanston, but would not involve Carver.  The situation here is no different.  Carver gambled that its settlement with Evanston would pressure the Belt Line to do likewise.  That did not happen, and Carver remains fully liable for all the Belt Line's damages, subject only to a credit for the $5,000,000 it actually paid.

**Conclusion**

For all the foregoing reasons, the Belt Line respectfully asks this Court to enter judgment in the Belt Line's favor against Carver as follows, with immediate execution thereon, and grant the Belt Line all other just relief: [10]

| | |
|---|---:|
| Compensatory Damages | $15,838,142 |
| Punitive Damages | $15,838,142 |
| Interest at 4% from June 15, 2024 | $2,394,658 |
| Costs | TBD |
| **Preliminary Judgment Amount** | **$34,070,942** |
| Credit to Carver | ($5,000,000) |
| **Final Judgment Amount** | **$29,070,942** |

Dated:  April 24, 2026

NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY


By: _____ */s/ W. Ryan Snow* _____
James L. Chapman, IV, VSB No. 21983
W. Ryan Snow, VSB No. 47423
Mackenzie R. Pensyl, VSB No. 100012
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
jchapman@cwm-law.com
wrsnow@cwm-law.com
mpensyl@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*

---

[10]    Interest is calculated at 4% compounded annually from June 15, 2024 through April 24, 2026. The daily amount is $3,660 from April 24, 2026 forward.  The Final Judgment Amount does not include costs, which the Belt Line will submit in a Bill of Costs.

35

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of April 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the Court's CM/ECF system, which will send a notice of electronic filing to all registered counsel of record, and mailed to:

James Morrissey
4723 Baywood Drive
Lynnhaven, FL 32444

By:    /s/ W. Ryan Snow
W. Ryan Snow, VSB No. 47423
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1923
Norfolk, Virginia 23510
Telephone: (757) 623-3000
Facsimile: (757) 623-5735
wrsnow@cwm-law.com
*Counsel for Norfolk and Portsmouth Belt Line Railroad Company*